## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-10846 |
| THE ROMAN CATHOLIC CHURCH OF | ) | |
| THE ARCHDIOCESE OF NEW ORLEANS | ) | Section "A" |
| | ) | |
| Debtor. | ) | Chapter 11 |

---

### MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DISMISS CHAPTER 11 CASE

**SUBJECT TO POTENTIAL RESCHEDULING AS SET FORTH BELOW, A HEARING WILL BE CONDUCTED ON THIS MATTER ON <u>AUGUST 20, 2020, AT 1:30 P.M. BY TELEPHONE THROUGH THE DIAL-IN FOR SECTION A 1-888-684-8852; CONFERENCE CODE 9318283</u>. IF YOU OBJECT TO THE RELIEF REQUESTED IN THIS PLEADING, YOU MUST RESPOND IN WRITING. UNLESS DIRECTED OTHERWISE BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT NO LATER THAN SEVEN (7) DAYS BEFORE THE HEARING DATE. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**PURSUANT TO LOCAL RULE 9013-1(G), THIS MATTER MAY BE RESCHEDULED FOR HEARING UNDER SEPARATE NOTICE TO BE PROVIDED.**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>"), hereby files this *Motion to Dismiss Chapter 11 Case* (the "<u>Motion</u>"). In support hereof, the Committee respectfully represents as follows:

### INTRODUCTION

1.      Under Fifth Circuit and other authority, "bad faith" dismissal of a Chapter 11 bankruptcy case is warranted when the debtor commences a bankruptcy not to reorganize or respond to financial crisis (or for some other valid reorganizational purpose), but instead to gain a litigation advantage.

1

2.      In this case, the Archdiocese insists that it is solvent and that it will pay its liabilities in full.  There is no indication of financial distress, or a need for reorganization or the tools of the Bankruptcy Code.  The Archdiocese asserts that it has net assets exceeding more than $50 million (including more than $25 million in cash and cash equivalents),[1] and annual revenue exceeding $100 million.  In contrast, the Archdiocese's financial reserve for abuse claims was most recently $8.5 million.  As of the Petition Date, no trial dates were set for any of the 34 pre-petition lawsuits brought by survivors of sexual abuse committed against them when they were children.[2]   No final judgments were imminent.

3.      At the same time, the Archdiocese has taken immediate and full advantage of the bankruptcy to gain a tactical advantage in the pending abuse claim litigation.  Immediately after filing for bankruptcy relief, the Archdiocese removed these actions from the Louisiana state courts, even though they involve events of intense local interest and arise exclusively under Louisiana law.[3]

4.      By filing the bankruptcy and removing the litigation to federal court, the Archdiocese worked to gain immediate tactical advantages, including:

- Stopping a discovery process that threatened to publicly expose information showing the Archdiocese's mishandling and coverup of abuse;

- Avoiding a May 28, 2020 scheduled deposition of Archbishop Aymond; and

- Evading upcoming evidentiary hearings on prescription defenses, with a change to a federal forum that will not provide plaintiffs with the same procedure.

---

[1] Even these numbers are understated, since they fail to take account of the true value of many of the Archdiocese's assets.  As discussed below, the Archdiocese has scheduled 211 separate real estate properties, and virtually all of its tangible personal properties, as having "undetermined" values.

[2] As discussed below, evidentiary hearings in two cases were being set on prescription exceptions.

[3] As mentioned below, there may be a single pre-petition action scheduled by the Archdiocese that has not yet been removed.

5.      The bankruptcy filing brought an immediate halt to the litigation, further delaying abuse claimants from any recovery.  The Archdiocese presumably hopes to force the abuse survivors into an involuntary collective bargaining process, with the benefit of a claims bar date, discharge and channeling injunction, while gaining the other tactical advantages noted above.

6.      As the Fifth Circuit has stated, bad faith dismissal is warranted where "the purpose of the [bankruptcy] petition was not primarily to reorganize or respond to financial crisis but instead was to gain unfair advantage" in litigation.  *Antelope Technologies, Inc. v. Lowe (In re Antelope Technologies, Inc.)*, 431 Fed.Appx. 272, 274 (5th Cir. 2011).  Also, as another court has observed:

> It appears that Debtor, suffering the frustration with lawsuits that many businesses share, seeks chapter 11 protection <u>not because its existence is genuinely threatened by that litigation, but because bankruptcy offered enticing advantages in dealing with that litigation</u>. . . .  Congress did not make the determination that all defendants should enjoy those enticing advantages irrespective of real need for bankruptcy protection.

*In re Liberate Technologies*, 314 B.R. 206, 214 (Bankr. N.D. Cal. 2004) (emphasis added; citation omitted).

## JURISDICTION AND VENUE

7.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 157 and § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

8.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory predicates for the relief requested is section 1112(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), Rules 1017 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Eastern District of Louisiana (the "<u>Local Rules</u>").

## BACKGROUND

10.     On May 1, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of Louisiana (the "Court") commencing the above-captioned chapter 11 case. The Debtor remains in possession of its property and is managing its business as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

11.     On May 20, 2020, the United States Trustee appointed the Committee. [Docket #94]  On June 10, 2020, the United States Trustee filed a *Notice of Appointment of Reconstituted Creditors Committee* to replace Hancock Whitney Bank (as bond trustee) with TMI Trust Company.  [Docket #151]

## LEGAL STANDARD

### A.     "Bad Faith" Under *Little Creek*

12.     Section 1112 of the Bankruptcy Code provides that a Chapter 11 case is subject to dismissal for cause and specifically provides:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).

13.     "Bad faith" in the filing of the bankruptcy case itself constitutes "cause" for dismissal, and the analysis must begin with the seminal case *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068 (5th Cir. 1986), in which the Fifth Circuit firmly established bad faith as a basis for Chapter 11 dismissal, stating that "[e]very bankruptcy statute since 1898 has incorporated literally, or by judicial

interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." *Id*. at 1071.

14.     The Fifth Circuit stated the rationale for "bad faith" dismissal, and began by recognizing the unique protections granted to bankruptcy debtors by the Bankruptcy Code: "Bankruptcy is an equitable remedy whereby a debtor is clothed with the protection of an automatic stay, preventing his creditors from acting against him for a period of time, in order to facilitate rehabilitation or reorganization of his finances…." *Id*.  The bad faith standard "prevents abuse" of these unique protections "by debtors whose <u>overriding motive is to delay creditors without benefitting them in any way</u> or to achieve reprehensible purposes." *Id*. at 1072. (emphasis added)

15.     The Fifth Circuit further determined that a court's "bad faith" analysis is fact-intensive and based on "the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities." *Id*. at 1072.  This approach is "based on a conglomerate of factors rather than on any single datum" and requires "an examination of all the particular facts and circumstances in each case." *Id*. at 1072 and 1074 (Quoting *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (9th Cir. B.A.P. 1983)).

**B.**     **Bad Faith Dismissal is Warranted Where the Debtor Filed for Bankruptcy Protection Not to Respond to a Financial Crisis, But Instead to Gain an Advantage in Litigation**

16.     Bad faith filing arises in a number of different contexts.  One such scenario—recognized by the Fifth Circuit and applicable here—is where a financially healthy or solvent debtor files bankruptcy not to respond to a financial crisis, but instead to gain an advantage in pending litigation.

17.     This type of bad faith sufficient to warrant dismissal has been recognized by the Fifth Circuit as well as other courts. In *Antelope Technologies, Inc. v. Lowe* (*In re Antelope*

*Technologies, Inc.*), Case No. 10-0205, 2010 WL 2901017 (S.D. Tex. July 21, 2010), *affirmed*, 431 Fed.Appx. 272, 274 (5th Cir. 2011), a technology company filed a Chapter 11 case after facing litigation filed by minority shareholders. Bad faith dismissal was affirmed, because the debtor was not in immediate financial distress,[4] and instead, "**the purpose of the [bankruptcy] petition was not primarily to reorganize or respond to financial crisis but instead was to gain unfair advantage in the shareholder derivative action**." *Id.,* 2010 WL 2901017 at *5 and 7, 431 Fed.Appx. at 275 (emphasis added).

18.     Similarly, in *Brazos Emergency Physicians Association, P.A. v. Woods (In re Brazos Emergency Physicians Association, P.A.)*, Case No. 11-399 (W.D.Tex. Aug. 26, 2011) (copy of district court opinion attached as **Exhibit "1"** hereto), *affirmed*, 471 Fed.Appx. 393, 394 (5th Cir. 2012), the debtor (a physician group) filed bankruptcy in the midst of a "long-running business dispute among physicians." The bankruptcy court, district court, and Fifth Circuit all found that bad faith dismissal was warranted because the debtor's "**financial condition did not warrant bankruptcy protection**" and instead, the debtor "**filed its bankruptcy petition for the purpose of obtaining a litigation advantage**." (*See* Exhibit "1" at p. 6; emphasis added).

19.     *See also In re SGL Carbon Corp.*, 200 F.3d 154, 163-66 (3d Cir. 1999) (bad faith dismissal warranted where debtor was in "no immediate financial difficulty," and lacked a "valid reorganizational purpose"; bankruptcy was filed as a litigation tactic in pending antitrust litigation against the debtor); *Investors Group, LLC v. Pottorff (In re Investors Group, LLC)*, 518 B.R. 380, 385 (N.D.Tex. 2014) (affirming bad faith dismissal of bankruptcy case "for filing the

---

[4] The district court found an "absence of evidence showing that [the debtor] had a clear need for financial reorganization." *Id*. at *5. Among other things, although the debtor was able to establish that "there may have existed an opportunity for growth of the Debtor's business through recapitalization," that evidence "does not show that Antelope's near-term capital needs were so urgent as to cause the filing of a Chapter 11 petition…." *Id*. at *6.

petition to gain a litigation advantage and for being solvent"); *Little Creek*, 779 F.2d at 1073

("Resort to the protection of the bankruptcy laws is not proper" where the bankruptcy

proceedings are not filed for a proper bankruptcy purpose such as preserving a going concern,

protecting employees, or rehabilitating the debtor's business).

## **ARGUMENT**

20.     Under the circumstances recognized by the Fifth Circuit, bad faith dismissal is

warranted where the debtor filed the Chapter 11 proceeding not to respond to financial stress, but

instead to gain an advantage in litigation.  These circumstances apply here.

**A.      The Archdiocese Has Consistently Asserted that it is Financially Healthy and
Solvent.**

21.     As discussed below, the Archdiocese has repeatedly asserted that it is solvent.  In

addition, the Archdiocese has not provided any basis to show that it faces financial distress or

crisis as a result of litigation or any other events.

22.     The Archdiocese commenced this case asserting (in its amended Schedules) that it

held more than $200 million in personal property assets alone as of the Petition Date, as well as a

multitude of underlined additional assets with "undetermined" values, including 211 separate real estate

assets and art, relics, and other items. [Docket #198] (For convenience, a copy of the relevant

portions of the amended Schedules is attached as **Exhibit "2"** hereto; *see* Summary and

Schedule A, pp. 1-10, 15-23, and 26-51 of 64).  The Archdiocese scheduled approximately $140

million in liabilities.  (*See id*.)

23.     Similarly, in the Financial Report of the Roman Catholic Church of the

Archdiocese of New Orleans Administrative Offices, dated June 30, 2019 (the "2019 Audited

Financial Statement," a copy of which is attached as **Exhibit "3"**), the Archdiocese reports that it

has over $51 million of net assets without donor restrictions (*See* Exhibit "3" at p. 5.).[5]

24.    The Archdiocese's amended Statement of Financial Affairs [Docket #197] (relevant portions attached as **Exhibit "4"** hereto) asserts that the Archdiocese realized $99.7 million in revenue for the 10 months ending in April 2020, with no apparent significant decline from the previous fiscal year (12 months) including $125.6 million in revenue. (*See* Exhibit "4" at pp. 1-5.)

25.    **The Archdiocese has repeatedly and unequivocally represented that it is solvent and will be able to pay all claims in full.**  As Father Carr testified at the section 341(a) meeting of creditors held on May 29, 2020 (the transcript is attached as **Exhibit "5"** hereto):

> MR. STANG: So Father Carr, is the Archdiocese insolvent?
> FATHER CARR: No, it is not insolvent.
> MR. STANG: Why did it file bankruptcy if it was not insolvent?
> FATHER CARR: Our intent was to pay 100 percent of all allowed claims….

(*See* Exhibit "5" at p. 99.)

> MR. STANG: If the Archdiocese was not in bankruptcy, would it be solvent?
> FATHER CARR: Yes.
> MR. STANG:  So it is solvent outside of the bankruptcy process and it is solvent given the possible outcome of the bankruptcy process?
> FATHER CARR: Yes.
> MR. STANG: And I know I asked you this question before, but we've had a few questions in between and I just want to ask you one time again: Why did the Archdiocese file bankruptcy if it was solvent without the bankruptcy process?
> FATHER CARR:  Like I said once before, to pay 100 percent of our allowed claims.

(*See* Exhibit "5" at pp. 102-103.)

26.    In statements by the Debtor's counsel (that were expressly ratified by Father Carr and the Debtor's other representatives), Mr. Mintz stated:

> MR. MINTZ:  [T]he Archdiocese intends to pay creditors 100 percent of their allowed claims. We intend to work with the committee and their constituencies to

---

[5] *See also* Exhibit "7" referenced below, at page 9, stating net assets without donor restrictions of approximately $54 million as of December 31, 2019.

develop a fair method of determining the allowed claim amounts and development and implementation of a plan to effectuate those payments.

(*See* Exhibit "5" at p. 10.)

27.    In addition, the Archdiocese has not asserted or disclosed any financial stress or any circumstances casting any doubt on the financial health of the Archdiocese.  The Declaration of Fr. Patrick R. Carr in Support of First Day Motions [Docket #14] (for convenience attached as **Exhibit "6"** hereto) does not identify or quantify any financial threats, either presently or prospectively.  There is only a vague allusion to unidentified and unquantified "financial and operational difficulties," ostensibly as the result of the survivor claims and a dip in donations as a result of the COVID-19 pandemic. (*See* Exhibit "6" at ¶ 9.)[6]

28.    As all parties have acknowledged, the claims against the Archdiocese on account of its own active, culpable role in the perpetration of child sexual abuse are at the center of this case.  However, in the filings to date, the Archdiocese has said nothing of substance about them.  Father Carr's "first day" declaration only mentions the abuse claims in passing, and the declaration does not address the nature, number or size of the claims.[7]

29.    Other statements made by the Archdiocese also give no indication of financial distress and place either no value or only limited value on abuse claims as contingent liabilities:

- The 2019 Audited Financial Statement makes no specific reference to any contingent liabilities arising from any child sex abuse litigation or claims. However, Note 16 of the 2019 Audited Financial Statement states that "The Archdiocese has certain pending and threatened litigation and claims; however, management believes the probable resolution of such claims will not exceed the

---

[6] This paragraph of Father Carr's declaration states:  "Operational challenges have strained the Archdiocese's financial position, have impacted its ability to sustain its ministries and charities, and have necessitated the commencement of this proceeding. The financial and operational difficulties burdening the Archdiocese range from claims and lawsuits alleging sexual abuse by clergy that occurred more than fifty years ago to losses of revenue from offerings and collections at Masses which are no longer publically celebrated due to the COVID-19 pandemic."

[7] Father Carr's declaration also does not address the availability of insurance to cover the child sex abuse claims.

established reserves or insurance coverage, and will not materially affect its financial position." (*See* Exhibit "3" at p. 45.)

- In the statement of financial position filed in connection with the Archdiocese's bond financing, the Archdiocese stated that "during fiscal year 2018, the [Archdiocese] recorded an $8.5 million reserve for personal misconduct claims," and that the Archdiocese "continues to monitor abuse claims working closely with legal counsel and maintains appropriate reserves." (*See* copy attached as **Exhibit "7"** at pp. 16 and 25.)[8]

- The Archdiocese's amended Statement of Financial Affairs discloses 34 filed abuse claim lawsuits.  The amended Schedules disclose an additional 37 "unresolved claims" which may include abuse claims.  All values of such claims are listed as "undetermined." (*See* Exhibit "2" at Schedule F; Exhibit "4" at Section 7.)[9]

30.     In short, there is simply no indication that this bankruptcy case was precipitated or necessitated by financial distress or creditor pressure.  Indeed, there is no indication that the Archdiocese is under any financial strain at all, and the Archdiocese has asserted at every turn that it is solvent (with more than $25 million available in cash and cash equivalents as of the Petition Date). (*See* Exhibit "2" at Schedule A, pp. 1-10 of 64)  Further, as discussed below, no judgments or findings of liability were imminent in the 34 scheduled abuse lawsuits. (In that respect, that distinguishes this case from other cases in which a debtor files the Chapter 11 petition in the face of looming judgments and litigation expenses beyond what can be paid from insurance proceeds or other acknowledged resources.)

**B.      The Bankruptcy Was Filed to Gain a Litigation Advantage, Rather Than to Address or Resolve Financial Distress.**

31.     As discussed above, there is no evidence of any financial stress or pressure that would explain the bankruptcy filing.  The Committee submits that the bankruptcy was filed as a means to gain tactical advantages in the 34 pending abuse claim lawsuits (and change the forum),

---

[8] Retrieved from https://emma.msrb.org/ER1313607-ER1023575-ER1429793.pdf

[9] *See* Exhibit "2" at Schedule F, listing claims as "unresolved claims" or "pending litigation," pp. 828-1140 of 1153 (Note that only the applicable pages are included within Exhibit "2"); *See* Exhibit "4" at  Sections 7.1 through 7.56, listing litigation actions as "abuse claims."

and to force the abuse survivors into an involuntary collective bargaining process and gain the other procedural advantages of bankruptcy including a claims bar date.

*(1)     Events in the Pre-Petition Abuse Claim Litigation*

32.     The Archdiocese has disclosed 34 filed abuse claim lawsuits (all filed between 2018 and 2020), and an additional 37 "unresolved claims" which may include abuse claims. (*See* Exhibit "2" at Schedule F; Exhibit "4" at Section 7.)  These lawsuits (with two exceptions) were filed in state court (Orleans Parish Civil District Court) and removed to federal court by the Archdiocese after the Petition Date.[10] The only apparent purpose for this bankruptcy case was to halt the progress of these lawsuits and gain an advantage in these litigation matters.

33.     As of the Petition Date, none of the 34 scheduled lawsuits had progressed beyond discovery.  No judgments or findings of liability were imminent in these cases. (As discussed below, an evidentiary hearing on prescription was being scheduled in at least two cases, but otherwise not a single matter even had a trial date scheduled.)  The Archdiocese did not file the bankruptcy to prevent the imminent attachment of assets or to guard against the effect of a judgment.

34.     Instead, the following (discussed in more detail below) was imminent as of the Petition Date in the litigation.  The Committee submits that the true purpose of the bankruptcy filing was to stop the following in its tracks (and gain the other procedural advantages of bankruptcy):

- In several cases, after resisting and delaying discovery production for more than a year, the plaintiffs managed to uncover and locate information and documents that

---

[10] On lawsuit, disclosed at Section 7.51 of the Statement of Financial Affairs, has not been located as a removed case as of the date of this Motion.  In addition, non-debtor affiliates have removed at least two suits (*Ralph Roe v. Catholic Charities Archdiocese New Orleans*, Case No. 20-1829; and *Zach Roe v. Catholic Charities Archdiocese New Orlean*s, Case No. 20-1819) in which the Archdiocese is not a defendant, on the asserted basis that these cases are "related to" the bankruptcy.

were highly prejudicial to the Archdiocese, concerning the Archdiocese's mishandling and coverup of abuse and stretching back many years. The Archdiocese was attempting to restrict such information, and in two cases <u>the court was set to rule on whether some information would be made publicly available</u>.

- The deposition of Archbishop Aymond was noticed and scheduled for May 28, 2020 (and a slew of other depositions were in the process of being scheduled.)

- The Archdiocese and related co-defendants had asserted a variety of "kitchen sink" preliminary defenses under Louisiana "exceptions" procedure, and most of those arguments were overruled in the state courts.[11] The remaining defense of prescription was still pending and in two cases was being set for an evidentiary hearing which would have been fast approaching.

35.      After the bankruptcy was filed on May 1, the Archdiocese wasted no time in immediately removing all of the pre-petition state court actions to federal district court, with 15 removals taking place on May 1, and the remainder being complete by May 12.[12]

36.      As discussed below, the Committee submits that in light of the lack of financial pressure, that the inescapable conclusion is that the bankruptcy was timed and intended to delay or avoid public disclosure of information, depositions, and evidentiary hearings on prescription that were all imminent or upcoming in the state court litigation, and move these cases to a federal forum which would be more favorable to the Archdiocese, and would allow for the procedural advantages of bankruptcy including a claims bar date.

       *(2)*      *Discovery, Further Disclosures and the Scheduled Deposition of Archbishop Aymond*

37.      Virtually all of the pre-petition activity in the state court proceedings (during the years 2018-2020) related to discovery disputes and specifically, to the strenuous efforts of the

---

[11] Plaintiffs did not challenge some inconsequential exceptions that challenged minor aspects of the plaintiffs' pleading, and such pleadings were modified, as discussed below.

[12] Case Nos. 20-1317 through 20-1341 in the United States District Court for the Eastern District of Louisiana are state court matters that were all removed on May 1, 2020. An additional 11 matters (Case Nos. 20-1349 through 20-1422) were removed between May 4 and May 12, and one matter filed on June 5, 2020 was removed on June 17, 2020 (Case No. 20-01754). The status of four lawsuits has not been confirmed but they are believed to be removed.

Archdiocese to delay discovery production and to keep discovery materials out of the public eye.

Specifically:

- In cases in which discovery requests were served on the Archdiocese, the Archdiocese's initial responses consisted of many pages of objections and only a very limited number of produced documents, consisting primarily of publicly available material from websites. (*See* copy attached as **Exhibit "8"** of one example from the *James Doe* case.[13])

- In at least nine of the pending cases,[14] the parties contested the scope and form of any protective order, and lengthy proceedings delayed further discovery and progress in these cases.  (As of the Petition Date, these disputes were still unresolved in at least four of these cases.  As illustration, *see* copy of the Archdiocese's motion for a protective order and other relief attached as **Exhibit "9"** from the *J.W. Doe* case.[15])

- In the *John Doe* case,[16] the court appointed a special master to oversee discovery disputes, and lengthy proceedings took place concerning such disputes. (*See* copy attached as **Exhibit "10"** of the court's order appointing the special master.)

- In the *John Doe* case, among other proceedings, the special master determined that the third party New Orleans Saints should be required to produce documents over objections (and the court confirmed and ordered such production). (*See* copy attached as **Exhibit "11"** of the court's order.)

- In several cases, despite the efforts of the Archdiocese to delay and obstruct discovery production, the plaintiffs succeeded in locating documents indicating that the Archdiocese mishandled and covered up abuse for many years.  **The Archdiocese undertook strenuous efforts to keep these documents "confidential" and hidden from the public**, including through lengthy motion practice and by unilaterally and heavily redacting such documents in the record of

---

[13] This case is *James Doe v. Archdiocese of New Orleans Indemnity, Inc., et al.* (Case No. 20-1338 in District Court; filed as Case No. 2019-1371 in Orleans Parish Civil District Court).

[14] The nine cases are those currently pending before the District Court as Case Nos. 20-1317, 20-1319, 20-1320, 20-1321, 20-1335, 20-1338, 20-1339, 20-1338, 20-1358, and 20-1363.

[15] This case is *J.W. Doe v. Archdiocese of New Orleans Indemnity, Inc., et al.* (Case No. 20-1321 in District Court; filed as Case No. 2019-3947 in Orleans Parish Civil District Court).

[16] This case is *John Doe v. Roman Catholic Church of the Archdiocese of New Orleans, et al.* (Case No. 20-1320 in District Court; filed as Case No. 2018-10864 in Orleans Parish Civil District Court).

the litigation. (As illustration, *see* transcript of hearing held on February 7, 2020 in the *James Doe* case,[17] attached as **Exhibit "12"**, at p. 23.)[18]

- As of the Petition Date, a further dispute was pending in the *John Doe* case concerning the scope of the New Orleans Saints' production and whether documents would be restricted from the public under the protective order.   The Archdiocese and the New Orleans Saints vociferously opposed making any documents public, and the matter was to be set for hearing before Judge Hazeur in Orleans Parish Civil District Court. (*See* Archdiocese's January 9, 2020 Motion to Maintain Confidentiality Designations attached as **Exhibit "13"**.)

38.    Despite the Archdiocese's efforts, plaintiffs in the pre-petition litigation were steadily locating and retrieving applicable materials.[19]   Motions were pending (including in the *John Doe* and *J.W. Doe* cases) to make some documents public.   Several depositions were noticed as of the Petition Date, including, most notably, the deposition of Archbishop Aymond scheduled for May 28. (*See* Notice of Deposition attached as **Exhibit "14"**.)[20]

39.    One clear impact of the bankruptcy was to suspend all of the above activity, with the implication that the bankruptcy was intended, in part, to prevent further discovery and disclosures.

---

[17] This case is *James Doe v. Archdiocese of New Orleans Indemnity, Inc., et al.* (Case No. 20-1338 in District Court; filed as Case No. 2019-1371 in Orleans Parish Civil District Court).

[18] In this hearing, counsel for the Archdiocese acknowledged that the Archdiocese intended to redact produced documents even when the court denied the Arcdiocese's motion for a protective order.

[19] Among other disclosures, information was being developed as to clergy that were not on the Archdiocese's published list of clergy against whom there were substantiated allegations.  The abuser in question was <u>not</u> on the Archdiocese's published list in cases including (among others) *A.A. Doe v. Archdiocese of New Orleans Indemnity, Inc., et al.* (Case No. 20-01317 in District Court; filed as Case No. 2019-06200 in Orleans Parish Civil District Court), *Stonebreaker v. Roman Catholic Church of the Archdiocese of New Orleans, et al.* (Case No. 20-01335 in District Court; filed as Case No. 2019-08551 in Orleans Parish Civil District Court), and *C.J. Doe v. Roman Catholic Church of the Archdiocese of New Orleans, et al.* (Case No. 20-1319 in District Court; filed as Case No. 2018-12393 in Orleans Parish Civil District Court).

[20] This deposition was scheduled in the *J.W. Doe* case.  Other noticed and scheduled depositions included removed priest and abuser Brian Highfill and Vicar General Muldowney of the Diocese of Scranton, Pennsylvania in *A.A. Doe*.   A number of other depositions were in the process of being scheduled as of the Petition Date.

14

(3)     *The Archdiocese Suffered Adverse Rulings on Defenses and Faced a Pending Prescription Trial*

40.     The Archdiocese also aggressively pursued a number of defenses on Louisiana "exceptions" and lost, with the defense of prescription being scheduled for trial (at plaintiff's request) in at least two of the pending cases.

41.     The Archdiocese and related co-defendants asserted a variety of "kitchen sink" preliminary defenses and arguments under Louisiana "exceptions" procedure.   Almost all of these defenses were rejected[21] after lengthy briefing and separate hearings:

- Dilatory exceptions of prematurity and partial lack of subject matter jurisdiction, and peremptory exception of no right of action -- Based on the theory that plaintiffs were suing for matters not yet accrued or not actionable under the Catholic Church's Charter for the Protection of Children and Young People (*See* attached as **Exhibit "15"** the Written Reasons for Judgment issued on October 19, 2019 in the *A.A. Doe* case);

- Peremptory exceptions of no right of action and no cause of action -- Based on the erroneous argument that plaintiff was asserting new causes of action under tort and contract based on the Catholic Church's Charter for the Protection of Children and Young People (*See id*.);

- Dilatory exception of nonconformity of the petition with the requirements of La. C.C.P. art. 891 -- For filing under a fictitious name (*See id*.);

- Dilatory exception of vagueness or ambiguity (*See id*.);

- The Archdiocese also filed motions to strike allegations as "having no bearing" on plaintiff's claims (*See id*.);

The foregoing defenses were denied, with the exception that one defense was deemed satisfied with pleading amendments (dilatory exception of nonconformity of the petition with the requirements of La. C.C.P. art. 891); and the exception of prematurity was sustained for a minor allegation that defendants may in the future seek to impugn plaintiff's credibility in contravention of the Catholic Church's Charter for the Protection of Children and Young People.

---

[21] As discussed below, some minor defenses were not contested and the pleadings were modified as a result, to clarify the basis for relief sought.

(*See id.* at pp. 2-3)[22]

42.    The remaining defense of prescription is still pending in all cases. Under Louisiana procedure, plaintiff is entitled to a special evidentiary hearing on prescription (or prescription "trial"), in order to resolve defendant's claim before the main trial on the merits. See La. C.C.P. art. 929 and 931[23] and *Doe v. Archdiocese of New Orleans*, 823 So.2d 360, 366-67 (La. App. 4th Cir. 2002) (in church abuse case, plaintiff was entitled to evidentiary hearing on prescription to consider complex issues of fact and questions of law raised by prescription).

43.    In the abuse claim lawsuits, prescription involves both factual and legal issues, and cannot be resolved in a simple motion hearing.  The allegations and claims at issue include fraudulent concealment, public nuisance, misrepresentation, fraud, invasion of privacy, and negligence.  Therefore, plaintiffs requested, and had received in the *A.A. Doe* and *J.W. Doe* cases, scheduling orders for the evidentiary hearing. (See, e.g., attached as **Exhibit "16"** the Pre-Trial Scheduling Order for Trial on Prescription issued on January 28, 2020 in the *J.W. Doe* case.)

44.    This specific Louisiana procedure (under La. C.C.P. art. 929 and 931)—insisted upon by the plaintiffs in this case—may not be available in federal district court. *See, e.g., Body By Cook, Inc. v. Ingersoll-Rand Co.,* 39 F.Supp.3d 827, 838 (E.D.La. 2014) (La. C.C.P. art. 929

---

[22] Similar judgments were entered in cases including in the *John Doe* and *J.W. Doe* cases, as well as in *John Roe I v. Roman Catholic Church of the Archdiocese of New Orleans, et al.* (Case No. 20-01330 in District Court; filed as Case No. 2018-11369 in Orleans Parish Civil District Court); and *B.B. Doe v. Archdiocese of New Orleans Indemnity, Inc., et al.* (Case No. 20-01318 in District Court; filed as Case No. 2019-10149 in Orleans Parish Civil District Court).

[23] Pursuant to LSA-C.C.P. Articles 929 and 931, a plaintiff is entitled to a trial on prescription, where that issue is raised by the defendant.  Plaintiff is entitled to an evidentiary hearing to present evidence, and provide testimony in opposition to the exception of prescription.  *See* La. C.C.P. art. 929 ("The declinatory exception, the dilatory exception, and the peremptory exception when pleaded before or in the answer shall be tried and decided in advance of the trial of the case. … If the peremptory exception has been filed after the answer, but at or prior to the trial of the case, it shall be tried and disposed of either in advance of or on the trial of the case.")

is a "state procedural rule" not applicable to proceedings in federal district court).  Therefore, the removal to federal district court may be detrimental to the plaintiffs.

45.      In summary, the Archdiocese had suffered defeats on defenses, and in at least two matters, the parties were moving swiftly towards a court determination on the remaining peremptory exception of prescription.  The Committee submits that the bankruptcy filing was intended to provide the Archdiocese with an advantage in these matters, and in particular, to deprive plaintiffs of their opportunity to resolve the prescription defense at a special hearing, as is the plaintiff's right under Louisiana procedure (but which may not occur in federal district court).

> *(4)      The Archdiocese Presumably Will Pursue the Procedural Advantages of Bankruptcy in Addressing Abuse Claims*

46.      In addition, the Archdiocese presumably hopes to take full advantage of the procedural aspects of Chapter 11.  Specifically, the process will effectively force the abuse survivors into an involuntary collective bargaining process as part of the negotiation of a Plan of Reorganization to resolve the bankruptcy case.  The Archdiocese will gain the benefit of a claims bar date and will almost certainly seek a discharge and channeling injunction.

**C.      Under *Little Creek*, *SGL Carbon*, and Related Authorities, Bad Faith Dismissal is Warranted.**

47.      As discussed above, bad faith dismissal is warranted where a financially healthy or solvent debtor files not to respond to a financial crisis, but instead to gain an advantage in pending litigation.  That is exactly the situation here, and dismissal is mandated by *Little Creek*, other Fifth Circuit authorities, as well as the strikingly similar circumstances considered by the Third Circuit in *SGL Carbon* (discussed below) and in other cases.

48.      *Little Creek* contemplates an examination of all the "particular facts and circumstances in each case," which the Committee submits are the circumstances discussed

above—specifically, the Archdiocese's financial health and solvency, and the purpose of the filing to obtain a litigation advantage. *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1074 (5th Cir. 1986). *See also Antelope Technologies, Inc. v. Lowe* (*In re Antelope Technologies, Inc.)*, 431 Fed.Appx. 272, 275 (5th Cir. 2011) (bad faith dismissal affirmed, because "<u>the purpose of the [bankruptcy] petition was not primarily to reorganize or respond to financial crisis but instead was to gain unfair advantage in the shareholder derivative action</u>."); *Brazos Emergency Physicians Association, P.A. v. Woods (In re Brazos Emergency Physicians Association, P.A.)*, Case No. 11-399 (W.D.Tex. Aug. 26, 2011), *affirmed*, 471 Fed.Appx. 393, 394 (5th Cir. 2012) (bad faith dismissal was warranted because the debtor's "<u>financial condition did not warrant bankruptcy protection</u>" and instead, the debtor "filed its bankruptcy petition <u>for the purpose of obtaining a litigation advantage</u>.") (*See* Exhibit "<u>1</u>" at p. 6; emphasis added).

49.    The Third Circuit's decision in *In re SGL Carbon Corp.*, 200 F.3d 154, 162-66 (3d Cir. 1999) is also highly relevant.  The Third Circuit applied essentially the same standard used in *Little Creek*. (*Compare SGL Carbon*, 200 F.3d at 162 with *Little Creek*, 779 F.2d at 1074.)

50.    In *SGL Carbon*, a creditors' committee comprised primarily of antitrust claimants moved to dismiss the chapter 11 case for lack of good faith, arguing that the debtor was not in financial distress, and that the bankruptcy had been filed solely as a litigation tactic in pending antitrust litigation against the debtor.  The Third Circuit noted, first, that "SGL Carbon faces no immediate financial difficulty" (*Id.* at 163)[24]; and that in certain cases (but not this one), the filing is in good faith where the debtor is "faced with pending litigation that posed a serious

---

[24] The Third Circuit also stated: "There is no evidence that the possible antitrust judgments might force SGL Carbon out of the business.  To the contrary, the record is replete with evidence of SGL Carbon's economic strength." *Id.*

threat to the companies' long term viability." *Id*. at 164. The Third Circuit cited examples of significant financial stress that could support a good faith finding, including *In re The Bible Speaks*, 65 B.R. 415, 426 (Bankr.D.Mass.1986) ("a cash flow problem which prevented [the debtor] from meeting its current obligations, compounded by an inability to obtain financing"); and *In re Johns–Manville*, 36 B.R. 727, 729-30 (Bankr.S.D.N.Y.1984) (tens of thousands of asbestos-related claims forced the debtor to file Chapter 11 as an alternative to booking a $1.9 billion reserve and triggering potential default on a $450 million debt).

51.     In *SGL Carbon*, despite the risks posed by the pending antitrust litigation, the Third Circuit found that bad faith dismissal was warranted.  The debtor was solvent on its face, had "a net worth of $124 million," was paying debts as they came due, and had no difficulty raising financing. *Id*. at 16. (The *SGL Carbon* court also noted that, in light of the debtor's financial strength and the use of the bankruptcy filing purely to gain an advantage in the litigation, the filing did not serve a "valid reorganizational purpose," mandating dismissal. *Id*. at 165-66.)  Further, *SGL Carbon* did not "allege [that] the antitrust litigation has impeded its financing or planning activities; instead, the petitioner has repeatedly insisted the litigation has had no material effect on its operations." *Id*. at 168.

52.     Similarly, many other courts have also granted or affirmed dismissal based on the debtor's lack of financial stress and use of bankruptcy as a tool to gain a litigation advantage. *E.g., Investors Group, LLC v. Pottorff (In re Investors Group, LLC),* 518 B.R. 380, 383-84 (N.D.Tex. 2014) (filing as litigation tactic; <u>bankruptcy case filed in advance of court-ordered deposition</u>, document production, and trial date); *In re Cedar Shore Resort, Inc.,* 235 F.3d 375, 380 (8th Cir. 2000) (the debtor "had publicly declared that the business was doing well" but had <u>filed for bankruptcy primarily to put pressure on plaintiffs in a shareholder derivative suit</u> to settle); *In re HBA East, Inc*., 87 B.R. 248, 259-60 (Bankr. E.D.N.Y. 1988) ("As a general rule

where, as here, the timing of the filing of a Chapter 11 petition is such that <u>there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith</u>"); *Furness v. Lilienfield*, 35 B.R. 1006, 1009 (D. Md. 1983) (the purpose of Chapter 11 is to give businesses "teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, <u>not to give profitable enterprises an opportunity to evade contractual or other liability</u>"); *In re Southern California Sound Systems, Inc*., 69 B.R. 893, 900 (Bankr. S.D. Cal. 1987) (if debtor's "<u>true purpose of filing a petition is [not] to reorganize a financially distressed business</u>, but to merely take advantage of one of the remedies available under the Code, dismissal is appropriate in order to protect the jurisdictional integrity of the Court"); *In re Liberate Technologies*, 314 B.R. 206, 214 (Bankr. N.D. Cal. 2004) ("It appears that Debtor, suffering the frustration with lawsuits that many businesses share, seeks chapter 11 protection <u>not because its existence is genuinely threatened by that litigation, but because bankruptcy offered enticing advantages in dealing with that litigation</u>…")

53.     Under these authorities, dismissal is warranted. The Archdiocese asserts that it is solvent, and the Archdiocese failed to identify any financial distress or basis for the Chapter 11 filing.  This is not a case in which there is a "race to the courthouse," or in which the Archdiocese faces looming judgments or indeed any imminent liability at all.  No urgent reorganization need or purpose has been identified.

> **D.**     **<u>The Illustrative "Single Asset Real Estate" Factors Listed in *Little Creek* are Irrelevant.</u>**

54.     The Committee anticipates that specific illustrative factors set forth in *Little Creek* may be cited for the completely inapplicable context of a "single asset real estate debtor" that has a single asset and no going concern or operations. *Little Creek Dev. Co. v. Commonwealth*

*Mortgage Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1073 (5th Cir. 1986) (factors include whether "[t]he debtor has one asset.... The secured creditor's liens encumber this [asset]. There are generally no employees ... little or no cash flow, and no available sources of income....")

55.     However, as noted in Judge Lynn's opinion in *In re Mirant Corp.*, Case No. 03-46590, 2005 WL 2148362, \*7 (Bankr. N.D. Tex. Jan. 26, 2005), these illustrative factors are not relevant to a non-"single asset real estate" debtor, and in *Mirant*, the court ignored these illustrative factors and cited the analysis from *SGL Carbon* and other similar cases.

56.     *See also Brazos Emergency Physicians Association, P.A. v. Woods (In re Brazos Emergency Physicians Association, P.A.)*, Case No. 11-399 (W.D.Tex. Aug. 26, 2011), a copy of which is attached as <u>Exhibit "1"</u> hereto (*see* p. 5), in which the district court stated that the *Little Creek* factors "are not the only factors to be considered, because 'the existence of good faith depends on an amalgam of factors and not upon a specific fact....") (quoting *Idaho v. Arnold (In re Arnold)*, 806 F.2d 937, 939 (9th Cir. 1986))

57.     In any case, the factors are illustrative and "**non-exclusive**" under *Little Creek* itself. *Little Creek* , 779 F.2d at 1072.

WHEREFORE, the Committee respectfully requests that the Court: (i) enter an Order providing for the dismissal of this Chapter 11 case; and (ii) provide such other relief as the Court deems appropriate and just.

Dated:  July 3, 2020                                        Respectfully submitted,

*/s/ C. Davin Boldissar*
Omer F. Kuebel, III (La #21682)
C. Davin Boldissar (La. #29094)
Locke Lord LLP
601 Poydras Street, Suite 2660
New Orleans, Louisiana 70130-6036
Telephone: (504) 558-5111

Facsimile: (504) 558-5200
Email: dboldissar@lockelord.com

and

James I. Stang (CA Bar No. 94435)
Linda F. Cantor (CA Bar No.153762)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., Suite 1300
Los Angeles, CA  90067
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760

*Co-Counsel to the Official Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

I hereby caused a true and correct copy of the foregoing *Response* to be served on July 3, 2020 upon all parties by electronic case filing for those parties receiving notice via the Court's Electronic Case Filing system, and on all other parties requiring service under the Court's *Ex Parte Order Authorizing the Debtor to Limit Notice and Establishing Notice Procedures* through the Master Service List via first-class United States mail, postage prepaid, to be sent on July 6, 2020.

*/s/ C. Davin Boldissar*
C. Davin Boldissar

83120773v.3