Transcript of the Testimony of

**Section 341 Meeting of Creditors**

**Date:**

May 29, 2020

**Case:**

ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE

**EXHIBIT 5**

1              UNITED STATES BANKRUPTCY COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4    In Re:

5    THE ROMAN CATHOLIC CHURCH OF *   Case No. 20-10846

6    THE ARCHDIOCESE OF NEW        *   Section "A"

7    ORLEANS, debtor               *   Chapter 11

8    *****************************************************

9

10

11   THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW

12        ORLEANS, SECTION 341 MEETING OF CREDITORS

13

14

15

16              PRESIDED BY: AMANDA B. GEORGE

17

18

19

20

21

22

23   TRANSCRIBED BY:

24   LESLEY H. CROCHET, CCR

25

1    AMANDA GEORGE:

2        Good morning, everybody.  My name is Amanda

3    George.  I am a trial attorney in the office of the

4    United States Trustee, which is a component of the

5    US Department of Justice.

6        This is the Section 341 Meeting of Creditors

7    held today, May 29, 2020, at 10:00 a.m.  We are here

8    on the Chapter 11 proceeding of the Roman Catholic

9    Church of the Archdiocese of New Orleans, Case No.

10   20-10846.  It was filed in the Bankruptcy Court for

11   the Eastern District of Louisiana.  This case is a

12   voluntary Chapter 11 proceeding that was filed on

13   May 1, 2020.  The first thing I would like to do is

14   take a count of who is here as a representative or

15   representatives of the debtor that will be

16   testifying today.  And if we could, go one by one,

17   stating your full name and your association with the

18   debtor.

19   MARK MINTZ:

20       Ms. George, my name is Mark Mintz.  I am an

21   attorney at Jones Walker.  I represent the

22   Archdiocese of New Orleans in this bankruptcy.  What

23   I would like to do is introduce the representatives

24   who will be testifying for you on video, also point

25   to who they are, and hopefully you can see and we

 1 | can do, how that works.

 2 |     Sitting closest to the camera is Father Patrick

 3 | Carr, who is the vicar of -- I'm going to get this

 4 | wrong, I'm sure -- vicar of finance and the third

 5 | vice president for the corporation.  Next to him is

 6 | Ms. Kathleen Zuniga, that is Z-u-n-i-g-a.  She is

 7 | with CRI as proposed CPA and financial advisor for

 8 | the debtors.  Or debtor.  Excuse me.

 9 |     And next to her is Jeff Entwisle,

10 | E-n-t-w-i-s-l-e.  Jeff is the CFO for the

11 | Corporation.

12 | AMANDA GEORGE:

13 |     And who, out of the three individuals that

14 | you've just introduced to me, who will be testifying

15 | primarily on behalf of the debtor?

16 | MARK MINTZ:

17 |     Primarily, it will be Father Patrick Carr, who

18 | is again our declarant for the first day hearings

19 | and is the one who signed the schedules.

20 | AMANDA GEORGE:

21 |     But do you anticipate all three individuals

22 | will be providing testimony?

23 | MARK MINTZ:

24 |     Yes.

25 | AMANDA GEORGE:

```
 1        All right.  So what I would like to do is,
 2   because all three of you will be examined under oath
 3   regarding in the bankruptcy case, I would like to
 4   swear each of you in.  And I will start with Father
 5   Carr.  If you could, raise your right hand.
 6        Do you solemnly swear or affirm to tell the
 7   truth, the whole truth, and nothing but the truth?
 8   FATHER PATRICK CARR:
 9        I do.
10   AMANDA GEORGE:
11        Thank you.  And then, Ms. Zuniga, am I saying
12   that correctly?
13   KATHLEEN ZUNIGA:
14        Zuniga, yes.
15   AMANDA GEORGE:
16        All right.  Ms. Zuniga, do you solemnly swear
17   or affirm to tell the truth, the whole truth, and
18   nothing but the truth?
19   KATHLEEN ZUNIGA:
20        I do.
21   AMANDA GEORGE:  Thank you, Ms. Zuniga.
22        And then, Mr. Entwisle, if you could, raise
23   your right hand.
24        Do you solemnly swear or affirm that the
25   testimony you will provide will be the truth, the
```

1   whole truth, and nothing but the truth?

2   JEFFREY ENTWISLE:

3       I do.

4   AMANDA GEORGE:

5       Thank you.  All right.  Our proceeding is being

6   recorded, and telephonically at that, so I would ask

7   that you all answer questions verbally, loudly, and

8   clearly so that we get a good recording of our

9   meeting today.  With regard to the recording, the US

10  Trustee's recording is the official transcript of

11  this meeting.  Parties to this call should not be

12  broadcasting this proceeding at this time.  If

13  anyone would like a copy of this audio recording,

14  you may contact me personally and I will make it

15  available to you as our physical offices do remain

16  closed.  So if you would like a copy of the audio

17  recording, you can call me, (504)589-4092, or e-mail

18  me at Amanda.B.George@USDOJ.gov.  That's Amanda,

19  A-m-a-n-d-a, dot B as in bird, dot G-e-o-r-g-e at

20  USDOJ dot gov.

21      So at this juncture, I would like to make some

22  opening remarks.  I anticipate we have a number of

23  parties on this call who may have received a notice

24  in the mail to call in today but may not have

25  participated in a meeting of creditors.  And for

```
 1   that reason, I am going to take a few minutes and

 2   explain both the purpose and the scope of today's

 3   meeting so that this exchange is beneficial to all

 4   parties and interests.

 5        Generally speaking, this meeting of creditors

 6   is the statutory forum under the bankruptcy code

 7   where the debtor -- in this case, the Archdiocese --

 8   must appear and answer questions under oath about

 9   the bankruptcy case.  The Court does not preside at

10   this meeting.  This meeting and all creditor

11   meetings are conducted by the office of the US

12   Trustee, which is also responsible for certain

13   administrative aspects of the case.

14        With regard to who may ask questions at this

15   meeting, the parties who may ask questions are

16   myself as representative of the US Trustee,

17   creditors of the Archdiocese, and any indentured

18   trustees.  So what this means is, any party on this

19   call that is not a creditor or an indenture trustee

20   may not ask questions today.  And I will discuss how

21   we will handle questions in a moment.  But I first

22   want to talk about the scope of today's examination.

23        While creditors will be allowed to ask the

24   debtor questions, the questions may relate only to

25   the administration of the bankruptcy estate, the
```

1    operation of the debtor's business, the plan for

2    exiting bankruptcy, and the schedules and statement

3    of financial affairs that were filed into the

4    record.  This is not the venue to ask questions

5    about your particular claim or the dischargeability

6    of a particular debt.  This is not a deposition on a

7    claim or a substitute for discovery.  So again,

8    questions should be focused on the debtor's current

9    operations and its plan for reorganization.

10          To the extent anyone on the call who is a

11   creditor or indenture trustee that has questions

12   about their claim or objections to any action of the

13   debtor, that should be dealt with via motion

14   practice before Judge Grabill.  The Court holding

15   motion days in this case every third Thursday of the

16   month, and their next motion day is set for June 18,

17   2020.

18          So with this said, if you are a creditor, an

19   indenture trustee, or an attorney representing

20   either and you wish to ask questions, in order to

21   deal with this telephonic meeting and the greater

22   elevated interest we have in this case, we are

23   asking that, if you would like to ask questions,

24   please e-mail your name, who you represent to us and

25   we will keep a list going during this meeting, and I

1 | will give the e-mail details in a moment.  But if

2 | you are an attorney for a survivor, you do not need

3 | to disclose the name of your client in the e-mail.

4 | And if you are a survivor/tort claimant without an

5 | attorney, we want to keep your information

6 | anonymous.  So if you fall into that category,

7 | please hold tight and I will call on that group to

8 | ask questions separately.  If we have multiple

9 | attorneys on the call representing a creditor or

10 | group of creditors, please only e-mail the name of

11 | the attorney that will be asking questions.

12 | So that said, if you would like to ask

13 | questions of the debtor, we are asking you to e-mail

14 | Mary.Langston@USDOJ.gov during this meeting if you

15 | are able to.  That's Mary, M-a-r-y, dot Langston,

16 | L-a-n-g-s-t-o-n, at US DOJ dot gov.  Mary is going

17 | to keep a list and, when we get to the creditor

18 | questioning, I will call on you in the order in

19 | which we receive your names, and we will have the

20 | committee go last.  Again, that's

21 | Mary.Langston@USDOJ.gov to get on the list, if you

22 | are able.  If you are unable to e-mail us, I will

23 | call on that group separately.

24 | Now, this is how we will proceed going forward.

25 | First, I'm going to allow the debtor to give some

1   opening remarks as the debtor would like to address

2   us all with regard to where this case is headed and

3   what the plan is for paying creditors and exiting

4   bankruptcy.  Second, I will ask my questions as

5   representative for the acting United States Trustee.

6   And after that, I will open up the floor to

7   creditors that have questions.  And again, we will

8   work from the list.  I will call your names as they

9   are received.  And if you are unable to e-mail and

10  get on the list, I will call on that group after we

11  call on the names that are e-mailed.  Questions will

12  be limited to two to three questions for the debtor,

13  so just keep that in mind.

14      All right.  So at this point, I would like to

15  turn over the floor to debtor's counsel to present

16  the debtor's opening remarks.

17  MARK MINTZ:

18      Thank you, Ms. George.  Again, for the record,

19  my name is Mark Mintz.  I am an attorney at Jones

20  Walker.  Jones Walker is proud to be representing

21  the Archdiocese of New Orleans through this process,

22  and we do have a few opening remarks to state and

23  then, of course we will get into the questions.

24      The Archdiocese of New Orleans has filed this

25  Chapter 11 with the ultimate goal of confirming a

1   100 percent plan.  What that means is that the

2   Archdiocese intends to pay creditors 100 percent of

3   their allowed claims.  We intend to work with the

4   committee and their constituencies to develop a fair

5   method of determining the allowed claim amounts and

6   development and implementation of a plan to

7   effectuate those payments.  We recognize that

8   today's meeting is the first step on the journey

9   towards that ultimate confirmation day and, like all

10  journeys, there are sure to be bumps in the road.

11  But we hope to do that with cooperation from the

12  creditors in this room -- well, telephonically, I

13  should say -- and we will make it to the end of this

14  process.

15      We hope to work with committee counsel to

16  develop a method of notifying potential survivor

17  claimant in this case through various means.  We

18  want to provide the broadest possible notice in the

19  areas where that is appropriate, whether that be

20  newspapers, internet, et cetera.  This leads us to

21  the setting of a bar date.  Ordinarily in this

22  district, unless the Court orders otherwise, the bar

23  date -- that is, the last date that you can file a

24  claim --

25      (Inaudible audio/background conversation.)

 1 | MARK MINTZ:

 2 |      Can we please mute, if you are ...

 3 | UNKNOWN SPEAKER:

 4 |      I cannot hear you.

 5 | MARK MINTZ:

 6 |      This leads to the setting of a bar date.

 7 | Ordinarily, in this district -- which is the last

 8 | date to file claims.  Ordinarily, in this district,

 9 | unless the Court orders otherwise, the bar date is

10 | 90 days from today.  That would be August 27.  We

11 | intend to work with the committee within the

12 | confines of the court rules to set an appropriate

13 | bar date and provide appropriate notice of it.

14 |      We chose this Chapter 11 as a means to address

15 | our claims so that we can be certain that all claims

16 | are brought forward and that all who wish to

17 | participate in this process are able to make their

18 | claims and that the claims can be fairly resolved

19 | and compensated through the bankruptcy process.  We

20 | anticipate, as has occurred in other diocesan's

21 | cases, that we will seek, soon after the bar date, a

22 | mediation process with the committee and the

23 | insurance companies to try to come to an overall

24 | resolution of the overall outcome in this case.

25 |      We are committed to try and ultimately do this

1   in a consensual manner in an expeditious manner as

2   possible.  We welcome this opportunity to discuss

3   with our creditors the nature of our schedules of

4   assets and liabilities as well as our statement of

5   financial affairs, our financial condition, and our

6   eventual plan, and I echo what Ms. George said about

7   the scope of today's proceedings.  I do want to take

8   a few minutes to discuss the schedules themselves in

9   a way that might help clarify them.

10          For those of you that went through them, you

11  know the schedules are extensive and we used a lot

12  of resources to complete them when we did.  In

13  preparing for this meeting, we think that, upon

14  reflection, we may have to amend the schedules to

15  fix some classifications to be sure this is a

16  situation on over disclosure rather than under

17  disclosure.  For instance, we have to take another

18  look at some of the entities that were identified as

19  affiliates, some of which may not be legal

20  affiliates as that term is defined in the bankruptcy

21  code.  Also internally -- and I think this is going

22  to be an important point as we go through today --

23  internally, we treat on our books some of the

24  schools that are owned by the Archdiocese as third

25  parties.  They are in fact part of the Archdiocese's

1   assets.  As an example, Archbishop Hannon High

2   School is a part of the Archdiocese and not a

3   separate legal entity unlike most of the parishes

4   which are separately incorporated.  The high schools

5   that we will talk about later are more akin to a

6   d/b/a than a legal affiliate.  So transactions shown

7   on the schedules with the high schools reflect the

8   Archdiocese's internal bookkeeping entries rather

9   than transactions with a third party.  We have tried

10  to address this in our in-notes and introductions

11  but think that, based on some questions that we have

12  received prior to this meeting, think that we may

13  have created some confusion that merits amendments

14  to the schedules which will occur shortly after this

15  meeting.

16      We also have clarifications to make with

17  regards to how the captive insurance program works,

18  and we can discuss that further about this meeting,

19  and it may require some additional amendments as

20  well.  But again, we are ready to proceed with the

21  questioning from the US Trustee's office at this

22  point.

23  AMANDA GEORGE:

24      All right.  Thank you, Mr. Mintz.  As Mr. Mintz

25  is not one of our parties under oath -- and I will

1   just direct this to Father Carr -- Father Carr, do

2   you adopt those statements made by Mr. Mintz as true

3   and correct?

4   FATHER PATRICK CARR:

5        Yes, I do.

6   AMANDA GEORGE:

7        Thank you.

8   AMANDA GEORGE:

9        And Father Carr, you are the individual who

10  signed the petition schedules and other documents in

11  this case; is that correct?

12  FATHER PATRICK CARR:

13       Yes.

14  AMANDA GEORGE:

15       And could you state again for me your positions

16  with the Archdiocese?

17  FATHER PATRICK CARR:

18       I am the vicar of finance.

19  AMANDA GEORGE:

20       And do you have authority to act on behalf of

21  the Archdiocese?

22  FATHER PATRICK CARR:

23       Yes, I do.

24  AMANDA GEORGE:

25       Did you have authority to sign the petition

1   schedules and other documents filed in this

2   proceeding?

3   FATHER PATRICK CARR:

4       Yes, I do.

5   AMANDA GEORGE:

6       Are you familiar with the information contained

7   in those documents?

8   FATHER PATRICK CARR:

9       Yes, I am.

10  AMANDA GEORGE:

11      And did you review the documents before signing

12  them?  (No audible response.)  Was that a yes?  I

13  didn't hear the audio.

14  FATHER PATRICK CARR:

15      Yes.  Yes, I did.

16  AMANDA GEORGE:

17      Thank you.  And taking into consideration the

18  amendments that Mr. Mintz just mentioned, to the

19  best of your knowledge, if the information contained

20  in those documents true and correct?

21      Excuse me, I believe I hear somebody on the

22  line.  Could you please mute your phone?  Thank you.

23      Father Carr, again, taking into consideration

24  the amendments that Mr. Mintz discussed, outside of

25  those items, to the best of your knowledge, is the

1   remaining information true and correct?

2   FATHER PATRICK CARR:

3        Yes.  Excuse me.  Yes.

4   AMANDA GEORGE:

5        Thank you.  And is the address on the petition

6   still the current mailing address?  And that is the

7   Walmsley Avenue address.

8   FATHER PATRICK CARR:

9        Yes.

10  AMANDA GEORGE:

11       Thank you.  All right.  So I will shift to some

12  administrative matters I would like to go over.  For

13  the record, and application to employ Jones Walker

14  law firm has been filed.  That is set for hearing on

15  June 18.  The debtors also filed an application to

16  employ Carr, Riggs, and Ingram as financial

17  advisors.  Will the financial advisor be preparing

18  the monthly operating reports?

19  FATHER PATRICK CARR:

20       Yes.

21  AMANDA GEORGE:

22       All right.  And just as a reminder, your first

23  monthly operating report for the Archdiocese for

24  May, 2020 is due on June 25.

25       All right.  So shifting over to insurance, I

1   understand the debtor's insurance program includes a

2   self-insurance program and some third-party

3   coverage.  We received -- well, we requested

4   certificates for the third-party coverage, and we

5   received a certificate from the Catholic Mutual

6   Relief Society.  So that was one certificate we

7   received.  Are there any others or is that it?

8   MARK MINTZ:

9        Amanda, this is Mark.  We have requested the

10  others.  It's quite possible that I have received a

11  couple and haven't forwarded them to you yet.  But

12  we are in the process of gathering them, and we will

13  also forward the rest to you.

14  AMANDA GEORGE:

15       Okay.  And it just so you all know, at the end

16  of this meeting, I will have a list of the documents

17  and items that we still need.  It is going to be

18  filed into the record, so I will just keep track.

19  So that will be something that we still need, are

20  those remaining third-party certificates of

21  coverage.

22       All right.  Speaking of the self-insurance

23  program and the third-party coverage, are those

24  coverages still in force today?

25  FATHER PATRICK CARR:

 1       Yes, they are.

 2   AMANDA GEORGE:

 3       And so, is it your understanding that all

 4   property of the estate is insured?

 5   FATHER PATRICK CARR:

 6       Yes.

 7   AMANDA GEORGE:

 8       And does that coverage include the artifacts,

 9   art, and collectibles that were listed in the

10   schedules?

11   FATHER PATRICK CARR:

12       Generally, yes.

13   AMANDA GEORGE:

14       One other item that we had requested was a list

15   of all of the flood insurance policies of the

16   debtor.  Was that provided?  I didn't see it.

17   MARK MINTZ:

18       It's very possible that it was one of the ones

19   I forgot to forward to you, Amanda.  So I will do

20   so.

21   AMANDA GEORGE:

22       All right.  Thank you.  And I will add that to

23   the list.

24       Shifting over to the bank accounts and

25   debtor-in-possession accounts, it looks, from the

1  schedules, that the Archdiocese has both school

2  accounts and other accounts that total 87 accounts.

3  That's the number of accounts that I was able to

4  tick off on the schedules.  It looked to me that 84

5  of the 87 accounts are already hosted at an

6  authorized depository.  Have those accounts been

7  reclassified as debtor-in-possession accounts?

8  KATHLEEN ZUNIGA:

9      Yes, they have.

10  AMANDA GEORGE:

11      All right.  And who was that speaking?

12  KATHLEEN ZUNIGA:

13      Kathleen Zuniga.

14  AMANDA GEORGE:

15      Thank you.  And when they were reclassified,

16  was a new bank authorization signature form required

17  or requested?

18  MARK MINTZ:

19      No.

20  AMANDA GEORGE:

21      Okay.  So they didn't issue a new form?

22  MARK MINTZ:

23      Not that I'm aware of.

24  AMANDA GEORGE:

25      So what I will need, because they didn't issue

1   a new form, can you provide us a chart with the

2   account and who has signature authority on the

3   account?

4   MARK MINTZ:

5       Yes.

6   AMANDA GEORGE:

7       All right.  The only three accounts that I took

8   notice of on the schedule that are not already at an

9   authorized depository -- and I will go through them

10  one by one.

11      First was an Archdiocese account at BMO Harris

12  Bank, and it was classified as a corporate

13  checking/insurance account.  What is the status of

14  that account?

15  KATHLEEN ZUNIGA:

16      It is being moved to the Whitney Bank.

17  AMANDA GEORGE:

18      All right.  Thank you, Ms. Zuniga.  So once it

19  is moved, we will just need updated information with

20  the new account number, if they issue you a new bank

21  authorized signature form, and a voided check from

22  the account.

23      All right.  The second account that I have is

24  an Academy of Our Lady account at Fifth District

25  Savings Bank.  What is the status of that account?

1   MARK MINTZ:

2        So the short answer, Amanda -- this is Mark --

3   is, under our cash management motion and the

4   negotiations with the Court, it is under $250,000

5   and therefore under the FDIC limit.  We had hoped to

6   not move it, based on that order and the

7   negotiations with your office.

8   AMANDA GEORGE:

9        Thank you, Mark.  That's fine.  I only brought

10  it up because it's getting close to the FDIC limit.

11  Do you expect that that account will exceed the FDIC

12  insurance limit?

13  MARK MINTZ:

14       We do not.  And if it does, we will revisit

15  what needs to be done.

16  AMANDA GEORGE:

17       And I will just have Ms. Zuniga confirm that,

18  as she is somebody I have under oath.

19  KATHLEEN ZUNIGA:

20       That is correct.  We will monitor it.

21  AMANDA GEORGE:

22       Thank you.  And in the last account was a St.

23  Scholastica account, it looked like a Raymond James

24  investment account, with a balance under $5,000.  So

25  is that another account that is just being left

1  alone?

2  KATHLEEN ZUNIGA:

3       Yes, it is.

4  AMANDA GEORGE:

5       Great.  Has the debtor opened any new bank

6  accounts since the filing of the bankruptcy?

7  KATHLEEN ZUNIGA:

8       Not -- no.

9  AMANDA GEORGE:

10      All right.  For the record, the debtor has

11 provided our office with a copy of the 2018 federal

12 and state tax returns for the debtor.  Are the

13 copies of those returns provided to our office true

14 and correct copies of what was filed with the IRS

15 and the state of Louisiana?

16 KATHLEEN ZUNIGA:

17      Yes.

18 AMANDA GEORGE:

19      All right.  Now I want to shift and discuss the

20 insiders or officers of the --

21 MARK MINTZ:

22      Ms. George, this is Mark.

23 AMANDA GEORGE:

24      Yes.

25 MARK MINTZ:

```
 1        Can I ask just one, a second time, we are

 2   getting a lot of feedback at least.  Ask people

 3   again to mute their phones, please?

 4   AMANDA GEORGE:

 5        Yes, of course.  Can everyone on the call

 6   except for the debtor's representatives and counsel

 7   please mute your phones so that we can have a good

 8   recording and continue this meeting?  We are still

 9   getting feedback.  Can everyone that is on the call

10   please mute your phones so that we can proceed with

11   our meeting?

12        All right.  Thank you.  Moving forward, there

13   were five individuals that were designated on the

14   petition, the corporate resolution authorizing the

15   filing of the case, and I would just like to go one

16   by one through the individuals and discuss any

17   compensation that they are paid in the regular

18   course.

19        And I will start with Archbishop Aymond, as he

20   was listed on the petition, or the attachment to the

21   petition, as well as the statement of financial

22   affairs as an officer of the debtor.  And I would

23   like to just identify payments that he receives in

24   the regular course from the Archdiocese.  The

25   statement of financial affairs noted that he
```

1   received a housekeeping payment of around $400 a

2   month, payroll of $2175 a month, it looked like a

3   monthly stipend of $600 a month.  Then there was a

4   payment that the Archdiocese made to a Barclay

5   credit card in various amounts on his behalf.  What

6   is that credit card used for?

7   FATHER PATRICK CARR:

8       That's -- business expense.

9   AMANDA GEORGE:

10      What type of business expense?

11  FATHER PATRICK CARR:

12      Lunches and various other things that are

13  associated with his office.

14  AMANDA GEORGE:

15      There's also a Cox cable payments, Entergy

16  payments.  Are there any other payments that the

17  Archdiocese makes on Archbishop Aymond's behalf in

18  the regular course?

19  FATHER PATRICK CARR:

20      I'm not aware of any.

21  AMANDA GEORGE:

22      And this is Father Carr that is testifying; is

23  that correct?

24  FATHER PATRICK CARR:

25      That's correct.

1    AMANDA GEORGE:

2        And has he been paid in the regular course

3    since the bankruptcy case was filed?

4    FATHER PATRICK CARR:

5        Yes.

6    AMANDA GEORGE:

7        All right.  And I will move on to the Father

8    Cheri?  Am I saying that right?

9    FATHER PATRICK CARR:

10       Cheri.

11   AMANDA GEORGE:

12       Cheri.  Thank you.

13   FATHER PATRICK CARR:

14       Yes.

15   AMANDA GEORGE:

16       And he is also listed in the statement of

17   financial affairs as an officer of the debtor.  Can

18   you describe for me his day-to-day role?

19   FATHER PATRICK CARR:

20       Yes.  He is the -- he is a bishop that assists

21   the Archbishop in the day-to-day affairs of the

22   Archdiocese.

23   AMANDA GEORGE:

24       All right.  And it looked like he is paid a

25   housekeeping expense of $400, payroll of $2,154.

1    The Archdiocese pays Cardmember Services credit card

2    in his behalf in various amounts.  What is that card

3    used for?

4    FATHER PATRICK CARR:

5          His business expenses.

6    AMANDA GEORGE:

7          So that's lunches and travel and other

8    expenses, like the same as Archbishop Aymond.

9    FATHER PATRICK CARR:

10         Correct.

11   AMANDA GEORGE:

12         All right.  There were also some expense

13   reimbursements, Cox cable payments, Entergy

14   payments.  Is Bishop Cheri paid anything else in the

15   ordinary course?

16   FATHER PATRICK CARR:

17         Not that I'm aware of.

18   AMANDA GEORGE:

19         Okay.  And has he been paid in the regular

20   course since the case was filed?

21   FATHER PATRICK CARR:

22         Yes.

23   AMANDA GEORGE:  All right then.  I know I am going

24   to mess this up.  I will move to Father Akpoghiran?

25   Is that correct?

 1  MARK MINTZ:

 2      That's a good try.  I'm not sure we have an

 3  answer either.  Just, yeah.  We know who you are

 4  talking about.

 5  FATHER PATRICK CARR:

 6      We know who you are talking about.

 7  AMANDA GEORGE:

 8      All right.  And what is his day-to-day role in

 9  the Archdiocese?

10  FATHER PATRICK CARR:

11      He is head of the tribunal.

12  AMANDA GEORGE:

13      All right.  And it looks like, according to the

14  statement of financial affairs, he is paid a payroll

15  of $2,059 a month, a monthly expense of $600, some

16  expense reimbursements in various amounts, Cox

17  cable.  Is he paid anything else in the ordinary

18  course from the Archdiocese?

19  FATHER PATRICK CARR:

20      Not that I'm aware of.

21  AMANDA GEORGE:

22      Okay.  And has he been paid in the regular

23  course since the case was filed?

24  FATHER PATRICK CARR:

25      Yes.

1    AMANDA GEORGE:

2         All right.  And I will move to Mr. Entwisle,

3    who is designated as the CFO of the debtor.  He also

4    signed the debtor's tax return.  So what is

5    Mr. Entwisle's day-to-day role in the Archdiocese?

6    FATHER PATRICK CARR:

7         I will defer to him.

8    JEFFREY ENTWISLE:

9         I am -- this is Jeff Entwisle.  And chief

10   financial officer, so I oversee all of the financial

11   administrative insurance and things along those

12   lines.

13   AMANDA GEORGE:

14        All right.  And it looks like, Mr. Entwisle,

15   you are paid $6,664.74 twice a month.  Is that

16   correct?

17   JEFFREY ENTWISLE:

18        I believe that's correct.

19   AMANDA GEORGE:

20        And then it looked like there were also some

21   mileage reimbursements in varying amounts.  Are you

22   paid anything else by the Archdiocese in the regular

23   course?

24   JEFFREY ENTWISLE:

25        No.

```
 1   AMANDA GEORGE:

 2        And have you been paid in the regular course

 3   since the case was filed?

 4   JEFFREY ENTWISLE:

 5        I have.

 6   AMANDA GEORGE:

 7        All right.  And then I will shift to Father

 8   Carr.

 9   FATHER PATRICK CARR:

10        Yes.

11   AMANDA GEORGE:

12        Father Carr, there was no payroll listed in the

13   statement of financial affairs.  Are you paid a

14   regular payroll amount?

15   FATHER PATRICK CARR:

16        Yes, but not from the administrative office.

17   AMANDA GEORGE:

18        Okay.  So you are not paid by the Archdiocese?

19   FATHER PATRICK CARR:

20        That's correct.  The administrative office.

21   That's correct.  I am not paid from the

22   administrative office.

23   AMANDA GEORGE:

24        Okay.  So you are not paid payroll or the

25   monthly $600 stipend; is that right?
```

1   FATHER PATRICK CARR:

2       From -- that's correct.

3   AMANDA GEORGE:

4       From the Archdiocese?

5   FATHER PATRICK CARR:

6       That's correct.

7   MARK MINTZ:

8       Amanda, to be clear, from the debtor entity.

9   It's, Archdiocese from a corporate standpoint means

10  something, and it is the corporate entity that is

11  filed.  Archdiocese from an ecclesiastical or

12  religious standpoint means something slightly

13  different, and so I think that's a little bit of

14  what Father Carr is talking about.

15  AMANDA GEORGE:

16      Okay.

17  MARK MINTZ:

18      So the answer is, he is paid as a parish

19  priest.  He does perform services for the

20  Archdiocese.  But his payments come not through the

21  Archdiocese.  It's a legal entity.

22  AMANDA GEORGE:

23      Okay.  So let me be clear:  I was using

24  Archdiocese interchangeably for the debtor.  I

25  clearly shouldn't do that, because it's --

```
 1   MARK MINTZ:

 2        No, you absolutely should.  It's fine.  I'm

 3   actually educating Father Carr.

 4   AMANDA GEORGE:

 5        All right.  So I will say:  Father Carr is not

 6   paid by the debtor; is that correct?  Is that a fair

 7   statement?

 8   FATHER PATRICK CARR:

 9        That's a fair statement.

10   AMANDA GEORGE:

11        Okay.  The tax return listed an individual,

12   Kathy Hebert, as COO on the tax return.  Is she an

13   officer of the debtor?

14   FATHER PATRICK CARR:

15        No, she is not.

16   AMANDA GEORGE:

17        All right.  So she is not being paid by the

18   debtor since the case has been filed; is that

19   correct?

20   FATHER PATRICK CARR:

21        She is being paid.

22   AMANDA GEORGE:

23        She is paid?  All right.  But not as --

24   MARK MINTZ:

25        She's not an officer --
```

1    AMANDA GEORGE:

2        But not as an officer?

3    FATHER PATRICK CARR:

4        She's not an officer.

5    AMANDA GEORGE:

6        Okay.  What is her role?

7    FATHER PATRICK CARR:

8        She is, again, the chief operating officer, and

9    she oversees the accounting function of the

10   Archdiocese.

11   AMANDA GEORGE:

12       Are there any other officers or board members

13   that are paid in the regular course by the

14   Archdiocese that we have not discussed, or by the

15   debtor that we have not discussed?

16   MARK MINTZ:

17       There is one more, Amanda.

18   AMANDA GEORGE:

19       Okay.

20   MARK MINTZ:

21       It is the vicar general.  And his name is --

22   AMANDA GEORGE:

23       Who?

24   MARK MINTZ:  Vicar general.

25   SANDRA ROBERTS:

```
 1        No, I'm Sandra Roberts.
 2   AMANDA GEORGE:
 3        Ms. Roberts, can you please mute your phone?
 4   SANDRA ROBERTS:
 5        Yeah, I'm at my phone.
 6   AMANDA GEORGE:
 7        I need you to mute your phone so we can proceed
 8   with our examination.
 9   SANDRA ROBERTS:
10        Okay.
11   AMANDA GEORGE:
12        Thank you.  Okay.  The vicar general?
13   MARK MINTZ:
14        Yes.
15   AMANDA GEORGE:
16        All right.  And his name?
17   MARK MINTZ:
18        Father Pat Williams.
19   AMANDA GEORGE:
20        All right.  And he is paid in the regular
21   course by the debtor.
22   FATHER PATRICK CARR:
23        No.
24   AMANDA GEORGE:
25        Okay.
```

 1   MARK MINTZ:

 2        So Amanda, this is Mark.  Let's do this,

 3   because there is some confusion in this room a

 4   little bit about this.  The short answer is:  We are

 5   researching if he is considered a corporate officer

 6   or not.  We will update as is appropriate and get

 7   back to you and, if it needs an amendment, we will

 8   provide it.

 9   AMANDA GEORGE:

10        Okay.  I will make a note.  And so the reason I

11   am going through this -- and this may be a question

12   for Mr. Mintz -- does the debtor plan to file a

13   motion for authorization to pay insiders?

14   MARK MINTZ:

15        Yes.

16   AMANDA GEORGE:

17        Yes.

18   MARK MINTZ:

19        To the extent that -- to the extent we need to.

20   We are still looking at if we need to, based on the

21   rules.  But yes, I mean, we have no problem with

22   doing that.

23   AMANDA GEORGE:

24        Okay.  Great.  According to the wage motion

25   that is docket entry seven, at the time of filing,

1   the debtor employed 602 full-time employees and 197

2   part-time employees, and the motion stated that the

3   payroll processors work Crescent Payroll and Prime

4   Pay.  Are those third-party payroll processors?

5   FATHER PATRICK CARR:

6       Yes.

7   AMANDA GEORGE:  Okay.  And is the debtor current on

8   its post-petition payroll obligations?

9   FATHER PATRICK CARR:

10      Yes.

11  AMANDA GEORGE:

12      All right.  I'm almost done with my questions.

13  I just want to make a comment for all who are on the

14  call regarding the global notes.  This is a document

15  that is affixed to the front of the schedules and

16  statement of financial affairs, and there are some

17  statements in the global notes that give us concern.

18  It's our position that the global notes document

19  does not override the schedules and statements

20  despite its claim to do so in paragraph 20.  The

21  global notes are not official bankruptcy forms.

22  They are not signed under penalty of perjury.  And

23  the legal weight that it grants itself, it's our

24  position it is not based in the bankruptcy code in

25  the bankruptcy rules.  And our position is that they

1   are not binding on the US trustees or the parties in

2   this case.  We have Father Carr's testimony that the

3   documents are true and correct to the best of his

4   knowledge, considering the amendments that we

5   discussed and that Mr. Mintz discussed at the very

6   beginning of this hearing -- of this meeting -- and

7   these global notes do not override this testimony,

8   or the signatures to that effect.  And so putting

9   the disclaimer statements aside, I do have a few

10  questions that stem from the statements in the

11  global notes.

12       In item three, where the debtor discusses the

13  net book value of assets, that is page three,

14  paragraph three.  And it states that, Assets that

15  have fully depreciated or were expensed for

16  accounting purposes may not appear in schedules and

17  statements if they have no net book value.

18       And I was wondering:  What type of assets are

19  we talking about here?  Are there any general

20  categories of assets?

21  KATHLEEN ZUNIGA:

22       Mostly furniture and equipment.  Things that

23  are extremely old that have been fully depreciated.

24  AMANDA GEORGE:

25       All right.  But this doesn't include buildings

1   or anything like that, does it?

2   KATHLEEN ZUNIGA:

3        No.  No.

4   AMANDA GEORGE:

5        All right.  And then paragraph six, which is on

6   page four, there is a statement that -- this is with

7   regard to excluded assets and liabilities.  And it

8   states that, Assets excluded include accrued

9   salaries and accrued benefits.

10       Can you just tell me what that means?

11  MARK MINTZ:

12       Honestly -- Amanda, this is Mark Mintz.  We

13  didn't excluded.  That was a general statement that

14  was done as a catchall.  Nothing has been excluded

15  based on paragraph six.

16  AMANDA GEORGE:

17       Okay.  And does Ms. Zuniga or Father Carr agree

18  with that statement?

19  FATHER PATRICK CARR:

20       Yes.

21  AMANDA GEORGE:

22       Thank you.  And I only have a handful of

23  questions left before I turn it over to our

24  creditors.

25       Generally speaking, with regard to the

 1   schedules, and the pleadings that have been filed in

 2   this case seem to state the same, the debtor is

 3   excluding the assets of the 112 parishes and those

 4   parish schools from the disclosed assets; is that

 5   correct?

 6   KATHLEEN ZUNIGA:

 7        Yes.

 8   MARK MINTZ:

 9        And Amanda, Mark Mintz again.  To be clear, it

10   is the debtor's position, and we think the correct

11   position, that the 112 assets and -- 112 parishes

12   and the parish schools are not debtor entities.

13   AMANDA GEORGE:

14        And I understand that position.  I just want to

15   make sure that, you know, we are stating that

16   clearly for the record.

17        Are there any other broad categories of assets

18   and liabilities that have been excluded from the

19   schedules, or does that pretty much cover it?

20   MARK MINTZ:

21        I'll chip in.  I don't understand the question,

22   Amanda, just to be very -- I'm not trying to be

23   difficult.  I'm saying, we included all of the

24   assets that belong to the debtor, or that we believe

25   belonging to the debtor, as explained in the

1   statements, and may have over included.  But we did

2   not include assets that belonged to other parties.

3   AMANDA GEORGE:

4        And does Father Carr or Ms. Zuniga agree with

5   that statement.

6   FATHER PATRICK CARR:

7        Yes.

8   AMANDA GEORGE:

9        All right.  On Schedule AB, item 10, with

10  regards to accounts receivable -- that is on page 24

11  of the schedules -- there is accounts receivable

12  listed from parishes and accounts receivable listed

13  from high schools.  What are these accounts

14  receivable?  What do they represent?  Are they

15  assessments or, could you just explain to me what

16  that is?

17  KATHLEEN ZUNIGA:

18       Sure, yes.  So the accounts receivable from

19  parishes are primarily comprised of the assessments

20  related to a church assessment tax that is charged

21  each of the parishes to support the operations of

22  the administrative offices, and these are recurring

23  assessments.  Assessments for property, casualty,

24  and workmen's comp insurance and other insurances.

25  And then there is a third assessment that is done in

 1  the parishes for priest health insurance and related

 2  costs for priests.

 3  AMANDA GEORGE:

 4       And that is for the parish assessment,

 5  Ms. Zuniga?

 6  KATHLEEN ZUNIGA:

 7       Yes.

 8  AMANDA GEORGE:

 9      All right.  And what about the high school

10  accounts receivable?  Is it the same?

11  KATHLEEN ZUNIGA:

12      Let me look, pull the schedule first real

13  quick.

14  AMANDA GEORGE:

15      Sure.  And this is on page 24.  And I just ask

16  because they are separately categorized.

17  MARK MINTZ:

18       And when you say page 24, Amanda, I just want

19  to make sure we are looking at the same thing.  You

20  mean from the top filing page or do you mean the

21  bottom --

22  AMANDA GEORGE:

23      Yes.  I'm sorry.  The top filing page.  24 of

24  1298.

25  MARK MINTZ:

1      And you are on the schedule; correct?

2    AMANDA GEORGE:

3      Correct.  So it's item -- I guess it is item

4    11a.

5    KATHLEEN ZUNIGA:

6      Those are going to be -- those are from the

7    loan and deposit fund receivables.  So those are the

8    loans that were made to the high schools primarily

9    for, under the loan and deposit fund, it could be

10   for capital, operating, or maintenance.

11   FATHER PATRICK CARR:

12     Correct.  That's correct.

13   AMANDA GEORGE:

14     Okay.  Got it.  With regard to the real

15   property that is listed --

16            (Background music playing.)

17   AMANDA GEORGE:

18     Can parties please mute their phones and not

19   place the call on hold?

20   FATHER PATRICK CARR:

21     They probably cannot hear you because they are

22   now on hold.

23   AMANDA GEORGE:

24     Right, yeah.

25   JAMES STANG:

```
 1         Amanda, this is Jim Stang.  (Inaudible)
 2   possibly calling back in because that person doesn't
 3   know that we are hearing their music.
 4   AMANDA GEORGE:
 5         I'm sorry.  You're going to have to shout into
 6   your phone for me to hear you.
 7   UNKNOWN SPEAKER:
 8         (Inaudible) for everyone to call back.
 9   AMANDA GEORGE:
10         Yeah.  Well, we can do that.  Would you all
11   like to hang up and call back in?  This is
12   prohibitively -- okay, yeah.  We can't go on like
13   this.  So if all parties can hang up and call back
14   into the line, and we will proceed from there.
15                   (Break in proceedings.)
16   AMANDA GEORGE:
17         Hi.  This is Amanda George from the US trustee
18   again.  Do we have the debtor on yet?
19         All right.  If I could have all parties to the
20   call, please mute your phones and do not place the
21   call on hold so that we get a good recording of our
22   meeting today.
23   UNKNOWN SPEAKER:
24         The debtor is back.
25   AMANDA GEORGE:
```

```
 1        Great.  All right.  And again, I will remind

 2   all parties, please mute your phones except for the

 3   debtor and the debtor's representatives.  And we

 4   will pick back --

 5   MARK MINTZ:

 6        And please do not place on hold.

 7   AMANDA GEORGE:

 8        Yeah.  And please do not place your calls on

 9   hold.  Despite the lovely classical music, we would

10   like to finish our recording.

11        I had a question about the real property listed

12   in the schedules, and that is Schedule AB, number

13   55, and it's on page 38.  And it's really a general

14   question:  Is the Archdiocese assessed ad valorem

15   taxes on these parcels?

16   FATHER PATRICK CARR:

17        No.

18   AMANDA GEORGE:

19        No?  Okay.  And then on Schedule D, page 83,

20   there is a secured claim listed for the Bank of New

21   York Trust Company.  Can you just describe for me

22   the basis of that claim?

23   FATHER PATRICK CARR:

24        Yield.

25   MARK MINTZ:
```

1        Yeah.  Amanda, this is Mark Mintz.  We believe

2   that it -- this was listed, and again, as something

3   that, if you ran a UCC, you would see.  It is, we

4   think, a leftover related to an old bond that is no

5   longer there.  But we are continuing to look at it,

6   which is why it was marked as contingent,

7   unliquidated, and it disputed at this point.

8   AMANDA GEORGE:

9        And Father Carr or Ms. Zuniga, do you adopt

10  that testimony?

11  KATHLEEN ZUNIGA:

12       Yes.

13  FATHER PATRICK CARR:

14       Yes.

15  AMANDA GEORGE:  All right.  And then, let's see.  On

16  Schedule F, and this is another general question,

17  every claim listed on Schedule F -- and that's all

18  975 claims -- are listed as disputed, contingent,

19  unliquidated, or some combination thereof.  Is there

20  a basis for listing every claim as disputed,

21  contingent, or unliquidated?

22  MARK MINTZ:  The short answer is -- again, Mark

23  Mintz, and I will ask the debtor to confirm this.

24  But the short answer is, in order to get these

25  filed, we went ahead and marked it, just to not to

1   the admission at this time.  We will amend to undo

2   it.  We do not intend to have literally everyone at

3   $275 file a proof of claim.  That is not our thing.

4   But at this point, what we had to list was literally

5   what was in our accounts payable system, and we have

6   not had a chance to review every single invoice to

7   make sure that it is accurate or that we agree with

8   it.  So that's why it is listed that way, and it

9   will be amended as we move forward.

10  AMANDA GEORGE:

11      When do you plan to make the amendment?

12  MARK MINTZ:

13      Along with the other ones.  I think we would

14  probably need, for that one itself, probably need

15  another 30 days.

16  AMANDA GEORGE:

17      Okay.  All right.  And Father Carr, do you

18  agree with those statements made by counsel?

19  FATHER PATRICK CARR:

20      I do.

21  AMANDA GEORGE:

22      All right.  Shifting to the Statement of

23  Financial Affairs, and I am specifically looking at

24  Statement of Financial Affairs, number 13, this is

25  docket 103, page 585 of 656.  What is the Holy

 1   Trinity Land Drive Corporation?

 2   KATHLEEN ZUNIGA:

 3        The Holy Trinity Land Drive Corporation is a

 4   supporting organization that was set up under the

 5   SID.  So it is separately incorporated, and it is --

 6   it was set up to create a lease for the lease of

 7   land for funeral homes.  I'm sorry.  Nursing homes.

 8   AMANDA GEORGE:

 9        I'm sorry.  Could you say that -- lease of land

10   for what?

11   KATHLEEN ZUNIGA:

12        A nursing home.

13   AMANDA GEORGE:

14        Okay.  And the transfer -- so I'm asking

15   because there is a transfer listed of $2,548,560 on

16   June 15, 2018.  So what was the purpose of that

17   transfer?  Was that to acquire the land?

18   KATHLEEN ZUNIGA:

19        It was really more for the purpose of limiting

20   the liability of the exposure to the administrative

21   offices, to separately incorporate it out.  I'm not

22   sure that that number, that dollar amount, is

23   correct though.

24   AMANDA GEORGE:

25        Okay.  At this time, those are all of my

 1   questions.  Thank you very much for your

 2   cooperation.  It was very helpful.

 3       At this time, I would like to open the floor to

 4   creditors or creditor attorneys who would like to

 5   ask questions.  As we previously discussed, only

 6   creditors, indenture trustees, and their attorneys

 7   or proxies may ask questions.  Questions must be

 8   limited to the assets, liabilities, financial

 9   condition, and reorganizing plan of the debtor as

10   this meeting will not serve as a substitute for a

11   deposition.  If you would like to participate and

12   you haven't yet done so, please e-mail your name

13   into your represents to Mary.Langston,

14   L-a-n-g-s-t-o-n, @USDOJ.gov.  If you are an attorney

15   for a survivor tort claimant, do not include the

16   name of your client.  And if you are a survivor tort

17   claimant here without an attorney, you do not need

18   to e-mail us.  Just sit tight until I call upon that

19   group.

20       I need everyone to please keep their phones

21   muted.  Do not place your phone on hold.  And when I

22   call on you, please unmute your phone, state your

23   name, if you are an attorney or a creditor who is

24   not a victim tort claimant, and you can proceed with

25   your questions.  Given the format and amount of

1   people participating today, and again, each party

2   should limit themselves to two to three questions.

3   And I will start with Mr. Adams.

4   JAMES ADAMS:

5        Yes.  Good morning.  Thank you, Ms. George, for

6   the opportunity to participate in this morning's

7   meetings.

8   AMANDA GEORGE:

9        Sure.

10  JAMES ADAMS:  And thank you, Ms. Zuniga,

11  Mr. Entwisle, and Father Carr for being here to help

12  us better understand the position and the financial

13  actions of the Archdiocese in lead-up to this

14  bankruptcy filing.  And Father Carr, on a personal

15  note, just a thanks to you, to your vocation.

16       My name is James Adams.  I am a victim survivor

17  of sexual abuse by a priest named Father James

18  Calleri that occurred at Saint Ann's Church in the

19  1980s.  Currently, I have the honor of

20  representing many victim survivors of clergy sexual

21  abuse by serving as the chair of the unsecured

22  creditors committee in this bankruptcy proceeding.

23       My questions will focus on some areas of

24  concern to all victim survivors.  And certainly, out

25  of respect to everyone's time, I will try to be

```
 1   brief.

 2        So Father Carr, in an interview given to FOX8

 3   on May 1 of this year referring to the bankruptcy

 4   and, more specifically, to victim survivors,

 5   Archbishop Aymond said the following:  He said, I

 6   wish, quote, to assure them that my prayers -- my

 7   prayer is that they will find peace and hope in

 8   God's comfort because this really is about them and

 9   treating them respectfully and treating them fairly.

10        The Archbishop went on to say, quote, the

11   reason we are doing this is twofold.  One, so that

12   we can reach out to victims and survivors, and so

13   that we treat them equally and fairly.  And it's not

14   just some who will get compensation.  We want to

15   make sure that we reach out to all of them, and we

16   do that in a way that is fair.

17        So I guess my question there is:  Would you

18   agree that Archbishop Aymond here explicitly states

19   that he wants all survivors, victim survivors, to

20   get compensation through this bankruptcy proceeding?

21   KATHLEEN ZUNIGA:

22        He said what he said.

23   JAMES ADAMS:

24        Father Carr?

25   FATHER PATRICK CARR:
```

 1   He said what he said.

 2  JAMES ADAMS:

 3   He said what he said.  In an article by Peter

 4  Finney on May 1, the Archbishop also said, We will

 5  be paying the people that we owe money two,

 6  100 percent of what we owe, because we are not

 7  bankrupt financially.

 8   And so for those two statements to be true, you

 9  would have to agree that the Archdiocese intends to

10  pay all sex abuse survivors 100 percent of what they

11  are owed; is that correct.

12  FATHER PATRICK CARR:

13   We said we would pay 100 percent of all allowed

14  claims.

15  JAMES ADAMS:

16   Well, let me touch upon, rather than with the

17  Archbishop said, maybe -- on the website of the

18  Archdiocese is placed, under renewing our

19  commitment, the following statement is given by the

20  vicar of finance for the Archdiocese.  Yourself

21  there, Father Carr.

22   It says, quote, Very importantly, this action,

23  taken -- I'm sorry.

24   Very importantly, taking this action will allow

25  us to address remaining clergy abuse claims, all of

 1  which stem from allegations dating back several

 2  decades ago, in a way that will allow funds to go

 3  directly to victims instead of costly litigation.

 4      So I guess my question there is:  In these

 5  statements, and Archbishop Aymond has previously

 6  said similarly, that there is publicly committing

 7  here that funds shall go directly to the victims.

 8  It stands to reason that, if all cases stem from

 9  several decades ago and then clearly all victims are

10  from several decades ago, therefore in order to be

11  sure that the funds go directly to victims as

12  promised, my concern here is wanting to make sure

13  that the Archdiocese is committing here that they

14  will not apply prescription to any of these cases in

15  an attempt to have these cases thrown out.

16  MARK MINTZ:

17      I think that is a question that has gone well

18  beyond what is needed for a 341 meeting at this

19  point.  But we appreciate your comment.

20  JAMES ADAMS:

21      Well, I guess it works to the operation of the

22  business, the intent of how they are going to

23  continue forward during this bankruptcy proceeding

24  as these claims are certainly part of it and, if not

25  the catalyst of the bankruptcy.

1    MARK MINTZ:

2        We are going to look at the claims and process

3    the claims within the process of the bankruptcy

4    court and within the process of litigation as may be

5    required.  It is our hope, as I said at the

6    beginning, that we do not have to go through costs

7    of costly litigation, and that is why we want to do

8    the mediation and we want to work with claimants to

9    get to a fair resolution.

10   AMANDA GEORGE:

11       And Father Carr, do you agree with that

12   statement?

13   FATHER PATRICK CARR:

14       Yes, I do.

15   AMANDA GEORGE:

16       All right, Mr. Adams.  Could you wrap up for

17   me, please?

18   JAMES ADAMS:

19       Sure.  I guess this is another area of concern.

20   Archbishop Aymond, he is offered multiple assurances

21   of increasing transparency as a result of this

22   bankruptcy.  And in the letter dated May 1, entitled

23   God Will Guide Us in Helping Abuse Victims to Heal,

24   this was posted in the May 9 Clarion Herald

25   commentary.  Archbishop Aymond says, I, along with a

1  team of advisors, believe that reorganization will

2  create an opportunity for us to renew our commitment

3  to the faithful and to the New Orleans community by

4  restructuring our financials, increasing

5  transparency, and creating a path forward.

6      And other Chapter 11 cases where dioceses have

7  sought Chapter 11 protection, there have been

8  agreements to disclose and make public documents

9  referable to clergy abuse within that diocese.  For

10  example, the Archdiocese of Santa Fe, Archbishop

11  John Wester of Santa Fe has pledged to open sealed

12  records related to priests' child sexual abuse cases

13  and victims.  And cases that the victims and

14  attorneys and others pushed for more transparency.

15      So I guess to increase transparency, as our

16  Archbishop has promised, will the Archdiocese of New

17  Orleans commit to making public all of its documents

18  that show, identify evidence of clergy abuse?

19  MARK MINTZ:

20      This is Mark Mintz again.  I will -- I can

21  answer that question to the extent that the

22  Archdiocese will provide the information as is

23  required under law and under the bankruptcy court

24  and through negotiations with the unsecured

25  creditors committee as to what is appropriate and

 1   when it is appropriate.

 2   AMANDA GEORGE:

 3        And Father Aymond, do you agree with that?  I

 4   mean, I'm sorry.  Father Carr, do you agree with

 5   that statement?

 6   FATHER PATRICK CARR:

 7        I do, yes.

 8   AMANDA GEORGE:

 9        All right.  Thank you.  Thank you, Mr. Adams.

10   We are going to need to move on down our list.  I

11   appreciate your participation.

12        Next, I will call upon Darryl Landwehr.  If you

13   could, state your name and who you represent, so

14   long as it is not a victim survivor.

15   DARRYL LANDWEHR:

16        Darryl Landwehr, representing Merle Noullet,

17   N-o-u-l-l-e-t.  I just have a couple of quick

18   questions.

19        First, does the Archdiocese own or lease the

20   property or premises at 306 St. Mary Street in

21   Madisonville, Louisiana, which I believe is the

22   Saint Anselm Church?

23   MARK MINTZ:

24        Darryl, this is Mark Mintz.  First of all, nice

25   to hear your voice again.  I haven't heard it -- we

1   haven't talked in a while.  Second, is there a

2   specific spot you were looking out or is that just a

3   general question?

4   DARRYL LANDWEHR:

5        No, it is specific.  My client, I understand,

6   has a personal injury claim, a fall at these

7   premises.  I stand the property address is 306

8   St. Mary Street in Madisonville, which I believe is

9   the Saint Anselm Church.  And all I am trying to

10  find out, Mark, is if the Archdiocese actually owns

11  or does it lease that premises?

12  MARK MINTZ:

13       I don't believe we do.  However, we will get

14  back to you, because there is a very large -- as you

15  saw from Schedule 55 -- as you saw from AB55, we

16  have a very large amount of property.  I am being

17  told in here that we do not own that building.  But,

18  if there is something else, we will get back to you

19  on that.

20  DARRYL LANDWEHR:

21       Okay.  And then Mark, just my other two

22  questions, just briefly, I'm just trying to find out

23  if -- whether it's owned or leased by the

24  Archdiocese; and then secondly, does the Archdiocese

25  carry liability insurance coverage for that premises

1   and, if so, who is that insurer, or is there some

2   sort of an arrangement by and between the

3   Archdiocese and Saint Anselmo Church with respect to

4   providing liability insurance coverage for that

5   property?

6   MARK MINTZ:

7        I understand, Darryl.  Why don't we do this --

8   and I'm not trying to cut you off.  I want you to

9   ask the questions that you want to ask.  But we can

10  provide you that information I think off-line in a

11  better form.

12  DARRYL LANDWEHR:

13       Great.  Thank you, Mark.  That's all the

14  questions I have.

15  MARK MINTZ:

16       Thank you.

17  AMANDA GEORGE:

18       All right.  Thank you, Mr. Landwehr.  We

19  appreciate your participation today.  Next, I will

20  call upon Soren Giselson.  And if everybody else

21  could, please keep your microphones muted so that we

22  get a clean recording and we can hear each other

23  talk.  Thank you.  Mr. Giselson?

24  SOREN GISELSON:

25       Thank you, Ms. George.  I've got a question for

 1  | Father Carr.
 2  |     Isn't it true that the Archdiocese believes it
 3  | has a moral obligation to pay credibly accused
 4  | priests retiree benefits?
 5  | FATHER PATRICK CARR:
 6  |     No, we -- no.
 7  | SOREN GISELSON:
 8  |     Do you agree that the Archdiocese owes a moral
 9  | obligation to abuse victims to make them whole.
10  | MARK MINTZ:
11  |     Soren, this is Mark Mintz.  I think my one
12  | response is, to the extent the word moral means
13  | something under law or something else, that's -- I
14  | mean, I think the question is a little far afield
15  | from what we need to be getting into at the moment.
16  | Certainly, ask your questions.  But I want to be
17  | very clear that, you know, I don't know if the word
18  | moral means something else that is being meant in
19  | different ways, and so that is what I want to be
20  | just -- I'm kind of concerned about the question in
21  | that sense.  With that said, obviously ask your
22  | question to Father Carr as you are permitted.
23  | SOREN GISELSON:
24  |     Father Carr, do you agree that the Archdiocese
25  | owes a moral obligation to abuse victims to make

```
 1   them whole?

 2   FATHER PATRICK CARR:

 3        No, I don't agree.

 4   SOREN GISELSON:

 5        Do you agree that the Archdiocese owes a moral

 6   obligation to abuse victims to make them whole --

 7   I'm sorry -- to compensate them fully?

 8   FATHER PATRICK CARR:

 9        I don't understand what you mean by a moral

10   obligation.

11   SOREN GISELSON:

12        So do you have an understanding of moral

13   obligation?

14   FATHER PATRICK CARR:  No.

15   SOREN GISELSON:

16        All right.  I'm going to switch topics right

17   quick.  Isn't it true that Hayden Glade offered more

18   than $103 million to purchase property owned by

19   Christopher Homes.

20   MARK MINTZ:

21        That is not a debtor entity.

22   SOREN GISELSON:

23        I'm sorry.  Was that Father Carr who answered?

24   MARK MINTZ:

25        That was Mark Mintz.
```

```
 1   SOREN GISELSON:

 2       All right.  I need Father Carr to answer.

 3   FATHER PATRICK CARR:

 4       He is correct.

 5   SOREN GISELSON:

 6       Isn't it true that -- okay.  Will the

 7   Archdiocese and/or Christopher Homes accept that

 8   $103 million offer?

 9   MARK MINTZ:

10       It is not a debtor entity.

11   SOREN GISELSON:

12       I'm sorry.  Was that Father Carr?

13   FATHER PATRICK CARR:

14       It is not a debtor entity.

15   SOREN GISELSON:

16       Was that Father Carr?

17   FATHER PATRICK CARR:

18       That is Father Carr.

19   AMANDA GEORGE:

20       Yes.

21   SOREN GISELSON:

22       All right.  Putting that aside, will the

23   Archdiocese or Christopher Homes accept the offer?

24   MARK MINTZ:

25       Soren, I don't think we -- I cannot answer a
```

 1   question as to a non-debtor entity.  This is about

 2   the debtor.  If Christopher Homes --

 3   SOREN GISELSON:

 4        Mark, the question wasn't asked to you.  The

 5   question was asked to Father Carr.

 6   AMANDA GEORGE:

 7        And this is Amanda George.  Father Carr, if you

 8   don't know the answer, that's an acceptable response

 9   as well.

10   FATHER PATRICK CARR:

11        This is Father Carr.  I do not know the answer.

12   AMANDA GEORGE:

13        All right.  Mr. Giselson, can you wrap up for

14   me, please?

15   SOREN GISELSON:

16        Ms. George, I believe those are all the

17   questions that I have.  Thank you for your time.

18   AMANDA GEORGE:

19        All right.  Thank you so much.  Thank you for

20   participating.  Again, if everyone can, keep their

21   phones on mute until you are called upon.  Next, I

22   will call upon John Denenea.

23   JOHN DENENEA:

24        Yes, good morning.  Thank you, Amanda, and

25   thank you, everyone.

1          Father Carr, in response to a question a moment

2    ago from Mr. Adams regarding statements by

3    Archbishop Aymond, your response was he said what he

4    said.  My question is:  In response to that answer,

5    can the victim survivors accept that what Archbishop

6    Aymond says to the media regarding the

7    reorganization plan and statements dealing with the

8    bankruptcy are true?

9    FATHER PATRICK CARR:

10         I can't speak for the Archbishop.

11   JOHN DENENEA:

12         I am asking you as on behalf of the

13   representative of the Archdiocese, does the

14   Archdiocese believe that what Archbishop Aymond says

15   to the media and in public regarding its

16   reorganization and bankruptcy is true information.

17   FATHER PATRICK CARR:

18         Yes.

19   JOHN DENENEA:

20         And in follow-up to a couple of other questions

21   raised about documents, do you agree that the

22   disclosure of documents in the possession of the

23   Archdiocese dealing with clergy abuse would go

24   towards the healing of victim survivors throughout

25   this reorganization and bankruptcy?

 1   FATHER PATRICK CARR:

 2        Maybe.

 3   JOHN DENENEA:

 4        And why do you say maybe?

 5   FATHER PATRICK CARR:

 6        Because I'm not -- I'm not really certain.

 7   Just, maybe.  That's the answer.

 8   JOHN DENENEA:

 9        Would you agree that, throughout this

10   reorganization plan, if victim survivors were able

11   to review certain documents and learn everything

12   that the Archdiocese knew about the priests that

13   violated them, it would go toward a healing process

14   for that victim survivor?

15   FATHER PATRICK CARR:

16        I can't speak for victim survivors.

17   JOHN DENENEA:

18        As a pastoral priest, wouldn't you agree, sir,

19   that the healing process involved with a victim

20   survivor would be that the individual would want to

21   know all of the true information about the person

22   that victimized him?

23        Is that Father Carr whispering or is that

24   Mr. Mintz whispering?

25   MARK MINTZ:

1    It is not Mr. Mintz.

2  JOHN DENENEA:

3    What is your answer, Father Carr?

4  FATHER PATRICK CARR:

5    Again, I can't speak for the victim.

6  JOHN DENENEA:

7    And one last follow-up, Father Carr.  In not

8  revealing any personal information in response to

9  that sort of conditional answer, I assume in your

10  experience -- well, let me ask you this:  How long

11  have you been a priest, Father Carr.

12  FATHER PATRICK CARR:  Four years.

13  JOHN DENENEA:

14    And how long have you been the vicar's general

15  of finance?

16  FATHER PATRICK CARR:

17    I am not the vicar's general.  I am vicar of

18  finance.

19  JOHN DENENEA:

20    The vicar of finance.  Excuse me.

21  FATHER PATRICK CARR:

22    How long have I been?

23  JOHN DENENEA:

24    Yes.

25  FATHER PATRICK CARR:

1   Since July.  Last July.

2   JOHN DENENEA:

3       Okay.  And since you have been a priest for the

4   last three years or so, sir, I assume you have had

5   changes to counsel individual victim survivors,

6   haven't you, sir.

7   FATHER PATRICK CARR:

8       I can't disclose anything like that.

9   JOHN DENENEA:

10      I'm not asking you to give me a name, sir.  I'm

11  trying to get a follow-up to my question where you

12  conditionally answered my question.  And I would

13  assume you have talked to individuals.  Assuming you

14  have, wouldn't you agree that that individual you

15  counseled would have a certain healing benefit to

16  know the information about his or her victimizer?

17  FATHER PATRICK CARR:

18      Again, I can't speak for the victim.

19  AMANDA GEORGE:

20      All right, Mr. Denenea, I think he has answered

21  the question.

22  JOHN DENENEA:

23      I don't think he has, Ms. George.

24  AMANDA GEORGE:

25      Well, I think you're going to get the --

1    JOHN DENENEA:

2        But I'm finished.  That's fine.  I'm finished.

3    Thank you.

4    AMANDA GEORGE:

5        Thank you.  Again, I think you are going to get

6    the answer that you got.  So now I will move on.

7    And thank you, Mr. Denenea, for participating.  I

8    will move on and call upon Mr. Baldone.

9    DAMON BALDONE:

10       Yes.  Hi.  My name is Damon Baldone.  I

11   represent George Coulon, who is a member of the

12   committee, as well as some other potential unsecured

13   victims.

14       When we decide to make a claim as a debtor,

15   Father Carr, y'all defined it as y'all will pay

16   claims that are allowed claims.  What is your

17   definition of an allowed claim?  Are these people

18   who have been victimized in the past, even though

19   their statute of limitations has run?

20   FATHER PATRICK CARR:

21       It is in accordance with what the bankruptcy

22   code means.

23   DAMON BALDONE:

24       What is your understanding of the bankruptcy

25   code for allowed claims as it pertains to victim

1  survivors?

2  MARK MINTZ:

3       It means what -- this is Mark Mintz.  It means

4  what the bankruptcy code means as to that,

5  Mr. Baldone.  It is a legal term.  It means what the

6  bankruptcy code means.

7  DAMON BALDONE:

8       Okay.  No further questions.

9  AMANDA GEORGE:

10      All right.  Thank you, Mr. Baldone.  Do I have

11 any parties on the line who wanted to ask questions

12 who were not able to send in an e-mail?  All right.

13 Hearing none.

14 MARK MINTZ:

15      Amanda?

16 AMANDA GEORGE:

17      Yes.

18 AMANDA GEORGE:

19      If we are about to move to the committee, and I

20 assume Mr. Stang or Mr. Boldissar is going to have

21 some longer questions, can I request a five minute

22 break?  Just, a personal break?

23 AMANDA GEORGE:

24      Yeah.  I don't see why not.

25 MARK MINTZ:

1       Okay.  Can we come back on in five minutes?

2   AMANDA GEORGE:

3       Yeah, yeah.  We can do that.  All right.  So we

4   are going to come back --

5   JAMES STANG:

6       This is Mr. Stang.  Are we going to hang up and

7   dial back in, or do you want us to stay on the line?

8   AMANDA GEORGE:

9       No.  Actually, Mark, is there any way we can

10  just finish this out?

11  MARK MINTZ:

12      We can go.  That's fine.

13  AMANDA GEORGE:

14      I'm only asking -- I'm mentioning because of

15  our technological capabilities over here and our

16  recording equipment.  Our dinosaur equipment, I

17  don't think we can pause and come back, especially

18  with our phone line.

19  MARK MINTZ:

20      I was simply trying to give everyone a few

21  minutes.  We had been on for an hour and 15, or

22  about that.

23  AMANDA GEORGE:

24      No, I understand.  I understand, and I

25  appreciate all of your endurance.  And let's just

 1   maybe try and tough it out.  So next, I will call

 2   upon Mr. Trahant.

 3   RICHARD TRAHANT:

 4       Good morning, everybody.  Mr. Entwisle, how

 5   much money has the Archdiocese paid out in sex abuse

 6   settlements?

 7   JEFFREY ENTWISLE:

 8       I don't know the answer to that.

 9   RICHARD TRAHANT:

10       Approximately how much?

11   JEFFREY ENTWISLE:

12       Again, I don't know the answer to that.

13   RICHARD TRAHANT:

14       Approximately how much has been paid out in the

15   past 10 years?

16   JEFFREY ENTWISLE:

17       Again, I don't know the answer to that.

18   RICHARD TRAHANT:

19       Who would?  Please don't whisper the answer.  I

20   am asking Mr. Entwisle the questions.

21       Mr. Entwisle, somebody whispered to you.  Who

22   was that?

23   MARK MINTZ:

24       His counsel is giving him advice on how to

25   answer questions.

1    RICHARD TRAHANT:

2         I would prefer you not to do that.

3    MARK MINTZ:

4         This is not a deposition, Mr. Trahant.

5    RICHARD TRAHANT:

6         He is under oath, and I am asking him

7    questions, Mark.  Not you.

8         Do you have an answer, Mr. Entwisle?

9    JEFFREY ENTWISLE:

10        I don't know.

11   RICHARD TRAHANT:

12        How much was paid out in sex abuse settlements

13   for the calendar year 2019?

14   JEFFREY ENTWISLE:

15        I don't know.

16   RICHARD TRAHANT:

17        Who would know?

18   JEFFREY ENTWISLE:

19        I don't --

20   RICHARD TRAHANT:

21        Who would know?

22   JEFFREY ENTWISLE:

23        I don't know.

24   RICHARD TRAHANT:

25        You have no idea who would have a running

1   tabulation of payments to sex abuse victims?  You

2   are saying under oath, sir, that you just don't

3   know?

4   JEFFREY ENTWISLE:

5        We would have to research that.

6   RICHARD TRAHANT:

7        And so prior to filing the bankruptcy, you are

8   telling me that for the calendar year 2019, the

9   Archdiocese has no idea how much it paid out in sex

10  abuse settlements; correct?

11  MARK MINTZ:

12       That is not what he said, Mr. Trahant.

13  RICHARD TRAHANT:

14       Well, answer the question I just asked, please.

15  JEFFREY ENTWISLE:

16       To answer the question, I don't know that

17  answer.

18  RICHARD TRAHANT:

19       How much was paid out in attorneys fees in the

20  last year?

21  MARK MINTZ:

22       Is on the schedules, Mr. Trahant if you would

23  like to --

24  RICHARD TRAHANT:

25       I want to see if know what he knows.  How much?

1    JEFFREY ENTWISLE:

2        I do not know, off the top of my head.

3    RICHARD TRAHANT:

4        Okay.  Where do those funds come from,

5    Mr. Entwisle?

6    JEFFREY ENTWISLE:

7        Where does what comes from?

8    RICHARD TRAHANT:

9        The funds to pay for sex abuse claims, related

10   costs, and attorneys fees.

11   JEFFREY ENTWISLE:

12       We have a number of sources of funds that come

13   in.  As a for-instance, we have captive insurance

14   dividends.  We have insurance relief payments.  We

15   have sales of properties and things along those

16   lines.

17   RICHARD TRAHANT:

18       What properties have been sold to pay off any

19   of the money?

20   JEFFREY ENTWISLE:

21       I do not have that right now.

22   RICHARD TRAHANT:

23       Could you get that for me?

24   JEFFREY ENTWISLE:

25       We could pull something together.  It wouldn't

 1   necessarily have a one-to-one relationship.

 2   RICHARD TRAHANT:

 3        Thank you.  As any person or entity not related

 4   to the Archdiocese paid any of these monies, whether

 5   for settlements, attorneys fees, or related costs?

 6   JEFFREY ENTWISLE:

 7        Not to the best of my knowledge.

 8   RICHARD TRAHANT:

 9        How much did the Archdiocese spend last year on

10   counseling for abuse survivors?

11   JEFFREY ENTWISLE:

12        I don't know the answer to that.

13   AMANDA GEORGE:

14        Mr. Trahant, can you wrap up for me please?

15   RICHARD TRAHANT:

16        I will, thank you.

17   MARK MINTZ:

18        And Mr. Trahant, by the way, to answer your

19   last question, that information is already in the

20   record.  Mr. Entwisle didn't know it, but just to

21   provide you that information, that was filed in

22   motion a couple of days ago.

23   RICHARD TRAHANT:

24        Did you review that information, Mr. Entwisle?

25   JEFFREY ENTWISLE:

1  | It's 2,000 pages.  I did not review every page.

2  | RICHARD TRAHANT:

3  | Okay.  I have one final question for you.

4  | Would you agree with me, Mr. Entwisle, that for

5  | purposes of paying benefits to retired priests, the

6  | composition of the November 2, 2018 Archdiocese list

7  | of credibly accused clergy is important?

8  | JEFFREY ENTWISLE:

9  | I'm not sure I am understanding the question.

10 | RICHARD TRAHANT:

11 | Well, in order to pay claims -- and I think you

12 | know there has been some dispute with respect to

13 | acknowledged pedophiles who remain on the payroll;

14 | correct?

15 | JEFFREY ENTWISLE:

16 | I know there has been some dispute.

17 | RICHARD TRAHANT:

18 | Okay.  And so you would agree with me, that

19 | being an issue, the composition of how that list was

20 | created and who is on that list for that issue would

21 | be important; correct?

22 | JEFFREY ENTWISLE:

23 | Again, I'm still not -- I'm not following the

24 | question.

25 | RICHARD TRAHANT:

```
 1       Okay.  Ms. George, can I just break this down
 2   and finish it up?
 3   AMANDA GEORGE:
 4       Sure.  You can take one last crack at it and
 5   then we will move on.
 6   RICHARD TRAHANT:
 7       So the question I am asking is:  If the Court
 8   has to use that list in order to determine who does
 9   or does not get paid as a retired priest, you would
10   agree with me that the composition of that list is
11   important?
12   JEFFREY ENTWISLE:
13       Again, I'm not -- whatever the Court decides is
14   what we would go with.
15   RICHARD TRAHANT:
16       Okay.  So I am not going to get an answer out
17   of you on that question.
18   AMANDA GEORGE:
19       All right.  Thank you Mr. Trahant.
20   MARK MINTZ:
21       At this point, I don't even understand your
22   question.  But that's fair.
23   AMANDA GEORGE:
24       All right.  Well, let's --
25   RICHARD TRAHANT:
```

```
 1        I think everybody else on the line probably
 2   does, Mark.
 3   AMANDA GEORGE:
 4        All right.  Let's move a long.  And I would
 5   like to move now to the unsecured creditors
 6   committee.
 7        And Mr. Stang, you can proceed with questions
 8   on behalf of the committee.
 9   JAMES STANG:
10        Thank you, Ms. George.  Ms. George, just a
11   couple of, I guess one might call ground rules, that
12   I would like to have for my questioning.  We have
13   three witnesses, and sometimes one is answering the
14   questions and sometimes another person is answering
15   the questions.  Can you instruct or adopt a ground
16   rule that, if one person answers and the other
17   witnesses disagree, that they must speak up or else
18   they are going to be deemed to have incorporated
19   that testimony?
20   AMANDA GEORGE:
21        Sure, yeah.  Generally, do I have the three
22   witnesses agreement that, if you disagree with what
23   one witness is stating, you will make your
24   disagreements known and object on the record?
25   MARK MINTZ:
```

```
 1        I'm not sure it's an objection, Ms. George, but
 2   we understand.
 3   AMANDA GEORGE:
 4        Well, a clarification.  I mean, we are not in a
 5   deposition.  We are not in court.  But you will
 6   clarify what your position is if it is different
 7   from one of your co-witnesses.  Is that fair?
 8   KATHLEEN ZUNIGA:
 9        Yes.
10   FATHER PATRICK CARR:
11        Yes.
12   JEFFREY ENTWISLE:
13        Yes.
14   AMANDA GEORGE:
15        Thank you.
16   JAMES STANG:
17        And Ms. George, the other thing I would like,
18   Father Carr affirmed the statement that Mr. Mintz
19   made at the beginning of this, but the other two
20   witnesses did not.  I would like to know if
21   Mr. Entwisle and Ms. Zuniga would affirm what
22   Mr. Mintz said in his opening comments.
23   KATHLEEN ZUNIGA:
24        I affirm what Mr. Mintz said in his opening
25   comments.
```

1  AMANDA GEORGE:

2       And that is Ms. Zuniga; correct.

3  KATHLEEN ZUNIGA:

4       Yes.

5  JEFFREY ENTWISLE:

6       And this is Mr. Entwisle.  I affirm also.

7  JAMES STANG:

8       And we are going to ask anyone who is on the

9  phone to please be on mute.  I will save Ms. George

10  that statement.

11  AMANDA GEORGE:

12       Thank you.

13  JAMES STANG:

14       Father Carr, my name is Jim Stang.  I am the

15  attorney -- I am one of the attorneys for the

16  official creditors committee, and Gavin Boldissar,

17  who also represents the committee, is on the line as

18  well.  But I will be taking the lead today and

19  asking questions.  So I guess, good morning.

20       Father Carr, are you in the same room with

21  Ms. Zuniga and Mr. Entwisle?

22  FATHER PATRICK CARR:

23       Yes.

24  JAMES STANG:

25       And is Mr. Mintz with you as well?

```
 1   FATHER PATRICK CARR:

 2        Yes.

 3   JAMES STANG:

 4        And is there anyone else in the room with you?

 5   FATHER PATRICK CARR:

 6        Yes.

 7   JAMES STANG:

 8        Who else is in the room with you?

 9   FATHER PATRICK CARR:

10        We have Susan Zeringue.

11   JAMES STANG:

12        Who is she?

13   FATHER PATRICK CARR:

14        She is the in-house counsel for the

15   Archdiocese.

16   JAMES STANG:

17        All right.  Is there anyone else besides her?

18   FATHER PATRICK CARR:

19        Yes.  There is Todd Gennardo.

20   JAMES STANG:

21        And who is Mr. Gennardo in relation to this

22   case?

23   FATHER PATRICK CARR:

24        He is our outside counsel.

25   JAMES STANG:
```

 1        And what firm is he employed by?

 2   FATHER PATRICK CARR:

 3        Denechaud.

 4   JAMES STANG:

 5        And what is their role in the representation of

 6   the Archdiocese?  What do they do for the

 7   Archdiocese?  Do you know, Father Carr?

 8   FATHER PATRICK CARR:

 9        Outside legal counsel.

10   JAMES STANG:

11        And I understand that.  But what kind of advice

12   do they provide to you?  Are they defense counsel in

13   personal injury matters?  Are they corporate

14   counsel?  What generally is their --

15   FATHER PATRICK CARR:

16        I do not know.  I do not know.

17   JAMES STANG:

18        And just so you understand, when I hear I don't

19   know, I am assuming the other two witnesses don't

20   know either.  That's part of that ground rule.

21   KATHLEEN ZUNIGA:

22        Mr. Stang, this is Ms. Zuniga.  Denechaud and

23   Denechaud has assisted the Archdiocese in various

24   matters with respect -- legal matters throughout the

25   years, is my understanding, and primarily more as

1  corporate counsel.

2  JAMES STANG:

3       Thank you.  Anyone else in the room besides the

4  additional folks, Father Carr, that you have

5  identified?

6  FATHER PATRICK CARR:

7       Yes.  There is Lee Eagan.

8  JAMES STANG:

9       Okay.  I don't know if Lee Eagan is a man or a

10  woman, but what is that person's relationship to the

11  Archdiocese?

12  FATHER PATRICK CARR:

13       Well, I can say, he is a man.  And he is on

14  the -- he heads the special committee for the

15  Archdiocese.

16  JAMES STANG:

17       And what is the function of that special

18  committee?

19             (Background music playing.)

20  FATHER PATRICK CARR:

21       It's to look at various finances for the

22  Archdiocese.

23  AMANDA GEORGE:

24       I'm sorry, Mr. Stang.  It appears we have been

25  put on hold again.  I had to ask everyone this, but

```
 1   can we hang up and call back and proceed with the
 2   questioning?
 3   JAMES STANG:
 4        It's heavenly music.  It's very appropriate.
 5   AMANDA GEORGE:
 6        Maybe it's a sign.  Okay.  So let's all hang up
 7   and call back in.  And I appreciate your patience
 8   and accommodation.
 9             (Short break in proceedings.)
10   AMANDA GEORGE:
11        Hello, everyone.  This is Amanda George from
12   the US Trustee's office.  Do we have the debtor
13   present?  It looks like they are dialing in.  While
14   they dial in, may I remind everyone to please place
15   your phones on mute.  Do not place your phones on
16   hold.  It interrupts our recording as your hold
17   music, while lovely, makes it impossible for us to
18   continue with our meeting today.
19        Do we have the debtor connected?  Mr. Stang,
20   are you connected?
21   JAMES STANG:
22        I am, Ms. George.
23   AMANDA GEORGE:
24        Thank you.  And thank you all for your
25   patience.
```

```
 1    GERALD MEUNIER:

 2         Ms. George, can you hear me?

 3    AMANDA GEORGE:

 4         Yes.

 5    GERALD MEUNIER:

 6         This is Jerry Meunier.  I am representing one

 7    of the abuse victims who is a member of the

 8    creditors committee.  I sent an an e-mail, and I am

 9    not sure I am in the queue for questioning.  I

10    thought we would all be asking questions before

11    Mr. Stang.

12    AMANDA GEORGE:

13         I'm sorry.  I did not have your name on the

14    list, Mr. Meunier.  And I apologize for that.

15    JAMES STANG:

16         Ms. George, I would be happy to yield to

17    Mr. Meunier so he can ask his questions.

18    AMANDA GEORGE:

19         Okay.  And I think we are still --

20    GERALD MEUNIER:

21         I just have a few.

22    AMANDA GEORGE:

23         I don't know if we have -- do we have the

24    debtor on the line yet?  All right.  It looks like

25    they haven't connected yet.  Mr. Meunier, I
```

 1   apologize.  But we will let you go as soon as the

 2   debtor is connected.

 3   GERALD MEUNIER:

 4        Thank you.

 5   MARK MINTZ:

 6        I apologize.  We are back.  The debtor is back.

 7   AMANDA GEORGE:

 8        Great.  So Mr. Meunier, who represents a

 9   survivor, got passed over, so Mr. Stang has very

10   generously allowed him to hop in and ask his few

11   questions before we jump back to Mr. Stang.

12        So Mr. Meunier, can you state your full name

13   and then proceed?

14   GERALD MEUNIER:

15        Yes.  This is Gerald Meunier with the law firm

16   of Gainsburgh Benjamin, and I represent Pat Moody, a

17   clergy abuse survivor who is a member of the

18   unsecured creditors committee.

19   AMANDA GEORGE:

20        All right.  You can proceed.

21   GERALD MEUNIER:

22        Yeah, I just have a few questions, really

23   dealing with clarification on the reference to

24   allowed claims.

25        First, in the bankruptcy petition, section 14,

 1  there is an estimated number of creditors checked by

 2  the Archdiocese.  Is that estimated number of

 3  between 10,000 and 25,000 creditors based on the

 4  number of creditors expected to have allowed claims

 5  in the bankruptcy?

 6  FATHER PATRICK CARR:

 7       I just, I don't know that answer.

 8  AMANDA GEORGE:

 9       And who is speaking, please?

10  GERALD MEUNIER:

11       I'm sorry, who was responding?

12  FATHER PATRICK CARR:

13       This is Father Carr.

14  GERALD MEUNIER:  And is it true that all of the

15  other witnesses today would likewise respond that

16  they do not know the answer to my question?

17  KATHLEEN ZUNIGA:

18       And not readily, no.

19  JEFFREY ENTWISLE:

20       That is correct.

21  GERALD MEUNIER:

22       Father Carr, when you signed the petition then,

23  you did not know the basis for that estimate between

24  10,000 and 25,000 creditors.

25  MARK MINTZ:

1    That is not what he testified to.  This is

2  Mr. Mintz.

3  GERALD MEUNIER:

4    Well, I am just asking for clarification.  Did

5  you not know the basis for the estimate at the time

6  you signed the petition?

7  FATHER PATRICK CARR:

8    Did not.

9  GERALD MEUNIER:

10    Likewise, in section 16 of the petition that

11  you signed, Father Carr, you estimate liabilities

12  between 100- and 500,000,000.  Did that estimate

13  have, as a basis, the number of creditors expected

14  to have allowed claims?

15  FATHER PATRICK CARR:

16    Yes.

17  GERALD MEUNIER:

18    In connection with the commitment of the

19  Archdiocese debtor to pay 100 percent of allowed

20  claims of sex abuse survivors and that term, allowed

21  claims, as defined in the bankruptcy code, does the

22  Archdiocese intend to reserve its statute of

23  limitation defenses in those cases?

24  FATHER PATRICK CARR:

25    I don't know.  I don't know that answer.

 1  GERALD MEUNIER:

 2       Is that Father Carr saying I don't know?

 3  FATHER PATRICK CARR:

 4       Yes.  Yes, it is.

 5  MARK MINTZ:

 6       Yes.

 7  GERALD MEUNIER:

 8       And do the other witnesses join in the response

 9  of, I don't know the answer to that question?

10  KATHLEEN ZUNIGA:

11       Correct.  I do not know.  This is Ms. Zuniga.

12  JEFFREY ENTWISLE:

13       This is Jeff Entwisle.  Yes, I agree with that.

14  GERALD MEUNIER:

15       Final question:  In the plan for

16  reorganization, will the Archdiocese recognized the

17  medical and scientific authority validating the

18  phenomenon of repressed memory, specifically in

19  cases where a minor has been subjected to sexual

20  abuse?

21  FATHER PATRICK CARR:

22       I don't know.

23  GERALD MEUNIER:

24       I'm sorry.  Is that Father Carr saying I don't

25  know?

```
 1   FATHER PATRICK CARR:

 2        Yes.   Father Carr.

 3   GERALD MEUNIER:

 4        And the other witnesses also say I don't know

 5   to that question?

 6   KATHLEEN ZUNIGA:

 7        Yes.

 8   JEFFREY ENTWISLE:

 9        That's correct.

10   GERALD MEUNIER:

11        Is there some point in these proceedings when,

12   Father Carr, you expect to know the answer to these

13   questions?

14   FATHER PATRICK CARR:

15        I don't know.

16   GERALD MEUNIER:

17        Thank you, Ms. George.   That's all I have.

18   AMANDA GEORGE:

19        All right.   Thank you, Mr. Meunier.   We

20   appreciate your participation.   And now we will give

21   the floor back to Mr. Stang on behalf of the

22   unsecured creditor committee.

23   JAMES STANG:

24        Thank you, Ms. George.   Father Carr, I think we

25   left off with you telling me that Lee Eagan was in
```

1  the room with you and the other witnesses and

2  Mr. Mintz.  What is Mr. Eagan's relationship to the

3  Archdiocese?

4  FATHER PATRICK CARR:

5      He is the chairperson of the special committee

6  on finances.

7  JAMES STANG:

8      Is that his only relationship to the

9  Archdiocese?

10 FATHER PATRICK CARR:

11     He is also on the finance committee.

12 JAMES STANG:

13     And those are his two capacities; is that

14 correct?

15 FATHER PATRICK CARR:

16     That is correct.

17 JAMES STANG:

18     Is Mr. Eagan a director of the captive

19 insurance company of the Archdiocese?

20 FATHER PATRICK CARR:

21     Yes.

22 JAMES STANG:

23     Do you think that that is a relationship that

24 he has with the Archdiocese?

25 FATHER PATRICK CARR:

1        Could you repeat that question again?

2   JAMES STANG:

3        Well, I asked you what his relationships were

4   with the Archdiocese.  You gave me two instances.

5   You have now indicated you knew he was also the

6   director of the indemnity company.  And my question

7   is:  Do you think that that role, being a director

8   of the indemnity corporation, which I understand is

9   wholly owned by the Archdiocese, is a relationship

10  that he has with the Archdiocese?

11  FATHER PATRICK CARR:

12       The captive is not a debtor entity.

13  JAMES STANG:

14       I understand that.  That's not what I asked

15  you.  I asked you if he had a relationship with the

16  Archdiocese.  You gave me two instances.  You did

17  not tell me he was a director of the indemnity

18  company.  I'm asking you if you consider that a

19  relationship with the Archdiocese.

20  FATHER PATRICK CARR:

21       It's -- I -- it's not a debtor entity, so I --

22  that's my answer.

23  JAMES STANG:

24       Okay.  In my understanding, you said no, you

25  don't think that's a relationship with the

 1   Archdiocese.  Is there anyone else in the room with

 2   you besides the people you have identified?

 3   FATHER PATRICK CARR:

 4        There is one more.  Wayne Zeringue.

 5   JAMES STANG:

 6        And what is Mr. Zeringue's relationship to the

 7   Archdiocese?

 8   FATHER PATRICK CARR:

 9        He is an attorney for Jones Walker.

10   JAMES STANG:

11        Got it.  Father Carr, have you or any of the

12   witnesses at today's meeting received any written

13   notes from anyone in the room who is not a lawyer?

14   FATHER PATRICK CARR:

15        No.

16   JAMES STANG:

17        Okay.  If you do receive any written notes from

18   anyone in the room who is not a lawyer on behalf of,

19   an Archdiocese lawyer, I would ask that you maintain

20   those notes as a document of the Archdiocese.

21        So Father Carr, your declaration -- I'm sorry.

22   It anyone disagrees with that request, I guess I

23   would like to know that.

24        Okay.  Father Carr, your declaration didn't

25   tell us much about your background.  Can you tell me

1    what your post high school education is?

2    FATHER PATRICK CARR:

3         Yes.  I went to -- I graduated with a bachelor

4    in accounting.

5    JAMES STANG:

6         From what school?

7    FATHER PATRICK CARR:

8         LSU.  Louisiana State University.

9    JAMES STANG:

10        Do you have any professional certificates or

11   licenses outside of those you may have as a priest?

12   FATHER PATRICK CARR:

13        I do.

14   JAMES STANG:

15        What are those?

16   FATHER PATRICK CARR:

17        I am a CPA.  A certified public accountant.

18   JAMES STANG:

19        Okay.  Was there someone who occupied the role

20   of vicar of finance before you were appointed to

21   that position?

22   FATHER PATRICK CARR:

23        No.

24   JAMES STANG:

25        And why did the Archdiocese create that

1  position back in July when I understand you took on

2  that office?

3  FATHER PATRICK CARR:

4      They just, the Archbishop felt like they needed

5  someone to oversee the finances as a whole.

6  JAMES STANG:

7      And how does your responsibility differ from

8  Mr. Entwisle's?

9  FATHER PATRICK CARR:

10     He is more day-to-day, and I am more of just an

11 overall picture, looking at it.

12 JAMES STANG:

13     So given your experience, given your education

14 and your CPA license, can you give me an analogous

15 position in the corporate world to the function you

16 serve in the Archdiocese as vicar of finance?

17 FATHER PATRICK CARR:

18     No.  Not really.

19 AMANDA GEORGE:

20     Mr. Stang, I hate to interrupt, but can

21 everyone mute their phones please?  We can hear some

22 typing in the background.  Thank you.

23 JAMES STANG:

24     Father Carr, what parish are you associated

25 with?

 1  FATHER PATRICK CARR:

 2       St. Peter Parish in Covington, Louisiana.

 3  JAMES STANG:

 4       And do you have an office in the chancery

 5  building?

 6  FATHER PATRICK CARR:

 7       I do.

 8  JAMES STANG:

 9       And do you have an office at the parish?

10  FATHER PATRICK CARR:

11       I do.

12  JAMES STANG:

13       Okay.  Father Carr, who asked you to be the

14  authorized officer as defined in the corporate

15  resolution that is attached to the bankruptcy

16  petition?

17  FATHER PATRICK CARR:

18       The Archbishop.

19  JAMES STANG:

20       And why did he ask you to have that role as

21  opposed to, say, Mr. Entwisle?

22  FATHER PATRICK CARR:

23       I don't know.

24  JAMES STANG:

25       Did you ask him why he was asking you to serve

1    in that capacity?

2    FATHER PATRICK CARR:

3         I never asked him why.

4    JAMES STANG:

5         Okay.  Father Carr, who approves archdiocesan

6    settlements with -- who at the Archdiocese approves

7    archdiocesan settlements with sexual abuse

8    survivors.

9    FATHER PATRICK CARR:

10        I don't know that.

11   JAMES STANG:

12        Again, I am assuming that none of the witnesses

13   know when Father Carr says he doesn't know.  And so

14   I just, I thought that was an important question,

15   and an important answer, and so I just wanted to

16   reiterate my understanding of how we are proceeding

17   today.

18   KATHLEEN ZUNIGA:

19        I don't know --

20   JAMES STANG:

21        Father Carr, do you -- I'm sorry.

22   KATHLEEN ZUNIGA:

23        Just, I don't know.  This is Ms. Zuniga.

24   JEFFREY ENTWISLE:

25        This is Mr. Entwisle.  Typically, that would

 1  run through legal.

 2  JAMES STANG:

 3      Well, I asked about who at the Archdiocese

 4  approves the settlement.  So what is it -- who is,

 5  quote, at legal, who is an employee of the

 6  Archdiocese?

 7  JEFFREY ENTWISLE:

 8      As we stated earlier, Susie Zeringue.

 9  AMANDA GEORGE:

10      And who is speaking?

11  JEFFREY ENTWISLE:

12      This is Jeff Entwisle.

13  AMANDA GEORGE:

14      Thank you.

15  JAMES STANG:

16      I'm sorry, Mr. Entwisle.  Remind me who she is?

17  JEFFREY ENTWISLE:

18      I'm sorry?

19  JAMES STANG:

20      Remind me who that person is.

21  JEFFREY ENTWISLE:

22      She is our in-house legal counsel.

23  JAMES STANG:

24      Got it.  Does the archdiocesan finance

25  committee consult with her regarding the

1   settlements?

2   JEFFREY ENTWISLE:

3        This is Jeff Entwisle.  They do not.

4   JAMES STANG:

5        Does the bishop consult with her regarding the

6   settlements?

7   JEFFREY ENTWISLE:

8        I don't know the answer to that.

9   JAMES STANG:

10       Does anyone who is a layperson -- does any

11  nonattorney at the Archdiocese consult with her

12  regarding sex abuse settlements?

13  JEFFREY ENTWISLE:

14       Again, I do not know the answer to that.

15  JAMES STANG:

16       Okay.  Father Carr, are you aware that the

17  committee asked Bishop Aymond to be at the meeting

18  today?

19  FATHER PATRICK CARR:

20       I was -- I am not aware.

21  JAMES STANG:

22       Anyone else was the witness aware that we --

23  that the committee asked Bishop Aymond to appear?

24  KATHLEEN ZUNIGA:

25       This is Ms. Zuniga.  I was aware that he was

```
 1   asked to appear.

 2   JEFFREY ENTWISLE:

 3        And this is Jeff Entwisle.  I was not aware.

 4   JAMES STANG:  Okay.  Ms. Zuniga, or any of you, do

 5   you know where Bishop Aymond is this morning?

 6   KATHLEEN ZUNIGA:

 7        I do not know.

 8   JEFFREY ENTWISLE:

 9        This is Mr. Entwisle.  I do not know either.

10   JAMES STANG:

11        Father Carr, do you know if Bishop Aymond

12   reviewed the schedules of assets and liabilities

13   before they were filed in the bankruptcy court?

14   FATHER PATRICK CARR:

15        I do not know.

16   JAMES STANG:

17        And do you know if he reviewed the statement of

18   financial affairs before they were filed with the

19   bankruptcy court?

20   FATHER PATRICK CARR:

21        I do not know.

22   JAMES STANG:

23        Father Carr, I heard Ms. George's statements

24   about the impact of the global notes and that the US

25   Trustees did not consider them part of the schedules
```

1   and part of the statement of financial affairs.  Is

2   it the debtor's intention to amend either of those

3   documents on the basis of her statement that the

4   global notes are not applicable?

5   FATHER PATRICK CARR:

6        No.

7   JAMES STANG:

8        Okay.  So when there was testimony that fully

9   depreciated -- the global notes say, for example,

10  fully depreciated assets are not scheduled.  The

11  schedules require that the Archdiocese disclose all

12  of its assets.  Is the Archdiocese intending to

13  amend the schedules to add these fully depreciated

14  assets?

15  FATHER PATRICK CARR:

16       If you would like us to, Mr. Stang, we

17  certainly can.

18  JAMES STANG:

19       Well, no.  I'm asking you what you intend to

20  do.  I'm not asking you what I would like you to do.

21  I know what I would like you to do.

22  MARK MINTZ:

23       It is not our intention to do so, Mr. Stang.

24  That's Mr. Mintz.

25  JAMES STANG:

 1          And by the way, because we don't have the

 2    opportunity to see any of you folks, and I'm

 3    starting to hear the distinction in your voices; but

 4    Mr. Mintz, if you could at least identify yourself

 5    so that anyone who transcribes this tape understands

 6    when you are speaking, since you are not sworn in, I

 7    would appreciate that.

 8          So Father Carr, is the Archdiocese insolvent?

 9    FATHER PATRICK CARR:

10          No, it is not insolvent.

11    JAMES STANG:

12          Why did it file bankruptcy if it was not

13    insolvent?

14    FATHER PATRICK CARR:

15          Our intent was to pay 100 percent of all

16    allowed claims.  That's right.

17    JAMES STANG:

18          Do you need to be in bankruptcy to pay

19    100 percent of -- well, actually, I would like to

20    hold that question for a moment.  That term, allowed

21    claims, has been used repeatedly.  You have affirmed

22    the statement right Mr. Mintz that he made at the

23    beginning.  You have used it in response to other

24    questions, and you just used it in response to my

25    question.  What is your understanding of an allowed

1   claim?

2   FATHER PATRICK CARR:

3       It is a claim allowed by the courts, according

4   to the bankruptcy code.

5   JAMES STANG:

6       Okay.  Well, you answered my question by --

7   you're asking for a definition by using the same

8   term.

9       What is an allowed -- what is your

10  understanding of an allowed claim?

11  FATHER PATRICK CARR:

12      Mr. Stang, that is my answer right there.

13  That's my understanding.

14  JAMES STANG:  Okay.  What are the terms -- what are

15  the considerations of the bankruptcy court in

16  determining whether a claim is allowed?

17  KATHLEEN ZUNIGA:

18      Mr. Stang, this is Ms. Zuniga.  I would like to

19  respond to that.

20  JAMES STANG:

21      Sure.

22  KATHLEEN ZUNIGA:

23      You know, there are accountants and there are

24  lawyers, and there is a very fine line when you are

25  an accountant, especially a CPA, with practicing

 1   law.  We do not practice law, and that is why we

 2   have attorneys present to help us and advise us and

 3   work with the bankruptcy court to help determine and

 4   define the bankruptcy code and what is an allowed

 5   claim.

 6   JAMES STANG:

 7        Thank you.  Father Carr, do you know what

 8   considerations the Court takes -- what the Court

 9   considers in determining whether or not a claim is

10   allowed?

11   FATHER PATRICK CARR:

12        I do not know.

13   JAMES STANG:

14        Okay.  Are you aware that the court can

15   consider prescription in determining whether or not

16   a claim is allowed?

17   FATHER PATRICK CARR:

18        I am not aware.

19   JAMES STANG:

20        Okay.  Who at the Archdiocese will make the

21   decision as to whether or not prescription will be

22   raised as a defense to the sexual abuse claims?

23   FATHER PATRICK CARR:

24        I don't know that answer.

25   JAMES STANG:

1        Okay.  Who at the Archdiocese, other than

2   counsel, makes the decision regarding defending

3   pending sexual abuse litigation?

4   FATHER PATRICK CARR:

5        I don't know.  I don't know that answer.

6   JAMES STANG:

7        So none of the witnesses today know who at the

8   Archdiocese makes the decision regarding legal

9   defenses to filed claims outside of counsel.  Is

10  that -- I just want to make sure I understand that,

11  no one knows who does that?

12  FATHER PATRICK CARR:

13       That's correct.

14  JAMES STANG:

15       So Father Carr, the Archdiocese is solvent

16  insofar as allowed claims are concerned.  What does

17  the Bankruptcy Court -- what does the bankruptcy

18  process do about --

19  FATHER PATRICK CARR:

20       This is --

21  JAMES STANG:

22       Well, I'm sorry.  Let me change the question,

23  please.

24       If the Archdiocese was not in bankruptcy, would

25  it be solvent?

1   FATHER PATRICK CARR:

2       Yes.

3   JAMES STANG:

4       So it is solvent outside of the bankruptcy

5   process and it is solvent given the possible outcome

6   of the bankruptcy process?

7   FATHER PATRICK CARR:

8       Yes.

9   JAMES STANG:

10       And I know I asked you this question before,

11   but we've had a few questions in between and I just

12   want to ask you one time again:  Why did the

13   Archdiocese file bankruptcy if it was solvent

14   without the bankruptcy process?

15   FATHER PATRICK CARR:

16       Like I said once before, to pay 100 percent of

17   our allowed claims.

18   JAMES STANG:

19       Why couldn't you pay 100 percent of the

20   claims --

21   FATHER PATRICK CARR:

22       Mr. Stang, I'm not an attorney.  I can't answer

23   that.

24   JAMES STANG:

25       I'm not asking you a legal question.  I'm

 1   asking you why -- I don't think I am.  I'm asking

 2   you why the Archdiocese could not pay its

 3   liabilities without the bankruptcy process.

 4   FATHER PATRICK CARR:

 5        Again, Mr. Stang, I don't know that answer.

 6   JAMES STANG:

 7        All right.  Thank you.  In the global notes --

 8   no, I'm just going to follow up on a couple of the

 9   questions people asked.

10        What is the relationship with Christopher Homes

11   to the Archdiocese?

12   FATHER PATRICK CARR:

13        Christopher Homes is an independent agency.

14   They are separately incorporated.

15   JAMES STANG:

16        And is there anyone -- so is there a

17   relationship between Christopher Homes and the

18   Archdiocese at all?

19   FATHER PATRICK CARR:

20        Define the Archdiocese.

21   JAMES STANG:

22        Well, I heard before that the Archdiocese is a

23   Louisiana corporation, so let's start with that one.

24   FATHER PATRICK CARR:

25        There's two separately independent

1   corporations.

2   JAMES STANG:

3       Okay.  Are there any overlapping officers?

4   FATHER PATRICK CARR:

5       Yes.

6   JAMES STANG:

7       Okay.  Who are they?

8   FATHER PATRICK CARR:

9       I don't know.

10  JAMES STANG:

11      Is the Archbishop one of them?

12  FATHER PATRICK CARR:

13      I don't know that answer.

14  JAMES STANG:

15      And I assume none of the witnesses in the room

16  are overlapping officers of Christopher Homes?  Is

17  that correct?

18  MARK MINTZ:

19      That is correct.

20  JAMES STANG:

21      Are there any overlapping directors between

22  Christopher Homes and the Archdiocese?

23  JEFFREY ENTWISLE:

24      Yes.  I am.  This is Jeff Entwisle.

25  JAMES STANG:

```
 1        Okay.  And Mr. Entwisle, what is the mission or

 2   the business of Christopher Homes?

 3   JEFFREY ENTWISLE:

 4        Affordable housing for the elderly.

 5   JAMES STANG:

 6        Is the Archdiocese responsible for any of the

 7   debts or liabilities of Christopher Homes?

 8   JEFFREY ENTWISLE:

 9        No.  The Archdiocese is not.

10   JAMES STANG:

11        So if Christopher Homes property -- does the

12   Christopher Homes property have any secured debt

13   against its assets?

14   JEFFREY ENTWISLE:

15        Yes.  It's had loans against the assets.

16   JAMES STANG:

17        Okay.  And if Christopher Holmes' assets were

18   sold for a value in excess of the claims against it,

19   what happens to that proceeds of sale?

20   MARK MINTZ:

21        Mr. Stang, can I ask the question -- this is

22   Mr. Mintz -- as to why we are talking about a

23   non-debtor entity at this point, especially about

24   how it would use its assets?

25   JAMES STANG:
```

1        Sure.  I would be happy to.  Someone before

2    asked if there was any interest or if the

3    Archdiocese had responded to any offers for the sale

4    of Christopher Homes, and I'm trying to understand

5    the relationship between Christopher Homes and the

6    Archdiocese.

7    MARK MINTZ:

8        And I think we have given you that.  So --

9    JAMES STANG:

10        I know.  That's why I'm asking.

11    MARK MINTZ:

12        I guess my concern is, if we have not given you

13    what that relationship is, if we really need to go

14    into how all of its finances work and how it

15    received different pieces -- or how it would deal

16    with monies that it may or may not receive.

17    JAMES STANG:

18        Well, frankly, I had found that some of my

19    questions seemed to elicit responses.  For example,

20    the role of the Mr. Eagan was not included in the

21    initial answers to the relationship, and it turns

22    out that he is the director of the captive insurance

23    company.  So I am asking these questions to see if I

24    can prod any memories of the witnesses if it doesn't

25    occur to them in response to my initial question.

1    That's why I am asking.

2          But let's move on to the schedules themselves.

3    I just want to make sure -- okay.  Sorry.  I just

4    wanted to check to see if there was anything.

5          Father Carr, do you have any training in the

6    area of -- I'm sorry.  Do you have any specialized

7    training in consulting with sexual abuse survivors.

8    FATHER PATRICK CARR:

9          I do not.

10   JAMES STANG:

11         All right.  I would like to turn to the global

12   notes for a moment.  Paragraph three refers to the

13   net book value of assets.  Can you tell me -- and it

14   makes a distinction between net book values and fair

15   market values.  Can you tell me what definition you

16   use for net book value?  And when I say you, I meant

17   the Archdiocese.

18   KATHLEEN ZUNIGA:

19         So net book value is the recorded value that is

20   on the books of the debtor.

21   JAMES STANG:

22         And is that recorded value based on the value

23   at the time that the Archdiocese acquired an

24   interest in the property?

25   KATHLEEN ZUNIGA:

1      That would be based on the value at the time.

2  Exactly.

3  JAMES STANG:

4      So just a hypothetical:  If the Archdiocese

5  received a piece of property in 1962 and in 1962 it

6  was worth $100,000, assuming it still owns that

7  property, is that property still reflected as net

8  book value of $100,000?

9  KATHLEEN ZUNIGA:

10      That is correct.  That is what gap would

11  require.

12  JAMES STANG:

13      Okay.  Mr. Mintz made a comment at the

14  beginning that lots of resources were used to do the

15  schedules, and each of you has said that you agree

16  with that statement.  When I look at the schedule of

17  real estate owned by the Archdiocese, perhaps there

18  are one or two exceptions, but substantially all of

19  them say that the value is undetermined.

20      Father Carr, would you please tell me what

21  resources the Archdiocese used, if any, to determine

22  the value of any of the property that is scheduled

23  in that matter?

24  FATHER PATRICK CARR:

25      I would like to defer to Kathleen Zuniga.

1    KATHLEEN ZUNIGA:

2         So the book value to us, as we started

3    preparing these schedules, really didn't have a lot

4    of meaning, given a lot of these properties date

5    back to the late 19th, early 20th century.  And so,

6    the Archdiocese has actually engaged both an

7    appraisal company and an abstract company to value

8    the company and to ensure -- you know, there are

9    no -- because there are no property tax bills, the

10   Archdiocese isn't subject to paying ad valorem tax,

11   there are no current assessed values of all of these

12   properties.  And so we don't have those.  Due to

13   Covid-19 and, you know, the six weeks that we had to

14   put these schedules together, we were not able to,

15   just due to the limited operations of the Court and

16   the various resources available that would be

17   required to pull fair value or get an updated value

18   of these properties, we did not -- we were not able

19   to put that value yet.  But we intend to update and

20   obtain more current real estate fair values for

21   these properties.

22   JAMES STANG:

23        What court resources are necessary for the

24   Archdiocese to determine the fair market value of

25   these properties?

1  KATHLEEN ZUNIGA:

2      And appraisal company and an abstract company

3  is my ...

4  JAMES STANG:

5      No.  But prior to the bankruptcy.

6  KATHLEEN ZUNIGA:

7      There was no need to determine fair value

8  prior.  We don't pay ad valorem -- or, the

9  Archdiocese doesn't pay property tax.

10  JAMES STANG:

11      Got it.  I understand.  Thank you.  I'm not

12  familiar with the term abstract company.  Is that a

13  title company?

14  KATHLEEN ZUNIGA:

15      Yes.

16  JAMES STANG:

17      Okay.  And what function would a title company

18  have in determining the fair market value of a piece

19  of property?

20  KATHLEEN ZUNIGA:

21      It was the intention to confirm that the

22  administrative offices held title, and confirmed

23  legally these properties.

24  JAMES STANG:

25      What is the distinction between the Archdiocese

1   as a Louisiana nonprofit corporation in the

2   Archdiocese administrative offices?

3   KATHLEEN ZUNIGA:

4        I don't know the answer to that question.

5   JAMES STANG:

6        Okay.  And I apologize if it is on the docket.

7   I don't -- I don't remember seeing it.  Has the

8   Archdiocese filed a motion with the bankruptcy court

9   to approve the employment of an appraiser?

10  MARK MINTZ:

11       This is Mark Mintz.  It has not filed that yet.

12  JAMES STANG:

13       Thank you.  Father Carr, who at the Archdiocese

14  is responsible for the employment of an appraiser?

15  FATHER PATRICK CARR:

16       I don't know that answer.

17  JAMES STANG:

18       Okay.  Paragraph 7 of the notes referred to the

19  definition of insider.  And in that definition, at

20  subsection C, it includes equity holders in excess

21  of 5 percent of the voting securities of the debtor.

22       Father Carr, does the Archdiocese, are there

23  any voting securities of the debtor?

24  FATHER PATRICK CARR:

25       I don't know the answer.

1   JAMES STANG:

2       Are there any shareholders of the debtor?

3   JEFFREY ENTWISLE:

4       This is Jeff Entwisle.  No, there are not.

5   JAMES STANG:

6       Okay.  So I'm going to take that that

7   definition was part of the boilerplate that

8   Mr. Mintz alluded to previously that some of these

9   global notes may incorporate.

10      Paragraph 10 of the global notes says that the

11  schedules and statements are without reference to

12  any materialmen's or mechanic's liens.  Father Carr,

13  walked to the schedules and statements not include

14  those kinds of liens?

15  MARK MINTZ:

16      If I may answer the question, Mr. Stang, and

17  then you can confirm the answer.  Essentially, to

18  the extent that they existed without us knowing, we

19  wouldn't know that.  So that would be why.  There is

20  possibility that there were possessory liens that we

21  don't know about or didn't realize existed, and we

22  just wanted to be clear about it.

23  JAMES STANG:

24      So Father Carr, the note says without

25  consideration of any of materialmen's liens.  It

 1   doesn't say of any known materialmen's liens.  Were

 2   there any known materialmen's liens or mechanic's

 3   liens that were not included in the schedules or

 4   statements?

 5   FATHER PATRICK CARR:

 6        I can't answer that question.

 7   KATHLEEN ZUNIGA:

 8        Not to my knowledge.

 9   JEFFREY ENTWISLE:

10        Not to my knowledge.

11   JAMES STANG:

12        To save the rest of you, whenever Father Carr

13   says he doesn't know or not to his knowledge, I am

14   going to assume that that covers both of you, so you

15   don't necessarily have to say that.  But I do

16   appreciate the fact that you said that.

17        All right.  Under paragraph 17, there is the

18   definition of intercompany.  And my question

19   there -- and it refers to obligations between the

20   debtor and any affiliate of the debtor.  Are the

21   parishes considered, for purposes of the schedules

22   and statement of financial affairs, are the parishes

23   considered an affiliate?

24   KATHLEEN ZUNIGA:

25        The parishes are considered an affiliate.  But

1   I think the intention of this intercompany was

2   referring to the debtor entities.  The entities that

3   are considered the debtor entities.

4   JAMES STANG:

5        Well, it actually says by the debtor -- between

6   the debtor or any affiliate of the debtor.  So is

7   this global note incorrect or is the schedule

8   incorrect?

9   KATHLEEN ZUNIGA:

10       Let me read it one more time.

11  JAMES STANG:

12       Sure.  Of course.

13  KATHLEEN ZUNIGA:

14       I do not believe the note is incorrect.

15  JAMES STANG:

16       Okay.  Well, I guess that's okay.  Because

17  apparently they don't count.  Let's see.

18       Further in the note, there are specific

19  disclosures regarding individual items in the

20  schedules.  And in response to schedule AB11, it

21  says, Accounts receivable do not include

22  intercompany receivables.

23       What other companies are -- can you identify

24  those other companies that are not reflected?

25  KATHLEEN ZUNIGA:

1      So accounts receivable do include -- so I'm

2 going to clarify it. I believe that that statement

3 is incorrect. And we went back and forth on this in

4 preparing the schedules. In the spirit of

5 transparency, we tried to mark each of the

6 schedules. For example, receivables between the

7 debtor entities and receivables between affiliates

8 or disclosed, but they were marked as such.

9 JAMES STANG:

10      Okay. Again, the notes of schedule AB55 says

11 that the debtor did limited searches of the public

12 conveyance records. Could you describe for me,

13 Father Carr, what those limited searches consisted

14 of?

15 FATHER PATRICK CARR:

16      I will defer to Kathleen. Ms. Zuniga.

17 KATHLEEN ZUNIGA:

18      Which number was that? I'm sorry.

19 JAMES STANG:

20      It says schedule A/B55.

21 KATHLEEN ZUNIGA:

22      I believe title searches were performed, or are

23 in the process of being performed.

24 JAMES STANG:

25      Okay. And then, the note -- well, we can pass

 1 | on from that.  Okay.  So schedule G -- I'm sorry.
 2 |     There is a note for schedule G.  We are now, if
 3 | you will, on pages eight and nine of the global
 4 | notes, at least as numbered by the Court.  And it
 5 | goes from page eight onto page nine.  And on page
 6 | nine, in the first full paragraph, it says, Certain
 7 | confidentiality and nondisclosure agreements may not
 8 | be listed on schedule G.
 9 |     Father Carr, the agreements that are not
10 | listed, would those include agreements with sexual
11 | abuse survivors?
12 | KATHLEEN ZUNIGA:
13 |     Yes.  This is Kathleen Zuniga.  Yes.
14 | JAMES STANG:
15 |     Okay.  Does the debtor intend to enforce
16 | confidentiality and nondisclosure agreements against
17 | sexual abuse survivors?
18 | KATHLEEN ZUNIGA:
19 |     I don't know.
20 | JAMES STANG:
21 |     Father Carr, are you aware of the fact that the
22 | United States Conference of Catholic Bishops
23 | recommends that sexual abuse survivor settlements
24 | not include confidentiality or nondisclosure
25 | agreements --

1    FATHER PATRICK CARR:

2         I am not aware of that.

3    JAMES STANG:

4         -- advocated by a diocese?

5    FATHER PATRICK CARR:

6         I am not aware of that.

7    JAMES STANG:

8         Several dioceses around the country have said

9    that they don't intend to hold survivors to such

10   agreements, obviously thus leaving it up to the

11   survivor.  Does this Archdiocese have a policy that

12   is consistent with that position?

13   FATHER PATRICK CARR:

14        I don't know.

15   JAMES STANG:

16        Okay.  All right.

17   JAMES STANG:

18        Father Carr, are you familiar with the

19   archdiocesan policy manuals?

20   FATHER PATRICK CARR:

21        No.  I -- no, I'm not.

22   JAMES STANG:

23        Okay.  One of the sections of the archdiocesan

24   policy manual is labeled finance.  Are you familiar

25   with the provisions of that part of the manual?

1  FATHER PATRICK CARR:

2       I am not.

3  JAMES STANG:

4       Mr. Entwisle, are you?

5  JEFFREY ENTWISLE:

6       I am.

7  JAMES STANG:

8       Okay.  There is a reference in, I believe it is

9  section 17.9 of that policy manual, that long-term

10 savings of the parishes are to be invested in the

11 archdiocesan investment pool.  Are you aware of that

12 provision?

13 JEFFREY ENTWISLE:

14      I am.

15 JAMES STANG:

16      Where does the archdiocesan investment pool

17 appear in the schedules of assets and liabilities,

18 if anywhere?

19 JEFFREY ENTWISLE:

20      For the schedule, I am going to defer to

21 Ms. Zuniga.

22 JAMES STANG:

23      And Ms. Zuniga, maybe I can cut through.  If

24 the answer is it is Portfolio A or Portfolio B, that

25 would be an answer that I would understand.

1   KATHLEEN ZUNIGA:

2      Yes.  It would be Portfolio A.

3   JAMES STANG:

4      Okay.  And then the 17.9 of the finance manual

5   also says that short-term savings of the parish are

6   on deposit with the Archdiocese, or are to be

7   deposited with the Archdiocese.

8   KATHLEEN ZUNIGA:

9      Yes.

10   JAMES STANG:

11      Where do those deposits appear on the

12   schedules?

13   KATHLEEN ZUNIGA:

14      So those deposits for -- so those are accounted

15   for in the loan and deposit fund on the Archdiocese

16   books.  The depositors which -- you know, the loan

17   and deposit fund operates as an internal bank for

18   the archdiocesan entities; and the depositors, they

19   are on a schedule, and I will have to give you the

20   exact number.  But they appear as funds held for

21   affiliates.

22   JAMES STANG:

23      Yes, I saw them.  So that would be Portfolio B?

24   KATHLEEN ZUNIGA:

25      Portfolio B is a hybrid cash management fund

1   that has funds pooled with excess Archdiocese

2   operational cash as well as funds from the loan

3   deposit funds, which are invested in cash or near

4   cash equipment.  In portfolio --

5   JAMES STANG:

6       And so B -- I'm sorry.  I apologize.

7   KATHLEEN ZUNIGA:

8       No, that's okay.

9   JAMES STANG:

10      So Portfolio B is both DLS money, deposited

11  loan fund money, and archdiocesan money?

12  KATHLEEN ZUNIGA:

13      Yes.

14  JAMES STANG:

15      And Portfolio A also has some archdiocesan

16  money in it as well; is that correct.

17  KATHLEEN ZUNIGA:

18      Yes.

19  JAMES STANG:

20      Okay.  So the pool is -- I'm sorry.  Help me

21  here.

22      The pool is both DLF money -- pool D is DLF

23  money and archdiocesan money?

24  KATHLEEN ZUNIGA:

25      Yes.

1  JAMES STANG:

2       Okay.  So let's go to Portfolio A for a moment.

3  If I ask you to show me a statement generated by an

4  outside institution -- a bank, an investment manager

5  firm -- for Portfolio A, is there such a single

6  unitary document?

7  KATHLEEN ZUNIGA:

8       So the investments in Portfolio A, just to give

9  you a background, the name of the account is

10 Archdiocese of New Orleans Custody Account, and they

11 are held at Whitney.  Hancock Whitney Bank.  It is a

12 pooled investment portfolio which consists of about,

13 you know, 300, if you will, individual accounts or

14 funds that are tracked between the Archdiocese --

15 archdiocesan entities and the other entities that

16 are not debtor entities within the diocese.  There

17 are separately managed investments within this

18 portfolio among 14 asset managers.  The trustee is

19 Hancock Whitney, and the custodian.  They do not --

20 they would not do the tracking or the calculation of

21 the individual interests within this account.  That

22 is actually tracked separately in a separate

23 software.

24 JAMES STANG:

25      Okay.  So if I'm looking at a monthly statement

1   for this account, all of the investments -- all of

2   the amounts on deposit, regardless of who manages

3   the particular -- well, let me step back for a

4   moment.  I'm sorry.

5        You said there were multiple investment

6   managers.

7   KATHLEEN ZUNIGA:

8        Yes.

9   JAMES STANG:

10       Does each investment manager generate its own

11  report for the investments it's handling.

12  KATHLEEN ZUNIGA:

13       Yes.

14  JAMES STANG:

15       And is there a process by which those -- I

16  thought you said 14, so I will just use that number.

17  Is there a process by which those 14 statements are

18  consolidated into one statement.

19  KATHLEEN ZUNIGA:

20       Yes.  There is a master statement at Hancock

21  Whitney that consolidates those investments into a

22  master custody account.

23  JAMES STANG:

24       Okay.  You have described the accounts to me.

25  It is the Archdiocese of New Orleans, something like

 1   that, custody account.  Who is the account holder?

 2   KATHLEEN ZUNIGA:

 3        So the Archdiocese -- it's in the name of

 4   Archdiocese of New Orleans Custody Account.  I'm not

 5   sure what you mean by account holder.  The

 6   individual interest in the funds, obviously there

 7   are about 300 individual funds, or a little over 300

 8   funds, that are tracked within that pooled

 9   investment portfolio.

10   JAMES STANG:

11        I got it.  So if I opened a custody account, I

12   would have to put my name on it.  It would say James

13   Stang Custody Account, but I would have to sign a

14   document opening that account.  Who opened that

15   account?

16   KATHLEEN ZUNIGA:

17        I don't -- I don't know.

18   JAMES STANG:

19        Okay.  Is there -- the investment management

20   function is allocated across 14 advisors.  Are

21   discrete depositor accounts given to investment

22   manager number one and other accounts are given to

23   investment manager number two and -- (crosstalk)

24   KATHLEEN ZUNIGA:

25        No.  No.

```
 1   JAMES STANG:

 2        -- or they just pick up a bunch of money and

 3   say, Manage it?

 4   JEFFREY ENTWISLE:

 5        They do not have discrete accounts go to them.

 6   It is just an allocation of funds.  I'm sorry, and

 7   that was Jeff Entwisle.

 8   JAMES STANG:

 9        Thank you, Jeff.  Thank you, Mr. Entwisle.  I'm

10   sorry.  I didn't mean to use your first name.

11   JEFFREY ENTWISLE:

12        You can call me Jeff.

13   JAMES STANG:

14        Is there -- when an entity deposits money into

15   the custody account, is there an agreement between

16   the account owner and the depositor?  A written

17   document that evidences that relationship?

18   KATHLEEN ZUNIGA:

19        I don't know.  Jeff?

20   JEFFREY ENTWISLE:

21        And I'm not positive.  We would have to look at

22   that.

23   JAMES STANG:

24        Okay.  So if I want to make a contribution to

25   Portfolio A and I called up the Archdiocese and I
```

1  said, "I have $100,000 I would like to donate.  I

2  would like it to go into the custody account," how

3  do I do that?

4  JEFFREY ENTWISLE:

5      What typically, for something that small,

6  $100,000 --

7  JAMES STANG:

8      That's a lot of money to me.

9  JEFFREY ENTWISLE:

10      It's a lot of money to me also.  But remember,

11  that portfolio is longer-term endowment type

12  investments as opposed to the bank -- what we call

13  the bank, but the deposit and loan fund -- which is

14  more of an operational type fund.  More of an

15  operational type account, similar to a DDA account.

16      But if somebody was going to come and put some

17  funds directly into Portfolio A, that hasn't been

18  done in quite a long time, because most people who

19  are coming into that now are doing so through the

20  Catholic Community Foundation, which is a

21  participant in Portfolio A.  But they would contact

22  me and we would go through the process to do so, if

23  that were -- if it were appropriate for a given

24  case.

25  JAMES STANG:

1        Mr. Entwisle, are you an officer or director of

2   the Catholic Community Foundation?

3   JEFFREY ENTWISLE:

4        No.

5   JAMES STANG:

6        And are any of the witnesses today officers,

7   directors or employees of -- I didn't ask you,

8   Mr. Entwisle, if you're an employee.  Are you --

9   JEFFREY ENTWISLE:

10       I am not.  I am not an employee of the Catholic

11  Community Foundation, no.

12  JAMES STANG:

13       Thank you.  Or any of the witnesses officers,

14  directors, or employees of the Catholic Community

15  Foundation?

16  KATHLEEN ZUNIGA:

17       No.  This is Ms. Zuniga.

18  FATHER PATRICK CARR:

19       No.  This is Father Carr.

20  JAMES STANG:

21       All right.  So what I'm getting from today's

22  testimony is that none of you are familiar with how

23  a donor -- are not familiar with any contracts or

24  documents of money that would -- I'm sorry.  I

25  apologize.

1        My understanding is that none of you are

2    familiar with how a donor would contract with or

3    convey money directly into Portfolio A.  Is that

4    (crosstalk) --

5    KATHLEEN ZUNIGA:

6        The majority of -- yeah.

7    JAMES STANG:

8        I'm sorry.

9    KATHLEEN ZUNIGA:

10       No.  No.

11   JAMES STANG:

12       Okay.  In the last five years, has any money

13   been deposited into Portfolio A through the

14   Archdiocese?

15   JEFFREY ENTWISLE:

16       I don't know for sure.

17   JAMES STANG:

18       Okay.  Hold on for one moment.  These footnotes

19   are sometimes hard to find where they are listed.  I

20   would ask you to go to -- okay.

21       So let's talk about the deposit and loan funds

22   for a moment.  Is that an entity under Louisiana

23   law?

24   KATHLEEN ZUNIGA:

25       No.

 1  JEFFREY ENTWISLE:

 2      No, it is not.

 3  JAMES STANG:

 4      It is not.  It's potentially a -- it's not.  Is

 5  there a bank account where the deposit and loan fund

 6  money is kept?  Well, I know there is.  But can you

 7  identify where the deposit and loan fund monies go?

 8  KATHLEEN ZUNIGA:

 9      The deposit -- the cash on hand in the deposit

10  and loan fund is maintained in Portfolio B.

11  JAMES STANG:

12      Right.  And is Portfolio B cash maintained at a

13  particular bank?

14  KATHLEEN ZUNIGA:

15      Yes.

16  JEFFREY ENTWISLE:

17      Yes.  Hancock Whitney.

18  JAMES STANG:

19      Okay.  And is it in one bank account?

20  KATHLEEN ZUNIGA:

21      Yes.

22  JAMES STANG:

23      And what is the name -- who owns that bank

24  account?

25  KATHLEEN ZUNIGA:

1      Archdiocese --

2  JAMES STANG:

3      In terms of the documentation.

4  KATHLEEN ZUNIGA:

5      It is in the name of the -- it's the

6  Archdiocese of New Orleans Portfolio B is the name

7  on the account.

8  JAMES STANG:

9      Okay.  And do you know who actually opened that

10 account?

11 KATHLEEN ZUNIGA:

12     I do not.

13 JAMES STANG:

14     Okay.  Is Portfolio B an entity separate from

15 the Archdiocese of New Orleans?

16 JEFFREY ENTWISLE:

17     No, it is not.

18 JAMES STANG:

19     Okay.  And I might have asked to this, and I

20 apologize if I did.  Is Portfolio A an entity

21 separate from the Archdiocese of New Orleans?

22 JEFFREY ENTWISLE:

23     No, it is not.

24 JAMES STANG:  Okay.  So footnote 4 on page, this is

25 your number -- I can use the number in the Court

1   gave, but page 20 of 1298, if you have a filed copy

2   of the document.  If you don't have a filed copy of

3   the document, it is page 8 of 66.

4        And footnote 4 says, The operating account for

5   the Archdiocese and this account -- which I think is

6   your operating account -- is also used for transfers

7   in and out of deposited loan funding.

8        So I'm going to ask you a couple of questions

9   that, I thought it was important to point you to

10  that footnote.  If I am the parish and I want to

11  make a deposit into the deposit and loan fund and I

12  have a check for, apparently $100,000 was not a lot

13  of money, but let's stay with that.  I have a check

14  for $100,000 and I want to put it into the DLF.  Who

15  do I give that check to?

16  JEFFREY ENTWISLE:

17       That check would be sent to Walmsley Avenue.

18  JAMES STANG:

19       I'm sorry.  To who?

20  JEFFREY ENTWISLE:

21       To the Archdiocese.

22  JAMES STANG:

23       Okay.  And then what does the Archdiocese --

24  where does the Archdiocese deposit that check?

25  JEFFREY ENTWISLE:

1    Into our operating account.

2  JAMES STANG:

3    Okay.  And is there a practice of how long it

4  takes from the deposit of that money and clearing

5  into -- let's just say that the check clears the

6  parish.  I assume it's going to.  How long does it

7  take in general for that money to go from the

8  operating account to the account for the deposit and

9  loan fund?

10 JEFFREY ENTWISLE:

11    Depends.

12 JAMES STANG:

13    And what does it depend on?

14 KATHLEEN ZUNIGA:

15    It all transfers in and out of -- when you

16 talked about deposit and loan fund, are you talking

17 about, there's the operating account of the

18 Archdiocese and then there is Portfolio B

19 investments -- right? -- which is a highly liquid

20 investment.  So what he is asking is, how long

21 typically before we make transfers.

22    On a monthly basis -- the deposit and loan fund

23 activity, that account, Portfolio B, fluctuates

24 every day as the operating account does.  Monthly,

25 the deposit within the deposit and loan fund are

1   tracked in a separate software.  And so the

2   balancing of the two cash accounts happens -- occurs

3   typically on a monthly basis can occur sooner.  I

4   mean, the transfers can go in and out through the

5   month.

6   JEFFREY ENTWISLE:

7        And portfolio be is a cash management

8   instrument also.  So it depends on cash possessions.

9   JAMES STANG:

10       Okay.  When I become a depositor -- when a

11  parish, I should say.  When a parish becomes a

12  depositor in the deposit and loan fund, is there a

13  deposit agreement executed between the parish and

14  the Archdiocese?

15  JEFFREY ENTWISLE:

16       There is not.

17  JAMES STANG:

18       Is there any documentation other than the

19  instruments transferring money, like the checks or

20  wires, that evidences the relationship between the

21  parish and the Archdiocese as it relates to the

22  deposit and loan fund?

23  JEFFREY ENTWISLE:

24       That is part of the services that are included

25  in the parish services agreement.

1    JAMES STANG:

2        So I would find the relationship spelled out in

3    the parish services agreement?

4    JEFFREY ENTWISLE:

5        Yes.  Yes.

6    JAMES STANG:

7        Okay.  Mr. Mintz, I don't recollect if the

8    parish service agreement has been attached to any of

9    the pleadings filed to date.  Can you tell me

10   whether it has?

11   MARK MINTZ:

12       I don't believe it has, but we can certainly

13   provide you a copy.

14   JAMES STANG:

15       Well, you and I have discussed with

16   Mr. Boldissar a document production request.  If you

17   have one easily at hand, I would appreciate seeing

18   it sooner than later.  But we will include that in

19   the document production request as well.

20   MARK MINTZ:

21       All right.

22   JAMES STANG:

23       Is there any kind of ordinary course process by

24   which the parish has, say a cover letter or an

25   e-mail or some kind of communication, when it

1    delivers the money to the Archdiocese for the DLF?

2    FATHER PATRICK CARR:

3         There could be.  But each parish receives a

4    statement on a regular basis showing their loan --

5    I'm sorry -- their deposit position with the

6    Archdiocese.

7    JAMES STANG:

8         Okay.  I was speaking more about as the money

9    goes in, but I understand your answer.  So now let's

10   talk about when money comes out of the DLF.

11        So I am the parish.  I have $100,000 on deposit

12   with the DLF, and I would like to get $20,000 out.

13   Let's put aside for the moment what approvals are

14   necessary for me to make that withdrawal.  I am not

15   asking you whether there are or aren't approval

16   processes for that.  My question really is the

17   mechanics.

18        So this $20,000 withdrawal has been approved.,

19   is (inaudible) approved, and I want to get my money.

20   How does that work?

21   FATHER PATRICK CARR:

22        The pastor would send in a request to withdraw

23   that $20,000 from his funds on deposit, and we would

24   send those funds, typically either a wire or an ACH.

25   JAMES STANG:

1    Okay.  So who is the we in that answer?

2    FATHER PATRICK CARR:

3    The Archdiocese.

4    JAMES STANG:

5    And the money is sitting at an account in a

6    bank that says DLF on it.  Does that money leave the

7    DLF account and go into the operating account and

8    then go to the parish, or does the money travel in a

9    different way?

10   FATHER PATRICK CARR:

11   The funds that are wired out are being wired

12   out of the operating account.

13   JAMES STANG:

14   Okay.  And when the funds are wired out of the

15   operating account, does the Archdiocese do that only

16   if it has withdrawn the money first from the DLF

17   account?

18   FATHER PATRICK CARR:

19   Not necessarily.  So it could just be coming

20   out of the operating account.

21   JAMES STANG:

22   Okay.  I assume eventually the money leaves the

23   DLF account to, in effect, reimburse the operating

24   account; is that correct?

25   MARK MINTZ:

```
 1       Mr. Stang, this is Mark.  I want to make sure I
 2  am at least understanding what you mean by DLF
 3  account.  Are you referring to Portfolio B with that
 4  or are you referring to specifically deposit loan
 5  fund accounts?
 6  JAMES STANG:
 7       Right now, I am specifically referring to
 8  deposit loan funding.
 9  MARK MINTZ:
10       That's right -- I want to try to correct his
11  testimony, to be clear as to what we are talking
12  about.  So Kathleen, do you want to explain that
13  begin?  Because that is, I think, where some of the
14  confusion came in.
15  KATHLEEN ZUNIGA:
16       Sure.
17  JAMES STANG:
18       Let me just explain what I thought was
19  happening.  I thought the DLF had its own bank
20  account.  But if I'm wrong about that and it's part
21  of a mix of funds, then you just tell me that and I
22  will understand your answers as amended to that
23  extent.
24  KATHLEEN ZUNIGA:
25       It is.  It is a hybrid cash management fund.
```

1  | MARK MINTZ:

2  |     So Portfolio B has the DLF funds in it.

3  | JAMES STANG:

4  |     Got it.  Got it.  Okay.  So the operating

5  | account gives the parish the $20,000 and, at some

6  | point, Portfolio B sends $20,000 to the operating

7  | account.  Is that correct?

8  | FATHER PATRICK CARR:

9  |     If needed.

10 | JAMES STANG:

11 |     And who determines the if needed part?

12 | FATHER PATRICK CARR:

13 |     The cash needs determine that.

14 | JAMES STANG:

15 |     The cash needs of the operating account?

16 | FATHER PATRICK CARR:

17 |     Yes.

18 | JAMES STANG:

19 |     Okay.  So let's turn to a different aspect of

20 | the deposit and loan fund operations, and, I mean to

21 | state from Portfolio B.  My understanding is, and it

22 | has been characterized as a kind of diocesan bank.

23 |     So I am the parish and I want to borrow

24 | $20,000.  Who do I go to at the Archdiocese to put

25 | in that loan application?

 1   FATHER PATRICK CARR:

 2        There are levels of authority for loans.  For

 3   any loan request, up to $100,000, that would come to

 4   me.

 5   AMANDA GEORGE:

 6        Can you say who you are for us?

 7   FATHER PATRICK CARR:

 8        The chief financial officer would come to that

 9   position.  For loans from $100,000 to $500,000, that

10   will go to the vicar general.  And in loans in

11   excess of $500,000, that would go to the finance

12   council for recommendation to the Archbishop.

13   JAMES STANG:

14        And does the Archbishop have to consult with

15   the archdiocesan finance committee for loans of that

16   size?

17   FATHER PATRICK CARR:

18        In excess of $500,000, yes.

19   JAMES STANG:

20        Okay.  So let's assume we got the approval.  I

21   assume these applications are done in writing?

22   FATHER PATRICK CARR:

23        Yes.

24   JAMES STANG:

25        Is there a form that the parish is required to

1 as a loan application?

2 FATHER PATRICK CARR:

3     It depends on the type of project. If it's --

4 in your example, being a $20,000 request, if that

5 was for some sort of repair, probably just a letter

6 would suffice, or possibly even an e-mail, depending

7 on the immediacy of the repair.

8     If it was a larger capital project request, we

9 do have a form for capital projects.

10 JAMES STANG:

11     Okay. So your loan has been approved. Do I --

12 does the parish. I'm sorry, I sometimes use

13 personal pronouns and I shouldn't. Does the parish

14 sign a promissory note to the Archdiocese for the

15 loan?

16 FATHER PATRICK CARR:

17     Yes.

18 JAMES STANG:

19     And is there a set interest rate that is

20 charged to the parish regardless of the amount

21 borrowed?

22 FATHER PATRICK CARR:

23     There is a set rate that is charged.

24 JAMES STANG:

25     And who determines that rate?

1  FATHER PATRICK CARR:

2        That rate is determined and approved by the

3  finance council.

4  JAMES STANG:

5        Okay.  Does the Archdiocese require that all

6  loans above a certain dollar amount be secured by

7  assets of the parish?

8  FATHER PATRICK CARR:

9        No.

10  JAMES STANG:

11        Who makes the decision on whether or not -- are

12  the loans sometimes secured by assets of the parish?

13  FATHER PATRICK CARR:

14        No.

15  JAMES STANG:

16        So all loans from the DLF to parishes are

17  unsecured loans?  Correct?

18  FATHER PATRICK CARR:

19        Yes.

20  JAMES STANG:

21        Does the DLF make loans to entities other than

22  parishes?

23  FATHER PATRICK CARR:

24        Yes.

25  JAMES STANG:

1      Does that loan approval process mirror the one

2  used for parishes?

3  FATHER PATRICK CARR:

4      Yes.

5  JAMES STANG:

6      And are any of the loans to non- parish

7  borrowers secured by assets of the non- borrowers?

8  FATHER PATRICK CARR:

9      No.

10  JAMES STANG:

11      Okay.  I assume that sometimes the parish that

12  is borrowing money would also have a balance on

13  deposit at the DLF; is that correct?  Is that how it

14  is typically?

15  FATHER PATRICK CARR:

16      It could.  It could.

17  JAMES STANG:

18      Okay.  Is there a requirement that there be a

19  ratio, a certain ratio, between the loan being

20  requested and the amount on deposit at the DLF?

21  FATHER PATRICK CARR:

22      There is a policy of 50 percent on deposit for

23  loans, typically for capital projects.

24  JAMES STANG:

25      Okay.  And does not apply to non-parish

1   borrowers as well?

2   FATHER PATRICK CARR:

3       Yes.

4   JAMES STANG:

5       And is it the same ratio?

6   FATHER PATRICK CARR:

7       Yes.

8   JAMES STANG:

9       Is that a hard and fast rule or is that kind of

10  a rule of thumb?

11  FATHER PATRICK CARR:

12      It is -- it is a policy, but there are

13  exceptions.

14  JAMES STANG:

15      Does the administration of the deposit and loan

16  fund fault -- does the responsibility for the

17  administration of the DLF fall to any specialized

18  council at the Archdiocese?  I know there is a

19  finance council, so I don't mean that.  Is there

20  like a special DLF committee?

21  FATHER PATRICK CARR:

22      No.  No, there is not.

23  JAMES STANG:

24      Okay.  Is there a subcommittee of the finance

25  committee that is charged specifically with

1  responsibility for overseeing the DLF?

2  FATHER PATRICK CARR:

3      No, there is not.

4  JAMES STANG:

5      Does the finance committee have any

6  subcommittee?  Formal subcommittees?

7  FATHER PATRICK CARR:

8      Yes, they do.

9  JAMES STANG:

10     Okay.  We will get into that in another forum.

11 We don't need to do that today.

12     So Father Carr, there is another manual on the

13 website called The Temporalities Manual for

14 Parishes.  Are you familiar with that?

15 FATHER PATRICK CARR:

16     I have heard of it.  I'm not -- I don't know

17 the details.

18 JAMES STANG:

19     Okay.  Mr. Entwisle, are you familiar with that

20 particular manual?

21 JEFFREY ENTWISLE:

22     I do have some familiarity with it.

23 JAMES STANG:

24     Okay.  That's the archdiocesan accounting

25 system post the accounting systems for the parishes?

1   FATHER PATRICK CARR:

2       No.

3   JAMES STANG:

4       Do you have any ability -- does the Archdiocese

5   have any ability to, on a real-time basis, go into

6   any parish's accounting system and see the activity?

7   FATHER PATRICK CARR:

8       We offer accounting assistance to any parishes

9   that want to participate in that.  And for those, we

10  would have that ability.

11  JAMES STANG:

12      How many parishes are there in the Archdiocese?

13  FATHER PATRICK CARR:

14      111.

15  JAMES STANG:

16      Have any take advantage of that program?

17  FATHER PATRICK CARR:

18      I am not sure about number.

19  JAMES STANG:

20      I'm going a little bit of bigger than a

21  breadbox with you.  More than half?

22  FATHER PATRICK CARR:

23      I don't believe so.

24  JAMES STANG:

25      Okay.  Do you have any sense of -- well, forget

 1    that.  Okay.  So under that Temporalities Manual for

 2    Parishes, it says, The long-term savings of the

 3    parish are intended to go to the Catholic Community

 4    Foundation.

 5        But the Archdiocese policy manual, section

 6    17.9, says long-term investments are to go to the

 7    Archdiocese investment pool.  Can one of you explain

 8    to me what to me seems a contradictory provision

 9    between these two manuals?

10    KATHLEEN ZUNIGA:

11        The Catholic Community Foundation is a

12    separately incorporated foundation.  It is really

13    the development arm of the Archdiocese as a whole.

14    And so what they do is, they look at -- you know,

15    they receive donor advised funds, endowments, things

16    that have restrictions.  So the agreements, when --

17    you know, you will have more restricted funds there.

18        However, the Catholic Community Foundation

19    invests in the Portfolio A.  They have a significant

20    interest of the amounts on deposit that go into

21    Portfolio A, which is, again, the custody account

22    that is listed in the name of the Archdiocese as a

23    custody account at Whitney.

24    JAMES STANG:

25        Okay.  The website includes a chart of accounts

```
1   for parishes.  Father Carr, are you familiar with

2   that form?

3   FATHER PATRICK CARR:

4        I'm familiar with that, but I don't know the

5   details of it.

6   JAMES STANG:

7        Mr. Entwisle, are you familiar with that?

8   JEFFREY ENTWISLE:

9        Again, I do have some familiarity with it.

10  JAMES STANG:

11       Okay.  There's a line item in that chart of

12  accounts that says cost for disclosure of the

13  archdiocesan savings account.  That's exactly the

14  words it uses.  Can you explain to me what that

15  account is as compared to the archdiocesan

16  investment pool and as compared to the Catholic

17  Community Foundation?

18  JEFFREY ENTWISLE:

19       That line is intended to account for those

20  funds that are put on deposit in our bank, in DLFs.

21  JAMES STANG:

22       Okay.  So that is a DLF line item; is that

23  correct?

24  JEFFREY ENTWISLE:

25       Yes.
```

1   JAMES STANG:

2        Okay.  Got it.

3   AMANDA GEORGE:

4        Mr. Stang, do you have an idea how many more

5   questions you have, or how much longer?  I'm

6   checking in because of our recording capabilities.

7   I want to make sure we don't exceed them.

8   JAMES STANG:

9        All right.  Well, I have a lot more questions.

10  Do you have a time limit?  Because I can prioritize

11  them, believe it or not.

12  AMANDA GEORGE:

13       I think we have maybe 30-ish minutes left on

14  our recorder.  And so again, I don't mean to cut you

15  off, but that's just the limits of our technology

16  right now.

17  JAMES STANG:

18       I appreciate that.  Thank you, and I will -- I

19  mean, we will determine at the end of this whether

20  you think it is advisable to have a continued

21  meeting.

22  AMANDA GEORGE:

23       Okay.

24  JAMES STANG:

25       But I will try to prioritize my questions so

1   that we make the best use of the time.

2   AMANDA GEORGE:

3       Thank you, Mr. Stang.

4   JAMES STANG:

5       So let's see.  Where am I?  Okay.  I would like

6   you to turn to page 13 of 66 on the schedules, or

7   page 25 of 1298, depending on your numbering system.

8   Okay?  Is everybody there?

9       Okay.  14.1, which is on page 13 of 66 says, in

10   reference to mutual funds, 9 schools.  What are the

11   9 schools?

12       And actually, I will ask the question

13   differently.  Are those 9 schools part of the

14   Archdiocese as a legal entity or are they separately

15   incorporated?

16   FATHER PATRICK CARR:

17       Okay.  First of all, let me give you the 9

18   schools.  Okay?

19   JAMES STANG:

20       Okay.

21   FATHER PATRICK CARR:

22       I will give you the 9 schools first of all.  Do

23   you want the list of them?

24   JAMES STANG:

25       Actually, why don't you just tell me if they

```
 1   are separately incorporated or not.

 2   FATHER PATRICK CARR:

 3        They are not separately incorporated.

 4   JAMES STANG:

 5        Okay.  And I don't need to -- we will find out

 6   the names of the 9 schools later.  Because that was

 7   really what I was trying to figure out.

 8        So then I turned to 14.2, and it has high

 9   schools.  I hope I am pronouncing this correctly,

10   Scholastica Academy.  Is that a separately

11   incorporated entity from the Archdiocese?

12   FATHER PATRICK CARR:

13        No.

14   JAMES STANG:

15        Okay.  And 14.4 -- oh, that's the custody

16   account.  Okay.  Got that.  14.3 says St. Louis

17   Cathedral accounts.  My understanding is that the

18   St. Louis Cathedral parish, if that's the correct,

19   Cathedral parish is not a separately incorporated

20   entity.  Is that correct?

21   FATHER PATRICK CARR:

22        That's correct.

23   JAMES STANG:

24        Okay.  I would like you then to scroll down to

25   15.2, which is just lower on the page.  And the
```

 1 │ footnote to the Holy Trinity Drive Land Corporation

 2 │ says that the net equity balance includes a building

 3 │ loan from the Archdiocese from the deposit and loan

 4 │ fund.  I didn't quite understand what that meant.

 5 │ Is the 2,000,549 and change number net of the DLF

 6 │ loan or inclusive of the DLF loan?  Because I didn't

 7 │ understand what you meant when you said this net

 8 │ equity balance includes a building loan.  I wasn't

 9 │ sure whether that decreased the number or it was

10 │ already reflected in the number.

11 │ KATHLEEN ZUNIGA:

12 │     I believe it is net in the number.  It is

13 │ decreasing the number.

14 │ JAMES STANG:

15 │     So it decreases the number.  So the 2,000,549

16 │ would be reduced to approximately $2 million because

17 │ of the loan?

18 │ KATHLEEN ZUNIGA:

19 │     Yes.  However, we are checking the value on

20 │ that.

21 │ JAMES STANG:

22 │     I understand.  I was just trying to understand

23 │ the impact of the phrase, net equity balance

24 │ included.

25 │     Okay.  So again, it wasn't very clear to me

1   from your testimony before.  The Holy Trinity Drive

2   Land Corporation, obviously the Archbishop is the

3   president.  It is a 501(c)(3), so I assume it has no

4   shareholders.  Well, does it have shareholders?

5   FATHER PATRICK CARR:

6       No, it does not.

7   JAMES STANG:

8       I didn't think so.  So did the Archdiocese

9   lease the land to Holy Trinity or did Holy Trinity

10  lease the land to the Archdiocese?

11  FATHER PATRICK CARR:

12      I'm not quite following the question.

13  JAMES STANG:

14      Well, Holy Trinity Drive land Corporation was

15  set up to facilitate the operation of housing.  Is

16  that correct?

17  FATHER PATRICK CARR:

18      I'm sorry.  Say that again?

19  JAMES STANG:

20      What is the business of Holy Trinity Drive Land

21  Corporation.

22  KATHLEEN ZUNIGA:

23      It leases a parcel of property for the

24  development and operation of the nursing home.

25  JAMES STANG:

1      Okay.  So is it the tenant under the lease or

2  the landlord under the lease?

3  KATHLEEN ZUNIGA:

4      The landlord.

5  FATHER PATRICK CARR:

6      The landlord.

7  JAMES STANG:

8      Okay.  And who transferred the real estate that

9  is the subject of the lease to Holy Trinity?

10  FATHER PATRICK CARR:

11      The Archdiocese.

12  JAMES STANG:

13      And when did it do that?

14  FATHER PATRICK CARR:

15      I'm not -- I'm not sure of the date.

16  JAMES STANG:

17      Can you give me a range of 10 years ago, 5

18  years ago?  That sort of thing?

19  MARK MINTZ:

20      Mr. Stang, they are looking for it.  Just give

21  us a second.

22  KATHLEEN ZUNIGA:

23      It was -- so for Holy Trinity, it was June 21,

24  2018.

25  JAMES STANG:

```
 1        Okay.  And what, if anything, did the
 2   Archdiocese receive in exchange for that transfer?
 3   KATHLEEN ZUNIGA:
 4        Not -- I don't know.
 5   JAMES STANG:
 6        You started to say nothing, and I'm just
 7   wondering if maybe it was just a transfer the
 8   property without consideration.  Am I -- I don't
 9   mean to put words in your mouth, but did I --
10   KATHLEEN ZUNIGA:
11        I believe it is -- I believe it was just a
12   property transfer, but I didn't want to say that
13   without certainty.  But I believe it.
14   JAMES STANG:
15        Okay.  And at the time of the transfer, was the
16   housing facility in existence?
17   KATHLEEN ZUNIGA:
18        I don't believe.
19   FATHER PATRICK CARR:
20        It was -- not at that point time, no.
21   JAMES STANG:
22        So this was essentially part of the development
23   of the facility?
24   FATHER PATRICK CARR:
25        Correct.
```

1    JAMES STANG:

2        Okay.  And do you know when that facility got

3    its certificate of occupancy?

4    FATHER PATRICK CARR:

5        I am not sure of that date.

6    JAMES STANG:

7        Okay.  But it was presumably after the transfer

8    of the real estate?

9    FATHER PATRICK CARR:

10       Yes.

11   JAMES STANG:

12       Okay.  Relatively recent development, is what I

13   am gathering.  But okay.

14       Does the Archdiocese conduct the business of

15   providing housing outside of the Holy Trinity Drive

16   Land Corporation transaction.

17   FATHER PATRICK CARR:

18       I'm sorry, but I'm not quite following the

19   question.

20   JAMES STANG:

21       Well, the Archdiocese transfers the property to

22   Holy Trinity so that a housing facility could be

23   developed.  Does the Archdiocese provide housing to

24   the public through any -- in any other manner, other

25   than through Holy Trinity?

1    FATHER PATRICK CARR:

2         The operation on that property is not housing.

3    It is a nursing home.

4    JAMES STANG:

5         Okay.  I considered that housing, but okay.

6    Does the Archdiocese provide any housing at whatever

7    level of care outside of the Holy Trinity Drive Land

8    Corporation businesses?

9    KATHLEEN ZUNIGA:

10        To its priests.

11   JAMES STANG:

12        And obviously, I'm not trying to --

13   FATHER PATRICK CARR:

14        We don't provide housing.  That is a third

15   party operating that.

16   JAMES STANG:

17        Okay.

18   FATHER PATRICK CARR:

19        The land corporation is just leasing the land.

20   JAMES STANG:

21        Other than the facility connected with Holy

22   Trinity, does the Archdiocese provide housing to the

23   public through any other assets that it owns?

24   FATHER PATRICK CARR:

25        That we own?  That -- no.

1    JAMES STANG:

2        Okay.  St. Tammany Catholic Cemetery, the

3    Archdiocese is the president of the corporation.  Do

4    you know when that corporation -- are any of you

5    officers, directors, or employees of that

6    corporation?

7    FATHER PATRICK CARR:

8        No.

9    JAMES STANG:

10       Do you know who the chief financial officer is

11   of St. Tammany Catholic Cemetery, if it has one?

12   FATHER PATRICK CARR:

13       No.

14   KATHLEEN ZUNIGA:

15       No.

16   JAMES STANG:

17       Does it have one?

18   FATHER PATRICK CARR:

19       I don't know.

20   JAMES STANG:

21       Does the Archdiocese provide accounting

22   services to St. Tammany Catholic Cemetery?

23   FATHER PATRICK CARR:

24       I'm not sure.

25   JAMES STANG:

1      Does the Catholic Cemetery have any funds on

2  deposit in Portfolio A or Portfolio B?

3  KATHLEEN ZUNIGA:

4      I would have to check.  I can't readily answer

5  that.  But if they do, it is in the schedule.

6  JAMES STANG:

7      Okay.  I would like you to go down to question

8  45.  And that this is now on page 35 of 1298 or page

9  24 of 66.  And the question is, Has any of the

10  property listed in part seven been appraised by a

11  professional within the last year?  And the answer

12  is no.

13     My question is:  Has any of the property been

14  appraised by a professional within the last five

15  years?

16  KATHLEEN ZUNIGA:

17     I don't know.

18  JAMES STANG:

19     Okay.  This question applies to a long list of

20  furniture, fixtures, and it includes collectibles.

21  Does the Archdiocese maintain any kind of separate

22  insurance endorsement for the articles described

23  from numbers 42.1 through 42.183?

24  FATHER PATRICK CARR:

25     I'm not sure.  We do have some that we schedule

1    separately.  It's obviously not this full list.  I'm

2    not sure which are and are not.

3    JAMES STANG:

4         In that separate insurance endorsement, are

5    there values associated with the particular insured

6    item?

7    FATHER PATRICK CARR:

8         I'm not sure.  We would have to look at the

9    policy.

10   JAMES STANG:

11        Okay.  All right.  So I would like you to turn

12   now to question number 71, which is -- I'm just

13   scrolling down, so it will take me a moment.  You

14   can probably turn the pages faster than I can scroll

15   down.

16   MARK MINTZ:

17        Some of us are on paper and some of us are on

18   computer doing the same thing.

19   JAMES STANG:

20        And of course, you know, my cursor is now

21   acting up.  So just to give me a moment, please.  I

22   don't know if this essay go to function.  Let's see

23   if I can pull it down a little faster than that.

24   Let's see, where am I?  Nope, that's obviously not

25   what I was looking for.

1    ROGER STETTER:

2        May I interrupt?  Jim, you are doing a

3    wonderful job.  I am Roger Stetter.  I represent

4    several survivors.  Can I have two minutes at the

5    end?

6    JAMES STANG:

7        Sir, you can have two minutes now, as far as I

8    am concerned.

9    ROGER STETTER:

10       All right.  Well, I am going to go.  I think

11   these two questions are very, very important.

12       Number one, will counsel, committee counsel or

13   any counsel for the survivors -- it will probably be

14   through committee counsel -- have the opportunity to

15   learn how the list of so-called credibly accused

16   abusive priests, how it was created and if it is

17   accurate and complete?  And I asked the question

18   because I represent some survivors who alleged that

19   they were abused by priests who are not yet on your

20   list.

21   MARK MINTZ:

22       Mr. Stetter, this is Mark Mintz, counsel for

23   the Archdiocese.  We will provide information as is

24   required or through the bankruptcy process and will

25   answer questions today specifically about the

 1   schedules and financial affairs as we have been

 2   doing.

 3        So, I mean, the short answer to your question

 4   is, if there is a process that we need to go through

 5   to determine that through the bankruptcy process, we

 6   will of course comply with that.

 7   ROGER STETTER:

 8        Thank you.  My next question is, and it was a

 9   follow-up to Jim's question.  He asked why was this

10   bankruptcy filed, and I think you answered it by

11   saying that the Archdiocese wanted to deal with all

12   of the survivor claims, pre-petition claims, and get

13   them wrapped up.  Is there any reason why the

14   Archdiocese filed this voluntary petition in the

15   midst of a pandemic?

16   MARK MINTZ:

17        It was the time to file the petition, sir.

18   ROGER STETTER:

19        The time?  A good time, you say?

20   MARK MINTZ:

21        Yes.

22   ROGER STETTER:

23        Okay.  Would you agree that --

24   MARK MINTZ:

25        It was the time that we needed to file the

1   petition that we had been working on to be able to

2   do it.  I'm not sure I understand the relevance

3   behind that.

4   ROGER STETTER:

5        Well, the relevance is that, would you agree

6   that it is appropriate for an attorney to meet with

7   an alleged victim before he asserts a claim on

8   behalf of that victim?

9   MARK MINTZ:

10       Honestly, sir, I have -- sir, this is Mark

11  Mintz, and I don't mean any offense.  I have no idea

12  what you're talking about.

13  ROGER STETTER:

14       What I am talking about is the pandemic

15  obviously has a significant impact on your intent to

16  allow all victims to have their day in this

17  proceeding.  And you have filed a bankruptcy

18  petition during the pandemic.  And I am asking you

19  whether or not you are going to take that into

20  consideration, that there is a pandemic, with

21  respect to the establishment of a bar date.

22  AMANDA GEORGE:

23       This is Amanda George.  Let me interject.

24  Mr. Stetter, if you have that question for

25  Mr. Mintz, he is not under oath.  I would ask for

1    you to separately call Mr. Mintz and discuss that

2    with him.  But if you have a question for our

3    debtor's representatives here -- that would be

4    Father Carr, Ms. Zuniga or Mr. Entwisle -- you can

5    direct your questions to them.  Thank you.

6    ROGER STETTER:

7        Okay.  I accept that.  I would like to go back

8    to my earlier question:  Will we have the

9    opportunity -- and this goes to the Archdiocese's

10   representatives, the witnesses who are here today --

11   have the opportunity to learn how your abuse list

12   was created and if it is accurate and complete?

13   FATHER PATRICK CARR:

14       This is Father Carr.  I don't know.

15   ROGER STETTER:

16       Okay.  Thank you.  I'm finished.

17   AMANDA GEORGE:

18       Thank you, Mr. Stetter.  We will go back to

19   Mr. Stang.

20   ROGER STETTER:

21       Thank you, Mr. Stang.

22   JAMES STANG:

23       Okay.  You are very welcome.

24       Father Carr, does the diocesan website contain

25   any information about how a sexual abuse claim is

1   handled when received by the Archdiocese?

2   FATHER CARR:

3       I'm not aware.  I haven't been on -- I'm just

4   not aware of it.  No.

5   JAMES STANG:

6       Okay.  Does the Archdiocese have something,

7   have a review board of some sort, that considers

8   claims of sexual abuse?

9   FATHER CARR:

10      I am not aware of it.

11  JAMES STANG:

12      All right.  Are any of the witnesses today

13  members of any review board, any archdiocesan review

14  board, that considers claims of sexual abuse --

15  JEFFREY ENTWISLE:

16      I am not --

17  JAMES STANG:

18      -- that is in charge of investigating and

19  determining credibility?

20  FATHER CARR:

21      No.

22  KATHLEEN ZUNIGA:

23      No.

24  JEFFREY ENTWISLE:

25      No.

1    JAMES STANG:

2        Does the Archdiocese have a victims assistance

3    coordinator or someone who performs the function of

4    interacting with sex abuse survivors who contact the

5    Archdiocese?

6    KATHLEEN ZUNIGA:

7        Yes.

8    FATHER CARR:

9        Yes.

10   JAMES STANG:

11       And who is that?

12   FATHER CARR:

13       I don't know the person's name, but they do

14   have one.

15   JAMES STANG:

16       Do you know if that person has any professional

17   training in psychology or therapy?

18   KATHLEEN ZUNIGA:

19       No.

20   FATHER CARR:

21       I'm not aware.

22   KATHLEEN ZUNIGA:

23       I don't know.

24   JAMES STANG:

25       Okay.  Father Carr, do you know how long the

1   Archdiocese intends to give creditors to file proofs

2   of claim in this case?

3   FATHER CARR:

4       I don't know.

5   JAMES STANG:

6       I'm going to again assume that the answers are

7   the same for the witnesses.  Because Mr. Mintz made

8   his statement in reference to the normal practice in

9   the district of using 90 days, so I couldn't tell

10  from his comment whether he was going to -- whether

11  the Archdiocese was planning to try to use that 90

12  day period or a shorter one or a longer one.  And

13  that's why I'm asking.

14  MARK MINTZ:

15      Mr. Stang, this is Mark Mintz, and I appreciate

16  your picking up on that.  What I also said was we

17  wanted to discuss with you as to an appropriate

18  (inaudible).

19  JAMES STANG:

20      Okay.  Thank you.  All right.  Thank you very

21  much.

22      So let's go to section 71 of the schedules.

23  This is, it is a long list of -- these are basically

24  notes receivables.  It's on page 55 of 66 or 66 of

25  1298.

1      Father Carr, can you tell me the status of the

2   BP structured settlement claim?  What are the

3   terms -- and specifically -- I'm sorry.  I'll try to

4   make my question a little clearer:  What are the

5   terms of the note receivable that is disclosed?

6   FATHER CARR:

7      Let me defer to Jeff Entwisle.

8   JEFFREY ENTWISLE:

9      Those are semiannual payments that are still in

10  progress.

11  JAMES STANG:

12     And what is the balance owing on the $2 million

13  face amount?

14  JEFFREY ENTWISLE:

15     That that is the amount.

16  JAMES STANG:

17     Oh.  So as of the petition date, 2 million was

18  owed.  How much has been paid under the structured

19  settlement to the Archdiocese to date?

20  FATHER CARR:

21     I believe it was 3 million so far.

22  JAMES STANG:

23     Got it.  And are the payments in equal dollar

24  amounts for the periodic payments?

25  FATHER CARR:

 1      Yes, they are.

 2  JAMES STANG:

 3      And when does this get paid off?

 4  FATHER CARR:

 5      I'm sorry?

 6  JAMES STANG:

 7      What is the due date from the note?

 8  FATHER CARR:

 9      From January and July, I believe.

10  JAMES STANG:

11      No, no.  But when is it paid off?  I mean, is

12  this a 10 year remaining obligation?  Three year

13  remaining obligation?

14  FATHER CARR:

15      Two.

16  KATHLEEN ZUNIGA:

17      Two years.  Two more years remaining.

18  FATHER CARR:

19      Two years left.

20  JAMES STANG:

21      Okay.  Thank you.  A number of the loans from

22  the loan and deposit fund are shown as name and

23  address intentionally omitted.  Is there a common

24  reason -- and there are many, many listed that way.

25  Is there a common reason for why the name and

1  address was omitted?

2  KATHLEEN ZUNIGA:

3      I believe those were because they were

4  individuals.  I think that was it probably, I

5  believe.  And I think some of them are (inaudible).

6  JAMES STANG:

7      I'm sorry.  I didn't hear the last part of your

8  answer.

9  KATHLEEN ZUNIGA:

10      These would have been loans to individual

11  priests.

12  JAMES STANG:

13      So there is a priest -- I'm looking at 71.4.

14  There is a priest who has been loaned $80,000?

15  KATHLEEN ZUNIGA:

16      Yes.

17  JAMES STANG:

18      And what was the purpose of that loan?

19  KATHLEEN ZUNIGA:

20      I do not know.

21          (Crosstalk amongst witnesses.)

22  FATHER CARR:

23      This is Father Patrick Carr.  It was to pay off

24  credit cards.

25  JAMES STANG:

```
 1        Okay.  Are all of the people whose identities

 2   have been intentionally omitted priests of the

 3   Archdiocese?

 4   FATHER CARR:

 5        Yes.  And there is also seminarians on there,

 6   too.

 7   JAMES STANG:

 8        And do those seminarian obligations reflect

 9   loans for tuition or for other things?

10   FATHER CARR:

11        Both.

12   JAMES STANG:

13        The priest that got the $80,000 loan, what is

14   his annual salary?

15   FATHER CARR:

16        He is paid according to the priest salary.

17   That is part of the archdiocesan policy.

18   JAMES STANG:

19        Okay.  What is his annual salary?

20   FATHER CARR:

21        I can't tell you because I don't know how long

22   he has been a priest.

23   JAMES STANG:

24        Is there any priest that is paid more than

25   $35,000 a month other than the Archbishop and any
```

```
 1   vicar?

 2   FATHER CARR:

 3        Do you mean per year?

 4   JAMES STANG:

 5        I'm sorry.  I meant to say 35,000 each year.

 6   Sorry.

 7   FATHER CARR:

 8        I am not aware of it, no.

 9   JAMES STANG:

10        When this loan was made for approximately

11   $80,000, what considerations were taken -- what was

12   taken into consideration regarding his ability to

13   repay this loan?

14   FATHER CARR:

15        I am not aware of it.  This was before my time,

16   so I don't know the details.

17   JAMES STANG:

18        Okay.  Well, but if the schedule shows that it

19   is zero on account of -- well, that the doubtful or

20   uncollectible amounts is zero, have any payments

21   been made by this priest against the balance owing?

22   FATHER CARR:

23        Yeah.  There's been payments.  There's been

24   payments in prior years.

25   JAMES STANG:
```

1    Are the periodic, taken as withdrawals from his

2  paycheck, or is it as he is able to pay it?

3  FATHER CARR:

4    As far as I know, Mr. Stang, I think it is

5  random.  It's according to his ability to pay.

6  JAMES STANG:

7    Do you know how old this priest is?

8  FATHER CARR:

9    Roughly, yes.

10 JAMES STANG:

11   Can you tell me -- I'm not trying to identify

12 him.  I'm trying to figure out if he will live long

13 enough to pay back $80,000 given his resources.

14 FATHER CARR:

15   I can give you a range.  I think he is between

16 58 and 62 years old.

17 JAMES STANG:

18   Okay.  And was the credit card that he used a

19 credit card of the Archdiocese?

20 FATHER CARR:

21   No.

22 JAMES STANG:

23   Okay.  Do you know if the debts incurred were

24 in connection with his services as a pastor?

25 FATHER CARR:

1    This was before.

2  JAMES STANG:

3    This was before you came on the scene?

4  FATHER CARR:

5    This was before he was -- this was his prior

6  history before he was ordained a priest.

7  JAMES STANG:

8    Got it.  And do you know if the Archdiocese was

9  aware of this liability at the time that it was

10  considering incardinating him to the Archdiocese?

11  FATHER CARR:

12    I am not aware of that.

13  JAMES STANG:

14    Okay.  Let's see.  There are a number of

15  accounts or notes receivable due here that have -- I

16  will just give you an example.  71.17, Christ the

17  King parish.  It is the Archdiocese $538,000, and it

18  looks like this is a total writeoff.  Does Christ

19  the King parish have any money in portfolio a or

20  portfolio B?

21  FATHER CARR:

22    I don't know for sure.

23  JAMES STANG:

24    If it did have money in either A or B, does the

25  Archdiocese have a policy regarding setting off

 1  those account balances against liabilities that are

 2  owed?  And I am specifically asking about Christ the

 3  King; but in general, is there such a policy?

 4  FATHER CARR:

 5      No, there is not.

 6  JAMES STANG:

 7      Is there a policy not to do it?

 8  FATHER CARR:

 9      That's correct.  Any movement of funds would

10  require pastor permission.

11  JAMES STANG:

12      So of Christ the King parish -- I'm sorry.  Did

13  I get the name right?

14  FATHER CARR:

15      Yes.  Yes, you did.

16  JAMES STANG:

17      Okay.  If Christ the King parish tomorrow

18  deposited $1 million with portfolio a or portfolio B

19  on an unrestricted funds -- unrestricted funds -- is

20  it the policy of the Archdiocese to still write off

21  this promissory note?

22  FATHER CARR:

23      No.

24  JAMES STANG:

25      I'm sorry.  I thought the answer was that the

1  policy is to not offset.

2  FATHER CARR:

3      Right.  But we wouldn't write it off.  We would

4  actually, we would meet with the pastor and figure

5  something out.

6  JAMES STANG:

7      Okay.  I would like you to go down to section

8  73.5.

9  FATHER CARR:

10     I'm sorry.  Say that number again, Mr. Stang.

11 JAMES STANG:

12     73.5, which is page 62 of 66 or 73 of 1298.

13     My question is:  Does the Archdiocese have an

14 equity interest in the Catholic Mutual Relief

15 Society of America?

16 KATHLEEN ZUNIGA:

17     No.

18 JAMES STANG:

19     Does it have an equity interest -- I'm sorry.

20 I didn't mean to cut you off.

21 FATHER CARR:

22     This is Father Patrick.  I don't know.  I don't

23 know if we do.  I don't know.

24 JAMES STANG:

25     Okay.  Do you know if the Archdiocese has an

1  equity interest in the Catholic Mutual Group?

2  FATHER CARR:

3       I don't know.

4  JAMES STANG:

5       Do you know if it has an equity interest in the

6  Catholic Mutual Umbrella Pool?

7  FATHER CARR:

8       Yes.  Yes, we do.

9  KATHLEEN ZUNIGA:

10      Yes.

11 JAMES STANG:

12      Okay.  What is the value -- it may be

13 disclosed, but I didn't write it down.  What is the

14 scheduled value of that interest?

15 FATHER CARR:

16      I don't have that.

17 JAMES STANG:

18      Okay.

19 MARK MINTZ:

20      Mr. Stang, we are pretty sure it's in here.  We

21 will -- again, they are very long.  As we are all

22 going through this, we will try and make sure it is

23 provided to you.

24 JAMES STANG:

25      Okay.  One of the things that I noticed -- and

 1   it's hard not to see it -- the Archdiocese is a

 2   creditor in a bankruptcy pending in the Western

 3   District of Michigan that appears associated with

 4   some payroll service fraud.  Can you tell me what

 5   the amount of that -- well, I see you have put down

 6   $631,448 is the amount requested.  Is the same

 7   amount for seven of the debtors in that proceeding.

 8   I assume that is all one claim against all seven and

 9   not 631 times 7; is that correct?

10   FATHER CARR:

11       That's correct.

12   JAMES STANG:

13       Okay.  What was the nature of the payroll

14   fraud.

15   JEFFREY ENTWISLE:

16       It was a third-party payroll provider, and it

17   was alleged that there were improprieties with state

18   and federal payroll taxes.

19   JAMES STANG:

20       That took your money and didn't pay it over to

21   the governmental authorities?

22   FATHER CARR:

23       Yep.

24   JAMES STANG:

25       And who in the Archdiocese was responsible for

 1   the oversight, for the handling of payroll?

 2   FATHER CARR:

 3        Each separate entity is responsible for their

 4   own payroll.

 5   JAMES STANG:

 6        But this is an archdiocesan claim; is that

 7   correct?

 8   FATHER CARR:

 9        That's correct.

10   JAMES STANG:

11        Okay.  So the Archdiocese got euphemistically

12   ripped off for $631,000.  I'm not asking about

13   parishes.  I'm not asking about the foundation.

14   This is a claim of the Archdiocese; is that right?

15   FATHER CARR:

16        The claim is, yes.

17   JAMES STANG:

18        The Archdiocese is not responsible for the

19   payroll taxes of a given parish; is that correct?

20   FATHER CARR:

21        That's correct.

22   JAMES STANG:

23        So the Archdiocese as compared to any other

24   juridical entity within the ecclesiastical

25   Archdiocese, the Archdiocese corporation lost

1    $631,000 to this fraud?

2    MARK MINTZ:

3         Mr. Stang, this is Mark Mintz the reason I'm

4    jumping in is because -- well, let's be perfectly

5    honest is, I was the attorney for the Archdiocese

6    with regards to this bankruptcy.  But the first step

7    is the proofs of claim and the amounts listed here

8    are aggregate amounts for what the Archdiocese did

9    cover for certain parishes in certain amounts.  So

10   it is -- these are the claims of it.  They relate to

11   claims of other parishes that were covered by the

12   Archdiocese as well.  There was one contract with

13   IOI that relates to this.

14   JAMES STANG:

15        Does the Archdiocese have -- let's go back for

16   a moment.

17        Does the Archdiocese handle the payroll of each

18   parish through a parish services agreement?

19   FATHER CARR:

20        No.

21   JAMES STANG:

22        Okay.  When the Archdiocese filed a proof of --

23   and Mr. Mintz, I know you are not a witness but, if

24   you can, since you were the attorney on the matter,

25   I would be happy to hear your explanation, although

1   I appreciate you are not under oath.  But I know

2   when you say you are being completely honest, I know

3   you are always being honest.

4       Did the Archdiocese file a proof of claim in

5   the case?

6   MARK MINTZ:

7       The Archdiocese filed a proof of claim, yes.

8   JAMES STANG:

9       And did it identify in the proof of claim that

10  it was filing it on behalf of any entity other than

11  the Archdiocese?

12  MARK MINTZ:

13      The proofs of claim in the case had attachments

14  to it that explained, I believe, what they were

15  being filed on behalf of.  Or who they were being

16  filed on behalf of.

17  JAMES STANG:

18      Okay.  And is there any agreement between the

19  parish is affected by this fraud and the Archdiocese

20  designating the Archdiocese as an agent of the

21  parishes?

22  MARK MINTZ:

23      I am not sure.

24  JAMES STANG:

25      Okay.  Is this bankruptcy in a Chapter 11 or

1   Chapter 7.

2   MARK MINTZ:

3       They are all Chapter 11.  They are -- I can't

4   even remember the number, but there is Chapter 11 in

5   Western District of Michigan all related to it.

6   JAMES STANG:

7       Right.  And how long -- oh, the case has been

8   pending since 2019.  And the Archdiocese is a member

9   of the creditor's committee, from what I understand?

10  MARK MINTZ:

11      The Archdiocese is a mem -- they are related

12  cases.  The Archdiocese is the chair -- I'm sorry --

13  is the former chairman.  Was on the creditor's -- is

14  still on the creditor's committee for one of the

15  cases, I believe the IOI cases, but not for the

16  other cases.

17  JAMES STANG:

18      Are there separate committees for each case.

19  MARK MINTZ:

20      There are separate committees for the IOI case

21  and then a separate committee for Najeeb Khan case.

22  JAMES STANG:

23      Got it.  And who is counsel -- do both

24  committees have the same committee counsel?

25  MARK MINTZ:

1        They do not.  IOI counsel is -- IOI committee

2   is Ice Miller.  The Najeeb Khan's counsel -- the

3   Najeeb Khan committee's counsel is Jones Walker.  We

4   no longer -- we had filed the withdrawals, and so --

5   you know, to be perfectly clear, we had filed the

6   withdrawals that were appropriate for the

7   Archdiocese based on that when that was filed.  When

8   we were hired by Najeeb Khan.

9   JAMES STANG:

10       I don't know what withdrawals you are referring

11  to.

12  MARK MINTZ:

13       We withdrew as counsel for the Archdiocese of

14  New Orleans in the IOI case in order to enroll as

15  counsel of the Najeeb Khan committee.

16  JAMES STANG:

17       Got it.  So your firm is counsel to a

18  creditor's committee in which the Archdiocese is a

19  member and a creditor?

20  MARK MINTZ:

21       I am counsel to a committee in which the

22  Archdiocese is a creditor.  I am not counsel to a

23  committee in which the Archdiocese is a member.

24  JAMES STANG:

25       Got it.  Okay.  Thank you.  I would like you to

1    turn to section 75, which is page 64 of 66 and page

2    76 of 1298.

3         Is not clear to me whether the claims that are

4    listed from 75.1 to 75.6 have actually been

5    submitted to the carriers that are listed.  Can you

6    tell me -- because they are all listed as unknown,

7    it is hard for me to prioritize my question.  Can

8    you tell me if the claims for these, if claims have

9    been submitted to the carriers for the claims that

10   are listed here?

11   KATHLEEN ZUNIGA:

12        I do not know.

13   JAMES STANG:

14        Does the Archdiocese have someone who is

15   responsible for risk management as an in-house

16   employee?

17   KATHLEEN ZUNIGA:

18        No.

19   JAMES STANG:

20        Who is responsible for the submission of a

21   claim if the Archdiocese believes it has an insured

22   claimant?

23   JEFFREY ENTWISLE:

24        That would be me.  Jeff Entwisle.

25   JAMES STANG:

 1        Okay.  So Mr. Entwisle, does risk management

 2   fall under your portfolio, if you will?

 3        That was actually a question mark at the end of

 4   that.

 5   JEFFREY ENTWISLE:

 6        I did not take that as a question.  I'm sorry.

 7   Could you ask it again?

 8   JAMES STANG:

 9        Are you the person at the Archdiocese

10   responsible for risk management and --

11   JEFFREY ENTWISLE:

12        Yes.  Yes.

13   JAMES STANG:

14        Okay.  Thank you.  We cleared up the bond

15   question.

16        Father Carr, can you tell me, are you familiar

17   with the property known as the St. John the Baptist

18   Church?

19   FATHER CARR:

20        Am I familiar with it?

21   JAMES STANG:

22        Yeah.  I mean, you are aware -- if I said the

23   St. John the Baptist Church, do you know what I am

24   talking about.

25   FATHER CARR:

1        Yes.

2   JAMES STANG:

3        Okay.  Is that a parish?

4   FATHER CARR:

5        Which one are you talking about?

6   JAMES STANG:

7        Well, I am not sure.  I was told that there was

8   a property that someone referred to as the St. John

9   the Baptist Church.

10  FATHER CARR:

11       There's two of them.

12  JAMES STANG:

13       Okay.  Are both of them -- is one of them not

14  currently occupied for religious purposes?

15  FATHER CARR:

16       One is -- there's one that is -- they have mass

17  there.

18  JAMES STANG:

19       Both properties that are referred to by that

20  name conduct masses in the buildings?

21  FATHER CARR:

22       Yes.

23  JAMES STANG:

24       Okay.  And is that a weekly mass at each one?

25  FATHER CARR:

1      Yes.

2    JAMES STANG:

3      Okay.  My understanding was, one of the

4    properties having that name had been closed or shut

5    down and was not operating.  I take it from your

6    answer that that information is not correct?

7    FATHER CARR:

8      That information is not correct.  They are both

9    being operated.  They both have masses every week.

10   JAMES STANG:

11     Okay.  I'm going to ask you -- let's see.  I

12   would like you to go to section -- I'm sorry.  I

13   will get the page number for you in just a minute.

14     Ms. George, how am I doing? I mean time wise.

15   AMANDA GEORGE:

16     Let me check.

17   JAMES STANG:

18     Time wise.

19   AMANDA GEORGE:

20     All right.  Keep going.

21   JAMES STANG:

22     All right.  So I would like you to look at --

23   I'm sorry, I'm almost there.  I apologize for my

24   computer problem.

25     I would like you to look at the claim of --

1    well, let's look at 3.53.  That is on page 926 of

2    1298 and 842 of 1157.  3.53.  And there are a number

3    like this.  I'm just, that one just happened to come

4    out.

5         This is a list of creditors, and 3.53

6    identifies the Archdiocese of New Orleans as a

7    creditor.  Can you explain to me -- and there are

8    other instances of this, and I'm not going to go

9    through each one -- why you are listing the debtor

10   as a creditor?

11   KATHLEEN ZUNIGA:

12        The decision was made to be as transparent as

13   we could with all of the transactions.  The debtor

14   entity, again, includes the administrative offices,

15   the nine schools, and the two parishes.  And so they

16   are footnoted that, if they are transactions within

17   the debtor entity.

18   JAMES STANG:

19        So this is -- okay.  I understand.  I thought

20   from your prior answer that that's what perhaps you

21   meant, and now I understand.

22        3.54, just go down one or two.  The Archdiocese

23   of New Orleans Indemnity Company, that is the

24   captive insurer; is that correct, Father Carr?

25   FATHER CARR:

1      Yes.

2    JAMES STANG:

3        And it says that there is a revolving line of

4    credit, but the amount of the claim is undetermined.

5    Does that mean that no draws, as of the petition

6    date, there was no draw outstanding on the revolving

7    line of credit?

8    FATHER CARR:

9        That is correct.

10   JAMES STANG:

11       And what is the amount that could be borrowed

12   under the revolving line of credit?

13   FATHER CARR:

14       I don't remember.

15   JAMES STANG:

16       Has the Archdiocese Indemnity Company informed

17   the debtor whether that revolving line of credit is

18   still available to it on a post-bankruptcy basis?

19   FATHER CARR:

20       They have not said that it is not.

21   JAMES STANG:

22       Okay.  Has the Archdiocese ever used that

23   revolving line of credit?

24   FATHER CARR:

25       I am not sure about that answer.

1   JAMES STANG:

2       Is there a loan agreement between the indemnity

3   company and the Archdiocese for the revolving line

4   of credit.

5   FATHER CARR:

6       There is.

7   JAMES STANG:

8       Okay.  I would like you to take a look at

9   3.117, which is on page 863 of 1157 and 948 of 1298.

10  MARK MINTZ:

11      Could you state the number again?

12  JAMES STANG:

13      I'm sorry.  3.117.  It is on your numbered

14  pages 863, and on the Court's numbered pages, 947.

15  MARK MINTZ:

16      Got it.

17  JAMES STANG:

18      Actually, could you just put a pause or met for

19  a minute?  I want to go back to St. John the

20  Baptist, I may mispronounce the name, on Oretha

21  Castle Haley Boulevard.

22      Father Carr, is that an active parish?

23  FATHER CARR:

24      Yes.

25  JAMES STANG:

1      Okay.

2    FATHER CARR:

3        It is an active parish of -- St. Patrick's down

4    the street runs the parish.

5    JAMES STANG:

6        And does St. Patrick's have a sanctuary?

7    FATHER CARR:

8        Does it have a sanctuary?

9    JAMES STANG:

10       Yes.  Is mass performed at the other -- at that

11   building?

12   FATHER CARR:

13       Yes.

14   JAMES STANG:

15       And how far away is it from St. John the

16   Baptist on --

17   FATHER CARR:

18       I would say about a half-mile.

19   JAMES STANG:

20       Okay.  So I would like you to go back now

21   please to 3.117.  The basis for the claim is an

22   unresolved claim.  What does that mean?  I mean, I

23   know what the words mean.  But what does it mean --

24   what are you trying to convey to us?  Is this a sex

25   abuse claim that is not in litigation?  What does

1  that mean?

2  KATHLEEN ZUNIGA:

3       I don't know which this one is.

4  JAMES STANG:

5       Well, was the phrase unresolved claim used

6  throughout this document to refer to a particular

7  kind of claim?

8  KATHLEEN ZUNIGA:

9       I don't know.

10  JAMES STANG:

11       Would the name that is intentionally omitted

12  assist anyone in telling us what this unresolved

13  claim is about?

14  FATHER CARR:

15       I don't know.

16  JAMES STANG:

17       Okay.  It's not a trade payable; is that

18  correct?

19  KATHLEEN ZUNIGA:

20       It is not listed as one, no.

21  JAMES STANG:

22       I mean, I know it's not listed as a trade

23  payable.  I was just trying to see if maybe there

24  was a trade payable that -- well, they are all

25  listed as disputed, so I guess that's not a

 1   distinction.  Okay.  Let's see.

 2       At schedule G, which is, I will have to scroll

 3   down a little more --

 4   MARK MINTZ:

 5       Starting on page 1242 of 1298, for those of

 6   you ...

 7   ROGER STETTER:

 8       Thank you.

 9   JAMES STANG:

10       Okay.  Let's see, I'm sorry.  Here we go.

11   Thank you very much.

12       At 2.1 -- I'm sorry.  Let's not do that.

13       At 2.78, which is, on your page, 16 of 55 for

14   this particular schedule, there is a contract with

15   the Gallagher Benefit Services.  A consulting

16   agreement with Gallagher Benefit Services.  Father

17   Carr or Mr. Entwisle, since you do more risk

18   management, can you tell me what this consulting

19   agreement, what they consult about under this

20   consulting agreement?

21   JEFFREY ENTWISLE:

22       They are our consultant for our self-insured

23   health insurance.

24   JAMES STANG:

25       And do they provide you consulting services

1   regarding any other risk management that is

2   performed for the Archdiocese?

3   JEFFREY ENTWISLE:

4        No, I don't believe so.

5   JAMES STANG:

6        Okay.  Please scroll down to 2.87.  This is the

7   investment management agreement with Harding Loevner

8   LP.  Is this an investment management agreement

9   regarding one of the portfolios?

10  FATHER CARR:

11       Yes.

12  JAMES STANG:

13       And which portfolio does this refer to?

14  FATHER CARR:

15       A.

16  JAMES STANG:

17       Okay.  I would like you to go down to 2.105.

18       Is St. Mary's Academy a school owned by the

19  Archdiocese?

20  FATHER CARR:

21       No, it is not.

22  JAMES STANG:

23       Why does the Archdiocese have a contract for

24  consulting services for an entity that it does not

25  own?

1    FATHER CARR:

2        I am not sure.

3    JAMES STANG:

4        Okay.  Is St. Elizabeth Ann Seton School owned

5    by the Archdiocese?

6    FATHER CARR:

7        No, it is not.

8    JAMES STANG:

9        Why does the Archdiocese have a consulting

10   agreement for an entity that it does not -- that

11   benefits an entity that it does not own?

12   FATHER CARR:

13       Again, I'm not sure.

14   JAMES STANG:

15       Okay.  I would like you to go down to 2.152.  I

16   noticed that this is an agreement with St. Tammany

17   Parish, and I think that's the same name as the

18   cemetery entity.  I don't know if they are related

19   or not.  But what is this agreement?  I cannot, from

20   the title, understand what a cooperative endeavor

21   agreement is.

22   MARK MINTZ:

23       Well, one thing I would like -- Mr. Stang, this

24   is Mark Mintz.  Just to clarify for you, St. Tammany

25   Parish is the civil parish north of New Orleans.

```
 1   That can become somewhat -- so that is the name of

 2   the -- thanks to the fact that we are in Louisiana,

 3   the word parish also means county.  And so it is

 4   St. Tammany county governance.

 5   JAMES STANG:

 6       Got it.  Okay.

 7   MARK MINTZ:

 8       But they will answer the question which you

 9   specifically asked, but I wanted to be clear on

10   that.

11   JAMES STANG:

12       So Mr. Mintz had mentioned, we are not talking

13   about an incorporated catholic parish.  We are

14   talking about a civil, governmental entity.

15   FATHER CARR:

16       Correct.

17   JAMES STANG:

18       Okay.  So can someone tell me what this is?

19   FATHER CARR:

20       Yeah.  I'm not sure.

21   JAMES STANG:

22       Okay.  And so let's go to 2.153.  This is an

23   agreement -- this is what looks like a lease between

24   the civil parish in the catholic cemetery for a

25   ground lease.  Can you explain what the
```

 1   Archdiocese's interest is in this ground lease

 2   agreement and guarantee?  Because on the face of it,

 3   it looks like the civil parish is leasing property

 4   to the catholic cemetery, but my understanding is

 5   that the catholic cemetery is a separate entity.

 6   What is the relationship of the Archdiocese for this

 7   particular executory contract?

 8   FATHER CARR:

 9       I'm not sure what exactly this contract is.

10   JAMES STANG:

11       Okay.  Anyone know what this is about?

12                   (No audible response.)

13   JAMES STANG:

14       Okay.  Same question regarding 2.154.  It

15   appears to be a contract between the civil parish

16   and the catholic cemetery regarding -- well, it's

17   self-evident -- management, marketing, and

18   accounting.  Can anyone tell me what the

19   relationship is of this contract to the Archdiocese?

20   MARK MINTZ:

21       Mr. Stang, you know, I think that -- I'm going

22   to let the witnesses obviously answer.  We are going

23   to get back to you on these, and it may have been

24   one of the ones that we overly disclosed or talked

25   about at the beginning.  But we are going to run

```
 1   this down.  So thank you for bringing it up.
 2   JAMES STANG:
 3        Okay.  Thank you.  And then on 2.156, we have
 4   State Street having a participation agreement and
 5   amendment.
 6        Father Carr, does this relate to the management
 7   of one of the two portfolios?
 8   FATHER CARR:
 9        The first -- I'm not sure which.  We would have
10   to look and see which contract it is, because the
11   State Street has a couple of roles with us.
12   JAMES STANG:
13        Okay.  I might have missed it, but I don't
14   recollect seeing any reference in the schedules --
15   and you can look at schedule G -- to the parish
16   services agreements.  And if I missed them, can you
17   point out to me where they are?  And if they are not
18   listed, could you tell me why they are not listed?
19   MARK MINTZ:
20        Mr. Stang, this is Mark Mintz.  It is very
21   possible that we forgot them.  So I will -- that can
22   be part of our amendments.  I am not seeing them in
23   here either, but that doesn't mean that I'm not seen
24   it either -- or that it's not there and I didn't
25   realize it.  But we will give any input we can make.
```

1　JAMES STANG:

2　　　Okay.  Ms. George, I have questions

3　regarding -- that's all I have, at least on the

4　schedules as filed.  I have questions regarding the

5　SOFA, but I know you had some technology-related

6　time constraints.

7　AMANDA GEORGE:

8　　　How long do you think it will take to ask your

9　questions about the SOFA, the statement of financial

10　affairs?  How many questions do you have?

11　JAMES STANG:

12　　　I think they're a little more -- well, I hope

13　they all seem focused.  I would say maybe another 30

14　minutes.

15　AMANDA GEORGE:

16　　　All right.  And I think by that point we will

17　have exhausted our little disk drive.  So we will

18　need to wrap up by 2:00.  And so, if you think you

19　can do that, Mr. Stang, let's finish up.

20　JAMES STANG:

21　　　I will make every effort to.

22　　　Father Carr, when did the Archdiocese cease

23　having in person masses as a result of Covid

24　restrictions?

25　FATHER CARR:

1       It was a little after St. Patrick's Day.

2    JAMES STANG:

3       I'm sorry.  I do celebrate it, because my late

4    wife was Irish, but can you remind me what date that

5    was?

6    FATHER CARR:

7       March 17.

8    JAMES STANG:

9       Okay.  Thank you.  So I'm going to direct your

10   attention to page one of the, we will call it SOFA,

11   statement of financial affairs, for gross revenue.

12   And so we have got a revenue report through

13   April 30.  Does the Archdiocese -- this is actually

14   perhaps best put to Mr. Entwisle.  Does the

15   Archdiocese keep account of revenue on a daily

16   basis?

17   JEFFREY ENTWISLE:

18      I'm not sure how to answer that.

19   JAMES STANG:

20      Well, I will put it this way:  I'm trying to

21   figure out how much revenue was received between

22   March 17 when masses stopped and April 30.

23   JEFFREY ENTWISLE:

24      I don't know that answer.

25   JAMES STANG:

```
 1        Is that an answer that we could get from the
 2   books and records of the Archdiocese?
 3   JEFFREY ENTWISLE:
 4        Possibly.
 5   KATHLEEN ZUNIGA:
 6        Revenue related to what though?
 7   JAMES STANG:
 8        Revenue.  I mean, I don't know.  It's
 9   whatever -- if I asked you to break down the
10   $52,077,000, could you tell me how much came in
11   between March 17 and April 30?
12   KATHLEEN ZUNIGA:
13        Yes.
14   JAMES STANG:
15        Okay.  Now, I know your monthly operating
16   reports are not due yet, but do you know how much
17   revenue you received for the month of May?
18   KATHLEEN ZUNIGA:
19        I do not.
20   JAMES STANG:
21        Okay.  And when does the Archdiocese close its
22   books for the month, a given month?  How many days
23   after the end of the month does the Archdiocese
24   close its books for the month?
25   KATHLEEN ZUNIGA:
```

1       There's not a set schedule.  There is with the

2   monthly operating reports.  But, you know, I'd say

3   within 15 days.

4   JAMES STANG:

5       Okay.  So I would like you now to turn to

6   question two, which is on page 4.  Page 14 of 656,

7   page 4 on the form.  I am looking at the first line

8   item.  It says July 1, 2019 to April 30, 2020,

9   approximately $495,000 for rents, royalties,

10  proceeds, blah, blah, blah.

11      And this is for, as I understand it -- let's

12  see, if I scroll down to the footnote -- for the

13  administrative office.  Did the administrative

14  offices receive any interest on its accounts for

15  this period?  Because I don't see interest income

16  listed like it is on some of the other line items.

17  KATHLEEN ZUNIGA:

18      Are you referring to the rents and royalties

19  proceeds from sales of assets?  That line item?

20  Because there are interest --

21  JAMES STANG:

22      Yes.  I don't see it listed -- well, if I go

23  down a few, I see interest income for, I think

24  probably it's one of the schools.  I'd have to go

25  down to the footnotes.  But at least this

1   operating -- this administrative office number does

2   not reflect any.  In the title of description of

3   sources of revenue, it doesn't say interest income.

4   Some of the other line items do.  And so I was

5   wondering if interest income is included in the

6   $495,000.

7   KATHLEEN ZUNIGA:

8       No.  That was really just the base -- what was

9   included was the description.  It is not interest

10  income.

11  JAMES STANG:

12      Okay.  Was there interest income earned by the

13  administrative offices for this period?

14  KATHLEEN ZUNIGA:

15      Yes.

16  JAMES STANG:

17      I'm sorry.  I didn't hear you.

18  KATHLEEN ZUNIGA:

19      Yes.

20  JAMES STANG:

21      And where would I find that reported on the

22  schedules -- statement of financial affairs?

23  KATHLEEN ZUNIGA:

24      The Archdiocese, it is probably included in the

25  SOFA 1.1 in the revenue from business.  Because

1   the ...

2   JAMES STANG:

3       I'm going to take that as we will figure that

4   out.  Is that fair?

5   KATHLEEN ZUNIGA:

6       Yes.  I can confirm that.

7   JAMES STANG:

8       Okay.  Thank you.  I'm going to just put this

9   to whoever the right person is.  For fiscal year

10  2020, what has been the rate of return including

11  unrealized gains on portfolio a?

12  FATHER CARR:

13      I don't know that answer right now.

14  JAMES STANG:

15      How about the same question for portfolio B?

16  FATHER CARR:

17      Again, I don't know the answer right now.

18  JAMES STANG:

19      Okay.  I assume that is something that could be

20  discerned from the reports from the bank as it's

21  aggregated the accounts?

22  FATHER CARR:

23      Right.  That's correct.

24  JAMES STANG:

25      Okay.  I would like you to scroll down to 3.51,

```
 1   which is creditors who have received, I believe this

 2   is the 90 day payments.  And there are a number of

 3   people here whose names and addresses are

 4   intentionally omitted.  Can you tell me if there is

 5   a common reason why the names of these creditors

 6   have been omitted from the schedule -- from the

 7   statement of financial affairs?

 8   KATHLEEN ZUNIGA:

 9       I'm trying to locate them.

10   MARK MINTZ:

11       Mr. Stang, again, this is Mr. Mintz.  I'm not

12   under oath.  I can tell you in general, many of

13   these, and I'm going to let the people under oath

14   say it, were for school related payments in order to

15   keep us from naming especially minors who may need

16   to have gotten some payments or provide individual

17   information that was not needed to give specific

18   information, we did admit at that point.  We will be

19   happy to provide you or -- you know, we didn't want

20   to publicly put people's addresses, especially if

21   they were minors.

22   JAMES STANG:

23       Okay.  So a lot of these might be victim

24   support payments?

25   MARK MINTZ:
```

1    For example.  Or they could have been related

2    to school payments of some sort through the schools.

3    However they worked on giving money back to a

4    student or something like that.

5    JAMES STANG:

6        Okay.  But if it was a payment to a school as

7    opposed to an individual, that would have been

8    disclosed, I would assume?

9    MARK MINTZ:

10       Correct.

11   KATHLEEN ZUNIGA:

12       Yes.

13   JAMES STANG:

14       Okay.  I would like you to look at 3.238 on

15   page 46, and then there are a few more that go on to

16   the next page.  I'm not great at math, but I totaled

17   up the payments to Catholic Mutual Group to be

18   approximately $1.9 million.  And I would note that

19   some of these sums are rounded.  For example, one of

20   them is for $556,000 as opposed to 3.240 which is

21   down to a penny.  Actually, 240 and 241 of the exact

22   same amounts.  What do these payments relate to?

23   FATHER CARR:

24       I'm not sure without looking up documentation

25   on it.

1  JAMES STANG:

2      Would these be premium payments of some sort,

3  or deductible payments, or self-insured retention

4  payments?

5  FATHER CARR:

6      Not self-insured retention payments, no.

7  JAMES STANG:

8      Okay.  All right.  I would like you to look at

9  3.775.  This is a payment to -- I will find the page

10  for you in a minute.

11  MARK MINTZ:

12      Page 146 of 656.

13  JAMES STANG:

14      Actually, it's -- yes.  Thank you.  This is a

15  payment to the Hard Rock Hotel Universal in Orlando

16  for $10,760.  Why did the Archdiocese owe an amount

17  of that size to a hotel in Orlando?

18  KATHLEEN ZUNIGA:

19      That was on one of the high schools relating to

20  a school trip.

21  JAMES STANG:

22      Would that be a high school that was owned by

23  the Archdiocese.

24  KATHLEEN ZUNIGA:

25      Yes.

1   JAMES STANG:

2      Okay.  I would like you to go to 3.786, which

3   is just down a page or two.  There is a payment to

4   the Hilton New Orleans Riverside for almost $19,000.

5   What did this relate to?

6   FATHER CARR:

7      Oh, it related to the priests -- we have a

8   priest convention every year, and we rent out a

9   hotel for all of the priests to have a priest

10   convention.

11   JAMES STANG:

12      So this would have been for conference rooms?

13   FATHER CARR:

14      It would have been -- not only for conference

15   rooms for hotel rooms and -- the whole thing.

16   JAMES STANG:

17      Okay.  Would those be priests serving in the

18   diocese?

19   FATHER CARR:

20      Only serving in the diocese, yes.

21   JAMES STANG:

22      Okay.  I would like you to go down to 3.1500.

23   That is -- let's see if someone beats me to it.

24   MARK MINTZ:

25      Resto Group?

1  JAMES STANG:

2      Yes.

3  MARK MINTZ:

4      On page 267.

5  JAMES STANG:

6      Yes.  The total payments to Resto Group come to

7  about, I don't know, I think it is in excess of

8  $15,000.  What is the Resto Group?

9  FATHER CARR:

10      I don't know.

11  JAMES STANG:

12      Okay.  I looked at this address up on Google

13  maps, and it doesn't look like a business, at least

14  on the street level.  I saw some references to an

15  entity called the Resto Group that was a restaurant

16  operation.  Does that refresh anyone's recollection?

17  I'm not saying it's the same entity, but there is a

18  restaurant group business called the Resto Group.

19  KATHLEEN ZUNIGA:

20      Yeah, I think --

21  JAMES STANG:

22      No?

23  MARK MINTZ:

24      We will get back to you, Mr. Stang.

25  JAMES STANG:

 1        Thank you.  3.1538, this is a payment -- we are

 2   on page 273 of 656.  This is a $50,000 payment to an

 3   architectural firm.  You don't identify it as such

 4   but I looked them up.  Why is the Archdiocese

 5   engaging an architectural firm?

 6   FATHER CARR:

 7        Don't know specifically what project this might

 8   be.

 9   JAMES STANG:

10        Okay.

11   KATHLEEN ZUNIGA:

12        I think this is related to one of the high

13   schools, but I don't really ...

14   JAMES STANG:

15        And would that be at high school owned by the

16   Archdiocese?

17   KATHLEEN ZUNIGA:

18        Yes.  If you give me a minute, I can try to see

19   if I can figure out.

20   MARK MINTZ:

21        We will get back to you, Mr. Stang, on it.

22   JAMES STANG:

23        Okay.  Father Carr, are there any Catholic high

24   schools in the Archdiocese that are not owned by the

25   Archdiocese?

1    FATHER CARR:

2         Yes.  That's -- yes.

3    JAMES STANG:

4         Okay.  I would like you to take a look at

5    4.282.  And I think I may know the answer to this,

6    but I just want to check.  This is on page 390 of

7    656.  It shows a transfer to the Archdiocese --

8    4.282 for the transfer to the Archdiocese on

9    accounts of Archbishop Hannan High School.  Is just

10   another instance of, in effect, an intracompany

11   transfer?

12   KATHLEEN ZUNIGA:

13        Yes.

14   JAMES STANG:

15        Okay.  Let's see.  Please turn to 4.619.  Does

16   the Archdiocese provide any accounting services or

17   support to the Catholic Community Foundation?

18   FATHER CARR:

19        Payroll support.

20   JAMES STANG:

21        What about other accounting support?

22   KATHLEEN ZUNIGA:

23        No.

24   FATHER CARR:

25        Not that I can think of.

1    JEFFREY ENTWISLE:

2        They have their own accounting.

3    JAMES STANG:

4        Okay.  Why did the Archdiocese of New Orleans

5    of the Catholic Community Foundation approximately

6    $5,000?

7    FATHER CARR:

8        I'm not sure.

9    JAMES STANG:

10       Okay.  I would like you to scroll down the page

11   to 4.625.  Châteaux de Notre Dame.  What is Châteaux

12   de Notre Dame?

13   FATHER CARR:

14       It is a nursing home, assisted living facility.

15   JAMES STANG:

16       And is it a separate legal is from the

17   Archdiocese?

18   FATHER CARR:

19       Yes, it is.

20   JAMES STANG:

21       And what does the Archdiocese owe it money?

22   KATHLEEN ZUNIGA:

23       I don't know.

24   JAMES STANG:

25       And it is listed as an affiliate relationship

1   to the debtor.  What is the basis for the affiliate

2   relationship designation?

3       I heard someone say something, but I wasn't

4   sure if it was directed to me.

5   FATHER CARR:

6       The charges for Châteaux would be for some

7   retired priests that are living over there.

8   JAMES STANG:

9       Okay.

10  FATHER CARR:

11      Housing costs.

12  JAMES STANG:

13      Got it.  Please turn to 4.960, which is page

14  477 on the form and page 487 on the docketing

15  numbering.  What is -- I'm sorry.  I will wait until

16  you get there.

17  MARK MINTZ:

18      All right.  This is the Mater Dolorosa?

19  JAMES STANG:

20      Yes.  What is Mater Dolorosa Apartments?

21  FATHER CARR:

22      That is an elderly living facility.

23  JAMES STANG:

24      And can I assume that payments from the

25  Archdiocese to the apartments is likewise for

1    residential costs of retired priests?

2    FATHER CARR:

3        Yes, sir.

4    JAMES STANG:

5        Or personnel?  Okay.

6    FATHER CARR:

7        Yes.

8    JAMES STANG:

9        All right.  I would like you to look at section

10   nine of the SOFA.  Let's see.  These are payments --

11   these are gifts and donations.  I noticed -- and I

12   hope you can just take my word for it.  I noticed,

13   for example, that Notre Dame Seminary got a gift of

14   $20,000 as reported on your statement of financial

15   affairs.  Notre Dame Seminary has a custodial

16   account balance, according to the schedules, of

17   $3.5 million.  Why did the Archdiocese give 20 grand

18   to an entity that has $3.5 million on deposit?  And

19   I can direct you to -- these are alphabetical, if it

20   helps you, but the entry doesn't really tell you

21   much in terms of the gift of donation.  It just

22   tells you that it was a gift of donation.

23       My question is:  Why would it have --

24   FATHER CARR:

25       We don't know --

1   JAMES STANG:

2        -- made a gift to an entity that has

3   $3.5 million on hand?

4   FATHER CARR:

5        We don't know that.  We can't answer that.

6   JAMES STANG:

7        All right.  Project Lazarus got collective

8   donations as recorded of approximately -- my notes

9   look like they say $56,000.  It has funds on deposit

10  in the custodial account of $1.4 million.  Why did

11  the Archdiocese make a gift of $56,000 to an entity

12  that has $1.4 million in its bank account?

13  FATHER CARR:

14       Again, I can't answer that.  I don't know.

15  JAMES STANG:

16       Okay.  I would like you to -- we are almost

17  done.  I would like you to look at 9.142, which is

18  on page 547 of the form and page 557 of the document

19  number.  It shows a donation of $120,000 to a

20  Catholic Archdiocese of Nassau Foundation in Coral

21  Gables, Florida.  And actually, there is another

22  donation, the next down, but it is only for about

23  $10,000.  Why did this Archdiocese make a donation

24  of almost $130,000 to a Florida foundation?

25  FATHER CARR:

1      I don't know.

2  KATHLEEN ZUNIGA:

3      We do know.

4  JEFFREY ENTWISLE:

5      That was a pass through donation.  It was

6  collected here and then sent to them.

7  KATHLEEN ZUNIGA:

8      For a disaster relief fund.

9  JAMES STANG:

10      When you say pass through, was this a second

11  collection?

12  FATHER CARR:

13      Yes.

14  JEFFREY ENTWISLE:

15      That's a good way to describe it.

16  JAMES STANG:

17      Okay.  Let's see.  I would like you to go down

18  to 9.145.  Why did the Archdiocese make a gift to

19  the catholic cemetery of $68,000?

20  FATHER CARR:

21      That was a land transfer.

22  JAMES STANG:

23      And why did the Archdiocese transfer -- well,

24  it was a land transfer.  How did you come up with a

25  value of $67,841.07?

1    FATHER CARR:

2        I would have to look back and see how the

3    valuation was determined.  But it was a transfer to

4    St. Tammany Catholic Cemetery for the property where

5    the third party is operating a cemetery and a

6    funeral home.

7    JAMES STANG:

8        And had that property been used by the cemetery

9    for operations prior to the gift and prior to the

10   transfer?

11   FATHER CARR:

12       I don't remember the timing of when they got

13   started, when they started operating.  No.

14   JAMES STANG:

15       Okay.  This is a little tongue-in-cheek, but I

16   want to find the appraiser who got a land value down

17   to 7 cents.  Maybe that's the one you will be

18   hiring.

19       Okay.  I would like you to scroll down to 10.2,

20   please, which is -- these are losses.  Can you tell

21   me what happened in this auto collision that

22   occurred a $132,000 property loss?  Did somebody

23   drive into a building?

24   FATHER CARR:

25       I don't know the answer to that.

 1   JAMES STANG:

 2        Okay.  Well, it looks like you got paid most of

 3   it.  But that just struck me.  I see, 10.2, there is

 4   an address.  I don't know, is Howard Avenue building

 5   the address for the chancery?

 6   FATHER CARR:

 7        No.

 8   JAMES STANG:

 9        What operation occurs there?

10   FATHER CARR:

11        We have a building located over there.

12   JAMES STANG:

13        Yeah.  But what happens there?

14   KATHLEEN ZUNIGA:

15        There are several offices within the

16   administrative offices that are housed there.  I

17   know HR is housed there.  Other industries are

18   housed there.

19   JAMES STANG:

20        Do any entities, do any businesses unrelated to

21   the Archdiocese, operate out of that property?

22   FATHER CARR:

23        Yes.

24   JAMES STANG:

25        And when I say Archdiocese, I'm using the term

```
 1   in a very broad ecclesiastical sense.
 2   FATHER CARR:
 3       Yes.
 4   KATHLEEN ZUNIGA:
 5       No.  Wait a minute.
 6   FATHER CARR:
 7       Wait.  I'm sorry.
 8   JAMES STANG:
 9       In other words, like the foundation might be
10   there --
11   KATHLEEN ZUNIGA:
12       Mr. Stang, I want you to --
13   MARK MINTZ:
14       Hold on one second, Mr. Stang.  Just not talk
15   over.  I want you to ask the question again to
16   Father Carr, because I'm not 100 percent sure he
17   heard that point.  Because I think you were using
18   the word Archdiocese very broad there, so I want to
19   be --
20   JAMES STANG:
21       Right.  I am using the term Archdiocese very
22   broadly to include, for example, Catholic Charities
23   or the foundation.  Are there any businesses
24   unrelated to the Archdiocese --
25   FATHER CARR:
```

1      No.

2  JAMES STANG:

3      -- at 1000 Howard Avenue?  Okay.  10.2 says off

4  and dir, which I assume means officer and director,

5  hyphen LBI.  What does LBI stand for?

6  KATHLEEN ZUNIGA:

7      Liability?

8  MARK MINTZ:

9      Really?

10 KATHLEEN ZUNIGA:

11     I don't know.  I don't know.  Director, LBI?  I

12 don't know.

13 JAMES STANG:

14     Is this claim related to the payroll fraud

15 claim that the Archdiocese has?

16 FATHER CARR:

17     I'm not sure.

18 JAMES STANG:  Okay.

19 AMANDA GEORGE:

20     Mr. Stang, I am just coming in to let you know

21 to start wrapping it up, because we are about to

22 lose our audio recording.

23 JAMES STANG:

24     Coming in?  You haven't been here the whole

25 time?

1   AMANDA GEORGE:

2        Oh, I've been here.

3   JAMES STANG:

4        I am actually just about done.

5   AMANDA GEORGE:

6        Thank you.

7   JAMES STANG:

8        Just scroll down -- I only have two or three

9   more questions.

10  AMANDA GEORGE:

11       Great.

12  JAMES STANG:

13       Section 19, does the Archdiocese maintain a

14  safe on any of its premises?  Be it the Howard

15  Avenue or the chancery, is there a safe with a

16  combination lock on it?

17  FATHER CARR:

18       Yes.

19  JAMES STANG:

20       And do those safes contain anything other than

21  files related to Canon 489, which is -- I assume,

22  Father Carr, do you know what I mean, what I'm

23  referring to when I say Canon 489?

24  FATHER CARR:

25       I do not.

1   JAMES STANG:

2      Canon 489 provides that the Bishop shall

3   maintain control over any documents that -- and

4   these are my words it -- relate to scandal.  Some

5   people refer to these as perpetrator files or abuse

6   files.  They are not exclusively that, but those

7   files would certainly fall under the protections of

8   Canon 489.

9      So do these safes contain any documents that

10   would be protected under Canon 489?

11   FATHER CARR:

12      I don't know.

13   JAMES STANG:

14      What is in the safes at these premises?

15   FATHER CARR:

16      Again, I don't know what's in there.

17   JAMES STANG:

18      Does the diocese maintain an inventory of the

19   contents of the safes?

20   FATHER CARR:

21      Not to the best of my knowledge.

22   JAMES STANG:

23      Would that be something that would fall within

24   the province of the archdiocesan archivist?

25   FATHER CARR:

 1        I'm not sure.

 2   JAMES STANG:

 3        Okay.  Does the Bishop maintain any locked

 4   files or drawers that are under his exclusive

 5   control?

 6   FATHER CARR:

 7        I don't know the answer to that.

 8   JAMES STANG:

 9        Father Carr, do you maintain any locked

10   cabinets that are under your exclusive control?

11   FATHER CARR:

12        No.

13   JAMES STANG:

14        Okay.  And then, just one more category and

15   then I am done.  And I appreciate everyone's

16   patience today.

17        I am looking at section 21, I will specifically

18   say 21.45.  This is on page 597 of 656.  There are

19   entries here for Catholic Community Foundation, and

20   they go on from 21.42 through 21.123.  There are

21   over 80 injuries.  At just a glance, they are all

22   for portfolio a.  Why is there a separate listing of

23   the statement of financial affairs for the Catholic

24   Community Foundation for these specific amounts?  I

25   mean, why are they being reported that way?

1    KATHLEEN ZUNIGA:

2         So the Catholic -- the donations, these are

3    funds that were set up at the Catholic Community

4    Foundation.  Many of them have custodial funds or

5    endowment funds by agencies or third parties that

6    they put on deposit with the Catholic Community

7    Foundation.  The Catholic Community Foundation then

8    took those funds and invested them in portfolio a.

9    JAMES STANG:

10        Okay.  So somewhere in the books and records of

11   the foundation, I would see in effect the

12   parenthetical that would identify who the donor was?

13   KATHLEEN ZUNIGA:

14        Yes.

15   JAMES STANG:

16        Okay.  Those are all of the questions that I

17   have on the debtor's statements and schedules as

18   filed, and I appreciate the time US Trustees

19   afforded the committee to ask these questions.

20   AMANDA GEORGE:

21        Thank you so much, Mr. Stang.  As I said

22   earlier, what I'm going to do is, probably sometime

23   later today or over the weekend, I will file a

24   proceeding memo detailing some of the items that the

25   US Trustees still needs and some of the amendments

1  that we discussed.  So just be on the lookout for

2  that.  Otherwise, we can conclude our meeting of

3  creditors.

4  JAMES STANG:

5      Ms. George, can I interrupt for a second?

6  AMANDA GEORGE:

7      Yes.

8  JAMES STANG:

9      I apologize to you, but someone e-mailed me

10 something and it pertains to what you were just

11 saying.

12     I expect, because I have spoken with Mr. Mintz,

13 that we are going to have a flow of information

14 between the committee in the Archdiocese.  And

15 today's questions should not reflect anything other

16 than the fact that it gives us an opportunity.

17 Mr. Mintz says, and he said today and he said in a

18 phone call, that he expects to have good

19 communications with us, and we hope the same is true

20 from the committee to the Archdiocese.

21     But if the schedules are going to get amended,

22 I would ask that the US Trustee put this into a

23 holding date and, if we are able to get

24 clarifications from the Archdiocese for whatever is

25 going to be amended, we would give as much notice as

1    possible to the US Trustee the fact that we don't

2    need the hearing to be -- the meeting to be

3    convened, at least not with any questions coming

4    from the committee.  But if these are going to get

5    amended and we don't have another meeting to ask

6    questions if we don't otherwise have answers, I

7    don't think that's a good result.  But it is your

8    meeting.  Obviously, I will leave it to you.

9    AMANDA GEORGE:

10        What I will do, Mr. Stang, is chat with our US

11   Trustee and we will make a determination on that

12   front.  But I can't give you a response right this

13   moment.

14   JAMES STANG:

15        Okay.  Thank you for considering.

16   AMANDA GEORGE:

17        Sure.  And if there is anybody still on the

18   line that would like a copy of the audio recording,

19   again, please call me at (504)589-4092, or e-mail me

20   at Amanda.B.George@US DOJ.gov.  I would like to

21   thank all of the parties for your participation

22   today.  I think you for your patience and endurance.

23   Thank you very much.  That does conclude our meeting

24   of creditors.

25                    (Meeting is concluded.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1              REPORTER'S PAGE

 2         I, Lesley H. Crochet, Certified Court

 3    Reporter No. 20079, in and for the State of

 4    Louisiana, the officer, as defined in Rule 28 of the

 5    Federal Rules of Civil Procedure and/or Article

 6    1434(B) of the Louisiana Code of Civil Procedure,

 7    before whom this proceeding was taken, do hereby

 8    state on the Record:

 9              That due to the interaction in the

10    spontaneous discourse of this proceeding, dashes

11    (--) have been used to indicate pauses, changes in

12    thought, and/or talkovers; that same is the proper

13    method for a Court Reporter's transcription of

14    proceeding, and that the dashes (--) do not indicate

15    that words or phrases have been left out of this

16    transcript;

17              That any words and/or names which could

18    not be verified through reference material have been

19    denoted with the phrase "(spelled phonetically)."

20

21

22

23                     _____

24                     Lesley H. Crochet, CCR No. 20079

25
```

```
 1              COURT REPORTER'S CERTIFICATE

 2    I, Lesley Harris Crochet, certified court reporter

 3  in and for the State of Louisiana, do hereby certify

 4  that the foregoing 227 page transcript of the 341

 5  hearing of The Roman Catholic Church of the

 6  Archdiocese of New Orleans, held on May 29, 2020,

 7  was prepared and transcribed by me and it is a true

 8  and correct transcript to the best of my ability and

 9  understanding; that the transcript has been prepared

10  in compliance with transcript format guidelines

11  required by statute or by rules of the board, that I

12  am informed about the complete arrangement,

13  financial or otherwise, with the person or entity

14  making arrangements for deposition services; that I

15  have acted in compliance with the prohibition on

16  contractual relationships, as defined by Louisiana

17  Code of Civil Procedure Article 1434 and in rules

18  and advisory opinions of the board; that I have no

19  actual knowledge of any prohibited employment or

20  contractual relationship, direct or indirect,

21  between a court reporting firm and any party

22  litigant in this matter nor is there any such

23  relationship between myself and a party litigant in

24  this matter.  I am not related to counsel or to the

25  parties herein, nor am I otherwise interested in the
```

1    outcome of this matter.

2            WITNESS my hand and official seal this 7th

3    day of June, 2020.

4

5

6                        _____

7                        Lesley H. Crochet, CCR

8                        Louisiana License No. 20079

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1** 174:18

**$1.4** 214:10,12

**$1.9** 205:18

**$10,000** 214:23

**$10,760** 206:16

**$100,000** 109:6,8 126:1,6 131:12, 14 135:11 139:3,9

**$103** 58:18 59:8

**$120,000** 214:19

**$130,000** 214:24

**$132,000** 216:22

**$15,000** 208:8

**$19,000** 207:4

**$2** 151:16 167:12

**$2,059** 27:15

**$2,154** 25:25

**$2,548,560** 46:15

**$20,000** 135:12,18,23 138:5,6,24 140:4 213:14

**$2175** 24:2

**$250,000** 21:4

**$275** 45:3

**$3.5** 213:17,18 214:3

**$35,000** 170:25

**$400** 24:1 25:25

**$495,000** 201:9 202:6

**$5,000** 21:24 211:6

**$50,000** 209:2

**$500,000** 139:9,11,18

**$52,077,000** 200:10

**$538,000** 173:17

**$556,000** 205:20

**$56,000** 214:9,11

**$6,664.74** 28:15

**$600** 24:3 27:15 29:25

**$631,000** 178:12 179:1

**$631,448** 177:6

**$67,841.07** 215:25

**$68,000** 215:19

**$80,000** 169:14 170:13 171:11 172:13

## 1

**1** 2:13 49:3 50:4 52:22 201:8

**1.1** 202:25

**10** 39:9 68:15 113:10 153:17 168:12

**10,000** 84:3,24

**10.2** 216:19 217:3 219:3

**100** 10:1,2 50:6,10,13 85:19 99:15, 19 103:16,19 218:16

**100-** 85:12

**1000** 219:3

**103** 45:25

**10:00** 2:7

**11** 2:8,12 9:25 11:14 53:6,7 180:25 181:3,4

**111** 145:14

**112** 38:3,11

**1157** 187:2 189:9

**11a** 41:4

**1242** 192:5

**1298** 40:24 131:1 149:7 158:8 166:25 175:12 183:2 187:2 189:9 192:5

**13** 45:24 149:6,9

**14** 83:25 122:18 123:16,17 124:20 201:6

**14.1** 149:9

**14.2** 150:8

**14.3** 150:16

**14.4** 150:15

**146** 206:12

**15** 46:16 67:21 201:3

**15.2** 150:25

**16** 85:10 192:13

**17** 114:17 199:7,22 200:11

**17.9** 119:9 120:4 146:6

**18** 7:16 16:15

**19** 220:13

**1962** 109:5

**197** 35:1

**1980s** 48:19

**19th** 110:5

## 2

**2** 73:6 167:17

**2,000** 73:1

**2,000,549** 151:5,15

**2.1** 192:12

**2.105** 193:17

**2.152** 194:15

**2.153** 195:22

**2.154** 196:14

**2.156** 197:3

**2.78** 192:13

**2.87** 193:6

**20** 35:20 131:1 213:17

**20-10846** 2:10

**2018** 22:11 46:16 73:6 153:24

**2019** 69:13 70:8 181:8 201:8

**2020** 2:7,13 7:17 16:24 201:8 203:10

**20th** 110:5

**21** 153:23 222:17

**21.123** 222:20

**21.42** 222:20

**21.45** 222:18

**24** 39:10 40:15,18,23 158:9

**240** 205:21

**241** 205:21

**25** 16:24 149:7

**25,000** 84:3,24

**267** 208:4

**27** 11:10

**273** 209:2

**29** 2:7

**2:00** 198:18

---

**3**

**3** 167:21

**3.117** 189:9,13 190:21

**3.1500** 207:22

**3.1538** 209:1

**3.238** 205:14

**3.240** 205:20

**3.51** 203:25

**3.53** 187:1,2,5

**3.54** 187:22

**3.775** 206:9

**3.786** 207:2

**30** 45:15 198:13 199:13,22 200:11 201:8

**30-ish** 148:13

**300** 122:13 124:7

**306** 54:20 55:7

**341** 2:6 51:18

**35** 158:8

**35,000** 171:5

**38** 43:13

**390** 210:6

---

**4**

**4** 130:24 131:4 201:6,7

**4.282** 210:5,8

**4.619** 210:15

**4.625** 211:11

**4.960** 212:13

**42.1** 158:23

**42.183** 158:23

**45** 158:8

**46** 205:15

**477** 212:14

**487** 212:14

**489** 220:21,23 221:2,8,10

---

**5**

**5** 112:21 153:17

**50** 142:22

**500,000,000** 85:12

**501(c)(3)** 152:3

**504 589-4092** 5:17

**547** 214:18

**55** 43:13 55:15 166:24 192:13

**557** 214:18

**58** 172:16

**585** 45:25

**597** 222:18

---

**6**

**602** 35:1

**62** 172:16 175:12

**631** 177:9

**64** 183:1

**656** 45:25 201:6 206:12 209:2 210:7 222:18

**66** 131:3 149:6,9 158:9 166:24 175:12 183:1

---

**7**

**7** 112:18 177:9 181:1 216:17

**71** 159:12 166:22

**71.17** 173:16

**71.4** 169:13

**73** 175:12

**73.5** 175:8,12

**75** 183:1

**75.1** 183:4

**75.6** 183:4

**76** 183:2

---

**8**

**8** 131:3

**80** 222:21

**83** 43:19

**84** 19:4

**842** 187:2

**863** 189:9,14

**87** 19:2,5

---

**9**

**9** 52:24 149:10,11,13,17,22 150:6

**9.142** 214:17

**9.145** 215:18

**90** 11:10 166:9,11 204:2

**926** 187:1

**947** 189:14

**948** 189:9

**975** 44:18

---

**@**

**@usdoj.gov** 47:14

---

**A**

**A-M-A-N-D-A** 5:19

**a.m.** 2:7

**A/b55** 116:20

**AB** 39:9 43:12

**AB11** 115:20

**AB55** 55:15 116:10

**ability** 145:4,5,10 171:12 172:5

Section 341 Meeting of Creditors

May 29, 2020
Index: absolutely..Amanda

**absolutely** 31:2

**abstract** 110:7 111:2,12

**abuse** 48:17,21 50:10,25 52:23 53:9,12,18 57:9,25 58:6 61:23 68:5 69:12 70:1,10 71:9 72:10 82:7 83:17 85:20 86:20 94:7 96:12 101:22 102:3 108:7 117:11,17,23 163:11,25 164:8,14 165:4 190:25 221:5

**abused** 160:19

**abusive** 160:16

**Academy** 20:24 150:10 193:18

**accept** 59:7,23 61:5 163:7

**acceptable** 60:8

**accommodation** 81:8

**accordance** 65:21

**account** 20:2,3,11,13,14,20,22,23, 24,25 21:11,22,23,24,25 122:9,10, 21 123:1,22 124:1,4,5,11,13,14,15 125:15,16 126:2,15 129:5,19,24 130:7,10 131:4,5,6 132:1,8,17,23, 24 136:5,7,12,15,17,20,23,24 137:3,20 138:5,7,15 146:21,23 147:13,15,19 150:16 171:19 174:1 199:15 213:16 214:10,12

**accountant** 91:17 100:25

**accountants** 100:23

**accounted** 120:14

**accounting** 32:9 36:16 91:4 144:24,25 145:6,8 157:21 196:18 210:16,21 211:2

**accounts** 18:24,25 19:2,3,5,6,7 20:7 22:6 39:10,11,12,13,18 40:10 45:5 115:21 116:1 122:13 123:24 124:21,22 125:5 133:2 137:5 146:25 147:12 150:17 173:15 201:14 203:21 210:9

**accrued** 37:8,9

**accurate** 45:7 160:17 163:12

**accused** 57:3 73:7 160:15

**ACH** 135:24

**acknowledged** 73:13

**acquire** 46:17

**acquired** 108:23

**act** 14:20

**acting** 9:5 159:21

**action** 7:12 50:22,24

**actions** 48:13

**active** 189:22 190:3

**activity** 132:23 145:6

**ad** 43:14 110:10 111:8

**Adams** 48:3,4,10,16 49:23 50:2,15 51:20 52:16,18 54:9 61:2

**add** 18:22 98:13

**additional** 13:19 80:4

**address** 9:1 11:14 13:10 16:5,6,7 50:25 55:7 168:23 169:1 208:12 217:4,5

**addresses** 204:3,20

**administration** 6:25 143:15,17

**administrative** 6:13 16:12 28:11 29:16,20,22 39:22 46:20 111:22 112:2 187:14 201:13 202:1,13 217:16

**admission** 45:1

**admit** 204:18

**adopt** 14:2 44:9 75:15

**advantage** 145:16

**advice** 68:24 79:11

**advisable** 148:20

**advise** 101:2

**advised** 146:15

**advisor** 3:7 16:17

**advisors** 16:17 53:1 124:20

**advocated** 118:4

**affairs** 7:3 12:5 23:22,25 25:17,21 27:14 29:13 35:16 45:23,24 97:18 98:1 114:22 161:1 198:10 199:11 202:22 204:7 213:15 222:23

**affected** 180:19

**affiliate** 13:6 114:20,23,25 115:6 211:25 212:1

**affiliates** 12:19,20 116:7 120:21

**affirm** 4:6,17,24 76:21,24 77:6

**affirmed** 76:18 99:21

**affixed** 35:15

**Affordable** 106:4

**afforded** 223:19

**afield** 57:14

**agencies** 223:5

**agency** 104:13

**agent** 180:20

**aggregate** 179:8

**aggregated** 203:21

**agree** 37:17 39:4 45:7,18 49:18 50:9 52:11 54:3,4 57:8,24 58:3,5 61:21 62:9,18 64:14 73:4,18 74:10 86:13 109:15 161:23 162:5

**agreement** 75:22 125:15 133:13, 25 134:3,8 179:18 180:18 189:2 192:16,19,20 193:7,8 194:10,16, 19,21 195:23 196:2 197:4

**agreements** 53:8 117:7,9,10,16, 25 118:10 146:16 197:16

**ahead** 44:25

**akin** 13:5

**Akpoghiran** 26:24

**allegations** 51:1

**alleged** 160:18 162:7 177:17

**allocated** 124:20

**allocation** 125:6

**allowed** 6:23 10:3,5 50:13 65:16, 17,25 83:10,24 84:4 85:14,19,20 99:16,20,25 100:3,9,10,16 101:4, 10,16 102:16 103:17

**alluded** 113:8

**alphabetical** 213:19

**Amanda** 2:1,2 3:12,20,25 4:10,15, 21 5:4,18 13:23 14:6,8,14,19,24 15:5,10,16 16:4,10,21 17:9,14 18:2,7,13,19,21 19:10,14,20,24 20:6,17 21:2,8,16,21 22:4,9,18,23 23:4 24:9,14,21 25:1,6,11,15,23 26:6,11,18,23 27:7,12,21 28:1,13, 19 29:1,6,11,17,23 30:3,8,15,22 31:4,10,16,22 32:1,5,11,17,18,22 33:2,6,11,15,19,24 34:2,9,16,23 35:7,11 36:24 37:4,12,16,21 38:9,

13,22 39:3,8 40:3,8,14,18,22 41:2, 13,17,23 42:1,4,9,16,17,25 43:7,18 44:1,8,15 45:10,16,21 46:8,13,24 48:8 52:10,15 54:2,8 56:17 59:19 60:6,7,12,18,24 64:19,24 65:4 66:9,15,16,18,23 67:2,8,13,23 72:13 74:3,18,23 75:3,20 76:3,14 77:1,11 80:23 81:5,10,11,23 82:3, 12,18,22 83:7,19 84:8 87:18 92:19 95:9,13 139:5 148:3,12,22 149:2 162:22,23 163:17 186:15,19 198:7, 15 219:19 220:1,5,10 223:20 224:6

**Amanda.b.george@usdoj.gov.** 5:18

**amend** 12:14 45:1 98:2,13

**amended** 45:9 137:22 224:21,25

**amendment** 34:7 45:11 197:5

**amendments** 13:13,19 15:18,24 36:4 197:22 223:25

**America** 175:15

**amount** 29:14 46:22 47:25 55:16 140:20 141:6 142:20 167:13,15 177:5,6,7 188:4,11 206:16

**amounts** 10:5 24:5 26:2 27:16 28:21 123:2 146:20 167:24 171:20 179:7,8,9 205:22 222:24

**analogous** 92:14

**and/or** 59:7

**Ann** 194:4

**Ann's** 48:18

**annual** 170:14,19

**anonymous** 8:6

**Anselm** 54:22 55:9

**Anselmo** 56:3

**answering** 75:13,14

**answers** 75:16 107:21 137:22 166:6

**anticipate** 3:21 5:22 11:20

**anyone's** 208:16

**apartments** 212:20,25

**apologize** 82:14 83:1,6 112:6 121:6 127:25 130:20 186:23 224:9

**apparently** 115:17 131:12

**appears** 80:24 177:3 196:15

**applicable** 98:4

**application** 16:13,15 138:25 140:1

**applications** 139:21

**applies** 158:19

**apply** 51:14 142:25

**appointed** 91:20

**appraisal** 110:7 111:2

**appraised** 158:10,14

**appraiser** 112:9,14 216:16

**approval** 135:15 139:20 142:1

**approvals** 135:13

**approve** 112:9

**approved** 135:18,19 140:11 141:2

**approves** 94:5,6 95:4

**approximately** 68:10,14 151:16 171:10 201:9 205:18 211:5 214:8

**April** 199:13,22 200:11 201:8

**Archbishop** 13:1 23:19 24:17 25:21 26:8 49:5,10,18 50:4,17 51:5 52:20,25 53:10,16 61:3,5,10,14 92:4 93:18 105:11 139:12,14 152:2 170:25 210:9

**archdiocesan** 94:5,7 95:24 118:19,23 119:11,16 120:18 121:11,15,23 122:15 139:15 144:24 147:13,15 164:13 170:17 178:6 221:24

**Archdiocese** 2:9,22 6:7,17 9:21, 24 10:2 12:24 13:2 14:16,21 16:23 19:1 20:11 23:24 24:4,17 25:22 26:1 27:9,18 28:5,22 29:18 30:4,9, 11,20,21,24 32:10,14 43:14 48:13 50:9,18,20 51:13 53:10,16,22 54:19 55:10,24 56:3 57:2,8,24 58:5 59:7,23 61:13,14,23 62:12 68:5 70:9 72:4,9 73:6 78:15 79:6,7,23 80:11,15,22 84:2 85:19,22 86:16 88:3,9,19,24 89:4,9,10,16,19 90:1, 7,19,20 91:25 92:16 94:6 95:3,6 96:11 98:11,12 99:8 101:20 102:1, 8,15,24 103:13 104:2,11,18,20,22 105:22 106:6,9 107:3,6 108:17,23 109:4,17,21 110:6,10,24 111:9,25 112:2,8,13,22 118:11 120:6,7,15

**121:1** 122:10,14 123:25 124:3,4 125:25 128:14 130:1,6,15,21 131:5,21,23,24 132:18 133:14,21 135:1,6 136:3,15 138:24 140:14 141:5 143:18 145:4,12 146:5,7,13, 22 149:14 150:11 151:3 152:8,10 153:11 154:2 155:14,21,23 156:6, 22 157:3,21 158:21 160:23 161:11, 14 164:1,6 165:2,5 166:1,11 167:19 170:3 172:19 173:8,10,17, 25 174:20 175:13,25 177:1,25 178:11,14,18,23,25 179:5,8,12,15, 17,22 180:4,7,11,19,20 181:8,11, 12 182:7,13,18,22,23 183:14,21 184:9 187:6,22 188:16,22 189:3 193:2,19,23 194:5,9 196:6,19 198:22 199:13,15 200:2,21,23 202:24 206:16,23 209:4,16,24,25 210:7,8,16 211:4,17,21 212:25 213:17 214:11,20,23 215:18,23 217:21,25 218:18,21,24 219:15 220:13 224:14,20,24

**Archdiocese's** 12:25 13:8 163:9 196:1

**architectural** 209:3,5

**archivist** 221:24

**area** 52:19 108:6

**areas** 10:19 48:23

**arm** 146:13

**arrangement** 56:2

**art** 18:9

**article** 50:3

**articles** 158:22

**artifacts** 18:8

**aspect** 138:19

**aspects** 6:13

**asserts** 162:7

**assessed** 43:14 110:11

**assessment** 39:20,25 40:4

**assessments** 39:15,19,23

**asset** 122:18

**assets** 12:4 13:1 36:13,14,18,20 37:7,8 38:3,4,11,17,24 39:2 47:8 97:12 98:10,12,14 106:13,15,17,24 108:13 119:17 141:7,12 142:7 156:23 201:19

**assist** 191:12

**assistance** 145:8 165:2

**assisted** 79:23 211:14

**assists** 25:20

**association** 2:17

**assume** 63:9 64:4,13 66:20 105:15 114:14 132:6 136:22 139:20,21 142:11 152:3 166:6 177:8 203:19 205:8 212:24 219:4 220:21

**assuming** 64:13 79:19 94:12 109:6

**assurances** 52:20

**assure** 49:6

**attached** 93:15 134:8

**attachment** 23:20

**attachments** 180:13

**attempt** 51:15

**attention** 199:10

**attorney** 2:3,21 7:19 8:2,5,11 9:19 47:14,17,23 77:15 90:9 103:22 162:6 179:5,24

**attorneys** 8:9 47:4,6 53:14 70:19 71:10 72:5 77:15 101:2

**audible** 15:12 196:12

**audio** 5:13,16 15:13 219:22

**audio/background** 10:25

**August** 11:10

**authorities** 177:21

**authority** 14:20,25 20:2 86:17 139:2

**authorization** 19:16 34:13

**authorized** 19:6 20:9,21 93:14

**authorizing** 23:14

**auto** 216:21

**Avenue** 16:7 131:17 217:4 219:3 220:15

**aware** 19:23 24:20 26:17 27:20 96:16,20,22,25 97:3 101:14,18 117:21 118:2,6 119:11 164:3,4,10 165:21 171:8,15 173:9,12 184:22

**Aymond** 23:19 26:8 49:5,18 51:5 52:20,25 54:3 61:3,6,14 96:17,23 97:5,11

**Aymond's** 24:17

---

**B**

**bachelor** 91:3

**back** 34:7 42:2,8,11,13,24 43:4 51:1 55:14,18 67:1,4,7,17 81:1,7 83:6,11 87:21 92:1 110:5 116:3 123:3 163:7,18 172:13 179:15 189:19 190:20 196:23 205:3 208:24 209:21 216:2

**background** 41:16 80:19 90:25 92:22 122:9

**balance** 21:24 142:12 151:2,8,23 167:12 171:21 213:16

**balances** 174:1

**balancing** 133:2

**Baldone** 65:8,9,10,23 66:5,7,10

**bank** 18:24 19:16 20:12,16,20,25 22:5 43:20 120:17 122:4,11 126:12,13 129:5,13,19,23 136:6 137:19 138:22 147:20 203:20 214:12

**bankrupt** 50:7

**bankruptcy** 2:10,22 4:3 6:6,9,25 7:2 9:4 11:19 12:20 22:6 25:3 35:21,24,25 48:14,22 49:3,20 51:23,25 52:3,22 53:23 61:8,16,25 65:21,24 66:4,6 70:7 83:25 84:5 85:21 93:15 97:13,19 99:12,18 100:4,15 101:3,4 102:17,24 103:4,6,13,14 104:3 111:5 112:8 160:24 161:5,10 162:17 177:2 179:6 180:25

**Baptist** 184:17,23 185:9 189:20 190:16

**bar** 10:21,22 11:6,9,13,21 162:21

**Barclay** 24:4

**base** 202:8

**based** 13:11 21:6 34:20 35:24 37:15 84:3 108:22 109:1 182:7

**basically** 166:23

**basis** 43:22 44:20 84:23 85:5,13

**98**:3 132:22 133:3 135:4 145:5 188:18 190:21 199:16 212:1

**beats** 207:23

**begin** 137:13

**beginning** 36:6 52:6 76:19 99:23 109:14 196:25

**behalf** 3:15 14:20 24:5,17 26:2 61:12 75:8 87:21 90:18 162:8 180:10,15,16

**believes** 57:2 183:21

**belong** 38:24

**belonged** 39:2

**belonging** 38:25

**beneficial** 6:3

**benefit** 64:15 192:15,16

**benefits** 37:9 57:4 73:5 194:11

**Benjamin** 83:16

**bigger** 145:20

**bills** 110:9

**binding** 36:1

**bird** 5:19

**bishop** 25:20 26:14 96:5,17,23 97:5,11 221:2 222:3

**Bishops** 117:22

**bit** 30:13 34:4 145:20

**blah** 201:10

**BMO** 20:11

**board** 32:12 164:7,13,14

**boilerplate** 113:7

**Boldissar** 66:20 77:16 134:16

**bond** 44:4 184:14

**book** 36:13,17 108:13,14,16,19 109:8 110:2

**bookkeeping** 13:8

**books** 12:23 108:20 120:16 200:2, 22,24 223:10

**borrow** 138:23

**borrowed** 140:21 188:11

**borrowers** 142:7 143:1

**borrowing** 142:12

**bottom** 40:21

**Boulevard** 189:21

**BP** 167:2

**breadbox** 145:21

**break** 42:15 66:22 74:1 81:9 200:9

**briefly** 55:22

**bringing** 197:1

**broad** 38:17 218:1,18

**broadcasting** 5:12

**broadest** 10:18

**broadly** 218:22

**brought** 11:16 21:9

**building** 55:17 93:5 151:2,8 190:11 216:23 217:4,11

**buildings** 36:25 185:20

**bumps** 10:10

**bunch** 125:2

**business** 7:1 24:8,10 26:5 51:22 106:2 152:20 155:14 202:25 208:13,18

**businesses** 156:8 217:20 218:23

---

**C**

---

**cabinets** 222:10

**cable** 24:15 26:13 27:17

**calculation** 122:20

**calendar** 69:13 70:8

**call** 5:11,17,23,24 6:19 7:10 8:7,9, 18,23 9:8,10,11 23:5,9 35:14 41:19 42:8,11,13,20,21 47:18,22 54:12 56:20 60:22 65:8 68:1 75:11 81:1,7 125:12 126:12 163:1 199:10 224:18

**called** 60:21 125:25 144:13 208:15,18

**Calleri** 48:18

**calling** 42:2

**calls** 43:8

**camera** 3:2

**Canon** 220:21,23 221:2,8,10

**capabilities** 67:15 148:6

**capacities** 88:13

**capacity** 94:1

**capital** 41:10 140:8,9 142:23

**captive** 13:17 71:13 88:18 89:12 107:22 187:24

**card** 24:5,6 26:1,2 172:18,19

**Cardmember** 26:1

**cards** 169:24

**care** 156:7

**Carr** 3:3,17 4:5,8 14:1,4,9,12,17,22 15:3,8,14,23 16:2,8,16,19 17:25 18:5,11 24:7,11,19,22,24 25:4,9, 13,19 26:4,9,16,21 27:5,10,19,24 28:6 29:8,9,12,15,19 30:1,5,14 31:3,5,8,14,20 32:3,7 33:22 35:5,9 37:17,19 39:4,6 41:11,20 43:16,23 44:9,13 45:17,19 48:11,14 49:2,24, 25 50:12,21 52:11,13 54:4,6 57:1, 5,22,24 58:2,8,14,23 59:2,3,12,13, 16,17,18 60:5,7,10,11 61:1,9,17 62:1,5,15,23 63:3,4,7,11,12,16,21, 25 64:7,17 65:15,20 76:10,18 77:14,20,22 78:1,5,9,13,18,23 79:2,7,8,15 80:4,6,12,20 84:6,12, 13,22 85:7,11,15,24 86:2,3,21,24 87:1,2,12,14,24 88:4,10,15,20,25 89:11,20 90:3,8,11,14,21,24 91:2, 7,12,16,22 92:3,9,17,24 93:1,6,10, 13,17,22 94:2,5,9,13,21 96:16,19 97:11,14,20,23 98:5,15 99:8,9,14 100:2,11 101:7,11,17,23 102:4,12, 15,19 103:1,7,15,21 104:4,12,19, 24 105:4,8,12 108:5,8 109:20,24 112:13,15,22,24 113:12,24 114:5, 12 116:13,15 117:9,21 118:1,5,13, 18,20 119:1 127:18,19 135:2,21 136:2,10,18 138:8,12,16 139:1,7, 17,22 140:2,16,22 141:1,8,13,18, 23 142:3,8,15,21 143:2,6,11,21 144:2,7,12,15 145:1,7,13,17,22 147:1,3 149:16,21 150:2,12,21 152:5,11,17 153:5,10,14 154:19,24 155:4,9,17 156:1,13,18,24 157:7, 12,18,23 158:24 159:7 163:4,13, 14,24 164:2,9,20 165:8,12,20,25 166:3 167:1,6,20,25 168:4,8,14,18 169:22,23 170:4,10,15,20 171:2,7, 14,22 172:3,8,14,20,25 173:4,11, 21 174:4,8,14,22 175:2,9,21 176:2, 7,15 177:10,22 178:2,8,15,20 179:19 184:16,19,25 185:4,10,15, 21,25 186:7 187:24,25 188:8,13, 19,24 189:5,22,23 190:2,7,12,17 191:14 192:17 193:10,14,20 194:1, 6,12 195:15,19 196:8 197:6,8 198:22,25 199:6 203:12,16,22 205:23 206:5 207:6,13,19 208:9 209:6,23 210:1,18,24 211:7,13,18 212:5,10,21 213:2,6,24 214:4,13, 25 215:12,20 216:1,11,24 217:6, 10,22 218:2,6,16,25 219:16 220:17,22,24 221:11,15,20,25 222:6,9,11

**Carr's** 36:2

**carriers** 183:5,9

**carry** 55:25

**case** 2:9,11 4:3 6:7,9,13 7:15,22 9:2 10:17 11:24 14:11 23:15 25:3 26:20 27:23 29:3 31:18 36:2 38:2 78:22 126:24 166:2 180:5,13 181:7,18,20,21 182:14

**cases** 11:21 51:8,14,15 53:6,12,13 85:23 86:19 181:12,15,16

**cash** 21:3 120:25 121:2,3,4 129:9, 12 133:2,7,8 137:25 138:13,15

**Castle** 189:21

**casualty** 39:23

**catalyst** 51:25

**catchall** 37:14

**categories** 36:20 38:17

**categorized** 40:16

**category** 8:6 222:14

**Cathedral** 150:17,18,19

**catholic** 2:8 17:5 117:22 126:20 127:2,10,14 146:3,11,18 147:16 157:2,11,22 158:1 175:14 176:1,6 195:13,24 196:4,5,16 205:17 209:23 210:17 211:5 214:20 215:19 216:4 218:22 222:19,23 223:2,3,6,7

**cease** 198:22

**celebrate** 199:3

**cemetery** 157:2,11,22 158:1

194:18 195:24 196:4,5,16 215:19 216:4,5,8

**cents** 216:17

**century** 110:5

**certainty** 154:13

**certificate** 17:5,6 155:3

**certificates** 17:4,20 91:10

**certified** 91:17

**cetera** 10:20

**CFO** 3:10 28:3

**chair** 48:21 181:12

**chairman** 181:13

**chairperson** 88:5

**chance** 45:6

**chancery** 93:4 217:5 220:15

**change** 102:22 151:5

**Chapter** 2:8,12 9:25 11:14 53:6,7 180:25 181:1,3,4

**characterized** 138:22

**charge** 164:18

**charged** 39:20 140:20,23 143:25

**charges** 212:6

**Charities** 218:22

**chart** 20:1 146:25 147:11

**check** 20:21 108:4 131:12,13,15, 17,24 132:5 158:4 186:16 210:6

**checked** 84:1

**checking** 148:6 151:19

**checking/insurance** 20:13

**checks** 133:19

**Cheri** 25:8,10,12 26:14

**chief** 28:9 32:8 139:8 157:10

**child** 53:12

**chip** 38:21

**chose** 11:14

**Christ** 173:16,18 174:2,12,17

**Christopher** 58:19 59:7,23 60:2 104:10,13,17 105:16,22 106:2,7, 11,12,17 107:4,5

**church** 2:9 39:20 48:18 54:22 55:9 56:3 184:18,23 185:9

**Châteaux** 211:11 212:6

**civil** 194:25 195:14,24 196:3,15

**claim** 7:5,7,12 10:5,24 35:20 43:20,22 44:17,20 45:3 55:6 65:14, 17 100:1,3,10,16 101:5,9,16 162:7 163:25 166:2 167:2 177:8 178:6, 14,16 179:7 180:4,7,9,13 183:21 186:25 188:4 190:21,22,25 191:5, 7,13 219:14,15

**claimant** 8:4 10:17 47:15,17,24 183:22

**claimants** 52:8

**claims** 10:3 11:8,15,18 44:18 50:14,25 51:24 52:2,3 65:16,25 71:9 73:11 83:24 84:4 85:14,20,21 99:16,21 101:22 102:9,16 103:17, 20 106:18 161:12 164:8,14 179:10, 11 183:3,8,9

**clarification** 76:4 83:23 85:4

**clarifications** 13:16 224:24

**clarify** 12:9 76:6 116:2 194:24

**Clarion** 52:24

**classical** 43:9

**classifications** 12:15

**classified** 20:12

**clean** 56:22

**clear** 30:8,23 38:9 57:17 113:22 137:11 151:25 182:5 183:3 195:9

**cleared** 184:14

**clearer** 167:4

**clearing** 132:4

**clears** 132:5

**clergy** 48:20 50:25 53:9,18 61:23 73:7 83:17

**client** 8:3 47:16 55:5

**close** 21:10 200:21,24

**closed** 5:16 186:4

**closest** 3:2

**co-witnesses** 76:7

**code** 6:6 12:21 35:24 65:22,25

66:4,6 85:21 100:4 101:4

**collected** 215:6

**collectibles** 18:9 158:20

**collection** 215:11

**collective** 214:7

**collision** 216:21

**combination** 44:19 220:16

**comfort** 49:8

**comment** 35:13 51:19 109:13 166:10

**commentary** 52:25

**comments** 76:22,25

**commit** 53:17

**commitment** 50:19 53:2 85:18

**committed** 11:25

**committee** 8:20 10:4,15 11:11,22 48:22 53:25 65:12 66:19 75:6,8 77:16,17 80:14,18 82:8 83:18 87:22 88:5,11 95:25 96:17,23 139:15 143:20,25 144:5 160:12,14 181:9,14,21,24 182:1,15,18,21,23 223:19 224:14,20

**committee's** 182:3

**committees** 181:18,20,24

**committing** 51:6,13

**common** 168:23,25 204:5

**communication** 134:25

**communications** 224:19

**community** 53:3 126:20 127:2,11, 14 146:3,11,18 147:17 210:17 211:5 222:19,24 223:3,6,7

**comp** 39:24

**companies** 11:23 115:23,24

**company** 43:21 88:19 89:6,18 107:23 110:7,8 111:2,12,13,17 187:23 188:16 189:3

**compared** 147:15,16 178:23

**compensate** 58:7

**compensated** 11:19

**compensation** 23:17 49:14,20

**complete** 12:12 160:17 163:12

**completely** 180:2

**comply** 161:6

**component** 2:4

**composition** 73:6,19 74:10

**comprised** 39:19

**computer** 159:18 186:24

**concern** 35:17 48:24 51:12 52:19 107:12

**concerned** 57:20 102:16 160:8

**conclude** 224:2

**condition** 12:5 47:9

**conditional** 63:9

**conditionally** 64:12

**conduct** 155:14 185:20

**conducted** 6:11

**conference** 117:22 207:12,14

**confidentiality** 117:7,16,24

**confines** 11:12

**confirm** 21:17 44:23 111:21 113:17 203:6

**confirmation** 10:9

**confirmed** 111:22

**confirming** 9:25

**confusion** 13:13 34:3 137:14

**connected** 81:19,20 82:25 83:2 156:21

**connection** 85:18 172:24

**consensual** 12:1

**consideration** 15:17,23 113:25 154:8 162:20 171:12

**considerations** 100:15 101:8 171:11

**considered** 34:5 114:21,23,25 115:3 156:5

**considers** 101:9 164:7,14

**consisted** 116:13

**consistent** 118:12

**consists** 122:12

**consolidated** 123:18

**consolidates** 123:21

**constituencies** 10:4

**constraints** 198:6

**consult** 95:25 96:5,11 139:14 192:19

**consultant** 192:22

**consulting** 108:7 192:15,18,20,25 193:24 194:9

**contact** 5:14 126:21 165:4

**contained** 15:6,19

**contents** 221:19

**contingent** 44:6,18,21

**continue** 23:8 51:23 81:18

**continued** 148:20

**continuing** 44:5

**contract** 128:2 179:12 192:14 193:23 196:7,9,15,19 197:10

**contracts** 127:23

**contradictory** 146:8

**contribution** 125:24

**control** 221:3 222:5,10

**convention** 207:8,10

**conversation** 10:25

**convey** 128:3 190:24

**conveyance** 116:12

**COO** 31:12

**cooperation** 10:11 47:2

**cooperative** 194:20

**coordinator** 165:3

**copies** 22:13,14

**copy** 5:13,16 22:11 131:1,2 134:13

**Coral** 214:20

**corporate** 20:12 23:14 30:9,10 34:5 79:13 80:1 92:15 93:14

**corporation** 3:5,11 46:1,3 89:8 104:23 112:1 151:1 152:2,14,21 155:16 156:8,19 157:3,4,6 178:25

**corporations** 105:1

**correct** 14:3,11 15:20 16:1 21:20 22:14 24:23,25 26:10,25 28:16,18 29:20,21 30:2,6 31:6,19 36:3 38:5, 10 41:1,3,12 46:23 50:11 59:4 70:10 73:14,21 77:2 84:20 86:11 87:9 88:14,16 102:13 105:17,19 109:10 121:16 136:24 137:10 138:7 141:17 142:13 147:23 150:18,20,22 152:16 154:25 174:9 177:9,11 178:7,9,19,21 186:6,8 187:24 188:9 191:18 195:16 203:23 205:10

**correctly** 4:12 150:9

**cost** 147:12

**costly** 51:3 52:7

**costs** 40:2 52:6 71:10 72:5 212:11 213:1

**Coulon** 65:11

**council** 139:12 141:3 143:18,19

**counsel** 9:15 10:15 23:6 45:18 64:5 68:24 78:14,24 79:9,12,14 80:1 95:22 102:2,9 160:12,13,14, 22 181:23,24 182:1,2,3,13,15,17, 21,22

**counseled** 64:15

**counseling** 72:10

**count** 2:14 115:17

**country** 118:8

**county** 195:3,4

**couple** 17:11 54:17 61:20 72:22 75:11 104:8 131:8 197:11

**court** 2:10 6:9 7:14 10:22 11:9,12 21:4 52:4 53:23 74:7,13 76:5 97:13,19 100:15 101:3,8,14 102:17 110:15,23 112:8 117:4 130:25

**Court's** 189:14

**courts** 100:3

**cover** 38:19 134:24 179:9

**coverage** 17:3,4,21,23 18:8 55:25 56:4

**coverages** 17:24

**covered** 179:11

**covers** 114:14

**Covid** 198:23

**Covid-19** 110:13

**Covington** 93:2

**Cox** 24:15 26:13 27:16

**CPA** 3:7 91:17 92:14 100:25

**crack** 74:4

**create** 46:6 53:2 91:25

**created** 13:13 73:20 160:16 163:12

**creating** 53:5

**credibility** 164:19

**credibly** 57:3 73:7 160:15

**credit** 24:5,6 26:1 169:24 172:18, 19 188:4,7,12,17,23 189:4

**creditor** 6:10,19 7:11,18 8:9,17 47:4,23 87:22 177:2 182:19,22 187:7,10

**creditor's** 181:9,13,14 182:18

**creditors** 2:6 5:25 6:5,17,23 8:10 9:3,7 10:2,12 12:3 37:24 47:4,6 48:22 53:25 75:5 77:16 82:8 83:18 84:1,3,4,24 85:13 166:1 187:5 204:1,5 224:3

**Crescent** 35:3

**CRI** 3:7

**crosstalk** 124:23 128:4 169:21

**current** 7:8 16:6 35:7 110:11,20

**cursor** 159:20

**custodial** 213:15 214:10 223:4

**custodian** 122:19

**custody** 122:10 123:22 124:1,4, 11,13 125:15 126:2 146:21,23 150:15

**cut** 56:8 119:23 148:14 175:20

—————

**D**

**d/b/a** 13:6

**daily** 199:15

**Dame** 211:11,12 213:13,15

**Damon** 65:9,10,23 66:7

**Darryl** 54:12,15,16,24 55:4,20 56:7,12

**date** 10:21,23 11:6,8,9,13,21 110:4 134:9 153:15 155:5 162:21 167:17, 19 168:7 188:6 199:4 224:23

**dated** 52:22

**dating** 51:1

**day** 3:18 7:16 10:9 132:24 162:16 166:12 199:1 204:2

**day-to-day** 25:18,21 27:8 28:5 92:10

**days** 7:15 11:10 45:15 72:22 166:9 200:22 201:3

**DDA** 126:15

**de** 211:11,12

**deal** 7:21 107:15 161:11

**dealing** 61:7,23 83:23

**dealt** 7:13

**debt** 7:6 106:12

**debtor** 2:15,18 3:8,15 6:7,24 7:13 8:13,25 9:1,12 18:16 22:5,10,12 23:22 25:17 28:3 30:8,24 31:6,13, 18 32:15 33:21 34:12 35:1,7 36:12 38:2,12,24,25 42:18,24 43:3 44:23 47:9 58:21 59:10,14 60:2 65:14 81:12,19 82:24 83:2,6 85:19 89:12, 21 108:20 112:21,23 113:2 114:20 115:2,3,5,6 116:7,11 117:15 122:16 187:9,13,17 188:17 212:1

**debtor's** 7:1,8 9:15,16 17:1 23:6 28:4 38:10 43:3 98:2 163:3 223:17

**debtor-in-possession** 18:25 19:7

**debtors** 3:8 16:15 177:7

**debts** 106:7 172:23

**decades** 51:2,9,10

**decide** 65:14

**decides** 74:13

**decision** 101:21 102:2,8 141:11 187:12

**declarant** 3:18

**declaration** 90:21,24

**decreased** 151:9

**decreases** 151:15

**decreasing** 151:13

**deductible** 206:3

**deemed** 75:18

**defending** 102:2

**defense** 79:12 101:22

**defenses** 85:23 102:9

**defer** 28:7 109:25 116:16 119:20 167:7

**define** 101:4 104:20

**defined** 12:20 65:15 85:21 93:14

**definition** 65:17 100:7 108:15 112:19 113:7 114:18

**delivers** 135:1

**Denechaud** 79:3,22,23

**Denenea** 60:22,23 61:11,19 62:3, 8,17 63:2,6,13,19,23 64:2,9,20,22 65:1,7

**Department** 2:5

**depend** 132:13

**depending** 140:6 149:7

**depends** 132:11 133:8 140:3

**deposit** 41:7,9 120:6,15,17 121:3 123:2 126:13 128:21 129:5,7,9 131:11,24 132:4,8,16,22,25 133:12,13,22 135:5,11,23 137:4,8 138:20 142:13,20,22 143:15 146:20 147:20 151:3 158:2 168:22 213:18 214:9 223:6

**deposited** 120:7 121:10 128:13 131:7 174:18

**deposition** 7:6 47:11 69:4 76:5

**depositor** 124:21 125:16 133:10, 12

**depositors** 120:16,18

**depository** 19:6 20:9

**deposits** 120:11,14 125:14

**depreciated** 36:15,23 98:9,10,13

**describe** 25:18 43:21 116:12 215:15

**description** 202:2,9

**designated** 23:13 28:3

**designating** 180:20

**designation** 212:2

**detailing** 223:24

**details** 8:1 144:17 147:5 171:16

**determine** 74:8 101:3 109:21 110:24 111:7 138:13 148:19 161:5

**determined** 141:2 216:3

**determines** 138:11 140:25

**determining** 10:5 100:16 101:9,15 111:18 164:19

**develop** 10:4,16

**developed** 155:23

**development** 10:6 146:13 152:24 154:22 155:12

**dial** 67:7 81:14

**dialing** 81:13

**differ** 92:7

**differently** 149:13

**difficult** 38:23

**dinosaur** 67:16

**diocesan** 138:22 163:24

**diocesan's** 11:20

**diocese** 53:9 118:4 122:16 207:18,20 221:18

**dioceses** 53:6 118:8

**dir** 219:4

**direct** 14:1 163:5 199:9 213:19

**directed** 212:4

**directly** 51:3,7,11 126:17 128:3

**director** 88:18 89:6,7,17 107:22 127:1 219:4,11

**directors** 105:21 127:7,14 157:5

**disagree** 75:17,22

**disagreements** 75:24

**disagrees** 90:22

**disaster** 215:8

**discerned** 203:20

**dischargeability** 7:5

**disclaimer** 36:9

**disclose** 8:3 53:8 64:8 98:11

**disclosed** 38:4 116:8 167:5 176:13 196:24 205:8

**disclosure** 12:16,17 61:22 147:12

**disclosures** 115:19

**discovery** 7:7

**discrete** 124:21 125:5

**discuss** 6:20 12:2,8 13:18 22:19 23:16 163:1 166:17

**discussed** 15:24 32:14,15 36:5 47:5 134:15 224:1

**discusses** 36:12

**disk** 198:17

**dispute** 73:12,16

**disputed** 44:7,18,20 191:25

**distinction** 99:3 108:14 111:25 192:1

**district** 2:11 10:22 11:7,8 20:24 166:9 177:3 181:5

**dividends** 71:14

**DLF** 121:22 131:14 135:1,10,12 136:6,7,16,23 137:2,19 138:2 141:16,21 142:13,20 143:17,20 144:1 147:22 151:5,6

**DLFS** 147:20

**DLS** 121:10

**docket** 34:25 45:25 112:6

**docketing** 212:14

**document** 35:14,18 90:20 122:6 124:14 125:17 131:2,3 134:16,19 191:6 214:18

**documentation** 130:3 133:18 205:24

**documents** 14:10 15:1,7,11,20 17:16 36:3 53:8,17 61:21,22 62:11 98:3 127:24 221:3,9

**DOJ** 8:16

**dollar** 46:22 141:6 167:23

**Dolorosa** 212:18,20

**donate** 126:1

**donation** 213:21,22 214:19,22,23 215:5

**donations** 213:11 214:8 223:2

**donor** 127:23 128:2 146:15 223:12

**dot** 5:19,20 8:15,16

**doubtful** 171:19

**draw** 188:6

**drawers** 222:4

**draws** 188:5

**drive** 46:1,3 151:1 152:1,14,20 155:15 156:7 198:17 216:23

**due** 16:24 110:12,15 168:7 173:15 200:16

---

### E

**e-mail** 5:17 7:24 8:1,3,10,13,22 9:9 47:12,18 66:12 82:8 134:25 140:6

**e-mailed** 9:11 224:9

**E-N-T-W-I-S-L-E** 3:10

**Eagan** 80:7,9 87:25 88:18 107:20

**Eagan's** 88:2

**earlier** 95:8 163:8 223:22

**early** 110:5

**earned** 202:12

**easily** 134:17

**Eastern** 2:11

**ecclesiastical** 30:11 178:24 218:1

**echo** 12:6

**educating** 31:3

**education** 91:1 92:13

**effect** 36:8 136:23 210:10 223:11

**effectuate** 10:7

**effort** 198:21

**elderly** 106:4 212:22

**elevated** 7:22

**elicit** 107:19

**Elizabeth** 194:4

**employ** 16:13,16

**employed** 35:1 79:1

**employee** 95:5 127:8,10 183:16

**employees** 35:1,2 127:7,14 157:5

**employment** 112:9,14

**end** 10:13 17:15 148:19 160:5
184:3 200:23

**endeavor** 194:20

**endorsement** 158:22 159:4

**endowment** 126:11 223:5

**endowments** 146:15

**endurance** 67:25

**enforce** 117:15

**engaged** 110:6

**engaging** 209:5

**enroll** 182:14

**ensure** 110:8

**Entergy** 24:15 26:13

**entities** 12:18 38:12 115:2,3 116:7
120:18 122:15,16 141:21 217:20

**entitled** 52:22

**entity** 13:3 30:8,10,21 58:21 59:10,
14 60:1 72:3 89:12,21 106:23
125:14 128:12 130:14,20 149:14
150:11,20 178:3,24 180:10 187:14,
17 193:24 194:10,11,18 195:14
196:5 208:15,17 213:18 214:2,11

**entries** 13:8 222:19

**entry** 34:25 213:20

**Entwisle** 3:9 4:22 5:2 28:2,8,9,14,
17,24 29:4 48:11 68:4,7,11,16,20,
21 69:8,9,14,18,22 70:4,15 71:1,5,
6,11,20,24 72:6,11,20,24,25 73:4,
8,15,22 74:12 76:12,21 77:5,6,21
84:19 86:12,13 87:8 93:21 94:24,
25 95:7,11,12,16,17,21 96:2,3,7,13
97:2,3,8,9 105:23,24 106:1,3,8,14
113:3,4 114:9 119:4,5,13,19 125:4,
7,9,11,20 126:4,9 127:1,3,8,9
128:15 129:1,16 130:16,22 131:16,
20,25 132:10 133:6,15,23 134:4
144:19,21 147:7,8,18,24 163:4
164:15,24 167:7,8,14 177:15
183:23,24 184:1,5,11 192:17,21
193:3 199:14,17,23 200:3 211:1
215:4,14

**Entwisle's** 28:5 92:8

**equal** 167:23

**equally** 49:13

**equipment** 36:22 67:16 121:4

**equity** 112:20 151:2,8,23 175:14,
19 176:1,5

**essay** 159:22

**essentially** 113:17 154:22

**establishment** 162:21

**estate** 6:25 18:4 109:17 110:20
153:8 155:8

**estimate** 84:23 85:5,11,12

**estimated** 84:1,2

**euphemistically** 178:11

**eventual** 12:6

**eventually** 136:22

**everyone's** 48:25 222:15

**evidence** 53:18

**evidences** 125:17 133:20

**exact** 120:20 205:21

**examination** 6:22 33:8

**examined** 4:2

**exceed** 21:11 148:7

**exceptions** 109:18 143:13

**excess** 106:18 112:20 121:1
139:11,18 208:7

**exchange** 6:3 154:2

**excluded** 37:7,8,13,14 38:18

**excluding** 38:3

**exclusive** 222:4,10

**exclusively** 221:6

**Excuse** 3:8 15:21 16:3 63:20

**executed** 133:13

**executory** 196:7

**exhausted** 198:17

**existed** 113:18,21

**existence** 154:16

**exiting** 7:2 9:3

**expect** 21:11 87:12 224:12

**expected** 84:4 85:13

**expects** 224:18

**expeditious** 12:1

**expense** 24:8,10 25:25 26:12
27:15,16

**expensed** 36:15

**expenses** 26:5,8

**experience** 63:10 92:13

**explain** 6:2 39:15 137:12,18 146:7
147:14 187:7 195:25

**explained** 38:25 180:14

**explanation** 179:25

**explicitly** 49:18

**exposure** 46:20

**extensive** 12:11

**extent** 7:10 34:19 53:21 57:12
113:18 137:23

**extremely** 36:23

**F**

**face** 167:13 196:2

**facilitate** 152:15

**facility** 154:16,23 155:2,22 156:21
211:14 212:22

**fact** 12:25 114:16 117:21 195:2
224:16

**fair** 10:4 31:6,9 49:16 52:9 74:22
76:7 108:14 110:17,20,24 111:7,18
203:4

**fairly** 11:18 49:9,13

**faithful** 53:3

**fall** 8:6 55:6 143:17 184:2 221:7,23

**familiar** 15:6 111:12 118:18,24
127:22,23 128:2 144:14,19 147:1,
4,7 184:16,20

**familiarity** 144:22 147:9

**fast** 143:9

**faster** 159:14,23

**Father** 3:2,17 4:4,8 14:1,4,9,12,17,
22 15:3,8,14,23 16:2,8,19 17:25
18:5,11 24:7,11,19,22,24 25:4,7,9,
13,19 26:4,9,16,21,24 27:5,10,19,
24 28:6 29:7,9,12,15,19 30:1,5,14
31:3,5,8,14,20 32:3,7 33:18,22
35:5,9 36:2 37:17,19 39:4,6 41:11,
20 43:16,23 44:9,13 45:17,19
48:11,14,17 49:2,24,25 50:12,21
52:11,13 54:3,4,6 57:1,5,22,24
58:2,8,14,23 59:2,3,12,13,16,17,18
60:5,7,10,11 61:1,9,17 62:1,5,15,
23 63:3,4,7,11,12,16,21,25 64:7,17
65:15,20 76:10,18 77:14,20,22
78:1,5,9,13,18,23 79:2,7,8,15 80:4,
6,12,20 84:6,12,13,22 85:7,11,15,
24 86:2,3,21,24 87:1,2,12,14,24
88:4,10,15,20,25 89:11,20 90:3,8,
11,14,21,24 91:2,7,12,16,22 92:3,
9,17,24 93:1,6,10,13,17,22 94:2,5,
9,13,21 96:16,19 97:11,14,20,23
98:5,15 99:8,9,14 100:2,11 101:7,
11,17,23 102:4,12,15,19 103:1,7,
15,21 104:4,12,19,24 105:4,8,12
108:5,8 109:20,24 112:13,15,22,24
113:12,24 114:5,12 116:13,15
117:9,21 118:1,5,13,18,20 119:1
127:18,19 135:2,21 136:2,10,18
138:8,12,16 139:1,7,17,22 140:2,
16,22 141:1,8,13,18,23 142:3,8,15,
21 143:2,6,11,21 144:2,7,12,15
145:1,7,13,17,22 147:1,3 149:16,
21 150:2,12,21 152:5,11,17 153:5,
10,14 154:19,24 155:4,9,17 156:1,
13,18,24 157:7,12,18,23 158:24
159:7 163:4,13,14,24 164:2,9,20
165:8,12,20,25 166:3 167:1,6,20,
25 168:4,8,14,18 169:22,23 170:4,
10,15,20 171:2,7,14,22 172:3,8,14,
20,25 173:4,11,21 174:4,8,14,22
175:2,9,21,22 176:2,7,15 177:10,
22 178:2,8,15,20 179:19 184:16,
19,25 185:4,10,15,21,25 186:7
187:24,25 188:8,13,19,24 189:5,
22,23 190:2,7,12,17 191:14 192:16
193:10,14,20 194:1,6,12 195:15,19
196:8 197:6,8 198:22,25 199:6
203:12,16,22 205:23 206:5 207:6,
13,19 208:9 209:6,23 210:1,18,24
211:7,13,18 212:5,10,21 213:2,6,
24 214:4,13,25 215:12,20 216:1,
11,24 217:6,10,22 218:2,6,16,25
219:16 220:17,22,24 221:11,15,20,
25 222:6,9,11

**fault** 143:16

**FDIC** 21:5,10,11

**Fe** 53:10,11

**federal** 22:11 177:18

**feedback** 23:2,9

**fees** 70:19 71:10 72:5

**felt** 92:4

**figure** 150:7 172:12 175:4 199:21
203:3 209:19

**file** 10:23 11:8 34:12 45:3 99:12
103:13 161:17,25 166:1 180:4
223:23

**filed** 2:10,12 7:3 9:24 15:1 16:14,
15 17:18 22:14 25:3 26:20 27:23
29:3 30:11 31:18 38:1 44:25 72:21
97:13,18 102:9 112:8,11 131:1,2
134:9 161:10,14 162:17 179:22
180:7,15,16 182:4,5,7 198:4
223:18

**files** 220:21 221:5,6,7 222:4

**filing** 22:6 23:15 34:25 40:20,23
48:14 70:7 180:10

**final** 73:3 86:15

**finance** 3:4 14:18 50:20 63:15,18,
20 88:11 91:20 92:16 95:24 118:24
120:4 139:11,15 141:3 143:19,24
144:5

**finances** 80:21 88:6 92:5 107:14

**financial** 3:7 7:3 12:5 16:16,17
23:21,25 25:17 27:14 28:10 29:13
35:16 45:23,24 47:8 48:12 97:18
98:1 114:22 139:8 157:10 161:1
198:9 199:11 202:22 204:7 213:14
222:23

**financially** 50:7

**financials** 53:4

**find** 49:7 55:10,22 128:19 134:2
150:5 202:21 206:9 216:16

**fine** 21:9 31:2 65:2 67:12 100:24

**finish** 43:10 67:10 74:2 198:19

**finished** 65:2 163:16

**Finney** 50:4

**firm** 16:14 79:1 83:15 122:5 182:17
209:3,5

**fiscal** 203:9

**fix** 12:15

**fixtures** 158:20

**flood** 18:15

**floor** 9:6,15 47:3 87:21

**Florida** 214:21,24

**flow** 224:13

**fluctuates** 132:23

**focus** 48:23

**focused** 7:8 198:13

**folks** 80:4 99:2

**follow** 104:8

**follow-up** 61:20 63:7 64:11 161:9

**footnote** 130:24 131:4,10 151:1
201:12

**footnoted** 187:16

**footnotes** 128:18 201:25

**for-instance** 71:13

**force** 17:24

**forget** 145:25

**forgot** 18:19 197:21

**form** 19:16,21 20:1,21 56:11
139:25 140:9 147:2 201:7 212:14
214:18

**Formal** 144:6

**format** 47:25

**forms** 35:21

**forum** 6:6 144:10

**forward** 8:24 11:16 17:13 18:19
23:12 45:9 51:23 53:5

**forwarded** 17:11

**found** 107:18

**foundation** 126:20 127:2,11,15
146:4,11,12,18 147:17 178:13
210:17 211:5 214:20,24 218:9,23
222:19,24 223:4,7,11

**FOX8** 49:2

**frankly** 107:18

**fraud** 177:4,14 179:1 180:19
219:14

Section 341 Meeting of Creditors

May 29, 2020
Index: front..happy

**front** 35:15

**full** 2:17 83:12 117:6 159:1

**full-time** 35:1

**fully** 36:15,23 58:7 98:8,10,13

**function** 32:9 80:17 92:15 111:17 124:20 159:22 165:3

**fund** 41:7,9 120:15,17,25 121:11 126:13,14 129:5,7,10 131:11 132:9,16,22,25 133:12,22 137:5,25 138:20 143:16 151:4 168:22 215:8

**funding** 131:7 137:8

**funds** 51:2,7,11 71:4,9,12 120:20 121:1,2,3 122:14 124:6,7,8 125:6 126:17 128:21 135:23,24 136:11, 14 137:21 138:2 146:15,17 147:20 149:10 158:1 174:9,19 214:9 223:3,4,5,8

**funeral** 46:7 216:6

**furniture** 36:22 158:20

─────────────

**G**

─────────────

**G-E-O-R-G-E** 5:19

**Gables** 214:21

**gains** 203:11

**Gainsburgh** 83:16

**Gallagher** 192:15,16

**gap** 109:10

**gathering** 17:12 155:13

**gave** 89:4,16 131:1

**Gavin** 77:16

**general** 32:21,24 33:12 36:19 37:13 43:13 44:16 55:3 63:14,17 132:7 139:10 174:3 204:12

**generally** 6:5 18:12 37:25 75:21 79:14

**generate** 123:10

**generated** 122:3

**generously** 83:10

**Gennardo** 78:19,21

**George** 2:1,3,20 3:12,20,25 4:10, 15,21 5:4 9:18 12:6 13:23 14:6,8, 14,19,24 15:5,10,16 16:4,10,21

17:14 18:2,7,13,21 19:10,14,20,24 20:6,17 21:8,16,21 22:4,9,18,22,23 23:4 24:9,14,21 25:1,6,11,15,23 26:6,11,18,23 27:7,12,21 28:1,13, 19 29:1,6,11,17,23 30:3,15,22 31:4,10,16,22 32:1,5,11,18,22 33:2,6,11,15,19,24 34:9,16,23 35:7,11 36:24 37:4,16,21 38:13 39:3,8 40:3,8,14,22 41:2,13,17,23 42:4,9,16,17,25 43:7,18 44:8,15 45:10,16,21 46:8,13,24 48:5,8 52:10,15 54:2,8 56:17,25 59:19 60:6,7,12,16,18 64:19,23,24 65:4, 11 66:9,16,18,23 67:2,8,13,23 72:13 74:1,3,18,23 75:3,10,20 76:1,3,14,17 77:1,9,11 80:23 81:5, 10,11,22,23 82:2,3,12,16,18,22 83:7,19 84:8 87:17,18,24 92:19 95:9,13 139:5 148:3,12,22 149:2 162:22,23 163:17 186:14,15,19 198:2,7,15 219:19 220:1,5,10 223:20 224:5,6

**George's** 97:23

**Gerald** 82:1,5,20 83:3,14,15,21 84:10,14,21 85:3,9,17 86:1,7,14,23 87:3,10,16

**gift** 213:13,21,22 214:2,11 215:18 216:9

**gifts** 213:11

**Giselson** 56:20,23,24 57:7,23 58:4,11,15,22 59:1,5,11,15,21 60:3,13,15

**give** 8:1,25 35:17 64:10 67:20 87:20 92:14 120:19 122:8 131:15 149:17,22 153:17,20 159:21 166:1 172:15 173:16 197:25 204:17 209:18 213:17 224:25

**giving** 68:24 205:3

**Glade** 58:17

**glance** 222:21

**global** 35:14,17,18,21 36:7,11 97:24 98:4,9 104:7 108:11 113:9, 10 115:7 117:3

**goal** 9:25

**God** 52:23

**God's** 49:8

**good** 2:2 5:8 23:7 27:2 42:21 48:5 60:24 68:4 77:19 161:19 215:15 224:18

**Google** 208:12

**gov** 5:20 8:16

**governance** 195:4

**governmental** 177:21 195:14

**Grabill** 7:14

**graduated** 91:3

**grand** 213:17

**grants** 35:23

**great** 22:5 34:24 43:1 56:13 83:8 205:16 220:11

**greater** 7:21

**gross** 199:11

**ground** 75:11,15 79:20 195:25 196:1

**group** 8:7,10,23 9:10 47:19 176:1 205:17 207:25 208:6,8,15,18

**guarantee** 196:2

**guess** 41:3 49:17 51:4,21 52:19 53:15 75:11 77:19 90:22 107:12 115:16 191:25

**Guide** 52:23

─────────────

**H**

─────────────

**Haley** 189:21

**half** 145:21

**half-mile** 190:18

**Hancock** 122:11,19 123:20 129:17

**hand** 4:5,23 129:9 134:17 214:3

**handful** 37:22

**handle** 6:21 179:17

**handled** 164:1

**handling** 123:11 178:1

**hang** 42:11,13 67:6 81:1,6

**Hannan** 210:9

**Hannon** 13:1

**happened** 187:3 216:21

**happening** 137:19

**happy** 82:16 107:1 179:25 204:19

**hard** 128:19 143:9 177:1 183:7 206:15

**Harding** 193:7

**Harris** 20:11

**hate** 92:20

**Hayden** 58:17

**head** 27:11 71:2

**headed** 9:2

**heads** 80:14

**Heal** 52:23

**healing** 61:24 62:13,19 64:15

**health** 40:1 192:23

**hear** 11:4 15:13,21 41:21 42:6 54:25 56:22 79:18 82:2 92:21 99:3 169:7 179:25 202:17

**heard** 54:25 97:23 104:22 144:16 212:3 218:17

**hearing** 16:14 36:6 42:3 66:13

**hearings** 3:18

**heavenly** 81:4

**Hebert** 31:12

**held** 2:7 111:22 120:20 122:11

**helpful** 47:2

**Helping** 52:23

**helps** 213:20

**Herald** 52:24

**high** 13:1,4,7 39:13 40:9 41:8 91:1 150:8 206:19,22 209:12,15,23 210:9

**highly** 132:19

**Hilton** 207:4

**hired** 182:8

**hiring** 216:18

**history** 173:6

**hold** 8:7 41:19,22 42:21 43:6,9 47:21 80:25 81:16 99:20 118:9 128:18 218:14

**holder** 124:1,5

**holders** 112:20

**holding** 7:14 224:23

**Holmes'** 106:17

**Holy** 45:25 46:3 151:1 152:1,9,14, 20 153:9,23 155:15,22,25 156:7,21

**home** 46:12 152:24 156:3 211:14 216:6

**homes** 46:7 58:19 59:7,23 60:2 104:10,13,17 105:16,22 106:2,7, 11,12 107:4,5

**honest** 179:5 180:2,3

**Honestly** 37:12 162:10

**honor** 48:19

**hop** 83:10

**hope** 10:11,15 49:7 52:5 150:9 198:12 213:12 224:19

**hoped** 21:5

**hosted** 19:5

**hotel** 206:15,17 207:9,15

**hour** 67:21

**housed** 217:16,17,18

**housekeeping** 24:1 25:25

**housing** 106:4 152:15 154:16 155:15,22,23 156:2,5,6,14,22 212:11

**Howard** 217:4 219:3 220:14

**HR** 217:17

**hybrid** 120:25 137:25

**hyphen** 219:5

**hypothetical** 109:4

---

**I**

---

**Ice** 182:2

**idea** 69:25 70:9 148:4 162:11

**identified** 12:18 80:5 90:2

**identifies** 187:6

**identify** 23:23 53:18 99:4 115:23 129:7 172:11 180:9 209:3 223:12

**identities** 170:1

**immediacy** 140:7

**impact** 97:24 151:23 162:15

**implementation** 10:6

**important** 12:22 73:7,21 74:11 94:14,15 131:9 160:11

**importantly** 50:22,24

**impossible** 81:17

**improprieties** 177:17

**in-house** 78:14 95:22 183:15

**in-notes** 13:10

**inaudible** 10:25 42:1,8 135:19 166:18 169:5

**incardinating** 173:10

**include** 18:8 36:25 37:8 39:2 47:15 113:13 115:21 116:1 117:10, 24 134:18 218:22

**included** 38:23 39:1 107:20 114:3 133:24 151:24 202:5,9,24

**includes** 17:1 112:20 146:25 151:2,8 158:20 187:14

**including** 203:10

**inclusive** 151:6

**income** 201:15,23 202:3,5,10,12

**incorporate** 46:21 113:9

**incorporated** 13:4 46:5 75:18 104:14 146:12 149:15 150:1,3,11, 19 195:13

**incorrect** 115:7,8,14 116:3

**increase** 53:15

**increasing** 52:21 53:4

**incurred** 172:23

**indemnity** 89:6,8,17 187:23 188:16 189:2

**indenture** 6:19 7:11,19 47:6

**indentured** 6:17

**independent** 104:13,25

**individual** 14:9 31:11 62:20 64:5, 14 115:19 122:13,21 124:6,7 169:10 204:16 205:7

**individuals** 3:13,21 23:13,16 64:13 169:4

**industries** 217:17

**information** 8:5 15:6,19 16:1
20:19 53:22 56:10 61:16 62:21
63:8 64:16 72:19,21,24 160:23
163:25 186:6,8 204:17,18 224:13

**informed** 188:16

**Ingram** 16:16

**initial** 107:21,25

**injuries** 222:21

**injury** 55:6 79:13

**input** 197:25

**insider** 112:19

**insiders** 22:20 34:13

**insolvent** 99:8,10,13

**instance** 12:17 210:10

**instances** 89:4,16 187:8

**institution** 122:4

**instruct** 75:15

**instrument** 133:8

**instruments** 133:19

**insurance** 11:23 13:17 16:25 17:1
18:15 21:12 28:11 39:24 40:1
55:25 56:4 71:13,14 88:19 107:22
158:22 159:4 192:23

**insurances** 39:24

**insured** 18:4 159:5 183:21

**insurer** 56:1 187:24

**intend** 10:3 11:11 45:2 85:22
98:19 110:19 117:15 118:9

**intended** 146:3 147:19

**intending** 98:12

**intends** 10:2 50:9 166:1

**intent** 51:22 99:15 162:15

**intention** 98:2,23 111:21 115:1

**intentionally** 168:23 170:2 191:11
204:4

**interacting** 165:4

**interchangeably** 30:24

**intercompany** 114:18 115:1,22

**interest** 7:22 107:2 108:24 124:6
140:19 146:20 175:14,19 176:1,5,

14 196:1 201:14,15,20,23 202:3,5,
9,12

**interests** 6:4 122:21

**interject** 162:23

**internal** 13:8 120:17

**internally** 12:21,23

**internet** 10:20

**interrupt** 92:20 160:2 224:5

**interrupts** 81:16

**interview** 49:2

**intracompany** 210:10

**introduce** 2:23

**introduced** 3:14

**introductions** 13:10

**inventory** 221:18

**invested** 119:10 121:3 223:8

**investigating** 164:18

**investment** 21:24 119:11,16
122:4,12 123:5,10 124:9,19,21,23
132:20 146:7 147:16 193:7,8

**investments** 122:8,17 123:1,11,
21 126:12 132:19 146:6

**invests** 146:19

**invoice** 45:6

**involved** 62:19

**IOI** 179:13 181:15,20 182:1,14

**Irish** 199:4

**IRS** 22:14

**issue** 19:21,25 20:20 73:19,20

**item** 18:14 36:12 39:9 41:3 147:11,
22 159:6 201:8,19

**items** 15:25 17:17 115:19 201:16
202:4 223:24

---

**J**

**James** 21:23 41:25 48:4,10,16,17
49:23 50:2,15 51:20 52:18 67:5
75:9 76:16 77:7,13,24 78:3,7,11,
16,20,25 79:4,10,17 80:2,8,16
81:3,21 82:15 87:23 88:7,12,17,22
89:2,13,23 90:5,10,16 91:5,9,14,

18,24 92:6,12,23 93:3,8,12,19,24
94:4,11,20 95:2,15,19,23 96:4,9,
15,21 97:4,10,16,22 98:7,18,25
99:11,17 100:5,14,20 101:6,13,19,
25 102:6,14,21 103:3,9,18,24
104:6,15,21 105:2,6,10,14,20,25
106:5,10,16,25 107:9,17 108:10,21
109:3,12 110:22 111:4,10,16,24
112:5,12,17 113:1,5,23 114:11
115:4,11,15 116:9,19,24 117:14,20
118:3,7,15,17,22 119:3,7,15,22
120:3,10,22 121:5,9,14,19 122:1,
24 123:9,14,23 124:10,12,18
125:1,8,13,23 126:7,25 127:5,12,
20 128:7,11,17 129:3,11,18,22
130:2,8,13,18,24 131:18,22 132:2,
12 133:9,17 134:1,6,14,22 135:7,
25 136:4,13,21 137:6,17 138:3,10,
14,18 139:13,19,24 140:10,18,24
141:4,10,15,20,25 142:5,10,17,24
143:4,8,14,23 144:4,9,18,23 145:3,
11,15,19,24 146:24 147:6,10,21
148:1,8,17,24 149:4,19,24 150:4,
14,23 151:14,21 152:7,13,19,25
153:7,12,16,25 154:5,14,21 155:1,
6,11,20 156:4,11,16,20 157:1,9,16,
20,25 158:6,18 159:3,10,19 160:6
163:22 164:5,11,17 165:1,10,15,24
166:5,19 167:11,16,22 168:2,6,10,
20 169:6,12,17,25 170:7,12,18,23
171:4,9,17,25 172:6,10,17,22
173:2,7,13,23 174:6,11,16,24
175:6,11,18,24 176:4,11,17,24
177:12,19,24 178:5,10,17,22
179:14,21 180:8,17,24 181:6,17,22
182:9,16,24 183:13,19,25 184:8,
13,21 185:2,6,12,18,23 186:2,10,
17,21 187:18 188:2,10,15,21
189:1,7,12,17,25 190:5,9,14,19
191:4,10,16,21 192:9,24 193:5,12,
16,22 194:3,8,14 195:5,11,17,21
196:10,13 197:2,12 198:1,11,20
199:2,8,19,25 200:7,14,20 201:4,
21 202:11,16,20 203:2,7,14,18,24
204:22 205:5,13 206:1,7,13,21
207:1,11,16,21 208:1,5,11,21,25
209:9,14,22 210:3,14,20 211:3,9,
15,20,24 212:8,12,19,23 213:4,8
214:1,6,15 215:9,16,22 216:7,14
217:1,8,12,19,24 218:8,20 219:2,
13,18,23 220:3,7,12,19 221:1,13,
17,22 222:2,8,13 223:9,15 224:4,8

**January** 168:9

**Jeff** 3:9,10 28:9 86:13 95:12 96:3
97:3 105:24 113:4 125:7,9,12,19

167:7 183:24

**JEFFREY** 5:2 28:8,17,24 29:4 68:7,11,16 69:9,14,18,22 70:4,15 71:1,6,11,20,24 72:6,11,25 73:8, 15,22 74:12 76:12 77:5 84:19 86:12 87:8 94:24 95:7,11,17,21 96:2,7,13 97:2,8 105:23 106:3,8,14 113:3 114:9 119:5,13,19 125:4,11, 20 126:4,9 127:3,9 128:15 129:1, 16 130:16,22 131:16,20,25 132:10 133:6,15,23 134:4 144:21 147:8, 18,24 164:15,24 167:8,14 177:15 183:23 184:5,11 192:21 193:3 199:17,23 200:3 211:1 215:4,14

**Jerry** 82:6

**Jim** 42:1 77:14 160:2

**Jim's** 161:9

**job** 160:3

**John** 53:11 60:22,23 61:11,19 62:3,8,17 63:2,6,13,19,23 64:2,9, 22 65:1 184:17,23 185:8 189:19 190:15

**join** 86:8

**Jones** 2:21 9:19,20 16:13 90:9 182:3

**journey** 10:8

**journeys** 10:10

**Judge** 7:14

**July** 64:1 92:1 168:9 201:8

**jump** 83:11

**jumping** 179:4

**juncture** 5:21

**June** 7:16 16:15,24 46:16 153:23

**juridical** 178:24

**Justice** 2:5

---

**K**

**Kathleen** 3:6 4:13,19 19:8,12,13 20:15 21:19 22:2,7,16 36:21 37:2 38:6 39:17 40:6,11 41:5 44:11 46:2,11,18 49:21 76:8,23 77:3 79:21 84:17 86:10 87:6 94:18,22 96:24 97:6 100:17,22 108:18,25 109:9,25 110:1 111:1,6,14,20 112:3 114:7,24 115:9,13,25

116:16,17,21 117:12,13,18 120:1, 8,13,24 121:7,12,17,24 122:7 123:7,12,19 124:2,16,24 125:18 127:16 128:5,9,24 129:8,14,20,25 130:4,11 132:14 137:12,15,24 146:10 151:11,18 152:22 153:3,22 154:3,10,17 156:9 157:14 158:3,16 164:22 165:6,18,22 168:16 169:2, 9,15,19 175:16 176:9 183:11,17 187:11 191:2,8,19 200:5,12,18,25 201:17 202:7,14,18,23 203:5 204:8 205:11 206:18,24 208:19 209:11, 17 210:12,22 211:22 215:2,7 217:14 218:4,11 219:6,10 223:1,13

**Kathy** 31:12

**Khan** 181:21 182:3,8,15

**Khan's** 182:2

**kind** 57:20 79:11 134:23,25 138:22 143:9 158:21 191:7

**kinds** 113:14

**King** 173:17,19 174:3,12,17

**knew** 62:12 89:5

**knowing** 113:18

**knowledge** 15:19,25 36:4 72:7 114:8,10,13 221:21

---

**L**

**L-A-N-G-S-T-O-N** 8:16 47:14

**labeled** 118:24

**Lady** 20:24

**land** 46:1,3,7,9,17 151:1 152:2,9, 10,14,20 155:16 156:7,19 215:21, 24 216:16

**landlord** 153:2,4,6

**Landwehr** 54:12,15,16 55:4,20 56:12,18

**Langston** 8:15

**large** 55:14,16

**larger** 140:8

**late** 110:5 199:3

**law** 16:14 53:23 57:13 83:15 101:1 128:23

**lawyer** 90:13,18,19

**lawyers** 100:24

**layperson** 96:10

**Lazarus** 214:7

**LBI** 219:5,11

**lead** 77:18

**lead-up** 48:13

**leads** 10:20 11:6

**learn** 62:11 160:15 163:11

**lease** 46:6,9 54:19 55:11 152:9,10 153:1,2,9 195:23,25 196:1

**leased** 55:23

**leases** 152:23

**leasing** 156:19 196:3

**leave** 136:6

**leaves** 136:22

**leaving** 118:10

**Lee** 80:7,9 87:25

**left** 21:25 37:23 87:25 148:13 168:19

**leftover** 44:4

**legal** 12:19 13:3,6 30:21 35:23 66:5 79:9,24 95:1,5,22 102:8 103:25 149:14 211:16

**legally** 111:23

**letter** 52:22 134:24 140:5

**level** 156:7 208:14

**levels** 139:2

**liabilities** 12:4 37:7 38:18 47:8 85:11 97:12 104:3 106:7 119:17 174:1

**liability** 46:20 55:25 56:4 173:9 219:7

**license** 92:14

**licenses** 91:11

**liens** 113:12,14,20,25 114:1,2,3

**likewise** 84:15 85:10 212:25

**limit** 21:5,10,12 48:2 148:10

**limitation** 85:23

**limitations** 65:19

Section 341 Meeting of Creditors

**limited** 9:12 47:8 110:15 116:11,13

**limiting** 46:19

**limits** 148:15

**lines** 28:12 71:16

**liquid** 132:19

**list** 7:25 8:17,21 9:8,10 17:16 18:14,23 45:4 54:10 73:6,19,20 74:8,10 82:14 149:23 158:19 159:1 160:15,20 163:11 166:23 187:5

**listed** 18:9 23:20 25:16 29:12 31:11 39:12 41:15 43:11,20 44:2, 17,18 45:8 46:15 117:8,10 128:19 146:22 158:10 168:24 179:7 183:4, 5,6,10 191:20,22,25 197:18 201:16,22 211:25

**listing** 44:20 187:9 222:22

**literally** 45:2,4

**litigation** 51:3 52:4,7 102:3 190:25

**live** 172:12

**living** 211:14 212:7,22

**loan** 41:7,9 120:15,16 121:2,11 126:13 128:21 129:5,7,10 131:7,11 132:9,16,22,25 133:12,22 135:4 137:4,8 138:20,25 139:3 140:1,11, 15 142:1,19 143:15 151:3,6,8,17 168:22 169:18 170:13 171:10,13 189:2

**loaned** 169:14

**loans** 41:8 106:15 139:2,9,10,15 141:6,12,16,17,21 142:6,23 168:21 169:10 170:9

**locate** 204:9

**located** 217:11

**lock** 220:16

**locked** 222:3,9

**Loevner** 193:7

**long** 54:14 63:10,14,22 75:4 126:18 132:3,6,20 158:19 165:25 166:23 170:21 172:12 176:21 181:7 198:8

**long-term** 119:9 146:2,6

**longer** 44:5 66:21 148:5 166:12 182:4

**longer-term** 126:11

**looked** 19:4 21:23 24:2 25:24 28:20 208:12 209:4

**lookout** 224:1

**lose** 219:22

**loss** 216:22

**losses** 216:20

**lost** 178:25

**lot** 12:11 23:2 110:3,4 126:8,10 131:12 148:9 204:23

**lots** 109:14

**loudly** 5:7

**Louis** 150:16,18

**Louisiana** 2:11 22:15 54:21 91:8 93:2 104:23 112:1 128:22 195:2

**lovely** 43:9 81:17

**lower** 150:25

**LP** 193:8

**LSU** 91:8

**lunches** 24:12 26:7

**M**

**M-A-R-Y** 8:15

**made** 14:2 24:4 41:8 45:18 76:19 99:22 109:13 166:7 171:10,21 187:12 214:2

**Madisonville** 54:21 55:8

**mail** 5:24

**mailing** 16:6

**maintain** 90:19 158:21 220:13 221:3,18 222:3,9

**maintained** 129:10,12

**maintenance** 41:10

**majority** 128:6

**make** 5:14,21 10:13 11:17 13:16 34:10 35:13 38:15 40:19 45:7,11 49:15 51:12 53:8 57:9,25 58:6 65:14 75:23 101:20 102:10 108:3 125:24 131:11 132:21 135:14 137:1 141:21 148:7 149:1 167:4 176:22 197:25 198:21 214:11,23

215:18

**makes** 24:17 81:17 102:2,8 108:14 141:11

**making** 53:17

**man** 80:9,13

**Manage** 125:3

**managed** 122:17

**management** 21:3 120:25 124:19 133:7 137:25 183:15 184:1,10 192:18 193:1,7,8 196:17 197:6

**manager** 122:4 123:10 124:22,23

**managers** 122:18 123:6

**manages** 123:2

**manner** 12:1 155:24

**manual** 118:24,25 119:9 120:4 144:12,13,20 146:1,5

**manuals** 118:19 146:9

**maps** 208:13

**March** 199:7,22 200:11

**mark** 2:19,20 3:16,23 9:17,19 11:1, 5 17:8,9 18:17 19:18,22 20:4 21:1, 2,9,13 22:21,22,25 27:1 30:7,17 31:1,24 32:16,20,24 33:13,17 34:1, 2,14,18 37:11,12 38:8,9,20 40:17, 25 43:5,25 44:1,22 45:12 51:16 52:1 53:19,20 54:23,24 55:10,12, 21 56:6,13,15 57:10,11 58:20,24, 25 59:9,24 60:4 62:25 66:2,3,14,25 67:9,11,19 68:23 69:3,7 70:11,21 72:17 74:20 75:2,25 83:5 84:25 86:5 98:22 105:18 106:20 107:7,11 112:10,11 113:15 116:5 134:11,20 136:25 137:1,9 138:1 153:19 159:16 160:21,22 161:16,20,24 162:9,10 166:14,15 176:19 179:2,3 180:6,12,22 181:2,10,19,25 182:12,20 184:3 189:10,15 192:4 194:22,24 195:7 196:20 197:19,20 204:10,25 205:9 206:11 207:24 208:3,23 209:20 212:17 218:13 219:8

**marked** 44:6,25 116:8

**market** 108:15 110:24 111:18

**marketing** 196:17

**Mary** 8:15,16 54:20 55:8

**Mary's** 193:18

**Mary.langston** 47:13

**Mary.langston@usdoj.gov**
8:14,21

**mass** 185:16,24 190:10

**masses** 185:20 186:9 198:23
199:22

**master** 123:20,22

**Mater** 212:18,20

**materialmen's** 113:12,25 114:1,2

**math** 205:16

**matter** 109:23 179:24

**matters** 16:12 79:13,24

**meaning** 110:4

**means** 6:18 10:1,17 11:14 30:9,12
37:10 57:12,18 65:22 66:3,4,5,6
195:3 219:4

**meant** 57:18 108:16 151:4,7 171:5
187:21

**mechanic's** 113:12 114:2

**mechanics** 135:17

**media** 61:6,15

**mediation** 11:22 52:8

**medical** 86:17

**meet** 162:6 175:4

**meeting** 2:6 5:9,11,25 6:3,5,10,15
7:21,25 8:14 10:8 12:13 13:12,15,
18 17:16 23:8,11 36:6 42:22 47:17
51:18 81:18 90:12 96:17 148:21
224:2

**meetings** 6:11 48:7

**mem** 181:11

**member** 65:11 82:7 83:17 181:8
182:19,23

**members** 32:12 164:13

**memo** 223:24

**memories** 107:24

**memory** 86:18

**mentioned** 15:18 195:12

**mentioning** 67:14

**merits** 13:13

**Merle** 54:16

**mess** 26:24

**met** 189:18

**method** 10:5,16

**Meunier** 82:1,5,6,14,17,20,25
83:3,8,12,14,15,21 84:10,14,21
85:3,9,17 86:1,7,14,23 87:3,10,16,
19

**Michigan** 177:3 181:5

**microphones** 56:21

**midst** 161:15

**mileage** 28:21

**Miller** 182:2

**million** 58:18 59:8 151:16 167:12,
17,21 174:18 205:18 213:17,18
214:3,10,12

**mind** 9:13

**minor** 86:19

**minors** 204:15,21

**Mintz** 2:19,20 3:16,23 9:17,19
11:1,5 13:24 14:2 15:18,24 17:8
18:17 19:18,22 20:4 21:1,13 22:21,
25 27:1 30:7,17 31:1,24 32:16,20,
24 33:13,17 34:1,12,14,18 36:5
37:11,12 38:8,9,20 40:17,25 43:5,
25 44:1,22,23 45:12 51:16 52:1
53:19,20 54:23,24 55:12 56:6,15
57:10,11 58:20,24,25 59:9,24
62:24,25 63:1 66:2,3,14,25 67:11,
19 68:23 69:3 70:11,21 72:17
74:20 75:25 76:18,22,24 77:25
83:5 84:25 85:2 86:5 88:2 98:22,24
99:4,22 105:18 106:20,22 107:7,11
109:13 112:10,11 113:8,15 134:7,
11,20 136:25 137:9 138:1 153:19
159:16 160:21,22 161:16,20,24
162:9,11,25 163:1 166:7,14,15
176:19 179:2,3,23 180:6,12,22
181:2,10,19,25 182:12,20 189:10,
15 192:4 194:22,24 195:7,12
196:20 197:19,20 204:10,11,25
205:9 206:11 207:24 208:3,23
209:20 212:17 218:13 219:8
224:12,17

**minute** 66:21 186:13 189:19
206:10 209:18 218:5

**minutes** 6:1 12:8 67:1,21 148:13
160:4,7 198:14

**mirror** 142:1

**mispronounce** 189:20

**missed** 197:13,16

**mission** 106:1

**mix** 137:21

**moment** 6:21 8:1 57:15 61:1 99:20
108:12 122:2 123:4 128:18,22
135:13 159:13,21 179:16

**money** 50:5 68:5 71:19 121:10,11,
16,22,23 125:2,14 126:8,10 127:24
128:3,12 129:6 131:13 132:4,7
133:19 135:1,8,10,19 136:5,6,8,16,
22 142:12 173:19,24 177:20 205:3
211:21

**monies** 72:4 107:16 129:7

**monitor** 21:20

**month** 7:16 24:2,3 27:15 28:15
133:5 170:25 200:17,22,23,24

**monthly** 16:18,23 24:3 27:15
29:25 122:25 132:22,24 133:3
200:15 201:2

**Moody** 83:16

**moral** 57:3,8,12,18,25 58:5,9,12

**morning** 2:2 48:5 60:24 68:4
77:19 97:5

**morning's** 48:6

**motion** 7:13,15,16 21:3 34:13,24
35:2 72:22 112:8

**mouth** 154:9

**move** 21:6 25:7 26:24 28:2 45:9
54:10 65:6,8 66:19 74:5 75:4,5
108:2

**moved** 20:16,19

**movement** 174:9

**Moving** 23:12

**multiple** 8:8 52:20 123:5

**music** 41:16 42:3 43:9 80:19 81:4,
17

**mute** 11:2 15:22 23:3,7,10 33:3,7
41:18 42:20 43:2 60:21 77:9 81:15
92:21

**muted** 47:21 56:21

**mutual** 17:5 149:10 175:14 176:1, 6 205:17

---

**N**

**N-O-U-L-L-E-T** 54:17

**Najeeb** 181:21 182:2,3,8,15

**named** 48:17

**names** 8:19 9:8,11 150:6 204:3,5

**naming** 204:15

**Nassau** 214:20

**nature** 12:3 177:13

**necessarily** 72:1 114:15 136:19

**needed** 51:18 92:4 138:9,11 161:25 204:17

**negotiations** 21:4,7 53:24

**net** 36:13,17 108:13,14,16,19 109:7 151:2,5,7,12,23

**newspapers** 10:20

**nice** 54:24

**non-** 142:6,7

**non-debtor** 60:1 106:23

**non-parish** 142:25

**nonattorney** 96:11

**nondisclosure** 117:7,16,24

**nonprofit** 112:1

**normal** 166:8

**north** 194:25

**note** 34:10 48:15 113:24 115:7,14, 18 116:25 117:2 140:14 167:5 168:7 174:21 205:18

**noted** 23:25

**notes** 35:14,17,18,21 36:7,11 90:13,17,20 97:24 98:4,9 104:7 108:12 112:18 113:9,10 116:10 117:4 166:24 173:15 214:8

**notice** 5:23 10:18 11:13 20:8 224:25

**noticed** 176:25 194:16 213:11,12

**notifying** 10:16

**Notre** 211:11,12 213:13,15

**Noullet** 54:16

**November** 73:6

**number** 5:22 19:3 20:20 43:12 45:24 46:22 71:12 84:1,2,4 85:13 116:18 120:20 123:16 124:22,23 130:25 145:18 151:5,9,10,12,13,15 159:12 160:12 168:21 173:14 175:10 181:4 186:13 187:2 189:11 202:1 204:2 214:19

**numbered** 117:4 189:13,14

**numbering** 149:7 212:15

**numbers** 158:23

**nursing** 46:7,12 152:24 156:3 211:14

---

**O**

**oath** 4:2 6:8 13:25 21:18 69:6 70:2 162:25 180:1 204:12,13

**object** 75:24

**objection** 76:1

**objections** 7:12

**obligation** 57:3,9,25 58:6,10,13 168:12,13

**obligations** 35:8 114:19 170:8

**obtain** 110:20

**occupancy** 155:3

**occupied** 91:19 185:14

**occur** 13:14 107:25 133:3

**occurred** 11:20 48:18 216:22

**occurs** 133:2 217:9

**off-line** 56:10

**offense** 162:11

**offer** 59:8,23 145:8

**offered** 52:20 58:17

**offers** 107:3

**office** 2:3 6:11 13:21 21:7 22:11,13 24:13 29:16,20,22 81:12 92:2 93:4, 9 201:13 202:1

**officer** 23:22 25:17 28:10 31:13,25 32:2,4,8 34:5 93:14 127:1 139:8 157:10 219:4

**officers** 22:20 32:12 105:3,16 127:6,13 157:5

**offices** 5:15 39:22 46:21 111:22 112:2 187:14 201:14 202:13 217:15,16

**official** 5:10 35:21 77:16

**offset** 175:1

**omitted** 168:23 169:1 170:2 191:11 204:4,6

**one-to-one** 72:1

**open** 9:6 47:3 53:11

**opened** 22:5 124:11,14 130:9

**opening** 5:22 9:1,16,22 76:22,24 124:14

**operate** 217:21

**operated** 186:9

**operates** 120:17

**operating** 16:18,23 32:8 41:10 131:4,6 132:1,8,17,24 136:7,12,15, 20,23 138:4,6,15 156:15 186:5 200:15 201:2 202:1 216:5,13

**operation** 7:1 51:21 152:15,24 156:2 208:16 217:9

**operational** 121:2 126:14,15

**operations** 7:9 39:21 110:15 138:20 216:9

**opportunity** 12:2 48:6 53:2 99:2 160:14 163:9,11 224:16

**opposed** 93:21 126:12 205:7,20

**ordained** 173:6

**order** 7:20 8:18 21:6 44:24 51:10 73:11 74:8 182:14 204:14

**orders** 10:22 11:9

**Ordinarily** 10:21 11:7,8

**ordinary** 26:15 27:17 134:23

**Oretha** 189:20

**organization** 46:4

**Orlando** 206:15,17

**Orleans** 2:9,22 9:21,24 53:3,17
122:10 123:25 124:4 130:6,15,21
182:14 187:6,23 194:25 207:4
211:4

**outcome** 11:24 103:5

**outstanding** 188:6

**overlapping** 105:3,16,21

**overly** 196:24

**override** 35:19 36:7

**oversee** 28:10 92:5

**overseeing** 144:1

**oversees** 32:9

**oversight** 178:1

**owe** 50:5,6 206:16 211:21

**owed** 50:11 167:18 174:2

**owes** 57:8,25 58:5

**owing** 167:12 171:21

**owned** 12:24 55:23 58:18 89:9
109:17 193:18 194:4 206:22
209:15,24

**owner** 125:16

**owns** 55:10 109:6 129:23 156:23

_____

**P**

**pages** 73:1 117:3 159:14 189:14

**paid** 23:17 25:2,24 26:14,19 27:14,
17,22 28:15,22 29:2,13,18,21,24
30:18 31:6,17,21,23 32:13 33:20
68:5,14 69:12 70:9,19 72:4 74:9
167:18 168:3,11 170:16,24 217:2

**pandemic** 161:15 162:14,18,20

**paper** 159:17

**paragraph** 35:20 36:14 37:5,15
108:12 112:18 113:10 114:17
117:6

**parcel** 152:23

**parcels** 43:15

**parenthetical** 223:12

**parish** 30:18 38:4,12 40:4 92:24
93:2,9 120:5 131:10 132:6 133:11,
13,21,25 134:3,8,24 135:3,11
136:8 138:5,23 139:25 140:12,13,

20 141:7,12 142:6,11 146:3
150:18,19 173:17,19 174:12,17
178:19 179:18 180:19 185:3
189:22 190:3,4 194:17,25 195:3,
13,24 196:3,15 197:15

**parish's** 145:6

**parishes** 13:3 38:3,11 39:12,19,21
40:1 114:21,22,25 119:10 141:16,
22 142:2 144:14,25 145:8,12 146:2
147:1 178:13 179:9,11 180:21
187:15

**part** 12:25 13:2 51:24 79:20 97:25
98:1 113:7 118:25 133:24 137:20
138:11 149:13 154:22 158:10
169:7 170:17 197:22

**part-time** 35:2

**participant** 126:21

**participate** 11:17 47:11 48:6
145:9

**participated** 5:25

**participating** 48:1 60:20 65:7

**participation** 54:11 56:19 87:20
197:4

**parties** 5:11,23 6:4,15 12:25 13:25
36:1 39:2 41:18 42:13,19 43:2
66:11 223:5

**party** 6:18 13:9 48:1 156:15 216:5

**pass** 116:25 215:5,10

**passed** 83:9

**past** 65:18 68:15

**pastor** 135:22 172:24 174:10
175:4

**pastoral** 62:18

**Pat** 33:18 83:16

**path** 53:5

**patience** 81:7,25 222:16

**Patrick** 3:2,17 4:8 14:4,12,17,22
15:3,8,14 16:2,8,19 17:25 18:5,11
24:7,11,19,24 25:4,9,13,19 26:4,9,
16,21 27:5,10,19,24 28:6 29:9,15,
19 30:1,5 31:8,14,20 32:3,7 33:22
35:5,9 37:19 39:6 41:11,20 43:16,
23 44:13 45:19 49:25 50:12 52:13
54:6 57:5 58:2,8,14 59:3,13,17
60:10 61:9,17 62:1,5,15 63:4,12,

16,21,25 64:7,17 65:20 76:10
77:22 78:1,5,9,13,18,23 79:2,8,15
80:6,12,20 84:6,12 85:7,15,24
86:3,21 87:1,14 88:4,10,15,20,25
89:11,20 90:3,8,14 91:2,7,12,16,22
92:3,9,17 93:1,6,10,17,22 94:2,9
96:19 97:14,20 98:5,15 99:9,14
100:2,11 101:11,17,23 102:4,12,19
103:1,7,15,21 104:4,12,19,24
105:4,8,12 108:8 109:24 112:15,24
114:5 116:15 118:1,5,13,20 119:1
127:18 135:2,21 136:2,10,18
138:8,12,16 139:1,7,17,22 140:2,
16,22 141:1,8,13,18,23 142:3,8,15,
21 143:2,6,11,21 144:2,7,15 145:1,
7,13,17,22 147:3 149:16,21 150:2,
12,21 152:5,11,17 153:5,10,14
154:19,24 155:4,9,17 156:1,13,18,
24 157:7,12,18,23 158:24 159:7
163:13 169:23 175:22

**Patrick's** 190:3,6 199:1

**pause** 67:17 189:18

**pay** 10:2 34:13 35:4 50:10,13 57:3
65:15 71:9,18 73:11 85:19 99:15,
18 103:16,19 104:2 111:8,9 169:23
172:2,5,13 177:20

**payable** 45:5 191:17,23,24

**paycheck** 172:2

**paying** 9:3 50:5 73:5 110:10

**payment** 24:1,4 205:6 206:9,15
207:3 209:1,2

**payments** 10:7 23:23 24:15,16
26:13,14 30:20 70:1 71:14 167:9,
23,24 171:20,23,24 204:2,14,16,24
205:2,17,22 206:2,3,4,6 208:6
212:24 213:10

**payroll** 24:2 25:25 27:14 29:12,14,
24 35:3,4,8 73:13 177:4,13,16,18
178:1,4,19 179:17 210:19 219:14

**pays** 26:1

**peace** 49:7

**pedophiles** 73:13

**penalty** 35:22

**pending** 102:3 177:2 181:8

**penny** 205:21

**people** 23:2 48:1 50:5 65:17 90:2
104:9 126:18 170:1 204:3,13 221:5

**people's** 204:20

**percent** 10:1,2 50:6,10,13 85:19 99:15,19 103:16,19 112:21 142:22 218:16

**perfectly** 179:4 182:5

**perform** 30:19

**performed** 116:22,23 190:10 193:2

**performs** 165:3

**period** 166:12 201:15 202:13

**periodic** 167:24 172:1

**perjury** 35:22

**permission** 174:10

**permitted** 57:22

**perpetrator** 221:5

**person** 42:2 62:21 72:3 75:14,16 95:20 165:16 184:9 198:23 203:9

**person's** 80:10 165:13

**personal** 48:14 55:6 63:8 66:22 79:13 140:13

**personally** 5:14

**personnel** 213:5

**pertains** 65:25 224:10

**Peter** 50:3 93:2

**petition** 14:10,25 16:5 23:14,20,21 83:25 84:22 85:6,10 93:16 161:14, 17 162:1,18 167:17 188:5

**phenomenon** 86:18

**phone** 15:22 33:3,5,7 42:6 47:21, 22 67:18 77:9 224:18

**phones** 23:3,7,10 41:18 42:20 43:2 47:20 60:21 81:15 92:21

**phrase** 151:23 191:5

**physical** 5:15

**pick** 43:4 125:2

**picking** 166:16

**picture** 92:11

**piece** 109:5 111:18

**pieces** 107:15

**place** 41:19 42:20 43:6,8 47:21

81:14,15

**plan** 7:1,9 9:3 10:1,6 12:6 34:12 45:11 47:9 61:7 62:10 86:15

**planning** 166:11

**playing** 41:16 80:19

**pleadings** 38:1 134:9

**pledged** 53:11

**point** 2:24 9:14 12:22 13:22 44:7 45:4 51:19 74:21 87:11 106:23 131:9 138:6 154:20 197:17 198:16 204:18 218:17

**policies** 18:15

**policy** 118:11,19,24 119:9 142:22 143:12 146:5 159:9 170:17 173:25 174:3,7,20 175:1

**pool** 119:11,16 121:20,22 146:7 147:16 176:6

**pooled** 121:1 122:12 124:8

**portfolio** 119:24 120:2,23,25 121:4,10,15 122:2,5,8,12,18 124:9 125:25 126:11,17,21 128:3,13 129:10,12 130:6,14,20 132:18,23 133:7 137:3 138:2,6,21 146:19,21 158:2 173:19,20 174:18 184:2 193:13 203:11,15 222:22 223:8

**portfolios** 193:9 197:7

**position** 35:18,24,25 38:10,11,14 48:12 76:6 91:21 92:1,15 118:12 135:5 139:9

**positions** 14:15

**positive** 125:21

**possession** 61:22

**possessions** 133:8

**possessory** 133:20

**possibility** 113:20

**possibly** 42:2 140:6 200:4

**post** 91:1 144:25

**post-bankruptcy** 188:18

**post-petition** 35:8

**posted** 52:24

**potential** 10:16 65:12

**potentially** 129:4

**practice** 7:14 101:1 132:3 166:8

**practicing** 100:25

**prayer** 49:7

**prayers** 49:6

**pre-petition** 161:12

**prefer** 69:2

**premises** 54:20 55:7,11,25 220:14 221:14

**premium** 206:2

**preparing** 12:13 16:17 110:3 116:4

**prescription** 51:14 101:15,21

**present** 9:15 81:13 101:2

**preside** 6:9

**president** 3:5 152:3 157:3

**pretty** 38:19 176:20

**previously** 47:5 51:5 113:8

**priest** 30:19 40:1 48:17 62:18 63:11 64:3 74:9 91:11 169:13,14 170:13,16,22,24 171:21 172:7 173:6 207:8,9

**priests** 40:2 57:4 62:12 73:5 156:10 160:16,19 169:11 170:2 207:7,9,17 212:7 213:1

**priests'** 53:12

**primarily** 3:15,17 39:19 41:8 79:25

**Prime** 35:3

**prior** 13:12 70:7 111:5,8 171:24 173:5 187:20 216:9

**prioritize** 148:10,25 183:7

**problem** 34:21 186:24

**proceed** 8:24 13:20 23:10 33:7 42:14 47:24 75:7 81:1 83:13,20

**proceeding** 2:8,12 5:5,12 15:2 48:22 49:20 51:23 94:16 162:17 177:7 223:24

**proceedings** 12:7 42:15 81:9 87:11

**proceeds** 106:19 201:10,19

**process** 9:21 10:14 11:17,19,22 17:12 52:2,3,4 62:13,19 102:18

103:5,6,14 104:3 116:23 123:15,17
126:22 134:23 142:1 160:24 161:4,
5

**processes** 135:16

**processors** 35:3,4

**prod** 107:24

**production** 134:16,19

**professional** 91:10 158:11,14
165:16

**program** 13:17 17:1,2,23 145:16

**progress** 167:10

**prohibitively** 42:12

**project** 140:3,8 209:7 214:7

**projects** 140:9 142:23

**promised** 51:12 53:16

**promissory** 140:14 174:21

**pronouncing** 150:9

**pronouns** 140:13

**proof** 45:3 179:22 180:4,7,9

**proofs** 166:1 179:7 180:13

**properties** 71:15,18 110:4,12,18,
21,25 111:23 185:19 186:4

**property** 18:4 39:23 41:15 43:11
54:20 55:7,16 56:5 58:18 106:11,
12 108:24 109:5,7,22 110:9 111:9,
19 152:23 154:8,12 155:21 156:2
158:10,13 184:17 185:8 196:3
216:4,8,22 217:21

**proposed** 3:7

**protected** 221:10

**protection** 53:7

**protections** 221:7

**proud** 9:20

**provide** 4:25 10:18 11:13 20:1
34:8 53:22 56:10 72:21 79:12
134:13 155:23 156:6,14,22 157:21
160:23 192:25 204:16,19 210:16

**provided** 18:16 22:11,13 176:23

**provider** 177:16

**providing** 3:22 56:4 155:15

**province** 221:24

**provision** 119:12 146:8

**provisions** 118:25

**proxies** 47:7

**psychology** 165:17

**public** 53:8,17 61:15 91:17 116:11
155:24 156:23

**publicly** 51:6 204:20

**pull** 40:12 71:25 110:17 159:23

**purchase** 58:18

**purpose** 6:2 46:16,19 169:18

**purposes** 36:16 73:5 114:21
185:14

**pushed** 53:14

**put** 80:25 110:14,19 124:12 126:16
131:14 135:13 138:24 147:20
154:9 177:5 189:18 199:14,20
203:8 204:20 223:6 224:22

**putting** 36:8 59:22

---

## Q

**question** 34:11 38:21 43:11,14
44:16 49:17 51:4,17 53:21 55:3
56:25 57:14,20,22 60:1,4,5 61:1,4
64:11,12,21 70:14,16 72:19 73:3,9,
24 74:7,17,22 84:16 86:9,15 87:5
89:1,6 94:14 99:20,25 100:6
102:22 103:10,25 106:21 107:25
112:4 113:16 114:6,18 135:16
149:12 152:12 155:19 158:7,9,13,
19 159:12 160:17 161:3,8,9 162:24
163:2,8 167:4 175:13 183:7 184:3,
6,15 195:8 196:14 201:6 203:15
213:23 218:15

**questioning** 8:18 13:21 75:12
81:2 82:9

**questions** 5:7 6:8,14,15,20,21,24
7:4,8,11,20,23 8:8,11,13 9:4,7,11,
12,23 13:11 35:12 36:10 37:23
47:1,5,7,25 48:2,23 54:18 55:22
56:9,14 57:16 60:17 61:20 66:8,11,
21 68:20,25 69:7 75:7,14,15 77:19
82:10,17 83:11,22 87:13 99:24
103:11 104:9 107:19,23 131:8
148:5,9,25 160:11,25 163:5 198:2,
4,9,10 220:9 223:16,19 224:15

**queue** 82:9

**quick** 40:13 54:17 58:17

**quote** 49:6,10 50:22 95:5

---

## R

**raise** 4:5,22

**raised** 61:21 101:22

**ran** 44:3

**random** 172:5

**range** 153:17 172:15

**rate** 140:19,23,25 141:2 203:10

**ratio** 142:19 143:5

**Raymond** 21:23

**reach** 49:12,15

**read** 115:10

**readily** 84:18 158:4

**ready** 13:20

**real** 40:12 41:14 43:11 109:17
110:20 153:8 155:8

**real-time** 145:5

**realize** 113:21 197:25

**reason** 6:1 34:10 49:11 51:8
161:13 168:24,25 179:3 204:5

**receivable** 39:10,11,12,14,18
40:10 115:21 116:1 167:5 173:15

**receivables** 41:7 115:22 116:6,7
166:24

**receive** 8:19 90:17 107:16 146:15
154:2 201:14

**received** 5:23 9:9 13:12 17:3,5,7,
10 24:1 90:12 107:15 109:5 164:1
199:21 200:17 204:1

**receives** 23:23 135:3

**recent** 155:12

**reclassified** 19:7,15

**recognize** 10:7

**recognized** 86:16

**recollect** 134:7 197:14

**recollection** 208:16

**recommendation** 139:12

**recommends** 117:23

**record** 7:4 9:18 16:13 17:18 22:10 38:16 72:20 75:24

**recorded** 5:6 108:19,22 214:8

**recorder** 148:14

**recording** 5:8,9,10,13,17 23:8 42:21 43:10 56:22 67:16 81:16 148:6 219:22

**records** 53:12 116:12 200:2 223:10

**recurring** 39:22

**reduced** 151:16

**refer** 191:6 193:13 221:5

**referable** 53:9

**reference** 83:23 113:11 119:8 149:10 166:8 197:14

**references** 208:14

**referred** 112:18 185:8,19

**referring** 49:3 115:2 137:3,4,7 182:10 201:18 220:23

**refers** 108:12 114:19

**reflect** 13:7 170:8 202:2 224:15

**reflected** 109:7 115:24 151:10

**reflection** 12:14

**refresh** 208:16

**regard** 5:9 6:14 9:2 37:7,25 41:14

**regular** 23:17,24 24:18 25:2 26:19 27:22 28:22 29:2,14 32:13 33:20 135:4

**reimburse** 136:23

**reimbursements** 26:13 27:16 28:21

**reiterate** 94:16

**relate** 6:24 179:10 197:6 205:22 207:5 221:4

**related** 39:20 40:1 44:4 53:12 71:9 72:3,5 181:5,11 194:18 200:6 204:14 205:1 207:7 209:12 219:14 220:21

**relates** 133:21 179:13

**relating** 206:19

**relation** 78:21

**relationship** 72:1 80:10 88:2,8,23 89:9,15,19,25 90:6 104:10,17 107:5,13,21 125:17 133:20 134:2 196:6,19 211:25 212:2

**relationships** 89:3

**relevance** 162:2,5

**relief** 17:6 71:14 175:14 215:8

**religious** 30:12 185:14

**remain** 5:15 73:13

**remaining** 16:1 17:20 50:25 168:12,13,17

**remarks** 5:22 9:1,16,22

**remember** 112:7 126:10 181:4 188:14 216:12

**remind** 43:1 81:14 95:16,20 199:4

**reminder** 16:22

**renew** 53:2

**renewing** 50:18

**rent** 207:8

**rents** 201:9,18

**reorganization** 7:9 53:1 61:7,16, 25 62:10 86:16

**reorganizing** 47:9

**repair** 140:5,7

**repay** 171:13

**repeat** 89:1

**repeatedly** 99:21

**report** 16:23 123:11 199:12

**reported** 202:21 213:14 222:25

**reports** 16:18 200:16 201:2 203:20

**represent** 2:21 7:24 39:14 54:13 65:11 83:16 160:3,18

**representation** 79:5

**representative** 2:14 6:16 9:5 61:13

**representatives** 2:15,23 23:6 43:3 163:3,10

**representing** 7:19 8:9 9:20 48:20 54:16 82:6

**represents** 47:13 77:17 83:8

**repressed** 86:18

**request** 66:21 90:22 134:16,19 135:22 139:3 140:4,8

**requested** 17:3,9 18:14 19:17 142:20 177:6

**require** 13:19 98:11 109:11 141:5 174:10

**required** 19:16 52:5 53:23 110:17 139:25 160:24

**requirement** 142:18

**research** 70:5

**researching** 34:5

**reserve** 85:22

**residential** 213:1

**resolution** 11:24 23:14 52:9 93:15

**resolved** 11:18

**resources** 12:12 109:14,21 110:16,23 172:13

**respect** 48:25 56:3 73:12 79:24 162:21

**respectfully** 49:9

**respond** 84:15 100:19

**responded** 107:3

**responding** 84:11

**response** 15:12 57:12 60:8 61:1,3, 4 63:8 86:8 99:23,24 107:25 115:20 196:12

**responses** 107:19

**responsibility** 92:7 143:16 144:1

**responsible** 6:12 106:6 112:14 177:25 178:3,18 183:15,20 184:10

**rest** 17:13 114:12

**restaurant** 208:15,18

**Resto** 207:25 208:6,8,15,18

**restricted** 146:17

**restrictions** 146:16 198:24

**restructuring** 53:4

**result** 52:21 198:23

**retention** 206:3,6

**retired** 73:5 74:9 212:7 213:1

**retiree** 57:4

**return** 28:4 31:11,12 203:10

**returns** 22:12,13

**revealing** 63:8

**revenue** 199:11,12,15,21 200:6,8, 17 202:3,25

**review** 15:11 45:6 62:11 72:24 73:1 164:7,13

**reviewed** 97:12,17

**revisit** 21:14

**revolving** 188:3,6,12,17,23 189:3

**RICHARD** 68:3,9,13,18 69:1,5,11, 16,20,24 70:6,13,18,24 71:3,8,17, 22 72:2,8,15,23 73:2,10,17,25 74:6,15,25

**Riggs** 16:16

**ripped** 178:12

**risk** 183:15 184:1,10 192:17 193:1

**Riverside** 207:4

**road** 10:10

**Roberts** 32:25 33:1,3,4,9

**Rock** 206:15

**Roger** 160:1,3,9 161:7,18,22 162:4,13 163:6,15,20 192:7

**role** 25:18 27:8 28:5 32:6 79:5 89:7 91:19 93:20 107:20

**roles** 197:11

**Roman** 2:8

**room** 10:12 34:3 77:20 78:4,8 80:3 88:1 90:1,13,18 105:15

**rooms** 207:12,15

**Roughly** 172:9

**rounded** 205:19

**royalties** 201:9,18

**rule** 75:16 79:20 143:9,10

**rules** 11:12 34:21 35:25 75:11

**run** 65:19 95:1 196:25

**running** 69:25

**runs** 190:4

---

**S**

**safe** 220:14,15

**safes** 220:20 221:9,14,19

**Saint** 48:18 54:22 55:9 56:3

**salaries** 37:9

**salary** 170:14,16,19

**sale** 106:19 107:3

**sales** 71:15 201:19

**sanctuary** 190:6,8

**Sandra** 32:25 33:1,4,9

**Santa** 53:10,11

**save** 77:9 114:12

**savings** 20:25 119:10 120:5 146:2 147:13

**scandal** 221:4

**scene** 173:3

**schedule** 20:8 39:9 40:12 41:1 43:12,19 44:16,17 55:15 109:16 115:7,20 116:10,20 117:1,2,8 119:20 120:19 158:5,25 171:18 192:2,14 197:15 201:1 204:6

**scheduled** 98:10 109:22 176:14

**schedules** 3:19 7:2 12:3,8,11,14 13:7,14 14:10 15:1 18:10 19:1,4 35:15,19 36:16 38:1,19 39:11 43:12 70:22 97:12,25 98:11,13 108:2 109:15 110:3,14 113:11,13 114:3,21 115:20 116:4,6 119:17 120:12 149:6 161:1 166:22 197:14 198:4 202:22 213:16 223:17 224:21

**Scholastica** 21:23 150:10

**school** 13:2 19:1 40:9 91:1,6 193:18 194:4 204:14 205:2,6 206:20,22 209:15 210:9

**schools** 12:24 13:4,7 38:4,12 39:13 41:8 149:10,11,13,18,22 150:6,9 187:15 201:24 205:2 206:19 209:13,24

**scientific** 86:17

**scope** 6:2,22 12:7

**scroll** 150:24 159:14 192:2 193:6 201:12 203:25 211:10 216:19 220:8

**scrolling** 159:13

**sealed** 53:11

**searches** 116:11,13,22

**section** 2:6 83:25 85:10 119:9 146:5 166:22 175:7 183:1 186:12 213:9 220:13 222:17

**sections** 118:23

**secured** 43:20 106:12 141:6,12 142:7

**securities** 112:21,23

**seek** 11:21

**self-evident** 196:17

**self-insurance** 17:2,22

**self-insured** 192:22 206:3,6

**semiannual** 167:9

**seminarian** 170:8

**seminarians** 170:5

**Seminary** 213:13,15

**send** 66:12 135:22,24

**sends** 138:6

**sense** 57:21 145:25 218:1

**separate** 13:3 122:22 130:14,21 133:1 158:21 159:4 178:3 181:18, 20,21 196:5 211:16 222:22

**separately** 8:8,23 13:4 40:16 46:5, 21 104:14,25 122:17,22 146:12 149:14 150:1,3,10,19 159:1 163:1

**serve** 47:10 92:16 93:25

**service** 134:8 177:4

**services** 26:1 30:19 133:24,25 134:3 157:22 172:24 179:18 192:15,16,25 193:24 197:16 210:16

**serving** 48:21 207:17,20

**set** 7:16 11:12 16:14 46:4,6 140:19, 23 152:15 201:1 223:3

**Seton** 194:4

**setting** 10:21 11:6 173:25

Section 341 Meeting of Creditors

**settlement** 95:4 167:2,19

**settlements** 68:6 69:12 70:10 72:5 94:6,7 96:1,6,12 117:23

**sex** 50:10 68:5 69:12 70:1,9 71:9 85:20 96:12 165:4 190:24

**sexual** 48:17,20 53:12 86:19 94:7 101:22 102:3 108:7 117:10,17,23 163:25 164:8,14

**shareholders** 113:2 152:4

**shift** 16:11 22:19 29:7

**shifting** 16:25 18:24 45:22

**short** 21:2 34:4 44:22,24 81:9 161:3

**short-term** 120:5

**shorter** 166:12

**shortly** 13:14

**shout** 42:5

**show** 53:18 122:3

**showing** 135:4

**shown** 13:6 168:22

**shows** 171:18 210:7 214:19

**shut** 186:4

**SID** 46:5

**sign** 14:25 81:6 124:13 140:14

**signature** 19:16 20:2,21

**signatures** 36:8

**signed** 3:19 14:10 28:4 35:22 84:22 85:6,11

**significant** 146:19 162:15

**signing** 15:11

**similar** 126:15

**similarly** 51:6

**simply** 67:20

**single** 45:6 122:5

**sir** 62:18 64:4,6,10 70:2 160:7 161:17 162:10 213:3

**sit** 47:18

**sitting** 3:2 136:5

**situation** 12:16

**size** 139:16 206:17

**slightly** 30:12

**small** 126:5

**so-called** 160:15

**Society** 17:6 175:15

**SOFA** 198:5,9 199:10 202:25 213:10

**software** 122:23 133:1

**sold** 71:18 106:18

**solemnly** 4:6,16,24

**solvent** 102:15,25 103:4,5,13

**sooner** 133:3 134:18

**Soren** 56:20,24 57:7,11,23 58:4, 11,15,22 59:1,5,11,15,21,25 60:3, 15

**sort** 56:2 63:9 140:5 153:18 164:7 205:2 206:2

**sought** 53:7

**sources** 71:12 202:3

**speak** 61:10 62:16 63:5 64:18 75:17

**SPEAKER** 11:3 42:7,23

**speaking** 6:5 17:22 19:11 37:25 84:9 95:10 99:6 135:8

**special** 80:14,17 88:5 143:20

**specialized** 108:6 143:17

**specific** 55:2,5 115:18 204:17 222:24

**specifically** 45:23 49:4 86:18 137:4,7 143:25 160:25 167:3 174:2 195:9 209:7 222:17

**spelled** 134:2

**spend** 72:9

**spirit** 116:4

**spoken** 224:12

**spot** 55:2

**St** 21:22 54:20 55:8 93:2 150:16,18 157:2,11,22 184:17,23 185:8 189:19 190:3,6,15 193:18 194:4, 16,24 195:4 199:1 216:4

**stand** 55:7 219:5

**standpoint** 30:9,12

**stands** 51:8

**Stang** 41:25 42:1 66:20 67:5,6 75:7,9 76:16 77:7,13,14,24 78:3,7, 11,16,20,25 79:4,10,17,22 80:2,8, 16,24 81:3,19,21 82:11,15 83:9,11 87:21,23 88:7,12,17,22 89:2,13,23 90:5,10,16 91:5,9,14,18,24 92:6, 12,20,23 93:3,8,12,19,24 94:4,11, 20 95:2,15,19,23 96:4,9,15,21 97:4,10,16,22 98:7,16,18,23,25 99:11,17 100:5,12,14,18,20 101:6, 13,19,25 102:6,14,21 103:3,9,18, 22,24 104:5,6,15,21 105:2,6,10,14, 20,25 106:5,10,16,21,25 107:9,17 108:10,21 109:3,12 110:22 111:4, 10,16,24 112:5,12,17 113:1,5,16, 23 114:11 115:4,11,15 116:9,19,24 117:14,20 118:3,7,15,17,22 119:3, 7,15,22 120:3,10,22 121:5,9,14,19 122:1,24 123:9,14,23 124:10,13,18 125:1,8,13,23 126:7,25 127:5,12, 20 128:7,11,17 129:3,11,18,22 130:2,8,13,18,24 131:18,22 132:2, 12 133:9,17 134:1,6,14,22 135:7, 25 136:4,13,21 137:1,6,17 138:3, 10,14,18 139:13,19,24 140:10,18, 24 141:4,10,15,20,25 142:5,10,17, 24 143:4,8,14,23 144:4,9,18,23 145:3,11,15,19,24 146:24 147:6, 10,21 148:1,4,8,17,24 149:3,4,19, 24 150:4,14,23 151:14,21 152:7, 13,19,25 153:7,12,16,20,25 154:5, 14,21 155:1,6,11,20 156:4,11,16, 20 157:1,9,16,20,25 158:6,18 159:3,10,19 160:6 163:19,21,22 164:5,11,17 165:1,10,15,24 166:5, 15,19 167:11,16,22 168:2,6,10,20 169:6,12,17,25 170:7,12,18,23 171:4,9,17,25 172:4,6,10,17,22 173:2,7,13,23 174:6,11,16,24 175:6,10,11,18,24 176:4,11,17,20, 24 177:12,19,24 178:5,10,17,22 179:3,14,21 180:8,17,24 181:6,17, 22 182:9,16,24 183:13,19,25 184:8,13,21 185:2,6,12,18,23 186:2,10,17,21 187:18 188:2,10, 15,21 189:1,7,12,17,25 190:5,9,14, 19 191:4,10,16,21 192:9,24 193:5, 12,16,22 194:3,8,14,23 195:5,11, 17,21 196:10,13,21 197:2,12,20 198:1,11,19,20 199:2,8,19,25 200:7,14,20 201:4,21 202:11,16,20 203:2,7,14,18,24 204:11,22 205:5, 13 206:1,7,13,21 207:1,11,16,21

208:1,5,11,21,24,25 209:9,14,21,
22 210:3,14,20 211:3,9,15,20,24
212:8,12,19,23 213:4,8 214:1,6,15
215:9,16,22 216:7,14 217:1,8,12,
19,24 218:8,12,14,20 219:2,13,18,
20,23 220:3,7,12,19 221:1,13,17,
22 222:2,8,13 223:9,15,21 224:4,8

**start** 4:4 23:19 48:3 104:23 219:21

**started** 110:2 154:6 216:13

**starting** 99:3 192:5

**state** 9:22 14:15 22:12,15 38:2
47:22 54:13 83:12 91:8 138:21
177:17 189:11 197:4,11

**stated** 35:2 95:8

**statement** 7:2 12:4 23:21,25 25:16
27:14 29:13 31:7,9 35:16 37:6,13,
18 39:5 45:22,24 50:19 52:12 54:5
76:18 77:10 97:17 98:1,3 99:22
109:16 114:22 116:2 122:3,25
123:18,20 135:4 166:8 198:9
199:11 202:22 204:7 213:14
222:23

**statements** 14:2 35:17,19 36:9,
10,17 39:1 45:18 50:8 51:5 61:2,7
97:23 113:11,13 114:4 123:17
223:17

**states** 2:4 9:5 36:14 37:8 49:18
117:22

**stating** 2:17 38:15 75:23

**status** 20:13,25 167:1

**statute** 65:19 85:22

**statutory** 6:6

**stay** 67:7 131:13

**stem** 36:10 51:1,8

**step** 10:8 123:3 179:6

**Stetter** 160:1,3,9,22 161:7,18,22
162:4,13,24 163:6,15,18,20 192:7

**stipend** 24:3 29:25

**stopped** 199:22

**street** 54:20 55:8 190:4 197:4,11
208:14

**struck** 217:3

**structured** 167:2,18

**student** 205:4

**subcommittee** 143:24 144:6

**subcommittees** 144:6

**subject** 110:10 153:9

**subjected** 86:19

**submission** 183:20

**submitted** 183:5,9

**subsection** 112:20

**substantially** 109:18

**substitute** 7:7 47:10

**suffice** 140:6

**sums** 205:19

**support** 39:21 204:24 210:17,19,
21

**supporting** 46:4

**survivor** 8:2 10:16 47:15,16 48:16
54:14 62:14,20 83:9,17 117:23
118:11 161:12

**survivor/tort** 8:4

**survivors** 48:20,24 49:4,12,19
50:10 61:5,24 62:10,16 64:5 66:1
72:10 85:20 94:8 108:7 117:11,17
118:9 160:4,13,18 165:4

**Susan** 78:10

**Susie** 95:8

**swear** 4:4,6,16,24

**switch** 58:16

**sworn** 99:6

**system** 45:5 144:25 145:6 149:7

**systems** 144:25

_____

T

_____

**tabulation** 70:1

**takes** 101:8 132:4

**taking** 15:17,23 50:24 77:18

**talk** 6:22 13:5 56:23 128:21 135:10
218:14

**talked** 55:1 64:13 132:16 196:24

**talking** 27:4,6 30:14 36:19 106:22
132:16 137:11 162:12,14 184:24
185:5 195:12,14

**Tammany** 157:2,11,22 194:16,24
195:4 216:4

**tape** 99:5

**tax** 22:12 28:4 31:11,12 39:20
110:9,10 111:9

**taxes** 43:15 177:18 178:19

**team** 53:1

**technological** 67:15

**technology** 148:15

**technology-related** 198:5

**telephonic** 7:21

**telephonically** 5:6 10:12

**telling** 70:8 87:25 191:12

**tells** 213:22

**Temporalities** 144:13 146:1

**tenant** 153:1

**term** 12:20 66:5 85:20 99:20 100:8
111:12 217:25 218:21

**terms** 100:14 130:3 167:3,5
213:21

**testified** 85:1

**testifying** 2:16,24 3:14 24:22

**testimony** 3:22 4:25 36:2,7 44:10
75:19 98:8 127:22 137:11 152:1

**therapy** 165:17

**thereof** 44:19

**thing** 2:13 40:19 45:3 76:17 153:18
159:18 194:23 207:15

**things** 24:12 28:11 36:22 71:15
146:15 170:9 176:25

**third-party** 17:2,4,20,23 35:4
177:16

**thought** 82:10 94:14 123:16 131:9
137:18,19 174:25 187:19

**thrown** 51:15

**thumb** 143:10

**Thursday** 7:15

**tick** 19:4

**tight** 8:7 47:18

**time** 5:12 23:1 34:25 45:1 46:25

47:3 48:25 60:17 85:5 103:12
108:23 109:1 115:10 126:18
148:10 149:1 154:15,20 161:17,19,
25 171:15 173:9 186:14,18 198:6
219:25 223:18

**times** 177:9

**timing** 216:12

**title** 111:13,17,22 116:22 194:20
202:2

**today** 2:7,16 5:9,24 6:20 11:10
12:22 17:24 42:22 48:1 56:19
77:18 81:18 84:15 94:17 96:18
102:7 127:6 144:11 160:25 163:10
164:12 222:16 223:23 224:17

**today's** 6:2,22 10:8 12:7 90:12
127:21 224:15

**Todd** 78:19

**told** 55:17 185:7

**tomorrow** 174:17

**tongue-in-cheek** 216:15

**top** 40:20,23 71:2

**topics** 58:16

**tort** 47:15,16,24

**total** 19:2 173:18 208:6

**totaled** 205:16

**touch** 50:16

**tough** 68:1

**track** 17:18

**tracked** 122:14,22 124:8 133:1

**tracking** 122:20

**trade** 191:17,22,24

**Trahant** 68:2,3,9,13,18 69:1,4,5,
11,16,20,24 70:6,12,13,18,22,24
71:3,8,17,22 72:2,8,14,15,18,23
73:2,10,17,25 74:6,15,19,25

**training** 108:5,7 165:17

**transaction** 155:16

**transactions** 13:6,9 187:13,16

**transcribes** 99:5

**transcript** 5:10

**transfer** 46:14,15,17 154:2,7,12,15
155:7 210:7,8,11 215:21,23,24

216:3,10

**transferred** 153:8

**transferring** 133:19

**transfers** 131:6 132:15,21 133:4
155:21

**transparency** 52:21 53:5,14,15
116:5

**transparent** 187:12

**travel** 26:7 136:8

**treat** 12:23 49:13

**treating** 49:9

**trial** 2:3

**tribunal** 27:11

**Trinity** 46:1,3 151:1 152:1,9,14,20
153:9,23 155:15,22,25 156:7,22

**trip** 206:20

**true** 14:2 15:20 16:1 22:13 36:3
50:8 57:2 58:17 59:6 61:8,16 62:21
84:14 224:19

**Trust** 43:21

**trustee** 2:4 6:12,16,19 7:11,19 9:5
42:17 122:18 224:22

**Trustee's** 5:10 13:21 81:12

**trustees** 6:18 36:1 47:6 97:25
223:18,25

**truth** 4:7,17,18,25 5:1

**tuition** 170:9

**turn** 9:15 37:23 108:11 138:19
149:6 159:11,14 183:1 201:5
210:15 212:13

**turned** 150:8

**turns** 107:21

**twofold** 49:11

**type** 24:10 36:18 126:11,14,15
140:3

**typically** 94:25 126:5 132:21
133:3 135:24 142:14,23

**typing** 92:22

─────────────

**U**

─────────────

**UCC** 44:3

**ultimate** 9:25 10:9

**ultimately** 11:25

**Umbrella** 176:6

**unable** 8:22 9:9

**uncollectible** 171:20

**understand** 17:1 38:14,21 48:12
55:5 56:7 58:9 67:24 74:21 76:2
79:11,18 89:8,14 92:1 102:10
107:4 111:11 119:25 135:9 137:22
151:4,7,22 162:2 181:9 187:19,21
194:20 201:11

**understanding** 18:3 58:12 65:24
73:9 79:25 89:24 94:16 99:25
100:10,13 128:1 137:2 138:21
150:17 186:3 196:4

**understands** 99:5

**undetermined** 109:19 188:4

**undo** 45:1

**unitary** 122:6

**United** 2:4 9:5 117:22

**Universal** 206:15

**University** 91:8

**unknown** 11:3 42:7,23 183:6

**unlike** 13:3

**unliquidated** 44:7,19,21

**unmute** 47:22

**unrealized** 203:11

**unrelated** 217:20 218:24

**unresolved** 190:22 191:5,12

**unrestricted** 174:19

**unsecured** 48:21 53:24 65:12
75:5 83:18 87:22 141:17

**update** 34:6 110:19

**updated** 20:19 110:17

**USDOJ** 5:20

─────────────

**V**

─────────────

**validating** 86:17

**valorem** 43:14 110:10 111:8

valuation 216:3

values 108:14,15 110:11,20 159:5

varying 28:21

venue 7:4

verbally 5:7

vicar 3:3,4 14:18 32:21,24 33:12 50:20 63:17,20 91:20 92:16 139:10 171:1

vicar's 63:14,17

vice 3:5

victim 47:24 48:16,20,24 49:4,19 54:14 61:5,24 62:10,14,16,19 63:5 64:5,18 65:25 162:7,8 204:23

victimized 62:22 65:18

victimizer 64:16

victims 49:12 51:3,7,9,11 52:23 53:13 57:9,25 58:6 65:13 70:1 82:7 162:16 165:2

video 2:24

violated 62:13

vocation 48:15

voice 54:25

voices 99:3

voided 20:21

voluntary 2:12 161:14

voting 112:21,23

W

wage 34:24

wait 212:15 218:5,7

walked 113:13

Walker 2:21 9:20 16:13 90:9 182:3

Walmsley 16:7 131:17

wanted 66:11 94:15 108:4 113:22 161:11 166:17 195:9

wanting 51:12

Wayne 90:4

ways 57:19

website 50:17 144:13 146:25

163:24

week 186:9

weekend 223:23

weekly 185:24

weeks 110:13

weight 35:23

Wester 53:11

Western 177:2 181:5

whisper 68:19

whispered 68:21

whispering 62:23,24

Whitney 20:16 122:11,19 123:21 129:17 146:23

wholly 89:9

wife 199:4

Williams 33:18

wire 135:24

wired 136:11,14

wires 133:20

wise 186:14,18

withdraw 135:22

withdrawal 135:14,18

withdrawals 172:1 182:4,6,10

withdrawn 136:16

withdrew 182:13

witnesses 75:13,17,22 76:20 79:19 84:15 86:8 87:4 88:1 90:12 94:12 102:7 105:15 107:24 127:6, 13 163:10 164:12 166:7 169:21 196:22

woman 80:10

wonderful 160:3

wondering 36:18 154:7 202:5

word 57:12,17 195:3 213:12 218:18

words 147:14 154:9 190:23 218:9 221:4

work 9:8 10:3,15 11:11 35:3 52:8 101:3 107:14 135:20

worked 205:3

working 162:1

workmen's 39:24

works 3:1 13:17 51:21

world 92:15

worth 109:6

wrap 52:16 60:13 72:14 198:18

wrapped 161:13

wrapping 219:21

write 174:20 175:3 176:13

writeoff 173:18

writing 139:21

written 90:12,17 125:16

wrong 3:4 137:20

Y

y'all 65:15

year 49:3 69:13 70:8,20 72:9 158:11 168:12 171:3,5 203:9 207:8

years 63:12 64:4 68:15 79:25 128:12 153:17,18 158:15 168:17, 19 171:24 172:16

yield 43:24 82:16

York 43:21

Z

Z-U-N-I-G-A 3:6

Zeringue 78:10 90:4 95:8

Zeringue's 90:6

Zuniga 3:6 4:11,13,14,16,19,21 19:8,12,13 20:15,18 21:17,19 22:2, 7,16 36:21 37:2,17 38:6 39:4,17 40:5,6,11 41:5 44:9,11 46:2,11,18 48:10 49:21 76:8,21,23 77:2,3,21 79:21,22 84:17 86:10,11 87:6 94:18,22,23 96:24,25 97:4,6 100:17,18,22 108:18,25 109:9,25 110:1 111:1,6,14,20 112:3 114:7, 24 115:9,13,25 116:16,17,21 117:12,13,18 119:21,23 120:1,8, 13,24 121:7,12,17,24 122:7 123:7, 12,19 124:2,16,24 125:18 127:16,

17 128:5,9,24 129:8,14,20,25
130:4,11 132:14 137:15,24 146:10
151:11,18 152:22 153:3,22 154:3,
10,17 156:9 157:14 158:3,16 163:4
164:22 165:6,18,22 168:16 169:2,
9,15,19 175:16 176:9 183:11,17
187:11 191:2,8,19 200:5,12,18,25
201:17 202:7,14,18,23 203:5 204:8
205:11 206:18,24 208:19 209:11,
17 210:12,22 211:22 215:2,7
217:14 218:4,11 219:6,10 223:1,13