## UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 20-10846** |
| THE ROMAN CATHOLIC CHURCH OF | § | |
| THE ARCHDIOCESE OF NEW ORLEANS, | § | Section "A" |
| | § | |
| Debtor.[1] | § | Chapter 11 |
| | § | |
| | § | |

## DECLARATION OF FR. PATRICK R. CARR
## IN SUPPORT OF FIRST DAY MOTIONS

I, Fr. Patrick R. Carr, state under penalty of perjury that the following is true and correct:

1.      I am a Director, the Third Vice President, and the Vicar of Finance for The Roman Catholic Church of the Archdiocese of New Orleans (sometimes referred to herein as the "**Archdiocese of New Orleans,**" the "**Archdiocese**" or the "**Debtor**"), a non-profit religious corporation incorporated under the laws of the State of Louisiana, and the debtor in the above-captioned Chapter 11 case (the "**Chapter 11 Case**").

2.      Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the administration, operations and finances of the Archdiocese of New Orleans; information learned from my review of relevant documents; and information provided to me by members of the Archdiocese's advisory team.  I am authorized to submit this Declaration on behalf of the Archdiocese, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

### PART I:  PRELIMINARY STATEMENT

3.      To enable the Archdiocese to minimize the adverse effects of its reorganization in this Chapter 11 Case and to avoid immediate and irreparable harm, the Archdiocese has requested various types

---

[1] The last four digits of the Debtor's federal tax identification number are 8966. The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

{N4007172.1}

1

**EXHIBIT 6**

of relief in its "first day" pleadings (each, a **"First Day Motion"**).  The First Day Motions seek relief intended to allow the Archdiocese to effectively transition into reorganization under Chapter 11 and to minimize disruption of its operations, thereby preserving and maximizing the value of the Archdiocese's estate.

4.      I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion serves the interests of the Archdiocese's estate and creditors.

5.      Part II of this Declaration provides a brief overview of the Archdiocese's history, its ministries and the circumstances affecting its financial condition which necessitated the commencement of this Chapter 11 Case.  Part III of this Declaration sets forth relevant facts in support of First Day Motions that address administrative issues.  Part IV of this Declaration sets forth relevant facts in support of First Day Motions that address operational issues.

### PART II:  BRIEF OVERVIEW OF THE MINISTRIES OF THE ARCHDIOCESE AND ITS FINANCIAL POSITION

6.      The Catholic Church is today, and has been for more than three centuries, a vital part of the city of New Orleans and surrounding areas.  Catholic institutions began ministries in what would become the State of Louisiana before New Orleans was founded in 1718.  Created as a diocese in 1793, and established as an archdiocese in 1850, the Archdiocese of New Orleans has educated hundreds of thousands in its schools, provided religious services to millions in its churches and provided charitable assistance to countless individuals in need, including those affected by hurricanes, floods, natural disasters, war, civil unrest, plagues, epidemics and illness.

7.      Currently, the Archdiocese's geographic footprint occupies over 4,200 square miles in southeast Louisiana and includes eight civil parishes – Jefferson, Orleans, Plaquemines, St. Bernard, St. Charles, St. John the Baptist, St. Tammany and Washington.  Approximately 517,000 Catholics call the Archdiocese home.  The Archdiocese of New Orleans consists of 112 church parishes, which are served by 213 archdiocesan priests and 112 religious order priests, who with the assistance of 219 permanent deacons,

celebrate daily and weekend Masses for Catholic parishioners.  Nearly 33,000 students are educated annually from nursery through high school in both independent and archdiocesan owned Catholic schools operating within the geographic footprint of the Archdiocese.  Catholic institutions of higher learning include two seminaries and three universities with a combined student population of over 8,800.  Two Catholic schools exclusively serve students with exceptional learning needs.

8.       Catholicism in the Archdiocese of New Orleans involves more than Mass on Sundays and attendance at Catholic schools.  Archdiocesan and other Catholic ministries support individuals, families and communities without regard to religion, race, ethnicity or economic status.  Archdiocesan and other Catholic charities and social service programs provide assistance to the homeless, hungry, elderly and developmentally challenged, as well as to at-risk youth, pregnant women, and many others.  Through its ministries, charities, and programs, the Archdiocese benefits the lives of nearly 500,000 residents of southeast Louisiana on a daily basis.

9.       Operational challenges have strained the Archdiocese's financial position, have impacted its ability to sustain its ministries and charities, and have necessitated the commencement of this proceeding. The financial and operational difficulties burdening the Archdiocese range from claims and lawsuits alleging sexual abuse by clergy that occurred more than fifty years ago to losses of revenue from offerings and collections at Masses which are no longer publically celebrated due to the COVID-19 pandemic.

10.      On May 1, 2020 (the "**Petition Date**"), the Archdiocese will file a petition with the Court under Chapter 11 of the Bankruptcy Code.  The purpose of this Chapter 11 Case is to develop a plan of reorganization, under the supervision of the Court, which will facilitate the equitable distribution of assets to creditors in accordance with law, sustain the financial viability of the Archdiocese, and allow the Catholic Church to continue the religious and charitable ministries and programs it has fostered throughout New Orleans and surrounding areas for more than three hundred years.

## PART III: FIRST DAY MOTIONS THAT ADDRESS ADMINISTRATIVE ISSUES

11.      Concurrently with the filing of the voluntary petition to commence this Chapter 11 Case, the Archdiocese has filed a number of First Day Motions.  The Archdiocese anticipates the Court will

{N4007172.1}

conduct a hearing within a business day or two after commencement of the Chapter 11 Case, during which the Court will entertain arguments of counsel with respect to the relief sought in each of the First Day Motions.

12. Generally, the First Day Motions have been designed to meet the immediate goals of: (a) establishing procedures for the efficient administration of this Chapter 11 Case; and (b) continuing the Archdiocese's operations during this Chapter 11 Case with as little disruption as possible. I have reviewed the First Day Motions, including the exhibits attached thereto, and believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Archdiocese's ability to achieve success through this Chapter 11 Case.

13. The following is a discussion of the First Day Motions that the Archdiocese will ask the Court to consider at the First Day Hearing.

**A.** **Ex Parte Motion for an Order Limiting Notice & Establishing Notice Procedures (the "Motion to Limit Notice") [Docket No. 3]**

14. As previously discussed, the Archdiocese spans eight civil parishes in the metropolitan New Orleans area, with 112 separate church parishes (the "**Parishes**"). The Archdiocese provides a wide range of critical services to the Parishes pursuant to various Parish Service Agreements, effective as of March 1, 2011 (the "**Parish Service Agreements**"). Consistent with its mission, the Archdiocese also provides a wide range of critical administrative services to 71 independent and archdiocesan owned catholic schools (collectively, the "**Schools**"). The Schools include (a) Parish-owned elementary schools and religious order schools (collectively, "**Parish Schools**"), (b) eight high schools and one special needs school owned and operated by the Archdiocese (collectively, the "**Archdiocesan Schools**"); and (c) one separately incorporated school for children with mild to moderate exceptionalities. Consistent with its mission, the Archdiocese also provides administrative services to separately incorporated nursing homes, affordable senior living facilities, and other community service entities and facilities (collectively, the "**Facilities**"). The Parishes, Parish Schools, Facilities, and other Catholic-related entities within the Archdiocesan

Boundaries to whom the Archdiocese provides administrative services are collectively referred to as the **"Non-Debtor Catholic Entities**."

15.     On the Petition Date, the Archdiocese filed its Motion to Limit Notice. The Archdiocese seeks entry of an order limiting notice to certain creditors and parties-in-interest as well as to establish certain notice procedures. The Archdiocese also respectfully requests approval of the **"Special Notice List**," as defined in the Motion to Limit Notice, and approval to update and amend the Special Notice List from time to time and to add parties requesting notice without further motion or order form this Court. The Special Notice List is requested in the Motion to Limit Notice to provide necessary creditors and other interested parties with adequate opportunity to object as required by the Bankruptcy Code and Bankruptcy Rules. Specifically, the Motion to Limit Notice provides notice will be given to:  (a) creditors who claim to hold security interests or liens, including Hancock Whitney Bank, KS State Bank, and Dell Financial Services LP, together with any of their known counsel; (b) the Archdiocese's twenty (20) largest unsecured creditors, together with any of their known counsel; (c) all parties who have requested special notice pursuant to Bankruptcy Rule 2002, together with any of their known counsel; (d) counsel for any official committee appointed herein; (e) the Office of the United States Trustee for the Eastern District of Louisiana; and (f) all applicable governmental agencies to the extent required, together with any of their known counsel.

16.     Furthermore, the relief sought through the Motion to Limit Notice does not contravene the Bankruptcy Rules in that the Special Notice List will not apply to: (a) notice of the first meeting of creditors pursuant to section 341 of the Bankruptcy Code; (b) notice of the time fixed for filings proofs of claim; (c) notice of the heating to consider approval of the disclosure statement and confirmation of a plan; (d) notice of the times fixed to submit ballots for accepting or rejecting the plan; (f) notice of any hearing on dismissal

of this Chapter 11 Case; and any other notice required to be served on the entire mailing matrix by the Bankruptcy Code or the Bankruptcy Rules.[2]

**B.**      **Expedited Motion for an Order Authorizing the Debtor to File Portions of the Schedules and SOFA, the Master Creditor Mailing Matrix, Other Pleadings and Documents Under Seal (the "Motion to File Documents Under Seal") [Docket No. 4]**

17.      On the Petition Date, the Archdiocese filed its Motion to File Documents Under Seal. The Archdiocese seeks entry of an order limiting notice to certain creditors and parties-in-interest as well as to establish certain notice procedures. Many of the unsecured creditors in this Chapter 11 Case are individuals whose claims against the Archdiocese are premised on allegations of abuse ("**Abuse Claimants**"). Some Abuse Claimants have filed claims in courts against the Archdiocese. Many, but not all, of the Abuse Claimants who have filed claims in courts have chosen to file their claims against the Archdiocese using a pseudonym, with their real identity to be revealed only to the defendants in the court of litigation and with the understanding that their identities would not be publicly disclosed. Other Abuse Claimants are non-litigants who contacted the Archdiocese prepetition, either with or without the assistance of counsel, and asserted claims of abuse by Archdiocesan employees or agents with the understanding that the Archdiocese would protect their identities and keep their claims confidential. The Archdiocese has also previously entered into out-of-court settlements with some of those Abuse Claimants where the Archdiocese agreed to keep the Abuse Claimant's name confidential but did not require the Abuse Claimant to keep the settlement confidential. In all instances, the Archdiocese has not objected to, and in fact has supported, the choice of each Abuse Claimant as to whether to keep their identity confidential or to publicly disclose their identity.

18.      In light of the sensitive nature of the claims of the Abuse Claimants, to avoid causing unnecessary anguish and to encourage such individuals to feel safe and secure in advancing their claims without fear of retribution or reprisal, the Archdiocese submits that it would be inappropriate to require the public disclosure of identifying information relating to Abuse Claimants who have, either informally,

---

[2]      *See also* Section 6 of the local Administrative Procedures for the United States Bankruptcy Court for the Eastern District of Louisiana.

formally, or through filing a lawsuit, notified the Archdiocese of allegations of abuse by clergy members, or others persons employed by Catholic entities or otherwise subject to Archdiocesan supervision.

19.     The Archdiocese has voluntarily agreed to confidentiality restrictions as requested by Abuse Claimants for some time, and believes that it is imperative that the decision to come forward and identify oneself as an Abuse Claimant be left to the individuals in question, and that such accommodations can be made without adversely affecting the rights of any other parties in interest.

20.     The Archdiocese respectfully requests permission to protect the identities of the Abuse Claimants while providing them notice of this Chapter 11 Case and notice of such events and motions as is required by the Bankruptcy Code and applicable Bankruptcy Rules.  The Archdiocese further seeks to share names and contact information for Abuse Claimants with the Court and Bankruptcy Clerk under seal.  It is proposed that Abuse Claimants currently represented by counsel be given notices in the Archdiocese's Chapter 11 Case other through their respective counsel.  In the Motion to File Documents Under Seal, the Archdiocese seeks leave of the Court to serve notice of this Chapter 11 Case, and other requisite notices, directly on Abuse Claimants who have advised the Archdiocese of potential claim, but have not yet identified counsel, without disclosing those Abuse Claimant's names or addresses to other parties. At the time of filing, the Archdiocese has contact information for all but one of these Abuse Claimants.

**C.      Expedited Application to Employ Donlin Recano ("DRC") as Claim, Noticing and Solicitation Agent for the Debtor *Nunc Pro Tunc* to the Petition Date (the "Donlin Recano Application") [Docket No. 10]**

20.     On the Petition Date, the Archdiocese filed its Donlin Recano Application.   The Archdiocese is seeking authorization of the Court to retain and appoint Donlin, Recano & Company, Inc. ("**DRC**") as the claims, noticing and solicitation agent to assume full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Chapter 11 Case.

21.     The Archdiocese anticipates that there will be thousands of entities to be noticed.  In view of the number of anticipated claimants and the complexity of the Archdiocese's business, the Archdiocese submits that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Estate and its creditors.  By appointing a claims and noticing agent in the Chapter 11 Case, the

{N4007172.1}

distribution of notices and the processing of claims will be expedited, and the Clerk's office will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

22. The Archdiocese seeks to retain DRC to provide a number of administrative and noticing services, as expounded on in the Donlin Recano Application. DRC will also be able to provide confidential on-line work spaces or virtual data rooms. While the Claims Register maintained by DRC would be open to the public for examination without charge, DRC would also be able to maintain confidentiality provided for by any orders of the Court. Additionally, DRC would also assist with solicitation, balloting and tabulation and calculation of votes for purposes of plan voting.

23. DRC is one of the country's leading chapter 11 administrators, with experience in noticing, claims administration, and facilitating other administrative aspects of chapter 11 cases. DRC has provided identical or substantially similar services in other chapter 11 cases filed both in this District and elsewhere. The Archdiocese submits, based on all engagement proposals obtained and reviewed, that DRC's rates are competitive and reasonable given DRC's quality of services and expertise. The terms of retention are set forth in the Standard Claims Administration and Noticing Agreement attached as Exhibit B to the Donlin Recano Application.

24. The Archdiocese respectfully submits that authorizing DRC to act as claims and noticing agent for the maintenance and processing of claims and the distribution of notices, as laid out more fully in the Donlin Recano Application, is in the best interests of the Archdiocese's estate and all parties in interest, due in part to the large number of anticipated claimants and the confidential nature of many of the claims and the claimants' identities. The Archdiocese requests the Court approve Donlin Recano as the claims, noticing and solicitation agent.

### PART IV FIRST DAY MOTIONS THAT ADDRESS OPERATIONAL ISSUES

**A.**   **Expedited Motion for Order (A) Prohibiting Utilities from Altering Refusing or Discontinuing Services to, or Discriminating Against, the Debtor on Account of Prepetition Amounts Due, (B) Establishing Procedures for Adequate Assurance for Determining Requests, and (C) Scheduling a Final Hearing ("Utilities Motion") [Docket No. 8].**

25.    On the Petition Date, the Archdiocese filed its Utilities Motion.  The Archdiocese requests that the Court enter interim and final orders: (a) prohibiting the Utility Companies from altering, refusing or discontinuing services on account of prepetition amounts due; and (b) establishing procedures for determining requests for additional adequate assurance.

26.    In connection with its operations in eight civil parishes in the metropolitan New Orleans area, the Archdiocese has over 44 utility accounts with various Utility Providers (collectively, the "**Utility Providers**").  The Archdiocese is responsible for utility expenses at numerous locations, including utility expenses for water, electricity, waste and gas and communications in the ordinary course of business.[3]  The Archdiocese estimates that the average aggregate monthly amount owed to the Utility Companies is approximately $385,000.  The range of services the Archdiocese provides includes administrative services to the Archdiocese and the Non-Debtor Catholic Entities, including the Parishes, Schools, and Facilities.

27.    Uninterrupted utility service is essential to the Archdiocese's ongoing operations and, therefore, to the success of the Archdiocese's reorganization. The Archdiocese could not operate the business in the absence of continuous utility service.  Should any Utility Company refuse or discontinue service, even for a brief period of time, the Archdiocese may be forced to cease its operations, resulting in a substantial disruption of their business and loss of revenue. The temporary or permanent discontinuation of utility services could irreparably harm the Archdiocese's business and jeopardize the Archdiocese's reorganization efforts.

28.    The Archdiocese has historically paid its Utility Companies on a regular and timely basis. As of the Petition Date, the Archdiocese believes it was current with all Utility Companies, except to the

---

[3] A list of the Archdiocese's Utility Companies is attached to the Utility Motion as Exhibit A.

extent that (a) the Archdiocese has not yet been billed for pre-petition utility services, (b) the Archdiocese had been billed by payment for such services was not yet due, or (c) checks have been written but have not yet cleared the Archdiocese's bank accounts. The Archdiocese intends to pay postpetition obligations to the Utility Companies timely. The Archdiocese will make these payments from its cash reserves as of the Petition Date and cash generated through its continued operations.

**B.      Expedited Motion for Interim and Final Orders (a) Authorizing the Debtor to Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (b) Authorizing the Debtor to Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (c) Scheduling a Final Hearing (the "Insurance Motion") [Docket No. 6].**

29.      On the Petition Date, the Archdiocese filed its Insurance Motion.  The Archdiocese requests that the Court enter interim and final orders authorizing the Archdiocese to: (a) continue insurance coverage (collectively, the **"Insurance Program"**) entered into prepetition, (b) satisfy prepetition obligations related thereto, including paying any applicable premiums, fees, deductibles, and self-insured retentions, and (b) renew, amend, supplement, extend, or purchase additional insurance policies, as needed, in the ordinary course of business.

30.      Approximately 220 to 230 of the Non-Debtor Catholic Entities participate with the Archdiocese in the Insurance Program (the **"Participating Non-Debtor Catholic Entities"**).  In each instance, the Participating Non-Debtor Catholic Entities reimburses the Archdiocese assessed fees for its share of the costs to participate in the Insurance Program.[4]  The overall costs of the Insurance Program for the Archdiocese and Participating Non-Debtor Catholic Entities are reduced by the inclusion of the Participating Non-Debtor Catholic Entities in the Insurance Program.  The failure of the Archdiocese to maintain the Insurance Program could lead to increase cost of insurance to the Archdiocese.  Additionally, insurance coverage is required by the regulations, laws, and contracts that govern the Archdiocese's

---

[4] Consistent with past practices, the Archdiocese will continue to assess each of the Participating Non-Debtor Entities their share of premiums paid on/or owed on the various insurance policies and with respect to the applicable self-insured retentions.

activities, including the Office of the United States Trustee's requirement that a debtor maintain adequate coverage given the circumstances of this Chapter 11 Case.

31.     The Archdiocese maintains the Insurance Program that includes a combination of self-insured retentions and deductibles, coverage from a self-insurance fund, a captive insurer, commercial insurers, excess or stop loss coverage, and third party administrators who manage different types of insured claims (collectively, the "**Insurance Program**").

32.     In May 2011, to reduce the cost of insurance, the Archdiocese incorporated The Archdiocese of New Orleans Indemnity, Inc. ("**ANOI**"), a non-profit captive insurance company incorporated in the State of Vermont. The Archdiocese initially capitalized ANOI with a $2,000,000 capital infusion. In the fiscal year ended June 30, 2016, ANOI declared a dividend of $2,000,000, and paid the dividend to the Archdiocese, thereby recovering its initial investment. ANOI also declared a dividend of $875,000 in fiscal year 2018, and dividend of $2,500,000 in fiscal year 2019.

33.     *Health Care Insurance Program.* In the current enrollment period the Archdiocese maintains a health care insurance program (the "**Health Care Insurance Program**"), with a combined enrollment of approximately 3,900, including full and part-time employees, substitute teachers, and clergy. Each month, Arthur J. Gallagher & Company. (**"Gallagher"**) collects money for the Health Insurance Program from the Archdiocese and each of the Participating Non-Debtor Catholic Entities, in the aggregate, approximate amount of $2,700,000, although the total may vary depending on factors such as the number of covered participants (the "**Collected Funds**"). On the first day of each month, Gallagher remits approximately 52% of the Collected Funds to the Archdiocese, in order to reimburse the Archdiocese for, among other things, (a) the Health Care SIR, (b) premiums for the ANOI Health Care Coverage, (c) premiums for the Excess Medical Coverage, (d) the UMR Fees and Gallagher Fees (each as discussed below), and (e) other general costs of administration. Gallagher remits the remaining, approximate 48% of the Collected Funds to ANOI for the ANOI Health Care Coverage. Before the Petition Date, Gallagher remitted the Collected Funds for April 2020 to ANOI and the Archdiocese, and, on or about May 1, 2020, will remit Collected Funds for May 2020.

{N4007172.1}

34.     Claims made under the Health Insurance Program are managed and processed by UMR, Inc. ("**UMR**"), a company affiliated with United Healthcare, acting as a third party administrator. For those services, UMR is paid, in advance, a monthly fee in the approximate amount of $90,000 (the "**UMR Fee**"). The next UMR Fee is due and payable on May 1, 2020, and compensates UMR for services rendered in the month of May 2020. The UMR Fee, therefore, does not include any fees for a period before the Petition Date. In the Insurance Motion, the Archdiocese seeks authority to continue to pay, in the ordinary course of business, the UMR Fees.

35.     As covered health care claims are approved by UMR, the Archdiocese pays all claims up to the $300,000 ANOI Health Care Limit, and ANOI reimburses the Archdiocese for all such payments over the $10,000 Health Care SIR. The Archdiocese estimates that health care claims that arose before the Petition Date will range from $2,500,000 to $3,000,000. Of that amount, ANOI is responsible for paying approximately 48%, while the Archdiocese is responsible for paying the remaining 52% (or $1,400,000 to $1,600,000). Gallagher will have remitted 52% of the Collected Funds to the Archdiocese for the payment of the Health Care SIR for itself and the Participating Non-Debtor Catholic Entities.

36.     A premium is paid for the ANOI Health Care Coverage. The next premium is due on or about August 20, 2020, and the Archdiocese will need to pay $1,500,000, or 52% of such premium. Gallagher will have remitted 52% of the Collected Funds to the Archdiocese for the payment of the premium for itself and the Participating Non-Debtor Catholic Entities.

37.     Each month, UHP is paid a premium for the Excess Medical Coverage, in the approximate amount of $75,000, with the next payment due on or about May 15, 2020, for the month of May 2020.

38.     The policy year for the ANOI Health Care Coverage and the Excess Medical Coverage expires on June 30, 2020. To the extent necessary, the Archdiocese further seeks authority to renew, amend, supplement, extend, or purchase health care insurance, as needed, in the ordinary course of business, consistent with its past practices.

39.     ***Workers' Compensation.*** The Archdiocese and Participating Non-Debtor Catholic Entities have approximately 7,700 full and part-time employees, with approximately 400 workers'

{N4007172.1}

compensation claims being made each year. The Archdiocese is self-insured up to $800,000 per occurrence for workers compensation, with no aggregate maximum (the "**Workers' Compensation SIR**"). Hancock Whitney has issued the following two standby letters of credit for the account of the Archdiocese: (a) to the Louisiana Workforce Commission, in the amount of $400,000; and (b) to the Mississippi Workers' Compensation Commission, in the amount of $100,000.

40.     The Archdiocese estimates that $2,150,000 is or will be owed with respect to workers' compensation claims that are attributable to the period before the Petition Date and that are within the Workers' Compensation SIR. The Archdiocese estimates that payments within the Workers' Compensation SIR through June 15, 2020 will be approximately $750,000.

41.     Workers' compensation claims that exceed the Workers' Compensation SIR are insured (the "**Excess Workers' Compensation Insurance**") by a non-affiliated insurer in the commercial insurance market, Safety National. A monthly premium in the approximate amount of $20,000 is paid on and with respect to the Excess Workers' Compensation Insurance. The next monthly premium due on the Excess Workers' Compensation Insurance is due on May 20, 2020, and covers the month of May 2020. In the Insurance Motion, the Archdiocese seeks authority to continue to pay, in the ordinary course of business, the premiums due on Excess Workers' Compensation Insurance.

42.     ***Property, Casualty, and Other Types of Coverage***.  The Archdiocese and Participating Non-Debtor Catholic Entities are also covered through the Catholic Mutual Relief Society of America ("**CMRS**"), a pooled self-insurance fund of the Roman Catholic Church for Catholic organizations in the United States and Canada. CMRS either covers the loss directly through its self-insurance fund, or acts as a broker and arranges for other insurers to cover certain losses. The coverage issued by CMRS (the "**CMRS Certificate**"), together certain additional coverages obtained from Bollinger Insurance Company ("**Bollinger Insurance Policies**", and, collectively with the CMRS Certificate, the "**Other Insurance Coverage**"), provides a broad range of coverage, including property and liability coverages, each subject to certain terms, conditions, limits, and self-insured retentions and deductibles (collectively, the "**Other Insurance SIR**"). The next monthly payment with respect to the CMRS Certificate is due on May 20, 2020,

{N4007172.1}

is in the amount of approximate amount $625,000, and covers the month of May 2020. No premium is due with respect to the Bollinger Insurance Policies.

43.    For claims that are attributable to the period before the Petition Date, the Archdiocese estimates that amount that will be owed with respect to the Other Insurance SIR is approximately $2,200,000. The estimate of the amount that will need to be paid through June 15, 2020 is $500,000.

*iv.    Flood Insurance.*

44.    The Archdiocese places flood insurance on certain of its properties and certain properties owned by Participating Non-Debtor Catholic Entities (collectively, the "**Flood Polices**"). Premiums on Flood Policies are paid, in advance, for an upcoming 12-month period. After the Petition Date, a number of Flood Policies will need to be renewed, and the Archdiocese estimates that renewed premiums will be approximately $175,000 for premiums due in May 2020, and approximately $400,000 for premiums due in June 2020.

45.    *Automobile Insurance.* The Archdiocese and Participating Non-Debtor Catholic Entities have approximately 231 automobiles, with the liability being self-insured up to $300,000 (the "**Auto SIR**"), after which the CMRS Certificate provides excess coverage for covered claims after a deductible (the "**Auto Deductible**"). The Archdiocese estimates that approximately $310,000 is or will be owed with respect to claims attributable to the period before the Petition Date with respect to the Auto Insurance SIR and Auto Deductible. The Archdiocese also manages and administers a clergy automobile insurance program (the "**Clergy Auto Insurance**"), pursuant to the Parish Service Agreements, with coverage through Church Mutual. The Clergy Auto Insurance currently covers approximately 193 automobiles, with the liability after a small deductible. The premium is paid monthly in advance. The next payment of approximately $60,800 due May 15, 2020.

46.    *The CRMRS Fees and Gallagher Fees.* CMRS also provides administrative services to the Diocese and Participating Non-Debtor Catholic Entities (the "**CMRS Services**") with respect to claims that may be workers' compensation claims and claims that may be covered by the CMRS Certificate. For the CMRS Services, the Archdiocese pays CMRS a monthly fee of approximately $64,000 (the "**CMRS**

{N4007172.1}

**Fee"**). The next payment of CMRS Fee is due and payable on May 20, 2020, and includes compensation for CMRS Services rendered during the month of May.

47.     The Archdiocese obtains some insurance policies through its insurance broker, Gallagher. Gallagher also assists the Archdiocese in obtaining and maintaining, in the most cost-efficient manner, comprehensive insurance coverage for operations, negotiates policy terms, provisions, and premiums.  In addition to the premium paid on the insurance policies, Gallagher also provides services in connection with assessing and collecting the Collected Fees (as defined above), and dispersing the same to ANOI and the Archdiocese (as previously discussed).  For these services, Gallagher is paid a fee $35,000 each month (the **"Gallagher Fees"**).  The next payment of the monthly Gallagher Fee is due on May 1, 2020, and covers the month of May 2020.

48.     ***Conclusion.*** In the Insurance Motion, the Archdiocese seeks an Interim and Final order for (a)  authority to maintain the Insurance Program that existed before the Petition Date, and to satisfy prepetition obligations related thereto, including paying any applicable premiums, fees, deductibles, and self-insured retentions, as described in the Insurance Motion, (b) authority to renew, amend, supplement, extend, or purchase additional insurance policies, as needed, to maintain the Insurance Program, and (c) an order scheduling a final hearing.  The Archdiocese has sufficient funds to pay the amounts described in the Insurance Motion in the ordinary course of business.  Accordingly, the Archdiocese respectfully requests that this Court authorize and direct all banks, when requested by the Archdiocese, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in the Insurance Motion.

**C.      Expedited Motion for Entry of (A) Interim and Final Orders (i) Authorizing the Maintenance of Existing Accounts, Continued Use of Existing Cash Management System, and Continued Use of Existing Business Forms, (ii) Waiving the Requirements of Section 345(b) of the Bankruptcy Code, and (iii) Granting Related Relief, and (B) an Order Scheduling a Final Hearing (the "Cash Management Motion") [Docket No. 9].**

49.     On the Petition Date, the Archdiocese filed the Cash Management Motion.  The Archdiocese requests that the Court enter interim and final orders (a) authorizing the maintenance of existing accounts, continued use of the existing cash management system, and continued use of existing

{N4007172.1}

business forms, (b) waiving the requirements of § 345(b) of the Bankruptcy Code, and (c) granting related relief.  Additionally, the Archdiocese requests a waiver of certain guidelines (the "**UST Guidelines**"), established by the Office of the United States Trustee, Region 5 (the "**UST**").

50.     *The Cash Management System and the Bank Accounts.*  In the ordinary course of business, the Archdiocese, as part of its Mission and Parish Service Agreement, routinely provides vital administrative services to the Non-Debtor Catholic Entities, including the Parishes.  Before the Petition Date, and in the ordinary course of its business, the Archdiocese maintained a cash management system designed to, among other things, efficiently collect, concentrate, and disburse funds generated or managed by the Archdiocese (the "**Cash Management System**").  The Archdiocese oversees the Cash Management System on a daily basis and employ various controls for entering, processing, and releasing funds.  The Archdiocese's books and records are maintained to reflect receivables, payables, promissory notes, and "due to/from" entries. These transactions occur as part of the routine, daily operation of the Cash Management System, and, at any given time, there are claims owing between the Archdiocese and certain of the Non-Debtor Catholic Entities arising in connection with the receipt and disbursement of funds. The Archdiocese monitors and records fund transfers in its accounting system and can determine, trace, and account for each such transaction.

51.     Before the Petition Date, in the ordinary course of its operations, the Archdiocese maintained certain demand deposit bank accounts (collectively, the "**Bank Accounts**").   **Exhibit C-1**, **Exhibit C-2**, and **Exhibit C-3** to the Cash Management Motion identify each of the Bank Accounts for which the Archdiocese is seeking relief, the institutions at which they are held, and their uses before the Petition Date.  As noted on Exhibit C-1, Exhibit C-2, and Exhibit C-3, the Bank Accounts are each used for specific purposes, such as payroll, health care benefits, insurance premiums, or the receipt of charitable contributions.  Exhibit C-1 lists each of the Bank Accounts maintained by the Archdiocese for and with respect to the Archdiocesan School (collectively, the "**Archdiocesan School Bank Accounts**").  Exhibit C-2 lists all the Bank Accounts other than the Archdiocesan School Bank Accounts (collectively, the "**Other Bank Accounts**").  Exhibit C-3 is a list of four additional Archdiocesan School Bank Accounts

{N4007172.1}

opened to hold funds that were received in April 2020 related to The Coronavirus Aid, Relief, and Economic Security Act ("**CARES**"). As noted on Exhibit C-1, Exhibit C-2 and Exhibit C-3, the Archdiocesan School Bank Accounts are each used for specific purposes, such as payroll, health care benefits, insurance premiums, the receipt of charitable contributions, for handle funds made available through CARES.

52.     Under the Cash Management System, depending on the type of payment obligations that are involved, the Archdiocese and all or certain of the Non-Debtor Catholic Entities transfer funds to certain Bank Accounts, so that the Archdiocese can remit the respective funds for and on behalf of itself and the participating Non-Debtor Catholic Entities. For example, as part of the administrative services it provides, on behalf of itself and all the Non-Catholic Entities, the Archdiocese handles the payment of health insurance premiums, related administrative expenses, and the applicable self-insured retention (collectively, the "**Insurance Liabilities**"). To fund their respective portion of the Insurance Liabilities, the Archdiocese and the Non-Debtor Catholic Entities directly or indirectly arrange for funds to be transferred to the appropriate Bank Account (an "**Insurance Account**"), from which Insurance Liabilities are paid. Other payment obligations, such as payroll obligations, are primarily made by each Non-Debtor Catholic Entity from separately maintained accounts, rather than being paid to the Archdiocese for disbursement for the account of such Non-Debtor Catholic Entities.

53.     Separate Bank Accounts are maintained with respect to each Archdiocesan School. The Archdiocesan School Bank Accounts include, for example, Bank Accounts for operating expenses and payroll obligations. Most of the Archdiocesan Schools maintain Bank Accounts for pre-funded tuition loans, pursuant to which a Bank financed student tuition payments (the "**Financed Tuition Payments**") for the families of children attending certain Archdiocesan Schools. The Bank deposits the total amount of the Financed Tuition Payments for a particular Archdiocesan School into a restricted account (a "**Tuition Reserve Account**"). As families make payment on the Financed Tuition Payments to the Bank, the Bank transfers a corresponding amount from the Tuition Reserve Account to an unreserved Archdiocesan School Bank Account, after deducting an agreed upon administrative fee.

{N4007172.1}

54.     Certain of the Bank Accounts hold funds that were donated to the Archdiocese with specific restrictions on use (the "**Donor Restricted Bank Account Funds**"). The Archdiocese acts as a custodian of the Donor Restricted Bank Account Funds, and, as such, the Archdiocese may have no claim to the Donor Restricted Bank Account Funds pursuant to applicable state law.

55.     In the Cash Management Motion, the Archdiocese seeks authority to continue: (a) using the Cash Management System in a manner that is consistent with practices before the Petition Date, and (b) maintaining the Archdiocesan School Bank Accounts and the Other Bank Accounts in a manner that is consistent with practices before the Petition Date.

56.     ***Portfolio A.***   Consistent with its mission and the Parish Service Agreements, the Archdiocese arranges for the investment in, and management of, a custodial account known as portfolio A ("**Portfolio A**"), a custodial account that is maintained at Hancock Whitney Bank ("**Hancock**"). The assets in Portfolio A include cash, cash equivalents, equity mutual funds, and other securities. On the Petition Date, and consistent with practices before the Petition Date, approximately 55% of the investments in Portfolio A are attributable to the Archdiocese (the "**Archdiocese Portfolio A Investment**").   The Archdiocese Portfolio A investment includes (a) investments with restricted uses, such as the School Endowment Fund, the Reverend Elmer Ponton Trust, and the Priest Pension Fund (collectively, the "**Restricted Portfolio A Assets**"), and (b) investments with no such restrictions, such as the General Fund and the Parish Development Fund. The remaining 45% of the investments in Portfolio A are attributable to approximately 270 different accounts for Non-Debtor Catholic Entities who participate in Portfolio A (collectively, the "**Non-Debtor Portfolio A Participants**"). The majority of the Non-Debtor Portfolio A Participates are Parishes and Parish Schools, and the minority are other Non-Debtor Catholic Entities.  In the Cash Management Motion, the Archdiocese seeks an Interim and Final order that (a) authorizes the Archdiocese to maintain Portfolio A in a manner that is consistent with pre-petition practices, and (b) provides that Hancock shall not be liable to any party on account of (a) following the Archdioceses' instructions or representations as to any order of the Court, and (b) honoring any checks, drafts, wires, or electronic funds transfers presented in a good faith belief that this Court has authorized the honoring of

{N4007172.1}

such checks, drafts, wires, or electronic funds transfers.  In the Cash Management Motion, the Archdiocese seeks authority to maintain Portfolio A in a manner that is consistent with pre-petition practices.

57.    ***Portfolio B and the Deposit and Loan Program and Fund***.  Consistent with its mission and the Parish Service Agreement, the Archdiocese also arranges for the investment in, and management of, an account commonly known as portfolio B ("Portfolio B"). The assets in Portfolio B include cash, cash equivalents and fixed income securities (including corporate bonds and government securities).  The Portfolio B is used to manage and invest the cash of the Non-Debtor Catholic Entities and, to a much lesser extent, the Archdiocese. Consistent with practices before the Petition Date, approximately two percent (2%) of the assets in Portfolio B are attributable to the Archdiocese.  For many years, assets in Portfolio B have also been used to provide the Archdiocese and certain of the Non-Debtor Catholic Entities with low-interest loans (the "**Deposit and Loan Program**") for construction, renovations, expansions, and other necessities (collectively, the "**Loans**"). Of the total Loans outstanding on March 31, 2020, approximately 57.47% are Loans made to Parishes, approximately 15.95% are Loans made to Archdiocesan Schools, approximately 23.99% are Loans made to other Non-Debtor Entities (including 0.79% to Parish Schools), approximately 2.37% were made to other Archdiocesan operations, and approximately 0.23% were made to clergy.

58.    Each Loan must meet certain criteria that are designed to ensure the borrower has both the need and ability to service the Loan.  Generally speaking, to qualify for a Loan, 50% is required to be held on deposit in the Deposit and Loan Fund with the Archdiocese, 25% is required to be pledged from donors, and the borrower is required to present a financial plan to the Archdiocese for servicing the remaining 25%. Loans up to $100,000 require the approval of the Archdiocese's Chief Operating Officer or Chief Financial Officer; Loans from $100,000 to $500,000 also require my approval, as the Vicar of Finance. Loans in excess of $500,000 require the recommendation of the Archdiocesan Finance Council and the Archbishop's approval.

59.    In the Cash Management Motion, the Archdiocese seeks authority to continue to approve and oversee Loans to the Non-Debtor Catholic Entities from funds available in Portfolio A, provided such Loans meet the existing loan criteria.  Pending the Final Hearing, absent further Order of this Court, (a) no

{N4007172.1}

Loans will be made to the Archdiocese from the Deposit and Loan Fund, including the Archdiocesan Schools, and (b) no Loans from the Deposit and Loan Fund will be made in an amount in excess of $100,000. No Loans will be made from Portfolio A, absent further Order of this Court.

60.     ***Credit Card Account***. Finally, the Debtor has a credit card account with Hancock, bearing account number xxxx 7044 (the "**Visa Credit Card Account**"). The Visa Credit Card Account has a limit of $20,000, and the balance on the Petition Date is approximately $3,940.00. In the Cash Management Motion, the Archdiocese seeks authority to maintain the Visa Credit Card Account, and to pay, in the ordinary course of business, amounts due and owing on the Visa Credit Card Account, including the balance as of the Petition Date. The Archdiocese uses the Visa Credit Card Account for monthly QuickBooks subscriptions, and for the payment of fees to the Louisiana Secretary of State to remain in good standing

61.     ***Procedures for the Bank Accounts and the Custodial and Investment Accounts.*** The Bank Accounts and Custodial and Investment Accounts (collectively, the "**Accounts**") are handled with procedures for tracking the funds in the Accounts, and for transferring money and other assets in and out of the Accounts. These procedures are carefully designed to monitor different categories of assets and funds, including, but not limited to, donor restricted assets. These policies and procedures further allow the Archdiocese to coordinate transfers between Accounts.

62.     The Archdiocese has established detailed procedures for monitoring claims and payments from the Bank Accounts, so that Archdiocese can separate and demarcate payments for claims that arose before the Petition Date from those that arise after the Petition Date, in order to comply with the Bankruptcy Code and this Court's Orders. The Archdiocese will work closely with the Banks to ensure that the Banks honor only those payments that the Archdiocese is authorized to make. If the relief requested in the Cash Management Motion is granted, the Archdiocese will not pay, and each of the Banks will be directed not to pay, any checks drawn on the Bank Accounts before the Petition Date other than as specifically authorized by this Court.

63.     ***The Existing Business Forms, Checks and Records.*** In the Cash Management Motion, the Archdiocese seeks authority to continue to use its business forms, which are used in the ordinary course

{N4007172.1}

20

of its business, without alteration or change.  It is important for the Archdiocese to continue using the business forms without alteration or change given the nature and scope of the businesses in which the Archdiocese is engaged and the number of suppliers with whom the Archdiocese transacts business.  To prevent unnecessary delay, confusion, and accrual of further expense to its estate, the Archdiocese requests that the Court waive any requirements of adding a "Debtor-in-Possession" legend or number to the business forms other than checks. The Archdiocese will begin using the "Debtor-in-Possession" stamp or legend for all checks as soon as possible.

64.    To minimize expense to the estate, the Archdiocese also requests authority to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.), as well as checks and bookkeeping records existing immediately before the Petition Date, without reference to the status as a debtor-in-possession.  The Archdiocese purchases its checks and other business forms in bulk.  Changing checks, correspondence and business forms would be unnecessarily burdensome to the estate, as well as expensive and disruptive to the Archdiocese's operations. These additional costs will reduce the resources available in the Archdiocese's estate to satisfy the claims of creditors and other parties-in-interest. Similarly, opening a new set of books and records as of the Petition Date would create unnecessary administrative burdens and expense. For these reasons, the Archdiocese requests authority to continue to use the existing records as well as its checks and business forms without placing the label "Debtor in Possession" on such checks or business forms.

65.    ***Waiver of Any Other Conflicting UST Guidelines or Requirements of § 345(b) of the Bankruptcy Code.***  To the best of Archdiocese's knowledge, the following Banks are not authorized depositories in Louisiana (collectively, the "**Non-Authorized Depository Banks**"): Gulf Coast Bank & Trust; Fifth District Saving Bank; First National Bank USA; BMO Harris Bank; [and] Home Bank; and Raymond James. Pursuant to § 105 of the Bankruptcy Code, the Archdiocese requests a waiver of the UST Guidelines to allow the Archdiocese to maintain its existing Accounts at the Non-Authorized Depository Banks.

{N4007172.1}

66.     In the interest of maintaining the continued and efficient operation of the Cash Management System during the pendency of the Chapter 11 Case, the Archdiocese requests that the Banks, including the Non-Authorized Depository Banks, be authorized and directed to continue to administer, service, and maintain the Accounts as such accounts were administered, serviced, and maintained before the Petition Date, without the necessity of any bond as required by § 345(b) of the Bankruptcy Code.

67.     ***Payment of the Custodial Fees, Hancock Investment Fees, Portfolio A Investment Fees, and Bank Fees.*** Periodic service charges and other fees are incurred related to Portfolio A, payable to Hancock, in its capacity as custodian of Portfolio A, which fees and services are generally paid monthly, in arrears at the end of the month (collectively, the "**Custodial Fees**"). Historically, the Custodial Fees are approximately of $9,500-$11,500 per quarter, and are debited from Portfolio A. Hancock also earns fees for services as an investment manager with respect to Portfolio B, in the range of $8,500 to $9,000 per month (the "**Hancock Investment Fees**"). With respect to Portfolio A, fees are incurred for the services by consultants who are retained for investment advice, including CAPFinancial Partners, LLC, d/b/a CAPTRUST Financial Advisors ("**CapTrust**"), and others (collectively, with CapTrust, the "**Portfolio A Managers**"). The Portfolio A Managers are paid from the income generated by the investments in Portfolio A based upon the market value of the investments, and allocated to the participants in Portfolio A (the "**Portfolio A Investment Fees**"). As of April 30, 2020, the Archdiocese estimates that approximately $196,000 is due in Portfolio A Investment Fees, including $65,725.64 due to CapTrust.

68.     Finally, the Archdiocese pays monthly fees for its bank accounts (as shown on Exhibit C-1, Exhibit C-2, and Exhibit C-3) (the "**Bank Fees**") in the collective, approximate amount of $3,500. The Bank Fees are paid, in arrears, at the end of the month, by way of deductions from the Bank Accounts. Accordingly, no Bank Fees for the period before the Petition Date should be due and owing. Out of an abundance of caution, however, the Archdiocese seeks authority in the Cash Management Motion to pay any such Bank Fees that were not paid as of the Petition Date. In the Cash Management Motion, the Archdiocese seeks authority to pay, in accordance with past practices, the Custodial Fees, the Hancock Investment Fees, the Portfolio A Investment Fees, and the Bank Fes that become due after the Petition Date,

{N4007172.1}

regardless of whether such Fees may be for a period before the Petition Date, and for authority to continue paying such Fees.

**D.**     **The Debtor's Expedited Debtor's Expedited Motion for (I) An Order Authorizing But Not Directing, the Debtor to Pay Certain Prepetition (A) Wages, Salaries and Other Compensation, (B) Employee Medical and Similar Benefits, and (C) Authorizing and Directing the Applicable Banks and Financial Institutions to Honor and Pay All Checks And Transfers Associated with the Foregoing (the "Wages Motion") [Docket No. 7].**

69.     The Archdiocese's employees (the "**Employees**") perform a variety of critical functions for the Archdiocese.  The Employees work in numerous ministries and other operations, providing ecclesiastical, managerial, financial, clerical, religious, and pastoral services to individuals with families living within the Archdiocese's territorial jurisdiction. The Employee's knowledge, skills and understanding of the Archdiocese's ministries, mission, business operations and relationships are essential to the success of the Archdiocese and this Chapter 11 Case.  Without the continued service and dedication of the Employees, it will be difficult, if not impossible, to effectively implement the Archdiocese's chapter 11 strategy.

70.     Therefore, to minimize the personal hardship that the Employees (and, in turn, the Archdiocese) would suffer if prepetition Employee-related obligations are not paid when due or as expected and to maintain morale and stability in the Archdiocese's workforce, the Archdiocese seeks authority to be exercised in its sole discretion, to pay and honor certain prepetition claims related to, among other things, wages, salaries, and other compensation, federal and state withholding taxes and other amounts withheld (including withholdings for garnishments, Employees' share of insurance premiums and taxes), health care benefits, vacation time, sick leave, and all other benefits that the Archdiocese has historically provided in the ordinary course of business (collectively, and as more fully described below, the "**Employee Wages and Benefits**"), and to pay all costs incident to the foregoing, as summarized on **Exhibit B** to the Wages Motion.  The Archdiocese also seeks authority, to be exercised in its sole discretion, to continue to reimburse Employees for various reimbursable expenses. In addition, the Archdiocese requests the right to modify, change and discontinue any of the Employee Wages and Benefits, and the policy related to

{N4007172.1}

reimbursable expenses, and to implement new Employee Wages and Benefits in the ordinary course of business during this Chapter 11 Case in its sole discretion without the need for further Court approval.

71.      ***Wages, Salaries, and Other Compensation***.   The Archdiocese's aggregate monthly compensation for the Employees, including wages and salaries, is approximately $2,913,988.  Most of the Archdiocese's payroll payments are made by direct deposit through the electronic transfer of funds directly to the Employees, while the remaining payments are made via check.  The Archdiocese pays its Employees on different schedules, including monthly, weekly, semi-monthly and bi-weekly basis.   On average, the Archdiocese has an aggregate payroll expenses to Employees of approximately $2,913,988 per month (the "**Payroll**").  As is typical with payroll, Employees may have accrued work days immediately before the payment of the Payroll. The last date on which the Employees were paid was April 15, 17, 24, 25, 27, and 30, 2020, and the next scheduled date to pay Employees is May 1, 8, 15, 25, and 31.  Additionally, since the last Payroll date, the Employees have continued to provide services to the Archdiocese and are thus entitled to receive pre-petition wages and benefits payable during the period before the Petition Date.

72.      The Archdiocese's payroll is made by direct deposit through electronic transfer of funds directly to Employees, with the balance of Employees receiving checks. These payroll payments are primarily made through the Archdiocese's payroll processors, Crescent Payroll Solutions ("**Crescent Payroll**") and PrimePay ("**PrimePay**" together with Crescent Payroll, the "**Payroll Services**"). Specifically, a few days before each payroll is paid, the Payroll Services receives an amount necessary to fund the payroll and taxes.  Specifically, a few days before each payroll is paid, the Payroll Services receives an amount necessary to pay:  (i) the amount necessary for the Archdiocese to fund the withholding portion of payroll; (ii) the amount necessary for the Archdiocese to fund the payroll; and (iii) the amount necessary to pay the Payroll Services. The Payroll Services then processes direct deposit transfers or administers payroll checks to the Archdiocese's Employees. Additionally, the Archdiocese use a third party services, AOD/B4time, Swipeclock, and IOI Time collectively the "**Time Management Companies**", to maintain time clocks and maintain Employee hours. The services of the Payroll Services and the Time Management Companies are crucial to the smooth functioning of the Archdiocese's payroll system and therefore to the

Archdiocese's operations generally.  The Archdiocese pays a total of approximately $8,700 per month on account of the Payroll Services, including the payroll administration and certain other payroll related services. In addition, the Archdiocese pays its time Management Companies a total of approximately $1,200 per month on account its services related to time keeping.  As of the Petition Date, the Archdiocese does not believe it owes any money on account of the Payroll Services rendered before the Petition Date, while it does owe its Time Management Companies approximately $527.10 for services before the Petition Date. In the Wages Motion, the Archdiocese request that it be authorized, but not directed, to continue to honor its Payroll Services and Time Management Companies in the ordinary course of business, and to honor and pay any prepetition amounts related thereto.

73.     Because all of the Employees are paid in arrears, as of the Petition Date, some of the Employees have not been paid all of their prepetition wages. Additionally, some Employees may be entitled to compensation because (a) discrepancies may exist between the amounts paid and the amounts that should have been paid, and (b) some payroll checks issued to Employees before the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.

74.     The Archdiocese believes that, as of the Petition Date (May 1), approximately $1,580,000 to $1,650,000 in total accrued Employee Wages, salaries and amounts withheld from Employees' payroll checks (but excluding, reimbursable expenses, medical benefits and accrued vacation benefits) was earned before the Petition Date and remains unpaid to Employees (collectively, the "**Unpaid Compensation**"). The Archdiocese seeks authority, but not direction, to pay the Unpaid Compensation in the ordinary course of business, as routinely done before the Petition Date.  The Archdiocese believes that, as of the Petition Date, no individual Employee, including any Seasonal Employee, is owed more than $13,650 for Unpaid Compensation.

75.     *Deductions and Withholdings*.   During each applicable pay period, the Archdiocese routinely deducts certain amounts from paychecks, including, without limitation, (a) garnishments, child support and similar deductions, and (b) other pre-tax and after-tax deductions payable pursuant to certain

{N4007172.1}

of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, legally ordered deductions, 401(k) and miscellaneous deductions) (collectively, the "**Deductions**"). The Archdiocese forwards the amount of the Deductions to the appropriate third-party recipients. On average, the Archdiocese has deducted approximately $325,000 from the Employees' paychecks per month.  Due to the commencement of this Chapter 11 Case, however, certain Deductions that were deducted from Employees' earnings may not have been forwarded to the appropriate third-party recipients before the Petition Date. As of the Petition Date, the Archdiocese estimates that it has withheld but not remitted approximately $205,000 in Deductions. Accordingly, the Archdiocese seeks authority to continue to forward these prepetition Deductions to the applicable third-party recipients on a postpetition basis, in the ordinary course of business, as routinely done before the Petition Date.

76.    Further, the Archdiocese is required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, social security and Medicare taxes for remittance to the appropriate federal, state or local taxing authority (collectively, the "**Withheld Amounts**"). The Withheld Amounts total approximately $479,000 per month. The Archdiocese must then match from its own funds for social security and Medicare taxes and pay (the "**Employer Payroll Taxes**," and together with the Withheld Amounts, the "**Payroll Taxes**"). The Payroll Taxes, including both the employee and employer portions, for 2019 were approximately $8,766,882.  Before the Petition Date, the Archdiocese withheld appropriate amounts from Employees' earnings for the Payroll Taxes, but such funds may not yet have been forwarded to the appropriate taxing authorities. As of the Petition Date, the Archdiocese estimates that it has withheld but not remitted approximately $422,000 in Payroll Taxes.  As a result, the Archdiocese ask that it be authorized, but not directed, to continue to honor and process the prepetition payments for the Payroll Taxes on a postpetition basis, in the ordinary course of business, as routinely done before the Petition Date.

77.    ***Honoring Checks for, and Payment of, Reimbursable Expenses***.  Before the Petition Date and in the ordinary course of its business, the Archdiocese reimburses Employees for certain expenses incurred by the Employees in the scope of their employment (the "**Reimbursable Expenses**"). The

{N4007172.1}

Reimbursable Expenses include certain expenses, all incurred in the ordinary course of business, for the following: (a) entertainment expenses incurred in developing business opportunities; (b) travel expenses for meals, hotels and rental cars, mileage; (c) professional dues/licenses and supplies; (d) a priest expense account for approximately 35 priests capped at $600 for each priest; and (e) priest medical expenses. The Archdiocese reimburses certain Employees for certain approved entertainment expenses incurred in the ordinary course of business. The Archdiocese also reimburses certain Employees for reasonable meal, hotel and rental car expenses incurred when traveling in the course of their employment. As of the Petition Date, approximately $40,500 in total Reimbursable Expenses remains unpaid.

78.     The Reimbursable Expenses were all incurred on the Archdiocese's behalf and with the understanding that they would be reimbursed. Accordingly, to avoid harming Employees who incurred the Reimbursable Expenses, the Archdiocese requests authority, to be exercised in its sole discretion, to (a) continue reimbursing the Reimbursable Expenses in accordance with prepetition practices, (b) modify its prepetition policies relating thereto as it deems appropriate, and (c) pay all Reimbursable Expenses that accrued prepetition in an amount not to exceed $40,500.

79.     ***Employee Benefits.***  The Archdiocese offers certain of the Employees the ability to participate in health care insurance (the "**Health Care Insurance Program**"). The Health Care Insurance Program is described in more detail at Paragraphs 19-25 of the Insurance Motion, discussed above. In the Insurance Motion, the Archdiocese seeks authority to maintain the Insurance Program (as defined therein) that existed before the Petition Date, and to satisfy prepetition obligations related thereto, including paying any applicable premiums, fees, deductibles, and self-insured retentions.

80.     In addition to the Health Care Insurance Program, the Archdiocese offers certain Employees dental and vision plans, vacation time and other paid leaves of absence, life insurance, accidental death and dismemberment insurance, short-term and long-term disability insurance, and 401(k) (collectively, the "**Employee Benefit Programs**"). These Employee Benefit Programs are described in more detail below.  The Archdiocese's Employees who work a minimum of 20 hours per week may participate in the Health Care Insurance Program, as discussed in more detail in the Insurance Motion. The

{N4007172.1}

Health Care Insurance Program provides health care coverage to approximately 3,800 Employees and their dependents which premiums are due on May 1, 2020 for the period of May 2020. A portion of the cost of the Health Care Program is paid from deductions through Employee payroll. In the Wages Motion, the Archdiocese seeks authority to remit funds for premiums for the Health Care Insurance Program that have been deducted from the Employee's wages as of the Petition Date.

81.     Certain Employees are eligible to participate in additional insurance, such as dental, vision insurance, with the applicable premiums for such insurance being paid from deductions made from the participants' payroll. The Archdiocese also offers a voluntary dental plan to all Employees, the costs of which are paid entirely by the participating Employees (the **"Guardian Dental Plan"**). The Guardian Dental Plan is fully-insured that provides dental care coverage to approximately 431 Employees and their dependents which premiums are due on May 1, 2020 for the period of May 2020. The premium for the Guardian Dental Plan is paid from deductions through Employee payroll. The Archdiocese offers a voluntary vision plan to all Employees, the costs of which are paid entirely by the participating Employees (the **"Vision Service Plan"**). The Vision Service Plan provides vision care coverage to approximately 303 Employees and dependents which premiums are due on May 1, 2020 for the period of May 2020. The premium for the Vision Service Plan is paid through deductions from deductions through Employee payroll. In the Wages Motion, the Archdiocese seeks authority, to be exercised in its sole discretion (a) to continue the Dental Plan and the Vision Service Plan for its Employees in the ordinary course of business, (b) continue making the above-described contributions to the Health Care Insurance Program, Dental Plan, and Vision Service Plan, and (c) pay any amounts related thereto, including on account of any deductions for premiums, to the extent that they remain unpaid as of the Petition Date.

82.     The Archdiocese offers its Employees who work a minimum of 20 hours per week as a paid time-off benefit (the **"Vacation Time"**). The amount of Vacation Time available to a particular Employee and the rate at which such Vacation Time accrues is generally determined by the Employee's position and the length of full- time employment. When an Employee elects to take Vacation Time, that

Employee is paid his or her regular hourly or salaried rate.  The Archdiocese estimates that approximately $598,000 of earned but unused Vacation Time will have accrued as of the Petition Date.

83.      In addition, in the ordinary course of business, Employees who work a minimum of 20 hours per week are eligible for sick leave due to illness or injury up to 12 days per year ("**Sick Leave**"). Employees may not cash out their unused Sick Leave upon termination. The Archdiocese  also allow its Employees to take certain other leaves of absence for personal reasons, many of which are required by law ("**Leaves of Absence**").  Leaves of Absence include family medical leaves, pregnancy, adoption and foster care leaves, military leaves, jury duty, voting leaves, personal leaves and bereavement leaves.  In the Wages Motion, the Archdiocese requests that it be authorized, but not directed, to continue to honor its Vacation Time, Sick Leave and Leaves of Absence policies in the ordinary course of business, and to honor and pay any prepetition amounts related thereto.

84.      *Additional Benefits.*  The Archdiocese offers its Employees who work a minimum of 20 hours per week primary life insurance coverage, primary accidental death and dismemberment insurance and short- and long-term disability benefits through Guardian, a third-party insurer (the "**Life and AD&D Insurance,** S**hort-Term Disability Benefits**" and "**Long-Term Disability Benefits**"). The Archdiocese is charged a 2% contribution to cover costs for the foregoing benefits by the "Employee Benefits Plan."  As of the Petition Date, approximately $27,000, remains unpaid, which accounts for the Archdiocese's 2% charge owed to the Plan on account of the Life and AD&D Insurance, Short Term Disability and Long Term Disability Benefits.

Employees who work a minimum of 20 hours per week are also offered the opportunity to voluntarily purchase supplemental life insurance through Guardian Supplemental Life and Accidental Death and Dismemberment Insurance Programs (the "**Supplemental Life and AD&D Insurance**"), the premiums for which are paid entirely by the electing Employee. The Archdiocese estimates that approximately 130 Employees have elected to purchase Supplemental Life and AD&D Insurance. The Archdiocese estimates that it has withheld approximately $3,700 _ in Employee contributions for Supplemental Life Insurance before the Petition Date, which amount has not yet been transferred to Guardian.  In the Wages Motion, the

{N4007172.1}

Archdiocese requests authority to forward up to $3,700 in prepetition amounts for Supplemental Life and AD&D Insurance  In the Wages Motion, the Archdiocese also seeks authority to (a) continue to provide the Life and AD&D Insurance, short Term Disability and Long Term Disability Benefits and Supplemental Life AD&D Insurance (b) continue making all contributions to such programs, and (c) pay any and all such amounts to the extent that they remain unpaid on the Petition Date.

85.     **The 401(k) Plan.** The Archdiocese offers a 401(k) defined contribution plan (the "**401(k) Plan**") to its lay employees and employees of affiliates through Voya. Employees electing to participate in the 401(k) Plan are required to contribute a minimum of 3% of their salaries, and may elect to contribute up to a maximum of 75%. The 401(k) Plan requires the Archdiocese to contribute 3.5% of the participants' salaries. Any remaining funds from the 2% contribution may be used as a discretionary employer contribution to the 401(k) Plan. The 401(k) Plan administrator is the Archdiocese. The Archdiocese is charged a 3.5% contribution per pay period to cover costs for Life and AD&D Insurance, Short Term Disability and Long Term Disability Benefits by the Employee Benefits Plan. As of the Petition Date, approximately $50,000, remains unpaid, which accounts for the Archdiocese's 3.5% charge owed to the 401(k) Plan. Incardinated priests of the Archdiocese, whose retirement from active service is duly accepted by the Archbishop, are eligible for retirement benefits under an unfunded retirement plan (the "**Plan**"). The Archdiocese has elected to account for these retirement benefits under accounting principles generally accepted in the United States of America, as a defined benefit pension plan.  In the Wages Motion, the Archdiocese seeks authority to (a) continue to provide the 401(k) Plan for the Employees in the ordinary course of business (b) continue making all contributions to such programs, (c) continue to pay any claims administrative fees related thereto, and (d) pay any and all such amounts to the extent that they remain unpaid on the Petition Date.

86.     *Housing Expenses.*  In the ordinary course of its business and pursuant to its obligations under Canon Law, the Archdiocese maintains a home that is owned by the Archdiocese and in which the Archbishop resides (the "Home").  The Archdiocese pays for the costs associated with maintaining the Home, in the approximate amount of $7,500 a month ("**Housing Expenses**"), including but not limited to

{N4007172.1}

utilities, supplies and maintenance.  As of the Petition Date, approximately $3,200 of Housing Expenses remain unpaid for the pre-petition period.  The Housing Expenses were all incurred in accordance with prepetition practices.  In the Wages Motion, the Archdiocese seeks authority to pay $3,200 in prepetition Housing Expenses and continue to pay for Housing Expenses in the ordinary course of business.

**E.      Expedited Motion for Interim and Final Order (i) Authorizing Postpetition Use Of Cash Collateral, (ii) Granting Adequate Protection to Lender, (iii) Modifying the Automatic Stay, (iv) Scheduling a Final Hearing, and (v) Granting Related Relief (the "Cash Collateral Motion") [Docket No. 5]**

87.      Prepetition, the Debtor is a borrower or guarantor on debt instruments that might give rise to a claim by various parties, including Hancock Whitney Bank, in cash assets held by the Debtor.

88.      On April 1, 2017, the Louisiana Public Facilities Authority issued Refunding Revenue Bonds (Archdiocese of New Orleans Project) Series 2017 (the "2017 Bonds") in the aggregate original principal amount of $41,895,000, all issued pursuant to the Trust Indenture of even date.  The 2017 Bonds are unsecured.  Hancock Whitney Bank serves as the indenture trustee under the 2017 Bonds.  Upon information and belief, Hancock Whitney Bank does not hold any of the debt under the 2017 Bonds.

89.      Separately from the 2017 Bonds, the Archdiocese guaranties certain debt related to St. Anthony's Garden as described below.  St. Anthony's Gardens ("SAG") is a non-profit Louisiana corporation formed in 2012 for the sole purpose of owning, developing and operating the SAG Project. The SAG Project is a rental fee-for-service senior living retirement community owned by SAG and known as St. Anthony's Gardens located in St. Tammany Parish, Louisiana.  On or about December 1, 2013, the Authority issued bonds (the "SAG Senior Bonds") pursuant to a Loan Agreement of even date.  The SAG Senior Bonds are secured by the SAG Project pursuant to a Multiple Indebtedness Mortgage properly filed in the mortgage records of St. Tammany Parish.  The SAG Senior Bonds are guaranteed by the Archdiocese. Upon information and belief Hancock Whitney holds all of the debt for the SAG Senior Bonds. Neither SAG nor the Archdiocese is in default on account of the SAG Senior Bonds.

90.      On or about April 25, 2017, SAG, as maker, issued a promissory note (the "SAG Subordinated Debt") in the original principal amount of $12,000,000 in favor of Hancock Whitney Bank

and guaranteed by the Archdiocese.  Pursuant to the terms of the SAG Subordinated Debt, the Debtor, as Guarantor is required to keep minimum "Unencumbered Liquid Assets" equal to the unsecured loan balance in Portfolio B as measured on a quarterly basis.

91.  As of the Petition Date, the amount outstanding on the SAG Senior Bonds and the SAG Subordinated Debt equaled $47,155,104.96.

### Cash Collateral and Adequate Protection

92.  As more fully explained above the Debtor has several accounts, including deposit accounts.

93.  The cash in the deposit accounts of the Debtor may be the cash collateral of Hancock Whitney Bank pursuant to the terms of La. Rev. Stat. § 6:316.  In order to ensure that it has the necessary funds and flexibility to manage its affairs in this Chapter 11 Case, the Debtor has agreed to provide Hancock Whitney Bank with Adequate Protection as follows.

94.  As adequate protection for the use of its cash collateral, the Debtor has offered and the Lender as accepted the following claims, liens, rights, and benefits on account of the Adequate Protection Obligations, in each case subject and subordinate to the Carve Out (as defined below):

95.  Section 507(b) Claim. The Adequate Protection Obligations due to the  Lender shall constitute allowed joint and several superpriority Lender claims against the Debtor as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against the Debtor, now existing or hereafter arising in the Chapter 11 Case (subject and subordinate only to the Carve Out (as defined below)), including all claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114, and shall at all times be senior to the rights of the Debtor, and any successor trustee or any creditor, in the Chapter 11 Case or any subsequent proceedings, including without limitation any Chapter 7 proceeding, under the Bankruptcy Code (the "507(b) Claim"), which Lender claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtor including, without limitation,

and solely upon entry of the Final Order, the proceeds and property recovered in respect of any Avoidance Actions.

96.     <u>Adequate Protection Liens</u>. Effective as of the Petition Date, solely to the extent of the Adequate Protection Obligations, the Lender is hereby granted a valid, binding, continuing, enforceable, fully-perfected, non-voidable first priority lien and/or replacement lien on, and security interest in (the "<u>Adequate Protection Liens</u>"), subject and subordinate only to the Carve Out (as defined below), in the post-petition funds in the Prepetition Collateral and the Debtor's rights, title and interest in the account defined as Portfolio A (collectively, the "<u>Adequate Protection Collateral</u>") in the Debtor's Expedited Motion for Entry of (A) Interim and Final Orders Authorizing (I) the Maintenance of Existing Accounts, Continued Use of Existing Cash Management System, and Continued Use of Existing Business Forms, (III) Waiving the Requirements of Section 345(b) of the Bankruptcy Code, and (III) Granting Related Relief, and (B) and Order Scheduling a Final Hearing ("<u>Cash Management Motion</u>"). The Debtor stipulates that it will not permit the balance in Portfolio A[5] fall below $10 million.

## CONCLUSION

For the reasons described herein and the First Day Motions, I believe that the prospect for achieving the objections for the benefit of the estate and its creditors, as well as any other parties-in-interest, will be substantially enhanced if the Court grants the relief requested in each of the First Day Motions and respectfully request the Court to do so.

---

[5] Portfolio A is a Custodial Account as defined and explained in the Bank Account Motion.

## DECLARATION

I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: April 30, 2020

_____
REVEREND PATRICK CARR

SWORN TO AND SUBSCRIBED
BEFORE ME, NOTARY PUBLIC,
THIS 30th DAY OF APRIL, 2020.



_____
NOTARY PUBLIC

{N4006581.2}

12