**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § | CASE NO: 20-10846 |
| | § | |
| THE ROMAN CATHOLIC CHURCH OF | § | CHAPTER 11 |
| THE ARCHDIOCESE OF NEW | § | |
| ORLEANS, | § | SECTION A |
| | § | |
| DEBTOR. | § | |

**MEMORANDUM OPINION AND ORDER**

This Court held a video evidentiary hearing (the "Hearing") to resolve *TMI Trust Company's Motion for Order (i) Requiring the United States Trustee To Appoint a Separate Committee of Unsecured Creditors and/or (ii) Reinstating TMI Trust Company as a Member of and Reconstituting the Official Committee of Unsecured Creditors* (the "§ 1102 Motion"). [ECF Doc. 521]. Upon a subsequent motion filed by TMI Trust Company ("TMI"), [ECF Doc. 546], and following the agreement of the parties, this Court bifurcated the issues raised by TMI in the § 1102 Motion and limited the matter to be considered at the Hearing to the sole issue of whether the Official Committee of Unsecured Creditors (the "Committee"), as constituted at the time of the Hearing, adequately represents the interests of all unsecured creditors of the estate, particularly commercial creditors. [ECF Doc. 574]; *see generally In re McLean Indus., Inc.*, 70 B.R. 852, 862 (Bankr. S.D.N.Y. 1987) (finding that an evidentiary hearing was required to determine whether the creditors' committee in that case adequately represented all unsecured creditors' interests). Based on the answer to that question, the Court will then decide whether to exercise its discretion under 11 U.S.C. §§ 1102(a)(2) or (a)(4) to order the appointment of an additional committee of creditors or to order the United States Trustee to change the membership of the current Committee.

The Court reserved the issues raised by TMI concerning its removal from the Committee and the prospect of its reappointment for a later time.  [ECF Docs. 546 & 574].

Creditor First Bank and Trust filed a joinder to the § 1102 Motion (the "Joinder").  [ECF Doc. 533].  The Roman Catholic Church of the Archdiocese of New Orleans (the "Debtor" or the "Archdiocese") filed a response in support of the § 1102 Motion.  [ECF Doc. 625].  Oppositions to the § 1102 Motion were filed by the Committee, [ECF Doc. 626], and the Acting United States Trustee for Region 5 (the "UST"), [ECF Doc. 629].  TMI filed a reply brief in support of the § 1102 Motion.  [ECF Doc. 644].

After the Hearing, the Court took the matter under advisement.  The Debtor and TMI filed post-hearing briefs in support of the § 1102 Motion, [ECF Docs. 678, 688 & 705], and the UST and the Committee filed post-hearing briefs in opposition, [ECF Docs. 686 & 687].  Based upon the pleadings, the record in this case, the arguments of counsel, the evidence presented at the Hearing, and applicable law, this Court GRANTS the § 1102 Motion to the extent that it (i) requests a finding that the Committee as it is currently constituted does not adequately represent the unsecured creditor body and (ii) asks this Court to exercise its discretion pursuant to § 1102(a)(2) to order the UST to appoint an additional committee of unsecured commercial creditors.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334 and the Order of Reference of the District Court dated April 11, 1990.  The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b).  The venue of the Debtor's chapter 11 case is proper under 28 U.S.C. §§ 1408 and 1409(a).

# FINDINGS OF FACT[1]

This Court has considered the record in this case and the testimony presented at the Hearing from:  (i) Kevin Dobrava, TMI's Managing Director; (ii) Colleen Murphy, counsel for TMI who attended Committee meetings with Mr. Dobrava; (iii) C. Davin Boldissar, counsel for the Committee; and (iv) James Adams, member and Chairperson of the Committee.  The Court also reviewed the certified deposition transcripts of two other current members of the Committee, Jackie Berthelot and Patricia W. Moody, to which the parties stipulated as evidence.  The Court reviewed all exhibits which were admitted into evidence at the Hearing.  The parties stipulated to the admission of the vast majority of exhibits and many of the exhibits consisted of pleadings already in the record.

## A.  The Debtor's Bankruptcy Filing

On May 1, 2020, the Debtor filed for bankruptcy protection under chapter 11 of the Bankruptcy Code and the Court designated the case as a "complex case" pursuant to its local rules. [ECF Docs. 1 & 2].[2]  The Debtor continues to operate as a debtor in possession pursuant to 11 U.S.C. §§ 1107 & 1108.  It is no secret that at the time of the Debtor's bankruptcy filing, there

---

[1]    These findings of fact and conclusions of law constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.  To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law.  To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

[2]    Pursuant to this Court's *Procedures for Complex Chapter 11 Cases*, "complex" cases require special scheduling and other procedures because of a combination of one or more of the following factors:

(1)    The size of the case (usually the total debt owed by the debtor(s) exceeds $10 million);
(2)    The large number of parties in interest in the case (usually more than 50 parties in interest);
(3)    The fact that claims against the debtor and/or equity interest in the debtor are publicly traded (with some creditors possibly being represented by indenture trustees); or
(4)    Any other circumstance justifying complex case treatment.

were 34 pending lawsuits filed in Louisiana state court between 2018 and 2020 by individuals alleging past sexual abuse by priests employed or supervised by the Archdiocese and the complicity of the Archdiocese in that abuse (the "Abuse Cases").  Upon filing for bankruptcy relief, the Debtor removed each of those lawsuits to the United States District Court for the Eastern District of Louisiana.

A few of the plaintiffs in the Abuse Cases mobilized quickly and participated through their state court counsel and newly retained bankruptcy counsel in the Debtor's first-day hearings on May 4 & 5, 2020.  [ECF Docs. 107 & 108].  Their participation resulted in heavily negotiated first-day Orders, including those regarding payment of prepetition and post-petition wages and benefits, use of cash collateral, and requirements to file under seal certain portions of the Debtor's schedules and statement of financial affairs.  [ECF Docs. 100, 173 & 177].

**B.  The Establishment of the Committee**

Attached to its Petition, the Debtor included a *List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (the "Top 20 List").  [ECF Doc. 1-1].  The creditors on the Top 20 List included bondholders, employee health claimants, professional and consulting services claimants, trade claimants, and an insurance claimant.  *Id.*

On May 20, 2020, the UST filed a *Notice of Appointment of Unsecured Creditors' Committee*, listing Hancock Whitney Bank,[3] as Trustee for Louisiana Public Facilities Authority Revenue Refunding Bonds (Archdiocese of New Orleans Project) Series 2017 (the "Bond Trustee"), as well as six redacted names as members of the Committee.  [ECF Doc. 94].  The same day, the UST moved the Court for an order granting permission to disclose the identities of those six redacted Committee members, whose names were initially redacted in compliance with the

---

[3]      Hancock Whitney is also the Debtor's prepetition secured lender and filed a proof of claim against the estate asserting a secured claim in the amount of $47,655,105.06.  *See* Proof of Claim No. 51.

4

Court's Order requiring confidential treatment of identifying information of anyone asserting abuse claims against the Debtor. [ECF Docs. 54 & 95]. According to the UST:

> The U.S. Trustee has appointed a Committee of Unsecured Creditors whose members include individuals whose claims against the Debtor are premised on allegations of abuse (the "Survivor Members"). The Survivor Members, as representatives and fiduciaries to all unsecured creditors, have consented to the disclosure of their first and last names on the Notice of Appointment document filed into the record by the U.S. Trustee.

[ECF Doc. 95, ¶ 3]. After the Court granted the UST's request, [ECF Doc. 110], the UST filed an unredacted list of Committee members with their attorneys' contact information. [ECF Doc. 114]. On June 10, 2020, the UST filed a *Notice of Appointment of Reconstituted Unsecured Creditors' Committee* to substitute TMI as the successor Bond Trustee, replacing Hancock Whitney on the Committee. [ECF Doc. 151].

### C. The Activity of the Committee in the Case to Date

As the record in this case reflects, the Committee has participated fervently in these proceedings.

#### 1. *The Noullet Lift-Stay Motion*

On June 4, 2020, a personal injury claimant who had named the Archdiocese as a defendant in her prepetition slip-and-fall lawsuit moved to terminate the automatic stay to allow her case to proceed to judgment in state court, proposing that any judgment be satisfied by insurance proceeds only (the "Noullet Lift-Stay Motion"). [ECF Doc. 131]. The Committee objected, asserting that insurance coverage had yet to be determined and added:

> There are other creditors of this estate who may have personal injury claims and who may have recourse against applicable insurance coverage. There is currently no way to determine how modification of the automatic stay may affect other creditors. . . . Granting the Motion could favor certain early-moving creditors by diminishing or exhausting available insurance coverage that may be available to all personal injury claimants.

[ECF Doc. 343, ¶¶ 3–4].  After weighing the factors cited in *In re Xenon Anesthesia of Texas*, 510 B.R. 106 (Bankr. S.D. Tex. 2014), to determine whether cause exists to lift the stay, this Court denied the Noullet Lift-Stay Motion, finding that the state court lawsuit was in its infancy and not trial-ready, that insurance coverage issues may exist, and that no evidence was available to indicate that the debtor's insurance carrier had assumed full financial responsibility for defending the litigation.  *See* Hr'g Tr. 9:10–20:18 (Aug. 20, 2020) [ECF Doc. 358].  In sum, the Court found that lifting the stay presented too great a risk that the Debtor's resources would be syphoned off, thereby negatively impacting the Debtor's reorganization efforts and other creditors' recovery, to justify allowing one creditor to jump ahead of all other similarly situated creditors and recover on her claim.  *Id*.

### 2.  *The Bar Date litigation*

On July 1, 2020, the Debtor filed an *ex parte* motion to set the bar date for filing proofs of claim (the "Bar Date") and to approve noticing procedures (the "Bar Date Motion").  [ECF Doc. 200].  On July 3, 2020, the Committee objected to that motion as premature in light of the Committee's contemporaneously filed Motion To Dismiss (discussed and defined below).  The Committee also objected to the timing, noticing procedures, and format of the proof of claim form specifically as those issues relate to individuals who have filed and are anticipated to file sexual abuse claims against the Debtor (the "Abuse Claimants").  [ECF Doc. 202].

The Committee propounded discovery requests on the Debtor related to both the Motion To Dismiss and the Bar Date Motion and, on July 16, 2020, it moved to shorten the time to respond to those requests.  [ECF Doc. 253].  The Committee's discovery requests related to the Motion To Dismiss focused on the Debtor's finances and its basis for seeking bankruptcy relief.  *See id*. ¶ 11 & Ex. 1.  The Committee's discovery requests related to the Bar Date Motion focused primarily

on gaining information spanning a forty-year period on the names and assignment/employment histories of any clergy or lay individuals, living or deceased, that were accused (credibly or not) of abuse, as well as any documents or communications circulated internally or externally regarding those allegations. *See id*. ¶ 12 & Ex. 2. Pursuant to an agreed order between the parties, the Court ordered that the Debtor provide responses to certain interrogatories and requests for production by July 31, 2020. [ECF Docs. 278 & 279].

On July 23, 2020, prior to responding to the Committee's discovery requests, the Debtor moved for a protective order to prevent the dissemination of certain confidential materials produced in discovery. [ECF Docs. 280 & 281]. The Committee objected to the Debtor's proposed protective order, [ECF Doc. 294], even though it contained provisions substantially similar to a protective order negotiated by Committee counsel in its representation of a creditors' committee in another diocesan bankruptcy case in a different district, [ECF Doc. 280, at 4–5].[4] Although the Committee's objection requested limitations on the scope of documents that could be designated under various levels of confidentiality (*e.g*., "confidential," "highly confidential," or "professionals' eyes only") and proposed changes to the process of challenging confidentiality designations, the main thrust of the objection was its central contention that, "it is a matter of the

---

[4]     In response, counsel for the Committee provided the following insight:

> There is—the Archdiocese attaches the documents from two cases that I was involved in as committee counsel and, in effect, says, "What's wrong with this protective order in our case," this case before you, Judge, "when you did it in two other cases?" And the answer is not really all that complicated. None of the Milwaukee committee members sit on the New Orleans committee. They have a perspective on how the relationship between the Archdiocese and the Committee should be structured and in the context of discovery this Committee is not prepared to abide what the Milwaukee committee did. And the, and the history . . . because history informs a lot of this—the history of this Archdiocese and its discovery battles prepetition with the state court lawyers, some of whom represent Committee members, informs the attitude about what should be done in your court on how discovery should be handled.

Hr'g Tr. 29:2–17 (July 30, 2020).

utmost public interest that the crimes and abuse against children perpetrated over decades not be subject to any undue secrecy or non-disclosure." [ECF Doc. 294, ¶ 9]; *see also id*. ¶¶ 8–16; Hr'g Tr. 23:5–31:3 (July 30, 2020) [ECF Doc. 321]. The Court accepted the Committee's proposed limitations on the scope of documents that qualify for various confidentiality designations, as well as its suggested the process for objecting to those designations, but declined to find that documents pertaining to abuse allegations should be separately classified or treated outside of the protective order. *See* Hr'g Tr. 38:2–18 (July 30, 2020).

On August 5, 2020, the Committee moved to compel the Debtor to produce documents responsive to four discovery requests related to the Bar Date Motion, asserting that production of such documents could lead to "reasonably ascertainable" creditors deserving of actual notice of the Bar Date. [ECF Docs. 322]. Those discovery requests sought assignment and employment histories of "all living, former or deceased priests, deacons, religious and lay individuals (whether Archdiocesean or religious order) who have operated within the Archdiocese for the last forty (40) years, against whom there were allegations of sexual abuse, regardless of whether the allegation was deemed credible, and their assignment and/or employment history," as well as a list of all locations within the Archdiocese at which that abuse was alleged to have occurred. [ECF Doc. 322, ¶ 2]. The Debtor objected, asserting that the documents requested were irrelevant to the resolution of the Bar Date Motion, and that the burden and cost to locating documents maintained in paper format would not be proportional to the needs of the case. [ECF Doc. 363]. After hearing oral argument on the motion, the Court denied the motion to compel, finding that the Committee's requests would not lead to finding current addresses of creditors so that they could receive actual notice of the Bar Date and that the burdens and costs of producing the discovery would not be proportional to the needs regarding resolution of the Bar Date Motion. *See* Hr'g Tr. 47:15–52:20

(Aug. 28, 2020) [ECF Doc. 377].

After three hearings in September 2020, and after considering, among other things, expert testimony offered by the Committee regarding advertising and notification as well as notice and information procedures relating to claims of sexual abuse victims particularly, this Court entered an order on October 1, 2020, setting a Bar Date of November 30, 2020, for the filing of general claims against the estate, and a Bar Date of March 1, 2021, for filing of sexual abuse claims against the estate; approving proof-of-claim forms; providing for confidentiality protocols; and approving the form and manner of notice of the Bar Dates. [ECF Doc. 461].

### 3. The Debtor's partial settlement with TMI

On September 10, 2020, the Debtor moved the Court on an expedited basis to enter into a settlement with TMI as the successor Bond Trustee (the "TMI Partial Settlement Motion"). [ECF Doc. 403]. Under the prepetition bond documents, the Debtor is required to pay principal and interest on the bonds twice each year, in January and July. *Id.* ¶ 15. As of the date of the Debtor's bankruptcy filing, the Debtor claimed it owed almost $38 million on the bond debt. *Id.* ¶ 14. The Debtor claimed it was in default on one or more of its bond covenants, *see id.* ¶¶ 1 & 19–23, and acknowledged that the bond documents contain transfer restrictions that prohibit the Debtor from freely transferring most of its revenues and properties, *see id.* ¶ 25. The deal proposed by the Debtor and TMI envisioned the Debtor making interest-only payments for the life of the chapter 11 case, plus paying the reasonable fees and expenses of Hancock Whitney as the initial Bond Trustee and TMI as the successor Bond Trustee. *See id.* ¶ 32. In exchange, TMI, among other things, would agree (i) not to object to a plan of reorganization that provides for the reinstatement of the bonds on the current, favorable terms, as long as the principal due at the time of reinstatement is paid as well as TMI's attorneys' fees; (ii) to waive any default and debt service reserve

9

requirements for the pendency of the bankruptcy case and nine months from the effective date of a confirmed plan of reorganization for failure to comply with financial covenants; and (iii) not to object to the sale of property by the Debtor to fund a plan of reorganization, as long as the net proceeds did not exceed $20 million. *See id*. ¶ 33. According to the Debtor and TMI, the deal would clear a path for the Debtor to fund a plan of reorganization. *See id*. ¶ 42.

The Committee and the UST objected to the TMI Partial Settlement Motion; the crux of those objections understandably focused on the fact that TMI would get paid, at least partially, on its unsecured debt so early in the case and outside of the plan process. [ECF Docs. 444 & 449]. The hearing on the TMI Partial Settlement Motion was continued at the request of the parties in interest to allow them to exchange discovery. [ECF Docs. 456, 472 & 515]. In the end, the parties in interest—which included the Committee and the UST—negotiated a consensual agreement without Court intervention and, on November 2, 2020, the Court approved the Debtor's amended deal with TMI, finding it to be in the best interests of the estate. [ECF Doc. 527]. The settlement presented to the Court constituted a scaled-back version of the original proposal, excluding, for example, payment of the initial or successor Bond Trustee's fees and costs. *Id*. The UST and the Committee reserved the rights of parties in interest to assert, among other things, that interest payments made to TMI during the course of the Debtor's chapter 11 case should be recharacterized as principal payments and to challenge interest rates and professional fees in the event that a plan that pays all allowed unsecured claims in full is not confirmed. *Id*. at Ex. 1, § 2.4. The agreement concerning certain obligations between the Debtor and TMI under the bond documents also contained the following provision:

> The Parties understand that [TMI] will imminently file a motion with regard to its membership on the Committee (the "<u>Motion</u>"). Nothing in this Agreement or the Approval Order thereon is in any way meant to limit any parties' right to make arguments with respect to the Motion and all such rights are expressly reserved.

The provisions of this Agreement, including without limitation Recital (G) and Sections 2.2 and 2.3 of the Agreement are agreements between the Debtor and [TMI] only, are not a finding of the Bankruptcy Court, and do not bind any other party including without limitation the Committee and the Office of the United States Trustee, and are without prejudice as to any position as may be taken on the Motion.

*Id*. at Ex. 1, § 2.5.

### 4. *The Committee's Motion To Dismiss and additional lift-stay motions*

As stated above, on July 3, 2020, together with its objection to the Bar Date Motion, the Committee also filed a motion to dismiss the Debtor's bankruptcy case entirely for "cause" pursuant to § 1112(b) of the Bankruptcy Code (the "Motion To Dismiss"). [ECF Doc. 203]. The Committee alleged that the Debtor filed its case in bad faith, as it remains solvent, and that it only pursued bankruptcy protection to gain a tactical advantage in the 34 Abuse Cases. *See* Motion To Dismiss, ¶¶ 21–46. After an evidentiary hearing on August 20, 2020, the Court requested post-trial briefs, [ECF Doc. 355], which were submitted by the Debtor, the Committee, and creditor Ed Roe, [ECF Docs. 365, 366 & 367], and took the matter under submission.

Additionally, on September 1, 2020, two of the 34 Abuse Case plaintiffs, represented by counsel who also represents individual Committee members in those members' Abuse Cases and in their capacity as Committee members, moved to lift the automatic stay pursuant to § 362(d)(1) of the Bankruptcy Code for "cause" to allow those plaintiffs to pursue their prepetition state court actions against the Debtor (the "Doe Lift-Stay Motions"). [ECF Docs. 378 & 380]. The Debtor and other parties in interest opposed those motions on September 25, 2020, [ECF Docs. 440, 441, 446 & 447]. Notably, TMI, a member of the Committee, but filing in its individual capacity, was among the parties in interest that opposed the Doe Lift-Stay Motions. [ECF Doc. 447]. On September 25, 2020, the Committee filed a muted response to the Doe Lift-Stay Motions, briefly stating that, based on information it had received from the Debtor, it was no longer concerned—

as it had been with the Noullet Lift-Stay Motion—that granting a lift-stay motion would deplete

insurance proceeds available to all personal injury claimants.  [ECF Doc. 450].  The Committee

added that "[t]o the extent that this is incorrect," it reserved the "same concern" that it had to the

Noullet Lift-Stay Motion.  *Id*.  On September 30, 2020, the Court denied in part the Doe Lift-Stay

Motions to the extent they sought to proceed with their litigation against the Debtor, finding as it

did with the Noullet Lift-Stay Motion, that the "balance of harms" did not justify the Debtor's

expenditure of resources to the detriment of its own reorganization efforts for the sole benefit of

one creditor's recovery over others similarly situated.  *See* Hr'g Tr. 55:20–62:14 (Sept. 30, 2020)

[ECF Doc. 479].  But on November 1, 2020, after additional briefing and oral argument, the Court

granted the movants' alternative request for relief and terminated the automatic stay solely for the

purpose of deposing and propounding limited discovery upon the non-Debtor defendant priests

named in the movants' Abuse Cases.  [ECF Doc. 528].

After the filing of the Doe Lift-Stay Motions on September 1, 2020, two additional non-

Abuse Claimants filed a motion to lift the automatic stay on September 10, 2020, seeking to depose

the Debtor as one of four named defendants in a slip-and-fall action pending in Louisiana state

court (the "Deemer Lift-Stay Motion").  [ECF Docs. 401 & 405].  The Debtor opposed the Deemer

Lift-Stay Motion and, as it had with its objection to the Doe Lift-Stay Motions, TMI also objected

to the Deemer Lift-Stay Motion as a party in interest in its own capacity.  [ECF Docs. 494 & 497].

On October 16, 2020, three weeks after responding to the Doe Lift-Stay Motions, the Committee

objected to the Deemer Lift-Stay Motion.  [ECF Docs.  495].  In a more robust objection, the

Committee asserted:

> The impact of the relief requested in the Motion cannot be determined at this time.
> The Debtor has not provided copies of its insurance policies to the Committee; it
> may be asserted that those policies also cover non-debtor Catholic entities.  At least
> one of the Non-Debtor Catholic Defendants [named in the slip-and-fall case] is

listed as a Parish under the Debtor's bar date order and counsel for the Parishes has represented that they, along with other Non-Debtor Catholic Entities, will be seeking a discharge in this case through a plan channeling injunction. Among other alleged grounds for the injunction is overlapping insurance coverage. The Committee understands that the Debtor may assert that the instant request for relief from stay to prosecute the claims will impact the Debtor's insurance coverage.

[ECF Doc. 495, ¶ 2 (footnotes omitted)]. The Court denied the Deemer Lift-Stay Motion on the

same grounds as it had denied the Noullet and Doe Lift-Stay Motions. *See* Hr'g Tr. 13:6–23:22

(Oct. 20, 2020) [ECF Doc. 516].

5. *TMI's removal from the Committee*

On October 8, 2020, the UST filed a *Notice of Appointment of Reconstituted Unsecured*

*Creditors' Committee*, which showed the removal of TMI as a member of the Committee, leaving

only the six Survivor Members, the term given by the UST to those members asserting sexual

abuse claims against the Debtor. [ECF Doc. 478]. On October 28, 2020, TMI filed the § 1102

Motion, currently before the Court, with First Bank and Trust filing its Joinder on November 6,

2020.

**D. The Hearing**

Much of the evidence at the Hearing pertained to the facts surrounding TMI's exit from

the Committee, which may be considered by this Court at a later date; however, the evidence

confirmed that no current members on the Committee hold commercial claims against the estate.

*See* Hr'g Tr. 269:5–7 (Dec. 17, 2020) (testimony of James Adams) [ECF Doc. 692]; Berthelot

Dep. 48:3–25 (Dec. 10, 2020) [TMI Ex. 32]. The evidence also supported what is plainly seen in

the record: the majority of the Committee's focus to date has been to resolve—either inside or

outside of the bankruptcy process—the abuse claims asserted against the Debtor. To be clear, the

Court finds no fault with the Committee's advocacy for the interests of Abuse Claimants. The

question before the Court, though, is whether the interests of the entire unsecured creditor body

here, particularly those interests of purely commercial creditors, are adequately represented when there are no longer commercial creditors seated on the Committee.

## CONCLUSIONS OF LAW

### A. The Powers of Bankruptcy Courts Over Committees

The 1978 Bankruptcy Reform Act envisioned the possibility of the constitution of more than one committee in a chapter 11 reorganization case and proposed committees to serve as "negotiating bodies for the classes of creditors that they represent." H.R. REP. 95-595, at 104 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6065. "As such, it is important that they be representative of their respective classes." *Id.* "When the Bankruptcy Code was enacted in 1978, bankruptcy courts had authority to appoint creditors committees in chapter 11 cases." *In re Caesars Entm't Operating Co.*, 526 B.R. 265, 268 (Bankr. N.D. Ill. 2015) (citing Kenneth N. Klee & K. John Shaffer, *Creditors' Committees Under Chapter 11 of the Bankruptcy Code*, 44 S.C. L. REV. 995, 1001–02 (1993)).

"Prior to 1986, § 1102(c) expressly authorized the bankruptcy court to, on request of a party in interest, change the size or the membership of a creditors' or equity security holders' committee if the committee was not sufficiently representative." *In re Mercury Fin. Co.*, 240 B.R. 270, 275 (N.D. Ill. 1999). "With the expansion of the U.S. Trustee program in 1986, however, Congress transferred that authority to the U.S. Trustee." *In re Caesars Entm't Operating Co.*, 526 B.R. at 268 (citations omitted); *see also* Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. No. 99-554, 100 Stat. 3088.

Transferring certain administrative functions to a trustee was the plan from the start. Congress drafted the 1978 Bankruptcy Code to alleviate the stress on the bankruptcy system by transferring some administrative tasks that had fallen to bankruptcy judges and reassigning them

to various types of trustees, including the United States Trustee, to allow bankruptcy judges to retain more impartiality and independence. As foreshadowed in one House Report from 1977:

> [T]he bankruptcy judge, because of the duties imposed upon him under the Bankruptcy Act, must take an active role in supervising and administering a bankruptcy case. No matter how fair a bankruptcy judge is, his statutory duties give him a certain bias in a case, and the bankruptcy court as a result has been viewed by many as an unfair forum. The bill removes many of the supervisory functions from the judge in the first instance, transfers most of them to the trustee and to the United States Trustee, and involves the judge only when a dispute arises. Because the judge no longer will have to take an active role in managing bankruptcy cases, the bankruptcy court should become a forum that is fair in fact and in appearance as well.

> Some of the supervisory functions removed from the judge will be transferred to a new system of United States Trustees who will act as bankruptcy watchdogs, overseeing the qualifications and appointments of private trustees in bankruptcy cases, supervising their performance, monitoring their fees, and serving as trustees in cases where a private trustee cannot be found to serve.

H.R. REP. 95-595, at 4 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 5966–67. But the 1986 amendments went further than that. They not only gave the power to appoint committees to the United States Trustee, they also unceremoniously deleted subsection (c) of § 1102, which had allowed the bankruptcy court the autonomy to alter the composition of an existing committee to ensure adequate representation of unsecured creditors.[5] Therefore, with the passage of the 1986 amendments, the United States Trustee possesses the authority to appoint committees of unsecured creditors and equity security holders under § 1102(a)(1) at the start of a case, or under § 1102(a)(2) after a bankruptcy court orders the appointment of additional committees to assure adequate representation of creditors or of equity holders.

To address any concern that the United States Trustee would enjoy "wholly unfettered discretion" over the appointment of committees "with no possibility of judicial review," between

---

[5]     "The legislative history [for the 1986 amendment] does not shed an additional light on the changes to § 1102 and the removal of § 1102(c)." *In re Mercury Fin. Co.*, 240 B.R. at 276.

1986 and 2005, bankruptcy courts "continued to inject themselves into the committee process, often invoking section 105(a) . . . as a basis for 'reviewing' the U.S. Trustee's appointments." *In re Shorebank Corp.*, 467 B.R. 156, 160, 162 (Bankr. N.D. Ill. 2012) (internal quotations and citations omitted). Then, in 2005, Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act which added subsection (a)(4) to § 1102, statutorily "reauthorizing" bankruptcy courts to decide when and if a committee's composition needed to be changed to ensure adequate protection of creditors. *See* Pub. L. 109-8, 119 Stat. 23. That subsection states in part:

> On request of a party in interest and after notice and hearing, the court may order the United States trustee to change the membership of a committee appointed under this subsection, if the court determines that the change is necessary to ensure adequate representation of creditors or equity security holders.

119 Stat. 105 (codified as amended at 11 U.S.C. § 1102(a)(4)).

Therefore, at this time the only powers over committees given to bankruptcy courts by the Code are found in §§ 1102(a)(2) and (a)(4), which allow, respectively, a court to order either the appointment of additional committees or changes to the membership of a committee if it determines such action is necessary to ensure "adequate representation" of creditors or equity security holders.

### B. What Constitutes "Adequate Representation"?

The Bankruptcy Code specifically states that unsecured creditors' committees "shall ordinarily consist of the persons . . . that hold the seven largest claims against the debtor of the kinds represented on such committee." 11 U.S.C. § 1102(b). "It is well settled that statutory unsecured creditors committees owe a fiduciary duty to the entire class of creditors represented by such committee and are required to place the collective interest of the class they represent above their own personal stake in the bankruptcy case." *In re Residential Capital, LLC*, 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2012) (citations omitted). "Furthermore, this fiduciary obligation is present

whether or not a particular group is included in its membership." *Id*. (internal quotation and citation omitted). "A committee must guide its actions so as to safeguard as much as possible the rights of minority as well as majority creditors." *Id*. (internal quotations and citations omitted).

Unfortunately, "[t]here is no framework provided in the Bankruptcy Code for this Court to determine adequate representation." *In re Enron Corp*., 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002) (citing *In re McLean Indus., Inc*., 70 B.R. 852, 861 (Bankr. S.D.N.Y. 1987) ("Because each case is distinct, there is no hard and fast rule.")). "For a particular group of creditors to be adequately represented by an existing committee, it is not necessary for the committee to be an exact reflection of that committee's designated constituents." *In re Dow Corning Corp*., 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997). But for a creditor group to be adequately represented by a committee, the interests of that group must "have a *meaningful* voice on the committee in relation to their posture in the case." *Id*. (emphasis added).

A determination of whether a committee as constituted adequately represents creditors, therefore, is left to the bankruptcy court upon an examination of the facts of each case. *See In re Hills Stores Co.*, 137 B.R. 4, 5 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp*., 55 B.R. 945, 948 (Bankr. S.D.N.Y. 1985). "The decision is not to be taken lightly, and involves a delicate balancing of various and sometimes diverging interests." *In re Enron Corp*., 279 B.R. at 685. Without a statutory definition of "adequate representation of creditors," courts evaluate the adequacy of representation by considering the following factors:

1.     The ability of the committee to function;

2.     The nature of the case;

3.     The standing and desires of the various constituencies;

4.     The ability for creditors to participate in the case even without an official committee and the potential to recover expenses pursuant to section 503(b)

17

5.      The delay and additional cost that would result if the court grants the motion;

6.      The tasks that a committee or separate committee is to perform; and

7.      Other factors relevant to the adequate representation issue.

*In re Dana Corp.*, 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006) (citations omitted). "Such analysis, however, should be made on a case-by-case basis, with no one factor being dispositive, both individually and in the aggregate." *In re Park W. Circle Realty, LLC*, No. 10-12965, 2010 WL 3219531, at *3 (Bankr. S.D.N.Y. Aug. 11, 2010) (citations omitted). Some courts have bifurcated this analysis, considering the first three factors listed above to determine initially whether a committee adequately represents the unsecured creditor body and, depending on the answer, then evaluating the other identified factors to determine whether the court should proceed and exercise its discretion to act pursuant to § 1102(a)(2) or (a)(4). *See, e.g.*, *Mirant Americas Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of Enron Corp.*, No. 02-6274, 2003 WL 22327118, at *4 (S.D.N.Y. Oct. 10, 2003); *In re Dow Corning Corp.*, 194 B.R. at 141–42.

Accordingly, this Court will apply the evidence and the record before it to determine first whether the Committee as it is currently constituted adequately represents the unsecured creditor body considering the relevant factors below, and will only proceed to evaluate whether any remedy is required if it concludes that the Committee does not adequately represent the unsecured creditor body.

### 1.  *Ability of the existing committee to function*

At this point, the Committee is composed entirely of "Survivor Members," that is, individuals whose claims against the Debtor are premised on allegations of abuse. As the Committee points out, committees appointed in other diocesan bankruptcy cases around the country have been comprised solely of sexual abuse claimants. [ECF Doc. 626, n.7 & Ex. 6]. The

18

Court does not find that fact to be persuasive.  There are diocesan and other cases with multiple committees appointed or one committee appointed and comprised of sexual abuse tort claimants and commercial creditors.  *See, e.g.*, *In re Boy Scouts of Am.*, No. 20-10343 (Bankr. D. Del. filed Feb. 18, 2020) (appointing two creditors' committees, one comprised of tort creditors and one of trade creditors); *In re Archbishop of Agaña*, No. 19-00010 (Bankr. D. Guam filed Jan. 16, 2019) (appointing one committee comprised of both commercial creditors and abuse claimants); *In re Archdiocese of Saint Paul & Minneapolis*, No. 15-30125 (Bankr. D. Minn. filed Jan. 16, 2015) (ordering the appointment of a committee of non-abuse claimants after appointment of creditors' committee consisting only of abuse claimants).  Indeed, this case began with the appointment of one committee comprised of both tort claimants and commercial claimants.  Counsel for the Committee has expressed reasons that this Committee may function differently from some of the other similarly comprised committees in other diocesan cases.  *See supra* note 4.  Ultimately, this Court is required to examine the facts of this case and determine whether unsecured creditors are adequately represented by the current Committee.

"Nowhere does the Code mandate that a committee must faithfully reproduce the exact complexion of the creditor body." *In re Hills Stores Co.*, 137 B.R. 4, 7 (Bankr. S.D.N.Y. 1992); c*f. In re Dana Corp.*, 344 B.R. 35, 38–39 (Bankr. S.D.N.Y. 2006) (declining to order separate committee in part because movant asbestos claimant had seat on committee with bondholders, indenture trustee, labor union representative, and trade creditors).  But "[w]hat is required is adequate representation of various creditor types." *In re Hills Stores Co.*, 137 B.R. at 7.  Here, the Committee is comprised entirely of Survivor Members.  Although the evidence revealed disagreements between TMI and the Survivor Members regarding the TMI Partial Settlement Motion and the Motion To Dismiss, *see generally* Hr'g Tr. 191:19–266:11 (Dec. 17, 2020); TMI

Exs. 31 & 32, the circumstances surrounding TMI's departure from the Committee are not before the Court at this time. The evidence showed that decisions to take Committee action were unanimous, save one vote where TMI abstained from voting. *See* Hr'g Tr. 61:2–24 (Dec. 17, 2020). But as one court observed, "a functioning committee, alone, does not necessarily ensure that all creditors groups are adequately represented." *In re Park W. Circle Realty, LLC*, 2010 WL 3219531, at *3 (citing *In re Enron Corp.*, 279 B.R. at 685 ("The problem is that a committee may function just fine . . . and still not adequately represent a particular creditor group.")).

## 2. *Nature of the case and the need for representation*

"A determination of whether one group of creditors has adequate representation on a committee will entail a balancing of that group's interest against the interest of other groups on the committee." *In re Dow Corning Corp.*, 194 B.R. at 142. "This, of course, cannot be done unless the various group of creditors and their interests are known." *Id.*

This case qualifies as a "complex" case under this Court's *Procedures for Complex Chapter 11 Cases* due to the amount of debt, the large number of parties in interest, and the fact that certain claims against the Debtor are publicly traded. "[A] case which is sufficiently large and complex may strongly indicate the need for additional committees representing different interests." *In re Hills Stores, Co.*, 137 B.R. at 6. That said, this case is not a "mega" case. Although "complex," it has a single debtor and is considered to be a medium-sized chapter 11 case. "[T]he size of a case alone is not determinative" in analyzing the adequacy of representation, however, *see In re Enron Corp.*, 279 B.R. at 688, and this case also exhibits certain contours that require consideration.

It is true that tort claims of the kind filed against this Debtor are not usually filed in chapter 11 business reorganization cases, although, horrifically, that appears to be changing, given the

number of diocesan cases and other cases involving allegations of child sexual abuse that have been filed across the country in recent years. But in addition to the significant number of abuse claims that have been filed and are anticipated to be filed, this Debtor has many creditors asserting commercial claims in substantial amounts against the estate, including creditors holding publicly traded bond debt. The Debtor scheduled approximately $91 million of unsecured, non-priority commercial debt. [ECF Doc. 572].[6] As this Court has observed on more than one occasion in

---

[6]      Compare that amount of commercial claims with other diocesan cases: *In re The Diocese of Buffalo, N.Y.*, No. 20-10322 (Bankr. W.D.N.Y. filed Feb. 28, 2020) [ECF Doc. 228, Ex. 1, at 67] (scheduling approximately $421,000 in nonpriority unsecured commercial debt); *In re Roman Catholic Church of the Archdiocese of Santa Fe*, No. 18-13027 (Bankr. D.N.M. filed Dec. 3, 2018) [ECF Doc. 148, at 2–24] (scheduling approximately $152,000 in nonpriority unsecured commercial debt); *In re Roman Catholic Bishop of Great Falls, Montana*, No. 17-60271 (Bankr. D. Mont. filed Mar. 31, 2017) [ECF Doc. 122, at 12–24] (scheduling approximately $105,000 in known nonpriority commercial debt); *In re Roman Catholic Bishop of Helena, Montana*, No. 14-60074 (Bankr. D. Mont. filed Jan. 31, 2014) [ECF Doc. 230, at 42–71] (scheduling approximately $27 million in nonpriority unsecured commercial debt, inclusive of approximately $14 million in unfunded retirement fund liabilities and annuity termination liability fees and approximately $12 million associated with a deposit and loan program for the benefit of parishes); *In re Roman Catholic Church of the Diocese of Gallup*, No. 13-13676 (Bankr. D.N.M. filed Nov. 12, 2013) [ECF Doc. 67, at 61–11] (scheduling approximately $427,000 in nonpriority unsecured commercial debt); *In re Christian Brothers' Inst*., No. 11-22820 (Bankr. S.D.N.Y. filed Apr. 28, 2011) [ECF Doc. 35, at 11–30] (scheduling approximately $1.9 million in nonpriority unsecured commercial debt); *In re Archdiocese of Milwaukee*, No. 11-20059 (Bankr. E.D. Wis. filed Jan. 4, 2011) [ECF Doc. 111, at 21–40] (scheduling approximately $3.8 in nonpriority unsecured commercial debt and approximately $14 million in pension liabilities); *In re Society of Jesus, Oregon Province*, No. 09-30938 (Bankr. D. Or. filed Feb. 17, 2009) [ECF Doc. 61] (scheduling no nonpriority unsecured commercial debt); *In re Catholic Diocese of Wilmington, Inc*., No. 09-13560 (Bankr. D. Del. filed Oct. 18, 2009) [ECF Doc. 146, at 22–40] (scheduling $11 million in letter-of-credit debt, approximately $78 million in pension liabilities, and approximately $172,000 in nonpriority unsecured commercial debt); *In re The Roman Catholic Bishop of San Diego*, No. 07-939 (Bankr. S.D. Cal. filed Feb. 27, 2007) [ECF Doc. 3-4] (scheduling approximately $28 million in contingent and unliquidated debt to Allied Irish Banks and approximately $2.5 million in nonpriority unsecured commercial debt); *In re Diocese of Davenport*, No. 06-2229 (Bankr. S.D. Iowa filed Oct. 10, 2006) [ECF Doc. 46] (scheduling no nonpriority unsecured commercial debt).

Each of the foregoing cases was cited by the Committee to demonstrate that it is typical in diocesan cases for only one creditors' committee comprised solely or predominantly of abuse claimants to be appointed. [ECF Doc. 626, ¶ 27 n.7 & Ex. 6]. That committee composition is understandable when there is limited or no commercial debt identified. In some diocesan cases in which significant commercial debt is present, however, the committee's membership has consisted of both abuse claimants and commercial creditors. *See, e.g.*, *In re Archbishop of Agaña*, No. 19-10 (Bankr. D. Guam filed Jan. 16, 2019) [ECF Doc. 89] (appointing to the committee a commercial creditor asserting an approximately $12 million claim against estate). In another diocesan case, the official unsecured creditors' committee was comprised solely of abuse claimants, but the court exercised its discretion to order the appointment of a second committee to represent the interests of 187 parishes, each affiliated but separately incorporated and a creditor of the

resolving disputes among the parties, this case is neither exclusively an "abuse" case, nor is it solely a "commercial" case.

Ideally, the Survivor Members of the Committee could simultaneously advocate for their interests as well as those of commercial creditors as a consequence of the fiduciary duties they owe to all creditors. The Court does not question or discount the capacity of individual Survivor Members to advocate for more than one set of interests, but the fact is that the interests of abuse claimants and standard commercial creditors are different. *See, e.g.*, Berthelot Dep. 48:10–25 (Dec. 10, 2020) (acknowledging those differences) [TMI Ex. 32]. The question for this Court is whether requiring the six Survivor Members to wear multiple hats can satisfy the requirements for adequate representation here, particularly when there is not even one member of the Committee holding a commercial claim to provide that perspective to the group.

Thus far, the record shows that the Committee has vigorously advocated for the rights of Abuse Claimants. For example, and as detailed above, the Committee strenuously litigated the Bar Date Motion, which would normally be a routine motion in a traditional commercial bankruptcy case, in order to address the special needs of Abuse Claimants. Additionally, the Committee's Motion To Dismiss asserts that the Debtor filed its case as a bad-faith litigation tactic "to gain tactical advantages in the 34 pending abuse claim lawsuits (and change the forum), and to force the abuse survivors into an involuntary collective bargaining process and gain the other procedural advantages of bankruptcy including a claims bar date." Motion To Dismiss, ¶ 31.

Of course, creditors are not required to support a debtor's efforts to reorganize in order to serve on the unsecured creditors' committee. Indeed, "[s]ome members [of a committee] may

---

debtor. *See In re The Archdiocese of Saint Paul and Minneapolis*, No. 15-30125 (Bankr. D. Minn. filed Jan. 16, 2015) [ECF Doc. 215].

favor liquidation; others may favor continuation of the business in order to preserve jobs or the viability of an important customer." *Mirant Americas Energy Mtkg., L.P. v. Official Comm. of Unsecured Creditors of Enron*, No. 02-CV-6274, 2003 WL 22327118, at *7 (S.D.N.Y. Oct. 10, 2003) (quoting *In re Hills Stores, Co*., 137 B.R. at 6). Conflicting interests can be adequately represented "through a single committee *as long as the diverse interests of the various creditor groups are represented on and have participated in the committee*." *Id*. (citing *In re Sharon Steel Corp*., 100 B.R. 767, 777–78 (Bankr W.D. Pa. 1989)) (emphasis added). With TMI's departure from the Committee, there is no longer a diverse set of interests represented on the Committee— but there still exist unsecured creditor constituencies that need representation. *See In re Beker Indus. Corp*., 55 B.R. 945, 949–51 (Bankr. S.D.N.Y. 1985).

   3. *Standing and desires of the various constituencies; ability of creditors to participate in a case without an additional committee*

TMI and other commercial creditors each have standing individually to participate fully as a party in interest in this case under § 1109(b) of the Bankruptcy Code, which provides that a creditor "may raise and may appear and be heard on any issue" in a chapter 11 case. But "[p]articipation by individual unsecured creditors may not be cost-effective if each unsecured creditor must retain its own counsel, appear in court, attempt to review the debtor's financial status, and otherwise participate alone." Greg M. Zipes & Lisa L. Lambert, *Creditors' Committee Formation Dynamics: Issues in the Real World*, 77 AM. BANKR. L.J. 229, 229 (2003). For that reason, unsecured creditors' committees are vital to the chapter 11 process to ensure that all unsecured creditors, most of which may be owed relatively small sums, are still represented in the reorganization process, for "much of the negotiation that occurs between creditors and the debtor in a reorganization case is carried on through committees of creditors." H.R. REP. No. 595, 95th Cong. 1st Sess. 220–61 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6194. Here, the Debtor has

23

scheduled $91 million in unsecured commercial debt belonging to approximately 900 claimants, the majority of those creditors with scheduled amounts ranging from hundreds to tens of thousands of dollars. A few, including TMI on behalf of bondholders and First Bank and Trust, assert they are owed millions. *See* § 1102 Motion, ¶ 37; Proof of Claim Nos. 37 & 38.

The primary purpose of chapter 11 committees is to maximize recovery for the creditors they represent. *See In re Nationwide Sports Distributors, Inc*., 227 B.R. 455, 463 (Bankr. E.D. Pa. 1998) (citation omitted). "[T]he legislative history of § 1102 of the Code suggests that Congress anticipated a multiple-committee structure in many cases" to create the dynamic tension that would "encourage parties to reevaluate alternatives and explore different or innovative ways to create value." Michelle M. Harner & Jamie Marincic, *The Potential Value of Dynamic Tension in Restructuring Negotiation*, 30 AM. BANKR. INST. J. 1, 1 (2011) (citing H.R. REP. No. 95-595, at 235–36 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6195 ("There will be at least one committee in each case. Because unsecured creditors are normally the largest body of creditors and most in need of representation, the bill requires that there be a committee of unsecured creditors . . . the bill also provides for additional committees, with status equal to that of the unsecured creditors' committee, when such additional committees are needed to represent various other interests in this case, including secured creditors, subordinated creditors, and equity security holders.")). As noted earlier, in bankruptcy cases featuring a significant number of tort claimants, it is not uncommon to have an unsecured creditors' committee comprised solely of tort claimants; however, in cases where the debtor also faces a substantial amount of commercial debt, it is also reasonable to expect that commercial creditors will either have a seat or seats on the committee, or else a second committee dedicated to protecting their diverse interests. *See supra* note 5.

With respect to the desires of other parties in interest, although the Committee filed an opposition to TMI's § 1102 Motion, the Chairperson of the Committee took a more tempered approach in his testimony at the Hearing, stating that he was not opposed to the appointment of additional members to the existing Committee and that his principal concerns with the appointment of an additional committee would be the time and costs associated with constituting a second committee. *See* Hr'g Tr. 327:10–329:15 (Dec. 17, 2020). The UST filed pleadings in opposition to the § 1102 Motion, but did not provide testimony or evidence at the Hearing. The Debtor supports the § 1102 Motion without preference to whether new members are added to the existing Committee or a second committee comprised of unsecured commercial creditors is constituted. Lastly, First Bank and Trust, a creditor asserting an unsecured commercial claim against the estate, filed a joinder to TMI's § 1102 Motion, expressing interest in serving on a second committee comprised of commercial creditors.

4. *The delay and additional costs that would result if the Court grants the motion*

While adding additional committee members may not add significant extra costs in the form of professional fees, the Court is sensitive to the fact that the addition of a second committee can potentially generate considerable costs if left unchecked. Although passing reference has been made to cost concerns, no evidence was put before the Court showing that the cost would be so burdensome as to justify denying representation to commercial creditors if this Court finds representation is needed. *See In re Beker Indus.*, 55 B.R. 945, 951 (Bankr. S.D.N.Y. 1985). This Court agrees with the Debtor, which aptly noted that "[w]hile [it] is mindful of the extra cost that a separate committee might entail, [it] appreciates that the cost concerns can be managed by this Court and the watchful eye of multiple parties in interest." [ECF Doc. 625, ¶ 30]. Regardless, "[t]he potential added cost is not sufficient in itself to deprive the creditors of the formation of an

additional committee if one is otherwise appropriate." *In re Hills Stores Co*., 137 B.R. 4, 6 (Bankr. S.D.N.Y. 1992) (citing *In re McLean Indus., Inc*., 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987)).

## CONCLUSION

"What the Code *requires* is that conflicting groups of creditors have a voice through adequate representation on a Committee." *Id.* at 7 (emphasis added). "The burden is on the moving party to prove that the existing committee does not provide adequate representation." *In re Residential Capital, LLC*, 480 B.R. 550, 557 (Bankr. S.D.N.Y. 2012) (citations omitted). Analyzing the *Dana Corp*. factors above in light of the record in this case and the evidence presented to the Court, the Court finds that TMI has met its burden to show that the Committee as it is presently constituted does not adequately represent the body of unsecured creditors, particularly commercial creditors. Although the possibility existed at one time that commercial creditors had a meaningful voice on the Committee, the Court is not persuaded that they continue to have that voice on this Committee now that this Committee is comprised solely of Survivor Members.

That said, the question becomes whether this Court should exercise its discretion and act pursuant to § 1102(a)(2) or (a)(4). If *any* commercial creditors were members of the current Committee, the Court would have been inclined to appoint special counsel to work with those members to represent the interests of commercial creditors in this case. *See In re Residential Capital, LLC*, 480 B.R. at 560–61 (finding the issue of whether a special committee comprised of homeowners facing foreclosure a "very close question," but allowing the retention of special counsel to work with the borrower representative on the committee to represent those interests). But here, the committee structure is "upside down." The Committee is comprised of special interests, but traditional, unsecured commercial interests go unrepresented. In that regard, this

case more resembles *In re Beker Industries Corp*., in which the issue was not whether particular representation was adequate but, rather, whether public debt was represented at all since no bondholders were appointed to that committee of unsecured creditors.   55 B.R. 945 (Bankr. S.D.N.Y. 1985).

Congress intended unsecured commercial creditors to be represented in the reorganization process through the unsecured creditors' committee.  Although the Abuse Claimants in this case, at times, may share interests with commercial creditors, their interests often differ from the issues facing other creditors.  Those special needs revealed themselves here, for instance, in the evidence this Court considered in appointing a separate Bar Date and claims procedure for Abuse Claimants and in the statements and the positions taken in the Committee's Motion To Dismiss.

Given the nature of this particular case, the Court is not convinced that the appointment of additional members to the existing Committee would provide commercial creditors with a meaningful voice.  Moreover, separate committees are commonly appointed to represent important constituencies and to provide dynamic tension in negotiations with the debtor and other parties in interest in the reorganization process.  Therefore, the Court finds that it should exercise its discretion under § 1102(a)(2) and orders the appointment of an additional committee of commercial creditors.  The Court finds that the value created will outweigh the costs associated with the formation of an additional committee, particularly when the Debtor, the UST, other parties in interest, and the Court will continue to monitor closely the fees and expenses generated by all professionals in this case.

The Court will enter a separate Order directing the United States Trustee to appoint an additional committee of commercial unsecured creditors pursuant to § 1102(a)(2) of the Bankruptcy Code.

New Orleans, Louisiana, February 8, 2021.

MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE