**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 20-10846 |
| THE ROMAN CATHOLIC CHURCH OF | ) |
| THE ARCHDIOCESE OF NEW ORLEANS | ) Section "A" |
| | ) |
| Debtor. | ) Chapter 11 |

**REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTOR'S OPPOSITION TO THE COMMITTEE'S MOTION TO COMPEL DEBTOR'S (1) PRODUCTION OF DOCUMENTS, AND (2) PRIVILEGE LOG, TO THE EXTENT NECESSARY, RELATED TO RULE 2004 ORDER**
[Relates to Docket # 804 and # 814]

The undersigned counsel, on behalf of the Official Committee of Unsecured Creditors (the "Committee"),[1] files this reply (the "Reply") to the Opposition (the "Opposition") [Docket #814] filed by the Roman Catholic Church of the Archdiocese of New Orleans (the "Debtor") to the Committee's *Motion to Compel Debtor's (1) Production of Documents, and (2) Privilege Log, to the Extent Necessary, Related to Rule 2004 Order* (the "Motion to Compel"). [Docket #804]

**INTRODUCTION**

1. The primary purpose of the Committee's Rule 2004 discovery is to facilitate its preparation for a mediated negotiation towards a consensual plan of reorganization, including treatment for abuse claims that the Committee would be expected to recommend to its constituency. Essential to the Committee's preparation is complete and accurate information as

---

[1] Pursuant to the Court's Order dated February 8, 2021 [Docket #746], the designation of the Committee may be changed; however as of the date of this Motion, the designation has not yet been changed.

91640012v.2

to the financial and insurance resources of the Debtor and its affiliates, as well as the nature, validity and extent of the abuse claims and any defenses thereto.

2. Rather than viewing the Committee's discovery requests in this light, the Debtor has chosen to engage in highly adversarial litigation tactics. The Debtor objects to the vast majority of the document requests based on legal positions unwarranted in a Rule 2004 context, drastically overstates the extent of its "cooperation," and refuses to produce the documents most critical for the Committee's preparation for mediation.

3. As for the Debtor's production to date:

- The Debtor has not produced any documents regarding its personal property or the value thereof, including without limitation the nearly 200 listed items of artwork, artifacts and other items;

- The Debtor has produced only limited and conflicting information regarding the value of its real property holdings (without support for asserted valuations);

- The Debtor has produced piecemeal, disconnected and woefully incomplete excerpts of its financial databases; and

- The Debtor has not produced any documents regarding abuse claims or its potential defenses thereto, despite have ready electronic access to the personnel files of 74 priests and other church representatives whom the Debtor has investigated and publicly confirmed to have committed acts of sexual abuse.

4. While crowing that it has produced 76,000 pages of documents, the Debtor admits that it has not produced documents responsive to a majority of the Requests, and has refused to produce documents with respect to those specific Requests that are most important to the Committee's preparation for a mediated negotiation. The Debtor's production amounts to a "dump" of pages that is easy to accumulate for an entity of the size and longevity of the Debtor. For example, instead of producing the requested electronic copies of the financial databases

(discussed below), the Debtor amassed pages by producing individual invoices from the Debtor to parishes for overhead costs, unconnected to any summaries thereof, produced in an Excel format so that the Debtor can claim to have produced in "native format" to address the Committee's request.

5. A negotiated plan of reorganization will be possible only if the Committee obtains the documents that it has requested. If the Debtor is permitted to continue to hide the extent of its assets and the availability of insurance, and to withhold abuse claim related documents to essentially anoint itself as investigator, judge and jury on the validity of the abuse claims, then the bankruptcy case should be dismissed. No plan will be confirmed over the dissent of abuse claimants, and the parties will be required to engage in litigation as to prescription and other defenses in 450 claim objection or other adversarial proceedings that will require extensive written discovery and depositions. That scenario will eviscerate the purpose for which the Debtor publicly claimed to have filed this case, to address "the growing financial strain caused by litigation stemming from decades-old incidents of clergy abuse."[2]

## ARGUMENT

### A. The Archdiocese Waived All Objections to the Rule 2004 Requests When It Violated the Rule 2004 Order By Failing to Provide Objections and Responses By February 26, 2021

6. The Court's Rule 2004 Order required the Archdiocese to provide written

---

[2] *See* May 1, 2020 statement by the Debtor, "Archdiocese Administrative Offices File for Chapter 11 Reorganization"; https://nolacatholic.org/news/archdiocese-administrative-offices-file-for-chapter-11-reorganization

91640012v.2

Objections and Responses to the Rule 2004 Requests by February 26, 2021. The Archdiocese did not provide its Objections and Responses until March 12, and its Objection offers no excuse therefor. This brazen violation of the Rule 2004 Order (to which the Debtor agreed in advance) is an affront to the Court and the bankruptcy process.

7. The Debtor's fallback argument of a lack of prejudice is misplaced and false. The Committee crafted the Rule 2004 Requests to revise and reduce the number and scope of its requests to account for previously produced documents and other items. Following the Rule 2004 Order, the parties engaged in several attempts to meet and confer that may have (and should have) led to a more cooperative approach from the Debtor, which the Committee expected to see in the Responses. The lateness of the Responses further hampered the Committee's effort to prepare the Motion to Compel.

### B. The Committee Has Requested a Complete Electronic Copy of the Accounting System Because It is Necessary and Cost Effective. (Request No. 49)

8. By its objections, the Debtor seeks to prevent the Committee from having a complete picture of the Debtor's finances and assets, by arbitrarily limiting access to accounting information and presenting only limited, incomplete and unconnected pages unilaterally selected by the Debtor. Informed by the experience of Committee counsel and financial advisors in past diocese cases, the Committee needs access to the Debtor's financial databases in order to have a complete picture of the Debtor's finances and assets, and its complex relationships with more than 180 affiliates.

9. As discussed at length in the Motion and supporting Declarations, the

Committee's request for a <u>native</u> copy of the Archdiocese's accounting systems ("<u>Accounting System Data</u>"), will allow the Committee, in the most cost-effective and efficient manner, to analyze potential assets, review the flow of monies in and out of the Archdiocese, identify potential avoidance actions, and determine whether funds allegedly belonging to parishes and other entities were commingled with Archdiocesan funds in the Deposit & Loan Program, rendering those monies property of the estate. This Request is among the most fundamental information that the Committee seeks to review in this Bankruptcy Case.

10. The financial documents produced to the Committee, most in pdf format and others in native, Excel format are a poor purported substitute for the Accounting System Data. They lack context, are incomplete, and not at all useful. Without a complete copy of the Financial Edge database, for example, it is not feasible for BRG to navigate the databases in excess of 1,500 tables and potentially up to 17 modules (i.e., general ledger, accounts receivable, accounts payable, purchasing, cash management, projects, grants, and endowments, fixed assets, etc.).

11. BRG has utilized an electronic copy of the debtor's financial system in a number of other sex abuse-related bankruptcy cases. Production of the copies is a simple and inexpensive IT task that does not create any risk of incursion or access to the systems themselves. The Debtor's resistance to this request is inexplicable.

    **C.**    **The Debtor's Arbitrary Three-Year Restriction on Other Financial Documents Prevents the Committee from Reviewing Necessary Information.**
**(Request Nos. 28-31 and 49 – Related to Avoidance Actions)**
**(Request Nos. 4, 20, 24, 43-45, 47, 50, 52-54, and 56-62)**

12.    In addition to the limitation on access to the Accounting System Data discussed above, the Debtor also seeks to impose an arbitrary limit on information limited to three years before the petition date on a wide range of other requests. (*See* Opposition at ¶¶ 34-44 and 49-53). This arbitrary three-year restriction is unwarranted, for three basic reasons.

13.    <u>First</u>, contract actions have a ten-year prescriptive period. The Committee's requests implicate a wide array of contractual issues with the more than 180 affiliates of the Debtor. It is a core function of a creditors committee to investigate and review potential actions of the estate to recover from third parties. Such actions include contractual actions. *See, e.g.*, *Hof v. Chandler (In re Levitron, L.L.C.)*, Adv. Case No. 10-1032, 2011 WL 4024805, *2 (Bankr. E.D.La. Sept. 9, 2011) (breach of contract action brought by trustee against debtor insiders, under its own prescriptive period). Here, the potential actions go far beyond preferential or fraudulent transfers. The estate has a complex set of financial relationships with more than 180 affiliates that are important for the Committee to investigate.

14.    For example, Claim No. 202 filed by the Debtor's affiliate All Saints Roman Catholic Church attaches a Parish Service Agreement (also attached to the claims of many other

6

affiliates).³ The Parish Service Agreement includes, among other contractual responsibilities, the obligation of the church parish to comply with campaigns and second collections, fund the cost of seminary training and the care of retired priests, and pay service fees, additional costs, and provide indemnification to the Debtor (*See id.*, at ¶¶2.5, 2.6, 4.1, 4.2, 6).

15. Second, as discussed in the Motion to Compel, many of the requests at issue also go beyond avoidance or contractual actions, and seek to examine the assets of the estate that are available to creditors. (*See* Motion to Compel at ¶30.) Request Nos. 4, 20, 24, 43-45, 47, 50, 52-54, and 56-62 address accounts receivable, meeting materials, pension plan documents, financial statements, annual reports, and financial reports, and agreements and statements involving the Archdiocese's Deposit & Loan Program that holds more than $130 million in assets. The Debtor's arbitrary three-year restriction will prevent the Committee from completing a complete analysis of these matters.

16. Third, as the Debtor acknowledges, a three-year limitation does not apply in cases of fraud. In the context of a creditor committee investigation, a broad investigation is appropriate and there is no requirement that a basis or specific fraud allegation be established before the investigation. As numerous courts have recognized, one purpose of a Rule 2004 investigation is to "unearth" frauds – it is not a requirement that the Committee already have such circumstances in hand as a predicate for the examination. *E.g., In re Orion Healthcorp, Inc.* 596 B.R. 228, 235 (Bankr. E.D.N.Y. 2019). A creditor committee's investigation and discovery

---

³ This Claim is available at the Claims Agent's website at
https://www.donlinrecano.com/Clients/rcano/FindClaimByNumber?ClaimFrom=202&ClaimTo=202

7

should not be conflated with rules relating to adverse discovery in fraud litigation. The Debtor became aware of abuse claims more than fifteen years prior to its bankruptcy filing. Only by investigating transactions in these years can the Committee learn whether the Debtor transferred any assets to affiliates or other entities as "asset planning" to attempt to avoid the reach of creditors.[4]

> D. **The Committee Must Have Access to Abuse-Related Documents in Order to Value Claims and Meaningfully Prepare for Mediation**
> **(Request Nos. 9, 10, 23, 65, 68-69, 71, 78-79, 85, 87, 93-96, 98, and 101)**

17. The value and treatment of abuse claims will be a central issue in the mediation. The Debtor expects the Committee to make an opening offer based on the value of claims, and the Committee can only do so if it has complete information.

18. Certain of the Committee's requests seek information directly bearing on valuation and the Debtor's expected defenses. As an initial matter, it should be noted that the Committee has offered to restrict these requests, at least initially, to perpetrators acknowledged by the Debtor and the abuse claims (and implicated clergy) that have been filed as of the claims bar date. (The Debtor declined this offer and has refused to produce any abuse-related documents whatsoever.)

19. The Debtor has refused to produce any abuse-related documents, essentially for

---

[4] Also, as stated in the Motion to Compel (¶¶34-35), it should be reiterated that any three-year (or other) time restriction on the electronic accounting records (Request No. 49) is entirely unwarranted. Any attempt to extract a three-year prepetition subset of data from the Archdiocese's electronic accounting systems will limit the content available even for that time period, as it may not provide beginning balances, all of the required fields to link the datasets and include all of the tables in that three-year window. (*See* Motion to Compel, ¶¶34-35.)

three reasons. First, the Debtor asserts that the Committee "must identify the legal basis" for claims against the Debtor as a threshold matter, and seeks to question whether the Debtor (as opposed to the accused clergy and other parties) is implicated at all in abuse claims under *respondeat superior* or another basis. (Opposition, ¶¶56-58.) However, the legal basis for the Debtor's liability is well known and set forth in the pending lawsuits, claims, and elsewhere. In the pending litigation, the state courts repeatedly rejected a "no cause of action" argument as to various theories of liability against the Debtor including *respondeat superior*, vicarious liability, and other bases.

20. For example, in one of the lawsuits that is currently an Adversary Proceeding before this Court (Adv. Proc. Case No. 20-01065, *A.A. Doe v. Archdiocese of New Orleans Indemnity, Inc.*), the record [Docket # 2-7] includes an October 19, 2019 opinion by the Orleans Parish Civil District Court denying the exception of no cause of action filed by the Debtor. For convenience, a copy of this order is attached as **Exhibit "1"** hereto. In that written opinion (*See* pp. 34-35 of 99 in Exhibit "1"), Judge Ervin-Knott stated: **"Louisiana law recognizes Plaintiff's right to pursue claims under the causes of action that were specifically pled in the Petition, specifically, vicarious liability, public nuisance, fraudulent concealment, negligent infliction of emotional distress, and invasion of privacy."**)

21. Second, the Debtor states that it will take the position that many claims are prescribed. (Opposition, ¶¶59-62.) This position reveals why the Committee needs the requested documents to prepare for a meaningful mediation.

22. Louisiana prescription is fact-intensive, and Louisiana courts have recently stated

9

that defendants in abuse cases must produce a broad range of information to consider the issue of prescription. This document production must take place well in advance of the trial on prescription. Very recently, on March 24, 2021, the Louisiana Third Circuit Court of Appeal held that the plaintiff "is entitled to conduct discovery as to those matters which pertain to a hearing on the exception of prescription," and the appeals court further ordered the trial court "to refrain from setting a hearing on [the] Exception of Prescription until all discovery on this issue has been properly answered and/or discovery issues are resolved by the trial court at a hearing set for that purpose." *See* opinion attached as **Exhibit "2"** hereto (*TM Doe v. Diocese of Lafayette*, Case No. CW 21-00147 (La. App. 3 Cir. March 24, 2001)).

23. The court went on to specifically require timely responses to a wide range of discovery requests. A copy of the applicable discovery requests is attached as **Exhibit "3"** hereto. The appeals court required production of the following documents (among others) as applicable to prescription:

- The personnel file for the accused clergy and related documents (*See* Exhibit "2" at second paragraph and Exhibit "3" at Requests for Production Nos. 8-10, 22, and 24);

- The restricted and confidential files concerning the accused clergy, and all other documents concerning that clergy (*See* Exhibit "2" at second paragraph and Exhibit "3" at Requests for Production Nos. 12, 20, and 21);

- Documents concerning claims against the accused clergy (*See* Exhibit "2" at second paragraph and Exhibit "3" at Requests for Production Nos. 25, 27, and 70); and

- Settlements and payments made on account of abuse (*See* Exhibit "2" at second paragraph and Exhibit "3" at Requests for Production No. 29)

24. As the Debtor intends to make prescription an issue, the Committee must be able

to analyze the merits of the defense in order to value claims and formulate an opening settlement demand. The Committee will need these same materials (all of which have been included in the requests at issue) to consider the issue of prescription.

25. <u>Third</u>, as a final reason to resist producing abuse-related documents, the Debtor cites the "pending proceeding" rule. For the reasons stated in the Motion to Compel, it is not applicable. Even if it were applicable, it applies only to the approximately 34 lawsuits pending as of the Petition Date.

26. The Debtor cites the very different circumstances of the *USA Gymnastics* case, in which virtually all of the survivor claimants were plaintiffs in two large pre-petition consolidated litigation actions. (In contrast, here only 34 out of 450 claimants had a pre-petition lawsuit pending.) Despite any "pending proceeding" rule, the court allowed Rule 2004 discovery of a number of abuse and insurance-related documents, but limited the scope. (Opposition, ¶¶73-74.)

27. A copy of the referenced *USA Gymnastics* order is attached as **Exhibit "4"** hereto. In *USA Gymnastics*, the court was focused on what was necessary for the upcoming mediation concerning circumstances very different from the case here. The mediation was to focus "on the extent of the insurance coverage," with the debtor having "fairly limited resources otherwise." (*See* Exhibit "4" at p. 3) Therefore, the court focused on discovery that "should be sufficient to ascertain the likely insurance funds that should be available to pay claims and to address certain very limited coverage questions that might arise." (*Id.*) The court's order did allow discovery of certain abuse-related documents, but imposed limitations (not applicable here) for "investigative matters" and "staffing, training, supervision, and oversight documents."

11

### E. The Insurance-Related Requests are Critical to the Committee's Investigation and Preparation.
**(Request Nos. 9-10)**

28. The Debtor objects to Requests Nos. 9 and 10, seeking insurance-related information, on relevance grounds. However, this information is necessary for the Committee to understand and address potential coverage positions of the insurers:

- Request No. 9 applies to <u>current and pending</u> insurance claims (not historical claims), which are clearly needed to understand and prepare for insurance coverage positions.

- Request No. 10 applies to recent denial of coverage and reservation of rights letters (within the last four years), which the. Committee submits is modest and is necessary to analyze availability of insurance and coverage positions.

### F. The Debtor's Unwillingness to Provide Adequate Information Highlights the Concerns Previously Stated by the Committee in the Motion to Dismiss.

29. The Committee filed a motion to dismiss this Chapter 11 case in light of the apparent fact that the Debtor commenced this case not because of financial distress and a need for reorganization, but in order to address and resolve abuse claims in a manner favorable to it.

30. While the motion to dismiss remains pending, the Committee has proceeded in good faith to explore case resolution with the Debtor, including a contemplated mediation. For a mediation to be productive, the Debtor must provide the information and documents necessary for the Committee to meaningfully participate and be in a position to recommend a settlement to its constituency. Given its fiduciary duty to act with due care and complete information, absent receipt of the requested information, the Committee will be unable to counsel its constituency with respect to any proposed case resolution.

31. The Debtor states in its Opposition that, if the mediation fails, the Debtor apparently intends to file 450 claim objections and "object to all or most of the abuse proofs of claim." (Opposition, ¶5.) That alternative highlights the futility of a bankruptcy proceeding intended to facilitate a prompt and fair resolution for creditors. Either the Debtor should be required to produce the necessary information—giving the mediation a chance of success—or the case should simply be dismissed in favor of state court abuse claim litigation.

Dated: April 13, 2021

Respectfully submitted,

*By: /s/ C. Davin Boldissar*
Omer F. Kuebel, III (La #21682)
C. Davin Boldissar (La. #29094)
Locke Lord LLP
601 Poydras Street, Suite 2660
New Orleans, Louisiana 70130-6036
Telephone: (504) 558-5111
Facsimile: (504) 558-5200
Email: dboldissar@lockelord.com

and

James I. Stang (CA Bar No. 94435) (admitted pro hac vice)
Andrew W. Caine (CA Bar No.110345) (admitted pro hac vice)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., Suite 1300
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

*Co-Counsel to the Official Committee of Unsecured Creditors*

## **CERTIFICATE OF SERVICE**

   I hereby caused a copy of the foregoing *Reply* to be served on April 13, 2021 upon all parties by electronic case filing for those parties receiving notice via the Court's Electronic Case Filing system, and on all other parties requiring service under the Court's *Ex Parte Order Authorizing the Debtor to Limit Notice and Establishing Notice Procedures* through the Master Service List via first-class United States mail, postage prepaid, to be sent on April 14, 2021.

              */s/ C. Davin Boldissar*
              C. Davin Boldissar