## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 20-10846** |
| **THE ROMAN CATHOLIC CHURCH** | § | |
| **OF THE ARCHDIOCESE OF NEW** | § | **Section "A"** |
| **ORLEANS,** | § | |
| | § | **Chapter 11** |
| **Debtor**. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

This Court held a video evidentiary hearing on August 20, 2020 (the "Hearing") to resolve the *Motion of the Official Committee of Unsecured Creditors To Dismiss Chapter 11 Case* (the "Motion To Dismiss"), [ECF Doc. 203], the *Abuse Claimant Ed Roe's Joinder*, [ECF Doc. 336], and the oppositions to the Motion To Dismiss filed by the Roman Catholic Church of the Archdiocese of New Orleans (the "Archdiocese" or the "Debtor"), [ECF Doc. 345], prepetition secured lender Hancock Whitney Bank, [ECF Doc. 338], and a group of affiliated church parishes, schools, nursing homes, senior living facilities, and other community service agencies and facilities (the "Apostolates"), [ECF Doc. 341].

The parties conducted extensive discovery prior to the Hearing and informed the Court at the Hearing of their joint stipulation to the submission of all evidence in the form of 145 joint exhibits comprised of approximately 6,350 pages of material, including written transcripts and video recordings of five depositions submitted in lieu of live testimony, all of which this Court admitted into evidence.[1] The Court heard oral argument from counsel for the Official Committee

---

[1] The following individuals provided deposition testimony in the course of discovery between the parties: (a) Father Patrick Carr, Director, Third Vice President, and Vicar of Finance for the Archdiocese; (b) Jeffrey Entwistle, Chief Financial Officer for the Archdiocese; (c) Kathleen Zuniga, Partner of the firm of Carr, Riggs & Ingram, LLC; (d) Stephen Riggs, Partner of the firm of Carr, Riggs & Ingram, LLC; and (e) Paul Shields, Managing Director of Berkeley Research Group. Although the parties stipulated to the

of Unsecured Creditors (the "Committee"), the Debtor, and the Apostolates during the Hearing.

After the completion of the Hearing, this Court took the matter under advisement and allowed

post-Hearing briefing from the parties.  Abuse claimant Ed Roe, the Debtor, and the Committee

submitted post-Hearing briefs.  [ECF Docs. 365, 366 & 367].

For the following reasons, based on the pleadings, the record,[2] the arguments of counsel,

the Court's review of all of the evidence submitted at the Hearing, and applicable law, this Court

DENIES the Committee's Motion To Dismiss.[3]

## JURISDICTION AND VENUE

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a

core proceeding under 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this District under 28 U.S.C.

§§ 1408 and 1409.

---

joint exhibits' admission as evidence, counsel for the Committee reserved its right to object to the weight
given specifically to the Debtor's expert report prepared by Carr, Riggs & Ingram, LLC (Ex. 62).  *See* Hr'g
Tr. 13:11–14:8 (Aug. 20, 2020).  The parties also informed the Court that none of the exhibits require
confidential designations or filing under seal.  *See* Hr'g Tr. 12:9–20.

[2]      *See In re Mirant Corp.*, No. 03-46590, 2005 WL 2148362, at *1 (Bankr. N.D. Tex. Jan.
26, 2005) ("As the Motions [To Dismiss] are contested matters, the court has also considered portions of
the prior record in these cases.").

[3]      Section 1112 of the Bankruptcy Code states:

The court shall commence the hearing on a motion under this subsection not later
than 30 days after filing of the motion, and shall decide the motion not later than 15 days
after commencement of such hearing, unless the movant expressly consents to a
continuance for a specific period of time or compelling circumstances prevent the court
from meeting the time limits established by this paragraph.

11 U.S.C. § 1112(b)(3).  Compelling circumstances prevented the Court from deciding the Motion
To Dismiss within fifteen days after the Hearing, including the amount of time required for the Court to
review and analyze the voluminous evidence presented by the parties and the challenges of administering
the Court's docket and operations remotely as a result of the outbreak of the Coronavirus Disease (COVID-
19).

## RELEVANT BACKGROUND

Created as a diocese in 1793 and established as an archdiocese in 1850, [ECF Doc. 14, ¶ 6], the Archdiocese filed for chapter 11 bankruptcy relief on May 1, 2020, joining 29 other diocesan bankruptcies that have filed for bankruptcy protection across the country between July 2004 and June 2020, *see* Ex. 66.  The Archdiocese covers eight civil parishes, consists of 112 church parishes, and educates approximately 33,000 students per year in both independent and archdiocesan-owned Catholic schools.  [ECF Doc. 14, ¶ 7].  According to Fr. Patrick Carr, the Vicar of Finance for the Archdiocese, "Archdiosesan and other Catholic charities and social service programs provide assistance to the homeless, hungry, elderly and developmentally challenged, as well as to at-risk youth, pregnant women, and many others," affecting "the lives of nearly 500,000 residents of southeast Louisiana on a daily basis."  [ECF Doc. 14, ¶ 8].

Although affiliated with various independent schools, parishes, and charitable organizations for which it provides administrative services, the Archdiocese as a corporate entity is comprised of administrative offices, nine schools, and two parishes.  *See* Ex. 62.  With its Petition, the Archdiocese attached a unanimous corporate resolution authorizing the filing and a *List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (the "Top 20 List").  [ECF Doc. 1].  The creditors on the Top 20 List included bondholders, employee health claimants, professional and consulting services claimants, trade claimants, and an insurance claimant.  *Id*.  The Archdiocese noticed this case as a "complex" case pursuant to this Court's *Complex Chapter 11 Case Procedures*, identifying the case as one in which (i) the Archdiocese has total debt of more than $10 million, (ii) more than fifty parties in interest are expected to participate, and (iii) significant media attention may be attracted.  [ECF Doc. 2].

In his Declaration filed in support of the Archdiocese's first-day motions, Fr. Carr submits

that "[o]perational challenges have strained the Archdiocese's financial position, have impacted its ability to sustain its ministries and charities, and have necessitated the commencement of this proceeding."  Ex. 6, ¶ 9.  Specifically, Fr. Carr asserts that "[t]he financial and operational difficulties burdening the Archdiocese range from claims and lawsuits alleging sexual abuse by clergy that occurred more than fifty years ago to losses of revenue from offerings and collections at Masses which are no longer publically [*sic*] celebrated due to the COVID-19 pandemic."  *Id*. The purpose of the Archdiocese's bankruptcy filing, in the words of Fr. Carr,

> is to develop a plan of reorganization, under the supervision of the Court, which will facilitate the equitable distribution of assets to creditors in accordance with law, sustain the financial viability of the Archdiocese, and allow the Catholic Church to continue the religious and charitable ministries and programs it has fostered throughout New Orleans and surrounding areas for more than three hundred years.

Ex. 6, ¶ 10.

As of the Petition Date, the Archdiocese was defending 34 lawsuits filed between 2018 and 2020 in a Louisiana state court by claimants alleging sexual abuse by clergy (the "Abuse Cases") and had been working to resolve a similar number of claims for which lawsuits had yet to be filed. [ECF Doc. 345, ¶ 16].  Upon filing for bankruptcy relief, the Archdiocese removed the Abuse Cases to the U.S. District Court for the Eastern District of Louisiana.  *See* Motion To Dismiss, ¶ 32; [ECF Doc. 345, ¶ 16 & Ex. B].  A few of the plaintiffs in the Abuse Cases mobilized quickly and participated through their state court counsel and newly retained bankruptcy counsel in the Debtor's first-day hearings on May 4 & 5, 2020.  [ECF Docs. 107 & 108].  Their participation resulted in heavily negotiated first-day Orders, including those regarding payment of prepetition and post-petition wages and benefits, use of cash collateral, and requirements to file under seal certain portions of the Debtor's schedules and statement of financial affairs.  [ECF Docs. 100, 173 & 177].

4

On May 20, 2020, the Acting United States Trustee for Region 5 ("UST") appointed the seven-member Committee, comprised of the trustee for bondholders and six individuals whose claims against the Debtor are premised on allegations of abuse.[4]  On July 1, 2020, the Debtor filed an *ex parte* motion to set the bar date for filing proofs of claim and to approve noticing procedures (the "Bar Date Motion").  [ECF Doc. 200].  On July 3, 2020, among its other objections, the Committee objected to the Bar Date Motion as premature in light of the Committee's contemporaneously filed Motion To Dismiss.  The Committee's motion seeks to dismiss the Debtor's bankruptcy case entirely for "cause" pursuant to § 1112(b) of the Bankruptcy Code, alleging that the Debtor filed its case in bad faith, as it remains solvent, and that it only pursued bankruptcy protection to gain a tactical advantage in the 34 Abuse Cases.  *See* Motion To Dismiss, ¶¶ 21–46.

## DISCUSSION

### A.  Dismissal of Bad-Faith Filings Under § 1112(b) and the Standard of Review

Section 1112(b) requires a bankruptcy court to convert a chapter 11 case to one under chapter 7 or dismiss the case entirely, whichever is in the best interests of creditors and the estate, for "cause," unless the court determines that appointment of a trustee or examiner under § 1104(a) is in the best interests of creditors and the estate.  11 U.S.C. § 1112(b)(1).  The Bankruptcy Code provides a non-exclusive list of examples that constitute "cause" in § 1112(b)(4).

"Lack of good faith is not one of the enumerated examples in section 1112(b), but many courts have held that lack of good faith is appropriate cause for dismissal under that section."  *In re Mirant Corp.*, No. 03-46590, 2005 WL 2148362, at *6 (Bankr. N.D. Tex. Jan. 26, 2005)

---

[4]     At this time, two official unsecured creditors' committees have been constituted, one comprised of individuals whose claims against the Debtor are premised on allegations of abuse and the other comprised of commercial creditors.  [ECF Docs. 745 & 746].

(collecting cases).  Indeed, "[e]very bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings."  *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1071 (5th Cir. 1986) (citations omitted).

This Court is instructed to consider the good faith of the Debtor's filing based on the totality of the circumstances, requiring an "on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities."  *In re Little Creek Dev. Co*., 779 F.2d at 1072.  This Court agrees with the court in *In re Mirant Corp*. that the typical benchmarks showing a lack of good faith identified in *Little Creek*—a fully encumbered, single asset in foreclosure at the time of filing, lack of employees, little or no cash flow, few unsecured creditors, and no available sources of income to fund a plan—are "antithetical" to the facts here as well.  2005 WL 2148362, at *7.  Therefore, "[m]ore useful to the court are cases that have adopted a 'valid bankruptcy purpose' test to determine good faith."  *Id*. (citing *Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resorts, Inc.)*, 235 F.3d 375, 379 (8th Cir. 2000); *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 829 (9th Cir. 1994); *In re Newsome*, 92 B.R. 941, 944 (Bankr. M.D. Fla. 1988)).

"[P]reserving going concerns" and "maximizing property available to satisfy creditors" are considered to be valid bankruptcy purposes.  *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 No. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999).  Filing a petition merely to obtain a tactical litigation advantage is not a valid bankruptcy purpose, as "[c]ourts universally demand more of Chapter 11 petitions than a naked desire to stay pending litigation."  *In re 15375 Mem'l Corp*., 400 B.R. 420, 427 (D.Del. 2009) (citing *In re Integrated Telecom Express, Inc*., 384 F.3d 108, 128 (3d Cir. 2004)).  Thus, "a good faith petition must seek to preserve or create some value that would otherwise be lost outside of bankruptcy and . . . it is not bad faith to seek to gain an advantage from

6

declaring bankruptcy." *In re Costa Bonita Beach Resort Inc*., 479 B.R. 14, 39–40 (Bankr. D.P.R. 2012) (citing *Fields Station LLC v. Capitol Food Corp. (In re Capitol Food Corp.)*, 490 F.3d 21, 25 (1st Cir. 2007)).

Further, "there is no insolvency requirement for Chapter 11 debtor status." *In re Johns-Manville Corp*., 36 B.R. 727, 730 (Bankr. S.D.N.Y. 1984).[5]  Indeed, "the drafters of the Bankruptcy Code understood the need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation." *In re SGL Carbon Corp*., 200 F.3d 154, 163 (3d Cir. 1999) (citing Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-Threatening Mass Tort Liability*, 148 U. PA. L. REV. 2045, 2055 (2000)). "Although a debtor need not be *in extremis* in order to file such a petition, it must, at least, face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future." *Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222, 228 (2d Cir. 1991) (citing *In re Johns-Manville Corp*., 36 B.R. at 736). Thus, "[c]ourts have allowed companies to seek the protections of bankruptcy when faced with pending litigation that posed a serious threat to the companies' long term viability." *Id.* (citing cases). "Such encouragement, however, does not open the door to premature filing, nor does it allow for the filing of a bankruptcy petition that lacks a valid reorganizational purpose." *Id.* (citations omitted). In sum, "in evaluating a debtor's

---

[5]     As explained by the *Johns-Manville* court:

> Moreover, it should also be noted that neither Section 109 nor any other provision relating to voluntary petitions by companies contains any insolvency requirement . . . . And, with specific regard to Chapter 11, the Code eliminates the requirement contained in former Sections 77(a), 130(1), 323 and 423 of the Act that the debtor be insolvent or unable to pay his debts as they mature.  This is in striking contrast to the requirement of insolvency contained in Code Section 303 with regard to the commencement of involuntary cases. . . . It is only with regard to Chapter 9 (Adjustment of Debts of a Municipality) that the Code mentions insolvency or inability to meet one's debts.

36 B.R. at 732–33 (citations omitted).

good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended." *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 345 (Bankr. D. Del. 1998) (quoting *In re Clinton Centrifuge, Inc.*, 72 B.R. 900, 905 (Bankr. E.D. Pa. 1987)).

The Fifth Circuit has not expressly ruled on the issue of which party bears the burden of proof when a party alleges that a debtor has filed its bankruptcy petition in bad faith. This Court again agrees with the *Mirant* court in that it, too, "is not satisfied that the allocation to the debtor of showing good faith is appropriate." 2005 WL 2148362, at *7 n.20. The Court infers from the Fifth Circuit's holding in *In re Little Creek Development Co.* that the initial burden falls to the movant to "provide sufficient evidence to show lack of good faith." 799 F.2d at 1073.[6] The text of the statute itself sets up a burden-shifting framework to establish "cause" to dismiss or convert a case: Upon request of a party-in-interest, the bankruptcy court is required to dismiss or convert a case for cause—unless the debtor or another party interest shows the court that unusual circumstances exist that warrant denying the relief sought by the movant. *See* 11 U.S.C. § 1112(b).[7] Therefore, this Court follows the lead of another judge in this District and finds:

---

[6]  The Fifth Circuit's holding in *Tucker v. Texas American Syndicate* is less helpful, as that case was decided under the Bankruptcy Act, which required proof by the debtor of its insolvency as a condition to relief. 170 F.2d 939 (5th Cir. 1948). The *Tucker* court reversed the bankruptcy court's finding that the petition was filed in good faith because evidence existed in the record showing that the debtor had taken active efforts to hide its solvency by "getting rid of its cash assets" to appear insolvent in order to qualify for bankruptcy relief. *Id.* at 940. Under the Bankruptcy Code, the gateway requirement to show insolvency has been removed. *See supra* note 5.

[7]  That burden-shifting framework could be seen more clearly in the text of § 1112(b) prior to the edits made by the Bankruptcy Technical Corrections Act of 2010, Pub. L. No. 111-327, 124 Stat. 3561 ("Bankruptcy Corrections Act"). Prior to those amendments, the text of § 1112(b) read as follows:

> (b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, **the court shall convert a case under this chapter to a case under chapter 7 or dismiss a**

8

"When attacking a debtor for lack of good faith in the filing of a petition, the movant must first establish a prima facie showing of bad faith to shift the burden to the debtor to offer proof that the petition was in fact filed in good faith."  *In re Namer*, 141 B.R. 603, 606 (Bankr. E.D. La. 1992) (citing *In re Davis*, 93 B.R. 501, 504 (S.D. Tex. 1987)).  Other courts in this Circuit have followed suit.  *See, e.g.*, *In re Baribeau*, 603 B.R. 797, 802 (Bankr. W.D. Tex. 2019); *In re Delta AG Grp., LLC*, 596 B.R. 186, 194 (Bankr. W.D. La. 2019).

## B.  The Committee Has Failed To Establish a *Prima Facie* Showing that the Debtor Filed Its Petition in Bad Faith[8]

The Committee relies upon two assertions to attempt to meet its burden to establish a *prima*

---

**case under this chapter**, whichever is in the best interests of creditors and the estate, **if the movant establishes cause**.

(2) **The relief provided in paragraph (1) shall not be granted absent unusual circumstances** specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, **if the debtor or another party in interest objects and establishes that**—

(A)     there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B)     the grounds for granting such relief include and act or omission of the debtor other than under paragraph (4)(A)—

(i)     for which there exists a reasonable justification for the act or omission; and

(ii)     that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b) (2009) (emphasis added); *see also In re Briggs-Cockerham, L.L.C.*, No. 10-34222, 2010 WL 4866874, at *3 (Bankr. N.D. Tex. Nov. 23, 2010) (quoting pre-Bankruptcy Corrections Act § 1112(b) and finding that "the statutory framework establishes that the initial burden to establish 'cause' lies with the [movant] here, and if the [movant] establishes 'cause,' then the burden shifts to the [debtor/other parties in interest] to establish the 'unusual circumstances' exception to mandatory dismissal").  Nothing in the text of the legislative history of the Bankruptcy Corrections Act suggests that Congress intended to modify the burden-shifting framework in the statute. *See, e.g.*, 156 CONG. REC. H7158–61 (daily ed. Sept. 28, 2010); 156 CONG. REC. E1973–74 (daily ed. Nov. 18, 2010).

[8]     Even if the burden rests solely with the Debtor "to show that it had a valid purpose in filing for chapter 11 relief," *In re Mirant Corp.*, 2005 WL 2148362, at *7 & n.20, after considering the totality of the circumstances and reviewing the evidence here, the Court finds that the Debtor has met that burden.

*facie* showing that the Archdiocese filed its petition in bad faith:  (1) the Archdiocese filed for bankruptcy relief "as a means to resolve the abuse claims in a manner favorable to it," [ECF Doc. 367, ¶ 16]; and (2) the Archdiocese is solvent and is not experiencing financial distress, [ECF Doc. 367, ¶¶ 25–37].   The assertions are interwoven; according to the Committee, the alleged absence of financial distress demonstrates that the *only* purpose remaining for the bankruptcy filing is to "force abuse victim survivors into a collective bargaining process where their claims could be settled and resolved in a manner favorable to the Archdiocese."  [ECF Doc. 367, ¶ 1].  As the court did in the case of the Johns-Manville Corporation, this Court is called upon to determine whether the Committee's evidence defeats the fact that, as of the Petition Date, the Archdiocese is "a real company with real debt, real creditors and a compelling need to reorganize in order to meet these obligations."  36 B.R. 727, 730 (Bankr. S.D.N.Y. 1984).

1. *The evidence demonstrates that the Archdiocese was experiencing financial distress at the time the bankruptcy petition was filed*

The fact that the Archdiocese may be "solvent" alone is a nonstarter.  As stated above, "there is no insolvency requirement for Chapter 11 debtor status." *In re Johns-Manville Corp*., 36 B.R. 727, 730 (Bankr. S.D.N.Y. 1984); *see also In re Marshall*, 298 B.R. 670, 682–83 (Bankr. C.D. Cal. 2003) ("The solvency issue need not detain us long, because insolvency is not a requirement for a chapter 11 filing.  Insolvency is not even a requirement for plan confirmation under the explicit 'good faith' requirement of § 1129(a)(3).").

But what is "financial distress" in the context of a § 1112(b) analysis?  Admittedly vague, some courts seem to define financial distress simply as being the opposite of financial health.  *See, e.g.*, *In re Dixie Broad., Inc*., 871 F.2d 1023, 1027 (11th Cir. 1989).  But the conditions of solvency and experiencing financial distress are not necessarily exclusive of one another.  One court instructs that the solvency of a debtor is but one factor to be considered in determining whether

10

that debtor was experiencing financial distress at the time it filed its bankruptcy petition. *See In re Rent-A-Wreck of Am., Inc.*, 580 B.R. 364, 375–76 (Bankr. D. Del. 2018) (internal citations omitted). In addition to solvency, courts also consider such factors as

> cash reserves; recent financial performance and profitability; the proportion of debt owed to insiders; realistic estimates of actual or likely liability; the threat of litigation; whether a debt is fixed, substantial, and imminent; current cash position or current liquidity; ability to raise capital; and overdue debts or the ability to pay debts as they become due.

*Id*. at 375–76 (internal citations omitted). "Any given case may touch on one or more of these factors." *Id*. at 376.

> a. The testimony of lay witnesses identified weak cash flow, unsustainable revenues, and the proliferation of lawsuits alleging claims of sexual abuse as contributors to the Archdiocese's financial distress

As stated above, contemporaneously with the filing for bankruptcy relief, Fr. Carr, the Vicar of Finance for the Archdiocese, submitted a declaration in support of the Debtor's first-day motions, in which he declared:

> Operational challenges have strained the Archdiocese's financial position, have impacted its ability to sustain its ministries and charities, and have necessitated the commencement of this proceeding. The financial and operational difficulties burdening the Archdiocese range from claims and lawsuits alleging sexual abuse by clergy that occurred more than fifty years ago to losses of revenue from offerings and collections at Masses which are no longer publically [*sic*] celebrated due to the COVID-19 pandemic.

Ex. 6, ¶ 9. In August 2020, Fr. Carr presented deposition testimony in his individual capacity and as a corporate representative of the Archdiocese. *See* Carr Dep. 11:24–12:27, Aug. 12, 2020 (Ex. 42). The Court reviewed his video deposition and found Fr. Carr to be a credible, earnest witness. In his deposition, Fr. Carr testified regarding the bases for his statements in paragraph 9 of his first-day declaration. *See* Carr Dep. 126:3–134:15. Fr. Carr testified that, over the last few years,

numerous parishes had fallen behind on loans and assessments[9] owed to the Archdiocese—many accounts were deemed "uncollectible"—and that the expenses of the Archdiocese were outpacing revenues. *See* Carr Dep. 132:14–23; 134:24–138:1. Within two years prior to its bankruptcy filing, the Archbishop, sharing Fr. Carr's concerns regarding the future financial viability of the Archdiocese, formed a subcommittee of the Archdiocese Finance Council, the membership of which included Fr. Carr, to examine "the uncollectibility of the loans [and] the uncollectibility of assessment income." Carr Dep. 146:17–147:7. But, as reported by Fr. Carr, "then we started uncovering a lot more deeper financial issues that we—that looked like we were—we were more fragile than we thought." Carr Dep. 147:1–4.

When asked "if the organization is solvent today, when does it become insolvent?" Fr. Carr explained:

> [T]he Archdiocese as it is right now, is heading toward insolvency. I mean, I've been looking at these financial statements for two years now, and I'm surprised it took us this long to file bankruptcy. I mean, we've been—we've been running these huge deficits. Our revenues—when I say revenues, our collection or assessments have increased 9 percent over 10 years, and our expenses have increased 79 percent over 10 years.

Carr Dep. 144:11–19. Regarding the more immediate term, Fr. Carr testified that the revenue base of the Archdiocese, that is, the amounts collected at the parish level from parishioners at weekly services, had decreased significantly as a result of the COVID-19 public health emergency and the stay-at-home orders that were issued by state and local governments in or around March 2020. *See* Carr Dep. 132:10–13. In mid-April 2020, the Archdiocese enacted partial and full furloughs among its staff, citing the negative impact of the pandemic on its finances. *See* WWLTV.com Staff, *Archdiocese Furloughs Staff Due to Financial Problems Caused by Coronavirus* (Apr. 20,

---

[9] An assessment is an annual amount owed by a parish to a diocesan entity, typically structured as a tax based on a parish's revenue.

2020) (Ex. 103).

The record also shows that the Fitch rating on the bonds issued by the Louisiana Public Facilities Authority on behalf of the Archdiocese in 2006 to fund a number of capital projects and refinanced in 2017 was downgraded in April 2020 from an "A+" rating to an "A" rating, reflecting "an expectation that operating performance will remain weaker into 2021, due in part to impacts from the coronavirus pandemic." Ex. 32. According to its Rating Action Commentary, Fitch's outlook remained "negative" and acknowledged the "Archdiocese's trend of thinner cash flow and coverage after adjusting for one-time items," and predicted that that the "pandemic will further exacerbate operating pressures under Fitch's baseline scenario assumptions." Ex. 32. Fitch assumed that "most social and cultural institutions will start to reopen following 3 months to 4 months of closure and use of remote offerings," and rated the Archdiocese's financial profile to be "stronger with consistent negative net-debt in the base case against relatively weak but sustainable cash flow." Ex. 32.

Jeffrey Entwistle, the Chief Financial Officer for the Archdiocese, provided further testimony in August 2020 on both the April 2020 Fitch rating and the effects of the pandemic on the finances of the Archdiocese:

> There's definitely weak cash flow. The sustainable portion—now that we're in the pandemic the sustainable portion has deteriorated significantly.
>
> . . . .
>
> We have parishes that had a long stretch of not being able to have any masses, that are now having masses with limited attendance, which is affecting their ability to pay their assessment to the Archdiocese.
>
> Q:      Is it expected that they may recover if the—you know, based on the overall situation with the pandemic?
>
> They'll never catch up what they couldn't pay. If somebody couldn't pay for a three-month period today, and they get back to full operation a year from now,

they're never going to make that three months back up, if that's what you're asking.

But as far as a lingering effect of the pandemic on our parishes it's still a great unknown.  But we could very well have parishes—and I would think it's highly likely that we'll have parishes that will struggle to survive.

Entwistle Dep. 67:21–68:16 (Aug. 12, 2020) (Ex. 43); *see also* Entwistle Dep. 85:14–88:21.[10]

When asked if the Archdiocese's cash flow could once again be qualified as "sustainable" when

churches and schools opened after the pandemic, Entwistle testified:

Again, assuming that a parish got all the way back to full attendance at masses, from that point forward theoretically they could keep up with their obligations, but they would never make up the stretch that was missed.

. . . .

And that's assuming . . . a couple of things.  First, assuming they got back to full strength.  But the effect of the pandemic isn't only on the parish, it's on the parishioners.

So for those parishioners who are struggling personally, out of work, working at a lesser capacity, they—even when they get back in the pew, when they can get back to church, they may still not be able to contribute at the level they could before.

Entwistle Dep. 69:4–19.

Mr. Entwistle explained that the Archdiocese's revenue base is limited to parish

assessments, as much of the other revenue that the Archdiocese collects is considered to be "pass-

through" funds or otherwise unavailable.  An example of "pass-through" funds is money that is

collected from parishes for insurance coverage that is paid directly dollar-for-dollar for the

premiums for that coverage.  *See* Entwistle Dep. 85:14–25. Kathleen Zuniga, a CPA, audit partner,

and consultant, as well as the Partner in Charge of the New Orleans office of Carr, Riggs & Ingram,

LLC ("CRI"), testified as a corporate representative of the Debtor, and explained that the

---

[10]     The Court reviewed Mr. Entwistle's video deposition in its entirety and found Mr. Entwistle to be an honest and convincing witness.

Archdiocese's revenue base is also limited because many of the donations are "restricted," meaning they have restrictions placed upon them as to the use of the donation or the timing of any expenditures. *See* Zuniga Dep. 55:9–25; 58:10–59:10 (Aug. 14, 2020) (Ex. 44). A third limitation on the Archdiocese's revenue base is the fact that many of the funds held by the Archdiocese belong to non-debtor affiliated entities. Common to diocesan organizations, a diocese or archdiocese will maintain deposits from parishes, schools, or other affiliated entities and, in turn, will make loans from those deposited funds to parishes or other entities within the diocese or archdiocese. Here, the Archdiocese maintains such a fund, which it calls the "Deposit & Loan Fund." *See* Carr Dep. 39:8–21. In addition to those funds being held on behalf of parishes and schools, Mr. Entwistle testified that some parishes are in default on their repayment obligations of loans made from that fund. *See* Entwistle Dep. 88:15–21.

Moreover, many of the large sources of revenue that have been collected by the Archdiocese in recent years stem from once-occurring events, such as the BP Deepwater Horizon oil spill or Hurricane Katrina, and cannot be counted as recurring or sustainable revenue sources going forward. *See* April 2019 Draft Report of Carr, Riggs & Ingram CPAs and Advisors (Ex. 144). After the Archdiocese failed to meet its debt service coverage ratio in fiscal year 2018 due to its increase in the reserve for personal misconduct claims, *see* discussion *infra* & n.12, the Archdiocese CRI in March 2019, to evaluate and offer recommendations to the Archdiocese regarding financial accounting and reporting processes as well as budgeting and forecasting processes. CRI reported in 2019 that the Archdiocese had experienced operating losses in the millions each year since 2012. *See* Ex. 144 ("[F]undamental fiscal problems appear to have been masked by significant, non-recurring cash inflows, including FEMA receipts and other financial support received associated with Hurricane Katrina; proceeds from property sales; and some

above-average investment returns in excess of the investment return designated for operations.”);[11]

*see also* Ex. 7 (Semi-Annual Financial Information Fiscal Year 2020) (identifying the need for the

Archdiocese to reduce its operating deficit).

In addition to weak cash flow and unsustainable revenues, the Archdiocese has faced a

proliferation of lawsuits alleging claims of sexual abuse by certain priests and vicarious liability

of the Archdiocese.   According to the *Semi-Annual Financial Information Fiscal Year 2020*,

prepared as a requirement under the bond documents and stating the Archdiocese's financial

position through June 30, 2019, during fiscal year 2018, the Archdiocese created an $8.5 million

reserve for its estimated sexual abuse claim liability.  *See* Ex. 7, at 16; Entwistle Dep. 108:14–

110:17.  As explained by Mr. Entwistle, a “reserve” is an accounting entry booked as an expense

and is a “liability that remains on the balance sheet”; it is not actual funding set aside or a one-time

expense.  Entwistle Dep. 76:17–77:17.  Ms. Zuniga confirmed that definition.  *See* Zuniga Dep.

7:20–8:6; 12:2–3; 21:5–23:10.  Ms. Zuniga added an explanation of certain accounting rules that

govern the establishment of reserves.  Those rules require entities

> to bucket contingencies in three buckets—or analyze them in three buckets for
> purposes of how they should be recorded in your financial statements.
>
> Those three buckets are probable, where it is probable that there will
> ultimately be . . . a pay out; reasonably possible[;] or remote.  If it's probable and
> it's estimable then it's recorded as a liability in the financial statements.  Typically
> that is done in consultation with legal counsel.  If it's reasonably possible and
> material then you would disclose it if you are not able to estimate it; and then if it's
> remote you don't record a reserve in your financial statements.

Zuniga Dep. 22:18–23:6.  Ms. Zuniga testified that “if [the Archdiocese] recorded the reserve then

---

[11]      Ms. Zuniga testified regarding the draft 2019 report and its recommendations.  *See* Zuniga
Dep. 12:2–13:4 (Aug. 14, 2020) (Ex. 44).  Although the 2019 report was not completed in final form, *see
id.*, the Court accepts the basic premise of the report that the Archdiocese had been operating at a significant
loss from 2012 to 2018 and had serious deficiencies in its financial oversight, accounting processes, and
budgetary controls.

[the liability] was probable and that was their estimate at the time they recorded it."  Zuniga Dep. 28:20–22; *see also* Zuniga Dep. 37:2–6.  Ms. Zuniga also testified that she believed that the Archdiocese had booked a reserve for its estimated sexual abuse claim liability prior to fiscal year 2018, *see* Zuniga Dep. 28:7–10, and the record suggests that the Archdiocese increased the amount of that reserve in 2018, indicating the Archdiocese had cause to believe that its liability for sexual abuse claims was rising.  *See* Ex. 7, at 16 ("During fiscal year 2018, the [Archdiocese] recorded an $8.5 million reserve for personal misconduct claims.  The **increase** in the reserve caused the [Archdiocese] to not meet the debt service coverage ratio covenant for fiscal year 2018." (emphasis added));[12] *see also Financial Report, Roman Catholic Church of the Archdiocese of New Orleans Administrative Offices, June 30, 2018* (Ex. 86), at 37 (stating that "[i]t is reasonably possible that [reserve] estimates included in the financial statements related to these contingencies [i.e., pending and threatened litigation of abuse claims] may change in the near term").  Ms. Zuniga testified that additional abuse claims had been filed after fiscal year 2018, but she was unaware if the reserve had been adjusted to account for the Archdiocese's potential liability for those claims.  *See* Zuniga Dep. 39:13–40:5.[13]

> b.  Expert testimony supports a finding that the Archdiocese was experiencing financial distress at the time of filing

The Archdiocese submitted an expert report prepared by CRI dated August 5, 2020 (the

---

[12]     The booking of the reserve itself did not constitute an event of default under the bond documents.  *See* Ex. 7, at 16.  Fr. Carr testified that the Archdiocese had been in default on its bond obligations in 2018, but was not in default as of the time of the bankruptcy filing.  *See* Carr Dep. 126:25–127:11.

[13]     In addition to the abuse claims asserted against the Archdiocese, Mr. Entwistle identified another significant disputed claim against the Archdiocese, one involving a FEMA-related issue initiated by the Department of Justice, the potential liability for which, he testified, may not be reflected in the Archdiocese's financial statements.  *See* Entwistle Dep. 89:1–14.  Ms. Zuniga also alluded to an additional reserve of approximately $1.5 million associated with a non-abuse claim, *see* Zuniga Dep. 41:4–17, but the record is unclear regarding the related source of potential liability for that reserve.

"CRI Report") (Ex. 62) and the August 17, 2020, deposition testimony of Stephen Riggs, CPA and a partner at CRI ("Riggs Dep.") (Ex. 44), assessing the overall financial condition of the Archdiocese as of the Petition Date, which included a five-year financial forecast, and providing an opinion as to whether the Archdiocese was experiencing financial distress as of the Petition Date.   The parties stipulated to the admission of the CRI Report and Mr. Riggs' deposition testimony—as well as the expert report and deposition testimony of the Committee's expert, Paul Shields—in lieu of live testimony and cross-examination.   Although the Committee did not assert a formal challenge to disqualify Mr. Riggs as an expert witness or exclude the CRI Report or the testimony of Mr. Riggs pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *see* Hr'g Tr. 13:11–14:8, the Committee does challenge the sources and bases of Riggs' expert opinion, such that the Committee asks this Court to give little or no weight to the expert opinion, *see* Hr'g Tr. 38:23–40:7.

This Court is required to ensure that all expert testimony is relevant and reliable.   *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (citing FED. R. EVID. 702; *Daubert*, 509 U.S. at 589).   Expert evidence is relevant when the evidence "assist[s] the trier of fact to understand the evidence or to determine a fact in issue" and reliable when the expert's reasoning or methodology "fits" the facts of the case.   *Daubert*, 509 U.S. at 591.   But a court's service as a gatekeeper of relevant and reliable expert evidence does not replace the traditional adversary system.   *See id.* at 596.   Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."   *Id.*   "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration," or, here, this Court's consideration.   *Viterbo v. Dow*

18

*Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1997).

In assessing the financial condition of the Archdiocese and then forming his opinion that the Archdiocese was experiencing financial distress at the time of its bankruptcy filing, Riggs reviewed, among other things, the Archdiocese's audited financial statements for the past ten years; the June 30, 2018 and June 30, 2019 bond debt covenant calculation workbooks; semi-annual financial information as of December 31, 2018, and December 31, 2019, published on the Electronic Municipal Market Access ("EMMA") and annual financial information as of June 30, 2019 published on EMMA; unaudited internal financial statements and supporting schedules for the fiscal year ending June 30, 2020; facilities evaluations on deferred maintenance capital items; and published bond ratings. *See* CRI Report, at 2. In asking this Court to give little or no weight to Mr. Riggs' expert testimony, the Committee asserts that Mr. Riggs was obligated to independently verify the financial information given to him by the Archdiocese before utilizing it to form his opinion. *See* Hr'g Tr. 38:23–40:7. The Committee further asserts that Mr. Riggs identified no reasonable basis for the methodology he used in forming his opinion. *See* Hr'g Tr. 38:23–40:7. Essentially, the Committee argues that the data upon which Mr. Riggs relied and his methodology for analyzing that data are unreliable and, therefore, the Court should disregard any conclusions he made.

Federal Rule of Evidence 702 provides that a qualified expert may give his opinion to assist the trier of fact in understanding the evidence or in determining a fact in issue if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Further, Federal Rule of Evidence 703 allows an expert to base his opinion "on facts or data in the case that the expert has been made aware of or personally observed." And "[i]f the

facts and data relied on are the sorts that experts in that field would reasonably rely on, then those facts 'need not be admissible for the opinion to be admitted.'" *Brickley v. Scattered Corp. (In re H & M Oil & Gas, LLC)*, 511 B.R. 408, 413 (Bankr. N.D. Tex. 2014) (quoting FED. R. EVID. 703). The Court disagrees with the Committee's assertion that an expert cannot rely on financial information given to him by his client. *Compare Legier & Matherne, APAC v. Great Plains Software, Inc.*, No. 03-278, 2004 WL 1488597, at *2–3 (E.D. La. June 30, 2004) (finding that expert was permitted to rely upon financial projections created by company employee), *with JRL Enters., Inc. v. ProCorp Assocs., Inc.*, No. 01-2893, 2003 WL 21284020, at *7–8 (E.D. La. June 3, 2003) (finding that an expert should not blindly rely *on another expert's* calculations in forming an opinion when that expert himself disavows the reliability of those projections); *see also Hunter's Run Gun Club, LLC v. Baker*, No. 17-176, 2019 WL 2357365, at *2 (M.D. La. June 4, 2019). The Court finds that the materials Mr. Riggs relied upon are of the sort that accountants rely upon to evaluate and describe the financial condition of an entity. There is no showing in the record to suggest otherwise, nor is there any indication that that the underlying financial information was inaccurate.

As to Mr. Riggs' methodology in forming an opinion as to the Archdiocese's "financial distress," the Supreme Court in *Kumho Tire Co*., 526 U.S. at 148–49, and *Daubert*, 509 U.S. at 592, endorsed expert testimony based on personal observation and experience. "[T]he Fifth Circuit has concluded that 'soft sciences' involve 'necessarily diminished methodological precision' when compared to other scientific disciplines like mathematics and engineering." *Trinity Med. Servs., L.L.C. v. Merge Healthcare Solutions, Inc*., No. 17-CV-592, 2020 WL 1307046, at *5 (M.D. La. Mar. 19, 2020) (citing *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006)).

> In such instances, other indicia of reliability are considered under *Daubert*, including professional experience, education, training, and observations. Because

> there are areas of expertise, such as the "social sciences in which the research
> theories and opinions cannot have the exactness of hard science methodologies,"
> trial judges are given broad discretion to determine "whether *Daubert*'s specific
> factors are, or are not, reasonable measures of reliability in a particular case."

*Id*. (quoting *Simmons*, 470 F.3d at 1123). "If the expert's testimony does not rest on traditional

scientific methods, the court may permit testimony 'where a proposed expert witness bases her

testimony on practical experience rather than scientific analysis.'" *Id*. at *6 (quoting *Davis v.

Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013)). Here, this Court is not convinced there is

any accepted methodology for forming an opinion from an accounting perspective specifically

regarding whether an entity is experiencing "financial distress"—except for an expert's reliance

on his or her professional judgment.[14] The Court declines to make a finding that no reasonable

basis exists for the methodology employed by Mr. Riggs in forming his opinion on the financial

distress of the Archdiocese at the time of filing. Rather, the Court will consider the Committee's

presentation of contrary evidence, the expert report and testimony provided by Paul Shields, and

will weigh Mr. Riggs' testimony accordingly.

According to Mr. Riggs, although the Archdiocese's corporate body is comprised of

administrative offices, two parishes, and nine schools, the latter two groups "have historically and

continue to be operated independently of the Archdiocese as it relates to operations and financial

---

[14]    Indeed, Mr. Riggs testified that "professional judgment" is the methodology that both he and the Committee's expert employed. *See* Riggs Dep. 43:21–45:5 ("It's agreed-upon procedures . . . and analyzing all this information to come to this report is professional judgment. My personal professional judgment based upon the years of experience that I have. . . . Professional judgment, it's accumulated over a period of time, and we get hired—professionals get hired to issue their professional judgment based upon their years of experience. . . . Professional judgment is what . . . I have, and I think it's what your expert has . . . coming to the table, and you're drawing upon our professional judgment to arrive at our conclusions. And I would think your expert is arriving at his conclusions based upon his professional judgment."). The Committee's expert, Paul Shields, agreed that no accounting or other professional standards use or define the term "financial distress" and that "an element of judgment" enters into any evaluation of whether an entity is experiencing or has experienced financial distress. *See* Shields Dep. 52:24–54:14 (Aug. 17, 2020) (Ex. 46).

reporting." CRI Report, at 1. "As a result, there is no historical consolidated financial statement presentation available." *Id*. The operations of the two parishes "collectively represent less than 2% of [the Archdiocese's] net assets." *Id*. And although the schools "collectively have positive cash and investments net of restricted assets and restricted liabilities," based on 2016 facilities evaluations prepared by a consultant, "the schools' cash and investment position at June 30, 2020 is insufficient to fully pay for the schools' deferred maintenance." *Id*.[15] For those reasons, Mr. Riggs did not take into account the assets and liabilities of the two parishes and nine schools when considering the overall financial condition of the Archdiocese as of the Petition Date, and found that "[t]he Administrative Offices operations represents the primary source of income for the Debtor." *Id*.

After reviewing ten years of audited financial statements of the Archdiocese and the most recent year's unaudited financial statement, Mr. Riggs reported approximately $13 million net assets at the end of June 2020. *See* CRI Report, Ex. 2; Riggs Dep. 98:17–99:21. Parish assessments have increased by 9% since June 2011. On its face, that seems like a positive financial condition. But that report also shows that the Archdiocese's expenses have increased by 79% since June 30, 2011, even excluding 2020 reorganization costs that had accrued up to the time of the report. *See* CRI Report, at 3 & Exs. 1 & 2. Mr. Riggs reported that the only reason the Archdiocese was able to show operations in the black at all was due to periodic one-time infusions of cash from non-operations sources:

> Q:     Isn't it true that assessments were held at a level that enabled the Archdiocese to not only hold net assets at a steady level but actually increase those net assets by $13 million over ten years?
>
> A:     Yeah, but you have all of these one-offs. You had . . . the FEMA Katrina

---

[15]     Mr. Entwistle confirmed that the "majority" of the deferred maintenance liabilities held by the Archdiocese relate to the schools. Entwistle Dep. 90:11–24.

money [that] generated approximately $[229] million-plus during that period of time.

During that period of time, they sold real estate and generated $10 million worth of profits over time, and so they had BP settlements that generated plus or minus 8 million.  So you take selling real estate that you're going to sell one time; Katrina, one time event, we hope and pray for; BP, we . . . sure hope that's a one-time event.  So you've got all these big chunks of one-off assets or opportunity to generate income; and, unfortunately, it's only netted them $13 million more on the schedule, which shows you that they've got a cash burn for ten years that's not sustainable.

Riggs Dep. 100:8–101:3; *see also* CRI Report Ex. 1.[16]

According to Mr. Riggs, one can see the Archdiocese's problem clearly by examining the cash and investments available for use in operations.[17]  Exhibit 2 of the CRI Report shows a beginning cash and investments balance of approximately $223 million in June 2011.  After deducting deposits payable, funds held for others, and restricted funds, the Archdiocese enjoyed approximately $37 million of cash and investments available for operations.  *See* CRI Report, Ex. 2; Riggs Dep. 101:21–102:6.  Nine years later, in June 2020, the beginning cash and investments balance starts at approximately $309 million.  *See* CRI Report, Ex. 2; Riggs Dep. 102:6–17.  But

---

[16]    Although the transcript of Riggs' deposition indicates his testimony regarding the amount the Archdiocese received in hurricane relief was $27 million, the amount indicated in the CRI Report and Exhibit 1 to that report is approximately $229 million over the course of ten years.  *See* CRI Report, at 4 & Ex. 1.

[17]    When asked why he didn't examine "liquidity," Mr. Riggs explained:

Liquidity distorts things.  You may have cash in the bank; but if it's reserves, you can't use it.  Some of these investments are long-term investments where they're illiquid.  But you would—you might say it's an investment, it might be liquid.  So I used "cash and investments available for use" because what we meant was the cash investments available for use.

    . . . .

[I]f money is reserved for something or something was done and it's spoken for, the Archdiocese cannot use it.  It's restricted.  And what we're referring to is cash and investments available for use are unrestricted cash and investments.

Riggs Dep. 121:3–18.

by that time, the Archdiocese's liabilities had increased considerably, and after accounting for deposits payable, funds held for others, and restricted funds, the Archdiocese's finances showed a **deficit** in cash and investments available for operations in the amount of approximately $888,000. *See* CRI Report, Ex. 2; Riggs Dep. 102:6–17.

Although the Debtor's Monthly Operating Report for April–June 2020 filed into the record in this case shows "cash and cash equivalents" balance of $22,052,676 as of April 2020, $35,171,296 as of May 31, 2020, and $51,935,708 as of June 30, 2020, Mr. Riggs' testimony asserts that those figures include restricted and otherwise committed funds, thereby masking the deficits in the Archdiocese's true working capital. *Compare* Ex. 18, *with* CRI Report, Exs. 1 & 2; *see also* Riggs Dep. 125:19–25 ("So, yes, money is in the bank. And so to answer your question, yes, on that date, that amount of $51 million is monies in the bank. But the schedule I'm preparing I don't think is in disagreement with that, but I'm showing what we have as far as current assets less current liability to work with."). In sum, in Mr. Riggs' view, to get a true picture of the Archdiocese's finances, one must back out the restricted funds and otherwise committed funds, including the tuitions paid to the Archdiocese-owned schools and the funds deposited by parishes in the Deposit & Loan Program, as the Archdiocese cannot use any of those earmarked funds to pay its own operational expenses. *See* Riggs Dep. 123:7–132:7. The CRI Report purports to do just that, thereby revealing a major, unsustainable decline in the Archdiocese's working capital. *See id*.; CRI Report.

Based on Mr. Riggs' assessment of the Archdiocese's financial condition and in his professional judgment based on his 40-plus years of experience as a CPA and consultant, Mr. Riggs concluded that the Archdiocese was experiencing financial distress at the time it filed for bankruptcy relief on May 1, 2020.

The Committee submitted the August 17, 2020 deposition testimony of Paul Shields, CPA of the Berkeley Research Group, LLC ("Shields Dep."), *see* Ex. 46, and his expert report ("Shields Report"), *see* Ex. 60, as rebuttal evidence to the CRI Report.  Mr. Shields offered no independent opinion of any financial distress that the Archdiocese may have been experiencing as of the Petition Date.  *See* Shields Dep. 39:3–5; 45:6–48:8.  His position, though, appears to equate an evaluation of "financial distress" with an evaluation of solvency.  *See id*. 54:24–56:10.  Mr. Shields pointed to three tests for solvency—that is, balance sheet solvency, sufficiency of capital, and ability to pay debts as they come due—and concluded that the failure of any one of those tests, particularly an entity's inability to pay its debts, would indicate the presence of financial distress. *See id*. 55:2–56:10.  Although Mr. Shields conceded that the Archdiocese was suffering some degree of financial distress at the time of its bankruptcy filing, *see id*. 26:24–27:10, his critique of the CRI Report opines that Mr. Riggs failed to consider factors that ameliorate the Archdiocese's financial distress, including the fair-market value of its real estate holdings and its credit rating, which would affect its ability to refinance its bond debt.  *See* Shields Report, at 4–5.

As discussed above, the Bankruptcy Code does not impose an insolvency requirement upon debtors, and solvency is but one of several factors that a court may consider in determining whether a debtor is experiencing financial distress at the time it filed for bankruptcy relief.  For that reason, the Shields Report and Mr. Shields' testimony is of very limited use to the Court in this context. But Mr. Shields does not dispute that the Archdiocese was suffering financial distress; rather, he concludes that perhaps the Archdiocese was not suffering as much financial distress as Mr. Riggs would assert.

The evidence before the Court shows that the Archdiocese's projected probable liability for sexual abuse claims was high and would likely climb higher, which affected its ability to raise

capital.  The threat of protracted and costly litigation against the Archdiocese to defend against those claims was real.  The Archdiocese was experiencing an unsustainable decline in its working capital in the years leading up to its filing—and that decline was exacerbated and accelerated by the effects of the COVID-19 public health emergency in March and April 2020.  Based upon all of the evidence before the Court, including the lay testimony as well as the compelling testimony of Mr. Riggs and his analysis contained in the CRI Report, the Court finds that the Archdiocese was experiencing financial distress at the time of its bankruptcy filing.

### 2.   *The Archdiocese's petition serves a valid bankruptcy purpose*

The Committee asserts that the absence of financial distress demonstrates that the **only** purpose for the bankruptcy filing is to gain a tactical advantage over the abuse claimants, that is, to stall the progress of the Abuse Cases that were pending in state court at the time of filing and "force abuse victim survivors into a collective bargaining process where their claims could be settled and resolved in a manner favorable to the Archdiocese."  [ECF Doc. 367, ¶ 1].  As detailed above, the evidence shows that the Archdiocese was, in fact, experiencing financial distress at the time of its bankruptcy filing.  Nevertheless, the Court also finds that the Archdiocese's petition serves a valid bankruptcy purpose.

"[P]reserving going concerns" and "maximizing property available to satisfy creditors" are considered to be valid bankruptcy purposes.  *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 No. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999).  Thus, "a good faith petition must seek to preserve or create some value that would otherwise be lost outside of bankruptcy and . . . it is not bad faith to seek to gain an advantage from declaring bankruptcy."  *In re Costa Bonita Beach Resort Inc.*, 479 B.R. 14, 39–40 (Bankr. D.P.R. 2012) (citing *Fields Station LLC v. Capitol Food Corp. (In re Capitol Food Corp.)*, 490 F.3d 21, 25 (1st Cir. 2007)).  Indeed, "[f]iling a bankruptcy petition with the

26

intent to frustrate creditors does not by itself 'establish an absence of intent to seek rehabilitation.'"

*Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222, 228

(2d Cir. 1991) (quoting *Banque de Financement, S.A. v. First Nat'l Bank*, 568 F.2d 911, 917 (2d

Cir. 1977)).

As Fr. Carr plainly stated in his April 30, 2020 Declaration, which was admitted as

evidence here:

> The purpose of this Chapter 11 Case is to develop a plan of reorganization, under
> the supervision of the Court, which will facilitate the equitable distribution of assets
> to creditors in accordance with law, sustain the financial viability of the
> Archdiocese, and allow the Catholic Church to continue the religious and charitable
> ministries and programs it has fosters throughout New Orleans and surrounding
> areas for more than three hundred years.

Ex. 6, ¶ 10.   Fr. Carr also provided deposition testimony regarding the purpose behind the

bankruptcy filing:

> The bankruptcy will allow us to deal with all of our outstanding
> commitments with the limited funds that we have.  And then, now especially with
> the challenges that we have with the—with the deteriorating financial condition in
> COVID, we only have limited resources, and Chapter 11 will allow us to—to deal
> with any outstanding liabilities or commitments that we do have.

Carr Dep. 69:4–10.  Ms. Zuniga, the corporate representative of the Archdiocese, further testified

that one reason for the bankruptcy filing was to allow the Archdiocese to stave off "[t]he mounting

legal cost with respect to the abuse cases and the increasing number of cases."  Zuniga Dep. 97:17–

20.

This Court is instructed to consider the good faith of the Debtor's filing based on the totality

of the circumstances, requiring an "on-the-spot evaluation of the debtor's financial condition,

motives, and the local financial realities."  *In re Little Creek Dev. Co.*, 779 F.2d at 1072.  The

Archdiocese was experiencing financial distress at the time of filing—New Orleans' stay-at-home

orders issued in March 2020 as a response to the pandemic halted in-person church gatherings,

significantly curtailing the Archdiocese's already diminishing working capital. The Archdiocese was forced to lay off staff. It continued to incur legal costs required to defend the 34 Abuse Claims—and reasonably believed that more abuse claims and liability for those claims would follow. Nothing in the evidence indicates that the Archdiocese sought to use bankruptcy law for a purpose for which it is not intended. *See In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 345 (Bankr. D. Del. 1998); *In re Johns-Manville Corp.*, 36 B.R. 727, 740–41 (Bankr. S.D.N.Y. 1984) (finding that filing for bankruptcy relief to administer and resolve tort claims does not in itself constitute an abuse of a bankruptcy court's jurisdiction). Rather, the testimony given by the Archdiocese's representatives shows a desire to obtain a "breathing spell" from litigation in order to preserve the Archdiocese's mission and ministries and maximize property available to satisfy creditors, including abuse claimants—both valid bankruptcy purposes. *In re Johns-Manville Corp.*, 36 B.R. at 737; *see also Bank of Am. Nat'l Tr. & Sav. Ass'n*, 526 U.S. at 453.

## CONCLUSION

For the foregoing reasons, the Court finds that the Committee failed to make a p*rima facie* showing that the Archdiocese filed its petition in bad faith. Therefore,

**IT IS ORDERED** that the *Motion of the Official Committee of Unsecured Creditors To Dismiss Chapter 11 Case* is **DENIED**.

New Orleans, Louisiana, August 4, 2021.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE