**In the Matter Of:**

*In Re: The Roman Catholic Church for the Archdiocese of New Orleans*

*RICHARD TRAHANT*

*May 18, 2022*



Case 20-10846 Doc 1843-5 Filed 10/11/22 Entered 10/11/22 13:32:39 Exhibit E - Redacted Trahant
Deposition of Richard C. Trahant 5-18-22 Page 2 of 66

Richard Trahant
May 18, 2022

## Page 1

```
 1              UNITED STATES BANKRUPTCY COURT
 2       EASTERN DISTRICT OF LOUISIANA (NEW ORLEANS)
 3          BANKRUPTCY PETITION NUMBER: 20-10846
 4
 5   In Re:                        )
                                   )
 6   THE ROMAN CATHOLIC CHURCH FOR )
     THE ARCHDIOCESE OF NEW        )
 7   ORLEANS, DEBTOR               )
     _____)
 8
 9
10
11
12
13
14
15      RULE 2004 EXAMINATION OF RICHARD TRAHANT
16                  Taken Remotely
17              Wednesday, May 18, 2022
18
19
20
21
22
23   STENOGRAPHICALLY REPORTED BY:
24   RHONDA HALL-BREUWET, RDR, CRR, LCR, CCR, FPR
25   JOB NO. 843968
```

## Page 2

```
 1
 2
 3
 4                   May 18, 2022
 5                   10:02 a.m.
 6
 7
 8            Deposition of RICHARD TRAHANT, held
 9   remotely before Rhonda Hall-Breuwet, Registered
10   Diplomate Reporter, Certified Realtime
11   Reporter, Licensed Court Reporter (TN),
12   Certified Court Reporter (GA and LA), Florida
13   Professional Reporter, and Notary Public of the
14   State of Florida.
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1   A P P E A R A N C E S :
 2   ATTORNEYS FOR U.S. TRUSTEE:
 3           OFFICE OF THE U.S. TRUSTEE, REGION 5
 4           400 Poydras Street
 5           Suite 2110
 6           New Orleans, Louisiana 70130
 7           (504) 589-4018
 8        BY:  AMANDA GEORGE, ESQUIRE
 9             ABIGAIL MARBURY, ESQUIRE
10             LAURA STEELE, ESQUIRE
11             RICHARD DREW, ESQUIRE
12        EMAIL:  amanda.b.george@usdoj.gov
13
14
15   ATTORNEYS FOR MR. RICHARD TRAHANT IN PERSONAL
16   CAPACITY:
17           LEWIS, KULLMAN, STERBCOW & ABRAMSON, LLC
18           601 Poydras Street
19           Suite 2615
20           New Orleans, Louisiana  70130
21           (504) 588-1500
22        BY:  PAUL M. STERBCOW, ESQUIRE
23        EMAIL:  sterbcow@lksalaw.com
24
25
```

## Page 4

```
 1   ATTORNEYS FOR OFFICIAL COMMITTEE FOR UNSECURED
 2   CREDITORS:
 3           PACHULSKI STANG ZIEHL & JONES LLP
 4           10100 Santa Monica Boulevard
 5           Suite 1300
 6           Los Angeles, California 90067
 7           (310) 277-6910
 8        BY:  ANDREW CAINE, ESQUIRE
 9        EMAIL:  acaine@pszjlaw.com
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 2:20-cv-01840-DSC Doc. 1043-5 Filed 10/11/22 Entered 10/11/22 13:32:39 Exhibit E - Redacted
Deposition of Richard C. Trahant 5-18-22 Page 3 of 66

Richard Trahant
May 18, 2022

**Page 5**

```
 1    --------------- I N D E X ------------------
 2   WITNESS:  RICHARD TRAHANT
 3   EXAMINATION                              PAGE
 4       BY MS. GEORGE                         12
 5       BY MR. STERBCOW                      152
 6       BY MS. GEORGE                        252
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 6**

```
 1    ---------- E X H I B I T S -----------
 2   NUMBER                              MARKED
 3   Exhibit 1    Order                     12
 4   Exhibit 2    Everlaw DEC Pages,       125
 5                Bates-stamped
 6                ANO_Committee2004_0000240
 7                - 256
 8   Exhibit 3    Report of Archdiocesan    30
 9                Review Board Meeting, May
10                24, 2021, Bates-stamped
11
12   Exhibit 4    Declaration of            34
13                Richard Trahant,
14                Bates-stamped UST 0106 -
15                109
16   Exhibit 5    Trahant-████ Texts,       36
17                Bates-stamped
18
19   Exhibit 6    Trahant Email to ███,     42
20                Bates-stamped
21
22   Exhibit 9    Everlaw DEC Pages,       108
23                Bates-stamped
24                ANO_Committee2004_0000998
25                - 1002
```

**Page 7**

```
 1    ---------- E X H I B I T S -----------
 2   NUMBER                              MARKED
 3   Exhibit 11   NOLA.com Article, ███     46
 4   ███
 5   Exhibit 12   Email Chain,              64
 6                Bates-stamped
 7                ANO_Committee2004_0000007
 8                - 12
 9   Exhibit 13   Trahant-████ Call         73
10                Log, Bates-stamped
11   ███
12   Exhibit 15   Quin Encrypted Email to   76
13                Trahant, Bates-stamped
14
15   Exhibit 16   Email Chain,              83
16                Bates-stamped
17
18   Exhibit 18   Email Chain,              99
19                Bates-stamped
20
21   Exhibit 20   Email Chain,             104
22                Bates-stamped
23
24
25
```

**Page 8**

```
 1    ---------- E X H I B I T S -----------
 2   NUMBER                              MARKED
 3   Exhibit 21   Email Chain,             118
 4                Bates-stamped
 5
 6   Exhibit 22   Letter and Attachments   120
 7                from Omer Keubel to
 8                ████, dated
 9                1/13/22, Bates-stamped
10
11   Exhibit 23   Email Chain,             132
12                Bates-stamped
13
14   Exhibit 24   Email from               139
15                Richard Trahant to
16                ████, dated
17                1/19/22, Bates-stamped
18
19   Exhibit 25   Excerpts from Second     130
20                Production, Various Bates
21                Numbers
22   Exhibit 26   Documents Bates-stamped  162
23
24   Exhibit 27   Documents Bates-stamped  166
25
```



Page 9

```
 1        ----------- E X H I B I T S -----------
 2   NUMBER                                       MARKED
 3   Exhibit 28   Document Bates-stamped     169
 4                ████████████
 5   Exhibit 29   Documents Bates-stamped    171
 6                ████████████
 7   Exhibit 30   Document Bates-stamped     173
 8                ████████████
 9   Exhibit 31   Documents Bates-stamped    175
10                ████████████
11   Exhibit 32   Document Bates-stamped     180
12                ████████████
13   Exhibit 33   Document Bates-stamped     183
14                ████████████
15   Exhibit 34   Documents Bates-stamped    184
16                ████████████
17   Exhibit 35   Documents Bates-stamped    187
18                ████████████
19   Exhibit 36   Documents Bates-stamped    191
20                ████████████
21   Exhibit 37   Document Bates-stamped     199
22                ████████████
23   Exhibit 38   Documents Bates-stamped    204
24                ████████████
25
```

Page 10

```
 1        ----------- E X H I B I T S -----------
 2   NUMBER                                       MARKED
 3   Exhibit 39   Documents Bates-stamped    207
 4                ████████████
 5   Exhibit 40   Documents Bates-stamped    213
 6                ████████████
 7   Exhibit 41   Documents Bates-stamped    220
 8                ████████████
 9   Exhibit 42   Documents Bates-stamped    229
10                ████████████
11   Exhibit 43   Documents Bates-stamped    232
12                ████████████
13   Exhibit 44   Document Bates-stamped     233
14                ████████████
15   Exhibit 45   Documents Bates-stamped    245
16                ████████████
17
18
19
20
21
22
23
24
25
```

Page 11

```
 1       CERTIFIED STENOGRAPHER:  Raise your
 2   right hand, please.
 3       Do you solemnly swear the testimony
 4   you are about to give will be the truth,
 5   the whole truth, and nothing but the truth?
 6       THE WITNESS:  I do.
 7       MS. GEORGE:  Thank you.
 8       My name is Amanda George.  I'm an
 9   attorney for the United States Trustee of
10   Region 5.  This is a Rule 2004 examination
11   of Mr. Richard Trahant.  This examination
12   is taking place pursuant to a motion for
13   Rule 2004 examination filed by the
14   United States Trustee on May 4th, 2022, in
15   the Chapter 11 bankruptcy case of the Roman
16   Catholic Church of the Archdiocese of
17   New Orleans, Case Number 20-10846 filed in
18   the United States Bankruptcy Court for the
19   Eastern District of Louisiana.
20       On May 3rd the Court entered an
21   order authorizing this examination at
22   Docket Number 1498, and the examination is
23   being held today, on May 18th.
24       And I have here what I've marked as
25   Trahant Exhibit 1.  I'm going to share my
```

Page 12

```
 1   screen.
 2       (Exhibit Number 1, Order, was marked
 3       for identification.)
 4           RICHARD TRAHANT
 5   acknowledged having been duly sworn to tell the
 6   truth and testified upon his oath as follows:
 7           DIRECT EXAMINATION
 8   BY MS. GEORGE:
 9       Q.   Mr. Trahant, have you seen this
10   order?
11       A.   Yes.
12       Q.   And just to confirm, this is the
13   order entered by the Court to turn over
14   documents to the U.S. Trustee and appear for
15   this examination; correct?
16       A.   Yes.
17       MS. GEORGE:  This Rule 2004
18   examination is being taken using a video
19   connection before a court reporter who is
20   not in the same location as the witness.
21   I, therefore, request that the parties
22   stipulate that the examination may be taken
23   remotely before this court reporter with
24   the same effect as under Federal Rules of
25   Bankruptcy Procedure 7029 and 9014.
```

Page 13

1    So, Mr. Sterbcow and Mr. Trahant, do
2  you consent that this examination being
3  taken remotely before this court reporter,
4  who's not in the same room as Mr. Trahant,
5  has the same effect as under bankruptcy
6  rules 7029 and 9014?
7    MR. STERBCOW:  We do.
8    MS. GEORGE:  I also must state that
9  this examination and the documents being
10  discussed are confidential and under seal
11  pursuant to the Court's order for the
12  U.S. Trustee to investigate this matter.
13  That order's at Docket Number 1468.
14    On August 3rd, 2020, the Court
15  entered a protective order that's at Docket
16  Number 305 to protect confidential
17  information and documents in connection
18  with this Chapter 11 case.  The protective
19  order was amended by Docket Number 729, and
20  it's been supplemented by Docket
21  Numbers 885 and 1120.
22    The bankruptcy court is concerned
23  about the possibility of a violation or
24  violations of these protective orders via
25  the intentional dissemination of

Page 14

1  confidential information.  It has come to
2  the Court's attention that information
3  available only from confidential records
4  may have been disclosed to third parties
5  who are not party to this Chapter 11 case
6  and are not permitted access to
7  confidentially produced information.
8    So this examination we're having
9  today is part of the court-ordered
10  independent investigation by the
11  U.S. Trustee for Region 5 into potential
12  violations of the protective order.
13    This examination is one of many that
14  are being conducted by the U.S. Trustee.
15  The examination is also narrow in scope.
16  The investigation is interested in only the
17  flow of information during a discrete
18  period of time and not with the merits of
19  any party's position on any substantive
20  bankruptcy matters.
21    With that said, I'll begin our
22  questions.
23  BY MS. GEORGE:
24    Q.   Mr. Trahant, could you state your
25  full name, please.

Page 15

1    A.   My name is Richard Charles Trahant.
2    Q.   And where are you testifying from
3  today?
4    A.   From Mr. Sterbcow's office, right
5  catercorner to where you are.
6    Q.   So are you in New Orleans,
7  Louisiana?
8    A.   I am.
9    Q.   And you have a role in the
10  archdiocese bankruptcy case.  Could you explain
11  that role.
12    A.   My role is as a -- an attorney for
13  several members of the
14  Unsecured Creditors Committee.  We are what's
15  referred to as "state court counsel."
16    Q.   And which individuals, specifically,
17  do you represent on the Official Committee of
18  Unsecured Creditors?
19    A.   Along with John Denenea and
20  Soren Gisleson, I represent James Adams,
21  Jackie Berthelot, Theodore Jackson, and
22  Eric Johnson.
23    Q.   Can you say the last name again for
24  me?
25    A.   Eric Johnson.

Page 16

1    Q.   Mr. Trahant, could you describe your
2  law practice, generally speaking?
3    A.   My law practice is 95 percent clergy
4  sexual abuse cases.  I have probably three or
5  four cases that have nothing to do with clergy
6  sexual abuse.
7    Once upon a time, I was a trial
8  lawyer.
9    Q.   But your law practice, as it is
10  today, focuses on clergy sexual abuse cases.
11  Is that a fair characterization?
12    A.   Yes, it is.
13    Q.   And are you aware, as part of the
14  archdiocese bankruptcy case, that confidential
15  information in possession of the archdiocese
16  has been shared with the Official Committee of
17  Unsecured Creditors?
18    A.   I agree that documents stamped
19  "Confidential" have been shared with the
20  committee.  I don't agree that the overwhelming
21  majority of those documents are actually
22  confidential.
23    Q.   Is it your understanding that some
24  of these documents stamped "Confidential"
25  include records regarding alleged clergy abuse?

Page 17

1    A.   Yes.
2    Q.   And were you aware of the protective
3  orders regarding the sharing of documents
4  stamped "Confidential" in the bankruptcy case?
5    A.   Yes.
6    Q.   And were you aware of these
7  protective orders prior to December of 2021?
8    A.   I was.
9    Q.   Have you read the protective orders
10  and their supplements?
11    A.   I have.
12    Q.   Do you believe that you were subject
13  to the protective orders and their supplements
14  during the period of December 2021 through
15  January 2022?
16    A.   Yes.
17    Q.   Have you ever signed a
18  confidentiality statement with respect to the
19  protective orders?
20    A.   I searched, and the only one that I
21  found was the one that dealt with the proof of
22  claims.  And had I signed any of the actual
23  protective orders, I believe they would have
24  been in my digital file.  But that was the only
25  one that I had.

Page 18

1    Q.   And the confidentiality statement
2  related to the proofs of claim is a separate
3  confidentiality statement than that related to
4  the protective orders; correct?
5    A.   Yes, as I understand it.
6    Q.   Who is Amy O. Trahant?
7    A.   The luckiest woman in the world.
8  No, she's my wife who came to work for me 23
9  years ago out of necessity, and, unlucky for
10  her, she has never left.  She is my office
11  manager and helps me with certain legal tasks.
12    Q.   Does she have access to any of the
13  documents marked "Confidential" that have been
14  produced by the archdiocese?
15    A.   Yes.
16    Q.   Does she have access to Everlaw?
17    A.   Yes.
18    Q.   Did she access Everlaw between
19  December 1st, 2021, through January 31st, 2022?
20    A.   Yes.
21    Q.   Did she sign a confidentiality
22  agreement to the protective order?
23    A.   Not that I know of.
24    Q.   Do you believe that Mrs. Amy Trahant
25  is bound by the protective order?

Page 19

1    A.   I do, and I told her as much.
2    Q.   Has she been in possession of any of
3  the documents produced in this case relating to
4  ████████?
5    A.   To the extent that she has read
6  them, yes.
7    Q.   And how did she read them?
8    A.   Through Everlaw.
9    Q.   Does she have her own independent
10  login to Everlaw?
11    A.   No.  I think it's all through my
12  login.
13    Q.   So if she accessed Everlaw, it would
14  be through your login and password --
15    A.   Yes.
16    Q.   -- is that fair to say?
17    A.   Absolutely.
18    Q.   Has Amy -- has Mrs. Amy Trahant
19  shared any documents marked "Confidential"
20  relating to ████████ with any third party?
21    A.   No.  In fact, unlike me, she speaks
22  to no one about any of this.
23    Q.   So let me break that down so I
24  can -- we can get a good record.
25        Has Mrs. Amy Trahant spoken with

Page 20

1  ████████ at any time between December 1st,
2  2021, and January 19th, 2022?
3    A.   No.
4    Q.   Has Mrs. Amy Trahant provided any
5  documents to ████████ at any time between
6  December 1st, 2021, and January 19th, 2022?
7    A.   No.
8    Q.   Is there anyone else at your law
9  firm that would have access to documents
10  produced by the archdiocese that are marked
11  "Confidential"?
12    A.   No.  Can I qualify that?
13    Q.   Yes, please.
14    A.   Our office was pretty significantly
15  damaged by Hurricane Ida, and I do have, you
16  know, files with clergy abuse documents that
17  are marked "Confidential."  I would bet my
18  bottom dollar that nobody's looked at any of
19  them, but we had workers in our office.  So
20  that's my qualification.
21    Q.   When you say you had files marked
22  "Confidential," are those files that had been
23  printed out, paper files?
24    A.   Yes, but not from the bankruptcy.
25    Q.   So these would be files marked

Page 21

1   "Confidential" from other cases but not from
2   the bankruptcy case, 20-10846?
3       A.   Yes, but the only -- the only
4   significant tranche, for lack of a better term,
5   of documents that I have on my desk is a file
6   related to ████████████████, and that
7   file was originally produced in state court.
8   And I used those documents in December of 2020
9   when I deposed ██████. They are not marked
10  "Confidential" in the bankruptcy, although they
11  had been marked "Confidential" in the state
12  court lawsuit.
13      Q.   You previously stated that
14  Mrs. Trahant had viewed documents relating to
15  ██████ that were produced in this
16  bankruptcy, and I believe you stated she
17  reviewed them on Everlaw; is that correct?
18      A.   Yes.
19      Q.   Did she ever download the documents
20  from Everlaw?
21      A.   No.
22      Q.   Did she ever print out the documents
23  from Everlaw?
24      A.   Not on hard, no.
25      Q.   All right.  Mr. Trahant, how do you

Page 22

1   access -- how do you personally access any
2   documents marked "Confidential" that have been
3   produced by the archdiocese in this bankruptcy
4   case?
5       A.   The primary way that I access them
6   is through my login with Everlaw.  However,
7   there's a lot of documents from priest
8   personnel files that go back-and-forth not only
9   between me and my co-counsel but between us and
10  committee counsel and oftentimes members of the
11  committee, and sometimes I am not the
12  generating source of that, but I will -- I'll
13  put it to you this way.  Sometimes I get
14  documents that I have not yet seen in Everlaw.
15      Q.   So, for example, could you receive
16  documents via email that are marked
17  "Confidential" that have been produced in this
18  bankruptcy case?
19      A.   Yes.
20      Q.   What is Everlaw?  Could you just
21  describe it generally for us.
22      A.   I actually learned what Everlaw was
23  about four years ago in a product liability
24  case.  Everlaw is a database with searchable
25  documents.  It's very detailed with respect to

Page 23

1   how you navigate in it.  It's really -- I guess
2   the best way I can describe it is a repository
3   for cases that require the transmission of very
4   large amounts of documents.
5       Q.   So if you were to access documents
6   in Everlaw, can you walk me through how you
7   would do that?
8       A.   Yeah.  I -- I have the Everlaw home
9   page saved on my desktop at my office.  I
10  entered my password and username way back when
11  it was set up and we were given access to it --
12  and I couldn't even tell you what those are
13  because I saved them -- and I really just click
14  on it and try to find what I'm looking for.
15      Q.   When did you first receive your
16  login and password for Everlaw in this case?
17      A.   I don't know.
18      Q.   Was it prior to December 2021?
19      A.   Oh, yeah.  Definitely.
20      Q.   And is this a login and password
21  that's personal to you?
22      A.   It's personal to me, but my wife
23  uses it to access Everlaw as well.
24      Q.   Does anyone else besides your wife
25  use your login and password to access Everlaw?

Page 24

1       A.   Not that I'm aware of, no.
2       Q.   Did you have to fill out a special
3   application to receive your password, or was it
4   provided to you?
5       A.   I think it was just provided to me.
6       Q.   And who provided it to you?
7       A.   It would have been somebody at the
8   Pachulski Stang firm.  I think it was someone
9   named Cia Mackle.
10      Q.   When you log in to Everlaw, do you
11  have to acknowledge any terms or conditions
12  before you sign in to the database?
13      A.   No.
14      Q.   Did you personally log in to Everlaw
15  in December 2021?
16      A.   I'm sure I did.
17      Q.   Did you personally log in to Everlaw
18  during January of 2022?
19      A.   Yes.
20      Q.   How do you know when new documents
21  are uploaded into Everlaw?
22      A.   We get -- routinely we get an email
23  from Mr. Caine saying, you know, the last batch
24  of documents has been uploaded and are
25  available for review.

Page 25

1　　Q.　Do you ever download documents
2　produced by the archdiocese in this bankruptcy
3　case?  Do you ever download those documents
4　from Everlaw?
5　　　A.　No, because I don't know how to.
6　　　Q.　Do you ever print the documents
7　directly from Everlaw?
8　　　A.　No.  At least not that I -- I don't
9　think I know how to do that.  It's -- Everlaw
10　is over my head in terms of technology.  I'm
11　not a big fan of it, but I don't recall ever
12　having -- I don't know how to download
13　anything, and I do not recall having ever
14　printed any of it.
15　　　Q.　So generally, if you wanted to
16　review and mark up some documents that were
17　provided by the debtor, how would you do that,
18　if not through Everlaw?
19　　　A.　No, I know how to make notes in
20　Everlaw.  So you can pull, for example, the
21　▓▓▓▓▓　800-page personnel file, and I know
22　how to make notes on particular pages.  I'm not
23　sure if that answers your question.
24　　　Q.　Do you have any of the
25　▓▓▓▓▓-related documents that were produced

Page 26

1　in this case?  Do you have any of those
2　documents in paper form?
3　　　A.　Not that I know of, no.
4　　　Q.　When were you first made aware of
5　the abuse allegations against ▓▓▓▓▓?
6　　　A.　I believe it was either
7　December 30th or December 31st.
8　　　Q.　And how were you made aware?
9　　　A.　I was alerted to it, I believe, by
10　Jessica Quin, Soren Gisleson's legal assistant.
11　As I understood it, the ▓▓▓▓▓ Archdiocesan
12　Review Board report was in a different file
13　which we'll talk about.  It's not uncommon in
14　the document production in this bankruptcy.
15　　　Q.　Let's chat about Ms. Jessica Quin
16　quickly.  So who is Jessica Quin?
17　　　A.　She is Soren Gisleson's legal
18　assistant.
19　　　Q.　And does she have a professional
20　relationship with you?
21　　　A.　Well, yeah.  We -- I don't pay her,
22　she's not my employee, but she is part of
23　the -- and a very instrumental part of the
24　group that I work with.
25　　　Q.　And who's in that group?

Page 27

1　　　A.　Myself, Soren, and Johnny Denenea.
2　　　Q.　And when you say she's an integral
3　part, what role does she play?
4　　　A.　Everything.  She reviews documents.
5　She is a technology whiz.  She's just very,
6　very useful and has been prior to the
7　bankruptcy.  She kind of does everything.
8　　　Q.　Does she review documents that are
9　produced by the archdiocese in this bankruptcy?
10　　　A.　Yes.
11　　　Q.　Is she an authorized Everlaw user?
12　　　A.　I'm not sure whether she has her own
13　login or whether she uses Soren's.
14　　　Q.　And does she have any instructions
15　from you when it comes to Everlaw and when
16　documents are loaded into Everlaw?
17　　　A.　She doesn't have any instructions
18　from me.  Everybody that either works with our
19　group or the committee -- support staff,
20　lawyers, members of the committee -- everyone
21　is fully aware that these documents are not to
22　be shared outside of our group.
23　　　Q.　More generally speaking, does she
24　have instruction to alert you to certain
25　documents when they're uploaded?  You had

Page 28

1　testified a minute ago that she let you know
2　that there were ▓▓▓▓▓ documents that were
3　uploaded into Everlaw.  Why did she alert you
4　to that?
5　　　A.　I'm almost positive that the ▓▓▓
6　ARB report was mixed in with the file of
7　another priest.  It may have been ▓▓▓▓▓
8　▓▓▓▓▓.  It didn't necessarily have anything
9　to do with her alerting me that documents had
10　been uploaded.  It was more along the lines of,
11　"Look what I found here."  And then I took it
12　from there.
13　　　Q.　Does she regularly -- well, scratch
14　that.
15　　　　When she alerted you to the
16　▓▓▓▓▓ documents, did she send you --
17　email you the physical documents?
18　　　A.　Yes.
19　　　Q.　And generally speaking, if she finds
20　something that she thinks you may find
21　noteworthy in Everlaw, will she email you those
22　documents?
23　　　A.　Generally -- and I would say over
24　95 percent of the time, every one of those
25　emails comes to me, Johnny, and Soren.

Page 29

1  Q.  So when you indicate she made you
2  aware of the ▮▮▮▮▮▮ documents on
3  December 30th or 31st, would she have also
4  alerted Mr. Gisleson and Mr. Denenea at the
5  same time?
6  A.  Much more than likely, yes.
7  Q.  Besides yourself, Mr. Gisleson, and
8  Mr. Denenea, does she send documents to anyone
9  else?
10  A.  Only if it's in response to a larger
11  group email that could include somebody like
12  James Adams or Brittany Wolf-Freedman or the
13  lawyers at Locke Lord and/or Pachulski. She
14  doesn't usually take it upon herself to blast
15  documents out to the entire committee and
16  committee counsel. She usually leaves that up
17  to me.
18  Q.  Does she create notes and highlights
19  and annotations in Everlaw?
20  A.  She has, yes.
21  Q.  Do you know if she signed a
22  confidentiality statement to the protective
23  order?
24  A.  I don't.
25  Q.  Do you believe she's bound by the

Page 30

1  protective order?
2  A.  Absolutely.
3  Q.  All right. I believe you testified
4  that when you were first made aware of the
5  abuse allegations against ▮▮▮▮▮▮,
6  Jessica Quin had made you aware and she sent
7  you some documents relating to ▮▮▮▮▮▮. Is
8  that an accurate characterization?
9  A.  Yeah, I don't know that I would call
10  it some documents. I think it was a PDF of the
11  ALB report.
12  Q.  I'm going to pull up what I've
13  marked as Trahant Exhibit 3.
14  (Exhibit Number 3, Report of
15  Archdiocesan Review Board Meeting, May 24,
16  2021, Bates-stamped ▮▮▮▮▮▮▮▮▮,
17  was marked for identification.)
18  BY MS. GEORGE:
19  Q.  And can you see this, Mr. Trahant?
20  A.  I can.
21  Q.  Do you recognize this document?
22  A.  Yes, I do.
23  Q.  And can you describe it.
24  A.  That is a fairly routine document
25  that we've seen which, in this instance, is

Page 31

1  called an Archdiocesan Review Board report.
2  Intermittently, they have been called internal
3  review boards. They have been called
4  independent review boards. This one is called
5  an Archdiocesan Review Board.
6  So if I say ARB or IRB, I think
7  those are interchangeable terms.
8  Q.  If we say the ARB report for
9  ▮▮▮▮▮▮, is that this report that we've
10  marked as Exhibit 3?
11  A.  Can you scroll down just so I can
12  see the entire thing.
13  Q.  Yes.
14  A.  Please.
15  Q.  Here's page 1. Page 2, you can see
16  it up there, and page 3.
17  A.  Yep, that's it.
18  Q.  Is this the document that Ms. Quin
19  sent you on December 30th or 31st?
20  A.  Yes.
21  Q.  Now, there are some -- and I'll
22  scroll through here -- interview memorandums.
23  Did she send you the interview memoranda?
24  A.  Not at that time.
25  Q.  Okay.

Page 32

1  A.  But the answer to the question is
2  yes, just not at that time, because we didn't
3  know about it.
4  Q.  So she didn't -- she did not send
5  the interview memoranda on or about
6  December 30th or 31st; correct?
7  A.  That's right.
8  Q.  She only sent the ARB report?
9  A.  Right.
10  Q.  And did she send the ARB report in
11  an email?
12  A.  Yes.
13  Q.  And what did you do once she sent
14  you the report?
15  A.  As best I can recall, the name
16  ▮▮▮▮▮▮ rang a bell with me, probably because
17  I grew up in St. Ann's Parish and went to
18  church there off and on probably after I got
19  married into the mid-'90s, mid to late '90s.
20  So in general, I knew who he was and I Googled
21  him to find out where he was and what he was
22  doing, and that's when I discovered that he was
23  the chaplain at ▮▮▮▮▮▮▮▮▮▮▮.
24  Q.  This particular ARB report, did you
25  print it out when you received it?

Page 33

1   A.   No.
2   Q.   Did you save it onto your computer?
3   A.   I don't recall if I saved it
4 individually or not.  I probably did.
5   Q.   You say you "probably did"?  Is that
6 what you said?
7   A.   I think I did.  I'm not positive.
8   Q.   If you did, would it have been a
9 personal computer or a work computer?
10   A.   It would have been my work computer.
11   Q.   And who has access to the files on
12 your work computer?
13   A.   Only me.
14   Q.   Does your wife have access?
15   A.   My wife never uses my computer.
16   Q.   Do you have a passcode, or PIN, that
17 locks your computer?
18   A.   I do.  I said "never," and that may
19 not be true because she has, from time to time,
20 sat at my computer.  I think, more often than
21 not, it's when we have our IT guy on the phone.
22      But in terms of anything having to
23 do with my documents, saving documents,
24 anything like that, she doesn't use my
25 computer.

Page 34

1   Q.   Did you email or send this ARB
2 report to any third party?  And that would
3 exclude your clients or your co-counsel or the
4 UCC counsel in this case.
5   A.   No.
6   Q.   Did you discuss the findings
7 contained within the ARB report with any third
8 party, with the same caveat?
9   A.   No.  I didn't discuss anything in
10 the report.  But as I've established in my
11 discovery responses, I did speak to
12 ████████████ on January 4th about the
13 contents of Mr. Kuebel's letter.
14      But the answer is no.
15   Q.   All right.  So let's talk about
16 ████████.  So I have here what I've marked
17 as Trahant Exhibit 4.
18      (Exhibit Number 4, Declaration of
19      Richard Trahant, Bates-stamped UST 0106 -
20      109, was marked for identification.)
21 BY MS. GEORGE:
22   Q.   And, Mr. Trahant, do you recognize
23 this document?
24   A.   I do.
25   Q.   And can you describe it, please.

Page 35

1   A.   That is my declaration that
2 addresses, more generally -- essentially my
3 contacts with ████████.  That's what we
4 were asked to do by committee counsel.  And
5 obviously mine probably looks different than
6 everybody else's.
7      But, yeah, I do.  I recognize the
8 document.
9      MS. GEORGE:  Now, I'm going to
10   scroll to paragraph 7.
11 BY MS. GEORGE:
12   Q.   And can you read the first two
13 sentences of paragraph 7.
14   A.   "I had first become aware of the
15 incredible finding of the sexual abuse of a
16 minor by ████████ on or about December 31st,
17 2022.  I took it upon myself to contact my
18 cousin and ███████████████████████
19 ████████████████████, for what I believed
20 (and still believe) to be a legitimate
21 compelling reason -- to protect minors."
22   Q.   Mr. Trahant, today do you agree with
23 that -- with those two sentences?
24   A.   Yes.
25   Q.   Who is ████████████?

Page 36

1   A.   ███████████████████████████
2 ████████████████████  He is my second
3 cousin.  His mother is my first cousin.
4   Q.   And why did you contact
5 ████████?
6   A.   To ask him if ████████ was still
7 the chaplain at ████████████████.
8   Q.   Did anyone direct you to contact
9 ████████?
10   A.   No.
11   Q.   And you may have testified to this
12 already.  How did you know ████████ was
13 serving at ████████?
14   A.   I Googled it.
15   Q.   And how -- by what means did you
16 contact ████████ on December 31st?
17   A.   Text message.
18   Q.   All right.
19      MS. GEORGE:  I'm going to pull up
20   what we've marked as Trahant Exhibit 5.
21      (Exhibit Number 5, Trahant-████████
22      Texts, Bates-stamped ████████████████,
23      was marked for identification.)
24 BY MS. GEORGE:
25   Q.   Do you recognize this document,

Richard Trahant
May 18, 2022



Page 37

1  Mr. Trahant?
2    **A.   I do.**
3    Q.   Can you describe it.
4    **A.   These are my -- all of my text**
5  **messages from the period that you requested**
6  **them with** ▮▮▮▮▮▮**, both to and from.  I**
7  **have a -- well, I had to buy a -- an app called**
8  **Transfer Companion to draw a transfer, and**
9  **that's how I put those into a PDF.**
10   Q.   These are the text messages that you
11  provided to our office in response to our
12  discovery request; correct?
13   **A.   Yes.**
14   Q.   So I'm going to focus on the first
15  three text messages here.
16        And first let me just clarify.  The
17  green bubble text messages are your texts;
18  correct?
19   **A.   Right.**
20   Q.   And the gray bubble text messages
21  are ▮▮▮▮▮▮▮?
22   **A.   Yes.**
23   Q.   All right.  So this first text
24  message sent on 12/31/2021 at 5:50 p.m., you
25  ask: "Is ▮▮▮▮▮ still the chaplain at

Page 38

1  ▮▮▮▮▮▮?"
2        And ▮▮▮▮▮▮ responds at
3  5:55 p.m.: "Yes."
4        And then you respond at 5:55 p.m.:
5  "You and I need to get together soon."
6        Do you see that?
7    **A.   I do.**
8    Q.   What did you mean by "you and I need
9  to get together soon"?
10   **A.   Well, I'm not sure I can elaborate**
11  **on it any further, but my intention at that**
12  **point was to make sure that** ▮▮▮▮▮▮ **did not**
13  **have any access to children.  And I needed to**
14  **figure out, as it relates to the committee,**
15  **what we were going to do, because we were going**
16  **to do something about this.  But I thought it**
17  **was imperative -- I thought I had a legal,**
18  **moral, and ethical obligation, based on what I**
19  **knew, to keep this man away from children.**
20   Q.   So why did you need to get together
21  with ▮▮▮▮▮▮?
22   **A.   Because I wanted to tell him, under**
23  **no circumstances let this guy back.  And it's**
24  **really -- that's not the kind of conversation**
25  **you want to have in a text.**

Page 39

1    Q.   After you say "you and I need to get
2  together soon," ▮▮▮▮▮▮ responds at
3  5:56 p.m.:
4    **A.   He did.**
5    Q.   My question here is when you contact
6  someone regarding a person in the clergy, do
7  you expect them to know that there's a sexual
8  abuse history associated with that person?
9    **A.   It's not necessarily that I expect**
10  **them to know there's a sexual abuse issue, but**
11  ▮▮▮▮▮▮ **knows what I do for a living.**
12  ▮▮▮▮▮▮ **and I have had discussions about**
13  **clergy sexual abuse prior to this.  I come from**
14  **a very, very Catholic family, and everybody**
15  **knows what I do.  Everybody wants to talk about**
16  **it.**
17  ▮▮▮▮▮ **is a great guy, but he**
18  **immediately knew -- simply based on my**
19  **question, he knew what the inference was.**
20   Q.   Then you respond at 5:56 p.m.:
21  "Indeed."
22   **A.   Yes.**
23   Q.   What did you mean by that text
24  message?
25   **A.** ▮▮▮ **indeed, that his -- and I'm**

Page 40

1  **sorry.  I don't mean to be flippant.  That**
2  **his -- clearly -- and you'll see it in the next**
3  **text -- clearly he knew where this was going.**
4    Q.   So in the next text, at 5:56 p.m.,
5  he says: "You beat me to the text.  That's an
6  ominous question coming from you."
7        Is that the text you're referring
8  to?
9    **A.   It is.**
10   Q.   All right.  Then a little bit
11  further down, at 5:57 p.m. -- again, this is
12  all on December 31st -- you say: "Maybe we can
13  grab lunch next week."
14   **A.   Yes.**
15   Q.   This may be the same answer, but why
16  did you want to grab lunch with ▮▮▮▮▮▮?
17   **A.   To impress upon him to keep**
18  ▮▮▮▮▮▮ **away from high school kids.**
19   Q.   Do you believe this text exchange
20  from December 31st, 2021, was permissible under
21  the protective order?
22   **A.   Yes.**
23   Q.   Were you in possession of the ARB
24  document that we had marked as Trahant
25  Exhibit 3?  Were you in possession of the ARB

Case 2:20-cv-10846-DSC-JVM Document 143-5 Filed 10/11/22 Entered 10/11/22 13:32:39   Exhibit E - Redacted   Richard Trahant
Deposition of Richard C. Trahant 5-18-22 Page 12 of 66

May 18, 2022

Page 41



1  documents when you spoke to ▮▮▮▮▮?
2      A.   When I spoke with him or when I --
3      Q.   I'm sorry.  When you texted with
4  him.  I'm sorry.
5      A.   That's okay.  Yeah.  Yeah.  Sure.  I
6  mean, that was the impetus for me texting him.
7      Q.   On December 31st, 2021, had you --
8  or did you provide those documents to
9  ▮▮▮▮▮?
10     A.   No.  I never provided any documents
11 to ▮▮▮▮▮.
12     Q.   So let me expound upon that.
13     Did you provide any
14 ▮▮▮▮▮-related documents to ▮▮▮▮▮
15 at any time between December 1st, 2021, through
16 January 31st, 2022?
17     A.   I did not.
18     Q.   Did you speak to anyone else on
19 December 31st about ▮▮▮▮▮?
20     A.   I did not speak to anyone, and I did
21 not text with anyone.  And I'm trying to
22 remember whether -- my commentary to my group
23 beyond that, that would have been via email.  I
24 don't know if it was the 31st or the 1st.
25     But, no, I didn't speak to anybody

Page 42

1  else about this.
2      Q.   All right.  So let's move to
3  January 1st.
4      MS. GEORGE:  And I'm going to pull
5  up what we've marked as Trahant Exhibit 6.
6      (Exhibit Number 6, Trahant Email to
7  ▮▮▮▮▮ Bates-stamped ▮▮▮▮▮, was
8  marked for identification.)
9      THE WITNESS:  Yep.
10 BY MS. GEORGE:
11     Q.   Can you see this?
12     A.   Yes.
13     Q.   Do you recognize this document?
14     A.   I do.
15     Q.   Can you describe it, please.
16     A.   That is a January 1st email from me
17 to ▮▮▮▮▮, who at the time was a
18 reporter with The Advocate.
19     Q.   And what is the subject of the
20 email?
21     A.   ▮▮▮▮▮.
22     Q.   And can you read the two sentences
23 that you sent to ▮▮▮▮▮.
24     A.   Yes.  "Keep this guy on your radar.
25 He is currently the chaplain at

Page 43

1  ▮▮▮▮▮."
2      Q.   Why did you send this email to
3  ▮▮▮▮▮?
4      A.   Because I don't trust the
5  archdiocese, and it has been borne out time and
6  time again that when the perpetrator is close
7  with Greg Aymond, they're not going to do the
8  right thing.
9      And ▮▮▮▮▮ has been deeply
10 involved in reporting on the clergy abuse
11 crisis.  And he is a very good reporter who
12 will dig and dig and dig until somebody gives
13 him the information he's looking for.  And so I
14 was alerting him, without telling him anything,
15 clearly, keep this guy on your radar.  This is
16 where he is.
17     Q.   You just stated that ▮▮▮▮▮
18 ▮▮▮▮▮ was close with Archbishop Aymond.
19 Is that -- is that what you said?
20     A.   Yep.
21     Q.   And how did you know he was close
22 with Archbishop Aymond?
23     A.   Because they were at St. Ann at the
24 same time.  Archbishop Aymond, in the '80s and
25 '90s, used to say mass in rotation at St. Ann.

Page 44

1      Q.   You also said or testified that you
2  sent the email because you didn't trust the
3  archdiocese to do the right thing.
4      Had you or -- had you asked the
5  archdiocese to do anything with regard to
6  ▮▮▮▮▮ at this point?
7      A.   No.
8      Q.   Do you have a professional
9  relationship with ▮▮▮▮▮, or did you at
10 this time?
11     A.   I wouldn't call it a professional
12 relationship.  We have, over the course of the
13 years that we've done clergy abuse work, dealt
14 with dozens of members of the media.  I find
15 ▮▮▮▮▮ to be a dogged reporter, which I
16 guess is why he got hired by The Guardian out
17 of the UK recently.  But I know the quality of
18 his work, and -- sure.  I mean, I know him.  I
19 know a lot of reporters well enough to give
20 them a heads-up about something.  But I chose
21 ▮▮▮▮▮.
22     Q.   Had you sent previous emails to
23 ▮▮▮▮▮ asking him to keep certain
24 individuals on his radar?
25     A.   Probably not, because usually the

**Page 45**

1 stories that he has done, some of which have
2 been in conjunction with WWL with ███████,
3 those were always really stories from the
4 victim's perspective; and here, although I
5 ultimately found out who the victim is and the
6 fact that I know her, it was a different type
7 of situation because there was no victim that
8 he could speak with.
9  Q. How did you ultimately find out who
10 the victim was, without revealing who it is?
11  A. She signed a -- it wasn't a
12 verification, but it was a certification of a
13 yearbook picture from St. Ann with Greg Aymond
14 and ███████ with their arms around each
15 other. And on that her name was not redacted,
16 and I knew who she was.
17  Q. Was that picture in the personnel
18 file or produced in -- in the bankruptcy case?
19  A. Yes.
20  Q. Did ███████ respond to this
21 email?
22  A. No. He rarely responds to emails.
23  Q. Do you believe this email was
24 permissible under the protective order?
25  A. I should hope so, yes.

**Page 46**

1  Q. Between January 1, when you sent
2 this email, and the time the article about
3 ███████ was published, did you send any
4 other emails to ███████?
5  A. No.
6  Q. And just to firm that date, I'm
7 going to pull what we've marked as Trahant
8 Exhibit 11.
9  (Exhibit Number 11, NOLA.com
10  Article, ███████, was marked for
11  identification.)
12 BY MS. GEORGE:
13  Q. Do you recognize this exhibit,
14 Mr. Trahant?
15  A. I do.
16  Q. All right. And what is it?
17  A. That is the article ███████
18 wrote about the ███████ situation, which, as
19 I understand it, was posted on the evening of
20 ███████, and I believe went into the
21 actual newspaper ███████.
22  Q. And I'm trying to blow this up for
23 you. On Exhibit 11, can you see the exact
24 published date and time?
25  A. Yes.

**Page 47**

1  Q. And what is that?
2  A. ███████
3 ███████
4  Q. All right. So I'm going to recite
5 my question again but with exact dates and
6 time.
7  So between January 1st at 4:46 p.m.
8 and ███████, did you send any
9 other emails to ███████?
10  A. No.
11  Q. Did you direct anyone to send emails
12 to ███████?
13  A. Never.
14  Q. Did you direct anyone to email any
15 other media person during that time period?
16  A. No.
17  Q. Did you send the ARB report to
18 ███████?
19  A. No.
20  Q. Do you know who sent the ARB report
21 to ███████?
22  A. I don't, and I'm not sure he ever
23 received any documents, because he wouldn't
24 tell me. But to my knowledge, nobody that I'm
25 affiliated with sent anything to ███████

**Page 48**

1 or anybody else in the media.
2  Q. Did you ever discuss the information
3 contained within the ARB report or any other
4 documents produced relating to ███████ with
5 ███████?
6  A. No, not until after he wrote his
7 story.
8  Q. You said "after he wrote his story."
9 When was that?
10  A. That was January ███████
11 ███████.
12  Q. So when did you speak with
13 ███████ about the story?
14  A. ███████. And then once after
15 that.
16  Q. All right. You spoke with
17 ███████ on ███████; is that correct?
18  A. I did.
19  Q. Did you speak with him at any time
20 prior to ███████ but after January 1st?
21  A. I did.
22  Q. All right. So when did you speak
23 with ███████? Can you just run through it
24 for me.
25  A. Yes. As I stated in my responses, I



Page 49

1    had one conversation with him. I don't know
2    what the date of that conversation was, but
3    I -- I'm guessing it was somewhere right in the
4    middle between the 4th ████████, and he
5    started asking me questions about the
6    issue, and ████████ and I had the same
7    conversation we've had many times: "I can't
8    tell you anything. It's all under the
9    protective order."
10       Q.  Did he call you, or did you call
11   him?
12       A.  I don't recall, and it's really --
13   it's impossible for me to look at call logs and
14   distinguish what topics we spoke about. And I
15   can give you a little context on that.
16   During -- during the run-up to his article, my
17   co-counsel and I have been fighting to protect
18   the new law prescription statute of
19   limitations, which incidentally we were very
20   integrally involved in getting passed. And so
21   that's what I -- Johnny Denenea and I were
22   doing in court on ████████. There's a lot
23   of stuff that -- that I would speak to him
24   about that had nothing to do with ███. I only
25   recall that one conversation, and I think I

Page 50

1    said something to the effect of, "███████ you
2    know the drill. Like, if you want it, you've
3    got to go find it. I can't give it to you."
4        Q.  And this would have been a call
5    sometime between January 4th and ████████?
6        A.  Yes, definitely.
7        Q.  Did you talk to ████████ again on
8    ████████?
9        A.  I did.
10       Q.  And who called whom for that
11   conversation?
12       A.  I believe I had missed a couple of
13   calls from him. Johnny and I walked out of
14   court in Lafayette somewhere around 4:30 or
15   4:45. And I called him back mainly because I
16   wanted to talk about what had just happened in
17   court, which was very, very significant, and he
18   said, "I'm going to post an article on ████████
19          And when he told me some of the
20   details of the story, I -- I think you know
21   from my written responses -- if you want me to
22   say it, I'll say it, but I was shocked that he
23   had the detail that he did.
24       Q.  Did he ask you to confirm any of the
25   facts that he was planning to publish in his

Page 51

1    article?
2        A.  The only -- and I racked my brain
3    about this, but the only thing I remember him
4    asking me, he said something to the effect of
5    "I've been told that ████████ has known
6    about this for a couple of weeks."
7           And I think I said, "Yeah, that's
8    right."
9        Q.  And did he ask you to confirm any
10   other facts?
11       A.  No. No. I think -- I think he knew
12   by my reaction that he had gotten it right.
13       Q.  And this was a telephone
14   conversation; correct?
15       A.  Yeah. It was. In fact, I think we
16   had a few that evening driving back from
17   Lafayette because part of it was about -- there
18   were three significant things going on that
19   day. So it wasn't just about ████
20       Q.  Did he ask you to send him any
21   documents relating to ████████ during this
22   ████████ call?
23       A.  No.
24       Q.  Did you send him any documents
25   relating to ████████ after your call?

Page 52

1        A.  No.
2        Q.  Do you know how ████████ had all
3    of the details that he had for his story about
4    ████████?
5        A.  No.
6        Q.  Do you know who the multiple sources
7    are that he mentions in the article?
8        A.  I don't, except for the fact that I
9    think he -- I think he attributed one of the
10   multiple source things to the fact that
11   ████████ had known. So I guess to the
12   extent that I confirmed that, you know -- his
13   article was already written. So I -- you know,
14   I don't know whether he considered me a source
15   with respect to the fact that ████████
16   knew or not. But if you're asking me if I know
17   who any of the sources are, I don't, but I wish
18   I did.
19       Q.  Do you believe your conversation
20   with ████████ was permissible
21   under the protective order?
22       A.  Absolutely.
23       Q.  I'm going to flip back in time
24   significantly. I jumped ahead prematurely,
25   but, you know, I wanted to talk about and

Case 20-10846 Doc 1843-5 Filed 10/11/22 Entered 10/11/22 13:32:39 Exhibit E - Redacted Trahant
Deposition of Richard C. Trahant 5-18-22 Page 15 of 66

Richard Trahant
May 18, 2022

Page 53

1 expound upon some of the items you had
2 testified to.
3     A.   Okay.
4     Q.   So we discussed the email that was
5 sent on January 1st where you had asked
6 ███████ to keep ████████ on his radar.
7 Now, your declaration, which I'll pull up, we
8 have marked as Trahant Exhibit 4. Let's see.
9 At paragraph 5, can you read the first
10 sentence, Mr. Trahant, of paragraph 5 from your
11 declaration.
12    A.   Yes. "During a Committee meeting on
13 January 3, 2022, I made the Committee members
14 and Committee Counsel, as well as 'State Court
15 Counsel,' generally aware of the contents of
16 certain documents produced by the Archdiocese
17 in December of 2021 related to ████
18 ████████, including documents labeled as ANO
19 (20-10846)_00149323 through 325. I had
20 reviewed the documents discussed in the
21 Committee meeting prior to the meeting."
22    Q.   Just to clarify, those Bates-labeled
23 documents from the archdiocese, that -- those
24 documents make up the ARB report; correct?
25    A.   Yes.

Page 54

1     Q.   So there was a committee meeting on
2 January 3rd, 2022; correct?
3     A.   Yes.
4     Q.   Do you recall what time the meeting
5 was?
6     A.   Our meetings began at 5:00 p.m.
7 Central Standard Time.
8     Q.   Generally, is there an agenda
9 circulated ahead of the meeting?
10    A.   Every time.
11    Q.   Was ████████ on the agenda for
12 this meeting?
13    A.   I can't -- I don't know. And let
14 me -- can I give a little caveat to that,
15 Ms. George?
16    Q.   Sure.
17    A.   Our understanding, again, from the
18 inception of the committee, it was very, very
19 strongly conveyed to the members of the
20 committee and state court counsel that anything
21 that happened within the committee was
22 privileged and/or confidential.
23        So I don't know to what extent the
24 agendas are considered to be confidential, and
25 I wanted to qualify it that way because I don't

Page 55

1 want to waive any of the committee or committee
2 counsel's -- and Mr. Caine's here, so I guess
3 I'm not doing that.
4        But I don't recall, but I certainly
5 could look at that agenda and let you know
6 whether or not it was added -- you know,
7 sometimes I will email Brad Knapp, and poor
8 Brad was brand new to this case when this issue
9 blew up. It was usually Davin Boldissar, but
10 Locke Lord routinely handles the agenda, and
11 they're very good about adding things to the
12 agenda.
13       I think I did make people aware --
14 the committee counsel aware of this. I can't
15 guarantee that, but I certainly can check that
16 agenda and let you know if it's on there.
17    Q.   Do you regularly attend the
18 regularly scheduled Official Committee
19 meetings?
20    A.   Yes.
21    Q.   How often does the Official
22 Committee meet?
23    A.   That really depends on what's
24 happening in the bankruptcy. We had a very,
25 very long period of time where we met every

Page 56

1 Monday. We tried to go to biweekly, but then
2 things would flare up and we would have to meet
3 every week anyway.
4        So, really, it's a "tentative
5 biweekly Monday at 5:00 Central Standard Time"
6 meeting that we usually find out maybe Monday
7 morning if it's going to be canceled and, you
8 know, we'll meet the next week.
9     Q.   Do you ever meet regularly with the
10 archdiocese bankruptcy counsel, you personally?
11    A.   I do not. They have rejected every
12 meeting I've ever requested with them.
13    Q.   Now, going back to your declaration,
14 Trahant Exhibit 4, you state that you made the
15 attendees of the meeting generally aware of the
16 issues relating to ████████.
17       What does that mean?
18    A.   As I understand it, the committee
19 members did not have the ARB report, and I
20 wanted to make them aware of -- and I guess I'm
21 okay talking about this because Mr. Caine's not
22 objecting -- but I wanted to make them aware
23 that I thought we had what was a pressing
24 situation. And without telling you the content
25 of the meeting, it was the most intense,

Case 2:10-cv-04346-DSC-MPK Document 943-5 Filed 10/11/22 Entered 10/11/22 13:32:39   Exhibit E - Redacted
Deposition of Richard C. Trahant 5-18-22 Page 16 of 66

Richard Trahant
May 18, 2022

**Page 57**

1  emotional meeting that committee has ever had.
2        MR. CAINE:  Before you ask a
3  question, Amanda, I do want to make clear
4  that, as you know from our document
5  production, this issue -- we believe that
6  all communications between and among
7  committee members, their counsel, and
8  committee counsel, including the agendas,
9  emails, any verbal communications, that
10  those are all subject to the
11  attorney-client privilege.
12        That being said, we want you and the
13  United States Trustee's office to get to
14  the bottom of this.  So I haven't objected
15  to any of the questions so far, but I do
16  want you and Mr. Trahant to understand that
17  the committee believes that he should not
18  be testifying as to communications that
19  occurred within these meetings.
20        MS. GEORGE:  I appreciate that.  I
21  understand that.  And I'll say this:  I
22  don't really want to know what was
23  discussed at the committee meeting outside
24  of who knew the information contained in
25  the ARB report and who actually had the

**Page 58**

1  report.  So I'm -- I really just want to
2  focus on the flow of that information.
3        I don't -- I don't want to know the
4  substance of any -- any discussions.  So
5  let me ask my next question this way.
6  BY MS. GEORGE:
7     Q.   Mr. Trahant, prior to the meeting,
8  did you circulate the ARB report to any of the
9  committee members?
10    **A.   No.**
11    Q.   Did you circulate the ARB report,
12  prior to the meeting, to any of the committee
13  counsel?
14    **A.   I may have.**
15    Q.   Following the meeting, did you
16  circulate the ARB report to any committee
17  members?
18    **A.   I don't know that I did.  I do
19  believe the report was circulated.  You know,
20  there's a master list of recipients of -- you
21  know, affiliated with the committee, and the
22  only way I can ever get everybody included is
23  to "reply all."  I don't think -- I don't think
24  I did.  I think -- I think one of the committee
25  counsel did.**

**Page 59**

1     Q.   So after the committee meeting -- so
2  we're still on January 3rd, the meeting was at
3  5:00 p.m.
4        So following the conclusion of the
5  meeting, did you talk to anyone else that day
6  about the ▮▮▮▮▮▮ abuse allegation?
7     **A.   No, not that I can recall.  I really
8  don't --**
9     Q.   And I'm not trying to trick you.
10    **A.   Well, I would be if I were you.
11  That's a little levity.  I'm sorry.**
12        (Stenographer requests
13  clarification.)
14        MS. GEORGE:  All right.  I pulled
15  Trahant Exhibit 5.
16  BY MS. GEORGE:
17    Q.   Which -- Mr. Trahant, do you
18  recognize this as the text log that you
19  provided?
20    **A.   Yes.**
21    Q.   All right.  And let me blow this up
22  for you.  I'm looking at the top here.
23        Message sent January 3rd, 2022, at
24  9:25 p.m. you sent ▮▮▮▮▮▮▮ a text that
25  says:  "We might need to talk as early as

**Page 60**

1  tomorrow afternoon.  What would be the best
2  time to call you after 1:00?"
3        So why did you send ▮▮▮▮▮
4  this message?
5     **A.   Because I wanted to wait until we
6  resolved what was going to be done at the
7  committee counsel meeting, which occurs at
8  11:00 Central Standard Time on Tuesday.  And I
9  wanted to have a firm idea of what action the
10  committee was going to take.  And I wanted to
11  let him know that it was, again, important not
12  only for me but to the entire committee that
13  ▮▮ be kept away from kids.**
14    Q.   So when you say you wanted to speak
15  tomorrow afternoon, you wanted to wait until
16  tomorrow afternoon because you wanted to
17  resolve what would be done at the committee
18  counsel meeting the next morning.  I just -- I
19  want to know what you mean by that.
20    **A.   Well --**
21    Q.   Were you expecting some decisions to
22  be made the next morning with regard to the
23  committee's official action?  I'm just not
24  understanding.
25    **A.   Yes.  Yeah.  Yeah, because we**

Case 20-10846 Doc 1043-5 Filed 10/11/22 Entered 10/11/22 13:32:39 Exhibit E - Redacted
Deposition of Richard C. Trahant 5-18-22 Page 17 of 66

Richard Trahant
May 18, 2022



Page 61

1 were -- we were following up on what had taken
2 place the evening before. And without delving
3 into communications among the committee and
4 state court counsel, obviously what we
5 concluded was that something needed to be done
6 and it needed to be done fast.
7    Q.   And were you planning on sharing
8 those decisions with ████████ the next
9 day?
10    A.   In general, yes.
11    Q.   And if I scroll down -- I'm still on
12 January 3rd looking at Exhibit 5 -- at
13 9:31 p.m. you sent ████████ a text that
14 said: "Ok. I don't mean to be so cryptic, but
15 I will have a better idea of some things after
16 a meeting I have about this in the morning."
17    What did you mean by this text
18 message?
19    A.   Just to kind of reiterate what I
20 just said, that meeting was the committee
21 counsel meeting, and I wanted to know how
22 ████████ was going to be apprised of this
23 and what the committee was going to do.
24    And ultimately, as you know, the
25 letter was sent by Mr. Kuebel that day. I was

Page 62

1 trying to be very careful, Ms. George, not to
2 jump the gun on anything, because if the
3 committee had decided or if the committee
4 counsel had decided we're not going to do
5 anything about this, then I guess I likely
6 would not have pursued it.
7    But obviously I was trying to abide
8 by the protective order. I was trying not to
9 provide him with information. This is
10 difficult -- it's a very difficult thing to do
11 when you can't report this type of activity and
12 yet I'm straddling that line to try and say,
13 "You have a very mentally defective sexual
14 predator on your campus. Get him out of
15 there."
16    And I wanted to do that. I was
17 constrained from doing that. And that's why --
18 you know, it does look -- if you read the
19 entirety of the text messages, it does seem
20 very cryptic.
21    Q.   This exchange from January 3rd,
22 2022, do you believe this exchange was
23 permissible under the protective order?
24    A.   Yes, it is. I hope so.
25    Q.   All right. So let's move to

Page 63

1 January 4th.
2    Without telling me what was
3 discussed or the substance of any -- any
4 conversation, did you have the meeting with
5 Official Committee counsel that morning?
6    A.   Yes.
7    Q.   Do you recall the time of the
8 meeting?
9    A.   Yes. Our counsel meeting is almost
10 all the time at 11:00 Central Standard Time on
11 Tuesday morning, which would have been the 4th.
12    And, yes, we did have the meeting
13 that morning.
14    Q.   And, again, I'm trying to be careful
15 because I don't want to get into any privileged
16 information or communication. So I'll just ask
17 the question this way: Was the debtor informed
18 that day about the committee's concerns
19 regarding ████████?
20    A.   Yes.
21    Q.   How was the debtor informed, if you
22 know?
23    A.   Mr. Kuebel sent a letter to, I
24 believe, Mr. Mintz and Mr. Wegmann.
25    MS. GEORGE: I'm going to pull what

Page 64

1 we've marked as Trahant Exhibit 12.
2    (Exhibit Number 12, Email Chain,
3    Bates-stamped ANO_Committee2004_0000007 -
4    12, was marked for identification.)
5 BY MS. GEORGE:
6    Q.   Do you recognize this document,
7 Mr. Trahant?
8    A.   Yes.
9    Q.   Can you describe it, please.
10    A.   Yes. That's the Tuesday,
11 January 4th, 2022, letter from Rick Kuebel to
12 Mark Mintz addressing the ███ situation.
13    Q.   Did you receive a copy of this
14 letter?
15    A.   Yes.
16    Q.   And I'm going to scroll up. I don't
17 know if you can read this.
18    A.   Yeah, I can read the header.
19    Q.   Okay. So does this look like -- can
20 you tell me what this is?
21    A.   That -- that's what I was just
22 referring to before. That's the standard
23 recipient list that the Locke Lord people have
24 that whenever they want to send something to
25 the entire committee, state court counsel, and



Page 65

1 the committee members. So that's what that
2 header is with all those various names in it.
3 Q. And what's the date on this email?
4 A. January 4th, 2022.
5 Q. And were you a recipient of this
6 email?
7 A. Yes.
8 Q. And this -- did this email have an
9 attachment?
10 A. Well, the letter that you just
11 showed me was the attachment to the email.
12 Q. Okay. And that letter being the
13 January 4th letter from the committee to the
14 archdiocese counsel regarding ▓▓▓▓▓; is
15 that correct?
16 A. Yes.
17 Q. Did you forward this email to any
18 third party?
19 A. Doubtful. I mean, if I forwarded to
20 anybody, it was somebody within that group.
21 But, no, I did not forward that to
22 anybody who was not named a recipient on that
23 email.
24 Q. And I believe you just testified
25 that this -- all these individuals and email

Page 66

1 addresses listed in the recipient list, that's
2 the standard recipient list for committee
3 emails; is that correct?
4 A. It is, but it changes from time to
5 time, mainly because one of our committee
6 members often has different counsel from the
7 same law firm. And I will also point out that
8 somehow Paul Shields and Matthew Babcock, who
9 are employed by BRG, which is the committee's
10 financial professionals, are included on that
11 as well. But generally, Ms. George, it's the
12 same list of recipients.
13 Q. Why are Paul Shields and Matthew
14 Babcock included on the recipient list?
15 A. I don't know. My guess is that we
16 were -- maybe Mr. Knapp was dealing with one of
17 the financial issues and, from time to time,
18 Mr. Babcock and Mr. Shields are included on
19 those emails. And from time to time, they
20 provide updates to the committee as it relates
21 to financial matters.
22 Q. Now, I may have asked you this.
23 What time were you sent this email?
24 A. It looks like 3:18.
25 Q. I'm going to go back to Trahant

Page 67

1 Exhibit 5, which are our text messages. And do
2 you see this text exchange, Mr. Trahant, on
3 January 4th, 2022, at 1:24 p.m.?
4 A. Yes.
5 Q. And you asked ▓▓▓▓▓: "Is
6 there any way that you can stop by my house
7 this evening?"
8 And he replies: "I can't today."
9 Do you see that?
10 A. Yes.
11 Q. All right. Why did you send this
12 message asking if he can stop by your house
13 that evening?
14 A. Because I wanted to speak to him
15 once we knew that letter was going out. There
16 was a long, long history of our group trying to
17 have credibly accused child predators removed
18 from ministry, and I've seen how it works out
19 over and over again, and I had the benefit of
20 having one of the administration members at
21 ▓▓▓▓▓▓▓▓▓▓▓▓▓ as a relative, and I
22 wanted to talk to him about it.
23 Q. When you said you have a "long
24 history of our group," who is the group?
25 A. Soren Gisleson and Johnny Denenea.

Page 68

1 Q. It's not the Official Committee;
2 correct?
3 A. No. No. But the Official Committee
4 has obviously been at least a spectator to
5 several instances where there are credibly
6 accused child predators and the archdiocese
7 refuses to do anything about it.
8 Q. All right. If we scroll down, there
9 are a few more text messages on January 4th.
10 I'm going to point you to this message at
11 3:29 p.m. And you say: "Gotcha. Do you have
12 a few minutes to talk? If so, I can call you
13 in about ten minutes."
14 And ▓▓▓▓▓ says: "Yes, I
15 do."
16 Do you see that text message?
17 A. Yes.
18 Q. Did you call ▓▓▓▓▓ in the
19 afternoon of January 4th?
20 A. Yes.
21 Q. Do you recall what time?
22 A. Probably would have been shortly
23 after that text exchange and I knew that the
24 letter either had gone out or was about to go
25 out.



**Page 69**

1  Q.   And what did you discuss with
2  ████████ during this call?
3     A.   Probably, you know, I guess the
4  safest thing for me to do would be just to
5  adopt or read my response in writing because it
6  was much -- you know, it's difficult to try and
7  remember everything about a telephone
8  conversation and I took considerable time in
9  the last couple of weeks in sitting down and
10  trying to reconstruct all of this in my mind.
11  And I think, more than likely, the best
12  description is at page 4 of my written
13  responses, Ms. George.
14       I can read that to you or I can tell
15  you.  You know, I'm a little reluctant to
16  answer the question without referencing what I
17  put in writing because what I say might not
18  include, you know, everything that's in my
19  response.  But that was when, you know, I
20  basically told him, "You need to get this guy
21  off campus.  There's a credible claim against
22  him."
23     Q.   You can read your response,
24  Mr. Trahant, if you'd like, into the record.
25     A.   At page 4: "My first conversation

**Page 70**

1  with ████████ about the ██████ matter
2  was late in the afternoon on January 4th of
3  2022.  I spoke to him from one of my office
4  lines.  As evidence by our text exchanges
5  beginning 12-31-21, ████████ already had
6  an idea that this was an issue of child sexual
7  abuse by ███.  The call was not very long.  I
8  immediately informed ████████ that there
9  was a Protective Order in place in the
10  bankruptcy, and that I could not provide him
11  with any documents or the details contained in
12  any documents.  I stuck to the content of the
13  January 4th, 2022, letter that Committee
14  Counsel Omer Kuebel, III sent to counsel for
15  the archdiocese because I knew the information
16  would have to be conveyed to ████████.  I
17  confirmed to ████████ that there was a
18  credible claim involving a minor female."
19       And I think he asked me if it was a
20  boy or a girl, if I remember correctly.
21  That -- I just editorialized that.
22       "At the time, I did not know the age
23  of the girl, the nature of the abuse, or what
24  school she had attended at the time of the
25  abuse.  My main objective was to make sure that

**Page 71**

1  ████████ was not permitted to return to campus and
2  be near children.  I believe I informed
3  ████████ that the Committee was requesting
4  that ████ not be permitted to return to
5  ████████, and that he be removed from
6  ministry.  ████████ told me that
7  ████████ had not been informed of this
8  incident when Archbishop Gregory Aymond
9  appointed ████ to be the chaplain at
10  ████████.  I told him that I figured as
11  much.  ████████ was very troubled by what
12  I told him.  ████████ asked if he should
13  use my name, and I told him that I would prefer
14  that he not because the Archdiocese would try
15  to make the issue 'who contacted
16  ████████,' as opposed to why Gregory
17  Aymond placed a known sexual predator on a high
18  school campus."
19       Here we are.
20     Q.   When you say at the time of your
21  conversation you didn't know the victim's age
22  or what school she had attended, is that
23  because as of January 4th you hadn't received
24  those interview summaries?
25     A.   Exactly.  Yes.

**Page 72**

1     Q.   When you say you discussed just what
2  was in the letter -- let me go back to the
3  letter.
4       So did you convey to
5  ████████ -- and I'm just reading this from
6  the letter -- that:  "Archdiocesan team review
7  board members concluded that the behavior to
8  which ████████ himself admitted constituted
9  sexual abuse of a minor girl"?
10     A.   Yes, I did know it was a girl.
11     Q.   And so you conveyed this information
12  to ████████; is that correct?
13     A.   Yes.
14     Q.   During your call with ████████
15  or at any other time, did you ever tell
16  ████████ that the ████████ information
17  would be made public?
18     A.   I'm sorry?  No.  Absolutely not.
19     Q.   During this call with ████████
20  or any other communication with ████████,
21  did you ever say that ████████ would be
22  embarrassed by a public disclosure of this
23  information?
24     A.   Definitely not.
25     Q.   Do you believe your conversation on

Case 2:20-cv-10846-DGE Doc 1043-5 Filed 10/11/22 Entered 10/11/22 13:32:39 Exhibit E - Redacted Trahant
Deposition of Richard C. Trahant 5-18-22 Page 20 of 66

Richard Trahant
May 18, 2022



Page 73

1  January 4th was permissible under the
2  protective order?
3  **A.   I do.**
4  Q.   I'm going to pull up what I've
5  marked as Trahant Exhibit 13.
6      (Exhibit Number 13,
7  Trahant-███        Call Log, Bates-stamped
8  ███████████, was marked for
9  identification.)
10 BY MS. GEORGE:
11  Q.   Do you recognize this document,
12 Mr. Trahant?
13  **A.   Yes.**
14  Q.   And what is it?
15  **A.   That is the call log from December**
16 **of 2021 to January 31st of 2022.**
17  Q.   Is your January 4th call with
18 ███████ on this log?
19  **A.   No.  I made it from an office phone.**
20  Q.   So what -- what is this call log
21 from?  Which phone?
22  **A.   That's from my cell phone.**
23  Q.   Okay.
24  **A.   As I indicated in my written**
25 **responses, I only had one conversation with**

Page 74

1  ███████, and that's -- so I have a -- I
2  **have a pet peeve about talking on my cell phone**
3  **while I'm in my office, and I usually prefer to**
4  **either take or make calls on an office line.**
5  **And that's why you'll see in the text exchanges**
6  **that I told him, "I'm going to be calling you**
7  **from a 780 number."  And that's the only call**
8  **we had from my office phone.  Everything else**
9  **was either in-person meetings, cell phones, or**
10 **texts.**
11  Q.   All right.  I'm going to flip back
12 to Trahant Exhibit 5, which is our text message
13 log.  And do you see ████████ text on
14 January 4th, 2022, at 9:06 p.m.?
15  **A.   Yes.**
16  Q.   And would this have been a text
17 after you spoke with ███████ on the
18 phone?
19  **A.   Yes.  It was later that night.**
20  Q.   So the first sentence of the text
21 says: "Thanks for the phone call.  I'm
22 completely disgusted on a number of levels."
23  Why was ███████ disgusted?
24  **A.   Well, I found that out in detail the**
25 **following day, because we met and he told me.**

Page 75

1  **And first of all, he was disgusted that a man**
2  **who was on his campus acting as a chaplain and**
3  **being pious around children had a credible**
4  **claim -- really an admission.  Forget about the**
5  **credible claim.  He admitted, ███ did, to**
6  **certain things.**
7      **And so, second, what really, I**
8  **believe, disgusted ███████ is the fact**
9  **that Archbishop Aymond put ███ on**
10 ███████ campus without notifying**
11 **anybody, not only about this incident, but, as**
12 **I'm sure you know, there were other sexual**
13 **improprieties alleged against ███.**
14  Q.   His next sentence says:  "We're in a
15 better position now to weather this.  So
16 thanks."
17      When he says "We're in a better
18 position now to weather this," what is he
19 referring to?  Weathering what?
20  **A.   I'm guessing the removal of ███.  I**
21 **mean, certainly -- and I guess I need to give a**
22 **little bit of context, Ms. George.  ███**
23 ███████, as the principal of ██████**
24 ██████, is familiar with the Charter For the**
25 **Protection of Children and Young People, and**

Page 76

1  **that charter requires outreach to whatever**
2  **Catholic institution a child predator happens**
3  **to operate within.  And so he knew, I'm sure,**
4  **that ███████ was going to have to reach**
5  **out.  Like, they couldn't keep this bottled up.**
6  **And I believe that he was appreciative of the**
7  **fact that I did not permit him to be blindsided**
8  **with this.**
9  Q.   All right.  That evening you also
10 had an interaction with Ms. Quin.  I'm going to
11 pull up what I've marked as Trahant Exhibit 15.
12  **A.   Okay.**
13      (Exhibit Number 15, Quin Encrypted
14 Email to Trahant, Bates-stamped
15 ███████████, was marked for
16 identification.)
17 BY MS. GEORGE:
18  Q.   Can you see this document?
19  **A.   I can.**
20  Q.   And what is this document?
21  **A.   That is an encrypted email from the**
22 **Herman, Herman & Katz firm.**
23  Q.   Does Jessica Quin work at the
24 Herman, Herman & Katz firm?
25  **A.   Yes.**

Case 2:20-cv-11049-DSC-DCJ Doc 18143-5 Filed 10/11/22 Entered 10/11/22 13:32:39 Exhibit E - Redacted Trahant
Case 2:20-cv-10846-DEW-KWR Doc 1943-5 Filed 09/12/22 Page 12 of 18
Deposition of Richard C. Trahant 5-18-22 Page 21 of 66

Richard Trahant
May 18, 2022

**Page 77**

1    Q.   And were you the recipient of this
2  email?
3    **A.   Yes.**
4    Q.   And who is it from specifically?
5    **A.   Well, those emails come through in**
6  **an odd-looking way, but it's from Jessica.**
7    Q.   What is Proofpoint Essentials?
8    **A.   As far as I know, it's an encrypted**
9  **system.  And I guess I have to be frank with**
10  **you.  I don't know why sometimes I get**
11  **encrypted messages and most of the time I**
12  **don't.  In other words, you know, we all trade**
13  **a ton of emails with a ton of PDFs attached,**
14  **and every now and then I get this Proofpoint**
15  **Essentials encrypted message, and I don't**
16  **really know why.**
17    Q.   Well, that was my next question.
18        Why would Jessica Quin send you an
19  encrypted email?
20    **A.   I don't know.**
21    Q.   When there's an encrypted email,
22  does that -- are there usually documents
23  attached to the email?
24    **A.   Yes.  It's almost always documents.**
25  **You know, it may be that it was maybe too much,**

**Page 78**

1  **you know, the file was too large.  I have to do**
2  **that, but I use the Microsoft share function,**
3  **SharePoint, I think.**
4        **That really -- and I don't know if**
5  **my SharePoint is encrypted, but I think that's**
6  **what it is.  I think it's probably when the**
7  **document exceeds their email capacity.**
8    Q.   Do you know what documents she was
9  sending you on this day, on January 4th at
10  6:03 p.m.?
11    **A.   I don't.  I could go back and look.**
12  **It may have been the private investigator**
13  **documents, if I had to guess.  I don't like to**
14  **guess, but I think maybe that's what it was.**
15    Q.   When you say the "private
16  investigator documents," is that the interview
17  summaries?
18    **A.   Yes.  Yeah, and I think also at one**
19  **point -- and it may have been then.  Like I**
20  **said, I can look and tell you.  But I think --**
21  **I think in one of those emails I received that**
22  **yearbook picture with the identity of the**
23  **victim.**
24    Q.   All right.  Let's move on to
25  January 5th, the following day.

**Page 79**

1        MS. GEORGE:  And I'm going to flip
2    back to Exhibit 5, the text message
3    exchange.
4  BY MS. GEORGE:
5    Q.   And do you see this text message
6  from ████████, January 5th, 2022, at
7  12:44 p.m.?
8    **A.   Yes.**
9    Q.   And what does he say?
10    **A.   "Any chance I can stop by your house**
11  **this evening?"**
12    Q.   Did you meet that evening of
13  January 5th?
14    **A.   We did.**
15    Q.   And what did you discuss?
16    **A.   Could I read my written response?**
17    Q.   Yes.
18    **A.   "On the evening of January 5th,**
19  **2022, ████████ texted me asking if he**
20  **could stop by my house that evening.  We met at**
21  **my home that evening.  This was one of two**
22  **in-person meetings we had relative to this**
23  **issue.  ████████ represented to me that he**
24  **was troubled by what had transpired that day.**
25  **He advised me that a man named ████████ had**

**Page 80**

1  **called one of the ████████, Board members**
2  **named ████████ that morning; I told**
3  **████████ that I knew who ████████ is.  My**
4  **understanding was ████████ called ████████**
5  **for the sole purpose of discussing the**
6  **issue.  ████████ told ████████ that he knew**
7  **of an incident with ████████ and a high school**
8  **girl but that it only involved kissing and over**
9  **the clothes touching.  ████████ is not an**
10  **employee of the Archdiocese and should not have**
11  **known any of this information.  ████████ then**
12  **conveyed this information to the**
13  **administration.  My understanding at the time**
14  **████████ and ████████ had this conversation,**
15  **neither knew that I had contacted**
16  **████████.  Later that day both (I believe**
17  in the afternoon) ████████ was meeting
18  with ████████ and
19  ████████.  As
20  ████████ conveyed it to me,
21  Archbishop Aymond called ████████ while they
22  were in a meeting" -- "in this meeting,"
23  rather.  "Aymond brought up the ████████ issue, and
24  ████████ said, 'We already know about it.'
25  Aymond demanded to know who had informed

Page 81

1  about ████ but ██████
2  refused to give you my name.  Obviously, as the
3  Principal of a Catholic school, ██████████
4  felt immense pressure, but he believed that he
5  was protecting me because that is the type of
6  person ██████████ is.  We also spoke about
7  an e-mail that Dirk Wegmann sent Mr. Kuebel
8  that day stating in part, 'we are in the
9  process of looking into the information that
10  you inquired about.'  I advised █████████
11  that the Archdiocese did not have to look into
12  the information because it was the Archdiocese
13  that provided us with the information.  I told
14  ████████████  that the Archdiocese and its
15  lawyers would not handle this in a forthright
16  manner."
17        That's pretty much what the -- I
18  remember.
19     Q.   When you mentioned that you spoke
20  about an email Mr. Wegmann sent Kuebel, did you
21  bring up that email?
22     A.   I believe I did.
23     Q.   Had you been cc'd on that email?
24     A.   I don't know if I was cc'd on it or
25  if it was forwarded to me or if it was

Page 82

1  something Rick Kuebel and I talked about.  But
2  I know I have, Ms. George, seen that email.  I
3  just don't know when.
4     Q.   And it sounds like primarily
5  ████████████ was giving you an update as to
6  what was happening at ██████████.  Is that
7  a fair characterization?
8     A.   It is.  And what I can tell you is
9  that I was extremely concerned for ████.  So --
10     Q.   Why were you concerned for him?
11     A.   Because I saw how he was wearing
12  this, meaning I saw what it was doing to him.
13  ██████████████ is a very stoic individual with
14  a good dry personality.  He's a sweetheart of a
15  guy.  I held him in my arms as a child.  I've
16  known ████ his whole life.  And I realized the
17  position he was now in and that, to a degree, I
18  felt as if I contributed to putting him in that
19  position.
20     Q.   Do you believe your conversation
21  with ██████████ on January 5th were
22  permissible under the protective order?
23     A.   Yeah.  I believe my conversation
24  with him was.  I don't believe ████████████
25  conversation or Greg Aymond's conversations

Page 83

1  were.
2     Q.   All right.  Let's move on to
3  January 6th, would be the next day.
4         MS. GEORGE:  And I am going to pull
5     up what we've marked as Trahant Exhibit 16.
6         (Exhibit Number 16, Email Chain,
7     Bates-stamped ██████████████████, was
8     marked for identification.)
9  BY MS. GEORGE:
10     Q.   And this is a little complicated
11  because, as you know, when you're producing
12  emails, they're in reverse order.
13     A.   Yes.
14     Q.   So I'm going to -- I'm going to
15  scroll to the bottom -- I think this is it --
16  and let you kind of look at this.
17     A.   Yep.
18     Q.   Okay.  I'm going to scroll slowly,
19  Mr. Trahant, so you can see what's happening
20  here on what day, and then you can give me just
21  a brief summary of what's happening in these
22  emails.
23     A.   This is -- this is the typical
24  slurry of emails if we don't have a standing
25  call or standing Zoom.  This is kind of what it

Page 84

1  evolves into when we're trying just to set up a
2  phone call.
3     Q.   Is it fair to say that on the
4  morning of January 6th you were setting up a
5  meeting with Mr. Gisleson and Mr. Denenea?
6     A.   Yes.
7     Q.   At this point on January 6, had
8  Mr. Gisleson and Mr. Denenea reviewed the ARB
9  report?
10     A.   Yes.
11     Q.   And what is the subject line of
12  these emails setting up the call?
13     A.   Regarding ██████████████
14  ████████
15     Q.   Without violating any privileges,
16  can you tell me what was discussed at this
17  call?
18     A.   No, because I believe that it was
19  mostly mental impressions and what we intended
20  to do.  When I produced those and I pulled them
21  up, I don't really remember what that call was
22  about.
23         I hate to keep offering more than
24  what you're asking me for, but --
25     Q.   It's okay.



Case 2:20-cv-01243-NJB-JVM Document 143-5 Filed 10/11/22 Entered 10/01/22 13:32:39 Exhibit E - Redacted
Deposition of Richard C. Trahant 5-18-22 Page 23 of 66

Richard Trahant
May 18, 2022

Page 85

1    A.   -- I have worked for nearly 30 years
2  on a contingency fee. So I don't -- I don't
3  clock my calls or bill for them, and in looking
4  at that when I produced it, I just couldn't
5  even remember what the call was about.
6    Q.   Did you ever discuss with
7  Mr. Gisleson or Mr. Denenea making the
8  _____ information public?
9    A.   I don't believe I did. Our concern
10 at that point was how do we get this guy out of
11 there.
12   Q.   And on that point -- let me jump
13 back to this email.
14       This first email to _____ from
15 January 1st when you sent this email, was your
16 intent to have _____ publish an article
17 that would disclose _____ conduct?
18   A.   Yes, but not only _____
19 conduct.
20   Q.   Who else's conduct?
21   A.   The archdiocese, for putting him
22 there to begin with.
23       We've done this, Ms. George --
24 meaning _____, other reporters -- enough
25 to know that -- just like _____ did,

Page 86

1  when I bring up a name, they have a pretty good
2  idea where it's going.
3       MS. GEORGE:  I'm going to jump back
4  to January 6th, and I'm back on Exhibit 5,
5       the text log.
6  BY MS. GEORGE:
7    Q.   And then do you see here on
8  January 6th, Mr. Trahant, at 4:59 p.m., you
9  text _____:  "Let me know when you have
10 a few minutes to talk"?
11       Do you see that?
12   A.   Yes.
13   Q.   All right.  Did you talk to
14 _____ that evening?
15   A.   On the 6th, yes.
16   Q.   All right.  Why did you want to talk
17 to _____ at this time?
18   A.   I'll paraphrase what's at the top of
19 page 5 in my responses:  Within a matter of
20 days this thing got flipped into -- it's all
21 about a protective order violation. Forget
22 about the fact that during the bankruptcy the
23 CEO of this debtor has had a number of
24 different child predators on high school
25 campuses, which in any reasonable world would

Page 87

1  be the issue here. The issue had now become:
2  You guys violated the protective order. You
3  better tell us who it is.
4       And I'm almost positive that was the
5  main topic during that conversation. And then
6  my understanding was that Mr. Mintz and
7  Mr. Wegmann had both independently made
8  statements or put in emails that _____ was out
9  on medical leave, and _____ told me that's not
10 true. You know, he -- he's due back at the end
11 of the month for a week. And, again, I was
12 bound and determined not to let that happen.
13   Q.   At any point did you file a motion
14 with the Court for permission to share
15 information under the -- that was covered under
16 the protective order with _____ or any
17 other party?
18   A.   No, I did not because I don't
19 believe I violated the protective order. And I
20 guess the best way I can put it is this:  Let's
21 say for argument's sake, or as an example, that
22 I see a known sexual predator like _____
23 _____ holding hands with a child and walking
24 in a park. I'm going to do something about it
25 ten out of ten times.

Page 88

1       It doesn't mean that I violated a
2  protective order simply because I know this
3  guy's a pedophile based on sealed documents.
4  That would prevent me from honoring that oath
5  that I took as an officer of the court.  It
6  would prevent me from doing what I believe was
7  legally, ethically, and morally my obligation
8  to do.
9       So, no, I did not -- and it would
10 have taken, as things tend to do in this
11 bankruptcy, a very long time, and we had -- let
12 me stop there. Anything else would be
13 privileged and confidential.
14   Q.   Generally, were you sharing the
15 content of your conversations and texts with
16 _____ with your co-counsel, being
17 Mr. Gisleson and Mr. Denenea?
18   A.   Not really. First, they weren't
19 involved in any of these conversations and --
20 I've said this repeatedly. I did all of this
21 on my own. Committee counsel, my co-counsel,
22 were aware of the fact pretty early on that
23 _____ is my cousin, but they didn't
24 know the particulars of what I was doing. And
25 certainly none of them were involved in any of

Case 20-10846 Doc 1043-5 Filed 10/11/22 Entered 10/11/22 13:32:39 Exhibit E - Redacted Trahant Deposition of Richard C. Trahant 5-18-22 Page 24 of 66

Richard Trahant
May 18, 2022



Page 89

1 the meetings, and -- so, yeah, that's my
2 answer.
3     Q.   Did you -- when did you disclose to
4 committee counsel, that being Locke Lord or
5 Pachulski, that you were in communications with
6 ▉▉▉▉▉ about ▉▉▉▉▉?
7     A.   In communications, not until much
8 later.  I believe I made a comment at the
9 January 3rd, 2022, meeting that could fairly
10 have been interpreted that I had contact with
11 ▉▉▉▉▉▉▉▉▉, but in terms of the extent of
12 the communications -- when we talked, when we
13 texted -- they didn't know anything about that.
14     Q.   Well, we know they found out
15 eventually.  Would it have been after the
16 article was published?
17     A.   I think so.  And I don't even think,
18 then, committee counsel knew the extent of my
19 communications with ▉▉▉.  There's a lot that
20 goes on that I don't share with committee
21 counsel because a lot of it doesn't have
22 anything to do with the bankruptcy.  But even
23 if it does and it's one of my clients and one
24 of my clients wants to tell his story to the
25 media, his or her story, I don't -- I don't

Page 90

1 consult with bankruptcy committee counsel on
2 that.
3     Q.   All right.  Let's move to
4 January 7th.  Just moving day by day here.  So
5 on January 7th, there were some texts sent and
6 here you see on January 7th at 4:59 p.m. --
7 and, again, we're still on Trahant Exhibit 5:
8 "Do you have time to grab a beer tomorrow or
9 Sunday?"
10         Do you see that, Mr. Trahant?
11     A.   You had to go there, didn't you?  I
12 do.  I'm sorry.
13     Q.   We'll call it a beverage.
14         Why did you want to meet again with
15 ▉▉▉▉▉▉?
16     A.   I believe that I reached out to him
17 because of the fact that there were a lot more
18 accusations about this protective order, and I
19 basically wanted to talk to him about, you
20 know, where this was going.  Things were
21 happening very, very rapidly, and so between
22 our meeting on the 5th, which I think was a
23 Wednesday evening, and then the end of the
24 week, a whole lot happened; and, again, you
25 know, the issue became the supposed protective

Page 91

1 order violation and not what should be and
2 should have been the issue the entire time.
3     Q.   Okay.  If I scroll down to the text
4 message on January 7th, 5:38 p.m., you say:
5 "Let's shoot for tomorrow at 2:00."
6         Do you see that?
7     A.   I do.
8     Q.   So "tomorrow" would have been
9 January 8th; correct?
10     A.   Yes.  A Saturday.
11     Q.   So did you meet with ▉▉▉▉▉▉
12 on January 8th?
13     A.   For quite a while, yes.
14     Q.   How long did you meet, would you
15 say?
16     A.   That Saturday meeting -- oh, you
17 know what?  You can -- we met at 2:00.  I shot
18 him that clericalism email almost right after
19 he left.  So that -- maybe two hours.
20 Actually, if you go down a little bit --
21     Q.   So here's the January 8th text
22 messages.
23     A.   Yeah.
24     Q.   So you sent a text message on
25 January 8th at 4:24 p.m.  Would that have been

Page 92

1 shortly after your meeting?
2     A.   Yes.  Definitely.  So probably two,
3 two and a half hours.
4     Q.   Okay.  And what did you discuss at
5 the January 8th meeting?
6     A.   I'll read it from my discovery
7 responses, but I will -- I will predicate it on
8 the fact that ▉▉▉ was very shaken by this
9 whole thing.  And as I wrote:  "On the
10 afternoon of January 8th, 2022 (a Saturday),
11 ▉▉▉▉▉▉▉▉ and I met again at my house.  One
12 of the first things we talked about was
13 Dirk Wegmann's e-mail of January 7, 2022, to
14 Rick Kuebel wherein Mr. Wegmann wrote:  'Rick,
15 in response to your request for information,
16 the Archdiocese received a call from
17 ▉▉▉▉▉▉▉▉ on behalf of ▉▉▉▉▉▉▉▉
18 ▉▉▉ stating that the school had been
19 informed that ▉▉▉▉▉ had been accused of
20 sexual abuse of a minor and that such
21 information would be made public and embarrass
22 the school.'"
23         That's the content of Mr. Wegmann's
24 email which I actually read to ▉▉▉▉▉▉
25 from my laptop.

Page 93

1      And he said two things.  First, it
2  was "false that ▮▮▮▮ had called the
3  Archdiocese" and it was also "false that anyone
4  had threatened to make the issue public and
5  embarrass the school.
6      "We spoke about the fact that
7  Archbishop Aymond had 'done the same thing'
8  when he appointed ▮▮▮▮▮▮▮▮▮▮ as a
9  chaplain at ▮▮▮▮▮▮▮▮▮▮ in
10 ▮▮▮▮▮ in the summer of 2020 without informing
11 the administration that ▮▮▮▮ had been
12 sending inappropriate texts to students.
13 ▮▮▮▮ said that he knows the principal of
14 ▮▮▮▮" -- I have III there -- '▮▮▮▮▮,
15 and that ▮▮▮ was livid when he found out
16 that Aymond had appointed ▮▮▮▮ without
17 telling ▮▮▮ about the texts; Aymond
18 appointed ▮▮▮ in the summer of 2020,
19 during the pendency of the bankruptcy...
20 ▮▮▮▮ was arrested on October 2nd, 2020, and
21 is currently being prosecuted in St. Tammany
22 Parish for sexually abusing one of our clients,
23 which I relayed to ▮▮▮▮▮.  I offered to
24 put ▮▮▮▮▮▮ in touch with ▮▮▮▮
25 because I thought it was important for

Page 94

1 ▮▮▮▮▮ to let the public know that
2 ▮▮▮▮▮▮▮ was blameless in this situation,
3 and that Aymond had caused this entire problem.
4 ▮▮▮▮ also told me that the ▮▮▮▮▮
5 ▮▮▮▮▮▮▮▮ (the
6 religious order that controls
7 ▮▮▮▮▮...) ▮▮▮▮▮ had
8 gotten involved in this matter.  According to
9 ▮▮▮▮▮ was very upset with
10 Archbishop Aymond for putting the school in
11 this position.  ▮▮▮▮▮ told me that ▮
12 ▮▮▮▮ had been on ▮▮▮▮ campus as recently
13 as the last Saturday in November to say a mass
14 for the football team before its playoff game
15 against ▮▮▮ High School.  ▮▮▮▮ said
16 that it was clear that Aymond and ▮▮▮ while
17 admitting that ▮▮ did something to this girl,
18 were trying to minimize it; and ▮▮▮▮▮
19 found it particularly odd that Aymond referred
20 to the girl on more than one occasion as a
21 'major.'  ▮▮▮▮ described the
22 ▮▮▮▮▮▮ administration being incredulous
23 that Aymond and ▮▮ were trying to justify
24 ▮▮▮ sexual abuse of a minor.  I spoke to
25 ▮▮▮▮ about a concept called

Page 95

1  'clericalism.'  Specifically I mentioned that
2  priests do not have to go through applications,
3  interviews, background checks to be able to
4  work with kids like lay people do.  I spoke
5  about the case of ▮▮▮
6  ▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮▮▮
9  ▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮
11 ▮▮▮▮▮ that I would e-mail a great
12 article on clericalism to him, which I did
13 after our meeting.  I assured him that
14 Greg Aymond could not be counted on to do the
15 right thing because he has a history of
16 covering for his brethren priest who are/were
17 child predators.  In addition to my being
18 concerned about how this would impact
19 ▮▮▮▮ career, ▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮
23 ▮▮▮▮▮
24 ▮▮▮
25

Page 96

1  ▮▮▮▮▮▮▮
2      Q.   Let me ask you a few questions about
3  some of the statements you just made,
4  Mr. Trahant.  All right.  So you testified that
5  you had read ▮▮▮▮ the email from your
6  laptop, that email being from Mr. Wegmann to
7  Mr. Kuebel where he referred to a conversation
8  with someone -- I forget who -- associated with
9  ▮▮▮▮ who said information about
10 ▮▮▮▮▮ would be made public and embarrass
11 the school.
12      And you said -- if you remind me,
13 you said that information was not true?
14      A.   ▮▮▮▮▮ said that's false.  I
15 knew it was false as it related to me.
16 Certainly I --
17      Q.   So that was where I wanted to
18 follow-up.  So you -- did you ever tell
19 ▮▮▮▮ that information -- this
20 information regarding ▮▮▮ past would
21 be made public and embarrass the school?
22      A.   Absolutely not.
23      Q.   And from your conversations with
24 ▮▮▮▮, did you have any indication that
25 ▮▮▮▮ told anyone at ▮▮▮▮▮





Page 97

1  that information about the ███████
2  allegations would be made public and embarrass
3  the school?
4      A.   I don't believe he told anybody
5  that, and if he did, that was his conclusion,
6  not -- not what I said or not what I intended
7  and he knew that.  I mean, I think clearly you
8  can look at the communications and it's very
9  clear that ████ understood that I was trying to
10  help him secondarily to getting ████ away from
11  kids.  I know people at ████████████
12  ████.  It was never my intention to embarrass
13  them.
14      Q.   You also mentioned that during this
15  meeting you had offered to put ████████████
16  in touch with ████████████.
17      Did you ever do that?
18      A.   No.  In fact, he -- ████ did not
19  seem disinclined to do that at the time.  You
20  know, I would advocate that he do the same
21  thing ████████████ did, which is to get it out
22  there in the media that we didn't know anything
23  about this guy's past, because the archbishop
24  did not tell us about his past.
25      Q.   So you encouraged ████ to get out in

Page 98

1  the media and get in front of the story?  Is
2  that an accurate characterization?
3      A.   I would say it was more that I -- I
4  offered it as an option.  I didn't really
5  encourage it, but I did offer it as an option.
6      Q.   And did he ever take you up on that
7  option in January of 2022?
8      A.   He did not, which will lead to some
9  things about the relationship between
10  ████████████ lawyer and Archbishop Aymond.
11      Q.   Did you ever provide ████████████
12  ████████████ contact information?
13      A.   I don't believe I did.
14      Q.   You also mentioned that ████████████
15  ████████████ conveyed to you that the folks
16  at the archdiocese were trying to minimize the
17  underlying issues with ████████ by saying
18  she was a major.  How did ████████████ know
19  that the victim was actually a minor?
20      A.   Well, I think he knew it because
21  that was the initial conversation based on
22  Mr. Kuebel's letter.  And then they already
23  knew -- ████████████ already knew by that time that
24  this guy, ████████████, had told ████████████ she
25  was a high school student who wasn't 18.  So

Page 99

1  that -- I think that's how he knew.
2      I didn't know.  I didn't know how
3  old she was.  I guess the best way to say it,
4  Ms. George, is that they knew -- they knew and
5  provided details that I did not know when I
6  reached out to ████████████ at first.
7      Q.   All right.  On January 8th there was
8  also an email sent.  I'm going to pull up what
9  we've marked as Trahant Exhibit 18.
10      (Exhibit Number 18, Email Chain,
11      Bates-stamped ████████████, was
12      marked for identification.)
13      THE WITNESS:  Yes, ma'am.
14      MS. GEORGE:  And, again, I will
15      scroll to the bottom, which I hope takes us
16      to the first -- here we go.  This is the
17      first email in the thread.
18  BY MS. GEORGE:
19      Q.   Do you see this email, Mr. Trahant?
20  On January 8, 2022, at 4:19 p.m. you wrote,
21  "Can we talk or get together tomorrow?"
22      Do you see that?
23      A.   Yeah, I don't think that's to
24  ████████████.
25      Q.   No.  I believe -- there.  Does this

Page 100

1  shed any light on who the recipients were?
2      A.   Yes.
3      Q.   All right.  And who were they?
4      A.   Johnny -- okay.  Wait.  I'm reading
5  from Soren to me and Johnny.
6      Q.   So is it fair to say these are
7  emails between yourself, Mr. Gisleson, and
8  Mr. Denenea?
9      A.   Yes.  Definitely.
10      Q.   And the first email in this thread
11  is from you -- correct? -- where you say, "Can
12  we talk or get together tomorrow?"
13      A.   Yes.
14      Q.   Why did you want to talk and get
15  together with your co-counsel the day following
16  your meeting with ████████████?
17      A.   Probably to let them know what I
18  knew.  I don't remember the call.  I guess
19  we've had it.
20      Q.   I was going to say, did you have the
21  call?  I mean, do you know if you had the call
22  or not?
23      A.   Yeah, if we established a time and a
24  call-in, then we likely did have the call.
25      Q.   When you say you wanted to let them

Case 2:20-cv-10846-CJB-JVM Document 943-5 Filed 10/11/22 Entered 10/11/22 13:32:39 Exhibit E - Redacted
Deposition of Richard C. Trahant 5-18-22 Page 27 of 66

Richard Trahant
May 18, 2022



Page 101

1  know what you knew, do you mean what you knew
2  from your conversations with ████████?
3     A.  Yes.
4     Q.  All right.  So let's move to
5  January 10th, and I'm going to pull up Trahant
6  Exhibit 13, which is our call log.  And if I
7  scroll to January 10th, it shows a missed call
8  from ████████ at 4:12 p.m., and then you
9  called ████████ back at 4:21 for 30
10  seconds, and then at 4:22 during which you had
11  about a 16-minute call.
12     A.  I see that.
13     Q.  Okay.  So why did ████
14  call you initially on January 10th?
15     A.  I believe it was to let me know --
16  and ultimately this is in my description -- I
17  believe to let me know that ████
18  would be getting his lawyer involved.  I think
19  that's why he was calling me.
20     Q.  And is that -- well, so during your
21  16-minute call, is that what you discussed?
22     A.  Yes.
23     Q.  Did you discuss anything else?
24     A.  I can read my response relative to
25  that phone call.

Page 102

1     Q.  Okay.
2     A.  And I qualify this with:  There may
3  have been things that were said that I don't
4  remember.
5        But what I wrote in my discovery
6  responses are:  "On the afternoon of
7  January 10th, 2022, I spoke to ████████
8  again.  I did not recall this call
9  independently until I reviewed my call logs,
10  which refreshed my memory.  I believe that this
11  was the call when ████████ told me that
12  ████████████ had gotten its lawyer
13  ████████████
14  ████████ involved in this matter.
15  ████████ told me that Dirk Wegmann had
16  threatened to have ████ held in
17  contempt of court if ████████ did not
18  disclose my identity.  ████ asked
19  ████████ to call me and ask if he could
20  disclose my identity.  My response was to laugh
21  and explain to ████████ that
22  ████████ was not a party to the
23  bankruptcy, and certainly had not violated any
24  court order or subpoena which would warrant a
25  motion for contempt.  I had major concerns

Page 103

1  about ████████ having a conflict of interest
2  in this matter because I know that he has a
3  close relationship with Greg Aymond, and that
4  ████ served on the Archdiocese Finance
5  Council.  Both Aymond and ███ have been
6  ████ 'Alumnus of the Year' in the
7  past.  Also, I knew that ████ was a
8  ████████ graduate.  I believe that this
9  was also the call where ████████ and I
10  discussed the fact that ████████ would be
11  provided with some of the ███ documents that
12  same week."
13        I remember him saying, "We're
14  supposed to be getting the documents from
15  ████ on Thursday."  That, I remember.
16     Q.  So ████████ let you know that
17  he was supposed to be receiving some of the
18  ████████ documents?
19     A.  Yes.  And I believe I already knew
20  that through Mr. Kuebel.
21     Q.  Had you told ████████ that
22  fact, or did he tell it to you?
23     A.  Well, he told me that they were
24  expecting to get documents.  And I -- I can't
25  remember whether ████ name first came up from

Page 104

1  ████ or from Mr. Kuebel.  But I had great
2  concerns, and I still do.
3     Q.  And you -- did you relay those
4  concerns about ████████ to ████████████?
5     A.  Yes.  I believe I called it a turkey
6  shoot.
7     Q.  Okay.  So let's move on to the next
8  day, January 11th.
9        MS. GEORGE:  I'm pulling up what
10  we've marked as Trahant Exhibit 20.
11        (Exhibit Number 20, Email Chain,
12  Bates-stamped ████████████, was
13  marked for identification.)
14  BY MS. GEORGE:
15     Q.  And I'll focus on -- see if you can
16  see this okay.
17        Do you see this first email right
18  here, Mr. Trahant, from you to Bradley Knapp?
19     A.  Yes.
20     Q.  And when did you send this email?
21     A.  Looks like I sent it on Tuesday,
22  January 11th, 2022, at 2:50 p.m., which would
23  have been later in the day after our Tuesday
24  committee counsel call.
25     Q.  All right.  And what did your email

Case 20-10846 Doc 1943-5 Filed 10/11/22 Entered 10/01/22 13:32:39 Exhibit E - Redacted Trahant
Deposition of Richard C. Trahant 5-18-22 Page 28 of 66

Richard Trahant
May 18, 2022

Page 105

1  say?  Can you just read this short email.
2      A.   Yes.  "Brad, give me a number where
3  I can call you.  It will take less than 5
4  minutes.  Thanks."
5      Q.   And did you speak with Mr. Knapp
6  that day?
7      A.   I'm sure I did.
8      Q.   Without violating any -- any
9  privileges, can you disclose what you discussed
10  with Mr. Knapp for less than five minutes?
11      A.   I really don't remember, and this
12  may have been -- I'm not sure that this had
13  anything to do with the ███ situation at all.
14  I don't -- I don't remember.  I mean, I've --
15  I've had quick calls with Brad.  Unlike
16  Rick Kuebel, you can have a quick call with
17  Brad.  And I've had several, but I -- I don't
18  remember the content of the conversation.
19          But if you're asking if it had
20  anything to do with me disclosing any of my
21  communications with ██████, it did not.
22          Oh, okay.  Can I add this?
23      Q.   Yes.
24      A.   I believe that document came up
25  because we word-searched ███ and

Page 106

1  ███████████   That's how I produced the
2  privilege log and the production log.  So I
3  think it picked ██ or ██████████ up out
4  of the original attachment, which was the
5  agenda, but I don't think this call was even
6  about the ███ issue.
7      Q.   Okay.  That makes sense.
8          MR. CAINE:  Amanda, when you reach a
9      natural stopping point, can we take a short
10      break whenever that happens?
11          MS. GEORGE:  Well, I -- I can make
12      this a natural stopping point.  I would
13      love to take a restroom break, if everybody
14      else would too.
15          How long -- I mean, how long of a
16      break would everyone like?
17          THE WITNESS:  Five minutes.
18          MS. GEORGE:  Does that work,
19      Mr. Caine?
20          MR. CAINE:  Yes.  You and I had the
21      same train of thought.
22          Why don't we take a brief recess and
23      reconvene at 12:30.  Does that work for
24      everyone?
25          THE WITNESS:  Yes.

Page 107

1          MR. CAINE:  Yes.
2          MS. GEORGE:  Okay.  Great.  See you
3      all in five.
4          (Break taken from 1:25 p.m. to
5      1:33 p.m.)
6          MS. GEORGE:  We can get back on the
7      record.
8  BY MS. GEORGE:
9      Q.   What I want to do is follow-up,
10  Mr. Trahant, on these interview summaries.  And
11  what I'm referring to specifically is
12  Exhibit 3, Trahant Exhibit 3.  Not the ARB
13  report, but these, I guess, summaries --
14  "Memorandum of Interview" attachment, which
15  I've also included in Exhibit 3.
16          Mr. Trahant, when did you first
17  become aware of these interview summaries?
18      A.   I'm not sure.  It may have been that
19  encrypted email.  I'm not sure.  I could go
20  back and pinpoint that for you, but I know -- I
21  know it was quite a number of days after I had
22  the ARB report.
23      Q.   And I want to focus your
24  attention -- let me see I can blow this up.
25          Do you see the archdiocese Bates

Page 108

1  number here ending in 14936 --
2          MR. CAINE:  You're not sharing.
3          THE WITNESS:  You're not sharing.
4          MS. GEORGE:  Oh, dear.
5          THE WITNESS:  That's okay.
6  BY MS. GEORGE:
7      Q.   How about now?
8      A.   Thank you.
9          MS. GEORGE:  Thanks, everyone.
10  BY MS. GEORGE:
11      Q.   So do you see the archdiocese Bates
12  number here, 149356?
13      A.   Yes.
14      Q.   Okay.  And that's at the bottom of
15  this Memorandum of Interview regarding
16  ███████.
17          Do you see that?
18      A.   Yes.
19          MS. GEORGE:  All right.  I'm going
20  to pull up what we've marked as Exhibit --
21  Trahant Exhibit 2.  And let me find what
22  I'm looking for.  I'm in the wrong exhibit.
23  I'm actually going to pull up Trahant
24  Exhibit 9.
25          (Exhibit Number 9, Everlaw DEC

Page 109

1     Pages, Bates-stamped
2 ANO_Committee2004_0000998 - 1002, was
3 marked for identification.)
4 BY MS. GEORGE:
5     Q.  Have you ever seen this document
6 before, Mr. Trahant?
7     **A.  I don't think so.**
8     Q.  Well, if you let me sort of explain
9 this, this was produced by the committee, and
10 it's an Everlaw log.
11     **A.  Okay.**
12     Q.  And you can see up here,
13 hopefully -- do you see where it says:
14 "Everlaw, Archdiocese of New Orleans -
15 Committee Review, Document 1 of 1 - ANO
16 (20-10846)" and then Bates numbers "149356"?
17     Do you see that?
18     **A.  I do.**
19     Q.  Is that the same Bates number of the
20 interview memorandum that we were just looking
21 at?
22     **A.  I'm not sure.**
23     Q.  Let me flip back.  If you look at --
24     **A.  I take your word for it, if it is.**
25     Q.  Just so that -- so, again, not

Page 110

1 tricking anyone.
2     Do you see this -- this is the
3 bottom of the interview memorandum, 149356?
4     **A.  356.  Okay.**
5     Q.  And then if I flip to our Everlaw
6 log, see where it says:  "149356"?
7     **A.  Yes.**
8     Q.  Okay.  And so it's our understanding
9 that this is a log of who accessed those
10 Bates-stamped documents on Everlaw.  And this
11 would be the interview summaries.
12     **A.  Okay.**
13     Q.  And you can see here, the only names
14 we really have since it was -- you know, the
15 document was added on December 15th at
16 9:17 a.m., and the only names that we have in
17 this log are James Adams and Jessica Quin.
18     **A.  Okay.**
19     Q.  Do you recall ever logging in to
20 Everlaw and pulling up those interview
21 summaries?
22     **A.  Only if they were in the entirety of**
23 **the  ████  file.  I believe those were excerpted**
24 **and sent to me in an email.**
25     Q.  Okay.

Page 111

1     **A.  And, again, the -- the interview**
2 **summaries and the ARB report came from**
3 **something else.  They didn't come from ████**
4 **████  personnel file because we didn't have**
5 **it.  I think that as it relates to ████**
6 **entire file, you'll see me logged in there a**
7 **lot.**
8     Q.  All right.  It looks like these --
9 the interview summaries you received earlier in
10 December 15th -- and we'll get into the
11 personnel file.  I believe you're right.  That
12 came much later.
13     **A.  Yes.**
14     Q.  And the only names we have in here,
15 again, are James Adams and Jessica Quin.  So is
16 it fair to say that Jessica Quin is the
17 individual who would have sent you the email --
18 I'm sorry -- that would have sent you the
19 interview summary?
20     **A.  I believe so, yes.**
21     Q.  Okay.  All right.  So let's move
22 back onto our timeline.  We had been talking
23 about January 11th and the short call with
24 Mr. Knapp that may not have had anything to do
25 with ████████.

Page 112

1     So now I want to jump to
2 January 13th, and I'll pull up what we've
3 marked as Exhibit 13, Trahant Exhibit 13, which
4 is the call log.  And if we go to January 13th,
5 you see that there was a call made by you,
6 Mr. Trahant, to ████████ on January 13th
7 at 1:14 p.m. lasting five seconds, and then it
8 looks like ████████ called you back on
9 January 13th at 4:23 p.m., and that call lasted
10 almost 28 minutes.
11     Do you see that?
12     **A.  I do.**
13     Q.  All right.  So why did you make that
14 initial call to ████████ at 1:14 p.m.?
15     **A.  Probably because that was the day he**
16 **told me he was going to review the documents**
17 **that were provided, I guess, by the archdiocese**
18 **to ████████.  And so once I knew he had**
19 **reviewed those documents, I did not see a**
20 **problem with me and him talking about those**
21 **documents.**
22     Q.  So did he confirm for you on this
23 date that he had, in fact, reviewed the
24 documents?
25     **A.  I believe he did.  I put in my**



Page 113

1  written responses that I really couldn't
2  differentiate between the January 13th call and
3  the January 14th call, but I do remember the
4  content -- I couldn't -- if you asked me, you
5  know, what was said on the 13th as opposed to
6  the 14th, I wouldn't know. I know he -- he was
7  very eager to talk about what he had read.
8      Q.  And what did he read?
9      A.  My understanding is that he read
10 everything that was provided, which I -- my
11 understanding, again, is that he would have
12 been provided the ARB report and the private
13 investigator summary.
14     Q.  And do you know how he received
15 those documents, how he received the letter and
16 the attachments of those documents?
17     A.  I do remember him saying that they
18 were going to ▮▮▮▮▮ office. Now, you
19 know, whether the documents were emailed or he
20 was given hard copies, I don't -- I don't
21 remember that, and I don't know if I ever knew
22 that.
23     Q.  But you're fairly certain on either
24 January 13th or January 14th, ▮▮▮▮▮ had
25 read those documents?

Page 114

1      A.  Oh, yeah.
2      Q.  And what was -- what was your
3  discussion with him regarding those documents?
4      A.  Again, I'm going to reference my
5  responses at page 6 because I believe that's a
6  better recitation than I can do on the fly.
7          And this is what I wrote: "My call
8  logs establish that I had two phone calls with
9  ▮▮▮▮▮ on the afternoons of January 13,
10 2022 and January 14, 2022. I combine these two
11 calls because I am not able to differentiate
12 between the two in my mind. I know that these
13 were calls about the ▮▮▮ documents that were
14 produced to ▮▮▮▮▮. As I understood
15 from Mr. Kuebel, the documents being produced
16 to ▮▮▮▮ would be the Archdiocesan
17 Review Board Report and the statements prepared
18 by the Archdiocese's private investigators
19 relative to the interviews of the victim, her
20 husband, and ▮▮▮▮ (there are another
21 approximately 800 pages of ▮▮▮ files that
22 ▮▮▮▮▮ has not been given). ▮
23 ▮▮▮▮ confirmed that he had reviewed these
24 documents. He and the group at ▮▮▮▮
25 (I believe at this point that it was ▮▮▮▮

Page 115

1  ▮▮▮▮▮) were even more upset
2  with Gregory Aymond after ▮▮▮▮ (and I
3  believe ▮▮▮) reviewed these documents."
4          I put the next sentence in italics:
5  "I would note at this point that the private
6  investigator documents appear to be incomplete,
7  which was the case with virtually every
8  document production the committee has received
9  in this case."
10         Now we're out of italics:
11 "▮▮▮▮ was appalled by what he had read
12 in these documents, especially because he had
13 known ▮▮ for many years. ▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. We
18 spoke about how ridiculous and non-credible ▮
19 ▮▮▮ statement to the private investigators
20 was. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23 I believe the second call might also have been
24 the call wherein ▮▮▮▮▮ referenced a
25 conference call with Aymond during which he

Page 116

1  admitted to 'an error in judgment' in
2  appointing ▮▮▮ to ▮▮▮▮▮, but that
3  this was all happening because 'those lawyers
4  who represent the victims on the committee are
5  very, very bad people.' (Aymond has made
6  several similar comments about us in other
7  contexts.) ▮▮▮▮▮ also told me that ▮▮
8  tendered his resignation on January 13th, 2022.
9  That is inconsistent with both the
10 Archdiocese's timeline and Aymond's
11 January 10th, 2022, letter accepting ▮▮▮
12 resignation. How could Aymond have accepted ▮
13 ▮▮ resignation on January 10, 2022 when ▮
14 ▮ did not resign until January 13, 2022?"
15         That ends with a question mark.
16 "This is why I have asked for the
17 native version of Aymond's January 10, 2022
18 letter, because I believe that letter might not
19 have been created until January 13, 2022 and
20 the metadata might show this."
21     Q.  When you state that you had
22 discussed that there were separate
23 allegations ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25 separate allegations referenced in the ARB



Page 117

1   report or the investigatory files?
2       A.   I believe they were both referenced
3   by him, by ▮▮▮▮ in his statement to the
4   private investigators.  But with respect to the
5   ARB report, I do not recall any mention of
6   those other two things.
7       Q.   And then you mentioned the
8   ▮▮▮▮ personnel file that hadn't yet been
9   produced.  Had you -- did you discuss with
10  ▮▮▮▮ that there were additional
11  documents that hadn't yet been turned over by
12  the archdiocese?
13      A.   I did.
14      Q.   And as of this date, January 13th or
15  January 14th, had you received or looked at
16  that larger personnel file?
17      A.   I don't know.  I don't know, but
18  that's another issue I could pinpoint in
19  Everlaw.  Maybe not me, but somebody who knows
20  more about how Everlaw works than I do.  I do
21  remember that I spent a Friday and a Saturday
22  reading and annotating ▮▮▮▮ file.
23      Q.   On January 13th, there were some
24  emails exchanged.  I'm going to pull what we've
25  marked as Trahant Exhibit 21.  Let me blow this

Page 118

1   up.
2           (Exhibit Number 21, Email Chain,
3       Bates-stamped ▮▮▮▮, was marked for
4       identification.)
5   BY MS. GEORGE:
6       Q.   Okay.  I'm going to start with
7   this -- with the first email down here.
8           Do you see this email, Mr. Trahant?
9       A.   I do.
10  ▮▮▮▮
11  ▮▮▮▮
12  ▮▮▮▮
13      Q.   Correct.
14      A.   January 14th, 2022.  I think it's
15  5:08 or 5:06.
16      Q.   Let me make it bigger.
17          MR. STERBCOW:  January 13th.
18          THE WITNESS:  Oh, I'm sorry.
19      January 13th, 2022, at 5:06.  I have
20      neither good nearsight or farsight.
21  BY MS. GEORGE:
22      Q.   I'm the same way.  That's why I have
23  my big glasses on.
24      A.   I know, and then I put my reading
25  glasses on and it makes it worse, but anyway.

Page 119

1       I'm sorry.
2       Q.   It's okay.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21          The reason I produced that to you is
22  because there really is no attorney-client
23  relationship, and if there's no work product --
24  which is why I produced it.  But I don't know
25  why she sent it.

Page 120

1       Q.   All right.  I'm going to flip to
2   what we've marked as Trahant Exhibit 22.
3           (Exhibit Number 22, Letter and
4       Attachments from Omer Keubel to
5       ▮▮▮▮, dated 1/13/22, Bates-stamped
6       ▮▮▮▮, was marked for
7       identification.)
8   BY MS. GEORGE:
9       Q.   Mr. Trahant, can you see this
10  document?
11      A.   Yes.  Yes, ma'am.
12      Q.   Do you recognize it?
13      A.   I do.
14      Q.   What -- what is the date of the
15  document, first?
16      A.   January 13th of 2022.
17      Q.   And what is this document?
18      A.   My understanding is that this was
19  the transmittal of the ARB report and the PI
20  summary from Rick Kuebel to ▮▮▮▮.
21      Q.   And how did you get a copy of this
22  letter?
23      A.   I may have gotten this in the
24  ▮▮▮▮ discovery production.  I -- so I
25  have, Ms. George, my copy of this letter.  It's



Page 121

1 stamped BMH -- BMHS 0001.
2     Q.  Okay. Who made the highlight on
3 this letter?
4     A.  I don't have highlights on mine.
5     Q.  You don't have highlights? Okay. I
6 believe this was from your production to us and
7 it came with a highlight.
8         All right. So you don't know who
9 made the highlight?
10     A.  Can you scroll up a little bit.
11     Q.  So where it says here received from
12 Trahant at 5/10/22, that's a UST note.
13     A.  Right. Right. I was asking if you
14 could scroll to the bottom.
15     Q.  Oh, I'm sorry. The other up.
16     A.  Yeah. Yeah. So if I produced that,
17 that means I got this document from the
18 production from ▇▇▇▇▇▇ as opposed to
19 from Mr. Kuebel.
20     Q.  Okay.
21     A.  And, you know, I may have made that
22 highlight. I don't think I did, but I may
23 have.
24     Q.  Okay. Did you send this letter or
25 its attachment to any third party besides

Page 122

1 committee members or your co-counsel or UCC
2 counsel?
3     A.  No.
4     Q.  Did you discuss this letter or its
5 attachments with any third party?
6     A.  Only ▇▇▇▇▇▇▇, who already had
7 them.
8     Q.  Did you discuss this letter or its
9 attachments with ▇▇▇▇▇▇▇?
10     A.  No.
11     Q.  Did you send these interview
12 summaries to ▇▇▇▇▇▇?
13     A.  No.
14     Q.  Do you know who did?
15     A.  I do not. And I don't know that
16 anything was sent to him.
17     Q.  All right. Let's go to the next
18 day, which is January 14th, which would be the
19 day after the committee sent this letter.
20         MS. GEORGE: And I'm going back to
21     Exhibit 13, our phone log.
22 BY MS. GEORGE:
23     Q.  And you see again, Mr. Trahant, that
24 on January 14th there was another call with
25 ▇▇▇▇▇▇ lasting approximately 22 minutes.

Page 123

1         And I'll just get you to state for
2 the record that your summary that you -- that
3 you testified to previously could be applied to
4 either the January 13th or the January 14th
5 calls or a combination thereof; is that
6 correct?
7     A.  It is.
8     Q.  At any point during or prior to this
9 January 14th call, did ▇▇▇▇▇▇ disclose
10 to you that ▇▇▇▇▇▇ had contacted him?
11     A.  I don't believe so. I do know at
12 some point -- at some point I knew that ▇▇▇
13 was calling the school.
14     Q.  Do you know when you learned -- or
15 when did you learn that ▇▇▇▇ was contacting
16 the school?
17     A.  I don't know. It doesn't -- and the
18 reason I don't know is because it doesn't seem
19 like ▇▇▇▇▇▇▇ and I had any substantive
20 calls for the remainder of January, ▇▇▇▇
21 ▇▇▇.
22         And I think what you'll see there is
23 that I missed a call from ▇▇▇ at about 3:12
24 because we were still in court, and I called
25 him back right when we got out of court. I

Page 124

1 think I got his voice mail.
2     Q.  And that would be on ▇▇▇▇▇▇;
3 correct?
4     A.  Right.
5     Q.  So given this call log, would
6 ▇▇▇▇ -- or would you have learned ▇▇▇▇
7 was contacting the school during either your
8 January 14th or January 13th call?
9     A.  I don't remember, and I don't
10 remember if I had learned that after the
11 article came out.
12         You know, I looked -- I looked at
13 ▇▇▇▇▇▇▇▇ discovery responses. I do --
14 I do -- and maybe it was ▇▇▇▇ who told me
15 that nobody from ▇▇▇▇▇▇▇ would talk to
16 him. But I don't -- I can't tell you with any
17 degree of certainty that he was calling on the
18 13th or 14th. I just don't know.
19     Q.  When you say ▇▇▇ told you no one
20 at ▇▇▇▇▇ would talk to him, was that
21 on your ▇▇▇▇▇▇ call?
22     A.  Yes. I think he said something
23 like, you know, "I've gotten a quote from ▇▇▇
24 I've gotten a quote from the archdiocese, and
25 ▇▇▇▇▇▇ won't say anything."

Page 125

1    Q.   Did he tell you who else he had
2  gotten a quote from?
3    A.   I don't believe so.
4    Q.   All right.  Let's move on to the --
5  I wanted to talk about that second batch of
6  documents that was produced by the archdiocese
7  which we've been referring to as the "personnel
8  file."
9        When did you receive those
10  documents?  You mentioned you looked at them on
11  a Friday and a Saturday.  So when would you
12  have first received them?
13    A.   They would have been received and
14  loaded into Everlaw.  I am certain that I
15  reviewed the entirety of what was produced in
16  the Everlaw program.  In terms of when those
17  documents were produced to committee counsel, I
18  don't know.
19    Q.   Well, what I can show you -- and I'm
20  going to flip to Trahant Exhibit 2, which I
21  will represent to you is the Everlaw log that
22  relates to the personnel file.  And you can see
23  here -- I know this is clear as mud.
24        (Exhibit Number 2, Everlaw DEC
25        Pages, Bates-stamped

Page 126

1    ANO_Committee2004_0000240 - 256, was marked
2    for identification.)
3    A.   That's okay.  I can see it now.
4    Q.   You can see this?  January 14th,
5  11:59 a.m., which -- it's my understanding from
6  Mr. Caine that this time is in Pacific
7  Standard, so we need to add two hours to -- you
8  know, to convert it to Central time.
9    A.   Right.
10    Q.   So at 1:59 p.m. Central, the
11  personnel file documents were added to the
12  Archdiocese of New Orleans committee review
13  folder, so to speak, in Everlaw.
14        And so January 14th -- I'm looking
15  at my calendar.  January 14th was a Friday.
16    A.   Yes.
17    Q.   Got it.
18        So then you can see James Adams, on
19  January 14th, was viewing the documents,
20  creating a highlight.
21        And then on January -- it was not
22  until January 15th at 11:49 a.m. Pacific,
23  1:49 p.m. Central, Jessica Quin batch-exports
24  the documents to a zip file.  Okay.  So I'm
25  just going through this to see if it refreshes

Page 127

1  any recollection for you as to when you may
2  have received this personnel file.
3        So January 15th would be that
4  Saturday afternoon.
5    A.   Okay.  So the best answer I can give
6  is that I knew the details that ████ reported
7  by the ███ --
8    Q.   Uh-huh.
9    A.   -- which would lead me to believe
10  that my review and all of my notes and
11  highlights were answered on the 14th and 15th.
12        It should be reflected on a log that
13  you have.  Because if I access Everlaw right
14  now, my comments and highlights are there.
15    Q.   So let me show you.  Everlaw does
16  not show that you accessed this document
17  until -- let's see if you can see this --
18  January 18th at 2:21 p.m. Pacific, 4:21 p.m.
19  Central.
20        But it's your testimony that you had
21  read and reviewed and highlighted the personnel
22  file prior to ████; correct?
23    A.   I am virtually positive that I did.
24    Q.   And would that have been in Everlaw
25  that you were making those highlights and

Page 128

1  notes?
2    A.   Yes.  In fact, I had those notes --
3  I don't know how to do it, but Jessica Quin
4  does.  She was able to make a document that
5  pulled all of my notes.
6    Q.   Okay.
7    A.   January 18th was Martin Luther King
8  Day.  That was a Monday, and I definitely -- my
9  recollection, Friday and Saturday, went through
10  all of those ████ documents, annotated, and
11  highlighted them.
12    Q.   And your testimony is that
13  Jessica Quin, at some point, was able to pull
14  your notes and highlights?  Is that what you
15  said?
16    A.   Not the highlight, but there's a
17  function in Everlaw where you can -- I think
18  it's -- I think she sent it to me in a Word
19  document.  Because I asked -- I believe it was
20  Brad Knapp, to review the notes that I had made
21  because there was some pretty compelling stuff
22  there and some pretty compelling stuff missing,
23  which is typical of the document production in
24  this bankruptcy.
25    Q.   Okay.  And I'm asking because what

Page 129

1  you said in your declaration, which I have here
2  as Trahant Exhibit 4, if you look at
3  paragraph 13 -- and do you see here the first
4  sentence of paragraph 13 in the declaration
5  says:  "Prior to being prohibited from
6  reviewing newly produced documents by this
7  Court, I read and annotated ████████ file,
8  which is comprised of nearly 800 pages."
9       So what I'm trying to drill down is
10  when did you annotate it and why isn't it
11  showing up in the Everlaw log?  Because --
12      **A.   I am -- I am virtually positive that
13  I annotated it that Friday and Saturday.  And I
14  would have -- I could have been in there, and
15  likely I was, on Monday.**
16       **But it's a good question, and I will
17  offer this unsolicited statement:  There's been
18  a problem with people going into Everlaw and
19  finding notes that other people have left.  I
20  mean, obviously the majority of the documents
21  have been reviewed by me, Ms. Quin, and
22  James Adams.**
23       **But that -- you know, I don't know
24  why it's not showing up, but to the best of my
25  recollection, I know I did it on a Saturday**

Page 130

1  **because I couldn't wait to get back to my
2  office and start reading these things again.**
3      Q.   And did you ever print out that
4  personnel file?
5      **A.   No.**
6      Q.   Would all of your review and
7  annotation have been in Everlaw?
8      **A.   Yes.**
9      Q.   Did you ever download the personnel
10  file onto your computer?
11      **A.   No.**
12      Q.   All right.  Let me show you this.
13       MS. GEORGE:  So this is what I've
14  marked as Trahant Exhibit 25.
15       (Exhibit Number 25, Excerpts from
16  Second Production, Various Bates Numbers,
17  was marked for identification.)
18  BY MS. GEORGE:
19      Q.   And this is -- you know, these are
20  some pages from that personnel file that you
21  produced to us in response to our request for
22  documents.
23       And do you see -- and I'm not asking
24  about the substance of what is highlighted, but
25  do you see that there are highlights on this

Page 131

1  page, Mr. Trahant?
2      **A.   I see that there are highlights,
3  Ms. George, but I can't read it.  You would
4  have to zoom in.**
5       **Yes.**
6      Q.   Who would have made these
7  highlights?
8      **A.   Judging by the sloppy first line of
9  Number 7, probably me.**
10      Q.   And would -- is this a highlight
11  that would have been made in Everlaw?
12      **A.   Yes.  Yeah.  It's that highlighting
13  function where you kind of have to drag the
14  icon in a straight line.  And then when it's
15  messed up like that is, you can go back and
16  click on the garbage can and do it over.  But
17  that probably was me.**
18      Q.   Okay.  Did you send your highlighted
19  document to any third party?
20      **A.   I don't know how to take documents
21  out of Everlaw.  I didn't send any of these
22  documents to anyone.**
23      Q.   Now, do you see here how there's
24  this note that says:  "Canonical proceedings"?
25      **A.   Yes.**

Page 132

1      Q.   Where did this note come from?
2      **A.   It's loaded into Everlaw like that,
3  meaning --**
4      Q.   Okay.  So did you add this note?
5      **A.   No.  And it's not uncommon,
6  Ms. George, that we get documents that are in
7  PDF format because little to nothing has been
8  produced in native format to afford us the
9  ability to look at the metadata.**
10       **But a lot of times we get documents
11  that are copied with notes on top of text.**
12      Q.   All right.  I'm going to jump to
13  January 17th.  I'm pulling what we've marked as
14  Exhibit 23.
15       (Exhibit Number 23, Email Chain,
16  Bates-stamped ████████████, was
17  marked for identification.)
18  BY MS. GEORGE:
19      Q.   I'm going to start with the first
20  email?
21       Do you see this email, Mr. Trahant?
22      **A.   I do.**
23      Q.   Okay.  And so this is an email to
24  you -- or from you -- I'm sorry -- to
25  Jessica Quin, and you say:  "I can't even find



Page 133

1 his file in Everlaw. Would you be able to
2 email it to me? Thanks!"
3 So what file are you talking about?
4 A. I don't know, but I know that the
5 notes that I put in and that I reviewed were in
6 Everlaw. That, I'm certain of because, like I
7 said, she was able to extract my notes.
8 So, yeah, I don't know exactly what
9 that's referring to.
10 Q. Because -- and I'm just trying to
11 drill down a timeline.
12 A. I understand.
13 Q. This email's on Monday, January 17th
14 at 2:58 p.m., and so where you say "I can't
15 even find his file in Everlaw," you would have
16 already reviewed ████████ large personnel
17 file by this date; correct?
18 A. Pretty sure I did.
19 Q. Okay.
20 A. I don't know what file I'm referring
21 to, but I know that I knew the content of what
22 ████████ reported prior to ████████.
23 Q. All right. And then you see here,
24 Jessica Quin responds to your email on
25 ████████████████ and she sends you

Page 134

1 some links.
2 Do you see that?
3 A. I do.
4 Q. Okay. And these are links to ███
5 ███ large personnel file. And, again, I'm
6 just trying to drill down the timeline.
7 Had you reviewed ████████ large
8 personnel file prior to ████████████
9 ████?
10 A. I'm virtually positive that I did,
11 and January 18th, I was in court in Lafayette
12 all day. So I wouldn't -- I wouldn't have even
13 seen those that day.
14 Q. What is a Citrix attachment?
15 A. To my understanding, it's another
16 one of these encrypted-type email programs.
17 Q. Okay.
18 A. Unless the -- my review is the
19 following weekend, I was -- I've been
20 relatively certain that I had read the entire
21 file before that article came out.
22 Q. All right. So let's go back to the
23 article.
24 A. Okay.
25 Q. Which was published shortly after

Page 135

1 this email. The article -- we established
2 already the article was published ████████
3 ████████, and you testified that you had
4 spoken with ████████ earlier that day on
5 ████████ maybe a few times because there
6 was a lot going on that day.
7 Is that a fair characterization of
8 your testimony?
9 A. Yes, it is.
10 Q. Now, you said that with regard to
11 ████████, you were shocked at some of the
12 details that he shared with you. What details
13 did he -- did he share that had elicited that
14 reaction?
15 A. Well, it was the entire scenario of
16 the archdiocese taking the position that the
17 ████████████████ and my understanding is
18 that only could have come from the entire file
19 because based on the ARB report and the
20 summaries from the PIs, everyone concluded she
21 was a minor. That information could not have
22 been known without the entire file. And then,
23 of course, he indicated that he spoke to ███
24 and the archdiocese, but ████████ would
25 not speak.

Page 136

1 Q. So when he shared those details with
2 you, you had -- you already -- did you already
3 know those details at that time?
4 A. I'm virtually positive that I did.
5 Q. I want to ask you about a couple of
6 things that are in this article, and I'm still
7 on Trahant Exhibit 11. Flipping through -- all
8 right.
9 Do you see this paragraph here where
10 it reads: "Then, on January 13, the
11 archdiocese was formally asked to notify the
12 school of the church investigation into claims
13 ███ had engaged in sexual contact with a
14 student"?
15 Do you see that sentence?
16 A. I do.
17 Q. How did ████████████ know
18 this fact?
19 A. I have no idea, and I don't even
20 really understand what that sentence means
21 because the school was asked on January 4th,
22 not January 13th.
23 Q. Okay. So did you give ████████
24 this fact for his story?
25 A. No. Again, I don't even understand

Page 137

1  what that sentence means. And had I told him
2  anything, I would have said the committee asked
3  for this on January 4th, not the 13th.
4      Q.   Now I'm going to scroll to another
5  paragraph. Do you see this paragraph: "Two of
6  the teen's friends told investigators they
7  recalled the student speaking about kissing
8  ███ at the time, but they did not remember her
9  talking about the more intense sexual contact,
10  the sources said"?
11       Did you -- did you know of this fact
12  prior to reading it in the article?
13      A.   I think I did because in the private
14  investigator summaries, there is, I believe, a
15  reference to another friend and her mother and
16  the friend's mother having to call ███ and
17  dress him down about calling her 17-year-old
18  daughter at home. I believe that the statement
19  about two of the teen's friends seems to come
20  from the larger personnel file. But I don't
21  believe, Ms. George, that there was anything I
22  read in this article that I didn't already
23  know.
24      Q.   All right. I'm going to scroll down
25  to this paragraph, which says: "Aymond's

Page 138

1  internal clerical advisors determined, at a
2  minimum, ███ had violated celibacy rules along
3  with priest-parishioner boundaries, the sources
4  said."
5       Were you one of these sources,
6  Mr. Trahant?
7      A.   No.
8      Q.   Do you know who the source -- who
9  the source or sources were that ███ is
10  referring to?
11      A.   I don't, and I asked him.
12      Q.   What was his response?
13      A.   "You know I can't tell you that."
14      Q.   Right. And then one more. Let's
15  see. This paragraph: "Aymond indicated to the
16  Vatican office which oversees clerical abuse
17  cases that ███ had not abused a minor in this
18  case, the sources said."
19       Were you the source or one of these
20  sources?
21      A.   Absolutely not.
22      Q.   Do you know who the source or
23  sources were?
24      A.   I don't.
25      Q.   And this -- this sentence: "Aymond

Page 139

1  indicated to the Vatican office which oversees
2  clerical abuse cases that ███ had not abused a
3  minor in this case," that fact did not come
4  from the ARB report; correct?
5      A.   Correct. That came from the larger
6  file.
7      Q.   I'm pulling up what I've marked as
8  Trahant Exhibit 24.
9       (Exhibit Number 24, Email from
10      Richard Trahant to ███████, dated
11      1/19/22, Bates-stamped ███████, was
12      marked for identification.)
13  BY MS. GEORGE:
14      Q.   All right. Can you see this
15  document, Mr. Trahant?
16      A.   Yes.
17      Q.   And can you describe it.
18      A.   That is an email I sent to
19  ███████, one of only two emails, about this
20  entire issue where I attached publicly
21  available documents about the Stella Roman
22  Foundation because I believe it was an
23  important component of this story that had been
24  not told.
25      Q.   Did ███████ request this

Page 140

1  information?
2      A.   No.
3      Q.   All right. We're in the
4  homestretch. I just have a few cleanup
5  questions I want to go through and make sure
6  I've asked everything.
7       So, Mr. Trahant, if you wanted to
8  access the ███ files right now, how
9  would you -- the personnel -- the large
10  personnel file, how would you access it?
11      A.   I would go into Everlaw and -- the
12  way I do this is I find a Bates-stamped page so
13  I know the number range, because the way these
14  documents are produced and uploaded into
15  Everlaw doesn't make it very user friendly to
16  pinpoint a particular individual. And -- look,
17  I'm happy to let you sit at my desk and look at
18  my Everlaw.
19       We have gone in and essentially
20  marked -- you know, whether it's ███████
21  ██████████████████████████ you know,
22  ██████████████, you'll see there's a column where
23  that is identified. And if I know the Bates
24  range, I can go to it or I can sit there for
25  five minutes scrolling, looking in one

Case 20-10846 Doc 1143-5 Filed 10/11/22 Entered 10/11/22 13:32:39 Exhibit E - Redacted Trahant
Deposition of Richard C. Trahant 5-18-22 Page 37 of 66

Richard Trahant
May 18, 2022



Page 141

1  **particular column for the name of the**
2  **particular predator.**
3      Q.    And I believe your -- the testimony
4  you provided today was that you have not
5  downloaded any of these files from Everlaw onto
6  your personal computer; is that correct?
7      **A.   I have not, and I don't know how to.**
8      Q.    I believe your testimony was also
9  that you haven't printed any of the documents
10  from the ▮▮▮ personnel file; is that correct?
11     **A.   Yes, that is correct.**
12     Q.    Now, I just wanted to go over -- I'm
13  sorry.  Did I interrupt you?
14     **A.   Yeah, no, I was going to say, I**
15  **actually had the documents printed for this**
16  **deposition only.**
17     Q.    So they were never printed prior to,
18  let's just say, January 31, 2022?
19     **A.   Not as far as I know.**
20     Q.    Now, generally -- I just want to
21  make sure I have my list correct.  I want to go
22  through every person that you personally
23  communicated with in any fashion -- whether
24  that's email, text, phone call conversation --
25  about ▮▮▮▮▮▮ sexual abuse allegations

Page 142

1  that does not include your clients, your
2  co-counsel, or the committee counsel.  So on my
3  list, I have ▮▮▮▮▮ and ▮▮▮▮▮.
4  And, again, this list is not -- you know, I
5  just want to know who you've discussed
6  ▮▮▮▮▮ with, whether those were about
7  anything confidential or not.  You know, we've
8  put that aside.
9          During the time period in
10  question -- that's December 1st, 2021, through
11  January 31, 2022 -- did you talk about
12  ▮▮▮▮▮ with anyone else besides
13  ▮▮▮▮ and ▮▮▮▮?
14     **A.   Oh, yes.**
15     Q.    Okay.  And that's not including your
16  co-counsel, your clients, members of the
17  committee, or the committee counsel?
18     **A.   That's correct.**
19     Q.    Okay.  So who else did you speak
20  with?
21     **A.   This is -- the identification of**
22  **these people is contained at page -- starting**
23  **at page 7 of my responses, and it's entitled**
24  **"Other Individuals."  And I did the best I**
25  **could because every single time there's a media**

Page 143

1  **story, people want to talk about it.**
2  **Ms. George, I virtually cannot leave my house**
3  **without people asking me about things that are**
4  **in the news or the bankruptcy.**
5          **It's not a lot of fun, but**
6  **routinely -- and what happened here and I gave**
7  **you every name that I could possibly recall --**
8  **the article comes out, people ask me about the**
9  **article, and then you talk about what's in the**
10  **article.  I have never offered any of these**
11  **people any information, certainly none of them**
12  **have documents or the content of documents, but**
13  **it's an ongoing narrative that -- you know,**
14  **essentially, like with ▮▮▮▮▮, people are**
15  **like, "What the hell is going on with these**
16  **guys," you know.  Why would Greg Aymond put**
17  **someone who was --** ▮▮▮▮▮
18  ▮▮▮▮▮▮▮▮▮**?**
19          **And to me, again, I reiterate,**
20  **that's the issue here.  That is a compelling**
21  **issue to normal, reasonable people that don't**
22  **know anything about ▮▮▮ file, you know, the**
23  **ARB report.  They don't know anything but what**
24  **they read.**
25          **And so if it's something out of a**

Page 144

1  **media story, then I will talk about what's**
2  **contained in the media story.  And I really did**
3  **do my best to try and figure out during that**
4  **period of time, because constantly -- it's**
5  **friends, it's family, it's other lawyers, it's**
6  ▮▮▮▮▮ **alumni -- like, my name is**
7  **nowhere in that article, but people just assume**
8  **that I know about it.  And so all of those**
9  **conversations were essentially the same, as I**
10  **recall.**
11     Q.    And were all of those conversations
12  after the article was published?
13     **A.   Yes.  Yeah.  They were all about the**
14  **article.**
15     Q.    Prior to the article being
16  published -- so that would be from
17  December 1st, 2021, through ▮▮▮▮▮,
18  ▮, -- did you talk to anyone about
19  ▮▮▮▮▮, outside of the clients, committee
20  members, committee counsel, your co-counsel,
21  besides ▮▮▮▮▮ and ▮▮▮▮▮?
22     **A.   No, with the exception of the people**
23  **that I talked to after the article came out.**
24     Q.    Are you aware of any other
25  individual who may have contacted ▮▮▮▮▮ or



Case 2:10-cv-10846 Doc 10143-5 Filed 10/11/22 Entered 10/01/22 13:32:39 Exhibit E - Redacted Trahant
Deposition of Richard C. Trahant 5-18-22 Page 38 of 66

Richard Trahant
May 18, 2022

Page 145

1  any news reporter about █████████ from
2  December 1st, 2021, to █████████?
3      **A.  I have not.**
4      Q.   Do you know how █████ got the
5  information from that personnel file for his
6  article?
7      **A.  I have absolutely no idea, but I am**
8  **confident that it wasn't any of my clients, it**
9  **wasn't me, it wasn't committee counsel, and I**
10  **believe it was not either of the two committee**
11  **members who we don't represent.**
12     Q.   During the bankruptcy case, have you
13  provided any documents marked "Confidential" by
14  the archdiocese to any third parties other than
15  your co-counsel and the Official Committee
16  members?
17     **A.  I have not.**
18     Q.   During the bankruptcy case, have you
19  provided any information within documents
20  marked "Confidential" by the archdiocese to any
21  third parties other than your co-counsel and
22  Official Committee members?
23     **A.  That's a different question that**
24  **requires a different answer because we**
25  **represent so many victims, and some of them**

Page 146

1  **have formed those complaints with the**
2  **archdiocese, and they can speak freely about**
3  **their own abuse.  And that -- that's happened.**
4      **Do I consider one of my clients**
5  **telling his or her story to be confidential?  I**
6  **don't.  But there may be some overlap in that**
7  **information.  But I have never, you know --**
8  **I've never talked about any of my clients'**
9  **abuse unless they approved me to.**
10     Q.   And the source of that information
11  would be from your client and not documents
12  produced by the archdiocese; correct?
13     **A.  That's right.  But, you know, the**
14  **point I'm making is there's some overlap.**
15  **Because if I have a client who went to the**
16  **archdiocese and told his or her story and**
17  **they've now stamped that "Confidential" and,**
18  **yes, it's information that technically is in a**
19  **document that's stamped "Confidential," but**
20  **then my client has every right to speak about**
21  **that.**
22     **I -- the answer to your question is**
23  **no, but I thought I had to qualify it.**
24     Q.   Yeah, I understand.  I understand
25  that qualification.  I understand the overlap,

Page 147

1  that what they share from their own -- which a
2  client may share from their own personal
3  experience may be somewhere documented in a
4  paper marked "Confidential" by the archdiocese.
5      Is that a fair characterization?
6      **A.  That's an exact characterization.**
7      Q.   And then just, I guess, a couple of
8  final questions, Mr. Trahant.
9      Do you consider all of your
10  conversations that you had with █████████
11  regarding █████ to be permissible under
12  the Court's protective order?
13     **A.  Yes.  Yes.  And --**
14     Q.   Similar --
15     **A.  -- and I would point out to you that**
16  **both ███ and the archdiocese spoke to █████**
17  **as well.**
18     Q.   And do you consider all of your
19  conversations that you had with █████████
20  regarding █████ to be permissible under
21  the Court's protective orders?
22     **A.  I believe they were.**
23     Q.   Okay.  I believe those are all the
24  questions that I have.
25     MS. GEORGE:  Let me check in with

Page 148

1  Ms. Marbury, who's also with the U.S.
2  Trustee.
3      Did you have any follow-up that I
4  missed?
5      MR. DREW:  Amanda, do you think it
6  might be possible to take, like, a
7  five-to-ten-minute break to have UST
8  counsel confer very quickly?
9      MS. GEORGE:  I'm okay with that if
10  everyone else is okay with a quick
11  ten-minute break.
12     MR. STERBCOW:  Sure.
13     MS. GEORGE:  Okay.  All right.  So
14  why don't we reconvene, given the time -- I
15  have 1:37, so maybe we can reconvene at
16  1:50.
17     Does that work for everyone?
18     MR. DREW:  Yeah.
19     MS. GEORGE:  Okay.  Great.  Thank
20  you all so much.  We'll reconvene at 1:50.
21     (Break taken from 2:37 p.m. to 1:51
22  p.m.)
23     MS. GEORGE:  Thankfully, I only have
24  one or two more questions, and it's really
25  just to clarify something that we already

Case 2:20-cv-10846-DEG-DMD Doc 1643-5 Filed 10/11/22 Entered 10/11/22 13:32:39 Exhibit E - Redacted Trahant
Deposition of Richard C. Trahant 5-18-22 Page 39 of 66

Richard Trahant
May 18, 2022



Page 149

1    discussed.
2  BY MS. GEORGE:
3    Q.   Mr. Trahant, do you remember how we
4  talked about your call with ▮▮▮▮ on
5  January 4th?
6    A.   Yes.
7    Q.   And that's where you called him from
8  your office line?
9    A.   Yes.
10    Q.   Okay.  And I believe you testified
11  that you discussed the letter that was sent by
12  the committee to the archdiocese bankruptcy
13  counsel; is that correct?
14    A.   Yes.
15    Q.   And my only question -- I'm going to
16  show you what I'm looking at here.  Okay.
17    So I have pulled up what we've
18  marked as Trahant Exhibit 12.
19    So do you see the letter?
20    A.   I do.
21    Q.   Okay.  So you testified that you
22  discussed the letter with ▮▮▮▮.
23    Can you remind me, why did you
24  discuss this letter with ▮▮▮▮?
25    A.   Well, for one reason, I wanted to

Page 150

1  give him a heads-up as to what I knew would
2  inevitably be something that landed in his lap.
3  I also held off for five days until I knew that
4  ▮▮▮▮ was going to be apprised of
5  this.
6    And I really did it for three
7  reasons:  Number one, because I thought that
8  ▮▮▮▮ needed to be removed from the campus, and
9  I didn't count on the archdiocese to do that.
10  And, in fact, they did not do that.
11    Number two, he is a family member,
12  and I did not want to see him get blindsided by
13  this.
14    And, number three, I thought at the
15  time, and I continue to think, that
16  ▮▮▮▮ got hung out to dry on this.
17    And I just knew they weren't going
18  to do the right thing.  As far as I know,
19  ▮▮▮▮ is still a priest.  He's still being
20  paid by the archdiocese during this bankruptcy,
21  those are things that should not be happening
22  right now.
23    Q.   And when you say you discussed the
24  letter, did you also discuss the attachments,
25  which are the ARB report -- it's only the ARB

Page 151

1  report that was attached.
2    A.   Right.
3    Q.   So did you discuss -- did you
4  discuss the ARB report with ▮▮▮▮ on
5  January 4th?
6    A.   I'm almost positive the only thing I
7  discussed was what -- and not everything in the
8  letter, but what was in the letter because I
9  remember looking at the letter while I was on
10  my office phone with him.
11    MS. GEORGE:  Okay.  I just wanted to
12    clean up that discussion.
13    So those are all of the questions
14    that I have.  Those are all the questions
15    the U.S. Trustee has.  And so I will turn
16    it over to Mr. Sterbcow or Mr. Caine, if
17    you have any follow-up, cleanup you'd like
18    to do at the conclusion of our exam here.
19    MR. STERBCOW:  Thank you,
20    Ms. George.
21    For the record, Paul Sterbcow,
22    representing Mr. Trahant in this
23    investigation.  And what we'd like to do --
24    I'm going to ask him some questions because
25    I think -- it's been alluded to, but I

Page 152

1    think it's very important that since he is
2    clearly being looked at as a potential
3    person who violated the Court's protective
4    order, that his conduct be viewed in the
5    context of this entire proceeding and his
6    position as one of the lead counsel
7    representing the victims; and what these
8    counsel are dealing with in navigating this
9    whole proceeding generally, and certainly
10    this protective order in particular.
11    CROSS-EXAMINATION
12  BY MR. STERBCOW:
13    Q.   So with that, Mr. Trahant, can you
14  tell me how long have you practiced law?
15    A.   Twenty-nine years.
16    Q.   In that 29 years, have you ever been
17  sanctioned for anything you've done
18  professionally?
19    A.   No.
20    Q.   Have you ever been disciplined in
21  any way by any court or the Louisiana State Bar
22  Association?
23    A.   No.
24    Q.   Have you ever been denied entry to
25  any court on a pro hac vice level for any

Page 153

1 reason whatsoever?
2    **A.    I have not.**
3    Q.    Have you ever had to report any
4 problems with your professional conduct to any
5 disciplinary body of any sort overseeing the
6 practice of law?
7    **A.    No.**
8    Q.    How long have you been dealing with
9 protective orders in your law practice?
10    **A.    Virtually the entire 29 years.**
11    Q.    Can you give us a flavor of the
12 types of cases in which you've had protective
13 orders that you've signed and dealt with?
14    **A.    Insurance litigation, product**
15 **liability litigation, municipality litigation,**
16 **and every clergy abuse case I've been involved**
17 **in.**
18    Q.    Over your many years of doing clergy
19 abuse work, can you give us an estimate about
20 how many members of the media that you've
21 communicated with?
22    **A.    Several dozen.  Probably more than**
23 **50.**
24    Q.    Is it a fair characterization to say
25 that this particular litigation, clergy abuse

Page 154

1 work, certainly in comparison to the other work
2 you've done, lends itself to much more media
3 scrutiny?
4         It's a subject that the media and
5 the public, in general, are keenly interested
6 in, in your experience?
7    **A.    Definitely.**
8    Q.    Have you ever provided any media
9 with any document stamped "Confidential"?
10    **A.    Never.**
11    Q.    Have you ever provided any media any
12 details that you've gleaned from documents
13 stamped "Confidential"?
14    **A.    I have not.  And there have been**
15 **some very in-depth media stories, reporters**
16 **that we have worked with, and I have never**
17 **provided documents marked "Confidential," even**
18 **if I believe they are not confidential, or any**
19 **information from those documents.**
20    Q.    And I think that's an important
21 point.
22         Even if you disagree with a
23 particular designation -- confidentiality
24 designation, has it been your longstanding and
25 ongoing practice to abide by that designation

Page 155

1 regardless of your personal subjective belief?
2    **A.    Yes.  I also have.**
3    Q.    Before this proceeding, before this
4 came up, have you ever been accused of
5 violating any protective order?
6    **A.    No.**
7    Q.    Now, in terms of your responsibility
8 to keep your clients informed, first of all, do
9 you recognize that you have an ethical duty to
10 keep your clients up to date on developments in
11 their cases?
12    **A.    I do.**
13    Q.    Do you provide updates to your
14 clients about the bankruptcy proceeding?
15    **A.    I do.**
16    Q.    Have you found -- has it been your
17 experience that the pre -- excuse me,
18 protective order entered by the Court in this
19 particular proceeding has hindered your ability
20 to satisfy your ethical duties?
21    **A.    Every day.**
22    Q.    How?
23    **A.    I cannot apprise my client of what**
24 **happened with their abusers unless they're on**
25 **the committee, and probably 75 of our clients**

Page 156

1 **are not on the committee.**
2         **And so I have these files, which,**
3 **again, are in no way confidential, that I can't**
4 **share with my clients.**
5         **Also, I cannot share with my clients**
6 **the overwhelming number of documents that are**
7 **filed into this bankruptcy under seal.  I -- I**
8 **have two clients in particular who are not on**
9 **the committee.  They both live out of the state**
10 **of Louisiana, and they read everything.  And**
11 **constantly they are asking me, "What is this**
12 **being filed under seal?  What is that?" and I**
13 **cannot say.**
14         **And it constrains my ethical duty to**
15 **my client every single day.**
16    Q.    Given that, then, is it your
17 testimony and your opinion -- professional
18 opinion that all of the sealed pleadings and
19 documents in this bankruptcy proceeding have
20 and continue to prevent you from fully
21 informing your clients as you otherwise deem
22 appropriate?
23    **A.    Yes.**
24    Q.    Now, in terms of confidentiality of
25 documents, many bankruptcy lawyers and the term

Case 2:20-cv-10846-CJB-DPC Document 194-5 Filed 10/11/22 Entered 10/11/22 13:32:39 Exhibit E - Redacted Trahant
Deposition of Richard C. Trahant 5-18-22 Page 41 of 66

Richard Trahant
May 18, 2022

Page 157

1  you used, "state court counsel," do you know
2  whether or not you would be the attorney who
3  has reviewed the most documents related to
4  child sexual abuse in this matter?
5      A.   I definitely am.
6      Q.   Have you reviewed all of the clergy
7  personnel files produced in this case?
8      A.   No, but I've reviewed the majority.
9      Q.   Generally, and if you'd like to
10  think about it in relation to other cases
11  you've handled, describe for us what the
12  document production in this proceeding has been
13  like.
14      A.   It's been a nightmare.  We get
15  documents that are copied upside down.  They're
16  never in sequential order.  They're never in
17  chronological order.  Every single file -- and
18  we'll look at some of ▮▮▮▮▮▮▮ file in a
19  bit, but every single file, you can sit there
20  and make notes about what documents we don't
21  get because they're referenced in other
22  documents, but we don't get them.
23          The overstamping of "Confidential"
24  in this case has been stunning because any one
25  of these documents that you look at,

Page 158

1  particularly documents that evidence
2  criminality, should never be confidential, but
3  we still don't give them out and we don't
4  discuss them.
5      Q.   Okay.  Can you give folks involved
6  in this proceeding an estimate of what
7  percentage of the documents you estimate the
8  archdiocese has stamped "Confidential"?
9      A.   I would say at least 98 percent.
10      Q.   And of those 98 percent, did you
11  give this group a few examples of documents
12  that have been stamped "Confidential" that
13  really could not reasonably possibly be deemed
14  confidential objectively?
15      A.   Yes.  We get blank documents with
16  nothing on the page that are stamped
17  "Confidential."  We get media stories,
18  newspaper articles that have already been out
19  that were stamped "Confidential."  We get
20  letters that have been sent to an entire
21  Catholic community that are stamped
22  "Confidential."  We get public records that are
23  stamped "Confidential."  We get documents that
24  would be the subject of a public records
25  request that are stamped "Confidential."  Those

Page 159

1  are some examples.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 160

1
2
3
4
5
6
7
8
9          MR. STERBCOW:  Can everybody see
10  what I just put up?
11          MS. GEORGE:  I can see it.
12  BY MR. STERBCOW:
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 2:20-cv-10846-DS-DPC Document 143-5 Filed 10/11/22 Entered 10/11/22 13:32:39  Exhibit E - Redacted
Deposition of Richard C. Trahant 5-18-22 Page 42 of 66

Richard Trahant
May 18, 2022



Page 165

1
2
3
4
5
6
7     Q.    Again, this all occurred during the
8  bankruptcy?
9     **A.    That is correct.**
10     Q.    During the existence of the
11  protective order?
12     **A.    That is correct.**
13     Q.    And do you believe that this
14  protective order has prevented you from
15  fulfilling an obligation to report a potential
16  crime?
17     **A.    It definitely has.**
18     Q.    Do you believe that Greg Aymond had
19  a duty to report this?
20     **A.    Yes.**
21     Q.    Are you aware of him doing so in any
22  form or fashion?
23     **A.    Absolutely not.**
24     Q.    All right.
25     **A.    And, in fact, as clergy under**

Page 166

1  **Louisiana law, he is a mandatory reporter.**
2     Q.    To your knowledge, has he taken any
3  steps to fulfill that obligation?
4     **A.    No.**

Page 167

Page 168

Case 20-10846 Doc 1043-5 Filed 10/11/22 Entered 10/11/22 13:32:39 Exhibit E - Redacted Deposition of Richard C. Trahant 5-18-22 Page 44 of 66

Richard Trahant
May 18, 2022





Case 2:10-cv-01843-NJB-DPC Document 1043-5 Filed 10/11/22 Entered 10/21/22 13:32:39 Exhibit E - Redacted
Deposition of Richard C. Trahant 5-18-22 Page 46 of 66

Richard Trahant
May 18, 2022



Lexitas



Case 2:01-10846-D Doc 1043-5 Filed 10/11/22 Entered 10/11/22 13:32:39   Exhibit E - Redacted
Deposition of Richard C. Trahant 5-18-22 Page 48 of 66

In Re: The Roman Catholic Church of...                                                    Richard Trahant
                                                                                           May 18, 2022





Richard Trahant
May 18, 2022









Page 205

1  is.
2      A.    This is Judge Grabill's order
3  mandating this investigation.
4      Q.    Page 2, paragraph 2, is it a fact
5  that Judge Grabill says the Court has studied
6  the discovery responses and is very concerned
7  about the possibility of, quote, intentional
8  dissemination of highly confidential
9  information in violation of this Court's
10  protective order?
11      A.    She wrote.
12      Q.    When you first made contact -- to be
13  clear for this record.  When you first made
14  contact with                      , what information
15  did you have about the              ARB report?
16      A.    I only had the three-page report.
17      Q.    Do you believe at the time -- did
18  you believe at the time that this document was
19  "highly confidential"?
20      A.    No.  It's not highly confidential.
21  In fact, nothing in this bankruptcy has been
22  stamped with the term "highly confidential."
23  That sentence worries me.  It worries me for my
24  future as a lawyer.  It worries me because we
25  were banned from three sealed status

Page 206

1  conferences that we wanted to attend.  And, in
2  fact, my co-counsel Soren Gisleson sent an
3  email saying we were willing to talk about who
4  had contact with                      .
5          This whole thing could have been
6  short-circuited, but that sentence of this
7  order tells me that because of what -- the only
8  thing Judge Grabill had at the time were
9                      discovery responses, and this
10  tells me that she already believes -- not a
11  possibility, but that I intentionally
12  disseminated highly confidential information,
13  and I didn't.
14      Q.    In fact, in referencing the report,
15  the ARB report, let's leave out highly
16  confidential.  Do you believe, based on your
17  experience in this case, and knowledge, that
18  the document should be confidential at all?
19      A.    No.
20      Q.    Why not?
21
22
23
24
25

Page 207

Page 208

23      Q.    And that's where we are?
24      A.    Exactly.
25      Q.    Are you aware of the fact that on

Page 209

1  January 13, 2022, the ▊▊ ARB report was
2  provided to ▊▊▊▊▊ directly through its
3  attorney?
4   A.  Yes.
5   Q.  So to be clear about that, did the
6  archdiocese, within days of your first
7  communication with ▊▊▊▊▊, provide this
8  very document to ▊▊▊▊▊?
9   A.  Yes.
10  Q.  All right.  In your professional
11 opinion as a trained lawyer, does that step,
12 providing it to ▊▊▊▊▊, constitute a
13 waiver of the archdiocese's right to claim
14 confidentiality?
15  A.  Absolutely.
16  Q.  And, again, to make sure we're
17 clear, this is the very document that it really
18 is the anchor, the linchpin, of why we're doing
19 this right now?
20  A.  That's a good way of putting it.
21  Q.  Okay.
22  A.  Yeah.
23  Q.  And so do you believe that the
24 archdiocese waived any confidentiality
25 designation when ▊▊▊▊▊ and Greg Aymond

Page 210

1  disclosed the detail to ▊▊▊▊▊ that you
2  did not know?
3   A.  Yeah.  Yeah.  And it's not the first
4  time they've done it.
15  Q.  Is it fair to say that
16 ▊▊▊▊▊ received documents with far more
17 detail, factual detail, than anything you had
18 seen or initially discussed with ▊▊▊▊▊?
19  A.  Definitely.
20  Q.  Do you know of any harm or prejudice
21 that was done to the archdiocese relative to
22 documents it ultimately produced to
23 ▊▊▊▊▊?
24  A.  No.  They gave them to
25 ▊▊▊▊▊.





**Page 213**

1

2

3

4

5

6

7      Q.   All right. Are you aware of past

8 false statements by the archdiocese?

9      A.   Plenty.

10        MR. STERBCOW: Let's look at

11       Bates -- mark this -- it's Bates 719

12       through 723. We'll mark it as Number 40.

13       (Exhibit Number 40, Documents

14       Bates-stamped             , was

15       marked for identification.)

16 BY MR. STERBCOW:

17      Q.   And, for the record, it's a

18             , news article by

19       that is in The Advocate. And I think

20 we've discussed this; right? Same article?

21      A.   Yep.

22      Q.   Okay. You're obviously very

23 familiar with this.

24      A.   I am.

25      Q.   All right. I'll highlight a few

**Page 214**

1 points from the article with you first.

2       Does this article make it clear that

3       the subject of this, spoke to

4      A.   Yes.

5      Q.   Does it also make clear that a

6 representative of the archdiocese spoke to

7

8      A.   Yes.

9      Q.   Take a look at the third paragraph

10 on page 1.

11      A.   Yes.

12      Q.   Do you believe those two sentences

13 are false?

14      A.   I know they're false.

15      Q.   How?

16      A.   I have had extensive conversations

17 with        . I have seen the

18 statements that       put out to its

19 board of directors and to the parents, which

20 have nothing whatsoever to do with his cancer.

21 And it's very clear that       asked

22 Archbishop Aymond to remove     because of

23 what happened with      .

24      Q.   Really no dispute about that, is

25 there?

**Page 215**

1      A.   No. No. And it says here the

2 archdiocese said the same. And, again, it's --

3 this is how they operate.

4      Q.   Go to Bates stamp 723. That's

5 correct?

6      A.   Go to 21. I wanted to point out to

7 everyone --

8      Q.   Sorry. I passed that over.

9      A.   That's okay.

10       -- on Bates stamp 721, the second

11 paragraph, 7, I quote: "When asked Monday

12 about the investigation, the archdiocese

13 declined to comment other than to say

14 retired on January 6."

15       Well, that is certainly not true

16 because on January 6th    sent an email to

17 Aymond saying that he would temporarily remove

18 himself until this issue was resolved. He

19 certainly did not retire on January 6th, and

20 the archdiocese knows this.

21       Additionally,       told me

22 that it was his understanding that    finally

23 tendered his resignation on January 13th, not

24 the 6th, not the 10th.

25       The second sentence says: "The

**Page 216**

1 statement added that the archdiocese was barred

2 from speaking about the case because of a

3 federal court order and apparent reference to a

4 mandate associated with the church's Chapter 11

5 bankruptcy filing from May 2020 when it was

6 faced with dozens of pending abuse-related

7 lawsuits."

8       As soon as I read that, I knew what

9 was going to happen here. I knew what they

10 were getting at. They have never hesitated to

11 comment, give television interviews during the

12 bankruptcy, provide statements during the

13 bankruptcy. This was all a foundation that

14 they were laying to say that I or someone else

15 associated with the committee violated the

16 protective order.

17       And as I understand it, because I

18 have asked time and time again: Is the

19 archdiocese constrained by the protective

20 order? And the response I've gotten from

21 committee counsel is, it's their documents.

22 They can do what they want with them. And, in

23 fact, they have.

24      Q.   So is this situation such that the

25 archdiocese, if they are the producer, they can



Page 217

1  mark a document confidential and then decide
2  unilaterally, for whatever purpose they think
3  is in their best interest, deem it not
4  confidential, release it, and be subject to no
5  potential discipline?
6    A.   That's my understanding.
7    Q.   Are you afforded the same right?
8    A.   I'm not.
9    Q.   Anybody representing the victims
10  afforded that right?
11   A.   No.
12   Q.   Let me then go to page 5 and show
13  you this quote.
14        '          for his part, denied that
15  anyone had ever accused him of misconduct with
16  someone younger than 18.
17        "'There's never been anything like
18  that,' he said. 'I retired because I have
19  cancer and am fighting right now.'"
20        Is that a lie?
21   A.   Several lies.
22
23
24
25

Page 219

4    Q.   Did that history and the attitude
5  you just expressed have anything to do with why
6  you initially reached out to       ?
7    A.   Absolutely. That's exactly the
8  reason I reached out to him. I trust him.
9    Q.   In reaching out to him, did you have
10  any intent whatsoever to intentionally or not
11  intentionally skirt or violate, in any form or
12  fashion, this protective order we've been
13  talking about?
14   A.   No, and it was the first thing I
15  told him, that I have to be very careful as to
16  what I say to you. And I was.
17   Q.   This is a news story --
18   A.   I'm happy to comment on that.
19        THE WITNESS: It looks like we lost
20  our -- I don't know if you did -- oh, you
21  didn't do a screen share on that.
22        MR. STERBCOW: Okay. That's fine.
23        THE WITNESS: Sorry, guys.
24        Go back to the camera at the bottom.
25  Okay? Click on that. Then go to screen

Page 218

Page 220

1    share at the bottom. Share screen. Then
2    click on the second document.
3  BY MR. STERBCOW:
4    Q.   Now we're going to go transition to
5  the final group of documents.
6        Oh, okay. I'm sorry. Let me go
7  back. One final document from this first
8  group.
9        And what is this?
10   A.   The committee members, individually,
11  and their state court counsel, of whom I am
12  one, filed a motion to participate in the
13  discovery relative to the allegation that we
14  violated the protective order.
15        And ultimately that motion was
16  continued, but this is part of the debtor's
17  objection to our motion to participate in
18  discovery.
19        MR. STERBCOW: And we'll mark this
20  as Exhibit 41. It's          .
21        (Exhibit Number 41, Documents
22  Bates-stamped              , was
23  marked for identification.)
24  BY MR. STERBCOW:
25   Q.   And let's take a look -- first, were

Case 20-10846 Doc 1943-5 Filed 10/11/22 Entered 10/11/22 13:32:39 Exhibit E - Redacted
Deposition of Richard C. Trahant 5-18-22 Page 57 of 66

Richard Trahant
May 18, 2022

Page 221

1  you and your co-counsel allowed to attend the
2  status conferences?
3      A.  No.  One of the other state court
4  counsel, Ms. Wolf-Freedman, attended the first
5  one.  There were four, as I understand it, for
6  the status conferences.
7          For the second one, we expressed our
8  desire to be in attendance, and we were told
9  no.
10         And so there are three sealed
11 transcripts, as they are about this issue, that
12 I have never seen and would love to see or
13 would love to have seen to defend myself
14 against this.
15     Q.   Specifically in paragraph -- what's
16 the significance of that language?
17     A.   So the -- the debtor, in objecting
18 to our motion to participate, cited to one of
19 the sealed status conferences.  And you can see
20 they put it right at the bottom in Footnote 8
21 that it's a transcript of a sealed status
22 conference.
23         Is that a violation of a court
24 order?  You betcha.  Do we have to try and
25 figure out who did it?  No, we don't.

Page 222

1          And so they just casually cited to
2  sealed transcript -- a sealed transcript.  We
3  don't know what the -- we don't know what the
4  content -- or the context, rather, of
5  Judge Grabill's statement was that it would not
6  be productive to imply that the debtor leaked
7  its own documents.  But that's exactly what
8  they did in the two news stories that we
9  weren't able to look at.
10     Q.   Right.
11     A.   They -- in both of those stories --
12 and, I mean, we can -- we can pinpoint it
13 within the two videos.  So if everybody wants
14 to look at the videos, Archbishop Aymond is
15 waiving around documents that are stamped
16 "Confidential."
17         And so when Judge Grabill says it's
18 not productive to suggest that they may have
19 leaked their own documents, they've already
20 done that during the bankruptcy repeatedly.
21 Not only leaked them, but talked about them on
22 television.
23
24
25



Case 20-10846 Doc 1843-5 Filed 10/11/22 Entered 10/11/22 13:32:39 Exhibit E - Redacted
Deposition of Richard C. Trahant 5-18-22 Page 58 of 66
In Re: The Roman Catholic Church for the Archdiocese of New Orleans
Richard Trahant
May 18, 2022









Case 2:10-md-02179-CJB-DPC Document 1643-5 Filed 10/11/22 Entered 10/11/22 13:32:39  Exhibit E - Redacted Trahant
Deposition of Richard C. Trahant 5-18-22 Page 62 of 66

Richard Trahant
May 18, 2022



Page 243

Page 244

11    MR. STERBCOW:  Do you-all mind if we
12 take a three-minute break?
13    CERTIFIED STENOGRAPHER:  I don't.
14    MS. GEORGE:  I would appreciate that
15 myself.
16    MR. STERBCOW:  I had a feeling.  All
17 right.  Three -- five minutes?  Whatever is
18 everyone's pleasure, and then we'll come
19 back and wrap it up.
20    MS. GEORGE:  Thank you.
21    (Break taken from 4:57 p.m. to
22 5:01 p.m.)
23    MR. STERBCOW:  Back on the record.





Page 249

(redacted)

Page 250

21  BY MR. STERBCOW:
22      Q.    Finally, Mr. Trahant, anytime during
23  any part of this litigation, even before this
24  happened and certainly in the relevant time
25  period December 30, 2021, to the end of

Page 251

1  January 2022, have you violated the Court's
2  protective order?
3      A.    No.
4      Q.    Do you subjectively believe that
5  this entire protective order violation
6  situation was contrived by the archdiocese in
7  an attempt to damage you and your co-counsel
8  Johnny Denenea and Soren Gisleson?
9      A.    Absolutely.
10     Q.    Why?
11     A.    Because we are the group of lawyers
12  that sued them into bankruptcy.  They despise
13  us as much as we despise pedophiles.  And
14  they've wanted us out of this committee from
15  day one and they got their shot.  And so here
16  we are.
17          MR. STERBCOW:  We have nothing
18  further.  Thank y'all very much.
19          MS. GEORGE:  Can I bother everyone
20  for just a couple more minutes.  I just
21  have a couple of follow-up questions, but I
22  will be very brief.
23          MR. STERBCOW:  Yeah, go ahead.  Go
24  ahead.
25          ///

Page 252

1          REDIRECT EXAMINATION
2  BY MS. GEORGE:
3      Q.    Earlier, Mr. Trahant, you mentioned
4  that ▓▓▓▓▓▓ was sent documents with far
5  more detail than what you had received in the
6  discovery production at that time.
7          Do you recall testifying that?
8      A.    Yes.
9      Q.    What document was ▓▓▓▓▓ --
10  or do you know what documents ▓▓▓▓
11  was sent that had more detail?
12     A.    Yes.  The -- well, the ARB report
13  had more detail, but the summaries from the
14  private investigators and ▓▓▓▓ and
15  Archbishop Aymond provided details that not
16  only did I not tell ▓▓▓▓ about, I
17  didn't know about at the time.
18     Q.    And was this -- did ▓▓▓▓
19  tell you that ▓▓▓▓ and the archbishop had
20  provided him with more detail regarding
21  ▓▓▓▓?
22     A.    Yeah.  That was our -- the two
23  meetings we had on January 5th and January 8th,
24  that was when ▓▓▓ told me about ▓▓▓▓
25  phone call to ▓▓▓▓, and by that -- by

Case 2:20-cv-10846-DCR Doc. 104-5 Filed 10/11/22 Entered 10/11/22 13:32:39 Exhibit E - Redacted Trahant
Deposition of Richard C. Trahant 5-18-22 Page 65 of 66

Richard Trahant
May 18, 2022



Page 253

1 the Saturday the 8th, the several calls that
2 **Archbishop Aymond had made to** ▮▮▮▮▮ **and**
3 ▮▮▮▮▮ .
4    Q.  Did ▮▮▮▮▮ ever tell you he
5 spoke with the archbishop?
6    **A.  Yes.  Well, let me -- let me correct**
7 **that.  I know he was on at least one conference**
8 **call with Archbishop Aymond.**
9    Q.  Do you know if ▮▮▮▮▮ talked
10 with ▮▮▮▮▮ directly?
11    **A.  I don't believe he did.**
12    Q.  You mentioned reviewing documents
13 throughout the debtor's document production in
14 this case that evidence crimes being committed
15 while this case has been pending.  Have you
16 ever asked relief from the Court -- or have you
17 ever asked the Court for relief from
18 protective -- the protective orders in order to
19 report any potential crime?
20    **A.  Not yet.  Not yet, and that's been**
21 **an issue hanging around this bankruptcy for two**
22 **years.**
23    Q.  Now, you also discussed the
24 burdensome task of challenging whether a
25 document has been properly marked as

Page 254

1 confidential by the archdiocese.  Have you
2 ever -- have you ever filed a motion with the
3 court to challenge the marking of a document as
4 confidential in this case?
5    **A.  I don't believe I can do that.  That**
6 **has to be done by committee counsel.  I have**
7 **begged every law enforcement agency that I work**
8 **with to issue me a subpoena.**
9    Q.  All right.  One last item I was
10 going to get clarification on, and this is from
11 our testimony prior.  You had mentioned during
12 one of your conversations you had encouraged
13 ▮▮▮▮▮ to reach out to ▮▮▮▮▮ --
14 or not encouraged.  I'm sorry, you didn't use
15 that word.  That you had mentioned to ▮▮▮▮▮
16 ▮▮▮▮▮ that there was an option to reach
17 out to ▮▮▮▮▮ in order to get ahead of
18 the story.  And I just can't recall your answer
19 to the question.
20    Did ▮▮▮▮▮ ever take you up
21 on that offer?
22    **A.  I don't believe he did, and between**
23 **the time he and I had that conversation on**
24 **January 8th at my house and the publication of**
25 ▮▮▮▮▮

Page 255

1 **got involved as the attorney for**
2 ▮▮▮▮▮ .
3    MR. DREW:  Can I ask just one
4 question?
5    MS. GEORGE:  Sure.
6    MR. DREW:  Mr. Trahant, I know
7 you've been here a long time, and I
8 appreciate you indulging me.  My name is
9 Richard Drew.  I'm an attorney for the
10 United States Trustee.
11    I believe you just testified in
12 response to one of Amanda's follow-up
13 questions that ▮▮▮▮▮ had told you
14 either when you talked to him on the 5th of
15 January or the 8th of January that
16 Archbishop Aymond and ▮▮▮▮▮ had
17 provided ▮▮▮▮▮ details that even
18 you were unaware of.
19    Do you remember what those details
20 were?
21    **THE WITNESS:  Yes.**
22
23
24
25

Page 256

1
2
3    MR. DREW:  But you understood that
4 to mean that she was, in the -- in
5 Archbishop Aymond's eyes, not a minor?
6    **THE WITNESS:  Yes.**
7    MR. DREW:  Thank you.  That's all I
8 have.
9    **THE WITNESS:  Good to meet you.**
10    MR. DREW:  Yes, sir.
11    MS. GEORGE:  All right.  That's all
12 I have as well.  I do want to conclude with
13 one last note, Mr. Trahant.  Because this
14 is a sealed examination that contains
15 confidential information, confidential
16 documents, that's all part of a sealed
17 investigation, we'd ask you not to discuss
18 your testimony that you've provided today
19 with anyone, including anyone that's
20 affiliated with this case.  We want to
21 protect the integrity of the U.S. Trustee's
22 examination as we continue to examine
23 witnesses and review documents.
24    **THE WITNESS:  Yeah.  And I**
25 **understand that, Ms. George, and as I**

Page 257

```
 1   indicated at the very beginning, I do not
 2   want my deposition under seal.  I
 3   understand that it has to remain under seal
 4   and I will abide by that.  I am an advocate
 5   of court transparency.  And I think that
 6   that transparency throughout this
 7   bankruptcy has been sorely lacking.
 8        MS. GEORGE:  I appreciate your
 9   response, Mr. Trahant.  And --
10        THE WITNESS:  But I won't talk with
11   anybody about my deposition.
12        MS. GEORGE:  Thank you.
13        And with that, we'll conclude our
14   2004 examination.  I appreciate everybody's
15   time today, especially yours, Mr. Trahant.
16   We -- we appreciate your cooperation.  I
17   understand this was a long day for everyone
18   and it's not unnoticed -- unappreciated and
19   unrecognized by our office.
20        THE WITNESS:  Well, you did a very
21   good job.
22        MR. STERBCOW:  Thank you, guys.
23   Thank you for your professionalism.
24        MS. GEORGE:  Thank you so much.
25        (Concluded at 4:20 p.m.)
```

Page 258

```
 1         C E R T I F I C A T E
 2   STATE OF LOUISIANA:
 3
 4         I, RHONDA HALL-BREUWET, RDR, CRR,
 5   LCR, CCR, FPR, stenographic shorthand reporter,
 6   do hereby certify:
 7         That the witness whose deposition is
 8   hereinbefore set forth was duly sworn, and that
 9   such deposition is a true record of the
10   testimony given by such witness.
11         I further certify that I am not
12   related to any of the parties to this action by
13   blood or marriage, and that I am in no way
14   interested in the outcome of this matter.
15         IN WITNESS WHEREOF, I have hereunto
16   set my hand this 19th day of May, 2022.
17
18
19
20
21
22   _____
23   RHONDA HALL-BREUWET, RDR, CRR, LCR, CCR, FPR
24   Stenographic Shorthand Reporter
25
```