## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-10846 |
| | § | |
| THE ROMAN CATHOLIC CHURCH FOR | § | CHAPTER 11 |
| THE ARCHDIOCESE OF NEW | § | |
| ORLEANS, | § | COMPLEX CASE |
| | § | |
| DEBTOR. | § | SECTION A |

## MEMORANDUM OPINION AND ORDER

When Congress adopted the Bankruptcy Reform Act of 1978 and ushered in the current Bankruptcy Code, it intended official committees to play a leading role—not some bit or walk-on part—in corporate reorganizations. The Bankruptcy Act of 1898, the Code's immediate predecessor, and the Act's amendments had been drafted under the assumption that all creditors— especially those in corporate reorganizations (which officially appeared on the bankruptcy scene in 1933)—would voluntarily supervise the collection and liquidation of the estate, as the estate itself served as a trust for their benefit. *See* H.R. REP. NO. 95-595, at 91 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6053; Vincent L. Leibell, Jr., *The Chandler Act—Its Effect Upon the Law of Bankruptcy*, 9 FORDHAM L. REV. 380, 392–395 (1940) [hereinafter Leibell, Jr., *Chandler Act*]. But after 80 years of bankruptcy administration under the Act, "[t]he notion of creditor control, while still theoretically sound, ha[d] failed in practical terms." H.R. REP. NO. 95-595, at 92. Understandably, "[c]reditors [took] little interest in pursuing a bankrupt debtor [as] [t]hey [were] unwilling to throw good money after bad." *Id.* That was apparently true whether a trustee had been installed to coordinate with creditors to formulate a plan of reorganization as required in a Chapter X case under the Act or when a creditors' committee had been elected to supervise the debtor-in-possession in forming its own plan in Chapter XI under the Act. *See* H.R. REP. NO. 95-

595, at 92–93; *see also* Leibell, Jr., *Chandler Act*, at 395.  It appeared that meaningful participation in cases on the creditors' side came only from attorneys who were getting paid for their participation as creditors' proxies.  *See* H.R. REP. NO. 95-595, at 92–93 ("In practice, creditor control has become attorney control, and the bankruptcy system operates more for the benefit of attorneys than for the benefit of creditors.  The practices that have grown out of this shift of control often work to the detriment of both debtors and creditor.  They benefit only those administering bankruptcy cases.").

Congress's new 1978 Bankruptcy Code contained several innovations designed to modernize the system, and, more importantly, to make the system fairer for everyone involved.  The role of creditors' committees was refocused and expanded.  No longer would a committee passively supervise a trustee or debtor-in-possession, but the committees would "primarily be negotiating bodies for the classes of creditors that they represent."  H.R. REP. No. 95-595, at 104.  For the first time, a case could have multiple committees if faced with a diverse creditor body requiring representation.  *See id.*  Membership in committees would be chosen and appointed from the holders of the largest claims of a represented class, a move that was believed to be "more likely to assist in successful reorganization than proxy election, by attorneys, of a committee that may not truly represent the interests of its constituents."  *Id.*

Congress wanted robust creditor participation in the corporate restructuring process to achieve fairer and better outcomes for debtors and creditors alike.  Broadly speaking,

> [t]he creditors' committee is not merely a conduit through whom the debtor speaks to and negotiates with creditors generally.  On the contrary, it is purposely intended to represent the necessarily different interests and concerns of the creditors it represents.  It must necessarily be adversarial in a sense, though its relations with the debtor may be supportive and friendly.  There is simply no other entity established by the Code to guard those interests.  The committee as the sum of its members is not intended to be merely an arbiter but a partisan which will aid, assist, and monitor the debtor pursuant to its own self-interest.

*In re Refco Inc*., 336 B.R. 187, 195 (Bankr. S.D.N.Y. 2006) (quoting *In re Daig Corp*., 17 B.R. 41, 43 (Bankr. D. Minn. 1981)).  Outside of the various individual rights that all creditors enjoy under the Bankruptcy Code, Congress empowered committees particularly, as the primary negotiating bodies for a chapter 11 plan, to "appear and be heard on any issue" in a case, *see* 11 U.S.C. § 1109(b), and to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan," *see* 11 U.S.C. § 1103(c)(2).  Indeed, contained in § 1103(c) "is a wide and important array of authority indicating the intent to create a significant and central role for committees in carrying out a reorganization." *Johns-Manville Sales Corp. v. Doan (In re Johns-Manville Corp.)*, 26 B.R. 919, 925 (Bankr. S.D.N.Y. 1983).

With those powers, however, also comes the fiduciary duty that an official committee owes to its constituency of unsecured creditors and, at times, to the debtor's estate.  *See In re Refco Inc*., 336 B.R. at 195 (citations omitted).  In exercising its powers and fulfilling its duties as the primary negotiating body for a plan of reorganization, a committee and its members and their agents should and will receive sensitive or proprietary information from the debtor or other parties, often in the context of settlement discussions.  *See id*. at 196.  Thus, "[i]t has frequently been held that committee members' fiduciary duties of loyalty and care to the unsecured creditor body require such information to be held in confidence."  *Id*. (citing cases).  Moreover, "[m]aintaining the parties' reasonable expectations of confidentiality . . . is often critical to a committee's performance of its oversight and negotiation functions."  *Id*. at 197.

In short, even in the face of evolving commercial financing trends that lean toward the creation of more secured debt, a functioning and focused unsecured creditors' committee remains

3

key to the integrity and success of the bankruptcy process itself.  Unsecured creditors' committees
and their professionals and agents play as large a part in the success or failure of any restructuring
case as that of debtors and secured creditors.  But the bankruptcy process as it was intended to
function under the Bankruptcy Code quickly falls apart when courts cannot depend on the integrity,
ethics, and honesty of litigants and professionals who have accepted roles of great responsibility
and trust.

On January 20, 2022, counsel for The Roman Catholic Church for the Archdiocese of New
Orleans (the "Archdiocese" or, post-petition, the "Debtor") notified the Court through a motion
that someone had contacted officials at a local high school in December 2021 or early January
2022 and wrongfully disclosed confidential information in violation of the Protective Order in
place governing discovery in this case.  The Debtor averred that the disclosed information could
only have come from discovery produced in early December 2021 by the Debtor to the Official
Committee of Unsecured Creditors (the "Committee").  [ECF Doc. 1256].  The Debtor's motion
further reported that the same confidential information, that is, the identity of a priest, details of
sexual abuse allegations made against that priest and the individual who alleged the abuse, and the
resolution of the subsequent Archdiocesan investigation—none of which had ever been publicly
disclosed—was then published in a local online newspaper article.  *See id.*  As discussed in detail
below, after the parties attempted to investigate the matter themselves with limited results, they
asked the Court to allow the Office of the United States Trustee ("UST") to perform an independent
investigation into the alleged breach of the Protective Order.  The UST's investigation revealed
that at least one source of the leak of the foregoing confidential information was Richard Trahant,
an attorney representing an individual member of the Committee.

Now before the Court is the *Order To Show Cause* issued to attorney Richard Trahant by this Court on June 13, 2022, [ECF Doc. 1589], and *Richard C. Trahant's Objections to Order To Show Cause and to Imposition of Additional Sanctions*, [ECF Doc. 1704]. The Court held an evidentiary hearing under seal on August 22, 2022, pursuant to the *Order To Show Cause*. After receiving sworn testimony from Trahant and listening to arguments of counsel, the Court took the matter under submission, [ECF Doc. 1749], and now makes the following findings of fact and conclusions of law.[1]

## RELEVANT BACKGROUND

### A. The Debtor's Bankruptcy Case Filing and Constitution of Official Committees

On May 1, 2020, the Archdiocese filed a petition for bankruptcy relief under chapter 11 of the Bankruptcy Code. [ECF Doc. 1]. The Court designated the Archdiocese's case as a "complex" case under the Court's *Procedures for Complex Chapter 11 Cases*, as the Debtor represented that it held total debt of more than $10 million, more than fifty parties-in-interest existed, and the case was expected to attract significant media attention. [ECF Docs. 2 & 18]. Indeed, leading up to the filing of its case, the Archdiocese had been defending against at least 34 pending lawsuits filed in Louisiana state court between 2018 and 2020 by individuals alleging claims of sexual abuse by priests or lay persons employed or supervised by the Archdiocese and complicity of the Archdiocese in that abuse (the "Abuse Cases"). Upon filing for bankruptcy relief, the Debtor removed each of those lawsuits to the United States District Court for the Eastern District of Louisiana and, at this time, all of the lawsuits remain stayed pursuant to 11 U.S.C. § 362(a).

---

[1] These findings of fact and conclusions of law constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052 and 9014. To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

A few of the plaintiffs in the Abuse Cases mobilized quickly and participated through their state court counsel and newly retained bankruptcy counsel in the Debtor's first-day hearings on May 4 and 5, 2020.  [ECF Docs. 107 & 108].  Trahant was among the state court counsel who participated in the first-day hearings on behalf of those plaintiffs, having represented several plaintiffs in the Abuse Cases.  [ECF MTR 43 & ECF Docs. 37, 65 & 1333].  The plaintiffs' participation resulted in heavily negotiated first-day Orders, including those regarding payment of prepetition wages and benefits, use of cash collateral, and the requirement to file under seal certain portions of the Debtor's schedules and statement of financial affairs to the extent those documents contained confidential identifying information of abuse claimants.  [ECF Docs. 100, 173 & 177].

The UST constituted the Committee on May 20, 2020, [ECF Doc. 94], and reconstituted it on June 10, 2020, [ECF Doc. 151], and again on October 8, 2020, [ECF Doc. 478].  At its inception, the Committee was comprised of abuse claimants and bondholders; since October 8, 2020, the Committee has been comprised entirely of abuse claimants, six total.  After the Committee's constitution, the Court approved the Committee's retention of the law firms of Locke Lord LLP and Pachulski Stang Ziehl & Jones LLP as counsel for the Committee.  [ECF Docs. 256 & 257].  Individual members of the Committee retained their state court counsel to advise them regarding their individual claims against the estate and to assist them in fulfilling their duties as members of the Committee, [ECF Docs. 151 & 478].  Until June 7, 2022, Trahant served as counsel to certain individual Committee members.  [ECF Docs. 151 & 478].

Pursuant to this Court's *Order Directing United States Trustee To Appoint Additional Committee of Commercial Unsecured Creditors* and the accompanying memorandum and opinion, [ECF Docs. 745 & 746], on March 5, 2021, the UST constituted an additional official committee comprised of unsecured commercial creditors (the "Commercial Committee"), [ECF Doc. 772].

On May 20, 2021, the Court approved the Commercial Committee's retention of Stewart Robbins Brown & Altazan, LLC as counsel.  [ECF Doc. 874].

### B.  The Court's Protective Order Governing Discovery

On July 24, 2020, the Debtor moved the Court for entry of a protective order pursuant to Federal Rule of Civil Procedure 26(c)[2] to govern discovery in this case in order "to protect the disclosure of certain confidential documents and other confidential information that will be produced in discovery . . . including, but not limited to, (1) confidential financial information and (2) sensitive and confidential information regarding sexual abuse claims." [ECF Doc. 280].  At the hearing on the motion, the Court resolved remaining objections lodged by the Committee, and on August 3, 2020, issued an Order accepting the form of Protective Order negotiated by the Debtor and the Committee. [ECF Doc. 305].  The Protective Order has been amended on occasion to adjust for the changing contours and needs of the case including, as examples, the addition of the Commercial Committee and to allow certain parties (such as  abuse claimants who do not serve on the Committee and their individual counsel, as well as the Debtor's insurers and reinsurers) to have access to certain confidential information so that they may participate in the mediation of abuse claims.   [ECF Docs. 729 (amending and superseding 305), 885 & 1120]; *see also* [ECF Doc. 1095].

Under the Protective Order, "Protected Material" is discovery produced and designated by the producing party as "CONFIDENTIAL" OR "CONFIDENTIAL—ATTORNEYS' EYES ONLY." [ECF Doc. 729, at 3].  Paragraph 7 of the Protective Order sets forth use and disclosure limits for material designated as "CONFIDENTIAL."  [ECF Doc. 729, ¶ 7].  Any discovery material designated or marked "CONFIDENTIAL" may be disclosed by a recipient only to certain

---

[2]     Rule 26 is made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 7026 and 9014.

persons: (i) the Debtor, including its officers, employees, and agents; (ii) the Committee, including its members and their attorneys; (iii) other creditors and case constituents, after they have signed a Confidentiality Statement; and (iv) the UST. *See id.*[3] Protected Material may only be used only for "Authorized Uses," which, in the case of the Committee, is

> solely in connection with Committee's obligations under the Bankruptcy Code, for purposes of the Chapter 11 Case, and/or for purposes of any judicial proceedings relating thereto (including informal discovery and any contested matters and adversary proceedings commenced in connection with the Chapter 11 Case); and not for any other purpose, including, without limitation, any business, competitive, governmental, commercial, administrative, publicity, press release, marketing, or research purpose or function, or in any other legal case, lawsuit, proceeding, investigation, or otherwise except as expressly provided herein, or as ordered by the Court.

*See id.* Paragraph 9 of the Protective Order conversely identifies prohibited uses for Protected Material obtained through discovery in this case:

> Any Protected Material, and all information derived from Protected Material (including, but not limited to, all testimony, deposition, or otherwise, that refers, reflets or otherwise discusses any information designated "CONFIDENTIAL" or "CONFIDENTIAL—ATTORNEYS' EYES ONLY" under this Protective Order), shall not be used, directly or indirectly, by any person for any business, commercial or competitive purposes, or for any purpose whatsoever other than for Authorized Uses.

[ECF Doc. 729, ¶ 9]. Indeed, the Protective Order completely restricts disclosure of Protected Material outside of the methods prescribed in the Protective Order:

> Except with the prior written consent of the person asserting "CONFIDENTIAL" OR "CONFIDENTIAL—ATTORNEYS' EYES ONLY" treatment, or in accordance with a prior order of the Court after notice, **any Protected Material, and any information contained in, or derived from Protected Material** (including, but not limited to, all deposition, examination or hearing testimony that refers, reflects, or otherwise discusses any information designated "CONFIDENTIAL" or "CONFIDENTIAL—ATTORNEYS' EYES ONLY") **may not be disclosed other than in accordance with this Protective Order.**

---

[3] Paragraph 8 of the Protective Order has similar restrictions on the disclosure of discovery material marked "CONFIDENTIAL—ATTORNEYS' EYES ONLY." [ECF Doc. 729, ¶ 8].

[ECF Doc. 729, ¶ 10 (emphasis added)].

The Protective Order also sets forth the protocol for challenging designations of "CONFIDENTIAL" OR "CONFIDENTIAL—ATTORNEYS' EYES ONLY." [ECF Doc. 729, ¶ 6].

## FINDINGS OF FACT

### A. Events Leading to the UST's Independent Investigation of the Breach of the Court's Protective Order

On January 20, 2022, the Debtor filed a motion under seal asserting that violations of the Court's Protective Order had occurred. The Debtor's motion alleged that the Committee allowed Protected Material produced by the Debtor to the Committee to be disclosed to administrators at a local high school as well as to a local reporter, resulting in the publication of Protected Material in the media a few weeks later. [ECF Doc. 1256]. The Protected Material disclosed and published in a local online newspaper article included the identity of a priest and the high school at which he was currently employed, details of sexual abuse allegations made against that priest and the individual who alleged the abuse, and the resolution of the subsequent Archdiocesan investigation. *See id.* The motion sought to compel the Committee to investigate the source of the breach within its ranks and asked this Court for an evidentiary hearing to consider imposition of sanctions for the breach of the Protective Order ("Motion To Compel"). *See id.*[4]

Specifically, the Debtor alleged that, on January 4, 2022, based on documents received by the Committee through discovery in this case in December 2021, Committee counsel contacted the Debtor's counsel and informed them of the Committee's concerns that a priest against whom

---

[4]      The Motion To Compel has been unsealed pursuant to this Court's Order of October 11, 2022, [ECF Doc. 1843]; however, the Court has redacted the motion to shield confidential information guarded by this Court's Protective Order and pursuant to 11 U.S.C. §§ 107(b)(2) and 107(c).

sexual abuse claims had been alleged in the past was currently serving as a chaplain at a local high school, albeit one not operated by the Debtor. [ECF Doc. 1256]. In response to the Committee's demand for action, Debtor's counsel immediately contacted their client and learned that the priest in question was currently out of work on extended medical leave and thus had no contact with minors. *See id.*[5] But Debtor's counsel also learned then that someone had contacted the high school prior to January 4 with detailed information about the priest, as officials from the high school had already called the Debtor about the issue. *See id.*

The Court held an initial status conference with counsel for the Committee and the Debtor on January 27, 2022, to discuss the Debtor's Motion To Compel; also in attendance at that status conference was counsel for the UST and individual counsel for one member of the Committee. [ECF Doc. 1257]. Counsel for the Debtor and the Committee conveyed to the Court their desire to engage in informal discovery regarding the breach. The Court allowed the parties to move forward with consensual, informal discovery, and held three status conferences with the parties between February 11 and April 14, 2022, to receive updates on their progress. [ECF Docs. 1290, 1295, 1296, 1308, 1414].[6] Counsel for the Committee reported in those status conferences that they had investigated possible sources of the breach of the Protective Order; after interviewing attorneys and support staff in their firms, Committee members, and those members' individual counsel, Committee counsel assured the Court and the Debtor that they had uncovered no evidence

---

[5]    The Debtor and the Committee jointly provided to administrators at the high school documents concerning the past sexual abuse allegations against the priest to the high school once those administrators executed the Protective Order. [ECF Doc. 1843, Ex. B (Hr'g Tr. 6:15–7:3 (March 11, 2022))]. The priest resigned from employment at the high school in mid-January. [ECF Doc. 1843, Ex. E].

[6]    Those *in camera* status conferences were transcribed and initially maintained under seal. At this time, the Court has unsealed the transcripts, but provides redacted copies to shield confidential information guarded by this Court's Protective Order and pursuant to 11 U.S.C. §§ 107(b)(2) and 107(c). [ECF Doc. 1843].

that revealed that the breach of the Protective Order originated from the Committee's side. *See* Hr'g Tr. 6:22–7:8 (Feb. 11, 2022), [ECF Doc. 1843, Ex. A]; Hr'g Tr. 16:20–20:1 (March 11, 2022), [ECF Doc. 1843, Ex. B].

Importantly, counsel for the Committee never disputed the allegation that a breach of the Protective Order had occurred. As a result of its internal investigation into the source of that breach, on or about April 4, 2022, the Committee and the Debtor received discovery responses from the local high school revealing, among other things, that Trahant had contacted the principal of the high school multiple times beginning on December 31, 2021 regarding Protected Material. About a week later, on April 13, 2022, counsel for the Committee filed under seal declarations of "certain Committee members, their state court counsel, and Committee bankruptcy counsel." [ECF Doc. 1438]. That set of declarations included the *Declaration of Richard C. Trahant* dated April 12, 2022 (the "Declaration")[7] in which Trahant declared that he served as counsel to four individual Committee members and that on December 31, 2021, he first contacted his cousin who serves as the principal at the local high school regarding Protected Material that he received in his role as counsel for a Committee member "for what [he] believed (and still believe[s]) to be a legitimate compelling reason – to protect minors." [ECF Doc. 1843, Ex. D, ¶¶ 1–9]. Trahant also declared that he "did not provide any 'confidential' documents to or discuss the contents of any 'confidential' documents with" any officials at the local high school and "did not disclose or disseminate any documents marked in any way confidential, the contents of documents, or any other information produced by the Debtor to" the reporter or anyone else affiliated with area newspapers. [ECF Doc. 1843, Ex. D, ¶¶ 10–11 & 15].

---

[7] The Court has unsealed the Declaration per its Order of October 11, 2022, and attached the Declaration as Exhibit D to that Order, redacted to shield confidential information guarded by this Court's Protective Order and pursuant to 11 U.S.C. §§ 107(b)(2) and 107(c). [ECF Doc. 1843].

At the April 14, 2022 status conference on the Motion To Compel, the parties requested that the UST be appointed to perform an independent investigation.  [ECF Doc. 1843, Ex. C].  The Court agreed.  As it stated in its April 25, 2022 Order instructing the UST to investigate the allegations of wrongful dissemination of Protected Material, the Court was concerned not only with enforcing its own Orders, but with the timing of such breach and the negative impact that violation would have on the functioning of the Committee, the rights of parties in interest in the bankruptcy process, and the ability of the parties in this case to proceed in good faith in the upcoming mediation of claims asserted against the estate.  [ECF Doc. 1468].  The Court instructed the UST to submit its findings on or before June 3, 2022, and enabled that expedited expectation by shortening the timelines for responding to discovery propounded by the UST.  *See id*.  The Court's Order instructed all parties in interest to preserve relevant hard-copy documents and electronically stored information in their custody and control, observing that counsel for the Committee and the Debtor had agreed on behalf of their clients and constituents to cooperate with the UST in its investigation.  *See id*.

The Court stated in its Order that, upon reviewing the results of the UST's investigation into the breach of the Protective Order, it would determine the need for further action.  *See id*. With that, the Debtor withdrew its Motion To Compel.  [ECF Doc. 1473].

### B.  The Results of the UST's Independent Investigation and the Court's Response

On June 3, 2022, the UST filed under seal its statement of position regarding the allegations made by the Debtor of violations of the Protective Order (the "UST Report").  [ECF Doc. 1572]. Counsel for the UST conducted its investigation efficiently and thoroughly, attaching to the report 78 sworn declarations; 18 transcripts of sworn examinations provided under Rule 2004 of the Federal Rules of Bankruptcy Procedure; one transcript and one summary of two unsworn

telephonic interviews; and numerous documents produced in discovery, including telephone and text-message logs, e-discovery transactions reports, and e-mail and letter correspondence.[8]  All parties who are bound by the Court's Protective Order, including Trahant, have had the opportunity to review the full UST Report and attachments.  [ECF Doc. 1669, 1671 & 1752].

According to the Debtor's website, in November 2018, "to foster the healing of victims, in a spirit of transparency, and in the pursuit of justice," the Archbishop made the decision to publish the names of those "Archdiocesan clergy (priests and deacons) who had been removed from ministry for an allegation of sexual abuse of a minor."  Archdiocese of New Orleans, Pastoral Letter, Clergy Report Regarding Abuse (Nov. 2, 2018), https://nolacatholic.org/2018-report-on-clergy-abuse.  That list has been referred to by the parties in this case as the "Credibly Accused List."  According to the deposition transcript of Debtor's counsel attached to the UST Report, in the course of producing documents to the Committee pursuant to Bankruptcy Rule 2004, the Debtor had prioritized the production of documents related to sexual abuse claims alleged against priests listed on the Credibly Accused List or named in a proof of claim filed in this case. [ECF Doc. 1572 (Wegmann Dep. 29:5–34:20 (May 23, 2022)) (under seal)].  Internal documents evaluating abuse allegations specifically against the priest whose name was disclosed in violation of the Protective Order here were first produced to the Committee by the Debtor in December 2021.  [ECF Doc. 1572 (Wegmann Dep. 29:5–34:20)].  Prior to that disclosure, no information regarding that priest had been produced by the Debtor, as the priest is not named in a proof of claim filed in this case and has never been listed on the Credibly Accused List.  *See id.*

---

[8]      The UST Report is voluminous and replete with Protected Material subject to this Court's Protective Order; any attempt at redaction would render the document useless to the reader. *See, e.g.*, Hr'g Tr. 12:8–13:9 (July 22, 2022) [ECF Doc. 1671].  Therefore, the Court is unable to unseal the UST Report and its attachments at this time.  But the Court has unsealed and redacted Trahant's deposition transcript, which was attached to the UST Report and is discussed at length in this opinion.  [ECF Doc. 1843, Ex. E].

During its investigation, counsel for the UST also deposed Trahant pursuant to Bankruptcy Rule 2004.  The transcript of that sworn deposition as well as the exhibits used in the deposition were attached to the UST Report.  In his deposition, Trahant disclosed that he, with two other attorneys, represented four of the then-current Committee members as plaintiffs in their prepetition Abuse Cases against the Archdiocese and continued to represent them as they fulfilled their duties on the Committee; he further disclosed that his law practice overwhelmingly consists of litigating clergy sexual abuse cases.  [ECF Doc. 1843, Ex. E (Trahant Dep. 15:1–16:12 (May 18, 2022))]. Trahant also admitted that he had read the Court's Protective Order and all amendments thereto and was bound by the Protective Order, although he stated he disagreed with many of the "confidential" designations of documents produced by the Debtor.   [ECF Doc. 1843, Ex. E (Trahant Dep. 16:13–17:16)].

Trahant stated that he first learned of abuse allegations against the priest at issue here on or about December 30 or 31, 2021, through his receipt of discovery produced by the Debtor.  [ECF Doc. 1843, Ex. E (Trahant Dep. 26:4–32:12)].  Trahant reported that he recognized the name of that priest and conducted an Internet search to find out where the priest currently resided or worked.  [ECF Doc. 1843, Ex. E (Trahant Dep. 32:13–:23)].   When the UST presented Trahant with his April 12, 2022 Declaration, as well as text messages dated December 31, 2021, that he had provided to the UST through discovery, Trahant admitted that he contacted his cousin who serves as the principal of the area high school where the priest was employed at that time.  [ECF Doc. 1843, Ex. E (Trahant Dep. 34:15–40:18; Exs. 4 & 5)].  Trahant stated that he mentioned the priest by name in the text message and, because his cousin knew the nature of his law practice, Trahant knew that his cousin would infer that an alleged sexual abuse history would be associated with that priest.  [ECF Doc. 1843, Ex. E (Trahant Dep. 37:14–40:18; Ex. 5)].  Indeed, Trahant

stated that his purpose in contacting his cousin was to ensure that the priest would not be allowed to return to work at the high school.  [ECF Doc. 1843, Ex. E (Trahant Dep. 37:14–41:6)].  Trahant engaged in further text messages and telephone calls with his cousin on December 31, 2021, and January 3–4, 2022, in which he disclosed the nature of allegations against the priest that he learned through his receipt of confidential documents produced by the Debtor.  [ECF Doc. 1843, Ex. E (Trahant Dep. 59:1–61:10, 66:25–76:8; Exs. 5 & 13)].

The UST also presented Trahant with an e-mail that he had produced to the UST; on January 1, 2021, Trahant sent that e-mail to a reporter with whom he had a professional relationship, and listed the name of the priest in the subject line.  [ECF Doc. 1843, Ex. E (Trahant Dep. 42:4–44:21; Ex. 6)].  Trahant told the reporter in the e-mail where the priest was currently employed and to "keep him on your radar"; he further testified that he sent the e-mail knowing that the reporter consistently investigated and reported on clergy abuse allegations and would relentlessly pursue any allegations of sexual abuse against the priest.  [ECF Doc. 1843, Ex. E (Trahant Dep. 42:4–43:16)].  Indeed, as explained by Trahant:

> UST:      This first email to [the reporter] from January 1st when you sent this email, was your intent to have [the reporter] publish an article that would disclose [the priest's] conduct?
>
> TRAHANT:   Yes, but not only [the priest's] conduct.
>
> UST:      Who else's conduct?
>
> TRAHANT:   The archdiocese, for putting him there to begin with. . . . We've done this . . . meaning [the reporter], other reporters—enough to know that—just like [my cousin] did, when I bring up a name, they have a pretty good idea where it's going.

[ECF Doc. 1843, Ex. E (Trahant Dep. 85:14–86:2)].

Trahant was adamant throughout his deposition that he believed that his actions did not constitute violations of the Protective Order; rather, he viewed the allegations of a Protective Order

violation to be "contrived" by the Debtor as retribution for "su[ing] them into bankruptcy." [ECF Doc. 1843, Ex. E (Trahant Dep. 250:22–251:16)]. Trahant conveyed that he felt restricted by the Protective Order, but at the same time, he conceded that he had never moved the Court for relief from the Protective Order to report potential crimes and never exercised the protocol available in the Protective Order to challenge the Debtor's "confidential" designations of documents. [ECF Doc. 1843, Ex. E (Trahant Dep. 253L12–254:8)].

Based on the Court's review of the UST's factual findings from its investigation and all of the attachments to the UST Report, the Court issued an Order on June 7, 2022, finding:

> The sworn testimony of attorney Richard Trahant accompanying the UST Report supports the UST's statement that Trahant serves as co-counsel with attorneys John Denenea and Soren Gisleson to represent the personal interests of four individual members of the Committee; prepetition, the three attorneys pursued those members' claims against the Archdiocese in state court. Trahant's testimony confirmed that he, Denenea, and Gisleson practice law as a group, even though they each may be sole proprietors or partners in different law firms.

> Trahant's testimony, as well as documents attached to the UST Report, also confirm the UST's finding that Trahant received confidential information produced by the Debtor in the course of discovery in this case. Finally, Trahant's testimony and certain documents support the UST's findings that (i) Trahant had read and was bound by the Protective Order; (ii) knew that he was bound by the Protective Order; and (iii) beginning on December 31, 2021, provided on multiple occasions confidential information he received to a third party and the media in direct violation of this Court's Protective Order. The Court finds, based on its review of Trahant's testimony, that his disclosures and violation of the Protective Order were knowing and willful.

[ECF Doc. 1574, at 2]. The Court continued:

> No dispute exists that the information that reached the media was information that could not have come from any other source but the Debtor's production of discovery in this case. Although the Court commends the UST's diligence and expeditiousness in investigating the disclosure of highly confidential information in violation of the Protective Order, as the UST Report acknowledges, serious questions remain regarding the extent of the information that was provided to third parties and the media by Trahant and whether documents or sensitive information contained therein was also provided to the media by someone else. The fact that no one may even be able to uncover the extent of the breach, however, does not affect this Court's duty to protect the integrity of the bankruptcy process

and enforce its own Orders.

[ECF Doc. 1574, at 3–4]. For the reasons stated in the Court's Order of June 7, 2022, to protect the integrity of the bankruptcy process, to guard the rights of all parties in interest, and to preserve the trust in the confidentiality of mediation (which was due to begin on June 8, 2022), the Court disqualified Trahant from receiving further Protected Material in this case. [ECF Doc. 1574, at 4–5]. Pursuant to 11 U.S.C. §§ 105(a) and 1102(a)(4), the Court further instructed the UST to relieve the four members represented by Trahant and his practice group from the Committee to prevent further abuse of process and to ensure adequate representation of creditors. [ECF Doc. 1574, at 5].[9]

The Court concluded its Order of June 7, 2022, by instructing that it would issue a separate *Order To Show Cause* to determine appropriate sanctions for Trahant's disclosure of confidential information in contempt of the Court's Protective Order. [ECF Doc. 1574, at 5]. On June 13, 2022, the Court issued the *Order To Show Cause* to Trahant to appear and explain to the Court why he should not be sanctioned for his willful violation of this Court's Protective Order. [ECF Doc. 1589]. The Court also instructed counsel for the Debtor and the Committee to compile and submit invoices identifying professional time spent on services related to the Debtor's Motion To Compel. *See id.* The following table summarizes those invoices and amounts charged to the estate:

---

[9]     On June 7, 2022, the UST issued a *Notice of Appointment of Reconstituted Official Committee of Unsecured Creditors*, identifying the names of the two remaining members of the Committee and their individual counsel. [ECF Doc. 1575]. On June 21, 2022, the UST filed another *Notice of Appointment of Reconstituted Official Committee of Unsecured Creditors*, identifying the names of three new members of the Committee and their individual counsel. [ECF Doc. 1618].

| Jones Walker LLP (Debtor's Counsel) | Donlin, Recano & Company, Inc. (Debtor's Noticing Agent) | Locke Lord LLP (Committee Counsel) | Pachulski Stang Ziehl & Jones LLP (Committee Counsel) | Berkeley Research Group, LLC (Committee Financial Advisor) | TOTAL |
|---|---|---|---|---|---|
| $261,294.35[10] | $33,160.55[11] | $268,168.64[12] | $57,001.00[13] | $3,149.50[14] | |
| $95,124.40[15] | $4,393.79[16] | $9,112.50[17] | $19,120.00[18] | | |
| | | | $8,400.00[19] | | |
| | | | $1,960.00[20] | | |
| $356,418.75 | $37,554.34 | $277,281.14 | $86,481.00 | $3,149.50 | **$760,884.73** |

Although the show-cause hearing was initially set for July 25, 2022, the Court continued the hearing to accommodate Trahant's counsel's scheduling conflicts; thus, the show-cause hearing occurred on August 22, 2022.  [ECF Doc. 1644 (denying Trahant's motion for stay of

[10]   Fees and expenses incurred between January 1, 2022, and June 30, 2022.  [ECF Doc. 1698, Exs. A & B (filed August 1, 2022)].

[11]   Fees and expenses incurred between January 1, 2022, and June 30, 2022.  [ECF Doc. 1698, Exs. C & D (filed August 1, 2022)].

[12]   Fees and expenses incurred between January 1, 2022, and June 30, 2022.  [ECF Docs. 1696 (filed August 1, 2022) & 1724 (filed August 16, 2022)].

[13]   Fees and expenses incurred between January 1, 2022, and May 31, 2022.  [ECF Doc. 1627 (filed June 23, 2022)].

[14]   Fees and expenses incurred between April 2022 and June 2022.  [ECF Doc. 1714 (filed August 11, 2022)].

[15]   Fees and expenses incurred during the month of July 2022.  [ECF Doc. 1785, Exs. A & B (filed September 14, 2022)].

[16]   Fees and expenses incurred during the month of July 2022.  [ECF Doc. 1785, Exs. C & D (filed September 14, 2022)]

[17]   Fees and expenses incurred during the month of July 2022.  [ECF Doc. 1786 (filed September 14, 2022)].

[18]   Fees and expenses incurred between May 1, 2022, and June 30, 2022.  [ECF Doc. 1699 (filed August 2, 2022)].

[19]   Fees and expenses incurred between April 1, 2022, and June 30, 2022.  [ECF Doc. 1723 (filed August 15, 2022)].  Because the time periods in ECF Docs. 1627, 1699, and 1723 overlap, the Court reviewed all invoices to ensure that no duplicate time entries were listed.

[20]   Fees and expenses incurred in the month of July 2022.  [ECF Doc. 1781 (filed September 14, 2022)].

hearing to consider sanctions pending appeal)].[21]

### C.  The Show-Cause Hearing

At the show-cause hearing,[22] the Court heard arguments from Trahant's counsel as to why

his client should not be sanctioned for violating the Protective Order.  Counsel asserted, among

other things, that no clear and convincing evidence of a Protective Order violation exists in the

UST Report.  Counsel further argued that the UST Report is hearsay, "lacks trustworthiness," and

should not be relied upon by the Court in making findings because the UST "is an interested party

in these whole proceedings."  Hr'g Tr. 18:14–23:1 (Aug. 22, 2022), [ECF Doc. 1752].[23]  And,

---

[21]     Citing *United States Abatement Corp. v. Mobil Exploration & Producing U.S. Inc. (In re United States Abatement Corp.)*, 39 F.3d 563 (5th Cir. 1994), this Court denied Trahant's motion for a stay pending appeal as premature; the Court found its Order of June 7, 2022, to be an interlocutory order because, although it made a finding of contempt, no sanctions had been imposed.  *See* Hr'g Tr. 10:16–14:3, 15:17–18:14 (July 1, 2022) [ECF Doc. 1642].  Alternatively, the Court denied Trahant's motion because he made no attempt to show that any of the four factors exist that would justify a stay pending appeal of a final order under Federal Rule of Bankruptcy Procedure 8007.  *See* Hr'g Tr. 18:14–20:7 (July 1, 2022) [ECF Doc. 1642].  The District Court likewise denied Trahant's motion to stay the show-cause hearing, finding that Trahant had not made the requisite showing of likelihood of success on the merits or irreparable harm to justify a stay of the show-cause hearing pending appeal.  *See In re Roman Catholic Church of the Archdiocese of New Orleans*, No. 22-1740 (E.D. La. Aug. 9, 2022) [ECF Doc. 31].

[22]     The Court held the show-cause hearing under seal, as the arguments and evidence presented at the hearing would necessarily discuss and pertain to Protected Material governed by the Court's Protective Order.  The Court has now unsealed that transcript pursuant to its Order of October 11, 2022, [ECF Doc. 1843]; however, the Court has redacted the transcript to shield confidential information guarded by this Court's Protective Order and pursuant to 11 U.S.C. §§ 107(b)(2) and 107(c).

[23]     The Court overrules counsel's objection to the UST Report as hearsay.  Federal Rule of Evidence 803 allows "[a] record or statement of a public office" to be excluded by the rule against hearsay if

    (A)     it sets out:

        (i)     the office's activities;

        (ii)     a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or

        (iii)     in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and

    (B)     the opponent does not show that the source of information or other circumstance indicate a lack of trustworthiness.

FED. R. EVID. 803(8).  "This rule is premised on the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record."  *Boyd v. Toyobo*

assuming *arguendo* that Trahant violated the Protective Order, counsel opined that the harm resulting from that violation was negligible.  *See* Hr'g Tr. 25:4–26:11.

Trahant himself offered sworn testimony at the show-cause hearing.  That testimony revealed that Trahant obtained confidential information regarding the priest at issue here **solely** from discovery he received through his affiliation with the Committee.  *See* Hr'g Tr. 34:4–34:15, 40:3–41:21.  Trahant knew that he was bound by the Protective Order issued by this Court, but he did not agree with the Debtor's designation of the information concerning the priest as "confidential" and believes that the Debtor "overstamp[s]" the vast majority of the documents it produces as "confidential."  *See* Hr'g Tr. 32:15–21, 39:1–40:2, 41:25–42:11.  Trahant was also aware of the provisions in the Protective Order that would have given him the opportunity to challenge the Debtor's "confidential" designations of information, but chose not to follow that procedure.  *See* Hr'g Tr. 40:3–5.  Trahant admitted that he sent text messages to his cousin containing the priest's name and asking if the priest were still employed by the high school where his cousin served as principal, understanding that his cousin would immediately know that the

---

*Am., Inc. (In re Second Chance Body Armor, Inc.)*, 421 B.R. 823, 830 (Bankr. W.D. Mich. 2010) (internal quotations and citations omitted).  "*Admissibility in the first instance is assumed* because of the reliability of the public agencies usually conducting the investigation, and their lack of any motive for conducting the studies other than to inform the public fairly and adequately."  *Id*. (internal quotations and citations omitted).

The Court observes that the UST is part of the federal executive branch and acted within its authority.  The UST is "a national program with broad administrative, regulatory, and litigation/enforcement authorities whose mission is to promote the integrity and efficiency of the bankruptcy system for the benefit of all stakeholders—debtors, creditors, and the public."  Dep't of Justice, U.S. Trustee Program, https://www.justice.gov/ust (last visited October 5, 2022).  The UST is routinely called upon to investigate allegations of bankruptcy fraud and other matters affecting the integrity of the bankruptcy system.  The UST Report also contains factual findings as required by Rule 803(8)(A)(iii).

Because the Court finds that the threshold requirements of Rule 803(8)(A)(iii) are met, the UST Report is presumed admissible unless Trahant affirmatively demonstrates that the UST Report is not trustworthy.  *See Lightsway Litig. Servs., LLC v. Wimar Tahoe Corp. f/k/a Tropicana Casinos & Resorts, Inc. (In re Tropicana Entm't, LLC)*, 613 B.R. 587, 593–94 (Bankr. D. Del. 2020); *In re Second Chance Body Armor, Inc.*, 421 B.R. at 832.  Trahant presented no evidence at the show-cause hearing to demonstrate the UST Report was biased or prejudiced against him.  Thus, the Court concludes that Trahant did not carry his burden to show that the UST Report is untrustworthy pursuant to Rule 803(8)(B).

priest had been accused of sexual abuse, given that Trahant has litigated sexual abuse claims

against the Archdiocese for years.  *See* Hr'g Tr. 31:17–32:6.  Although Trahant voiced his belief

that he did not violate the Protective Order because he gave no physical or electronic documents

to his cousin or a reporter, *see* Hr'g Tr. 32:5–14, he conceded that, in divulging the name of the

priest and alleged abuse allegations against him to his cousin and a reporter, he planted the seeds

of information that he knew would accomplish his own goal:

> COURT:  . . . In your deposition and in the text messages and all of the exhibits
> that I reviewed . . . it came through that you didn't take physical documents and
> hand them over, but I would invite you to consider the fact that you took [the
> priest's] name and the information that you had about him—and you said you were
> very concerned.  You had a good reason.  You were concerned with protecting
> children at that high school—but I would invite you to consider that you took the
> confidential information and . . . planted the seed that then [officials at the high
> school], once they had the seed planted, came back at Archbishop Aymond and
> others from the Archdiocese and [asked questions] about [the priest].  Once you
> planted the seed with [the reporter], he's a reporter and he's going to go do what
> reporters do.
>
> . . . .
>
> TRAHANT:  And did I plant a seed?  Absolutely.  Absolutely.  Your Honor is a
> hundred percent right.  Yeah, I planted that seed.  Why did I plant the seed as it
> related to [my cousin]?  Because it was simple.  I communicate with [my cousin]
> fairly frequently and I didn't want that guy back on campus.
>
> . . . .
>
> TRAHANT:  That was, that was the seed I planted with [the high school].  The seed
> I planted with [the reporter] . . .
>
> > But yes, I planted a seed . . .
> >
> > Because I think this, I think this stuff needs to be exposed.

Hr'g Tr. 36:20–38:24.

The Court asked Trahant  why—if he did not believe he had violated the Court's Protective

Order or if he believed he had good cause that justified his violation of the Protective Order—why

he declined to tell counsel for the Committee that he had communicated confidential information with his cousin and with a reporter.  The Court heard equivocation, deflection, and inconsistency in Trahant's answers.  *See* Hr'g Tr. 31:10–16, 34:16–36:3.  Further, his answers do not comport with the record and the timeline of events in this case or the actions taken by Committee counsel in investigating the breach.

The Court also heard statements from counsel for the Debtor regarding the harm that has been caused by the breach of the Protective Order and wrongful disclosure of confidential information, including the hurt and trauma revisited upon the survivor of the priest's alleged abuse, the harm to the level of trust among parties with already-strained relations as they entered the mediation process, and the financial harm to the estate for professional fees incurred needlessly due to Trahant's delay in admitting his communications with his cousin and the reporter.  *See* Hr'g Tr. 47:10–54:13.  The Debtor requested that the Court impose sanctions against Trahant in the form of attorneys' fees and costs for willful violation of the Protective Order and the harm that his actions caused.  *See id.*

## CONCLUSIONS OF LAW

"At the outset, the Court notes that it has broad discretion to preserve the integrity and purpose of its own orders."  *Skyport Global Commc'ns, Inc. v. Intelsat Corp. (In re Skyport Global Commc'ns, Inc.)*, 408 B.R. 687, 694 (Bankr. S.D. Tex. 2009) (citing *Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996)).

## A.      Rule 37(b)(2) Permits Sanctions for Violations of the Protective Order.

Federal Rule of Civil Procedure 37(b)[24] "empowers the courts to impose sanctions for failures to obey discovery orders" and the Fifth Circuit has held that violations of protective orders are sanctionable within the scope of Rule 37(b)(2)(A).  *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 488–90 (5th Cir. 2012).[25]  In addition to the broad range of sanctions listed in Rule 37(b)(2)(A), including contempt, Rule 37(b)(2) "authorize[s] the court to impose a concurrent sanction of reasonable expenses, including attorney's fees, caused by the failure to obey a discovery order."  *Id.* at 488 (citation omitted); *see also* FED. R. CIV. P. 37(b)(2)(C).  Although this Court "has broad discretion under Rule 37(b) to fashion remedies suited to the misconduct," usually a "finding of bad faith or willful misconduct [is required] to support the severest remedies under Rule 37(b)—striking pleadings or dismissal of a case."  *Id.* (quoting *Pressey v. Patterson*, 898 F. 2d 1018, 1021 (5th Cir. 1990)).[26]  But "[l]esser sanctions," such as imposition of attorneys' fees, "do not require a finding of willfulness."  *Id.*

"Rule 37 sanctions must be applied diligently both to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct

---

[24]     Rule 37 is made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 7026 and 9014.

[25]     The Court's Protective Order, like the one examined in *Cooper Tire & Rubber Co.*, (a) governs confidential material produced or disclosed in response to formal or informal discovery conducted in the case; (b) allows parties to designate material as "confidential"; (c) addresses inadvertent production of confidential material; (d) includes procedures for objections to designation of material produced as "confidential"; and (e) includes provisions regulating the storage, return, or destruction of confidential material.  *See* 685 F.3d at 489–90.  Thus, the Court's Protective Order was entered "to provide or permit discovery" of documents within the meaning of Rule 37(b).

[26]     "Noncompliance with discovery orders is considered willful when the 'court's orders have been clear, when the party has understood them, and when the party's noncompliance is not due to factors beyond the party's control . . . .'"  *In re Express Grain Terminals, LLC*, No. 21-11832, 2022 WL 1136313, at *4 (Bankr. N.D. Miss. Apr. 15, 2022) (quoting *Ali v. Dainese USA, Inc.*, 577 F. Supp. 3d 205, 221 (S.D.N.Y. 2021)).

in the absence of such a deterrent." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763–64 (1980); *see also Cooper Tire & Rubber Co.*, 685 F.3d at 490; *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1542 (11th Cir. 1985). "Sanctions are proper where clear and convincing evidence indicates '(1) that a court order was in effect, (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court order.'" *Shaw v. Ciox Health LLC*, No. 19-14778, 2021 WL 5140615, at *3 (E.D. La. Nov. 4, 2021) (quoting *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 291 (5th Cir. 2002)).

### B. The Court May Also Impose Sanctions Pursuant to 11 U.S.C. § 105(a) and Its Inherent Authority.

In addition to the authority granted by Rule 37 to impose sanctions for violation of the Court's Protective Order, "it is firmly established that 'the power to punish for contempt is inherent in all courts.'" *In re Skyport Global Commc'ns, Inc.*, 408 B.R. at 695 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (citation omitted)). Indeed, "[f]ederal courts have inherent powers which include the authority to sanction a party or attorney when necessary to achieve the orderly and expeditious disposition of their dockets." *Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 815 (5th Cir. 2017) (citations omitted); *see also In re Spectee Grp., Inc.*, 185 B.R. 146, 155 (Bankr. S.D.N.Y. 1995) ("A Court has inherent authority to supervise and control its own proceedings, and to require the payment of the other party's attorney's fees by one who has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986))).

> This power reaches both conduct before the court and that beyond the court's confines, for "[t]he underlying concern that gave rise to the contempt power was not . . . merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial."

*Chambers*, 501 U.S. at 44 (quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S.

24

787, 798 (1987)).

Specifically, the Court has the power to assess attorneys' fees against both attorneys and litigants who engage in abusive litigation practices or in bad-faith conduct. *See Chambers*, 501 U.S. at 45–46; *Roadway Express, Inc*., 447 U.S. at 765. A party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." *Hutto v. Finney*, 437 U.S. 678, 689 n.14 (1978). "The 'less severe sanction' of an assessment of attorney's fees is undoubtedly within a court's inherent power." *Chambers*, 501 U.S. at 45 (citing *Roadway Express, Inc.*, 447 U.S. at 765). "Where the Court concludes 'that the very temple of justice has been defiled . . . [or when a party] shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order,' then the Court may invoke its inherent powers." *In re Skyport Global Commc'ns, Inc.*, 408 B.R. at 696 (quoting *Chambers*, 501 U.S. at 46). Although the Court's inherent powers are typically exercised when conduct is not subject to discipline under statutes or rules, "neither is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the [r]ules." *Chambers*, 501 U.S. at 50.

This Court also has a statutory grant of authority under § 105(a) of the Bankruptcy Code "to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). In addition to granting broad power to implement provisions of the Bankruptcy Code, § 105(a) "has been interpreted as supporting the inherent authority of the bankruptcy courts to impose civil sanctions for abuses of the bankruptcy process." *In re Carroll*, 850 F.3d at 816 (quoting *Walton v. LaBarge, Jr. (In re Clark)*, 223 F.3 859, 864 (8th Cir. 2000); *Friendly Fin. Discount Corp. v. Tucker (In re Tucker)*, No. 99-31069, 2000 WL 992448, at *3 (5th

Cir. June 28, 2000)); *see also In re Tabor*, 583 B.R. 155, 177 (Bankr. N.D. Ill. 2018) (citing *In re Volpert*, 110 F.3d 494, 500 (7th Cir. 1997)).

"The Fifth Circuit has held that the imposition of sanctions using § 105 as well as the inherent power of the Court must be accompanied by a specific finding of bad faith." *In re Bradley*, 495 B.R. 747, 793 (Bankr. S.D. Tex. 2013) (collecting cases); *see also In re Skyport Global Commc'ns, Inc*., 408 B.R. at 695 (quoting *Chambers*, 501 U.S. at 45); *Goldin v. Bartholow*, 166 F. 3d 710, 722 (5th Cir. 1999).

### C.    Trahant's Disobedience of the Court's Protective Order and His Subsequent Choice To Obscure His Actions Justifies a Finding of Bad Faith and Warrants Sanctions.

The Court based its finding that Trahant violated the Protective Order primarily upon the factual findings contained in the UST Report—and in no small part upon Trahant's own sworn statements and the e-mails and text messages that he himself produced to the UST.   The evidence presented at the show-cause hearing reconfirmed that finding.  Trahant's testimony and the record in this case presents clear and convincing evidence that, even though a Protective Order was in place governing the confidential information produced by the Debtor and Trahant was bound by that Protective Order, he nevertheless took confidential information he received through his affiliation with the Committee and used it for his own purposes—not one for which it was intended or protected.

But Trahant's testimony at the show-cause hearing and the record in this case further reveal that his actions created waste, disrupted the progress in this case, and delayed resolution of this particular matter for months.  Trahant not only disobeyed this Court's Protective Order, but his subsequent evasion and failure to provide information timely to counsel for the Committee and the Debtor regarding his own conduct constitute bad-faith actions which caused the Debtor, the

Committee, and the UST to divert and expend resources unnecessarily to uncover information that Trahant had all along.

Trahant maintains his belief that he has complied with the terms of the Protective Order because he did not turn over any physical or electronic documents to his cousin or the reporter, but the Court finds those statements to be disingenuous and difficult to accept considering the clear language of the Protective Order that prohibits disclosure of "any Protected Material, **and any information contained in, or derived from Protected Material . . . other than in accordance with this Protective Order**." [ECF Doc. 729, ¶ 10 (emphasis added)].   The Protective Order further describes specifically the purposes for which information governed by the Protective Order may be used.  [ECF Doc. 729, ¶ 10].  Trahant is a seasoned attorney and an officer of the Court who has a responsibility to uphold and follow Court Orders—even those he may disagree with and those that become inconvenient to him.  Further, through his legal representation of a member of the Committee—the primary negotiating body for a plan of reorganization in this case—Trahant was able to receive confidential information; thus, he and his client-members of the Committee and other Committee professionals owe fiduciary duties to that Committee's constituency that require such information to be held in confidence.  Thus, pursuant to Rule 37, its inherent authority, and § 105 of the Bankruptcy Code, the Court imposes sanctions in the form of attorneys' fees and expenses against Trahant not only to serve as a deterrent for any attorney or law firm who might be tempted to violate the Court's discovery orders, but also to preserve the integrity of the bankruptcy process and protect it from abuse.

"Once a court orders that a party must pay reasonable fees and expenses as a sanction, the lodestar analysis is then used to determine the proper amount of fees 'by multiplying the reasonable number of hours expended in defending the suit by the reasonable hourly rates for the participating

lawyers.'"  *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL NO. 2179, 2021 WL 4192060, at *2 (E.D. La. Sept. 15, 2021) (quoting *Skidmore Energy v. KPMG*, 455 F.3d 564, 568 (5th Cir. 2006)).   "In determining the fee award, the court should exclude all time that is excessive, duplicative, or inadequately documented."  *Id*. (citing *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993)).   "In doing so, it is of importance for the court to keep in mind that '[t]he essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection.'"  *Id*. (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)).   "So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time."  *Id*. (quoting *Fox*, 563 U.S. at 838).   That goal of "rough justice" is significant when combined with the purpose of Rule 37 sanctions, which, as stated above, is deterrence—not full repayment.  *See id*.  "Specifically, the court may reduce an award 'by a percentage to substitute for the exercise of proper billing judgment.'"  *Id*. (quoting *Gilmore v. Audubon Nature Inst., Inc*., 353 F. Supp. 3d 499, 508 (E.D. La. 2018)).   Courts in this district have repeatedly reduced fee awards by 50% in this context.  *See id*. (collecting cases).

At no time has Trahant objected to the reasonableness of the fee statements submitted by the professionals of the Debtor and the Committee pursuant to the *Order To Show Cause*, [ECF Doc. 1589].  The Court has nevertheless independently reviewed the fee statements submitted by those professionals.  Considering the complexities of this matter, including the seriousness of the breach of the Protective Order, as well as the number of attorneys and law firms involved, and the prevailing rates in the home markets of those law firms, the Court is satisfied that the amounts incurred by those firms in dealing with this matter are reasonable.  The Court further observes that, pursuant to § 330(a)(1) of the Bankruptcy Code, the estate pays all allowed fees and expenses for professionals of the Debtor as well as the Committee.

Based on the circumstances of this matter, the Court finds that an award of a percentage of the fees and costs incurred will serve the desired purpose of deterring Trahant and others from engaging in similar misconduct.   Therefore, the Court imposes sanctions in the amount of $400,000.00, which is approximately 53% of $760,884.73, the total amount of attorneys' fees and costs that were incurred by professionals of the Debtor and the Committee in responding to the Motion To Compel and investigating the breach of the Protective Order.[27]

Accordingly,

**IT IS ORDERED**  that monetary sanctions are assessed against Richard C. Trahant in the amount of $400,000.00 and shall be payable to the Debtor within thirty days of this Order by mailing via commercial courier or hand-delivering certified funds to the Debtor's bankruptcy counsel, Jones Walker LLP, 201 St. Charles Avenue, Ste. 4900, New Orleans, Louisiana 70170.

**IT IS FURTHER ORDERED** that the Court will hold a hearing on **Monday, November 21, at 4:00 p.m.** at the United States Bankruptcy Court, 500 Poydras Street, Courtroom B-709, New Orleans, Louisiana 70130 to assess compliance with this Order and, in the event of non-compliance, to assess whether additional action should be taken by the Court to ensure compliance with this Order.   Parties are to review this Court's General Order 2021-2, as amended, for information on conduct of hearings, which allow in-person participation in court proceedings as well as telephonic participation (Dial-In:  504.517.1385; Conf. Code 129611).

**IT IS FURTHER ORDERED** that the Debtor is instructed to serve this Memorandum Opinion and Order via first-class U.S. Mail on all parties not receiving electronic notice via this

---

[27]     The Court notes that the figure of $760,884.73 does not reflect the time and resources spent by the UST in completing its very thorough and comprehensive investigation into the breach of the Court's Protective Order.  The Court and the parties owe their gratitude for the diligence and steadfastness of the UST as it continues to fulfill its mission to serve as an independent watchdog over cases filed in this district and to protect the bankruptcy process for the benefit of all parties in interest.

Court's CM/ECF system and on Richard Trahant at the address listed below within three days pursuant to the Federal Rules of Bankruptcy Procedure, this Court's Complex Case Procedures, and any Orders limiting notice and file a certificate of service to that effect.

Richard C. Trahant
Attorney at Law
2908 Hessmer Avenue
Metairie, Louisiana 70002

New Orleans, Louisiana, this 11th day of October, 2022.

MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE
