UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | § § | CASE NO: 20-10846 |
| THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS, | § § § § | CHAPTER 11 COMPLEX CASE |
| DEBTOR. | § § | SECTION A |

## MEMORANDUM OPINION AND ORDER

Before the Court is the *Official Committee of Unsecured Creditors' Motion To Compel Debtor's (1) Production of Documents, and (2) Privilege Log, to the Extent Necessary, Related to Rule 2004 Order* (the "Motion To Compel"), [ECF Doc. 804], filed by the Official Committee of Unsecured Creditors (the "Committee"); the objection to the Motion To Compel filed by The Roman Catholic Church of the Archdiocese of New Orleans (the "Archdiocese"), the debtor in the above-captioned bankruptcy case, [ECF Doc. 814]; and the Committee's reply brief filed in support of the Motion To Compel, [ECF Doc. 821]. Pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7052, the Court makes the following findings of fact and conclusions of law related to the current contested matter and **GRANTS** the relief requested in the Motion To Compel.[1]

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. The matter presently before the Court constitutes a core proceeding that this Court

---

[1] To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(B). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## FINDINGS OF FACT

After more than three years, the events of this case have become more detailed and voluminous. To avoid repetition, the Court relies upon and incorporates its findings in past opinions to fill in the details of the case. [ECF Docs. 745, 991, 1759 & 1844].

In March 2020, two months prior to the Archdiocese filing for bankruptcy relief, Mark Mintz, a partner in the law firm of Jones Walker LLP, the Archdiocese's bankruptcy counsel, engaged The Ehrhardt Group ("TEG") on behalf of the Archdiocese to be "the sole provider of public relations and crisis communication counsel" for the Archdiocese regarding its "potential restructuring." Joint Ex. 4. The *Letter of Agreement for Professional Services* was signed by Marc Ehrhardt, President of TEG, and returned to Mintz on March 10, 2020. *See id*. Despite containing a signature line for Mintz, neither he nor anyone else on behalf of the Archdiocese ever signed the agreement. *See id*. The agreement set an initial term of six months, which could be renewed "upon mutual agreement," and provided that fixed monthly fees would be paid by the Archdiocese directly to TEG. *Id*.

On May 1, 2020, the Archdiocese filed a petition for bankruptcy relief in the face of 34 pending lawsuits alleging sexual abuse claims. Shortly thereafter, the Office of the United States Trustee constituted the Committee and, later, constituted a separate Official Committee of Unsecured Commercial Creditors. [ECF Doc. 745]. The parties have conducted significant discovery regarding both the financial structure and operations of the Archdiocese, as well as discovery regarding sexual abuse allegations against employees and affiliates of the Archdiocese and how such allegations have been addressed by the Archdiocese. Under a protective order issued

by this Court, the Debtor produced documents responsive to the Committee's discovery requests on a rolling basis and agreed to produce a log at the close of discovery that catalogued documents it withheld from production on the basis of the attorney-client privilege or the attorney work-product doctrine.

Displeased with the pace of document production and the responsiveness of documents produced, the Committee filed the Motion To Compel. [ECF Doc. 804]. The Court held numerous hearings over two years, issuing discovery rulings and assisting the parties to reach consensual resolution on many of the discovery disputes. The final remaining discovery dispute concerns the privilege log. The Archdiocese maintains that 67 documents (52 e-mails and 15 attachments thereto), dated between May 5, 2020, and March 18, 2021, are protected under the attorney-client privilege and attorney work-product doctrine and thus exempt from discovery (the "Disputed Communications"). [ECF Doc. 2261]; Joint Ex. 1. Counsel for the Archdiocese submitted unredacted versions of the Disputed Communications to chambers prior to the evidentiary hearing and the Court has reviewed each of the Disputed Communications *in camera*. [ECF Doc. 2261]. All of the Disputed Communications include Sarah McDonald, in-house Director of Communications for the Archdiocese, and William Kearney, Senior Vice President of TEG, who sent and received e-mails both from a TEG e-mail account and a personal Yahoo! e-mail account. *See* Joint Ex. 1. Malcolm Ehrhardt, an employee of TEG, was included on nine of the Disputed Communications. *See id*. Susan Zeringue, in-house counsel for the Archdiocese, was also included on all but one of the Disputed Communications. *See id*. No outside bankruptcy counsel for the Archdiocese were included on any of the Disputed Communications. *See id.* Archdiocese employees, such as Archbishop Gregory M. Aymond, as well as individuals who appear to be

affiliated with the Archdiocese, such as financial advisor Lee Eagan or Fr. Timothy Hedrick of St. Catherine of Siena Parish, were also included on certain Disputed Communications. *See id.*[2]

The Committee disagrees with the Archdiocese's characterization of the Disputed Communications as privileged. It contends that communications including TEG, an outside public-relations firm, cannot be protected under the attorney-client privilege or attorney work-product doctrine. [ECF Docs. 2259 & 2262]. At the evidentiary hearing on this contested matter, the Court heard testimony from William Kearney and Sarah C. McDonald and admitted as evidence Joint Exhibits 1 and 4, as well as Joint Exhibits 7–39 (redacted e-mails).

## CONCLUSIONS OF LAW

**A. Standards for Applying the Attorney-Client Privilege to Communications**

The federal common law of attorney-client privilege applies when federal law determines the substantive rights of the parties. *See* FED. R. EVID. 501; FED. R. BANKR. P. 9017; *In re Royce Homes, LP*, 449 B.R. 709, 722 (Bankr. S.D. Tex. 2011); *Dynamic Fin. Corp. v. Kipperman (In re N. Plaza, LLC)*, 395 B.R. 113, 122 (S.D. Cal. 2008). The party asserting the attorney-client privilege bears the burden of proof and must show that she "(1) made a *confidential* communication; (2) to a lawyer or his subordinate; (3) for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding." *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997).

Application of the privilege is a fact-specific inquiry for the Court that is "to be determined in the light of the purpose of the privilege and guided by judicial precedents." *Hodges, Grant &*

---

[2] Several of the Disputed Communications include third parties other than TEG who are not clearly identifiable as Archdiocese employees. *See* Joint Ex. 1. For purposes of this ruling, the Court assumes without deciding that each of the Disputed Communications would otherwise have been protected by the attorney-client privilege. The Court need not reach that issue because, for the reasons outlined in Subpart B *infra*, the Court finds that the attorney-client privilege does not extend to TEG.

4

*Kaufmann v. U.S. Gov't, Dep't of the Treasury, I.R.S.*, 768 F.2d 719, 721 (5th Cir. 1985) (citation omitted); *see also King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 722 (5th Cir. 2011); *United States v. Neal*, 27 F.3d 1035, 1048 (5th Cir. 1994). The purpose of the privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Essential to a claim of privilege "is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer." *United States v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982) (internal quotations and citation omitted). Indeed, "[w]hen a corporation simultaneously sends communications to both lawyers and non-lawyers . . . 'it usually cannot claim that the primary purpose of the communication was for legal advice or assistance because the communication served both business and legal purposes.'" *Slocum v. Int'l Paper Co.*, 549 F. Supp. 3d 519, 524 (E.D. La. 2021) (quoting *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789, 805 (E.D. La. 2007)).

Because the privilege operates "to restrict or withhold relevant information from the fact-finder, it has been interpreted narrowly by the Fifth Circuit." *Nw. Senior Hous. Corp. v. Intercity Inv. Props., Inc. (In re Nw. Senior Hous. Corp.)*, No. 22-30659, 2023 WL 2938386, at *3 (Bankr. N.D. Tex. Apr. 13, 2023) (citing *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001)); *see also Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000) ("[I]t must not be forgotten that the attorney-client privilege, like all evidentiary privileges, stands in derogation of the search for truth so essential to the effective operation of any system of justice: therefore, the privilege must be narrowly construed." (citing *United States v. Nixon*, 418 U.S. 683, 710 (1974)).

**B. Inclusion of TEG in Communications Which Otherwise May Have Been Privileged Resulted in Waiver of the Attorney-Client Privilege.**

Generally, disclosure of communications protected by the attorney-client privilege to a third party constitutes a waiver of the privilege. *See United States v. El Paso Co.*, 682 F.2d 530, 539 (5th Cir. 1982) ("[A] breach of confidentiality forfeits the client's right to claim the privilege."). Courts have identified at least four ways, however, that the attorney-client privilege can be extended to cover communications with third parties. First, the "common legal interest" extension involves communications between an attorney and a third party who shares a common legal interest with the client. *See, e.g., United States v. Krug*, 868 F.3d 82, 86 (2d Cir. 2017); *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710–11 (5th Cir. 2001); *Hodges, Grant & Kaufmann v. U.S. Gov't, Dep't of the Treasury, I.R.S.*, 768 F.2d 719, 721 (5th Cir. 1985). Second, the "translator" extension applies in cases where a third party is essential to improve or facilitate communication between the attorney and the client. *See El Paso Co.*, 682 F.2d at 541 (citing *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961) and explaining that "the privilege does not attach to tax work prepared by accountants unless the accountant is translating complex tax terms into a form intelligible to a lawyer at the lawyer's behest"). Next, the "functional equivalent" extension involves cases where a third party is deemed the "functional equivalent" of a corporate client's employee or principal and, thus, essentially becomes the client. *See Viacom, Inc. v. Sumitomo Corp. (In re Copper Mkt. Antitrust Litig.)*, 200 F.R.D. 213, 216 (S.D.N.Y. 2001) (finding that a public relations firm "was the functional equivalent of an in-house public relations department with respect to . . . media relations, having authority to make decisions and statements on [the client's] behalf, and seeking and receiving legal advice from [the client's] counsel with respect to the performance of its duties"). Lastly, the "consultant" extension involves narrow situations where a third party is retained by counsel to "assist[] the lawyer in the rendition of legal services"

6

and "advance the client's legal position." *In re Grand Jury Subpoenas Dated Mar. 24, 2003 Directed to (A) Grand Jury Witness Firm & (B) Grand Jury Witness*, 265 F. Supp. 2d 321, 324–31 (S.D.N.Y. 2003).

Here, the Archdiocese bears the burden of proof to show that the attorney-client privilege applies to each of the Disputed Communications. Based upon the pleadings, testimony, and arguments made at the evidentiary hearing, the Court infers that the Archdiocese asserts that each of the Disputed Communications is privileged under either the "translator" extension or the "functional equivalent" extension.[3]

> 1. *The "translator" exception does not apply to protect the Disputed Communications from disclosure.*

As explained above, the "translator" extension applies in cases where a third party is essential to improve or facilitate communication between the attorney and the client. *See El Paso*

---

[3] The Court agrees that neither the "common legal interest" extension nor the "consultant" extension applies to any of the Disputed Communications. The "common legal interest" extension applies only to co-defendants and their shared counsel in current litigation or potential co-defendants and their shared counsel in anticipated litigation. *See, e.g.*, *Hodges, Grant & Kaufmann*, 768 F.2d at 721. TEG is not a co-defendant or co-debtor with the Archdiocese in the bankruptcy case; therefore, that extension is inapplicable.

The "consultant" extension would protect the Disputed Communications under the attorney-client privilege if this Court were to find that those communications were

> (1) confidential . . . (2) between lawyers and public relations consultants (3) hired by the lawyers to assist them in dealing with the media . . . (4) that are made for the purpose of giving or receiving advice [and] (5) directed at handling the client's legal problems. . . .

*In re Grand Jury Subpoenas*, 265 F. Supp. 2d at 331. The evidence presented at trial shows that the Jones Walker firm retained TEG on behalf of the Archdiocese to perform public relations services and answer inquiries to the Archdiocese in anticipation of and after the bankruptcy filing, but not to assist Jones Walker in representing the legal interests of Archdiocese vis-à-vis the bankruptcy and advancing the Archdiocese's legal position. *See* Joint Ex. 4; Hr'g Tr. 16:3–30:2 (June 26, 2023) [ECF Doc. 2358]; *see also McNamee v. Clemens*, No. 09-1647, 2013 WL 6572899, at *6 (E.D.N.Y. Sept. 18, 2013) ("[T]he development of a public relations campaign and media strategy primarily aimed at protecting [the client's] public image and reputation in the face of allegations . . . is decidedly different from the use of the public relations firm in *In re Grand Jury Subpoenas*, where the firm was hired by plaintiff's counsel with the specific aim of reducing public pressure on prosecutors and regulators to bring charges."). Thus the "consultant" extension likewise does not apply here.

7

*Co.*, 682 F.2d at 541. In essence, the third party must operate as a translator between the client and counsel so as to assist counsel in providing legal services to the client. Although the term "translator" is used somewhat loosely to refer to an individual who operates as an intermediary between the client and counsel, the extension has been largely limited to actual translators or accountants who are "necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *Kovel*, 296 F.2d at 922. "For this rule to apply, the party asserting the privilege must show (1) . . . a reasonable expectation of confidentiality under the circumstances, and (2) [that] disclosure to the third party was necessary for the client to obtain informed legal advice." *Cohen v. Cohen*, No. 09-10230, 2015 WL 745712, at *3 (S.D.N.Y. Jan. 30, 2015) (internal quotations and citation omitted).

The third party must be present to improve the attorney-client communications being made for the ultimate purpose of obtaining legal advice from the attorney: "If the advice sought is the [third-party's] rather than the lawyer's, no privilege exists." *Kovel*, 296 F.2d at 922. Key to remember in applying this extension is that "the possibility that communications between [a third party] and [counsel] may help the latter to formulate legal advice is not in itself sufficient to implicate the privilege: 'the privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client.'" *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 54 (S.D.N.Y. 2000) (quoting *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999)).

An *in camera* review of every Disputed Communication reveals that the communications were made to craft responses to media inquiries, but not to assist Jones Walker in providing legal advice to the Archdiocese. Indeed, no Jones Walker attorney is included in any of the e-mails. William Kearney testified that the ultimate purpose of TEG's public-relations advice to the

Archdiocese was to benefit the Archdiocese's reputational and business/mission goals. *See* Hr'g Tr. 28:23–29:10 (June 26, 2023) [ECF Doc. 2358]; *see also Nw. Senior Hous. Corp. v. Intercity Inv. Props., Inc. (In re Nw. Senior Hous. Corp.)*, No. 22-30659, 2023 WL 2938386, at *4 (Bankr. N.D. Tex. Apr. 13, 2023). The Court's *in camera* review of the Disputed Communications reveals that any requests for TEG's advice made by in-house professionals of the Archdiocese were solely related to public-relations concerns, not to devise a legal strategy with bankruptcy counsel.

Moreover, none of the Disputed Communications flowed through TEG as an intermediary or "translator." Rather, the Disputed Communications generally occurred among various employees of the Archdiocese and TEG. Like the public relations firm in *Calvin Klein*, TEG provided ordinary public relations advice including reviewing press coverage and preparing various responses to the media. *See* 198 F.R.D. at 54–55. Such "advice simply serves to assist counsel in assessing the probable public reaction to various strategic alternatives, as opposed to enabling counsel to understand aspects of the client's own communications that could not otherwise be appreciated in the rendering of legal advice." *Id.* at 55. Thus, the Court finds that the attorney-client privilege cannot be extended to include TEG as a "translator."

> 2. *The "functional equivalent" extension also fails to protect the Disputed Communications from disclosure.*

The fundamental purpose of the attorney-client privilege

> is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.

*Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). But "a corporation cannot act on its own; it can act only if authorized by appropriate agents." *Franchise Servs. of N. Am. v. United States Trustee (In re Franchise Servs. of N. Am.)*, 891 F.3d 198, 206 (5th Cir. 2018). When it comes to

9

formulating sound legal advice on behalf of a corporation, in addition to senior management directly responsible for directing a corporation's action in response to legal advice, often low-level employees and mid-level managers will possess the information needed by counsel to defend or prosecute litigation. *See Upjohn Co.*, 449 U.S. at 390–91. Acknowledging that reality, courts have held that a client does not waive attorney-client privilege if privileged communications are disclosed to a third party deemed to be the "functional equivalent" of the client's employee. *See, e.g.*, *In re Bieter Co.*, 16 F.3d 929, 935–38 (8th Cir. 1994); *Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 88–89 (S.D.N.Y. 2019); *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. at 220; *Joyner v. Liprie (In re Liprie)*, 480 B.R. 658, 661, 664–65 (Bankr. W.D. La. 2012). To determine whether the "functional equivalent" extension applies to otherwise privileged communications, courts ask whether the third party (i) exercised independent decision-making on the company's behalf; (ii) possessed information held by no one else at the company; (iii) served as a company representative to third parties; (iv) maintained an office at the company or otherwise spent a substantial amount of time working for it; and (v) sought legal advice from corporate counsel to guide his or her work for the company. *See Universal Standard Inc.*, 331 F.R.D. at 89 (citing *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 352 F. Supp. 3d 207, 213 (E.D.N.Y. 2019)); *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. at 219 (analyzing the degree to which outside public relations firm was incorporated into client's staff and the degree to which third party had independent authority to speak or act on behalf of client).

The Archdiocese has not shown that TEG is the "functional equivalent" of the Archdiocese for purposes of extending the attorney-client privilege. The evidence before the Court reveals that TEG exercised no independent decision-making authority on behalf of the Archdiocese, and did not serve as the Archdiocese's sole representative to the media. *See* Hr'g Tr. 11:1–14:1 (June 26,

2023); Joint Ex. 4. Similar to the consultants in *Restasis*, TEG was retained to provide "specialized public relations and communications services for the Archdiocese" in spite of the fact that the Archdiocese already had its own in-house media consultant and that TEG possessed no special information or expertise that was not already held by others at the Archdiocese. *See* Hr'g Tr. 16:3–29:25 (June 26, 2023); *see also* 352 F. Supp. 3d at 214–15. TEG did not maintain an office within the Archdiocese's facilities and no evidence exists that TEG spent a substantial amount of time completing work for the Archdiocese; rather, the Archdiocese was but one of many of TEG's clients. *See* Joint Ex. 4 ("You are aware that [TEG] represents many other entities. We confirm that you do not object to our undertaking to represent clients in other matters, even if the interests of such clients in those other matters are adverse to you, provided that they are unrelated to our representation of you."). Lastly, the Court's *in camera* review of the Disputed Communications reveals that, although in-house counsel for the Archdiocese was copied on all but one of the Disputed Communications, TEG did not seek or receive legal advice via those communications from in-house counsel to guide its work for the Archdiocese. Instead, the Disputed Communications focus on developing the right public messaging in response to media inquiries.

For the foregoing reasons and given that this Court is required to apply the attorney-client privilege narrowly, the Court finds that the Archdiocese has failed to carry its burden to show that the attorney-client privilege extends to TEG. Thus, the Archdiocese must produce all Disputed Communications in the form of e-mails identified on the privilege log to the Committee, with the reminder to all parties that the Protective Order as amended, [ECF Doc. 1120], remains in place and governs discovery between the Archdiocese and the Committee.

### C. The Documents Attached to E-mails Are Not Protected by the Attorney Work-Product Doctrine.

In addition to 52 e-mails, the Disputed Communications are also comprised of 15 documents attached to those e-mails, which the Archdiocese asserts are shielded from production under the attorney work-product doctrine.

The work-product privilege "is 'distinct from and broader than the attorney-client privilege.'" *Haugh v. Schroder Inv. Mgmt. N. Am. Inc.*, No. 02-7955, 2003 WL 21998674, at *4 (S.D.N.Y. Aug. 25, 2003) (quoting *United States v. Nobles*, 422 U.S. 225, 238 n.11 (1975)). "Federal law governs the applicability of the work product doctrine." *Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 92 (S.D.N.Y. 2019) (citations omitted). Federal Rule of Civil Procedure 26(b)(3) codifies the work-product doctrine and provides that a party is not entitled to obtain discovery of "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative" unless the party makes a showing of substantial need "and cannot, without undue hardship, obtain their substantial equivalent by other means." FED. R. CIV. P. 26(b)(3)(A). Rule 26 expressly provides heightened protection against disclosure of "the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." FED. R. CIV. P. 26(b)(3)(B). "Attorney work product can thus conceptually be divided into two classes: that which recites factual matters and that which reflects the attorney's opinions, conclusions, mental impressions or legal theories." *Haugh*, 2003 WL 21998674, at *5; *see also United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982) (quoting *Nobles*, 422 U.S. at 238).

But "[t]he work product doctrine is not an umbrella that shades all materials prepared by a lawyer." *El Paso Co.*, 682 F.2d at 542. "The burden of establishing that a document is work product is on the party who asserts the claim, but the burden of showing that the materials that

constitute work product should nonetheless be disclosed is on the party who seeks their production." *Hodges, Grant & Kaufmann v. U.S. Gov't, Dept. of the Treasury, I.R.S.*, 768 F.2d 719, 721 (5th Cir. 1985) (citations omitted). Here, to protect any of the e-mail attachments from production under the work-product doctrine, the Archdiocese must show that the attachments (1) are documents or tangible things; (2) were prepared in anticipation of litigation or for trial; (3) were prepared by an attorney or an attorney's representative; and (4) contain mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of the party. *Osherow v. Vann (In re Hardwood P-G, Inc.)*, 403 B.R. 445, 463 (Bankr. W.D. Tex. 2009) (citations omitted).

"The work product doctrine focuses only on materials assembled and brought into being in anticipation of litigation." *El Paso Co.*, 682 F.2d at 542. For that reason, "it is not enough to show merely that the material was prepared at the behest of a lawyer or was provided to a lawyer." *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 435 (S.D.N.Y. 2013). "Rather, the materials must result from the conduct of 'investigative or analytical tasks to aid counsel in preparing for litigation.'" *Id.* Whether materials were created in anticipation of litigation is a highly fact-specific inquiry. *See In re Hardwood P-G, Inc.*, 403 B.R. at 463. Although litigation need not be imminent, "the primary motivating purpose behind the creation of the document [must be] to aid in possible future litigation." *United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. 1981); *accord In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000); *Houston Cas. Co. v. Supreme Towing Co.*, No. 10-3367, 2012 WL 13055045, at *3 (E.D. La. Sept. 17, 2012) ("Courts consider the primary motivating purpose behind the creation of the document, more so than the timing of production of that document."). That analysis "requires a determination, based upon evidence and not mere argument, that the principal factor motivating the creation of the document was

13

anticipation of litigation or preparation for trial, as opposed to ordinary business practice." *La. Corral Mgmt., LLC v. Axis Surplus Ins. Co.*, No. 22-2398, 2023 WL 156876, at *3 (E.D. La. Jan. 11, 2023). Materials assembled in the ordinary course of business are excluded from the work product doctrine. *See El Paso Co.*, 682 F.2d at 542.

"As a general matter, public relations activities, even if they bear on anticipated litigation, fall outside the ambit of the work product doctrine." *Chan v. Big Geyser, Inc.*, No. 17-06473, 2018 WL 6075066, at *2 (S.D.N.Y. Nov. 21, 2018) (citation omitted); *see also Egiazaryan*, 290 F.R.D. at 435 (citing *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 78–79 (S.D.N.Y. 2010); *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000)). Moreover,

> the work product doctrine does not extend to public relations activities even if they bear on the litigation strategy because the purpose of the rule is to provide a zone of privacy for strategizing about the conduct of litigation itself, not for strategizing about the effects of the litigation on the client's customers, the media, or on the public generally.

*Egiazaryan*, 290 F.R.D. at 435 (citations omitted). As a result, courts have consistently rejected claims of work-product protection over communications with public relations firms. *See id.* (citing cases).

The Court has reviewed *in camera* the 15 documents in the context of the e-mail to which each is attached. All of the documents are draft, voluntary responses to media requests made to the Archdiocese through its public relations professionals; the draft responses were circulated for the purpose of discussion and simultaneous review by both non-legal and legal personnel. All of the draft responses dealt with allegations of sexual abuse by individual priests or settlements reached with claimants, but none addressed the Archdiocese's bankruptcy case or pending lawsuits directly. The vast majority of the documents were created by the Archdiocese's in-house public relations professional. Those few that were created or edited by in-house counsel appear to recite

14

only factual matters; they did not reflect any investigative or analytical tasks that would aid counsel in preparing for litigation which would be subject to heightened protection under Rule 26(b)(3)(B).

Very little of the evidence presented by the Archdiocese at the hearing dealt squarely with the elements required to apply the work-product doctrine to the 15 documents attached to e-mails. Thus, based on the record before it, the Court cannot conclude that the primary purpose motivating the creation of any of the documents was anticipation of litigation or preparation for trial. Rather, the Court finds that each of the documents was created in furtherance of public relations, an ordinary business practice and, therefore, none of the documents qualify as privileged under the attorney work-product doctrine. *See Slocum v. Int'l Paper Co.*, 549 F. Supp. 3d 519, 524–25 (E.D. La. 2021); *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789, 805 (E.D. La. 2007).

| Privilege Log No. | Author/Editor | Recites factual matters or reflects legal opinions, conclusions, mental impressions or legal theories? | Primary purpose of doc to aid in possible current or future litigation? | Work Product Doctrine applies? |
|---|---|---|---|---|
| ANO ESI (20-10846)_PRIV_00000011 | In-house public relations | Neither | No | No |
| ANO ESI (20-10846)_PRIV_00000013 | In-house counsel | Recites factual matters | No | No |
| ANO ESI (20-10846)_PRIV_00000015 | In-house public relations and counsel | Recites factual matters | No | No |
| ANO ESI (20-10846)_PRIV_00000018 | In-house public relations | Recites factual matters | No | No |
| ANO ESI (20-10846)_PRIV_00000020 | In-house counsel | Recites factual matters | No | No |
| ANO ESI (20-10846)_PRIV_00000022 | In-house public relations | Recites factual matters | No | No |
| ANO ESI (20-10846)_PRIV_00000024 | In-house counsel | Recites factual matters | No | No |
| ANO ESI (20-10846)_PRIV_00000026 | In-house counsel | Recites factual matters | No | No |
| ANO ESI (20-10846)_PRIV_00000030 | In-house public relations | Recites factual matters | No | No |
| ANO ESI (20-10846)_PRIV_00000034 | In-house public relations and counsel | Recites factual matters | No | No |
| ANO ESI (20-10846)_PRIV_00000037 | In-house public relations | Recites factual matters | No | No |
| ANO ESI (20-10846)_PRIV_00000049 | In-house public relations | Recites factual matters | No | No |

| | | | | |
|---|---|---|---|---|
| ANO ESI (20-10846)_PRIV_00000054 | In-house public relations | Recites factual matters | No | No |
| ANO ESI (20-10846)_PRIV_00000057 | In-house public relations and counsel | Recites factual matters | No | No |
| ANO ESI (20-10846)_PRIV_00000067 | In-house public relations | Recites factual matters | No | No |

For those reasons, the Court finds that the Archdiocese has failed to carry its burden to show that the work-product doctrine applies to the Disputed Communications comprised of 15 attachments to e-mails listed on the privilege log. Thus, the Archdiocese must also produce those 15 documents to the Committee, with the reminder to all parties that the Protective Order remains in place and governs discovery between the Archdiocese and the Committee.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the remaining relief requested in the Motion To Compel is **GRANTED**.

**IT IS FURTHER ORDERED** that the Archdiocese must produce all e-mails and documents identified on the privilege log in unredacted form to the Committee within fourteen days of this Order becoming a final Order.

New Orleans, Louisiana, this 5th day of January, 2024.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

16