## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: | Case No. 20-10846 |
| THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS, | Section "A" |
| Debtor.[1] | Chapter 11 |

### CERTAIN ABUSE SURVIVORS' MOTION TO APPOINT A CHAPTER 11 TRUSTEE AND FEE EXAMINER PURSUANT TO 11 U.S.C. § 1104

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON SEPTEMBER 16, 2024, AT 1:30 P.M. AT THE UNITED STATES BANKRUPTCY COURT, 500 POYDRAS ST., COURTROOM B-709, NEW ORLEANS, LOUISIANA 70130. PARTIES IN INTEREST MAY PARTICIPATE IN THE HEARING (I) IN PERSON; (II) BY TELEPHONE ONLY (DIAL IN: 504.517.1385, ACCESS CODE: 129611); OR (III) BY TELEPHONE USING THE DIAL-IN NUMBER AND VIDEO USING HTTPS://GOTOMEET.ME/JUDGEGRABILL (MEETING CODE: "JUDGEGRABILL"). IF YOU OBJECT TO THE RELIEF REQUESTED IN THIS PLEADING, YOU MUST RESPOND IN WRITING. UNLESS DIRECTED OTHERWISE BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT NO LATER THAN SEVEN (7) DAYS BEFORE THE HEARING DATE. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**NOW INTO COURT,** through undersigned counsel, come **CERTAIN SEXUAL ABUSE SURVIVORS,** who move to appoint a Chapter 11 Trustee to manage the bankruptcy and an independent fee examiner to conduct an audit of all past fees and expenses as well as review the reasonableness and necessity of fees and reimbursements into the future.[2]  Movers also request written discovery, depositions, and an evidentiary hearing to further prove the

---

[1] The last four digits of the Debtor's federal tax identification number are 8966.  The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

[2] "Certain Sexual Abuse Survivors" are those identified in Rec. Doc. 2340 as well as those clients represented by claimants' counsel on the signature block.

1

matters discussed herein.

One of the central people who enabled generations of the sexual abuse of children should not manage this bankruptcy.  Archbishop Gregory Aymond's personal and professional failings caused the filing of the bankruptcy in the first instance.  Whether as a new priest rising through the ranks, someone attaining the rank of Vicar General, and eventually becoming the Archbishop, Aymond's adult life (minus a short stint at the Diocese of Austin, Texas) has been tied to the Archdiocese of New Orleans.  He has known about the breadth and scope of Archdiocese clergy assaulting children for generations.  He lived with some of these child molesters for decades at the Notre Dame Seminary.  They have been his friends and colleagues since the 1960s. Aymond knew.  Aymond always knew.

The subject of a criminal investigation should not manage this bankruptcy.  Aymond is now a likely criminal target or person of interest in an ongoing and expanding investigation by the Louisiana State Police.  His career-long knowledge of the breadth and depth of abuse, his bullying tactics to settle more than one hundred childhood sexual abuse claims for practically nothing, using prescription as a cudgel, and his active maneuvering of his pedophile priests in and around the Archdiocese has legitimately raised his profile with law enforcement.  His status as a likely criminal target precludes him from providing reasoned and unbiased guidance in this bankruptcy.

Aymond's gross mismanagement also extends to the more than four years of this bankruptcy.  Aymond assigned Lee Eagan, an unpaid volunteer who recently admitted to "cognitive decline" from a car accident, as the person to manage this bankruptcy on his behalf. Aymond has not provided any document authorizing Eagan's duties and responsibilities.  Eagan is not a C.P.A. or a lawyer.  Eagan has no staff, no budget, and no experience managing a

bankruptcy.  He has no office and uses his personal home computer to work.  No one has provided him with written guidelines or any tutorial on how to manage a bankruptcy or what bills in the bankruptcy to pay or not pay.  Nonetheless, Eagan has been the primary person responsible for authorizing payment of <u>almost $40 million</u> in fees and expenses.  This amount increases by the day.

This is one of the oldest and costliest bankruptcies of a religious organization in the country with or without a plan being confirmed by a court.  This is the second oldest bankruptcy of a religious organization among those with plans having already been confirmed.  This is the second most expensive bankruptcy of a religious organization.  Only two other pending religious bankruptcies are older than this one, and both of them are drastically cheaper and/or much further along.

Movers are not requesting that the Court remove Aymond from his position as Archbishop, though it my be a sound decision by the Debtor.  Movers are requesting that the Court issue an order appointing a trustee to manage the bankruptcy, manage the assets of the Archdiocese and all that it owns, review and pay professionals' fees and costs, and negotiate the terms of a final resolution of the bankruptcy.

## <u>JURISDICTION AND VENUE</u>

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## <u>BACKGROUND</u>

3.      This case was initially filed as a voluntary Chapter 11 Petition on May 1, 2020.

4.      To date, over 550 claims filed by sexual abuse survivors and commercial creditors have been filed into the bankruptcy.

5.      From the Petition Date through May 31, 2024, the estate has incurred $38,801,624.51 in professional fees. *See Chapter 11 Monthly Operating Report for the Month Ending: 05/31/2024*, [Rec. Doc. 3098].  This total amount is made of Debtor's bankruptcy professionals ($16,492,131.94), Debtor's ordinary course professionals ($4,711,001.74), professionals employed by the Official Committee of Unsecured Creditors ($14,362,233.84), and professionals employed by the Official Committee of Unsecured Commercial Creditors ($3,272,256.34). *Id.* The fees and expenses the Debtor has paid to date are almost **five times** the average of similar religious organization bankruptcies until plan confirmation -- the average of which is approximately $8.66 million.

6.      Since June 12, 2009, Aymond has been the Archbishop.  Aymond decided to file bankruptcy in early 2020.

7.      Although no document supports his role in the bankruptcy, Aymond apparently appointed Lee Eagan to "manage the bankruptcy" on his behalf from the beginning.

## APPLICABLE LAW

8.      11 U.S.C. § 1104(a)(1) provides that, after request by a party in interest and after notice and hearing, the court "shall" order the appointment of a trustee in the following circumstances:

> for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor . . . .

9.      Even if the Court decides not to order the appointment of a trustee, then the Court shall order the appointment of an independent fee examiner "to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of

the debtor of or by current or former management of the debtor" if at least one of two conditions are met:  "(1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000."  11 U.S.C. § 1104(c)(1)&(2).  Such an appointment would review all past and future payments of costs and fees.

10.     In fact, even the U.S. Trustee is duty-bound to move for the appointment of a trustee when "under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive or chief financial officer, or members of the governing body who selected the debtor's chief executive or chief financial officer, participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor or the debtor's public financial reporting."  11 U.S.C. § 1104(e).

11.     This Court has found cause to appoint a trustee in a Chapter 11 bankruptcy due to the management's continued conflicts of interests, pre and post petition gross mismanagement, and dishonesty.  *In re Westbank Holdings, LLC*, No. 22-10082, at *27-*30 (E.D. La. Bkrptcy. Ct. 08/01/22) (Grabill, B.J.).  This Court further held that a trustee was needed to prevent further unnecessary depletion to the debtor's assets through continued mismanagement and improve the ability of the creditors to recoup what they are owed.  *Id.*

12.     At least  one bankruptcy court appointed a chapter 11 trustee in the religious bankruptcy of *In re United Church of the Ministers of God*, 74 B.R. 271, 273 (Bankr. E.D. Pa. 1987), where the church had been under the exclusive control of a man accused of having imprisoned, raped, murdered, and dismembered a number of mentally disabled young girls in the basement of his home.

13.     A chapter 11 trustee was appointed in *In re Greater Ministries International, O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1200 (11th Cir. 2003) ("Kevin O'Halloran, a plaintiff in the present action, was appointed trustee of the bankruptcy estate.") where the debtor was a church organization that had accumulated hundreds of millions of dollars in one of the largest Ponzi schemes in American history.  No case appears to have been published concerning the appointment.

14.     The possibility of appointment of a trustee was explicitly raised in *In re Charles Street African Methodist Epis-copal Church of Boston*, 499 B.R. 66, 116–17 (Bankr. D. Mass. 2013), but an examiner with much more limited powers than a trustee's was appointed instead.  The court found that "[t]hese limited duties would not require the examiner to cross boundaries protecting the religious liberty interests of [the Church]," and so obviated the need to engage with the religious liberty problems posed by appointment of a trustee.  *Id.* at 116.

15.     Nor would appointment of a trustee violate the First Amendment because bankruptcy jurisdiction is by its nature *in rem* jurisdiction and does not implicate the underlying doctrines of belief but the mere administration of assets and liabilities.  *Central Virginia Community College v. Katz*, 546 U.S. 356, 362 (2006).

16.     Religious freedom concerns are not implicated because the Archdiocese <u>voluntarily</u> sought Chapter 11 protection.  *Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106, 127 (1939) (reasoning that a debtor who invokes the Bankruptcy Code does so "risking all of the disadvantages which may flow to him as a consequence, as well as gaining all of the benefits").  *See also id.* at 127 ("[t]he right to remain in unmolested dominion and control over the property [is] necessarily waived or abandoned on invoking the jurisdiction of the federal courts in these proceedings.").

6

17.     The Archdiocese knew when it filed that this bankruptcy was predicated on generations of felonies committed by its clergy.  More than 500 claims for sexual abuse have been filed so far.  More are filed every month.  If the Archdiocese wants to deprive these sexual abuse survivors' right to a state court lawsuit with a state court jury through its voluntary use of the federal court bankruptcy process, then it needs to acknowledge some fundamental fairness trade off.  *See In re Navarro*, 83 B.R. 348, 352 (Bankr. E.D. Pa. 1988) ("When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." (quoting *United States v. Lee*, 455 U.S. 252, 261) (internal quotation marks omitted)).  *See also In re Roman Catholic Archbishop of Portland*, 335 B.R. 842, 861–62 (Bankr. D. Or. 2005).

18.     The Archdiocese's risk of some kind of indirect "religious interference" through manipulation of its assets is offset by the organization-saving benefit of achieving finality from these and future claims all at once through a possible settlement.  Without this benefit, the Archdiocese faces the existential threat of total and complete asset liquidation from hundreds of lawsuits.  This bankruptcy is the <u>only</u> means by which the Archdiocese may survive with or without a trustee appointed by this Court.

19.     Ultimately, if the Archdiocese believes appointing a trustee impedes too greatly on its perceived religious freedom, then the appropriate relief is to dismiss this bankruptcy.  *In re Catholic Bishop of Spokane*, 329 B.R. 304, 324 n.5 (Bankr. E.D. Wash. 2005) (reasoning that even if "application of a particular Code section would constitute a substantial burden on religion, the appropriate remedy would be dismissal of the bankruptcy case. The Code is an integrated statutory scheme. Bankruptcy debtors who voluntarily choose to participate in that

statutory scheme, even those of a religious nature, should not be able to "pick and choose" among Code sections. Dismissal would alleviate any undue burden suffered by the debtor in the application of any particular Code section."). *See also In re Roman Catholic Archbishop of Portland*, 335 B.R. at 853 n.9.

**I.**    **The Archdiocese's and Aymond's status as likely criminal targets require the appointment of a trustee.**

20.    On April 25, 2024, the Louisiana State Police served a search warrant on the Archdiocese. *La. State Police Search Warrant*, attached as Exhibit 1.

21.    The Search Warrant clearly reflects that the Archdiocese is a criminal target in an investigation relating to generations of sexual abuse that it enabled, resulting in hundreds, if not thousands, of victims.

22.    A review of the documents sought by the warrant also include many in which Aymond was the author or recipient.  These documents will reflect what Aymond knew and what he did with that information.  Upon information and belief, these documents will support criminal charges.

23.    As a likely criminal target, Aymond is now conflicted from managing the Archdiocese without thinking about his own self-preservation.  In any event, he has never managed this bankruptcy and is not qualified to do so.

24.    As a likely target, Aymond will need separate criminal counsel from the Archdiocese, creating tension between what is best for the Archdiocese as a criminal target and what is best for Aymond as a criminal target.

25.    As a likely target, Aymond will likely fortify his direction to keep the abuse documents under seal in order to protect himself, even though this will significantly delay the bankruptcy.

26.     The future of the bankruptcy is at risk if a trustee is not appointed.  If Aymond or the Archdiocese is charged or indicted by any state, local, or federal authority, then Aymond will be forced to leave his post which means that the current "management" of the bankruptcy will be replaced.  This would upset any plan discussions and result in delay and/or a complete reset of any plan discussions.

27.     Nor would it matter if the Archdiocese is charged and/or indicted but Aymond is not. The corporate structure of the Archdiocese is such that the Archbishop is the Archdiocese.  If the Archdiocese was charged, Aymond would likely be immediately removed by the Vatican, leaving the bankruptcy without management and resulting in further delay and expense which could be avoided if a trustee is appointed now.

28.     As a likely criminal target, Aymond should not continue to manage the bankruptcy.  For all the reasons he is a likely criminal target, Aymond's gross mismanagement, incompetence, and dishonesty require the appointment of a trustee pursuant to Section 1104.

## II.     **Aymond's pre-petition misconduct equates to fraud, gross mismanagement, and incompetence, requiring the appointment of a trustee**

29.     The operation of the Archdiocese functions as a fiefdom with all rights, powers, and even ownership solely vested with the Archbishop.  *2022 Semi-Annual Financial Information for Archdiocese of New Orleans*, at 3 ("The Archbishop of New Orleans is the sole member and chief administrator of the [Archdiocese], and his responsibilities include appointment and removal of priests and deans, review and approval of the [Archdiocese's] budget and expenses, and policy development regarding the [Archdiocese].").  Attached as Exhibit 2.

30.     The Archbishop also serves as president of the Archdiocese.  *Id.*  All boards are merely advisory.  *Id.*  No board or other individual has the authority to overrule or block any decision by the Archbishop.  Stated another way, Aymond exercises all "legislative, executive, and judicial

power" within the Archdiocese.  CODE OF CANON LAW, 391 § 1.  Aymond also exercises sole authority to "dissolve" the Archdiocese and "determine disposition of its assets".  *Archdiocese Amendments to Articles of Incorporation*, *Article VI*, at 3-4, attached as Exhibit 3.

31.     On June 12, 2009, Aymond became Archbishop.

32.     What Aymond knew relative to the generational sexual abuse crisis inside the Archdiocese and what Aymond did with that information is detailed in an Evidentiary Memorandum already introduced into the bankruptcy record.  [Rec. Doc. 2663]  For the sake of convenience, the Evidentiary Memorandum is attached as Exhibit 4, filed under seal.

33.     The Evidentiary Memorandum establishes that Aymond's gross mismanagement and dishonesty of the sexual abuse crisis was one of the reasons for the bankruptcy filing.  Aymond's incompetence also led to the filing of this bankruptcy.

34.     Someone who mismanaged such a devastating multi-generational tragedy is not qualified or fit to manage this bankruptcy.

35.     Upon information and belief, no other archbishop or bishop remained in power after filing for bankruptcy after his role in covering up and grossly mismanaging the childhood sexual abuse crisis became documented and known to the parties.

36.     One of the many reasons Aymond filed for bankruptcy was to hide his role in the mismanagement and to prevent documents related to the sexual abuse crises from becoming public.

37.     Even assuming he was nothing more than a "witness" to the generations of sexual abuse, Aymond's incompetence meant he did nothing, thereby enabling the abuse to continue to worsen.

10

38.     Aymond recently spoke to a local news outlet about the generations of child sexual abuse enabled by the Archdiocese.  In the article, Aymond conceded publicly (for perhaps the first time) that the child sexual abuse in fact occurred on a multi-generational scale.  Aymond laid the blame, however, on the preceding three Archbishops.  *New Orleans Archbishop Aymond Fights to Save Church, Legacy Amid Bankruptcy, Priest Scandal*, at *1 (07/21/24).

39.     Incredibly, Aymond also blamed society at large, claiming that not enough was known about pedophilia: "But it was a sign of the times."  *Id.* at *8.  Aymond's incompetence and gross mismanagement apparently includes believing that pedophilia was acceptable in regular society in the 1960s, 1970s, 1980s, 1990s, 2000s, 2010s, and after this bankruptcy was filed in 2020.

40.     Aymond's refusal to acknowledge his own involvement in the abuse scandal, his role in the cover-up, and the more than 100 secret abuse settlements he negotiated before filing bankruptcy is the tell-tale sign of a "manager" who will continue to make the same mistakes in the future.  He blames other people, the society at large, but never himself.  The Evidentiary Memorandum provides exhaustive analysis of Aymond's pattern and practice of following the policies that he championed which led to this abuse.  As outlined, *infra*, the abuse continues to happen under his watch and after the bankruptcy petition has been filed.

41.     Another example of Aymond's pre-petition incompetence and gross mismangement also includes involving the New Orleans Saints public relations team, at least two current federal judges, and other public officials to assist the Archdiocese in determing how to handle the credibly accused list, how the list of names would be published, and when the publication of the names should be made.

42.     Aymond's decision to involve a private company, without expertise in religious canon law or childhood sexual abuse, without a contract, and without written guidelines demonstrates a pattern of bad decision making motivated by his own self-preservation.

43.     The Archdiocese's pre-petition gross mismanagement also led to a massive lawsuit filed against the Archdiocese for making fraudulent flood insurance claims after Hurricane Katrina. Pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3730, a qui tam action was filed against the Archdiocese and others alleging that Archdiocese, knowingly, recklessly, and/or with willful blindness submitted or caused to be submitted, false information to FEMA to increase the amount of FEMA Katrina-relief funding they received resulting in an overpayment to the Archdiocese in the amount of $46,000,000.  While it later settled the claim for a reduced sum after the bankruptcy was filed, the Archdiocese likely leveraged the need to pay sexual abuse survivors as a reason to pay less to the federal government – only to use these "savings" as a reason to pay its lawyers more money to engage in a three-year fight against the look-back window.

44.     Aymond's pre-petition incompetence, gross mismanagement, and dishonesty disqualifies him from managing the bankruptcy.  A trustee should be appointed.

**III.    Aymond's gross mismanagement during the bankruptcy equates to incompetence and requires the appointment of a trustee.**

45.     From just before filing the bankruptcy until the present, Aymond has grossly mismanaged, to the extent he has had any hands-on management at all, almost every aspect of this bankruptcy.  Aymond's mismanagement has resulted in one of the oldest, most expensive religious bankruptcies in the country without any end in sight.  Aymond's mismanagement includes, but is not limited to, the following:  (1) misinforming the Vatican about the cost of the bankruptcy and value of the claims; (2) appointing an unpaid volunteer to "manage the

bankruptcy" who has no bankruptcy, CPA, or legal experience (without staff or a budget) and who testified under oath to "cognitive decline"; (3) paying approximately $40 million in fees and expenses without due diligence, creating one of the most expensive religious bankruptcies in United States history; (4) instructing Archdiocese lawyers to stall any meaningful efforts to resolve the bankruptcy for three years in order to defeat the look-back window, all the while misrepresenting to the public that it would pay the full value of claims regardless of the constitutionality of the lookback window;  (5) refusing to make timely, necessary decisions, resulting in one of the oldest religious bankruptcies in United States history; (6) refusing to supplement the Archdiocese's schedules with the value of the real and personal property owned by the Archdiocese after more than four years; (7) having a proof of claim filed against Aymond personally for racial and sexual work harassment; (8) mishandling post-petition sexual abuse allegations; and (9) entering into a settlement with TMI and arguing that it removed hundreds of millions of dollars of assets from consideration in any plan.

> **1.    Misinforming the Vatican.**

Before filing the petition for bankruptcy, Aymond was required to send a letter to the Vatican which either notified it of the bankruptcy filing or requested permission to file bankruptcy.  The difference between providing notice and requesting permission depended on the value of the childhood sexual abuse claims, costs, and fees.  If the abuse claims were valued less than $7.5 million, then Aymond could just provide notice.  If the abuse claims were valued at more than $7.5 million, Aymond needed to seek permission.  Despite having just settled one abuse claim for $1 million pre-petition, Aymond informed the Vatican that "the estimated settlement cost of the aggregate abuse claims is less than $7.5 million".  *LTR Aymond to Vatican*, at 1-2 (04/28/2020), attached as Exhibit 5.

13

Aymond's misrepresentations were even more fundamental:

> The Archdiocese is not insolvent.  We have sufficient cash, cash equivalents, and investments to cover 100% of our current liabilities.  Our parishes and the majority of our social outreach apostolates and ministries are separately incorporated civilly, and should be protected during the proceedings.

*Id.* at 1 (emphasis supplied).

Aymond then represented to the Vatican that the Archdiocese's share in any bankruptcy settlement "will be approximately $7 million."   *Id.* (emphasis supplied).   To date, the Archdiocese has paid more than $40 million in fees, costs, and expenses from the bankruptcy, more than five times the estimated cost of the share of any settlement without any end in sight.

Aymond's initial misrepresentations boxed the Archdiocese into a grossly miscalculated estimate with the Vatican.  Aymond's drastic miscalculation has fundamentally hampered any meaningful plan developments.  Because Aymond was locked in with the Archdiocese, he chose to put all of his faith in the look-back window being declared unconstitutional.  This resulted in three years of neglect, decay, and excessive fees and costs.

**2.    Appointing an unpaid volunteer to "manage the bankruptcy" who has no bankruptcy, CPA, or legal experience (without staff or a budget) and who testified under oath to "diminished mental capacity".**

46.    From the begining of the bankruptcy, Aymond appointed Lee Eagan, and only Lee Eagan, to manage the "financial side" of the bankruptcy.  *Eagan Deposition*, at 30.  Eagan is an unpaid volunteer.  He has no position inside the Archdiocese.  *Id.* at 31.  He has no written document from Aymond or the Archdiocese that outlines his duties and responsibilities.  *Id.* at 25-26.  Nonetheless, Eagan maintains that he has spent on average 35 hours per week for more than four years "managing" the bankruptcy.  *Id.* at 29.   Eagan Deposition attached in globo as Exhibit 6.

47.     Eagan has no experience managing a bankruptcy.  *Id.* at 32-33   Eagan is not an accountant with a CPA.  *Id.* at 31.  Eagan is not a lawyer.  Eagan is not a bankruptcy expert.  *Id.* at 36-37.  Eagan is not a professional financial advisor.  *Id.* at 33.  Eagan's professional experience centered around his family's business which he sold some years ago and retired.  Eagan is 72 years old.  *Id.* at 239.

48.     Eagan has no staff, no administrative support, and no budget.  *Id.* at 239.  The Archdiocese did not provide him with any help or a computer.  *Id.*  He uses his own desk-top computer from home.  *Id.*  He presumably buys all of his own pens, paper, and office supplies when volunteering to "manage the bankruptcy".

49.     On March 5, 2024, Eagan testified that he has reduced mental capacity.  *Eagan 3/05/2024 Deposition Vol III.*, at 28.  He testified that he was in a car accident on October 26, 2022 and as a result struggles with memory issues like reading spreadsheets, working long hours, and engaging in other financial tasks requiring concentration.  *Id.* at 19, 23, 24 & 28.   He testified that each afternoon his condition deteriorates until his spouse forces him to stop working.  *Id.* at 21, attached as Exhibit 7.  Jones Walker did not learn of his alleged cognitive decline until Eagan testified about it in his deposition in July 2024.  *Mintz Deposition*, at 109, attached as Exhibit 8.

50.     After neck surgery allegedly resulting from the accident, Eagan was out of commission for approximately six weeks.  *Eagan Deposition*, at 217-218.  Eagan was unaware of who managed the bankruptcy and approved legal bills in his absence.  *Id.* at 218.  He has undergone at least one significant surgery with another alleged surgery possible.  *Id.* at 223.  Eagan wears an enlarged neck brace for long periods throughout the day that reduces his movements and activities.

51.     Nonetheless, Aymond appointed him to approve all of the legal bills and costs for every law firm, professional, and accountant related to the bankruptcy.  *Id.* at 15.  In more than four years, Eagan has never refused to pay any bill or cost submitted to him despite testifying that he contests at least some Jones Walker bills every month.  *Mintz Deposition*, at 95-96.  So far, he has approved nearly $40 million in fees and costs.

52.     To put this in perspective, the approximately $40 million in fees and costs over the more than four years which he has approved to date can be broken down into tens of thousands of hours billed by more than 100 professionals across the spectrum of lawyers, accountants, and real estate agents spending money on an ever ranging collection of challenges.  Only the incompetent head of a grossly mismanaged organization could believe this qualifies as any kind of "due diligence".

53.     Eagan also testified that he does not know of any regulations or guidelines to look to when determining whether legal fees should be paid.  *Eagan Deposition*, at 79.  He did not know about the United States Trustee guidelines.  *Id.* at 70-71 & 79.  Jones Walker did not provide him with any guidelines.  *Id.* at 82.  Eagan did not know that the standard to pay legal fees was whether they were "reasonable and necessary".  *Id.* at 77.  All of this in spite of the fact that these guidelines and others are specifically listed in a certificate in every fee application he supposedly reviews so closely.  Eagan did not know that there were companies who specialized in auditing legal bills.  *Id.* at 118.

54.     Eagan also represents the Archdiocese at settlement discussions.  *Id.* at 42.  In his car accident depositions, Eagan testified about mediation-privileged conversations between himself and Claimants' Counsel at mediation.  *Id.* at 192-93.  He testified that his settlement strategy is to be flatly obstructionist to any suggestion or offer made by Claimants' Counsel:

EAGAN: John Perry was mediating with lawyers from Jones Walker. It was a small mediation. It wasn't 30 people. We had a plaintiff's lawyer, two attorneys there, a guy named "Soren Gisleson" and "Johnny Denenea", and they were talking to me and I would -- they would bring up some points, and I would say to them -- this is towards -- after lunch -- so maybe 2:00. I said, okay, I need to -- they just said, the wall's blue. I've got to say. You know, I'm not sure it's blue. I think it's pink.

*Eagan Deposition*, at 194.

55. To ensure his testimony would not be misconstrued, counsel asked again:

QUESTION: So would you agree that reflexively disagreeing when you don't even know why you're disagreeing is the very opposite of good faith?

EAGAN: I would disagree with that.

QUESTION: Why?

EAGAN: I think it's strategy sometimes.

*Id.* at 199.

56. Eagan's blatant obstructionist approach is likely a reflection of his "absolute" adherence to confederate generals' "code of conduct", a fact he raised unprompted in his car accident deposition and then doubled-down on in this deposition:

QUESTION: You live by the honor code of Confederate General Robert E. Lee, do you not?

EAGAN: <u>Absolutely</u>. Do you? I mean, <u>he's a good guy</u>.

*Id.* at 190-91 (emphasis supplied).

57. Eagan's bad faith approach to settlement negotiations can only be at Aymond's explicit direction and/or with Aymond's approval.

58. Eagan also has a conflict of interest across three different entities. While serving as a volunteer to "manage the bankruptcy", Eagan also sits on the board of the Apostolate the New Orleans Catholic Cemetery and sits on the board for the Archdiocese's captive insurer, Catholic

17

Mutual Relief Society of America. *Eagan Deposition*, at 17. As a result, Eagan owes a fiduciary duty to the Archdiocese in the bankruptcy, owes another fiduciary duty to the Apostolate, and a third separate fiduciary duty to the insurer. All three separate entites have conflicting interests to preserve their resources and pay as little as possible at the expense of the other. No written conflict waiver to approve Eagan's divided loyalties between and among the Archdiocese, the Apostolate, and the insurer is known to exist.

59.    Aymond's appointment of Eagan to manage the bankruptcy has resulted in delay, the unregulated payment of bloated attorneys fees, professional fees, costs, and bad faith plan negotiations that were never intended to go anywhere.

60.    Aymond's inexplicable decision to designate management of the bankruptcy to an unqualified volunteer without any resources suffering from admitted cognitive decline is consistent with all of Aymond's other acts of incompetence and gross mismanagement. Even if Aymond removes Eagan, Aymond is likely to designate an equally unqualified, incompetent representative.

   **3.    Aymond has paid approximately $40 million to administer this bankruptcy without due diligence.**

61.    Related to Aymond's incompetent decision to appoint an incompetent representative to "manage the bankruptcy" is Aymond's inability to identify, include, or establish any guidelines (written or otherwise) on whether to pay for professionals' fees and costs. Aymond's failure to manage from the top with guidelines and direction has resulted in the second most expensive religious bankruptcy in history.

62.    Jones Walker is the largest beneficiary of Aymond's gross mismanagement. Claimants adopt and incorporate by reference all facts, law, and argument made in the *Objection to Jones*

18

*Walker's Eleventh Interim Fee Application*, [Rec. Doc. 2943].   Claimants also intend to file another objection which addresses all of Jones Walker's fee applications to date.

63.     Even Eagan, without training, experience, or guidelines to follow to determine whether fees should be paid as "reasonable and necessary", knew on a guttural level that the professionals' fees have been "outrageous":

QUESTION:  Like people, friends, relatives, people on the street, who know that you're involved in this, do they express their opinions to you that these fees and costs are outrageous?

EAGAN:        Yes.

QUESTION:   All right.  Do you agree?

EAGAN:        Yes.

*Eagan Deposition*, at 74-75.

64.     A few of Jones Walker's billing practices deserve special attention.   Aymond's mismanagement has resulted in the Archdiocese's general counsel Susan Zeringue enjoying a windfall without actually being responsible for any billing practices.   In addition to her own salary, she enjoys the multiple ways her husband, Jones Walker partner Wayne Zeringue, triple dips the Archdiocese through his own billing and his status as originating partner.

65.     The Archdiocese testified that it did not know about Wayne Zerengue receiving a generator fee.  *Eagan Deposition*, at 45.  Jones Walker refused to provide testimony about the nature and extent of Wayne Zerengue's generator fee.  *Mintz Deposition*, at 60.

66.     Aymond's apparent answer to this issue aggravated the problem, not mitigated it.  Aymond instructed that a "Chinese wall" be placed around Susan Zeringue so she would not approve the bills for payment but could still nonetheless participate with her husband's excessive communications who could then bill that time to her client the Archdiocese.  *Mintz Deposition*,

at 21-22.  Since Eagan was responsible for authorizing payment (with all of his issues discussed above), for four years Susan Zeringue has a free pass to help her spouse bill with impunity, knowing that Eagan was ill equipped and incapable of meaningfully reviewing the bills.

67.      The Archdiocese is without in-house counsel to provide an objective review of billing, and the Archdiocese wrongfully chose Eagan to assume Susan Zeringue's job to review legal bills without direction, instruction, a budget, or any guidelines.  No legitimate explanation has been provided for what Wayne Zerengue has been doing for four years as a maritime lawyer in this bankruptcy. For example, Wayne Zeringue bills for time preparing for mediation sessions which he has never attended.

68.      Jones Walker's corporate representative and lead bankruptcy counsel Mark Mintz has testified that its billing practices will continue, regardless of vague or duplicative entries and regardless of excessive billing between Wayne and Susan Zeringue.  *Id.* at 127-128.

69.      Jones Walker's billing practices are further complicated by one of its partners, Remy Donnelly, who serves as chairperson of the board for the Apostolate Christopher Homes, Inc.  *Id.* at 71.  This creates a conflict of interest between Jones Walker and the Archdiocese, since one of Jones Walker's partners owes a fiduciary duty to the Apostolate at the same time his firm (of which he is a member) owes a fiduciary duty to the Archdiocese.  Christopher Homes' assets are at risk in this bankruptcy.

70.      Even Jones Walker's corporate representative understood that Jones Walker would have a conflict of interest if it represented both the Archdiocese and an Apostolate.  *Id.* at 76.

71.      Despite this testimony, Jones Walker continues to maintain there is no conflict of interest. *Mintz Deposition*, at 76.

72.     The assets of Apostolate Christopher Homes have become a central player in the bankruptcy, especially with the appointment of Terri North (spouse of United States Magistrate Judge Michael North) as the new executive director.

73.     Upon information and belief, an offer to purchase the assets of Christopher Homes has been made wherein the net profits would be reserved for payment to abuse survivors.  Jones Walker partner Donnelly and Christopher Homes director North would be actively involved in any decision of whether to employ any of Christopher Homes' assets to be used for abuse survivors.

74.     This position by a Jones Walker partner has created a conflict of interest between Jones Walker and the Archdiocese, between Christopher Homes and the Archdiocese, and between Donnelly and Jones Walker.

75.     Aymond's mismanagement also includes retaining redundant and unnecessary professionals and services.  For example, after the bankruptcy, Aymond hired the Earhardt Group to conduct public relations for the Archdiocese, despite already paying the salary of Sarah Commisky McDonald, an in-house public relations employee.   This Court has already found that this was unnecessary and wasteful:  "Similar to the consultants in *Restasis*, [the Earhardt Group] was retained to provide 'specialized public relations and communications services for the Archdiocese' in spite of the fact that the Archdiocese already had its own in-house media consultant and that [the Earhardt Group] possessed no special information or expertise that was not already held by others at the Archdiocese."  *Memorandum Opinion & Order*, at 11 (01/05/24) [Rec. Doc. 2782].

76.     Even after this *Opinion*, the Archdiocese continues to waste funds paying the Earhardt Group that could be used for sexual abuse survivors.

77.     All the while, Aymond is absent and has not appeared in any court proceeding or presented any statement under oath in this more than four year bankruptcy.

78.     Aymond's continued incompetence and gross mismanagement will result in more waste without any end in sight.

**4.      Instructing Archdiocese lawyers to stall any meaningful effort to develop a plan to resolve the bankruptcy for three years in order to defeat the look-back window, all the while misrepresenting to the public that it would pay claims regardless of the constitutionality of the lookback window.**

79.     On June 10, 2021, the Louisiana Legislature unanimously passed a law that revived expired claims for a period of three years to allow survivors of childhood sexual abuse to seek justice.  The lookback window initially expired on June 14, 2024.

80.     As soon as the lookback window was passed, Aymond engaged in a secret campaign to have the lookback window declared unconstitutional.  Knowing it may take years, Aymond instructed his lawyers to stonewall meaningful progress until his secret campaign was successful.

81.     Aymond used every tool at his disposal to first defeat the passage of the look-back window and then have it declared as unconstitutional.  Upon information and belief, during the passage of the look-back window, Aymond and/or his proxies pressured members of the legislature to kill and/or veto the look-back window.

82.     Aymond's campaign also included an effort to utilize the Diocese of Lafayette and the Louisiana Conference of Catholic Bishops.  Aymond oversees the Diocese of Lafayette because Aymond exercises sole control as the metropolitan.  The Diocese of Lafayette was the primary religious entity challenging the lookback window's constitutionality.  The Diocese of Lafayette is a suffragan diocese, which answers to the Archdiocese.  *Eagan Deposition*, at 158.

83.     Aymond also heads the Louisiana Conference of Catholic Bishops which filed numerous *amici* in the Louisiana Supreme Court in support of declaring the lookback window unconstitutional. *Id.*

84.     Until the very end, Aymond instructed his lawyers, including Jones Walker, to coordinate these efforts to have the look-back window declared unconstitutional. *Mintz Deposition*, at 155-57.

85.     All the while, Aymond was misrepresenting to the public that he supported the look-back window and wanted to provide full support to the survivors and their claims. *See, e.g., Louisiana Supreme Court Reverses Previous Decision, Upholds Law for Childhood Sexual Abuse Lawsuits*, at 3 (06/21/24) (emphasis supplied) ("Archbishop Greg Aymond said last month that the New Orleans Archdiocese has never opposed the look-back window statute, which was challenged in court by the Diocese of Lafayette, and that it would contribute the same amount of funds toward a settlement regardless of the court's ruling."), attached as Exhibit 9.

86.     Behind closed doors, Aymond paid Jones Walker and other law firms hundreds of thousands of dollars in fees and expenses to have the look-back window declared unconstitutional.

87.     Aymond's decision to challenge the look-back window's constitutionality created a zero-sum game inside the bankruptcy. Aymond's decision meant that the Archdicoese would fail to engage in any meaningful progress towards a plan until the constitutionality of the look-back window was resolved. The Archdiocese then engaged in typical misdirection by blaming certain survivors' lawyers for the delay -- when it was the survivors' lawyers who actively participated in drafting the law, getting it passed, and defending its constitutionality all the way to the Louisiana Supreme Court.

88.     As a result, Aymond wasted three years and tens of millions with nothing to show for it but bloated attorneys fees for Jones Walker, other counsel, and a host of other professionals.

89.     Aymond's strategy to stall the bankruptcy is reflected by his decision to wait to inform the Apostolates that they would need to contribute to a final plan.   According to the Archdiocese's corporate representative, the Archdiocese knew as soon as <u>six months into the bankruptcy</u> that the Apostolates would need to contribute to a final resolution but waited almost <u>three years</u> to inform them.  *Eagan Deposition*, at 142-43.

90.     Aymond made the choice that the Archdiocese would rather take a gamble to pay its lawyers than abuse survivors:

QUESTION:   Do you agree that every dollar the Archdiocese pays to Jones Walker is one less dollar available for the Archdiocese to pay the abuse survivors?

MINTZ:     I believe that is an accurate quote that is -- or an accurate statement that is wholly misleading.

QUESTION:  Okay.  You want to explain that?

MINTZ:     Well, I think every dollar that is paid in administrative cost is a dollar that can't go to a -- to a claimant, and there's -- Jones Walker is not the only or even the largest unsecured -- or administrative cost.

QUESTION:   All right. So your testimony is it's a true statement, but it's also true as to everybody else who is billing into this bankruptcy; is that fair?

MINTZ:     Correct.

*Mintz Deposition*, at 88-89.

5.      **Refusing to make timely, necessary decisions, resulting in one of the oldest religious bankruptcies in United States history.**

91.     Aymond's mismanagement has led to costly delays.  In addition to Aymond's campaign of delay to defeat the lookback window, Aymond has repeatedly slow-walked important decisions that resulted in unnecessary delay.  Aymond instructed his lawyers to fight every effort to produce abuse related documents, thereby resulting in the Unsecured Creditor's Committee filing a motion to compel that lasted years with a meager drip-drip of production.

92.     Aymond has instructed his lawyers to fight the release of any abuse related documents to the public, resulting in costly fights over production, baseless investigations, delayed appeals, unnecessary motion practice, and a pall of secrecy that, as a driving force inside the Archdiocese as a way it conducts its business, has become a hallmark of this bankruptcy.

93.     Not even Jones Walker believes hiding criminal conduct should be tolerated:

QUESTION:   Do you believe lawyers who hide criminal conduct should face consequences?

MINTZ:        As a general proposition, yes.

*Mintz Deposition*, at 136.

94.     Aymond's decision to appoint Eagan -- an unqualified, inexperienced, conflicted volunteer with reduced mental capacity, to "manage the bankruptcy" has resulted in years of bad decisions or no decisions at all.

95.     As detailed below, Aymond and Eagan are incapable of completing the simplest tasks, like updating schedules of their real and personal property and filing them into the bankruptcy under penalty of perjury, so that creditors can develop a reliable appreciation for what the assets are worth.

96.     Aymond's poor decision-making includes what, if anything, to do with the Apostolates in this bankruptcy.  For years, Aymond informed the Apostolates (and the Vatican) that the

Apsotolates would <u>not</u> need to pay anything into the bankruptcy, only to issue a letter in September 2023 informing them that some Apostolates will need to make some contribution of an amount not yet determined.  *LTR from Aymond to Congregation*, at 1 (09/08/23), attached as Exhibit 10.

97.     True to form, Aymond blamed his about-face on anyone but himself.  Aymond blamed Jones Walker, his "legal counsel" for the estimate of the bankruptcy and for his initial misguided belief that the assets of the Apostolates would not be at risk.  *Id.* at 2.

98.     Aymond also supported the creation of the Unsecured Commercial Creditor's Committee, resulting in more delay by creating another unnecessary layer of expense and time by paying more lawyers and professionals to read documents and attend hearings that are duplicative.  The Archdiocese testified that, if the value of TMI's bonds are removed, the cost of paying these lawyers and their professionals <u>exceed</u> the remaining value of what the unsecured commercial creditors are due.  *Eagan Deposition*, at 185.

99.     Aymond's mismanagement has led to a criminal investigation into the Archdiocese and Aymond personally.  The criminal investigation may also cause further delay with Aymond hiring more lawyers for himself personally and for the Archdiocese and with these lawyers needing to read the thousands of pages of files found in the hundreds of Archdiocesan clergy who abused children.

100.    Aymond has failed to timely inform his insurers or provide them with relevant documents, resulting in delayed involvement in the bankruptcy process.  More than four years after the bankruptcy started, insurers are clamoring for access to documents and a seat at the table.

101.     As detailed below, Aymond has failed to timely and adequately address post-petition complaints of sexual misconduct by his priests, resulting in delay with more criminal and civil proceedings.  Six of Aymond's clergy members have been arrested for sex crimes ***during*** this bankruptcy.

102.     This bankruptcy is in its fifth year.  There is no end in sight with Aymond at the helm.

103.     The Archdiocese's corporate structure vests all control with Aymond.  Aymond has absolute power to sell property, issue checks, and decide the fate of the Archdiocese.  Aymond does not need consent from any board.  Consequently, Aymond is solely responsible for the delay tactics in this bankruptcy.

104.     Aymond has continued to show a lack of involvement in every area, whether it is management, identifying what property to sell, selling apostolates, and liquidating assets.

105.     Until Aymond is removed from making bankruptcy decisions and a trustee appointed, the bankruptcy will remain adrift with indecision where the primary work being performed is paying the lawyers' bills.

> **6.     Refusing to supplement the Archdiocese's schedules with the identity and value of the real and personal property owned by the Archdiocese after more than four years**

106.     For more than four years, the Archdiocese has failed to amend its schedules to identify all of the real and personal property it owns and assign a value to it.  On May 22, 2020, the Archdiocese filed schedules into this bankruptcy identifying certain real property and personal property.  *Schedule A/B of Global Notes, Methodology and Specific Disclosures Regarding the Debtor's Schedules of Assets and Liabilities, and Statement of Financial Affairs*, at 12-77 (05/22/2020) [Rec. Doc. 104].  However, the value assigned to the majority of real property was

left as "undetermined" with the following placeholder:  "At this time, the Debtor is unable to assign property values to the real property, and/or improvement values." *Id.* at 7.

107.    The Archdiocese has not amended any of these schedules to attest, under penalty of perjury, the universe of all the real and personal property it owns and their current market value. While some spreadsheets have been exchanged in plan negotiations, they do not carry the weight or reliability of those filed into the court record under penalty of perjury.

108.    Upon information and belief, the properties listed on these schedules do not include all property owned by the Archdiocese.

109.    Aymond's decision to hold onto as much real property as possible is reckless.  The real property is an albatross around the Archdiocese's proverbial neck.  Although it does not pay taxes, the Archdiocese pays tens of millions each year on insurance and maintenance.  The Archdiocese still has not resolved previous hurricane and storm damage insurance claims.

110.    Aymond's approach to personal property is worse.  No list purporting to identify all or even a substantial accounting of personal property has ever been produced.  What has been informally produced is an incomplete smattering of personal property identified on insurance policies.

111.    Until a full accounting of real and personal property is achieved, meaningful plan discussions cannot be conducted.

112.    Aymond's mismanagement and absence allows these typically straightforward bankruptcy issues to fester and prevent a finalized plan.

       **7.      Having a proof of claim filed against Aymond personally for racial discrimination and sexual work harassment.**

113.    At least one claimant has publicly disclosed his story about a claim he filed against Aymond in the bankruptcy.

114.    On December 2, 2022, the Guardian ran an article with an interview with Lawrence Eghabor who attended the Notre Dame Seminary as a seminarian student in the 1990s when Aymond headed the Seminary.  *Ex-Seminarian Accuses New Orleans Archbishop of Harassment in Decades Long Dispute*, at 1 (12/02/22), attached as Exhibit 11.

115.    Eghabor filed a claim into the bankruptcy alleging that Aymond made an unwanted sexual pass by placing his hands on Eghabor's lap, waist, and buttocks during a private meeting. *Id.* at 2.

116.    Eghabor had met with Aymond on multiple occasions to complain about the sexual and racial harassment he was subject to while a student at Notre Dame Seminary.  *Id.*  Eghabor is black.  Aymond dismissed Eghabor's complaints of racial and sexual harassment as a "joke".  *Id.* at 3.

117.    Because there is a serious personal claim against him in the bankruptcy, Aymond is conflicted from resolving the bankruptcy in the best interest of the Archdiocese.  Aymond has stated that he believes the claim is baseless and extortion.  Aymond should not be allowed to make decisions about these abuse claims when one has been filed against him personally.

### 8.    Mishandling post-petition sexual abuse allegations.

118.    A number of post-petition sexual abuse allegations have been made against Archdiocesan clergy.  Aymond mishandled each one of them by trying to silence the victim, move the accused, and/or failing to timely report any of them to the authorities.  Those allegations and Aymond's mismanagement are chronicled in the aforementioned Evidentiary Memorandum.  *See Evidentiary Memorandum*, § 7, at 44-48.

119.    During the pendency of this bankruptcy, at least six of Aymond's clergy members have been arrested for sexual misconduct either with children or adults.  They are Michael Mulenga,

29

Patrick Wattigny, Travis Clark, Lawrence Hecker, VM Wheeler, III, and Anthony Odiong. To have six employees of a corporate debtor arrested for sex crimes during the debtor's reorganization (which is itself predicated on more than 500 claims of sexual abuse) while a criminal investigation by the Louisiana State Police is underway for the cover-up of childhood sexual abuse is the definition of incompetence and gross mismanagement.

120. As recently as July 16, 2024, Archdiocesan priest Odiong was arrested for having child pornography on his computer and sexually assaulting a number of women. It is unclear at this time whether his computer belonged to the Archdiocese, but Odiong had been welcome into the Diocese of Austin, Texas and later into the Archdiocese of New Orleans -- both times by Aymond.

121. Aymond continues to misrepresent the current state of its sex abuse crisis with the public. Just days after Odiong's arrest, Aymond stated "there has only been one instance of clergy abuse that occurred on his watch. In 2020, the Rev. Pat Wattigny was arrested and charged with molesting a 15-year-old boy on the northshore in 2013. Wattigny later pled guilty." *Aymond Fighting Article*, at 4. This is simply wrong.

122. <u>Six priests, not one, have been arrested for sexual misconduct in the last four years alone</u>. Nonetheless, Aymond continues to misrepresent to the public: "For 25 years now, there has been a different approach," Aymond said. "Not that that makes up for the sins of the past, but it does say we have repented, and we really want to do what is right." *Id.*

123. Upon information and belief, Aymond knew and/or should have known of the risks these six clergy posed to the public but kept them in their positions.

124. Even today, Aymond continues to intentionally maintain policies that increase the risk of sexual abuse to children and adults. Since the bankruptcy, Aymond has instructed the

Archdiocese general counsel and staff to <u>not</u> investigate any of its clergy who have been accused of sexually assaulting children or adults in a civil or criminal proceeding, including this bankruptcy.  Aymond has created a policy and practice that no internal investigations should commence against new allegations of abuse against clergy if (a) there is a civil lawsuit against them, (b) there is a proof of claim filed in the bankruptcy naming Archdiocesan clergy, and (c) whether there is a criminal investigation against them.

125.    Aymond's policy has resulted in named abusers remaining in their Archdiocesean position, continuing to collect retirement and health benefits, and enjoying the social status of being called "Father".

126.    Another of Aymond's policies increases risk to children and adults in the community. Aymond has also instructed its general counsel not to report allegations of child sexual abuse to criminal authorities if the victim reporting the allegation is now an adult.  Aymond's policy requires that only the victim can decide whether to report the abuse to authorities.

127.    However, this policy ignores that the abuser may still be alive and active inside the Archdiocese, posing a real and present danger to children.  The policy also ignores that the Archdiocese may be continuing to operate under a policy or set of policies that enable more childhood sexual assault.  Without any investigation, Aymond has ensured none of the Archdiocese's reckless and dangerous policies will be discovered.

128.    When combining these two policies (not investigating new allegations of abuse if there is an existing civil or criminal claim and not requiring reporting of childhood abuse to authorities by adults), Aymond has again facilitated an environment where childhood sexual abuse will likely continue.

31

129.    This is the type of incompetence and gross mismanagement that requires new leadership in the bankruptcy.

> **9.      Entering into a settlement with TMI to argue that it removed hundreds of millions of dollars of assets from consideration in any plan.**

130.    Shortly after the bankruptcy petition was filed and before any adequate accounting of any assets, the Archdiocese entered into a settlement with TMI.  The terms generally provide that the Archdiocese would pay the outstanding interest on the almost $40 million in bonds which had accrued and make semi-annual payments on the interest throughout the bankruptcy.  *Amended Settlement Agreement*, at § 2 (11/02/2020) [Rec. Doc. 527].  In exchange, TMI would not object to any final plan based on any argument that it was prejudiced or raise default options.  *Id.* at §§ 2.2.1 & 2.2.2

131.    Another material term to the settlement is that the Archdiocese agreed to not sell more than **$20 million of real estate** during the course of the bankruptcy.  *Id.* at § 2.2.5.  The Archdiocese has argued that this term protects the Archdiocese's property from being sold to fund resolution of claims by sexual abuse survivors.

132.    The Archdiocese presently owns (directly and indirectly) over **$2.1 billion** in real property according to its own insurance documents.  The Archdiocese has repeatedly refused to discuss including more than $20 million in sales of real property into any plan, relying on this clause in the TMI settlement.

133.    For more than three years, the Archdiocese has used the settlement term of the $20 million sales cap as a shield against selling the number of properties it will need to achieve a plan.

134.    The bad faith argument has resulted in delay and unnecessary expenses and fees.

## **CONCLUSION**

The foregoing is not intended to be an exhaustive summary of all of the examples or issues with Aymond's gross mismanagement and incompetence before and during the bankruptcy. Movers also submit that they have made an adequate showing to conduct written discovery, take depositions, and conduct an evidentiary hearing on the matters discussed herein. Movers reserve their right to supplement, edit, and/or amend the factual basis for appointing a trustee and fee examiner during discovery.

Movers respectfully submit that a Trustee be appointed pursuant to 11 USC § 1104 to manage the bankruptcy and assist in determining a fair and final resolution for all creditors and an independent fee examiner to conduct an audit of all past fees and expenses as well as review the reasonableness and necessity of fees and reimbursements into the future.

Respectfully submitted,

S/Soren E. Gisleson
SOREN E. GISLESON (#26302)
HERMAN, HERMAN & KATZ
909 Poydras Street, Suite 1860
New Orleans, La 70112
Tel: (504) 581-4892
Fax: (504) 561-6024
sgisleson@hhklawfirm.com

RICHARD C. TRAHANT (# 22653)
ATTORNEY AT LAW
2908 Hessmer Avenue
Metairie, LA 70002
Tel: (504) 780-9891
Fax: (504) 780-9891
trahant@trahantlawoffice.com

JOHN H. DENENEA, JR. (#18861)
SHEARMAN~DENENEA, L.L.C.
4240 Canal Street
New Orleans, LA 70119
Telephone: (504) 304-4582
FAX: (504) 304-4587
jdenenea@midcitylaw.com

-AND-

s/ *Desirée M. Charbonnet*
Desirée M. Charbonnet (LSBA #24051)
CHARBONNET LAW FIRM
501 Clearview pkwy
Metairie, LA 70001
Desi@charbonnetlawfirm.com
Ph. 504.888.2227

s/ *Craig M. Robinson*
CRAIG M. ROBINSON (Bar No. 32934)
Robinson Law Offices, LLC
700 Camp Street
New Orleans, Louisiana 70130
T: (504) 458-5100
F: (504) 717-4627
craig@rlolegal.com

s/ *Frank J. D'Amico, Jr.*
FRANK J. D'AMICO, JR.
4608 Rye Street
Metairie, LA 70006
Tel: 504.525.7272
frank@damicolaw.net

s/ *Nicholas R. Rockforte*
Nicholas R. Rockforte, La. Bar #31305
**LABORDE EARLES LAW FIRM, LLC**
1901 Kaliste Saloom Road
P.O. Box 80098
Lafayette, Louisiana 70598-0098
Phone:  337-261-2617
Fax: 337-261-1934
nicholas@onmyside.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing *Motion to Appoint Trustee* will be served upon all parties by electronic case filing for those parties receiving notice via the Court's Electronic Case Filing system.

/s/ *Soren E. Gisleson*
Soren E. Gisleson