## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: | Case No. 20-10846 |
| THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS, | Section "A" |
| Debtor.[1] | Chapter 11 |

### RULE 706 EXPERT WITNESS' REPORT

Mohsin Y. Meghji of M3 Advisory Partners, LP ("M3"), the Court-appointed expert in these cases (the "Expert"), submits this final report (the "Report") pursuant to the *Order Appointing an Expert Witness Under Federal Rule of Evidence 706* [Docket No. 3308] (the "Expert Order"), entered by the Bankruptcy Court for the Eastern District of Louisiana (the "Court") on August 21, 2024.

## I.   BACKGROUND

### A.   Appointment of the Expert

On August 15, 2024, the Court entered the *Order to Show Cause* [Docket No. 3266], pursuant to which the Court determined that it required an independent assessment of the above-captioned chapter 11 case (the "Chapter 11 Case") prior to addressing certain pending contested matters (the "Contested Matters").[2]  On August 20, 2024, the Court subsequently held a hearing

---

[1]   The last four digits of the Debtor's federal tax identification number are 8966.  The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

[2]   *See id.* at 1.  The Contested Matters include: (i) *Eleventh Interim Application of Jones Walker LLP for Allowance of Compensation and Reimbursement of Expenses, as Counsel to the Debtor and the Debtor in Possession, for the Period from November 1, 2023 through February 29, 2024* [Docket No. 2927], and the objection thereto [Docket No. 2943]; (ii) *U.S. Fire Insurance Company's and International Insurance Company's (I) Statement in Connection with the Court's Order on the Continuance of the Hearing on Jones Walker, LLP's Eleventh Interim Application for Allowances of Compensation and Reimbursement, (II) Response to Jones Walker's Fee Application (Dkt. 2927) and Gisleson's Objection (Dkt. 2943), and (III) Motion for (A) Implementation of Fee Holdback for Estate Professional Interim Fee Applications and (B) Granting Related Relief* [Docket No. 3168], and the responses thereto [Docket Nos. 3234, 3236, 3244, 3245, 3253, and 3258]; (iii) *Motion to Consider Whether the Materials in Question Should Be Sealed Pursuant to Local Rule 5.6(D)(2)* [Docket No. 3248], and the response thereto [Docket No. 3260]; and (iv) *Certain Abuse Survivors' Motion to Appoint a Chapter 11 Trustee and Fee Examiner Pursuant to 11 U.S.C. § 1104* [Docket No. 3246] (the "Chapter 11 Trustee Motion").

on the Order to Show Cause to hear from parties-in-interest regarding whether the Court should appoint an expert to conduct an independent assessment of certain issues.[3]

On August 21, 2024, the Court entered the Expert Order, which appointed Mr. Meghji to serve as the Expert pursuant to Federal Rule of Evidence 706 for the purposes of addressing certain matters described in Section I.B., *infra*.[4]  The Expert Order also appointed (i) Latham & Watkins LLP ("L&W") to serve as counsel to the Expert and (ii) M3 to provide advisory services for the purpose of assisting the Expert in fulfilling his duties as set forth in the Expert Order.

### B.        Scope of the Expert's Duties

The Court appointed the Expert for the purpose of conducting a strategic assessment of the status of this Chapter 11 Case, including to address the following four topics (the "Expert Issues"):

1.        The existence and status of a plan structure(s) and available alternatives;

2.        The structure, functioning, and capabilities of the Debtor's management;

3.        Administrative costs incurred in the context of the record in the Chapter 11 Case and an assessment of ongoing resources required to bring the Chapter 11 Case to conclusion; and

4.        The Debtor's current tort liability, the financial wherewithal of the Debtor to reorganize and proceed as a going concern, including the availability of insurance proceeds and contributions from non-debtor affiliates, as well as implementation of non-monetary remedies to attempt to prevent and/or respond to any future tort liability.[5]

The Expert was appointed on August 21, 2024.  The Court ordered this Report to be filed within 63 days, no later than October 23, 2024 (such 63-day period, the "Investigation Period").[6] During the Investigation Period, the Expert considered the legal and factual issues necessary to address the Expert Issues.

Consistent with the Expert Order and the practical realities of the limited time the Expert and his advisors had to conduct this investigation, the Expert has explicitly not undertaken certain analyses or considered matters that go beyond the Expert Issues.  The Expert did not, among other things, (i) conduct his own independent valuation or confirmation of the Debtor's and its non-debtor affiliates' (x) assets and real property (including any that may be available for distribution

---

[3]   *See* Order to Show Cause at 2–3 (holding "the Debtor, the two official committees of unsecured creditors, U.S. Fire Insurance Company and International Insurance Company, counsel for Certain Abuse Survivors [. . .], Argent Institutional Trust Company (as indenture trustee), and the United States Trustee **SHALL** appear and other parties in interest **MAY** appear.").

[4]   Prior to entry of the Expert Order, the Expert spoke to the Court twice in an effort to understand the scope of the appointment.  Neither the Expert nor his advisors have spoken to the Court since the Expert Order was entered.

[5]   Expert Order at 3.

[6]   *Id.* (holding that "time is of the essence" in setting the expedited Investigation Period).

to creditors) or (y) liabilities, and instead relied on financial and other information provided to the Expert by the parties to the Chapter 11 Case, (ii) conduct an independent assessment or analysis of insurance coverage and relevant defenses, (iii) engage in a line-by-line analysis of estate professionals' fees incurred since the filing of the Chapter 11 Case, or (iv) undertake an independent analysis regarding all potential plan confirmation issues.

In addition, although the Expert familiarized himself with and considered the Debtor's tort liability in the aggregate, reviewed certain proofs of claim filed by Survivors (as defined herein), and met with (in-person or remotely) a number of Survivors, an analysis of the underlying facts, claims, defenses or other factors related to the hundreds of sexual abuse proofs of claim (the "Abuse Claims") asserted against the Debtor is beyond the scope of the Report. The Expert lauds both the candor of the Survivors in their proofs of claim and in his meetings with them as well as the Survivors' constructive approach to the resolution of the Chapter 11 Case. The omission of a detailed discussion of the Abuse Claims is in no way intended to diminish or disregard the experiences of Survivors or the profoundly devastating and horrific nature of the underlying allegations. The Expert's goal and intent in authoring this Report is to recommend a path forward that benefits all parties, but most importantly, the Survivors, who deserve closure, transparency, and accountability in connection with this Chapter 11 Case.

Finally, the Expert understands mediation between the Debtor and the UCC is currently underway. The Expert is not a party to the mediation and has not attended any mediation sessions.[7] The Expert instructed the Identified Parties and other Participants (each as defined below) that although the Expert and his advisors are bound by the Protective Orders[8] governing disclosure of confidential information in the Chapter 11 Case,[9] information provided to and discussions with the Expert and his advisors would not be subject to mediation privilege. Toward the conclusion of the Investigation Period, the Expert and his advisors met with each Mediator separately. As discussed in more detail herein, the Expert acknowledges the important role mediation will continue to play in this Chapter 11 Case and felt it was important to meet with the Mediators and obtain their perspectives.

### C. Examination Process Undertaken

The Expert and his advisors commenced their work immediately following the Expert's appointment. Those efforts began with gathering relevant information and conducting preliminary interviews with certain parties-in-interest identified by the Court in the Expert Order (the

---

[7]   On September 15, 2021, upon joint motion of the Debtor and the UCC, the Court entered the *Order Granting Joint Motion to Appoint Mediator* [Docket No. 1058], pursuant to which Hon. Gregg W. Zive was appointed as a mediator in the Chapter 11 Case effective October 1, 2021. On March 11, 2024, upon joint motion of the Debtor and the UCC, the Court entered an order appointing John W. Perry, Jr. as an additional mediator, effective February 1, 2024, for an initial period of 120 days. *See Order* [Docket No. 2892]. On October 11, 2024 and October 21, 2024, the Court extended the appointment of each of Judge Zive [Docket No. 3413] and Mr. Perry [Docket No. 3430] (the "Mediators"), respectively, through March 31, 2025.

[8]   *See Amended Protective Order* [Docket No. 729] (amending and superseding the *Protective Order* [Docket No. 305]); *Supplemental and Amended Protective Order* [Docket No. 885]; and *Second Supplemental and Amended Protective Order* [Docket No. 1120] (together, the "**Protective Orders**").

[9]   *See* Expert Order at 2.

3

"Identified Parties")[10] and also included outreach and meetings with other parties-in-interest relevant to the Chapter 11 Case (together with the Identified Parties, the "Participants"). The Participants included the following:

    a.    Counsel and advisors to the Roman Catholic Church of the Archdiocese of New Orleans (the "Debtor" or the "Archdiocese"), including Jones Walker LLP, counsel to the Debtor; Blank Rome LLP, special insurance counsel to the Debtor; and Keegan Linscott & Associates PC, financial advisor to the Debtor.

    b.    The Debtor's principals, including Archbishop Aymond; Lee Eagan; and the General Counsel of the Archdiocese.

    c.    The non-debtor affiliate group known as the "Apostolates" (including Saint Joseph Abbey and Seminary College) and its counsel, Douglas Draper of Heller, Draper & Horn, L.L.C.

    d.    Certain UCC professionals, including Pachulski Stang Ziehl & Jones LLP and Locke Lord LLP, counsel to the UCC; and Berkeley Research Group LLP ("BRG"), financial advisor to the UCC.

    e.    Certain Official Committee of Unsecured Commercial Creditors ("Commercial Committee") professionals, including Stewart Robbins Brown & Altazan LLC, counsel to the Commercial Committee; and Dundon Advisors LLC, financial advisor to the Commercial Committee.

    f.    Counsel to and representatives of various insurers, including United States Fidelity & Guaranty Company ("Travelers"); Twin City Fire Insurance Company and First State Insurance Company (together, "Hartford"); U.S. Fire Insurance Company and International Insurance Companies ("U.S. Fire"); and SPARTA Insurance Company ("SPARTA") (collectively, the "Insurers").

    g.    Counsel to Certain Abuse Survivors.[11]

    h.    Certain individuals who have asserted Abuse Claims in the Chapter 11 Case (the "Survivors").

    i.    Certain counsel to other Survivors.

    j.    Greenberg Traurig LLP, as counsel to Argent Institutional Trust Company as the Trustee for the Bondholders, successor in interest to TMI Trust Company (the "Bond Trustee") of the $41,895,000 Louisiana Public

---

[10]   *See id.* at 3–5.

[11]   The "Certain Abuse Survivors" refers to the group of certain Survivors represented by Soren E. Gisleson, John H. Denenea, Jr., and Richard C. Trahant.

Facilities Authority Refunding Revenue Bonds (Archdiocese of New Orleans Project) Series 2017 (the "<u>Bonds</u>").

k.      Counsel to certain non-debtor affiliate agencies, including Second Harvest Food Bank of Greater New Orleans ("<u>Second Harvest</u>") and Catholic Mutual Relief Society of America ("<u>Catholic Mutual</u>").

The Expert met with each of the Participants and/or their representatives and advisors (in several cases, numerous times).[12]  In addition, the Expert and his advisors spoke with the appointed Mediators, Judge Zive and John Perry, prior to the conclusion of the Investigation Period.[13]

By the end of the Investigation Period, the Expert and his advisors had (i) met or corresponded with all Participants, their representatives, and/or their advisors, (ii) reviewed sixteen (16) written submissions from Participants, (iii) reviewed substantial additional documents, pleadings, and other analyses related to the Chapter 11 Case, and (iv) conducted independent analysis and legal research relevant to the Expert Issues.

The Expert's examination process included, but was not limited to:

### 1.      <u>Review and analysis of extensive information received by the Expert</u>

On August 22, 2024, the Expert contacted the Identified Parties via email and requested that each Identified Party submit a brief, confidential written submission addressing certain key topics (the "<u>Submissions</u>").[14]  The Identified Parties were asked to address the following topics in their Submissions: (i) key obstacles that the parties encountered in the case; (ii) views of key terms or features of any contemplated chapter 11 plans; (iii) preferred plan structure(s); (iv) view of the financial wherewithal of the Debtor; (v) perspectives on the administrative costs of the Chapter 11 Case (professional fees and otherwise); and (vi) any other topics believed to be relevant to the Expert's analysis.  In addition, the Expert offered for the Identified Parties to suggest any individuals or parties-in-interest they believed the Expert should meet with and also to provide or identify up to five (5) documents or pleadings in the Chapter 11 Case relevant to the Expert's scope of investigation.  The Expert received Submissions from all but three Identified Parties originally contacted and solicited Submissions from three additional Participants at the suggestion of certain of the Identified Parties.[15]  The Expert and his counsel reviewed each Submission in detail and

---

[12]  *See* Exhibit B.

[13]  For the avoidance of doubt, the Expert and his advisors did not receive any materials from the Mediators and did not discuss anything covered by mediation privilege with either Mediator.

[14]  A copy of the *Notice of Expert's Request for Party Submissions* (the "<u>Expert's Request for Submissions</u>") is attached hereto as <u>Exhibit C</u>.

[15]  The Expert and his advisors received Submissions from: counsel to the Debtor, counsel to the Apostolates, counsel to the UCC, counsel to the Commercial Committee, counsel to Catholic Mutual Relief Society, counsel to Second Harvest, counsel to Hartford, counsel to Travelers, counsel to U.S. Fire, counsel to the Bond Trustee, and counsel to Survivors, including from the firms Alystock Witkin Kreis & Overholtz; Gainsburgh Benjamin David Meunier & Warshauer LLC; Herman Herman & Katz LLC; Richard C. Trahant; Shearman Denenea, L.L.C.; Huber Thomas & Marcelle LP; Lamothe Law Firm LLC; and Robinson Law Offices LLC.

scheduled follow-up video conference interviews with each of the Identified Parties that provided a Submission.

In addition to Submissions, during the Investigation Period, Participants provided the Expert and his counsel with certain additional materials, including, but not limited to: (i) selected proofs of claim related to Abuse Claims (pursuant to explicit permission by Survivors who submitted such proofs of claim); (ii) financial data and asset analysis related to the Debtor and Apostolates; (iii) news articles; (iv) legal analysis, including case law and pleadings from other diocese bankruptcy cases and other mass tort bankruptcy cases; and (v) other miscellaneous documents and correspondence.

### 2. Hundreds of hours of video conference meetings and in-person interviews with stakeholders in the Chapter 11 Case

Following receipt of the Submissions, the Expert and his advisors met with each of the Participants at least once (and often multiple times), in furtherance of the investigation. With respect to counsel and representatives for the Debtor, the Apostolates, the UCC, and Certain Abuse Survivors, the Expert and/or his advisors engaged in numerous formal and informal meetings, calls, and written correspondence over the course of the Investigation Period.

On September 9–10, 2024, the Expert and his advisors traveled to New Orleans and conducted in-person interviews with Archbishop Aymond, Mr. Lee Eagan, counsel to the Debtor and counsel to the Apostolates. On this trip, the Expert and his advisors also met with four Survivors and their counsel in-person and via video conference.[16]

In addition, the Expert and/or his advisors had nearly a dozen separate meetings with the Debtor's financial advisor, Chris Linscott, and/or Lee Eagan, and another nine meetings with the UCC's financial advisor, BRG. These conversations focused on the Debtor's and Apostolates' assets and cash flow projections, as well as related diligence, including, among other things, the assets and ownership of Portfolio A and Portfolio B; other cash and investments; donor and state law restrictions on cash and investments; operating cash flows; deferred maintenance and natural disaster costs, risks, and reimbursements; real property; and issues specific to certain Archdiocesan Agencies.

A list of all Participants that provided Submissions, participated in interviews, and/or corresponded with the Expert is annexed hereto as Exhibit A. A table identifying the dates of formal discussions between and among such Participants and the Expert has been annexed hereto as Exhibit B. The Expert and his advisors also had a number of informal conversations with

---

In response to the Expert's Request for Submissions, counsel to Hancock Whitney Bank informed the Expert that its claim had been substantially satisfied. As a result, the Expert did not believe Hancock Whitney Bank's involvement in the investigation was necessary.

Also, although not included as an Identified Party, counsel to the Expert also reached out via email to the Hon. Michael R. Hogan as the appointed "Unknown Tort Claims Representative" [Docket No. 1012], but did not receive a response.

[16] All counsel to Survivors identified by the Court in the Expert Order were offered the opportunity to have one or more of their clients meet with the Expert and his advisors.

various Participants over the course of the Investigation Period, which are not reflected on Exhibit B.  A high level timeline of the Expert and his advisors' meetings during the Investigation Period is included below:



### 3.    Independent Research

The Expert and his advisors also reviewed the docket for the Chapter 11 Case and identified and reviewed relevant filings, including the plans filed by the Debtor and UCC, respectively, and related exhibits.  The Expert and his advisors also conducted independent legal and fact-based research in connection with the Expert Issues and the preparation of this Report.

## II.    PRELIMINARY STATEMENT

The Expert was appointed to cast light on why the Chapter 11 Case has proceeded for nearly four and a half years without achieving settlement or resolution, but also, and perhaps more importantly, to provide insight into whether there is a path forward that would expeditiously and efficiently address open issues and bring some closure to all parties, most importantly the Survivors.

The Expert firmly believes that this Chapter 11 Case is capable of reaching a resolution through a broadly consensual, confirmed plan of reorganization.  While there are some substantive hurdles to achieving this goal, their existence fails to explain why more progress has not been made.  The parties to this proceeding are competent, thoughtful, and should be able to achieve a consensual resolution.

Stated bluntly, this Chapter 11 Case is still pending because the parties, and primarily their attorneys, have allowed toxicity and interpersonal animus to cloud the negotiation process in a way that has been extremely detrimental to progress in the Chapter 11 Case.  Indeed, more than one Participant informed the Expert that this was the most adversarial proceeding they had ever experienced in their careers.  Further (or perhaps as a result), the Chapter 11 Case has proceeded in fits and starts and in a way that lacks purpose or vision.  For example, it is apparent that the

parties have spent significant time litigating issues that are not fundamental to reaching a consensual deal—the motivation for which is unclear to the Expert. While at least certain of this litigation may have been unavoidable, the Expert is concerned that these disputes were not addressed in parallel while progressing negotiations amongst the key parties.

One thing is certain—the Survivors deserve better. This is one of the primary reasons the next 90 days in the Chapter 11 Case are critical. Although some incremental progress has been made and negotiations have resumed following the Court's appointment of the Expert, the time to achieve a consensual plan is now. The Expert is keenly aware (as all parties should be aware) that every dollar spent on administrative costs in this case is a dollar not available to fund a trust to pay Abuse Claims for the benefit of Survivors (the "<u>Survivor Trust</u>") and every hour of delay pushes back the time when Survivors, other creditors, the Debtor, and Apostolates can move on from this incredibly challenging process. The recommendations in this Report are therefore focused on ensuring the parties optimize their chances of reaching consensus in a manner that minimizes administrative costs. The fact of the matter is that this Chapter 11 Case has proceeded for too long, to the detriment of the Survivors, the Debtor, and its other creditors. A solution must be crafted that establishes sufficient guardrails to promote the pursuit of a consensual resolution on an expedited basis.

There are three necessary goals that the parties must address to conclude this Chapter 11 Case:

- Negotiate a plan that incorporates a Survivor Trust that is funded with significant cash and other assets from the Archdiocese and the Apostolates that will be utilized to pay the claims of Survivors;

- Ensure that the Archdiocese and the Apostolates are left with sufficient funding and resources to reasonably continue their core operations following the effective date of such plan; and

- Incorporate non-monetary relief that include robust and effective safeguards intended to prevent any future sexual abuse from occurring in the Archdiocese.

The Report, and the recommendations provided at the end of the Report, are in furtherance of these three goals.

The Expert recognizes that this case is fundamentally about Survivors and providing them much deserved closure, finality and a source of recovery on account of the claims they hold against the Debtor and/or the Apostolates. Notably, while the Debtor and the Apostolates contest the validity and timeliness of at least certain Abuse Claims, the Expert's understanding is that Abuse Claims would not be litigated or contested in connection with a consensual deal.

## III.    KEY FACTUAL FINDINGS

### A.    Current Status of the Chapter 11 Case

The Debtor's chapter 11 petition was filed over four years ago, on May 1, 2020 (the "Petition Date").[17]    Formal mediation was first commenced over three years ago.[18] The Participants have advised the Expert that they have engaged in mediation and informal negotiations intermittently over the years.  Despite spending over four years in chapter 11, to date, no consensual deal has been reached between or among the key parties.[19]  Further, no plan had been filed by any party in the Chapter 11 Case until September 13, 2024, when the Debtor and the UCC both filed competing plans (as discussed in greater detail in Section IV.C.).

After reviewing the two plans filed by the Debtor and UCC, respectively, and speaking with various parties-in-interest, including representatives for the Debtor, Apostolates, and the UCC, it is clear the parties still have significant work to do to bridge material disputes before a consensual settlement is possible.  The Expert is heartened to see some progress was made in recent weeks, including the recommencement of formal mediation between the Debtor and the UCC.  However, negotiations must continue to proceed at a minimum between the Debtor, the UCC, the Apostolates, and counsel to Certain Abuse Survivors[20] (for ease of reference, referred to as the "Plan Parties") without delay if a consensual agreement is to be reached, let alone on a timeline that will minimize administrative expense.  This case will be solved at the negotiating table, not through the prosecution of competing chapter 11 plans or other ancillary litigation.

At this critical juncture of the Chapter 11 Case, there is an opportunity, perhaps the last opportunity, for the Plan Parties to work in earnest towards reaching a comprehensive resolution that gives the Survivors the finality and closure to this Chapter 11 Case that they deserve. The Expert hopes that the Plan Parties' representatives and advisors rise to the occasion for the benefit of their respective clients.

---

[17]  *See The Roman Catholic Church for the Archdiocese of New Orleans' Voluntary Petition for Non-Individuals Filing for Bankruptcy* [Docket No. 1].

[18]  *See Order Granting Joint Motion to Appoint Mediator* [Docket No. 1058] (dated September 15, 2021).

[19]  The Debtor and the Bond Trustee reached a court-approved settlement early on in the Chapter 11 Case regarding the treatment of the Unsecured Bonds.  *See Order (I) Approving the Amended Settlement Agreement, and (II) Granting Related Relief* [Docket No. 527] and the *Amended Settlement Agreement*, attached as Exhibit 1 thereto (the "Bond Settlement Agreement").  Based on conversations with advisors to the Debtor, the UCC and the Bond Trustee, given the passage of time and the current contemplated parameters of both filed chapter 11 plans there are still open issues that need to be resolved or litigated with respect to the Bond Trustee and its settlement in advance of plan confirmation.

[20]  The Debtor, the Apostolates, and the UCC have stated an interest in reaching consensus with counsel to Certain Abuse Survivors.  A number of Participants have taken the position that receiving the support of counsel to Certain Abuse Survivors may be necessary to achieve a confirmable plan.  Without opining on the foregoing, the Expert includes them here as a key party to negotiations.

B.      **Themes Underlying the Expert's Conclusions**

Fundamental to the Expert's analysis is an understanding of the factors that led the parties to where they are today. The Expert identified a handful of notable themes that arose repeatedly during the course of his investigation, which are described below.

1.      <u>Significant Adversity and Lack of Trust</u>

The level of adversity and the ensuing lack of trust that has developed between the key parties to the Chapter 11 Case, and notably, the legal representatives for such parties, cannot be understated. A pervasive focus of many of the Participants' comments in their Submissions and during interviews with the Expert and his advisors was the extensive adversarial history between certain of the Participants (notably, but not exclusively, between counsel for the Debtor and the Apostolates, on the one hand, and counsel for the UCC and Certain Abuse Survivors, on the other). The Expert observed this animosity firsthand during the Investigation Period, when the parties, particularly early on, often appeared more focused on shifting blame rather than moving the process forward.

The aforementioned animosity has, at times, entirely eclipsed what should be the parties' overarching goal—to conclude the Chapter 11 Case in a consensual, value-maximizing manner and for the benefit of Survivors and other stakeholders. There are a number of factors that have caused this excessively adversarial dynamic, and some are highlighted below:

- <u>Nature of the Abuse Claims / History with the Debtor</u>: A number of Survivors expressed (both directly to the Expert and through counsel) that they came to the Chapter 11 Case with a lack of trust in the Debtor as an institution due to the nature of the underlying Abuse Claims and Survivors' interactions with the Archdiocese and Archbishop Aymond prior to the bankruptcy. In addition, certain Survivors expressed the belief that the Debtor generally, and the Archbishop, specifically, have not indicated a willingness to take appropriate accountability for the underlying claims.

- <u>Prior Breach of Protective Orders / Press Coverage</u>: An attorney for Certain Abuse Survivors was found to have breached the Protective Order[s] and was subsequently subject to sanctions.[21] This breach, as well as the litigation surrounding this breach, was highly scrutinized by the media, and in general, the intensive press coverage surrounding the Chapter 11 Case has been used as leverage. The Debtor and the Apostolates expressed that they are hesitant fully to engage with counsel to Certain Abuse Survivors on a go-forward basis due to the concern that counsel will again improperly use information in violation of the Protective Orders or to litigate issues related to the Chapter 11 Case in the press. On their end, Survivors and

---

[21] *See Memorandum Opinion and Order* [Docket No. 1844], 29 ("Therefore, the Court imposes sanctions in the amount of $400,000.00, which is approximately 53% of $760,884.73, the total amount of attorneys' fees and costs that were incurred by professionals of the Debtor and the Committee in responding to the Motion to Compel and investigating the breach of the Protective Order.").

their counsel stated the belief that the Debtor and the Archbishop are primarily interested in protecting the Archdiocese and its public reputation rather than reaching an appropriate resolution.

- <u>Litigation Tactics</u>:  The Expert has also observed that aggressive litigation tactics have been disruptive to the forward progress of negotiations.  For example, the Chapter 11 Trustee Motion filed by counsel to Certain Abuse Survivors contained personal attacks against management of the Debtor that the Expert concludes were largely inaccurate (as addressed in greater detail below) and further eroded the relationship between the Debtor and counsel to the Survivors.[22]  Contentious litigation has hampered negotiation efforts, distracted the parties from their core mission of resolving the Chapter 11 Case, and has led to increased administrative costs borne by the estate.  Certain Survivors also expressed concern with the aggressive litigation tactics in the Chapter 11 Case.

## 2.   Issues Surrounding the Provision of Relevant Information

One significant factor contributing to the failure to progress the Chapter 11 Case is the perceived and/or actual lack of transparency, particularly with respect to the exchange of key diligence by the Debtor and Apostolates with other key parties.  Over the course of the Expert's investigation, several Participants noted that they believed they had incomplete information or that the Debtor and the Apostolates were not forthcoming in sharing all relevant information.  This complaint is particularly troublesome to the extent directed at the provision of fulsome information regarding the assets held by the Debtor and the Apostolates and related analysis regarding who controls such assets, whether such assets are "core" to the mission of the Debtor and/or the Apostolates, and which assets can be contributed and/or monetized to fund a plan.  Too often, it appears the approach has been to provide information only when directly asked, and with a view towards a litigation posture, as opposed to proactively sharing information in furtherance of plan negotiations.

Ultimately, it has been difficult for the Expert to ascertain how much of this concern is legitimate (*e.g.*, a failure by the Debtor and/or the Apostolates in timely sharing all relevant information), but the concern appears to have infected the process nonetheless and contributed to delayed progress in the Chapter 11 Case.  At the very least, information sharing seems to have occurred irregularly, with some requests requiring extensive follow-up.  This has only served to erode confidence in the Debtor's and Apostolates' stated commitments to transparency.

The Debtor owes an obligation of transparency by virtue of the fact that it sought relief under chapter 11 of the Bankruptcy Code, and the Apostolates, too, must fully engage in a transparent exchange of relevant information if they are seeking to contribute, and receive releases, through a consensual chapter 11 plan.  The Expert recognizes that the inherent distrust among case constituents and various issues with respect to adherence to the terms of the Court's Protective

---

[22] *See e.g.*, Chapter 11 Trustee Motion, ¶ 47 (allegations that Mr. Eagan has a reduced mental capacity and is cognitively impaired).

Orders may have inhibited the free-flow of relevant information and documents, but having parties in negotiations on an even informational playing field is essential to continued progress.

Conversely, the Expert observed at least a few scenarios where information had been shared by the Debtor and the Apostolates, but there appeared to have been limited follow-up or further engagement by the recipient. Parties seeking information from the Debtor and Apostolates should be engaging fully in the negotiation process. And to the extent there remain informational gaps, the Expert believes that it is essential that (i) those seeking additional information focus their requests and promptly bring those to the attention of the Debtor and the Apostolates, and (ii) all necessary information be provided as soon as possible, in a manner consistent with the terms of the Protective Orders.

More fulsome, proactive information sharing and engagement by and between the key parties pursuing settlement is not only possible, but it is critical to achieving a consensual resolution. During the Investigation Period, the Expert observed that the Debtor and UCC, and their respective financial advisors, were able to quickly provide additional information and analysis where it would further the discussion, and the Expert believes this kind of informal information sharing must occur promptly, directly, and efficiently between and among the Plan Parties.[23] Indeed, the Expert found the Debtor's and the UCC's respective financial advisors to be candid, thoughtful, and respectful of each other, and believes that the process could potentially be advanced if these financial advisors took the initiative and provided additional leadership in an effort to bridge the remaining informational gaps between the parties.

### 3.   Lack of Leadership

The parties to this case are represented by qualified and experienced counsel and financial advisors. As discussed below, the Expert found the Debtor's management, Lee Eagan, and Archbishop Aymond, to be cognitively capable of making the decisions necessary to lead and progress the Chapter 11 Case to conclusion. The Expert also found that the Survivors he spoke to were exceptionally engaged, well-informed, and motivated to reach a resolution in the Chapter 11 Case.

Nevertheless, this case suffers from a lack of leadership and vision. The expectation is that the Debtor's management, specifically Mr. Eagan, with the support of his advisors, would drive the chapter 11 process. Although competent, Mr. Eagan has not yet been able to provide the leadership necessary to guide the Chapter 11 Case to conclusion. It is also important to note that Mr. Eagan is not a restructuring professional and may not be fully aware of all of the chapter 11 tools available to push parties to a deal, but the expectation is that his counsel and advisors should provide him with the necessary guidance. Whether unwilling or unable, the Expert suspects this lack of leadership is largely a result of the atmosphere of distrust amongst the parties, which has been in many ways incited by the attorneys involved in the Chapter 11 Case. This lack of leadership also presented an opportunity for the UCC and its counsel to step up and take more control over the Chapter 11 Case. The Expert acknowledges that the UCC was reconstituted and this reconstitution would have resulted in significant disruption and may have impacted their

---

[23]   The Expert notes that, as with other aspects of the discussions among the parties, the parties seem to have remedied at least certain gaps in the exchange of information since the Court issued its Expert Order.

ability to negotiate effectively.  However, this reconstitution occurred almost two years ago.[24]  And yet, the UCC has similarly been unable to successfully lead this case to conclusion.

At bottom, counsel to the key parties have overwhelmingly defaulted to a reactive approach rather than proactively prosecuting the Chapter 11 Case.  While the Expert recognizes that challenges arose over the course of the Chapter 11 Case, he is not convinced that they were insurmountable and opportunities for creative problem-solving were overlooked.  For example, Participants often cited lack of information, ancillary litigation, and mediator availability, among other points, as reasons for the lack of progress.  It is not clear why those issues, which are often encountered and overcome in other complicated chapter 11 cases, effectively stalled progress here.

Indeed, it is striking that a plan was not filed in this case for four years, and only after the Expert Order was entered.  And it is further concerning that the two competing plans that were filed plainly represent the beginning of a negotiation, and not the end.  The Expert has a significant concern that, absent appropriate incentives and external pressure, the Participants (specifically the Plan Parties) will default to the same reactive approach that has persisted in this case for the past four years and the case will fail to progress.

###    4.    External Factors and Litigation that Have Contributed to Delayed Progress

Beyond the issues between and among the parties, certain external factors have been cited by Participants as having negatively impacted the ability to progress the Chapter 11 Case.

Participants often referenced the change in the prescription period for certain Abuse Claims and the related uncertainty while the constitutionality of that change was challenged as a complicating factor in the Chapter 11 Case, and one that delayed progress.  Prescription has been the Debtor's primary defense to the assertion of Abuse Claims, *i.e.*, the Debtor has asserted that certain of the Abuse Claims asserted against it are time-barred.[25]

However, in 2021 and 2022, amendments to La. R.S. 9:2800.9 were passed by the Louisiana state legislature, which ultimately had the effect of "reviving" previously prescribed claims.  As a result, victims of childhood sexual abuse that were previously time-barred from bringing suit are now permitted to bring suit against responsible parties to June 14, 2027 (the "Revival Window").[26]   In March 2024, the Louisiana Supreme Court ruled that the amendments were unconstitutional as they violated the due process protections of the Louisiana Constitution,[27] but later granted a rehearing and, in June 2024, vacated its prior decision, upholding

---

[24]  *See Notice of Appointment of Reconstituted Official Committee of Unsecured Creditors* [Docket No. 2081] (filed on February 13, 2023).

[25]  *See Disclosure Statement, Dated as of September 13, 2024, for the Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans, Dated as of September 13, 2024* [Docket No. 3385] (the "Disclosure Statement"), § 4.19(c).

[26]  *See* 2021 La. Sess. Law Serv. Act 322 (H.B. 492) (WEST); 2022 La. Sess. Law Serv. Act 386 (H.B. 402) (WEST); *see also* 2024 La. Sess. Law Serv. Act 481 (S.B. 246) (WEST).

[27]  *Bienvenu v. Defendant 1*, 382 So. 3d 38 (La. 2024).

the relevant amendments.[28]   The Debtor has taken the position that the Revival Window is inapplicable to the Abuse Claims filed in the Chapter 11 Case, but acknowledges that the UCC and counsel to Survivors "may disagree."[29]

The overhang of uncertainty surrounding the changes to the prescription period following the Bar Date impacted the Plan Parties' perception of their ability to negotiate key issues in the Chapter 11 Case, particularly in understanding the number of viable Abuse Claims and valuing those claims.[30]  Nevertheless, uncertainty is inherent in many chapter 11 cases, and parties may be successful in utilizing uncertainty to progress negotiations.  The Expert believes that the Plan Parties failed to fully and creatively take initiative during this period of uncertainty, instead choosing to take a "wait-and-see" approach.

In addition, certain Participants suggested that the uncertainty surrounding the scope of non-consensual third-party releases pending the decision by the U.S. Supreme Court in *Harrington v. Purdue Pharma L. P.*, 144 S. Ct. 2071 (2024) hampered the ability to propose a plan or make material progress toward a workable plan construct.  Although there is no doubt that those in the restructuring space were eager to see how the U.S. Supreme Court would weigh in on the issue, applicable Fifth Circuit precedent[31] already provided guidance on the subject.  While the U.S. Supreme Court could have overturned existing Fifth Circuit precedent, settlement negotiations could have progressed against the backdrop of this uncertainty, and with Plan Parties exploring creative solutions to anticipate different outcomes.  Indeed, other chapter 11 cases were able to progress and debtors were able to propose and confirm bankruptcy plans even while the issue of non-consensual third-party releases was weaving its way through the appeal process.[32]

Finally, as discussed above, the Participants' focus was distracted with costly and time-consuming litigation not directly relevant to the overarching goal of achieving a confirmable plan.  Certain notable proceedings are highlighted below:[33]

---

[28]   *See Bienvenu v. Defendant 1*, 386 So. 3d 280 (La. 2024) (finding provision reviving cause of action for sexual abuse of a minor had a substantial relationship to Louisiana's legitimate interests in public safety, morals, and welfare).

[29]   *See* Disclosure Statement, § 4.19(d).

[30]   The Expert notes that a Bar Date was established in the Chapter 11 Case (*see* Docket No. 461), albeit prior to the resolution of this constitutional challenge. Although the Bar Date Notice instructs recipients that they "should file a Sexual Abuse Survivor Proof of Claim regardless of whether [he or she] . . . [b]elieve[s] the applicable statute of limitations may have run on [her or his] Sexual Abuse Claim . . . " (*see* Docket No. 461, Ex. E at 3), the Court does not appear to have ruled on the enforceability of the Bar Date given the overlay of the change in the prescription period and related constitutional challenge, and the Expert notes that an influx of claims were submitted in the case even after the otherwise applicable Bar Date.

[31]   *See Bank of N.Y. Tr. Co. v. 9 Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009).

[32]   *See, e.g.*, *In re Diocese of Camden* Case No. 20-21257 (Bankr. D.N.J.) [Docket No. 3684]; *see also* Corky Siemazsko, *Catholic Diocese Agrees to Pay $100 Million Settlement to Hundreds of Abuse Victims*, NBC NEWS (July 28, 2023, 3:53 PM), https://www.nbcnews.com/news/us-news/catholic-diocese-agrees-pay-100-million-settlement-hundreds-abuse-vict-rcna96904.

[33]   The Debtor's Disclosure Statement contains a description of litigation proceedings during the Chapter 11 Case. *See* Disclosure Statement, § 6.

- The UCC filed a Motion to Dismiss on July 3, 2020 [Docket No. 203]. Following extensive discovery and a court hearing, on August 4, 2021, the Court denied the Motion.

- There was significant litigation surrounding an attorney to Certain Abuse Survivors' breach of the Protective Order in the Chapter 11 Case.[34] In addition to being subject to significant media coverage, this litigation ultimately led to the reconstitution of the UCC and sanctions being ordered against the counsel by the Court (which ruling is now currently under appeal to the Fifth Circuit).[35]

- The Archdiocese is reportedly under criminal investigation by the state of Louisiana relating to the allegations of clerical sexual abuse. In April 2024, the Louisiana State Police executed a search warrant on the Debtor related to the criminal investigation.[36]

- The Bond Trustee was removed from the UCC in June 2020 by the United States Trustee after it entered into a settlement with the Debtor regarding the Bonds (described further below).[37] The Bond Trustee filed a motion for relief seeking either appointment of an additional commercial creditors' committee or reinstatement on the UCC.[38] The Bankruptcy Court ordered the United States Trustee to appoint a second committee in the Chapter 11 Case, charged with representing the Debtor's commercial creditors.[39] The Bond Trustee initially was not appointed to the Commercial Committee by the United States Trustee, but now is a non-voting constituent.[40]

- In April 2022, the UCC initiated an adversary proceeding against the Debtor and certain other entities regarding the ownership of assets associated with

---

[34] *See* Sanctions Opinion [Docket No. 1844] and subsequent appeals by various parties as described in Section 6.04 of the Disclosure Statement.

[35] *In the Matter of the Roman Catholic Church of the Archdiocese of New Orleans*, Case No. 23-30466 (5th Cir. 2023).

[36] Jim Mustian, *Expanding Clergy Sexual Abuse Probe Targets New Orleans Catholic Church Leaders*, AP (May 1, 2024, 2:23 p.m. EDT), https://apnews.com/article/catholic-church-sexual-abuse-investigation-orleans-16996720f5a1c04625167cfbb3c02c56.

[37] *See* Section IV.D.4.ii., *infra*.

[38] *See TMI Trust Company's Motion for Order (I) Requiring the United States Trustee to Appoint a Separate Committee of Unsecured Creditors and/or (II) Reinstating the TMI Trust Company as a Member of and Reconstituting the Official Committee of Unsecured Creditors* [Docket No. 521].

[39] *See Order Directing United States Trustee to Appoint Additional Committee of Commercial Unsecured Creditors* [Docket No. 746].

[40] *See Application for Entry of an Order Authorizing the Retention and Employment of Dundon Advisers LLC, as Financial Advisor to the Official Committee of Unsecured Commercial Creditors Effective as of April 14, 2021* [Docket No. 854], ¶ 5, n.2 (detailing the Bond Trustee's (then TMI Trust Company) appointment to the Commercial Committee in an *ex officio* capacity on April 7, 2021).

Portfolio A and Portfolio B.[41] The Debtor filed a motion to dismiss the adversary proceeding, arguing that (a) the claims asserted were property of the bankruptcy estate and (b) the adversary proceeding violated a tolling agreement between the Debtor and UCC.[42] The Bankruptcy Court granted the Debtor's motion to dismiss, without prejudice.[43]

## C.  Substantive Areas of Agreement

Despite the acrimonious nature of the Chapter 11 Case and the hurdles detailed above, there are significant areas of substantive agreement amongst the parties that should be leveraged in pursuing a negotiated resolution.

*First*, the Debtor, the Apostolates, and the UCC largely agree that the settlement discussions should focus on the "ability to pay" as well as non-monetary commitments. In the first instance, the "ability to pay" analysis should involve negotiations surrounding (i) the identification of the available assets and the value of such assets available for contribution to the Survivor Trust, and (ii) the identification and valuation of what assets are required to ensure the Debtor and the Apostolates remain viable following the effective date of a plan. In addition, the Plan Parties agree that non-monetary relief, which can be achieved only in the context of a consensual chapter 11 plan, must be negotiated. Survivors expressed to the Expert that they were not seeking to dismantle the Debtor or render it incapable of operating and fulfilling its core mission, but rather, wanted to receive some measure of finality and closure regarding their Abuse Claims and to ensure that appropriate safeguards were in place to prevent future abuse within the Archdiocese.

*Second*, the Plan Parties recognize that any consensual chapter 11 plan that includes both the Debtor and the Apostolates must be structured in a way that promotes finality, by way of appropriate court-ordered protections from the Abuse Claims. The Debtor and the Apostolates agree and understand that the contribution provided to resolve the Abuse Claims in a chapter 11 plan must be significant enough to ensure widespread support from the Survivors.

*Third*, the Participants largely agreed that (i) the Chapter 11 Case has languished for far too long, (ii) the Chapter 11 Case should proceed promptly to a resolution, and (iii) reaching and confirming a consensual chapter 11 plan supported by the key parties is a preferable outcome to dismissal.[44]

*Fourth*, the Participants recognized the importance of increased transparency and collaboration among the parties. As described in Section III.B.2., *supra*, the meetings the Expert had with advisors to the Debtor and the UCC have served as a catalyst for increased information sharing. The Expert is hopeful this engagement will both resolve outstanding information

---

[41] *See Complaint for Declaratory Relief*, Adv. Proc. No. 22-01015 [Adv. Proc. Docket No. 1].

[42] *See Motion to Dismiss First Amended Complaint for Declaratory Relief* [Adv. Proc. Docket No. 80].

[43] *See Order* [Adv. Proc. Docket No. 96].

[44] Counsel to one creditor expressed a somewhat indifferent attitude to the dismissal of the Chapter 11 Case, noting that they could exercise remedies outside of the chapter 11 process. The Expert believes that this position is not in the best interest of any of the parties.

deficiencies (the resolution of which is necessary to progress the Chapter 11 Case) and foster increased trust and collaboration among the Participants.

*Finally*, the Participants expressed an interest in proceeding with consensual negotiations and the belief that a global settlement was achievable.

## IV.    THE EXPERT ISSUES: ANALYSIS AND CONCLUSIONS

The Expert now turns to his conclusions regarding each of the four questions posed by the Court.  The Expert Issues are addressed in the following order: (i) the structure, functioning, and capabilities of Debtor's management; (ii) the administrative costs incurred and an assessment of ongoing resources required to bring the Chapter 11 Case to conclusion; (iii) the existence and status of plan structures and available alternatives; and (iv) the Debtor's current tort liability, financial wherewithal, available of insurance and other contributions, and non-monetary remedies.

### A.    Competency of the Debtor's Management

The Debtor advised that the day-to-day case management of the Chapter 11 Case is primarily handled by Mr. Lee Eagan.  Mr. Eagan is retired, and previously ran a New Orleans-based regional industrial supply and machine tool distributor.  He has historically volunteered at the Archdiocese, serving roles on the Finance Council and its various subcommittees, and is a current member of the Finance Council.[45]  The Debtor also advised that higher level decision-making primarily lies with Archbishop Aymond, including decision-making surrounding the terms of any settlement or consensual plan (and such issues may require further committee or clerical approvals).  Archbishop Aymond is the current Archbishop and President of the Archdiocese.  He became the Archbishop in 2009, but has been involved in various capacities with the Archdiocese of New Orleans beginning in 1975, when he was initially ordained as a priest in New Orleans.[46]

The Expert and his advisors met with Mr. Eagan in person on September 9, 2024 and, following this initial meeting, via video conference at least four additional times during the Investigation Period.  The Expert and his advisors also met with Archbishop Aymond in person on September 9, 2024.

The Expert found no evidence that Mr. Eagan lacks the mental capacity or cognitive ability necessary to manage the Chapter 11 Case.  The Expert further concludes that the statements made in the Chapter 11 Trustee Motion are not reflective of his capabilities.[47]  Both Mr. Eagan and Archbishop Aymond are well apprised of the Chapter 11 Case and appear appropriately positioned and able to make the decisions necessary to reach a resolution.

However, the Expert has concerns that, until recently, Mr. Eagan had not exercised, and his counsel had not appropriately guided him in exercising, the leadership necessary to progress this case to conclusion.  Mr. Eagan is not a bankruptcy professional and arrived at his role in the Chapter 11 Case without any relevant experience.  Although it is not uncommon for a debtor-in-

---

[45]  Disclosure Statement, §§ 4.13–14.

[46]  Disclosure Statement, § 4.12.

[47]  *See* Chapter 11 Trustee Motion, ¶¶ 47–50, 94.

possession to be managed by an individual who lacks chapter 11 experience, those individuals charged with managing a complex chapter 11 case must be supported and guided in their efforts by their advisors, who do have such experience. As such, Mr. Eagan has the tools and capabilities to drive this case to conclusion, he (and his advisors) just need to utilize them. In addition, while Mr. Eagan's primary goal should be overseeing this case to a successful conclusion, Mr. Eagan must familiarize himself at a basic level with appropriate practices for managing fees and costs in a chapter 11. Going forward, Mr. Eagan should exercise appropriate oversight over his advisors and their professional costs, and the Expert believes he is competent to do so.

### B. Administrative Costs and Resources Required to Conclude the Chapter 11 Case

There is no doubt that the administrative costs of the Chapter 11 Case are significant, particularly in light of the Plan Parties' lack of progress towards a consensual resolution. Based on a review of publicly available information by the Expert's advisors, nearly 84,000 hours of professional time has been spent on these cases through June 30, 2024, excluding ordinary course and other professionals that do not file fee statements. This reflects a staggering amount of professional time spent in this Chapter 11 Case, with limited progress. Of course, administrative costs are driven, in large part, by the sheer amount of time that the Debtor has remained in chapter 11.

For reference, it is helpful to compare this case with other Archdiocese cases that have filed for chapter 11 protection. Out of the 40 U.S. Catholic organizations that have filed for bankruptcy, only three have remained in bankruptcy for as long as the Debtor.[48]

While the Participants had differing views as to what has contributed to the high administrative costs and whether such costs were appropriately incurred, all Participants recognized that the administrative costs in the Chapter 11 Case were too high and efforts should be made to manage costs going forward. Indeed, the Expert was troubled to hear one Survivor state that the case was being "run" by, and for the benefit of, attorneys. Regardless of the truth of this statement, the mere perception is disconcerting.

The Expert was not appointed as a fee examiner and has not undertaken a line-by-line analysis of the fees incurred historically in this case. However, he came away with the impression that significant time and effort in the case had been spent on ancillary litigation matters or unsuccessful mediation efforts that did not meaningfully move the case forward. The Expert's recommendation, described in further detail in Section V.C., *infra*, is specifically targeted at managing administrative fees and incentivizing the parties to promptly reach a resolution of the Chapter 11 Case. Excessive administrative costs ultimately serves to reduce the pool of assets

---

[48] Those three cases are: (1) the Archdiocese of Milwaukee, which filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on January 4, 2011, and confirmed its plan of reorganization on November 13, 2015. *In re Archdiocese of Milwaukee*, Case No. 11-20059 (Bankr. E. D. Wis. 2011); (2) the Diocese of Rochester, which filed a filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on September 12, 2019 and the case is still pending. *In re Diocese of Rochester*, Case No. 19-20905 (Bankr. W. D. N. Y. 2019); and (3) the Diocese of Buffalo, which filed a voluntary petition for relief under chapter 11 on February 28, 2020 and the case is still pending. *In re Diocese of Buffalo, NY*, Case No. 20-10322 (Bankr. W. D. N. Y. 2020).

available for the satisfaction of the Debtor's claims, including, most importantly, the funds available to fund a Survivor Trust.

## C.      Existence and Status of Current Plan Structures

On September 13, 2024, the Debtor filed a proposed plan of reorganization that was supported by the Apostolates (the "Debtor Plan").[49]  On the same day, the UCC filed a competing plan of reorganization that the Expert understands was also supported by the counsel to Certain Abuse Survivors[50] (the "UCC Plan"[51] and together with the Debtor Plan, the "Competing Plans").

The Competing Plans, as currently drafted, are likely incapable of being confirmed. Pursuing confirmation of either plan without a broader settlement is ill-advised and would lead to significant litigation and delay.  The Debtor Plan lacks the support of the UCC and counsel to Certain Abuse Survivors.[52]  The UCC Plan conversely lacks the support of the Debtor and the Apostolates.[53]  While the UCC Plan contains toggle mechanisms to address the scenario where no deal is reached,[54] confirming a Plan that lacks Debtor support, even if possible, would likely require litigation with the Apostolates surrounding what assets are estate assets,[55] significantly complicate issues of shared insurance, and fail to provide Survivors with certain remedies, including non-monetary remedies, that the Expert understands are viewed as critically important.[56] The Expert is skeptical as to whether any chapter 11 plan that does not include a consensual deal that is supported by the Plan Parties, at a minimum, should be prosecuted to confirmation, as such a plan may be unable to achieve the goals articulated in Section II, *supra*.

---

[49]   *See Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans Dated as of September 13, 2024* [Docket No. 3384].

[50]   *See* Stephanie Riegel, *The big question arrives in New Orleans Catholic church bankruptcy: How much to pay survivors?* Times-Picayune (Sept. 17, 2024) https://www.nola.com/news/business/the-big-question-arrives-in-new-orleans-catholic-church-bankruptcy-how-much-to-pay-survivors/article_28cb36ca-747d-11ef-884b-4362f5dea084.html ("Attorney Soren Gisleson, whose firm represents about one third of the abuse survivors, has said his clients fully support the committee plan, even though 'no amount of money can compensate them for what the archdiocese did.'").

[51]   *See Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors* [Docket No. 3382].

[52]   It is worth noting a similar result in *In re The Roman Catholic Diocese of Rockville Centre, New York*, Case No. 20-12345 (Bankr. S.D.N.Y. 2020) ("Rockville Centre"), where the debtor proposed a plan and a supermajority of voting survivors voted to reject the plan.  *See id.* [Docket No. 3057].  In addition, every Archdiocese case that the Expert is aware of that resulted in a confirmed plan (i) had the support of the official committee of abuse claimants and (ii) did not seek to cramdown the class of abuse survivors.

[53]   Similarly, the Expert is unaware of any Archdiocese case where a plan has been confirmed over the objection of the debtor.  The Expert also does not have a view as to whether this would raise any constitutional issues, but notes that he expects such a path could be subject to litigation.

[54]   *See* UCC Plan, § 3.3–3.7.

[55]   *See* UCC Plan, §§ 3.6, 13.3.

[56]   The Expert understands that the Apostolates and the Debtor both assert rights to certain of the insurance policies providing coverage for the Abuse Claims, which could give rise to litigation and significantly complicate any plan which does not provide for a resolution for claims against the Apostolates.

The Rockville Centre case illustrates how pursuing a chapter 11 plan without the requisite support of necessary stakeholders can result in significant litigation, delay, and cost to the estate. In January 2023, the Rockville UCC and Rockville Debtor filed competing chapter 11 plans.[57] The Rockville Debtor had incurred upwards of $106 million in professional fees as of April 2024, which included litigation surrounding the dueling plans.[58]   Notably, after the failure of the Rockville Debtor's chapter 11 plan in April 2024, counsel to the Rockville UCC noted that the "unilateral solicitation of [the P]lan without Committee support was a fool's errand," which led to "great expense of time, as well as tens of millions of dollars, an unnecessary waste of resource that could have gone to compensate Survivors."[59]

The Expert has met with the Plan Parties and their advisors following the filing of the Competing Plans to encourage consensus and negotiations aimed at filing a single, consensual chapter 11 plan.[60]   The Debtor, the Apostolates, the UCC, and other parties in interest have also participated in formal mediation with both Judge Zive and Mr. Perry[61] and the Expert understands there is an upcoming mediation session scheduled for November 5, 2024 with Judge Zive.   The Expert further understands that some progress has been made towards reaching agreement on the overall settlement contribution in the negotiation and/or mediation sessions held since the Competing Plans were filed.

### D.   The Ability to Reorganize: Analysis of the Debtor's Liability, Financial Wherewithal, Available Assets, and Non-Monetary Remedies

The Debtor's ability to emerge from chapter 11 with finality depends on the parties' ability to reach a broadly consensual plan that includes funding for a Survivor Trust, sufficient safeguards to ensure the Debtor's and the Apostolates' viability, appropriate treatment of the Debtor's liabilities and appropriate non-monetary remedies.   The Expert believes that the gaps between the Plan Parties on the terms of a consensual plan can be bridged.   A  discussion of key areas of dispute that require resolution are noted below.

### 1.   Trust Asset Contribution from Debtor and Apostolates

The Plan Parties must reach agreement regarding the settlement contribution to be made by the Debtor and Apostolates in order to fund a Survivor Trust.   This contribution should include, among other things, cash and real estate assets that can be monetized (likely through

---

[57]   *See Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors* [Docket No. 1574] and *Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Rockville Centre, New York* [Docket No. 1614].

[58]   *See* Motion to Dismiss, ¶11.

[59]   *See Survivors Overwhelmingly Reject the Roman Catholic Diocese of Rockville Centre's Plan of Reorganization* (Apr. 12, 2024), Pachulski, Stang, Ziehl & Jones,  https://www.pszjlaw.com/newsroom-news-Survivors-Reject-Roman-Catholic-Diocese-Rockville-Centre-Plan-Of-Reorganization.html.

[60]   *See* <u>Exhibit B</u> for a timeline of meetings between the Expert, the Debtor, and the UCC, as well as their respective advisors following the filing of the Competing Plans.

[61]   *See The Official Committee of Unsecured Creditors' Comment on Debtor's Motion to Extend Appointment of Mediators* [Docket No. 3412] (the "<u>UCC Mediation Comment</u>"), ¶ 1 ("The Committee has participated actively in the mediation process and communicated with both mediators within the last two weeks.").

third party sales and pursuant to an agreed-upon process) for the benefit of holders of Abuse Claims. Insurance assets, including rights, interests, and proceeds arising from insurance policies, are also subject to contribution to a Survivor Trust and discussed in more detail in this section.

Not only do the Competing Plans disagree as to the amount and sources of the cash contribution, but they also disagree on what real estate assets should be available for contribution. As described above, the Plan Parties are negotiating under the assumption that this is an "ability to pay" case. In order to bridge the gap on contribution, negotiations should center upon two key points: (1) what assets are available for potential contribution to a plan and (2) what assets must be left behind to ensure the feasibility of the Debtor and the Apostolates on a go-forward basis.

At the outset of his appointment, it was clear to the Expert that the Debtor and the Apostolates had not shared sufficient information with the other Plan Parties regarding the two key points listed above and that all of the Plan Parties had failed to engage in sufficient negotiations to narrow the gap. The Expert and his advisors have attended numerous calls with financial advisors to the Debtor and the UCC and the Expert believes that progress has been made. However, further information sharing and negotiation is critical in order to reach a resolution.

The Debtor Plan contemplates an initial cash contribution of $50 million from the Debtor and $12.5 million from the Apostolates.[62] In addition, the Debtor Plan provides that the Debtor must contribute net sale proceeds from certain real estate from both the Debtor and the Apostolates, and anticipates the real estate would be sold within one year of the effective date of the Plan or else transferred to a Survivor Trust.[63] While the Debtor filed a list of real property held by the Debtor and Apostolates as exhibits to the Debtor Plan, it did not describe with particularity the "Contributed Real Property" that would be transferred to a Survivor Trust.[64]

The UCC Plan contemplates an initial cash contribution of $84 million from the Debtor and $133 million from the Apostolates.[65] The UCC Plan also contemplates a sale of certain real property held by the Debtor and the Apostolates (listed on Exhibit K and N to the Plan, respectively), with the real property to have been listed for sale within sixty (60) calendar days of the effective date of the Plan.[66] In addition, the UCC Plan identifies certain personal property for sale (Exhibit L attached thereto) and contemplates an "Archdiocese Bequest" that would require the Debtor to transfer a percentage of all future bequests valued at over $250,000.00 to a Survivor Trust.[67]

---

[62] *See* Debtor Plan, § 5.2.

[63] *Id.*

[64] *Id.*

[65] *See* UCC Plan, § 9.2.

[66] *See id.*, §§ 3.1, 12.2. The UCC identified 86 Debtor properties and 60 Apostolate properties that it believed should be monetized for the benefit of claimants.

[67] *See id.*, § 9.2.6.

i.    Analysis of Available Cash Assets

As of the filing of this Report, the Debtor and the UCC appear to be making meaningful progress on the requisite Debtor cash funding for a Survivor Trust. The main sources of cash from the Debtor appear to be cash and investments on hand (including from the proceeds of certain real estate sales). Further negotiations may be required regarding (i) what assets are restricted and (ii) how to calculate/treat any "deficit" in Portfolio B (*i.e.*, the "Deposit and Loan Fund Program").[68] The UCC has also requested that the Debtor transfer a percentage of all future bequests over a certain dollar amount. The Expert understands this is a unique request and not typical to Archdiocese cases, but does not take a position as to whether the facts of this Chapter 11 Case warrant such a contribution.

Negotiations over the cash contribution from the Apostolates are more complex. As described above, the Apostolates are a group of over 150 separate entities with different levels of (i) financial resources, (ii) interconnectivity with the Debtor, and (iii) direct exposure on account of Abuse Claims. The Apostolates include both the Archdiocesan Parishes and Archdiocesan Agencies (as those terms are defined in the Debtor Plan).[69]

With respect to the Archdiocesan Parishes' ability to contribute, on an aggregate basis, there are a few areas of dispute, with the largest and most critical appearing to be whether and to what extent the Archdiocesan Parishes need to reserve for certain maintenance and natural disaster expenses. Discussions over these reserves appear to have been contentious, with material resources expended. But they at least appear to have been fairly comprehensive.

With respect to the Archdiocesan Agencies' ability to contribute, there has been limited progress to date, including with respect to those with direct Abuse Claims. Information sharing and negotiating, including with the Archdiocesan Agencies directly, should progress rapidly. The Debtor and the Apostolates have noted that certain Archdiocesan Agencies are not subject to Abuse Claims; however, to the extent that those Agencies are seeking relief in connection with the Chapter 11 Case, it is reasonable to expect that a contribution would be provided or calculated in connection with the such Archdiocesan Agency. Moreover, some Archdiocesan Agencies without exposure to Abuse Claims may have exposure to liability from litigation concerning ownership of certain assets (*i.e.*, whether the Debtor or the Agency owns the disputed asset), their historical relationship and transactions with the Debtor, and/or other issues that could be resolved consensually as part of a global settlement.

Further complicating these discussions is the unique internal control structures within certain of these individual Parishes and Agencies. The Debtor has represented that while Archbishop Aymond has varying degrees of influence over these entities, there are certain bureaucracies that may make decision-making difficult. In addition, at least one Agency, Second Harvest, has retained its own counsel separate from the Apostolates in connection with the Chapter

---

[68]  *See Disclosure Statement, Dated as of September 13, 2024, for the Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans, Dated as of September 13, 2024* [Docket No. 3385] (the "Disclosure Statement"), § 5.05.

[69]  *See Verified Statement of the Apostolates Under Bankruptcy Rule 2019* [Docket No. 40].

11 Case and is separately negotiating its involvement in any potential plan.[70]  Complications aside, negotiations surrounding the Apostolates' filling of the "pot" to fund a contribution can be approached in a number of ways and through different sources and the Plan Parties should think creatively about how to reach an appropriate funding amount.

ii.    Analysis of Available Real Estate and Personal Property

In addition, as reflected in the Competing Plans, the Debtor and the UCC disagree on the availability of Debtor and Apostolate properties to be contributed and the appropriate process for monetizing such assets.  The Expert understands that the properties available range from vacant land and residential properties to properties more closely affiliated with the "core mission" of the Archdiocese.

In recent weeks, the Debtor prepared and shared with the UCC clarifying information regarding Debtor and Apostolate real property.  This will hopefully enable the Debtor and the UCC to have a property-by-property negotiation concerning what should be contributed for the benefit of Survivors in order to achieve a global resolution.  The Expert believes that contributions of non-core real property will be critical to resolving these cases, and further notes that the disposition of unnecessary real estate may potentially enhance the Debtor's and the Apostolate's long term sustainability by reducing costs associated with maintenance and insurance.

While the parties appear poised for progress on the real estate contribution,[71] an important potential exception concerns "Christopher Homes," an Archdiocesan Agency that has real estate the UCC has included in its plan[72] and which has been the subject of significant discussion and scrutiny.[73]  In particular, the Plan Parties disagree on the potential value of the underlying real estate, the ability to liquidate the real estate (given that the underlying property relates to affordable housing programs), and the Debtor's and the Apostolates' actions (or alleged inaction) in pursuing inbound expressions of interest and pursuing related diligence in connection with a potential sale

---

[70]  *See Order Granting Motion to Substitute Baker, Donelson, Bearman, Caldwell, & Berkowitz, P.C. as Counsel of Record for Second Harvest Food Bank of Greater New Orleans and Acadiana. Heller Draper & Horn, L.L.C. terminated as Attorney* [Docket No. 2398].

[71]  There are some unique obstacles to overcome with respect the Bond Trustee's positions concerning the disposition of real estate, which are discussed in greater in Section IV.D.4.ii. of the Report.

[72]  Christopher Homes refers to "21 apartment complexes for the elderly and those with physical disabilities in nearly 2,500 apartment units located in the New Orleans metropolitan area."  Disclosure Statement, § 4.10.

[73]  Christopher Homes is also listed as one of the defendants in the litigation brought by the Official Committee of Unsecured Creditors against the Debtor, for a determination by the Court that it constitutes property of the Debtor's estate. *See Complaint For Declaratory Relief by Official Committee of Unsecured Creditors against Roman Catholic Church for the Archdiocese of New Orleans, Philmat Inc., Second Harvest Food Bank, Propagation of Faith, Catholic Community Foundation, Christopher Homes, Inc., Catholic Charities Archdiocese of New Orleans, Notre Dame Seminary, Archdiocese Cemeteries Office, School Food and Nutrition Services of NO, Inc., St. Ann School, Immaculate Conception School, St. Peter School, Holy Name of Jesus School, St. Elizabeth Ann Seton School, Our Lady of the Lake School, St. Celtus School, Notre Dame Health System, Mary Queen of Vietnam Parish, Our Lady of the Lake Parish, St. Maria Goretti Parish, St. Edward the Confessor Parish, Our Lady of Lourdes Parish, Our Lady of Perpetual Help Parish, St. Raymond & St. Leo the Great Parish, Our Lady of Prompt Succor Parish, St. Patrick Parish, St. Ann Parish, St. Paul the Apostle Parish* [Docket No. 1448].

23

of the property.  The Expert understands that the Archdiocesan Agency has reengaged with prospective bidders and that discussions are ongoing, but progress is slow at best.

Given the history of mistrust among the parties, it could prove very productive if the Debtor and the UCC agreed to develop a jointly-controlled process to evaluate alternatives for Christopher Homes and any other real estate that is potentially available for contribution as part of a global resolution.

The Debtor Plan does not reference any contribution of personal property.  The UCC Plan identifies certain personal property that would be monetized with proceeds contributed to the Survivor Trust.  The Expert understands that discussions surrounding this contribution are ongoing.

### 2. Scope of Releases for the Plan and Structure of "Channeling Injunction"

The Debtor requires certainty and finality in connection with the conclusion of this Chapter 11 Case and will seek to confirm a chapter 11 plan that provides it with the appropriate scope of protections available under applicable law to ensure a full and widespread resolution of the Abuse Claims and other liabilities.  In addition, any chapter 11 plan that includes an Apostolate settlement should provide sufficient protections to incentivize the Apostolates to make a significant contribution (*i.e.*, absent certainty that the chapter 11 plan will provide for significant resolution of outstanding claims, the Apostolates may be unlikely to contribute meaningfully).  Ensuring the Apostolates participate in a plan is particularly important to Survivors given the significant assets the Apostolates may have available to contribute to a plan and the costs of litigation that could arise in connection with a "Debtor-only" plan due to the issues of shared insurance and potential disputes, among other things, over what constitutes estate property.

The Plan Parties must agree upon the structure and scope of the releases granted to the Apostolates in exchange for a chapter 11 plan contribution.  Under the U.S. Supreme Court's ruling in *Purdue*, a plan cannot provide for the discharge of claims against a nondebtor absent the consent of the affected creditors.[74]  Accordingly, any releases for the benefit of the Apostolates must be given by claimants "consensually."  The Supreme Court explicitly did not opine on what constitutes consent.[75]  Lower courts are split as to what constitutes "consent"; some hold that allowing creditors the opportunity to "opt-out" from third-party releases in plans is sufficient to constitute consent, while others have held that creditors must affirmatively "opt-in" to releases to ensure that they are truly consensual.[76]  Bankruptcy courts in the Fifth Circuit have been split on

---

[74] *See Harrington v. Purdue Pharma L. P.*, 144 S. Ct. 2071 (2024).

[75] *Id.* at 2088. ("Nor do we have occasion today to express a view on what qualifies as a consensual release or pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor…only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants").

[76] *Compare In re LMCHH PCP LLC*, 2017 WL 4498162 (Bankr. E.D. Louisiana 2017) (holding that opt-out releases were appropriate and reasonable in the context of the various compromises and settlements in the case) *with In re Rite Aid Corp.*, Case No. 23-18993 (MBK) (Bankr. D.N.J.) (the Court confirmed the plan after the opt-out release of non-debtors was changed to an opt-in release) with *In re 2u Inc.*, Case No. 24-11279 (MEW) (Bankr. S.D.N.Y.) (the Court directed the debtors to replace the opt-out procedures with an opt-in release mechanism).

the issue.[77]   In addition, at least one court appears to have changed its view on what constitutes consensual releases following the U.S. Supreme Court's opinion.[78]

The Competing Plans reflect the uncertainty regarding the state of the law.  The Debtor Plan provides for an "opt-out" mechanism, whereby a "Known Abuse Claimant"[79] (assuming it does not affirmatively exercise the option on its ballot to be treated as a "Known Abuse Convenience Claim"[80]) may "opt-out" of granting the Third Party Releases and Third Party Permanent Injunction contemplated under the Debtor Plan by affirmatively indicating its opt-out election in advance of the Voting Deadline.[81]   Conversely, the UCC Plan provides for an "opt-in" mechanism, whereby the applicable "Participating Parties Channeling Injunction" does not enjoin "Abuse Claimants"[82] from pursuing their claims against non-debtor "Participating Parties" unless the claimant both votes in favor of the plan and "opts-in" to the granting of the release.[83]

A further complicating issue is the treatment of "unknown" Abuse Claims.  Unknown Abuse Claims are defined differently in the Competing Plans (and the Debtor Plan indicates the Debtor would seek a court order clarifying which categories of claims constitute unknown Abuse Claims), but the Competing Plans generally include claims not filed in advance of either the confirmation or the effective date of the Plan for a delineated reason.[84]   The Debtor Plan

---

[77]   *Compare In re Robertshaw US Holding Corp*., 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (providing that "[t]here is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan" and noting that "hundreds of chapter 11 cases have been confirmed in [the] District with consensual third-party releases with an opt-out"), *and  In re Think Finance, LLC*, 2019 WL 827638 (Bankr. N.D. Tex. 2019) (upholding as a consensual third party release an opt-out structure), *with In re Ebix, Inc.*, Case No. 23-80004 (Bankr. N.D. Tex. Aug. 2, 2024) (departing from Northern District of Texas precedent and requiring parties to affirmatively opt-in to the third party releases).

[78]   *In re Smallhold, Inc*., 2024 WL 4296938 *2 (D. Del. 2024) (finding that "[a]fter *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection.").

[79]   A "Known Abuse Claimant" is defined in the Debtor Plan as an Abuse Claimant holding a Known Abuse Claim, together with the legal representative of such holder, including, but not limited to, a bankruptcy trustee, the estate of a deceased individual who held a Known Abuse Claim, or the personal executor or personal representative of the estate of a deceased individual who held a Known Abuse Claim, as the case may be.

[80]   Each Abuse Claimant holding an Allowed Known Abuse Convenience Claim will receive $25,000.00, to be paid by the Settlement Trustee from the Known Abuse Convenience Claims Reserve Fund.  Debtor Plan, § 4.3.

[81]   *Id.*

[82]   An "Abuse Claimant" means the Holder of an Abuse Claim, the estate of a deceased Holder of an Abuse Claim, or the personal executor or personal representative of the estate of a deceased Holder of an Abuse Claim.  *See* UCC Plan, § 2.4.

[83]   *See* UCC Plan, § 15.8.

[84]   For example, while both of the Competing Plans include "repressed memory" claims (claims where the claimant asserts that they were unaware of the abuse due to memory repression or suppression), the Debtor Plan also expressly contemplates claims that were not filed due to the mistaken belief that they were barred by the statute of limitations.  *See* Debtor Plan, Exhibit A, § 311.

contemplates that the representative for the "Unknown Abuse Claims" would have the opportunity to "opt-out" of the releases on behalf of his constituents.[85]

Without opining on the advisability or confirmability of the provisions of the Competing Plan, a critical piece of the mediation will be reaching agreement on plan treatment of the above categories of claims. The Expert acknowledges that there is not clear legal guidance on the appropriate scope of third-party releases in non-524(g) mass tort cases, and that courts continue to grapple with the issue of consensual releases and the implication of the *Purdue* ruling. The Expert encourages the parties to consider all potential solutions in the context of mediation negotiations.[86]

### 3.   Non-Monetary Remedies

Another critical piece of any chapter 11 plan is the delineation and scope of non-monetary remedies. Non-monetary remedies typically include disclosure obligations, internal safeguards, and other reforms that the Archdiocese would commit to undertake in order to promote efforts to prevent future occurrences of sexual abuse.[87] The existence and scope of non-monetary remedies are of critical importance to the Survivors and were consistently referenced by Survivors and their counsel in interviews as being a necessary component of any acceptable chapter 11 plan. Indeed, the Chapter 11 Case may be the only forum by which the Survivors could achieve the non-monetary remedies that they seek, and therefore a further incentive for Survivors to attempt to reach a consensual deal in the context of this proceeding.

Both of the Competing Plans include requirements for the Debtor to agree to "Non-Monetary Commitments,"[88] however, the specific details of such commitments are not disclosed. The Expert understands that the Debtor and the UCC have made substantial progress in negotiating the terms of the non-monetary remedies, although the Expert understands that there remain certain areas of material disagreement that need to be addressed. The parties have not shared details with the Expert on the current non-monetary terms, citing mediation privilege, but the Expert encourages them to continue to utilize the mediation process to reach a resolution.

---

[85]   *Id.* at § 12.2.

[86]   The Expert notes (for reference only) the recent Rockville Centre settlement, which included an anticipated bankruptcy filing for each of the 136 participating parishes in order to effectuate the releases anticipated in that case. *See Disclosure Statement for Plan of Reorganization Proposed by the Roman Catholic Diocese of Rockville Centre, New York and Additional Debtors* [Docket No. 3291], Annex 1, § A.1.b.

[87]   *In re Roman Cath. Church of Archdiocese of Santa Fe*, No. 18-13027-T11, 2024 WL 3091482, at *1 (Bankr. D. N.M. June 21, 2024) (stipulating to disclose and publicize the list of credibly accused clergy and remove public recognitions of perpetrators); *In re Archdiocese of Milwaukee*, No. 11-20059-GMH, 2024 WL 4355563, at *1 (Bankr. E.D. Wis. Sept. 30, 2024) (requiring the debtor to publish the names of the accused and restrict them from presenting themselves as priests); *In re Roman Catholic Bishop of Great Falls Montana,* Case No. 17-60271 (Bankr. D. Mont. 2017) [Docket No. 426] (publicizing perpetrators, agreeing to never challenge the constitutionality or legitimacy of the statute of limitations or child abuse reporting requirements; adopting a whistle-blower policy, and making the bishop available to survivors); *In re Roman Catholic Bishop of Stockton*, Case No. 14-20371 (Bankr. E. D. Cal. 2014) [Docket No. 757] (designating a person responsible for assisting survivors of sexual abuse, providing counseling to personas credibly claiming sexual abuse, and providing personal letter of apology from the bishop to all tort claimants and immediate family members).

[88]   *See* Debtor Plan, § 5.4; UCC Plan § 17.1.

### 4.   Resolutions with Other Parties

Negotiations between the Plan Parties can and should be prioritized in order to efficiently move this case to a conclusion.  That being said, there are other key parties in interest that must be engaged with by the Debtor and the UCC in order to minimize unnecessary litigation and promote settlement where available.  The Debtor and the UCC must be more proactive about approaching parties in interest in order to encourage negotiations or, at the very least, crystallize areas of disagreement so that any future litigation can be narrowed.

### i.   Insurance Assets

The Expert met with each of the Insurers' representatives and discussed insurance issues at length with counsel to the Debtor, the UCC, and the Apostolates.[89]   Based on these conversations, insurance coverage, and the settlement of insurance claims held by the Debtor and the Apostolates, appears be a material source of potential recovery.[90]  The Expert acknowledges that the Debtor and the other Plan Parties believe that Travelers and SPARTA[91] have the most potential exposure and therefore encourages continued conversations with those Insurers in the first instance.

Both Competing Plans contemplate the possibility of reaching settlements with the Insurers, although no settlements have been reached to date.[92]  The Debtor and the UCC have made very limited progress with any Insurers, despite the fact that Insurers having attended and participated to some extent in previous mediation sessions and that an additional mediator was appointed seven months ago who, the Expert understands, is focused largely on resolving insurance issues.[93]  This lack of progress appears to be a function of a few factors, including lack of Debtor, UCC and Insurer engagement and lack of progress in insurance-specific mediation.

Certain Insurers, including Travelers and SPARTA, have expressed that they lacked the necessary information from the Debtor and the UCC to evaluate claims and initiate negotiations.  A fulsome exchange of relevant information should be occurring on a parallel track with Insurers as the Debtor pursues settlement with the Plan Parties.  The Expert also believes that Insurers have not been sufficiently proactive in engaging with the Debtor or completing critical internal analyses that certain Insurers have stated is necessary to initiate negotiations.  Although there are certainly complicating factors in this case (*e.g.*, certain Insurers have now asserted potential defenses to coverage as a result of a criminal investigation into the Archdiocese), none explains or excuses the lack of progress with Insurers, particularly in light of the Expert's understanding that there is ongoing mediation targeting insurance issues.

---

[89]  *See* Exhibit B.

[90]  An analysis into available insurance coverage, defenses any Insurers may have to such coverage, and/or the appropriate amount and structure of any insurance settlement is beyond the scope of the Expert's duties in this case.

[91]  The Expert understands that SPARTA's ability to contribute remains an open issue that needs to be addressed.

[92]  *See* Debtor Plan, § 7; UCC Plan, § 9.2.3.

[93]  *See Order* [Docket No. 2892], which appointed John W. Perry as an additional mediator in the Chapter 11 Case.

Dual-tracking settlement discussions with the Plan Parties, Travelers, and SPARTA will allow the Debtor to potentially secure funding for the Plan, which could help garner support for a plan amongst their creditor base. Engaging with all Insurers at the appropriate time will also avoid unnecessary litigation on the back-end, irrespective of whether a settlement is reached, as the parties can work on agreeing on plan language regarding treatment of claims and rights to insurance policies and coverage (or at least identifying areas of disagreement that will need to be litigated). That being said, unnecessary litigation tactics, including serving discovery on the Debtor and the UCC with the intent to delay, rather than promote, negotiations, is similarly not an advisable use of the parties' time.

Further, the Expert understands that certain of the Apostolates may assert rights to shared insurance coverage relevant to the underlying Abuse Claims. Although shared insurance issues can be complex and litigious, a consensual chapter 11 plan that includes a settlement with the Apostolates should minimize litigation surrounding the non-debtors' rights to insurance settled by the Debtor or otherwise transferred to a Survivor Trust. Accordingly, a Debtor-only plan that does not include the Apostolates is not preferred.

ii.    2017 Unsecured Bonds

The Debtor acknowledges it is indebted on certain unsecured bonds that totaled a principal amount of $37.97 million as of the Petition Date. Shortly after the Petition Date, the Debtor entered into the Bond Settlement with the Bond Trustee under which, among other things, it agreed to pay semi-annual interest payments coming due after the Petition Date. The Debtor has not made annual principal payments during the Chapter 11 Case or paid certain asserted fee claims which it estimates total $2 million.[94]

The underlying loan agreement on the Bonds (the "Loan Agreement"), as modified by the Bond Settlement, contains financial and restrictive covenants, including a purported transfer restriction that restricts the Debtor from selling Debtor property to fund a plan of reorganization in excess of $20 million in the aggregate.[95] In addition, the Bond Trustee has taken the position that the Loan Agreement, as modified by the Bond Settlement, restricts any use of the Debtor's funds outside of the ordinary course.[96] Therefore, any plan that proposes cash funding by the

---

[94] The Debtor has not paid (i) the annual principal payments that have become due since the Petition Date, in the aggregate amount of $7,485,00 as of July 1, 2024 or (ii) the claim and fee claim of the 2017 Bond Trustee, which are estimated to total $2 million. *See* Disclosure Statement, § 4.21.

[95] *See* Bond Settlement Agreement, § 2.2.5 ("[T]he Trustee, solely in its capacity as Trustee under the Bond Documents and on behalf of the holders of Bonds, waives any default by the Debtor under Section 6.03 of the Loan Agreement triggered by the sales of properties, the proceeds of which the Debtor intends to use to fund a plan of reorganization, as long as the net sale proceeds for such sales do not exceed $20.0 million in the aggregate [. . .].").

[96] *See* Loan Agreement, § 6.03(a)(ii)(C)

(a) The Corporation covenants that, so long as any of the Bonds remain outstanding [. . .] (ii) it shall not sell, transfer or otherwise alienate its Revenues and Properties (but only as to the Corporation's assets, including real and personal property included in the Corporation's Statements of Financial Position under the heading 'Total Assets' excluding custodial accounts) to any other person or entity, but such restriction shall not extend to [. . .] (C) budgeted expenditures of Revenues by the Corporation in connection with its mission and

28

Debtor for the purposes of funding claims against Survivors violates the Loan Agreement and would result in a default upon the Debtor's emergence from chapter 11. Although both Competing Plans anticipate reinstating the Bonds,[97] the Plan Parties should expect that the Bond Trustee would object to both plans in their current form. The Bond Trustee's position regarding the use of estate assets is incompatible with any consensual plan that could be reached by the Plan Parties in this case and therefore will need to be resolved.

The Plan Parties should engage with the Bond Trustee at the appropriate time to determine whether the above issues are capable of resolution via negotiation or will need to be litigated in connection with plan confirmation. The Expert's view is that the focus of the Plan Parties should remain on reaching a plan resolution amongst themselves and that the Debtor and UCC should proactively seek to negotiate or otherwise resolve any arguments that would interfere with the pursuit of a consensual plan, to the extent possible.

### iii.   Second Harvest

We understand that Second Harvest is uniquely situated and, as a result, is represented separately from the Apostolates. Although the Plan Parties and Second Harvest have conflicting views as to what an appropriate contribution by Second Harvest should be, the Expert understands that there are alleged restrictions on Second Harvest's funds and threshold issues regarding Second Harvest's defenses that must be resolved. Regardless, Second Harvest should be included in the negotiation process.

## V.   **EXPERT RECOMMENDATIONS**

### A.   **Progress Following Expert Appointment**

Although there is no doubt that progress in this Chapter 11 Case has been delayed for a variety of reasons, there have been some recent signs that the parties are both open to and intent on making material progress toward a consensual resolution in the near term. Specifically, while not ideal for the reasons noted above, the mere fact that Competing Plans have now been filed evidences recent efforts undertaken by the key case constituents. And the recent renewed efforts by stakeholders to engage in further mediation also suggests that the parties are focused on bringing this Chapter 11 Case to a conclusion in the near term.

That said, the parties are far apart on several key issues, including the amount that the Apostolates can and should contribute to fund a Survivor Trust. Substantial work remains to be done to close the gap on these issues such that a confirmable plan that has the support of a majority of stakeholders can be put before the Court with minimal litigation. All parties need to be appropriately motivated and aligned to make additional progress in a timely manner. The Expert

---

activities and otherwise in the ordinary course of business so long as the Corporation has determined that such expenditure will not adversely affect the ability of the Corporation to make its required loan repayments under [the Loan] Agreement and to make any payments on any other of its indebtedness when due.

[97] *See* Debtor Plan, § 11.1(e); UCC Plan, § 6.3.5.

has significant concerns that absent appropriate incentives, the Chapter 11 Case could face continued delay.

### B.      Potential Paths to Conclude the Chapter 11 Case

The Expert sees three potential paths for conclusion of the Chapter 11 Case, they are addressed in turn below.

#### 1.      <u>Path A: Confirmation of a consensual plan including the Apostolates</u>

For the reasons described in detail in the Report, confirmation of a consensual plan proposed by the Plan Parties and that includes widespread Survivor support and a contribution from the Apostolates is the optimal scenario. Such a plan would provide for the most significant recovery to Survivors, in that it would make available the largest amount of assets for trust funding and also limit the amount of litigation that would result from Paths B and C below. In addition, such a plan would set the stage for settlements with other key parties, including Insurers. Finally, a consensual plan would provide for the most finality for the Debtor and Apostolates and increase the likelihood of those entities' continued feasibility post-bankruptcy.

#### 2.      <u>Path B: Confirmation of a Debtor-only plan</u>

It is possible that a Debtor-only plan could also be confirmed. Such a plan is not in the best interests of all parties because it would not include meaningful contribution from the Apostolates and it would potentially give rise to significant litigation, including as a result of shared insurance issues and disputes over what constitutes estate assets.

#### 3.      <u>Path C: Dismissal of the Chapter 11 Case</u>

In the event the parties are unable to make meaningful progress on Path A, dismissal of the Chapter 11 Case may (ultimately) be the only available alternative to avoid continued administrative expense. The Expert is cognizant of the sunk cost fallacy and therefore does not want to dismiss as a potential outcome only because significant costs have been incurred to date. That being said, the Expert cannot imagine a scenario where dismissal of the Chapter 11 Case benefits any of the Participants.

The Expert is also cognizant that the Chapter 11 Trustee Motion remains pending. Based on the Expert's discussions with the Participants, to date, there is likely to be litigation surrounding the Court's ability to appoint a chapter 11 trustee and the Expert has concerns surrounding the impact of a chapter 11 trustee appointment on the current progress being made in negotiations between the Plan Parties.

### C.      Expert's Conclusions

Based on the overwhelming consensus among stakeholders and the Expert's own conclusion that it is imperative for the Chapter 11 Case to progress toward a prompt resolution, the Expert recommends that, over the next 90 days (the "<u>90-Day Period</u>"), the parties dedicate all available resources to exhausting efforts to reach a consensual resolution. The Expert believes it is imperative that the parties demonstrate a willingness, and also have an appropriate process and

structure in place, to get to a single consensual plan that is confirmable without meaningful litigation. Indeed, although some progress appears to have been made since the Expert's appointment, if there is a deal to be had here, then the Expert sees no reason why it is not achievable in the next 90 days. Conversely, if no deal can be reached in the next 90 days, then that may signal that, at least absent some additional outside pressure or influence, the parties simply are not in a position to proceed with a plan that has the support of the majority of affected stakeholders while providing the transparency, accountability, and closure that the Survivors rightfully desire and deserve. Likewise, the Debtor and its affiliates desire much needed closure so they can focus on their ongoing mission and charitable work.

The Expert thus makes the following recommendations, each of which is made in the spirit of aligning interests in the near term, curbing continuing administrative spend without material progress, allowing the parties to focus their efforts on achieving a consensual resolution, and deferring further litigation or imposing more severe remedies until those near term efforts are exhausted:

- During the 90-Day Period, there be a standstill on (i) further litigation related to the Chapter 11 Trustee Motion, (ii) fee objections, or (iii) filing other motions or pleadings seeking to litigate other issues in the Chapter 11 Case;

- As to all counsel and advisors for which fees are paid by the Debtor's estate, they each should consent to (or the Court can so order)[98] a moratorium on the further payment of fees for a period that shall be set as the shorter of the 90-Day Period or as soon as a plan of reorganization is filed that has the support of at least the Debtor and the UCC, with 80% of the incurred and documented fees payable at the expiration of that period, and the remaining 20% payable when the Court next considers interim approval of fees covering that period; at which point the Court may consider progress towards a final resolution during the 90-Day Period in determining whether to approve fees on an interim or final basis;[99]

- The Plan Parties use the first 30 days of the 90-Day Period to complete the exchange of all remaining information that is identified as essential to plan-related discussions, and bring any remaining disputes related to requested information or documents to the attention of the Court for prompt resolution;

- The Court establish a robust schedule for the 90-Day Period with interim periodic reports to be filed every two weeks jointly by the Debtor and the

---

[98] Prior to finalizing the Report, the Expert suggested to Debtor's counsel that they voluntarily agree to a fee moratorium for a 90-day period. As of the submission of this report, Debtor's counsel neither agreed to nor rejected such a moratorium.

[99] If the parties do not consent, then the Expert notes that the Court may determine it is appropriate or advisable to issue a temporary order requiring the Debtor to receive Court approval prior to paying any estate professionals during the 90-Day Period.

UCC designed to ensure that the Debtor is actively engaging with Plan Parties (and Insurers) in mediation over the 90-Day Period in an effort to address and resolve as many open issues as possible;

- The Court invite each of the Mediators to provide interim periodic reports to the Court (either contemporaneously with the reports submitted by the Debtor and UCC or at any other point in time during the 90-Day Period), weighing in on the status of mediation efforts, parties' good faith participation in mediation, and/or whether either Mediator believes that continued mediation is no longer a good use of the parties' time and resources such that he recommends the 90-Day Period be terminated; and

- If no consensual resolution amongst the Plan Parties is announced at the conclusion of the 90-Day Period,[100] then the Court should appoint an examiner under Section 1104(c) of the Bankruptcy Code with expanded duties and powers, as further determined by the Court, including but not limited to (A) to investigate and provide independent evaluation of, among other things, (i) the value of all of the Debtor's assets, including cash, real estate, personal property, insurance proceeds, and estate claims (including against the Apostolates and others) to fund a plan, (ii) the value and validity of claims asserted against the Debtor and any viable defenses, (iii) the Debtor's good faith in filing the Chapter 11 Case, and (iv) whether the Chapter 11 Case should be dismissed; and (B) the ability to propose and file a single plan on behalf of the Debtor.

Ultimately, the Expert believes the above structure, including the appointment of an examiner with expanded powers, is within the Court's powers and the acceptable contours of applicable federal law, and could be appropriately drafted to ensure the examiner does not cross boundaries protecting religious liberty interests under the Constitution.[101] Furthermore, the appointment of an examiner is, in the Expert's opinion, preferable to the appointment of a chapter 11 trustee or the dismissal of the Chapter 11 Case if progress is not made in the near term. The Expert respectfully submits that, if a resolution of the issues in the Chapter 11 Case is possible, then it is achievable in the near term.

The Expert remains available to assist the Court and, if requested by the Court, will appear at any status conference set by the Court to address this Report and will otherwise make himself available as needed. In the event the Court determines to adopt the Expert's recommendations, in

[100] It may make sense for the Court to set a status conference at the conclusion of the 90-Day Period to assess status of the Chapter 11 Case, gather input from interested parties, and determine whether, if no consensual plan has yet been filed, there is good cause to extend the 90-Day Period for some finite additional period prior to proceeding with appointment of an examiner.

[101] See, e.g., In re Charles St. Afr. Methodist Episcopal Church of Bos., 499 B.R. 66, 166 (Bankr. D. Mass. 2013) (appointing an examiner and noting that such duties "would not require the examiner to cross boundaries protecting religious liberty interests" and permitting an expansion of powers following appointment); In re The Church at San Francisco Where Jesus is Lord, Case No. 04-31865TEC, 2008 WL 323425 (Bankr. N.D. Cal. Feb. 5, 2008) (appointing examiner); In re Holy Hill Cmty. Church, Case No. 2:14-AP-01744-WB, 2016 WL 878262 (B.A.P. 9th Cir. Mar. 7, 2016) (appointing examiner).

32

whole or in part, the Expert attaches as <u>Exhibit D</u> a proposed order designed to implement his recommendations.[102]

*[Remainder of page intentionally left blank]*

---

[102] The Expert will separately email the proposed form of order to the Court in editable form.

Respectfully Submitted,

*/s/ Mohsin Y. Meghji*

**RULE 706 EXPERT WITNESS**

Mohsin Y. Meghji
mmeghji@m3-partners.com
1700 Broadway, 19th Floor,
New York, NY 10019
Telephone: (212) 202-2300

**LATHAM & WATKINS LLP**

Jeffrey E. Bjork
Helena G. Tseregounis
Amy C. Quartarolo
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
E-mail: jeff.bjork@lw.com
        helena.tseregounis@lw.com
        amy.quartarolo@lw.com

- and -

Caroline A. Reckler
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
E-mail: caroline.reckler@lw.com

- and –

Madeleine C. Parish
1271 Avenue of the Americas
New York, NY 10020-1401
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
E-mail: madeleine.parish@lw.com

*Counsel to Rule 706 Expert Witness*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 23, 2024 a true and correct copy of the foregoing Expert's Report was served electronically via the court's ECF noticing system on all parties registered to receive notice.

By:   <u>/s/ *Caroline A. Reckler*                    </u>

Caroline A. Reckler