UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: | * | |
| | * | Case No. 20-10846 |
| THE ROMAN CATHOLIC CHURCH | * | |
| OF THE ARCHDIOCESE OF | * | Section "A" |
| NEW ORLEANS | * | |
| | * | Chapter 11 |
| Debtor.[1] | * | |

**JOINT MEMORANDUM IN CONNECTION WITH DISCOVERY CONFERENCE**

This memorandum is submitted in connection with the Court discovery conference that has been set for June 26, 2025. The purpose of this memorandum is to provide to the Court what the parishes and other non-Debtor affiliates (collectively, the "Apostolates") of the Roman Catholic Church of The Archdiocese of New Orleans ("Debtor" or the "Archdiocese") and the Debtor believe are appropriate guard rails on the discovery so that discovery disputes do not become the focal point of Court time as we move towards confirmation of the joint plan that will be filed on July 15, 2025. The Apostolates and the Debtor recognize that the plan has yet to be filed, however, the Memorandum of Understanding [Dkt. # 4020-1] that was filed with the Court has provided all parties sufficient information such that they were able to file and provide for the Court soft discovery in order that the discovery conference can be held on June 26, 2025.

**"SOFT" DISCOVERY REQUESTS RECEIVED ON JUNE 20 2025**

The plan proponents received "soft" discovery requests from the following parties:

<u>Certain Abuse Survivors</u> – certain categories of written discovery

<u>Official Committee of Unsecured Commercial Creditors (the "Trade Creditors Committee")</u> – 37 requests for production and 2 interrogatories

<u>United States Fidelity & Guaranty Company ("Travelers")</u> – 8 requests for production

---

[1] The last four digits of the Debtor's federal tax identification number are 8966. The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.
{00383726-1}

<u>U.S. Fire Insurance Company and International Insurance Company ("U.S. Fire and International")</u> – 15 requests for production to the Committee; 19 requests for production to the Debtor

<u>Argent Institutional Trust Company ("Argent")</u> – 28 requests for production

In addition, the Trade Creditors Committee proposed taking over 100 depositions.

The soft discovery requests (deposition and document requests) can be cataloged as follows:

- 11 U.S.C. § 1112(b) Motion
- Financial Information (Assets of the Debtor and filing Apostolates)
- Valuation of Abuse Claims against the Debtor and filing Apostolates
- Insurance policies and policy defenses
- Feasibility
- Canon Law

The Apostolates and the Debtor admit that all parties are entitled to documentation within the financial category (both asset valuation and claims valuation), insurance policy (not policy defenses) and feasibility categories. The dispute the Court will be required to address is exactly what documentation must be produced within these categories where the parties seeking discovery are asking for communication between the plan proponents that were exchanged as part of the mediation and those documents and correspondence sent to the mediators under the mediation privilege. The Court should note that the parties seeking these mediation privilege correspondence documents are all mediation parties.

**CERTAIN ABUSE SURVIVORS' MOTION TO DISMISS**

Certain Sexual Abuse Survivors filed the *Certain Abuse Survivors' Motion to Dismiss Bankruptcy Pursuant to 11 U.S.C. § 1112(b)* [Dkt. # 3965] ("Motion to Dismiss"). The Motion to Dismiss asserts that the case should be dismissed due to certain actions by the Debtor both before and after the filing of the case.

{00383726-1}

This Court has issued an *Order to Show Cause* ("Order to Show Cause") [Dkt. # 3949] that was originally returnable on June 26, 2025, which required the Debtor to appear in Court on June 26, 2025, and tell the Court why the case should not be dismissed. The focus of the Order to Show Cause is the age of the case and the failure of the Debtor to make progress in confirming a plan. The Order to Show Cause was issued prior to the plan proponents executing a Memorandum of Understanding [Dkt. # 4020-1] and the recent status conferences where the parties have discussed a scheduling Order with the Court. The Court stated that the Order to Show Cause will now be heard as part of plan confirmation and that, if the plan is not confirmed, the Court will dismiss the case.

The presence of the Order to Show Cause makes any testimony, in connection with Certain Abuse Survivors' Motion to Dismiss, unnecessary. Either the plan to be filed on July 15, 2025, is confirmed or the case will be dismissed. This Court should limit the discovery taken by Certain Abuse Survivors to the discovery related to the 1129(a) elements for the confirmation of the to-be-filed plan. Allowing discovery on the allegations contained in the Motion to Dismiss will increase the discovery disputes and, regarding certain depositions, will lead to frequent calls to the Court, incident to questions that are unrelated to the 1129 elements that the plan proponents must prove to confirm a plan.

## GOOD FAITH FOR PLAN PURPOSES

Good faith under 11 U.S.C. § 1129(a)(3) is in fact an element the plan proponents must prove for the plan to be confirmed. However, good faith under 11 U.S.C. § 1129(a)(3) is a much more narrow inquiry than the inquiry raised by Certain Abuse Survivors under 11 U.S.C. § 1112 reexamining the Debtor's good faith in filing this case.

Section 1129(a)(3) requires the plan to have been "proposed in good faith and not by any means forbidden by law."[2] Good faith is not a defined term in the Code, but it is generally interpreted in the context of section 1129(a)(3) to mean that there is a "reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[3] A plan is proposed in good faith "only if it has a legitimate and honest purpose to reorganize the debtor."[4] The case law requires the Court to consider the totality of the circumstances in the course of a "fact-intensive, case-by-case inquiry."[5]

Section 1129(a)(3) "speaks more to the process of plan development than to the content of the plan."[6] Accordingly, the good faith inquiry focuses on the conduct manifested in obtaining the confirmation votes, and not necessarily on the substantive plan provisions.[7] Section 1129(a)(3) does not require the bankruptcy court to determine whether the ends achieved in the plan contravene non-bankruptcy law,[8] as other Code provisions permit the court's review of the legality of substantive plan provisions.[9] A plan may satisfy the good faith requirement even though the plan may not otherwise be confirmable.[10]

---

[2] 11 U.S.C. § 1129(a)(3).

[3] See *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (Gerber, J.); *see also In re Breitburn Energy Partners LP,* 582 B.R. 321, 352 (Bankr. S.D.N.Y. 2018) (Bernstein, J.); *Matter of Madison Hotel Assocs.*, 749 F.2d 410, 424-26 (7th Cir. 1984).

[4] *Chemtura Corp.*, 439 B.R. at 608 (internal quotation omitted); *see In re 20 Bayard Views, LLC*, 445 B.R. 83, 95-96.

[5] *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197, 211-12 (3d Cir. 2003); *see Chemtura Corp.*, 439 B.R. at 608 ("The bankruptcy judge is in the best position to assess the good faith of the parties' proposals.") (internal quotation omitted).

[6] *See In re Chemtura*, 439 BR 561,608 (Bankr S.D.N.Y.2010)

[7] *20 Bayard Views*, 445 B.R. at 95-96.

[8] *Id.* at 95-96; *In re Ocean Shores Cmty. Club, Inc.*, 1991 WL 184827, at *2 (9th Cir. Sept. 19, 1991) ("[S]ection 1129(a)(3) bars confirmation of plans proposed in violation of law, not those that contain terms that may contravene law.").

[9] *See In re Food City, Inc.*, 110 B.R. 808, 812 n.10 (Bankr. W.D. Tex. 1990) (Clark, J.) (reserving the court's consideration of "potentially illegal provisions" as a relevant consideration in the confirmation process that could affect the plan's feasibility under section 1129(a)(11)).

[10] *Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997).
{00383726-1}

Although there is agreement regarding the general test for good faith under section 1129(a)(3), its application is less straightforward.[11] For example, courts have generally rejected arguments that good faith is lacking and permitted confirmation to proceed, where the purpose of the case was for the debtor to obtain a benefit or result inside of bankruptcy that it could not achieve outside of bankruptcy.[12]

## FIFTH CIRCUIT CASES ON GOOD FAITH FOR PLAN PURPOSES

The two lead Fifth Circuit cases that discuss 1129(a)(3) are *Matter of T-H New Orleans Ltd.*, 116 F.3d 790, 796 (5th Cir. 1997) and *In re Liljeberg Enterprises.,* 97-cv-3312-T (unpublished opinion). Both of these cases stand for the proposition that for 11 U.S.C. § 1129(a)(3), the focus should be on the plan and not what occurred before the case was filed or the results that the plan accomplishes.

The Fifth Circuit in the Per Curium decision in *Liljeberg* ("LEI") held

> … While LEI may arguably have been relatively financially healthy, "the Bankruptcy Code permits a firm that has debts to declare bankruptcy even though it is not insolvent" (*In re James Wilson Assoc.*, 965 F.2d 160, 170 (7th Cir. 1992)).
>
> In this case, it cannot be said that there is no realistic possibility of an effective reorganization, and it is not evident that LEI is seeking to delay or frustrate the legitimate efforts of secured creditors to enforce rights (*In re Albany Partners Ltd.*, 749 F.2d 670, 674 (1984)).

The argument that the Debtor's bankruptcy was not filed in good faith has already been litigated by the Court in the first days of the case and the Court held that the case was in fact filed in "good faith" [Dkt. # 991]. Issues and assertions raised in that motion have already been heard and decided. Deposition questions on the reasons for filing should not be allowed. The good faith

---

[11] 7 COLLIER ON BANKRUPTCY ¶ 1129.02[3][a][ii][B].

[12] *Id.* ¶ 1129.02[3][a][ii][B]; *see PPI Enters.*, 324 F.3d at 211-12 (finding that it was not bad faith for a debtor to file chapter 11 for the primary purpose of capping a creditor's claim under section 502(b)(6)); *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074-75 (9th Cir. 2002), *cert. denied* 538 U.S. 1035 (2003) (confirming a plan proposed by a solvent debtor solely for the purpose of curing its prepetition default, avoiding liability for default interest, and thereby reducing its debt to a particular creditor by $1 million over an objection regarding the debtor's good faith under section 1129(a)(3)).

{00383726-1}

of the filling has already been determined by this Court. Certain Abuse Survivors filed a joinder [Dkt. # 336] to the initial *Motion of The Official Committee of Unsecured Creditors to Dismiss Chapter 11 Case* [Dkt. # 203]. Certain Abuse Survivors have already litigated the good faith of the filing.

Questions as to why the Debtor filed and what occurred prior to the filing of the case are not relevant to the determination of "good faith" for 11 U.S.C. § 1129(a)(3).

The Ninth Circuit decision in *Garvin v Cook Invs. NW, SPNWY, LLC,* 922 F.3d 1031, 1035 (9th Cir. 2019) is in line with the Fifth Circuit on the limitations of the 11 USC § 1129(a)(3) inquiry. The Court in *Garvin* held:

> The text of section 1129(a)(3) speaks only to the process by which the plan was proposed requiring that it has been "proposed in good faith and not by any means forbidden by law." The section says nothing about the substance of the plan's terms.

As stated in *In re Charles St. African Methodist Episcopal Church of Boston*, 578 B.R. 56, 95-96 (Bankr. E.D. Mass. 2017) (Bailey, J.): good faith under 1129(a)(3) requires a showing that the plan maximizes value, provides the debtor a fresh start, and reaches a compromise among disparate constituencies, not addressed by other Code provisions.

**CORRESPONDENCE RELATED TO THE PLAN AND ITS NEGOTIATION**

The soft discovery requests seek correspondence and documentation relative to both plan terms and settlements with the Settling Insurers. The Apostolates and the Debtor recognize that discovery is allowed in most instances concerning settlement discussions, notwithstanding FED. R. EVID. 408. The issue with the correspondence request in this case is that it is not purely an issue of settlement discussions but also involves the mediation privilege.

Correspondence relative to plan negotiations, plan terms and settlements with Settling Insurers should not be produced where the mediation privilege is involved. The fact that the correspondence was sent as part of the mediation between the plan proponents and also the Settling Insurers changes the result and compels that no correspondence be produced.

{00383726-1}

In support of this position, the Court merely needs to look at its Orders that appointed the mediators that protects the confidentiality of documents and correspondence that were exchanged as part of the Mediation. [Dkt. # 3694, 2892, and 1058]. These Orders largely readopted this Court's Complex Case Order, Part XVII.F relating to the confidentiality of mediation and the materials exchanged therein. In *Benson v. Rosenthal*, No. 15-782, 2016 U.S. Dist. LEXIS 68612 at *29 (E.D. La. May 25, 2016), Judge Wilkinson made clear that all alternative dispute resolution proceedings are confidential pursuant to the District Court's Local Rules.

The Court should also note that most, if not all, of the "correspondence" was between the various parties and the mediators. The settlement, as set forth in the MOU, is that the result negotiations centered on a mediator proposal. The correspondence between the plan proponents and, for that matter, any party including Argent, the Trade Creditors Committee, Certain Abuse Survivors, Travelers, and U.S. Fire and International (who were all mediation parties), with the mediators should be confidential and not subject to discovery.

## TRADE CREDITORS COMMITTEE

The Trade Creditors Committee has circulated proposed soft discovery requests to both the plan proponents and Certain Abuse Survivors. The issue with the Trade Creditors Committee is one of cost and necessity. The soft discovery requests contain 28 requests directed to the plan proponents that are duplicative of the requests of others. More problematic is the request to take over 100 depositions on behalf of a constituency that is actually only made up of "trade creditors."

The true trade debt (separate and apart from whom the Trade Creditors Committee believes it represents) total less than $750,000. The Trade Creditors Committee has justified its continued position in the case espousing the view that it represents the interests of both bondholders and the Apostolates. This view is based upon the Court's Order establishing the Trade Creditors Committee and not the reality that both the bondholders and the Apostolates have told the Court that they do not believe and do not want the Trade Creditors Committee or its counsel or its

{00383726-1}

financial advisors to assert any position on their behalf or, for that matter, represent them. The bondholders have already been removed as an ex-officio member of the Trade Creditors Committee. To the extent the Trade Creditors Committee or its counsel are fearful that either bondholders or the Apostolates will accuse them of breaching a duty, the Court, amending its Order appointing such committee can delete the bondholders and the Apostolates from the parties represented by the Trade Creditors Committee.

The real constituents of the Trade Creditors Committee will be placed in a convenience class that will make virtually all true trade creditors nonvoters under the plan and paid in full.

## DISCOVERY RELATED TO POLICY DEFENSES

A review of the Travelers soft discovery contains a request (Number 5) related to Travelers' liability under its policies. A similar type request is contained in other discovery. These requests are unrelated to the 1129 requirements.

## ASSET VALUATION DISCOVERY SHOULD BE LIMITED TO LIQUIDATION VALUE AND FEASIBILITY, ABSOLUTE PRIORITY RULE IS A LEGAL ISSUE

Various parties objecting to the plan (including Argent) have raised the fair and equitable standard contained in 11 U.S.C. § 1129(b) and defined in 11 U.S.C. § 1129(b)(2)(B). The fair and equitable standard in 11 U.S.C. § 1129(b)(2)(B) is also known as the absolute priority rule. The plan proponents are not proposing a new equity plan. Whether the Debtor is solvent or insolvent, the Court still must address whether the absolute priority rule applies. *See Norwest Bank Worthington v Ahlers,* 485 US 197 (1988). The absolute priority issue in this case is not a value issue (what is being retained by the Debtor as a result of the Plan); rather, whether the absolute priority applies to nonprofits. The bondholders are not being paid in full, and the Debtor is retaining control of its assets after confirmation and so the legal issue as to the applicability of the absolute priority to nonprofits will be a decision the Court makes without the need for a fair market valuation determination being made by the Court.

{00383726-1}

A second part to this issue relates to the valuation testimony the Court must hear at the plan confirmation hearing. In *In Re Houston Regional Sports Network,* 886 F.3d 523, 532 (5th Cir. 2018), the Fifth Circuit held that collateral valuation under section 506 of the Bankruptcy Code would not have a brightline test either as to method or date of the valuation. The Court passed on whether for purposes of 11 U.S.C. § 1129(b)(2)(B), section 506 requires a fair market value valuation on the effective date of the plan. Inasmuch as the absolute priority issue in the case is not a value based decision, rather a legal one, the inquiry mandated by *Houston Regional Sports* is not necessary or warranted.

In this case, the valuation methodology is mandated by § 1129(a)(7) which requires a liquidation valuation as of an assumed plan effective date.

## OTHER ISSUES

The Court should set a time limit on the time that a witness (either appearing in his or her own capacity or as a 30(b)(6) designee) should sit. Further, all parties wishing to take the deposition of the prospective witnesses should share the time set by the Court. The timing may be different as to witnesses, but the timing should be set and incorporated in a Court order. Depositions must be properly limited to the plan issues as discussed *supra*. For certain depositions, the Debtor and the Apostolates suggest that efficiency will require the depositions to be held in the Courtroom in front of the Bankruptcy Judge or other appropriate neutral in order to ensure that the questions remain on track and do not veer into unauthorized territory.

If the Court does not set limits on depositions (both number and time), assuming five parties seek discovery from the same ten witnesses (including experts) and three separate 30(b)(6) depositions, the parties will have a total of sixty-five deposition days totaling hundreds of hours.

A similar problem exists if the plan proponents must respond to five different sets of document requests with each seeking the same documents but where the number of the document request is different. The Court should allow the plan proponents to set up a data room, identify the

{00383726-1}

documents in the data room, and provide that list to all parties seeking the information. If a specific document is not in the data room, the plan proponents can provide the document in its answers to formal discovery

Both the Apostolates and Certain Abuse Survivors are not corporate juridical entities. The Apostolates are represented by one counsel; however, Certain Abuse Survivors are represented by different counsel. The issue the Court needs to clarify or address is who must be served and how, who must respond to discovery, and whether the discovery produced and responses are binding on the group.

## CONCLUSION

The Apostolates and the Debtor are filing this memorandum in the hope that, through guidance or orders issued by the Court, the discovery disputes can be kept to a minimum. The existence of discovery disputes are costly, counterproductive to the interests of the creditors, take up Court time and deflect attention from the parties working on the meaningful issues necessary for the Court to rule on the confirmation of the plan proposed by the plan proponents.

Dated: June 25, 2025

Respectfully submitted,

*/s/ Douglas S. Draper*
Douglas S. Draper, La. Bar No. 5073
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130-6103
Telephone: 504.299.3300/Fax: 504.299.3399
E-mail: ddraper@hellerdraper.com

*Attorneys for the Apostolates*

**-AND-**

*/s/ Mark A. Mintz*
R. PATRICK VANCE (#13008)
ELIZABETH J. FUTRELL (#05863)

{00383726-1}

MARK A. MINTZ (#31878)
SAMANTHA A. OPPENHEIM (#38364)
Jones Walker LLP
201 St. Charles Avenue, 51st Floor
New Orleans, LA 70170
Telephone: (504) 582-8000
Facsimile: (504) 589-8260
Email: pvance@joneswalker.com
Email: efutrell@joneswalker.com
Email: mmintz@joneswalker.com
Email: soppenheim@joneswalker.com

**ATTORNEYS FOR**
**THE ROMAN CATHOLIC CHURCH OF**
**THE ARCHDIOCESE OF NEW ORLEANS**

{00383726-1}