**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In re: § <br> § <br> **THE ROMAN CATHOLIC CHURCH** § <br> **OF THE ARCHDIOCESE OF NEW** § <br> **ORLEANS,** § <br> § <br> § <br> Debtor.[1] § <br> § | Case No. 20-10846 <br><br> Section "A" <br><br> Chapter 11 |

**ARGENT INSTITUTIONAL TRUST COMPANY, AS INDENTURE TRUSTEE'S, REQUEST FOR A DETERMINATION THAT THE AUTOMATIC STAY IS NOT APPLICABLE TO POTENTIAL POST-PETITION CAUSES OF ACTION FOR SECURITIES FRAUD**

> **A HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 8, 2025, AT 9:00 A.M. AT THE UNITED STATES BANKRUPTCY COURT, 500 POYDRAS ST., COURTROOM B709, NEW ORLEANS, LOUISIANA 70130. PARTIES IN INTEREST MAY PARTICIPATE IN THE HEARING (I) IN PERSON; (II) BY TELEPHONE ONLY (DIAL IN: 504.517.1385, ACCESS CODE: 129611); OR (III) BY TELEPHONE USING THE DIAL-IN NUMBER AND VIDEO USING HTTPS://GOTOMEET.ME/JUDGEGRABILL (MEETING CODE: "JUDGEGRABILL"). IF YOU OBJECT TO THE RELIEF REQUESTED IN THIS PLEADING, YOU MUST RESPOND IN WRITING. UNLESS DIRECTED OTHERWISE BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT NO LATER THAN SEVEN (7) DAYS BEFORE THE HEARING DATE. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

---

[1] The last four digits of the Debtor's federal tax identification number are 8966. The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

1

Argent Institutional Trust Company, successor-in-interest to TMI Trust Company, as indenture trustee (the "Bond Trustee"), by and through counsel requests a determination that the automatic stay is not applicable to certain potential post-petition causes of action against the Debtor. In further support hereof, the Bond Trustee states as follows:

**PRELIMINARY STATEMENT**[2]

In the early days of this case, counsel for the Debtor approached counsel to the Bond Trustee and requested that the Bond Trustee enter into a settlement agreement whereby the Debtor would timely pay post-petition interest as it became due on the Bonds in exchange for the Bond Trustee agreeing to terms under which the Bond debt could be reinstated under a plan of reorganization. The Debtor also requested that the Bond Trustee consent to it selling up to $20 million of real property, an amount that was proposed by the Debtor,[3] during this bankruptcy case to fund the case and a plan of reorganization. The Debtor's counsel represented to the Bond Trustee's counsel that it was seeking this unusual deal because, under Canon Law, the Debtor was required to timely pay interest on the Bonds, and failure to do so would violate Canon Law, which the Debtor could not do.

This request by the Debtor, and the settlement agreement that followed, had significant consequences for the Bond Trustee, and others, in this case, including the removal of the Bond Trustee from the Official Committee of Unsecured Creditors and subsequent litigation which resulted in the formation of a second committee which was charged with representing the interests

---

[2] Capitalized terms used in this Introduction have the meanings given to such terms below.

[3] It is the Bond Trustee's understanding that the Debtor advocated for this cap on real estate sales to use it as a shield against attempts by the Tort Committee to force it to sell properties from its expansive real estate portfolio to fund payments to the abuse survivors.

2

of all unsecured creditors in this case, other than abuse survivors, to which the Bond Trustee was not appointed.[4]

For almost five years, the Debtor has consistently represented to all creditors, including holders of the Bonds (the "<u>Bondholders</u>"), that it would pay all creditors in full. A few of the many such representations include:

- "Current creditors of the Archdiocese will be assured payment via a Chapter 11 plan of reorganization that will be approved and controlled by the Court." – Father Carr, Vicar of Finance[5]

- "We will be paying the people that we owe money to 100% of what we owe, because we are not bankrupt financially." –Archbishop Gregory Aymond.[6]

- "What we're telling our creditors is they will be 100 percent paid. . . . We will pay all of our bills." – Father Carr, Vicar of Finance.[7]

- "The Archdiocese of New Orleans has filed this Chapter 11 with the ultimate goal of confirming a 100 percent plan. What that means is that the Archdiocese intends to pay creditors 100 percent of their allowed claims." – Mark Mintz, May 29, 2020 Section 341 Meeting of Creditors.

- "Like I said once before, to pay 100 percent of our allowed claims." Father Carr, Vicar of Finance, May 29, 2020 Section 341 Meeting of Creditors (responding to the question from the Tort Committee's counsel: "Why did the Archdiocese file bankruptcy if it was solvent without the bankruptcy process?").

---

[4] The settlement effectively sidelined the Bond Trustee during the last four years of this case, and the Bond Trustee did not hire financial professionals or incur the substantial costs that other constituents in these cases did, based on the Debtor's assurances that the Bonds would be paid in full. Indeed, had the Debtor been true to its word and provided for payment in full of the Bonds, it would not have been prudent for the Bond Trustee to incur the millions of dollars, that other parties have spent to investigate the Debtor's financial wherewithal. However, the Debtor has now reneged on its repeated promises, has shown itself to be faithless, and is now proposing that the Bonds will be the only non-settling claims in this case that will not be paid in full.

[5] *Statement from Archdiocese of New Orleans' Vicar of Finance Regarding Decision to Pursue Chapter 11 Reorganization*, (May 1, 2020)
https://files.ecatholic.com/16596/documents/2020/4/Statement%20from%20Fr.%20Carr.pdf?t=1588297469000

[6] Peter Finney Jr, *Archdiocese files for Chapter 11 financial reorganization of its administrative offices*, Clarion Herald, May 9, 2020.

[7] https://www.wwltv.com/article/news/local/orleans/archdiocese-files-bankruptcy/289-791ebed3-689f-474a-9fdd-7d00541665e8 (accessed 7/6/2025).

With regard to the Bondholders, these statements were bolstered by repeated assurances posted by the Debtor to the Municipal Securities Rulemaking Board's Electronic Municipal Market Access website ("EMMA"), a website created to provide information directly to the bondholders and prospective holders of publicly traded bonds, such as the Bonds in this case, over several years that the Debtor is required, under Canon Law, to pay interest on its debts as it becomes due and to timely pay all of its debts:

> The [Archdiocese] is also required to comply with the provisions of the Code of Canon Law for the Church in carrying out its mission and in conducting its business affairs. Canon Law includes policies, procedures and practices that must be followed by the [Archdiocese] and the Archdiocesan Councils in conducting the business of the [Archdiocese]. . . . Canon Law directs administrators serving the Church to fulfill their function with diligence, and consequently they must pay, at the stated time, the interest due on loans and take care that the debt itself is repaid in a timely manner."[8]

Despite these repeated assurances, and despite the fact that the Debtor consistently maintained throughout the first five years of this case that it would pay its debts in full and that it is required to do so under Canon Law, on June 6, 2025 the Debtor notified the Bondholders that it would not make the July 1, 2025 interest payment on the Bonds.[9] The Debtor subsequently failed to make that payment.

But the Debtor apparently does not intend to stop there. The Debtor has also represented to the Bond Trustee and the Court that it and the Official Committee of Unsecured Creditors (the "Tort Committee") will propose a plan that will attempt to further impair the Bonds and seek to

---

[8] https://emma.msrb.org/P31414125-P31099558-P31509325.pdf (2/11/2021); https://emma.msrb.org/P11524301-P11178945-P11595388.pdf (8/28/2021); https://emma.msrb.org/P21574756-P21216122-P21637583.pdfhttps://emma.msrb.org/IssueView/Details/ES378255 (8/29/2022); https://emma.msrb.org/P21671244-P21286173-P21715516.pdf (3/1/2023); https://emma.msrb.org/P21724451-P21325367-P21758686.pdf (8/29/2023). The Debtor made the same representations when initially offering the Bonds for purchase. https://emma.msrb.org/ER1037561-ER813168-ER1214200.pdf (3/15/2017).

[9] https://emma.msrb.org/P31456181-P31130378-P31543153.pdf (6/6/2025) (the "June 6, 2025 EMMA Notice").

4

significantly reduce, without the consent of the Bondholders, the principal owed on the Bonds, among other things. If confirmed, the Debtor's plan would be the first in the more than 40 Catholic religious organization bankruptcies filed to date specifically to deal with abuse claims, and the more than 25 confirmed bankruptcy plans in those cases, to be confirmed over the objection of commercial creditors. Indeed, despite entering this case robustly solvent, with well over of $100 million of cash and investments, and at least hundreds of millions of dollars of real estate at its disposal, the Debtor is now apparently claiming to be insolvent, presumably due to the approximately $50 million in fees that estate professionals have billed and already been paid in this case.

This case is distinguishable from one in which a debtor is simply reneging on its promise to pay its creditors. This Debtor availed itself of the benefits of the securities markets by inducing the Louisiana Public Facilities Authority to issue the Bonds, which are publicly traded municipal bonds, for its benefit, and in doing so subjected itself to various antifraud provisions of the federal and state securities laws, including Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, as well as common law ("Section 10(b)" and "Rule 10b-5" collectively the "Securities Laws"). By making express representations that, *inter alia*, (i) the Bonds would be paid in full, (ii) that the Debtor is required to comply with Canon Law, and (iii) that Canon Law requires that the Debtor pay interest on its debts when it becomes due and to timely pay all of its debts, all of which have now been rendered untrue by the Debtor's filing the June 6, 2025 EMMA Notice and failing to make the July 1, 2025 interest payment, it appears the Debtor has violated the Securities Laws.

The Trustee and the Bondholders are entitled to bring causes of action against the Debtor based on this post-petition conduct (the "Potential Securities Fraud Claims").[10] Because the Potential Securities Fraud Claims arose from the Debtor's post-petition actions, the Trustee does not believe that the automatic stay applies to these claims. Nonetheless, in an abundance of caution, the Bond Trustee files this motion seeking a "comfort order" that the Potential Securities Fraud Claims are post-petition causes of action, and that pursuing those claims will not violate the automatic stay.

## JURISDICTION

1. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. The relief requested herein is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are sections 105(a) and 362(d) of the Bankruptcy Code.

## BACKGROUND

4. On May 1, 2020 the Debtor filed for Chapter 11 bankruptcy. The Debtor remains in possession of its property and is managing its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. Argent Institutional Trust Company serves as indenture trustee with respect to the holders of the Louisiana Public Facilities Authority Refunding Revenue Bonds (Archdiocese of New Orleans Project), Series 2017, issued in the original principal amount of $41,895,000 (the "Bonds").

---

[10] The Trustee is continuing to investigate other causes of action against the Debtor arising from its representations to the securities markets in this case and reserves all rights to bring those post-petition causes of action in connection with the Potential Securities Fraud Claims.

6

6. Throughout this case, the Debtor and its representatives have repeatedly assured all creditors that they would be paid in full. In addition, the Debtor has repeatedly assured the Bondholders that the Debtor is required to comply with Canon Law, that Canon Law requires that interest be timely paid on the Bonds and that all of the Debtor's debts, including the Bond debt, must be paid in full.

7. On September 10, 2020, the Debtor filed a 9019 Motion with the Court (the "Settlement Motion") asking for approval of the proposed settlement agreement between the Debtor and the Bond Trustee (the "Settlement Agreement"). *See Debtor's Motion for Entry of an Order (I) Approving Settlement with TMI Trust Company, as Indenture Trustee, Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [ECF No. 403]. On November 2, 2020 the Court entered an order approving the Settlement Agreement, as amended by the parties. [ECF No. 527].

8. The Settlement Agreement provided that, in exchange for timely paying post-petition interest on the Bonds, the Debtor would be allowed to sell up to $20 million in property to fund this case and a plan of reorganization and set forth terms under which the Bonds could be reinstated under a plan. The Debtor and the Bond Trustee considered the Settlement Agreement to be an important first step in moving this case towards a plan of reorganization designed to pay all creditors in full.

9. On June 6, 2025, the Debtor posted a notice to EMMA indicating that the "Plan Proponents do not intend to seek the reinstatement of the Bonds pursuant to the Joint Plan" and that the Debtor would not make the payment due on the Bonds on July 1, 2025. Subsequently, the Debtor did not make the July 1, 2025 interest payment on the Bonds.

10. On June 25, 2025, the Debtor and the non-Debtor affiliates (collectively, the "Apostolates") filed a *Joint Memorandum in Connection with Discovery Conference*, confirming that the Debtor does not intend to pay the Bonds in full despite the Debtor's repeated assurances to the bond market to the contrary:

> The bondholders are not being paid in full, and the Debtor is retaining control of its assets after confirmation and so the legal issue as to the applicability of the absolute priority [rule] to nonprofits will be a decision the Court makes without the need for a fair market valuation determination being made by the Court.

*See Joint Memorandum in Connection with Discovery Request*, ECF No. 4079, p. 8.

### The Potential Securities Fraud Claims

11. The Debtor's actions during this case appear to have given rise to the Potential Securities Fraud Claims under both federal and state law. Under federal law, Section 10(b) and Rule 10b-5 provide that entities and individuals may be civilly liable if a plaintiff establishes the following elements: (1) that the entity or individual misrepresented a material fact; (2) that the entity or individual did so knowingly, i.e., with scienter; (3) that the plaintiff relied on the entity's or individual's material misrepresentation; and (4) that the plaintiff's reliance on the material misrepresentation caused its loss.

12. Under the state law of Louisiana (as well as other states), this conduct has also given rise to liability under the Louisiana Uniform Securities Act. To establish securities fraud, claim under Louisiana law, plaintiff must show: (1) defendant made an untrue statement of material fact; (2) plaintiff did not know of the untruth; and (3) defendant knew, or in exercise of reasonable care could have known, of the untruth. La. Stat. Ann. § 51:712; *Meadaa v. Karsan*, C.A.5 (La.) 2016, 822 F.3d 202 (citing *Ponthier v. Manalla*, 951 So. 2d 1242, 1255 (La. Ct. App. 2007)).

13. Plaintiffs alleging securities fraud may bring actions under both federal and analogous state securities laws and at common law, and the Trustee is evaluating which of the Potential Securities Fraud Claims to plead and where to file the various Potential Securities Fraud Claims, and anticipates that the Potential Securities Fraud Claims will be brought in either Federal or state court either here or in another jurisdiction in which the Trustee and Bondholders are located, or a jurisdiction with ties to the Debtor or the issuance of the Bonds.

## ARGUMENT

### A. The Potential Securities Fraud Claims are not barred by the automatic stay because they are based on the Debtor's post-petition conduct

14. The automatic stay of 11 U.S.C. § 362 operates to stay the commencement or continuation of any action against the debtor "that was or could have been commenced before the commencement of this case under this title . . . ." 11 U.S.C. § 362(a)(1). Against this backdrop, the Fifth Circuit Court of Appeals has drawn a clear distinction between claims and cases that arise pre-petition and those that arise post-petition, and in so doing, has unambiguously laid down the rule that the automatic stay imposed by Section 362 "does not apply to claims that arise post-petition." *See Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 353 (5th Cir. 2008); *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 996 (5th Cir. 1985) ("The stay simply does not apply to post-bankruptcy events"); *In re Roman Cath. Church of the Archdiocese of New Orleans*, 653 B.R. 524, 532-33 (E.D. La. 2023) (citing *Campbell v. Countrywide Home Loans*).

15. Here, the misconduct underlying the Potential Securities Fraud Claims unquestionably arises from post-petition conduct of the Debtor, specifically the numerous statements made by the Debtor in the media, in pleadings, in in-court statements and directly to the Bondholders, that they would be paid in full, and that Canon Law, which the Debtor stated that

9

it is required to follow, requires the Debtor to pay interest on its debts as it becomes due and to timely pay its debts.

16. When the Debtor made its repeated assurances that the Bonds would be paid in full, the Bondholders relied, and were entitled to rely, on those statements. Thus, investors made trading decisions with respect to the Bonds, including buying the Bonds, selling the Bonds and holding the Bonds, in an environment in which they were repeatedly assured over a five-year period that the Debtor intended to – and would – pay the Bonds in full.

17. From the Debtor's actions in this case, it now appears that the Debtor either made material misrepresentations about being required to follow Canon Law, made material misrepresentations about Canon Law requiring it to pay the Bonds timely and in full, or made material misrepresentations about both things. Whichever it is, those material misrepresentations are actionable and give rise to the Potential Securities Fraud Claims, for which the Bondholders, and the Trustee on their behalf, have claims against the Debtor.

18. Further, the Court has made its position on this case exceedingly clear – either the Debtor will confirm a plan before the end of this year, or the case will be dismissed. It makes little sense to force the Bondholders, many of whom are individuals and likely residents of Louisiana who hold the Bonds in their retirement accounts, and who have not received principal payments due on their Bonds during the last five years, to wait months longer just to bring their potential claims against the Debtor for the frauds that appear to have been perpetrated on them during the pendency of this case. The Bondholders were willing to wait five years for the Debtor to confirm a plan because the Debtor misled them into believing that it would pay the Bonds in full, and that interest would continue to be paid on the Bonds during the case. Now that the Debtor has shown itself to be a faithless partner, whose promises are worthless, the Bondholders should not be

required to wait any longer to seek to recoup the damages that they have suffered at the hands of the Debtor after the filing of this case.

19. Moreover, there is little risk that these contemplated actions will result in a judgment against the Debtor between now and the end of 2025, at which time the case will either be dismissed, or the Debtor will have confirmed a plan and the automatic stay will be terminated.

## CONCLUSION

Wherefore, for the foregoing reasons, the Bond Trustee respectfully requests that the Court find that the automatic stay does not apply to the Potential Securities Fraud Claims and grants any other or further relief as the Court deems appropriate under the circumstances.

DATED: July 11, 2025

Respectfully submitted,

*/s/ Colleen A. Murphy*
Colleen A. Murphy (*admitted pro hac vice*)
Charles Azano (*admitted pro hac vice*)
Christopher Marks (*admitted pro hac vice*)
GREENBERG TRAURIG, LLP
One International Place Suite, 2000
Boston, MA 02110
Telephone: (617) 310-6000
Email: Colleen.Murphy@gtlaw.com
      Chip.Azano@gtlaw.com
      Chris.Marks@gtlaw.com

*/s/ Annette Jarvis*
Annette Jarvis (*admitted pro hac vice*)
GREENBERG TRAURIG, LLP
222 S. Main Street, Suite 1730
Salt Lake City, UT 84101
Telephone: (801) 478-6907
Email: jarvisa@gtlaw.com

-and-

*/s/ David S. Rubin*
David S. Rubin (La. 11525)
BUTLER SNOW LLP
445 North Boulevard, Suite 300
Baton Rouge, LA 70802
Telephone: (225) 325-8728
Email: david.rubin@butlersnow.com

*Attorneys for Argent Institutional Trust Company*
