**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 20-10846 |
| **THE ROMAN CATHOLIC CHURCH** | § | |
| **OF THE ARCHDIOCESE OF NEW** | § | Section "A" |
| **ORLEANS,** | § | |
| | § | Chapter 11 |
| Debtor.[1] | § | |
| | § | |

**ARGENT INSTITUTIONAL TRUST COMPANY, AS**
**INDENTURE TRUSTEE'S, MOTION TO DISMISS BANKRUPTCY CASE**

---

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 21, 2025, AT 1:30 P.M. AT THE UNITED STATES BANKRUPTCY COURT, 500 POYDRAS ST., COURTROOM B709, NEW ORLEANS, LOUISIANA 70130. PARTIES IN INTEREST MAY PARTICIPATE IN THE HEARING (I) IN PERSON; (II) BY TELEPHONE ONLY (DIAL IN: 504.517.1385, ACCESS CODE: 129611); OR (III) BY TELEPHONE USING THE DIAL-IN NUMBER AND VIDEO USING HTTPS://GOTOMEET.ME/JUDGEGRABILL (MEETING CODE: "JUDGEGRABILL"). IF YOU OBJECT TO THE RELIEF REQUESTED IN THIS PLEADING, YOU MUST RESPOND IN WRITING. UNLESS DIRECTED OTHERWISE BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT NO LATER THAN SEVEN (7) DAYS BEFORE THE HEARING DATE. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

---

Pursuant to 11 U.S.C. §1112(b), Argent Institutional Trust Company, successor-in-interest to TMI Trust Company, as indenture trustee (the "Bond Trustee"), by and through counsel hereby moves to dismiss this bankruptcy case for cause. In further support hereof, the Bond Trustee states as follows:

---

[1]     The last four digits of the Debtor's federal tax identification number are 8966. The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

## PRELIMINARY STATEMENT[2]

*Thou shall not steal.*[3]

*Thou shall not bear false witness against thy neighbor.*[4]

What started out as a case that was supposed to address the incalculable pain that the Debtor inflicted upon innocent children over decades, and pay all creditors in full, has now morphed into something entirely different. Not only have the Debtor, the Apostolates, and the Official Committee of Unsecured Creditors (the "Tort Committee," and, collectively, the "Plan Proponents") proposed a plan of reorganization (the "Plan") that does not adequately address the decades of harm in the eyes of many of the Tort Committee's constituents, they have proposed a plan that is an all-out assault on certain creditors' rights under the Bankruptcy Code.

The primary purpose of the Debtor's bankruptcy and Plan is to resolve the Debtor's tort liability with the abuse survivors. Under its current proposal, the Debtor attempts to accomplish that with a contribution to the Plan of approximately $45.5 million, ***an amount that constitutes only a fraction of its vast wealth***. Meanwhile, the Debtor proposes that it retain hundreds of millions of dollars of unencumbered assets, including over ***$70 million of cash and investments,***[5]

---

[2]     Capitalized terms used in this Introduction have the meanings given to such terms below. To the extent that a term is capitalized herein and not defined, such term shall have the same meaning as set forth in Exhibit A to the Plan.

[3]     New King James Version Bible, 1984, Ex. 20:15.

[4]     *Id.* at 20:16.

[5]     The Debtor's financial projections purport to show that following confirmation it will have $30,192,407 of cash on hand. ECF No. 4151-2. However, these projections omit the $23 million that the Debtor will receive from the net sale proceeds of Christopher Homes to repay the promissory note to the Settlement Trust [*see* Plan at §5.3(iii)], and this ending cash balance amount does not include $20,755,009 of "working capital" that the Debtor intends to segregate under the Plan. ECF No. 4151-2 at p. 2. Thus, the Debtor's total ending cash balance following its funding of its Plan contributions should really be $73,947,416. Nor does this cash amount include the millions of additional dollars that the Debtor and its insiders will retain from the sale of Christopher Holmes, which could exceed $5 million depending on the sale price achieved for those assets. In addition, the Debtor's projections appear to remove $1,876,996 of cash from the Debtor's balance sheet in each of the first 3 years under the Plan by deducting this amount out as "restricted cash" each year but not adding the restricted cash amount that was deducted in the prior year to

94877905.v1

***millions of dollars of art and other collectibles and over $100 million of real estate***,[6] even though nearly all Plan payments are made on the Effective Date, and nearly all pre-petition, non-insider liabilities are removed from its balance sheet on the Effective Date.

Such a plan is patently unfair and inequitable to the creditors who are not being paid in full in this case, including the Bondholders.

Despite retaining substantial assets, and after making years of promises that it would pay all creditors in full, the Debtor proposes that it cut the Bond debt by more than $35 million (approximately 90%). Far from complying with its fiduciary duty to maximize value for creditors, the Plan is specifically designed to *minimize* the Bondholders' recovery and *maximize* the benefits derived by the Debtor and its insiders. Indeed, while the Debtor proposes to pay the Bondholders pennies on the dollar, it continues to pay its employees and affiliates in full by passing its insider-liabilities through the bankruptcy, specifically: (i) millions of dollars annually to retired priests on account of their purported pension and medical expense claims, which are unsecured pre-petition claims of equal priority to the Bond Claims, (ii) millions of dollars annually to refill the Portfolio B investment pool with monies that the Debtor supposedly borrowed, pre-petition, from its insiders under the Deposit and Loan Program, which it is using to fund the Plan and this case, and (iii) more than $1 million per year to support the operations of the high schools and parishes that are owned by the Debtor. ECF No. 4151-2.

The Debtor's hostile treatment appears reserved for the Bondholders. All other creditors are either passed through the bankruptcy (such as the insiders noted above), paid in full (such as

---

"beginning cash." Hopefully, this is a simple error on the part of the Debtor and not something more nefarious (particularly in light of the fact that this amount is almost exactly the annual debt service that would have been paid on the Bonds under the Debtor's prior plan).

[6]     The Debtor lists the value of its real estate holdings as having a net value of $114 million, however, it fails to attribute any value to many of the listed properties. In all likelihood, the value of the Debtor's real estate far exceeds the value set forth in the Debtor's plan.

the "convenience class," which appears to be all or nearly all of the unsecured creditors, other than the Bondholders), or will purportedly agree to how they are treated in the Plan (most notably, the tort claimants).  In stark contrast, the Plan calls for Bondholders to be paid pennies on the dollar. The Debtor justifies this disparate treatment solely based on the "best interest of creditors" test and the Debtor's estimate of what the Bondholders would allegedly receive on a *pro rata* basis in a hypothetical Chapter 7 liquidation.  Not surprisingly, the Debtor's projected recovery in such a hypothetical case is minimal.  That results, in part, because Chapter 7 is the wrong forum in which to resolve the Debtor's mass tort issues.  Not only is the concept of a Chapter 7 for this Debtor an impossibility since the Debtor is a non-profit and this case cannot be converted without its consent (and the Debtor has indicated that it would not voluntary subject itself to the appointment of a trustee), but a chapter 7 suffers from the same problems as does attempting to resolve the Debtor's mass tort liability outside of bankruptcy, high costs and uncertainty.[7]

As this Court has consistently recognized, the Debtor's liabilities are best resolved in Chapter 11.  This appears to be 100% correct, as the Debtor is now proposing to be able to resolve what it claims is $1.221 billion in tort liabilities for a contribution from the Debtor of $45 million. If the Debtor can accomplish this, that is a credit to everyone in the case and the chapter 11 process itself, but it does not mean that the Debtor can capture all of the value achieved in this bankruptcy case for itself by retaining its vast wealth for the benefit of its insiders, and pay the Bondholders only what they would receive in a hypothetical chapter 7.  If the Debtor could, the Bondholders would receive ***zero*** value from this "reorganization" and are no better off than if the Debtor simply

---

[7]     The Bond Trustee reserves all rights on how a hypothetical chapter 7 could be resolved, including whether a chapter 7 trustee could creatively step-into-the-shoes of the Debtor's proposed settlement that is set forth in the Plan to consensually resolve the Debtor's tort liability for the same $45 million contribution proposed by the Debtor, liquidate all of the other assets of the Debtor, and pay all creditors in full.

liquidated (based on the Plan Proponents' grossly inaccurate liquidation analysis).  Such a plan would be unconscionable and certainly not confirmable.  "Do unto others" indeed.

By focusing solely on the best interest of creditors test, the Debtor misses the mark.  A plan must also be "fair and equitable" and a plan that calls for a debtor to capture the entirety of the value obtained through the chapter 11 process for itself, retain hundreds of millions of dollars of value, and not pay its creditors in full, is not.  The "fair and equitable" requirement is not, as the Debtor suggests, inapplicable just because the Debtor is a non-profit.[8]  The same principles that have guided hundreds of years of bankruptcy law, and guide for-profit bankruptcies, apply in this case and require the plan to be fair and equitable. This Plan is not.

In addition to attempting to steal almost $35 million from Bondholders, the Debtor also lied to the Bond Trustee and Bondholders repeatedly throughout this bankruptcy case in an apparent attempt to lull them into a false sense of security.  As the Court knows, the Debtor has repeatedly assured the Bond Trustee and the Bondholders that their claims would be paid in full.  To that end, at the beginning of this case, the Debtor entered into a settlement agreement with the Bond Trustee and the Bondholders to effectuate those promises.  In September 2024, the Debtor filed a proposed plan that contemplated paying the Bonds in full.  And, at a status conference on December 19, 2024, the Debtor represented to the Court that the reinstatement of the Bonds was critical to the success of any plan.[9]

---

[8]     As discussed herein, the cases finding that the absolute priority rule are inapplicable to non-profit entities merely conclude that a non-profit debtor does not have "equity" and therefore its management or members (in the case of a union or co-op) can remain in place even if senior creditors are not paid in full. The equivalent here would be if the Bond Trustee were arguing that the Archbishop could not retain his position unless creditors were paid in full. That is not the Bond Trustee's argument.

[9]     Specifically, counsel for the Debtor stated:

> From a feasibility standpoint, the reinstatement of the bonds is incredibly, incredibly important. The debtor sitting here today does not know if a plan can be feasible if the bonds are not reinstated. I realize that was about a triple negative, but I think I got there. And so in other words, to put a finer point on it, we need the bonds to be reinstated and to be able to have that discussion. These are very,

Relying on the Debtor's promises of full payment and the Settlement Agreement, the Bond Trustee waited over five years while the Debtor and the estate professionals drove this case into administrative insolvency and diverted tens of millions of dollars from the estate to pay professionals with seemingly no oversight from the Debtor whatsoever.  Had the Bond Trustee and Bondholders known the truth, despite the Debtor's assurance of payment in full for all of these years, they would have moved for dismissal of this case years ago.  Shockingly, the Debtor now engages in classic "gaslighting," distorting and manipulating its reasons for backing away from five years of statements that it would pay the Bondholders in full by now freely boasting in the Disclosure Statement that the Settlement Agreement could never have been effectuated, supposedly, because the reinstatement of the Bonds requires the approval of all Abuse Survivors. *See* ECF No. 4151 at p. 36.[10]  Assuming that the Debtor actually believes this obviously incorrect legal conclusion, if the Debtor entered into the Settlement Agreement believing that it could not be effectuated without the consent of ***all*** of the Abuse Survivors, which could never have been reasonably obtained in this case, then the Debtor perpetrated a fraud on the Bond Trustee, which

---

for lack of a better term, to the extent there is debt that is favorable, this is debt that is favorable. It is at favorable interest rates. It is at favorable terms. And we have been working with them to come up with a way to continue that relationship in order to confirm a, a feasible plan.

December 19, 2024, Hearing Trans. p. 21:11-22.

[10]     The lie is put to this specious position by the fact that the Debtor will be providing full payment through the assumption and/or reinstatement of their insider "Pension and Retiree Medical Benefits Claims" (previously class 7 in the Debtor's initial plan) and the "Portfolio Claims" (previously class 8 in the Debtor's initial plan), which claims will "pass" through this case unaffected and are not even classified in the Plan. However, the Debtor apparently does not believe that all Bondholder or Abuse Claimants need to approve of this full treatment. The Debtor has provided no explanation for why it believes the assumption of the Bond Claims is any different from the assumption and reinstatement of its insiders' claims.  That is because it is not.

94877905.v1

is all the more reason to dismiss this case for cause. Apparently not wanting to stop at securities fraud, the Debtor has decided to add fraud in the inducement to its resume of post-petition torts.[11]

The eleventh hour seismic change of direction in this case, from a 100% payment case to a pennies-on-the-dollar cramdown fight, apparently arose as a result of a clandestine meeting between the Debtor and the Tort Committee on January 15, 2025, the purpose of which was "to address issues presented by the Bonds and the proposed treatment of the Bonds under both the Debtor's and the Committee's plans."[12] The Bond Trustee was not informed about this meeting, nor was it invited to participate in the discussions about its claim. Just weeks after telling the Court how integral reinstatement of the Bonds was to a plan, the Debtor had a change of heart and sold out the Bondholders for 30 pieces of silver. This backroom deal apparently gave the parties what they both wanted. The Tort Committee obtained a settlement worth tens of millions of dollars over what the Debtor originally offered survivors (again, at the expense of the Bondholders but apparently many millions below what many of its constituents believe would be a fair settlement).[13] And the Debtor and its insiders got to shift the cost of the additional compensation to survivors and estate professionals away from themselves and to the Bondholders. The loser: the Bondholders who are now being asked to fund the Debtor's Plan even though they bear no responsibility for the excessive administrative costs of this case or the Debtor's tort liability. The clear winner: the Debtor and its insiders, who, under the Plan, would get to keep hundreds of millions of dollars in assets, including tens of millions of dollars of cash and investments and well

---

[11] Of course, the Debtor is no stranger to allegations that it has committed fraud, having paid $1 million in 2021 to settle claims brought by the Department of Justice that it defrauded FEMA. https://www.occrp.org/en/news/us-catholic-church-pays-1-million-to-settle-fraudulent-claims-to-fema

[12] ECF No. 3870-1 p. 79.

[13] And, as a bonus, the Tort Committee exacts retribution on the Bond Trustee and the Bondholders for having the audacity to insist, at the beginning of this case, that they receive representation of their interests through a statutory committee of creditors.

94877905.v1

over a hundred million dollars (and likely much more) of real estate, including the Archbishop's personal mansion, which is located in a $4.8 million complex owned by the Debtor.  God forbid the Archbishop should lose a single night's sleep, or experience any discomfort whatsoever, over this case.[14]

The Debtor has squandered its chance to reorganize, along with tens of millions of dollars in the process, and it should not be allowed to continue to inflict more damage on its creditors. And it is not just the Bond Trustee that feels this way.  A large, if not majority, group of Abuse Survivors have already asked the Court to dismiss this case.  *See* ECF No. 3965.  The Debtor has not settled with its largest insurer, Travelers.  As this Court warned the Debtor and the Tort Committee many months ago, a non-consensual Plan cannot be confirmed in this case. *See infra* at fn. 17.  Allowing this case to move forward when the vast majority of commercial creditors, an apparent blocking group of tort claimants, and possibly the major insurer support resolution of this case in the state courts, will only result in many more millions of dollars being squandered in a failed process.

The Debtor has failed to file a confirmable plan as directed by the Court, and all creditors should, at long last, be permitted to pursue their rights under state law against the Debtor and its insiders.[15]

---

[14]     It almost goes without saying that the Archdiocese's and Archbishop's handing of this case has been markedly different – and far less humane – than similar cases by other Catholic entities.  No other Catholic entity has attempted to steal value from creditors as the Debtor has done in this case.  To the Bond Trustee's knowledge, no other Catholic entity has blatantly lied to its creditors assuring them of payment in full when it apparently did not consider itself bound by that promise.  And unlike Archbishop Aymond, who apparently believes that he is entitled to continue to live a life of luxury despite attempting to steal millions of dollars from creditors, the Archbishop of the Archdiocese of Boston – without the pressures of a bankruptcy case – voluntarily sold his lavish residence in order to compensate abuse survivors.  https://www.snapnetwork.org/news/massachusetts/boston/sell_cardinals_mansion.htm

[15]     The Court should also impose the same 90% reduction that the Plan Proponents are trying to foist onto the Bondholders to reduce the professionals' fees in this case.  Doing so would free up more than enough money to pay all of the creditors and would appropriately allocate the consequences of the failures to the parties who are responsible for the years of delay and infighting. The Debtor supposedly now claims that it no longer has sufficient assets to fund its settlement with the Tort Claimants and pay its creditors in full. If that has any truth at all – and it does not, since as

## JURISDICTION

1.       The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. The relief requested herein is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.       Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       The statutory predicates for the relief requested herein is section 1112(b) of the Bankruptcy Code.

## BACKGROUND

4.       On May 1, 2020, over five years ago, the Debtor filed for Chapter 11 bankruptcy. The Debtor remains in possession of its property and is managing its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.       Argent Institutional Trust Company serves as indenture trustee with respect to the holders (the "Bondholders") of the Louisiana Public Facilities Authority Refunding Revenue Bonds (Archdiocese of New Orleans Project), Series 2017, issued in the original principal amount of $41,895,000 (the "Bonds").

6.       On September 10, 2020, the Debtor filed a 9019 Motion with the Court (the "Settlement Motion") asking for approval of a proposed settlement agreement between the Debtor and the Bond Trustee (the "Settlement Agreement"). *See Debtor's Motion for Entry of an Order (I) Approving Settlement with TMI Trust Company, as Indenture Trustee, Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [ECF No. 403].

---

noted herein, the Debtor clearly does have sufficient assets to pay all creditors in full – it is only because of the approximately $50 million in fees the Debtor has paid to the professionals during the case. The Trustee is not aware of any bankruptcy case where such massive professional fees transformed a case from one where all creditors were being told they would be paid in full to one where a debtor needed to resort to cramdown. Indeed, such a case would flip a debtor's fiduciary duty to maximize its value for creditors on its head.

94877905.v1

7. The Settlement Agreement involved a settlement of contractual rights under the documents (the "Bond Documents") that govern the $41,895,000 Louisiana Public Facilities Authority Refunding Revenue Bonds (Archdiocese of New Orleans Project), Series 2017 (the "Bonds") between the Bond Trustee and the Debtor. Under the Settlement Agreement, the Bond Trustee made limited waivers of its personal contractual rights under the Bond Documents that the Debtor negotiated for as an important step in moving this case towards a plan of reorganization designed to pay all creditors in full, in exchange for certain contractual interest payments during the pendency of this case.[16]

8. Although the Debtor and the Tort Committee spent years negotiating and mediating, they were unable to agree on the terms of a plan of reorganization. The situation became so dire that, on August 21, 2024, the Court appointed Mohsin Y. Meghji of M3 Advisory Partners, L.P. as an expert witness tasked with producing a report to help the Court determine whether a plan could be confirmed in this case.

9. Mr. Meghji produced his report on October 23, 2024 (the "Expert Report"). Strikingly, Mr. Meghji concluded that the primary impetus to achieving a consensual resolution in this case was the fact that "the parties, and primarily their attorneys, have allowed toxicity and interpersonal animus to cloud the negotiation process . . . ." Expert Report at 7.

10. It seemingly took the appointment of Mr. Meghji to motivate the Debtor and the Tort Committee to finally get on with the task of proposing a plan that would bring this contentious case to an end. On September 13, 2024, each of the Debtor and the Tort Committee filed its own,

---

[16] In fact, Father Patrick Carr averred, in support of the Settlement Agreement that "if the Archdiocese was not able to reach an Agreement with the Bond Trustee concerning outstanding defaults on the Bond Debt at the time of confirmation of a reorganization plan it could be required to pay off the Bond Debt at confirmation in the amount sufficient to pay all interest and principal becoming due on the Bond Debt through July 1, 2027. . . . The Settlement Agreement allows [the Debtor] to avoid costly, time-consuming, and complex litigation in which it would most likely not prevail." Settlement Motion, ¶¶ 28, 38.

94877905.v1

separate proposed plan of reorganization. [ECF Nos. 3382, 3384]. The proposed plans, while containing material differences in the amounts and sources of funding that could be distributed to creditors, both contemplated the creation of a trust to pay the Tort Claims. They both also contemplated payment in full of the Bonds, through reinstatement of the Bonds at confirmation.

11.     Although the appointment of Mr. Meghji apparently finally spurred the Debtor and the Tort Committee to get on with the business of actually proposing a plan, the issuance of the Expert Report and his admonitions regarding the conduct of the attorneys in this case unfortunately did not inspire the Debtor and the Tort Committee to put aside their differences and work collectively toward a long-overdue consensual resolution of this case.

12.     That inspiration did not come until much later when, on April 28, 2025, the Court issued its *Order to Show Cause* [ECF No. 3949] ordering the parties to show cause why the Court should not dismiss this case. Apparently, at that point, the attorneys for the Debtor and the Tort Committee finally found common ground—presumably none of them were willing to risk having their fees disgorged if the case was dismissed. Miraculously, after being completely unable to work cooperatively for five years, on May 16, 2025, just a few short weeks before the Court's deadline to show cause why the case should not be dismissed, the Debtor and the Tort Committee filed a *Memorandum of Understanding* [ECF No. 4020-1] outlining the very broad terms of a proposed joint plan.

13.     On July 15, 2025, the Debtor, Apostolates and the Tort Committee filed their *Joint Plan of Reorganization* [ECF No. 4150] (the "Plan").

## ARGUMENT

### I.     THE COURT SHOULD DISMISS THIS CASE FOR CAUSE DUE TO THE DEBTOR'S INABILITY TO CONFIRM A PLAN

The Court should dismiss this case for cause, pursuant to section 1112(b) of the Bankruptcy Code because after languishing for more than five years in this case the Debtor will not be able to confirm a plan.   The Court gave the Debtor one final chance to propose a confirmable plan and resolve this highly contentious case, but instead of bringing all of the parties together through a globally consensual plan, as the Court directed,[17] the Debtor and the Tort Committee have proposed a Plan that has fundamentally changed the landscape of this case five years in, alienated practically all of the major constituent bodies and that is not confirmable on its face.

Section 1112(b) defines "cause" as including:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
>
> (B) gross mismanagement of the estate;
>
> (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;
>
> (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;
>
> (E) failure to comply with an order of the court;
>
> (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter [11 USCS §§ 1101 et seq.];
>
> (G) failure to attend the meeting of creditors convened under section 341(a) [11 USCS § 341(a)] or an examination ordered under rule

---

[17]     At the January 16, 2025 status conference in this case the Court commented:

> [W]e're either going to confirm a plan or we're going to dismiss the case. I mean, that's, you know, and I agree with the expert on that and I think I've been clear. So whatever mediator comes on, it's with the intent of negotiating a consensual plan among the parties and if we can't get it done, then we all know what the alternative is.

January 6, 2025, Hearing Trans. at p. 29:1-6.

2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28 [28 USCS §§ 1911 et seq.];

(L) revocation of an order of confirmation under section 1144 [11 USCS § 1144];

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

11 U.S.C. §1112(b)(4). The factors listed in section 1112(b)(4) are a non-exhaustive list and the Court may look to other factors to determine whether "cause" exists. *See Tuli v. United States Tr.*, 124 F. App'x 830, 831 (5th Cir. 2005) ("Section 1112 sets forth a non exhaustive list of factors to assist the bankruptcy court in determining when cause exist."); *In re Who Dat?, Inc.*, No. 21-10292, 2024 Bankr. LEXIS 743, at \*35-36 (Bankr. E.D. La. Mar. 27, 2024) ("The Bankruptcy Code does not expressly define 'cause' as it is used in § 1112(b)(1), but it does set forth a non-exhaustive list of examples of events that may constitute cause.")

Cause to dismiss this case exists because the Court has already stated that if the Debtor's Plan is not confirmed or does not go effective before the end of 2025, the case will be dismissed. The proposed Plan is so obviously not confirmable that it makes little sense for the estate and creditors to spend many millions of additional dollars and four to five more months litigating the

inevitable.  The years of delay and tens of millions of dollars that have already been spent in this case have severely injured all creditors, and it is time to put an end to that suffering.

Courts have determined that "a debtor's inability to accomplish substantive progress toward confirmation inherently carries the risk of unreasonable and undue delay, which is nearly always prejudicial toward creditors . . . and which is adequate justification, in and of itself, for dismissal of a Chapter 11 case for cause." *Synovus Bank v. Brooks (In re Brooks)*, 488 B.R. 483, 490 (Bankr. N.D. Ga. 2013) (internal citations omitted); *see also In re Lashley*, 664 B.R. 408, 416 (Bankr. W.D. Ky. 2024) ("Courts have also determined that conversion or dismissal of a chapter 11 case is warranted for other reasons, including the debtor's 'inability to effectuate a plan' and 'unreasonable delay by the debtor that is prejudicial to creditors.'")

For the reasons stated herein, and many others, the Debtor's Plan is clearly not confirmable, and the estate need not waste any more time or money litigating a Plan that is doomed from the start.[18]

### A.    The Plan Is Not Fair and Equitable to the Bondholders.

On its face the Plan does not treat the Bond Claims in Class 6 fairly or equitably, and therefore it cannot be confirmed through cramdown under 11 U.S.C. §1129(b)(2)(B) over the objection of the Bondholders.[19]  Even assuming *arguendo*,[20] that the codified absolute priority rule aspect of "fair and equitable" does not apply to the Debtor as a non-profit entity without true "equity," the Plan Proponents still cannot meet their burden of proving that the treatment of the

---

[18]    The Bond Trustee reserves all rights to raise any other objections to the Plan through the confirmation process and in accordance with the Court's *Order Scheduling Trial and Pretrial Deadlines* [ECF No. 4105] and to conduct discovery on these, and any other confirmation or disclosure statement issues, as permitted thereby.

[19]    The Bond Trustee reserves the right to argue that the Plan fails to satisfy the confirmation standards under 11 U.S.C. §1129(a) obviating any need for a cramdown analysis.

[20]    The Bond Trustee reserves all rights with respect to the Plan Proponents' assertion that the absolute priority rule does not apply in this case.

94877905.v1

Bond Claims is "fair and equitable" under the circumstances.  Despite the Plan Proponents' protestations to the contrary, the Bankruptcy Code does not provide a "Get Out of Jail Free Card" to non-profits that would allow for legitimate creditors' claims to be wiped out while the non-profit retains its vast wealth and deploys its assets post-confirmation in ways that do not maximize value for creditors.

The Plan Proponents try to sidestep the "fair and equitable" requirement of section 1129(b)(2) by haphazardly conflating it with the absolute priority rule, which some courts have found is not applicable to non-profit debtors because of the capital structure of those entities.[21]  Of course, "fair and equitable" means much more than just "absolute priority." Indeed, section 1129(b)(2) provides a non-exclusive list of how a debtor may satisfy the fair and equitable standard.  *See Sandy Ridge Dev. Corp. v. La. Nat'l Bank (In re Sandy Ridge Dev. Corp.),* 881 F.2d 1346, 1352 (5th Cir. 1989).  Nothing in the Bankruptcy Code suggests that a reorganized non-profit can take any property for itself without first paying its creditors in full.  Had Congress intended that a non-profit be exempt from the broader fair and equitable requirement of section 1129(b)(2)(B), it would have explicitly provided for that result in the Code.  *See e.g.*, 11 U.S.C. § 303 (protecting non-profit entities from involuntary bankruptcies); 11 U.S.C. § 1112(c) (protecting non-profit entities from involuntary conversion); *see also Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972) ("'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"))  To allow any lesser result would be to permit

---

[21]    *See e.g.*, *In re Wabash Valley Power Ass'n*, 72 F.3d 1305 (7th Cir. 1995); *Sec. Farms v. Gen. Teamsters, Warehousemen & Helpers Union, Local 890 (In re Gen. Teamsters, Warehousemen & Helpers Union, Local 890)*, 265 F.3d 869 (9th Cir. 2001).

a debtor to abuse the Chapter 11 reorganization process in a way that section 1129(b) was meant to prevent simply because the debtor is a not for profit.  This abuse is exactly what the Debtor is attempting to visit upon the Bondholders in the Plan.

As this Court has recognized, simple technical compliance with the requirement of section 1129(b)(2), i.e., the absolute priority rule, does not assure that the plan is "fair and equitable."  *In re M & C P'ship, No*. 19-11529, 2020 Bankr. LEXIS 3780, at *29 (Bankr. E.D. La. Mar. 15, 2021) (quoting *In re Sandy Ridge Dev. Corp.,* 881 F.2d at 1352); *see also Bank of N.Y. Tr. Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 244 (5th Cir. 2009) ("The absolute priority rule and the fair and equitable standard must both be satisfied before a court may 'cram down' a reorganization plan over the objection of a dissenting creditor class.") Rather, section 1129(b)(2) "merely sets minimal standards that a plan must meet, and does not require that every plan not prohibited be approved."  *Id*. (quoting *In re Sandy Ridge Dev. Corp.,* 881 F.2d 1352) (internal citations and quotations omitted).  "A court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is 'fair and equitable.'" *In re D & F Constr., Inc.*, 865 F.2d 673, 675 (5th Cir. 1989).

Indeed, the court in *In re Wabash Valley Power Ass'n*, the seminal case on whether the absolute priority rule applies to a non-profit debtor, addressed whether the plan in that case treated the objecting creditor fairly and equitably notwithstanding the fact that creditors were not paid in full and the debtor's co-op members were permitted to retain their patronage accounts and Board representation.  *In re Wabash Valley Power Ass'n,* 72 F.3d 1319 ("REA is by far the biggest unsecured and secured creditor of Wabash. A cramdown of the Wabash Plan over REA's strenuous opposition is therefore a very serious matter and one requiring the most careful consideration of

16

whether the Plan is fair and equitable to REA. To be weighed in the balance, however, is the fact that the only apparent alternative to a cramdown is liquidation, under which REA's recovery would be less than under the Wabash Plan.")

Although the court in *Wabash* concluded that the absolute priority rule as codified in section 1129(b)(2)(B) did not bar the members from retaining their interest, it continued its analysis of whether the plan was "fair and equitable" to the objecting creditor.   Integral to the court's reasoning was that the debtor's plan substantially maximized value to creditors and awarded that value to creditors.  *In re Wabash Valley Power Ass'n*, 72 F.3d at 1315 ("Beyond complying with the [absolute priority] rule, this outcome also seems to make economic sense, since it maximizes the value available to meet creditor claims.").

The bankruptcy court likewise found that the plan allocated all property to Wabash's creditors: "Wabash's Plan satisfies the economic underpinnings of the absolute priority rule because it converts every piece of economic property in Wabash into cash to be paid to its creditors." *In re Wabash Valley Power Ass'n*, 1991 Bankr. LEXIS 2213, at *177-78 (Bankr. S.D. Ind. Aug. 7, 1991).   Indeed, in *Wabash*, creditors were projected to receive $457 million, an amount far greater than the projected going-concern value of $190 million as well as the liquidation value of $213.2 million.   Accordingly, *Wabash* stands for the principle that even if the absolute priority rules does not apply to a non-profit, in order for a non-profit's reorganization plan to be "fair and equitable" all going concern value must be allocated to unsecured creditors, just as the absolute priority rule requires with respect to for-profit entities.  *See also In re Gen Teamsters, Warehousemen & Helpers Union, Local 890*, 265 F.3d at 877 (Noting that "[i]n the bankruptcy

court's view, the plan represented the [union]'s honest effort to satisfy the demands of its creditors …").[22]

Stated differently, there is no colorable argument that the absolute priority rule is the end of the inquiry with respect to whether a plan treats a dissenting class of creditors fairly and equitably as required under section 1129(b)(2).[23]

Here, the Plan cannot be considered "fair and equitable" because it preserves hundreds of millions of dollars of the Debtor's assets for the Debtor, not creditors.  Specifically, under the Plan, the Debtor is only contributing approximately $45.5 million to pay its creditors.  In exchange for this consideration, the Debtor is receiving a discharge of purportedly $1.2 billion of tort claims, reducing over $40 million of Bond Claims to under $4 million and retaining $73 million of cash, at least $114 million of real property, at least $2.5 million of art and collectables and tens of millions of dollars of receivables, income streams and other valuable intangible property.  [ECF Nos. 4151-2 and 4151-3].  Unlike in *Wabash*, which stands for the proposition that in order for a not for profit reorganization to be "fair and equable" the highest attainable value of a debtor's assets must be allocated to creditors (just as the absolute priority rule requires with respect to for

---

[22]    The bankruptcy court in *In re General Teamsters,* found that the "[d]ebtor will distribute to creditors … an amount equal to the equity in the estate's real property and tangible personal property … [A]ny gain realized by the [d]ebtor though sale or refinance of assets … is also to be distributed to unsecured creditors." *In re General Teamsters, Warehousemen and Helpers Union Local 890*, 225 B.R. 719, 722 (Bankr. N.D. Cal 1998).

[23]    At its core, the *Wabash* decision stands for the proposition that prior management of a non-profit can retain control of the entity post-confirmation regardless of whether creditors are paid in full.  *See In re Wabash Valley Power Ass'n*, 72 F.3d at 1315.  That is not an issue in this case because the Bond Trustee is not seeking to displace the Archbishop from his position of control over the reorganized debtor.  *Wabash* and its progeny do not stand for the proposition that a non-profit debtor can invoke the Bankruptcy Code, pay its creditors only the liquidation value of their claims, and retain all of the residual value in the estate.  Such a result is antithetical to the very underpinnings of the Bankruptcy Code, including the requirement that a plan be fair and equitable to objecting creditors and that value be maximized for the benefit of creditors, not the debtor to the exclusion of legitimate creditors.  *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 437, 119 S. Ct. 1411, 1414 (1999) (two of the "recognized policies underlying Chapter 11" are "preserving going concerns and maximizing property available to satisfy creditors.")

profit debtors), the Debtor here is not converting even a fraction of its assets to pay creditors and therefore the Plan is not fair and equitable to the Bondholders.

### 1. The Plan Diverts Value from Bondholders to the Debtor and its Insiders.

Drilling down on exactly who benefits from the Plan, it the clear that the Debtor's insiders are deriving a substantial, if not the exclusive, benefit from the continued operation of the Debtor. For example, under the Plan, the Debtor is simply "passing through" its obligations under the Priest Pension Plan and the Priest Retiree Medical Benefits, and the Debtor projects that it will pay approximately $1.2 million per year (after taking into consideration contributions from the Apostolates) on account of those claims.  ECF No. 4151-2.[24]  The Debtor is also projecting to pay $4.8 million per year as "Portfolio B Deficit Funding."  *Id.*  Essentially, according to the Disclosure Statement, the Debtor has used monies deposited with it by the Apostolates pre-petition, to fund this case and the payments that will be due under the Plan.  And, while not disclosed in the Plan, the financial projections attached to the Plan show that the Debtor intends to repay the amounts that it has used from the Deposit and Loan Program back to Portfolio B after the Effective Date.  Thus, the Debtor proposes to pay the claims of its insiders while refusing to pay the Bondholders what they are owed.

Each of these insider claims were separately classified under the Debtor's prior plan.  *See* ECF No. 3385 at p. 6.  However, the Debtor is now not classifying its insider claims in an obvious attempt to conceal that fact that all such claims are being paid in full post confirmation, at the expense of the claims of the Bondholders, which are essentially being all but wiped out.  This is

---

[24]    Thus, the Debtor proposes that, as to its Priests (and other insiders), the Plan will essentially erase the last five and half years and make it as if this case was never filed. If only that result would pertain to all of the creditors who have suffered through these last five and a half years of the Debtor's mismanagement of this case. Surely everyone (other than the estate professionals) would welcome that miracle. Fortunately, the Debtor can achieve that result. The Debtor could make only one modification to the Plan – it could provide for the payment in full of the Bond Claims. The Debtor has more than sufficient assets to do that; it just does not yet have the motivation to do so.

94877905.v1

*per se* not fair or equitable. It is bad faith, and it is unfair discrimination against the Bondholders. For these reasons, the Plan cannot be confirmed, and this case should be immediately dismissed.

What's more, the financial projections attached to the Plan show that the Debtor has found $900,000 per year, i.e., more than triple what the Plan proposes to pay Bondholders, to fund the High Schools that it owns and operates at a loss,[25] and another $400,000 per year (twice the annual payout to Bondholders) to fund the parishes that it owns. ECF No. 4151-2. And, the Debtor seeks to retain its ownership of the Archbishop's mansion, which costs the estate, as of the Petition Date, $7,500 per month just to maintain. ECF No. 7 at ¶46.[26] There is simply no legitimate justification for the Debtor to use the $73 million of cash that it will retain under the Plan to keep its unprofitable lines of business open post confirmation and fund the Archbishop's personal expenses, when that cash could be used to pay the Bonds in full, with interest and fees, and still leave the Debtor with more than the 90 days' of working capital as a cushion that it supposedly needs to operate post-confirmation.

Moreover, the Debtor projects that it will liquidate $2 million per year of assets, presumably real estate, to cover operating losses incurred as a result of the Debtor's support of its insiders. ECF No. 4151-2. However, the Debtor is refusing to liquidate its assets in pay the Bondholders what they are owed, illustrating exactly who this Plan benefits, i.e., not the Bondholders. Again, this is *per se* not fair or equitable to the Bondholders who would be paid

---

[25]    Obviously, it would make far better sense for the Debtor to divest itself of these school assets and use the sale proceeds, the market value of which the Debtor estimates to be approximately $50 million, to pay the Bondholders. ECF No. 4151-6. However, the Debtor is simply choosing not to do so and keeping these highly valuable assets for itself. The same can be said for the Debtor's vast portfolio of vacant, unused or superfluous real estate which is worth millions of dollars according to the Debtor's own disclosures that the Debtor proposes to retain under the Plan. Incredibly, instead of liquidating these assets to pay claims in this case, the Debtor proposes to retain its real estate portfolio and liquidate it post-confirmation to fund its own operating shortfalls. ECF No. 4151-2.

[26]    This property is located in a 160,000 sq. ft. compound referred to as the "Bishop's Residence" that the Debtor values at $4.8 million. ECF No. 3385-3 at 84-85.

pennies on the dollar over the next decade under the Plan.  The Debtor could sell a relatively small fraction of its assets and pay off the Bonds in full, with post-petition interest and fees, and still carry out its religious mission post-petition in any way it chooses.  Thus, unlike *Wabash*, the Plan makes no economic sense for Bondholders and is clearly aimed at preserving value for the Reorganized Debtor and its insiders and not maximizing value for the creditors of the estate.

### 2.   The Bondholders Relied on the Equity that the Debtor is Now Attempting to Shield When the Bonds Were Issued.

Moreover, the *Wabash* court noted that the proposed plan before it, and the debtor's retention of assets without full payment to unsecured creditors, was not unfair to the objecting creditor because, *inter alia,* that creditor, a government agency, encouraged investment in nuclear power and would presumably support and benefit from the debtor's continued operations as a nuclear power generator (as opposed to a liquidation), and the objecting creditor relied on the debtor's contracts as security for repayment of its loan and knew the risks that those contracts could be canceled or diminished in value due to its knowledge of the nuclear power industry. *Id.* at 1319.  Indeed, in *Wabash*, the objecting creditor was receiving the maximum value on account of its security interest in the debtor's power contracts and satisfaction of its unsecured claim through a percentage of the value being derived by the members of the cooperative debtor post-confirmation. *Id.* at p. 1320.

Here, the Bonds were issued without security, based, in part, on the Debtor's robust solvency and its representations in the Offering Statement that:

> [t]he [Archdiocese] is also required to comply with the provisions of the Code of Canon Law for the Church in carrying out its mission and in conducting its business affairs. Canon Law includes policies, procedures and practices that must be followed by the [Archdiocese] and the Archdiocesan Councils in conducting the business of the [Archdiocese]. . . . Canon Law directs administrators serving the Church to fulfill their function with diligence, and consequently they

21

must pay, at the stated time, the interest due on loans and take care that the debt itself is repaid in a timely manner[27]

Thus, unlike in *Wabash*, here it would be highly inequitable for the Debtor to refuse to use its vast net worth to pay amounts owed on the Bonds because Bondholders explicitly relied on that vast net worth, and the Borrower's representations that it was required by Canon Law to pay amounts owed on the Bonds and its promises not to encumber, use or transfer its assets, when the Bonds were issued without requiring security.[28] There is nothing fair or equitable about the Debtor's attempts to violate the promises it made when the Bonds were issued and to deprive the Bondholders of payments to which they are entitled and which the Debtor can easily afford to pay. The fact that the Debtor is a non-profit does not change that analysis.

### 1. The Debtor is Not Entitled to Retain Assets When it has the Ability to Pay Dissenting Creditors in Full.

At its core, the Plan represents an agreement between the Debtor and the Tort Committee to divvy up the Debtor's, and its insiders', assets between those two parties without making any meaningful payments to the Bondholders. But the fact that the Debtor was able to convince the Tort Committee to agree to a "substantial discount" on the unknown value of the Abuse Claims[29] does not entitle the Debtor to force an equal "discount" on non-consenting creditors and retain all of the benefits of those "discounts" for itself. That would result in the Debtor using its alleged insolvency to steal tens of millions of dollars from Bondholders and then instantly becoming

---

[27] https://emma.msrb.org/ER1037561-ER813168-ER1214200.pdf at page 50.

[28] *Id.* at pp. 15-22 (stating that the amounts due under the Loan Agreement would be derived from the Debtor's revenues and assets, and describing the various financial covenants requiring the Debtor to, among other things, maintain liquidity and a net worth in excess of 110% of its total debt to satisfy its obligations under the Bonds and not transfer or encumber its property, which was the only basis for the Bondholders to recover the amounts due to them).

[29] The Bond Trustee has filed a Motion For the Estimation of Tort Claims. ECF No. 4136. To the extent that the Court does not immediately dismiss this case, the Court will need to employ an estimation process to value the Tort Claims. The Debtor's and the Tort Committee's alleged estimated value is meaningless, self-serving, and cannot serve as the basis for determining distributions under the Plan.

94877905.v1

supremely solvent overnight after it confirms its Plan with hundreds of millions of dollars' worth of cash and other unencumbered assets and little to no non-insider liabilities. Any "savings" that the Debtor has achieved through the Tort Committee's agreement to discount the Abuse Claims must be shared with the other creditors of the estate, not retained by the Reorganized Debtor and disbursed to its insiders' post-confirmation. As it stands, the Plan does not provide fair or equitable treatment to the Bondholders and cannot be confirmed over their objection.

Indeed, unlike in *Wabash*, the Debtor's retention of $73,000,000 of cash and investments, at least $114,000,000 of real estate (which does not even ascribe any value to many of the Debtor's priceless properties, including the St. Louis Cathedral) and other valuable assets will not result in the best or even an increased recovery to the Bondholders, given that the proceeds from the sale of a mere fraction of these retained assets could pay the Bonds in full while still leaving sufficient assets for the Debtor to continue its mission.

This situation is precisely the harm that the absolute priority rule was initially meant to protect against. As recognized by the *Wabash* court, the absolute priority rule was originally "designed to preclude the practice in railroad reorganizations of 'squeezing out' intermediate unsecured creditors through collusion between secured creditors and stockholders (who were often the same people)." *In re Wabash Valley Power Ass'n*, 72 F.3d at 1314. In this case, while there is no secured creditor, the Tort Committee is acting with the Debtor to attempt to "squeeze out" the Bonds. The Debtor's assets are more than sufficient to effectuate its settlements with other parties in this case, pay the Bond Claims in full at confirmation and continue to operate post-confirmation. In fact, this result could be achieved with the Debtor's cash on hand alone, leaving all of its real estate untouched and a cash cushion of more than 90 days of working capital (according to the Debtor). ECF No. 4151-1. Therefore, no legitimate bankruptcy purpose is served

23

by the proposed treatment of the Bonds, and the Plan fails to meet the fair and equitable requirement of section 1129(b)(2).

Indeed, it is a basic tenet of the Bankruptcy Code that when a debtor has sufficient assets to pay all of its creditors in full, as the Debtor does in this case, it must do so.  As the Fifth Circuit Court of Appeals recognized in *In re Ultra Petroleum*, when it determined that the solvent debtor exception survived the enactment of the Bankruptcy Code:

> For some three centuries of bankruptcy law, courts have held that an equitable exception to the usual rules applies in the unusual case of a solvent debtor. When a debtor proves solvent—that is, when the debtor's assets exceed its liabilities—bankruptcy's ordinary suspension of post-petition interest is itself suspended. When a debtor can pay its creditors interest on its unpaid obligations in keeping with the valid terms of their contract, it must. *Am. Iron & Steel Mfg. Co. v. Seaboard Air Line Ry.*, 233 U.S. 261, 266, 34 S. Ct. 502, 58 L. Ed. 949 (1914) ("[I]f, as a result of good fortune or good management, the [debtor's] estate prove[s] sufficient to discharge the claims in full, interest as well as principal should be paid."); *see also Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*, 679 F.2d 264, 269 (1st Cir. 1982) ("Where the debtor is solvent, the bankruptcy rule is that where there is a contractual provision, valid under state law, providing for interest on unpaid installments of interest, the bankruptcy court will enforce the contractual provision with respect to both installments due before and . . . after the petition was filed." (emphasis added)).

*Ultra Petro. Corp. v. Ad Hoc Comm. of OpCo Unsecured Creditors (In re Ultra Petro. Corp.)*, 51 F.4th 138, 150 (5th Cir. 2022).

Here, despite its protestations to the contrary, the Debtor has ample resources to pay the settlement agreed to with the Tort Committee, and to pay the Bonds in full, with post-petition interest and fees.  It simply prefers not to pay the Bonds in full and retain millions of dollars of assets for itself, and invokes its status as a non-profit in a misguided attempt to side-step the "fair and equitable" requirement of section 1129(b)(2) of the Bankruptcy Code to achieve that goal. The

Debtor's preference to not part with its assets does not justify its treatment of the Bond Claims, and its status as a non-profit is simply not relevant to the inquiry.

Thus, the treatment of the Class 6 Bond Claim is not fair and equitable and cannot be approved without the consent of the Bondholders and therefore the Debtor will not be able to confirm the Plan such that this case should be dismissed.

**B.      The Plan's Separate Classification of the Bond Claims from Other Commercial Claims Renders it Not Confirmable**

The Plan is also not confirmable because the Bond Claims in Class 6 have been separately classified from the other general unsecured creditors and trade creditors in Class 7 without a legitimate justification. In *In re Greystone III Joint Venture*, the Fifth Circuit Court of Appeals stated that:

> Chapter 11 requires classification of claims against a debtor for two reasons. Each class of creditors will be treated in the debtor's plan of reorganization based upon the similarity of its members' priority status and other legal rights against the debtor's assets. Proper classification is essential to ensure that creditors with claims of similar priority against the debtor's assets are treated similarly. A plan may not be confirmed unless either (1) it is approved by two-thirds in amount and more than one-half in number of each "impaired" class, 11 U.S.C. §§ 1126(c), 1129(a)(8); or (2) at least one impaired class approves the plan, § 1129(a)(10), and the debtor fulfills the cramdown requirements of § 1129(b) to enable confirmation notwithstanding the plan's rejection by one or more impaired classes. Classification of claims thus affects the integrity of the voting process, for, if claims could be arbitrarily placed in separate classes, it would almost always be possible for the debtor to manipulate "acceptance" by artful classification.

*In re Greystone III Joint Venture*, 995 F.2d 1274, 1277 (5th Cir. 1991). "A fair reading of both subsections [of section 1122] suggests that ordinarily 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class" with the exception being administrative convenience classes. *Id.* at 1278. "Permissible justifications vary with circumstances, but '[i]n many bankruptcies, the proffered reasons . . . will

be insufficient to warrant separate classification.'" *Bank of N.Y. Tr. Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 251 (5th Cir. 2009) (quoting *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (in Re Briscoe Enters.)*, 994 F.2d 1160, 1167 (5th Cir. 1993)).  However, "facilitating a plan's confirmation is definitely not a valid justification." *Id.*

The court in *Greystone* held "that if § 1122(a) permits classification of "substantially similar" claims in different classes, such classification may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." *Id.* at 1279 ("thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.")  The Greystone court then determined that the debtor's separate classification of its secured creditor's unsecured deficiency claim from its trade creditors was impermissible because there was no evidence of a limited market for trade goods and services at issue, nor was there any evidence that the debtor would be unable to obtain any of the trade services if the trade creditors did not receive preferential treatment under the plan. *Id.* at 1281.

Here, similarly to *Greystone*, the Debtor has separately classified the Bond Claims from the general unsecured creditors and trade creditors without providing a legitimate basis for this separate classification.  That is because no such justification exists.  The Class 7 creditors and the Bond Claims have the exact same priority under the Bankruptcy Code and the same legal rights against the Debtor.  There is no question that the Debtor is not dependent on the continued services of the trade creditors to operate post-confirmation (particularly given that trade creditors have gone more than five years without payment), nor is there any suggestion that any trade creditors would be willing to continue to do business with the Debtor if they are paid in full, or refuse to do business with it if they are not (again, not surprising given that this case has gone on for five years).  Thus, under *Greystone*, there is no legitimate business justification for the separate classification of Class

94877905.v1

6 and Class 7 creditors under the Plan and therefore the Plan does not comply with section 1122 and cannot be confirmed pursuant to section 1129(a)(1).

The Debtor's separate classification of the Bond Claims and other commercial creditors is a transparent attempt to: (1) gerrymander an impaired[30] accepting class, and (2) alienate the Bond Trustee from the Commercial Committee, whose members will have to choose whether to object to the unfair treatment of the Bond Claims, and risk their own full payment (thus creating a conflict for the Commercial Committee members), or leave the Bond Trustee out in the cold to fend for itself without the estate resources to support its objections.   Neither of these motives are permissible justifications for the separate classification of the unsecured claims under the Plan.

### C.     The Plan Unfairly Discriminates Against Class 6 Bond Claims

While the Plan purports to pay Class 7 creditors an amount that is less than the proposed payment to Bondholders, i.e., about 12% of the reduced claim amount, that equal treatment is illusory.  Rather, the Debtor includes an alternate treatment for general unsecured and trade claims under $50,000, or those who elect to reduce their claims to $50,000, in Class 7, with payment in full on the Effective Date.  While styled as "convenience treatment," what the Plan Proponents are really doing is disguising payment in full to the Class 7 creditors while purporting to impair those creditors for voting purposes.  The reality of this case is that most, if not all, of the Class 7 creditors have claims less than $50,000 or will voluntarily reduce their claims to $50,000.[31]   Thus, practically all of the creditors in Class 7 will receive payment in full on the Effective Date while

---

[30]     In fact, the Debtor's labeling of Class 7 as "impaired" is suspect because it is providing most, if not all of the creditors in that class with payment in full on the Effective Date through its "convenience" treatment option. The Bond Trustee reserves all rights to object to Class 7 being designated as "impaired" and to the proposed treatment of Class 7 under the Plan.

[31]     A review of the claims register in this case reveals that only a handful of the filed Class 7 claims exceed $50,000.

the Class 6 Bond Claims will be paid less than 12% over 10 years. This disparate treatment clearly renders the Plan not confirmable on its face.

Moreover, to the extent that the Debtor refers to Class 7 as a "convenience class" pursuant to section 1122(b) of the Bankruptcy Code, there is no legitimate basis for such a class in this case. Indeed, "the creation of an administrative convenience class is not merely a matter of showing that there are a group of small claims that could be nicely segregated; rather, the debtor must show that it is reasonable and necessary to create a separate class and that it is about 'something more than just tending to ease the administrative burden.'" *In re Nw. Timberline Enters.*, 348 B.R. 412, 439-40 (Bankr. N.D. Tex. 2006) (quoting *Beal Bank, S.S.B. v. Way Apartments (In re Way Apartments)*, 201 B.R. 444, 452 (N.D. Tex. 1996)). "In other words, there is not only an administrative burden eased (e.g., such as eliminating hundreds or thousands of small claims from the ledger and avoiding the nuisance of having to pay those out over time), but unless the unsecured creditors are paid quickly, they will cease to provide services that are necessary to the debtor's survival." *Id.*

Here, not only would the proposed "convenience" treatment of Class 7 have no effect, whatsoever, on the administrative burden of the Plan, but it is clearly not necessary. The Class 7 claims are being paid on the Effective Date regardless of whether a creditor elects "convenience treatment" or not. The only result of the convenience treatment within Class 7 is to effectuate the Debtor's stated intention to pay all general unsecured claims and trade claims in full to mute the objection of the Commercial Committee and to drive a wedge between the Commercial Committee and the Bond Trustee to isolate the Bond Trustee from estate resources. *See* ECF No 4079 at 8. There is nothing "convenient" about this devious stratagem.

Moreover, similarly to the facts in *Nw. Timberline Enters*, the trade creditors here have not been paid for five years and thus, it cannot be said that without convenience treatment and

immediate payment in full, those creditors will not continue their relationship with the Debtor. *See In re Nw. Timberline Enters*., 348 B.R. at 440 ("given that the fourteen trade creditors have not been paid in more than two years, there is either no threat of them ceasing to deal with the Debtors or the Debtors have found other providers"). If the trade creditors have not already ceased doing business with the Debtor it is highly unlikely that they will do so now.

Again, the Debtor's motives here are on full display. They want to pay off most, if not all, of the trade creditors, whose claims almost entirely are under $50,000, but do not want to provide the same treatment to the Bondholders, many of whose individual holdings of the Bonds are $50,000 or less. The proposed treatment is *per se* unfair discrimination.

## CONCLUSION

The Plan Proponents will no doubt argue, as they did when faced with another motion to dismiss, that they should be allowed to continue with the Plan process and that this Motion should be sidelined, as the other motion to dismiss and the Court's own Order to Show Cause have been. But the proposed Plan demonstrates (as if anyone needed further proof) that the Debtor is a faithless partner, intent on protecting itself and its insiders without regard to the effects of its actions on those it has harmed and continues to harm, wholly unconcerned with its fiduciary duty to the creditors of this estate.  Simply put, the Debtor does not deserve any more chances to salvage this case, as it has completely ignored the Court's admonitions to propose a consensual plan and now proposes to usurp value for itself as if it should somehow be rewarded for striking a settlement with the Tort Committee that is not even supported by a large contingent of its constituents.  How many more millions of dollars should this Debtor be allowed to waste while pursuing confirmation of a Plan that is utterly and undeniably not confirmable on its face?

94877905.v1

As presently proposed, the Plan is not confirmable because it unfairly discriminates against the Bondholders among many other reasons.

WHEREFORE, the Bond Trustee respectfully requests that the Court dismiss this case and grant any other or further relief as the Court deems necessary under the circumstances.

DATED: July 18, 2025

Respectfully submitted,

*/s/ Colleen A. Murphy*
Colleen A. Murphy (*admitted pro hac vice*)
Kevin J. Walsh (*admitted pro hac vice*)
Charles W. Azano (*admitted pro hac vice*)
Christopher Marks (*admitted pro hac vice*)
GREENBERG TRAURIG, LLP
One International Place Suite, 2000
Boston, MA 02110
Telephone: (617) 310-6000
Email: Colleen.Murphy@gtlaw.com
        Kevin.Walsh@gtlaw.com
        Chip.Azano@gtlaw.com
        Chris.Marks@gtlaw.com

*/s/ Annette Jarvis*
Annette Jarvis (*admitted pro hac vice*)
GREENBERG TRAURIG, LLP
222 S. Main Street, Suite 1730
Salt Lake City, UT 84101
Telephone: (801) 478-6907
Email: jarvisa@gtlaw.com

-and-

*/s/ David S. Rubin*
David S. Rubin (La. 11525)
BUTLER SNOW LLP
445 North Boulevard, Suite 300
Baton Rouge, LA 70802
Telephone: (225) 325-8728
Email: david.rubin@butlersnow.com
*Attorneys for Argent Institutional Trust Company*

94877905.v1