## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 20-10846 |
| **THE ROMAN CATHOLIC CHURCH** | § | |
| **OF THE ARCHDIOCESE OF NEW** | § | Section "A" |
| **ORLEANS,** | § | |
| | § | Chapter 11 |
| Debtor.[1] | § | |
| | § | |

### ARGENT INSTITUTIONAL TRUST COMPANY, AS INDENTURE
### BOND TRUSTEE'S, OBJECTION TO DISCLOSURE STATEMENT

Argent Institutional Trust Company, successor-in-interest to TMI Trust Company, as indenture Bond Trustee (the "Bond Trustee"), by and through counsel hereby opposes the *Motion to Approve* (the "Motion") [ECF No. 4152] the Plan Proponents'[2] *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of July 15, 2025* (the "Disclosure Statement") [ECF No. 4151].

In further support hereof, the Bond Trustee states as follows:[3]

---

[1] The last four digits of the Debtor's federal tax identification number are 8966. The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

[2] The Plan Proponents are collectively the Apostolates, The Roman Catholic Church of the Archdiocese of New Orleans (the "Debtor") and the Official Committee of Unsecured Creditors (the "Tort Committee").

[3] Pursuant to this Court's Scheduling Order, on July 24, 2025 counsel for the Bond Trustee met and conferred with counsel for the Plan Proponents and discussed the Bond Trustee's preliminary objections to the Disclosure Statement. The Plan Proponents agreed to make certain changes to the Disclosure Statement and related documents to address certain of the Bond Trustee's objections. However, as of the time of this filing, the Plan Proponents have not filed an amended Disclosure Statement or related documents, and, when they do, some of the objections raised herein may be addressed. The Bond Trustee reserves the right to raise any additional objections to any revised or amended disclosure statement filed by the Plan Proponents either before or during the July 31, 2025 hearing on the Motion.

## PRELIMINARY STATEMENT[4]

Over the course of the last month, it has become increasing clear that a primary area of dispute between the Bond Trustee and the Plan Proponents, now and at confirmation, will be the applicability of the "fair and equitable" requirement of the Bankruptcy Code. The Plan Proponents' argument appears to be that the "fair and equitable" test is one-and-the-same as the codified absolute priority rule set forth in Section 1129(b)(2)(B) of the Bankruptcy Code, and that if the codified absolute priority rule is inapplicable to this Debtor because it is a non-profit entity without equity, so too is the "fair and equitable" requirement.[5] The Plan Proponents thus conclude that if the "fair and equitable" requirement is inapplicable, confirmation will not require valuation of the Debtor or its assets, and will only require the Debtor to comply with the best-interest-of-creditors' test under Section 1129(a)(7).[6] Through this argument, the Plan Proponents attempt to read the "fair and equitable" requirement for cramdown under Section 1129(b) out of the Bankruptcy Code with respect to non-profit entities such as the Debtor.

In contrast, the Bond Trustee asserts, in accord with Fifth Circuit precedent and the Legislative History of Section 1129, that the "fair and equitable" requirement of Section 1129 includes uncodified components and rules other than the absolute priority rule, and that the "fair and equitable" requirement is applicable to **all** debtors, regardless of their for-profit or non-profit status. Specifically, the Bond Trustee believes[7] that a plan that permits a debtor to retain hundreds of millions of dollars in value, yet does not pay creditors in full, or even maximize their recovery,

---

[4] Capitalized terms used in this Introduction have the meanings given to such terms below. To the extent that a term is capitalized herein and not defined, such term shall have the same meaning as set forth in Exhibit A to the Plan.

[5] *See* Joint Memorandum in Connection with Discovery Conference, ECF No. 4079, at p. 8 (filed June 25, 2025).

[6] *See id.*

[7] *See* Argent Institutional Trust Company, as Indenture Trustee's, Motion to Dismiss Bankruptcy Case, ECF No. 4158, at p. 5 (filed July 18, 2025) (the "Motion to Dismiss").

is not "fair and equitable" and cannot be confirmed.[8] Thus, unlike the Plan Proponents, the Bond Trustee believes that valuation of the Debtor and its assets is an essential confirmation and disclosure issue in this case, not only for purposes of the best-interest-of-creditors' test but also for purposes of a "fair and equitable" analysis.

While the decision on the extent of the "fair and equitable" requirement of Section 1129 will ultimately be determined by the Court in connection with confirmation, the importance of that issue is front-and-center now in the context of whether the Disclosure Statement includes "adequate information," and will likely continue to be an area of dispute throughout discovery, because the Bond Trustee and the Plan Proponents fundamentally disagree on the need to value the Debtor and its assets and liabilities under the Plan.

The Plan Proponents have filed a Disclosure Statement that is consistent with their theory that the value of the Debtor and its assets are of minimal importance to the confirmation process.[9] Basic information in the Disclosure Statement about the cash the Debtor will have on and after the Effective Date (after any payments made by it to fund the Settlement Trust), the Debtor's investments, the amount and collectability of receivables, the value of its art and collectibles and its vast real estate holdings, is at best minimal, and at worst concealed. In drafting their Disclosure

---

[8] If the facts and circumstances of this case remained the same except that the Debtor was a for-profit entity with equity holders, it would be obvious that the proposed plan could not be confirmed because the Debtor retains hundreds of millions of dollars in value without paying its creditors in full. There simply is no way equity could remain in place in that scenario, and a bankruptcy court would easily deny confirmation of such a plan as a clear violation of the statutory absolute priority rule. The same principles behind that application of the statutory absolute priority rule are also inherent in the "fair and equitable" requirement in general. Those principles are as applicable to non-profit entities as they are to for-profit entities. An unconfirmable plan does not magically become confirmable just because the debtor is a non-profit so that it is retaining hundreds of millions of dollars of value *for itself*, rather than for the benefit of equity holders as would be the case with a for-profit. If a non-profit debtor could game the system so effortlessly, then surely someone other than the Debtor would have figured it out by now and non-profit debtors would be inundating bankruptcy courts nationwide to rid themselves of unsecured debt while otherwise retaining significant assets.

[9] *See* Joint Memorandum in Connection with Discovery Conference, ECF No. 4079, at p. 8 (filed June 25, 2025). ("The absolute priority issue in this case is not a value issue …").

Statement in this way, the Plan Proponents act as if the Court has already ruled in their favor on the applicability and extent of the "fair and equitable" requirement, which it has not. In the Plan Proponents' view, since the value of the Debtor and its assets is not an issue other than in the context of a hypothetical Chapter 7 – an exercise that can be, and has been here, easily manipulated in favor of the Plan Proponents (at least for purposes of the Disclosure Statement) – clear descriptions and valuations of the Debtor's assets and liabilities are unnecessary, and therefore are not provided in the Disclosure Statement.

A failure to adequately and clearly describe a debtor's assets and liabilities and the values of those assets and liabilities would normally doom any disclosure statement. Here, however, the effect of that deficiency is magnified because the Debtor is only using a fraction of its assets to pay its creditors. The rest of the Debtor's assets – at least $50 to $70 million in cash and investments, $62 - $70 million of accounts receivable, at least $2.4 million of art and collectibles, and hundreds of millions of dollars (perhaps as much as a billion dollars) of real estate – passes through the bankruptcy, unaffected, and unavailable for unsecured creditor recoveries. The Debtor's desire to shield and retain these assets is a primary objection of the Bond Trustee to confirmation and the adequacy of the Disclosure Statement. Every creditor that is not being paid in full under the Plan should have a full understanding, *before* they vote on the Plan, of the assets the Debtor proposes to retain, the value of those assets, whether those assets are necessary for the Debtor's post-petition operations, and why those assets are not being sold or otherwise made available to repay creditors. Such information is missing from the Disclosure Statement. The Court should not approve the Disclosure Statement unless and until the Plan Proponents provide this information.

ACTIVE 713379119v1

The Plan Proponents' failure to adequately describe the Debtor's assets and liabilities is not the only flaw in the Disclosure Statement. The Disclosure Statement also fails to adequately and clearly explain the treatment of the Bond Trustee's claim, fails to explain the implementation mechanics of its Plan (notably the specific amounts to be contributed by various debtors), has numerous problems with its proposed liquidation analysis, and multiple technical defects and mistakes that should be remedied. Until all of these problems are fixed, so that a reasonable and hypothetical investor can make an informed decision about the Plan, the Court should not approve the Disclosure Statement.

## ARGUMENT

## I.  LEGAL STANDARD TO APPROVE DISCLOSURE STATEMENT

1.      Section 1125(b) of the Bankruptcy Code requires that a disclosure statement contain "adequate information." "Adequate information" is defined as "information of a kind, and in sufficient detail [to enable] a hypothetical investor of the relevant class to make an informed judgment about the plan . . . ."[10] "[I]t is understood that the general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan."[11]

2.      "[A] disclosure statement is intended to be a source of factual information upon which one can make an informed judgment about a reorganization," and not "an advertisement or sales brochure."[12] It "must contain factual support for any opinions contained therein since

---

[10] 11 U.S.C. § 1125(a)(1).

[11] *In re Phoenix Petroleum Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001).

[12] *In re Avianca Holdings Sociedad Aomima*, 632 B.R. 124, 129-30 (Bankr. S.D.N.Y. 2021) (internal quotations and citations omitted).

ACTIVE 713379119v1

opinions alone do not provide the parties voting on the plan with sufficient information upon which to formulate decisions."[13] The supporting information in a disclosure statement must be factual, not the plan proponent's aspirations and opinions; the sources and methodology utilized by the plan proponent must be disclosed.[14]

3.       The information required and set forth in a disclosure statement should be "clear and comprehensible" and the information therein should not be "overly technical" or need to be "decipher[ed]."[15] Some courts have summarized this need for clear and comprehensible disclosure as requiring the disclosure statement to be written in "plain English."[16]

4.       Over the years, courts have developed specific lists of items that plan proponents must disclose to creditors in the context of a disclosure statement.[17] While the specifics of these

---

[13] *Id.* (citing 7 Collier on Bankruptcy, ¶ 1125.02[2]).

[14] *See In re Egan*, 33 B.R. 672,675 (Bankr. N.D. Ill 1983).

[15] *See In Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

[16] *See Id.* (citing to and crediting *In re. Dakota Rail*, 104 B.R. 138, 150 (Bankr. D. Minn. 1989) with creating the "Plain English Disclosure Statement Rule").

[17] Courts in the Fifth Circuit frequently look to the "Metrocraft Factors" as a non-exhaustive list of factors, which factors include:

    a)  the events which led to the filing of a bankruptcy petition;
    b)  a description of the available assets and their value;
    c)  the anticipated future of the company;
    d)  the source of information stated in the disclosure statement;
    e)  a disclaimer;
    f)  the present condition of the debtor while in Chapter 11;
    g)  the scheduled claims;
    h)  the estimated return to creditors under a Chapter 7 liquidation;
    i)  the accounting method utilized to produce financial information and the name of the accountants responsible for such information;
    j)  the future management of the debtor;
    k)  the Chapter 11 plan or a summary thereof;
    l)  the estimated administrative expenses, including attorneys' and accountants' fees;
    m)  the collectability of accounts receivable;
    n)  financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;
    o)  information relevant to the risks posed to creditors under the plan;
    p)  the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

lists are not always identical, they *consistently* include the requirement that a disclosure statement must include a complete description of the debtor's assets and liabilities, with corresponding values.[18] "Failure to disclose assets prior to confirmation of a Chapter 11 plan gives the debtor an unfair advantage at confirmation over creditors entitled to vote on the plan."[19]

## II. THE DISCLOSURE STATEMENT DOES NOT CLEARLY DESCRIBE THE PROPOSED TREATMENT OF THE BOND TRUSTEE'S CLAIM IN "PLAIN ENGLISH."

5.     Before turning to the Bond Trustee's primary objection to the Disclosure Statement – that the Disclosure Statement fails to clearly, simply and accurately lay out the Debtor's assets and the values of those assets – it is important to first address the manner in which the Plan Proponents describe treatment of the Bond Trustee's claim.

---

q)   litigation likely to arise in a nonbankruptcy context;
r)   tax attributes of the debtor; and
s)   the relationship of the debtor with the affiliates.

*See, e.g., In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984). *See also In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401-02 (Bankr. S.D. Tex. 2016) (adopting the Metrocraft Factors to evaluate whether a disclosure statement contains adequate information); *In re United States Brass Corp.*, 194 B.R. 420, 425 (Bankr. E.D. Tex. 1996).

[18] *See, e.g., Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993) ("To provide adequate information, a disclosure statement should include: A. The events which led to the filing of Chapter 11; B. A description of the available assets and their value; C. The scheduled claims; D. The estimated return to creditors under a Chapter 7 liquidation; and E. Litigation likely to arise in a non-bankruptcy context."); *In re Microwave Prods. of Am., Inc.*, 100 B.R. 376, 378 (W.D. Tenn. 1989) (including "a description of the available assets and their value," "the scheduled claims as allowed or estimated by category," and administrative claims among requirements); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 171 (Bankr. S.D. Ohio 1988) (including "a complete description of the available assets and their value," "information regarding claims against the estate," and administrative expenses, among requirements); *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. at 567 (listing "a description of the available assets and their value," "the scheduled claims" and administrative claims among requirements).

[19] *Creekwood Rental Townhomes, LLC v. Kiln Underwriting Ltd.*, 2012 U.S. Dist. LEXIS 139991, at *9 fn. 6 (D. Minn. Sept. 28, 2012) (citing and quoting *In re Grelier*, 400 B.R. 826, 831 (Bankr. N.D. Ala. 2009) (finding that clause reserving the right to prosecute any and all claims against the defendant was not adequate disclosure of a Chapter 11 debtor's state-court malpractice claim) and *Cannata v. Wyndham Worldwide Corp.*, 798 F. Supp. 1165 (D. Nev. 2011) ("[I]nformation provided on bankruptcy schedules informs the actions creditors plan to take during the bankruptcy proceeding, and the same information forms the basis upon which the bankruptcy court decides whether to approve a reorganization plan.").

ACTIVE 713379119v1

6.      The Disclosure Statement's summary of the payments to be made to the Bond Trustee under the Plan is vague, internally inconsistent and insufficient to allow Bondholders to evaluate their expected recovery. Indeed, the Disclosure Statement fails to let Bondholders know what they will receive under the Plan. Instead, the Disclosure Statement employs an equation that is little more than gobbledygook that does not describe what the Bondholders will receive:

> A numerator equal to the Allowed Bond Claim and a denominator equal to all Unsecured Claims against the Debtor to be paid under this Joint Plan times the amount available to be distributed to Unsecured Claimants of the Debtor under the Joint Plan.[20]

7.      At first blush it appears that the Plan Proponents are attempting to structure the Bondholders' recovery to mirror the "best-interest-of-creditors' test," which they are required to comply with, at a minimum, under Section 1129(a)(7) of the Bankruptcy Code to confirm the Plan. However, when read literally, the equation used in the Plan and Disclosure Statement is not consistent with the hypothetical used in the Disclosure Statement to purportedly illustrate what payments the Bond Trustee might receive under the Plan. In fact, a literal reading of this equation would result in the following:

$$(\$28,667,937.50^{21} / \$224,649,988\,^{22}) * \$280,097,404^{23} = \$35,743,669.26.$$

However, based on the Plan Proponents' hypothetical recovery calculation included in the Disclosure Statement, the Bond Trustee is only expected to receive principal and interest payments equal to $462,492.12 per year for 10 years. Thus, it is not clear what the actual recovery for the Bondholders will be under the Plan based on the Disclosure Statement's inconsistencies. At a

---

[20] See Disclosure Statement, at p. 44 – ***Class 6 – Bond Claims***.

[21] See Plan at §4.6 (stating the amount of the Allowed Bond Claim).

[22] See ECF 4151-2 at p. 3 (showing the estimated payments to unsecured claims under the Plan).

[23] See id. at p. 2 (showing the estimated amount of unrestricted cash available to be distributed on account of unsecured claims under the Plan, plus working capital holdback).

ACTIVE 713379119v1

minimum, the Disclosure Statement should clearly state what payments will be made to the Bond Trustee, and include an amortization schedule, so that Bondholders have a clear understanding of what they will receive and when they will receive it if the Plan is confirmed.

8.      Moreover, the proposed Amended Bond Documents are not attached to the Disclosure Statement and thus the Bondholders cannot evaluate what loan documents will govern their claims against the Reorganized Debtor if this Plan is confirmed. Without a chance to review the Amended Bond Documents, and a redline showing the proposed changes, Bondholders cannot possibly know *inter alia,* what covenants will be included in the Amended Bond Documents, what events of default will be included, what rights the Bond Trustee will have against the Reorganized Debtor or any other pertinent information that any reasonable investor would want to know before entering into a lending relationship. The Amended Bond Documents are a crucial component of the treatment of the Bond Claims, and should be attached to the Disclosure Statement, with a redline to the current Bond Documents, to provide adequate information to Bondholders.

9.      The lack of Amended Bond Documents is not only an issue for voting purposes, but also for the Bond Trustee, and the Court, to determine whether the Plan treats Bondholders "fairly and equitably" under the circumstances. If the Debtor is preparing to strip additional rights and remedies from the Bondholders and Bond Trustee or loosen covenants that were the only protection for Bondholders pre-petition, such proposed terms must be made clear in the Disclosure Statement to afford the Bondholders and the Bond Trustee due process to understand, and if appropriate, to challenge those amendments. Requiring the Bond Trustee to wait until immediately before, or even after the confirmation hearing, to even see the new Bond Documents offends the most basic notions of due process and should not be allowed.

10.     Another key component of the treatment of the Bond Claims that is not addressed in the Disclosure Statement is how the Bonds will be reissued or exchanged for the new bonds being provided under the Plan. The Disclosure Statement, and solicitation procedures simply ignore this point and leave the Bondholders completely in the dark on how they will receive their new Bonds.

11.     As the Court is well aware, the interest paid on the Bonds by the Debtor is exempt from Federal and state income tax. Based on the limited information in the Plan, the proposed treatment of the Bonds will result in a reissuance of the Bonds. To preserve the tax-exempt status of the Bonds, the Debtor must comply with Internal Revenue Code requirements relating to the reissuance. But the Disclosure Statement does not address this issue, or whether the Plan will preserve the tax exemption on the Bonds at all. It simply ignores this extremely important issue to the Bondholders who purchased the Bonds based on, *inter alia*, their tax-exempt status.[24]

12.     Indeed, if the Plan does not preserve the tax exemption on the Bonds and the Debtor does not take the steps necessary to ensure that the Bonds remain freely tradable, then the Plan is, on its face not "fair and equitable" and should not be confirmed.

13.     The bankruptcy court in *La Guardia Associates* addressed this precise issue and found that:

> The plan, as noted, proposes to take triple tax exempt bonds, which are fully amortizing, subject to debt reserve requirements, and freely tradable in the marketplace, and replace them with debt instruments which bear no relation whatever to them. The Court concurs with SunTrust that it is inconceivable that this plan can satisfy the fair and equitable standard for cramdown of the plan over objection

---

[24] Indeed, it is the tax-exempt nature of the Bonds that likely made them an attractive investment option for the Bondholders in the first instance. Eliminating that feature of the Bonds would result in further economic harm to the Bondholders, who, under the proposed Plan, will already suffer a 90% loss of the principal of their investment.

ACTIVE 713379119v1

under § 1129(b). In this respect as well, the FHA amended plan is patently unconfirmable on its face . . . ."[25]

Therefore, it is of paramount importance that the Debtor disclose how the Bonds are being treated, whether the Federal and state income tax exemption is being preserved and whether the Bonds will be reissued and/or exchanged. Otherwise, Bondholders cannot determine key aspects of the treatment of their claims that are highly material for the confirmation process and voting.

14.     Keeping the Bondholders, the Bond Trustee and the Court in the dark about key components of the Plan's treatment of the Bond Claims and proceeding to confirmation with a trial by ambush strategy is highly inappropriate, particularly in light of the accelerated time frame in which Plan Proponents are attempting to confirm this Plan. There is no legitimate reason why the Plan Proponents cannot provide the Amended Bond Documents as an exhibit to the Disclosure Statement. The Plan Proponents will undoubtedly claim that there is not sufficient time to draft Amended Bond Documents before the Disclosure Statement needs to be distributed under the current timeline, but this case has lingered in bankruptcy for more than five years and the professionals have incurred, or are anticipated to incur, more than $50 million in fees. As such, any failure to have Amended Bond Documents ready to go for distribution with the Disclosure Statement is entirely of their own making. Moreover, all of the parties, including the Bond Trustee, are working diligently under very tight timelines to accommodate the Plan Proponents' attempt to cram this Plan down on them.  If everyone else is being required to work under difficult time pressures, so too should the Plan Proponents.

15.     At bottom, the Bondholders and Bond Trustee are entitled to have a complete picture of how they will be treated, how the Bonds will be reissued or exchanged, in what amount,

---

[25] *In re La Guardia Assocs., L.P.,* 2006 Bankr. LEXIS 4735, at *173 (Bankr. E.D. Pa. Sep. 13, 2006) (declining to approve disclosure statement).

what the payment schedule will be, and under what governing documents. Without this information, the Disclosure Statement does not contain adequate information about the treatment of the Bonds and should not be approved.[26]

### III. THE DISCLOSURE STATEMENT FAILS TO CLEARLY IDENTIFY THE DEBTOR'S ASSETS AND THE VALUE OF THOSE ASSETS.

16.     One item that all courts agree must be included in a disclosure statement in order for it to include "adequate information" is a complete description of the debtor's assets and the value of those assets.[27] A failure to disclose assets prior to confirmation gives a debtor an "unfair advantage."[28] Disclosure of assets should not merely "scratch the surface" but instead, should be a "comprehensive summary . . . in easily reviewable form that includes . . . a list of assets, their values and the bases for the valuation (including reference to appraisals or other supporting documentation if any)."[29]

17.     The Disclosure Statement is a lengthy 70 pages plus exhibits. Yet, its description of the Debtor's assets merely "scratches the surface" and is limited to just a few pages.[30] Given

---

[26] *See In re RADCO Props., Inc.*, 402 B.R. 666, 683 (Bankr. E.D.N.C. 2009) (quoting *In re Ferretti*, 128 B.R. at 19 ("A disclosure statement should provide the average unsecured creditor 'what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution'").

[27] *See, e.g., Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*, 157 B.R. at 102 ("A description of the available assets and their value"); *In re Microwave Prods. of Am., Inc.*, 100 B.R. at 378 ("a description of the available assets and their value); *In re Scioto Valley Mortg. Co.*, 88 B.R. at 171 ("a complete description of the available assets and their value"); *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. at 567 ("a description of the available assets and their value").

[28] *Creekwood Rental Townhomes, LLC v. Kiln Underwriting Ltd.*, 2012 U.S. Dist. LEXIS 139991, at *9 fn. 6 (D. Minn. Sept. 28, 2012) (citing and quoting *In re Grelier*, 400 B.R. 826, 831 (Bankr. N.D. Ala. 2009) (finding that clause reserving the right to prosecute any and all claims against the defendant was not adequate disclosure of a Chapter 11 debtor's state-court malpractice claim) and *Cannata v. Wyndham Worldwide Corp.*, 798 F. Supp. 1165 (D. Nev. 2011) ("[I]nformation provided on bankruptcy schedules informs the actions creditors plan to take during the bankruptcy proceeding, and the same information forms the basis upon which the bankruptcy court decides whether to approve a reorganization plan.").

[29] *See In re Robert's Plumbing & Heating, LLC*, 2011 Bankr. LEXIS 2879, at *6, *24 (Bankr. D. Md. July 20, 2011).

[30] Disclosure Statement, at pp. 27-29.

the likely substantial value of these assets, this is woefully insufficient. Moreover, basic information – such as how much cash the Debtor projects to retain after making the required Effective Date Plan payments – is nowhere to be found in the Disclosure Statement and must be uncovered by parsing through the financial statements, backing out deducts, and applying undisclosed assumptions. This muddled presentation is the opposite of the clear and comprehensible, "plain English," description a Disclosure Statement must contain.

18.     Moreover, the Plan Proponents' failure to value the Debtor's assets is particularly inexcusable in this case, which has been pending for over five years, with many millions of dollars having been spent on experts and financial advisors to value the Debtor's assets and estimate its liabilities. It is inconceivable that neither the Debtor nor the Tort Committee would, under these circumstances, know how much the Debtor's assets are worth. This information must be disclosed regardless of whether the Plan Proponents find it to be inconvenient to their current narrative.

### A.     The Debtor's Cash and Investments

19.     The Plan Proponents should be required to clearly set forth how much cash the Debtor anticipates it will have immediately before the Effective Date of the Plan, how that cash will be used to make Effective Date payments required by the Plan (including any payments to the Settlement Trust), and how much cash the Debtor anticipates having as it emerges from bankruptcy on the Effective Date. **In its current form, the Disclosure Statement suggests that the Debtor will have somewhere between $50 million and $70 million in cash and/or unrestricted investments after it has made the Effective Date payments (including to the Settlement Trust) and emerges from bankruptcy.[31]** This information should be clearly set forth and creditors

---

[31] As an example of just one of the issues presented by the inadequacy of the Disclosure Statement, the Trustee relied on the Disclosure Statement to assert in its Motion to Dismiss that the Debtor was retaining $73 million in cash and investments after making the proposed Effective Date payments and the funding of the promissory note from the proceeds of the Christopher Homes sales, which was not separately identified on the feasibility analysis as it is

should not have to rely on the Debtor's financial schedules (and certainly should not have to make additional calculations or assumptions based on those schedules) to uncover this information. The Plan Proponents should also be required to provide an explanation as to why the Debtor is entitled to, or needs to, retain $50 million to $70 million in cash and unrestricted investments if it is not paying its creditors in full.[32]

### B. The Debtor's Accounts Receivable

20. The Disclosure Statement indicates that the Debtor is owed $70,179,090 by the Additional Debtors and Non-Debtor Catholic Entities. The Debtor reduces this amount by almost $8 million to account for uncollectable debts.[33]

21. The Disclosure Statement should have a more detailed narrative on these receivables, including the specific Additional Debtors and Non-Debtor Catholic Entities obligated to the Debtor, the amounts of those obligations, the efforts the Debtor has made to collect amounts owed, and whether the Debtor has any set-off rights against each of the entities. Similarly, as with the cash and investments above, the Plan Proponents should be required to explain in the

---

[32] Essential to an understanding of the Debtor's Effective Date cash position is the precise contribution each of the Debtor, the Additional Debtors, and the Non-Debtor Catholic Entities are making to fund the Settlement Trust. A related issue is that there should be disclosure as to which entity or entities are expected to advance amounts pursuant to the $20 million Settlement Trust Promissory Note and which entity will receive the Debtor and Apostolates' portions of the Christopher Holmes proceeds. The Debtor appears to retain flexibility with respect to which entity funds these amounts and which entity is entitled to receive the proceeds of the sale of Christopher Homes, and by retaining this flexibility, the Debtor operates its Plan like a shell-game, moving the payment obligations and refund rights however it suits it at the time to disadvantage its creditors.

[33] *See* Disclosure Statement, at p. 29.

ACTIVE 713379119v1

Disclosure Statement why the Debtor needs to retain $62 million to $70 million in receivables and why the Debtor cannot use those receivables to repay creditors.

**C.**     **The Debtor's Tangible Moveable (Personal) Property**

22.      How is a debtor that is not paying its creditors in full permitted to retain more than $2.4 million of art and collectables?[34] How does the retention of art and collectibles by the Debtor generate more value for the Debtor's creditors than would be generated by selling the art and collectibles to pay creditors? The Debtor's proposed retention of its art and collectibles is indicative of much of the property the Debtor seeks to retain under its Plan – it's not that the Debtor *needs* to retain property to operate post-confirmation, it's just that it *wants* to. That desire is not appropriate, acceptable or supportable when a debtor is not paying its creditors in full.

23.     The Plan Proponents should be required to provide in the Disclosure Statement a detailed inventory of the Debtor's art and collectibles and why those items cannot be sold to repay creditors.

**D.**     **The Debtor's Real Property**

24.     According to the Disclosure Statement, the Debtor's real property has a balance sheet value of approximately $114 million and a liquidation value of $87 million.[35] These amounts are in all likelihood severely underestimated by hundreds of millions of dollars (perhaps $1 billion

---

[34] See Disclosure Statement, at p. 27.

[35] See Disclosure Statement, at Ex. 4, p. 2.

ACTIVE 713379119v1

or more).[36] Notwithstanding the extensive value of this real estate, the Plan Proponents devote a mere six lines of narrative in the Disclosure Statement to describing the property.[37]

25.     The rest of the disclosure about the Debtor's real property is set forth on a five-page chart attached to the Disclosure Statement as Exhibit 6. The chart includes 200 parcels of property, only 52 of which list values (the rest are blank or are listed at $0.00). For the 52 properties that do have values, there is no explanation for the bases of such values.[38]

26.     Even more concerning is that there are 148 parcels assigned no value. The types of properties with $0.00 or blank values include churches, schools, a retreat center, parking lots, storage areas, vacant land, an athletic complex, and the St. Louis Cathedral. The lack of ascribed values for these real property assets is particularly shocking where the Plan Proponents have disclosed, in the Disclosure Statement, that both they and the Tort Committee have obtained real estate appraisals on at least some of the Debtor's and the Apostolates' assets. It is incomprehensible

---

[36] By way of example, Certain Abuse Survivors in this case have highlighted that the Debtor insures the property it owns directly and indirectly (e.g., owned by the Additional Debtors) for **$2.1 billion**. *See* Certain Abuse Survivors' Motion to Dismiss Bankruptcy Pursuant to 11 U.S.C. § 1112(b), ECF No. 3965, at ¶ 125. In contrast, the Plan Proponents list the Debtor's real property as having a value of approximately $114 million ($87 million liquidation value) and the Additional Debtor's real property as having a liquidation value of approximately $170 million liquidation (based on Exhibit 5) or approximately $286 million (based on Exhibit 7).

[37] The Disclosure Statement provides:

> "**Section 6.02 The immovable (Real) Property.** The Debtor and the Additional Debtors have significant real estate assets comprising of approximately 1,500 properties and/or structures including church buildings, rectories, residential homes, apartments, schools, and vacant land. While certain assets have been appraised at various times by the Debtor or the Survivors' Committee, the Debtor does not have comprehensive appraisals of all of its assets. A summary of the Debtor's immovable property is attached to this Disclosure Statement as Exhibit 6. Information regarding the immovable property of the Additional Debtors is set forth in Exhibit 7 to this Disclosure Statement."

*See* Disclosure Statement, at p. 27.

[38] *See In re Robert's Plumbing & Heating, LLC*, 2011 Bankr. LEXIS 2879, at *24 (Bankr. D. Md. July 20, 2011) ("…a future … disclosure statement should include a comprehensive summary of [the debtor's] assets and liabilities in easily reviewable form that includes, (1) a list of assets, their values *and the bases for the valuations* (including reference to appraisals or other supporting documentation if any)…") (emphasis added).

to imagine that the Tort Committee has not obtained an appraisal of the St. Louis Cathedral. The Plan Proponents include two properties on Exhibit 6 as having $0.00 value, even though the Debtor has them listed for sale for millions of dollars. One of these properties has a list price of $1.95 million[39] and the other has a list price of $1.25 million.[40] The Debtor and the Tort Committee should be required to disclose the values for all properties for which they obtained appraisals. In addition, the Plan Proponents should be made to disclose any liens or mortgages filed against any of the properties the Debtor retains under the Plan.

27.     Even in cases where debtors have just a few pieces of property, courts require full descriptions of the property and the value of the property in order to approve a disclosure statement. For example, in *In re. Robert's Plumbing & Heating, LLC,* 2011 Bankr. LEXIS 2879 (Bankr. D. Md. July 20, 2011), the bankruptcy court required a debtor to analyze each parcel of real estate:

> "Ms. Harenberg must provide a meaningful summary of her pre-bankruptcy financial affairs. At a minimum, this should include financial statements sufficient to detail Ms. Harenberg's changing fortunes for a representative period of time. ***As Ms. Harenberg's income appears to flow primarily from her real estate interests, each parcel should be analyzed individually in this regard.*** Without a reasonable sampling of pre-bankruptcy history that includes a history of ***each parcel***, creditors will have no basis for determining the impact of this reorganization case."[41]

In that case, Ms. Harenberg had avoided providing accurate values of her real estate property interests in her schedules on the basis that it would be "unduly burdensome to obtain current market

---

[39] https://www.mceneryco.com/property/historic-church-rectory/ (listing price of $1.95 million as of 7/28/25).

[40] https://www.loopnet.com/Listing/1032-1042-Loyola-Ave-New-Orleans-LA/33625096/ (listing price of $1.25 million as of 7/28/25).

[41] *See In re Robert's Plumbing & Heating, LLC*, 2011 Bankr. LEXIS 2879, at *30 (Bankr. D. Md. July 20, 2011).

ACTIVE 713379119v1

valuations" and that they were unnecessary because her real property was covered by exemptions, to which the court responded: "To call this an act of bad faith would be a gross understatement."[42]

28.     The Court should require the Plan Proponents to provide values for ___**each**___ of those parcels and an explanation as to how those values were determined. If the principal of a plumbing and heating company is required to provide such information in a disclosure statement, so too should the Archdiocese of New Orleans be, particularly given that it has spent five years in this case and more than $50 million in fees for professionals and advisors for the estate who have undoubtedly endeavored to value the Debtor's assets. Just because the Debtor seeks to retain hundreds of parcels of real property and not just a few, it should not be excused from the same disclosure requirements that would be expected of other debtors.

29.     There is no "too big to disclose" or "too difficult to disclose" rule anywhere in the Bankruptcy Code. Moreover, just like the art and collectibles the Debtor seeks to retain, the Plan Proponents should be required to explain why a portion of the Debtor's vast real estate holdings cannot be sold to pay the Debtor's creditors in full. Until this information is included in the Disclosure Statement, it should not be approved to be distributed to creditors.

**IV.     THE DISCLOSURE STATEMENT FAILS TO CLEARLY IDENTIFY THE DEBTOR'S LIABILITIES, HOW THOSE LIABILITIES ARE TREATED UNDER THE PLAN, AND WHY CERTAIN INSIDER CLAIMS, "PASS THROUGH" THE BANKRUPTCY.**

30.     Just as courts routinely require debtors to detail all assets and their values in a disclosure statement, courts also routinely require debtors to describe and value their liabilities and claims, including administrative claims.[43] Clear disclosure of the Debtor's liabilities, in particular

---

[42] *See Id. at *27.*

[43] *See, e.g., In re Microwave Prods. of Am., Inc.*, 100 B.R. at 378 (including "the scheduled claims as allowed or estimated by category," and "administrative claims" among requirements); *In re Scioto Valley Mortg. Co.,* 88 B.R. at 171 (including "information regarding claims against the estate," and "administrative expenses" among requirements);

administrative claims, is essential to understanding the excess cash and other assets the Debtor should have available to pay its creditors.

A.     **The Disclosure Statement Does Not Contain Adequate Information about the Administrative Claims Incurred and Expected to be Incurred in this Case**

31.     Pursuant to Section 2.2 of the Plan, the Bankruptcy Court will not hear final fee applications until *after* its confirmation hearing and final fee applications are not due to be filed until 45 days after the Effective Date. The Disclosure Statement does not contain adequate information regarding the amount or treatment of the administrative claims in this case and merely points to the applicable bar date and objection deadline set forth in the Plan.[44] Reference to a bar date and an objection deadline without more is not adequate or sufficient information, and creditors are entitled to know what the total administrative fees and expenses in this case are expected to be.[45] Specifically, the Disclosure Statement contains no information regarding what the total estimated fees in this case will be or what will happen to any fees that have been allowed and paid to professionals, on an interim basis, that are ultimately disallowed by the Bankruptcy Court after the Effective Date. The Disclosure Statement does not even mention this possibility, notwithstanding the Bankruptcy Court's acknowledgement during recent hearings that fees are subject to review and possible disgorgement.

32.     Nor does the Disclosure Statement provide creditors with information concerning what will happen to the interim professional fees that have already been paid if this case is dismissed. This fact is material to creditors' evaluation of the Plan because if it is not confirmed,

---

*In re Metrocraft Pub. Servs., Inc*., 39 B.R. at 567 (listing "the scheduled claims" and "administrative claims" among requirements).

[44] *See* Disclosure Statement, at § 8.1.

[45] *See In re United States Brass Corp.*, 194 B.R. at 424 ("the relevant factors for evaluating the adequacy of a disclosure statement may include… (12) the estimated administrative expenses, including attorneys' and accountants' fees").

ACTIVE 713379119v1

and this case is dismissed, professionals may be required to disgorge millions of dollars of fees that have already been paid, making those monies readily available to satisfy creditors' claims against the Debtor under state law. The Plan Proponents put this value in play when they proclaim in the Disclosure Statement that the confirmed Plan is better than dismissal for creditors.[46]

33.     Similarly, the possibility that estate professionals may be required to disgorge fees should be included in the Debtor's liquidation analysis, because if this case were hypothetically converted to a Chapter 7 liquidation, the Bankruptcy Court would have to determine what portion, if any, of the approximately $50 million of professional fees that have been allowed and paid on an interim basis to date were necessary and reasonable in light of the results, or lack thereof, achieved under that scenario. Again, proper accounting of potentially disgorged fees could result in tens of millions of dollars being returned to a hypothetical Chapter 7 estate for distribution to creditors. Because the Debtor is only paying the Bondholders what they would receive in a hypothetical liquidation under Chapter 7, adding millions of dollars to a Chapter 7 estate's balance sheet if this case were hypothetically converted would defray some of the administrative costs of a Chapter 7. This fact is highly material to the Bondholders' recovery under the Plan, and thus, they should be informed of this potential asset when considering the Plan and their potential recovery thereunder versus their potential recovery if the case is dismissed.[47]

---

[46] *See* Disclosure Statement at p. 63 (Section 12.02).

[47] As discussed below, the Plan Proponents have included millions of dollars of administrative costs that might be incurred in connection with a hypothetical conversion to a Chapter 7 case to reduce the expected recovery to Bondholders under that scenario, and they should be required to acknowledge and include all other obvious sources of recovery that might be available to a Chapter 7 trustee, including insurance recoveries, disgorged professional fees, contributions from joint tortfeasors and expected recoveries from avoidance actions.

**B.     The Disclosure Statement Does Not Contain Adequate Information Regarding the Post-Effective Date Payments on Account of "Passed Through" Affiliate and Insider Claims.**

34.     Pursuant to Section 10.7 of the Plan, the Debtor will allow the unsecured claims of its affiliates and insiders, including the Priest Pension Plan, the Priest Retiree Medical Benefits, and the Deposit and Loan Program Claims, to pass through the Bankruptcy Case unaffected and with all of their rights intact.[48] However, the Disclosure Statement does not identify the post-effective date payments that will be made by the Reorganized Debtor to its affiliates and insiders on account of their passed-through unsecured claims. Although it is not directly addressed, it appears, based on the Debtor's feasibility analysis, that the Debtor will be paying tens of millions of dollars to its insiders and affiliates on account of their passed through claims in the years following the Effective Date. If that is the case, these payments must be identified and addressed in order for the Bondholders and Bond Trustee to evaluate the treatment of the Bond Claims as compared to creditors with equal priority claims, such as the beneficiaries of those insider programs.

35.     This information is highly relevant to Bondholders, the Bond Trustee, and the Court's evaluation of whether the Plan is "fair and equitable" to Bondholders and whether the Plan treats Bondholders disparately from other unsecured claims against the Debtor that are in effect being paid in full through the Plan's specious "pass through" mechanism. The fact that the Debtor is attempting to disguise its treatment of these affiliate unsecured claims by not classifying them, despite the fact that it did classify them in its first plan filed less than a year ago, is telling. But

---

[48] *See* Plan § 10.7.

ACTIVE 713379119v1

whatever the Debtor's motives, it cannot relieve itself of the obligation to provide clear information on how other creditors are being treated under the Plan.[49]

36.      Significantly, the Debtor has taken the position that the Bond Claims cannot be reinstated under the Plan absent consent from all of the Abuse Survivors, but nonetheless is planning to reinstate the debt of its affiliates and insiders through the Plan without seeking the same unanimous consent from the Bondholders or the Abuse Survivors.[50] The basis and rationale for disparate treatment between the unsecured claims of the Debtor's insiders and affiliates and the unsecured Bond Claims must be addressed in the Disclosure Statement.

**C.      The Disclosure Statement Provides No Information Regarding the Treatment of The Bondholders and Bond Trustee's Claims Against the Debtor for Securities Fraud.**

37.      The Debtor is seeking a discharge of all claims against it that arose prior to the date of confirmation of the Plan.[51] That discharge would include the claims of the Bondholders and the Bond Trustee against the Debtor arising from the Debtor's pre-petition and post-petition statements

---

[49] The efforts of the Plan Proponents to eliminate some debt (such as that owed to the Bond Trustee) and retain or "pass through" the debt it owes to its affiliates and insiders, all while emerging from bankruptcy, shedding liabilities, and operating in the same way as it did pre-petition is strikingly similar to the description provided in *In re Robert's Plumbing & Heating, LLC* to a plan that the court found "particularly repugnant":

> "Taken at face value, it appears that the [debtor's] principals intend to "buy" [the debtor's] assets, rid themselves of such "bad" debt as they select, cherry pick certain "good" debt to keep, scrub themselves clean of personal liability and then continue to operate the same business as if the Chapter 11 had never been filed. If this played out, this scenario would reflect a particularly repugnant version of bad faith. And even if the proposed transaction could be justified as legitimate, the starting point must be the disclosure of significantly more information."

*See In re Robert's Plumbing & Heating, LLC*, 2011 Bankr. LEXIS 2879, at *21-22 (Bankr. D. Md. July 20, 2011). Of course, this case has the added complexity of the settlement with the Abuse Survivors, but once that settlement has been reached, the Debtor should be required to play by the same rules as any other debtor. Approval of the settlement, no matter how beneficial that settlement may be, does not justify non-compliance with the Bankruptcy Code, especially when the Debtor can easily pay all of its other creditors in full. Just as the court in the above-case concluded, the starting point for this Plan must be disclosure of significantly more information.

[50] Disclosure Statement at pp. 36-37.

[51] Plan at § 12.2.

ACTIVE 713379119v1

made to the bond market regarding the treatment of the Bonds in this case, and the Debtor's obligations under Canon law.[52] However, neither the Plan nor the Disclosure Statement mention those claims or identify what class those claims belong to under the Plan. Without this information, it is impossible for creditors holding those litigation claims against the Debtor to assess how the claims are being treated, or whether to vote for or against the Plan.

38.     The Bondholders and Bond Trustee's pre-petition and post-petition securities fraud claims should be included in Class 8, along with all other non-abuse tort claims against the Debtor and allowed to pass through this case. The Debtor cannot simply ignore the claims, not classify them, not solicit a vote from the holders of those claims and discharge the claims through the Plan. Again, this strategy being employed by the Debtor provides no due process and should not be countenanced.

39.     At a minimum, the Disclosure Statement should identify how the Bondholders and Bond Trustee's securities fraud claims are being treated under the Plan, if at all, identify what class those claims belong to, and provide a mechanism for soliciting votes from those creditors on the Plan. Without this basic information the Disclosure Statement does not provide adequate information to creditors and cannot be approved.

40.     Moreover, the Debtor's counsel informed counsel for the Bond Trustee during the parties' meet and confer conference that it intends to include a statement in an amended disclosure statement that the Debtor intends to sue certain undersigned counsel for defamation in connection with their assertion of securities fraud claims against the Debtor on behalf of the Bondholders and

---

[52] *See e.g.*, ECF No. 4135.  In addition to the post-petition causes of action that the Bond Trustee identified in its motion seeking a comfort order that the automatic stay does not apply to those causes of action, the Bond Trustee believes that certain of the Debtor's pre-petition statements, including those contained in the Offering Memorandum that accompanied the sale of the Bonds in 2017, give rise to causes of action under state and federal securities laws. If the Debtor will agree to classify the Bondholders' pre- and post-petition securities fraud claims in Class 8, along with all the other non-abuse tort claims, then the Bond Trustee is willing to take the motion seeking a comfort order [ECF No. 4135] down.

Bond Trustee. Obviously, this statement is included in the Disclosure Statement only to scare and intimidate Bondholders in a thinly veiled attempt to chill their rights to assert causes of action against the Debtor for violations of state and federal securities laws and other common law torts. There is no conceivable need for the Debtor to advertise its frivolous assertion of what might be potential legal actions against the Bond Trustee's counsel for such assertions, which are obviously subject to the Louisiana litigation privilege, because those causes of action have no bearing on the Plan or creditors' recovery thereunder.

41.     Thus, it is highly inappropriate for the Debtor to use the Disclosure Statement to attempt to intimidate and silence its creditors and this statement regarding the Debtor's assertion of defamation claims against counsel for the Bond Trustee should be stricken.

## V.     THE LIQUIDATION ANALYSIS IS MANIPULATIVE AND MISLEADING.

42.     This case has always been about the Debtor's ability to settle its liabilities with the Abuse Survivors (and the Disclosure Statement's primary focus on the Abuse Survivors, almost to the exclusion of all other creditors, further underscores this fact). If the Plan is accepted by the Abuse Survivors, the Debtor will have accomplished this settlement with a payment to the Settlement Trust of approximately $225 million, funded by contributions from the Debtor, the Additional Debtors, the Non-Debtor Catholic Entities, the insurers, and the proceeds from the sale of Christopher Homes. Excluding Christopher Homes and the insurers, the contributions of the Debtor, the Additional Debtors, and the Non-Debtor Catholic Entities on the Effective date are expected to total approximately $150 million. The Debtor's contribution to this amount appears to fall somewhere between $45 million and $65 million. Based on the feasibility projections, this will allow the Debtor to retain between $50 million to $70 million in cash.

43.     *If one thing is clear from the above, it is that this Debtor has more than sufficient assets to make the required payment to the Settlement Trust, to pay all of its claims in full and*

***to emerge from bankruptcy as a viable entity able to carry on its mission.*** Indeed, even after making the expected $45 million to $65 million contribution to the Settlement Trust, the Debtor has sufficient cash and investments to pay the Bond Trustee claim and general unsecured creditors in full. Thus, the Debtor could effectuate its plan and pay its creditors in full without having to sell any of its vast real estate holdings, art or collectibles. It can do this. It just doesn't want to.

44.     Notwithstanding the ease with which the Debtor could fund the Settlement Trust and pay its other creditors in full, it has put forth a liquidation analysis suggesting that unsecured creditors will only be paid a fraction of what they are owed. Some of this is due to the fact that a hypothetical Chapter 7 liquidation is not the most efficient forum in which to liquidate the Debtor because the settlement agreement with the Abuse Survivors requires the channeling injunction, non-debtor releases and other benefits only (or most readily) available in a Chapter 11 plan. **Indeed, the Debtor could easily propose a *liquidating Chapter 11 plan* that pays all of its creditors in full.** Such a plan would be a far better metric to use than a hypothetical Chapter 7 plan for purposes of determining the liquidation value of the Debtor.

45.     Even though the most accurate way of understanding the Debtor's hypothetical liquidation value would be to do so through the context of a liquidating Chapter 11 plan, the Bond Trustee recognizes that Section 1129(a)(7) refers to a hypothetical Chapter 7. Thus, even though a Chapter 7 is an impossibility – a fact which the Debtor has acknowledged, and in fact, emphasizes, [53] the Bond Trustee recognizes that the Plan Proponents must conduct a hypothetical

---

[53] The Plan Proponents freely acknowledge that this case will never end up in Chapter 7. *See* Disclosure Statement, at § 12.03:

    **Section 12.03 Chapter 7 Liquidation is Not an Alternative.**

    Pursuant to section 1112(c) of the Bankruptcy Code, if a debtor is "not a moneyed corporation," the debtor's Chapter 11 cannot be converted to a Chapter 7 without the debtor's consent. As a non-profit entity, the Archdiocese may not be forced to convert its Chapter 11 Case to a liquidation

Chapter 7 analysis. Still, the Plan Proponents should not be permitted to manipulate that analysis to the extent they do in the Disclosure Statement by inflating costs, maximizing inefficiencies, and wasting efforts. Because this case will never actually end up in a Chapter 7 liquidation, a **_hypothetical_** Chapter 7 analysis leaves the Plan Proponents free to make up whatever facts suit their interests. They do. If this case were ever to be administered by a **_real_** Chapter 7 trustee, the Bond Trustee has no doubt that that Chapter 7 trustee would likely achieve a much better result for unsecured creditors than what is proposed by the Plan Proponents in its liquidation analysis.

46.     Ultimately, this Court should give very little weight to the Plan Proponents' proposed liquidation analysis in a hypothetical Chapter 7 (and instead should place far more emphasis on the fact that a liquidation plan in Chapter 11 would undoubtedly pay all creditors in full), but for purposes of the Disclosure Statement and what can be accomplished now, the Plan Proponents should be required to address the following concerns:

> ➢ ***The liquidation analysis vastly overestimates the Abuse Survivors' Claim:*** If accepted, the Plan resolves the Abuse Survivors' claim for anticipated contributions to the Settlement Trust of approximately $225 million. Yet the liquidation analysis lists the Abuse Survivors' claim as a "payable" of $1.221 billion, <u>more than five times the proposed settlement amount.</u> The $1.221 billion amount is not a "payable" as it would be if it were a liquidated, non-contingent, undisputed claim. Rather, the $1.221 billion figure is based on asserted amounts from the Tort Committee's expert that presumably the Debtor disputes. Tellingly, the Debtor did not include the amount that its own experts estimate those claims to be worth or any of its defenses to liability on the Abuse Claims, which a Chapter 7 trustee would undoubtedly assert. In fact, the Debtor included 6 pages of defenses to certain of the Abuse Claims in its initial disclosure statement [ECF No. 3385 a pp. 23 -29] that it omits in this Disclosure Statement.  In other words, without the settlement with the Tort Committee the Debtor expected the Abuse Claims to be a fraction of the $1.2 billion that they now estimate, but because the Debtor will not be required to pay $1.2 billion for those claims under the Plan, it has no downside to inflating the value of those claims to use the Abuse Claims to collaterally attack the

---

under Chapter 7 of the Bankruptcy Code. Because the Archdiocese would likely never grant such consent, conversion to a Chapter 7 case is not an available alternative to the Joint Plan.

26

Bondholders' recovery. The Debtor is talking out of both sides of its mouth and should not be allowed to play games with the liquidation analysis. In effect, the Debtor has constructed its liquidation analysis to show a worst-case scenario, where the Abuse Claims are allowed in full, with no reduction, and a hypothetical trustee and its professionals are paid $20 million to chase causes of action and contributions but come up with $0 of recovery. This is obviously not an appropriate use of a liquidation analysis. Because the Debtor asserts that it would be too difficult to estimate all of the contributions and deductions that would reduce the Abuse Claims in a hypothetical Chapter 7, the Court should use the $45 million to $65 million that the Debtor is actually paying as its contribution to the Settlement Trust. The Debtor cannot have its cake and eat it too by settling its tort claims but refusing to perform a legitimate liquidation analysis of those claims to artificially inflate them to reduce the Bondholders' recovery.

➢ ***The liquidation analysis fails to account for the other contributing parties:*** The $1.221 billion amount included in the liquidation analysis represents the estimated demand against all defendants, but does not apportion that liability among those defendants either by taking into account the availability of insurance proceeds, or rights of contribution the Debtor would have against the Additional Debtors and Non-Debtor Catholic Entities. These rights should either be treated as assets to be pursued, or as suggested in the above bullet-point the liability should be reduced to the Debtor's contribution in the actual settlement (assuming there is agreement from the Abuse Survivors at confirmation).[54] In either case, after taking into account rights of contribution, the Debtor's liability for the Abuse Survivors should be set at the $45 million to $65 million the Debtor will pay under the Plan.

➢ ***The liquidation analysis includes $12 million to pursue the Additional Debtors and Non-Debtor Catholic Entities.*** Notwithstanding the fact that the liquidation analysis shows no recovery against the Additional Debtors and Non-Debtor Catholic Entities for contribution (or a reduction in the $1.221 claim amount for

---

[54] Moreover, valuing the Abuse Survivor claims at $1.221 billion is at odds with the approximately $13.3 million value used by the Debtor in the liquidation analysis it filed with its disclosure statement in September 2024. *See* Disclosure Statement, dated as of September 13, 2024, for the Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans, Dated as of September 13, 2024, ECF No. 3385 (filed September 13, 2024) (the "September 2024 Disclosure Statement") (liquidation analysis, at Exhibit 7). The obvious reason for the difference is that the September 2024 Disclosure Statement was filed as a way to negotiate with the Abuse Survivors and thus the claims of the Abuse Survivors were minimized. Now that an agreement has been reached with the Tort Committee, the current Disclosure Statement takes aim at the Bond Trustee (whereas under the prior plan and disclosure statement the Debtor proposed paying the Bond Trustee claims in full), and because the Plan Proponents seek to use the best-interest-of-creditors' test to set the Bond Trustee's claim, the estimate of the Abuse Survivors' claims is no longer minimized, but maximized. The September 2024 disclosure statement detailed multiple reasons why the liability to the Abuse Survivors was overstated by those claimants, *see* September 2024 Disclosure Statement, at pp. 23-29 (Sections 4.19 and 4.20), including arguments that the Debtor has no liability because it "did not sexually abuse any Abuse Claimant" and the doctrine of vicarious liability/respondeat superior is not applicable in this case. *See* September 2024 Disclosure Statement, at p. 28. Such wild swings in values for the Debtor's hypothetical Chapter 7 evidence the games the Plan Proponents are playing. Those claims should be set at a reasonable amount, which as the Bond Trustee suggests above should be no more than the amount the Debtor will actually pay under the proposed settlement agreement (currently $45 million to $65 million).

ACTIVE 713379119v1

contributions they might make), the analysis shows $12 million being spent in "attorney and financial professional fees" to pursue that recovery. The Plan Proponents should be required to include estimated contributions and recoveries in addition to the expenses that would result in those contributions and recoveries.

➤ *The liquidation analysis suffers from the same valuation flaws discussed above.* The liquidation analysis settles on a liquidation value for the Debtor's real property of $87 million. This is based on the property values set forth on Exhibit 6 to the Disclosure Statement, the majority of which are left blank or set at $0.00. As discussed above, the value of the Debtor's real property holdings is likely in the hundreds of millions of dollars, if not a billion dollars or more.

➤ *The liquidation analysis includes the same "pass throughs" to insider entities as the Plan.* The liquidation analysis appears to pay the Debtor's insiders (Portfolio B claimants) in full, as the Debtor proposes in its plan. These claims would not receive this favorable treatment in a Chapter 7 but rather would share pro rata with other unsecured claimants, such as the Bondholders.

➤ *Additional sources of recovery.* The Plan Proponents should be required to acknowledge and include all other obvious sources of recovery that might be available to a Chapter 7 trustee, including disgorged professional fees, and expected recoveries from avoidance actions. In particular, the Bond Trustee notes that the professional fees in this case now exceed ***$50 million***. If this case were to be converted to a Chapter 7 – especially in the scenario outlined by the Plan Proponents where all claims with the Abuse Survivors need to be litigated – all of the professionals' efforts to date will have been for naught and those efforts would have conveyed no benefit to the estate. A Chapter 7 trustee (and unsecured creditors) would undoubtedly come after those fees.

## VI. The Disclosure Statement Contains Numerous Other Omissions and Misstatements that Should be Corrected Before it is Provided to Creditors.

47. While the most egregious problems with the Plan Proponents' Disclosure Statement are those outlined above, there are numerous other omissions and misstatements that should be corrected before it is distributed to creditors. The chart below details some of these deficiencies:

| Disclosure Statement Deficiency | Suggested Remedial Provision |
|---|---|
| The Disclosure Statement provides that one of the contributions to the Settlement Trust is a $130,000,000 cash transfer from the Archdiocese, the Additional Debtors, and the Non-Catholic Entities.[55] The Disclosure | The Plan Proponents should specify each entity's contribution to the $130,000,000. If assets (including real property) have already been sold by the Debtor, the Additional Debtors or the Non-Catholic entities, and the |

---

[55] Disclosure Statement, at p. 5.

| Disclosure Statement Deficiency | Suggested Remedial Provision |
|---|---|
| Statement is deficient in that it does not specify each entity's contribution to or share of the $130,000,000. | proceeds of these sales will be used to fund part of the $130,000,000, the amount of such proceeds and the entity holding such proceeds should be made clear.[56] In addition, the Plan Proponents should clarify if any of such proceeds are included in the cash the Debtor is expected to have on the Effective Date to fund the plan or if those amounts are being held elsewhere. |
| The description of the payment obligations relating to the $20,000,000 Promissory Note is unclear. The Disclosure Statement provides that one of the contributions to the Settlement Trust is a $20,000,000 Promissory Note.[57] The obligor on the Note is identified as the Archdiocese and the Additional Debtors. | The Promissory Note should be an exhibit to the Disclosure Statement. If the Promissory Note has not been drafted, the Plan Proponents should specify which entity will make the payments to the Settlement Trust on account of the Promissory Note, and in what amounts. |
| The description of the repayment rights relating to the $20,000,000 Promissory Note is unclear. The Disclosure Statement provides that the first $23 million in net proceeds from the sale of the Affordable Housing Facilities will be paid to the "applicable Debtor, Reorganized Archdiocese, Additional Debtors, and Reorganized Additional Debtors."[58] | It appears that by using the term "applicable" it is the intent of the Plan Proponents to use the first proceeds received from the sale of the Affordable Housing Facilities to repay the debtor-entity that paid an amount to the Settlement Trust on account of the Promissory Note.[59] If true, this should be clearly stated. |

---

[56] Section 7.09 of the Disclosure Statement indicates that there are net proceeds from the sale of the Debtor's property of $19,188,585 and that there have been sales of real property by Non-Debtor Catholic Entities. Footnote 1 of the Feasibility Projections indicate that $45,070,571 of "Beginning Cash" (presumably only for the period ending June 30, 2026) is segregated cash from real estate sales. Additional detail on (i) which proceeds from which sales comprise the $45,070,571 and if those are all sales of Debtor assets, and (ii) if any Additional Debtors or Non-Debtor Catholic Entities are holding cash from sales (with such cash not being included in "Beginning Cash" on the Feasibility Projections.)

[57] Disclosure Statement, at p. 5.

[58] *See* Disclosure Statement, at p. 6.

[59] In all likelihood, none of the debtor entities will need to advance money to the Settlement Trust on account of the Promissory Note since the first payment is not due until July 1 2026. *See* Disclosure Statement, at p. 6. If any of the Christopher Homes/Affordable Housing Facilities are sold before that date, the first funds from that sale are used to pay the Promissory Note obligation. Given that bids on the properties are expected in July or August 2025, *see* Disclosure Statement at p. 6, closing by July 1, 2026 should be within the Debtor's control and expected.

ACTIVE 713379119v1

| **Disclosure Statement Deficiency** | **Suggested Remedial Provision** |
|---|---|
| | |
| The Feasibility Projections imply that the $20,000,000 Promissory Note obligation will be funded by June 30, 2026 from "Unrestricted Cash Available for Plan Disbursements."[60] This makes it appear that the Debtor is using $20,000,000 in cash or investments to make this payment. Under no circumstance is this correct.<br><br>In actuality, the flow of funds will depend on whether the sale of the Affordable Housing Facilities occurs before or after July 1, 2026. If the sale occurs before that date, then no payment on the Promissory Note will have become due by either the Debtor or the Additional Debtor to the Settlement Trust since the first such payment does not become due until July 1, 2026.[61]  Under this circumstance, the first $20,000,000 from the sale of the Affordable Housing Facilities is transferred to the Settlement Trust and the Promissory Note is cancelled.<br><br>If the sale of the Affordable Housing Facilities occurs after July 1, 2026, there still is no payment from the Debtor or the Additional Debtors to the Settlement Trust on account of the Promissory Note before July 1, 2026 and therefore there should not be a deduction of $20,000,000 from the amount listed on the Feasibility Projection from the line identified as Unrestricted Cash Available for Plan Disbursements. In this circumstance, the Debtor or the Additional Debtor would make the first payment to the Settlement Trust on July 1, 2026[62]  and would be repaid from | This problem should be fixed in the Feasibility Projection by adding $20,000,000 to the Plan Contributions section of the Feasibility Analysis on account of the Promissory Note which should in effect increase the Debtor's "Ending Unrestricted Cash After Plan Disbursements" by $20,000,000. |

---

[60] *See* Disclosure Statement, at Exhibit 2 (the total payment to Known Abuse Claims on page 3 of the Feasibility Projections is $223,985,000 which amount includes the $20,000,000 Note as if fully funded in the six months ended June 30, 2026).

[61] *See* Disclosure Statement, at p. 6.

[62] *See* Disclosure Statement, at p. 6.

ACTIVE 713379119v1

| Disclosure Statement Deficiency | Suggested Remedial Provision |
|---|---|
| the first proceeds of the Affordable Housing Facilities when they are sold (presumably during what is identified in the Feasibility Projections as "Plan Fiscal 2027"). | |
| The Plan Proponents should identify who gets the excess funds from the sale of the Affordable Housing Facilities.<br><br>The Plan Proponents project proceeds of $44,787,438 will be available from the sale of the Affordable Housing Facilities. This equates to a net sale price of the Affordable Housing Facilities of $72,596,058.46. Of this amount $20,000,000 is used to pay or repay the Promissory Note, $44,787,438,438 is paid to the Settlement Trust, and the remaining $7,808,620.46 is paid to a "Debtor or Additional Debtor."[63] | The Plan Proponents should disclose which entity will receive this anticipated $7,808,620.46 amount. The bids for the Affordable Housing Facilities (expected to be received in July or August 2025) should be disclosed in the Disclosure Statement. If they are received after the Disclosure Statement is distributed, they should be made available to creditors.<br><br>If the Archbishop seeks to retain discretion to distribute these excess funds to whichever entity he chooses (Archdiocese or other), that should be clearly explained in the Disclosure Statement. If there are criteria on which the Archbishop makes this decision, it should be adequately explained. |
| The Disclosure Statement should provide significantly more information on the causes of action the Debtor is releasing against the Non-Debtor Catholic Entities (and presumably the Additional Debtors).<br><br>The Debtor indicates that it is releasing claims against the Non-Debtor Catholic Entities, including but not limited to (i) whether the property of the Non-Debtor Catholic Entities is property of the estate, (ii) alter ego and substantive consolidation claims, and (iii) avoidance actions.[64] Presumably similar claims exist against the Additional Debtors.<br><br>If successful, these claims would bring hundreds of millions of dollars into the Debtor's estate. If the Debtor is going to release claims against these entities that are | The Disclosure Statement should provide significantly more information on the causes of action the Debtor is releasing against the Non-Debtor Catholic Entities and the Additional Debtors. Appropriate disclosure should mirror that required for a settlement under Federal Bankruptcy Rule 9019. The burden for such a settlement should be particularly high considering the claims are against entities with close connections, and that could be considered insiders or affiliates. |

---

[63] See Disclosure Statement, at p. 6 (this amount is comprised of $3 million of the first $23 million of sale proceeds, $2.5 million of the proceeds between $56 million and $66 million, and 65% of the proceeds above $66 million (based on a sale of $72,596,058.46, this amount is $2,308,620.46)).

[64] See Disclosure Statement, at p. 16-17 (section 4.07).

| Disclosure Statement Deficiency | Suggested Remedial Provision |
|---|---|
| worth hundreds of millions of dollars, there should be significantly more information in the Disclosure Statement about the likelihood of succeeding on these claims, including if the Debtor had an independent law firm or other entity evaluate the claims, which is appropriate considering the close connections between the Debtor, the Non-Debtor Catholic Entities and the Additional Debtors. | |
| The Disclosure Statement provides that the Priest Retirement Plan and Priest Retiree Medical Benefits pass through unaffected by the Plan.[65]<br><br>These claims appear to be general unsecured claims, yet are being passed through the bankruptcy so they are paid in full. | The Disclosure Statement should include additional information regarding why these claims are being passed through the bankruptcy and paid in full, when they are unsecured claims. The burden should be particularly high considering the claims are held by priests, who could be considered insiders of the Debtor. |
| The Disclosure Statement should provide additional detail on the creditors eligible (and not eligible) for the convenience class payment and why the threshold was set at $50,000.<br><br>Under the Plan, the Debtor provides holders of General Unsecured Claims the option to accept a 1% dividend, or payment in full up to a cap of $50,000.[66]<br><br>On its face, this appears to be a way for the Plan Proponents to pay most unsecured creditors in full, while trying to cramdown the claim of the Bond Trustee. | The Plan Proponents should disclose the specific number of General Unsecured Claims that fall below the $50,000 threshold and the number of claims (identified by holder and amount) that are above the $50,000 threshold.<br><br>In addition, the Plan Proponents should explain how they determined that the threshold should be $50,000 and why a threshold so high is "reasonable and necessary for administrative convenience" under Section 1122(b) of the Bankruptcy Code. |
| The Disclosure Statement should provide additional detail on the Deposit and Loan Program (Portfolio B) and why it shows a repayment of nearly $17 million on a loan portfolio during the first 3 years of the Plan when other pre-petition unsecured debt is being paid pennies on the dollar. | The Disclosure Statement should explain, in "Plain English" who owns the funds in the Deposit and Loan Program (Portfolio B) and if there are any other entities that have an ownership interest in those funds. It appears that the Debtor used the Deposit and Loan Program (Portfolio B) to fund this case. If the |

---

[65] *See* Disclosure Statement, at p. 24 (Section 5.04).

[66] *See* Disclosure Statement, at p. 25 (Section 5.08).

ACTIVE 713379119v1

| Disclosure Statement Deficiency | Suggested Remedial Provision |
|---|---|
|  | Debtor obtained Court authority prior to using those funds, that should be set forth in the Disclosure Statement. Finally, if the Debtor has a payment obligation to individual entities for its use of these funds during the case, the Debtor should explain why those are "pass through" obligations and not claims that are provided equivalent treatment to other unsecured claims. As with some of the other Catholic-affiliated claimants (i.e., the priests, the Non-Debtor Catholic Entities, and the Additional Debtors) the entities owed these amounts are arguably insiders or affiliates so there is a particularly high burden on the Plan Proponents to allow these "pass throughs" and with respect to the appropriate level of disclosure. |
| The Disclosure Statement does not include listing values for the Debtor's property that are for sale. | The Plan Proponents should provide listing amounts for the properties that are currently listed for sale, including (a) 3200 Canal St., New Orleans, LA 70119 (known as Sacred Heart of Jesus Church); and (b) a surface parking lot located at 1032 and 1042 S. Rampart St., New Orleans, LA 70113 (also known as 1032 and 1042 Loyola Ave., New Orleans, LA 70113). A quick internet search indicated that the first of these properties is listed for sale with a list price of $1.95 million. The second is listed for sale with a list price of $1.25 million. Both of these assets are listed on the Plan Proponents Exhibit 6 has having a value of $0.00. The Disclosure Statement should also clearly indicate how those sale proceeds will be used. |

## VII.   Reservation of Rights

48.     The Bond Trustee reserves its rights to object to the Disclosure Statement and any proposed changes that the Plan Proponents make to the Disclosure Statement or its exhibits or to object to any exhibit filed in connection with any hearing on or in connection with the Disclosure

Statement. The Bond Trustee further reserves all of its rights to object to confirmation of the Plan whether or not such potential confirmation issues are raised herein.

WHEREFORE, the Bond Trustee respectfully requests entry of an order denying the Motion and granting such other and further relief as this Court deems just and proper.

DATED: July 28, 2025                    Respectfully submitted,


*/s/ Colleen A. Murphy*
Colleen A. Murphy (*admitted pro hac vice*)
Kevin J. Walsh (*admitted pro hac vice*)
Charles W. Azano (*admitted pro hac vice*)
Christopher Marks (*admitted pro hac vice*)
GREENBERG TRAURIG, LLP
One International Place Suite, 2000
Boston, MA 02110
Telephone: (617) 310-6000
Email: Colleen.Murphy@gtlaw.com
        Kevin.Walsh@gtlaw.com
        Chip.Azano@gtlaw.com
        Chris.Marks@gtlaw.com


*/s/ Annette Jarvis*
Annette Jarvis (*admitted pro hac vice*)
GREENBERG TRAURIG, LLP
222 S. Main Street, Suite 1730
Salt Lake City, UT 84101
Telephone: (801) 478-6907
Email: jarvisa@gtlaw.com

-and-

*/s/ David S. Rubin*
David S. Rubin (La. 11525)
BUTLER SNOW LLP
445 North Boulevard, Suite 300
Baton Rouge, LA 70802
Telephone: (225) 325-8728
Email: david.rubin@butlersnow.com

*Attorneys for Argent Institutional Trust Company*

ACTIVE 713379119v1