## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | ) |
| | ) |
| **THE ROMAN CATHOLIC CHURCH OF** | ) **Case No. 20-10846** |
| **THE ARCHDIOCESE OF NEW** | ) |
| **ORLEANS** | ) **Section "A"** |
| | ) |
| **DEBTOR.**[1] | ) **Chapter 11** |
| | ) |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' REPLY IN SUPPORT OF DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS AND ADDITIONAL DEBTORS, PROPOSED BY THE DEBTOR, THE ADDITIONAL DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, DATED AS OF JULY 15, 2025**

The Official Committee of Unsecured Creditors (the "Abuse Survivor Committee") files this *Reply* (the "Reply") in support of the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of July 15, 2025* ("Disclosure Statement") (Doc. No. 4151), as may be amended.

1.      For five years, the Abuse Survivor Committee has reiterated its goals in this case: (i) obtaining fair compensation for the entire Abuse survivor community and (ii) establishing new policies that will provide transparency into the Archdiocese's history of abuse and procedures to foster accountability and implement safeguards to prevent future abuse.[2] The Joint

---

[1] The last four digits of the Debtor's federal tax identification number are 8966. The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

[2] The Abuse Survivor Committee represents the interests of all Abuse Claimants unlike counsel for Certain Abuse Survivors who represent a select minority of the constituency.

Plan[3] accomplishes these goals. It creates a substantial Settlement Trust fund to compensate Abuse Claimants and implements robust Non-Monetary Plan Provisions that will require public disclosure of abuse records and will significantly transform the approach of the Debtor and Additional Debtors to Abuse and Abuse claims in the future.

2.      Since filing the Disclosure Statement, the Abuse Survivor Committee has collaborated with the Debtor and Additional Debtors to meet and confer with other parties to resolve objections where possible.[4] Many of these objections raise confirmation issues, which are premature at this stage. Other objections focus on financial and real estate information and projections inherently within the control of the Debtor and Additional Debtors. For purposes of this Reply, the Abuse Survivor Committee does not address these concerns and instead responds only to those key issues and objections pertinent to Abuse Survivor Claimants at the disclosure stage of these proceedings.

3.      <u>Joint Plan versus Dismissal</u>. As the Disclosure Statement clearly explains, the Joint Plan assures that Abuse Claimants will achieve significant financial recovery in the  near future. If the Joint Plan is confirmed, Abuse Claims will be promptly resolved, and allowed claims can expect to receive initial distributions in early 2026.

4.      Dismissal of the Chapter 11 Case, on the other hand, offers no promise of ANY recovery and certainly none in the near term. Dismissal will result in a race in which Abuse

---

[3] Capitalized terms shall have the same meaning set forth in the definitions to the Joint Plan. (Doc. No. 4150, Ex. A).

[4] For example, Certain Abuse Survivors raised concerns regarding matters addressed in the Allocation Protocol, including the timing of distributions to Abuse Claimants who will elect to file lawsuits against Travelers. (Doc. No. 4172 at 7-8). The Abuse Survivor Committee has revised the Allocation Protocol to address the stated concerns at Section 10.9 of the Allocation Protocol. The Abuse Survivor Committee has also prepared a summary, with hypotheticals, for the Disclosure Statement to assist Abuse Claimants in understanding the provisions.

145710590v.5

Claimants will have to engage in lengthy, time-consuming, and hotly contested litigation with the Archdiocese and its affiliates (who will contest liability and damages) and their insurers (who will contest insurance coverage). Meanwhile, the Archdiocese will also face collection efforts from the Bond Trustee, who will have a much quicker legal path to obtain and collect on a judgment that could total nearly $40 million. Therefore, Abuse Claimants who do obtain judgments will be required to compete to enforce their claims against dwindling assets, making actual recoveries uncertain. While some Abuse Claimants may successfully litigate to obtain substantial jury verdicts (enabling large fees for their counsel), it will take years to do so.[5] Moreover, the Archdiocese will have the opportunity to file another bankruptcy case to affect Abuse Claimant recoveries.

5.      Many, if not most, Abuse Claimants, particularly those of advanced age with serious health conditions or limited financial resources, will likely be unable or unwilling to take on and endure this difficult process and will be left behind to receive nothing. It is this community that the Abuse Survivor Committee endeavors to benefit through the Joint Plan. The Joint Plan ensures that **all** Abuse Claimants with valid claims will receive a significant recovery now.

6.      <u>Non-Monetary Plan Provisions</u>. Certain Abuse Survivors raise an unwarranted concern that the Non-Monetary Plan Provisions fail to bind the Archbishop "who will always

---

[5] Certain Abuse Survivors' reference to the recent *Lousteau* verdict exemplifies the failure or unwillingness to understand the choice faced by Abuse Survivors. While the jury trial system may result in greater financial compensation for some Abuse Claimants than the bankruptcy system, the effort will take years, at great emotional cost, without any guarantee of a recovery. The *Lousteau* case has been pending for four years, post-trial motions are expected, appeals are likely after that, and insurance coverage may be nonexistent. <u>Indeed, the legal counsel who obtained the *Lousteau* verdict support the Joint Plan</u>.

yield to the secrecy demands of canon law."[6] First, the Non-Monetary Plan Provisions absolutely

bind the Archbishop, who is expressly included in several definitions of Archdiocese personnel

bound by the provisions, such as the definition of "Clergy."[7] Second, in the final paragraph of

each of the Non-Monetary Plan Provisions and Survivor Bill of Rights Procedures, "RCCANO

certifies that these Provisions are compatible with the promulgated Canon Law on the Effective

Date."[8] In negotiating the Non-Monetary Plan Provisions, the Abuse Survivor Committee was

unyielding in its insistence that there be no Canon Law "out." Consistent with Canon Law and

binding on the Archbishop, these new requirements will foster improved child protection and

create transparency through a public archive of abuse records to be housed at a secular

university.[9]

 7.  <u>Settlement Trust Funding</u>. The Bond Trustee and Certain Abuse Survivors assert

that the Settlement Trust's funding is insufficient because the Archdiocese has additional assets.

This objection ignores the large <u>non-Debtor</u> asset contributions to the Settlement Trust that will

pay Abuse Claimants. These include contributions from entities with no Abuse Claims against

them, which would likely be shielded from collection if the Chapter 11 Case is dismissed. With

respect to real estate assets, the Archdiocese's real-estate assets have been scheduled and

disclosed in a variety of ways over the course of this case and, outside of this case, are a matter

of public record. Litigation over real-estate assets and sales has occurred throughout this Chapter

---

[6] (Doc. No. 4172 at 2).

[7] (Doc. No. 4150, Ex. E at 4).

[8] (Doc. No. 4150, Ex. E at 36).

[9] Indeed, the creation of an archive will achieve the same result counsel for Certain Abuse Survivors has attempted to accomplish through litigation in this Chapter 11 Case. (*See* Doc. No. 3967).

145710590v.5

11 Case, and the limitation on real-estate sales during the case was imposed by the Bond Trustee in an agreement with the Archdiocese.[10] What real estate can or should be sold remains a confirmation issue tied to financial modeling and feasibility.

8.     <u>Claim Objections</u>. Certain Abuse Survivors also raise the specter of claim objections as a fundamental flaw with the Joint Plan. However, the fact that the Abuse Claims Reviewer and Settlement Trustee will evaluate claims should <u>encourage</u> Abuse Claimants who hold valid claims. In any bankruptcy case, some claims may be invalid. Here, for example, some Abuse Claims are unrelated to the Archdiocese—they may involve a separate religious order, a separate diocese, or an institution that is not part of the Archdiocese or its affiliates. An Abuse Claimant who asserted a claim against the Archdiocese for which another entity is responsible has an open window and nearly two more years to file a lawsuit against that entity. Removing invalid claims from the Archdiocese claims pool will increase the compensation available to the hundreds of individuals who do have valid abuse claims against the Archdiocese. Similarly, the Abuse Claims vary in severity. While all Abuse is horrific and unconscionable, every Abuse Claimant will receive an individual, consistent review of his or her claim, which will allow those who suffered the worst to receive more compensation. In other words, the many survivors who suffered terrible abuse at the hands of a Lawrence Hecker or who endured the notorious Hope Haven and Madonna Manor should be encouraged that all claims will be promptly reviewed, evaluated, and compensated based on a consistent set of factors.

9.     <u>Affordable Housing Facilities</u>. With very little explanation and no factual support,

---

[10] (Doc. No. 527).

Certain Abuse Survivors assert that there is a "likelihood that no money will be paid for the benefit of survivors" from the Affordable Housing Facilities Sale.[11] First, as a matter of disclosure, the Disclosure Statement states that "[a]ny sale outcome could be higher or lower than the Newmark estimates" and further notes that ". . . no sale or sale price can be certain and closing costs may require additional adjustments . . ."[12] Additionally, the Abuse Survivor Committee expects that Newmark will receive <u>multiple</u> written offers and/or letters of intent for the Affordable Housing Facilities as early as July 31, 2025. Once these offers are received, the Disclosure Statement can be updated as the sale process unfolds to provide more information to creditors. As a result of anticipated significant buyer interest, the Disclosure Statement properly advises Abuse Claimants that they can expect a substantial contribution to the Settlement Trust from these assets, which is a remarkable benefit to the Abuse Claimants <u>because these assets are not otherwise subject to Abuse Claims</u>.

10.     Finally, the Abuse Survivor Committee addresses the proposed insert to the Disclosure Statement drafted by the Certain Abuse Survivors.[13] While recognizing that this Chapter 11 Case can be inherently confusing to creditors because of the existence of two official committees, the Abuse Survivor Committee suggests, for the above reasons, that the proposed language is unfounded and misleading and, at minimum, will cause additional confusion. The assets available are far insufficient to fully compensate Abuse Claims. But, as the Disclosure Statement makes clear, Abuse Claimants will receive a fair and equitable distribution of cash on

---

[11] (Doc. No. 4172 at 7).

[12] (Doc. No. 4151 at 18).

[13] (Doc. No. 4172 at 10).

their claims now instead of the prospect of another multi-year slog of uncertain litigation and inconsistent recovery. The Abuse Survivor Committee believes that the balance presented in the Joint Plan represents a fair and meaningful outcome for Abuse Claimants to finally reach closure and receive real compensation for the abuses they suffered after lifetimes spent waiting for justice.

Dated:  July 30, 2025

Respectfully submitted,

By:  *Bradley C. Knapp*
James I. Stang (CA Bar No. 94435)
(admitted pro hac vice)
Iain A.W. Nasatir (CA Bar No. 148977)
(admitted pro hac vice)
Andrew W. Caine (CA Bar No. No. 110345)
(admitted pro hac vice)
Karen B. Dine (NY Bar 2625366)
(admitted pro hac vice)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., Suite 1300
Los Angeles, CA  90067
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760

-and-

Omer F. Kuebel, III (La #21682)
Bradley C. Knapp (La #35867)
Troutman Pepper Locke LLP
601 Poydras Street, Suite 2660
New Orleans, Louisiana 70130-6036
Telephone: (504) 558-5111
Facsimile: (504) 558-5200
Email: rick.kuebel@troutman.com
        brad.knapp@troutman.com

-and-

145710590v.5

W. Steven Bryant (*admitted pro hac vice*)
Texas Bar. No. 24027413
Federal I.D. No. 32913
Troutman Pepper Locke LLP
300 Colorado St., Suite 2100
Austin, Texas 78701
Telephone: (512) 305-4726
Facsimile: (512) 305-4800
Email: steven.bryant@troutman.com

*Co-Counsel to the Official Committee of Unsecured Creditors*

145710590v.5

## **CERTIFICATE OF SERVICE**

I hereby caused a true and correct copy of the foregoing *Reply* to be served on July 30, 2025, upon all parties by electronic case filing for those parties receiving notice via the Court's Electronic Case Filing system. I will file a supplemental certificate of service when service on the Special Notice List as defined and required under the Court's May 1, 2020 *Ex Parte Order Authorizing the Debtor to Limit Notice and Establishing Notice Procedures* is accomplished.

*/s/ Bradley C. Knapp*
Bradley C. Knapp

145710590v.5