## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Case No. 20-10846** |
| **THE ROMAN CATHOLIC CHURCH OF** | ) | |
| **THE ARCHDIOCESE OF NEW** | ) | **Section "A"** |
| **ORLEANS,** | ) | |
| | ) | **Chapter 11** |
| Debtor.[1] | ) | |

### TRAVELERS' MOTION TO TAKE DEPOSITIONS OF
### MEMBERS OF THE SETTLEMENT TRUST ADVISORY COMMITTEE

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON SEPTEMBER 25, 2025, AT 1:30 P.M.  IN COURTROOM B-709, 500 POYDRAS STREET, NEW ORLEANS, LOUISIANA 70130, OR BY TELEPHONE THROUGH THE DIAL-IN 1-504-517-1385, CONFERENCE CODE 129611.  IF YOU OBJECT TO THE RELIEF REQUESTED IN THIS PLEADING, YOU MUST RESPOND IN WRITING.  UNLESS DIRECTED OTHERWISE BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT NO LATER THAN SEPTEMBER 23, 2025.  YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

United States Fidelity & Guaranty Company (as referred to herein as "Travelers"), by and through undersigned counsel, files this *Motion to Take Depositions of the Members of the Settlement Trust Advisory Committee* (this "Motion") seeking an order from this Court allowing Travelers to take the depositions of the five (5) Settlement Trust Advisory Committee members (collectively, the "Advisory Committee" or each individually, a "Member").  In support of this Motion, Travelers states as follows:

---

[1] The last four digits of the Debtor's federal tax identification number are 8966.  The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

## PRELIMINARY STATEMENT

1.     Travelers requests that this Court authorize the depositions of the Members of the Advisory Committee for the purpose of inquiring about their understanding of the expanded role and function of the Advisory Committee following significant and substantive changes to the Settlement Trust Agreement resulting from the memorandum of understanding (the "MOU") among the Plan Proponents and the Certain Abuse Survivors, reflected in the Third Amended Joint Plan and as described to this Court on September 9, 2025.  As set forth in the amended Settlement Trust Agreement, and as described more fully below, under the MOU a minority two-fifths of the Members of the Advisory Committee, whose Members will be appointed by the Committee and the Certain Abuse Survivors, will now have veto power over the Settlement Trustee's ability to enter a settlement agreement with a Non-Settling Insurer and this Court's ability to consider and approve any such agreement.

2.     These changes to the Settlement Trust Agreement, which were not revealed until September 9, 2025, significantly change the authority and function of the Advisory Committee, with the Archdiocese and other Plan Proponents effectively giving as few as two Members of the Advisory Committee and their lawyers control over any and all potential future settlements with the Archdiocese's insurer.  As was made clear by the Debtor's presentation to this Court on September 9, 2025, this new power dynamic is the result of demands from counsel to the Certain Abuse Survivors to control any settlement with the Travelers.  *See* Trans. of Status Hrg., 17:2-25 and 18:1-2 (Sept. 9, 2025).  The changes call into question the independence of the Settlement Trustee and the Advisory Committee Members and raise questions relevant to whether the Joint Plan is being proposed in good faith under 11 U.S.C. § 1129.  As such, the depositions are relevant

to the confirmation issues in this case and Travelers should be entitled to depose the Advisory Committee Members in addition to the Settlement Trustee.

## **BACKGROUND**

3.      On August 6, 2025, the Plan Proponents filed the *Second Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of August 6, 2025* [ECF No. 4235] (the "Second Amended Joint Plan").

4.      On August 11, 2025, the Court entered the *Amended Order Scheduling Trial and Pretrial Deadlines in Connection with (I) Confirmation of Plan Proponents' Joint Amended Plan of Reorganization (II) Motions to Approve Settlements with Insurers, (III) Certain Abuse Survivors' Motion to Dismiss Bankruptcy Pursuant to 11 U.S.C. § 1112(b), and (IV) the Court's Order to Show Cause Issued Against the Debtor, Dated April 28, 2025* [Dkt. No. 4249] (the "Amended Scheduling Order").   The Amended Scheduling Order established August 18, 2025 as the deadline for parties to file "may call" witness lists.

5.      On August 18, 2025, Travelers filed its may call witness list, listing the following parties:  (1) Representative of the Archdiocese, (2) Representative of the Creditors' / Survivors' Committee, (3) Representative of the Additional Debtors, (4) Representative of the Non-Debtor Catholic Entities, (5) the Settlement Trustee, (6) the Abuse Claims Reviewer, (7) the Unknown Abuse Claims Reviewer, (8) any witness designated or called by any other party, and (9) any witness necessary to rebut the evidence or testimony of any witness designated or called by any other party [Dkt. No. 4281] (the "May Call List").   Given discovery regarding issues relevant to plan confirmation remained ongoing, Travelers reserved the right to supplement its May Call List.

3

*Id.* at 2. Travelers also reserved all rights to call additional witnesses at the hearing on the Joint Plan, whether for direct testimony or rebuttal. *Id.*

6. On September 8, 2025, the Plan Proponents filed the *Third Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of September 8, 2025* [Dkt. 4331] (as may be further amended, the "Joint Plan").[2] The Joint Plan includes changes reflected as a result of the settlement reached between the Plan Proponents and the Certain Abuse Survivors reflected in the MOU. During a status hearing on September 9, 2025, counsel to the Archdiocese read into the record relevant provisions of the MOU, including those relating to the Settlement Trust that are the subject of this Motion. A transcript of the September 9, 2025 hearing is attached hereto as **Exhibit A**. As of the date of filing of this Motion, the Plan Proponents have yet to provide Travelers with a copy of the MOU.

7. The Joint Plan made several substantive revisions to the Settlement Trust Agreement regarding Insurance Settlements. *See* Joint Plan at Plan Exhibit D-1. First, the Advisory Committee was increased from three to five Members. Joint Plan Exhibit D-1, Section 7.1. On September 9, 2025, counsel for the Archdiocese revealed that the Committee would appoint three Members of the Advisory Committee and the Certain Abuse Survivors would appoint the remaining two Members. *See* Trans. of Status Hrg., 17:15-18 (Sept. 9, 2025). The Joint Plan amendments also made specific revisions regarding the Settlement Trustee's ability to enter into an Insurance Settlement with a Non-Settling Insurer. Whereas under the Settlement Trust Agreement in the Second Amended Joint Plan this Court would retain authority and jurisdiction

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Joint Plan.

to approve an Insurance Settlement where a member of the Advisory Committee dissented from the Settlement Trustee's decision to enter into an Insurance Settlement, under the revised Trust Agreement, two of the five Members of the Advisory Committee may block the Settlement Trustee from entering into an Insurance Settlement.  *See* Joint Plan Exhibit D-1, Section 2.2(b). The limitations on the Settlement Trustee's authority are further set forth in the changes to Section 7.3 of the Trust Agreement, which states explicitly that the Settlement Trustee may not enter into an Insurance Settlement if "two [Advisory Committee] members dissent from the Settlement Trustee's approval of an Insurance Settlement."  As a result of these changes, a minority two-fifths of the Advisory Committee will have full veto power over any Insurance Settlement that the Settlement Trustee proposes to enter into with a Non-Settling Insurer.

8.      On September 9, 2025, the Court held a status hearing related to various plan discovery matters.  Travelers previewed to the Court that it intended to depose the Members of the Advisory Committee, to which the Committee responded it would object.  The Court asked the parties to meet and confer on a briefing schedule and return for a hearing on September 25, 2025.

9.      Thereafter, the parties met and conferred and agreed the deadline for Travelers to file this Motion is September 18, 2025, and the Committee will respond by September 23, 2025.

## ARGUMENT

10.      The revisions to the Settlement Trust Agreement in the Joint Plan significantly limit the Settlement Trustee's decision making ability regarding a very important issue:  whether the Settlement Trustee can enter into Insurance Settlements with the Archdiocese's insurers. Information sought via the depositions of the Advisory Committee is relevant to confirmation of the Joint Plan and the Plan Proponents' burden at plan confirmation under 11 U.S.C. § 1129. Specifically, the Plan Proponents must establish that the Joint Plan has been proposed in good faith

and not by any means forbidden by law. *See In re Diocese of Camden, New Jersey*, 653 B.R. 309, 352 (Bankr. D.N.J. 2023) ("[F]or purposes of determining good faith under section 1129(a)(3) ... the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.").

11.     Rule 26(b)(1), incorporated by Federal Rules of Bankruptcy Procedure ("<u>FRBP</u>") 9014 and 7030, defines the permissible scope of discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

"[R]elevance has been construed liberally under Rule 26(b)(1), to 'encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case.'" *United States v. Dentsply Int'l, Inc.*, Civil Action No. 99-5 MMS, 2000 U.S. Dist. LEXIS 6925, at *12–13 (D. Del. May 10, 2000).   The depositions of the Members seek relevant information regarding whether the Joint Plan was proposed in good faith.   Among other things, in connection with its objection to confirmation of the Joint Plan, Travelers is entitled to explore the MOU, and whether the changes to the Joint Plan demanded by counsel to the Certain Abuse Survivors impact the "good faith" analysis under § 1129(a)(3).   *See In re Star Ambulance Serv., LLC*, 540 B.R. 251, 262 (Bankr. S.D. Tex. 2015) ("As several courts have observed, the good faith requirement should be viewed in light of the totality of the circumstances surrounding the plan, and 'the requirement of Section 1129(a)(3) speaks more to the process of plan development than to the content of the plan.'") (citing *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010)).

12.     Travelers is also entitled to inquire into the control the Advisory Committee will exert over the Settlement Trustee and how that control affects the Settlement Trustee's post-effective date role.  Based upon information provided to the Court, among the key concessions to the Certain Abuse Survivors as part of the MOU were the changes to the makeup and powers of Advisory Committee.  As described above, as a result of those changes, a minority of two Members of the Advisory Committee have effective veto power over the Settlement Trustee's ability to enter into Insurance Settlements.  As revised, the Settlement Trust Agreement provides the Members of the Advisory Committee with far greater power than they had previously.

13.     This raises issues not just on the independence of the Settlement Trustee, but also about whether the Joint Plan effectively puts Abuse Claimants (and their counsel) in charge of any settlement agreement with Travelers.  As such, the depositions are relevant to whether the Joint Plan has been proposed in good faith under 11 U.S.C. § 1129, and as a party in interest whose rights will be impacted by decisions of the Advisory Committee and the Settlement Trustee involving a potential Insurance Settlement, Travelers has standing to investigate such questions. *Truck Insurance Exchange v. Kaiser Gypsum Co., Inc.*, 144 S. Ct. 1414 (2024).

14.     Moreover, Travelers' deposition of the Advisory Committee in light of the MOU and changes to the Joint Plan is entirely consistent with its prior listing of the Settlement Trustee on the May Call List, to which the Committee did not object.  Travelers intends to ask the Settlement Trustee questions to evaluate what his role is vis-à-vis the Debtor's insurers and his independence.  Given the larger role the Members now play in Insurance Settlements, Travelers should be similarly allowed to inquire as to the same regarding the Advisory Committee Members.  Travelers intends to inquire whether the Settlement Trustee will be independent, or whether the Members are effectively usurping his role and decision-making ability regarding Insurance

Settlements.  Travelers, moreover, will seek to understand what each Member believes his or her role is in Insurance Settlements and whether each Member is simply a proxy for their attorney.  As such, Travelers should be permitted to depose the Members in their capacity as Members of the Advisory Committee.

## **CONCLUSION**

Travelers requests the Court enter an order granting Travelers leave to take the depositions of each of the Advisory Committee Members.

Dated: September 18, 2025

Respectfully submitted,

**DENTONS US LLP**

By: */s/ Patrick Maxcy*
Patrick C. Maxcy (IL #6275469)
M. Keith Moskowitz (IL #6274101)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606-6362
(312) 876-8000 – Telephone
patrick.maxcy@dentons.com
keith.moskowitz@dentons.com

Jerry A. Beatmann, Jr. (LA #26189)
DENTONS US LLP
650 Poydras Street, Suite 2850
New Orleans, LA 70130-6132
(504) 524-5446 - Telephone
jay.beatmann@dentons.com

*Attorneys for Travelers*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **Motion** was filed this 18th day of September, 2025, by using the Court's electronic filing system.

_/s/  Patrick Maxcy_

# **EXHIBIT A**

**September 9, 2025 Hearing Transcript**

1

```
1                   UNITED STATES BANKRUPTCY COURT
                     EASTERN DISTRICT OF LOUISIANA
2
    IN RE:                   :      Case No. 20-10846
3
    THE ROMAN CATHOLIC CHURCH :      Chapter 11
4   FOR THE ARCHDIOCESE OF NEW
    ORLEANS,                 :      New Orleans, Louisiana
5                                    Tuesday, September 9, 2025
         Debtor.             :      3:30 p.m.
6
    : : : : : : : : : : : : : : : : : : : : : : : : : : : :
7

8                      TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE MEREDITH S. GRABILL,
9                   UNITED STATES BANKRUPTCY JUDGE


10
    APPEARANCES:
11
    For Certain Abuse Survivors:  Robinson Law Offices
12                                BY:  CRAIG ROBINSON, ESQ.
                                  700 Camp Street
13                                New Orleans, LA  70130

14  APPEARING ELECTRONICALLY:

15  For the Debtor:               Jones Walker LLP
                                  BY:  MARK MINTZ, ESQ.
16                                     EDWARD DIRK WEGMANN, ESQ.
                                       ALLISON KINGSMILL, ESQ.
17                                201 St. Charles Ave., 49th Floor
                                  New Orleans, LA  70170-5100
18


19
    Audio Operator:               L. VILLNEURVE
20

21  Transcript prepared by:       JANICE RUSSELL TRANSCRIPTS
                                  1418 Red Fox Circle
22                                Severance, CO  80550
                                  (757) 422-9089
23                                trussell31@tdsmail.com


24
    Proceedings recorded by electronic sound recording; transcript
25  produced by transcription service.
```

```
 1    APPEARING ELECTRONICALLY (continued):

 2

 3    For Official Committee of      Stewart Robbins
      Unsecured Commercial           BY:  A. BROOKE ALTAZAN, ESQ.
      Creditors:                     301 Main St., Suite 1640
 4                                   Baton Rouge, LA  70801-0016

 5    For the Additional Debtors:    Heller, Draper & Horn L.L.C.
                                     BY:  DOUGLAS DRAPER, ESQ.
 6                                        MICHAEL LANDIS, ESQ.
                                     650 Poydras Street, Suite 2500
 7                                   New Orleans, LA  70130

 8    For Travelers Companies:       Dentons US LLP
                                     BY:  PATRICK MAXCY, ESQ.
 9                                        M. KEITH MOSKOWITZ, ESQ.
                                     233 South Wacker Dr., Suite 7800
10                                   Chicago, IL  60606

11    For Catholic Mutual Relief     Bienvenu Foster
      Society:                       BY:  DAVID E. WALLE, ESQ.
12                                   1010 Common Street, Suite 2805
                                     New Orleans, LA  70112
13
      For Official Committee of      Troutman Pepper Locke LLP
14    Unsecured Creditors:           BY:  BRADLEY C. KNAPP, ESQ.
                                          OMER F. KUEBEL, III, ESQ.
15                                   601 Poydras Street, Suite 2660
                                     New Orleans, LA  70130
16
                                     Pachulski Stang Ziehl & Jones
17                                   BY:  ANDREW CAINE, ESQ.
                                          JAMES STANG, ESQ.
18                                        IAIN A.W. NASATIR, ESQ
                                     10100 Santa Monica Blvd., Fl. 13
19                                   Los Angeles, CA  90067

20    For the United States          U. S. Trustee's Office
      Trustee:                       BY:  AMANDA GEORGE, ESQ
21                                   600 S. Maestri Place, Suite 840-T
                                     New Orleans, LA  70130
22
      For SPARTA Insurance           Liskow & Lewis
23    Corporation:                   BY:  MICHAEL D. RUBENSTEIN, ESQ.
                                     1001 Fannin Street, Suite 1800
24                                   Houston, Texas  77002

25
```

1   APPEARING ELECTRONICALLY (continued):

2   For Certain Abuse Survivors:   Salim-Beasley, LLC
                                   BY:  ROBERT SALIM, ESQ.
3                                  1901 Texas Street
                                   Natchitoches, LA  71457
4
                                   FRANK ELLIOT, III, ESQ.
5                                  Post Office Box 3065
                                   Lake Charles, LA  70602
6

7
    APPEARANCES (via telephone/GoToMeeting):
8
    For Certain Abuse Survivors:   Herman, Katz, Gisleson & Cain
9                                  BY:  SOREN E. GISLESON, ESQ.
                                   909 Poydras Street, Suite 1860
10                                 New Orleans, LA  70112

11  For Argent Institutional       Greenberg Traurig, P.A.
    Trust Company:                 BY:  CHRISTOPHER D. MARKS, ESQ.
12                                 One International Place, #2000
                                   Boston, MA  02110
13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    P R O C E E D I N G S

2        (Call to Order of the Court)

3             THE COURT:  Good afternoon.  Be seated.

4             All right.  Good afternoon.  We're here in Case No.

5    20-10846, In re The Roman Catholic Church of the Archdiocese of

6    New Orleans.

7             I do have electronic appearances from the Commercial

8    Committee, Catholic Mutual.  I've got Mr. Elliot onboard.  I've

9    got Committee for, the Official Committee of Unsecured

10   Creditors.  I do have counsel for Travelers, the United States

11   Trustee, SPARTA, the Additional Debtors.  I have Mr. Salim for

12   Sexual Abuse Survivors, counsel for the debtor

13            Is there anybody on the line that wishes to make an

14   appearance?

15            Anybody in the court --

16            MR. GISLESON:  Your Honor, Soren Gisleson, also on

17   behalf of Certain Abuse Survivors.

18            THE COURT:  Okay.  Thank you, Mr. Gisleson.

19            And Mr. Marks, I can see you.  I think you're on mute,

20   Mr. Marks.

21            MR. MARKS:  Is this better, your Honor?

22            THE COURT:  Oh, perfect.  Thank you.

23            MR. MARKS:  Good afternoon, your Honor.  Christopher

24   Marks on behalf of the bond trustee, Argent Institutional Trust

25   Company.

1          THE COURT:  Perfect.  Thank you.

2          Anybody else?

3     (No response)

4          THE COURT:  All right.  Anybody in the courtroom that

5  wishes to make an appearance?

6          Come on up, Mr. Townsend.

7          MR. ROBINSON:  Craig Robinson on behalf of --

8          THE COURT:  Oh.

9          MR. ROBINSON:  -- Certain Abuse Survivors.

10          THE COURT:  Perfect.  Thank you.

11          Anybody else?

12     (No response)

13          THE COURT:  Okay.

14          All right.  Mr. Mintz.

15          MR. MINTZ:  Good afternoon, your Honor.  Mark Mintz on

16  behalf of the debtor.

17          Your Honor, I will also start by saying Mr. Lee Eagan

18  is in the courtroom present as well.

19          Your Honor, so we're actually here on extraordinarily

20  good news, we think.  And there's, you know, I don't want to

21  beat around the bush or, or what it is, but -- I know your

22  Honor does not read the media for lots of reasons, but it has

23  been reported in the media.  It has been reported in what we

24  filed last night that Certain Abuse Survivors, as identified as

25  the ones who filed the motion to dismiss, have reached an

6

1    agreement with the debtor, with the Commercial Committee,

2    basically with the plan proponents.  We're going to read parts

3    of this agreement into the record in order to describe it.  The

4    essential terms of such are, have been put into the Third

5    Amended Plan that was also filed.  And we're going to go

6    through sort of how we had to do it.

7          I will say upfront to people who have now started

8    asking me this question.  We recognize a hundred percent that

9    we missed a couple of spots where we needed to update

10   something.  That was not intentional.  We're not trying to do

11   anything underhanded.  We just missed a couple of spots.  And

12   it is our intent to live by the terms of the Memoran,

13   Memorandum of Understanding that we have.  If there needs to be

14   some language changes, we will certainly do that.  As your

15   Honor knows, we tend to move quickly as these things come in,

16   and it is very possible we missed something or some word

17   choices that need to be further amended.

18          So all that to say is, yes, what we have sitting in

19   front of the Court now is a Third Amended Joint Plan.  I fully

20   expect there will be a Fourth Amended Joint Plan shortly coming

21   up.  I'm going to describe where I know there will be changes

22   into Fourth Amended, and there may be other things we need to

23   make.  We will, of course, tell people about them.  But I don't

24   want anyone to think this is a hundred percent the last that

25   changed it or we, or now we're immutable.  We, we understand

1   where the points are.

2          So your Honor, the other thing that, as, as I start

3   here, is we also have an agreement with the Commercial

4   Committee as well that will -- you know, they don't have the

5   same sort of, you know, motions that, that are in there, but

6   they will participate in discovery.  So when Mr. Caine talks in

7   a little bit about the deposition schedule that the parties

8   have worked towards, you will notice that the Commercial

9   Committee's, is not there.  Again, I want to talk about their

10  Memorandum of Understanding as well --

11         THE COURT:  Okay.

12         MR. MINTZ:  -- and, and what we have agreed to.

13         So your Honor, let's start with --actually, I'll start

14  with the Commercial Committee 'cause I have it sitting in this

15  way.  And the agreement with the Commercial Committee is

16  relatively simple here.  We have amended Class 7 in the, or the

17  treatment of Class 7, I should say, in the Third Amended Plan

18  in a small, but significant way.  Previously in Class 7, we had

19  two different treatments that you could have.  You could elect

20  into the convenience class, which was any amount at $50,000 or

21  below and you would get paid a hundred cents on the dollar in,

22  of the convenience within 15 days.  It then said if you did not

23  opt in to the convenience class, you would get 1 percent.  And

24  I think it, I don't know if it had a timeline, but it didn't

25  have a -- it, it was 1 percent.  We've amended that to say, and

1   after looking at this, if you are not in the convenience class,

2   you will now get 100 cents on the dollar.  You will get no

3   interest, but we will pay you within 12 months of the effective

4   date.  The reason for the time delay is, honestly, to give us

5   time.  We believe most of these have been paid during the case,

6   or should have been paid during the case due to, due to first

7   day motions that existed.  Some of these were medical things

8   that should have been paid.  We believe were.  These are

9   accounting issues that are out there.

10          I, I don't want to hold things up.  It is easier,

11  therefore, to say right now we are going to go through it.  We

12  have the ability to object if we need to, but that is the

13  purpose of trying to make that change.

14          Once -- so that's why we're reserving the right

15  specifically to object to those.  It says we are reserving the

16  right to object to general unsecured claims.  Of course, what

17  we mean is to the ones who are not opting in the convenience

18  class.  The entire point of opting in to the convenience class

19  is that you're getting paid at that amount.

20          So your Honor, in return for these concessions and

21  changes to the plan, the Commercial Committee has agreed to (1)

22  withdraw any further discovery requests related to the plan and

23  (2) has agreed further to send a letter to its constituency

24  asking them to vote for the plan.

25          And I believe Ms. Altazan is on and she can talk

1   through that or discuss those if she wants to.

2           THE COURT:  All right.

3           Ms. Altazan, would you like to be heard?

4           MS. ALTAZAN:  Yes, your Honor.  Good afternoon.

5   Brooke Altazan on behalf of the Commercial Committee.

6           I just want to make one point of clarification.  I

7   believe Mr. Mintz misspoke earlier when he was speaking about

8   the Memorandum of Understanding as between the debtor and the

9   Abuse Survivors.  I believe he accidentally said the Commercial

10  Committee as well, but intended for it to be the other

11  committee.  We are not a party to that Memorandum of

12  Understanding.

13          MR. MINTZ:  That --

14          THE COURT:  Okay.

15          MS. ALTAZAN:  But that clarification aside, with

16  regard to our agreement with the debtor, Mr. Mintz spoke

17  correctly.  I spoke with him this morning about that clarifying

18  point on that other, adding the language other than convenience

19  claims where he has included that redline to Section 4.7(a)(i).

20  And I believe that that will not be an issue.  I expected that

21  to be, will be revised in any later iteration of an amended

22  plan.

23          I do want to clarify one point.  He, he mentioned that

24  the Commercial Committee will send a letter to its

25  constituents.  We intend to do that.  We intend to send a

1   letter advising them that the Commercial Committee does support

2   plan confirmation.

3              THE COURT:  Okay.  All right.  Thank you, Ms. Altazan.

4              MR. MINTZ:  So your Honor, that now leads us to the

5   Memoran -- and, and Ms., Ms. Altazan is correct.  I -- the

6   Abuse Committee is part of, or the Abuse Survivors' Committee

7   is part of this Memorandum of Understanding.

8              THE COURT:  Okay.

9              MR. MINTZ:  The agreement we have with Ms. Altazan and

10  the Commercial Committee was via email directly.  Whether you

11  call it a memorandum, whatever, it's an email agreement that we

12  have --

13             THE COURT:  Okay.

14             MR. MINTZ:  -- and where we are.

15             The Memorandum of Understanding, your Honor, we have

16  not filed this Memorandum of Understanding into the record.  I

17  don't think that it's necessarily appropriate to do so at this,

18  at this juncture.  We can, if we feel like that we absolutely

19  need to.  I do want to read some of the points into the record,

20  as I think that's the best way to kind of get this in here and,

21  and counsel can discuss issues as needed.

22             This is an agreement by the debtor, the Additional

23  Debtor, the Official Committee of Unsecured Creditors, and

24  Certain Abuse Survivors who are signatories to this.  That is,

25  in fact -- and we'll go through the list of who are the

1   signatories -- but that is, in fact, the people who did file

2   the motion to dismiss that was set for trial on, in November.

3        So -- and the best way to think about this is we had a

4   structure in which money was going to be funded into the

5   settlement trust through a variety of sources.  One was cash

6   that came from the debtor, the Additional Debtors, and the non-

7   debtor Catholic entities.  That amount is not changing.  It is

8   still 130 million.  It will be paid in cash on or before the

9   effective date of the plan, as already intended.

10       The second group, or second way is the settling

11  insurers.  For these purposes, we are calling it 30 million.

12  It's a little bit less than that.  I think it's 29.75, I think,

13  but it's right around 30 million.  That also is not changing

14  for the purposes of this.

15       The third area that had existed from funding was we

16  were, we did have and still do have a note that we are now

17  calling the First Settlement Trust Promissory Note.  That is a

18  $20 million note.  That Note will be delivered on the effective

19  date.  That Note is payable, it does not bear interest.  It is

20  payable at $5 million a year for four years.  However, upon the

21  close of Christopher Homes, the sale of Christopher Homes, or,

22  as we call it in the plan the Affordable Housing Entities, then

23  you have to pay off that note, any outstanding amounts on that

24  note.  That remains in this new deal.

25       What is new here is we will also issue now on the

1   effective date a second -- I'm sorry.  Actually, there's a

2   slight change and I should say it correctly.  Within five

3   business days of the entry of a plan confirmation order, the

4   Additional Debtors and the debtor shall issue a non-interest

5   bearing promissory note in the principal amount of $50 million

6   -- that's 5 0 million dollars -- maturing March 31, 2026.

7   We're referring to this as the Second Settlement Trust

8   Promissory Note.  And it will be secured by a letter of credit,

9   as we will define in a bit.  If the effective date has not

10  occurred as of March 31, 2026, the Committee will have the

11  ability to call the letter of credit and fund the $50 million

12  into an interest-bearing escrow agreement.  And so we will call

13  that the Escrow Account for this purpose.  I think we call it

14  the Affordable Housing Sale Escrow Account in the plan in, in

15  order to be clear.  It will be called into the interest-bearing

16  Escrow Account for the benefit of the settlement trust.  If the

17  effective date has occurred by, as of March 31, 2026, the

18  settlement trustee shall call the letter of credit and fund the

19  50 million into the settlement trust.  Secondary note, as we've

20  said, is secured by a $50 million irrevo, irrevocable letter of

21  credit issued by a federally insured bank or financial

22  institution acceptable to the Committee.  And what we say in

23  here is "in a form substantially similar to Exhibit A."  We did

24  have a form that we showed to them of what a exhibit looks

25  like.  It was not part of -- it's an exemplar.  We were very

1   clear that it's an exemplar of what it is, but it's a standard

2   letter of credit.

3         If the CHI sale has closed before the effective date,

4   the Escrow Account shall be funded into the amounts of both the

5   promissory note, shall be funded in the amount of both the

6   promissory note --that's $20 million -- and the secondary note,

7   that's the $50 million one -- from the CHI sale closing.

8   Followed, following the effective date, the Escrow Account Fund

9   shall be deposited into the settlement trust.

10         So again, to be very clear, the purpose of these notes

11  is to have them be paid, be delivered to the trust.  And the

12  CHI sale, the Affordable Housing Entity sale, will pay off the,

13  these notes.  That is $70 million that is being paid out upon

14  those sales.

15         The next thing that was in here is issues about the

16  Escrow Account.  If the Escrow Account is established as set

17  forth above, the Escrow Account Fund shall remain in the Escrow

18  Account until (a) a confirmation order has become final, not

19  subject to appeal, has been afform, affirmed by a final non-

20  appealable order by an appellate court; (b) an appellate court

21  has entered an order reversing plan confirmation order or such,

22  and such order becomes final and not appealable; or (c) until

23  such time as the debtor, Committee, and counsel for Certain

24  Abuse Survivors shall agree to in writing.  If the confirmation

25  order is affirmed by a final non-appealable order, the Escrow

1    Account Fund shall be deposited into the settlement, settlement

2    trust.   If the confirmation order is reversed by a final non-

3    appealable order, the Escrow Account Fund shall be returned to

4    the debtor.   We did have a statement in here that the letter of

5    credit shall be incorporated into both the plan of

6    reorganization and any purchase and sale agreement.

7         So what I can announce today, your Honor, is we are

8    far down the road of a purchase and sale.   We are working with

9    parties to do so.   We think we will get there.   I am not at

10   liberty, or ready at this point to announce we have a sale, we

11   have a buyer, or any of that.   We are still working on it, but

12   we are, the debtor is very confident that we can get to

13   closings or close to closings by the March 31 deadline in here,

14   that this is going to be very, very doable.

15        Plan shall be revised to provide that on or before

16   March 31, 2026, the debtor and Additional Debtors shall (a)

17   fund the settlement trust with $130 million cash; (b) issue the

18   promissory note in the amount of $20 million; and (c) issue the

19   secondary note in the amount of 50 million secured by the

20   letter of credit.   Again, we believe the plan has now said

21   that.

22        So to be clear, and, and I'll be honest with you, we

23   really repeated this waterfall that I'm about to say now for,

24   maybe, four times in here 'cause it was very important to the

25   parties and it should be.   But the way the payment waterfall,

1    therefore, will have to work is even though the second note is

2    the second note, as we call it, it needs to be paid first

3    because of the different funding mechanisms.  So we simply did

4    reverse that in the, in the plan.  But again, from the way that

5    we should see the waterfalls come out of the CHI sale, it

6    should be that they're both being paid at the same time in full

7    from the amounts that we are looking at.

8             So your Honor, this would -- we should say that any

9    net proceeds exceeding $70 million --

10            THE COURT:  Uh-huh (indicating an affirmative

11   response).

12            MR. MINTZ:  -- that come out of here will be retained

13   by the Additional Debtors as the selling entities.  That is the

14   full extent of the funding that the, that the settlement trust

15   will receive from the sale, is that 70 million split among

16   (indiscernible).  So your Honor, the previously negotiated

17   percentage splits, if you will recall, previously we had, for

18   lack of a better word, a complex-splitting arrangement where

19   the first 23 million net of, the first 23 million net went to

20   the debtor to pay off the note --

21            THE COURT:  Uh-huh (indicating an affirmative

22   response).

23            MR. MINTZ:  -- and then the next 46 million went to

24   the, or next 23  --

25            MR. WEGMANN:  33.  33.

1        MR. MINTZ: -- next 33 million -- sorry -- next 33

2   million went to the Committee or for the settlement trust and

3   then there was a 25/75 split for 10 million and a 35/65 and

4   then a 50/50.  All of that's gone.

5        THE COURT:  All right.

6        MR. MINTZ:  So that has all been abolished.  And we

7   have amended the plan to state that it has been, that that has

8   been abolished and put in everything else that I've talked

9   about.  We should add that based on the way this sale is

10  working, when we did the sale procedures in the, in the new

11  version of the plan, we don't say that we're hiring the

12  independent financial advisor and that that person is going to

13  direct the sale with advice from both the debtor, etc., 'cause

14  we're moving forward with the sale.  The Commercial -- the --

15  the -- excuse me.  Not the Commercial Committee -- the Abuse

16  Survivors' Committee is a consulting party on that sale.  We

17  are moving forward with them.  We'll continue to move forward

18  with them and with Certain Abuse Survivors so they know what is

19  happening as we make that sale and proceed with it.

20       I will remind the Court -- I don't think you need

21  reminding -- but I will remind the Court that it is currently

22  non-debtor entities that are selling and in fact, they will

23  always be non-debtor entities.  The entities that own the

24  properties that we're talking about, the Affordable Housing

25  Entities, will never be debtors and they are not listed as

1 | Additional Debtors in the, in the plan at all.

2 | Insurance settlement credit mechanism. Essentially,

3 | what we have discussed here is, as has been reported and I

4 | think as Travelers Insurance, who is on the phone, will say,

5 | they are not currently a settling insurer in, in this. I think

6 | negotiations are continuing along with them. What we really

7 | said in here that's, that's important here is any, any Traveler

8 | settlement must be acceptable to the Committee and counsel for

9 | Certain Abuse Survivors. After the effective date, any

10 | settlement must be acceptable to the settlement trustee with

11 | approval of the settlement trust oversight committee.

12 | The settlement trust agreement, we say will be

13 | amended, has been amended in what we filed, has been amended to

14 | have five members on the trust oversight committee away from

15 | the three that were there. The Committee shall appoint three

16 | of those members and we name two of the three members. I do

17 | not want to read their names now. And Certain Abuse survivors

18 | shall appoint two members and we do name their members, but I

19 | do not want to read them now.

20 | THE COURT: Okay.

21 | MR. MINTZ: The trust agreement will be amended to

22 | provide that if only one oversight committee member objects to

23 | a settlement with Travelers, then the settlement trustee can

24 | seek bankruptcy court approval of the settlement. However, if

25 | two or more oversight committee members object to the

1    settlement with Travelers, the trustee cannot seek bankruptcy

2    court approval over two or more objectors.

3         So again, we explain that this is -- what we were

4    trying to do is come up with a way to guarantee money into the

5    trust, into the settlement trust.  So for everybody's

6    edification, again, we say it again, but I will be very clear.

7    This mechanism ensures the settlement trust receives at least

8    $230 million, comprised of 130 million in cash from the debtor

9    and Additional Debtors; 20 million from the existing promissory

10   note; 50 million from the second, secondary note, or Second

11   Settlement Trust Note secured by the letter of credit; and $30

12   million from the current settling insurers.

13        I do want to add that with regards to the security, we

14   do have a provision in the plan that states that if we have

15   closed prior to the effective date for this -- for -- for the

16   entire thing or for portions of it, we can substitute the

17   letter of credit for cash.  We don't have to get a letter of

18   credit for the full amount.

19        THE COURT:  Uh-huh (indicating an affirmative

20   response).

21        MR. MINTZ:  If, you know, if it's 50, if we have $50

22   million cash, I think they would prefer the cash.  And so we

23   have a provision we can do that.

24        In return for these, the Certain Abuse Survivors have

25   agreed to the following obligations:

1      They will withdraw the motion to dismiss within five

2 business days of the entry into this.

3      They will agree to suspend all discovery against plan

4 proponents, including depositions, within five days of entry

5 into this Memorandum.

6      Lobbying cessation.  They will cease all lobbying

7 efforts against the plan.  They will send a letter to the

8 client, to clients, encouraging plan support.

9      They will agree that the debtor, the Additional

10 Debtor, and the Committee may send a press release regarding

11 the Memorandum of Understanding at any time after yesterday at

12 5:00 p.m.

13      Plan confirmation support.  They have agreed to

14 provide such other support for plan confirmation as the plan

15 proponents shall reasonably request.

16      So your Honor, the reason that we wanted to go through

17 that is it's important.  What we think we have done, and we

18 recognize we need to work on some language and make the other

19 changes that we have discussed.  One important change that we

20 need to make is in the plan Exhibit F.  There is a Frequently

21 Asked Questions section that we, quite frankly, most of us

22 dealing with this, forgot that it was giving information about

23 the CHI sale and it was not updated.  So it does need to be

24 updated.  And there's some other cleanups and languages that

25 we're going to continue to talk to.

1          So it's signed by the debtor, counsel for the

2    Additional Debtors, counsel for Christopher Homes, counsel for

3    the Official Committee of Unsecured Creditors.  It was also

4    signed by Mr. Gisleson, Mr. Trahant, Mr. Denenea,, Ms.

5    Charbonnet, Mr. Robinson, Mr. D'Amico, Mr. Salim, Mr.

6    Rockforte, Mr. Townsend, and Mr. Elliot.

7          So your Honor, these are the terms of the settlement

8    that we reached with two, you know, very, very important

9    constituencies in this case.  We've attempted to amend the plan

10   to get there.  We will, I'm sure, have another amendment, as we

11   said, but we thought it was important to get that in front of

12   the Court now to understand exactly where, where we are, why

13   the discovery -- honestly, some of the discovery issues that we

14   were dealing with on deposition scheduling, which we know we

15   owed you, we wanted to wait until we could say this to be able

16   to explain clearly what was happening 'cause I think that was

17   an important part of it.  Your Honor was going to ask questions

18   that we weren't ready to answer yet.

19         So that's where we are today.  I, I will turn it over

20   to Mr. Caine to talk about the depo, deposition scheduling and,

21   and other things, but we wanted to inform the Court --

22         THE COURT:  Okay.

23         MR. MINTZ:  -- of those points.

24         THE COURT:  Well, thank you for that.  And before we

25   turn it over to Mr. Caine and, and change tact.

1          Mr. Gisleson, or anybody from your cohort, do you want

2     to be heard on this?

3          MR. GISLESON:  Yes, your Honor.  Thank you very much.

4     Soren Gisleson for Certain Abuse Survivors.

5          What Mark said is essentially correct.  The main thing

6     for the Certain Abuse Survivors was that there was a guarantee

7     that the $230 million be paid out before the end of the first

8     quarter 2026, regardless of the Christopher Homes sale.  We

9     understand that they needed to include the Christopher Homes

10    sale as a funding mechanism for the Court to insert the plan.

11    But rest assured, there's a guarantee that no matter what

12    happens to the Christopher Homes sale, that money will be paid

13    out into the trust or into some account by the end of the first

14    quarter of next year.  That was the linchpin, to shift the risk

15    of the Christopher Homes sale onto the Archdiocese and the

16    Additional Debtors and take it off the shoulders of the Certain

17    Abuse Survivors.

18         There will be some sort of amendments.  We will talk

19    to co-counsel.  Maybe it does make sense to file the MOU into

20    the record since it does have that guarantee, just for

21    clarity's sake.

22         But yeah, other than that, everything else that Mr.

23    Mintz said is correct and we're pleased and the, and the

24    clients are pleased with that guarantee.  That was of the

25    utmost importance to them and, and was the ultimate linchpin

1    that clinched this deal.

2            Thank you.

3            THE COURT:  All right.  Thank you very much.

4            Does anybody else want to have any comment, provide to

5    the Court any color on the deal, on the agreement?

6        (No response)

7            THE COURT:  Okay.  All right.

8            MR. MAXCY:  Your Honor --

9            THE COURT:  Yeah.

10           MR. MAXCY:  -- Patrick -- I'm sorry.  Patrick Maxcy

11   for Travelers.  I didn't want to add anything obviously to the,

12   to, to discuss the --

13           THE COURT:  Uh-huh (indicating an affirmative

14   response).

15           MR. MAXCY:  -- the proposed deal that Mr. Mintz just

16   described, but just a point of clarification or question.

17           I, I haven't seen on the record -- and maybe I missed

18   it -- the actual MOU.  I know it was referenced in the notice

19   of filing of the amended plan last evening.  I haven't -- I'm

20   not sure that there has been, the MOU itself has been filed in

21   the record.  I'd like to clar, seek, seek clarification whether

22   or not Mr. Mintz is intending to provide the MOU in the record

23   or otherwise provide it to us, to the other parties in the

24   case.

25           THE COURT:  All right.

23

1      MR. MINTZ:  We have not yet filed it into the record.

2  I, I still need to discuss, as Mr. Gisleson just said, it's the

3  first I heard that maybe we do want to file it.  And, and I

4  understand the reasons why.  There are reasons why to do it,

5  reasons why not to do it.

6      THE COURT:  Uh-huh (indicating an affirmative

7  response).

8      MR. MINTZ:  We have not yet done it.  And we will

9  discuss.

10      But I've -- we'll work with Mr. Maxcy so he can see

11  it.

12      THE COURT:  Okay.  But just for clarity, it has been

13  executed.

14      MR. MINTZ:  Yes.

15      THE COURT:  So all of these, all of these things that

16  you read off that are going to happen within five days of

17  entering the agreement, the clock's running right now?

18      MR. MINTZ:  As far as I know, yes.

19      THE COURT:  Okay.  All right.

20      MR. CAINE:  That's correct, your Honor.

21      THE COURT:  Okay.

22      MR. MAXCY:  And, and to Be clear, your Honor, we

23  believe that, you know, we are entitled to see the MOU.  We

24  hope that the debtor and the parties will share it with us.

25      THE COURT:  Yeah.  I mean, and just from the Court's

1    point of view, I think it's in the best interests of all

2    parties in interest and the Court to have that, to the extent

3    it's not divulging any personally identifying information, you

4    know, revealing specific abuse survivors, or, if there's any

5    confidential information that, of course, needs to be redacted,

6    please redact it.  But to the extent that you can provide

7    transparency about the agreement, I think that's in the best

8    interest of everybody.

9            MR. MINTZ:  And, and I agree, your Honor.  And

10   honestly, as I was reading it, that was what helped me realize

11   there is some personally identifiable information with the

12   names of certain abuse survivors that we, of course, don't want

13   to put into the public record.

14           There are also -- I, I was 90 percent sure.  And, and

15   this reminded me that we didn't name other things that we would

16   need to redact.

17           THE COURT:  Okay.

18           MR. MINTZ:  So I think we can get there, but I will

19   check with everyone else and make sure.  But I, I agree with

20   your Honor.

21           THE COURT:  Okay, perfect.  All right.

22           Does anybody else have any questions?  Any other

23   questions for the debtor or for any of the plan proponents or

24   Mr. Gisleson?

25           MR. MARKS:  Your Honor, can you -- this is Christopher

1    Marks.  Can you hear me?

2              THE COURT:  Yes.

3              MR. MARKS:  Your Honor, Christopher Marks on behalf of

4    the bond trustee.

5              I certainly don't have any color on the plan.  I

6    obviously wasn't consulted in any way with respect to it, but I

7    would like --

8              THE COURT:  Okay.  Mr. Marks, I'm going to ask you to

9    use your handheld because you're not coming through very

10   clearly on the ECRO.

11             MR. MARKS:  Is that better?

12             THE COURT:  Perfect.  Thank you.

13             MR. MARKS:  Good.  I'll just start over, your Honor.

14   Christopher Marks on behalf of the bond trustee.

15             I would like to address the aspect of this settlement

16   that's being reported with respect to the Commercial Committee.

17   The bond trustee was certainly not -- was not -- this, this

18   agreement was not discussed with the bond trustee.  The bond

19   trustee had absolutely no input in the Commercial Committee

20   withdrawing its participation in this confirmation process and

21   settling with the debtor.  We think it's a clear breach of the

22   Commercial Committee's fiduciary duties to its constituents.

23   This includes the bond trustee.  And we just want to make that

24   clear for the record, that we had absolutely no participation

25   or say in that settlement.

1          THE COURT:  Okay.  Thank you.  All right.

2          Okay.  Mr. Caine, let's talk, let's pivot, then, and

3    talk about -- in light of, in light of this very good news --

4    and believe me, a settlement is always good news -- why don't

5    you talk to me a little bit about logistics and how we're going

6    to proceed with the depositions that are scheduled for this

7    month and the month of October.

8          MR. CAINE:  Yes, your Honor.  As Mr. Mintz -- sorry.

9    Andrew Caine for the Abuse Survivors' Committee.

10          As Mr. Mintz said, we were cognizant that we owed the

11    Court a schedule of depositions, but we wanted to get to the

12    pared-down list that was the result of these two settlements.

13          So that is what I sent over by email today.  I, I hope

14    your Honor has received that.

15          THE COURT:  I have.

16          MR. CAINE:  I, I have spoken -- very well.

17          I have spoken with counsel for all of the involved

18    parties and arrived at the schedule that is set forth in the

19    Excel file that I sent to your Honor.  After sending it, there

20    were a couple of other emails that I received from parties, who

21    can speak for themselves in this hearing, asking for additional

22    depositions that aren't on the list.

23          But as for the ones that were, were on the may call

24    list and still survive, the schedule is before your Honor.  And

25    what we've attempted to do is cover this still substantial

1  number of depositions in a reasonable period of time, providing

2  as many as we can in the same week, stacking them on the same

3  day if the parties estimated in my conversations with them that

4  they would be a short day, understanding now that the, the

5  number of parties wanting to participate in the depositions has

6  been reduced.  So for example, for the deposition of the

7  Archbishop, that's going to be much shorter than it would have

8  been after these settlements.

9       The only deponents for whom there are not dates

10  plugged in are the 30(b)(6) representatives for whom we are

11  waiting to see the topics on September 17th.  Mr. Marks and I

12  did agree on Argent for that week.  We put in September 24th

13  because they're available.  We've talked about, maybe, if it's

14  a short one, we could pair it with the deposition later that

15  week of Ms. Moody.  I hope the Court will indulge counsel to

16  try and figure that out if we want to change the date a little

17  bit.

18       There -- all of the experts for the plan proponents

19  have dates that are inserted and Argent has indicated it's

20  going to have two experts.  So those probably won't get set

21  with dates until after those reports come in --

22       THE COURT:  Uh-huh (indicating an affirmative

23  response).

24       MR. CAINE:  -- on October 2nd.

25       But we want to get you these dates so that we could

1    try to get Courtroom B set aside and we can schedule the court

2    reporters and get everything moving forward and everyone could

3    plan on this schedule.

4            THE COURT:  Okay.  All right.  Well, I, I am looking

5    at it.  It is significantly pared down, which I'm thankful for.

6    Okay, let's see.  I just want to look at my schedule and

7    compare your schedule with mine.

8            So most of these are going to happen probably the week

9    starting October 26th.  We've got a couple that are scheduled

10   for late September, but the majority of action is going to

11   start, we'll start off October 3rd, Friday, October 3rd, with

12   the Archbishop.  Okay.  And then go that week.  Okay.  All

13   right.

14           I'm just perusing it very quickly.  It looks like I

15   will be completely available for these in case the parties have

16   any disagreements, any objections they can't resolve, and they

17   need my help.

18           The -- I will give -- if you -- am I okay to take

19   these dates that you've given me and at least send the dates to

20   the U. S. Marshals and the CSOs downstairs and all of my court

21   staff?  They're pretty much locked in, Mr. Caine?

22           MR. CAINE:  Yes, your Honor.

23           THE COURT:  Okay.  All right.

24           Well, I, I shall do that.  And like I said, the, you

25   know, we'll be available if anybody needs any assistance.  And

1    if you want to -- I know that you'll want to use all the

2    breakout rooms and conference rooms we have here, you know, for

3    meals, snacks, whatever you need.  We'll, we'll be available to

4    help you with that.  Okay.

5           And then, of course, the, the scopes of inquiry are

6    coming in on the 17th, correct?

7           MR. CAINE:  Correct, your Honor.

8           THE COURT:  All right.

9           MR. CAINE:  Your Honor, do you have a specific time

10   that you would prefer that the depositions start or not start

11   before?

12          THE COURT:  No.  We're, we're completely open.  We, we

13   arrive early and stay late.  So whatever works for you.

14          MR. CAINE:  Okay.

15          THE COURT:  And then we will -- again, if you -- you

16   need to let me know if you have folks who want to observe or

17   participate remotely.  The deponents need to be here, you know.

18   If you're asking hours' worth of questions, then you need to be

19   here.  But if you represent a client and you only want to ask

20   one or two questions, I'm not sure that's a good use of

21   resources to fly into New Orleans if you are out in California,

22   or wherever you are.

23          So if you want to, you know, use the courtroom

24   technology, this GoToMeeting setup, you just need to let us

25   know if you've got folks that need to participate, or at least

```
1    just observe remotely.  That's just okay.  But you just need to
2    let us know ahead of time.
3              MR. CAINE:  Thank you.
4              THE COURT:  And I would ask you to coordinate with
5    Allen McIlwain, the courtroom deputy, and Scott Anderson, one
6    of our IT staff, and they're going to help you set that up.
7              MR. CAINE:  Thank you, your Honor.  I'm sure that
8    there are parties who will want to at least observe.  So --
9              THE COURT:  Uh-huh (indicating an affirmative
10   response).
11             MR. CAINE:  -- I, I will lean on Mr. Knapp to help get
12   all that set up.
13             THE COURT:  Okay.
14             Congratulations.
15             MR. MARKS:  Your Honor, just --
16             THE COURT:  All right.  Okay.
17             MR. MARKS:  Your Honor, Christopher Marks on behalf of
18   the bond trustee on depositions?
19             THE COURT:  Oh.  I'm sorry, Mr. Marks.  Can, can you
20   speak up?
21             MR. MARKS:  Yes.  Your Honor, can you hear me?
22             THE COURT:  Yes.
23             MR. MARKS:  Just one point on depositions.
24             And Mr. Maxcy, you might also have this emotion.
25             Mr. Caine mentioned it.  After seeing the plan -- that
```

1  was obviously after we discussed the list with Mr. Caine.

2  We -- we -- and the Commercial Committee was on our may call

3  list and we had initially decided not to take their deposition.

4  And now after seeing the plan, we do want to take their

5  30(b)(6) deposition.

6          So your Honor will be seeing, you know,

7  (indiscernible) examination coming in for them.  I believe Ms.

8  Altazan is going to object to that, but we want to flag that

9  for your Honor, that, given the change in treatment and, and

10  the circumstances of the plan, we, we now want to take the

11  depo, the 30(b)(6) of the Commercial Committee.

12          THE COURT  Okay.

13          MS. ALTAZAN:  Brooke Altazan on behalf of the

14  Commercial Committee.

15          Obviously, I first would like to flag for the Court

16  that we vehemently disagree with Mr. Marks' prior

17  representations that we have in any way breached our fiduciary

18  obligations or obligations at all.

19          But saving that for another day, your Honor, I, I

20  think that it is ripe to discuss Argent's now desire to have

21  the Commercial Committee sit for a 30(b)(6), you know.

22  Obviously, as the Court is well aware, the Commercial Committee

23  is neither a plan proponent, nor has it objected to the plan.

24  And Argent has been an ex-officio member up until May of this

25  year.  I cannot for the life of me imagine any factual

1    information that a Commercial Committee representative could

2    provide that would be relevant to confirmation or to Argent's

3    dismissal notion.  And even then, even in the event that

4    something could be relevant, I cannot imagine any of that

5    information wouldn't be privileged.

6         So I think that dovetails to the next issue, which I,

7    I certainly believe it to be unduly burdensome to require a

8    Commercial Committee representative, who is a volunteer

9    position, to take time from their schedule to come sit for a

10   deposition under those circumstances.

11        THE COURT:  All right.

12        Here's what I would suggest.  And this, you know,

13   transitions nicely to the, the pleading that I read today.

14   It's Docket No. 4334.  It's styled as a, as Argent

15   Institutional Trust Company, as Indenture Trustee's Response to

16   Debtor's Request for Status Conference, but what it is is a

17   motion to compel.  And so, you know, I, I got to tell you that

18   this is procedurally inappropriate, the way that it's drafted,

19   the way it's presented to the Court.  It's, you know, it's not

20   noticed for hearing.  I don't have -- there's no opportunity

21   for a response.  You're asking the Court for relief and so you

22   need to follow the Rules, okay?

23        So what I will say is that why don't we convert this,

24   you know, Docket No. 4334 to a motion to compel, set it on this

25   -- let's see -- this month's omnibus date, which is the 25th.

1    So that's about, you know, a little over two weeks.  And any

2    responses can be filed on Tuesday, the 23rd, at 5:00 p.m.

3            And what I would also suggest is that if you want to

4    notice a deposition, Mr. Marks, of, a 30(b)(6) of the

5    Commercial Committee, that you also tee that up and also set

6    that on the 25th, on the omnibus date.

7            And Ms. Altazan, if you have a response, file that on

8    the 23rd, and we can just talk about these things then.

9            But you know, the Court doesn't really appreciate the,

10   the mechanism that was used to get the, the complaint on file,

11   okay?

12           So if that works for you, Mr. Marks, that works for

13   the Court, and it'll give everybody the due process that they

14   deserve to respond to what you need, okay?  I preapproved the

15   discovery -- and I'll just say this -- I preapproved the

16   discovery in an effort to avoid motions to quash and motion to

17   compel, but that didn't bar, certainly didn't bar anyone from

18   filing a motion to quash or a motion to compel.

19           And I would also say, without getting into it, you

20   know, the Court set deadlines.  We had three status conferences

21   before we set the scheduling order in this matter, okay?  And

22   yes, it is on a, a tight timeline, but it is sufficient to meet

23   everybody's due process needs.  It's not that quick, okay?

24           And so if you're not getting what you need, then you

25   need to absolutely come to the Court for assistance, but you

1    got to do it in a way that, that satisfies due process and

2    complies with the Federal Rules of Civil Procedure and the

3    Bankruptcy Rules, okay?

4          So we'll deal with the discovery disputes, if you

5    can't work them out ahead of time, we'll deal with the

6    discovery disputes on the 25th after everybody's had an

7    appropriate time to respond.

8          But I would strongly encourage you to resolve the --

9    the -- any discovery disputes that you have.  Because, you

10   know, like I said, we're looking at depositions essentially,

11   you know, for the most part, starting the first of October, and

12   we want to make sure that people have sufficient information,

13   the documents they requested.  I thought I made myself pretty

14   clear about what was deserved and what was to be given, okay?

15         So let's see if we can't work it out very timely.  If

16   not, we'll deal with it on the 25th.  Okay?  All right.

17         MR. MARKS:  Your Honor, may I be heard on --

18         THE COURT:  Sure.

19         MR. MARKS:  -- on that point?

20         THE COURT:  Sure.

21         MR. MARKS:  To give, to give your Honor a little bit

22   of context, I actually had believed that this was supposed to

23   be a status conference on discovery.  I think that's what the

24   representation was made to the Court on that Friday afternoon

25   email.  I had, obviously, no idea there'd be plan amendments

1    and that would be the kind of thrust of this, this status

2    conference.  And I, my understanding was it was to specifically

3    address the issues that were raised in, in my response.  And,

4    and therefore, I wanted to, you know, kind of bring, bring that

5    out and file a pleading before the, before the hearing.  And I

6    thought, even after the plan was disclosed, that these would

7    still be issues that the, that it would be asking the Court to

8    rule on in a discovery con, conference context.

9         Happy, happy to have it heard as a motion to compel.

10   I was trying to work, you know, kind of within the tight

11   timelines, but that was why it was filed the way it was.  It

12   wasn't to be improper to deny anyone due process.  It was to --

13   because my -- I had, I had no information about what this, you

14   know, what this status conference was going to be about today

15   before, you know, the plan was filed.  And even the notice that

16   was filed was, was rather vague.

17        So it certainly wasn't meant to circumvent the, the

18   Rules.  But, you know, we're -- we're -- every day that goes by

19   here, we need, we're not having documents.  The debtor is not

20   and the Additional Debtors are not providing us with the

21   discovery that your Honor ordered.  And so, you know, we're

22   losing time here.  And that, that was the reason for that

23   filing and, and the way it was presented.

24        But again, happy to have it heard under the Rules and

25   as your Honor outlined.

1          THE COURT:  Okay.  And you know, I understand.  Like I

2   said, I had been waiting on, as Mr. Caine and other counsel

3   noted, the Court was just waiting on the discovery schedule,

4   the deposition schedule, and it never came.  So that's -- I --

5   that's why I thought that I was here just to, to make more

6   rulings on deposition times, frankly.  But, you know, what a

7   surprise.  And so, yes, you know, this case is full of

8   surprises, but the ability of professionals to work together

9   and, and get there is not surprising at all, okay?

10          All right.  So do we need -- Mr. Mintz, do we need to

11   do anything else today?

12          MR. MINTZ:  I don't think so, your Honor.

13          MR. MAXCY:  Your, your Honor?

14          MR. MINTZ:  Sorry.

15          THE COURT:  Oh.  Go ahead, Mr. Maxcy.

16          MR. MAXCY:  I'm sorry.

17          Yeah.  So I, I id have a couple of things, your Honor,

18   I did want to raise.  Hopefully, it will just take a few

19   minutes.

20          THE COURT:  Sure.

21          MR. MAXCY:  Patrick Maxcy for Travelers.

22          Two things, your Honor, I just wanted to flag for you,

23   or one thing I wanted to flag for you and one thing I wanted to

24   raise.  First, with respect to the depositions that have

25   already been noticed and are part of the schedule.  As you

1    know, the, the Archbishop Aymond is on that list as well as

2    other representatives of, of the Church, of the Archdiocese, I

3    should say.  Travelers did not specifically notice Archbishop

4    Aymond.  We're still evaluating to the extent to which we would

5    participate in that, in that deposition.  I understand things

6    are changing a little bit, given how, how, the number of

7    parties that will probably want to depose him at this point.

8            I just wanted to let the Court know and flag it for

9    the Court that Travelers is, will be filing a complaint for

10   declaratory judgment regarding its insurance rights under the

11   policies.  And in connection with that complaint, we're

12   certainly reserving all rights to take the deposition of

13   Archbishop Aymond and any other party.

14           So to the extent that we, to the extent we don't

15   participate in his deposition, which hasn't, the decision

16   hasn't been made yet, but to the extent we don't participate in

17   his deposition in connection with plan confirmation

18   specifically doesn't mean that we will not be seeking his

19   deposition in connection with other litigation.

20           So I just wanted to --

21           THE COURT:  Uh-huh (indicating an affirmative

22   response).

23           MR. MAXCY:  --  point that out, your Honor, and flag

24   that for you.  We certainly reserve all rights.

25           Secondly, your Honor, I think Mr. Caine referenced

1    this briefly in his opening remarks.  We did have, and an issue

2    we raise today, which, once, once we looked at the revisions to

3    the plan, which were filed last night, and we saw the revisions

4    specifically to the settlement trust agreement, and then we

5    heard Mr. Mintz describe how, the, the MOU today, how I heard

6    Mr. Mintz describe the MOU today also was consistent with the,

7    the changes in the settlement trust agreement.  There are some

8    substantive changes to that agreement that affect how the, how

9    the trustee operates and, and not just the appointment of a

10   settlement trust advisory committee, but the individuals on

11   that settlement trust advisory committee and the powers those

12   individuals have over decisions that the trustee will make.

13          So to that -- because, primarily because of those

14   changes that we saw in the, in the plan last night and, and,

15   and reviewed this morning, we asked that Mr. Caine and the

16   other parties agree to Travelers' deposition, taking the

17   deposition of the new, the members of the settlement trust

18   advisory committee.  Mr. Caine has responded that, that they,

19   they, they would object to us taking that deposition, but we

20   think it's, those depositions, but we think it's entirely

21   appropriate, given that these were, that, that the trust

22   agreement was just changed literally in the last 24 hours, that

23   we have the opportunity to take those depositions.

24          So that's, that was what I wanted to raise with your

25   Honor, I think, because we do have a disagreement on that

1   point.

2           THE COURT:  Okay.  All right.

3           Well, as to your first point, you're pretty much in

4   the same boat as the, the bondholders are.  The bondholders

5   have also filed an adversary.  And I think I had this

6   conversation with Mr. Marks last time, who asked the exact same

7   question as you, you know.  The depositions that we've got

8   relate to confirmation and the, the, the bond trustee's

9   adversary is, of course, completely separate and apart from

10  that.

11          So any, any discovery that takes, that takes place

12  part and parcel to those adversaries is just, of course,

13  completely separate and apart from these depositions that are

14  set right now for confirmation.  So I, I am in agreement with

15  you that, you know, you have separate discovery rights in those

16  adversaries over there.

17          So you, you may want to participate in this particular

18  deposition, to the extent that you have issues related to

19  confirmation, but that is the scope of this deposition.  It's

20  not -- it's not -- it's not noticed for the purpose of either

21  the adversary that's been filed or the one that's coming, okay?

22          MR. MAXCY:  Thank you, your Honor.

23          THE COURT:  Mr. Caine, would you like to comment on

24  the second, second issue?

25          MR. CAINE:  Yes.  Thank you, your Honor.  Andrew Caine

1  for the Abuse Survivors' Committee.

2          The role of the settlement advisory committee has not

3  substantially at all materially changed in the new plan.  And

4  Travelers listed as may call witnesses the claims reviewer

5  before he was named and the settlement trustee before -- well,

6  he still hasn't been named, but hopefully any day -- as their

7  roles.  And so those are on the list.  We viewed that as pretty

8  tangential because Travelers really shouldn't have a voice in

9  who makes the decisions on behalf of the settlement trust.

10 They're potentially adversarial parties, in fact, likely

11 adversarial parties, unless there is a pre-confirmation

12 settlement.  So the request for Travelers to take their

13 depositions, we thought, was far afield, but it's not going to

14 be a major time commitment.  So if they want to ask some

15 questions, they can ask some questions.

16         The settlement advisory committee is substantively

17 different.  So as a procedural matter, they didn't put them on

18 their list.  So we think they're time barred.  As a substantive

19 matter, this is a committee that's made up of sexual abuse

20 survivors who are going to consult with the settlement trustee

21 as to whatever actions the trustee is going to take with

22 respect to all matters of the trust.  It would be not only

23 emotionally difficult for any of them to sit for deposition,

24 but Travelers is going to have to articulate some basis upon

25 which, anything that they could ask is a matter upon which they

1   have standing or pecuniary or any other interest before going

2   so far as to burden these people.  And so that is why we

3   object, your Honor.

4            MR. MAXCY:  Your Honor, if I can, if I can be heard

5   just for a moment in response?

6            THE COURT:  Sure, go ahead.

7            MR. MAXCY:  Your Honor, the, the, the notion that

8   there's been no change in the, in the way that the settlement

9   trust advisory committee operates, I don't think is, it, it

10  bears out when you read the document.  The way the trust

11  agreement previously read was that the settlement trustee would

12  have the ability to enter into a, quote, unquote, insurance

13  agreement.  I believe that's what, what's referred to in the,

14  in the trust agreement.  If a, if a, if a settlement trust

15  advisory member or committee member objected -- I believe that,

16  previously, there were three members.  Now there are five.  If

17  one of those members objected, he could, the, the trustee could

18  still go to the bankruptcy court and seek approval of that

19  agreement.

20           The way the trust agreement has been revised, as I

21  read it, and I think as has been described by Mr. Mintz today,

22  the trust advisory committee has effective veto power over any

23  such settlement agreement that the trustee would enter into.

24  If two of the five individuals who are on the committee object

25  to a settlement agreement that the trustee entered into, then

1    he may not seek approval.  He's not allowed to go to the

2    bankruptcy court to seek approval over their objection.

3           So they have effective veto power over important

4    aspects of the, of the trust mechanisms that they did not have

5    before.  In, in fact, they also, whereas the trust used to, the

6    trust formally, formerly -- sorry -- provided that the

7    trustee's compensation was set, I believe, I believe it was for

8    at least a year.  Now I believe it would, it provides that the

9    committee will have the ability to, or he will have to submit

10   invoices on a monthly basis, on a regular basis, to the

11   committee who will approve his compensation.

12          So these issues go directly, your Honor, to the

13   independence of a trustee.  The trustee, effectively under the

14   plan, has -- has -- is going to be, step into the shoes of the

15   insured, who is the Archdiocese, for purposes of the policies.

16   So we believe that the insured, that the trustee needs to have

17   a semblance of independence, has to be an independent party, or

18   should be.  We intend to take -- that's why we, that we noticed

19   his deposition for purposes of, of exploring that issue, as

20   well as other issues related to 1129(a)(3) and, and other

21   bankruptcy issues.  Now that the committee has been, the, the,

22   the trust document has been changed to give the committee

23   members, the advisory committee members themselves, much more

24   power in that, in that, in the trust process, we believe it's,

25   it's relevant to the plan, our, our plan confirmation

1   objections to explore how they intend to, how, how they will be

2   operating under the committee structure that's been changed in

3   the plan.

4           THE COURT:  Okay.  All right.

5           Well, I'm looking at the --

6           MR. CAINE:  May I respond, your Honor?

7           THE COURT:  Yeah, go ahead.  Just briefly, please.

8           MR. CAINE:  Yes, very briefly.

9           Mr. Maxcy is correct.  There have been those changes

10  in the plan in terms of the way the settlement trustee may

11  proceed.  But essentially, what Travelers is asking to do and

12  is asserting is that it, it has a right to do is to intervene

13  in the decision making between a client, essentially, a group

14  of clients, and its adversary, which is Travelers.  And so that

15  doesn't seem to be something they have standing to do.  They,

16  they might have a pecuniary interest if they don't like the

17  settlement position of the settlement trust, but it's not

18  within their purview to take the depositions of the individuals

19  in order to make some argument that they don't like who they

20  are.  These are abuse survivors serving on this committee, and

21  they should not be burdened with what we believe is a very

22  tangential and irrelevant request.

23          THE COURT:  All right.

24          All right.  Well, why don't you do this?  Like I said,

25  I haven't --, I'm staring at the Third Amended plan's redline,

44

1    but I haven't dived in to any of the other documents.  Why

2    don't you do this?  Why don't you do whatever you can to tee it

3    up, again for the 25th, the omnibus, and we'll deal with it

4    then.

5              From listening to you, and, and it caught my ear as

6    well when Mr. Mintz was speaking, some of this is a, touches

7    upon issues regarding the retention of bankruptcy court

8    jurisdiction and, and how involved the bankruptcy court is

9    going, is going to be post-effective date.  So those are the

10   conversations that I would like to have as well as we, as we

11   move forward.

12             But I hear what everybody's saying.  I would just

13   appreciate it being teed up.  I'm, I'm not prepared to start

14   giving out advisory opinions right now.  So, or ever.  So let's

15   tee it up for the 25th and really have a conversation about it

16   and -- and -- so that everybody can see exactly what it does

17   say.  Because I, I feel like there's, just from listening to

18   the two of you, there might be some discrepancies about what it

19   actually says, and we just need to look at it and see if it's

20   changed and how it's changed and who's affected by the change,

21   and then we can decide what's relevant for discovery regarding

22   confirmation on that particular plan term, okay?

23             MR. MAXCY:  Thank you, your Honor.

24             THE COURT:  All right.  Okay.

25             MR. MARKS:  Your Honor?  Your Honor, Christopher

1 Marks --

2    THE COURT: Yes. Mr. Marks.

3    MR. MARKS: -- for the bond trustee.

4    Another, another point I discussed with a couple of

5 the parties. It, it relates to the claim of mediation

6 privilege and other privileges that, that I think we've talked

7 about a little bit, your Honor, and, and potentially having a

8 briefing schedule set to address some of those issues.

9    THE COURT: Uh-huh (indicating an affirmative

10 response).

11    MR. MARKS: So I wanted to book that now. But there

12 is one kind of gating issue which is that we don't -- and this

13 was mentioned in the, in the brief this morning that we just

14 talked about -- but we don't have, really, a complete or, in

15 some instances, a privilege log at all from some parties to

16 really actually kind of make specific references to documents

17 or categories of documents that we'd like to compel and, and

18 address with this mediation privilege or common interest is

19 another one, issue.

20    And so, you know, I would like to have a, a briefing

21 schedule, you know, that, that fits with whatever your Honor

22 is, is comfortable with on whether there is a mediation

23 privilege on certain documents, whether or not that mediation

24 privilege can be invaded for the purpose of discovery into, for

25 example, (a)(3), 1129(a)(3) arguments, and then a similar type

1   of briefing on common interest or joint defense.

2           But, but my, my issue right now, and doesn't seem like

3   I'll have an answer for it until the 25th, is I don't really

4   have a -- I know the Commer, the, the Survivor Committee -- I

5   apologize -- is, is revising their privilege log, is my

6   understanding.  They'll have that sometime this week.  I don't

7   know.  I understand the debtor is now, apparently, working on a

8   different privilege log that addresses, you know, communication

9   between it and Additional Debtors, but I've never seen that.

10  My understanding is that will be deficient and won't actually

11  have descriptions of, of what the privilege being asserted is,

12  aside from just the privilege and the subject matter of the

13  email.

14          So I don't know when we could start that briefing

15  schedule necessarily.  'Cause I, I'd like to have the actual

16  logs before I, I start filing things with your Honor.

17          THE COURT:  All right.

18          So as I recall, September 5th was sort of the drop-

19  dead date for the production of documents.  And we didn't

20  necessarily, I don't think, expressly -- I can't remember if we

21  had a deadline for privilege logs.

22          But Mr. Knapp, I understand that the, from what he

23  says, the Committee's working on theirs, correct?

24          MR. KNAPP:  Yes, your Honor.  The Committee produced a

25  log that would encompass all the communications between us and

1    the debtor team about the plan development.

2              THE COURT:  Uh-huh (indicating an affirmative

3    response).

4              MR. KNAPP:  And so that log is about 3300 items.  We

5    don't have time to complete the spoke descriptions.  It was an

6    extraordinary effort.  I'll just --

7              THE COURT:  Uh-huh (indicating an affirmative

8    response).

9              MR. KNAPP:  My team's not listening 'cause they're

10   busy working on the privilege log, but we had at one point

11   about 16 people working on this last week.

12             THE COURT:  Uh-huh (indicating an affirmative

13   response).

14             MR. KNAPP:  We're working through privilege

15   descriptions, but as, you know, I don't think anyone needs to

16   see a log or to understand that there's an overall -- there is

17   either a mediation privilege or there's not.

18             THE COURT:  Right.

19             MR. KNAPP:  And so we can negotiate with the debtor in

20   and after a mediation to implement a plan, you know.  That is

21   what it is and no log is going to change that.

22             I mean, the other thing is it doesn't really change

23   the plan treatment.  We email, "Hey, did you revise," you know,

24   "Section 7 of the plan?"  The plan is what it is.  It's a

25   confirmation hearing.

1           THE COURT:  Uh-huh (indicating an affirmative

2  response).

3           MR. KNAPP:  And so I don't really see how any of this

4  is going to be relevant.  But if the issue is just is there a

5  mediation privilege or not, seeing a log doesn't really change

6  that whatsoever.

7           THE COURT:  Okay.

8           MR. MARKS:  Your Honor, can I respond to that?

9           THE COURT:  Yeah.  And just before you do.

10          So there aren't any other privileges besides --

11          MR. KNAPP:  We assert -- so we reached an agreement

12  with the bond trustee, which is really very nice of them,

13  professional, to not have to log our internal work-product

14  drafts, emails between us and the Pachulski firm, you know,

15  back and forth over the years, emails between us and our

16  committee members over the years.  So the only privileges at

17  issue in our log are mediation privilege and then joint defense

18  privilege, which pops up in a couple ways.  We assert a joint

19  defense privilege with the debtor following the entry of the

20  MOU in May, and there are certain work we did with the

21  Commercial Committee related primarily to avoidance actions

22  that we think a joint defense, joint prosecution-type privilege

23  applies.

24           THE COURT:  Uh-huh (indicating an affirmative

25  response).

1        MR. KNAPP:  That ties to the tolling agreement, which

2   is now, you know, public record.

3        THE COURT:  Right.

4        MR. KNAPP:  But those are really the privileges at

5   issue.

6        THE COURT:  Okay.  All right.

7        Mr. Marks?

8        MR. MARKS:  Yeah.  Your Honor, as much as I'd like to

9   take credit for being nice, I mean, I think that that's just

10  appropriate, I think, in any litigation.  If you had to log

11  every single attorney-client communication you had during the

12  litigation or right before, I think it would be, you know, no

13  litigations would ever really go forward.

14       But, you know, there's a couple of issues there.  One,

15  your Honor is correct.  September 5th was the drop-dead date

16  for privilege logs in your Honor's, I believe it was, the

17  discovery order.  Mr. Knapp was the only person to produce a

18  privilege log.  My understanding, and, and, and this came up

19  actually this afternoon and I briefly addressed with Mr.

20  Knapp -- you know, I don't know that the Pachulski firm's, what

21  their involvement was in producing that privilege log or

22  searching their emails.  Certainly, the debtor is just relying

23  on that privilege log.  I don't know if the debtor's even

24  searched their emails.  I certainly don't have a log from the

25  debtor.  The Additional Debtors, I haven't heard a peep from

1    them.  So I don't know, you know, anything about what they've

2    logged or not.

3         So I think we're going to hear that, basically, the

4    debtor just thinks that all their communications in this case

5    that would be responsive to my, my, my document requests are

6    encompassed in the Committee's privilege logs, absent,

7    apparently, communications with the Additional Debtors.  I

8    don't agree with that.  I think that that's a huge issue.  I

9    think, you know, we're just kind of, trying to cut too many

10   corners here.  And, and, and quite frankly, I think they didn't

11   provide a privilege log under your Honor's deadlines.  And now

12   I'm being further prejudiced because I can't even start my

13   briefing on this mediation issue.

14        And I, I do think Mr. Knapp is simplifying the issue a

15   little bit too much.  There's a few issues.  There is whether

16   or not a mediation privilege exists over specific documents,

17   and you would, in fact, only get that information from a

18   privilege log.  It depends on timing.  It depends on subject

19   matter of the discussions, in my mind.

20        So not everything that's done in this case is, is

21   mediation.  There's been mediation for, I believe, about four

22   years.  But just because there's a mediation going on doesn't

23   mean every communication in the case is a mediation

24   communication.  So you need to identify what emails I'm talking

25   about that are, I believe, are not subject to a mediation.  I'd

1  like to bring that to your Honor.  I'd like to brief the issue.

2  And the same thing with a common interest-joint defense type

3  privilege.

4        Timing is hugely important and subject matter is

5  hugely important.  And without a log that sufficiently

6  describes what the communica, what the, you know, what the

7  general subject matter of the, of the communication is, I can't

8  do that.  And then I'm kind of, theoretically, briefing issues

9  for your Honor and your Honor be, theoretically, ruling on

10  issues and we have to go back and apply it to actual

11  communications later.

12        So that doesn't make sense.  I'd like to do it all at

13  once in an efficient manner and once I -- I mean, my position

14  is -- and we'll apparent, we'll, we'll deal with this as your

15  Honor suggested on, on August [sic] 25th -- the folks who

16  haven't produced a privilege log have waived the privilege.  We

17  can't just keep extending these deadlines, you know.  It's

18  having a material effect on, on my case and on my client.

19        So you know, I don't know what else to say about that.

20  I just, I, I understand the debtor's doing a lot of work, but

21  that doesn't excuse them from just kind of deciding not to give

22  a log or review their documents.  I mean, that's just -- I

23  don't, I don't know where that came from.

24        THE COURT:  All right.

25        Ms. Kingsmill.

1        MS. KINGSMILL:  Good afternoon, your Honor.  Allison

2   Kingsmill on behalf of the debtor.  I would just like to

3   address what Mr. Knapp mentioned.

4        So they kind of -- we, we coordinated on the privilege

5   log just due to the sheer volume of emails that we had to, you

6   know, review and produce.  And so Mr. Knapp's firm, they

7   conducted a review of, you know, all of their communications,

8   which included communications between all of the plan

9   proponents.  So that included communications with Pachulski,

10  Troutman, Jones Walker, and the Additional Debtor.  We took

11  their privilege log and we identified the emails they produced,

12  and we looked to see what is not covered by that.  And we

13  conducted our own search of that.  It was about 10,000

14  documents.  Most of the documents were communications with

15  Heller Draper, the Additional Debtors.  And so we were going to

16  provide a supplemental privilege log.

17        I did have a conversation with Mr. Marks on Friday and

18  just mentioned we needed a couple more days.  I did expect to

19  finish that today.  I was a little, you know, scrambling this

20  morning trying to respond to this pleading that was filed.  And

21  so that might be put off until tomorrow, but we expect to be,

22  finish that tomorrow.

23        So it'll be a supplemental log, in addition to the

24  joint log that was provided by Mr. Knapp's firm.

25        THE COURT:  Okay.  I appreciate that.

1        All right.

2            MS. KINGSMILL:  And I would also --

3            THE COURT:  Yeah.

4            MS. KINGSMILL:  -- just like to add.  We, we are done

5    producing documents.  So the documents that we reviewed in

6    connection with this privilege log, they were all privileged.

7    There was no additional documents.

8            THE COURT:  Gotcha.  Okay.

9            Mr. Draper.

10            MR. DRAPER:  Your Honor, just to be clear.  The, the,

11    the search that was done by the Troutman firm included all of

12    my correspondence with the, them.  So -- and, and really, the

13    Troutman firm privilege log is, is one that's, one by all three

14    of us.

15            What, what's being argued here is, like, we've all had

16    to take the same privilege log and do that.  It made no, it

17    makes no sense.  And you have one from all three.  The only

18    thing that's left is a, is a small group of documents, which

19    are basically between Heller Draper and Jones Walker, which

20    will be supplemented and that, that's it.  And we're not

21    dealing with a ton of documents.

22            THE COURT:  Okay, gotcha.  All right.

23            MR. MARKS:  Your Honor?

24            THE COURT:  Yes.

25            MR. MARKS:  Apologies, your Honor.  Can I just add one

1   thing?

2           I mean, I -- your Honor allowed requests, email

3   communications with third parties as well.  It's not limited to

4   the plan proponents.  I mean, you know, that one law firm

5   amongst four, I believe, is now producing and certifying that

6   the only responsive documents to, of email communications to

7   every single request where I requested emails and your Honor

8   allowed emails is, I mean, I, I've never heard of that before.

9   I'm stunned that this is the position that's being taken, that

10  one law firm is doing the search for everybody based on just

11  that one law firm's email.  I mean, what if the debtor emailed

12  the United States Trustee or the Commercial Committee or any of

13  these firms emailed the Commercial Committee?  No one's

14  searching their emails for any of that, apparently, and they're

15  just relying on the Troutman firm's review of its emails before

16  they decide to produce a privilege log.  I mean, I -- I

17  don't -- I, I can't comprehend how, how that's appropriate

18  under the Rules.

19          THE COURT:  All right.

20          Ms. Kingsmill, before I get to you.

21          Mr. Maxcy, you had your hand raised.  Oh, you're on

22  mute, Mr. Maxcy.  Sorry.

23          MR. MAXCY:  Sorry, your Honor.  Patrick Maxcy for

24  Travelers.

25          I just wanted to, to raise quickly, your Honor, that

1    I'm not sure if Ms., Ms. Kingsmill and others are, are talking

2    about the universe of discovery responses, or just, just

3    specifically as to Argent.  Just for Travelers, I don't

4    believe, unless I'm mistaken, we have not received a privilege

5    log yet, either.  My understanding, from past responses to our

6    discovery requests, is, basically, what Mr. Marks just

7    explained, is that we believe the debtor is going to take the

8    position, or the plan opponents, I should say, are going to

9    take the position with, with regard to many of the requests, if

10   not most of the requests, that they're all covered by the

11   mediation privilege.  And certainly, we want to be part of the

12   briefing on that issue.

13         But it wasn't clear to me from, from Ms. Kingsmill's

14   comments just now, and others, whether or not there was, they

15   were intending to provide a privilege log to Travelers also, or

16   they were simply saying they don't need to provide a privilege,

17   privilege log.

18         THE COURT:  Okay.

19         Now Ms. Kingsmill.

20         MS. KINGSMILL:  So when we set up the email search, it

21   was kind of a comprehensive search to cover, you know, all

22   discovery requests that requested communications.  A lot, there

23   was a lot of overlap between their requests.  So Travelers had

24   a lot of overlap with the bond trustee.  I think there were

25   several requests for Travelers where we had just no documents,

 1   period.  But we will double check and if they are not included

 2   on that log, we will add them to the log.  But I, I believe

 3   they should cover those requests.

 4        THE COURT:  Okay.  And you will provide a log to

 5   Travelers?

 6        MS. KINGSMILL:  Yes.

 7        THE COURT:  Okay.  Got it.

 8        All right.  Well, what I would suggest is that, again,

 9   we use the omnibus day that's slated for September 25th.  We're

10   going to --  I'm converting the response to a motion to compel.

11   So objections or responses to that will be due the 23rd.

12        So that covers our -- the, the motion to compel, as I

13   read it -- and that's what I'm calling it, is a motion to

14   compel -- as I read it, covers privilege log complaints,

15   discovery complaints.  So in your responses, if you want to

16   brief the issues of whether or not mediation privilege extends

17   to the discovery process, you can do that.  To the extent we

18   need to tackle this, you know, the depo, on the deposition

19   side, the deposition disputes, everybody, I mean, the, from

20   what I'm looking at, it's fairly consensual.  Now we have

21   Travelers with this issue of wanting to depose individual

22   members, to the extent they've been identified, of the

23   settlement trust advisory committee.

24        So we can brief that.  Just tee it up.  Tee it up, Mr.

25   Maxcy.  And again, for, for that -- and how would you like to,

1   how would you like to do this?  Because, you know, the, the

2   motion to compel is already out there, right?  And so we're

3   going to get a response, any response to that on the 23rd.

4          But how, Mr. Knapp and Mr. Maxcy, how would you like

5   to tee up the, or I guess it would be Mr. Caine, tee up this

6   issue of who's going to be deposed, if anybody's going to be

7   deposed, that's been identified from the settlement trust

8   advisory committee?  Because as Mr. Caine was saying earlier,

9   the, the, the trustee was already identified and he's on the

10  list of, to be deposed, correct, Mr. Caine?

11          MR. CAINE:  That's correct, your Honor.

12          THE COURT:  Okay.

13          So it's just, it's not whether or not we're going to

14  depose the trustee.  Because we are.  It's whether or not these

15  individual members of the settlement trust advisory committee

16  are going to be deposed, right?

17          MR. MAXCY:  Right.

18          MR. CAINE:  That's correct.

19          MR. MAXCY:  Correct, your Honor.

20          THE COURT:  Okay.

21          MR. MAXCY:  Yes.

22          THE COURT:  All right.  So how --

23          MR. MAXCY:  And if I can --

24          THE COURT:  Yeah.  Go ahead, Mr. Maxcy.

25          MR. MAXCY:  If I, if I could suggest, your Honor,

1    maybe Mr. Caine and, and, and I can, can meet and confer about

2    how to, how to best tee it up for you and, and agree on, agree

3    on a process, if that's --

4              THE COURT:  Yeah, that --

5              MR. MAXCY:  -- if that's acceptable to your Honor.

6              THE COURT:  Yeah, that would be helpful.  And again,

7    you know, it's -- it's just -- I guess the issue of whether or

8    not -- I know that the, the advisory committee has been, the

9    membership has been expanded, the, the degree to which the

10   roles that it is playing, I just haven't seen those documents

11   yet.  I just haven't, I haven't looked at them.  So I, I

12   couldn't tell you.

13             But like I said, I have a feeling it's, you know, you

14   know, it's, it's more an issue of what role the bankruptcy is

15   going to, court is going to play post-effective date.  And I

16   would be curious to see if there are other litigation trusts or

17   settlement trust agreements out there that prohibit someone

18   from coming to the court under any circumstance.  I mean,

19   typically, there's always, that's always sort of the default.

20   If you can't, if you just can't agree, you've got these fail

21   safes, you've got these, you know, checks and balances set up.

22   But if you just can't agree, you can always fall back because

23   the court has an ongoing obligation to enforce the plan terms.

24   And so, and I, I have, have to go back and look at the

25   retention of jurisdiction that's included in the plan.  But as

1  I recall, it's fairly broad and to, you know, to have this sort

2  of, essentially, a prohibition on coming to the court, I need

3  to know if that's unusual or not.

4       So if you have any other cases, whether they be

5  diocesan cases or not, that, in these large, in these large

6  mega cases -- Mr. Draper wants to speak -- but, you know, I'd

7  be curious to see them.  But I think that that's at the heart

8  of this, rather than exactly, you know -- because the folks

9  that are going to sit on the settlement trust advisory

10  committee, it's, it's not real yet, put it that way.  It's not,

11  it's just not real yet.

12       So I'm not sure exactly what -- I think -- I'm not

13  sure what you would ask them, but, I'm not saying no, but I, I

14  think that we need to, perhaps, reframe the issue a little bit.

15       Mr. Draper.

16       MR. DRAPER:  I'm, I'm not going to address that issue.

17  I, I have --

18       THE COURT:  Okay, go ahead.

19       MR. DRAPER:  -- a different question for the Court.

20  'Cause I'm a little bit confused.

21       I, I've read the pleading that you have there and, and

22  the, what I'll call a motion to compel.  But what you have are

23  two comments.  One is "they didn't give us enough" and two,

24  that "you gave us a data dump."  And so if we're going to show

25  up here on the 25th -- and I'm not talking about the privilege

1    logs now.  I'm talking about what documents didn't they get.

2             THE COURT:  Uh-huh (indicating an affirmative

3    response).

4             MR. DRAPER:  Mr. Marks is going to have to be a little

5    bit more specific, especially when you limited the categories.

6    For example, the categories that they can get from me are

7    minuscule.  And, and so I need to know so that I can respond to

8    the 25th exactly what didn't he get in connection with his

9    categories.

10            THE COURT:  Uh-huh (indicating an affirmative

11   response).

12            MR. DRAPER:  Now I understand the privilege log issue,

13   but he got a ton of documents.  And so we need to be,

14   understand what, what he's contending.  Because you have on one

15   side (a) "we didn't get it" and (2) "you gave us a data dump."

16            So I think the Court's going to need to hone this in

17   so that we understand exactly what we're talking about on the

18   25th.

19            THE COURT:  Okay.  Would you prefer a meet and confer

20   with Mr. Marks so you can go over what, what he's lacking and

21   what he thinks he needs, or would you rather him put it, you

22   know, maybe amend the pleading or massage the pleading in some

23   way before the end of the week to let you know exactly what it

24   is that, that he needs?

25            MR. DRAPER:  I like amendment.

1          THE COURT:  Okay.

2          Mr. Marks, you --

3          MR. MARKS:  Yes.

4          THE COURT:  -- you said you might be working on it as

5   it is.  I mean, you wrote, you wrote the response.  So the

6   bones of it are there.  But are you prepared to supplement it

7   by this Friday with exactly what you need and what you didn't

8   get?

9          MR. MARKS:  I mean, I, I don't, I don't know that I

10  could have been more clear than -- perhaps Mr. Draper -- just

11  very quickly.  It was filed this morning.  But I was -- that

12  motion to compel or the, the brief on communications.  And he

13  hasn't produced a single communication to me.  It's, it's a

14  single communication.  The, the, the Committee produced

15  communications.

16         We referred to the previous issue that we had with

17  your Honor with respect to the document dump to explain the

18  history and what's been happening in this case and how the

19  discovery process has been going.  The debtor, and, and I

20  believe the Additional Debtors provided written responses that

21  pointed us to documents in the data room.  I'm not saying they

22  didn't.  They, they did and we're reviewing those with our

23  financial experts.

24         My brief is talking about the communications.  I

25  believe the relief list was specifically tailored to

1    communications.  And so Mr. Draper hasn't provided me with

2    communications.  The Committee did.  If he's saying, "Well, you

3    have everything from the Committee," from what I'm hearing --

4    and maybe it's a little bit changed today -- no one searched

5    anyone else's records aside from the Troutman firm.

6          So I don't know what they have.  So everything -- all

7    of his -- I want all of his responsive communications.  Same

8    thing with the debtor.  Same thing with the Committee, to the

9    extent that only one of the law firms for the Committee

10   searched their records.  I don't know that, how the Pachulski

11   firm handled it.  I need to work that out with, with counsel

12   and I'll address that with Mr. Caine after this hearing.

13         But my understanding is that only the Locke Lord firm

14   searched their records for emails.  The other law firms just

15   looked at their privilege log and the, the documents they

16   produced to us and said, "Yeah, that looks about right.  I

17   think that, that's all of our emails as well."  And then the

18   debtor and the Additional Debtors and Mr. Draper's firm

19   specifically are working out some form of privilege log that's

20   now going to be multiple days late, if not a week.

21         So, so I'm not talking about documents outside of

22   communications right now.  I'm just looking for the

23   communications.

24         THE COURT:  Okay.

25         MR. MARKS:  I hope that helps, your Honor.

1          THE COURT:  All right.

2          Mr. Caine?

3          MR. CAINE:  Yes, your Honor, just to -- thank you --

4    to answer the question.

5          I think I told Mr. Marks before in our conversation

6    that the Pachulski firm did the same search and was looking for

7    any communications that were additional to what the Troutman

8    firm had, and there weren't any.  As, as is typical in this

9    case, we were on the same emails with each other.  There were a

10   couple of documents that we found with respect to other

11   discovery that we provided to the Troutman firm, which has been

12   leading the production itself.

13         But it is, it is Incorrect to say that my firm did not

14   do the same search.

15         THE COURT:  All right.

16         Well, listen.  I have the, I have the Court's order

17   with the discovery categories that I preapproved and I can just

18   sit with that on the 25th and we can go down the list and you

19   can tell me what you provided and what you didn't.  So I don't

20   really need that.

21         But what I would ask is for everyone to meet and

22   confer before this Friday to sort of go over some of these

23   issues so that you really understand.  And I assume that when

24   you made your productions, if, if the information, for example,

25   if everybody were on these emails and the Troutman firm

1    produced the emails, then there would be some acknowledgement

2    from the other plan proponents that, "You got all of my stuff

3    right there.  We searched," just like Mr. Caine said, "I

4    searched for anything different.  I have, I got two emails that

5    were different where," you know, "Troutman wasn't on that

6    email.  I gave them to Troutman.  Troutman gave them to the

7    bondholders," something that describes the process that says,

8    "We certify that we have searched this and we have this, and

9    here it is," or, "We don't have anything."  And that's what it

10   is.

11         But you got to sign off on the email, on the discovery

12   and, and at least represent as officers of the Court that you

13   did your due diligence.  If you're not producing anything,

14   there's nothing to produce.  So that's -- and that way, Mr.

15   Marks doesn't have to guess.

16         But again, meet and confer by this Friday.  I'll have

17   my order, I'll have all the discovery that I preapproved, and

18   we can go through it again and see what's there.

19         So again, I'll leave it to Mr. Maxcy and Mr. Caine to

20   -- or -- to  decide exactly how you want to tee up the issue

21   regarding the deposition of the settlement trust advisory

22   committee.  I would prefer that I have something on that by,

23   you know, Tuesday, the 23rd.  That'll give me plenty of time to

24   prep for that.  If that's, if that's workable, I would

25   appreciate that.

1    I'm not sure, Mr. Maxcy, if you need to have something

2    specific on the docket that, that we can point to once we

3    either resolve it or I rule on it or whatever it is, but I just

4    need to have something on the docket akin to the bondholders'

5    response that tells me that, what we're going to -- I got to

6    have a live dispute, in other words.

7         MR. MAXCY:  Understood, your Honor.  So I'll work with

8    -- I'm sure Mr. Caine and I can work out a schedule to get

9    something appropriately on the docket that, that records the

10   request and --

11        THE COURT:  Okay.

12        MR. MAXCY:  -- the ability to object.

13        THE COURT:  All right, perfect.

14        Okay.  All right.

15        MS. ALTAZAN:  Judge, Brooke Altazan on behalf of the

16   Commercial Committee.

17        I, I would also request that we have something similar

18   with regard to the Commercial Committee's 30(b)(6) as well.  I

19   understand that you have asked me to provide a response by

20   September 23rd.  I don't have anything to respond to as of yet.

21        THE COURT:  Yeah.

22        MS. ALTAZAN:  So I, I might suggest that perhaps Mr.

23   Marks could issue his notice by the end of the week and then we

24   will get our response on file by September 23rd pursuant to

25   your request.

```
1              THE COURT:  Okay.

2              Mr. Marks, is that realistic for you to get a 30(b)(6)

3  notice to the Committee by the 12th?

4              MR. MARKS:  I'm -- I'm -- if, if, if your Honor's

5  ordering it, I'll do --

6              THE COURT:  Yeah.

7              MR. MARKS: -- what your Honor orders.

8              THE COURT:  Well, let's see.  Hold on a, hold on just

9  a second.  'Cause we were having -- where's my notes?  The

10 other --

11             MR. MARKS:  We have a deadline.

12             THE COURT:  Yeah.  The 30(b)(6) deadline, is that the

13 17th?

14             MR. MARKS:  Yes.  Yes, your Honor.

15             THE COURT:  Yeah.

16             MR. MARKS:  I'd prefer to --

17             THE COURT:  So Ms. Altazan, why don't I just have him

18 do it on the 17th with everyone, you know?  I know that most

19 were noticed.  The scope of, the scopes of inquiry are due on

20 the 17th.  Let me just have him notice it and have his scope of

21 inquiry included on the 17th as well.

22             MS. ALTAZAN:  Okay.  And then our response will still

23 be on the 19th?

24             THE COURT:  On the 23rd, if you don't mind.

25             MS. ALTAZAN:  Okay.  So instead of the -- and just --
```

1    I'm, I apologize, your Honor.  I just want to be clear.

2              THE COURT:  Yeah.

3              MS. ALTAZAN:  So as we currently have it structured,

4    the 30(b)(6), everyone is required to lodge their notices on

5    the 17th with any objections due on the 19th.  But what you are

6    saying is that Argent will issue its 30(b)(6) of the Commercial

7    Committee on the 17th and our response will be due on the 23rd.

8              THE COURT:  Yes, I think that's right.

9              MS. ALTAZAN:  Okay.  That works for us, your Honor.

10             THE COURT:  Okay, very good.

11             Mr. Mintz?

12             MR. MINTZ:  And --

13             MR. MARKS:  Marks.

14             THE COURT:  Hold on, Mr. Marks.

15             Mr. Mintz?

16             MR. MINTZ:  I was, I was going to let Mr. Marks do

17   this.

18             THE COURT:  Okay.

19             MR. MINTZ:  I had one more thing at the end.

20             THE COURT:  Okay, got it.

21             Mr. Marks.

22             MR. MARKS:  Oh.  I was just going to say.  And, and

23   Ms. Altazan and I are also working on some other issues as

24   well.  So we can certainly discuss these.

25             THE COURT:  Okay.  Thank you.

1    MR. MINTZ:  Thank you, your Honor.  As I was -- Mark

2 Mintz on behalf of the debtor.

3    As I was going through emails while the discussion was

4 also happening, I, I was informed that I missed one settlement

5 that I also need to make sure that we also said --

6    THE COURT:  Okay.

7    MR. MINTZ:  -- which was one more.  And we put this in

8 Section 5.10, I believe, 5.10.  This is a settlement with the

9 Unknown, Unknown Claims Trust, or Trustee, if you will.  That

10 is Judge Michael Hogan, as we had identified earlier.  He's

11 identified in the plan as well.  The agreement that we've

12 reached with him is he has asked for $1.5 million to be set

13 aside from the settlement trust for unknown abuse claims.  We

14 had reached an agreement with him.  The debtor will fund that

15 separately from the 200, or the 130 million cash or anything

16 else.

17    THE COURT:  Uh-huh (indicating an affirmative

18 response).

19    MR. MINTZ:  The debtor will fund that separately on an

20 as-needed basis and has agreed to fund that within 60 days of

21 it being asked.  But again, that is according to the terms of

22 the trust, as the trust works.  But it is an additional funding

23 that would come from the debtor as asked, if asked.

24    THE COURT:  All right.  Thank you.

25    All right.

1    MR. MINTZ:  And with that, your Honor, I don't think

2  there's anything else.  I mean, we didn't have an agenda,

3  but --

4    THE COURT:  Right.

5    MR. MINTZ:  -- that seems to be everything else we've

6  suggested.

7    THE COURT:  Yeah.  Okay.

8    So just out of curiosity, as these iterations of the

9  plan -- and they're not, I mean, this is, this is a major

10  change for the better -- how is it being noticed?  How are

11  folks finding out about it?

12    MR. MINTZ:  So your Honor -- and, and I think that's

13  a, a legitimate question.  And you know, we, we've talked

14  internally a lot under 1127, you know, as, you know, as a

15  material modification, immaterial modification.  It is a major

16  change.  There's no getting around that.

17    THE COURT:  Uh-huh (indicating an affirmative

18  response).

19    MR. MINTZ:  But it's a change for the better for

20  specific people.

21    THE COURT:  Right.

22    MR. MINTZ:  It is our belief, therefore, that it does

23  not need to be renoticed for that purpose.  We do have everyone

24  we're dealing with from our side, we, we are dealing with

25  counsel, having them talk to their clients.

1      THE COURT:  Uh-huh (indicating an affirmative

2  response).

3      MR. MINTZ:  Again, notice that -- with regards to

4  Certain Abuse Survivors settlement, with regards to the

5  Commercial Committee settlement, we have asked specifically for

6  the Committees to contact their constituencies and say, "These

7  are the changes.  This is why we're supporting it.  This is" --

8      THE COURT:  Uh-huh (indicating an affirmative

9  response).

10      MR. MINTZ:  "Please contact us with, please contact us

11  with questions."

12      THE COURT:  Uh-huh (indicating an affirmative

13  response).

14      MR. MINTZ:  As far as communications with abuse

15  survivors who are, I hate saying it this way, who are not

16  certain abuse survivors.  So the --

17      THE COURT:  Right.

18      MR. MINTZ:  -- the, the constituency --

19      THE COURT:  So who are not represented by counsel that

20  filed the 1112(b).

21      MR. MINTZ:  We can do it that way, too.  That's,

22  that's probably a better way to put it.

23      With regards to that group, I believe -- and the

24  Committee can talk to, Committee counsel can talk about it --

25  but they have been communicating with that group and will

1    continue to do so.

2          As it stands now, the notices -- the, the ballots are

3    out --

4          THE COURT:  Uh-huh (indicating an affirmative

5    response).

6          MR. MINTZ:  -- and have gone out.  The -- and you

7    noticed in the changes that we made, there were typographical

8    changes that were made in the ballots, but nothing that was

9    substantive and nothing substantive regarding the Third Amended

10   Plan would change that as well, either.

11         So we have sent it out to the group.  When we're ready

12   to do so, I do suggest that we send it almost again just as a

13   group to say, "Hey, this is the version after the settlements."

14   We're not ready to do that yet.

15         THE COURT:  Uh-huh (indicating an affirmative

16   response).

17         MR. MINTZ:  But I don't think it's a full-on

18   resoliciting, new changes, new disclosure statement.  It's a --

19         THE COURT:  No, no.  That's not what I'm suggesting.

20         MR. MINTZ:  Here -- here's --

21         THE COURT:  I just, out of curiosity, you know, how do

22   you get your news out?

23         MR. MINTZ:  Yeah.  I mean, honestly, your Honor, where

24   we're doing it now is media --

25         THE COURT:  Uh-huh (indicating an affirmative

1    response).

2          MR. MINTZ:  -- and communications directly from

3    counsel.

4          THE COURT:  Okay.

5          Mr. Knapp?

6          MR. KNAPP:  The other thing, your Honor, we scheduled

7    a number of survivor town hall meetings in the --

8          THE COURT:  Hmm.

9          MR. KNAPP:  -- Committee letter that went out to the

10   survivor community with their solicitation package.

11         THE COURT:  Uh-huh (indicating an affirmative

12   response).

13         MR. KNAPP:  For the record, those are September 12th

14   at 3:00 p.m. Central, September 24th at noon Central, and

15   October 20th at 7:00 p.m. Central.  We try to capture a variety

16   of dates for people who work at different times, whatever else.

17         THE COURT:  Uh-huh (indicating an affirmative

18   response).

19         MR. KNAPP:  So we'll have those town halls as forums

20   also to talk to survivors.  And their lawyers are, stayed up on

21   this.  It's all over the news.

22         THE COURT:  Uh-huh (indicating an affirmative

23   response).

24         MR. KNAPP:  So we think that the word will be out

25   enough.  The *pro ses* who call me, I update them, but most of

1  them were going to vote, anyway, for the plan as structured.

2  So this is just more good news.

3          THE COURT:  Uh-huh (indicating an affirmative

4  response).

5          MR. KNAPP:  So.

6          THE COURT:  Okay.  And so for, for anyone that's

7  already voted, remind me.  The plan says that it's just the

8  latest vote that's received, right?

9          MR. MINTZ:  That, that is correct.  It does say that.

10 And we can go through those issues as needed.  I have not

11 checked with Donlin, actually, to even know if there are any

12 votes in, so.

13         THE COURT:  Okay.

14         MR. MINTZ:  But we will check.

15         THE COURT:  Okay.  All right.

16         And Mr. Knapp, you have a -- the Committee maintains a

17 website, correct, or no?

18         MR. KNAPP:  I, I, I believe there is a website with,

19 that the Pachulski firm hosts where we post --

20         THE COURT:  Yeah.

21         MR. KNAPP:  -- information from time to time.

22         THE COURT:  Yeah.

23         MR. KNAPP:  We'll need to check on that.

24         Also, as part of this whole noticing process Donlin

25 Recano has built out additional FAQ pages.  I mean, there,

1    there's, there's really a lot of accessible information for the

2    survivors.

3              THE COURT:  Okay.

4              MR. MINTZ:  And we do need -- and, and those are some

5    of the areas where we do need to change things.  A lot of it

6    was printed, dealt with prior to these amendments.

7              THE COURT:  Got it.

8              MR. MINTZ:  And we are still in the process of

9    identifying and updating them.

10             THE COURT:  Gotcha.  Okay.  All right.  Very good.

11             All right.  Well again, I'm, I'm very impressed with

12   the work that this group of professionals has done, has

13   performed, and the fact that, you know, they've, you know, been

14   zealous advocates for their client and have acted

15   professionally and you know, clearly in the best interest of

16   their clients.  So, and will continue to do so.

17             Let's, let's plan on reconvening on the 25th.

18             Do we have anything before then, Mr. Mintz?

19             MR. MINTZ:  I, I don't -- I'll be honest with you.

20             MR. KNAPP:  Your Honor, I believe there's a hearing on

21   the 22nd --

22             MR. MINTZ:  Okay.

23             MR. KNAPP:  -- to discuss the 30(b)(6) topics.

24             THE COURT:  Got it.  We might want to --

25             MR. MINTZ:  Do you want to push that --

1             THE COURT:  Yeah.

2             MR. MINTZ:  -- to the 25th.

3             THE COURT:  Well, you know, I don't want to delay

4   because the -- let's see.  The -- you've got a deposition

5   that's going to start on the 26th.  Is that the early -- the

6   24th.

7             MR. MINTZ:  There is a Argent -- we had put --

8             THE COURT:  Yeah.

9             MR. MINTZ:  -- in at 20, on the 24th as a --

10            THE COURT:  Yeah.

11            MR. MINTZ:  -- placeholder --

12            THE COURT:  Uh-huh (indicating an affirmative

13  response).

14            MR. MINTZ:  -- I think.

15            THE COURT:  Yeah.  Let's go ahead and just keep the

16  22nd.

17            MR. MINTZ:  Okay.

18            THE COURT:  Because I'll deal with everybody's

19  inquiries except for this latest one from the bondholders to

20  the Commercial Committee, the 30(b)(6).  And I'll wait and deal

21  with that one on the 25th.

22            So let's go ahead and keep the 22nd.  Because I don't

23  want to hold up the proposed deposition schedule at all.

24            MR. MINTZ:  Yes, your Honor.

25            THE COURT:  Okay.

1          All right, perfect.  We'll see everybody on the 22nd,

2     then.

3          MR. MINTZ:  Thank you.

4          THE COURT:  All right.  Thank you.

5        (Proceedings concluded at 5:01 p.m.)

6

7

8

9

10

11                          CERTIFICATE

12          I, court-approved transcriber, certify that the

13     foregoing is a correct transcript from the official electronic

14     sound recording of the proceedings in the above-entitled

15     matter.

16

17     /s/ *Janice Russell*                          September 11, 2025

18     Janice Russell, Transcriber                      Date

19

20

21

22

23

24

25