## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:<br><br>**THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS**,<br>　　　　　　　　　　Debtor.[1] | Case No. 20-10846<br><br>Section "A"<br><br>**Chapter 11**<br><br>Objection Deadline: October 9, 2025 |

### OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OPPOSITION TO USF&G'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned chapter 11 bankruptcy case (the "Bankruptcy Case") of The Roman Catholic Church of The Archdiocese of New Orleans (the "Debtor") files this objection to United States Fidelity & Guaranty Company's Motion for Relief from Stay to File A Complaint for Declaratory Relief (the "Motion") [Dkt. 4404]. In support of its objection, the Committee respectfully states as follows:

### PRELIMINARY STATEMENT

1.　　United States Fidelity & Guaranty Company ("USF&G" a/k/a "Travelers") brought this motion based upon three arguments:

　　a.　"Only the District Court can adjudicate the legally and factually complex insurance coverage issues present in the Complaint [because it] is a non-core matter …." (Motion at paragraph 1-2).

　　b.　"Resolving the Coverage Action … would provide the parties with a more prompt determination of USF&G's obligations…." (Motion at paragraph 3).

---

[1] The last four digits of the Debtor's federal tax identification number are 8966. The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

4929-5794-6225.3 05067.002

c.  "There will be no prejudice to the Archdiocese and other stakeholders in the bankruptcy case [the Committee] if the Coverage Action is allowed to proceed." (Motion at paragraph 4).

2. All three of these arguments for relief from stay are demonstrably incorrect, as explained in greater detail below:

a.  The coverage dispute involves property of the estate because the USF&G policies are insufficient to pay its coverage obligations;

b.  Louisiana law mandates that coverage issues be adjudicated in the context of individual tort claims;

c.  Disenfranchising the Settlement Trustee from making decisions on the Coverage Action will not provide a "more prompt determination"; and

d.  The burden the Committee faces, having to make vital decisions regarding a litigation it will not be responsible for in several months, and the burden on the Settlement Trustee for having those decisions made for him, constitute greater prejudice than any benefit from granting the Motion.

3. The timing of the Motion can only be seen as a cynical attempt to achieve some settlement leverage on the eve of the Plan Confirmation hearings.

## USF&G IGNORES THE RELEVANT LAW WHETHER "CAUSE" EXISTS TO GRANT RELIEF FROM THE AUTOMATIC STAY

4. The Sonnax factors strongly support the Committee's opposition. The twelve factors and their applicability to the motion are:

(a) *whether relief would result in partial or complete issue resolution*: Based on Louisiana law regarding the "expected and intended" coverage defense and the right of abuse survivors to be parties to the anticipated coverage action, the proposed declaratory relief action does not result in complete issue resolution;

(b) *lack of connection with or interference with bankruptcy case*: USF&G's exposure under its policies and potential extra-contractual exposure has a critical impact on

2

survivors' recoveries and the timing of the declaratory relief will directly interfere with plan confirmation and any appeals from a confirmation order;

(c) *whether other proceeding involves debtor as fiduciary*: Not applicable;

(d) *whether specialized tribunal with necessary expertise has been established to hear cause of action*: Not applicable;

(e) *whether debtor's insurer has assumed full defense responsibility*: Not applicable;

(f) *whether the action primarily involves third parties*: As discussed below, survivors have an interest in the declaratory relief action and should have a right to intervene in it;

(g) *whether litigation in another forum would prejudice interests of other creditors*: As discussed below, Louisiana law on the "expected and intended" coverage defense is survivor specific;

(h) *whether judgment claim arising from other action is subject to equitable subordination*: Not applicable;

(i) *whether movant's success in other proceeding would result in a judicial lien avoidable by debtor*: Not applicable;

(j) *interests of judicial economy and expeditious and economical resolution of litigation*: Louisiana law on the "expected and intended" defense and the survivors rights in a declaratory relief action result in the relief action doing nothing to further interests of judicial economy and efficient resolution of litigation;

(k) *whether parties are ready for trial in other proceeding*: Not applicable to the majority of cases in which USF&G has risk;

(l) *impact of stay on parties and balance of harms*: The impact of the declaratory relief action on the settlement trust and the Committee far exceeds the harm to USF&G, especially in light of Louisiana law on the "expected and intended" defense that is a claim by claim defense and the rights of abuse survivors to litigate coverage issues.

3

The Court has discretion to balance all of these considerations and should do so in favor of denying the motion. *See Sewell v. MGF Funding, Inc. (In re Sewell)*, 345 B.R. 174, 179 (B.A.P. 9th Cir. 2006).

## THE COURT SHOULD DENY USF&G'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

A. **The Court Should Classify the Proceeds of the USG&G Policies as Part of ADNO's Bankruptcy Estate.**

   1. **When the claims of abuse survivors are above policy limits, the proceeds of the insurance policies should be classified as property of the bankruptcy estate.**

   5. In *Martinez v. OGA Charters, L.L.C. (In re Charters, L.L.C.)*, 901 F.3d 599 (2018), the Fifth Circuit considered whether the proceeds of liability insurance policies are "property of a bankruptcy estate when the policy limit was insufficient to cover a multitude of tort claims." 901 F.3d at 599-600. The *Martinez* court held that "where a siege of tort claimants threaten the debtor's estate over and above policy limits, we classify the proceeds as property of the estate." *Id*. at 604.

   > When there are multiple claimants to the policy proceeds, the court should be able to oversee the allocation of the proceeds among claimants. Although policy proceeds are not available to all creditors, and in that sense are different from other property of the estate, [these proceeds] may be available to a class of creditors whose claims are covered by insurance, and may be insufficient to satisfy that class fully. *In such a case, oversight by the court is necessary to assure an equitable distribution of the available assets*.

   *Martinez*, 901 F.3d at 604 (quoting 3 Collier on Bankruptcy ¶ 362.03 (16th ed.)) (emphasis added). "A holding to the contrary," the court wrote, "would 'prevent [the] bankruptcy court from marshalling the insurance proceeds, and, along with the other assets, arranging for their distribution so as to maximize their ability both to satisfy legitimate creditor claims and to preserve the debtor's estate.'" *Id*. at 604-05 (quoting *Tringali v. Hathaway Mach. Co*., 796 F.2d 533, 560 (1st Cir. 1986)). *See also Law Office of Rogelio Solis PLLC v. Curtis*, 83 F.4th 409,

412-414 (5th Cir. 2023) (relying on *Martinez v. OGA Charters* and affirming a bankruptcy court's ruling that proceeds from the debtor's liability policy were the debtor's property under 11 U.S.C. § 547).

### 2. The survivors' claims against ADNO likely will exceed the limits of coverage in the USF&G policies.

6. The USF&G primary policies are property of the Estate. The Committee's expert has determined that if USF&G is correct in its allegation in the Complaint that its primary policies all have aggregate limit (Complaint at paragraph 23), its potential liability exceeds policy limits.[2] Hence, *Martinez* applies here. Additionally, the remaining umbrella policies could also be exhausted, depending upon how occurrence is interpreted.[3]

7. As stated in the McNally Declaration attached hereto as Exhibit A, in each year that USF&G issued a primary policy, the potential liability exceeds the limits. The expert, Stout Risius Ross, LLC., utilized a claims valuation methodology that creates a high/low range. That high/low range is identified as "Scenario A" and "Scenario B" respectively. Under either Scenario, USF&G's primary policy limits are blown. Therefore, the primary policy proceeds are property of the Estate, and any coverage proceeding is a core proceeding.

8. Additionally, depending on how USF&G argues in the interpretation of "occurrence" in the excess Umbrella Policies (paragraph 24 of the Complaint), such interpretation may limit coverage available under the Umbrella Policies *even if* there are no explicit aggregate limits. If Travelers' position is that there is one occurrence per policy period, (and their use of "Limits" in the Complaint is ambiguous), then all but one of those Umbrella

---

[2] To be clear, the Committee disputes there are any aggregate limits on almost all USF&G policies. However, USF&G's Complaint attached to the Motion argues that there are aggregate limits on the primary policies. Further certain excess policies could be exhausted depending on how Travelers argues "occurrence" is interpreted. Assuming USF&G is correct regarding the aggregate limits, the Committee's expert conducted an analysis of the impact on those purported coverage limits on the primary policies and concluded those limits were exhausted, under its analysis of the potential claim liability exposure USF&G has. See McNally Declaration.

[3] See paragraph 38 of Exhibit A in the Motion for Relief from *Stay To File Complaint For Declaratory Judgement*, Case 20-10846, Docket Number 4404, filed and entered on 9/23/2025

Policies limits will be exhausted too, under Stout's analysis, and the remaining policy becomes exhausted under Scenario B.[4]

9. Because most or all of the USF&G policies are property of the Estate, this Court can control – and decline to permit -- the Coverage Action to go forward if it is in the interests of the Estate and its stakeholders, such as the Committee. The record is clear that at this time, in this case, with Plan Confirmation pending, this Court should use its authority to manage the calendar, the docket and the Plan Confirmation proceedings. That means denying USF&G's Motion.

B. **If the Court Grants Relief from the Automatic Stay for USF&G to Litigate Coverage Under the Policies, It Should Grant Relief Only to Allow the Litigation of Coverage in Direct Actions Prosecuted by the Survivors in Their State-Court Tort Actions.**

   1. **The Louisiana Supreme Court's Decision in *Breland v. Schilling* and Louisiana's Direct Action Statute**

10. In *Breland v. Schilling*, 550 So.2d 609 (1989), the Louisiana Supreme Court adopted a "fact-sensitive test" for determining an "insured's subjective intent" when adjudicating insurance contract language precluding coverage "for bodily injury or property damage that was either expected or intended from the standpoint of the insured." 550 So.2d at 609 & 613. In adopting this "fact-sensitive test" and focusing on the "the insured's subjective intent," the *Breland* court rejected "the approach, followed by certain courts, that an insured intends, as a matter of law, all injuries which flow from an intentional act." *Id*. at 613. Under *Breland*, the insured must have intended this *specific* harm to this *specific* victim.

11. Effective August 1, 2024, Louisiana revised its direct action statute to limit direct actions by tort victims against their tortfeasors' liability carriers to seven specific circumstances. *See* La. R.S. art. 1269(B). Two of these circumstances exist here: ADNO has filed for bankruptcy, and USF&G has either denied coverage or is providing coverage under a reservation

---

[4] See paragraphs 30 and 31 of Exhibit A in the Motion for Relief from *Stay To File Complaint For Declaratory Judgement*, Case 20-10846, Docket Number 4404, filed and entered on 9/23/2025

6

4929-5794-6225.3 05067.002

of rights. *See* La. R.S. art. 1269(B)(1)(a) & (B)(1)(g). Thus, under Louisiana law, the ADNO's victims may prosecute direct actions against USF&G in their state-court tort actions.

> **2. USF&G's proposed "Complaint for Declaratory Relief" is a legal grab-bag seeking declarations regarding 24 different policies with differing contract language involving dozens or hundreds of different alleged perpetrators and hundreds of different survivors over a period of more than 16 years.**

12. According to USF&G's proposed "Complaint for Declaratory Relief," ADNO "has tendered approximately 400 POCs [proofs of claim] to USF&G contending, based on dates of alleged sexual abuse, that these Sexual Abuse Claims are covered under one or more USF&G policies." USF&G's Proposed "Complaint for Declaratory Relief, ¶ 21, at 6.

13. In its proposed complaint, USF&G provides a summary of the policies that it issued to ADNO. This summary reveals the following about the "Primary Policies":

- USF&G issued 17 separate "Primary Policies" over a 16-year period beginning February 01, 1973 and ending July 01, 1989. USF&G's Proposed "Complaint for Declaratory Relief, ¶ 23, at 6-7.

- The language for the grant of coverage in the Primary Policies in force during the first ten-and-a-half years differs from the language for the grant of coverage in the policies in the last six years. *Id*., ¶¶ 26 & 27, at 8.

- The Primary Policies' definition for "bodily injury" in the first ten-and-a-half years of coverage differs from the definition for "bodily injury" in the last six years. *Id*., ¶¶ 28 & 29, at 8.

- The Primary Policies' definition for "occurrence" in the first ten-and-a-half years of coverage differs from the definition for "occurrence" in the last six years. *Id*., ¶¶ 30 & 31, at 8-9.

- There are a series of three different exclusions that appear in the Primary Policies beginning July 01, 1983, *id*., ¶¶ 33-35, at 9-10, but that do not appear in the earlier policies.

- The Excess Policies contain their own grants of coverage and their own definitions for "bodily injury" and "occurrence. *Id*., ¶¶ 36-38, at 10.

- The Primary Policies have three different limitations on liability, depending on the year. *Id*., ¶¶ 43-45, at 12-13.

7

14. USF&G's summary also reveals the following about the "Excess Policies":

- USF&G seven "Excess Policies" over a seven-year period. *Id.*, ¶ 24, at 7.

- Each of the Excess Policies contain its own grant of coverage, its own definitions for "bodily injury" and "occurrence," and its own "LIMITS OF LIABILITY." *Id.*, ¶¶ 36-38, at 10; *id.*, ¶ 47, at 13.

   **3. Given Louisiana law, allowing the survivors to prosecute direct actions against USF&G is a superior approach for resolving the coverage issues under the USF&G policies.**

15. Given the fact-sensitive inquiry that Louisiana law requires, given that a decision-maker must evaluate each insured's subjective intent, given the differing definitions, exclusions, and liability limitations in the various USF&G policies, and given the hundreds of different circumstances for hundreds of different victims, justice would be better served if the victims litigate the coverage issues in direct actions against USF&G in their individual tort actions.

16. This common sense conclusion is consistent with the case law regarding a tort victim's procedural rights in a declaratory relief actions regarding insurance coverage. The Fifth Circuit has held, "In a declaratory judgment action brought by an insurer to determine coverage under a liability policy issued to the insured, third parties claiming liability in state tort suits against the insured have been held to be proper parties to the declaratory suit, even though their claims against the insurer was contingent upon recovery of a judgment against the insured." *Dairyland Ins. Co. v. Makover*, 654 F.2d 1120, 1123 (5th Cir. 1981),

17. A Louisiana federal district court has stated: "For a proper declaratory judgment action in insurance, the third-party claimant must be made a party. The Fifth Circuit has held that 'the appellants [the third-party claimants], as potential judgment creditors claiming liability in a state court tort action against the putative insured, have standing to appeal the judicial declaration that the policy of insurance issued by Dairyland does not cover the putative insured.'" *Looney Ricks Kiss Architects, Inc. v. Bryan*, 761 F. Supp. 2d 399, 404 (W.D. La. 2010) (quoting *Dairyland*, 654 F.2d at 1123), rev'd on other grounds sub nom. *Looney Ricks Kiss Architects, Inc. v. State Farm Fire & Cas. Co.*, 677 F.3d 250 (5th Cir. 2012).

18. Not surprisingly, naming injured parties is a common practice. *See, e.g., Essex Ins. Co. v. Foley*, 827 F. Supp. 2d 1326, 1331 (S.D. Ala. 2011) ("Like most insurers in declaratory judgment actions, Essex joined all known interested parties to obtain a global resolution of coverage issues that would be binding on all of them, rather than litigating these issues piecemeal across multiple lawsuits spanning separate interested parties.").

19. Louisiana law mandates naming all interested parties in a declaratory judgment action, and the abuse survivors indisputably are interested parties:

> "[T]he proper parties to a declaratory judgment action are governed by La. C.C.P. art. 1880, which states, in pertinent part, as follows: 'When declaratory relief is sought, all persons should be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding.' [Emphasis added.] Under the provisions of the above article, 'all persons . . . who have . . . any interest which would be affected by the declaration' are indispensable parties to the declaratory judgment action. [Emphasis added.] *Nicholas v. Richardson*, 573 So. 2d 1317, 1318 (La. App. 3d Cir. 1991); *Blanchard v. Naquin*, 428 So.2d 926, 928 (La. App. 1st Cir.), writ denied, 433 So. 2d 162 (La. 1983).

*Hernandez v. State*, 841 So. 2d 808, 817–18 (La. Ct. App. 2002).

20. This conclusion is supported by La. C.C.P. art. 641, which defines an indispensable party to a judicial proceeding as a person 'whose interests in the subject matter are so interrelated that a complete and equitable adjudication of the controversy cannot be made unless they are joined in the action.' Thus, when both the existence and the claim of a person who would be affected by a declaratory judgment are evident, that person must be joined in the petition for declaratory judgment. *Nicholas*, 573 So.2d at 1318, citing *Humble Oil & Refining Co. v. Jones*, 241 La. 661, 130 So. 2d 408 (1961). A necessary corollary to the rule is that a party's failure to join an indispensable party to a declaratory judgment action deprives the trial court of subject-matter jurisdiction over that action."

9

21. The Motion, and the Complaint by extension, have no meaningful future. Put another way, granting the Motion is pointless. USF&G cannot achieve its purported goal of a "more prompt determination" of coverage (Motion at 2-3).

    **4. USF&G will not be prejudiced if it must litigate the coverage issues in separate direct actions.**

22. USF&G may assert in state-court direct actions the same coverage defenses that it can assert in the proposed declaratory judgment action. *See* La. R.S. art. 22:1269.

    **5. The prejudice that the victims will suffer far outweighs the "prejudice" that USF&G might suffer.**

23. If the Court grants USF&G's motion, then hundreds of individual victims will be forced to intervene in USF&G's proposed declaratory judgment action. They and their attorneys will be forced to litigate in two jurisdictions—their tort actions in Louisiana state courts, and the coverage action in federal court. This is an unfair burden to victims who already have suffered enough.

24. In contrast, while USF&G no doubt prefers to litigate the coverage issues in a single, consolidated declaratory judgment action in federal court—hence its motion—this Court's refusal to honor USF&G's *preference* does not constitute *prejudice*. The assertion that USF&G—a multi-billion insurance company that litigates cases in federal courts and state courts across the nation—will be genuinely prejudiced if it must litigate coverage issues in state-court direct actions defies credulity.

**C. <u>Granting USF&G's Motion Will Handcuff the Settlement Trustee.</u>**

25. Under the Fourth Amended Plan (including Plan Exhibit D-1 (Settlement Trust Agreement)), the Settlement Trustee has both duties and rights that commence on Plan Confirmation. Under the Settlement Trust Agreement, the Settlement Trustee must create the trust (Section 1.1) and collect assets (Section 1.3). He can hire counsel (Section 5.8(b)). The Settlement Trustee also receives the right to authorize Sexual Abuse Claimants to bring suit (Section 2.1(c). Perhaps most relevant to the Complaint attached to the Motion, the Settlement

10

Trustee has the right to authorize a settlement with a Non-Settling Insurer, with certain approvals (Section 2.2.(b)).

26. If the Motion is granted and Travelers proceeds to file the Complaint, chaos will ensue. The filing of the Complaint will require immediate action: (i) hire litigation coverage counsel; (2) rapid and expensive review of the case, the policies at issue, the documents produced, the legal theories regarding coverage etc.; (3) develop a litigation strategy; and (4) take appropriate action within the limited time to answer or move to dismiss (or remand or other potential motions). Several immediate, important decision are triggered. Is it appropriate for the Committee, currently the responsible decision-maker for survivors, to hire counsel that presumably will be bequeathed to the Settlement Trustee? Who will pay for the Committee's litigation coverage counsel, the Estate? Is it appropriate for the Committee to make strategy decisions that will bind the Settlement Trustee?

27. But the court need not answer these vital questions if the Complaint is not filed until the Settlement Trustee is in place, which could be only several months from now. Is the benefit to Travelers in filing the Complaint now greater than the prejudice the Settlement Trustee will suffer from inheriting a litigation whose course has been (unwillingly) predetermined by the Committee? If the Settlement Trustee were able to make critical strategy decisions, such as hiring counsel, he might consider alternative fee arrangements, such as a contingency fee arrangement for his litigation coverage counsel. The Committee cannot afford that luxury under the Bankruptcy Code. If the Settlement Trustee does not like or approve of the litigation coverage counsel the Committee hires, he will be faced with the additional cost of new litigation coverage counsel's need to catch up to the complicated facts and legal developments in this matter.

28. As stated above, the law surrounding when it is inappropriate to grant relief from stay apply here. The Court should not allow USF&G to handcuff the Settlement Trustee's future.

## CONCLUSION

For the reasons stated above, the Court should deny USF&G's Motion for Relief from the Automatic Stay.

Dated: October 9, 2025

Respectfully submitted,

By: */s/ Andrew W. Caine*
James I. Stang (CA Bar No. 94435)
Iain A.W. Nasatir (CA Bar No. 148977)
Andrew W. Caine (CA Bar No. 110345)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., Suite 1300
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Emails: jstang@pszjlaw.com
inasatir@pszjlaw.com
acaine@pszjlaw.com

*Co-Counsel to the Official Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

I hereby caused a true and correct copy of the foregoing to be served on October 9, 2025 upon counsel through electronic mail.

*Andrew W. Caine*
Andrew W. Caine

4929-5794-6225.3 05067.002