Case 20-10846 Doc 4545-1 Filed 11/04/25 Entered 11/04/25 16:07:54 PP Ex. 1 - Joint Plan
Page 1 of 271
Case 20-10846 Doc 4518 Filed 10/27/25 Entered 10/27/25 18:53:26 Main Document Page 1 of
61

*10-27-25 Filing Version*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 20-10846** |
| THE ROMAN CATHOLIC CHURCH OF | § | |
| THE ARCHDIOCESE OF NEW | § | **Section "A"** |
| ORLEANS, | § | |
| | § | **Chapter 11** |
| Debtor.[1] | § | |
| | § | |

---

## FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS AND ADDITIONAL DEBTORS, PROPOSED BY THE DEBTOR, THE ADDITIONAL DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, DATED AS OF OCTOBER 27, 2025

| | |
|---|---|
| JONES WALKER LLP<br>R. Patrick Vance (#13008)<br>Elizabeth J. Futrell (#05863)<br>Mark A. Mintz (#31878)<br>Samantha A. Oppenheim (#38364)<br>201 St. Charles Avenue, 51st Floor<br>New Orleans, LA 70170<br>Telephone: (504) 582-8000<br>Facsimile: (504) 589-8260<br>Email: pvance@joneswalker.com<br>efutrell@joneswalker.com<br>mmintz@joneswalker.com<br>soppenheim@joneswalker.com | PACHULSKI STANG ZIEHL & JONES LLP<br>James I. Stang (CA Bar 94435) (pro hac vice)<br>Iain A.W. Nasatir (CA Bar 148977) (pro hac vice)<br>Andrew W. Caine (CA Bar 110345) (pro hac vice)<br>Karen B. Dine (NY Bar 2625366) (pro hac vice)<br>10100 Santa Monica Blvd., Ste. 1300<br>Los Angeles, CA 90067<br>Telephone: (310) 277-6910<br>Facsimile: (310) 201-0760<br>Email: jstang@pszjlaw.com<br>inasatir@pszjlaw.com<br>acaine@pszjlaw.com<br>kdine@pszjlaw.com |
| **ATTORNEYS FOR**<br>**THE ROMAN CATHOLIC CHURCH OF THE**<br>**ARCHDIOCESE OF NEW ORLEANS**<br><br>HELLER, DRAPER, & HORN, L.L.C.<br>Douglas S. Draper<br>Greta S. Brouphy<br>Michael E. Landis<br>650 Poydras Street, Suite 2500<br>New Orleans, Louisiana 70130<br>Telephone: 504-299-3300<br>Facsimile: 504-299-3399<br>E-mail: ddraper@hellerdraper.com<br>gbrouphy@hellerdraper.com<br>mlandis@hellerdraper.com<br><br>**ATTORNEYS FOR**<br>**THE ADDITIONAL DEBTORS** | TROUTMAN PEPPER LOCKE LLP<br>Omer F. Kuebel, III (La #21682)<br>Bradley C. Knapp (La #35867)<br>601 Poydras Street, Suite 2660<br>New Orleans, Louisiana 70130-6036<br>Telephone: (504) 558-5210<br>Facsimile: (504) 910-6847<br>Email: rick.kuebel@troutman.com<br>brad.knapp@troutman.com<br><br>TROUTMAN PEPPER LOCKE LLP<br>W. Steven Bryant (TX Bar No. 2427413)<br>300 Colorado Street, Ste. 2100<br>Austin, Texas 78701<br>Telephone: (512) 305-4726<br>Facsimile: (512) 305-4800<br>Email: steven.bryant@troutman.com<br><br>**ATTORNEYS FOR THE OFFICIAL COMMITTEE**<br>**OF UNSECURED CREDITORS** |

---

[1] The last four digits of the Debtor's federal tax identification number are 8966. The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

**PP Ex.**
**1**

1

## **TABLE OF CONTENTS**

| | | |
|---|---|---|
| ARTICLE 1 | DEFINED TERMS AND RULES OF INTERPRETATION | 1 |
| ARTICLE 2 | UNCLASSIFIED CLAIMS | 2 |
| ARTICLE 3 | CLASSIFICATION, VOTING, AND ACCEPTANCE | 3 |
| ARTICLE 4 | TREATMENT OF CLASSIFIED CLAIMS | 4 |
| ARTICLE 5 | MEANS FOR IMPLEMENTATION OF THE JOINT PLAN | 11 |
| ARTICLE 6 | THE SETTLEMENT TRUST AND RELATED MATTERS | 17 |
| ARTICLE 7 | SETTLING INSURERS AND NON-SETTLING INSURERS | 28 |
| ARTICLE 8 | ADMINISTRATION OF NON-ABUSE CLAIMS | 34 |
| ARTICLE 9 | DISTRIBUTIONS ON ACCOUNT OF NON-ABUSE CLAIMS | 35 |
| ARTICLE 10 | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 37 |
| ARTICLE 11 | CONDITIONS TO THE EFFECTIVE DATE | 40 |
| ARTICLE 12 | ADDITIONAL EFFECTS OF CONFIRMATION | 41 |
| ARTICLE 13 | RETENTION OF JURISDICTION | 50 |
| ARTICLE 14 | MISCELLANEOUS | 52 |

## PLAN EXHIBITS

| | |
|---|---|
| PLAN EXHIBIT A | Defined Terms |
| PLAN EXHIBIT B-1 | Additional Debtors |
| PLAN EXHIBIT B-2 | Non-Debtor Catholic Entities |
| PLAN EXHIBIT C | Abuse Claim Release and Certification |
| PLAN EXHIBIT D-1 | Settlement Trust Agreement |
| PLAN EXHIBIT D-2 | Allocation Protocol |
| PLAN EXHIBIT E | Non-Monetary Plan Provisions |
| PLAN EXHIBIT F | Additional Debtors' Abuse Claims Bar Date Notice |
| PLAN EXHIBIT G | Additional Debtors' Abuse Claims Bar Date Publication Notice |
| PLAN EXHIBIT H | Additional Debtors' Abuse Proof of Claim Form |
| PLAN EXHIBIT I | Reserved |
| PLAN EXHIBIT J | Additional Debtors' Non-Trade Claims Bar Date Publication Notice |
| PLAN EXHIBIT K | Additional Debtors' Non-Trade Proof of Claim Form |

## PLAN SUPPLEMENTS

| | |
|---|---|
| PLAN SUPPLEMENT 4.6(c)(i) | Description and Transfer Terms of the Settlement Properties |
| PLAN SUPPLEMENT 4.6(c)(ii) | Amended Bond Documents |
| PLAN SUPPLEMENT 5.3(a)(ii) | First Settlement Trust Promissory Note and First Settlement Trust Promissory Note Letter of Credit |
| PLAN SUPPLEMENT 5.3(a)(iv) | Second Settlement Trust Promissory Note and Second Settlement Trust Promissory Note Letter of Credit |
| PLAN SUPPLEMENT 5.3(a)(vii) | Affordable Housing Facilities Sale Escrow Agreement |
| PLAN SUPPLEMENT 5.7(a) | Reorganized Archdiocese's Directors and Officers |
| PLAN SUPPLEMENT 5.7(b) | Reorganized Additional Debtors' Directors and Officers |
| PLAN SUPPLEMENT 6.3 | Settlement Trustee Disclosures |
| PLAN SUPPLEMENT 6.5 | Abuse Claims Reviewer Disclosures |
| PLAN SUPPLEMENT 7.1(a) | Insurance Settlement Agreements |
| PLAN SUPPLEMENT 7.1(f) | List of the Settling Insurers' Policies |
| PLAN SUPPLEMENT 7.2 | List of the Non-Settling Insurers' Policies |
| PLAN SUPPLEMENT 10.1(a) | Rejected Executory Contracts and Leases (if any) |
| PLAN SUPPLEMENT 10.1(b) | Assumption and Cure Schedule |
| PLAN SUPPLEMENT 12.12(a) | Debtor's Preserved Estate Causes of Action |
| PLAN SUPPLEMENT 12.12(b) | Additional Debtors' Preserved Estate Causes of Action |

This *Fifth Amended Joint Chapter 11 Plan of Reorganization*, as the same may be amended and supplemented, (the "**Joint Plan**") for the Archdiocese and the Additional Debtors (as listed in Plan Exhibit B-1) is proposed by the Archdiocese, the Additional Debtors, and the Creditors' Committee. For a discussion of the Archdiocese's and Additional Debtors' history, operations, historical financial information, projections and more, please refer to the accompanying *Second Amended Modified Disclosure Statement for the Joint Plan*, as the same may be amended and supplemented from time to time, (the "**Disclosure Statement**"). All creditors are encouraged to consult the Disclosure Statement before voting to accept or reject the Joint Plan. The contents of the Joint Plan should not be construed as legal, business, or tax advice. Creditors should consult with their own legal counsel and accountant as to legal, tax, and other matters concerning their Claims.

## ARTICLE 1
## DEFINED TERMS AND RULES OF INTERPRETATION

**Section 1.1.    Definitions.** For the purposes of the Joint Plan and Disclosure Statement, except as expressly provided and unless the context otherwise requires, all capitalized terms have the meanings ascribed to them in Plan Exhibit A.

**Section 1.2.    Interpretation, Other Capitalized Terms, and Rules of Construction.** For purposes of the Joint Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Joint Plan, any reference in the Joint Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Joint Plan to an existing document, schedule or exhibit Filed or to be Filed means such document, schedule or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to the Joint Plan; (d) any reference to an Entity as a Creditor includes that Entity's successors and assigns; (e) unless otherwise stated, all references in the Joint Plan to Articles or Sections are references to Articles or Sections of the Joint Plan, as the same may be amended, waived or modified from time to time in accordance with the terms hereof; (f) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Joint Plan as a whole and not to any particular Article, Section, or clause contained in the Joint Plan; (g) the words "include," "includes" and "including," and variations thereof, will not be deemed to be terms of limitation and will be deemed to be followed by the words "without limitation;" (h) the phrase "relating to", "related to" and various thereof, will mean, directly or indirectly, "with regard to, by reason of, based on, arising out of, relating to, or in any way connected with;" (i) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Joint Plan, the rights and obligations arising pursuant to the Joint Plan will be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (j) any term used herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (k) any immaterial effectuating provisions may be interpreted by the Reorganized Archdiocese or applicable Reorganized Additional Debtors in such a manner that is consistent with the overall purpose and intent of the Joint Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (l) captions and headings to Articles or Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Joint Plan; and (m) the rules of construction set forth in section 102 of the Bankruptcy Code will apply.

**Section 1.3.    Computation of Time.** Except as otherwise specifically provided in the Joint Plan, in computing any period prescribed or permitted by the Joint Plan, the provisions of Bankruptcy Rule 9006(a) apply.

**Section 1.4.** **Plan Exhibits and Plan Supplements.** All Plan Exhibits and Plan Supplements are hereby incorporated by reference and made part of the Joint Plan as if fully set forth in the Joint Plan. The Plan Exhibits and Plan Supplements will be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order. Creditors may inspect a copy of the Plan Supplements, after they are Filed, at the Claims and Voting Agent's website, https://www.donlinrecano.com/Clients/rcano/Index.

<div align="center">

### ARTICLE 2
### UNCLASSIFIED CLAIMS

</div>

In accordance with section 1123(a)(l) of the Bankruptcy Code, certain Claims have not been classified, and, thus, are excluded from the Classes of Claims in Article 3 of the Joint Plan. Each Creditor holding an unclassified Claim is conclusively presumed to have accepted the Joint Plan and, therefore, is not entitled to vote to accept or reject the Joint Plan.

**Section 2.1** **Administrative Claims and Administrative Claims Bar Date against the Debtor and/ or any Additional Debtors.**

(a) *Treatment*. Except to the extent that the Creditor holding an Allowed Administrative Claim against the Debtor and/or any Additional Debtors agrees to less favorable treatment of such Claim, in satisfaction, settlement, release and extinguishment of such Administrative Claim, each Creditor holding an Allowed Administrative Claim other than a Professional Fee Claim or an Administrative Trade Claim will receive from the applicable Reorganized Archdiocese or Reorganized Additional Debtor Cash equal to the Allowed amount of such Claim within the later of fifteen (15) days after (i) the Effective Date and (ii) the date on which such Administrative Claim becomes an Allowed Administrative Claim.

(b) *Administrative Claims Bar Date*. Except as provided in Sections 2.1(c), 2.2 and 2.3 of the Joint Plan, on or before the Administrative Claims Bar Date, which is thirty (30) days after the Effective Date, Creditors holding Administrative Claims that are required to, but do not, File a request for payment of such Administrative Claims on or before the Administrative Claims Bar Date will be forever barred, estopped, and enjoined from asserting such Administrative Claims against the applicable Debtor, Reorganized Archdiocese, Additional Debtors, and Reorganized Additional Debtors, and such Administrative Claims will be deemed compromised, settled, and released as of the Effective Date.

(c) *Creditors Who Are Not Required to File Requests for Payment on or before the Administrative Claims Bar Date*. Creditors are not required to File a request for payment regarding the following Claims on or before the Administrative Claims Bar Date: (i) the Professional Fee Claims, which will be paid in accordance with Section 2.2 of the Joint Plan; (ii) the Administrative Trade Claims, which will be paid in accordance with Section 2.3 of the Joint Plan; (iii) the DIP Credit Card Claim and Letters of Credit Claims, which will be paid in accordance with Section 2.4 of the Joint Plan; and (iv) the Cure Claims, which will be paid in accordance with Section 10.1(c) of the Joint Plan.

(d) *Objections to Certain Administrative Claims*. Objections to Filed requests for the payment of an Administrative Claim other than Professional Fee Claims and Administrative Trade Claims must be Filed and served on the Creditor holding such Claim within the later of (i) one hundred and twenty (120) days after the Effective Date, and (ii) ninety (90) days after the Filing of the applicable request for payment.

**Section 2.2** **Professional Fee Claims against the Debtor or any Additional Debtors.**

(a) *Treatment*. Except to the extent that the holder of an Allowed Professional Fee Claim against the Debtor and/or any Additional Debtors agrees to less favorable treatment of such Claim, the applicable Reorganized Archdiocese or Reorganized Additional Debtor will pay the

<div align="center">2</div>

Allowed amount of each Professional Fee Claim, in full, in Cash, within fifteen (15) days from the date such Claim becomes an Allowed Professional Fee Claim.

(b) *Professional Fee Claims Bar Date.* On or before the Professional Fee Claims Bar Date, which is forty-five (45) days after the Effective Date, Creditors asserting a Professional Fee Claim for services rendered before the Effective Date must File a Fee Application seeking final Allowance of such Professional Fee Claim.

**Section 2.3        Administrative Trade Claims against the Debtor and/or any Additional Debtors.** Except to the extent that Creditor holding an Administrative Trade Claim against the Debtor and/or any Additional Debtors agrees to less favorable treatment of such Claim, the applicable Reorganized Archdiocese or Reorganized Additional Debtor will pay each Allowed Administrative Trade Claim pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Trade Claim; provided, however, that each Allowed Cure Claim will be paid in accordance with Section 10.1(c) of the Joint Plan.

**Section 2.4        DIP Credit Card Claim and Letters of Credit Claims against the Debtor.** Except to the extent that HWB agrees to less favorable treatment of the DIP Credit Card Claim or Letter of Credit Claims, the applicable Debtor or Reorganized Archdiocese will pay the DIP Credit Card Claim and Letters of Credit Claims pursuant to the terms and conditions of the documents that govern the same.

**Section 2.5        Priority Tax Claims against the Debtor and/or any Additional Debtor.** Except to the extent that Creditor holding an Allowed Priority Tax Claim against the Debtor and/or any Additional Debtors agrees to less favorable treatment of such Claim, the applicable Reorganized Archdiocese or Reorganized Additional Debtor will pay each Allowed Priority Tax Claim in full, in Cash, within fifteen (15) days from the later of (a) the Effective Date, and (b) the date such Claim becomes an Allowed Priority Tax Claim**.**

**Section 2.6        Elimination of Treatment for Certain Unclassified Claims.** To the extent the Debtor or Additional Debtors, as applicable, do not owe any amounts on the Effective Date for the DIP Credit Card Claim, Letters of Credit Claims, or Priority Tax Claims, the treatment set forth above will be deemed automatically eliminated from the Joint Plan.

**Section 2.7        U.S. Trustee Fees and Post-Confirmation Reports.** Within fifteen (15) days from the Effective Date, the Reorganized Archdiocese and Reorganized Additional Debtors will pay, in full, in Cash, any fees due and owing to the U.S. Trustee as of the Confirmation Date. On and after the Effective Date, the applicable Reorganized Archdiocese and Reorganized Additional Debtors will be responsible for (i) Filing any required Post-Confirmation Reports in accordance with the applicable U.S. Trustee guidelines or Order and (ii) paying quarterly fees due to the U.S. Trustee, until the entry of an applicable Final Decree. For the avoidance of doubt, the following will not constitute a disbursement within the meaning of 28 U.S.C. § 1930(a)(6): (a) any Settlement Trust Distribution, including any Settlement Trust Distribution to any Settlement Trust Beneficiary and/or (b) any compensation or expenses paid from the Settlement Trust, including to any Professional retained by the Settlement Trust.

# ARTICLE 3
# CLASSIFICATION, VOTING, AND ACCEPTANCE

Except for those Claims addressed in Article 2 of the Joint Plan, all Claims are placed in the Classes that are described in Articles 3 and 4 of the Joint Plan. A Claim is placed in a particular Class solely to the extent that the Claim falls within the description of that Class, and the portion of a Claim that does not fall within such description will be classified in another Class, to the extent that such portion falls within the description of such other Class. A Claim is also placed in a particular Class for the purpose of receiving Distributions or Settlement Trust Distributions pursuant to the Joint Plan solely to the extent that such Claim (a) is an Allowed Claim in that Class, and (b) has not been paid, released, or otherwise settled before the

Effective Date. There are no equity interests in the Debtor or Additional Debtors within the meaning of the Bankruptcy Code.

**Section 3.1     Elimination of Vacant Classes and Subclasses**. Any Class that does not contain any Allowed Claims or any Claims that are temporarily Allowed for voting purposes under Bankruptcy Rule 3018 as of the date of commencement of the Confirmation Hearing will be eliminated from the Joint Plan for purposes of (a) voting to accept or reject the Joint Plan and (b) determining whether such Class has accepted or rejected the Joint Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

**Section 3.2     Deemed Acceptance If No Votes Cast.** If no Creditor who is eligible to vote in a particular Class votes to accept or reject the Joint Plan, the Joint Plan will be deemed accepted by the Creditors in such Class.

**Section 3.3     Acceptance by Impaired Classes.** An Impaired Class will have accepted the Joint Plan if, not counting the vote of any Creditor designated under section 1126(e) of the Bankruptcy Code, (a) the Creditors holding at least two-thirds (2/3) in dollar amount of the Allowed Claims that actually vote in such Class have voted to accept the Joint Plan, and (b) the Creditors holding more than one-half (1/2) in number of the Allowed Claims that actually vote in such Class have voted to accept the Joint Plan.

**Section 3.4     Nonconsensual Confirmation of the Joint Plan.** The Debtor, the Additional Debtors, and the Creditors' Committee reserve the right to request Confirmation under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that has not accepted or is deemed to have rejected the Joint Plan pursuant to section 1126 of the Bankruptcy Code.

**Section 3.5     Classification and Voting**. Below is a chart identifying Classes of Claims, a description of whether each Class is Impaired, and the voting rights of each Class:

| Class No. | Class Description | Impaired or Unimpaired | Voting Rights |
|---|---|---|---|
| 1 | **Other Priority Claims** (Against the Debtor and the Additional Debtors) | Unimpaired | No, deemed to accept |
| 2 | **Secured Claims** (Against the Debtor and the Additional Debtors) | Unimpaired | No, deemed to accept |
| 3 | **Known Abuse Claims** (Against the Debtor and the Additional Debtors) | Impaired | Yes |
| 4 | **Unknown Abuse Claims** (Against the Debtor and the Additional Debtors) | Impaired | Yes |
| 5 | **Non-Insurer Contribution Claims** (Against the Debtor and the Additional Debtors) | Impaired | No, deemed to reject |
| 6 | **Bond Claims** (Against the Debtor) | Impaired | Yes |
| 7 | **General Unsecured Claims and Unsecured Trade Claims—Debtor** (Against the Debtor) | Impaired | Yes |
| 8 | **Non-Abuse Personal Injury Claims--Debtor** (Against the Debtor) | Impaired | Yes |
| 9 | **Unsecured Trade Claims—Additional Debtors** (Against the Additional Debtors) | Unimpaired | No, deemed to accept |
| 10 | **Additional Debtors' Non-Trade Unsecured Claims— Additional Debtors** (Against the Additional Debtors) | Unimpaired | No, deemed to accept |

**ARTICLE 4**
**TREATMENT OF CLASSIFIED CLAIMS**

**Section 4.1     Class 1 (Other Priority Claims).**  Class 1 includes Other Priority Claims against the Debtor and/or the Additional Debtors.

(a)     *Treatment*. Except to the extent that the Creditor holding an Allowed Other Priority Claim against the Debtor and/or an applicable Additional Debtor agrees to less favorable treatment of such Claim, the Reorganized Archdiocese or applicable Additional Debtor will pay each Allowed Other Priority Claim against the Debtor or applicable Additional Debtor in full, in Cash, within fifteen (15) days from the later of (i) the Effective Date, and (ii) the date such Claim becomes an Allowed Other Priority Claim.

(b)     *Voting*. Because Other Priority Claims are Unimpaired by the Joint Plan, each Creditor holding an Other Priority Claim is presumed to have accepted the Joint Plan with respect to such Claim. No Creditor holding an Other Priority Claim, therefore, is entitled to vote to accept or reject the Joint Plan on account of such Claim.

**Section 4.2     Class 2 (Secured Claims).**  Class 2 consists of any Secured Claims against the Debtor and/or Additional Debtors. Although all Secured Claims have been placed in one Class for the purposes of nomenclature, each Secured Claim will be treated as being in a separate Subclass for all purposes, including for the purpose of receiving Distributions under the Joint Plan.

(a)     *Treatment*. Except to the extent that the Creditor holding an Allowed Secured Claim against the Debtor and/or an applicable Additional Debtor agrees to less favorable treatment of such Claim, each Creditor holding an Allowed Secured Claim against the applicable Debtor or Additional Debtor will receive, at the sole option of the applicable Reorganized Archdiocese or Reorganized Additional Debtor, one of the following in full and final satisfaction of, and in exchange for, such Allowed Secured Claim: (i) Cash equal to the full Allowed amount of such Claim; (ii) Reinstatement of such Claim; (iii) the return or abandonment to such Creditor of the Collateral that secures such Claim; or (iv) such other treatment as will render such Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(b)     *Voting*. Because Secured Claims are Unimpaired by the Joint Plan, each Creditor holding a Secured Claim is presumed to have accepted the Joint Plan with respect to such Claim. No Creditor holding a Secured Claim, therefore, is entitled to vote to accept or reject the Joint Plan on account of such Claim.

**Section 4.3     Class 3 (Known Abuse Claims).**  Class 3 consists of the Known Abuse Claims against the Debtor and/or any Additional Debtors.

(a)     *Treatment*. Except to the extent that a Known Abuse Claimant against the Debtor and/or any Additional Debtors agrees to less favorable treatment of such Known Abuse Claim and except as otherwise provided in Section 12.14 of the Joint Plan regarding Non-Settling Insurers, each Known Abuse Claimant will, in full and final satisfaction, settlement, release, and discharge of its Known Abuse Claim against the Debtor and/or any Additional Debtors, receive such Settlement Trust Distributions as and to the extent provided in the Settlement Trust Documents. The Abuse Claims Reviewer's review or determination of a Known Abuse Claim will not affect the rights of a Non-Settling Insurer. Subject to the Debtor's and Additional Debtors' rights under the Bankruptcy Code, Non-Settling Insurers retain all coverage defenses under their Non-Settling Insurers' Policies and applicable non-bankruptcy law. Additionally:

(i)     The Reorganized Debtor and the Reorganized Additional Debtors will reasonably cooperate with any inquiries made by the Settlement Trustee and/or the Abuse Claims Reviewer regarding the administration and implementation of the Allocation Protocol.

(ii)     Any Known Abuse Claimant's Claim or Cause of Action for punitive or exemplary damages related to Abuse constitutes a Penalty Claim, is hereby Disallowed with respect to the Settlement Trust, and shall receive no

5

8

Settlement Trust Distribution or any other Distribution on account of such Claim or Cause of Action.

(b)    On and after the Effective Date, (i) no Abuse Claimant may challenge the merit, validity, or amount of any Known Abuse Claim, and (ii) any pending objections to a Known Abuse Claim will be deemed withdrawn. The Settlement Trustee shall succeed to the rights of the Creditors' Committee to object to Known Abuse Claims, and, as of the Effective Date, the Settlement Trust and the Settlement Trustee shall constitute the successors-in-interest to the Creditors' Committee for purposes of any objections to Known Abuse Claims, including any pending as of the Effective Date. Only the Settlement Trustee, a Non-Settling Insurer, and a Settling Insurer (but only to the extent set forth in Section 7.6) may object to a Known Abuse Claim. Neither the Debtor, the Reorganized Archdiocese, the Additional Debtors, the Reorganized Additional Debtors, or any other Entity besides the Settlement Trustee, a Non-Settling Insurer, or a Settling Insurer may object to a Known Abuse Claim. No decision regarding whether to object (or not object) to a Known Abuse Claim or whether to settle or otherwise dispose of any objection to a Known Abuse Claim will affect the rights or obligations of a Non-Settling Insurer.

(c)    *Channeling Injunction – Protected Parties and Settling Insurers*. Pursuant to the Injunctions set forth in Article 12 of the Joint Plan, each Known Abuse Claim against any Protected Party or any of the Settling Insurers will be permanently channeled to the Settlement Trust, and (subject to Section 12.14 of the Joint Plan regarding Non-Settling Insurers) such Known Abuse Claim will thereafter be asserted exclusively against the Settlement Trust and resolved in accordance with the Settlement Trust Documents. Known Abuse Claimants holding Channeled Claims are enjoined from prosecuting any pending, or Filing any future, litigation, Claims, or Causes of Action asserting such Channeled Claims against the Protected Parties or Settling Insurers. Additionally, such Known Abuse Claimants may not proceed in any manner against any Protected Parties or Settling Insurers in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue their Channeled Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

(d)    *Voting*. Each Known Abuse Claimant is entitled to vote to accept or reject the Joint Plan on account of such Claims.

**Section 4.4    Class 4 (Unknown Abuse Claims).** Class 4 consists of the Unknown Abuse Claims against the Debtor and/or any Additional Debtors.

(a)    *Treatment*. Except to the extent that an Unknown Abuse Claimant against the Debtor and/or any Additional Debtors agrees to less favorable treatment of such Unknown Abuse Claim and except as otherwise provided in Section 12.14 of the Joint Plan regarding Non-Settling Insurers, each Unknown Abuse Claimant will, in full and final satisfaction, settlement, release, and discharge of its Unknown Abuse Claim against the Debtor and/or any Additional Debtors, receive such Settlement Trust Distributions as and to the extent provided in the Settlement Trust Documents. The Abuse Claims Reviewer's review or determination of an Unknown Abuse Claim will not affect the rights of a Non-Settling Insurer. Subject to the Debtor's and Additional Debtors' rights under the Bankruptcy Code, Non-Settling Insurers retain all coverage defenses under their Non-Settling Insurers' Policies and applicable non-bankruptcy law. Additionally:

(i)    The Reorganized Debtor and the Reorganized Additional Debtors will reasonably cooperate with any inquiries made by the Settlement Trustee and/or the Abuse Claims Reviewer regarding the administration and implementation of the Allocation Protocol.

(ii)    Any Unknown Abuse Claimant's Claim or Cause of Action for punitive or exemplary damages related to Abuse constitutes a Penalty Claim, is

6

9

hereby Disallowed with respect to the Settlement Trust, and shall receive no Settlement Trust Distribution or any other Distribution on account of such Claim or Cause of Action.

(b) On and after the Effective Date, (i) no Abuse Claimant may challenge the merit, validity, or amount of any Unknown Abuse Claim, and (ii) any pending objections to any Unknown Abuse Claims will be deemed withdrawn. The Settlement Trustee shall succeed to the rights of the Creditors' Committee to object to Unknown Abuse Claims, and, as of the Effective Date, the Settlement Trust and the Settlement Trustee shall constitute the successors-in-interest to the Creditors' Committee for purposes of any objections to Unknown Abuse Claims, including any pending as of the Effective Date. The Settlement Trustee, a Non-Settling Insurer, and a Settling Insurer (but only to the extent set forth in Section 7.6) may object to an Unknown Abuse Claim. Neither the Debtor, the Reorganized Archdiocese, the Additional Debtors, the Reorganized Additional Debtors, or any other Entity besides the Settlement Trustee, a Non-Settling Insurer, or a Settling Insurer may object to an Unknown Abuse Claim. No decision regarding whether to object (or not object) to an Unknown Abuse Claim or whether to settle or otherwise dispose of any objection to an Unknown Abuse Claim will affect the rights or obligations of a Non-Settling Insurer.

(c) *Channeling Injunction – Protected Parties and Settling Insurers*. Pursuant to the Injunctions set forth in Article 12 of the Joint Plan, each Unknown Abuse Claim against any Protected Party or any of the Settling Insurers will be permanently channeled to the Settlement Trust, and (subject to Section 12.14 of the Joint Plan regarding Non-Settling Insurers), such Unknown Abuse Claim will thereafter be asserted exclusively against the Settlement Trust and resolved in accordance with the Settlement Trust Documents. Unknown Abuse Claimants holding Channeled Claims are enjoined from prosecuting any pending, or Filing any future, litigation, Claims, or Causes of Action asserting such Channeled Claims against the Protected Parties or Settling Insurers. Additionally, such Unknown Abuse Claimants may not proceed in any manner against any Protected Parties or Settling Insurers in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue their Channeled Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

(d) *Voting*. The Unknown Abuse Claims Representative is entitled to vote to accept or reject the Joint Plan on account of the Unknown Abuse Claims against the Debtor or any Additional Debtors, as the representative of the Unknown Abuse Claimants.

**Section 4.5    Class 5 (Non-Insurer Contribution Claims).** Class 5 consists of the Non-Insurer Contribution Claims against the Debtor and/or any Additional Debtors.

(a) *Treatment*. In accordance with section 502(e)(1) of the Bankruptcy Code, each Non-Insurer Contribution Claim against the Debtor and/or any Additional Debtors will be extinguished as of the Effective Date. Additionally, in exchange for the Channeling Injunction provided in the Joint Plan, as of the Effective Date, the Non-Insurer Contribution Claims of the Non-Debtor Catholic Entities who hold Non-Insurer Contribution Claims against the Debtor and/or any Additional Debtors are hereby released and waived. Class 5 Claims will receive no Distribution or Settlement Trust Distribution.

(b) *Voting*. Creditors holding Non-Insurer Contribution Claims against the Debtor and/or any Additional Debtors are deemed to have rejected the Joint Plan under section 1126(g) of the Bankruptcy Code because no Distribution will be made to such Creditors on account of such Claims. Therefore, no Creditor holding a Non-Insurer Contribution Claim against the Debtor or any Additional Debtors is entitled to vote on the Joint Plan on account of such Non-Insurer Contribution Claim.

**Section 4.6     Class 6 (Bond Claims).** Class 6 consists of the Bond Claims against the Debtor.

(a)     *Treatment of Post-Petition Bond Payments.* On the Effective Date, the Post-Petition Bond Payments will be treated as a payment under the Joint Plan in calculating whether the Joint Plan meets the requirements of section 1129(a)(7) of the Bankruptcy Code.

(b)     *Amount of Bond Claim.* On the Effective Date (i) the principal amount of the Bond Claims shall be reduced, without prepayment premium or penalty, by the total Post-Petition Bond Payments (totaling $9,302,062.50) received from the Debtor, with such Post-Petition Bond Payments treated as payments of principal as provided in Section 4.6(a), (ii) the Bond Trustee's Claim and the Bond Trustee's Professional Fee Claim will receive no recovery under this Joint Plan and will be valued for purposes of this Joint Plan at $0.00, and (iii) any portion of the Bond Claims representing Claims for unmatured, post-petition interest will receive no recovery and will be Disallowed pursuant to Bankruptcy Code § 502(b)(2). After the application of such Post-Petition Bond Payments, the determination that the Bond Trustee's Claim and the Bond Trustee's Professional Fee Claim shall receive no recovery, and the Disallowance of any Claim for unmatured, post-petition interest, the Bond Claims will be Allowed, collectively, in the reduced amount of **$28,667,937.50**.

(c)     *Treatment.* Beginning on the Effective Date, and except to the extent that a Creditor holding an Allowed Bond Claim agrees to less favorable treatment, each Creditor holding an Allowed Bond Claim shall receive, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Allowed Bond Claim, its pro rata share of the following consideration:

(i)     *Transfer of Immovable Property.* Within ninety (90) days after the Effective Date, the Debtor shall transfer to the Bond Trustee (or its designee(s)) the following parcels of immovable property (collectively, the "**Settlement Properties**"), free and clear of all liens, claims, encumbrances, and interests:

- Holy Guardian Angels Mission Church, Jefferson Parish, Louisiana, valued for purposes of this Joint Plan at $403,700;

- Madonna Manor (Former Site), Jefferson Parish, Louisiana, valued for purposes of this Joint Plan at $2,000,000;

- Old Hannan High School, St. Bernard Parish, Louisiana, valued for purposes of this Joint Plan at $2,337,534;

- RCCANO Offices/Catholic Charities (Parking), Orleans Parish, Louisiana, valued for purposes of this Joint Plan at $1,903,000;

- Sacred Heart of Jesus Catholic Church, Orleans Parish, Louisiana, valued for purposes of this Joint Plan at $4,365,359;

- St. Bonaventure Church, Jefferson Parish, Louisiana, valued for purposes of this Joint Plan at $1,228,433;

- Residence - Bridget Street, Jefferson Parish, Louisiana, valued for purposes of this Joint Plan at $215,000; and

8

- St. Pius X, Jefferson Parish, Louisiana, valued for purposes of this Joint Plan at $604,667.

The Settlement Properties shall have an aggregate value for purposes of this Joint Plan of $13,057,693. Legal descriptions and additional details regarding the Settlement Properties, including the terms of transfer, are set forth in Plan Supplement 4.6(c)(i).

(ii) *Cash Payments.* In addition to the transfer of the Settlement Properties, the Reorganized Debtor shall make Cash payments to the Bond Trustee (on behalf of the Bondholders) in the aggregate principal amount of $7,200,000, payable in equal annual installments over twelve (12) years commencing on July 1, 2026. This Cash payment treatment as described in this Section 4.6(c)(ii) will be memorialized in the Amended Bond Documents, which Amended Bond Documents shall: (i) substantially conform to this Joint Plan as set forth in Plan Supplement 4.6(c)(ii); and (ii) be executed and delivered to the Bond Trustee by the Debtor or the Reorganized Archdiocese on or before the Effective Date.

(d) *Voting.* Because the Bond Claims against the Debtor are Impaired by the Joint Plan, Creditors holding Bond Claims are entitled to vote to accept or reject the Joint Plan on account of such Claims.

**Section 4.7** **Class 7 (General Unsecured Claims and Unsecured Trade Claims—Debtor).** Class 7 consists of General Unsecured Claims and Unsecured Trade Claims against the Debtor.

(a) *Treatment.*

(i) *Regular Claims Treatment.* Except to the extent that a Creditor holding an Allowed General Unsecured Claim or an Allowed Unsecured Trade Claims agrees to less favorable treatment, each Creditor holding an Allowed General Unsecured Claim or an Allowed Unsecured Trade Claim that is not a Convenience Claim, will receive Cash from the Reorganized Archdiocese equal to one hundred percent (100%) of the principal amount of such Claim within one year after the later of (i) the Effective Date and (ii) the date such Claim becomes an Allowed Claim. For the avoidance of doubt, the Debtor shall retain the right to object to any General Unsecured Claim or Unsecured Trade Claim that is not a Convenience Claim, after the Effective Date.

(ii) *Convenience Class Election and Treatment.* Every Creditor holding a General Unsecured Claim or an Unsecured Trade Claim against the Debtor may make the Convenience Class Election if the amount of such Creditor's General Unsecured Claim or Unsecured Trade Claim exceeds $50,000. A Creditor may make a Convenience Class Election by submitting a properly completed Ballot to the Claims and Voting Agent by the Voting Deadline. Upon making a Convenience Class Election, the Creditor holding such General Unsecured Claim or Unsecured Trade Claim affirmatively and irrevocably agrees to: (i) waive its right to treatment of such Claim under Section 4.7(a)(i), (ii) receive treatment of such Claim as a Convenience Claim, and (iii) vote to accept the Joint Plan as a Creditor holding a Convenience Claim in Class 7. Except to the extent that a Creditor holding an Allowed Convenience Claim agrees to less favorable treatment, each

9

Creditor holding an Allowed Convenience Claim will receive Cash from the Reorganized Archdiocese equal to the lesser of (i) $50,000 or (ii) the Allowed Amount of such Convenience Claim within fifteen (15) days after the later of (i) the Effective Date and (ii) the date such Claim becomes an Allowed Claim.

(b) *Voting*. Because the General Unsecured Claims and Unsecured Trade Claims against the Debtor are Impaired by the Joint Plan, each Creditor holding a General Unsecured Claim or an Unsecured Trade Claim against the Debtor is entitled to vote to accept or reject the Joint Plan on account of such Claim. Any Creditor that properly makes a Convenience Class Election with respect to its General Unsecured Claim or Unsecured Trade Claim is deemed to vote to accept the Joint Plan as a Creditor holding a Convenience Claim in Class 7.

**Section 4.8    Class 8 (Non-Abuse Personal Injury Claims—Debtor).** Class 8 consists of the Non-Abuse Personal Injury Claims against the Debtor.

(a) *Treatment*. On the Effective Date, Creditors holding Non-Abuse Personal Injury Claims against the Debtor may litigate such Non-Abuse Personal Injury Claims against the Reorganized Archdiocese (including by commencing, or recommencing, litigation in any court exercising competent jurisdiction), and such litigation will not be stayed or enjoined, whether by the Joint Plan or any provision of the Bankruptcy Code. However, such Creditors may only recover on account of such Allowed Non-Abuse Personal Injury Claims as follows: (i) first, from such Cash, funds, or other property as may be available under the Preserved Coverage or any other applicable insurance policy or policies, if any, until occurrence limits applicable to the Non-Abuse Personal Injury Claim under such insurance policy or policies are fully exhausted and (ii) second, from the Reorganized Archdiocese in an amount equal to the balance of such Allowed Non-Abuse Personal Injury Claim still remaining (if any) after such Creditor recovers all Cash, funds, or other property from such applicable insurance policy or policies (which payment the Reorganized Archdiocese shall make to the Creditor in Cash by no later than fifteen (15) days after the Creditor sends written notification to the Reorganized Archdiocese of the exhaustion of such applicable insurance policy or policies). Until such occurrence limits are exhausted, a Non-Abuse Personal Injury Claimant may not recover (and is hereby enjoined from taking any action to collect or otherwise recover) such Non-Abuse Personal Injury Claim from the Reorganized Archdiocese. Nothing in the Joint Plan will enlarge the rights or Claims of Creditors holding Non-Abuse Personal Injury Claims or limit or waive any defenses to such Claims. Nothing in the Joint Plan affects, diminishes, or impairs any rights a Creditor holding a Non-Abuse Personal Injury Claim may have against Entities other than the Debtor or the Reorganized Archdiocese, including such other Entities' joint and several or extra-contractual liability, if any, for such Non-Abuse Personal Injury Claim.

(b) *Voting*. Because the Non-Abuse Personal Injury Claims against the Debtor are Impaired by the Joint Plan, any Creditor holding a Class 8 Non-Abuse Personal Injury Claim against the Debtor is entitled to vote to accept or reject the Joint Plan on account of such Claim.

(c) *Reservation of Rights With Respect to Non-Abuse Personal Injury Claims*. Subject in all respects to the Insurance Settlement Agreements, including the releases therein (i.e., solely to the extent of Preserved Coverage, if any, with respect to any Settling Insurers' Policies), the insurance rights of the Debtor or other Covered Parties that pertain to Non-Abuse Personal Injury Claims are expressly reserved for each Covered Party, as applicable, and the Plan Documents will not, and will not be deemed to, transfer, grant, or assign such insurance rights to the Settlement Trust. For the avoidance of doubt, the insurance rights of any Entity that is not a Covered Party are expressly reserved for such Entity and the Plan Documents will not, and will not be deemed to, transfer, grant, or assign such rights to the Settlement Trust.

**Section 4.9    Class 9 (Unsecured Trade Claims—Additional Debtors).** Class 9 consists of Unsecured Trade Claims against the Additional Debtors.

(a)    *Treatment.* Except to the extent that the Creditor holding an Allowed Unsecured Trade Claim against an applicable Additional Debtor agrees to less favorable treatment of such Claim, the applicable Reorganized Additional Debtor will pay each Allowed Unsecured Trade Claim of such Reorganized Additional Debtor in accordance with the terms and conditions otherwise governing such Allowed Unsecured Trade Claims so that such Allowed Unsecured Trade Claims are rendered Unimpaired by the Joint Plan and pass through after the Effective Date for all purposes as if the Additional Debtors' Chapter 11 Cases had never been filed.

(b)    *Voting.* Because the Allowed Unsecured Trade Claims against the Additional Debtors are Unimpaired by the Joint Plan, each Creditor holding an Unsecured Trade Claim against an Additional Debtor (or Additional Debtors) is presumed to have accepted the Joint Plan with respect to such Claim. Therefore, no Creditor holding such a Class 9 Unsecured Trade Claim against the Additional Debtors is entitled to vote to accept or reject the Joint Plan on account of such Claim.

**Section 4.10    Class 10 (Additional Debtors' Non-Trade Unsecured Claims—Additional Debtors).** Class 10 consists of all Additional Debtors' Non-Trade Unsecured Claims against any Additional Debtors.

(a)    *Treatment.*  Subject to the requirement that all Additional Debtors' Non-Trade Unsecured Claims (other than Previously Asserted Claims) File Proofs of Claim for such Additional Debtors' Non-Trade Unsecured Claims in accordance with Section 6.12 of this Joint Plan, each holder of an Allowed Additional Debtors' Non-Trade Unsecured Claim shall retain all rights possessed under such Allowed Additional Debtors' Non-Trade Unsecured Claims and under non-bankruptcy law so that such Additional Debtors' Non-Trade Unsecured Claims are rendered Unimpaired by the Joint Plan and pass through after the Effective Date for all purposes as if the Additional Debtors' Chapter 11 Cases had never been filed.

(b)    *Voting.* Because the Allowed Additional Debtors' Non-Trade Unsecured Claims against the Additional Debtors are Unimpaired by the Joint Plan, each Creditor holding an Additional Debtors' Non-Trade Unsecured Claim against an Additional Debtor (or Additional Debtors) is presumed to have accepted the Joint Plan with respect to such Claim. Therefore, no Creditor holding such a Class 10 General Unsecured Claim against the Additional Debtors is entitled to vote to accept or reject the Joint Plan on account of such Claim.

(c)    *Reservation of Rights with Respect to Non-Abuse Personal Injury Claims.* Subject in all respects to the Insurance Settlement Agreements, including the releases therein (i.e., solely to the extent of Preserved Coverage, if any, with respect to any Settling Insurers' Policies), the insurance rights of the Additional Debtors or other Covered Parties that pertain to Non-Abuse Personal Injury Claims of the Additional Debtors are expressly reserved for each Covered Party, as applicable, and the Plan Documents will not, and will not be deemed to, transfer, grant, or assign such insurance rights to the Settlement Trust. For the avoidance of doubt, the insurance rights of any Entity that is not a Covered Party are expressly reserved for such Entity and the Plan Documents will not, and will not be deemed to, transfer, grant, or assign such rights to the Settlement Trust.

# ARTICLE 5
## MEANS FOR IMPLEMENTATION AND FUNDING OF THE JOINT PLAN

**Section 5.1    Creation of the Settlement Trust for the Benefit of Abuse Claimants.** In accordance with Article 6 of the Joint Plan, on or before the Effective Date, the Settlement Trust will be established for the purposes of (a) assuming responsibility for the liabilities of the Debtor and Additional

Debtors for the Abuse Claims and (b) receiving, liquidating, and distributing Settlement Trust Assets in accordance with the Joint Plan and Settlement Trust Documents. The Settlement Trust Agreement is attached as Plan Exhibit D-1, and the Allocation Protocol is attached as Plan Exhibit D-2.

**Section 5.2     Plan Funding Entities**. As more fully set forth in Section 5.3, the Debtor, the Additional Debtors, the Contributing Non-Debtor Catholic Entities, and the Settling Insurers shall fund the Settlement Trust. The Debtor shall fund its portion of the Debtor and Additional Debtor Settlement Consideration from the Debtor's Assets directly to the Settlement Trust. The Settling Insurers shall fund the Settling Insurers' Settlement Consideration as outlined in the relevant Insurance Settlement Agreement. The Additional Debtors and the Contributing Non-Debtor Catholic Entities shall collectively contribute their portion of the Debtor and Additional Debtor Settlement Consideration to 1793 Group, a newly formed Louisiana non-profit corporation, which will transfer such consideration to the Settlement Trust upon the Effective Date. Additionally, 1793 Group shall also receive, on behalf of all the Contributing Non-Debtor Catholic Entities, the Additional Debtors, or the Reorganized Additional Debtors certain proceeds from the sale of the Affordable Housing Facilities to which the Additional Debtors may be entitled under Section 5.3(a)(v). Finally, 1793 Group will also make on behalf of the Additional Debtors or the Reorganized Additional Debtors any and all payments, if any, that the Additional Debtors or the Reorganized Additional Debtors may be obligated to make to the Debtor or the Reorganized Archdiocese under Section 12.10 (The Debtor's Settlement of Certain Claims).

**Section 5.3     Settlement Consideration with respect to the Abuse Claims**. From and after the Effective Date, any Cash, proceeds, or other property received by the Settlement Trust will constitute Settlement Trust Assets.

(a)     *The Debtor and Additional Debtor Settlement Consideration*. The consideration provided by the Debtor and Additional Debtor in connection with this Joint Plan (the "**Debtor and Additional Debtor Settlement Consideration**") consists of the following:

(i)     *Cash on the Effective Date.* As a condition to the occurrence of the Effective Date, the Debtor (directly) and the Additional Debtors and Non-Debtor Catholic Entities (indirectly through 1793 Group) will transfer Cash in the collective amount of $130,000,000 to the Settlement Trust; provided further that, prior to the Effective Date, the Debtor (directly) and the Additional Debtors and Non-Debtor Catholic Entities (indirectly through 1793 Group) may transfer Cash in the collective amount of $130,000,000 into the Affordable Housing Facilities Sale Escrow Account to be funded to the Settlement Trust upon the occurrence of the Effective Date.

(ii)     *First Settlement Trust Promissory Note.* On the Effective Date, the Debtor and Additional Debtors will execute and deliver to the Settlement Trust the First Settlement Trust Promissory Note in the principal amount of $20 million. The First Settlement Trust Promissory Note will mature on July 15, 2026. The First Settlement Trust Promissory Note will be secured by the First Settlement Trust Promissory Note Letter of Credit, issued in the amount of the First Settlement Trust Promissory Note not to exceed $20 million by a federally insured bank or financial institution acceptable to the Creditors' Committee.[2] The First Settlement Trust Promissory Note

---

[2] The Debtor and the Additional Debtors may, in their discretion, substitute the First Settlement Trust Promissory Note Letter of Credit or any portion thereof with Cash distributed to the Creditors' Committee to be held in escrow in the Affordable Housing Facilities Sale Escrow Account pending the Effective Date and transfer to the Settlement Trust. Further, the Debtor and the Additional Debtors may, in their discretion, substitute the First Settlement Trust

Letter of Credit shall not be delivered until March 16, 2026 to the extent that the First Settlement Trust Promissory Note has not yet been paid. The First Settlement Trust Promissory Note Letter of Credit shall not be called until July 15, 2026 to the extent that the First Settlement Trust Promissory Note has not yet been paid on or before July 15, 2026. A copy of the First Settlement Trust Promissory Note and the First Settlement Trust Promissory Note Letter of Credit is attached as Plan Supplement 5.3(a)(ii).

(iii) *Sale of Affordable Housing Facilities*. The Debtor, Additional Debtors, and Creditors' Committee have selected NEWMARK Affordable Housing Advisors as the Affordable Housing Facilities Broker to act as a broker to market the Affordable Housing Facilities for sale. The Debtor, the Additional Debtors, and the Affordable Housing Entities have selected [_____•_____][3] (the "**Affordable Housing Facilities Buyer**") as the buyer of the Affordable Housing Facilities. The Creditors' Committee[4] shall be a consulting party with regards to the Affordable Housing Facilities Buyer's purchase of the Affordable Housing Facilities, and the terms and conditions of such purchase shall be set forth in a purchase and sale agreement that shall otherwise conform to the requirements of this Section 5.3(a) of the Joint Plan.

(iv) *The Second Settlement Trust Promissory Note*. By no later than five (5) Business Days after the Confirmation Date, the Debtor and the Additional Debtors will execute the Second Settlement Trust Promissory Note in the principal amount of $50 million and deliver it to the Creditors' Committee (or to the Settlement Trust if the Effective Date has already occurred). The Second Settlement Trust Promissory Note shall be non-interest bearing and shall mature on March 31, 2026. The Second Settlement Trust Promissory Note shall be secured by the Second Settlement Trust Promissory Note Letter of Credit, a $50 million irrevocable letter of credit issued by a federally insured bank or financial institution acceptable to the Creditors' Committee.[5] Copies of the Second Settlement Trust Promissory Note and the Second Settlement Trust Promissory Note Letter of Credit are attached as Plan Supplement 5.3(a)(iv).

(v) *Affordable Housing Facilities Sale Proceeds.* If the sale of the Affordable Housing Facilities closes before the occurrence of the Effective Date, the

---

Promissory Note Letter of Credit with already-paid portions of the Second Settlement Trust Promissory Note Letter of Credit. For clarification and by way of example, if before March 31, 2026, the Settlement Trust has received $47 million from CHI sale proceeds, then the amount callable on the $50 million letter of credit will be $3 million. If the Settlement Trust has received $50 million from CHI sale proceeds, then the $50 million letter of credit would be canceled. If the Settlement Trust by March 16, 2026 received $54 million from CHI sale proceeds, then the face amount of the $20 million First Settlement Trust Promissory Note Letter of Credit would be $16 million.

[3] To be provided.

[4] After the Effective Date, the Settlement Trustee shall be substituted for the Creditors' Committee and shall succeed to the Creditors' Committee's consultation rights under this section.

[5] The Debtor and the Additional Debtors may, in their discretion, substitute the Second Settlement Trust Promissory Note Letter of Credit or any portion thereof with Cash distributed to the Creditors' Committee to be held in escrow in the Affordable Housing Facilities Sale Escrow Account pending the Effective Date and transfer to the Settlement Trust.

13

Affordable Housing Facilities Sale Escrow Account shall be funded, at closing, from the proceeds of such sale in the amounts of both the First Settlement Trust Promissory Note and the Second Settlement Trust Promissory Note, in accordance with the priority of payments set forth in this section. Following the Effective Date, all funds in the Affordable Housing Facilities Sale Escrow Account shall be immediately deposited into the Settlement Trust. At the closing of the sale of the Affordable Housing Facilities, whether such closing occurs before or after the occurrence of the Effective Date, the net proceeds from the sale of the Affordable Housing Facilities shall be applied in the following order of payment priority:

(a) If the Second Settlement Trust Promissory Note Letter of Credit has not yet been called, the first $50 million of proceeds shall be paid to the Settlement Trust (or into the Affordable Housing Facilities Sale Escrow Account, as the case may be) to satisfy the Second Settlement Trust Promissory Note and release the Second Settlement Trust Promissory Note Letter of Credit (which Second Settlement Trust Promissory Note Letter of Credit shall be released upon satisfaction of the Second Settlement Trust Promissory Note). If the Second Settlement Trust Promissory Note Letter of Credit has already been called and the Second Settlement Trust Promissory Note thereby released, the first $50 million shall be paid to the Additional Debtors.

(b) If the Effective Date has occurred, the next $20 million will be paid to the Settlement Trust to satisfy the First Settlement Trust Promissory Note. If the Effective Date has not occurred, the next $20 million will be paid into the Affordable Housing Facilities Sale Escrow Account.

(c) Any net proceeds exceeding $70 million shall be paid to the Additional Debtors.

(vi) *Calling the Second Settlement Trust Promissory Note Letter of Credit.* If the sale of the Affordable Housing Facilities has not closed as of the Effective Date, then

(a) If the Effective Date has not occurred by March 31, 2026, the Creditors' Committee shall call the Second Settlement Trust Promissory Note Letter of Credit on April 1, 2026 (or the next, succeeding Business Day) and shall immediately fund the $50 million it receives from calling the Second Settlement Trust Promissory Note Letter of Credit into the Affordable Housing Facilities Settlement Trust Escrow Account and shall release the Second Settlement Trust Promissory Note.

(b) If the Effective Date has occurred on or before March 31, 2026, the Settlement Trustee shall call the Second Settlement Trust Promissory Note Letter of Credit on April 1, 2026 (or the next, succeeding Business Day) and shall immediately fund the $50 million he receives from calling the Second Settlement Trust Promissory Note

14

Letter of Credit into the Settlement Trust and shall release the Second Settlement Trust Promissory Note.

(vii) *Affordable Housing Facilities Sale Escrow Account*. If the Affordable Housing Facilities Sale Escrow Account is established, the Affordable Housing Facilities Sale Escrow Account funds shall remain in the Affordable Housing Facilities Sale Escrow Account until: (a) the Confirmation Order has become a Final Order; (b) an appellate court has entered an Order reversing the Confirmation Order and such Order has become a Final Order; or (c) until such time as the Debtor, the Additional Debtors, the Creditors' Committee, and Certain Abuse Survivors' Counsel shall otherwise agree to in writing. If the Confirmation Order is affirmed by a Final Order, the amounts in the Affordable Housing Facilities Sale Escrow Account shall be immediately deposited in the Settlement Trust upon the occurrence of the Effective Date. If the Confirmation Order is reversed by a Final Order, the amounts in the Affordable Housing Facilities Sale Escrow Account shall be returned to the Debtor. A copy of the Affordable Housing Facilities Sale Escrow Agreement is attached as Plan Supplement 5.3(a)(vii).

(viii) *Settlement Trust Guarantee*. This mechanism ensures the Settlement Trust receives approximately $230 million, comprised of:

- $130 million in cash from the Debtor and the Additional Debtors;

- $20 million from the First Settlement Trust Promissory Note secured by the First Settlement Trust Promissory Note Letter of Credit;

- $50 million from the Second Settlement Trust Promissory Note secured by the Second Settlement Trust Promissory Note Letter of Credit; and

- Approximately $30 million from the Settling Insurers ($29,275,000) in the form of the Settling Insurers' Settlement Consideration.

(ix) *Non-Settling Insurance Rights Transfer*. On the Effective Date, the Non-Settling Insurance Rights Transfer to the Settlement Trust will become effective, as set forth in Section 7.2 of this Joint Plan.

(x) *Additional Plan Consideration*. On the Effective Date, the Debtor and the Additional Debtors will provide the Additional Plan Consideration.

(b) *The Settling Insurers' Settlement Consideration*. In accordance with the respective Insurance Settlement Agreements, the Settling Insurers will transfer to the Settlement Trust or Escrow Agent certain amounts as follows: (i) SPARTA, in the amount of $21,000,000;[6] (ii) U.S.

---

[6] SPARTA's contribution of $21,000,000 and status as a Settling Insurer is contingent on SPARTA providing financial assurance acceptable to the Creditors' Committee in the Creditors' Committee's discretion by the commencement of the Confirmation Hearing. If SPARTA fails to provide such financial assurance, SPARTA will become a Non-Settling Insurer, and litigation rights will be preserved against SPARTA and any insurance guarantee fund, should SPARTA trigger guarantee fund coverage.

Fire/International, in the amount of $5,000,000; (iii) Catholic Mutual, in the amount of $2,000,000; (iv) Puritan, in the amount of $85,000; (v) National Union, in the amount of $290,000; and (vi) Twin City, in the amount of $900,000 (collectively, the "**Settling Insurers' Settlement Consideration**"). The Settling Insurers' Policies are listed on Plan Supplement 7.1(f), and the Insurance Settlement Agreements are attached as Plan Supplement 7.1(a).

**Section 5.4** **Non-Monetary Plan Provisions**. Subject to the occurrence of the Effective Date, the Debtor, the Reorganized Archdiocese, the Additional Debtors, the Reorganized Additional Debtors, and the Non-Debtor Catholic Entities have agreed to undertake the Non-Monetary Plan Provisions (Plan Exhibit E—*The Roman Catholic Church of the Archdiocese of New Orleans' Non-Monetary Plan Provisions to Foster Child Safety and Prevent Child Sexual Abuse*).

**Section 5.5** **Settlement Trust Distributions**. Abuse Claimants will receive Settlement Trust Distributions on account of their Claims in accordance with the Settlement Trust Documents. **For the avoidance of doubt, Abuse Claimants will not receive any portion of the Settling Insurers' Settlement Consideration without having signed an Abuse Claim Release and Certification that releases all Claims against the Settling Insurers.**

**Section 5.6** **Distributions to Creditors Holding Allowed Non-Abuse Claims.** The Debtor or Reorganized Archdiocese, or the Additional Debtors, the Reorganized Additional Debtors, or 1793 Group (as the case may be) will serve as the source of funds to make Distributions to Creditors holding Allowed Non-Abuse Claims against the Debtor or the Additional Debtors, in accordance with Sections 2.1 through 2.7 and Sections 4.1, 4.2, 4.6, 4.7, 4.8, 4.9, and 4.10 of the Joint Plan.

**Section 5.7** **Continued Corporate Existence and Vesting of Assets.** As of the Effective Date: (a) the Archdiocese will continue, as the Reorganized Archdiocese, to exist as a legal entity, with all of the powers of such legal entity under applicable law and without prejudice to any right to alter or terminate such existence (by merger, dissolution or otherwise) under applicable law; (b) each Additional Debtor will continue, as a Reorganized Additional Debtor, to exist as a legal entity, with all of the powers of such legal entity under applicable law and without prejudice to any right to alter or terminate such existence (by merger, dissolution or otherwise) under applicable law, and (c) property of the respective Estates, and any property acquired by the applicable Debtor, Reorganized Archdiocese, Additional Debtor, or Reorganized Additional Debtor will vest in the applicable Reorganized Archdiocese or Reorganized Additional Debtor free and clear of all Claims, Liens, charges, and other interests, except as expressly provided in this Joint Plan. Except as otherwise provided by this Joint Plan (such as, for a non-exclusive example, the restrictions imposed under Section 5.3 on the marketing and sale of the Affordable Housing Facilities and the disposition of any sales proceeds therefrom), the Reorganized Archdiocese and Reorganized Additional Debtors may, on and after the Effective Date, operate, use, acquire, and dispose of property, and compromise or settle any Non-Abuse Claim, without supervision or approval by the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On and after the Effective Date, the Archdiocese and the Additional Debtors will continue to operate in accordance with the principles of their respective missions, Canon Law, and applicable laws.

**Section 5.8** **Officers and Directors after the Effective Date.**

(a) *The Reorganized Archdiocese*. In accordance with section 1129(a)(5) of the Bankruptcy Code, Plan Supplement 5.7(a) discloses the identities and affiliations of the Entities proposed to serve as directors and officers of the Reorganized Archdiocese on and after the Effective Date.

(b) *The Reorganized Additional Debtors*. In accordance with section 1129(a)(5) of the Bankruptcy Code, Plan Supplement 5.7(b) discloses the identities and affiliations of the Entities proposed to serve as directors and officers of the Reorganized Additional Debtors on and after the Effective Date.

Section 5.9 **Further Authorization.** The Reorganized Archdiocese and Reorganized Additional Debtors will be entitled to seek such Orders, judgments, injunctions, rulings, and other assistance as each deems necessary to implement the intentions and purposes, and to give full effect to the provisions, of the Joint Plan.

Section 5.10 **Appointment of Unknown Abuse Claims Representative—Unknown Abuse Claims of Additional Debtors.** On the Effective Date, Michael R. Hogan, who is the Unknown Abuse Claims Representative for the Debtor and the Reorganized Archdiocese, shall be appointed as the legal representative of all Abuse Claimants holding Unknown Abuse Claims against the Additional Debtors, and the Unknown Abuse Claims Representative Appointment Order shall be amended to provide that Michael R. Hogan is the Unknown Abuse Claims Representative for all Abuse Claimants holding Unknown Abuse Claims against both the Reorganized Archdiocese and the Reorganized Additional Debtors. Furthermore, the Debtor, in addition to satisfying its obligations under Section 5.3 of this Joint Plan with respect to the Debtor and Additional Debtor Settlement Consideration, shall pay additional Cash to the Settlement Trust up to a maximum amount of $1,500,000 on account of an Unknown Abuse Claim (or Unknown Abuse Claims). The Debtor shall pay such additional amount by no later than sixty (60) days after receiving a written request for payment of such amount from the Unknown Claims Representative.

# ARTICLE 6

## THE SETTLEMENT TRUST AND RELATED MATTERS

Section 6.1 **Creation of the Settlement Trust and Assignment and Assumption of Channeled Claims.**

(a) On the Effective Date, the Settlement Trust will be established in accordance with the Settlement Trust Documents. The Settlement Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. The Archdiocese is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Settlement Trustee will be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Settlement Trust Documents are incorporated herein by reference.

(b) On the Effective Date, the liability of the Debtor, Additional Debtors, and Settling Insurers for, and obligation to pay, Abuse Claims will become the responsibility of the Settlement Trust. Abuse Claims will be paid by the Settlement Trust from the Settlement Trust Assets in accordance with the Settlement Trust Documents. Additionally, as of the Effective Date, the transfer to, vesting in, and assumption by the Settlement Trust of the Settlement Trust Assets as contemplated by the Joint Plan will discharge all obligations and liabilities of and bar any recovery or action against the Protected Parties and Settling Insurers for or in respect of all Channeled Claims. The Confirmation Order will provide for such discharge.

(c) The Settlement Trust will have no liability or responsibility for Non-Abuse Claims, and Creditors holding Non-Abuse Claims will have no recourse to the Settlement Trust or Settlement Trust Assets with respect to such Claims.

Section 6.2 **Vesting of Settlement Trust Assets**. As of the Effective Date, title to all rights and interests in the Settlement Trust Assets will be free and clear of any and all Liens, Claims, or interests of any kind in or on such property.

Section 6.3 **Appointment of the Settlement Trustee.** As of the Effective Date, the Settlement Trustee will be Donald C. Massey; provided, however, the Settlement Trustee may (a) act in accordance with the terms of the Settlement Trust Agreement (Plan Exhibit D-1) from such earlier date as authorized by the Debtor, Additional Debtors, and Creditors' Committee, and (b) seek compensation for such services

17

as permitted by the Joint Plan and Settlement Trust Documents. Plan Supplement 6.3 includes appropriate disclosures of the Settlement Trustee.

**Section 6.4**      **The Settlement Trust Advisory Committee.** As set forth in the Settlement Trust Agreement, the Settlement Trust Advisory Committee will be appointed on the Effective Date and shall have the duties, functions, rights, and obligations described in the Settlement Trust Agreement. The initial Settlement Trust Advisory Committee will consist of five (5) members, who will be entitled to reimbursement of expenses for their service to the extent set forth in the Settlement Trust Agreement.

**Section 6.5**      **The Abuse Claims Reviewer and the Allocation Protocol.** As of the Effective Date, the Abuse Claims Reviewer will be Richard Arsenault. Plan Supplement 6.5 includes appropriate disclosures of the Abuse Claims Reviewer, including the Abuse Claims' Reviewer's compensation (which shall be paid by the applicable Debtor, Reorganized Archdiocese, Additional Debtors, and/or Reorganized Additional Debtors). The Abuse Claims Reviewer will have the duties, functions, rights, and obligations described in the Settlement Trust Agreement and Allocation Protocol (Plan Exhibit D-2).

**Section 6.6**      **Medicare Reimbursement and Reporting Obligations.**

(a)      The Settlement Trust will register as a "Responsible Reporting Entity" under the reporting provisions of MMSEA. The Settlement Trust will confirm whether an Abuse Claimant holding an Abuse Claim that occurred after December 5, 1980 is enrolled in Medicare Parts A and B (fee-for-service), Part C (Medicare Advantage), or Medicare Part D (drug coverage). This includes implementing an appropriate process to gather the necessary information for querying CMS on such determination, including the claimant's first and last name, date of birth, gender, address, and social security number or health insurance claim number. The Settlement Trust will timely submit all reports required under MMSEA because of any Abuse Claim that occurred after December 5, 1980. The Settlement Trust, as a Responsible Reporting Entity, will follow all applicable guidance published by CMS and/or any other agency or successor entity charged with responsibility for tracking, assessing, or receiving reports made under MMSEA to determine whether, and, if so, how, to report to such agency or agencies under MMSEA.

(b)      For Abuse Claims that occurred after December 5, 1980, before remitting funds to any Entity on account of such an Abuse Claim (other than a Non-Insurer Contribution Claim), the Settlement Trustee will obtain: (i) a certification that said Entity (or such Entity's authorized representative) has provided or will provide for the payment and/or resolution of any obligations owing or potentially owing under the MSP Provisions, or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim, and (ii) an agreement that such Entity indemnify the Settlement Trust for any such obligations. The failure by one or more Abuse Claimants to follow these provisions will not delay or impair the payment by the Settlement Trust to any other Abuse Claimant following these provisions.

(c)      The Settlement Trust will submit reimbursement to CMS for Medicare Claims relating to Abuse Claims. With respect to all Abuse Claims, the Settlement Trust will maintain sufficient funds to pay any potential reimbursements to CMS in full and consider the potential future interests of CMS.

(d)      Nothing in this Section 6.6 of the Joint Plan implies, or constitutes an admission, that the Debtor, Reorganized Archdiocese, Additional Debtors, Reorganized Additional Debtors, any other Covered Party, or any Settling Insurer are "applicable plans" within the meaning of MMSEA, or that they have any legal obligation to report any actions undertaken by the Settlement Trust or contributions to the Settlement Trust under MMSEA or any other statute or regulation.

**Section 6.7**      **Settlement Trustee's Immunity; Liability; Indemnification.**

(a)      In connection with the performance of the Settlement Trustee's functions and in Settlement Trustee's sole and absolute discretion, the Settlement Trustee may consult with its attorneys, accountants, financial advisors, and agents, and will not be liable for any act taken,

omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Entities. Notwithstanding such authority, the Settlement Trustee has no obligation to consult with its attorneys, accountants, financial advisors, or agents, and its determination not to do so will not impose any liability on the Settlement Trustee unless such determination is based on the Settlement Trustee's recklessness, gross negligence, willful misconduct, or fraud.

(b)     No recourse will ever be had, directly or indirectly, against the Settlement Trustee personally, or against any employee, contractor, agent, attorney, accountant, or other professional that the Settlement Trust retains in accordance with the Settlement Trust Documents or the Joint Plan, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant, or agreement executed by the Settlement Trustee in implementation of the Settlement Trust Documents or the Joint Plan, or by reason of the creation of any indebtedness by the Settlement Trust for any purpose authorized by the Settlement Trust Documents or the Joint Plan, it being expressly understood and agreed that all such liabilities, covenants, and other obligations of the Settlement Trust, whether in writing or otherwise, will be enforceable only against, and be satisfied only from, the Settlement Trust Assets. Notwithstanding the foregoing, the Settlement Trustee may be held liable for specific acts or omissions resulting from the Settlement Trustee's willful misconduct, gross negligence, fraud, breach of the fiduciary duty of loyalty, recklessness, or willful violation of any confidentiality agreement; and if liability on such grounds is established, recourse may be had directly against the Settlement Trustee. The Settlement Trustee will not be required to obtain a bond.

(c)     The Settlement Trust will defend, indemnify, and hold harmless the Settlement Trustee and the Settlement Trustee's employees, contractors, agents, attorneys, accountants, or other professionals, to the fullest extent that an Entity organized under the laws of Louisiana may indemnify and defend against all liabilities, expenses, claims, damages, or losses incurred by the Settlement Trust in the performance of its duties under the Settlement Trust Documents and Joint Plan; provided, however, neither the Settlement Trustee, nor the Settlement Trustee's employees, contractors, agents, attorneys, accountants, or other professionals, will be defended, indemnified or held harmless in any way for any liability, expense, Claim, damage, or loss for which they are ultimately liable in accordance with this Section 6.7 of the Joint Plan.

(d)     Subject to the occurrence of the Settlement Agreement Effective Date and each Settling Insurer's payment of the Settlement Consideration, and subject to the limitations set forth below, the Settlement Trust shall defend, indemnify, and hold harmless the Settling Insurers with respect to any Claim against any Settling Insurer that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Subject Insurance Policies or that was otherwise released pursuant to any Insurance Settlement Agreement, including any Claims made by (i) any Entity who is an insured (as a named insured, additional insured, or otherwise) under any of the Subject Insurance Policies; (ii) any Entity who has made, will make, or can make (a) an Abuse Claim or (b) a Related Insurance Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a Claim under any of the Subject Insurance Policies (collectively, the "**Indemnified Claims**"), as set forth below:

(i)     The Settling Insurers shall have the right (but not the obligation) to (a) seek to enforce the Injunctions against any Entity seeking to assert an Indemnified Claim, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions) identified in this Section 6.7. With the Settling Insurers' consent, such consent not to be unreasonably withheld, the Settlement Trustee can satisfy the obligations contained in (a) and (b) above. An amount equal to 1.19% of the Settlement Consideration for each Settling Insurer (the "**Indemnity Cost Reserve**") shall be reserved from the Settlement Consideration for payment of reasonable attorneys' fees, expenses, costs, and other amounts incurred by the Settling Insurers in

19

defending against such Indemnified Claims, which amount shall be released from reserve if no Indemnified Claims are asserted within 30 days after the Revival Window has closed under every applicable Revival Window Law.  The Indemnity Cost Reserve is a reserve amount provided for each individual Settling Insurer and cannot be aggregated.

     (ii)  The Settlement Trust shall not in any way assist, any Entity in the establishment or pursuit of any Claim against any Settling Insurer that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Subject Insurance Policies or that was otherwise released pursuant to any Insurance Settlement Agreement.

     (iii)  The Settlement Trust and Archdiocese shall support and join in the enforcement of the Injunctions against any Entity seeking to assert an Indemnified Claim; *provided that* if the Settling Insurer(s) elect(s) not to enforce the Injunctions in accordance with this Section 6.7, the Settlement Trust shall (a) seek to enforce the Injunctions against such Entity, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions).

     (iv)  To the extent that a Final Order is entered against any Settling Insurer with respect to any Indemnified Claim, the Settlement Trust shall indemnify and hold harmless such Settling Insurer with respect thereto up to the Settling Insurers' Settlement Consideration; *provided that* to the extent the Settling Insurer(s) elect(s) not to enforce the Injunctions or defend against the Indemnified Claims, the Settlement Trust's indemnity obligation shall be limited to the amount of the Indemnity Cost Reserve; *provided further* that if the Settlement Trust breaches its obligation set forth in this Section 6.7(ii) hereof, the Settlement Trust's indemnity obligation shall not be so limited and shall instead be up to each Settling Insurer's Settling Insurers' Settlement Consideration.  In no event shall the Settlement Trust's indemnity obligation exceed each individual Settling Insurer's Settling Insurers' Settlement Consideration.  To the extent the Settling Insurer's Settling Insurers' Settlement Consideration has been distributed in accordance with the Joint Plan, the Settlement Trust's indemnification obligation shall be so reduced.

     (v)  The indemnification provided for in this Section 6.7 shall not impose liability on the Settlement Trustee or Settlement Trust professionals for their own acts or omissions; *further*, funds provided for the administration of the Settlement Trust or payment of the Settlement Trustee or Settlement Trust professionals shall not be subject to indemnification claims as provided for herein.

  (e)  The Settlement Trust will not be responsible for any Claim by a Covered Party for contribution, indemnity, equitable indemnity, subrogation or equitable subrogation, allocation or reallocation, or reimbursement or any direct or indirect recovery, on account of or with respect to any Abuse Claim against a Non-Settling Insurer.

  (f)  The Debtor will indemnify and hold harmless the Settlement Trust with respect to any Indemnified Claims that relate to any claim against the Diocese of Baton Rouge SD.

  **Section 6.8**  **Legal Effect of Settlement Trust Distributions.** The evaluation or determination of Abuse Claims under the Joint Plan or the Settlement Trust Documents and the payment of Settlement Trust Distributions: (a) will not be construed as an admission of liability by any of the Debtor, Reorganized Archdiocese, Additional Debtors, Reorganized Additional Debtors, Settlement Trust, or Settling Insurers and (b) will not have any *res judicata* or collateral estoppel or preclusive effect on the Reorganized

Archdiocese, the Reorganized Additional Debtors, the Settlement Trust, or the Non-Settling Insurers. For the avoidance of doubt, such evaluations or determinations under the Joint Plan or Settlement Trust Documents are for the sole purpose of Settlement Trust Distributions. Such evaluations or determinations have no binding legal effect on the Reorganized Archdiocese, the Reorganized Additional Debtors, the Settlement Trust, or the Non-Settling Insurers and will not constitute findings and/or conclusions of fact or liability regarding any Abuse Claim.

**Section 6.9    Judgment Reduction for Settling Insurer Contribution Claims.** The Channeling Injunction will channel all Non-Settling Insurer Contribution Claims against Protected Parties or Settling Insurers and all Non-Insurer Contribution Claims against Protected Parties or Settling Insurers to the Settlement Trust in accordance with Article 12 of this Joint Plan. If, for any reason any court does not recognize the channeling of the Non-Settling Insurer Contribution Claims to the Settlement Trust, or such Claims are not channeled for any reason, then the following provisions will apply:

(a)    The Settling Insurers will retain their Settling Insurer Contribution Claims, provided, however, that:

(i)    the Settling Insurers will not pursue any Settling Insurer Contribution Claims against any Non-Settling Insurer (A) that asserts a Non-Settling Insurer Contribution Claim solely against the Settlement Trust; (B) whose Non-Settling Insurer Contribution Claim is satisfied and extinguished entirely by the application of this Section 6.9 of the Joint Plan; or (C) that does not assert a Non-Settling Insurer Contribution Claim against the Settling Insurers; and

(ii)    if a Non-Settling Insurer asserts its Non-Settling Insurer Contribution Claim only against the Settlement Trust, then the Settling Insurers will assign any Settling Insurer Contribution Claims they may hold against such Non-Settling Insurer to the Settlement Trust, and the Settlement Trust will be free to assert such Settling Insurer Contribution Claims against such Non-Settling Insurer.

(b)    If a Non-Settling Insurer releases its Non-Settling Insurer Contribution Claims, if any such exist, that it may have against a Settling Insurer, then such released Settling Insurer will release its Settling Insurer Contribution Claims against such releasing Non-Settling Insurer.

(c)    If a Non-Settling Insurer asserts a Non-Settling Insurer Contribution Claim against any Settling Insurer, and:

(i)    the Settlement Trust fully indemnifies the Settling Insurer, then the Settling Insurer will assign its Settling Insurer Contribution Claims to the Settlement Trust; or

(ii)    the Settlement Trust partially, but not fully, indemnifies the Settling Insurer for such Claim, then the Settling Insurer will retain its Settling Insurer Contribution Claims and may assert those Claims against the Non-Settling Insurer asserting the Non-Settling Insurer Contribution Claim against the Settling Insurer. Any recovery by the Settling Insurer exceeding the amount necessary to satisfy the Settlement Trust's full indemnity obligation plus litigation costs will be turned over to the Settlement Trust.

(d)    In any Insurance Action involving, on the one hand, an Abuse Claimant, a Covered Party, and/or the Settlement Trust, as applicable, and, on the other hand, one or more Non-Settling Insurers, where a Non-Settling Insurer has asserted, asserts, or could assert any Non-Settling

21

24

Insurer Contribution Claim against a Settling Insurer, then any judgment or award obtained by such Abuse Claimant, Covered Party, and/or the Settlement Trust against such Non-Settling Insurer will be automatically reduced by the amount, if any, that such Settling Insurer is liable to pay such Non-Settling Insurer as a result of its Non-Settling Insurer Contribution Claim, so that the Non-Settling Insurer Contribution Claim is thereby satisfied and extinguished entirely ("**Reduction Amount**"). In any Insurance Action involving, on the one hand, an Abuse Claimant, a Covered Party, and/or the Settlement Trust, and, on the other hand, a Non-Settling Insurer, where the respective Settling Insurer is not a party, such Abuse Claimant, Covered Party, and/or Settlement Trust will obtain a finding from that court or arbitrator(s), as applicable, of the Reduction Amount before entry of judgment against such Non-Settling Insurer. If such a reduction is not made as described above, then any Non-Settling Insurer Contribution Claim by any Non-Settling Insurer against any Settling Insurer will be reduced by the Reduction Amount, as determined by the court or arbitrator(s) in which such Non-Settling Insurer Contribution Claim is filed. Settling Insurers will be required to cooperate in good faith with the Abuse Claimant, Covered Party, and/or Settlement Trust to take reasonable steps to defend against any Non-Settling Insurer Contribution Claim, in each case at the sole expense of the Entity requesting such cooperation. If the reduction eliminates the Non-Settling Insurer's Non-Settling Insurer Contribution Claim, then any determination regarding the reimbursement of costs and expenses, including legal fees, will be determined by a court of competent jurisdiction.

(e)     If an Abuse Claimant, a Covered Party, and/or the Settlement Trust, on the one hand, and a Non-Settling Insurer, on the other hand, enter into an agreement settling one or more Abuse Claims, such agreement will include a provision whereby such Non-Settling Insurer releases its Non-Settling Insurer Contribution Claims against each Settling Insurer so long as each Settling Insurer releases its Settling Insurer Contribution Claims against such Non-Settling Insurer. If such settlement agreement fails to include such a release provision, and the Non-Settling Insurer has asserted, asserts, or could assert a Non-Settling Insurer Contribution Claim against Settling Insurers, then any settlement amount in such settlement agreement will be deemed automatically reduced by the Reduction Amount. In such event, the settling parties will obtain a finding from the applicable court or arbitrator(s) of the Reduction Amount. If (a) the settlement agreement was entered into without litigation or arbitration such that no judge or arbitrator can determine the Reduction Amount, or (b) such a reduction is not otherwise made as described above, then any Non-Settling Insurer Contribution Claim by any Non-Settling Insurer against any Settling Insurer will be reduced by the Reduction Amount, as determined by the court or arbitrator(s) in which such Non-Settling Insurer Contribution Claim is filed. Settling Insurers will be required to cooperate in good faith with the Abuse Claimant, the Covered Party, and/or the Settlement Trust to take reasonable steps to defend against any Non-Settling Insurer Contribution Claim by a Non-Settling Insurer, in each case at the sole expense of the Entity requesting such cooperation. If the reduction eliminates the Non-Settling Insurer's Non-Settling Insurer Contribution Claim, then any determination regarding the reimbursement of costs and expenses, including legal fees, will be determined by a court of competent jurisdiction.

(f)     To ensure that the reduction contemplated in this Section 6.9 of the Joint Plan is accomplished, the Settling Insurers will be entitled to: (i) notice, within a reasonable time of the initiation of any future Insurer Action against or future settlement negotiations with any Non-Settling Insurer in which a Non-Settling Insurer Contribution Claim is asserted against any Settling Insurer, and periodic notices thereafter on at least an annual basis of the status of such Insurer Action or negotiations; (ii) the opportunity to participate in the Insurer Action or settlement negotiations, but only to the extent necessary to accomplish the reduction contemplated in this Section 6.9 of the Joint Plan; (iii) the reasonable cooperation of the applicable Abuse Claimant, Covered Party and/or Settlement Trust, at the sole cost and expense of the Settling Insurers, so that the Settling Insurers can assert this Section 6.9 of the Joint Plan as a defense in any Insurer Action

22

against any of them for any Non-Settling Insurer Contribution Claim; and (iv) have the court or appropriate tribunal issue such orders as are necessary to effectuate the judgment, award, or settlement reduction in order to protect the Settling Insurers from any Non-Settling Insurer Contribution Claim. The notice required above will be given by (a) the Covered Party and/or the Settlement Trust that is a party to such Insurer Action or settlement negotiations; (b) if none of the foregoing is such a party, the Non-Settling Insurer that is a party to such Insurer Action or settlement negotiations; or (c) if no Abuse Claimant, Covered Party, the Settlement Trust, or Non-Settling Insurer is a party to such Insurer Action or settlement negotiations, the Abuse Claimant bound by this Joint Plan.

(g)     The above procedures will bind, and inure to the benefit of, the Settling Insurers.

**Section 6.10     Judgment Reduction for Co-Defendant Parties**.

(a)     The release of Abuse Claims as contemplated in this Joint Plan and in the Settlement Trust Documents are provided in good faith by Abuse Claimants. Without limiting the discharges, releases, and injunctions set forth in the Joint Plan and Confirmation Order, including the Injunctions, pursuant to applicable non-bankruptcy law, (i) any Co-Defendant Party will not be entitled to recover against any Covered Parties, the Settlement Trust, or any other Entity on account of any Claim against any Covered Party for contribution, and (ii) any Abuse Claim against such Co-Defendant Party will be reduced against such Co-Defendant Party to the extent of (A) any amount stipulated by the releases provided for in the Joint Plan and the Settlement Trust Documents, or (B) in the amount of the Settlement Trust Distribution received by the Abuse Claimant holding such Abuse Claim, or (C) in the amount of the Covered Party's equitable share of the damages under any applicable non-bankruptcy law, whichever is the greatest.

(b)     To facilitate the foregoing judgment reduction, notwithstanding anything in the Settlement Trust Documents to the contrary, the Settlement Trustee will be authorized to and will, upon the written request of a Co-Defendant Party that identifies a particular Abuse Claimant holding an Abuse Claim against the Co-Defendant Party, disclose to such Co-Defendant Party the amount of the Settlement Trust Distribution made by the Settlement Trust, if any, to such Abuse Claimant.

(c)     The foregoing provisions of this Section 6.10 of the Joint Plan will be binding upon, and inure to the benefit of, the Co-Defendant Parties.

**Section 6.11     Additional Debtors' Abuse Claims Bar Date.**

(a)     *Establishment of Additional Debtors' Abuse Claims Bar Date*. Except for Abuse Claims that are Previously Asserted Claims (which Abuse Claims are classified and treated in accordance with Sections 4.3 and 4.4 of the Joint Plan), all Abuse Proofs of Claim against any Additional Debtor, if any, must be Filed by no later than the Additional Debtors' Abuse Claims Bar Date.

Any Known Abuse Claim against any Additional Debtor that is not a Previously Asserted Claim and for which a timely Abuse Proof of Claim is not Filed will be automatically Disallowed, forever barred from assertion, and unenforceable against any Additional Debtors or any Reorganized Additional Debtors, their respective Estates, or their respective property, without the need for any objection by any Reorganized Additional Debtors or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Abuse Proof of Claim against any Additional Debtors will be deemed fully satisfied, released, and discharged, notwithstanding anything in the Abuse Proof of Claim to the contrary.

For the avoidance of doubt, the fact that a Known Abuse Claim against any Additional Debtor is or may be time-barred or subject to a statute of limitations or other defense under applicable non-

23

bankruptcy law does not excuse such Abuse Claimant from compliance with the Joint Plan, including this Section 6.11, the Additional Debtors' Abuse Claims Bar Date, or the Confirmation Order.

(b) *Additional Debtors' Abuse Claims Bar Date Procedures*. The following procedures govern the Filing of Abuse Proofs of Claim that i) assert Abuse Claims against any Additional Debtors and (ii) that do not qualify as Previously Asserted Claims:

(i) Any Abuse Proof of Claim asserted against an Additional Debtor must conform substantially to the Additional Debtors' Abuse Proof of Claim Form (Plan Exhibit H).

(ii) Any Abuse Proof of Claim asserted against an Additional Debtor must be submitted as follows: (i) If sent by mail, to Donlin, Recano & Company, LLC, Re: The Roman Catholic Church of the Archdiocese of New Orleans, P.O. Box 2053, New York, NY 10272-2042, or (ii) If sent by hand delivery or overnight courier, send to: Donlin, Recano & Company, LLC, c/o Angeion Group, Re: The Roman Catholic Church of the Archdiocese of New Orleans, 200 Vesey Street, 24th Floor, New York, NY 10281; or (iii) If submitted electronically, by using the interface available at: https://www.donlinrecano.com/Clients/rcano/FileSexualAbuseClaim.

(iii) Any Abuse Proof of Claim asserted against an Additional Debtor will be deemed Filed only when received by the Claims and Voting Agent on or before the Additional Debtors' Abuse Claims Bar Date.

(iv) Any Abuse Proof of Claim asserted against an Additional Debtor must (A) be signed by the Abuse Claimant or the Abuse Claimant's legal representative (including documentation confirming the legal ability of the signatory to act on behalf of the Abuse Claimant), (B) include supporting documentation (if voluminous, attach a summary) or an explanation as to why documentation is not available, and (C) be in the English language.

(v) Any Abuse Proof of Claim asserted against an Additional Debtor and sent by facsimile, telecopy, or electronic mail transmission will not be accepted.

(vi) Pursuant to Bankruptcy Rule 3003(c)(2), all Abuse Claimants holding Abuse Claims against Additional Debtors that fail to comply with this Section 6.11 of this Joint Plan by timely Filing an Abuse Proof of Claim in appropriate form will not be treated as a Creditor with respect to such Abuse Claim for the purpose of Settlement Trust Distributions.

(vii) Parties asserting against an Additional Debtor an Abuse Claim that arose before the Additional Debtors' Petition Date must use the Additional Debtors' Abuse Proof of Claim Form.

(viii) Due to the sensitive nature of the information requested in the Additional Debtors' Abuse Proof of Claim Form, the Confidentiality Protocol, as stated in the Archdiocese Claims Bar Date Order [ECF Doc. No. 461], will apply to all Additional Debtors' Abuse Proof of Claim Forms submitted by Abuse Claimants.

(ix) The Claims and Voting Agent will assign to each Abuse Claimant Filing an Additional Debtors' Abuse Proof of Claim Form against an Additional Debtor a unique identifier code and will maintain a confidential list of the

identities of such claimants, their corresponding identifier code, and their respective Additional Debtors' Abuse Proof of Claim Forms.

(x)     The Debtor will cause the Additional Debtors' Abuse Claims Bar Date Notice (Plan Exhibit F) and the Additional Debtors' Abuse Proof of Claim Form (Plan Exhibit H) to be posted on the website established by the Claims and Voting Agent for the Chapter 11 Cases.

(xi)    Pursuant to Bankruptcy Rules 2002(l) and 9008, the Debtor and Additional Debtors may publish notice of the Additional Debtors' Abuse Bar Date substantially in the form of the Additional Debtors' Abuse Claims Bar Date Publication Notice (Plan Exhibit G).

(xii)   The Additional Debtors may (A) post a link on their respective websites to the Additional Debtors' Abuse Claims Bar Date Notice and the Additional Debtors' Abuse Proof of Claim Form, or (B) provide additional notice to the extent they consider appropriate.

(c)     The Debtor, Additional Debtors, and Claims and Voting Agent are authorized and empowered to take such steps and perform such acts as may be necessary to implement and effectuate the terms of this Section 6.11 of this Joint Plan.

(d)     Nothing in this Section 6.11 of this Joint Plan will (i) prejudice the right of the Additional Debtors, the Reorganized Additional Debtors, the Settlement Trust, the Settlement Trustee, any Covered Party, or any Non-Settling Insurers to dispute or assert offsets or defenses to any Abuse Claim, (ii) limit the releases, discharges, and injunctions set forth elsewhere in the Joint Plan or the Confirmation Order, or (iii) be construed to modify, amend, or enlarge any Creditor's rights with respect to any Claim.

**Section 6.12    Additional Debtors' Non-Trade Claims Bar Date.**

(a)     *Establishment of Additional Debtors' Non-Trade Claims Bar Date*. Except for Additional Debtors' Non-Trade Unsecured Claims that are Previously Asserted Claims, all Proofs of Claim asserting Additional Debtors' Non-Trade Unsecured Claims against any Additional Debtor must be Filed by no later than the Additional Debtors' Non-Trade Claims Bar Date.

Any Additional Debtors' Non-Trade Unsecured Claim (other than a Previously Asserted Claim) against an Additional Debtor for which a timely Proof of Claim is not Filed will be automatically Disallowed, forever barred from assertion, and unenforceable against any Additional Debtors or any Reorganized Additional Debtors, their respective Estates, or their respective property, without the need for any objection by any Reorganized Additional Debtors or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Proof of Claim against any Additional Debtors will be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.

For the avoidance of doubt, the fact that an Additional Debtors' Non-Trade Unsecured Claim against any Additional Debtor is or may be time-barred or subject to a statute of limitations or other defense under applicable non-bankruptcy law does not excuse such Creditor from compliance with the Joint Plan, including this Section 6.12, the Additional Debtors' Non-Trade Claims Bar Date, or the Confirmation Order.

(b)     *Additional Debtors' Non-Trade Claims Bar Date Procedures.* The following procedures govern the Filing of Proofs of Claim that (i) assert Additional Debtors' Non-Trade Unsecured Claims against any Additional Debtors and (ii) that do not qualify as Previously Asserted Claims:

25

(i)     Any Proof of Claim asserting an Additional Debtors' Non-Trade Unsecured Claim against an Additional Debtor must conform substantially to the Additional Debtors' Non-Trade Proof of Claim Form (Plan Exhibit K).

(ii)    Any Proof of Claim asserting an Additional Debtors' Non-Trade Unsecured Claim against an Additional Debtor must be submitted as follows: (i) If sent by mail, to Donlin, Recano & Company, LLC, Re: The Roman Catholic Church of the Archdiocese of New Orleans, P.O. Box 2053, New York, NY 10272-2042, or (ii) If sent by hand delivery or overnight courier, send to: Donlin, Recano & Company, LLC, c/o Angeion Group, Re: The Roman Catholic Church of the Archdiocese of New Orleans, 200 Vesey Street, 24th Floor, New York, NY 10281; or (iii) If submitted electronically, by using the interface available at: https://bankruptcy.angeiongroup.com/Clients/rcano/FileClaim.

(iii)   Any Proof of Claim asserting an Additional Debtors' Non-Trade Unsecured Claim against an Additional Debtor will be deemed Filed only when received by the Claims and Voting Agent on or before the Additional Debtors' Non-Trade Claims Bar Date.

(iv)   Any Proof of Claim asserting an Additional Debtors' Non-Trade Unsecured Claim against an Additional Debtor must (A) be signed by the Creditor or the Creditor's legal representative (including documentation confirming the legal ability of the signatory to act on behalf of the Creditor), (B) include supporting documentation (if voluminous, attach a summary) or an explanation as to why documentation is not available, and (C) be in the English language.

(v)    Any Proof of Claim asserting an Additional Debtors' Non-Trade Unsecured Claim against an Additional Debtor and sent by facsimile, telecopy, or electronic mail transmission will not be accepted.

(vi)   Parties asserting against an Additional Debtor an Additional Debtors' Non-Trade Unsecured Claim that arose before the Additional Debtors' Petition Date must use the Additional Debtors' Non-Trade Proof of Claim Form.

(vii)  The Claims and Voting Agent will assign to each Creditor Filing an Additional Debtors' Non-Trade Proof of Claim Form against an Additional Debtor a unique identifier code and will maintain a list of such Creditors, their corresponding identifier code, and their respective Additional Debtors' Non-Trade Proof of Claim Forms.

(viii)  The Debtor will cause the Additional Debtors' Non-Trade Claims Bar Date Notice (Plan Exhibit I) and the Additional Debtors' Non-Trade Proof of Claim Form (Plan Exhibit K) to be posted on the website established by the Claims and Voting Agent for the Chapter 11 Cases.

(ix)   Pursuant to Bankruptcy Rules 2002(l) and 9008, the Debtor and Additional Debtors may publish notice of the Additional Debtors' Non-Trade Claims Bar Date substantially in the form of the Additional Debtors' Non-Trade Claims Bar Date Publication Notice (Plan Exhibit J).

26

(x)     The Additional Debtors may (A) post a link on their respective websites to the Additional Debtors' Non-Trade Claims Bar Date Notice and the Additional Debtors' Non-Trade Proof of Claim Form, or (B) provide additional notice to the extent they consider appropriate.

(c)     The Debtor, Additional Debtors, and Claims and Voting Agent are authorized and empowered to take such steps and perform such acts as may be necessary to implement and effectuate the terms of this Section 6.12 of this Joint Plan.

(d)     Nothing in this Section 6.12 of this Joint Plan will (i) prejudice the right of the Additional Debtors, the Reorganized Additional Debtors, any Covered Party, or any Non-Settling Insurers to dispute or assert offsets or defenses to any Additional Debtors' Non-Trade Unsecured Claim, (ii) limit the releases, discharges, and injunctions set forth elsewhere in the Joint Plan or the Confirmation Order, or (iii) be construed to modify, amend, or enlarge any Creditor's rights with respect to any Claim.

**Section 6.13     Miscellaneous Provisions.**

(a)     *Registry of Abuse Claimants Who Are Settlement Trust Beneficiaries.* The Settlement Trustee will maintain a registry of each Abuse Claimant who is a Settlement Trust Beneficiary to evidence such Abuse Claimant's beneficial interest.

(b)     *Non-Transferability of Beneficial Interests in the Settlement Trust.* Except for any transfer of a beneficial interest in the Settlement Trust made by operation of non-bankruptcy law that does not require notice to the Settlement Trustee, any transfer of beneficial interests in the Settlement Trust will be ineffective until and unless the Settlement Trustee receives written notice of such transfer.

(c)     *Tax Matters.* The Settlement Trust will not be deemed to be the same legal entity as the applicable Debtor, Reorganized Archdiocese, Additional Debtors, or Reorganized Additional Debtors, but only (i) the assignee of the Settlement Trust Assets, and (ii) a representative of any Estates for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code. The Settlement Trust is expected to be Tax exempt.

(d)     *Any Pending Objections Deemed Withdrawn.* Any pending objection to any Abuse Claim that was Filed by an Entity is deemed withdrawn without prejudice as of the Effective Date.

(e)     *Notation on Claims Register Regarding Abuse Claims.* On the Effective Date, all Abuse Proofs of Claim will be marked on the Claims Register as "Channeled to the Settlement Trust," and will be resolved exclusively in accordance with the Settlement Trust Documents.

(f)     *Abuse Claim Withdrawal.* An Abuse Claimant may withdraw his or her Abuse Claim at any time by providing written notice to the Settlement Trustee and filing a notice of withdrawal with the Bankruptcy Court. If withdrawn, (i) the Abuse Claim will be withdrawn with prejudice and may not be reasserted, (ii) such Abuse Claimant will be subject to the Injunctions as provided by this Joint Plan, and (iii) any reserve maintained by the Settlement Trustee on account of such Abuse Claim will be available for Settlement Trust Distributions in accordance with the Settlement Trust Documents.

(g)     *No Settlement Trust Distributions on Account of Penalty Claims or Post-Petition Interest.* No Settlement Trust Distribution will be made on account of an Abuse Claim for (a) any Penalty Claim, or (b) any interest that may have accrued on such Abuse Claim after the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date. For the avoidance of doubt, all Penalty Claims will be subject to the Injunctions as provided by this Joint Plan.

27

(h)     *Single Recovery*. In no case will the aggregate Settlement Trust Distributions on account of any Abuse Claim exceed one hundred percent (100%) of the Abuse Claim (including applicable interest).

(i)     *Venue*. The Confirmation Order will provide that, without the permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other Action will be commenced in any forum other than the Bankruptcy Court against the Settlement Trustee in its official capacity, with respect to such Settlement Trustee's status, duties, powers, acts, or omissions as Settlement Trustee.

(j)     *Unclaimed or Excess Settlement Trust Property*. Before the Settlement Trust is terminated, the Settlement Trustee shall contribute to a non-profit corporation doing business in the State of Louisiana any Settlement Trust Distribution in the amount of $500 or less that constitutes Unclaimed Property as of the expected termination date of the Settlement Trust. All Settlement Trust Distributions totaling over $500 that constitute Unclaimed Property as of the expected termination of the Settlement Trust shall be transferred to the Louisiana Department of Treasury in accordance with the laws of the State of Louisiana governing unclaimed or abandoned property.

(k)     *No Liability*. The Debtor, Reorganized Archdiocese, Additional Debtors, and Reorganized Additional Debtors will not have nor incur any liability to, or be subject to any right of action by, any Entity for any act, omission, transaction, event, or other circumstance in connection with or related to the Settlement Trustee, the Settlement Trust Documents, the Abuse Claims Reviewer, or the administration of the Settlement Trust.

(l)     *Modification of the Settlement Trust Documents and Consent Rights*. The Settlement Trust Documents may be amended or modified, but only with the prior written consent of the Reorganized Archdiocese, Reorganized Additional Debtors, Covered Parties, the Settlement Trust, and the Settling Insurers to the extent that such amendment or modification is (i) inconsistent with the Joint Plan or Insurance Settlement Agreements, (ii) adds any obligation or imposes any duty on the Reorganized Archdiocese, Reorganized Additional Debtors, Covered Parties, the Settlement Trustee, or the Settling Insurers, or (iii) adversely affects the Reorganized Archdiocese, Reorganized Additional Debtors, Covered Party, the Settlement Trustee, or Settling Insurers.

(m)     *Other Notice*. The Settlement Trustee will promptly provide notice to the Reorganized Archdiocese and Reorganized Additional Debtors of any amendments or modifications of the identity of any successor Settlement Trustee or Settlement Trust Advisory Committee members.

**Section 6.14     Termination.** The Settlement Trust will terminate after the liquidation, administration, and distribution of the Settlement Trust Assets in accordance with this Joint Plan, and its full performance of any and all other duties and functions set forth in the Joint Plan or Settlement Trust Agreement; provided, however, that the Settlement Trust will terminate on or before the later of (a) the twentieth (20th) anniversary of the Effective Date, or (b) the death of the last Abuse Claimant.

## ARTICLE 7
## SETTLING INSURERS AND NON-SETTLING INSURERS

**Section 7.1     The Settling Insurers and Insurance Settlement Agreements.**

(a)     *Binding Effect*. Each Insurance Settlement Agreement will be effective and binding upon all Entities (and any of those Entities' successors and assigns) on the date that such Insurance Settlement Agreement is made effective under the Insurance Settlement Order approving that Insurance Settlement Agreement. The Insurance Settlement Agreements are collectively attached as Plan Supplement 7.1(a). Payments by each Settling Insurer to the Settlement Trust, and the releases by the Protected Parties, Non-Debtor Catholic Entities and the Settling Insurers pursuant to the Insurance Settlement Agreements will occur and/or be effective according to the terms of

each such Insurance Settlement Agreement. The Insurance Settlement Agreements will survive the Confirmation, effectiveness, and consummation of the Joint Plan. The rights of the parties under any Insurance Settlement Agreement will be determined exclusively under the applicable Insurance Settlement Agreement, and those provisions of the applicable Insurance Settlement Order and the Confirmation Order.

(b)     *Sale Free and Clear of Subject Interests in and to Settling Insurers' Policies*. As provided in the Insurance Settlement Orders, subject to the occurrence of the Effective Date, each Settling Insurer Policy (other than the Preserved Coverage), including without limitation all Coverage Claims and Related Insurance Claims, will be sold to the issuing Settling Insurer, pursuant to sections 105, 363, and 1123 of the Bankruptcy Code, free and clear of all Liens, Claims and Subject Interests of all Entities, to the extent provided for in each applicable Insurance Settlement Agreement and the applicable Insurance Settlement Order. As required by any Insurance Settlement Agreement, the Non-Debtor Catholic Entities shall assign the Non-Debtor Catholic Entities' Subject Interests, if any, in the relevant Settling Insurers' Policies to the Archdiocese Estate, and the Archdiocese Estate shall sell the Subject Interests of such Non-Debtor Catholic Entities to the Settling Insurer free and clear of all Liens, Claims and Subject Interests of any Entity in such Settling Insurers' Policies pursuant to sections 105, 363, 1124 and/or 1141 of the Bankruptcy Code.

(c)     *Waiver/Consent*. In consideration of the releases and Injunctions and other covenants set forth in the Joint Plan, subject to the occurrence of the Effective Date and the satisfaction of the other conditions precedent to the effectiveness of the Insurance Settlement Agreements, and upon receipt by the Settlement Trust or Escrow Agent pursuant to the Escrow Agreement of the Settling Insurers' Settlement Consideration, each of the Protected Parties: (i) irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Claims it has or might have now or in the future against the Settling Insurers with respect to any Claim arising from or relating to any Settling Insurer Policies; and (ii) consents to the sale of the Debtor's and Covered Parties' Claims and Subject Interests, if any, related to the Settling Insurer Policies in accordance with the Insurance Settlement Agreements, and to the contribution of the proceeds from such sale and settlement to the Settlement Trust, as provided in the Joint Plan. Nothing in this Section 7.1 of the Joint Plan will be construed to bar either: (x) an Abuse Claim against any Excluded Party; or (y) a Claim by such Entity for insurance coverage in connection with a Claim described in the foregoing subsection (x) under an insurance policy other than any Settling Insurers' Policy.

(d)     *Timing*. The injunctions, releases, and discharges to which any Settling Insurer is entitled pursuant to such Insurance Settlement Agreement, the Joint Plan, the Confirmation Order, any Insurance Settlement Order, and the Bankruptcy Code will become effective as provided in such Insurance Settlement Agreement and the Insurance Settlement Order approving such Insurance Settlement Agreement.[7]

(e)     *The Settling Insurers' Policies*. The Settling Insurers' Policies are listed on Plan Supplement 7.1(f).

(f)     *Settling Insurers' Reinsurance Recoveries*. Notwithstanding anything in the Insurance Settlement Agreements or the Joint Plan, nothing in the Insurance Settlement Agreements or the Joint Plan is intended to or shall be construed to apply to or have any effect on the Settling Insurers' rights to reinsurance recoveries under any applicable reinsurance treaties,

---

[7] The support of the Unknown Abuse Claims Representative for the releases and protections of the Settling Insurers, in a manner acceptable to the Settling Insurers, is a condition precedent to the effectiveness of the Insurance Settlement Agreements.

certificates, or contracts that cover losses arising under or in connection with the Subject Insurance Policies or any other binder, certificate, or policy of insurance issued by a Settling Insurer.

**Section 7.2    Non-Settling Insurers and the Non-Settling Insurance Transfer.**

(a)    *Non-Settling Insurers and the Non-Settling Insurers' Policies*. Plan Supplement 7.2 includes both a list of the Non-Settling Insurers and a description of the known Non-Settling Insurers' Policies.

(b)    *Non-Settling Insurance Rights Transfer*. As of the Effective Date, the Debtor and the Covered Parties will transfer to the Settlement Trust, and the Settlement Trust will receive and accept, the Non-Settling Insurance Rights Transfer. Additionally:

(i)    The Settlement Trust will be solely responsible for satisfying, to the extent required under applicable law, any premiums, deductibles, self-insured retentions, and fronting obligations under or related to the Non-Settling Insurers' Policies arising in any way out of any and all Abuse Claims.

(ii)    The Settlement Trust will comply with any and all notice obligations required under the Subject Insurance Policies and applicable law pertaining to Abuse Claims.

(iii)    The Non-Settling Insurance Rights Transfer is made to the extent permitted by applicable law.

(iv)    The Non-Settling Insurance Rights Transfer is absolute and does not require any further action by the Covered Parties, the Settlement Trust, the Bankruptcy Court, or any other Entity, but is subject to any and all rights and defenses the Non-Settling Insurers have under the applicable law.

(v)    The Non-Settling Insurance Rights Transfer is not an assignment of any insurance policy itself.

(vi)    The Non-Settling Insurance Rights Transfer will be governed by the Bankruptcy Code and applicable non-bankruptcy law.

(vii)    Subject in all respects to the Insurance Settlement Agreements, including the releases therein, the insurance rights of the Debtor, Additional Debtors, or other Covered Parties that pertain to Non-Abuse Personal Injury Claims are expressly reserved for each Covered Party, as applicable, and the Plan Documents will not, and will not be deemed to, transfer, grant, or assign such insurance rights to the Settlement Trust. For the avoidance of doubt, the insurance rights of any Entity that is not a Covered Party are expressly reserved for such Entity and the Plan Documents will not, and will not be deemed to, transfer, grant, or assign such rights to the Settlement Trust.

(viii)    The applicable Debtor, Reorganized Archdiocese, Additional Debtors, and Reorganized Additional Debtors will timely provide the Settlement Trust with such documents or other information as is reasonably requested by the Settlement Trust to pursue recoveries in connection with Non-Settling Insurers' Policies.

(c)    *No Impact on Insurance Rights Not Related to Abuse Claims*. For the avoidance of doubt, the Non-Settling Insurance Rights Transfer that is the subject of this Section 7.2 of the Joint Plan will not, and will not be deemed to, transfer, grant, or assign to the Settlement Trust any insurance rights of the Debtor, the Additional Debtors, or the other Covered Parties that pertain to any Non-Abuse Personal Injury Claims. Subject in all respects to the Insurance Settlement

Agreements, including the releases therein, the insurance rights of the Covered Parties that pertain to Non-Abuse Personal Injury Claims are expressly reserved for the Debtor, the Additional Debtors, and each Covered Party, as applicable, and the Plan Documents will not, and will not be deemed to, transfer, grant, or assign such rights to the Settlement Trust. Moreover, for the avoidance of doubt, the insurance rights of any Entity that is not the Debtor, an Additional Debtor, or other Covered Party are expressly reserved for such Entity (including any rights of any director, manager, officer or employee of the Debtor, the Additional Debtors or any other Entity under any D&O Liability Insurance Policies), and the Plan Documents will not, and will not be deemed to, transfer, grant, or assign such rights to the Settlement Trust.

**Section 7.3     Non-Settling Insurance Rights Transfer Back-Up.** Except as otherwise expressly provided herein, the Debtor and the other Covered Parties will make the Non-Settling Insurance Rights Transfer to the Settlement Trust as required by this Joint Plan. If the Covered Party is, at any time, legally precluded from transferring its rights, titles, privileges, interests, claims, demands, or entitlements to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, Disputed or undisputed, fixed or contingent, arising under or attributable to the Insurance Rights subject to the Non-Settling Insurance Rights Transfer, then the Covered Party will: (a) take such actions reasonably requested by the Settlement Trustee to pursue any such Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of such Insurance Rights; provided, however, that while any such amounts are held by or under the control of any Covered Party, such amounts will be held for the benefit of the Settlement Trust.

**Section 7.4     Insurance Neutrality and Related Matters.**

(a)     *Insurance Neutrality.*

Nothing in the Joint Plan, the Settlement Trust Documents, the Confirmation Order, any other Plan Document, any Insurance Settlement Order, or any other Order, judgment, conclusion of law, finding of fact, determination or statement (written or oral, on or off the record) made by the Bankruptcy Court (or any other court exercising jurisdiction over one or more of the Chapter 11 Cases under 28 U.S.C. sec. 1334) to the contrary (including any other provision that purports to be preemptory, supervening, or grants a release):

(i)     constitutes an adjudication, judgment, trial, determination on the merits, finding, or conclusion of law against an Insurer, that:

(A)     establishes or liquidates the liability (in the aggregate or otherwise) of (1) the Debtor or any Additional Debtor with respect to any Abuse Claims, or (2) any Insurer with respect to any Abuse Related Insurance Claim;

(B)     establishes the liability or obligation of the Debtor, any Additional Debtor, or the Settlement Trust with respect to any Abuse Claim;

(C)     establishes that the aggregate value of the Abuse Claims is equal to the amount to be paid by the Debtor or any Additional Debtor to the Settlement Trust;

(D)     establishes that it is reasonable, in good faith, or consistent with the terms and conditions of any Subject Insurance Policies for the Debtor, any Additional Debtor, or the Settlement Trust, to settle, allow, assign any value to, liquidate, and/or pay (or present to any Insurers for payment) any Abuse Claim on any terms or conditions

31

contemplated by the Joint Plan, the Settlement Trust Documents, any other Plan Document, or any other document or agreement;

(E)     establishes that the Joint Plan, any other Plan Document, or any other document or agreement (including the Allocation Protocol) are reasonable or consistent with any procedures that were used to evaluate, settle, or pay Abuse Claims against the Debtor before the Archdiocese's Petition Date or against any Additional Debtor on the Additional Debtors' Petition Date, or under the terms and conditions of any Subject Insurance Policies or applicable non-bankruptcy law;

(F)     establishes that the conduct of the Debtor, the Additional Debtors, the Non-Debtor Catholic Entities, the Creditors' Committees, the Non-Settling Insurers, the Settlement Trustee, or the Abuse Claimants (collectively, the "**Neutrality Parties**"), in connection with the negotiation, development, settlement, and/or implementation of the Joint Plan (including the aggregate value or amount of the Settlement Consideration), the other Plan Documents, or any related documents or agreements was, is, or will be consistent with the terms and conditions of any Subject Insurance Policies or applicable non-bankruptcy law;

(G)     establishes that any Insurers were invited to participate in or participated in, consulted on, negotiated, and/or consented to the Settlement Trust Documents and the other Plan Documents; and

(ii)     has any *res judicata*, collateral estoppel or other preclusive effect with respect to any matter set forth in this Section 7.4(a) of the Joint Plan, or will otherwise prejudice, diminish, impair, or affect (under principles of waiver, estoppel, or otherwise) any defense, Claim, or right any Insurers may have under any Subject Insurance Policies or applicable non-bankruptcy law with respect thereto; provided, however, without limiting the foregoing, but subject to Section 7.4(c) of the Joint Plan, the Debtor, the Additional Debtors, the Creditors' Committee, and the Settling Insurers expressly agree that they are not litigating any issue set forth in this Section 7.4(a) of the Joint Plan, or any other Insurers' coverage defenses, rights, obligations, or other coverage issue of any kind in any Chapter 11 Cases; subject in all respects to the Insurance Settlement Agreements;

(iii)     constitutes a decision on any matter at issue, or which may be raised as an issue, in any Action against any Insurers, and, therefore, any judgment, order, finding of fact, conclusion of law, determination or other statement of the Bankruptcy Court or issued or affirmed by the District Court, or entered by any other court exercising jurisdiction over any Chapter 11 Cases under 28 U.S.C. § 1334, including any Confirmation Order, the Settlement Trust Documents, and/or other Plan Documents, and any finding, conclusion or determination entered in connection therewith is not intended – and will not be construed – to constitute a finding, conclusion, or determination regarding any matter set forth in this Section 7.4(a) of the Joint Plan, or any other issue for any insurance coverage purpose whatsoever, and the neither the Protected Parties, the Creditors'

32

Committee, the Settlement Trustee, any Abuse Claimant, nor the Abuse Claims Reviewer will contend otherwise in any Action against any Insurers;

(iv)      subject to Section 7.4(c) of the Joint Plan, impair any Insurer's legal, equitable, or contractual rights under any Subject Insurance Policies or with respect to Abuse Related Insurance Claims, or any policyholder's legal, equitable or contractual rights under any Subject Insurance Policies or with respect to Abuse Related Insurance Claims;

(v)      subject to Section 7.4(b) and Section 7.4(c) of the Joint Plan, impair any Non-Settling Insurer's Non-Settling Insurer Contribution Claims, which may be asserted as a defense or counterclaim against the applicable Neutrality Party in any Action against any such Non-Settling Insurer; and

(vi)      to the extent the Non-Settling Insurer Contribution Claims are determined to be valid, the liability (if any) of such Non-Settling Insurers to the Settlement Trust will be reduced by the amount of such Non-Settling Insurer Contribution Claims. For avoidance of doubt, and notwithstanding anything to the contrary in this Section 7.4(a) of the Joint Plan, all Non-Settling Insurer Contribution Claims will be channeled to the Settlement Trust in accordance with Article 12 of the Joint Plan, and no Non-Settling Insurer Contribution Claim will be the basis for any affirmative recovery against the Archdiocese, the Reorganized Archdiocese, the Additional Debtors, or the Reorganized Additional Debtors or the Settling Insurers.

(b)      *Denial of Coverage as Sole Remedy.* Notwithstanding anything to the contrary in the Joint Plan, the sole remedy of any Non-Settling Insurers for any failure by the applicable Debtor, Reorganized Archdiocese, Additional Debtors, or Reorganized Additional Debtors to observe and perform any of the Post-Effective Date Insurance Obligations (if any) or any other duties or obligations that may exist under a Non-Settling Insurer's Subject Insurance Policy will be limited to asserting any defenses to providing insurance coverage under the applicable Non-Settling Insurer's Subject Insurance Policies, and nothing in the Joint Plan will serve as a basis for any Non-Settling Insurers to seek or be granted any affirmative relief against the applicable Archdiocese, Reorganized Archdiocese, Additional Debtors, Reorganized Additional Debtors, or Settling Insurer.

(c)      *Contrary Positions Prohibited; Enforceability.* On and after entry of the Confirmation Order, no Protected Party, Abuse Claimant, or the Settlement Trustee will assert any Claim, right, or argument in any Action against any Insurer that is contrary to Section 7.4 of the Joint Plan. Each such Protected Party, Abuse Claimant, and the Settlement Trustee may seek to enforce Section 7.4 of the Joint Plan.

(d)      *Preservation of Plan Provisions Among Persons Other Than Non-Settling Insurers.* For the avoidance of doubt, nothing set forth in Section 7.4 of the Joint Plan shall impair any provision of the Joint Plan, including, without limitation, the Injunctions, or any other release or injunctive provisions set forth in the Joint Plan, as between and among (i) any Neutrality Parties who are not Non-Settling Insurers or (ii) any Person who is not a Neutrality Party and each of the Neutrality Parties.

**Section 7.5      Post-Effective Date Insurance Obligations.** After the Effective Date, the Reorganized Archdiocese and Reorganized Additional Debtors will use reasonable efforts to comply with the Post-Effective Date Insurance Obligations. The Bankruptcy Court will retain jurisdiction to adjudicate any disputes that may arise with respect to the Post-Effective Date Insurance Obligations.

33

**Section 7.6    Settling Insurers' Objection Rights.** Where any of the Settling Insurers' Policies are implicated by a Known Abuse Claim or Unknown Abuse Claim, and the holder of such Claim or the Unknown Claims Representative, as applicable, has commenced an action against a Settling Insurer, the Settling Insurer may object to such Claim or defend on any grounds in that action to the extent provided by law. The Protected Parties shall cooperate in good faith regarding a Settling Insurer's defense or objection.

## ARTICLE 8

## ADMINISTRATION OF NON-ABUSE CLAIMS

**Section 8.1    Reservation of Rights to Object to Non-Abuse Claims.** Unless a Non-Abuse Claim against the Debtor or any Additional Debtor is expressly described as an Allowed Claim in the Joint Plan, or otherwise becomes an Allowed Claim before the Effective Date, on the Effective Date, the applicable Reorganized Archdiocese or Reorganized Additional Debtor will be deemed to have reserved any and all of the rights, interests, and objections of the applicable Debtor, Additional Debtors, the Creditors' Committees, or the Estates to object to any Non-Abuse Claims, or motions or requests that seek a Distribution or other payment of or on account of such Non-Abuse Claims, whether an Administrative Claim, Priority Claim, Secured Claim, or Unsecured Claim, including any and all rights, interests, and objections to the validity or amount of any Non-Abuse Claims, Liens, and interests, whether under the Bankruptcy Code, other applicable law, or contract. The failure to object to any Non-Abuse Claim in any Chapter 11 Cases will be without prejudice to the applicable Reorganized Archdiocese's and Reorganized Additional Debtors' rights to contest or otherwise defend against such Non-Abuse Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the Creditor holding such Claim.

**Section 8.2    Administration of Non-Abuse Claims***. From and after the Effective Date, the applicable Reorganized Archdiocese and Reorganized Additional Debtors will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making Distributions, if any, with respect to Non-Abuse Claims.

**Section 8.3    Claim Objection Bar Date (Non-Abuse Claims)**. Unless otherwise provided in the Joint Plan or by Order entered by the Bankruptcy Court, any objections by the applicable Reorganized Archdiocese or Reorganized Additional Debtor to a Non-Abuse Claim will be Filed by no later than the Claims Objection Bar Date (Non-Abuse Claims), or any Bankruptcy Court approved extension thereof. The Reorganized Archdiocese and Reorganized Additional Debtors reserve the right to extend the Claims Objection Bar Date (Non-Abuse Claims) by Filing a motion, with notice to the Post-Confirmation Notice Parties, based upon a reasonable exercise of their business judgment. A motion seeking to extend the Claims Objection Bar Date (Non-Abuse Claims) will not be deemed an amendment to the Joint Plan.

**Section 8.4    Determination of Non-Abuse Claims.** From and after the Effective Date, any Non-Abuse Claim as to which a Proof of Claim or motion or request for payment was timely Filed in any Chapter 11 Cases, or deemed timely Filed by Order entered by the Bankruptcy Court or pursuant to this Joint Plan, may be determined and liquidated pursuant to: (a) an Order entered by the Bankruptcy Court; (b) applicable bankruptcy law; (c) an agreement of the parties without the need for Bankruptcy Court approval; (d) applicable non-bankruptcy law; or (e) the lack of (i) an objection to such Claim, (ii) an application to equitably subordinate such Claim, or (iii) an application to otherwise limit recovery with respect to such Claim, Filed by the applicable Reorganized Archdiocese or Reorganized Additional Debtor on or before any applicable deadline for Filing such objection or request for payment with respect to such Claim. Any such Non-Abuse Claim so determined and liquidated will be deemed to be an Allowed Non-Abuse Claim for such liquidated amount and will be satisfied in accordance with the Joint Plan. Nothing contained in this Section 8.4 of the Joint Plan will constitute, or be deemed a waiver of, any Claims, rights, or Causes of Action that the applicable Debtor, Reorganized Archdiocese, Additional Debtor, or Reorganized Additional Debtor may have against any Entity in connection with or arising out of any Non-Abuse Claim.

**Section 8.5        No Distributions Pending Allowance.** No Distributions will be made with respect to a Disputed Non-Abuse Claim, or any portion thereof, unless and until all objections to such Disputed Non-Abuse Claim have been settled or withdrawn, or have been determined by a Final Order, and such Disputed Non-Abuse Claim has become an Allowed Non-Abuse Claim.

**Section 8.6        Estimation of Non-Abuse Claims.** To effectuate Distributions to Non-Abuse Claims and avoid undue delay in the administration of any Chapter 11 Cases, after notice and a hearing (which notice may be limited to the Creditor holding the applicable Disputed Non-Abuse Claim), the Reorganized Archdiocese and Reorganized Additional Debtors will have the right to seek an Estimation Order related to any Disputed Non-Abuse Claim; provided, however, the Bankruptcy Court or the District Court, as applicable, will determine whether the Disputed Non-Abuse Claims are subject to estimation under section 502(c) of the Bankruptcy Code, and the timing and procedures for such estimation proceedings, if any.

Notwithstanding anything in Section 8.4 or this Section 8.6, a Non-Abuse Personal Injury Claim as to which a Proof of Claim or motion or request for payment was timely Filed in any Chapter 11 Cases, or deemed timely Filed by Order entered by the Bankruptcy Court or pursuant to this Joint Plan, shall not be subject to the provisions of Section 8.4 and Section 8.6 unless agreed to in writing by the Holder of such Non-Abuse Personal Injury Claim and the Debtor (a ballot or vote cast accepting the Joint Plan by the Holder of such Non-Abuse Personal Injury Claim shall **not** constitute such an agreement). And further, nothing in Sections 8.4 and 8.6 alters the treatment, limits the recourse, or otherwise precludes the Holder of such Non-Abuse Personal Injury Claim to seek to liquidate the amount of such Non-Abuse Personal Injury Claim[s] (and to pursue claims against any non-Debtor and/or non-Additional Debtor parties) in any available, non-bankruptcy court forum in accordance with applicable law.

**Section 8.7        Disallowance of Certain Priest Pension Claims.** Notwithstanding anything else to the contrary in the Joint Plan (including any assumption or pass-through of liability set forth in this Joint Plan), all Priest Pension Claims to or for the benefit of any Archdiocesan Priest against whom there have been allegations of Abuse of a minor or vulnerable adult where the Archdiocesan Priest is identified in either (A) the Report Regarding Clergy Abuse or (B) by an Order entered by the Bankruptcy Court before the Confirmation Date are hereby Disputed under this Joint Plan and shall be Disallowed as of the Effective Date. Neither the Reorganized Archdiocese nor any Reorganized Additional Debtor will make any Distribution with respect to any such Disallowed Priest Pension Claim.

## ARTICLE 9
## DISTRIBUTIONS ON ACCOUNT OF NON-ABUSE CLAIMS

**Section 9.1        Distributions Effective upon Tender.** Whenever the Joint Plan requires a Distribution to a Creditor holding a Non-Abuse Claim, such Distributions will be deemed made and effective upon tender thereof by the applicable Reorganized Archdiocese or Reorganized Additional Debtor to the Creditor to whom the Distribution is due. If any Creditor refuses a tender, the amount tendered and refused will be held by the applicable Reorganized Archdiocese or Reorganized Additional Debtor for the benefit of that Creditor pending final adjudication of the dispute. When and if the dispute is finally adjudicated, and the Creditor receives the Distribution previously tendered and refused, the Creditor will be obliged to apply the Distribution in accordance with the Joint Plan as of the date of the tender. While the dispute is pending and after adjudication thereof, the Creditor will not have the right to claim interest or other charges, or to exercise any other rights that would be enforceable by the Creditor if the applicable Reorganized Archdiocese or Reorganized Additional Debtor failed to pay the tendered Distribution.

**Section 9.2        Non-Abuse Claims against the Debtor and/or any Additional Debtors and Setoff.** To the extent permitted under applicable law, on and after the Effective Date, the applicable Reorganized Archdiocese and/or Reorganized Additional Debtors may set off against any Distribution due on account of a Non-Abuse Claim, the Claims, rights, and Estate Causes of Action of any nature that the Reorganized Archdiocese or Reorganized Additional Debtors may hold against the Creditor holding such

Non-Abuse Claim that are not otherwise waived, released, or compromised in accordance with the Joint Plan; provided, however, neither such a setoff, nor the Allowance of any Non-Abuse Claim under the Joint Plan, will constitute a waiver or release by the applicable Reorganized Archdiocese or Reorganized Additional Debtors of any of the Claims, rights, and Estate Causes of Action that the Reorganized Archdiocese or Reorganized Additional Debtors possess against such Creditor.

**Section 9.3      No Distributions on Account of Penalty Claims or Post-Petition Interest**. No Distribution will be made on account of a Non-Abuse Claim for (a) any Penalty Claim or (b) any interest that may have accrued on such Non-Abuse Claim after the applicable Archdiocese's Petition Date or the Additional Debtors' Petition Date.

**Section 9.4      No Distribution on Account of Late-Filed Non-Abuse Claims**. No Distribution will be made on account of a Late-Filed Non-Abuse Claim unless it is Allowed either (a) by the Bankruptcy Court, after notice and hearing, or (b) a written agreement between the Creditor holding such Late-Filed Non-Abuse Claim and the applicable Debtor, Reorganized Archdiocese, Additional Debtor, or Reorganized Additional Debtor.

**Section 9.5      Single Recovery.** In no case will the aggregate value of any Distribution on account of any Allowed Non-Abuse Claim exceed one hundred percent (100%) of the Allowed Non-Abuse Claim.

**Section 9.6      Withholding Taxes**. The Reorganized Archdiocese and Reorganized Additional Debtors will comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions to Creditors holding Allowed Non-Abuse Claims will be subject to any such withholding and reporting requirements. As a condition to making any Distribution under the Joint Plan, the applicable Reorganized Archdiocese or Reorganized Additional Debtors may require the Creditor holding an Allowed Non-Abuse Claim to furnish the applicable Reorganized Archdiocese or Reorganized Additional Debtors with such Creditor's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable Tax reporting and withholding laws.

**Section 9.7      Distribution Record Date.**

(a)      *Allowed Non-Abuse Claims*. Except as otherwise provided in the Joint Plan, the Reorganized Archdiocese and Reorganized Additional Debtors will have no obligation to recognize the transfer of, or the sale of any participation in, any Non-Abuse Claim that occurs after the Distribution Record Date and will be entitled for all purposes herein to recognize and make Distributions only to those Creditors holding Non-Abuse Claims as of the Distribution Record Date.

(b)      *Pending Transfers*. Except as otherwise provided in a Final Order, the transferees of Non-Abuse Claims that are transferred pursuant to Bankruptcy Rule 3001 before the Distribution Record Date will be treated as Creditors holding such Non-Abuse Claims for all purposes, notwithstanding the expiration of any period provided by Bankruptcy Rule 3001 for objection to such a transfer before the Distribution Record Date.

**Section 9.8      *De Minimis* Distributions**. No Distribution will be made by the Reorganized Archdiocese or any Reorganized Additional Debtors on account of an Allowed Non-Abuse Claim against the Debtor or an Additional Debtor if the amount to be distributed to the applicable Creditor holding such Allowed Non-Abuse Claim has an economic value of less than $50.00.

**Section 9.9      Special Provisions Regarding Unimpaired and Reinstated Claims and Reservation of Setoff Rights.** Except as otherwise specifically provided in the Joint Plan, nothing herein will be deemed to affect, diminish, or impair the Debtor's, Reorganized Archdiocese's, Additional Debtors', or Reorganized Additional Debtors' rights and defenses, both legal and equitable, with respect to

any Unimpaired or Reinstated Claims, including legal and equitable defenses to, or setoff against, such Unimpaired or Reinstated Claims.

**Section 9.10 Allowed Claims Paid by Third Parties.** To the extent a Creditor receives a Distribution on account of an Allowed Claim and also receives payment from a party other than the applicable Debtor, Additional Debtors, Reorganized Archdiocese, or Reorganized Additional Debtors on account of such Allowed Claim, such holder will, within thirty (30) days of receipt thereof, repay or return the Distribution to the applicable Reorganized Archdiocese or the Reorganized Additional Debtor to the extent the Creditor's total recovery on account of such Allowed Claim from the third party and under the Joint Plan exceeds the amount of the Allowed Claim as of the date of any such Distribution.

**Section 9.11 Saturdays, Sundays, or Legal Holidays.** If any Distribution or act under the Joint Plan is required to be made or performed on a date that is not a Business Day, then the making of such Distribution or the performance of such act may be completed on the next succeeding Business Day and will be deemed to have been completed as of the required date.

## ARTICLE 10
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**Section 10.1 Executory Contracts or Unexpired Leases to Be Rejected or Assumed.**

(a) *Rejection.* Except as otherwise provided in the Joint Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Joint Plan, each Executory Contract or Unexpired Lease listed the Rejection Schedule (Plan Supplement 10.1(a)) will be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Rejection Schedule will be served on parties to the Executory Contracts or Unexpired Leases listed therein. The Confirmation Order will constitute an Order approving each such rejection, pursuant to section 365 of the Bankruptcy Code as of the Effective Date; provided, however, the Archdiocese and Additional Debtors reserve the right to amend Plan Supplement 10.1(a) to (i) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its assumption, or (ii) add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection. The applicable Archdiocese and Additional Debtors will provide notice of any amendments to Plan Supplement 10.1(a) to the parties to the Executory Contracts or Unexpired Leases affected thereby. The Confirmation Order will constitute an Order, effective as of the Effective Date, approving the rejection of each Executory Contract and Unexpired Lease hereunder.

(b) *Approval of Assumptions and Cure Claims.* The Confirmation Order will constitute an Order, effective as of the Effective Date, approving the assumption of the Preserved Coverage and each Executory Contract and Unexpired Lease that is not rejected pursuant to Section 10.1(a) of the Joint Plan, pursuant to section 365 of the Bankruptcy Code. The only adequate assurance of future performance will be the promise of the applicable Reorganized Archdiocese or Reorganized Additional Debtors to perform any and all obligations under the applicable assumed Executory Contract or Unexpired Lease. The Assumption and Cure Schedule (Plan Supplement 10.1(b)) will be served on parties to the Executory Contracts or Unexpired Leases listed therein; provided, however, the Archdiocese and Additional Debtors reserve the right to amend the Assumption and Cure Schedule (Plan Supplement 10.1(b)) to (i) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection, or (ii) add any Executory Contract or Unexpired Lease thereto, thus providing for its assumption. The Archdiocese and Additional Debtors, as applicable, will provide notice of any amendments to the Assumption and Cure Schedule (Plan Supplement 10.1(b)) to the parties to the Executory Contracts or Unexpired Leases affected thereby. The Confirmation Order will constitute an Order, effective as of the Effective Date, approving the assumption of each Executory Contract and Unexpired Lease hereunder.

**THE ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE JOINT PLAN OR OTHERWISE WILL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE APPLICABLE DEBTOR, REORGANIZED ARCHDIOCESE, ADDITIONAL DEBTORS, OR REORGANIZED ADDITIONAL DEBTORS ASSUMES SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED WILL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT.**

(c) *Payment of Cure Claims*. Unless otherwise agreed in a written agreement between the applicable Creditor and the applicable Debtor, Reorganized Archdiocese, Additional Debtor, or Reorganized Additional Debtor, in full and final satisfaction of, and in exchange for, each Cure Claim, the applicable Reorganized Archdiocese or Reorganized Additional Debtor will pay each Allowed Cure Claim in full, in Cash, within fifteen (15) days after the later of (i) the Effective Date, or (ii) the date such Claim becomes an Allowed Cure Claim.

(d) *Dispute*. In the event of a dispute pertaining to assumption, the Cure Claim payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order that resolves the dispute and approves the assumption. On or before the Plan Supplements Filing Date, the applicable Archdiocese and Additional Debtor will provide a copy of the Assumption and Cure Notice and the Cure Claims for the Executory Contracts and Unexpired Leases listed therein to each applicable contract and lease counterparty. Any objection by any counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim must be Filed, served, and actually received by the applicable Archdiocese or Additional Debtor by the date on which objections to the Confirmation are due (or such other date as may be provided in the applicable assumption notice). Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim will be deemed to have assented to such assumption and the amount of the applicable Cure Claim.

**Section 10.2    Rejection Damage Claims and the Rejection Damage Claims Bar Date**. Notwithstanding anything to the contrary in the Archdiocese Claims Bar Date Order, without the need for any further notice to, or action, Order, or approval of the Bankruptcy Court, if the rejection of an Executory Contract or Unexpired Lease pursuant to Section 10.1(a) of the Joint Plan gives rise to a Rejection Damage Claim, such Claim will be forever barred and will not be enforceable against the applicable Debtor, Reorganized Archdiocese, Additional Debtor, or Reorganized Additional Debtor unless a Proof of Claim asserting the Rejection Damage Claim is Filed by the Rejection Damage Claims Bar Date.

**Section 10.3    Policies of Insurance.**

(a) On the Effective Date, the Debtor's and Additional Debtors' insurance policies in force and not expired by their term on the Effective Date, other than the Settling Insurers' Policies, will continue in accordance with their terms and, to the extent applicable, will be deemed assumed by the applicable Reorganized Archdiocese and Reorganized Additional Debtors pursuant to section 365 of the Bankruptcy Code and this Article 10 of the Joint Plan. Nothing in the Joint Plan will affect, impair, or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Archdiocese and Reorganized Additional Debtors under such insurance policies, other than the Settling Insurers' Policies, in any manner, and such insurance carriers, the insureds, the Reorganized Archdiocese, the Reorganized Additional Debtors, and the Settlement Trust will retain all rights and defenses under such insurance policies, subject to the Non-Settling Insurance

Rights Transfer. All insurance policies in force and not expired by their term on the Effective Date under this Joint Plan, the Confirmation Order, the Bankruptcy Code, and other applicable law are non-executory contracts for all purposes.

(b) Notwithstanding anything herein to the contrary, the Reorganized Archdiocese and Reorganized Additional Debtors will be deemed to have assumed all the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code, effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Archdiocese's and Reorganized Additional Debtors' foregoing assumption of the unexpired D&O Liability Insurance Policies.

**Section 10.4     Existing Benefits Programs.** On the Effective Date, all Existing Benefits Programs will be honored except for any Disallowed Priest Pension Claims (including any Priest Pension Claims Disallowed by Section 8.7 of this Joint Plan).

**Section 10.5     Priest Pension Plan and Retiree Medical Benefits.** On the Effective Date, all Priest Pension Claims (other than Disallowed Priest Pension Claims) and Priest Retiree Medical Benefits Claims will be satisfied in compliance with the Priest Pension Plan and Priest Retiree Medical Benefits.

**Section 10.6     Workers' Compensation Programs.** On the Effective Date, the Reorganized Archdiocese and Reorganized Additional Debtors will continue to honor their obligations under: (a) all applicable workers' compensation laws in all applicable states; and (b) the Workers' Compensation Programs. All Proofs of Claims on account of Workers' compensation, including the Workers' Compensation Program, will be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that (a) nothing in the Joint Plan will limit, diminish, or otherwise alter any defenses, Estate Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; and (b) nothing herein will be deemed to impose any obligations on the Debtor, the Reorganized Archdiocese, the Additional Debtors, the Reorganized Additional Debtors, or their insurers in addition to what is provided for under the terms of the Workers' Compensation Program and applicable state law.

**Section 10.7     Claims Incurred After the Effective Date.** The Reorganized Archdiocese and Reorganized Additional Debtors may pay Claims that they incur after the Effective Date in the ordinary course of business, without application for or Court approval, subject to any agreements with such Creditors and applicable law.

**Section 10.8     Pass-Through of Parish-Related Agreements.** Notwithstanding anything else to the contrary in this Article 10 and except as otherwise specifically set forth in this Joint Plan, the Parish Service Agreements, the Temporalities Manual, and all oral agreements between the Archdiocesan Parishes and the Archdiocese (**Pass-Through Parish Related Agreements**) will be neither assumed nor rejected under Bankruptcy Code § 365 and will instead pass through and be treated on and after the Effective Date for all purposes as if the Archdiocese Chapter 11 Case and the Additional Debtors' Chapter 11 Cases had never been filed. All rights, claims, and liabilities of the Archdiocesan Parishes and the Archdiocese under such Parish Service Agreements, the Temporalities Manual, and any oral agreements between the Archdiocesan Parishes and the Archdiocese will remain unaltered and unimpaired for all purposes, except in all cases, for the avoidance of doubt and to the extent applicable, any rights, Claims, and liabilities associated with the Insurance Settlement Agreements as otherwise set forth in this Joint Plan. Notwithstanding the foregoing, in any calendar year, the Debtor shall not make a payment on the Pass-Through Parish Related Agreements if:

(a) payments to Class 6 Claims are not current;

(b)    the payment on the Pass-Through Parish Related Agreement would impair the feasibility of the Joint Plan or the ability of the Debtor to make the next annual payment to the Class 6 Claims under the Joint Plan; and

(c)    the payment in any plan year is in excess of $3,000,000. For purposes of calculating this limitation, amounts not paid in a prior year may be carried over on a cumulative basis to future years.

The foregoing restriction on payment shall continue only until the Class 6 Claims have been paid the full amount due under this Joint Plan.

**Section 10.9    Reservation of Rights.** Nothing contained in any Plan Document will constitute an admission by any Entity that any contract or lease is in fact an Executory Contract or Unexpired Lease of the Debtor or any Additional Debtor, or that the applicable Debtor, Reorganized Archdiocese, Additional Debtor, or Reorganized Additional Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the applicable Debtor, Reorganized Archdiocese, Additional Debtor, or Reorganized Additional Debtor will have fifteen (15) days after entry of a Final Order resolving such dispute to alter the treatment of such contract or lease, in which case the deemed assumption provided for in the Joint Plan will not apply to such contract or lease.

## ARTICLE 11
## CONDITIONS TO THE EFFECTIVE DATE

**Section 11.1    Conditions Precedent to Confirmation**. Confirmation of this Joint Plan will not occur unless all of the following conditions precedent have been satisfied:

(a)    the Confirmation Order is in form and substance acceptable to the Debtor, Additional Debtors, and the Creditors' Committee;

(b)    the Confirmation Order approves and implements the Injunctions set forth in the Joint Plan;

(c)    the Plan Documents will be in form and substance acceptable to the Debtor, the Additional Debtors, and the Creditors' Committee; and

(d)    the Bankruptcy Court shall have granted the Insurance Settlement Motions (with both such Insurance Settlement Orders and Insurance Settlement Agreements in a form and substance acceptable to the Debtor, the Additional Debtors, the Creditors' Committee and the applicable Settling Insurer).

**Section 11.2    Conditions Precedent to the Effective Date.** The Effective Date will not occur unless all of the following conditions precedent have been satisfied, unless waived in accordance with Section 11.3 of this Joint Plan:

(a)    the Confirmation Order, in form and substance acceptable to the Debtor, the Additional Debtors, and the Creditors' Committee, will have been entered by the Bankruptcy Court and will have become a Final Order; provided that if any appeal of the Confirmation Order is determined by a court of competent jurisdiction to be equitably moot due to substantial consummation as provided in the Joint Plan, the Confirmation Order will be considered a Final Order as of the date that the order determining such appeal to be moot has become a Final Order;

(b)    the Settlement Trust Documents will have become effective in accordance with the terms of the Joint Plan;

(c)    the Settlement Trust will have been established and funded with the Settlement Consideration in accordance with Section 5.3 and Section 7.2 of the Joint Plan;

40

(d)    the Additional Debtors' Petition Date will have occurred;

(e)    the Debtor and the Additional Debtors will have obtained all authorizations, consents, certifications, approvals, rulings, opinions or other documents that are necessary to implement and effectuate the Joint Plan, including any and all canonical approvals;

(f)    all actions, documents, and agreements necessary to implement and effectuate the Joint Plan will have been effected or executed;

(g)    the Debtor will have executed and delivered the Amended Bond Documents to the Bond Trustee; and

(h)    the Bankruptcy Court shall have entered Insurance Settlement Orders approving all the Insurance Settlement Agreements (with both such Insurance Settlement Orders and Insurance Settlement Agreements in a form and substance acceptable to the Debtor, the Additional Debtors, the Creditors' Committee, and applicable Settling Insurer), and such Insurance Settlement Orders shall have become Final Orders.

**Section 11.3    Waiver of Conditions**. The conditions set forth in Section 11.2 of this Joint Plan may be waived by the written consent of the Debtor, the Additional Debtors, the Creditors' Committee, and applicable Settling Insurer.

**Section 11.4    Filing Notice of Occurrence of the Effective Date.** The Reorganized Archdiocese will File a notice of occurrence of the Effective Date by no later than three (3) days after the Effective Date. Such Notice must state (a) that all conditions to the Joint Plan's becoming effective have been satisfied and (b) the date of the Effective Date.

**Section 11.5    Timing of Effective Date.** The Effective Date shall occur on or before the ninetieth (90th) calendar day after the Confirmation Date, which Effective Date may be extended upon (a) consent of the Plan Proponents or (b) Order of the Bankruptcy Court. Notwithstanding anything in this Article XI to the contrary, the applicable Debtor, Reorganized Archdiocese, Additional Debtors, or Reorganized Additional Debtors shall provide the Debtor and Additional Debtor Settlement Consideration on or before December 31, 2025 or as otherwise indicated in Section 5.3(a).

**Section 11.6    Effect of Non-Occurrence of Conditions**. If either (a) the Effective Date does not occur in accordance with Section 11.5 of this Joint Plan or (b) substantial consummation of this Joint Plan does not occur, then this Joint Plan will be null and void in all respects and nothing contained in the Plan Documents or the Disclosure Statement will: (i) constitute a waiver or release of any Claims by or against the applicable Debtor, Reorganized Archdiocese, Additional Debtors, or Reorganized Additional Debtors; (ii) prejudice in any manner the rights of the applicable Debtor, Reorganized Archdiocese, Additional Debtors, or Reorganized Additional Debtors; (iii) constitute an admission, acknowledgement, offer, or undertaking by the applicable Debtor, Reorganized Archdiocese, Additional Debtors, or Reorganized Additional Debtors in any respect, including in any proceeding or case against the Archdiocese or Additional Debtors; or (iv) be admissible in any Action against the Debtor, Reorganized Archdiocese, Additional Debtors, or Reorganized Additional Debtors in any court or other forum. In that event, the Archdiocese, Additional Debtors, and all Creditors will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though Confirmation never occurred.

## ARTICLE 12
## ADDITIONAL EFFECTS OF CONFIRMATION

**Section 12.1    Binding Effect**. As of the Effective Date, all provisions of the Joint Plan, including all agreements, instruments, and other documents Filed in connection with the Joint Plan by the Debtor, Reorganized Archdiocese, Additional Debtors, or Reorganized Additional Debtors will be binding upon the Debtor, Additional Debtors, Estates, Reorganized Archdiocese, Reorganized Additional Debtors, Settling Insurers, Non-Settling Insurers, Creditors holding Claims against the Debtor or any Additional

Debtor (including all Abuse Claimants), each such Creditor's respective successors and assigns, and all other Entities that are affected in any manner by the Joint Plan, regardless of whether the Claim of such Creditor is Impaired under the Joint Plan or whether such Creditor has accepted the Joint Plan. Except as otherwise expressly provided in the Joint Plan, all agreements, instruments, and other documents Filed in connection with the Joint Plan will be given full force and effect and will bind all Entities referred to therein on and after the Effective Date, whether or not such agreements are actually issued, delivered, or recorded on or after the Effective Date, and whether or not such Entities have actually executed any such agreement.

**Section 12.2    Discharge and Discharge Injunctions.**

(a)    *Discharge of the Debtor.*  Except as expressly provided in the Insurance Settlement Agreements, Joint Plan (including but not limited to section 12.14 below), or Confirmation Order, all consideration distributed under the Joint Plan, as well as the Debtor and Additional Debtor Settlement Consideration, will be in exchange for, and in complete satisfaction, settlement, discharge, and termination of, all Claims of any nature whatsoever against or in the Debtor or any of its assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date, and, as of the Effective Date, the Debtor will be deemed discharged, and each Creditor and any successor, assign, and affiliate of such Creditor will be deemed to have forever waived and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, liabilities, and debts of the kind specified in section 502 of the Bankruptcy Code, based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date, in each case whether or not (a) a Proof of Claim based upon such debt is Filed or deemed Filed under section 501 of the Bankruptcy Code, (b) a Claim (including an Abuse Claim) based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has become an Expunged Claim, or (d) an Abuse Claimant holding an Abuse Claim based upon such debt is deemed to have accepted the Joint Plan.

Without limiting the foregoing, the Archdiocesan Schools are not separate Entities from the Debtor, and all Abuse Claims asserted against the Archdiocesan Schools are discharged and released in accordance with the preceding paragraph.

In the event any Entity takes any action that is prohibited by, or is otherwise inconsistent with, the injunction provisions in the Joint Plan or the Confirmation Order, then, upon notice to the Bankruptcy Court by an affected party, the action or proceeding in which the Claim of such Entity is asserted will automatically be transferred to the Bankruptcy Court or District Court for enforcement of the Joint Plan. In a successful action to enforce the injunctive provisions of this Section 12.2(a) of the Joint Plan in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

**Notwithstanding any other provision of this Joint Plan, if any court of competent jurisdiction enters a Final Order releasing a Non-Settling Insurer of its duty to defend and/or indemnify the Debtor, the Reorganized Archdiocese, or any other Covered Party or Settling Insurer due, in whole or in part, to the Debtor's or Reorganized Archdiocese's breach of its Post-Effective Date Insurance Obligations, the Debtor and/or the Reorganized Archdiocese shall be liable for any such breach causing a loss of insurance coverage under any Non-Settling Insurers' Policies, and the Debtor and the Reorganized Archdiocese shall not have a discharge of any Claim that becomes uninsured as a result, and any release or discharge of such Claim under section 1141 of the Bankruptcy Code and this Joint Plan shall be null and void. The Settlement Trustee and the Reorganized Archdiocese shall have the right at their respective discretion to intervene and be heard as parties-in-interest in any Action related to an Abuse Claim in which (i) the Debtor's or the Reorganized Archdiocese's**

42

**Post-Effective Date Insurance Obligations or (ii) the duty of a Non-Setting Insurer to defend and/or indemnify the Debtor, the Reorganized Archdiocese, or any other Covered Party, are implicated, disputed, or otherwise raised.**

(b)     *Discharge of the Additional Debtors.* Except as expressly provided in the Insurance Settlement Agreements, Joint Plan (including but not limited to section 12.14 below), or Confirmation Order, all consideration distributed under the Joint Plan, as well as the Debtor and Additional Debtor Settlement Consideration, will be in exchange for, and in complete satisfaction, settlement, discharge, and termination of all Claims of any nature whatsoever against or in the Additional Debtors or any of their assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date, and, as of the Effective Date, the Additional Debtors will be deemed discharged, and each Creditor and any successor, assign, and affiliate of such Creditor will be deemed to have forever waived and discharged the Additional Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, liabilities, and debts of the kind specified in section 502 of the Bankruptcy Code, based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date, in each case whether or not (a) a Proof of Claim based upon such debt is Filed or deemed Filed under section 501 of the Bankruptcy Code, (b) a Claim (including an Abuse Claim) based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has become an Expunged Claim, or (d) an Abuse Claimant holding an Abuse Claim based upon such debt is deemed to have accepted the Joint Plan.

Without limiting the foregoing, the Parish Schools are not separate Entities from the Additional Debtors, and all Abuse Claims asserted against the Parish Schools are discharged and released in accordance with the preceding paragraph.

If any Entity takes any action that is prohibited by, or is otherwise inconsistent with, the injunction provisions in the Joint Plan or the Confirmation Order, then, upon notice to the Bankruptcy Court by an affected party, the action or proceeding in which the Claim of such Entity is asserted will automatically be transferred to the Bankruptcy Court or District Court for enforcement of the Joint Plan. In a successful action to enforce the injunctive provisions of this Section 12.2(b) of the Joint Plan in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

**Notwithstanding any other provision of the Joint Plan, if any court of competent jurisdiction enters a Final Order releasing any Non-Settling Insurer of its duty to defend and/or indemnify an Additional Debtor (or Additional Debtors), a Reorganized Additional Debtor (or Reorganized Additional Debtors), or any other Covered Party or Settling Insurer due, in whole or in part, to such Additional Debtor's(s') or such Reorganized Additional Debtor's(s') breach of its (or their) Post-Effective Date Insurance Obligations, then such Additional Debtor(s) and/or Reorganized Additional Debtor(s) shall be liable for any breach causing a loss of insurance coverage under any Non-Settling Insurers' Policies, and such Additional Debtor(s) and/or Reorganized Additional Debtor(s) shall not have a discharge of any Claim that becomes uninsured as a result, and any release or discharge of such Claim under section 1141 of the Bankruptcy Code and this Joint Plan shall be null and void. The Settlement Trustee and such Reorganized Additional Debtor (or Reorganized Additional Debtors) shall have the right at their respective discretion to intervene and be heard at any time as parties-in-interest in any Action related to an Abuse Claim in which (i) the Additional Debtor's (or Additional Debtors') or the Reorganized Additional Debtor's(s') Post-Effective Date Insurance Obligations or (ii) the duty of a Non-Setting Insurer to defend and/or**

indemnify the Additional Debtors, the Reorganized Additional Debtors, or any other Covered Party, are implicated, disputed, or otherwise raised.

(c)     *Discharge Injunction – Debtor.* As of the Effective Date, except as expressly provided in the Insurance Settlement Agreements, the Joint Plan, or the Confirmation Order, all Creditors holding Claims of any nature whatsoever against or in the Debtor or any of its assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date will be precluded and permanently enjoined from prosecuting or asserting any such discharged Claim against the Debtor, the Reorganized Archdiocese, or the property of the Debtor or the Reorganized Archdiocese. In accordance with the foregoing, except as expressly provided in the Joint Plan, the Insurance Settlement Agreements, the Confirmation Order, or the Insurance Settlement Orders, the Confirmation Order will be a judicial determination of discharge or termination of all Claims, and other debts and liabilities against or in the Debtor pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtor or the Reorganized Archdiocese at any time to the extent such judgment relates to a discharged Claim.

Without limiting the foregoing, the Archdiocesan Schools are not separate Entities from the Debtor, and the discharge injunction set forth in the preceding paragraph will include the Archdiocesan Schools and will apply to all discharged Claims against the Archdiocesan Schools.

(d)     *Discharge Injunction – Additional Debtors.* As of the Effective Date, except as expressly provided in the Insurance Settlement Agreements, the Joint Plan, or the Confirmation Order, all Creditors holding Claims of any nature whatsoever against or in any Additional Debtors or any of the assets or properties of any Additional Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date will be precluded and permanently enjoined from prosecuting or asserting any such discharged Claim against the Additional Debtors, the Reorganized Additional Debtors, or the property of the Additional Debtors or Reorganized Additional Debtors. In accordance with the foregoing, except as expressly provided in the Joint Plan, the Insurance Settlement Agreements, the Confirmation Order, or the Insurance Settlement Orders, the Confirmation Order will be a judicial determination of discharge or termination of all Claims, and other debts and liabilities against or in the Additional Debtors pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Additional Debtors or the Reorganized Additional Debtors at any time to the extent such judgment relates to a discharged Claim.

Without limiting the foregoing, the Parish Schools are not separate Entities from the applicable Additional Debtors, and the discharge injunction set forth in the preceding paragraph will include the Parish Schools and will apply to all discharged Claims against the Parish Schools.

**Section 12.3     Exculpations and Limitation of Liability, and Exculpation Injunction.**

(a)     From and after the Effective Date, to the maximum extent permitted by law, no Exculpated Party will have or incur any liability for, and each Exculpated Party will be released from, any Claims, Causes of Action, or liability, and each Exculpated Party is hereby exculpated from any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, Estate Cause of Action, remedy, loss, and liability for conduct occurring on or after the applicable Archdiocese's Petition Date or the Additional Debtors' Petition Date in connection with or arising out of: (a) the Filing and administration of any Chapter 11 Cases; (b) the negotiation and pursuit of the Disclosure Statement, the Joint Plan, or the Plan Documents, as well as the solicitation of votes for, or Confirmation of, the Joint Plan; (c) the funding or consummation of the Joint Plan, the Settlement Trust, the Plan Documents, or any related agreements, instruments, or other documents, as well as any offer, issuance, and/or Distribution under the Joint Plan or any Settlement Trust Distributions or other disbursements made by the Settlement Trust, whether or not such

44

Distributions, Settlement Trust Distributions, or other disbursements occur following the Effective Date; (d) the implementation of the Joint Plan; and (e) any negotiations, transactions, and documentation in connection with the foregoing clauses (a)-(d); provided, however, the foregoing will not apply to any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct. The Exculpations will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Joint Plan, which protect such Exculpated Parties from liability.

(b) The Exculpated Parties have participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and any distribution of consideration made pursuant to the Joint Plan or Settlement Trust and, therefore, are not, and on account of such distributions, will not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Joint Plan, any Distributions made pursuant to the Joint Plan, or any Settlement Trust Distributions or other disbursements made by the Settlement Trust.

(c) As of the Effective Date, all Creditors are, and will be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Exculpated Party and, solely to the extent provided by section 1125(e) of the Bankruptcy Code, any Entity described in section 1125(e) or its or their property or successors or assigns on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise with respect to any liability or obligation for which an Exculpated Party is discharged, exculpated, or released under the Joint Plan (which, as set forth in this Section 12.3(a) does not include any liability or obligation arising out of or related to acts or omissions of such Exculpated Party that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct): (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, Action, or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other Order; (iii) creating, perfecting, or in any way enforcing in any matter, directly or indirectly, any Lien or encumbrance; and/or (v) setting off, seeking reimbursement, contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged or released under the Joint Plan.

**Section 12.4** *Channeling Injunction Regarding Abuse Claims against the Protected Parties and Settling Insurers.* **In consideration of the undertakings of the Protected Parties and Settling Insurers, their respective contributions to the Settlement Trust, and other consideration, and, where applicable, pursuant to their respective settlements with the Debtor and/or any Additional Debtors and to further preserve and promote the agreements between and among the Protected Parties and Settling Insurers, and to supplement where necessary the injunctive effect of the discharge as provided in section 1141 and 524 of the Bankruptcy Code, and pursuant to sections 105 and 363 of the Bankruptcy Code:**

**(a) Any and all Channeled Claims against the Protected Parties and Settling Insurers are channeled into the Settlement Trust and will be treated, administered, determined, and resolved under the procedures and protocols and in the amounts established under the Joint Plan and the Settlement Trust Documents as the sole and exclusive remedy for all Entities holding Channeled Claims;**

**(b) all Entities that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Channeled Claims against the Protected Parties and Settling**

**Insurers will be permanently and forever stayed, restrained, enjoined, and barred from taking any action, directly or indirectly, for the purpose of asserting, enforcing, collecting, recovering, or receiving payments, satisfaction, or recovery from any Protected Party or any of the Settling Insurers, including:**

      (i)      **commencing, conducting, or continuing, in any manner, whether directly or indirectly, any suit, Action, or other proceeding of any kind in any forum with respect to any such Channeled Claim against any Protected Party, Settling Insurer, or any property or interest in property of any Protected Party or Settling Insurer;**

      (ii)      **enforcing, levying, attaching, collecting, or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or other Order against any Protected Party, Settling Insurer, or any property or interest in property of any Protected Party or Settling Insurer with respect to any such Channeled Claim;**

      (iii)      **creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, any Lien or encumbrance of any kind against any Protected Party, Settling Insurer, or any property or interest in property of any Protected Party or Settling Insurer with respect to any such Channeled Claim;**

      (iv)      **asserting, implementing, or effectuating any Channeled Claim of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any Protected Party or Settling Insurer, (B) any Protected Party or Settling Insurer, or (C) any property or interest in property of any Protected Party or Settling Insurer; and**

      (v)      **taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Joint Plan and the Plan Documents.**

      (c)      **The foregoing Channeling Injunction is an integral part of this Joint Plan and is essential to the Joint Plan's consummation and implementation. The channeling of the Channeled Claims as provided in this Section 12.4 of the Joint Plan will inure to the benefit of the Protected Parties and the Settling Insurers. In a successful action to enforce the injunctive provisions of this Section 12.4 of the Joint Plan in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice to the Post-Confirmation Notice Parties and a hearing.**

      (d)      Notwithstanding anything to the contrary in Section 12.4 of the Joint Plan, the Channeling Injunction will not enjoin the following:

      (i)      the right of any Entity to the treatment afforded to such Entity under the Joint Plan;

      (ii)      the right of any Entity to assert any Claim for payment of Settlement Trust expenses solely against the Settlement Trust;

      (iii)      the Settlement Trustee's enforcing rights under the Settlement Trust Documents;

<div style="margin-left:2em">

(iv)    the Settling Insurers' enforcing rights under the Insurance Settlement Agreements;

(v)    the rights of the Settlement Trust, the Settlement Trustee, Abuse Claimants, Covered Parties, the Reorganized Archdiocese, and the Reorganized Additional Debtors (in each case, to the extent permitted or required under this Joint Plan) to prosecute any Claims against the Non-Settling Insurers based on or arising from the Non-Settling Insurance Rights Transfer or otherwise; or

(vi)    the rights of the Covered Parties with respect to Non-Insurer Contribution Claims against, or with respect to, the Settlement Trust.

</div>

**Section 12.5** *Supplemental Settling Insurers' Injunction*. **Pursuant to sections 105(a) and 363 of the Bankruptcy Code, and in consideration of the undertakings of the Settling Insurers pursuant to any Insurance Settlement Agreement and the Joint Plan, including the Settling Insurers' purchases of the Settling Insurers' Policies pursuant to section 363(f) of the Bankruptcy Code and the Insurance Settlement Orders, any and all Entities who have held, now hold, or who may in the future hold any Claims against any Protected Party, any Covered Party, or any Settling Insurer, which, directly or indirectly, relate to, any of the Settling Insurers' Policies, are hereby permanently and forever stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce, collect, or recover, or attempt to assert, enforce, collect, or recover, any such Claim against any Settling Insurer, and/or any Settling Insurers' Policies, including:**

> (a)    **commencing, conducting, or continuing, in any manner, whether directly or indirectly, any suit, Action, or other proceeding of any kind in any forum with respect to any such Claim against any Settling Insurer, or any property or interest in property of any Settling Insurer;**

> (b)    **enforcing, levying, attaching, collecting, or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or other Order against any Settling Insurer, or any property or interest in property of any Settling Insurer with respect to any such Claim;**

> (c)    **creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, any Lien or encumbrance of any kind against any Settling Insurer, or any property or interest in property of any Settling Insurer with respect to such Claim;**

> (d)    **asserting, implementing, or effectuating any Claim of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any Settling Insurer, (B) any Settling Insurer, or (C) any property or interest in property of any Settling Insurers; and**

> (e)    **taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Joint Plan and the Plan Documents.**

The Supplemental Settling Insurers' Injunction will not apply to the rights of any Settling Insurer to any reinsurance recoveries, as provided in Section 7.1(f) of the Joint Plan.

**Section 12.6    Injunction against Interference with the Joint Plan**. Upon entry of the Confirmation Order, all Creditors holding Claims will be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Joint Plan.

**Section 12.7    General Settlement of Claims.** Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, Settlement Trust

47

Distributions, releases, and other benefits provided under the Joint Plan, on the Effective Date, the Joint Plan constitutes a good faith compromise and settlement of any and all Claims and controversies resolved pursuant to the Joint Plan.

**Section 12.8     Gatekeeper Injunction.  Subject in all respects to Article 12 of the Joint Plan, no Enjoined Party may assert a Claim or cause of action of any kind or institute any proceeding of any kind against any of the Covered Parties, Settling Insurers, or Settlement Trust that arises from or is in any manner related to the Chapter 11 Cases, the negotiation of the Joint Plan, the negotiation of the Insurance Settlement Agreements, the administration of the Joint Plan by the Settlement Trust and the Debtor, or the property to be distributed under the Joint Plan, or transactions in furtherance of the foregoing without the Bankruptcy Court 1) determining, after Notice and Hearing, that such claim or cause of action (a) is a colorable claim of any kind against the Debtor, the Additional Debtors, the Settlement Trust, or the Settling Insurers; (b) did not arise prior to the Effective Date of the Joint Plan; and (c) is not a Claim owned by the Debtor or Settling Insurers against such Protected Party, Settling Insurer, or the Settlement Trust and 2) subject in all respects to the Injunctions, specifically authorizing such Enjoined Party to initiate a proceeding to assert such Claim or cause of action against such Protected Party, Settling Insurer, or the Settlement Trust.**

**     To the extent that a Claim or cause of action is filed against a Covered Party, Settling Insurer, or the Settlement Trust, without the Bankruptcy Court authorizing such Claim or cause of action in accordance with the preceding paragraph, the Claim or cause of action shall be deemed a willful violation of the Injunctions contained in this Joint Plan if the Claim or cause of action is not dismissed within 10 days of the lawyer filing such Claim or cause of action being provided notice that the Claim or cause of action is in violation of the Injunctions contained in the Joint Plan and this provision. The Bankruptcy Court, for any willful violation of the Injunctions contained in this Joint Plan and this provision, shall assess the attorney filing such Claim or cause of action and the named plaintiff in the Claim or cause of action reasonable legal fees incurred by the party enforcing the respective Injunction and this provision.**

**Section 12.9     Exceptions to Exculpation, Injunction, and Release Provisions**. Notwithstanding any provision of the Joint Plan or Confirmation Order to the contrary, no exculpation (including the Exculpations), injunction (including the Injunctions), or release provision contained in the Joint Plan or Confirmation Order will provide any protection or benefit to any Excluded Party.

**Section 12.10   The Debtor's Settlement of Certain Claims.** For other good and valuable consideration, pursuant to Bankruptcy Rule 9019, as of the Effective Date, the Debtor and Reorganized Archdiocese irrevocably and unconditionally, without limitation, release, acquit, forever discharge, and waive any and all (a) Single Business Enterprise Claims, (b) Avoidance Actions against the Additional Debtors or the Non-Debtor Catholic Entities, and (c) Claims or Causes of Action asserted in the Portfolios Adversary Proceeding. The foregoing release is an integral part of the Joint Plan and is essential to the Joint Plan's consummation and implementation. For the avoidance of doubt, the release contained in this Section 12.10 of the Joint Plan does not release any Non-Debtor Catholic Entity from liability due on or with respect to any Preserved Estate Causes of Action, including the following: (i) the Archdiocesan Agency Assessments; (ii) Archdiocesan Parish Assessments; (iii) Deposit and Loan Notes Receivables; (iv) any liability or obligation relating to or arising out of any Parish Service Agreement; (v) any liability related to or arising out of the Priest Pension Plan or the Priest Retiree Medical Benefits (other than any Disallowed Priest Pension Claim), (vi) any of the Debtor's Administrative Claims against any of the Additional Debtors; or (vii) any charges for services subcontracted by the Archdiocese or owed to other Entities, including legal fees, bank-investment charges and services, employee benefits charges and services, insurance premiums, and self-insured retentions and deductibles.

**Section 12.11   Avoidance Actions.** On the Effective Date, the Archdiocese and the Additional Debtors, on behalf of themselves and their Estates, will release any and all Avoidance Actions, and the

Archdiocese and the Additional Debtors, and any Entity acting on behalf of the Archdiocese or the Additional Debtors, will be deemed to have waived the right to pursue any and all Avoidance Action. No Avoidance Actions will revert, or be transferred, to any Creditor or the Settlement Trust.

**Section 12.12    Reservation and Retention of Preserved Estate Causes of Action and Defenses of the Archdiocese and Additional Debtors.** Except to the extent such rights, Claims, Estate Causes of Action, defenses, and counterclaims are otherwise dealt with in the Joint Plan or are expressly and specifically released in connection with the Joint Plan, the Confirmation Order, or any settlement agreement approved during any Chapter 11 Cases, in accordance with section 1123(b) of the Bankruptcy Code, as of the Effective Date, the Reorganized Archdiocese and the Reorganized Additional Debtors reserve any and all rights, Claims, Estate Causes of Action, defenses, and counterclaims of, or accruing to, the applicable Debtor, Reorganized Archdiocese, Additional Debtor, or Reorganized Additional Debtors, whether or not litigation relating thereto is pending on the Effective Date, including any types of Preserved Estate Causes of Action described in Plan Supplement 12.12(a), and as to the Additional Debtors and Reorganized Additional Debtors, any types of Preserved Estate Causes of Action described in Plan Supplement 12.12(b). Except as provided in the Joint Plan or Confirmation Order, on the Effective Date, the Preserved Estate Causes of Action and defenses of the Debtor will re-vest in the Reorganized Archdiocese, and the Preserved Estate Causes of Action and defenses of the Additional Debtors will re-vest in the Reorganized Additional Debtors.

Without limiting the generality of the foregoing, notwithstanding any otherwise applicable principle of law or equity including any principles of judicial estoppel, *res judicata*, collateral estoppel, issue preclusion, or any similar doctrine, **THE FAILURE TO LIST, DISCLOSE, DESCRIBE, IDENTIFY, OR REFER TO A RIGHT, CLAIM, ESTATE CAUSE OF ACTION, DEFENSE, OR COUNTERCLAIM, OR POTENTIAL RIGHT, CLAIM, ESTATE CAUSE OF ACTION, DEFENSE, OR COUNTERCLAIM, IN THE JOINT PLAN, THE SCHEDULES, PLAN SUPPLEMENTS 12.12(a) AND 12.12(b), OR ANY OTHER DOCUMENT FILED WITH THE BANKRUPTCY COURT, WILL IN NO MANNER WAIVE, ELIMINATE, MODIFY, RELEASE, OR ALTER ANY RIGHT OF THE APPLICABLE DEBTOR, REORGANIZED ARCHDIOCESE, ADDITIONAL DEBTORS, OR REORGANIZED ADDITIONAL DEBTORS TO COMMENCE, PROSECUTE, DEFEND AGAINST, SETTLE, AND REALIZE UPON ANY RIGHTS, CLAIMS, ESTATE CAUSES OF ACTION, DEFENSES, OR COUNTERCLAIMS THAT THE ARCHDIOCESE, the ADDITIONAL DEBTORS, OR THEIR ESTATES HAVE, OR MAY HAVE, AS OF THE EFFECTIVE DATE**.

**Section 12.13    Term of Pre-Confirmation Injunctions or Stays.** Unless otherwise provided herein, any and all injunctions or stays arising before the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.

**Section 12.14    Non-Settling Insurance Coverage.** Notwithstanding any Joint Plan provisions other than those set forth in this Section 12.14 of the Joint Plan (and subject in all respects to the provisions of this Section 12.14 of the Joint Plan):

(a)        Abuse Claimants specifically reserve, and do not release, any Claims, to the extent such Claims implicate coverage under any Non-Settling Insurer's Policies, that they may have against (i) the Settlement Trust, as successor to the Debtor and the Additional Debtors as set forth herein or (ii) the Debtor and the Additional Debtor solely if a court of competent jurisdiction determines in a Final Order that the Settlement Trust's assumption of responsibility for the Debtor's and/or Additional Debtor's liability for, and obligation to pay, Abuse Claims nullifies or renders inaccessible coverage from the Non-Settling Insurer for the Abuse Claim of an Abuse Claimant; provided, however, that (notwithstanding anything else herein to the contrary) recourse for such claims is limited to the Non-Settling Insurer and the proceeds of the Non-Settling Insurer's Policies;

and provided further that any recovery for such claims will be paid in accordance with the Settlement Trust Documents. The Debtor, the Additional Debtors, and the Co-Insured Parties deny any liability with respect to any Abuse Claims implicating Non-Settling Insurers' coverage obligations.

(b)     Pursuant to the Settlement Trust Documents, Abuse Claimants may commence and name or continue an action against (a) the Settlement Trust, as successor to the Debtor and the Additional Debtors as set forth herein, or (b) the Debtor and an Additional Debtor, solely if a court of competent jurisdiction determines in a Final Order that the Settlement Trust's assumption of responsibility for the Debtor's and/or Additional Debtor's liability for, and obligation to pay, Abuse Claims nullifies or renders inaccessible coverage from the Non-Settling Insurer for the Abuse Claim of an Abuse Claimant, provided that in any such action the sole remedy will be a judgment against the Non-Settling Insurers. Any recovery for such claims will be paid only in accordance with the Settlement Trust Documents. Any recovery from the prosecution of such action is deemed assigned to the Settlement Trust to the extent provided in the Joint Plan and the Settlement Trust Documents. The discharge provided for in the Joint Plan does not apply to and will not limit in any way any obligations of Non-Settling Insurers contained in any Non-Settling Insurers' Policies.

(c)     For the avoidance of doubt, recourse for the Abuse Claims referred to in this Section 12.14 of the Joint Plan is limited to Non-Settling Insurers, the Non-Settling Insurers' Policies, and the proceeds of the Non-Settling Insurers' Policies.

**Section 12.15  Ratification of Sale Injunction. Pursuant to sections 105(a), 363, and 1123 of the Bankruptcy Code, and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including the Settling Insurers' purchase of the Settling Insurers' Policies free and clear of all Liens, Claims, and Subject Interests pursuant to section 363(f) of the Bankruptcy Code, this Joint Plan hereby incorporates by reference, adopts, and ratifies (and the Confirmation Order shall adopt and ratify) the injunction of Claims against a Settling Insurer with respect to any Subject Insurance Policy set forth in the Insurance Settlement Order(s) (each, a "Sale Injunction") in all respects. The Sale Injunction(s) are in addition to and independent of the injunctions in Sections 12.4 and 12.5 herein.**

## ARTICLE 13
## RETENTION OF JURISDICTION

**Section 13.1     Bankruptcy Court.** Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over any and all matters arising out of, or related to, any Chapter 11 Cases or the Joint Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)     resolve any matters related to (i) the assumption or rejection of any Executory Contract or Unexpired Lease to which the Debtor or any Additional Debtor is party or with respect to which the applicable Debtor, Reorganized Archdiocese, Additional Debtor, or Reorganized Additional Debtor may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code, and (ii) any dispute regarding whether a contract or lease is or was executory or expired;

(b)     determine, adjudicate, or decide any other applications, adversary proceedings, contested matters, and any other matters pending on the Effective Date;

(c)     ensure that Distributions and Settlement Trust Distributions to Creditors holding Allowed Claims are accomplished as provided herein;

(d)     resolve disputes as to the ownership of any Claim;

(e) Allow, Disallow, determine, liquidate, classify, estimate, or establish the Priority, Secured, or Unsecured status, or amount of any Claim, including the resolution of (i) any request for payment of any Administrative Claim, (ii) any objections to the secured or unsecured status, priority, amount, or Allowance of Claims, or (iii) any dispute concerning any excusable neglect issues related to any Late-Filed Abuse Claim or Late-Filed Non-Abuse Claim;

(f) resolve any Claim or Cause of Action against an Exculpated Party, or the applicable Debtor, Reorganized Archdiocese, Additional Debtor, or Reorganized Additional Debtor that arises from, or is related to, any Chapter 11 Cases, the negotiation of the Joint Plan, the administration of the Joint Plan, the Plan Documents, Distributions, Settlement Trust Distributions, or any conduct or transaction in furtherance of the foregoing;

(g) make any determination with respect to Article 12 of the Joint Plan, including enforcement thereof, and jurisdiction to adjudicate the merits of any underlying colorable Claim or Cause of Action;

(h) enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, reversed, modified, or vacated;

(i) enter such Orders in aid of implementation of the Joint Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(j) consider any modifications of the Joint Plan, to cure any defect or omission, or to reconcile any inconsistency in any Order, including the Confirmation Order;

(k) hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 330, 331, and 503(b) of the Bankruptcy Code;

(l) hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Joint Plan or Confirmation Order;

(m) hear and determine any issue for which the Joint Plan requires an Order;

(n) hear and determine matters concerning state, local, and federal Taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o) hear and determine disputes arising in connection with compensation and reimbursement of expenses of Professionals for services rendered during the period commencing on the applicable Archdiocese's Petition Date or the Additional Debtors' Petition Date through and including the Effective Date;

(p) hear and determine any Preserved Estate Causes of Action;

(q) hear and determine any matter regarding the existence, nature, and scope of the releases, injunctions and discharge of the Archdiocese, Additional Debtors, or Settling Insurers;

(r) hear and determine any matter, case, controversy, Action, suit, dispute, or Cause of Action (i) regarding the existence, nature, and scope of the discharge, releases, injunctions (including the Injunctions), and exculpation (including the Exculpations) provided under the Joint Plan, and (ii) enter such Orders as may be necessary or appropriate to implement such discharge, releases, injunctions, exculpations, and other provisions;

(s) hear and determine conflicts and disputes among the Settlement Trust, the Reorganized Archdiocese, the Reorganized Additional Debtors, and all Creditors, including whether the applicable Debtor, Reorganized Archdiocese, Additional Debtors, or Reorganized Additional Debtors have failed to comply with the Post-Effective Date Insurance Obligations;

(t) issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with the Joint Plan, the

Archdiocese or its property, the Reorganized Archdiocese or its property, the Additional Debtors or their property, the Reorganized Additional Debtors or their property, the Estates, the Settlement Trust or its property, the Settlement Trustee, the Professionals, or the Confirmation Order;

(u)  resolve any and all disputes related to the Non-Monetary Plan Provisions, including any action seeking specific performance of the Non-Monetary Plan Provisions;

(v)  issue injunctions, enter and implement other Orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation or enforcement of the Joint Plan;

(w)  adjudicate all disputes arising from or relating to Distributions under the Joint Plan or Settlement Trust Distributions under the Settlement Trust Documents;

(x)  enforce all Orders previously entered by the Bankruptcy Court;

(y)  enter a Final Decree; and

(z)  hear any other matter not inconsistent with the Bankruptcy Code.

**Section 13.2  By the District Court.** Pursuant to sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. § 1334, on and after the Effective Date, the District Court will retain original, but not exclusive, jurisdiction to hear and determine any and all matters arising under the Bankruptcy Code or arising in or related to any Chapter 11 Cases.

## ARTICLE 14
## MISCELLANEOUS

**Section 14.1  No Successor Liability**. Except as otherwise expressly provided in the Joint Plan, neither the Reorganized Archdiocese nor the Reorganized Additional Debtors, pursuant to the Joint Plan or otherwise, assume, agree to perform, pay, or indemnify any Entity, or otherwise have any responsibility for any liabilities or obligations of the Debtor relating to or arising out of the operations of or assets of the Debtor or Additional Debtors, whether arising before, on or after the Effective Date. The applicable Debtor, Additional Debtors, Reorganized Archdiocese, or Reorganized Additional Debtors will not be deemed to be a successor to the applicable Debtor or Additional Debtors by reason of any theory of law or equity, and none will have any successor or transferee liability of any kind or character; provided, however, (a) the Reorganized Archdiocese and Reorganized Additional Debtors will assume and remain liable for their respective obligations specified in the Joint Plan, the Plan Documents, and the Confirmation Order, and (b) the Settlement Trust will assume the obligations of the Settlement Trust that are specified in the Settlement Trust Documents, Joint Plan, and Confirmation Order.

**Section 14.2  Certain Transfer Taxes.** Pursuant to section 1146(c) of the Bankruptcy Code, the following will not be subject to a stamp Tax, real estate transfer Tax, sales or use Tax or similar Tax as follows: (a) the creation of any mortgage, Lien, or other security interest; (b) the making or assignment of any lease or sublease; (c) any transaction related to the Joint Plan, including the sale of the Affordable Housing Facilities; or (d) the making or delivery of any deed, bill of sale or other instrument of transfer or assignment or any plan of merger, consolidation, liquidation or dissolution under, in furtherance of or in connection with the Joint Plan.

**Section 14.3  Operations between the Confirmation Date and Effective Date**. During the period from the Confirmation Date through and until the Effective Date, the Debtor and Additional Debtors may continue to operate as a debtor-in-possession, subject to any and all applicable Orders of the Bankruptcy Court.

**Section 14.4  Dissolution of Creditors' Committees.** On the Effective Date, the Creditors' Committees will dissolve automatically, whereupon their members, Professionals, and agents will be released from any further duties and responsibilities in the Archdiocese's Chapter 11 Case and under the

Bankruptcy Code, provided, however, that such parties will continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), mediation and settlement privileges, and protective Orders entered during any of the Chapter 11 Cases, which will remain in full force and effect according to their terms. For the avoidance of doubt, the Creditors' Committees and Creditors' Committees' Professionals will continue to have a right to be heard with respect to all Fee Applications for their Professional Fee Claims and appeals from the Confirmation Order.

**Section 14.5    Indemnification of Members, Managers, Officers, and Employees.** Any obligation of the Archdiocese or Additional Debtors to indemnify any individual serving at any time on or before the Effective Date, as one of its respective officers, employees, council members, or volunteers by reason of such individual's service in such capacity, to the extent provided in any of the applicable constituent documents, by a written agreement with the Archdiocese, or under the laws of the State of Louisiana, will be deemed and treated as Executory Contracts that are assumed by the applicable Reorganized Archdiocese or Reorganized Additional Debtors, pursuant to the Joint Plan and section 365 of the Bankruptcy Code as of the Effective Date; provided, however, under no circumstances will the applicable Debtor or Reorganized Archdiocese, or Additional Debtors or Reorganized Additional Debtors, assume or be responsible for any alleged indemnification of any Perpetrator or other individual against whom the applicable Archdiocese or Additional Debtor has determined or may, in the future, determine, that there are credible allegations of Abuse, or such individual has or may have engaged in some other conduct that otherwise would excuse the applicable Reorganized Archdiocese or Reorganized Additional Debtors from providing such indemnification to such individual.

**Section 14.6    Good Faith and Section 1125 of the Bankruptcy Code.** As of, and subject to the occurrence of, the Confirmation Date, the Debtor, Additional Debtors, Creditors' Committee, and the Settling Insurers will be deemed to have solicited acceptances of the Joint Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including sections 1125(a) and 1125(e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosures in connection with such solicitation.

**Section 14.7    Additional Reservation of Rights.** In accordance with the Joint Plan, the Debtor and Additional Debtors reserve the right to sell property of their respective Estates in any Section 363 Sale, or compromise Estate Causes of Action on behalf of the applicable Estate, at any time before the Effective Date, subject to Bankruptcy Court approval.

**Section 14.8    Special Provisions Governing Unimpaired Claims**. Except as otherwise provided in the Joint Plan, nothing will affect the rights and defenses of the applicable Debtor, Reorganized Archdiocese, Additional Debtor, or Reorganized Additional Debtor with respect to any Unimpaired Claims, including any and all rights with respect to legal and equitable defenses to, or setoffs or Final Orders against, such Unimpaired Claims.

**Section 14.9    Tax Exemption.** Pursuant to section 1146 of the Bankruptcy Code, the delivery or recording of an instrument of transfer on or after the Confirmation Date will be deemed to be made pursuant to and under the Joint Plan, including any transfer by the Debtor and/or any Additional Debtors, or any subsequent transfer by the Reorganized Archdiocese or Reorganized Additional Debtor to the Settlement Trust, or by the Settlement Trustee of property from the Settlement Trust or the sale of the Affordable Housing Facilities and will not be taxed under any law imposing a stamp Tax, transfer Tax, state deed Tax, or similar Tax or fee.

**Section 14.10    Retention of Professionals on and After the Effective Date.** On and after the Effective Date, the Reorganized Archdiocese and Reorganized Additional Debtors may employ and pay any professional without any further notice to or action, Order, or approval of the Bankruptcy Court.

**Section 14.11    Protections against Discriminatory Treatment.** Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Entity, including

Governmental Units, will discriminate against the Reorganized Archdiocese or Reorganized Additional Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Archdiocese or Reorganized Additional Debtors, or another Entity with whom the Reorganized Archdiocese or Reorganized Additional Debtors has been associated, solely because the Archdiocese or Additional Debtors have been a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of any Chapter 11 Cases, or has not paid a debt that is dischargeable in any Chapter 11 Cases.

Section 14.12   **Non-Severability.** If, before the entry of the Confirmation Order, any term or provision of the Joint Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, Additional Debtor, and Creditors' Committee will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Joint Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The terms and provisions of the Joint Plan, including Article 12 of the Joint Plan, are mutually dependent and non-severable. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Joint Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Joint Plan and may not be deleted or modified without the written consent of the applicable Debtor, Reorganized Archdiocese, Additional Debtor, or Reorganized Additional Debtor, and (c) non-severable and mutually dependent.

Section 14.13   **Modification of the Joint Plan.** Subject to the restrictions on modification set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3019 and the Insurance Settlement Agreements, the Debtor, Additional Debtors, and Creditors' Committee reserve the right to jointly alter, amend, or modify the Joint Plan before the substantial consummation of the Joint Plan. An Order of the Bankruptcy Court approving any amendment or modification made to the Joint Plan will constitute an Order in aid of consummation of the Joint Plan and will not require the re-solicitation of votes on the Joint Plan. The Joint Plan may not be altered, amended or modified without the express consent of the Debtor, Additional Debtors, and the Creditors' Committee.

Section 14.14   **Revocation or Withdrawal of the Joint Plan.** The Debtor, Additional Debtors, and Creditors' Committee each reserve the right to revoke or withdraw their respective status as plan proponents to the Joint Plan at any time before the Confirmation Date by Filing a notice of withdrawal or revocation.

Section 14.15   **Substantial Consummation**. On the Effective Date, the Joint Plan will be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

Section 14.16   **Filing Additional Documents.** At any time before substantial consummation, the Settlement Trust, the applicable Debtor, Reorganized Archdiocese, Additional Debtors, or Reorganized Additional Debtors may File with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Joint Plan, or otherwise to comply with applicable law.

Section 14.17   **Powers of Officers.** The officers of the applicable Debtor, Reorganized Archdiocese, Additional Debtors, and Reorganized Additional Debtors will have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Joint Plan.

54

Section 14.18   **Effective Date Actions Simultaneous.** Unless the Joint Plan or Confirmation Order provides otherwise, actions required to be taken on the Effective Date will take place and be deemed to have occurred simultaneously, and no such action will be deemed to have occurred before the taking of any other such action.

Section 14.19   **Successors and Assigns.** The rights, benefits, and obligations of any Entity named or referred to in the Joint Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

Section 14.20   **Headings.** Headings are used in the Joint Plan for convenience and reference only and will not constitute a part of the Joint Plan for any other purpose.

Section 14.21   **Conflicts.** The terms of the Joint Plan will govern in the event of any inconsistency between the Joint Plan and Disclosure Statement. In the event of any inconsistency with the Joint Plan and Confirmation Order, the Confirmation Order will govern with respect to such inconsistency. If there is any inconsistency between the terms of the Confirmation Order and the terms of any final, executed Plan Exhibit or Plan Supplement, the terms of the final, executed Plan Exhibit or Plan Supplement will govern and control. The terms of the Insurance Settlement Order will govern in the event of any inconsistency between the Insurance Settlement Order and the Joint Plan, Disclosure Statement, Confirmation Order, or Plan Documents. Notwithstanding anything to the contrary in the Joint Plan, in the event of any inconsistency between (a) the Insurance Settlement Agreements, on the one hand, and (b) the Joint Plan, on the other, the terms of the applicable Insurance Settlement Agreement shall control and govern; and in the event of any inconsistency between the (x) Insurance Settlement Order, on the one hand, and (y) the Joint Plan and Confirmation Order, on the other, the terms of the Insurance Settlement Order shall control and govern.

Section 14.22   **Governing Law**. Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Joint Plan will be governed by and construed and enforced as provided in the laws of the State of Louisiana, without giving effect to the principles of conflict of laws thereof.

Section 14.23   **Entire Agreement**. The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions, negotiations, understandings, and documents. No Entity will be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided in the Joint Plan or other Plan Documents, or as may be agreed to by the affected parties in writing after the Effective Date.

Section 14.24   **Post-Confirmation Notices.** On and after the Effective Date, Post-Confirmation Notices will be deemed to have been duly given when such Notices are served on the Post-Confirmation Notice Parties. After the Effective Date, the Reorganized Archdiocese, Reorganized Additional Debtors, and Settlement Trustee are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed a renewed request to receive documents pursuant to Bankruptcy Rule 2002.

Section 14.25   **No Admissions.** Other than as expressly provided under the Joint Plan or the Confirmation Order, nothing in the Joint Plan or Disclosure Statement, or any document or pleading Filed in connection therewith, will constitute or be deemed to constitute an admission that the Debtor or any Additional Debtor is subject to, or liable for, any Claim, or is liable for or guilty of any wrongdoing or misconduct of any type.

Section 14.26   **Duplicate Proofs of Claim.** Any duplicate Proof of Claim that has been paid or satisfied, or any Proof of Claim that is clearly marked as amended or superseded by a subsequently Filed Proof of Claim that remains on the Claims Register, may be adjusted or expunged on the Claims Register by the Claims and Voting Agent at the direction of the Reorganized Archdiocese upon stipulation between

55

the parties in interest, without an objection having to be Filed, and without any further notice to or action, Order, or approval of the Bankruptcy Court.

**Section 14.27    Consent to Jurisdiction.** Upon default under the Joint Plan, the (a) Debtor and Reorganized Archdiocese, (b) the Additional Debtors and the Reorganized Additional Debtors, (c) the Contributing Non-Debtor Catholic Entities, (d) the Settlement Trust, (e) the Settlement Trustee, (f) the Creditors' Committees, (g) the Settlement Trust Advisory Committee, (h) the Unknown Abuse Claims Representative, (i) the Abuse Claims Reviewer, and (j) the successors, if any, to (a) through (i) hereof, consent to the jurisdiction of the Bankruptcy Court, and agree that the Bankruptcy Court is and will be the preferred forum for all proceedings relating to any such default.

**Section 14.28    Immediate Binding Effect.** Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Joint Plan (including the Plan Supplements) will be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtor, the Additional Debtors, Creditors holding Claims, any Covered Parties, and each of their respective successors and assigns, including the Reorganized Archdiocese and Reorganized Additional Debtors.

**Section 14.29    Closing the Chapter 11 Cases.** As soon as practicable after the Effective Date, when the applicable Reorganized Archdiocese and Reorganized Additional Debtors deem appropriate, the Reorganized Archdiocese or Reorganized Additional Debtors will seek authority from the Bankruptcy Court to close any applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules; provided, however, that entry of a Final Decree closing any Chapter 11 Cases will, whether or not specified therein, be without prejudice to the right of the Reorganized Archdiocese, the Reorganized Additional Debtors, the Settlement Trust, or any other party in interest to reopen the applicable Chapter 11 Case for any matter over which the Bankruptcy Court or District Court has retained jurisdiction under the Joint Plan. Any Order closing any Chapter 11 Case will provide that the Bankruptcy Court or District Court, as appropriate, will retain (a) jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation Order, any other Orders entered in the Chapter 11 Cases, and the obligations created by any Plan Document, and (b) any and all other jurisdiction and authority granted to it under any Plan Document. The existence and continued operation of the Settlement Trust will not prevent the Bankruptcy Court from closing any Chapter 11 Cases or entering a Final Decree. In any Action involving the Settlement Trust or any Action seeking the specific performance of the Non-Monetary Plan Provisions, any costs incurred in reopening the applicable Chapter 11 Case, including any statutory fee, will be paid solely paid by the Settlement Trustee from the Settlement Trust Assets.

56

Dated as of October 27, 2025.

**THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS**

By: _____
Most Reverend Gregory M. Aymond
Archbishop

**THE ADDITIONAL DEBTORS**

By: _____
Very Reverend Patrick R. Carr

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: _____
Patricia M. Moody, Committee Chair

57

Dated: October 27, 2025

| | |
|---|---|
| /s/ Samantha A. Oppenheim | /s/ James S. Stang |
| JONES WALKER LLP | PACHULSKI STANG ZIEHL & JONES LLP |
| R. Patrick Vance (#13008) | James I. Stang (CA Bar 94435) (pro hac vice) |
| Elizabeth J. Futrell (#05863) | Iain A.W. Nasatir (CA Bar 148977) (pro hac vice) |
| Mark A. Mintz (#31878) | Andrew W. Caine (CA Bar 110345) (pro hac vice) |
| Samantha A. Oppenheim (#38364) | Karen B. Dine (NY Bar 2625366) (pro hac vice) |
| 201 St. Charles Avenue, 51st Floor | 10100 Santa Monica Blvd., Ste. 1300 |
| New Orleans, LA  70170 | Los Angeles, CA  90067 |
| Telephone: (504) 582-8000 | Telephone:  (310) 277-6910 |
| Facsimile:  (504) 589-8260 | Facsimile:  (310) 201-0760 |
| Email:  pvance@joneswalker.com | Email:  jstang@pszjlaw.com |
|             efutrell@joneswalker.com |            inasatir@pszjlaw.com |
|             mmintz@joneswalker.com |            acaine@pszjlaw.com |
|             soppenheim@joneswalker.com |            kdine@pszjlaw.com |

**ATTORNEYS FOR**
**THE ROMAN CATHOLIC CHURCH OF**
**THE ARCHDIOCESE OF NEW ORLEANS**

| | |
|---|---|
| /s/ Douglas S. Draper | /s/ Bradley C. Knapp |
| HELLER, DRAPER, & HORN, L.L.C. | TROUTMAN PEPPER LOCKE LLP |
| Douglas S. Draper | Omer F. Kuebel, III (La #21682) |
| Greta S. Brouphy | Bradley C. Knapp (La #35867) |
| Michael E. Landis | 601 Poydras Street, Suite 2660 |
| 650 Poydras Street, Suite 2500 | New Orleans, Louisiana 70130-6036 |
| New Orleans, Louisiana 70130 | Telephone: (504) 558-5210 |
| Telephone: 504-299-3300 | Facsimile: (504) 910-6847 |
| Facsimile: 504-299-3399 | Email:  rick.kuebel@troutman.com |
| E-mail: ddraper@hellerdraper.com |            brad.knapp@troutman.com |
|           gbrouphy@hellerdraper.com | |
|           mlandis@hellerdraper.com | TROUTMAN PEPPER LOCKE LLP |
| | W. Steven Bryant (TX Bar No. 2427413) |
| | 300 Colorado Street, Ste. 2100 |
| | Austin, Texas 78701 |
| | Telephone: (512) 305-4726 |
| | Facsimile: (512) 305-4800 |
| | Email: steven.bryant@troutman.com |

**ATTORNEYS FOR**
**THE ADDITIONAL DEBTORS**

**ATTORNEYS FOR THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS**

# PLAN EXHIBIT A

**DEFINED TERMS FOR THE FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS AND THE ADDITIONAL DEBTORS, PROPOSED BY THE DEBTOR, THE ADDITIONAL DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, DATED AS OF OCTOBER 27, 2025, AND THE ACCOMPANYING DISCLOSURE STATEMENT**

1.     "**1793 Group**" means 1793 Group, Inc. a Louisiana non-profit corporation.

2.     "**Abuse**" means any of the following actual or alleged acts: (a) touching by the Perpetrator of the person's intimate body parts (genitals, breasts, or buttocks), the touching by the person of the Perpetrator's intimate body parts, showing pictures of the person's body or other persons' bodies, taking pictures of the person's body, showing pornography, or making images of the person while naked or engaged in any sexual activity, or any sexualized interaction including observing the person in bathing, toileting, or undressing that was made possible by the Perpetrator's position of authority, or by the inducement of the Perpetrator; or (b) sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to the genital or anal openings: (i) of the person's body by any part of the Perpetrator's body or any object used by the Perpetrator for this purpose; or (ii) of the person's body by any part of the body of the Perpetrator or by any part of the body of another person, or by any object used by the Perpetrator or another person for this purpose; (c) inappropriate physical contact and/or contact that infringes upon another's personal, physical boundaries including but not limited to groping, kissing, extended hugging, and/or any unwelcomed touching; (d) grooming or trying to create a special relationship, including but not limited to: talk of a sexual nature, talk of a romantic nature, communications expressing individual love to the person, as opposed to a salutation, providing material resources or experiences which induce the person into a relationship where trust is then violated; or (e) any actual or alleged acts of the kind described in subsections (a)-(c) above that occur between or among minors and that the Perpetrator orchestrates or encourages. For the avoidance of doubt, "Abuse" also includes: any actual or alleged conduct which (a) is described in the Louisiana Child Victims Act or (b) would constitute (i) a sexual offense as defined in article 603(2) of the Louisiana Children's Code; (ii) sexual battery as defined in L A. R EV. S TAT. §§ 14:43.1; 14:43.1.1; 14:43.2; 14: or 43.3, (iii) a crime against nature as defined in L A. R EV. S TAT. § 14:89, or (i) pornography involving juveniles as defined in L A. R EV. S TAT. § 14:81.1, or with respect to the foregoing subsection (i)-(iv), any predecessor statute that prohibited such conduct at the time of the act.

3.     "**Abuse Action**" means an Action asserting an Abuse Claim against any of the Covered Parties.

4.     "**Abuse Claim**" means any Claim that has been asserted, or could be asserted, against any Covered Party, Settling Insurer or Non-Settling Insurer, that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively alleged Abuse that occurred, in whole or in part, before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date, including any such Claim that seeks monetary damages or any other relief, under any legal or equitable theory of liability, including, but not limited to, the following: vicarious liability; *respondeat superior*; any conspiracy, fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, negligent, insufficient, or inadequate supervision, retention or misrepresentation; any theory based on misrepresentation, concealment, or unfair practice; public or private nuisance; or any theory, including, without limitation, any theory based on public policy or any acts or failures to act by any Covered Party, any Settling Insurer, or any other Entity for whom any Covered Party or any Settling Insurer is allegedly responsible, including, but not limited to, any such Abuse Claim against any Covered Party, Settling Insurer Non-Settling Insurer, or any other Entity for whom any Covered Party, Settling Insurer or Non-Settling Insurer is alleged to be responsible. Abuse Claims are: (a) the Known Abuse Claims, which are treated in Class 3; and (b) the Unknown Abuse Claims, which are treated in Class 4. For the avoidance of doubt, "Abuse Claim" includes (a) all Unknown Abuse Claims, (b) Claims or causes of action defined or described in the Revival Window Laws against the Archdiocese or any other Covered Party, (c) Direct Action Claims, and (d) any Claim against the Archdiocese or any other Covered Party that is attributable to, arises from, is based upon, relates to, or results from Abuse that, as of the Petition Date is barred by any applicable statute of limitations, and in each case, irrespective of whether (x) such Claims also involve the conduct of joint tortfeasors (or similar concepts under applicable

**Plan Exhibit A**
Page 2

law), (y) such Claims arise under, or were revived pursuant to, the Revival Window Laws, or any future reviver law, statute, or binding precedential decision passed or issued on or after the Joint Plan Effective Date, or (z) a proof of claim has been filed, before or after the Claims Bar Date, or not at all, or an Abuse Action has been commenced with respect to such Claim. "Abuse Claim" does not include: (a) Related Insurance Claims or Coverage Claims against Settling Insurers or Non-Settling Insurers; (b) Non-Insurer Contribution Claims with respect to any Abuse Claim; (c) Insurer Contribution Claims with respect to any Abuse Claim; or (d) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to a Claim against such diocese only. For the avoidance of doubt, a Claim based on Abuse solely occurring following the applicable Petition Date is not an Abuse Claim. Nothing in this definition shall constitute a waiver of any defense that would otherwise be available under applicable law to any Covered Party, Settling Insurer, the Settlement Trust, or any other Entity.

5.  "**Abuse Claim Release and Certification**" means a written release in favor of the Debtor, the Additional Debtors, and the Settling Insurers, in the form of Plan Exhibit C, that an Abuse Claimant must execute and deliver before he or she is entitled to receive any Settlement Trust Distributions.

6.  "**Abuse Claimant**" means the holder of an Abuse Claim, including, but not limited to, any Known Abuse Claim, Unknown Abuse Claim, or Direct Action Claim. For the avoidance of doubt, Abuse Claimants are Creditors. The definition of an Abuse Claimant includes the legal representative of the holder of an Abuse Claim, such as a bankruptcy trustee, the estate of a deceased individual who held an Abuse Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Abuse Claim, as the case may be. A Creditor holding the following Claim is not an Abuse Claimant: (i) a Non-Insurer Contribution Claim with respect to such Abuse Claim, (ii) an Insurer Contribution Claim with respect to such Abuse Claim; (iii) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to a Claim against such diocese only.

7.  "**Abuse Claims Reviewer**" means the Entity identified in Plan Supplement 6.5, including the designee of such Entity, who will assess Abuse Claims pursuant to the Allocation Protocol and Plan. Disclosures related to the Abuse Claims Reviewer are contained in Plan Supplement 6.5.

8.  "**Abuse Proof of Claim**" means a Proof of Claim alleging, reflecting, memorializing, or otherwise asserting an Abuse Claim.

9.  "**Abuse Related Insurance Claims**" collectively means any Claims against any Insurer for defense, indemnity, reimbursement, contribution, subrogation, or similar relief that directly or indirectly relates to any Abuse Claim, whether sounding in contract, tort, or otherwise, including equity and bad faith, held by: (a) the Archdiocese for any reason related to any Abuse Claim including those for (i) indemnity and payment of any Abuse Claim, (ii) any Insurer's failure or refusal to provide insurance coverage for any Abuse Claim under any Subject Insurance Policy, (iii) any Insurer's tortious or wrongful claims handling including the failure or refusal of any Insurer to timely compromise and settle any Abuse Claims against the Archdiocese pursuant to any Subject Insurance Policy, (iv) to the extent not otherwise encompassed by section (iii) above, any Insurer's failure or refusal to reasonably settle the Abuse Claims, and (v) the interpretation or enforcement of the terms of any Subject Insurance Policy as it pertains to any of the foregoing; and/or (b) any of the other Protected Parties or Settling Insurers for any reason related to any Abuse Claim against the other Protected Party or Settling Insurer, whether independently or jointly liable with the Archdiocese on such Abuse Claim, including for (i) indemnity and payment of any Abuse Claim, (ii) any Insurer's failure or refusal to provide insurance coverage under any Subject Insurance Policy for any Abuse Claim against any Protected Party or a Settling Insurer, (iii) any Insurer's tortious or wrongful claims handling including the failure or refusal of any Insurer to timely compromise and settle any Abuse Claims against any Protected Party or a Settling Insurer pursuant to any Subject Insurance Policy, (iv) to the extent not otherwise encompassed by section (iii) above, any Insurer's failure or refusal to reasonably settle the Abuse Claims, and (v) the interpretation or enforcement of the terms of any Subject Insurance

#104076707v1

Policy as it pertains to any of the foregoing. The term "Abuse Related Insurance Claim" also includes any Claims or Causes of Action for reimbursement of Post-Effective Date Costs under any Subject Insurance Policy, but only to the extent such Post-Effective Date Costs are actually owed by the Settlement Trust.

10. "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

11. "**Additional Debtors**" or "**Catholic Entities**" means the Entities listed on Plan <u>Exhibit B-1</u>.

12. "**Additional Debtors' Abuse Proof of Claim Form**" is the proof of claim form attached as <u>Plan Exhibit H</u>.

13. "**Additional Debtors' Abuse Claims Bar Date**" means the applicable date established by the Joint Plan as the last date for Filing Proofs of Claim asserting Abuse Claims against any Additional Debtors, which date is December 2, 2025

14. "**Additional Debtors' Abuse Claims Bar Date Notice**" is the Notice attached as <u>Plan Exhibit F</u>.

15. "**Additional Debtors' Abuse Claims Bar Date Publication Notice**" is the Notice attached as <u>Plan Exhibit G</u>.

16. "**Additional Debtors' Assets**" collectively means all property of the Additional Debtors, respectively, of every kind and character, wherever located, whether real or personal, tangible or intangible, and specifically including Cash, Estate Causes of Action, and Avoidance Actions.

17. "**Additional Debtors' Chapter 11 Cases**" means the chapter 11 cases Filed or to be Filed by the Additional Debtors on the Additional Debtors' Petition Date. The Additional Debtors' Chapter 11 Cases will be jointly administered with the Archdiocese's Chapter 11 Case.

18. "**Additional Debtors' Estate**" means the estate of each Additional Debtor, created pursuant to section 541 of the Bankruptcy Code upon the filing of each Additional Debtor's Chapter 11 Case.

19. "**Additional Debtors' Petition Date**" means the date on which the Additional Debtors each Filed a petition for relief under chapter 11 of the Bankruptcy Code.

20. "**Additional Debtors' Non-Trade Proof of Claim Form**" is the proof of claim form attached as <u>Plan Exhibit K</u>.

21. "**Additional Debtors' Non-Trade Claims Bar Date**" means the applicable date established by the Joint Plan as the last date for Filing Proofs of Claim asserting Additional Debtor Non-Trade Claims against any Additional Debtors, which date is December 2, 2025.

22. "**Additional Debtors' Non-Trade Claims Bar Date Publication Notice**" is the Notice attached as <u>Plan Exhibit J</u>.

23. "**Additional Debtors' Non-Trade Unsecured Claims**" means all General Unsecured Claims against the Additional Debtors and all Non-Abuse Personal Injury Claims against the Additional Debtors. The Additional Debtors' Non-Trade Unsecured Claims are treated in Class 10, at Section 4.10 of the Joint Plan.

24. "**Additional Plan Consideration**" means the following:

    a. The Debtor's and the Additional Debtors' agreement to the Non-Monetary Plan Provisions.

<div align="center">

**Plan Exhibit A**
Page 4

</div>

    b.    The Debtor's and Additional Debtors' execution of, and consent to, the Insurance Settlement Agreements;

    c.    The Additional Debtors' consent to the treatment of the Additional Debtors' Non-Insurer Contribution Claims as provided in Section 4.5 of the Joint Plan;

    d.    The Debtor's and Additional Debtors' agreement to pay the compensation of the Abuse Claims Reviewer, as set forth in Section 6.5 of the Joint Plan;

    e.    The Debtor's and Additional Debtors' waiver of any indemnification from the Settlement Trust in connection with the Non-Settling Insurance Rights Transfer and the Non-Setting Insurance Rights Transfer Backup; and

    f.    The Archdiocesan Parishes' release of any Cure Claims owed by the Reorganized Archdiocese in connection with its assumption of the Parish Service Agreements.

25. "**Administrative Claim**" means a Claim for costs and expenses of administration incurred during the applicable Chapter 11 Cases against the Debtor and/any Additional Debtor that is allowable and entitled to priority under sections 503, 507(a)(2), 507(b), and 1114(e)(2) of the Bankruptcy Code, including any actual and necessary expenses of preserving the respective Estates, any actual and necessary expenses of operating the business of the applicable Archdiocese or any Additional Debtor; provided, however, that the definition of Administrative Claim does not include fees or charges assessed against the applicable Estates under 28 U.S.C. § 1930.

26. "**Administrative Claims Bar Date**" means the deadline for Filing requests for payment of Administrative Claims other than Professional Fee Claims against the Debtor and/or any Additional Debtors, which deadline will be thirty (30) days after the Effective Date; provided, however, that the Administrative Claims Bar Date does not apply with respect to any Professional Fee Claims, the DIP Credit Card Claim, or any Administrative Trade Claims.

27. "**Administrative Offices**" means the Debtor's administrative offices and excludes the separate operations of (a) the Archdiocesan Schools, or (b) the following parishes that operate within the Region that are not separately incorporated: (i) St. Louis Cathedral; (ii) Our Lady of Guadalupe Church & Shrine of St. Jude.

28. "**Administrative Trade Claim**" means an Administrative Claim against the Debtor and/or any Additional Debtors arising from or with respect to the sale of goods or rendition of services on or after the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date in the ordinary course of business, including, but not limited to, Administrative Claims of employees for ordinary course wages, expense reimbursement, and health and welfare benefits.

29. "**Affordable Housing Entities**" means the Louisiana entities identified in Schedule A-1 to these Definitions, each of which is organized as a non-profit entity and is a Non-Debtor Catholic Entity.

30. "**Affordable Housing Facilities**" means the low- and moderate-income housing and related facilities identified in Schedule A-2 to these Definitions, each of which is managed by Christopher Homes Management and owned by one of the Affordable Housing Entities.

31. "**Affordable Housing Facilities Broker**" means NEWMARK Affordable Housing Advisors, who will act as a broker to market the sale of the Affordable Housing Facilities and assignment of contracts related to the same as set forth in Section 5.3(a)(iii) of the Joint Plan.

32. **"Affordable Housing Facilities Buyer"** means [____•____], the buyer of the Affordable Housing Facilities.[1]

33. **"Affordable Housing Facilities Sale Escrow Account"** means the account established by the Affordable Housing Facilities Sale Escrow Agreement.

34. **"Affordable Housing Facilities Sale Escrow Agreement"** means the agreement governing the escrow established by Section 5.3(a)(vii) which shall hold the proceeds of the sale of the Affordable Housing Facilities if such sale has closed before the Effective Date. The Affordable Housing Facilities Sale Escrow Agreement is attached as Plan Supplement 5.3(a)(vii).

35. **"Allow,"** **"Allowed,"** or **"Allowance"** when used with respect to a Claim means: (a) a Claim that has been listed on the Schedules, as liquidated in amount and not Disputed or Contingent, and as to which no Proof of Claim or objection to the scheduled amount has been timely Filed; (b) a Claim as to which a Proof of Claim has been timely Filed, or deemed timely Filed by Final Order, and either (i) no objection thereto has been timely Filed, or application to subordinate or otherwise limit recovery has been made, or (ii) the Claim has been allowed (but only to the extent allowed) by a Final Order; (c) a Claim that has been allowed under the provisions of the Joint Plan; (d) which is a Professional Fee Claim for which a fee award amount has been approved by a Final Order; or (e) a Claim that is allowed pursuant to any stipulation of amount and nature of Claim executed by the applicable Creditor and the Archdiocese, Reorganized Archdiocese, Additional Debtors, or Reorganized Additional Debtors (as applicable).

36. **"Allocation Protocol"** means the *Allocation Protocol for Known Abuse Claims and Unknown Abuse Claims*, in form and substance substantially similar to Plan Exhibit D-2.

37. **"Amended Bond Documents"** means: (a) the *Bond Indenture*, as amended as of the Effective Date; (b) that certain *Loan Agreement* by the Archdiocese, dated as of April 1, 2017, related to the Bonds, as amended as of the Effective Date; (c) the *Continuing Disclosure Agreement* by the Archdiocese, also dated as of April 1, 2017, as amended as of the Effective Date; (d) the *Bond Trustee Settlement Agreement*, as amended as of the Effective Date; and (e) any other documents and agreements related to the Bonds, as amended as of the Effective Date. The Amended Bond Documents will be attached to Plan Supplement 4.6.

38. **"ANOI"** means The Archdiocese of New Orleans Indemnity, Inc., a non-profit captive insurance company incorporated in the State of Vermont. ANOI is one of the Non-Debtor Catholic Entities. ANOI is a wholly owned subsidiary of 7887 Walmsley, Inc., 7887 Walmsley, Inc is a wholly owned subsidiary of the Archdiocese.

39. **"Archbishop"** means, as the context requires: (a) the office of the ordinary of the Archdiocese under Canon Law; (b) the Most Reverend Gregory Michael Aymond, the Archbishop on the Effective Date; and (c) any duly appointed or elected administrator of the Archdiocese pending the appointment of a new individual to serve as the Archbishop, and his duly appointed or elected successor.

40. **"Archdiocesan Agencies"** means the Entities identified on Plan Exhibit B-1, at Part III, and Plan Exhibit B-2, each of which is organized as a non-profit corporation.

41. **"Archdiocesan Agency Assessments"** means the fees the Debtor charges each of the Archdiocesan Agencies as compensation for the services the Debtor provides to the Archdiocesan Agencies. For the avoidance of doubt, the definition of Archdiocesan Agency Assessments excludes charges for services subcontracted by the Archdiocese or owed to other Entities, including, but not limited to, legal fees, bank investment charges and services, employee benefits charges and services, insurance premiums and self-insured retentions and deductibles.

---

[1] To be provided.

#104076707v1

42.     "**Archdiocesan Parish Assessments**" means the fees the Debtor charges each of the Archdiocesan Parishes as compensation for the services the Debtor provides to the Archdiocesan Parishes pursuant to, among other things, the Parish Service Agreements.  For the avoidance of doubt, the definition of Archdiocesan Parish Assessments excludes charges for services subcontracted by the Archdiocese or owed to other Entities, including, but not limited to, legal fees, bank investment charges and services, employee benefits charges and services, insurance premiums and self-insured retentions and deductibles.

43.     "**Archdiocesan Parishes**" means all currently Catholic Church parishes and missions, as identified on Plan Exhibit B-1, at Part I. Each of the Archdiocesan Parishes is organized as a non-profit corporation.  For the avoidance of doubt, the definition of Archdiocesan Parishes does not include St. Louis Cathedral, Our Lady of Guadalupe Church & Shrine of St. Jude, or any Suppressed Archdiocesan Parish identified on Plan Exhibit B-1, at Part II.

44.     "**Archdiocesan Priests**" means priests who were ordained by the Archdiocese and who work or worked within the Region. For the avoidance of doubt, the definition of Archdiocesan Priests does not include Religious Order priests.

45.     "**Archdiocesan Schools**" means the following schools that are owned and operated by the Archdiocese: (a) the Academy of Our Lady High School; (b) Archbishop Chapelle High School; (c) Archbishop Hannan High School; (d) Archbishop Rummel High School; (e) Archbishop Shaw High School; (f) Pope John Paul II High School; (g) St. Charles Catholic High School; (h) St. Scholastica Academy; and (i) St. Michael Special School.

46.     "**Archdiocese**" or the "**Debtor**" refers to The Roman Catholic Church of the Archdiocese of New Orleans, the Debtor and debtor-in-possession, a non-profit Louisiana corporation.

47.     "**Archdiocese Abuse Claims Bar Date**" means March 1, 2021, at 5:00 p.m. (Central Time), as the deadline to File Abuse Proofs of Claim.

48.     "**Archdiocese Claims Bar Date Order**" means the *Order Fixing Time for Filing Proofs of Claims; Approving Claim Forms; Providing for Confidentiality Protocols; and Approving Form and Manner of Notice* [ECF Doc. No. 461] entered in the Archdiocese's Chapter 11 Case on October 1, 2020.

49.     "**Archdiocese Claims Bar Dates**" means the applicable date established by the Bankruptcy Court as the last date for Filing Proofs of Claim against the Archdiocese, as established in the Claims Bar Date Order, including: (a) November 30, 2020, 5:00 p.m. (Central Time), as the General Claims Bar Date and Governmental Claims Bar Date (as defined in the Archdiocese Claims Bar Date Order) in the Archdiocese's Chapter 11 Case; and (b) March 1, 2021, at 5:00 p.m. (Central Time), as the Archdiocese Abuse Claims Bar Date.

50.     "**Archdiocese's Assets**" collectively means all property of the Archdiocese and the Archdiocese's Estate, of every kind and character, wherever located, whether real or personal, tangible or intangible, and specifically including Cash, Estate Causes of Action, and Avoidance Actions.

51.     "**Archdiocese's Chapter 11 Case**" means the case Filed by the Archdiocese under chapter 11 of the Bankruptcy Code, which is pending in the Bankruptcy Court as Case No. 20-10846 on the Archdiocese's Petition Date.

52.     "**Archdiocese's Estate**" means the estate, created pursuant to section 541 of the Bankruptcy Code, on the Archdiocese's Petition Date.

53.     "**Archdiocese's Petition Date**" means May 1, 2020, the date on which the Archdiocese commenced the Archdiocese's Chapter 11 Case by Filing a petition for relief under chapter 11 of the Bankruptcy Code.

54.     "**Assessments**" collectively means the Archdiocesan Agency Assessments and the Archdiocesan Parish Assessments.

55.     "**Assets**" collectively means the Archdiocese's Assets and the Additional Debtors' Assets.

56.     "**Assumption and Cure Notice**" means the notice that will be served on counterparties to Executory Contracts and Unexpired Leases that will be assumed pursuant to the Joint Plan, in accordance with the Disclosure Statement Order.

57.     "**Assumption and Cure Schedule**" means the Executory Contracts and Unexpired Leases, if any, identified in Plan Supplement 10.1(b).

58.     "**Avoidance Actions**" means all actual or potential avoidance, recovery, subordination or other Claims, or remedies of the Archdiocese, Reorganized Archdiocese, Additional Debtors, or the Reorganized Additional Debtors against all Entities, including: (a) any Claims for the recovery of transfers of Cash, offsets, debt forgiveness and other types or kinds of property, or the value thereof, recoverable exclusively pursuant to sections 502, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, or otherwise applicable non-bankruptcy law; (b) any Claims or Estate Causes of Action for subordination under section 510 of the Bankruptcy Code or under other applicable laws; and (c) any Claims or Estate Causes of Action that arise under chapter 5 of the Bankruptcy Code.

59.     "**Ballots**" means the ballots, the forms of which has been approved by the Bankruptcy Court in the Disclosure Statement Order, as provided to Creditors entitled to vote to accept or reject the Joint Plan.

60.     "**Bankruptcy Code**" means title 11 of the United States Code, §§ 101-1532, as in effect on the Archdiocese's Petition Date.

61.     "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Louisiana, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

62.     "**Bankruptcy Local Rules**" means, collectively, the *Bankruptcy Local Rules for the Bankruptcy Court of the Eastern District of Louisiana, including, but not limited to, Sections II and XI of the Procedures for Complex Chapter 11 Cases for the Bankruptcy Court of the Eastern District of Louisiana.*

63.     "**Bankruptcy Rules**" means the *Federal Rules of Bankruptcy Procedure* applicable to the Chapter 11 Cases.

64.     "**Bond Claims**" means the Unsecured Claims arising out of and under the Bonds and, for the avoidance of doubt, includes: (a) principal and interest due with respect to the Bonds; (b) the Bond Trustee's Claim; and (c) the Bond Trustee's Professional Fee Claim. The Bond Claims are treated in Class 6, at Section 4.6 of the Joint Plan.

65.     "**Bond Documents**" means: (a) the Bond Indenture; (b) that certain *Loan Agreement* by the Archdiocese, dated as of April 1, 2017, related to the Bonds; (c) the *Continuing Disclosure Agreement* by the Archdiocese, also dated as of April 1, 2017; (d) the Bond Trustee Settlement Agreement; and (e) any other documents and agreements related to the Bonds.

66.     "**Bond Indenture**" means that certain *Trust Indenture*, dated as of April 1, 2017, pursuant to which the Bonds were issued.

67.     "**Bond Trustee**" means the indenture trustee under the Bond Indenture, including, at various times: (a) HWB, in its capacity as the indenture trustee under the Bond Indenture; (b) Argent Institutional Trust Company, formerly known as TMI Trust Company, Inc., in its capacity as HWB's

successor as the indenture trustee under the Bond Indenture; and (c) any subsequent successor trustee appointed pursuant to the Bond Indenture.

68. "**Bond Trustee Settlement Agreement**" means that certain Settlement Agreement by and between the Debtor and the Bond Trustee, as approved by and attached to the *Order (i) Approving the Amended Settlement Agreement, and (ii) Granting Related Relief* [ECF Doc. No. 527] entered in the Archdiocese's Chapter 11 Case.

69. "**Bond Trustee's Claim**" means any Claim of the Bond Trustee in respect of its internal fees and expenses for services rendered by the Bond Trustee under the Bond Indenture until the Effective Date. For the avoidance of doubt, the definition of Bond Trustee's Claim does not include the Bond Trustee's Professional Fee Claim, or the principal and interest due with respect to the Bonds.

70. "**Bond Trustee's Professional Fee Claim**" means any Claim of the Bond Trustee for reimbursement of the fees and expenses of the Bond Trustee's Professionals incurred in connection with the Archdiocese's Chapter 11 Case or the Additional Debtors' Chapter 11 Cases through the Effective Date, in accordance with Section 4.6 of the Joint Plan. For the avoidance of doubt, the definition of Bond Trustee's Professional Fee Claim does not include the Bond Trustee's Claim, or the principal and interest due with respect to the Bonds.

71. "**Bond Trustee's Professionals**" means: (a) Carver Darden Koretzky Tessier Finn Blossman & Areaux LLC, as counsel to HWB in its former capacity as the Bond Trustee; and (b) Greenberg Traurig, LLP and Butler Snow, LLP, as counsel to Argent Institutional Trust Company, formerly known as TMI Trust Company, Inc., in its capacity as the Bond Trustee.

72. "**Bonds**" means the *Louisiana Public Facilities Authority Refunding Revenue Bonds (Archdiocese of New Orleans Project) Series 2017,* in the aggregate original principal amount of $41,895,000, issued pursuant to the Bond Indenture.

73. "**Bondholders**" means the Creditors holding the Bonds on the Voting Record Date. The Bond Claims are treated in Class 6, at Section 4.6 of the Joint Plan.

74. "**BSA**" collectively means the Boy Scouts of America and Delaware BSA, LLC, each of whom filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, nos. 20-10343 and 20-10342 on the docket of that court.

75. "**BSA Motion of the Archdiocese**" means the *Debtor's Expedited Motion for Entry of an Order, Pursuant to §§ 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 9019, (i) Authorizing the Debtor to "Opt in" to Treatment as a Participating Chartered Organization Under the Boy Scouts of America Chapter 11 Plan, to the Extent Necessary, and (ii) Granting Related* [ECF Doc. No. 1368].

76. "**BSA Plan**" means the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC,* [ECF 8813, *In re Boy Scouts of America,* No. 20-10343-LSS (Bankr. D. Del.)], as the same was amended, modified, or supplemented, and together with any exhibits and schedules thereto.

77. "**Business Day**" means any day that is not a Saturday, a Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

78. "**Canon Law**" means the current promulgated Code of Canon Law (English Translation) to the canon law of the Roman Catholic Church as may be amended or promulgated during the term of these Provisions.

79. "**Cash**" means the legal tender of the United States of America.

**Plan Exhibit A**
Page 9

80. "**Catholic Charities**" means Catholic Charities Archdiocese of New Orleans, a nonprofit charitable organization, a nonprofit charitable organization incorporated under the laws of Louisiana. Catholic Foundation is one of the Archdiocesan Agencies and Additional Debtors.

81. "**Catholic Entities**" or "**Additional Debtors**" means the Entities listed on Plan Exhibit B-1.

82. "**Catholic Foundation**" means The Catholic Community Foundation Archdiocese of New Orleans, a nonprofit charitable organization incorporated under the laws of Louisiana. Catholic Foundation is one of the Archdiocesan Agencies and Non-Debtor Catholic Entities.

83. "**Causes of Action**" means (excluding Avoidance Actions and Estate Causes of Action) any Claims, interests, damages, remedies, causes of action, demands, rights, Actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, Contingent or non-Contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, capable of being asserted, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, whether arising before, on, or after the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest claims; and (c) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses.

84. "**Certain Abuse Survivors' Counsel**" means those individuals listed on Schedule A-3 to these Definitions.

85. "**Channeled Claims**" means: (a) any Abuse Claim against the Debtor, the Additional Debtors, or any Co-Insured Parties; (b) any Non-Settling Insurer Contribution Claims; (c) any Medicare Claim; (d) any Related Insurance Claim; or (e) any other Claim (including any Direct Action Claim) against (i) the Debtor and/or any Additional Debtors, (ii) any Non-Debtor Catholic Entity, (iii) the Diocese of Houma-Thibodaux CP, (iv) the Diocese of Baton Rouge CP, (v) any Co-Insured Parties or (vi) any Settling Insurer, to the extent that such Claim is under, arises out of, relates (directly or indirectly) to, or connects in any way with any Settling Insurers' Policies. A Channeled Claim further includes any Claim against a Covered Party or Settling Insurer based on allegations that it is an alter ego or liable as a successor of an Entity that is not a Covered Party or Settling Insurer or that the Covered Party's or Settling Insurer's corporate veil should be pierced on account of Claims against an Entity that is not a Covered Party or based on any other theory under which the legal separateness of any Person and any other Entity may be disregarded to impose liability for a claim on either such Entity.

Notwithstanding the foregoing, Channeled Claims do not include any Claims to the extent they are asserted against (x) Entities that are not (i) Covered Parties or (ii) Settling Insurers; (y) Non-Settling Insurers, or (z) Excluded Parties, notwithstanding that such Entity may also have asserted or be able to assert a Claim for contribution, indemnity, reimbursement, or subrogation against any Covered Party or Settling Insurer relating to or arising from a such Claim; provided, however, that, for the avoidance of doubt, (i) any Claims that assert liability against such Entity in conjunction with a Covered Party or Settling Insurer will in all events be Channeled Claims as to the Covered Party or Settling Insurer, (ii) any such Claim for contribution, indemnity, reimbursement, or subrogation against a Covered Party or Settling Insurer Party is a Channeled Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Subject Insurance Policy is not an Excluded Party for the purposes of this definition.

Further notwithstanding the foregoing and notwithstanding whether the Diocese of Houma-Thibodaux SD or the Diocese of Baton Rouge SD are Co-Insured Parties or Covered Parties, in no event

<div align="center">

**Plan Exhibit A**
Page 10

</div>

shall any Claim by or against the Diocese of Houma-Thibodaux SD or the Diocese of Baton Rouge SD be a Channeled Claim, with respect to a Claim against such diocese only.

86.  "**Channeling Injunction**" means the injunction imposed pursuant to Section 12.4 of the Joint Plan.

87.  "**Chapter 11 Cases**" means the (a) Archdiocese's Chapter 11 Case, and (b) Additional Debtors' Chapter 11 Cases.

88.  "**Claim**" means any past, present or future claim, demand, Action, request, right, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether sounding in law, equity, tort, warranty, contract, or under any other theory, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been or may be asserted by or on behalf of any Entity, whether seeking damages (including compensatory, exemplary, punitive, or Penalty claims) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, or orders, including without limitation whether by way of direct action, subrogation, contribution, indemnity, alter ego, veil piercing, or regulatory action, or otherwise,  regardless of whether such Claims arise under law, in equity, or under statute, before or after the Petition Date(s), or *in rem* or *in personam*, and include all Claims for damages to the environment or based on any theory of *respondeat superior,* vicarious, successor or transferee liability, or change in control, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

89.  "**Claims and Voting Agent**" means Donlin, Recano & Company, LLC, the claims, noticing, and voting agent in the Chapter 11 Cases pursuant to that *Final Order Appointing Donlin, Recano & Company, Inc. as Claims and Noticing Agent for the Debtor Pursuant to 28 U.S.C. § 156(c), Nunc Pro Tunc to the Petition Date* [ECF Doc. No. 188] entered in the Archdiocese's Chapter 11 Case.

90.  "**Claims Objection Bar Date (Non-Abuse Claims)**" means one-hundred twenty (120) days after the later of (a) the Effective Date, or (b) the date a Non-Abuse Claim is Filed, as set forth in Section 8.3 of the Joint Plan.

91.  "**Class**" means a category of Claims as set forth in Article 3 of the Joint Plan pursuant to section 1122 of the Bankruptcy Code.  For the avoidance of doubt, Class also refers to any Subclass.

92.  "**Clergy**" means the Archbishop and any other cardinal, metropolitan, archbishop, bishop, auxiliary bishop, regional bishop, titular bishop, vicar general, chancellor, episcopal vicar, vicar forane, dean of a deanery, archpriest, priest, prelate, simplex, pastor, prior, sub-prior, rector, parochial vicar, assistant pastor, associate pastor, deacon, vicar, director, counselor, chaplain, councilor, president, or master working in, serving in, or otherwise associated in any way with the Archdiocese or the Non-Debtor Catholic Entities with  the permission of the Archbishop or his delegate; provided, however, any of the foregoing individuals must be sacramentally ordained by the Roman Catholic Church to the diaconate, whether or not incardinated to the Archdiocese.

93.  "**CMS**" means The Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agency or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA.

94.  "**Co-Defendant Party**" means an Entity other than a Covered Party, a Settling Insurer, or a Non-Settling Insurer that is named or could be named as a defendant in an Action in which the Debtor and/or any Additional Debtor is also named or could be named as a defendant, and/or who is alleged to be fully, partially, or jointly responsible for an Abuse Claim asserted or that could be asserted in the future against both such Entity and the Debtor and/or any Additional Debtor, including a co-debtor as described

<div align="center">

**Plan Exhibit A**
Page 11

</div>

in section 509 of the Bankruptcy Code. For purposes of the Joint Plan, none of the Covered Parties is or will be deemed to be a Co-Defendant Party.

95.     "**Co-Insured Party**" means any Entity that is a "Named Assured" or "named insured" or "protected person" under the Subject Insurance Policies and all other Entities that are determined by agreement or a court of competent jurisdiction to be an "Assured," an "Additional Assured," an "insured," or otherwise entitled to insurance coverage under any Subject Insurance Policies.

96.     "**Collateral**" means any property or interest in property of the Estates that is subject to a valid and enforceable Lien to secure a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

97.     "**Commercial Creditors' Committee**" means the Official Committee of Unsecured Commercial Creditors appointed by the U.S. Trustee on March 5, 2021 [ECF Doc. Nos. 772 & 792] in the Archdiocese's Chapter 11 Case, as such committee may be constituted from time to time.

98.     "**Confirmation**" or "**Confirmation of the Joint Plan**" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases. "**Confirm**" and "**Confirmed**" will have correlative meanings.

99.     "**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

100.     "**Confirmation Hearing**" means the hearing or hearings before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b), at which the Debtor and the Additional Debtors will seek Confirmation of the Joint Plan and entry of the Confirmation Order.

101.     "**Confirmation Hearing Notice**" means the Notice of the hearing on the Confirmation of the Joint Plan, to be served on Creditors in accordance with the Disclosure Statement Order.

102.     "**Confirmation Order**" means the Order entered by the Bankruptcy Court that Confirms the Joint Plan pursuant to section 1129 of the Bankruptcy Code, as such Order may be amended, modified, or supplemented.

103.     "**Contingent**" means, with respect to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on, is dependent upon a future event that may or may not occur.

104.     "**Contributing Non-Debtor Catholic Entities**" means the Entities listed on <u>Plan Exhibit B-2</u> (none of whom are Additional Debtors) and identified in <u>Plan Exhibit B-2</u> as having contributed Cash or other property to 1793 Group for the purpose of funding the Debtor and Additional Debtor Settlement Consideration.

105.     "**Contribution Claim**" means (a) any Non-Settling Insurer Contribution Claim; (b) any Settling Insurers' Contribution Claim; and (c) any Non-Insurer Contribution Claim for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, on account of or with respect to the payment of any Abuse Claim made by an Entity. A Contribution Claim does not include any Claim by a Covered Party for contribution, indemnity, equitable subrogation, allocation or reallocation, or reimbursement or any direct or indirect recovery, on account of or with respect to any Abuse Claim against a Non-Settling Insurer.

106.     "**Convenience Claim**" means (i) a General Unsecured Claim or an Unsecured Trade Claim against the Archdiocese if the Allowed Amount of such Claim is equal to or less than $50,000 and (ii) a General Unsecured Claim or an Unsecured Trade Claim against the Archdiocese if the Allowed Amount of

such Claim is greater than $50,000 and the Creditor holding such Claim elects to reduce the Allowed Amount of its Claim to $50,000 or less by making the Convenience Class Election on a properly completed Ballot submitted to the Claims and Voting Agent by the Voting Deadline.

107. "**Convenience Class Election**" means the election by a Creditor holding a General Unsecured Claim or an Unsecured Trade Claim against the Archdiocese that exceeds $50,000 to reduce such General Unsecured Claim or Unsecured Trade Claim, in its entirety, to $50,000 or less, and thereby receive the treatment accorded to Convenience Claims against the Archdiocese in full satisfaction of such General Unsecured Claim or Unsecured Trade Claim. A Convenience Class Election may be made by submitting a properly completed Ballot to the Claims and Voting Agent by the Voting Deadline.

108. "**Coverage Claims**" has the meaning set forth in the Insurance Settlement Agreements.

109. "**Covered Parties**" means, collectively, the following Entities: (a) the Debtor and Reorganized Archdiocese; (b) the Additional Debtors and Reorganized Additional Debtors; (c) the Non-Debtor Catholic Entities; (d) the Diocese of Houma-Thibodaux CP; (e) the Diocese of Baton Rouge CP; (f) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Archbishop; (g) any Co-Insured Party; and (h) with respect to each of the foregoing Entities in clauses (a) through (g), such Entities' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, estates, and nominees, including the applicable Parish Schools and Archdiocesan Schools. For the avoidance of doubt, the Entities or persons in clauses (f), (g), and (h) are only Covered Parties in connection with the Abuse Claims and the Setting Insurers' Policies. No Excluded Party shall constitute, or be deemed to be, a Covered Party under any circumstances, provided however, that any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Subject Insurance Policy is a Covered Party.

110. "**Creditor**" means any holder of a Claim that arose before the Effective Date. For the avoidance of doubt, Abuse Claimants are Creditors.

111. "**Creditors' Committee**" or "**Survivors' Committee**" means the Official Committee of Unsecured Creditors appointed in the Archdiocese's Chapter 11 Case on May 20, 2020, [ECF Doc. Nos. 94 & 114], as such committee may be reconstituted from time to time.

112. "**Creditors' Committees**" means both (a) the Commercial Creditors' Committee, and (b) the Creditors' Committee, as each may be reconstituted from time to time.

113. "**Cure Claim**" or "**Cure Cost**" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults and other obligations required to cure any non-monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Archdiocese pursuant to sections 365 or 1123 of the Bankruptcy Code.

114. "**D&O Liability Insurance Policies**" means all directors and officers/executive liability insurance policies (including extension of coverage of any policy beyond the end of the policy period) issued to or providing insurance coverage at any time to any of the Debtor's or Additional Debtors' directors, officers, managers or authorized agents, in their respective capacities as such, for alleged wrongful acts (as defined in such policies) or similar triggering acts, and all agreements, documents or instruments relating thereto.

115. "**Debtor**" or "**Archdiocese**" means, before the Effective Date, The Roman Catholic Church of the Archdiocese of New Orleans.

116. "**Debtor and Additional Debtor Settlement Consideration**" means the consideration described in Section 5.3(a) of the Joint Plan.

117. "**Definitions**" means these *Defined Terms for the Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and the Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, and the Accompanying Disclosure Statement*, as set forth in this <u>Plan Exhibit A</u>, as the same may be amended and supplemented from time to time.

118. "**Deposit and Loan Deposits**" means deposits made under the Deposit and Loan Program, which are invested in Portfolio B.

119. "**Deposit and Loan Program**" means the program established by the Archdiocese that provides savings and loan services to certain of the Additional Debtors and the Non-Debtor Catholic Entities.

120. "**Deposit and Loan Fund Notes**" means those certain promissory notes, executed by certain of the Non-Debtor Catholic Entities, regarding loans from the Deposit and Loan Program.

121. "**Deposit and Loan Notes Receivables**" means the loans receivable related to and arising out of the Deposit and Loan Fund Notes.

122. "**Diocese of Baton Rouge**" means the Diocese of Baton Rouge. References to the "Diocese of Baton Rouge CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) July 22, 1961 whichever occurred last; references to the "Diocese of Baton Rouge SD" refer to the period after such date.

123. "**Diocese of Houma-Thibodaux**" means the Diocese of Houma-Thibodaux. References to the "Diocese of Houma-Thibodaux CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) June 5, 1977, whichever occurred last; references to the "Diocese of Houma-Thibodaux SD" refer to the period after such date.

124. "**DIP Credit Card Claim**" means the Claim for money owed by the Debtor for credit cards issued by HWB, as approved by: (a) the *Final Order Authorizing (i) the Maintenance of Existing Bank Accounts, Continued Use of Existing Cash Management System, and Continued Use of Existing Business Forms, (ii) Waiving the Requirements of section 345(b) of the Bankruptcy Code, and (iii) Granting Related Relief*, [ECF Doc. No. 174]; and (b) the *Order Authorizing the Debtor to Obtain and Use Post-Petition Secured Credit Card Account Pursuant to 11 U.S.C. §§ 105, 364, Fed. R. Bankr. P. 4001(c), and Local Rule 4001-3*, [ECF Doc. No. 758]. The DIP Credit Card Claim is treated in Section 2.4 of the Joint Plan.

125. "**Direct Action Claim**" means any Claim by any Entity that is a "direct action" as that term is used in LA. REV. STAT § 22:1269 *et. seq*, against any Insurer or related to any Subject Insurance Policy including, without limitation, (a) any claim that is similar or related to any Claim that could also be asserted by the Archdiocese, or any other Covered Party, (b) any Claim that directly or indirectly arises out of, relates to, or is connected with any Abuse Claim, (c) any Claim that directly or indirectly arises out of, relates to, or is in connection with any Insurers' handling of any Abuse Claim under the laws of any applicable jurisdiction, or (d) any Claim arising under any law of any jurisdiction that may give a third party a direct Cause of Action against an Insurer (or its Related Persons) for monetary or other relief**.**

126. "**Disallow**" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been Disallowed by a Final Order; (b) is set forth on the applicable Schedule or Schedules as zero or as Contingent, Disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order entered by the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Joint Plan; (c) is not set forth on the applicable Schedule or Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or

**Plan Exhibit A**
Page 14

deemed timely Filed pursuant to either the Bankruptcy Code or any Final Order entered by the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Joint Plan; (d) has been waived or withdrawn by agreement of the Archdiocese and the holder thereof; or (e) has been waived or withdrawn by the holder thereof. "**Disallowing**" and "**Disallowance**" have correlative meanings.

127. "**Disallowed Priest Pension Claim**" means any Priest Pension Claim to or for the benefit of any Archdiocesan Priest against whom there have been substantiated allegations of Abuse of a minor or vulnerable adult, where the Archdiocesan Priest is identified in either (a) the Report Regarding Clergy Abuse or (b) by Final Order entered by the Bankruptcy Court before the Confirmation Date.

128. "**Discharge Injunction**" means the discharge injunction imposed pursuant to Section 12.2 of the Joint Plan.

129. "**Disclosure Statement**" means the disclosure statement for the Joint Plan approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017 (including all schedules and exhibits thereto), as such disclosure statement may be amended or modified from time to time.

130. "**Disclosure Statement Exhibits**" means the exhibits to the Disclosure Statement, as the same may be amended.

131. "**Disclosure Statement Order**" means the Order, [ECF Doc. No. 4253], that: (a) authorizes the Debtor and Additional Debtors to solicit votes on the Joint Plan; (b) approves the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code; (c) approves the solicitation materials and documents to be included in the Solicitation Package; and (d) approves procedures for soliciting, receiving, and tabulating votes on the Joint Plan and for Filing objections to the Joint Plan.

132. "**Disputed**" means: (a) a Claim, or any portion thereof, that has been Disallowed by a Final Order; (b) a Claim that has been listed in the Schedules at zero or as Contingent, disputed, or unliquidated and as to which no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code; or (c) a Claim that has not been listed in the Schedules and as to which no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code, Final Order, or other applicable law.

133. "**Distribution**" means any transfer of Cash to a Creditor holding Non-Abuse Claims against the applicable Reorganized Archdiocese or any Reorganized Additional Debtor. For the avoidance of doubt, a Distribution excludes any Settlement Trust Distribution.

134. "**Distribution Record Date**" means the date for determining which Creditors holding Non-Abuse Claims are eligible to receive Distributions under the Joint Plan, as provided in Section 9.7 of the Joint Plan, and will be the date designated in an Order.

135. "**District Court**" means the United States District Court for the Eastern District of Louisiana.

136. "**Effective Date**" means the Business Day on which the Joint Plan becomes effective pursuant to Article 11 the Joint Plan; provided, however, that if any stay or injunction against enforcement or execution of the Confirmation Order is issued before the date that would otherwise be the Effective Date, the Effective Date will be the first Business Day after all such stays or injunctions are no longer in effect.

137. "**Enjoined Party**" means all Entities who have held, hold or may hold or who have held or hold Causes of Action that have been released or discharged or are subject to exculpation, the Channeling Injunction, the Supplemental Settling Insurer Injunction, the Confirmation Order, or any Insurance Settlement Order.

138. "**Entity**" means any individual, corporation, corporation sole, partnership, association, limited liability company, joint stock company, proprietorship, unincorporated organization, joint venture, trust, estate, executor, legal representative, or any other entity or organization, as well as any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency, department, board or instrumentality thereof, any other "Person" within the definition of section 101(41) of the Bankruptcy Code, and any successor in interest, heir executor, administrator, trustee, trustee in bankruptcy, or receiver of any Entity and also has the meaning set forth in section 101(15) of the Bankruptcy Code.

139. "**Escrow Agent**" means the agent appointed in accordance with the Escrow Agreement.

140. "**Escrow Agreement**" means the agreement governing the escrow which shall hold the Settling Insurers' Settlement Consideration in escrow and in trust for the benefit of a Settling Insurer, and which shall provide for the: (i) transfer of the Settling Insurers' Settlement Consideration, with any accrued interest, to the Settlement Trust following the effective date of the Settling Insurer's Insurance Settlement Agreement, or (ii) return of the Settling Insurers' Settlement Consideration to such Settling Insurer, with any accrued interest, upon receipt of notice that the Settling Insurer's Insurance Settlement Agreement has been terminated.

141. "**Estates**" means the (a) the Archdiocese's Estate and (b) Additional Debtors' Estates, each created pursuant to section 541 of the Bankruptcy Code.

142. "**Estate Causes of Action**" means all Causes of Action and Claims owned, held, or capable of being asserted by or on behalf of the Archdiocese, the Archdiocese's Estate, the Additional Debtors, or the Additional Debtors' Estates, including the Avoidance Actions, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction, including Actions that arise out of or are based on breach of contract, fraudulent conveyances and transfers, breach of fiduciary duty, breach of duty of loyalty or obedience, legal malpractice, recovery of attorneys' fees, turnover of property and avoidance or recovery Actions of the Archdiocese, the Additional Debtors, or the Estates, including Actions that constitute property of the Estates under section 541 of the Bankruptcy Code that are or may be pursued by a representative of the Estates, including pursuant to section 323 of the Bankruptcy Code, and Actions, including Avoidance Actions, that may be commenced by a representative of the Estates under section 362 or chapter 5 of the Bankruptcy Code, seeking relief in the form of damages (actual and punitive), imposition of a constructive trust, turnover of property, restitution, and declaratory relief with respect thereto or otherwise. For the avoidance of doubt, Estate Causes of Action include, but are not limited to (a) any Claims that assert any of the Non-Debtor Catholic Entities or Additional Debtors are a single business enterprise or alter ego of the Archdiocese, or should be substantively consolidated with the Archdiocese; and (b) any Claims that seek a ruling that any money in one or both Portfolios is owned by the Archdiocese and/or otherwise available to satisfy Creditors' Claims.

143. "**Estimated Amount**" means the amount at which the Bankruptcy Court or the District Court, pursuant to 28 U.S.C. § 157(b)(2)(B), section 502(c) of the Bankruptcy Code, and Bankruptcy Rule 3018(a) as the case may be, estimates any Claim or Class of Claims that is Contingent, unliquidated, or Disputed, including any Abuse Claim or Class thereof, for the purpose of: (a) Allowance; (b) Distributions; (c) Confirming the Joint Plan pursuant to section 1129 of the Bankruptcy Code; (e) voting to accept or reject the Joint Plan pursuant to section 1126 of the Bankruptcy Code; or (f) any other purpose.

144. "**Estimation Order**" means an Order that determines the Estimated Amount of any Claim or Claims for any purpose, whether individually or as part of an aggregate. For the avoidance of doubt, no Estimation Order will be entered regarding any Channeled Claim on or after the Effective Date.

145. "**Excluded Party**" means the following Entities: (a) the Holy See (State of Vatican City); (b) any archdiocese or diocese other than the Archdiocese itself, the Diocese of Houma-Thibodaux CP, or

#104076707v1

the Diocese of Baton Rouge CP; (c) any Perpetrator; and (d) any Religious Order or other Entity that is an affiliate or associated with the Roman Catholic Church (in its capacity as such, and other than (i) the Non-Debtor Catholic Entities; (ii) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP and the applicable Parish Schools and Archdiocesan School; (iii) any other Entity that is a "Named Assured" or "named insured" or "protected person" under the Subject Insurance Policies, including all other Entities that are determined by agreement or a court of competent jurisdiction to be an "Assured," an "Additional Assured," an "insured," or "protected person" or otherwise entitled to insurance coverage under any Subject Insurance Policies); provided, however, that any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any of Settling Insurers' Policy is not an Excluded Party.

146. "**Exculpated Parties**" means: (a) the Debtor; (b) the Additional Debtors; (c) the Creditors' Committees; and (d) the members of the Creditors' Committees, in their capacities as such and only for such actions or conduct that occurred during the time period in which such members were actually serving on such Creditors' Committees (and expressly excluding any ex officio members of such Creditors' Committees).

147. "**Exculpations**" means the exculpatory and limitation of liability provisions that relate to and affect the rights, Claims, and/or Causes of Actions that Creditors may have against the Exculpated Parties, as set forth in Section 12.3 of the Joint Plan. For the avoidance of doubt, the Exculpations do not include the fines or any other penalties set forth in the *Memorandum Opinion and Order* entered by the Bankruptcy Court on October 11, 2022 [ECF Doc. No. 1844].

148. "**Executory Contract**" means any contract to which the Archdiocese and/or one or more of the Additional Debtors is a party and that is subject to assumption or rejection under sections 365 and 1123 of the Bankruptcy Code.

149. "**Existing Benefits Programs**" means all employment, vacation, severance, and similar or related agreements, arrangements, programs, and policies of the Debtor or Additional Debtors that are applicable to the Debtor or Additional Debtors as of the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date that is applicable to the applicable Debtor's or Additional Debtors' employees, former employees, retirees, and non-employee directors; provided, however, that Existing Benefits Programs exclude the Priest Pension Plan and the Priest Retiree Medical Benefits.

150. "**Expunged Claim**" means a Claim that has been Disallowed and expunged by a Final Order of the Bankruptcy Court without leave to amend or refile.

151. "**Extra-Contractual Claim**" means, with respect to any Insurer, any Claim against Insurer seeking any type of relief, other than coverage or benefits, under or with respect to any Subject Insurance Policies issued by such Insurer. Extra-Contractual Claims include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs, or any other type of relief, alleging any of the following with respect to (a) any Subject Insurance Policy, (b) any Claim allegedly or actually covered under a Subject Insurance Policy, or (c) the conduct of any Insurer with respect to (a) or (b): (i) bad faith; (ii) failure to provide insurance coverage under any Subject Insurance Policy, including any failure to investigate or to provide a defense or adequate defense; (iii) failure or refusal to compromise and settle any Claim insured under any Subject Insurance Policy; (iv) failure to act in good faith; (v) violation or breach of any covenant or duty of good faith and fair dealing, whether express, implied, or otherwise; (vi) violation of any state insurance codes, state surplus lines statutes, or similar codes or statutes; (vii) violation of any unfair claims practices act or similar statute, regulation, or code, including any statute, regulation, or code relating to unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising; (viii) any type of misconduct; or (ix) any other act or omission of any type by any Insurer for which the Creditor seeks relief other than coverage or benefits under a Subject Insurance Policy.

"Extra-Contractual Claims" further include all Claims relating to any Insurer's (x) handling of any Claims under Subject Insurance Policies, (y) conduct in negotiating any Insurance Settlement Agreement and/or the Joint Plan, and (z) conduct in the settlement of any Claims. For the avoidance of doubt, Extra-Contractual Claims are included within the property purchased by any Settling Insurer under any Insurance Settlement Agreement.

152.    "**Fee Application**" means an application Filed with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules for payment of a Professional Fee Claim.

153.    "**FEMA**" means the Federal Emergency Management Administration, an agency of the United States Department of Homeland Security

154.    "**File**" means (a) file, filed or filing with the Bankruptcy Court or District Court, as applicable, or (b) with respect to Proofs of Claim, file, filed or filing a Proof of Claim with the Bankruptcy Court or with the Claims and Voting Agent. "**Filed**" and "**Filing**" will have correlative meanings.

155.    "**Final Decree**" means the decree contemplated under Bankruptcy Rule 3022.

156.    "**Final Order**" means an order as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending and in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order will have been affirmed by the highest court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari,* petition for review, or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order will not cause such order not to be a Final Order.

157.    "**First Settlement Trust Promissory Note**" means the promissory note, executed by the Debtor and the Additional Debtors, pursuant to Section 5.3(a)(ii) of the Joint Plan and made payable to the order of the Settlement Trust. A copy of the First Settlement Trust Promissory Note is attached as Plan Supplement 5.3(a)(ii).

158.    "**First Settlement Trust Promissory Note Letter of Credit**" means the $20 million irrevocable letter of credit issued by a federally insured bank or financial institution acceptable to the Creditors' Committee and securing the First Settlement Trust Promissory Note, in accordance with Section 5.3(a) of the Joint Plan. A copy of the First Settlement Trust Promissory Note Letter of Credit is included in Plan Supplement 5.3(a)(ii).

159.    "**Fiscal Year**" means the fiscal year of the Archdiocese, which runs from July 1 through June 30.

160.    "**Gatekeeper Injunction**" means the injunction imposed pursuant to Section 12.8 of the Joint Plan.

161.    "**General Unsecured Claim**" means any Claim against the Archdiocese or the Additional Debtors that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a Secured Claim, a Known Abuse Claim, an Unknown Abuse Claim, a Non-Insurer Contribution Claim, a Bond Claim, a Non-Abuse Personal Injury Claim, or an Unsecured Trade Claim. General Unsecured Claims against the Archdiocese are treated in Class 7, at Section 4.7 of the Joint Plan (along with Unsecured Trade Claims). General Unsecured Claims against the Additional Debtors are treated in Class 10, at Section 4.10 of the Joint Plan (as Additional Debtors' Non-Trade Unsecured Claims).

**Plan Exhibit A**
Page 18

162. "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

163. "**HUD**" means the U.S. Department of Housing and Urban Development.

164. "**HWB**" means Hancock Whitney Bank, formerly known as Whitney Bank. HWB is the holder of the DIP Credit Card Claim and the Letters of Credit Claim.

165. "**Independent Financial Advisor**" has the meaning set forth in Section 5.3(a)(iii) of the Joint Plan

166. "**Impaired**" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

167. "**Indemnified Claim**" has the meaning set forth in Section 6.7 of the Joint Plan.

168. "**Indemnity Cost Reserve**" has the meaning set forth in Section 6.7 of the Joint Plan.

169. "**Injunctions**" means the Sale Injunction, Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeper Injunction.

170. "**Insurance Action**" means any claim, cause of action, or enforceable rights of the Debtor, any Additional Debtors, or any Co-Insured Party, under the laws of any jurisdiction, against any Insurer, whether sounding in contract, tort, or otherwise, including equity and bad faith. Insurance Action shall include any claim for or relating to (a) indemnity and payment of an Abuse Claim, (b) any Insurer's failure or refusal to provide insurance coverage for any Abuse Claim under any Subject Insurance Policies; (c) any Insurer's tortious or wrongful claims handling including the failure or refusal of any Insurer to timely compromise and settle any Abuse Claims against the Archdiocese and/or any Additional Debtors pursuant to any Subject Insurance Policies; (d) to the extent not otherwise encompassed by section (c) above, any Insurer's failure or refusal to reasonably settle the Abuse Claims; and (e) the interpretation or enforcement of the terms of any Insurance Policy as it pertains to any of the foregoing. The term "Insurance Action" includes any Extra-Contractual Claim.

171. "**Insurance Program**" means the insurance program that the Archdiocese administers for itself and the Non-Debtor Catholic Entities, including, but not limited to, insurance for building and contents including named storm, business interruption, commercial general liability, excess liability, personal misconduct, directors' and officers' liability, healthcare liability, professional liability, flood, and cyber security.

172. "**Insurance Rights**" means any and all rights, titles, privileges, interests, claims, demands, or entitlements of the Abuse Claimants, the Debtor, and/or any Co-Insured Parties to any insurance proceeds, payments, benefits, Causes of Action, Insurance Actions, choses in action, defenses, or indemnities arising under or attributable to any and all Subject Insurance Policies, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, with respect to Abuse Claims. For the avoidance of doubt, the term "Insurance Rights" includes all Claims and Causes of Action against any liquidator, liquidation bureau, guaranty association, or security fund. For the further avoidance of doubt, the term "Insurance Rights" does not include any Claims or Causes of Action against any Settling Insurer.

173. "**Insurance Settlement Agreements**" means each Settlement Agreement, Release, and Policy Buyback, by, between, and among (a) each Settling Insurer, (b) the Debtor, (c) the Additional Debtors; and (d) the Non-Debtor Catholic Entities, copies of which will be Filed as Plan Supplement 7.1(a).

174. "**Insurance Settlement Motions**" means the Motions jointly Filed or to be Filed by the Debtor, the Additional Debtors, and the Creditors' Committee for approval of the Insurance Settlement Agreements subject to the occurrence of the Effective Date.

#104076707v1

175. "**Insurance Settlement Order**" means any Order approving any Insurance Settlement Motion and such motion's respective Insurance Settlement Agreement.

176. "**Insurer Action**" means any Action by any Non-Settling Insurer in which it seeks to recover its Non-Settling Insurer Contribution Claim against any Settling Insurer.

177. "**Insurer Contribution Claim**" means any (a) Non-Settling Insurer Contribution Claim or (b) Settling Insurer Contribution Claim.

178. "**Insurers**" means the Settling Insurers and the Non-Settling Insurers.

179. "**IRC**" means the Internal Revenue Code of 1986, 26 U.S.C. § 1 *et seq.,* as may be amended.

180. "**IRS**" means the Internal Revenue Service of the Department of Treasury of the United States of America.

181. "**Joint Plan**" means the *Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors*, as the same may be amended or modified from time to time.

182. "**Known Abuse Claimant**" means an Abuse Claimant holding a Known Abuse Claim, together with the legal representative of such holder, including, but not limited to, a bankruptcy trustee, the estate of a deceased individual who held a Known Abuse Claim, or the personal executor or personal representative of an individual (or the estate of a deceased individual) who holds or held a Known Abuse Claim, as the case may be.

183. "**Known Abuse Claims**" means any Abuse Claim, other than an Unknown Abuse Claim, against any Protected Party, Covered Party, Settling Insurer, and/or Non-Settling Insurer.

184. "**Late-Filed Non-Abuse Claim**" means a Proof of Claim that asserts a Non-Abuse Claim, and that was Filed after the Claims Objection Bar Date (Non-Abuse Claims).

185. "**Letters of Credit**" means the following outstanding letters of credit, as the same may be amended or supplemented, issued by HWB for the account of the Archdiocese, as applicant: (a) *Irrevocable Standby Letter of Credit No. SB73328L* for the benefit of the Mississippi Workers' Compensation Commission in the amount of $100,000; and (b) *Irrevocable Standby Letter of Credit SB73449L* for the benefit of the Louisiana Workforce Commission in the amount of $400,000. The Letters of Credit are the subject of HWB's Proof of Claim No. 51-1.

186. "**Letters of Credit Claims**" means any Claim of HWB arising under the Letters of Credit after the submission of any sight draft thereon.

187. "**Lien**" means any mortgage, lien, pledge, security interest or other charge or encumbrance or security device of any kind in, upon, or affecting any Asset of the Archdiocese or the Additional Debtors as contemplated by section 101(37) of the Bankruptcy Code.

188. "**Liquidation Analysis**" means the liquidation analysis annexed to and incorporated into the Disclosure Statement.

189. "**LPFA**" means The Louisiana Public Facilities Authority, a public trust and public corporation of the State of Louisiana, in its capacity as the issuer of the Bonds.

190. "**Mediator Zive**" means United States Bankruptcy Judge Gregg W. Zive, who was appointed to mediate the Archdiocese's Chapter 11 Case [ECF Doc. Nos. 982, 1332, 2107, 2443, 2817, 3413 & 3758].

**Plan Exhibit A**
Page 20

191.    "**Mediator Perry**" means John W. Perry, Jr., who was appointed as an additional mediator in the Archdiocese's Chapter 11 Case [ECF Doc. Nos. 2828, 2844, 2892, 3036, 3430, & 4029].

192.    "**Mediator Sontchi**" means Judge Christopher Sontchi (Ret.), who was appointed as an additional mediator in the Archdiocese's Chapter 11 Case [ECF Doc. Nos. 3694 & 4022].

193.    "**Mediators**" means Mediator Zive, Mediator Perry, and Mediator Sontchi.

194.    "**Medicaid**" means medical assistance provided under a state plan approved under title XIX of the Social Security Act.

195.    "**Medicare Claims**" means any Claim by CMS, and/or any agent or successor of CMS, charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA or pursuing a Claim under MSP Provisions, relating to any payments in respect of any Abuse Claim, including any Claim for reimbursement of conditional payments, and any Claim relating to reporting obligations.

196.    "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which imposes reporting obligations on those Entities with payment obligations under the MSPA.

197.    "**MSP Provisions**" means the Medicare Secondary Payer statute, 42 U.S.C. §1395y(b), and its accompanying regulations.

198.    "**Neutrality Parties**" has the meaning set forth in Section 7.4 of the Joint Plan.

199.    "**Non-Abuse Claims**" means, collectively, the Non-Abuse Claims against the Archdiocese and the Non-Abuse Claims against the Additional Debtors.

200.    "**Non-Abuse Claims against the Archdiocese**" means any Claims against the Archdiocese that are not Abuse Claims or Non-Insurer Contribution Claims.

201.    "**Non-Abuse Claims against the Additional Debtors**" means any Claims against any Additional Debtor that are not Abuse Claims or Non-Insurer Contribution Claims.

202.    "**Non-Abuse Personal Injury Claims**" means all Claims for personal injury other than Abuse Claims or Non-Insurer Contribution Claims.

203.    "**Non-Debtor Catholic Entities**" collectively means the Entities listed on Plan Exhibit B-2 (none of whom are Additional Debtors).

204.    "**Non-Monetary Plan Provisions**" means *The Roman Catholic Church of the Archdiocese of New Orleans Non-Monetary Plan Provisions to Foster Child Protection and Prevent Child Sexual Abuse*, attached as Plan Exhibit E.

205.    "**Non-Insurer Contribution Claim**" means any Claim for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law that is attributable to, arises from, is based upon, relates to, or results from, an Abuse Claim or payment of an Abuse Claim, and any other derivative or indirect Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, other than a Non-Settling Insurer Contribution Claim or a Settling Insurer Contribution Claim.

206.    "**Non-Settling Insurance Rights Transfer**" means the transfer and vesting of Insurance Rights.

207.    "**Non-Settling Insurer**" means any insurer that is not a Settling Insurer.

**Plan Exhibit A**
Page 21

208. **"Non-Settling Insurer Contribution Claim"** means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Non-Settling Insurer against any Settling Insurer for the payment of money where such Non-Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

209. **"Non-Settling Insurers' Policies"** means all Subject Insurance Policies issued, subscribed to, or underwritten in whole or in part or allegedly issued, subscribed to, or underwritten in whole or in part by any Non-Settling Insurer. The Non-Settling Insurers' Policies are included in the Non-Settling Insurance Rights Transfer.

210. **"Non-Voting Claim"** means a Claim that is not entitled to vote to accept or reject the Joint Plan regardless of whether the holder of such Claim does *not* vote to accept or reject the Joint Plan.

211. **"Non-Voting Classes"** means Claims in the following Classes: Class 1 (Other Priority Claims); Class 2 (Secured Claims); Class 5 (Non-Insurer Contribution Claims); Class 9 (Unsecured Trade Claims—Additional Debtors); and Class 10 (Additional Debtors' Non-Trade Unsecured Claims—Additional Debtors).

212. **"Non-Voting Status Notice"** means the Notices approved in the Disclosure Statement Order, in the forms of **Schedule 6** to the Disclosure Statement Order.

213. **"Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the applicable docket in the Chapter 11 Cases or the docket of any other court of competent jurisdiction.

214. **"Ordinary Course Professionals"** means the various attorneys, accountants, auditors, and other professionals the Archdiocese retains in the ordinary course of its business pursuant to the Ordinary Course Professionals Order.

215. **"Ordinary Course Professionals Order"** means that *Order Authorizing the Debtor to Employ Professionals in the Ordinary Course of Business as of the Petition Date* [ECF Doc. No. 26] entered in the Archdiocese's Chapter 11 Case and permitting the Archdiocese to retain Ordinary Course Professionals.

216. **"Other Priority Claim"** means any Allowed Claim against the Debtor or the Additional Debtors, to the extent not paid before the Effective Date, that is entitled to priority in right of payment under sections 507(a) or 503(b)(9) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim. Other Priority Claims are treated in Class 1, at Section 4.1 of the Joint Plan.

217. **"Parish Schools"** means the elementary Catholic schools that are owned and operated by the Archdiocesan Parishes. For the avoidance of doubt, the definition of Parish Schools expressly excludes Catholic schools that are owned and operated by Religious Orders and the Archdiocesan Schools. For the further avoidance of doubt, the Parish Schools are not separately incorporated.

218. **"Parish Service Agreements"** means those certain Parish Service Agreements by and between the Archdiocese and certain of the Archdiocesan Parishes, each with effective dates of March 1, 2011.

219. **"Penalty Claims"** means a Claim against any Covered Party or Settling Insurer for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Creditor holding such Claim.

220. **"Perpetrator"** means an individual who personally committed or is alleged to have personally committed an act of Abuse. For the avoidance of doubt, the definition of Perpetrator does not include any individual who did not personally commit an act of Abuse or is not alleged to have personally committed an act of Abuse, but against whom an Abuse Claim or Non-Insurer Contribution Claim is asserted nonetheless, or may be asserted, by virtue of such individual's position or service as a member, representative, contractor, consultant, professional, or volunteer of the Archdiocese or any Non-Debtor Catholic Entity or any council or representative body associated with such Entities.

221. **"Plan Documents"** mean the Joint Plan, the Plan Exhibits, the Joint Plan Supplements, and the Confirmation Order, as the same may be amended or supplemented.

222. **"Plan Exhibits"** means the exhibits to the Joint Plan, as the same may be amended.

223. **"Plan Supplements"** means those documents in furtherance of consummation of the Joint Plan and/or to be executed to consummate the Joint Plan. No later than the Plan Supplements Filing Date, the Archdiocese will File the Plan Supplements.

224. **"Plan Supplements Filing Date"** means, unless otherwise provided in the Joint Plan, the date that is ten (10) days before the deadline to File written objections to the Confirmation of the Joint Plan.

225. **"Portfolios Adversary Proceeding"** means the adversary proceeding Filed by the Creditors' Committee in the Archdiocese's Chapter 11 Case against the Debtor, certain of the Non-Debtor Catholic Entities, and others, bearing case no. 22-0105 on the docket of the Bankruptcy Court, which Portfolios Adversary Proceeding was dismissed without prejudice by the Bankruptcy Court.

226. **"Post-Confirmation Notices"** means any notices that are required to be provided to the Post-Confirmation Notice Parties on and after the Effective Date in accordance with Section 14.24 of the Joint Plan.

227. **"Post-Confirmation Notice Parties"** means (a) the Reorganized Archdiocese, (b) the Reorganized Additional Debtors, (d) the Settlement Trustee, and (e) the U.S. Trustee. If the Post-Confirmation Notice relates to the Reorganized Archdiocese the Post-Confirmation Notice Parties include the Bond Trustee.

228. **Post-Effective Date Insurance Obligations"** means those duties or obligations (if any) required of the Archdiocese and/or any Co-Insured Party on or after the Effective Date with respect to any of the Non-Settling Insurers' Policies.

229. **"Post-Petition Bond Payments"** means the semi-annual Cash payment in the amount of $930,206.25, in the cumulative amount of $9,302,062.50, paid by the Debtor to the Bond Trustee with respect to the Bonds, subject to the *Order (I) Approving the Amended Settlement Agreement, and (II) Granting Related Relief* [ECF Doc. No. 527] entered in the Archdiocese's Chapter 11 Case.

230. **"Preserved Coverage"** means with respect to the certificates of coverage issued by Catholic Mutual to the Debtor, the obligations of Catholic Mutual to defend and indemnify the protected persons under such certificates with respect to the personal injury claims listed in the attached Schedule [X] to the Insurance Settlement Agreement with Catholic Mutual, in each case, subject to the limits, declarations, terms and conditions of such certificates; provided, however, that Preserved Coverage shall not include coverage for any and all Abuse Claims or other "Barred Claims" as defined in such settlement agreement.

231. **"Preserved Estate Causes of Action"** collectively means all Estate Causes of Action of the applicable Debtor or Additional Debtors, whether arising before or after the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date, except for (a) the Avoidance Actions and (b) those Claims and Estate Causes of Action that are expressly waived, relinquished, exculpated, released,

compromised, or settled pursuant to the Joint Plan or other Order. A non-exhaustive list of the Preserved Estate Causes of Action of the Debtor appears in <u>Plan Supplement 12.12(a)</u>, and a non-exhaustive list of Preserved Estate Causes of Action of the Additional Debtors appears in <u>Plan Supplement 12.12(b)</u>.

232. "**Previously Asserted Claim**" means any Claim (including any Abuse Claim) for which the Creditor (including an Abuse Claimant) has, on or before August 14, 2025, (a) Filed a Proof of Claim in the Archdiocese's Chapter 11 Case, regardless of whether such Proof of Claim was timely Filed, and regardless of whether such Proof of Claim is or was an Expunged Claim, or (b) Filed and served an Action against the Debtor and/or any Additional Debtors that remains pending, regardless of whether such Action was timely commenced under applicable state law.

233. "**Priest Pension Claims**" means Claims of priests and retired priests against the Debtor who are eligible for payments pursuant to the Priest Pension Plan.

234. "**Priest Pension Plan**" means the multi-employer, non-ERISA retirement plan for incardinated priests of the Archdiocese and Archdiocesan Parishes whose retirement from active service has been duly accepted, or will be accepted, by the Archbishop.

235. "**Priest Retiree Medical Benefits**" means medical benefits available to incardinated priests of the Archdiocese and Archdiocesan Parishes who have retired from active service and whose retirement from active service has been duly accepted, or will be duly accepted, by the Archbishop.

236. "**Priest Retiree Medical Benefits Claims**" means Claims of retired priests for Priest Retiree Medical Benefits.

237. "**Priority Claim**" means a Claim against the Debtor or the Additional Debtors to the extent that it is of the kind described in, and entitled to priority under, section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

238. "**Priority Tax Claim**" means a Claim of a Governmental Unit against the Debtor, the Reorganized Archdiocese, the Additional Debtors, or the Reorganized Additional Debtors of the kind described in, and entitled to priority under, section 507(a)(8) of the Bankruptcy Code. Priority Tax Claims are treated in Section 2.5 of the Joint Plan.

239. "**Professional**" means any professional employed or to be compensated pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code, and expressly excludes the Bond Trustee's Professionals.

240. "**Professional Fee Claim**" means a Claim for compensation for services and/or reimbursement of expenses pursuant to sections 327, 328, 330, 331 or 503(b) of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in any of the Chapter 11 Cases, including, but not limited to, the Professional Fee Claims of Professionals retained by the Debtor and the Creditors' Committees; <u>provided, however</u>, that the definition of Professional Fee Claim does not include the Bond Trustee's Professional Fee Claim.

241. "**Professional Fee Claims Bar Date**" means the deadline for Filing final Fee Applications for Professional Fee Claims, which will be forty-five (45) days after the Effective Date.

242. "**Proof of Claim**" means a proof of claim Filed in the applicable Chapter 11 Cases pursuant to section 501 of the Bankruptcy Code and/or pursuant to any Order entered by the Bankruptcy Court, together with supporting documents.

243. "**Protected Parties**" collectively means (a) the Archdiocese, (b) the Reorganized Archdiocese, (c) the Additional Debtors, and (d) the Reorganized Additional Debtors.

244.    "**Qui Tam Claim**" means the Claims asserted under the False Claims Act, 31 U.S.C. §§ 3729-3733, and otherwise in that certain Action pending before the District Court, bearing Civil Action No. 16-15092, and includes the Claims asserted in both (a) *Proof of Claim No. 52* by the United States of America, and (b) *Proof of Claim No. 49* by Robert Romero. The Qui Tam Claim was compromised under a settlement agreement approved by the Bankruptcy Court on October 26, 2021 pursuant to its *Order Granting Debtor's Motion for Entry of an Order (I) Approving Settlement Agreement with the United States of America and Robert Romero, Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [ECF Doc. No. 1139].

245.    "**Reduction Amount**" has the meaning set forth in Section 6.9(d) of the Joint Plan.

246.    "**Region**" means the following Louisiana civil parishes where the Archdiocese operates: Jefferson; Orleans; Plaquemines; St. Bernard; St. Charles; St. John the Baptist; St. Tammany; and Washington.

247.    "**Reinstatement**" means that the Claim will not be discharged under the Joint Plan, and the Creditor's legal, equitable, and contractual rights on account of such Claim will remain unaltered by implementation of the Joint Plan in accordance with section 1124(1) of the Bankruptcy Code. "**Reinstated**" and "**Reinstate**" will have correlative meanings.

248.    "**Rejection Damage Claims**" means Claims for damages arising from the rejection of Executory Contracts or Unexpired Leases in accordance with Section 10.2 of the Joint Plan.

249.    "**Rejection Damage Claims Bar Date**" means thirty (30) days after the Confirmation Date, as set forth in Section 10.2 of the Joint Plan, which will be the last day to assert Rejection Damage Claims against the Archdiocese, the Reorganized Archdiocese, the Additional Debtors, or the Reorganized Additional Debtors, or their respective properties.

250.    "**Rejection Notice**" means the notice that will be served on counterparties to Executory Contracts and Unexpired Leases that will be rejected pursuant to the Joint Plan, in accordance with the Disclosure Statement Order.

251.    "**Rejection Schedule**" means the Executory Contracts and Unexpired Leases, if any, identified in Plan Supplement 10.1(a).

252.    "**Related Insurance Claim**" means (a) any Extra-Contractual Claim and (b) any other Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Subject Insurance Policies, including, without limitation, bad faith Claims.

253.    "**Related Persons**" means, with respect to any Entity, such Entity's (a) predecessors, successors, assigns, and any Entity that assumed the obligation of the forgoing for the Subject Insurance Policies by novation or otherwise, (b) direct and indirect past, present and future Affiliates (as defined in section 101(2) of the Bankruptcy Code), holding companies, merged companies, related companies, subsidiaries, divisions, acquired companies, joint ventures, joint venturers, (c) current and former employees, officers, directors, principals, partners, managing agents, trustees, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, brokers, adjusters, reinsurers, retrocessionaires, subrogees, consultants, agents, claims handling administrators, and other professionals, and (d) respective heirs, executors, estates, and nominees; and all Entities acting on behalf of, by, through or in concert with them, each solely in their capacities as such with respect to such Entity (and with respect to such Entity (including Insurer) that is an insurer of any Covered Party or has assumed the obligations of such by novation or otherwise, such Entity's Subject Insurance Policy). For the purposes of this definition, the Joint Plan, and the SPARTA Settlement Agreement, Pennsylvania General Insurance Corporation shall not be a considered a Related Party of SPARTA.

#104076707v1

254.    "**Religious**" means any individual whom an archbishop, bishop, the Holy See, religious superior, or other authority of the Roman Catholic Church has appointed to, considered, treated, or determined to be a member of a Roman Catholic Church institute of consecrated life or society of apostolic life society, house, or order and should be treated as religious, and includes but is not limited to, a nun, perpetually professed, religious brother, religious sister, superior, major superior, prior, abbot, abbot primate, abbot superior, supreme moderator, superior of a monastic congregation, provincial, prior provincial, provincial superior, supreme superior, monk, member of an institute of consecrated life or society of apostolic life, or consecrated hermit, and may include a cardinal, metropolitan, archbishop, bishop, auxiliary bishop, regional bishop, titular bishop, vicar general, chancellor, episcopal vicar, vicar forane, dean, archpriest, priest, prelate, simplex, pastor, prior, sub-prior, rector, parochial vicar, assistant pastor, associate pastor, deacon, vicar, or  chaplain, and includes any diocesan right institutes of consecrated life and societies of apostolic life.

255.    "**Religious Order**" means, collectively, an institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy.

256.    "**Reorganized Archdiocese**" means The Roman Catholic Church of the Archdiocese of New Orleans, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date, after giving effect to the transactions implementing the Plan.

257.    "**Reorganized Additional Debtors**" means the Additional Debtors, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date, after giving effect to the transactions implementing the Plan.

258.    "**Report Regarding Clergy Abuse**" means the information published on the Debtor's website at https://nolacatholic.org/2018-report.

259.    "**Revival Window**" means Section 2 of La. Acts 2021, No. 322, as amended by La. Acts 2022, No. 386, and La. Acts 2024, No. 481.

260.    "**Revival Window Laws**" means the Revival Window, together with any other law that extends the prescriptive period or statute of limitations for asserting Abuse Claims under Louisiana or other applicable state law.

261.    "**Sale Injunction**" means the sale injunction imposed pursuant to Section 12.15 of the Joint Plan.

262.    "**Schedules**" means the Archdiocese's schedules of assets and liabilities Filed with the clerk of the Bankruptcy Court pursuant to pursuant to section 521(a) of the Bankruptcy Code and Bankruptcy Rule 1007, [ECF Doc. Nos. 104, 198, & 572], as they have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009.

263.    "**Schools**" means: (a) the Parish Schools; (b) the Archdiocesan Schools; (c) St. Thérèse Catholic Academy; and (d) any other independent school that is authorized by the Archbishop to teach the approved Roman Catholic curriculum.  For the avoidance of doubt, the definition of Schools expressly excludes (a) Roman Catholic schools that are owned and operated by a Religious Order, and (b) any other independent school that is not authorized by the Archbishop to teach the approved Roman Catholic curriculum.

264.    "**Second Settlement Trust Promissory Note**" means the promissory note, executed by the Debtor and the Additional Debtors, pursuant to Section 5.3(a)(iv) of the Joint Plan and made payable

to the order of the Settlement Trust. A copy of the Second Settlement Trust Promissory Note is included in <u>Plan Supplement 5.3(a)(iv)</u>

265. **"Second Settlement Trust Promissory Note Letter of Credit"** means the $50 million irrevocable letter of credit issued by a federally insured bank or financial institution acceptable to the Creditors' Committee and securing the Second Settlement Trust Promissory Note, in accordance with Section 5.3(a) of the Joint Plan. A copy of the Second Settlement Trust Promissory Note Letter of Credit is included in <u>Plan Supplement 5.3(a)(iv)</u>.

266. **"Section 363 Sale"** means a sale of property pursuant to the provisions of section 363 of the Bankruptcy Code, including, but not limited to, the buyback provisions contained in the Insurance Settlement Agreement.

267. **"Secured Claim"** means a Claim against the Archdiocese or any Additional Debtor that is secured by a Lien on, or security interest in, property of the Archdiocese or such Additional Debtor, or that has the benefit of rights of setoff under section 553 of the Bankruptcy Code, but only to the extent of the value of the Creditor's interest in the Archdiocese's or Additional Debtor's interest in such property, or to the extent of the amount subject to setoff, which value will be determined by the Bankruptcy Court pursuant to sections 506(a), 553, and/or 1129(b)(2)(A)(i)(II) of the Bankruptcy Code, as applicable. Secured Claims are treated in Class 2 of the Joint Plan, at Section 4.2 of the Joint Plan.

268. **"Settlement Consideration"** has the meaning set forth in Section 5.3 of the Joint Plan, and includes: (a) the Debtor and Additional Debtor Settlement Consideration described in Section 5.3(a) of the Joint Plan and <u>Plan Supplement 5.3(a)(ii)</u>, (b) the Settling Insurers' Settlement Consideration described in Section 5.3(b) of the Joint Plan, and (c) the Non-Settling Insurance Rights Transfer to the Settlement Trust, as set forth in Sections 5.3(a)(iv) and 7.2 of the Joint Plan.

269. **"Settlement Agreement Effective Date"** has the meaning set forth in the Insurance Settlement Agreements.

270. **"Settlement Trust"** means *The Archdiocese of New Orleans Settlement Trust* created in accordance with the Joint Plan and Settlement Trust Agreement for the benefit of the Settlement Trust Beneficiaries.

271. **"Settlement Trust Advisory Committee"** means the committee, to be appointed by the Creditors' Committee no later than the Effective Date, to oversee certain actions of the Settlement Trustee, as set forth in the Settlement Trust Agreement.

272. **"Settlement Trust Agreement"** means *The Archdiocese of New Orleans Settlement Trust Agreement,* as may be amended, together with such additional documents as may be executed in connection with the Settlement Trust Agreement, in form and substance substantially similar to <u>Plan Exhibit D-1</u>.

273. **"Settlement Trust Assets"** means the Cash and other property to be transferred to the Settlement Trust in accordance with the Joint Plan as well as any income or sale proceeds of the same.

274. **"Settlement Trust Beneficiaries"** means: (a) Abuse Claimants and (b) Entities entitled to the benefit of the Settlement Trust defense and indemnity obligations under Section 6.9 of the Joint Plan.

275. **"Settlement Trust Distribution"** means a distribution by the Settlement Trust to a Settlement Trust Beneficiary pursuant to the Settlement Trust Documents. For the avoidance of doubt, pursuant to Section 2.7 of the Joint Plan, Settlement Trust Distributions will not constitute a disbursement within the meaning of 28 U.S.C. § 1930(a)(6).

276. **"Settlement Trust Documents"** means (a) the Settlement Trust Agreement, (b) the Allocation Protocol, (c) Abuse Claim Release and Certification executed in connection with the Joint Plan, and (d) any other document related to (a) through (c).

**Plan Exhibit A**
Page 27

277. "**Settlement Trustee**" means Donald C. Massey, the Entity identified in Section 6.3 of the Joint Plan. Certain disclosures of the Settlement Trustee are attached as <u>Plan Supplement 6.3</u>.

278. "**Settling Insurers**" means (a) SPARTA Insurance Company and American Employers' Insurance Company ("**SPARTA**");[2] (b) United States Fire Insurance Company ("**U.S. Fire**"), International Insurance Company ("**International**"), Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company individually and, to the extent that policies issued by U.S. Fire and/or International were novated to or assumed by either or both of them ("**U.S. Fire/International**"); (c) Catholic Mutual Relief Society of America ("**Catholic Mutual**"); (d) Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation ("**Puritan**"); (e) National Union Fire Insurance Company of Pittsburgh, Pa. ("**National Union**"); and (f) Twin City Fire Insurance Company and First State Insurance Company ("**Twin City**"), together with the following: (i) each such Entity's past, present and future affiliates, divisions, reinsurers, and retrocessionaires, including Entities released pursuant to any Insurance Settlement Agreement; (ii) each such Entity's respective past, present and future affiliates, holding companies, merged companies, related companies, divisions and acquired companies, including the Entities released pursuant to any Insurance Settlement Agreement; and (iii) each such Entity's Related Persons. With respect to (i)-(iii) above, they are limited to each in their capacities solely as such. Notwithstanding the foregoing, to the extent that any such Insurer has not executed its respective Insurance Settlement Agreement prior to the Confirmation Hearing, such Insurer shall not be deemed a Settling Insurer.

279. "**Settling Insurers' Policies**" means all Subject Insurance Policies issued, subscribed to, or underwritten in whole or in part or allegedly issued, subscribed to, or underwritten in whole or in part by any Settling Insurer.

280. "**Settling Insurers' Settlement Consideration**" means the consideration described in Section 5.3(b) of the Joint Plan.

281. "**Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Settling Insurer against any Settling Insurer or Non-Settling Insurer for the payment of money where such Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

282. "**Single Business Enterprise Claims**" means any applicable legal or equitable Claim that seeks to hold an Additional Debtor and/or a Non-Debtor Catholic Entity liable for the obligations, debts, or wrongdoing of the Archdiocese based on the relationships or affiliations with the Archdiocese, including, but not limited to, to substantive consolidation, the single business enterprise doctrine, or other veil piercing legal theories.

283. "**Solicitation Package**" means the materials and documents to be sent to Creditors entitled to vote to accept or reject the Joint Plan, in accordance with the Disclosure Statement Order.

284. "**Statement of Financial Affairs**" means the Archdiocese's statement of financial affairs Filed with the clerk of the Bankruptcy Court pursuant to section 521(a) of the Bankruptcy Code, [ECF Doc. No. 197], as the same may have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009.

---

[2] SPARTA's contribution of $21,000,000 and status as a Settling Insurer is contingent on SPARTA providing financial assurance acceptable to the Creditors' Committee in the Creditors' Committee's discretion by the commencement of the Confirmation Hearing. If SPARTA fails to provide such financial assurance, SPARTA will become a Non-Settling Insurer, and litigation rights will be preserved against SPARTA and any insurance guarantee fund, should SPARTA trigger guarantee fund coverage.

**Plan Exhibit A**
Page 28

285.    "**Subclass**" means a category of Creditors holding Claims as set forth in Article 3 of the Joint Plan pursuant to section 1122 of the Bankruptcy Code.

286.    "**Subject Insurance Policies**" means (a) the contracts, binders, certificates, and policies of insurance that are listed on Plan Supplements 7.1(f) and 7.2, and (b) all other known and unknown contracts, binders, certificates, or policies of general liability insurance, including all of the insurance policies mentioned or referred to in any Insurance Settlement Agreement, in effect on or before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date that were issued to, or for the benefit of, or subscribed on behalf or that otherwise actually insure, (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) policies issued to the Archdiocese that name as an insured or additional insured (or related concept under applicable law or document) the Diocese of Houma-Thibodaux or Diocese of Baton Rouge, but not policies issued to either of these dioceses that were not already issued to the Archdiocese or name it as insured, (iv) any Entity owned, created, operated, affiliated with, or controlled by the Archdiocese or the Archbishop, or (v) any institution, religious organization or subsidiaries of any organization listed in the declarations of the Subject Insurance Policies, or any other organization coming under any named insured's control or active management; in each case of (a) and (b) that were issued, subscribed to, or underwritten in whole or in part or allegedly issued, subscribed to, or underwritten in whole or in part by any Insurer or any of its predecessors in interest, successors, or assigns.

287.    "**Subject Interests**" means all Claims, liens (as defined by Section 101(37) of the Bankruptcy Code), encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief, including: (a) all interests of the Archdiocese in, to and under the Subject Insurance Policies; (b) all interests in, to, and under the Subject Insurance Policies of any Entity other than the Archdiocese (including all Abuse Claimants and the Covered Parties); and (c) all interests in, to and under the Subject Insurance Policies of any other Entity claiming coverage by, through, or on behalf of any Covered Party, including, without limitation, rights and interests as an insured, co-insured or additional insured, insurer or creditors of the Covered Parties; in each case within the meaning of "interest" as used in sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code. For the avoidance of doubt, a Direct Action Claim constitutes an Interest.

288.    "**Supplemental Settling Insurers' Injunction**" means the injunction imposed pursuant to Section 12.5 of the Joint Plan.

289.    "**Suppressed Archdiocesan Parishes**" means those Catholic Church parish Entities listed on Plan Exhibit B-1, at Part II. Each of the Suppressed Archdiocesan Parishes is organized as a non-profit corporation.

290.    "**Survivors' Committee**" or "**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed in the Archdiocese's Chapter 11 Case on May 20, 2020, [ECF Doc. Nos. 94 & 114], as such committee may be reconstituted from time to time.

291.    "**Tax**" means (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority, or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

**Plan Exhibit A**
Page 29

292.    "**Tax Claim**" means any Claim of a Governmental Unit, whether federal, state or local, for recovery of a tax of any kind whatsoever (including any interest, penalty, or addition thereto) incurred or arising before the Effective Date, including, but not limited to, Claims of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

293.    "**Temporalities Manual**" means the *Temporalities Manual for Parishes (Accounting and Budgeting Manual for Parishes)*, approved April 2019, as set forth at the following website: https://files.ecatholic.com/16596/documents/2020/8/Parish%20Temporalities%20Manual.pdf?t=1596475 555000

294.    "**Tolling Agreements**" mean those certain *Tolling Agreements* executed by the Archdiocese and the Creditors' Committees, on the one hand, and the Tolling Parties, on the other hand, as the same were extended from time to time, including those agreements with the Non-Debtor Catholic Entities approved the Bankruptcy Court in the Archdiocese's Chapter 11 Case [ECF Doc. Nos. 1406, 2154, 2883, 3774].

295.    "**Tolling Parties**" means: (a) each of the Non-Debtor Catholic Entities; (b) St. Joseph Abbey and Seminary College; (c) Guillory Sheet Metal Works Inc., Inc.; (d) FL+WB Architects, A Professional Construction; (e) Voelkel McWilliams Construction, L.L.C.; (f) St. Ann 2017, L.L.C.; (g) St. Ann 2017 MM, L.L.C.; (h) Denechaud & Denechaud LLC; (i) the Louisiana Conference of Catholic Bishops; and (j) St. Mary's Academy of the Holy Family.

296.    "**Treasury Regulations**" means 31 C.F.R. part 900 *et seq.*

297.    "**Unclaimed Property**" means any Cash or other property in the Settlement Trust which is unclaimed as provided in Section 6.13(j) of the Joint Plan.

298.    "**Unexpired Lease**" means any lease to which the Archdiocese and/or one or more of the Additional Debtors is a party and that is subject to assumption or rejection under sections 365 and 1123 of the Bankruptcy Code.

299.    "**Unimpaired**" means, with respect to a Class of Claims, that such Class is not Impaired.

300.    "**Unknown Abuse Claim**" means an Abuse Claim against the Debtor and/or any Additional Debtors that occurred before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date but was not Filed by the Additional Debtors' Abuse Claims Bar Date, for which there exists a valid legal excuse for not Filing by the Additional Debtors' Abuse Claims Bar Date.  For the purposes of the Joint Plan, a "valid legal excuse" must be at least one of the following (as in effect within the 180 days prior to the Claims Bar Date): (a) the Abuse Claimant was below the age of eighteen (18); (b) the Abuse Claimant was in the active military service of the United States, or otherwise entitled to the protections of the Soldiers' and Sailors' Relief Act of 1940, or the Service members' Civil Relief Act of 2003 (whether in or out of the United States, and whether in or out of a combat zone); (c) the Abuse Claimant was suffering from insanity; (d) the Abuse Claimant was suffering from mental disability short of insanity, which could reasonably be expected to materially impair the Abuse Claimant's ability to understand that the Abuse Claimant had a claim, or materially impair the Abuse Claimant's ability to timely File one; and (e) the Abuse Claimant was suffering from memory repression, memory suppression, or any similar mental condition that could reasonably be expected to materially impair the Abuse Claimant's ability to File a timely Abuse Claim.

301.    "**Unknown Abuse Claimant**" means an Abuse Claimant holding an Unknown Abuse Claim, together with the legal representative of such holder, including, but not limited to, a bankruptcy trustee, the estate of a deceased individual who held an Unknown Abuse Claim, or the personal executor or personal representative of an individual (or the estate of a deceased individual) who holds or held an Unknown Abuse Claim, as the case may be.

302. "**Unknown Abuse Claims Representative**" means Michael R. Hogan, appointed in accordance with the Unknown Abuse Claims Representative Appointment Order, and any successor or such other Entity appointed by the Bankruptcy Court or otherwise.

303. "**Unknown Abuse Claims Representative Appointment Order**" means the *Order (I) Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, and (II) Approving the Retention of Michael R. Hogan as the Unknown Tort Claims Representative,* Nunc Pro Tunc *to July 26, 2021* [ECF Doc. No. 1012] entered in the Archdiocese's Chapter 11 Case.

304. "**Unsecured Claims**" means all Claims that are not secured by a Lien on Collateral.

305. "**Unsecured Trade Claims**" means all Unsecured Claims against the Debtor and/or any Additional Debtors that arise from or with respect to the sale of goods or rendition of services on or before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date in the ordinary course of business. Unsecured Trade Claims against the Archdiocese are treated in Class 7, at Section 4.7 of the Joint Plan (along with General Unsecured Claims). Unsecured Trade Claims against the Additional Debtors are treated in Class 9, at Section 4.9 of the Joint Plan.

306. "**USCCB**" means the United States Conference of Catholic Bishops, is a nonprofit corporation, the members of which are the active Roman Catholic Bishops in the United States.

307. "**U.S. Trustee**" means the Office of the United States Trustee for Region 5, which services the federal judicial districts established for Louisiana and Mississippi.

308. "**Voting Classes**" means Class 3 (Known Abuse Claims), Class 4 (Unknown Abuse Claims, acting by and through the Unknown Abuse Claims Representative), Class 6 (Bond Claims), Class 7 (General Unsecured Claims and Unsecured Trade Claims - Debtor), and Class 8 (Non-Abuse Personal Injury Claims – Debtor).

309. "**Voting Deadline**" means the deadline established by the Bankruptcy Court by which a Creditor must execute and deliver his or her Ballot to cast a vote to accept or reject the Joint Plan.

310. "**Voting Record Date**" means the date, to be established by the Bankruptcy Court, for determining (a) which Creditors holding Claims in the Voting Classes are entitled to vote to accept or reject the Joint Plan, and (b) whether Claims have been properly assigned or transferred to an assignee under Bankruptcy Rule 3001(e) such that the assignee or transferee, as applicable, can vote to accept or reject the Joint Plan.

311. "**Workers' Compensation Programs**" means any of the Debtor's or any Additional Debtor's (a) written contracts, agreements, agreements of indemnity, in each case relating to workers' compensation, (b) self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance issued to or entered into at any time by the Debtor or any Additional Debtor.

#104076707v1

## SCHEDULE A-1 TO PLAN EXHIBIT A

## AFFORDABLE HOUSING ENTITIES

1. Christopher Inn
2. The Apartments at Mater Dolorosa
3. Metairie Manor
4. Metairie Manor III
5. St. Bernard II
6. Dubourg Home
7. St. Tammany Manor, Inc.
8. Rouquette Lodge III
9. St. Bernard III
10. Monsignor Wynhoven Apartments, Inc.
11. Mental Health Association Development Corporation
12. St. Bernard Manor
13. St. Martin's Manor
14. Villa St. Maurice, Inc.
15. Villa Additions

**Plan Exhibit A**
Page 32

#104076707v1

## SCHEDULE A-2 TO PLAN EXHIBIT A

## AFFORDABLE HOUSING FACILITIES

1. **Christopher Inn** (owned by Christopher Inn)
2. **The Apartments at Mater Dolorosa** (owned by The Apartments at Mater Dolorosa)
3. **Metairie Manor** (owned by Metairie Manor)
4. **Metairie Manor III** (owned by Metairie Manor III)
5. **Metairie Manor IV** (owned by St. Bernard II)
6. **Place DuBourg** (owned by Dubourg Home)
7. **Rouquette Lodge** (owned by St. Tammany Manor, Inc.)
8. **Rouquette Lodge III** (owned by Rouquette Lodge III)
9. **Rouquette Lodge, IV** (owned by St. Bernard III)
10. **Wynhoven** (owned by Monsignor Wynhoven Apartments, Inc.)
11. **St. Martin House** (owned by Mental Health Association Development Corporation)
12. **St. Bernard Manor** (owned by St. Bernard Manor)
13. **St. Martin's Manor** (owned by St. Martin's Manor)
14. **Villa St. Maurice** (owned by Villa St. Maurice, Inc.)
15. **St. Teresa's Villa** (owned by Villa Additions)

#104076707v1

## SCHEDULE A-3 TO PLAN EXHIBIT A

## CERTAIN ABUSE SURVIVORS' COUNSEL

1. **Soren E. Gisleson**
2. **Richard C. Trahant**
3. **John H. Denenea, Jr.**
4. **Desirée M. Charbonnet**
5. **Craig M. Robinson**
6. **Frank J. D'Amico, Jr.**
7. **Robert L. Salim**
8. **Nicholas R. Rockforte**
9. **Taylor Townsend**
10. **N. Frank Elliot III**

#104076707v1

# PLAN EXHIBIT B-1

# Additional Debtors

# PLAN EXHIBIT B-1

## Additional Debtors

**I.      Archdiocesan Parishes**

1.      All Saints Roman Catholic Church, New Orleans, Louisiana
2.      Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana
3.      Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana
4.      Assumption of Mary Roman Catholic Church, Avondale, Louisiana
5.      Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana[1]
6.      Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana
7.      Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana
8.      Blessed Trinity Roman Catholic Church, New Orleans, Louisiana
9.      Christ the King Roman Catholic Church, Gretna, Louisiana
10.     Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana
11.     Divine Mercy Roman Catholic Church, Kenner, Louisiana
12.     Good Shepherd Roman Catholic Church, New Orleans, Louisiana
13.     Holy Family Roman Catholic Church, Franklinton, Louisiana
14.     Holy Family Roman Catholic Church, Luling, Louisiana
15.     Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana
16.     Holy Spirit Roman Catholic Church, New Orleans, Louisiana
17.     Immaculate Conception Roman Catholic Church, Marrero, Louisiana
18.     Immaculate Conception Roman Catholic Church, New Orleans, Louisiana
19.     Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana
20.     Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana
21.     Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana
22.     Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana
23.     Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana
24.     Most Holy Trinity Roman Catholic Church, Covington, Louisiana
25.     Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana
26.     Our Lady of Grace Roman Catholic Church, Reserve, Louisiana
27.     Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana
28.     Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana
29.     Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana
30.     Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana
31.     Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana
32.     Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana
33.     Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana
34.     Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana
35.     Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana
36.     Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana

---

[1] Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

37.  Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana
38.  Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana
39.  Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana
40.  St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana
41.  St. Agnes Roman Catholic Church, Jefferson, Louisiana
42.  St. Alphonsus Roman Catholic Church, New Orleans, Louisiana
43.  St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana
44.  St. Angela Merici Roman Catholic Church, Metairie, Louisiana
45.  St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana
46.  St. Anselm Roman Catholic Church, Madisonville, Louisiana
47.  St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana
48.  St. Anthony of Padua Roman Catholic Church, Luling, Louisiana
49.  St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana
50.  St. Anthony Roman Catholic Church, Gretna, Louisiana
51.  St. Augustine Roman Catholic Church, New Orleans, Louisiana
52.  St. Benedict Roman Catholic Church, Covington, Louisiana
53.  St. Benilde Roman Catholic Church, Metairie, Louisiana
54.  St. Bernard Roman Catholic Church, St. Bernard, Louisiana
55.  St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana
56.  St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana
57.  St. Christopher Roman Catholic Church, Metairie, Louisiana
58.  St. Clement of Rome Roman Catholic Church, Metairie, Louisiana
59.  St. Cletus Roman Catholic Church, Gretna, Louisiana
60.  St. David Roman Catholic Church, New Orleans, Louisiana
61.  St. Dominic's Roman Catholic Church, New Orleans, Louisiana
62.  St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana
63.  St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana
64.  St. Francis Xavier Roman Catholic Church, Metairie, Louisiana
65.  St. Genevieve Roman Catholic Church, Slidell, Louisiana
66.  St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana
67.  St. Jerome Roman Catholic Church, Kenner, Louisiana
68.  St. Joachim Roman Catholic Church, Marrero, Louisiana
69.  St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana
70.  St. John of the Cross Roman Catholic Church, Lacombe, Louisiana
71.  St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our
     Lady of the Angels Roman Catholic Church, Waggaman, Louisiana
72.  St. John the Baptist Roman Catholic Church, Edgard, Louisiana
73.  St. John the Baptist Roman Catholic Church, Folsom, Louisiana
74.  St. Joseph Roman Catholic Church, Algiers, Louisiana
75.  St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana
76.  St. Joseph's Roman Catholic Church, Gretna, Louisiana
77.  St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known
     as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana
78.  St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana
79.  St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana
80.  St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana

81. St. Margaret Mary Roman Catholic Church, Slidell, Louisiana
82. St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana
83. St. Mark Roman Catholic Church, Ama, Louisiana
84. St. Martha Roman Catholic Church, Harvey, Louisiana
85. St. Martin de Porres Roman Catholic Church, New Orleans, formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana
86. St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana
87. St. Mary's Roman Catholic Church, New Orleans, Louisiana
88. St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana
89. St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St. John the Baptist Roman Catholic Church, Paradis, Louisiana
90. St. Patrick's Roman Catholic Church, New Orleans, Louisiana
91. St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana
92. St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana
93. St. Peter Claver Roman Catholic Church, New Orleans, Louisiana
94. St. Peter Roman Catholic Church, Reserve, Louisiana
95. St. Peter's Roman Catholic Church, Covington, Louisiana
96. St. Philip Neri Roman Catholic Church, Metairie, Louisiana
97. St. Pius X Roman Catholic Church, New Orleans, Louisiana
98. St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana
99. St. Rita Roman Catholic Church, Harahan, Louisiana
100. St. Rita Roman Catholic Church, New Orleans, Louisiana
101. St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana[2]
102. Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana
103. The Congregation of St. Rita Roman Catholic Church of Harahan
104. The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana

## II. Suppressed Archdiocesan Parishes[3]

1. Blessed Sacrament, Inc.
2. Epiphany, Inc.

---

[2] As noted earlier, Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

[3] The Suppressed Archdiocesan Parishes no longer operate as separate church parishes. The Suppressed Archdiocesan Parishes were not dissolved, and may own property.

Following Hurricane Katrina, the operations of certain of the Suppressed Archdiocesan Parishes were combined with Archdiocesan Parishes.  In 2024, in the ongoing aftermath of Hurricane Ida and a result of storm damage, the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental statistics, and financial difficulties encountered, the following additional Suppressed Archdiocesan Parishes were canonically merged with neighboring Archdiocesan Parishes: (a) St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc., was canonically merged into St. Peter Roman Catholic Church, Reserve, Louisiana; (b) (i) St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and (ii) St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc., were both canonically merged into Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, now known as St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana; (c) St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc., was canonically merged into St. Rosalie Roman Catholic Church, Harvey, Louisiana, now known as Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana; (d) St. Bonaventure

3

3. Immaculate Heart of Mary, Inc.
4. Incarnate Word, Inc.
5. Our Lady of Good Counsel, Inc.
6. Our Lady of Good Harbor, Inc.
7. Our Lady of Lourdes, New Orleans, Louisiana, Inc.
8. Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.
9. Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana
10. St. Ann, New Orleans, Louisiana, Inc.
11. St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana
12. St. Frances Xavier Cabrini, Inc.
13. St. Francis de Salles, Inc.
14. St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana
15. St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana
16. St. Henry's, Inc.
17. St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana
18. St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana
19. St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana
20. St. John the Baptist, New Orleans, Louisiana, Inc.
21. St. Julian Eymard, Inc.
22. St. Lawrence the Martyr, Inc.
23. St. Louise de Marillac, Inc.
24. St. Maurice, Inc.
25. St. Monica, Inc.
26. St. Philip the Apostle, Inc.
27. St. Raymond's, Inc.
28. St. Rose of Lima, Inc.
29. St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana

---

Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc., was canonically merged into Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, now known as St. John Paul II Roman Catholic Church, Waggaman, Louisiana; (e) St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc., was canonically merged into St. John the Baptist Roman Catholic Church, Paradis, Louisiana, now known as St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana; (f) Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc., was canonically merged into St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, now known as St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana; and (g) St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc., had its canonical territory divided so that (i) the area north of the Pontchartrain Expressway was canonically merged into St. Patrick's Roman Catholic Church, New Orleans, Louisiana, and (ii) the area south of the Pontchartrain Expressway was canonically merged into St. Alphonsus Roman Catholic Church, New Orleans, Louisiana.

4

30.      St. Theresa of the Child Jesus, Inc.
31.      The Congregation of Saints Peter and Paul Roman Catholic Church
32.      The Congregation of St. Cecelia Roman Catholic Church
33.      The Congregation of the Annunciation Roman Catholic Church
34.      The Congregation of the Holy Trinity Roman Catholic Church

### III.     Archdiocesan Agencies

1.      Archdiocesan Spirituality Center
2.      Catholic Charities Archdiocese of New Orleans
3.      Catholic Charities Children's Day Care Centers
4.      Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)
5.      Clarion Herald Publishing Company
6.      Korean Catholic Community of New Orleans, Inc.
7.      Notre Dame Seminary
8.      Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana
9.      Pace Greater New Orleans
10.      Padua House (merged into Catholic Charities Archdiocese of New Orleans)
11.      Philmat, Inc.
12.      Project Lazarus
13.      Roman Catholic Center of Jesus the Lord
14.      School Food and Nutrition Services of New Orleans, Inc.
15.      Second Harvest Food Bank of Greater New Orleans and Acadiana
16.      St. Jude Community Center, Inc.
17.      St. Michael Special School
18.      St. Thérèse Catholic Academy
19.      The Society for the Propagation of the Faith, Archdiocese of New Orleans

#103965227v3

# PLAN EXHIBIT B-2

# Non-Debtor Catholic Entities

**PLAN EXHIBIT B-2**

**Non-Debtor Catholic Entities**

**Archdiocesan Agencies**

1.   7887 Walmsley, Inc.
2.   Annunciation Inn, Inc.
3.   Archdiocese of New Orleans Indemnity, Inc.
4.   Aspiring Scholars
5.   Catholic Community Foundation Archdiocese of New Orleans
6.   Christopher Homes, Inc.
7.   Christopher Inn
8.   Dubourg Home
9.   Holy Redeemer Catholic Virtual Academy
10.  Holy Trinity Drive Land Corporation
11.  Iberia Investment Fund II, LLC
12.  Metairie III
13.  Metairie Manor
14.  Monsignor Wynhoven Apartments, Inc.
15.  Nazareth II
16.  Nazareth Manor
17.  New Orleans Archdiocesan Cemeteries
18.  Notre Dame Health System (f/k/a Chateau de Notre Dame)
19.  Rouquette III
20.  St. Anthony's Gardens
21.  St. Bernard II
22.  St. Bernard III
23.  St. Bernard Manor
24.  St. Martin's Manor, Inc.
25.  St. Tammany Catholic Cemetery
26.  St. Tammany Manor
27.  The Apartments at Mater Dolorosa
28.  The Mental Health Association Development Corporation
29.  Villa Additions, doing business as St. Teresa's Villa
30.  Villa St. Maurice, Inc.

#103965229v3

# PLAN EXHIBIT C

# Abuse Claim Release and Certification

## GENERAL RELEASE AGREEMENT

This General Release Agreement (this "**Release**") is made and entered into by [Claimant Name/Claimant Number] ("**Claimant**"), pursuant to the _____ *Joint Chapter 11 Plan of The Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of* _____ [Docket No. ____] (the "**Joint Plan**"), filed by The Roman Catholic Church of the Archdiocese of New Orleans (the "**Archdiocese**" or the "**Debtor**") and the Additional Debtors identified in Exhibit B-1 to the Joint Plan in their jointly-administered bankruptcy cases captioned *In re The Roman Catholic Church of the Archdiocese of New Orleans* filed in the Bankruptcy Court for the Eastern District of Louisiana, Case No. 20-10846 (the "**Chapter 11 Cases**"), and in connection with the receipt of distributions from The Archdiocese of New Orleans Settlement Trust (the "**Settlement Trust**") under the Plan Documents, including, but not limited to, Settlement Trust Documents. **All capitalized terms used and not otherwise defined in this Release have the meanings ascribed to such terms in the Joint Plan.**

WHEREAS, Claimant has asserted an Abuse Claim against the Debtor and/or Additional Debtors;

WHEREAS, on [_____], 2025, the Court entered an order confirming the Joint Plan;

WHEREAS, pursuant to the Joint Plan, the Settlement Trust was created, among other reasons, for the reconciliation, and compensation of Known Abuse Claims in accordance with the Settlement Trust Documents, including, but not limited to, the Trust Allocation Protocol.

WHEREAS, pursuant to the Joint Plan, on or about the Effective Date (i) the Debtor and Additional Debtors and certain Non-Debtor Third Parties will contribute [$_____] to the Trust (the "**Debtor Settlement Amounts**"), and (ii) the Settling Insurers will contribute $29,275,000 (the "**Insurance Settlement Amounts,**" together with the Debtor Settlement Amounts and the Third Party Settlement Amounts, the "**Effective Date Amounts**") to the Trust.

WHEREAS, the Effective Date of the Joint Plan occurred on [_____], 2025;

NOW, THEREFORE, in consideration of the treatment to be provided to Claimant's Abuse Claim under the Joint Plan, the Settlement Trust Agreement, the Trust Allocation Protocol, and other Settlement Trust Documents, Claimant hereby irrevocably covenants and agrees as follows:

## GENERAL RELEASES IN ACCORDANCE WITH THE JOINT PLAN

1. Subject to the limitations set forth in section 12.14 of the Joint Plan, Claimant, on Claimant's own behalf and on behalf of his or her respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or Entity to the extent he, she, or it is entitled to assert any claim on Claimant's behalf, including, but not limited to, any legal

4923-9375-2658.8 05067.002

Case 20-10846 Doc 4545-1 Filed 11/04/25 Entered 11/04/25 16:07:54  PP Ex. 1 - Joint Plan
Page 106 of 271

Case 20-10846 Doc 4518-4 Filed 10/27/25 Entered 10/27/25 18:53:26  Plan Exhibit C - Abuse
Claim Release and Certification Page 3 of 6

representative(s), does hereby as of the Effective Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Debtor or Additional Debtors from and with respect to any and all Channeled Claims; provided, however, that such waiver, release, remittance, acquittal, and discharge with respect to the Debtor and Additional Debtor shall be subject in all respects to the Joint Plan, including but not limited to Article 12 of the Joint Plan.

2.      Notwithstanding anything to the contrary in this Release, Claimant specifically reserves, and does not release, any Claims, to the extent such Claims implicate coverage under any Non-Settling Insurer's Policies, that they may have against (i) the Settlement Trust, as successor to the Debtor and the Additional Debtors as set forth herein or (ii) the Debtor and the Additional Debtor solely if a court of competent jurisdiction determines in a Final Order that the Settlement Trust's assumption of responsibility for the Debtor's and/or Additional Debtor's liability for, and obligation to pay, Abuse Claims nullifies or renders inaccessible coverage from the Non-Settling Insurer for the Abuse Claim of an Abuse Claimant; provided, however, that (notwithstanding anything else in the Joint Plan to the contrary) recourse for such claims is limited to the Non-Settling Insurer and the proceeds of the Non-Settling Insurer's Policies; and provided further that any recovery for such claims will be paid in accordance with the Settlement Trust Documents

3.      Claimant hereby acknowledges and agrees that Claimant is subject to and bound by the Joint Plan, including the releases and injunctions as set forth in Article 12 of the Joint Plan, and further that Claimant will not knowingly (i) institute or continue prosecution of a lawsuit or other action in violation of the Joint Plan, (ii) knowingly participate, assist or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute such action.

4.      Claimant hereby acknowledges that, pursuant to the Joint Plan, the Confirmation Order, the Sale Order, and the injunctions contained in the foregoing, the sole recourse of any holder of an Abuse Claim against a Protected Party or Settling Insurer on account of such Abuse Claim shall be against the Settlement Trust. Claimant hereby further acknowledges that Claimant shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or Settling Insurer or any property or interest in property of any Protected Party or Settling Insurer, except as set forth in Article 12 of the Joint Plan and in compliance with the Trust Allocation Protocol.

5.      In further consideration of the benefit of the opportunity to seek compensation from the Settlement Trust, as of the Effective Date, Claimant shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including costs of defense and attorneys' fees of, the Settlement Trust and the Settlement Trustee arising from my failure to comply with the terms of this Release.

### ELECTION TO RELEASE SETTLING INSURERS

6.      In order to receive his or her share of the Insurance Settlement Amount, a Claimant must elect to receive those funds by signing the release of the Settling Insurers on the signature page hereto.  A Claimant who elects to take his or her share of the Insurance Settlement Amounts

will receive an enhanced Trust Distribution, which is estimated, based on the Trust's receipt of the Effective Date Amounts, to be approximately 19.5% higher than would be received by a Claimant who does not elect to take his or her share of the Insurance Settlement Amounts.

7.      Upon electing to receive its share of the Insurance Settlement Amounts by signing the release of the Settling Insurers on the signature page hereto, Claimant, on Claimant's own behalf and on behalf of his or her respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or Entity to the extent he, she, or it is entitled to assert any claim on Claimant's behalf, including, but not limited to, any legal representative(s), does hereby as of the Effective Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Settling Insurers from and with respect to any and all Claims of any kind under, arising out of, relating (directly or indirectly) to, or connecting in any way with Claimant's Abuse Claim or any of the Archdiocese Policies.

8.      Claimant covenants and agrees that Claimant will honor the release as set forth herein, and, further, that Claimant will not knowingly (i) institute or continue prosecution of a lawsuit or other action against any Settling Insurer based upon, arising out of, or relating to any such released Claims, (ii) knowingly participate, assist, or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute any such action.

**LITIGATION CLAIMANT PROVISIONS**

9.      If Claimant has elected or elects (i) to be a Litigation Claimant (as defined in the Allocation Protocol), Claimant acknowledges and agrees to the provisions of the Allocation Protocol with respect to the rights and responsibilities of Litigation Claimants, including, but not limited to, that such Claimant's Allocated Payment shall be held in reserve by the Settlement Trustee until the occurrence of Release Event as defined in Section 10.8 of the Allocation Protocol, or (ii) not to pursue litigation against the Non-Settling Insurer and assigns any claims it has against the Non-Settling Insurer to the Settlement Trust.

10.     If Claimant has elected to be a Litigation Claimant, such Litigation Claimant may elect to receive his or her Allocated Payment (rather than having such Allocated Payment held in reserve) by affirmatively electing (the "**Distribution Election**") to receive such Allocated Payment and acknowledging that by exercising such election, Claimant **irrevocably agrees to assign and transfer to the Settlement Trust** any proceeds of any Litigation Award or any Litigation Claimant as set forth in Sections 10.8 and 10.9 of the Allocation Protocol, and the Litigation Claimant will receive the same treatment as other Litigation Claimants as set forth in 10.8 and 10.9, as applicable, including the Claim Enhancements. Claimant further acknowledges and accepts any risk or consequences to his or her rights in any litigation against any Target Insurer from its acceptance and receipt of its Allocated Payment.

**ADDITIONAL PROVISIONS**

11.     Claimant acknowledges that the Settlement Trust is not providing any tax advice with respect to the receipt of any compensation or any component thereof, and Claimant

understands and agrees that Claimant shall be solely responsible for compliance with all tax laws with respect to any compensation received, to the extent applicable.

12. Claimant represents and warrants that Claimant is the sole holder of the Abuse Claim that Claimant has asserted against the Debtor and/or the Additional Debtors, and that Claimant has not assigned, transferred or granted any interest in such Abuse Claim to any other Entity, except to the extent of any agreement with Claimant's counsel.

13. Claimant represents and warrants that Claimant will provide for the payment and/or resolution of any obligation owing or potentially owing under the Medicare Secondary Payer Statute ("**MSPA**") relating to Claimant's Abuse Claim.

14. Claimant agrees to provide the Settlement Trustee with any information necessary to comply with reporting obligations arising under the MMSEA, and has provided or will provide for the payments/and or resolution of any obligations owing or potentially owing under the MSPA relating to Claimant's Abuse Claim and any Distribution from the Settlement Trust. Claimant acknowledges and agrees that if Claimant does have any obligations owing or potentially owing under the MSPA relating to any Abuse Claim or Distribution from the Settlement Trust, the Settlement Trustee may withhold from any payment directly or indirectly to Claimant funds sufficient to assure that any obligations owing or potentially owing under the MSPA relating to such Abuse Claim are paid to the applicable agency.

15. Claimant acknowledges that Claimant is voluntarily and freely entering into this General Release in exchange for consideration. Claimant further declares that Claimant is or has been given the opportunity to receive legal advice regarding this General Release prior to entering into it.

16. The provisions of this General Release shall be binding upon Claimant, and upon Claimant's heirs, successors, assigns, agents, and representatives.

17. This Agreement, the Plan Documents and the Settlement Trust Documents contain the entire understanding of the parties. Any modification of any of the provisions of this General Release shall be effectively only if made in writing and executed by the Claimant and all Protected Parties, and, to the extent such modification modifies the release of the Settling Insurers, by the Settling Insurers, and, to the extent such modification modifies the release of the Non-Debtor Third Parties, the Non-Debtor Third Parties.

18. This General Release shall be governed and construed pursuant to the laws of the State of Louisiana, without regard to its conflicts of law principles.

*[signature page follows]*

**SETTLING INSURANCE RELEASE SIGNATURE**

☐ **I ELECT TO RECEIVE A SHARE OF INSURANCE SETTLEMENT AMOUNTS AND RELEASE THE SETTLING INSURERS AS SET FORTH IN PARAGRAPHS 6 through 8 ABOVE**

**Signature:**

**LITIGATION CLAIMANT ELECTION**

☐ **I AM A LITIGATION CLAIMANT. I HEREBY ELECT TO RECEIVE MY ALLOCATED PAYMENT, AND I IRREVOCABLY AGREE TO ASSIGN AND TRANSFER THE PROCEEDS OF ANY LITIGATION AWARD OR LITIGATION CLAIMANT SETTLEMENT TO THE SETTLEMENT TRUST ON THE TERMS AND CONDITIONS DESCRIBED IN THE TRUST ALLOCATION PROTOCOL.**

**Signature:**

**GENERAL RELEASE SIGNATURE (REQUIRED FOR RECEIPT OF ANY FUNDS FROM THE TRUST)**

IN WITNESS THEREOF, this General Release has been executed by Claimant (or, in the case of death or legal disability, Claimant's duly-authorized legal representative acting under power of attorney) and delivered to the Trustee as of the date set forth below.

Dated: [_____]

_____
Address

_____
Claimant's date of birth

_____
Signature

_____
Claimant's full Social Security Number

_____
Print or type full name of Claimant

_____
Claim number (if known)

# PLAN EXHIBIT D-1

# Settlement Trust Agreement

**SETTLEMENT TRUST AGREEMENT**

**DATED AS OF OCTOBER 27, 2025**

**PURSUANT TO THE FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS AND THE ADDITIONAL DEBTORS**

i

## Table of Contents

**ARTICLE 1. AGREEMENT OF TRUST** ................................................................. **7**

Section 1.1     **Creation and Name.** ...........................................................................7

Section 1.2     **Purposes.** ...........................................................................................7

Section 1.3     **Transfer of Assets.** ..........................................................................7

Section 1.4     **Acceptance of Assets.** .....................................................................7

Section 1.5     **Receipt of Proceeds.** ........................................................................8

Section 1.6     **Settlement Trust Beneficiaries.** .....................................................8

Section 1.7     **Jurisdiction.** .....................................................................................8

Section 1.8     **Privileged and confidential information.** ......................................8

Section 1.9     **Relation-back election.** ....................................................................9

Section 1.10    **Employer identification number.** ...................................................9

Section 1.11    **Relationship to Joint Plan.** ...........................................................9

**ARTICLE 2. POWERS AND TRUST ADMINISTRATION** .............................. **9**

Section 2.1     **Powers.** .............................................................................................9

Section 2.2     **Limitations on the Settlement Trustee and Settlement Trust Advisory Committee.** ...............13

Section 2.3     **General Administration.** ................................................................14

Section 2.4     **Accounting.** ....................................................................................14

Section 2.5     **Financial Reporting.** .....................................................................14

Section 2.6     **Names and addresses.** ....................................................................15

Section 2.7     **Transfers of the Settlement Trust Assets.** ...................................15

**ARTICLE 3. ACCOUNTS, INVESTMENTS, EXPENSES** ................................ **15**

Section 3.1     **Accounts.** ........................................................................................15

Section 3.2     **Investment Guidelines.** ..................................................................16

Section 3.3     **Payment of Settlement Trust Operating Expenses.** ...................16

**ARTICLE 4. CLAIMS ADMINISTRATION AND DISTRIBUTIONS** ............................... 16

Section 4.1    Claims Administration and Distributions. ................................................................16

Section 4.2    Manner of Payment. ...........................................................................................17

Section 4.3    Delivery of Distributions. ....................................................................................17

Section 4.4    Medicare Reimbursement and Reporting Obligations. ......................................18

**ARTICLE 5. SETTLEMENT TRUSTEE** ..................................................................... 19

Section 5.1    Initial Settlement Trustee. ...................................................................................19

Section 5.2    Term of Service, Successor Settlement Trustee. ................................................19

Section 5.3    Appointment of Successor Settlement Trustee. ..................................................19

Section 5.4    Settlement Trustee Meetings. ..............................................................................20

Section 5.5    Compensation and Expenses of Settlement Trustee. ...........................................21

Section 5.6    Settlement Trustee's Independence. .....................................................................21

Section 5.7    Standard of Care; Exculpation. ...........................................................................21

Section 5.8    Protective Provisions. ..........................................................................................23

Section 5.9    Indemnification. ..................................................................................................24

Section 5.10    Bond. ...................................................................................................................25

**ARTICLE 6.** ...................................................................................................... 25

**DURATION OF SETTLEMENT TRUST** ................................................................... 25

Section 6.1    Duration. .............................................................................................................25

Section 6.2    Dissolution/Termination of Settlement Trust. ....................................................25

Section 6.3    No Termination by Settlement Trust Beneficiaries. ...........................................26

Section 6.4    Continuance of Settlement Trust for Winding Up; Discharge and Release of Settlement
Trustee.    26

**ARTICLE 7.** ...................................................................................................... 26

**SETTLEMENT TRUST ADVISORY COMMITTEE** ..................................................... 26

iii

Section 7.1   Appointment, Composition, and Governance of Settlement Trust Advisory Committee. .....26

Section 7.2   Rights and Duties of Settlement Trust Advisory Committee; Corresponding Limitations on Settlement Trustee's Actions. ...............................................................................................................................27

Section 7.3   Approval and Authorization on Negative Notice. ...............................................................27

Section 7.4   Reimbursement of Settlement Trust Advisory Committee Expenses.................................27

Section 7.5   Settlement Trust Advisory Committee Member's Conflicts of Interest...............................27

Section 7.6   Resignation and Replacement of Settlement Trust Advisory Committee Member. ...............28

Section 7.7   Absence of Settlement Trust Advisory Committee. ...........................................................28

ARTICLE 8. ..................................................................................................................................... 28

GENERAL PROVISIONS .................................................................................................................. 28

Section 8.1   Irrevocability. ....................................................................................................................28

Section 8.2   Outgoing Settlement Trustee Obligations.........................................................................28

Section 8.3   Taxes. ...............................................................................................................................29

Section 8.4   Modification.......................................................................................................................30

Section 8.5   Severability. ......................................................................................................................31

Section 8.6   Notices. .............................................................................................................................31

Section 8.7   Successors and Assigns. ..................................................................................................31

Section 8.8   Limitation on Transferability; Settlement Trust Beneficiaries' Interests.............................31

Section 8.9   Exemption from Registration.............................................................................................32

Section 8.10  Entire Agreement; No Waiver. ..........................................................................................32

Section 8.11  Headings...........................................................................................................................32

Section 8.12  Governing Law..................................................................................................................32

Section 8.13  Settlor's Representative.....................................................................................................33

Section 8.14  Independent Legal and Tax Counsel. ...............................................................................33

Section 8.15  Waiver of Jury Trial. .........................................................................................................33

Section 8.16  Effectiveness. ...................................................................................................................33

iv

**Section 8.17**    **Counterpart Signatures.**...................................................................................................................34

**EXHIBIT 1  ALLOCATION PROTOCOL** .............................................................................. **39**

v

# SETTLEMENT TRUST AGREEMENT

This Settlement Trust Agreement (this "**Settlement Trust Agreement**"), dated as of October 27, 2025, and effective as of the Confirmation Date, is entered in accordance with the *Fifth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of October 27, 2025* (as it may be amended, modified, or supplemented, the "**Joint Plan**"),[1] by the Debtor and the Additional Debtors, (collectively, the **"Settlors,"** in their capacities as settlors of the Trust), on the one hand, and Donald C. Massey as trustee (together with any successor serving in such capacity, the "**Settlement Trustee**") and the Settlement Trust Advisory Committee, who are either former members of the Official Committee of Unsecured Creditors, other abuse survivors, or legal counsel for abuse survivors (together with any successors serving in such capacity, the "**Settlement Trust Advisory Committee**"), on the other hand;

## RECITALS

(A)     The Archdiocese and the Additional Debtors have reorganized or will reorganize under the provisions of chapter 11 of the Bankruptcy Code in a case filed in the Bankruptcy Court, administered and known as *In re The Roman Catholic Church of the Archdiocese of New Orleans,* Case No. 20-10846 (Bankr. E.D. La.) (the "**Chapter 11 Case**").

(B)     The Joint Plan and the Confirmation Order in the Chapter 11 Case provide, among other things, for the creation of the Settlement Trust.

(C)     This Settlement Trust Agreement is made effective by the Confirmation Order to implement the Joint Plan and to create the Settlement Trust (the "**Settlement Trust**") for the exclusive benefit of the holders of Abuse Claims, as set forth in the Joint Plan.

(D)     The Bankruptcy Court held in the Confirmation Order that all the prerequisites for the Channeling Injunction have been satisfied, and such Channeling Injunction is fully effective and enforceable as provided in the Joint Plan and Confirmation Order with respect to the Channeled Claims.

(E)     The Joint Plan and Confirmation Order provide that, on the Effective Date and continuing thereafter in accordance with the Joint Plan, the Settlement Trust Assets (as defined in Section 1.3) shall be transferred to and vested in the Settlement Trust free and clear of all liens, encumbrances, charges, claims, interests or other liabilities of any kind of the Debtor or their affiliates, any creditor or any other entity, other than as provided in the Channeling Injunction with respect to the Channeled Claims and as provided in Section 1.3.

---

[1]     All capitalized terms used but not otherwise defined herein shall have their respective meanings as set forth in the Joint Plan or in the Confirmation Order, as applicable, or, if not defined therein, as set forth in the Allocation Protocol (as defined in Section 1.2 below).

**NOW, THEREFORE**, it is hereby agreed as follows:

## ARTICLE 1.
## AGREEMENT OF TRUST

Section 1.1 _Creation and Name._ The Settlors hereby create a trust known as the "**Archdiocese of New Orleans Settlement Trust**" which is the Settlement Trust provided for and referred to in the Joint Plan. The Settlement Trustee may transact the business and affairs of the Settlement Trust in the name of the Archdiocese of New Orleans Abuse Claim Trust and references herein to the Settlement Trust shall include the Settlement Trustee acting on behalf of the Settlement Trust. The Plan Documents and this Settlement Trust Agreement, including the Exhibits hereto, including the Allocation Protocol (collectively, the "**Settlement Trust Documents**"), constitute the governing instruments of the Settlement Trust. The Settlement Trustee is hereby authorized to execute and file a Certificate of Trust with the Louisiana Secretary of State.

Section 1.2 _Purposes._ The purposes of the Settlement Trust are (i) to assume all liability for the Channeled Claims; (ii) to administer Abuse Claims; and (iii) to make distributions to holders of Abuse Claims, in accordance with the Allocation Protocol attached hereto as **Exhibit 1** (the "**Allocation Protocol**"). In connection therewith, the Settlement Trust shall hold, manage, protect and monetize the Settlement Trust Assets (as defined in Section 1.3 below) in accordance with the terms of the Settlement Trust Documents for the benefit of the Settlement Trust Beneficiaries (as defined in Section 1.6(a) below). All Abuse Claims shall be resolved exclusively in accordance with the Allocation Protocol.

Section 1.3 _Transfer of Assets._ Pursuant to the Joint Plan, the Archdiocese, the Additional Debtors, the Contributing Non-Debtor Catholic Entities, and any Settling Insurers, shall pay all funds to the Settlement Trust by wire transfer or otherwise effectuate the transfers of assets required under the Joint Plan. The Settlement Trust will receive and hold all right, title and interest in and to the funds transferred (the "**Aggregate Settlement Consideration**" and together with any income or gain earned thereon and proceeds derived therefrom, collectively, the "**Settlement Trust Assets**"). The Settlement Trust Assets shall be transferred to the Settlement Trust free and clear of any liens, encumbrances, charges, claims, interests or other liabilities of any kind of the Debtor or its affiliates, any creditor or any other person or entity, other than as provided in the Channeling Injunction with respect to Channeled Claims. The Debtor, Additional Debtors, Reorganized Debtor, Reorganized Additional Debtors and Settling Insurers shall execute and deliver such documents to the Settlement Trust as the Settlement Trustee reasonably requests to transfer and assign any assets comprising all or a portion of the Settlement Trust Assets to the Settlement Trust.

Section 1.4 _Acceptance of Assets._ In furtherance of the purposes of the Settlement Trust, the Settlement Trustee, on behalf of the Settlement Trust, hereby expressly accepts the transfer to the Settlement Trust of the Settlement Trust Assets, subject to the terms of the Settlement Trust Documents and the Plan Documents. The Settlement Trust shall succeed to all of the Archdiocese, Additional Debtors, the Contributing Non-Debtor Catholic Entities, and Settling Insurers' respective rights, title, and interest, including all legal privileges, in the Settlement Trust Assets and neither the Archdiocese nor any other person or entity transferring such will have any further

7

equitable or legal interest in, or with respect to, the Settlement Trust, or the Settlement Trust Assets.

(b)       Except as otherwise provided in the Joint Plan, Confirmation Order or Settlement Trust Documents, the Settlement Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding Channeled Claims that the Archdiocese, Additional Debtors, the Reorganized Archdiocese, or the Reorganized Additional Debtors have or would have had under applicable law.

(c)       No provision in the Settlement Trust Documents shall be construed or implemented in a manner that would cause the Settlement Trust to fail to qualify as a "qualified settlement fund" under the QSF Regulations (as defined in Section 8.4(a) below).

(d)       Nothing in this Settlement Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction, the Supplemental Settling Insurer Injunction or other terms of the Joint Plan or Confirmation Order.

(e)       In the Settlement Trust Documents, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

Section 1.5      _Receipt of Proceeds._

The proceeds of any recoveries from any litigation or claims of the Settlement Trust (including the Actions) will be deposited in the Settlement Trust's accounts and become the property of the Settlement Trust as Settlement Trust Assets.

Section 1.6      _Settlement Trust Beneficiaries._

(a)       The Settlement Trust is established for the benefit of the holders of Abuse Claims (the "**Settlement Trust Beneficiaries**").

(b)       The Settlement Trust Beneficiaries shall be subject to the terms of this Settlement Trust Agreement and Settlement Trust Documents, including without limitation, the Allocation Protocol.

Section 1.7      _Jurisdiction._ The Bankruptcy Court shall have continuing jurisdiction with respect to the Settlement Trust; provided however, the courts of the State of Louisiana, including any federal court located therein, shall also have jurisdiction over the Settlement Trust only if and to the extent the Bankruptcy Court cannot exercise or abstains from exercising jurisdiction over the Settlement Trust.

Section 1.8      _Privileged and confidential information._

The transfer or assignment of any information subject to an attorney-client or similar privilege to the Settlement Trustee shall not result in the destruction or waiver of any applicable

8

Case 20-10846 Doc 4545-1 Filed 11/04/25 Entered 11/04/25 16:07:54 PP Ex. 1 - Joint Plan Page 119 of 271

Case 20-10846 Doc 4518-5 Filed 10/27/25 Entered 10/27/25 18:53:26 Plan Exhibit D-1 - Settlement Trust Agreement Page 10 of 40

privileges pertaining thereto. Further, with respect to any such privileges: (a) they are transferred to or contributed for the purpose of enabling the Settlement Trustee to perform his or her duties to administer the Settlement Trust and (b) they are vested solely in the Settlement Trustee and not in the Settlement Trust, or any other person, committee or subcomponent of the Settlement Trust, or any other person (including counsel and other professionals) who has been engaged by, represents, or has represented any holder of a Channeled Claim.

Section 1.9      _Relation-back election._

Upon request of the Settlement Trustee, the Settlors shall fully cooperate in filing a relation-back election under Treasury Regulation Section 1.468B-1(j)(2), to treat the Settlement Trust as coming into existence as a settlement fund as of the earliest possible date.

Section 1.10      _Employer identification number._

Upon or in anticipation of establishment of the Settlement Trust, the Settlement Trustee shall apply for an employer identification number for the Settlement Trust in accordance with Treasury Regulation Section 1.468B-2(k)(4).

Section 1.11      _Relationship to Joint Plan._

The principal purpose of this Settlement Trust Agreement is to aid in the implementation of the Joint Plan and the Confirmation Order, and therefore, this Settlement Trust Agreement incorporates the provisions of the Joint Plan and the Confirmation Order (which may amend or supplement the Joint Plan). To the extent that there is conflict between the provisions of the Settlement Trust Documents and the provisions of the Joint Plan or the Confirmation Order, each document shall have controlling effect in the following order: (1) the Confirmation Order; (2) the Joint Plan; (3) this Settlement Trust Agreement; and (4) the Allocation Protocol.

## ARTICLE 2.
## POWERS AND TRUST ADMINISTRATION

Section 2.1      _Powers._

(a)      The Settlement Trustee is empowered to take all actions, including such actions as may be consistent with those expressly set forth above, as the Settlement Trustee deems necessary to reasonably ensure that the Settlement Trust is treated as a "qualified settlement fund" under Section 468B of the Tax Code and the regulations promulgated pursuant thereto. Further, the Settlement Trustee may, unilaterally and without court order, amend, either in whole or in part, any administrative provision of this Settlement Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with the foregoing.

(b)      The Settlement Trustee shall act in accordance with the provisions of the Settlement Trust Documents. The Settlement Trustee shall administer the Settlement Trust, the Settlement Trust Assets, and any other amounts to be received under the terms of the Settlement Trust Documents in accordance with the purposes set forth in Section 1.2 above and in the manner

9

prescribed by the Settlement Trust Documents. Subject to the limitations set forth in the Settlement Trust Documents, the Settlement Trustee shall have the power to take any and all actions that in the judgment of the Settlement Trustee are necessary or advisable to fulfill the purposes of the Settlement Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any trust power now or hereafter permitted under the laws of the State of Louisiana. Nothing in the Settlement Trust Documents or any related document shall require the Settlement Trustee to take any action if the Settlement Trustee reasonably believes that such action is contrary to law. In addition to all powers enumerated in the Settlement Trust Documents, including, but not limited to, the Settlement Trustee's powers and authority in respect of the interpretation, application of definitions and rules of construction set forth in the Joint Plan to the fullest extent set forth therein, from and after the Effective Date, the Settlement Trust shall succeed to all of the rights and standing of the Settlors with respect to the Settlement Trust Assets in its capacity as a trust administering assets for the benefit of the Settlement Trust Beneficiaries. The Settlement Trustee and the Settlement Trustee's professionals do not represent any individual Settlement Trust Beneficiary hereunder and are not responsible for nor will they be deemed to provide any legal or tax advice to any individual Settlement Trust Beneficiary hereunder.

(c)     Except as required by applicable law or the Settlement Trust Documents, the Settlement Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(d)     Without limiting the generality of Sections 2.1(a) and (b) above, and except as limited in the Settlement Trust Documents and by applicable law, the Settlement Trustee shall have the power to:

(i)     supervise and administer the Settlement Trust in accordance with the Settlement Trust Documents, including the Allocation Protocol;

(ii)    receive and hold the Settlement Trust Assets, and exercise all rights with respect thereto including the right to vote and sell any securities that are included in such funds;

(iii)   invest the monies held from time to time by the Settlement Trust in accordance with Section 3.2;

(iv)    sell, transfer or exchange any or all of the Settlement Trust Assets at such prices and upon such terms as the Settlement Trustee may determine proper and consistent with the other terms of the Settlement Trust Documents;

(v)     enter into leasing, financing or other agreements with third parties, as determined by the Settlement Trustee, in his or her discretion, to be useful in carrying out the purposes of the Settlement Trust;

(vi)    determine and pay liabilities and pay all fees and expenses incurred in administering the Settlement Trust, managing the Settlement Trust Assets and making

10

distributions in accordance with the Settlement Trust Documents (the "**Settlement Trust Operating Expenses**");

(vii)     establish accounts and reasonable reserves within the Settlement Trust, in her/his discretion, to be necessary, prudent or useful in administering the Settlement Trust;

(viii)     establish reserves required by the Joint Plan and Insurance Settlement Agreement, including, but not limited to, the Indemnity Cost Reserve;

(ix)     separately account for funds received by the Debtor, Additional Debtors, Non-Debtor Catholic Entities, and Settling Insurers to carry out distributions in accordance with the Late Claim provisions at Section 5.4 – 5.6 of the Allocation Protocol;

(x)     sue, be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative or other proceeding, however nothing herein shall be deemed to either (a) affect, limit or expand any party's rights under the Plan Documents to sue or otherwise commence a case or proceeding against the Settlement Trustee or (b) allow any party asserting an Abuse Claim and/or Channeled Claim to commence any action against the Settlement Trustee or the Settlement Trust with respect to such claim;

(xi)     appoint such officers and retain such employees, consultants, advisors, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as the Settlement Trust requires, which may be those formerly retained by the Committee, and delegate to such persons such powers and authorities as this Settlement Trust Agreement provides or the fiduciary duties of the Settlement Trustee permits and as the Settlement Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Settlement Trust Agreement;

(xii)     pay reasonable compensation and reimbursement of expenses to any of the Settlement Trust's employees, consultants, advisors, independent contractors, experts and agents for legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as the Settlement Trust requires;

(xiii)     compensate the Settlement Trust Advisory Committee members for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xiv)     compensate the Settlement Trust's professionals for services, costs and expenses incurred prior to the Effective Date in accordance with the terms of the Settlement Trust Documents;

(xv)     execute and deliver such instruments as the Settlement Trustee considers advisable or necessary in administering the Settlement Trust;

11

(xvi)   timely file such income tax and other tax returns and statements required to be filed and timely pay all taxes, if any, required to be paid from the Settlement Trust Assets and comply with all applicable tax reporting and withholding obligations;

(xvii)   require, in respect of any distribution of Settlement Trust Assets, the timely receipt of properly executed documentation (including, without limitation, IRS Form W-9) as the Settlement Trustee determines in his or her discretion necessary or appropriate to comply with applicable tax laws;

(xviii)   resolve all applicable lien resolution matters with respect to Settlement Trust Beneficiaries that may be subject to liens arising pursuant to the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) ("**MMSEA**") in accordance with the Joint Plan; provided, however, that for claims where the Settlement Trustee has actual knowledge of an open chapter 7 bankruptcy case, such lien resolution is subject to the approval of the chapter 7 bankruptcy trustee and applicable bankruptcy court; and provided further, however, that in such cases, the chapter 7 bankruptcy trustee shall have sole responsibility to seek court approval for such lien resolution;

(xix)   register as a responsible reporting entity ("**RRE**") and timely submit all reports under the reporting provisions of section 111 MMSEA as required under Section 4.6 below and the terms of the Joint Plan;

(xx)   enter into such other arrangements with third parties as are deemed by the Settlement Trustee to be useful in carrying out the purposes of the Settlement Trust, provided such arrangements do not conflict with any other provision of the Settlement Trust Documents;

(xxi)   in accordance with Section 5.9 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Settlement Trust Indemnified Parties (as defined in Section 5.7(a) below) solely from the Settlement Trust Assets and to the fullest extent permitted by law;

(xxii)   delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Settlement Trust Assets to any one or more reputable investment advisors or investment managers without liability for any action taken or omission made because of any such delegation;

(xxiii)   delegate any or all of the authority conferred with respect to the protection, preservation, and monetization of the non-cash Settlement Trust Assets;

(xxiv)   initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, all legal actions and other proceedings related to any asset, liability, or responsibility of the Settlement Trust;

(xxv)   enter into structured settlements and other similar arrangements with any Settlement Trust Beneficiary (including a minor or other person in need of special

consideration) or any attorney of any Settlement Trust Beneficiary, upon such terms as the Settlement Trustee and such Settlement Trust Beneficiary (or such Settlement Trust Beneficiary's counsel or other authorized person) agree, in all cases in accordance with the Allocation Protocol; provided that the Settlement Trustee has no duty to advise a Settlement Trust Beneficiary regarding the propriety or terms and conditions of any structured settlement or other similar arrangement;

(xxvi)  take any and all actions appropriate or necessary in order to carry out the terms of the Settlement Trust Documents; and

(xxvii) except as otherwise expressly provided in the Settlement Trust Documents, exercise any other powers now or hereafter conferred upon or permitted to be exercised by a trustee under the laws of the State of Louisiana.

(e)     The Settlement Trustee shall have the power to (i) authorize the commencement or continuation of a lawsuit by an Abuse Claimant in accordance with the Allocation Protocol (a "**Litigation Claim**"), and (ii) enter into any settlement that causes an Insurer to become a Settling Insurer (an "**Insurance Settlement**"), provided however, the powers set forth in this Section 2.1(e) shall in each case be subject to the provisions of the Settlement Trust Documents and the Allocation Protocol.

(f)     With the advice and counsel of the Settlement Trust Advisory Committee, the Settlement Trustee, in his or her sole discretion, may take all actions necessary or advisable for the enforcement of the non-monetary commitments of the Archdiocese, Additional Debtors, and Contributing Non-Debtor Catholic Entities with respect to child protection as set forth in the Joint Plan and Confirmation Order and establishment of a survivor memorial at the former Hope Haven site as set forth in the Hope Haven sale order, purchase agreement, and act of sale.  This power is without prejudice to any other party having the right to take actions for the enforcement of such non-monetary commitments.

(g)     The Settlement Trustee shall provide periodic financial reports to and shall consult with the Settlement Trust Advisory Committee on the matters set forth in in the Settlement Trust Documents.

Section 2.2     _Limitations on the Settlement Trustee and Settlement Trust Advisory Committee._

(a)     Notwithstanding anything in the Settlement Trust Documents to the contrary, the Settlement Trustee shall not do or undertake any of the following:

(i)     guaranty any debt;

(ii)     make or enter into any loan of Settlement Trust Assets;

(iii)     make any transfer or distribution of Settlement Trust Assets other than those authorized by the Settlement Trust Documents;

(iv)    engage in any trade or business with respect to the Settlement Trust Assets or proceeds therefrom, other than managing such assets;

(v)     engage in any investment of the Settlement Trust Assets, other than as explicitly authorized by this Settlement Trust Agreement; and

(vi)    engage in any activities inconsistent with the treatment of the Settlement Trust as a "qualified settlement fund" within the meaning of Treasury Regulations issued under section 468B of the Tax Code.

(b)    Insurance Settlements.

The Settlement Trustee may effectuate Insurance Settlements without Bankruptcy Court approval. Notwithstanding the foregoing, if one Settlement Trust Advisory Committee member dissents from the Settlement Trustee's approval of an Insurance Settlement, the Settlement Trustee may override the dissent by obtaining Bankruptcy Court approval of the proposed settlement. If two Settlement Trust Advisory Committee members dissent from the Settlement Trustee's approval of an Insurance Settlement, the Insurance Settlement may not be approved by the Settlement Trustee.

Section 2.3    General Administration. The Settlement Trustee shall act in accordance with the Settlement Trust Documents. The Settlement Trustee shall establish the location of the principal office of the Settlement Trust and may change the location of the principal office or establish other offices at other locations in his or her discretion.

Section 2.4    Accounting. The fiscal year of the Settlement Trust shall begin on January 1 and shall end on December 31 of each calendar year, except that the first fiscal year shall run from the Confirmation Date to December 31. If the first fiscal year is less than three (3) months, any accounting under the Settlement Trust Documents shall not be required until the end of the second fiscal year. The Settlement Trustee shall maintain the books and records relating to the Settlement Trust Assets and income and the payment of Settlement Trust Operating Expenses and other liabilities of the Settlement Trust. The detail of these books and records and the duration of time during which the Settlement Trustee shall keep such books and records shall be such as to allow the Settlement Trustee to make a full and accurate accounting of all Settlement Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of the Settlement Trust, including, without limitation, the assets and liabilities of the Settlement Trust as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided however, that the Settlement Trustee shall maintain such books and records until the wind-up of the Settlement Trust's affairs and satisfaction of all of Settlement Trust liabilities.

Section 2.5    Financial Reporting.

(a)    Within one hundred twenty (120) days following the end of each calendar year, for as long as the Chapter 11 Case is open, the Settlement Trustee shall file with the

Bankruptcy Court the Annual Report and provide such Annual Report to the Settlement Trust Advisory Committee.

(b)    All materials filed with the Bankruptcy Court pursuant to this Section 2.5 need not be served on any parties in the Chapter 11 Case.

Section 2.6    _Names and addresses._

The Settlement Trustee shall keep a register (the "**Register**") in which the Settlement Trustee shall maintain the names and addresses of the Settlement Trust Beneficiaries and the awards made to the Settlement Trust Beneficiaries pursuant to the Settlement Trust Documents. The Settlement Trustee may rely upon this Register for the purposes of delivering distributions or notices. In preparing and maintaining this Register, the Settlement Trustee may rely on the name and address of each Abuse Claimant as set forth in a proof of claim filed by such holder, or proper notice of a name or address change, which has been delivered in writing by such Abuse Claimant to the Settlement Trustee. The Settlement Trustee may deliver distributions and notices to counsel for any Abuse Claimant identified in such Settlement Trust Beneficiary's proof of claim or proper notice of a name or address change.

Section 2.7    _Transfers of the Settlement Trust Assets._

To the fullest extent permitted by law, neither the principal nor income of the Settlement Trust, in whole or part, shall be subject to any legal or equitable claims of creditors of any Settlement Trust Beneficiary or others, nor to legal process, nor be voluntarily or involuntarily transferred, assigned, anticipated, pledged or otherwise alienated or encumbered except as may be ordered by the Bankruptcy Court or other competent court of jurisdiction.

## ARTICLE 3.
## ACCOUNTS, INVESTMENTS, EXPENSES

Section 3.1    _Accounts._

(a)    The Settlement Trustee shall maintain one or more accounts ("**Settlement Trust Accounts**") on behalf of the Settlement Trust, including at the Settlement Trustee's discretion a disputed claims trust reserve, with one or more financial depository institutions (each a "**Financial Institution**").

(b)    The Settlement Trustee, at his or her discretion, may replace any retained Financial Institution with a successor Financial Institution at any time.

(c)    The Settlement Trustee shall set up separate accounts for funds received from each of the Archdiocese, the Additional Debtors, the Contributing Non-Catholic Entities, and the Settling Insurers. The Settlement Trustee shall use these separate accounts to adjust distributions based on whether Abuse Claimants execute the Abuse Claim Release and Certification in favor of the Contributing Non-Debtor Catholic Entities and / or the Settling

15

Insurers in accordance with the Plan Documents and whether claims were timely with respect to the Additional Debtors but late with respect to the Archdiocese.

(d)     The Settlement Trustee shall set up a reserve for Unknown Abuse Claims as provided by the Plan Documents.

(e)     The Settlement Trustee may, from time to time, create such accounts and reasonable reserves within the Settlement Trust Accounts, including a disputed claim trust reserve, as authorized in this Section 3.1 and as he or she may deem necessary, prudent or useful in order to provide for distributions to the Settlement Trust Beneficiaries and the payment of Settlement Trust Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Settlement Trust Subaccounts**"). Any such Settlement Trust Subaccounts established by the Settlement Trustee shall be held as Settlement Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" or a "disputed ownership fund" within the meaning of the Internal Revenue Code ("**IRC**") or Treasury Regulations.

Section 3.2     _Investment Guidelines._

(a)     The Settlement Trustee may invest the Settlement Trust Assets in insured checking accounts, money market accounts, and certificates of deposit. This Section 3.2(a) is intended to modify the application to the Settlement Trust of the "prudent person" rule, "prudent investor" rule and any other rule of law that would require the Settlement Trustee to diversify the Settlement Trust Assets.

Section 3.3     _Payment of Settlement Trust Operating Expenses._ All Settlement Trust Operating Expenses shall be payable out of the Settlement Trust Assets. None of the Settlement Trustee, the Settlement Trust Advisory Committee, the Settlement Trust Beneficiaries nor any of their officers, agents, advisors, professionals or employees shall be personally liable for the payment of any Settlement Trust Operating Expense or any other liability of the Settlement Trust.

## ARTICLE 4.
## CLAIMS ADMINISTRATION AND DISTRIBUTIONS

Section 4.1     _Claims Administration and Distributions._     The Settlement Trust shall distribute Settlement Trust Assets, solely in accordance with the Settlement Trust Documents, including the Allocation Protocol. In order to be eligible for distribution, the following conditions (in addition to any others set forth in the Allocation Protocol, the Joint Plan and/or the Confirmation Order) must be satisfied with respect to the Settlement Trust Beneficiary and the Abuse Claim:

    a)  The validity and point allocation of the Abuse Claim must be determined by the Abuse Claim Reviewer;

    b)  The Settlement Trust Beneficiary must provide the Settlement Trust with all information requested by the Settlement Trust for queries and (if applicable) reporting to Medicare;

<p style="text-align:center">16</p>

c) The Settlement Trust Beneficiary must provide the Settlement Trust with a completed and executed lien certification;

d) Any unsatisfied lien that the Settlement Trust receives actual notice of must be paid or otherwise resolved;

e) The Settlement Trust Beneficiary must provide the Debtor with a completed and executed Abuse Claim Release and Certification, in the form attached to the Joint Plan as Exhibit C;

f) The Settlement Trust Beneficiary shall also inform the Settlement Trustee in the certification referenced in subsection c) above whether the Settlement Trust Beneficiary is the debtor in a pending Chapter 7 bankruptcy case, and to the extent a Settlement Trust Beneficiary discloses that he/she is the subject of a pending Chapter 7 case, whether distribution(s) to the Settlement Trust Beneficiary rather than the Chapter 7 Trustee have been consented to by the Chapter 7 Trustee; and

g) The Settlement Trust Beneficiary must provide the Settlement Trust with such tax documents, including but not limited to a completed IRS form W-9, as the Settlement Trustee may request in writing.

Section 4.2  *Manner of Payment.* Distributions from the Settlement Trust to the Settlement Trust Beneficiaries may be made by the Settlement Trustee on behalf of the Settlement Trust or by a disbursing agent retained by the Settlement Trust to make distributions on behalf of the Settlement Trust.

Section 4.3  *Delivery of Distributions.*

(a)  Distributions shall be payable to the Settlement Trust Beneficiary if s/he is not represented by counsel according to a filed Abuse Claims or to counsel for the Settlement Trust Beneficiary if s/he is represented by counsel according to a filed Abuse Claim on the date approved for distribution by the Settlement Trustee (the "**Distribution Date**") in accordance with the terms of the Settlement Trust Documents, including the Allocation Protocol. With respect to each Abuse Claim approved for payment, distributions shall be made only after all conditions to the distribution with respect to each such Abuse Claim have been satisfied. In the event that any distribution to a Settlement Trust Beneficiary is returned as undeliverable, no further distribution to such Settlement Trust Beneficiary shall be made unless and until the Settlement Trustee has been notified by the Settlement Trust Beneficiary or the Settlement Trust Beneficiary's counsel of the then current address of such Settlement Trust Beneficiary or the Settlement Trust Beneficiary's counsel, at which time such distribution shall be made to such Settlement Trust Beneficiary or such Settlement Trust Beneficiary's counsel without interest; provided however, that all distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the applicable Distribution Date, subject to extension for good cause shown. After such date, (i) all unclaimed distributions shall be subject to escheat as unclaimed property under Section 6.12(i) of the Joint Plan, (ii) the Abuse Claim of such Settlement

17

Trust Beneficiary shall be released, settled, compromised and forever barred as against the Settlement Trust, and (iii) all unclaimed property interests shall be distributed to other Settlement Trust Beneficiaries in accordance with the Settlement Trust Documents, as if the Abuse Claim of such Settlement Trust Beneficiary had been disallowed as of the date the undeliverable distribution was first made. The Settlement Trustee shall take reasonable efforts to obtain a current address for any Settlement Trust Beneficiary with respect to which any distribution is returned as undeliverable.

(b)     In the event the Settlement Trust holds cash after paying all Settlement Trust Operating Expenses and making all distributions contemplated under the Settlement Trust Documents in an amount insufficient to make additional distributions, such remaining cash shall be distributed to a nationally recognized charitable organization of the Settlement Trustee's choice to the extent economically feasible, which charitable organization shall be independent of the Settlement Trustee and, to the extent possible, shall have a charitable purpose consistent with the protection of children from sexual abuse or its ramifications. Other than unclaimed distributions subject to escheat under section 6.12(i) of the Joint Plan, no Settlement Trust Asset or any unclaimed property shall escheat to any federal, state, or local government or any other entity.

(c)     Notwithstanding any provision in the Settlement Trust Documents to the contrary, no payment shall be made to any Settlement Trust Beneficiary on account of any Abuse Claim if the Settlement Trustee determines that the costs of making such distribution is greater than the amount of the distribution to be made.

Section 4.4     _Medicare Reimbursement and Reporting Obligations._

(a)     The Settlement Trust shall register as a Responsible Reporting Entity ("**RRE**") under the reporting provisions of section 111 of MMSEA (as defined in the Joint Plan); provided that this shall apply only to Channeled Claims that occurred after December 5, 1980.

(b)     The Settlement Trust shall timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the Settlement Trust. The Settlement Trust, in its capacity as an RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agency or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(c)     Before remitting funds to Abuse Claimants' counsel, or to the Abuse Claimant if such Abuse Claimant is acting _pro se_, in respect of any Channeled Claim, the Settlement Trustee shall obtain (i) a certification from said Abuse Claimant (or such Abuse Claimant's authorized decedent's estate representative) that said Abuse Claimant has provided or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Channeled Claim and (ii) that the Abuse Claimant indemnifies the Settlement Trust for any such obligations.

# ARTICLE 5.
## SETTLEMENT TRUSTEE

**Section 5.1**  *Initial Settlement Trustee.*  The initial Settlement Trustee shall be Donald C. Massey.

**Section 5.2**  *Term of Service, Successor Settlement Trustee.*

(a)  The Settlement Trustee shall serve from the Effective Date until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 5.2(b) below, (iii) his or her removal pursuant to Section 5.2(c) below, and (iv) the termination of the Settlement Trust pursuant to Section 6.2 below; provided that the Settlement Trustee may, after entry of the Confirmation Order, undertake such actions as reasonably necessary to ensure that the Settlement Trust can accept the Settlement Trust Assets.

(b)  The Settlement Trustee may resign at any time upon written notice to the Settlement Trust Advisory Committee and filed with the Bankruptcy Court. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)  The Settlement Trustee may be removed by consent of (i) at least two/thirds (2/3) majority of the Settlement Trust Advisory Committee or (ii) an order from the Bankruptcy Court, in the event that the Settlement Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided the Settlement Trustee has received reasonable notice and an opportunity to be heard. Other good cause shall mean gross negligence, fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to the Settlement Trust, any substantial failure to comply with the administration of the Settlement Trust or a consistent pattern of neglect and failure to perform or participate in performing the duties of the Settlement Trustee hereunder. For the avoidance of doubt, any removal of the Settlement Trustee pursuant to this Section 5.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

**Section 5.3**  *Appointment of Successor Settlement Trustee.*

(a)  In the event of any vacancy in the office of the Settlement Trustee, including the death, resignation or removal of any successor Settlement Trustee, such vacancy shall be filled by the Settlement Trust Advisory Committee as set forth herein. The Settlement Trust Advisory Committee will nominate an individual to serve as successor Settlement Trustee. If the majority of the Settlement Trust Advisory Committee then in office agree upon a successor Settlement Trustee, then, subject to the approval of the Bankruptcy Court, such individual shall become the Settlement Trustee. If the Settlement Trust Advisory Committee cannot agree upon a successor Settlement Trustee, counsel for the Settlement Trust may apply to the Bankruptcy Court for an order appointing a successor Settlement Trustee.

19

(b)    Immediately upon the appointment of any successor Settlement Trustee pursuant to Section 5.3(a) above, all rights, titles, duties, powers and authority of the predecessor Settlement Trustee hereunder shall be vested in and undertaken by the successor Settlement Trustee without any further act. No successor Settlement Trustee shall be liable personally for any act or omission of his or her predecessor Settlement Trustee. No predecessor Settlement Trustee shall be liable personally for any act or omission of his or her successor Settlement Trustee. No successor Settlement Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Settlement Trustee.

(c)    Each successor Settlement Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 5.2(b) above, (iii) his or her removal pursuant to Section 5.2(c) above, and (iv) the termination of the Settlement Trust pursuant to Section 6.2 below.

Section 5.4    _Settlement Trustee Meetings._

(a)    **Regular Meeting**. The Settlement Trustee shall hold regular meetings with the Settlement Trust Advisory Committee not less than quarterly, which may be held at such times and at such places as may be determined from time to time by the Settlement Trustee, including remotely.

(b)    **Special Meetings**. Special meetings of the Settlement Trustee with the Settlement Trust Advisory Committee may be called by the Settlement Trustee upon exigent circumstances by giving written notice to the Settlement Trust Advisory Committee not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to the address as shown upon the records of the Settlement Trust or as may have been given to the Settlement Trustee for purposes of notice. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)    **Participation in Meetings by Telephone Conference**. The Settlement Trustee may convene, and persons may participate in, a meeting by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all persons participating in such meeting can hear one another. Participation in a meeting pursuant to this Section 5.4(c) shall constitute presence in person at such meeting.

(d)    **Waiver of Notice**. Notice of a meeting need not be given to any person who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with the Settlement Trust records or made a part of the minutes of the meeting. Attendance at a meeting shall constitute a waiver of notice of such meeting. Neither the business to be transacted at, nor the purpose of, any Settlement Trustee meeting need be specified in any waiver of notice.

Section 5.5    *Compensation and Expenses of Settlement Trustee.* The Settlement Trustee shall receive compensation from the Settlement Trust for his or her services as Settlement Trustee. The Settlement Trustee shall initially be compensated at a flat fee of $45,000 per month for the first three months following the Effective Date of the Joint Plan. Afterwards, the Settlement Trustee shall bill hourly at a rate of $550.00 per hour. The Settlement Trustee shall provide invoices to the Settlement Trust Advisory Committee on a monthly basis for review and approval by a majority vote of the Settlement Trust Advisory Committee.

The Settlement Trustee compensation may be adjusted as reasonably determined by the majority of the Settlement Trust Advisory Committee or order of the Bankruptcy Court. The Settlement Trust shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred by the Settlement Trustee in the course of carrying out his or her duties as Settlement Trustee in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Settlement Trustee. The amounts paid to the Settlement Trustee for compensation and expenses shall be disclosed in the Annual Report.

Section 5.6    *Settlement Trustee's Independence.*

(a)    The Settlement Trustee shall not, during his or her service, hold a financial interest in, act as attorney or agent for or serve as any other professional for Reorganized Archdiocese, Additional Debtors, Contributing Non-Debtor Catholic Entities, Settling Insurers, or any of the foregoing's affiliated persons, or any Non-Settling Insurer. No Settlement Trustee shall act as an attorney for, or otherwise represent, any Person who holds a claim in the Case.

(b)    The Settlement Trustee shall be indemnified by the Settlement Trust in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)    Persons dealing with the Settlement Trust and the Settlement Trustee, respect to the affairs of the Settlement Trust, shall have recourse only to the Settlement Trust Assets to satisfy any liability incurred by the Settlement Trust or the Settlement Trustee to such Person in carrying out the terms of this Settlement Trust Agreement, and neither the Settlement Trustee, the Settlement Trust Beneficiaries, nor any of their professionals, advisors, officers, agents, consultants or lawyers shall have any personal obligation to satisfy any such liability.

Section 5.7    *Standard of Care; Exculpation.*

(a)    As used herein, the term "**Settlement Trust Indemnified Party**" shall mean the Settlement Trustee, the Abuse Claims Reviewer, the Settlement Trust Advisory Committee, and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals (collectively, the "**Settlement Trust Indemnified Parties**").

(b)    No Settlement Trust Indemnified Party shall be liable to the Settlement Trust, any other Settlement Trust Indemnified Party, any Settlement Trust Beneficiary or any other

Case 20-10846 Doc 4545-1 Filed 11/04/25 Entered 11/04/25 16:07:54  PP Ex. 1 - Joint Plan
Page 132 of 271

Case 20-10846 Doc 4518-5 Filed 10/27/25 Entered 10/27/25 18:53:26  Plan Exhibit D-1 -
Settlement Trust Agreement Page 23 of 40

Person for any damages arising out of the creation, operation, administration, enforcement or termination of the Settlement Trust, except in the case of such Settlement Trust Indemnified Party's willful misconduct, bad faith, or fraud as finally judicially determined by a court of competent jurisdiction. To the fullest extent permitted by applicable law, the Settlement Trust Indemnified Parties shall have no liability for any action in performance of their duties under this Settlement Trust Agreement taken in good faith with or without the advice of counsel, accountants, appraisers and other professionals retained by the Settlement Trust Indemnified Parties. None of the provisions of this Settlement Trust Agreement shall require the Settlement Trust Indemnified Parties to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their respective rights and powers. Any Settlement Trust Indemnified Party may rely, without inquiry, upon writings delivered to it under any of the Settlement Trust Documents, which the Settlement Trust Indemnified Party reasonably believes to be genuine and to have been given by a proper person. Notwithstanding the foregoing, nothing in this Section 5.7 shall relieve the Settlement Trust Indemnified Parties from any liability for any actions or omissions arising out of the willful misconduct, bad faith, or fraud as finally judicially determined by a court of competent jurisdiction; provided that in no event will any such person be liable for punitive, exemplary, consequential or special damages under any circumstances. Any action taken or omitted by the Settlement Trust Indemnified Parties with the approval of the Bankruptcy Court, or any other court of competent jurisdiction, will conclusively be deemed not to constitute willful misconduct, bad faith, or fraud.

(c)     The Settlement Trust Indemnified Parties shall not be subject to any personal liability whatsoever, whether in tort, contract or otherwise, to any Person in connection with the affairs of the Settlement Trust or for any liabilities or obligations of the Settlement Trust except for those acts that are finally judicially determined by a court of competent jurisdiction to have arisen out of their own willful misconduct, bad faith, or fraud, and all Persons claiming against the Settlement Trust Indemnified Parties, or otherwise asserting claims of any nature in connection with affairs of the Settlement Trust, shall look solely to the Settlement Trust Assets for satisfaction of any such claims.

(d)     To the extent that, at law or in equity, the Settlement Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the Settlement Trust or the Settlement Trust Beneficiaries, it is hereby understood and agreed by the parties hereto and the Settlement Trust Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Settlement Trust Agreement with respect to the Settlement Trust Indemnified Parties, provided however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Settlement Trust Agreement, including but not limited to this Section 5.7 and its subparts.

(e)     The Settlement Trust Indemnified Parties shall be indemnified to the fullest extent permitted by law by the Settlement Trust against all liabilities arising out of the creation, operation, administration, enforcement or termination of the Settlement Trust, including actions taken or omitted in fulfillment of their duties with respect to the Settlement Trust, except for those

acts that are finally judicially determined by a court of competent jurisdiction to have arisen out of their own willful misconduct, bad faith, or fraud.

(f)     The Settlement Trust may maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Settlement Trustee in his or her discretion.

Section 5.8     _Protective Provisions._

(a)     Every provision of this Settlement Trust Agreement relating to the conduct or affecting the liability of or affording protection to Settlement Trust Indemnified Parties shall be subject to the provisions of this Section 5.8.

(b)     In the event the Settlement Trustee retains counsel (including at the expense of the Settlement Trust), the Settlement Trustee shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Settlement Trustee be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Settlement Trustee in the performance of duties hereunder. A successor to any Settlement Trustee shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Settlement Trust Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all parties.

(c)     To the extent that, at law or in equity, the Settlement Trustee has duties (including fiduciary duties) and liabilities relating hereto, to the Settlement Trust or to the Settlement Trust Beneficiaries, it is hereby understood and agreed by the Parties and the Settlement Trust Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Settlement Trust Agreement with respect to the Settlement Trustee, provided however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Settlement Trust Agreement, including but not limited to Section 5.7 herein.

(d)     No Settlement Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, or fraud as finally judicially determined by a court of competent jurisdiction.

(e)     No provision of this Settlement Trust Agreement shall require the Settlement Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties, and powers hereunder.

(f)     In the exercise or administration of the Settlement Trust hereunder, the Settlement Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Settlement Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Settlement Trust Indemnified Parties in good

23

faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

Section 5.9      _Indemnification._

      (a)    Without the need for further court approval, the Settlement Trust hereby indemnifies, holds harmless, and defends the Settlement Trust Indemnified Parties in the performance of their duties hereunder to the fullest extent that a trust, including a statutory trust organized under the laws of the State of Louisiana, is entitled to indemnify, hold harmless and defend such persons against any and all liabilities, expenses, claims, damages or losses (including attorneys' fees and costs) incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to or after the Effective Date in connection with the formation, establishment, funding or operations of the Settlement Trust except for those acts that are finally judicially determined by a court of competent jurisdiction to have arisen out of their own willful misconduct, bad faith, or fraud.

      (b)    Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Settlement Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Settlement Trust shall be paid by the Settlement Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Settlement Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by final order of the Bankruptcy Court that the Settlement Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the Settlement Trust.

      (c)    The Settlement Trustee may purchase and maintain appropriate amounts and types of insurance on behalf of the Settlement Trust Indemnified Parties, as determined by the Settlement Trustee, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Settlement Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

      (d)    The indemnification provisions of this Settlement Trust Agreement with respect to any Settlement Trust Indemnified Party shall survive the termination of such Settlement Trust Indemnified Party from the capacity for which such Settlement Trust Indemnified Party is indemnified. Termination or modification of this Settlement Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Settlement Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Settlement Trust Indemnified Party is entitled to indemnification under this Settlement Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

Case 20-10846 Doc 4545-1 Filed 11/04/25 Entered 11/04/25 16:07:54  PP Ex. 1 - Joint Plan
Page 135 of 271

Case 20-10846 Doc 4518-5 Filed 10/27/25 Entered 10/27/25 18:53:26  Plan Exhibit D-1 -
Settlement Trust Agreement Page 26 of 40

(e)     The rights to indemnification hereunder are not exclusive of other rights which any Settlement Trust Indemnified Party may otherwise have at law or in equity, including rights to indemnification or contribution.

Section 5.10    _Bond._ The Settlement Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

### ARTICLE 6.

### DURATION OF SETTLEMENT TRUST

Section 6.1    _Duration._ Once the Settlement Trust becomes effective upon the Effective Date of the Joint Plan, the Settlement Trust and this Settlement Trust Agreement shall remain and continue in full force and effect until the Settlement Trust is terminated.

Section 6.2    _Dissolution/Termination of Settlement Trust._ The term for which the Settlement Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the following provisions.

(b)     The Settlement Trust shall be dissolved at such time as (i) all of the Settlement Trust Assets have been distributed pursuant to the Joint Plan and this Settlement Trust Agreement, (ii) the Settlement Trustee determines that the administration of any remaining Settlement Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit, (iii) all Litigation Claims have been resolved, or (iv) all distributions required to be made by the Settlement Trustee under the Joint Plan and this Settlement Trust Agreement have been made; provided, however, that in no event shall the Settlement Trust be dissolved later than seven (7) years from the Effective Date unless a court of competent jurisdiction determines that a fixed period extension is necessary to facilitate or complete the recovery and liquidation of the Settlement Trust Assets.  If at any time the Settlement Trustee determines, in reliance upon such professionals as the Settlement Trustee may retain, that the expense of continued administration of the Settlement Trust is likely to exceed the value of the remaining Settlement Trust Assets, the Settlement Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Settlement Trust, (ii) disburse any remaining cash, including any reserve for Unknown Tort Claims, for disposition under the Joint Plan, and (iii) donate any remaining assets to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from U.S. federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation" as defined in section 509(a) of the Tax Code, and (D) that is unrelated to the Debtors, the Settlement Trust, and any insider of the Settlement Trustee, (iii) submit a final accounting to the Bankruptcy Court, and (iv) dissolve the Settlement Trust.

(c)     Following the dissolution and distribution of the Settlement Trust Assets, the Settlement Trust shall terminate, and the Settlement Trustee shall execute and cause a Certificate of Cancellation of the Certificate of Settlement Trust to be filed. Notwithstanding anything to the contrary contained in this Settlement Trust Agreement, the existence of the Settlement Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

(d) After termination of the Settlement Trust and solely for the purpose of liquidating and winding up its affairs, the Settlement Trustee shall continue to act as Settlement Trustee until its duties hereunder have been fully performed. The Settlement Trustee shall retain the books, records, documents and files that shall have been delivered to or created by the Settlement Trustee until distribution of all the Settlement Trust Assets. For purposes of this provision, Settlement Trust Assets will be deemed distributed when the total amount remaining in the Settlement Trust is less than $50,000 and no further actions are pending or have yet to be brought. At the Settlement Trustee's discretion, all of such books, records, documents and files may be destroyed at any time following the later of: (i) the first anniversary of the final distribution of the Settlement Trust Assets, and (ii) the date until which the Settlement Trustee is required by applicable law to retain such books, records, documents and files; provided however, that, notwithstanding the foregoing, the Settlement Trustee shall not destroy or discard any books, records, documents or files relating to the Settlement Trust without giving Reorganized Debtor the opportunity to take control of such books, records, documents and/or files.

(e) Upon termination of the Settlement Trust and accomplishment of all activities described in this agreement, the Settlement Trustee and its professionals shall be discharged and exculpated from liability (except for acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law or fraud of the Settlement Trustee or his agents or representatives). The Settlement Trustee may, at the expense of the Settlement Trust, seek an Order of the Bankruptcy Court confirming the discharges, exculpations and exoneration referenced in the preceding sentence.

Section 6.3 *No Termination by Settlement Trust Beneficiaries.* The Settlement Trust may not be terminated at any time by the Settlement Trust Beneficiaries.

Section 6.4 *Continuance of Settlement Trust for Winding Up; Discharge and Release of Settlement Trustee.* After the termination of the Settlement Trust and solely for the purpose of liquidating and winding up the affairs of the Settlement Trust, the Settlement Trustee shall continue to act as such until his responsibilities have been fully performed and his final trust accounting has been approved by the Bankruptcy Court. Except as otherwise specifically provided herein, upon approval of the Settlement Trustee's final trust accounting, the Settlement Trust Advisory Committee members, the Settlement Trustee, and the Settlement Trust's professionals and agents shall be deemed discharged under this Agreement and have no further duties or obligations hereunder. Upon a motion by the Settlement Trustee, the Bankruptcy Court may enter an order relieving the Settlement Trust Advisory Committee members and the Settlement Trustee, his employees, and the Settlement Trust's professionals and agents of any further duties, discharging and releasing the Settlement Trustee from all liability related to the Settlement Trust, and releasing the Settlement Trustee's bond, if any.

## ARTICLE 7.

## SETTLEMENT TRUST ADVISORY COMMITTEE

Section 7.1 *Appointment, Composition, and Governance of Settlement Trust Advisory Committee.* The Settlement Trust Advisory Committee shall consist of five members. The initial

26

members of the Settlement Trust Advisory Committee will be Patricia Moody, Tim Gioe, Steve McEvoy, James Adams, and Darren Boesch. The Settlement Trust Advisory Committee may, by majority vote, appoint such additional members to the Settlement Trust Advisory Committee as they see fit.

Section 7.2    _Rights and Duties of Settlement Trust Advisory Committee; Corresponding Limitations on Settlement Trustee's Actions._ The rights and duties of the Settlement Trust Advisory Committee shall be those set forth in this Agreement. The Settlement Trustee shall limit its actions on behalf of the Settlement Trust in accordance with the limits established by those provisions.

Section 7.3    _Approval and Authorization on Negative Notice._ The Settlement Trustee may obtain approval or authorization required with respect to any matter in which the amount of up to $250,000 is in dispute under the Joint Plan or this Settlement Trust Agreement from the Settlement Trust Advisory Committee on seven (7) business days' negative notice. The Settlement Trustee may obtain approval or authorization required with respect to any matter, other than an Insurance Settlement, in which the amount of more than $250,000 is in dispute under the Joint Plan or this Settlement Trust Agreement from the Settlement Trust Advisory Committee by an affirmative vote of two-thirds of the Settlement Trust Advisory Committee. The Settlement Trustee shall consult with the Settlement Trust Advisory Committee and seek written approval from the Settlement Trust Advisory Committee before accepting any Insurance Settlement. If one Settlement Trust Advisory Committee member dissents from the Settlement Trustee's approval of an Insurance Settlement, the Settlement Trustee may override the dissent by obtaining Bankruptcy Court approval of the proposed settlement. If two Settlement Trust Advisory Committee members dissent from the Settlement Trustee's approval of an Insurance Settlement, the Settlement Trustee shall not approve the Insurance Settlement.

To the extent the consent of the Settlement Trust Advisory Committee is required, the Settlement Trustee may make requests for approval or authorization by the Settlement Trust Advisory Committee in writing, which may be made in the form of an e-mail. In the event any Settlement Trust Advisory Committee member objects to the Settlement Trustee's request within seven (7) business days, the Settlement Trustee shall consult with the members of the Settlement Trust Advisory Committee about how to proceed. In the event of an impasse, other than as set forth above with respect to an Insurance Settlement, the Settlement Trustee may present the dispute to the Bankruptcy Court, which shall hear and finally determine any dispute arising out of this section or this Article. Nothing herein shall provide a right of judicial review for the point allocation determined by the Abuse Claims Reviewer.

Section 7.4    _Reimbursement of Settlement Trust Advisory Committee Expenses._ The Settlement Trustee shall pay from the Settlement Trust Assets all reasonable costs and expenses of the Settlement Trust Advisory Committee.

Section 7.5    _Settlement Trust Advisory Committee Member's Conflicts of Interest._ The Settlement Trust Advisory Committee members shall disclose any actual or potential conflicts of interest that such member has with respect to any matter arising during administration of the Settlement Trust to the other Settlement Trust Advisory Committee members and the Settlement

Trustee and such member shall be recused from voting on any matter on which such member has an actual or potential conflict of interest.

Section 7.6    _Resignation and Replacement of Settlement Trust Advisory Committee Member._ A member of the Settlement Trust Advisory Committee may resign at any time on notice (including e-mailed notice) to the other Settlement Trust Advisory Committee members and the Settlement Trustee.  The resignation shall be effective on the later of (i) the date specified in the notice delivered to the other Settlement Trust Advisory Committee members and the Settlement Trustee or (ii) the date that is thirty (30) days after the date such notice is delivered.  In the event of the resignation, death, incapacity, or removal of a member of the Settlement Trust Advisory Committee, the Settlement Trustee may nominate and the remaining members of Settlement Trust Advisory Committee may approve, by a majority vote, a replacement member of the Settlement Trust Advisory Committee.

Section 7.7    _Absence of Settlement Trust Advisory Committee._  If the Settlement Trust Advisory Committee has less than five (5) members for a period of thirty (30) consecutive days, then the Settlement Trustee may, during such vacancy and thereafter until the Settlement Trust Advisory Committee has five (5) members, ignore any reference in this Settlement Trust Agreement to a Settlement Trust Advisory Committee, and all references to the Settlement Trust Advisory Committee's rights and responsibilities in this Settlement Trust Agreement will be null and void. Notwithstanding the foregoing, the Settlement Trustee shall not enter into an Insurance Settlement without Bankruptcy Court approval upon notice and motion unless the Settlement Trust Advisory Committee has five members.

## ARTICLE 8.

### GENERAL PROVISIONS

Section 8.1    _Irrevocability._ To the fullest extent permitted by applicable law, the Settlement Trust is irrevocable. The Settlor shall not (i) retain any ownership or residual interest whatsoever with respect to any Settlement Trust Assets, including, but not limited to, the funds transferred to fund the Settlement Trust, and (ii) have any rights or role with respect to the management or operation of the Settlement Trust, or the Settlement Trustee's administration of the Settlement Trust.

Section 8.2    _Outgoing Settlement Trustee Obligations._

In the event of the resignation or removal of the Settlement Trustee, the resigning or removed Settlement Trustee shall:

(a)    execute and deliver by the effective date of resignation or removal such documents, instruments, records and other writings as may be reasonably requested by the successor Settlement Trustee to effect such resignation or removal and the conveyance of the Settlement Trust Assets then held by the resigning or removed Settlement Trustee to the successor Settlement Trustee;

28

(b)     deliver to the successor Settlement Trustee all documents, instruments, records and other writings relating to the Settlement Trust Assets as may be in the possession or under the control of the resigning or removed Settlement Trustee;

(c)     otherwise assist and cooperate in effecting the assumption of the resigning or removed Settlement Trustee's obligations and functions by the successor Settlement Trustee; and

(d)     irrevocably appoint the successor Settlement Trustee (and any interim trustee) as its attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such resigning or removed Settlement Trustee is obligated to perform under this Settlement Trust Agreement. Such appointment shall not be affected by the subsequent disability or incompetence of the Settlement Trustee making such appointment. The Bankruptcy Court also may enter such orders as are necessary to effect the termination of the appointment of the Settlement Trustee and the appointment of the successor Settlement Trustee.

Section 8.3     _Taxes._

(a)     The Settlement Trust is intended to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 et seq. of the Treasury Regulations promulgated under section 468B of the IRC, as amended (the "**QSF Regulations**"), with respect to which Reorganized Debtor shall timely make an election to treat the Settlement Trust as a "grantor trust" for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes.

(b)     The Settlement Trustee shall be the "administrator" of the Settlement Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by the Settlement Trust out of the Settlement Trust Assets, which assets may be sold by the Settlement Trustee to the extent necessary to satisfy tax liabilities of the Settlement Trust, (ii) comply with all applicable tax reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of Settlement Trust as a qualified settlement fund and a grantor trust, within the meaning of the QSF Regulations, and (iv) take no action that could cause the Trust to fail to qualify as a qualified settlement fund and a grantor trust within the meaning of the QSF Regulations. The Settlement Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Settlement Trust for all taxable periods through the Dissolution Date.

(c)     As soon as reasonably practicable after the Effective Date, but in no event later than one hundred twenty (120) days thereafter, the Settlement Trust shall make a good faith valuation of the Settlement Trust Assets and such valuation shall be used consistently by all parties for all U.S. federal income tax purposes. In connection with the preparation of the valuation contemplated hereby, the Settlement Trust shall be entitled to retain such professionals and advisors as the Settlement Trustee shall determine to be appropriate or necessary, and the

Settlement Trustee shall take such other actions in connection therewith as he or she determines to be appropriate or necessary.

(d)     The Settlement Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution. All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed or paid for all purposes of this Settlement Trust Agreement. The Settlement Trustee shall be authorized to collect such tax information (including tax identification numbers) as in his or her sole discretion is deemed necessary to effectuate the Joint Plan, the Confirmation Order and this Settlement Trust Agreement. In order to receive distributions, all Settlement Trust Beneficiaries shall be required to provide tax information to the Settlement Trustee to the extent the Settlement Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Settlement Trustee for these purposes. The Settlement Trustee may refuse to make a payment or distribution unless or until such information is delivered; provided however, that, upon the delivery of such information, the Settlement Trustee shall make such delayed payment or distribution, without interest. Notwithstanding the foregoing, if a person fails to furnish any tax information reasonably requested by the Settlement Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such distribution shall irrevocably revert to the Settlement Trust. In no event shall any escheat to any federal, state or local government or any other entity.

Section 8.4     _Modification._

(a)     Material modifications to this Settlement Trust Agreement, including Exhibits hereto, may be made only with the consent of the Settlement Trustee and the majority of the Settlement Trust Advisory Committee and subject to the approval of the Bankruptcy Court; provided however, that the Settlement Trustee may amend this Settlement Trust Agreement from time to time without the consent, approval or other authorization of, but with notice on the Bankruptcy Court docket, to make minor corrective or clarifying amendments necessary to enable the Settlement Trustee to effectuate the provisions of this Settlement Trust Agreement, provided such minor corrective or clarifying amendments shall not take effect until ten (10) days after notice to on the Bankruptcy Court docket, subject to any objection by a Beneficiary. Except as permitted pursuant to the preceding sentence, the Settlement Trustee shall not modify this Settlement Trust Agreement in any manner that is inconsistent with the Joint Plan or the Confirmation Order without the approval of the Bankruptcy Court. The Settlement Trustee shall file notice of any modification of this Settlement Trust Agreement with the Bankruptcy Court.

(b)     Notwithstanding anything set forth in this Settlement Trust Agreement to the contrary, none of this Settlement Trust Agreement, nor any document related thereto shall be modified or amended in any way that could jeopardize or impair (i) the applicability of section 105 of the Bankruptcy Code to the Joint Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in

connection with the Joint Plan and Confirmation Order or (iii) the Settlement Trust's qualified settlement fund status and grantor trust status under the QSF Regulations.

Section 8.5    *Severability.* If any provision of this Settlement Trust Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Settlement Trust Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Settlement Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

Section 8.6    *Notices.* Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by overnight courier, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

> To the Settlement Trustee:
>
> Donald C. Massey
> Couhig Partners, LLC
> 1100 Poydras Street, Suite 3250
> New Orleans, Louisiana 70163
> Telephone: (504) 599-5777
> Email: dmassey@couhigpartners.com

All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.

Section 8.7    *Successors and Assigns.* The provisions of this Settlement Trust Agreement shall be binding upon and inure to the benefit of the Settlement Trust, the Settlement Trustee, the Settlement Trust Advisory Committee and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Settlement Trust Agreement except, in the case of the Settlement Trust and the Settlement Trustee, as contemplated by Section 2.1 and Section 5.2 above.

Section 8.8    *Limitation on Transferability; Settlement Trust Beneficiaries' Interests.* Except as may be ordered by the Bankruptcy Court, the Settlement Trust Beneficiaries' interests in the Settlement Trust shall not (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly and any purported assignment, conveyance, pledge or transfer shall be null and void *ab initio*; (b) be evidenced by a certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of the Settlement Trust or the Settlement Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of any Settlement Trustee, whether by petition to the Bankruptcy Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on distributions; and (g) give rise to any rights to seek a partition or division

31

of the Settlement Trust Assets. Settlement Trust Beneficiaries shall have no interest of any kind in any of the Settlement Trust Assets; rather, the Settlement Trust Beneficiaries shall have an undivided beneficial interest only in cash assets of but only to the extent such cash assets are declared by the Settlement Trustee to be distributable as distributions in accordance with the Settlement Trust Documents. For the avoidance of doubt, the Settlement Trust Beneficiaries shall have only such rights as expressly set forth in the Settlement Trust Documents. The interest of each of the Settlement Trust Beneficiaries hereunder shall be subject to the maximum spendthrift restraints permitted by Louisiana law. The foregoing is subject to the Settlement Trustee's right to cooperate with a Beneficiary to establish a structured settlement or other similar arrangement.

Section 8.9       _Exemption from Registration._

The Parties hereto intend that the rights of the Settlement Trust Beneficiaries arising under this Settlement Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Joint Plan of the beneficial interests in the Settlement Trust will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

Section 8.10      _Entire Agreement; No Waiver._

The entire agreement of the parties relating to the subject matter of this Settlement Trust Agreement is contained herein and in the documents referred to herein, and this Settlement Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

Section 8.11      _Headings._ The headings used in this Settlement Trust Agreement are inserted for convenience only and do not constitute a portion of this Settlement Trust Agreement, nor in any manner affect the construction of the provisions of this Settlement Trust Agreement.

Section 8.12      _Governing Law._

This Settlement Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Louisiana, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction. For the avoidance of doubt, none of the following provisions of Louisiana law shall apply to the extent inconsistent with the terms of the Settlement Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or

other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of Settlement Trust Assets, (g) the existence of rights or interests (beneficial or otherwise) in Settlement Trust Assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Settlement Trustee or the Settlement Trust Advisory Committee set forth or referenced in this Settlement Trust Agreement.

Section 8.13    _Settlor's Representative._

Pursuant to the Settlement Trust Documents, the Reorganized Debtor, and Reorganized Additional Debtors are hereby irrevocably designated as the "**Settlor's Representatives**" and are hereby authorized to take any action consistent with Reorganized Debtor's and Reorganized Additional Debtors' obligations under the Settlement Trust Documents that is reasonably requested of the Settlor by the Settlement Trustee pursuant to the Settlement Trust Documents. Pursuant to the Settlement Trust Documents, the Settlor's Representatives shall cooperate with the Settlement Trustee and the Settlement Trust's officers, employees and professionals in connection with the Settlement Trust's administration, including, but not limited to, providing the Settlement Trustee or his or her officers, employees and professionals, upon written request (including e-mail), reasonable access to information, including, without limitation, delivery of documents in the possession of, or witnesses under the control of, the Settlors to the extent that the Settlement Trustee could obtain the same by subpoena, notice of deposition or other permissible discovery request, without the need for a formal discovery request.

Section 8.14    _Independent Legal and Tax Counsel._

All parties to this Settlement Trust Agreement have been or have had the opportunity to be represented by counsel and advisors of their own selection in this matter. It is specifically acknowledged and understood that this Settlement Trust Agreement has not been submitted to, nor reviewed or approved by, the IRS or the taxing authorities of any state or territory of the United States of America.

Section 8.15    _Waiver of Jury Trial._

Each party hereto and each Settlement Trust Beneficiary hereof hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to a trial by jury in any legal proceeding arising out of or relating to this Settlement Trust Agreement.

Section 8.16    _Effectiveness._

This Settlement Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

Section 8.17     *Counterpart Signatures.*

      This Settlement Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument. A signed copy of this Settlement Trust Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[SIGNATURE PAGES TO FOLLOW]*

THUS DONE AND PASSED in the Parish of Orleans, State of Louisiana on the ___ day of _____, 2025, to be effective as of the date set forth above, in the presence of the undersigned competent witnesses who have hereunto signed their names with the below appearer and me, Notary Public, after due reading of the whole.

**WITNESSES:**                                    **SETTLOR:**

_____
Printed Name: _____                The Roman Catholic Church of the Archdiocese of New Orleans

_____
Printed Name: _____                By: _____

Name: _____

Title: _____

_____
Notary Public
Printed Name of Notary: _____
Bar or Notary No.: _____

35

THUS DONE AND PASSED in the Parish of Orleans, State of Louisiana on the ____ day of _____, 2025, to be effective as of the date set forth above, in the presence of the undersigned competent witnesses who have hereunto signed their names with the below appearer and me, Notary Public, after due reading of the whole.

**WITNESSES:**                                   **SETTLOR:**

_____
Printed Name: _____                  Additional Debtors

_____
Printed Name: _____                  By: _____
                                                 Name: _____
                                                 Title: _____


_____
            Notary Public
Printed Name of Notary: _____
Bar or Notary No.: _____

36

THUS DONE AND PASSED in the Parish of Orleans, State of Louisiana on the ____ day of _____, 2025, to be effective as of the date set forth above, in the presence of the undersigned competent witnesses who have hereunto signed their names with the below appearer and me, Notary Public, after due reading of the whole.

**WITNESSES:**                    **TRUSTEE:**

_____     By: _____
Printed Name: _____     Name: _____
                                 Title: _____

_____
Printed Name: _____

_____
                Notary Public
        Printed Name of Notary: _____
        Bar or Notary No. _____

37

Case 20-10846 Doc 4545-1 Filed 11/04/25 Entered 11/04/25 16:07:54  PP Ex. 1 - Joint Plan Page 148 of 271

Case 20-10846 Doc 4518-5 Filed 10/27/25 Entered 10/27/25 18:53:26  Plan Exhibit D-1 - Settlement Trust Agreement Page 39 of 40

THUS DONE AND PASSED in the Parish of Orleans, State of Louisiana on the ___ day of _____, 2025, to be effective as of the date set forth above, in the presence of the undersigned competent witnesses who have hereunto signed their names with the below appearer and me, Notary Public, after due reading of the whole.

**SETTLEMENT TRUST ADVISORY COMMITTEE MEMBERS:**

**WITNESSES:**

_____
Printed Name: _____

By: _____
Name: _____
Title: _____

_____
Printed Name: _____

_____
Notary Public
Printed Name of Notary: _____
Bar or Notary No. _____

38

**EXHIBIT 1**
**ALLOCATION PROTOCOL**

# PLAN EXHIBIT D-2

# Allocation Protocol

# ALLOCATION PROTOCOL

## 1.   PURPOSE

The Allocation Protocol is to provide for the distribution of funds to Abuse Claimants.

## 2.   DEFINITIONS

### 2.1   Capitalized Terms.

Capitalized terms used shall have the meanings given them in the Plan Documents, Disclosure Statement or the Bankruptcy Code unless otherwise defined, and such definitions are incorporated herein by reference.

"**Documentary Information**" includes a filed complaint, proof of claim, medical records, therapy records, educational records, criminal case records, personnel files and Supplemental Submission.

"**Late Claim**" means an Abuse Claim against the Archdiocese filed after May 16, 2025.

"**Late Claimant**" means an Abuse Claimant who filed an Abuse Claim after the May 16, 2025, against the Archdiocese, and had not previously filed an Abuse Claim against the Archdiocese.

"**Litigation Award**" means a final, nonappealable judgment or verdict (other than a judgment or verdict based on a liability and damage settlement of the Litigation) determining that the Reorganized Debtor and/or any Covered Party is/are liable to a Litigation Claimant because of such Litigation Claimant's Abuse Claim.

"**Litigation Claimant**" means any Abuse Claimant whose Abuse Claim the Settlement Trustee believes in good faith to be covered, in whole or in part, by policies of insurance issued by one or more Non-Settling Insurers, and who is authorized by the Settlement Trustee to liquidate their Abuse Claim under the Plan Documents by litigation of the Abuse Claim. The Settlement Trustee may consult the Reorganized Debtor and Reorganized Additional Debtors prior to making such a determination.

"**Perpetrator of the Debtor**" means a Natural Person: (1) who was an employee or other agent of the Debtor or any other Covered Party (as defined in the Joint Plan) when such person committed an act of Abuse; or (2) for whom or for whose actions the Debtor or any other Covered Party (as defined in the Joint Plan) was otherwise responsible or liable.

## 3.   RULES OF INTERPRETATION AND GENERAL GUIDELINES

### 3.1   Sole and Exclusive Method.

145670913v.2
145670913v.4

The Joint Plan and this Allocation Protocol shall together be the sole and exclusive method by which an Abuse Claimant may seek distribution on account of an Abuse Claim against the Debtor, the Additional Debtors, the Non-Debtor Catholic Entities, and the Settling Insurers.

**3.2     Conflict with Joint Plan.**

If there is any conflict between the terms of the Joint Plan and this Allocation Protocol, then the terms of the confirmed Joint Plan (as it may be amended) and the Confirmation Order shall prevail.

**3.3     Non-Compensatory Damages and Other Theories of Liability.**

Any distribution from the Settlement Trust to an Abuse Claimant shall be solely on account of bodily injury and/or emotional distress or mental anguish attributable to the bodily injury to such Abuse Claimant. The Settlement Trust shall not make any distribution to an Abuse Claimant based on that Abuse Claimants' assertion of punitive damages and damages that can be classified as economic damages that do not compensate the Abuse Claimant for bodily injury and/or emotional distress or mental anguish attributable to their bodily injury shall not be considered or allowed, even if the damages could have been considered or allowed under applicable non-bankruptcy law. Notwithstanding the foregoing, a Settlement Trust Asset may include extra contractual damages recovered from a Non-Settling Insurer and the Settlement Trust may distribute such damages to Abuse Claimants in accordance with the Allocation Protocol.

**3.4     Withdrawal of Claims.**

An Abuse Claimant can irrevocably withdraw an Abuse Claim at any time upon written notice to the Settlement Trustee and the Reorganized Debtor. Once withdrawn, the Abuse Claim may not be reasserted against the Settlement Trust (including filing an Unknown Abuse Claim by an Abuse Claimant who withdrew his or her Abuse Claim).

**3.5     Res Judicata Effect.**

Any determination by the Abuse Claims Reviewer regarding an Abuse Claim shall have no preclusive, res judicata, judicial estoppel or similar effect outside of this Case as to any third party including, but not limited to, a Non-Settling Insurer.

**3.6     Successor to Abuse Claimant.**

An Abuse Claim filed by or on behalf of an Abuse Claimant who died before receiving a distribution shall be reviewed and scored without reference to the Abuse Claimant's death or any penalty as a result of the Abuse Claimant's death, and shall be paid to the Abuse Claimant's successor, estate or survivors in accordance with applicable law. The executor or administrator of the estate or other person authorized under applicable law to administer the assets of the decedent (an "**Estate Representative**") shall provide documentation satisfactory in form and substance to the Settlement Trustee affirming such Estate Representative's authority to administer the Abuse Claim on behalf of the decedent Abuse

Claimant's estate within 90 days of the Settlement Trustee's request for such documentation.

### 3.7 <u>Confidentiality and Privilege.</u>

The Abuse Claim Reviewer, the Settlement Trustee and their respective professionals including, but not limited to counsel, financial professionals and professionals retained with respect to Medicare/Medicaid matters, shall be entitled to access to all Proof of Claim information and the Confirmation Order shall so reflect. All information that the Abuse Claims Reviewer receives from any source about any Abuse Claim or Abuse Claimant shall be held in strict confidence and shall not be disclosed absent an Order of the Bankruptcy Court or the written consent of the Abuse Claimant (or such Abuse Claimant's counsel of record). All information that the Abuse Claims Reviewer receives from any Abuse Claimant (including from counsel to such Abuse Claimant) shall be subject to a mediation privilege, and receipt of such information by the Abuse Claims Reviewer shall not constitute a waiver of any attorney-client privilege or attorney work-product claim or any similar privilege or doctrine.

No later than 90 days after the completion of all allocations and the exhaustion of any periods for reconsideration of the Abuse Claims Reviewer's review of all Abuse Claims, all confidential materials provided to the Abuse Claims Reviewer shall be destroyed. The Abuse Claims Reviewer shall file a 30-day notice of intention to destroy such confidential materials on the docket of the Archdiocese's Bankruptcy Case. Any timely objections to such notice of intention shall be resolved by the Bankruptcy Court.

### 4. <u>ABUSE CLAIMS REVIEWER</u>

Richard Arsenault is the Abuse Claims Reviewer under the terms of this Allocation Protocol and an order of the Bankruptcy Court. The Abuse Claims Reviewer shall review each of the Abuse Claims (as and when such Abuse Claims may be filed or submitted) and, according to the guidelines in section 5 below, make determinations upon which individual monetary distributions will be made subject to the Joint Plan and the Settlement Trust Documents. The Abuse Claims Reviewer's review as to each Abuse Claim shall be the final review, subject only to reconsideration as set forth in section 7 below.

The Archdiocese and Additional Debtors, directly or through Donlin Recano, shall provide electronic copies of all Abuse Proof of Claim forms (including any attachments thereto and as the same may have been amended from time to time) to the Abuse Claims Reviewer upon request, and shall provide electronic copies of any Abuse Claim (including any attachments thereto and as the same may have been amended from time to time) filed after the Effective Date to the Settlement Trustee and Abuse Claim Reviewer within 7 days of the filing of such Abuse Claim.

### 5. <u>PROCEDURE FOR ALLOCATION AMONG ABUSE CLAIMS</u>

### 5.1 <u>Proof of Abuse Claim.</u>

The Abuse Claims Reviewer shall consider all the Documentary Information submitted by an Abuse Claimant. An Abuse Claimant need not submit any filed Abuse Proof of Claim (as amended prior to the Abuse Claims Reviewer's order of appointment) because all shall be provided to the Abuse Claims Reviewer by the Archdiocese or the Additional Debtors as set forth in above Section 4. No form of Documentary Information is necessarily of more or less value than another. The Abuse Claims Reviewer also shall have access to all Abuse-related documents provided by the Archdiocese and Additional Debtors to the Survivors' Committee.

Abuse Claimants may provide supplemental evidence and information pursuant to the below procedures. The Abuse Claims Reviewer has the right to request additional Documentary Information or other information from the Abuse Claimant. The Abuse Claimant's failure to respond to the request is grounds for a reduction of a point award, including to zero (0) points.

Unknown Abuse Claimants shall send their Abuse Claim form directly to the Settlement Trustee and the Abuse Claims Reviewer and are not required to file such Abuse Claim with the Claims Agent or the Bankruptcy Court. The Settlement Trustee shall transmit a copy of any Unknown Abuse Claims received to the Abuse Claims Reviewer within a reasonable time after receipt thereof. The Abuse Claims Reviewer may request additional information, including Documentary Information, from an Unknown Abuse Claimant.

Each Abuse Claimant may submit a written statement (a "**Supplemental Submission**") to the Abuse Claims Reviewer. Unless otherwise provided in a Bankruptcy Court order, the Abuse Claims Reviewer shall establish a deadline of no less than 30 days from the Date of the Abuse Claims Reviewer's order of appointment (the "**Submission Deadline**") by which Abuse Claimants may submit Supplemental Statements to the Abuse Claims Reviewer (except for submission of an Unknown Abuse Claim). Notice of the Submission Deadline (the "**Supplement Notice**") shall provide, among other things, the method for submission of Supplemental Statements. All notices by the Abuse Claims Reviewer to Abuse Claimants, including the Supplement Notice, shall be sent to each Abuse Claimant's counsel of record via email and first-class mail to unrepresented Abuse Claimant at the address(es) provided in the applicable Abuse Proof of Claim Form.

A Supplemental Submission shall be typewritten, no longer than 10 pages, single sided and double spaced with 12-point font; provided, however, that an Abuse Claimant not represented by counsel may submit a handwritten Supplemental Submission not to exceed 10 single sided pages in length. The Supplemental Submission may summarize any expert reports but shall not include them as exhibits. The Abuse Claims Reviewer may request copies of any expert reports but the Abuse Claims Reviewer's decision not to request such copies shall not be a basis for reconsideration of a points award.

Supplemental Submissions shall be submitted by the Submission Deadline (or other deadline established by the Bankruptcy Court) unless the Abuse Claims Reviewer determines, in his or her sole discretion, that there is good cause for delay. The Abuse

Claims Reviewer may exercise the sole discretion to allow an Abuse Claimant to exceed the page limit for the Supplemental Submission.

In lieu of a written statement, an Abuse Claimant may submit a video Supplemental Submission of no more than ten minutes. An Abuse Claimant may submit either a written or video Supplemental Submission, but not both. A video submission may only record the Abuse Claimant and no other person, including an agent or representative of an Abuse Claimant; provided, however, the ten-minute video may include a recording of a portion of the Abuse Claimant's deposition. If an Abuse Claimant declines to submit a written or video Supplemental Submission, such declination shall not be held against the Abuse Claimant or be used as grounds to discount the Abuse Claim. **The medium of the Supplemental Submission (whether in writing or by video) shall not advantage or disadvantage an Abuse Claimant.**

**5.2**     **Guidelines for Allocation for Abuse Claims.**

    (a)     **Initial Evaluation.**

The Abuse Claims Reviewer shall consider whether the Abuse Claimant has proven by credible evidence that the Abuse was perpetrated by a Perpetrator and that the Abuse Claim was filed the earlier of an applicable claims bar date established by the Bankruptcy Court or an applicable state law prescriptive period. The Abuse Claims Reviewer shall give notice to the Abuse Claimant and the Settlement Trustee of a determination that the Abuse Claimant has not met the foregoing burden of proof and will provide the Abuse Claimant a reasonable opportunity to provide facts and/or legal basis to establish that the foregoing burden of proof has been met. The Abuse Claimant's failure to provide such facts or legal basis is cause for the Abuse Claims Reviewer to determine that the Abuse Claimant has not provided such credible evidence. The Debtor and any Covered Party must cooperate with any information or discovery request by an Abuse Claimant related to the Abuse Claims Reviewer's determination that the Abuse Claimant has not met the foregoing burden of proof. During this review, the Settlement Trustee may request that the Abuse Claims Reviewer evaluate the Claim under Section 5.2(b) to enable the Settlement Trustee to reserve sufficient amounts to pay the Abuse Claimant if the Abuse Claims Reviewer ultimately determines that the Abuse Claimant has met the foregoing burden of proof.

    (b)     **Evaluation Factors**

        (i)     Each Abuse Claimant that has met his or her burden under the initial evaluation described in section 5.2(a) will be evaluated by the Abuse Claims Reviewer. The Abuse Claims Reviewer shall not consider the mere fact of a Claimant's current or prior incarceration unless an element of the crime for which the Claimant was convicted includes any fraud or misrepresentation. Each Abuse Claim will be scored on a scale not to exceed one hundred (100) points based on the provisions pf paragraphs 5.2, 5.3, 5.4, 5.5 and 6 of the Allocation

Protocol. Schedule 5.2(b) hereto sets forth the maximum number of points that may be awarded on account of the factors in the following paragraph 5.2(b)(i)(1).

(1)  Nature of the Sexual Abuse:

   a.  Duration;

   b.  Frequency/number of instances;

   c.  Degree of intrusiveness into child's body (e.g. clothed/unclothed, masturbation by or of perpetrator, oral penetration, anal penetration, vaginal penetration);

   d.  Level or severity of force/violence/coercion/threats;

   e.  Control of environment (e.g. boarding school, orphanage, trip under supervision of perpetrator, day school, employment relationship with Perpetrator of the Debtors);

   f.  Number of Perpetrators of the Debtors that abused the Claimant;

   g.  Physical pain suffered;

   h.  Grooming; and/or

   i.  Additional factors that may be provided by the Claimant.

(2)  Impact of Abuse:

   a.  School behavior problems;

   b.  School academic problems;

   c.  Getting into legal trouble as a minor;

   d.  Loss of faith;

   e.  Damage to family relationships/ interpersonal difficulties;

   f.  Mental health symptoms, including:

      i.  Depression;

145670913v.2
145670913v.4

156

      ii.     Suicide attempt or suicidal ideation;

      iii.    Anxiety;

      iv.    Substance abuse;

      v.     Sexual acting out;

      vi.    Runaway;

      vii.   Flashbacks;

      viii.  Nightmares; and/or

      ix.    Additional factors that may be provided by the Claimant.

   g.    Adult and current functioning:

      i.     Criminal record as an adult;

      ii.     Underemployment/unemployment;

      iii.    Relationship problems

      iv.    Substance abuse; and/or additional factors that may be provided by the Claimant.

   h.    The risk of the foregoing factors affecting the Abuse Claimant in the future based on the Abuse Claimant's age at the present time; and/or

   i.    Additional factors that may be provided by the Claimant.

(ii)    Consent Factor

The Abuse Claim Reviewer has discretion to reduce an Abuse Claimant's score by twenty percent (20%) to eighty percent (80%) if there was consent for the at issue contact between the Abuse Claimant and the Perpetrator of the Debtor. All contact that occurred prior to the Claimant's eighteenth birthday will be deemed as non-consensual.

(iii)   Additional Factors:

Level of participation by the Abuse Claimant in public/litigation events related to the Abuse Claims, including but not limited to:

a.  leadership role in helping sexual abuse survivors, including, but not limited to, participation in organizations and efforts to promote legislation beneficial to sexual abuse survivors;

b.  participation in litigation against the Debtor or a Perpetrator before the Petition Date;

c.  participation in criminal proceedings against the Debtor or a Perpetrator and/or;

d.  filing of a lawsuit naming an Other Insured Entity.

5.3     There will be no consideration of an Abuse Claimant's claims against any other entity that may be liable for the abuse to the Abuse Claimant.

5.4     An Abuse Claim that was filed before May 16, 2025, shall be deemed timely filed. An Abuse Claim that is timely filed under the Additional Debtors' Abuse Claim Bar Date Order shall not be treated as a late claim solely with respect to the Trust consideration provided by the Additional Debtors, the Non-Debtor Catholic Entities, and the Settling Insurers. An Abuse Claimant that timely filed an Abuse Claim under the Additional Debtors' Abuse Claim Bar Date Order that is a Late Claim with respect to the Archdiocese may follow the procedure set forth in Sections 5.5 and 5.6 to obtain a discounted recovery of the Settlement Trust consideration provided by the Archdiocese.

5.5     Any Late Claimant must either file a motion to allow a Late Claim, i.e. a claim filed after May 16, 2025, against the Debtor with the Bankruptcy Court (on notice to the Abuse Claims Reviewer and Settlement Trustee), or submit to the Abuse Claim Reviewer a written request to allow a late filed claim and a statement (collectively no longer than 10 pages, single sided, double spaced with 12-point font) regarding the basis for filing an Abuse Claim after May 16, 2025. The deadline to submit such motion or statement shall be the Submission Deadline provided upon notice by the Abuse Claims Reviewer. A Late Claimant shall have no right of review of the Abuse Claims Reviewer's determination of the request. The Abuse Claims Reviewer shall award zero (0) points for any Late Claimant that fails to submit a timely motion or statement.

5.6     With respect to any Late Claim deemed untimely by order of the Bankruptcy Court or the Abuse Claim Reviewer notwithstanding the Late Claimant's submission of a timely motion or statement as required by Section 5.5, the Abuse Claim Reviewer shall reduce the points awarded to any such Late Claim by 90% to the extent such Late Claim is asserted against the Archdiocese. For example, if the Abuse Claims Reviewer assesses a Late Claim at one hundred (100) points, he or she shall reduce the assessment to no more than ten (10) points. Notwithstanding the foregoing, an Abuse Claim that is timely with respect to the Additional Debtors shall not be

145670913v.2
145670913v.4

158

discounted with respect to any recovery against the Additional Debtors. For the avoidance of doubt, any Late Claimant who fails to submit a timely motion or statement for a Late Claim against the Archdiocese as required by Section 5.5 shall receive no recovery against the Archdiocese under any circumstance as set forth in Section 5.5.

## 6. ADJUSTMENTS.

The Abuse Claims Reviewer shall adjust all Reviewed Claims as follows:

### 6.1 No Award for Non-Abuse.

The Abuse Claims Reviewer shall allocate zero (0) points for any Claim that is not an Abuse Claim.

### 6.2 Disallowed Abuse Claims.

The Abuse Claims Reviewer shall allocate zero (0) points to any Disallowed Abuse Claim.

### 6.3 Inconsistent Statements.

If an Abuse Claimant submits information, including Documentary Information, that contains an account of the Abuse that differs materially from the information submitted in a filed Abuse Proof of Claim, the Abuse Claims Reviewer may require an explanation for the discrepancy, including by an in-person interview with the Abuse Claimant. The Abuse Claims Reviewer will consider any explanation provided or refusal by the Abuse Claimant to provide an explanation or submit to a requested interview, and will have the discretion to discount the point award accordingly.

### 6.4 Other Discount Factors

The Abuse Claims Reviewer shall discount any point award for the following reasons by the stated percentage:

(a) **Missing Information**: The Abuse Proof of Claim lacks information regarding the nature of the Abuse, date of Abuse, age at time of Abuse, Perpetrator's name or description of Abuse: up to 100%; provided that a discount for partial name of the Perpetrator shall not exceed 25% and a discount for an unnamed Perpetrator who is described shall not exceed 75%.

(b) **Familial Relationship**: The Perpetrator was a family member (up to 3d level of consanguinity): up to 50%.

(c) **Non Settling Party**: The Abuse Proof of Claim alleges Abuse (i) that occurred at a location owned by an entity other than the Debtor or an Additional Debtor, and/or (ii) by an identified Perpetrator not affiliated

with the Archdiocese or a Covered Party: up to 50% (both conditions: up to 100%).

## 7. DETERMINATION OF POINT TO DOLLAR VALUE.

The Abuse Claims Reviewer will arrive at a point total for each Abuse Claimant in accordance with this Allocation Protocol.

The Settlement Trustee shall calculate the value of an individual "point" after all Abuse Claims, except Unknown Abuse Claims, have been reviewed on a final basis. The point value will be determined by dividing (a) the total dollars in the amount funded to the Settlement Trust for the Abuse Claims by (b) the total of points allocated to the individual Abuse Claims. For example, if there are 650 abuse claimants awarded a total of 50,000 points, with total distributable Settlement Trust Assets of $180 million, each point would be valued at $3,600. An Abuse Claimant with a 70-point award would receive a distribution from the trust of $252,000, subject to any amounts due under the Abuse Claimant's retainer agreement with counsel.

## 8. DETERMINATIONS BY THE ABUSE CLAIMS REVIEWER AND REQUESTS FOR RECONSIDERATION AND APPEAL.

Following completion of the Abuse Claim Reviewer's point determinations but before any consideration of reconsideration requests, the Settlement Trustee shall notify each Abuse Claimant in writing of the likely monetary distribution regarding the Abuse Claimant's Claim (the "**Allocated Payment**"), which distribution may be greater or smaller than the actual distribution to be received based on reserves established by the Settlement Trustee and the outcome of any reconsideration of claims. The Settlement Trustee shall mail this preliminary determination to the Abuse Claimant's counsel of record, or in the case of unrepresented parties, to the last address based on the Abuse Claimant's filed proof of claim.

The Abuse Claims Reviewer's point award shall be final unless the Abuse Claimant makes a timely request for the point award to be reconsidered by the Abuse Claims Reviewer. The Abuse Claimant shall not have a right to any other appeal of the Abuse Claims Reviewer's point award. The Abuse Claimant may request reconsideration of the Abuse Claims Reviewer's point award by delivering a written request for reconsideration to the Abuse Claims Reviewer within 30 calendar days after mailing of the preliminary monetary distribution. The Abuse Claimant's request for reconsideration may include additional supporting evidence and argument upon a showing that such additional information could not have been timely provided under this Allocation Protocol. Additionally, the Abuse Claimant must include a check for $1,000.00 with the request to cover the costs of the reconsideration. The Settlement Trustee may waive the reconsideration fee if an Abuse Claimant submits to the Settlement Trustee a statement signed under the penalty of perjury and evidenced by reasonable documentation that they are unable to pay the reconsideration fee.

The Abuse Claims Reviewer shall have sole discretion to determine how to respond to the request for reconsideration. The Abuse Claims Reviewer's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review or appeal by any party, including a court.

## 9.  MONETARY DISTRIBUTIONS

### 9.1  Distributions to Abuse Claimants (except Unknown Tort Claimants)

Once the Abuse Claims Reviewer's determinations are final, the Settlement Trustee shall make monetary distributions to the Abuse Claimants, except Unknown Abuse Claimants and Litigation Claimants, in accordance with the terms of the Joint Plan, the Settlement Trust Agreement, and this Allocation Protocol. Distributions to Litigation Claimants will be made in accordance with Section 10 below.

### 9.2  Distributions to Unknown Abuse Claimants

The Settlement Trustee shall pay Unknown Abuse Claimants in accordance with the terms of the Joint Plan, Confirmation Order, and the Settlement Trust Documents, as follows:

(a)  The Settlement Trustee shall make a distribution to Unknown Abuse Claimants at least once during every twelve (12) months after the Effective Date if and to the extent any such claims have been filed. The date of any such distribution is referred to herein as a "**Distribution Date**."

(b)  The maximum value of a point allocated to the Unknown Abuse Claimants pursuant to this Allocation Protocol shall be equal to the value of a point allocated to all Class X Abuse Claimants (such amount, the "**Maximum Future Abuse Claim Amount**").

(c)  During any twelve (12) month period, the Settlement Trustee shall distribute no more than: (a) 12.5% of the remaining amount available from the Unknown Claims Reserve collectively to all Unknown Abuse Claimants who have filed Unknown Abuse Claims entitled to a distribution as of a given Distribution Date and (b) 4% of the remaining amount available from the Unknown Abuse Claims Reserve to any single Unknown Abuse Claimant. The Settlement Trustee shall not, however, distribute more than the Maximum Future Abuse Claim Amount to any Unknown Abuse Claimant, but upon any distribution, shall: (x) first distribute funds to Unknown Abuse Claimants who filed compensable Unknown Abuse Claims after other Unknown Abuse Claimants have already received a distribution, until Holders of such later filed Unknown Claims receive an amount equal (on a per point basis) to the amount already distributed to Unknown Abuse Claimants who previously received a distribution, and (y) thereafter distribute additional available funds to all holders of allowed Unknown Abuse Claims as of such distribution Date.

### 9.3 Release and Dismissal of Pending Litigation

To receive a distribution that includes funds from Settling Insurers and Non-Debtor Catholic Entities, an Abuse Claimant, including a Litigation Claimant, must deliver to the Settlement Trustee an executed Abuse Claim Release and Certification, the form of which is attached to Joint Plan as Exhibit C. Each Abuse Claimant must release all Claims against the Covered Parties and Settling Insurers as provided therein. Upon request, the Settlement Trust must provide copies of an executed Abuse Claim Release and Certification to the (a) releasing Abuse Claimant and /Covered Party and (b) to any Joint Tortfeasor that has executed a non-disclosure or confidentiality agreement acceptable in form and substance to the Settlement Trustee. For the avoidance of doubt, nothing herein shall require an Abuse Claimant to release any Person that is not a Covered Party or Settling Insurer.

If the Abuse Claimant is deceased or otherwise legally incapable of executing a release, the signatory representative must include legal authority to execute on behalf of the Abuse Claimant. Such legal authority may not include any restrictions on authority.

In addition to the Abuse Claim Release and Certification, within 45 days of the Effective Date, the Abuse Claimant must dismiss any lawsuit concerning the subject Abuse Claim asserted against any Covered Party, with prejudice, and without fees and costs being recoverable against the releasing Abuse Claimant or any Covered Party. The failure to dismiss any such lawsuit within the 45 day period will result in the loss of any distribution to the Abuse Claimant from the Settlement Trust.

## 10. PROCEDURE FOR LITIGATION

### 10.1 Litigation Against Co-Defendants.

Except as provided in the Plan Documents and the Allocation Protocol, all Abuse Claimants are free to pursue litigation against any party other than a Covered Party, a Non-Settling Insurer, or Settling Insurer without any permission, oversight, or any restriction by the Settlement Trustee. Litigation against a Non-Settling Insurer must be pursued in accordance with this Section 10 of this Allocation Protocol.

### 10.2 Notice of Interest in Litigation.

Abuse Claimants who believe their claim is covered, in whole or in part, by Insurance Policies issued by a Non-Settling Insurer must, by the Submission Deadline, submit to the Settlement Trustee written notice ("**Litigation Claimants**") of their election to move forward with litigation against a Covered Party, under the limitations and provisions of the Joint Plan. If an Abuse Claimant with a Claim against a Non-Settling Insurer elects not to pursue litigation, such Abuse Claimant must assign its claim against the Non-Settling Insurer to the Settlement Trust.

**10.3    Designation as Litigation Claimant.**

The Settlement Trustee will confirm that the Litigation Claimants who elect to be Litigation Claimants and allege Abuse covered, in whole or in part, by Insurance Policies issued by one or more Non-Settling Insurers are actually covered, in whole or party by Insurance Policies one or more Non-Settling Insurers ("**Litigation Claimants**"). The Settlement Trustee may, but is not required to, consult with any Covered Party before making such a determination. The Settlement Trustee shall give written notice to all Litigation Claimants of his determination as to whether their claims are allegedly covered, in whole or in part, by Insurance Policies issued by a Non-Settling Insurer. The Settlement Trustee's determination is not a determination of coverage and is without prejudice to any coverage defenses related to such Insurance Policy.

**10.4    Litigation Authorization.**

The Settlement Trustee may authorize up to twenty (20) Litigation Claimants per month to pursue their Abuse Claims in any court of competent jurisdiction, at such Litigation Claimants' expense, to determine any liability that any Covered Party, and / or any Non-Settling Insurer may have regarding an Abuse Claim and the amount of that liability. Within sixty (60) days of the Submission Deadline, the Settlement Trustee shall, in consultation with the Settlement Trust Advisory Committee, prepare a six-month schedule of the claims authorized to begin litigation and provide notice of such schedule to all Litigation Claimants ("**Notice of Litigation Schedule**"). The Settlement Trustee shall prioritize Claims that initiated litigation prior to the Petition Date and Claims with the highest awarded point values, but may consider additional factors such as the legal merits of Abuse Claimant's case. Notwithstanding the foregoing, the Settlement Trustee shall authorize all Litigation Claimants to pursue their Abuse Claims in any court of competent jurisdiction prior to the expiration of the window statute established by 2021 Louisiana Act 322, 2022 Louisiana Act 386, and 2024 Louisiana Act 481. A Litigation Claimant must give the Settlement Trustee written notice of the commencement of any (re)commenced Litigation authorized hereunder within ten (10) day of the filing of a complaint or notice to a court that the litigation is being pursued.  If a Litigation Claimant fails to (re)initiate litigation within sixty (60) days of the date provided in the Notice of Litigation Schedule, the Settlement Trustee may rescind the authorization and adjust the Litigation Schedule to accelerate other Litigation Claimants. If a Litigation Claimant files a lawsuit that has not been authorized by the Settlement Trustee, the Litigation Claimant will forfeit the right to receive any distribution from the Settlement Trust.

**10.5    Just Cause for Expedition of Litigation.**

Litigation Claimants may, within 14 days of receipt of the Notice of Litigation Schedule, submit a written statement to the Settlement Trustee explaining any specific cause requiring earlier authorization of their pursuit of litigation. The Settlement Trustee, in consultation with the Settlement Trust Advisory Committee, shall review such statements and, if needed, provide an amended Notice of Litigation Schedule to all Litigation Claimants. If the Settlement Trustee does not include a Litigation Claimant on the Notice of Litigation Schedule, then the Litigation Claimant may request mediation with the

Settlement Trustee. If the mediation is unsuccessful, the Litigation Claimant may appeal to the Bankruptcy Court for just cause to be authorized to pursue his or her claim against a Covered Party and / or Non-Settling Insurer.

**10.6     Litigation Claims Enhancements.**

To the extent a Covered Party, with the consent of the Settlement Trustee, enters into a settlement agreement whereby a Non-Settling Insurer becomes a Settling Insurer (such settlement, a "**Insurance Settlement**") that covers a Litigation Claimant's Abuse Claim (the policy or policies that cover such Abuse Claim(s) are a "**Target Policy**"), such Litigation Claimants shall receive an enhancement (the "**Claim Enhancement**") to his or her point allocation. The Claim Enhancement shall be payable only from the proceeds of the applicable Insurance Settlement. The Claim Enhancements are independent of one another and are not intended to be cumulative. The Settlement Trustee shall reserve sufficient amounts to fund such enhanced payments before distribution of Insurance Settlement proceeds to Abuse Claimants who are not Litigation Claimants.

Claim Enhancements shall be applied as follows:

(a)     A Litigation Claimant shall receive an enhancement of 1.1 times their Allocated Payment if the Insurance Settlement for a Target Policy is entered into before the Litigation Claimant files a substantive pleading (not merely a notice, certificate or other procedural document) or propounds discovery after the Settlement Trustee has issued the Notice of Litigation Schedule.

(b)     A Litigation Claimant shall receive an enhancement of 1.5 times their Allocated Payment if the Insurance Settlement for a Target Policy is entered into after a Litigation Claimant files a substantive pleading (not merely a notice, certificate or other procedural document) or propounds discovery after the Settlement Trustee has issued the Notice of Litigation Schedule, but before a deposition of the Litigation Claimant by opposing counsel.

(c)     A Litigation Claimant shall receive an enhancement of 2 times their Allocated Payment if the Settlement Trust negotiates an Insurance Settlement for a Target Policy if the Insurance Settlement is entered into after a post-Notice of Litigation Schedule deposition of the Litigation Claimant by opposing counsel but before commencement of a trial in such Litigation Claimant's case.

(d)     A Litigation Claimant shall receive an enhancement of 3 times their Allocated Payment if the Trust negotiates an Insurance Settlement for a Target Policy if the Insurance Settlement is entered into on or after the first day of a trial in such Litigation Claimant's case.

(e)     A Litigation Claimant shall receive an enhancement of 4 times their Allocated Payment if the Settlement Trust negotiates an Insurance Settlement for a Target Policy if the Insurance Settlement is entered into

after a Litigation Award is entered in favor of the Litigation Claimant in such litigation.

**10.7    Withdrawal of Litigation Election.**

A Litigation Claimant may withdraw his or her election to be a Litigation Claimant at any time.

**10.8    Withholding of Litigation Claimant's Allocated Payment.**

Subject to the provisions of section 10.9, the Settlement Trustee shall establish a reserve for the Allocated Payment of a Claim held by a Litigation Claimant. This reserve shall be the exclusive source of payment from the Settlement Trust for Litigation Claims against a Covered Party unless a Target Policy becomes the subject of an Insurance Settlement. For avoidance of doubt, the creation and existence of this reserve does not affect, diminish, or impair a Litigation Claimant's rights to collect a judgment, including a judgment based on joint and several liability, against any Covered Party to the extent permitted by the Joint Plan. The creation and existence of this reserve is not a settlement, release, accord or novation of the Claim of the Litigation Claimant and cannot be used by any Co-Defendant as a defense to any alleged joint liability with a Covered Party. If a Final Order is entered against the Litigation Claimant finding that a Covered Party or Non-Settling Insurer does not have any liability to such Claimant on account of an Abuse Claim, then the Allocated Payment reserve shall revert to the non-reserved assets of the Settlement Trust and the Litigation Claimant shall have no recourse against the Settlement Trustee, the Settlement Trust or the Settlement Trust Assets.

Unless a Litigation Claimant makes the Distribution Election as set forth in section 10.9 hereof, a Litigation Claimant's Allocated Payment shall be held in reserve by the Settlement Trustee until one of the below occur ("**Release Events**"). Following a Release Event, each Litigation Claimant shall receive his or her Allocated Payment (including any enhancement described above).

    (a)    The Settlement Trust enters into an Insurance Settlement regarding the applicable Target Policy, in which case the Litigation Claimant's Abuse Claim shall be treated as a Channeled Claim under the Joint Plan subject to the point enhancements provided in Section 10.7;

    (b)    A court enters a Litigation Award, in which case, at the election of the Litigation Claimant: (i) the Litigation Claimant retains the entirety of his or her Litigation Award and the Settlement Trustee shall release such Litigation Claimant's Allocated Payment reserve for distribution to other Abuse Claimants and the Litigation Claimant shall not be entitled to any enhancement of his or her award or any Insurance Settlement proceeds; or (ii) the Litigation Claimant shall assign his or her Litigation Award to the Settlement Trust and participate in all distributions from the Settlement Trust with enhancement. If the election is not made within 30 days of the Litigation Award, the Litigation Claimant shall be deemed to have elected

option (i) of this Paragraph. Notwithstanding the foregoing, 10% of any Litigation Award, net of attorneys' fees and costs, if collected from any Non-Settling Insurer and not assigned to the Settlement Trust under section (ii) of this paragraph, shall be paid by the Litigation Claimant to the Settlement Trust on account of costs and expenses incurred by the Settlement Trust in connection with the Litigation Claimant's Claim. For example, if a Litigation Claimant receives a $50,000 award with $15,000 in attorneys' fees and costs, the Settlement Trust will receive $3,500 and the Litigation Claimant will receive $31,500.

(c)     The Litigation Claimant enters into a settlement regarding his or her Abuse Claim (other than an Insurance Settlement) (the "**Litigation Claimant Settlement**"), in which case, at the election of the Litigation Claimant: (i) the Litigation Claimant retains the entirety of his or her Litigation Claimant Settlement and Settlement Trustee shall then release such Litigation Claimant's Allocated Payment reserve for distribution to other Abuse Claimants and the Litigation Claimant shall not be entitled to (i) any enhancement of his or her award and/or any Insurance Settlement proceeds; or (ii) the Litigation Claimant assigns his or her Litigation Claimant Settlement to the Settlement Trust and participates in all distributions from the Settlement Trust with enhancement. If the election is not made within 30 days of the settlement, the Litigation Claimant shall be deemed to have elected option (i) of this Paragraph. Notwithstanding the foregoing, a portion of any Litigation Claimant Settlement, net of attorneys' fees and costs, if collected from any Non-Settling Insurer by a Litigation Claimant and not assigned to the Trust under section (ii) of this paragraph, shall be paid by the Litigation Claimant to the Settlement Trust on account of costs and expenses incurred by the Settlement Trust in connection with the Litigation Claimant's Abuse Claim. The portion payable to the Settlement Trust is based on the following litigation case milestones: (a) 50% to the Settlement Trust and 50% to the Litigation Claimant if the Abuse Claim is settled after litigation is commenced but prior to discovery; (b) 25% to the Settlement Trust and 75% to the Litigation Claimant if the Abuse Claim is settled after at least one party has produced documents or at least one deposition has occurred; and (c) 100% to the Litigation Claimant if the Abuse Claim is settled after a trial commences. For example, if a Litigation Claimant reaches a settlement of $50,000 under the scenario of foregoing subparagraph (b) and incurs $15,000 in attorneys' fees and costs after a deposition is taken, the Settlement Trust will receive $8,750, and the Litigation Claimant will receive the remaining $26,250.

**If a Final Order is entered against the Litigation Claimant finding that a Covered Party or Non-Settling Insurer does not have any liability to such Litigation Claimant on account of an Abuse Claim, then the Allocated Payment reserve shall revert to the non-reserved assets of the Settlement Trust and the Litigation Claimant shall have no recourse against the Settlement Trustee, the Settlement Trust or the Settlement Trust Assets.**

145670913v.2
145670913v.4

### 10.9     Litigation Claimant Distribution Election.

A Litigation Claimant may elect to receive his or her Allocated Share before the occurrence of a Release Event (the "**Distribution Election**") by executing the Distribution Election in the Abuse Claim Release and Certification. By executing the Distribution Election, the Litigation Claimant irrevocably agrees to transfer the proceeds of any Litigation Award or Litigation Claimant Settlement to the Settlement Trust as provided in section 10.8(b)(ii) or 10.8(c)(ii) hereof. Upon the Litigation Claimant's receipt of a Litigation Award or entry into a Litigation Claimant Settlement, and the transfer of any proceeds of such Litigation Award or Litigation Claimant Settlement, the Litigation Claimant will be entitled to receive any enhancement to which such Litigation Claimant is entitled to receive hereunder and shall be treated in accordance with section 10.8(b)(ii) or 10.8(c)(ii), as applicable.

In the event of Litigation Claimants receiving his or her Allocated Payment following a Distribution Election, the Litigation Claimant assumes any risk to the Litigation Claimant's litigation against Target Insurer, including any risk of a reduced Litigation Award or Litigation Claimant Settlement.

| ABUSE | MAX POINTS (prior to enhancements) |
|---|---|
| Penetration of Victim's Vagina or Anus with Perpetrator's Penis | 75 points |
| Penetration of Victim's Mouth with Perpetrator's Penis; Penetration of Perpetrator's Mouth with Victim's Penis; Penetration of Victim's Vagina or Anus with Perpetrator's finger or mouth or an object. | 56 points |
| Masturbation | 37 points |
| Taking and Publishing of Video of abuse | 20 points |
| Victim's Hand on Perpetrator's Genitals; Perpetrator touching Victim under Victim's clothes | 18 points |
| Perpetrator touching Victim over the Victim's Clothing | 10 points |
| Perpetrator shows the Victim portrayals of Nudity or Pornography | 10 points |
| Grooming | 5 points |
| Sexually-explicit statement with no physical touching | 3 points |
| No Abuse Described | 0 points |

# PLAN EXHIBIT E

# Non-Monetary Plan Provisions

**Dated: 9/8/2025**

# THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS' NON-MONETARY PLAN PROVISIONS TO FOSTER CHILD PROTECTION AND PREVENT CHILD SEXUAL ABUSE

i

## Table of Contents

Page

A.  PRELIMINARY STATEMENT ..................................................................1

B.  DEFINITIONS ............................................................................................1

C.  POLICIES AND PROCEDURES ..............................................................8

   1.  Child Protection Consultant. .............................................................8

   2.  Independent Review Board. .............................................................10

   3.  Youth Protection Advisor. ...............................................................12

   4.  Youth Protection Executive. ...........................................................12

   5.  Compliance with Laws Regarding Child Sexual Abuse and Third-Party Child Protection Audits. ...............................................................................................13

   6.  Improved Reporting Mechanisms. ..................................................14

   7.  Whistle-Blower Policy. ...................................................................21

   8.  Continued Protection Initiatives. ....................................................21

   9.  Prohibition on Being Alone With a Child. ......................................21

   10.  Evaluation of Non-Incardinated Clergy or Religious. ....................22

   11.  Anti-Abuse Plaques. .......................................................................23

   12.  Annual Remembrance Campaign. ...................................................24

   13.  Publication Encouraging Reporting of Abuse. ................................24

D.  TRANSPARENCY ...................................................................................24

   1.  Public Availability of Documents Concerning Sexual Abuse and Sexual Abuse Claims..24

   2.  Survivor Access to Documents and Information. ............................27

   3.  Improved Terminology. ...................................................................28

   4.  Publication of List. .........................................................................29

   5.  Release from Confidentiality. .........................................................29

E.  RECOGNITION .......................................................................................30

   1.  Individual Archbishop Meetings. ....................................................30

   2.  Group Archbishop Meetings. ..........................................................30

   3.  Individual Apology Letters. ............................................................31

   4.  Public Apology Letter. ....................................................................31

#104059074v7

    5.    Remove Perpetrator Recognitions. ..................................................................32

    6.    Publish Survivor Stories. ...............................................................................32

    7.    Place of Remembrance. ..................................................................................32

F.    SURVIVOR INTERACTION AND COUNSELING. ............................................33

G.    MISCELLANEOUS ...............................................................................................33

    1.    Reports Must Be In Writing..............................................................................33

    2.    Adult Sexual Abuse. ........................................................................................33

    3.    Anti-Lobbying.................................................................................................34

    4.    Jurisdiction and Standing.................................................................................34

    5.    Publication of Non-Monetary Provisions. .......................................................35

    6.    Compliance Reporting. ....................................................................................35

    7.    Reservation of Rights.......................................................................................36

**Appendix A    Archivist Agreement**

**Appendix B    Access Request Form**

**Appendix C    Private Apology Letter**

**Appendix D    Public Apology Letter**

**Appendix E    Written Sexual Abuse Claim Procedures and Survivor Bill of Rights**

#104059074v7

## A.     <u>PRELIMINARY STATEMENT</u>

RCCANO[1] shall strive to become the "gold standard" in youth protection and Child Sexual Abuse prevention. RCCANO shall continue to clearly state that Child protection and the prevention of Child Sexual Abuse is of paramount importance. Accordingly, RCCANO will not compromise the protection of Children from Child Sexual Abuse and is committed to the care and well-being of survivors of abuse. To promote these goals, RCCANO will adopt and implement these Provisions on and after the Effective Date.

## B.     <u>DEFINITIONS</u>

The following terms have the meanings set forth below:[2]

1.     "Additional Publications" means the print news publications identified in Section B of the "Publication Notice Program" attached as <u>Exhibit G</u> to the Bar Date Order.

2.     "Adult Sexual Abuse" means offenses of a sexual nature that are (a) prohibited under applicable state or federal law, including but not limited to sexual battery, oral sexual battery, verbal sexual abuse, sexual manipulation, extortion or rape (of any degree), where such offenses were committed by an RCCANO Actor, against an individual who was eighteen (18) or more years of age at the time, but who is not a Vulnerable Adult at the time of the alleged acts, or (b) acts by Clergy that may not be criminal under state or federal law, but vitiate the knowing and informed consent of the victim.

3.     "Adult Sexual Abuse Claim" means a Claim that alleges Adult Sexual Abuse and includes any Claim, report, charge, indictment, allegation, accusation, complaint, petition, contention, or assertion that (a) arises out of, is based on, results from, charges, depicts, describes, alleges, or otherwise concerns Adult Sexual Abuse, and/or (b) that seeks compensation, damages, costs, recompense, or reimbursement for injury, damage, harm, or loss that arises from, or results from Adult Sexual Abuse, which may include, without limitation, an Adult Sexual Abuse Proof of Claim.

---

[1] Capitalized terms used in this Article shall have the meanings ascribed to them in these Provisions.

[2] All defined terms in these Provisions apply equally both to the singular and plural forms of these terms as well as to their masculine and feminine forms. If there are any conflicts between these definitions and the Plan to which these Provisions are appended, the Plan language will control.

4.    "Adult Sexual Abuse Claimant" means an individual who has filed, alleged, or otherwise asserted an Adult Sexual Abuse Claim, including, without limitation, any individual who filed an Adult Sexual Abuse Proof of Claim.

5.    "Adult Sexual Abuse Proof of Claim" is a proof of claim filed in the Chapter 11 Case and that asserts an Adult Sexual Abuse Claim.

6.    "Affiliate" means the Canon Law public juridic person (Code of Canon Law, cc. 113-123) and/or the secular entity organized under the laws of the State of Louisiana or any other state of the United States of America, for any of the following: (a) any parish or mission of RCCANO; and (b) any entity identified as one of the "Apostolates" in the Apostolate Verified Statement.

7.    "Apostolate Verified Statement" means Exhibit "A" to the *Second Amended Verified Statement of the Apostolates Under Bankruptcy Rule 2019* [Doc. No. 1583] filed on June 10, 2022, in the Chapter 11 Case, as well as any subsequent amendment and/or supplement.

8.    "Archbishop" means both the Roman Catholic Archbishop of RCCANO and the natural person (a) currently appointed (or confirmed) and serving as Roman Catholic Archbishop of RCCANO, who, as of the Effective Date is Gregory Michael Aymond, or (b) following the term of Archbishop Aymond, as well as any duly appointed or elected administrator of RCCANO pending the appointment of a new individual to serve as the Archbishop, and his duly appointed or elected successor.

9.    "Bankruptcy Code" means Title 11 of the United States Code, as amended or supplemented, 11 U.S.C. § 101 *et seq.* (2023).

10.    "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Louisiana.

11.    "Bar Date Order" means the *Order Fixing Time for Filing Proofs of Claims; Approving Proof of Claim Forms; Providing for Confidentiality Protocols; and Approving Form and Manner of Notic*e [Doc. No. 461] entered in the Chapter 11 Case on October 1, 2020.

12.    "Canon Law" means the current promulgated *Code of Canon Law* (English Translation) to the canon law of the Roman Catholic Church as may be amended or promulgated during the term of these Provisions.

13.    "Chapter 11 Case" means the voluntary case under Chapter 11 of the Bankruptcy Code commenced by RCCANO on May 1, 2020, in the Bankruptcy Court, and styled *In re The Roman Catholic Church of the Archdiocese of New Orleans*, Case No. 20-10846.

14.    "Child" or "Children" has the meaning set forth in the Louisiana Children's Code as of the Effective Date, or as it may be amended during the term of these Provisions, provided that, for purposes of these Provisions, the definition of "Child" or "Children" also includes the following individuals where the Louisiana Children's Code would otherwise exclude such individuals from the definition of a "Child" or "Children": (a) a legally-emancipated individual younger than

eighteen (18) years of age, (b) an individual eighteen (18) years of age or older who is a current enrolled student at a RCCANO School or Non-RCCANO School, or (c) a Vulnerable Adult.

15. "Child Protection Consultant" means one or more third-party experts in the field of Child Sexual Abuse prevention that is acceptable to both the Creditors' Committee and RCCANO.

16. "Child Protection Consultant's Retention Period" means the effective date of Child Protection Consultant's retention through the date when the Child Protection Consultant issues a report and final recommendations.

17. "Child Sexual Abuse" includes any conduct that violates any Law Regarding Child Sexual Abuse where alleged to have been committed by any RCCANO Actor, against an individual who was a Child at the time, for the following acts or actions: (a) intentional touching of the individual's intimate body parts (genitals, breasts, or buttocks) by such RCCANO Actor, intentional touching by the individual of the intimate body parts of such RCCANO Actor, showing pictures of the individual's intimate body parts, or another individual's intimate body parts (including the body parts of such RCCANO Actor), showing or describing pornography or making images of the individual while naked or engaged in any sexual activity, or any sexualized interaction that was made possible by the position of authority of such RCCANO Actor, or by the inducement of such RCCANO Actor; (b) sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to the oral, genital or anal openings: (i) of the individual's body by any part of the body of such RCCANO Actor, by any part of the body of another individual, or by any object used by such RCCANO Actor for this purpose; or (ii) of the body of such RCCANO Actor by any part of the individual's body; (c) inappropriate and/or unwelcome intimate physical contact that infringes upon another's personal, physical boundaries, including but not limited to groping, kissing, and/or extended hugging; or (d) grooming by or trying to create a special relationship of a sexual nature, including, but not limited to, any communications of a sexual or romantic nature, including communications expressing romantic love to the individual (as opposed to a salutation) or providing material resources or experiences that induce the individual into a sexual relationship with such RCCANO Actor.

18. "Child Sexual Abuse Claim" means a Claim that alleges Child Sexual Abuse and includes any Claim, report, charge, indictment, allegation, accusation, complaint, petition, contention, or assertion that (a) arises out of, is based on, results from, charges, depicts, describes, alleges, or otherwise concerns Child Sexual Abuse, and/or (b) that seeks compensation, damages, costs, recompense, or reimbursement for injury, damage, harm, or loss that arises from, or results from Child Sexual Abuse, which may include, without limitation, a Child Sexual Abuse Proof of Claim.

19. "Child Sexual Abuse Claimant" means an individual who has filed, alleged, or otherwise asserted a Child Sexual Abuse Claim, including, without limitation, any individual who filed a Child Sexual Abuse Proof of Claim.

20. "Child Sexual Abuse Proof of Claim" is a proof of claim filed in the Chapter 11 Case and that asserts a Child Sexual Abuse Claim.

#104059074v7

21.  "Child Sexual Abuse Reporting Obligations" has the meaning set forth in Section C.6.b of these Provisions.

22.  "Church" means the Roman Catholic Church in the United States of America in communion with, and under the jurisdiction of, The Holy See, which includes, without limitation, RCCANO.

23.  "Claim" has the meaning set forth in Bankruptcy Code § 101(5).

24.  "Clergy" means the Archbishop and any other cardinal, metropolitan, archbishop, bishop, auxiliary bishop, regional bishop, titular bishop, vicar general, chancellor, episcopal vicar, vicar forane, dean of a deanery, archpriest, priest, prelate, simplex, pastor, prior, sub-prior, rector, parochial vicar, assistant pastor, associate pastor, deacon, vicar, director, counselor, chaplain, councilor, president, or master working in, serving in, or otherwise associated in any way with the RCCANO Parties with the permission of the Archbishop or his delegate; provided, however, such individual must be sacramentally ordained by the Church to the diaconate, whether or not incardinated to RCCANO.

25.  "Confirmation Order" means any order entered in the Chapter 11 Case confirming any Plan pursuant to Bankruptcy Code § 1129; provided, however, such Confirmation Order must be acceptable to RCCANO.

26.  "Creditors' Committee" means the Official Committee of Unsecured Creditors of The Roman Catholic Church of the Archdiocese of New Orleans, appointed by the Office of the United States Trustee on May 20, 2020 [Doc. No. 94] in the Chapter 11 Case and reconstituted on October 8, 2020 [Doc. No. 478], June 7, 2022 [Doc. No. 1575], June 21, 2022 [Doc. No. 1618], and February 13, 2023 [Doc. No. 2081].

27.  "Effective Date" means the date upon which a confirmed Plan in the Chapter 11 Case that is acceptable to RCCANO becomes effective in accordance with the Plan's terms, any Confirmation Order, and the Bankruptcy Code.

28.  "Eligible Documents" has the meaning set forth in Section D.1 of these Provisions.

29.  "Federal Rules of Evidence" means the United States' *Federal Rules of Evidence* (2023), as amended or supplemented.

30.  "Individual" or "individual" means a natural person as distinguished from an artificial person such as a corporation, partnership, or limited liability company.

31.  "IRB" means RCCANO's Independent Review Board.

32.  "Laity" means any lay faithful who serve one or more of the RCCANO Parties as an employee, or any volunteer recognized by one or more of the RCCANO Parties as serving in ministry to Children.

33.  "Laws Regarding Child Sexual Abuse" has the meaning set forth in Section C.5(a)(i) of these Provisions.

34.     "Legal Proceeding" means (a) any judicial, administrative, mediation, or arbitral action, (b) investigation, litigation, suit, proceeding, hearing before any Secular Governmental Authority, or (c) any appeal from any of the foregoing.

35.     "Louisiana Children's Code" means that *Louisiana Children's Code Annotated* (2022), as amended or supplemented.

36.     "Louisiana Code of Evidence" means the *Louisiana Code of Evidence Annotated* (2023), as amended or supplemented.

37.     "Non-RCCANO School" means any private educational institution (day or residential) that provides instruction and/or care to individuals at any time from birth through Grade 12 (i.e., any nursery, primary, grammar, and/or secondary school) that is owned and operated within the geographic boundaries of RCCANO by (a) a Religious order, (b) a canonically erected parish or mission, or (c) an independent school that is recognized as catholic by the Archbishop.

38.     "Plan" means the Chapter 11 plan for RCCANO and Additional Debtors confirmed in the Chapter 11 Case pursuant to the Confirmation Order that is acceptable to RCCANO.

39.     "Privilege Claims" means any privilege, requirement of confidentiality, or exemption from disclosure or discovery of any kind under any applicable federal or state law, rule, regulation, decision, or directive, or under Canon Law or other Church policies and procedures, including, without limitation, any of the testimonial privileges described in Chapter 5 of the Louisiana Code of Evidence, or any federal privilege at common law reserved under Rules 501 and 502 of the Federal Rules of Evidence. This definition includes, but is not limited to, the lawyer-client privilege, the health-care provider privilege, the clergy-penitent privilege, the non-testifying expert privilege, mediation and/or other settlement negotiation privilege, and the work-product doctrine, unless the document is otherwise discoverable as a matter of law.

40.     "Provisions" means these *Non-Monetary Plan Provisions to Foster Child Protection and Prevent Child Sexual Abuse*.

41.     "RCCANO" means both the civil entity and the Canon Law juridic person (Code of Canon Law, cc. 113-123) identified as The Roman Catholic Church of the Archdiocese of New Orleans, on its voluntary petition for chapter 11 relief filed in the Chapter 11 Case, any predecessor or successor thereof, and any person (including the Archbishop or administrator of RCCANO) acting on behalf of RCCANO and/or in RCCANO's stead.

42.     "RCCANO Actor" means any individual for whom RCCANO is legally responsible, including but not limited to any Clergy, former Clergy, Religious or Laity while such individual is engaged in any activity or ministry for RCCANO or a RCCANO Party.

43.     "RCCANO Parties" means (a) RCCANO, (b) any Affiliate that is the beneficiary of a channeling injunction, exculpation, or discharge as a Protected Party under the Plan and Confirmation Order, and (c) any Religious order that is a beneficiary of a channeling injunction, exculpation, or discharge under the Plan and Confirmation Order.

5

44.     "RCCANO Publications" means (a) *The Clarion Herald* (i.e., the official RCCANO newspaper), (b) all magazines, bulletins, newspapers, newsletters, or other publications published, sold, and/or distributed by RCCANO, and (c) any social media accounts (*e.g.*, Facebook, X (formerly Twitter), or Instagram) or websites owned, maintained, hosted, and/or controlled by RCCANO.

45.     "RCCANO School" means any private educational institution (day or residential) that provides instruction and/or care to individuals at any time from birth through Grade 12 (i.e., any nursery, primary, grammar, and/or secondary school) and that is, or was, owned and operated as an administrative unit of RCCANO.

46.     "RCCANO Website" means https://nolacatholic.org/, or any successor thereto.

47.     "Religious" means any individual whom an archbishop, bishop, the Holy See, religious superior, or other authority of the Church has appointed to, considered, treated, or determined to be a member of a Church institute of consecrated life or society of apostolic life society, house, or order and should be treated as religious, and includes but is not limited to, a nun, perpetually professed, religious brother, religious sister, superior, major superior, prior, abbot, abbot primate, abbot superior, supreme moderator, superior of a monastic congregation, provincial, prior provincial, provincial superior, supreme superior, monk, member of an institute of consecrated life or society of apostolic life, or consecrated hermit, and may include a cardinal, metropolitan, archbishop, bishop, auxiliary bishop, regional bishop, titular bishop, vicar general, chancellor, episcopal vicar, vicar forane, dean, archpriest, priest, prelate, simplex, pastor, prior, sub-prior, rector, parochial vicar, assistant pastor, associate pastor, deacon, vicar, or chaplain, and includes any diocesan right institutes of consecrated life and societies of apostolic life.

48.     "Report Regarding Clergy Abuse" means the report on the RCCANO Website, currently at https://nolacatholic.org/2018-report, as the same may be supplemented.

49.     "Secular Governmental Authority" means any federal, state, local, or foreign government (other than The Holy See) or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any secular arbitrator, secular court, or secular tribunal of competent jurisdiction.

50.     "Secular Law-Enforcement" means any federal, state, local, or foreign law enforcement department, agency, division, or other secular policing authority that is responsible for enforcing laws, investigating crimes, making arrests, maintaining public order, and managing public safety.

51.     "Settlement Trust" means The Archdiocese of New Orleans Settlement Trust created in accordance with the Plan and Confirmation Order.

52.     "Settlement Trust Advisory Committee" means the committee appointed pursuant to the Plan and Confirmation Order.

53.     "Settlement Trustee" means the individual appointed pursuant to the Plan to be the Trustee of the Settlement Trust.

54. "Sexual Abuse" means Adult Sexual Abuse and Child Sexual Abuse.

55. "Sexual Abuse Claim" means Adult Sexual Abuse Claim or Child Sexual Abuse Claim.

56. "Sexual Abuse Claimant" means Adult Sexual Abuse Claimant or Child Sexual Abuse Claimant.

57. "Sexual Abuse Proof of Claim" is a proof of claim filed in the Chapter 11 Case and that asserts a claim based on Sexual Abuse.

58. "Third-Party Child Protection Audit" has the meaning set forth in Section C.5(a) and (b) of these Provisions.

59. "Third-Party Child Protection Auditor" has the meaning set forth in Section C.5(b) of these Provisions.

60. "Third-Party Child Protection Audit Report" has the meaning set forth in Section C.5(c) of these Provisions.

61. "USCCB" means the United States Conference of Catholic Bishops, the episcopal conference of the Church in the United States of America.

62. "*USCCB Charter*" means UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, CHARTER FOR THE PROTECTION OF CHILDREN AND YOUNG PEOPLE adopted in 2002 and amended thereafter (last rev. June 2018), as adopted by RCCANO.

63. "*USCCB Essential Norms*" means U.S. CONFERENCE OF CATHOLIC BISHOPS, ESSENTIAL NORMS FOR DIOCESAN / EPARCHIAL POLICIES DEALING WITH ALLEGATIONS OF SEXUAL ABUSE OF MINORS BY PRIESTS OR DEACONS (May 5, 2006, as adopted by RCCANO).

64. "*Vademecum*" means DICASTERY FOR THE DOCTRINE OF THE FAITH, *VADEMECUM*: ON CERTAIN POINTS OF PROCEDURE IN TREATING CASES OF SEXUAL ABUSE OF MINORS COMMITTED BY CLERICS (July 16, 2020).

65. "*Vos Estis Lux Mundi*" means SUPREME PONTIFF FRANCIS, APOSTOLIC LETTER ISSUED MOTU PROPRIO: *VOS ESTIS LUX MUNDI* (March 25, 2023).

66. "Vulnerable Adult" means an individual who (a) is eighteen (18) years of age or more, (b) cannot physically or mentally protect themselves, and (c) lacks the capacity to consent. Capacity to consent, as used herein, means the ability to understand and appreciate the nature and consequences of making decisions concerning one's person.

67. "YPA" has the meaning set forth in Section C.3 of these Provisions, and who is trained and experienced in the fields of Child protection and the treatment of survivors of Child Sexual Abuse.

68. "YPE" has the meaning set forth in Section C.4 of these Provisions.

7

## C.    POLICIES AND PROCEDURES

### 1.    Child Protection Consultant.

a.    Retention of Child Protection Consultant and Child Sexual Abuse Policy and Procedure Review. On or before the Effective Date, RCCANO will retain a "Child Protection Consultant" who is acceptable to the Creditors' Committee and RCCANO as reflected in an express written consent document. During the Child Protection Consultant's Retention Period, the Child Protection Consultant will provide detailed recommendations for improving and revising the current RCCANO policies and procedures regarding Child Sexual Abuse. The scope of review and report will include updates to the RCCANO Parties' existing policies and procedures regarding: (i) Child-protection training and training materials; (ii) procedure and process for the investigation and reporting any allegations of Child Sexual Abuse including, by way of example, implementation of protocols and other measures to be followed after a Child Sexual Abuse allegation has been received; (iii) the handling of Child Sexual Abuse Claims, including communications and interactions with survivors of Child Sexual Abuse; (iv) the enforcement of existing policies and procedures regarding Child Sexual Abuse; (v) the background-check requirements for all RCCANO Actors (other than where an individual is, as more fully described in the Louisiana Children's Code, the parent or legal guardian of the Child with whom he or she has such contact); and (vi) any appropriate credentials for RCCANO employees who interact with survivors who report Child Sexual Abuse.

Subject to the Child Protection Consultant's entering into a form of confidentiality agreement mutually acceptable to the Creditors' Committee and RCCANO, during the Child Protection Consultant's Retention Period, the Child Protection Consultant will have full access to the RCCANO Parties' records, policies and procedures from January 1, 2000 forward regarding

8

Child Sexual Abuse, regardless of any claims of confidentiality of such records, policies and procedures, and including, but not limited to, all documents provided to the Creditors' Committee in any way related to Child Sexual Abuse and the Eligible Documents described in Section D "Transparency" below. The RCCANO Parties will make all their Clergy and current employees available for interviews upon reasonable request by the Child Protection Consultant during the Child Protection Consultant's Retention Period. The Child Protection Consultant shall also consider all materials submitted for review by the Creditors' Committee, Child Sexual Abuse Claimants, and the Settlement Trustee, and their counsel, and conduct personal interviews, subject to the consent of the submitting party. After completing consideration, the Child Protection Consultant shall provide all considered information to RCCANO upon request.

> b. <u>Publication of Child Protection Consultant's Report and Recommendations</u>. The Child Protection Consultant will provide the RCCANO Parties and the Settlement Trustee with a preliminary report and recommendations. The RCCANO Parties shall have a maximum of ninety (90) days to review and discuss this report and recommendations with the Child Protection Consultant, after which the report and recommendations must be finalized. RCCANO will thereafter promptly publish, on its website and in all RCCANO Publications, a link to the Child Protection Consultant's final report and recommendations.

Within ninety (90) days after receipt of the Child Protection Consultant's final report and recommendations, the Archbishop, after consulting with the YPE, the IRB and the YPA, will determine what revisions or additions will be made to RCCANO's existing policies and procedures after reviewing the Child Protection Consultant's final report and recommendations. Thereafter, RCCANO will publish a website link or links to any revised and/or updated RCCANO Parties' policies and procedures made in response to such final report and recommendations.

#104059074v7

## 2. **Independent Review Board.**

RCCANO maintains an IRB pursuant to the requirements of the USCCB Essential Norms. For currently serving members of the IRB, the background or experience that led to the individual's service on the IRB shall be posted on the RCCANO Website at all times, under a clearly visible tab designated for "Child and Youth Protection." No IRB member shall serve longer than ten (10) years from the Effective Date. Prior to serving, all incoming IRB members shall be required to take the RCCANO course (at RCCANO's expense) that entitles an individual to become safe environment certified.

Although not required by the USCCB Essential Norms, RCCANO currently maintains two positions on the IRB for survivors of Sexual Abuse. RCCANO agrees that: (i) the members of the IRB will include (a) at least two (2) survivors of Sexual Abuse, and (b) at least one individual recognized as an expert in the prevention of Child Sexual Abuse; and (ii) RCCANO will make a good faith effort to include on the IRB at least one current or former investigator or prosecutor with experience in handling Legal Proceedings involving Child Abuse. For at least five (5) years following the Effective Date, and further thereafter until completion of the IRB reviews of the Child Sexual Abuse Claims described below, one of the Sexual Abuse survivors serving on the IRB (the "Nominated Survivor Representative") shall be ███████████. If ███████████ resigns from this role prior to the end of this term, then a successor shall be chosen as follows. Within thirty (30) days after receiving a written notice from RCCANO of the vacancy, the Settlement Trustee shall propose a slate of no less than seven (7) individuals who are willing and able to fill the vacancy, none of whom shall have served at any time as counsel to a Survivor that has asserted a claim against RCCANO. Within thirty (30) days thereafter, the Archbishop shall choose one of the nominated individuals to fill the vacancy. The presence of survivors of Sexual Abuse on the IRB

10

is intended to reflect RCCANO's sincere effort to consider the interests and voices of Sexual Abuse survivors.

The IRB shall meet at least four (4) times in each calendar year and provide advice on the following: (a) all recommendations made by the Child Protection Consultant; (b) any changes to RCCANO's Child-protection policies and procedures; (c) all Third-Party Child Protection Audits; and (d) best practices (i) to address Child Sexual Abuse Claims and (ii) interactions and communications by the RCCANO Parties with Child Sexual Abuse Claimants. The IRB should use its best efforts to work with the Archbishop to implement those Child Protection Consultant recommendations that the Archbishop determines are appropriate.

In addition to its existing responsibilities, the IRB will review Child Sexual Abuse Claims to make recommendations to the Archbishop on the Clergy's suitability for ministry where the Child Abuse Claim has not been previously considered by the IRB and involves any Clergy who is currently not listed in the Report Regarding Clergy Abuse. Additionally, upon the written request of a Child Sexual Abuse Claimant to RCCANO's Vicar General, RCCANO will retain an investigator to examine such Claimant's Child Sexual Abuse Claim provided the Claimant (i) identifies a Clergy as a perpetrator, (ii) such identified Clergy is not listed on the Report Regarding Clergy Abuse, and (iii) either (A) the IRB has not previously reviewed such Child Sexual Abuse Claim, or (B) the IRB has previously reviewed such Child Sexual Abuse Claim, but additional substantive information has become available regarding such Child Sexual Abuse Claim. Upon completion, the investigator shall report to the IRB, and the IRB will make a recommendation to the Archbishop as to whether the Clergy should be added to the Report Regarding Clergy Abuse. If the Archbishop disagrees with an IRB recommendation, then (a) the Archbishop will provide the

#104059074v7

IRB with any additional information that was considered by the Archbishop, and (b) thereafter, the Archbishop and the IRB shall meet to discuss the Archbishop's decision.

### 3. Youth Protection Advisor.

As soon as practical after the Effective Date, RCCANO will retain the services of a "Youth Protection Advisor" (the "YPA") acceptable to the Archbishop, who will provide services to RCCANO as set forth herein. If RCCANO receives an allegation of Child Sexual Abuse against any RCCANO Actor, the YPA will assist RCCANO in each step of its response to such allegation. Additionally, the YPA will (a) review any changes to RCCANO's Child protection policies and procedures, (b) review all Third-Party Child Protection Audits, and (c) advise RCCANO concerning the best practices to address Child Sexual Abuse Claims, respond to and interact with survivors. For a period of three (3) years after the Effective Date, RCCANO will use its best efforts to maintain the office of the YPA and ensure that the position remains filled. After the expiration of this period, RCCANO may delegate the duties of the YPA to the YPE or another appropriate office dedicated specifically to child protection.

### 4. Youth Protection Executive.

As soon as practical after the Effective Date, RCCANO will establish the position of "Youth Protection Executive" (the "YPE") under RCCANO's Office of Child and Youth Protection. The YPE serves, and must report to, the Archbishop or his designee. RCCANO will use its best efforts to ensure that the position of YPE will not remain unfilled for more than one month in any given one-year period. Any individual selected as the YPE must have extensive expertise in preventing, recognizing, and responding to Child Sexual Abuse Claims. The YPE's scope of duties will include, without limitation, the following:

    a.    Developing, refining, and implementing Child-protection policies and training practices;

<div align="center">12</div>

b.    Monitoring compliance with Child-protection policies and training;

c.    Receiving notification of every Child Sexual Abuse Claim;

d.    Receiving copies of the Child Protection Consultant's report and recommendations;

e.    Participating in all activities and meetings of the IRB relating to Child Sexual Abuse.

f.    Coordinating activities of RCCANO's Victims' Assistance Coordinator and Safe Environment programs; and

g.    Implementing these Provisions.

5.    **Compliance with Laws Regarding Child Sexual Abuse and Third-Party Child Protection Audits.**

a.    <u>Compliance with Laws Regarding Child Sexual Abuse</u>. The RCCANO Parties will continue to comply with (i) all applicable laws and regulations of Secular Governmental Authorities that relate to Child Sexual Abuse, Child Sexual Abuse Claims, and Child protection, including, but not limited to, Louisiana Children's Code Articles 603, 609, and 610 (collectively, "<u>Laws Regarding Child Sexual Abuse</u>"),[3] (ii) all of RCCANO's internal policies, procedures and programs concerning Child Sexual Abuse, Child Sexual Abuse Claims, and Child protection, (iii) all Canon Law, and (iv) the *USCCB Charter*, the instructions and/or *Vademecum* of the Roman Curia, the *USCCB Essential Norms*, and the *Vos Estis Lux Mundi.*

b.    <u>Third-Party Child Protection Auditor and Audits</u>. RCCANO will continue to use StoneBridge Business Partners (or other expert with similar credentials) as a third-party auditor (the "<u>Third-Party Child Protection Auditor</u>") to conduct an annual audit (or audits) of the Child protection policies and procedures for responding to Child Sexual Abuse Claims (a "<u>Third-Party Child Protection Audit</u>"). RCCANO will ensure that such Third-Party Child Protection Audits are conducted and completed within a reasonable time. If the Third-Party Child Protection Auditor

---

[3] *See USCCB Charter,* Art. 4; *USCCB Essential Norms* § 11; *Vademecum; Vox Estis Lux Mundi.*

resigns or is terminated, then RCCANO will use the replacement Third-Party Child Protection Auditor designated by USCCB.

c. <u>Third-Party Child Protection Audit Reports</u>. The Third-Party Child Protection Auditor will prepare and submit a complete, written report (the "<u>Third-Party Child Protection Audit Report</u>") summarizing the results of any Third-Party Child Protection Audit. At the discretion of the Third-Party Child Protection Auditor, a Third-Party Child Protection Audit Report may summarize one (1) or more separate Third-Party Child Protection Audits, but will include, with respect to each audit, any rubric and/or scores for each audited entity in the categories of, at least, the following as to each audited entity: (i) the Child protection policies and procedures; (ii) the internal policies and procedures for responding to Child Sexual Abuse Claims; and (iii) compliance with Laws Regarding Child Sexual Abuse. RCCANO will publish (or post) a link to each Third-Party Child Protection Audit Report on the RCCANO Website within thirty (30) days from receipt of the Third-Party Child Protection Audit Report. RCCANO will maintain a copy of each Third-Party Child Protection Audit Report for a period of at least twenty-five (25) years after receipt. RCCANO will, at their own expense, make such Audit Report(s) freely available to any individual or entity upon request.

**6.** **Improved Reporting Mechanisms.**

a. <u>Improved Intake Process for Third-Party Reports of Child Sexual Abuse Claims</u>. The RCCANO Parties will post a website link to the RCCANO's Child Protection and Safe Environment page on any website homepage maintained by any such RCCANO Party, including, but not limited, to the RCCANO Website. RCCANO will continue to provide, maintain, and timely monitor a phone number and email address to which anonymous Child Sexual Abuse Claims can

14

186

be made and/or submitted.[4] This website link will also continue to include the telephone number for the Catholic Bishop Abuse Reporting Service and its reporting website link (https://reportbishopabuse.org) where any party may report Sexual Abuse by a bishop or archbishop (including the Archbishop), or any intentional interference by a bishop or archbishop (including the Archbishop) in the investigation of a Child Sexual Abuse Claim. Whether received from the website, email, telephone or any other source, all Child Sexual Abuse Claims must be logged by the RCCANO Parties on a written form in accordance with guidelines and procedures acceptable to the Archbishop, in consultation with the YPE and YPA. From and after the Effective Date, the logged information related to new Child Sexual Abuse Claims must be provided to the YPE, YPA, and Third-Party Child Protection Auditor.

      b.    <u>Reporting of Sexual Abuse Claims</u>. With the exception of information obtained by an ordained priest in the *Sacrament of Penance* in accordance with Canon Law (Code of Canon Law, cc. 959-991), neither RCCANO nor any RCCANO Party or Actor may delay or avoid any of the reporting obligations set forth below based on a view that they are not required by or are superseded by Canon Law.

      (i)    Every RCCANO Party and Actor will continue to comply with all Laws Regarding Child Sexual Abuse, including, without limitation, any obligation, duty, or mandate to report Child Sexual Abuse, whether imposed by Canon Law, Church policies and procedures (including, but not limited to, the *USCCB Charter*, the *USCCB Essential Norms*, the *Vademecum,* and the *Vos Estis Lux Mundi*), and/or any applicable laws, regulations, and policies of Secular

---

[4] *See USCCB Charter* Art. 2; *Vademecum* § 11 ("At times, a *notitia de delicto* can derive from an anonymous source, namely, from unidentified or unidentifiable persons. The anonymity of the source should not automatically lead to considering the report as false . . .").

Governmental Authorities, such as Louisiana Children's Code Articles 603, 609, and 610 (together, the "<u>Child Sexual Abuse Reporting Obligations</u>").

(ii)     In addition to the Child Sexual Abuse Reporting Obligations, upon learning of a Child Sexual Abuse Claim involving a survivor who is currently a Child, any RCCANO Actor who is a mandatory reporter must (a) report in writing to appropriate Secular Governmental Authorities in compliance with the Louisiana Children's Code,[5] (b) immediately thereafter report in writing to the Victims' Assistance Coordinator (if the Child Sexual Abuse Claim involves Clergy) or the Safe Environment Coordinator (if the Child Sexual Abuse Claim does not involve Clergy), and (c) maintain a copy of each such written report for a period of thirty (30) years. If a RCCANO Party and/or RCCANO Actor discovers that an applicable individual has not complied with the foregoing reporting provisions, then the RCCANO Party or RCCANO Actor will make the applicable report within the shorter of two (2) business days and three (3) calendar days, and take appropriate, disciplinary action against such adult individual for failure to comply. No RCCANO Party or RCCANO Actor may delay complying with the Child Sexual Abuse Reporting Obligations for the purpose of first conducting its own internal investigation.[6]

(iii)     Any RCCANO Actor who is notified of, or otherwise becomes aware of, a Child Sexual Abuse Claim involving a survivor who is no longer a Child (whether such Child Sexual Abuse Claim is transmitted to such RCCANO Actor via phone, email, website, direct report, or otherwise) (the "<u>Recipient</u>"), shall encourage the individual or entity submitting the Child Sexual Abuse Claim to contact the Victims' Assistance Coordinator (if the alleged perpetrator is Clergy)

---

[5] The applicable requirement is currently set forth in Louisiana Children's Code Article 610.

[6] *Vademecum,* § 17 ("Even in cases where there is no explicit legal obligation to do so, the ecclesiastical authorities should make a report to the competent civil authorities if this is considered necessary to protect the person involved or other minors from the danger of further criminal acts.").

#104059074v7

or the Safe Environment Coordinator (if the alleged perpetrator is not Clergy) for assistance with reporting the Child Sexual Abuse Claim to appropriate local law enforcement. In the event that such Child Sexual Abuse Claim concerns (a) a clearly-identified survivor and (b) a clearly-identified, living RCCANO Actor as the individual who personally committed or is alleged to have personally committed an act of Abuse, the Recipient must: (a) advise the individual or entity submitting the Child Sexual Abuse Claim that, in accordance with these Provisions, the information received will be reported to local law enforcement; and (b) provide the information received to the Victims' Assistance Coordinator (if the alleged perpetrator is Clergy) or the Safe Environment Coordinator (if the alleged perpetrator is not Clergy). The Victims' Assistance Coordinator or the Safe Environment Coordinator, in turn, must: (a) provide to local law enforcement in the jurisdiction where the Child Sexual Abuse was alleged to have occurred (i) the information received and (ii) a written offer for access to any existing personnel file of the alleged perpetrator (which should include all documents concerning any prior Child Sexual Abuse Claims as to the alleged perpetrator); and (b) notify the individual or entity submitting the Child Sexual Abuse Claim of the law enforcement office to whom, and the date on which, the report was made.

(iv)    If a reported claim concerns Adult Sexual Abuse, then the applicable RCCANO Party shall encourage the reporting individual or entity to contact the Vicar for Clergy (if the alleged perpetrator is Clergy) or the Director of Human Resources (if the alleged perpetrator is not Clergy) for assistance with reporting such claim to appropriate local law enforcement. In the event that the report is made by the survivor of such Adult Sexual Abuse and concerns (a) Adult Sexual Abuse that may be criminal under state or federal law, (b) a clearly-identified survivor, and (c) a clearly-identified, living RCCANO Actor as the alleged perpetrator, then the applicable RCCANO Party must: (a) advise the reporting survivor that, in accordance with these Provisions,

the information received will be reported to local law enforcement; and (b) provide the information received to the Vicar for Clergy (if the alleged perpetrator is Clergy) or the Director of Human Resources (if the alleged perpetrator is not Clergy). The Vicar for Clergy or the Director of Human Resources, in turn, must: (a) provide to local law enforcement in the jurisdiction where the Adult Sexual Abuse was alleged to have occurred (i) the information received and (ii) a written offer for access to any existing personnel file of the alleged perpetrator (which should include all documents concerning any prior Sexual Abuse Claims as to the alleged perpetrator); (b) notify the reporting survivor of the law enforcement office to whom, and the date on which, the report was made; and (c) within ten (10) business days of receipt of the report from the reporting survivor, review RCCANO's records and inform the reporting survivor whether any other Sexual Abuse Claims have been made to RCCANO concerning the alleged perpetrator and, if so, how many such Claims have been made.

   c.  <u>Submission of Notification Letters to Secular Law-Enforcement After the Effective Date</u>.

   (i)  Within ninety (90) days after the Effective Date, RCCANO and the Settlement Trustee will send a joint written letter to all Secular Law-Enforcement that have jurisdiction over RCCANO and/or exercise authority within RCCANO's geographic boundaries. Such letter must identify the following individuals by name: (A) to the extent not previously provided to Secular Law-Enforcement by RCCANO, all living Clergy (or former Clergy) or Religious identified on the Report Regarding Clergy Abuse as of the Effective Date; and (B) all living Clergy (or former Clergy) who are later determined to be credibly accused of Child Sexual Abuse, as determined by the Archbishop, in consultation with the IRB.

#104059074v7

   (ii)  RCCANO and the Settlement Trustee will send a joint written letter to all Secular Law-Enforcement that have jurisdiction over RCCANO and/or exercise authority within RCCANO's geographic boundaries, which letter will include an unredacted copy of each Proof of Claim filed by or on behalf of a Child Sexual Abuse Claimant; provided, however, that RCCANO and the Settlement Trustee will only include any particular Proof of Claim if the Settlement Trust Advisory Committee informs both RCCANO and the Settlement Trustee, in writing, that the Settlement Trust Advisory Committee has obtained written permission from the Child Sexual Abuse Claimant for inclusion of his or her Proof of Claim with the letter.

   (iii)  Each of the foregoing letters to Secular-Law Enforcement must offer RCCANO's cooperation with any criminal investigation that concerns the individuals identified in the letters, including, but not limited to, providing the applicable Secular Law-Enforcement authorities with access to (A) all Documents in RCCANO's possession that relate to, or concern in any way, the referenced Child Sexual Abuse Claim, (B) copies of the applicable Child Sexual Abuse Proof of Claim, without redaction, and (C) other allegations of misconduct with a Child against the same RCCANO Actor and whether the RCCANO Actor is still employed by RCCANO or otherwise in active ministry.

   d.  Publication of Sexual Abuse Resources and Secular Law-Enforcement Information. Beginning on the Effective Date, RCCANO will publish in *The Clarion Herald* and *The New Orleans Times-Picayune/The New Orleans Advocate* (and/or on their websites and any digital equivalents), at least four times per year, a prominent statement urging any individual with knowledge of Child Sexual Abuse to contact Secular Government Authorities and Secular Law-Enforcement to make a report of any Child Sexual Abuse. Such statement must be published in a form acceptable to the Creditors' Committee and RCCANO and must contain contact information

for Secular Law-Enforcement. If there is a dispute regarding the content of the publication, the Bankruptcy Court shall have exclusive jurisdiction to resolve such disputes.

e.     <u>Quarterly Reports of Child Sexual Abuse Claims and Notifications of Claims</u>. Beginning on the first quarter following Effective Date, RCCANO will provide confidential quarterly summary reports of any Child Sexual Abuse Claim, whether credible or not, received in that quarter (with appropriate redactions of any personally identifying information of the Child Sexual Abuse Claimant) to (i) the YPA, (ii) the YPE, (iii) the IRB, (iv) the Child Protection Consultant during the Child Protection Consultant's Retention Period, and (v) the principal of any RCCANO School where (A) such Child was enrolled at the time the Child Sexual Abuse occurred, and (B) the Child Sexual Abuse is asserted against an RCCANO Actor at such RCCANO School.

A RCCANO School will notify the parents (or legal guardians) of any Child in attendance at a RCCANO School of any Child Sexual Abuse Claim where (A) such Child was enrolled at the RCCANO School at the time the Child Sexual Abuse occurred, and (B) the Child Sexual Abuse is asserted against an RCCANO Actor at such RCCANO School; <u>provided</u>, <u>however</u>, that the RCCANO School may only provide such notification if (i) a determination has been made, in writing, by the Archbishop, in consultation with the IRB, or Secular Law-Enforcement, that the Child Sexual Abuse Claim in question is credible, and (ii) such notification is acceptable to applicable Secular Law-Enforcement. In any case, a RCCANO School must always redact or withhold the identity and contact information of any Child when notifying parents (or legal guardians) of any Child Sexual Abuse Claim (other than when giving notice to the parent or legal guardian of the Child involved).

f.    Reporting by Non-RCCANO Schools and Clergy. RCCANO will require, as a condition of operating as a "Catholic" institution or ministerial individual within the geographic boundaries of the RCCANO, that all Non-RCCANO Schools and all Clergy (whether or not incardinated to or employed by any RCCANO Party) comply with all (i) Laws Regarding Child Sexual Abuse, (ii) RCCANO policies regarding Child Sexual Abuse, and (iii) Child Sexual Abuse Reporting Obligations.

### 7.    Whistle-Blower Policy.

The RCCANO Parties will comply with RCCANO's existing written whistle-blower policy that prohibits penalizing or otherwise retaliating against anyone who, in good faith, reports alleged Child Abuse to either Secular Law-Enforcement, Secular Government Authorities, or RCCANO. The existing Whistle–Blower policy and compliance therewith is subject to review and comment by the Child Protection Consultant during the Child Protection Consultant's Retention Period.

### 8.    Continued Protection Initiatives.

The RCCANO Parties will continue to implement RCCANO's current Child-protection, policies—including the VIRTUS training program, criminal background checks, and psychological evaluations for seminarians. Additionally, all RCCANO Parties will work cooperatively to adopt and implement programs and initiatives recommended by the Child Protection Consultant during the Child Protection Consultant's Retention Period, as the same may be approved by the Archbishop.[7]

### 9.    Prohibition on Being Alone With a Child.

a.    The RCCANO Parties will comply with RCCANO existing policies concerning adults being alone with Children, as articulated in RCCANO's *Principles of Ethics and*

---

[7] *See USCCB Charter*, Art. 12.

#104059074v7

*Integrity in Ministry: Code of Ethics, Policy Regarding Youth Activities* and all other related policies as they may be revised and implemented from time to time based on the recommendations of the Child Protection Consultant during the Child Protection Consultant's Retention Period, as the same may be approved by the Archbishop; provided, however, that any ordained priest administering the *Sacrament of Penance* shall take appropriate precautions to ensure that such Child is protected, notwithstanding the confidential nature of the *Sacrament*. These precautions shall include (i) best efforts to avoid the priest who administers the *Sacrament of Penance* from being alone with the Child in a confessional without another adult being present in the area, outside of earshot but close enough to visually observe the confession participants, and (ii) adopting a Policy that encourages RCCANO Schools to conduct the *Sacrament of Penance* with another adult being present near the confessional outside of earshot but close enough to visually observe the confession participants. Further, the RCCANO Parties will consider Child-protection concerns when building new confessionals. Notwithstanding the foregoing, (i) an ordained priest administering the *Sacrament of Penance* in accordance with Canon Law (Code of Canon Law, cc. 959-991) may be alone with a Child as required by Canon Law to hear individual confession and grant absolution to such Child (Code of Canon Law, cc. 962-964), and (ii) nothing in these Provisions waives any civil law related to the *Sacrament of Penance*.

## 10. Evaluation of Non-Incardinated Clergy or Religious.

Written attestations of suitability for non-incardinated Clergy to work or serve within the geographic boundaries of RCCANO will include a statement as to whether such person has (or is alleged to have) committed Child Sexual Abuse.[8] The Archbishop will evaluate the background of all such non-incardinated Clergy at least once every three (3) years and will reduce the evaluation

---

[8] *See USCCB Charter*, Art. 13; *USCCB Essential Norms*, § 12.

to writing when concluded. All such written evaluations must be placed in the individual's personnel file maintained with RCCANO and/or an RCCANO Party.

Any Religious in active ministry who is working within RCCANO's boundaries must provide then-serving Vicar of Religious at the RCCANO with both a *Testimonial Of Suitability for Religious in Ministry* and a completed *Archdiocese of New Orleans Religious Profile* form, as currently promulgated by RCCANO.[9] Copies of these completed testimonials and religious profile forms for each such Religious will continue to be maintained in the RCCANO's Department of Religious.

Non-incardinated Clergy and Religious in active ministry are not exempt from criminal background checks and must comply with all Laws Regarding Child Sexual Abuse, all Child Sexual Abuse Reporting Obligations, and/or other RCCANO policies and procedures regarding Child protection applicable to Clergy incardinated to RCCANO and/or to any other RCCANO Party.

## 11. <u>Anti-Abuse Plaques.</u>

Following the Effective Date, RCCANO will prominently and visibly display a plaque at the entrance of each RCCANO School that has not been permanently closed before the Effective Date. Each plaque may be no smaller than eight-and-a-half (8.5) inches by eleven (11) inches and will state: "The Archdiocese of New Orleans has zero tolerance for abuse. God has chosen you to protect His children. If you have cause to believe a minor has been abused, contact the Louisiana Department of Children and Family Services (1-855-452-5437) or the local police." RCCANO will order these plaques no later than sixty (60) days after the Effective Date and will provide these plaques to all RCCANO Schools as required by these Provisions promptly after they are delivered

---

[9] The forms for the testimonial and the religious profile form may be found online at the RCCANO Website (https://nolacatholic.org/religious-vicar-for-religious).

to RCCANO. The RCCANO Schools will install these plaques by no later than ten (10) days after receiving them.

### 12. **Annual Remembrance Campaign.**

RCCANO will designate the month of April as Child Sexual Assault Awareness Month and National Child Abuse Prevention Month. During that month, the RCCANO Parties will emphasize the importance of Child protection and the prevention of Child Sexual Abuse. This annual campaign will seek to raise awareness of Child Sexual Abuse among the Clergy, Religious, and Laity and to prevent Child Sexual Abuse within both the RCCANO Parties and in society more broadly. RCCANO may satisfy this requirement by participating in any national campaign conducted by the Church recognizing April as Child Sexual Assault Awareness Month and/or National Child Abuse Prevention Month.

### 13. **Publication Encouraging Reporting of Abuse.**

The following statement shall be included somewhere clearly visible on the RCCANO Website and in every issue of *The Clarion Herald*: "The Archdiocese of New Orleans has zero tolerance for abuse. God has chosen you to protect His children. If you have cause to believe a minor has been abused, contact the Louisiana Department of Children and Family Services (1-855-452-5437) or local law enforcement."

## D. **TRANSPARENCY**

### 1. **Public Availability of Documents Concerning Sexual Abuse and Sexual Abuse Claims.**

a. <u>Archival of Eligible Documents</u>. To promote healing and reconciliation and to help prevent Child Sexual Abuse from occurring in the future, prior to the Effective Date, RCCANO will enter into an agreement (in substantially the form attached hereto as **Appendix A**) with a college or university that is mutually acceptable to the Creditors' Committee and RCCANO

(the "<u>Archivist</u>") to post the Eligible Documents on the Archivist's website.  For the first year from the Effective Date, the Archivist will be paid from the Settlement Trust and, thereafter, will receive no additional payments for services rendered as the Archivist.  The RCCANO website shall include a clearly identified link to the Archivist website.

    b. <u>Eligible Documents</u>. The Eligible Documents will be submitted by RCCANO to the Archivist on a rolling basis beginning no later than thirty (30) days after the Effective Date and concluding no later than six (6) months after the Effective Date (the "<u>Submission Period</u>"); <u>provided</u>, <u>however</u>, that RCCANO may obtain up to two (2) extensions of the Submission Period not to exceed six (6) months in the aggregate by providing notice to the Settlement Trustee no later than sixty (60) days before the Submission Period would expire. The Eligible Documents will remain posted on the Archivist's website as provided in subsection a. above for a period of no less than thirty (30) years from the Effective Date. The Eligible Documents consist of the following:

    i. Sexual Abuse Proofs of Claim where the RCCANO Actors identified as perpetrators are (A) currently identified in the Report Regarding Clergy Abuse, (B) later added to the Report Regarding Clergy Abuse; or (C) identified as perpetrators in three or more Child Sexual Abuse Proofs of Claim;[10]

    ii. Personnel files of any RCCANO Actors who are identified as in accordance with Section D.1.b.i. above.

    iii. Files of survivors of Sexual Abuse where the RCCANO Actors are identified in accordance with Section D.1.b.i. above; and

    iv. Other documents that were produced to the Creditors' Committee during the Chapter 11 Case relating to Sexual Abuse if the RCCANO Actors are identified in accordance with Section D.1.b.i. above.

---

  [10] Any person who has filed a Sexual Abuse Proof of Claim (or their representative) may elect to exclude the claim from the Eligible Documents.

#104059074v7

    c.    <u>Redactions</u>. Before the Eligible Documents are transmitted to the Archivist for posting, RCCANO or its designee will redact the following information as it appears on each Eligible Document:

    i.    Personally identifying information of the survivor, including, but not limited to, the following: (A) the survivor's signature, printed name, address(es), email address(es), telephone number(s), and social security number, or any portion thereof; (B) any other name or names by which the survivor has been known; (C) any Department of Corrections inmate number; (D) the identity of the survivor's family members, guardians, or caretakers; (E) photographs of the survivor; (F) the identity of any person identified as having been aware of the abuse; and (G) the identity of any person who provided counseling to the survivor, or to his or her family;

    ii.    Personally identifying information of any individual identified as a perpetrator who is not currently identified in the Report Regarding Clergy Abuse, or later added to the Report Regarding Clergy Abuse, including, but not limited to, the following: (A) such individual's signature, printed name, address(es), email address(es), telephone number(s), and social security number, or any portion thereof; (B) any other name or names by which such individual has been known; (C) the identity of such individual's family members; (D) photographs of such individual; and (E) titles or positions that are or were held by such individual; and

    iii.    Privilege Claims.

    d.    <u>Resolution of Disputed Privilege Claims and Disputed Eligible Documents</u>. When an Eligible Document has been redacted for Privilege Claims, RCCANO will produce to the Settlement Trustee a privilege log within ten (10) days that identifies Eligible Documents that have been redacted based on any Privilege Claims. The Settlement Trustee will have ninety (90) days thereafter to object to any such Privilege Claims. The Settlement Trustee must reduce this objection to writing and file such objection with the Bankruptcy Court, and the Bankruptcy Court shall have exclusive jurisdiction to make all rulings regarding any disputed Privilege Claim. If there are any disputes between RCCANO and the Settlement Trustee related to any privilege designations,

#104059074v7

198

then RCCANO shall bear the burden of proving the allegedly privileged information is privileged pursuant to this section.

      **2.**      **Survivor Access to Documents and Information.**

      a.      <u>Description of Documents and Information</u>. The following documents and information are covered in this Section D.2: (i) all personal records of such survivor in the RCCANO Party's files, such as the survivor's school and sacramental records; and (ii) information about the number of Sexual Abuse Proofs of Claim that identify the individual(s) named as a perpetrator of Child Sexual Abuse against the survivor, as well as the dates of the alleged perpetrator's service or tenure related to the RCCANO Party.

      b.      <u>If the Living Survivor of Child Sexual Abuse Has Not Attained the Age of 18 Years.</u> With respect to a living Child Sexual Abuse survivor who has not attained the age of 18 years at the time of the written request, any RCCANO Party will provide such requesting individual the documents and information described in Section D.2.a; <u>provided,</u> however, (i) such requesting individual must be the survivor or a parent or legal guardian of such survivor, and (ii) with respect to any personally identifiable information or educational records of such survivor, the requesting individual must have submitted a signed and dated written consent to such RCCANO Party.

      c.      <u>If the Living Survivor of Child Sexual Abuse Has Attained the Age of 18 Years</u>. With respect to a living Child Sexual Abuse survivor who has attained the age of 18 years at the time of the written request, any RCCANO Party will provide such requesting individual the documents and information described in Section D.2.a; <u>provided</u>, <u>however</u>, (i) such requesting individual must be the survivor, and (ii) with respect to any personally identifiable information or educational records of such survivor, such survivor must have submitted a signed and dated written consent to such RCCANO Party.

d. <u>Deceased Survivors of Child Sexual Abuse</u>. If the Child Sexual Abuse survivor is deceased, the following individuals may make a written request to any RCCANO Party to provide to such requesting individual the records and information described in Section D.2.a. above: (i) the deceased survivor's living, surviving spouse; (ii) if the deceased survivor has no living, surviving spouse, the living, surviving child of such survivor; (iii) if the deceased survivor has no living, surviving spouse or child, the living parent of such survivor; and (iv) if the deceased survivor has no living, surviving spouse, child, or parent, then the living sibling of such survivor.

e. <u>Access Request Form</u>. RCCANO has created a form for the access requests described above, a copy of which is attached as **<u>Appendix B</u>**.

f. <u>Time to Provide Documents and Information; Redaction</u>. The RCCANO Party shall deliver the records and information to the individual qualified to make such a request under Section D.2.b or Section D.2.c above, as applicable, no later than thirty (30) days after the requesting party delivers to the RCCANO Party (i) a written request, and (ii) for any personally identifiable information or educational records of such survivor, a signed and dated written consent. Any documents so provided may not redact the identity of the requesting individual but may be redacted to preserve Privilege Claims and/or to the extent the records contain confidential information of third parties.

3. **<u>Improved Terminology.</u>**

The RCCANO Parties will direct their employees, spokespersons, representatives and agents (including any individuals communicating with the media on the RCCANO Parties' collective or individual behalf) (a) not to characterize (either orally or in writing) Child Sexual Abuse Claimants, or any other individuals who have stated that they have experienced Child Sexual Abuse, as "alleged" claimants, "alleged" victims, or "alleged" survivors, and (b) to refer to all Child Sexual Abuse Claimants and such other individuals as "survivors" or "survivors of sexual abuse."

Notwithstanding the forgoing, the RCCANO Parties, including, but not limited to, canon or civil attorneys, may use the term "alleged" in connection with a Child Sexual Abuse Claim where (a) such Child Sexual Abuse Claim is the subject of a pending or threatened Legal Proceeding, or (b) the Archbishop, in consultation with the IRB, or Secular Law-Enforcement, has determined such Child Sexual Abuse Claim is not credible.

**4.    Publication of List.**

RCCANO will update the current list published in the Report Regarding Clergy Abuse to include the names of all known past and present Clergy identified in any Child Sexual Abuse Proof of Claim where such Clergy are (a) deemed credibly accused by the Archbishop, in consultation with the IRB, or Secular Law-Enforcement, or (b) are permanently removed from ministry as a result of a Child Sexual Abuse Claim. The updated list will include the date(s) and place(s) of service of such Clergy and the number of Proofs of Claim that identify any Clergy as perpetrators of Child Sexual Abuse. RCCANO will post this updated information on the RCCANO Website, and RCCANO will further update such list on the RCCANO Website within ten (10) days of a Clergy's permanent removal from ministry.

**5.    Release from Confidentiality.**

RCCANO will publicly announce and post on the RCCANO Website the full and complete release of all Child Sexual Abuse Claimants from any mandatory confidentiality requirements contained in any agreement, instrument, or other document settling, resolving, terminating, or otherwise concluding such Claimant's Child Sexual Abuse Claim (including, without limitation, any Legal Proceeding related to such Child Sexual Abuse Claim).[11] No future agreement,

---

[11] *USCCB Charter*, Art. 3; *Vademecum,* § 30 ("It must be remembered, however, that an obligation of silence about the allegations cannot be imposed on the one reporting the matter, on a person who claims to have been harmed, and on witnesses."); *Vox Estis Lux Mundi*, Art. 4 § 3 ("An

#104059074v7

instrument, or document entered into by any RCCANO Party to resolve, settle, terminate, or otherwise conclude any Claimant's Child Sexual Abuse Claim may contain any mandatory confidentiality provision except at the written request of Child Sexual Abuse Claimant (or the Claimant's parent or legal guardian if still a Child). Furthermore, the Child Sexual Abuse Claimant (or the Claimant's parent or legal guardian if the Claimant is still Child) may, at any time and at his or her discretion, revoke any such mandatory confidentiality provision without prejudice to the effectiveness, validity and enforcement of any such agreement, instrument or document. Except for any reporting or disclosure request required to be made to Secular Law-Enforcement or a Secular Governmental Authority, no RCCANO Party may release or reveal the identity of any such Child Sexual Abuse Claimant without his or her prior written permission (or the prior written permission of the Claimant's parent or legal guardian if the Claimant is a still Child).

## E.  **RECOGNITION**

### 1.  **Individual Archbishop Meetings.**

For a period of one (1) year following the Effective Date, the Archbishop will make himself available upon reasonable notice to participate in a private conference or meeting with any Child Sexual Abuse Claimant.[12]

### 2.  **Group Archbishop Meetings.**

Within eighteen (18) months following the Effective Date, the Archbishop will visit each deanery in RCCANO. (As of the Effective Date, RCCANO has ten (10) such deaneries.) RCCANO will: (a) publish a schedule of each such visit in the RCCANO Publications at least thirty (30) days

---

obligation to keep silent may not be imposed on any person with regard to the contents of his or her report.").

[12] *See USCCB Charter*, Art. 1.

#104059074v7

in advance of such visit; and (b) also send a press release announcing the visit to the Additional Publications. Every visit will be open to, *inter alia*, all Child Sexual Abuse Claimants and to any other individual claiming to have experienced Sexual Abuse so that, among other things, such individuals may ask questions of the Archbishop, explain his or her history and circumstances, and otherwise freely participate in the visit.[13]

### 3.  **Individual Apology Letters.**

By no later than ninety (90) days after the Effective Date and using United States mail, first class delivery, RCCANO will mail written letters of apology to any individual that filed a Child Sexual Abuse Proof of Claim to the address specified therein. The form of the letter of apology, which has been approved by the Creditors' Committee, is attached hereto as **Appendix C**. The Archbishop will personally sign all such letters of apology.

### 4.  **Public Apology Letter.**

No later than thirty (30) days after the Effective Date, RCCANO will publish a public letter of apology to all known Child Sexual Abuse Claimants. RCCANO will prominently print (or post) this public apology letter in (or on) *The Clarion Herald* and other RCCANO Publications. Additionally, RCCANO will also buy advertising space sufficient to prominently print or post the public letter with the Additional Publications within the geographic boundaries of RCCANO, and will issue a press release to accompany the public letter of apology when RCCANO provides the letter of apology to the RCCANO Publications and the Additional Publications. A copy of the public letter of apology, which has been approved by the Creditors' Committee, is attached hereto as **Appendix D**. The Archbishop will personally sign the public letter of apology.

---

[13] *See id.*

### 5. Remove Perpetrator Recognitions.

For all properties owned or operated by any RCCANO Party, each RCCANO Party will remove all plaques, pictures, statutes, or other public recognitions of all past and present Clergy, Laity, or other RCCANO Actor who is (or was) the subject of credible allegations of Child Sexual Abuse Claim as determined by the Archbishop, in consultation with the IRB, or Secular Law-Enforcement.

### 6. Publish Survivor Stories.

Following the Effective Date, RCCANO will make available to all Child Sexual Abuse Claimants reasonable space on the RCCANO's Website in which to tell their stories of Child Sexual Abuse. RCCANO will not charge the Child Sexual Abuse Claimants for such space, which in any case may not exceed more than one printable page on the RCCANO Website per calendar quarter. RCCANO may suggest edits to any survivor story, or object to publishing any such story that (a) contains information that is under current investigation, (b) contains profanity, explicit content, or other objectionable material, or (c) identifies any individual unless the Archbishop, in consultation with the IRB, or Secular Law-Enforcement has determined that such individual has been credibly accused of Child Sexual Abuse. The Bankruptcy Court shall have exclusive jurisdiction to resolve any disputes that may arise over any such RCCANO edits, objections, or disclaimers.

### 7. Place of Remembrance.

In consultation with the Settlement Trust Advisory Committee, RCCANO will design and install a place of remembrance for all survivors of Sexual Abuse at a prominent location at the entrance of the RCCANO chancery. RCCANO will organize a dedication ceremony for this place of remembrance. This dedication ceremony will not include any Eucharistic liturgy, celebration of the Mass, or religious discourse (such as a sermon or homily). RCCANO will publish notice of the dedication ceremony in the RCCANO Publications no more than thirty (30) and not less than fifteen

(15) days before the ceremony is scheduled to occur and will issue a press release regarding the ceremony to the Additional Publications. The Archbishop will attend the dedication ceremony.

## F.     SURVIVOR INTERACTION AND COUNSELING.

On or before the Effective Date, RCCANO shall adopt the Written Sexual Abuse Claim Procedures and Survivor Bill of Rights (the "Bill of Rights") set forth in attached **Appendix E**, and insist that all parishes do so as well.

## G.     MISCELLANEOUS

### 1.     Reports Must Be In Writing.

Any reports required by (a) these Provisions, (b) RCCANO's existing Child-protection policies and procedures, (c) by Laws Regarding Child Sexual Abuse, or (d) by any Child Sexual Abuse Reporting Obligations, must be in writing. If any such report is made orally, the report must be promptly memorialized in a written report and must be delivered as required under the Child Sexual Abuse Reporting Obligations, and in any event by no later than five (5) days after the oral report is made.

### 2.     Adult Sexual Abuse.

Upon receiving any report of Adult Sexual Abuse, the RCCANO Parties shall (a) encourage the person reporting the abuse to promptly report the Adult Sexual Abuse Claim(s) to Secular Law-Enforcement, (b) provide outreach and reasonable counseling alternatives through the RCCANO's Victims' Assistance Coordinator, (c) investigate any Clergy or Religious who, while serving an RCCANO Party, are alleged to have committed a violation of Canon Law with respect to an adult, and (d) take other appropriate measures to address such Adult Sexual Abuse Claims, including, without limitation, by terminating the employment of any RCCANO Actor or other individual who committed Adult Sexual Abuse.

#104059074v7

3. **Anti-Lobbying.**

The RCCANO Parties will not direct, pay or hire any attorney, agent, employee, or third party for the purpose of lobbying, supporting or advocating for (a) loosening or otherwise weakening the existing mandatory reporting requirements contained in Louisiana Children's Code Articles 603, 609, and 610, or (b) altering any prescriptive periods or statutes of limitations regarding Child Sexual Abuse. This Anti-Lobbying provision requires any official representative of RCCANO who serves as a director, officer, or board member of any entity to recuse himself or herself from discussions and decisions covered by this Anti-Lobbying provision.

4. **Jurisdiction and Standing.**

a.     The Bankruptcy Court will retain exclusive jurisdiction to adjudicate any disputes that may arise regarding the meaning or performance of these Provisions. Any order confirming a plan of reorganization in this case shall provide for continuing jurisdiction of the Bankruptcy Court for this purpose. If, however, the Bankruptcy Court or U.S. District Court finds that it does not have jurisdiction to adjudicate such disputes, then any and all such disputes shall be settled in arbitration. In the event that arbitration is necessary, the parties shall select a single arbitrator within ninety (90) days pursuant to the Commercial Arbitration Rules of the American Arbitration Association; arbitration shall be administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules; the place of the arbitration shall be New Orleans, Louisiana; and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

b.     The sole parties who have authority and/or standing to seek the specific performance of these Provisions shall be (i) the Settlement Trustee, and (ii) any Child Sexual Abuse Claimant, the parent or legal guardian of a Child Sexual Abuse Claimant who has not attained 18

#104059074v7

years of age, or if a Child Sexual Abuse Claimant is deceased, one surviving family member as identified in accordance with Section D.2.d above.

c.      The sole remedy available to any party who raises any dispute concerning these Provisions shall be the specific performance of these Provisions.

d.      By agreeing to these Provisions, RCCANO also agrees that the Religious Freedom Restoration Act of 1993, 42 U.S.C. §2000bb *et seq.* (2024) (as amended), and any similar state statute, or under other applicable law (collectively, the "<u>RFRA Laws</u>"), do not prevent a party with standing (in accordance with Section G.4.b of these Provisions) from seeking specific performance of any of these Provisions as the same are written.  For the avoidance of doubt, RCCANO reserves its right to raise any RFRA Laws if (i) any party seeks to expand, modify or otherwise alter any of the Provisions as written, or (ii) alleges that these Provisions are ambiguous in any way.

### 5.    <u>Publication of Non-Monetary Provisions.</u>

RCCANO will publish these Provisions on the RCCANO Website as a stand-alone document.

### 6.    <u>Compliance Reporting.</u>

RCCANO will issue a semi-annual report detailing the scope, nature, and success (or failure) of the RCCANO Parties' compliance with these Provisions, including, without limitation, (a) describing any amendments or revisions to RCCANO's policies and procedures regarding Child Sexual Abuse and Child Sexual Abuse Claims adopted during the semi-annual period, (b) disclosing the number of Child Sexual Abuse Claims received by the RCCANO Parties in that semi-annual period and the RCCANO Parties' responses thereto, and (c) summarizing the results from any Third-Party Child Protection Audit conducted in the year. Each report shall be signed by

#104059074v7

the Archbishop and the YPE, delivered by email to the Settlement Trustee, and published on the RCCANO Website. Nothing in such reports shall constitute an admission of liability.

7. **Reservation of Rights.**

a.      Except for the rights to seek specific enforcement of these Provisions as set forth in Section G.4 hereof, nothing in these Provisions, and no conduct authorized, directed, or prohibited by these Provisions, is intended to, or will, (i) give rise to any Claim or cause of action that does not exist under any applicable state or federal laws, (ii) alter or supplement, in any fashion, any Claim or cause of action that exists under any applicable state or federal laws, or (iii) constitute any admission of liability.

b.      Nothing in these Provisions gives the Settlement Trustee, any Secular Governmental Authority, Secular Law-Enforcement, or any other individual or entity, any standing or rights to change, alter, interpret, or adjudicate Canon Law.

c.      In addition to observing these Provisions, the RCCANO Parties will observe all applicable secular laws and Canon Law.  RCCANO certifies that these Provisions are compatible with the promulgated Canon Law on the Effective Date.

#104059074v7

Case 20-10846 Doc 4545-1 Filed 11/04/25 Entered 11/04/25 16:07:54  PP Ex. 1 - Joint Plan
Page 209 of 271

Case 20-10846 Doc 4518-7 Filed 10/27/25 Entered 10/27/25 18:53:26  Plan Exhibit E -
Non-Monetary Plan Provisions Page 41 of 67

# APPENDIX A

**Archivist Agreement**

## PUBLIC SERVICE AGREEMENT

**WHEREAS,** The Roman Catholic Church of the Archdiocese of New Orleans ("**Sponsor**"), the settlement trustee appointed in connection within the Plan (the "**Settlement Trustee**"), and the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("**LSU**") enter into this Public Service Agreement (the "**Agreement**" or "**Archivist Agreement**") effective the first day of the Project Period defined in Paragraph 1.1 below, in accordance with *The Roman Catholic Church of the Archdiocese of New Orleans' Non-Monetary Plan Provisions to Foster Child Protection and Prevent Child Sexual Abuse* (the "**Non-Monetary Plan Provisions**"), attached as Plan Exhibit E to the chapter 11 plan of reorganization for the Sponsor and Additional Debtors (the "**Plan**") confirmed by the U.S. Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**").

**WHEREAS,** the project contemplated by this Agreement is expected to be of mutual interest and benefit to LSU, Sponsor, and the general public, and will further the instructional, research and public service objectives of LSU in a manner consistent with its status as a non-profit, tax-exempt, educational institution;

**THEREFORE,** in consideration of the mutual obligations set forth in this Agreement, Sponsor and LSU have agreed as follows:

**Article 1 – Project Period**

1.1 **"Project Period"** means a period of thirty-six (36) months starting from the date of entry of the Bankruptcy Court's order confirming the Plan. Sponsor shall timely notify LSU Contract Matters point of contact of the date of entry. Notwithstanding the foregoing, in accordance with Section D.1.b of the Non-Monetary Plan Provisions, the documents will remain posted on LSU Library's website and available to the public for a period of no less than thirty (30) years from the effective date of the Plan.

**Article 2 – Scope of Work**

2.1 **"Project"** shall mean the project described below under the direction of Stanley Wilder as Project Director.

This Agreement establishes a collaborative framework to collect, preserve and publicly disseminate redacted, primary source materials in accordance with Section D.1 of the Non-Monetary Plan Provisions. The shared purpose is to ensure that records remain permanently accessible for research, education, and public accountability. By pooling expertise in archival science and survivor-centered practices, the parties will advance transparency, historical integrity, and community awareness.

**I. Project Summary**

LSU will establish a secure, publicly accessible collection in the LSU Libraries Scholarly Repository to host files in PDF format. This digital archiving project involves the collection, review, processing and public dissemination of documents concerning sexual abuse in accordance with the Non-Monetary Plan Provisions. The parties agree to maintain the confidentiality of designated information in accordance with Article 9 Confidentiality of this Agreement, comply with applicable legal and ethical standards, and establish procedures for secure handling, review, and disclosure consistent with the goals of transparency, historical integrity, accountability, and public interest. The resulting open access repository will serve as a historical and research resource, ensuring long-term accessibility. The foregoing notwithstanding, the parties acknowledge that LSU is a governmental entity subject to the requirements of the Louisiana

Page 2 of 8

Public Records Law (La. R.S. 44:1 *et seq.*) and that any information in the custody of LSU may be subject to disclosure pursuant to such law.

## II. Project Objectives

1. **Create a Repository Collection** – Develop and host an online collection in LSU's institutional repository utilizing files provided by the RCCANO to LSU, that provides long-term access to the digitized records while ensuring data integrity and security.

2. **Ensure Public Accessibility** – Implement appropriate metadata and search functionalities in consultation with the RCCANO to facilitate public access.

3. **Ensure Best Practices for Digital Archives** – Utilize expertise in digital preservation, records management, and ethical considerations to serve as a model for similar repositories nationwide.

## III. Technical Requirements

1. **Storage Capacity** – Secure hosting infrastructure to support records including files of various sizes.

2. **Metadata & Indexing** – Develop a metadata structure adhering to professional and academic standards and parameters.

## IV. Timeline

1. **Phase 1: Planning & Infrastructure Setup (months 1-3)** – Hiring personnel, procuring infrastructure, and finalizing repository design.

2. **Phase 2: Digitization, Metadata Processing, Launch, & Public Access (months 4-12)** – Ingesting and cataloging documents, refining search functionalities, and making the repository publicly available.

3. **Phase 3: Continued Support (months 13-36)** – Additional documents added to repository as needed; continued maintenance and adjustments based on user/scholar experience.

4. **Phase 4: Maintenance (after 36 months)** – Continued maintenance of repository at no additional charge; provided, however, that any additional services beyond maintenance of the Eligible Documents on LSU Library's website are contingent upon a new agreement or a continuation amendment to this Agreement that funds such additional service(s).

## V. Expected Impact

1. **Historical Accountability** – Ensuring public access to critical records.

2. **Scholarly Research** – Providing a resource for academic, legal, historical, and theological studies.

3. **Digital Preservation** – Establishing a sustainable, long-term archive for the historical documents.

#104277267v2

Page 3 of 8

**Article 3 - Payment and Other Support**

3.1    The total amount to be paid to LSU under this Agreement is <u>two hundred sixty-four thousand five hundred twenty-one dollars</u> ($264,521), which amount shall be invoiced to and paid by the Settlement Trustee no later than ten (10) days after the effective date of the Plan. Any unexpended funds will be retained by LSU.

3.2    Payment will be made via either electronic transfer (wire or ACH) or check and will reference the invoice number and name of the Project Director for purposes of identification.

Electronic transfer to:

> J.P. Morgan Chase Bank, NA
> Baton Rouge, LA
> Account # 7900000051
> ABA/Routing # 065400137
> Name on Account: Louisiana State University
> Invoice # _____

Checks shall be made payable to Louisiana State University and Agricultural and Mechanical College, and shall be mailed to:

> Louisiana State University and Agricultural and Mechanical College
> Office of Accounting Services
> Sponsored Program Accounting
> Baton Rouge, Louisiana 70803-2901
> Invoice # _____

3.3    If Sponsor loans any equipment or supplies to LSU, Sponsor shall bear all risk of damage or loss to the equipment or supplies, except to the extent due to LSU's willful or intentional acts. Sponsor shall maintain all such equipment or supplies while in LSU's custody.

**Article 4 – Publications**

4.1    Whereas LSU is an institution of higher education, and whereas the freedom to publish is of cardinal importance to universities and to their personnel, it is understood that LSU, the Project Director, and other LSU personnel shall be free to make such publications as they see fit concerning the Project. LSU shall own the copyright in such works, except to the extent that LSU's Bylaws waive ownership of copyright in favor of the authors.

**Article 5 - Publicity**

5.1    Without prior written approval, neither party may make any use whatsoever of the name, marks, insignia, or logos of the other party, or of any of its campuses, departments, centers, institutes, or employees; whether in news releases, advertisements, promotional materials, or otherwise; except that: **(1)** LSU may acknowledge the Settlement Trustee as the source of funding for the Project; and **(2)** Sponsor and the Settlement Trustee may use LSU's name to the extent necessary to

#104277267v2

Case 20-10846 Doc 4545-1 Filed 11/04/25 Entered 11/04/25 16:07:54  PP Ex. 1 - Joint Plan
Case 20-10846 Doc 4518-7 Filed 10/27/25 Entered 10/27/25 18:53:26  Plan Exhibit E -
Non-Monetary Plan Provisions Page 45 of 67

Page 4 of 8

supply information whose disclosure may be required by law.  However, in no circumstance may Sponsor state or imply that LSU endorses a particular investment, product, process, or treatment.

**Article 6 - Term and Termination**

6.1    This Agreement is effective during the Project Period, unless terminated earlier in accordance with its terms.

6.2    If any party commits a material breach of this Agreement, and fails to remedy that breach within thirty days of written notice, the other parties may, at their option, in addition to any other legal remedies, terminate this Agreement immediately upon written notice.

6.3    In the Court's discretion, the prevailing party in any dispute arising out of this Agreement may be awarded reasonable attorneys' fees, court costs and expenses, including those associated with appellate or enforcement proceedings.

6.4    Termination of this Agreement for any reason shall not affect rights and obligations accrued prior to termination, nor release the parties from their respective rights and obligations under Articles 3, 4, 5, 7 and 8.

**Article 7 - Independent Contractors**

7.1    In the performance of all obligations under this Agreement: **(a)** Each party shall be an independent contractor.  No party shall be entitled to any benefits applicable to employees of the other party. **(b)** No party is authorized to act as agent for any other party for any purpose. No party shall enter into any contract, warranty, or representation as to any matter on behalf of another party.  No party shall be bound by the acts of any other party.

7.2    Each party represents that it is acting on its own account and not on behalf of another private or governmental party.  None of the funding to be provided under this Agreement is derived from a contract or grant from the United States government.  Neither this Agreement nor any rights under this Agreement may be assigned by any party without the prior written consent of the applicable party.

**Article 8 – Insurance and Indemnity**

8.1    LSU represents that LSU has adequate liability insurance, such protection being applicable to LSU's officers, employees, and agents while acting within the scope of their employment by LSU.  LSU has no liability insurance as such that extends protection to any other person.

8.2    Each party shall indemnify, defend, and hold harmless the other parties, and their officers, directors, agents and employees, from and against any and all losses, liabilities, demands, suits, judgments and claims, including reasonable attorneys' fees, to the extent that such losses, liabilities, demands, suits, judgments, claims, or fees are attributable to the willful act, fault, omission, or negligence of the indemnifying party, or of their employees, servants, or agents, in performing its obligations under this Agreement; provided, however, that no party shall hereby be liable for consequential damages.

#104277267v2

Case 20-10846 Doc 4545-1 Filed 11/04/25 Entered 11/04/25 16:07:54 PP Ex. 1 - Joint Plan
Page 214 of 271

Case 20-10846 Doc 4518-7 Filed 10/27/25 Entered 10/27/25 18:53:26 Plan Exhibit E -
Non-Monetary Plan Provisions Page 46 of 67

**8.3**   Sponsor shall indemnify, defend, and hold harmless LSU and LSU's officers, directors, agents and employees, from and against any and all losses, liabilities, demands, suits, judgments and claims, including reasonable attorneys' fees, for losses arising out of the use, by Sponsor or by a third party, of products or processes developed or made as a result of information or materials received from LSU.

**Article 9 – Confidentiality**

**9.1**   The attached Confidentiality and Non-Disclosure Agreement executed by the parties is hereby incorporated into this Agreement as Appendix A and shall govern the confidentiality of this Project. The foregoing and the Confidentiality and Non-Disclosure Agreement notwithstanding, the parties acknowledge and agree that LSU is a governmental entity subject to the requirements of the Louisiana Public Records Law (La. R.S. 44:1 *et seq.*) and that any agreement by LSU as to confidentiality and non-disclosure is subject to the Louisiana Public Records Law.

**Article 10 – Miscellaneous**

**10.1**   This Agreement shall be construed in accordance with the laws of the State of Louisiana.

**10.2**   Any controversy arising out of or related to this Agreement that cannot be resolved by the parties shall be adjudicated in accordance with the Non-Monetary Plan Provisions.

**10.3**   To the extent not inconsistent with the Non-Monetary Plan Provisions, this Agreement constitutes the entire understanding between Sponsor and LSU and supersedes any prior agreement or understanding on the same subject matter. Any modification, extension, or amendment to this Agreement shall not be effective unless reduced to writing and signed by both parties.

**10.4**   LSU makes no representation or warranty whatsoever regarding the results of the Project.

**10.5**   Any otherwise irresolvable inconsistency shall be resolved by giving precedence in the following order: **(a)** first, to the main body of this Agreement, and **(b)** second, to the attached Confidentiality and Non-Disclosure Agreement (Appendix A); provided, however, that in the event of an inconsistency between any of the foregoing documents and the Non-Monetary Plan Provisions, the Non-Monetary Plan Provisions shall control. This Agreement shall not be altered by the acknowledgement or acceptance by LSU of any purchase order form or similar document containing terms or conditions at variance with, or in addition to those set forth herein.

**10.6**   If any part of this Agreement is deemed void or unenforceable by a court of competent jurisdiction, the remaining provisions shall remain in full force and effect. Furthermore, in lieu of that invalid part, there shall be automatically added to this Agreement a provision as similar in terms to that invalid part as may be possible, legal, valid, and enforceable.

**10.7**   Notices, invoices, and other communications shall be deemed made if sent postage prepaid, addressed as shown below, or to such other address as a party may hereafter designate by written notice:

Page 6 of 8

If to Sponsor:

Mark A. Mintz
Samantha A. Oppenheim
Jones Walker LLP
Telephone: 504-582-8368
Telephone: 504-582-8641
Email: mmintz@joneswalker.com
Email: soppenheim@joneswalker.com

If to the Settlement Trustee:

[TO BE PROVIDED]

Andrew W. Caine
Pachulski, Stang, Ziehl & Jones LLP
10100 Santa Monica Blvd, Suite 1300
Los Angeles, CA 90067
Telephone: 310-277-6910
Email: acaine@pszjlaw.com

If to LSU:
(Project Matters)

Stanley Wilder, Dean of Libraries
Louisiana State University and A&M College
Telephone: 225-773-1136
Email: wilder@lsu.edu

Michael Pasquier, Professor of Religious Studies and Interim Dean
College of Humanities & Social Sciences
Louisiana State University and A&M College
Telephone: 225-578-2271
Email: mpasquier@lsu.edu

#104277267v2

215

Page 7 of 8

If to LSU:
(Contract Matters)

Darya Courville, Assistant Vice President of
Sponsored Programs
202 Himes Hall
Louisiana State University
Baton Rouge, Louisiana 70803
Phone:  225-578-2760
Fax:  225-578-2751
Email:  osp@lsu.edu

If to LSU:
(Financial Matters)

Jaime Estave, Director of Sponsored Program Accounting
Louisiana State University
336 Thomas Boyd Hall
Baton Rouge, Louisiana 70803
Telephone: 225-578-2204
Email: jestav1@lsu.edu

Page 8 of 8

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed.

| | |
|---|---|
| **The Roman Catholic Church of the Archdiocese of New Orleans** | **Board of Supervisors of Louisiana State University and Agricultural and Mechanical College** |

BY:_____     BY:  _____

Date: _____     Date: _____

**The Settlement Trustee**

BY:_____

Date: _____

## CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

This Agreement is effective as of June 16, 2025, and is entered into by and among the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("LSU"), The Roman Catholic Church of the Archdiocese of New Orleans ("RCCANO"), and the Official Committee of Unsecured Creditors for The Roman Catholic Church of the Archdiocese of New Orleans ("Committee"). For purposes of this Agreement, RCCANO and the Committee are collectively referred to as the "Company." LSU and the Company are hereinafter collectively referred to as the "Parties." This Agreement sets forth the terms under which the Parties will disclose certain proprietary and confidential information ("Confidential Information") and materials, subject to the terms and conditions contained herein.

1. The Parties' primary contacts for disclosing or receiving confidential information are:

| RCCANO | Committee | LSU |
|---|---|---|
| Elizabeth J. Futrell, Partner Jones Walker LLP Telephone: 504-582-8260 Email: efutrell@joneswalker.com | Andrew W. Caine PACHULSKI STANG ZIEHL & JONES LLP 10100 Santa Monica Blvd., Ste. 1300 Los Angeles, CA 90067 Telephone: (310) 277-6910 Facsimile: (310) 201-0760 Email: acaine@pszjlaw.com | Stanley Wilder, Dean of Libraries Louisiana State University and A&M College Telephone: 225-773-1136 Email: wilder@lsu.edu |

2. The Confidential Information to be disclosed under this Agreement is described generally as: "Project for the digital archival of Archdiocese records."

This Agreement is entered into by all parties to facilitate collaboration on a digital archiving project involving the collection, review, processing, and public dissemination of historical records in accordance with the Non-Monetary Plan Provisions in the Chapter 11 case of The Roman Catholic Church of the Archdiocese of New Orleans.. The parties recognize that certain information contained in these records may be sensitive, confidential, or legally protected, including but not limited to personally identifiable information, case-related documents, and other restricted data.

This Agreement is intended to protect such information while allowing the parties to work jointly to prepare and make appropriate materials publicly accessible through a digital platform. The parties agree to maintain the confidentiality of designated information, comply with applicable legal and ethical standards, and establish procedures for secure handling, review, redaction, and disclosure consistent with the goals of transparency, historical integrity, accountability, and public interest.

**Confidential Information from LSU may include but is not limited to:**

Internal collection development policies, donor or access agreements governing archival holdings, restricted metadata schemas or cataloging protocols, unpublished research aids or

finding guides, staff notes or annotations regarding collection organization, digitization workflows, proprietary digital preservation strategies, unpublished oral history transcripts collected by LSU, and any information regarding LSU's internal systems or platforms used for managing or disseminating archival materials that are not publicly disclosed.

**Confidential Information from Company may include but is not limited to:**

Unpublished, redacted archival materials, digitized or physical documents not yet released to the public, restricted historical records, internal cataloging or metadata systems, donor-restricted collections, research notes, institutional correspondence, collection acquisition files, protected survivor statements, legal case records under seal or not yet disclosed, and any proprietary methodologies or processes used by LSU for archival curation, preservation, or redaction.

3. Further to the stated purpose of Section 2 above, the Parties agree that this Agreement shall allow LSU to assess Company's ability to perform under the proposed business relationship. The Parties agree that neither party nor its officers, directors, or employees, except to the extent authorized by the disclosing party in writing, will use ANY Confidential Information for any purpose other than this assessment, or the eventual purpose of any forthcoming definitive Agreement, and in particular shall not use this Confidential Information in any commercial activity without the disclosing party's prior, express, written consent.

4. A party receiving confidential information (the "**Recipient**") shall limit disclosure of the Confidential Information to those of its officers, directors, or employees whom Recipient considers necessary to complete the assessment or to engage in discussions, consultations or negotiations concerning the Confidential Information, and who agree to abide by the obligations under this Agreement.

5. A Recipient shall, for a period of three (3) years from the date of initial disclosure of Confidential Information, maintain the Confidential Information so disclosed as confidential and refrain from disclosing it to others.

6. The time period of disclosure of information to Recipient under this Agreement shall expire three (3) years from the effective date, regardless of when the document was fully signed. The obligations of non-disclosure and non-use shall survive in accordance with the time period set forth in Paragraph 5 above.

7. Confidential Information shall be disclosed in writing or other tangible form and marked as "Confidential." If disclosed orally or by other intangible means, such information shall be confirmed in writing and marked as "Confidential" within thirty (30) days of disclosure. However, any information disclosed orally or in intangible form shall nonetheless be considered Confidential Information from the time of disclosure if a person of reasonable sophistication in the subject matter would reasonably understand, under the circumstances, that such information is confidential in nature.

8. No obligation of confidentiality shall exist as to such proprietary and confidential information

<div align="right">
LSU-XXXX-CDA-XXX<br>
Company Name: Company name<br>
Page 2 of 5
</div>

and material that: **(a)** at the time of receipt is public knowledge, or after receipt becomes public knowledge through no act or omission of Recipient; **(b)** was known to Recipient as evidenced by written records prior to the disclosure; **(c)** is received from a third party who did not, directly or indirectly, obtain the information or material from the disclosing party; **(d)** is independently developed by Recipient as evidenced by written records, or **(e)** is required to be disclosed by a court or government agency, provided that the disclosing party is given reasonable notice and opportunity to contest the required disclosure.

9. Any and all proprietary written materials or other information in tangible form, including all copies thereof, received by Recipient shall, upon request, be immediately returned to the disclosing party.

10. In the event that a Recipient or any of its officers, directors, or employees breach the obligation of confidentiality contained herein, they will be liable to the disclosing party, not only for damages arising out of such breach, but also for reasonable attorney's fees and reasonable costs incurred in enforcing the obligations of this Agreement.

11. All Confidential Information is provided "AS IS", without warranty or guarantee of any kind as to its accuracy, completeness, operability, fitness for a particular purpose, or any other warranty, express or implied. Neither party shall be liable to the other for any damages, loss, expense or claim of loss arising from use or reliance on the Confidential Information of the other.

12. It is understood that no patent license or other license is granted to a Recipient by this Agreement, and that the disclosure of proprietary and confidential information and materials shall not result in any obligation to grant the Recipient any rights in the subject matter disclosed.

13. This Agreement shall be construed according to the laws of the State of Louisiana.

14. This Agreement is not a joint research agreement under the CREATE Act and neither Party shall use this Agreement to invoke the CREATE Act (pursuant to 35 U.S.C. §103(c)) during patent examination to overcome prior art rejections.

15. Notwithstanding any other provision of this Agreement, the parties understand and agree that they are subject to, and agree to abide by, any and all applicable United States laws and regulations controlling the export of technical data, computer software, laboratory prototypes and other commodities. As an institution of higher learning, LSU performs fundamental research that is exempt from export control licensing under applicable export control laws and retains its right to publish its research. Company agrees that it will not transfer its confidential export-controlled information to LSU except as may be knowingly and expressly agreed to in writing by LSU's authorized export control representative, and for which LSU has made specific arrangements. Company agrees that it will not provide or make accessible to LSU any confidential export-controlled materials (including, without limitation, equipment, information and/or data) without first informing LSU of the export-controlled nature and classification of the materials and obtaining LSU's prior written consent to accept such materials. LSU's

consent shall be contingent upon Company's ability to obtain the required licenses, if necessary, or establish its qualification for any available exemptions or exceptions under applicable U.S. export control regulations.

**16.** Any notices or written information pursuant to this Agreement shall be sent to the following addresses:

| COMPANY | LSU |
|---|---|
| BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE | Trey Jones, General Counsel Louisiana State University 3810 West Lakeshore Drive Suite 124 Baton Rouge, LA 70808 |

**17.** This Agreement is not final until signed by all individuals indicated below. In the event an agreement is later negotiated with LSU concerning the disclosed subject matter or any other subject matter, Company understands that the agreement will not be final, and will not be binding on either party, until reduced to writing and signed by both: (1) an individual authorized to sign on behalf of Company, and (2) an authorized LSU official.

**BOARD OF SUPERVISORS OF
LOUISIANA STATE UNIVERSITY
AND AGRICULTURAL AND
MECHANICAL COLLEGE**

**The Roman Catholic Church of the
Archdiocese of New Orleans**

_____
Signature
**Trey Jones**

_____
Signature
**Most Reverend Gregory M. Aymond
Archbishop**

JUL – 1 2025

_____
Date

_____
Date

**The Official Committee of Unsecured
Creditors of The Roman Catholic Church
of the Archdiocese of New Orleans**

_____
Andrew Caine

LSU-XXXX-CDA-XXX
Company Name: Company name
Page 4 of 5

#104047771v2

_____          _____

While not party to the Agreement, undersigned has read and understands his/her obligations as an LSU employee to abide by the terms herein:

_____          _____
Trent Dunkin                                               Date


_____          _____
Sigrid Kelsey                                              Date


_____          _____
Stanley Wilder                                             Date


_____          _____
Julie Perkins                                              Date


LSU-XXXX-CDA-XXX
Company Name: Company name
Page 5 of 5

# APPENDIX B

**Access Request Form**

## Request for Access to Survivor Records

Records and information requested will be gathered and mailed by
the Youth Protection Executive to the qualified requesting person at the address provided

## Requestor Information

**Survivor's full name including maiden name**

_____

**Survivor's Date of birth**: _____ **Survivor's Date of Death**, if applicable

_____

**Requestor's Name, if other than Survivor, and relationship to Survivor**[1]

_____

**Requestor's Contact Information**:

**Address** _____

**City, State, Zip**: _____

**Daytime Phone Number**: _____

**Email address**: _____

By my signature below and under penalty of perjury, I certify that I am legally entitled to these records by _The Roman Catholic Church of the Archdiocese of New Orleans' Non-Monetary Provisions to Foster Child Protection and Prevent Child Sexual Abuse_ Section D.2.a.-d. (hyperlink to Non-Monetary Provisions) and authorize RCCANO to release these requested records to me.

Signature: _____ Date: _____

==**A COPY OF PHOTO IDENTIFICATION MUST ACCOMPANY THIS REQUEST**==

---

[1] Non-Monetary Plan Provision Section D 2 a-d delineates Individuals other than survivor entitled to access records (add hyperlink)

Child Sexual Abuse Records Request page 2

## Request for Information on Person Accused
## of Child Sexual Abuse of the identified Survivor

Name of Accused: _____

Relationship of Accused to Archdiocese of New Orleans
    Priest or Deacon_____
    Religious Order _____
    Lay Employee or Volunteer_____
        Place of Employment or Volunteer_____

---

## Authorization for Release of Information from Survivor's Sacramental Records

Check all that apply to your request

  o  Baptism
    Church where performed_____
    Name at time of sacrament_____
    Approximate Date of sacrament_____
    Name of parents (include mother's maiden name) _____

  o  Marriage
    Church where performed_____
    Name at time of sacrament_____
    Approximate Date of sacrament_____
    Name of parents (include mother's name) _____

  o  First Communion
    Church where performed_____
    Name at time of sacrament_____
    Approximate Date of sacrament_____
    Name of parents (include mother's name) _____

  o  Confirmation
    Church where performed_____
    Name at time of sacrament_____
    Approximate Date of sacrament_____
    Name of parents (include mother's maiden name) _____

Child Sexual Abuse Records Request page 3

## Authorization for Release of
## Survivor's Student Transcript

If the Office of Archives and Records does not hold the records, we will contact the school directly

**Date of Birth of student**: _____

For each School Records request, provide the following information:

**Name of School** _____
     Student Name at time of attendance _____
     Dates of Attendance and/or graduation_____

**Name of School** _____
     Student Name at time of attendance _____
     Dates of Attendance and/or graduation_____

**Name of School** _____
     Student Name at time of attendance _____
     Dates of Attendance and/or graduation_____

Mail or Email
Request to:

The Roman Catholic Church of the
Archdiocese of New Orleans
**Youth Protection Executive**
7887 Walmsley Ave.
New Orleans, LA 70125
YPE@archdiocese-no.org

## APPENDIX C

### Private Apology Letter

[INSERT DATE]

Dear Survivor:

With this letter, I express on behalf of the clergy, religious, and laity of the Archdiocese of New Orleans, my predecessors, and myself, profound regret over the tragic and inexcusable harm you have suffered at the hands of your abuser or abusers. I sincerely apologize to you for the trauma caused to you and to those close to you as a survivor of sexual abuse perpetrated by a member of the clergy, a religious sister or brother, or a lay employee or volunteer working within the Catholic Church. Sexual abuse is an inexcusable evil, and I am ashamed that you or anyone should have been sexually abused by someone working within the Catholic Church.

Please know that you are not to blame for the abuse perpetrated on you. You were and are completely innocent and did nothing to deserve the pain you have suffered because of the hideous crime of sexual abuse of a minor. The Archdiocese of New Orleans takes responsibility for the abuse you have suffered and pledges to keep children and all vulnerable people safe in our ministry.

It is my fervent hope that as we bring these Chapter 11 proceedings to a close, you will achieve some sense of peace, justice, and healing. I hold you and all survivors of abuse in prayer daily and encourage all to join me in prayer for you.

With my sincere admiration for your courage in coming forward, I am,

Sincerely yours,

Most Reverend Gregory M. Aymond

Archbishop of New Orleans

#104059074v7

Case 20-10846 Doc 4545-1 Filed 11/04/25 Entered 11/04/25 16:07:54 PP Ex. 1 - Joint Plan
Page 228 of 271

Case 20-10846 Doc 4518-7 Filed 10/27/25 Entered 10/27/25 18:53:26 Plan Exhibit E -
Non-Monetary Plan Provisions Page 60 of 67

## APPENDIX D

### Public Apology Letter

[INSERT DATE]

To All Child Sexual Abuse Claimants in the Archdiocese of New Orleans:

With this letter, I express on behalf of the clergy, religious, and laity of the Archdiocese of New Orleans, my predecessors, and myself, profound regret over the tragic and inexcusable harm you have suffered at the hands of your abusers. I sincerely apologize to you for the trauma caused to you and to those close to you as a survivor of sexual abuse perpetrated by a member of the clergy, a religious sister or brother, or a lay employee or volunteer working within the Catholic Church. Sexual abuse is an inexcusable evil, and I am ashamed that you or anyone should have been sexually abused by someone working within the Catholic Church.

Please know that you are not to blame for the abuse perpetrated on you. You were and are completely innocent and did nothing to deserve the pain you have suffered because of the hideous crime of sexual abuse of a minor. The Archdiocese of New Orleans takes responsibility for the abuse you have suffered and pledges to keep children and all vulnerable people safe in our ministry.

It is my fervent hope that as we bring these Chapter 11 proceedings to a close, you will achieve some sense of peace, justice, and healing. I hold you and all survivors of abuse in prayer daily and encourage all to join me in prayer for you.

With my sincere admiration for your courage in coming forward, I am,

Sincerely yours,

Most Reverend Gregory M. Aymond

Archbishop of New Orleans

#104059074v7

## APPENDIX E

**Written Sexual Abuse Claim Procedures and Survivor Bill of Rights**

Any Sexual Abuse Claimant or survivor shall be treated with dignity and respect throughout the reporting and investigative processes. As such, these *Written Sexual Abuse Claim Procedures and Survivor Bill of Rights* (the "Bill of Rights") supplement *The Roman Catholic Church of the Archdiocese of New Orleans' Non-Monetary Plan Provisions to Foster Child Protection and Prevent Child Sexual Abuse* [Doc. No. ____] (the "Provisions") adopted as part of the Plan.[14]

A. Upon receipt of a report regarding a new claim of Sexual Abuse perpetrated by a current or former RCCANO Actor;[15]

1. The Victims' Assistance Coordinator (if the Sexual Abuse Claim involves Clergy) or the Safe Environment Coordinator (if the Sexual Abuse Claim does not involve Clergy), will memorialize the initial contact in a written report (the "Initial Contact Report") that shall contain (a) the date of the contact, (b) method of contact (email, phone, in-person visit, etc.), (c) name of the Sexual Abuse Claimant or reporting individual and his/her contact information, (d) all details of the Sexual Abuse provided by the Sexual Abuse Claimant or reporting individual, including (i) the name of the individual accused of committing the reported abuse (the "Accused"), (ii) date(s) and location(s) of the abuse, (iii) names and contact information of any other person(s) with

---

[14] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Provisions; provided, however, that the terms Adult Sexual Abuse Claim, Adult Sexual Abuse Claimant, Child Sexual Abuse Claim, Child Sexual Abuse Claimant, Sexual Abuse Claim, and Sexual Abuse Claimant shall refer to new Claims.

[15] If RCCANO determines that the alleged perpetrator is not a current or former RCCANO Actor, then it will undertake reasonable due diligence efforts to provide the reporting person with information as to the entity that should be contacted to report the Claim.

#104059074v7

knowledge of the abuse, and (iv) any other information that may aid any investigation of the claim. RCCANO shall create a written form to guide the Victims' Assistance Coordinator ("<u>VAC</u>") or the Safe Environment Coordinator ("<u>SEC</u>"), as applicable, to gather all of the above information.

2.      If the initial contact is a voice message or email, then within two (2) business days of RCCANO's receipt, the VAC or SEC (as applicable) shall contact the reporting person to conduct an interview and gather the information described in paragraph 1 above in order to complete the Initial Contact Report.

3.      In the initial contact interview, the VAC or SEC shall:

(a)      explain the next steps to be taken by RCCANO in its internal review process in response to the Sexual Abuse Claim, that all interactions with the Sexual Abuse Claimant or reporting individual will be memorialized in writing, and that the Sexual Abuse Claimant is entitled to receive a copy of all such writings,

(b)      with respect to a Child Sexual Abuse Claim, explain that RCCANO will provide the Child Sexual Abuse Claimant, within ten (10) business days, with a report that identifies whether it has received any other Child Sexual Abuse Claim(s) concerning the same Accused and, if so, how many such claims and the dates of receipt of the claims (which report shall be supplemented to include any subsequent Child Sexual Abuse Claims involving the Accused),

(c)      offer to be available to the Sexual Abuse Claimant for further contact/discussion and provide (i) a Child Sexual Abuse Claimant with the VAC or SEC's contact information (as applicable), and (ii) an Adult Sexual Abuse Claimant with the contact information of the Vicar for Clergy (if the Accused is Clergy) or the Director of Human Resources (if the Accused is not Clergy),

#104059074v7

(d)      inform the Sexual Abuse Claimant that the Archbishop will make himself available to meet with him/her[16],

(e)      provide the Sexual Abuse Claimant with information about RCCANO Parties and other ministries that provide food, shelter, clothing or medication, if needed,

(f)      inform a Child Sexual Abuse Claimant who suffered Child Sexual Abuse after the Petition Date that RCCANO will pay for reasonable counseling and trauma focused therapy for up to twelve (12) counseling sessions with a specialist in the treatment of Child Sexual Abuse,

(g)      remind the Sexual Abuse Claimant that he/she is entitled to seek legal counsel,

(h)      advise a Child Sexual Abuse Claimant that Secular Law-Enforcement will be notified of the report and encourage all Sexual Abuse Claimants to notify and cooperate with the appropriate Secular Governmental Authority and appropriate Secular Law-Enforcement, and provide them, in writing, with the applicable contact information for Secular Law-Enforcement[17], and

(i)      provide a Child Sexual Abuse Claimant (or their legal guardians or other reporting individuals), in any in-person meeting or promptly by email after a phone or other remote interview, with a copy of RCCANO's policies regarding the handling of Child Sexual Abuse Claims in effect at the time of the report.

The Initial Contact Report shall include a section in which the VAC or SEC (a) confirms that each of the required elements to paragraph 3 has been met, and (b) notes whether the Sexual Abuse Claimant would like to be contacted further (and, if so, the method of contact), personally meet with the Archbishop, and receive the documentation of RCCANO's further actions.

---

[16] *See USCCB Charter*, Art. 1.

[17] *See USCCB Charter*, Art. 4; *USCCB Essential Norms*, § 11.

3

4.      Within three (3) business days following the VAC or SEC's interview with the Sexual Abuse Claimant, a typewritten copy of the completed Initial Contact Report shall be provided to the following: (a) for Child Sexual Abuse Claims, (i) the Archbishop, (ii) the YPE, and (iii) if the Accused is Clergy, the Vicar for Clergy, and (b) for Adult Sexual Abuse Claims, (i) the Archbishop and (ii) either the Vicar for Clergy (if the Accused is Clergy) or the Director of Human Resources (if the Accused is not Clergy). The Initial Contact Report shall be placed in both (a) a newly-created file for the Sexual Abuse Claim that bears the Sexual Abuse Claimant's name, and (b) if an Accused is named, in any existing personnel file for the Accused or, if no such file exists, then in a newly-created file that bears the Accused's name. Such newly-created files shall be maintained by the YPE and the Vicar General. The newly-created Sexual Abuse Claimant file shall have a checklist of the following documents, to be updated as each document is placed in the file, and shall bear the date of filing of the document: (1) Initial Contact Report; (2) Initial Action Report; (3) Child Sexual Abuse Claim investigation report(s) and all underlying documents; (4) a list of all individuals interviewed and/or consulted in the course of the investigation and the last known phone number, home address, and email address for each; (5) any and all correspondence concerning any IRB deliberations and recommendations regarding the Child Sexual Abuse Claim, including all documents reviewed by the IRB; (6) the Archbishop's determinations as to any discipline arising from the Child Sexual Abuse Claim; and (7) a copy of the written communication to the Child Sexual Abuse Claimant of the final disposition of the Child Sexual Abuse Claim.

5.      For a Child Sexual Abuse Claim where the Accused is Clergy, within three (3) business days of receipt of the Initial Contact Report, the Archbishop shall order the commencement of a prompt and objective investigation of such claim.[18] Pending resolution of the investigation,

---

[18] *See USCCB Charter*, Art. 5; *USCCB Essential Norms*, § 6.

the Archbishop shall implement precautionary protocols and other measures to best ensure the protection of the Claimant, Children, and the general public and safeguard against potential harm by the Accused by: (a) restricting the Accused's access to RCCANO locations and activities that might result in contact with the Claimant; and (b) exercising his discretion to: (i) place the Accused on administrative leave, or (ii) remove the Accused from ministry[19] with Children; provided, however, that the RCCANO investigation may be suspended during the pendency of any Legal Proceeding[20] (although any applicable administrative leave may not). For a Child Sexual Abuse Claim where the Accused is not Clergy, within three (3) business days of receipt of the Initial Contact Report, the SEC shall consult with and assist the supervisor or employer of the Accused to implement precautionary protocols and other measures to place the Accused on administrative leave, pending resolution of any investigation of the Child Sexual Abuse Claim.[21]

6.        With respect to Child Sexual Abuse Claims, within five (5) business days after receiving the Initial Contact Report, the YPE shall (a) review all documents in the newly-created claimant file and the Accused's personnel file, and (b) create and maintain a written form (the "Initial Action Report") that will include a description of each step and task to be completed in response to the Child Sexual Abuse Claim. The Initial Action Report shall be copied to the VAC or SEC (as applicable), the Archbishop, and the Vicar for Clergy if the Accused is Clergy, and placed in the files of the Child Sexual Abuse Claimant and the Accused as noted above. The YPE

---

[19] As set forth in RCCANO's *Principles of Ethics and Integrity in Ministry: Code of Ethics*, "'[m]inistry' is any activity held under the auspices of the Archdiocese of New Orleans."

[20] *See Vademecum*, § 26.

[21] For the avoidance of doubt, the protections set forth in this paragraph 5 are additive to the reporting requirements set forth in Section C.6.b of the Provisions.

#104059074v7

also shall follow the procedures in this paragraph and paragraph 5 if RCCANO first learns of a Child Sexual Abuse Claim through a Legal Proceeding (rather than an informal contact).

7.     To ensure timely and thorough compliance with the procedures set forth herein, the YPE shall create a compliance report (the "Compliance Report") that will include all of the tasks set forth in the Initial Action Report and monitor the progress on these tasks on no less than a monthly basis. The YPE shall review and update the Compliance Report (a) on a monthly basis and (b) contemporaneously upon notice of new or completed activity. Every step of the internal review process shall be memorialized in the Compliance Report.

8.     Upon completion of monthly review, the YPE shall send an updated copy of the Compliance Report to (a) the Archbishop, (b) if the Accused is Clergy, the Vicar for Clergy, (c) the VAC or SAC (as applicable), and (d) the Child Sexual Abuse Claimant as indicated in the Initial Contact Report. An updated copy of the Compliance Report also shall be placed in the files of the Child Sexual Abuse Claimant and the Accused.

9.     RCCANO shall create a form for Sexual Abuse Claimants to make a complaint. The form shall be prominently displayed on the RCCANO Website, together with a telephone number and email address. Upon request by email or telephone, the form will be made available to the requesting party by email or regular U.S. mail.

B.     Upon receipt of an unsolicited report of new information regarding an existing Sexual Abuse Claim, the report/information shall be: (a) memorialized in the files of the existing Sexual Abuse Claimant and the Accused as set forth in paragraph 4 above; (b) shared with Secular Law-Enforcement to the extent required by the Provisions; and (c) during the pendency of an ongoing canonical investigation, made available to the investigator.

C.      Any Sexual Abuse Claimant shall have the right to bring directly to the Archbishop or the YPE his/her perceived concerns or belief that the claim at issue is being mishandled under this Bill of Rights or the Provisions.

D.      In addition to observing this Bill of Rights and the Provisions, the RCCANO Parties will observe all applicable secular laws and Canon Law.  RCCANO certifies that this Bill of Rights and the Provisions are compatible with the promulgated Canon Law on the Effective Date.

#104059074v7

# PLAN EXHIBIT F

# Additional Debtors' Abuse Claims Bar Date Notice

Case 20-10846 Doc 4545-1 Filed 11/04/25 Entered 11/04/25 16:07:54  PP Ex. 1 - Joint Plan
Page 237 of 271

Case 20-10846 Doc 4518-8 Filed 10/27/25 Entered 10/27/25 18:53:26  Plan Exhibit F -
Additional Debtors Abuse Claims Bar Date Notice Page 2 of 11

**LEGAL NOTICE**

# Multimillion Dollar Plan Proposed to Pay Sexual Abuse Claims
# in the Archdiocese of New Orleans Bankruptcy

### *Your rights could be impacted if you have Sexual Abuse Claims against Catholic parishes, schools, or ministries.*

- **Please read this notice carefully, as it may impact your rights regarding your Sexual Abuse Claim.**

- The Roman Catholic Church of the Archdiocese of New Orleans ("**Archdiocese**") and 157 related Catholic organizations ("**Catholic Entities**") have agreed to pay people who validly claim they were sexually abused by clergy or church personnel. This settlement would resolve claims against the Archdiocese and Catholic Entities through a joint bankruptcy plan ("**Joint Plan**").

- If you believe you were sexually abused in connection with the Archdiocese or any Catholic Entities, you may have an opportunity to vote on a bankruptcy plan that governs how claims will be funded and paid.

- Under the Joint Plan, qualifying Sexual Abuse Claims will be compensated through a Settlement Trust. The Joint Plan may only move forward if two-thirds of abuse claimants who vote, accept the Plan.

- If there are enough votes to accept the Plan, the Catholic Entities will file for bankruptcy to become part of the settlement alongside the Archdiocese.

- A Settlement Trust will be created to pay Sexual Abuse Claimants. If the Joint Plan is approved, you cannot sue the Archdiocese, Catholic Entities, or the Settling Insurers in the future on account of sexual abuse that occurred before the respective bankruptcy filings of the Archdiocese or the Catholic Entities.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE BANKRUPTCY | |
|---|---|
| **FILE A PROOF OF CLAIM** | If you have not already filed a proof of claim against the Archdiocese, or filed a lawsuit against the Archdiocese or any of the Catholic Entities, then filing a proof of claim is the only way to ensure you preserve any right to compensation. |
| **VOTE ON THE PLAN** | Vote to accept or reject the Joint Plan. |
| **OBJECT TO THE PLAN** | Tell the Bankruptcy Court what you do not like about the Joint Plan. |
| **DO NOTHING** | If you do nothing, and you have not filed a proof of claim or lawsuit as mentioned above, you will not be entitled to vote on the Joint Plan and may not receive any compensation from the Settlement Trust. |
| **CONFIRMATION HEARING** | If two-thirds or more of voters accept the Joint Plan, the Catholic Entities will file for bankruptcy. The Bankruptcy Court will hold a hearing to consider confirmation of the Joint Plan, beginning on November 17, 2025. |

**QUESTIONS?  1-877- 476-4389 (TOLL-FREE) OR VISIT WWW.NOLACHURCHCLAIMS.COM**

## BASIC INFORMATION

| 1. | Why was this notice issued? |
|---|---|

The Bankruptcy Court authorized this notice.  You may have the right to file a Sexual Abuse
Claim (if you have not already done so) and to vote on the proposed Joint Plan in this bankruptcy
case if you were sexually abused by persons associated with the Archdiocese or Catholic Entities
regardless of how old you are today.  This includes sexual abuse in connection with entities or
activities associated with the Archdiocese, including schools, orphanages, parishes, or Catholic
Charities.

The Archdiocese case is filed in the U.S. Bankruptcy Court for the Eastern District of Louisiana,
and the case is known as *In re The Roman Catholic Church of the Archdiocese of New Orleans,*
No. 20-10846 (Bankr. E.D. La.).  The Bankruptcy Court judge overseeing the case is the
Honorable Meredith Grabill.

| 2. | Who are the Catholic Entities? |
|---|---|

The Catholic Entities are 157 Catholic organizations related to the Archdiocese that have not yet
filed for bankruptcy but plan to do so if at least two-thirds of Sexual Abuse Claimants who vote,
support the Joint Plan. These organizations will contribute money to the Settlement Trust and
include:

- Catholic parishes (individual churches)
- Catholic schools and academies
- Catholic Charities organizations
- Other Catholic ministries and agencies

A complete list of the Catholic Entities is available at www.NOLAchurchclaims.com or by
calling 1-877-476-4389.  Please note, in the Joint Plan and Disclosure Statement, the Catholic
Entities are referred to as "Additional Debtors."

| 3. | What is a debtor? |
|---|---|

A debtor is a person or organization that has filed for bankruptcy protection. The Archdiocese is
a debtor, and the Catholic Entities will become debtors only if enough Sexual Abuse Claimants
vote to accept the Joint Plan.

| 4. | Do I need to file a proof of claim based on my sexual abuse? |
|---|---|

**If you previously filed a proof of claim against the Archdiocese or a lawsuit against the
Archdiocese or a Catholic Entity alleging sexual abuse on or before August 14, 2025:**

- You do NOT need to file a new claim.
- Your existing claim covers the Catholic Entities automatically.
- You can vote on the proposed Joint Plan.

**QUESTIONS?  1-877-476-4389 (TOLL-FREE) OR VISIT WWW.NOLACHURCHCLAIMS.COM**

2

**If you have Sexual Abuse Claims against the Catholic Entities, and you have NOT filed a proof of claim against the Archdiocese or a lawsuit against the Archdiocese or a Catholic Entity on or before August 14, 2025:**

- You MUST file a claim using the Additional Debtors' Abuse Proof of Claim Form.
- If you file by October 15, 2025, you will be able to vote, and you may be entitled to compensation if the Bankruptcy Court approves the Joint Plan.
- If you file by December 2, 2025, you will not be able to vote, but you may be entitled to compensation if the Bankruptcy Court approves the Joint Plan.

## SEXUAL ABUSE CLAIMS

| 5. | What is considered sexual abuse? |
|---|---|

You have a Sexual Abuse Claim if you experienced sexual abuse. **Sexual abuse** is defined to include but is not limited to any of the following acts:

a. Touching by the abuser of the person's intimate body parts (genitals, breasts, or buttocks), touching by the person of the abuser's intimate body parts, showing pictures of the person's body or other persons' bodies, taking pictures of the person's body, showing pornography, or making images of the person while naked or engaged in any sexual activity, or any sexualized interaction, including observing the person in bathing, toileting, or undressing, which was made possible by the abuser's position of authority, or by the inducement of the abuser, or;

b. Sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to the genital or anal openings:

   (i) Of the person's body by any part of the abuser's body or any object used by the abuser for this purpose;

   (ii) Of the person's body by any part of the abuser's body or by any part of the body of another person, or by any object used by the abuser or another person for this purpose;

c. Inappropriate physical contact and/or contact that infringes upon another's personal, physical boundaries, including but not limited to groping, kissing, extended hugging, and/or any unwelcomed touching;

d. Grooming or trying to create a special relationship, including but not limited to: talk of a sexual nature, talk of a romantic nature, communications expressing individual love to the person, as opposed to a salutation, providing material resources or experiences which induce the person into a relationship where trust is then violated; and

e. Sexualized acts between minors if encouraged or arranged by the abuser.

#104077195v3

239

Please note that sexual abuse includes acts that would be considered a sexual offense under Louisiana law.

If you have a claim from other types of abuse, including non-sexual physical abuse, non-sexual emotional abuse, bullying or hazing, you should file a General Proof of Claim (Official Bankruptcy Form 410).

| | |
|---|---|
| **6.** | **Who should file an Abuse Proof of Claim?** |

You should file an Abuse Proof of Claim if you have a Sexual Abuse Claim as defined above against the Catholic Entities and have not previously filed a proof of claim against the Archdiocese or filed a lawsuit against the Archdiocese or any of the Catholic Entities by August 14, 2025.  You should file an Abuse Proof of Claim even if you:

- Did or did not report your sexual abuse to the Archdiocese or to anyone else;
- Believe the applicable statute of limitations may have run on your Sexual Abuse Claim;
- Previously asserted unsettled claims in connection with the sexual abuse;
- Previously had your Sexual Abuse Claim paid in full by the Archdiocese under a settlement, but you believe you may have additional Sexual Abuse Claims beyond what was released in the settlement agreement;
- Are included in, or represented by, another action with respect to your Sexual Abuse Claim, including *In re Boy Scouts of America and Delaware BSA, LLC (Bankr. D. Del.)*.

You may submit an Abuse Proof of Claim regardless of your age now or the length of time that has passed since the sexual abuse took place.

| | |
|---|---|
| **7.** | **What if I am still not sure if I have a Sexual Abuse Claim?** |

You should consult with an attorney if you have any questions, including whether you should file an Abuse Proof of Claim.

| | |
|---|---|
| **8.** | **How can I file my Abuse Proof of Claim?** |

**A copy of the Additional Debtors' Abuse Proof of Claim Form is enclosed.  You may also obtain a copy of the form by following the instructions below.**

The Abuse Proof of Claim must be completed by you and mailed or submitted to Donlin, Recano & Company, LLC, the Bankruptcy Court-approved agent for the Debtor (the **"Claims Agent"**), **no later than December 2, 2025,** at **11:59 p.m. (Central Time)** as follows:

    a) If sent by mail, send to: Donlin, Recano & Company, LLC, Re: The Roman Catholic Church of the Archdiocese of New Orleans, P.O. Box 2053, New York, NY 10272-2042; or

#104077195v3

b) If sent by hand delivery or overnight courier, send to: Donlin, Recano & Company, LLC, c/o Angeion Group, Re: The Roman Catholic Church of the Archdiocese of New Orleans, 200 Vesey Street, 24th Floor, New York, NY 10281; or

c) If submitted electronically, by using the interface available at: https://www.donlinrecano.com/Clients/rcano/FileSexualAbuseClaim and following the instructions set forth therein.

An Abuse Proof of Claim Form sent by any other means (such as facsimile transmission or email through a different manner than described in (c) above) **will not** be accepted.

For additional copies of the Abuse Proof of Claim Form: (a) photocopy the enclosed Abuse Proof of Claim Form; (b) contact the claims agent Donlin, Recano & Company, LLC by e-mail at rcanoinfo@donlinrecano.com or phone, toll free at 1-877-476-4389, between the hours of 9:00 a.m. and 5:00 p.m. (Eastern Time), Monday through Friday, or (c) visit the Debtor's website at: https://www.donlinrecano.com/Clients/rcano/Index.

If you have questions, you can contact your attorney or call 1-877-476-4389 to speak to the Claims Agent.  The Claims Agent can provide information about how to file a claim but cannot offer any legal advice.

Please note that the Archdiocese's staff and the Catholic Entities' staff are not permitted to give legal advice. You should consult your own attorney for assistance regarding any other inquiries, such as questions concerning the completion or filing of a proof of claim.

| 9. | Will my information be kept confidential? |
|---|---|

Your information will be kept confidential, subject to the limitations described below.  The Bankruptcy Court has set up a procedure to protect your privacy.  In order to protect your privacy, please do not file your Abuse Proof of Claim with the Bankruptcy Court.  Instead, you must file according to the directions above.

Abuse Proofs of Claim will not be available to the public unless you choose to release that information by checking the box in Part 1 of the Abuse Proof of Claim Form.  However, information about your Sexual Abuse Claim will be confidentially provided to the following parties:

- The Archdiocese, the Catholic Entities, and their attorneys and advisors;

- Certain insurers of the Archdiocese and the Catholic Entities, including authorized claims administrators of such insurers and their reinsurers and counsel;

- Attorneys for the Official Creditors' Committee and its members;

- Attorneys at the Office of the United States Trustee for the Eastern District of Louisiana;

- Honorable Michael Hogan (retired judge), the unknown claims representative appointed in the bankruptcy case;

- The Claims Agent (Donlin, Recano & Company, LLC);

- Any special arbitrator, mediator, or claims reviewer appointed to review and evaluate Sexual Abuse Claims;

- Any trustee, or functional equivalent thereof, appointed to administer payments to holders of Sexual Abuse Claims; and

- Such other persons that the Bankruptcy Court determines need the information in order to evaluate Sexual Abuse Claims.

Please note that information in your Abuse Proof of Claim may be disclosed to governmental authorities under mandatory reporting laws in many jurisdictions.

## THE JOINT PLAN

**10. What is the proposed Joint Plan and how will it compensate Sexual Abuse Claimants?**

The Archdiocese, the Catholic Entities, and the Official Creditors' Committee are asking the Bankruptcy Court to approve the Joint Plan to pay people who were sexually abused. The proposed settlement includes:

- $130 million in immediate cash from the Archdiocese and Catholic Entities.

- $20 million in additional payments from the Archdiocese and Catholic Entities.

- $50 million in additional payments from the Archdiocese and Catholic Entities.

- Approximately $29 million from insurance company settlements (see Question 11).

A Settlement Trust will be created to pay approved claims. If at least two-thirds of voters support the Joint Plan, the Catholic Entities will also file their own cases and join the settlement.

**11. What is the Insurance Settlement and why is it important?**

The Archdiocese has filed a motion asking the Bankruptcy Court to approve settlement agreements with certain insurance companies. These agreements are designed to add at least $29,275,000 to the Settlement Trust for survivors, on top of the Archdiocese and Catholic Entities' contributions. Under these agreements, the insurers will buy back their insurance policies and related claims from the Archdiocese and Catholic Entities. In return, the insurers will receive protections from future lawsuits, including an injunction that prevents survivors from suing these insurers later for claims related to those policies. These protections will only take effect if the Court approves both the Joint Plan and the Insurance Settlement Motion. More

#104077195v3

details about the Insurance Settlement Motion are available at www.NOLAchurchclaims.com or by calling 1-877-476-4389.

| 12. | What child protection provisions are part of the Joint Plan? |
|---|---|

The Joint Plan also provides for specific non-monetary protections for children. These are detailed in a separate document called the "Non-Monetary Plan Provisions to Foster Child Safety and Prevent Child Sexual Abuse," which is included as Joint Plan Exhibit E. This document lays out actions the Archdiocese and Catholic Entities agree to undertake to enhance child safety and reduce the risk of abuse including increased accountability and abuser discipline and transparency through oversight, record keeping and disclosure, and the publication of abuse related documents through an archive to be administered by an approved third-party academic institution.

| 13. | How much money could I get from the Joint Plan? |
|---|---|

Individual payments depend on several factors, including: (a) severity and nature of the abuse, (b) the total number of valid claims received, (c) the results of the Christopher Homes sale, (d) the results of litigation against a non-settling insurance company, and (e) the evaluation of claims by a neutral third-party reviewer (the "**Abuse Claims Reviewer**").

Because each claim is unique, exact payment amounts cannot be determined until all claims are reviewed. All approved claims will be paid from the Settlement Trust, and claimants with more severe and long-lasting impacts generally will receive higher payments.

| 14. | Does the Joint Plan cover punishment or deterrent damages? |
|---|---|

No. The Joint Plan explicitly states that claims for punitive or exemplary damages (punishment or deterrent damages) will not receive payment from the Settlement Trust. Claimants will only receive compensation for actual harm experienced.

| 15. | How was the Claims deadline set? |
|---|---|

The Joint Plan proposes that the Claims deadline be set on December 2, 2025, the last day of the confirmation hearing.  Ultimately, the Bankruptcy Court will decide if the proposed deadline is approved.

## VOTING ON THE PLAN

| 16. | Who can vote on the Joint Plan? |
|---|---|

You can vote on the Joint Plan if you are:
- A Sexual Abuse Claimant who filed a claim or a lawsuit against the Archdiocese by August 14, 2025.
- A Sexual Abuse Claimant who filed a lawsuit against the Catholic Entities by August 14, 2025.

**QUESTIONS?  1-877-476-4389 (TOLL-FREE) OR VISIT WWW.NOLACHURCHCLAIMS.COM**

#104077195v3

- A Sexual Abuse Claimant who files a claim against the Catholic Entities by October 15, 2025.

| **17.** | **How can I vote on the Joint Plan?** |
|---|---|

You or your attorney will receive a ballot if you are eligible to vote on the Joint Plan. To be counted, your signed Ballot indicating your acceptance or rejection of the Joint Plan must be received by Donlin, Recano & Company, LLC, the appointed claims and voting agent, no later than **11:59 p.m. (Central Time)** on **October 29, 2025**.

Ways to submit your vote:

- **Online at: https://bankruptcy.angeiongroup.com/Clients/rcano/Vote** - You will need your unique eBallot ID#: _____

- **By mail to:**

Donlin, Recano & Company, LLC
Re: Archdiocese of New Orleans -- Voting
P.O. Box 2053
New York, NY 10272-2042

- **By overnight delivery or hand delivery to:**

Donlin, Recano & Company, LLC, c/o Angeion Group
Re: The Roman Catholic Church of the Archdiocese of New Orleans
Attn: Voting Department
200 Vesey Street, 24th Floor
New York, NY 10281

## OBJECTING TO THE PLAN

| **18.** | **Can I object to the Joint Plan if I don't like it?** |
|---|---|

If you disagree with the Joint Plan or any part of it—including who is being released from future lawsuits—you can file a written objection with the Bankruptcy Court by **November 6, 2025, at 11:59 p.m. (Central Time)**. You can vote against the Joint Plan without filing an objection as well. If you do file an objection, your objection must include:

- Claimant's name and contact information.
- Clear and specific reasons for the objection.
- Supporting documentation or evidence (if applicable).

Objections must be filed in writing and sent to the Clerk of the Bankruptcy Court.

United States Bankruptcy Court
Eastern District of Louisiana

QUESTIONS? 1-877-476-4389 (TOLL-FREE) OR VISIT WWW.NOLACHURCHCLAIMS.COM

#104077195v3

500 Poydras St., Courtroom B709
New Orleans, Louisiana 70130

| 19. | What about Louisiana Law and Direct Action Rights? |
|---|---|

Under Louisiana law, you normally have the right to sue an insurance company directly, even if you never sued the Archdiocese or Catholic Entities. If the Joint Plan is approved, this "direct action" right will be permanently eliminated for the insurers participating in the settlement. A full list of Settling Insurers is in the Joint Plan and Schedule 3 of the Ballot and available at the website or by calling the toll-free number.

| 20. | What are the Settling Insurer injunctions? |
|---|---|

These injunctions mean that you will not be able to sue the insurers that are contributing money to the Settlement Trust. Even if the Joint Plan is approved, you will be able to sue the non-settling insurer.

## DOING NOTHING

| 21. | What happens if I do nothing? |
|---|---|

If you take no action, and the Joint Plan is approved by the Bankruptcy Court:

- **And you previously filed against the Archdiocese:** Your claim remains in place, and you will be bound by the Joint Plan's terms.
- **And you have not filed any claim:** You will lose all rights to compensation from the Archdiocese, Catholic Entities, and the settling insurance companies.

## THE CONFIRMATION HEARING

| 22. | When and where will the Bankruptcy Court decide whether to approve the Joint Plan? |
|---|---|

The Bankruptcy Court set a hearing, beginning on **November 17, 2025, at 9:00 a.m. CT**, to consider confirmation of the Joint Plan. The hearing will be held at the United States Bankruptcy Court, Eastern District of Louisiana 500 Poydras St., Courtroom B709, New Orleans, Louisiana 70130.

QUESTIONS? 1-877-476-4389 (TOLL-FREE) OR VISIT WWW.NOLACHURCHCLAIMS.COM

9

#104077195v3

## ADDITIONAL INFORMATION

| 23. | How do I report my sexual abuse to the authorities? |
|---|---|

Reporting the sexual abuse protects other persons.  You can learn more about how to report sexual abuse at http://www.dcfs.louisiana.gov/page/109.

Please know that reporting sexual abuse is different than filing a proof of claim in the Archdiocese's bankruptcy case.

| 24. | What happens if I do not file any Abuse Proof of Claim? |
|---|---|

If you fail to file any Sexual Abuse Claim in this bankruptcy (and you had not filed a lawsuit against the Archdiocese or the Catholic Entities on or before August 14, 2025), you may not be able to:

- Vote on the Joint Plan; or
- Receive any compensation from the Archdiocese, the Catholic Entities, or the settling insurers for your Sexual Abuse Claim.

| 25. | What is Chapter 11? |
|---|---|

The main objectives of chapter 11 are to:

- Propose a plan of reorganization to address claims,
- Have eligible claimants vote to accept or reject the plan, and
- Implement the plan if the Bankruptcy Court approves it.

| 26. | What is a Disclosure Statement? |
|---|---|

The Disclosure Statement is a summary of information about the Archdiocese, Catholic Entities and the Joint Plan.  It contains more detailed information about the Archdiocese's history, litigation against the Archdiocese, and significant events that have led to the Joint Plan.  It also provides more detail about the Joint Plan and what happens if the Joint Plan is approved by the Bankruptcy Court, including how claims will be resolved and payments will be made.

The Joint Disclosure Statement is available online at www.NOLAchurchclaims.com.

> **You may want to consult with an attorney regarding this notice and whether you should file an Abuse Proof of Claim or vote on the Joint Plan.**

#104077195v3

246

# PLAN EXHIBIT G

# Additional Debtors' Abuse Claims Bar Date Publication Notice

**Legal Notice**

Case 20-10846 Doc 4518-9 Filed 10/27/25 Entered 10/27/25 18:53:26  Plan Exhibit G -
Additional Debtors Abuse Claims Bar Date Publication Not Page 2 of 2

# Multimillion Dollar Proposed Plan to Pay Sexual Abuse Claims in the Archdiocese of New Orleans Bankruptcy

## Your rights could be impacted if you have sexual abuse claims against Catholic parishes, schools, or ministries. File your claim by December 2, 2025.

The Roman Catholic Church of the Archdiocese of New Orleans ("**Archdiocese**") and 157 affiliated Catholic organizations ("**Catholic Entities**") have agreed to compensate people who claim they were sexually abused by clergy or church personnel.

The Catholic Entities include Catholic parishes, schools, academies, Catholic Charities organizations, and other ministries. They plan to file for bankruptcy if at least two-thirds of sexual abuse claimants who vote support the Joint Plan. A complete list is available at www.NOLAchurchclaims.com or by calling 1-877-476-4389.

### What is the Joint Plan?

A Settlement Trust will be created to pay sexual abuse claimants. More money may be added from additional insurance settlements from a non-settling insurer. The Archdiocese has also asked the Court to approve separate settlement agreements with certain insurers that would add millions of dollars to the Trust. These agreements will only take effect if the Court confirms the Joint Plan and approves the settlement motion. The Joint Plan also includes rules for how money will be distributed and protections for children. If the Joint Plan is approved, you cannot sue the Archdiocese, Catholic Entities, or all but one of their insurers in the future. If the Joint Plan is approved, it will block any future claims against any insurance company except the non-settling insurer—even under Louisiana's "direct action" law that normally allows lawsuits against them.

### Who is eligible to receive money?

If you experienced sexual abuse involving the Archdiocese or any of the Catholic Entities, you may be eligible to receive money from the Settlement Trust. If you already filed an Abuse Proof of Claim in this bankruptcy case or filed and served a lawsuit against the Archdiocese or any of the Catholic Entities by **August 14, 2025**, your claim already includes the Catholic Entities—you do not need to file again.

If you have not yet filed a claim or lawsuit against the Catholic Entities, you must do so by **December 2, 2025 at 11:59 p.m. Central Time** to preserve your right to compensation. Missing the deadline may result in the permanent loss of your right to receive money from the Settlement Trust.

"Sexual abuse" includes unwanted sexual behavior, contact, comments, or any behavior—whether or not you realized it was abuse at the time.

### How to file a claim, vote on the Plan, or object?

File a claim online at www.NOLAchurchclaims.com, download a claim form from the website, or call 1-877-476-4389 to request one by mail. If you file a claim by October 15, 2025, you may vote to accept or reject the Joint Plan.  If you file a claim after October 15 but before December 2, 2025 at 11:59 p.m. Central Time, you will not be able to vote, but you may be entitled to compensation if the Joint Plan is approved. You may also object to the Plan to tell the Court what you don't like about it.  The Court has set a hearing to consider whether to confirm the Joint Plan.

**Key Deadlines:** Vote by **October 29, 2025**. File objections by **November 6, 2025**. Confirmation hearing begins: **November 17, 2025**, at **9:00 a.m. Central Time**.

The case is called *In re: The Roman Catholic Church of the Archdiocese of New Orleans* (Bankr. E.D. La.). More details are available at www.NOLAchurchclaims.com or by calling toll-free 1-877-476-4389.

### *Your information will be kept private.*

## www.NOLAchurchclaims.com          1-877-476-4389

# PLAN EXHIBIT H

# Additional Debtors' Abuse Proof of Claim Form

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-10846 |
| THE ROMAN CATHOLIC CHURCH OF | ) | |
| THE ARCHDIOCESE OF NEW ORLEANS | ) | Section "A" |
| | ) | |
| Debtor[1]. | ) | Chapter 11 |

---

### SEXUAL ABUSE SURVIVOR PROOF OF CLAIM FOR THE ADDITIONAL DEBTORS' BANKRUPTCY FILINGS

### IMPORTANT:

### THIS COMPLETED FORM MUST BE RECEIVED ON OR BEFORE DECEMBER 2, 2025, AT 11:59 P.M. (CENTRAL TIME)

### IMPORTANT - DO NOT FILE THIS DOCUMENT WITH THE COURT

This Sexual Abuse Survivor Proof of Claim relates to the Chapter 11 filings of the Catholic entities listed on Exhibit A ("Additional Debtors") and must be received no later than **11:59 p.m. (Central Time)** on **December 2, 2025**. Please carefully read the following instructions included with this SEXUAL ABUSE SURVIVOR PROOF OF CLAIM and complete all applicable questions to the extent of your knowledge or recollection.

If you do not know the answer to an open-ended question, you can write "I don't recall" or "I don't know." If a question does not apply, please write "N/A." If you are completing this form in hard copy, please write or type clearly using blue or black ink.

This Sexual Abuse Survivor Proof of Claim must be mailed or submitted to Donlin, Recano & Company, LLC, the Court-approved agent for the Debtor (the "Claims Agent"), as follows:

(i)    If sent by mail, to Donlin, Recano & Company, LLC, Re: The Roman Catholic Church of the Archdiocese of New Orleans, P.O. Box 2053, New York, NY 10272-2042, or

(ii)   If sent by hand delivery or overnight courier, send to: Donlin, Recano & Company, LLC, c/o Angeion Group, Re: The Roman Catholic Church of the Archdiocese of New Orleans, 200 Vesey Street, 24th Floor, New York, NY 10281; or

(iii)  If submitted electronically, by using the interface available at: https://www.donlinrecano.com/Clients/rcano/FileSexualAbuseClaim.

Sexual Abuse Survivor Proofs of Claim sent by any other means (such as facsimile transmission or email through a different manner than described in (iii) above) **will not** be accepted.

### You May Wish To Consult An Attorney Regarding This Matter.

---

[1] The last four digits of the Debtor's federal tax identification number are 8966. The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

**Failure To Complete And Return This Form May Result In Your Inability To Vote On A Plan Of Reorganization And Receive A Distribution From the case styled The Roman Catholic Church Of The Archdiocese Of New Orleans or the cases of the Additional Debtors**

"You" and/or "Sexual Abuse Survivor" refers to the person asserting a Sexual Abuse Claim against any of the Additional Debtors related to the Sexual Abuse Survivor's sexual abuse.

For this claim to be valid, the Sexual Abuse Survivor must sign this form. If the Sexual Abuse Survivor is deceased or incapacitated, the form must be signed by the Sexual Abuse Survivor's representative or the attorney for the Sexual Abuse Survivor's estate.

If the Sexual Abuse Survivor is a minor, the form must be signed by the survivor's parent, legal guardian or attorney. Any Sexual Abuse Survivor Proof of Claim signed by a representative or legal guardian must attach documentation establishing such person's authority to sign the claim for the Sexual Abuse Survivor.

---

### Who Should File a Sexual Abuse Survivor Proof of Claim?

---

This Sexual Abuse Survivor Proof of Claim is only for people who have experienced sexual abuse (defined below) **on or before the bankruptcy filings of the Additional Debtors**. This Sexual Abuse Survivor Proof of Claim is the way you can make a claim against the Additional Debtors based on sexual abuse. Any person making a claim based on anything other than sexual abuse should consult the *Notice Of Bar Dates For Filing Of General Proofs Of Claim* and file a General Proof of Claim (Official Bankruptcy Form 410).

---

### Who Is a Sexual Abuse Survivor?

---

The term Sexual Abuse Survivor refers to a person who experienced sexual abuse, as defined below.

---

### What Is Sexual Abuse?

---

For the purposes of this Sexual Abuse Survivor Proof of Claim, **sexual abuse** is defined as any of the following acts:

a. Touching by the abuser of the person's intimate body parts (genitals, breasts or buttocks), the touching by the person of the abuser's intimate body parts, showing pictures of the person's body or other persons' bodies, taking pictures of the person's body, showing pornography, or making images of the person while naked or engaged in any sexual activity, or any sexualized interaction including observing the person in bathing, toileting, or undressing which was made possible by the abuser's position of authority, or by the inducement of the abuser, or;

b. sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to the genital or anal openings:

    (i) Of the person's body by any part of the abuser's body or any object used by the abuser for this purpose;

    (ii) Of the person's body by any part of the body of the abuser or by any part of the body of another person, or by any object used by the abuser or another person for this purpose;

c. Inappropriate physical contact and/or contact that infringes upon another's personal, physical boundaries including but not limited to groping, kissing, extended hugging, and/or any unwelcomed touching;

d. Grooming or trying to create a special relationship, including but not limited to: talk of a sexual nature, talk of a romantic nature, communications expressing individual love to the person, as opposed to a salutation, providing material resources or experiences which induce the person into a relationship where trust is then violated; and

e. Sexualized acts between minors if encouraged or arranged by the abuser.

Please note that sexual abuse includes acts that would be considered a sexual offense under Louisiana law.

If you have a claim arising from other types of abuse, including non-sexual physical abuse, non-sexual emotional abuse, bullying or hazing, you should file a General Proof of Claim form (Official Bankruptcy Form 410)

---

**You May Wish to Consult an Attorney Regarding This Matter.**

---

You may also obtain information from the Claims Agent by: (1) calling toll free at 1-(877) 476-4389, (2) emailing at rcanoinfo@donlinrecano.com, or (3) visiting the case website at www.NOLAchurchclaims.com (do not contact the Claims Agent for legal advice).

---

**What If I Don't File on Time?**

---

**Failure to complete and return this Sexual Abuse Survivor Proof of Claim by December 2, 2025, at 11:59 p.m. (Central Time) may result in your inability to receive compensation for sexual abuse related to the Additional Debtors.**

---

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.

---

**PART 1: CONFIDENTIALITY**

---

Unless you indicate below, your identity and your Sexual Abuse Survivor Proof of Claim will be kept **confidential**, under seal, and outside the public record. However, information in this Sexual Abuse Survivor Proof of Claim will be confidentially provided to the Debtor, the Additional Debtors, and their counsel; certain insurers of the Debtor and the Additional Debtors, including authorized claims administrators of such insurers and their reinsurers and counsel; attorneys for the Official Creditors' Committee and members of the Official Creditors' Committee, attorneys at the Office of the United States Trustee for the Eastern District of Louisiana, any unknown claims representative appointed in the bankruptcy case, any special arbitrator, mediator, or claims reviewer appointed to review and resolve Sexual Abuse Survivor Proof of Claims, any trustee, or functional equivalent thereof, appointed to administer payments to holders of Sexual Abuse Survivor Proof of Claims, and confidentially to such other persons that the Court determines need the information in order to evaluate the claim. Information in this Sexual Abuse Survivor Proof of Claim may be required to be disclosed to governmental authorities under mandatory reporting laws in various jurisdictions.

**This Sexual Abuse Survivor Proof of Claim (along with any accompanying exhibits and attachments) will be maintained as confidential unless you expressly request that it be publicly available by checking the "public" box and signing below.**

---

☐ **PUBLIC**: I want my identity and this Sexual Abuse Survivor Proof of Claim (together with any exhibits and attachments) to be made part of the official claims register in this case. **My claim will be available for review by any and all members of the public.**

Signature: _____

Print Name: _____

---

**PART 2: IDENTIFYING INFORMATION**

---

A. **Identity of Sexual Abuse Survivor**

First Name _____ Middle Initial _____ Last Name _____ Jr/Sr/III _____

Mailing Address (If Sexual Abuse Survivor is incapacitated, is a minor, or is deceased, provide the address of the individual submitting the claim. If you are in jail or prison, provide the address of your place of incarceration):

| Number and Street: | | | | |
|---|---|---|---|---|
| City: | | State: | | Zip Code: | |
| Country (not USA): | | Email Address: | | |
| Telephone (Home): | | Telephone (Cell): | | |

For communications regarding this claim you may use (check the appropriate boxes):

Email ☐     US Mail ☐     Home Voicemail ☐     Cell Voicemail ☐     Counsel listed below ☐

Social Security Number of Sexual Abuse Survivor (last four digits <u>only</u>): XXX-XX-__ __ __ __

If the Sexual Abuse Survivor is in jail or prison, provide the Sexual Abuse Survivor's identification number
_____

Birthdate of Sexual Abuse Survivor (only the month and year): (MM/YYYY): __ __ / __ __ __ __

Any other name, or names, by which the Sexual Abuse Survivor has ever been known:
_____

Gender of Sexual Abuse Survivor:     Male ☐     Female ☐     Other (specify) _____

**B.** **If you have hired an attorney relating to the sexual abuse described in this Sexual Abuse Survivor Proof of Claim, please provide his or her name and contact information:**

| Law Firm Name: | |
|---|---|
| Attorney's Name: | |
| Number and Street: | |
| City: | | State: | | Zip Code: | |
| Country (not USA): | | Email Address: | |
| Telephone (Work): | | Fax No.: | |

## PART 3: NATURE OF THE SEXUAL ABUSE

**(Attach additional sheets if necessary)**

**For each of the questions listed below, please complete your answers to the best of your recollection.**

Note: If you have previously filed a lawsuit about your sexual abuse in state or federal court, you may attach a copy of the complaint. If you have not filed a lawsuit, or if the complaint does not contain all of the information requested below, you must provide the information below to the extent of your recollection.

Please answer each of the following questions as best you are able. **If you do not know or recall an answer, you may indicate that you do not know or recall the answer and move on to the next question.**

A.     Were you sexually abused by more than one person?     Yes ☐     No ☐

B.     Please identify each person who sexually abused you. If you do not remember the name of the sexual abuser(s), provide as much information about the individual that you recall and their relationship to the Additional Debtors.

_____

_____

_____

_____

_____

C.  What was the sexual abuser's position, title, or relationship to you (if you know):

_____

_____

D.  Where were you at the time you were sexually abused?   Please be specific and provide all relevant information that you recall including the City and State, name of the religious Parish or School or Orphanage (if applicable) and/or the name of any other locations.

_____

_____

_____

E.  When did the first act of sexual abuse take place?  If you do not remember the calendar date, approximately what season of the year was it (spring, summer, fall, winter), approximately what age were you when it started, and, if applicable, what school grade were you in at the time?

_____

_____

F.  If the sexual abuse took place over a period of time, please state when it started and when it stopped.  If you were sexually abused by more than one sexual abuser, indicate when the sexual abuse by each of the sexual abusers started and stopped.  You may provide approximate dates if you do not recall the specific dates.

_____

_____

_____

_____

_____

G.  Please describe the sexual abuse in as much detail as you can recall in the lines below.  You may attach additional pages if needed.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

H.   Did you or anyone on your behalf tell anyone involved with the Additional Debtors about the sexual abuse?
     Yes ☐   No ☐

I.   Have you ever reported the sexual abuse to law enforcement or investigators?  This includes telling someone
     when you were a minor or when you were an adult.  Yes ☐   No ☐

J.   Are you aware of anyone who knew about the sexual abuse?  Yes ☐   No ☐  If your answer is "Yes", can you
     describe who they were and how they knew about the abuse?

_____

_____

_____

K.   If subsequent wrongful conduct by the Additional Debtors or its employees or officials caused you further
     trauma, directly or indirectly, related to the sexual abuse, please describe:

     a.   What happened:

_____

_____

_____

     b.   When it happened:

_____

_____

c.  The name, title, position or relationship to you of any individual involved in the subsequent wrongful conduct (if you know):

_____

_____

_____

---

**PART 4: IMPACT OF SEXUAL ABUSE**

**(Attach additional pages if necessary)**

**(If you currently cannot describe any harm you have suffered on account of the sexual abuse, you may omit this section for now.  However, you may be asked to provide the information requested at a later date.)**

A.  Please describe how you believe you were impacted, harmed, damaged, or injured as a result of the sexual abuse you described above.  You can check the boxes, fill in the narrative, or both.  **Please note that the boxes are not meant to limit the characterization or description of the impact(s) of your sexual abuse.** (Check all that apply.)

☐ Psychological / emotional health (including depression, anxiety, suicidal thoughts, feeling numb, difficulty managing or feeling emotions including anger)

☐ Post-traumatic stress reactions (including intrusive images, feelings from the abuse, numbing or avoidance behaviors)

☐ Physical health (including chronic disease, chronic undiagnosed pain or physical problems)

☐ Education (not graduating high school, being unable to finish training or education)

☐ Employment (including difficulties with supervisors, difficulty maintaining steady employment, being fired from jobs)

☐ Intimate relationships (including difficulty maintaining emotional attachments, difficulty with sexual behavior, infidelity)

☐ Social relationships (including distrust of others, isolating yourself, not being able to keep healthy relationships)

☐ Alcohol and/or substance abuse (including other addictive behaviors such as gambling)

☐ Other (please explain and add any other information you remember to the categories above)

If you wish to provide a narrative description of how you were impacted, harmed, damaged, or injured as a result of the sexual abuse you described above, please provide it below.  Please provide in as much detail as you can recall in the lines below.  You may use additional pages if needed.

_____

_____

_____

_____

_____

_____

_____

_____

B.   Have you ever sought counseling or other mental health treatment for any reason even if you did not connect that treatment as being related to the sexual abuse that you described above?

Yes ☐      No ☐

If your response to the prior question is "Yes," please state with whom you sought counseling and when.

_____

_____

_____

| PART 5: ADDITIONAL INFORMATION |
|---|

A.   **Prior Litigation.**

Was a lawsuit regarding the sexual abuse you have described in this Sexual Abuse Survivor Proof of Claim filed by you or on your behalf.

Yes ☐ No ☐  (If "Yes," you are required to attach a copy of the complaint.)

B.   **Prior Bankruptcy Claims.** Have you filed any claims in any other bankruptcy case relating to the sexual abuse you have described in this Sexual Abuse Survivor Proof of Claim?  Yes ☐ No ☐  (If "Yes," you are required to attach a copy of any completed claim form.)

C.   **Settlements.**  Regardless of whether a complaint was ever filed against any party because of the sexual abuse, have you settled any claim relating to the sexual abuse you have described in this Sexual Abuse Survivor Proof of Claim?  Yes ☐   No ☐  (If "Yes," please describe, including parties to the settlement. You are required to attach a copy of any settlement agreement.)

_____

_____

_____

D.   **Current Bankruptcy Case.** Are you currently a debtor in a bankruptcy case? Yes ☐    No ☐

If yes, please provide the following information:

Name of Case: _____  Court: _____

Date filed: _____  Case No. _____

Chapter of your bankruptcy case.  Chapter: 7 ☐      Chapter 11 ☐      Chapter 12 ☐      Chapter 13 ☐

Name of Trustee: _____]

| SIGNATURE |
| --- |

      **To be valid, this Sexual Abuse Survivor Proof of Claim must be signed by you.** If the Sexual Abuse Survivor is deceased or incapacitated, the form must be signed by the Sexual Abuse Survivor's representative or the attorney for the Sexual Abuse Survivor's estate.  If the Sexual Abuse Survivor is a minor, the form must be signed by the Sexual Abuse Survivor's parent or legal guardian, or the Sexual Abuse Survivor's attorney.  (Any form signed by a representative or legal guardian <u>must</u> attach documentation establishing such person's authority to sign this form for the Sexual Abuse Survivor.)

**Penalty for presenting a fraudulent claim is a fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152, 157 and 3571.**

**Check the appropriate box:**

☐    I am the Sexual Abuse Survivor.

☐    I am the Sexual Abuse Survivor's attorney, guardian, kinship (or other authorized) caretaker, executor, or authorized representative.

☐    Other (describe):

_____

**I have examined the information in this Sexual Abuse Survivor Proof of Claim and have a reasonable belief that the information is true and correct.**

**I declare under penalty of perjury that the foregoing statements are true and correct.**

**Date:** _____

**Signature:** _____

**Print Name:** _____

**Relationship to Sexual Abuse Survivor (if not signed by Sexual Abuse Survivor):**

_____

**Address:** _____

_____

**Contact Phone:** _____

**Email:** _____

258

## EXHIBIT A

### Additional Debtors

**I.    Archdiocesan Parishes**

1.    All Saints Roman Catholic Church, New Orleans, Louisiana
2.    Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana
3.    Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana
4.    Assumption of Mary Roman Catholic Church, Avondale, Louisiana
5.    Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana[1]
6.    Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana
7.    Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana
8.    Blessed Trinity Roman Catholic Church, New Orleans, Louisiana
9.    Christ the King Roman Catholic Church, Gretna, Louisiana
10.   Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana
11.   Divine Mercy Roman Catholic Church, Kenner, Louisiana
12.   Good Shepherd Roman Catholic Church, New Orleans, Louisiana
13.   Holy Family Roman Catholic Church, Franklinton, Louisiana
14.   Holy Family Roman Catholic Church, Luling, Louisiana
15.   Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana
16.   Holy Spirit Roman Catholic Church, New Orleans, Louisiana
17.   Immaculate Conception Roman Catholic Church, Marrero, Louisiana
18.   Immaculate Conception Roman Catholic Church, New Orleans, Louisiana
19.   Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana
20.   Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana
21.   Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana
22.   Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana
23.   Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana
24.   Most Holy Trinity Roman Catholic Church, Covington, Louisiana
25.   Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana
26.   Our Lady of Grace Roman Catholic Church, Reserve, Louisiana
27.   Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana
28.   Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana
29.   Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana
30.   Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana
31.   Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana
32.   Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana
33.   Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana
34.   Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana
35.   Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana
36.   Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana

---

[1] Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

#103965227v3

37.  Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana
38.  Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana
39.  Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana
40.  St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana
41.  St. Agnes Roman Catholic Church, Jefferson, Louisiana
42.  St. Alphonsus Roman Catholic Church, New Orleans, Louisiana
43.  St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana
44.  St. Angela Merici Roman Catholic Church, Metairie, Louisiana
45.  St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana
46.  St. Anselm Roman Catholic Church, Madisonville, Louisiana
47.  St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana
48.  St. Anthony of Padua Roman Catholic Church, Luling, Louisiana
49.  St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana
50.  St. Anthony Roman Catholic Church, Gretna, Louisiana
51.  St. Augustine Roman Catholic Church, New Orleans, Louisiana
52.  St. Benedict Roman Catholic Church, Covington, Louisiana
53.  St. Benilde Roman Catholic Church, Metairie, Louisiana
54.  St. Bernard Roman Catholic Church, St. Bernard, Louisiana
55.  St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana
56.  St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana
57.  St. Christopher Roman Catholic Church, Metairie, Louisiana
58.  St. Clement of Rome Roman Catholic Church, Metairie, Louisiana
59.  St. Cletus Roman Catholic Church, Gretna, Louisiana
60.  St. David Roman Catholic Church, New Orleans, Louisiana
61.  St. Dominic's Roman Catholic Church, New Orleans, Louisiana
62.  St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana
63.  St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana
64.  St. Francis Xavier Roman Catholic Church, Metairie, Louisiana
65.  St. Genevieve Roman Catholic Church, Slidell, Louisiana
66.  St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana
67.  St. Jerome Roman Catholic Church, Kenner, Louisiana
68.  St. Joachim Roman Catholic Church, Marrero, Louisiana
69.  St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana
70.  St. John of the Cross Roman Catholic Church, Lacombe, Louisiana
71.  St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana
72.  St. John the Baptist Roman Catholic Church, Edgard, Louisiana
73.  St. John the Baptist Roman Catholic Church, Folsom, Louisiana
74.  St. Joseph Roman Catholic Church, Algiers, Louisiana
75.  St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana
76.  St. Joseph's Roman Catholic Church, Gretna, Louisiana
77.  St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana
78.  St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana
79.  St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana
80.  St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana

2

81.  St. Margaret Mary Roman Catholic Church, Slidell, Louisiana
82.  St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana
83.  St. Mark Roman Catholic Church, Ama, Louisiana
84.  St. Martha Roman Catholic Church, Harvey, Louisiana
85.  St. Martin de Porres Roman Catholic Church, New Orleans, formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana
86.  St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana
87.  St. Mary's Roman Catholic Church, New Orleans, Louisiana
88.  St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana
89.  St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St. John the Baptist Roman Catholic Church, Paradis, Louisiana
90.  St. Patrick's Roman Catholic Church, New Orleans, Louisiana
91.  St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana
92.  St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana
93.  St. Peter Claver Roman Catholic Church, New Orleans, Louisiana
94.  St. Peter Roman Catholic Church, Reserve, Louisiana
95.  St. Peter's Roman Catholic Church, Covington, Louisiana
96.  St. Philip Neri Roman Catholic Church, Metairie, Louisiana
97.  St. Pius X Roman Catholic Church, New Orleans, Louisiana
98.  St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana
99.  St. Rita Roman Catholic Church, Harahan, Louisiana
100.  St. Rita Roman Catholic Church, New Orleans, Louisiana
101.  St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana[2]
102.  Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana
103.  The Congregation of St. Rita Roman Catholic Church of Harahan
104.  The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana

## II.  Suppressed Archdiocesan Parishes[3]

1.  Blessed Sacrament, Inc.
2.  Epiphany, Inc.

---

[2] As noted earlier, Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

[3] The Suppressed Archdiocesan Parishes no longer operate as separate church parishes. The Suppressed Archdiocesan Parishes were not dissolved, and may own property.

Following Hurricane Katrina, the operations of certain of the Suppressed Archdiocesan Parishes were combined with Archdiocesan Parishes.  In 2024, in the ongoing aftermath of Hurricane Ida and a result of storm damage, the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental statistics, and financial difficulties encountered, the following additional Suppressed Archdiocesan Parishes were canonically merged with neighboring Archdiocesan Parishes: (a) St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc., was canonically merged into St. Peter Roman Catholic Church, Reserve, Louisiana; (b) (i) St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and (ii) St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc., were both canonically merged into Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, now known as St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana; (c) St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc., was canonically merged into St. Rosalie Roman Catholic Church, Harvey, Louisiana, now known as Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana; (d) St. Bonaventure

3. Immaculate Heart of Mary, Inc.
4. Incarnate Word, Inc.
5. Our Lady of Good Counsel, Inc.
6. Our Lady of Good Harbor, Inc.
7. Our Lady of Lourdes, New Orleans, Louisiana, Inc.
8. Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.
9. Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana
10. St. Ann, New Orleans, Louisiana, Inc.
11. St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana
12. St. Frances Xavier Cabrini, Inc.
13. St. Francis de Salles, Inc.
14. St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana
15. St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana
16. St. Henry's, Inc.
17. St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana
18. St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana
19. St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana
20. St. John the Baptist, New Orleans, Louisiana, Inc.
21. St. Julian Eymard, Inc.
22. St. Lawrence the Martyr, Inc.
23. St. Louise de Marillac, Inc.
24. St. Maurice, Inc.
25. St. Monica, Inc.
26. St. Philip the Apostle, Inc.
27. St. Raymond's, Inc.
28. St. Rose of Lima, Inc.
29. St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana

---

Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc., was canonically merged into Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, now known as St. John Paul II Roman Catholic Church, Waggaman, Louisiana; (e) St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc., was canonically merged into St. John the Baptist Roman Catholic Church, Paradis, Louisiana, now known as St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana; (f) Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc., was canonically merged into St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, now known as St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana; and (g) St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc., had its canonical territory divided so that (i) the area north of the Pontchartrain Expressway was canonically merged into St. Patrick's Roman Catholic Church, New Orleans, Louisiana, and (ii) the area south of the Pontchartrain Expressway was canonically merged into St. Alphonsus Roman Catholic Church, New Orleans, Louisiana.

4

30.    St. Theresa of the Child Jesus, Inc.
31.    The Congregation of Saints Peter and Paul Roman Catholic Church
32.    The Congregation of St. Cecelia Roman Catholic Church
33.    The Congregation of the Annunciation Roman Catholic Church
34.    The Congregation of the Holy Trinity Roman Catholic Church

### III.    Archdiocesan Agencies

1.    Archdiocesan Spirituality Center
2.    Catholic Charities Archdiocese of New Orleans
3.    Catholic Charities Children's Day Care Centers
4.    Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)
5.    Clarion Herald Publishing Company
6.    Korean Catholic Community of New Orleans, Inc.
7.    Notre Dame Seminary
8.    Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana
9.    Pace Greater New Orleans
10.    Padua House (merged into Catholic Charities Archdiocese of New Orleans)
11.    Philmat, Inc.
12.    Project Lazarus
13.    Roman Catholic Center of Jesus the Lord
14.    School Food and Nutrition Services of New Orleans, Inc.
15.    Second Harvest Food Bank of Greater New Orleans and Acadiana
16.    St. Jude Community Center, Inc.
17.    St. Michael Special School
18.    St. Thérèse Catholic Academy
19.    The Society for the Propagation of the Faith, Archdiocese of New Orleans

#103965227v3

# PLAN EXHIBIT I

# [Reserved]

# PLAN EXHIBIT J

# Additional Debtors' Non-Trade Claims Bar Date Publication Notice

**Legal Notice**

# Did you experience a personal injury or property damage involving a Catholic parish, school, or ministry in the Archdiocese of New Orleans?

### File your claim by December 2, 2025 to preserve your rights.

The Roman Catholic Church of the Archdiocese of New Orleans filed for bankruptcy in 2020. Now, 157 other Catholic organizations may also file for bankruptcy, including parishes, schools, ministries, and other Church-affiliated groups ("**Catholic Entities**"). For a complete list of the Catholic Entities, visit www.NOLAchurchclaims.com or call 1-877-476-4389.

If you had a personal injury (like a slip-and-fall, asbestos exposure, or another injury), or if your property was damaged by one of the Catholic Entities, you may still be able to pursue a claim but you have to file a valid claim form by the deadline.

### Is this about sexual abuse?

No. This notice is not about sexual abuse claims. It's for other types of personal injury or property damage that were not related to sexual abuse.

### What happens if I don't file a claim?

If you do not file a claim by the deadline, you may permanently lose the right to:

- Sue any of the Catholic Entities in the future about your claim.
- Receive any compensation from the Catholic Entities.

**Important:** Regardless of whether you file a claim or not, you will keep the right to pursue claims against an insurance company if your claim is covered by insurance.

### Who should file a claim?

You may need to file a claim if:

- You were hurt on Church property (such as a parish or school).
- You were exposed to hazardous materials, like asbestos.
- Your property was damaged by Church operations or facilities.
- You have any other injury or damage involving the Catholic Entities in the Archdiocese of New Orleans.

If you previously filed a claim against the Archdiocese or a lawsuit against the Archdiocese or a Catholic Entity by August 14, 2025, your claim automatically covers the Catholic Entities.

### How to file a claim?

File a claim online at www.NOLAchurchclaims.com, download a Non-Abuse Proof of Claim from the website, or call 1-877-476-4389 to request one by mail. Claims must be filed by **December 2, 2025** at **11:59 p.m. Central Time.**

### Where can I get more information?

The case is called, *In re: The Roman Catholic Church of the Archdiocese of New Orleans* (Bankr. E.D. La.). More details are available at www.NOLAchurchclaims.com or by calling toll-free 1-877-476-4389.

**www.NOLAchurchclaims.com**          **1-877-476-4389**

# PLAN EXHIBIT K

# Additional Debtors' Non-Trade Proof of Claim Form

**Fill in this information to identify the case:**

Debtor name: The Roman Catholic Church of the Archdiocese of New Orleans

United States Bankruptcy Court for the Eastern District of Louisiana

Case number: 20-10846

Proof of Claim

# Proof of Claim

Additional Debtors' Non-Trade Proof of Claim Form

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents**; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1: Identify the Claim

| | |
|---|---|
| **1. Who is the current creditor?**<br>**Name and address of the creditor.** | Name and address of creditor (the person or entity to be paid for this claim):<br><br><br><br><br>Other names the creditor used with the debtor: _____ |
| **2. Has this claim been acquired from someone else?** | ☐ No          ☐ Yes.<br>                         From whom? _____ |
| **3. Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g). | Where should notices to the creditor be sent?<br><br>Name: _____<br><br>Address: _____<br><br>City: _____ State: ____ Zip: _____<br><br>Phone: _____<br><br>Email: _____<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one): _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | Where should payments to the creditor be sent? (if different)<br><br>Name: _____<br><br>Address: _____<br><br>City: _____ State: ____ Zip: _____<br><br>Phone: _____<br><br>Email: _____ |
| **4. Does this claim amend one already filed?** | ☐ No          ☐ Yes. Claim number on court<br>                         claims registry (if known): _____ | Filed on<br>(MM/DD/YYYY): _____ |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☐ No          ☐ Yes.<br>                         Who made the earlier filing? _____ | |

## Part 2: Give Information About the Claim as of the Date the Case was Filed

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☐ No          ☐ Yes. Last 4 digits of the debtor's<br>                         account or any identification number used: ____ ____ ____ ____ |
| **7. How much is the claim?** | $_____          Does this amount include interest or other charges?<br>                                        ☐ No          ☐ Yes. Attach statement itemizing interest, fees, expenses, or<br>                                                           other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| **8. What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information. |

| 9. Is all or part of the claim secured? | ❑ No | | |
|---|---|---|---|
| | ❑ Yes. The claim is secured by a lien on property. | ❑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*. | ❑ Motor vehicle ❑ Other (describe): _____ |

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____     **Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured** (the sum of the secured and unsecured amounts should match the amount in line 7):     $_____

**Amount necessary to cure any default as of the date of the petition:** $_____     **Annual interest rate** (when case was filed): _____%     ❑ Fixed ❑ Variable

| 10. Is this claim based on a lease? | ❑ No | ❑ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____ |
|---|---|---|
| 11. Is this claim subject to a right of setoff? | ❑ No | ❑ Yes. Identify the property: _____ |

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ❑ No | |
|---|---|---|
| | ❑ Yes. *Check all that apply:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ❑ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ❑ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ❑ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | ❑ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ❑ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ❑ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it.** FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*
❑ I am the creditor.
❑ I am the creditor's attorney or authorized agent.
❑ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
❑ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date (MM/DD/YYYY): _____

Signature: _____

**Print the name of the person who is completing and signing this claim:**

First name: _____     Middle: _____     Last: _____

Title: _____

Company (identify the corporate servicer as the company if the authorized agent is a servicer): _____

Address: _____

City: _____     State: _____     Zip: _____

Phone: _____     Email: _____

269

# Instructions for Proof of Claim

United States Bankruptcy Court                                          12/15

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**
  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the reverse page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form or you may access the claims agent's website (www.donlinrecano.com/rccano) to view the filed form.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Uniform claim identifier:** An optional 24-character identifier that some creditors use to facilitate electronic payment.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

**PLEASE SEND COMPLETED PROOF(S) OF CLAIM TO:**

**If Proof of Claim is sent by mail, send to:**

Donlin, Recano & Company, LLC
Re: The Roman Catholic Church of the Archdiocese
  of New Orleans
P.O. Box 2053
New York, NY 10272-2042

**If Proof of Claim is sent by Overnight Courier or Hand Delivery, send to:**

Donlin, Recano & Company, LLC
c/o Angeion Group
Re: The Roman Catholic Church of the Archdiocese
  of New Orleans
200 Vesey Street, 24th Floor
New York, NY 10281

**Alternatively, your claim may be filed electronically on DRC's website at:**
https://www.donlinrecano.com/Clients/rcano/FileClaim

**Do not file these instructions with your form.**