**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 20-10846** |
| **THE ROMAN CATHOLIC CHURCH OF** | § | |
| **THE ARCHDIOCESE OF NEW** | § | **Section "A"** |
| **ORLEANS,** | § | |
| | § | **Chapter 11** |
| Debtor.[1] | § | |
| | § | |

## NOTICE OF FILING PLAN SUPPLEMENTS

**PLEASE TAKE NOTICE** that:

1.     On August 12, 2025, the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**") entered an Order (the "**Disclosure Statement Order**"), [ECF 4253],[2] that: (a) authorizes the Roman Catholic Church of the Archdiocese New Orleans, the debtor and debtor-in-possession herein (the "**Debtor**" or "**Archdiocese**") in this chapter 11 case (the "**Chapter 11 Case**"), the Additional Debtors, and the Official Committee of Unsecured Creditors (collectively the "**Plan Proponents**" and each a "**Plan Proponent**"), to solicit votes on the *Second Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of August 6, 2025*, [ECF 4235], (as amended, modified, or supplemented from time to time, the "**Joint Plan**");[3] (b) approves the corresponding *Second Amended Modified Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of August 6, 2025*, [ECF 4242], (the "**Disclosure Statement**"), as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approves the solicitation materials and documents to be included in the solicitation packages (the "**Solicitation Package**"); and (d) approves procedures for soliciting, receiving, and tabulating votes on the Joint Plan and Filing objections to the Joint Plan.

2.     In accordance with the Third Amended Scheduling Order, [ECF 4506], the Bankruptcy Court will hold a hearing to consider Confirmation of the Joint Plan (the "**Confirmation Hearing**"), commencing on **November 17, 2025, at 9:00 a.m. (Central Time)**, before the Honorable Meredith S. Grabill, in the Bankruptcy Court located at 500 Poydras Street, Suite B-601, New Orleans, LA 70130. You may participate in the Confirmation Hearing (a) in person, (b) by telephone through the Bankruptcy Court's Teleconference Line, 504-517-1385, Conference Code 129611, or (c) by video at https://gotomeet.me/JudgeGrabill (audio will still be through the dial in Conference Code above).  Parties in interest are directed to the Bankruptcy Court's General Order 2021-2 for information on hearings,

---

[1] The last four digits of the Debtor's federal tax identification number are 8966.  The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA  70125.

[2] Capitalized terms not otherwise defined herein will have the same meaning as set forth in the Joint Plan or the Disclosure Statement Order.

[3] Most recently, on October 27, 2025, the Plan Proponents filed the *Fifth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of October 27, 2025*, [ECF 4518].

**PP Ex.**

**2**

1

available at https://www.laeb.uscourts.gov/. The Confirmation Hearing may be adjourned from time to time without further notice other than by such adjournment being announced during the Confirmation Hearing, or by a notice of adjournment Filed with the Bankruptcy Court.

3. The Joint Plan and Disclosure Statement contemplate the submission of certain documents or forms (the "**Plan Supplements**") in advance of the Confirmation Hearing. The following Plan Supplements are attached hereto:

| |
|---|
| Plan Supplement 4.6(c)(i) - Description and Transfer Terms of the Settlement Properties |
| Plan Supplement 4.6(c)(ii) - Amended Bond Documents |
| Plan Supplement 5.3(a)(ii) - First Settlement Trust Promissory Note and First Settlement Trust Promissory Note Letter of Credit |
| Plan Supplement 5.3(a)(iv) - Second Settlement Trust Promissory Note and Second Settlement Trust Promissory Note Letter of Credit |
| Plan Supplement 5.3(a)(vii) - Affordable Housing Facilities Sale Escrow Agreement |
| Plan Supplement 5.7(a) - Reorganized Archdiocese's Directors & Officers |
| Plan Supplement 5.7(b) - Reorganized Additional Debtors' Directors & Officers |
| Plan Supplement 6.3 - Settlement Trustee Disclosures |
| Plan Supplement 6.5 - Abuse Claims Reviewer Disclosures |
| Plan Supplement 7.1(a) - Insurance Settlement Agreements, consisting of the following:<br>• Plan Supplement 7.1(a) Pt. 1 - SPARTA Settlement Agreement<br>• Plan Supplement 7.1(a) Pt. 2 - SPARTA REDLINE<br>• Plan Supplement 7.1(a) Pt. 3 - U.S. Fire/International Settlement Agreement<br>• Plan Supplement 7.1(a) Pt. 4 - U.S. Fire/International REDLINE<br>• Plan Supplement 7.1(a) Pt. 5 - Catholic Mutual Settlement Agreement<br>• Plan Supplement 7.1(a) Pt. 6 - Catholic Mutual REDLINE<br>• Plan Supplement 7.1(a) Pt. 7 - Puritan Settlement Agreement<br>• Plan Supplement 7.1(a) Pt. 8 - Puritan REDLINE<br>• Plan Supplement 7.1(a) Pt. 9 - National Union Settlement Agreement<br>• Plan Supplement 7.1(a) Pt. 10 - National Union REDLNE<br>• Plan Supplement 7.1(a) Pt. 11 - Twin City Settlement Agreement<br>• Plan Supplement 7.1(a) Pt. 12 - Twin City REDLINE |
| Plan Supplement 7.1(f) - List of the Settling Insurers' Policies |
| Plan Supplement 7.2 - List of the Non-Settling Insurers' Policies |
| Plan Supplement 12.12(a) - Debtor's Preserved Estate Causes of Action |
| Plan Supplement 12.12(b) - Additional Debtors' Preserved Estate Causes of Action |

4. The Plan Supplements are integral to, and are considered part of, the Joint Plan. If the Joint Plan is confirmed, the Plan Supplements will be approved by the Bankruptcy Court pursuant to the order confirming the Joint Plan.

5. The Plan Proponents reserve the right, subject to the terms and conditions set forth in the Joint Plan, to alter, amend, modify, or supplement any Plan Supplement through the Effective Date.

6. If you would like to obtain a copy of the Disclosure Statement, the Joint Plan, any Plan Supplement, or any other pleading or document Filed in the Chapter 11 Case, you should contact the noticing, claims, and voting agent retained by the Debtor in the Chapter 11 Case, Donlin, Recano & Company, LLC (the "**Claims and Voting Agent**"), by: (a) telephoning the Claims and Voting Agent at 1-877-476-4389 (toll free); (b) visiting the restructuring website, maintained by the Claims and Voting Agent, at https://www.donlinrecano.com/Clients/rcano/Index; (c) writing the Claims and Voting Agent, (i) via First Class Mail, to Donlin, Recano & Company, LLC, re: The Roman Catholic Church of the Archdiocese of New Orleans, Attn: Voting Department, P.O. Box 2053, New York, NY 10272- 2042, or (ii) via

#110099618v1

Overnight/hand delivery, Donlin, Recano & Company, LLC, c/o Angeion Group, re: The Roman Catholic Church of the Archdiocese of New Orleans, Attn: Voting Department, 200 Vesey Street, 24th Floor, New York, NY 10281; or (d) emailing the Claims and Voting Agent at DRCVote@angeiongroup.com.

      All the pleadings Filed in the Chapter 11 Case are available for inspection and copying, without a fee, on the restructuring website at https://www.donlinrecano.com/Clients/rcano/Index, or on the Bankruptcy Court's website, for a fee, at http://www.laeb.uscourts.gov.

Dated: October 27, 2025

/s/ Samantha A. Oppenheim
JONES WALKER LLP
R. Patrick Vance (#13008)
Elizabeth J. Futrell (#05863)
Mark A. Mintz (#31878)
Samantha A. Oppenheim (#38364)
201 St. Charles Avenue, 51st Floor
New Orleans, LA 70170
Telephone: (504) 582-8000
Facsimile: (504) 589-8260
Email: pvance@joneswalker.com
     efutrell@joneswalker.com
     mmintz@joneswalker.com
     soppenheim@joneswalker.com

**ATTORNEYS FOR**
**THE ROMAN CATHOLIC CHURCH OF**
**THE ARCHDIOCESE OF NEW ORLEANS**

/s/ Douglas S. Draper
HELLER, DRAPER, & HORN, L.L.C.
Douglas S. Draper
Greta S. Brouphy
Michael E. Landis
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130
Telephone: 504-299-3300
Facsimile: 504-299-3399
E-mail: ddraper@hellerdraper.com
     gbrouphy@hellerdraper.com
     mlandis@hellerdraper.com

**ATTORNEYS FOR**
**THE ADDITIONAL DEBTORS**

/s/ James S. Stang
PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang (CA Bar 94435) (pro hac vice)
Iain A.W. Nasatir (CA Bar 148977) (pro hac vice)
Andrew W. Caine (CA Bar 110345) (pro hac vice)
Karen B. Dine (NY Bar 2625366) (pro hac vice)
10100 Santa Monica Blvd., Ste. 1300
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jstang@pszjlaw.com
     inasatir@pszjlaw.com
     acaine@pszjlaw.com
     kdine@pszjlaw.com

/s/ Bradley C. Knapp
TROUTMAN PEPPER LOCKE LLP
Omer F. Kuebel, III (La #21682)
Bradley C. Knapp (La #35867)
601 Poydras Street, Suite 2660
New Orleans, Louisiana 70130-6036
Telephone: (504) 558-5210
Facsimile: (504) 910-6847
Email: rkuebel@lockelord.com
     bknapp@lockelord.com

TROUTMAN PEPPER LOCKE LLP
W. Steven Bryant (TX Bar No. 2427413)
300 Colorado Street, Ste. 2100
Austin, Texas 78701
Telephone: (512) 305-4726
Facsimile: (512) 305-4800
Email: steven.bryant@troutman.com

**ATTORNEYS FOR THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS**

## PLAN SUPPLEMENT 4.6(c)(i)
### DESCRIPTION AND TRANSFER TERMS OF THE SETTLEMENT PROPERTIES

## I. SETTLEMENT PROPERTIES

The Settlement Properties consist of the following eight (8) parcels of immovable property located in Louisiana, which the Debtor shall transfer to the Bond Trustee (or its designee(s)) pursuant to Section 4.6(c)(i) of the Joint Plan:

**Property 1: Holy Guardian Angels Mission Church**
**Address:** 1701 Bridge City Ave., Bridge City, LA 70094
**Parish:** Jefferson Parish, Louisiana
**Legal Description:** [Insert complete metes and bounds legal description]
**Plan Value:** $403,700
**Valuation Source:** BDO Consulting Group, LLC Expert Report dated October 6, 2025
**Current Use/Status:** Former mission church; currently vacant

**Property 2: Madonna Manor (Former Site)**
**Address:** 1130 Barataria Blvd., Marrero, LA 70072
**Parish:** Jefferson Parish, Louisiana
**Legal Description:** [Insert complete metes and bounds legal description]
**Plan Value:** $2,000,000
**Valuation Source:** BDO Consulting Group, LLC Expert Report dated October 6, 2025
**Current Use/Status:** Former site of Madonna Manor; currently vacant

**Property 3: Old Hannan High School**
**Address:** 2501 Archbishop Philip M Hannan Blvd., Meraux, LA 70075
**Parish:** St. Bernard Parish, Louisiana
**Legal Description:** [Insert complete metes and bounds legal description]
**Plan Value:** $2,337,534
**Valuation Source:** BDO Consulting Group, LLC Expert Report dated October 6, 2025
**Current Use/Status:** Former high school; currently vacant

**Property 4: RCCANO Offices/Catholic Charities (Parking)**
**Address:** 1032 and 1042 S. Rampart St., New Orleans, LA 70113
**Parish:** Orleans Parish, Louisiana
**Legal Description:** [Insert complete metes and bounds legal description]
**Plan Value:** $1,903,000
**Valuation Source:** BDO Consulting Group, LLC Expert Report dated October 6, 2025
**Current Use/Status:** Parking lot of former administrative offices; currently vacant

**Property 5: Sacred Heart of Jesus Catholic Church**
**Address:** 3200 Canal Street, New Orleans, LA 70119
**Parish:** Orleans Parish, Louisiana
**Legal Description:** [Insert complete metes and bounds legal description]
**Plan Value:** $4,365,359

**Valuation Source:** BDO Consulting Group, LLC Expert Report dated October 6, 2025
**Current Use/Status:** Former church; partially vacant

**Property 6: St. Bonaventure Church**
**Address:** 329 S. Jamie Blvd, Avondale, LA 70094
**Parish:** Jefferson Parish, Louisiana
**Legal Description:** [Insert complete metes and bounds legal description]
**Plan Value:** $1,228,433
**Valuation Source:** BDO Consulting Group, LLC Expert Report dated October 6, 2025
**Current Use/Status:** Former church; currently vacant

**Property 7: Residence - Bridget Street**
**Address:** 6105 Bridget St., Metairie, LA 70003
**Parish:** Jefferson Parish, Louisiana
**Legal Description:** [Insert complete metes and bounds legal description]
**Plan Value:** $215,000
**Valuation Source:** BDO Consulting Group, LLC Expert Report dated October 6, 2025
**Current Use/Status:** Active housing entity

**Property 8: St. Pius X**
**Address:** 8151 Barataria Blvd., Crown Point, LA 70072
**Parish:** Jefferson Parish, Louisiana
**Legal Description:** [Insert complete metes and bounds legal description]
**Plan Value:** $604,667
**Valuation Source:** BDO Consulting Group, LLC Expert Report dated October 6, 2025
**Current Use/Status:** Former church; currently vacant

**AGGREGATE TOTAL VALUE: $13,057,693**

## II. PROPERTY TRANSFER TERMS AND CONDITIONS

### A. <u>Transfer Procedure</u>

**1. Timing:** The Debtor shall convey the Settlement Properties to the Bond Trustee (or its designee) within ninety (90) days after the Effective Date.

**2. Conveyance Documents:** Conveyance shall be by act of cash sale or other appropriate instrument under Louisiana law, executed by the Archbishop or his authorized representative.

**3. Free and Clear:** The Settlement Properties shall be conveyed free and clear of all liens, claims, encumbrances, and interests pursuant to sections 1123(a)(5)(D) and 1141(c) of the Bankruptcy Code, except for:
- Current year ad valorem taxes not yet due and payable
- Building and zoning ordinances
- Recorded easements and servitudes that do not materially impair use
- Matters disclosed by survey or inspection

2

5

**4. Deed Restriction:** The Bond Trustee shall acknowledge the following restrictions on the Settlement Properties which restrictions shall, to the fullest extent allowed by law, run with the land and be binding on the Bond Trustee and any future owners (the following restrictions are collectively referred to as the "**Use Restrictions**"):

The Settlement Properties shall not be used for the following uses or purposes:
1. An abortion clinic or medical-service-type facility that includes the provision of abortion services or counseling that promotes and/or encourages individuals to obtain abortions; or
2. A counseling service that includes as part of its options and/or recommendation to clients the consideration of abortion as an alternative to carrying a pregnancy through birth; or
3. An organization that advocates, in any manner, abortion or right of free choice of an individual to elect abortion.

## B. "AS IS, WHERE IS" - NO WARRANTIES

**ALL SETTLEMENT PROPERTIES ARE CONVEYED STRICTLY "AS IS," "WHERE IS," AND "WITH ALL FAULTS."**

**1. No Warranties**

**The Debtor makes NO representations or warranties of any kind regarding the Settlement Properties, including but not limited to:**
- **Physical condition, fitness, or habitability**
- **Compliance with building codes, zoning, or environmental laws**
- **Existence or condition of improvements or systems**
- **Value or marketability**
- **Absence of defects, whether patent or latent**
- **Environmental condition or contamination**
- **Accuracy of information provided**

**2. Limited Representations Only**

**The ONLY representations made by the Debtor are:**
- **The Debtor has authority to convey the Settlement Properties;**
- **To the Debtor's actual knowledge without investigation, there are no undisclosed liens other than those: (i) being discharged at closing; (ii) shown on title commitments; or (iii) eliminated by bankruptcy free-and-clear provisions; and**
- **The Settlement Properties shall be conveyed free and clear pursuant to §§ 1123(a)(5)(D) and 1141(c).**

**ALL OTHER WARRANTIES ARE EXPRESSLY DISCLAIMED.**

## C. Bond Trustee's Inspection Rights and Right to Refuse

**1. Inspection Period**

**(a)** The Bond Trustee shall have sixty (60) days after the Effective Date (the "**Inspection Period**") to inspect the Settlement Properties.

**(b)** The Debtor shall provide reasonable access for inspections upon five (5) business days' advance notice.

**(c)** The Bond Trustee may conduct physical inspections, environmental assessments, and other due diligence, subject to:
- No invasive testing without the Debtor's consent
- No damage to properties
- The Bond Trustee maintains liability insurance
- The Bond Trustee indemnifies Debtor for inspection-related claims

**2. Right to Refuse Properties**

**(a)** Within the Inspection Period, the Bond Trustee may refuse to accept any or all Settlement Properties by providing written notice to the Debtor specifying which properties are refused.

**(b) Effect of Refusal:**

**(i)** If the Bond Trustee refuses to accept any particular Settlement Property or Settlement Properties, then the Bond Trustee shall receive the Settlement Properties not refused and cash payments of $7,200,000 as provided in Section 4.6(c)(ii) of the Joint Plan.

**(ii)** If the Bond Trustee refuses to accept all of the Settlement Properties, then the Bond Trustee shall be deemed to have waived the property transfer component of the treatment under Section 4.6(c)(i) of the Joint Plan and shall receive only the cash payments of $7,200,000 as provided in Section 4.6(c)(ii) of the Joint Plan.

In either case, the Bond Trustee shall have no right to additional consideration, substitute properties, or any other recovery beyond that described above.

**(c) If Bond Trustee Does Not Refuse:** If the Bond Trustee does not provide written notice refusing properties within the Inspection Period, then the Bond Trustee shall be deemed to have accepted all Settlement Properties and shall be required to accept conveyance on the terms set forth in this Plan Supplement.

**3. Deemed Acceptance as Admission:** The Bond Trustee's acceptance of the Settlement Properties (whether express or by failure to refuse within the Inspection Period) shall constitute:
- An acknowledgment that the Bond Trustee has conducted such inspections and due diligence as it deemed appropriate;
- An acknowledgment that the Settlement Properties have value equal to or greater than the values stated in Section I above;
- A waiver of any claims that the Settlement Properties are not worth the stated values or that the valuation methodology used by BDO Consulting Group, LLC was unreliable; and

- Satisfaction with accepting the Settlement Properties in their current "AS IS, WHERE IS" condition.

## D. <u>Environmental Liabilities</u>

### 1. Bond Trustee Assumes All Environmental Liability

From and after conveyance (or the Effective Date if risk of loss passes earlier), the Bond Trustee assumes ALL environmental liabilities relating to the Settlement Properties, including:
- Liability under CERCLA, RCRA, Clean Water Act, Clean Air Act, and all other environmental laws
- Contamination from asbestos, lead paint, petroleum, PCBs, mold, or any other hazardous materials
- All cleanup, remediation, and monitoring costs
- All fines, penalties, and third-party claims
- Status as potentially responsible party (PRP) under CERCLA

### 2. No Environmental Representations

The Debtor makes NO representations regarding environmental condition. The Settlement Properties may contain hazardous materials and contamination. The Bond Trustee accepts all environmental risks.

### 3. Bond Trustee Indemnifies Debtor

The Bond Trustee shall indemnify and hold harmless the Debtor and all related parties from any environmental claims relating to the Settlement Properties arising after conveyance.

## E. <u>Other Key Terms</u>

**1. Possession:** The Bond Trustee receives possession upon recordation of conveyance documents.

**2. Taxes:** Property taxes prorated as of Effective Date; the Bond Trustee responsible for all taxes accruing after Effective Date.

**3. Risk of Loss:** Passes to the Bond Trustee upon earlier of: (a) conveyance; or (b) 91 days after Effective Date.

**4. Closing Costs:** Recording fees and transfer taxes (if any) divided equally between parties. Each party pays own legal fees and title insurance premiums.

**5. Personal Property:** Not included; The Debtor may remove all personal property before or within 30 days after conveyance.

**6. Designee Rights:** The Bond Trustee may designate third party to take title, provided designee agrees to all terms herein.

**F. Alternative Treatment if Conveyance Impossible**

If any Settlement Property cannot be conveyed within 180 days after the Effective Date due to circumstances beyond the Debtor's control (title defects that cannot be cured, legal impediments, physical destruction, etc.), the Debtor may:

**(a) Substitute Property:** Substitute alternative property of equivalent value (using BDO methodology), subject to the Bond Trustee's reasonable approval; or

**(b) Cash Payment:** Pay Cash equal to the Plan value in four semi-annual installments at 6% interest.

**G. Release**

Upon conveyance, the Bond Trustee releases all claims against the Debtor relating to the condition, value, or marketability of the Settlement Properties, except for claims arising from intentional fraud, willful misconduct, or breach of the Limited Representations in Section II.B.2 of this Plan Supplement.

**H. Governing Law and Jurisdiction**

This Plan Supplement is governed by Louisiana law (except to extent federal bankruptcy law applies). The Bankruptcy Court retains exclusive jurisdiction to resolve all disputes.

DRAFT: 10/27/2025

---

AMENDMENT NO. 1 TO
TRUST INDENTURE


BETWEEN


LOUISIANA PUBLIC FACILITIES AUTHORITY


AND


ARGENT INSTITUTIONAL TRUST COMPANY,
as Trustee


DATED AS OF JANUARY 1, 2026

---


$41,895,000
(ORIGINAL PRINCIPAL AMOUNT)
LOUISIANA PUBLIC FACILITIES AUTHORITY
REFUNDING REVENUE BONDS
(ARCHDIOCESE OF NEW ORLEANS PROJECT)
SERIES 2017

---

# TABLE OF CONTENTS

\*  \*  \*  \*  \*  \*

## ARTICLE I

### AMENDMENT

**SECTION 1.01.** Amendment to Section 1.01 of Original Indenture................................2
**SECTION 1.02.** Amendment to Section 3.02 of Original Indenture................................2
**SECTION 1.03.** Form of Bond.................................................................................................3

## ARTICLE II

### MISCELLANEOUS

**SECTION 2.01.** Severability. ................................................................................................3
**SECTION 2.02.** Execution in Counterparts..........................................................................3
**SECTION 2.03.** Applicable Law.............................................................................................3
**SECTION 2.04.** No Other Amendments. ...............................................................................3

**EXHIBIT A:** Form of Series 2017 Bond

## AMENDMENT NO. 1 TO
## TRUST INDENTURE

This **AMENDMENT NO. 1 TO TRUST INDENTURE** dated as of January 1, 2026  (this "Amendment") between the **LOUISIANA PUBLIC FACILITIES AUTHORITY**, a public trust and public corporation established for the benefit of the State of Louisiana (the "State") (the "Authority") by a certain Indenture of Trust dated August 21, 1974, and **ARGENT INSTITUTIONAL TRUST COMPANY**, successor-in-interest to TMI Trust Company, as trustee (the "Trustee"), amends and supplements the Trust Indenture dated April 1, 2017 (the "Original Indenture", as amended through this Amendment, the "Indenture"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Original Indenture.

### W I T N E S S E T H :

WHEREAS, the Authority is a public trust and public corporation of the State of Louisiana (the "State") created by a certain Indenture of Trust dated August 21, 1974 pursuant to the provisions of Chapter 2-A of Title 9 of the Louisiana Revised Statutes of 1950, as amended (the "Public Trust Act") to promote, encourage and further the accomplishment of all activities which are or may become of benefit to the State and its inhabitants and which have a public purpose, and to procure any funds necessary therefor by mortgage, pledge or other encumbrance of the trust estate dedicated by it therefor and is authorized pursuant to Chapter 14-A of Title 39 of the Louisiana Revised Statutes of 1950, as amended (the "Refunding Act") to refund bonded indebtedness incurred for said facilities; and

WHEREAS, for the benefit of The Roman Catholic Church of the Archdiocese of New Orleans (the "Corporation"), a Louisiana nonprofit corporation and 501(c)(3) corporation, the Authority entered into the Original Indenture, pursuant to which the Authority issued $41,895,000 (original principal amount) of its Louisiana Public Facilities Authority Refunding Revenue Bonds (Archdiocese of New Orleans Project) Series 2017 (the "Bonds"); and

WHEREAS, the Authority and the Corporation entered into a Loan Agreement dated as of April 1, 2017 (the "Original Loan Agreement" and together with the Indenture and the Bonds, the "Bond Documents"), pursuant to which the Authority loaned the proceeds of the Bonds to the Corporation for the purposes of providing funds to, together with other available monies of the Corporation, (i) to refund the bonds described in the Original Indenture and (ii) pay the costs of issuance of the Bonds; and

WHEREAS, on May 1, 2020, the Corporation declared bankruptcy and on ____ __, __ the Bankruptcy Court approved a reorganization plan (the "Plan"); and

WHEREAS, the Authority's rights, duties and obligations under the Original Loan Agreement (except for certain rights of reimbursement of expenses, indemnification and exculpation, and rights to notices) have been assigned by the Authority to the Trustee for the benefit and security of the present and future owners of the Bonds; and

WHEREAS, the Corporation desires to amend the amortization requirements of the Bonds as set forth in the Plan; and

WHEREAS, the Authority is authorized under the Act to amend the Original Indenture, and

WHEREAS, the Corporation has also provided a written consent to the amendment of the Original Indenture in accordance with Section 8.02 of the Original Loan Agreement; and

1

WHEREAS, pursuant to the Loan Agreement, the Corporation agrees to make payments at times and in amounts sufficient to pay Debt Service on the Bonds; and

WHEREAS, the Authority has adopted a resolution authorizing the execution and delivery of this Amendment and other actions to be taken by the Board of Trustees of the Authority in connection therewith; and

WHEREAS, the fully registered Bonds and the certificate of authentication by the Trustee to be endorsed thereon with respect to the Bonds are to be in substantially the form attached as **Exhibit A** hereto, with all necessary and appropriate variations, omissions and insertions as permitted or required under the Indenture; and

WHEREAS, all acts, conditions and things required by the laws of the State and the rules and regulations of the Authority to happen, exist and be performed precedent to and in the execution and delivery of this Indenture have happened, exist and have been performed as so required in order to make this Indenture a valid and binding agreement in accordance with its terms; and

WHEREAS, each of the parties hereto represents that it is fully authorized to enter into and perform and fulfill the obligations imposed upon it under the Indenture and the parties are now prepared to execute and deliver this Amendment;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the Authority and the Trustee hereby covenant and agree as follows:

# ARTICLE I
## AMENDMENT

**SECTION 1.01.** **Amendment to Section 1.01 of Original Indenture.** Section 1.01 of the Original Indenture is hereby amended and supplemented as follows:

(a)     The following terms are added to Section 1.01:

**"Amendment"** means the Amendment No. 1 to Trust Indenture dated as of January 1, 2026 between the Authority and the Trustee.

**SECTION 1.02.** **Amendment to Section 3.02 of Original Indenture.** Section 3.02 of the Original Indenture is hereby amended in its entirety to read as follows:

Effective and commencing on January __, 2026, the Bonds shall be numbered from No. R-1 upwards and shall bear interest from the date thereof, payable on each Interest Payment Date commencing July 1, 2026, and computed on the basis of a 360-day year having twelve 30-day months, until the principal amount of the Bonds is paid at maturity or upon redemption, at the rates, and shall mature, subject to prior redemption as hereafter set forth, on July 1 of each of the years and in the principal amounts as follows:

| Payment Date | Principal Amount | Interest %* |
|---|---|---|
| July 1, 2026 | $600,000.00 | |
| July 1, 2027 | $600,000.00 | |
| July 1, 2028 | $600,000.00 | |
| July 1, 2029 | $600,000.00 | |

2

13

| July 1, 2030 | $600,000.00 | |
| July 1, 2031 | $600,000.00 | |
| July 1, 2032 | $600,000.00 | |
| July 1, 2033 | $600,000.00 | |
| July 1, 2034 | $600,000.00 | |
| July 1, 2035 | $600,000.00 | |
| July 1, 2036 | $600,000.00 | |
| July 1, 2037 | $600,000.00 | |

*Fair Market Value Rate TBD

Each Bond shall bear interest payable from the Interest Payment Date next preceding the date of its authentication to which interest has been paid or duly provided for, except that if any Bond shall be authenticated on any Interest Payment Date to which interest has been paid, it shall bear interest from such date and except if any Bond shall be authenticated prior to January 1, 2026, it shall bear interest from the closing date.

**SECTION 1.03.** **Form of Bond.** Effective January __, 2026 the Bonds shall be issued in substantially the form set forth in **Exhibit A** hereto.

# ARTICLE II
## MISCELLANEOUS

**SECTION 2.01.** **Severability.** In the event any provisions of this Amendment shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

**SECTION 2.02.** **Execution in Counterparts.** This Amendment may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

**SECTION 2.03.** **Applicable Law.** This Amendment shall be governed by and construed in accordance with the laws of the State.

**SECTION 2.04.** **No Other Amendments.** There are no other amendments to the Bond Documents other than the amendments described herein, and all other provisions of the Bond Documents shall remain in full force and effect.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

3

14

[Signature Page of Amendment No. 1 to Trust Indenture]

IN WITNESS WHEREOF, the Authority and the Trustee have caused this Amendment No. 1 to Trust Indenture to be signed on their behalf by their duly authorized representatives as of the date first written above.

LOUISIANA PUBLIC FACILITIES
AUTHORITY

By: _____
                    Chairman

ATTEST:

By: _____
            Assistant Secretary                                                    [SEAL]

ARGENT INSTITUTIONAL TRUST COMPANY

By: _____
                    Authorized Signatory

                                                                                          [SEAL]

# FORM OF SERIES 2017 BOND

Unless this Bond is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC") to the Authority or its agent for registration of transfer, exchange, or payment, and any Bond issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein.

As provided in the Indenture referred to herein, until the termination of the system of book-entry-only transfers through The Depository Trust Company, New York, New York, and notwithstanding any other provision of the Indenture to the contrary, this Bond may be transferred, in whole but not in part, only to a nominee of DTC, or by a nominee of DTC to DTC or a nominee of DTC, or by DTC or a nominee of DTC to any successor securities depository or any nominee thereof.

## UNITED STATE OF AMERICA
## STATE OF LOUISIANA

## Louisiana Public Facilities Authority
## Refunding Revenue Bonds
## (Archdiocese of New Orleans Project)
## Series 2017

Maturity Date: _____                              CUSIP NO. 5463986
Registered Owner: Cede & Co. (Tax Identification No. 13-2555119)
Bond Date: _____, 2026
Principal Amount: $600,000.00
Interest Rate: __%

      The LOUISIANA PUBLIC FACILITIES AUTHORITY (the "Authority"), a public trust and public corporation of the State of Louisiana (the "State"), for value received, hereby promises to pay from the source and as hereinafter provided, to the Registered Owner (named above), or registered assigns, on the Maturity Date (stated above), the Principal Amount (stated above) subject to right of prior redemption as provided hereinafter, and to pay interest on said sum on January 1 and July 1 of each year, commencing July 1, 2026 (each an "interest payment date"), from the Bond Date (stated above) at the rate of interest per annum shown above until said principal sum is paid. The principal of, premium, if any, and interest on this Bond are payable in such coin or currency of the United States of America as, at the respective times of payment, is legal tender for the payment of public and private debts. The principal of and premium, if any, on this Bond shall be payable to the registered owner hereof or his assigns upon surrender hereof at the corporate trust office of Whitney Bank, as trustee (the "Trustee") designated by it from time to time. The interest on this Bond, when due and payable, shall be paid by check or draft mailed

16

by the Trustee on the interest payment date to the person in whose name this Bond is registered at his address as it appears on the Bond Register maintained by the Trustee at the close of business on the June 15 or December 15, as the case may be, next preceding an interest payment date, or if such day shall not be a business day, the next preceding business day (the "Record Date"), irrespective of any transfer or exchange of this Bond subsequent to such Record Date and prior to such interest payment date, unless the Authority shall default in payment of interest due on such interest payment date. Interest on this bond shall be computed on the basis of a 360-day year having twelve 30-day months. In the event of any such default, such defaulted interest shall be payable on a payment date established by the Trustee to the person in whose name this Bond is registered at the close of business on a special record date for the payment of such defaulted interest established by notice mailed by the Trustee to the registered owner of this Bond not less than 15 days preceding such special record date.

This Bond is one of the duly authorized issue of the Authority's Refunding Revenue Bonds (Archdiocese of New Orleans Project) Series 2017, issued under and secured by a Trust Indenture dated as of April 1, 2017, between the Authority and the Trustee (together with all amendments and supplements thereto, the "Indenture"), pursuant to which the Authority is issuing $41,895,000 original principal amount of said bonds (the "Bonds") for the purpose of providing funds to refund all of the Authority's outstanding Revenue and Revenue Refunding Bonds (Archdiocese of New Orleans Project) Series 2007 and pay costs of issuance of the Bonds [(and which are now outstanding in the amount of $_____)].

The proceeds of the Bonds are being loaned to The Roman Catholic Church of the Archdiocese of New Orleans (the "Corporation"), pursuant to a Loan Agreement dated as of April 1, 2017 between the Authority and the Corporation (together with all amendments and supplements thereto called the "Loan Agreement") for the foregoing purposes.

The Bonds are issued pursuant to the laws of the State, particularly Chapter 14-A of Title 39 of the Louisiana Revised Statutes of 1950, as amended (the "Refunding Act"), and pursuant to the Indenture, to which Indenture, a fully executed counterpart of which is on file in the corporate trust office of the Trustee in Baton Rouge, Louisiana, reference is hereby made for a more complete description of the assigned revenues constituting the Trust Estate, the nature and extent of the security, the terms and conditions under which the Bonds are issued and secured, the rights, duties and immunities of the Authority, the rights, duties and immunities of the Trustee and the rights of the registered owners of the Bonds. The registered owner of this Bond shall have no rights to institute any suit, action or proceeding for the enforcement of the Indenture or for the execution of any trust thereunder or for any remedy under the Indenture, except as provided in the Indenture, and by acceptance of this Bond, the owner hereof assents to all of the provisions of the Indenture. All terms not defined herein shall have the meanings assigned thereto in the Indenture.

This Bond shall not be valid or become obligatory for any purpose or be entitled to any security or benefit under the Indenture until the certificate of authentication hereon shall have been signed by a duly authorized representative of the Trustee.

The Bonds are limited and special revenue obligations of the Authority and are payable solely from (i) payments received by the Authority from the Corporation pursuant to the Loan Agreement and (ii) all funds held by the Trustee under the Indenture and available for such payment, said payments and funds being herein referred to as the "Trust Estate". The Loan Agreement, a fully executed counterpart of which is on file in the corporate trust office of the Trustee in Baton Rouge, Louisiana, provides that the Corporation is unconditionally obligated to make payments in an aggregate amount sufficient, with any other funds available therefor, for the

6

payment in full of the principal, premium, if any, and interest of all Bonds issued and outstanding under the Indenture, to the date of payment thereof, and certain costs, expenses and charges of the Authority and the Trustee. The Loan Agreement imposes upon the Corporation certain obligations respecting the use and operation of its Properties (as defined in the Loan Agreement) and the maintenance and repair of said Properties.

THE BONDS ARE LIMITED AND SPECIAL OBLIGATIONS OF THE AUTHORITY AND DO NOT CONSTITUTE OR CREATE AN OBLIGATION, GENERAL OR SPECIAL, DEBT, LIABILITY OR MORAL OBLIGATION OF THE STATE OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY PROVISIONS WHATSOEVER AND NEITHER THE FAITH OR CREDIT NOR THE TAXING POWER OF THE STATE OR OF ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR THE INTEREST ON THE BONDS. THE BONDS ARE NOT A GENERAL OBLIGATION OF THE AUTHORITY (WHICH HAS NO TAXING POWER AND RECEIVES NO FUNDS FROM ANY GOVERNMENTAL BODY) BUT ARE A LIMITED AND SPECIAL REVENUE OBLIGATION OF THE AUTHORITY PAYABLE SOLELY FROM THE INCOME, REVENUES AND RECEIPTS DERIVED OR TO BE DERIVED FROM PAYMENTS MADE PURSUANT TO THE LOAN AGREEMENT.

EXCHANGE AND TRANSFER OF BONDS

The Bonds are issuable in Authorized Denominations. As long as any of the Bonds remain outstanding, there shall be permitted the exchange of Bonds at the designated corporate trust office of the Trustee. Any Bond or Bonds upon surrender thereof at the designated corporate trust office of the Trustee, with a written instrument of transfer satisfactory to the Trustee, duly executed by the registered owner or his legal representative duly authorized in writing, may, at the option of the registered owner thereof, be exchanged for an equal aggregate principal amount of other Bonds of the same series in Authorized Denominations.

This Bond may be transferred by the registered owner hereof in person or by his legal representative at the designated corporate trust office of the Trustee, and the registration of such transfer shall be made upon the Bond Register by the Trustee in the manner and subject to the limitations and conditions provided in the Indenture and upon surrender and cancellation of this Bond. The Trustee shall not be required to register the transfer or exchange of (a) any Bonds during the 15 day period next preceding the selection of Bonds to be redeemed and thereafter until the date of the mailing of a notice of redemption of Bonds selected for redemption, or (b) any Bonds selected, called or being called for redemption in whole or in part, except in the case of any Bond to be redeemed in part, the portion thereof not so to be redeemed.

This Bond is transferable only at the designated corporate trust office of the Trustee.

REDEMPTION PROVISIONS

*Optional Redemption*

The Bonds maturing on or after July 1, 2028, are subject to redemption prior to their respective stated maturities at the option of the Authority (which option shall be exercised upon request of the Corporation), from any source of available funds, in whole or in part on any date on or after July 1, 2027 (in such maturities as are designated by the Corporation or, if the

7

Corporation fails to designate such maturities, in inverse order of maturity, and by lot within a maturity), at a redemption price of par plus accrued interest to the redemption date.

*Extraordinary Redemption*

The Bonds are subject to extraordinary redemption in whole or in part on any date at the principal amount thereof plus accrued interest to the redemption date and without premium, if the Corporation shall have elected to make prepayment of all Payments payable under the Agreement as provided therein (and the Corporation shall have delivered to the Trustee a copy, duly certified by an Authorized Corporation Representative, of a resolution of the Corporation making such determination and requesting such redemption) because the Corporation is required or ordered by legislative, judicial or administrative action of the United States of America or the State or any agency, department or subdivision thereof to operate the facilities financed or refinanced by the Refunded Bonds in a manner inconsistent with the stated goals, purposes and policies of the Corporation, and such action is applicable to the Corporation because the Corporation is a party to the Agreement.

The Bonds are also subject to extraordinary redemption in whole or in part on any date at the principal amount thereof plus accrued interest to the redemption date and without premium, if as a result of any changes in the State Constitution or the Constitution of the United States of America or legislative, judicial or administrative action of the United States of America or the State or any agency, department or subdivision thereof, (i) the Indenture or the Agreement shall have become void or unenforceable or impossible of performance in accordance with the intention of the parties as expressed therein, or (ii) the interest on the Bonds shall no longer be excluded from the gross income of the owners thereof for federal income tax purposes

The Bonds are also subject to extraordinary redemption in whole or in part on any date at the principal amount thereof plus accrued interest to the redemption date and without premium, in the event of damage, destruction or condemnation with respect to the Corporation (i) finding that the reasonable fair market value of the Refunded Projects damaged, destroyed or condemned is equal to or greater than 5% of the fair market value of all of the Properties of the Corporation and (ii) determining to apply all or a portion of any casualty loss or condemnation awards related to the Refunded Projects to the redemption of the Bonds.

*Notice and Method of Redemption*

At least 30 days before the redemption date of any Bonds, the Trustee shall cause a notice of any such redemption, signed by an authorized officer of the Trustee to be mailed, postage prepaid, to all Bondholders of record owning Bonds to be redeemed in whole or in part, at their addresses as they appear on the Bond Register, but any failure to mail any such notice to one or more owners shall not affect the validity of the proceedings for such redemption with respect to the owners to whom notice was duly mailed. Neither the failure to receive any notice nor any defect in such notice so given shall affect the validity of the proceedings for such redemption. Each such notice shall set forth the date fixed for redemption, the redemption price to be paid and, if less than all of the Bonds then outstanding shall be called for redemption, the numbers of such Bonds to be redeemed and, in the case of Bonds to be redeemed in part only, the portion of the principal amount thereof to be redeemed. In case any Bond is to be redeemed in part only, the notice of redemption shall state also that on or after the redemption date, upon surrender of such

8

Bond, a new Bond in principal amount equal to the unredeemed portion of such Bond will be issued.

On the date so designated for redemption, notice having been given in the manner and under the conditions provided in the Indenture and money for payment of the redemption price being held in the Debt Service Fund in trust for the owners of the Bonds or portions thereof to be redeemed, the Bonds or portions of Bonds so called for redemption shall become and be due and payable at the redemption price provided for redemption of such Bonds or portions of Bonds on such date, interest on the Bonds or portions of Bonds so called for redemption shall cease to accrue, such Bonds or portions of Bonds shall cease to be entitled to any benefit or security under the Indenture, and the owners of such Bonds or portions of Bonds shall not have rights in respect thereof except to receive payment of the redemption price thereof and, to the extent provided in the next paragraph, to receive Bonds for any unredeemed portions of Bonds.

With respect to any notice of optional redemption of Bonds, unless upon the giving of such notice such Bonds or portions thereof shall be deemed to have been paid within the meaning of the Indenture, such notice shall state that such redemption shall be conditioned upon the receipt by the Trustee on or prior to the date fixed for such redemption of moneys or Defeasance Obligations, or a combination thereof, sufficient to pay the principal of, premium, if any, and interest on such Bonds or portions thereof to be redeemed, and that if such moneys or Defeasance Obligations, or a combination thereof, shall not have been so received said notice shall be of no force and effect and the Trustee shall not be required to redeem such Bonds or portions thereof. In the event that such notice of redemption contains such a condition and such moneys or Defeasance Obligations, or a combination thereof, are not so received, the redemption shall not be made and the Trustee shall within five (5) days after the scheduled redemption date give notice, in the manner in which the notice of redemption was given, that such moneys or Defeasance Obligations, or a combination thereof, were not so received.

In case part, but not all, of an outstanding Bond shall be selected for redemption, the registered owner thereof or his legal representative shall present and surrender such Bond to the Trustee for payment of the principal amount thereof so called for redemption, and the Trustee shall authenticate and deliver to or upon the order of such registered owner or his legal representative, without charge therefor, for the unredeemed portion of the principal amount of the Bond so surrendered, a new Bond.

In certain events, on the conditions, in the manner and with the effect set forth in the Indenture, the principal of all the Bonds then outstanding may be declared and may become due and payable before the stated maturity thereof, together with accrued interest thereon.

Modifications or alterations of the Indenture or any agreement supplemental thereto or of the Loan Agreement or any agreement supplemental thereto may be made only to the extent and in the circumstances permitted by the Indenture and the Loan Agreement. The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Authority and the owners of the Bonds at any time with the consent of the owners of a majority in aggregate principal amount of all Bonds at the time outstanding. The Indenture also contains provisions permitting the owners of a majority in aggregate principal amount of all Bonds at the time outstanding, on behalf of the owners of all Bonds, to waive compliance by the Authority with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences. Any such consent or waiver by the owner of this Bond shall be conclusive and binding upon such owner and all future owners of this Bond and of

9

any Bond issued in lieu hereof whether or not notation of such consent or waiver is made upon this Bond.

This Bond is not an obligation, general or special, debt, liability or moral obligation of the State or of any political subdivision thereof, or any individual trustee of the Authority in his or her individual capacity, but it is a limited and special revenue obligation of the Authority payable solely from the Trust Estate. This Bond is issued with the intent that the laws of the State shall govern its construction.

No recourse under, or upon any statement, obligation, covenant, or agreement contained in the Indenture or in any Bond thereby secured or in the Loan Agreement or in any document or certification whatsoever or under any judgment obtained against the Authority or by the enforcement of any assessment or by any legal or equitable proceeding by virtue of any constitution or statute or otherwise or under any circumstance shall be had against any trustee, employee or officer, as such, of the Authority, either directly or through the Authority, or otherwise, for the payment for, or to, the Authority or any receiver thereof, or for, or to, the owner of any Bond issued under the Indenture or otherwise, of any sum that may be due and unpaid by the Authority upon any such Bond. Any and all personal liability of every nature, whether at law or in equity, or by statute or by constitution or otherwise, of any such trustee, employee or officer, as such, to respond by reason of any act or omission on his or her part or otherwise for the payment for, or to, the Authority or any receiver thereof, or for, or to the owner of any Bond issued under the Indenture or otherwise, of any sum that may remain due and unpaid upon the Bonds thereby secured or any of them, is hereby expressly waived and released as an express condition of, and in consideration for, the execution of the Indenture and the issuance of the Bonds.

It is hereby certified, recited and declared that all acts, conditions and things required to exist, happen and be performed precedent to and in the execution and delivery of the Indenture and the issuance of this Bond do exist, have happened and have been performed in due time, form and manner as required by law.

10

IN WITNESS WHEREOF, the Louisiana Public Facilities Authority has caused this Bond to be executed in its name by the manual or facsimile signature of its Chairman and its official seal to be impressed or printed hereon and attested by the manual or facsimile signature of its Assistant Secretary.

<div align="center">LOUISIANA PUBLIC FACILITIES AUTHORITY</div>

By:_____
<div align="center">Chairman</div>

Attest:

_____
<div align="center">Assistant Secretary</div>                    [SEAL]

<div align="center">**Certificate of Authentication**</div>

This is one of the Bonds referred to in the within-mentioned Indenture.

<div align="center">ARGENT INSTITUTIONAL TRUST COMPANY, as Trustee</div>

By:_____
<div align="center">Authorized Signatory</div>

Date of authentication: _____, 20___

**Assignment**

For value received, _____ hereby sell(s), assign(s) and transfer(s) unto [Please insert name and taxpayer identification number] _____ this Bond and hereby irrevocably constitute(s) and appoint(s) _____ attorney to transfer this Bond on the books of the within named Authority at the office of the within named Trustee, with full power of substitution in the premises.

Dated: _____

_____

**NOTE**: The name signed to this assignment must correspond with the name of the payee written on the face of the within bond in all respects, without alteration, enlargement or change whatsoever.

Signature Guaranteed:

_____

(Bank or Trust Company)

By_____

(Authorized Officer)

*Signature(s) must be guaranteed by an eligible guarantor institution which is a member of the recognized signature guarantee program, i.e., Securities Transfer Agents Medallion Program (STAMP), Stock Exchanges Medallion Program (SEMP), or New York Stock Exchange Medallion Signature Program (MSP).

## LEGAL OPINION CERTIFICATE

I, the undersigned Assistant Secretary of the Louisiana Public Facilities Authority, do hereby certify that attached hereto is a true copy of the complete legal opinion of Foley & Judell, L.L.P., the original of which was manually executed, dated and issued as of the date of payment for and delivery of this Bond and was delivered to the original purchaser of the Bonds.

I further certify that an executed copy of the legal opinion is on file in my office and that an executed copy thereof has been furnished to the Trustee for this Bond.

_____

Assistant Secretary

**PROMISSORY NOTE**

MAKER:         The Roman Catholic Church of the Archdiocese of New Orleans, as debtor-in-possession
7887 Walmsley Ave.
New Orleans, Louisiana 70125

PAYEE:         The Archdiocese of New Orleans Settlement Trust
[Address]

PRINCIPAL AMOUNT: $20,000,000.00                        DATE: [__], 2025

---

1. <u>BANKRUPTCY PLAN</u>.  Reference is hereby made to that certain Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, dated as of [__], 2025 (the "<u>Bankruptcy Plan</u>"). The parties hereto hereby acknowledge and agree that this Promissory Note (this "<u>Note</u>") is being executed and delivered pursuant to the Bankruptcy Plan.  Capitalized terms used and not otherwise defined herein have the meaning ascribed thereto in the Bankruptcy Plan.

2. <u>PROMISE TO PAY</u>.  For value received, **THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS**, a Louisiana non-profit religious corporation, as debtor-in-possession ("<u>Maker</u>"), promises to pay to the order of **THE ARCHDIOCESE OF NEW ORLEANS SETTLEMENT TRUST**, a Louisiana trust ("<u>Payee</u>"), the principal sum of **TWENTY MILLION AND NO/100 DOLLARS** ($20,000,000.00) ("<u>Principal Amount</u>"), together with interest thereon at the Note Rate (as hereinafter defined), as set forth below by July 15, 2026 (the "<u>Maturity Date</u>"), all in accordance with the terms and conditions set forth herein.

3. <u>PAYMENT AND INTEREST</u>.

    (a)    Maker agrees to pay to Payee under this Note the Principal Amount due hereunder, and all accrued but unpaid interest thereon, and any other remaining unpaid fees and other amounts due hereunder on the Maturity Date, unless sooner paid in full.  Interest will accrue on the outstanding principal balance of this Note at a rate of [zero] percent ([0]%) per annum (the "<u>Note Rate</u>").  Interest will be calculated on a 365-day year basis and paid for the actual number of days elapsed (including the first but excluding the last day) during any period.

    (b)    The parties hereto hereby acknowledge that Maker is in the process of selling those certain Affordable Housing Facilities and that, pursuant to the Bankruptcy Plan, if the sale of the Affordable Housing Facilities closes before the Effective Date , an Affordable Housing Facilities Sale Escrow Account shall be opened and funded with the net proceeds from the sale of such Affordable Housing Facilities (the "<u>Housing Facilities Sale Proceeds</u>") in an amount not to exceed **SEVENTY MILLION AND NO/100 DOLLARS** ($70,000,000.00).

    To the extent not otherwise paid by the Maker in the ordinary course, the Housing Facilities Sale Proceeds hall be used to repay this Note.  Notwithstanding the payment schedule set forth in Section 3(a) hereof or the Maturity Date of this Note, Maker hereby agrees that, as soon as practicable after its receipt in full of the Housing Facilities Sale Proceeds, Maker

shall utilize the Housing Facilities Sale Proceeds to pay or caused to be paid to Payee any and all amounts outstanding under this Note. To the extent that the Housing Facilities Sale Proceeds are deposited in the Affordable Housing Facilities Sale Escrow Account, such Housing Facilities Sale Proceeds will be released from the Affordable Housing Facilities Sale Escrow Account to satisfy the Maker's obligations hereunder in accordance with the terms of the Affordable Housing Facilities Sale Escrow Agreement (as defined in the Bankruptcy Plan).

If this Note is not paid in full on or before the Maturity Date either by Maker in the ordinary course or with the Housing Facilities Sale Proceeds, then the Payee may draw on the LOC referred to in Section 4 hereof.

(c)     Any payments made by Maker will be applied first to any and all accrued but unpaid interest, with the remaining balance being applied to reduce the unpaid Principal Amount due on this Note. All payments on this Note are to be made in lawful money of the United States of America payable to Payee at Payee's address stated hereinabove (or at such other place as Payee may designate in writing to Maker from time to time). If a payment of principal or interest falls due on a Saturday, Sunday, or any other day on which financial institutions are generally not open for business in New Orleans, Louisiana, payment will be made on the next succeeding business day.

4.     SECURITY. This Note shall be secured by an irrevocable Letter of Credit in an amount equal to the Principal Amount issued on behalf of Maker by a federally insured bank or financial institution acceptable to the Creditors' Committee (as such term is defined in the Bankruptcy Plan) with Payee as beneficiary (the "LOC"); provided that the LOC shall not be required to be delivered until March 16, 2026 and only to the extent that this Note has not yet been paid. Furthermore, LOC shall not be permitted to be called by the beneficiary until the Maturity Date, solely to the extent that this Note has not yet been paid on or before the Maturity Date.

5.     PREPAYMENT. Maker may prepay this Note, in full or in part, at any time without penalty or premium, by paying to Payee all or any portion of the outstanding principal balance of the Note, together with any unpaid interest on the principal amount being prepaid on the date of such prepayment.

6.     DEFAULT. Each of the following will constitute an "Event of Default" under this Note:

(a)     Maker fails to pay principal or interest within fifteen (15) days when due under this Note; or

(b)     Maker fails to comply with Maker's obligations contained in this Note, and such failure is not cured within thirty (30) days of Payee's notice to Maker detailing such failure.

7.     GUARANTY. Each of the parties listed on Schedule 1 hereto (each, a "Guarantor" and collectively, the "Guarantors"), hereby unconditionally and irrevocably guarantees to Payee, its successors and assigns, the due and punctual payment and performance of Maker's obligations hereunder as and when such obligations become due and payable in accordance with the terms hereof.

8.     PAYEE'S RIGHTS UPON AN EVENT OF DEFAULT.

(a)     Should any one or more Events of Default occur or exist under this Note as provided above, Payee will have the right, at its sole option, to accelerate the payments due under, and/or

2

maturity of, this Note and insist upon immediate payment in full, from Maker and/or the Guarantors, of the unpaid Principal Amount then outstanding under this Note, plus accrued interest and reasonable attorneys' fees, costs, expenses and other fees and charges as provided herein.

(b) Notwithstanding anything contained in this Note to the contrary, Payee will not proceed to exercise any of Payee's remedies hereunder following the occurrence of any Event(s) of Default unless and until Payee provides Maker prior written notice of the Event(s) of Default which have occurred and Payee's intention to exercise any of Payee's remedies hereunder as a result of the occurrence of such Event(s) of Default and Maker does not cure such Event(s) of Default within fifteen (15) days of receiving such written notice from Payee.

9.  <u>GOVERNING LAW</u>.  This Note will be governed by, construed and enforced in accordance with federal law and the laws of the State of Louisiana without regard to any laws that might result in the application of the laws of any other jurisdiction. This Note has been delivered to and accepted by Payee in the State of Louisiana.

10.  <u>ATTORNEYS' FEES</u>.  If Payee refers this Note to an attorney for collection due to an Event of Default by Maker, Maker agrees to pay Payee's reasonable attorneys' fees.

11.  <u>WAIVERS</u>.  Maker and each Guarantor hereby waives presentment for payment, protest and notice of protest. Maker and each Guarantor agrees that Payee's acceptance of payment other than in accordance with the terms of this Note or Payee's subsequent agreement to extend or modify such repayment terms, or Payee's failure or delay in exercising any rights or remedies granted to Payee, will not have the effect of releasing Maker or any Guarantor or any other party or parties from their respective obligations to Payee. In addition, any failure or delay on the part of Payee to exercise any of the rights and remedies granted to Payee will not have the effect of waiving any of Payee's rights and remedies. Any partial exercise of any rights and/or remedies granted to Payee will furthermore not be construed as a waiver of any other rights and remedies; it being Maker's and each Guarantor's intent and agreement that Payee's rights and remedies will be cumulative in nature. Maker and each Guarantor further agrees that, should any Event of Default occur or exist under this Note, any waiver or forbearance on the part of Payee to pursue the rights and remedies available to Payee will be binding upon Payee only to the extent that Payee specifically agrees to any such waiver or forbearance in writing. A waiver or forbearance on the part of Payee as to one Event of Default will not be construed as a waiver or forbearance as to any other default.

12.  <u>AMENDMENT, SUPPLEMENT, WAIVER</u>.  This Note may only be amended or supplemented with the consent of Maker, Payee and each Guarantor party hereto.

13.  <u>SUCCESSORS AND ASSIGNS LIABLE</u>.  Maker's and each Guarantor's obligations and agreements under this Note will be binding upon Maker's and each Guarantor's heirs, legal representatives, successors and assigns. The rights and remedies granted to Payee under this Note will inure to the benefit of Payee's heirs, legal representatives, successors and assigns, as well as to any subsequent holder or holders of this Note.  No party hereto may assign its rights and/or obligations under this Note without the prior written consent of the other party.

14.  <u>CAPTION HEADINGS</u>.  Caption headings of the sections of this Note are for convenience purposes only and are not to be used to interpret or to define their provisions. In this Note, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

3

15. <u>SEVERABILITY</u>.  If any term or provision of this Note (including interest charged hereunder), or the application thereof to any person or circumstance, is at any time or to any extent invalid, illegal or unenforceable in any respect as written, the parties intend for any court or arbitrator construing this Note to reform, modify or limit such provision so as to render it valid and enforceable to the fullest extent allowed by law.  Any such provision that is not susceptible of such reformation will be ignored so as to not affect any other term or provision hereof, and the remainder of this Note, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid, illegal or unenforceable, will not be affected thereby and each term and provision of this Note will be valid and enforced to the fullest extent permitted by law.

[*Signature page follows*]

**IN WITNESS WHEREOF**, Maker and each Guarantor party hereto have executed this Note as of the date first above written.

<div align="center"></div>

                  **MAKER:**

                  THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS

                  By: _____
                  Name:
                  Title:

                  **GUARANTORS:**

                  [__]

                  By: _____
                  Name:
                  Title:

# SCHEDULE 1

## Guarantors

1. All Saints Roman Catholic Church, New Orleans, Louisiana
2. Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana
3. Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana
4. Assumption of Mary Roman Catholic Church, Avondale, Louisiana
5. Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana
6. Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana
7. Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana
8. Blessed Trinity Roman Catholic Church, New Orleans, Louisiana
9. Christ the King Roman Catholic Church, Gretna, Louisiana
10. Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana
11. Divine Mercy Roman Catholic Church, Kenner, Louisiana
12. Good Shepherd Roman Catholic Church, New Orleans, Louisiana
13. Holy Family Roman Catholic Church, Franklinton, Louisiana
14. Holy Family Roman Catholic Church, Luling, Louisiana
15. Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana
16. Holy Spirit Roman Catholic Church, New Orleans, Louisiana
17. Immaculate Conception Roman Catholic Church, Marrero, Louisiana
18. Immaculate Conception Roman Catholic Church, New Orleans, Louisiana
19. Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana
20. Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana
21. Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana
22. Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana
23. Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana
24. Most Holy Trinity Roman Catholic Church, Covington, Louisiana
25. Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana
26. Our Lady of Grace Roman Catholic Church, Reserve, Louisiana
27. Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana
28. Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana
29. Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana
30. Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana
31. Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana
32. Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana
33. Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana
34. Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana
35. Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana
36. Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana
37. Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana
38. Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana
39. Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana
40. St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana
41. St. Agnes Roman Catholic Church, Jefferson, Louisiana
42. St. Alphonsus Roman Catholic Church, New Orleans, Louisiana
43. St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana
44. St. Angela Merici Roman Catholic Church, Metairie, Louisiana
45. St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana
46. St. Anselm Roman Catholic Church, Madisonville, Louisiana

47.     St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana
48.     St. Anthony of Padua Roman Catholic Church, Luling, Louisiana
49.     St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana
50.     St. Anthony Roman Catholic Church, Gretna, Louisiana
51.     St. Augustine Roman Catholic Church, New Orleans, Louisiana
52.     St. Benedict Roman Catholic Church, Covington, Louisiana
53.     St. Benilde Roman Catholic Church, Metairie, Louisiana
54.     St. Bernard Roman Catholic Church, St. Bernard, Louisiana
55.     St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana
56.     St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana
57.     St. Christopher Roman Catholic Church, Metairie, Louisiana
58.     St. Clement of Rome Roman Catholic Church, Metairie, Louisiana
59.     St. Cletus Roman Catholic Church, Gretna, Louisiana
60.     St. David Roman Catholic Church, New Orleans, Louisiana
61.     St. Dominic's Roman Catholic Church, New Orleans, Louisiana
62.     St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana
63.     St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana
64.     St. Francis Xavier Roman Catholic Church, Metairie, Louisiana
65.     St. Genevieve Roman Catholic Church, Slidell, Louisiana
66.     St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana
67.     St. Jerome Roman Catholic Church, Kenner, Louisiana
68.     St. Joachim Roman Catholic Church, Marrero, Louisiana
69.     St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana
70.     St. John of the Cross Roman Catholic Church, Lacombe, Louisiana
71.     St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana
72.     St. John the Baptist Roman Catholic Church, Edgard, Louisiana
73.     St. John the Baptist Roman Catholic Church, Folsom, Louisiana
74.     St. Joseph Roman Catholic Church, Algiers, Louisiana
75.     St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana
76.     St. Joseph's Roman Catholic Church, Gretna, Louisiana
77.     St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana
78.     St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana
79.     St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana
80.     St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana
81.     St. Margaret Mary Roman Catholic Church, Slidell, Louisiana
82.     St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana
83.     St. Mark Roman Catholic Church, Ama, Louisiana
84.     St. Martha Roman Catholic Church, Harvey, Louisiana
85.     St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana
86.     St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana
87.     St. Mary's Roman Catholic Church, New Orleans, Louisiana
88.     St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana
89.     St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St. John the Baptist Roman Catholic Church, Paradis, Louisiana
90.     St. Patrick's Roman Catholic Church, New Orleans, Louisiana
91.     St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana
92.     St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana
93.     St. Peter Claver Roman Catholic Church, New Orleans, Louisiana

94.  St. Peter Roman Catholic Church, Reserve, Louisiana
95.  St. Peter's Roman Catholic Church, Covington, Louisiana
96.  St. Philip Neri Roman Catholic Church, Metairie, Louisiana
97.  St. Pius X Roman Catholic Church, New Orleans, Louisiana
98.  St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana
99.  St. Rita Roman Catholic Church, Harahan, Louisiana
100. St. Rita Roman Catholic Church, New Orleans, Louisiana
101. St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana
102. Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana
103. The Congregation of St. Rita Roman Catholic Church of Harahan
104. The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana
105. Blessed Sacrament, Inc.
106. Epiphany, Inc.
107. Immaculate Heart of Mary, Inc.
108. Incarnate Word, Inc.
109. Our Lady of Good Counsel, Inc.
110. Our Lady of Good Harbor, Inc.
111. Our Lady of Lourdes, New Orleans, Louisiana, Inc.
112. Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.
113. Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana
114. St. Ann, New Orleans, Louisiana, Inc.
115. St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana
116. St. Frances Xavier Cabrini, Inc.
117. St. Francis de Salles, Inc.
118. St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana
119. St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana
120. St. Henry's, Inc.
121. St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana
122. St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana
123. St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana
124. St. John the Baptist, New Orleans, Louisiana, Inc.
125. St. Julian Eymard, Inc.
126. St. Lawrence the Martyr, Inc.
127. St. Louise de Marillac, Inc.
128. St. Maurice, Inc.
129. St. Monica, Inc.
130. St. Philip the Apostle, Inc.
131. St. Raymond's, Inc.
132. St. Rose of Lima, Inc.
133. St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana
134. St. Theresa of the Child Jesus, Inc.
135. The Congregation of Saints Peter and Paul Roman Catholic Church
136. The Congregation of St. Cecelia Roman Catholic Church
137. The Congregation of the Annunciation Roman Catholic Church

138. The Congregation of the Holy Trinity Roman Catholic Church
139. Archdiocesan Spirituality Center
140. Catholic Charities Archdiocese of New Orleans
141. Catholic Charities Children's Day Care Centers
142. Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)
143. Clarion Herald Publishing Company
144. Korean Catholic Community of New Orleans, Inc.
145. Notre Dame Seminary
146. Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana
147. Pace Greater New Orleans
148. Padua House (merged into Catholic Charities Archdiocese of New Orleans)[1]
149. Philmat, Inc.
150. Project Lazarus
151. Roman Catholic Center of Jesus the Lord
152. School Food and Nutrition Services of New Orleans, Inc.
153. Second Harvest Food Bank of Greater New Orleans and Acadiana
154. St. Jude Community Center, Inc.
155. St. Michael Special School
156. St. Thérèse Catholic Academy
157. The Society for the Propagation of the Faith, Archdiocese of New Orleans

---

[1] This entity has been omitted from the signature page to this Promissory Note as the result of its merger into Catholic Charities Archdiocese of New Orleans.

## IRREVOCABLE STANDBY LETTER OF CREDIT

Reference Number: _____

Transaction Date: _____, 2025

**BENEFICIARY**:

Settlement Trust for the Roman Catholic Church of the Archdiocese of New Orleans, Inc.

Ladies and Gentlemen:

_____ (the "**Bank**") hereby establishes this Irrevocable Standby Letter of Credit ("**Letter of Credit**") in favor of the Settlement Trust for the Roman Catholic Church of the Archdiocese of New Orleans, Inc. (the "**Beneficiary**"), for the account of the Roman Catholic Church of the Archdiocese of New Orleans, Inc. (the "**Applicant**"), for the amount of TWENTY MILLION AND NO/100 Dollars ($20,000,000.00) (the "**Available Amount**"), effective immediately. This Letter of Credit shall be of no further force or effect upon the close of business on December 31, 2026 (the "Expiration Date").

Subject to the terms and conditions herein, funds under this Letter of Credit are available to the Beneficiary by presentation in compliance on or prior to the Expiration Date, of the following:

    1.    The original of this Letter of Credit and all amendments (or photocopy of the original for partial drawings); and

    2.    The Drawing Certificate issued in the form of <u>Attachment A</u> attached hereto and which forms an integral part hereof, duly completed and purportedly bearing the signature of an authorized representative of the Beneficiary.

Notwithstanding the foregoing, any drawing hereunder may be requested by transmitting the requisite documents as described above to the Bank by facsimile at _____ or such other number as specified from time to time by the Bank. The facsimile transmittal shall be deemed delivered when received. It is understood that drawings made by facsimile transmittal are deemed to be the operative instrument without the need of originally signed documents.

Partial drawing of funds shall be permitted under this Letter of Credit, and this Letter of Credit shall remain in full force and effect with respect to any continuing balance; provided that, the Available Amount shall be reduced by the amount of each such drawing.

This Letter of Credit is transferable in its entirety (but not in part) to the Settlement Trustee who will succeed to the interest of Beneficiary under the agreement between Beneficiary and Applicant and may be successively so transferred. Transfer of the Available Amount under this Letter of Credit to such transferee shall be effected by the presentation to us of this Letter of Credit

accompanied by a certificate in the form of __Attachment B__ attached hereto and payment of our customary transfer fee.

Multiple transfers or assignments of this Letter of Credit are permitted.

Banking charges shall be the sole responsibility of the Applicant.

This Letter of Credit sets forth in full our obligations and such obligations shall not in any way be modified, amended, amplified, or limited by reference to any documents, instruments or agreements referred to herein, except only the attachment referred to herein; and any such reference shall not be deemed to incorporate by reference any document, instrument or agreement except for such attachment.

The Bank engages with the Beneficiary that Beneficiary's drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the Bank on or before the Expiration Date.

Except so far as otherwise stated, this Letter of Credit is subject to the International Standby Practices ISP98 (also known as ICC Publication No. 590), or revision currently in effect (the "__ISP__").  As to matters not covered by the ISP and to the extent of any conflict between the ISP and the statutes and laws of the State of Louisiana in effect on the date of issuance of this Letter of Credit, the statutes and laws of the State of Louisiana in effect on the date of issuance of this Letter of Credit, without regard to the principles of conflicts of laws thereunder, shall govern all matters with respect to this Letter of Credit.  The Bank irrevocably (a) submits to the exclusive jurisdiction of the United States Bankruptcy Court for the Eastern District of Louisiana for any action or proceeding arising out of or relating to the credit provided to Beneficiary by this Letter of Credit and (b) waives to the fullest extent permitted by law any defense asserting an inconvenient forum in connection therewith. Service of process by Beneficiary in connection with such action or proceeding shall be binding on the Bank if sent to the Bank by registered or certified mail at its address specified on the first page, the Bank hereby expressly waiving any other form of service of process.

AUTHORIZED SIGNATURE for Bank

By: _____
Name: _____
Title: _____

# ATTACHMENT A

## DRAWING CERTIFICATE

TO: [ISSUING BANK NAME]

**IRREVOCABLE STANDBY LETTER OF CREDIT**

Reference Number. _____

## DRAWING CERTIFICATE

[Bank]

_____

_____

_____

      Subject:  Irrevocable Nontransferable Standby Letter of Credit

      Reference Number:  _____

The undersigned _____, an authorized representative of the Settlement Trust for the Roman Catholic Church of the Archdiocese of New Orleans, Inc. (the "***Beneficiary***"), hereby certifies to [Issuing Bank Name] (the "***Bank***"), and The Roman Catholic Church of the Archdiocese of New Orleans, Inc. (the "***Applicant***"), with reference to Irrevocable Standby Letter of Credit No. _____, dated _____, 2025, (the "***Letter of Credit***"), issued by the Bank in favor of the Beneficiary, as follows as of the date hereof:

      1.     Either (a) a default has occurred and is continuing with respect to the Applicant under the Second Promissory Note or (b) a breach has occurred and is continuing with respect to the Applicant under the Second Promissory Note.

      2.     Based upon the foregoing, the Beneficiary hereby makes demand under the Letter of Credit for payment of _____ U.S. DOLLARS AND ____/100ths (U.S.$_____), which amount does not exceed (i) the amount set forth in paragraph 1 of the Letter of Credit, (ii) the Available Amount under the Letter of Credit as of the date hereof, (iii) the amount of damages, as estimated in good faith by Beneficiary, suffered or to be suffered by Beneficiary as a result of Applicant's default, or (iv) the amount entitled to be drawn by Beneficiary as a result of Applicant's breach.

      3.     Funds paid pursuant to the provisions of the Letter of Credit shall be wire-transferred to the Beneficiary in accordance with the following instructions:

      [insert wire transfer instructions]

Unless otherwise provided herein, capitalized terms which are used and not defined herein shall have the meaning given each such term in the Letter of Credit.

IN WITNESS WHEREOF, this Certificate has been duly executed and delivered on behalf of the Beneficiary by its authorized representative as of this ____ day of _____, 20__.

**Beneficiary**:

By: _____
Name: _____
Title: _____

# ATTACHMENT B

## TRANSFER CERTIFICATE

TO: [ISSUING BANK NAME]

**IRREVOCABLE STANDBY LETTER OF CREDIT**

Reference Number. _____

## TRANSFER CERTIFICATE

_____, _____

[Bank]

_____

_____

_____

      Subject:  Irrevocable Nontransferable Standby Letter of Credit

      Reference Number:  _____

Ladies and Gentlemen:

For value received, the undersigned Beneficiary hereby irrevocably instructs you to transfer to:

_____

(Name of Transferee)

_____

(Address)

all rights of the undersigned Beneficiary to draw under the above captioned Letter of Credit (the "*Letter of Credit*").  The transferee has succeeded the undersigned as the court-appointed fiduciary for the Settlement Trust established by the _____ *Amended Joint Chapter 11 Plan of Reorganization of the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of [Date]*,  (the "**Agreement**").

By this transfer, all rights of the undersigned Beneficiary in the Letter of Credit are transferred to the transferee and the transferee shall hereafter have the sole rights as beneficiary thereof; provided, however, that no rights shall be deemed to have been transferred to the transferee until such transfer complies with the requirements of the Letter of Credit pertaining to transfers.

The original of such Letter of Credit is returned herewith, and we ask you to endorse the transfer on the reverse thereof and forward it directly to the transferee with your customary notice of transfer.

IN WITNESS WHEREOF, the Beneficiary has executed and delivered this Certificate as of the _____ day of _____, ___.

**Beneficiary**:

By: _____

Name: _____

Title: _____

**PROMISSORY NOTE**

MAKER:         The Roman Catholic Church of the Archdiocese of New Orleans, as debtor-in-possession
7887 Walmsley Ave.
New Orleans, Louisiana 70125

PAYEE:         [The Archdiocese of New Orleans Settlement Trust][1]
[Address]

PRINCIPAL AMOUNT: $50,000,000.00              DATE: [__], 2025[2]

---

1.   <u>BANKRUPTCY PLAN</u>. Reference is hereby made to that certain Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, dated as of [__], 2025(the "<u>Bankruptcy Plan</u>"). The parties hereto hereby acknowledge and agree that this Promissory Note (this "<u>Note</u>") is being executed and delivered pursuant to the Bankruptcy Plan. Capitalized terms used and not otherwise defined herein have the meaning ascribed thereto in the Bankruptcy Plan.

2.   <u>PROMISE TO PAY</u>. For value received, **THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS**, a Louisiana non-profit religious corporation, as debtor-in-possession ("<u>Maker</u>"), promises to pay to the order of [**THE ARCHDIOCESE OF NEW ORLEANS SETTLEMENT TRUST**, a Louisiana trust] ("<u>Payee</u>"), the principal sum of **FIFTY MILLION AND NO/100 DOLLARS** ($50,000,000.00) ("<u>Principal Amount</u>"), together with interest thereon at the Note Rate (as hereinafter defined), as set forth below by March 31, 2026 (the "<u>Maturity Date</u>"), all in accordance with the terms and conditions set forth herein.

3.   <u>PAYMENT AND INTEREST</u>.

     (a)      Maker agrees to pay to Payee under this Note the Principal Amount due hereunder, and all accrued but unpaid interest thereon, and any other remaining unpaid fees and other amounts due hereunder on the Maturity Date, unless sooner paid in full. Interest will accrue on the outstanding principal balance of this Note at a rate of [zero] percent ([0]%) per annum (the "<u>Note Rate</u>"). Interest will be calculated on a 365-day year basis and paid for the actual number of days elapsed (including the first but excluding the last day) during any period.

     (b)      The parties hereto hereby acknowledge that Maker is in the process of selling those certain Affordable Housing Facilities and that, pursuant to the Bankruptcy Plan, if the sale of the Affordable Housing Facilities closes before the Effective Date , an Affordable Housing Facilities Sale Escrow Account shall be opened and funded with the net proceeds from the sale of such Affordable Housing Facilities (the "<u>Housing Facilities Sale Proceeds</u>") in an amount not to exceed **SEVENTY MILLION AND NO/100 DOLLARS** ($70,000,000.00).

---

[1] <u>Note to Draft</u>: To be the Creditors' Committee if the Effective Date has not passed.
[2] <u>Note to Draft</u>: To be no later than 5 business days after the Confirmation Date.

1

To the extent not otherwise paid by the Maker in the ordinary course, the Housing Facilities Sale Proceeds shall be used to repay this Note. Notwithstanding the payment schedule set forth in Section 3(a) hereof or the Maturity Date of this Note, Maker hereby agrees that, as soon as practicable after its receipt in full of the Housing Facilities Sale Proceeds, Maker shall utilize the Housing Facilities Sale Proceeds to pay or caused to be paid to Payee any and all amounts outstanding under this Note. To the extent that the Housing Facilities Sale Proceeds are deposited in the Affordable Housing Facilities Sale Escrow Account, such Housing Facilities Sale Proceeds will be released from the Affordable Housing Facilities Sale Escrow Account to satisfy the Maker's obligations hereunder in accordance with the terms of the Affordable Housing Facilities Sale Escrow Agreement (as defined in the Bankruptcy Plan).

If this Note is not paid in full on or before the Maturity Date either by Maker in the ordinary course or with the Housing Facilities Sale Proceeds, then the Payee may draw on the LOC referred to in Section 4 hereof.

(c)     Any payments made by Maker will be applied first to any and all accrued but unpaid interest, with the remaining balance being applied to reduce the unpaid Principal Amount due on this Note. All payments on this Note are to be made in lawful money of the United States of America payable to Payee at Payee's address stated hereinabove (or at such other place as Payee may designate in writing to Maker from time to time). If a payment of principal or interest falls due on a Saturday, Sunday, or any other day on which financial institutions are generally not open for business in New Orleans, Louisiana, payment will be made on the next succeeding business day.

4.      SECURITY. This Note shall be secured by an irrevocable Letter of Credit issued on the date hereof in an amount equal to the Principal Amount on behalf of Maker by a federally insured bank or financial institution acceptable to the Creditors' Committee (as such term is defined in the Bankruptcy Plan) with Payee as beneficiary (the "LOC"). Furthermore, LOC shall not be permitted to be called by the beneficiary until the Maturity Date, solely to the extent that this Note has not yet been paid on or before the Maturity Date.

5.      PREPAYMENT. Maker may prepay this Note, in full or in part, at any time without penalty or premium, by paying to Payee all or any portion of the outstanding principal balance of the Note, together with any unpaid interest on the principal amount being prepaid on the date of such prepayment.

6.      DEFAULT. Each of the following will constitute an "Event of Default" under this Note:

(a)     Maker fails to pay principal or interest within fifteen (15) days when due under this Note; or

(b)     Maker fails to comply with Maker's obligations contained in this Note, and such failure is not cured within thirty (30) days of Payee's notice to Maker detailing such failure.

7.      GUARANTY. Each of the parties listed on Schedule 1 hereto (each, a "Guarantor" and collectively, the "Guarantors"), hereby unconditionally and irrevocably guarantees to Payee, its successors and assigns, the due and punctual payment and performance of Maker's obligations hereunder as and when such obligations become due and payable in accordance with the terms hereof.

8.      PAYEE'S RIGHTS UPON AN EVENT OF DEFAULT.

(a)     Should any one or more Events of Default occur or exist under this Note as provided above, Payee will have the right, at its sole option, to accelerate the payments due under, and/or maturity of, this Note and insist upon immediate payment in full, from Maker and/or the Guarantors, of the unpaid Principal Amount then outstanding under this Note, plus accrued interest and reasonable attorneys' fees, costs, expenses and other fees and charges as provided herein.

(b)     Notwithstanding anything contained in this Note to the contrary, Payee will not proceed to exercise any of Payee's remedies hereunder following the occurrence of any Event(s) of Default unless and until Payee provides Maker prior written notice of the Event(s) of Default which have occurred and Payee's intention to exercise any of Payee's remedies hereunder as a result of the occurrence of such Event(s) of Default and Maker does not cure such Event(s) of Default within fifteen (15) days of receiving such written notice from Payee.

9.     <u>GOVERNING LAW</u>.  This Note will be governed by, construed and enforced in accordance with federal law and the laws of the State of Louisiana without regard to any laws that might result in the application of the laws of any other jurisdiction. This Note has been delivered to and accepted by Payee in the State of Louisiana.

10.     <u>ATTORNEYS' FEES</u>.  If Payee refers this Note to an attorney for collection due to an Event of Default by Maker, Maker agrees to pay Payee's reasonable attorneys' fees.

11.     <u>WAIVERS</u>.  Maker and each Guarantor hereby waives presentment for payment, protest and notice of protest. Maker and each Guarantor agrees that Payee's acceptance of payment other than in accordance with the terms of this Note or Payee's subsequent agreement to extend or modify such repayment terms, or Payee's failure or delay in exercising any rights or remedies granted to Payee, will not have the effect of releasing Maker or any Guarantor or any other party or parties from their respective obligations to Payee. In addition, any failure or delay on the part of Payee to exercise any of the rights and remedies granted to Payee will not have the effect of waiving any of Payee's rights and remedies. Any partial exercise of any rights and/or remedies granted to Payee will furthermore not be construed as a waiver of any other rights and remedies; it being Maker's and each Guarantor's intent and agreement that Payee's rights and remedies will be cumulative in nature. Maker and each Guarantor further agrees that, should any Event of Default occur or exist under this Note, any waiver or forbearance on the part of Payee to pursue the rights and remedies available to Payee will be binding upon Payee only to the extent that Payee specifically agrees to any such waiver or forbearance in writing. A waiver or forbearance on the part of Payee as to one Event of Default will not be construed as a waiver or forbearance as to any other default.

12.     <u>AMENDMENT, SUPPLEMENT, WAIVER</u>.  This Note may only be amended or supplemented with the consent of Maker, Payee and each Guarantor party hereto.

13.     <u>SUCCESSORS AND ASSIGNS LIABLE</u>.   Maker's and each Guarantor's obligations and agreements under this Note will be binding upon Maker's and each Guarantor's heirs, legal representatives, successors and assigns. The rights and remedies granted to Payee under this Note will inure to the benefit of Payee's heirs, legal representatives, successors and assigns, as well as to any subsequent holder or holders of this Note.  No party hereto may assign its rights and/or obligations under this Note without the prior written consent of the other party.

14.   <u>CAPTION HEADINGS</u>.  Caption headings of the sections of this Note are for convenience purposes only and are not to be used to interpret or to define their provisions. In this Note, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

15.   <u>SEVERABILITY</u>.  If any term or provision of this Note (including interest charged hereunder), or the application thereof to any person or circumstance, is at any time or to any extent invalid, illegal or unenforceable in any respect as written, the parties intend for any court or arbitrator construing this Note to reform, modify or limit such provision so as to render it valid and enforceable to the fullest extent allowed by law.  Any such provision that is not susceptible of such reformation will be ignored so as to not affect any other term or provision hereof, and the remainder of this Note, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid, illegal or unenforceable, will not be affected thereby and each term and provision of this Note will be valid and enforced to the fullest extent permitted by law.

*[Signature page follows]*

4

**IN WITNESS WHEREOF**, Maker and each Guarantor party hereto have executed this Note as of the date first above written.

 

                                          **MAKER:**

                                          THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS

                                          By: _____

                                          Name:

                                          Title:

 

                                          **GUARANTORS:**

                                          [__]

                                          By: _____

                                          Name:

                                          Title:

*[Signature Page to Promissory Note]*

43

## SCHEDULE 1

### Guarantors

1. All Saints Roman Catholic Church, New Orleans, Louisiana
2. Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana
3. Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana
4. Assumption of Mary Roman Catholic Church, Avondale, Louisiana
5. Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana
6. Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana
7. Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana
8. Blessed Trinity Roman Catholic Church, New Orleans, Louisiana
9. Christ the King Roman Catholic Church, Gretna, Louisiana
10. Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana
11. Divine Mercy Roman Catholic Church, Kenner, Louisiana
12. Good Shepherd Roman Catholic Church, New Orleans, Louisiana
13. Holy Family Roman Catholic Church, Franklinton, Louisiana
14. Holy Family Roman Catholic Church, Luling, Louisiana
15. Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana
16. Holy Spirit Roman Catholic Church, New Orleans, Louisiana
17. Immaculate Conception Roman Catholic Church, Marrero, Louisiana
18. Immaculate Conception Roman Catholic Church, New Orleans, Louisiana
19. Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana
20. Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana
21. Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana
22. Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana
23. Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana
24. Most Holy Trinity Roman Catholic Church, Covington, Louisiana
25. Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana
26. Our Lady of Grace Roman Catholic Church, Reserve, Louisiana
27. Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana
28. Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana
29. Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana
30. Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana
31. Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana
32. Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana
33. Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana
34. Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana
35. Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana
36. Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana
37. Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana
38. Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana
39. Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana
40. St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana
41. St. Agnes Roman Catholic Church, Jefferson, Louisiana
42. St. Alphonsus Roman Catholic Church, New Orleans, Louisiana
43. St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana
44. St. Angela Merici Roman Catholic Church, Metairie, Louisiana
45. St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana
46. St. Anselm Roman Catholic Church, Madisonville, Louisiana

47.   St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana
48.   St. Anthony of Padua Roman Catholic Church, Luling, Louisiana
49.   St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana
50.   St. Anthony Roman Catholic Church, Gretna, Louisiana
51.   St. Augustine Roman Catholic Church, New Orleans, Louisiana
52.   St. Benedict Roman Catholic Church, Covington, Louisiana
53.   St. Benilde Roman Catholic Church, Metairie, Louisiana
54.   St. Bernard Roman Catholic Church, St. Bernard, Louisiana
55.   St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana
56.   St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana
57.   St. Christopher Roman Catholic Church, Metairie, Louisiana
58.   St. Clement of Rome Roman Catholic Church, Metairie, Louisiana
59.   St. Cletus Roman Catholic Church, Gretna, Louisiana
60.   St. David Roman Catholic Church, New Orleans, Louisiana
61.   St. Dominic's Roman Catholic Church, New Orleans, Louisiana
62.   St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana
63.   St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana
64.   St. Francis Xavier Roman Catholic Church, Metairie, Louisiana
65.   St. Genevieve Roman Catholic Church, Slidell, Louisiana
66.   St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana
67.   St. Jerome Roman Catholic Church, Kenner, Louisiana
68.   St. Joachim Roman Catholic Church, Marrero, Louisiana
69.   St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana
70.   St. John of the Cross Roman Catholic Church, Lacombe, Louisiana
71.   St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana
72.   St. John the Baptist Roman Catholic Church, Edgard, Louisiana
73.   St. John the Baptist Roman Catholic Church, Folsom, Louisiana
74.   St. Joseph Roman Catholic Church, Algiers, Louisiana
75.   St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana
76.   St. Joseph's Roman Catholic Church, Gretna, Louisiana
77.   St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana
78.   St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana
79.   St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana
80.   St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana
81.   St. Margaret Mary Roman Catholic Church, Slidell, Louisiana
82.   St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana
83.   St. Mark Roman Catholic Church, Ama, Louisiana
84.   St. Martha Roman Catholic Church, Harvey, Louisiana
85.   St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana
86.   St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana
87.   St. Mary's Roman Catholic Church, New Orleans, Louisiana
88.   St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana
89.   St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St. John the Baptist Roman Catholic Church, Paradis, Louisiana
90.   St. Patrick's Roman Catholic Church, New Orleans, Louisiana
91.   St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana
92.   St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana
93.   St. Peter Claver Roman Catholic Church, New Orleans, Louisiana

94.   St. Peter Roman Catholic Church, Reserve, Louisiana
95.   St. Peter's Roman Catholic Church, Covington, Louisiana
96.   St. Philip Neri Roman Catholic Church, Metairie, Louisiana
97.   St. Pius X Roman Catholic Church, New Orleans, Louisiana
98.   St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana
99.   St. Rita Roman Catholic Church, Harahan, Louisiana
100.  St. Rita Roman Catholic Church, New Orleans, Louisiana
101.  St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana
102.  Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana
103.  The Congregation of St. Rita Roman Catholic Church of Harahan
104.  The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana
105.  Blessed Sacrament, Inc.
106.  Epiphany, Inc.
107.  Immaculate Heart of Mary, Inc.
108.  Incarnate Word, Inc.
109.  Our Lady of Good Counsel, Inc.
110.  Our Lady of Good Harbor, Inc.
111.  Our Lady of Lourdes, New Orleans, Louisiana, Inc.
112.  Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.
113.  Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana
114.  St. Ann, New Orleans, Louisiana, Inc.
115.  St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana
116.  St. Frances Xavier Cabrini, Inc.
117.  St. Francis de Salles, Inc.
118.  St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana
119.  St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana
120.  St. Henry's, Inc.
121.  St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana
122.  St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana
123.  St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana
124.  St. John the Baptist, New Orleans, Louisiana, Inc.
125.  St. Julian Eymard, Inc.
126.  St. Lawrence the Martyr, Inc.
127.  St. Louise de Marillac, Inc.
128.  St. Maurice, Inc.
129.  St. Monica, Inc.
130.  St. Philip the Apostle, Inc.
131.  St. Raymond's, Inc.
132.  St. Rose of Lima, Inc.
133.  St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana
134.  St. Theresa of the Child Jesus, Inc.
135.  The Congregation of Saints Peter and Paul Roman Catholic Church
136.  The Congregation of St. Cecelia Roman Catholic Church
137.  The Congregation of the Annunciation Roman Catholic Church

138.  The Congregation of the Holy Trinity Roman Catholic Church
139.  Archdiocesan Spirituality Center
140.  Catholic Charities Archdiocese of New Orleans
141.  Catholic Charities Children's Day Care Centers
142.  Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)
143.  Clarion Herald Publishing Company
144.  Korean Catholic Community of New Orleans, Inc.
145.  Notre Dame Seminary
146.  Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana
147.  Pace Greater New Orleans
148.  Padua House (merged into Catholic Charities Archdiocese of New Orleans)[3]
149.  Philmat, Inc.
150.  Project Lazarus
151.  Roman Catholic Center of Jesus the Lord
152.  School Food and Nutrition Services of New Orleans, Inc.
153.  Second Harvest Food Bank of Greater New Orleans and Acadiana
154.  St. Jude Community Center, Inc.
155.  St. Michael Special School
156.  St. Thérèse Catholic Academy
157.  The Society for the Propagation of the Faith, Archdiocese of New Orleans

---

[3] This entity has been omitted from the signature page to this Promissory Note as the result of its merger into Catholic Charities Archdiocese of New Orleans.

# IRREVOCABLE STANDBY LETTER OF CREDIT

Reference Number: _____

Transaction Date: _____, 2025

**BENEFICIARY**:

Settlement Trust for the Roman Catholic Church of the Archdiocese of New Orleans, Inc.


Ladies and Gentlemen:

_____ (the "***Bank***") hereby establishes this Irrevocable Standby Letter of Credit ("***Letter of Credit***") in favor of the Settlement Trust for the Roman Catholic Church of the Archdiocese of New Orleans, Inc. (the "***Beneficiary***"), for the account of the Roman Catholic Church of the Archdiocese of New Orleans, Inc. (the "***Applicant***"), for the amount of FIFTY MILLION AND NO/100 Dollars ($50,000,000.00) (the "***Available Amount***"), effective immediately. This Letter of Credit shall be of no further force or effect upon the close of business on December 31, 2026 (the "Expiration Date").

Subject to the terms and conditions herein, funds under this Letter of Credit are available to the Beneficiary by presentation in compliance on or prior to the Expiration Date, of the following:

1.  The original of this Letter of Credit and all amendments (or photocopy of the original for partial drawings); and

2.  The Drawing Certificate issued in the form of <u>Attachment A</u> attached hereto and which forms an integral part hereof, duly completed and purportedly bearing the signature of an authorized representative of the Beneficiary.

Notwithstanding the foregoing, any drawing hereunder may be requested by transmitting the requisite documents as described above to the Bank by facsimile at _____ or such other number as specified from time to time by the Bank. The facsimile transmittal shall be deemed delivered when received. It is understood that drawings made by facsimile transmittal are deemed to be the operative instrument without the need of originally signed documents.

Partial drawing of funds shall be permitted under this Letter of Credit, and this Letter of Credit shall remain in full force and effect with respect to any continuing balance; provided that, the Available Amount shall be reduced by the amount of each such drawing.

This Letter of Credit is transferable in its entirety (but not in part) to the Settlement Trustee who will succeed to the interest of Beneficiary under the agreement between Beneficiary and Applicant and may be successively so transferred. Transfer of the Available Amount under this Letter of Credit to such transferee shall be effected by the presentation to us of this Letter of Credit

accompanied by a certificate in the form of <u>Attachment B</u> attached hereto and payment of our customary transfer fee.

Multiple transfers or assignments of this Letter of Credit are permitted.

Banking charges shall be the sole responsibility of the Applicant.

This Letter of Credit sets forth in full our obligations and such obligations shall not in any way be modified, amended, amplified, or limited by reference to any documents, instruments or agreements referred to herein, except only the attachment referred to herein; and any such reference shall not be deemed to incorporate by reference any document, instrument or agreement except for such attachment.

The Bank engages with the Beneficiary that Beneficiary's drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the Bank on or before the Expiration Date.

Except so far as otherwise stated, this Letter of Credit is subject to the International Standby Practices ISP98 (also known as ICC Publication No. 590), or revision currently in effect (the "***ISP***"). As to matters not covered by the ISP and to the extent of any conflict between the ISP and the statutes and laws of the State of Louisiana in effect on the date of issuance of this Letter of Credit, the statutes and laws of the State of Louisiana in effect on the date of issuance of this Letter of Credit, without regard to the principles of conflicts of laws thereunder, shall govern all matters with respect to this Letter of Credit. The Bank irrevocably (a) submits to the exclusive jurisdiction of the United States Bankruptcy Court for the Eastern District of Louisiana for any action or proceeding arising out of or relating to the credit provided to Beneficiary by this Letter of Credit and (b) waives to the fullest extent permitted by law any defense asserting an inconvenient forum in connection therewith. Service of process by Beneficiary in connection with such action or proceeding shall be binding on the Bank if sent to the Bank by registered or certified mail at its address specified on the first page, the Bank hereby expressly waiving any other form of service of process.

AUTHORIZED SIGNATURE for Bank


By: _____
Name: _____
Title: _____

**ATTACHMENT A**

**DRAWING CERTIFICATE**

TO: [ISSUING BANK NAME]

**IRREVOCABLE STANDBY LETTER OF CREDIT**

Reference Number. _____

**DRAWING CERTIFICATE**

[Bank]

_____

_____

_____

Subject: Irrevocable Nontransferable Standby Letter of Credit

Reference Number: _____

The undersigned _____, an authorized representative of the Settlement Trust for the Roman Catholic Church of the Archdiocese of New Orleans, Inc. (the "***Beneficiary***"), hereby certifies to [Issuing Bank Name] (the "***Bank***"), and The Roman Catholic Church of the Archdiocese of New Orleans, Inc. (the "***Applicant***"), with reference to Irrevocable Standby Letter of Credit No. _____, dated _____, 2025, (the "***Letter of Credit***"), issued by the Bank in favor of the Beneficiary, as follows as of the date hereof:

1.    Either (a) a default has occurred and is continuing with respect to the Applicant under the Second Promissory Note or (b) a breach has occurred and is continuing with respect to the Applicant under the Second Promissory Note.

2.    Based upon the foregoing, the Beneficiary hereby makes demand under the Letter of Credit for payment of _____ U.S. DOLLARS AND ____/100ths (U.S.$_____), which amount does not exceed (i) the amount set forth in paragraph 1 of the Letter of Credit, (ii) the Available Amount under the Letter of Credit as of the date hereof, (iii) the amount of damages, as estimated in good faith by Beneficiary, suffered or to be suffered by Beneficiary as a result of Applicant's default, or (iv) the amount entitled to be drawn by Beneficiary as a result of Applicant's breach.

3.    Funds paid pursuant to the provisions of the Letter of Credit shall be wire-transferred to the Beneficiary in accordance with the following instructions:

[insert wire transfer instructions]

Unless otherwise provided herein, capitalized terms which are used and not defined herein shall have the meaning given each such term in the Letter of Credit.

IN WITNESS WHEREOF, this Certificate has been duly executed and delivered on behalf of the Beneficiary by its authorized representative as of this _____ day of _____, 20___.

**Beneficiary**:

By: _____
Name: _____
Title: _____

## ATTACHMENT B

## TRANSFER CERTIFICATE

TO: [ISSUING BANK NAME]

**IRREVOCABLE STANDBY LETTER OF CREDIT**

Reference Number. _____

## TRANSFER CERTIFICATE

_____, _____

[Bank]

_____

_____

_____

      Subject:  Irrevocable Nontransferable Standby Letter of Credit

      Reference Number:  _____

Ladies and Gentlemen:

For value received, the undersigned Beneficiary hereby irrevocably instructs you to transfer to:

_____

(Name of Transferee)

_____

(Address)

all rights of the undersigned Beneficiary to draw under the above captioned Letter of Credit (the "***Letter of Credit***").  The transferee has succeeded the undersigned as the court-appointed fiduciary for the Settlement Trust established by the _____ *Amended Joint Chapter 11 Plan of Reorganization of the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of [Date]*, (the "***Agreement***").

By this transfer, all rights of the undersigned Beneficiary in the Letter of Credit are transferred to the transferee and the transferee shall hereafter have the sole rights as beneficiary thereof; provided, however, that no rights shall be deemed to have been transferred to the transferee until such transfer complies with the requirements of the Letter of Credit pertaining to transfers.

The original of such Letter of Credit is returned herewith, and we ask you to endorse the transfer on the reverse thereof and forward it directly to the transferee with your customary notice of transfer.

IN WITNESS WHEREOF, the Beneficiary has executed and delivered this Certificate as of the _____ day of _____, ___.

**Beneficiary**:

By: _____
Name: _____
Title: _____

# ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "**Agreement**") is entered into as of [_____], 2025, by and among The Roman Catholic Church of the Archdiocese of New Orleans, as debtor-in-possession ("**Debtor**"), The Archdiocese of New Orleans Settlement Trust ("**Payee**", and together with Debtor, sometimes referred to individually as a "**Party**" and collectively as the "**Parties**"), and [ ] ("**Escrow Agent**").

**WHEREAS,** Debtor is currently in bankruptcy pursuant to that certain Joint Chapter 11 Plan of Reorganization for Debtor and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, dated as of [__], 2025 (the "**Bankruptcy Plan**").

**WHEREAS**, in connection with the bankruptcy, Debtor is in the process of selling those certain Affordable Housing Facilities (as such term is defined in the Bankruptcy Plan) and, pursuant to the Bankruptcy Plan, if the sale of the Affordable Housing Facilities closes before the Effective Date (as such term is defined in the Bankruptcy Plan), an Affordable Housing Facilities Sale Escrow Account ("**Escrow Account**") shall be opened and funded with the net proceeds from the sale of such Affordable Housing Facilities (the "**Housing Facilities Sale Proceeds**") which proceeds may be used to satisfy the obligations of Debtor to Payee under (i) that certain Promissory Note by Debtor in favor of Payee dated [ ], in the original principal amount of $20,000,000 and (ii) that certain Promissory Note by Debtor in favor of Payee dated [ ], in the original principal amount of $50,000,000.

**WHEREAS**, this Agreement is being executed pursuant to the Bankruptcy Plan to establish the Escrow Account.

1.      **Appointment**.  The Parties hereby appoint Escrow Agent as their escrow agent for the purposes set forth herein, and Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

2.      **Escrow Deposit**.  Provided that the sale of the Affordable Housing Facilities is completed prior to the Effective Date, upon receipt of the Housing Facilities Sale Proceeds, Debtor agrees to deliver and deposit with Escrow Agent such proceeds in an aggregate amount not to exceed $70,000,000 (the "**Escrow Deposit**").  The Escrow Deposit may only be distributed and released in accordance with the provisions in Section 3 below.

3.      **Disposition and Termination.** (a)  Except as otherwise expressly provided herein, the Escrow Deposit shall only be distributed and released as follows:

The Escrow Deposit shall remain in the Escrow Account until the earlier of: (a) the Confirmation Order becoming a Final Order; (b) an appellate court entering an Order reversing the Confirmation Order and such Order becoming a Final Order; or (c) until such time as the Debtor, the Additional Debtors, the Creditors' Committee, and Certain Abuse Survivors' Counsel shall otherwise agree to in writing. If the Confirmation Order is affirmed by a Final Order, the Escrow Deposit shall be immediately deposited with Payee upon the occurrence of the Effective Date. If the Confirmation Order is reversed by a Final Order, the Escrow Deposit shall be returned to the Debtor.

(i)     Until the Escrow Agent receives either (I) a joint written instruction from the Parties substantially in the form of Exhibit A (a "Joint Instruction") authorizing the release to Payee of the Escrow Deposit or (II) a copy of a final, nonappealable order or decree of a court of competent jurisdiction stating (a) the Confirmation Order has become a Final Order or (b) an appellate court has entered an Order reversing the Confirmation Order and such Order has become a Final Order (each an "Order") and accompanied by (1) a written certification of counsel for the instructing Party attesting that such Order is final and not subject to further proceedings or appeal and (2) a written instruction from the instructing Party given to effectuate such Order.  The instructing Party shall simultaneously provide a copy of any Order, certification and written instructions to the other Parties.  Escrow Agent shall be entitled to conclusively rely upon any such certification and instruction and shall have no responsibility to review the final determination to which such certification and instruction refers or to make any determination as to whether such Order is final.  Within one (1) Business Day after the Escrow Agent's receipt of such Joint Instruction or a copy of such Order, which is accompanied by the certification and instruction as described above, as the case may be, the Escrow Agent shall release the Escrow Deposit to Payee or Debtor (or its designee(s)) in accordance with such Joint Instruction or Order.

(b)     Notwithstanding anything to the contrary, any instructions in any way related to the transfer or distribution of the Escrow Deposit must, in order to be deemed delivered and effective, be in writing and executed by the appropriate Party or Parties as evidenced by the signatures of the person or persons signing this Agreement (each an "**Authorized Representative**"), and delivered to Escrow Agent only by facsimile (as evidenced by a confirmed transmittal to the applicable Party's or Parties' transmitting fax number) or as a Portable Document Format ("PDF") attached to an email only at the fax number or email address set forth in Section 6 below.  Escrow Agent shall not be liable to any Party or other person for refraining from acting upon any instruction for or related to the transfer or distribution of the Escrow Deposit that does not satisfy the requirements herein.  Escrow Agent may rely and act upon the confirmation of anyone purporting to be an Authorized Representative in connection with any of Escrow Agent's verifying call-backs or email confirmations.  Notwithstanding anything to the contrary, the Parties acknowledge and agree that Escrow Agent shall have no obligation to take any action in connection with this Agreement on a non-Business Day and any action Escrow Agent may otherwise be required to perform on a non-Business Day may be performed by Escrow Agent on the following Business Day.

(c)   The persons designated as Authorized Representatives and telephone numbers and email addresses for same may be changed only in a writing executed by an Authorized Representative or other duly authorized person of the applicable Party setting forth such changes and actually received by Escrow Agent via facsimile or as a PDF attached to an email.  Escrow Agent may confirm any such change in Authorized Representatives by a telephone call-back or email confirmation according to its security procedures.

(d)   As used in this Section 3, "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which Escrow Agent located at the notice address set forth below is authorized or required by law or executive order to remain closed.  Upon delivery of the Escrow Deposit in full by Escrow Agent in accordance with this Section 3, this Agreement shall terminate.

4.     **Escrow Agent**.  Escrow Agent shall have only those duties as are specifically and expressly provided herein.  Notwithstanding the terms of any other agreement, the terms and conditions of this Agreement shall control the actions of Escrow Agent.  Escrow Agent may conclusively rely upon any written notice, document, instruction or request delivered by the Parties believed by it to

be genuine and to have been signed by an Authorized Representative(s), as applicable, without inquiry and without requiring substantiating evidence of any kind, and Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. Any notice, document, instruction or request delivered by a Party but not required under this Agreement may be disregarded by Escrow Agent. ESCROW AGENT SHALL NOT BE LIABLE FOR ANY ACTION TAKEN, SUFFERED OR OMITTED TO BE TAKEN BY IT IN GOOD FAITH EXCEPT TO THE EXTENT THAT ESCROW AGENT'S GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT WAS THE CAUSE OF ANY DIRECT LOSS TO EITHER PARTY. Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents.   In the event Escrow Agent shall be uncertain, or believes there is some ambiguity, as to its duties or rights hereunder or receives instructions, claims or demands from any Party hereto which in Escrow Agent's judgment conflict with the provisions of this Agreement, or if Escrow Agent receives conflicting instructions from the Parties,  Escrow Agent shall be entitled either to: (a) refrain from taking any action until it shall be given (i) a joint written direction executed by Authorized Representatives of the Parties which eliminates such ambiguity or conflict or (ii) a court order issued by a court of competent jurisdiction (it being understood that Escrow Agent shall be entitled conclusively to rely and act upon any such court order and shall have no obligation to determine whether any such court order is final); or (b) file an action in interpleader.

5.      **Indemnification and Reimbursement.**   The Parties agree jointly and severally to indemnify, defend, hold harmless, pay or reimburse Escrow Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "**Indemnitees**") from and against any and all losses, damages, claims, liabilities, taxes (other than taxes on income earned by an Indemnitee in connection herewith), costs or expenses (including reasonable and documented attorney's fees) (collectively "**Losses**"), resulting directly or indirectly from (a) Escrow Agent's performance of this Agreement, except to the extent that such Losses are determined by a court of competent jurisdiction to have been caused by the gross negligence, willful misconduct, or bad faith of such Indemnitee; and (b) Escrow Agent's following, accepting or acting upon any instructions or directions from the Parties received in accordance with this Agreement.  The obligations set forth in this Section 5 shall survive the resignation, replacement or removal of Escrow Agent or the termination of this Agreement.

6.      **Notices.**  Except as otherwise provided in Section 3, all communications hereunder shall be in writing or set forth in a PDF attached to an email, and shall be delivered by facsimile, email or overnight courier only to the appropriate fax number, email address, or notice address set forth for each party as follows:

If to Payee:            The Archdiocese of New Orleans Settlement Trust
                        [ ]
                        Attention: _____
                        Tel No.: _____
                        Fax No.: _____
                        Email Address: _____


If to Debtor:           The Roman Catholic Church of the Archdiocese of New Orleans
                        [ ]
                        Tel No.: _____
                        Fax No.: _____

Email Address: _____

If to Escrow Agent:   [ ]

_____
_____
Attention: _____
Fax No.: _____
Email Address: _____

7.  **Compliance with Directives.**  In the event that a legal garnishment, attachment, levy, restraining notice, court order or other governmental order (a "**Directive**") is served with respect to any of the Escrow Deposit, or the delivery thereof shall be stayed or enjoined by a Directive, Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all such Directives so entered or issued, and in the event that Escrow Agent obeys or complies with any such Directive it shall not be liable to any of the Parties hereto or to any other person by reason of such compliance notwithstanding such Directive be subsequently reversed, modified, annulled, set aside or vacated.

8.  **Miscellaneous**. (a) The provisions of this Agreement may be waived, altered, amended or supplemented only by a writing signed by Escrow Agent and the Parties. Neither this Agreement nor any right or interest hereunder may be assigned by any Party without the prior consent of Escrow Agent and the other Party and any assignment in violation of this Agreement shall be ineffective and void. This Agreement shall be governed by and construed under the laws of the State of Louisiana without regard to the conflicts of law principles thereof. Each Party and Escrow Agent irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of Louisiana. To the extent that in any jurisdiction either Party may now or hereafter be entitled to claim for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process or immunity from liability, such Party shall not claim, and hereby irrevocably waives, such immunity. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(b)  No party to this Agreement is liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, public health emergencies, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control. This Agreement and any joint instructions from the Parties may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument or instruction, as applicable. This Agreement may be executed and transmitted by facsimile or as a PDF attached to an email and each such execution shall be of the same legal effect, validity and enforceability as a manually executed original, wet-inked signature. All signatures of the parties to this Agreement may be transmitted by facsimile or as a PDF attached to an email, and such facsimile or PDF will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or

unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. The Parties each represent, warrant and covenant that (i) each document, notice, instruction or request provided by such Party to Escrow Agent shall comply with applicable laws and regulations; (ii) such Party has full power and authority to enter into this Agreement and to perform all of the duties and obligations to be performed by it hereunder; and (iii) the person(s) executing this Agreement on such Party's behalf has been duly and properly authorized to do so.

[Signatures on next page]

#110036547v2

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth above.

**DEBTOR**                                          **ESCROW AGENT**

**The Roman Catholic Church**                       **[ ]**
**of the Archdiocese of New Orleans**

By: _____          By: _____
Name: _____          Name: _____
Title: _____          Title: _____

**PAYEE**

**The Archdiocese of New Orleans Settlement Trust**

By: _____
Name: _____
Title: _____

## EXHIBIT A

## FORM OF ESCROW RELEASE NOTICE – JOINT INSTRUCTIONS

[ ]

_____

Fax No.: _____

Email Address: _____

Attention: _____

[Date]

Re:  The Roman Catholic Church of the Archdiocese of New Orleans and The Archdiocese of New Orleans Settlement Trust – Escrow Agreement

Dear Sir/Madam:

We refer to an escrow agreement dated [_____], 2025 among The Roman Catholic Church of the Archdiocese of New Orleans and The Archdiocese of New Orleans Settlement Trust, and [ ], as Escrow Agent (the "**Escrow Agreement**").

Capitalized terms in this letter that are not otherwise defined shall have the same meaning given to them in the Escrow Agreement.

Pursuant to Section 3 of the Escrow Agreement, the Parties instruct Escrow Agent to release the Escrow Deposit to the specified party as instructed below.

[*Insert instructions*]

**Debtor:**

**THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS**

By: _____

Name:

Title:

Date:

**Payee:**

**THE ARCHDIOCESE OF NEW ORLEANS SETTLEMENT TRUST**

By: _____

Name:

Title:

Date:

## PLAN SUPPLEMENT 5.7(a)

### Reorganized Archdiocese's Directors and Officers

In accordance with section 1129(a)(5) of the Bankruptcy Code, the following list discloses the identities and affiliations of the Entities proposed to serve as directors and officers of the Reorganized Archdiocese on and after the Effective Date.

| Name | Affiliations |
|---|---|
| Most Rev. Gregory M. Aymond, D.D. | • Archbishop, President, and Board Member |
| Most Rev. James F. Checchio, J.C.D. | • Coadjutor Archbishop |
| Very Rev. Patrick J. Williams, V.G. | • Vicar General, First-Vice President, Executive Director of Clergy/Vicar for Clergy, and Board Member<br>• Rector of St. Louis Cathedral |
| Very Rev. Peter O. Akpoghiran, J.C.D. | • Judicial Vicar, Second-Vice President, Chancellor, and Board Member<br>• Pastor of St. Mark Roman Catholic Church, Ama, Louisiana |
| Very Rev. Patrick R. Carr | • Vicar of Finance, Third Vice-President, and Board Member<br>• Pastor of St. Rita Roman Catholic Church, New Orleans, Louisiana |
| Dirk J. Wild | • Chief Financial Officer, Secretary, and Board Member |

In addition, to the extent not already identified above, the following list discloses the identities of the Entities proposed to serve in the offices set forth in the Non-Monetary Plan Provisions.

| Name | Affiliations |
|---|---|
| The UP Institute | • Child Protection Consultant |
| Stacie Schrieffer LeBlanc, J.D., M.ED. | • Youth Protection Advisor |
| Sr. Mary Ellen Wheelahan, O. Carm. | • Youth Protection Executive<br>• Safe Environment Coordinator |
| Dr. Joseph Pistorius, Ph.D., LPC-SA, NCC | • Victims' Assistance Coordinator |
| Chalana Alexander Landry | • Director of Human Resources |

61

## PLAN SUPPLEMENT 5.7(b)

### Reorganized Additional Debtors' Directors and Officers

**I.**   <u>Listing of Board of Directors and Officers – Archdiocesan Parishes</u>

**All Saints Roman Catholic Church, New Orleans, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. FRED KADDU, S.S.J.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. ANGEL ANTONIO DIAZ-PEREZ

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. CYRIL M. BUYEERA

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Assumption of Mary Roman Catholic Church, Avondale, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. DUNG TUAN "FRANCIS" NGUYEN

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. SAMPSON ABDULAI

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. ALEXANDER GUZMAN

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: President, Director

DIRK J. WILD

Title: Director

**Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director, Vice-President

REV. JOSE L. LAVASTIDA

Title: Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: President, Director

DIRK J. WILD

Title: Director

**Blessed Trinity Roman Catholic Church, New Orleans, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director, Vice-President

REV. BARTHOLOMEW CHUKWUMA

Title: Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: President, Director

DIRK J. WILD

Title: Director

**Christ the King Roman Catholic Church, Gretna, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director, Vice-President

REV. MICHAEL NAM HOAN NGUYEN

Title: Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. KINGSLEY OGBUJI, S.S.J.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**Divine Mercy Roman Catholic Church, Kenner, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. LUIS FELIPE RODRIGUEZ

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**Good Shepherd Roman Catholic Church, New Orleans, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

VERY REV. MSGR. CHRISTOPHER H. NALTY J.C.L.

Title:  Director, Secretary/Treasurer

Case 23-90846 Document 2545-2 Filed in TXSB on 10/27/24 Page 5 of 56
Case 23-90846 Document 2504-5 Filed in TXSB on 10/27/24 Page 130
- Reorganized Additional Debtors Directors Office Page 5 of 56

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Holy Family Roman Catholic Church, Franklinton, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. PEDRO PRADA

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Holy Family Roman Catholic Church, Luling, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. VINCENT KIEN NGUYEN

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. JOHN TALAMO

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**Holy Spirit Roman Catholic Church, New Orleans, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. PATRICK COLLUM

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**Immaculate Conception Roman Catholic Church, Marrero, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. STEPHEN LEAKE

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**Immaculate Conception Roman Catholic Church, New Orleans, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. ANTHONY MCGINN, S.J.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. ROBERT T. COOPER

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. ROBERT T. COOPER

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. ANTHONY MCGINN, S.J.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. HERBERT KIFF

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. MARK THIBODEAUX, S.J.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Most Holy Trinity Roman Catholic Church, Covington, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. RODNEY P. BOURG

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. MICHAEL MITCHELL

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Our Lady of Grace Roman Catholic Church, Reserve, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. RODERICK COATES, S.S.J.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:  Director, Vice-President

REV. VINH VAN NGUYEN, S.D.D.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. CHRISTOPHER ZAVACKIS

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. KENNETH SMITH

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. KYLE V. DAVE

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

### Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. CHARLES WHITNEY DUSSOUY

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

### Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. MARLON MANGUBAT

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

### Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

 REV. EMILE "BUDDY" G. NOEL

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:  President, Director

DIRK J. WILD

Title:  Director

## Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:  Director, Vice-President

VERY REV. PAUL A. CLARK, V.F.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:  President, Director

DIRK J. WILD

Title:  Director

## Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:  Director, Vice-President

REV. DOUGLAS BUSCH

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:  President, Director

DIRK J. WILD

Title:  Director

## Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:  Director, Vice-President

REV. PHILIP G. LANDRY

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. JOQUES ABENAWE, F.M.H.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. JOHN YIKE

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. EDMUND AKORDOR

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

### St. Agnes le Thi Thanh Roman Catholic Church, Marrero, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. HOAI G. NGUYEN

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

### St. Agnes Roman Catholic Church, Jefferson, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. DENNIS HAYES, IIII

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

### St. Alphonsus Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. CHUNG CONG TRAN, C.Ss.R.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

VERY REV. MICHAEL PATRICK LAMY, V.F.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## St. Angela Merici Roman Catholic Church, Metairie, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. CLAYTON J. CHARBONNET

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. WILLIAM O'RIORDAN

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## St. Anselm Roman Catholic Church, Madisonville, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. MSGR. FRANK J. GIROIR

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. JUDE EMUNEMU

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## St. Anthony of Padua Roman Catholic Church, Luling, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. VINH DINH LUU, J.C.L.

Title: Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: President, Director

DIRK J. WILD

Title: Director

## St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director, Vice-President

REV. AUGUSTINE DEARMOND, O.P.

Title: Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: President, Director

DIRK J. WILD

Title: Director

## St. Anthony Roman Catholic Church, Gretna, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director, Vice-President

REV. GARY COPPING

Title: Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: President, Director

DIRK J. WILD

Title: Director

## St. Augustine Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director, Vice-President

REV. EMMANUEL BWALYA MULENGA, O.M.I.

Title: Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: President, Director

DIRK J. WILD

Title: Director

## St. Benedict Roman Catholic Church, Covington, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director, Vice-President

REV. CHARLES J. BENOIT, J.C.L.

Title: Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: President, Director

DIRK J. WILD

Title: Director

## St. Benilde Roman Catholic Church, Metairie, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director, Vice-President

REV. MATTHEW DAVID JOHNSTON, J.C.L.

Title: Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: President, Director

DIRK J. WILD

Title: Director

## St. Bernard Roman Catholic Church, St. Bernard, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director, Vice-President

REV. HOANG M. TUONG

Title: Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: President, Director

DIRK J. WILD

Title: Director

## St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director, Vice-President

REV. TIMOTHY DANIEL HEDRICK, J.C.L.

Title: Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: President, Director

DIRK J. WILD

Title: Director

## St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director, Vice-President

REV. CLETUS ORJI

Title: Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: President, Director

DIRK J. WILD

Title: Director

## St. Christopher Roman Catholic Church, Metairie, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director, Vice-President

REV. RAYMOND A. IGBOGIDI

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:  President, Director

DIRK J. WILD

Title:  Director

## St. Clement of Rome Roman Catholic Church, Metairie, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:  Director, Vice-President

REV. JOSEPH KRAFFT

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:  President, Director

DIRK J. WILD

Title:  Director

## St. Cletus Roman Catholic Church, Gretna, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:  Director, Vice-President

REV. BRYAN J. HOWARD

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:  President, Director

DIRK J. WILD

Title:  Director

## St. David Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:  Director, Vice-President

REV. OSWALD P. PIERRE-JULES, S.S.J.

Title: Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: President, Director

DIRK J. WILD

Title: Director

## St. Dominic's Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director, Vice-President

REV. WAYNE C. PAYSSE

Title: Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: President, Director

DIRK J. WILD

Title: Director

## St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director, Vice-President

REV. JOSEPH MAN TRAN

Title: Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: President, Director

DIRK J. WILD

Title: Director

## St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director, Vice-President

REV. NILE C. GROSS, S.T.L.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

### St. Francis Xavier Roman Catholic Church, Metairie, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. JOSEPH SANTO PALERMO

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

### St. Genevieve Roman Catholic Church, Slidell, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

VERY REV. GERALD L. SEILER, J.C.L., V.F.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

### St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. DANIEL OKAFOR

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

### St. Jerome Roman Catholic Church, Kenner, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV.  LUIS CARLOS DUARTE

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

### St. Joachim Roman Catholic Church, Marrero, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV.  KYLE J. SANDERS

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

### St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV.  JOSE L. LAVASTIDA

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:  President, Director

DIRK J. WILD

Title:  Director

## St. John of the Cross Roman Catholic Church, Lacombe, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:  Director, Vice-President

REV.  TUAN ANH PHAM

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:  President, Director

DIRK J. WILD

Title:  Director

## St. John Paul II, Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:  Director, Vice-President

REV.  VINCENT H. PHAN

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:  President, Director

DIRK J. WILD

Title:  Director

## St. John the Baptist Roman Catholic Church, Edgard, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:  Director, Vice-President

REV. ROBUSTIANO MORGIA

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**St. John the Baptist Roman Catholic Church, Folsom, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. LUKE NGUYEN

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**St. Joseph Roman Catholic Church, Algiers, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. JOSEPH THANG DINH TRAN

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. SIDNEY SPEAKS

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**St. Joseph Roman Catholic Church, Gretna, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. GARRY COPPING

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. GARRY COPPING

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. LAMBERTUS ARKIAN LEIN, S.V.D.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. COLM CAHILL

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. JARED RODRIGUE

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

88

**St. Margaret Mary Roman Catholic Church, Slidell, Louisiana**

    VERY REV. PETER O. AKPOGHIRAN, J.C.D.

    Title:   Director, Vice-President

    REV. DANIEL DARMANIN

    Title:  Director, Secretary/Treasurer

    VERY REV. PATRICK J. WILLIAMS, V.G.

    Title:   President, Director

    DIRK J. WILD

    Title:   Director

**St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana**

    VERY REV. PETER O. AKPOGHIRAN, J.C.D.

    Title:   Director, Vice-President

    REV. DANIEL H. GREEN

    Title:  Director, Secretary/Treasurer

    VERY REV. PATRICK J. WILLIAMS, V.G.

    Title:   President, Director

    DIRK J. WILD

    Title:   Director

**St. Mark Roman Catholic Church, Ama, Louisiana**

    VERY REV. PATRICK CARR

    Title:   Director, Vice-President

    VERY REV. PETER O. AKPOGHIRAN, J.C.D.

    Title:  Director, Secretary/Treasurer

    VERY REV. PATRICK J. WILLIAMS, V.G.

    Title:   President, Director

    DIRK J. WILD

    Title:   Director

**St. Martha Roman Catholic Church, Harvey, Louisiana**

> VERY REV. PETER O. AKPOGHIRAN, J.C.D.
>
> Title:   Director, Vice-President
>
> REV. LICH VAN NGUYEN
>
> Title:  Director, Secretary/Treasurer
>
> VERY REV. PATRICK J. WILLIAMS, V.G.
>
> Title:   President, Director
>
> DIRK J. WILD
>
> Title:   Director

**St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana**

> VERY REV. PETER O. AKPOGHIRAN, J.C.D.
>
> Title:   Director, Vice-President
>
> REV. FRANCIS OFFIA
>
> Title:  Director, Secretary/Treasurer
>
> VERY REV. PATRICK J. WILLIAMS, V.G.
>
> Title:   President, Director
>
> DIRK J. WILD
>
> Title:   Director

**St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana**

> VERY REV. PETER O. AKPOGHIRAN, J.C.D.
>
> Title:   Director, Vice-President
>
> REV. CHRISTIAN W. DELERNO, JR.
>
> Title:  Director, Secretary/Treasurer
>
> VERY REV. PATRICK J. WILLIAMS, V.G.
>
> Title:   President, Director
>
> DIRK J. WILD

Title:   Director

**St. Mary's Roman Catholic Church, New Orleans, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

VERY REV. PATRICK CARR

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. LEON POCHE

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St.  John the Baptist Roman Catholic Church, Paradis, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. LANCE CAMPO

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## St. Patrick's Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. GARRETT OBRIEN

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. MUNNA LAWRENCE MURORI

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. CHARLES NDUMBI, S.V.D.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## St. Peter Claver Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. AJANI GIBSON

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## St. Peter Roman Catholic Church, Reserve, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. RAY HYMEL

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

## St. Peter's Roman Catholic Church, Covington, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. DANIEL BROUILLETTE

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

### St. Philip Neri Roman Catholic Church, Metairie, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. ANDREW RUDMANN

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

### St. Pius X Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. JONATHAN HEMELT

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

### St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. STANLEY L. IHUOMA, S.S.J.

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**St. Rita Roman Catholic Church, Harahan, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. STEVEN V. BRUNO

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**St. Rita Roman Catholic Church, New Orleans, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. PATRICK CARR

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana, as noted earlier, Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate as one Archdiocesan Parish**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. SAMPSON ABDULAI

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. KEVIN DELERNO

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**The Congregation of St. Rita Roman Catholic Church of Harahan**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. STEVEN V. BRUNO

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director, Vice-President

REV. COLIN BRAUD

Title:  Director, Secretary/Treasurer

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   President, Director

DIRK J. WILD

Title:   Director

**II.      Listing of Board of Directors and Officers – Suppressed Parishes**

**Blessed Sacrament, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

**Epiphany, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

**Immaculate Heart of Mary, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

**Incarnate Word, Inc.**

    MOST REV. GREGORY M. AYMOND, D.D.

    Title:   President, Director

    DIRK J. WILD

    Title:   Secretary/Treasurer, Director

    VERY REV. PATRICK J. WILLIAMS, V.G.

    Title:   Vice-President, Director

**Our Lady of Good Counsel, Inc.**

    MOST REV. GREGORY M. AYMOND, D.D.

    Title:   President, Director

    DIRK J. WILD

    Title:   Secretary/Treasurer, Director

    VERY REV. PATRICK J. WILLIAMS, V.G.

    Title:   Vice-President, Director

**Our Lady of Good Harbor, Inc.**

    MOST REV. GREGORY M. AYMOND, D.D.

    Title:   President, Director

    DIRK J. WILD

    Title:   Secretary/Treasurer, Director

    VERY REV. PATRICK J. WILLIAMS, V.G.

    Title:   Vice-President, Director

**Our Lady of Lourdes, Inc., New Orleans, Louisiana**

    MOST REV. GREGORY M. AYMOND, D.D.

    Title:   President, Director

    DIRK J. WILD

    Title:   Secretary/Treasurer, Director

    VERY REV. PATRICK J. WILLIAMS, V.G.

98

Title:   Vice-President, Director

**Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

**Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

REV. FRANCIS KAMAU, F.M.H

Title:   Director

**St. Ann, New Orleans, Louisiana, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

**St. Bonaventure, Inc., formerly known as St. Gertrude Roman Catholic Church, Avondale, Louisiana**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

REV. VINCENT PHAN

Title :  Director

**St. Francis Xavier Cabrini, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

**St. Francis de Salles, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

**St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

REV. FRANCIS OFFIA

Title:   Director

**St. Gertude, Inc., formerly known as St. Hubert Roman Catholic Church, Des Allemands, Louisiana**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

REV. LANCE CAMPO

Title:   Director

**St. Henry's, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

**St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

REV. RAY HYMEL

Title:   Director

**St. James Major, Inc., formerly known as St. James Major Roman Catholic Church,  New Orleans, Louisiana**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

REV. FRANCIS OFFIA

Title:   Director

**St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

REV. MARK HYDE, S.D.B

Title:   Director

**St. John the Baptist, New Orleans, Louisiana, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

REV. GARRET O'BRIEN, J.C.L.

Title:   Director

**St. Julian Eymard, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

**St. Lawrence the Martyr, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

**St. Louise de Marillac, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

**St. Maurice, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

## St. Monica, Inc.

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

## St. Philip the Apostle, Inc.

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

## St. Raymond's, Inc.

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title:   Vice-President, Director

**St. Rose of Lima, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title: President, Director

DIRK J. WILD

Title: Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: Vice-President, Director

**St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana**

MOST REV. GREGORY M. AYMOND, D.D.

Title: President, Director

DIRK J. WILD

Title: Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: Vice-President, Director

**St. Theresa of the Child Jesus, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title: President, Director

DIRK J. WILD

Title: Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: Vice-President, Director

**The Congregation of Saints Peter and Paul Roman Catholic Church**

MOST REV. GREGORY M. AYMOND, D.D.

Title: President, Director

DIRK J. WILD

Title: Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: Vice-President, Director

**The Congregation of St. Cecelia Roman Catholic Church**

MOST REV. GREGORY M. AYMOND, D.D.

Title: President, Director

DIRK J. WILD

Title: Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: Vice-President, Director

**The Congregation of the Annunciation Roman Catholic Church**

MOST REV. GREGORY M. AYMOND, D.D.

Title: President, Director

DIRK J. WILD

Title: Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: Vice-President, Director

**The Congregation of the Holy Trinity Roman Catholic Church**

MOST REV. GREGORY M. AYMOND, D.D.

Title: President, Director

DIRK J. WILD

Title: Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: Vice-President, Director

III. **Listing of Board of Directors and Officers – Archdiocesan Agencies**

**Archdiocesan Spirituality Center**

MOST REV. GREGORY M. AYMOND, D.D.

Title: President, Director

VERY REV. PATRICK WILLIAMS

Title:   Vice-President, Director

VERY REV. PATRICK CARR

Title:   Secretary/Treasurer, Director

**Catholic Charities Archdiocese of New Orleans**

CYNTHIA HAYES

Title: President, Ex officio non-voting Director

VERY REV. PATRICK CARR

Title: Director

VERONICA CARTER

TITLE: DIRECTOR

RON PAUL CHERAMIE

Title: Secretary, Director

ALLISON MILLET DAIGLE

Title: Director

RONALD DAWSON

Title: Director

DR. PIERRE DEIEGE

Title: Board Chair, Director

DR. THOMAS D. FRAZEL

Title: Board Vice Chair, Director

DONNA GLOVER

Title: Director

LAURA GRAVENER

Title: Director

MARLIN GUSMAN

Title: Director

WILLIAM D. HOFFMAN

Title: Treasurer, Director

DAVID MELANCON

Title: Director

DEANNE G. RAYMOND

Title: Director

ANGELICA RIVERA

Title: Director

Dr. ROY A. SALGADO, JR.

Title: Director

RENNY SIMNO

Title: Director

DIRK WILD

Title: Director

TIMOTHY J. YOUNG

Title: Director

## Catholic Charities Children's Day Care Centers

MOST REV. GREGORY M. AYMOND

Title:   Director, President

CYNTHIA T. HAYES

Title:   Treasurer, Director, Secretary

## Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)

See Catholic Charities, above.

## Clarion Herald Publishing Company

VERY REV PATRICK WILLIAMS, V.G.

Title:   President

VERY REV. PATRICK CARR

Title:   Vice-President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

## Korean Catholic Community of New Orleans, Inc.

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

DIRK J. WILD

Title:   Secretary/Treasurer, Director

## Notre Dame Seminary

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President, Director

VERY REV. JOSHUA J. RODRIGUE, S.T.L.

Title:   Secretary, Director

VERY REV. PATRICK J. WILLIAMS

Title:   Vice-President, Director

MOST REV. ROBERT W. MARSHALL, JR. J.D.

Title: Director

MOST REV. SIMON PETER ENGURAIT, D.D.

Title: Director

MOST REV. EDWARD J. BURNS, D.D.

Title: Director

MOST REV. JOHN N. TRAN, D.D.

Title: Director

MOST REV. MICHAEL G. DUCA, J.C.L.

Title: Director

MOST REV. LOUIS F. KIHNEMAN, III, D.D.

Title: Director

MOST REV. STEVEN J. RAICA, J.C.D.

Title: Director

MOST REV. JOSEPH R. KOPACZ, PH.D.

Title: Director

MOST REV. JOHN DOUGLAS DESHOTEL, D.D.

Title: Director

MOST REV. GLEN J. PROVOST, D.D.

Title: Director

MOST REV. MARK S. RIVITUSO, J.C.L.

Title: Director

MOST REV. FRANCIS I. MALONE, J.C.L.

Title: Director

VERY REV. JOHN M. PAUL TAI VAN TRAN, CRM

Title: Director

RIGHT REV. GREGORY M. BOQUET, O.S.B.

Title: Director

VERY REV. MATTHEW CLARK, O.S.B.

Title: Director

JOSE JUAN S. BAUTISTA, PH.D.

Title: Director

JILL C. CABES, M.ED., M.A.T.S.

Title: Director

RAENELL BILLIOT HOUSTON, PH.D.

Title: Director

LAUREN R. LAGARDE, M.A.P.L.

Title: Director

HON.  WENDY BALDWIN VITTER, J.D.

Title: Director

**Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana**

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Vice-President, Director

REV. DAMIAN ZABLOCKI

Title:   Secretary/Treasurer, Director

DIRK J. WILD

Title:   Director

VERY REV. PATRICK J. WILLIAMS

Title:   President, Director

**Pace Greater New Orleans**

CHIP HELLMERS

Title: Board Chair, Director

KYLE MEGUESS

Title:   Secretary-Treasurer, Director

DR. ELMORE RIGAMER

Title:   Director

JOHN HUMMEL

Title: Director

SONTRA CARMOUCHE

Title: Board Chair, Director

KATHY HEBERT

Title: Board Chair, Director

DR. SUSAN NELSON

Title: Board Chair, Director

KURT WOOTAN

Title:  Director *ex officio*, PACE Executive Director

CYNTIA HAYES

Title: Director *ex officio*

DR. KUNTAL MOHARE

Title: Director *ex officio*

**Padua House (merged into Catholic Charities Archdiocese of New Orleans)**

See Catholic Charities, above.

**Philmat, Inc.**

CYNTHIA T. HAYES

Title:   President, Director

MARTIN GUTIERREZ

Title:   Secretary, Director

STACIE BONCK

Title:   Treasurer, Director

**Project Lazarus**

DANNY AKERS
Title: Board Chair, Director

GARRY SCHIRO
Title: Board Vice-Chair, Director

JASON ALLEN

Title: Secretary, Director

MEGAN DECUIR

Title: Treasurer, Director

DIRK WILD

Title: Director

LISA JOHNSON

Title: Director

JERRY FREDIEU

Title: Director

BRAD RICHARD

Title: Director

LOUIS DAVID

Title: Director

REV. MICHAEL SCHNELLER

Title: Director

RICHARD WEIBELT

Title: Director

WILLIAM LUTTON

Title: Director

DR. FALON BROWN

Title: Director

MARK CARBON
Title: Director

**Roman Catholic Center of Jesus the Lord**

MOST REV. GREGORY M. AYMOND, D.D.

Title:   President

VERY REV. PATRICK CARR

Title:   Secretary/Treasurer, Director

VERY REV. PATRICK WILLIAMS

Title:   Vice-President, Director

DIRK J. WILD

Title:   Director

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title:   Director

113

**School Food and Nutrition Services of New Orleans, Inc.**

    VERY REV. PATRICK WILLIAMS

    Title:   President, Director

    ELLEN GAUTHREAUX

    Title:   Secretary/Treasurer, Director

    DIRK J. WILD

    Title:   Vice-President, Director

**Second Harvest of Greater New Orleans and Acadiana**

    WILLIAM "BILL" HOFFMAN

    Title: Board Chair, Director

    DAVID GALLO

    Title: Board Vice Chair, Director

    LYNNE BURKART

    Title: Treasurer, Director

    TODD LAMBERT

    Title: Secretary, Director

    GARY LORIO

    Title: Director

    JODI AAMODY

    Title: Director

    REV. MSGR. HENRY J. BUGLER

    Title: Director

    ERIC DANOS

    Title: Director

    WILMER "BILLY" FREIBERG

    Title: Director

    MICHAEL "MIKE" HULEFELD

114

Title: Director

DR. DARVELLE HUTCHINS

Title: Director

ELLIS LANAUX

Title: Director

DR. NICOLE J. MONCRIEF

Title: Director

SALLY RINEHARDT

Title: Director

DENNIS STINE

Title: Director

RACHEL TARAVELLA

Title: Director

MONIQUE THIERRY

Title: Director

DANA BELAIRE TOPHAM

Title: Director

PAULA WATER

Title: Director

DIRK WILD

Title: Director

**St. Jude Community Center, Inc.**

MOST REV. GREGORY M. AYMOND, D.D.

Title:    President, Directo

VERY REV. PATRICK CARR

Title:    Secretary/Treasurer, Director

VERY REV. PATRICK J. WILLIAMS, V.G.

Title: Vice-President, Director

VERY REV. PETER O. AKPOGHIRAN, J.C.D.

Title: Director

DIRK WILD

Title: Director

## St. Michael Special School for Exceptional Children

SR. MARY ELLEN WHEELAHAM, O. CARM

Title: Vice-President, Director

DR. RAENELL HOUSTON

Title: Director

DR. ELIZABETH LAFORGE

Title: Director

VERY REV. PATRICK CARR

Title: Secretary/Treasurer, Director

## St. Thérèse Catholic Academy

MOST REV. GREGORY M. AYMOND, D.D.

Title: President

DIRK J. WILD

Title: Vice-President, Director

REV. PATRICK R. CARR

Title: Secretary/Treasurer, Director

DR. RAENELL BILLIOT HOUSTON

Title: Director

## The Society for the Propagation of the Faith, Archdiocese of New Orleans

MOST REV. GREGORY M. AYMOND, D.D.

Title: President, Director

REV. PATRICK CARR

Title:   Secretary, Director

DIRK J. WILD

Title:   Treasurer, Director

REV. WAYNE PAYSSE

Title:   Vice-President, Director

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re:** | **Case No. 20-10846** |
| **THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS,** | **Chapter 11** |
| | **Complex Case** |
| **Debtor.**[1] | **Section A** |

**DECLARATION OF DONALD C. MASSEY WITH RESPECT TO PLAN SUPPLEMENT 6.3 TO THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS AND ADDITIONAL DEBTORS, PROPOSED BY THE DEBTOR, THE ADDITIONAL DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, DATED AS OF SEPTEMBER 23, 2025**

I, Donald C. Massey, declare under penalty of perjury as follows:

1.      I am an attorney, duly admitted and licensed to practice in the State of Louisiana. I am also admitted to practice in the following courts: (i) the Supreme Court of the United States, (ii) the United States Court of Appeals for the Fifth Circuit, (iii) the United States District Courts for the Eastern, Middle, and Western Districts of Louisiana, and (iv) the United States District Court for the District of Colorado. I submit this declaration as part of Plan Supplement 6.3 to the *Fourth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, dated as of September 23, 2025* (the "Joint Plan") as well as any subsequent or further amended versions of the Joint Plan.[2]

2.      I understand that the Creditor's Committee, after consultation with the Debtor, has

---

[1] The last four digits of the Debtor's federal tax identification number are 8966. The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

[2] All capitalized terms not otherwise defined in this Declaration have the meanings ascribed to them in the Joint Plan.

selected me to serve as the Settlement Trustee of the Settlement Trust, as more fully explained in the Joint Plan. I have extensive experience as an attorney and special master responsible for developing and implementing dispute and claims-resolution processes in complex litigation. These matters have involved the administration and resolution of thousands of separate claims as well as the distribution of many millions of dollars to claimants. The following cases illustrate my experience in these matters:

- In December 2021, I was appointed by the 24th Judicial District Court, Jefferson Parish, Louisiana in the proceeding styled *In re: Hurricane Ida Claims, En Banc* to serve as a Co-Special Master. Over 4,500 first-party insurance cases were filed in that court. In my role, I was integrally involved in the administration and resolution of these claims.

- Judge Lance Africk of the United States District Court for the Eastern District of Louisiana appointed me in the case styled *Evans v. TIN, Inc.*, Civ. Act. No. 11-2067 Div M, as a special master to supervise and administer the class-action, claims-settlement process in that case. Beginning in 2013, in accordance with the Class Settlement Agreement reached in that case, I proposed allocations of settlement proceeds to class members as well as, in certain instances, enhancements and incentive awards. I also resolved objections regarding the allocation of settlement proceeds and made recommendations to the Court on issues that it directed to me. Lastly, I also oversaw the distribution of millions in proceeds to claimants.

- Judge Ivan Lemelle (also of the United States District Court for the Eastern District of Louisiana) appointed me in 2014 as the court-compliance officer in the case styled *Moore v. Tangipahoa Parish School Board,* Civ. Act. No. 65-15556 Div. B. Just before my appointment, this school-board desegregation case (which was filed in 1965) had become very active. As court-compliance officer, I monitored and addressed the school-board's continuing compliance with a long-standing, permanent desegregation injunction. My monitoring and reporting duties in this role resemble those that the Settlement Trustee must perform under the Non-Monetary Plan Provisions adopted in connection with the Joint Plan. The *Moore* court recently found that the Tangipahoa school board was unitary in six of seven constitutionally mandated areas.

3.     Since 2022, I have co-owned the firm known as SMS Dispute Resolution ("SMS"). SMS helps parties resolve disputes in both litigation and non-litigation contexts. SMS's dispute-

2

119

administration and resolution-process emphasizes the timely exchange of information among litigants so that they may achieve a prompt and defensible resolution of their competing claims.

4.      Before preparing this Declaration, I received and reviewed a list of the Debtor's non-confidential Creditors and other persons identified as parties-in-interest in the Debtor's *Schedules of Assets and Liabilities*, as amended (the "Schedules"), filed in the Bankruptcy Case. I also received the most current list setting forth the Debtor, the Additional Debtors, the Contributing Non-Debtor Catholic Entities, the Settling Insurers, any affiliates of any of the foregoing, and the Non-Settling Insurer (together, the "Related Entities"). I reviewed these lists to identify potential conflicts, connections, and other relationships (the "Connections") that I and/or SMS had with any Related Entities and to ascertain my independence and disinterestedness in preparation for my appointment as Settlement Trustee, as required by Section 5.6 of the Settlement Trust Agreement. After conducting this review, I have determined, as specifically set forth below, that I have the following Connections (the "Identified Connections") to the Related Entities:

a)  *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179 Section J: For approximately the last ten (10) years, I have served in an Of Counsel position at the law firm of Couhig Partners, LLC ("Couhig Partners") in New Orleans, Louisiana. Before I joined Couhig Partners, attorneys at that firm engaged and undertook representation of the Debtor and certain of the Additional Debtors in the multi-district litigation styled *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179 Section J (the "Deepwater Horizon Case"), which was then pending in the United States District Court for the Eastern District of Louisiana ("EDLA"). I was not involved in the Deepwater Horizon Case, nor did I ever discuss, participate in, or receive any confidential information pertaining to, Couhig Partners' representation of the Debtor and certain of the Additional Debtors in that matter. As of today's date, no attorney at Couhig Partners represents the Debtor or the Additional Debtors in any pending litigation or other capacity. Nevertheless, Couhig Partners has agreed, before the Effective Date of the Joint Plan, to erect an internal, ethical screen to wall me off from any future representation by Couhig Partners of the Debtor, the Additional

3

Debtors, the Contributing Non-Debtor Catholic Entities, or any of these entities' affiliates.

b) Within the last ten (10) years, I have not represented any of the Settling Insurers or the Non-Settling Insurer. I do not have access to any records of any insurer-related representations that I might have been involved with and that date back before the last ten (10) years. I cannot recall any specific case where I personally represented any Settling Insurer or the Non-Settling Insurer at any time before July 2015. I understand that prior to my affiliation with Couhig Partners, no Couhig Partners lawyers personally represented any Settling Insurer or Non-Settling Insurer either. However, if I or any other attorney at Couhig Partners did represent a Settling Insurer or the Non-Settling Insurer more than ten (10) years ago, that representation would have had no relation to the Debtor, the Additional Debtors, the Contributing Non-Debtor Catholic Entities, and/or their affiliates.

c) I understand that the Non-Settling Insurer is an affiliate of The Travelers Companies, Inc. ("Travelers"). I serve as counsel to the plaintiffs in two (2) matters in which Travelers and/or one of its affiliates is a defendant. These matters are not related to the Bankruptcy Case or to the Debtors, the Additional Debtors, the Contributing Non-Debtor Catholic Entities, or their affiliates. These two matters are as follows;

    i. *Stephanie Forster v. versus Z Line Kitchen and Bath, LLC, The Home Depot, Inc., Home Depot U.S.A., Inc., Home Depot Management Company, LLC, Jimmy McNamara Plumbing & General Contracting, LLC, Steve Wobbema, Travelers Casualty Insurance Company of America, and XYZ Insurance Company*, Case No. 2024-00247, "J-15", in the Civil District Court, Parish of Orleans; and

    ii. *Larry Abadie, Individually, and as Legal Tutor For His Minor Child, A.A., and on Behalf of the Decedent, Page Ann Abadie v. Unopened Succession of Ethelwaldo De Jesus*, Case No, C-152029 "A", in the 17th Judicial District Court, Parish of Lafourche.

d) Court-Appointed and Private Mediation Matters: I have been assigned direct responsibility for over 2,000 matters involving disputes between plaintiffs and their first-party insurers. In such cases, I ordinarily served as a special master, mediator, or both. No Settling Insurer was involved in these matters. A Travelers affiliate was involved in the following matter in which I served as a special master: *Safe Pack, LLC v. Travelers Property and Surety Company*, Case No. 836-218 "F", in the 24th Judicial District Court, Parish of Jefferson. This matter was not related to the Bankruptcy Case or to the Debtors, the Additional Debtors, the Contributing Non-Debtor Catholic Entities, or their affiliates. This matter is now closed.

e) Arbitration Matters: I have been designated as an arbitrator in approximately ten (10) to fifteen (15) first-party insurance claims. In matters where multiple syndicates shared risks, one or more Settling Insurers and/or the Non-Settling Insurer (or their related affiliates) might have shared some coverage or risk. My records do not reflect,

4

and I do not personally recall, that any Settling Insurers, the Non-Settling Insurer, or their related affiliates were involved in these matters.

f)   <u>Relationships with Counsel</u>: During my career, I have met and am familiar with several attorneys who personally represent members of the Creditors' Committee. I also know several attorneys who represent Abuse Claimants who are active participants in the Bankruptcy Case but who do not themselves currently serve on the Creditors' Committee. I have also served as counsel to plaintiffs in multi-plaintiff proceedings where attorneys now representing members of the Creditors' Committee or other Abuse Claimants represented co-plaintiffs. I do not have any financial relationship with any of these attorneys and am not currently receiving any compensation or expense reimbursements from these attorneys or their law firms. Previously, I was involved in one case in which I and attorneys for certain Abuse Claimants both received compensation. Specifically, I served as a special master and mediator in the case styled *Sherie Conrad and Julian Pembo v. Louisiana Insurance Guaranty Association*, Case No. 843-685, in the 24th Judicial District Court, Parish of Jefferson. I received compensation for my services in that case. The law firm of Herman, Katz, Gisleson & Cain, LLC ("<u>Herman Katz</u>") represented the plaintiffs in this same case. That matter was settled, and my fee was small, which for the plaintiffs was an amount less than $1,000.00. My billing as a court-appointed neutral was on an hourly basis, with twenty-five percent (25%) of my total fee due from the plaintiffs, in accordance with the court's plenary case management order relative to Hurricane Ida cases. I had no involvement in, or knowledge of, any fee relationship counsel on either side of that case may have had with their clients. I do not recall any other past cases where I received any compensation or expense reimbursements from Herman Katz or any other attorneys or law firms representing Abuse Claimants.

g)   <u>Charitable Contributions</u>: I have made charitable contributions to the following entities in the last ten (10) years: (i) The St. Paul's School (Covington, Louisiana), (ii) Loyola School of Law (New Orleans, Louisiana), (iii) Xavier University (New Orleans, Louisiana), and (iv) Archbishop Hannan High School (Covington, Louisiana). Although these entities are affiliated with The Roman Catholic Church, they are not Additional Debtors or Contributing Non-Debtor Catholic Entities. The contributions to these entities represent only a fraction of the charitable contributions my wife and I made during this same ten-year period. We also contributed to many other charities and organizations that were not Catholic or religious in nature.

5.   To the best of my knowledge and the information available to me and except as otherwise set forth in the immediately preceding paragraph, none of the Identified Connections specified above involve any representation of an interest materially adverse to the Debtor, the Additional Debtors, or any other party-in-interest in the Bankruptcy Case, nor do the Identified Connections relate in any way to my proposed appointment as Settlement Trustee of the Settlement

Trust. Furthermore, I do not hold any interest in, currently act as attorney or agent for, or serve in any other professional capacity for, any Related Entities except as described above. I conclude that the Identified Connections have not affected, do not now affect, and will not in the future affect my service as Settlement Trustee of the Settlement Trust. I am therefore independent as required by Section 5.6 of the Settlement Trust Agreement.

6.      I am not affiliated with, nor do I have any connection with, the Office of the United States Trustee or any of its employees.

7.      I have not received any transfer, assignment, or pledge of property of the Debtor, of the Debtor's bankruptcy estate, of the Additional Debtors, or of any Abuse Claimants as of the date of this Declaration.

8.      I have not shared or agreed to share with any other person any compensation or reimbursement that I may receive or be paid as the Settlement Trustee of the Settlement Trust.

9.      As more fully described in the Settlement Trust Agreement, my compensation for my services as Settlement Trustee will be as follows:

a.      Beginning on the Effective Date of the Joint Plan, I will receive a flat fee of $45,000 per month for the first three (3) months following the Effective Date of the Joint Plan.

b.      For all months following the third month after the Effective Date of the Joint Plan, I will initially bill for my services at a rate of $550 per hour. As Settlement Trustee, I will provide monthly invoices to the Settlement Trust Advisory Committee for review and approval by a majority vote of the Settlement Trust Advisory Committee.

c.      My compensation as Settlement Trustee in the months following the third month after the Effective Date may be adjusted as reasonably determined by the majority of the Settlement Trust Advisory Committee or by order of the Bankruptcy Court.

d.      As Settlement Trustee, I will receive reimbursement from the Settlement Trust of all reasonable, out-of-pocket costs and expenses that I incur while performing my duties as Settlement Trustee and for which I have provided appropriate documentation to

6

the Settlement Trust. Such reimbursement of expenses shall conform to the reasonable policies and procedures adopted by the Settlement Trust from time to time.

e.    I will disclose in the Annual Report required by the Settlement Trust Agreement all amounts I receive as compensation for, and reimbursement of expenses related to, my services as Settlement Trustee in the year covered by the Annual Report.

10.    All compensation and reimbursement of expenses that I receive as Settlement Trustee shall be paid from the Settlement Trust, as more fully set forth in the Settlement Trust Agreement.

11.    Information contained in an Abuse Claim and any other information provided to me by an Abuse Claimant, including but not limited to, the names and other personal identification information of Abuse Claimants, are confidential in accordance with the terms of the Archdiocese Claims Bar Date Order. I presume that any future Abuse Claims filed with respect to the Additional Debtors will be deemed confidential by orders of the Bankruptcy Court. To the extent I become aware of any such confidential material, I will use that material solely in connection with the Bankruptcy Case in my role as the Settlement Trustee. I will maintain the confidentiality of such information in accordance with the Archdiocese Claims Bar Date Order, and I will not disclose any such confidential material to any person or entity except upon order of a court of competent jurisdiction after notice to all affected parties.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 24th day of October 2025.

_____

DONALD C. MASSEY

7

**DONALD C. MASSEY**
**ENERGY CENTRE, SUITE 3250**
**1100 POYDRAS**
**NEW ORLEANS, LOUISIANA  70163**
**PH: (504) 599-0777**
**FAX: (504) 588-9750**
**CELL: (504) 430-6276**
**EMAIL:  don@donmasseylaw.com**

**PROFESSIONAL**

Co-Owner, SMS Dispute Resolution ("SMS"); (2022-present). SMS assists parties before and during litigation, as well as in non-litigation matters, in achieving resolution of their disputes. Unlike traditional mediation, SMS developed and uses an integrated dispute resolution process that focuses on timely in exchange of important information and assurances that the parties have reasonably complete information to make sound resolution decisions on a prompt basis.  Multiple parties have engaged SMS to mediate thousands of matters.  We utilize creative mediative tools, including proprietary administrative software we developed, to bring matters to an early and cost effective resolution. Most parties find our optional flat fee billing approach highly competitive and attractive.  Given our proven track-record and high resolution rates in Hurricane Ida matters, the Louisiana Insurance Guaranty Association ("LIGA") and multiple Plaintiffs' counsel have engaged us to assist them in resolving several thousand outstanding first party insurance cases in litigation throughout Louisiana stemming from Hurricanes Laura, Delta, Zeta and Ida, as well as non-Hurricane matters.

Special Master – Hurricane Ida.  Hurricane Ida Case Management Order and Extrajudicial Resolution Processes.   Louisiana (December 2021 through present). Selected by 24th JDC Judges, as well as multiple requests by parties and lawyers to assist in resolving claims stemming from Hurricane Ida.  As of August 16, 2024, approximately 4,500 Hurricane Ida cases had been filed in the 24th JDC.  Along with my two colleague special masters, over 95% of those cases have been resolved and approximately 250 cases remain open.  No responsive pleadings have been filed in many of the open cases.  With a 95% resolution rate, our  average time from start to finish has been under 100 days.

Of Counsel, Couhig Partners, LLC; New Orleans, Louisiana; (June 2015 through present).

Corporate Counsel/ Americas Counsel, DeepOcean U.S (f/k/a Delta SubSea, LLC). Houston, Texas; (November 2019 through present). In 2019, Delta SubSea, LLC was acquired by DeepOcean N.S., a worldwide, full service subsea services

125

Donald C. Massey
Page 2

provider. (June 2015 through present).

Counsel, PetroStar Services, LLC; San Antonio, Texas; (January 2019 through March 2023). PetroStar provided pump down and pressure control services to operators in the multiple shale plays. PetroStar acquired an impressive spread of equipment ranging from top of the line pump-down units, to coiled tubing rigs and management assembled a superior team of professionals. Following a downturn in the industry and the COVID pandemic, PetroStar was sold, and the assets subject of that sale were deployed in new owners' operations.

General Counsel. Delta SubSea, LLC; Houston, Texas; Outside General Counsel (2009 through June 2015); General Counsel (July 2015-October 2019); Outside General Counsel for Delta SubSea, LLC (and legacy entity, Delta Marine Technologies, Inc. 2009-2015) Provided a full range of general counsel representation and service as a member of the executive team. Point person on transactional team that successfully closed a transaction for over $50,000,000 in investment capital on May 1, 2014.

Capital Partner, Adams and Reese LLP, New Orleans, Louisiana: Division Manager, Energy and Environmental Division; Team Leader, Environmental and Toxic Tort Litigation Team. (1984 through June 2015).

Adjunct Professor, University of New Orleans — Torts Law and Legal Investigation and Interviewing courses: (1987 through 2006).

Trial Counsel in approximately 150 trials, predominately jury trials.

Class action experience includes participation as counsel, including liaison counsel, and lead counsel, consultant, and expert witness, and service as a special master in various class action matters.

Martindale-Hubbell —AV Preeminent® Rating

**SPECIAL MASTER BACKGROUND**

*In re; Hurricane Ida Claims, En Banc* appointment, 24th Judicial District Court, Parish of Jefferson, State of Louisiana. Appointment as Co-Special Master to develop, implement and administer a process for expedited case management of potentially substantial number first party insurance claims. Over 4,300 cases filed in 24th JDC; Individually assigned to over 1,000

cases, with a resolution rate of approximately 95%. (December 2021 – present).

*Kailas and VS, LLC v. Ryan,* 792-740, Division O, Judge Danyelle Taylor, 24th Judicial District Court, Parish of Jefferson, State of Louisiana. Appointment as Special Master to act as manager of Lake Forest Plaza, LLC, and as appropriate, act as a receiver and or liquidator of the entity. Joint appointment with Mr. Blair Constant as co-special master, and liquidator if required. (June 2021 – June 2024).

*Moore v. Tangipahoa Parish School Board*, 65-15556. Div. B. Judge Ivan Lemelle, United States District Court, Eastern District of Louisiana. Appointment as Court Compliance Counsel in school desegregation case filed in 1965. Assist Court in investigation of issues central to compliance with multiple consent decrees and court orders, interface with litigants, counsel and community in efforts to bring school system into compliance and hopefully to the point of achieving status as a unitary school system. On March 31, 2021, the Court entered an Order (Rec. Doc. 1661) providing for a three-year path forward toward a final fairness hearing and ultimate consideration of final unitary status. As of April 23, 2025, the Court had granted unitary status to the Tangipahoa Parish School Board, vacated and lifted the previously granted permanent injunctions, and terminated its supervision in all areas except for Facilities. (August 2014 – present).

*Evans v. TIN, Inc.,* civil action no. 11-2067, Div. M., Judge Lance Africk, United States District Court, Eastern District of Louisiana. Appointment to oversee class action settlement claims process, allocation of proceeds and resolution of allocation objections, distribution of settlement proceeds and related matters. (2013-2015).

Member, Academy of Court Appointed Neutrals (f/k/a Academy of Court Appointed Masters).

**ALTERNATIVE DISPUTE RESOLUTION BACKGROUND**

*Mediator*
Conducted and facilitated well over 1,500 mediations in various matters.

Qualified and Included on Louisiana Register of Civil Mediator pursuant to La. Rev. Stat. Ann. § 9:1406.

Member, Association of Attorney Mediators.

Donald C. Massey
Page 4

Member Louisiana State Bar Association Alternative Dispute
Resolution Committee.

American Arbitration Association, "Essential Mediation Skills for
the New Mediator." Intensive forty (40) hour course completed
April 2014.

### *Appraiser and Umpire*
Umpire and Appraiser. Registered Umpire/ Appraiser pursuant to
La. Rev. Stat. 22:1311(F)(2). Available to serve as Umpire in
insurance appraisal disputes, in accordance with Louisiana
Insurance Code.

- Louisiana Registration (current through August 27, 2025)
- Certified Umpire - WIND (May 2025-May 2028)
- Certified Appraiser - WIND (May 2025-May 2028)

### *Arbitrator*
Approved Arbitrator Panel Chair - Financial Industries
Regulatory Authority (FINRA); qualified chairperson and panelist
available to serve as a non-industry arbitrator in both intra-
industry and customer disputes. Appointment as an arbitrator to
multiple FINRA arbitration matters involving public customers.
FINRA has oversight of members and associated persons
involved in securities trading, including those participating in the
New York Stock Exchange (NYSE) and National Association of
Securities Dealers Automated Quotations ("NASDAQ").
(February 2019 – present).

Approved Arbitrator Panel Chair - National Futures Association
("NFA"); qualified chairperson and panelist available to serve as
a non-industry arbitrator in both intra-industry and customer
disputes. Recent appointment as arbitrator chair in a large,
complex group of arbitration matters scheduled for arbitration
over multiple weeks in 2024. (November 2022– present). The
NFA oversees firms and associated persons registered with the
Commodities Futures Trading Commission. Exchanges
associated with registrants include the Chicago Board of Trade
("CBOT"), Chicago Mercantile Exchange ("CME"), New York
Mercantile Exchange ("NYMEX"), and Foreign Exchange
Market ("FOMEX").

Member of Energy Arbitration Club. The Energy Arbitration
Club is a UK based organization dedicated to enhancing
arbitration of energy industry disputes. Members are a diverse

group of international arbitrators, mediators, experts, and others involved in energy industry disputes.

Regular attendance at various continuing legal education seminars on topics central to alternative dispute resolution.

Hurricane Ida Arbitration Appointments:

- In re: *Louisiana Political Subdivision v. Certain Underwriters, Lloyds* (private arbitration; New York, NY; JAMS ref. 1425039735).
- In re: *Louisiana Private Limited Liability Company v. Certain Underwriters, Lloyds* (private arbitration; Nashville, TN) (*resolved).*
- In re: *Louisiana Private Homeowners Assoc. v. Indep. Spec. Ins. Co.* (private arbitration; Nashville, TN).(*resolved).*
- In re: *Louisiana Not For Profit Juridical Entity v. Certain Underwriters, Lloyds* (private arbitration; New York, NY)
- In re: *Louisiana Not For Profit Juridical Entity v. Certain Underwriters, Lloyds* (private arbitration; New Orleans, LA).
- In re: *Louisiana Political Subdivision v. Certain Underwriters, Lloyds* (New York, NY).
- In re: *Louisiana Political Subdivision v. Certain Underwriters, Lloyds.* Arbitration Matter (private arbitration; New York, NY).
- In re. *Louisiana Private Homeowners Assoc. v. Certain Underwriters, Lloyds* (private arbitration; New York, NY).
- In re: *Louisiana Private Limited Liability Company v. Certain Underwriters, Lloyds* (private arbitration; New York, NY).

**CLASS ACTION LIAISON AND LEAD COUNSEL SERVICE**

***Class Action Lead and Liaison Counsel***
*Anderson v. Bob Dean, Jr., et al,* 24th Judicial District Court, Jefferson Parish, Louisiana, docket no. 820-839 "H"; removal, USDC, EDLA, docket no. 2L21-CV-01891 "LMA-JVM". Class counsel. (certified as mandatory, non-opt out class under La. CCP arts 591(b)(1)(B) and 591(b)(2).

*Melby v. America's MHT, Inc.,* United States District Court, Northern District of Texas, Dallas Division docket no. 3:17-cv-155 (*"Melby").* Class counsel.

*Kumar v. America's MHT, Inc.,* United States District Court,

Donald C. Massey
Page 6

Northern District of Texas, Dallas Division docket no. 3:17-cv-732 (consolidated with *Melby*). Class counsel.

*Bhagia v. America's MHT, Inc.,* United States District Court, Northern District of Texas, Dallas Division docket no. 3:17-cv-868 (consolidated with *Melby*). Class counsel.

*Patel v. Scott Postle,* United States District Court, Northern District of Texas, Dallas Division docket no. 3:17-cv-963 (consolidated with *Melby*). Class counsel.

*In re Harvey TERM Litigation,* Parish of Orleans, State of Louisiana, Civil District Court docket no. 01-8708 "D." Served as liaison counsel. Judge: Lloyd Medley. Plaintiffs' liaison counsel: Henry Dart.

*Lester v. Exxon Mobil,* Parish of Orleans, State of Louisiana, Civil District Court docket no. 2002-19657 "N." Served as liaison counsel. Judge: Ethel Sems Julien; Plaintiffs' liaison counsel: Tim Falcon.

*Lester v. Exxon Mobil,* Parish of Jefferson, State of Louisiana, 24th JDC docket no. 630-402 "G." Served as liaison counsel. Judge: Brady Fitzsimmons *ad hoc.* Plaintiffs' liaison counsel: Tim Falcon.

*Dottie Adams v Joseph Grefer,* Parish of Jefferson, State of Louisiana, 24th JDC, docket no. 624-278 "K." Served as liaison counsel. Judge: Brady Fitzsimmons *ad hoc.* Plaintiffs' liaison counsel: George Reiss.

*Earl Adams v. Chevron U.S.A., Inc.,* Parish of Orleans, State of Louisiana, Civil District Court docket no. 02-19308 "D." Served as liaison counsel. Judge: Lloyd Medley. Plaintiffs' liaison counsel: Darlene Jacobs and Robert Harvey.

*Olivia Bailey v. Exxon Mobil,* Parish of Orleans, State of Louisiana, Civil District Court, docket no. 2009-1973 "B." Served as liaison counsel. Judge: Ethel Sems Julien. Plaintiffs' liaison counsel: Tim Falcon.

*Olivia Bailey v. Exxon Mobil,* Parish of Jefferson, State of Louisiana, 24th JDC, docket no. 670-803 "J. Served as liaison counsel. Judge Brady Fitzsimmons *ad hoc.* Plaintiffs' liaison counsel: Tim Falcon.

130

Case 2:20-cv-01846-CJB-DPC Document 46-3 Filed 10/27/25 Entered 10/27/25 14:57:54 Part B Supplemental 6.3 - Settlement Trustee Reports Page 14 of 26

Donald C. Massey
Page 7

*Bernice Adams v. Joseph Grefer,* Parish of Jefferson, State of Louisiana, 24th JDC, docket no. 669-987 "J." Served as liaison counsel. Judge: Brady Fitzsimmons *ad hoc.* Plaintiffs' liaison counsel: Jay Andry.

*Brittany Roache v. Alpha Technical Services,* Parish of Jefferson, State of Louisiana, 24th JDC, docket no. 669-999 "D." Served as liaison counsel. Judge: Brady Fitzsimmons *ad hoc.* Plaintiffs' liaison counsel: Henry Dart

*Melvin Burmaster v. Plaquemines Parish Government,* Parish of Plaquemines, State of Louisiana, 25th JDC, docket no. 53-238. Served as lead class action and settlement counsel. Judge: Franklin Foil *ad hoc.* Plaintiffs' lead counsel: Eric O'Bell and John Smith.

*In Re: New Orleans Truck/Train Collision of 10/22/90,* Parish of Orleans, State of Louisiana, Civil District Court, docket no. 90-23265 "C." Served as lead counsel for target defendant. Judge: Richard Garvey. Plaintiffs' lead counsel: Henry Dart.

*Gertrude Garrett, et al v. Blanton and Hoechst Celanese Corp.,* Parish of St. Tammany, State of Louisiana, 22nd JDC, docket no. 89-14666 "D." Served as lead class settlement counsel. Judge: Peter Garcia. Plaintiffs' lead counsel Donna Cummings.

### *Reicieviership/ Liquidator*
Appointed Panel Member, Louisiana State Bar Association Receivership Program (2019-present).

*Kailas and VS, LLC v. Ryan,* 792-740, Division O, Judge Danyelle Taylor, 24th Judicial District Court, Parish of Jefferson, State of Louisiana. Appointment as Special Master to act as manager of Lake Forest Plaza, LLC, and as appropriate, act as a receiver and or liquidator of the entity. Joint appointment with Mr. Blair Constant as co-special master, and liquidator if required. (June 2021 – March 2024).

**EXPERT TESTIMONY**

*Geraldine Oubre v. Louisiana Citizens Fair Plan,* Parish of Jefferson 24th JDC docket no. 625-527 "M." – offered by plaintiffs' as an expert in class action procedure and accepted as tendered by Judge Henry Sullivan.

**DISCIPLINARY OPINIONS AUTHORED**

◊     *In re: David J. Motter, 23-DB-024*
◊     *In re: Flynn K. Smith, 22-DB-045*
◊     *In re: Confidential Party, 22-PDB-007*

| | |
|---|---|
| ◊ | *In re: Edward McCloskey,* 21-DB-046 |
| ◊ | *In re: Steven Gill*, 21-DB-011 |
| ◊ | *In re: Michael Sepcich,* 18-DB-027 |
| ◊ | *In re: Kevin Steel,* 17-DB-018 |
| ◊ | *In re: Bruce Ashley,* 16-DB-068 |
| ◊ | *In re: Debra Cassibry,* 14-DB-040 (*Cassibry III*) |
| ◊ | *In re: Roger Kitchens,* 16-DB-03 |
| ◊ | *In re: Heather Murphy,* 15-DB-010 (*Murphy II*) |
| ◊ | *In re: Joseph Bruno, Sr.,* 15-DB-043 |
| ◊ | *In re: Heather Murphy,* 15-DB-010 (*Murphy I*) |
| ◊ | *In re: Joan Benge,* 13-DB-020 |
| ◊ | *In re: Carl Lewis,* 09-DB-044 c/w 09-DB-070 |
| ◊ | *In re: Gair Oldenburg,* 07-DB-070 |
| ◊ | *In re: Confidential Party,* 07-PDB-040 |
| ◊ | *In re: Edward Herbert, II,* 07-DB-015 |
| ◊ | *In re: Barry Bolton,* 06-DB-013 |
| ◊ | *In re: Daniel McKearan, Jr.,* 05-DB-073 |
| ◊ | *In re: William Lewis,* 05-DB-02 |
| ◊ | *In re: Peter Meisner,* 03-DB-021 |

In addition, participation as a hearing committee member, usually as hearing committee chair, on many hearing committee panels in attorney discipline matters.

Service as Hearing Committee Chair for three (3) separate six (6) year terms, the last of which commenced in 2020.

**INSURANCE COMMISSIONER REPRESENTATION**

*James "Jim" Brown, as Commissioner of Insurance for the State of Louisiana v. ANA Insurance Group, A Louisiana Partnership,* 2007-C-2116 (La. 10/14/2008)

**ACADEMIC AND COURT ADMISSIONS**

**Legal:** Loyola University of New Orleans, School of Law; J.D., 1984.

**Undergraduate:** University of New Orleans; B.S., Finance/Insurance, 1981.

**Academic Honors:** Loyola Law Review, 1982-1984, Articles and Comments Editor, 1983-1984; Loyola National Appellate Advocacy Team, 1983 - 1984; Loyola Law School Honor Board, 1982-1984; Alpha Theta Epsilon Honor Society, University of New Orleans, 1978-1981.

**Court Admissions:** **Federal Courts**
- Supreme Court of the United States

- United States Fifth Circuit Court of Appeals
- Louisiana – USDC EDLA, MDLA and WDLA
- Colorado – UDSC D-CO
- Mississippi – USDC SDMS (*pro hac vice*)
- Texas - USDC-SDTX (*pro hac vice*); USDC-NDTX (*pro hac vice*)

**State Courts**
- Louisiana: All Louisiana State Courts.
- Alabama: *pro hac vice* admissions for specific case(s).
- California: *pro hac vice* admissions for specific case(s).
- Illinois: *pro hac vice* admission for specific case(s).
- Mississippi: *pro hac vice* admission for specific case(s).
- New York: *pro hac vice* admission for specific case(s).
- Texas: *pro hac vice* admissions for specific cases and all requisite notification and authorization for in house counsel practice.

**MEMBERSHIPS, HONORS AND ACTIVITIES**

Academy of Hospitality Industry Attorneys, charter member – 1998-2015.

Academy of Court Appointed Neutrals, *f/k/a* Academy of Court Appointed Masters, 2013-present.

America's Top 100 High Stakes Litigators, 2018-present.

Bar Association Memberships – American Bar Association, Louisiana State Bar Association, New Orleans Association of Defense Counsel, New Orleans Bar Association.

*Best Lawyers in America – Louisiana and New Orleans;* selected multiple years in field of commercial litigation.

Cerebral Palsy of Louisiana, Inc. — Telethon emcee — 1995-present; Board of Directors — 1996-2004.

East Jefferson Family YMCA, Board of Directors — 2001-2003.

Ed Blewer Assistance Foundation, Board of Directors; P — 2021-present; President, 2023-present.

Institute of Politics — Fellow — 1993-present.

International Association of Defense Counsel Advanced Trial Academy — 1990.

Jefferson Library Institute; Board of Directors — 1999-2001.

Judicial Appointments —appointed at various times as Judge *ad hoc* and *pro tempore* by the Louisiana Supreme Court, 2003-2008.

KID smART, Inc. – Advisory Board – 2003-2004; Board of Directors – 2004-2013; Executive Committee – 2007-2013; Chairperson elect – 2008-2009; Chairperson and President – 2009-2011; Advisory Board – 2012-2016.

Lewisburg Estates Homeowner's Association – Member, Board of Directors – 2019-present; President – 2021-2022.

Litigation Counsel of America – fellow – 2007-2015; senior fellow, 2016-present.

Louisiana Attorney Disciplinary Board – Hearing Committee Chairperson – 2005-2011; 2013-2018; 2020-present; author of multiple disciplinary opinions and recommendations.

Louisiana Bar Foundation – fellow, 2007-present; appointed member of Judicial Liaison Committee – 2008-2009.

Louisiana State Bar Association – John Peter Zenger Project, Constitutional Bicentennial; Young Lawyer's Section of Louisiana Bar Association, Committee on the United States Constitutional Bicentennial, 1986-1987.

Louisiana State Bar Association, Committee on Alcoholism and Drug Abuse; Executive Committee Member (2000-2014); Chairperson (2010-2012); Judges and Lawyers Assistance Program, LLC; Operating Committee Member (2015-2018); Board of Directors (2015-2020); Secretary and Executive Committee Member (2016-2018); Vice President and Executive Committee Member (2018-2020).

Louisiana State Bar Association Receivership Program. Appointed Receivership Panel Member (2019-present).

Loyola Law Alumni Association; Board of Directors — 1986-1991.

Men of Fashion – One of New Orleans' "Ten Best Dressed Men" in 2004; charitable cause to benefit New Orleans Ballet; awards

principally upon business, civic and charitable endeavors.

Metropolitan Area Committee Leadership Forum —1993-1994.

National Association of Distinguished Counsel —2015-present.

Public Broadcasting fundraising for WYES, New Orleans — telethon emcee — 2003-2004.

"*Superlawyer*" selection for multiple years.

"Top Lawyers in New Orleans." *New Orleans Magazine,* multiple years; Commercial and Tort Litigation.

Transportation Law Practice - American Trucking Associations Litigation Center; American Bar Association, Rail and Motor Carrier Committee; Transportation Law Association; Trucking Industry Defense Association.

U.S. Chamber of Commerce; Trade and Transportation – Study of North American Port and Intermodal Systems – Member of the Blue-Ribbon Panel — 2001-2003.

University of New Orleans International Alumni Association: Management Committee; Member – 2004-2007.

Young Leadership Council; Member — 1990-2000.

Various pro bono and non-legal volunteer activities, including a variety of criminal and civil case appointments, child advocacy and crisis intervention.

**PUBLICATIONS**       Massey and D'Amour, "The Ethical Considerations of Alternative Billing," 28 Southern Univ. L. Rev. 111 (2001).

Massey, "Proposed On-Board Recorders for Motor Carriers; Fostering Safer Highways or Unfairly Tilting the Litigation Playing Field?" 24 S. Ill. U.L.J. 453 (2000).

Massey, "Discovery of Electronic Data from Motor Carriers - Is Resistance Futile?" 35 Gonzaga L. Rev. 145 (2000).

Massey, LaCour and Sercovich, "Curtailing the Tidal Surge: Current Reforms in Louisiana Class Action Law," 44 Loy. L. Rev. 7 (1998).

Massey and Stern, "Punitive Damages and the Louisiana

Constitution:  Don't Leave Home Without It," 56 La. L. Rev. 743 (1996).

Massey and Gasperecz, "Employer Fault in Tort Litigation:  Now You See It, Now You Don't," 45 La. Bar J., 274 (1995).

Massey and Gasperecz, "Employers Beware:  The Free Ride May be Over," 33 Loy. L. Rev. 947 (1988).

Comment, "Intentional Torts and Workers Compensation: *Bazley v. Tortorich* Revisited," 30 Loy. L. Rev. 337 (1984).

Note, *Farber v. New York,* "No First Amendment Protection for the Sexploitation of Children," 29 Loy. L. Rev. 227 (1983).

**PRESENTATIONS**

May 5, 2025; New Orleans, LA. Louisiana State Bar Association; "Business of Mediation" Panel.

March 28, 2025; Metairie, LA.  Louisiana Attorney Disciplinary Board; Annual Hearing Committee Training: Panel on Professionalism.

October 16, 2019; New Orleans, LA; Louisiana State Bar Association, *Bridging the Gap;* Presentation:  Professionalism.

September 20, 2019; New Orleans, LA; Louisiana State Bar Association and Gilsbar, Inc. Loss Prevention Seminar; Presentation:  Professionalism.

September 5, 2019; Lafayette, LA; Louisiana State Bar Association and Gilsbar, Inc. Loss Prevention Seminar; Presentation:  Professionalism.

June 28, 2019; New Orleans, LA; Louisiana State Bar Association, Ethics School; Ethics; Professionalism.

April 16, 2019; New Orleans, LA; Loyola University School of Law, Panel Discussion on Committee on Bar Admissions, Character, and Fitness:  Presentation:  Panel Presentation.

December 17, 2018; New Orleans, LA; Louisiana State Bar Association; "Got CLE?"; Presentation:   Mediation vs. Traditional Civil Litigation – Best Effective Use of Mediation.

November 29, 2018; New Orleans, LA; 32nd Annual Conference on Treating and Counseling People of Color: An International Perspective; Presentation: Incarceration and Substance Abuse.

October 16, 2018; New Orleans, LA; Louisiana State Bar Association, *Bridging the Gap;* Presentation: Professionalism.

September 7, 2018; New Orleans, LA; Louisiana State Bar Association, *Personal Injury CLE;* Presentation: Trials and Mediation.

August 1, 2018; New Orleans, LA; National Bar Association; Presentation: Professionalism.

July 15, 2018; Loranger, LA: Louisiana Judges and Lawyers Assistance Program *Camp JLAP;* Presentation: Ethics: JLAP and Louisiana Supreme Court Rule XIX.

May 23, 2018; New Orleans, LA; Louisiana Judiciary Commission and Louisiana Attorney Disciplinary Board, *In Search of Higher Ground;* Presentation: Panelist, Recognizing, Defending and Advising an Impaired Client.

May 8, 2018; New Orleans, LA; Louisiana State Bar Association, *Bridging the Gap;* Presentation: Professionalism.

February 16, 2018; New Orleans, LA; Texas Trial Lawyers Association; *Commercial Vehicles and Workplace Injuries;* Presentation: The Professional Duty of Self Care.

October 17, 2017; New Orleans, LA; Louisiana State Bar Association, *Bridging the Gap;* Presentation: Professionalism.

February 2, 2017; Miami, FL; National Conference on Lawyer Disciplinary Boards, Panel Discussion on Mental Health and Substance Abuse and Relationship with Lawyer Discipline.

January 20, 2017; Metairie, LA; Louisiana Attorney Disciplinary Board; Annual Hearing Committee Training; Panel Discussion on Judges and Lawyers Assistance Program as a Resource in Lawyer Discipline Matters.

November 15, 2016; New Orleans, LA; Sir Thomas More Inns of Court; USDC EDLA; Presentation: Panel Discussion on Professionalism.

May 10, 2016; New Orleans, LA; Louisiana State Bar Association, *Bridging the Gap;* Presentation: Professionalism.

April 2, 2016; Biloxi, MS; Jefferson Bar Association, *CLE by the*

*Sea;* Ethics.

October 20, 2015; New Orleans, LA; Louisiana State Bar Association, *Bridging the Gap;* Presentation: Professionalism.

December 29, 2014; New Orleans, LA; New Orleans Bar Association, *Procrastinators' Program*, "Update on Class Action and Complex Litigation."

September 18, 2014; Kenner, LA; Louisiana Attorney Disciplinary Board FREE CLE, "Conflicts of Interest: Rules and Trends."

July 9, 2014; Lafayette, LA: Louisiana Attorney Disciplinary Board FREE CLE, "Conflicts of Interest: Rules and Trends."

June 24, 2014; Kenner, LA; Louisiana Attorney Disciplinary Board FREE CLE, "Conflicts of Interest: Rules and Trends."

June 12, 2014; Alexandria, LA; Louisiana Attorney Disciplinary Board FREE CLE, "Conflicts of Interest: Rules and Trends."

May 29, 2014; In House presentation to client's management team and staff regarding the Foreign Corrupt Practice Act of 1977, as amended, 15 U.S.C. §§ 78dd-1, et seq ("FCPA").

May 13, 2014; Baton Rouge, LA; Louisiana Attorney Disciplinary Board FREE CLE, "Conflicts of Interest: Rules and Trends."

February 25, 2013; Tulane University Character and Fitness Program for First Year Law Students. Panelist.

December 11, 2012, Louisiana State Bar Association, "The Pursuit of Balance." Presentation: Professionalism.

June 16, 2011; Louisiana State Bar Association Ethics School, New Orleans, Louisiana. Presentation: Professionalism.

January 21, 2011: Louisiana Attorney Disciplinary Annual Board Hearing Committee Training Session. Presentation: Meeting the Challenges of Being a Volunteer Adjudicator: "Turning Lemons in Lemonade"

December 17, 2010: Louisiana State Bar Association. "Summer School Revisited. Presentation: "Next on the Docket: Practical

Case 2:20-cv-03046-WBV-DMD Document 465-2 Filed 10/27/23 Entered 10/27/23 14:57:54 Main Part 6.3 - Supplemental Disclosures Page 22 of 26

Donald C. Massey
Page 15

Tips for Your First Oral Argument."

December 13, 2010:  Louisiana State Bar Association. "The Pursuit of Balance:  Life and Law."  Presentation: Professionalism.

June 25, 2010:  Louisiana State Bar Association Ethics School, New Orleans, Louisiana.  Presentation:  Professionalism.

June 7, 2010:  Louisiana State Bar Association; Summer School. Destin, Florida.  Presentation: "Next on the Docket:  Practical Tips for Your First Oral Argument."

April 16, 2010:  Louisiana State Bar Association 3rd Annual Solo and Small Firm Conference, New Orleans, Louisiana. Presentation:  Professionalism.

January 15, 2010:  Louisiana State Bar Association Ethics School, New Orleans, Louisiana.  Presentation:  Professionalism.

November 24, 2009:  Lafayette Bar Association; Lafayette, Louisiana.  Presentation:  Professionalism.

October 20, 2009:  Louisiana State Bar Association's 49th Annual Bridging the Gap Seminar;  New Orleans, Louisiana. Presentation:  Professionalism.

June 25, 2009:  Louisiana State Bar Association Ethics School, New Orleans, Louisiana.  Presentation:  Professionalism.

May 15, 2009:  Louisiana State Bar Association; Ethics, Law Office Management and Professionalism Seminar for New Practitioners, New Orleans, Louisiana.  Presentation: Professionalism.

March 6, 2009:  New Orleans Chapter, Association of Legal Administrators; Human Resources Management Workshop. Presentation:  "Handling Problem Attorneys – Drugs and Alcohol."

January 23, 2009:  Louisiana State Bar Association Ethics School, New Orleans, Louisiana.  Presentation:  Professionalism.

October 21, 2008:  Louisiana State Bar Association's 48th Annual Bridging the Gap Seminar;  New Orleans, Louisiana. Presentation:  Professionalism.

Case 2:20-cv-08346-DSF-JEM Filed 10/27/23 Entered 10/27/23 16:37:54 Main Document Page 140 of 1383

Case 2:20-cv-08346-DSF-JEM Doc 2545-2 Filed 10/27/23 Entered 10/27/23 14:53:54 PB Suppl. Plan 6.3 - Settlement Trustee Disclosures Page 140 of 1383    Page 23 of 26

June 27, 2008:  Louisiana State Bar Association Ethics School, New Orleans, Louisiana.  Presentation:  Professionalism.

June 25, 2008:  New Orleans Pro Bono Project and Loyola University School of Law, Katrina Law Clinic.  New Orleans, Louisiana.  Presentation: "Handling Louisiana Road Home Cases for Pro Bono Clients."

May 16, 2008:  Louisiana Attorney Disciplinary Board; Hearing Committee Training Seminar, Baton Rouge, Louisiana. Presentation:  "Drafting Hearing Committee Reports and Determination of Sanctions."

April 25, 2008:  Louisiana State Bar Association; Ethics, Law Office Management and Professionalism Seminar for New Practitioners,  New  Orleans,  Louisiana.  Presentation: Professionalism.

February 12, 2008: Louisiana State Bar Association; Seminar on the Dynamics of Disability Law, New Orleans, Louisiana. Presentation:  Professionalism.

January 25, 2008:  Louisiana State Bar Association Ethics School, New Orleans, Louisiana.  Presentation:  Professionalism.

December 5, 2007:  New Orleans Bar Association, New Orleans, Louisiana.  Presentation: "How the Louisiana Attorney Disciplinary System Works and Current Trends."

November 2, 2007:  Lorman Educational Services, Legal Ethics in Louisiana, New Orleans, Louisiana.  Presentation: "How the Louisiana Attorney Disciplinary System Works."

October 25, 2007:  Louisiana State Bar Association's 47th Annual Bridging the Gap Seminar; New Orleans, Louisiana. Presentation:  Professionalism.

June 29, 2007:  Louisiana State Bar Association Ethics School, New Orleans, Louisiana.  Presentation:  Professionalism.

May 3, 2007:  Louisiana State Bar Association's Ethics, Law Office Management and Professionalism Seminar for New Practitioners,  New  Orleans,  Louisiana.  Presentation: Professionalism

Case 20-20816-26 Doc 4524 5-2 Filed 10/27/23 Entered 10/27/23 16:57:54 Main Document 6.3 - Settlement Supplement Restated Pages 141 of 1339 24 of 26

Donald C. Massey
Page 17

December 27, 2006; New Orleans Bar Association's Procrastinators Program, New Orleans, Louisiana. Presentation: Professionalism.

December 1, 2006: Louisiana State Bar Association Ethics School, New Orleans, Louisiana. Presentation: Professionalism.

October 26, 2006; Louisiana State Bar Association's 46th Annual Bridging the Gap Seminar; New Orleans, Louisiana. Presentation: Professionalism.

September 29, 2006; American Trucking Associations Litigation Center, Risk Management Safety Forum, Las Vegas, Nevada. "On Board Recorders and Current Trends."

June 30, 2006; Louisiana State Bar Association's Ethics School, Kenner, Louisiana. Presentation: "Ethics."

December 22, 2004; New Orleans Bar Association Continuing Legal Education; New Orleans, Louisiana. Presentation: "Professionalism in a Civilized Society."

October 20, 2004; 44th Annual Bridging the Gap Seminar; New Orleans, Louisiana. Presentation: "State Civil Court Rules & Motions."

July 28, 2004; American Trucking Association Litigation Center, Forum for Motor Carrier General Counsels; Vail, Colorado. Presentation: "I Feel Like Somebody's Watching Me: The Implications of Electronic Data in Highway Accident Litigation."

May 5, 2004; Panel Discussion sponsored by Westlaw Group; New Orleans, Louisiana. Panel: "Miller's Court Comes to Adams and Reese: Professor Arthur Miller Hosts a Panel to Discuss Current Hot Topics at the U. S. Fifth Circuit Court of Appeals."

February 27, 2004; New Orleans Association of Defense Counsel; New Orleans, Louisiana. Presentation: "Special Masters in Class Action/Complex Litigation."

February 27, 2004; Air Conditioning Contractors of America Annual Convention; New Orleans, Louisiana. Presentation: "Mold and Class Actions – The Next Epidemic?"

Spring, 2004; University of New Orleans; Adjunct Professor – torts law course; three undergraduate credit hours.

December 18, 2003; Professionalism, New Orleans Bar Association; New Orleans, Louisiana. Presentation: "Masters of the Courtroom – Professionalism."

November 21, 2003; New Orleans City Attorney's Office; New Orleans, Louisiana. Presentation: "Ethics and Professionalism."

November 4, 2003; New Orleans Bar Association; New Orleans, Louisiana. Presentation: "Perspectives on Professionalism."

October 23, 2003; 43rd Annual Bridging the Gap Seminar; New Orleans, Louisiana. Presentation: "Practice Prospective – State Court Procedures."

June 18, 2003; Professionalism & Ethics, New Orleans Bar Association; New Orleans, Louisiana. Presentation: "Professionalism & Advocacy – Do They Mix?"

March 4, 2003; Mardi Gras at Seaside CLE, New Orleans Bar Association; Seaside, Florida. Presentation: "Class Actions – Case Management and the Special Master."

October 17, 2002; 42nd Annual Bridging the Gap Seminar; New Orleans, Louisiana. Presentation: "State Civil Court Rules and Motions."

Fall, 2002; University of New Orleans; Adjunct Professor – torts law course; three undergraduate credit hours.

October 21, 2001; Sixth Annual Life Care Planning Conference; New Orleans, Louisiana. Presentation: "Discoverability of Email."

June 4, 2001; Intelligent Transportation Society of America; Miami Beach, Florida. Presentation: "On-Board Recorders and You."

May 14, 2001; Commercial Vehicle Safety Alliances; New Orleans, Louisiana. Presentation: "On Board Recorders for Trucks – Sword, Shield or Neither."

February 26 - March 1, 2001; Organización Nacional Abogado Bufetes Colectivos de Cuba y Union Nacional de Juristos de Cuba; Havana, Cuba. Presentation: "A Comparison and Contrast of the Evolutionary Paths of the Louisiana and Cuban Civil Codes."

Spring, 2001; University of New Orleans; Adjunct Professor — torts law course; three undergraduate credit hours.

November 2, 2000: Legal Ethics in Louisiana Seminar; New Orleans, Louisiana. Presentation: "The Ethical Considerations of Alternative Billing."

October 2000: American Trucking Associations Management Conference and Exhibition, San Diego, California. Presentation: "Dangers of On-Board Recorders."

August 2000; Louisiana Association of Rehabilitation Professionals' 2000 Regional Rehabilitation Conference, New Orleans, Louisiana. Presentation: "Ethical Considerations in Electronic Discovery."

February 2000; Third International Symposium on Death and Coma; Havana, Cuba. Presentation: "Legal Issues Implicated in Determination of Death, Termination of Life Support and Organ Donation."

October 1999; Vocational Rehabilitation Counselors Association, Lafayette, Louisiana. Presentation: "Electronic Mail in Workers Compensation Case Management & Forensic Rehabilitation."

September 1999; Louisiana Association of Rehabilitation Professionals' Regional Rehabilitation Conference. New Orleans, Louisiana. Presentation: "Ethical Issues in Rehabilitation."

August 1999; Louisiana State Paralegal Association; New Orleans, Louisiana; Summary courses for Paralegal Certification; presentations on torts and evidence.

Spring, 1999; University of New Orleans; Adjunct Professor — torts law course; three undergraduate credit hours.

Responsibility for and management of comprehensive training of over eighty associates with Adams and Reese law firm; multiple presentations on a wide range of legal, business and administrative topics pertinent to training associates at a full service, regional law firm (1996 - 1999).

**PERSONAL**         Married to Amanda Bishop Massey
Daughters – Alexandra Massey Verdin and Christabella Massey

Case 20-10846 Doc 2045-2 Filed 10/17/23 Entered 10/17/23 16:57:54 Main Document Page 1 of 69

Case 20-10846 Doc 2054-2 Filed 10/27/23 Entered 10/27/23 14:03:54 Plan Supplement 6.5 - Abuse Claims Reviewer Disclosures Page 144 of 1339

# PLAN SUPPLEMENT 6.5
## Abuse Claims Reviewer Disclosures

|                                          |                   |
| ---------------------------------------- | ----------------- |
| In re:                                   | Chapter 11        |
|                                          | Case No. 20-10846 |
| THE ROMAN CATHOLIC CHURCH OF THE         |                   |
| ARCHDIOCESE OF NEW ORLEANS,              |                   |
|                                          |                   |
| Debtor.[1]                               |                   |

### DECLARATION OF RICHARD ARSENAULT IN SUPPORT OF APPLICATION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ORDER (I) AUTHORIZING AND APPROVING EMPLOYMENT AND (II) AUTHORIZING ACTIONS TO BE TAKEN PURSUANT TO [PROPOSED] ALLOCATION PROTOCOL

I, Richard Arsenault, declare under penalty of perjury as follows:

1. I am an attorney, duly admitted in the states of Louisiana, Texas, Colorado and District of Columbia. I submit this declaration in support of the Application of the Official Committee of Unsecured Creditors for an Order (I) Authorizing and Approving the Employment of Richard Arsenault as Abuse Claims Reviewer and (II) Authorizing Actions to be Taken Pursuant to the [Proposed] Allocation Protocol (the "Application").[2]

2. I understand that I have been selected by the Committee, after consultation with the Debtor, to be employed as the Abuse Claims Reviewer in this case.

3. I have extensive experience as an attorney evaluating personal injury claims and as a tort claims allocator.

4. I have been involved in over 25 Multidistrict Litigation (MDL) proceedings, often appointed by members of the federal bench to leadership positions. I am the co-author of the

---

[1] The last four digits of the Debtor's federal tax identification number are 8966. The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

[2] Capitalized terms not defined herein shall have the meanings and definitions ascribed to them in the Application.

ABA Treatise Chapter on Multidistrict Litigation. My co-author is Professor Thomas Galligan who at the time was the Dean of the LSU Law School.

5.      I served as Lead Counsel in Actos MDL No.2299 where the presiding federal judge noted my "high degree of skill and expertise in complex litigation." Professor Arthur Miller described me as one of the "leaders in the area of complex litigation." Similarly, Professor Edward Sherman, former Dean of Tulane Law School, described me as one of the "experts in class actions." Honorable Kenneth W. Starr observed that I have a "stunning ability to brilliantly multi-task. *The Wall Street Journal* has described me as having "national notoriety" and as a "big gun" amongst attorneys in competition for leadership roles. *BusinessWeek* has described me as "a Dean of the Louisiana Tort Bar." *The NY Times* has described me as one of the "big players" in the legal community; and, *USA Today* featured me as "an authority on class actions."

6.      I have worked on allocations involving many thousands of claimants, involving dozens of law firms, and billions of dollars. That has included allocations involving  companies such as Monsanto, Johnson & Johnson, and Bayer. In fact, I was involved in assignments from some of those companies to audit the work of other Special Masters.

7.      I have made the following investigation of disinterestedness prior to submitting this Declaration:  In connection with my proposed retention as Abuse Claims Reviewer, I was provided a list of the Debtor's non-confidential creditors and other persons identified as parties in interest in the Debtor's Schedules of Assets and Liabilities ("Schedules") and the Additional Debtors.  I reviewed the Schedules and concluded that I do not have any conflicts with any of the entities listed therein.

2

8.    To the best of my knowledge and information available, I have no connection with the Debtor or any other party in interest in this case.

9.    To the best of my knowledge, I do not represent any interest adverse to the Debtor, Additional Debtors, or any party in interest in the matters upon which I am to be engaged.

10.    I am not affiliated nor have any connection with the Office of the United States Trustee or any of its employees.

11.    I have not received any transfer, assignment or pledge of property of the Debtor's estate, Additional Debtors, or any of the survivors as of the date of this Declaration.

12.    I have not shared or agreed to share with any other person any compensation to be paid with respect to this case.

13.    Based on my agreement with the Committee, and subject to Court approval, compensation for my work as Abuse Claims Reviewer will be as follows:

   a.    $1500 for each Abuse Claim reviewed, including review of proofs of claims filed by the Additional Debtors Sexual Abuse Bar Date set forth in the Joint Plan; and $1000 per clam for the review of Abuse Claims seeking reconsideration after an initial award.  The reconsideration fee will be paid by the claimant as a deduction from the award at the time of distribution.

   b.    I charge for all expenses connected with the review of Abuse Claims. These expenses include conference call charges, mail and express mail

4914-9887-3952.9 05067.002

#104304177v1

147

charges, special or hand delivery charges, document retrieval charges,

photocopying charges, travel expenses, expenses for working meals,

computerized research, transcription costs, and non-ordinary overhead

expenses such as secretarial overtime and other staffing overtime. Billing

for these expenses is consistent with those charged to other clients, and

will be in accordance with the rules and requirements of this Court.

c.      With the exception of fees for reconsideration of claims, my fees and

expenses will be paid by the Debtor,[3] or, following the effective date of

the Joint Plan, the Trust.

14.     Information contained in an Abuse Claim and any other information provided to

me by a sexual abuse claimant with respect to my review of his or her Abuse Claim, including

but not limited to, the names and other personal identification information of survivors, are

confidential in accordance with the terms of the Bar Date Order, and I presume, any Abuse

Claims filed with respect to the Additional Debtors will be deemed confidential by orders of this

Court. I will use such material solely in connection with this case in my capacity as the Abuse

Claims Reviewer. I will maintain the confidentiality of such information in accordance with the

terms of the Bar Date Order, and not disclose the confidential material to any person or entity

except upon order of a court of competent jurisdiction after notice to affected parties.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

---

[3] It is my understanding that any amounts paid by the Debtor will not be deducted from the amounts to be paid by
the Debtor to the Trust pursuant to the Joint Plan.

4

4914-9887-3952.9 05067.002

#104304177v1

Dated this 25th day of September 2025.

_____

Richard Arsenault



# RICHARD J. ARSENAULT

**NBA** NEBLETT, BEARD & ARSENAULT
ATTORNEYS AT LAW



rarsenault@nbalawfirm.com
800.256.1050

## CURRICULUM VITAE

- Recognized as one of **America's 50 Most Influential Trial Lawyers** by *Trial Lawyer* magazine.

- Selected as one of **America's Top 100 High Stakes Litigators** for Louisiana by *America's Top 100 LLC*.

- Inducted into **Trial Lawyer Hall of Fame** by National Trial Lawyers Association honoring lawyers who have left an indelible mark through a lifetime of service to the American public, the Constitution, and the American trial bar.

- Selected by Mark Lanier to receive the **Making the World a Better Place Dr. David Egilman Award** in recognition of educating and integrating the next generation of lawyers. The award is given in honor of Dr. David Egilman of Brown University, double board certified, who saved countless lives through educating the world.

- Recipient of the Alexandria Bar Association **Causidicus Award** presented to a member who promotes professional courtesy, ethics and civility, consistently demonstrates an interest in the welfare of his clients, professes a willingness to assist fellow members of the bar to improve the standards of the practice of law, and is active in community endeavors.

- Nominated for the **Trial Lawyer of the Year** Award by the *Public Justice Foundation*.

- Selected by the *National Trial Lawyers* as the **Trial Lawyer of the Year Civil Plaintiff Finalist**.

- Actos MDL 2299 – Lead Counsel and Trial Team **$9 Billion Verdict** followed by a **$2.4 Billion Settlement** which is the largest single mass tort settlement for a drug that is still on the market.

- Pinnacle MDL 2244 – Executive Committee and Trial Team, 3 trials resulting in **$502 Million**, **$1 Billion** and **$247 Million Verdicts**.

- Recognized as having the #1 and #3 **Top 50 Verdicts** in Texas in 2016.

- Recognized as having the #4 and #8 top verdicts by the **National Law Journal's Top 100** in 2016.

- Recognized by the **National Law Journal** as one of **America's Elite Trial Lawyers**.

- *National Academy of Personal Injury Attorneys'* **Top 10 Attorney Award for the State of Louisiana**.

- **Member of the Nation's Top One Percent** by the *National Association of Distinguished Counsel*.

- Appointed by the **Louisiana Supreme Court Chief Justice** to serve on the Rules of Professional Conduct Class Action Committee, Bench Book Committee, and State MDL Exploratory Committee.

1150

- Founding Board Director of the **National Board of Complex Litigation Lawyers**, a division of the National Board of Trial Advocacy (NBTA). Approved by the American Bar Association, the NBTA is the oldest and largest legal certification specialization board in the nation.

- Described by **The Wall Street Journal** as having "national notoriety" and as a "big gun" amongst attorneys in competition for leadership roles.

- Described by **BusinessWeek** as "a Dean of the Louisiana Tort Bar."

- Described by **The New York Times** as one of the "big players" in the legal community.

- Referred to by **Newsday** as a "well-known class-action lawyer."

- Featured by **USA Today** as a member of the "Legal Elite."

- **U.S. News & World Report** has included Arsenault in the U.S. News – Best Lawyers "Best Law Firms" Rankings.

- **The National Law Journal** has recognized Arsenault as having one of the nation's largest personal injury verdicts.

- **The New Orleans Times Picayune** has referred to Arsenault as "an authority on class actions."

- **Law 360** has referred to Arsenault's firm as one of the nation's "heavyweights."

- **Honorable Kenneth W. Starr**, former United States Federal Court of Appeals Judge, observed that "Richard Arsenault has a stunning ability to brilliantly multi-task."

- **Honorable William Royal Furgeson, Jr.**, former United States District Court Judge, Western and Northern Districts of Texas, and former United States Judicial Panel on Multidistrict Litigation, remarked regarding Arsenault that "It is always a pleasure—and an honor—to be a part of any CLE that you are organizing, because it is always first rate and best of the best!"

- Described by **Baylor Law School** Professor James Wren as being at the pinnacle of the national plaintiff's bar, "integral to the process of conceptualizing a national board certification in complex litigation," and "…an absolute superstar of multibillion dollar plaintiff litigation management. He understands how to direct mega-cases from inception to verdict to collection."

- In Louisiana State Bar Association MDL Conference materials, Arsenault was referred to as a **"leader in the field"** with a **"proven MDL background."**

- Invited lecturer at **Duke Law School**, **Emory Law School**, **Baylor Law School**, **George Washington Law School**, **Northwestern Pritzker School of Law**, **University of Texas School of Law**, **Tulane Law School** and the **LSU Law School**.

- **The New York Times** observed that Arsenault has "repeatedly played a leading role in mass cases."

- **National Public Radio** referred to Arsenault as one of the "top lawyers" filing cases against Toyota in connection with the unintended acceleration litigation.

- Arsenault has been appointed to steering committees with verdicts and recoveries exceeding **$15 billion**.

- In the Genetically Modified Rice MDL Litigation, where Arsenault serves as Chair of the Executive Committee, seven trials produced verdicts exceeding **$200 million** and the litigation has now been partially resolved for **$750 million**.

- For over 25 years, Arsenault has had **Martindale Hubbell's highest rating** for legal ability and ethical standards. He is also listed in other peer reviewed publications, including the Bar Register of Preeminent Lawyers and **"Best of United States."** He has appeared in the **"Best Lawyers in America"** publication for over 25 consecutive years. This inclusion is based on an exhaustive and rigorous peer-review survey comprising more than 6 million confidential evaluations by top attorneys.

- Arsenault served as a **faculty member for LSU Law School's Trial Advocacy Program**; a faculty composed of Federal and State Court Judges, professors and prominent attorneys.

- **LSU Professor Frank L. Maraist** observed that "Richard is one of the outstanding litigators in this part of the world and is a leading faculty member at continuing legal education programs in the state, both for LSU and the state bar. He also has been a valuable member of the LSU Trial Advocacy Program."

- Described by **University of Texas Law School Professor Lynn A. Baker** as being the best when it comes to hosting continuing legal education programs.

- Arsenault is the **Co-founder of the Baylor Law Executive LL.M. in Litigation Management program** which has assembled leading-edge litigation specialists, seasoned general counsel, accomplished Judges, top litigation professors, and nationally recognized thought leaders. This program brings participants face-to-face with some of the foremost experts in their respective fields, providing the opportunity to learn from the best.

In addition to a busy litigation practice, Arsenault has also been retained to provide expert testimony and has served as a mediator in mass tort litigation. Trial Magazine also regularly calls upon Arsenault to peer review articles they consider for publication. He also serves as a peer reviewer for Martindale-Hubbell in connection with their attorney evaluations process.

Arsenault has been selected to serve as a **State Executive Committee Member for The National Trial Lawyers** for 2018 by the National Trial Lawyers Top 100.

Arsenault has been selected by the **National Trial Lawyers Top 100 Trial Lawyers** as Trial Lawyer of the Year Civil Plaintiff Finalist 2014. The National Trial Lawyers is a professional organization composed of premier trial lawyers from each state in the nation who meet stringent qualifications. Selection is based on a thorough multi-phase process which includes peer nominations combined with third-party research. Membership is extended solely to the select few of the most qualified attorneys from each state who demonstrate superior qualifications of leadership, reputation, influence, stature and public profile.

Arsenault was named by the **American Trial Lawyers Association (ATLA) Top 100 Trial Lawyers** in Louisiana. The Association is a national organization composed of the Top 100 Trial Lawyers from each state. Membership is obtained through special invitation and is extended only to those attorneys who exemplify superior qualifications of leadership, reputation, influence, stature and profile as civil plaintiff or criminal defense trial lawyers.

Arsenault has been selected by the **American Society of Legal Advocates (ASLA) Top 100 Litigation Lawyers** in the State of Louisiana. The ASLA is an invitation only legal organization comprised of the nation's most skilled lawyers designed to identify and promote the most outstanding legal talent throughout the country. They invite lawyers who combine stellar legal credentials with proven commitment to communication engagement, leadership and the highest professional standards.

Arsenault has been selected for inclusion in **The Trial Lawyer Round Table: America's 50 Most Influential Trial Lawyers** by *The Trial Lawyer* magazine. This selection places Arsenault among the top 50 civil plaintiff and criminal defense attorneys in the United States and is based on significant achievements in the legal profession.

Arsenault, who **according to the Wall Street Journal, "hosts must-attend legal seminars on the hot cases of the moment,"** has been featured on numerous occasions by The New York Times, L.A. Times, NPR, Associated Press,

CBS, BBC, Wall Street Journal, BusinessWeek, Miami Herald and other national press outlets for his roles in both Toyota and the Gulf Coast Oil Spill. Arsenault was appointed to serve on the Toyota Plaintiffs' Lead Counsel Committee for Economic Loss Class Actions in the National Multi-District Litigation pending in California. The Judge remarked:

> "The Court spent considerable time in evaluating candidates for leadership on the Plaintiffs' side in this proceeding. The Court believes that while many candidates for leadership were well qualified, those chosen are of exceptional talent and experience, and the Court has reposed great confidence in them."

**Complex Litigation**

Appointed by the Louisiana Supreme Court to serve on the new Rules of Professional Conduct Class Action Committee. This committee is tasked with examining Louisiana's Rules of Professional Conduct as they relate to representation of parties involved in class actions, mass torts, and other multi-client representations. The committee will also examine the efficacy of requesting that the Legislature enact a Multi District Litigation (MDL) procedure for Louisiana when actions of the same subject matter are pending in more than a single judicial district.

Richard Arsenault has been appointed to the Board Certification Examination Committee in connection with the National Board of Complex Litigation Lawyers. He has also been appointed by the Louisiana Supreme Court to serve on a committee to revise the Complex Litigation Bench Book.

Richard Arsenault was Lead Counsel in MDL 2299 where the litigation was resolved for $2.4 billion after a $9 billion verdict. Near the conclusion of the case, MDL Judge Rebecca Doherty, entered an Order (Doc.6943) where she observed;

- Arsenault was central to the effective organization, development and management of the potential Actos litigation leading to the formation of the Actos MDL.

- His teamwork, organizational activity and case development and preparation for the first bellwether case for trial was performed in a seamless and exemplary manner.

- He played a key role in the successful implementation of the settlement program.

- He was of critical importance to the overall operation of the PSC.

- He has served as lead and/or co-lead counsel in numerous cases involving complex litigation, is a frequent lecturer at seminars and other educational efforts involving complex litigation across the nation.

- Judge Doherty observed; "All assignments given to Mr. Arsenault were performed in a truly timely and exemplary manner, reflecting his high degree of skill and expertise in complex litigation. He was critical to the formation of the highly organized structure of the PSC, the seamless trial preparation, and the implementation and oversight of the settlement program."

Arsenault served as co-counsel with Professor Arthur Miller in the Baycol Multidistrict Litigation when the Plaintiff Steering Committee designated him along with Professor Miller to argue the class certification motion before Judge Michael J. Davis in Minneapolis. Later, at a class action fairness hearing in federal court, Professor Arthur Miller, while testifying regarding class action related issues, described Arsenault as one of the **"leaders in the area of complex litigation."** Similarly, Professor Edward Sherman, former dean of Tulane Law School, with whom Arsenault has participated in panel presentations and for whom he has served as a guest lecturer at Tulane Law School, has described Arsenault as **one of the "experts" in class actions.**

Judge Donovan Frank appointed Arsenault to serve as co-lead counsel in the Guidant Multidistrict Litigation. As the litigation came to a close, the court acknowledged lead counsels' significant mass tort experience and explained:

> "This experience benefitted immensely the court's ability to effectively and expeditiously move the case along, and more importantly, this experience benefitted the individual plaintiffs."

The Guidant MDL presented many unique challenges and much of Arsenault's time was spent in critical management efforts which were essential to coordinating the litigation. Again, this did not go unnoticed by Judge Frank:

"The attorneys had superb case management experience that permitted them to efficiently handle this complex case. In addition, many of the managing attorneys have the ability to combine their skills with experienced trial lawyers in a way that proved efficient and a benefit to all plaintiffs as the bellwether trial dates approached. Had it not been for the skill of counsel, there may have been no settlement and no recovery for the plaintiffs here at all."

Arsenault was one of the lead negotiators in the Guidant MDL and was involved in every step of the process, all of which was directly supervised by Magistrate Arthur Boylan who noted that the negotiations were some of the "most complex" that he had been involved in and praised the

"professionalism, competence and skill of counsel"

during the settlement process. Judge Frank stated that Magistrate Boylan's observations were consistent with what the court had observed throughout the case as well.

U.S. District Judge Rebecca Doherty, at a fairness hearing for the New Iberia Train Derailment litigation made the following remarks: "This is a matter where counsel took it upon themselves to take this out of the norm and to handle it somewhat creatively, and they have handled it efficiently, well, expeditiously, and it is -- has been reflective of the collective talent, experience, and ability of the attorneys involved and the Special Master and the court disbursal agent that this has gone as beautifully as it has." "I think the novelty in which this was handled is extremely laudable and great and high in the manner in which this matter was handled, and I think that is something that the --particularly, the counsel that were the common benefit attorneys should be properly rewarded for. The skill required to perform the legal services properly, I think, is perhaps one of the major factors in this matter. I think the skill required by the common benefit lawyers in order to bring this matter from start to finish in two years' time with only 300 and something objections, almost all of them ultimately being resolved to the satisfaction of all parties involved, is exemplary." "The experience, reputation, and ability of the attorneys is exemplary. I think the curriculum vitaes point that out, and I don't think it's every day that you have someone of Mr. Arthur Miller's stature who says that you have some of the best in the country working in a given case. That is high praise not unnoted by this Court that came from the expert witness this morning." "It is my opinion this is a unique class action that has been handled in an exemplary fashion by skilled, talented lawyers, an excellent Special Master, and an excellent court disbursal agent, and I think that that adds value to the matter. It is rare that a train derailment is taken from start to finish in approximately two years with pretty much everybody happy and a tremendously high percentage of the monies that are expended going to the litigants and the litigants getting their money within about two years. That is almost unheard of, and I think that has true value, and I don't think it would have happened without having the quality of counsel that was in this case, as well as the Special Master and the court disbursal agent."

**Litigation Resolution**

The architect of many significant litigation recoveries, Arsenault has been appointed to many negotiating teams, some resulting in nine figure settlements. He served on the Executive Committee and as Class Counsel in environmental litigation where the defendant agreed to a $330 million dollar settlement just days before trial. He was Lead Counsel and one of the lead negotiators in a train derailment that was resolved in federal court by Judge Rebecca Doherty in Lafayette, Louisiana. Subsequently, she invited Arsenault to make a presentation with her at the Fifth Circuit Judicial Conference regarding the innovative and progressive ideas employed in resolving that litigation. Arsenault was one of the negotiators in a class action resolved before Judge Parker in the Middle District of Louisiana and served as Class Counsel and one of the lead negotiators in that case. He was also appointed to the Vioxx Plaintiff Steering Committee, which was resolved for $4.85 billion dollars.

5154

## Legal Excellence & Professionalism

Arsenault's commitment to legal excellence is reflected in years of service which has included teaching at law schools, publishing law review articles, lecturing at Judicial Colleges and assuming leadership roles in both local, as well as national bar associations. Through an appointment by the President of the Louisiana Bar Association, Arsenault joined the Professional Assessment Committee composed of a distinguished panel including Federal and State Court Judges along with members of the Bar. He also coordinates an annual tort law presentation by several United States District Judges and the former Dean of the University of Tennessee, College of Law, Thomas C. Galligan, Jr. Other examples include service as:

- President of the Alexandria Bar Association;
- President of the American Inns of Court's Crossroads Chapter. (U.S. District Judge F.A. Little and Arsenault worked together to create the Alexandria Chapter);
- Chair of American Trial Lawyers Association Admiralty Section;
- Chair of both the Louisiana Bar Association's Annual Admiralty Symposium and Annual Class Action Symposium since their inception;
- Speaker and guest lecturer at a variety of symposiums, including those sponsored by Tulane Law School, LSU Law School, the Louisiana Judicial College and the U.S. Fifth Circuit Judicial Conference;
- Editor of the Louisiana Bar Journal's Recent Developments for the Section on Insurance, Negligence, Worker's Compensation and Admiralty;
- Tulane Law School's Continuing Legal Education Committee;
- Chair of the Louisiana Bar Association's Section on Insurance, Negligence, Worker's Compensation and Admiralty.

## National Plaintiff Steering Committees

Selected by courts nationwide to serve on Steering Committees in some of the nation's largest litigation, Arsenault's appointments by the federal bench include:

- U.S. District Judge James V. Selna, Central District of California, to serve on the Plaintiffs' Lead Counsel Committee for Economic Loss Class Actions in the Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation.
- U.S. District Judge Donovan W. Frank, District of Minnesota, to serve as Co-Lead Plaintiffs' Counsel in the Guidant MDL Litigation.
- U.S. District Judge Donald C. Nugent, Northern District of Ohio, to serve as Co-Lead Plaintiffs' Counsel in the Kaba Simplex Locks Litigation.
- U.S. District Judge Sarah S. Vance, Eastern District of Louisiana, to serve as Liaison Counsel in the Educational Testing Service Praxis MDL Litigation.
- U.S. District Judge Eldon E. Fallon, Eastern District of Louisiana, to serve on the Plaintiffs' Steering Committee in the Vioxx MDL Litigation.
- U.S. District Judge Charles R. Breyer, Northern District of California, to serve on the Plaintiffs' Steering Committee in the Bextra/Celebrex MDL Litigation.
- U.S. District Judge James M. Rosenbaum, District of Minnesota, to serve on the Plaintiffs' Steering Committee in the Medtronic MDL Litigation.
- U.S. District Judge Ivan L.R. Lemelle, Eastern District of Louisiana, to serve on the MDL Plaintiffs' Steering Committee in the High Sulfur Content Gasoline Products Liability MDL Litigation (Shell).
- U.S. District Judge David A. Katz, Northern District of Ohio, to serve on the Plaintiffs' Discovery Committee in the Ortho Evra MDL Litigation.
- U. S. District Judge Catherine D. Perry, Eastern District of Missouri, to serve as a member of the Plaintiffs' Executive Committee in Rice Contamination MDL.
- U.S. District Judge Richard H. Kyle, District of Minnesota, to serve on the Plaintiffs' Steering Committee in the Medtronic Sprint Fidelis Leads MDL.
- U.S. District Judge Frederick J. Martone, District of Arizona, to serve on the Plaintiffs' Steering Committee in the Zicam Cold Remedy Marketing, Sales Practices and Products Liability MDL Litigation.

- U.S. District Judge Rebecca Pallmeyer, Northern District of Illinois, to serve on the Plaintiffs' Steering Committee in the Zimmer Nexgen Knee Implant Litigation.
- U.S. District Judge Steven J. McAuliffe, District of New Hampshire, to serve on the Plaintiffs' Steering Committee in the Dial Complete Marketing and Sales Litigation.
- U.S. District Judge Gene E.K. Pratter, Eastern District of Pennsylvania, to serve as Interim Lead Counsel in the Imprelis Herbicide Marketing, Sales Practices and Products Liability Litigation.
- U.S. District Judge Ed Kinkeade, Northern District of Texas, to serve on the Plaintiffs' Executive Committee in the DePuy Orthopaedics, Inc. Pinnacle Hip Implant Products Liability Litigation.
- U.S. District Judge Paul Barbadoro, District of New Hampshire, to serve as Plaintiffs' Executive Committee in Colgate-Palmolive Softsoap Antibacterial Hand Soap Marketing and Sales Litigation.
- U.S. District Judge Rebecca Doherty, Western District of Louisiana, to serve as Co-Lead Plaintiffs' Counsel in the Actos MDL Litigation.
- U.S. District Judge Sarah S. Vance, Eastern District of Louisiana, to serve on the Plaintiffs' Steering Committee in the Pool Products Distribution Market Antitrust Litigation, MDL No. 2328.
- U.S. District Judge Kathleen B. Burke, Northern District of Ohio, to serve on the Plaintiffs' Executive Committee in the Gentek Building Products, Inc. and Associated Materials, LLC Litigation.
- U.S. District Judge David A. Katz, Northern District of Ohio, to serve on the Plaintiffs' Discovery Committee in the DePuy Orthopaedics, Inc. ASR Hip Implant Products Litigation, MDL No. 2197.
- U.S. District Judge Robert L. Miller, Jr., Northern District of Indiana, to serve on the Plaintiffs' Steering Committee and the Plaintiffs' Executive Committee in the Biomet M2a Magnum Hip Implant Products Liability Litigation, MDL No. 2391.
- U.S. District Judge David Norton, District of South Carolina, to serve on the Plaintiffs' Steering Committee in the Pella Corporation Architect and Designer Series Windows Marketing, Sales Practices and Products Liability Litigation, MDL No. 2514.

**Presentations & Publications**

Arsenault has been appointed to numerous editorial boards, and has made presentations throughout the U.S. and Canada on a variety of mass tort, class action, and complex litigation related topics. He has over 250 articles and presentations to his credit. Arsenault co-authored with Professor Thomas C. Galligan, Jr., a chapter in the original treatise published by the American Bar Association's Tort, Trial & Insurance Practice Section (A Practitioner's Guide to Class Actions) titled, "MDL's – A Practitioner's Global Positioning Guide." Arsenault co-authored two chapters in the second and third editions of the treatise published by the American Bar Association's Tort, Trial & Insurance Practice Section (A Practitioner's Guide to Class Actions) (1) with Professor Thomas C. Galligan, Jr., titled "Multidistrict Litigation;" and (2) with Professor Jaime L. Dodge and Eric Holland, titled "Bellwether Trials." Arsenault has authored many Law Review articles including one published in the Federal Courts Law Review (Knowledge is Power: A Practical Proposal to Protect Putative Class Members From Improper Pre-Certification Communication).Its use was approved as a course material at Berkley Law School. Other publications include:

- "The Increasing Central Role of Bellwether Trials and MDL's" published in *The Brief*, quarterly magazine of the ABA Tort Trial & Insurance Practice Section.
- "Settlement Strategies for Complex Global Litigation" published in "*TRIAL*" the Journal of the American Association of Justice.
- "Class Action Settlement of 'Future Claims'" which appeared in a recent edition of the Louisiana Trial Lawyers Association publication.
- "Gathering Digital Data" published in "*TRIAL*" the Journal of the American Association of Justice.
- "Daubert in Class Certification" published in the Louisiana Bar Journal.
- "Will Daubert Challenge Your Class Certification?" published in *"TRIAL"* the Journal of the American Association of Justice.
- "Precertification Discovery: A User's Guide" published in the Tulane Law Review, 80 Tul. L. Rev. 5/6 (June 2006).
- "Multidistrict Litigation and Bellwether Trials: Leading Litigants to Resolution in Complex Litigation" published in *The Brief*, quarterly magazine of the ABA Tort Trial & Insurance Practice Section.

## National and International Press Coverage

Arsenault is known inside and outside the legal community as an authority on complex litigation issues. He has been interviewed and featured in print, online, on television, and radio regarding his expertise and involvement with some of the nation's largest litigation. Arsenault has been called upon and often quoted by leaders in the news media, including the Wall Street Journal, New York Times, CNN, CBS 60 Minutes, CBS Evening News, Washington Post, Newsday, London Times, Los Angeles Times, Associated Press, National Public Radio, MSNBC, Public Broadcasting System, Morningstar.com, CBS News' Moneywatch.com, The Boston Globe, The Miami Herald, MarketWatch, Yahoo Finance, Reuters, Forbes, Bloomberg News, Huffington Post, NPR Market Watch, CBS Radio Los Angeles, Houston Chronicle, Los Angeles Daily Journal, San Francisco Chronicle, JD Journal Legal News, TRIAL Magazine (Mar. 2011, p. 19), TV Tokyo America, Toronto Star, Toronto Sun, Edmonton Sun, Calgary Sun, Metro News Ottawa, The Detroit Bureau, Real Simple Syndication, Businesswire.com, CNBC, KTVU San Francisco, British Broadcasting Corporation Radio, British Broadcasting Corporation World Television London, Reuters UK, New Zealand Herald, Australian Broadcasting Corporation, Al Jazeera English TV News, Agence France-Presse (AFP), Japanese weekly magazine "Shukan Kinyobi," and various other national and local media outlets.

## Internet Articles Quoting

Louisiana Tire News-Tire Industry Today, Broker Forex Online, Biology and Medicine, Wall Street Journal blog, Legal News Line, BusinessWeek, National Law Journal, Financial Hub, Leader-Post/Los Angeles Times, Ziet Online, Yahoo! News, Oil Spill News, Online PR News, The American Lawyer, Reuters.

## Nationwide Networking

Arsenault has helped chair national complex litigation programs with speakers that have included former President Bill Clinton, Robert F. Kennedy, Jr., Eliot Spitzer, Harvard Professor Alan Dershowitz, Morris Dees, Arianna Huffington, Al Franken, Bob Woodward, Al Sharpton and Paul Begala. He has chaired dozens of symposiums with guests ranging from Ken Starr to Jan Schlichtman (lawyer portrayed by John Travolta in "A Civil Action"). Arsenault has organized numerous counsel meetings and conferences, comprising hundreds of law firms in venues across the country. These have been designed to facilitate consensus for leadership roles, consider organizational structures and promote coordinated litigation efforts. Arsenault recently co-chaired the national HarrisMartin Toyota Recall Litigation Conference, which attracted over 100 plaintiff and defense attorneys seeking to learn more about the unique circumstances of the Toyota litigation. The conference agenda featured some of the nation's preeminent attorneys, many with decades of experience handling large, complex national cases. The event, which was held in San Diego was profiled by the Associated Press, the Wall Street Journal, Bloomberg News, National Public Radio, CBS Radio, CBC Montreal and other national and international news organizations. Consequently, he understands and functions well in the national complex litigation landscape.

_____

# CURRICULUM VITAE HIGHLIGHTS

- AV Martindale-Hubbell rating.
- Martindale-Hubbell Bar Register of Preeminent Lawyers listing.
- "The Best Lawyers in America" Woodward/ White publication listing.
- Licensed in Louisiana, Texas, Colorado, and Washington, D.C.
- National Law Journal recognition for one of the nation's largest (top 100) verdicts in 2001; $21 million.
- Faculty member at LSU Law School's Trial Advocacy Training Program.
- Guest Lecturer at Tulane and LSU Law Schools.
- Past President of Alexandria Bar Association.
- Past President of Crossroads Chapter of the American Inns of Court.
- Guest lecturer at Louisiana Judicial College.
- Guest lecturer at Federal Fifth Circuit Judicial Conference.
- Numerous presentations at law schools, judicial conferences, and bar association functions throughout the United States and Canada on a variety of mass tort, class action, maritime and litigation related topics (nearly 200 articles and presentations).
- Editor of Louisiana Bar Journal, Recent Developments for the Section on Insurance, Negligence, Workers' Compensation and Admiralty Law (1983-2000).
- Multi-District Litigation experience: Pedicle Screw, Breast Implant, Fen-Phen, Microsoft, Propulsid, Air Bag, Sulzer Hip, PPA, Firestone, Baycol, Serzone and Meridia.
- Appointed by U.S. District Judge Rodney W. Sippel to serve on the Plaintiffs' Steering Committee in the **NUVARING** Products Liability Litigation, MDL No. 1964. ($100 million recovery).
- Class Counsel in Craig West, et al v. G& H Seed Company, et al, Docket No. 99-C-4984-A, 27thJudicial District Court (**ICON/CRAWFISH**), St. Landry Parish, Louisiana ($45 million recovery during fifth week of trial).
- Appointed by Federal District Court Judge John Parker as Class Counsel for **INGRAM** litigation; served on Settlement Committee ($40.5 million recovery).
- Appointed by Federal District Court Judge Edith Brown Clement to serve as Liaison Counsel in **KAISER** Litigation; served on Settlement Committee ($30,425,000.00 recovery).
- Appointed by Federal District Court Judge Richard Haik to serve as Class Counsel and appointed to the Settlement Committee for the **EUNICE TRAIN DERAILMENT** Litigation ($65 million recovery).
- Appointed by Federal District Court Judge Rebecca F. Doherty to serve as Co-Liaison Counsel and Class Counsel in **NEW IBERIA TRAIN DERAILMENT** LITIGATION ($5 million recovery).
- Appointed by Federal District Court Judge Barker to serve on the **FIRESTONE** MDL No. 1373 Settlement Committee.
- Appointed to Repository Committee in In Re: Ford Motor Company **CROWN VICTORIA** Police Interceptor Products Liability Litigation, MDL Docket No. 1488.
- Appointed by Federal District Court Judge Eldon E. Fallon to serve on State Liaison Committee in **PROPULSID** MDL No. 1355 litigation.
- Appointed by Federal District Court Judge Rothstein to serve on Federal/ State Coordination Committee in **PPA** MDL No. 1407 litigation.
- Appointed to Plaintiffs' Steering Committee and Executive Committee in **SERZONE** Products Liability Litigation, MDL No. 1477.
- Appointed to Plaintiffs' Steering Committee in In Re:  **MERIDIA** Product Liability Litigation, MDL No. 1481.
- Chair for Louisiana State Bar Association's Annual Class Action/Mass Tort Symposium since inception.
- Chair of Louisiana State Bar Association's Annual Admiralty Symposium since inception.
- Appointed by U.S. District Judge Feldman to serve as a member of the Plaintiffs' Steering Committee in In Re: **AIR BAGS** Products Liability Litigation, MDL No. 1181.
- Appointed by U.S. District Judge Eldon E. Fallon to serve as a member of the Plaintiffs' Steering Committee and Interim Class Counsel In Re: **VIOXX** Products Liability Litigation, MDL No. 1657.

- Appointed by U.S. District Judge Eldon E. Fallon to serve as Interim Class Counsel, Plaintiffs' Steering Committee member and Executive Committee member In Re: Turner v. **MURPHY OIL** USA, Inc. Case Number 05-4206, U.S. District Court, Eastern District of Louisiana.
- Appointed by U.S. District Judge Vance to serve as Liaison Counsel, In Re: **OCA**, Inc. Securities and Derivative Litigation, Master File No. 05-2165, Section R(3), Judge Vance, United States District Court, Eastern District of Louisiana.
- Appointed by U.S. District Judge Charles R. Breyer to serve as a member of the Plaintiff's Steering Committee In Re: **BEXTRA** and **CELEBREX** Marketing Sales Practices and Product Liability Litigation, Case No. M:05-CV-01699-CRB, MDL No. 1699, United States District Court, Northern District of California.
- Appointed by U.S. District Judge Donovan W. Frank to serve as a member of the Plaintiffs' Lead Counsel Committee In re: **GUIDANT** Corp. Implantable Defibrillators Products Liability Litigation, MDL No. 05-1708, United States District Court, District of Minnesota.
- Appointed by U.S. District Judge James M. Rosenbaum to serve as a member of the Plaintiffs' Steering Committee In Re: **MEDTRONIC**, Inc. Implantable Defibrillators Litigation, MDL No. 05-1726, United States District Court, District of Minnesota (1of the 3 lead negotiators for the settlement which including the separate payment for attorney's fees exceeds $113 million).
- Appointed by U.S. District Judge Catherine D. Perry to serve as a member of the Plaintiffs' Executive Committee In Re LL**RICE** 601 Contamination Litigation, Case Number 4:06 MD 1811-CDP, U.S. District Court, Eastern District of Missouri, Eastern Division.
- Appointed by U.S. District Judge Carl J. Barbier to serve as Class Counsel in Lincoln, et al v. **SHELL** Pipeline Company, L.P., et al, Civil Action no. 05-CV-4197 c/w 05-cv-4199 & 06-cv-5154, United States District Court, Eastern District of Louisiana.
- Appointed by U.S. District Magistrate Judge Arthur J. Boylan to serve on the Claims Review Committee and the Common Benefit Attorneys' Fees Committee In Re: **MEDTRONIC**, Inc. Implantable Defibrillators Products Liability Litigation, MDL No. 05-1726 (JMR/AJB) United States District Court, District of Minnesota.
- Appointed by U.S. District Magistrate Judge Arthur J. Boylan to serve on the Common Benefit Attorneys' Fees Committee In Re: **MEDTRONIC**, Inc. Implantable Defibrillators Products Liability Litigation, MDL No. 05-1726 (JMR/AJB) United States District Court, District of Minnesota.
- Appointed by U.S. District Judge Richard H. Kyle and United States Magistrate Judge Janie S. Mayeron to serve on the Plaintiffs' Steering Committee, In Re: Medtronic, Inc., **SPRINT FIDELIS** Leads Product Liability Litigation, MDL No. 08-1905 (RHK/JSM), United States District Court, District of Minnesota.
- Appointed by U.S. Magistrate Judge Arthur J. Boylan to serve on the Claims Review Committee, In re: **GUIDANT** Corp. Implantable Defibrillators Products Liability Litigation, MDL No. 05-1708, United States District Court, District of Minnesota.
- Appointed by U.S. District Judge James V. Selna, Central District of California, to serve on the Plaintiffs' Lead Counsel Committee for Economic Loss Class Actions in the **TOYOTA** Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation, MDL No. 2151.
- Appointed by U.S. District Judge Rebecca Doherty, Western District of Louisiana, to serve as Co-lead counsel in **ACTOS** (Pioglitazone) Products Liability Litigation, MDL No. 2299.
- Appointed by U.S. District Judge Paul Barbadoro, District of New Hampshire, to serve on Plaintiffs' Executive Committee in the Colgate-Palmolive **SOFTSOAP** Antibacterial Hand Soap Marketing and Sales Practice Litigation, MDL 2320.
- Appointed by U.S. District Judge Joseph R. Goodwin, Southern District of West Virginia to serve on Plaintiffs' Steering Committee in the C.R. Bard Inc., **PELVIC REPAIR** System Products Liability Litigations, MDL No. 2187, MDL No. 2325, MDL No. 2326 and MDL No. 2327.
- Appointed by U.S. District Judge David C. Norton, District of South Carolina, to serve on the Homeowner Plaintiffs' Steering Committee in the **MI WINDOWS** and Doors, Inc. Products Liability Litigation, MDL No. 2333.
- Appointed by U.S. District Judge Benita Y. Pearson, Northern District of Ohio, Eastern Division, to serve on the Settlement Class Counsel in the **GENTEK** Building Products Inc., and Associated Materials, LLC. Products Liability Litigation, Case No. 1:10cv2093.

---

# EDUCATION

B.A. 1977 - State University of New York
J.D. 1980 - Louisiana State University Law Center

---

# STATE COURT BAR ADMISSIONS

Louisiana (10/17/80)
Texas (04/17/92)
Colorado (10/01/90)
Washington, D.C. (11/06/91)

---

# FEDERAL COURT BAR ADMISSIONS

United States Supreme Court (5/10/84)

United States Courts of Appeals
Fifth Circuit (12/04/80) Eleventh Circuit (10/01/81) Third Circuit (11/26/13)

United States District Courts of Louisiana
Middle District (12/09/80) Eastern District (11/14/80) Western District (01/30/81)

United States District Courts of Texas
Eastern District (06/17/88) Southern District (09/07/90) Northern District (07/11/90)

United States District Court of Colorado (3/2/12)

Admitted to appear Pro Hac Vice (1/10/94)
United States District Court for the Eastern District of Missouri, Southeastern Division
In the matter of the Complaint of NewCo Marine, Inc. as Bareboat
Charterer, Operator and Owner

Pro Hac Vice of the M/V HOOSIER STATE, Official No. 288407,
for Exoneration From or Limitation of Liability, Civil Action No. 1:93-CV-00200

Special admission to appear
Tina Wall, et al v. Sunoco, Inc., et al
Case No. 3:CV-01-809
United States District Court, Middle District of Pennsylvania

Admitted to appear Pro Hac Vice
Kaiser Aluminum Corporation, et al
Case No. 02-10429
United States Bankruptcy Court, District of Delaware

Admitted to appear Pro Hac Vice
In re: Medtronic, Inc., Implantable Defibrillators Products Liability Litigation
MDL No. 1726 (JMR/AJB)
United States District Court, District of Minnesota

Admitted to appear Pro Hac Vice
In re: Bextra and Celebrex Marketing, Sales Practices and Product Liability Litigation
MDL No. 1699(CRB)
United States District Court, Northern District of California

Admitted to appear Pro Hac Vice
In re: Guidant Corp. Implantable Defibrillators Products Liability Litigation
MDL No. 1708
United States District Court, District of Minnesota

Admitted to appear Pro Hac Vice
Arthur Sokol v. Pfizer, Inc.
Case No. 05-80750CV
United States District Court, Southern District of Florida, West Palm Beach Division

Admitted to appear Pro Hac Vice 2006
Joseph Birdsong, individually and as representative of the Class
United States District Court, Northern District of California, San Jose Division

Admitted to appear Pro Hac Vice (10/13/2006)
Ralph Shaffer, individually and on behalf of all others similarly situated
v. Continental Casualty Company & CNA Financial Corporation, d/b/a CNA, LTC.
Case No. CV06-2235 RGK (PJA)
United States District Court, Central District of California, Western Division

Admitted to appear Pro Hac Vice (10/9/2006)
Sondra Zekowski, et al v. Princess Cruise Lines, Ltd.
Case No. BC356095
Superior Court, State of California, County of Los Angeles

Admitted to appear Pro Hac Vice  (8/8/2007)
Danny Dunham, individually and on behalf of all others similarly situated
v. Coffeyville Resources, LLC., et al
Case No. 6:07-cv-01186-JTM-DWB
United States District Court, State of Kansas

Admitted to appear Pro Hac Vice (11/15/07)
Luisi, et al v. Medtronic, Inc., et al
Civil Docket No. 0:07cv-04250-RHK-JSM
United States District Court, District of Minnesota (DMN)

Admitted to appear Pro Hac Vice (8/10/09)
Sydnes v. National Arbitration Forum, Inc. et al
Civil Docket No. 09-cv-01939-PAM-JSM
United States District Court, District of Minnesota

Admitted to appear Pro Hac Vice (3/9/10)
Poole v. MATRIXX Initiatives, Inc., et al
Civil Docket No. 2:10-cv-00127-FJM
United States District Court, District of Arizona

Admitted to appear Pro Hac Vice (3/23/10)
Gazaryan v. Toyota Motor Sales U.S.A. Inc., et al
Civil Docket No. 2:10-cv-00849-AHM
United States District Court, Central District of California

Admitted to appear Pro Hac Vice (3/22/10)
Horn v. Toyota Motor Sales U.S.A. Inc., et al
Civil Action No. 4-10-cv-0090
United States District Court, Eastern District of Arkansas

Admitted to appear Pro Hac Vice (3/24/10)
Menssen v. Toyota Motor Sales U.S.A. Inc., et al
Civil Docket No. 1:10-cv-00260-SO
United States District Court, Northern District of Ohio

Admitted to appear Pro Hac Vice (4/5/10)
Jerry Baker Auto Sales, LLC v. Toyota Motor Sales U.S.A. Inc., et al
Civil Docket No. 2:10-cv-04025-NKL
United States District Court, Western District of Missouri

Admitted to appear Pro Hac Vice (4/7/10)
Halverson v. Matrixx Initiatives, Inc., et al
Civil Docket No. 2:10-cv-00626-SRB
United States District Court, District of Arizona

Admitted to appear Pro Hac Vice (4/14/10)
In Re: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices and Products Liability Litigation
Case No. 8:10ML2151-JVS (FMOx)
United States District Court, Central District of California

Admitted to appear Pro Hac Vice (6/14/10)
Key West Tiki Charters, Inc. v. Transocean Ltd. et al
Case No. 4:10-cv-10039-KMM
United States District Court, Southern District of Florida

Admitted to appear Pro Hac Vice (8/24/10)
Johnson Investment Counsel, Inc. v. Transocean Ltd. et al
Case No. 1:10-cv-04515-NRB
United States District Court, Southern District of New York

Admitted to appear Pro Hac Vice (8/17/11)
Luanne Miller v. E. I. Du Pont Nemours and Company
Case No. 1:11-cv-01517-DCN
United States District Court, Northern District of Ohio

Admitted to appear Pro Hac Vice (9/12/11)
Kristina Pearson v. Colgate-Palmolive Co.
Case No. 11-C-6086
United States District Court, Northern District of Illinois

Admitted to appear Pro Hac Vice (9/20/11)
In Re: Navistar 6.0L Diesel Engine Products Liability Litigation
Case No. 11-C-2496
United States District Court, Northern District of Illinois

Admitted to appear Pro Hac Vice (3/15/12)
Stout et al v. Takeda Pharmaceuticals America, Inc. et al
Case No. 1:12-cv-00033-IMK
United States District Court, Northern District of West Virginia

Admitted to appear Pro Hac Vice (3/30/12)
Gentek Building Products, Inc. and Associated Materials, Inc.
Case No. 1:11-cv-02719-PAG
U.S. District Court Northern District of Ohio Eastern Division

Admitted to appear Pro Hac Vice (4/9/12)
Ridley v. Boston Scientific Corporation
Case No. 2:12-cv-00034-RWS
U.S. District Court Northern District of Georgia

Admitted to appear Pro Hac Vice (12/12/12)
Davis et al v. Biomet Orthopedics, Inc. et al
Case No. 3:12-cv-00625-RLM-CAN
U.S. District Court, Northern District of Indiana, South Bend Division

Admitted to appear Pro Hac Vice (2/5/13)
Pollard v. Remington Arms Company, LLC et al
Case No. 4:13-cv-00086-ODS
U.S. District Court, Western District of Missouri

Admitted to appear Pro Hac Vice (2/6/13)
Moodie et al v. Remington Arms Company, LLC et al
Case No. 2:13-cv-00172-JCC
U.S. District Court, Western District of Washington

Admitted to appear Pro Hac Vice (4/18/13)
Jemeliah Sade Smith v. Volkswagen Group of America, Inc.
Case No. 3:13-cv-00370
U.S. District Court, Southern District of Illinois (East St. Louis)

Admitted to appear Pro Hac Vice (5/21/13)
Glodo et al v. CPG International, Inc. et al
Case No. 3:13-cv-00402-DRH-SCW
U.S. District Court, Southern District of Illinois

Admitted to appear Pro Hac Vice (6/4/13)
In Re: Mirena IUD Products Liability Litigation
Case No. 7:13-md-02434-CS
U.S. District Court, Southern District of New York

Admitted to appear Pro Hac Vice (7/18/13)
James L. Mace, et al v. Georgia-Pacific LLC, et al
Case No. 3:13-cv-328-J-99TJC-MCR
United States District Court, Middle District of Florida, Jacksonville Division

Admitted to appear Pro Hac Vice (8/16/13)
Stephen Trewin, et al v. Church & Dwight, Inc.
Case No. 3:12-cv-01475-MAS-DEA
United States District Court for the District of New Jersey

Admitted to appear Pro Hac Vice (8/29/13)
Karen Jacobs-Poles and Dwayne Poles v. Wellnx Life Sciences, USA, et al
Case No. 2:13-cv-01884-CMR
United States District Court for the Eastern District of Pennsylvania

Admitted to appear Pro Hac Vice (1/24/14)
Kanawha Gourmet Sandwiches, LLC, a West Virginia limited liability company, individually and on behalf of all
others similarly situated, v. Freedom Industries, Inc., a West Virginia corporation; and West Virginia-American
Water Company, a West Virginia corporation
Case No. 14-C-55
Circuit Court of Kanawha County, West Virginia

Admitted to appear Pro Hac Vice (3/2/15)
Dennis Nicholas, et al v. Medtronic, Inc., et al
Case No. 1522-CC00232
In the Circuit Court of the City of St. Louis, State of Missouri

Admitted to appear Pro Hac Vice
Flowers-Smith, Cynthia et al v. Wellnx Life Sciences, Inc. et al
Case No. 3:15-cv-00168-JDP
United States District Court, Western District of Wisconsin

## TEACHING/FACULTY/ALUMNI BOARD POSITIONS

1. LSU Trial Advocacy Faculty Member – Paul M. Hebert Law Center, Louisiana State University, Baton Rouge, Louisiana, Trial Advocacy Training Program, 1991 - 1998, 2004, 2006, 2007, 2008, 2009.

2. Guest Lecturer – Tulane Law School, New Orleans, Louisiana, September 22, 2004. Topic: Class Actions.

3. Guest Lecturer - March 1994 – Paul M. Hebert Law Center, Louisiana State University, Baton Rouge, Louisiana, Advanced Tort Litigation Course. Topic: Deposition Practice.

4. Faculty – Northwestern State University, Natchitoches, Louisiana, Litigation Course, 1983 to 1987.

5. Faculty – Seventeenth Post Graduate Summer School for Lawyers Presentation at the Paul M. Hebert Law Center, Louisiana State University, Baton Rouge, Louisiana, 1994. Topic: Deposition Practice.

6. Guest Lecturer – Paul M. Hebert Law Center, Louisiana State University, Baton Rouge, Louisiana, February 1997. Topic: Discovery Strategy.

7. Board Member – Vice President for Alexandria, Louisiana National Alumni Board, Paul M. Hebert Law Center, Louisiana State University, Baton Rouge, Louisiana.

8. Member – Chancellor's Council, Paul M. Hebert Law Center, Louisiana State University, Baton Rouge, Louisiana.

9. Member – Professional Assessment Committee, Louisiana State Bar Association.

10. Guest Lecturer – Paul M. Hebert Law Center, Louisiana State University, Baton Rouge, Louisiana, April 2006, Pre-Trial Litigation Class.

11.     Adjunct Professor – Paul M. Hebert Law Center, Louisiana State University, Baton Rouge, Louisiana, Spring 2012, Pre-Trial Litigation Class.

12.     Guest Lecturer – Tulane Law School, New Orleans, Louisiana, April 2018. Topic: "Cause Lawyering: A broad exploration of how lawyers in different fields use the law to effect change and promote justice."

13.     Guest Lecturer – Baylor Law School LLM Litigation Management Program, November 2019. Topic: Plaintiff Perspective of Complex Litigation.

14.     Guest Lecturer – University of Texas at Austin Colloquium Seminar, Austin, Texas, December 2019. Topic: Current Issues in Complex Litigation.

15.     Guest Lecturer – Baylor Law School LLM Litigation Management Program, June 2020. Topic: Litigation Management from the Plaintiff's Perspective.

16.     Guest Lecturer – Baylor Law School LLM Litigation Management Program, August 2020. Topic: United States Supreme Court Lexicon Issues.

17.     Guest Lecturer – Baylor Law School LLM Litigation Management Program, August 2020. Topic: Complex Litigation and Associated Federal/State Coordination.

18.     Guest Lecturer – Baylor Law School LLM Litigation Management Program, August 2020. Topic: Management Considerations in Complex Litigation.

19.     Guest Lecturer – Baylor Law School LLM Litigation Management Program, August 2020. Topic: Strategies for Bellwether and Multi-Plaintiffs Trials.

20.     Guest Lecturer – Baylor Law School LLM Litigation Management Program, August 2020. Topic: Litigation Exit Strategies.

21.     Guest Lecturer – Baylor Law School LLM Litigation Management Program, August 2020. Topic: Whether to Pursue Multidistrict Litigation and Associated Issues.

22.     Guest Lecturer – Baylor Law School LLM Litigation Management Program, August 2020. Topic: Complex Litigation Attorney Compensation and Common Benefit Orders.

23.     Guest Lecturer – Baylor Law School LLM Litigation Management Program, Waco, Texas, January 2021, Topics: (1) Artificial Intelligence: Ethical Implications of its Application in law practices and Mandatory Ethical Requirements Regarding Technology Skills; (2) Complying with Ethical Rules Associated with Aggregate Settlements.  Obligations for Practitioners on Both Sides of the "V;"  (3) Third Party Litigation Funding, Hedge Fund Invasions, and jurisdictions now allowing Fee Sharing with Nonlawyers; (4) Ethical Issues Associated with Court Appointed Multidistrict Litigation Leadership; (5) The Chilling Impacts of Blogs and "Judicial Hellhole" Labels. Ethical? (6) Navigating Social Media ethically; (7)  Attorney Cybersecurity Obligations.

24.     Guest Lecturer – Baylor Law School LLM Litigation Management Program, January 14, 2021. Topic: Complex Litigation.

25.     Guest Lecturer – Baylor Law School LLM Litigation Management Program, January 11, 2022, Waco, Texas. Topic: Complex Litigation Management, PSC Team Selection and Resolution Strategy.

26.     Guest Lecturer – George Washington Law School Complex Litigation Center, Advanced Strategy Mass Tort MDL Certificate Course, February 25, 2022, Coral Gables, Florida. Topic: Common Benefit Fund.

27.     Guest Lecturer – Baylor Law School LLM Litigation Management Program, June 9, 2022, Waco, Texas. Topics: Mass Tort Challenges; Strategic Considerations; Game Changing Rules; Challenges with Litigating in the Digital Age; Managing Mass Tort "Bet The Company" Trials; Mass Tort Resolution Strategy.

## COMMUNITY ACTIVITIES

Eucharistic Minister and Lector
    St. Frances Xavier Cathedral
    1993 to 2001

Member - Stewardship Committee
    St. Frances Xavier Cathedral
    1994

Co-Chairman
    Annual Hope House Function
    (Shepherd Ministries)
    1994

Vice Chairman
    Annual Arthritis Foundation Function
    (Hotel Bentley) Alexandria, Louisiana
    1994

Lector
    Red Mass for the Alexandria
    Diocese of the Roman Catholic Church
    St. Frances Xavier Cathedral
    September 25, 1994 & September 21, 1997

Member - Major Gift Committee
    St. Frances Xavier Cathedral
    Cathedral Restoration Project
    1996

Elected Member of
    St. Frances Xavier Cathedral Financial Board
    1998

Host Committee Member
    Alexandria Reception for Chancellor John Costonis
    LSU Law Center
    1998

SOLACE Program for the Louisiana State Bar Association - Volunteer
    Support of Lawyers/Legal Personnel - Community Action Committee
    2003

SOLACE Program for the Louisiana State Bar Association – Alexandria Coordinator
    Support of Lawyers/Legal Personnel - Community Action Committee
    2010

Soccer Coach
     Country Day School (4th - 6th Grade)
     2001, 2003 Seasons

---

# EDITORIAL POSITIONS

- Editor, Louisiana Bar Journal Recent Developments. (Insurance, Negligence, Workers' Compensation and Admiralty Law). 1983 to 2000.
- Co-Editor, American Trial Lawyers Association Admiralty Newsletter. 1990 to 1992.
- Editorial Board Member, Maritime Law Reporter. 1987 to 2000.
- Editorial Board Member, The Forum. 1982-1986.
- Editor, Alexandria Bar Association Publication. 1983.
- Editor, The Forum. 1987-1988.
- Editor, Maritime and Auto Tort Column for the Louisiana Advocates (Louisiana Trial Lawyers Association Monthly Publication). 2000-2001.

---

# SPECIAL APPOINTMENTS AND RECOGNITION

1.     A-V Martindale-Hubbell rating.

2.     Recognized by THE BEST LAWYERS IN AMERICA (1993 to date).

3.     Recognized by BEST LAWYER IN THE U.S. (2007 to date).

4.     Recognized by LOUISIANA SUPER LAWYERS (2007 to date).

5.     Included in the 2008 Louisiana Life Magazine's Super Lawyer Section "Top Attorneys in Louisiana."

6.     Included in the Martindale-Hubbell Bar Register of Preeminent Lawyers from 1992 to date.

7.     Selected by The Best of the U.S., Inc. as one of the "Best of Class" in the legal profession, 2006 to date.

8.     Louisiana Trial Lawyers Association's President's Advisory Committee, 1983.

9.     Chairman, Louisiana Bar Association Section on Insurance, Negligence, Compensation and Admiralty Law, 1986-1987.

10.     Southern Trial Lawyers Association, Board of Governors, 1988 to 1992.

11.     President, Alexandria Bar Association, 1991-1992.

12.     Executive Committee Member, American Inns of Court, (Crossroads Chapter: Alexandria) 1992-1995.

13.     President, American Inns of Court, (Crossroads Chapter: Alexandria) 1992-1993.

14.     Chairman - Louisiana State Bar Association Section on Insurance, Negligence, Worker's Compensation and Admiralty Law, 1994/1995.

15.     1st Chair (Chairman elect) - ATLA Admiralty Section, 1994/1995.

16.     Louisiana State Bar Association Sandestin Planning Committee Member, 1994/1995.

17.     Chairman - ATLA Admiralty Section, 1995-1996.

18.     Selected honored member of the National Directory of Who's Who, 1994/1995.

19.     Member of the Louisiana Coordinating Counsel for the American Inns of Court, 1994 to date.

20.     Committee Member - Louisiana State Bar Association's Bar Governance Committee, 1995/1996.

21.     Member - Louisiana State Bar Association Continuing Legal Education Program Committee, 1996.

22.     Vice Chair - Louisiana State Bar Association Theme Seminar Sub-Committee of Continuing Legal Education Program Committee, 1995/1996.

23.     June 1996 to June 1998 - Elected to Louisiana State Bar Association House of Delegates for the 9th Judicial District.

24.     1996 Program Chairman - Section on Insurance, Negligence, Workers' Compensation and Admiralty Section of the Louisiana State Bar Association.

25.     Member of the Louisiana State Bar Association's Long-Range Planning Committee, 1996 to-date.

26.     Vice Chair - testimonial dinner honoring retired Judge Alfred Mansour, April, 1996.

27.     Chair - Bar Governance Committee of the Louisiana State Bar Association, 1996/97.

28.     Louisiana State Bar Association  - Nominating Committee - Sixth District, June 97/June 98.

29.     Invited for inclusion in the 1997/1998 Edition of "Who's Who in Executives and Professionals."

30.     Louisiana State Bar Association's Long Range Planning Retreat member, Alexandria, Louisiana, March 2-3, 1996.

31.     Vice Chair of the Section on Insurance, Negligence, Workers' Compensation and Admiralty Section of the Louisiana State Bar Association for 1997/98 term.

32.     Committee Member - Louisiana State Bar Association's Bar Governance Committee, 1997/1998.

33.     Member - Louisiana State Bar Association Continuing Legal Education Program Committee, 1997/1998.

34.     Member - Louisiana State Bar Association Theme Seminar Committee, 1997/1998.

35.     Chairman-Elect of the Section on Insurance, Negligence, Workers' Compensation and Admiralty Section of the Louisiana State Bar Association for 1997/98 term.

36.     Chairman of the Section on Insurance, Negligence, Workers' Compensation and Admiralty Section of the Louisiana State Bar Association for 1998/99 term.

37.     Committee Member - Louisiana State Bar Association's Bar Governance Committee, 1998/1999.

38.     Member - Louisiana State Bar Association Continuing Legal Education Program Committee, 1998/1999.

39.     Invited for inclusion in the 2000/2001 Millennium Edition of "Who's Who in American Law."

40.     Invited for inclusion in "The National Registry of Who's Who," 2000 edition.

41.     Committee Member - Louisiana State Bar Association's Bar Governance Committee, 1999/2000.

42.     Member - Louisiana State Bar Association Continuing Legal Education Program Committee, 1999/2000.

43.     Member - Louisiana State Bar Association Continuing Legal Education Program Committee, 2000/2001.

44.     Louisiana State Bar Association Amicus Brief Committee, 2000/2001.

45.     Louisiana State Bar Association Corporate Sponsorship Committee, 2000/2001.

46.     Member - Louisiana State Bar Association Continuing Legal Education Program Committee, 2001/2002.

47.     Appointed as delegate from the Ninth Judicial District to the House of Delegates of the Louisiana State Bar Association for the term of June 2002 - June 2004.

48.     Member - Louisiana State Bar Association Continuing Legal Education Committee, 2002/2003.

49.     Member - Louisiana State Bar Association Continuing Legal Education Committee, 2003/2004.

50.     Member - Outstanding Lawyers of America, 2003/2004.

51.     Member - Louisiana State Bar Association Continuing Legal Education Program Committee, 2004/2005.

52.     Member - Louisiana State Bar Association's Professional Assessment Committee, 2004/2005.

53.     Chair - Examination of the Public's Needs Subcommittee of the Louisiana State Bar Association's Professional Assessment Committee, 2005.

54.     Chairman, Louisiana Bar Association Section on Insurance, Negligence, Compensation and Admiralty Law, 2005/2006.

55.     Selected by acceptance committee as one of several candidates from Alexandria for inclusion in the 2005-2006 Edition of America's Registry of Outstanding Professionals.

56.     Member - Louisiana State Bar Association Continuing Legal Education Committee, 2005/2006.

57.     Invited for inclusion in "America's Who's Who Registry," 2006/2007 edition.

58.     Invited for inclusion in Prestige International Who's Who Registries of Outstanding Professionals, 2006/2007.

59.     Selected as "Best of Class" and listed on www.bestofus.com website to inform the public who the "Best of Class" are in fourteen professions including lawyers, 2007.

60.     Chairman, Louisiana Bar Association Section on Insurance, Negligence, Compensation and Admiralty Law, 2006/2007.

61.     Member - Louisiana State Bar Association's Professional Assessment Committee, 2006/2007.

62.     Member - Louisiana State Bar Association Continuing Legal Education Committee, 2006/2007.

63.     Editor/Peer Reviewer for Trial Magazine regarding article for January, 2007 publication.

64.     Member - Louisiana State Bar Association Continuing Legal Education Committee, 2007/2008.

65.  Member - Louisiana State Bar Association's Professional Assessment Committee, 2007/2008.

66.  Invited for inclusion in America's Premier Lawyers, to be featured in Fortune Magazine, July 2007.

67.  Peer Reviewer - invited by Louisiana Super Lawyers to be part of a select group of Louisiana Lawyers to serve on their Blue Ribbon Panel to assist in evaluating the 2008 Super Lawyers Nominees.

68.  Expert Peer Reviewer for Trial Magazine.

69.  Peer Reviewer for Louisiana Super Lawyers in connection with evaluating nominees for the 2009 Louisiana Super Lawyers Directory.

70.  Member - Louisiana State Bar Association Continuing Legal Education Committee, 2008/2009.

71.  Selected to participate in the Martindale-Hubbell Peer Review Ratings evaluation, 2009.

72.  Invited for inclusion in 2009/2010 Princeton Global Networks' "Honors Edition" of the Registry of Professional Business Leaders.

73.  Accepted for inclusion in the 2009/2010 edition of Presidential Who's Who, a publication recognizing key executives, professionals and organizations for outstanding business and professional achievements.

74.  Member - Louisiana State Bar Association Continuing Legal Education Committee and Theme Seminar Sub-Committee, 2009/2010.

75.  Named to the American Trial Lawyers Association (ATLA) Top 100 Trial Lawyers in Louisiana.

76.  Selected to participate in the Martindale-Hubbell Peer Review Ratings evaluation, 2010.

77.  Selected for inclusion in the 2010 Louisiana Life and Louisiana Super Lawyers Magazines section, "Top Attorneys in Louisiana."

78.  Selected for inclusion in the 2010 International Association of Business Leaders Hardcover Edition.

79.  Selected for inclusion in the 2010/2011 Edition of "Cambridge Who's Who."

80.  Member - Louisiana State Bar Association Continuing Legal Education Committee, 2010/2011.

81.  Selected for inclusion in the 2011 Louisiana Life and Louisiana Super Lawyers Magazines section, "Top Attorneys in Louisiana."

82.  Selected as the Alexandria Coordinator for the Support of Lawyers/Legal Personnel – All Concern Encouraged (SOLACE) program for the Louisiana State Bar Association. The SOLACE program provides community outreach to members of the legal field and their families who have recently suffered from a significant illness, accident, loss or injury.  The program aims to provide simple, but meaningful support to those in difficult and emergency situations. Many members of the legal community, which includes judges, lawyers, court personnel, paralegals, legal secretaries and other professionals, have already benefited from the outreach and support provided by SOLACE. In his role as Program Coordinator, Arsenault oversees and coordinates support efforts in the greater Alexandria area and serves as a liaison to the Louisiana State Bar Association's Community Action Committee, which founded the program.

83.  Selected for inclusion in the 2011-12 Edition of The Blackstone Who's Who Registry of Accomplished Professionals and Entrepreneurs.

84. Selected for inclusion in Euromoney's *Benchmark Plaintiffs: The Definitive Guide to America's Leading Litigation Firms and Attorneys*.

85. Member - Inaugural Executive Committee of the Class Action Trial Lawyers which is associated with the National Trial Lawyers; an invitation-only trial lawyer organization consisting of premier plaintiff trial lawyers.

86. Selected for inclusion in the 2012 Louisiana Life and Louisiana Super Lawyers Magazines section, "Top Attorneys in Louisiana."

87. Selected to serve on the 2012 Executive Committee for The Environmental Trial Lawyers Association.

88. Selected for inclusion in the 2012 Edition of Worldwide Who's Who Registry.

89. Member – The Top Trial Lawyers in America: Million Dollar Advocates Forum and the Multi-Million Dollar Advocates Forum.

90. Selected by the American Society of Legal Advocates as one of the Top 100 Litigation Lawyers in the State of Louisiana for 2013.

91. Selected for inclusion in the 2013 Louisiana Life and Louisiana Super Lawyers Magazines section, "Top Attorneys in Louisiana."

92. Member – The American Society of Legal Advocates, 2013.

93. Selected by the American Society of Legal Advocates as one of the Top 100 Litigation Lawyers in the State of Louisiana for 2014.

94. Recognized with America's Most Honored Professionals 2014 Award.

95. Selected for inclusion in the 2014 Louisiana Life and Louisiana Super Lawyers Magazines section, "Top Attorneys in Louisiana."

96. Selected by American Lawyer Media and Martindale-Hubbell as 2014 Top Rated Lawyers in Personal Injury Law.

97. Member - Louisiana State Bar Association Continuing Legal Education Committee, 2014/2015.

98. Selected for inclusion in the 2015 Louisiana Life and Louisiana Super Lawyers Magazines section, "Top Attorneys in Louisiana."

99. Selected by Best Lawyers to be included in the 2015 edition of *The Best Lawyers in America*.

100. Selected by The National Law Journal as one of the Top 50 National Law Journal Verdicts & Settlements of 2014 for the case "Allen v. Takeda Pharmaceuticals International, Inc."

101. Recognized by the National Trial Lawyers for Top 100 Trial Lawyers – Civil Plaintiff.

102. Arsenault is a 2014 Litigator Award Nominee for having achieved the distinction of winning Multi-Million and Billion Dollar cases.

103. Selected as 2014 Lawyer of the Year by CorporateLiveWire for achievements in Personal Injury law.

104. Selected as a Member of the Nation's Top One Percent by The National Association of Distinguished Counsel.

105. Appointed by United States Bankruptcy Court Judge Alan M. Koschik, Northern District of Ohio, Eastern Division, to serve as Special Counsel in the matter of Dianna F. Jeter.

106. Nominated by the National Trial Lawyers Top 100 Trial Lawyers to serve on the 2015 Executive Committee.

107. Selected by peers to be included in the 2016 edition of *The Best Lawyers in America*. This inclusion is based on an exhaustive and rigorous peer-review survey comprising more than 6 million confidential evaluations by top attorneys.

108. Selected for inclusion in the 2016 Louisiana Life and Louisiana Super Lawyers Magazines section, "Top Attorneys in Louisiana."

109. Selected by U.S. News & World Report for inclusion in the 2016 U.S. News – Best Lawyers "Best Law Firms" Rankings.

110. Selected by the American Society of Legal Advocates as one of the Top 100 Litigation Lawyers in the State of Louisiana for 2016.

111. Selected as 2015 Most Outstanding Class Action Law Firm – Louisiana in the Corporate LiveWire Legal Awards publication for achievements in Personal Injury Law.

112. Selected for inclusion in The Trial Lawyer Round Table: America's 100 Most Influential Trial Lawyers by The Trial Lawyer magazine. This selection places Arsenault among the top 100 civil plaintiff and criminal defense attorneys in the United States and is based on significant achievements in the legal profession.

113. Selected by the National Trial Lawyers Association to serve on the 2016 Executive Committee.

114. Recognized in the ALM Media LLC 2016 Elite Trial Lawyers Report as one of the firms to achieve high-dollar recoveries for clients and that did some of the most creative and significant work on the plaintiff side.

115. Selected for inclusion in The Trial Lawyer Round Table: America's 50 Most Influential Trial Lawyers by The Trial Lawyer magazine. This selection places Arsenault among the top 50 civil plaintiff and criminal defense attorneys in the United States and is based on significant achievements in the legal profession.

116. Selected as one of America's 25 Most Influential Law Firms by The National Trial Lawyers, a professional organization of America's premier trial lawyers. Selection is extended to attorneys who have demonstrated superior leadership, reputation, influence and stature in the legal community.

117. Selected as one of the 2017 Top 10 Personal Injury Attorneys for Louisiana by American Jurist Institute for dedication to excellence in the practice of law.

118. Selected as one of the 2016 "10 Best Personal Injury Attorneys" for Client Satisfaction in Louisiana by the American Institute of Personal Injury Attorneys.

119. Nominated as a Top 10% Lawyer in the USA by Lawyers of Distinction.

120. Nominated as one of America's Top 100 Attorneys by America's Top 100 LLC.

121. Member - Louisiana State Bar Association Continuing Legal Education Committee, 2017-2018.

122. Selected as one of America's Top 100 High Stakes Litigators for Louisiana by America's Top 100 LLC.

123. Selected by the American Society of Legal Advocates as one of the Top 100 Litigation Lawyers in the State of Louisiana for 2017.

124. Selected by peers to be included in the 2017 edition of *The Best Lawyers in America*. This inclusion is based on an exhaustive and rigorous peer-review survey comprising more than 6 million confidential evaluations by top attorneys.

125. Selected by Acquisition International magazine as 2018's "Leading Trial Attorney of the Year, Louisiana."

126. Selected to serve as a **State Executive Committee Member for The National Trial Lawyers** for 2018 by the National Trial Lawyers Top 100.

127. Nominated as one of Louisiana's Top 10 Attorneys in Personal Injury Law, an achievement reserved only for those attorneys who have demonstrated the highest degree of excellence. This Top 10 list by Attorney and Practice Magazine recognizes dynamic attorneys who have achieved and continue to maintain the highest standards of excellence.

128. Recognized in The National Law Journal 2018 Elite Trial Lawyers 2018 Report as one of the firms to achieve high-dollar recoveries for clients and that performed exemplary and cutting-edge work on behalf of plaintiffs.

129. Member – Louisiana State Bar Association Continuing Legal Education Committee, 2018-2019.

130. Selected as one of the Top 25 Mass Tort Trial Lawyers in the State of Louisiana by The National Trial Lawyers, a professional organization of America's premier trial lawyers. Selection is extended to attorneys who meet stringent qualifications as trial lawyers.

131. Recognized as one of Louisiana's Top 100 Attorneys in Personal Injury Law by the American Academy of Attorneys, an organization of legal professionals committed to supporting the work of the most elite and ethical attorneys in pursuit of justice for their clients.

132. Nominated to be featured in the 2019 Marquis Who's Who in America, the best-known, most trusted biographical resource on America's most accomplished individuals since 1898.

133. Nominated for membership in 2019 Premier Lawyers of America for having demonstrated the highest standards in the practice of law.

134. Selected for renewal as a Member of the Nation's Top One Percent by The National Association of Distinguished Counsel.

135. Selected as one of the "10 Best Attorneys" for Louisiana. By the American Institute of Personal Injury Attorneys.

136. Member – Louisiana State Bar Association Continuing Legal Education Committee, 2019-2020.

137. Selected for inclusion in the Lawdragon 500 Leading Plaintiff Consumer Lawyer guide, a published guide to the most elite U.S. lawyers since 2007.

138. Selected by U.S. News & World Report for inclusion in the 2020 U.S. News – Best Lawyers "Best Law Firms" Rankings.

139. Selected by peers to be included in the 26th edition of *The Best Lawyers in America*. This inclusion is based on an exhaustive and rigorous peer-review survey comprising more than 8.2 million confidential evaluations by top attorneys.

140. Selected by Acquisition International magazine as 2019's "Leading Trial Attorney of the Year, Louisiana."

141. Nominated for membership in 2020 Premier Lawyers of America for having demonstrated the highest standards of excellence in the practice of law.

142.  Selected by American Institute of Trial Lawyers for membership in "2020 Litigator of the Year" for outstanding accomplishments in the field of Personal Injury.

143.  Selected as one of America's Top 100 Personal Injury Attorneys by America's Top 100 LLC.

144.  Selected by Martindale Hubbell to receive an AV Preeminent Rating in 2020, the highest possible rating in both legal ability and ethical standards, reflecting the confidential opinions of members of the Bar and Judiciary.

145.  Nominated to be featured in the 2020 Marquis Who's Who in America, the best-known, most trusted biographical resource on America's most accomplished individuals since 1898.

146.  Nominated as a member of Louisiana's Top 10 Attorneys in Personal Injury Law in 2020, an achievement reserved only for those attorneys who have demonstrated the highest degree of excellence. This Top 10 list by Attorney and Practice Magazine recognizes dynamic attorneys who have achieved and continue to maintain the highest standards of excellence.

147.  Member – Louisiana State Bar Association Continuing Legal Education Committee, 2020-2021.

148.  Recognized by The American Registry as having received a Top-Rated Attorney Rating in 2020 by the legal community.

149.  Nominated for membership in 2021 Premier Lawyers of America for having demonstrated the highest standards of excellence in the practice of law.

150.  Selected for Fall 2020 Membership in Lawyers of Distinction listing of attorneys who have been recognized for "Excellence in the Practice of Law."

151.  Selected for inclusion as Top Rated Lawyer 2020 in Avvo.com Legal Directory.

152.  Nominated to receive the Alexandria Bar Association Causidicus Award. This award is presented every year to a member of the Bar who has been active in state and local bar associations, promotes professional courtesy, ethics and civility, consistently demonstrates an interest in the welfare of his clients, professes a willingness to assist fellow members of the bar so as to improve the standards of the practice of law, and is active in community endeavors.

153.  Selected for the 2020 Top Ranking Attorney list for Personal Injury Law by The American Association of Attorneys Advocates extended only to top attorneys committed to providing the best service for their clients.

154.  Appointed to the Louisiana State Bar Association Theme CLE Planning Subcommittee.

155.  Selected by peers to be included in the 27th edition of *The Best Lawyers in America*. This inclusion is based on an exhaustive and rigorous peer-review survey comprising more than 8.2 million confidential evaluations by top attorneys.

156.  Selected by U.S. News & World Report for inclusion in the 2021 U.S. News – Best Lawyers "Best Law Firms" Rankings.

157.  Selected as one of the 2020/2021 Top 10 Personal Injury Attorneys for Louisiana by Best of the Best Attorneys for dedication to excellence in the practice of law.

158.  Selected by Martindale Hubbell to receive an AV Preeminent Rating in 2021, the highest possible rating in both legal ability and ethical standards, reflecting the confidential opinions of members of the Bar and Judiciary.

159. Selected for inclusion as Top Rated Lawyer 2021 in Avvo.com Legal Directory.

160. Selected to serve as a member of Baylor Law Executive LL.M. National Advisory Panel, a best-in-class convergence of the nation's premiere thought leaders for expertise in the field of litigation management to help frame the Executive LL.M. program.

161. Appointed as a Planning Steering Committee member for Multidistrict Litigation Conferences at the George Washington Law School Complex Litigation Center.

162. Selected for inclusion in the 2021 Lawdragon 500 Leading Plaintiff Consumer Lawyer guide, a published guide to the most elite U.S. lawyers since 2007.

163. Selected by peers to be included in the 28th edition of *The Best Lawyers in America*. This inclusion is based on an exhaustive and rigorous peer-review survey comprising more than 8.2 million confidential evaluations by top attorneys.

164. Appointed as a Reviewer in the development of a compendium of Multidistrict Litigation best practices by George Washington Law School.

165. Co-founder of the Baylor Law Executive LL.M. in Litigation Management program which has assembled leading-edge litigation specialists, seasoned general counsel, accomplished Judges, top litigation professors, and nationally recognized thought leaders. This program brings participants face-to-face with some of the foremost experts in their respective fields, providing the opportunity to learn from the best.

166. Selected by The National Trial Lawyers as one of the Top 10 Environmental Trial Lawyers in Louisiana. This membership is extended only to a select few of the most qualified attorneys from each state who demonstrate superior qualifications of leadership, reputation, influence, stature, and public profile measured by applicable standards in compliance with state bar and national Rule 4.7.

167. Selected for inclusion in a special section of The National Law Journal by Legal Leaders partnering with Martindale-Hubbell, featuring AV Rated Elite Lawyers of the South 2021. Martindale-Hubbell is the gold standard in attorney ratings.

168. Selected for inclusion in the 2021 Top 50 Lawyers in America list by Top Lawyers in America, an honor reserved for attorneys in America who exhibit excellence in their practice.

169. Awarded the highly regarded Top Lawyer Rating for 2022 in the AVVO Legal Directory.

170. Selected for inclusion in Acadiana Profile magazine's 2022 list of Top Lawyers in Acadiana, Louisiana. This inclusion is by a vote of peers and is based solely upon one's standing within their peer group.

171. Selected for renewal in 2022 as a Member of the Nation's Top One Percent by The National Association of Distinguished Counsel.

172. Selected for inclusion in the 2022 Lawdragon 500 Leading Plaintiff Consumer Lawyer guide, a published guide to the most elite U.S. lawyers since 2007.

173. Selected by peers to be included in the 2023 29th edition of *The Best Lawyers in America*. This inclusion is based on an exhaustive and rigorous peer-review survey comprising more than 8.2 million confidential evaluations by top attorneys.

174. Selected for inclusion in a special section of The National Law Journal by Legal Leaders partnering with Martindale-Hubbell, featuring AV Rated Elite Lawyers of the South 2022. Martindale-Hubbell is the gold standard in attorney ratings.

175.    Selected by U.S. News & World Report for inclusion in the 2023 U.S. News – Best Lawyers "Best Law Firms" Rankings.

176.    Awarded the highly regarded Top Lawyer Rating for 2023 in the AVVO Legal Directory.

177.    Selected for inclusion in the 2023 Lawdragon 500 Leading Plaintiff Consumer Lawyer guide, a published guide to the most elite U.S. lawyers since 2007.

178.    Selected by Martindale Hubbell to receive an AV Preeminent Rating in 2023, the highest possible rating in both legal ability and ethical standards, reflecting the confidential opinions of members of the Bar and Judiciary.

179.    Selected for renewal in 2023 as a Member of the Nation's Top One Percent by The National Association of Distinguished Counsel.

180.    Member – Louisiana State Bar Association Continuing Legal Education Committee, 2023-2024.

181.    Selected by peers to be included in the 2024 30th edition of *The Best Lawyers in America*. This inclusion is based on an exhaustive and rigorous peer-review survey comprising more than 13.7 million confidential evaluations by top attorneys.

182.    Selected for inclusion in the 2024 Best Lawyers® "Best Law Firms" Rankings. Best Lawyers® is the oldest and most respected peer-review research and accolades company in the legal profession whose data is a trusted resource for legal professionals and the clients they serve.

183.    Selected by Martindale Hubbell to receive an AV Preeminent Rating in 2024, the highest possible rating in both legal ability and ethical standards, reflecting the confidential opinions of members of the Bar and Judiciary.

184.    Awarded the highly regarded Top Lawyer Rating for 2024 in the AVVO Legal Directory.

185.    Hall of Fame Induction, Mass Torts Made Perfect 2024 Spring Seminar, Las Vegas, Nevada.

186.    Selected by Mark Lanier to receive the 2024 Making the World a Better Place Dr. David Egilman Award in recognition of educating and integrating the next generation of lawyers. The award is given in honor of Dr. David Egilman of Brown University, double board certified, who saved countless lives through educating the world.

187.    Selected for inclusion in the 2025 Best Lawyers® "Best Law Firms" Rankings. Best Lawyers® is the oldest and most respected peer-review research and accolades company in the legal profession whose data is a trusted resource for legal professionals and the clients they serve.

188.    Selected for 2024 Membership in Lawyers of Distinction listing of attorneys who have been recognized for "Excellence in the Practice of Law."

189.    Selected as one of the 2024/2025 Top 10 High Verdict Attorneys for Louisiana by Best of the Best Attorneys for demonstrating the highest ideals of the legal profession.

190.    Selected by The National Trial Lawyers as one of the Top 25 Products Liability Trial Lawyers in Louisiana. This membership is extended only to the most qualified attorneys from each state that demonstrate superior qualifications in leadership, reputation, and influence.

191.    Nominated for "Recognizing Excellence in the Practice of Law" by Lawyers of Distinction.

192.     Selected by Martindale Hubbell to the 2025 AV Preeminent Attorney – Judicial Edition.

193.     Member – Louisiana State Bar Association Continuing Legal Education Committee, 2025-2026.

---

# PUBLICATIONS

1.     "Johnson v. Penrod: Years of Tradition Unhampered by Progress," Vol. 29, No. 1, Louisiana Bar Journal (June 1981).

2.     "A Primer on Remedies Available to the Offshore Oil Worker," Vol. 17, No. 9, Trial Magazine, 1981.

3.     "Maritime Personal Injury: Developing the Seaman's Claim," Vol. 6, No. 7, Voir Dire, 1981.

4.     "Maritime Personal Injuries: Developing the Offshore Platform Worker's Claim," Vol. 7, No. 2, Voir Dire, 1981.

5.     "Maintenance, Cure and Wages: General Principles and Recent Developments," Vol. 14, No. 2, The Forum, Winter, 1982.

6.     "Recognizing and Developing the Brownwater Seaman's Remedies," The Federal Bar News, May, 1982.

7.     "The General Maritime Law Counterpart to Worker's Compensation: Maintenance, Cure and Wages," Vol. 16, No. 4, The Forum (Texas Trial Lawyers Publication), April-June, 1982.

8.     "Problems Associated with Fixed Platform Maritime Personal Injury Claims," The Arkansas Trial Lawyers Association, The ATLA Docket, April, 1982.

9.     "Remedies Available to Seamen Part I Maintenance, Cure and Wages," The Arkansas Bar Association Journal, Vol. 16, No. 2, April 1982.

10.     "Remedies Available to Seamen Part II Unseaworthiness," The Arkansas Bar Association Journal, July, 1982.

11.     "Remedies Available to Seamen Part III The Jones Act," The Arkansas Bar Association Journal, October, 1982.

12.     "The Maritime Consortium Action: Moragne Through Cruz," The Journal of the Academy of Florida Trial Lawyers, No. 235, April, 1982.

13.     "A Postscript," The Arkansas Trial Lawyers Association, The ATLA Docket, June, 1982.

14.     "Bringing Pleasure-Boat Accidents Under the Forum," Trial Magazine, October, 1982.

15.     "Foremost Insurance Co. v. Richardson: Admiralty Jurisdiction Extended to Pleasure Craft Collisions," The Forum, Fall 1982.

16.     "Johnson v. Penrod Evidence of Inflation Admissible," Louisiana Bar Journal, December, 1982.

17.     "An Analytical Starting Point: The Elusive Determination of Seaman's Status," The Forum, Spring 1984.

18.     "Jones & McLaughlin v. Pfeiffer: No More Than Necessary," The Louisiana Bar Journal, October 1983.

19.     "Maritime Personal Injury on Foreign Waters," Trial Magazine, June, 1984.

20.    "Tort Immunity Under the Longshoreman Harbor Workers Compensation Act," Louisiana Bar Journal, October 1984.

21.    "Washington Metropolitan Area Transit Authority v. Johnson: The Sudden Rise and Fall of General Contractor Tort Immunity Under the LHWCA," The Maritime Lawyer, Spring, 1984.

22.    "Longshoreman and Harbor Workers' Compensation Act Tort Immunity Challenge," Trial Lawyers Forum, Volume 19, Nos. 1 and 2, 1984.

23.    "WMATA v. Johnson; LHWCA Tort Immunity Reconsidered," The Forum, Vol. 2, No. 2 (Winter, 1985).

24.    "Offshore Platform Workers: Remedies Available and Recent Developments in Defenses," Trial Magazine, July, 1985.

25.    "When is an Offshore Oilfield Worker a "Seaman" for Purposes of the Jones Act," Louisiana Bar Journal, Vol. 34, No. 1, June 1986.

26.    "Seaman's Status Takes an Unexpected Tack," Vol. 1, No. 3, Maritime Law Reporter (October 1987).

27.    "Seaman's Status Continues its Voyage Through Unchartered Brown Water Applications Using Barrett v. Chevron To Set Its Course," Tulane Maritime Law Review, The Maritime Lawyer, Vol. II, No. 2, Maritime Lawyer Article (Spring 1989).

28.    "Seaman v. Harbor Worker; What Test Applies to Determine Status"; Louisiana Bar Journal, June 1989, Vol., 37, No. 1.

29.    "Seaman Status: Just When You Thought It Was Safe To Get Back Into The Water"; Louisiana Bar Journal, Vol. 37, No. 1 (June 1989).

30.    "Seaman Status: Aid in Navigation Test Rejected," Louisiana Bar Journal, Vol. 38, No. 6, (April 1991).

31.    "Has the Traditional Mariner Been Forgotten," Trial Magazine, Vol. 28, No. 9 (September, 1992).

32.    "McDermott International, Inc. v. Wilander:  The Supreme Court Casts Aside the Navigation Function Requirement," Maritime Law Reporter, Vol. 3, No. 6.

33.    "Defendants Shop for Favorable Maritime Forums," Maritime Law Reporter, Vol. 4, No. 3.

34.    "Special Purpose Vessels Under Attack," Maritime Law Reporter, Vol. 5, No. 3 (1993).

35.    "Mitigating Weaknesses at Trial," Good Counsel Section, Page 17, Trial Magazine, Vol. 30, No. 2, February 1994.

36.    "Maritime Gaming & Available Tort Remedies," Maritime Law Reporter, Vol. 7, No. 2.

37.    "Maritime Personal Injury - Recovery Under the Death on the High Seas Act," Vol. XIII, No. 6, August 1998 issue, Louisiana Advocates.

38.    "U.M. v. Worker's Compensation; Who Pays," Vol. XIII, No. 7, September 1998 issue, Louisiana Advocates.

39.    "Demystifying MIST (Minor Impact; Soft Tissue) Claims," Vol. XIII, No. 8, October 1998 issue, Louisiana Advocates.

40.    "Hunting Season:  Remedies Available to Camp/Club Employees," Vol. XIII, No. 9, November 1998 issue, Louisiana Advocates.

41.    "Venue; Where Can Jones Act Claims be Brought?" Vol. XIII, No. 10, December 1998 issue, Louisiana Advocates.

42.    "Brown Water Vessel Status," Vol. XIV, No. 1, January, 1999 issue, Louisiana Advocates.

43.    "Does Payment of Workers' Compensation Benefits Interrupt Prescriptive Periods for Maritime Claims," Vol. XIV, No. 2, February, 1999 issue, Louisiana Advocates.

44.    "Driving While Intoxicated; A Formula for Punitive Damages," Vol. XIV, No. 3, March, 1999 issue, Louisiana Advocates.

45.    "Does Daubert Apply to Non-Scientific Experts," Vol. XIV, No. 4, April, 1999 issue, Louisiana Advocates.

46.    "Judicial Gatekeeping of Experts; Kumho Tire Co., Ltd. v. Carmichael," Vol. XIV, No. 5, May, 1999 issue, Louisiana Advocates.

47.    "Maritime Personal Injury Venue," Vol. XIV, No. 6, June, 1999 issue, Louisiana Advocates.

48.    "Recovery Under the Death on High Seas Act," Vol. 18, Issue No. 1, Spring 1999, San Francisco Trial Lawyer.

49.    "The Louisiana Supreme Court Addresses Seaman's Status - Perils of the Sea Standard," Vol. XIV, No. 7, July, 1999 issue, Louisiana Advocates.

50.    "Restoring the Injured Party v. Sales Tax Recovery," Vol. XIV, No. 8, August, 1999 issue, Louisiana Advocates.

51.    "Vendetto v. Sonat; Louisiana Supreme Court Addresses Jones Act Standards," Vol. XIV, No. 9, September, 1999 issue, Louisiana Advocates.

52.    "Who Enjoys the Benefits of the Limitation of Vessel Owner's Liability Act?" Vol. XIV, No. 10, October 1999 issue, Louisiana Advocates.

53.    "Floating Casinos Beware; Maritime Rule Governs Dram Shop Liability," Vol. XIV, No. 11, November 1999 issue, Louisiana Advocates.

54.    "Removal Under the Jones Act, OCSLA and the GML," Vol. XV No. 2, February, 2000 issue, Louisiana Advocates.

55.    "Maritime Forum Non Conveniens; La.C.C.P. art.123 v. 46 U.S.C. App. §688(b)," Vol. XV No. 3, March 2000 issue, Louisiana Advocates.

56.    "Limitation of Vessel Owner's Liability; Inapplicability to Non-Shipowners," Vol. IX, No. 1, Summer 2000, Currents International Trade Law Journal, South Texas College of Law.

57.    "Class Action Settlement of Future Claims," Vol. XIX, Number 12, December 2004 issue, Louisiana Advocates.

58.    "Daubert-Lite, Daubert's Role, If Any, at Class Certification Hearings, Louisiana Bar Journal, Volume 52, Number 5, February/March 2005.

59.    "Using Conflicts Principles to Obtain Punitive Damages in Louisiana Court," Vol. XX, No. 5, May 2005 issue, Louisiana Advocates.

60. "Gathering Digital Data," *Trial* (Journal of the Association of Trial Lawyers of America), October 2005 issue (Pg. 20-21).

61. "Knowledge is Power: A Practical Proposal to Protect Putative Class Members from Improper Pre-Certification Communication," 2006 Fed. Cts. L. Rev. 2.

62. "The (Un)Availability of Act of God and Force Majeure Affirmative Defenses After Rita Katrina," Louisiana Advocates, June 2006.

63. "Pre-Certification Discovery: A User's Guide," Tulane Law Review, 80 TLNLR 1827.

64. "Hanks v. Entergy Corp. — The Supreme Court Provides Some Clarity But Leaves A Big Question Unanswered," Louisiana Advocates, February, 2007.

65. "Duty to Find and Prepare a Knowledgeable Corporate Representative" Louisiana Bar Journal, Volume 55, Number 3.

66. "Settlement Strategies for Complex Global Litigation," *TRIAL*, December 2007 issue (pages 40-41).

67. "Mass Torts and Class Action Settlements," *TRIAL*, Accepted for Publication.

68. "Will Daubert Challenge Your Class Certification," *TRIAL*, July 2009 issue (pages 38-39).

69. "The Increasing Central Role of Bellweather Trials and MDL's," *The Brief,* quarterly magazine of the ABA Tort Trial & Insurance Practice Section, Fall issue, October 2009, Accepted for Publication.

70. "Food-Borne Illness Litigation: Critical Questions," Louisiana Advocates, March 2010, Volume XXV, Number 3.

71. "The Role and Function of Corporate Representatives at Trial," *The Trial Lawyer*, Fall 2012, Volume II, Number IV (pages 34-37).

72. "Mass Tort Roundtable," *Brook Hollow Review*, Fall Edition 2013, Volume 02, Issue 03 (pages 21-22).

73. Invited to write a paper for the International In-house Counsel Journal. Since 2007, the IICJ has published papers by over 1500 leading in-house counsel on a range of commercial law topics and legal team management with a global readership of over 200,000.

---

# BOOK CHAPTERS

1. Co-author with Professor Thomas C. Galligan, Jr., a chapter in the treatise published by the American Bar Association's Tort, Trial & Insurance Practice Section (***A Practitioner's Guide to Class Actions***). The chapter is titled "MDL's – A Practitioner's Global Positioning Guide."

2. Co-author with Professor Jaime L. Dodge and Eric Holland, a chapter regarding Bellwether Trials in the second edition of the treatise published by the American Bar Association's Tort, Trial & Insurance Practice Section (***A Practitioner's Guide to Class Actions***).

3. Co-author with Professor Thomas C. Galligan, Jr., a chapter in the second edition of the treatise published by the American Bar Association's Tort, Trial & Insurance Practice Section (***A Practitioner's Guide to Class Actions***). The chapter is titled "Multidistrict Litigation."

4.   Co-author with Professor Jaime L. Dodge and Eric Holland, a chapter regarding Bellwether Trials in the third edition of the treatise published by the American Bar Association's Tort, Trial & Insurance Practice Section (*A Practitioner's Guide to Class Actions*).

5.   Co-author with Professor Thomas C. Galligan, Jr., a chapter in the third edition of the treatise published by the American Bar Association's Tort, Trial & Insurance Practice Section (*A Practitioner's Guide to Class Actions*). The chapter is titled "Multidistrict Litigation."

---

# PRESENTATIONS, PAPERS, SPEAKING ENGAGEMENTS

1.   Speaker - Louisiana Judicial College, Sports Torts and Premises Liability, Summer 1991.

2.   Speaker - American Trial Lawyers Association Convention. Topic: "Past, Present and Future; The Admiralty Practice," 1990, San Diego, California.

3.   Speaker - ATLA Annual Convention 1991; Toronto, Canada.

4.   Speaker - ATLA Annual Convention 1992; Washington, D.C.

5.   Speaker - Annual Convention of the American Trial Lawyers Association in Chicago, Illinois, July 1994.

6.   Speaker - Louisiana Trial Lawyer's Association. Topic: "Recent Developments in Admiralty Law," December 29, 1993, Baton Rouge, Louisiana.

7.   Speaker - Southern Trial Lawyers Association Annual Convention. Topic: "Unique Problems Associated with Maritime Personal Injury Claims," June, 1990.

8.   Louisiana Annual Bar Convention/Summer School Speaker - "Recent Tort Developments," June1990.

9.   Crossroads American Inn of Court of Alexandria Pineville Speaker - "Organization and Time Management," September 1990.

10.  Speaker - CLE Seminar on Maritime Law Presented by Lafayette Parish Bar Association, Cypremore Point, "Recent Developments in Maritime Torts," October 1990.

11.  Speaker - 3rd Annual Sandestin Summer School Revisited: "Torts: Did I Miss Anything Last Year," October 1990.

12.  Louisiana State Paralegal Association Seminar co-sponsored by the Alexandria Bar Association, Topic: "New Federal Rules Governing Discovery," September 17, 1993.

13.  Chairman - Louisiana Bar Association's Admiralty Seminar (Litigating Admiralty Claims), Lafayette, October 27, 1993.

14.  Speaker - LSU Law Center "Litigation Strategies," 1993.

15.  Speaker - Louisiana Trial Lawyers Association 1993 "Yours to Choose Seminar," Topic:  "Update on Admiralty," December 29, 1993.

16.  Guest Lecturer  - LSU Law Center, Deposition Practice, March 1, 1994.

17.  Speaker -Shreveport Bar Association, Topic: "Marine Gaming and Maritime Personal Injury," May 13, 1994.

18.   Speaker - Psychological and Hedonic Damages, Louisiana State Bar Association Summer School for Lawyers, June 6, 1994, Destin, Florida.

19.   Moderator - Panel Presentation on Class Actions and Multi-District Litigation, Annual Louisiana State Bar Convention, June 10, 1994, Destin, Florida.

20.   Speaker - Deposition Practice, 17th Post Graduate Summer School for Lawyers, LSU Law Center, Baton Rouge, Louisiana, July 11, 1994.

21.   Speaker – Panel Presentation concerning issues and problems associated with maritime cases, 1994 ATLA Annual Convention, Chicago, Illinois, July 25, 1994.

22.   Faculty Member - 1994 Trial Advocacy Program - LSU Law Center, Baton Rouge, Louisiana, August 15-17, 1994.

23.   Seminar Chairman and Moderator - Admiralty Symposium -  Louisiana State Bar Association - Lafayette, Louisiana, September 16, 1994.

24.   Speaker - Tulane Law School - Maritime Law in the 90's Seminar, New Orleans, Louisiana, September 30, 1994.  Topic:  Post-Miles Maritime Worker Remedies.

25.   Guest lecturer - LSU Law Center - Admiralty Court - Professor Frank Maraist - Topic:  Plaintiffs' Maritime Practice Overview.

26.   Chairman - 1995 Louisiana State Bar Association Annual Meeting, Section on Insurance, Negligence, Workers' Compensation and Admiralty Law Program: Billiot; Tort Immunity Inroads, Destin, Florida, June 9, 1995.

27.   ATLA Admiralty Section Program Coordinator and Moderator - 1995 ATLA Annual Convention - New York, New York, July 17, 1995.

28.   Seminar Chairman and Moderator - Louisiana Bar Association Admiralty Seminar - New Orleans, Louisiana, Fall 1995.

29.   Faculty member - Trial Advocacy Program at LSU, August 12-14, 1996, Baton Rouge, Louisiana.

30.   Seminar Chairman and Moderator - Louisiana State Bar Association's Fourth Annual Admiralty Symposium, September 6, 1996, New Orleans, Louisiana.

31.   Program Chair - Section on Insurance, Negligence, Workers' Compensation and Admiralty Section of the Louisiana State Bar Association; June 6, 1997; "Paul Revere Tour of Louisiana Personal Injury Law"; participated in Panel Presentation with Federal District Judges, G. Thomas Porteous, Jr. and Richard T. Haik in Sandestin, Florida.

32.   Faculty - LSU Trial Advocacy Program (Louisiana State University Law Center) August 11-13, 1997.

33.   Panelist - Tulane  "6th Fall Maritime Law Seminar - September 26, 1997, New Orleans, Louisiana. Topic - Ethics, Mediation and the Maritime Lawyer.

34.   Seminar Chairman and Moderator - Louisiana State Bar Association's Fifth Annual Admiralty Symposium, September 5, 1997, New Orleans, Louisiana.

35.   Speaker - 1997 Catch the Falling Leaves CLE Seminar - Asheville, North Carolina - November 1-3, 1997, Topic - Jurors in Modern Litigation; the Use of Consultants and Questionnaires.

36.     Program Chair - Section on Insurance, Negligence, Workers' Compensation and Admiralty Section of the Louisiana State Bar Association;  participated in Panel Presentation with Federal District Judges, G. Thomas Porteous, Jr. and Richard T. Haik and Professor Thomas Galligan,  Topic: "Torts and Admiralty:  What's Been Happening in the Last Year While You've Been Practicing Law," June 12, 1998, Destin, Florida.

37.     Seminar Chairman and Moderator - Louisiana State Bar Association's Sixth Annual Admiralty Symposium, September 11, 1998, New Orleans, Louisiana.

38.     Faculty - 7th Fall Maritime Law Seminar - September 25, 1998 - New Orleans, Louisiana.

39.     Speech - St. Mary Parish Bar Association - Topic:  "Maritime Experts and Recent Admiralty Developments" - November 9, 1998.

40.     Program Chair - Section on Insurance, Negligence, Workers' Compensation and Admiralty Section of the Louisiana State Bar Association;  participated in Panel Presentation with Federal District Judges, G. Thomas Porteous, Jr. and Richard T. Haik and Professor Thomas Galligan,  Topic: "Torts and Admiralty:  What's Been Happening in the Last Year While You've Been Practicing Law," June 11, 1999, Destin, Florida.

41.     Seminar Chairman and Moderator - Louisiana State Bar Association's Seventh Annual Admiralty Symposium, September 10, 1999, New Orleans, Louisiana.

42.     Faculty - Mealey's Judges & Lawyers in Complex Litigation: Class Actions, Mass Torts, MDL and the Monster Case Conference - November 8-9, 1999, West Palm Beach, Florida.

        Moderator - Managing Counsel:  Organization, Payments And Ethical Issues
        •   Considerations in appointing steering committees
        •   The judge's role regarding attorney fee disputes
        •   Fee reductions in awarding attorney fees
        •   Ethical issues for judges in statewide MDLs

        Speaker - Experts
        •   The Court's role under *Daubert* and *Frye*
        •   Court-appointed experts
        •   Effect of Kumho Tire on use of experts
        •   Lawyers' strategies in selecting experts - number, type, etc.
        •   How judges assess the reliability of non-scientific experts

43.     Program Chair - Section on Insurance, Negligence, Workers' Compensation and Admiralty Section of the Louisiana State Bar Association; Panel Presentation with Federal District Judges, G. Thomas Porteous, Jr. and Richard T. Haik, Dean Thomas Galligan, and Albert George "Alec" Alexander.  Topic: "Torts and Admiralty:  What's Been Happening in the Last Year While You've Been Practicing Law," June 9, 2000, Destin, Florida.

44.     Seminar Chairman and Moderator - Louisiana State Bar Association's Eighth Annual Admiralty Symposium, September 8, 2000, New Orleans, Louisiana.

45.     Seminar Chairman - Louisiana State Bar Association's Class Action/Mass Tort Symposium, October 27, 2000, New Orleans, Louisiana.

46.     Panelist - Louisiana State Bar Association's Ethics 2000 Conference "New Rules for a New Era," December 1, 2000, New Orleans, Louisiana.

47.     Panelist - Mealey's Propulsid Litigation Conference, January 22, 2001, New Orleans, Louisiana; Topic: Update on the MDL and Class Actions (Discovery).

48.     Panelist - Southern University Law Center - Winning Million Dollar Cases - The Anatomy of a Mass Tort Case, March 31, 2001, Baton Rouge, Louisiana.

49.     Panelist - Mealey's Propulsid Litigation: Preparing for Trial, June 15, 2001, New Orleans, Louisiana.  Topic: Impressions From the Field: Panel Discussion on Experiences in Propulsid Cases and Latest Developments in the Litigation.

50.     Program Chair - Section on Insurance, Negligence, Workers' Compensation and Admiralty Section of the Louisiana State Bar Association; Panel Presentation with Federal District Judges, G. Thomas Porteous, Jr. and Richard T. Haik, Dean Thomas Galligan, and Albert George "Alec" Alexander.  Topic: "Torts and Admiralty:  What's Been Happening in the Last Year While You've Been Practicing Law," June 8, 2001, Destin, Florida.

51.     Speaker - Propulsid Products Liability Litigation - MDL Seminar held August 2, 2001.  Presentation on "State Liaison Committee - Structure and Mission."

52.     Seminar Chairman and Moderator - Louisiana State Bar Association's Ninth Annual Admiralty Symposium, September 7, 2001, New Orleans, Louisiana.

53.     Seminar Chairman - Louisiana State Bar Association's Class Action/Mass Torts Symposium, October 26, 2001, New Orleans, Louisiana.

54.     Invited Speaker - Mass Torts Made Perfect, Inc. Seminar - November 1, 2001   Topic: "PPA Litigation - MDL Activity," Las Vegas, Nevada.

55.     Invited Speaker - Louisiana Judicial College 2001 Annual Torts Seminar - December 14, 2001  - New Orleans, Louisiana.  Topic: "Certification of the Class Action; Subclasses, and Management of Class Actions."

56.     Invited Speaker - Mealey's Conference on Baycol Litigation-  January 14-15, 2002 -  San Diego, California  Topic: "Litigation Update - What are the Latest Developments in the Class Action?  Who is in the Class? Who is Out?  Status of the MDL and Medical Monitoring Claims."

57.     Invited Speaker - ATLA Convention - Mid-Winter Meeting - Propulsid Litigation Group - February 11, 2002, Miami, Florida.  Topic: "Federal/State Cooperation."

58.     Co-Chairman - Mealey's Conference on Baycol Litigation, May 2-3, 2002, Pasadena, California.

59.     Invited Speaker - Louisiana Judicial College, June 25, 2002, San Destin, Florida  Topic: "Role of the Judiciary in the Management of Class Actions."

60.     Program Chair - Section on Insurance, Negligence, Workers' Compensation and Admiralty Section of the Louisiana State Bar Association; Panel Presentation with Federal District Judges, G. Thomas Porteous, Jr. and Richard T. Haik, Dean Thomas Galligan, and Albert George "Alec" Alexander.  Topic: "Torts and Admiralty:  What's Been Happening in the Last Year While You've Been Practicing Law," June 28, 2002, San Destin, Florida.

61.     Seminar Chairman and Moderator - Louisiana State Bar Association's 10th Annual Admiralty Symposium, September 6, 2002, New Orleans, Louisiana.

62.     Invited Speaker - Mass Torts Made Perfect - Drug Litigation Seminar, September 12-13, 2002 Atlantis - Paradise Island, Bahamas   Topic: "Trial Preparation - Baycol."

63.     Seminar Chairman - Louisiana State Bar Association's 3rd Annual Class Action/Mass Tort Symposium, October 25, 2002, New Orleans, Louisiana.

64.     Invited Speaker - Baycol Trial Preparation and Current Settlement Activity Seminar, December 5- 6, 2002 Miami, Florida. Topics: Trial & Testimony Evidence; Bayer & GSK Liability; and Bayer & GSK Punitive Conduct.

65.     Invited Speaker - Needles Mass Tort Seminar – Bahamas, December 6, 2002. Topic: Baycol Litigation: Trial Preparation.

66.     Invited Speaker - The Federal Judicial Center's Workshop for Judges of the Fifth Circuit - April 3, 2003 - New Orleans, Louisiana.   Topic: Managing Class Action/Mass Tort Cases.

67.     Invited Speaker - L.A. Baycol Seminar (Trial Preparation Seminar), April 24, 2003, Los Angeles, CA Topics: Trial & Testimony Evidence, Overall Trial Strategy - Mock Trial/Focus Groups.

68.     Invited Speaker - Mealey's Baycol Litigation Conference, June 2-3, 2003 Amelia Island, Florida Topic: Update on Discovery.

69.     Program Chair - Section on Insurance, Tort, Workers' Compensation and Admiralty Section of the Louisiana State Bar Association; Panel Presentation with Federal District Judges, Richard T. Haik and Jay C. Zainey, Dean Thomas Galligan, & Joseph Guilbeau.  Topic: "Torts and Admiralty:  What's Been Happening in the Last Year While You've Been Practicing Law," June 13, 2003, San Destin, Florida.

70.     Invited Seminar Chairman and Moderator - Louisiana State Bar Association's 11th Annual Admiralty Symposium, September 5, 2003, New Orleans, Louisiana.

71.     Invited Speaker - Louisiana Bar Association's Environmental Litigation Seminar, Nuts & Bolts of Environmental Litigation.  Topic: "The Class Action in Environmental Litigation," September 19, 2003, New Orleans.

72.     Invited Seminar Chairman and Moderator - Louisiana State Bar Association's 4th Annual Class Action/Mass Tort Symposium, October 24, 2003, New Orleans, Louisiana.

73.     Invited Speaker - Mass Torts Made Perfect Seminar  Topic: "Baycol Pharmaceutical Litigation Status and Strategy," November 6 & 7, 2003, New Orleans.

74.     Invited Speaker - Louisiana State University's Maritime Personal Injury Seminar, Topic: "Creative Settlements," November 13, 2003, Baton Rouge.

75.     Moderator - Mass Torts Made Perfect Symposium - Topics included Medical Devices, Pharmaceuticals, Predatory Lending, San Francisco, March 18 & 19, 2004; Featured Speakers: Eliot Spitzer and Al Franken.

76.     Moderator - Practice Made Perfect:  "Protecting Your Practice in a Changing World," Atlantis, Paradise Island, Bahamas,  June 10 & 11, 2004.

77.     Organized presentation for the Section on Insurance, Tort, Workers' Compensation and Admiralty Section of the Louisiana State Bar Association's Panel Presentation with Federal District Judges, Richard T. Haik, G. Thomas Porteous, Jr., and Dean Thomas Galligan.  Topic: "Torts and Admiralty:  What's Been Happening in the Last Year While You've Been Practicing Law," June 11, 2004, San Destin, Florida.

78.     Faculty Member -  LSU Trial Advocacy  Training Program, Aug 9-11, 2004.

79.     Seminar Chairman and Moderator - Louisiana State Bar Association's 12th Annual Admiralty Symposium, September 3, 2004, New Orleans, Louisiana.

80.  Invited Speaker - Louisiana State Bar Association's Insurance Oscars: Award-winning Strategies for Dealing with Insurance Issues; Seminar Topic: Monster (Coverage Questions) -- Multi-headed, Multi-complex, Multi-year, Multi- policy Litigation Panel; October 1, 2004, New Orleans.

81.  Seminar Chairman and Moderator - Louisiana State Bar Association's 5th Annual Class Action/Mass Tort Symposium, October 22, 2004, New Orleans, Louisiana.

82.  Invited Speaker - Mealey's Vioxx Litigation Conference, November 9, 2004, Pasadena, California;

Topic: Alleged Health Effects from the Ingestion of Vioxx
• Vioxx History
• Vioxx Withdrawal Dynamics
• Review of the Clinical Studies
• Daubert Considerations

83.  Guest Speaker - Legal Broadcast Network Radio Show hosted by Jan Schlichtman (lawyer portrayed by John Travolta in "A Civil Action"), Topic: Managing Mass Tort Litigation; November 11, 2004, Las Vegas, Nevada.

84.  Co-Host - Legal Broadcast Network, "Tort Talk." Topic: FDA Whistleblower Names Five Unsafe Drugs: Impact for Mass Torts; December 2, 2004.

85.  Guest Speaker - Legal Broadcast Network, "Lawyer Talk." Topic: Rights at Risk: Can We Win in the Court of Public Opinion?; December 2, 2004.

86.  Co-Host and guest, Legal Broadcast Network. Topic: Pharmaceutical Litigation and Tort Reform. Also appearing was former Congressman and MSNBC TV personality, Joe Scarborough; December 8, 2004.

87.  Speaker - Panel presentation regarding Vioxx liability timeline. Co-panelists included Chris Seeger and Andy Birchfield; December 13, 2004, Washington, D.C.

88.  Co-Host - Legal Broadcast Network, "Tort Talk." Topic: Vioxx Litigation; December 16, 2004.

89.  Guest Speaker - Legal Broadcast Network, "Ask the Experts." Topic: Medicare & Mass Tort Litigation Organization; December 23, 2004.

90.  Co-Host - Legal Broadcast Network, "Tort Talk." Topic: Pharmaceutical Litigation. Appearing as guests were Dr. Jerry Avorn, Harvard M.D. (well-known author of Powerful Medicines; the benefits, risks & costs of prescription drugs); December 23, 2004.

91.  Guest Speaker - Legal Broadcast Network, "Lawyer Talk." Topic: Tort Reform; December 23, 2004.

92.  Co-Host - Legal Broadcast Network, "Tort Talk." Topic: Lawyers Representing Vioxx Victims Plan Their Attack Against Merck, January 21, 2005.

93.  Co-Host - Legal Broadcast Network, "Tort Talk." Topic: The Pain "Killers": How Vioxx, Celebrex, and Bextra Can Relieve You of Life, January 27, 2005.

94.  Invited Speaker - Vioxx Litigation Group Symposium; Topic: Vioxx Liability and Science Issues; ATLA Convention, Palm Springs, CA, January, 2005.

95.  Invited Speaker - Louisiana State Bar Association's Multi Topic CLE Seminar, Florida, February 7 9, 2005 Topic: Personal Injury Practice; Practical Suggestions.

96.     Moderator - Complex Litigation Seminar in New York,  March 17, 2005.  Featured speakers included Robert F. Kennedy, Jr., Jan Schlichtmann, and Eliot Spitzer.

97.     Guest Speaker, Legal Broadcast Network, "Tort Talk."  Topic: Issues surrounding the Vioxx litigation; March 17, 2005.

98.     Invited Speaker - LSU Law School Environmental Law Roundtable; Topic: Effect of Federal Class Action Statute on Louisiana Class Action Practice, April 19, 2005.  Co-panelists include Honorable  Richard Haik, Chief Judge, U.S. District Court, Western  District of Louisiana; Edward Sherman, Professor of Law and Dean-Emeritus, Tulane Law School; David M. Bienvenue, Jr., Taylor Porter Brooks & Phillips; and  William Jarman, Kean Miller Hawthorne Darmond McCowan & Jarman.

99.     Invited to be a guest on the "Special Tribute to America's Best Lawyers" show on the American Airlines Business program broadcast exclusively on the "Forbes Radio" channel.

100.    Interviewed by Jan Schlichtmann for the Legal Broadcast Network regarding the Vioxx MDL status conference, April 28, 2005.

101.    Invited Guest and Speaker - 2005 Judicial Conference of the Fifth Circuit, New Orleans, May 2-4, 2005 Topic: Voir Dire/Practices and Policies.

102.    Invited to make presentation regarding scientific literature, American Trial Lawyers' Association Vioxx Mock Trial Seminar, May 19, 2005, New Orleans.

103.    Seminar Co-Chair,  Mealey's Bextra/Celebrex Litigation Conference, May 11, 2005, Chicago, Illinois.

104.    Invited Speaker - HarrisMartin's Bextra Litigation Conference, May 18, 2005, New Orleans, Louisiana. Topic: Bextra Litigation History and Timeline.

105.    Speaker - Mealey's Vioxx Litigation Conference, June 22, 2005, New Orleans, Louisiana.  Topic: Vioxx: A Factual Overview.

106.    Interviewed by Jan Schlichtmann regarding Vioxx litigation, Guidant implanted defibrillators, and Medtronic recall of heart pacing devices, August 1, 2005.

107.    Speaker - ATLA Heart Device Litigation Group Seminar, September 15, 2005, Las Vegas, Nevada.  Topic: Timeline of Key Events.

108.    Speaker - ATLA Trends and Hot Topics in Pharmaceutical Litigation Seminar, September 16-17, 2005, Las Vegas, nevada.  Topic: Guidant and Medtronic Update.

109.    Interviewed by Jan Schlichtmann on the Legal Broadcast Network. Topic: Recent MDL Developments; October 11, 2005.

110.    Speaker - Louisiana State University School of Law, ethics panel presentation with Federal District Judge Frank J. Polozola & District Judge Hadley Ward Fontenot, October 14, 2005.

111.    Invited Speaker - Mealey's Heart Device Litigation Conference, October 27, 2005, Las Vegas.

112.    Invited Co-Chair - Mealey's Vioxx - the Ernst Jurors Speak - Teleconference, November 2, 2005.

113.    Speaker - HarrisMartin Cox-2 Litigation Conference, Topic: Bextra Liability Overview &Timeline, San Francisco,  November 3, 2005.

114.    Invited Speaker - American Bar Association's The Future of Class Action Litigation in America Seminar, Topic: Class Actions and MDLs – Hot Topics in Class Actions, Keynote Speaker, Senator Orrin Hatch, November 11, 2005, Washington, D.C.

115.    Moderator and Invited Speaker - Mass Torts Made Perfect A Win, Wynn Situation Seminar; topic: "As a Small Office, Learn How to Make Money in Big Projects without Going Broke," Las Vegas, Nevada, November 17-18, 2005.

116.    Invited Speaker - Mealey's Vioxx Litigation Conference, Topic: Motions in Limine and Daubert Issues Associated with the Vioxx Litigation, Las Vegas, December 12 & 13, 2005.

117.    Invited Speaker - ATLA Heart Device Litigation Group Meeting; Topic: MDL Status and Associated Organizational Issues; Minneapolis, MN, December 15, 2005.

118.    Invited Speaker - Class Actions in the Gulf South and Beyond Seminar, February 3-4, 2006, Tulane University, Tulane Law School, New Orleans, LA.

119.    Invited Speaker - ATLA Cox-2 Seminar, Topic: Bextra Litigation, Honolulu, Hawaii, February 20, 2006.

120.    Speaker - Propulsid II Settlement Seminar, Topic: Administrative Claims, February 23, 2006, Jackson, MS.

121.    Invited Co-Chair - Mealey's Vioxx Litigation Conference - Amelia Island, Florida - May 8-9, 2006 and Moderator of the Judicial Panel  Topic: Perspectives from the Bench.  Panelists Hon. Wilson, Hon. Duval & Patrick Juneau.

122.    Invited Speaker - ATLA Heart Device Litigation  Group Seminar, Topic: The Guidant Liability Case Discovery Update for the Guidant Litigation, May 12, 2006, Washington, D.C.

123.    Invited Speaker - ATLA Ortho Evra Litigation Group Seminar, Topic: Liability Issues, May 12, 2006, Washington, D.C.

124.    Faculty Member - 2006 Trial Advocacy Program, LSU Law Center, August 7-9, 2006.

125.    Seminar Chairman and Moderator - Louisiana State Bar Association's 13th Annual Admiralty Symposium, September 1, 2006, New Orleans, Louisiana.

126.    Invited Speaker - Tulane's 22nd New Orleans Fall Maritime Law Seminar  Topic:  Motions: Challenging the Evidence and Shifting the Forum: Challenging Electronic and Simulator Evidence, Expert Testimony and Motions to Shift Forums, September 8-9, 2006, New Orleans, LA.

127.    Speaker - Mealey's Teleconference, "How to Get on an MDL Committee, September 15, 2006.

128.    Moderator and Speaker - Mass Torts Made Perfect Complex Litigation Seminar, October 12 & 13, 2006, Las Vegas.  Featured speakers included former President Bill Clinton.

129.    Seminar Chairman and Moderator - Louisiana State Bar Association's 6th Annual Class Action/Mass Tort Symposium, October 20, 2006, New Orleans, Louisiana.

130.    Speaker - ATLA's Protecting the Public: Pharmaceutical and Medical Device Seminar, Topic: Bausch & Lomb State Court Update, November 16, 2006, Las Vegas.

131.    Speaker - ATLA's Protecting the Public: Pharmaceutical and Medical Device Seminar, Topic: Heart Device Litigation: Guidant and Medtronic,  November 17-18, 2006, Las Vegas.

132. Invited Speaker - 21st Annual Federal Practice & Advocacy Seminar, Topic: Electronic Discovery, Creative Litigation Exit Strategies, February 8, 2007, New Orleans, Louisiana.

133. Speaker - ATLA Convention, Heart Device Litigation Group Meeting, Topic: Medtronic Discovery, February 12, 2007, Miami, Florida.

134. Speaker - ATLA Convention, Renu Litigation Group Meeting, Topic: State Court Litigation and Proceedings, February 13, 2007, Miami, Florida.

135. Invited Speaker - LSU's 5th Judge Alvin B. Rubin Conference on Maritime Personal Injury Law, Topic: Should the Rising Tides Wash Away the U.S. Corps of Engineers' Immunity? (Did the storm surge up the MRGO expose a potential hole in the Corps' Protection?), March 2, 2007, LSU Law Center, Baton Rouge, Louisiana.

136. Moderator - Mass Torts Made Perfect, "Changing Times, Changing Politics. Is your Firm Ready?" Seminar, March 29-30, 2007, Las Vegas, key note speakers to include Robert F. Kennedy, Jr.

137. Invited Speaker - Mealey's Drug & Medical Device Litigation Conference, Topic: Preemption, May 3, 2007, San Diego, California.

138. Speaker - Louisiana State Bar Association's 2007 Summer School for Lawyers, Topic: Class Action Fairness Act; It's Application and Practical Implication, June 5, 2007, San Destin, Florida.

139. Invited Speaker - Harris Martin's Hot Topics in Pharmaceutical Litigation Conference, June 7-8, 2007, Miami Beach, Florida.

140. Program Chair - Section on Insurance, Tort, Workers' Compensation and Admiralty Section of the Louisiana State Bar Association's Panel Presentation with Federal District Judges, June 8, 2007, San Destin, Florida. Topic: Torts and Admiralty: What's Been Happening in the Last Year While You've Been Practicing Law.

141. Seminar Chairman and Moderator - Louisiana State Bar Association's 14th Annual Admiralty Symposium, September 7, 2007, New Orleans, Louisiana.

142. Seminar Chairman and Moderator - Louisiana State Bar Association's 7th Annual Class Action/Mass Tort Symposium, October 19, 2007, New Orleans, Louisiana.

143. Speaker - ABA Conference on Class Actions, October 25, 2007, Washington, D.C. Topic: The Increasing Central Role of Bellwether Trials and MDL's.

144. Invited Moderator – Teleseminar, November 1, 2007. Topic: American Association for Justice Education More Medtronic Recalls: What's the Impact on Your Clients?

145. Speaker - Whatley Drake & Kallas Complex Litigation, Mass Torts & Class Actions CLE Summit, November 1 - 3, 2007, Birmingham, Alabama. Topic: Mass Torts.

146. Moderator - Mass Torts Seminar, November 8-9, 2007, Las Vegas, Nevada. Key note speaker: Dan Rather.

147. Speaker - Louisiana State Bar Association's New York, New York, Multi-Topic Seminar, November 18, 2007, New York, New York. Topic: Navigating Complex Litigation, Class Actions and MDL's ... An Overview from Inception to Exit Strategies (And the Chaos in Between).

148. Invited Speaker - Louisiana State Bar Association's Summer School Revisited, Dececember 13, 2007, New Orleans, Louisiana. Topic: Class Action Fairness Act - Its Application and Practical Implications.

149.    Speaker - ATLAS 2008 Seminar, February 7, 2008, Palm Beach Gardens, Florida. Topic: Evaluating Mass Tort Litigation.

150.    Speaker -  Tulane Law Review Symposium on Multidistrict Litigation, February 15-16, 2008, Tulane Law School, New Orleans, Louisiana. Topic:  Bellwether Trials and Settlement Devices.

151.    Attended the American Conference Institute's Food Borne Illness Litigation Seminar, Feb. 28-29, 2008, Scottsdale, Arizona.

152.    Program Chair - Section on Insurance, Tort, Workers' Compensation and Admiralty Section of the Louisiana State Bar Association's Panel Presentation with Federal District Judges, June 13, 2008, San Destin, Florida. Topic: Torts and Admiralty:  What's Been Happening in the Last Year While You've Been Practicing Law.

153.    Invited Speaker - AAJ 2008 Annual Convention, July 12-16, 2008, Philadelphia, Pennsylvania. Topic: Does Daubert Apply to Class Certification?

154.    Seminar Chairman and Moderator - Louisiana State Bar Association's 15th Annual Admiralty Symposium, September 5, 2008, New Orleans, Louisiana.

155.    Invited Speaker – AAJ Pharmaceutical Seminar, September 12, 2008, Las Vegas, Nevada. Topic: Hot Topic Litigation Update.

156.    Seminar Chairman and Moderator – Louisiana State Bar Association's 8th Annual Class Action/Mass Tort Symposium, October 17, 2008, New Orleans, Louisiana.

157.    Program Chair – Section on Insurance, Tort, Workers' Compensation and Admiralty Section of the Louisiana State Bar Association's Panel Presentation with Federal District Judges, June 12, 2009, San Destin, Florida. Topic: Torts and Admiralty - What's Been Happening in the Last Year While You've Been Practicing Law.

158.    Invited Speaker – Federal Bar Association seminar,  Panel Presentation with U.S. District Court Chief Judge James M. Rosenbaum of the District of Minnesota, Topic:  Preemption, June 24, 2009, Minneapolis, Minnesota.

159.    Faculty Member – 2009 Trial Advocacy Program - LSU Law Center, Baton Rouge, Louisiana, August 10-12, 2009.

160.    Seminar Chairman and Moderator – Louisiana State Bar Association's 16th Annual Admiralty Symposium, September 18, 2009, New Orleans, Louisiana.

161.    Seminar Chairman and Moderator – Louisiana State Bar Association's 9th Annual Class Action/Mass Tort Symposium, October 16, 2009, New Orleans, Louisiana.

162.    Speaker – AAJ 2010 Annual Convention, July 10-14, 2010; Topic: *Iqbal/Twombley* at the End of Notice Pleadings; Vancouver, BC, Canada.

163.    Speaker – Louisiana State Bar Association's 9th Annual Class Action/Mass Tort Symposium, October 16, 2009, New Orleans, Louisiana, Mass Foodborne Illness Torts; How Are Your Individual and Commercial Clients Impacted by Recalls?

164.    Interviewed by Jennifer Yang for Toronto Star regarding Stork Craft Crib recall lawsuit, November 25, 2009.

165.    Speaker – LSBA 21st Annual Summer School Revisited; Topic: Recent Maritime Developments; December 10-11, 2009, New Orleans, Louisiana.

166. Seminar Chairman– HarrisMartinToyota Recall Litigation Conference, March 24, 2010, San Diego, California. The following press was in attendance: Associated Press, San Diego Tribune, Reuters, Wall Street Journal, Nippon Television (Japan), Local ABC, NBC and CBS affiliates, Los Angeles Times, Automotive News, CBS Radio Los Angeles, KPBS San Diego News, Fox News and NBC-San Diego.

167. Interviewed by Nippon Television (Japan) at the HarrisMartinToyota Recall Litigation Conference, March 24, 2010, San Diego, California.

168. Interviewed by Amanda Bronstad with the National Law Journal, March 15, 2010. Topic: Toyota Recall.

169. Interview requested by Susan Li with Bloomberg TV, April 6, 2010. Topic: Toyota Recall.

170. Seminar Chairman – HarrisMartinToyota Recall Litigation Conference Part II, May 12, 2010, Costa Mesa, California.

171. Interviewed by Sebastian Walker with Al Jazeera English TV News, May 3, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

172. Interviewed by Bard Aune with BBC Radio, April 30, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

173. Interviewed by Russell Trott, BBC World News TV, April 30, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

174. Interviewed by Amanda Bronstad with the National Law Journal, May 6, 2010. Topic: Toyota Recall, HarrisMartinToyota Recall Litigation Conference Part II.

175. Interviewed by Graham Messick with CBS News, 60 Minutes, May 8, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

176. Interviewed on multiple occasions by National Correspondent Ian Urbina with The New York Times. Topic: Deepwater Horizon Drilling Rig Explosion.

177. Interviewed by Wade Goodwyn with National Public Radio on May 10, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

178. Interviewed by Ciaran McEvoy with Los Angeles Daily Journal on May 14, 2010. Topic: Toyota Recall, Appointment to Economic Loss Committee.

179. Seminar speaker – LSBA Annual Meeting on June 11, 2010, Sandestin, Florida. Topic: Recent Tort and Maritime Developments Including the Gulf Coast Oil Spill Litigation.

180. Seminar speaker – AAJ Annual Convention on July 10, 2010, Vancouver, Canada. Topic: Twombley/Iqhbar: The End of Notice Pleadings.

181. Seminar speaker – AAJ Annual Convention on July 12, 2010, Vancouver, Canada. Topic: Foodborne Illness 101.

182. Chair of educational meeting at AAJ Annual Convention on July 14, 2010, Vancouver, Canada. Topic: Gulf Coast Oil Spill Litigation Group.

183. Chair of LSBA Annual Meeting Gulf Coast Oil Spill Litigation Meeting on June 11, 2010, Sandestin, Florida.

184. Interviewed by Businessweek on May 25, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

185.    Interviewed by The Miami Herald on May 25, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

186.    Interviewed by The Wall Street Journal on May 24, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

187.    Interviewed by Kim Taylor-Galway with CBC on May 26, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

188.    Interviewed by Joe Johns with CNN on June 2, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

189.    Interviewed by Gabe Friedman with Los Angeles Daily Journal on June 15, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

190.    Co-Chair of LSBA Annual Meeting on June 10, 2010, Sandestin, Florida. Co-panelists include Chief Justice Pascal Calogero, Judge Robert Klees, Judge Ward Fontenot, Judge Ronald Cox and Professor Tom Galligan. Topic: Louisiana's Judiciary and Mass Torts, Class Actions and Complex Litigation.

191.    Interviewed by Stacey Vanek-Smith for NPR Market Watch on June 7, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

192.    Interviewed by Kimberly Kindy for Washington Post on July 21, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

193.    Interviewed by Dan Froomkin for Huffington Post on July 14, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

194.    Interviewed by Thorsten Schroder for New York German Press on July 19, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

195.    Interviewed by Romain Raynaldy for Agence France-Presse (AFP) on July 27, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

196.    Interviewed by Carol Williams for the Los Angeles Times on July 23, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

197.    Interviewed by Michael Saba with CBC Montreal on July 28, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

198.    Interview requested by Pierre Rene with Excelsior Newspaper on August 10, 2010. Topic: Deepwater Horizon Drilling Rig Explosion.

199.    Speaker - J&J DePuy Hip Recall Litigation Conference on November 17, 2010 in Durham, North Carolina. Topic: MDL Status Update; Examining Where Cases are Filed and in What Number, Comparing Venues, Predicting the JPMDL's Decision.

200.    Moderator - 2011 AAJ Winter Convention on February 5-9, 2011 in Miami, Florida. Theme: Gulf Coast Oil Spill and DePuy Hip Implant Recall.

201.    Speaker - Louisiana State Bar Association's 10th Annual Class Action/Mass Tort Symposium, December10, 2010, New Orleans, Louisiana, Mass Foodborne Illness Torts; How Are Your Individual and Commercial Clients Impacted by Recalls?

202.    Chairman, HarrisMartin Darvon and Darvocet Recall Litigation Conference, January 14, 2011, New Orleans, Louisiana.

203.    Co-Chair - HarrisMartin Darvon/DePuy Symposium, March 29, 2011, San Diego, California.

204.  Interviewed by Melissa Maleske with InsideCounsel magazine on February 25, 2011. Topic: Deepwater Horizon Drilling Rig Explosion.

205.  Interviewed by Shelia Kaplan with The Center for Public Integrity on February 23, 2011. Topic: Deepwater Horizon Drilling Rig Explosion.

206.  Speaker - Harris Martin DePuy Pinnacle Hip Implant Litigation Conference, May 15, 2011, Louisville, Kentucky.  Topic: DePuy Pinnacle MDL Status Update.

207.  Co-Chair - HarrisMartin Zimmer Knee and DePuy Hip Symposium, July 27, 2011 in San Francisco, California.  Topic: Discovery Update – ASR and Pinnacle Litigation.

208.  Speaker - Law Seminars International Litigating Class Actions Seminar, October 24-25, 2011 in Chicago, Illinois. Topic: Privilege Logs, Litigation Holds, Electronic Discovery.

209.  Invited Speaker – LSU Seminar Litigation & Liability in the Workplace on September 23, 2011 in Baton Rouge, Louisiana. Topic: Illnesses With Long Latency Periods.

210.  Chair – LSBA Annual Meeting, Insurance, Tort, Workers' Compensation and Admiralty Law Section Seminar on June 30, 2011 in Las Vegas, Nevada.  Topic: What's Been Happening During the Year – While You've Been Practicing Law.

211.  Invited to serve as judge for the 2011-12 Robert Lee Tullis Moot Court Competition, LSU Law Center, Baton Rouge, Louisiana.

212.  Speaker – Actos Teleseminar, September 8, 2011. Topic: Status of Current Litigation.

213.  Seminar Chairman and Speaker - Louisiana State Bar Association's 18th Annual Admiralty Symposium, September 30, 2011, New Orleans, Louisiana.  Topic:  Creative Techniques for Managing Documents.

214.  Speaker – 2012 AAJ Winter Convention, July 28-August 1, 2012, Chicago, Illinois. Topic: Aggregate Settlement Considerations, DePuy MoM Hip Seminar.

215.  Invited Speaker – FJA Workhorse Seminar on March 22, 2012. Topic: What You Need to Know About the New Procedure of 'Trying a Case on the Clock' - Knowing How to Plan and Prepare for This New System - Avoiding Traps That Can Get You and Your Case in a Very Bad Fix! The Psychology of Trial and Persuasion Under This New System (A New System Coming to Your Courthouse Soon!)

216.  Invited Speaker - Law Seminars International Litigating Class Actions Seminar, May 14-15, 2012 in Seattle, Washington. Topic: Privilege Logs, Litigation Holds, Electronic Discovery. Topic:  Developing Trial Strategies and Approaches.

217.  Speaker – 2012 AAJ Winter Convention on February 11-15, 2012 in Phoenix, Arizona. Topic: Actos.

218.  Speaker – 2012 AAJ Annual Convention, DePuy Metal on Metal Hip Implant Litigation Group on July 29, 2012 in Chicago, Illinois.  Topic:  Aggregate Settlement Considerations.

219.  Speaker – First Annual NYSTLA Product Liability & Mass Tort Seminar on April 27, 2012 in New York, New York.

220.  Invited Speaker – Mealey's Webinar, May 16, 2012. Topic: Manufacturers.

221.  Co-Chair - HarrisMartin MDL and Class Action Litigation Conference, July 25, 2012, Cleveland, Ohio.

222. Speaker – Summer Law Clerks & Young Lawyer Seminar, FBA Lafayette-Acadiana Chapter, June 21, 2012 in Lafayette, Louisiana.

223. Chairman – Insurance, Tort, Workers' Compensation & Admiralty Law Seminar, LSBA Annual Joint Summer School and Annual Meeting with Judges Haik, Minaldi, Zainey and Professor Tom Galligan, June 8, 2012 in Destin, Florida.

224. Co-Chair – HarrisMartin Metal on Metal Hip Seminar, September 19, 2012 in New York, New York.

225. Speaker – Law Seminars International Litigating Class Actions Seminar, December 6, 2012 in Chicago, Illinois. Topic: Developing Trial Strategies and Approaches.

226. Speaker – Webinar, Topic: The Supreme Court's War on Consumers: Concepcion, Dukes, and the Near Miss in First American v. Edwards: What the Consumer Practitioner Needs to Know.

227. Moderator – Actos Teleseminar, July 28, 2012. Topic: A Basic Background on Actos Bladder Cancer Litigation.

228. Speaker – LSBA Section CLE Presentation with Val Exnicios, December 18, 2012 in New Orleans, Louisiana. Topic: Navigating Mass Torts, Class Actions and Consumer Litigation: Avoiding Self-Inflicted Wounds.

229. Speaker – AAJ 2013 Annual Convention, DePuy Metal on Metal Hip Implant Litigation Group on July 20-23, 2013 in San Francisco, California. Topic: Aggregate Settlement Considerations.

230. Speaker – AAJ 2013 Annual Convention, Actos Bladder Cancer Litigation Group on July 20-23, 2013 in San Francisco, California. Topic: MDL Status.

231. Chairman and Speaker – LSBA 12th Annual Class Action/Complex Litigation Symposium on November 30, 2012 in New Orleans, Louisiana. Topic: Important MDL Trends: What, When and Why to Argue.

232. Speaker – HarrisMartin's Mass Tort Litigation Conference with Judge Corodemus on March 11, 2013 in New York, New York. Topic: Experience with Experts.

233. Moderator – 2013 Fifth Circuit Judicial Conference on May 5-8, 2013 in San Antonio, Texas. Topic: MDL/Class Action Current Developments.

234. Chairman – HarrisMartin's MDL Conference: Fungal Meningitis, Stryker Hip, Mirena IUD and More, November 28, 2012, in Dallas, TX.

235. Invited Speaker – Duke Law School "The Future of MDL" Conference, May 2 -3, 2013 in Washington, D.C.

236. Speaker – 2013 Fifth Circuit Judicial Conference, May 5-8, 2013 in Fort Worth, Texas. Topic: Navigating the Mine Field of MDL by Implementing Creative Strategies. Topic: Discovery Issues Associated with Electronically Stored Information.

237. Co-Chair – HarrisMartin's Complex Litigation Symposium on May 29, 2013 in Chicago, Illinois. Topic: Actos MDL Status.

238. Moderator and Panelist – Insurance, Tort, Workers' Compensation & Admiralty Law Seminar, LSBA Annual Joint Summer School and Annual Meeting with Judges Brady, Haik, Zainey and Professor Tom Galligan, June 5, 2013 in Destin, Florida.

239. Moderator and Panelist – 20th Annual Admiralty Symposium on September 20, 2013 in New Orleans, Louisiana.

240.  Moderator and Panelist – 13th Annual Class Action / Complex Litigation Symposium on November 22, 2013 in New Orleans, Louisiana

241.  Speaker – 2014 LSU Law Review MDL Symposium in Baton Rouge, Louisiana. Topic: Collaboration of Judges and Attorneys in MDL Case Management. Topic: Integrating Aggregated and Disaggregated Discovery Issues.

242.  Speaker – LSBA 2014 MDL Conference in New Orleans, Louisiana. Topic: Predictive Coding, ESI and Associated Preservation Obligations.

243.  Interviewed by Andrew Ward for the Financial Times regarding the Actos Bellwether trial verdict announced on April 7, 2014.

244.  Speaker – AAJ Plaintiff-Only Hot Topics and Trends in Litigation Seminar in Chicago, Illinois. Topic: 9 Billion dollar Actos MDL Verdict.

245.  Moderator and Panelist – Insurance, Tort, Workers' Compensation & Admiralty Law Seminar, LSBA Annual Joint Summer School and Annual Meeting with Judge Zainey, Judge Africk, and Peggy Giglio, June 4, 2014 in Destin, Florida.

246.  Speaker – HarrisMartin's CLE Summit on Major Developments in Drug & Medical Device Litigation on June 20, 2014 in New Orleans, Louisiana. Topic: Actos – Trial Update, Litigation Landscape, and Settlement News.

247.  Invited Speaker – AAJ 2014 Annual Convention, DePuy Metal on Metal Hip Implant Litigation Group on July 26, 2014 in Baltimore, Maryland. Topic: Litigation Update.

248.  Invited Speaker – AAJ 2014 Annual Convention, Actos Bladder Cancer Litigation Group on July 28, 2014 in Baltimore, Maryland. Topic: Trial Strategies, Motions in Limine, and Juror Reactions – Lessons Learned.

249.  Invited Speaker – Kentucky Justice Association Annual Convention on September 10, 2014 in Cincinnati, OH. Topic: 9 Bases for a $9 Billion Punitive Damage Award.

250.  Moderator and Panelist – 21st Annual Admiralty Symposium on September 19, 2014 in New Orleans, Louisiana.

251.  Moderator and Panelist – 14th Annual Class Action / Complex Litigation Symposium on November 21, 2014 in New Orleans, Louisiana.

252.  Panelist – LSBA Destin Summer School on June 8, 2015 in Destin, Florida. Topic: Family vs. Efficiency.

253.  Moderator – LSBA 2015 Summer School & Annual Convention on June 12, 2015 in Sandestin, Florida. Topic: Important Maritime and Tort Developments (…With Practical Observations from the Bench).

254.  Panelist – AJEFO (Association des Juristes d'Expression Francaise de l'Ontario) Annual Conference on June 26, 2015 in Lafayette, Louisiana. Topic: Class actions with an emphasis on the distinctions between Louisiana class actions law and that of Canada.

255.  Panelist – HarrisMartin's MDL Conference: Morcellator, Fluoroquinolone (FLQ) and Invokana Litigation Agenda, September 30, 2015 in Manhattan, New York. Topic: Actos MDL Litigation Update.

256.  Panelist – HarrisMartin's MDL Conference: Morcellator, Fluoroquinolone (FLQ) and Invokana Litigation Agenda, September 30, 2015 in Manhattan, New York. Topic: Pinnacle MDL Litigation Update.

257.    Panelist – HarrisMartin's MDL Conference: Morcellator, Fluoroquinolone (FLQ) and Invokana Litigation Agenda, September 30, 2015 in Manhattan, New York. Topic: Volkswagen Diesel Fuel Emissions Fraud.

258.    Chairman – HarrisMartin Volkswagen Diesel Fuel Emissions Recall Litigation Conference, October 27, 2015 in Miami Beach, Florida.

259.    Moderator– HarrisMartin Volkswagen Diesel Fuel Emissions Recall Litigation Conference, October 27, 2015 in Miami Beach, Florida. Topic: Managing Complex Litigation and Challenges Presented by the Volkswagen Recall.

260.    Speaker – HarrisMartin Volkswagen Diesel Fuel Emissions Recall Litigation Conference, October 27, 2015 in Miami Beach, Florida. Topic: Volkswagen's Litigation History and Lessons "Not" Learned.

261.    Invited Speaker – Duke School of Law's Multidistrict Litigation Institute on November 9-10, 2015 in Arlington, Virginia.

262.    Chairman – LSBA 15th Annual Class Action/Complex Litigation Symposium, November 13, 2015 in New Orleans, Louisiana.

263.    Moderator – LSBA 15th Annual Class Action/Complex Litigation Symposium, November 13, 2015 in New Orleans, Louisiana. Topic: Does Complex Litigation Complicate Ethics? (And P.S. Ethical Responses to Negative Online Feedback).

264.    Speaker – LSBA 15th Annual Class Action/Complex Litigation Symposium, November 13, 2015 in New Orleans, Louisiana. Topic: The Volkswagen Emissions "Defeat Device" Debacle.

265.    Panelist – HB Litigation Conference's Mass Torts Judicial Forum with Hon. Marina Corodemus (ret.), April 15, 2016 in Manhattan, New York. Topic: Sufficient Proof in Multiple Plaintiff Trials.

266.    Interviewed by Asako Murakami with Japanese weekly magazine, "Shukan Kinyobi" on November 28, 2015. Topic: Actos Litigation.

267.    Chairman – HarrisMartin's MDL Conference: Volkswagen and Pharmaceutical Update, December 2, 2015 in New Orleans, Louisiana.

268.    Moderator – HarrisMartin's MDL Conference: Volkswagen and Pharmaceutical Update, December 2, 2015 in New Orleans, Louisiana. Topic:  Dealing with MDL's and Parallel Universes.

269.    Speaker – HarrisMartin's MDL Conference: Volkswagen and Pharmaceutical Update, December 2, 2015 in New Orleans, Louisiana. Topic:  Update on Current MDL's: Pinnacle Hip Implant, Benicar, Onglyza, Power Morcellator, Actos, FLQ's Zofran, Xarelto, Medtronic Infuse and Bard IVC.

270.    Speaker – HarrisMartin's MDL Conference: Volkswagen and Pharmaceutical Update, December 2, 2015 in New Orleans, Louisiana. Topic:  Volkswagen's Litigation History and Lessons "Not" Learned.

271.    Faculty Member – Mass Torts Judicial Forum with Hon. Marina Corodemus (ret.), April 15, 2016 in New York, New York. Subject: Sufficient Proof of Injury in Multiple-Plaintiff Trials.

272.    Co-Chair – HarrisMartin's MDL Conference: "Bet the Company" Mass Tort Litigation Conference, May 25, 2016 in Chicago, Illinois.

273.    Speaker at a pharmaceutical/medical device complex litigation HarrisMartin Symposium on July 27, 2016 in Seattle, Washington addressing the topic of processing mass torts with multi-plaintiff trials.

274. Panelist at Duke Law School's invitation-only conference on emerging issues in MDLs in Washington, DC on October 27-28, 2016 addressing the recourse of participating MDL lawyers dissatisfied with decisions of Co-Lead Counsel and PSC.

275. Speaker – Masters of Mass Tort inaugural seminar, January 18, 2017, Cancun, Mexico. Topic: Pinnacle MDL.

276. Speaker – Masters of Mass Tort inaugural seminar, January 19, 2017, Cancun, Mexico. Topic: The Role Within and Politics of Plaintiffs Steering Committees.

277. Interviewed by Amanda Bronstad with The National Law Journal on August 1, 2016. Topic: Remington Arms Litigation.

278. Seminar Chair – 23rd Annual Admiralty Symposium on September 16, 2016 in New Orleans, Louisiana.

279. Invited Speaker – Emory Law School Federal Judicial Center/Judicial Panel on Multidistrict Litigation Conference, December 2016.

280. Interviewed by Stanford Law School regarding court-imposed trial limits, 2017.

281. Participation in the Plaintiffs' Forum on Mass Tort Litigation, November 7, 2017 by invitation only. The Steering Committee invites only those they believe are sufficiently experienced and confident enough to share their personal insights, perspectives and experiences on this subject matter.

282. Co-Chairman – HarrisMartin's MDL Conference: "Opioid, Equifax & Talcum Powder," November 29, 2017 in St. Louis, Missouri.

283. Speaker – HarrisMartin's MDL Conference: "Opioid, Equifax & Talcum Powder," November 29, 2017 in St. Louis, Missouri. Topic: The Increasing Role and Diverse Functions of Special Masters Managing Mass Torts.

284. Speaker – HarrisMartin's MDL Conference: "Opioid, Equifax & Talcum Powder," November 29, 2017 in St. Louis, Missouri. Topic: Mass Tort Updates: Roundup, Onglyza, PPI, Hernia Mesh, Pinnacle and More.

285. Speaker – Masters of Mass Tort Conference, January 17, 2018 in Cancun, Mexico. Topic: Why Mass Torts Make Sense as a Compliment to Your Existing Personal Injury or Med Mal Practice.

286. Speaker – Masters of Mass Tort Conference, January 17, 2018 in Cancun, Mexico. Topic: Key Issues to Consider When Entering a Mass Tort.

287. Speaker – Masters of Mass Tort Conference, January 17, 2018 in Cancun, Mexico. Topic: Tales from the Trenches and Lessons Learned in Mass Tort Litigation: Onoing Lessons in Pinancle.

288. Speaker – Tulane Law School course, April 12, 2018 in New Orleans, Louisiana. Topic: "Cause Lawyering," which is an exploration of how lawyers in different fields use the law to effect change or promote justice.

289. Speaker – HarrisMartin's Conference, April 25, 2018 in Laguna Niguel, California. Topic: Talcum Powder Ovarian Cancer Litigation.

290. Co-Chairman – HarrisMartin Symposium, May 30, 2018 in Chicago, IL. "Bet the Company" Mass Torts: A Comprehensive Analysis of Key Mass Tort Litigation Nationwide Along With Game-Changing Jurisprudential Developments.

291. Seminar Chair – 25th Annual Admiralty Symposium on September 14, 2018 in New Orleans, Louisiana.

292. Seminar Chair – HarrisMartin Conference, September 26, 2018 in San Francisco, California.

293.    Seminar Chair – 18th Annual Class Action/Complex Litigation Symposium, November 9, 2018 in New Orleans, Louisiana.

294.    Seminar Chair – HarrisMartin Conference, November 28, 2018 in New York, New York.

295.    Seminar Chair – HarrisMartin's Conference: "The Mass Tort Litigation Landscape; A Critical Analysis," September 26, 2018 in Napa, California.

296.    Speaker – Perrin National Asbestos Litigation Conference, October 2, 2018 in San Francisco, California. Topic: "The Use of Focus Groups in Pre-Trial – Gaining Valuable Information from Multiple Focus Groups."

297.    Seminar Co-Chair – HarrisMartin's MDL Conference: "Current Mass Torts from E-Discovery Through Exit Strategies – Navigating 'Game-Changing' Dynamics," November 28, 2018 in New York, NY.

298.    Moderator – HarrisMartin's MDL Conference: "Current Mass Torts from E-Discovery Through Exit Strategies – Navigating 'Game-Changing' Dynamics," November 28, 2018 in New York, NY. Moderator for Focus Group Functions and Associated Options: Internet-Based Focus Groups; Developing Themes; Testing Evidence, Witnesses, Demonstratives, and Verdict Forms; Identifying Best Juror Demographics.

299.    Seminar Chair – HarrisMartin Complex Litigation Symposium, March 27, 2019, Washington, D.C.

300.    Speaker – Louisiana State Bar Association Symposium, March 29, 2019, Quebec, Canada.  Topic: "Bet the Company" Mass Torts: Navigating Game-Changing Dynamics from Electronic Discovery Through Exit Strategies.

301.    Speaker – Masters of Mass Tort Conference, February 27, 2019 in Cancun, Mexico. Topic: Thorny Issues Affecting Mass Torts: How to overcome issues such as BMS, preemption, trial chess clocks, issues dealing with foreign defendants, complex discovery/eDiscovery, etc.  utilizing case studies and how-to tips from cases such as Opioids, Essure, Talcum Powder and Round Up.

302.    Speaker – Masters of Mass Tort Conference, February 27, 2019 in Cancun, Mexico. Topic: Pre-Trial and Trial Strategies Particular to Mass Torts: Practical tips and tales from the trenches re: issues like whether to waive Lexecon, Daubert hearing issues, use of live video testimony, multi-plaintiff trials, federal/state coordination , depositions techniques, etc.

303.    Speaker – Masters of Mass Tort Conference, February 27, 2019 in Cancun, Mexico. Topic: Ethics Associated with Aggregate Settlements including competing obligations owed by Plaintiff Steering Committee and Plaintiff Negotiating Committee Members to (1) retained clients, (2) the court vs. clients, (3) individual clients vs. the larger group of claimants; (4) managing client expectations from intake through settlement in light of the aggregate nature of the litigation, etc.

304.    Seminar Chair – 26th Annual Admiralty Symposium on September 13, 2019 in New Orleans, Louisiana.

305.    Chairman – LSBA Complex Litigation CLE Symposium, November 8, 2019 in New Orleans, Louisiana.

306.    Speaker – Masters of Mass Tort Conference, EM Combat Arms Earplugs, February 28, 2019 in Cancun, Mexico.

307.    Invited Speaker – Perrin Conference National Asbestos Litigation Seminar on September 10, 2019, San Francisco, California. Topic: Technological advances including artificial intelligence and its impact on jury selection, focus groups, trials (including witnesses appearing via satellite transmission), and document review employing predictive coding.

308.    Guest Lecturer – Baylor Law School's LLM Litigation Management Program on November 11, 2019 in Waco, Texas. Topic: Plaintiff Perspective of Complex Litigation.

309.   Seminar Chair – 19th Annual Louisiana State Bar Association Complex Litigation Symposium, November 8, 2019 in New Orleans, Louisiana.

310.   Guest Lecturer – University of Texas in Austin's Colloquium Seminar on December 3, 2019. Topic: Current Issues in Complex Litigation.

311.   Moderator – Masters of Mass Tort Conference, February 26, 2020 in Cancun, Mexico. Topic: Building a strong personal brand and identity among your peers, becoming an industry influencer, and learning the politics and how-tos of Plaintiff Steering Committees.

312.   Chairman – HarrisMartin "Bet the Company Mass Tort Litigation; Current Activity and Developing Trends" symposium, May 27, 2020 in San Francisco, California.

313.   Invited Speaker – George Washington Law School Complex Litigation Center conference on Mass-Tort MDL Flash Points: Challenges for the Next Generation of Transferee MDL Judges, April 30-May 1, 2020 in Washington, D.C.

314.   Speaker – High Stakes on the High Seas, A Maritime Law Conference on August 21, 2020 in New Orleans, Louisiana. Topic: Artificial intelligence, predictive coding and discovery associated with electronically stored data; interesting techniques defendants are using to communicate semi-offline; intranet; text messaging; voice recorded attachment; the key liability dead bodies are being buried in more difficult places to locate or they are a needle in a haystack which requires an economically feasible method to find them.

315.   Guest Lecturer – Baylor Law School's LLM Litigation Management Program on June 24, 2020 in Waco, Texas. Topic: Litigation Management from the Plaintiff's Perspective.

316.   Guest Lecturer – August 6, 2020, Baylor Law School LLM Litigation Management Program, Waco, Texas. Topic: United States Supreme Court Lexicon Issues.

317.   Guest Lecturer – August 2020, Baylor Law School LLM Litigation Management Program, Waco, Texas. Topic: Complex Litigation and Associated Federal/State Coordination.

318.   Guest Lecturer – August 11, 2020, Baylor Law School LLM Litigation Management Program, Waco, Texas. Topic: Management Considerations in Complex Litigation.

319.   Guest Lecturer – August 3, 2020, Baylor Law School LLM Litigation Management Program, Waco, Texas. Topic: Strategies for Bellwether and Multi-Plaintiffs Trials.

320.   Guest Lecturer – August 4, 2020, Baylor Law School LLM Litigation Management Progra, Waco, Texas. Topic: Litigation Exit Strategies.

321.   Guest Lecturer – August 4, 2020, Baylor Law School LLM Litigation Management Program, Waco, Texas. Topic: Whether to Pursue Multidistrict Litigation and Associated Issues.

322.   Guest Lecturer – August 13, 2020, Baylor Law School LLM Litigation Management Program, Waco, Texas. Topic: Complex Litigation Attorney Compensation and Common Benefit Orders.

323.   Seminar Chair – 27th Annual Admiralty Symposium on September 18, 2020 in New Orleans, Louisiana.

324.   Chairman – LSBA 20th Complex Litigation CLE Symposium, November 6, 2020 in New Orleans, Louisiana.

325.   Presiding Chair – Insurance, Tort, Workers' Compensation and Admiralty Law Section CLE for LSBA Annual Meeting & Joint LSBA/LJC June 6, 2021.

326. Speaker at the George Washington Law School Complex Litigation Center's first annual invitation-only MDL conference with 50 Federal Judges, September 30, 2021, Washington, D.C. Topic: State court coordination and the claims administration process.

327. Seminar Chair – HarrisMartin Symposium, MDLs: Navigating the Landmines, December 1, 2021 in Texas.

328. Moderator – Malcolm Monroe Ethics Seminar Panel: Ethical Obligations (and Landmines) Associated with Social Media and Technology, December 9, 2021 in New Orleans, Louisiana.

329. Seminar Chair – LSBA 28th Annual Admiralty Symposium on September 17, 2021 in New Orleans, Louisiana.

330. Guest Lecturer – Baylor Law School LLM Litigation Management Program, Waco, Texas, January 2021, Topics: (1) Artificial Intelligence: Ethical Implications of its Application in law practices and Mandatory Ethical Requirements Regarding Technology Skills; (2) Complying with Ethical Rules Associated with Aggregate Settlements.  Obligations for Practitioners on Both Sides of the "V;" (3) Third Party Litigation Funding, Hedge Fund Invasions, and jurisdictions now allowing Fee Sharing with Nonlawyers; (4) Ethical Issues Associated with Court Appointed Multidistrict Litigation Leadership; (5) The Chilling Impacts of Blogs and "Judicial Hellhole" Labels. Ethical? (6) Navigating Social Media ethically; (7)  Attorney Cybersecurity Obligations.

331. Guest Lecturer – Baylor Law School LLM Litigation Management Program, January 14, 2021. Topic: Complex Litigation.

332. Seminar Chair – LSBA 21st Complex Litigation Symposium, November 5, 2021, New Orleans, Louisiana.

333. Moderator – LSBA 21st Complex Litigation Symposium Panel: Steering Committees, November 5, 2021, New Orleans, Louisiana.

334. Participation in the Cambridge Forum on Plaintiffs' Mass Tort Litigation, an annual meeting of up to 48 leading Plaintiff Mass Tort litigators, personally selected and invited by the Steering Committee based on their vast experience and expertise in mass tort claims, November 8, 2021, Manalapan, Florida.

335. Moderator – Western Alliance Bank webinar, Spring 2022. Topic: Organizing a PSC Along with Guiding the MDL Process and Associated Settlement Issues.

336. Moderator – San Diego School of Law Symposium sponsored by Western Alliance Bank, March 16, 2022, San Diego, California.

337. Guest Lecturer – Baylor Law School LLM Litigation Management Program, January 11, 2022, Waco, Texas. Topic: Complex Litigation Management, PSC Team Selection and Resolution Strategy.

338. Seminar Chair – LSBA 29th Annual Admiralty Symposium on September 16, 2022 in New Orleans, Louisiana.

339. Seminar Chair – LSBA 22nd Complex Litigation Symposium, November 11, 2022, New Orleans, Louisiana.

340. Guest Lecturer – George Washington Law School Complex Litigation Center, Advanced Strategy Mass Tort MDL Certificate Course, February 25, 2022, Coral Gables, Florida. Topic: Common Benefit Fund.

341. Co-Chair – HarrisMartin's Webinar Series: MDL Litigation Conference – Mass Tort Litigation & The Current Landscape, January 26, 2022.

342. Moderator – HarrisMartin's Webinar Series: MDL Litigation Conference – Mass Tort Litigation & The Current Landscape, Panel 1 Topic: Complex Litigation Management, January 26, 2022.

343.    Moderator – HarrisMartin's Webinar Series: MDL Litigation Conference – Mass Tort Litigation & The Current Landscape, Panel 2 Topic: PSC Team Selection, January 26, 2022.

344.    Speaker – M&L 2022 Summer Seminar on July 28, 2022 in Vancouver, Canada. Topic: Mass Torts – A Primer for Handling a Mass Tort Docket of Cases.

345.    Co-Chair – HarrisMartin Symposium on September 28, 2022 in St. Louis, Missouri. Title: The Current Mass Tort Landscape: Best Management Practices and updates on the key litigation including APAP/Acetaminophen, Exactech, Social Media Youth/Adolescent Addiction And Much More.

346.    Co-Chair – HarrisMartin's Symposium on November 30, 2022 in New York City. Title: Navigating the Current Mass Tort Litigation.

347.    Speaker – Masters of Mass Tort Symposium presented by Archer: Toxic Forever Chemicals, Contaminated Water on September 13, 2022 in Denver, Colorado.

348.    Speaker – Epiq's Mass and Class Summit, February 28, 2023, Topic: Session 2 – Resolution Strategies and Associated Best Practices, Fort Lauderdale, Florida.

349.    Co-Chair – HarrisMartin's MDL Conference: Managing Mass Torts, Status of Key Litigations and Lessons Learned Seminar, March 29, 2023, Tucson, Arizona.

350.    Moderator – Mass Torts Made Perfect 2023 Spring Seminar, Topic: Hall of Fame Panel, April 11-13, 2023, Las Vegas, Nevada.

351.    Co-Chair – Mass Torts Puerto Rico, May 3, 2023, San Juan, Puerto Rico.

352.    Speaker – LSBA Sandestin Summer School, Topic: Playing it by Ear: Tips on Reading the Room, June 6, 2023, Destin, Florida.

353.    Seminar Chair - LSBA 30th Annual Admiralty Symposium, September 15, 2023, New Orleans, Louisiana.

354.    Speaker – Masters of Mass Tort Symposium presented by Archer: Toxic Forever Chemicals, Contaminated Water on September 19-20, 2023, Boulder, Colorado.

355.    Seminar Chair – LSBA 23rd Annual Complex Litigation Symposium, November 10, 2023, New Orleans, Louisiana.

356.    Moderator – San Diego School of Law Mass Torts Symposium sponsored by Western Alliance Bank, March 14, 2023, San Diego, California.

357.    Moderator – Mass Torts Puerto Rico, Topic: Critical Tools for Navigating Mass Torts (Part 1), May 4, 2023, San Juan, Puerto Rico.

358.    Moderator – Mass Torts Puerto Rico, Topic: Critical Tools for Navigating Mass Torts (Part 2), May 5, 2023, San Juan, Puerto Rico.

359.    Speaker – Mass Torts Puerto Rico, Topic: Exit Strategies, May 5, 2023, San Juan, Puerto Rico.

360.    Moderator – HarrisMartin's MDL Conference: Managing Mass Torts, Status of Key Litigations and Lessons Learned Seminar, Topic: Key Bankruptcy Developments Regarding J&J and 3M, March 29, 2023, Tucson, Arizona.

361. Speaker – HarrisMartin's MDL Conference: Managing Mass Torts, Status of Key Litigations and Lessons Learned Seminar, Topic: Resolution Strategy and Associated Best Practices, March 29, 2023, Tucson, Arizona.

362. Moderator – HarrisMartin's MDL Conference: Managing Mass Torts, Status of Key Litigations and Lessons Learned Seminar, Topic: Game Changing Rules, March 29, 2023, Tucson, Arizona.

363. Co-Chair – HarrisMartin's MDL Conference: Updates and Challenges Facing Current High Stakes Mass Tort Litigation, May 24, 2023, Philadelphia, Pennsylvania.

364. Moderator – HarrisMartin's MDL Conference: Updates and Challenges Facing Current High Stakes Mass Tort Litigation, Topic: Initial Activity Following the MDL Assignment, May 24, 2023, Philadelphia, Pennsylvania.

365. Moderator – HarrisMartin's MDL Conference: Updates and Challenges Facing Current High Stakes Mass Tort Litigation, Topic: Selection of Plaintiff and Defense Steering Committees, May 24, 2023, Philadelphia, Pennsylvania.

366. Co-Chair – 2023 Baylor MDL Judicial Summit, June 18-20, 2023, Aspen Colorado.

367. Moderator – 2023 Baylor MDL Judicial Summit, Topic: Key Activity Following an MDL Assignment (Part 1), June 18-20, 2023, Aspen Colorado.

368. Moderator – 2023 Baylor MDL Judicial Summit, Topic: Exit Strategies, Resolution Options and Dealing with the "Tail," June 18-20, 2023, Aspen Colorado.

369. Co-Chair – Mass Torts Made Perfect Connect Webinar, Topic: Ethical Conundrums Associated with Litigation Funding and Non-Lawyer Firm Ownership, June 28, 2023.

370. Panelist – Mass Torts Made Perfect Seminar, Topic: View from the Bench, October 11, 2023, Las Vegas, Nevada.

371. Moderator – Mass Torts Made Perfect Seminar, Topic: Special Masters in Mass Torts, October 11, 2023, Las Vegas, Nevada.

372. Moderator – Mass Torts Made Perfect Seminar, Topic: Mass Tort Ethical Conundrums, October 12, 2023, Las Vegas, Nevada.

373. Participation in The Litigation Series Mass Torts Litigation Forum, an invitation only meeting of elite leading Plaintiff Mass Tort litigators, personally selected and invited by the Steering Committee based on their vast experience and expertise in mass tort claims, November 5-7, 2023, Manalapan, Florida.

374. Moderator – Mass Torts Made Perfect Webinar, Topic: Navigating the Unique Ethical Challenges Associated with Artificial Intelligence (Chat GPT and other AI Platforms), September 20, 2023.

375. Moderator – Mass Torts Made Perfect Connect Webinar, Topic: If AI Isn't in Your Litigation Toolbox, It Should Be. But Proceed with Caution, February 13, 2024.

376. Speaker – Epiq's Mass and Class Summit, March 4, 2024, Topic: Resolution Strategies and Exit Options, Fort Lauderdale, Florida.

377. Speaker – Northwestern Pritzker School of Law Contemporary Issues in Complex Litigation Seminar, Topic: What Keeps Plaintiffs' Lawyers, Defense Lawyers, and In-house Lawyers Up at Night, March 6-7, 2024, Chicago, Illinois.

378.     Moderator – San Diego School of Law Mass Torts Symposium sponsored by Western Alliance Bank, Topic: Ethical Conundrums Associated with Litigation Funding, Non-Lawyer Firm Ownership and Fee Sharing, March 14, 2024, San Diego, California.

379.     Moderator – San Diego School of Law Mass Torts Symposium sponsored by Western Alliance Bank, Topic: Artificial Intelligence in the Mass Tort Space and the Associated Ethical Obligation, March 14, 2024, San Diego, California.

380.     Moderator – San Diego School of Law Mass Torts Symposium sponsored by Western Alliance Bank, Topic Recusals, Motions to Disqualify, Mandamus and the Related Professionalism Issues, March 14, 2024, San Diego, California.

381.     Moderator – San Diego School of Law Mass Torts Symposium sponsored by Western Alliance Bank, Topic Exit Strategies, Resolution Options, Dealing with the "Tail" and the Fee Disgorgement Risk, March 14, 2024, San Diego, California.

382.     Moderator – Mass Torts Made Perfect 2024 Spring Seminar, Topic: View from the Bench;  Federal Judicial Panel; Judicial Challenges in the Complex Litigation Landscape, April 3-5, 2024, Las Vegas, Nevada.

383.     Moderator – Mass Torts Made Perfect 2024 Spring Seminar, Topic: Court-Appointed Neutrals in Mass Torts, April 3-5, 2024, Las Vegas, Nevada.

384.     Moderator – Mass Torts Made Perfect Seminar, the largest gathering in the nation of over 2,000 mass tort lawyers from all 50 states, Topic: The Role of the Judiciary and Timely Views from the Bench, October 9, 2024, Las Vegas, Nevada.

385.     Moderator – Mass Torts Made Perfect Seminar, the largest gathering in the nation of over 2,000 mass tort lawyers from all 50 states, Topic: The Dangers and Chaos of Evaluating a New Mass Tort Project:  Don't Get it Wrong, October 9, 2024, Las Vegas, Nevada.

386.     Speaker – Epiq Mass and Class Seminar, Topic:  Mass Tort Challenges in a Rapidly Changing Environment, February 13, 2025, Fort Lauderdale, Florida.

387.     Invited Speaker – Northwestern Law School Complex Litigation Conference, Topic: What Keeps In-House Lawyers Up at Night, April 3, 2025, Chicago, Illinois.

388.     Moderator – Annual Class Action Forum, San Diego School of Law Symposium sponsored by Western Alliance Bank, March 18, 2025, San Diego, California.

389.     Moderator – Mass Torts Made Perfect Seminar, Topic:  Navigating Mass Torts from the Unique Perspective of the Judiciary; Practical Guidance and Insightful Observations, and Speaker – Hall of Fame Panel, April 2, 2025, Las Vegas, Nevada.

390.     Speaker – Mass Torts Puerto Rico Seminar, Topic:  Litigation Funding, Non-Lawyer Firm Ownership, and Fee Sharing:  Ethical Considerations and Artificial Intelligence:  Assessing the Risk/Benefit Profile While Navigating the Ethical Obligations, May 6, 2025, San Juan, Puerto Rico.

---

# MEMBER (PRESENT AND/OR FORMER)

American Bar Association (Admiralty and Maritime Law Committee Port Watch Subcommittee).

Louisiana Trial Lawyers Association.

Mississippi Trial Lawyers Association.

Texas Trial Lawyers Association.

The Association of Trial Lawyers of America.

Southeastern Admiralty Law Institute.

ATLA Breast Implant Litigation Group.

Alexandria Bar Association.

American Inns of Court.

Louisiana Bar Association CLE Committee.

Louisiana State Bar Association Federal Court Bench-Bar Liaison Committee.

Tulane Law School Maritime Seminar Planning Committee 1996/1997.

---

# MEDIATOR EXPERIENCE

July 29, 2004 served as Mediator in environmental/toxic tort class action, Joe Clark, et al v. Trus Joist MacMillan, a Limited Partnership, et al, Case No. 70287, Division B, 10th Judicial District Court, Natchitoches Parish, Louisiana, plaintiffs represented by William P. Crews, Jr., defendants represented by James P. Dore' of Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, L.L.P.

---

# MASS TORT/CLASS ACTION/MULTIDISTRICT LITIGATION EXPERIENCE

1.  Chairman - 1994/1995 - Law Committee - Louisiana Plaintiffs' Steering Committee - Breast Implant Litigation; Marilyn Spitzfaden, individually, and as representative of a class of those similarly situated v. Dow Corning Corporation, et al, Civil Suit No. 92-2589, Civil District Court for the Parish of Orleans, State of Louisiana.

2.  Baxter Plaintiff Trial Team Member, Breast Implant Litigation; Marilyn Spitzfaden, individually, and as representative of a class of those similarly situated v. Dow Corning Corporation, et al, Civil Suit No. 92-2589, Civil District Court for the Parish of Orleans, State of Louisiana.

3.  Dow Chemical Plaintiff Trial Team Member, Breast Implant Litigation; Marilyn Spitzfaden, individually, and as representative of a class of those similarly situated v. Dow Corning Corporation, et al, Civil Suit No. 92-2589, Civil District Court for the Parish of Orleans, State of Louisiana.

4.      Bristol-Myers Squibb Plaintiff Trial Team Member, Breast Implant Litigation; Marilyn Spitzfaden, individually, and as representative of a class of those similarly situated v. Dow Corning Corporation, et al, Civil Suit No. 92-2589, Civil District Court for the Parish of Orleans, State of Louisiana.

5.      Plaintiffs' Steering Committee Member; Frederick Lewis, et al v. Volvo of North America, Inc., et al, Case No. 96-19724, Division F, Civil District Court for the Parish of Orleans, State of Louisiana. (Passenger Air Bag)

6.      Represented class member plaintiffs; John R. Duncan, Sr. and Helene Duncan v. IMC Fertilizer, Inc., Angus Chemical Company and W.W. Patterson, Civil Suit No. 92-0719,  United States District Court, Western District of Louisiana, Monroe Division and Catherine Roberson and Gene Roberson, individually and on behalf of their minor children, Ashley and Gerard Roberson v. IMC Fertilizer, Inc., Angus Chemical Company and W.W. Patterson, Civil Suit No. 92-0720, United States District Court, Western District of Louisiana, Monroe Division. (Burlington Explosion)

7.      Represented class member plaintiffs; In Re:  Orthopedic Bone Screw Products Liability Litigation, MDL Docket No. 1014, United States District Court for the Eastern District of Pennsylvania.

8.      Represented class member plaintiffs; Bobbie Timberlake, et al v. World Rio Corporation, et al, Civil Action No. 95-1291, United States District Court, Central District of California. (Class Action Complaint)

9.      Represented class member plaintiffs; Dalkon Shield Litigation; RE: A.H. Robins Company, Incorporated, Debtor, Chapter 11, Case No. 85-01307-R, United States District Court for the Eastern District of Virginia, Richmond Division.

10.     Claimants' Steering Committee Member; In the Matter of the Complaint of Ingram Barge Company, as Owner of the M/V F.R. Bigelow and the IB-960, and Ingram Ohio Barge Co., as Owner Pro Hac Vice of the ING-371, Petitioning for Exoneration from or Limitation of Liability, Civil Action No. 97-226, United States District Court, Middle District of Louisiana. (Chemical Spill Class Action)

11.     Plaintiffs' Steering Committee Member - Dinah Borros and Dianne J. Solsky v. American Home Products Corporation d/b/a Wyeth Ayerst Laboratories, Interneuron Pharmaceuticals, Inc., Quick Trim Clinic of Louisiana, Inc., Aspen Clinic, Inc. and St. Charles General Hospital, Civil Docket No. 97-16466, Civil District Court for the Parish of Orleans, New Orleans, Louisiana. (Fen-Phen)

12.     Plaintiffs' Steering Committee Member - Theresa Marble, Robert Johnson, Lou Daisy Scott and Harry Stovall v. Chrysler Corporation, Civil Action No. 97-2055, United States District Court, Eastern District of Louisiana, New Orleans Division, New Orleans, Louisiana.  (Passenger Air Bag)

13.     Plaintiffs' Steering Committee Member - Damian Castillo, et al, on Behalf of Themselves and all others Similarly Situated v. Mike Tyson; Don King, et al, Supreme Court of the State of New York, County of New York  (Tyson Class Action)

14.     Baxter Healthcare Corporation Settlement Committee - 1997/98 - Louisiana Plaintiffs' Steering Committee - Breast Implant Litigation; Marilyn Spitzfaden, individually, and as representative of a class of those similarly situated v. Dow Corning Corporation, et al, Civil Suit No. 92-2589, Civil District Court for the Parish of Orleans, State of Louisiana.

15.     McGhan Medical Corporation 3M Settlement Committee - 1997/98 - Louisiana Plaintiffs' Steering Committee - Breast Implant Litigation; Marilyn Spitzfaden, individually, and as representative of a class of those similarly situated v. Dow Corning Corporation, et al, Civil Suit No. 92-2589, Civil District Court for the Parish of Orleans, State of Louisiana.

16.     Appointed by U.S. District Judge Feldman to serve as a member of the Plaintiffs' Steering Committee in In Re: Air Bags Products Liability Litigation, MDL No. 1181.

17. Appointed by the Court to serve as Co-Lead Counsel, Co-Liaison Counsel and Plaintiffs' Steering Committee Member - Baton Rouge DSI Sulfur Spill - Jimmie Badon, Jr., Individually and on Behalf of his Minor Son, Jimmie Badon, III and Lashawndra Rollins versus DSI Transports, Inc. and Dwight Stewart, Civil Suit No. 450,957 "M," 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana.

18. Co-Liaison Counsel and Plaintiffs' Steering Committee Member - Lead Consolidated Case - Carl Bell, et al v. Kaiser Aluminum and Chemical Corp., Civil Action No. 99-2078, U.S. Dist. Ct. (East. Dist. of La.). Appointed by the Court to serve as Special Liaison Counsel to receive and disseminate all communications from the Court.

19. Associated as Counsel of Record by Plaintiffs' Steering Committee - Kendrick Milligan and all other similarly situated persons v. Borden Chemicals and Plastics A/K/A and/or D/B/A BCP Management, Inc., 18th JDC, West Baton Rouge Parish, Louisiana, Civil Action No. 29,282-B consolidated with 29,286-B.

20. Plaintiffs' Steering Committee Member - Hilda N. Garrison, Marva Joseph, Todd Powers Powell, Joan B. Wilson, individually and as Representatives of the Class v. St. Charles General Hospital, Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, and Touro Infirmary, Individually, and as Representatives of Defendant Class, Parish of Orleans, State of Louisiana, Civil Suit No. 99-9855, Division E, Section 9.

21. Plaintiffs' Steering Committee Member - Steven M. Davis, Dawn Davis and Brain Chandler v. First USA Bank, N.A., 19th JDC, East Baton Rouge Parish, Louisiana, Civil Suit No. 464,834, Division A.

22. Plaintiffs' Steering Committee Member - Peter Hahn, et al v. Hydrochem Industrial Services, Inc., et al, 24th JDC, Jefferson Parish, Louisiana, Civil Suit No. 544-377, Division F.

23. Plaintiffs' Steering Committee Member and Court Appointed Class Counsel - Craig West, et al v. G & H Seed Co., et al, 27th JDC, St. Landry Parish, Louisiana, Civil Suit No. 99-C-4984, Division A. (ICON)

24. Plaintiffs' Steering Committee Member - Clair Falgoust, et al v. Microsoft Corporation, 23rd JDC, St. James Parish, Louisiana, Civil Suit No. 26,433.

25. Class Counsel - Tangy Washington, et al v. Donald E. Carlton, et al, United States District Court for the Middle District of Louisiana, Civil Action No. 98-341, Section A, Magistrate (2).

26. Appointed as Co-Plaintiff Liaison Counsel, Arthur Gregorie, III, et al v. The Burlington Northern and Santa Fe Railway Company, U.S. District Court, Western District of Louisiana, Lafayette-Opelousas Division, #CV00-1188-LO, Judge Rebecca F. Doherty, Magistrate Judge Methvin. (New Iberia Train Derailment)

27. Counsel of Record, Vivian Folse, et al v. C.F. Industries, Inc., 23rd Judicial District Court, St. James Parish, Louisiana, #26728. (CF Industries Plant Explosion - Donaldsonville, LA)

28. Counsel of Record, Ronnie Francois, et al v. Norfolk Southern Corporation, et al, Civil District Court, Parish of Orleans, State of Louisiana, #2000-7347, Division E, Sec. 9. (New Orleans Tank Car)

29. Plaintiffs' Interim Steering Committee Member and Court Appointed Co-Lead Counsel, Ebony Willis, et al v. Union Pacific Railroad Company, et al, #00-C-2335, Section C, 27th JDC, St. Landry Parish, Louisiana. (Eunice Train Derailment)

30. Court Appointed Member of the Interim Plaintiffs' Liaison Committee, Eric Vizena, et al v. Union Pacific Railroad Company, 00-1267 (and all related cases) Judge Richard T. Haik, Sr., Magistrate Judge Tynes, U.S. District Court, Western District, Lafayette-Opelousas Division. (Eunice Train Derailment)

31. Plaintiffs' Steering Committee Member, Roger and Dianne Crowe v. Pearl River Polymers, Inc., et al, #99-14413 "G," 22nd Judicial District Court, St. Tammy Parish, LA. (Pearl River)

32.     Counsel in MDL 1363-In Re: Industrial Accident at Donaldsonville, Louisiana, on May 24, 2000.

33.     Counsel in In Re: 1993 Exxon Coker Fire Litigation, Master Docket No. 93-MS-2-A-M2, United States District Court, Middle District of Louisiana.

34.     Counsel in In Re: 1994 Exxon Chemical Plant Fire Litigation, Master Docket No. 94-MS-3-M1, United States District Court, Middle District of Louisiana.

35.     Plaintiffs' Interim Steering Committee Member - Geraldine Taylor, et al  v. Novartis Crop Protection, Inc. and Rudy Lambert, Civil Action No. 00CV635, Sec. "D-3," United States District Court, Middle District of Louisiana.

36.     Discovery Committee Member of the Microsoft Anti-Trust Litigation in MDL #1332. (Microsoft)

37.     Co-Chair of the Interim General Motions, Pleadings and Law Committee in MDL #1355.  (Propulsid)

38.     Plaintiffs' Interim Steering Committee Member - Hoyt Calvey, et al v. Dupre Transport, Inc., #31089 "C," 18th JDC, West Baton Rouge Parish, Louisiana.  (Dupre Transport)

39.     Appointed as member of the Settlement/Alternative Dispute Resolution Committee and Discovery Committee - In Re:  Bridgestone/Firestone, Inc., ATX, ATX II, and Wilderness Tires Products Liability Litigation, Master File No. IPOO-9373-C-B/S, MDL No. 1373, United States District Court, Southern District of Indiana, Indianapolis Division (centralized before Hon. Sarah Evans Barker, Chief Judge).  (Firestone)

40.     Appointed as member of the Discovery Committee, In Re: Propulsid Products Liability Litigation, MDL No. 1355, Section "L" Judge Eldon E. Fallon, Magistrate Judge Africk, United States District Court, Eastern District of Louisiana. (Propulsid)

41.     Appointed Co-Chair of the Drafting and Generic Research Committee, In Re: Propulsid Products Liability Litigation, MDL No. 1355, Section "L" Judge Eldon E. Fallon, Magistrate Judge Africk, United States District Court, Eastern District of Louisiana. (Propulsid)

42.     Appointed as Plaintiffs' State Liaison Counsel by Judge Eldon E. Fallon, In Re: Propulsid Products Liability Litigation, MDL No. 1355, Section "L" Judge Eldon E. Fallon, Magistrate Judge Africk, United States District Court, Eastern District of Louisiana. (Propulsid)

43.     Appointed as Co-Lead Counsel for the Plaintiffs' Steering Committee by Judge Holdridge, Dale Dennis, et al v. CF Industries, Inc., No. 67,243, Division C, 23rd Judicial District Court, Ascension Parish, Louisiana. (CF Industries)

44.     Appointed as member of the Plaintiffs' Steering Committee by Judge Lemmon in Aline Ricks and Ernest Ricks v. American Home Products Corporation, et al, Civil Action No. 01-0488, Sec. S,  Mag. 2 United States District Court., Eastern District of Louisiana. (PPA)

45.     Appointed as Co-Lead Counsel for the Plaintiffs' Steering Committee by Judge Tureau in Barbara Chapman, et al v. Vulcan Chemicals, a Business Group of Vulcan Materials Company, et al, Civil Docket No. 69,433, 23rd Judicial District Court, Ascension Parish, Louisiana. (Vulcan)

46.     Appointed as Co-Lead and Co-Liaison Counsel for the Plaintiffs' Steering Committee in Mazie Ayo, et al v. The State of Louisiana, Through the Department of Health and Hospitals, Civil Suit Number 483,299, Division H, 19th Judicial District Court, East Baton Rouge Parish, Louisiana. (DHH/Georgia Gulf)

47.     Appointed by Judge Mire on June 20, 2001 as Class Counsel and as an Executive Committee Member, In Re: Gramercy Plant Explosion at Kaiser, Master Docket No. 25975, Division D, 23rd Judicial District Court, St. James Parish, Louisiana.  (Kaiser)

48. Appointed by Judge Jay C. Zainey on July 23, 2001 as a member of the Plaintiffs' Steering Committee in Alicia Tanguis, et al v. M/V Westchester, et al, Civil Action No. 01-0449 c/w 01-1558, Section N, United States District Court, Eastern District of Louisiana.

49. Appointed by Magistrate Judge Christine Noland as a member of the Plaintiffs' Steering Committee, In Re: Vulcan Chemicals Litigation, Civil Action No. 01-MD-1-A-M2, United States District Court, Middle District of Louisiana. (Vulcan)

50. Appointed as a member of the Plaintiffs' Steering Committee and member of the Litigation Deposition Committee, Trial Committee, Class Certification Committee, Settlement Committee, Punitive Damages Development Committee and Chairman of the Pleadings Committee in Noretta Thomas, et al v. A. Wilbert & Sons, L.L.C., et al, Civil Suit No. 55,127, Division B, 18th Judicial District Court, Iberville Parish, Louisiana, And All Related Cases. (Myrtle Grove Trailer Park)

51. Appointed to the Federal/State Coordination Committee In Re: Phenylpropanolamine Product Liability Litigation, MDL No. 1407, United States District Court, Western District of Washington at Seattle. (PPA)

52. Appointed as member of the Plaintiffs' Executive Committee, Discovery & Liability Development Committee, Legal Research/Pleadings/Class Certification/Punitive Damages Committee, Trial Committee, Insurance Committee, and Settlement Committee in Jerry Oldham, et al v. State of Louisiana, Through the Department of Health and Hospitals (consolidated cases), Docket No. 55,160-A, 18th Judicial District Court, Iberville Parish, Louisiana. (DHH/Georgia Gulf)

53. Appointed on January 17, 2002 as member of the State/Federal Coordination Committee by United States District Judge, Barbara Jacobs Rothstein in In Re: Phenylpropanolamine (PPA) Products Liability Litigation, United States District Court, Western District of Washington at Seattle, MDL No. 1407. (PPA)

54. Appointed as member of the Plaintiffs' Steering Committee in Alice Davis, et al v. Potash Corporation of Saskatchewan Sales, Ltd. A/K/A PCS Nitrogen, No. 51,834 c/w 52,096, c/w 52,097, c/w 52,813, c/w 53,271, c/w 53,283, c/w 53,289, c/w 54,388, 18th Judicial District Court, Iberville Parish, Louisiana. (PCS Nitrogen)

55. Appointed as member of the Plaintiffs' Steering Committee by United States District Judge James S. Gwin in In Re: Meridia Product Liability Litigation, MDL No. 1481, United States District Court, Northern District of Ohio, Eastern Division. (Meridia)

56. Appointed as member of the Plaintiffs' Steering Committee in In Re: Serzone Products Liability Litigation, MDL No. 1477. (Serzone)

57. Appointed as Co-Chairman of the Plaintiffs' Discovery Committee by United States Magistrate Judge Mary E. Stanley In Re: Serzone Products Liability Litigation MDL No. 1477, United States District Court, Southern District of West Virginia, Charleston Division. (Serzone)

58. Appointed by Federal Judge Rebecca F. Doherty as Class Counsel, Arthur Gregorie, III, et al v. The Burlington Northern and Santa Fe Railway Company, U.S. District Court, Western District of Louisiana, Lafayette-Opelousas Division, #CV00-1188-LO. (New Iberia Train Derailment)

59. Appointed by United States District Judge Joseph R. Goodwin as member of the Plaintiffs' Executive Committee In Re: Serzone Products Liability Litigation, MDL No. 1477, United States District Court for the Southern District of West Virginia, Charleston Division. (Serzone)

60. Appointed by Federal Judge Richard T. Haik, Sr. to Special Committee for Mediation, Eric Vizena, et al v. Union Pacific Railroad Company, 00-1267 (and all related cases) Judge Richard T. Haik, Sr., Magistrate Judge Tynes, U.S. District Court, Western District, Lafayette-Opelousas Division. (Eunice Train Derailment)

61.  Appointed by United States District Judge Lemelle to serve as Plaintiffs' Legal Committee member and Expert Committee Co-Chair, Herbert Barnes, et al v. Motiva Enterprises, LLC, et al, Civil Action No. 04-1793 J (2), Judge Lemelle, Magistrate Judge Roby, United States District Court, Eastern District of Louisiana. (Shell)

62.  Appointed by United States District Judge Sarah S. Vance to serve as Liaison Counsel in the Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12 Litigation, MDL No. 1643. (ETS PRAXIS)

63.  Appointed by United States District Judge Lemelle to serve as Plaintiffs' Steering Committee member, MDL-1632 – In re High Sulfur Content Gasoline Products Liability Litigation. (Shell)

64.  Appointed to Chair Federal/State Court Liaison Sub-Committee In Re: Neurontin Marketing and Sales Practices Litigation, MDL No. 1629. (Neurontin)

65.  Appointed by U.S. District Judge Eldon E. Fallon to serve as a member of the Plaintiffs' Steering Committee In Re: Vioxx Products Liability Litigation,  MDL No. 1657. (Vioxx)

66.  Appointed member of the Administrative Committee In Re: Vioxx Products Liability Litigation,  MDL No. 1657. (Vioxx)

67.  Appointed Vice Chair of the Discovery Committee In Re: Vioxx Products Liability Litigation, MDL No. 1657. (Vioxx)

68.  Appointed by U.S. District Judge Eldon E. Fallon to serve as Interim Class Counsel In Re: Vioxx Products Liability Litigation,  MDL No. 1657. (Vioxx)

69.  Appointed by U.S. District Judge Eldon E. Fallon to serve as Interim Class Counsel, Plaintiffs' Steering Committee member and Executive Committee member  In Re: Turner v. Murphy Oil USA, Inc. Case Number 05-4206, U.S. District Court, Eastern District of Louisiana. (Murphy Oil)

70.  Appointed by U.S. District Judge Vance to serve as Liaison Counsel, In Re: OCA, Inc. Securities and Deriviative Litigation, Master File No. 05-2165, Section R(3), Judge Vance, United States District Court, Eastern District of Louisiana. (OCA)

71.  Appointed by U.S. District Judge Charles R. Breyer to serve as a member of the Plaintiff's Steering Committee In Re: Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation, Case No. M:05-CV-01699-CRB, MDL No. 1699, United States District Court, Northern District of California. (Bextra/Celebrex)

72.  Appointed by U.S. District Judge Donovan W. Frank to serve as a member of the Plaintiffs' Lead Counsel Committee  In re: Guidant Corp. Implantable Defribrillators Products Liability Litigation, MDL No. 05-1708, United States District Court, District of Minnesota. (Guidant)

73.  Appointed by U.S. District Judge James M. Rosenbaum to serve as a member of the Plaintiffs' Steering Committee In Re:  Medtronic, Inc. Implantable Defibrillators Litigation, MDL No. 05-1726, United States District                Court,                District               of                Minnesota.                (Medtronic)

74.  Appointed by U.S. District Judge Ivan L. R. Lemelle, Eastern District of Louisiana, to serve as Plaintiffs Legal Committee member and Expert Committee Co-Chair in the High Sulfur Content Gasoline Products Liability Litigation. (Shell)

75.  Appointed by U.S. District Judge Sarah S. Vance, Eastern District of Louisiana, to serve as Liaison Counsel in the Educational Testing Service PRAXIS litigation. (ETS PRAXIS)

76.  Appointed by U.S. District Judge David A. Katz, Northern District of Ohio, to serve on the Plaintiffs' Discovery Committee in the Ortho Evra Products Liability Litigation. (Ortho Evra)

77.     Appointed by U.S. District Judge Catherine D. Perry to serve as a member of the Plaintiffs' Executive Committee In Re LLRICE 601 Contamination Litigation, Case Number 4:06 MD 1811-CDP, U.S. District Court, Eastern District of Missouri, Eastern Division. (Rice Contamination)

78.     Appointed by U.S. District Judge Carl J. Barbier to serve as Class Counsel in Lincoln, et al v. Shell Pipeline Company, L.P., et al , Civil Action No. 05-CV-4197 c/w 05-CV-4199 and 06-CV-5154, United States District Court, Eastern District of Louisiana. (Shell)

79.     Appointed by U.S. District Magistrate Judge Arthur J. Boylan to serve on the Claims Review Committee In Re: Medtronic, Inc. Implantable Defibrillators Products Liability Litigation, MDL No. 05-1726 (JMR/AJB) United States District Court District of Minnesota. (Medtronic)

80.     Appointed by U.S. District Magistrate Judge Arthur J. Boylan to serve on the Common Benefit Attorneys' Fees Committee In Re: Medtronic, Inc. Implantable Defibrillators Products Liability Litigation, MDL No. 05-1726 (JMR/AJB) United States District Court, District of Minnesota. (Medtronic)

81.     Appointed by U.S. District Judge Richard H. Kyle and United States Magistrate Judge Janie S. Mayeron to serve on the Plaintiffs' Steering Committee, In Re: Medtronic, Inc., Sprint Fidelis Leads Product Liability Litigation, MDL No. 08-1905. (RHK/JSM), United States District Court, District of Minnesota. (Medtronic Sprint Fidelis)

82.     Appointed by U.S Magistrate Judge Arthur J. Boylan to serve on the Claims Review Committee, In re: Guidant Corp. Implantable Defibrillators Products Liability Litigation, MDL No. 05-1708, United States District Court, District of Minnesota. (Guidant)

83.     Appointed by AAJ to serve as Committee Co-Chair of Foodborne Illness Litigation Group, March 2010.

84.     Appointed by U.S. District Judge Frederick J. Martone, District of Arizona, to serve on the Plaintiffs' Steering Committee in the Zicam Cold Remedy Marketing, Sales Practices and Products Liability MDL Litigation. (Zicam)

85.     Appointed by U.S. District Judge James V. Selna, Central District of California, to serve on the Plaintiffs' Lead Counsel Committee for Economic Loss Class Actions in the Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation, MDL 2151. (Toyota)

86.     Appointed by AAJ to serve as Co-Chair of AAJ Gulf Coast Litigation Group as well as Liaison to the main organization. (Deepwater Horizon Oil Spill)

87.     Appointed by AAJ to serve as Co-Chair of AAJ Food Borne Illness Litigation Group. (Food Borne Illness)

88.     Appointed by U.S. District Judge Rodney W. Sippel, United States District Court, Eastern District of Missouri, to serve on the Plaintiffs' Steering Committee in the NuvaRing Products Liability Litigation, MDL No. 1964. (NuvaRing)

89.     Appointed by Judge Leon L. Emanuel, First Judicial District Court, Caddo Parish, Louisiana, to serve as interim Co-Lead Class Counsel in Civil Suit Number 545,245-C, Joey Canterbury, et al v. Willis Knighton Medical Center a/k/a Willis Knighton Health Systems, d/b/a Willis Knighton Pierremont Medical Center. (Willis Knighton)

90.     Appointed by U.S. District Judge David A. Katz, Northern District of Ohio, to serve on the Plaintiffs' Discovery Committee in the DePuy Hip Litigation, MDL No. 2197. (DePuy)

91.     Appointed by U.S. District Judge Donald C. Nugent, Northern District of Ohio, to serve on the Plaintiffs' Co-Lead Counsel Committee in the Kaba Locks Litigation, MDL No. 2220. (Kaba)

92.   Appointed by the AAJ to serve as Chair and Moderator of the National AAJ Actos Bladder Cancer Litigation Group. (Actos)

93.   Appointed to Plaintiff Steering Committee in the Zimmer Nexgen Knee Implant Products Liability Litigation, MDL No. 2272, Northern District of Illinois. (Zimmer Nexgen Knee)

94.   Appointed to Plaintiffs' Steering Committee in the Dial Complete Marketing and Sales Litigation, MDL 2263, District of New Hampshire. (Dial)

95.   Appointed as Interim Lead Counsel in the Imprelis Herbicide Marketing, Sales Practices and Products Liability Litigation, MDL 2284, Eastern District of Pennsylvania. (Imprelis)

96.   Appointed to Plaintiffs' Executive Committee in the DePuy Orthopaedics, Inc. Pinnacle Hip Implant Products Liability Litigation, MDL 2244, Northern District of Texas. (DePuy Pinnacle)

97.   Appointed as Co-Lead Counsel in Actos Products Liability Litigation, MDL 2299, Western District of Louisiana. (Actos)

98.   Appointed to Executive Steering Committee in Colgate-Palmolive Softsoap Antibacterial Hand Soap Marketing and Sales Practice Litigation, MDL 2320, District of New Hampshire. (Colgate Softsoap)

99.   Appointed to Homeowner Plaintiffs' Steering Committee in MI Windows and Doors Liability Litigation, MDL 2333, District Court of South Carolina. (MI Windows)

100.   Appointed by U.S. District Judge Joseph R. Goodwin, Southern District of West Virginia to serve on Plaintiffs' Steering Committee in the C.R. Bard Inc., Pelvic Repair System Products Liability Litigations, MDL No. 2187, MDL No. 2325, MDL No. 2326 and MDL No. 2327. (Pelvic Repair)

101.   Appointed by U.S. District Judge Sarah S. Vance, Eastern District of Louisiana, to serve on the Plaintiffs' Steering Committee in the Pool Products Distribution Market Antitrust Litigation, MDL No. 2328. (Pool Products)

102.   Appointed by U.S. District Judge Kathleen B. Burke, Northern District of Ohio, to serve on the Plaintiffs' Executive Committee in the Gentek Building Products, Inc. and Associated Materials, LLC Litigation. (Gentek)

103.   Appointed by U.S. District Judge David A. Katz, Northern District of Ohio, to serve on the Plaintiffs' Discovery Committee in the DePuy Orthopaedics, Inc. ASR Hip Implant Products Litigation, MDL No. 2197. (DePuy ASR)

104.   Appointed by U.S. District Judge Robert L. Miller, Jr., Northern District of Indiana, to serve on the Plaintiffs' Steering Committee and the Plaintiffs' Executive Committee in the Biomet M2a Magnum Hip Implant Products Liability Litigation, MDL No. 2391. (Biomet)

105.   Appointed by U.S. District Judge Benita Y. Pearson, Northern District of Ohio, Eastern Division, to serve on the Settlement Class Counsel in the Gentek Building Products Inc., and Associated Materials, LLC. Products Liability Litigation, Case No. 1:10-CV-2093. (Gentek)

106.   Appointed by U.S. District Judge Henry Edward Autrey, Eastern District of Missouri, Eastern Division, to serve on the Executive Committee in the Emerson Electric Co. Wet/Dry Vac Marketing and Sales Practices Litigation, Case No. 4:12MD2382 HEA. (Emerson Wet Dry Vac)

107.   Appointed to Plaintiffs' Steering Committee in the Long Island Power Authority Hurricane Sandy Litigation, Index No. 601434/2013, Supreme Court State of New York. (LIPA)

108.   Appointed to Plaintiffs' Steering Committee in the Pella Corporation Architect and Designer Series Windows Marketing, Sales Practices and Products Liability Litigation, MDL No. 2514. (Pella)

109.   Appointed by the Louisiana Supreme Court to serve on the new Rules of Professional Conduct Class Action Committee. This committee is tasked with examining Louisiana's Rules of Professional Conduct as they relate to representation of parties involved in class actions, mass torts, and other multi-client representations. The committee will also examine the efficacy of requesting that the Legislature enact a Multi District Litigation (MDL) procedure for Louisiana when actions of the same subject matter are pending in more than a single judicial district.

110.   Appointed by United States District Judge James E. Kinkeade for the Northern District of Texas to serve on the Exam Committee of NBTA National Board of Complex Litigation. This committee is tasked with reviewing and advising as to the changes needed on the complex litigation board certification exam.

111.   Appointed by NBTA National Complex Litigation Board to be part of a five-member Specialty Program Commission for Complex Litigation to serve as the official liaison from this National Board of Complex Litigation to the NBTA Examination Committee and the NBTA Standards Committee, specifically relating to any changes to the specialty examination for Complex Litigation, any changes to the certification and recertification standards for Complex Litigation, and generally overseeing the examination process.

112.   Appointed as a Planning Steering Committee member for Multidistrict Litigation Conferences at the George Washington Law School Complex Litigation Center.

113.   Appointed as a Reviewer in the development of a compendium of Multidistrict Litigation best practices by George Washington Law School.

114.   Contributor to the National Complex Litigation Board Certification Examination Ethics questions.

115.   Appointed by NBTA National Complex Litigation Board to be part of a five-member Specialty Program Commission for Complex Litigation to serve a 3-year term from July 1, 2023 through July 1, 2026, as the official liaison from this National Board of Complex Litigation to the NBTA Examination Committee and the NBTA Standards Committee, specifically relating to any changes to the specialty examination for Complex Litigation, any changes to the certification and recertification standards for Complex Litigation, and generally overseeing the examination process.

## SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK

This Settlement Agreement, Release, and Policy Buyback ("**Settlement Agreement**") is hereby made by, and between, and among The Roman Catholic Archdiocese of New Orleans (the "**Archdiocese**" or "**Debtor**" as further defined in Section 1.1.31 below), the other Archdiocese Signatory Parties (as defined in Section 1.1.15 below), and SPARTA Insurance Company and American Employers' Insurance Company ("**Insurer**" as further defined in Section 1.1.47 below). Insurer, the Archdiocese, the other Archdiocese Signatory Parties, and the Creditors' Committee (as defined below), collectively are the "**Parties**" and each a "**Party**" to this Settlement Agreement.

## RECITALS:

WHEREAS, on May 1, 2020 (the "**Petition Date**" as further defined in Section 1.1.65 below), the Archdiocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**" as further defined in Section 1.1.17) pending under Case No. 20-10846 (the "**Bankruptcy Case**" as further defined in Section 1.1.16 below);

WHEREAS, each of the Additional Debtors (as defined in Section 1.1.11 below) intends to file in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;

WHEREAS, certain Entities have asserted or may hold Claims, including Abuse Claims, against the Archdiocese Bound Parties (each as defined below);

WHEREAS, Insurer issued, allegedly issued, may have issued, assumed by novation or otherwise, or may be administering the Archdiocese Policies (as defined in Section 1.1.9 below) providing certain coverage to the Archdiocese Bound Parties;

WHEREAS, asserted disputes between the Debtor Parties (as defined below) and Insurer have arisen, and assertable disputes between the Archdiocese Bound Parties and Insurer may arise in the future, concerning the scope and nature of Insurer's responsibilities, if any, to provide insurance coverage to the Archdiocese Bound Parties under the Archdiocese Policies (as further defined in Section 1.1.29 below, the "**Coverage Claims**");

WHEREAS, claimants may contend, as a matter of Louisiana law, particularly La. Rev. Stat § 22:1269 *et. seq*., that certain Entities may have Claims arising under or related to the Archdiocese Policies that could entitle them to bring a Direct Action Claim (as defined in Section 1.1.35 below) against Insurer;

WHEREAS, claimants may contend that as a matter of Louisiana law, the time within which Claims relating to Abuse may be asserted against certain of the Archdiocese Bound Parties and/or the Insurer may not have expired with respect to certain Claims;

WHEREAS, the Archdiocese Signatory Parties and Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Claims and all other

disputes between and among them and to release Insurer from any further obligations under the Archdiocese Policies;

WHEREAS, Insurer would not pay the full amount of the Settlement Amount (as defined in Section 1.1.79 below) without the buy-back of the Subject Interests (as defined below) in the Archdiocese Policies, including without limitation, the interests of the Archdiocese, Additional Debtors, other Archdiocese Bound Parties and holders of Direct Action Claims, pursuant to section 363 of the Bankruptcy Code, and without the Sale Injunction, the Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeping Injunction (each as defined below), additionally providing protection to the Insurer Released Parties (as defined below) from Claims against the Insurer Released Parties and their property;

WHEREAS, through this Settlement Agreement and the Plan (as defined in Section 1.1.66 below) the Archdiocese Signatory Parties intend to provide Insurer Released Parties with the broadest possible release of all Claims and Subject Interests with respect to the Archdiocese Policies; and

WHEREAS, through this Settlement Agreement and the Plan, as part of the compromise and resolution of the Coverage Claims, the Debtor Parties and Insurer also wish to effect a sale, pursuant to § 363(b), (f), and (m) of the Bankruptcy Code of the Archdiocese Policies, along with the Coverage Claims and Related Insurance Claims (the "**Purchased Property**" as further defined in Section 1.1.69 below), to provide the Insurer Released Parties with the broadest possible release and buyback with respect to the Archdiocese Policies, resulting in the Insurer Released Parties having no obligations now or in the future with respect to the Archdiocese Policies, including without limitation to any Direct Action Claim.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Settlement Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound subject to the approval of the Bankruptcy Court pursuant to Section 2 below, the Parties hereby agree as follows:

## 1.    DEFINITIONS

1.1    As used in this Settlement Agreement (as defined above), the following terms shall have the meanings set forth below.

1.1.1    "**Abuse**" means any of the following actual or alleged acts: (a) touching by the Perpetrator of the person's intimate body parts (genitals, breasts, or buttocks), the touching by the person of the Perpetrator's intimate body parts, showing pictures of the person's body or other persons' bodies, taking pictures of the person's body, showing pornography, or making images of the person while naked or engaged in any sexual activity, or any sexualized interaction including observing the person in bathing, toileting, or undressing that was made possible by the Perpetrator's position of authority, or by the inducement of the Perpetrator; or (b) sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to the genital or anal openings:  (i) of the person's body by any part of the Perpetrator's body or any object used by the Perpetrator for this purpose; or (ii) of the person's body by any

2

part of the body of the Perpetrator or by any part of the body of another person, or by any object used by the Perpetrator or another person for this purpose; (c) inappropriate physical contact and/or contact that infringes upon another's personal, physical boundaries including but not limited to groping, kissing, extended hugging, and/or any unwelcomed touching; (d) grooming or trying to create a special relationship, including but not limited to: talk of a sexual nature, talk of a romantic nature, communications expressing individual love to the person, as opposed to a salutation, providing material resources or experiences which induce the person into a relationship where trust is then violated; or (e) any actual or alleged acts of the kind described in subsections (a)-(c) above that occur between or among minors and that the Perpetrator orchestrates or encourages. For the avoidance of doubt, "Abuse" also includes: any actual or alleged conduct which (a) is described in the Louisiana Child Victims Act or (b) would constitute (i) a sexual offense as defined in article 603(2) of the Louisiana Children's Code; (ii) sexual battery as defined in LA. REV. STAT. §§ 14:43.1; 14:43.1.1; 14:43.2; 14: or 43.3, (iii) a crime against nature as defined in LA. REV. STAT. § 14:89, or (i) pornography involving juveniles as defined in LA. REV. STAT. § 14:81.1, or with respect to the foregoing subsection (i)-(iv), any predecessor statute that prohibited such conduct at the time of the act.

1.1.2 "**Abuse Action**" means an Action asserting an Abuse Claim against any of the Covered Parties.

1.1.3 "**Abuse Claim**" means any Claim that has been asserted, or could be asserted, against any Settling Party or Non-Settling Insurer, that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively alleged Abuse that occurred, in whole or in part, before the applicable Debtor's Petition Date or Additional Debtors' Petition Date, including any such Claim that seeks monetary damages or any other relief, under any legal or equitable theory of liability, including, but not limited to, the following: vicarious liability; *respondeat superior*; any conspiracy, fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, negligent, insufficient, or inadequate supervision, retention or misrepresentation; any theory based on misrepresentation, concealment, or unfair practice; public or private nuisance; or any theory, including, without limitation, any theory based on public policy or any acts or failures to act by any Settling Party, or any other Entity for whom any Settling Party is allegedly responsible, including, but not limited to, any such Abuse Claim against any Settling Party, Non-Settling Insurer, or any other Entity for whom any Settling Party or Non-Settling Insurer is alleged to be responsible. Abuse Claims are: (a) the Known Abuse Claims, which are treated in Class 3; and (b) the Unknown Abuse Claims, which are treated in Class 4. For the avoidance of doubt, "Abuse Claim" includes (a) all Unknown Abuse Claims, (b) Claims or causes of action defined or described in the Revival Window Laws against the Archdiocese or any other Archdiocese Bound Party, (c) Direct Action Claims, and (d) any Claim against the Archdiocese or any other Archdiocese Bound Party that is attributable to, arises from, is based upon, relates to, or results from Abuse that, as of the Petition Date is barred by any applicable statute of limitations, and in each case, irrespective of whether (x) such Claims also involve the conduct of joint tortfeasors (or similar concepts under applicable law), (y) such Claims arise under, or were revived pursuant to, the Revival Window Laws, or any future reviver law, statute, or binding

3

precedential decision passed or issued on or after the Bankruptcy Plan Effective Date, or (z) a proof of claim has been filed, before or after the Claims Bar Date, or not at all, or an Abuse Action has been commenced with respect to such Claim. "Abuse Claim" does not include: (a) Related Insurance Claims or Coverage Claims against Settling Insurers or Non-Settling Insurers; (b) Non-Insurer Contribution Claims with respect to any Abuse Claim; (c) Insurer Contribution Claims with respect to any Abuse Claim; or (d) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to a Claim against these dioceses only. For the avoidance of doubt, a Claim based on Abuse solely occurring following the applicable Petition Date is not an Abuse Claim. Nothing in this definition shall constitute a waiver of any defense that would otherwise be available under applicable law to any Settling Party, the Settlement Trust, or any other Entity.

1.1.4 "**Abuse Claim Release and Certification**" means a written release in favor of the Insurer Released Parties, in the form of Exhibit C to the Acceptable Plan, or otherwise in form and substance acceptable to the Parties, which an Abuse Claimant must deliver before he or she is entitled to Settlement Trust Distributions, which shall provide that the Claimant releases the Insurer Released Parties from any and all Claims related to his/her Abuse Claim or any of the Archdiocese Policies, subject to Section 12.14 and related provisions of the Plan.

1.1.5 "**Abuse Claimant**" means the holder of an Abuse Claim, including, but not limited to, any Known Abuse Claim, Unknown Abuse Claim, or Direct Action Claim. For the avoidance of doubt, Abuse Claimants are Creditors. The definition of an Abuse Claimant includes the legal representative of the holder of an Abuse Claim, such as a bankruptcy trustee, the estate of a deceased individual who held an Abuse Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Abuse Claim, as the case may be. An Entity holding the following Claim is not an Abuse Claimant: (i) a Non-Insurer Contribution Claim with respect to such Abuse Claim; (ii) an Insurer Contribution Claim with respect to such Abuse Claim; (iii) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to such Entity's claim against such dioceses only.

1.1.6 "**Acceptable Plan**" means the *Fourth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and The Official Committee of Unsecured Creditors* filed at Docket No. [4419], and its exhibits and schedules, which as may be modified solely in accordance herewith (i.e., with the consent of the Insurer), and such modified plan constituting the "Acceptable Plan" for the purposes hereof.

1.1.7 "**Archdiocesan Parishes**" means all currently Catholic Church parishes and missions, as identified on Exhibit B-1, Part I, of the Acceptable Plan. Each of the Archdiocesan Parishes is organized as a non-profit corporation. For the avoidance of doubt, the definition of Archdiocesan Parishes does not include St. Louis Cathedral, Our Lady of Guadalupe Church & Shrine of St. Jude, or any Suppressed Archdiocesan Parish identified on Exhibit B-1, Part II, of the Acceptable Plan.

1.1.8   "**Archdiocesan Schools**" means the means the following schools that are owned and operated by the Archdiocese: (a) the Academy of Our Lady High School; (b) Archbishop Chapelle High School; (c)Archbishop Hannan High School; (d) Archbishop Rummel High School; (e) Archbishop Shaw High School; (f) Pope John Paul II High School; (g) St. Charles Catholic High School; (h) St. Scholastica Academy; and (i) St. Michael Special School.

1.1.9   "**Archdiocese Policies**" means (a) the contracts, binders, certificates, and policies of insurance that are listed on Schedule 1 hereto, and (b) all other known and unknown contracts, binders, certificates, or policies of general liability insurance, in effect on or before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date that were issued to, or for the benefit of, or subscribed on behalf or that otherwise actually insure, (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) policies issued to the Archdiocese that name as an insured or additional insured (or related concept under applicable law or document) the Diocese of Houma-Thibodaux or Diocese of Baton Rouge, but not policies issued to either of these dioceses that were not also issued to the Archdiocese or name it as insured, (iv) any Entity owned, created, operated, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, or (v) any institution, religious organization or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control or active management; in each case of (a) and (b), that were issued, subscribed to, or underwritten in whole or in part or allegedly issued, subscribed to, or underwritten in whole or in part by Insurer or any of its predecessors. For the avoidance of doubt, the "Archdiocese Policies" include any and all known and unknown contracts, binders, certificates, or policies of general liability insurance that were issued, allegedly issued, or may have been issued by or in the name of American Employers Insurance Company.

1.1.10   "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

1.1.11   "**Additional Debtors**" means the Entities listed on Acceptable Plan Exhibit B-1.  As used herein, references to the "Additional Debtors" includes the Additional Debtor's Estates.

1.1.12   "**Approval Motion**" means the motion filed in the Archdiocese Bankruptcy Case at Docket No. 4181 seeking approval of this Settlement Agreement as described in Section 2.1 of this Settlement Agreement.

1.1.13 "**Approval Order**" means the order granting the Approval Motion described in Section 2.1 of this Settlement Agreement and providing the relief described in Section 2.1 of this Settlement Agreement and in substantially form attached **Exhibit A,** with only such changes as are satisfactory to Insurer.

1.1.14   "**Archbishop**" has the meaning given to it in Section 3.7.

1.1.15 "**Archdiocese Signatory Parties**" means, collectively, (a) the Debtor Parties and (b) the Non-Debtor Catholic Entities.

1.1.16 "**Bankruptcy Case**" means all of the following: (a) with respect to the Archdiocese, "Bankruptcy Case" has the meaning set forth in the Recitals; and (b) with respect to any given Additional Debtor, "Bankruptcy Case" means the case initiated when such Additional Debtor filed in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.17 "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Louisiana, having subject matter jurisdiction over the Bankruptcy Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

1.1.18 "**Bankruptcy Plan Effective Date**" means the date upon which a Plan approved by the Bankruptcy Court that contains terms and conditions consistent with those required by this Settlement Agreement becomes effective.

1.1.19 "**Barred Claim**" means any Claim against a Settling Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with an Abuse Claim or any of the Archdiocese Policies, including, but not limited to, any: (a) Abuse Claim; (b) Direct Action Claim; (c) Coverage Claim; (d) Related Insurance Claim; (e) Non-Insurer Contribution Claim; (f) Insurer Contribution Claim; (g) Medicare Claim; (h) Penalty Claim; and (i) any other Claim that is otherwise released herein. A Barred Claim further includes any Claim against a Settling Party based on allegations that it is an alter ego or liable as a successor of an Entity that is not a Settling Party or that the Settling Party's corporate veil should be pierced on account of Claims against an Entity that is not a Settling Party or based on any other theory under which the legal separateness of any Person and any other Entity may be disregarded to impose liability for a claim on either such Entity. Notwithstanding the foregoing, Barred Claims do not include any Claims to the extent they are asserted against (x) Non-Settling Insurers or (y) Excluded Parties, notwithstanding that such Entity may also have asserted or be able to assert a Claim for contribution, indemnity, reimbursement, or subrogation against any Settling Party relating to or arising from a such Claim; provided, however, that, for the avoidance of doubt, (i) any Claims that assert liability against such Entity in conjunction with a Settling Party will in all events be Barred Claims as to the Settling Party, (ii) any such Claim for contribution, indemnity, reimbursement, or subrogation against a Settling Party is a Barred Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party for the purposes of this definition.

1.1.20 "**Catholic Charities**" has the meaning set forth in Section 6.3.15.

1.1.21 "**Channeling Injunction**" has the meaning set forth in Section 2.2.2.

1.1.22 "**Claim**" means any past, present or future claim, demand, Action, request, right, cause of action, suit, proceeding or liability of any kind or nature whatsoever,

whether sounding in law, equity, tort, warranty, contract, or under any other theory, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been or may be asserted by or on behalf of any Entity, whether seeking damages (including compensatory, exemplary, punitive, or Penalty claims) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, or orders, including without limitation whether by way of direct action, subrogation, contribution, indemnity, alter ego, veil piercing, or regulatory action, or otherwise, regardless of whether such Claims arise under law, in equity, or under statute, before or after the Petition Date(s), or *in rem* or *in personam*, and include all Claims for damages to the environment or based on any theory of *respondeat superior,* vicarious, successor or transferee liability, or change in control, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

1.1.23 "**Claims Bar Date**" means the date(s) and time(s) indicated in the Final Order(s) (which may be the Plan Confirmation Order) setting the deadline(s) for filing proofs of Abuse Claim against the Debtor or Additional Debtor(s), as applicable.

1.1.24 "**CMS**" has the meaning set forth in Section 2.4.1.

1.1.25 "**Co-Insured Party**" means any other Entity that is a "Named Assured" or "named insured" or "protected person" under the Archdiocese Policies, and all other Entities that are determined by agreement or a court of competent jurisdiction to be an "Assured," an "Additional Assured," an "insured," or "protected person" or otherwise entitled to insurance coverage under any Archdiocese Policies.

1.1.26 "**Conditional Payment**" means any payment made to an Abuse Claimant under the MMSEA, including any payment by a Medicare Advantage Organization (as defined in the MSPA).

1.1.27 "**Controlling Document Provision**" has the meaning given to it in Section 2.2.9.

1.1.28 "**Covered Parties**" or "**Archdiocese Bound Parties**" means, collectively, the following Entities: (a) the Debtor Parties; (b) the Reorganized Debtor; (c) the Reorganized Additional Debtors; (d) the Non-Debtor Catholic Entities; (e) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP; (f) the Parish Schools and Archdiocesan Schools; (g) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans; (h) any Co-Insured Party; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entities' predecessors, successors, assigns, subsidiaries, direct and indirect past, present, and future affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, and estates. For the avoidance of doubt, the

Entities in clauses (g), (h), and (i) are only Archdiocese Bound Parties in connection with the Archdiocese Policies.

1.1.29 "**Coverage Claims**" has the meaning set forth in the Recitals and further includes any Claim under relating to or arising out of the Archdiocese Policies or the rights and obligations thereunder, or the breach thereof, including any Claim seeking insurance coverage.

1.1.30 "**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed in the Archdiocese's Chapter 11 Case on May 20, 2020, [Docket Nos. 94 & 114], as such committee may be reconstituted from time to time.

1.1.31 "**Debtor**" or "**Archdiocese**" means, before the Bankruptcy Plan Effective Date, The Roman Catholic Church of the Archdiocese of New Orleans of Louisiana. As used herein, references to the "Debtor" or "Archdiocese" includes the Debtor's Estate.

1.1.32 "**Debtor Parties**" means (i) the Archdiocese and (ii) all of the Additional Debtors.

1.1.33 "**Diocese of Baton Rouge**" means the Diocese of Baton Rouge. References to the "Diocese of Baton Rouge CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) July 22, 1961 whichever occurred last; references to the "Diocese of Baton Rouge SD" refer to the period after such date.

1.1.34 "**Diocese of Houma-Thibodaux**" means the Diocese of Houma-Thibodaux. References to the "Diocese of Houma-Thibodaux CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) June 5, 1977, whichever occurred last; references to the "Diocese of Houma-Thibodaux SD" refer to the period after such date.

1.1.35 "**Direct Action Claim**" means any Claim by any Entity that is a "direct action" as that term is used in La. Rev. Stat § 22:1269 *et. seq* (or similar law in other jurisdictions) against any Insurer Released Party or related to any Archdiocese Policy, including, without limitation, (a) any claim that is similar or related to any Abuse Claim that could also be asserted by the Archdiocese or any Archdiocese Bound Party, (b) any Claim that directly or indirectly arises out of, relates to, or is connected with any Abuse Claim, (c) any Claim that directly or indirectly arises out of, relates to, or is in connection with any Insurer Released Party's handling of any Abuse Claim under the laws of any applicable jurisdiction, or (d) any Claim arising under any law of any jurisdiction that may give a third party a direct Cause of Action against an Insurer Released Party for monetary or other relief. For the avoidance of doubt, Direct Action Claim does not include the following action: SPARTA Insurance Company v. Pennsylvania General Insurance Company, No. 21-11205 (D. Mass.).

1.1.36 "**Entity**" means any individual, corporation, corporation sole, partnership, association, limited liability company, joint stock company, proprietorship, unincorporated organization, joint venture, trust, estate, executor, legal representative, or any other entity or organization, as well as any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency, department,

board or instrumentality thereof, any other "Person" within the definition of section 101(41) of the Bankruptcy Code, and any successor in interest, heir executor, administrator, trustee, trustee in bankruptcy, or receiver of any Entity and also has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.1.37 "**Estate**" means the (a) the Debtor's estate, and (b) Additional Debtors' estates, each created pursuant to section 541 of the Bankruptcy Code.

1.1.38 "**Excluded Party**" means the following Entities: (a) the Holy See (State of Vatican City); (b) any Perpetrator; and (c) any archdiocese or diocese (other than the Archdiocese itself), any Religious Order, or other Entity that is an affiliate or associated with the Roman Catholic Church (in its capacity as such, and other than (i) the Non-Debtor Catholic Entities; (ii) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP, (iii) the Parish Schools and Archdiocesan Schools; and (iv) any Co-Insured Party); provided, however, that any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party.

1.1.39 "**Extra-Contractual Claim**" means any Claim against any Insurer Released Party seeking any type of relief, other than coverage or benefits, under or with respect to the Archdiocese Policies. Extra-Contractual Claims include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs, or any other type of relief, alleging any of the following with respect to (a) any Archdiocese Policy; (b) any Claim allegedly or actually covered under a Archdiocese Policy; or (c) the conduct of any Insurer Released Party with respect to (a) or (b): (i) bad faith; (ii) failure to provide insurance coverage under any Archdiocese Policy, including any failure to investigate or to provide a defense or adequate defense; (iii) failure or refusal to compromise and settle any Claim insured under any Archdiocese Policy; (iv) failure to act in good faith; (v) violation or breach of any covenant or duty of good faith and fair dealing, whether express, implied, or otherwise; (vi) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (vii) violation of any unfair claims practices act or similar statute, regulation or code, including any statute, regulation, or code relating to unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising; (viii) any type of misconduct; or (ix) any other act or omission of any type by any Insurer Released Party for which the claimant seeks relief other than coverage or benefits under a Archdiocese Policy. "Extra-Contractual Claims" further include all Claims relating to any Insurer Released Party's (x) handling of any Claims under the Archdiocese Policies, (y) conduct in negotiating this Settlement Agreement and/or the Plan, and (z) conduct in the settlement of any Claims. For the avoidance of doubt, Extra-Contractual Claims of the Archdiocese Bound Parties are included within the property Insurer is purchasing hereunder.

1.1.40 "**Final Order**" means an order as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending and in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order will have been affirmed by

9

the highest court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari,* petition for review, or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order will not cause such order not to be a Final Order.

1.1.41  "**Gatekeeper Injunction**" has the meaning set forth in Section 2.2.2.

1.1.42  "**HH**" has the meaning set forth in Section 6.3.15.

1.1.43  "**Indemnified Claims**" has the meaning set forth in Section 7.2 of this Settlement Agreement.

1.1.44  "**Indemnity Cost Reserve**" has the meaning set forth in Section 7.2.1.

1.1.45 "**Injunctions**" means the Sale Injunction, Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeper Injunction.

1.1.46 "**Insurance Settlement Agreement**" has the meaning set forth in the Acceptable Plan.

1.1.47  "**Insurer**" means SPARTA Insurance Company and American Employers' Insurance Company ("SPARTA").[1]

1.1.48 "**Insurer Contribution Claim**" means any (a) Non-Settling Insurer Contribution Claim or (b) Settling Insurer Contribution Claim.

1.1.49 "**Insurer Released Party**" means Insurer and its Related Parties, each in their capacities solely as such with respect to the Archdiocese Policies and all Subject Interests therein.

1.1.50  "**Known Abuse Claims**" means any Abuse Claim, other than an Unknown Abuse Claim, against any Settling Party, Settling Insurer, and/or Non-Settling Insurer.

1.1.51  "**Letter of Credit**" has the meaning set forth in Section 3.1

1.1.52 "**Medicare Claims**" means any Claim by CMS, and/or any agent or successor of CMS, charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA or pursuing a Claim under MSP Provisions, relating to any payments in respect of any Abuse Claim, including any Claim for reimbursement of conditional payments, and any Claim relating to reporting obligations.

---

[1] For the purposes herein, consent to be granted by Insurer may be granted by a corporate representative of SPARTA Insurance Company, a Connecticut entity, solely.

1.1.53 "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which imposes reporting obligations on those Entities with payment obligations under the MSPA.

1.1.54 "**MSPA**" means 42 U.S.C. §1395y et seq., or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto, including the regulations promulgated thereunder, found at 42 C.F.R. §411.1 et seq.

1.1.55 "**Non-Debtor Catholic Entity Policy Sale**" has the meaning set forth in Section 4.6.

1.1.56 "**Non-Debtor Catholic Entities**" collectively means those entities listed on the Acceptable Plan Exhibit B-2 who are not Additional Debtors, but which are (a) insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies and/or (b) have actually or allegedly acquired or been assigned the right to make a claim for coverage under any of the Archdiocese Policies (excluding, however, for the avoidance of doubt, the Debtor Parties, the Settlement Trust, and any Abuse Claimant).

1.1.57 "**Non-Insurer Contribution Claim**" means any Claim for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law that is attributable to, arises from, is based upon, relates to, or results from, an Abuse Claim or payment of an Abuse Claim, and any other derivative or indirect Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, other than a Non-Settling Insurer Contribution Claim or a Settling Insurer Contribution Claim.

1.1.58 "**Non-Settling Insurer**" means any insurer (together with its Related Parties) that is not a Settling Insurer.

1.1.59 "**Non-Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Non-Settling Insurer against any Settling Insurer for the payment of money where such Non-Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.60 "**Parish Schools**" means the elementary Catholic schools that are owned and operated by the Archdiocesan Parishes. For the avoidance of doubt, the definition of Parish Schools expressly excludes Catholic schools that are owned and operated by Religious Orders and the Archdiocesan Schools. For the further avoidance of doubt, the Parish Schools are not separately incorporated.

1.1.61 "**Parties**" has the meaning set forth in the first paragraph of this Settlement Agreement.

1.1.62 "**Penalty Claims**" means a Claim against any Settling Party or Settling Insurer for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Creditor holding such Claim.

1.1.63 "**Perpetrator**" means an individual who personally committed or is alleged to have personally committed an act of Abuse. For the avoidance of doubt, the definition of Perpetrator does not include any individual who did not personally commit an act of Abuse or is not alleged to have personally committed an act of Abuse, but against whom an Abuse Claim or Non-Insurer Contribution Claim is asserted nonetheless, or may be asserted, by virtue of such individual's position or service as a member, representative, contractor, consultant, professional, or volunteer of the Archdiocese or any Non-Debtor Catholic Entity or any council or representative body associated with such Entities.

1.1.64 "**Person**" has the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

1.1.65 "**Petition Date**" means (a) with respect to the Archdiocese, May 1, 2020; and (b) with respect to each Additional Debtor, the date(s) on which such Additional Debtor files in the Bankruptcy Court its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.66 "**Plan**" refers to the Chapter 11 Plan of Reorganization for the Archdiocese and all Additional Debtors (and all exhibits annexed thereto) which shall, among other things, provide for the resolution of Abuse Claims and Subject Interests in the Archdiocese Policies as set forth herein, and which shall be in form and substance acceptable to Insurer in its sole discretion.

1.1.67 "**Plan Confirmation Order**" has the meaning set forth in Section 2.3.

1.1.68 "**Preserved Coverage**" means [**Intentionally Omitted**.]

1.1.69 "**Purchased Property**" means any and all right, title, and interest (including all Subject Interests) in and to the Archdiocese Policies and the Related Insurance Claims and Coverage Claims.

1.1.70 "**Related Insurance Claim**" means (a) any Extra-Contractual Claim and (b) any other Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies, including, without limitation, bad faith Claims.

1.1.71 "**Related Party**" means, with respect to any Entity, such Entity's (a) predecessors, successors, assigns, and any Entity that assumed the obligation of the forgoing for the Archdiocese Policies by novation or otherwise (b) direct and indirect past, present, and future Affiliates (as defined in section 101(2) of the Bankruptcy Code), holding companies, merged companies, related companies, subsidiaries, divisions, acquired companies, joint ventures, joint venturers, (c) current and former employees, officers, directors, principals, partners, managing agents, trustees, volunteers, attorneys,

financial advisors, accountants, investment bankers, consultants, representatives, brokers, adjusters, reinsurers, retrocessionaires, subrogees, agents, claims handling administrators, and other professionals, and (d) respective heirs, executors, estates, and nominees; and all Entities acting on behalf of, by, through or in concert with them, each solely in their capacities as such with respect to such Entity (and with respect to such Entity (including Insurer) that is an insurer of any Archdiocese Bound Party or has assumed the obligations of such by novation or otherwise, such insurer's applicable insurance policy(ies) (including the Archdiocese Policies)). For the purposes of this definition and this Settlement Agreement, Pennsylvania General Insurance Corporation shall not be considered a Related Party of SPARTA Insurance Company.

1.1.72 "**Religious Order**" means, collectively, an institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy.

1.1.73 "**Reorganized Additional Debtors**" means the Additional Debtors, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.74 "**Reorganized Debtor**" means the Debtor, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.75 "**Revival Window**" means Section 2 of La. Acts 2021, No. 322, as amended by La. Acts 2022, No. 386, and La. Acts 2024, No. 481.

1.1.76 "**Revival Window Laws**" means the Revival Window, together with any other law that extends the prescriptive period or statute of limitations for asserting Abuse Claims under Louisiana or other applicable state law.

1.1.77 "**Sale Injunction**" has the meaning set forth in Section 2.1.

1.1.78 "**Settlement Agreement Effective Date**" means the first day on which: (a) the Archdiocese Signatory Parties and Insurer have executed this Settlement Agreement; (b) the Unknown Abuse Claims Representative shall have supported the releases provided for herein and the protections granted hereby and in the Plan in favor of the Insurer Released Parties, in a manner acceptable to Insurer in its sole discretion; (c) the Approval Order shall have become a Final Order; (d) the Plan Confirmation Order shall have become a Final Order; and (e) the Settlement Trust shall have been created pursuant to the Plan; provided, however, with the prior written consent of the Trustee, not to be unreasonably withheld, Insurer may elect to waive the conditions set forth in clauses (b) through (e) and pay or direct the payment of the Settlement Amount to the Settlement Trust prior to the occurrence of the events set forth in (b) through (e) hereof, in which case, the

13

date of such payment shall be the Settlement Agreement Effective Date for all purposes hereunder including the date of the closing of the purchase and sale of the Archdiocese Policies.

1.1.79  "**Settlement Amount**" means the sum of Twenty One Million and 00/100 Dollars ($21,000,000.00) to be paid (in accordance with Section 3.1) by Insurer after satisfaction of all conditions precedent herein in accordance herewith.

1.1.80  "**Settlement Trust**" means the settlement trust established under the Plan for the purposes set forth therein, including assuming liability for all Channeled Claims (as defined in the Acceptable Plan) and Indemnified Claims (as defined herein), subject to the limitations on indemnification and liability contained in Section 7.2 of this Settlement Agreement.

1.1.81  "**Settlement Trust Agreement**" means the agreement between the Debtor and the Settlement Trustee governing the Settlement Trust, in the form of Exhibit D-1 to the Acceptable Plan.

1.1.82 "**Settlement Trust Allocation Protocol**" means the Settlement Trust Allocation Protocol (as defined and used in the Settlement Trust Agreement), in the form of Exhibit D-2 to the Acceptable Plan.

1.1.83  "**Settlement Trust Documents**" means, collectively, (a) the Settlement Trust Agreement, (b) the Settlement Trust Allocation Protocol, and (c) any other agreements, instruments and documents governing the establishment and administration of the Settlement Trust, which shall be consistent with the terms of the Plan, as the same may be amended or modified from time to time in accordance with the terms thereof.

1.1.84  "**Settlement Trustee**" means the Entity appointed to act as the initial trustee of the Settlement Trust pursuant to the terms of the Settlement Trust Documents, along with any successor trustee appointed in accordance with the Settlement Trust Documents.

1.1.85  "**Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Settling Insurer against any Settling Insurer or Non-Settling Insurer for the payment of money where such Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.86  "**Settling Insurers**" shall have the meaning set forth in the Acceptable Plan.

1.1.87 "**Settling Insurers' Policies**" shall have the meaning set forth in the Acceptable Plan.

1.1.88  "**Settling Parties**" means, collectively, the following Entities: (a) Archdiocese Bound Parties; and (b) the Settling Insurers.

    1.1.89 "**Subject Interests**" means all Claims, liens (as defined by Section 101(37) of the Bankruptcy Code), encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief, including: (a) all interests of the Archdiocese in, to and under the Archdiocese Policies; (b) all interests in, to, and under the Archdiocese Policies of any Entity other than the Archdiocese (including all Abuse Claimants and the Archdiocese Bound Parties); and (c) all interests in, to and under the Archdiocese Policies of any other Entity claiming coverage by, through, or on behalf of any Archdiocese Bound Party, including, without limitation, rights and interests as an insured, co-insured or additional insured, insurer or creditors of the Archdiocese Bound Parties; in each case within the meaning of "interest" as used in sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code. For the avoidance of doubt, a Direct Action Claim constitutes a Subject Interest.  The meaning of Subject Interests also includes: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief

whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property.

1.1.90 "**Supplemental Settling Insurers' Injunction**" has the meaning set forth in Section 2.2.2.

1.1.91 "**Unknown Abuse Claim**" means an Abuse Claim that occurred before the Petition Date and the Abuse Claimant did not file a proof of claim by the applicable Abuse Claims Bar Date, for which there exists a valid legal excuse for not filing, as further defined in the in the Acceptable Plan.

1.1.92 "**Unknown Abuse Claims Representative**" means Michael R. Hogan, the legal representative appointed by the Bankruptcy Court pursuant to the *Order (I) Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, and (II) Approving the Retention of Michael R. Hogan as the Unknown Tort Claims Representative, Nunc Pro Tunc To July 26, 2021* (Docket No. 1012), any successor legal representative appointed by the Bankruptcy Court, or, on and after the Bankruptcy Plan Effective Date, any successor legal representative appointed in accordance with the applicable Settlement Trust Document.

1.2 Capitalized terms not defined in this Section 1 or elsewhere in this Settlement Agreement shall have the meanings given to them in the Bankruptcy Code.

## 2. THE BANKRUPTCY CASE AND PLAN OF REORGANIZATION

2.1 On or before July 29, 2025, the Archdiocese shall file a motion in the Bankruptcy Court (the "**Approval Motion**"), in form and substance acceptable to Insurer in its sole discretion, that seeks the entry of an order in substantially the form attached as **Exhibit A** to this Settlement Agreement, or otherwise in form and substance acceptable to Insurer in its sole discretion (the "**Approval Order**") that:

(a) approves this Settlement Agreement, including Insurer's buyback of the Archdiocese Policies and the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests, and otherwise authorizes the Parties to undertake the settlement and the transactions contemplated by this Settlement Agreement, in each case pursuant to sections 363(b), (f),and (m) of the Bankruptcy Code and any other applicable provisions of the Bankruptcy Code;

(b) contains an injunction (the "**Sale Injunction**") that, subject to and conditioned upon the Settlement Agreement Effective Date and the Insurer's payment of the Settlement Amount, bars all Claims against the Insurer Released Parties and their property and assets of each based on or arising out of any Subject Interests in the Archdiocese Policies including without limitation all Coverage Claims, Related Insurance Claims, and Barred Claims, leaving the Settling Insurers free and clear of all Subject Interests of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer

16

(including Non-Settling Insurers); any Abuse Claimant; or any holder of a Barred Claim pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code;

(c) provides that this Settlement Agreement is binding on the Archdiocese Signatory Parties, all other Settling Parties, any trust created in the Bankruptcy Case(s), and any successors of the foregoing; and

(d) provides, subject to and conditioned upon the Settlement Agreement Effective Date, that the Approval Order is binding on all Persons (including, for the avoidance of doubt, all Persons set forth in the foregoing (c)).

2.1.1    The Archdiocese shall provide written notice of the Approval Motion, which notice shall be in form and substance acceptable to Insurer, to, at a minimum, any known Archdiocese Bound Party, holder of an Abuse Claim, or party whose rights or interests may reasonably be considered to be impacted by the relief requested in the Approval Motion, and any party identified on Schedule 3 hereto.  In addition, the Archdiocese shall include notice of the Approval Motion together with notice provided with respect to confirmation of the Joint Plan, including publication notice of the hearing on the Approval Motion. The Archdiocese will provide a draft service list of the foregoing for Insurer's review and comment.

2.1.2    If any Entity files an objection to the Approval Motion, the Archdiocese and Creditors' Committee shall consult with Insurer in connection with filing any written response thereto.  The Archdiocese Signatory Parties, as applicable, and Creditors' Committee shall take commercially reasonable steps to defend against any objection, appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order.  Insurer will cooperate with the Archdiocese Signatory Parties and Creditors' Committee in this regard, including making commercially reasonable submissions.

2.2    The Archdiocese shall file and prosecute a joint Plan with the Creditors Committee, which shall be in form and substance satisfactory to the Insurer in its sole discretion, substantially in the form as the Acceptable Plan, which the Parties acknowledge and agree satisfies the terms of this Settlement Agreement.  Any modifications to the Plan, the Settlement Trust Documents, the Plan Confirmation Order, or the Approval Order, including those relating to the Channeling Injunction, Supplemental Settling Insurers' Injunction, Gatekeeper Injunction, releases by holders of Abuse Claims, Insurers, Insurance Settlement Agreements, and related definitional terms, including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Abuse Related Insurance Claims," "Channeled Claim," "Covered Parties," "Direct Action Claim," "Enjoined Party," "Insurer Contribution Claim," "Non-Insurer Contribution Claim," "Penalty Claims," "Protected Parties," "Settling Insurers," "Settling Insurer's Policies," "Subject Insurance Policies," "Subject Interests," or any exhibits, schedules, and documents related thereto, must be in all respects consistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties without Insurer's written consent in its sole discretion.

2.2.1    The Plan shall create the Settlement Trust, which shall be responsible for making any and all payments to the Abuse Claimants entitled to receive payment under the Plan and which shall assume all liability for Channeled Claims.

2.2.2    The Plan shall include: (a) an injunction in substantially the form included in Article 12.4 of the Acceptable Plan (the "**Channeling Injunction**"); and (b) an injunction in substantially the form included in Article 12.5 of the Acceptable Plan (the "**Supplemental Settling Insurers' Injunction**"); and (c) an injunction in substantially the form included in Article 12.8 of the Acceptable Plan (the "**Gatekeeper Injunction**").

2.2.3    The Plan shall incorporate by reference the releases and indemnities set forth in this Settlement Agreement, including that the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to all Indemnified Claims as forth in Section 7.2 of this Settlement Agreement.

2.2.4    The Settlement Trust Documents shall provide that as a condition to receiving payment from the Settlement Trust, all Abuse Claimants shall provide an Abuse Claim Release and Certification.

2.2.5    The Plan shall provide for the commencement, prior to the Court's consideration of the Approval Motion, by the Additional Debtors of Chapter 11 cases to be jointly administered with the Bankruptcy Case.

2.2.6    The Plan shall provide a supplemental bar date for the Additional Debtors in a form and substance satisfactory to the Insurer with respect to Abuse Claims against the Additional Debtors and the form, manner, and deadline for filing proofs of claim and the treatment of confidential information contained therein.

2.2.7    The Plan shall provide that confirmation of the Plan will not occur unless all of the following conditions precedent have been satisfied: (a) the Plan Confirmation Order approves and implements the Injunctions and (b) the Bankruptcy Court shall have granted the Approval Motion in form and substance acceptable to Insurer in its sole discretion.

2.2.8    The Plan shall provide that the Bankruptcy Plan Effective Date will not occur unless all of the following conditions precedent have been satisfied or waived (as applicable with consent of Insurer): (a) the Plan Confirmation Order will have been entered by the Bankruptcy Court and become a Final Order, and (b) the Bankruptcy Court shall have entered the Approval Order (with both such Approval Order and this Settlement Agreement in form and substance acceptable to the Insurer) and such Approval Order shall have become a Final Order.

2.2.9    The Plan shall provide that (collectively, as follows, the "**Controlling Document Provision**") in the event of a conflict between (a) the Settlement Agreement, on the one hand, and (b) the Plan, on the other, the terms of the Settlement Agreement shall control and govern; and in the event of a conflict between the (x) Approval Order, on the one hand, and (y) Plan Confirmation Order, on the other, the terms of the Approval Order shall control and govern.

18

2.2.10 The Plan shall provide that the execution and delivery of this Settlement Agreement is a condition to entry of the Plan Confirmation Order and the occurrence of the Bankruptcy Plan Effective Date. The inclusion of this Settlement Agreement in the Plan shall not be waivable as a condition to entry of the Plan Confirmation Order or the occurrence of the Bankruptcy Plan Effective Date absent the prior written consent of the Settling Insurers.

2.3     The Debtor Parties shall seek and obtain entry of an order from the Bankruptcy Court, which order shall be in form and substance acceptable to the Parties, that: (i) approves the Plan pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code; (ii) contains the Channeling Injunction; (iii) ratifies the Sale Injunction as independent of the Channeling Injunction and Supplemental Settling Insurers' Injunction; (iv) contains the Gatekeeper Injunction; (v) provides that this Settlement Agreement is binding on any Settlement Trust created in the Bankruptcy Case, the Reorganized Debtor, the Reorganized Additional Debtors, and any successors of the Settlement Trust, Reorganized Debtor, or Reorganized Additional Debtors, and all of the Archdiocese Bound Parties; and (vi) contains the Controlling Document Provision (the "**Plan Confirmation Order**").

2.3.1     The Plan and Plan Confirmation Order must not be inconsistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties.

2.3.2     In seeking to obtain the Plan Confirmation Order, the Debtor and Additional Debtors will: (i) seek a confirmation hearing on an appropriately timely basis; (ii) urge the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) take all reasonable steps to defend against any objection, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order.

2.3.3     Prior to entry of the Plan Confirmation Order, the Archdiocese and/or any applicable Additional Debtor shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Abuse Claim that (i) is asserted against any Debtor Party and (ii) implicates, or is reasonably likely to implicate, any Archdiocese Insurance Policies (including by alleging Abuse that took place during any policy period of any Archdiocese Policy). If, prior to the Plan Confirmation Order becoming a Final Order, the Bankruptcy Court allows any Entity to prosecute any such Abuse Claim, the Debtor Parties shall defend themselves against such Abuse Claims and comply with the terms of any order of the Bankruptcy Court, and Insurer's rights and obligations relating to such litigation shall be determined by, and subject to, the terms and conditions of the Archdiocese Policies, this Settlement Agreement, and any applicable orders of the Bankruptcy Court.

2.3.4     The Plan and Plan Confirmation Order shall provide that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any Covered Party with respect to any Archdiocese Policy, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as

19

confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

2.3.5    Nothing in this Section or elsewhere in this Settlement Agreement shall bar any party from arguing that any appeal from the Plan Confirmation Order should be dismissed on grounds of statutory or equitable mootness or otherwise.

2.3.6    None of the releases, Injunctions, or other provisions of the Plan with apply to, or have any effect, on the rights of the Settling Insurers to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with any Settling Insurer's Policy.

2.4    The Settlement Trust Documents shall require the Settlement Trust to register as a Responsible Reporting Entity under the reporting provisions of MMSEA.

2.4.1    The Settlement Trust Documents shall require the Settlement Trust, at its sole expense, to timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated and to follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

2.4.2    The Settlement Trust Documents shall require the Settlement Trust to obtain, prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Abuse Claim, a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. §1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim.

2.5    The Debtor Parties and Reorganized Debtor and Reorganized Additional Debtors will undertake commercially reasonable actions to cooperate with Insurer in connection with responding to any inquiry from Insurer's regulators, auditors, reinsurers, or retrocessionaires.

2.6    From and after the execution date of this Settlement Agreement and until the earlier of: (A) occurrence of (i) the Settlement Agreement Effective Date and (ii) Insurer's remittance of the Settlement Amount (at which time this covenant is superseded by the releases provided in Section 4); and (B) the date on which this Settlement Agreement is terminated, (i) none of the Insurer Released Parties, the Debtor, the Additional Debtors or Creditors' Committee will initiate any litigation activity against the other in any Bankruptcy Case and (ii) the Archdiocese and the Insurer Released Parties shall cease all litigation activities against each other in the Bankruptcy Case, including that the Insurer Released Parties will neither object to any proposed Plan consistent with this Settlement Agreement, nor serve or compel any discovery in connection with the Bankruptcy Case; *provided that*: (y) neither the Archdiocese nor any Additional Debtor shall include any provision in any Plan that adversely affects the rights or benefits of the Insurer Released Parties under this Settlement Agreement, or that otherwise violates, or is contrary to, the

20

agreements and covenants contained in this Settlement Agreement; and (z) neither the Archdiocese nor any Additional Debtor shall act, or fail to act, in such a way that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement. Notwithstanding the foregoing, the Insurer Released Parties may participate in the Bankruptcy Case for the purpose of supporting or enforcing any of the terms of this Settlement Agreement and protecting their rights.

2.7 From and after the execution date of this Settlement Agreement and until the date on which this Settlement Agreement is terminated, the obligations of the Debtors Parties set forth in this Section 2 shall be binding on the Debtor Parties.

## 3. PAYMENT OF THE SETTLEMENT AMOUNTS

3.1 It is a condition to effectiveness of this Agreement that Insurer shall have arranged for the issuance of a documentary letter of credit for an amount equal to the Settlement Amount (the "**Letter of Credit**") in the form attached as **Exhibit C** to effectuate payment of the Settlement Amount. References herein or in the Plan to "payment" or "delivery" of the Settlement Amount shall be deemed to mean a draw down of the Letter of Credit.

3.1.1 The beneficiary of the Letter of Credit may draw upon the Letter of Credit only in strict accordance with its express terms. In the event that the beneficiary draws down on the Letter of Credit prior to the Settlement Agreement Effective Date, the beneficiary shall hold the entirety of the proceeds in a segregated, interest-bearing trust account, pending the occurrence of the Settlement Agreement Effective Date.

3.1.2 If (a) the beneficiary has drawn down the Letter of Credit and (b) the Settlement Agreement Effective Date has not occurred by December 31, 2031, the beneficiary shall promptly, and in any event within fifteen (15) business days, return to Insurer the full amount of the trust funds, together with any interest accrued thereon, free and clear of any claims, setoffs, or deductions.

3.1.3 If either (a) both (i) the Plan Confirmation Order and (ii) the Approval Order have not been entered by the Bankruptcy Court by June 30, 2026, or (b) this Settlement Agreement is terminated in accordance with Section 5 of this Settlement Agreement, the beneficiary of the Letter of Credit shall return the Letter of Credit to financial institution that issued the Letter of Credit along with written instructions directing that financial institution to terminate and/or cancel the Letter of Credit.

3.1.4 If the Bankruptcy Court enters an order dismissing the Bankruptcy Case, the beneficiary of the Letter of Credit shall return the Letter of Credit to the financial institution that issued the Letter of Credit along with written instructions directing that financial institution to terminate and/or cancel the Letter of Credit.

3.1.5 Nothing in this Section shall be construed to (i) grant the beneficiary any right to retain, use, or apply the proceeds of the Letter of Credit except as expressly provided herein, or (ii) limit either the Insurer's or the beneficiary of the Letter of Credit's right to seek immediate injunctive or equitable relief to enforce the provisions of this Section.

3.2     The delivery of the Settlement Amount to the Settlement Trust shall be in full and final settlement of all responsibilities under and arising out of the Archdiocese Policies, the sale of the Purchased Property to Insurer free and clear of all Subject Interests of any Entity, and the other releases provided.

3.3     Subject to the occurrence of the Settlement Agreement Effective Date, the Parties agree:  (i) the Settlement Amount is the total amount that Insurer is obligated to pay on account of any and all Claims under, arising out of, relating to, or in connection with the Archdiocese Policies (including Barred Claims, and any reimbursement obligations for Conditional Payments under the MSPA); (ii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of anyone in connection with the Archdiocese Policies, including any payments in connection with amounts allegedly owed under the MSPA or in connection with any Claims, including any Barred Claim; (iii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of the Archdiocese Bound Parties or any Abuse Claimants in connection with the Archdiocese Policies; and (iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted. The Parties further agree that the Settlement Amount includes the full purchase price of the Archdiocese Policies and Related Insurance Claims and Coverage Claims of the Archdiocese Bound Parties and consideration for the releases and other protections afforded by this Settlement Agreement.

3.4     The Parties represent and agree that (i) the consideration to be provided by Insurer pursuant to this Settlement Agreement constitutes a fair and reasonable compromise and exchange for the consideration granted to the Insurer Released Parties in this Settlement Agreement (including the releases set forth below), and (ii) the consideration to be provided by the Archdiocese Bound Parties to the Insurer Released Parties pursuant to this Settlement Agreement (including the releases set forth below) constitutes a fair and reasonable compromise and exchange for the consideration granted to the Archdiocese Bound Parties in this Settlement Agreement. The Insurer Released Parties are not acting as volunteers, and the Settlement Amount reflects potential liabilities and obligations to the Archdiocese Bound Parties of the amount Insurer allegedly is obligated to pay.

3.5     Each of the Archdiocese Signatory Parties: (i) consents to the sale of the Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests and Claims of all Persons, including, without limitation, the Archdiocese Bound Parties in accordance with the terms of this Settlement Agreement, and (ii) agrees and acknowledges that the contribution of the proceeds from such sale and settlement to the Settlement Trust, as provided in the Plan and this Settlement Agreement, is a fair and reasonable compromise and exchange for value and constitutes reasonable and adequate consideration for any Subject Interest or Claim the Archdiocese Bound Parties may have in the Archdiocese Policies.

3.6     The Parties further agree that they have attempted to resolve the matters set forth herein in compliance with both state and federal law and believe that the settlement terms adequately consider CMS's interest and do not reflect any attempt to shift responsibility for

22

payment of medical expenses to CMS pursuant to 42 U.S.C. § 1395y(b). The Parties acknowledge, understand, and agree that any present or future action or decision by CMS, including actions regarding an Abuse Claimant's eligibility or entitlement to receive Medicare or Medicare payments, will not render this Settlement Agreement (including the releases set forth in it) void or ineffective, or in any way affect the finality of this Settlement Agreement. The Settlement Trust is responsible for all future medical payments, including any and all claims by CMS and/or CMS contractors that have been or may be in the future arising out of, relating (directly or indirectly) in any way to, or in connection with this Settlement Agreement.

3.7    To facilitate the purchase of the Purchased Property as set forth herein, each Archdiocese Bound Party is authorized to designate a lawful attorney in fact, with full powers of substitution, to execute any bill of sale or other document reasonably requested by the Archdiocese or Insurer to accomplish the sale and purchase contemplated herein. A form of Bill of Sale is attached hereto as **Exhibit B**.

## 4.    RELEASES AND SALE FREE AND CLEAR

4.1    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust, with no further action being required, the Archdiocese Signatory Parties fully, finally, and completely remise, release, acquit, and forever discharge the Insurer Released Parties (including, for the avoidance of doubt, any of their reinsurers or retrocessionaires, solely in their capacity as such), from any and all past, present, and future: (a) Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies or Claims that are covered or are determined to be covered by agreement or a court of competent jurisdiction under the Archdiocese Policies, including, without limitation, any Barred Claims, Direct Action Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims, the handling of the Abuse Claims or the Bankruptcy Case. The Archdiocese Signatory Parties further acknowledge, stipulate, and agree that (x) the releases in this Section 4.1 specifically include all Unknown Abuse Claims, and demands that are based in whole or in part on Unknown Abuse Claims and (y) **with respect to all Claims released under this Section 4.1, the Archdiocese Signatory Parties waive any and all provisions, rights, and benefits conferred by Cal. Civ. Code 1542 or any law of any state of the United States, or any principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code 1542, which provides: "a general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, that, if known by him or her, would have materially affected his or her settlement with the debtor or released party"** and (z) the releases in this Section 4.1 shall be equal in breadth to the broadest releases and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

4.2    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust, and with no further action being required, Insurer shall fully, finally, and completely remise, release, acquit, and forever discharge the Archdiocese Signatory Parties from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies, including

23

any Barred Claims, and reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case subject to the protections in favor of the Insurer Released Parties set forth herein.

4.3    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, none of the Archdiocese Signatory Parties or other Archdiocese Bound Parties shall assert against the Insurer Released Parties any Claim with respect to any matter, conduct, transaction, occurrence, fact, or other circumstance that, directly or indirectly, arises out of, relates to, or is in connection with any of the Archdiocese Policies, any Barred Claim, or any other matter released pursuant to Sections 4.1 and 4.2 above.

4.4    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer hereby buys back the Archdiocese Policies free and clear of all Subject Interests, including without limitation all Coverage Claims and Related Insurance Claims, of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); and any Abuse Claimant, or any other holder of a Barred Claim. This sale is pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code. The Parties acknowledge and agree, and the Approval Order shall find and conclude, that upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount:

4.4.1    Insurer is a good faith purchaser of the Archdiocese Policies and any Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), within the meaning of section 363(m) of the Bankruptcy Code, with all the protections afforded such a purchaser under 363(m) of the Bankruptcy Code;

4.4.2    the consideration exchanged constitutes a fair and reasonable settlement and compromise of the Parties' disputes and of their respective rights and obligations relating to the foregoing Archdiocese Policies and Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), and constitutes reasonably equivalent value;

4.4.3    the releases in this Settlement Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy law;

4.4.4    the Archdiocese Policies and all Subject Interests therein (including, without limitation, to the extent applicable, any Direct Action Claim) shall be terminated and of no further force and effect;

4.4.5    Insurer's payment of the Settlement Amount constitutes Insurer's full and complete performance of any and all obligations under the Archdiocese Policies, including any performance owed to the Archdiocese Bound Parties or any holder or purported holder of any Claim against (including any Abuse Claim or Direct

24

Action Claim) or Subject Interest in, the Archdiocese Policies, and exhausts all limits of liability of the Archdiocese Policies;

4.4.6 All Subject Interests the Archdiocese Bound Parties and any other Entity may have had, may presently have, or in the future may have in the Archdiocese Policies are released pursuant to the terms of this Settlement Agreement and policy buyback;

4.4.7 all per occurrence and/or aggregate limits of coverage under the Archdiocese Policies are fully eroded, exhausted and settled upon the Settlement Agreement Effective Date;

4.4.8 the Insurer would not pay the Settlement Amount without buyback of the Archdiocese Policies upon all of the terms and conditions set forth herein; and

4.4.9 the Archdiocese Signatory Parties accept the Settlement Amount in full and complete compromise and satisfaction of all Insurer Released Parties' past, present, and future obligations, including any obligations to any of the Archdiocese Bound Parties under such Archdiocese Policies or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever that are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies (including without limitation Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether or not such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, the Bankruptcy Case, or otherwise.

4.5 Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer shall have no obligation to pay, handle, object, or otherwise respond to any Claim against the Archdiocese Bound Parties; and the Archdiocese Bound Parties will: (i) will withdraw, and are deemed to have withdrawn, all outstanding tenders of Claims to the Insurer Released Parties for defense and indemnity; (ii) will not tender any Claims to the Insurer Released Parties; and (iii) will not request that the Insurer Released Parties fund any judgments, settlements, or defense costs that, in each case, are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies issued by a Settling Insurer.

4.6 To the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer consent to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under this Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Subject Interests of any Entity in such Archdiocese Policies (the "**Non-Debtor Catholic Entity Policy Sale**"). The Plan Confirmation Order and Approval Order shall so provide and Insurer shall be designated in the Plan

25

Confirmation Order as a good-faith purchaser of the Archdiocese Policies with all the protections afforded such a purchaser under section 363(m) of the Bankruptcy Code.

4.7     [Intentionally Omitted.]

4.8     The Archdiocese Signatory Parties further covenant, stipulate and agree that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Abuse Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any insured or additional insured covered by any insurance policy issued by any Insurer Released Party, and to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in any Archdiocese Policy to the Debtor's Estate and sale thereof to Insurer, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court. Without limiting the foregoing, the Insurer Released Parties shall receive protections against Claims by Non-Debtor Catholic Entities and any other Entity equal in breadth to the broadest protections received by any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, or any Insurance Settlement Agreement approved by the Bankruptcy Court.

4.9     If the Archdiocese Signatory Parties, or anyone of them, enter into any agreement (that is embodied in such agreement as approved by the Bankruptcy Court, the Plan, and/or the Plan Confirmation Order) with any other one of the Settling Insurers (including any Non-Settling Insurer who becomes a Settling Insurer) in the Bankruptcy Case, that provides that insurer with releases, injunctions or other protections that are more favorable than those contained in this Settlement Agreement, then this Settlement Agreement shall be deemed to be modified to provide Insurer with those more favorable injunctions, releases or other protections.

4.10    Notwithstanding anything in this Settlement Agreement, nothing in this Settlement Agreement is intended to or shall be construed to:

4.10.1  apply to or have any effect on the Insurer Released Parties' rights to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer;[2]

4.10.2  release any Claims that any Insurer Released Party has or might have against any Non-Settling Insurer, except that, to the extent such other insurers have agreed or in the future agree to release any Claims against the Insurer Released Parties arising out of or related in any way to the Abuse Claims, then the Insurer Released Parties also release such Claims against such other insurers to the same extent; or

---

[2] For the avoidance of doubt, any release provided pursuant to this Settlement Agreement does not include any release by Insurer of any Claims against Pennsylvania General Insurance Corporation. Nothing in the Settlement Agreement shall impair any right of Insurer to pursue any direct claim or claim based on theories of contribution, indemnity, reimbursement, or subrogation against Pennsylvania General Insurance Corporation.

4.10.3 release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Settlement Agreement or the Plan (to the extent not inconsistent with this Settlement Agreement).

## 5. TERMINATION OF AGREEMENT

5.1 The Parties may terminate this Settlement Agreement by mutual agreement in writing.

5.2 Insurer may terminate this Settlement Agreement upon fifteen (15) days written notice to the other Parties in the event of any of the following occurs prior to the Settlement Agreement Effective Date: (i) any of the Debtor Parties or the Creditors' Committee files a plan inconsistent with this Settlement Agreement; (ii) the Approval Order and the Plan Confirmation Order are not entered by February 15, 2026; (iii) the Bankruptcy Court enters an order that becomes a Final Order that (a) denies the Approval Motion or (b) is inconsistent with the Approval Order or the Plan Confirmation Order; (iv) a plan that is inconsistent with the terms of this Settlement Agreement is confirmed; or (v) any Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

5.3 In the event of termination pursuant to this Section 5, unless the Parties agree otherwise in writing, the Parties' interests, rights, and obligations under the Archdiocese Policies shall not be impacted by such termination.

## 6. REPRESENTATIONS AND WARRANTIES OF THE PARTIES

6.1 The Parties separately represent and warrant as follows:

6.1.1 To the extent it is a corporation, including a non-profit, religious, or charitable corporation, or other legal entity, each such Party has the requisite power and authority to enter into this Settlement Agreement and to perform the obligations contemplated by this Settlement Agreement,[3] subject only to approval of the Bankruptcy Court; and

6.1.2 This Settlement Agreement has been analyzed by counsel to the Parties and executed and delivered in good faith pursuant to arm's length negotiations and for value and valuable consideration.

6.2 The Archdiocese Signatory Parties represent and warrant that they have not assigned, and will not assign, any Subject Interests in the Archdiocese Policies to any Entity, except for the avoidance of doubt, the assignment of the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate.

6.3 The Archdiocese Signatory Parties represent and warrant that (i) all Archdiocese Bound Parties have either signed this agreement, are represented herein by the Archdiocese or the

---

[3] Specifically, each Archdiocese Signatory Party is duly authorized to execute this Settlement Agreement and any related document and the signatory hereto on behalf of such Archdiocese Signatory Party has full power and authority to bind such Archdiocese Signatory Party. The related corporate resolutions and incumbency certificates are identified in Schedule 4 and Schedule 5 respectively.

Archdiocese Signatory Parties, or are juridical entities whose existence has been terminated as a matter of applicable non-bankruptcy law and (ii) the Archdiocese Signatory Parties are duly authorized to bind the Archdiocese Bound Parties who are not Archdiocese Signatory Parties. Without limiting the foregoing, the Archdiocese Signatory Parties represent and warrant that:

6.3.1   all entities known to them that are Co-Insured Parties under the Archdiocese Policies (by express reference, assignment, judicial determination or any related concept under applicable law or other document) other than the Debtor, the Additional Debtors, the Parish Schools and Archdiocesan Schools, the Non-Debtor Catholic Entities, and the cemeteries identified in Section 6.3.3, are identified in Schedule 2 hereto, if any. The Archdiocese Signatory Parties represent and warrant that they are not aware of being an "additional assured" (or related concept under applicable law or document) under any American Employers Insurance Company policy;

6.3.2   the Archdiocesan Schools are not separately incorporated and are merely unincorporated operations of the Debtor and the Parish Schools are not separately incorporated and are merely unincorporated operations of the Archdiocesan Parishes that are Additional Debtors;

6.3.3   the Debtor, through the Office of Catholic Cemeteries, operates certain cemeteries including, without limitation: All God's Babies Tomb & Holy Innocents Prayer Garden, St. Charles Cemetery, St. Joseph Cemetery #1, St. Joseph Cemetery #2, St. Louis Cemetery #1, St. Louis Cemetery #2, St. Louis Cemetery #3, St. Patrick Cemetery #1, St. Patrick Cemetery #2, St. Patrick Cemetery #3, St. Roch Cemetery #1, St. Roch Cemetery #2, St. Vincent De Paul Cemetery #1, St. Vincent DePaul Cemetery #2, which cemeteries are either: (a) Non-Debtor Catholic Entities or (b) not separately incorporated and are merely unincorporated operations of the Debtor;

6.3.4   Holy Redeemer School, Redeemer-Seton High School, and St. Joseph Benedectine High School were formerly owned and operated by the Archdiocese, but ceased operations and were closed by the Debtor at some point prior to the Petition Date, and were not separately incorporated and were merely unincorporated operations of the Debtor;

6.3.5   St. Robert Bellarmine School was formerly owned and operated by one or more of the Archdiocese Signatory Parties, but ceased operations and was closed by one or more of the Archdiocese Signatory Parties at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of one of the Additional Debtors;

6.3.6   Notre Dame Seminary and the Society of the Propagation of the Faith of the Archdiocese of New Orleans are owned and operated by the Archdiocese and are not separately incorporated, but are merely unincorporated operations of the Debtor;

6.3.7   San Pedro Pescador Church was owned and operated by the Archdiocese, but was closed by the Archdiocese prior to the Petition Date and was not separately incorporated, but was merely an unincorporated operation of the Archdiocese;

6.3.8    the following Roman Catholic Schools: the Academy of the Sacred Heart, Holy Cross, Jesuit, St. Mary's Academy, St. Mary's Dominican, Brother Martin, Mount Carmel Academy, Ursuline Academy, Cabrini, De La Salle, and St. Paul's School, are not Co-Insured Parties, named insured's or additional insureds (or related concept under applicable law or document) under the Archdiocese Policies, or institutions, religious organizations or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control and active management, and were themselves not under the control or active management of the Archdiocese;

6.3.9    St. John Vianney Preparatory School was formerly owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.10   the Louise Home a/k/a as the Louise Headstart Center was an unincorporated ministry of the Debtor;

6.3.11   Holy Guardian Angel was owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.12   the Social Apostolate Housing Program was an unincorporated ministry of the Debtor;

6.3.13   at all times Tulane Catholic and the Newman Center were and are unincorporated activities of the Debtor, with no existence separate and apart from the Debtor;

6.3.14   Crescent City Convent Corporation, Lyric Realty and Parking Company, Inc., The Chinchuba Deaf-Mute Institute, People for Teens of St. Anthony of Padua Corporation, Kiwanis Foundation of New Orleans, Kiwanis Club of New Orleans, and Seminarians Parents Association, Inc. were never owned, operated, or controlled by the Debtor or the Additional Debtors and were neither insureds nor additional insureds under the Archdiocese Policies; and

6.3.15   (a) Catholic Charities Archdiocese of New Orleans ("**Catholic Charities**") owned and operated Hope Haven – Madonna Manor ("**HH**"), which was organized under Louisiana law; (b) HH was dissolved and its status as a juridical person was, thus, terminated as a matter of Louisiana law; (c) at all times, Catholic Charities was the sole member and/ or shareholder of HH; and (d) it is the intention of Catholic Charities that HH be bound by this Agreement as if it remained in existence and had signed the Agreement as a Party.

6.4     The Archdiocese Signatory Parties represent and warrant that they are not aware of any Abuse Claim asserted against any entity associated with the Archdiocese (including any parishes, institutions or religious organizations or any subsidiary of the person or organization listed in the declarations of the Archdiocese Policies, or any other organization coming under the

Archdiocese's control and active management), that is not listed on Exhibit B-1 to the Acceptable Plan.

6.5     The Debtor represents and warrants that it will undertake good faith efforts to cause actual notice of the Approval Motion to be sent in accordance with Section 2.1.1 hereof.  Without limitation, the Debtor has sent or will send notice to the entities on Schedule 3.

6.6     The Archdiocese Signatory Parties and Insurer (limited to such Insurer person that worked on and were familiar with this Settlement Agreement and matters referenced therein), respectively, represent and warrant that they have completed a reasonable search for evidence of any policy of insurance issued by Insurer to the Archdiocese Signatory Parties that would afford coverage with respect to any Abuse Claim, Coverage Claim, or Related Insurance Claim and other than the policies identified in Schedule 1, no such policies have been identified.  The Archdiocese Signatory Parties further represent and warrant that, to the best of their knowledge after reasonably diligent investigation: there are no contracts, binders, certificates, and policies of insurance that insure or purport to insure (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) (x) the Diocese of Houma-Thibodaux or (y) the Diocese of Baton Rouge (excluding, for the avoidance of doubt, policies issued to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD, but including any such policies issued to the Archdiocese that provide or may provide insurance coverage to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD), or (iv) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, other than the policies identified in Schedule 1. Notwithstanding the foregoing, nothing in this Settlement Agreement, including the Schedules or Exhibits hereto, shall be construed as or deemed to be an admission or evidence that any binder, certificate, or policy of insurance was in fact issued or affords coverage in connection with any Abuse Claims.

6.7     The Debtor Parties represent and warrant that they have not in any way assisted, and covenant that they shall not in any way assist, any Entity in the establishment or pursuit of any Claim, including any Barred Claim, against the Insurer Released Parties.

## 7.     ACTIONS INVOLVING THIRD PARTIES

7.1     For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Archdiocese Policies resulting from the purchase and sale thereof contemplated by this Settlement Agreement, the Parties hereby agree as follows:

7.1.1     From and after (i) the occurrence of the Settlement Agreement Effective Date, and (ii) Insurer's payment of the Settlement Amount, if any other insurer of the Archdiocese Bound Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from Insurer as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for any of Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense or indemnity obligation of Insurer for any Claims or reimbursement obligations for Conditional Payments released or resolved pursuant to this Settlement Agreement, the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and the Settlement Trust

30

shall voluntarily reduce any judgment or Claim against, or settlement with, such other insurers to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against Insurer. To ensure that such a reduction is accomplished, Insurer shall be entitled to assert this Section 7 as a defense to any action against it brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Insurer from any liability for the judgment or Claim. Moreover, if a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against Insurer, such Claim may be asserted as a defense against a Claim by the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust in any coverage litigation (and the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and/or the Settlement Trust may assert the legal and equitable rights of Insurer in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust shall be reduced dollar for dollar by the amount so determined.

7.1.2 Unless this Settlement Agreement is terminated, Insurer shall not seek reimbursement for any payments it makes under this Settlement Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other Settling Insurer unless that other insurer first seeks contribution, subrogation, indemnification, or similar relief from Insurer. Notwithstanding the foregoing, nothing in this Settlement Agreement, the Approval Order or the Plan Confirmation Order shall be construed as prohibiting Insurer from seeking recovery (including with respect to the Settlement Amount or otherwise) from its reinsurers or retrocessionaires in their capacity as such.

7.2 Subject to the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, and subject to the limitations set forth below, the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein, including any Claims made by (i) any Entity who is an insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies; (ii) any Entity who makes (a) an Abuse Claim or (b) a Related Insurance Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a Claim under any of the Archdiocese Policies (collectively, the "**Indemnified Claims**"), as set forth below:

7.2.1 The Insurer Released Parties shall have the right (but not the obligation) to (a) seek to enforce the Injunctions against any Entity seeking to assert an Indemnified Claim, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions) identified in this Section 7.2. With the Insurer Released Parties' consent, such consent not to be unreasonably withheld, the Settlement Trustee can satisfy the obligations contained in (a) and (b) above. An amount equal to Two Hundred Fifty Thousand and 00/100 Dollars (250,000.00) (the "**Indemnity Cost Reserve**") shall be reserved from the Settlement Amount for payment of reasonable attorneys' fees, expenses, costs, and other amounts incurred by the Insurer Released Parties in defending against such Indemnified Claims, which amount shall be released from

31

reserve if no Indemnified Claims are asserted within 30 days after the Revival Window has closed under every applicable Revival Window Law.

       7.2.2    Neither any Archdiocese Bound Party, nor the Settlement Trust shall in any way assist, any Entity in the establishment or pursuit of any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein.

       7.2.3    The Settlement Trust and Archdiocese shall support and join in the enforcement of the Injunctions against any Entity seeking to assert an Indemnified Claim; *provided that* if the Insurer Released Party(ies) elect(s) not to enforce the Injunctions in accordance with Section 7.2.1, the Settlement Trust shall (a) seek to enforce the Injunctions against such Entity, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions).

       7.2.4    To the extent that a Final Order is entered against any Insurer Released Party with respect to any Indemnified Claim, the Settlement Trust shall indemnify and hold harmless such Insurer Released Party with respect thereto up to the Settlement Amount; *provided that* to the extent the Insurer Released Party(ies) elect not to enforce the Injunctions or defend against the Indemnified Claims, the Settlement Trust's indemnity obligation shall be limited to the amount of the Indemnity Cost Reserve; *provided further* that if the Settlement Trust breaches its obligation set forth in Section 7.2.2 hereof, the Settlement Trust's indemnity obligation shall not be so limited and shall instead be up to the Settlement Amount. In no event shall the Settlement Trust's indemnity obligation exceed each individual Settling Insurer's Settlement Amount. To the extent the Settlement Amount has been distributed in accordance with the Plan, the Settlement Trust's indemnification obligation shall be so reduced.

       7.2.5    The indemnification provided for herein shall not impose liability on the Settlement Trustee or Settlement Trust professionals for their own acts or omissions; *further*, funds provided for the administration of the Settlement Trust or payment of the Settlement Trustee or Settlement Trust professionals shall not be subject to indemnification claims as provided for herein.

       7.3    If any Entity attempts to prosecute a Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies against the Insurer Released Parties before the Approval Order and Plan Confirmation Order become Final Orders, then promptly following notice to do so from Insurer, the Archdiocese and/or the Additional Debtor(s), as applicable, will file a motion and supporting papers to obtain an order from the Bankruptcy Court pursuant to sections 362 and 105(a) of the Bankruptcy Code protecting the Insurer Released Parties from any such Claims until the Plan Confirmation Order has become a Final Order, the Bankruptcy Case is dismissed, or this Settlement Agreement is terminated under Section 5 hereof.

## 8.    MISCELLANEOUS

8.1     If any action or proceeding of any type whatsoever is commenced or prosecuted by any Entity not a Party to this Settlement Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Settlement Agreement, the Parties mutually agree to cooperate fully in opposing such action or proceeding.

8.2     The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Settlement Agreement and to preserve its validity and enforceability.

8.3     The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Plan Confirmation Order, and the Bankruptcy Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof.

8.4     Notwithstanding any language to the contrary in this Settlement Agreement, under no circumstance will any Archdiocese Signatory Party be obligated to take any action that violates any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, and if a court of competent jurisdiction determines that a term or condition in this Settlement Agreement does violate any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, the applicable Archdiocese Signatory Party shall be relieved of such term or condition, but the scope and finality of the releases, injunctions, and buybacks set forth in this Settlement Agreement shall not be affected or modified.

8.5     This Settlement Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.6     This Settlement Agreement may be modified only by a written amendment signed by all of the Parties, and no waiver of any provision of this Settlement Agreement or of a breach thereof shall be effective unless expressed in a writing signed by the waiving Party.  The waiver by any Party of any of the provisions of this Settlement Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach. Any change or modification of this Agreement that would result in a material adverse change to the rights of the Abuse Claimants or Trust shall require the consent of the Creditors' Committee (if at the time of the proposed change or modification a Trustee has not been appointed) or Settlement Trustee (if at the time of the proposed change or modification a Trustee has been appointed and approved), as applicable, which consent shall not be unreasonably withheld.

8.7     By entering into this Settlement Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Settlement Agreement.  No part of this Settlement Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Settlement Agreement.  All actions taken and statements made by the Parties or by their representatives relating to this Settlement Agreement or

33

participation in this Settlement Agreement, including its development and implementation, shall be without prejudice or value as precedent.

8.8     This Settlement Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession regarding liability, culpability, wrongdoing, or insurance coverage. All related discussions, negotiations, and all prior drafts of this Settlement Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. Any evidence of the negotiations or discussions associated with this Settlement Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.8, in (i) an action or proceeding to enforce the terms of this Settlement Agreement, including any use as set forth in Section 7.1.1, or (ii) any possible action or proceeding between the Insurer Released Parties and any reinsurers. This Settlement Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Insurer Released Parties' obligations under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer.

8.9     None of the Parties shall make any public statements or disclosures (i) regarding another Party's rationale or motivation for negotiating or entering into this Settlement Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued or determined by agreement or a court of competent jurisdiction to have been issued by the Insurer Released Parties, including handling of or involvement in connection with any claims asserted thereunder.

8.10    Neither this Settlement Agreement nor the rights and obligations set forth in this Settlement Agreement shall be assigned without the prior written consent of the other Parties.

8.11    This Settlement Agreement was jointly drafted by the Parties, and the wording of this Settlement Agreement was reviewed by legal counsel for each of the Parties, and each of them had sufficient opportunity to propose and negotiate changes prior to its execution. The language of all parts of this Settlement Agreement shall in all cases be construed as a whole according to its meaning and not strictly for or against any Party.

8.12    Section titles and headings contained in this Settlement Agreement are included only for ease of reference and shall have no substantive effect.

8.13    All notices, demands, or other communication to be provided pursuant to this Settlement Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other Entity or address as any of them may designate in writing from time to time:

　　　　If to the Debtor or Reorganized Debtor:

　　　　　　Mark A. Mintz
　　　　　　Samantha A. Oppenheim

Jones Walker LLP
Telephone: 504-582-8368
Telephone: 504-582-8641
Email: mmintz@joneswalker.com
Email: soppenheim@joneswalker.com
            with copies to:


            -and-




If to an Archdiocese Signatory Party other than a Debtor Party:

        As set forth on Plan Exhibit B-2.

If to Insurer or the Insurer Released Parties:

Tess Leopold
242 Trumbull Street,
Suite 204
Hartford, CT 06103

            with copies to:

Michael Rubenstein
Liskow & Lewis, APLC
1001 Fannin Street,
Suite 1800
Houston, Texas 77002
mdrubenstein@liskow.com

If to the Settlement Trust:

Donald C. Massey
Couhig Partners, LLC
1100 Poydras Street, Suite 3250
New Orleans, Louisiana 70163
Telephone: (504) 599-5777
Email: dmassey@couhigpartners.com


            with copies to:

35

Andrew W. Caine
Pachulski, Stang, Ziehl & Jones LLP
10100 Santa Monica Blvd, Suite 1300
Los Angeles, CA 90067
Telephone: 310-277-6910
Email: acaine@pszjlaw.com

8.14    This Settlement Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument. This Settlement Agreement may be executed and delivered by facsimile, e-mail, or other electronic image, which facsimile, e-mail, or other electronic image counterparts shall be deemed to be originals.

8.15    Nothing contained in this Settlement Agreement shall be deemed or construed to constitute (i) an admission by the Insurer Released Parties that the Archdiocese Bound Parties, or any other Entity, was or is entitled to any insurance coverage under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by the Insurer Released Parties or as to the validity of any of the positions that have been or could have been asserted by the any of the Archdiocese Bound Parties, (ii) an admission by any of the Archdiocese Bound Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by the Insurer Released Parties or any Claims that have been or could have been asserted by the Archdiocese Bound Parties against the Insurer Released Parties, or (iii) an admission by the Archdiocese Bound Parties or the Insurer Released Parties of any liability whatsoever with respect to any of the Abuse Claims.

8.16    The Parties to this Settlement Agreement, all of the Entities included in the definition of "Insurer Released Parties," and the Settlement Trust are intended beneficiaries of this Settlement Agreement. Except as set forth in the preceding sentence or otherwise set forth in this Settlement Agreement, there are no third-party beneficiaries of this Settlement Agreement.

8.17    The Archdiocese Signatory Parties and the Insurer Released Parties shall each be responsible for their own fees and costs incurred in connection with the Bankruptcy Case, this Settlement Agreement, and the implementation of this Settlement Agreement, except as specifically set forth herein (including in Section 7).

8.18    The following rules of construction shall apply to this Settlement Agreement:

8.18.1    Unless the context of this Settlement Agreement otherwise requires: (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Settlement Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.18.2    References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and

regulatory provisions regardless of whether specifically referenced in this Settlement Agreement.

       8.18.3  The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Settlement Agreement when the stated intent is not achieved.

       8.19    The Bankruptcy Court in the Bankruptcy Case shall retain jurisdiction to interpret and enforce the provisions of this Settlement Agreement, which shall be construed in accordance with Louisiana law without regard to conflicts of law principles thereof. The Insurer Released Parties do not, by virtue of this Section 8.19 or any other provision in this Settlement Agreement, consent to the Bankruptcy Court's jurisdiction as to any other matter.

       8.20    This Settlement Agreement and each Debtor Party's obligations under this Settlement Agreement shall be binding on each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) and shall survive the entry of the Plan Confirmation Order; provided, however, after the occurrence of the Bankruptcy Plan Effective Date, recourse for all obligations, other than those set forth in Sections 6.5, 6.7, and 7 hereof or a remedy of specific performance, shall be to the Settlement Trust; provided further, however, if specific performance is not available, each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) may be held liable for an intentional breach of a representation in this Agreement or their bad faith material breach of this Agreement, and if liability on any such ground is established, then recourse may be had directly against the Debtor Party, Reorganized Debtor, and/or Reorganized Additional Debtor(s) responsible.

       8.21    The obligations of the Parties herein, other than those conditioned upon the Settlement Agreement Effective Date, shall be binding upon execution hereof by the Parties.

       8.22    Nothing in this Settlement Agreement will prevent Insurer from allocating the Settlement Amount among the Archdiocese Policies at Insurer's discretion.

       8.23    If any provision of this Settlement Agreement, or the application thereof, shall for any reason or to any extent, be construed to be invalid or unenforceable, the remainder of this Settlement Agreement, and the application of such provision to other circumstances, shall be interpreted so as to best effect the intent of the Parties, unless such determination of invalidity or unenforceability deprives any Party of the substantial benefit of its bargain.

       8.24    The Parties agree that all matters relating to the negotiation and terms of this Settlement Agreement (including by way of example and not limitation, all prior drafts, exchanges of terms, and related discussions or correspondence) shall be confidential and are not to be disclosed except by order of court or consent of the Parties in writing. This Section 8.24 does not prevent or prohibit the Parties from publicly filing on the docket in the Bankruptcy Case the final, executed copy of this Settlement Agreement.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed: _____

_____

Date: _____

*[Signatures Continue on Adjacent Pages]*

38

**SPARTA Insurance Company and American Employers' Insurance Company**

Signed: _____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

39

**All Archdiocese Signatory Parties**
**Other than the Archdiocese**


Signed: _____


Name Printed: _____

Title:        **Their Authorized Signer** _____

Date:        _____


*[Signatures Continue on Adjacent Pages]*


40

**Exhibit A**

**Sale Order**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: | § | CASE NO. 20-10846 (MSG) |
|  | § |  |
| THE ROMAN CATHOLIC CHURCH | § | CHAPTER 11 |
| OF THE ARCHDIOCESE OF NEW | § |  |
| ORLEANS, *et al.*,[1] | § | SECTION A |
|  | § |  |
| DEBTORS. | § | COMPLEX CASE |
|  | § |  |

## ORDER (I) APPROVING SPARTA INSURANCE COMPANY'S SETTLEMENT AGREEMENT, RELEASE AND BUYBACK, (II) APPROVING THE SALE OF THE ARCHDIOCESE POLICIES FREE AND CLEAR, (III) ENJOINING CLAIMS, AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated July 29, 2025 [D.E. 4181] and supplemented by the filing of the revised Settlement Agreement (as defined below) on October 27, 2025 [D.E.[∗]] ("Approval Motion") of The Roman Catholic Church of the Archdiocese of New Orleans, the lead debtor and debtor-in-possession (the "Debtor" or "Archdiocese") and the other debtors and debtors-in-possession[2] (the "Additional Debtors" and, together with the Archdiocese and their respective Bankruptcy Estates, the "Debtor Parties") in the above-captioned chapter 11 cases, by and through their respective counsel, for entry of an order (this "Order") approving the settlement agreement, releases, insurance policy buyback, and related injunction-in-aid ("Settlement") by and among the Archdiocese, the Additional Debtors, the other Archdiocese Signatory Parties, the Creditors' Committee, and SPARTA Insurance Company and American Employers' Insurance Company ("Insurer" and, collectively with the foregoing, the "Parties"), pursuant to Sections 105(a) and 363

---

[1]  The last four digits of the Debtor's federal tax identification number is 8966.

[2]  In connection with the Plan, the Catholic Entities listed on Plan Exhibit B-1 (the **"Additional Debtors"**) filed individual chapter 11 cases. The Plan is a combined joint Plan for the Archdiocese and the Additional Debtors, and the Approval Motion is deemed to have been filed (and this Order is entered) in each Additional Debtor's bankruptcy case for purposes of the relief requested herein.

of Title 11 of the United States Code ("Bankruptcy Code") and Rules 2002(a)(2), 6004, and 9019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), in each case as described in the Approval Motion and the *Settlement Agreement, Release, and Policy Buyback* attached to this Order as **Exhibit 1** (the "Settlement Agreement");[3] and the Bankruptcy Court having reviewed the Approval Motion and the Settlement Agreement; and it appearing that due and adequate notice of the Approval Motion and Settlement Agreement having been given to all Entities entitled thereto, and that no other or further notice need be given; and the Bankruptcy Court on November 17, 2025 at 9:00 AM having held a hearing (the "Sale Hearing") to consider the relief requested in the Approval Motion; and upon the record of the Sale Hearing; and, after due deliberation, including, without limitation, for the reasons stated by the Bankruptcy Court on the record of the Sale Hearing, it appearing that the relief requested in the Approval Motion and granted herein is in the best interests of the Debtor Parties' estates (the "Estates"), their creditors, and other parties in interest; and good sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.     This Bankruptcy Court has jurisdiction over the Approval Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of this case and the Approval Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.     The statutory predicates for the relief sought in the Approval Motion are Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007. 9008 and 9019,

---

[3]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

2

4910-0549-1059v.7

and Rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Louisiana.

C.      It is necessary and appropriate for the Bankruptcy Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Settlement Agreement, and to adjudicate, if necessary, to the extent provided under 28 U.S.C. § 1334(b), any and all disputes arising from or relating to the Settlement Agreement or this Order.

D.      Proper, timely, adequate and sufficient notice of the Sale Hearing and Approval Motion and the relief requested therein, including, without limitation, the Settlement and the transactions described in the Settlement Agreement, including, without limitation, issuance of the injunction-in-aid referenced in the Settlement Agreement and the Approval Motion (all such transactions being collectively referred to, for convenience, as the "Sale Transaction") has been provided by the Debtor Parties in accordance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules to all interested Entities, including without limitation the parties listed on **Schedule 3** of the Settlement Agreement, through service of the Confirmation Hearing Notice (as defined in the Plan) in accordance with the Disclosure Statement Order (also as defined in the Plan).

E.      Notice of the Approval Motion was provided through publication of the Additional Debtors' Abuse Claims Bar Date Publication Notice (**Plan Exhibit G**) in daily and community newspapers throughout Louisiana.

F.      The notices described above were good, sufficient, and appropriate under the circumstances, and no other notice of the Approval Motion or Sale Hearing is required.

G.      The disclosures made by the Debtor Parties concerning the Settlement Agreement, the Sale Transaction, and the Sale Hearing were good, complete, and adequate.

3

4910-0549-1059v.7

H.      The Unknown Abuse Claims Representative has consented to, and approved of the Settlement Agreement and Sale Transaction on behalf of Unknown Abuse Claims in connection with the treatment of such Claims under the Plan.

I.      A reasonable opportunity to object or be heard with respect to the Approval Motion and the relief requested therein has been afforded to all interested Entities.

J.      The Archdiocese Signatory Parties, on their own behalf and on behalf of the Archdiocese Bound Parties, as applicable, have duly executed the Insurance Settlement Agreement by their duly authorized representative, agent and/or attorney in fact, and have full corporate power and authority to consummate the Sale Transaction pursuant to the Settlement Agreement and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Settlement Agreement, are required for the Archdiocese Bound Parties to consummate the Sale Transaction.

K.      The Debtor Parties have demonstrated (i) good, sufficient, and sound business purpose and justification and compelling circumstances for the Sale Transaction pursuant to Section 363(b) of the Bankruptcy Code and (ii) that the Sale Transaction is fair, reasonable, and in the best interests of their Estates and creditors pursuant to Bankruptcy Rule 9019. Among other things, the Debtor Parties have demonstrated that: the Settlement Agreement, and closing thereon, is necessary and appropriate to realize the value of the Purchased Property (as defined below) and maximize the value of their Estates; the probability of success for their Estates in litigation over the matters resolved by the Settlement Agreement is uncertain; litigation of the matters resolved by the Settlement Agreement would be complex and costly to their Estates; and the Settlement Amount is within the reasonable range of potential litigation outcomes. As used herein, "Purchased Property" means, collectively, all right, title and interest (including "Interests" as defined below)

4

4910-0549-1059v.7

257

in and to the Archdiocese Policies issued by Insurer and the Related Insurance Claims and Coverage Claims. The Sale Transaction constitutes a reasonable and sound exercise of the Debtor Parties' business judgment and their powers and duties under applicable law and should be approved. Approval of the Settlement Agreement and consummation of the Sale Transaction are in the best interests of the Debtor Parties' Estates, their creditors (specifically including the Abuse Claimants of the Debtor Parties), and other parties-in-interest, including because the proceeds of and from the Sale Transaction will benefit Abuse Claimants.

L.      The Settlement Agreement was negotiated, proposed, and entered into without collusion, in good faith, and from arm's length bargaining positions. Without limiting the foregoing, the Settlement Agreement resulted from a lengthy mediation that proceeded pursuant to a prior order of the Bankruptcy Court. Insurer is not an "insider" or "affiliate" (as those terms are defined in the Bankruptcy Code) of any of the Debtor Parties. None of the Archdiocese Bound Parties or Insurer have engaged in any conduct that would: (i) cause or permit the avoidance of the Settlement Agreement or the consummation of the Sale Transaction under Section 363(n) of the Bankruptcy Code; (ii) cause or permit the imposition of any costs or damages (including without limitation attorneys' fees or punitive damages) under Section 363(n) of the Bankruptcy Code; or (iii) prevent the application of Section 363(m) of the Bankruptcy Code. The releases, injunctions, policy buyback, and all other components of the Sale Transaction comply with the Bankruptcy Code and all applicable non-bankruptcy law.

M.      Pursuant to the Settlement Agreement and to the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer have consented to the assignment of the Non-Debtor Catholic Entities' Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities'

5

Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under the Settlement Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Interests of any Entity in such Archdiocese Policies (the "Non-Debtor Catholic Entity Policy Sale").

N.     Insurer is a good faith purchaser of the Purchased Property under Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, in that, among other things: (i) all payments to be made by or to Insurer, and other agreements or arrangements entered into by Insurer, including without limitation any escrow agreement pertaining to the payment of the Settlement Amount, in connection with the Sale Transaction have been disclosed; (ii) Insurer neither induced nor caused the Debtor Parties' chapter 11 filings; (iii) the negotiation and execution of the Settlement Agreement and any other agreements or instruments related thereto was in good faith, the arm's length transaction between Insurer and the other Parties was the product of mediation, and all Parties to the Settlement Agreement were, or had the opportunity to be, represented by counsel; and (iv) Insurer has not violated Section 363(n) of the Bankruptcy Code by any action or inaction. Insurer has at all times acted in good faith with respect to the Settlement Agreement and will continue to be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale Transaction.

O.     The terms and conditions of the Settlement Agreement are fair and reasonable. The Settlement Amount provided by Insurer pursuant to the Settlement Agreement (i) is fair and reasonable; (ii) monetizes the Purchased Property at the highest and best amount; (iii) will provide a higher and more certain recovery for the Debtor Parties' creditors than would be provided by

4910-0549-1059v.7

any other practical available alternative given the complexity, cost, and uncertainty of such alternatives; (iv) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (v) constitutes reasonably equivalent value (as defined in Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law. The Settlement Amount is within the reasonable range of potential litigation outcomes, and the Debtor Parties' determination to accept the Settlement Amount and otherwise enter into the Settlement Agreement is a valid and sound exercise of their business judgment and consistent with the Debtor Parties' fiduciary duties. The releases to be made pursuant to the Settlement Agreement, including without limitation the releases of the Archdiocese Bound Parties and the Insurer Released Parties, are appropriate and should be approved.

P.      Insurer: (i) is not a mere continuation of any of the Archdiocese Bound Parties or the Estate of any of the Debtor Parties, nor is there any continuity of enterprise between Insurer and the Debtor Parties or Insurer and any of the other Archdiocese Bound Parties; (ii) is not holding itself out to the public as a continuation of any of the Archdiocese Bound Parties; and (iii) is not a successor to the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties for any purpose, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of Insurer and any of the Archdiocese Bound Parties.

Q.      The Settlement Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither Insurer nor any of the Archdiocese Bound Parties are fraudulently entering into the Sale Transaction.

4910-0549-1059v.7

R.      The transfer of the Purchased Property to Insurer (i) does not constitute an avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law and (ii) does not and will not subject Insurer to any liability whatsoever with respect to the Debtor Parties' operation prior to the closing of the Sale Transaction (i.e., the occurrence of both the Settlement Agreement Effective Date and payment[4] of the Settlement Amount by Insurer to the Settlement Trust or Escrow Agent pursuant to the terms of Insurer's Settlement Agreement) (the "Closing").

S.      Insurer has agreed to purchase the Purchased Property pursuant to its Settlement Agreement and this Order; Insurer has not agreed to purchase, and is not purchasing, any other assets of the Estate of any of the Debtor Parties. Insurer has not agreed to assume, and after Closing shall have no obligations with respect to, any liabilities of the Archdiocese Bound Parties. Without limiting the generality of the foregoing, Insurer: (i) is not assuming and shall have no liability for any Claims arising from or relating to Abuse, the Purchased Property, or the Bankruptcy Case; and (ii) is not assuming and shall have no liability with respect to the Archdiocese's or any other Archdiocese Bound Party's obligations to Abuse Claimants, any other creditors, future claimants (including without limitation Unknown Abuse Claimants), or the Archdiocese's or any Archdiocese Bound Party's employees, in each case, by reason of the purchase of the Purchased Property under the Settlement Agreement.

T.      The Purchased Property constitutes property of the Debtor Parties' Estates, and the Archdiocese Bound Parties are the lawful owner of the Purchased Property and hold good title thereto. The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement

---

[4]   For the avoidance of doubt, all references to "payment" or "delivery" of the Settlement Amount by Insurer herein shall encompass all transfers of the Settlement Amount contemplated by the Settlement Agreement, including without limitation funding and transfer of funds to the Settlement Trust via letters of credit or escrow accounts.

4910-0549-1059v.7

will be a legal, valid, binding, and effective transfer of the Purchased Property, and will vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property, in each case free and clear of all Interests (as defined below, including, without limitation, any Interests of the Archdiocese Bound Parties, Abuse Claimants, and holders of Direct Action Claims). Upon Closing, Insurer shall have no liability for any Claims against or liabilities of the Debtor Parties, their Estates, or the other Archdiocese Bound Parties. Without limiting any of the foregoing, the Archdiocese, the Archdiocese Signatory Parties, and Insurer have agreed that, upon Closing: (i) the Purchased Property shall be deemed void *ab initio*, terminated, extinguished, and of no further force and effect; and (ii) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

U.    Pursuant to §§ 363(f) and 105(a) of the Bankruptcy Code, and subject to the terms and conditions set forth in the Settlement Agreement, and upon Closing, without the need for further action, the Debtor Parties shall be deemed to have sold, transferred and conveyed the Purchased Property to the Insurer, and the Insurer shall be deemed to have purchased from the Debtor Parties, all right title and interest in and under the Purchased Property, free and clear of all "Interests" of any Entity of any kind or nature whatsoever, to the fullest extent permitted under §§ 363(b) and (f) of the Bankruptcy Code, with such "Interests" including: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands,

9

encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not

limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any

attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all

debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any

and all Claims, Subject Interests, obligations, demands, guaranties, options, rights, contractual

commitments, executory contracts, unexpired leases, employment agreements, any other

employee, workers' compensation, occupational diseases or unemployment or temporary

disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims,

interests and matters of any kind and nature, whether arising prior to or subsequent to the

commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law,

equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand,

liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost,

assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in

admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual,

direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims,

any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims

practices, breach of any implied duty of good faith and fair dealing, including, but not limited to,

La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action

Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5)

of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and

(d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor

Parties' Estates, including without limitation any asserted by any third party or any other person

or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand

10

is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property. Without limiting the generality of the foregoing and without finding that any Entity has any Interest in the Archdiocese Policies: (i) any Entity with Interests (if any) in or with respect to the Purchased Property who did not object, or who withdrew their objections to the Sale Transaction or the Approval Motion have waived their right to object to the sale of the Purchased Property free and clear of such Entity's Interests in the Purchased Property pursuant to Section 363(f)(2) of the Bankruptcy Code; and (ii) any such Entity with Interests in or with respect to the Purchased Property who objected to the Approval Motion and did not withdraw any such objection (a) are the holders of Interests subject to *bona fide* dispute under Bankruptcy Code Section 363(f)(4) and/or (b) can be compelled to accept a monetary satisfaction of their Interests within the meaning of Section 363(f)(5) of the Bankruptcy Code.

V.      If the sale of the Purchased Property were not free and clear of all Interests, including without limitation all Abuse Claims, Direct Action Claims, and Coverage Claims, or if the Insurer Released Parties would, or in the future could, be liable for any of the Interests, Insurer would not have entered into the Settlement Agreement and would not consummate the Sale Transaction or pay the Settlement Amount, thus adversely affecting the Debtor Parties, their Estates, and their creditors (including, without limitation, the Abuse Claimants), as well as the other Archdiocese Bound Parties.

4910-0549-1059v.7

W.      Issuing a supplemental injunction under Section 105(a) of the Bankruptcy Code as provided herein is essential to give effect to the sale of the Purchased Property to Insurer and this Order's approval of such sale free and clear of Interests pursuant to Section 363(f) of the Bankruptcy Code. The Sale Injunction set forth in Paragraph 23 below not only is a necessary prerequisite for Insurer's assent to the terms and conditions of its Settlement Agreement, such that Insurer will not consummate the Sale Transaction or pay its Settlement Amount in the absence of such an injunction from this Bankruptcy Court, but also is warranted to ensure compliance with this Order.  Likewise, Insurer will not consummate the Sale Transaction or pay its Settlement Amount without the benefit of the releases contained in the Settlement Agreement and approval thereof by the Bankruptcy Court.

X.      Neither the Settlement Agreement nor the Sale Transaction constitute a *sub rosa* chapter 11 plan. The Settlement Agreement does not impermissibly restructure the rights of the Debtor Parties' creditors nor impermissibly dictate a chapter 11 plan for the Debtor Parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.      The Approval Motion, and the relief sought therein (including without limitation the approval of the Settlement Agreements and the Sale Transaction) is GRANTED and APPROVED, in all respects as set forth herein.

2.      The findings of fact set forth above and conclusions of law stated herein, in addition to any findings of fact and conclusions of law stated by the Bankruptcy Court at the Sale Hearing, shall constitute this Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the Approval Motion pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall

12

be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.      Any and all objections, if any, to the Approval Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case the Entity asserting the objection or reservation of rights is enjoined from taking any action against the Insurer Released Parties or the assets or property of any Insurer Released Parties to recover any Claim or Interest held by such objecting Entity. Those parties who did not object or who withdrew their objections to the Approval Motion are deemed to have consented to the relief granted herein, pursuant to Section 363(f)(2) of the Bankruptcy Code.

## Approval of the Settlement Agreement

4.      The Settlement Agreement is approved in its entirety, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Without limiting the generality of the foregoing, the settlement and releases of Claims as set forth in the Settlement Agreement is hereby approved pursuant to Bankruptcy Rule 9019. All factors set forth in *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey* (*In re Cajun Elec. Power Coop.*), 119 F. 3d 349, 356 (5th Cir. 1997), either weigh in favor of the Settlement Agreement or do not apply.

5.      Pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, the Non-Debtor Catholic Entity Policy Sale, free and clear of all Interests of any Entity in the Archdiocese Policies, is hereby approved.

6.      Pursuant to Section 363(b) of the Bankruptcy Code, each of the Parties is authorized to consummate the Sale Transaction under and in accordance with the terms and conditions of the

13

Settlement Agreement, and the Archdiocese Bound Parties shall at all times act in accordance with the terms thereof.

7.      Any representative, agent or attorney in fact of the Archdiocese Signatory Parties is authorized to execute any other documentation and perform such other ministerial tasks as may be reasonably necessary to effectuate the Settlement Agreement and the Sale Transaction on behalf of the Archdiocese Bound Parties, including without limitation, any bill of sale substantially in the form attached to the Settlement Agreement as **Exhibit B**.

8.      Subject to all of the terms and conditions of the Settlement Agreement, upon Closing, the Archdiocese Bound Parties and Insurer shall be deemed to have granted the releases as set forth in the Settlement Agreement.

9.      The Parties are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Settlement Agreement, together with all additional instruments and documents that may be reasonably necessary, convenient, or desirable to implement the Settlement Agreement and consummate the Sale Transaction pursuant thereto and effectuate the provisions of this Order and the transactions approved hereby, and to take all further actions as may be requested by Insurer for the purpose of assigning, transferring, granting, conveying, and conferring to Insurer or reducing to Insurer's possession, the Purchased Property, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Settlement Agreement.

10.      Insurer is authorized and directed to pay the Settlement Amount under and subject to the satisfaction of all terms and conditions of the Settlement Agreement.

11.      The Settlement Amount provided by Insurer for the Purchased Property (i) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title

14

IV, Chapter 12 of the Louisiana Civil Code; and (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

12.     None of the Insurer Released Parties shall be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its or their rights or remedies under the Settlement Agreement or any other document related to the Settlement Agreement or the Sale Transaction. The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order; *provided*, *however*, that this Bankruptcy Court shall retain jurisdiction over any and all disputes with respect thereto.

13.     This Order shall be binding in all respects upon: (a) the Debtor Parties and their Related Parties; (b) the Debtor Parties' Estates; (c) the other Archdiocese Bound Parties; (d) all creditors of the Debtor Parties; (e) all Abuse Claimants and holders of Direct Action Claims; (f) all holders of Interests whether known or unknown against or on all or any portion of the Purchased Property; (g) any Non-Settling Insurer; (h) the Insurer Released Parties; (i) the Purchased Property; (j) the Unknown Claims Representative; (k) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code; and (l) all Entities receiving notice (or deemed to have received notice pursuant to this Order) of the Approval Motion or the Sale Hearing, including without limitation all Entities listed on **Schedule 3** to the Settlement Agreement.  The Settlement Agreement shall be binding in all respects upon: (x) the Debtor Parties, their Estates, and their Related Parties; (y) the

4910-0549-1059v.7

Archdiocese Bound Parties; and (z) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code.

## Transfer of Assets

14.     The conditions of Section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Archdiocese may sell the Purchased Property free and clear of any Interests therein.

15.     Pursuant to Sections 105 and 363(b) and (f) of the Bankruptcy Code, Bankruptcy Rule 9019, applicable Louisiana State law, the testimonial and other documentary evidence filed in support of the Approval Motion, and the record of the Sale Hearing, the Archdiocese has set forth the legal authority necessary to support this Bankruptcy Court's findings herein.

16.     Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Property and the Archdiocese Bound Parties' rights, title, and interest therein shall upon Closing be transferred to Insurer, free and clear of all Interests (including without limitation the Interests of any of the Archdiocese Bound Parties), and all such Interests are unconditionally and forever released and extinguished as against the Purchased Property. Without limiting the generality of the foregoing, the sale of the Purchased Property under the Settlement Agreement shall be free and clear of all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any

4910-0549-1059v.7

other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim
or any portion of the Purchased Property.

17.     Upon the Closing, (a) all of the Archdiocese Bound Parties', the Debtor Parties'
Estates', and the Settlement Trustee's rights under and with respect to the Purchased Property, if
any, shall be permanently and irrevocably extinguished as if the Archdiocese Policies had never
been issued and (b) the Insurer Released Parties shall be entitled to all of the protections afforded
by §363(m) of the Bankruptcy Code.

18.     Upon Closing, all Entities (and their respective successors and assigns), including
but not limited to all governmental, tax, and regulatory authorities, Archdiocese Bound Parties,
Non-Settling Insurers, Abuse Claimants, Direct Action Claimants, trade and other creditors, and
any Entities holding Interests (whether legal or equitable, secured or unsecured, matured or
unmatured, contingent or non-contingent, senior or subordinated) against, in, or with respect to the
Purchased Property, including, without limitation, such Interests arising or accruing under or out
of, in connection with, or in any way relating to the transfer of the Purchased Property to Insurer,
hereby are forever barred, estopped, and permanently enjoined from asserting such Person's or
Entity's Interests against the Purchased Property, the Insurer Released Parties, or the assets or
property of any Insurer Released Parties. Effective upon Closing, none of the Insurer Released
Parties shall have any liability for any Claims (a) against the Debtor Parties, their Estates, or any
of the Archdiocese Bound Parties or (b) that arise under or related in any way or in respect of the
Purchased Property.

19.     The transfer of the Purchased Property to Insurer pursuant to the Settlement
Agreement constitutes a legal, valid, and effective transfer of the Purchased Property, and shall
vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties

4910-0549-1059v.7

in and to the Purchased Property. Upon Closing, the Archdiocese Policies shall be terminated and no longer in force or effect, exhausted in retrospect as to all coverages, and all Interests that the Archdiocese or any other Person or Entity (including without limitation any of the other Archdiocese Bound Parties) may have had, may presently have, or may in the future have, in such Purchased Property are released and extinguished, and all such Entities (including without limitation the Archdiocese Bound Parties) hereby are forever barred, estopped, and permanently enjoined from asserting any such Interest against the Purchased Property and/or any of the Insurer Released Parties. Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent constitutes full and complete performance of any and all obligations under the Purchased Property, including without limitation any performance owed to the Archdiocese Bound Parties, and all limits of coverage under the Archdiocese Policies, including per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

20.     Upon occurrence of the Closing:

(a)     all Interests the Archdiocese Bound Parties may have had, may presently have, or in the future may have in the Purchased Property, as applicable, are released pursuant to the terms of the Settlement Agreement; and

(b)     the Archdiocese Bound Parties accept Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent in full and complete satisfaction of Insurer's past, present, and future obligations, including, without limitation, any obligations to any of the Archdiocese Bound Parties under such Purchased Property or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever arising out of or related in any way to such Purchased Property

18

(including Coverage Claims), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, direct or indirect, and regardless of whether such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, or otherwise.

## No Successor Liability

21. The transfer of the Purchased Property to Insurer shall not result in any Insurer Released Parties or the Purchased Property having any of the following: (a) any liability or responsibility for Interests in or Claims against the Archdiocese Bound Parties or any of their Related Parties; (b) liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any Claims or Interests; or (c) any liability or responsibility to the Archdiocese Bound Parties except as is expressly set forth in the Settlement Agreement.

22. Without limiting the generality of the foregoing, none of the Insurer Released Parties shall have any successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability, *de facto* merger or joint venture, mere continuation or substantial continuity, whether known or unknown as of Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between the Archdiocese Bound Parties and any non-debtor subsidiary or affiliate (including, without limitation, any other Archdiocese Bound Party), liabilities relating to or arising from any environmental laws, and any taxes arising, accruing, or

19

payable under, out of, in connection with, or in any way relating to the Purchased Property prior

to Closing.

<div align="center">

**Sale Injunction**

</div>

23.     Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, and in

consideration of the undertakings of Insurer pursuant to the Settlement Agreement, including

Insurer's purchase of the Purchased Property free and clear of all Claims and Interests pursuant to

Section 363(f) of the Bankruptcy Code as provided herein, any and all Entities that have held, now

hold, or who may in the future hold any Claims or Interests (including without limitation all debt

holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other

creditors, Abuse Claimants, holders of Direct Action Claims, Perpetrators, Non-Settling Insurers,

the Archdiocese Bound Parties, and all others holding Claims or Interests of any kind or nature

whatsoever, including, without limitation, those Claims released or to be released pursuant to the

Settlement Agreement), which Claims or Interests are under, arise out of, relate to, or connect in

any way with an Abuse Claim or any of the Purchased Property, including, without limitation, (a)

all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action

Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer

Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other

Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any

portion of the Purchased Property, (b) the payment of any of the Claims identified previously,

including, without limitation, Abuse Claims, Direct Action Claims, and Coverage Claims and (c)

all other Interests, are hereby permanently stayed, enjoined, barred, and restrained from taking any

Action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or

<div align="center">

20

</div>

4910-0549-1059v.7

Interest against any of (x) the Insurer Released Parties, (y) the assets or property of any Insurer Released Parties, or (z) the Purchased Property, including by:

(a)     commencing, conducting, or continuing in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind, in any forum, with respect to any such Claim or Interest, against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(b)     enforcing, levying, attaching, collecting, or otherwise recovering, or seeking to accomplish any of the preceding, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(c)     creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, or seeking to accomplish any of the preceding, any lien of any kind against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(d)     asserting, implementing, or effectuating any such Claim or Interest of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any of the Insurer Released Parties, (B) any of the Insurer Released Parties, or (C) any property or interest in property of any Insurer Released Party; and

(e)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Order.

21

The actions described in this Paragraph 23 are "**Enjoined Actions**," and the injunction set forth herein is the "**Sale Injunction**." The Sale Injunction shall be a permanent injunction against the Enjoined Actions and may not be modified, dissolved, or terminated.

24.     The Sale Injunction shall be effective upon Closing. The Sale Injunction bars pursuit of the above referenced Claims and/or Interests against the Insurer Released Parties, or the property or assets of each (including, without limitation, the Purchased Property), but against no other person or thing.

25.     In a successful action to enforce this Sale Injunction in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

26.     The Sale Injunction shall not enjoin (a) the right of any Person or Entity against the Settlement Trust or a Non-Settling Insurer, or (b) the Settlement Trustee from enforcing the Settlement Trust Documents.

### Additional Provisions

27.     From and after the date hereof, no Person or Entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreements and this Order.

28.     This Bankruptcy Court hereby retains jurisdiction, regardless of whether a chapter 11 plan has been confirmed in the Bankruptcy Case and consummated and irrespective of the provisions of any such plan or order confirming such plan, to enforce and implement the terms and provisions of the Settlement Agreement, all amendments thereto, any waivers and consents thereunder, and of any agreement(s) executed in connection therewith in all respects, including but

22

not limited to retaining jurisdiction to: (a) compel delivery of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreement; (b) resolve any dispute, controversy, or claim arising under or related to the Settlement Agreement, or the breach thereof; and (c) interpret, implement, and enforce the provisions of this Order and resolve any disputes related thereto.

29.     Nothing contained in any plan confirmed in the Bankruptcy Case or any order of this Bankruptcy Court confirming such plan shall conflict with or derogate from the provisions of the Settlement Agreement or the terms of this Order.

30.     This Order shall not limit or preclude the entry or effectiveness of any additional releases or injunctions that may be granted protecting the Insurer Released Parties and/or the assets or property of any Insurer Released Parties in connection with, or as part of, any order confirming a chapter 11 plan.

31.     The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Settlement Agreement be authorized and approved in its entirety.

32.     The transactions contemplated by the Settlement Agreement are undertaken by Insurer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code. Insurer is a good faith purchaser of the Purchased Property and is entitled to all the protections afforded by Section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction to Insurer.

33.     Insurer has given substantial consideration under the Settlement Agreement for the benefit of the Debtor Parties, their Estates, and creditors, along with the other Archdiocese Bound

4910-0549-1059v.7

Parties. Such consideration given by Insurer constitutes valid and valuable consideration for the Purchased Property and the releases set forth in the Settlement Agreement, including, without limitation, the extinguishment and release of all Interests pursuant to this Order. The consideration provided by Insurer for the Purchased Property under the Settlement Agreement is fair and reasonable; accordingly, the purchase may not be avoided under Section 363(n) of the Bankruptcy Code.

34.     The terms and provisions of the Settlement Agreement and this Order shall be binding notwithstanding any subsequent appointment of any trustee(s) examiner(s) or receiver(s) under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtor Parties, their Estates, their creditors, or any examiner(s) or receiver(s).

35.     The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Bankruptcy Court that the Settlement Agreement and the Parties' performance thereof be authorized and approved in its entirety.

36.     Pursuant to the provisions of the Settlement Agreement, each of the Archdiocese Bound Parties and Insurer shall be authorized to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper, or advisable under applicable law or otherwise to consummate and make effective the transactions contemplated by the Settlement Agreement.

37.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

4910-0549-1059v.7

38.     All obligations of the Debtor Parties under the Settlement Agreement shall be deemed administrative expenses of their Estates under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

39.     Each and every federal, state, and local governmental agency or department is hereby directed to accept this Order in lieu of any document necessary to consummate the transactions contemplated by the Settlement Agreement and this Order.

40.     The Settlement Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the Parties, in a writing signed by the Parties, and in accordance with the terms thereof, without further order of this Bankruptcy Court; *provided* that such modification, amendment, or supplement does not constitute a material change to the relief sought in the Approval Motion and approved by this Order.

**IT IS SO ORDERED.**

New Orleans, Louisiana, _____, 2025

_____
        MEREDITH S. GRABILL
        UNITED STATES BANKRUPTCY JUDGE

4910-0549-1059v.7

**Exhibit B**

**Bill of Sale**

## BILL OF SALE AND ASSIGNMENT

**THIS BILL OF SALE AND ASSIGNMENT** is made and entered into as of _____, 2025, by and between The Roman Catholic Archdiocese of New Orleans, and its Bankruptcy Estate (the "**Archdiocese**" or "**Debtor**"), the Additional Debtors and their respective Bankruptcy Estates, Non-Debtor Catholic Entities (collectively, "**Archdiocese Signatory Parties**"), and SPARTA Insurance Company (the "**Insurer**"). All capitalized terms used herein without definition have the meanings set forth in the Settlement Agreement, Release, and Policy Buyback by, between, and among The Archdiocese, the other Archdiocese Signatory Parties, and Insurer, as amended or modified (the "**Settlement Agreement**").

## W I T N E S S E T H:

WHEREAS, pursuant to the Settlement Agreement, the Archdiocese Signatory Parties have, on behalf of themselves and all other Archdiocese Bound Parties, agreed to sell and/or convey any and all right, title, and interest (including all Subject Interests) in and to the Purchased Property (as defined in the Approval Order), and Insurer has agreed to purchase and buy-back the Purchased Property, in consideration of the payment of a purchase price of $21,000,000.00 (the "**Purchase Price**") and other good and valuable consideration as provided in and under the Settlement Agreement and Plan;

WHEREAS, the Approval Order, as filed at Docket No. [_], has approved the Sale Transaction (as defined in the Approval Order) and found that the Purchase Price is a fair and reasonable price for the Purchased Property;

NOW, THEREFORE, in consideration of the payment of the Purchase Price by Insurer as set forth in the Settlement Agreement, and in accordance therewith and with Approval Order, the Debtor Parties do hereby sell, transfer, and assign to Insurer, and Insurer does hereby accept, all of the Archdiocese Bound Parties' right, title, and interest in and to the Purchased Property, and all Subject Interests therein.

[signatures appear on following pages]

2

4928-8303-0899v.25

280

**IN WITNESS WHEREOF**, the Parties have executed this Bill of Sale and Assignment by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed: _____

_____

Date: _____

*[Signatures Continue on Adjacent Pages]*

3

**[Insurer]**

Signed: _____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

4

**All Archdiocese Signatory Parties**
**Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title: **Their Authorized Signer** _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

5

**Exhibit C**

**SPARTA Letter of Credit[1]**

---

[1] Letter of Credit subject to finalization and execution.

[NATIXIS LETTERHEAD]

**Irrevocable Letter of Credit Number: [●]**

Date: [●], 2025

ISSUING BANK
Natixis, New York Branch
1251 Avenue of the Americas – 3rd Floor
New York, NY 10020
Attention: Letter of Credit Department

Telephone: [(212) 872-5141; 5109; 5051]
[Fax: (201) 761-6936]
Email: Letter_of_Credit@natixis.com

BENEFICIARY

     THE ARCHDIOCESE OF NEW ORLEANS SETTLEMENT TRUST
     Attention: Donald C. Massey, in his capacity as trustee of The Archdiocese of New
     Orleans Settlement Trust, or any successor trustee of The Archdiocese of New Orleans
     Settlement Trust
     c/o Couhig Partners
     1100 Poydras Street
     Suite 3250
     New Orleans, LA 70163
     Email : dmassey@couhigpartners.com

Date of Expiration:  xxxx (one year from issuance) or such date as may be extended pursuant to the terms hereof.

REF: IRREVOCABLE LETTER OF CREDIT NO. [●]

This Irrevocable Standby Letter of Credit (the "Letter of Credit") is hereby issued in favor of The Archdiocese of New Orleans Settlement Trust (hereinafter called "you", the "Settlement Trust", or the "Beneficiary"), acting through Donald C. Massey in his capacity as trustee for the Settlement Trust, for the account of SPARTA Insurance Company, a Connecticut [insurance company] (the "Account Party"), in connection with the Fourth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of The Archdiocese of New Orleans and Additional Debtors, proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, dated as of September 8, 2025, for an amount equal to $21,000,000.00 (the "Stated Amount"). This Letter of Credit is effective immediately and will expire on [●expiry date ], 2026[1], as such date may be extended pursuant to the terms hereof (the "Expiration Date"), provided, further, that in no event shall the expiration date of this Letter of Credit extend beyond January 31, 2029 (the "Final Expiration Date").

We hereby engage with you that demands for payment made by presentation of a demand for payment of an amount available under this Letter of Credit in the form of Attachment A completed and signed by Beneficiary, and presented under and in compliance with the terms of this Letter of Credit, will be duly

---

[1] Insert first one year anniversary of the Letter of Credit issuance date.

honored if received by us on a Business Day at or before 3:00 p.m. New York time, on or prior to the Expiration Date or the Final Expiration Date specified above, at the specified physical or email address above (or such other address which may be designated by us in a written notice delivered to you at the physical or email address above), by physical or courier overnight delivery in the case of the physical address.

If a demand for payment is made by you hereunder at or prior to 12:00 noon, New York City time, on a Business Day, and provided that such demand for payment and the documents presented in connection therewith conform to the terms and conditions hereof, payment shall be made to you of the amount demanded, on the third (3rd) Business Day following the date of receipt of such demand for payment; and if a demand is made by you hereunder after 12:00 noon, New York City time, on a Business Day, and provided that such demand for payment and the documents presented in connection therewith conform to the terms and conditions hereof, payment shall be made to you of the amount demanded, on the fourth (4th) Business Day following the date of receipt of such demand for payment.

If any drawings or the documentation presented in connection therewith does not in our opinion conform to the terms and conditions hereof, we will further advise you of same by email, within two Business Days and give the reasons for such non-conformance. Provided the Final Expiration Date has not occurred, Beneficiary shall be entitled, at its sole option, to cure the stated discrepancies by presenting substitute and/or corrected documents (the "Cure Presentation") to the Issuing Bank within five (5) Business Days after the date of the Issuing Bank's notice of refusal, but in any event no later than the Final Expiration Date. If a Cure Presentation is made, the Issuing Bank may substitute corrected documents for those originally presented to the extent necessary to perfect a complying presentation. The Issuing Bank shall examine the Cure Presentation within a reasonable time not to exceed two (2) Business Days following the day of receipt. If the Cure Presentation complies, the Issuing Bank shall honor. If the Cure Presentation is discrepant, the Issuing Bank shall issue a further single notice of refusal limited to discrepancies in the Cure Presentation. Nothing in this paragraph extends the Final Expiration Date absent a formal amendment issued by the Issuing Bank and accepted by Beneficiary. If the Cure Presentation cannot be made within the Final Expiration Date, this clause shall not be construed as an extension.

As used herein, the term "Business Day" means a day on which we are open in the State of New York to conduct our letter of credit business. Notwithstanding any provision to the contrary in UCP 600 (as hereinafter defined), if the Expiration Date or the Final Expiration Date is not a Business Day then such date shall be automatically extended to the next succeeding date that is a Business Day.

Payment under this Letter of Credit shall be made in immediately available funds by wire transfer to such account as may be designated by Beneficiary in the applicable drawing request and accompanying payment instructions. By paying to you or your account an amount demanded we make no representation as to the correctness of the amount demanded or the purpose therefore.

The Expiration Date of this Letter of Credit will be automatically extended without amendment for a period of one (1) year from the Expiration Date, or any future Expiration Date (except for the Final Expiration Date, in which case this Letter of Credit will be automatically extended without amendment for a period from the then current Expiration Date through the Final Expiration Date), unless at least **thirty (30)** Business Days prior to the then current Expiration Date we send notice to Beneficiary, by overnight courier at Beneficiary's address shown above or by email to its address shown above, with a copy to the Account Party, that we elect not to extend the Expiration Date of this Letter of Credit for any such additional period.

Upon such notice to you, you may draw at any time prior to the then current Expiration Date up to the full amount of this Letter of Credit. Alternatively, you may draw at any time prior to the Final Expiration Date up to the full amount of this Letter of Credit.

Upon the earlier to occur of (a) payment to you of the Stated Amount pursuant to your demand or (b) the expiration of this Letter of Credit, we shall be fully discharged of our obligations to you.

We may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary.

Beneficiary's rights to demand payment under this Letter of Credit shall apply to any successor trustee acting in its capacity as trustee for The Archdiocese of New Orleans Settlement Trust, without further notice or approval.

This Letter of Credit sets forth in full terms of our undertaking herein and such undertaking shall not in any way be modified, amended or amplified by reference to any document or instrument referred to herein or in which this Letter of Credit is referred to or to which this Letter of Credit relates, and any such reference shall not be deemed to incorporate herein by reference any document or instrument.

All inquiries regarding this Letter of Credit and all correspondence and requests for drawings under this Letter of Credit should be directed to the Letter of Credit Department at the phone number or address referenced above, as applicable.

To the extent not inconsistent with the express terms hereof, this Letter of Credit is subject to the Uniform Customs and Practice for Documentary Credits, 2007 Revision, ICC Publication No. 600 ("UCP 600"). This Letter of Credit shall be governed by the law of the State of New York and shall, as to matters not governed by UCP 600, be governed by and construed in accordance with the law of such State without regard to any conflicts of law provisions. In the event of any conflict between the laws of the State of New York and the provisions of UCP 600, the provisions of UCP 600 shall control.

We are subject to various laws, regulations, and executive and judicial orders (including economic sanctions, embargoes, anti-boycott, anti-money laundering, anti-terrorism, and anti-drug trafficking laws and regulations) of the United States of America and other countries that are enforceable under applicable law. We will not be liable for our failure to or our delay in making payment under this letter of credit or for other action we take or do not take, or disclosure we make, under or in connection with this letter of credit (including, without limitation, any refusal to transfer this letter of credit) that is required by such laws, regulations, or orders.

Yours faithfully,
Natixis, New York Branch

_____          _____
Authorized Signature                    Authorized Signature
Name:                                         Name:
Title:                                           Title:

287

**ATTACHMENT A**

<div align="center">

**(Demand for Sight Payment)**

</div>

Date:_____, _____

ISSUING BANK
Natixis, New York Branch
1251 Avenue of the Americas – 3rd Floor
New York, NY 10020
Attention: Letter of Credit Department

Telephone: [(212) 872-5141; 5109; 5051]
[Fax: (201) 761-6936]
[Email: Letter_of_Credit@natixis.com]

**Re: Natixis, New York Branch Irrevocable Standby Letter of Credit No. [●] ("Letter of Credit")**

The undersigned Beneficiary demands payment of USD _____ AND __/100 DOLLARS (U.S. $_____.__) under the Letter of Credit.

<div align="center">

[*Use Following Insert:*]

</div>

Beneficiary hereby certifies that (i) the Settlement Effective Date, as defined in the Settlement Agreement, Release, and Policy Buyback (the "Agreement") by, between, and among The Roman Catholic Archdiocese of New Orleans (the "Debtor"), the other Archdiocese Signatory Parties (as defined in Section 1.1.13 of the Agreement), and SPARTA Insurance Company ("SPARTA"), has occurred; (ii) attached hereto is a copy of the notice of occurrence of the Settlement Effective Date filed by the Beneficiary with the United States Bankruptcy Court for the Eastern District of Louisiana; and (iii) both the Plan Confirmation Order and the Approval Order, as those terms are defined in the Agreement, were entered on the docket of the United States Bankruptcy Court for the Eastern District of Louisiana on or prior to June 30, 2026. Beneficiary is entitled in accordance with the terms and conditions of the Agreement to draw the amount requested hereunder.

<div align="center">

[*Or, Alternatively Use:*]

</div>

Beneficiary has received notice from the Issuing Bank that it has elected not to extend the Expiration Date of this Letter of Credit.

<div align="center">

[*Or, Alternatively Use:*]

</div>

Beneficiary hereby certifies that the Final Expiration Date of this Letter of Credit will occur within thirty (30) days of the date of this demand for payment.

The proceeds from this demand under the Letter of Credit will be used to satisfy the Account Party's obligations under the Agreement.

Payment should be made to the account and pursuant to the wire transfer instructions attached hereto.

This demand is made as of the date hereof.

Yours faithfully,

THE ARCHDIOCESE OF NEW ORLEANS SETTLEMENT TRUST

By: _____

Name: _____

Title: _____Trustee_____

*Attachments: Beneficiary's Wiring Instructions*

## Schedule 1

### Archdiocese Policies

The following policies shall be included in the definition of Archdiocese Policies:

| Policy No. | Period |
|---|---|
| A11-9154-150 | 2/1/64 – 2/1/66 |
| A11-9154-175 | 2/1/66 – 2/1/67 |
| A11-9154-229 | 2/1/67 – 2/1/68 |
| A11-9154-270 | 2/1/68 – 2/1/69 |
| A11-9154-296 | 2/1/69 – 2/1/70 |
| A11-9154-324 | 2/1/70 – 2/1/71 |
| A11-9154-342 | 2/1/71 – 2/1/72 |

1

**<u>Schedule 2</u>**

**Other Co-Insureds Known to the Archdiocese Signatory Parties**

1.    **NONE.**

For the avoidance of the doubt, the following entities are bound by the terms of the Settlement Agreement:[1]

I.    **Archdiocesan Parishes**

1.    All Saints Roman Catholic Church, New Orleans, Louisiana

2.    Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana

3.    Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana

4.    Assumption of Mary Roman Catholic Church, Avondale, Louisiana

5.    Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana[2]

6.    Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana

7.    Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana

8.    Blessed Trinity Roman Catholic Church, New Orleans, Louisiana

9.    Christ the King Roman Catholic Church, Gretna, Louisiana

10.   Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana

11.   Divine Mercy Roman Catholic Church, Kenner, Louisiana

12.   Good Shepherd Roman Catholic Church, New Orleans, Louisiana

13.   Holy Family Roman Catholic Church, Franklinton, Louisiana

14.   Holy Family Roman Catholic Church, Luling, Louisiana

15.   Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana

16.   Holy Spirit Roman Catholic Church, New Orleans, Louisiana

17.   Immaculate Conception Roman Catholic Church, Marrero, Louisiana

18.   Immaculate Conception Roman Catholic Church, New Orleans, Louisiana

19.   Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana

20.   Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana

21.   Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana, for itself and as successor to St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc.

---

[1] Without limiting Section 6.4 of the Settlement Agreement, Insurer does not concede that any of the Entities listed on this schedule are "insureds," "additional insureds," or "protected persons" under its Archdiocese Policies.

[2] Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

1

22. Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana

23. Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana

24. Most Holy Trinity Roman Catholic Church, Covington, Louisiana

25. Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana

26. Our Lady of Grace Roman Catholic Church, Reserve, Louisiana

27. Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana

28. Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana

29. Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana

30. Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana

31. Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana

32. Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana

33. Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana

34. Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana

35. Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana

36. Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana

37. Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana

38. Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana

39. Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana

40. St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana

41. St. Agnes Roman Catholic Church, Jefferson, Louisiana

42. St. Alphonsus Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

43. St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana

44. St. Angela Merici Roman Catholic Church, Metairie, Louisiana

45. St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana

46. St. Anselm Roman Catholic Church, Madisonville, Louisiana

47. St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana

48. St. Anthony of Padua Roman Catholic Church, Luling, Louisiana

49. St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana

50. St. Anthony Roman Catholic Church, Gretna, Louisiana

51. St. Augustine Roman Catholic Church, New Orleans, Louisiana

52. St. Benedict Roman Catholic Church, Covington, Louisiana

53.    St. Benilde Roman Catholic Church, Metairie, Louisiana

54.    St. Bernard Roman Catholic Church, St. Bernard, Louisiana

55.    St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana

56.    St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana

57.    St. Christopher Roman Catholic Church, Metairie, Louisiana

58.    St. Clement of Rome Roman Catholic Church, Metairie, Louisiana

59.    St. Cletus Roman Catholic Church, Gretna, Louisiana

60.    St. David Roman Catholic Church, New Orleans, Louisiana

61.    St. Dominic's Roman Catholic Church, New Orleans, Louisiana

62.    St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana

63.    St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana

64.    St. Francis Xavier Roman Catholic Church, Metairie, Louisiana

65.    St. Genevieve Roman Catholic Church, Slidell, Louisiana

66.    St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana

67.    St. Jerome Roman Catholic Church, Kenner, Louisiana

68.    St. Joachim Roman Catholic Church, Marrero, Louisiana

69.    St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana

70.    St. John of the Cross Roman Catholic Church, Lacombe, Louisiana

71.    St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, for itself and as successor to St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc.

72.    St. John the Baptist Roman Catholic Church, Edgard, Louisiana

73.    St. John the Baptist Roman Catholic Church, Folsom, Louisiana

74.    St. Joseph Roman Catholic Church, Algiers, Louisiana

75.    St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana

76.    St. Joseph's Roman Catholic Church, Gretna, Louisiana

77.    St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc.

78.    St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana

79.    St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana

80.    St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana

81.     St. Margaret Mary Roman Catholic Church, Slidell, Louisiana

82.     St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana

83.     St. Mark Roman Catholic Church, Ama, Louisiana

84.     St. Martha Roman Catholic Church, Harvey, Louisiana

85.     St. Martin de Porres Roman Catholic Church, New Orleans, formerly known as
        Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, for itself
        and as successor to St. James Major Roman Catholic Church, New Orleans, Louisiana,
        now known as St. James Major, Inc., and St. Gabriel Roman Catholic Church, New
        Orleans, Louisiana, now known as St. Gabriel, Inc.

86.     St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana

87.     St. Mary's Roman Catholic Church, New Orleans, Louisiana

88.     St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana

89.     St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known
        as St. John the Baptist Roman Catholic Church, Paradis, Louisiana, for itself and as
        successor to St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now
        known as St. Gertrude, Inc.

90.     St. Patrick's Roman Catholic Church, New Orleans, Louisiana, for itself and as successor
        to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as
        St. Theresa of Avila, Inc.

91.     St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana

92.     St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana

93.     St. Peter Claver Roman Catholic Church, New Orleans, Louisiana

94.     St. Peter Roman Catholic Church, Reserve, Louisiana, for itself and as successor to St.
        Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc.

95.     St. Peter's Roman Catholic Church, Covington, Louisiana

96.     St. Philip Neri Roman Catholic Church, Metairie, Louisiana

97.     St. Pius X Roman Catholic Church, New Orleans, Louisiana

98.     St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana

99.     St. Rita Roman Catholic Church, Harahan, Louisiana

100.    St. Rita Roman Catholic Church, New Orleans, Louisiana

101.    St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana[3]

102.    Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana

103.    The Congregation of St. Rita Roman Catholic Church of Harahan

---

[3]     As stated in footnote 2, Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman
        Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

4928-8303-0899v.25

104.  The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana

**II.     Suppressed Archdiocesan Parishes**[4]

1.  Blessed Sacrament, Inc.

2.  Epiphany, Inc.

3.  Immaculate Heart of Mary, Inc.

4.  Incarnate Word, Inc.

5.  Our Lady of Good Counsel, Inc.

6.  Our Lady of Good Harbor, Inc.

7.  Our Lady of Lourdes, New Orleans, Louisiana, Inc.

8.  Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.

9.  Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana

10.  St. Ann, New Orleans, Louisiana, Inc.

11.  St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana

12.  St. Frances Xavier Cabrini, Inc.

13.  St. Francis de Salles, Inc.

14.  St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana

---

[4]  The Suppressed Archdiocesan Parishes no longer operate as separate church parishes.  The Suppressed Archdiocesan Parishes were not dissolved, and may own property.

Following Hurricane Katrina, the operations of certain of the Suppressed Archdiocesan Parishes were combined with Archdiocesan Parishes.  In 2024, in the ongoing aftermath of Hurricane Ida and a result of storm damage, the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental statistics, and financial difficulties encountered, the following additional Suppressed Archdiocesan Parishes were canonically merged with neighboring Archdiocesan Parishes: (a) St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc., was canonically merged into St. Peter Roman Catholic Church, Reserve, Louisiana; (b) (i) St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and (ii) St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc., were both canonically merged into Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, now known as St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana; (c) St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc., was canonically merged into St. Rosalie Roman Catholic Church, Harvey, Louisiana, now known as Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana; (d) St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc., was canonically merged into Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, now known as St. John Paul II Roman Catholic Church, Waggaman, Louisiana; (e) St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc., was canonically merged into St. John the Baptist Roman Catholic Church, Paradis, Louisiana, now known as St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana; (f) Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc., was canonically merged into St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, now known as St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana; and (g) St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc., had its canonical territory divided so that (i) the area north of the Pontchartrain Expressway was canonically merged into St. Patrick's Roman Catholic Church, New Orleans, Louisiana, and (ii) the area south of the Pontchartrain Expressway was canonically merged into St. Alphonsus Roman Catholic Church, New Orleans, Louisiana.

4928-8303-0899v.25

15.     St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana

16.     St. Henry's, Inc.

17.     St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana

18.     St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana

19.     St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana

20.     St. John the Baptist, New Orleans, Louisiana, Inc.

21.     St. Julian Eymard, Inc.

22.     St. Lawrence the Martyr, Inc.

23.     St. Louise de Marillac, Inc.

24.     St. Maurice, Inc.

25.     St. Monica, Inc.

26.     St. Philip the Apostle, Inc.

27.     St. Raymond's, Inc.

28.     St. Rose of Lima, Inc.

29.     St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana

30.     St. Theresa of the Child Jesus, Inc.

31.     The Congregation of Saints Peter and Paul Roman Catholic Church

32.     The Congregation of St. Cecelia Roman Catholic Church

33.     The Congregation of the Annunciation Roman Catholic Church

34.     The Congregation of the Holy Trinity Roman Catholic Church

**III.     Archdiocesan Agencies**

1.     Archdiocesan Spirituality Center

2.     Catholic Charities Archdiocese of New Orleans

3.     Catholic Charities Children's Day Care Centers

4.     Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)

5.     Clarion Herald Publishing Company

6.     Korean Catholic Community of New Orleans, Inc.

6

7.  Notre Dame Seminary

8.  Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana

9.  Pace Greater New Orleans

10. Padua House (merged into Catholic Charities Archdiocese of New Orleans)

11. Philmat, Inc.

12. Project Lazarus

13. Roman Catholic Center of Jesus the Lord

14. School Food and Nutrition Services of New Orleans, Inc.

15. Second Harvest Food Bank of Greater New Orleans and Acadiana

16. St. Jude Community Center, Inc.

17. St. Michael Special School

18. St. Thérèse Catholic Academy

19. The Society for the Propagation of the Faith, Archdiocese of New Orleans


## IV. Non-Debtor Catholic Entities


### Archdiocesan Agencies

1.  7887 Walmsley, Inc.

2.  Annunciation Inn, Inc.

3.  Archdiocese of New Orleans Indemnity, Inc.

4.  Aspiring Scholars

5.  Catholic Community Foundation Archdiocese of New Orleans

6.  Christopher Homes, Inc.

7.  Christopher Inn

8.  Dubourg Home

9.  Holy Redeemer Catholic Virtual Academy

10. Holy Trinity Drive Land Corporation

11. Iberia Investment Fund II, LLC

12. Metairie III

13. Metairie Manor

14. Monsignor Wynhoven Apartments, Inc.

15. Nazareth II

7

16.     Nazareth Manor

17.     New Orleans Archdiocesan Cemeteries

18.     Notre Dame Health System (f/k/a Chateau de Notre Dame)

19.     Rouquette III

20.     St. Anthony's Gardens

21.     St. Bernard II

22.     St. Bernard III

23.     St. Bernard Manor

24.     St. Martin's Manor, Inc.

25.     St. Tammany Catholic Cemetery

26.     St. Tammany Manor

27.     The Apartments at Mater Dolorosa

28.     The Mental Health Association Development Corporation

29.     Villa Additions, doing business as St. Teresa's Villa

30.     Villa St. Maurice, Inc.

8

**Schedule 3**

**Additional Notice Parties**

**The Redemptorists/Denver Province**
1633 North Cleveland Avenue
Chicago, IL 60614

**Dominican Province of St. Albert the Great**
1910 S. Ashland Avenue
Chicago, Illinois, 60608-2905

**Congregation of Holy Cross**
P.O. Box 1064
Notre Dame, IN 46556-0541

**St. Elio Roman Catholic Church**
1335 Bayou Dularge Road
Theriot, LA 70397

**Central Catholic High School**
2100 Cedar Street, Unit 1
Morgan City, LA 70380

**Edward Douglas White Catholic High School**
555 Cardinal Drive
Thibodaux, LA 70301

**Chinchuba Institute for the Deaf**
2929 Carrollton
New Orleans, LA 70118

and

1231 Prytania St.
New Orleans, LA 70130

**St. Scholastica Academy**
122 South Massachusetts St.
Covington, Louisiana 70433

**Hope Haven – Madonna Manor**
1231 Prytania
New Orleans LA  70130

7887 Walmsley Ave.
New Orleans, LA 70125

2929 Carrollton
New Orleans, LA  70118

**Holy Cross College, Inc.**
Attn Remy Donnelly
5500 Paris Ave.
New Orleans, LA  70122

1

**Tulane Catholic**
1037 Audubon St
New Orleans, LA 70118

**University of New Orleans**
2000 Lakeshore Drive
New Orleans, LA 70148

**Our Lady of Peace Catholic Church**
13281 LA-644
South Vacherie, LA 70090

**St. Lucy Child Development Center**
1220 Aycock St
Houma, LA 70360

**St. Augustine High School, Inc.**
c/o Alfred Harrell, III
2600 A.P. Tureaud Ave
New Orleans LA 70119

**St. Joseph's Society of the Sacred Heart**
P.O. Box 65010
Baltimore, MD 21209

**The Community of the Sisters of the Immaculate Conception**
c/o Melanie Baglow
6208 Ithaca Street
Metairie, LA 70003

**Sisters of Mount Carmel**
**Generalate Office**
21388 Smith Road
Covington, LA 70435-6349

**Daughters of St. Paul**
50 St. Paul's Ave.
Jamaica Plain, MA 02130

and

c/o Mary Martha Moss
4403 Veterans Blvd.
Metairie, LA 70006

Crescent City Convent Corporation
210 Baronne St.
New Orleans, LA 70112

2

**Lyric Realty and Parking Company, Inc.**
c/o Kenneth D. Boudreaux
1115 Tallowtree Dr.
Mandeville, LA 70448

**Sacred Heart of Jesus Catholic Church**
1111 Highway 55
PO Box 2
Montegut, LA 70377

**Diocese of Houma Thibodaux**
P.O. Box 505
Schriever, LA

**Diocese of Baton Rouge**
Post Office Box 2028
Baton Rouge, Louisiana 70821-2028

**Vandebilt Catholic High School**
209 South Hollywood Road
Houma, LA 70360

**General Services Administration**
1800 F St., NW
Washington, DC 20405

**People For Teens of St. Anthony of Padua Corporation**
4700 Cleveland
New Orleans, LA 70119

**Society of the Sacred Heart**
4120 Forest Park Avenue
St. Louis, MO 63108

**Seminarians Parents Association, Inc.**
718 Wood St
Houma, La 70360

**Society of the Divine Word**
PO Box 6038
Techny, IL 60082

**Ursuline Sisters of the Roman Union, Central Province,**
353 South Sappington
St. Louis, MO 63122

**Salesians of Don Bosco, Eastern Province**
in the USA d/b/a Salesian Society, Inc.
Through its agent for service of process:

3

Rev. Louis Molinelli, SDB
1000 Barataria Boulevard
Marrero, LA 70072

And

Rev. Louis Molinelli, S.D.B.
1000 Salesian Lane
Marrero, LA 70072

<u>Schedule 4</u>

**Form of Corporate Resolutions**

<u>CORPORATE RESOLUTION</u>

RESOLUTION OF THE MEMBERSHIP AND BOARD OF DIRECTORS OF [NAME], [ADDRESS], A LOUISIANA NON-PROFIT [CORPORATION][LIMITED LIABILITY COMPANY (hereinafter this "Corporation").

BE IT RESOLVED, that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation, are hereby authorized to transact on behalf of this Corporation any and all business related to the following:

1. Engaging 1793 Group, a Louisiana non-profit corporation, on terms and conditions deemed appropriate in their sole discretion, to assist with and administer on this Corporation's behalf, any and all matters in which this Corporation may have an interest in relation to a Plan of Reorganization filed or anticipated to be filed by The Roman Catholic Church of the Archdiocese of New Orleans in proceedings commenced under Chapter 11 of the Bankruptcy Code, captioned *In re The Roman Catholic Church of the Archdiocese of New Orleans*, Case No. 20-10846 (Bankr. E.D. La.) (the "Chapter 11 Case"), including, but not limited to, preparing and filing a petition in the Chapter 11 Case seeking relief under Chapter 11 of the United States Bankruptcy Code as an additional debtor, executing any and all documents necessary for this Corporation to file for relief in the Chapter 11 Case, executing on behalf of this Corporation all documents required to comply with the requirements imposed upon parties filing for relief under Chapter 11of the Bankruptcy Code, Bankruptcy Rules, Local Rules for the Eastern District of Louisiana and/or the requirement imposed by the United States Trustee.

2. Engaging the firm of Heller Draper and/or any other attorneys to represent this Corporation in actions or proceedings related to the Chapter 11 Case.

3. Engaging accountants, financial advisors, and any other professionals necessary to administer the Chapter 11 Case on behalf of this Corporation.

4. Making decisions with regard to the payment of fees and costs for which this Corporation may become responsible to pay in the Chapter 11 Case.

5. Making decisions with regard to the filing of any plan within the Chapter 11 case, provided that such shall contain terms and provisions consistent with those set forth in Appendix "A" attached hereto and incorporated herein by this reference.

FURTHER RESOLVED that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation with the power of substitution, is authorized to execute and deliver on behalf of this Corporation each and every Insurance Settlement Agreement with the Settling Insurers, as those terms are defined in the Fourth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of September 23, 2025 (the "Plan"), and any amendment or

1

modification to the Plan, including, without limitation, the documents attached or referred to in Plan Supplement 7.1(a), any Bill of Sale required under such Insurance Settlement Agreements, and any other documents reasonably requested by any such Settling Insurer to effectuate the transactions provided for in its Insurance Settlement Agreement or the Plan.

FURTHER GIVING AND GRANTING unto either Very Rev. Patrick Carr or Rev. Leon Poche, full power and authority to sign any and all documents and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER GIVING AND GRANTING unto Very Rev. Peter Akpoghiran or any other officer of the Corporation, full power and authority to certify the passage and effectiveness of this Resolution to the Settling Insurers and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER RATIFYING AND CONFIRMING all that either Very Rev. Patrick Carr or Rev. Leon Poche, in his said capacity may do or cause to be done in the premises.

I, the undersigned President of this Corporation do hereby certify that the above and foregoing is a true and correct copy of a resolution adopted by the Membership and Board of Directors of said corporation in conformity with the Articles of Incorporation and Louisiana law, and that said resolution remains in full force and effect and has not been amended or rescinded.

WITNESS MY HAND AND SEAL, effective this _____day of _____, 2025

_____
Very Reverend Patrick J. Williams, V.G.

ATTEST

_____
Dirk Wild, Director

2

## Schedule 5

## Form of Incumbency Certificates

## INCUMBENCY CERTIFICATE

 I, **Very Rev. Peter Akpoghiran, J.C.D**., the duly elected, qualified, and acting **Vice President** of each of the Louisiana nonprofit corporations or limited liability companies listed on **Exhibit A** attached hereto (each, a "Corporation," and collectively, the "Corporations"), do hereby certify as follows:

1.  That the person named below has been duly elected or appointed and is the qualified and acting officer of each of the Corporations holding the office set forth opposite his/her name.

    | NAME | TITLE |
    |------|-------|
    | **Very Rev. Patrick J. Williams, V.G.** | **President and Director** |

2.  That the foregoing person is duly authorized to act on behalf of each Corporation in such capacity and to exercise the powers and perform the duties incident to said office under the respective Articles of Incorporation and Bylaws of each Corporation.


3.  That attached hereto as **Exhibit B** is a true and correct copy of a resolution adopted at a duly noticed special meeting by the sole member of each of the Corporations and all of the Board of Directors of each said Corporation in attendance at such meeting in conformity with such Articles of Incorporation and Louisiana law and that said resolution remains in full force and effect and has not been amended or rescinded.

    IN WITNESS WHEREOF, I have hereunto set my hand as Vice President of each of the

Corporations as of this ____ day of October, 2025.

_____
Very Rev. Peter Akpoghiran, J.C.D
Vice President of Each Corporation
(See Attached Exhibit A)

1

4928-8303-0899v.25

310

State of Louisiana
Parish of Orleans

On this _____ day of October, 2025, before me, the undersigned Notary Public, personally
appeared **Very Rev. Peter Akpoghiran, J.C.D.,** who acknowledged that he/she executed the
foregoing instrument for the purposes therein contained and in the capacity therein stated.

Notary Public
Printed Name: _____
Notary ID or Bar Roll No.: _____
My Commission Expires: _____


**EXHIBIT A**
**List of Corporations**


2

4928-8303-0899v.25

## SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK

This Settlement Agreement, Release, and Policy Buyback ("**Settlement Agreement**") is hereby made by, and between, and among The Roman Catholic Archdiocese of New Orleans (the "**Archdiocese**" or "**Debtor**" as further defined in Section 1.1.28 1.1.31 below), the other Archdiocese Signatory Parties (as defined in Section 1.1.13 1.1.15 below), and [——]SPARTA Insurance Company and American Employers' Insurance Company ("**Insurer**" as further defined in Section 1.1.45 1.1.47 below). Insurer, the Archdiocese, the other Archdiocese Signatory Parties, and the Creditors' Committee (as defined below), collectively are the "**Parties**" and each a "**Party**" to this Settlement Agreement.

## RECITALS:

WHEREAS, on May 1, 2020 (the "**Petition Date**" as further defined in Section 1.1.62 1.1.65 below), the Archdiocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**" as further defined in Section 1.1.15 1.1.17) pending under Case No. 20-10846 (the "**Bankruptcy Case**" as further defined in Section 1.1.14 1.1.16 below);

WHEREAS, each of the Additional Debtors (as defined in Section 1.1.9 1.1.11 below) intends to file in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;

WHEREAS, certain Entities have asserted or may hold Claims, including Abuse Claims, against the Archdiocese Bound Parties (each as defined below);

WHEREAS, Insurer issued, allegedly issued, may have issued, assumed by novation or otherwise, or may be administering the Archdiocese Policies (as defined in Section 1.1.7 1.1.9 below) providing certain coverage to the Archdiocese Bound Parties;

WHEREAS, asserted disputes between the Debtor Parties (as defined below) and Insurer have arisen, and assertable disputes between the Archdiocese Bound Parties and Insurer may arise in the future, concerning the scope and nature of Insurer's responsibilities, if any, to provide insurance coverage to the Archdiocese Bound Parties under the Archdiocese Policies (as further defined in Section 1.1.25 1.1.29 below, the "**Coverage Claims**");

WHEREAS, claimants may contend, as a matter of Louisiana law, particularly La. Rev. Stat § 22:1269 *et. seq*., that certain Entities may have Claims arising under or related to the Archdiocese Policies that could entitle them to bring a Direct Action Claim (as defined in Section 1.1.32 1.1.35 below) against Insurer;

WHEREAS, claimants may contend that as a matter of Louisiana law, the time within which Claims relating to Abuse may be asserted against certain of the Archdiocese Bound Parties and/or the Insurer may not have expired with respect to certain Claims;

WHEREAS, the Archdiocese Signatory Parties and Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Claims and all other

disputes between and among them and to release Insurer from any further obligations under the Archdiocese Policies;

WHEREAS, Insurer would not pay the full amount of the Settlement Amount (as defined in Section ~~1.1.75~~1.1.79 below) without the buy-back of the Subject Interests (as defined below) in the Archdiocese Policies, including without limitation, the interests of the Archdiocese, Additional Debtors, other Archdiocese Bound Parties and holders of Direct Action Claims, pursuant to section 363 of the Bankruptcy Code, and without the Sale Injunction, the Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeping Injunction (each as defined below), additionally providing protection to the Insurer Released Parties (as defined below) from Claims against the Insurer Released Parties and their property;

WHEREAS, through this Settlement Agreement and the Plan (as defined in Section ~~1.1.63~~1.1.66 below) the Archdiocese Signatory Parties intend to provide Insurer Released Parties with the broadest possible release of all Claims and Subject Interests with respect to the Archdiocese Policies; and

WHEREAS, through this Settlement Agreement and the Plan, as part of the compromise and resolution of the Coverage Claims, the Debtor Parties and Insurer also wish to effect a sale, pursuant to § 363(b), (f), and (m) of the Bankruptcy Code of the Archdiocese Policies, along with the Coverage Claims and Related Insurance Claims (the "**Purchased Property**" as further defined in Section ~~1.1.66~~1.1.69 below), to provide the Insurer Released Parties with the broadest possible release and buyback with respect to the Archdiocese Policies, resulting in the Insurer Released Parties having no obligations now or in the future with respect to the Archdiocese Policies, including without limitation to any Direct Action Claim.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Settlement Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound subject to the approval of the Bankruptcy Court pursuant to Section 2 below, the Parties hereby agree as follows:

**1.    DEFINITIONS**

1.1    As used in this Settlement Agreement (as defined above), the following terms shall have the meanings set forth below.

1.1.1    "**Abuse**" means any of the following actual or alleged acts: (a) touching by the Perpetrator of the person's intimate body parts (genitals, breasts, or buttocks), the touching by the person of the Perpetrator's intimate body parts, showing pictures of the person's body or other persons' bodies, taking pictures of the person's body, showing pornography, or making images of the person while naked or engaged in any sexual activity, or any sexualized interaction including observing the person in bathing, toileting, or undressing that was made possible by the Perpetrator's position of authority, or by the inducement of the Perpetrator; or (b) sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to the genital or anal openings: (i) of the person's body by any part of the Perpetrator's body or any object used by the Perpetrator for this purpose; or (ii) of the person's body by

4928-8303-0899v.25

any part of the body of the Perpetrator or by any part of the body of another person, or by any object used by the Perpetrator or another person for this purpose; (c) inappropriate physical contact and/or contact that infringes upon another's personal, physical boundaries including but not limited to groping, kissing, extended hugging, and/or any unwelcomed touching; (d) grooming or trying to create a special relationship, including but not limited to: talk of a sexual nature, talk of a romantic nature, communications expressing individual love to the person, as opposed to a salutation, providing material resources or experiences which induce the person into a relationship where trust is then violated; or (e) any actual or alleged acts of the kind described in subsections (a)-(c) above that occur between or among minors and that the Perpetrator orchestrates or encourages. For the avoidance of doubt, "Abuse" also includes: any actual or alleged conduct which (a) is described in the Louisiana Child Victims Act or (b) would constitute (i) a sexual offense as defined in article 603(2) of the Louisiana Children's Code; (ii) sexual battery as defined in LA. REV. STAT. §§ 14:43.1; 14:43.1.1; 14:43.2; 14: or 43.3, (iii) a crime against nature as defined in LA. REV. STAT. § 14:89, or (i) pornography involving juveniles as defined in LA. REV. STAT. § 14:81.1, or with respect to the foregoing subsection (i)-(iv), any predecessor statute that prohibited such conduct at the time of the act.

1.1.2 "**Abuse Action**" means an Action asserting an Abuse Claim against any of the Covered Parties.

1.1.3 "**Abuse Claim**" means any Claim that has been asserted, or could be asserted, against any Settling Party or Non-Settling Insurer, that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively alleged Abuse that occurred, in whole or in part, before the applicable Debtor's Petition Date or Additional Debtors' Petition Date, including any such Claim that seeks monetary damages or any other relief, under any legal or equitable theory of liability, including, but not limited to, the following: vicarious liability; *respondeat superior*; any conspiracy, fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, negligent, insufficient, or inadequate supervision, retention or misrepresentation; any theory based on misrepresentation, concealment, or unfair practice; public or private nuisance; or any theory, including, without limitation, any theory based on public policy or any acts or failures to act by any Settling Party, or any other Entity for whom any Settling Party is allegedly responsible, including, but not limited to, any such Abuse Claim against any Settling Party, Non-Settling Insurer, or any other Entity for whom any Settling Party or Non-Settling Insurer is alleged to be responsible. Abuse Claims are: (a) the Known Abuse Claims, which are treated in Class 3; and (b) the Unknown Abuse Claims, which are treated in Class 4. For the avoidance of doubt, "Abuse Claim" includes (a) all Unknown Abuse Claims, (b) Claims or causes of action defined or described in the Revival Window Laws against the Archdiocese or any other Archdiocese Bound Party, (c) Direct Action Claims, and (d) any Claim against the Archdiocese or any other Archdiocese Bound Party that is attributable to, arises from, is based upon, relates to, or results from Abuse that, as of the Petition Date is barred by any applicable statute of limitations, and in each case, irrespective of whether (x) such Claims also involve the conduct of joint tortfeasors (or similar concepts under applicable law), (y) such Claims

arise under, or were revived pursuant to, the Revival Window Laws, or any future reviver law, statute, or binding precedential decision passed or issued on or after the Bankruptcy Plan Effective Date, or (z) a proof of claim has been filed, before or after the Claims Bar Date, or not at all, or an Abuse Action has been commenced with respect to such Claim. "Abuse Claim" does not include: (a) Related Insurance Claims or Coverage Claims against Settling Insurers or Non-Settling Insurers; (b) Non-Insurer Contribution Claims with respect to any Abuse Claim; (c) Insurer Contribution Claims with respect to any Abuse Claim; or (d) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to a Claim against these dioceses only. For the avoidance of doubt, a Claim based on Abuse solely occurring following the applicable Petition Date is not an Abuse Claim. Nothing in this definition shall constitute a waiver of any defense that would otherwise be available under applicable law to any Settling Party, the Settlement Trust, or any other Entity.

1.1.4 "**Abuse Claim Release and Certification**" means a written release in favor of the Insurer Released Parties, in the form of Exhibit C to the Acceptable Plan, or otherwise in form and substance acceptable to the Parties, which an Abuse Claimant must deliver before he or she is entitled to Settlement Trust Distributions, which shall provide that the Claimant releases the Insurer Released Parties from any and all Claims related to his/her Abuse Claim or any of the Archdiocese Policies, subject to Section 12.14 and related provisions of the Plan.

1.1.5 "**Abuse Claimant**" means the holder of an Abuse Claim, including, but not limited to, any Known Abuse Claim, Unknown Abuse Claim, or Direct Action Claim. For the avoidance of doubt, Abuse Claimants are Creditors. The definition of an Abuse Claimant includes the legal representative of the holder of an Abuse Claim, such as a bankruptcy trustee, the estate of a deceased individual who held an Abuse Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Abuse Claim, as the case may be. An Entity holding the following Claim is not an Abuse Claimant: (i) a Non-Insurer Contribution Claim with respect to such Abuse Claim; (ii) an Insurer Contribution Claim with respect to such Abuse Claim; (iii) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to such Entity's claim against such dioceses only.

1.1.6 "**Acceptable Plan**" means the *Fourth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and The Official Committee of Unsecured Creditors* filed at Docket No. [—4419], and its exhibits and schedules, which as may be modified solely in accordance herewith (i.e., with the consent of the Insurer), and such modified plan constituting the "Acceptable Plan" for the purposes hereof.

1.1.7 "**Archdiocesan Parishes**" means all currently Catholic Church parishes and missions, as identified on Exhibit B-1, Part I, of the Acceptable Plan. Each of the Archdiocesan Parishes is organized as a non-profit corporation. For the avoidance of doubt, the definition of Archdiocesan Parishes does not include St. Louis Cathedral, Our

Lady of Guadalupe Church & Shrine of St. Jude, or any Suppressed Archdiocesan Parish identified on Exhibit B-1, Part II, of the Acceptable Plan.

    1.1.8   "**Archdiocesan Schools**" means the means the following schools that are owned and operated by the Archdiocese: (a) the Academy of Our Lady High School; (b) Archbishop Chapelle High School; (c)Archbishop Hannan High School; (d) Archbishop Rummel High School; (e) Archbishop Shaw High School; (f) Pope John Paul II High School; (g) St. Charles Catholic High School; (h) St. Scholastica Academy; and (i) St. Michael Special School.

    ~~1.1.7~~1.1.9   "**Archdiocese Policies**" means (a) the contracts, binders, certificates, and policies of insurance that are listed on Schedule 1 hereto, and (b) all other known and unknown contracts, binders, certificates, or policies of general liability insurance, in effect on or before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date that were issued to, or for the benefit of, or subscribed on behalf or that otherwise actually insure, (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) policies issued to the Archdiocese that name as an insured or additional insured (or related concept under applicable law or document) the Diocese of Houma-Thibodaux or Diocese of Baton Rouge, but not policies issued to either of these dioceses that were not also issued to the Archdiocese or name it as insured, (iv) any Entity owned, created, operated, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, or (v) any institution, religious organization or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control or active management; in each case of (a) and (b), that were issued, subscribed to, or underwritten in whole or in part or allegedly issued, subscribed to, or underwritten in whole or in part by Insurer or any of its predecessors. ~~†~~For the avoidance of doubt, the "Archdiocese Policies" include any and all known and unknown contracts, binders, certificates, or policies of general liability insurance that were issued, allegedly issued, or may have been issued by or in the name of American Employers Insurance Company.

    ~~1.1.8~~1.1.10   "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

    ~~1.1.9~~1.1.11   "**Additional Debtors**" means the Entities listed on Acceptable Plan Exhibit B-1. As used herein, references to the "Additional Debtors" includes the Additional Debtor's Estates.

---

~~† SPARTA Settlement Agreement to provide:~~

~~For the avoidance of doubt, the "Archdiocese Policies" include any and all known and unknown contracts, binders, certificates, or policies of general liability insurance that were issued, allegedly issued, or may have been issued by or in the name of American Employers Insurance Company."~~

~~1.1.10~~1.1.12  "**Approval Motion**" means the motion filed in the Archdiocese Bankruptcy ~~Court~~Case at Docket No. 4181 seeking approval of this Settlement Agreement as described in Section ~~2~~2.1 of this Settlement Agreement.

~~1.1.11~~1.1.13  "**Approval Order**" means the order granting the Approval Motion described in Section ~~2~~2.1 of this Settlement Agreement and providing the relief described in Section ~~2~~2.1 of this Settlement Agreement and in substantially form attached **Exhibit A,** with only such changes as are satisfactory to Insurer.

~~1.1.12~~1.1.14  "**Archbishop**" has the meaning given to it in Section 3.7.

~~1.1.13~~1.1.15  "**Archdiocese Signatory Parties**" means, collectively, (a) the Debtor Parties and (b) the Non-Debtor Catholic Entities.

~~1.1.14~~1.1.16  "**Bankruptcy Case**" means all of the following: (a) with respect to the Archdiocese, "Bankruptcy Case" has the meaning set forth in the Recitals; and (b) with respect to any given Additional Debtor, "Bankruptcy Case" means the case initiated when such Additional Debtor filed in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

~~1.1.15~~1.1.17  "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Louisiana, having subject matter jurisdiction over the Bankruptcy Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

~~1.1.16~~1.1.18  "**Bankruptcy Plan Effective Date**" means the date upon which a Plan approved by the Bankruptcy Court that contains terms and conditions consistent with those required by this Settlement Agreement becomes effective.

~~1.1.17~~1.1.19  "**Barred Claim**" means any Claim against a Settling Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with an Abuse Claim or any of the Archdiocese Policies, including, but not limited to, any: (a) Abuse Claim; (b) Direct Action Claim; (c) Coverage Claim; (d) Related Insurance Claim; (e) Non-Insurer Contribution Claim; (f) Insurer Contribution Claim; (g) Medicare Claim; (h) Penalty Claim; and (i) any other Claim that is otherwise released herein. A Barred Claim further includes any Claim against a Settling Party based on allegations that it is an alter ego or liable as a successor of an Entity that is not a Settling Party or that the Settling Party's corporate veil should be pierced on account of Claims against an Entity that is not a Settling Party or based on any other theory under which the legal separateness of any Person and any other Entity may be disregarded to impose liability for a claim on either such Entity. Notwithstanding the foregoing, Barred Claims do not include any Claims to the extent they are asserted against (x) Non-Settling Insurers or (y) Excluded Parties, notwithstanding that such Entity may also have asserted or be able to assert a Claim for contribution, indemnity, reimbursement, or subrogation against any Settling Party relating to or arising from a such Claim; provided, however, that, for the avoidance of doubt, (i) any Claims that assert liability against such Entity in conjunction with a Settling Party will in all events be Barred Claims as to the Settling

Party, (ii) any such Claim for contribution, indemnity, reimbursement, or subrogation against a Settling Party is a Barred Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party for the purposes of this definition.

1.1.20  **"Catholic Charities"** has the meaning set forth in Section 6.3.15.

~~1.1.18~~1.1.21  **"Channeling Injunction"** has the meaning set forth in Section 2.2.2.

~~1.1.19~~1.1.22  **"Claim"** means any past, present or future claim, demand, Action, request, right, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether sounding in law, equity, tort, warranty, contract, or under any other theory, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been or may be asserted by or on behalf of any Entity, whether seeking damages (including compensatory, exemplary, punitive, or Penalty claims) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, or orders, including without limitation whether by way of direct action, subrogation, contribution, indemnity, alter ego, veil piercing, or regulatory action, or otherwise,  regardless of whether such Claims arise under law, in equity, or under statute, before or after the Petition Date(s), or *in rem* or *in personam*, and include all Claims for damages to the environment or based on any theory of *respondeat superior,* vicarious, successor or transferee liability, or change in control, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

~~1.1.20~~1.1.23  **"Claims Bar Date"** means the date(s) and time(s) indicated in the Final Order(s) (which may be the Plan Confirmation Order) setting the deadline(s) for filing proofs of Abuse Claim against the Debtor or Additional Debtor(s), as applicable.

~~1.1.21~~1.1.24  **"CMS"** has the meaning set forth in Section 2.4.1.

~~1.1.22~~1.1.25  **"Co-Insured Party"** means  any other Entity that is a "Named Assured" or "named insured" or "protected person" under the Archdiocese Policies, and all other Entities that are determined by agreement or a court of competent jurisdiction to be an "Assured," an "Additional Assured," an "insured," or "protected person" or otherwise entitled to insurance coverage under any Archdiocese Policies.

~~1.1.23~~1.1.26  **"Conditional Payment"** means any payment made to an Abuse Claimant under the MMSEA, including any payment by a Medicare Advantage Organization (as defined in the MSPA).

~~1.1.24~~1.1.27  **"Controlling Document Provision"** has the meaning given to it in Section 2.2.9.

~~1.1.25~~1.1.28  **"Covered Parties"** or **"Archdiocese Bound Parties"** means, collectively, the following Entities: (a) the Debtor Parties; (b) the Reorganized Debtor;

(c) the Reorganized Additional Debtors; (d) the Non-Debtor Catholic Entities; (e) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP; (f) the ~~applicable~~ Parish Schools and Archdiocesan Schools ~~(each as defined in the Acceptable Plan)~~; (g) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans; (h) any Co-Insured Party; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entities' predecessors, successors, assigns, subsidiaries, direct and indirect past, present, and future affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, and estates.  For the avoidance of doubt, the Entities in clauses (g), (h), and (i) are only Archdiocese Bound Parties in connection with the Archdiocese Policies.

~~1.1.26~~1.1.29  "**Coverage Claims**" has the meaning set forth in the Recitals and further includes any Claim under relating to or arising out of the Archdiocese Policies or the rights and obligations thereunder, or the breach thereof, including any Claim seeking insurance coverage.

~~1.1.27~~1.1.30  "**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed in the Archdiocese's Chapter 11 Case on May 20, 2020, [Docket Nos. 94 & 114], as such committee may be reconstituted from time to time.

~~1.1.28~~1.1.31  "**Debtor**" or "**Archdiocese**" means, before the Bankruptcy Plan Effective Date, The Roman Catholic Church of the Archdiocese of New Orleans of Louisiana.  As used herein, references to the "Debtor" or "Archdiocese" includes the Debtor's Estate.

~~1.1.29~~1.1.32  "**Debtor Parties**" means (i) the Archdiocese and (ii) all of the Additional Debtors.

~~1.1.30~~1.1.33  "**Diocese of Baton Rouge**" means the Diocese of Baton Rouge. References to the "Diocese of Baton Rouge CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) July 22, 1961 whichever occurred last; references to the "Diocese of Baton Rouge SD" refer to the period after such date.

~~1.1.31~~1.1.34  "**Diocese of Houma-Thibodaux**" means the Diocese of Houma-Thibodaux.  References to the "Diocese of Houma-Thibodaux CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) June 5, 1977, whichever occurred last; references to the "Diocese of Houma-Thibodaux SD" refer to the period after such date.

~~1.1.32~~1.1.35  "**Direct Action Claim**" means any Claim by any Entity that is a "direct action" as that term is used in La. Rev. Stat § 22:1269 *et. seq*~~,~~ (or similar law in other jurisdictions) against any Insurer Released Party or related to any Archdiocese Policy, including, without limitation, (a) any claim that is similar or related to any Claim that could also be asserted by the Archdiocese or any Archdiocese Bound Party, (b) any

Claim that directly or indirectly arises out of, relates to, or is connected with any Abuse Claim, (c) any Claim that directly or indirectly arises out of, relates to, or is in connection with any Insurer Released Party's handling of any Abuse Claim under the laws of any applicable jurisdiction, or (d) any Claim arising under any law of any jurisdiction that may give a third party a direct Cause of Action against an Insurer Released Party for monetary or other relief.[2]   For the avoidance of doubt, Direct Action Claim does not include the following action: SPARTA Insurance Company v. Pennsylvania General Insurance Company, No. 21-11205 (D. Mass.).

1.1.33 1.1.36   "**Entity**" means any individual, corporation, corporation sole, partnership, association, limited liability company, joint stock company, proprietorship, unincorporated organization, joint venture, trust, estate, executor, legal representative, or any other entity or organization, as well as any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency, department, board or instrumentality thereof, any other "Person" within the definition of section 101(41) of the Bankruptcy Code, and any successor in interest, heir executor, administrator, trustee, trustee in bankruptcy, or receiver of any Entity and also has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.1.34   "**Escrow Agent**" means the agent appointed in accordance with the Escrow Agreement.

1.1.35   "**Escrow Agreement**" means the agreement governing the escrow which shall hold the Settlement Amount in escrow and in trust for the benefit of Insurer, and which shall provide for the: (i) transfer of the Settlement Amount, with any accrued interest, to the Settlement Trust following the Settlement Agreement Effective Date, or (ii) return of the Settlement Amount to Insurer, with any accrued interest, upon receipt of notice that the Settlement Agreement has been terminated.

1.1.36 1.1.37   "**Estate**" means the (a) the Debtor's estate, and (b) Additional Debtors' estates, each created pursuant to section 541 of the Bankruptcy Code.

1.1.37 1.1.38   "**Excluded Party**" means the following Entities: (a) the Holy See (State of Vatican City); (b) any Perpetrator; and (c) any religious order (i.e., institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy)archdiocese or diocese (other than the Archdiocese itself), any Religious Order, or other Entity that is an affiliate or associated with the Roman Catholic Church (in its capacity as such, and other than (i) the Non-Debtor Catholic Entities; (ii) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP, (iii) the applicable Parish Schools and Archdiocesan Schools (each as defined in the Acceptable Plan); and (iv), any Co-Insured Party); provided, however,

---

[2] SPARTA Settlement Agreement will provide:

For the avoidance of doubt, Direct Action Claim does not include the following action:  SPARTA Insurance Company v. Pennsylvania General Insurance Company, No. 21-11205 (D. Mass.).

that any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party.²²

~~1.1.38~~1.1.39    "**Extra-Contractual Claim**" means any Claim against any Insurer Released Party seeking any type of relief, other than coverage or benefits, under or with respect to the Archdiocese Policies.    Extra-Contractual Claims include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs, or any other type of relief, alleging any of the following with respect to (a) any Archdiocese Policy; (b) any Claim allegedly or actually covered under a Archdiocese Policy; or (c) the conduct of any Insurer Released Party with respect to (a) or (b): (i) bad faith; (ii) failure to provide insurance coverage under any Archdiocese Policy, including any failure to investigate or to provide a defense or adequate defense; (iii) failure or refusal to compromise and settle any Claim insured under any Archdiocese Policy; (iv) failure to act in good faith; (v) violation or breach of any covenant or duty of good faith and fair dealing, whether express, implied,  or otherwise; (vi) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (vii) violation of any unfair claims practices act or similar statute, regulation or code, including any statute, regulation, or code relating to  unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising; (viii) any type of misconduct; or (ix) any other act or omission of any type by any Insurer Released Party for which the claimant seeks relief other than coverage or benefits under a Archdiocese Policy. "Extra-Contractual Claims" further include all Claims relating to any Insurer Released Party's (x) handling of any Claims under the Archdiocese Policies, (y) conduct in negotiating this Settlement Agreement and/or the Plan, and (z) conduct in the settlement of any Claims.  For the avoidance of doubt, Extra-Contractual Claims of the Archdiocese Bound Parties are included within the property Insurer is purchasing hereunder.

~~1.1.39~~1.1.40    "**Final Order**" means an order as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending and in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order will have been affirmed by the highest court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari,* petition for review, or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order will not cause such order not to be a Final Order.

~~1.1.40~~1.1.41    "**Gatekeeper Injunction**" has the meaning set forth in Section 2.2.2.

1.1.42   "**HH**" has the meaning set forth in Section 6.3.15.

1.1.41 1.1.43    "**Indemnified Claims**" ~~shall have~~has the meaning set forth in Section 7.2 of this Settlement Agreement.

1.1.42 1.1.44    "**Indemnity Cost Reserve**" ~~shall have~~has the meaning set forth in Section 7.2 7.2.1.

1.1.43 1.1.45    "**Injunctions**" means the Sale Injunction, Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeper Injunction.

1.1.44 1.1.46    "**Insurance Settlement Agreement**" ~~shall have~~has the meaning set forth in the Acceptable Plan.

1.1.45 1.1.47    "**Insurer**" means [___].[3] SPARTA Insurance Company and American Employers' Insurance Company ("SPARTA").[1]

1.1.46 1.1.48    "**Insurer Contribution Claim**" means any (a) Non-Settling Insurer Contribution Claim or (b) Settling Insurer Contribution Claim.

1.1.47 1.1.49    "**Insurer Released Party**" means Insurer and its Related Parties, each in their capacities solely as such with respect to the Archdiocese Policies and all Subject Interests therein.

1.1.48 1.1.50    "**Known Abuse Claims**" means any Abuse Claim, other than an Unknown Abuse Claim, against any Settling Party, Settling Insurer, and/or Non-Settling Insurer.

1.1.51  "**Letter of Credit**" has the meaning set forth in Section 3.1

___

[3] ~~US Fire/International Settlement Agreement to include the following definition for "Insurer": "United States Fire Insurance Company ("U.S. Fire"), International Insurance Company ("International"), and Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company individually and, to the extent that policies issued by U.S. Fire and/or International were novated to or assumed by either or both of them ("U.S. Fire/International"). Any Entity that meets the definition set forth above shall be individually referred to as an 'Insurer.'"~~

~~SPARTA Settlement Agreement to include the following definition for "Insurer":~~

~~"SPARTA Insurance Company and American Employers' Insurance Company ("SPARTA")."~~

~~Catholic Mutual Settlement Agreement to include the following definition for "Insurer":~~

~~"Catholic Mutual Relief Society of America."~~

~~National Union Settlement Agreement to include the following definition for "Insurer":~~

~~"National Union Fire Insurance Company of Pittsburgh, Pa., or its successors and assigns."~~

~~Puritan Insurance Company to include the following definition for "Insurer":~~

~~"Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation."~~

~~Twin City Settlement Agreement to include the following definition for "Insurer":~~

~~"Twin City Fire Insurance Company and First State Insurance Company."~~

[1] For the purposes herein, consent to be granted by Insurer may be granted by a corporate representative of SPARTA Insurance Company, a Connecticut entity, solely.

4928-8303-0899v.25

~~1.1.49~~1.1.52 "**Medicare Claims**" means any Claim by CMS, and/or any agent or successor of CMS, charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA or pursuing a Claim under MSP Provisions, relating to any payments in respect of any Abuse Claim, including any Claim for reimbursement of conditional payments, and any Claim relating to reporting obligations.

~~1.1.50~~1.1.53 "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which imposes reporting obligations on those Entities with payment obligations under the MSPA.

~~1.1.51~~1.1.54 "**MSPA**" means 42 U.S.C. §1395y et seq., or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto, including the regulations promulgated thereunder, found at 42 C.F.R. §411.1 et seq.

~~1.1.52~~1.1.55 "**Non-Debtor Catholic Entity Policy Sale**" has the meaning set forth in Section 4.6.

~~1.1.53~~1.1.56 "**Non-Debtor Catholic Entities**" collectively means those entities listed on the Acceptable Plan Exhibit B-2 who are not Additional Debtors, but which are (a) insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies and/or (b) have actually or allegedly acquired or been assigned the right to make a claim for coverage under any of the Archdiocese Policies (excluding, however, for the avoidance of doubt, the Debtor Parties, the Settlement Trust, and any Abuse Claimant).

~~1.1.54~~1.1.57 "**Non-Insurer Contribution Claim**" means any Claim for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law that is attributable to, arises from, is based upon, relates to, or results from, an Abuse Claim or payment of an Abuse Claim, and any other derivative or indirect Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, other than a Non-Settling Insurer Contribution Claim or a Settling Insurer Contribution Claim.

~~1.1.55~~1.1.58 "**Non-Settling Insurer**" means any insurer (together with its Related Parties) that is not a Settling Insurer.

~~1.1.56~~1.1.59 "**Non-Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Non-Settling Insurer against any Settling Insurer for the payment of money where such Non-Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

4928-8303-0899v.25

1.1.60 "**Parish Schools**" means the elementary Catholic schools that are owned and operated by the Archdiocesan Parishes. For the avoidance of doubt, the definition of Parish Schools expressly excludes Catholic schools that are owned and operated by Religious Orders and the Archdiocesan Schools. For the further avoidance of doubt, the Parish Schools are not separately incorporated.

1.1.57 1.1.61 "**Parties**" has the meaning set forth in the first paragraph of this Settlement Agreement.

1.1.58 "**Payment Security**]" means [**Intentionally Omitted**][4]

1.1.59 1.1.62 "**Penalty Claims**" means a Claim against any Settling Party or Settling Insurer for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Creditor holding such Claim.

1.1.60 1.1.63 "**Perpetrator**" means an individual who personally committed or is alleged to have personally committed an act of Abuse. For the avoidance of doubt, the definition of Perpetrator does not include any individual who did not personally commit an act of Abuse or is not alleged to have personally committed an act of Abuse, but against whom an Abuse Claim or Non-Insurer Contribution Claim is asserted nonetheless, or may be asserted, by virtue of such individual's position or service as a member, representative, contractor, consultant, professional, or volunteer of the Archdiocese or any Non-Debtor Catholic Entity or any council or representative body associated with such Entities.

1.1.61 1.1.64 "**Person**" has the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

1.1.62 1.1.65 "**Petition Date**" means (a) with respect to the Archdiocese, May 1, 2020; and (b) with respect to each Additional Debtor, the date(s) on which such Additional Debtor files in the Bankruptcy Court its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.63 1.1.66 "**Plan**" refers to the Chapter 11 Plan of Reorganization for the Archdiocese and all Additional Debtors (and all exhibits annexed thereto) which shall, among other things, provide for the resolution of Abuse Claims and Subject Interests in the Archdiocese Policies as set forth herein, and which shall be in form and substance acceptable to Insurer in its sole discretion.

1.1.64 1.1.67 "**Plan Confirmation Order**" has the meaning set forth in Section 2.3.

---

[4] Intentionally omitted, except the SPARTA Settlement Agreement, in which this section will provide:

has the meaning given to it in Section 3.1.1 hereof.

4928-8303-0899v.25

1.1.65 1.1.68 **"Preserved Coverage"** means **[Intentionally Omitted.]**[5]

1.1.66 1.1.69 **"Purchased Property"** means any and all right, title, and interest (including all Subject Interests) in and to the Archdiocese Policies and the Related Insurance Claims and Coverage Claims.

1.1.67 1.1.70 **"Related Insurance Claim"** means (a) any Extra-Contractual Claim and (b) any other Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies, including, without limitation, bad faith Claims.

1.1.68 1.1.71 **"Related Party"** means, with respect to any Entity, such Entity's (a) predecessors, successors, assigns, and any Entity that assumed the obligation of the forgoing for the Archdiocese Policies by novation or otherwise (b) direct and indirect past, present, and future Affiliates (as defined in section 101(2) of the Bankruptcy Code), holding companies, merged companies, related companies, subsidiaries, divisions, acquired companies, joint ventures, joint venturers, (c) current and former employees, officers, directors, principals, partners, managing agents, trustees, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, brokers, adjusters, reinsurers, retrocessionaires, subrogees, agents, claims handling administrators, and other professionals, and (d) respective heirs, executors, estates, and nominees; and all Entities acting on behalf of, by, through or in concert with them, each solely in their capacities as such with respect to such Entity (and with respect to such Entity (including Insurer) that is an insurer of any Archdiocese Bound Party or has assumed the obligations of such by novation or otherwise, such insurer's applicable insurance policy(ies) (including the Archdiocese Policies)).[6] For the purposes of this definition and this Settlement Agreement, Pennsylvania General Insurance Corporation shall not be considered a Related Party of SPARTA Insurance Company.

1.1.72 **"Religious Order"** means, collectively, an institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy.

1.1.69 1.1.73 **"Reorganized Additional Debtors"** means the Additional Debtors, as reorganized pursuant to and under the Plan, or any successor thereto by

---

[5] Intentionally omitted, except the Catholic Mutual Settlement Agreement, in which this section will provide:

"Preserved Coverage" means Insurer's obligations under Certificate No. [•] issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the personal injury claims listed in the attached Schedule [X], in each case, subject to the limits, declarations, terms and conditions of such certificate; provided, however, that Preserved Coverage shall not include coverage for any and all Abuse Claims or other Barred Claims.

[6] The SPARTA Settlement Agreement will additionally provide:

For the purposes of this definition and this Settlement Agreement, Pennsylvania General Insurance Corporation shall not be considered a Related Party of SPARTA Insurance Company.

merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.70 1.1.74 "**Reorganized Debtor**" means the Debtor, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.71 1.1.75 "**Revival Window**" means Section 2 of La. Acts 2021, No. 322, as amended by La. Acts 2022, No. 386, and La. Acts 2024, No. 481.

1.1.72 1.1.76 "**Revival Window Laws**" means the Revival Window, together with any other law that extends the prescriptive period or statute of limitations for asserting Abuse Claims under Louisiana or other applicable state law.

1.1.73 1.1.77 "**Sale Injunction**" has the meaning set forth in Section 2.1.

1.1.74 1.1.78 "**Settlement Agreement Effective Date**" means the first day on which: (a) the Archdiocese Signatory Parties and Insurer have executed this Settlement Agreement; (b) the Unknown Abuse Claims Representative shall have supported the releases provided for herein and the protections granted hereby and in the Plan in favor of the Insurer Released Parties, in a manner acceptable to Insurer in its sole discretion; (c) the Approval Order shall have become a Final Order; (d) the Plan Confirmation Order shall have become a Final Order; and (e) the Settlement Trust shall have been created pursuant to the Plan; provided, however, that in Insurer's sole discretion with the prior written consent of the Trustee, not to be unreasonably withheld, Insurer may elect to waive the conditions set forth in clauses (b) through (e) and pay or direct the payment of the Settlement Amount to the escrow or Settlement Trust prior to the occurrence of the events set forth in (b) through (e) hereof, in which case, the date of such payment shall be the Settlement Agreement Effective Date for all purposes hereunder including the date of the closing of the purchase and sale of the Archdiocese Policies.[7]

1.1.75 1.1.79 "**Settlement Amount**" means the sum of Twenty One Million and 00/100 Dollars ($[___]21,000,000.00) to be paid (in accordance with Section 3.1) by Insurer after satisfaction of all conditions precedent herein in accordance herewith.

1.1.76 1.1.80 "**Settlement Trust**" means the settlement trust established under the Plan for the purposes set forth therein, including assuming liability for all Channeled Claims (as defined in the Acceptable Plan) and Indemnified Claims (as defined herein), subject to the limitations on indemnification and liability contained in Section 7.2 of this Settlement Agreement.

---

[7] *Note: Subject to further discussion.*

1.1.77 1.1.81   "**Settlement Trust Agreement**" means the agreement between the Debtor and the Settlement Trustee governing the Settlement Trust, to be filed with the Plan Supplement (as defined in the in the form of Exhibit D-1 to the Acceptable Plan).

1.1.78 1.1.82   "**Settlement Trust Allocation Protocol**" means the Settlement Trust Allocation Protocol (as defined and used in the Settlement Trust Agreement), to be filed with the in the form of Exhibit D-2 to the Acceptable Plan Supplement.

1.1.79 1.1.83   "**Settlement Trust Documents**" means, collectively, (a) the Settlement Trust Agreement, (b) the Settlement Trust Allocation Protocol, and (c) any other agreements, instruments and documents governing the establishment and administration of the Settlement Trust, which shall be consistent with the terms of the Plan, as the same may be amended or modified from time to time in accordance with the terms thereof.

1.1.80 1.1.84   "**Settlement Trustee**" means the Entity appointed to act as the initial trustee of the Settlement Trust pursuant to the terms of the Settlement Trust Documents, along with any successor trustee appointed in accordance with the Settlement Trust Documents.

1.1.81 1.1.85   "**Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Settling Insurer against any Settling Insurer or Non-Settling Insurer for the payment of money where such Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.82 1.1.86   "**Settling Insurers**" shall have the meaning set forth in the Acceptable Plan.

1.1.83 1.1.87   "**Settling Insurers' Policies**" shall have the meaning set forth in the Acceptable Plan.

1.1.84 1.1.88   "**Settling Parties**" means, collectively, the following Entities: (a) Archdiocese Bound Parties; and (b) the Settling Insurers.

1.1.85 1.1.89   "**Subject Interests**" means all Claims, liens (as defined by Section 101(37) of the Bankruptcy Code), encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief, including: (a) all interests of the Archdiocese in, to and under the Archdiocese Policies; (b) all interests in, to, and under the Archdiocese Policies of any Entity other than the Archdiocese (including all Abuse Claimants and the Archdiocese Bound Parties); and (c) all interests in, to and under the Archdiocese Policies of any other Entity claiming coverage by, through, or on behalf of any Archdiocese Bound Party, including, without limitation, rights and interests as an insured, co-insured or additional insured, insurer or creditors of the Archdiocese Bound Parties; in each case within the meaning of "interest" as used in sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code. For the avoidance of doubt, a Direct Action

16

Claim constitutes a Subject Interest. The meaning of Subject Interests also includes: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property.

1.1.86 1.1.90 "**Supplemental Settling Insurers' Injunction**" has the meaning set forth in Section 2.2.2.

1.1.87 1.1.91 "**Unknown Abuse Claim**" means an Abuse Claim that occurred before the Petition Date and the Abuse Claimant did not file a proof of claim by the applicable Abuse Claims Bar Date, for which there exists a valid legal excuse for not filing, as further defined in the in the Acceptable Plan.

~~1.1.88~~1.1.92   "**Unknown Abuse Claims Representative**" means Michael R. Hogan, the legal representative appointed by the Bankruptcy Court pursuant to the *Order (I) Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, and (II) Approving the Retention of Michael R. Hogan as the Unknown Tort Claims Representative, Nunc Pro Tunc To July 26, 2021* (Docket No. 1012 ), any successor legal representative appointed by the Bankruptcy Court, or, on and after the Bankruptcy Plan Effective Date, any successor legal representative appointed in accordance with the applicable Settlement Trust Document.

1.2   Capitalized terms not defined in this Section 1 or elsewhere in this Settlement Agreement shall have the meanings given to them in the Bankruptcy Code.

## 2.   THE BANKRUPTCY CASE AND PLAN OF REORGANIZATION

2.1   On or before July 29, 2025, the Archdiocese shall file a motion in the Bankruptcy Court (the "**Approval Motion**"), in form and substance acceptable to Insurer in its sole discretion, that seeks the entry of an order in substantially the form attached as **Exhibit A** to this Settlement Agreement, or otherwise in form and substance acceptable to Insurer in its sole discretion (the "**Approval Order**"), that:

(a) approves this Settlement Agreement, including Insurer's buyback of the Archdiocese Policies and the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests, and otherwise authorizes the Parties to undertake the settlement and the transactions contemplated by this Settlement Agreement, in each case pursuant to sections 363(b), (f),and (m) of the Bankruptcy Code and any other applicable provisions of the Bankruptcy Code;

(b) contains an injunction (the "**Sale Injunction**") that, subject to and conditioned upon the Settlement Agreement Effective Date and the Insurer's payment of the Settlement Amount, bars all Claims against the Insurer Released Parties and their property and assets of each based on or arising out of any Subject Interests in the Archdiocese Policies including without limitation all Coverage Claims, Related Insurance Claims, and Barred Claims, leaving the Settling Insurers free and clear of all Subject Interests of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); any Abuse Claimant; or any holder of a Barred Claim pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code;

(c) provides that this Settlement Agreement is binding on the Archdiocese Signatory Parties, all other Settling Parties, any trust created in the Bankruptcy Case(s), and any successors of the foregoing; and

(d) provides, subject to and conditioned upon the Settlement Agreement Effective Date, that the Approval Order is binding on all Persons (including, for the avoidance of doubt, all Persons set forth in the foregoing (c)).

2.1.1   The Archdiocese shall provide written notice of the Approval Motion, which notice shall be in form and substance acceptable to Insurer, to, at a minimum, any known Archdiocese Bound Party, holder of an Abuse Claim, or party whose rights or interests may reasonably be considered to be impacted by the relief requested in the Approval Motion, and any party identified on Schedule 3 hereto.  In addition, the Archdiocese shall include notice of the Approval Motion together with notice provided with respect to confirmation of the Joint Plan, including publication notice of the hearing on the Approval Motion. The Archdiocese will provide a draft service list of the foregoing for Insurer's review and comment.

2.1.2   If any Entity files an objection to the Approval Motion, the Archdiocese and Creditors' Committee shall consult with Insurer in connection with filing any written response thereto.  The Archdiocese Signatory Parties, as applicable, and Creditors' Committee shall take commercially reasonable steps to defend against any objection, appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order.  Insurer will cooperate with the Archdiocese Signatory Parties and Creditors' Committee in this regard, including making commercially reasonable submissions.

2.2    The Archdiocese shall file and prosecute a joint Plan with the Creditors Committee, which shall be in form and substance satisfactory to the Insurer in its sole discretion, substantially in the form as the Acceptable Plan, which the Parties acknowledge and agree satisfies the terms of this Settlement Agreement.  Any modifications to the Plan, the Settlement Trust Documents, the Plan Confirmation Order, or the Approval Order, including those relating to the Channeling Injunction,  Supplemental Settling Insurers' Injunction, Gatekeeper Injunction, releases by holders of Abuse Claims, Insurers, Insurance Settlement Agreements, and related definitional terms, including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Abuse Related Insurance Claims," "Channeled Claim," "Covered Parties," "Direct Action Claim," "Enjoined Party," "Insurer Contribution Claim," "Non-Insurer Contribution Claim," "Penalty Claims," "Protected Parties," "Settling Insurers," "Settling Insurer's Policies," "Subject Insurance Policies," "Subject Interests," or any exhibits, schedules, and documents related thereto, must be in all respects consistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties without Insurer's written consent in its sole discretion.

2.2.1   The Plan shall create the Settlement Trust, which shall be responsible for making any and all payments to the Abuse Claimants entitled to receive payment under the Plan and which shall assume all liability for Channeled Claims.

2.2.2   The Plan shall include: (a) an injunction in substantially the form included in Article [12.4] of the Acceptable Plan (the **"Channeling Injunction"**); and (b) an injunction in substantially the form included in Article [12.5] of the Acceptable Plan (the **"Supplemental Settling Insurers' Injunction"**); and (c) an injunction in substantially

4928-8303-0899v.25

the form included in Article [12.6]12.8 of the Acceptable Plan (the "**Gatekeeper Injunction**").

2.2.3   The Plan shall incorporate by reference the releases and indemnities set forth in this Settlement Agreement, including that the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to all Indemnified Claims as forth in Section 7.2 of this Settlement Agreement.

2.2.4   The Settlement Trust Documents shall provide that as a condition to receiving payment from the Settlement Trust, all Abuse Claimants shall provide an Abuse Claim Release and Certification.

2.2.5   The Plan shall provide for the commencement, prior to the Court's consideration of the Approval Motion, by the Additional Debtors of Chapter 11 cases to be jointly administered with the Bankruptcy Case.

2.2.6   The Plan shall provide a supplemental bar date for the Additional Debtors in a form and substance satisfactory to the Insurer with respect to Abuse Claims against the Additional Debtors and the form, manner, and deadline for filing proofs of claim and the treatment of confidential information contained therein.

2.2.7   The Plan shall provide that confirmation of the Plan will not occur unless all of the following conditions precedent have been satisfied: (a) the Plan Confirmation Order approves and implements the Injunctions and (b) the Bankruptcy Court shall have granted the Approval Motion in form and substance acceptable to Insurer in its sole discretion.

2.2.8   The Plan shall provide that the Bankruptcy Plan Effective Date will not occur unless all of the following conditions precedent have been satisfied or waived (as applicable with consent of Insurer): (a) the Plan Confirmation Order will have been entered by the Bankruptcy Court and become a Final Order, and (b) the Bankruptcy Court shall have entered the Approval Order (with both such Approval Order and this Settlement Agreement in form and substance acceptable to the Insurer) and such Approval Order shall have become a Final Order.

2.2.9   The Plan shall provide that (collectively, as follows, the "**Controlling Document Provision**") in the event of a conflict between (a) the Settlement Agreement, on the one hand, and (b) the Plan, on the other, the terms of the Settlement Agreement shall control and govern; and in the event of a conflict between the (x) Approval Order, on the one hand, and (y) Plan Confirmation Order, on the other, the terms of the Approval Order shall control and govern.

2.2.10  The Plan shall provide that the execution and delivery of this Settlement Agreement is a condition to entry of the Plan Confirmation Order and the occurrence of the Bankruptcy Plan Effective Date. The inclusion of this Settlement Agreement in the Plan shall not be waivable as a condition to entry of the Plan Confirmation Order or the

occurrence of the Bankruptcy Plan Effective Date absent the prior written consent of the Settling Insurers.

2.3  The Debtor Parties shall seek and obtain entry of an order from the Bankruptcy Court, which order shall be in form and substance acceptable to the Parties, that: (i) approves the Plan pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code; (ii) contains the Channeling Injunction; (iii) ratifies the Sale Injunction as independent of the Channeling Injunction and Supplemental Settling Insurers' Injunction; (iv) contains the Gatekeeper Injunction; (v) provides that this Settlement Agreement is binding on any Settlement Trust created in the Bankruptcy Case, the Reorganized Debtor, the Reorganized Additional Debtors, and any successors of the Settlement Trust, Reorganized Debtor, or Reorganized Additional Debtors, and all of the Archdiocese Bound Parties; and (vi) contains the Controlling Document Provision (the "**Plan Confirmation Order**").

2.3.1  The Plan and Plan Confirmation Order must not be inconsistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties.

2.3.2  In seeking to obtain the Plan Confirmation Order, the Debtor and Additional Debtors will: (i) seek a confirmation hearing on an appropriately timely basis; (ii) urge the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) take all reasonable steps to defend against any objection, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order.

2.3.3  Prior to entry of the Plan Confirmation Order, the Archdiocese and/or any applicable Additional Debtor shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Abuse Claim that (i) is asserted against any Debtor Party and (ii) implicates, or is reasonably likely to implicate, any Archdiocese Insurance Policies (including by alleging Abuse that took place during any policy period of any Archdiocese Policy).  If, prior to the Plan Confirmation Order becoming a Final Order, the Bankruptcy Court allows any Entity to prosecute any such Abuse Claim, the Debtor Parties shall defend themselves against such Abuse Claims and comply with the terms of any order of the Bankruptcy Court, and Insurer's rights and obligations relating to such litigation shall be determined by, and subject to, the terms and conditions of the Archdiocese Policies, this Settlement Agreement, and any applicable orders of the Bankruptcy Court.

2.3.4  The Plan and Plan Confirmation Order shall provide that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any Covered Party with respect to any Archdiocese Policy, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

4928-8303-0899v.25

2.3.5    Nothing in this Section or elsewhere in this Settlement Agreement shall bar any party from arguing that any appeal from the Plan Confirmation Order should be dismissed on grounds of statutory or equitable mootness or otherwise.

2.3.6    None of the releases, Injunctions, or other provisions of the Plan with apply to, or have any effect, on the rights of the Settling Insurers to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with any Settling Insurer's Policy.

2.4      The Settlement Trust Documents shall require the Settlement Trust to register as a Responsible Reporting Entity under the reporting provisions of MMSEA.

2.4.1    The Settlement Trust Documents shall require the Settlement Trust, at its sole expense, to timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated and to follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

2.4.2    The Settlement Trust Documents shall require the Settlement Trust to obtain, prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Abuse Claim, a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. §1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim.

2.5      The Debtor Parties and Reorganized Debtor and Reorganized Additional Debtors will undertake commercially reasonable actions to cooperate with Insurer in connection with responding to any inquiry from Insurer's regulators, auditors, reinsurers, or retrocessionaires.

2.6      From and after the execution date of this Settlement Agreement and until the earlier of: (A) occurrence of (i) the Settlement Agreement Effective Date and (ii) Insurer's remittance of the Settlement Amount (at which time this covenant is superseded by the releases provided in Section 4); and (B) the date on which this Settlement Agreement is terminated, (i) none of the Insurer Released Parties, the Debtor, the Additional Debtors or Creditors' Committee will initiate any litigation activity against the other in any Bankruptcy Case and (ii) the Archdiocese and the Insurer Released Parties shall cease all litigation activities against each other in the Bankruptcy Case, including that the Insurer Released Parties will neither object to any proposed Plan consistent with this Settlement Agreement, nor serve or compel any discovery in connection with the Bankruptcy Case; *provided that*: (y) neither the Archdiocese nor any Additional Debtor shall include any provision in any Plan that adversely affects the rights or benefits of the Insurer Released Parties under this Settlement Agreement, or that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement; and (z) neither the Archdiocese nor any Additional Debtor shall act, or fail to act, in such a way that otherwise violates, or is contrary to, the agreements and covenants contained in this

Settlement Agreement. Notwithstanding the foregoing, the Insurer Released Parties may participate in the Bankruptcy Case for the purpose of supporting or enforcing any of the terms of this Settlement Agreement and protecting their rights.

~~2.7~~ ~~The Parties shall each bear, as to each other only, their own costs, expenses, and counsel and professional fees in the Bankruptcy Case.~~

~~2.8~~2.7 From and after the execution date of this Settlement Agreement and until the date on which this Settlement Agreement is terminated, the obligations of the ~~Debtors~~ Parties set forth in this Section 2 shall be binding on the Debtor Parties.

## 3.    PAYMENT OF THE SETTLEMENT AMOUNTS

3.1 ~~By no later than thirty (30) days after (a) the Settlement Agreement Effective Date, and (b) Insurer receiving appropriate instructions for the transmission of the payment to the Escrow Agent or Settlement Trust, Insurer shall pay (or cause to be paid)~~It is a condition to effectiveness of this Agreement that Insurer shall have arranged for the issuance of a documentary letter of credit for an amount equal to the Settlement Amount ~~to~~ (the ~~Settlement Trust or Escrow Agent pursuant to the Escrow Agreement.   Payment~~**"Letter of Credit"**) in the form attached as **Exhibit C** to effectuate payment of the Settlement Amount ~~may be by check, ACH transfer, wire transfer, or other method.~~  References herein or in the Plan to "payment" or "delivery" of the Settlement Amount shall be deemed to mean a draw down of the Letter of Credit.

~~3.1.1~~    ~~[Intentionally Omitted.]⁸~~

3.1.1    The beneficiary of the Letter of Credit may draw upon the Letter of Credit only in strict accordance with its express terms. In the event that the beneficiary draws down on the Letter of Credit prior to the Settlement Agreement Effective Date, the beneficiary shall hold the entirety of the proceeds in a segregated, interest-bearing trust account, pending the occurrence of the Settlement Agreement Effective Date.

3.1.2    If (a) the beneficiary has drawn down the Letter of Credit and (b) the Settlement Agreement Effective Date has not occurred by December 31, 2031, the beneficiary shall promptly, and in any event within fifteen (15) business days, return to Insurer the full amount of the trust funds, together with any interest accrued thereon, free and clear of any claims, setoffs, or deductions.

3.1.3    If either (a) both (i) the Plan Confirmation Order and (ii) the Approval Order have not been entered by the Bankruptcy Court by June 30, 2026, or (b) this Settlement Agreement is terminated in accordance with Section 5 of this Settlement Agreement, the beneficiary of the Letter of Credit shall return the Letter of Credit to

---

⁸ ~~Intentionally omitted, except the SPARTA Settlement Agreement, in which this section will provide:~~

~~[SPARTA shall provide a standby letter of credit, in a manner acceptable to the Debtor, to secure payment of the Settlement Amount.  References herein or in the Plan to "payment" of the Settlement Amount shall be deemed to include the draw down of the letter of credit, as applicable.]~~

financial institution that issued the Letter of Credit along with written instructions directing that financial institution to terminate and/or cancel the Letter of Credit.

    3.1.4   If the Bankruptcy Court enters an order dismissing the Bankruptcy Case, the beneficiary of the Letter of Credit shall return the Letter of Credit to the financial institution that issued the Letter of Credit along with written instructions directing that financial institution to terminate and/or cancel the Letter of Credit.

    3.1.5   Nothing in this Section shall be construed to (i) grant the beneficiary any right to retain, use, or apply the proceeds of the Letter of Credit except as expressly provided herein, or (ii) limit either the Insurer's or the beneficiary of the Letter of Credit's right to seek immediate injunctive or equitable relief to enforce the provisions of this Section.

    3.2   The delivery of the Settlement Amount to the ~~Escrow Agent or~~ Settlement Trust shall be in full and final settlement of all responsibilities under and arising out of the Archdiocese Policies, the sale of the ~~Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties back~~ Purchased Property to Insurer free and clear of all Subject Interests of any Entity, and the other releases provided.

    3.3   Subject to the occurrence of the Settlement Agreement Effective Date, the Parties agree: (i) the Settlement Amount is the total amount that Insurer is obligated to pay on account of any and all Claims under, arising out of, relating to, or in connection with the Archdiocese Policies (including Barred Claims, and any reimbursement obligations for Conditional Payments under the MSPA); (ii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of anyone in connection with the Archdiocese Policies, including any payments in connection with amounts allegedly owed under the MSPA or in connection with any Claims, including any Barred Claim; (iii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of the Archdiocese Bound Parties or any Abuse Claimants in connection with the Archdiocese Policies; and (iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted[9]. The Parties further agree that the Settlement Amount includes the full purchase price of the Archdiocese Policies and Related Insurance Claims and Coverage Claims of the Archdiocese Bound Parties and consideration for the releases and other protections afforded by this Settlement Agreement.

    3.4   The Parties represent and agree that (i) the consideration to be provided by Insurer pursuant to this Settlement Agreement constitutes a fair and reasonable compromise and exchange for the consideration granted to the Insurer Released Parties in this Settlement Agreement (including the releases set forth below), and (ii) the consideration to be provided by

---

[9] ~~The Catholic Mutual Settlement Agreement will include the following:~~

~~["(iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted *except for the Preserved Coverage*."]~~

the Archdiocese Bound Parties to the Insurer Released Parties pursuant to this Settlement Agreement (including the releases set forth below) constitutes a fair and reasonable compromise and exchange for the consideration granted to the Archdiocese Bound Parties in this Settlement Agreement. The Insurer Released Parties are not acting as volunteers, and the Settlement Amount reflects potential liabilities and obligations to the Archdiocese Bound Parties of the amount Insurer allegedly is obligated to pay.

3.5    Each of the Archdiocese Signatory Parties: (i) consents to the sale of the Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests and Claims of all Persons, including, without limitation, the Archdiocese Bound Parties in accordance with the terms of this Settlement Agreement, and (ii) agrees and acknowledges that the contribution of the proceeds from such sale and settlement to the Settlement Trust, as provided in the Plan and this Settlement Agreement, is a fair and reasonable compromise and exchange for value and constitutes reasonable and adequate consideration for any Subject Interest or Claim the Archdiocese Bound Parties may have in the Archdiocese Policies.

3.6    The Parties further agree that they have attempted to resolve the matters set forth herein in compliance with both state and federal law and believe that the settlement terms adequately consider CMS's interest and do not reflect any attempt to shift responsibility for payment of medical expenses to CMS pursuant to 42 U.S.C. § 1395y(b).  The Parties acknowledge, understand, and agree that any present or future action or decision by CMS, including actions regarding an Abuse Claimant's eligibility or entitlement to receive Medicare or Medicare payments, will not render this Settlement Agreement (including the releases set forth in it) void or ineffective, or in any way affect the finality of this Settlement Agreement.  The Settlement Trust is responsible for all future medical payments, including any and all claims by CMS and/or CMS contractors that have been or may be in the future arising out of, relating (directly or indirectly) in any way to, or in connection with this Settlement Agreement.

3.7    To facilitate the purchase of the ~~Archdiocese Policies~~Purchased Property as set forth herein, ~~the Archdiocese and~~ each ~~of the other~~ Archdiocese Bound ~~Parties authorizes the Archbishop[10]or any other person employed by the Archdiocese that he designates, as its~~Party is authorized to designate a lawful attorney in fact, with full powers of substitution, to execute any bill of sale or other document reasonably requested by the Archdiocese or Insurer to accomplish the sale and purchase contemplated herein. A form of Bill of Sale is attached hereto as **Exhibit B**.

4.    **RELEASES AND SALE FREE AND CLEAR**

4.1    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust ~~or Escrow Agent~~, with no further action being required, the Archdiocese Signatory Parties fully, finally, and completely remise, release, acquit, and forever discharge the Insurer Released Parties (including, for the avoidance

---

[10] ~~As used herein, "Archbishop" refers to: (a) the office of the ordinary of the Archdiocese under Canon Law; (b) the Most Reverend Gregory Michael Aymond, the Archbishop on the Effective Date; and (c) any duly appointed or elected administrator of the Archdiocese pending the appointment of a new individual to serve as the Archbishop, and his duly appointed or elected successor.~~

4928-8303-0899v.25

of doubt, any of their reinsurers or retrocessionaires, solely in their capacity as such), from any and all past, present, and future: (a) Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies or Claims that are covered or are determined to be covered by agreement or a court of competent jurisdiction under the Archdiocese Policies, including, without limitation, any Barred Claims, Direct Action Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims, the handling of the Abuse Claims or the Bankruptcy Case. The Archdiocese Signatory Parties further acknowledge, stipulate, and agree that (x) the releases in this Section 4.1 specifically include all Unknown Abuse Claims, and demands that are based in whole or in part on Unknown Abuse Claims and (y) **with respect to all Claims released under this Section 4.1, the Archdiocese Signatory Parties waive any and all provisions, rights, and benefits conferred by Cal. Civ. Code 1542 or any law of any state of the United States, or any principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code 1542, which provides: "a general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, that, if known by him or her, would have materially affected his or her settlement with the debtor or released party"** and (z) the releases in this Section 4.1 shall be equal in breadth to the broadest releases and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

4.2    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, and with no further action being required, Insurer shall fully, finally, and completely remise, release, acquit, and forever discharge the Archdiocese Signatory Parties from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies, including any Barred Claims, and reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case subject to the protections in favor of the Insurer Released Parties set forth herein[11].

4.3    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, none of the Archdiocese Signatory Parties or other Archdiocese Bound Parties shall assert against the Insurer Released Parties any Claim with respect to any matter, conduct, transaction, occurrence, fact, or other circumstance that, directly or indirectly, arises out of, relates to, or is in connection with any of the Archdiocese Policies, any Barred Claim, or any other matter released pursuant to Sections 4.1 and 4.2 above.

4.4    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer hereby buys back the Archdiocese Policies free and clear of all Subject Interests, including without limitation all Coverage Claims and Related

---

[11] Catholic Mutual Settlement Agreement will include the following addition:

"all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case *provided that, the obligations of the applicable Archdiocese Bound Parties are not released from their obligations under the Archdiocese Policies with respect to the Preserved Coverage."*

Insurance Claims, of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); and any Abuse Claimant, or any other holder of a Barred Claim. This sale is pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code. The Parties acknowledge and agree, and the Approval Order shall find and conclude, that upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount:

4.4.1   Insurer is a good faith purchaser of the Archdiocese Policies and any Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), within the meaning of section 363(m) of the Bankruptcy Code, with all the protections afforded such a purchaser under 363(m) of the Bankruptcy Code;

4.4.2   the consideration exchanged constitutes a fair and reasonable settlement and compromise of the Parties' disputes and of their respective rights and obligations relating to the foregoing Archdiocese Policies and Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), and constitutes reasonably equivalent value;

4.4.3   the releases in this Settlement Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy law;

4.4.4   the Archdiocese Policies and all Subject Interests therein (including, without limitation, to the extent applicable, any Direct Action Claim) shall be terminated and of no further force and effect;

4.4.5   Insurer's payment of the Settlement Amount constitutes Insurer's full and complete performance of any and all obligations under the Archdiocese Policies, including any performance owed to the Archdiocese Bound Parties or any holder or purported holder of any Claim against (including any Abuse Claim or Direct Action Claim) or Subject Interest in, the Archdiocese Policies, and exhausts all limits of liability of the Archdiocese Policies;

4.4.6   All Subject Interests the Archdiocese Bound Parties and any other Entity may have had, may presently have, or in the future may have in the Archdiocese Policies are released pursuant to the terms of this Settlement Agreement and policy buyback;

4.4.7   all per occurrence and/or aggregate limits of coverage under the Archdiocese Policies are fully eroded, exhausted and settled upon the Settlement Agreement Effective Date;

4.4.8   the Insurer would not pay the Settlement Amount without buyback of the Archdiocese Policies upon all of the terms and conditions set forth herein; and

4.4.9   the Archdiocese Signatory Parties accept the Settlement Amount in full and complete compromise and satisfaction of all Insurer Released Parties' past,

4928-8303-0899v.25

present, and future obligations, including any obligations to any of the Archdiocese Bound Parties under such Archdiocese Policies or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever that are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies (including without limitation Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether or not such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, the Bankruptcy Case, or otherwise.

4.5     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer shall have no obligation to pay, handle, object, or otherwise respond to any Claim against the Archdiocese Bound Parties; and the Archdiocese Bound Parties will: (i) will withdraw, and are deemed to have withdrawn, all outstanding tenders of Claims to the Insurer Released Parties for defense and indemnity; (ii) will not tender any Claims to the Insurer Released Parties; and (iii) will not request that the Insurer Released Parties fund any judgments, settlements, or defense costs that, in each case, are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies issued by a Settling Insurer.

4.6     To the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer consent to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under this Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Subject Interests of any Entity in such Archdiocese Policies (the "**Non-Debtor Catholic Entity Policy Sale**"). The Plan Confirmation Order and Approval Order shall so provide and Insurer shall be designated in the Plan Confirmation Order as a good-faith purchaser of the Archdiocese Policies with all the protections afforded such a purchaser under section 363(m) of the Bankruptcy Code.

4.7     [Intentionally Omitted.]~~12~~

4.8     The Archdiocese Signatory Parties further covenant, stipulate and agree that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Abuse Claims against any Insurer Released Party and to releases, injunctions, and other

---

~~12 Intentionally omitted, except the Catholic Mutual Settlement Agreement, in which this section will provide:~~

~~4.15 Notwithstanding anything in this Settlement Agreement to the contrary, nothing in the Settlement Agreement shall sell or purchase the Preserved Coverage; erode, exhaust the limits of, or terminate the Preserved Coverage; release the Insurer from providing the Preserved Coverage to the applicable Archdiocese Bound Parties; or release the obligations of the applicable Archdiocese Bound Parties under the Archdiocese Policies with respect to such Preserved Coverage.~~

protections, including injunctions and releases of Abuse Claims against any insured or additional insured covered by any insurance policy issued by any Insurer Released Party, and to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in any Archdiocese Policy to the Debtor's Estate and sale thereof to Insurer, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court. Without limiting the foregoing, the Insurer Released Parties shall receive protections against Claims by Non-Debtor Catholic Entities and any other Entity equal in breadth to the broadest protections received by any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, or any Insurance Settlement Agreement approved by the Bankruptcy Court.

4.9     If the Archdiocese Signatory Parties, or anyone of them, enter into any agreement (that is embodied in such agreement as approved by the Bankruptcy Court, the Plan, and/or the Plan Confirmation Order) with any other one of the Settling Insurers (including any Non-Settling Insurer who becomes a Settling Insurer) in the Bankruptcy Case, that provides that insurer with releases, injunctions or other protections that are more favorable than those contained in this Settlement Agreement, then this Settlement Agreement shall be deemed to be modified to provide Insurer with those more favorable injunctions, releases or other protections.

4.10    Notwithstanding anything in this Settlement Agreement, nothing in this Settlement Agreement is intended to or shall be construed to:

4.10.1   apply to or have any effect on the Insurer Released Parties' rights to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer;¹³²

4.10.2   release any Claims that any Insurer Released Party has or might have against any Non-Settling Insurer, except that, to the extent such other insurers have agreed or in the future agree to release any Claims against the Insurer Released Parties arising out of or related in any way to the Abuse Claims, then the Insurer Released Parties also release such Claims against such other insurers to the same extent; or

4.10.3   release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Settlement Agreement or the Plan (to the extent not inconsistent with this Settlement Agreement).

---

¹³ SPARTA Settlement Agreement will provide:

² For the avoidance of doubt, any release provided pursuant to this Settlement Agreement does not include any release by Insurer of any Claims against Pennsylvania General Insurance Corporation. Nothing in the Settlement Agreement shall impair any right of Insurer to pursue any direct claim or claim based on theories of contribution, indemnity, reimbursement, or subrogation against Pennsylvania General Insurance Corporation.

The Plan shall provide the same.

## 5. TERMINATION OF AGREEMENT

5.1     The Parties may terminate this Settlement Agreement by mutual agreement in writing.

5.2     Insurer may terminate this Settlement Agreement upon fifteen (15) days written notice to the other Parties in the event of any of the following occurs prior to the Settlement Agreement Effective Date: (i) any of the Debtor Parties or the Creditors' Committee files a plan inconsistent with this Settlement Agreement; (ii) the Approval Order and the Plan Confirmation Order are not entered by February 15, 2026; (iii) the Bankruptcy Court enters an order that becomes a Final Order that (a) denies the Approval Motion or (b) is inconsistent with the Approval Order or the Plan Confirmation Order; (iv) a plan that is inconsistent with the terms of this Settlement Agreement is confirmed; or (v) any Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

5.3     In the event of termination pursuant to this Section 5, unless the Parties agree otherwise in writing, the Parties' interests, rights, and obligations under the Archdiocese Policies shall not be impacted by such termination.

## 6. REPRESENTATIONS AND WARRANTIES OF THE PARTIES

6.1     The Parties separately represent and warrant as follows:

6.1.1     To the extent it is a corporation, including a non-profit, religious, or charitable corporation, or other legal entity, each such Party has the requisite power and authority to enter into this Settlement Agreement and to perform the obligations contemplated by this Settlement Agreement,[3] subject only to approval of the Bankruptcy Court; and

6.1.2     This Settlement Agreement has been analyzed by counsel to the Parties and executed and delivered in good faith pursuant to arm's length negotiations and for value and valuable consideration.

6.2     The Archdiocese Signatory Parties represent and warrant that they have not assigned, and will not assign, any Subject Interests in the Archdiocese Policies to any Entity, except for the avoidance of doubt, the assignment of the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate.

6.3     The Archdiocese Signatory Parties represent and warrant that (i) all Archdiocese Bound Parties have either signed this agreement, are represented herein by the Archdiocese or the Archdiocese Signatory Parties, or are juridical entities whose existence has been terminated as a matter of applicable non-bankruptcy law and (ii) the Archdiocese Signatory Parties are duly

[3] Specifically, each Archdiocese Signatory Party is duly authorized to execute this Settlement Agreement and any related document and the signatory hereto on behalf of such Archdiocese Signatory Party has full power and authority to bind such Archdiocese Signatory Party. The related corporate resolutions and incumbency certificates are identified in Schedule 4 and Schedule 5 respectively.

authorized to bind the Archdiocese Bound Parties who are not Archdiocese Signatory Parties. Without limiting the foregoing, the Archdiocese Signatory Parties represent and warrant that:

6.3.1   all entities known to them that are Co-Insured Parties (or under the Archdiocese Policies (by express reference, assignment, judicial determination or any related concept under applicable law or other document) under the Archdiocese Policies other than the Debtor, the Additional Debtors, the Parish Schools and Archdiocesan Schools, the Non-Debtor Catholic Entities, and the cemeteries identified in Section 6.3.3, are identified in Schedule 2 hereto, if any. The Archdiocese Signatory Parties represent and warrant that they are not aware of being an "additional assured" (or related concept under applicable law or document) under any American Employers Insurance Company policy;[14]

6.3.2   the Archdiocesan Schools are not separately incorporated and are merely unincorporated operations of the Debtor and the Parish Schools are not separately incorporated and are merely unincorporated operations of the Archdiocesan Parishes that are Additional Debtors;

6.3.3   the Debtor, through the Office of Catholic Cemeteries, operates certain cemeteries including, without limitation: All God's God's Babies Tomb & Holy Innocents Prayer Garden, St. Charles Cemetery, St. Joseph Cemetery #1, St. Joseph Cemetery #2, St. Louis Cemetery #1, St. Louis Cemetery #2, St. Louis Cemetery #3, St. Patrick Cemetery #1, St. Patrick Cemetery #2, St. Patrick Cemetery #3, St. Roch Cemetery #1, St. Roch Cemetery #2, St. Vincent De Paul Cemetery #1, St. Vincent DePaul Cemetery #2, which  cemeteries are either: (a) Non-Debtor Catholic Entities or (b) not separately incorporated and are merely unincorporated operations of the Debtor;

6.3.4   Holy Redeemer School, Redeemer-Seton High School, and St. Joseph Benedictine High School were formerly owned and operated by the Archdiocese, but ceased operations and were closed by the Debtor at some point prior to the Petition Date, and were not separately incorporated and were merely unincorporated operations of the Debtor;

6.3.5   St. Robert Bellarmine School was formerly owned and operated by one or more of the Archdiocese Signatory Parties, but ceased operations and was closed by one or more of the Archdiocese Signatory Parties at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of one of the Additional Debtors;

---

[14] SPARTA Settlement Agreement to include:

The Archdiocese Signatory Parties represent and warrant that they are not aware of being an "additional assured" (or related concept under applicable law or document) under any American Employers Insurance Company ("AEIC") policy.

Note: SPARTA Settlement Agreement Schedule 2, will be listed as "None."

6.3.6     Notre Dame Seminary and the Society of the Propagation of the Faith of the Archdiocese of New Orleans are owned and operated by the Archdiocese and are not separately incorporated, but are merely unincorporated operations of the Debtor;

6.3.7     San Pedro Pescador Church was owned and operated by the Archdiocese, but was closed by the Archdiocese prior to the Petition Date and was not separately incorporated, but was merely an unincorporated operation of the Archdiocese;

6.3.8     the following Roman Catholic Schools: the Academy of the Sacred Heart, Holy Cross, Jesuit, St. Mary's Academy, St. Mary's Dominican, Brother Martin, Mount Carmel Academy, Ursuline Academy, Cabrini, De La Salle, and St. Paul's School, are not Co-Insured Parties, named insured's or additional insureds (or related concept under applicable law or document) under the Archdiocese Policies, or institutions, religious organizations or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control and active management, and were themselves not under the control or active management of the Archdiocese.;

6.3.9     St. John Vianney Preparatory School was formerly owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.10    the Louise Home a/k/a as the Louise Headstart Center was an unincorporated ministry of the Debtor;

6.3.11    Holy Guardian Angel was owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.12    the Social Apostolate Housing Program was an unincorporated ministry of the Debtor;

6.3.13    at all times Tulane Catholic and the Newman Center were and are unincorporated activities of the Debtor, with no existence separate and apart from the Debtor;

6.3.14    Crescent City Convent Corporation, Lyric Realty and Parking Company, Inc., The Chinchuba Deaf-Mute Institute, People for Teens of St. Anthony of Padua Corporation, Kiwanis Foundation of New Orleans, Kiwanis Club of New Orleans, and Seminarians Parents Association, Inc. were never owned, operated, or controlled by the Debtor or the Additional Debtors and were neither insureds nor additional insureds under the Archdiocese Policies; and

6.3.15    (a) Catholic Charities Archdiocese of New Orleans ("**Catholic Charities**") owned and operated Hope Haven – Madonna Manor ("**HH**"), which was organized under Louisiana law; (b) HH was dissolved and its status as a juridical person was, thus, terminated as a matter of Louisiana law; (c) at all times, Catholic Charities was

the sole member and/ or shareholder of HH; and (d) it is the intention of Catholic Charities that HH be bound by this Agreement as if it remained in existence and had signed the Agreement as a Party.

6.4     The Archdiocese Signatory Parties represent and warrant that they are not aware of any Abuse Claim asserted against any entity associated with the Archdiocese (including any parishes, institutions or religious organizations or any subsidiary of the person or organization listed in the declarations of the Archdiocese Policies, or any other organization coming under the Archdiocese's control and active management), that is not listed on Exhibit B-1 to the Acceptable Plan.

6.5     The Debtor represents and warrants that it will undertake good faith efforts to cause actual notice of the Approval Motion to be sent in accordance with Section 2.1.1 hereof. Without limitation, the Debtor has sent or will send notice to the entities on Schedule 3.

6.6     The Archdiocese Signatory Parties and Insurer (limited to such Insurer person that worked on and were familiar with this Settlement Agreement and matters referenced therein), respectively, represent and warrant that they have completed a reasonable search for evidence of any policy of insurance issued by Insurer to the Archdiocese Signatory Parties that would afford coverage with respect to any Abuse Claim, Coverage Claim, or Related Insurance Claim and other than the policies identified in Schedule 1, no such policies have been identified.  The Archdiocese Signatory Parties further represent and warrant that, to the best of their knowledge after reasonably diligent investigation: there are no contracts, binders, certificates, and policies of insurance that insure or purport to insure (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) (x) the Diocese of Houma-Thibodaux or (y) the Diocese of Baton Rouge (excluding, for the avoidance of doubt, policies issued to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD, but including any such policies issued to the Archdiocese that provide or may provide insurance coverage to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD), or (iv) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, other than the policies identified in Schedule 1.   Notwithstanding the foregoing, nothing in this Settlement Agreement, including the Schedules or Exhibits hereto, shall be construed as or deemed to be an admission or evidence that any binder, certificate, or policy of insurance was in fact issued or affords coverage in connection with any Abuse Claims.

6.7     The Debtor Parties represent and warrant that they have not in any way assisted, and covenant that they shall not in any way assist, any Entity in the establishment or pursuit of any Claim, including any Barred Claim, against the Insurer Released Parties.

## 7.     ACTIONS INVOLVING THIRD PARTIES

7.1     For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Archdiocese Policies resulting from the purchase and sale thereof contemplated by this Settlement Agreement, the Parties hereby agree as follows:

7.1.1    From and after (i) the occurrence of the Settlement Agreement Effective Date, and (ii) Insurer's payment of the Settlement Amount, if any other insurer of the Archdiocese Bound Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from Insurer as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for any of Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense or indemnity obligation of Insurer for any Claims or reimbursement obligations for Conditional Payments released or resolved pursuant to this Settlement Agreement, the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and the Settlement Trust shall voluntarily reduce any judgment or Claim against, or settlement with, such other insurers to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against Insurer.  To ensure that such a reduction is accomplished, Insurer shall be entitled to assert this Section 7 as a defense to any action against it brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Insurer from any liability for the judgment or Claim.  Moreover, if a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against Insurer, such Claim may be asserted as a defense against a Claim by the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust in any coverage litigation (and the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and/or the Settlement Trust may assert the legal and equitable rights of Insurer in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust shall be reduced dollar for dollar by the amount so determined.

7.1.2    Unless this Settlement Agreement is terminated, Insurer shall not seek reimbursement for any payments it makes under this Settlement Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other Settling Insurer unless that other insurer first seeks contribution, subrogation, indemnification, or similar relief from Insurer.  Notwithstanding the foregoing, nothing in this Settlement Agreement, the Approval Order or the Plan Confirmation Order shall be construed as prohibiting Insurer from seeking recovery (including with respect to the Settlement Amount or otherwise) from its reinsurers or retrocessionaires in their capacity as such.

7.2    Subject to the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, and subject to the limitations set forth below, the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein, including any Claims made by (i) any Entity who is an insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies; (ii) any Entity who ~~has made, will make, or can make~~makes (a) an Abuse Claim or (b) a Related Insurance Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the

right to make a Claim under any of the Archdiocese Policies (collectively, the "**Indemnified Claims**"), as set forth below: ~~15~~

      7.2.1   The Insurer Released Parties shall have the right (but not the obligation) to (a) seek to enforce the Injunctions against any Entity seeking to assert an Indemnified Claim, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions) identified in this Section 7.2. With the Insurer Released Parties' consent, such consent not to be unreasonably withheld, the Settlement Trustee can satisfy the obligations contained in (a) and (b) above. An amount equal to ~~[____]16~~<u>Two Hundred Fifty Thousand and 00/100 Dollars (250,000.00)</u> (the "**Indemnity Cost Reserve**") shall be reserved from the Settlement Amount for payment of reasonable attorneys' fees, expenses, costs, and other amounts incurred by the Insurer Released Parties in defending against such Indemnified Claims, which amount shall be released from reserve if no Indemnified Claims are asserted within 30 days after the Revival Window has closed under every applicable Revival Window Law.

      7.2.2  ~~The~~<u>Neither any Archdiocese Bound Party, nor the</u> Settlement Trust shall ~~not~~ in any way assist, any Entity in the establishment or pursuit of any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein.

      7.2.3   The Settlement Trust and Archdiocese shall support and join in the enforcement of the Injunctions against any Entity seeking to assert an Indemnified Claim; *provided that* if the Insurer Released Party(ies) elect(s) not to enforce the Injunctions in accordance with Section 7.2.1, the Settlement Trust shall (a) seek to enforce the Injunctions against such Entity, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions).

      7.2.4   To the extent that a Final Order is entered against any Insurer Released Party with respect to any Indemnified Claim, the Settlement Trust shall indemnify and hold harmless such Insurer Released Party with respect thereto up to the Settlement Amount; *provided that* to the extent the Insurer Released Party(ies) elect not to enforce the Injunctions or defend against the Indemnified Claims, the Settlement Trust's indemnity obligation shall be limited to the amount of the Indemnity Cost Reserve; *provided further* that if the Settlement Trust breaches its obligation set forth in Section 7.2.2 hereof, the Settlement Trust's indemnity obligation shall not be so limited and shall instead be up to the Settlement Amount. In no event shall the Settlement Trust's indemnity obligation exceed each individual Settling Insurer's Settlement Amount. To the extent the Settlement Amount has been distributed in accordance with the Plan, the Settlement Trust's indemnification obligation shall be so reduced.

---

~~15~~ *~~Note: Certain limitations on scope of indemnity subject to further discussion.~~*

~~16~~ ~~Amount to be equal to $250,000 for SPARTA, and an equivalent percentage of Settlement Amount for other Settling Insurers. The Indemnity Cost Reserve is a reserve amount provided for each individual Settling Insurer and cannot be aggregated.~~

7.2.5   The indemnification provided for herein shall not impose liability on the Settlement Trustee or Settlement Trust professionals for their own acts or omissions; *further*, funds provided for the administration of the Settlement Trust or payment of the Settlement Trustee or Settlement Trust professionals shall not be subject to indemnification claims as provided for herein.

7.3   If any Entity attempts to prosecute a Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies against the Insurer Released Parties before the Approval Order and Plan Confirmation Order become Final Orders, then promptly following notice to do so from Insurer, the Archdiocese and/or the Additional Debtor(s), as applicable, will file a motion and supporting papers to obtain an order from the Bankruptcy Court pursuant to sections 362 and 105(a) of the Bankruptcy Code protecting the Insurer Released Parties from any such Claims until the Plan Confirmation Order has become a Final Order, the Bankruptcy Case is dismissed, or this Settlement Agreement is terminated under Section 5 hereof.

## 8.   MISCELLANEOUS

8.1   If any action or proceeding of any type whatsoever is commenced or prosecuted by any Entity not a Party to this Settlement Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Settlement Agreement, the Parties mutually agree to cooperate fully in opposing such action or proceeding.

8.2   The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Settlement Agreement and to preserve its validity and enforceability.

8.3   The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Plan Confirmation Order, and the Bankruptcy Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof.

8.4   Notwithstanding any language to the contrary in this Settlement Agreement, under no circumstance will any Archdiocese Signatory Party be obligated to take any action that violates any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, and if a court of competent jurisdiction determines that a term or condition in this Settlement Agreement does violate any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, the applicable Archdiocese Signatory Party shall be relieved of such term or condition, but the scope and finality of the releases, injunctions, and buybacks set forth in this Settlement Agreement shall not be affected or modified.

8.5   This Settlement Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.6   This Settlement Agreement may be modified only by a written amendment signed by all of the Parties, and no waiver of any provision of this Settlement Agreement or of a breach

4928-8303-0899v.25
347

thereof shall be effective unless expressed in a writing signed by the waiving Party.  The waiver by any Party of any of the provisions of this Settlement Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach. Any change or modification of this Agreement that would result in a material adverse change to the rights of the Abuse Claimants or Trust shall require the consent of the Creditors' Committee (if at the time of the proposed change or modification a Trustee has not been appointed) or Settlement Trustee (if at the time of the proposed change or modification a Trustee has been appointed and approved), as applicable, which consent shall not be unreasonably withheld.

8.7     By entering into this Settlement Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Settlement Agreement. No part of this Settlement Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Settlement Agreement.  All actions taken and statements made by the Parties or by their representatives relating to this Settlement Agreement or participation in this Settlement Agreement, including its development and implementation, shall be without prejudice or value as precedent.

8.8     This Settlement Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession regarding liability, culpability, wrongdoing, or insurance coverage.  All related discussions, negotiations, and all prior drafts of this Settlement Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. Any evidence of the negotiations or discussions associated with this Settlement Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.8, in (i) an action or proceeding to enforce the terms of this Settlement Agreement, including any use as set forth in Section 7.1.1, or (ii) any possible action or proceeding between the Insurer Released Parties and any reinsurers.  This Settlement Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Insurer Released Parties' obligations under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer.

8.9     None of the Parties shall make any public statements or disclosures (i) regarding another Party's rationale or motivation for negotiating or entering into this Settlement Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued or determined by agreement or a court of competent jurisdiction to have been issued by the Insurer Released Parties, including handling of or involvement in connection with any claims asserted thereunder.

8.10    Neither this Settlement Agreement nor the rights and obligations set forth in this Settlement Agreement shall be assigned without the prior written consent of the other Parties.

8.11    This Settlement Agreement was jointly drafted by the Parties, and the wording of this Settlement Agreement was reviewed by legal counsel for each of the Parties, and each of them had sufficient opportunity to propose and negotiate changes prior to its execution.  The language of all parts of this Settlement Agreement shall in all cases be construed as a whole according to its meaning and not strictly for or against any Party.

8.12    Section titles and headings contained in this Settlement Agreement are included only for ease of reference and shall have no substantive effect.

8.13    All notices, demands, or other communication to be provided pursuant to this Settlement Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other Entity or address as any of them may designate in writing from time to time:

If to the Debtor or Reorganized Debtor:

Mark A. Mintz
Samantha A. Oppenheim
Jones Walker LLP
Telephone: 504-582-8368
Telephone: 504-582-8641
Email: mmintz@joneswalker.com
Email: soppenheim@joneswalker.com
with copies to:

-and-

If to an Archdiocese Signatory Party other than a Debtor Party:

As set forth on Plan Exhibit B-2.

If to Insurer or the Insurer Released Parties:

Tess Leopold
242 Trumbull Street,
Suite 204
Hartford, CT 06103

with copies to:

38

Michael Rubenstein
Liskow & Lewis, APLC
1001 Fannin Street,
Suite 1800
Houston, Texas 77002
mdrubenstein@liskow.com

–and–

–and–

If to the Settlement Trust:

Donald C. Massey
Couhig Partners, LLC
1100 Poydras Street, Suite 3250
New Orleans, Louisiana 70163
Telephone: (504) 599-5777
Email: dmassey@couhigpartners.com

with copies to:

Andrew W. Caine
–and–

Pachulski, Stang, Ziehl & Jones LLP
10100 Santa Monica Blvd, Suite 1300
Los Angeles, CA 90067
Telephone: 310-277-6910
Email: acaine@pszjlaw.com

–and–

8.14   This Settlement Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument.  This Settlement Agreement may be executed and delivered by facsimile, e-mail, or other electronic image, which facsimile, e-mail, or other electronic image counterparts shall be deemed to be originals.

8.14 8.15   Nothing contained in this Settlement Agreement shall be deemed or construed to constitute (i) an admission by the Insurer Released Parties that the Archdiocese Bound Parties, or any other Entity, was or is entitled to any insurance coverage under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by the Insurer Released Parties or as to the validity of any of the positions that have been or could have been

39

asserted by the any of the Archdiocese Bound Parties, (ii) an admission by any of the Archdiocese Bound Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by the Insurer Released Parties or any Claims that have been or could have been asserted by the Archdiocese Bound Parties against the Insurer Released Parties, or (iii) an admission by the Archdiocese Bound Parties or the Insurer Released Parties of any liability whatsoever with respect to any of the Abuse Claims.

8.15 8.16    The Parties to this Settlement Agreement, all of the Entities included in the definition of "Insurer Released Parties," and the Settlement Trust are intended beneficiaries of this Settlement Agreement.  Except as set forth in the preceding sentence or otherwise set forth in this Settlement Agreement, there are no third-party beneficiaries of this Settlement Agreement.

8.16 8.17    The Archdiocese Signatory Parties and the Insurer Released Parties shall each be responsible for their own fees and costs incurred in connection with the Bankruptcy Case, this Settlement Agreement, and the implementation of this Settlement Agreement, except as specifically set forth herein (including in Section 7).

8.17 8.18    The following rules of construction shall apply to this Settlement Agreement:

8.17.1 8.18.1    Unless the context of this Settlement Agreement otherwise requires:  (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Settlement Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.17.2 8.18.2    References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Settlement Agreement.

8.17.3 8.18.3    The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Settlement Agreement when the stated intent is not achieved.

8.18 8.19    The Bankruptcy Court in the Bankruptcy Case shall retain jurisdiction to interpret and enforce the provisions of this Settlement Agreement, which shall be construed in accordance with Louisiana law without regard to conflicts of law principles thereof.  The Insurer Released Parties do not, by virtue of this Section 8.18 8.19 or any other provision in this Settlement Agreement, consent to the Bankruptcy Court's jurisdiction as to any other matter.

8.19 8.20    This Settlement Agreement and each Debtor Party's obligations under this Settlement Agreement shall be binding on each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) and shall survive the entry of the Plan Confirmation Order; provided, however, after the occurrence of the Bankruptcy Plan Effective

Date, recourse for all obligations, other than those set forth in Sections 6.5, 6.7, and 7 hereof or a remedy of specific performance, shall be to the Settlement Trust; provided further, however, if specific performance is not available, each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) may be held liable for an intentional breach of a representation in this Agreement or their bad faith material breach of this Agreement, and if liability on any such ground is established, then recourse may be had directly against the Debtor Party, Reorganized Debtor, and/or Reorganized Additional Debtor(s) responsible.

8.20 8.21 The obligations of the Parties herein, other than those conditioned upon the Settlement Agreement Effective Date, shall be binding upon execution hereof by the Parties.

8.21 8.22 Nothing in this Settlement Agreement will prevent Insurer from allocating the Settlement Amount among the Archdiocese Policies at Insurer's discretion.

8.22 8.23 If any provision of this Settlement Agreement, or the application thereof, shall for any reason or to any extent, be construed to be invalid or unenforceable, the remainder of this Settlement Agreement, and the application of such provision to other circumstances, shall be interpreted so as to best effect the intent of the Parties, unless such determination of invalidity or unenforceability deprives any Party of the substantial benefit of its bargain.

8.23 8.24 The Parties agree that all matters relating to the negotiation and terms of this Settlement Agreement (including by way of example and not limitation, all prior drafts, exchanges of terms, and related discussions or correspondence) shall be confidential and are not to be disclosed except by order of court or consent of the Parties in writing. This Section 8.23 8.24 does not prevent or prohibit the Parties from publicly filing on the docket in the Bankruptcy Case the final, executed copy of this Settlement Agreement.

[*Remainder of Page Intentionally Left Blank*]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed: _____

_____

41

Date: _____

*[Signatures Continue on Adjacent Pages]*

4928-8303-0899v.25

353

**SPARTA Insurance Company and American Employers' Insurance Company**

Signed: _____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**All Archdiocese Signatory Parties
Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title: **Their Authorized Signer** _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**Exhibit A**

**Sale Order**

**Exhibit B**

**Bill of Sale**

**BILL OF SALE AND ASSIGNMENT**

**THIS BILL OF SALE AND ASSIGNMENT** is made and entered into as of _____, 2025, by and between The Roman Catholic Archdiocese of New Orleans, and its Bankruptcy Estate (the "**Archdiocese**" or "**Debtor**"), the Additional Debtors and their respective Bankruptcy Estates, Non-Debtor Catholic Entities (collectively, "**Archdiocese Signatory Parties**"), and SPARTA Insurance Company (the "**Insurer**"). All capitalized terms used herein without definition have the meanings set forth in the Settlement Agreement, Release, and Policy Buyback by, between, and among The Archdiocese, the other Archdiocese Signatory Parties, and Insurer, as amended or modified (the "**Settlement Agreement**").

**W I T N E S S E T H:**

WHEREAS, pursuant to the Settlement Agreement, the Archdiocese Signatory Parties have, on behalf of themselves and all other Archdiocese Bound Parties, agreed to sell and/or convey any and all right, title, and interest (including all Subject Interests) in and to the Purchased Property (as defined in the Approval Order), and Insurer has agreed to purchase and buy-back the Purchased Property, in consideration of the payment of a purchase price of $21,000,000.00 (the "**Purchase Price**") and other good and valuable consideration as provided in and under the Settlement Agreement and Plan;

WHEREAS, the Approval Order, as filed at Docket No. [_], has approved the Sale Transaction (as defined in the Approval Order) and found that the Purchase Price is a fair and reasonable price for the Purchased Property;

NOW, THEREFORE, in consideration of the payment of the Purchase Price by Insurer as set forth in the Settlement Agreement, and in accordance therewith and with Approval Order, the Debtor Parties do hereby sell, transfer, and assign to Insurer, and Insurer does hereby accept, all of the Archdiocese Bound Parties' right, title, and interest in and to the Purchased Property, and all Subject Interests therein.

[signatures appear on following pages]

2

**IN WITNESS WHEREOF**, the Parties have executed this ~~Agreement~~<u>Bill of Sale and Assignment</u> by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed: _____

_____

Date: _____

*[Signatures Continue on Adjacent Pages]*

4928-8303-0899v.25

360

**[Insurer]**

Signed: _____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**All Archdiocese Signatory Parties
Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title:     **Their Authorized Signer** _____

Date:     _____

*[Signatures Continue on Adjacent Pages]*

**Exhibit C**

**SPARTA Letter of Credit**[1]

---

[1] Letter of Credit subject to finalization and execution.

**Schedule 1**

**Archdiocese Policies**

The following policies shall be included in the definition of Archdiocese Policies:

| Policy No. | Period |
|---|---|
| A11-9154-150 | 2/1/64 – 2/1/66 |
| A11-9154-175 | 2/1/66 – 2/1/67 |
| A11-9154-229 | 2/1/67 – 2/1/68 |
| A11-9154-270 | 2/1/68 – 2/1/69 |
| A11-9154-296 | 2/1/69 – 2/1/70 |
| A11-9154-324 | 2/1/70 – 2/1/71 |
| A11-9154-342 | 2/1/71 – 2/1/72 |

4928-8303-0899v.25

365

**Schedule 2**

**Other Co-Insureds Known to the Archdiocese Signatory Parties**

1.     **NONE.**

For the avoidance of the doubt, the following entities are bound by the terms of the Settlement Agreement:[1]

I.     **Archdiocesan Parishes**

1.     All Saints Roman Catholic Church, New Orleans, Louisiana

2.     Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana

3.     Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana

4.     Assumption of Mary Roman Catholic Church, Avondale, Louisiana

5.     Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana[2]

6.     Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana

7.     Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana

8.     Blessed Trinity Roman Catholic Church, New Orleans, Louisiana

9.     Christ the King Roman Catholic Church, Gretna, Louisiana

10.    Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana

11.    Divine Mercy Roman Catholic Church, Kenner, Louisiana

12.    Good Shepherd Roman Catholic Church, New Orleans, Louisiana

13.    Holy Family Roman Catholic Church, Franklinton, Louisiana

14.    Holy Family Roman Catholic Church, Luling, Louisiana

15.    Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana

16.    Holy Spirit Roman Catholic Church, New Orleans, Louisiana

17.    Immaculate Conception Roman Catholic Church, Marrero, Louisiana

18.    Immaculate Conception Roman Catholic Church, New Orleans, Louisiana

19.    Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana

20.    Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana

21.    Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana, for itself and as successor to St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc.

22.    Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana

---

[1] Without limiting Section 6.4 of the Settlement Agreement, Insurer does not concede that any of the Entities listed on this schedule are "insureds," "additional insureds," or "protected persons" under its Archdiocese Policies.

[2] Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

23. Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana

24. Most Holy Trinity Roman Catholic Church, Covington, Louisiana

25. Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana

26. Our Lady of Grace Roman Catholic Church, Reserve, Louisiana

27. Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana

28. Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana

29. Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana

30. Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana

31. Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana

32. Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana

33. Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana

34. Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana

35. Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana

36. Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana

37. Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana

38. Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana

39. Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana

40. St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana

41. St. Agnes Roman Catholic Church, Jefferson, Louisiana

42. St. Alphonsus Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

43. St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana

44. St. Angela Merici Roman Catholic Church, Metairie, Louisiana

45. St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana

46. St. Anselm Roman Catholic Church, Madisonville, Louisiana

47. St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana

48. St. Anthony of Padua Roman Catholic Church, Luling, Louisiana

49. St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana

50. St. Anthony Roman Catholic Church, Gretna, Louisiana

51. St. Augustine Roman Catholic Church, New Orleans, Louisiana

52. St. Benedict Roman Catholic Church, Covington, Louisiana

53. St. Benilde Roman Catholic Church, Metairie, Louisiana

| 54. | St. Bernard Roman Catholic Church, St. Bernard, Louisiana |
| 55. | St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana |
| 56. | St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana |
| 57. | St. Christopher Roman Catholic Church, Metairie, Louisiana |
| 58. | St. Clement of Rome Roman Catholic Church, Metairie, Louisiana |
| 59. | St. Cletus Roman Catholic Church, Gretna, Louisiana |
| 60. | St. David Roman Catholic Church, New Orleans, Louisiana |
| 61. | St. Dominic's Roman Catholic Church, New Orleans, Louisiana |
| 62. | St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana |
| 63. | St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana |
| 64. | St. Francis Xavier Roman Catholic Church, Metairie, Louisiana |
| 65. | St. Genevieve Roman Catholic Church, Slidell, Louisiana |
| 66. | St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana |
| 67. | St. Jerome Roman Catholic Church, Kenner, Louisiana |
| 68. | St. Joachim Roman Catholic Church, Marrero, Louisiana |
| 69. | St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana |
| 70. | St. John of the Cross Roman Catholic Church, Lacombe, Louisiana |
| 71. | St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, for itself and as successor to St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc. |
| 72. | St. John the Baptist Roman Catholic Church, Edgard, Louisiana |
| 73. | St. John the Baptist Roman Catholic Church, Folsom, Louisiana |
| 74. | St. Joseph Roman Catholic Church, Algiers, Louisiana |
| 75. | St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana |
| 76. | St. Joseph's Roman Catholic Church, Gretna, Louisiana |
| 77. | St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc. |
| 78. | St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana |
| 79. | St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana |
| 80. | St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana |
| 81. | St. Margaret Mary Roman Catholic Church, Slidell, Louisiana |

82. St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana

83. St. Mark Roman Catholic Church, Ama, Louisiana

84. St. Martha Roman Catholic Church, Harvey, Louisiana

85. St. Martin de Porres Roman Catholic Church, New Orleans, formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc.

86. St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana

87. St. Mary's Roman Catholic Church, New Orleans, Louisiana

88. St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana

89. St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St. John the Baptist Roman Catholic Church, Paradis, Louisiana, for itself and as successor to St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc.

90. St. Patrick's Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

91. St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana

92. St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana

93. St. Peter Claver Roman Catholic Church, New Orleans, Louisiana

94. St. Peter Roman Catholic Church, Reserve, Louisiana, for itself and as successor to St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc.

95. St. Peter's Roman Catholic Church, Covington, Louisiana

96. St. Philip Neri Roman Catholic Church, Metairie, Louisiana

97. St. Pius X Roman Catholic Church, New Orleans, Louisiana

98. St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana

99. St. Rita Roman Catholic Church, Harahan, Louisiana

100. St. Rita Roman Catholic Church, New Orleans, Louisiana

101. St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana[3]

102. Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana

103. The Congregation of St. Rita Roman Catholic Church of Harahan

104. The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana

---

[3] As stated in footnote 2, Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

## II.     Suppressed Archdiocesan Parishes[4]

1.      Blessed Sacrament, Inc.

2.      Epiphany, Inc.

3.      Immaculate Heart of Mary, Inc.

4.      Incarnate Word, Inc.

5.      Our Lady of Good Counsel, Inc.

6.      Our Lady of Good Harbor, Inc.

7.      Our Lady of Lourdes, New Orleans, Louisiana, Inc.

8.      Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.

9.      Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana

10.     St. Ann, New Orleans, Louisiana, Inc.

11.     St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana

12.     St. Frances Xavier Cabrini, Inc.

13.     St. Francis de Salles, Inc.

14.     St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana

15.     St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana

---

[4]   The Suppressed Archdiocesan Parishes no longer operate as separate church parishes. The Suppressed Archdiocesan Parishes were not dissolved, and may own property.

Following Hurricane Katrina, the operations of certain of the Suppressed Archdiocesan Parishes were combined with Archdiocesan Parishes. In 2024, in the ongoing aftermath of Hurricane Ida and a result of storm damage, the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental situations, and financial difficulties encountered, the following additional Suppressed Archdiocesan Parishes were canonically merged with neighboring Archdiocesan Parishes: (a) St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc., was canonically merged into St. Peter Roman Catholic Church, Reserve, Louisiana; (b) (i) St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and (ii) St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc., were both canonically merged into Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, now known as St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana; (c) St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc., was canonically merged into St. Rosalie Roman Catholic Church, Harvey, Louisiana, now known as Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana; (d) St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc., was canonically merged into Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, now known as St. John Paul II Roman Catholic Church, Waggaman, Louisiana; (e) St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc., was canonically merged into St. John the Baptist Roman Catholic Church, Paradis, Louisiana, now known as St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana; (f) Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc., was canonically merged into St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, now known as St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana; and (g) St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc., had its canonical territory divided so that (i) the area north of the Pontchartrain Expressway was canonically merged into St. Patrick's Roman Catholic Church, New Orleans, Louisiana, and (ii) the area south of the Pontchartrain Expressway was canonically merged into St. Alphonsus Roman Catholic Church, New Orleans, Louisiana.

4928-8303-0899v.25

16.    St. Henry's, Inc.

17.    St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana

18.    St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana

19.    St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana

20.    St. John the Baptist, New Orleans, Louisiana, Inc.

21.    St. Julian Eymard, Inc.

22.    St. Lawrence the Martyr, Inc.

23.    St. Louise de Marillac, Inc.

24.    St. Maurice, Inc.

25.    St. Monica, Inc.

26.    St. Philip the Apostle, Inc.

27.    St. Raymond's, Inc.

28.    St. Rose of Lima, Inc.

29.    St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana

30.    St. Theresa of the Child Jesus, Inc.

31.    The Congregation of Saints Peter and Paul Roman Catholic Church

32.    The Congregation of St. Cecelia Roman Catholic Church

33.    The Congregation of the Annunciation Roman Catholic Church

34.    The Congregation of the Holy Trinity Roman Catholic Church


**III.    Archdiocesan Agencies**

1.    Archdiocesan Spirituality Center

2.    Catholic Charities Archdiocese of New Orleans

3.    Catholic Charities Children's Day Care Centers

4.    Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)

5.    Clarion Herald Publishing Company

6.    Korean Catholic Community of New Orleans, Inc.

7.    Notre Dame Seminary

8.    Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana

9.      Pace Greater New Orleans

10.     Padua House (merged into Catholic Charities Archdiocese of New Orleans)

11.     Philmat, Inc.

12.     Project Lazarus

13.     Roman Catholic Center of Jesus the Lord

14.     School Food and Nutrition Services of New Orleans, Inc.

15.     Second Harvest Food Bank of Greater New Orleans and Acadiana

16.     St. Jude Community Center, Inc.

17.     St. Michael Special School

18.     St. Thérèse Catholic Academy

19.     The Society for the Propagation of the Faith, Archdiocese of New Orleans

**IV.      Non-Debtor Catholic Entities**

**Archdiocesan Agencies**

1.      7887 Walmsley, Inc.

2.      Annunciation Inn, Inc.

3.      Archdiocese of New Orleans Indemnity, Inc.

4.      Aspiring Scholars

5.      Catholic Community Foundation Archdiocese of New Orleans

6.      Christopher Homes, Inc.

7.      Christopher Inn

8.      Dubourg Home

9.      Holy Redeemer Catholic Virtual Academy

10.     Holy Trinity Drive Land Corporation

11.     Iberia Investment Fund II, LLC

12.     Metairie III

13.     Metairie Manor

14.     Monsignor Wynhoven Apartments, Inc.

15.     Nazareth II

16.     Nazareth Manor

4928-8303-0899v.25

373

17.  New Orleans Archdiocesan Cemeteries

18.  Notre Dame Health System (f/k/a Chateau de Notre Dame)

19.  Rouquette III

20.  St. Anthony's Gardens

21.  St. Bernard II

22.  St. Bernard III

23.  St. Bernard Manor

24.  St. Martin's Manor, Inc.

25.  St. Tammany Catholic Cemetery

26.  St. Tammany Manor

27.  The Apartments at Mater Dolorosa

28.  The Mental Health Association Development Corporation

29.  Villa Additions, doing business as St. Teresa's Villa

30.  Villa St. Maurice, Inc.

4928-8303-0899v.25

374

**Schedule 3**

**Additional Notice Parties**

**The Redemptorists/Denver Province**
1633 North Cleveland Avenue
Chicago, IL 60614

**Dominican Province of St. Albert the Great**
1910 S. Ashland Avenue
Chicago, Illinois, 60608-2905

**Congregation of Holy Cross**
P.O. Box 1064
Notre Dame, IN 46556-0541

**St. Elio Roman Catholic Church**
1335 Bayou Dularge Road
Theriot, LA 70397

**Central Catholic High School**
2100 Cedar Street, Unit 1
Morgan City, LA 70380

**Edward Douglas White Catholic High School**
555 Cardinal Drive
Thibodaux, LA 70301

**Chinchuba Institute for the Deaf**
2929 Carrollton
New Orleans, LA 70118

and

1231 Prytania St.
New Orleans, LA 70130

**St. Scholastica Academy**
122 South Massachusetts St.
Covington, Louisiana 70433

**Hope Haven – Madonna Manor**
1231 Prytania
New Orleans LA  70130

7887 Walmsley Ave.
New Orleans, LA 70125

2929 Carrollton
New Orleans, LA  70118

**Holy Cross College, Inc.**
Attn Remy Donnelly
5500 Paris Ave.
New Orleans, LA  70122

**Tulane Catholic**
1037 Audubon St
New Orleans, LA 70118

**University of New Orleans**
2000 Lakeshore Drive
New Orleans, LA 70148

**Our Lady of Peace Catholic Church**
13281 LA-644
South Vacherie, LA 70090

**St. Lucy Child Development Center**
1220 Aycock St
Houma, LA 70360

**St. Augustine High School, Inc.**
c/o Alfred Harrell, III
2600 A.P. Tureaud Ave
New Orleans LA 70119

**St. Joseph's Society of the Sacred Heart**
P.O. Box 65010
Baltimore, MD 21209

**The Community of the Sisters of the Immaculate Conception**
c/o Melanie Baglow
6208 Ithaca Street
Metairie, LA 70003

**Sisters of Mount Carmel**
**Generalate Office**
21388 Smith Road
Covington, LA 70435-6349

**Daughters of St. Paul**
50 St. Paul's Ave.
Jamaica Plain, MA 02130

and

c/o Mary Martha Moss
4403 Veterans Blvd.
Metairie, LA 70006

Crescent City Convent Corporation
210 Baronne St.
New Orleans, LA 70112

**Lyric Realty and Parking Company, Inc.**
c/o Kenneth D. Boudreaux
1115 Tallowtree Dr.
Mandeville, LA 70448

**Sacred Heart of Jesus Catholic Church**
1111 Highway 55
PO Box 2
Montegut, LA 70377

**Diocese of Houma Thibodaux**
P.O. Box 505
Schriever, LA

**Diocese of Baton Rouge**
Post Office Box 2028
Baton Rouge, Louisiana 70821-2028

**Vandebilt Catholic High School**
209 South Hollywood Road
Houma, LA 70360

**General Services Administration**
1800 F St., NW
Washington, DC 20405

**People For Teens of St. Anthony of Padua Corporation**
4700 Cleveland
New Orleans, LA 70119

**Society of the Sacred Heart**
4120 Forest Park Avenue
St. Louis, MO 63108

**Seminarians Parents Association, Inc.**
718 Wood St
Houma, La 70360

**Society of the Divine Word**
PO Box 6038
Techny, IL 60082

**Ursuline Sisters of the Roman Union, Central Province,**
353 South Sappington
St. Louis, MO 63122

**Salesians of Don Bosco, Eastern Province**

in the USA d/b/a Salesian Society, Inc.
Through its agent for service of process:
Rev. Louis Molinelli, SDB
1000 Barataria Boulevard
Marrero, LA 70072

And

Rev. Louis Molinelli, S.D.B.
1000 Salesian Lane
Marrero, LA 70072

4

**Schedule 4**

**Form of Corporate Resolutions**

## CORPORATE RESOLUTION

RESOLUTION OF THE MEMBERSHIP AND BOARD OF DIRECTORS OF [NAME], [ADDRESS], A LOUISIANA NON-PROFIT [CORPORATION][LIMITED LIABILITY COMPANY (hereinafter this "Corporation").

BE IT RESOLVED, that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation, are hereby authorized to transact on behalf of this Corporation any and all business related to the following:

1. Engaging 1793 Group, a Louisiana non-profit corporation, on terms and conditions deemed appropriate in their sole discretion, to assist with and administer on this Corporation's behalf, any and all matters in which this Corporation may have an interest in relation to a Plan of Reorganization filed or anticipated to be filed by The Roman Catholic Church of the Archdiocese of New Orleans in proceedings commenced under Chapter 11 of the Bankruptcy Code, captioned *In re The Roman Catholic Church of the Archdiocese of New Orleans*, Case No. 20-10846 (Bankr. E.D. La.) (the "Chapter 11 Case"), including, but not limited to, preparing and filing a petition in the Chapter 11 Case seeking relief under Chapter 11 of the United States Bankruptcy Code as an additional debtor, executing any and all documents necessary for this Corporation to file for relief in the Chapter 11 Case, executing on behalf of this Corporation all documents required to comply with the requirements imposed upon parties filing for relief under Chapter 11of the Bankruptcy Code, Bankruptcy Rules, Local Rules for the Eastern District of Louisiana and/or the requirement imposed by the United States Trustee.

2. Engaging the firm of Heller Draper and/or any other attorneys to represent this Corporation in actions or proceedings related to the Chapter 11 Case.

3. Engaging accountants, financial advisors, and any other professionals necessary to administer the Chapter 11 Case on behalf of this Corporation.

4. Making decisions with regard to the payment of fees and costs for which this Corporation may become responsible to pay in the Chapter 11 Case.

5. Making decisions with regard to the filing of any plan within the Chapter 11 case, provided that such shall contain terms and provisions consistent with those set forth in Appendix "A" attached hereto and incorporated herein by this reference.
FURTHER RESOLVED that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation with the power of substitution, is authorized to execute and deliver on behalf of this Corporation each and every Insurance Settlement Agreement with the Settling Insurers, as those terms are defined in the Fourth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of September 23, 2025 (the "Plan"), and any amendment or

1

modification to the Plan, including, without limitation, the documents attached or referred to in Plan Supplement 7.1(a), any Bill of Sale required under such Insurance Settlement Agreements, and any other documents reasonably requested by any such Settling Insurer to effectuate the transactions provided for in its Insurance Settlement Agreement or the Plan.

FURTHER GIVING AND GRANTING unto either Very Rev. Patrick Carr or Rev. Leon Poche, full power and authority to sign any and all documents and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER GIVING AND GRANTING unto Very Rev. Peter Akpoghiran or any other officer of the Corporation, full power and authority to certify the passage and effectiveness of this Resolution to the Settling Insurers and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER RATIFYING AND CONFIRMING all that either Very Rev. Patrick Carr or Rev. Leon Poche, in his said capacity may do or cause to be done in the premises.

I, the undersigned President of this Corporation do hereby certify that the above and foregoing is a true and correct copy of a resolution adopted by the Membership and Board of Directors of said corporation in conformity with the Articles of Incorporation and Louisiana law, and that said resolution remains in full force and effect and has not been amended or rescinded.

WITNESS MY HAND AND SEAL, effective this ____ day of _____, 2025

_____
Very Reverend Patrick J. Williams, V.G.

ATTEST

_____
Dirk Wild, Director

*Filing Version 7/29/2025*

**Schedule 5**

**Form of Incumbency Certificates**

# INCUMBENCY CERTIFICATE

I, **Very Rev. Peter Akpoghiran, J.C.D**., the duly elected, qualified, and acting **Vice President of each of the Louisiana nonprofit corporations or limited liability companies listed on Exhibit A** attached hereto (each, a "Corporation," and collectively, the "Corporations"), do hereby certify as follows:

1.  That the person named below has been duly elected or appointed and is the qualified and acting officer of each of the Corporations holding the office set forth opposite his/her name.

    **NAME**                                  **TITLE**

    **Very Rev. Patrick J. Williams, V.G.**    **President and Director**

2.  That the foregoing person is duly authorized to act on behalf of each Corporation in such capacity and to exercise the powers and perform the duties incident to said office under the respective Articles of Incorporation and Bylaws of each Corporation.


3.  That attached hereto as **Exhibit B** is a true and correct copy of a resolution adopted at a duly noticed special meeting by the sole member of each of the Corporations and all of the Board of Directors of each said Corporation in attendance at such meeting in conformity with such Articles of Incorporation and Louisiana law and that said resolution remains in full force and effect and has not been amended or rescinded.

    IN WITNESS WHEREOF, I have hereunto set my hand as Vice President of each of the

Corporations as of this ____ day of October, 2025.


_____
Very Rev. Peter Akpoghiran, J.C.D
Vice President of Each Corporation
(See Attached Exhibit A)

1

State of Louisiana
Parish of Orleans

On this _____ day of October, 2025, before me, the undersigned Notary Public, personally appeared **Very Rev. Peter Akpoghiran, J.C.D.,** who acknowledged that he/she executed the foregoing instrument for the purposes therein contained and in the capacity therein stated.

Notary Public
Printed Name: _____
Notary ID or Bar Roll No.: _____
My Commission Expires: _____

**EXHIBIT A**
**List of Corporations**

2

| Summary report: Litera Compare for Word 11.11.0.158 Document comparison done on 10/24/2025 11:33:44 AM | |
|---|---|
| **Style name:** Sidley Default | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** nd://4922-4535-1762/65/ADNO - Insurer Model Settlement Agreement.docx | |
| **Modified DMS:** nd://4928-8303-0899/25/ADNO - SPARTA Settlement Agreement.docx | |
| **Changes:** | |
| Add | 648 |
| Delete | 244 |
| Move From | 5 |
| Move To | 5 |
| Table Insert | 4 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 906 |

**Exhibit A**
**Form of Proposed Order**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | § § § | CASE NO. 20-10846 (MSG) |
| THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS, *et al.*,[1] | § § § § | CHAPTER 11 SECTION A |
| DEBTORS. | § § § | COMPLEX CASE |

**ORDER (I) APPROVING [•]'SSPARTA INSURANCE COMPANY'S SETTLEMENT AGREEMENT, RELEASE AND BUYBACK, (II) APPROVING THE SALE OF THE ARCHDIOCESE POLICIES FREE AND CLEAR, (III) ENJOINING CLAIMS, AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated July 29, 2025 [D.E. 4181] and supplemented by the filing of the revised Settlement Agreement (as defined below) on October 27, 2025 [D.E.[*]] ("Approval Motion") of The Roman Catholic Church of the Archdiocese of New Orleans, the lead debtor and debtor-in-possession (the "Debtor" or "Archdiocese") and the other debtors and debtors-in-possession[2] (the "Additional Debtors" and, together with the Archdiocese and their respective Bankruptcy Estates, the "Debtor Parties") in the above-captioned chapter 11 cases, by and through their respective counsel, for entry of an order (this "Order") approving the settlement agreement, releases, insurance policy buyback, and related injunction-in-aid ("Settlement") by and among the Archdiocese, the Additional Debtors, the other Archdiocese Signatory Parties, the Creditors' Committee, and [•][3]SPARTA Insurance Company and

---

[1]  The debtors in these chapter 11 cases, along with the last four digits of each debtors' the Debtor's federal tax identification number, are: [•] is 8966.

[2]  In connection with the Plan, the Catholic Entities listed on Plan Exhibit B-1 (the **"Additional Debtors"**) filed individual chapter 11 cases. The Plan is a combined joint Plan for the Archdiocese and the Additional Debtors, and the Approval Motion is deemed to have been filed (and this Order is entered) in each Additional Debtor's bankruptcy case for purposes of the relief requested herein.

[3]  [This Order is the proposed form of order for the Settling Insurers. The Debtor Parties will file proposed orders for each Settling Insurer prior to the Sale Hearing.]

American Employers' Insurance Company ("Insurer" and, collectively with the foregoing, the "Parties"), pursuant to Sections 105(a) and 363 of Title 11 of the United States Code ("Bankruptcy Code") and Rules 2002(a)(2), 6004, and 9019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), in each case as described in the Approval Motion and the *Settlement Agreement, Release, and Policy Buyback* attached to this Order as **Exhibit 1**[4] (the "Settlement Agreement");[53] and the Bankruptcy Court having reviewed the Approval Motion and the Settlement Agreement; and it appearing that due and adequate notice of the Approval Motion and Settlement Agreement having been given to all Entities entitled thereto, and that no other or further notice need be given; and the Bankruptcy Court on November 17, 2025 at [[ ] AM/PM]9:00 AM having held a hearing (the "Sale Hearing") to consider the relief requested in the Approval Motion; and upon the record of the Sale Hearing; and, after due deliberation, including, without limitation, for the reasons stated by the Bankruptcy Court on the record of the Sale Hearing, it appearing that the relief requested in the Approval Motion and granted herein is in the best interests of the Debtor Parties' estates (the "Estates"), their creditors, and other parties in interest; and good sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.     This Bankruptcy Court has jurisdiction over the Approval Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of this case and the Approval Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

[4]   [The form of Settlement Agreement is attached as **Exhibit 1** to this Order. Prior to the hearing on the Approval Motion, the Debtor Parties will file the proposed Settlement Agreement for each Settling Insurer.]

[53]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

B.      The statutory predicates for the relief sought in the Approval Motion are Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007. 9008 and 9019, and Rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Louisiana.

C.      It is necessary and appropriate for the Bankruptcy Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Settlement Agreement, and to adjudicate, if necessary, to the extent provided under 28 U.S.C. § 1334(b), any and all disputes arising from or relating to the Settlement Agreement or this Order.

D.      Proper, timely, adequate and sufficient notice of the Sale Hearing and Approval Motion and the relief requested therein, including, without limitation, the Settlement and the transactions described in the Settlement Agreement, including, without limitation, issuance of the injunction-in-aid referenced in the Settlement Agreement and the Approval Motion (all such transactions being collectively referred to, for convenience, as the "Sale Transaction") has been provided by the Debtor Parties in accordance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules to all interested Entities, including without limitation the parties listed on **Schedule 3** of the Settlement Agreement, through service of the Confirmation Hearing Notice (as defined in the Plan) in accordance with the Disclosure Statement Order (also as defined in the Plan).

E.      Notice of the Approval Motion was ~~duly published as follows: [   ]~~ provided through publication of the Additional Debtors' Abuse Claims Bar Date Publication Notice (**Plan Exhibit G**) in daily and community newspapers throughout Louisiana.

F.      The notices described above were good, sufficient, and appropriate under the circumstances, and no other notice of the Approval Motion or Sale Hearing is required.

3

G.      The disclosures made by the Debtor Parties concerning the Settlement Agreement, the Sale Transaction, and the Sale Hearing were good, complete, and adequate.

H.      [The Unknown Abuse Claims Representative has consented to, and approved of the Settlement Agreement and Sale Transaction on behalf of Unknown Abuse Claims in connection with the treatment of such Claims under the Plan.][6]

I.      A reasonable opportunity to object or be heard with respect to the Approval Motion and the relief requested therein has been afforded to all interested Entities.

J.      The Archdiocese Signatory Parties, on their own behalf and on behalf of the Archdiocese Bound Parties, as applicable, have duly executed the Insurance Settlement Agreement by their duly authorized representative, agent and/or attorney in fact, and have full corporate power and authority to consummate the Sale Transaction pursuant to the Settlement Agreement and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Settlement Agreement, are required for the Archdiocese Bound Parties to consummate the Sale Transaction.

K.      The Debtor Parties have demonstrated (i) good, sufficient, and sound business purpose and justification and compelling circumstances for the Sale Transaction pursuant to Section 363(b) of the Bankruptcy Code and (ii) that the Sale Transaction is fair, reasonable, and in the best interests of their Estates and creditors pursuant to Bankruptcy Rule 9019. Among other things, the Debtor Parties have demonstrated that: the Settlement Agreement, and closing thereon, is necessary and appropriate to realize the value of the Purchased Property (as defined below) and maximize the value of their Estates; the probability of success for their Estates in

---

[6]   [To confirm consent and approval by the Unknown Abuse Claims Representative.]

4910-0549-1059v.7

litigation over the matters resolved by the Settlement Agreement is uncertain; litigation of the matters resolved by the Settlement Agreement would be complex and costly to their Estates; and the Settlement Amount is within the reasonable range of potential litigation outcomes. As used herein, "Purchased Property" means, collectively, all right, title and interest (including "Interests" as defined below) in and to the Archdiocese Policies issued by Insurer and the Related Insurance Claims and Coverage Claims ~~of the Archdiocese Bound Parties; [Intentionally Omitted.]~~[7]. The Sale Transaction constitutes a reasonable and sound exercise of the Debtor Parties' business judgment and their powers and duties under applicable law and should be approved. Approval of the Settlement Agreement and consummation of the Sale Transaction are in the best interests of the Debtor Parties' Estates, their creditors (specifically including the Abuse Claimants of the Debtor Parties), and other parties-in-interest, including because the proceeds of and from the Sale Transaction will benefit Abuse Claimants.

L.    The Settlement Agreement was negotiated, proposed, and entered into without collusion, in good faith, and from arm's length bargaining positions. Without limiting the foregoing, the Settlement Agreement resulted from a lengthy mediation that proceeded pursuant to a prior order of the Bankruptcy Court. Insurer is not an "insider" or "affiliate" (as those terms are defined in the Bankruptcy Code) of any of the Debtor Parties. None of the Archdiocese Bound Parties or Insurer have engaged in any conduct that would: (i) cause or permit the

---

[7] ~~Intentionally omitted, except the Order approving the Catholic Mutual Settlement Agreement, in which this section will provide:~~

~~". . . provided that the Purchased Property does not include Insurer's obligations under the Certificate No. [*] issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the personal injury claims listed in Schedule [X] attached to the Settlement Agreement, in each case, subject to the limits, declarations, terms and conditions of such certificate (the "Preserved Coverage"), and provided further that the Preserved Coverage does not include coverage for any and all Abuse Claims or other Barred Claims."~~

avoidance of the Settlement Agreement or the consummation of the Sale Transaction under Section 363(n) of the Bankruptcy Code; (ii) cause or permit the imposition of any costs or damages (including without limitation attorneys' fees or punitive damages) under Section 363(n) of the Bankruptcy Code; or (iii) prevent the application of Section 363(m) of the Bankruptcy Code. The releases, injunctions, policy buyback, and all other components of the Sale Transaction comply with the Bankruptcy Code and all applicable non-bankruptcy law.

M.   Pursuant to the Settlement Agreement and to the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer have consented to the assignment of the Non-Debtor Catholic Entities' Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under the Settlement Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Interests of any Entity in such Archdiocese Policies (the "Non-Debtor Catholic Entity Policy Sale").

N.   Insurer is a good faith purchaser of the Purchased Property under Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, in that, among other things: (i) all payments to be made by or to Insurer, and other agreements or arrangements entered into by Insurer, including without limitation any escrow agreement pertaining to the payment of the Settlement Amount, in connection with the Sale Transaction have been disclosed; (ii) Insurer neither induced nor caused the Debtor Parties' chapter 11

6

filings; (iii) the negotiation and execution of the Settlement Agreement and any other agreements or instruments related thereto was in good faith, the arm's length transaction between Insurer and the other Parties was the product of mediation, and all Parties to the Settlement Agreement were, or had the opportunity to be, represented by counsel; and (iv) Insurer has not violated Section 363(n) of the Bankruptcy Code by any action or inaction. Insurer has at all times acted in good faith with respect to the Settlement Agreement and will continue to be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale Transaction.

O. The terms and conditions of the Settlement Agreement are fair and reasonable. The Settlement Amount provided by Insurer pursuant to the Settlement Agreement (i) is fair and reasonable; (ii) monetizes the Purchased Property at the highest and best amount; (iii) will provide a higher and more certain recovery for the Debtor Parties' creditors than would be provided by any other practical available alternative given the complexity, cost, and uncertainty of such alternatives; (iv) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (v) constitutes reasonably equivalent value (as defined in Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law. The Settlement Amount is within the reasonable range of potential litigation outcomes, and the Debtor Parties' determination to accept the Settlement Amount and otherwise enter into the Settlement Agreement is a valid and sound exercise of their business judgment and consistent with the Debtor Parties' fiduciary duties. The releases to be made pursuant to the Settlement Agreement, including without limitation the releases of the Archdiocese Bound Parties and the Insurer Released Parties, are appropriate and should be approved.

7

P.     Insurer: (i) is not a mere continuation of any of the Archdiocese Bound Parties or the Estate of any of the Debtor Parties, nor is there any continuity of enterprise between Insurer and the Debtor Parties or Insurer and any of the other Archdiocese Bound Parties; (ii) is not holding itself out to the public as a continuation of any of the Archdiocese Bound Parties; and (iii) is not a successor to the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties for any purpose, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of Insurer and any of the Archdiocese Bound Parties.

Q.     The Settlement Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither Insurer nor any of the Archdiocese Bound Parties are fraudulently entering into the Sale Transaction.

R.     The transfer of the Purchased Property to Insurer (i) does not constitute an avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law and (ii) does not and will not subject Insurer to any liability whatsoever with respect to the Debtor Parties' operation prior to the closing of the Sale Transaction (i.e., the occurrence of both the Settlement Agreement Effective Date and payment[84] of the Settlement Amount by Insurer to the Settlement Trust or Escrow Agent pursuant to the terms of Insurer's Settlement Agreement) (the "Closing").

S.     Insurer has agreed to purchase the Purchased Property pursuant to its Settlement Agreement and this Order; Insurer has not agreed to purchase, and is not purchasing, any other

---

[84]    For the avoidance of doubt, all references to "payment" or "delivery" of the Settlement Amount by Insurer herein shall encompass all transfers of the Settlement Amount contemplated by the Settlement Agreement, including without limitation funding and transfer of funds to the Settlement Trust via letters of credit or escrow accounts.

assets of the Estate of any of the Debtor Parties. Insurer has not agreed to assume, and after Closing shall have no obligations with respect to, any liabilities of the Archdiocese Bound Parties. Without limiting the generality of the foregoing, Insurer: (i) is not assuming and shall have no liability for any Claims arising from or relating to Abuse, the Purchased Property, or the Bankruptcy Case; and (ii) is not assuming and shall have no liability with respect to the Archdiocese's or any other Archdiocese Bound Party's obligations to Abuse Claimants, any other creditors, future claimants (including without limitation Unknown Abuse Claimants), or the Archdiocese's or any Archdiocese Bound Party's employees, in each case, by reason of the purchase of the Purchased Property under the Settlement Agreement.

T.     The Purchased Property constitutes property of the Debtor Parties' Estates, and the Archdiocese Bound Parties are the lawful owner of the Purchased Property and hold good title thereto. The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement will be a legal, valid, binding, and effective transfer of the Purchased Property, and will vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property, in each case free and clear of all Interests (as defined below, including, without limitation, any Interests of the Archdiocese Bound Parties, Abuse Claimants, and holders of Direct Action Claims). Upon Closing, Insurer shall have no liability for any Claims against or liabilities of the Debtor Parties, their Estates, or the other Archdiocese Bound Parties. Without limiting any of the foregoing, the Archdiocese, the Archdiocese Signatory Parties, and Insurer have agreed that, upon Closing: (i) the Purchased Property shall be deemed void *ab initio*, terminated, extinguished, and of no further force and effect; and (ii) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each

9

professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

U.        Pursuant to §§ 363(f) and 105(a) of the Bankruptcy Code, and subject to the terms and conditions set forth in the Settlement Agreement, and upon Closing, without the need for further action, the Debtor Parties shall be deemed to have sold, transferred and conveyed the Purchased Property to the Insurer, and the Insurer shall be deemed to have purchased from the Debtor Parties, all right title and interest in and under the Purchased Property, free and clear of all "Interests" of any Entity of any kind or nature whatsoever, to the fullest extent permitted under §§ 363(b) and (f) of the Bankruptcy Code, with such "Interests" including: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, Subject Interests, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by

10

agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property. Without limiting the generality of the foregoing and without finding that any Entity has any Interest in the Archdiocese Policies: (i) any Entity with Interests (if any) in or with respect to the Purchased Property who did not object, or who withdrew their objections to the Sale Transaction or the Approval Motion have waived their right to object to the sale of the

11

Purchased Property free and clear of such Entity's Interests in the Purchased Property pursuant to Section 363(f)(2) of the Bankruptcy Code; and (ii) any such Entity with Interests in or with respect to the Purchased Property who objected to the Approval Motion and did not withdraw any such objection (a) are the holders of Interests subject to *bona fide* dispute under Bankruptcy Code Section 363(f)(4) and/or (b) can be compelled to accept a monetary satisfaction of their Interests within the meaning of Section 363(f)(5) of the Bankruptcy Code.

V.      If the sale of the Purchased Property were not free and clear of all Interests, including without limitation all Abuse Claims, Direct Action Claims, and Coverage Claims, or if the Insurer Released Parties would, or in the future could, be liable for any of the Interests, Insurer would not have entered into the Settlement Agreement and would not consummate the Sale Transaction or pay the Settlement Amount, thus adversely affecting the Debtor Parties, their Estates, and their creditors (including, without limitation, the Abuse Claimants), as well as the other Archdiocese Bound Parties.

W.      Issuing a supplemental injunction under Section 105(a) of the Bankruptcy Code as provided herein is essential to give effect to the sale of the Purchased Property to Insurer and this Order's approval of such sale free and clear of Interests pursuant to Section 363(f) of the Bankruptcy Code. The Sale Injunction set forth in Paragraph 23 below not only is a necessary prerequisite for Insurer's assent to the terms and conditions of its Settlement Agreement, such that Insurer will not consummate the Sale Transaction or pay its Settlement Amount in the absence of such an injunction from this Bankruptcy Court, but also is warranted to ensure compliance with this Order.  Likewise, Insurer will not consummate the Sale Transaction or pay its Settlement Amount without the benefit of the releases contained in the Settlement Agreement and approval thereof by the Bankruptcy Court.

4910-0549-1059v.7

X. Neither the Settlement Agreement nor the Sale Transaction constitute a *sub rosa* chapter 11 plan. The Settlement Agreement does not impermissibly restructure the rights of the Debtor Parties' creditors nor impermissibly dictate a chapter 11 plan for the Debtor Parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

### General Provisions

1. The Approval Motion, and the relief sought therein (including without limitation the approval of the Settlement Agreements and the Sale Transaction) is GRANTED and APPROVED, in all respects as set forth herein.

2. The findings of fact set forth above and conclusions of law stated herein, in addition to any findings of fact and conclusions of law stated by the Bankruptcy Court at the Sale Hearing, shall constitute this Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the Approval Motion pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3. Any and all objections, if any, to the Approval Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case the Entity asserting the objection or reservation of rights is enjoined from taking any action against the Insurer Released Parties or the assets or property of any Insurer Released Parties to recover any Claim or Interest held by such objecting Entity. Those parties who did not object or who

13

withdrew their objections to the Approval Motion are deemed to have consented to the relief granted herein, pursuant to Section 363(f)(2) of the Bankruptcy Code.

### Approval of the Settlement Agreement

4.     The Settlement Agreement is approved in its entirety, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Without limiting the generality of the foregoing, the settlement and releases of Claims as set forth in the Settlement Agreement is hereby approved pursuant to Bankruptcy Rule 9019. All factors set forth in *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey* (*In re Cajun Elec. Power Coop.*), 119 F. 3d 349, 356 (5th Cir. 1997), either weigh in favor of the Settlement Agreement or do not apply.

5.     Pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, the Non-Debtor Catholic Entity Policy Sale, free and clear of all Interests of any Entity in the Archdiocese Policies, is hereby approved.

6.     Pursuant to Section 363(b) of the Bankruptcy Code, each of the Parties is authorized to consummate the Sale Transaction under and in accordance with the terms and conditions of the Settlement Agreement, and the Archdiocese Bound Parties shall at all times act in accordance with the terms thereof.

7.     ~~The Parties and their attorneys in fact under the Settlement Agreement or otherwise are~~Any representative, agent or attorney in fact of the Archdiocese Signatory Parties is authorized to execute any other documentation and perform such other ministerial tasks as may be reasonably necessary to effectuate the Settlement Agreement and the Sale Transaction on

4910-0549-1059v.7

Case 2:20-bk-18433 Doc 9245-1 Filed 10/27/25 Entered 10/27/25 16:27:54 Plan Supplement 7.1(a) Pts Supp Amrt A Page 402 of 1339 Page 91 of 103

behalf of the Archdiocese Bound Parties, including without limitation, any bill of sale substantially in the form attached to the Settlement Agreement as **Exhibit B**.

8.      Subject to all of the terms and conditions of the Settlement Agreement, upon Closing, the Archdiocese Bound Parties and Insurer shall be deemed to have granted the releases as set forth in the Settlement Agreement.

9.      The Parties are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Settlement Agreement, together with all additional instruments and documents that may be reasonably necessary, convenient, or desirable to implement the Settlement Agreement and consummate the Sale Transaction pursuant thereto and effectuate the provisions of this Order and the transactions approved hereby, and to take all further actions as may be requested by Insurer for the purpose of assigning, transferring, granting, conveying, and conferring to Insurer or reducing to Insurer's possession, the Purchased Property, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Settlement Agreement.

10.      Insurer is authorized and directed to pay the Settlement Amount under and subject to the satisfaction of all terms and conditions of the Settlement Agreement.

11.      The Settlement Amount provided by Insurer for the Purchased Property (i) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

12.      None of the Insurer Released Parties shall be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its or their rights

or remedies under the Settlement Agreement or any other document related to the Settlement Agreement or the Sale Transaction. The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order; *provided*, *however*, that this Bankruptcy Court shall retain jurisdiction over any and all disputes with respect thereto.

13.     This Order shall be binding in all respects upon: (a) the Debtor Parties and their Related Parties; (b) the Debtor Parties' Estates; (c) the other Archdiocese Bound Parties; (d) all creditors of the Debtor Parties; (e) all Abuse Claimants and holders of Direct Action Claims; (f) all holders of Interests whether known or unknown against or on all or any portion of the Purchased Property; (g) any Non-Settling Insurer; (h) the Insurer Released Parties; (i) the Purchased Property; (j) the Unknown Claims Representative; (k) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code; and (l) all Entities receiving notice (or deemed to have received notice pursuant to this Order) of the Approval Motion or the Sale Hearing, including without limitation all Entities listed on **Schedule 3** to the Settlement Agreement.  The Settlement Agreement shall be binding in all respects upon: (x) the Debtor Parties, their Estates, and their Related Parties; (y) the Archdiocese Bound Parties; and (z) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code.

**Transfer of Assets**

14.  The conditions of Section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Archdiocese may sell the Purchased Property free and clear of any Interests therein.

15.  Pursuant to Sections 105 and 363(b) and (f) of the Bankruptcy Code, Bankruptcy Rule 9019, applicable Louisiana State law, the testimonial and other documentary evidence filed in support of the Approval Motion, and the record of the Sale Hearing, the Archdiocese has set forth the legal authority necessary to support this Bankruptcy Court's findings herein.

16.  Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Property and the Archdiocese Bound Parties' rights, title, and interest therein shall upon Closing be transferred to Insurer, free and clear of all Interests (including without limitation the Interests of any of the Archdiocese Bound Parties), and all such Interests are unconditionally and forever released and extinguished as against the Purchased Property. Without limiting the generality of the foregoing, the sale of the Purchased Property under the Settlement Agreement shall be free and clear of all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property.

17.  Upon the Closing, (a) all of the Archdiocese Bound Parties', the Debtor Parties' Estates', and the Settlement Trustee's rights under and with respect to the Purchased Property, if any, shall be permanently and irrevocably extinguished as if the Archdiocese Policies had never

17

been issued and (b) the Insurer Released Parties shall be entitled to all of the protections afforded by §363(m) of the Bankruptcy Code.

18.     Upon Closing, all Entities (and their respective successors and assigns), including but not limited to all governmental, tax, and regulatory authorities, Archdiocese Bound Parties, Non-Settling Insurers, Abuse Claimants, Direct Action Claimants, trade and other creditors, and any Entities holding Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) against, in, or with respect to the Purchased Property, including, without limitation, such Interests arising or accruing under or out of, in connection with, or in any way relating to the transfer of the Purchased Property to Insurer, hereby are forever barred, estopped, and permanently enjoined from asserting such Person's or Entity's Interests against the Purchased Property, the Insurer Released Parties, or the assets or property of any Insurer Released Parties. Effective upon Closing, none of the Insurer Released Parties shall have any liability for any Claims (a) against the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties or (b) that arise under or related in any way or in respect of the Purchased Property.

19.     The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement constitutes a legal, valid, and effective transfer of the Purchased Property, and shall vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property. Upon Closing, the Archdiocese Policies shall be terminated and no longer in force or effect, exhausted in retrospect as to all coverages, and all Interests that the Archdiocese or any other Person or Entity (including without limitation any of the other Archdiocese Bound Parties) may have had, may presently have, or may in the future have, in such Purchased Property are released and extinguished, and all such Entities (including

18

without limitation the Archdiocese Bound Parties) hereby are forever barred, estopped, and permanently enjoined from asserting any such Interest against the Purchased Property and/or any of the Insurer Released Parties. Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent constitutes full and complete performance of any and all obligations under the Purchased Property, including without limitation any performance owed to the Archdiocese Bound Parties, and all limits of coverage under the Archdiocese Policies, including per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

20.    Upon occurrence of the Closing:

(a)    all Interests the Archdiocese Bound Parties may have had, may presently have, or in the future may have in the Purchased Property, as applicable, are released pursuant to the terms of the Settlement Agreement; and

(b)    the Archdiocese Bound Parties accept Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent in full and complete satisfaction of Insurer's past, present, and future obligations, including, without limitation, any obligations to any of the Archdiocese Bound Parties under such Purchased Property or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever arising out of or related in any way to such Purchased Property (including Coverage Claims), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, direct or indirect, and regardless of whether such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, or otherwise.

19

**No Successor Liability**

21.     The transfer of the Purchased Property to Insurer shall not result in any Insurer Released Parties or the Purchased Property having any of the following: (a) any liability or responsibility for Interests in or Claims against the Archdiocese Bound Parties or any of their Related Parties; (b) liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any Claims or Interests; or (c) any liability or responsibility to the Archdiocese Bound Parties except as is expressly set forth in the Settlement Agreement.

22.     Without limiting the generality of the foregoing, none of the Insurer Released Parties shall have any successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability, *de facto* merger or joint venture, mere continuation or substantial continuity, whether known or unknown as of Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between the Archdiocese Bound Parties and any non-debtor subsidiary or affiliate (including, without limitation, any other Archdiocese Bound Party), liabilities relating to or arising from any environmental laws, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Purchased Property prior to Closing.

20

**Sale Injunction**

23.    Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, and in consideration of the undertakings of Insurer pursuant to the Settlement Agreement, including Insurer's purchase of the Purchased Property free and clear of all Claims and Interests pursuant to Section 363(f) of the Bankruptcy Code as provided herein, any and all Entities that have held, now hold, or who may in the future hold any Claims or Interests (including without limitation all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Abuse Claimants, holders of Direct Action Claims, Perpetrators, Non-Settling Insurers, the Archdiocese Bound Parties, and all others holding Claims or Interests of any kind or nature whatsoever, including, without limitation, those Claims released or to be released pursuant to the Settlement Agreement), which Claims or Interests are under, arise out of, relate to, or connect in any way with an Abuse Claim or any of the Purchased Property, including, without limitation, (a) all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property, (b) the payment of any of the Claims identified previously, including, without limitation, Abuse Claims, Direct Action Claims, and Coverage Claims and (c) all other Interests, are hereby permanently stayed, enjoined, barred, and restrained from taking any Action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or Interest against any of (x) the Insurer Released Parties, (y) the assets or property of any Insurer Released Parties, or (z) the Purchased Property, including by:

21

(a)     commencing, conducting, or continuing in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind, in any forum, with respect to any such Claim or Interest, against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(b)     enforcing, levying, attaching, collecting, or otherwise recovering, or seeking to accomplish any of the preceding, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(c)     creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, or seeking to accomplish any of the preceding, any lien of any kind against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(d)     asserting, implementing, or effectuating any such Claim or Interest of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any of the Insurer Released Parties, (B) any of the Insurer Released Parties, or (C) any property or interest in property of any Insurer Released Party; and

(e)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Order.

The actions described in this Paragraph 23 are "**Enjoined Actions**," and the injunction set forth herein is the "**Sale Injunction**." The Sale Injunction shall be a permanent injunction against the Enjoined Actions and may not be modified, dissolved, or terminated.

22

24.     The Sale Injunction shall be effective upon Closing. The Sale Injunction bars pursuit of the above referenced Claims and/or Interests against the Insurer Released Parties, or the property or assets of each (including, without limitation, the Purchased Property), but against no other person or thing.

25.     In a successful action to enforce this Sale Injunction in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

26.     The Sale Injunction shall not enjoin (a) the right of any Person or Entity against the Settlement Trust or a Non-Settling Insurer, or (b) the Settlement Trustee from enforcing the Settlement Trust Documents.

**Preserved Coverage**

27.     **[Intentionally Omitted.]**[9]

**Additional Provisions**

~~28~~27.     From and after the date hereof, no Person or Entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreements and this Order.

---

[9]     Intentionally omitted, except the Order approving the Catholic Mutual Settlement Agreement, in which this section will provide:

    "Nothing in this Order, the Settlement Agreement or the Sale Transaction affects Insurer's Preserved Coverage or the Archdiocese Bound Parties' continuing obligations in connection with the Preserved Coverage under the Archdiocese Policies issued by Insurer, all of which shall survive the Settlement Agreement Effective Date, Bankruptcy Plan Effective Date and the closing of the Sale Transaction."

23

2928.   This Bankruptcy Court hereby retains jurisdiction, regardless of whether a chapter 11 plan has been confirmed in the Bankruptcy Case and consummated and irrespective of the provisions of any such plan or order confirming such plan, to enforce and implement the terms and provisions of the Settlement Agreement, all amendments thereto, any waivers and consents thereunder, and of any agreement(s) executed in connection therewith in all respects, including but not limited to retaining jurisdiction to: (a) compel delivery of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreement; (b) resolve any dispute, controversy, or claim arising under or related to the Settlement Agreement, or the breach thereof; and (c) interpret, implement, and enforce the provisions of this Order and resolve any disputes related thereto.

3029.   Nothing contained in any plan confirmed in the Bankruptcy Case or any order of this Bankruptcy Court confirming such plan shall conflict with or derogate from the provisions of the Settlement Agreement or the terms of this Order.

3130.   This Order shall not limit or preclude the entry or effectiveness of any additional releases or injunctions that may be granted protecting the Insurer Released Parties and/or the assets or property of any Insurer Released Parties in connection with, or as part of, any order confirming a chapter 11 plan.

3231.   The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Settlement Agreement be authorized and approved in its entirety.

3332.   The transactions contemplated by the Settlement Agreement are undertaken by Insurer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code. Insurer is a

24

good faith purchaser of the Purchased Property and is entitled to all the protections afforded by Section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction to Insurer.

~~34~~33. Insurer has given substantial consideration under the Settlement Agreement for the benefit of the Debtor Parties, their Estates, and creditors, along with the other Archdiocese Bound Parties. Such consideration given by Insurer constitutes valid and valuable consideration for the Purchased Property and the releases set forth in the Settlement Agreement, including, without limitation, the extinguishment and release of all Interests pursuant to this Order. The consideration provided by Insurer for the Purchased Property under the Settlement Agreement is fair and reasonable; accordingly, the purchase may not be avoided under Section 363(n) of the Bankruptcy Code.

~~35~~34. The terms and provisions of the Settlement Agreement and this Order shall be binding notwithstanding any subsequent appointment of any trustee(s) examiner(s) or receiver(s) under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtor Parties, their Estates, their creditors, or any examiner(s) or receiver(s).

~~36~~35. The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Bankruptcy Court that the Settlement Agreement and the Parties' performance thereof be authorized and approved in its entirety.

25

4910-0549-1059v.7

412

37~~36~~.  Pursuant to the provisions of the Settlement Agreement, each of the Archdiocese Bound Parties and Insurer shall be authorized to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper, or advisable under applicable law or otherwise to consummate and make effective the transactions contemplated by the Settlement Agreement.

38~~37~~.  All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39~~38~~.  All obligations of the Debtor Parties under the Settlement Agreement shall be deemed administrative expenses of their Estates under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

40~~39~~.  Each and every federal, state, and local governmental agency or department is hereby directed to accept this Order in lieu of any document necessary to consummate the transactions contemplated by the Settlement Agreement and this Order.

41~~40~~.  The Settlement Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the Parties, in a writing signed by the Parties, and in accordance with the terms thereof, without further order of this Bankruptcy Court; *provided* that such modification, amendment, or supplement does not constitute a material change to the relief sought in the Approval Motion and approved by this Order.

**IT IS SO ORDERED.**

New Orleans, Louisiana, _____, 2025

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

26

4910-0549-1059v.7

413

| Summary report: Litera Compare for Word 11.11.0.158 Document comparison done on 10/24/2025 11:32:35 AM | |
|---|---|
| **Style name:** Sidley Default | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Exhibit A - Form of Proposed Sale Order - FINAL.docx | |
| **Modified DMS:** nd://4910-0549-1059/7/ADNO - SPARTA Proposed Sale Order.docx | |
| **Changes:** | |
| Add | 37 |
| Delete | 53 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 90 |

## SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK

This Settlement Agreement, Release, and Policy Buyback ("**Settlement Agreement**") is hereby made by, and between, and among The Roman Catholic Archdiocese of New Orleans (the "**Archdiocese**" or "**Debtor**" as further defined in Section 1.1.31 below), the other Archdiocese Signatory Parties (as defined in Section 1.1.15 below), and U.S. Fire/International ("**Insurer**" as further defined in Section 1.1.49 below).  Insurer, the Archdiocese, the other Archdiocese Signatory Parties, and the Creditors' Committee (as defined below), collectively are the "**Parties**" and each a "**Party**" to this Settlement Agreement.

### RECITALS:

WHEREAS, on May 1, 2020 (the "**Petition Date**" as further defined in Section 1.1.67 below), the Archdiocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**" as further defined in Section 1.1.17) pending under Case No. 20-10846 (the "**Bankruptcy Case**" as further defined in Section 1.1.16 below);

WHEREAS, each of the Additional Debtors (as defined in Section 1.1.11 below) intends to file in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;

WHEREAS, certain Entities have asserted or may hold Claims, including Abuse Claims, against the Archdiocese Bound Parties (each as defined below);

WHEREAS, Insurer issued, allegedly issued, may have issued, assumed by novation or otherwise, or may be administering the Archdiocese Policies (as defined in Section 1.1.9 below) providing certain coverage to the Archdiocese Bound Parties;

WHEREAS, asserted disputes between the Debtor Parties (as defined below) and Insurer have arisen, and assertable disputes between the Archdiocese Bound Parties and Insurer may arise in the future, concerning the scope and nature of Insurer's responsibilities, if any, to provide insurance coverage to the Archdiocese Bound Parties under the Archdiocese Policies (as further defined in Section 1.1.29 below, the "**Coverage Claims**");

WHEREAS, claimants may contend, as a matter of Louisiana law, particularly La. Rev. Stat § 22:1269 *et. seq*., that certain Entities may have Claims arising under or related to the Archdiocese Policies that could entitle them to bring a Direct Action Claim (as defined in Section 1.1.35 below) against Insurer;

WHEREAS, claimants may contend that as a matter of Louisiana law, the time within which Claims relating to Abuse may be asserted against certain of the Archdiocese Bound Parties and/or the Insurer may not have expired with respect to certain Claims;

WHEREAS, the Archdiocese Signatory Parties and Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Claims and all other

disputes between and among them and to release Insurer from any further obligations under the Archdiocese Policies;

WHEREAS, Insurer would not pay the full amount of the Settlement Amount (as defined in Section 1.1.81 below) without the buy-back of the Subject Interests (as defined below) in the Archdiocese Policies, including without limitation, the interests of the Archdiocese, Additional Debtors, other Archdiocese Bound Parties and holders of Direct Action Claims, pursuant to section 363 of the Bankruptcy Code, and without the Sale Injunction, the Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeping Injunction (each as defined below), additionally providing protection to the Insurer Released Parties (as defined below) from Claims against the Insurer Released Parties and their property;

WHEREAS, through this Settlement Agreement and the Plan (as defined in Section 1.1.68 below) the Archdiocese Signatory Parties intend to provide Insurer Released Parties with the broadest possible release of all Claims and Subject Interests with respect to the Archdiocese Policies; and

WHEREAS, through this Settlement Agreement and the Plan, as part of the compromise and resolution of the Coverage Claims, the Debtor Parties and Insurer also wish to effect a sale, pursuant to § 363(b), (f), and (m) of the Bankruptcy Code of the Archdiocese Policies, along with the Coverage Claims and Related Insurance Claims (the "**Purchased Property**" as further defined in Section 1.1.71 below), to provide the Insurer Released Parties with the broadest possible release and buyback with respect to the Archdiocese Policies, resulting in the Insurer Released Parties having no obligations now or in the future with respect to the Archdiocese Policies, including without limitation to any Direct Action Claim.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Settlement Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound subject to the approval of the Bankruptcy Court pursuant to Section 2 below, the Parties hereby agree as follows:

## 1.    DEFINITIONS

1.1    As used in this Settlement Agreement (as defined above), the following terms shall have the meanings set forth below.

1.1.1    "**Abuse**" means any of the following actual or alleged acts: (a) touching by the Perpetrator of the person's intimate body parts (genitals, breasts, or buttocks), the touching by the person of the Perpetrator's intimate body parts, showing pictures of the person's body or other persons' bodies, taking pictures of the person's body, showing pornography, or making images of the person while naked or engaged in any sexual activity, or any sexualized interaction including observing the person in bathing, toileting, or undressing that was made possible by the Perpetrator's position of authority, or by the inducement of the Perpetrator; or (b) sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to the genital or anal openings: (i) of the person's body by any part of the Perpetrator's body or any object used by the Perpetrator for this purpose; or (ii) of the person's body by any

part of the body of the Perpetrator or by any part of the body of another person, or by any object used by the Perpetrator or another person for this purpose; (c) inappropriate physical contact and/or contact that infringes upon another's personal, physical boundaries including but not limited to groping, kissing, extended hugging, and/or any unwelcomed touching; (d) grooming or trying to create a special relationship, including but not limited to: talk of a sexual nature, talk of a romantic nature, communications expressing individual love to the person, as opposed to a salutation, providing material resources or experiences which induce the person into a relationship where trust is then violated; or (e) any actual or alleged acts of the kind described in subsections (a)-(c) above that occur between or among minors and that the Perpetrator orchestrates or encourages.  For the avoidance of doubt, "Abuse" also includes: any actual or alleged conduct which (a) is described in the Louisiana Child Victims Act or (b) would constitute (i) a sexual offense as defined in article 603(2) of the Louisiana Children's Code; (ii) sexual battery as defined in LA. REV. STAT. §§ 14:43.1; 14:43.1.1; 14:43.2; 14: or 43.3, (iii) a crime against nature as defined in LA. REV. STAT. § 14:89, or (i) pornography involving juveniles as defined in LA. REV. STAT. § 14:81.1, or with respect to the foregoing subsection (i)-(iv), any predecessor statute that prohibited such conduct at the time of the act.

1.1.2   "**Abuse Action**" means an Action asserting an Abuse Claim against any of the Covered Parties.

1.1.3   "**Abuse Claim**" means any Claim that has been asserted, or could be asserted, against any Settling Party or Non-Settling Insurer, that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively alleged Abuse that occurred, in whole or in part, before the applicable Debtor's Petition Date or Additional Debtors' Petition Date, including any such Claim that seeks monetary damages or any other relief, under any legal or equitable theory of liability, including, but not limited to, the following:  vicarious liability; *respondeat superior*; any conspiracy, fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, negligent, insufficient, or inadequate supervision, retention or misrepresentation; any theory based on misrepresentation, concealment, or unfair practice; public or private nuisance; or any theory, including, without limitation, any theory based on public policy or any acts or failures to act by any Settling Party, or any other Entity for whom any Settling Party is allegedly responsible, including, but not limited to, any such Abuse Claim against any Settling Party, Non-Settling Insurer, or any other Entity for whom any Settling Party or Non-Settling Insurer is alleged to be responsible.  Abuse Claims are:  (a) the Known Abuse Claims, which are treated in Class 3; and (b) the Unknown Abuse Claims, which are treated in Class 4.  For the avoidance of doubt, "Abuse Claim" includes (a) all Unknown Abuse Claims, (b) Claims or causes of action defined or described in the Revival Window Laws against the Archdiocese or any other Archdiocese Bound Party, (c) Direct Action Claims, and (d) any Claim against the Archdiocese or any other Archdiocese Bound Party that is attributable to, arises from, is based upon, relates to, or results from Abuse that, as of the Petition Date is barred by any applicable statute of limitations, and in each case, irrespective of whether (x) such Claims also involve the conduct of joint tortfeasors (or similar concepts under applicable law), (y) such Claims arise under, or were revived pursuant to, the Revival Window Laws, or any future reviver law, statute, or binding

precedential decision passed or issued on or after the Bankruptcy Plan Effective Date, or (z) a proof of claim has been filed, before or after the Claims Bar Date, or not at all, or an Abuse Action has been commenced with respect to such Claim. "Abuse Claim" does not include: (a) Related Insurance Claims or Coverage Claims against Settling Insurers or Non-Settling Insurers; (b) Non-Insurer Contribution Claims with respect to any Abuse Claim; (c) Insurer Contribution Claims with respect to any Abuse Claim; or (d) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to a Claim against these dioceses only. For the avoidance of doubt, a Claim based on Abuse solely occurring following the applicable Petition Date is not an Abuse Claim. Nothing in this definition shall constitute a waiver of any defense that would otherwise be available under applicable law to any Settling Party, the Settlement Trust, or any other Entity.

1.1.4 "**Abuse Claim Release and Certification**" means a written release in favor of the Insurer Released Parties, in the form of Exhibit C to the Acceptable Plan, or otherwise in form and substance acceptable to the Parties, which an Abuse Claimant must deliver before he or she is entitled to Settlement Trust Distributions, which shall provide that the Claimant releases the Insurer Released Parties from any and all Claims related to his/her Abuse Claim or any of the Archdiocese Policies, subject to Section 12.14 and related provisions of the Plan.

1.1.5 "**Abuse Claimant**" means the holder of an Abuse Claim, including, but not limited to, any Known Abuse Claim, Unknown Abuse Claim, or Direct Action Claim. For the avoidance of doubt, Abuse Claimants are Creditors. The definition of an Abuse Claimant includes the legal representative of the holder of an Abuse Claim, such as a bankruptcy trustee, the estate of a deceased individual who held an Abuse Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Abuse Claim, as the case may be. An Entity holding the following Claim is not an Abuse Claimant: (i) a Non-Insurer Contribution Claim with respect to such Abuse Claim; (ii) an Insurer Contribution Claim with respect to such Abuse Claim; (iii) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to such Entity's claim against such dioceses only.

1.1.6 "**Acceptable Plan**" means the *Fourth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and The Official Committee of Unsecured Creditors* filed at Docket No. [4419], and its exhibits and schedules, which as may be modified solely in accordance herewith (i.e., with the consent of the Insurer), and such modified plan constituting the "Acceptable Plan" for the purposes hereof.

1.1.7 "**Archdiocesan Parishes**" means all currently Catholic Church parishes and missions, as identified on Exhibit B-1, Part I, of the Acceptable Plan. Each of the Archdiocesan Parishes is organized as a non-profit corporation. For the avoidance of doubt, the definition of Archdiocesan Parishes does not include St. Louis Cathedral, Our Lady of Guadalupe Church & Shrine of St. Jude, or any Suppressed Archdiocesan Parish identified on Exhibit B-1, Part II, of the Acceptable Plan.

1.1.8   "**Archdiocesan Schools**" means the means the following schools that are owned and operated by the Archdiocese: (a) the Academy of Our Lady High School; (b) Archbishop Chapelle High School; (c)Archbishop Hannan High School; (d) Archbishop Rummel High School; (e) Archbishop Shaw High School; (f) Pope John Paul II High School; (g) St. Charles Catholic High School; (h) St. Scholastica Academy; and (i) St. Michael Special School.

1.1.9   "**Archdiocese Policies**" means (a) the contracts, binders, certificates, and policies of insurance that are listed on Schedule 1 hereto, and (b) all other known and unknown contracts, binders, certificates, or policies of general liability insurance, in effect on or before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date that were issued to, or for the benefit of, or subscribed on behalf or that otherwise actually insure, (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) policies issued to the Archdiocese that name as an insured or additional insured (or related concept under applicable law or document) the Diocese of Houma-Thibodaux or Diocese of Baton Rouge, but not policies issued to either of these dioceses that were not also issued to the Archdiocese or name it as insured, (iv) any Entity owned, created, operated, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, or (v) any institution, religious organization or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control or active management; in each case of (a) and (b), that were issued, subscribed to, or underwritten in whole or in part or allegedly issued, subscribed to, or underwritten in whole or in part by Insurer or any of its predecessors.

1.1.10   "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

1.1.11   "**Additional Debtors**" means the Entities listed on Acceptable Plan Exhibit B-1.   As used herein, references to the "Additional Debtors" includes the Additional Debtor's Estates.

1.1.12   "**Approval Motion**" means the motion filed in the Archdiocese Bankruptcy Case at Docket No. 4181 seeking approval of this Settlement Agreement as described in Section 2.1 of this Settlement Agreement.

1.1.13   "**Approval Order**" means the order granting the Approval Motion described in Section 2.1 of this Settlement Agreement and providing the relief described in Section 2.1 of this Settlement Agreement and in substantially form attached **Exhibit A,** with only such changes as are satisfactory to Insurer.

1.1.14   "**Archbishop**" has the meaning given to it in Section 3.7.

1.1.15   "**Archdiocese Signatory Parties**" means, collectively, (a) the Debtor Parties and (b) the Non-Debtor Catholic Entities.

1.1.16 "**Bankruptcy Case**" means all of the following: (a) with respect to the Archdiocese, "Bankruptcy Case" has the meaning set forth in the Recitals; and (b) with respect to any given Additional Debtor, "Bankruptcy Case" means the case initiated when such Additional Debtor filed in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.17 "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Louisiana, having subject matter jurisdiction over the Bankruptcy Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

1.1.18 "**Bankruptcy Plan Effective Date**" means the date upon which a Plan approved by the Bankruptcy Court that contains terms and conditions consistent with those required by this Settlement Agreement becomes effective.

1.1.19 "**Barred Claim**" means any Claim against a Settling Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with an Abuse Claim or any of the Archdiocese Policies, including, but not limited to, any: (a) Abuse Claim; (b) Direct Action Claim; (c) Coverage Claim; (d) Related Insurance Claim; (e) Non-Insurer Contribution Claim; (f) Insurer Contribution Claim; (g) Medicare Claim; (h) Penalty Claim; and (i) any other Claim that is otherwise released herein. A Barred Claim further includes any Claim against a Settling Party based on allegations that it is an alter ego or liable as a successor of an Entity that is not a Settling Party or that the Settling Party's corporate veil should be pierced on account of Claims against an Entity that is not a Settling Party or based on any other theory under which the legal separateness of any Person and any other Entity may be disregarded to impose liability for a claim on either such Entity. Notwithstanding the foregoing, Barred Claims do not include any Claims to the extent they are asserted against (x) Non-Settling Insurers or (y) Excluded Parties, notwithstanding that such Entity may also have asserted or be able to assert a Claim for contribution, indemnity, reimbursement, or subrogation against any Settling Party relating to or arising from a such Claim; provided, however, that, for the avoidance of doubt, (i) any Claims that assert liability against such Entity in conjunction with a Settling Party will in all events be Barred Claims as to the Settling Party, (ii) any such Claim for contribution, indemnity, reimbursement, or subrogation against a Settling Party is a Barred Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party for the purposes of this definition.

1.1.20 "**Catholic Charities**" has the meaning set forth in Section 6.3.15.

1.1.21 "**Channeling Injunction**" has the meaning set forth in Section 2.2.2.

1.1.22 "**Claim**" means any past, present or future claim, demand, Action, request, right, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether sounding in law, equity, tort, warranty, contract, or under any other theory, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been

or may be asserted by or on behalf of any Entity, whether seeking damages (including compensatory, exemplary, punitive, or Penalty claims) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, or orders, including without limitation whether by way of direct action, subrogation, contribution, indemnity, alter ego, veil piercing, or regulatory action, or otherwise, regardless of whether such Claims arise under law, in equity, or under statute, before or after the Petition Date(s), or *in rem* or *in personam*, and include all Claims for damages to the environment or based on any theory of *respondeat superior,* vicarious, successor or transferee liability, or change in control, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

1.1.23 **"Claims Bar Date"** means the date(s) and time(s) indicated in the Final Order(s) (which may be the Plan Confirmation Order) setting the deadline(s) for filing proofs of Abuse Claim against the Debtor or Additional Debtor(s), as applicable.

1.1.24 **"CMS"** has the meaning set forth in Section 2.4.1.

1.1.25 **"Co-Insured Party"** means any other Entity that is a "Named Assured" or "named insured" or "protected person" under the Archdiocese Policies, and all other Entities that are determined by agreement or a court of competent jurisdiction to be an "Assured," an "Additional Assured," an "insured," or "protected person" or otherwise entitled to insurance coverage under any Archdiocese Policies.

1.1.26 **"Conditional Payment"** means any payment made to an Abuse Claimant under the MMSEA, including any payment by a Medicare Advantage Organization (as defined in the MSPA).

1.1.27 **"Controlling Document Provision"** has the meaning given to it in Section 2.2.9.

1.1.28 **"Covered Parties"** or **"Archdiocese Bound Parties"** means, collectively, the following Entities: (a) the Debtor Parties; (b) the Reorganized Debtor; (c) the Reorganized Additional Debtors; (d) the Non-Debtor Catholic Entities; (e) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP; (f) the Parish Schools and Archdiocesan Schools; (g) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans; (h) any Co-Insured Party; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entities' predecessors, successors, assigns, subsidiaries, direct and indirect past, present, and future affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, and estates. For the avoidance of doubt, the Entities in clauses (g), (h), and (i) are only Archdiocese Bound Parties in connection with the Archdiocese Policies.

1.1.29 "**Coverage Claims**" has the meaning set forth in the Recitals and further includes any Claim under relating to or arising out of the Archdiocese Policies or the rights and obligations thereunder, or the breach thereof, including any Claim seeking insurance coverage.

1.1.30 "**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed in the Archdiocese's Chapter 11 Case on May 20, 2020, [Docket Nos. 94 & 114], as such committee may be reconstituted from time to time.

1.1.31 "**Debtor**" or "**Archdiocese**" means, before the Bankruptcy Plan Effective Date, The Roman Catholic Church of the Archdiocese of New Orleans of Louisiana. As used herein, references to the "Debtor" or "Archdiocese" includes the Debtor's Estate.

1.1.32 "**Debtor Parties**" means (i) the Archdiocese and (ii) all of the Additional Debtors.

1.1.33 "**Diocese of Baton Rouge**" means the Diocese of Baton Rouge. References to the "Diocese of Baton Rouge CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) July 22, 1961 whichever occurred last; references to the "Diocese of Baton Rouge SD" refer to the period after such date.

1.1.34 "**Diocese of Houma-Thibodaux**" means the Diocese of Houma-Thibodaux. References to the "Diocese of Houma-Thibodaux CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) June 5, 1977, whichever occurred last; references to the "Diocese of Houma-Thibodaux SD" refer to the period after such date.

1.1.35 "**Direct Action Claim**" means any Claim by any Entity that is a "direct action" as that term is used in La. Rev. Stat § 22:1269 *et. seq* (or similar law in other jurisdictions) against any Insurer Released Party or related to any Archdiocese Policy, including, without limitation, (a) any claim that is similar or related to any Claim that could also be asserted by the Archdiocese or any Archdiocese Bound Party, (b) any Claim that directly or indirectly arises out of, relates to, or is connected with any Abuse Claim, (c) any Claim that directly or indirectly arises out of, relates to, or is in connection with any Insurer Released Party's handling of any Abuse Claim under the laws of any applicable jurisdiction, or (d) any Claim arising under any law of any jurisdiction that may give a third party a direct Cause of Action against an Insurer Released Party for monetary or other relief.

1.1.36 "**Entity**" means any individual, corporation, corporation sole, partnership, association, limited liability company, joint stock company, proprietorship, unincorporated organization, joint venture, trust, estate, executor, legal representative, or any other entity or organization, as well as any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency, department, board or instrumentality thereof, any other "Person" within the definition of section 101(41) of the Bankruptcy Code, and any successor in interest, heir executor, administrator, trustee, trustee in bankruptcy, or receiver of any Entity and also has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.1.37  "**Escrow Agent**" means the agent appointed in accordance with the Escrow Agreement.

1.1.38  "**Escrow Agreement**" means the agreement governing the escrow which shall hold the Settlement Amount in escrow and in trust for the benefit of Insurer, and which shall provide for the: (i) transfer of the Settlement Amount, with any accrued interest, to the Settlement Trust following the Settlement Agreement Effective Date, or (ii) return of the Settlement Amount to Insurer, with any accrued interest, upon receipt of notice that the Settlement Agreement has been terminated.

1.1.39  "**Estate**" means the (a) the Debtor's estate, and (b) Additional Debtors' estates, each created pursuant to section 541 of the Bankruptcy Code.

1.1.40  "**Excluded Party**" means the following Entities: (a) the Holy See (State of Vatican City); (b) any Perpetrator; and (c) any archdiocese or diocese (other than the Archdiocese itself), any Religious Order, or other Entity that is an affiliate or associated with the Roman Catholic Church (in its capacity as such, and other than (i) the Non-Debtor Catholic Entities; (ii) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP, (iii) the Parish Schools and Archdiocesan Schools; and (iv) any Co-Insured Party); provided, however, that any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party.

1.1.41  "**Extra-Contractual Claim**" means any Claim against any Insurer Released Party seeking any type of relief, other than coverage or benefits, under or with respect to the Archdiocese Policies.  Extra-Contractual Claims include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs, or any other type of relief, alleging any of the following with respect to (a) any Archdiocese Policy; (b) any Claim allegedly or actually covered under a Archdiocese Policy; or (c) the conduct of any Insurer Released Party with respect to (a) or (b): (i) bad faith; (ii) failure to provide insurance coverage under any Archdiocese Policy, including any failure to investigate or to provide a defense or adequate defense; (iii) failure or refusal to compromise and settle any Claim insured under any Archdiocese Policy; (iv) failure to act in good faith; (v) violation or breach of any covenant or duty of good faith and fair dealing, whether express, implied,  or otherwise; (vi) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (vii) violation of any unfair claims practices act or similar statute, regulation or code, including any statute, regulation, or code relating to  unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising; (viii) any type of misconduct; or (ix) any other act or omission of any type by any Insurer Released Party for which the claimant seeks relief other than coverage or benefits under a Archdiocese Policy.  "Extra-Contractual Claims" further include all Claims relating to any Insurer Released Party's (x) handling of any Claims under the Archdiocese Policies, (y) conduct in negotiating this Settlement Agreement and/or the Plan, and (z) conduct in the settlement of any Claims.  For the avoidance of doubt, Extra-Contractual Claims of the Archdiocese Bound Parties are included within the property Insurer is purchasing hereunder.

1.1.42 "**Final Order**" means an order as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending and in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order will have been affirmed by the highest court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order will not cause such order not to be a Final Order.

1.1.43 "**Gatekeeper Injunction**" has the meaning set forth in Section 2.2.2.

1.1.44 "**HH**" has the meaning set forth in Section 6.3.15.

1.1.45 "**Indemnified Claims**" has the meaning set forth in Section 7.2 of this Settlement Agreement.

1.1.46 "**Indemnity Cost Reserve**" has the meaning set forth in Section 7.2.1.

1.1.47 "**Injunctions**" means the Sale Injunction, Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeper Injunction.

1.1.48 "**Insurance Settlement Agreement**" has the meaning set forth in the Acceptable Plan.

1.1.49 "**Insurer**" means United States Fire Insurance Company ("U.S. Fire"), International Insurance Company ("International"), and Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company individually and, to the extent that policies issued by U.S. Fire and/or International were novated to or assumed by either or both of them (collectively, "U.S. Fire/International"). Any Entity that meets the definition set forth above shall be individually referred to as an 'Insurer.'

1.1.50 "**Insurer Contribution Claim**" means any (a) Non-Settling Insurer Contribution Claim or (b) Settling Insurer Contribution Claim.

1.1.51 "**Insurer Released Party**" means Insurer and its Related Parties, each in their capacities solely as such with respect to the Archdiocese Policies and all Subject Interests therein.

1.1.52 "**Known Abuse Claims**" means any Abuse Claim, other than an Unknown Abuse Claim, against any Settling Party, Settling Insurer, and/or Non-Settling Insurer.

1.1.53 "**Medicare Claims**" means any Claim by CMS, and/or any agent or successor of CMS, charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA or pursuing a Claim under MSP Provisions, relating to any

payments in respect of any Abuse Claim, including any Claim for reimbursement of conditional payments, and any Claim relating to reporting obligations.

1.1.54 "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which imposes reporting obligations on those Entities with payment obligations under the MSPA.

1.1.55 "**MSPA**" means 42 U.S.C. §1395y et seq., or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto, including the regulations promulgated thereunder, found at 42 C.F.R. §411.1 et seq.

1.1.56 "**Non-Debtor Catholic Entity Policy Sale**" has the meaning set forth in Section 4.6.

1.1.57 "**Non-Debtor Catholic Entities**" collectively means those entities listed on the Acceptable Plan Exhibit B-2 who are not Additional Debtors, but which are (a) insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies and/or (b) have actually or allegedly acquired or been assigned the right to make a claim for coverage under any of the Archdiocese Policies (excluding, however, for the avoidance of doubt, the Debtor Parties, the Settlement Trust, and any Abuse Claimant).

1.1.58 "**Non-Insurer Contribution Claim**" means any Claim for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law that is attributable to, arises from, is based upon, relates to, or results from, an Abuse Claim or payment of an Abuse Claim, and any other derivative or indirect Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, other than a Non-Settling Insurer Contribution Claim or a Settling Insurer Contribution Claim.

1.1.59 "**Non-Settling Insurer**" means any insurer (together with its Related Parties) that is not a Settling Insurer.

1.1.60 "**Non-Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Non-Settling Insurer against any Settling Insurer for the payment of money where such Non-Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.61 "**Parish Schools**" means the elementary Catholic schools that are owned and operated by the Archdiocesan Parishes. For the avoidance of doubt, the definition of Parish Schools expressly excludes Catholic schools that are owned and operated by Religious Orders and the Archdiocesan Schools. For the further avoidance of doubt, the Parish Schools are not separately incorporated.

1.1.62 "**Parties**" has the meaning set forth in the first paragraph of this Settlement Agreement.

1.1.63 "**Payment Security**" means [**Intentionally Omitted**]

1.1.64 "**Penalty Claims**" means a Claim against any Settling Party or Settling Insurer for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Creditor holding such Claim.

1.1.65 "**Perpetrator**" means an individual who personally committed or is alleged to have personally committed an act of Abuse. For the avoidance of doubt, the definition of Perpetrator does not include any individual who did not personally commit an act of Abuse or is not alleged to have personally committed an act of Abuse, but against whom an Abuse Claim or Non-Insurer Contribution Claim is asserted nonetheless, or may be asserted, by virtue of such individual's position or service as a member, representative, contractor, consultant, professional, or volunteer of the Archdiocese or any Non-Debtor Catholic Entity or any council or representative body associated with such Entities.

1.1.66 "**Person**" has the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

1.1.67 "**Petition Date**" means (a) with respect to the Archdiocese, May 1, 2020; and (b) with respect to each Additional Debtor, the date(s) on which such Additional Debtor files in the Bankruptcy Court its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.68 "**Plan**" refers to the Chapter 11 Plan of Reorganization for the Archdiocese and all Additional Debtors (and all exhibits annexed thereto) which shall, among other things, provide for the resolution of Abuse Claims and Subject Interests in the Archdiocese Policies as set forth herein, and which shall be in form and substance acceptable to Insurer in its sole discretion.

1.1.69 "**Plan Confirmation Order**" has the meaning set forth in Section 2.3.

1.1.70 "**Preserved Coverage**" means [**Intentionally Omitted**.]

1.1.71 "**Purchased Property**" means any and all right, title, and interest (including all Subject Interests) in and to the Archdiocese Policies and the Related Insurance Claims and Coverage Claims.

1.1.72 "**Related Insurance Claim**" means (a) any Extra-Contractual Claim and (b) any other Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies, including, without limitation, bad faith Claims.

1.1.73 "**Related Party**" means, with respect to any Entity, such Entity's (a) predecessors, successors, assigns, and any Entity that assumed the obligation of the

forgoing for the Archdiocese Policies by novation or otherwise (b) direct and indirect past, present, and future Affiliates (as defined in section 101(2) of the Bankruptcy Code), holding companies, merged companies, related companies, subsidiaries, divisions, acquired companies, joint ventures, joint venturers, (c) current and former employees, officers, directors, principals, partners, managing agents, trustees, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, brokers, adjusters, reinsurers, retrocessionaires, subrogees, agents, claims handling administrators, and other professionals, and (d) respective heirs, executors, estates, and nominees; and all Entities acting on behalf of, by, through or in concert with them, each solely in their capacities as such with respect to such Entity (and with respect to such Entity (including Insurer) that is an insurer of any Archdiocese Bound Party or has assumed the obligations of such by novation or otherwise, such insurer's applicable insurance policy(ies) (including the Archdiocese Policies)).

1.1.74  "**Religious Order**" means, collectively, an institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy.

1.1.75  "**Reorganized Additional Debtors**" means the Additional Debtors, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.76  "**Reorganized Debtor**" means the Debtor, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.77  "**Revival Window**" means Section 2 of La. Acts 2021, No. 322, as amended by La. Acts 2022, No. 386, and La. Acts 2024, No. 481.

1.1.78  "**Revival Window Laws**" means the Revival Window, together with any other law that extends the prescriptive period or statute of limitations for asserting Abuse Claims under Louisiana or other applicable state law.

1.1.79  "**Sale Injunction**" has the meaning set forth in Section 2.1.

1.1.80  "**Settlement Agreement Effective Date**" means the first day on which: (a) the Archdiocese Signatory Parties and Insurer have executed this Settlement Agreement; (b) the Unknown Abuse Claims Representative shall have supported the releases provided for herein and the protections granted hereby and in the Plan in favor of the Insurer Released Parties, in a manner acceptable to Insurer in its sole discretion; (c) the Approval Order shall have become a Final Order; (d) the Plan Confirmation Order shall have become a Final Order; and (e) the Settlement Trust shall have been created pursuant to the Plan; provided, however, with the prior written consent of the Trustee, not to be

unreasonably withheld, Insurer may elect to waive the conditions set forth in clauses (b) through (e) and pay or direct the payment of the Settlement Amount to the escrow or Settlement Trust prior to the occurrence of the events set forth in (b) through (e) hereof, in which case, the date of such payment shall be the Settlement Agreement Effective Date for all purposes hereunder including the date of the closing of the purchase and sale of the Archdiocese Policies.

1.1.81 "**Settlement Amount**" means the sum of $5,000,000 to be paid (in accordance with Section 3.1) by Insurer after satisfaction of all conditions precedent herein in accordance herewith.

1.1.82 "**Settlement Trust**" means the settlement trust established under the Plan for the purposes set forth therein, including assuming liability for all Channeled Claims (as defined in the Acceptable Plan) and Indemnified Claims (as defined herein), subject to the limitations on indemnification and liability contained in Section 7.2 of this Settlement Agreement.

1.1.83 "**Settlement Trust Agreement**" means the agreement between the Debtor and the Settlement Trustee governing the Settlement Trust, in the form of Exhibit D-1 to the Acceptable Plan.

1.1.84 "**Settlement Trust Allocation Protocol**" means the Settlement Trust Allocation Protocol (as defined and used in the Settlement Trust Agreement), in the form of Exhibit D-2 to the Acceptable Plan.

1.1.85 "**Settlement Trust Documents**" means, collectively, (a) the Settlement Trust Agreement, (b) the Settlement Trust Allocation Protocol, and (c) any other agreements, instruments and documents governing the establishment and administration of the Settlement Trust, which shall be consistent with the terms of the Plan, as the same may be amended or modified from time to time in accordance with the terms thereof.

1.1.86 "**Settlement Trustee**" means the Entity appointed to act as the initial trustee of the Settlement Trust pursuant to the terms of the Settlement Trust Documents, along with any successor trustee appointed in accordance with the Settlement Trust Documents.

1.1.87 "**Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Settling Insurer against any Settling Insurer or Non-Settling Insurer for the payment of money where such Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.88 "**Settling Insurers**" shall have the meaning set forth in the Acceptable Plan.

1.1.89 "**Settling Insurers' Policies**" shall have the meaning set forth in the Acceptable Plan.

1.1.90 "**Settling Parties**" means, collectively, the following Entities: (a) Archdiocese Bound Parties; and (b) the Settling Insurers.

1.1.91 "**Subject Interests**" means all Claims, liens (as defined by Section 101(37) of the Bankruptcy Code), encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief, including: (a) all interests of the Archdiocese in, to and under the Archdiocese Policies; (b) all interests in, to, and under the Archdiocese Policies of any Entity other than the Archdiocese (including all Abuse Claimants and the Archdiocese Bound Parties); and (c) all interests in, to and under the Archdiocese Policies of any other Entity claiming coverage by, through, or on behalf of any Archdiocese Bound Party, including, without limitation, rights and interests as an insured, co-insured or additional insured, insurer or creditors of the Archdiocese Bound Parties; in each case within the meaning of "interest" as used in sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code. For the avoidance of doubt, a Direct Action Claim constitutes a Subject Interest. The meaning of Subject Interests also includes: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or

legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property.

1.1.92 "**Supplemental Settling Insurers' Injunction**" has the meaning set forth in Section 2.2.2.

1.1.93 "**Unknown Abuse Claim**" means an Abuse Claim that occurred before the Petition Date and the Abuse Claimant did not file a proof of claim by the applicable Abuse Claims Bar Date, for which there exists a valid legal excuse for not filing, as further defined in the in the Acceptable Plan.

1.1.94 "**Unknown Abuse Claims Representative**" means Michael R. Hogan, the legal representative appointed by the Bankruptcy Court pursuant to the *Order (I) Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, and (II) Approving the Retention of Michael R. Hogan as the Unknown Tort Claims Representative, Nunc Pro Tunc To July 26, 2021* (Docket No. 1012 ), any successor legal representative appointed by the Bankruptcy Court, or, on and after the Bankruptcy Plan Effective Date, any successor legal representative appointed in accordance with the applicable Settlement Trust Document.

1.2     Capitalized terms not defined in this Section 1 or elsewhere in this Settlement Agreement shall have the meanings given to them in the Bankruptcy Code.

## 2.     THE BANKRUPTCY CASE AND PLAN OF REORGANIZATION

2.1     On or before July 29, 2025, the Archdiocese shall file a motion in the Bankruptcy Court (the "**Approval Motion**"), in form and substance acceptable to Insurer in its sole discretion, that seeks the entry of an order in substantially the form attached as **Exhibit A** to this Settlement Agreement, or otherwise in form and substance acceptable to Insurer in its sole discretion (the "**Approval Order**"), that:

(a) approves this Settlement Agreement, including Insurer's buyback of the Archdiocese Policies and the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests, and otherwise authorizes the Parties to undertake the settlement and the transactions contemplated by this Settlement Agreement, in each case pursuant to sections 363(b), (f),and (m) of the Bankruptcy Code and any other applicable provisions of the Bankruptcy Code;

(b) contains an injunction (the "**Sale Injunction**") that, subject to and conditioned upon the Settlement Agreement Effective Date and the Insurer's payment of the Settlement Amount, bars all Claims against the Insurer Released Parties and their property and assets of each based on or arising out of any Subject Interests in the Archdiocese Policies including without limitation all Coverage Claims, Related Insurance Claims, and Barred Claims, leaving the Settling Insurers free and clear of all Subject Interests of all Entities, including all Subject Interests of: the

Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); any Abuse Claimant; or any holder of a Barred Claim pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code;

(c) provides that this Settlement Agreement is binding on the Archdiocese Signatory Parties, all other Settling Parties, any trust created in the Bankruptcy Case(s), and any successors of the foregoing; and

(d) provides, subject to and conditioned upon the Settlement Agreement Effective Date, that the Approval Order is binding on all Persons (including, for the avoidance of doubt, all Persons set forth in the foregoing (c)).

2.1.1    The Archdiocese shall provide written notice of the Approval Motion, which notice shall be in form and substance acceptable to Insurer, to, at a minimum, any known Archdiocese Bound Party, holder of an Abuse Claim, or party whose rights or interests may reasonably be considered to be impacted by the relief requested in the Approval Motion, and any party identified on Schedule 3 hereto.  In addition, the Archdiocese shall include notice of the Approval Motion together with notice provided with respect to confirmation of the Joint Plan, including publication notice of the hearing on the Approval Motion. The Archdiocese will provide a draft service list of the foregoing for Insurer's review and comment.

2.1.2    If any Entity files an objection to the Approval Motion, the Archdiocese and Creditors' Committee shall consult with Insurer in connection with filing any written response thereto.  The Archdiocese Signatory Parties, as applicable, and Creditors' Committee shall take commercially reasonable steps to defend against any objection, appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order.  Insurer will cooperate with the Archdiocese Signatory Parties and Creditors' Committee in this regard, including making commercially reasonable submissions.

2.2    The Archdiocese shall file and prosecute a joint Plan with the Creditors Committee, which shall be in form and substance satisfactory to the Insurer in its sole discretion, substantially in the form as the Acceptable Plan, which the Parties acknowledge and agree satisfies the terms of this Settlement Agreement.  Any modifications to the Plan, the Settlement Trust Documents, the Plan Confirmation Order, or the Approval Order, including those relating to the Channeling Injunction, Supplemental Settling Insurers' Injunction, Gatekeeper Injunction, releases by holders of Abuse Claims, Insurers, Insurance Settlement Agreements, and related definitional terms, including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Abuse Related Insurance Claims," "Channeled Claim," "Covered Parties," "Direct Action Claim," "Enjoined Party," "Insurer Contribution Claim," "Non-Insurer Contribution Claim," "Penalty Claims," "Protected Parties," "Settling Insurers," "Settling Insurer's Policies," "Subject Insurance Policies," "Subject Interests," or any exhibits, schedules, and documents related thereto, must be in all respects consistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties without Insurer's written consent in its sole discretion.

2.2.1    The Plan shall create the Settlement Trust, which shall be responsible for making any and all payments to the Abuse Claimants entitled to receive payment under the Plan and which shall assume all liability for Channeled Claims.

2.2.2    The Plan shall include: (a) an injunction in substantially the form included in Article 12.4 of the Acceptable Plan (the "**Channeling Injunction**"); and (b) an injunction in substantially the form included in Article 12.5 of the Acceptable Plan (the "**Supplemental Settling Insurers' Injunction**"); and (c) an injunction in substantially the form included in Article 12.8 of the Acceptable Plan (the "**Gatekeeper Injunction**").

2.2.3    The Plan shall incorporate by reference the releases and indemnities set forth in this Settlement Agreement, including that the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to all Indemnified Claims as forth in Section 7.2 of this Settlement Agreement.

2.2.4    The Settlement Trust Documents shall provide that as a condition to receiving payment from the Settlement Trust, all Abuse Claimants shall provide an Abuse Claim Release and Certification.

2.2.5    The Plan shall provide for the commencement, prior to the Court's consideration of the Approval Motion, by the Additional Debtors of Chapter 11 cases to be jointly administered with the Bankruptcy Case.

2.2.6    The Plan shall provide a supplemental bar date for the Additional Debtors in a form and substance satisfactory to the Insurer with respect to Abuse Claims against the Additional Debtors and the form, manner, and deadline for filing proofs of claim and the treatment of confidential information contained therein.

2.2.7    The Plan shall provide that confirmation of the Plan will not occur unless all of the following conditions precedent have been satisfied: (a) the Plan Confirmation Order approves and implements the Injunctions and (b) the Bankruptcy Court shall have granted the Approval Motion in form and substance acceptable to Insurer in its sole discretion.

2.2.8    The Plan shall provide that the Bankruptcy Plan Effective Date will not occur unless all of the following conditions precedent have been satisfied or waived (as applicable with consent of Insurer): (a) the Plan Confirmation Order will have been entered by the Bankruptcy Court and become a Final Order, and (b) the Bankruptcy Court shall have entered the Approval Order (with both such Approval Order and this Settlement Agreement in form and substance acceptable to the Insurer) and such Approval Order shall have become a Final Order.

2.2.9    The Plan shall provide that (collectively, as follows, the "**Controlling Document Provision**") in the event of a conflict between (a) the Settlement Agreement, on the one hand, and (b) the Plan, on the other, the terms of the Settlement Agreement shall control and govern; and in the event of a conflict between the (x) Approval Order, on the one hand, and (y) Plan Confirmation Order, on the other, the terms of the Approval Order shall control and govern.

2.2.10 The Plan shall provide that the execution and delivery of this Settlement Agreement is a condition to entry of the Plan Confirmation Order and the occurrence of the Bankruptcy Plan Effective Date. The inclusion of this Settlement Agreement in the Plan shall not be waivable as a condition to entry of the Plan Confirmation Order or the occurrence of the Bankruptcy Plan Effective Date absent the prior written consent of the Settling Insurers.

2.3    The Debtor Parties shall seek and obtain entry of an order from the Bankruptcy Court, which order shall be in form and substance acceptable to the Parties, that: (i) approves the Plan pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code; (ii) contains the Channeling Injunction; (iii) ratifies the Sale Injunction as independent of the Channeling Injunction and Supplemental Settling Insurers' Injunction; (iv) contains the Gatekeeper Injunction; (v) provides that this Settlement Agreement is binding on any Settlement Trust created in the Bankruptcy Case, the Reorganized Debtor, the Reorganized Additional Debtors, and any successors of the Settlement Trust, Reorganized Debtor, or Reorganized Additional Debtors, and all of the Archdiocese Bound Parties; and (vi) contains the Controlling Document Provision (the "**Plan Confirmation Order**").

2.3.1    The Plan and Plan Confirmation Order must not be inconsistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties.

2.3.2    In seeking to obtain the Plan Confirmation Order, the Debtor and Additional Debtors will: (i) seek a confirmation hearing on an appropriately timely basis; (ii) urge the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) take all reasonable steps to defend against any objection, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order.

2.3.3    Prior to entry of the Plan Confirmation Order, the Archdiocese and/or any applicable Additional Debtor shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Abuse Claim that (i) is asserted against any Debtor Party and (ii) implicates, or is reasonably likely to implicate, any Archdiocese Insurance Policies (including by alleging Abuse that took place during any policy period of any Archdiocese Policy). If, prior to the Plan Confirmation Order becoming a Final Order, the Bankruptcy Court allows any Entity to prosecute any such Abuse Claim, the Debtor Parties shall defend themselves against such Abuse Claims and comply with the terms of any order of the Bankruptcy Court, and Insurer's rights and obligations relating to such litigation shall be determined by, and subject to, the terms and conditions of the Archdiocese Policies, this Settlement Agreement, and any applicable orders of the Bankruptcy Court.

2.3.4    The Plan and Plan Confirmation Order shall provide that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any Covered Party with respect to any Archdiocese Policy, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as

confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

2.3.5    Nothing in this Section or elsewhere in this Settlement Agreement shall bar any party from arguing that any appeal from the Plan Confirmation Order should be dismissed on grounds of statutory or equitable mootness or otherwise.

2.3.6    None of the releases, Injunctions, or other provisions of the Plan with apply to, or have any effect, on the rights of the Settling Insurers to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with any Settling Insurer's Policy.

2.4    The Settlement Trust Documents shall require the Settlement Trust to register as a Responsible Reporting Entity under the reporting provisions of MMSEA.

2.4.1    The Settlement Trust Documents shall require the Settlement Trust, at its sole expense, to timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated and to follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

2.4.2    The Settlement Trust Documents shall require the Settlement Trust to obtain, prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Abuse Claim, a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. §1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim.

2.5    The Debtor Parties and Reorganized Debtor and Reorganized Additional Debtors will undertake commercially reasonable actions to cooperate with Insurer in connection with responding to any inquiry from Insurer's regulators, auditors, reinsurers, or retrocessionaires.

2.6    From and after the execution date of this Settlement Agreement and until the earlier of: (A) occurrence of (i) the Settlement Agreement Effective Date and (ii) Insurer's remittance of the Settlement Amount (at which time this covenant is superseded by the releases provided in Section 4); and (B) the date on which this Settlement Agreement is terminated, (i) none of the Insurer Released Parties, the Debtor, the Additional Debtors or Creditors' Committee will initiate any litigation activity against the other in any Bankruptcy Case and (ii) the Archdiocese and the Insurer Released Parties shall cease all litigation activities against each other in the Bankruptcy Case, including that the Insurer Released Parties will neither object to any proposed Plan consistent with this Settlement Agreement, nor serve or compel any discovery in connection with the Bankruptcy Case; *provided that*: (y) neither the Archdiocese nor any Additional Debtor shall include any provision in any Plan that adversely affects the rights or benefits of the Insurer Released Parties under this Settlement Agreement, or that otherwise violates, or is contrary to, the

agreements and covenants contained in this Settlement Agreement; and (z) neither the Archdiocese nor any Additional Debtor shall act, or fail to act, in such a way that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement. Notwithstanding the foregoing, the Insurer Released Parties may participate in the Bankruptcy Case for the purpose of supporting or enforcing any of the terms of this Settlement Agreement and protecting their rights.

2.7    From and after the execution date of this Settlement Agreement and until the date on which this Settlement Agreement is terminated, the obligations of the Debtors Parties set forth in this Section 2 shall be binding on the Debtor Parties.

## 3.    PAYMENT OF THE SETTLEMENT AMOUNTS

3.1    By no later than thirty (30) days after (a) the Settlement Agreement Effective Date, and (b) Insurer receiving appropriate instructions for the transmission of the payment to the Escrow Agent or Settlement Trust, Insurer shall pay (or cause to be paid) the Settlement Amount to the Settlement Trust or Escrow Agent pursuant to the Escrow Agreement.   Payment of the Settlement Amount may be by check, ACH transfer, wire transfer, or other method.

3.1.1    [Intentionally Omitted.]

3.2    The delivery of the Settlement Amount to the Escrow Agent or Settlement Trust shall be in full and final settlement of all responsibilities under and arising out of the Archdiocese Policies, the sale of the Purchased Property to Insurer free and clear of all Subject Interests of any Entity, and the other releases provided.

3.3    Subject to the occurrence of the Settlement Agreement Effective Date, the Parties agree:  (i) the Settlement Amount is the total amount that Insurer is obligated to pay on account of any and all Claims under, arising out of, relating to, or in connection with the Archdiocese Policies (including Barred Claims, and any reimbursement obligations for Conditional Payments under the MSPA); (ii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of anyone in connection with the Archdiocese Policies, including any payments in connection with amounts allegedly owed under the MSPA or in connection with any Claims, including any Barred Claim; (iii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of the Archdiocese Bound Parties or any Abuse Claimants in connection with the Archdiocese Policies; and (iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted. The Parties further agree that the Settlement Amount includes the full purchase price of the Archdiocese Policies and Related Insurance Claims and Coverage Claims of the Archdiocese Bound Parties and consideration for the releases and other protections afforded by this Settlement Agreement.

3.4    The Parties represent and agree that (i) the consideration to be provided by Insurer pursuant to this Settlement Agreement constitutes a fair and reasonable compromise and exchange for the consideration granted to the Insurer Released Parties in this Settlement Agreement

(including the releases set forth below), and (ii) the consideration to be provided by the Archdiocese Bound Parties to the Insurer Released Parties pursuant to this Settlement Agreement (including the releases set forth below) constitutes a fair and reasonable compromise and exchange for the consideration granted to the Archdiocese Bound Parties in this Settlement Agreement. The Insurer Released Parties are not acting as volunteers, and the Settlement Amount reflects potential liabilities and obligations to the Archdiocese Bound Parties of the amount Insurer allegedly is obligated to pay.

3.5    Each of the Archdiocese Signatory Parties: (i) consents to the sale of the Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests and Claims of all Persons, including, without limitation, the Archdiocese Bound Parties in accordance with the terms of this Settlement Agreement, and (ii) agrees and acknowledges that the contribution of the proceeds from such sale and settlement to the Settlement Trust, as provided in the Plan and this Settlement Agreement, is a fair and reasonable compromise and exchange for value and constitutes reasonable and adequate consideration for any Subject Interest or Claim the Archdiocese Bound Parties may have in the Archdiocese Policies.

3.6    The Parties further agree that they have attempted to resolve the matters set forth herein in compliance with both state and federal law and believe that the settlement terms adequately consider CMS's interest and do not reflect any attempt to shift responsibility for payment of medical expenses to CMS pursuant to 42 U.S.C. § 1395y(b). The Parties acknowledge, understand, and agree that any present or future action or decision by CMS, including actions regarding an Abuse Claimant's eligibility or entitlement to receive Medicare or Medicare payments, will not render this Settlement Agreement (including the releases set forth in it) void or ineffective, or in any way affect the finality of this Settlement Agreement. The Settlement Trust is responsible for all future medical payments, including any and all claims by CMS and/or CMS contractors that have been or may be in the future arising out of, relating (directly or indirectly) in any way to, or in connection with this Settlement Agreement.

3.7    To facilitate the purchase of the Purchased Property as set forth herein, each Archdiocese Bound Party is authorized to designate a lawful attorney in fact, with full powers of substitution, to execute any bill of sale or other document reasonably requested by the Archdiocese or Insurer to accomplish the sale and purchase contemplated herein. A form of Bill of Sale is attached hereto as **Exhibit B**.

4.    **RELEASES AND SALE FREE AND CLEAR**

4.1    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, with no further action being required, the Archdiocese Signatory Parties fully, finally, and completely remise, release, acquit, and forever discharge the Insurer Released Parties (including, for the avoidance of doubt, any of their reinsurers or retrocessionaires, solely in their capacity as such), from any and all past, present, and future: (a) Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies or Claims that are covered or are determined to be covered by agreement or a court of competent jurisdiction under the Archdiocese Policies, including, without limitation, any Barred Claims, Direct Action Claims, reimbursement obligations for Conditional

Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims, the handling of the Abuse Claims or the Bankruptcy Case. The Archdiocese Signatory Parties further acknowledge, stipulate, and agree that (x) the releases in this Section 4.1 specifically include all Unknown Abuse Claims, and demands that are based in whole or in part on Unknown Abuse Claims and (y) **with respect to all Claims released under this Section 4.1, the Archdiocese Signatory Parties waive any and all provisions, rights, and benefits conferred by Cal. Civ. Code 1542 or any law of any state of the United States, or any principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code 1542, which provides: "a general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, that, if known by him or her, would have materially affected his or her settlement with the debtor or released party"** and (z) the releases in this Section 4.1 shall be equal in breadth to the broadest releases and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

4.2     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, and with no further action being required, Insurer shall fully, finally, and completely remise, release, acquit, and forever discharge the Archdiocese Signatory Parties from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies, including any Barred Claims, and reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case subject to the protections in favor of the Insurer Released Parties set forth herein.

4.3     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, none of the Archdiocese Signatory Parties or other Archdiocese Bound Parties shall assert against the Insurer Released Parties any Claim with respect to any matter, conduct, transaction, occurrence, fact, or other circumstance that, directly or indirectly, arises out of, relates to, or is in connection with any of the Archdiocese Policies, any Barred Claim, or any other matter released pursuant to Sections 4.1 and 4.2 above.

4.4     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer hereby buys back the Archdiocese Policies free and clear of all Subject Interests, including without limitation all Coverage Claims and Related Insurance Claims, of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); and any Abuse Claimant, or any other holder of a Barred Claim. This sale is pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code. The Parties acknowledge and agree, and the Approval Order shall find and conclude, that upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount:

4.4.1     Insurer is a good faith purchaser of the Archdiocese Policies and any Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), within the meaning of section 363(m) of the

Bankruptcy Code, with all the protections afforded such a purchaser under 363(m) of the Bankruptcy Code;

4.4.2    the consideration exchanged constitutes a fair and reasonable settlement and compromise of the Parties' disputes and of their respective rights and obligations relating to the foregoing Archdiocese Policies and Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), and constitutes reasonably equivalent value;

4.4.3    the releases in this Settlement Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy law;

4.4.4    the Archdiocese Policies and all Subject Interests therein (including, without limitation, to the extent applicable, any Direct Action Claim) shall be terminated and of no further force and effect;

4.4.5    Insurer's payment of the Settlement Amount constitutes Insurer's full and complete performance of any and all obligations under the Archdiocese Policies, including any performance owed to the Archdiocese Bound Parties or any holder or purported holder of any Claim against (including any Abuse Claim or Direct Action Claim) or Subject Interest in, the Archdiocese Policies, and exhausts all limits of liability of the Archdiocese Policies;

4.4.6    All Subject Interests the Archdiocese Bound Parties and any other Entity may have had, may presently have, or in the future may have in the Archdiocese Policies are released pursuant to the terms of this Settlement Agreement and policy buyback;

4.4.7    all per occurrence and/or aggregate limits of coverage under the Archdiocese Policies are fully eroded, exhausted and settled upon the Settlement Agreement Effective Date;

4.4.8    the Insurer would not pay the Settlement Amount without buyback of the Archdiocese Policies upon all of the terms and conditions set forth herein; and

4.4.9    the Archdiocese Signatory Parties accept the Settlement Amount in full and complete compromise and satisfaction of all Insurer Released Parties' past, present, and future obligations, including any obligations to any of the Archdiocese Bound Parties under such Archdiocese Policies or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever that are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies (including without limitation Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether or not such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, the Bankruptcy Case, or otherwise.

4.5    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer shall have no obligation to pay, handle, object, or otherwise respond to any Claim against the Archdiocese Bound Parties; and the Archdiocese Bound Parties will: (i) will withdraw, and are deemed to have withdrawn, all outstanding tenders of Claims to the Insurer Released Parties for defense and indemnity; (ii) will not tender any Claims to the Insurer Released Parties; and (iii) will not request that the Insurer Released Parties fund any judgments, settlements, or defense costs that, in each case, are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies issued by a Settling Insurer.

4.6    To the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer consent to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under this Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Subject Interests of any Entity in such Archdiocese Policies (the "**Non-Debtor Catholic Entity Policy Sale**"). The Plan Confirmation Order and Approval Order shall so provide and Insurer shall be designated in the Plan Confirmation Order as a good-faith purchaser of the Archdiocese Policies with all the protections afforded such a purchaser under section 363(m) of the Bankruptcy Code.

4.7    [Intentionally Omitted.]

4.8    The Archdiocese Signatory Parties further covenant, stipulate and agree that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Abuse Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any insured or additional insured covered by any insurance policy issued by any Insurer Released Party, and to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in any Archdiocese Policy to the Debtor's Estate and sale thereof to Insurer, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court. Without limiting the foregoing, the Insurer Released Parties shall receive protections against Claims by Non-Debtor Catholic Entities and any other Entity equal in breadth to the broadest protections received by any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, or any Insurance Settlement Agreement approved by the Bankruptcy Court.

4.9    If the Archdiocese Signatory Parties, or anyone of them, enter into any agreement (that is embodied in such agreement as approved by the Bankruptcy Court, the Plan, and/or the Plan Confirmation Order) with any other one of the Settling Insurers (including any Non-Settling Insurer who becomes a Settling Insurer) in the Bankruptcy Case, that provides that insurer with releases, injunctions or other protections that are more favorable than those contained in this Settlement Agreement, then this Settlement Agreement shall be deemed to be modified to provide Insurer with those more favorable injunctions, releases or other protections.

439

4.10    Notwithstanding anything in this Settlement Agreement, nothing in this Settlement Agreement is intended to or shall be construed to:

4.10.1   apply to or have any effect on the Insurer Released Parties' rights to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer;

4.10.2   release any Claims that any Insurer Released Party has or might have against any Non-Settling Insurer, except that, to the extent such other insurers have agreed or in the future agree to release any Claims against the Insurer Released Parties arising out of or related in any way to the Abuse Claims, then the Insurer Released Parties also release such Claims against such other insurers to the same extent; or

4.10.3   release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Settlement Agreement or the Plan (to the extent not inconsistent with this Settlement Agreement).

## 5.    TERMINATION OF AGREEMENT

5.1    The Parties may terminate this Settlement Agreement by mutual agreement in writing.

5.2    Insurer may terminate this Settlement Agreement upon fifteen (15) days written notice to the other Parties in the event of any of the following occurs prior to the Settlement Agreement Effective Date: (i) any of the Debtor Parties or the Creditors' Committee files a plan inconsistent with this Settlement Agreement; (ii) the Approval Order and the Plan Confirmation Order are not entered by February 15, 2026; (iii) the Bankruptcy Court enters an order that becomes a Final Order that (a) denies the Approval Motion or (b) is inconsistent with the Approval Order or the Plan Confirmation Order; (iv) a plan that is inconsistent with the terms of this Settlement Agreement is confirmed; or (v) any Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

5.3    In the event of termination pursuant to this Section 5, unless the Parties agree otherwise in writing, the Parties' interests, rights, and obligations under the Archdiocese Policies shall not be impacted by such termination.

## 6.    REPRESENTATIONS AND WARRANTIES OF THE PARTIES

6.1    The Parties separately represent and warrant as follows:

6.1.1   To the extent it is a corporation, including a non-profit, religious, or charitable corporation, or other legal entity, each such Party has the requisite power and authority to enter into this Settlement Agreement and to perform the obligations

440

contemplated by this Settlement Agreement[1], subject only to approval of the Bankruptcy Court; and

      6.1.2    This Settlement Agreement has been analyzed by counsel to the Parties and executed and delivered in good faith pursuant to arm's length negotiations and for value and valuable consideration.

      6.2    The Archdiocese Signatory Parties represent and warrant that they have not assigned, and will not assign, any Subject Interests in the Archdiocese Policies to any Entity, except for the avoidance of doubt, the assignment of the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate.

      6.3    The Archdiocese Signatory Parties represent and warrant that (i) all Archdiocese Bound Parties have either signed this agreement, are represented herein by the Archdiocese or the Archdiocese Signatory Parties, or are juridical entities whose existence has been terminated as a matter of applicable non-bankruptcy law and (ii) the Archdiocese Signatory Parties are duly authorized to bind the Archdiocese Bound Parties who are not Archdiocese Signatory Parties. Without limiting the foregoing, the Archdiocese Signatory Parties represent and warrant that:

      6.3.1    all entities known to them that are Co-Insured Parties under the Archdiocese Policies (by express reference, assignment, judicial determination or any related concept under applicable law or other document) other than the Debtor, the Additional Debtors, the Parish Schools and Archdiocesan Schools, the Non-Debtor Catholic Entities, and the cemeteries identified in Section 6.3.3, are identified in Schedule 2 hereto, if any;

      6.3.2    the Archdiocesan Schools are not separately incorporated and are merely unincorporated operations of the Debtor and the Parish Schools are not separately incorporated and are merely unincorporated operations of the Archdiocesan Parishes that are Additional Debtors;

      6.3.3    the Debtor, through the Office of Catholic Cemeteries, operates certain cemeteries including, without limitation: All God's Babies Tomb & Holy Innocents Prayer Garden, St. Charles Cemetery, St. Joseph Cemetery #1, St. Joseph Cemetery #2, St. Louis Cemetery #1, St. Louis Cemetery #2, St. Louis Cemetery #3, St. Patrick Cemetery #1, St. Patrick Cemetery #2, St. Patrick Cemetery #3, St. Roch Cemetery #1, St. Roch Cemetery #2, St. Vincent De Paul Cemetery #1, St. Vincent DePaul Cemetery #2, which cemeteries are either: (a) Non-Debtor Catholic Entities or (b) not separately incorporated and are merely unincorporated operations of the Debtor;

      6.3.4    Holy Redeemer School, Redeemer-Seton High School, and St. Joseph Benedictine High School were formerly owned and operated by the Archdiocese, but ceased operations and were closed by the Debtor at some point prior to the Petition Date,

---

[1] Specifically, each Archdiocese Signatory Party is duly authorized to execute this Settlement Agreement and any related document and the signatory hereto on behalf of such Archdiocese Signatory Party has full power and authority to bind such Archdiocese Signatory Party. The related corporate resolutions and incumbency certificates are identified in Schedule 4 and Schedule 5, respectively.

and were not separately incorporated and were merely unincorporated operations of the Debtor;

6.3.5    St. Robert Bellarmine School was formerly owned and operated by one or more of the Archdiocese Signatory Parties, but ceased operations and was closed by one or more of the Archdiocese Signatory Parties at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of one of the Additional Debtors;

6.3.6    Notre Dame Seminary and the Society of the Propagation of the Faith of the Archdiocese of New Orleans are owned and operated by the Archdiocese and are not separately incorporated, but are merely unincorporated operations of the Debtor;

6.3.7    San Pedro Pescador Church was owned and operated by the Archdiocese, but was closed by the Archdiocese prior to the Petition Date and was not separately incorporated, but was merely an unincorporated operation of the Archdiocese;

6.3.8    the following Roman Catholic Schools: the Academy of the Sacred Heart, Holy Cross, Jesuit, St. Mary's Academy, St. Mary's Dominican, Brother Martin, Mount Carmel Academy, Ursuline Academy, Cabrini, De La Salle, and St. Paul's School, are not Co-Insured Parties, named insured's or additional insureds (or related concept under applicable law or document) under the Archdiocese Policies, or institutions, religious organizations or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control and active management, and were themselves not under the control or active management of the Archdiocese;

6.3.9    St. John Vianney Preparatory School was formerly owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.10  the Louise Home a/k/a as the Louise Headstart Center was an unincorporated ministry of the Debtor;

6.3.11  Holy Guardian Angel was owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.12  the Social Apostolate Housing Program was an unincorporated ministry of the Debtor;

6.3.13  at all times Tulane Catholic and the Newman Center were and are unincorporated activities of the Debtor, with no existence separate and apart from the Debtor;

6.3.14  Crescent City Convent Corporation, Lyric Realty and Parking Company, Inc., The Chinchuba Deaf-Mute Institute, People for Teens of St. Anthony of Padua

Corporation, Kiwanis Foundation of New Orleans, Kiwanis Club of New Orleans, and Seminarians Parents Association, Inc. were never owned, operated, or controlled by the Debtor or the Additional Debtors and were neither insureds nor additional insureds under the Archdiocese Policies; and

6.3.15   (a) Catholic Charities Archdiocese of New Orleans ("**Catholic Charities**") owned and operated Hope Haven – Madonna Manor ("**HH**"), which was organized under Louisiana law; (b) HH was dissolved and its status as a juridical person was, thus, terminated as a matter of Louisiana law; (c) at all times, Catholic Charities was the sole member and/ or shareholder of HH; and (d) it is the intention of Catholic Charities that HH be bound by this Agreement as if it remained in existence and had signed the Agreement as a Party.

6.4    The Archdiocese Signatory Parties represent and warrant that they are not aware of any Abuse Claim asserted against any entity associated with the Archdiocese (including any parishes, institutions or religious organizations or any subsidiary of the person or organization listed in the declarations of the Archdiocese Policies, or any other organization coming under the Archdiocese's control and active management), that is not listed on Exhibit B-1 to the Acceptable Plan.

6.5    The Debtor represents and warrants that it will undertake good faith efforts to cause actual notice of the Approval Motion to be sent in accordance with Section 2.1.1 hereof.  Without limitation, the Debtor has sent or will send notice to the entities on Schedule 3.

6.6    The Archdiocese Signatory Parties and Insurer (limited to such Insurer person that worked on and were familiar with this Settlement Agreement and matters referenced therein), respectively, represent and warrant that they have completed a reasonable search for evidence of any policy of insurance issued by Insurer to the Archdiocese Signatory Parties that would afford coverage with respect to any Abuse Claim, Coverage Claim, or Related Insurance Claim and other than the policies identified in Schedule 1, no such policies have been identified.  The Archdiocese Signatory Parties further represent and warrant that, to the best of their knowledge after reasonably diligent investigation: there are no contracts, binders, certificates, and policies of insurance that insure or purport to insure (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) (x) the Diocese of Houma-Thibodaux or (y) the Diocese of Baton Rouge (excluding, for the avoidance of doubt, policies issued to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD, but including any such policies issued to the Archdiocese that provide or may provide insurance coverage to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD), or (iv) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, other than the policies identified in Schedule 1. Notwithstanding the foregoing, nothing in this Settlement Agreement, including the Schedules or Exhibits hereto, shall be construed as or deemed to be an admission or evidence that any binder, certificate, or policy of insurance was in fact issued or affords coverage in connection with any Abuse Claims.

6.7    The Debtor Parties represent and warrant that they have not in any way assisted, and covenant that they shall not in any way assist, any Entity in the establishment or pursuit of any Claim, including any Barred Claim, against the Insurer Released Parties.

## 7.    ACTIONS INVOLVING THIRD PARTIES

7.1    For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Archdiocese Policies resulting from the purchase and sale thereof contemplated by this Settlement Agreement, the Parties hereby agree as follows:

7.1.1    From and after (i) the occurrence of the Settlement Agreement Effective Date, and (ii) Insurer's payment of the Settlement Amount, if any other insurer of the Archdiocese Bound Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from Insurer as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for any of Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense or indemnity obligation of Insurer for any Claims or reimbursement obligations for Conditional Payments released or resolved pursuant to this Settlement Agreement, the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and the Settlement Trust shall voluntarily reduce any judgment or Claim against, or settlement with, such other insurers to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against Insurer.  To ensure that such a reduction is accomplished, Insurer shall be entitled to assert this Section 7 as a defense to any action against it brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Insurer from any liability for the judgment or Claim.  Moreover, if a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against Insurer, such Claim may be asserted as a defense against a Claim by the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust in any coverage litigation (and the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and/or the Settlement Trust may assert the legal and equitable rights of Insurer in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust shall be reduced dollar for dollar by the amount so determined.

7.1.2    Unless this Settlement Agreement is terminated, Insurer shall not seek reimbursement for any payments it makes under this Settlement Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other Settling Insurer unless that other insurer first seeks contribution, subrogation, indemnification, or similar relief from Insurer.  Notwithstanding the foregoing, nothing in this Settlement Agreement, the Approval Order or the Plan Confirmation Order shall be construed as prohibiting Insurer from seeking recovery (including with respect to the Settlement Amount or otherwise) from its reinsurers or retrocessionaires in their capacity as such.

7.2    Subject to the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, and subject to the limitations set forth below, the Settlement

Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein, including any Claims made by (i) any Entity who is an insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies; (ii) any Entity who makes (a) an Abuse Claim or (b) a Related Insurance Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a Claim under any of the Archdiocese Policies (collectively, the "**Indemnified Claims**"), as set forth below:

    7.2.1    The Insurer Released Parties shall have the right (but not the obligation) to (a) seek to enforce the Injunctions against any Entity seeking to assert an Indemnified Claim, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions) identified in this Section 7.2. With the Insurer Released Parties' consent, such consent not to be unreasonably withheld, the Settlement Trustee can satisfy the obligations contained in (a) and (b) above. An amount equal to $59,523.81 (the "**Indemnity Cost Reserve**") shall be reserved from the Settlement Amount for payment of reasonable attorneys' fees, expenses, costs, and other amounts incurred by the Insurer Released Parties in defending against such Indemnified Claims, which amount shall be released from reserve if no Indemnified Claims are asserted within 30 days after the Revival Window has closed under every applicable Revival Window Law.

    7.2.2    Neither any Archdiocese Bound Party, nor the Settlement Trust shall in any way assist, any Entity in the establishment or pursuit of any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein.

    7.2.3    The Settlement Trust and Archdiocese shall support and join in the enforcement of the Injunctions against any Entity seeking to assert an Indemnified Claim; *provided that* if the Insurer Released Party(ies) elect(s) not to enforce the Injunctions in accordance with Section 7.2.1, the Settlement Trust shall (a) seek to enforce the Injunctions against such Entity, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions).

    7.2.4    To the extent that a Final Order is entered against any Insurer Released Party with respect to any Indemnified Claim, the Settlement Trust shall indemnify and hold harmless such Insurer Released Party with respect thereto up to the Settlement Amount; *provided that* to the extent the Insurer Released Party(ies) elect not to enforce the Injunctions or defend against the Indemnified Claims, the Settlement Trust's indemnity obligation shall be limited to the amount of the Indemnity Cost Reserve; *provided further* that if the Settlement Trust breaches its obligation set forth in Section 7.2.2 hereof, the Settlement Trust's indemnity obligation shall not be so limited and shall instead be up to the Settlement Amount. In no event shall the Settlement Trust's indemnity obligation exceed each individual Settling Insurer's Settlement Amount. To the extent the Settlement Amount has been distributed in accordance with the Plan, the Settlement Trust's indemnification obligation shall be so reduced.

7.2.5    The indemnification provided for herein shall not impose liability on the Settlement Trustee or Settlement Trust professionals for their own acts or omissions; *further*, funds provided for the administration of the Settlement Trust or payment of the Settlement Trustee or Settlement Trust professionals shall not be subject to indemnification claims as provided for herein.

7.3    If any Entity attempts to prosecute a Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies against the Insurer Released Parties before the Approval Order and Plan Confirmation Order become Final Orders, then promptly following notice to do so from Insurer, the Archdiocese and/or the Additional Debtor(s), as applicable, will file a motion and supporting papers to obtain an order from the Bankruptcy Court pursuant to sections 362 and 105(a) of the Bankruptcy Code protecting the Insurer Released Parties from any such Claims until the Plan Confirmation Order has become a Final Order, the Bankruptcy Case is dismissed, or this Settlement Agreement is terminated under Section 5 hereof.

## 8.    MISCELLANEOUS

8.1    If any action or proceeding of any type whatsoever is commenced or prosecuted by any Entity not a Party to this Settlement Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Settlement Agreement, the Parties mutually agree to cooperate fully in opposing such action or proceeding.

8.2    The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Settlement Agreement and to preserve its validity and enforceability.

8.3    The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Plan Confirmation Order, and the Bankruptcy Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof.

8.4    Notwithstanding any language to the contrary in this Settlement Agreement, under no circumstance will any Archdiocese Signatory Party be obligated to take any action that violates any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, and if a court of competent jurisdiction determines that a term or condition in this Settlement Agreement does violate any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, the applicable Archdiocese Signatory Party shall be relieved of such term or condition, but the scope and finality of the releases, injunctions, and buybacks set forth in this Settlement Agreement shall not be affected or modified.

8.5    This Settlement Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.6    This Settlement Agreement may be modified only by a written amendment signed by all of the Parties, and no waiver of any provision of this Settlement Agreement or of a breach

thereof shall be effective unless expressed in a writing signed by the waiving Party. The waiver by any Party of any of the provisions of this Settlement Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach. Any change or modification of this Agreement that would result in a material adverse change to the rights of the Abuse Claimants or Trust shall require the consent of the Creditors' Committee (if at the time of the proposed change or modification a Trustee has not been appointed) or Settlement Trustee (if at the time of the proposed change or modification a Trustee has been appointed and approved), as applicable, which consent shall not be unreasonably withheld.

8.7    By entering into this Settlement Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Settlement Agreement. No part of this Settlement Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Settlement Agreement. All actions taken and statements made by the Parties or by their representatives relating to this Settlement Agreement or participation in this Settlement Agreement, including its development and implementation, shall be without prejudice or value as precedent.

8.8    This Settlement Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession regarding liability, culpability, wrongdoing, or insurance coverage. All related discussions, negotiations, and all prior drafts of this Settlement Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. Any evidence of the negotiations or discussions associated with this Settlement Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.8, in (i) an action or proceeding to enforce the terms of this Settlement Agreement, including any use as set forth in Section 7.1.1, or (ii) any possible action or proceeding between the Insurer Released Parties and any reinsurers. This Settlement Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Insurer Released Parties' obligations under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer.

8.9    None of the Parties shall make any public statements or disclosures (i) regarding another Party's rationale or motivation for negotiating or entering into this Settlement Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued or determined by agreement or a court of competent jurisdiction to have been issued by the Insurer Released Parties, including handling of or involvement in connection with any claims asserted thereunder.

8.10    Neither this Settlement Agreement nor the rights and obligations set forth in this Settlement Agreement shall be assigned without the prior written consent of the other Parties.

447

8.11    This Settlement Agreement was jointly drafted by the Parties, and the wording of this Settlement Agreement was reviewed by legal counsel for each of the Parties, and each of them had sufficient opportunity to propose and negotiate changes prior to its execution. The language of all parts of this Settlement Agreement shall in all cases be construed as a whole according to its meaning and not strictly for or against any Party.

8.12    Section titles and headings contained in this Settlement Agreement are included only for ease of reference and shall have no substantive effect.

8.13    All notices, demands, or other communication to be provided pursuant to this Settlement Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other Entity or address as any of them may designate in writing from time to time:

If to the Debtor or Reorganized Debtor:

Mark A. Mintz
Samantha A. Oppenheim
Jones Walker LLP
Telephone: 504-582-8368
Telephone: 504-582-8641
Email: mmintz@joneswalker.com
Email: soppenheim@joneswalker.com

If to an Archdiocese Signatory Party other than a Debtor Party:

    As set forth on Plan Exhibit B-2.

If to Insurer or the Insurer Released Parties:

Tancred Schiavoni
Emma Jones
O'Melveny & Myers LLP
Telephone: 212-326-2267
Telephone: 972-360-1913
Telephone: 832-254-1536
Email: tschiavoni@omm.com
Email: eljones@omm.com
Email: jjilovec@omm.com

If to the Settlement Trust:

Donald C. Massey
Couhig Partners, LLC
1100 Poydras Street, Suite 3250
New Orleans, Louisiana 70163
Telephone: (504) 599-5777
Email: dmassey@couhigpartners.com

with copies to:

Andrew W. Caine
Pachulski, Stang, Ziehl & Jones LLP
10100 Santa Monica Blvd, Suite 1300
Los Angeles, CA 90067
Telephone: 310-277-6910
Email: acaine@pszjlaw.com

8.14    This Settlement Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument. This Settlement Agreement may be executed and delivered by facsimile, e-mail, or other electronic image, which facsimile, e-mail, or other electronic image counterparts shall be deemed to be originals.

8.15    Nothing contained in this Settlement Agreement shall be deemed or construed to constitute (i) an admission by the Insurer Released Parties that the Archdiocese Bound Parties, or any other Entity, was or is entitled to any insurance coverage under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by the Insurer Released Parties or as to the validity of any of the positions that have been or could have been asserted by the any of the Archdiocese Bound Parties, (ii) an admission by any of the Archdiocese Bound Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by the Insurer Released Parties or any Claims that have been or could have been asserted by the Archdiocese Bound Parties against the Insurer Released Parties, or (iii) an admission by the Archdiocese Bound Parties or the Insurer Released Parties of any liability whatsoever with respect to any of the Abuse Claims.

8.16    The Parties to this Settlement Agreement, all of the Entities included in the definition of "Insurer Released Parties," and the Settlement Trust are intended beneficiaries of this Settlement Agreement. Except as set forth in the preceding sentence or otherwise set forth in this Settlement Agreement, there are no third-party beneficiaries of this Settlement Agreement.

8.17    The Archdiocese Signatory Parties and the Insurer Released Parties shall each be responsible for their own fees and costs incurred in connection with the Bankruptcy Case, this Settlement Agreement, and the implementation of this Settlement Agreement, except as specifically set forth herein (including in Section 7).

8.18    The following rules of construction shall apply to this Settlement Agreement:

8.18.1  Unless the context of this Settlement Agreement otherwise requires: (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Settlement Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.18.2  References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Settlement Agreement.

8.18.3  The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Settlement Agreement when the stated intent is not achieved.

8.19   The Bankruptcy Court in the Bankruptcy Case shall retain jurisdiction to interpret and enforce the provisions of this Settlement Agreement, which shall be construed in accordance with Louisiana law without regard to conflicts of law principles thereof.  The Insurer Released Parties do not, by virtue of this Section 8.19 or any other provision in this Settlement Agreement, consent to the Bankruptcy Court's jurisdiction as to any other matter.

8.20   This Settlement Agreement and each Debtor Party's obligations under this Settlement Agreement shall be binding on each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) and shall survive the entry of the Plan Confirmation Order; provided, however, after the occurrence of the Bankruptcy Plan Effective Date, recourse for all obligations, other than those set forth in Sections 6.5, 6.7, and 7 hereof or a remedy of specific performance, shall be to the Settlement Trust; provided further, however, if specific performance is not available, each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) may be held liable for an intentional breach of a representation in this Agreement or their bad faith material breach of this Agreement, and if liability on any such ground is established, then recourse may be had directly against the Debtor Party, Reorganized Debtor, and/or Reorganized Additional Debtor(s) responsible.

8.21   The obligations of the Parties herein, other than those conditioned upon the Settlement Agreement Effective Date, shall be binding upon execution hereof by the Parties.

8.22   Nothing in this Settlement Agreement will prevent Insurer from allocating the Settlement Amount among the Archdiocese Policies at Insurer's discretion.

8.23   If any provision of this Settlement Agreement, or the application thereof, shall for any reason or to any extent, be construed to be invalid or unenforceable, the remainder of this Settlement Agreement, and the application of such provision to other circumstances, shall be interpreted so as to best effect the intent of the Parties, unless such determination of invalidity or unenforceability deprives any Party of the substantial benefit of its bargain.

8.24   The Parties agree that all matters relating to the negotiation and terms of this Settlement Agreement (including by way of example and not limitation, all prior drafts, exchanges

450

of terms, and related discussions or correspondence) shall be confidential and are not to be disclosed except by order of court or consent of the Parties in writing. This Section 8.24 does not prevent or prohibit the Parties from publicly filing on the docket in the Bankruptcy Case the final, executed copy of this Settlement Agreement.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

### The Roman Catholic Archdiocese of New Orleans

Signed: _____

_____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**U.S. Fire/International**

Signed: _____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**All Archdiocese Signatory Parties**
**Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title:        **Their Authorized Signer**_____

Date:        _____

*[Signatures Continue on Adjacent Pages]*

Case 20-10846 Doc 4284-2 Filed 10/27/25 Entered 10/27/25 16:24:54 Plan Supplement
7.1(a) Pt. 3 - U.S. First International Settlement Agreement Page 41 of 91

Case 20-10846 Doc 3255-1 Filed 11/07/25 Entered 11/07/25 19:27:53 Part Supplemental Documents Settled of 1339

**Exhibit A**

**Sale Order**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 20-10846 (MSG)** |
| | § | |
| **THE ROMAN CATHOLIC CHURCH** | § | **CHAPTER 11** |
| **OF THE ARCHDIOCESE OF NEW** | § | |
| **ORLEANS,** *et al.,*[1] | § | **SECTION A** |
| | § | |
| **DEBTORS.** | § | **COMPLEX CASE** |
| | § | |

### ORDER (I) APPROVING UNITED STATES FIRE INSURANCE COMPANY'S AND INTERNATIONAL INSURANCE COMPANY'S SETTLEMENT AGREEMENT, RELEASE AND BUYBACK, (II) APPROVING THE SALE OF THE ARCHDIOCESE POLICIES FREE AND CLEAR, (III) ENJOINING CLAIMS, AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated July 29, 2025 [D.E. 4181] and supplemented by the filing of the revised Settlement Agreement (as defined below) on October 27, 2025 [D.E.[*]] ("Approval Motion") of The Roman Catholic Church of the Archdiocese of New Orleans, the lead debtor and debtor-in-possession (the "Debtor" or "Archdiocese") and the other debtors and debtors-in-possession[2] (the "Additional Debtors" and, together with the Archdiocese, the "Debtor Parties") in the above-captioned chapter 11 cases, by and through their respective counsel, for entry of an order (this "Order") approving the settlement agreement, releases, insurance policy buyback, and related injunction-in-aid ("Settlement") by and among the Archdiocese, the Additional Debtors, the other Archdiocese Signatory Parties, the Creditors' Committee, and United States Fire Insurance Company ("U.S. Fire"), International Insurance Company ("International"), and Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company

---

[1]    The last four digits of the Debtor's federal tax identification number is 8966.

[2]    In connection with the Plan, the Catholic Entities listed on  Plan **Exhibit B-1** (the "**Additional Debtors**") filed individual chapter 11 cases. The Plan is a combined joint Plan for the Archdiocese and the Additional Debtors, and the Approval Motion is deemed to have been filed (and this Order is entered) in each Additional Debtor's bankruptcy case for purposes of the relief requested herein.

4937-5901-2438v.19

individually and, to the extent that policies issued by U.S. Fire and/or International were novated to or assumed by either or both of them (collectively, "Insurer" and, collectively with all the foregoing, the "Parties"), pursuant to Sections 105(a) and 363 of Title 11 of the United States Code ("Bankruptcy Code") and Rules 2002(a)(2), 6004, and 9019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), in each case as described in the Approval Motion and the *Settlement Agreement, Release, and Policy Buyback* attached to this Order as **Exhibit 1** (the "Settlement Agreement");[3] and the Bankruptcy Court having reviewed the Approval Motion and the Settlement Agreement; and it appearing that due and adequate notice of the Approval Motion and Settlement Agreement having been given to all Entities entitled thereto, and that no other or further notice need be given; and the Bankruptcy Court on November 17, 2025 at 9:00 AM having held a hearing (the "Sale Hearing") to consider the relief requested in the Approval Motion; and upon the record of the Sale Hearing; and, after due deliberation, including, without limitation, for the reasons stated by the Bankruptcy Court on the record of the Sale Hearing, it appearing that the relief requested in the Approval Motion and granted herein is in the best interests of the Debtor Parties' estates (the "Estates"), their creditors, and other parties in interest; and good sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.      This Bankruptcy Court has jurisdiction over the Approval Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of this case and the Approval Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

2

B.     The statutory predicates for the relief sought in the Approval Motion are Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007. 9008 and 9019, and Rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Louisiana.

C.     It is necessary and appropriate for the Bankruptcy Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Settlement Agreement, and to adjudicate, if necessary, to the extent provided under 28 U.S.C. § 1334(b), any and all disputes arising from or relating to the Settlement Agreement or this Order.

D.     Proper, timely, adequate and sufficient notice of the Sale Hearing and Approval Motion and the relief requested therein, including, without limitation, the Settlement and the transactions described in the Settlement Agreement, including, without limitation, issuance of the injunction-in-aid referenced in the Settlement Agreement and the Approval Motion (all such transactions being collectively referred to, for convenience, as the "Sale Transaction") has been provided by the Debtor Parties in accordance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules to all interested Entities, including, without limitation the parties listed on **Schedule 3** of the Settlement Agreement, through service of the Confirmation Hearing Notice (as defined in the Plan) in accordance with the Disclosure Statement Order (also as defined in the Plan).

E.     Notice of the Approval Motion was provided through publication of the Additional Debtors' Abuse Claims Bar Date Publication Notice (**Plan Exhibit G**) in daily and community newspapers throughout Louisiana.

F.     The notices described above were good, sufficient, and appropriate under the circumstances, and no other notice of the Approval Motion or Sale Hearing is required.

3

G.      The disclosures made by the Debtor Parties concerning the Settlement Agreement, the Sale Transaction, and the Sale Hearing were good, complete, and adequate.

H.      The Unknown Abuse Claims Representative has consented to, and approved of the Settlement Agreement and Sale Transaction on behalf of Unknown Abuse Claims in connection with the treatment of such Claims under the Plan.

I.      A reasonable opportunity to object or be heard with respect to the Approval Motion and the relief requested therein has been afforded to all interested Entities.

J.      The Archdiocese Signatory Parties, on their own behalf and on behalf of the Archdiocese Bound Parties, as applicable, have duly executed the Insurance Settlement Agreement by their duly authorized representative, agent and/or attorney in fact, and have full corporate power and authority to consummate the Sale Transaction pursuant to the Settlement Agreement and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Settlement Agreement, are required for the Archdiocese Bound Parties to consummate the Sale Transaction.

K.      The Debtor Parties have demonstrated (i) good, sufficient, and sound business purpose and justification and compelling circumstances for the Sale Transaction pursuant to Section 363(b) of the Bankruptcy Code and (ii) that the Sale Transaction is fair, reasonable, and in the best interests of their Estates and creditors pursuant to Bankruptcy Rule 9019. Among other things, the Debtor Parties have demonstrated that: the Settlement Agreement, and closing thereon, is necessary and appropriate to realize the value of the Purchased Property (as defined below) and maximize the value of their Estates; the probability of success for their Estates in litigation over the matters resolved by the Settlement Agreement is uncertain; litigation of the matters resolved by the Settlement Agreement would be complex and costly to their Estates; and the Settlement

4

459

Amount is within the reasonable range of potential litigation outcomes. As used herein, "Purchased Property" means, collectively, all right, title and interest (including "Interests" as defined below) in and to the Archdiocese Policies issued by Insurer and the Related Insurance Claims and Coverage Claims; [**Intentionally Omitted.**] The Sale Transaction constitutes a reasonable and sound exercise of the Debtor Parties' business judgment and their powers and duties under applicable law and should be approved. Approval of the Settlement Agreement and consummation of the Sale Transaction are in the best interests of the Debtor Parties' Estates, their creditors (specifically including the Abuse Claimants of the Debtor Parties), and other parties-in-interest, including because the proceeds of and from the Sale Transaction will benefit Abuse Claimants.

L.      The Settlement Agreement was negotiated, proposed, and entered into without collusion, in good faith, and from arm's length bargaining positions. Without limiting the foregoing, the Settlement Agreement resulted from a lengthy mediation that proceeded pursuant to a prior order of the Bankruptcy Court. Insurer is not an "insider" or "affiliate" (as those terms are defined in the Bankruptcy Code) of any of the Debtor Parties. None of the Archdiocese Bound Parties or Insurer have engaged in any conduct that would: (i) cause or permit the avoidance of the Settlement Agreement or the consummation of the Sale Transaction under Section 363(n) of the Bankruptcy Code; (ii) cause or permit the imposition of any costs or damages (including without limitation attorneys' fees or punitive damages) under Section 363(n) of the Bankruptcy Code; or (iii) prevent the application of Section 363(m) of the Bankruptcy Code. The releases, injunctions, policy buyback, and all other components of the Sale Transaction comply with the Bankruptcy Code and all applicable non-bankruptcy law.

M.      Pursuant to the Settlement Agreement and to the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer have consented to the assignment of

5

460

the Non-Debtor Catholic Entities' Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under the Settlement Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Interests of any Entity in such Archdiocese Policies (the "Non-Debtor Catholic Entity Policy Sale").

N.    Insurer is a good faith purchaser of the Purchased Property under Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, in that, among other things: (i) all payments to be made by or to Insurer, and other agreements or arrangements entered into by Insurer, including without limitation any escrow agreement pertaining to the payment of the Settlement Amount, in connection with the Sale Transaction have been disclosed; (ii) Insurer neither induced nor caused the Debtor Parties' chapter 11 filings; (iii) the negotiation and execution of the Settlement Agreement and any other agreements or instruments related thereto was in good faith, the arm's length transaction between Insurer and the other Parties was the product of mediation, and all Parties to the Settlement Agreement were, or had the opportunity to be, represented by counsel; and (iv) Insurer has not violated Section 363(n) of the Bankruptcy Code by any action or inaction. Insurer has at all times acted in good faith with respect to the Settlement Agreement and will continue to be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale Transaction.

O.    The terms and conditions of the Settlement Agreement are fair and reasonable. The Settlement Amount provided by Insurer pursuant to the Settlement Agreement (i) is fair and

reasonable; (ii) monetizes the Purchased Property at the highest and best amount; (iii) will provide a higher and more certain recovery for the Debtor Parties' creditors than would be provided by any other practical available alternative given the complexity, cost, and uncertainty of such alternatives; (iv) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (v) constitutes reasonably equivalent value (as defined in Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law. The Settlement Amount is within the reasonable range of potential litigation outcomes, and the Debtor Parties' determination to accept the Settlement Amount and otherwise enter into the Settlement Agreement is a valid and sound exercise of their business judgment and consistent with the Debtor Parties' fiduciary duties. The releases to be made pursuant to the Settlement Agreement, including without limitation the releases of the Archdiocese Bound Parties and the Insurer Released Parties, are appropriate and should be approved.

P.      Insurer: (i) is not a mere continuation of any of the Archdiocese Bound Parties or the Estate of any of the Debtor Parties, nor is there any continuity of enterprise between Insurer and the Debtor Parties or Insurer and any of the other Archdiocese Bound Parties; (ii) is not holding itself out to the public as a continuation of any of the Archdiocese Bound Parties; and (iii) is not a successor to the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties for any purpose, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of Insurer and any of the Archdiocese Bound Parties.

Q.      The Settlement Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United

7

462

States, any state, territory, possession, or the District of Columbia. Neither Insurer nor any of the Archdiocese Bound Parties are fraudulently entering into the Sale Transaction.

R.     The transfer of the Purchased Property to Insurer (i) does not constitute an avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law and (ii) does not and will not subject Insurer to any liability whatsoever with respect to the Debtor Parties' operation prior to the closing of the Sale Transaction (i.e., the occurrence of both the Settlement Agreement Effective Date and payment[4] of the Settlement Amount by Insurer to the Settlement Trust or Escrow Agent pursuant to the terms of Insurer's Settlement Agreement) (the "Closing").

S.     Insurer has agreed to purchase the Purchased Property pursuant to its Settlement Agreement and this Order; Insurer has not agreed to purchase, and is not purchasing, any other assets of the Estate of any of the Debtor Parties. Insurer has not agreed to assume, and after Closing shall have no obligations with respect to, any liabilities of the Archdiocese Bound Parties. Without limiting the generality of the foregoing, Insurer: (i) is not assuming and shall have no liability for any Claims arising from or relating to Abuse, the Purchased Property, or the Bankruptcy Case; and (ii) is not assuming and shall have no liability with respect to the Archdiocese's or any other Archdiocese Bound Party's obligations to Abuse Claimants, any other creditors, future claimants (including without limitation Unknown Abuse Claimants), or the Archdiocese's or any Archdiocese Bound Party's employees, in each case, by reason of the purchase of the Purchased Property under the Settlement Agreement.

---

[4]  For the avoidance of doubt, all references to "payment" or "delivery" of the Settlement Amount by Insurer herein shall encompass all transfers of the Settlement Amount contemplated by the Settlement Agreement, including without limitation funding and transfer of funds to the Settlement Trust via letters of credit or escrow accounts.

T.      The Purchased Property constitutes property of the Debtor Parties' Estates, and the Archdiocese Bound Parties are the lawful owner of the Purchased Property and hold good title thereto. The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement will be a legal, valid, binding, and effective transfer of the Purchased Property, and will vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property, in each case free and clear of all Interests (as defined below, including, without limitation, any Interests of the Archdiocese Bound Parties, Abuse Claimants, and holders of Direct Action Claims). Upon Closing, Insurer shall have no liability for any Claims against or liabilities of the Debtor Parties, their Estates, or the other Archdiocese Bound Parties. Without limiting any of the foregoing, the Archdiocese, the Archdiocese Signatory Parties, and Insurer have agreed that, upon Closing: (i) the Purchased Property shall be deemed void *ab initio*, terminated, extinguished, and of no further force and effect; and (ii) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

U.      Pursuant to §§ 363(f) and 105(a) of the Bankruptcy Code, and subject to the terms and conditions set forth in the Settlement Agreement, and upon Closing, without the need for further action, the Debtor Parties shall be deemed to have sold, transferred and conveyed the Purchased Property to the Insurer, and the Insurer shall be deemed to have purchased from the Debtor Parties, all right title and interest in and under the Purchased Property, free and clear of all "Interests" of any Entity of any kind or nature whatsoever, to the fullest extent permitted under §§ 363(b) and (f) of the Bankruptcy Code, with such "Interests" including: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention

9

agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, Subject Interests, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and

10

(d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property. Without limiting the generality of the foregoing and without finding that any Entity has any Interest in the Archdiocese Policies: (i) any Entity with Interests (if any) in or with respect to the Purchased Property who did not object, or who withdrew their objections to the Sale Transaction or the Approval Motion have waived their right to object to the sale of the Purchased Property free and clear of such Entity's Interests in the Purchased Property pursuant to Section 363(f)(2) of the Bankruptcy Code; and (ii) any such Entity with Interests in or with respect to the Purchased Property who objected to the Approval Motion and did not withdraw any such objection (a) are the holders of Interests subject to *bona fide* dispute under Bankruptcy Code Section 363(f)(4) and/or (b) can be compelled to accept a monetary satisfaction of their Interests within the meaning of Section 363(f)(5) of the Bankruptcy Code.

V.     If the sale of the Purchased Property were not free and clear of all Interests, including without limitation all Abuse Claims, Direct Action Claims, and Coverage Claims, or if the Insurer Released Parties would, or in the future could, be liable for any of the Interests, Insurer would not have entered into the Settlement Agreement and would not consummate the Sale Transaction or pay the Settlement Amount, thus adversely affecting the Debtor Parties, their

11

Estates, and their creditors (including, without limitation, the Abuse Claimants), as well as the other Archdiocese Bound Parties.

W.     Issuing a supplemental injunction under Section 105(a) of the Bankruptcy Code as provided herein is essential to give effect to the sale of the Purchased Property to Insurer and this Order's approval of such sale free and clear of Interests pursuant to Section 363(f) of the Bankruptcy Code. The Sale Injunction set forth in Paragraph 23 below not only is a necessary prerequisite for Insurer's assent to the terms and conditions of its Settlement Agreement, such that Insurer will not consummate the Sale Transaction or pay its Settlement Amount in the absence of such an injunction from this Bankruptcy Court, but also is warranted to ensure compliance with this Order. Likewise, Insurer will not consummate the Sale Transaction or pay its Settlement Amount without the benefit of the releases contained in the Settlement Agreement and approval thereof by the Bankruptcy Court.

X.     Neither the Settlement Agreement nor the Sale Transaction constitute a *sub rosa* chapter 11 plan. The Settlement Agreement does not impermissibly restructure the rights of the Debtor Parties' creditors nor impermissibly dictate a chapter 11 plan for the Debtor Parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.     The Approval Motion, and the relief sought therein (including without limitation the approval of the Settlement Agreements and the Sale Transaction) is GRANTED and APPROVED, in all respects as set forth herein.

2.     The findings of fact set forth above and conclusions of law stated herein, in addition to any findings of fact and conclusions of law stated by the Bankruptcy Court at the Sale Hearing, shall constitute this Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the Approval Motion pursuant to Bankruptcy Rule

12

9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.      Any and all objections, if any, to the Approval Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case the Entity asserting the objection or reservation of rights is enjoined from taking any action against the Insurer Released Parties or the assets or property of any Insurer Released Parties to recover any Claim or Interest held by such objecting Entity. Those parties who did not object or who withdrew their objections to the Approval Motion are deemed to have consented to the relief granted herein, pursuant to Section 363(f)(2) of the Bankruptcy Code.

### Approval of the Settlement Agreement

4.      The Settlement Agreement is approved in its entirety, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Without limiting the generality of the foregoing, the settlement and releases of Claims as set forth in the Settlement Agreement is hereby approved pursuant to Bankruptcy Rule 9019. All factors set forth in *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey* (*In re Cajun Elec. Power Coop.*), 119 F. 3d 349, 356 (5th Cir. 1997), either weigh in favor of the Settlement Agreement or do not apply.

5.      Pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, the Non-Debtor Catholic Entity Policy Sale, free and clear of all Interests of any Entity in the Archdiocese Policies, is hereby approved.

6.      Pursuant to Section 363(b) of the Bankruptcy Code, each of the Parties is authorized to consummate the Sale Transaction under and in accordance with the terms and conditions of the Settlement Agreement, and the Archdiocese Bound Parties shall at all times act in accordance with the terms thereof.

7.      Any representative, agent or attorney in fact of the Archdiocese Signatory Parties is authorized to execute any other documentation and perform such other ministerial tasks as may be reasonably necessary to effectuate the Settlement Agreement and the Sale Transaction on behalf of the Archdiocese Bound Parties, including without limitation, any bill of sale substantially in the form attached to the Settlement Agreement as **Exhibit B**.

8.      Subject to all of the terms and conditions of the Settlement Agreement, upon Closing, the Archdiocese Bound Parties and Insurer shall be deemed to have granted the releases as set forth in the Settlement Agreement.

9.      The Parties are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Settlement Agreement, together with all additional instruments and documents that may be reasonably necessary, convenient, or desirable to implement the Settlement Agreement and consummate the Sale Transaction pursuant thereto and effectuate the provisions of this Order and the transactions approved hereby, and to take all further actions as may be requested by Insurer for the purpose of assigning, transferring, granting, conveying, and conferring to Insurer or reducing to Insurer's possession, the Purchased Property, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Settlement Agreement.

10.      Insurer is authorized and directed to pay the Settlement Amount under and subject to the satisfaction of all terms and conditions of the Settlement Agreement.

11.     The Settlement Amount provided by Insurer for the Purchased Property (i) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

12.     None of the Insurer Released Parties shall be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its or their rights or remedies under the Settlement Agreement or any other document related to the Settlement Agreement or the Sale Transaction. The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order; *provided*, *however*, that this Bankruptcy Court shall retain jurisdiction over any and all disputes with respect thereto.

13.     This Order shall be binding in all respects upon: (a) the Debtor Parties and their Related Parties; (b) the Debtor Parties' Estates; (c) the other Archdiocese Bound Parties; (d) all creditors of the Debtor Parties; (e) all Abuse Claimants and holders of Direct Action Claims; (f) all holders of Interests whether known or unknown against or on all or any portion of the Purchased Property; (g) any Non-Settling Insurer; (h) the Insurer Released Parties; (i) the Purchased Property; (j) the Unknown Claims Representative; (k) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code; and (l) all Entities receiving notice (or deemed to have received notice pursuant to this Order) of the Approval Motion or the Sale Hearing, including without limitation all Entities

15

listed on **Schedule 3** to the Settlement Agreement. The Settlement Agreement shall be binding in all respects upon: (x) the Debtor Parties, their Estates, and their Related Parties; (y) the Archdiocese Bound Parties; and (z) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code.

### Transfer of Assets

14.    The conditions of Section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Archdiocese may sell the Purchased Property free and clear of any Interests therein.

15.    Pursuant to Sections 105 and 363(b) and (f) of the Bankruptcy Code, Bankruptcy Rule 9019, applicable Louisiana State law, the testimonial and other documentary evidence filed in support of the Approval Motion, and the record of the Sale Hearing, the Archdiocese has set forth the legal authority necessary to support this Bankruptcy Court's findings herein.

16.    Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Property and the Archdiocese Bound Parties' rights, title, and interest therein shall upon Closing be transferred to Insurer, free and clear of all Interests (including without limitation the Interests of any of the Archdiocese Bound Parties), and all such Interests are unconditionally and forever released and extinguished as against the Purchased Property. Without limiting the generality of the foregoing, the sale of the Purchased Property under the Settlement Agreement shall be free and clear of all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims,

16

471

Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property.

17.     Upon the Closing, (a) all of the Archdiocese Bound Parties', the Debtor Parties' Estates', and the Settlement Trustee's rights under and with respect to the Purchased Property, if any, shall be permanently and irrevocably extinguished as if the Archdiocese Policies had never been issued and (b) the Insurer Released Parties shall be entitled to all of the protections afforded by §363(m) of the Bankruptcy Code.

18.     Upon Closing, all Entities (and their respective successors and assigns), including but not limited to all governmental, tax, and regulatory authorities, Archdiocese Bound Parties, Non-Settling Insurers, Abuse Claimants, Direct Action Claimants, trade and other creditors, and any Entities holding Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) against, in, or with respect to the Purchased Property, including, without limitation, such Interests arising or accruing under or out of, in connection with, or in any way relating to the transfer of the Purchased Property to Insurer, hereby are forever barred, estopped, and permanently enjoined from asserting such Person's or Entity's Interests against the Purchased Property, the Insurer Released Parties, or the assets or property of any Insurer Released Parties. Effective upon Closing, none of the Insurer Released Parties shall have any liability for any Claims (a) against the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties or (b) that arise under or related in any way or in respect of the Purchased Property.

19.     The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement constitutes a legal, valid, and effective transfer of the Purchased Property, and shall

17

472

vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property. Upon Closing, the Archdiocese Policies shall be terminated and no longer in force or effect, exhausted in retrospect as to all coverages, and all Interests that the Archdiocese or any other Person or Entity (including without limitation any of the other Archdiocese Bound Parties) may have had, may presently have, or may in the future have, in such Purchased Property are released and extinguished, and all such Entities (including without limitation the Archdiocese Bound Parties) hereby are forever barred, estopped, and permanently enjoined from asserting any such Interest against the Purchased Property and/or any of the Insurer Released Parties. Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent constitutes full and complete performance of any and all obligations under the Purchased Property, including without limitation any performance owed to the Archdiocese Bound Parties, and all limits of coverage under the Archdiocese Policies, including per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

20.     Upon occurrence of the Closing:

(a)     all Interests the Archdiocese Bound Parties may have had, may presently have, or in the future may have in the Purchased Property, as applicable, are released pursuant to the terms of the Settlement Agreement; and

(b)     the Archdiocese Bound Parties accept Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent in full and complete satisfaction of Insurer's past, present, and future obligations, including, without limitation, any obligations to any of the Archdiocese Bound Parties under such Purchased Property or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any

18

473

nature whatsoever arising out of or related in any way to such Purchased Property (including Coverage Claims), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, direct or indirect, and regardless of whether such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, or otherwise.

## No Successor Liability

21.     The transfer of the Purchased Property to Insurer shall not result in any Insurer Released Parties or the Purchased Property having any of the following: (a) any liability or responsibility for Interests in or Claims against the Archdiocese Bound Parties or any of their Related Parties; (b) liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any Claims or Interests; or (c) any liability or responsibility to the Archdiocese Bound Parties except as is expressly set forth in the Settlement Agreement.

22.     Without limiting the generality of the foregoing, none of the Insurer Released Parties shall have any successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability, *de facto* merger or joint venture, mere continuation or substantial continuity, whether known or unknown as of Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between the Archdiocese Bound Parties and any non-debtor subsidiary or affiliate (including, without limitation, any other Archdiocese Bound Party), liabilities relating to or arising from any environmental laws, and any taxes arising, accruing, or

19

payable under, out of, in connection with, or in any way relating to the Purchased Property prior to Closing.

<div align="center">

**Sale Injunction**

</div>

23.     Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, and in consideration of the undertakings of Insurer pursuant to the Settlement Agreement, including Insurer's purchase of the Purchased Property free and clear of all Claims and Interests pursuant to Section 363(f) of the Bankruptcy Code as provided herein, any and all Entities that have held, now hold, or who may in the future hold any Claims or Interests (including without limitation all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Abuse Claimants, holders of Direct Action Claims, Perpetrators, Non-Settling Insurers, the Archdiocese Bound Parties, and all others holding Claims or Interests of any kind or nature whatsoever, including, without limitation, those Claims released or to be released pursuant to the Settlement Agreement), which Claims or Interests are under, arise out of, relate to, or connect in any way with an Abuse Claim or any of the Purchased Property, including, without limitation, (a) all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property, (b) the payment of any of the Claims identified previously, including, without limitation, Abuse Claims, Direct Action Claims, and Coverage Claims and (c) all other Interests, are hereby permanently stayed, enjoined, barred, and restrained from taking any Action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or

<div align="center">

20

</div>

Interest against any of (x) the Insurer Released Parties, (y) the assets or property of any Insurer Released Parties, or (z) the Purchased Property, including by:

(a)     commencing, conducting, or continuing in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind, in any forum, with respect to any such Claim or Interest, against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(b)     enforcing, levying, attaching, collecting, or otherwise recovering, or seeking to accomplish any of the preceding, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(c)     creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, or seeking to accomplish any of the preceding, any lien of any kind against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(d)     asserting, implementing, or effectuating any such Claim or Interest of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any of the Insurer Released Parties, (B) any of the Insurer Released Parties, or (C) any property or interest in property of any Insurer Released Party; and

(e)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Order.

21

476

The actions described in this Paragraph 23 are "**Enjoined Actions**," and the injunction set forth herein is the "**Sale Injunction**." The Sale Injunction shall be a permanent injunction against the Enjoined Actions and may not be modified, dissolved, or terminated.

24. The Sale Injunction shall be effective upon Closing. The Sale Injunction bars pursuit of the above referenced Claims and/or Interests against the Insurer Released Parties, or the property or assets of each (including, without limitation, the Purchased Property), but against no other person or thing.

25. In a successful action to enforce this Sale Injunction in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

26. The Sale Injunction shall not enjoin (a) the right of any Person or Entity against the Settlement Trust or a Non-Settling Insurer, or (b) the Settlement Trustee from enforcing the Settlement Trust Documents.

### Preserved Coverage

27. [**Intentionally Omitted.**]

### Additional Provisions

28. From and after the date hereof, no Person or Entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreements and this Order.

29. This Bankruptcy Court hereby retains jurisdiction, regardless of whether a chapter 11 plan has been confirmed in the Bankruptcy Case and consummated and irrespective of the provisions of any such plan or order confirming such plan, to enforce and implement the terms and

22

provisions of the Settlement Agreement, all amendments thereto, any waivers and consents thereunder, and of any agreement(s) executed in connection therewith in all respects, including but not limited to retaining jurisdiction to: (a) compel delivery of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreement; (b) resolve any dispute, controversy, or claim arising under or related to the Settlement Agreement, or the breach thereof; and (c) interpret, implement, and enforce the provisions of this Order and resolve any disputes related thereto.

30.     Nothing contained in any plan confirmed in the Bankruptcy Case or any order of this Bankruptcy Court confirming such plan shall conflict with or derogate from the provisions of the Settlement Agreement or the terms of this Order.

31.     This Order shall not limit or preclude the entry or effectiveness of any additional releases or injunctions that may be granted protecting the Insurer Released Parties and/or the assets or property of any Insurer Released Parties in connection with, or as part of, any order confirming a chapter 11 plan.

32.     The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Settlement Agreement be authorized and approved in its entirety.

33.     The transactions contemplated by the Settlement Agreement are undertaken by Insurer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code. Insurer is a good faith purchaser of the Purchased Property and is entitled to all the protections afforded by Section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction to Insurer.

34.     Insurer has given substantial consideration under the Settlement Agreement for the benefit of the Debtor Parties, their Estates, and creditors, along with the other Archdiocese Bound Parties. Such consideration given by Insurer constitutes valid and valuable consideration for the Purchased Property and the releases set forth in the Settlement Agreement, including, without limitation, the extinguishment and release of all Interests pursuant to this Order. The consideration provided by Insurer for the Purchased Property under the Settlement Agreement is fair and reasonable; accordingly, the purchase may not be avoided under Section 363(n) of the Bankruptcy Code.

35.     The terms and provisions of the Settlement Agreement and this Order shall be binding notwithstanding any subsequent appointment of any trustee(s) examiner(s) or receiver(s) under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtor Parties, their Estates, their creditors, or any examiner(s) or receiver(s).

36.     The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Bankruptcy Court that the Settlement Agreement and the Parties' performance thereof be authorized and approved in its entirety.

37.     Pursuant to the provisions of the Settlement Agreement, each of the Archdiocese Bound Parties and Insurer shall be authorized to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper, or advisable under applicable law or otherwise to consummate and make effective the transactions contemplated by the Settlement Agreement.

24

38.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39.     All obligations of the Debtor Parties under the Settlement Agreement shall be deemed administrative expenses of their Estates under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

40.     Each and every federal, state, and local governmental agency or department is hereby directed to accept this Order in lieu of any document necessary to consummate the transactions contemplated by the Settlement Agreement and this Order.

41.     The Settlement Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the Parties, in a writing signed by the Parties, and in accordance with the terms thereof, without further order of this Bankruptcy Court; *provided* that such modification, amendment, or supplement does not constitute a material change to the relief sought in the Approval Motion and approved by this Order.

**IT IS SO ORDERED.**

New Orleans, Louisiana, _____, 2025

<div style="text-align:center; margin-top:2em;">

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

</div>

Case 20-10846 Doc 4294-2 Filed 10/27/25 Entered 10/27/25 16:27:54 Exhibit
Supplemental Settlement Page 481 of 1339

**Exhibit B**

**Bill of Sale**

## BILL OF SALE AND ASSIGNMENT

**THIS BILL OF SALE AND ASSIGNMENT** is made and entered into as of
_____, 2025, by and between The Roman Catholic Archdiocese of New
Orleans and its Bankruptcy Estate (the "**Archdiocese**" or "**Debtor**"); the Additional Debtors and
their respective Bankruptcy Estates, Non-Debtor Catholic Entities (collectively, "**Archdiocese
Signatory Parties**"); and United States Fire Insurance Company ("**U.S. Fire**"), International
Insurance Company ("**International**"), and Westchester Fire Insurance Company and
Westchester Surplus Lines Insurance Company individually and, to the extent that policies
issued by U.S. Fire and/or International were novated to or assumed by either or both of them
(collectively, "**U.S. Fire/International**" or "**Insurer**"). All capitalized terms used herein
without definition have the meanings set forth in the Settlement Agreement, Release, and Policy
Buyback by, between, and among The Archdiocese, the other Archdiocese Signatory Parties, and
Insurer, as amended or modified (the "**Settlement Agreement**").

## W I T N E S S E T H:

WHEREAS, pursuant to the Settlement Agreement, the Archdiocese Signatory Parties
have, on behalf of themselves and all other Archdiocese Bound Parties, agreed to sell and/or
convey any and all right, title, and interest (including all Subject Interests) in and to the
Purchased Property (as defined in the Approval Order), and Insurer has agreed to purchase and
buy-back the Purchased Property, in consideration of the payment of a purchase price of
$5,000,000 (the "**Purchase Price**") and other good and valuable consideration as provided in
and under the Settlement Agreement and Plan;

WHEREAS, the Approval Order, as filed at Docket No. [_], has approved the Sale
Transaction (as defined in the Approval Order) and found that the Purchase Price is a fair and
reasonable price for the Purchased Property;

NOW, THEREFORE, in consideration of the payment of the Purchase Price by Insurer as
set forth in the Settlement Agreement, and in accordance therewith and with Approval Order, the
Debtor Parties do hereby sell, transfer, and assign to Insurer, and Insurer does hereby accept, all
of the Archdiocese Bound Parties' right, title, and interest in and to the Purchased Property, and
all Subject Interests therein.

[signatures appear on following pages]

**IN WITNESS WHEREOF**, the parties have executed this Bill of Sale and Assignment by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed: _____

_____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**U.S. Fire/International**

Signed: _____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

484

**All Archdiocese Signatory Parties
Other than the Archdiocese**


Signed: _____


Name Printed: _____

Title:    **Their Authorized Signer**   

Date: _____


*[Signatures Continue on Adjacent Pages]*

**Schedule 1**

**Archdiocese Policies**

The following policies shall be included in the definition of Archdiocese Policies:

| Incept | Expire | Insurer | Policy No. |
|---|---|---|---|
| February 1, 1977 | March 1, 1978 | U.S. Fire Insurance Company | 520 02210 9 |
| March 1, 1978 | February 1, 1979 | U.S. Fire Insurance Company | 522 00084 6 |
| February 1, 1979 | March 1, 1980 | U.S. Fire Insurance Company | 522 007224 3 |
| March 1, 1980 | March 1, 1981 | U.S. Fire Insurance Company | 522 010391 4 |
| March 1, 1981 | February 1, 1982 | International Insurance Company | 522 010882 8 |
| March 1, 1981 | February 1, 1982 | International Insurance Company | 522 010833 7 |
| February 1, 1982 | February 1, 1983 | International Insurance Company | 522 0291231 1 |
| February 1, 1983 | June 30, 1983 | International Insurance Company | 522 029140 2 |

## Schedule 2

### Other Co-Insureds Known to the Archdiocese Signatory Parties

**1.     None**

For the avoidance of the doubt, the following entities are bound by the terms of the Settlement Agreement:[1]

### I.     Archdiocesan Parishes

1.     All Saints Roman Catholic Church, New Orleans, Louisiana

2.     Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana

3.     Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana

4.     Assumption of Mary Roman Catholic Church, Avondale, Louisiana

5.     Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana[2]

6.     Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana

7.     Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana

8.     Blessed Trinity Roman Catholic Church, New Orleans, Louisiana

9.     Christ the King Roman Catholic Church, Gretna, Louisiana

10.     Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana

11.     Divine Mercy Roman Catholic Church, Kenner, Louisiana

12.     Good Shepherd Roman Catholic Church, New Orleans, Louisiana

13.     Holy Family Roman Catholic Church, Franklinton, Louisiana

14.     Holy Family Roman Catholic Church, Luling, Louisiana

15.     Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana

16.     Holy Spirit Roman Catholic Church, New Orleans, Louisiana

17.     Immaculate Conception Roman Catholic Church, Marrero, Louisiana

18.     Immaculate Conception Roman Catholic Church, New Orleans, Louisiana

19.     Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana

20.     Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana

21.     Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana, for itself and as successor to St.

---

[1] Without limiting Section 6.4 of the Settlement Agreement, Insurer does not concede that any of the Entities listed on this schedule are "insureds," "additional insureds," or "protected persons" under its Archdiocese Policies.

[2] Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc.

22. Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana

23. Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana

24. Most Holy Trinity Roman Catholic Church, Covington, Louisiana

25. Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana

26. Our Lady of Grace Roman Catholic Church, Reserve, Louisiana

27. Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana

28. Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana

29. Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana

30. Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana

31. Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana

32. Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana

33. Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana

34. Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana

35. Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana

36. Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana

37. Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana

38. Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana

39. Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana

40. St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana

41. St. Agnes Roman Catholic Church, Jefferson, Louisiana

42. St. Alphonsus Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

43. St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana

44. St. Angela Merici Roman Catholic Church, Metairie, Louisiana

45. St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana

46. St. Anselm Roman Catholic Church, Madisonville, Louisiana

47. St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana

48. St. Anthony of Padua Roman Catholic Church, Luling, Louisiana

49. St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana

50. St. Anthony Roman Catholic Church, Gretna, Louisiana

51.    St. Augustine Roman Catholic Church, New Orleans, Louisiana

52.    St. Benedict Roman Catholic Church, Covington, Louisiana

53.    St. Benilde Roman Catholic Church, Metairie, Louisiana

54.    St. Bernard Roman Catholic Church, St. Bernard, Louisiana

55.    St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana

56.    St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana

57.    St. Christopher Roman Catholic Church, Metairie, Louisiana

58.    St. Clement of Rome Roman Catholic Church, Metairie, Louisiana

59.    St. Cletus Roman Catholic Church, Gretna, Louisiana

60.    St. David Roman Catholic Church, New Orleans, Louisiana

61.    St. Dominic's Roman Catholic Church, New Orleans, Louisiana

62.    St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana

63.    St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana

64.    St. Francis Xavier Roman Catholic Church, Metairie, Louisiana

65.    St. Genevieve Roman Catholic Church, Slidell, Louisiana

66.    St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana

67.    St. Jerome Roman Catholic Church, Kenner, Louisiana

68.    St. Joachim Roman Catholic Church, Marrero, Louisiana

69.    St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana

70.    St. John of the Cross Roman Catholic Church, Lacombe, Louisiana

71.    St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, for itself and as successor to St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc.

72.    St. John the Baptist Roman Catholic Church, Edgard, Louisiana

73.    St. John the Baptist Roman Catholic Church, Folsom, Louisiana

74.    St. Joseph Roman Catholic Church, Algiers, Louisiana

75.    St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana

76.    St. Joseph's Roman Catholic Church, Gretna, Louisiana

77.    St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc.

78.    St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana

79. St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana

80. St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana

81. St. Margaret Mary Roman Catholic Church, Slidell, Louisiana

82. St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana

83. St. Mark Roman Catholic Church, Ama, Louisiana

84. St. Martha Roman Catholic Church, Harvey, Louisiana

85. St. Martin de Porres Roman Catholic Church, New Orleans, formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc.

86. St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana

87. St. Mary's Roman Catholic Church, New Orleans, Louisiana

88. St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana

89. St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St. John the Baptist Roman Catholic Church, Paradis, Louisiana, for itself and as successor to St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc.

90. St. Patrick's Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

91. St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana

92. St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana

93. St. Peter Claver Roman Catholic Church, New Orleans, Louisiana

94. St. Peter Roman Catholic Church, Reserve, Louisiana, for itself and as successor to St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc.

95. St. Peter's Roman Catholic Church, Covington, Louisiana

96. St. Philip Neri Roman Catholic Church, Metairie, Louisiana

97. St. Pius X Roman Catholic Church, New Orleans, Louisiana

98. St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana

99. St. Rita Roman Catholic Church, Harahan, Louisiana

100. St. Rita Roman Catholic Church, New Orleans, Louisiana

101. St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana[3]

---

[3] As stated in footnote 2, Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

102.    Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana

103.    The Congregation of St. Rita Roman Catholic Church of Harahan

104.    The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana

## II.    Suppressed Archdiocesan Parishes[4]

1.    Blessed Sacrament, Inc.

2.    Epiphany, Inc.

3.    Immaculate Heart of Mary, Inc.

4.    Incarnate Word, Inc.

5.    Our Lady of Good Counsel, Inc.

6.    Our Lady of Good Harbor, Inc.

7.    Our Lady of Lourdes, New Orleans, Louisiana, Inc.

8.    Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.

9.    Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana

10.    St. Ann, New Orleans, Louisiana, Inc.

11.    St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana

12.    St. Frances Xavier Cabrini, Inc.

13.    St. Francis de Salles, Inc.

---

[4] The Suppressed Archdiocesan Parishes no longer operate as separate church parishes. The Suppressed Archdiocesan Parishes were not dissolved, and may own property.

Following Hurricane Katrina, the operations of certain of the Suppressed Archdiocesan Parishes were combined with Archdiocesan Parishes. In 2024, in the ongoing aftermath of Hurricane Ida and a result of storm damage, the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental statistics, and financial difficulties encountered, the following additional Suppressed Archdiocesan Parishes were canonically merged with neighboring Archdiocesan Parishes: (a) St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc., was canonically merged into St. Peter Roman Catholic Church, Reserve, Louisiana; (b) (i) St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and (ii) St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc., were both canonically merged into Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, now known as St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana; (c) St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc., was canonically merged into St. Rosalie Roman Catholic Church, Harvey, Louisiana, now known as Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana; (d) St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc., was canonically merged into Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, now known as St. John Paul II Roman Catholic Church, Waggaman, Louisiana; (e) St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc., was canonically merged into St. John the Baptist Roman Catholic Church, Paradis, Louisiana, now known as St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana; (f) Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc., was canonically merged into St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, now known as St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana; and (g) St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc., had its canonical territory divided so that (i) the area north of the Pontchartrain Expressway was canonically merged into St. Patrick's Roman Catholic Church, New Orleans, Louisiana, and (ii) the area south of the Pontchartrain Expressway was canonically merged into St. Alphonsus Roman Catholic Church, New Orleans, Louisiana.

14. St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana

15. St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana

16. St. Henry's, Inc.

17. St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana

18. St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana

19. St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana

20. St. John the Baptist, New Orleans, Louisiana, Inc.

21. St. Julian Eymard, Inc.

22. St. Lawrence the Martyr, Inc.

23. St. Louise de Marillac, Inc.

24. St. Maurice, Inc.

25. St. Monica, Inc.

26. St. Philip the Apostle, Inc.

27. St. Raymond's, Inc.

28. St. Rose of Lima, Inc.

29. St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana

30. St. Theresa of the Child Jesus, Inc.

31. The Congregation of Saints Peter and Paul Roman Catholic Church

32. The Congregation of St. Cecelia Roman Catholic Church

33. The Congregation of the Annunciation Roman Catholic Church

34. The Congregation of the Holy Trinity Roman Catholic Church

**III.    Archdiocesan Agencies**

1. Archdiocesan Spirituality Center

2. Catholic Charities Archdiocese of New Orleans

3. Catholic Charities Children's Day Care Centers

4. Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)

5. Clarion Herald Publishing Company

6.      Korean Catholic Community of New Orleans, Inc.

7.      Notre Dame Seminary

8.      Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana

9.      Pace Greater New Orleans

10.    Padua House (merged into Catholic Charities Archdiocese of New Orleans)

11.    Philmat, Inc.

12.    Project Lazarus

13.    Roman Catholic Center of Jesus the Lord

14.    School Food and Nutrition Services of New Orleans, Inc.

15.    Second Harvest Food Bank of Greater New Orleans and Acadiana

16.    St. Jude Community Center, Inc.

17.    St. Michael Special School

18.    St. Thérèse Catholic Academy

19.    The Society for the Propagation of the Faith, Archdiocese of New Orleans

## IV.     Non-Debtor Catholic Entities

### Archdiocesan Agencies

1.      7887 Walmsley, Inc.

2.      Annunciation Inn, Inc.

3.      Archdiocese of New Orleans Indemnity, Inc.

4.      Aspiring Scholars

5.      Catholic Community Foundation Archdiocese of New Orleans

6.      Christopher Homes, Inc.

7.      Christopher Inn

8.      Dubourg Home

9.      Holy Redeemer Catholic Virtual Academy

10.    Holy Trinity Drive Land Corporation

11.    Iberia Investment Fund II, LLC

12.    Metairie III

13.    Metairie Manor

14.    Monsignor Wynhoven Apartments, Inc.

493

15. Nazareth II

16. Nazareth Manor

17. New Orleans Archdiocesan Cemeteries

18. Notre Dame Health System (f/k/a Chateau de Notre Dame)

19. Rouquette III

20. St. Anthony's Gardens

21. St. Bernard II

22. St. Bernard III

23. St. Bernard Manor

24. St. Martin's Manor, Inc.

25. St. Tammany Catholic Cemetery

26. St. Tammany Manor

27. The Apartments at Mater Dolorosa

28. The Mental Health Association Development Corporation

29. Villa Additions, doing business as St. Teresa's Villa

30. Villa St. Maurice, Inc.

## Schedule 3

### Additional Notice Parties

**The Redemptorists/Denver Province**
1633 North Cleveland Avenue
Chicago, IL 60614

**Dominican Province of St. Albert the Great**
1910 S. Ashland Avenue
Chicago, Illinois, 60608-2905

**Congregation of Holy Cross**
P.O. Box 1064
Notre Dame, IN 46556-0541

**St. Elio Roman Catholic Church**
1335 Bayou Dularge Road
Theriot, LA 70397

**Central Catholic High School**
2100 Cedar Street, Unit 1
Morgan City, LA 70380

**Edward Douglas White Catholic High School**
555 Cardinal Drive
Thibodaux, LA 70301

**Chinchuba Institute for the Deaf**
2929 Carrollton
New Orleans, LA 70118

And

1231 Prytania St.
New Orleans, LA 70130

**St. Scholastica Academy**
122 South Massachusetts St.
Covington, Louisiana 70433

**Hope Haven – Madonna Manor**
1231 Prytania
New Orleans LA 70130

7887 Walmsley Ave.
New Orleans, LA 70125
2929 Carrollton
New Orleans, LA 70118

**Holy Cross College, Inc.**
Attn Remy Donnelly
5500 Paris Ave.
New Orleans, LA 70122

**Tulane Catholic**
1037 Audubon St
New Orleans, LA 70118

**University of New Orleans**
2000 Lakeshore Drive
New Orleans, LA 70148

**Our Lady of Peace Catholic Church**
13281 LA-644
South Vacherie, LA 70090

**St. Lucy Child Development Center**
1220 Aycock St
Houma, LA 70360

**St. Augustine High School, Inc.**
c/o Alfred Harrell, III
2600 A.P. Tureaud Ave
New Orleans LA 70119

**St. Joseph's Society of the Sacred Heart**
P.O. Box 65010
Baltimore, MD 21209

**The Community of the Sisters of the Immaculate Conception**
c/o Melanie Baglow
6208 Ithaca Street
Metairie, LA 70003

**Sisters of Mount Carmel**
**Generalate Office**
21388 Smith Road
Covington, LA 70435-6349

**Daughters of St. Paul**
50 St. Paul's Ave.
Jamaica Plain, MA 02130

and

c/o Mary Martha Moss
4403 Veterans Blvd.
Metairie, LA 70006

**Crescent City Convent Corporation**
210 Baronne St.
New Orleans, LA 70112

**Holy Rosary Academy High School**
2437 Jena St
New Orleans, LA 70115

**St. Brigid Parish**
7887 Walmsey Avenue
New Orleans, LA 70125

**Prince of Peace Parish**
7887 Walmsey Avenue
New Orleans, LA 70125

**St. Nicholas of Myra Mission**
9701 Hammond St
New Orleans, LA 70127

**Infant Jesus of Prague Mission**
c/o St. Martha Parish
2555 Apollo Drive
Harvey, LA 70058

**Catholic Youth Ministry**
1007 Airline Park Blvd
Metaire, LA 70003

**Family Life Apostolate**
7887 Walmsey Avenue
New Orleans, LA 70125

**Ozanam Inn Inc**
P.O. Box 30565
New Orleans, LA 70190

**Gayle & Tom Benson House of Priestly Formation**
2925 South Carrolton
New Orleans, LA 70118

**Stella Maris Maritime Center**
7887 Walmsey Avenue
New Orleans, LA 70125

**Camp Abbey**
**CYO Youth Office**
1007 Airline Park Blvd
Metaire, LA 70003

**St. Therese Academy**
917 N. Atlanta St
Metaire, LA 70003

**Our Lady of Guadalupe Parish**
411 North Rampart Street
New Orleans, LA 70112

**Lyric Realty and Parking Company, Inc.**
c/o Kenneth D. Boudreaux
1115 Tallowtree Dr.
Mandeville, LA 70448

**Sacred Heart of Jesus Catholic Church**
1111 Highway 55
PO Box 2
Montegut, LA 70377

**Diocese of Houma Thibodaux**
P.O. Box 505
Schriever, LA

**Diocese of Baton Rouge**
Post Office Box 2028
Baton Rouge, Louisiana 70821-2028

**Vandebilt Catholic High School**
209 South Hollywood Road
Houma, LA 70360

**General Services Administration**
1800 F St., NW
Washington, DC 20405

**People For Teens of St. Anthony of Padua Corporation**
4700 Cleveland
New Orleans, LA 70119

**Society of the Sacred Heart**
4120 Forest Park Avenue
St. Louis, MO 63108

**Seminarians Parents Association, Inc.**
718 Wood St
Houma, La 70360

**Society of the Divine Word**
PO Box 6038
Techny, IL 60082

**Ursuline Sisters of the Roman Union, Central Province,**
353 South Sappington
St. Louis, MO 63122

**Salesians of Don Bosco, Eastern Province
in the USA d/b/a Salesian Society, Inc.**
Through its agent for service of process:
Rev. Louis Molinelli, SDB
1000 Barataria Boulevard
Marrero, LA 70072

and

Rev. Louis Molinelli, S.D.B.
1000 Salesian Lane
Marrero, LA 70072

## Schedule 4

**Form of Corporate Resolutions**

## CORPORATE RESOLUTION

RESOLUTION OF THE MEMBERSHIP AND BOARD OF DIRECTORS OF [NAME], [ADDRESS], A LOUISIANA NON-PROFIT [CORPORATION][LIMITED LIABILITY COMPANY (hereinafter this "Corporation").

      BE IT RESOLVED, that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation, are hereby authorized to transact on behalf of this Corporation any and all business related to the following:

1. Engaging 1793 Group, a Louisiana non-profit corporation, on terms and conditions deemed appropriate in their sole discretion, to assist with and administer on this Corporation's behalf, any and all matters in which this Corporation may have an interest in relation to a Plan of Reorganization filed or anticipated to be filed by The Roman Catholic Church of the Archdiocese of New Orleans in proceedings commenced under Chapter 11 of the Bankruptcy Code, captioned *In re The Roman Catholic Church of the Archdiocese of New Orleans*, Case No. 20-10846 (Bankr. E.D. La.) (the "Chapter 11 Case"), including, but not limited to, preparing and filing a petition in the Chapter 11 Case seeking relief under Chapter 11 of the United States Bankruptcy Code as an additional debtor, executing any and all documents necessary for this Corporation to file for relief in the Chapter 11 Case, executing on behalf of this Corporation all documents required to comply with the requirements imposed upon parties filing for relief under Chapter 11 of the Bankruptcy Code, Bankruptcy Rules, Local Rules for the Eastern District of Louisiana and/or the requirement imposed by the United States Trustee.

2. Engaging the firm of Heller Draper and/or any other attorneys to represent this Corporation in actions or proceedings related to the Chapter 11 Case.

3. Engaging accountants, financial advisors, and any other professionals necessary to administer the Chapter 11 Case on behalf of this Corporation.

4. Making decisions with regard to the payment of fees and costs for which this Corporation may become responsible to pay in the Chapter 11 Case.

5. Making decisions with regard to the filing of any plan within the Chapter 11 case, provided that such shall contain terms and provisions consistent with those set forth in Appendix "A" attached hereto and incorporated herein by this reference.

      FURTHER RESOLVED that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation with the power of substitution, is authorized to execute and deliver on behalf of this Corporation each and every Insurance Settlement Agreement with the Settling Insurers, as those terms are defined in the Fourth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of September 23, 2025 (the "Plan"), and any amendment or modification to the Plan, including, without limitation, the documents attached or referred to in Plan Supplement 7.1(a), any Bill of Sale required under such Insurance Settlement Agreements,

and any other documents reasonably requested by any such Settling Insurer to effectuate the transactions provided for in its Insurance Settlement Agreement or the Plan.

FURTHER GIVING AND GRANTING unto either Very Rev. Patrick Carr or Rev. Leon Poche, full power and authority to sign any and all documents and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER GIVING AND GRANTING unto Very Rev. Peter Akpoghiran or any other officer of the Corporation, full power and authority to certify the passage and effectiveness of this Resolution to the Settling Insurers and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER RATIFYING AND CONFIRMING all that either Very Rev. Patrick Carr or Rev. Leon Poche, in his said capacity may do or cause to be done in the premises.

I, the undersigned President of this Corporation do hereby certify that the above and foregoing is a true and correct copy of a resolution adopted by the Membership and Board of Directors of said corporation in conformity with the Articles of Incorporation and Louisiana law, and that said resolution remains in full force and effect and has not been amended or rescinded.

WITNESS MY HAND AND SEAL, effective this _____day of _____, 2025

_____
Very Reverend Patrick J. Williams, V.G.

ATTEST

_____
Dirk Wild, Director

2

502

<u>**Schedule 5**</u>

**Form of Incumbency Certificates**

## INCUMBENCY CERTIFICATE

 I, **Very Rev. Peter Akpoghiran, J.C.D**., the duly elected, qualified, and acting **Vice President** of each of the Louisiana nonprofit corporations or limited liability companies listed on **Exhibit A** attached hereto (each, a "Corporation," and collectively, the "Corporations"), do hereby certify as follows:

1. That the person named below has been duly elected or appointed and is the qualified and acting officer of each of the Corporations holding the office set forth opposite his/her name.

   **NAME**                                      **TITLE**

   **Very Rev. Patrick J. Williams, V.G.**       **President and Director**

2. That the foregoing person is duly authorized to act on behalf of each Corporation in such capacity and to exercise the powers and perform the duties incident to said office under the respective Articles of Incorporation and Bylaws of each Corporation.

3. That attached hereto as **Exhibit B** is a true and correct copy of a resolution adopted at a duly noticed special meeting by the sole member of each of the Corporations and all of the Board of Directors of each said Corporation in attendance at such meeting in conformity with such Articles of Incorporation and Louisiana law and that said resolution remains in full force and effect and has not been amended or rescinded.

   IN WITNESS WHEREOF, I have hereunto set my hand as Vice President of each of the

Corporations as of this ___ day of October, 2025.

_____
Very Rev. Peter Akpoghiran, J.C.D
Vice President of Each Corporation
(See Attached Exhibit A)

504

State of Louisiana
Parish of Orleans

On this _____ day of October, 2025, before me, the undersigned Notary Public, personally appeared **Very Rev. Peter Akpoghiran, J.C.D.,** who acknowledged that he/she executed the foregoing instrument for the purposes therein contained and in the capacity therein stated.

Notary Public
Printed Name: _____
Notary ID or Bar Roll No.: _____
My Commission Expires: _____

## EXHIBIT A
## List of Corporations

## <u>SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK</u>

This Settlement Agreement, Release, and Policy Buyback ("**Settlement Agreement**") is hereby made by, and between, and among The Roman Catholic Archdiocese of New Orleans (the "**Archdiocese**" or "**Debtor**" as further defined in Section ~~1.1.28~~<u>1.1.31</u> below), the other Archdiocese Signatory Parties (as defined in Section ~~1.1.13~~<u>1.1.15</u> below), and ~~[___]~~<u>U.S. Fire/International</u> ("**Insurer**" as further defined in Section ~~1.1.45~~<u>1.1.49</u> below). Insurer, the Archdiocese, the other Archdiocese Signatory Parties, and the Creditors' Committee (as defined below), collectively are the "**Parties**" and each a "**Party**" to this Settlement Agreement.

## RECITALS:

WHEREAS, on May 1, 2020 (the "**Petition Date**" as further defined in Section ~~1.1.62~~<u>1.1.67</u> below), the Archdiocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**" as further defined in Section ~~1.1.15~~<u>1.1.17</u>) pending under Case No. 20-10846 (the "**Bankruptcy Case**" as further defined in Section ~~1.1.14~~<u>1.1.16</u> below);

WHEREAS, each of the Additional Debtors (as defined in Section ~~1.1.9~~<u>1.1.11</u> below) intends to file in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;

WHEREAS, certain Entities have asserted or may hold Claims, including Abuse Claims, against the Archdiocese Bound Parties (each as defined below);

WHEREAS, Insurer issued, allegedly issued, may have issued, assumed by novation or otherwise, or may be administering the Archdiocese Policies (as defined in Section ~~1.1.7~~<u>1.1.9</u> below) providing certain coverage to the Archdiocese Bound Parties;

WHEREAS, asserted disputes between the Debtor Parties <u>(as defined below)</u> and Insurer have arisen, and assertable disputes between the Archdiocese Bound Parties and Insurer may arise in the future, concerning the scope and nature of Insurer's responsibilities, if any, to provide insurance coverage to the Archdiocese Bound Parties under the Archdiocese Policies (as further defined in Section ~~1.1.25~~<u>1.1.29</u> below, the "**Coverage Claims**");

WHEREAS, claimants may contend, as a matter of Louisiana law, particularly La. Rev. Stat § 22:1269 *et. seq*., that certain Entities may have Claims arising under or related to the Archdiocese Policies that could entitle them to bring a Direct Action Claim (as defined in Section ~~1.1.32~~<u>1.1.35</u> below) against Insurer;

WHEREAS, claimants may contend that as a matter of Louisiana law, the time within which Claims relating to Abuse may be asserted against certain of the Archdiocese Bound Parties and/or the Insurer may not have expired with respect to certain Claims;

WHEREAS, the Archdiocese Signatory Parties and Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Claims and all other

disputes between and among them and to release Insurer from any further obligations under the Archdiocese Policies;

WHEREAS, Insurer would not pay the full amount of the Settlement Amount (as defined in Section 1.1.75 1.1.81 below) without the buy-back of the Subject Interests (as defined below) in the Archdiocese Policies, including without limitation, the interests of the Archdiocese, Additional Debtors, other Archdiocese Bound Parties and holders of Direct Action Claims, pursuant to section 363 of the Bankruptcy Code, and without the Sale Injunction, the Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeping Injunction (each as defined below), additionally providing protection to the Insurer Released Parties (as defined below) from Claims against the Insurer Released Parties and their property;

WHEREAS, through this Settlement Agreement and the Plan (as defined in Section 1.1.63 1.1.68 below) the Archdiocese Signatory Parties intend to provide Insurer Released Parties with the broadest possible release of all Claims and Subject Interests with respect to the Archdiocese Policies; and

WHEREAS, through this Settlement Agreement and the Plan, as part of the compromise and resolution of the Coverage Claims, the Debtor Parties and Insurer also wish to effect a sale, pursuant to § 363(b), (f), and (m) of the Bankruptcy Code of the Archdiocese Policies, along with the Coverage Claims and Related Insurance Claims (the "**Purchased Property**" as further defined in Section 1.1.66 1.1.71 below), to provide the Insurer Released Parties with the broadest possible release and buyback with respect to the Archdiocese Policies, resulting in the Insurer Released Parties having no obligations now or in the future with respect to the Archdiocese Policies, including without limitation to any Direct Action Claim.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Settlement Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound subject to the approval of the Bankruptcy Court pursuant to Section 2 2 below, the Parties hereby agree as follows:

## 1. DEFINITIONS

1.1 As used in this Settlement Agreement (as defined above), the following terms shall have the meanings set forth below.

1.1.1 "**Abuse**" means any of the following actual or alleged acts: (a) touching by the Perpetrator of the person's intimate body parts (genitals, breasts, or buttocks), the touching by the person of the Perpetrator's intimate body parts, showing pictures of the person's body or other persons' bodies, taking pictures of the person's body, showing pornography, or making images of the person while naked or engaged in any sexual activity, or any sexualized interaction including observing the person in bathing, toileting, or undressing that was made possible by the Perpetrator's position of authority, or by the inducement of the Perpetrator; or (b) sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to

the genital or anal openings: (i) of the person's body by any part of the Perpetrator's body or any object used by the Perpetrator for this purpose; or (ii) of the person's body by any part of the body of the Perpetrator or by any part of the body of another person, or by any object used by the Perpetrator or another person for this purpose; (c) inappropriate physical contact and/or contact that infringes upon another's personal, physical boundaries including but not limited to groping, kissing, extended hugging, and/or any unwelcomed touching; (d) grooming or trying to create a special relationship, including but not limited to: talk of a sexual nature, talk of a romantic nature, communications expressing individual love to the person, as opposed to a salutation, providing material resources or experiences which induce the person into a relationship where trust is then violated; or (e) any actual or alleged acts of the kind described in subsections (a)-(c) above that occur between or among minors and that the Perpetrator orchestrates or encourages. For the avoidance of doubt, "Abuse" also includes: any actual or alleged conduct which (a) is described in the Louisiana Child Victims Act or (b) would constitute (i) a sexual offense as defined in article 603(2) of the Louisiana Children's Code; (ii) sexual battery as defined in LA. REV. STAT. §§ 14:43.1; 14:43.1.1; 14:43.2; 14: or 43.3, (iii) a crime against nature as defined in LA. REV. STAT. § 14:89, or (i) pornography involving juveniles as defined in LA. REV. STAT. § 14:81.1, or with respect to the foregoing subsection (i)-(iv), any predecessor statute that prohibited such conduct at the time of the act.

 1.1.2 "**Abuse Action**" means an Action asserting an Abuse Claim against any of the Covered Parties.

 1.1.3 "**Abuse Claim**" means any Claim that has been asserted, or could be asserted, against any Settling Party or Non-Settling Insurer, that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively alleged Abuse that occurred, in whole or in part, before the applicable Debtor's Petition Date or Additional Debtors' Petition Date, including any such Claim that seeks monetary damages or any other relief, under any legal or equitable theory of liability, including, but not limited to, the following: vicarious liability; *respondeat superior*; any conspiracy, fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, negligent, insufficient, or inadequate supervision, retention or misrepresentation; any theory based on misrepresentation, concealment, or unfair practice; public or private nuisance; or any theory, including, without limitation, any theory based on public policy or any acts or failures to act by any Settling Party, or any other Entity for whom any Settling Party is allegedly responsible, including, but not limited to, any such Abuse Claim against any Settling Party, Non-Settling Insurer, or any other Entity for whom any Settling Party or Non-Settling Insurer is alleged to be responsible. Abuse Claims are: (a) the Known Abuse Claims, which are treated in Class 3; and (b) the Unknown Abuse Claims, which are treated in Class 4. For the avoidance of doubt, "Abuse Claim" includes (a) all Unknown Abuse Claims, (b) Claims or causes of action defined or described in the

Revival Window Laws against the Archdiocese or any other Archdiocese Bound Party, (c) Direct Action Claims, and (d) any Claim against the Archdiocese or any other Archdiocese Bound Party that is attributable to, arises from, is based upon, relates to, or results from Abuse that, as of the Petition Date is barred by any applicable statute of limitations, and in each case, irrespective of whether (x) such Claims also involve the conduct of joint tortfeasors (or similar concepts under applicable law), (y) such Claims arise under, or were revived pursuant to, the Revival Window Laws, or any future reviver law, statute, or binding precedential decision passed or issued on or after the Bankruptcy Plan Effective Date, or (z) a proof of claim has been filed, before or after the Claims Bar Date, or not at all, or an Abuse Action has been commenced with respect to such Claim. "Abuse Claim" does not include: (a) Related Insurance Claims or Coverage Claims against Settling Insurers or Non-Settling Insurers; (b) Non-Insurer Contribution Claims with respect to any Abuse Claim; (c) Insurer Contribution Claims with respect to any Abuse Claim; or (d) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to a Claim against these dioceses only.  For the avoidance of doubt, a Claim based on Abuse solely occurring following the applicable Petition Date is not an Abuse Claim. Nothing in this definition shall constitute a waiver of any defense that would otherwise be available under applicable law to any Settling Party, the Settlement Trust, or any other Entity.

1.1.4  "**Abuse Claim Release and Certification**" means a written release in favor of the Insurer Released Parties, in the form of Exhibit C to the Acceptable Plan, or otherwise in form and substance acceptable to the Parties, which an Abuse Claimant must deliver before he or she is entitled to Settlement Trust Distributions, which shall provide that the Claimant releases the Insurer Released Parties from any and all Claims related to his/her Abuse Claim or any of the Archdiocese Policies, subject to Section 12.14 and related provisions of the Plan.

1.1.5  "**Abuse Claimant**" means the holder of an Abuse Claim, including, but not limited to, any Known Abuse Claim, Unknown Abuse Claim, or Direct Action Claim. For the avoidance of doubt, Abuse Claimants are Creditors.  The definition of an Abuse Claimant includes the legal representative of the holder of an Abuse Claim, such as a bankruptcy trustee, the estate of a deceased individual who held an Abuse Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Abuse Claim, as the case may be.  An Entity holding the following Claim is not an Abuse Claimant: (i) a Non-Insurer Contribution Claim with respect to such Abuse Claim; (ii) an Insurer Contribution Claim with respect to such Abuse Claim; (iii) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to such Entity's claim against such dioceses only.

1.1.6  "**Acceptable Plan**" means the *Fourth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and The Official Committee of Unsecured Creditors* filed at Docket No. [—4419], and its exhibits and schedules, which as may be modified solely in accordance herewith (i.e., with the consent

of the Insurer), and such modified plan constituting the "Acceptable Plan" for the purposes hereof.

1.1.7  "**Archdiocesan Parishes**" means all currently Catholic Church parishes and missions, as identified on Exhibit B-1, Part I, of the Acceptable Plan. Each of the Archdiocesan Parishes is organized as a non-profit corporation. For the avoidance of doubt, the definition of Archdiocesan Parishes does not include St. Louis Cathedral, Our Lady of Guadalupe Church & Shrine of St. Jude, or any Suppressed Archdiocesan Parish identified on Exhibit B-1, Part II, of the Acceptable Plan.

1.1.8  "**Archdiocesan Schools**" means the means the following schools that are owned and operated by the Archdiocese: (a) the Academy of Our Lady High School; (b) Archbishop Chapelle High School; (c)Archbishop Hannan High School; (d) Archbishop Rummel High School; (e) Archbishop Shaw High School; (f) Pope John Paul II High School; (g) St. Charles Catholic High School; (h) St. Scholastica Academy; and (i) St. Michael Special School.

1.1.9  ~~1.1.7~~ "**Archdiocese Policies**" means (a) the contracts, binders, certificates, and policies of insurance that are listed on Schedule 1 hereto, and (b) all other known and unknown contracts, binders, certificates, or policies of general liability insurance, in effect on or before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date that were issued to, or for the benefit of, or subscribed on behalf or that otherwise actually insure, (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) policies issued to the Archdiocese that name as an insured or additional insured (or related concept under applicable law or document) the Diocese of Houma-Thibodaux or Diocese of Baton Rouge, but not policies issued to either of these dioceses that were not also issued to the Archdiocese or name it as insured, (iv) any Entity owned, created, operated, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, or (v) any institution, religious organization or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control or active management; in each case of (a) and (b), that were issued, subscribed to, or underwritten in whole or in part or allegedly issued, subscribed to, or underwritten in whole or in part by Insurer or any of its predecessors. †

1.1.10  ~~1.1.8~~ "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

---

† SPARTA Settlement Agreement to provide:

For the avoidance of doubt, the "Archdiocese Policies" include any and all known and unknown contracts, binders, certificates, or policies of general liability insurance that were issued, allegedly issued, or may have been issued by or in the name of American Employers Insurance Company."

1.1.11    ~~1.1.9~~ "**Additional Debtors**" means the Entities listed on Acceptable Plan Exhibit B-1.  As used herein, references to the "Additional Debtors" includes the Additional Debtor's Estates.

1.1.12    ~~1.1.10~~ "**Approval Motion**" means the motion filed in the Archdiocese Bankruptcy ~~Court~~Case at Docket No. 4181 seeking approval of this Settlement Agreement as described in Section ~~2~~2.1 of this Settlement Agreement.

1.1.13    ~~1.1.11~~ "**Approval Order**" means the order granting the Approval Motion described in Section ~~2~~2.1 of this Settlement Agreement and providing the relief described in Section ~~2~~2.1 of this Settlement Agreement and in substantially form attached **Exhibit A,** with only such changes as are satisfactory to Insurer.

1.1.14    ~~1.1.12~~ "**Archbishop**" has the meaning given to it in Section ~~3.7~~3.7.

1.1.15    ~~1.1.13~~ "**Archdiocese Signatory Parties**" means, collectively, (a) the Debtor Parties and (b) the Non-Debtor Catholic Entities.

1.1.16    ~~1.1.14~~ "**Bankruptcy Case**" means all of the following: (a) with respect to the Archdiocese, "Bankruptcy Case" has the meaning set forth in the Recitals; and (b) with respect to any given Additional Debtor, "Bankruptcy Case" means the case initiated when such Additional Debtor filed in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.17    ~~1.1.15~~ "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Louisiana, having subject matter jurisdiction over the Bankruptcy Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

1.1.18    ~~1.1.16~~ "**Bankruptcy Plan Effective Date**" means the date upon which a Plan approved by the Bankruptcy Court that contains terms and conditions consistent with those required by this Settlement Agreement becomes effective.

1.1.19    ~~1.1.17~~ "**Barred Claim**"  means any Claim against a Settling Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with an Abuse Claim or any of the Archdiocese Policies, including, but not limited to, any:  (a) Abuse Claim; (b) Direct Action Claim; (c) Coverage Claim; (d) Related Insurance Claim;  (e) Non-Insurer  Contribution  Claim;  (f)  Insurer  Contribution  Claim; (g) Medicare Claim; (h) Penalty Claim; and (i) any other Claim that is otherwise released herein.  A Barred Claim further includes any Claim against a Settling Party based on allegations that it is an alter ego or liable as a successor of an Entity that is not a Settling Party or that the Settling Party's corporate veil should be pierced on account of Claims against an Entity that is not a Settling Party or based on any other theory under which the legal separateness of any Person and any other Entity may be disregarded to impose liability for a claim on either such Entity.  Notwithstanding the foregoing, Barred Claims do not include any Claims to the extent they are asserted against (x) Non-Settling Insurers or (y) Excluded Parties, notwithstanding that such Entity may also have asserted or be able to assert a Claim for contribution, indemnity, reimbursement, or subrogation

against any Settling Party relating to or arising from a such Claim; <u>provided, however,</u> that, for the avoidance of doubt, (i) any Claims that assert liability against such Entity in conjunction with a Settling Party will in all events be Barred Claims as to the Settling Party, (ii) any such Claim for contribution, indemnity, reimbursement, or subrogation against a Settling Party is a Barred Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party for the purposes of this definition.

1.1.20  "**Catholic Charities**" has the meaning set forth in Section 6.3.15.

1.1.21 ~~1.1.18~~ "**Channeling Injunction**" has the meaning set forth in Section ~~2.2.22~~2.2.2.

1.1.22 ~~1.1.19~~ "**Claim**" means any past, present or future claim, demand, Action, request, right, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether sounding in law, equity, tort, warranty, contract, or under any other theory, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been or may be asserted by or on behalf of any Entity, whether seeking damages (including compensatory, exemplary, punitive, or Penalty claims) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, or orders, including without limitation whether by way of direct action, subrogation, contribution, indemnity, alter ego, veil piercing, or regulatory action, or otherwise,  regardless of whether such Claims arise under law, in equity, or under statute, before or after the Petition Date(s), or *in rem* or *in personam*, and include all Claims for damages to the environment or based on any theory of *respondeat superior,* vicarious, successor or transferee liability, or change in control, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

1.1.23 ~~1.1.20~~ "**Claims Bar Date**" means the date(s) and time(s) indicated in the Final Order(s) (which may be the Plan Confirmation Order) setting the deadline(s) for filing proofs of Abuse Claim against the Debtor or Additional Debtor(s), as applicable.

1.1.24 ~~1.1.21~~ "**CMS**" has the meaning set forth in Section ~~2.4.1~~2.4.1.

1.1.25 ~~1.1.22~~ "**Co-Insured Party**" means  any other Entity that is a "Named Assured" or "named insured" or "protected person" under the Archdiocese Policies, and all other Entities that are determined by agreement or a court of competent jurisdiction to be an "Assured," an "Additional Assured," an "insured," or "protected person" or otherwise entitled to insurance coverage under any Archdiocese Policies.

1.1.26 ~~1.1.23~~ "**Conditional Payment**" means any payment made to an Abuse Claimant under the MMSEA, including any payment by a Medicare Advantage Organization (as defined in the MSPA).

1.1.27 ~~1.1.24~~ "**Controlling Document Provision**" has the meaning given to it in Section ~~2.2.9~~2.2.9.

1.1.28 ~~1.1.25~~ "**Covered Parties**" or "**Archdiocese Bound Parties**" means, collectively, the following Entities: (a) the Debtor Parties; (b) the Reorganized Debtor; (c) the Reorganized Additional Debtors; (d) the Non-Debtor Catholic Entities; (e) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP; (f) the ~~applicable~~ Parish Schools and Archdiocesan Schools ~~(each as defined in the Acceptable Plan)~~; (g) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans; (h) any Co-Insured Party; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entities' predecessors, successors, assigns, subsidiaries, direct and indirect past, present, and future affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, and estates. For the avoidance of doubt, the Entities in clauses (g), (h), and (i) are only Archdiocese Bound Parties in connection with the Archdiocese Policies.

1.1.29 ~~1.1.26~~ "**Coverage Claims**" has the meaning set forth in the Recitals and further includes any Claim under relating to or arising out of the Archdiocese Policies or the rights and obligations thereunder, or the breach thereof, including any Claim seeking insurance coverage.

1.1.30 ~~1.1.27~~ "**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed in the Archdiocese's Chapter 11 Case on May 20, 2020, [Docket Nos. 94 & 114], as such committee may be reconstituted from time to time.

1.1.31 ~~1.1.28~~ "**Debtor**" or "**Archdiocese**" means, before the Bankruptcy Plan Effective Date, The Roman Catholic Church of the Archdiocese of New Orleans of Louisiana. As used herein, references to the "Debtor" or "Archdiocese" includes the Debtor's Estate.

1.1.32 ~~1.1.29~~ "**Debtor Parties**" means (i) the Archdiocese and (ii) all of the Additional Debtors.

1.1.33 ~~1.1.30~~ "**Diocese of Baton Rouge**" means the Diocese of Baton Rouge. References to the "Diocese of Baton Rouge CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) July 22, 1961 whichever occurred last; references to the "Diocese of Baton Rouge SD" refer to the period after such date.

1.1.34 ~~1.1.31~~ "**Diocese of Houma-Thibodaux**" means the Diocese of Houma-Thibodaux. References to the "Diocese of Houma-Thibodaux CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) June 5, 1977, whichever occurred last; references to the "Diocese of Houma-Thibodaux SD" refer to the period after such date.

1.1.35 ~~1.1.32~~ "**Direct Action Claim**" means any Claim by any Entity that is a "direct action" as that term is used in La. Rev. Stat § 22:1269 *et. seq*, (or similar law in other jurisdictions) against any Insurer Released Party or related to any Archdiocese Policy, including, without limitation, (a) any claim that is similar or related to any Claim that could also be asserted by the Archdiocese or any Archdiocese Bound Party, (b) any Claim that directly or indirectly arises out of, relates to, or is connected with any Abuse Claim, (c) any Claim that directly or indirectly arises out of, relates to, or is in connection with any Insurer Released Party's handling of any Abuse Claim under the laws of any applicable jurisdiction, or (d) any Claim arising under any law of any jurisdiction that may give a third party a direct Cause of Action against an Insurer Released Party for monetary or other relief.[2]

1.1.36 ~~1.1.33~~ "**Entity**" means any individual, corporation, corporation sole, partnership, association, limited liability company, joint stock company, proprietorship, unincorporated organization, joint venture, trust, estate, executor, legal representative, or any other entity or organization, as well as any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency, department, board or instrumentality thereof, any other "Person" within the definition of section 101(41) of the Bankruptcy Code, and any successor in interest, heir executor, administrator, trustee, trustee in bankruptcy, or receiver of any Entity and also has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.1.37 ~~1.1.34~~ "**Escrow Agent**" means the agent appointed in accordance with the Escrow Agreement.

1.1.38 ~~1.1.35~~ "**Escrow Agreement**" means the agreement governing the escrow which shall hold the Settlement Amount in escrow and in trust for the benefit of Insurer, and which shall provide for the: (i) transfer of the Settlement Amount, with any accrued interest, to the Settlement Trust following the Settlement Agreement Effective Date, or (ii) return of the Settlement Amount to Insurer, with any accrued interest, upon receipt of notice that the Settlement Agreement has been terminated.

1.1.39 ~~1.1.36~~ "**Estate**" means the (a) the Debtor's estate, and (b) Additional Debtors' estates, each created pursuant to section 541 of the Bankruptcy Code.

1.1.40 ~~1.1.37~~ "**Excluded Party**" means the following Entities: (a) the Holy See (State of Vatican City); (b) any Perpetrator; and (c) any ~~religious order (i.e., institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy)~~archdiocese or diocese (other than the Archdiocese itself), any Religious Order, or other Entity that is an affiliate or associated with the Roman Catholic Church (in its capacity as such, and other than (i)

---

[2] ~~SPARTA Settlement Agreement will provide:~~

~~For the avoidance of doubt, Direct Action Claim does not include the following action: SPARTA Insurance Company v. Pennsylvania General Insurance Company, No. 21-11205 (D. Mass.).~~

the Non-Debtor Catholic Entities; (ii) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP, (iii) the applicable Parish Schools and Archdiocesan Schools (each as defined in the Acceptable Plan); and (iv), any Co-Insured Party); provided, however, that any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party."

1.1.41 1.1.38 "**Extra-Contractual Claim**" means any Claim against any Insurer Released Party seeking any type of relief, other than coverage or benefits, under or with respect to the Archdiocese Policies. Extra-Contractual Claims include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs, or any other type of relief, alleging any of the following with respect to (a) any Archdiocese Policy; (b) any Claim allegedly or actually covered under a Archdiocese Policy; or (c) the conduct of any Insurer Released Party with respect to (a) or (b): (i) bad faith; (ii) failure to provide insurance coverage under any Archdiocese Policy, including any failure to investigate or to provide a defense or adequate defense; (iii) failure or refusal to compromise and settle any Claim insured under any Archdiocese Policy; (iv) failure to act in good faith; (v) violation or breach of any covenant or duty of good faith and fair dealing, whether express, implied, or otherwise; (vi) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (vii) violation of any unfair claims practices act or similar statute, regulation or code, including any statute, regulation, or code relating to unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising; (viii) any type of misconduct; or (ix) any other act or omission of any type by any Insurer Released Party for which the claimant seeks relief other than coverage or benefits under a Archdiocese Policy. "Extra-Contractual Claims" further include all Claims relating to any Insurer Released Party's (x) handling of any Claims under the Archdiocese Policies, (y) conduct in negotiating this Settlement Agreement and/or the Plan, and (z) conduct in the settlement of any Claims. For the avoidance of doubt, Extra-Contractual Claims of the Archdiocese Bound Parties are included within the property Insurer is purchasing hereunder.

1.1.42 1.1.39 "**Final Order**" means an order as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending and in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order will have been affirmed by the highest court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari,* petition for review, or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order will not cause such order not to be a Final Order.

1.1.43 1.1.40 "**Gatekeeper Injunction**" has the meaning set forth in Section 2.2.2 2.2.2.

1.1.44 "**HH**" has the meaning set forth in Section 6.3.15.

1.1.45 1.1.41 "**Indemnified Claims**" shall have has the meaning set forth in Section 7.2 7.2 of this Settlement Agreement.

1.1.46 1.1.42 "**Indemnity Cost Reserve**" shall have has the meaning set forth in Section 7.2 7.2.1.

1.1.47 1.1.43 "**Injunctions**" means the Sale Injunction, Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeper Injunction.

1.1.48 1.1.44 "**Insurance Settlement Agreement"** shall have has the meaning set forth in the Acceptable Plan.

1.1.49 1.1.45 "**Insurer**" means [___].[2] United States Fire Insurance Company ("U.S. Fire"), International Insurance Company ("International"), and Westchester Fire Insurance Company and Westchester Fire Insurance Company individually and, to the extent that policies issued by U.S. Fire and/or International were novated to or assumed by either or both of them (collectively, "U.S. Fire/International"). Any Entity that meets the definition set forth above shall be individually referred to as an 'Insurer.'

1.1.50 1.1.46 "**Insurer Contribution Claim**" means any (a) Non-Settling Insurer Contribution Claim or (b) Settling Insurer Contribution Claim.

1.1.51 1.1.47 "**Insurer Released Party**" means Insurer and its Related Parties, each in their capacities solely as such with respect to the Archdiocese Policies and all Subject Interests therein.

---

[2] US Fire/International Settlement Agreement to include the following definition for "Insurer": "United States Fire Insurance Company ("U.S. Fire"), International Insurance Company ("International"), and Westchester Fire Insurance Company and Westchester Fire Insurance Company individually and, to the extent that policies issued by U.S. Fire and/or International were novated to or assumed by either or both of them ("U.S. Fire/International"). Any Entity that meets the definition set forth above shall be individually referred to as an 'Insurer.'"

SPARTA Settlement Agreement to include the following definition for "Insurer":

"SPARTA Insurance Company and American Employers' Insurance Company ("SPARTA")."

Catholic Mutual Settlement Agreement to include the following definition for "Insurer":

"Catholic Mutual Relief Society of America."

National Union Settlement Agreement to include the following definition for "Insurer":

"National Union Fire Insurance Company of Pittsburgh, Pa., or its successors and assigns."

Puritan Insurance Company to include the following definition for "Insurer":

"Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation."

Twin City Settlement Agreement to include the following definition for "Insurer":

"Twin City Fire Insurance Company and First State Insurance Company."

1.1.52 ~~1.1.48~~ "**Known Abuse Claims**" means any Abuse Claim, other than an Unknown Abuse Claim, against any Settling Party, Settling Insurer, and/or Non-Settling Insurer.

1.1.53 ~~1.1.49~~ "**Medicare Claims**" means any Claim by CMS, and/or any agent or successor of CMS, charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA or pursuing a Claim under MSP Provisions, relating to any payments in respect of any Abuse Claim, including any Claim for reimbursement of conditional payments, and any Claim relating to reporting obligations.

1.1.54 ~~1.1.50~~ "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which imposes reporting obligations on those Entities with payment obligations under the MSPA.

1.1.55 ~~1.1.51~~ "**MSPA**" means 42 U.S.C. §1395y et seq., or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto, including the regulations promulgated thereunder, found at 42 C.F.R. §411.1 et seq.

1.1.56 ~~1.1.52~~ "**Non-Debtor Catholic Entity Policy Sale**" has the meaning set forth in Section ~~4.64~~.6.

1.1.57 ~~1.1.53~~ "**Non-Debtor Catholic Entities**" collectively means those entities listed on the Acceptable Plan Exhibit B-2 who are not Additional Debtors, but which are (a) insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies and/or (b) have actually or allegedly acquired or been assigned the right to make a claim for coverage under any of the Archdiocese Policies (excluding, however, for the avoidance of doubt, the Debtor Parties, the Settlement Trust, and any Abuse Claimant).

1.1.58 ~~1.1.54~~ "**Non-Insurer Contribution Claim**" means any Claim for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law that is attributable to, arises from, is based upon, relates to, or results from, an Abuse Claim or payment of an Abuse Claim, and any other derivative or indirect Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, other than a Non-Settling Insurer Contribution Claim or a Settling Insurer Contribution Claim.

1.1.59 ~~1.1.55~~ "**Non-Settling Insurer**" means any insurer (together with its Related Parties) that is not a Settling Insurer.

1.1.60 ~~1.1.56~~ "**Non-Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Non-Settling Insurer against any Settling

Insurer for the payment of money where such Non-Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.61 "**Parish Schools**" means the elementary Catholic schools that are owned and operated by the Archdiocesan Parishes. For the avoidance of doubt, the definition of Parish Schools expressly excludes Catholic schools that are owned and operated by Religious Orders and the Archdiocesan Schools. For the further avoidance of doubt, the Parish Schools are not separately incorporated.

1.1.62 1.1.57 "**Parties**" has the meaning set forth in the first paragraph of this Settlement Agreement.

1.1.63 1.1.58 "**Payment Security**]" means [**Intentionally Omitted**]⁴

1.1.64 1.1.59 "**Penalty Claims**" means a Claim against any Settling Party or Settling Insurer for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Creditor holding such Claim.

1.1.65 1.1.60 "**Perpetrator**" means an individual who personally committed or is alleged to have personally committed an act of Abuse. For the avoidance of doubt, the definition of Perpetrator does not include any individual who did not personally commit an act of Abuse or is not alleged to have personally committed an act of Abuse, but against whom an Abuse Claim or Non-Insurer Contribution Claim is asserted nonetheless, or may be asserted, by virtue of such individual's position or service as a member, representative, contractor, consultant, professional, or volunteer of the Archdiocese or any Non-Debtor Catholic Entity or any council or representative body associated with such Entities.

1.1.66 1.1.61 "**Person**" has the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

1.1.67 1.1.62 "**Petition Date**" means (a) with respect to the Archdiocese, May 1, 2020; and (b) with respect to each Additional Debtor, the date(s) on which such Additional Debtor files in the Bankruptcy Court its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.68 1.1.63 "**Plan**" refers to the Chapter 11 Plan of Reorganization for the Archdiocese and all Additional Debtors (and all exhibits annexed thereto) which shall, among other things, provide for the resolution of Abuse Claims and Subject Interests in the Archdiocese Policies as set forth herein, and which shall be in form and substance acceptable to Insurer in its sole discretion.

---

⁴ Intentionally omitted, except the SPARTA Settlement Agreement, in which this section will provide:

has the meaning given to it in Section 3.1.1 hereof.

**1.1.69** ~~1.1.64~~ "**Plan Confirmation Order**" has the meaning set forth in Section ~~2.3~~2.3.

**1.1.70** ~~1.1.65~~ "**Preserved Coverage**" means **[Intentionally Omitted.]**[5]

**1.1.71** ~~1.1.66~~ "**Purchased Property**" means any and all right, title, and interest (including all Subject Interests) in and to the Archdiocese Policies and the Related Insurance Claims and Coverage Claims.

**1.1.72** ~~1.1.67~~ "**Related Insurance Claim**" means (a) any Extra-Contractual Claim and (b) any other Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies, including, without limitation, bad faith Claims.

**1.1.73** ~~1.1.68~~ "**Related Party**" means, with respect to any Entity, such Entity's (a) predecessors, successors, assigns, and any Entity that assumed the obligation of the forgoing for the Archdiocese Policies by novation or otherwise (b) direct and indirect past, present, and future Affiliates (as defined in section 101(2) of the Bankruptcy Code), holding companies, merged companies, related companies, subsidiaries, divisions, acquired companies, joint ventures, joint venturers, (c) current and former employees, officers, directors, principals, partners, managing agents, trustees, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, brokers, adjusters, reinsurers, retrocessionaires, subrogees, agents, claims handling administrators, and other professionals, and (d) respective heirs, executors, estates, and nominees; and all Entities acting on behalf of, by, through or in concert with them, each solely in their capacities as such with respect to such Entity (and with respect to such Entity (including Insurer) that is an insurer of any Archdiocese Bound Party or has assumed the obligations of such by novation or otherwise, such insurer's applicable insurance policy(ies) (including the Archdiocese Policies)).[6]

**1.1.74** "**Religious Order**" means, collectively, an institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy.

**1.1.75** ~~1.1.69~~ "**Reorganized Additional Debtors**" means the Additional Debtors, as reorganized pursuant to and under the Plan, or any successor thereto by

---

[5] ~~Intentionally omitted, except the Catholic Mutual Settlement Agreement, in which this section will provide:~~

~~"Preserved Coverage" means Insurer's obligations under Certificate No. [●] issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the personal injury claims listed in the attached Schedule [X], in each case, subject to the limits, declarations, terms and conditions of such certificate; provided, however, that Preserved Coverage shall not include coverage for any and all Abuse Claims or other Barred Claims.~~

[6] ~~The SPARTA Settlement Agreement will additionally provide:~~

~~For the purposes of this definition and this Settlement Agreement, Pennsylvania General Insurance Corporation shall not be a considered a Related Party of SPARTA Insurance Company.~~

merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.76 ~~1.1.70~~ "**Reorganized Debtor**" means the Debtor, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.77 ~~1.1.71~~ "**Revival Window**" means Section 2 of La. Acts 2021, No. 322, as amended by La. Acts 2022, No. 386, and La. Acts 2024, No. 481.

1.1.78 ~~1.1.72~~ "**Revival Window Laws**" means the Revival Window, together with any other law that extends the prescriptive period or statute of limitations for asserting Abuse Claims under Louisiana or other applicable state law.

1.1.79 ~~1.1.73~~ "**Sale Injunction**" has the meaning set forth in Section ~~2.1~~2.1.

1.1.80 ~~1.1.74~~ "**Settlement Agreement Effective Date**" means the first day on which: (a) the Archdiocese Signatory Parties and Insurer have executed this Settlement Agreement; (b) the Unknown Abuse Claims Representative shall have supported the releases provided for herein and the protections granted hereby and in the Plan in favor of the Insurer Released Parties, in a manner acceptable to Insurer in its sole discretion; (c) the Approval Order shall have become a Final Order; (d) the Plan Confirmation Order shall have become a Final Order; and (e) the Settlement Trust shall have been created pursuant to the Plan~~;~~ provided, however, ~~that in Insurer's sole discretion~~with the prior written consent of the Trustee, not to be unreasonably withheld, Insurer may elect to waive the conditions set forth in clauses (b) through (e) and pay or direct the payment of the Settlement Amount to the escrow or Settlement Trust prior to the occurrence of the events set forth in (b) through (e) hereof, in which case, the date of such payment shall be the Settlement Agreement Effective Date for all purposes hereunder including the date of the closing of the purchase and sale of the Archdiocese Policies.]7

1.1.81 ~~1.1.75~~ "**Settlement Amount**" means the sum of $~~[ ]~~5,000,000 to be paid (in accordance with Section 3.1) by Insurer after satisfaction of all conditions precedent herein in accordance herewith.

1.1.82 ~~1.1.76~~ "**Settlement Trust**" means the settlement trust established under the Plan for the purposes set forth therein, including assuming liability for all Channeled Claims (as defined in the Acceptable Plan) and Indemnified Claims (as defined herein), subject to the limitations on indemnification and liability contained in Section 7.2 of this Settlement Agreement.

---

7 *Note: Subject to further discussion.*

1.1.83 1.1.77 "**Settlement Trust Agreement**" means the agreement between the Debtor and the Settlement Trustee governing the Settlement Trust, to be filed with the Plan Supplement (as defined in the in the form of Exhibit D-1 to the Acceptable Plan).

1.1.84 1.1.78 "**Settlement Trust Allocation Protocol**" means the Settlement Trust Allocation Protocol (as defined and used in the Settlement Trust Agreement), to be filed with the in the form of Exhibit D-2 to the Acceptable Plan Supplement.

1.1.85 1.1.79 "**Settlement Trust Documents**" means, collectively, (a) the Settlement Trust Agreement, (b) the Settlement Trust Allocation Protocol, and (c) any other agreements, instruments and documents governing the establishment and administration of the Settlement Trust, which shall be consistent with the terms of the Plan, as the same may be amended or modified from time to time in accordance with the terms thereof.

1.1.86 1.1.80 "**Settlement Trustee**" means the Entity appointed to act as the initial trustee of the Settlement Trust pursuant to the terms of the Settlement Trust Documents, along with any successor trustee appointed in accordance with the Settlement Trust Documents.

1.1.87 1.1.81 "**Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Settling Insurer against any Settling Insurer or Non-Settling Insurer for the payment of money where such Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.88 1.1.82 "**Settling Insurers**" shall have the meaning set forth in the Acceptable Plan.

1.1.89 1.1.83 "**Settling Insurers' Policies**" shall have the meaning set forth in the Acceptable Plan.

1.1.90 1.1.84 "**Settling Parties**" means, collectively, the following Entities: (a) Archdiocese Bound Parties; and (b) the Settling Insurers.

1.1.91 1.1.85 "**Subject Interests**" means all Claims, liens (as defined by Section 101(37) of the Bankruptcy Code), encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief, including: (a) all interests of the Archdiocese in, to and under the Archdiocese Policies; (b) all interests in, to, and under the Archdiocese Policies of any Entity other than the Archdiocese (including all Abuse Claimants and the Archdiocese Bound Parties); and (c) all interests in, to and under the Archdiocese Policies of any other Entity claiming coverage by, through, or on behalf of any Archdiocese Bound Party, including, without limitation, rights and interests as an insured, co-insured or additional insured, insurer or creditors of the Archdiocese Bound Parties; in each case within the meaning of "interest" as used in sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code. For the avoidance of doubt, a Direct Action

Claim constitutes a Subject Interest. The meaning of Subject Interests also includes: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property.

    1.1.92 ~~1.1.86~~ "**Supplemental Settling Insurers' Injunction**" has the meaning set forth in Section ~~2.2.22~~2.2.

    1.1.93 ~~1.1.87~~ "**Unknown Abuse Claim**" means an Abuse Claim that occurred before the Petition Date and the Abuse Claimant did not file a proof of claim by the applicable Abuse Claims Bar Date, for which there exists a valid legal excuse for not filing, as further defined in the in the Acceptable Plan.

1.1.94 ~~1.1.88~~ "**Unknown Abuse Claims Representative**" means Michael R. Hogan, the legal representative appointed by the Bankruptcy Court pursuant to the *Order (I) Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, and (II) Approving the Retention of Michael R. Hogan as the Unknown Tort Claims Representative, Nunc Pro Tunc To July 26, 2021* (Docket No. 1012 ), any successor legal representative appointed by the Bankruptcy Court, or, on and after the Bankruptcy Plan Effective Date, any successor legal representative appointed in accordance with the applicable Settlement Trust Document.

1.2 Capitalized terms not defined in this Section ~~1~~1 or elsewhere in this Settlement Agreement shall have the meanings given to them in the Bankruptcy Code.

## 2. THE BANKRUPTCY CASE AND PLAN OF REORGANIZATION

2.1 On or before July 29, 2025, the Archdiocese shall file a motion in the Bankruptcy Court (the "**Approval Motion**"), in form and substance acceptable to Insurer in its sole discretion, that seeks the entry of an order in substantially the form attached as **Exhibit A** to this Settlement Agreement, or otherwise in form and substance acceptable to Insurer in its sole discretion (the "**Approval Order**"), that:

(a) approves this Settlement Agreement, including Insurer's buyback of the Archdiocese Policies and the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests, and otherwise authorizes the Parties to undertake the settlement and the transactions contemplated by this Settlement Agreement, in each case pursuant to sections 363(b), (f),and (m) of the Bankruptcy Code and any other applicable provisions of the Bankruptcy Code;

(b) contains an injunction (the "**Sale Injunction**") that, subject to and conditioned upon the Settlement Agreement Effective Date and the Insurer's payment of the Settlement Amount, bars all Claims against the Insurer Released Parties and their property and assets of each based on or arising out of any Subject Interests in the Archdiocese Policies including without limitation all Coverage Claims, Related Insurance Claims, and Barred Claims, leaving the Settling Insurers free and clear of all Subject Interests of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); any Abuse Claimant; or any holder of a Barred Claim pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code;

(c) provides that this Settlement Agreement is binding on the Archdiocese Signatory Parties, all other Settling Parties, any trust created in the Bankruptcy Case(s), and any successors of the foregoing; and

(d) provides, subject to and conditioned upon the Settlement Agreement Effective Date, that the Approval Order is binding on all Persons (including, for the avoidance of doubt, all Persons set forth in the foregoing (c)).

2.1.1    The Archdiocese shall provide written notice of the Approval Motion, which notice shall be in form and substance acceptable to Insurer, to, at a minimum, any known Archdiocese Bound Party, holder of an Abuse Claim, or party whose rights or interests may reasonably be considered to be impacted by the relief requested in the Approval Motion, and any party identified on Schedule 3 hereto.  In addition, the Archdiocese shall include notice of the Approval Motion together with notice provided with respect to confirmation of the Joint Plan, including publication notice of the hearing on the Approval Motion. The Archdiocese will provide a draft service list of the foregoing for Insurer's review and comment.

2.1.2    If any Entity files an objection to the Approval Motion, the Archdiocese and Creditors' Committee shall consult with Insurer in connection with filing any written response thereto.  The Archdiocese Signatory Parties, as applicable, and Creditors' Committee shall take commercially reasonable steps to defend against any objection, appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order.  Insurer will cooperate with the Archdiocese Signatory Parties and Creditors' Committee in this regard, including making commercially reasonable submissions.

2.2     The Archdiocese shall file and prosecute a joint Plan with the Creditors Committee, which shall be in form and substance satisfactory to the Insurer in its sole discretion, substantially in the form as the Acceptable Plan, which the Parties acknowledge and agree satisfies the terms of this Settlement Agreement.  Any modifications to the Plan, the Settlement Trust Documents, the Plan Confirmation Order, or the Approval Order, including those relating to the Channeling Injunction,  Supplemental Settling Insurers' Injunction, Gatekeeper Injunction, releases by holders of Abuse Claims, Insurers, Insurance Settlement Agreements, and related definitional terms, including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Abuse Related Insurance Claims," "Channeled Claim," "Covered Parties," "Direct Action Claim," "Enjoined Party," "Insurer Contribution Claim," "Non-Insurer Contribution Claim," "Penalty Claims," "Protected Parties," "Settling Insurers," "Settling Insurer's Policies," "Subject Insurance Policies," "Subject Interests," or any exhibits, schedules, and documents related thereto, must be in all respects consistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties without Insurer's written consent in its sole discretion.

2.2.1    The Plan shall create the Settlement Trust, which shall be responsible for making any and all payments to the Abuse Claimants entitled to receive payment under the Plan and which shall assume all liability for Channeled Claims.

2.2.2    The Plan shall include: (a) an injunction in substantially the form included in Article ⌊12.4⌋ of the Acceptable Plan (the "**Channeling Injunction**"); and (b) an injunction in substantially the form included in Article ⌊12.5⌋ of the Acceptable Plan (the "**Supplemental Settling Insurers' Injunction**"); and (c) an injunction in substantially

the form included in Article [12.6]12.8 of the Acceptable Plan (the "**Gatekeeper Injunction**").

2.2.3    The Plan shall incorporate by reference the releases and indemnities set forth in this Settlement Agreement, including that the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to all Indemnified Claims as forth in Section 7.27.2 of this Settlement Agreement.

2.2.4    The Settlement Trust Documents shall provide that as a condition to receiving payment from the Settlement Trust, all Abuse Claimants shall provide an Abuse Claim Release and Certification.

2.2.5    The Plan shall provide for the commencement, prior to the Court's consideration of the Approval Motion, by the Additional Debtors of Chapter 11 cases to be jointly administered with the Bankruptcy Case.

2.2.6    The Plan shall provide a supplemental bar date for the Additional Debtors in a form and substance satisfactory to the Insurer with respect to Abuse Claims against the Additional Debtors and the form, manner, and deadline for filing proofs of claim and the treatment of confidential information contained therein.

2.2.7    The Plan shall provide that confirmation of the Plan will not occur unless all of the following conditions precedent have been satisfied: (a) the Plan Confirmation Order approves and implements the Injunctions and (b) the Bankruptcy Court shall have granted the Approval Motion in form and substance acceptable to Insurer in its sole discretion.

2.2.8    The Plan shall provide that the Bankruptcy Plan Effective Date will not occur unless all of the following conditions precedent have been satisfied or waived (as applicable with consent of Insurer): (a) the Plan Confirmation Order will have been entered by the Bankruptcy Court and become a Final Order, and (b) the Bankruptcy Court shall have entered the Approval Order (with both such Approval Order and this Settlement Agreement in form and substance acceptable to the Insurer) and such Approval Order shall have become a Final Order.

2.2.9    The Plan shall provide that (collectively, as follows, the "**Controlling Document Provision**") in the event of a conflict between (a) the Settlement Agreement, on the one hand, and (b) the Plan, on the other, the terms of the Settlement Agreement shall control and govern; and in the event of a conflict between the (x) Approval Order, on the one hand, and (y) Plan Confirmation Order, on the other, the terms of the Approval Order shall control and govern.

2.2.10    The Plan shall provide that the execution and delivery of this Settlement Agreement is a condition to entry of the Plan Confirmation Order and the occurrence of the Bankruptcy Plan Effective Date. The inclusion of this Settlement Agreement in the Plan shall not be waivable as a condition to entry of the Plan Confirmation Order or the

occurrence of the Bankruptcy Plan Effective Date absent the prior written consent of the Settling Insurers.

2.3     The Debtor Parties shall seek and obtain entry of an order from the Bankruptcy Court, which order shall be in form and substance acceptable to the Parties, that: (i) approves the Plan pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code; (ii) contains the Channeling Injunction; (iii) ratifies the Sale Injunction as independent of the Channeling Injunction and Supplemental Settling Insurers' Injunction; (iv) contains the Gatekeeper Injunction; (v) provides that this Settlement Agreement is binding on any Settlement Trust created in the Bankruptcy Case, the Reorganized Debtor, the Reorganized Additional Debtors, and any successors of the Settlement Trust, Reorganized Debtor, or Reorganized Additional Debtors, and all of the Archdiocese Bound Parties; and (vi) contains the Controlling Document Provision (the "**Plan Confirmation Order**").

2.3.1     The Plan and Plan Confirmation Order must not be inconsistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties.

2.3.2     In seeking to obtain the Plan Confirmation Order, the Debtor and Additional Debtors will: (i) seek a confirmation hearing on an appropriately timely basis; (ii) urge the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) take all reasonable steps to defend against any objection, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order.

2.3.3     Prior to entry of the Plan Confirmation Order, the Archdiocese and/or any applicable Additional Debtor shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Abuse Claim that (i) is asserted against any Debtor Party and (ii) implicates, or is reasonably likely to implicate, any Archdiocese Insurance Policies (including by alleging Abuse that took place during any policy period of any Archdiocese Policy). If, prior to the Plan Confirmation Order becoming a Final Order, the Bankruptcy Court allows any Entity to prosecute any such Abuse Claim, the Debtor Parties shall defend themselves against such Abuse Claims and comply with the terms of any order of the Bankruptcy Court, and Insurer's rights and obligations relating to such litigation shall be determined by, and subject to, the terms and conditions of the Archdiocese Policies, this Settlement Agreement, and any applicable orders of the Bankruptcy Court.

2.3.4     The Plan and Plan Confirmation Order shall provide that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any Covered Party with respect to any Archdiocese Policy, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

526

2.3.5    Nothing in this Section or elsewhere in this Settlement Agreement shall bar any party from arguing that any appeal from the Plan Confirmation Order should be dismissed on grounds of statutory or equitable mootness or otherwise.

2.3.6    None of the releases, Injunctions, or other provisions of the Plan with apply to, or have any effect, on the rights of the Settling Insurers to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with any Settling Insurer's Policy.

2.4    The Settlement Trust Documents shall require the Settlement Trust to register as a Responsible Reporting Entity under the reporting provisions of MMSEA.

2.4.1    The Settlement Trust Documents shall require the Settlement Trust, at its sole expense, to timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated and to follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

2.4.2    The Settlement Trust Documents shall require the Settlement Trust to obtain, prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Abuse Claim, a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. §1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim.

2.5    The Debtor Parties and Reorganized Debtor and Reorganized Additional Debtors will undertake commercially reasonable actions to cooperate with Insurer in connection with responding to any inquiry from Insurer's regulators, auditors, reinsurers, or retrocessionaires.

2.6    From and after the execution date of this Settlement Agreement and until the earlier of: (A) occurrence of (i) the Settlement Agreement Effective Date and (ii) Insurer's remittance of the Settlement Amount (at which time this covenant is superseded by the releases provided in Section 4); and (B) the date on which this Settlement Agreement is terminated, (i) none of the Insurer Released Parties, the Debtor, the Additional Debtors or Creditors' Committee will initiate any litigation activity against the other in any Bankruptcy Case and (ii) the Archdiocese and the Insurer Released Parties shall cease all litigation activities against each other in the Bankruptcy Case, including that the Insurer Released Parties will neither object to any proposed Plan consistent with this Settlement Agreement, nor serve or compel any discovery in connection with the Bankruptcy Case; *provided that*: (y) neither the Archdiocese nor any Additional Debtor shall include any provision in any Plan that adversely affects the rights or benefits of the Insurer Released Parties under this Settlement Agreement, or that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement; and (z) neither the Archdiocese nor any Additional Debtor shall act, or fail to act, in such a way that otherwise violates, or is contrary to, the agreements and covenants contained in this

Settlement Agreement. Notwithstanding the foregoing, the Insurer Released Parties may participate in the Bankruptcy Case for the purpose of supporting or enforcing any of the terms of this Settlement Agreement and protecting their rights.

~~2.7 The Parties shall each bear, as to each other only, their own costs, expenses, and counsel and professional fees in the Bankruptcy Case.~~

2.7 ~~2.8~~ From and after the execution date of this Settlement Agreement and until the date on which this Settlement Agreement is terminated, the obligations of the ~~Debtors~~ Parties set forth in this Section 2 shall be binding on the Debtor Parties.

## 3. PAYMENT OF THE SETTLEMENT AMOUNTS

3.1 By no later than thirty (30) days after (a) the Settlement Agreement Effective Date, and (b) Insurer receiving appropriate instructions for the transmission of the payment to the Escrow Agent or Settlement Trust, Insurer shall pay (or cause to be paid) the Settlement Amount to the Settlement Trust or Escrow Agent pursuant to the Escrow Agreement. Payment of the Settlement Amount may be by check, ACH transfer, wire transfer, or other method.

    3.1.1 [Intentionally Omitted.]~~8~~

3.2 The delivery of the Settlement Amount to the Escrow Agent or Settlement Trust shall be in full and final settlement of all responsibilities under and arising out of the Archdiocese Policies, the sale of the ~~Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties back~~ Purchased Property to Insurer free and clear of all Subject Interests of any Entity, and the other releases provided.

3.3 Subject to the occurrence of the Settlement Agreement Effective Date, the Parties agree: (i) the Settlement Amount is the total amount that Insurer is obligated to pay on account of any and all Claims under, arising out of, relating to, or in connection with the Archdiocese Policies (including Barred Claims, and any reimbursement obligations for Conditional Payments under the MSPA); (ii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of anyone in connection with the Archdiocese Policies, including any payments in connection with amounts allegedly owed under the MSPA or in connection with any Claims, including any Barred Claim; (iii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of the Archdiocese Bound Parties or any Abuse Claimants in connection with the Archdiocese Policies; and (iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted~~9~~. The Parties further agree that the Settlement Amount includes the

---

~~8 Intentionally omitted, except the SPARTA Settlement Agreement, in which this section will provide:~~

~~[SPARTA shall provide a standby letter of credit, in a manner acceptable to the Debtor, to secure payment of the Settlement Amount. References herein or in the Plan to "payment" of the Settlement Amount shall be deemed to include the draw down of the letter of credit, as applicable.]~~

~~9 The Catholic Mutual Settlement Agreement will include the following~~

~~["(iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits,~~

full purchase price of the Archdiocese Policies and Related Insurance Claims and Coverage Claims of the Archdiocese Bound Parties and consideration for the releases and other protections afforded by this Settlement Agreement.

3.4     The Parties represent and agree that (i) the consideration to be provided by Insurer pursuant to this Settlement Agreement constitutes a fair and reasonable compromise and exchange for the consideration granted to the Insurer Released Parties in this Settlement Agreement (including the releases set forth below), and (ii) the consideration to be provided by the Archdiocese Bound Parties to the Insurer Released Parties pursuant to this Settlement Agreement (including the releases set forth below) constitutes a fair and reasonable compromise and exchange for the consideration granted to the Archdiocese Bound Parties in this Settlement Agreement. The Insurer Released Parties are not acting as volunteers, and the Settlement Amount reflects potential liabilities and obligations to the Archdiocese Bound Parties of the amount Insurer allegedly is obligated to pay.

3.5     Each of the Archdiocese Signatory Parties: (i) consents to the sale of the Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests and Claims of all Persons, including, without limitation, the Archdiocese Bound Parties in accordance with the terms of this Settlement Agreement, and (ii) agrees and acknowledges that the contribution of the proceeds from such sale and settlement to the Settlement Trust, as provided in the Plan and this Settlement Agreement, is a fair and reasonable compromise and exchange for value and constitutes reasonable and adequate consideration for any Subject Interest or Claim the Archdiocese Bound Parties may have in the Archdiocese Policies.

3.6     The Parties further agree that they have attempted to resolve the matters set forth herein in compliance with both state and federal law and believe that the settlement terms adequately consider CMS's interest and do not reflect any attempt to shift responsibility for payment of medical expenses to CMS pursuant to 42 U.S.C. § 1395y(b).  The Parties acknowledge, understand, and agree that any present or future action or decision by CMS, including actions regarding an Abuse Claimant's eligibility or entitlement to receive Medicare or Medicare payments, will not render this Settlement Agreement (including the releases set forth in it) void or ineffective, or in any way affect the finality of this Settlement Agreement.  The Settlement Trust is responsible for all future medical payments, including any and all claims by CMS and/or CMS contractors that have been or may be in the future arising out of, relating (directly or indirectly) in any way to, or in connection with this Settlement Agreement.

3.7     To facilitate the purchase of the Archdiocese PoliciesPurchased Property as set forth herein, the Archdiocese and each of the other Archdiocese Bound Parties authorizes the Archbishop10or any other person employed by the Archdiocese that he designates, as itsParty is

[\"(iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, \"each professional incident,\" per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted *except for the Preserved Coverage.\"*]

10 As used herein, \"Archbishop\" refers to: (a) the office of the ordinary of the Archdiocese under Canon Law; (b) the Most Reverend Gregory Michael Aymond, the Archbishop on the Effective Date; and (c) any duly appointed or elected administrator of the Archdiocese pending the appointment of a new individual to serve as the Archbishop, and his duly appointed or elected successor.

<u>authorized to designate a</u> lawful attorney in fact, with full powers of substitution, to execute any bill of sale or other document reasonably requested by the Archdiocese or Insurer to accomplish the sale and purchase contemplated herein. A form of Bill of Sale is attached hereto as **Exhibit B**.

## 4.    RELEASES AND SALE FREE AND CLEAR

4.1    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, with no further action being required, the Archdiocese Signatory Parties fully, finally, and completely remise, release, acquit, and forever discharge the Insurer Released Parties (including, for the avoidance of doubt, any of their reinsurers or retrocessionaires, solely in their capacity as such), from any and all past, present, and future: (a) Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies or Claims that are covered or are determined to be covered by agreement or a court of competent jurisdiction under the Archdiocese Policies, including, without limitation, any Barred Claims, Direct Action Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims, the handling of the Abuse Claims or the Bankruptcy Case.    The Archdiocese Signatory Parties further acknowledge, stipulate, and agree that (x) the releases in this Section 4.~~1~~4.1 specifically include all Unknown Abuse Claims, and demands that are based in whole or in part on Unknown Abuse Claims and (y) **with respect to all Claims released under this Section 4.~~1~~4.1, the Archdiocese Signatory Parties waive any and all provisions, rights, and benefits conferred by Cal. Civ. Code 1542 or any law of any state of the United States, or any principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code 1542, which provides: "a general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, that, if known by him or her, would have materially affected his or her settlement with the debtor or released party"** and (z) the releases in this Section 4.1 shall be equal in breadth to the broadest releases and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

4.2    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, and with no further action being required, Insurer shall fully, finally, and completely remise, release, acquit, and forever discharge the Archdiocese Signatory Parties from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies, including any Barred Claims, and reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case subject to the protections in favor of the Insurer Released Parties set forth herein[11].

---

[11] ~~Catholic Mutual Settlement Agreement will include the following addition:~~

~~"all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case *provided that, the obligations of the applicable Archdiocese Bound Parties are not released from their obligations under the Archdiocese Policies with respect to the Preserved Coverage."*~~

4.3     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, none of the Archdiocese Signatory Parties or other Archdiocese Bound Parties shall assert against the Insurer Released Parties any Claim with respect to any matter, conduct, transaction, occurrence, fact, or other circumstance that, directly or indirectly, arises out of, relates to, or is in connection with any of the Archdiocese Policies, any Barred Claim, or any other matter released pursuant to Sections 4.14.1 and 4.24.2 above.

4.4     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer hereby buys back the Archdiocese Policies free and clear of all Subject Interests, including without limitation all Coverage Claims and Related Insurance Claims, of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); and any Abuse Claimant, or any other holder of a Barred Claim.  This sale is pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code.  The Parties acknowledge and agree, and the Approval Order shall find and conclude, that upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount:

    4.4.1   Insurer is a good faith purchaser of the Archdiocese Policies and any Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), within the meaning of section 363(m) of the Bankruptcy Code, with all the protections afforded such a purchaser under 363(m) of the Bankruptcy Code;

    4.4.2    the consideration exchanged constitutes a fair and reasonable settlement and compromise of the Parties' disputes and of their respective rights and obligations relating to the foregoing Archdiocese Policies and Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), and constitutes reasonably equivalent value;

    4.4.3    the releases in this Settlement Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy law;

    4.4.4    the Archdiocese Policies and all Subject Interests therein (including, without limitation, to the extent applicable, any Direct Action Claim) shall be terminated and of no further force and effect;

    4.4.5   Insurer's payment of the Settlement Amount constitutes Insurer's full and complete performance of any and all obligations under the Archdiocese Policies, including any performance owed to the Archdiocese Bound Parties or any holder or purported holder of any Claim against (including any Abuse Claim or Direct Action Claim) or Subject Interest in, the Archdiocese Policies, and exhausts all limits of liability of the Archdiocese Policies;

    4.4.6   All Subject Interests the Archdiocese Bound Parties and any other Entity may have had, may presently have, or in the future may have in the Archdiocese

Policies are released pursuant to the terms of this Settlement Agreement and policy buyback;

4.4.7    all per occurrence and/or aggregate limits of coverage under the Archdiocese Policies are fully eroded, exhausted and settled upon the Settlement Agreement Effective Date;

4.4.8    the Insurer would not pay the Settlement Amount without buyback of the Archdiocese Policies upon all of the terms and conditions set forth herein; and

4.4.9    the Archdiocese Signatory Parties accept the Settlement Amount in full and complete compromise and satisfaction of all Insurer Released Parties' past, present, and future obligations, including any obligations to any of the Archdiocese Bound Parties under such Archdiocese Policies or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever that are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies (including without limitation Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether or not such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, the Bankruptcy Case, or otherwise.

4.5    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer shall have no obligation to pay, handle, object, or otherwise respond to any Claim against the Archdiocese Bound Parties; and the Archdiocese Bound Parties will: (i) will withdraw, and are deemed to have withdrawn, all outstanding tenders of Claims to the Insurer Released Parties for defense and indemnity; (ii) will not tender any Claims to the Insurer Released Parties; and (iii) will not request that the Insurer Released Parties fund any judgments, settlements, or defense costs that, in each case, are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies issued by a Settling Insurer.

4.6    To the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer consent to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under this Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Subject Interests of any Entity in such Archdiocese Policies (the "**Non-Debtor Catholic Entity Policy Sale**"). The Plan Confirmation Order and Approval Order shall so provide and Insurer shall be designated in the Plan Confirmation Order as a good-faith purchaser of the Archdiocese

Policies with all the protections afforded such a purchaser under section 363(m) of the Bankruptcy Code.

4.7     [Intentionally Omitted.][12]

4.8     The Archdiocese Signatory Parties further covenant, stipulate and agree that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Abuse Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any insured or additional insured covered by any insurance policy issued by any Insurer Released Party, and to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in any Archdiocese Policy to the Debtor's Estate and sale thereof to Insurer, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court. Without limiting the foregoing, the Insurer Released Parties shall receive protections against Claims by Non-Debtor Catholic Entities and any other Entity equal in breadth to the broadest protections received by any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, or any Insurance Settlement Agreement approved by the Bankruptcy Court.

4.9     If the Archdiocese Signatory Parties, or anyone of them, enter into any agreement (that is embodied in such agreement as approved by the Bankruptcy Court, the Plan, and/or the Plan Confirmation Order) with any other one of the Settling Insurers (including any Non-Settling Insurer who becomes a Settling Insurer) in the Bankruptcy Case, that provides that insurer with releases, injunctions or other protections that are more favorable than those contained in this Settlement Agreement, then this Settlement Agreement shall be deemed to be modified to provide Insurer with those more favorable injunctions, releases or other protections.

4.10    Notwithstanding anything in this Settlement Agreement, nothing in this Settlement Agreement is intended to or shall be construed to:

   4.10.1   apply to or have any effect on the Insurer Released Parties' rights to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer;[13]

---

[12] Intentionally omitted, except the Catholic Mutual Settlement Agreement, in which this section will provide:

   4.15 Notwithstanding anything in this Settlement Agreement to the contrary, nothing in the Settlement Agreement shall sell or purchase the Preserved Coverage; erode, exhaust the limits of, or terminate the Preserved Coverage; release the Insurer from providing the Preserved Coverage to the applicable Archdiocese Bound Parties; or release the obligations of the applicable Archdiocese Bound Parties under the Archdiocese Policies with respect to such Preserved Coverage.

[13] SPARTA Settlement Agreement will provide:

   For the avoidance of doubt, any release provided pursuant to this Settlement Agreement does not include any release by Insurer of any Claims against Pennsylvania General Insurance Corporation. Nothing in the Settlement Agreement shall impair any right of Insurer to pursue any direct claim or claim based on theories of contribution, indemnity, reimbursement, or subrogation against Pennsylvania General Insurance Corporation.

   The Plan shall provide the same.

4.10.2  release any Claims that any Insurer Released Party has or might have against any Non-Settling Insurer, except that, to the extent such other insurers have agreed or in the future agree to release any Claims against the Insurer Released Parties arising out of or related in any way to the Abuse Claims, then the Insurer Released Parties also release such Claims against such other insurers to the same extent; or

4.10.3  release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Settlement Agreement or the Plan (to the extent not inconsistent with this Settlement Agreement).

## 5.  TERMINATION OF AGREEMENT

5.1  The Parties may terminate this Settlement Agreement by mutual agreement in writing.

5.2  Insurer may terminate this Settlement Agreement upon fifteen (15) days written notice to the other Parties in the event of any of the following occurs prior to the Settlement Agreement Effective Date: (i) any of the Debtor Parties or the Creditors' Committee files a plan inconsistent with this Settlement Agreement; (ii) the Approval Order and the Plan Confirmation Order are not entered by February 15, 2026; (iii) the Bankruptcy Court enters an order that becomes a Final Order that (a) denies the Approval Motion or (b) is inconsistent with the Approval Order or the Plan Confirmation Order; (iv) a plan that is inconsistent with the terms of this Settlement Agreement is confirmed; or (v) any Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

5.3  In the event of termination pursuant to this Section 5, unless the Parties agree otherwise in writing, the Parties' interests, rights, and obligations under the Archdiocese Policies shall not be impacted by such termination.

## 6.  REPRESENTATIONS AND WARRANTIES OF THE PARTIES

6.1  The Parties separately represent and warrant as follows:

6.1.1  To the extent it is a corporation, including a non-profit, religious, or charitable corporation, or other legal entity, each such Party has the requisite power and authority to enter into this Settlement Agreement and to perform the obligations contemplated by this Settlement Agreement[1], subject only to approval of the Bankruptcy Court; and

6.1.2  This Settlement Agreement has been analyzed by counsel to the Parties and executed and delivered in good faith pursuant to arm's length negotiations and for value and valuable consideration.

---

[1] Specifically, each Archdiocese Signatory Party is duly authorized to execute this Settlement Agreement and any related document and the signatory hereto on behalf of such Archdiocese Signatory Party has full power and authority to bind such Archdiocese Signatory Party. The related corporate resolutions and incumbency certificates are identified in Schedule 4 and Schedule 5, respectively.

6.2     The Archdiocese Signatory Parties represent and warrant that they have not assigned, and will not assign, any Subject Interests in the Archdiocese Policies to any Entity, except for the avoidance of doubt, the assignment of the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate.

6.3     The Archdiocese Signatory Parties represent and warrant that (i) all Archdiocese Bound Parties have either signed this agreement, are represented herein by the Archdiocese or the Archdiocese Signatory Parties, or are juridical entities whose existence has been terminated as a matter of applicable non-bankruptcy law and (ii) the Archdiocese Signatory Parties are duly authorized to bind the Archdiocese Bound Parties who are not Archdiocese Signatory Parties. Without limiting the foregoing, the Archdiocese Signatory Parties represent and warrant that:

6.3.1     all entities known to them that are Co-Insured Parties ~~(or~~under the Archdiocese Policies (by express reference, assignment, judicial determination or any related concept under applicable law or other document) ~~under the Archdiocese Policies~~ other than the Debtor, the Additional Debtors, the Parish Schools and Archdiocesan Schools, the Non-Debtor Catholic Entities, and the cemeteries identified in Section ~~6.3.3~~6.3.3, are identified in Schedule 2 hereto, if any;[14]

6.3.2     the Archdiocesan Schools are not separately incorporated and are merely unincorporated operations of the Debtor and the Parish Schools are not separately incorporated and are merely unincorporated operations of the Archdiocesan Parishes that are Additional Debtors;

6.3.3     the Debtor, through the Office of Catholic Cemeteries, operates certain cemeteries including, without limitation: All God's Babies Tomb & Holy Innocents Prayer Garden, St. Charles Cemetery, St. Joseph Cemetery #1, St. Joseph Cemetery #2, St. Louis Cemetery #1, St. Louis Cemetery #2, St. Louis Cemetery #3, St. Patrick Cemetery #1, St. Patrick Cemetery #2, St. Patrick Cemetery #3, St. Roch Cemetery #1, St. Roch Cemetery #2, St. Vincent De Paul Cemetery #1, St. Vincent DePaul Cemetery #2, which cemeteries are either: (a) Non-Debtor Catholic Entities or (b) not separately incorporated and are merely unincorporated operations of the Debtor;

6.3.4     Holy Redeemer School, Redeemer-Seton High School, and St. Joseph Benedectine High School were formerly owned and operated by the Archdiocese, but ceased operations and were closed by the Debtor at some point prior to the Petition Date, and were not separately incorporated and were merely unincorporated operations of the Debtor;

6.3.5     St. Robert Bellarmine School was formerly owned and operated by one or more of the Archdiocese Signatory Parties, but ceased operations and was closed by one

---

[14] SPARTA Settlement Agreement to include:

The Archdiocese Signatory Parties represent and warrant that they are not aware of being an "additional assured" (or related concept under applicable law or document) under any American Employers Insurance Company ("AEIC") policy.

Note: SPARTA Settlement Agreement Schedule 2, will be listed as "None."

or more of the Archdiocese Signatory Parties at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of one of the Additional Debtors;

6.3.6    Notre Dame Seminary and the Society of the Propagation of the Faith of the Archdiocese of New Orleans are owned and operated by the Archdiocese and are not separately incorporated, but are merely unincorporated operations of the Debtor;

6.3.7    San Pedro Pescador Church was owned and operated by the Archdiocese, but was closed by the Archdiocese prior to the Petition Date and was not separately incorporated, but was merely an unincorporated operation of the Archdiocese;

6.3.8    the following Roman Catholic Schools: the Academy of the Sacred Heart, Holy Cross, Jesuit, St. Mary's Academy, St. Mary's Dominican, Brother Martin, Mount Carmel Academy, Ursuline Academy, Cabrini, De La Salle, and St. Paul's School, are not Co-Insured Parties, named insured's or additional insureds (or related concept under applicable law or document) under the Archdiocese Policies, or institutions, religious organizations or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control and active management, and were themselves not under the control or active management of the Archdiocese.;

6.3.9    St. John Vianney Preparatory School was formerly owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.10    the Louise Home a/k/a as the Louise Headstart Center was an unincorporated ministry of the Debtor;

6.3.11    Holy Guardian Angel was owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.12    the Social Apostolate Housing Program was an unincorporated ministry of the Debtor;

6.3.13    at all times Tulane Catholic and the Newman Center were and are unincorporated activities of the Debtor, with no existence separate and apart from the Debtor;

6.3.14    Crescent City Convent Corporation, Lyric Realty and Parking Company, Inc., The Chinchuba Deaf-Mute Institute, People for Teens of St. Anthony of Padua Corporation, Kiwanis Foundation of New Orleans, Kiwanis Club of New Orleans, and Seminarians Parents Association, Inc. were never owned, operated, or controlled by the Debtor or the Additional Debtors and were neither insureds nor additional insureds under the Archdiocese Policies; and

536

6.3.15    (a) Catholic Charities Archdiocese of New Orleans ("**Catholic Charities**") owned and operated Hope Haven – Madonna Manor ("**HH**"), which was organized under Louisiana law; (b) HH was dissolved and its status as a juridical person was, thus, terminated as a matter of Louisiana law; (c) at all times, Catholic Charities was the sole member and/ or shareholder of HH; and (d) it is the intention of Catholic Charities that HH be bound by this Agreement as if it remained in existence and had signed the Agreement as a Party.

6.4    The Archdiocese Signatory Parties represent and warrant that they are not aware of any Abuse Claim asserted against any entity associated with the Archdiocese (including any parishes, institutions or religious organizations or any subsidiary of the person or organization listed in the declarations of the Archdiocese Policies, or any other organization coming under the Archdiocese's control and active management), that is not listed on Exhibit B-1 to the Acceptable Plan.

6.5    The Debtor represents and warrants that it will undertake good faith efforts to cause actual notice of the Approval Motion to be sent in accordance with Section 2.1.12.1.1 hereof.  Without limitation, the Debtor has sent or will send notice to the entities on Schedule 3.

6.6    The Archdiocese Signatory Parties and Insurer (limited to such Insurer person that worked on and were familiar with this Settlement Agreement and matters referenced therein), respectively, represent and warrant that they have completed a reasonable search for evidence of any policy of insurance issued by Insurer to the Archdiocese Signatory Parties that would afford coverage with respect to any Abuse Claim, Coverage Claim, or Related Insurance Claim and other than the policies identified in Schedule 1, no such policies have been identified.  The Archdiocese Signatory Parties further represent and warrant that, to the best of their knowledge after reasonably diligent investigation: there are no contracts, binders, certificates, and policies of insurance that insure or purport to insure (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) (x) the Diocese of Houma-Thibodaux or (y) the Diocese of Baton Rouge (excluding, for the avoidance of doubt, policies issued to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD, but including any such policies issued to the Archdiocese that provide or may provide insurance coverage to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD), or (iv) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, other than the policies identified in Schedule 1.    Notwithstanding the foregoing, nothing in this Settlement Agreement, including the Schedules or Exhibits hereto, shall be construed as or deemed to be an admission or evidence that any binder, certificate, or policy of insurance was in fact issued or affords coverage in connection with any Abuse Claims.

6.7    The Debtor Parties represent and warrant that they have not in any way assisted, and covenant that they shall not in any way assist, any Entity in the establishment or pursuit of any Claim, including any Barred Claim, against the Insurer Released Parties.

## 7.    ACTIONS INVOLVING THIRD PARTIES

7.1     For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Archdiocese Policies resulting from the purchase and sale thereof contemplated by this Settlement Agreement, the Parties hereby agree as follows:

7.1.1     From and after (i) the occurrence of the Settlement Agreement Effective Date, and (ii) Insurer's payment of the Settlement Amount, if any other insurer of the Archdiocese Bound Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from Insurer as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for any of Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense or indemnity obligation of Insurer for any Claims or reimbursement obligations for Conditional Payments released or resolved pursuant to this Settlement Agreement, the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and the Settlement Trust shall voluntarily reduce any judgment or Claim against, or settlement with, such other insurers to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against Insurer.  To ensure that such a reduction is accomplished, Insurer shall be entitled to assert this Section 7 as a defense to any action against it brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Insurer from any liability for the judgment or Claim.  Moreover, if a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against Insurer, such Claim may be asserted as a defense against a Claim by the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust in any coverage litigation (and the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and/or the Settlement Trust may assert the legal and equitable rights of Insurer in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust shall be reduced dollar for dollar by the amount so determined.

7.1.2     Unless this Settlement Agreement is terminated, Insurer shall not seek reimbursement for any payments it makes under this Settlement Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other Settling Insurer unless that other insurer first seeks contribution, subrogation, indemnification, or similar relief from Insurer.  Notwithstanding the foregoing, nothing in this Settlement Agreement, the Approval Order or the Plan Confirmation Order shall be construed as prohibiting Insurer from seeking recovery (including with respect to the Settlement Amount or otherwise) from its reinsurers or retrocessionaires in their capacity as such.

7.2     Subject to the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, and subject to the limitations set forth below, the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein, including any Claims made by (i) any Entity who is an insured (as a

538

named insured, additional insured, or otherwise) under any of the Archdiocese Policies; (ii) any Entity who ~~has made, will make, or can make~~makes (a) an Abuse Claim or (b) a Related Insurance Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a Claim under any of the Archdiocese Policies (collectively, the "**Indemnified Claims**"), as set forth below: ~~15~~

     7.2.1   The Insurer Released Parties shall have the right (but not the obligation) to (a) seek to enforce the Injunctions against any Entity seeking to assert an Indemnified Claim, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions) identified in this Section ~~7.2~~7.2. With the Insurer Released Parties' consent, such consent not to be unreasonably withheld, the Settlement Trustee can satisfy the obligations contained in (a) and (b) above. An amount equal to ~~[____]16~~$59,523.81 (the "**Indemnity Cost Reserve**") shall be reserved from the Settlement Amount for payment of reasonable attorneys' fees, expenses, costs, and other amounts incurred by the Insurer Released Parties in defending against such Indemnified Claims, which amount shall be released from reserve if no Indemnified Claims are asserted within 30 days after the Revival Window has closed under every applicable Revival Window Law.

     7.2.2   ~~The~~Neither any Archdiocese Bound Party, nor the Settlement Trust shall ~~not~~ in any way assist, any Entity in the establishment or pursuit of any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein.

     7.2.3   The Settlement Trust and Archdiocese shall support and join in the enforcement of the Injunctions against any Entity seeking to assert an Indemnified Claim; *provided that* if the Insurer Released Party(ies) elect(s) not to enforce the Injunctions in accordance with Section 7.2.1, the Settlement Trust shall (a) seek to enforce the Injunctions against such Entity, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions).

     7.2.4   To the extent that a Final Order is entered against any Insurer Released Party with respect to any Indemnified Claim, the Settlement Trust shall indemnify and hold harmless such Insurer Released Party with respect thereto up to the Settlement Amount; *provided that* to the extent the Insurer Released Party(ies) elect not to enforce the Injunctions or defend against the Indemnified Claims, the Settlement Trust's indemnity obligation shall be limited to the amount of the Indemnity Cost Reserve; *provided further* that if the Settlement Trust breaches its obligation set forth in Section 7.2.2 hereof, the Settlement Trust's indemnity obligation shall not be so limited and shall instead be up to the Settlement Amount. In no event shall the Settlement Trust's indemnity obligation exceed each individual Settling Insurer's Settlement Amount. To

---

~~15~~ ~~*Note: Certain limitations on scope of indemnity subject to further discussion.*~~

~~16~~ ~~Amount to be equal to $250,000 for SPARTA, and an equivalent percentage of Settlement Amount for other Settling Insurers. The Indemnity Cost Reserve is a reserve amount provided for each individual Settling Insurer and cannot be aggregated.~~

the extent the Settlement Amount has been distributed in accordance with the Plan, the Settlement Trust's indemnification obligation shall be so reduced.

7.2.5    The indemnification provided for herein shall not impose liability on the Settlement Trustee or Settlement Trust professionals for their own acts or omissions; *further*, funds provided for the administration of the Settlement Trust or payment of the Settlement Trustee or Settlement Trust professionals shall not be subject to indemnification claims as provided for herein.

7.3    If any Entity attempts to prosecute a Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies against the Insurer Released Parties before the Approval Order and Plan Confirmation Order become Final Orders, then promptly following notice to do so from Insurer, the Archdiocese and/or the Additional Debtor(s), as applicable, will file a motion and supporting papers to obtain an order from the Bankruptcy Court pursuant to sections 362 and 105(a) of the Bankruptcy Code protecting the Insurer Released Parties from any such Claims until the Plan Confirmation Order has become a Final Order, the Bankruptcy Case is dismissed, or this Settlement Agreement is terminated under Section 55 hereof.

## 8.    MISCELLANEOUS

8.1    If any action or proceeding of any type whatsoever is commenced or prosecuted by any Entity not a Party to this Settlement Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Settlement Agreement, the Parties mutually agree to cooperate fully in opposing such action or proceeding.

8.2    The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Settlement Agreement and to preserve its validity and enforceability.

8.3    The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Plan Confirmation Order, and the Bankruptcy Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof.

8.4    Notwithstanding any language to the contrary in this Settlement Agreement, under no circumstance will any Archdiocese Signatory Party be obligated to take any action that violates any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, and if a court of competent jurisdiction determines that a term or condition in this Settlement Agreement does violate any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, the applicable Archdiocese Signatory Party shall be relieved of such term or condition, but the scope and finality of the releases, injunctions, and buybacks set forth in this Settlement Agreement shall not be affected or modified.

8.5    This Settlement Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.6    This Settlement Agreement may be modified only by a written amendment signed by all of the Parties, and no waiver of any provision of this Settlement Agreement or of a breach thereof shall be effective unless expressed in a writing signed by the waiving Party. The waiver by any Party of any of the provisions of this Settlement Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach. Any change or modification of this Agreement that would result in a material adverse change to the rights of the Abuse Claimants or Trust shall require the consent of the Creditors' Committee (if at the time of the proposed change or modification a Trustee has not been appointed) or Settlement Trustee (if at the time of the proposed change or modification a Trustee has been appointed and approved), as applicable, which consent shall not be unreasonably withheld.

8.7    By entering into this Settlement Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Settlement Agreement. No part of this Settlement Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Settlement Agreement. All actions taken and statements made by the Parties or by their representatives relating to this Settlement Agreement or participation in this Settlement Agreement, including its development and implementation, shall be without prejudice or value as precedent.

8.8    This Settlement Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession regarding liability, culpability, wrongdoing, or insurance coverage. All related discussions, negotiations, and all prior drafts of this Settlement Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. Any evidence of the negotiations or discussions associated with this Settlement Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.8 8.8, in (i) an action or proceeding to enforce the terms of this Settlement Agreement, including any use as set forth in Section 7.1.1 7.1.1, or (ii) any possible action or proceeding between the Insurer Released Parties and any reinsurers. This Settlement Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Insurer Released Parties' obligations under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer.

8.9    None of the Parties shall make any public statements or disclosures (i) regarding another Party's rationale or motivation for negotiating or entering into this Settlement Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued or determined by agreement or a court of competent jurisdiction to

have been issued by the Insurer Released Parties, including handling of or involvement in connection with any claims asserted thereunder.

8.10    Neither this Settlement Agreement nor the rights and obligations set forth in this Settlement Agreement shall be assigned without the prior written consent of the other Parties.

8.11    This Settlement Agreement was jointly drafted by the Parties, and the wording of this Settlement Agreement was reviewed by legal counsel for each of the Parties, and each of them had sufficient opportunity to propose and negotiate changes prior to its execution.  The language of all parts of this Settlement Agreement shall in all cases be construed as a whole according to its meaning and not strictly for or against any Party.

8.12    Section titles and headings contained in this Settlement Agreement are included only for ease of reference and shall have no substantive effect.

8.13    All notices, demands, or other communication to be provided pursuant to this Settlement Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other Entity or address as any of them may designate in writing from time to time:

> If to the Debtor or Reorganized Debtor:
>
> ~~with copies to:~~
>
> Mark A. Mintz
> Samantha A. Oppenheim
> Jones Walker LLP
> Telephone: 504-582-8368
> Telephone: 504-582-8641
> Email: mmintz@joneswalker.com
> Email: soppenheim@joneswalker.com
>
> ~~and~~
>
> If to an Archdiocese Signatory Party other than a Debtor Party:
>
> As set forth on Plan Exhibit B-2.
>
> If to Insurer or the Insurer Released Parties:
>
> Tancred Schiavoni
> Emma Jones
> O'Melveny & Myers LLP
> Telephone: 212-326-2267
> Telephone: 972-360-1913
> Telephone: 832-254-1536

Email: tschiavoni@omm.com
Email: eljones@omm.com
Email: jjilovec@omm.com

with copies to:

-and-

-and-

If to the Settlement Trust:

Donald C. Massey
Couhig Partners, LLC
1100 Poydras Street, Suite 3250
New Orleans, Louisiana 70163
Telephone: (504) 599-5777
Email: dmassey@couhigpartners.com

with copies to:

Andrew W. Caine
-and-

Pachulski, Stang, Ziehl & Jones LLP
10100 Santa Monica Blvd, Suite 1300
Los Angeles, CA 90067
Telephone: 310-277-6910
Email: acaine@pszjlaw.com

-and-

8.14  This Settlement Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument. This Settlement Agreement may be executed and delivered by facsimile, e-mail, or other electronic image, which facsimile, e-mail, or other electronic image counterparts shall be deemed to be originals.

8.15  8.14 Nothing contained in this Settlement Agreement shall be deemed or construed to constitute (i) an admission by the Insurer Released Parties that the Archdiocese Bound Parties, or any other Entity, was or is entitled to any insurance coverage under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by the Insurer

Released Parties or as to the validity of any of the positions that have been or could have been asserted by the any of the Archdiocese Bound Parties, (ii) an admission by any of the Archdiocese Bound Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by the Insurer Released Parties or any Claims that have been or could have been asserted by the Archdiocese Bound Parties against the Insurer Released Parties, or (iii) an admission by the Archdiocese Bound Parties or the Insurer Released Parties of any liability whatsoever with respect to any of the Abuse Claims.

8.16    8.15 The Parties to this Settlement Agreement, all of the Entities included in the definition of "Insurer Released Parties," and the Settlement Trust are intended beneficiaries of this Settlement Agreement.  Except as set forth in the preceding sentence or otherwise set forth in this Settlement Agreement, there are no third-party beneficiaries of this Settlement Agreement.

8.17    8.16 The Archdiocese Signatory Parties and the Insurer Released Parties shall each be responsible for their own fees and costs incurred in connection with the Bankruptcy Case, this Settlement Agreement, and the implementation of this Settlement Agreement, except as specifically set forth herein (including in Section 7 7).

8.18    8.17 The following rules of construction shall apply to this Settlement Agreement:

8.18.1    8.17.1 Unless the context of this Settlement Agreement otherwise requires:  (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Settlement Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.18.2    8.17.2 References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Settlement Agreement.

8.18.3    8.17.3 The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Settlement Agreement when the stated intent is not achieved.

8.19    8.18 The Bankruptcy Court in the Bankruptcy Case shall retain jurisdiction to interpret and enforce the provisions of this Settlement Agreement, which shall be construed in accordance with Louisiana law without regard to conflicts of law principles thereof.  The Insurer Released Parties do not, by virtue of this Section 8.18 8.19 or any other provision in this Settlement Agreement, consent to the Bankruptcy Court's jurisdiction as to any other matter.

8.20    8.19 This Settlement Agreement and each Debtor Party's obligations under this Settlement Agreement shall be binding on each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) and shall survive the entry of the Plan Confirmation Order; provided, however, after the occurrence of the Bankruptcy Plan Effective

Date, recourse for all obligations, other than those set forth in Sections 6.5, 6.7 6.5, 6.7, and 7 7 hereof or a remedy of specific performance, shall be to the Settlement Trust; provided further, however, if specific performance is not available, each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) may be held liable for an intentional breach of a representation in this Agreement or their bad faith material breach of this Agreement, and if liability on any such ground is established, then recourse may be had directly against the Debtor Party, Reorganized Debtor, and/or Reorganized Additional Debtor(s) responsible.

8.21    8.20 The obligations of the Parties herein, other than those conditioned upon the Settlement Agreement Effective Date, shall be binding upon execution hereof by the Parties.

8.22    8.21 Nothing in this Settlement Agreement will prevent Insurer from allocating the Settlement Amount among the Archdiocese Policies at Insurer's discretion.

8.23    8.22 If any provision of this Settlement Agreement, or the application thereof, shall for any reason or to any extent, be construed to be invalid or unenforceable, the remainder of this Settlement Agreement, and the application of such provision to other circumstances, shall be interpreted so as to best effect the intent of the Parties, unless such determination of invalidity or unenforceability deprives any Party of the substantial benefit of its bargain.

8.24    8.23 The Parties agree that all matters relating to the negotiation and terms of this Settlement Agreement (including by way of example and not limitation, all prior drafts, exchanges of terms, and related discussions or correspondence) shall be confidential and are not to be disclosed except by order of court or consent of the Parties in writing. This Section 8.23 8.24 does not prevent or prohibit the Parties from publicly filing on the docket in the Bankruptcy Case the final, executed copy of this Settlement Agreement.

[*Remainder of Page Intentionally Left Blank*]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed: _____

_____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**U.S. Fire/International**

Signed: _____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**All Archdiocese Signatory Parties
Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title: **Their Authorized Signer**

Date: _____

*[Signatures Continue on Adjacent Pages]*

**Exhibit A**

**Sale Order**

Case 20-10846 Doc 954-3 Filed 10/27/25 Entered 10/27/25 16:27:54 Plan Supplement
7.1(a) Pt. 4 - Supplemental Exhibits 350 to 1359 Page 45 of 98

Case 2:20-08466 Doc 4254-1-2 Filed 10/24/25 Entered 10/24/25 19:24:53 Plan Exhibit
- US Settlements Page 570 of 1389 Page 45 of 98

**Exhibit B**

**Bill of Sale**

## BILL OF SALE AND ASSIGNMENT

**THIS BILL OF SALE AND ASSIGNMENT** is made and entered into as of _____, 2025, by and between The Roman Catholic Archdiocese of New Orleans and its Bankruptcy Estate (the "**Archdiocese**" or "**Debtor**"); the Additional Debtors and their respective Bankruptcy Estates, Non-Debtor Catholic Entities (collectively, "**Archdiocese Signatory Parties**"); and United States Fire Insurance Company ("**U.S. Fire**"), International Insurance Company ("**International**"), and Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company individually and, to the extent that policies issued by U.S. Fire and/or International were novated to or assumed by either or both of them (collectively, "**U.S. Fire/International**" or "**Insurer**").  All capitalized terms used herein without definition have the meanings set forth in the Settlement Agreement, Release, and Policy Buyback by, between, and among The Archdiocese, the other Archdiocese Signatory Parties, and Insurer, as amended or modified (the "**Settlement Agreement**").

### W I T N E S S E T H:

WHEREAS, pursuant to the Settlement Agreement, the Archdiocese Signatory Parties have, on behalf of themselves and all other Archdiocese Bound Parties, agreed to sell and/or convey any and all right, title, and interest (including all Subject Interests) in and to the Purchased Property (as defined in the Approval Order), and Insurer has agreed to purchase and buy-back the Purchased Property, in consideration of the payment of a purchase price of $5,000,000 (the "**Purchase Price**") and other good and valuable consideration as provided in and under the Settlement Agreement and Plan;

WHEREAS, the Approval Order, as filed at Docket No. [_], has approved the Sale Transaction (as defined in the Approval Order) and found that the Purchase Price is a fair and reasonable price for the Purchased Property;

NOW, THEREFORE, in consideration of the payment of the Purchase Price by Insurer as set forth in the Settlement Agreement, and in accordance therewith and with Approval Order, the Debtor Parties do hereby sell, transfer, and assign to Insurer, and Insurer does hereby accept, all of the Archdiocese Bound Parties' right, title, and interest in and to the Purchased Property, and all Subject Interests therein.

[signatures appear on following pages]

**IN WITNESS WHEREOF**, the ~~Parties~~<u>parties</u> have executed this ~~Agreement~~<u>Bill of Sale and Assignment</u> by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed: _____

_____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**[Insurer]**

**U.S. Fire/International**

Signed:

_____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**All Archdiocese Signatory Parties
Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title: **Their Authorized Signer** _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

## Schedule 1

## Archdiocese Policies

The following policies shall be included in the definition of Archdiocese Policies:

| Incept | Expire | Insurer | Policy No. |
|--------|--------|---------|-----------|
| February 1, 1977 | March 1, 1978 | U.S. Fire Insurance Company | 520 02210 9 |
| March 1, 1978 | February 1, 1979 | U.S. Fire Insurance Company | 522 00084 6 |
| February 1, 1979 | March 1, 1980 | U.S. Fire Insurance Company | 522 007224 3 |
| March 1, 1980 | March 1, 1981 | U.S. Fire Insurance Company | 522 010391 4 |
| March 1, 1981 | February 1, 1982 | International Insurance Company | 522 010882 8 |
| March 1, 1981 | February 1, 1982 | International Insurance Company | 522 010833 7 |
| February 1, 1982 | February 1, 1983 | International Insurance Company | 522 0291231 1 |
| February 1, 1983 | June 30, 1983 | International Insurance Company | 522 029140 2 |

## Schedule 2

## Other Co-Insureds Known to the Archdiocese Signatory Parties

**1.** **None**

For the avoidance of the doubt, the following entities are bound by the terms of the Settlement Agreement:[1]

### I. Archdiocesan Parishes

1. All Saints Roman Catholic Church, New Orleans, Louisiana
2. Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana
3. Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana
4. Assumption of Mary Roman Catholic Church, Avondale, Louisiana
5. Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana[2]
6. Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana
7. Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana
8. Blessed Trinity Roman Catholic Church, New Orleans, Louisiana
9. Christ the King Roman Catholic Church, Gretna, Louisiana
10. Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana
11. Divine Mercy Roman Catholic Church, Kenner, Louisiana
12. Good Shepherd Roman Catholic Church, New Orleans, Louisiana
13. Holy Family Roman Catholic Church, Franklinton, Louisiana
14. Holy Family Roman Catholic Church, Luling, Louisiana
15. Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana
16. Holy Spirit Roman Catholic Church, New Orleans, Louisiana
17. Immaculate Conception Roman Catholic Church, Marrero, Louisiana
18. Immaculate Conception Roman Catholic Church, New Orleans, Louisiana
19. Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana
20. Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana
21. Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana, for itself and as successor to St.

---

[1] Without limiting Section 6.4 of the Settlement Agreement, Insurer does not concede that any of the Entities listed on this schedule are "insureds," "additional insureds," or "protected persons" under its Archdiocese Policies.

[2] Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc.

22. Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana

23. Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana

24. Most Holy Trinity Roman Catholic Church, Covington, Louisiana

25. Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana

26. Our Lady of Grace Roman Catholic Church, Reserve, Louisiana

27. Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana

28. Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana

29. Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana

30. Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana

31. Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana

32. Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana

33. Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana

34. Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana

35. Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana

36. Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana

37. Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana

38. Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana

39. Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana

40. St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana

41. St. Agnes Roman Catholic Church, Jefferson, Louisiana

42. St. Alphonsus Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

43. St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana

44. St. Angela Merici Roman Catholic Church, Metairie, Louisiana

45. St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana

46. St. Anselm Roman Catholic Church, Madisonville, Louisiana

47. St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana

48. St. Anthony of Padua Roman Catholic Church, Luling, Louisiana

49. St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana

50. St. Anthony Roman Catholic Church, Gretna, Louisiana

51.   St. Augustine Roman Catholic Church, New Orleans, Louisiana

52.   St. Benedict Roman Catholic Church, Covington, Louisiana

53.   St. Benilde Roman Catholic Church, Metairie, Louisiana

54.   St. Bernard Roman Catholic Church, St. Bernard, Louisiana

55.   St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana

56.   St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana

57.   St. Christopher Roman Catholic Church, Metairie, Louisiana

58.   St. Clement of Rome Roman Catholic Church, Metairie, Louisiana

59.   St. Cletus Roman Catholic Church, Gretna, Louisiana

60.   St. David Roman Catholic Church, New Orleans, Louisiana

61.   St. Dominic's Roman Catholic Church, New Orleans, Louisiana

62.   St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana

63.   St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana

64.   St. Francis Xavier Roman Catholic Church, Metairie, Louisiana

65.   St. Genevieve Roman Catholic Church, Slidell, Louisiana

66.   St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana

67.   St. Jerome Roman Catholic Church, Kenner, Louisiana

68.   St. Joachim Roman Catholic Church, Marrero, Louisiana

69.   St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana

70.   St. John of the Cross Roman Catholic Church, Lacombe, Louisiana

71.   St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, for itself and as successor to St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc.

72.   St. John the Baptist Roman Catholic Church, Edgard, Louisiana

73.   St. John the Baptist Roman Catholic Church, Folsom, Louisiana

74.   St. Joseph Roman Catholic Church, Algiers, Louisiana

75.   St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana

76.   St. Joseph's Roman Catholic Church, Gretna, Louisiana

77.   St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc.

78.   St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana

79. St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana

80. St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana

81. St. Margaret Mary Roman Catholic Church, Slidell, Louisiana

82. St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana

83. St. Mark Roman Catholic Church, Ama, Louisiana

84. St. Martha Roman Catholic Church, Harvey, Louisiana

85. St. Martin de Porres Roman Catholic Church, New Orleans, formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc.

86. St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana

87. St. Mary's Roman Catholic Church, New Orleans, Louisiana

88. St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana

89. St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St. John the Baptist Roman Catholic Church, Paradis, Louisiana, for itself and as successor to St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc.

90. St. Patrick's Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

91. St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana

92. St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana

93. St. Peter Claver Roman Catholic Church, New Orleans, Louisiana

94. St. Peter Roman Catholic Church, Reserve, Louisiana, for itself and as successor to St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc.

95. St. Peter's Roman Catholic Church, Covington, Louisiana

96. St. Philip Neri Roman Catholic Church, Metairie, Louisiana

97. St. Pius X Roman Catholic Church, New Orleans, Louisiana

98. St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana

99. St. Rita Roman Catholic Church, Harahan, Louisiana

100. St. Rita Roman Catholic Church, New Orleans, Louisiana

101. St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana[3]

[3] As stated in footnote 2, Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

102.   Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana

103.   The Congregation of St. Rita Roman Catholic Church of Harahan

104.   The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana

## II.   Suppressed Archdiocesan Parishes[4]

1.   Blessed Sacrament, Inc.

2.   Epiphany, Inc.

3.   Immaculate Heart of Mary, Inc.

4.   Incarnate Word, Inc.

5.   Our Lady of Good Counsel, Inc.

6.   Our Lady of Good Harbor, Inc.

7.   Our Lady of Lourdes, New Orleans, Louisiana, Inc.

8.   Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.

9.   Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana

10.   St. Ann, New Orleans, Louisiana, Inc.

11.   St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana

12.   St. Frances Xavier Cabrini, Inc.

13.   St. Francis de Salles, Inc.

---

[4]   The Suppressed Archdiocesan Parishes no longer operate as separate church parishes.  The Suppressed Archdiocesan Parishes were not dissolved, and may own property.

Following Hurricane Katrina, the operations of certain of the Suppressed Archdiocesan Parishes were combined with Archdiocesan Parishes.  In 2024, in the ongoing aftermath of Hurricane Ida and a result of storm damage, the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental statistics, and financial difficulties encountered, the following additional Suppressed Archdiocesan Parishes were canonically merged with neighboring Archdiocesan Parishes: (a) St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc., was canonically merged into St. Peter Roman Catholic Church, Reserve, Louisiana; (b) (i) St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and (ii) St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc., were both canonically merged into Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, now known as St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana; (c) St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc., was canonically merged into St. Rosalie Roman Catholic Church, Harvey, Louisiana, now known as Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana; (d) St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc., was canonically merged into Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, now known as St. John Paul II Roman Catholic Church, Waggaman, Louisiana; (e) St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc., was canonically merged into St. John the Baptist Roman Catholic Church, Paradis, Louisiana, now known as St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana; (f) Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc., was canonically merged into St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, now known as St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana; and (g) St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc., had its canonical territory divided so that (i) the area north of the Pontchartrain Expressway was canonically merged into St. Patrick's Roman Catholic Church, New Orleans, Louisiana, and (ii) the area south of the Pontchartrain Expressway was canonically merged into St. Alphonsus Roman Catholic Church, New Orleans, Louisiana.

14.  St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana

15.  St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana

16.  St. Henry's, Inc.

17.  St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana

18.  St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana

19.  St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana

20.  St. John the Baptist, New Orleans, Louisiana, Inc.

21.  St. Julian Eymard, Inc.

22.  St. Lawrence the Martyr, Inc.

23.  St. Louise de Marillac, Inc.

24.  St. Maurice, Inc.

25.  St. Monica, Inc.

26.  St. Philip the Apostle, Inc.

27.  St. Raymond's, Inc.

28.  St. Rose of Lima, Inc.

29.  St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana

30.  St. Theresa of the Child Jesus, Inc.

31.  The Congregation of Saints Peter and Paul Roman Catholic Church

32.  The Congregation of St. Cecelia Roman Catholic Church

33.  The Congregation of the Annunciation Roman Catholic Church

34.  The Congregation of the Holy Trinity Roman Catholic Church


III.  **Archdiocesan Agencies**

1.  Archdiocesan Spirituality Center

2.  Catholic Charities Archdiocese of New Orleans

3.  Catholic Charities Children's Day Care Centers

4.  Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)

5.      Clarion Herald Publishing Company

6.      Korean Catholic Community of New Orleans, Inc.

7.      Notre Dame Seminary

8.      Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana

9.      Pace Greater New Orleans

10.    Padua House (merged into Catholic Charities Archdiocese of New Orleans)

11.    Philmat, Inc.

12.    Project Lazarus

13.    Roman Catholic Center of Jesus the Lord

14.    School Food and Nutrition Services of New Orleans, Inc.

15.    Second Harvest Food Bank of Greater New Orleans and Acadiana

16.    St. Jude Community Center, Inc.

17.    St. Michael Special School

18.    St. Thérèse Catholic Academy

19.    The Society for the Propagation of the Faith, Archdiocese of New Orleans

**IV.    Non-Debtor Catholic Entities**

**Archdiocesan Agencies**

1.      7887 Walmsley, Inc.

2.      Annunciation Inn, Inc.

3.      Archdiocese of New Orleans Indemnity, Inc.

4.      Aspiring Scholars

5.      Catholic Community Foundation Archdiocese of New Orleans

6.      Christopher Homes, Inc.

7.      Christopher Inn

8.      Dubourg Home

9.      Holy Redeemer Catholic Virtual Academy

10.    Holy Trinity Drive Land Corporation

11.    Iberia Investment Fund II, LLC

12.    Metairie III

13.    Metairie Manor

14.    Monsignor Wynhoven Apartments, Inc.

15.    Nazareth II

16.    Nazareth Manor

17.    New Orleans Archdiocesan Cemeteries

18.    Notre Dame Health System (f/k/a Chateau de Notre Dame)

19.    Rouquette III

20.    St. Anthony's Gardens

21.    St. Bernard II

22.    St. Bernard III

23.    St. Bernard Manor

24.    St. Martin's Manor, Inc.

25.    St. Tammany Catholic Cemetery

26.    St. Tammany Manor

27.    The Apartments at Mater Dolorosa

28.    The Mental Health Association Development Corporation

29.    Villa Additions, doing business as St. Teresa's Villa

30.    Villa St. Maurice, Inc.

**Schedule 3**

**Additional Notice Parties**

**The Redemptorists/Denver Province**
1633 North Cleveland Avenue
Chicago, IL 60614

**Dominican Province of St. Albert the Great**
1910 S. Ashland Avenue
Chicago, Illinois, 60608-2905

**Congregation of Holy Cross**
P.O. Box 1064
Notre Dame, IN 46556-0541

**St. Elio Roman Catholic Church**
1335 Bayou Dularge Road
Theriot, LA 70397

**Central Catholic High School**
2100 Cedar Street, Unit 1
Morgan City, LA 70380

**Edward Douglas White Catholic High School**
555 Cardinal Drive
Thibodaux, LA 70301

**Chinchuba Institute for the Deaf**
2929 Carrollton
New Orleans, LA 70118

And

1231 Prytania St.
New Orleans, LA 70130

**St. Scholastica Academy**
122 South Massachusetts St.
Covington, Louisiana 70433

**Hope Haven – Madonna Manor**
1231 Prytania
New Orleans LA 70130

7887 Walmsley Ave.
New Orleans, LA 70125
2929 Carrollton
New Orleans, LA 70118

**Holy Cross College, Inc.**
Attn Remy Donnelly
5500 Paris Ave.
New Orleans, LA 70122

**Tulane Catholic**
1037 Audubon St
New Orleans, LA 70118

**University of New Orleans**
2000 Lakeshore Drive
New Orleans, LA 70148

**Our Lady of Peace Catholic Church**
13281 LA-644
South Vacherie, LA 70090

**St. Lucy Child Development Center**
1220 Aycock St
Houma, LA 70360

**St. Augustine High School, Inc.**
c/o Alfred Harrell, III
2600 A.P. Tureaud Ave
New Orleans LA 70119

**St. Joseph's Society of the Sacred Heart**
P.O. Box 65010
Baltimore, MD 21209

**The Community of the Sisters of the Immaculate Conception**
c/o Melanie Baglow
6208 Ithaca Street
Metairie, LA 70003

**Sisters of Mount Carmel**
**Generalate Office**
21388 Smith Road
Covington, LA 70435-6349

**Daughters of St. Paul**
50 St. Paul's Ave.
Jamaica Plain, MA 02130

and

c/o Mary Martha Moss
4403 Veterans Blvd.
Metairie, LA 70006

**Crescent City Convent Corporation**
210 Baronne St.
New Orleans, LA 70112

**Holy Rosary Academy High School**
2437 Jena St
New Orleans, LA 70115

**St. Brigid Parish**
7887 Walmsey Avenue
New Orleans, LA 70125

**Prince of Peace Parish**
7887 Walmsey Avenue
New Orleans, LA 70125

**St. Nicholas of Myra Mission**
9701 Hammond St
New Orleans, LA 70127

**Infant Jesus of Prague Mission**
c/o St. Martha Parish
2555 Apollo Drive
Harvey, LA 70058

**Catholic Youth Ministry**
1007 Airline Park Blvd
Metaire, LA 70003

**Family Life Apostolate**
7887 Walmsey Avenue
New Orleans, LA 70125

**Ozanam Inn Inc**
P.O. Box 30565
New Orleans, LA 70190

**Gayle & Tom Benson House of Priestly Formation**
2925 South Carrolton
New Orleans, LA 70118

**Stella Maris Maritime Center**
7887 Walmsey Avenue
New Orleans, LA 70125

**Camp Abbey**
**CYO Youth Office**
1007 Airline Park Blvd
Metaire, LA 70003

**St. Therese Academy**
917 N. Atlanta St
Metaire, LA 70003

**Our Lady of Guadalupe Parish**
411 North Rampart Street
New Orleans, LA 70112

**Lyric Realty and Parking Company, Inc.**
c/o Kenneth D. Boudreaux
1115 Tallowtree Dr.
Mandeville, LA 70448

**Sacred Heart of Jesus Catholic Church**
1111 Highway 55
PO Box 2
Montegut, LA 70377

**Diocese of Houma Thibodaux**
P.O. Box 505
Schriever, LA

**Diocese of Baton Rouge**
Post Office Box 2028
Baton Rouge, Louisiana 70821-2028

**Vandebilt Catholic High School**
209 South Hollywood Road
Houma, LA 70360


**General Services Administration**
1800 F St., NW
Washington, DC 20405


**People For Teens of St. Anthony of Padua Corporation**
4700 Cleveland
New Orleans, LA 70119


**Society of the Sacred Heart**
4120 Forest Park Avenue
St. Louis, MO 63108


**Seminarians Parents Association, Inc.**
718 Wood St
Houma, La 70360


**Society of the Divine Word**
PO Box 6038
Techny, IL 60082


**Ursuline Sisters of the Roman Union, Central Province,**
353 South Sappington
St. Louis, MO 63122


**Salesians of Don Bosco, Eastern Province
in the USA d/b/a Salesian Society, Inc.**
Through its agent for service of process:
Rev. Louis Molinelli, SDB
1000 Barataria Boulevard
Marrero, LA 70072


and


Rev. Louis Molinelli, S.D.B.
1000 Salesian Lane
Marrero, LA 70072

**Schedule 4**

**Form of Corporate Resolutions**

## CORPORATE RESOLUTION

RESOLUTION OF THE MEMBERSHIP AND BOARD OF DIRECTORS OF [NAME], [ADDRESS], A LOUISIANA NON-PROFIT [CORPORATION][LIMITED LIABILITY COMPANY (hereinafter this "Corporation").

BE IT RESOLVED, that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation, are hereby authorized to transact on behalf of this Corporation any and all business related to the following:

1. Engaging 1793 Group, a Louisiana non-profit corporation, on terms and conditions deemed appropriate in their sole discretion, to assist with and administer on this Corporation's behalf, any and all matters in which this Corporation may have an interest in relation to a Plan of Reorganization filed or anticipated to be filed by The Roman Catholic Church of the Archdiocese of New Orleans in proceedings commenced under Chapter 11 of the Bankruptcy Code, captioned *In re The Roman Catholic Church of the Archdiocese of New Orleans*, Case No. 20-10846 (Bankr. E.D. La.) (the "Chapter 11 Case"), including, but not limited to, preparing and filing a petition in the Chapter 11 Case seeking relief under Chapter 11 of the United States Bankruptcy Code as an additional debtor, executing any and all documents necessary for this Corporation to file for relief in the Chapter 11 Case, executing on behalf of this Corporation all documents required to comply with the requirements imposed upon parties filing for relief under Chapter 11of the Bankruptcy Code, Bankruptcy Rules, Local Rules for the Eastern District of Louisiana and/or the requirement imposed by the United States Trustee.

2. Engaging the firm of Heller Draper and/or any other attorneys to represent this Corporation in actions or proceedings related to the Chapter 11 Case.

3. Engaging accountants, financial advisors, and any other professionals necessary to administer the Chapter 11 Case on behalf of this Corporation.

4. Making decisions with regard to the payment of fees and costs for which this Corporation may become responsible to pay in the Chapter 11 Case.

5. Making decisions with regard to the filing of any plan within the Chapter 11 case, provided that such shall contain terms and provisions consistent with those set forth in Appendix "A" attached hereto and incorporated herein by this reference.

FURTHER RESOLVED that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation with the power of substitution, is authorized to execute and deliver on behalf of this Corporation each and every Insurance Settlement Agreement with the Settling Insurers, as those terms are defined in the Fourth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of September 23, 2025 (the "Plan"), and any amendment or modification to the Plan, including, without limitation, the documents attached or referred to in Plan Supplement 7.1(a), any Bill of Sale required under such Insurance Settlement Agreements,

570

and any other documents reasonably requested by any such Settling Insurer to effectuate the transactions provided for in its Insurance Settlement Agreement or the Plan.

FURTHER GIVING AND GRANTING unto either Very Rev. Patrick Carr or Rev. Leon Poche, full power and authority to sign any and all documents and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER GIVING AND GRANTING unto Very Rev. Peter Akpoghiran or any other officer of the Corporation, full power and authority to certify the passage and effectiveness of this Resolution to the Settling Insurers and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER RATIFYING AND CONFIRMING all that either Very Rev. Patrick Carr or Rev. Leon Poche, in his said capacity may do or cause to be done in the premises.

I, the undersigned President of this Corporation do hereby certify that the above and foregoing is a true and correct copy of a resolution adopted by the Membership and Board of Directors of said corporation in conformity with the Articles of Incorporation and Louisiana law, and that said resolution remains in full force and effect and has not been amended or rescinded.

WITNESS MY HAND AND SEAL, effective this _____day of _____, 2025

_____
Very Reverend Patrick J. Williams, V.G.

ATTEST

_____
Dirk Wild, Director

**Schedule 5**

**Form of Incumbency Certificates**

*[Different first page link-to-previous setting changed from off in original to on in modified.].*

*Filing Version 7/29/2025*

## INCUMBENCY CERTIFICATE

I, **Very Rev. Peter Akpoghiran, J.C.D**., the duly elected, qualified, and acting **Vice President** of each of the Louisiana nonprofit corporations or limited liability companies listed on **Exhibit A** attached hereto (each, a "Corporation," and collectively, the "Corporations"), do hereby certify as follows:

1. That the person named below has been duly elected or appointed and is the qualified and acting officer of each of the Corporations holding the office set forth opposite his/her name.

   **NAME**                              **TITLE**

   **Very Rev. Patrick J. Williams, V.G.**        **President and Director**

2. That the foregoing person is duly authorized to act on behalf of each Corporation in such capacity and to exercise the powers and perform the duties incident to said office under the respective Articles of Incorporation and Bylaws of each Corporation.

3. That attached hereto as **Exhibit B** is a true and correct copy of a resolution adopted at a duly noticed special meeting by the sole member of each of the Corporations and all of the Board of Directors of each said Corporation in attendance at such meeting in conformity with such Articles of Incorporation and Louisiana law and that said resolution remains in full force and effect and has not been amended or rescinded.

   IN WITNESS WHEREOF, I have hereunto set my hand as Vice President of each of the

Corporations as of this ____ day of October, 2025.

_____
Very Rev. Peter Akpoghiran, J.C.D
Vice President of Each Corporation
(See Attached Exhibit A)

*[Different first page link-to-previous setting changed from off in original to on in modified.].*

State of Louisiana
Parish of Orleans

On this _____ day of October, 2025, before me, the undersigned Notary Public, personally appeared **Very Rev. Peter Akpoghiran, J.C.D.,** who acknowledged that he/she executed the foregoing instrument for the purposes therein contained and in the capacity therein stated.

Notary Public
Printed Name: _____
Notary ID or Bar Roll No.: _____
My Commission Expires: _____

**EXHIBIT A**
**List of Corporations**

*[Link-to-previous setting changed from off in original to on in modified.]*

| Summary report: Litera Compare for Word 11.3.0.46 Document comparison done on 10/27/2025 3:59:28 PM | |
|---|---|
| **Style name:** OMM Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** ADNO - Insurer Model Settlement Agreement FINAL 4922-4535-1762 65.docx | |
| **Modified DMS:** nd://4900-0233-6117/4/Settlement Agreement (US Fire and International) - Conformed w. Exhibits and Schedules (Except for Sale Order, separately attached).docx | |
| **Changes:** | |
| Add | 722 |
| Delete | 272 |
| Move From | 5 |
| Move To | 5 |
| Table Insert | 4 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1008 |

**Exhibit A**
**Form of Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-10846 (MSG) |
| | § | |
| | § | |
| THE ROMAN CATHOLIC CHURCH | § | CHAPTER 11 |
| OF THE ARCHDIOCESE OF NEW | § | |
| ORLEANS, *et al.*,[1] | § | SECTION A |
| | § | |
| DEBTORS. | § | COMPLEX CASE |
| | § | |
| | § | |

**ORDER (I) APPROVING [●]'S UNITED STATES FIRE INSURANCE COMPANY'S AND INTERNATIONAL INSURANCE COMPANY'S SETTLEMENT AGREEMENT, RELEASE AND BUYBACK, (II) APPROVING THE SALE OF THE ARCHDIOCESE POLICIES FREE AND CLEAR, (III) ENJOINING CLAIMS, AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated July 29, 2025 [D.E. 4181] and supplemented by the filing of the revised Settlement Agreement (as defined below) on October 27, 2025 [D.E.[*]] ("Approval Motion") of The Roman Catholic Church of the Archdiocese of New Orleans, the lead debtor and debtor-in-possession (the "Debtor" or "Archdiocese") and the other debtors and debtors-in-possession[2] (the "Additional Debtors" and, together with the Archdiocese, the "Debtor Parties") in the above-captioned chapter 11 cases, by and through their respective counsel, for entry of an order (this "Order") approving the settlement agreement, releases, insurance policy buyback, and related injunction-in-aid ("Settlement") by and among the Archdiocese, the Additional Debtors, the other Archdiocese Signatory Parties, the Creditors'

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtors' the Debtor's federal tax identification number, are: [●] is 8966.

[2] In connection with the Plan, the Catholic Entities listed on Plan **Exhibit B-1** (the "**Additional Debtors**") filed individual chapter 11 cases. The Plan is a combined joint Plan for the Archdiocese and the Additional Debtors, and the Approval Motion is deemed to have been filed (and this Order is entered) in each Additional Debtor's bankruptcy case for purposes of the relief requested herein.

Committee, and [●][3]("United States Fire Insurance Company ("U.S. Fire"), International Insurance Company ("International"), and Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company individually and, to the extent that policies issued by U.S. Fire and/or International were novated to or assumed by either or both of them (collectively, "Insurer" and, collectively with all the foregoing, the "Parties"), pursuant to Sections 105(a) and 363 of Title 11 of the United States Code ("Bankruptcy Code") and Rules 2002(a)(2), 6004, and 9019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), in each case as described in the Approval Motion and the *Settlement Agreement, Release, and Policy Buyback* attached to this Order as **Exhibit 1**[4] (the "Settlement Agreement");[53] and the Bankruptcy Court having reviewed the Approval Motion and the Settlement Agreement; and it appearing that due and adequate notice of the Approval Motion and Settlement Agreement having been given to all Entities entitled thereto, and that no other or further notice need be given; and the Bankruptcy Court on November 17, 2025 at [[  ] AM/PM]9:00 AM having held a hearing (the "Sale Hearing") to consider the relief requested in the Approval Motion; and upon the record of the Sale Hearing; and, after due deliberation, including, without limitation, for the reasons stated by the Bankruptcy Court on the record of the Sale Hearing, it appearing that the relief requested in the Approval Motion and granted herein is in the best interests of the Debtor Parties' estates (the "Estates"), their creditors, and other parties in interest; and good sufficient cause appearing therefor,

---

[3]   [This Order is the proposed form of order for the Settling Insurers. The Debtor Parties will file proposed orders for each Settling Insurer prior to the Sale Hearing.]

[4]   [The form of Settlement Agreement is attached as **Exhibit 1** to this Order. Prior to the hearing on the Approval Motion, the Debtor Parties will file the proposed Settlement Agreement for each Settling Insurer.]

[53]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

*[Link-to-previous setting changed from on in original to off in modified.]*

2

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.    This Bankruptcy Court has jurisdiction over the Approval Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of this case and the Approval Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief sought in the Approval Motion are Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007. 9008 and 9019, and Rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Louisiana.

C.    It is necessary and appropriate for the Bankruptcy Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Settlement Agreement, and to adjudicate, if necessary, to the extent provided under 28 U.S.C. § 1334(b), any and all disputes arising from or relating to the Settlement Agreement or this Order.

D.    Proper, timely, adequate and sufficient notice of the Sale Hearing and Approval Motion and the relief requested therein, including, without limitation, the Settlement and the transactions described in the Settlement Agreement, including, without limitation, issuance of the injunction-in-aid referenced in the Settlement Agreement and the Approval Motion (all such transactions being collectively referred to, for convenience, as the "Sale Transaction") has been provided by the Debtor Parties in accordance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules to all interested Entities, including, without limitation the parties listed on **Schedule 3** of the Settlement Agreement, through service of the Confirmation Hearing Notice (as defined in the Plan) in accordance with the Disclosure Statement Order (also as defined in the Plan).

*[Link-to-previous setting changed from on in original to off in modified.].*

3

E.     Notice of the Approval Motion was ~~duly published as follows: [___]~~provided through publication of the Additional Debtors' Abuse Claims Bar Date Publication Notice (**Plan Exhibit G**) in daily and community newspapers throughout Louisiana.

F.     The notices described above were good, sufficient, and appropriate under the circumstances, and no other notice of the Approval Motion or Sale Hearing is required.

G.     The disclosures made by the Debtor Parties concerning the Settlement Agreement, the Sale Transaction, and the Sale Hearing were good, complete, and adequate.

H.     [The Unknown Abuse Claims Representative has consented to, and approved of the Settlement Agreement and Sale Transaction on behalf of Unknown Abuse Claims in connection with the treatment of such Claims under the Plan.][6]

I.     A reasonable opportunity to object or be heard with respect to the Approval Motion and the relief requested therein has been afforded to all interested Entities.

J.     The Archdiocese Signatory Parties, on their own behalf and on behalf of the Archdiocese Bound Parties, as applicable, have duly executed the Insurance Settlement Agreement by their duly authorized representative, agent and/or attorney in fact, and have full corporate power and authority to consummate the Sale Transaction pursuant to the Settlement Agreement and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Settlement Agreement, are required for the Archdiocese Bound Parties to consummate the Sale Transaction.

K.     The Debtor Parties have demonstrated (i) good, sufficient, and sound business purpose and justification and compelling circumstances for the Sale Transaction pursuant to

---

[6]    ~~[To confirm consent and approval by the Unknown Abuse Claims Representative.]~~

*[Link-to-previous setting changed from on in original to off in modified.]*.

Section 363(b) of the Bankruptcy Code and (ii) that the Sale Transaction is fair, reasonable, and in the best interests of their Estates and creditors pursuant to Bankruptcy Rule 9019. Among other things, the Debtor Parties have demonstrated that: the Settlement Agreement, and closing thereon, is necessary and appropriate to realize the value of the Purchased Property (as defined below) and maximize the value of their Estates; the probability of success for their Estates in litigation over the matters resolved by the Settlement Agreement is uncertain; litigation of the matters resolved by the Settlement Agreement would be complex and costly to their Estates; and the Settlement Amount is within the reasonable range of potential litigation outcomes. As used herein, "Purchased Property" means, collectively, all right, title and interest (including "Interests" as defined below) in and to the Archdiocese Policies issued by Insurer and the Related Insurance Claims and Coverage Claims of the Archdiocese Bound Parties; [**Intentionally Omitted.**][7] The Sale Transaction constitutes a reasonable and sound exercise of the Debtor Parties' business judgment and their powers and duties under applicable law and should be approved. Approval of the Settlement Agreement and consummation of the Sale Transaction are in the best interests of the Debtor Parties' Estates, their creditors (specifically including the Abuse Claimants of the Debtor Parties), and other parties-in-interest, including because the proceeds of and from the Sale Transaction will benefit Abuse Claimants.

---

[7]   Intentionally omitted, except the Order approving the Catholic Mutual Settlement Agreement, in which this section will provide:

"... *provided that* the Purchased Property does not include Insurer's obligations under the Certificate No. [*] issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the personal injury claims listed in Schedule [X] attached to the Settlement Agreement, in each case, subject to the limits, declarations, terms and conditions of such certificate (the "Preserved Coverage"), and *provided further that* the Preserved Coverage does not include coverage for any and all Abuse Claims or other Barred Claims."

*[Link-to-previous setting changed from on in original to off in modified.]*.

5

L.     The Settlement Agreement was negotiated, proposed, and entered into without collusion, in good faith, and from arm's length bargaining positions. Without limiting the foregoing, the Settlement Agreement resulted from a lengthy mediation that proceeded pursuant to a prior order of the Bankruptcy Court. Insurer is not an "insider" or "affiliate" (as those terms are defined in the Bankruptcy Code) of any of the Debtor Parties. None of the Archdiocese Bound Parties or Insurer have engaged in any conduct that would: (i) cause or permit the avoidance of the Settlement Agreement or the consummation of the Sale Transaction under Section 363(n) of the Bankruptcy Code; (ii) cause or permit the imposition of any costs or damages (including without limitation attorneys' fees or punitive damages) under Section 363(n) of the Bankruptcy Code; or (iii) prevent the application of Section 363(m) of the Bankruptcy Code. The releases, injunctions, policy buyback, and all other components of the Sale Transaction comply with the Bankruptcy Code and all applicable non-bankruptcy law.

M.     Pursuant to the Settlement Agreement and to the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer have consented to the assignment of the Non-Debtor Catholic Entities' Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under the Settlement Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Interests of any Entity in such Archdiocese Policies (the "Non-Debtor Catholic Entity Policy Sale").

*[Link-to-previous setting changed from on in original to off in modified.].*

6

582

N.     Insurer is a good faith purchaser of the Purchased Property under Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, in that, among other things: (i) all payments to be made by or to Insurer, and other agreements or arrangements entered into by Insurer, including without limitation any escrow agreement pertaining to the payment of the Settlement Amount, in connection with the Sale Transaction have been disclosed; (ii) Insurer neither induced nor caused the Debtor Parties' chapter 11 filings; (iii) the negotiation and execution of the Settlement Agreement and any other agreements or instruments related thereto was in good faith, the arm's length transaction between Insurer and the other Parties was the product of mediation, and all Parties to the Settlement Agreement were, or had the opportunity to be, represented by counsel; and (iv) Insurer has not violated Section 363(n) of the Bankruptcy Code by any action or inaction. Insurer has at all times acted in good faith with respect to the Settlement Agreement and will continue to be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale Transaction.

O.     The terms and conditions of the Settlement Agreement are fair and reasonable. The Settlement Amount provided by Insurer pursuant to the Settlement Agreement (i) is fair and reasonable; (ii) monetizes the Purchased Property at the highest and best amount; (iii) will provide a higher and more certain recovery for the Debtor Parties' creditors than would be provided by any other practical available alternative given the complexity, cost, and uncertainty of such alternatives; (iv) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (v) constitutes reasonably equivalent value (as defined in Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law. The Settlement Amount is within the reasonable range of potential litigation outcomes, and the

*[Link-to-previous setting changed from on in original to off in modified.]*.

7

Debtor Parties' determination to accept the Settlement Amount and otherwise enter into the Settlement Agreement is a valid and sound exercise of their business judgment and consistent with the Debtor Parties' fiduciary duties. The releases to be made pursuant to the Settlement Agreement, including without limitation the releases of the Archdiocese Bound Parties and the Insurer Released Parties, are appropriate and should be approved.

P.      Insurer: (i) is not a mere continuation of any of the Archdiocese Bound Parties or the Estate of any of the Debtor Parties, nor is there any continuity of enterprise between Insurer and the Debtor Parties or Insurer and any of the other Archdiocese Bound Parties; (ii) is not holding itself out to the public as a continuation of any of the Archdiocese Bound Parties; and (iii) is not a successor to the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties for any purpose, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of Insurer and any of the Archdiocese Bound Parties.

Q.      The Settlement Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither Insurer nor any of the Archdiocese Bound Parties are fraudulently entering into the Sale Transaction.

R.      The transfer of the Purchased Property to Insurer (i) does not constitute an avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law and (ii) does not and will not subject Insurer to any liability whatsoever with respect to the Debtor Parties' operation prior to the closing of the Sale Transaction (i.e., the occurrence of both the Settlement Agreement Effective Date and payment[84] of the Settlement

---

[84]   For the avoidance of doubt, all references to "payment" or "delivery" of the Settlement Amount by Insurer herein shall encompass all transfers of the Settlement Amount contemplated by the Settlement Agreement, including without limitation funding and transfer of funds to the Settlement Trust via letters of credit or escrow accounts.

*[Link-to-previous setting changed from on in original to off in modified.]*

Amount by Insurer to the Settlement Trust or Escrow Agent pursuant to the terms of Insurer's Settlement Agreement) (the "Closing").

S.      Insurer has agreed to purchase the Purchased Property pursuant to its Settlement Agreement and this Order; Insurer has not agreed to purchase, and is not purchasing, any other assets of the Estate of any of the Debtor Parties. Insurer has not agreed to assume, and after Closing shall have no obligations with respect to, any liabilities of the Archdiocese Bound Parties. Without limiting the generality of the foregoing, Insurer: (i) is not assuming and shall have no liability for any Claims arising from or relating to Abuse, the Purchased Property, or the Bankruptcy Case; and (ii) is not assuming and shall have no liability with respect to the Archdiocese's or any other Archdiocese Bound Party's obligations to Abuse Claimants, any other creditors, future claimants (including without limitation Unknown Abuse Claimants), or the Archdiocese's or any Archdiocese Bound Party's employees, in each case, by reason of the purchase of the Purchased Property under the Settlement Agreement.

T.      The Purchased Property constitutes property of the Debtor Parties' Estates, and the Archdiocese Bound Parties are the lawful owner of the Purchased Property and hold good title thereto. The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement will be a legal, valid, binding, and effective transfer of the Purchased Property, and will vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property, in each case free and clear of all Interests (as defined below, including, without limitation, any Interests of the Archdiocese Bound Parties, Abuse Claimants, and holders of Direct Action Claims). Upon Closing, Insurer shall have no liability for any Claims against or liabilities of the Debtor Parties, their Estates, or the other Archdiocese Bound Parties. Without limiting any of the foregoing, the Archdiocese, the Archdiocese

*[Link-to-previous setting changed from on in original to off in modified.].*

9

Signatory Parties, and Insurer have agreed that, upon Closing: (i) the Purchased Property shall be deemed void *ab initio*, terminated, extinguished, and of no further force and effect; and (ii) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

U.     Pursuant to §§ 363(f) and 105(a) of the Bankruptcy Code, and subject to the terms and conditions set forth in the Settlement Agreement, and upon Closing, without the need for further action, the Debtor Parties shall be deemed to have sold, transferred and conveyed the Purchased Property to the Insurer, and the Insurer shall be deemed to have purchased from the Debtor Parties, all right title and interest in and under the Purchased Property, free and clear of all "Interests" of any Entity of any kind or nature whatsoever, to the fullest extent permitted under §§ 363(b) and (f) of the Bankruptcy Code, with such "Interests" including: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, Subject Interests, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment

*[Link-to-previous setting changed from on in original to off in modified.].*

10

agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving

*[Link-to-previous setting changed from on in original to off in modified.]*.

11

the Purchased Property. Without limiting the generality of the foregoing and without finding that any Entity has any Interest in the Archdiocese Policies: (i) any Entity with Interests (if any) in or with respect to the Purchased Property who did not object, or who withdrew their objections to the Sale Transaction or the Approval Motion have waived their right to object to the sale of the Purchased Property free and clear of such Entity's Interests in the Purchased Property pursuant to Section 363(f)(2) of the Bankruptcy Code; and (ii) any such Entity with Interests in or with respect to the Purchased Property who objected to the Approval Motion and did not withdraw any such objection (a) are the holders of Interests subject to *bona fide* dispute under Bankruptcy Code Section 363(f)(4) and/or (b) can be compelled to accept a monetary satisfaction of their Interests within the meaning of Section 363(f)(5) of the Bankruptcy Code.

V. If the sale of the Purchased Property were not free and clear of all Interests, including without limitation all Abuse Claims, Direct Action Claims, and Coverage Claims, or if the Insurer Released Parties would, or in the future could, be liable for any of the Interests, Insurer would not have entered into the Settlement Agreement and would not consummate the Sale Transaction or pay the Settlement Amount, thus adversely affecting the Debtor Parties, their Estates, and their creditors (including, without limitation, the Abuse Claimants), as well as the other Archdiocese Bound Parties.

W. Issuing a supplemental injunction under Section 105(a) of the Bankruptcy Code as provided herein is essential to give effect to the sale of the Purchased Property to Insurer and this Order's approval of such sale free and clear of Interests pursuant to Section 363(f) of the Bankruptcy Code. The Sale Injunction set forth in Paragraph 23 below not only is a necessary prerequisite for Insurer's assent to the terms and conditions of its Settlement Agreement, such that Insurer will not consummate the Sale Transaction or pay its Settlement Amount in the

*[Link-to-previous setting changed from on in original to off in modified.]*

12

absence of such an injunction from this Bankruptcy Court, but also is warranted to ensure compliance with this Order. Likewise, Insurer will not consummate the Sale Transaction or pay its Settlement Amount without the benefit of the releases contained in the Settlement Agreement and approval thereof by the Bankruptcy Court.

X.     Neither the Settlement Agreement nor the Sale Transaction constitute a *sub rosa* chapter 11 plan. The Settlement Agreement does not impermissibly restructure the rights of the Debtor Parties' creditors nor impermissibly dictate a chapter 11 plan for the Debtor Parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

### General Provisions

1.     The Approval Motion, and the relief sought therein (including without limitation the approval of the Settlement Agreements and the Sale Transaction) is GRANTED and APPROVED, in all respects as set forth herein.

2.     The findings of fact set forth above and conclusions of law stated herein, in addition to any findings of fact and conclusions of law stated by the Bankruptcy Court at the Sale Hearing, shall constitute this Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the Approval Motion pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.     Any and all objections, if any, to the Approval Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case the Entity

*[Link-to-previous setting changed from on in original to off in modified.].*

13

asserting the objection or reservation of rights is enjoined from taking any action against the Insurer Released Parties or the assets or property of any Insurer Released Parties to recover any Claim or Interest held by such objecting Entity. Those parties who did not object or who withdrew their objections to the Approval Motion are deemed to have consented to the relief granted herein, pursuant to Section 363(f)(2) of the Bankruptcy Code.

### Approval of the Settlement Agreement

4.      The Settlement Agreement is approved in its entirety, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Without limiting the generality of the foregoing, the settlement and releases of Claims as set forth in the Settlement Agreement is hereby approved pursuant to Bankruptcy Rule 9019. All factors set forth in *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey* (*In re Cajun Elec. Power Coop.*), 119 F. 3d 349, 356 (5th Cir. 1997), either weigh in favor of the Settlement Agreement or do not apply.

5.      Pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, the Non-Debtor Catholic Entity Policy Sale, free and clear of all Interests of any Entity in the Archdiocese Policies, is hereby approved.

6.      Pursuant to Section 363(b) of the Bankruptcy Code, each of the Parties is authorized to consummate the Sale Transaction under and in accordance with the terms and conditions of the Settlement Agreement, and the Archdiocese Bound Parties shall at all times act in accordance with the terms thereof.

7.      ~~The Parties and their attorneys in fact under the Settlement Agreement or otherwise are~~Any representative, agent or attorney in fact of the Archdiocese Signatory Parties is authorized to execute any other documentation and perform such other ministerial tasks as may

*[Link-to-previous setting changed from on in original to off in modified.]*

14

590

be reasonably necessary to effectuate the Settlement Agreement and the Sale Transaction on behalf of the Archdiocese Bound Parties, including without limitation, any bill of sale substantially in the form attached to the Settlement Agreement as **Exhibit B**.

8.      Subject to all of the terms and conditions of the Settlement Agreement, upon Closing, the Archdiocese Bound Parties and Insurer shall be deemed to have granted the releases as set forth in the Settlement Agreement.

9.      The Parties are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Settlement Agreement, together with all additional instruments and documents that may be reasonably necessary, convenient, or desirable to implement the Settlement Agreement and consummate the Sale Transaction pursuant thereto and effectuate the provisions of this Order and the transactions approved hereby, and to take all further actions as may be requested by Insurer for the purpose of assigning, transferring, granting, conveying, and conferring to Insurer or reducing to Insurer's possession, the Purchased Property, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Settlement Agreement.

10.     Insurer is authorized and directed to pay the Settlement Amount under and subject to the satisfaction of all terms and conditions of the Settlement Agreement.

11.     The Settlement Amount provided by Insurer for the Purchased Property (i) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

*[Link-to-previous setting changed from on in original to off in modified.]*

12.     None of the Insurer Released Parties shall be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its or their rights or remedies under the Settlement Agreement or any other document related to the Settlement Agreement or the Sale Transaction. The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order; *provided*, *however*, that this Bankruptcy Court shall retain jurisdiction over any and all disputes with respect thereto.

13.     This Order shall be binding in all respects upon: (a) the Debtor Parties and their Related Parties; (b) the Debtor Parties' Estates; (c) the other Archdiocese Bound Parties; (d) all creditors of the Debtor Parties; (e) all Abuse Claimants and holders of Direct Action Claims; (f) all holders of Interests whether known or unknown against or on all or any portion of the Purchased Property; (g) any Non-Settling Insurer; (h) the Insurer Released Parties; (i) the Purchased Property; (j) the Unknown Claims Representative; (k) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code; and (l) all Entities receiving notice (or deemed to have received notice pursuant to this Order) of the Approval Motion or the Sale Hearing, including without limitation all Entities listed on **Schedule 3** to the Settlement Agreement. The Settlement Agreement shall be binding in all respects upon: (x) the Debtor Parties, their Estates, and their Related Parties; (y) the Archdiocese Bound Parties; and (z) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed

*[Link-to-previous setting changed from on in original to off in modified.]*.

under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code.

### Transfer of Assets

14.    The conditions of Section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Archdiocese may sell the Purchased Property free and clear of any Interests therein.

15.    Pursuant to Sections 105 and 363(b) and (f) of the Bankruptcy Code, Bankruptcy Rule 9019, applicable Louisiana State law, the testimonial and other documentary evidence filed in support of the Approval Motion, and the record of the Sale Hearing, the Archdiocese has set forth the legal authority necessary to support this Bankruptcy Court's findings herein.

16.    Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Property and the Archdiocese Bound Parties' rights, title, and interest therein shall upon Closing be transferred to Insurer, free and clear of all Interests (including without limitation the Interests of any of the Archdiocese Bound Parties), and all such Interests are unconditionally and forever released and extinguished as against the Purchased Property. Without limiting the generality of the foregoing, the sale of the Purchased Property under the Settlement Agreement shall be free and clear of all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property.

17.    Upon the Closing, (a) all of the Archdiocese Bound Parties', the Debtor Parties' Estates', and the Settlement Trustee's rights under and with respect to the Purchased Property, if

*[Link-to-previous setting changed from on in original to off in modified.]*

17

593

any, shall be permanently and irrevocably extinguished as if the Archdiocese Policies had never been issued and (b) the Insurer Released Parties shall be entitled to all of the protections afforded by §363(m) of the Bankruptcy Code.

18.     Upon Closing, all Entities (and their respective successors and assigns), including but not limited to all governmental, tax, and regulatory authorities, Archdiocese Bound Parties, Non-Settling Insurers, Abuse Claimants, Direct Action Claimants, trade and other creditors, and any Entities holding Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) against, in, or with respect to the Purchased Property, including, without limitation, such Interests arising or accruing under or out of, in connection with, or in any way relating to the transfer of the Purchased Property to Insurer, hereby are forever barred, estopped, and permanently enjoined from asserting such Person's or Entity's Interests against the Purchased Property, the Insurer Released Parties, or the assets or property of any Insurer Released Parties. Effective upon Closing, none of the Insurer Released Parties shall have any liability for any Claims (a) against the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties or (b) that arise under or related in any way or in respect of the Purchased Property.

19.     The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement constitutes a legal, valid, and effective transfer of the Purchased Property, and shall vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property. Upon Closing, the Archdiocese Policies shall be terminated and no longer in force or effect, exhausted in retrospect as to all coverages, and all Interests that the Archdiocese or any other Person or Entity (including without limitation any of the other Archdiocese Bound Parties) may have had, may presently have, or may in the future

*[Link-to-previous setting changed from on in original to off in modified.]*

18

have, in such Purchased Property are released and extinguished, and all such Entities (including without limitation the Archdiocese Bound Parties) hereby are forever barred, estopped, and permanently enjoined from asserting any such Interest against the Purchased Property and/or any of the Insurer Released Parties. Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent constitutes full and complete performance of any and all obligations under the Purchased Property, including without limitation any performance owed to the Archdiocese Bound Parties, and all limits of coverage under the Archdiocese Policies, including per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

20.    Upon occurrence of the Closing:

(a)    all Interests the Archdiocese Bound Parties may have had, may presently have, or in the future may have in the Purchased Property, as applicable, are released pursuant to the terms of the Settlement Agreement; and

(b)    the Archdiocese Bound Parties accept Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent in full and complete satisfaction of Insurer's past, present, and future obligations, including, without limitation, any obligations to any of the Archdiocese Bound Parties under such Purchased Property or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever arising out of or related in any way to such Purchased Property (including Coverage Claims), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, direct or indirect, and regardless of whether such

*[Link-to-previous setting changed from on in original to off in modified.]*

19

Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, or otherwise.

## No Successor Liability

21.    The transfer of the Purchased Property to Insurer shall not result in any Insurer Released Parties or the Purchased Property having any of the following: (a) any liability or responsibility for Interests in or Claims against the Archdiocese Bound Parties or any of their Related Parties; (b) liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any Claims or Interests; or (c) any liability or responsibility to the Archdiocese Bound Parties except as is expressly set forth in the Settlement Agreement.

22.    Without limiting the generality of the foregoing, none of the Insurer Released Parties shall have any successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability, *de facto* merger or joint venture, mere continuation or substantial continuity, whether known or unknown as of Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between the Archdiocese Bound Parties and any non-debtor subsidiary or affiliate (including, without limitation, any other Archdiocese Bound Party), liabilities relating to or arising from any environmental laws, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Purchased Property prior to Closing.

*[Link-to-previous setting changed from on in original to off in modified.].*

## Sale Injunction

23.    Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, and in consideration of the undertakings of Insurer pursuant to the Settlement Agreement, including Insurer's purchase of the Purchased Property free and clear of all Claims and Interests pursuant to Section 363(f) of the Bankruptcy Code as provided herein, any and all Entities that have held, now hold, or who may in the future hold any Claims or Interests (including without limitation all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Abuse Claimants, holders of Direct Action Claims, Perpetrators, Non-Settling Insurers, the Archdiocese Bound Parties, and all others holding Claims or Interests of any kind or nature whatsoever, including, without limitation, those Claims released or to be released pursuant to the Settlement Agreement), which Claims or Interests are under, arise out of, relate to, or connect in any way with an Abuse Claim or any of the Purchased Property, including, without limitation, (a) all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property, (b) the payment of any of the Claims identified previously, including, without limitation, Abuse Claims, Direct Action Claims, and Coverage Claims and (c) all other Interests, are hereby permanently stayed, enjoined, barred, and restrained from taking any Action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or Interest against any of (x) the Insurer Released Parties, (y) the assets or property of any Insurer Released Parties, or (z) the Purchased Property, including by:

*[Link-to-previous setting changed from on in original to off in modified.].*

21

(a)     commencing, conducting, or continuing in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind, in any forum, with respect to any such Claim or Interest, against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(b)     enforcing, levying, attaching, collecting, or otherwise recovering, or seeking to accomplish any of the preceding, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(c)     creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, or seeking to accomplish any of the preceding, any lien of any kind against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(d)     asserting, implementing, or effectuating any such Claim or Interest of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any of the Insurer Released Parties, (B) any of the Insurer Released Parties, or (C) any property or interest in property of any Insurer Released Party; and

(e)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Order.

The actions described in this Paragraph 23 are "**Enjoined Actions**," and the injunction set forth herein is the "**Sale Injunction**." The Sale Injunction shall be a permanent injunction against the Enjoined Actions and may not be modified, dissolved, or terminated.

*[Link-to-previous setting changed from on in original to off in modified.].*

22

24.     The Sale Injunction shall be effective upon Closing. The Sale Injunction bars pursuit of the above referenced Claims and/or Interests against the Insurer Released Parties, or the property or assets of each (including, without limitation, the Purchased Property), but against no other person or thing.

25.     In a successful action to enforce this Sale Injunction in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

26.     The Sale Injunction shall not enjoin (a) the right of any Person or Entity against the Settlement Trust or a Non-Settling Insurer, or (b) the Settlement Trustee from enforcing the Settlement Trust Documents.

### Preserved Coverage

27.     [**Intentionally Omitted.**][9]

### Additional Provisions

28.     From and after the date hereof, no Person or Entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreements and this Order.

29.     This Bankruptcy Court hereby retains jurisdiction, regardless of whether a chapter 11 plan has been confirmed in the Bankruptcy Case and consummated and irrespective of the

---

[9]     ~~Intentionally omitted, except the Order approving the Catholic Mutual Settlement Agreement, in which this section will provide:~~

~~"Nothing in this Order, the Settlement Agreement or the Sale Transaction affects Insurer's Preserved Coverage or the Archdiocese Bound Parties' continuing obligations in connection with the Preserved Coverage under the Archdiocese Policies issued by Insurer, all of which shall survive the Settlement Agreement Effective Date, Bankruptcy Plan Effective Date and the closing of the Sale Transaction."~~

*[Link-to-previous setting changed from on in original to off in modified.].*

provisions of any such plan or order confirming such plan, to enforce and implement the terms and provisions of the Settlement Agreement, all amendments thereto, any waivers and consents thereunder, and of any agreement(s) executed in connection therewith in all respects, including but not limited to retaining jurisdiction to: (a) compel delivery of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreement; (b) resolve any dispute, controversy, or claim arising under or related to the Settlement Agreement, or the breach thereof; and (c) interpret, implement, and enforce the provisions of this Order and resolve any disputes related thereto.

30.      Nothing contained in any plan confirmed in the Bankruptcy Case or any order of this Bankruptcy Court confirming such plan shall conflict with or derogate from the provisions of the Settlement Agreement or the terms of this Order.

31.      This Order shall not limit or preclude the entry or effectiveness of any additional releases or injunctions that may be granted protecting the Insurer Released Parties and/or the assets or property of any Insurer Released Parties in connection with, or as part of, any order confirming a chapter 11 plan.

32.      The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Settlement Agreement be authorized and approved in its entirety.

33.      The transactions contemplated by the Settlement Agreement are undertaken by Insurer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code. Insurer is a good faith purchaser of the Purchased Property and is entitled to all the protections afforded by Section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of

*[Link-to-previous setting changed from on in original to off in modified.].*

the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction to Insurer.

34.     Insurer has given substantial consideration under the Settlement Agreement for the benefit of the Debtor Parties, their Estates, and creditors, along with the other Archdiocese Bound Parties. Such consideration given by Insurer constitutes valid and valuable consideration for the Purchased Property and the releases set forth in the Settlement Agreement, including, without limitation, the extinguishment and release of all Interests pursuant to this Order. The consideration provided by Insurer for the Purchased Property under the Settlement Agreement is fair and reasonable; accordingly, the purchase may not be avoided under Section 363(n) of the Bankruptcy Code.

35.     The terms and provisions of the Settlement Agreement and this Order shall be binding notwithstanding any subsequent appointment of any trustee(s) examiner(s) or receiver(s) under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtor Parties, their Estates, their creditors, or any examiner(s) or receiver(s).

36.     The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Bankruptcy Court that the Settlement Agreement and the Parties' performance thereof be authorized and approved in its entirety.

37.     Pursuant to the provisions of the Settlement Agreement, each of the Archdiocese Bound Parties and Insurer shall be authorized to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper, or advisable under applicable law or

*[Link-to-previous setting changed from on in original to off in modified.].*

otherwise to consummate and make effective the transactions contemplated by the Settlement Agreement.

38.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39.     All obligations of the Debtor Parties under the Settlement Agreement shall be deemed administrative expenses of their Estates under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

40.     Each and every federal, state, and local governmental agency or department is hereby directed to accept this Order in lieu of any document necessary to consummate the transactions contemplated by the Settlement Agreement and this Order.

41.     The Settlement Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the Parties, in a writing signed by the Parties, and in accordance with the terms thereof, without further order of this Bankruptcy Court; *provided* that such modification, amendment, or supplement does not constitute a material change to the relief sought in the Approval Motion and approved by this Order.

**IT IS SO ORDERED.**

New Orleans, Louisiana, _____, 2025

<br>

_____
        MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

*[Link-to-previous setting changed from on in original to off in modified.].*

| Summary report:<br>Litera Compare for Word 11.3.0.46 Document comparison done on<br>10/27/2025 4:01:30 PM | |
|---|---|
| **Style name:** OMM Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Exhibit A - Form of Proposed Sale Order - FINAL.docx | |
| **Modified DMS:** nd://4920-3290-3541/1/Sale Order (US Fire and International).docx | |
| **Changes:** | |
| Add | 20 |
| Delete | 37 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 57 |

# SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK

This Settlement Agreement, Release, and Policy Buyback ("**Settlement Agreement**") is hereby made by, and between, and among The Roman Catholic Archdiocese of New Orleans (the "**Archdiocese**" or "**Debtor**" as further defined in Section 1.1.31 below), the other Archdiocese Signatory Parties (as defined in Section 1.1.15 below), and The Catholic Mutual Relief Society of America ("**Insurer**" as further defined in Section 1.1.49 below). Insurer, the Archdiocese, the other Archdiocese Signatory Parties, and the Creditors' Committee (as defined below), collectively are the "**Parties**" and each a "**Party**" to this Settlement Agreement.

## RECITALS:

WHEREAS, on May 1, 2020 (the "**Petition Date**" as further defined in Section 1.1.67 below), the Archdiocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**" as further defined in Section 1.1.17) pending under Case No. 20-10846 (the "**Bankruptcy Case**" as further defined in Section 1.1.16 below);

WHEREAS, each of the Additional Debtors (as defined in Section 1.1.11 below) intends to file in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;

WHEREAS, certain Entities have asserted or may hold Claims, including Abuse Claims, against the Archdiocese Bound Parties (each as defined below);

WHEREAS, Insurer issued, allegedly issued, may have issued, assumed by novation or otherwise, or may be administering the Archdiocese Policies (as defined in Section 1.1.9 below) providing certain coverage to the Archdiocese Bound Parties;

WHEREAS, asserted disputes between the Debtor Parties (as defined below) and Insurer have arisen, and assertable disputes between the Archdiocese Bound Parties and Insurer may arise in the future, concerning the scope and nature of Insurer's responsibilities, if any, to provide insurance coverage to the Archdiocese Bound Parties under the Archdiocese Policies (as further defined in Section 1.1.28 below, the "**Coverage Claims**");

WHEREAS, claimants may contend, as a matter of Louisiana law, particularly La. Rev. Stat § 22:1269 *et seq.*, that certain Entities may have Claims arising under or related to the Archdiocese Policies that could entitle them to bring a Direct Action Claim (as defined in Section 1.1.35 below) against Insurer;

WHEREAS, claimants may contend that as a matter of Louisiana law, the time within which Claims relating to Abuse may be asserted against certain of the Archdiocese Bound Parties and/or the Insurer may not have expired with respect to certain Claims;

WHEREAS, the Archdiocese Signatory Parties and Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Claims and all other disputes between and among them and to release Insurer from any further obligations under the

Archdiocese Policies except with respect to Preserved Coverage (as defined in Section 1.1.67 below);

WHEREAS, Insurer would not pay the full amount of the Settlement Amount (as defined in Section 1.1.81 below) without the buy-back of the Subject Interests (as defined below) in the Archdiocese Policies, including without limitation, the interests of the Archdiocese, Additional Debtors, other Archdiocese Bound Parties and holders of Direct Action Claims, pursuant to section 363 of the Bankruptcy Code, and without the Sale Injunction, the Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeping Injunction (each as defined below), additionally providing protection to the Insurer Released Parties (as defined below) from Claims against the Insurer Released Parties and their property;

WHEREAS, through this Settlement Agreement and the Plan (as defined in Section 1.1.68 below) the Archdiocese Signatory Parties intend to provide Insurer Released Parties with the broadest possible release of all Claims and Subject Interests with respect to the Archdiocese Policies, except with respect to Preserved Coverage; and

WHEREAS, through this Settlement Agreement and the Plan, as part of the compromise and resolution of the Coverage Claims, the Debtor Parties and Insurer also wish to effect a sale, pursuant to § 363(b), (f), and (m) of the Bankruptcy Code of the Archdiocese Policies, along with the Coverage Claims and Related Insurance Claims (the "**Purchased Property**" as further defined in Section 1.1.71 below), to provide the Insurer Released Parties with the broadest possible release and buyback with respect to the Archdiocese Policies, resulting in the Insurer Released Parties having no obligations now or in the future with respect to the Archdiocese Policies, including without limitation to any Direct Action Claim, except with respect to Preserved Coverage.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Settlement Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound subject to the approval of the Bankruptcy Court pursuant to Section 2 below, the Parties hereby agree as follows:

1. **DEFINITIONS**

    1.1    As used in this Settlement Agreement (as defined above), the following terms shall have the meanings set forth below.

    1.1.1   "**Abuse**" means any of the following actual or alleged acts: (a) touching by the Perpetrator of the person's intimate body parts (genitals, breasts, or buttocks), the touching by the person of the Perpetrator's intimate body parts, showing pictures of the person's body or other persons' bodies, taking pictures of the person's body, showing pornography, or making images of the person while naked or engaged in any sexual activity, or any sexualized interaction including observing the person in bathing, toileting, or undressing that was made possible by the Perpetrator's position of authority, or by the inducement of the Perpetrator; or (b) sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to the genital or anal openings: (i) of the person's body by any part of the Perpetrator's body or any object used by the Perpetrator for this purpose; or (ii) of the person's body by any

2

part of the body of the Perpetrator or by any part of the body of another person, or by any object used by the Perpetrator or another person for this purpose; (c) inappropriate physical contact and/or contact that infringes upon another's personal, physical boundaries including but not limited to groping, kissing, extended hugging, and/or any unwelcomed touching; (d) grooming or trying to create a special relationship, including but not limited to: talk of a sexual nature, talk of a romantic nature, communications expressing individual love to the person, as opposed to a salutation, providing material resources or experiences which induce the person into a relationship where trust is then violated; or (e) any actual or alleged acts of the kind described in subsections (a)-(c) above that occur between or among minors and that the Perpetrator orchestrates or encourages. For the avoidance of doubt, "Abuse" also includes: any actual or alleged conduct which (a) is described in the Louisiana Child Victims Act or (b) would constitute (i) a sexual offense as defined in article 603(2) of the Louisiana Children's Code; (ii) sexual battery as defined in LA. REV. STAT. §§ 14:43.1; 14:43.1.1; 14:43.2; 14: or 43.3, (iii) a crime against nature as defined in LA. REV. STAT. § 14:89, or (i) pornography involving juveniles as defined in LA. REV. STAT. § 14:81.1, or with respect to the foregoing subsection (i)-(iv), any predecessor statute that prohibited such conduct at the time of the act.

1.1.2  "**Abuse Action**" means an Action asserting an Abuse Claim against any of the Covered Parties.

1.1.3  "**Abuse Claim**" means any Claim that has been asserted, or could be asserted, against any Settling Party or Non-Settling Insurer, that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively alleged Abuse that occurred, in whole or in part, before the applicable Debtor's Petition Date or Additional Debtors' Petition Date, including any such Claim that seeks monetary damages or any other relief, under any legal or equitable theory of liability, including, but not limited to, the following: vicarious liability; *respondeat superior*; any conspiracy, fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, negligent, insufficient, or inadequate supervision, retention or misrepresentation; any theory based on misrepresentation, concealment, or unfair practice; public or private nuisance; or any theory, including, without limitation, any theory based on public policy or any acts or failures to act by any Settling Party, or any other Entity for whom any Settling Party is allegedly responsible, including, but not limited to, any such Abuse Claim against any Settling Party, Non-Settling Insurer, or any other Entity for whom any Settling Party or Non-Settling Insurer is alleged to be responsible. Abuse Claims are: (a) the Known Abuse Claims, which are treated in Class 3; and (b) the Unknown Abuse Claims, which are treated in Class 4. For the avoidance of doubt, "Abuse Claim" includes (a) all Unknown Abuse Claims, (b) Claims or causes of action defined or described in the Revival Window Laws against the Archdiocese or any other Archdiocese Bound Party, (c) Direct Action Claims, and (d) any Claim against the Archdiocese or any other Archdiocese Bound Party that is attributable to, arises from, is based upon, relates to, or results from Abuse that, as of the Petition Date is barred by any applicable statute of limitations, and in each case, irrespective of whether (x) such Claims also involve the conduct of joint tortfeasors (or similar concepts under applicable law), (y) such Claims arise under, or were revived pursuant to, the Revival Window Laws, or any future reviver law, statute, or binding

3

precedential decision passed or issued on or after the Bankruptcy Plan Effective Date, or (z) a proof of claim has been filed, before or after the Claims Bar Date, or not at all, or an Abuse Action has been commenced with respect to such Claim. "Abuse Claim" does not include: (a) Related Insurance Claims or Coverage Claims against Settling Insurers or Non-Settling Insurers; (b) Non-Insurer Contribution Claims with respect to any Abuse Claim; (c) Insurer Contribution Claims with respect to any Abuse Claim; or (d) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to a Claim against these dioceses only. For the avoidance of doubt, a Claim based on Abuse solely occurring following the applicable Petition Date is not an Abuse Claim. Nothing in this definition shall constitute a waiver of any defense that would otherwise be available under applicable law to any Settling Party, the Settlement Trust, or any other Entity.

1.1.4 "**Abuse Claim Release and Certification**" means a written release in favor of the Insurer Released Parties, in the form of Exhibit C to the Acceptable Plan, or otherwise in form and substance acceptable to the Parties, which an Abuse Claimant must deliver before he or she is entitled to Settlement Trust Distributions, which shall provide that the Claimant releases the Insurer Released Parties from any and all Claims related to his/her Abuse Claim or any of the Archdiocese Policies, subject to Section 12.14 and related provisions of the Plan.

1.1.5 "**Abuse Claimant**" means the holder of an Abuse Claim, including, but not limited to, any Known Abuse Claim, Unknown Abuse Claim, or Direct Action Claim. For the avoidance of doubt, Abuse Claimants are Creditors. The definition of an Abuse Claimant includes the legal representative of the holder of an Abuse Claim, such as a bankruptcy trustee, the estate of a deceased individual who held an Abuse Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Abuse Claim, as the case may be. An Entity holding the following Claim is not an Abuse Claimant: (i) a Non-Insurer Contribution Claim with respect to such Abuse Claim; (ii) an Insurer Contribution Claim with respect to such Abuse Claim; (iii) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to such Entity's claim against such dioceses only.

1.1.6 "**Acceptable Plan**" means the *Fourth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and The Official Committee of Unsecured Creditors* filed at Docket No. [4419], and its exhibits and schedules, which as may be modified solely in accordance herewith (i.e., with the consent of the Insurer), and such modified plan constituting the "Acceptable Plan" for the purposes hereof.

1.1.7 "**Archdiocesan Parishes**" means all currently Catholic Church parishes and missions, as identified on Exhibit B-1, Part I, of the Acceptable Plan. Each of the Archdiocesan Parishes is organized as a non-profit corporation. For the avoidance of doubt, the definition of Archdiocesan Parishes does not include St. Louis Cathedral, Our Lady of Guadalupe Church & Shrine of St. Jude, or any Suppressed Archdiocesan Parish identified on Exhibit B-1, Part II, of the Acceptable Plan.

4

1.1.8  "**Archdiocesan Schools**" means the means the following schools that are owned and operated by the Archdiocese: (a) the Academy of Our Lady High School; (b) Archbishop Chapelle High School; (c)Archbishop Hannan High School; (d) Archbishop Rummel High School; (e) Archbishop Shaw High School; (f) Pope John Paul II High School; (g) St. Charles Catholic High School; (h) St. Scholastica Academy; and (i) St. Michael Special School.

1.1.9  "**Archdiocese Policies**" means (a) the contracts, binders, certificates, and policies of insurance that are listed on Schedule 1 hereto, and (b) all other known and unknown contracts, binders, certificates, or policies of general liability insurance, in effect on or before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date that were issued to, or for the benefit of, or subscribed on behalf or that otherwise actually insure, (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) policies issued to the Archdiocese that name as an insured or additional insured (or related concept under applicable law or document) the Diocese of Houma-Thibodaux or Diocese of Baton Rouge, but not policies issued to either of these dioceses that were not also issued to the Archdiocese or name it as insured, (iv) any Entity owned, created, operated, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, or (v) any institution, religious organization or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control or active management; in each case of (a) and (b), that were issued, subscribed to, or underwritten in whole or in part or allegedly issued, subscribed to, or underwritten in whole or in part by Insurer or any of its predecessors.

1.1.10  "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

1.1.11  "**Additional Debtors**" means the Entities listed on Acceptable Plan Exhibit B-1 and on Schedule 2 hereto.  As used herein, references to the "Additional Debtors" includes the Additional Debtor's Estates.

1.1.12  "**Approval Motion**" means the motion filed in the Archdiocese Bankruptcy Case at Docket No. 4181 seeking approval of this Settlement Agreement as described in Section 2.1 of this Settlement Agreement.

1.1.13 "**Approval Order**" means the order granting the Approval Motion described in Section 2.1 of this Settlement Agreement and providing the relief described in Section 2.1 of this Settlement Agreement and in substantially form attached **Exhibit A,** with only such changes as are satisfactory to Insurer.

1.1.14  "**Archbishop**" has the meaning given to it in Section 3.7.

1.1.15  "**Archdiocese Signatory Parties**" means, collectively, (a) the Debtor Parties and (b) the Non-Debtor Catholic Entities.

1.1.16 "**Bankruptcy Case**" means all of the following: (a) with respect to the Archdiocese, "Bankruptcy Case" has the meaning set forth in the Recitals; and (b) with respect to any given Additional Debtor, "Bankruptcy Case" means the case initiated when such Additional Debtor filed in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.17 "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Louisiana, having subject matter jurisdiction over the Bankruptcy Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

1.1.18 "**Bankruptcy Plan Effective Date**" means the date upon which a Plan approved by the Bankruptcy Court that contains terms and conditions consistent with those required by this Settlement Agreement becomes effective.

1.1.19 "**Barred Claim**" means any Claim against a Settling Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with an Abuse Claim or any of the Archdiocese Policies, including, but not limited to, any: (a) Abuse Claim; (b) Direct Action Claim; (c) Coverage Claim; (d) Related Insurance Claim; (e) Non-Insurer Contribution Claim; (f) Insurer Contribution Claim; (g) Medicare Claim; (h) Penalty Claim; and (i) any other Claim that is otherwise released herein. A Barred Claim further includes any Claim against a Settling Party based on allegations that it is an alter ego or liable as a successor of an Entity that is not a Settling Party or that the Settling Party's corporate veil should be pierced on account of Claims against an Entity that is not a Settling Party or based on any other theory under which the legal separateness of any Person and any other Entity may be disregarded to impose liability for a claim on either such Entity. Notwithstanding the foregoing, Barred Claims do not include any Claims to the extent they are asserted against (x) Non-Settling Insurers or (y) Excluded Parties, notwithstanding that such Entity may also have asserted or be able to assert a Claim for contribution, indemnity, reimbursement, or subrogation against any Settling Party relating to or arising from a such Claim; *provided, however,* that, for the avoidance of doubt, (i) any Claims that assert liability against such Entity in conjunction with a Settling Party will in all events be Barred Claims as to the Settling Party, (ii) any such Claim for contribution, indemnity, reimbursement, or subrogation against a Settling Party is a Barred Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party for the purposes of this definition.

1.1.20 "**Catholic Charities**" has the meaning set forth in Section 6.3.15.

1.1.21 "**Channeling Injunction**" has the meaning set forth in Section 2.2.2.

1.1.22 "**Claim**" means any past, present or future claim, demand, Action, request, right, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether sounding in law, equity, tort, warranty, contract, or under any other theory, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been

or may be asserted by or on behalf of any Entity, whether seeking damages (including compensatory, exemplary, punitive, or Penalty claims) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, or orders, including without limitation whether by way of direct action, subrogation, contribution, indemnity, alter ego, veil piercing, or regulatory action, or otherwise, regardless of whether such Claims arise under law, in equity, or under statute, before or after the Petition Date(s), or *in rem* or *in personam*, and include all Claims for damages to the environment or based on any theory of *respondeat superior,* vicarious, successor or transferee liability, or change in control, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

1.1.23 **"Claims Bar Date"** means the date(s) and time(s) indicated in the Final Order(s) (which may be the Plan Confirmation Order) setting the deadline(s) for filing proofs of Abuse Claim against the Debtor or Additional Debtor(s), as applicable.

1.1.24 **"CMS"** has the meaning set forth in Section 2.4.1.

1.1.25 **"Co-Insured Party"** means any other Entity that is a "Named Assured" or "named insured" or "protected person" under the Archdiocese Policies, and all other Entities that are determined by agreement or a court of competent jurisdiction to be an "Assured," an "Additional Assured," an "insured," or "protected person" or otherwise entitled to insurance coverage under any Archdiocese Policies.

1.1.26 **"Conditional Payment"** means any payment made to an Abuse Claimant under the MMSEA, including any payment by a Medicare Advantage Organization (as defined in the MSPA).

1.1.27 **"Controlling Document Provision"** has the meaning given to it in Section 2.2.9.

1.1.28 **"Covered Parties"** or **"Archdiocese Bound Parties"** means, collectively, the following Entities: (a) the Debtor Parties; (b) the Reorganized Debtor; (c) the Reorganized Additional Debtors; (d) the Non-Debtor Catholic Entities; (e) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP; (f) the Parish Schools and Archdiocesan Schools; (g) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans; (h) any Co-Insured Party; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entities' predecessors, successors, assigns, subsidiaries, direct and indirect past, present, and future affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, and estates. For the avoidance of doubt, the Entities in clauses (g), (h), and (i) are only Archdiocese Bound Parties in connection with the Archdiocese Policies.

1.1.29  "**Coverage Claims**" has the meaning set forth in the Recitals and further includes any Claim under relating to or arising out of the Archdiocese Policies or the rights and obligations thereunder, or the breach thereof, including any Claim seeking insurance coverage.

1.1.30  "**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed in the Archdiocese's Chapter 11 Case on May 20, 2020, [Docket Nos. 94 & 114], as such committee may be reconstituted from time to time.

1.1.31  "**Debtor**" or "**Archdiocese**" means, before the Bankruptcy Plan Effective Date, The Roman Catholic Church of the Archdiocese of New Orleans of Louisiana.  As used herein, references to the "Debtor" or "Archdiocese" includes the Debtor's Estate.

1.1.32  "**Debtor Parties**" means (i) the Archdiocese and (ii) all of the Additional Debtors.

1.1.33  "**Diocese of Baton Rouge**" means the Diocese of Baton Rouge.  References to the "Diocese of Baton Rouge CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) July 22, 1961 whichever occurred last; references to the "Diocese of Baton Rouge SD" refer to the period after such date.

1.1.34  "**Diocese of Houma-Thibodaux**" means the Diocese of Houma-Thibodaux.  References to the "Diocese of Houma-Thibodaux CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) June 5, 1977, whichever occurred last; references to the "Diocese of Houma-Thibodaux SD" refer to the period after such date.

1.1.35  "**Direct Action Claim**" means any Claim by any Entity that is a "direct action" as that term is used in La. Rev. Stat § 22:1269 *et.* seq (or similar law in other jurisdictions), against any Insurer Released Party or related to any Archdiocese Policy, including, without limitation, (a) any claim that is similar or related to any Claim that could also be asserted by the Archdiocese or any Archdiocese Bound Party, (b) any Claim that directly or indirectly arises out of, relates to, or is connected with any Abuse Claim, (c) any Claim that directly or indirectly arises out of, relates to, or is in connection with any Insurer Released Party's  handling of any Abuse Claim under the laws of any applicable jurisdiction, or (d) any Claim arising under any law of any jurisdiction that may give a third party a direct Cause of Action against an Insurer Released Party for monetary or other relief.

1.1.36  "**Entity**" means any individual, corporation, corporation sole, partnership, association, limited liability company, joint stock company, proprietorship, unincorporated organization, joint venture, trust, estate, executor, legal representative, or any other entity or organization, as well as any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency, department, board or instrumentality thereof, any other "Person" within the definition of section 101(41) of the Bankruptcy Code, and any successor in interest, heir executor, administrator, trustee, trustee in bankruptcy, or receiver of any Entity and also has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.1.37 "**Escrow Agent**" means the agent appointed in accordance with the Escrow Agreement.

1.1.38 "**Escrow Agreement**" means the agreement governing the escrow which shall hold the Settlement Amount in escrow and in trust for the benefit of Insurer, and which shall provide for the: (i) transfer of the Settlement Amount, with any accrued interest, to the Settlement Trust following the Settlement Agreement Effective Date, or (ii) return of the Settlement Amount to Insurer, with any accrued interest, upon receipt of notice that the Settlement Agreement has been terminated.

1.1.39 "**Estate**" means the (a) the Debtor's estate, and (b) Additional Debtors' estates, each created pursuant to section 541 of the Bankruptcy Code.

1.1.40 "**Excluded Party**" means the following Entities: (a) the Holy See (State of Vatican City); (b) any Perpetrator; and (c) any archdiocese or diocese (other than the Archdiocese itself), any Religious Order or other Entity that is an affiliate or associated with the Roman Catholic Church (in its capacity as such, and other than (i) the Non-Debtor Catholic Entities; (ii) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP, (iii) the Parish Schools and Archdiocesan Schools; and (iv) any Co-Insured Party); *provided, however*, that any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party.

1.1.41 "**Extra-Contractual Claim**" means any Claim against any Insurer Released Party seeking any type of relief, other than coverage or benefits, under or with respect to the Archdiocese Policies. Extra-Contractual Claims include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs, or any other type of relief, alleging any of the following with respect to (a) any Archdiocese Policy; (b) any Claim allegedly or actually covered under a Archdiocese Policy; or (c) the conduct of any Insurer Released Party with respect to (a) or (b): (i) bad faith; (ii) failure to provide insurance coverage under any Archdiocese Policy, including any failure to investigate or to provide a defense or adequate defense; (iii) failure or refusal to compromise and settle any Claim insured under any Archdiocese Policy; (iv) failure to act in good faith; (v) violation or breach of any covenant or duty of good faith and fair dealing, whether express, implied, or otherwise; (vi) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (vii) violation of any unfair claims practices act or similar statute, regulation or code, including any statute, regulation, or code relating to unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising; (viii) any type of misconduct; or (ix) any other act or omission of any type by any Insurer Released Party for which the claimant seeks relief other than coverage or benefits under a Archdiocese Policy. "Extra-Contractual Claims" further include all Claims relating to any Insurer Released Party's (x) handling of any Claims under the Archdiocese Policies, (y) conduct in negotiating this Settlement Agreement and/or the Plan, and (z) conduct in the settlement of any Claims. For the avoidance of doubt, Extra-Contractual Claims of the Archdiocese Bound Parties are included within the property Insurer is purchasing hereunder.

1.1.42 "**Final Order**" means an order as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending and in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order will have been affirmed by the highest court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari,* petition for review, or move for reargument or rehearing will have expired; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order will not cause such order not to be a Final Order.

1.1.43 "**Gatekeeper Injunction**" has the meaning set forth in Section 2.2.2.

1.1.44 "**HH**" has the meaning set forth in Section 6.3.15.

1.1.45 "**Indemnified Claims**" has the meaning set forth in Section 7.2 of this Settlement Agreement.

1.1.46 "**Indemnity Cost Reserve**" has the meaning set forth in Section 7.2.

1.1.47 "**Injunctions**" means the Sale Injunction, Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeper Injunction.

1.1.48 "**Insurance Settlement Agreement"** has the meaning set forth in the Acceptable Plan.

1.1.49 "**Insurer**" means The Catholic Mutual Relief Society of America.

1.1.50 "**Insurer Contribution Claim**" means any (a) Non-Settling Insurer Contribution Claim or (b) Settling Insurer Contribution Claim.

1.1.51 "**Insurer Released Party**" means Insurer and its Related Parties, each in their capacities solely as such with respect to the Archdiocese Policies and all Subject Interests therein.

1.1.52 "**Known Abuse Claims**" means any Abuse Claim, other than an Unknown Abuse Claim, against any Settling Party, Settling Insurer, and/or Non-Settling Insurer.

1.1.53 "**Medicare Claims**" means any Claim by CMS, and/or any agent or successor of CMS, charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA or pursuing a Claim under MSP Provisions, relating to any payments in respect of any Abuse Claim, including any Claim for reimbursement of conditional payments, and any Claim relating to reporting obligations.

1.1.54 "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which imposes reporting obligations on those Entities with payment obligations under the MSPA.

10

1.1.55 "**MSPA**" means 42 U.S.C. §1395y et seq., or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto, including the regulations promulgated thereunder, found at 42 C.F.R. §411.1 et seq.

1.1.56 "**Non-Debtor Catholic Entity Policy Sale**" has the meaning set forth in Section 4.6.

1.1.57 "**Non-Debtor Catholic Entities**" collectively means those entities listed on the Acceptable Plan Exhibit B-2 and Schedule 2 hereto who are not Additional Debtors, but which are (a) insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies and/or (b) have actually or allegedly acquired or been assigned the right to make a claim for coverage under any of the Archdiocese Policies (excluding, however, for the avoidance of doubt, the Debtor Parties, the Settlement Trust, and any Abuse Claimant).

1.1.58 "**Non-Insurer Contribution Claim**" means any Claim for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law that is attributable to, arises from, is based upon, relates to, or results from, an Abuse Claim or payment of an Abuse Claim, and any other derivative or indirect Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, other than a Non-Settling Insurer Contribution Claim or a Settling Insurer Contribution Claim.

1.1.59 "**Non-Settling Insurer**" means any insurer (together with its Related Parties) that is not a Settling Insurer.

1.1.60 "**Non-Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Non-Settling Insurer against any Settling Insurer for the payment of money where such Non-Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.61 "**Parish Schools**" means the elementary Catholic schools that are owned and operated by the Archdiocesan Parishes. For the avoidance of doubt, the definition of Parish Schools expressly excludes Catholic schools that are owned and operated by Religious Orders and the Archdiocesan Schools. For the further avoidance of doubt, the Parish Schools are not separately incorporated.

1.1.62 "**Parties**" has the meaning set forth in the first paragraph of this Settlement Agreement.

1.1.63 [**Intentionally Omitted**.]

1.1.64 "**Penalty Claims**" means a Claim against any Settling Party or Settling Insurer for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Creditor holding such Claim.

1.1.65 "**Perpetrator**" means an individual who personally committed or is alleged to have personally committed an act of Abuse. For the avoidance of doubt, the definition of Perpetrator does not include any individual who did not personally commit an act of Abuse or is not alleged to have personally committed an act of Abuse, but against whom an Abuse Claim or Non-Insurer Contribution Claim is asserted nonetheless, or may be asserted, by virtue of such individual's position or service as a member, representative, contractor, consultant, professional, or volunteer of the Archdiocese or any Non-Debtor Catholic Entity or any council or representative body associated with such Entities.

1.1.66 "**Person**" has the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

1.1.67 "**Petition Date**" means (a) with respect to the Archdiocese, May 1, 2020; and (b) with respect to each Additional Debtor, the date(s) on which such Additional Debtor files in the Bankruptcy Court its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.68 "**Plan**" refers to the Chapter 11 Plan of Reorganization for the Archdiocese and all Additional Debtors (and all exhibits annexed thereto) which shall, among other things, provide for the resolution of Abuse Claims and Subject Interests in the Archdiocese Policies as set forth herein, and which shall be in form and substance acceptable to Insurer in its sole discretion.

1.1.69 "**Plan Confirmation Order**" has the meaning set forth in Section 2.3.

1.1.70 "**Preserved Coverage**" means Insurer's obligations under Certificate No. 8554 issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the bodily injury or personal injury claims listed in the attached Schedule 4, in each case, subject to the limits, declarations, terms and conditions of such certificate; *provided, however*, that Preserved Coverage shall not include coverage for any and all Abuse Claims or any and all other Barred Claims.

1.1.71 "**Purchased Property**" means any and all right, title, and interest (including all Subject Interests) in and to the Archdiocese Policies and the Related Insurance Claims and Coverage Claims.

1.1.72 "**Related Insurance Claim**" means (a) any Extra-Contractual Claim and (b) any other Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies, including, without limitation, bad faith Claims.

1.1.73 "**Related Party**" means, with respect to any Entity, such Entity's (a) predecessors, successors, assigns, and any Entity that assumed the obligation of the

12

615

forgoing for the Archdiocese Policies by novation or otherwise (b) direct and indirect past, present, and future Affiliates (as defined in section 101(2) of the Bankruptcy Code), holding companies, merged companies, related companies, subsidiaries, divisions, acquired companies, joint ventures, joint venturers, (c) current and former employees, officers, directors, principals, partners, managing agents, trustees, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, brokers, adjusters, reinsurers, retrocessionaires, subrogees, agents, claims handling administrators, and other professionals, and (d) respective heirs, executors, estates, and nominees; and all Entities acting on behalf of, by, through or in concert with them, each solely in their capacities as such with respect to such Entity (and with respect to such Entity (including Insurer) that is an insurer of any Archdiocese Bound Party or has assumed the obligations of such by novation or otherwise, such insurer's applicable insurance policy(ies) (including the Archdiocese Policies)).

1.1.74 "**Religious Order**" means, collectively, an institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy.

1.1.75 "**Reorganized Additional Debtors**" means the Additional Debtors, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.76 "**Reorganized Debtor**" means the Debtor, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.77 "**Revival Window**" means Section 2 of La. Acts 2021, No. 322, as amended by La. Acts 2022, No. 386, and La. Acts 2024, No. 481.

1.1.78 "**Revival Window Laws**" means the Revival Window, together with any other law that extends the prescriptive period or statute of limitations for asserting Abuse Claims under Louisiana or other applicable state law.

1.1.79 "**Sale Injunction**" has the meaning set forth in Section 2.1.

1.1.80 "**Settlement Agreement Effective Date**" means the first day on which: (a) the Archdiocese Signatory Parties and Insurer have executed this Settlement Agreement; (b) the Unknown Abuse Claims Representative shall have supported the releases provided for herein and the protections granted hereby and in the Plan in favor of the Insurer Released Parties, in a manner acceptable to Insurer in its sole discretion; (c) the Approval Order shall have become a Final Order; (d) the Plan Confirmation Order shall have become a Final Order; and (e) the Settlement Trust shall have been created pursuant to the Plan[; *provided, however*, with the prior written consent of the Trustee, not to be

unreasonably withheld, Insurer may elect to waive the conditions set forth in clauses (b) through (e) and pay or direct the payment of the Settlement Amount to the escrow or Settlement Trust prior to the occurrence of the events set forth in (b) through (e) hereof, in which case, the date of such payment shall be the Settlement Agreement Effective Date for all purposes hereunder including the date of the closing of the purchase and sale of the Archdiocese Policies.

1.1.81 "**Settlement Amount**" means the sum of Two Million and 00/100 Dollars ($2,000,000.00) to be paid (in accordance with Section 3.1) by Insurer after satisfaction of all conditions precedent herein in accordance herewith.

1.1.82 "**Settlement Trust**" means the settlement trust established under the Plan for the purposes set forth therein, including assuming liability for all Channeled Claims (as defined in the Acceptable Plan) and Indemnified Claims (as defined herein), subject to the limitations on indemnification and liability contained in Section 7.2 of this Settlement Agreement.

1.1.83 "**Settlement Trust Agreement**" means the agreement between the Debtor and the Settlement Trustee governing the Settlement Trust, in the form of Exhibit D-1 to the Acceptable Plan.

1.1.84 "**Settlement Trust Allocation Protocol**" means the Settlement Trust Allocation Protocol (as defined and used in the Settlement Trust Agreement), in the form of Exhibit D-2 to the Acceptable Plan.

1.1.85 "**Settlement Trust Documents**" means, collectively, (a) the Settlement Trust Agreement, (b) the Settlement Trust Allocation Protocol, and (c) any other agreements, instruments and documents governing the establishment and administration of the Settlement Trust, which shall be consistent with the terms of the Plan, as the same may be amended or modified from time to time in accordance with the terms thereof.

1.1.86 "**Settlement Trustee**" means the Entity appointed to act as the initial trustee of the Settlement Trust pursuant to the terms of the Settlement Trust Documents, along with any successor trustee appointed in accordance with the Settlement Trust Documents.

1.1.87 "**Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Settling Insurer against any Settling Insurer or Non-Settling Insurer for the payment of money where such Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.88 "**Settling Insurers**" shall have the meaning set forth in the Acceptable Plan.

1.1.89 "**Settling Insurers' Policies**" shall have the meaning set forth in the Acceptable Plan.

1.1.90 "**Settling Parties**" means, collectively, the following Entities: (a) Archdiocese Bound Parties; and (b) the Settling Insurers.

1.1.91 "**Subject Interests**" means all Claims, liens (as defined by Section 101(37) of the Bankruptcy Code), encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief, including: (a) all interests of the Archdiocese in, to and under the Archdiocese Policies; (b) all interests in, to, and under the Archdiocese Policies of any Entity other than the Archdiocese (including all Abuse Claimants and the Archdiocese Bound Parties); and (c) all interests in, to and under the Archdiocese Policies of any other Entity claiming coverage by, through, or on behalf of any Archdiocese Bound Party, including, without limitation, rights and interests as an insured, co-insured or additional insured, insurer or creditors of the Archdiocese Bound Parties; in each case within the meaning of "interest" as used in sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code. For the avoidance of doubt, a Direct Action Claim constitutes a Subject Interest. The meaning of Subject Interests also includes: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or

legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property.

1.1.92 "**Supplemental Settling Insurers' Injunction**" has the meaning set forth in Section 2.2.2.

1.1.93 "**Unknown Abuse Claim**" means an Abuse Claim that occurred before the Petition Date and the Abuse Claimant did not file a proof of claim by the applicable Abuse Claims Bar Date, for which there exists a valid legal excuse for not filing, as further defined in the in the Acceptable Plan.

1.1.94 "**Unknown Abuse Claims Representative**" means Michael R. Hogan, the legal representative appointed by the Bankruptcy Court pursuant to the *Order (I) Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, and (II) Approving the Retention of Michael R. Hogan as the Unknown Tort Claims Representative, Nunc Pro Tunc To July 26, 2021* (Docket No. 1012 ), any successor legal representative appointed by the Bankruptcy Court, or, on and after the Bankruptcy Plan Effective Date, any successor legal representative appointed in accordance with the applicable Settlement Trust Document.

1.2 Capitalized terms not defined in this Section 1 or elsewhere in this Settlement Agreement shall have the meanings given to them in the Bankruptcy Code.

## 2. THE BANKRUPTCY CASE AND PLAN OF REORGANIZATION

2.1 On or before July 29, 2025, the Archdiocese shall file a motion in the Bankruptcy Court (the "**Approval Motion**"), in form and substance acceptable to Insurer in its sole discretion, that seeks the entry of an order in substantially the form attached as **Exhibit A** to this Settlement Agreement, or otherwise in form and substance acceptable to Insurer in its sole discretion (the "**Approval Order**"), that:

(a) approves this Settlement Agreement, including Insurer's buyback of the Archdiocese Policies and the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests except Preserved Coverage, and otherwise authorizes the Parties to undertake the settlement and the transactions contemplated by this Settlement Agreement, in each case pursuant to sections 363(b), (f),and (m) of the Bankruptcy Code and any other applicable provisions of the Bankruptcy Code;

(b) contains an injunction (the "**Sale Injunction**") that, subject to and conditioned upon the Settlement Agreement Effective Date and the Insurer's payment of the Settlement Amount, bars all Claims except Claims for Preserved Coverage against the Insurer Released Parties and their property and assets of each based on or arising out of any Subject Interests in the Archdiocese Policies including without limitation all Coverage Claims, Related Insurance Claims, and Barred Claims, leaving the Settling Insurers free and clear of all Subject Interests of all Entities, including all

16

Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); any Abuse Claimant; or any holder of a Barred Claim pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code;

(c) provides that this Settlement Agreement is binding on the Archdiocese Signatory Parties, all other Settling Parties, any trust created in the Bankruptcy Case(s), and any successors of the foregoing; and

(d) provides, subject to and conditioned upon the Settlement Agreement Effective Date, that the Approval Order is binding on all Persons (including, for the avoidance of doubt, all Persons set forth in the foregoing (c)).

2.1.1    The Archdiocese shall provide written notice of the Approval Motion, which notice shall be in form and substance acceptable to Insurer, to, at a minimum, any known Archdiocese Bound Party, holder of an Abuse Claim, or party whose rights or interests may reasonably be considered to be impacted by the relief requested in the Approval Motion, and any party identified on Schedule 3 hereto.    In addition, the Archdiocese shall include notice of the Approval Motion together with notice provided with respect to confirmation of the Joint Plan, including publication notice of the hearing on the Approval Motion. The Archdiocese will provide a draft service list of the foregoing for Insurer's review and comment.

2.1.2    If any Entity files an objection to the Approval Motion, the Archdiocese and Creditors' Committee shall consult with Insurer in connection with filing any written response thereto.    The Archdiocese Signatory Parties, as applicable, and Creditors' Committee shall take commercially reasonable steps to defend against any objection, appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order.    Insurer will cooperate with the Archdiocese Signatory Parties and Creditors' Committee in this regard, including making commercially reasonable submissions.

2.2    The Archdiocese shall file and prosecute a joint Plan with the Creditors Committee, which shall be in form and substance satisfactory to the Insurer in its sole discretion, substantially in the form as the Acceptable Plan, which the Parties acknowledge and agree satisfies the terms of this Settlement Agreement.  Any modifications to the Plan, the Settlement Trust Documents, the Plan Confirmation Order, or the Approval Order, including those relating to the Channeling Injunction, Supplemental Settling Insurers' Injunction, Gatekeeper Injunction, releases by holders of Abuse Claims, Insurers, Insurance Settlement Agreements, and related definitional terms, including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Abuse Related Insurance Claims," "Channeled Claim," "Covered Parties," "Direct Action Claim," "Enjoined Party," "Insurer Contribution Claim," "Non-Insurer Contribution Claim," "Penalty Claims," "Protected Parties," "Settling Insurers," "Settling Insurer's Policies," "Subject Insurance Policies," "Subject Interests," or any exhibits, schedules, and documents related thereto, must be in all respects consistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties without Insurer's written consent in its sole discretion.

2.2.1    The Plan shall create the Settlement Trust, which shall be responsible for making any and all payments to the Abuse Claimants entitled to receive payment under the Plan and which shall assume all liability for Channeled Claims.

2.2.2    The Plan shall include: (a) an injunction in substantially the form included in Article 12.4 of the Acceptable Plan (the "**Channeling Injunction**"); and (b) an injunction in substantially the form included in Article 12.5 of the Acceptable Plan (the "**Supplemental Settling Insurers' Injunction**"); and (c) an injunction in substantially the form included in Article 12.8 of the Acceptable Plan (the "**Gatekeeper Injunction**").

2.2.3    The Plan shall incorporate by reference the releases and indemnities set forth in this Settlement Agreement, including that the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to all Indemnified Claims as forth in Section 7.2 of this Settlement Agreement.

2.2.4    The Settlement Trust Documents shall provide that as a condition to receiving payment from the Settlement Trust, all Abuse Claimants shall provide an Abuse Claim Release and Certification.

2.2.5    The Plan shall provide for the commencement, prior to the Court's consideration of the Approval Motion, by the Additional Debtors of Chapter 11 cases to be jointly administered with the Bankruptcy Case.

2.2.6    The Plan shall provide a supplemental bar date for the Additional Debtors in a form and substance satisfactory to the Insurer with respect to Abuse Claims against the Additional Debtors and the form, manner, and deadline for filing proofs of claim and the treatment of confidential information contained therein.

2.2.7    The Plan shall provide that confirmation of the Plan will not occur unless all of the following conditions precedent have been satisfied: (a) the Plan Confirmation Order approves and implements the Injunctions and (b) the Bankruptcy Court shall have granted the Approval Motion in form and substance acceptable to Insurer in its sole discretion.

2.2.8    The Plan shall provide that the Bankruptcy Plan Effective Date will not occur unless all of the following conditions precedent have been satisfied or waived (as applicable with consent of Insurer): (a) the Plan Confirmation Order will have been entered by the Bankruptcy Court and become a Final Order, and (b) the Bankruptcy Court shall have entered the Approval Order (with both such Approval Order and this Settlement Agreement in form and substance acceptable to the Insurer) and such Approval Order shall have become a Final Order.

2.2.9    The Plan shall provide that (collectively, as follows, the "**Controlling Document Provision**") in the event of a conflict between (a) the Settlement Agreement, on the one hand, and (b) the Plan, on the other, the terms of the Settlement Agreement shall control and govern; and in the event of a conflict between the (x) Approval Order, on the one hand, and (y) Plan Confirmation Order, on the other, the terms of the Approval Order shall control and govern.

18

2.2.10  The Plan shall provide that the execution and delivery of this Settlement Agreement is a condition to entry of the Plan Confirmation Order and the occurrence of the Bankruptcy Plan Effective Date. The inclusion of this Settlement Agreement in the Plan shall not be waivable as a condition to entry of the Plan Confirmation Order or the occurrence of the Bankruptcy Plan Effective Date absent the prior written consent of the Settling Insurers.

2.3    The Debtor Parties shall seek and obtain entry of an order from the Bankruptcy Court, which order shall be in form and substance acceptable to the Parties, that: (i) approves the Plan pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code; (ii) contains the Channeling Injunction; (iii) ratifies the Sale Injunction as independent of the Channeling Injunction and Supplemental Settling Insurers' Injunction; (iv) contains the Gatekeeper Injunction; (v) provides that this Settlement Agreement is binding on any Settlement Trust created in the Bankruptcy Case, the Reorganized Debtor, the Reorganized Additional Debtors, and any successors of the Settlement Trust, Reorganized Debtor, or Reorganized Additional Debtors, and all of the Archdiocese Bound Parties; and (vi) contains the Controlling Document Provision (the "**Plan Confirmation Order**").

2.3.1    The Plan and Plan Confirmation Order must not be inconsistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties.

2.3.2    In seeking to obtain the Plan Confirmation Order, the Debtor and Additional Debtors will: (i) seek a confirmation hearing on an appropriately timely basis; (ii) urge the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) take all reasonable steps to defend against any objection, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order.

2.3.3    Prior to entry of the Plan Confirmation Order, the Archdiocese and/or any applicable Additional Debtor shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Abuse Claim that (i) is asserted against any Debtor Party and (ii) implicates, or is reasonably likely to implicate, any Archdiocese Insurance Policies (including by alleging Abuse that took place during any policy period of any Archdiocese Policy).  If, prior to the Plan Confirmation Order becoming a Final Order, the Bankruptcy Court allows any Entity to prosecute any such Abuse Claim, the Debtor Parties shall defend themselves against such Abuse Claims and comply with the terms of any order of the Bankruptcy Court, and Insurer's rights and obligations relating to such litigation shall be determined by, and subject to, the terms and conditions of the Archdiocese Policies, this Settlement Agreement, and any applicable orders of the Bankruptcy Court.

2.3.4    The Plan and Plan Confirmation Order shall provide that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any Covered Party with respect to any Archdiocese Policy, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable

Insurance Settlement Agreement approved by the Bankruptcy Court, except with respect to Preserved Coverage.

2.3.5    Nothing in this Section or elsewhere in this Settlement Agreement shall bar any party from arguing that any appeal from the Plan Confirmation Order should be dismissed on grounds of statutory or equitable mootness or otherwise.

2.3.6    None of the releases, Injunctions, or other provisions of the Plan with apply to, or have any effect, on the rights of the Settling Insurers to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with any Settling Insurer's Policy.

2.4    The Settlement Trust Documents shall require the Settlement Trust to register as a Responsible Reporting Entity under the reporting provisions of MMSEA.

2.4.1    The Settlement Trust Documents shall require the Settlement Trust, at its sole expense, to timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated and to follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

2.4.2    The Settlement Trust Documents shall require the Settlement Trust to obtain, prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Abuse Claim, a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. §1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim.

2.5    The Debtor Parties and Reorganized Debtor and Reorganized Additional Debtors will undertake commercially reasonable actions to cooperate with Insurer in connection with responding to any inquiry from Insurer's regulators, auditors, reinsurers, or retrocessionaires.

2.6    From and after the execution date of this Settlement Agreement and until the earlier of: (A) occurrence of (i) the Settlement Agreement Effective Date and (ii) Insurer's remittance of the Settlement Amount (at which time this covenant is superseded by the releases provided in Section 4); and (B) the date on which this Settlement Agreement is terminated, (i) none of the Insurer Released Parties, the Debtor, the Additional Debtors or Creditors' Committee will initiate any litigation activity against the other in any Bankruptcy Case and (ii) the Archdiocese and the Insurer Released Parties shall cease all litigation activities against each other in the Bankruptcy Case, including that the Insurer Released Parties will neither object to any proposed Plan consistent with this Settlement Agreement, nor serve or compel any discovery in connection with the Bankruptcy Case; *provided that*: (y) neither the Archdiocese nor any Additional Debtor shall include any provision in any Plan that adversely affects the rights or benefits of the Insurer Released Parties under this Settlement Agreement, or that otherwise violates, or is contrary to, the

agreements and covenants contained in this Settlement Agreement; and (z) neither the Archdiocese nor any Additional Debtor shall act, or fail to act, in such a way that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement. Notwithstanding the foregoing, the Insurer Released Parties may participate in the Bankruptcy Case for the purpose of supporting or enforcing any of the terms of this Settlement Agreement and protecting their rights.

2.7    From and after the execution date of this Settlement Agreement and until the date on which this Settlement Agreement is terminated, the obligations of the Debtors Parties set forth in this Section 2 shall be binding on the Debtor Parties.

## 3.    PAYMENT OF THE SETTLEMENT AMOUNTS

3.1    By no later than thirty (30) days after (a) the Settlement Agreement Effective Date, and (b) Insurer receiving appropriate instructions for the transmission of the payment to the Escrow Agent or Settlement Trust, Insurer shall pay (or cause to be paid) the Settlement Amount to the Settlement Trust or Escrow Agent pursuant to the Escrow Agreement.   Payment of the Settlement Amount may be by check, ACH transfer, wire transfer, or other method.

3.1.1    [Intentionally Omitted.]

3.2    The delivery of the Settlement Amount to the Escrow Agent or Settlement Trust shall be in full and final settlement of all responsibilities under and arising out of the Archdiocese Policies, the sale of the Purchased Property to Insurer free and clear of all Subject Interests of any Entity, and the other releases provided.

3.3    Subject to the occurrence of the Settlement Agreement Effective Date, the Parties agree:  (i) the Settlement Amount is the total amount that Insurer is obligated to pay on account of any and all Claims under, arising out of, relating to, or in connection with the Archdiocese Policies (including Barred Claims, and any reimbursement obligations for Conditional Payments under the MSPA); (ii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of anyone in connection with the Archdiocese Policies, including any payments in connection with amounts allegedly owed under the MSPA or in connection with any Claims, including any Barred Claim; (iii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of the Archdiocese Bound Parties or any Abuse Claimants in connection with the Archdiocese Policies; and (iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted, *except that* this Section 3.3 shall not apply to Preserved Coverage. The Parties further agree that the Settlement Amount includes the full purchase price of the Archdiocese Policies and Related Insurance Claims and Coverage Claims of the Archdiocese Bound Parties and consideration for the releases and other protections afforded by this Settlement Agreement.

3.4    The Parties represent and agree that (i) the consideration to be provided by Insurer pursuant to this Settlement Agreement constitutes a fair and reasonable compromise and exchange

for the consideration granted to the Insurer Released Parties in this Settlement Agreement (including the releases set forth below), and (ii) the consideration to be provided by the Archdiocese Bound Parties to the Insurer Released Parties pursuant to this Settlement Agreement (including the releases set forth below) constitutes a fair and reasonable compromise and exchange for the consideration granted to the Archdiocese Bound Parties in this Settlement Agreement. The Insurer Released Parties are not acting as volunteers, and the Settlement Amount reflects potential liabilities and obligations to the Archdiocese Bound Parties of the amount Insurer allegedly is obligated to pay.

3.5    Each of the Archdiocese Signatory Parties: (i) consents to the sale of the Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests and Claims of all Persons, including, without limitation, the Archdiocese Bound Parties in accordance with the terms of this Settlement Agreement, and (ii) agrees and acknowledges that the contribution of the proceeds from such sale and settlement to the Settlement Trust, as provided in the Plan and this Settlement Agreement, is a fair and reasonable compromise and exchange for value and constitutes reasonable and adequate consideration for any Subject Interest or Claim the Archdiocese Bound Parties may have in the Archdiocese Policies.

3.6    The Parties further agree that they have attempted to resolve the matters set forth herein in compliance with both state and federal law and believe that the settlement terms adequately consider CMS's interest and do not reflect any attempt to shift responsibility for payment of medical expenses to CMS pursuant to 42 U.S.C. § 1395y(b). The Parties acknowledge, understand, and agree that any present or future action or decision by CMS, including actions regarding an Abuse Claimant's eligibility or entitlement to receive Medicare or Medicare payments, will not render this Settlement Agreement (including the releases set forth in it) void or ineffective, or in any way affect the finality of this Settlement Agreement. The Settlement Trust is responsible for all future medical payments, including any and all claims by CMS and/or CMS contractors that have been or may be in the future arising out of, relating (directly or indirectly) in any way to, or in connection with this Settlement Agreement.

3.7    To facilitate the purchase of the Purchased Property as set forth herein, each Archdiocese Bound Party is authorized to designate a lawful attorney in fact, with full powers of substitution, to execute any bill of sale or other document reasonably requested by the Archdiocese or Insurer to accomplish the sale and purchase contemplated herein. A form of Bill of Sale is attached hereto as **Exhibit B**.

## 4.    RELEASES AND SALE FREE AND CLEAR

4.1    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, with no further action being required, the Archdiocese Signatory Parties fully, finally, and completely remise, release, acquit, and forever discharge the Insurer Released Parties (including, for the avoidance of doubt, any of their reinsurers or retrocessionaires, solely in their capacity as such), from any and all past, present, and future: (a) Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies or Claims that are covered or are determined to be covered by agreement or a court of competent jurisdiction under the Archdiocese Policies, including, without

22

limitation, any Barred Claims, Direct Action Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims, the handling of the Abuse Claims or the Bankruptcy Case *provided that*, the Insurer is not released from its obligations under the Archdiocese Policies with respect to the Preserved Coverage.  The Archdiocese Signatory Parties further acknowledge, stipulate, and agree that (x) the releases in this Section 4.1 specifically include all Unknown Abuse Claims, and demands that are based in whole or in part on Unknown Abuse Claims and (y) **with respect to all Claims released under this Section 4.1, the Archdiocese Signatory Parties waive any and all provisions, rights, and benefits conferred by Cal. Civ. Code 1542 or any law of any state of the United States, or any principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code 1542, which provides: "a general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, that, if known by him or her, would have materially affected his or her settlement with the debtor or released party"** and (z) the releases in this Section 4.1 shall be equal in breadth to the broadest releases and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

4.2    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, and with no further action being required, Insurer shall fully, finally, and completely remise, release, acquit, and forever discharge the Archdiocese Signatory Parties from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies, including any Barred Claims, and reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case, *provided that*, the obligations of the applicable Archdiocese Bound Parties are not released from their obligations under the Archdiocese Policies with respect to the Preserved Coverage.

4.3    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, none of the Archdiocese Signatory Parties or other Archdiocese Bound Parties shall assert against the Insurer Released Parties any Claim with respect to any matter, conduct, transaction, occurrence, fact, or other circumstance that, directly or indirectly, arises out of, relates to, or is in connection with any of the Archdiocese Policies, any Barred Claim, or any other matter released pursuant to Sections 4.1 and 4.2 above.

4.4    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer hereby buys back the Archdiocese Policies free and clear of all Subject Interests, including without limitation all Coverage Claims and Related Insurance Claims, of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); and any Abuse Claimant, or any other holder of a Barred Claim.  This sale is pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code.  The Parties acknowledge and agree, and the Approval Order shall find and conclude, that upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount:

4.4.1   Insurer is a good faith purchaser of the Archdiocese Policies and any Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), within the meaning of section 363(m) of the Bankruptcy Code, with all the protections afforded such a purchaser under 363(m) of the Bankruptcy Code;

4.4.2   the consideration exchanged constitutes a fair and reasonable settlement and compromise of the Parties' disputes and of their respective rights and obligations relating to the foregoing Archdiocese Policies and Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), and constitutes reasonably equivalent value;

4.4.3   the releases in this Settlement Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy law;

4.4.4   the Archdiocese Policies and all Subject Interests therein (including, without limitation, to the extent applicable, any Direct Action Claim) shall be terminated and of no further force and effect;

4.4.5   Insurer's payment of the Settlement Amount constitutes Insurer's full and complete performance of any and all obligations under the Archdiocese Policies, including any performance owed to the Archdiocese Bound Parties or any holder or purported holder of any Claim against (including any Abuse Claim or Direct Action Claim) or Subject Interest in, the Archdiocese Policies, and exhausts all limits of liability of the Archdiocese Policies;

4.4.6   All Subject Interests the Archdiocese Bound Parties and any other Entity may have had, may presently have, or in the future may have in the Archdiocese Policies are released pursuant to the terms of this Settlement Agreement and policy buyback;

4.4.7   all per occurrence and/or aggregate limits of coverage under the Archdiocese Policies are fully eroded, exhausted and settled upon the Settlement Agreement Effective Date;

4.4.8   the Insurer would not pay the Settlement Amount without buyback of the Archdiocese Policies upon all of the terms and conditions set forth herein;

4.4.9   the Archdiocese Signatory Parties accept the Settlement Amount in full and complete compromise and satisfaction of all Insurer Released Parties' past, present, and future obligations, including any obligations to any of the Archdiocese Bound Parties under such Archdiocese Policies or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever that are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies (including without limitation Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether or not such Claims arise from, relate to, or

are in connection with the Abuse Claims, Barred Claims, the Bankruptcy Case, or otherwise; and.

4.4.10   notwithstanding any of the foregoing, nothing in the Sale Approval Order, the Settlement Agreement or the Sale Transaction affects the Preserved Coverage or the Archdiocese Bound Parties' rights or continuing obligations in connection with the Preserved Coverage under the Archdiocese Policies issued by Insurer, all of which shall survive the Settlement Agreement Effective Date, Bankruptcy Plan Effective Date and the closing of the Sale Transaction.

4.5     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer shall have no obligation to pay, handle, object, or otherwise respond to any Claim against the Archdiocese Bound Parties; and the Archdiocese Bound Parties will: (i) will be withdrawn, and are deemed to have withdrawn, all outstanding tenders of Claims to the Insurer Released Parties for defense and indemnity; (ii) will not tender any Claims to the Insurer Released Parties; and (iii) will not request that the Insurer Released Parties fund any judgments, settlements, or defense costs that, in each case, are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies issued by a Settling Insurer.

4.6     To the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer consent to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under this Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Subject Interests of any Entity in such Archdiocese Policies (the "**Non-Debtor Catholic Entity Policy Sale**"). The Plan Confirmation Order and Approval Order shall so provide and Insurer shall be designated in the Plan Confirmation Order as a good-faith purchaser of the Archdiocese Policies with all the protections afforded such a purchaser under section 363(m) of the Bankruptcy Code.

4.7     Notwithstanding anything in this Settlement Agreement to the contrary, nothing in the Settlement Agreement shall assign, sell or purchase the Preserved Coverage; withdraw or deem withdrawn the tender of the claims listed in attached Schedule 4; erode, exhaust the limits of, or terminate the Preserved Coverage; release the Insurer from providing the Preserved Coverage to the applicable Archdiocese Bound Parties; or release the rights or obligations of the applicable Archdiocese Bound Parties under the Archdiocese Policies with respect to such Preserved Coverage.

4.8     The Archdiocese Signatory Parties further covenant, stipulate and agree that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Abuse Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any insured or additional insured covered by any insurance policy issued by any Insurer Released Party, and to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in any Archdiocese

25

Policy to the Debtor's Estate and sale thereof to Insurer, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court. Without limiting the foregoing, the Insurer Released Parties shall receive protections against Claims by Non-Debtor Catholic Entities and any other Entity equal in breadth to the broadest protections received by any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, or any Insurance Settlement Agreement approved by the Bankruptcy Court.

4.9     If the Archdiocese Signatory Parties, or anyone of them, enter into any agreement (that is embodied in such agreement as approved by the Bankruptcy Court, the Plan, and/or the Plan Confirmation Order) with any other one of the Settling Insurers (including any Non-Settling Insurer who becomes a Settling Insurer) in the Bankruptcy Case, that provides that insurer with releases, injunctions or other protections that are more favorable than those contained in this Settlement Agreement, then this Settlement Agreement shall be deemed to be modified to provide Insurer with those more favorable injunctions, releases or other protections, except with respect to Preserved Coverage.

4.10     Notwithstanding anything in this Settlement Agreement, nothing in this Settlement Agreement is intended to or shall be construed to:

4.10.1   apply to or have any effect on the Insurer Released Parties' rights to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer;

4.10.2   release any Claims that any Insurer Released Party has or might have against any Non-Settling Insurer, except that, to the extent such other insurers have agreed or in the future agree to release any Claims against the Insurer Released Parties arising out of or related in any way to the Abuse Claims, then the Insurer Released Parties also release such Claims against such other insurers to the same extent; or

4.10.3   release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Settlement Agreement or the Plan (to the extent not inconsistent with this Settlement Agreement).

## 5.     TERMINATION OF AGREEMENT

5.1     The Parties may terminate this Settlement Agreement by mutual agreement in writing.

5.2     Insurer may terminate this Settlement Agreement upon fifteen (15) days written notice to the other Parties in the event of any of the following occurs prior to the Settlement Agreement Effective Date: (i) any of the Debtor Parties or the Creditors' Committee files a plan inconsistent with this Settlement Agreement; (ii) the Approval Order and the Plan Confirmation Order are not entered by February 15, 2026; (iii) the Bankruptcy Court enters an order that becomes a Final Order that (a) denies the Approval Motion or (b) is inconsistent with the Approval Order or the Plan Confirmation Order; (iv) a plan that is inconsistent with the terms of this

Settlement Agreement is confirmed; or (v) any Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

5.3    In the event of termination pursuant to this Section 5, unless the Parties agree otherwise in writing, the Parties' interests, rights, and obligations under the Archdiocese Policies shall not be impacted by such termination.

## 6.    REPRESENTATIONS AND WARRANTIES OF THE PARTIES

6.1    The Parties separately represent and warrant as follows:

6.1.1    To the extent it is a corporation, including a non-profit, religious, or charitable corporation, or other legal entity, each such Party has the requisite power and authority to enter into this Settlement Agreement and to perform the obligations contemplated by this Settlement Agreement[1], subject only to approval of the Bankruptcy Court; and

6.1.2    This Settlement Agreement has been analyzed by counsel to the Parties and executed and delivered in good faith pursuant to arm's length negotiations and for value and valuable consideration.

6.2    The Archdiocese Signatory Parties represent and warrant that they have not assigned, and will not assign, any Subject Interests in the Archdiocese Policies to any Entity, except for the avoidance of doubt, the assignment of the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate.

6.3    The Archdiocese Signatory Parties represent and warrant that (i) all Archdiocese Bound Parties have either signed this agreement, are represented herein by the Archdiocese or the Archdiocese Signatory Parties, or are juridical entities whose existence has been terminated as a matter of applicable non-bankruptcy law and (ii) the Archdiocese Signatory Parties are duly authorized to bind the Archdiocese Bound Parties who are not Archdiocese Signatory Parties. Without limiting the foregoing, the Archdiocese Signatory Parties represent and warrant that:

6.3.1    all entities known to them that are Co-Insured Parties under the Archdiocese Policies (by express reference, assignment, judicial determination or any related concept under applicable law or other document) other than the Debtor, the Additional Debtors, the Parish Schools and Archdiocesan Schools, the Non-Debtor Catholic Entities, and the cemeteries identified in Section 6.3.3, are identified in Schedule 2 hereto, if any;

6.3.2    the Archdiocesan Schools are not separately incorporated and are merely unincorporated operations of the Debtor and the Parish Schools are not separately incorporated and are merely unincorporated operations of the Archdiocesan Parishes that are Additional Debtors;

[1] Specifically, each Archdiocese Signatory Party is duly authorized to execute this Settlement Agreement and any related document and the signatory hereto on behalf of such Archdiocese Signatory Party has full power and authority to bind such Archdiocese Signatory Party. Forms of the related corporate resolutions and incumbency certificate are attached in Schedule 5 and Schedule 6 respectively.

27

6.3.3 the Debtor, through the Office of Catholic Cemeteries, operates certain cemeteries including, without limitation: All God's Babies Tomb & Holy Innocents Prayer Garden, St. Charles Cemetery, St. Joseph Cemetery #1, St. Joseph Cemetery #2, St. Louis Cemetery #1, St. Louis Cemetery #2, St. Louis Cemetery #3, St. Patrick Cemetery #1, St. Patrick Cemetery #2, St. Patrick Cemetery #3, St. Roch Cemetery #1, St. Roch Cemetery #2, St. Vincent De Paul Cemetery #1, St. Vincent DePaul Cemetery #2, which cemeteries are either: (a) Non-Debtor Catholic Entities or (b) not separately incorporated and are merely unincorporated operations of the Debtor;

6.3.4 Holy Redeemer School, Redeemer-Seton High School, and St. Joseph Benedictine High School were formerly owned and operated by the Archdiocese, but ceased operations and were closed by the Debtor at some point prior to the Petition Date, and were not separately incorporated and were merely unincorporated operations of the Debtor;

6.3.5 St. Robert Bellarmine School was formerly owned and operated by one or more of the Archdiocese Signatory Parties, but ceased operations and was closed by one or more of the Archdiocese Signatory Parties at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of one of the Additional Debtors;

6.3.6 Notre Dame Seminary and the Society of the Propagation of the Faith of the Archdiocese of New Orleans are owned and operated by the Archdiocese and are not separately incorporated, but are merely unincorporated operations of the Debtor;

6.3.7 San Pedro Pescador Church was owned and operated by the Archdiocese, but was closed by the Archdiocese prior to the Petition Date and was not separately incorporated, but was merely an unincorporated operation of the Archdiocese;

6.3.8 the following Roman Catholic Schools: the Academy of the Sacred Heart, Holy Cross, Jesuit, St. Mary's Academy, St. Mary's Dominican, Brother Martin, Mount Carmel Academy, Ursuline Academy, Cabrini, De La Salle, and St. Paul's School, are not Co-Insured Parties, named insured's or additional insureds (or related concept under applicable law or document) under the Archdiocese Policies, or institutions, religious organizations or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control and active management, and were themselves not under the control or active management of the Archdiocese.

6.3.9 St. John Vianney Preparatory School was formerly owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.10 the Louise Home a/k/a as the Louise Headstart Center was an unincorporated ministry of the Debtor;

28

631

6.3.11  Holy Guardian Angel was owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.12  the Social Apostolate Housing Program was an unincorporated ministry of the Debtor;

6.3.13  at all times Tulane Catholic and the Newman Center were and are unincorporated activities of the Debtor, with no existence separate and apart from the Debtor;

6.3.14  Crescent City Convent Corporation, Lyric Realty and Parking Company, Inc., The Chinchuba Deaf-Mute Institute, People for Teens of St. Anthony of Padua Corporation, Kiwanis Foundation of New Orleans, Kiwanis Club of New Orleans, and Seminarians Parents Association, Inc. were never owned, operated, or controlled by the Debtor or the Additional Debtors and were neither insureds nor additional insureds under the Archdiocese Policies; and

6.3.15  (a) Catholic Charities Archdiocese of New Orleans ("**Catholic Charities**") owned and operated Hope Haven – Madonna Manor ("**HH**"), which was organized under Louisiana law; (b) HH was dissolved and its status as a juridical person was, thus, terminated as a matter of Louisiana law; (c) at all times, Catholic Charities was the sole member and/ or shareholder of HH; and (d) it is the intention of Catholic Charities that HH be bound by this Agreement as if it remained in existence and had signed the Agreement as a party.

6.4     The Archdiocese Signatory Parties represent and warrant that they are not aware of any Abuse Claim asserted against any entity associated with the Archdiocese (including any parishes, institutions or religious organizations or any subsidiary of the person or organization listed in the declarations of the Archdiocese Policies, or any other organization coming under the Archdiocese's control and active management), that is not listed on Exhibit B-1 to the Acceptable Plan.

6.5     The Debtor represents and warrants that it will undertake good faith efforts to cause actual notice of the Approval Motion to be sent in accordance with Section 2.1.1 hereof.  Without limitation, the Debtor has sent or will send notice to the entities on Schedule 3.

6.6     The Archdiocese Signatory Parties and Insurer (limited to such Insurer person that worked on and were familiar with this Settlement Agreement and matters referenced therein), respectively, represent and warrant that they have completed a reasonable search for evidence of any policy of insurance issued by Insurer to the Archdiocese Signatory Parties that would afford coverage with respect to any Abuse Claim, Coverage Claim, or Related Insurance Claim and other than the policies identified in Schedule 1, no such policies have been identified.  The Archdiocese Signatory Parties further represent and warrant that, to the best of their knowledge after reasonably diligent investigation: there are no contracts, binders, certificates, and policies of insurance that insure or purport to insure (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) (x) the Diocese of

Houma-Thibodaux or (y) the Diocese of Baton Rouge (excluding, for the avoidance of doubt, policies issued to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD, but including any such policies issued to the Archdiocese that provide or may provide insurance coverage to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD), or (iv) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, other than the policies identified in Schedule 1. Notwithstanding the foregoing, nothing in this Settlement Agreement, including the Schedules or Exhibits hereto, shall be construed as or deemed to be an admission or evidence that any binder, certificate, or policy of insurance was in fact issued or affords coverage in connection with any Abuse Claims.

6.7    The Debtor Parties represent and warrant that they have not in any way assisted, and covenant that they shall not in any way assist, any Entity in the establishment or pursuit of any Claim, including any Barred Claim, against the Insurer Released Parties.

## 7.    ACTIONS INVOLVING THIRD PARTIES

7.1    For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Archdiocese Policies resulting from the purchase and sale thereof contemplated by this Settlement Agreement, the Parties hereby agree as follows:

7.1.1    From and after (i) the occurrence of the Settlement Agreement Effective Date, and (ii) Insurer's payment of the Settlement Amount, if any other insurer of the Archdiocese Bound Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from Insurer as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for any of Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense or indemnity obligation of Insurer for any Claims or reimbursement obligations for Conditional Payments released or resolved pursuant to this Settlement Agreement, the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and the Settlement Trust shall voluntarily reduce any judgment or Claim against, or settlement with, such other insurers to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against Insurer.  To ensure that such a reduction is accomplished, Insurer shall be entitled to assert this Section 7 as a defense to any action against it brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Insurer from any liability for the judgment or Claim.  Moreover, if a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against Insurer, such Claim may be asserted as a defense against a Claim by the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust in any coverage litigation (and the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and/or the Settlement Trust may assert the legal and equitable rights of Insurer in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust shall be reduced dollar for dollar by the amount so determined.

7.1.2    Unless this Settlement Agreement is terminated, Insurer shall not seek reimbursement for any payments it makes under this Settlement Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other Settling Insurer unless that other insurer first seeks contribution, subrogation, indemnification, or similar relief from Insurer.  Notwithstanding the foregoing, nothing in this Settlement Agreement, the Approval Order or the Plan Confirmation Order shall be construed as prohibiting Insurer from seeking recovery (including with respect to the Settlement Amount or otherwise) from its reinsurers or retrocessionaires in their capacity as such.

7.2    Subject to the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, and subject to the limitations set forth below, the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein, including any Claims made by (i) any Entity who is an insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies; (ii) any Entity who makes (a) an Abuse Claim or (b) a Related Insurance Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a Claim under any of the Archdiocese Policies (collectively, the "**Indemnified Claims**"), as set forth below:

7.2.1    The Insurer Released Parties shall have the right (but not the obligation) to (a) seek to enforce the Injunctions against any Entity seeking to assert an Indemnified Claim, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions) identified in this Section 7.2.  With the Insurer Released Parties' consent, such consent not to be unreasonably withheld, the Settlement Trustee can satisfy the obligations contained in (a) and (b) above.  An amount equal to Twenty Thousand and 00/00 Dollars ($20,000.00) (the "**Indemnity Cost Reserve**") shall be reserved from the Settlement Amount for payment of reasonable attorneys' fees, expenses, costs, and other amounts incurred by the Insurer Released Parties in defending against such Indemnified Claims, which amount shall be released from reserve if no Indemnified Claims are asserted within 30 days after the Revival Window has closed under every applicable Revival Window Law.

7.2.2    Neither any Archdiocese Bound Party, nor the Settlement Trust shall in any way assist, any Entity in the establishment or pursuit of any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein.

7.2.3    The Settlement Trust and Archdiocese shall support and join in the enforcement of the Injunctions against any Entity seeking to assert an Indemnified Claim; *provided that* if the Insurer Released Party(ies) elect(s) not to enforce the Injunctions in accordance with Section 7.2.1, the Settlement Trust shall (a) seek to enforce the Injunctions against such Entity, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions).

7.2.4    To the extent that a Final Order is entered against any Insurer Released Party with respect to any Indemnified Claim, the Settlement Trust shall indemnify and hold

31

harmless such Insurer Released Party with respect thereto up to the Settlement Amount; *provided that* to the extent the Insurer Released Party(ies) elect not to enforce the Injunctions or defend against the Indemnified Claims, the Settlement Trust's indemnity obligation shall be limited to the amount of the Indemnity Cost Reserve; *provided further* that if the Settlement Trust breaches its obligation set forth in Section 7.2.2 hereof, the Settlement Trust's indemnity obligation shall not be so limited and shall instead be up to the Settlement Amount. In no event shall the Settlement Trust's indemnity obligation exceed each individual Settling Insurer's Settlement Amount. To the extent the Settlement Amount has been distributed in accordance with the Plan, the Settlement Trust's indemnification obligation shall be so reduced.

7.2.5   The indemnification provided for herein shall not impose liability on the Settlement Trustee or Settlement Trust professionals for their own acts or omissions; *further*, funds provided for the administration of the Settlement Trust or payment of the Settlement Trustee or Settlement Trust professionals shall not be subject to indemnification claims as provided for herein.

7.3     If any Entity attempts to prosecute a Claim other than any of the claims listed in attached Schedule 4 that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies against the Insurer Released Parties before the Approval Order and Plan Confirmation Order become Final Orders, then promptly following notice to do so from Insurer, the Archdiocese and/or the Additional Debtor(s), as applicable, will file a motion and supporting papers to obtain an order from the Bankruptcy Court pursuant to sections 362 and 105(a) of the Bankruptcy Code protecting the Insurer Released Parties from any such Claims until the Plan Confirmation Order has become a Final Order, the Bankruptcy Case is dismissed, or this Settlement Agreement is terminated under Section 5 hereof.

## 8.   MISCELLANEOUS

8.1     If any action or proceeding of any type whatsoever is commenced or prosecuted by any Entity not a Party to this Settlement Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Settlement Agreement, the Parties mutually agree to cooperate fully in opposing such action or proceeding.

8.2     The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Settlement Agreement and to preserve its validity and enforceability.

8.3     The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Plan Confirmation Order, and the Bankruptcy Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof.

8.4     Notwithstanding any language to the contrary in this Settlement Agreement, under no circumstance will any Archdiocese Signatory Party be obligated to take any action that violates

any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, and if a court of competent jurisdiction determines that a term or condition in this Settlement Agreement does violate any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, the applicable Archdiocese Signatory Party shall be relieved of such term or condition, but the scope and finality of the releases, injunctions, and buybacks set forth in this Settlement Agreement shall not be affected or modified.

8.5     This Settlement Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.6     This Settlement Agreement may be modified only by a written amendment signed by all of the Parties, and no waiver of any provision of this Settlement Agreement or of a breach thereof shall be effective unless expressed in a writing signed by the waiving Party.  The waiver by any Party of any of the provisions of this Settlement Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach. Any change or modification of this Agreement that would result in a material adverse change to the rights of the Abuse Claimants or Trust shall require the consent of the Creditors' Committee (if at the time of the proposed change or modification a Trustee has not been appointed) or Settlement Trustee (if at the time of the proposed change or modification a Trustee has been appointed and approved), as applicable, which consent shall not be unreasonably withheld.

8.7     By entering into this Settlement Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Settlement Agreement.  No part of this Settlement Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Settlement Agreement.  All actions taken and statements made by the Parties or by their representatives relating to this Settlement Agreement or participation in this Settlement Agreement, including its development and implementation, shall be without prejudice or value as precedent.

8.8     This Settlement Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession regarding liability, culpability, wrongdoing, or insurance coverage.  All related discussions, negotiations, and all prior drafts of this Settlement Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. Any evidence of the negotiations or discussions associated with this Settlement Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.8, in (i) an action or proceeding to enforce the terms of this Settlement Agreement, including any use as set forth in Section 7.1.1, or (ii) any possible action or proceeding between the Insurer Released Parties and any reinsurers.  This Settlement Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Insurer Released Parties' obligations under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer.

8.9     None of the Parties shall make any public statements or disclosures (i) regarding another Party's rationale or motivation for negotiating or entering into this Settlement Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued or determined by agreement or a court of competent jurisdiction to have been issued by the Insurer Released Parties, including handling of or involvement in connection with any claims asserted thereunder.

8.10    Neither this Settlement Agreement nor the rights and obligations set forth in this Settlement Agreement shall be assigned without the prior written consent of the other Parties.

8.11    This Settlement Agreement was jointly drafted by the Parties, and the wording of this Settlement Agreement was reviewed by legal counsel for each of the Parties, and each of them had sufficient opportunity to propose and negotiate changes prior to its execution.  The language of all parts of this Settlement Agreement shall in all cases be construed as a whole according to its meaning and not strictly for or against any Party.

8.12    Section titles and headings contained in this Settlement Agreement are included only for ease of reference and shall have no substantive effect.

8.13    All notices, demands, or other communication to be provided pursuant to this Settlement Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other Entity or address as any of them may designate in writing from time to time:

        If to the Debtor or Reorganized Debtor:

        Mark A. Mintz
        Samantha A. Oppenheim
        Jones Walker LLP
        Telephone: 504-582-8368
        Telephone: 504-582-8641
        Email: mmintz@joneswalker.com
        Email: soppenheim@joneswalker.com


        with copies to:

        [*]

34

If to an Archdiocese Signatory Party other than a Debtor Party:

    As set forth on Plan Exhibit B-2.

If to Insurer or the Insurer Released Parties:

Michael Lee
Catholic Mutual Group
Director of Specialty Claims
10843 Old Mill Road
Omaha, NE 68164
mlee@catholicmutual.org

    with copies to:

Everett J. Cygal, Esq.
ArentFox Schiff LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
everett.cygal@afslaw.com

If to the Settlement Trust:

Donald C. Massey
Couhig Partners, LLC
1100 Poydras Street, Suite 3250
New Orleans, Louisiana 70163
Telephone: (504) 599-5777
Email: dmassey@couhigpartners.com

    with copies to:

Andrew W. Caine
Pachulski, Stang, Ziehl & Jones LLP
10100 Santa Monica Blvd, Suite 1300
Los Angeles, CA 90067
Telephone: 310-277-6910
Email: acaine@pszjlaw.com

    8.14    This Settlement Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument. This Settlement Agreement may be executed and delivered by facsimile, e-mail, or other electronic image, which facsimile, e-mail, or other electronic image counterparts shall be deemed to be originals.

    8.15    Nothing contained in this Settlement Agreement shall be deemed or construed to constitute (i) an admission by the Insurer Released Parties that the Archdiocese Bound Parties, or

any other Entity, was or is entitled to any insurance coverage under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by the Insurer Released Parties or as to the validity of any of the positions that have been or could have been asserted by the any of the Archdiocese Bound Parties, (ii) an admission by any of the Archdiocese Bound Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by the Insurer Released Parties or any Claims that have been or could have been asserted by the Archdiocese Bound Parties against the Insurer Released Parties, or (iii) an admission by the Archdiocese Bound Parties or the Insurer Released Parties of any liability whatsoever with respect to any of the Abuse Claims.

8.16    The Parties to this Settlement Agreement, all of the Entities included in the definition of "Insurer Released Parties," and the Settlement Trust are intended beneficiaries of this Settlement Agreement.  Except as set forth in the preceding sentence or otherwise set forth in this Settlement Agreement, there are no third-party beneficiaries of this Settlement Agreement.

8.17    The Archdiocese Signatory Parties and the Insurer Released Parties shall each be responsible for their own fees and costs incurred in connection with the Bankruptcy Case, this Settlement Agreement, and the implementation of this Settlement Agreement, except as specifically set forth herein (including in Section 7).

8.18    The following rules of construction shall apply to this Settlement Agreement:

8.18.1 Unless the context of this Settlement Agreement otherwise requires: (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Settlement Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.18.2 References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Settlement Agreement.

8.18.3 The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Settlement Agreement when the stated intent is not achieved.

8.19    The Bankruptcy Court in the Bankruptcy Case shall retain jurisdiction to interpret and enforce the provisions of this Settlement Agreement, which shall be construed in accordance with Louisiana law without regard to conflicts of law principles thereof.  The Insurer Released Parties do not, by virtue of this Section 8.19 or any other provision in this Settlement Agreement, consent to the Bankruptcy Court's jurisdiction as to any other matter.

8.20    This Settlement Agreement and each Debtor Party's obligations under this Settlement Agreement shall be binding on each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) and shall survive the entry of the Plan Confirmation Order; *provided, however*, after the occurrence of the Bankruptcy Plan Effective

Date, recourse for all obligations, other than those set forth in Sections 6.5, 6.7, and 7 hereof or a remedy of specific performance, shall be to the Settlement Trust; *provided further, however*, if specific performance is not available, each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) may be held liable for an intentional breach of a representation in this Agreement or their bad faith material breach of this Agreement, and if liability on any such ground is established, then recourse may be had directly against the Debtor Party, Reorganized Debtor, and/or Reorganized Additional Debtor(s) responsible.

8.21    The obligations of the Parties herein, other than those conditioned upon the Settlement Agreement Effective Date, shall be binding upon execution hereof by the Parties.

8.22    Nothing in this Settlement Agreement will prevent Insurer from allocating the Settlement Amount among the Archdiocese Policies at Insurer's discretion.

8.23    If any provision of this Settlement Agreement, or the application thereof, shall for any reason or to any extent, be construed to be invalid or unenforceable, the remainder of this Settlement Agreement, and the application of such provision to other circumstances, shall be interpreted so as to best effect the intent of the Parties, unless such determination of invalidity or unenforceability deprives any Party of the substantial benefit of its bargain.

8.24    The Parties agree that all matters relating to the negotiation and terms of this Settlement Agreement (including by way of example and not limitation, all prior drafts, exchanges of terms, and related discussions or correspondence) shall be confidential and are not to be disclosed except by order of court or consent of the Parties in writing.  This Section 8.24 does not prevent or prohibit the Parties from publicly filing on the docket in the Bankruptcy Case the final, executed copy of this Settlement Agreement.

[*Remainder of Page Intentionally Left Blank*]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed: _____

_____

Date: _____

*[Signatures Continue on Adjacent Pages]*

38

**The Catholic Mutual Relief Society of America**

Signed: _____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**All Archdiocese Signatory Parties
Other than the Archdiocese**


Signed: _____


Name Printed: _____

Title:    **Their Authorized Signer Pursuant to
  Resolutions** _____

Date:    _____


*[Signatures Continue on Adjacent Pages]*

**SCHEDULE 1 – Catholic Mutual Certificates that are "Archdiocese Policies"**

- Certificate Number 8139 (for the term 7/1/89-7/1/90)

- Certificate Number 8554 (initially issued for the 7/1/90-7/1/91 term and annually renewed until the Archdiocese non-renewed effective 7/1/21)

## SCHEDULE 2 – Co-Insured Parties[1]

**Other Co-Insureds Known to Diocesan Signatory Parties**

NONE

For the avoidance of doubt, the following Entities are bound by the terms of the

Settlement Agreement in addition to the Archdiocese:

### Additional Debtors

**I.      Archdiocesan Parishes**

1.      All Saints Roman Catholic Church, New Orleans, Louisiana

2.      Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana

3.      Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana

4.      Assumption of Mary Roman Catholic Church, Avondale, Louisiana

5.      Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana[2]

6.      Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana

7.      Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana

8.      Blessed Trinity Roman Catholic Church, New Orleans, Louisiana

9.      Christ the King Roman Catholic Church, Gretna, Louisiana

10.     Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana

11.     Divine Mercy Roman Catholic Church, Kenner, Louisiana

12.     Good Shepherd Roman Catholic Church, New Orleans, Louisiana

13.     Holy Family Roman Catholic Church, Franklinton, Louisiana

14.     Holy Family Roman Catholic Church, Luling, Louisiana

15.     Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana

16.     Holy Spirit Roman Catholic Church, New Orleans, Louisiana

17.     Immaculate Conception Roman Catholic Church, Marrero, Louisiana

18.     Immaculate Conception Roman Catholic Church, New Orleans, Louisiana

---

[1]    Without limiting Section 6.4 of the Settlement Agreement, Insurer does not concede that any of the Entities listed on this schedule are "insureds," "additional insureds," or "protected persons" under its Archdiocese Policies.

[2]    Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana, operate jointly as one Archdiocesan Parish.

19.   Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana

20.   Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana

21.   Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana, for itself and as successor to St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc.

22.   Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana

23.   Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana

24.   Most Holy Trinity Roman Catholic Church, Covington, Louisiana

25.   Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana

26.   Our Lady of Grace Roman Catholic Church, Reserve, Louisiana

27.   Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana

28.   Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana

29.   Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana

30.   Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana

31.   Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana

32.   Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana

33.   Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana

34.   Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana

35.   Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana

36.   Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana

37.   Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana

38.   Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana

39.   Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana

40.   St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana

41.   St. Agnes Roman Catholic Church, Jefferson, Louisiana

42.   St. Alphonsus Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

43.   St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana

44.   St. Angela Merici Roman Catholic Church, Metairie, Louisiana

45.   St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana

46.   St. Anselm Roman Catholic Church, Madisonville, Louisiana

47.   St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana

48. St. Anthony of Padua Roman Catholic Church, Luling, Louisiana

49. St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana

50. St. Anthony Roman Catholic Church, Gretna, Louisiana

51. St. Augustine Roman Catholic Church, New Orleans, Louisiana

52. St. Benedict Roman Catholic Church, Covington, Louisiana

53. St. Benilde Roman Catholic Church, Metairie, Louisiana

54. St. Bernard Roman Catholic Church, St. Bernard, Louisiana

55. St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana

56. St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana

57. St. Christopher Roman Catholic Church, Metairie, Louisiana

58. St. Clement of Rome Roman Catholic Church, Metairie, Louisiana

59. St. Cletus Roman Catholic Church, Gretna, Louisiana

60. St. David Roman Catholic Church, New Orleans, Louisiana

61. St. Dominic's Roman Catholic Church, New Orleans, Louisiana

62. St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana

63. St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana

64. St. Francis Xavier Roman Catholic Church, Metairie, Louisiana

65. St. Genevieve Roman Catholic Church, Slidell, Louisiana

66. St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana

67. St. Jerome Roman Catholic Church, Kenner, Louisiana

68. St. Joachim Roman Catholic Church, Marrero, Louisiana

69. St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana

70. St. John of the Cross Roman Catholic Church, Lacombe, Louisiana

71. St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, for itself and as successor to St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc.

72. St. John the Baptist Roman Catholic Church, Edgard, Louisiana

73. St. John the Baptist Roman Catholic Church, Folsom, Louisiana

74. St. Joseph Roman Catholic Church, Algiers, Louisiana

75. St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana

76. St. Joseph's Roman Catholic Church, Gretna, Louisiana

77. St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, for itself and

3

as successor to Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc.

78.   St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana

79.   St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana

80.   St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana

81.   St. Margaret Mary Roman Catholic Church, Slidell, Louisiana

82.   St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana

83.   St. Mark Roman Catholic Church, Ama, Louisiana

84.   St. Martha Roman Catholic Church, Harvey, Louisiana

85.   St. Martin de Porres Roman Catholic Church, New Orleans, formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc.

86.   St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana

87.   St. Mary's Roman Catholic Church, New Orleans, Louisiana

88.   St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana

89.   St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St. John the Baptist Roman Catholic Church, Paradis, Louisiana, for itself and as successor to St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc.

90.   St. Patrick's Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

91.   St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana

92.   St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana

93.   St. Peter Claver Roman Catholic Church, New Orleans, Louisiana

94.   St. Peter Roman Catholic Church, Reserve, Louisiana, for itself and as successor to St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc.

95.   St. Peter's Roman Catholic Church, Covington, Louisiana

96.   St. Philip Neri Roman Catholic Church, Metairie, Louisiana

97.   St. Pius X Roman Catholic Church, New Orleans, Louisiana

98.   St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana

99.   St. Rita Roman Catholic Church, Harahan, Louisiana

100.  St. Rita Roman Catholic Church, New Orleans, Louisiana

4

101.   St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana[3]

102.   Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana

103.   The Congregation of St. Rita Roman Catholic Church of Harahan

104.   The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana

## II.   Suppressed Archdiocesan Parishes[4]

1.   Blessed Sacrament, Inc.

2.   Epiphany, Inc.

3.   Immaculate Heart of Mary, Inc.

4.   Incarnate Word, Inc.

5.   Our Lady of Good Counsel, Inc.

6.   Our Lady of Good Harbor, Inc.

7.   Our Lady of Lourdes, New Orleans, Louisiana, Inc.

8.   Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.

9.   Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana

10.   St. Ann, New Orleans, Louisiana, Inc.

11.   St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana

---

[3]   As stated in footnote 2, Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

[4]   The Suppressed Archdiocesan Parishes no longer operate as separate church parishes. The Suppressed Archdiocesan Parishes were not dissolved, and may own property.

Following Hurricane Katrina, the operations of certain of the Suppressed Archdiocesan Parishes were combined with Archdiocesan Parishes. In 2024, in the ongoing aftermath of Hurricane Ida and a result of storm damage, the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental statistics, and financial difficulties encountered, the following additional Suppressed Archdiocesan Parishes were canonically merged with neighboring Archdiocesan Parishes: (a) St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc., was canonically merged into St. Peter Roman Catholic Church, Reserve, Louisiana; (b) (i) St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and (ii) St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc., were both canonically merged into Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, now known as St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana; (c) St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc., was canonically merged into St. Rosalie Roman Catholic Church, Harvey, Louisiana, now known as Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana; (d) St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc., was canonically merged into Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, now known as St. John Paul II Roman Catholic Church, Waggaman, Louisiana; (e) St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc., was canonically merged into St. John the Baptist Roman Catholic Church, Paradis, Louisiana, now known as St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana; (f) Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc., was canonically merged into St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, now known as St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana; and (g) St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc., had its canonical territory divided so that (i) the area north of the Pontchartrain Expressway was canonically merged into St. Patrick's Roman Catholic Church, New Orleans, Louisiana, and (ii) the area south of the Pontchartrain Expressway was canonically merged into St. Alphonsus Roman Catholic Church, New Orleans, Louisiana.

12.     St. Frances Xavier Cabrini, Inc.

13.     St. Francis de Salles, Inc.

14.     St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana

15.     St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana

16.     St. Henry's, Inc.

17.     St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana

18.     St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana

19.     St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana

20.     St. John the Baptist, New Orleans, Louisiana, Inc.

21.     St. Julian Eymard, Inc.

22.     St. Lawrence the Martyr, Inc.

23.     St. Louise de Marillac, Inc.

24.     St. Maurice, Inc.

25.     St. Monica, Inc.

26.     St. Philip the Apostle, Inc.

27.     St. Raymond's, Inc.

28.     St. Rose of Lima, Inc.

29.     St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana

30.     St. Theresa of the Child Jesus, Inc.

31.     The Congregation of Saints Peter and Paul Roman Catholic Church

32.     The Congregation of St. Cecelia Roman Catholic Church

33.     The Congregation of the Annunciation Roman Catholic Church

34.     The Congregation of the Holy Trinity Roman Catholic Church


**III.     Archdiocesan Agencies**

1.     Archdiocesan Spirituality Center

2.     Catholic Charities Archdiocese of New Orleans

3.     Catholic Charities Children's Day Care Centers

4.    Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)

5.    Clarion Herald Publishing Company

6.    Korean Catholic Community of New Orleans, Inc.

7.    Notre Dame Seminary

8.    Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana

9.    Pace Greater New Orleans

10.   Padua House (merged into Catholic Charities Archdiocese of New Orleans)

11.   Philmat, Inc.

12.   Project Lazarus

13.   Roman Catholic Center of Jesus the Lord

14.   School Food and Nutrition Services of New Orleans, Inc.

15.   Second Harvest Food Bank of Greater New Orleans and Acadiana

16.   St. Jude Community Center, Inc.

17.   St. Michael Special School

18.   St. Thérèse Catholic Academy

19.   The Society for the Propagation of the Faith, Archdiocese of New Orleans


IV.    **Non-Debtor Catholic Entities**


**Archdiocesan Agencies**

1.    7887 Walmsley, Inc.

2.    Annunciation Inn, Inc.

3.    Archdiocese of New Orleans Indemnity, Inc.

4.    Aspiring Scholars

5.    Catholic Community Foundation Archdiocese of New Orleans

6.    Christopher Homes, Inc.

7.    Christopher Inn

8.    Dubourg Home

9.    Holy Redeemer Catholic Virtual Academy

10.   Holy Trinity Drive Land Corporation

11.   Iberia Investment Fund II, LLC

12.	Metairie III

13.	Metairie Manor

14.	Monsignor Wynhoven Apartments, Inc.

15.	Nazareth II

16.	Nazareth Manor

17.	New Orleans Archdiocesan Cemeteries

18.	Notre Dame Health System (f/k/a Chateau de Notre Dame)

19.	Rouquette III

20.	St. Anthony's Gardens

21.	St. Bernard II

22.	St. Bernard III

23.	St. Bernard Manor

24.	St. Martin's Manor, Inc.

25.	St. Tammany Catholic Cemetery

26.	St. Tammany Manor

27.	The Apartments at Mater Dolorosa

28.	The Mental Health Association Development Corporation

29.	Villa Additions, doing business as St. Teresa's Villa

30.	Villa St. Maurice, Inc.

## SCHEDULE 3 – Additional Notice Parties

**The Redemptorists/Denver Province**
1633 North Cleveland Avenue
Chicago, IL 60614

**Dominican Province of St. Albert the Great**
1910 S. Ashland Avenue
Chicago, Illinois, 60608-2905

**Congregation of Holy Cross**
P.O. Box 1064
Notre Dame, IN 46556-0541

**St. Elio Roman Catholic Church**
1335 Bayou Dularge Road
Theriot, LA 70397

**Central Catholic High School**
2100 Cedar Street, Unit 1
Morgan City, LA 70380

**Edward Douglas White Catholic High School**
555 Cardinal Drive
Thibodaux, LA 70301

**Chinchuba Institute for the Deaf**
2929 Carrollton
New Orleans, LA 70118

and

1231 Prytania St.
New Orleans, LA 70130

**St. Scholastica Academy**
122 South Massachusetts St.
Covington, Louisiana 70433

**Hope Haven – Madonna Manor**
1231 Prytania
New Orleans LA  70130

7887 Walmsley Ave.
New Orleans, LA 70125

2929 Carrollton
New Orleans, LA  70118

**Holy Cross College, Inc.**
Attn Remy Donnelly
5500 Paris Ave.
New Orleans, LA  70122

**Tulane Catholic**
1037 Audubon St
New Orleans, LA 70118

**University of New Orleans**
2000 Lakeshore Drive
New Orleans, LA 70148

**Our Lady of Peace Catholic Church**
13281 LA-644
South Vacherie, LA 70090

**St. Lucy Child Development Center**
1220 Aycock St
Houma, LA 70360

**St. Augustine High School, Inc.**
c/o Alfred Harrell, III
2600 A.P. Tureaud Ave
New Orleans LA 70119

**St. Joseph's Society of the Sacred Heart**
P.O. Box 65010
Baltimore, MD 21209

**The Community of the Sisters of the Immaculate Conception**
c/o Melanie Baglow
6208 Ithaca Street
Metairie, LA  70003

**Sisters of Mount Carmel**
**Generalate Office**
21388 Smith Road
Covington, LA 70435-6349

**Daughters of St. Paul**
50 St. Paul's Ave.
Jamaica Plain, MA  02130

and

c/o Mary Martha Moss
4403 Veterans Blvd.
Metairie, LA  70006

Crescent City Convent Corporation
210 Baronne St.
New Orleans, LA  70112

**Holy Rosary Academy High School**
2437 Jena St
New Orleans, LA 70115

**St. Brigid Parish**
7887 Walmsey Avenue
New Orleans, LA 70125

**Prince of Peace Parish**
7887 Walmsey Avenue
New Orleans, LA 70125

**St. Nicholas of Myra Mission**
9701 Hammond St
New Orleans, LA 70127

**Infant Jesus of Prague Mission**
c/o St. Martha Parish
2555 Apollo Drive
Harvey, LA 70058

**Catholic Youth Ministry**
1007 Airline Park Blvd
Metaire, LA 70003

**Family Life Apostolate**
7887 Walmsey Avenue
New Orleans, LA 70125

**Ozanam Inn Inc**
P.O. Box 30565
New Orleans, LA 70190

**Gayle & Tom Benson House of Priestly Formation**
2925 South Carrolton
New Orleans, LA 70118

**Stella Maris Maritime Center**
7887 Walmsey Avenue
New Orleans, LA 70125

**Camp Abbey**
CYO Youth Office
1007 Airline Park Blvd
Metaire, LA 70003

**St. Therese Academy**
917 N. Atlanta St
Metaire, LA 70003

**Our Lady of Guadalupe Parish**
411 North Rampart Street
New Orleans, LA 70112

**Lyric Realty and Parking Company, Inc.**
c/o Kenneth D. Boudreaux
1115 Tallowtree Dr.
Mandeville, LA  70448

**Sacred Heart of Jesus Catholic Church**
1111 Highway 55
PO Box 2
Montegut, LA 70377

**Diocese of Houma Thibodaux**
P.O. Box 505
Schriever, LA

**Diocese of Baton Rouge**
Post Office Box 2028
Baton Rouge, Louisiana 70821-2028

**Vandebilt Catholic High School**
209 South Hollywood Road
Houma, LA 70360

**General Services Administration**
1800 F St., NW
Washington, DC 20405

**People For Teens of St. Anthony of Padua Corporation**
4700 Cleveland
New Orleans, LA  70119

**Society of the Sacred Heart**
4120 Forest Park Avenue
St. Louis, MO 63108

**Seminarians Parents Association, Inc.**
718 Wood St
Houma, La 70360

**Society of the Divine Word**
PO Box 6038
Techny, IL 60082

**Ursuline Sisters of the Roman Union, Central Province,**
353 South Sappington
St. Louis, MO 63122

**Salesians of Don Bosco, Eastern Province**
in the USA d/b/a Salesian Society, Inc.
Through its agent for service of process:
Rev. Louis Molinelli, SDB
1000 Barataria Boulevard
Marrero, LA 70072

And

Rev. Louis Molinelli, S.D.B.
1000 Salesian Lane
Marrero, LA 70072

5

**SCHEDULE 4**
**Bodily Injury or Personal Injury Claimants Within Catholic Mutual Preserved Coverage**

| |
|---|
| MIKKAL PETERSON |
| JO ANN REDMOND WADE |
| GINO CAMINITA |
| LAUREN THEOBOLD |
| BEOLIA MARTIN |
| WARREN DEEMER |
| MELISSA BLUNT |
| TINA GUIDRY JOHNSON |
| MERLE NOULLET |
| KENDRA LAFRANCE |
| TONY MIGLIORE |
| PAMELA MIGLIORE |
| MICAYLA BROWN |
| FATHER KENNETH HAMILTON |
| PATSY PERKINS |
| ANGEL CARDONA |
| LA Fair Housing Action Center, Inc. |
| CARRIE KINARD |
| CCANO-PACE GREATER NEW ORLEANS |

**Schedule 5**

**[Form of Corporate Resolutions]**

CORPORATE RESOLUTION

RESOLUTION OF THE MEMBERSHIP AND BOARD OF DIRECTORS OF [NAME], [ADDRESS], A LOUISIANA NON-PROFIT [CORPORATION][LIMITED LIABILITY COMPANY (hereinafter this "Corporation").

      BE IT RESOLVED, that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation, are hereby authorized to transact on behalf of this Corporation any and all business related to the following:

1. Engaging 1793 Group, a Louisiana non-profit corporation, on terms and conditions deemed appropriate in their sole discretion, to assist with and administer on this Corporation's behalf, any and all matters in which this Corporation may have an interest in relation to a Plan of Reorganization filed or anticipated to be filed by The Roman Catholic Church of the Archdiocese of New Orleans in proceedings commenced under Chapter 11 of the Bankruptcy Code, captioned *In re The Roman Catholic Church of the Archdiocese of New Orleans*, Case No. 20-10846 (Bankr. E.D. La.) (the "Chapter 11 Case"), including, but not limited to, preparing and filing a petition in the Chapter 11 Case seeking relief under Chapter 11 of the United States Bankruptcy Code as an additional debtor, executing any and all documents necessary for this Corporation to file for relief in the Chapter 11 Case, executing on behalf of this Corporation all documents required to comply with the requirements imposed upon parties filing for relief under Chapter 11 of the Bankruptcy Code, Bankruptcy Rules, Local Rules for the Eastern District of Louisiana and/or the requirement imposed by the United States Trustee.

2. Engaging the firm of Heller Draper and/or any other attorneys to represent this Corporation in actions or proceedings related to the Chapter 11 Case.

3. Engaging accountants, financial advisors, and any other professionals necessary to administer the Chapter 11 Case on behalf of this Corporation.

4. Making decisions with regard to the payment of fees and costs for which this Corporation may become responsible to pay in the Chapter 11 Case.

5. Making decisions with regard to the filing of any plan within the Chapter 11 case, provided that such shall contain terms and provisions consistent with those set forth in Appendix "A" attached hereto and incorporated herein by this reference.

      FURTHER RESOLVED that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation with the power of substitution, is authorized to execute and deliver on behalf of this Corporation each and every Insurance Settlement Agreement with the Settling Insurers, as those terms are defined in the Fourth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of September 23, 2025 (the "Plan"), and any amendment or modification to the Plan, including, without limitation, the documents attached or referred to in Plan Supplement 7.1(a), any Bill of Sale required under such Insurance Settlement Agreements,

and any other documents reasonably requested by any such Settling Insurer to effectuate the transactions provided for in its Insurance Settlement Agreement or the Plan.

FURTHER GIVING AND GRANTING unto either Very Rev. Patrick Carr or Rev. Leon Poche, full power and authority to sign any and all documents and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER GIVING AND GRANTING unto Very Rev. Peter Akpoghiran or any other officer of the Corporation, full power and authority to certify the passage and effectiveness of this Resolution to the Settling Insurers and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER RATIFYING AND CONFIRMING all that either Very Rev. Patrick Carr or Rev. Leon Poche, in his said capacity may do or cause to be done in the premises.

I, the undersigned President of this Corporation do hereby certify that the above and foregoing is a true and correct copy of a resolution adopted by the Membership and Board of Directors of said corporation in conformity with the Articles of Incorporation and Louisiana law, and that said resolution remains in full force and effect and has not been amended or rescinded.

WITNESS MY HAND AND SEAL, effective this _____day of _____, 2025

_____
Very Reverend Patrick J. Williams, V.G.

ATTEST

_____
Dirk Wild, Director

2

**Schedule 6**

**[Form of Incumbency Certificates]**

# INCUMBENCY CERTIFICATE

I, **Very Rev. Peter Akpoghiran, J.C.D**., the duly elected, qualified, and acting **Vice President** of each of the Louisiana nonprofit corporations or limited liability companies listed on **Exhibit A** attached hereto (each, a "Corporation," and collectively, the "Corporations"), do hereby certify as follows:

1. That the person named below has been duly elected or appointed and is the qualified and acting officer of each of the Corporations holding the office set forth opposite his/her name.

   **NAME**                                        **TITLE**

   **Very Rev. Patrick J. Williams, V.G.**         **President and Director**

2. That the foregoing person is duly authorized to act on behalf of each Corporation in such capacity and to exercise the powers and perform the duties incident to said office under the respective Articles of Incorporation and Bylaws of each Corporation.


3. That attached hereto as **Exhibit B** is a true and correct copy of a resolution adopted at a duly noticed special meeting by the sole member of each of the Corporations and all of the Board of Directors of each said Corporation in attendance at such meeting in conformity with such Articles of Incorporation and Louisiana law and that said resolution remains in full force and effect and has not been amended or rescinded.

   IN WITNESS WHEREOF, I have hereunto set my hand as Vice President of each of the

Corporations as of this ____ day of October, 2025.


_____
Very Rev. Peter Akpoghiran, J.C.D
Vice President of Each Corporation
(See Attached Exhibit A)

4922-4535-1762v.79

State of Louisiana
Parish of Orleans

On this _____ day of October, 2025, before me, the undersigned Notary Public, personally appeared **Very Rev. Peter Akpoghiran, J.C.D.,** who acknowledged that he/she executed the foregoing instrument for the purposes therein contained and in the capacity therein stated.

Notary Public
Printed Name: _____
Notary ID or Bar Roll No.: _____
My Commission Expires: _____

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § § | CASE NO. 20-10846 (MSG) |
| | § | |
| THE ROMAN CATHOLIC CHURCH | § | CHAPTER 11 |
| OF THE ARCHDIOCESE OF NEW | § | |
| ORLEANS, *et al.*,[1] | § | SECTION A |
| | § | |
| DEBTORS. | § | COMPLEX CASE |
| | § | |
| | § | |

**ORDER (I) APPROVING THE CATHOLIC MUTUAL RELIEF SOCIETY OF AMERICA'S SETTLEMENT AGREEMENT, RELEASE AND BUYBACK, (II) APPROVING THE SALE OF THE ARCHDIOCESE POLICIES FREE AND CLEAR, (III) ENJOINING CLAIMS, AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated July 29, 2025 [D.E. 4181] and supplemented by the filing of the Settlement Agreement (as defined below) on October 27, 2025 [D.E.[∗]] ("Approval Motion") of The Roman Catholic Church of the Archdiocese of New Orleans, the lead debtor and debtor-in-possession (the "Debtor" or "Archdiocese") and the other debtors and debtors-in-possession[2] (the "Additional Debtors" and, together with the Archdiocese, the "Debtor Parties") in the above-captioned chapter 11 cases, by and through their respective counsel, for entry of an order (this "Order") approving the settlement agreement, releases, insurance policy buyback, and related injunction-in-aid ("Settlement") by and among the Archdiocese, the Additional Debtors, the other Archdiocese Signatory Parties, the Creditors' Committee, and The Catholic Mutual Relief Society of America ("Insurer" and, collectively with the foregoing, the "Parties"), pursuant to Sections 105(a) and 363 of Title 11 of the United States Code ("Bankruptcy Code") and Rules 2002(a)(2),

---

[1] The last four digits of the Debtor's federal tax identification number are 8966.

[2] In connection with the Plan, the Catholic Entities listed on Plan Exhibit B-1 (the **"Additional Debtors"**) filed individual chapter 11 cases. The Plan is a combined joint Plan for the Archdiocese and the Additional Debtors, and the Approval Motion is deemed to have been filed (and this Order is entered) in each Additional Debtor's bankruptcy case for purposes of the relief requested herein.

6004, and 9019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), in each case as described in the Approval Motion and the *Settlement Agreement, Release, and Policy Buyback* attached to this Order as **Exhibit 1** (the "Settlement Agreement");[3] and the Bankruptcy Court having reviewed the Approval Motion and the Settlement Agreement; and it appearing that due and adequate notice of the Approval Motion and Settlement Agreement having been given to all Entities entitled thereto, and that no other or further notice need be given; and the Bankruptcy Court on November 17, 2025 at 9:00 AM having held a hearing (the "Sale Hearing") to consider the relief requested in the Approval Motion; and upon the record of the Sale Hearing; and, after due deliberation, including, without limitation, for the reasons stated by the Bankruptcy Court on the record of the Sale Hearing, it appearing that the relief requested in the Approval Motion and granted herein is in the best interests of the Debtor Parties' estates (the "Estates"), their creditors, and other parties in interest; and good sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.     This Bankruptcy Court has jurisdiction over the Approval Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of this case and the Approval Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.     The statutory predicates for the relief sought in the Approval Motion are Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007. 9008 and 9019, and Rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Louisiana.

---

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

C.     It is necessary and appropriate for the Bankruptcy Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Settlement Agreement, and to adjudicate, if necessary, to the extent provided under 28 U.S.C. § 1334(b), any and all disputes arising from or relating to the Settlement Agreement or this Order.

D.     Proper, timely, adequate and sufficient notice of the Sale Hearing and Approval Motion and the relief requested therein, including, without limitation, the Settlement and the transactions described in the Settlement Agreement, including, without limitation, issuance of the injunction-in-aid referenced in the Settlement Agreement and the Approval Motion (all such transactions being collectively referred to, for convenience, as the "Sale Transaction") has been provided by the Debtor Parties in accordance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules to all interested Entities, including, without limitation the parties listed on **Schedule 3** of the Settlement Agreement, through service of the Confirmation Hearing Notice (as defined in the Plan) in accordance with the Disclosure Statement Order (also as defined in the Plan).

E.     Notice of the Approval Motion was provided through publication of the Additional Debtors' Abuse Claims Bar Date Publication Notice (**Plan Exhibit G**) in daily and community newspapers throughout Louisiana.

F.     The notices described above were good, sufficient, and appropriate under the circumstances, and no other notice of the Approval Motion or Sale Hearing is required.

G.     The disclosures made by the Debtor Parties concerning the Settlement Agreement, the Sale Transaction, and the Sale Hearing were good, complete, and adequate.

3

668

H.       The Unknown Abuse Claims Representative has consented to, and approved of the Settlement Agreement and Sale Transaction on behalf of Unknown Abuse Claims in connection with the treatment of such Claims under the Plan.

I.       A reasonable opportunity to object or be heard with respect to the Approval Motion and the relief requested therein has been afforded to all interested Entities.

J.       The Archdiocese Signatory Parties, on their own behalf and on behalf of the Archdiocese Bound Parties, as applicable, have duly executed the Insurance Settlement Agreement by their duly authorized representative, agent and/or attorney in fact, and have full corporate power and authority to consummate the Sale Transaction pursuant to the Settlement Agreement and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Settlement Agreement, are required for the Archdiocese Bound Parties to consummate the Sale Transaction.

K.       The Debtor Parties have demonstrated (i) good, sufficient, and sound business purpose and justification and compelling circumstances for the Sale Transaction pursuant to Section 363(b) of the Bankruptcy Code and (ii) that the Sale Transaction is fair, reasonable, and in the best interests of their Estates and creditors pursuant to Bankruptcy Rule 9019. Among other things, the Debtor Parties have demonstrated that: the Settlement Agreement, and closing thereon, is necessary and appropriate to realize the value of the Purchased Property (as defined below) and maximize the value of their Estates; the probability of success for their Estates in litigation over the matters resolved by the Settlement Agreement is uncertain; litigation of the matters resolved by the Settlement Agreement would be complex and costly to their Estates; and the Settlement Amount is within the reasonable range of potential litigation outcomes. As used herein, "Purchased Property" means, collectively, all right, title and interest (including "Interests" as defined below)

4

669

in and to the Archdiocese Policies issued by Insurer and the Related Insurance Claims and Coverage Claims; *provided that* the Purchased Property does not include Insurer's obligations under Certificate No. 8554 issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the bodily injury or personal injury claims listed in Schedule 4 attached to the Settlement Agreement, in each case, subject to the limits, declarations, terms and conditions of such certificate (the "Preserved Coverage"), and *provided further that* the Preserved Coverage does not include coverage for any and all Abuse Claims or for any and all other Barred Claims. The Sale Transaction constitutes a reasonable and sound exercise of the Debtor Parties' business judgment and their powers and duties under applicable law and should be approved. Approval of the Settlement Agreement and consummation of the Sale Transaction are in the best interests of the Debtor Parties' Estates, their creditors (specifically including the Abuse Claimants of the Debtor Parties), and other parties-in-interest, including because the proceeds of and from the Sale Transaction will benefit Abuse Claimants.

L.       The Settlement Agreement was negotiated, proposed, and entered into without collusion, in good faith, and from arm's length bargaining positions. Without limiting the foregoing, the Settlement Agreement resulted from a lengthy mediation that proceeded pursuant to a prior order of the Bankruptcy Court. Insurer is not an "insider" or "affiliate" (as those terms are defined in the Bankruptcy Code) of any of the Debtor Parties. None of the Archdiocese Bound Parties or Insurer have engaged in any conduct that would: (i) cause or permit the avoidance of the Settlement Agreement or the consummation of the Sale Transaction under Section 363(n) of the Bankruptcy Code; (ii) cause or permit the imposition of any costs or damages (including without limitation attorneys' fees or punitive damages) under Section 363(n) of the Bankruptcy Code; or (iii) prevent the application of Section 363(m) of the Bankruptcy Code. The releases, injunctions,

policy buyback, and all other components of the Sale Transaction comply with the Bankruptcy Code and all applicable non-bankruptcy law.

M.     Pursuant to the Settlement Agreement and to the maximum extent permitted by applicable law, and except with respect to Preserved Coverage, the Non-Debtor Catholic Entities and Insurer have consented to the assignment of the Non-Debtor Catholic Entities' Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under the Settlement Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Interests of any Entity in such Archdiocese Policies (the "Non-Debtor Catholic Entity Policy Sale").

N.     Insurer is a good faith purchaser of the Purchased Property under Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, in that, among other things: (i) all payments to be made by or to Insurer, and other agreements or arrangements entered into by Insurer, including without limitation any escrow agreement pertaining to the payment of the Settlement Amount, in connection with the Sale Transaction have been disclosed; (ii) Insurer neither induced nor caused the Debtor Parties' chapter 11 filings; (iii) the negotiation and execution of the Settlement Agreement and any other agreements or instruments related thereto was in good faith, the arm's length transaction between Insurer and the other Parties was the product of mediation, and all Parties to the Settlement Agreement were, or had the opportunity to be, represented by counsel; and (iv) Insurer has not violated Section 363(n)

of the Bankruptcy Code by any action or inaction. Insurer has at all times acted in good faith with respect to the Settlement Agreement and will continue to be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale Transaction.

O.      The terms and conditions of the Settlement Agreement are fair and reasonable. The Settlement Amount provided by Insurer pursuant to the Settlement Agreement (i) is fair and reasonable; (ii) monetizes the Purchased Property at the highest and best amount; (iii) will provide a higher and more certain recovery for the Debtor Parties' creditors than would be provided by any other practical available alternative given the complexity, cost, and uncertainty of such alternatives; (iv) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (v) constitutes reasonably equivalent value (as defined in Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law. The Settlement Amount is within the reasonable range of potential litigation outcomes, and the Debtor Parties' determination to accept the Settlement Amount and otherwise enter into the Settlement Agreement is a valid and sound exercise of their business judgment and consistent with the Debtor Parties' fiduciary duties. The releases to be made pursuant to the Settlement Agreement, including without limitation the releases of the Archdiocese Bound Parties and the Insurer Released Parties, are appropriate and should be approved.

P.      Insurer: (i) is not a mere continuation of any of the Archdiocese Bound Parties or the Estate of any of the Debtor Parties, nor is there any continuity of enterprise between Insurer and the Debtor Parties or Insurer and any of the other Archdiocese Bound Parties; (ii) is not holding itself out to the public as a continuation of any of the Archdiocese Bound Parties; and (iii) is not a successor to the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties for any

7

672

purpose, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of Insurer and any of the Archdiocese Bound Parties.

      Q.     The Settlement Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither Insurer nor any of the Archdiocese Bound Parties are fraudulently entering into the Sale Transaction.

      R.     The transfer of the Purchased Property to Insurer (i) does not constitute an avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law and (ii) does not and will not subject Insurer to any liability whatsoever with respect to the Debtor Parties' operation prior to the closing of the Sale Transaction (i.e., the occurrence of both the Settlement Agreement Effective Date and payment[4] of the Settlement Amount by Insurer to the Settlement Trust or Escrow Agent pursuant to the terms of Insurer's Settlement Agreement) (the "Closing").

      S.     Insurer has agreed to purchase the Purchased Property pursuant to its Settlement Agreement and this Order; Insurer has not agreed to purchase, and is not purchasing, any other assets of the Estate of any of the Debtor Parties. Insurer has not agreed to assume, and after Closing shall have no obligations with respect to, any liabilities of the Archdiocese Bound Parties. Without limiting the generality of the foregoing, Insurer: (i) is not assuming and shall have no liability for any Claims arising from or relating to Abuse, the Purchased Property, or the Bankruptcy Case; and (ii) is not assuming and shall have no liability with respect to the Archdiocese's or any other Archdiocese Bound Party's obligations to Abuse Claimants, any other creditors, future claimants

---

[4] For the avoidance of doubt, all references to "payment" or "delivery" of the Settlement Amount by Insurer herein shall encompass all transfers of the Settlement Amount contemplated by the Settlement Agreement, including without limitation funding and transfer of funds to the Settlement Trust via letters of credit or escrow accounts.

(including without limitation Unknown Abuse Claimants), or the Archdiocese's or any Archdiocese Bound Party's employees, in each case, by reason of the purchase of the Purchased Property under the Settlement Agreement.

T. The Purchased Property constitutes property of the Debtor Parties' Estates, and the Archdiocese Bound Parties are the lawful owner of the Purchased Property and hold good title thereto. The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement will be a legal, valid, binding, and effective transfer of the Purchased Property, and will vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property, in each case free and clear of all Interests (as defined below, including, without limitation, any Interests of the Archdiocese Bound Parties, Abuse Claimants, and holders of Direct Action Claims). Upon Closing, Insurer shall have no liability for any Claims against or liabilities of the Debtor Parties, their Estates, or the other Archdiocese Bound Parties. Without limiting any of the foregoing, the Archdiocese, the Archdiocese Signatory Parties, and Insurer have agreed that, upon Closing: (i) the Purchased Property shall be deemed void *ab initio*, terminated, extinguished, and of no further force and effect; and (ii) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

U. Pursuant to §§ 363(f) and 105(a) of the Bankruptcy Code, and subject to the terms and conditions set forth in the Settlement Agreement, and upon Closing, without the need for further action, the Debtor Parties shall be deemed to have sold, transferred and conveyed the Purchased Property to the Insurer, and the Insurer shall be deemed to have purchased from the Debtor Parties, all right title and interest in and under the Purchased Property, free and clear of all

9

674

"Interests" of any Entity of any kind or nature whatsoever, to the fullest extent permitted under §§ 363(b) and (f) of the Bankruptcy Code, with such "Interests" including: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, Subject Interests, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to,

10

675

La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property. Without limiting the generality of the foregoing and without finding that any Entity has any Interest in the Archdiocese Policies: (i) any Entity with Interests (if any) in or with respect to the Purchased Property who did not object, or who withdrew their objections to the Sale Transaction or the Approval Motion have waived their right to object to the sale of the Purchased Property free and clear of such Entity's Interests in the Purchased Property pursuant to Section 363(f)(2) of the Bankruptcy Code; and (ii) any such Entity with Interests in or with respect to the Purchased Property who objected to the Approval Motion and did not withdraw any such objection (a) are the holders of Interests subject to *bona fide* dispute under Bankruptcy Code Section 363(f)(4) and/or (b) can be compelled to accept a monetary satisfaction of their Interests within the meaning of Section 363(f)(5) of the Bankruptcy Code.

V. If the sale of the Purchased Property were not free and clear of all Interests, including without limitation all Abuse Claims, Direct Action Claims, and Coverage Claims, or if

the Insurer Released Parties would, or in the future could, be liable for any of the Interests, Insurer would not have entered into the Settlement Agreement and would not consummate the Sale Transaction or pay the Settlement Amount, thus adversely affecting the Debtor Parties, their Estates, and their creditors (including, without limitation, the Abuse Claimants), as well as the other Archdiocese Bound Parties.

W.     Issuing a supplemental injunction under Section 105(a) of the Bankruptcy Code as provided herein is essential to give effect to the sale of the Purchased Property to Insurer and this Order's approval of such sale free and clear of Interests pursuant to Section 363(f) of the Bankruptcy Code. The Sale Injunction set forth in Paragraph 23 below not only is a necessary prerequisite for Insurer's assent to the terms and conditions of its Settlement Agreement, such that Insurer will not consummate the Sale Transaction or pay its Settlement Amount in the absence of such an injunction from this Bankruptcy Court, but also is warranted to ensure compliance with this Order.  Likewise, Insurer will not consummate the Sale Transaction or pay its Settlement Amount without the benefit of the releases contained in the Settlement Agreement and approval thereof by the Bankruptcy Court.

X.     Neither the Settlement Agreement nor the Sale Transaction constitute a *sub rosa* chapter 11 plan. The Settlement Agreement does not impermissibly restructure the rights of the Debtor Parties' creditors nor impermissibly dictate a chapter 11 plan for the Debtor Parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.     The Approval Motion, and the relief sought therein (including without limitation the approval of the Settlement Agreements and the Sale Transaction) is GRANTED and APPROVED, in all respects as set forth herein.

12

2.      The findings of fact set forth above and conclusions of law stated herein, in addition to any findings of fact and conclusions of law stated by the Bankruptcy Court at the Sale Hearing, shall constitute this Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the Approval Motion pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.      Any and all objections, if any, to the Approval Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case the Entity asserting the objection or reservation of rights is enjoined from taking any action against the Insurer Released Parties or the assets or property of any Insurer Released Parties to recover any Claim or Interest held by such objecting Entity. Those parties who did not object or who withdrew their objections to the Approval Motion are deemed to have consented to the relief granted herein, pursuant to Section 363(f)(2) of the Bankruptcy Code.

**Approval of the Settlement Agreement**

4.      The Settlement Agreement is approved in its entirety, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Without limiting the generality of the foregoing, the settlement and releases of Claims as set forth in the Settlement Agreement is hereby approved pursuant to Bankruptcy Rule 9019. All factors set forth in *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey* (*In re Cajun Elec. Power Coop.*), 119 F. 3d 349, 356 (5th Cir. 1997), either weigh in favor of the Settlement Agreement or do not apply.

5. Pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, the Non-Debtor Catholic Entity Policy Sale, free and clear of all Interests of any Entity in the Archdiocese Policies, is hereby approved.

6. Pursuant to Section 363(b) of the Bankruptcy Code, each of the Parties is authorized to consummate the Sale Transaction under and in accordance with the terms and conditions of the Settlement Agreement, and the Archdiocese Bound Parties shall at all times act in accordance with the terms thereof.

7. Any representative, agent or attorney in fact of the Archdiocese Signatory Parties is authorized to execute any other documentation and perform such other ministerial tasks as may be reasonably necessary to effectuate the Settlement Agreement and the Sale Transaction on behalf of the Archdiocese Bound Parties, including without limitation, any bill of sale substantially in the form attached to the Settlement Agreement as **Exhibit B**.

8. Subject to all of the terms and conditions of the Settlement Agreement, upon Closing, the Archdiocese Bound Parties and Insurer shall be deemed to have granted the releases as set forth in the Settlement Agreement.

9. The Parties are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Settlement Agreement, together with all additional instruments and documents that may be reasonably necessary, convenient, or desirable to implement the Settlement Agreement and consummate the Sale Transaction pursuant thereto and effectuate the provisions of this Order and the transactions approved hereby, and to take all further actions as may be requested by Insurer for the purpose of assigning, transferring, granting, conveying, and conferring to Insurer or reducing to Insurer's possession, the Purchased Property, or as may be

necessary or appropriate to the performance of the obligations as contemplated by the Settlement Agreement.

10.     Insurer is authorized and directed to pay the Settlement Amount under and subject to the satisfaction of all terms and conditions of the Settlement Agreement.

11.     The Settlement Amount provided by Insurer for the Purchased Property (i) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

12.     None of the Insurer Released Parties shall be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its or their rights or remedies under the Settlement Agreement or any other document related to the Settlement Agreement or the Sale Transaction. The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order; *provided*, *however*, that this Bankruptcy Court shall retain jurisdiction over any and all disputes with respect thereto.

13.     This Order shall be binding in all respects upon: (a) the Debtor Parties and their Related Parties; (b) the Debtor Parties' Estates; (c) the other Archdiocese Bound Parties; (d) all creditors of the Debtor Parties; (e) all Abuse Claimants and holders of Direct Action Claims; (f) all holders of Interests whether known or unknown against or on all or any portion of the Purchased Property; (g) any Non-Settling Insurer; (h) the Insurer Released Parties; (i) the Purchased Property; (j) the Unknown Claims Representative; (k) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without

limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code; and (l) all Entities receiving notice (or deemed to have received notice pursuant to this Order) of the Approval Motion or the Sale Hearing, including without limitation all Entities listed on **Schedule 3** to the Settlement Agreement. The Settlement Agreement shall be binding in all respects upon: (x) the Debtor Parties, their Estates, and their Related Parties; (y) the Archdiocese Bound Parties; and (z) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code.

### Transfer of Assets

14.     The conditions of Section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Archdiocese may sell the Purchased Property free and clear of any Interests therein.

15.     Pursuant to Sections 105 and 363(b) and (f) of the Bankruptcy Code, Bankruptcy Rule 9019, applicable Louisiana State law, the testimonial and other documentary evidence filed in support of the Approval Motion, and the record of the Sale Hearing, the Archdiocese has set forth the legal authority necessary to support this Bankruptcy Court's findings herein.

16.     Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Property and the Archdiocese Bound Parties' rights, title, and interest therein shall upon Closing be transferred to Insurer, free and clear of all Interests (including without limitation the Interests of any of the Archdiocese Bound Parties), and all such Interests are unconditionally and forever

released and extinguished as against the Purchased Property. Without limiting the generality of the foregoing, the sale of the Purchased Property under the Settlement Agreement shall be free and clear of all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property.

17.     Upon the Closing, (a) all of the Archdiocese Bound Parties', the Debtor Parties' Estates', and the Settlement Trustee's rights under and with respect to the Purchased Property, if any, shall be permanently and irrevocably extinguished as if the Archdiocese Policies had never been issued and (b) the Insurer Released Parties shall be entitled to all of the protections afforded by §363(m) of the Bankruptcy Code.

18.     Upon Closing, all Entities (and their respective successors and assigns), including but not limited to all governmental, tax, and regulatory authorities, Archdiocese Bound Parties, Non-Settling Insurers, Abuse Claimants, Direct Action Claimants, trade and other creditors, and any Entities holding Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) against, in, or with respect to the Purchased Property, including, without limitation, such Interests arising or accruing under or out of, in connection with, or in any way relating to the transfer of the Purchased Property to Insurer, hereby are forever barred, estopped, and permanently enjoined from asserting such Person's or Entity's Interests against the Purchased Property, the Insurer Released Parties, or the assets or property of any Insurer Released Parties. Effective upon Closing, none of the Insurer Released Parties shall have any liability for any Claims (a) against the Debtor Parties, their Estates, or any

17

of the Archdiocese Bound Parties or (b) that arise under or related in any way or in respect of the Purchased Property.

19.    The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement constitutes a legal, valid, and effective transfer of the Purchased Property, and shall vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property. Upon Closing, the Archdiocese Policies shall be terminated and no longer in force or effect, exhausted in retrospect as to all coverages, and all Interests that the Archdiocese or any other Person or Entity (including without limitation any of the other Archdiocese Bound Parties) may have had, may presently have, or may in the future have, in such Purchased Property are released and extinguished, and all such Entities (including without limitation the Archdiocese Bound Parties) hereby are forever barred, estopped, and permanently enjoined from asserting any such Interest against the Purchased Property and/or any of the Insurer Released Parties. Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent constitutes full and complete performance of any and all obligations under the Purchased Property, including without limitation any performance owed to the Archdiocese Bound Parties, and all limits of coverage under the Archdiocese Policies, including per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

20.    Upon occurrence of the Closing:

(a)    all Interests the Archdiocese Bound Parties may have had, may presently have, or in the future may have in the Purchased Property, as applicable, are released pursuant to the terms of the Settlement Agreement; and

(b)     the Archdiocese Bound Parties accept Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent in full and complete satisfaction of Insurer's past, present, and future obligations, including, without limitation, any obligations to any of the Archdiocese Bound Parties under such Purchased Property or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever arising out of or related in any way to such Purchased Property (including Coverage Claims), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, direct or indirect, and regardless of whether such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, or otherwise.

### No Successor Liability

21.     The transfer of the Purchased Property to Insurer shall not result in any Insurer Released Parties or the Purchased Property having any of the following: (a) any liability or responsibility for Interests in or Claims against the Archdiocese Bound Parties or any of their Related Parties; (b) liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any Claims or Interests; or (c) any liability or responsibility to the Archdiocese Bound Parties except as is expressly set forth in the Settlement Agreement.

22.     Without limiting the generality of the foregoing, none of the Insurer Released Parties shall have any successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability, *de facto* merger or joint venture, mere continuation or substantial continuity, whether known or unknown as of Closing, now existing or hereafter arising,

whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between the Archdiocese Bound Parties and any non-debtor subsidiary or affiliate (including, without limitation, any other Archdiocese Bound Party), liabilities relating to or arising from any environmental laws, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Purchased Property prior to Closing.

### Sale Injunction

23.　　Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, and in consideration of the undertakings of Insurer pursuant to the Settlement Agreement, including Insurer's purchase of the Purchased Property free and clear of all Claims and Interests pursuant to Section 363(f) of the Bankruptcy Code as provided herein, any and all Entities that have held, now hold, or who may in the future hold any Claims or Interests (including without limitation all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Abuse Claimants, holders of Direct Action Claims, Perpetrators, Non-Settling Insurers, the Archdiocese Bound Parties, and all others holding Claims or Interests of any kind or nature whatsoever, including, without limitation, those Claims released or to be released pursuant to the Settlement Agreement), which Claims or Interests are under, arise out of, relate to, or connect in any way with an Abuse Claim or any of the Purchased Property, including, without limitation, (a) all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any

portion of the Purchased Property, (b) the payment of any of the Claims identified previously, including, without limitation, Abuse Claims, Direct Action Claims, and Coverage Claims and (c) all other Interests, are hereby permanently stayed, enjoined, barred, and restrained from taking any Action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or Interest against any of (x) the Insurer Released Parties, (y) the assets or property of any Insurer Released Parties, or (z) the Purchased Property, including by:

(a)     commencing, conducting, or continuing in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind, in any forum, with respect to any such Claim or Interest, against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(b)     enforcing, levying, attaching, collecting, or otherwise recovering, or seeking to accomplish any of the preceding, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(c)     creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, or seeking to accomplish any of the preceding, any lien of any kind against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(d)     asserting, implementing, or effectuating any such Claim or Interest of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any of the Insurer Released Parties, (B) any of the Insurer Released Parties, or (C) any property or interest in property of any Insurer Released Party; and

21

686

(e)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Order.

The actions described in this Paragraph 23 are "**Enjoined Actions**," and the injunction set forth herein is the "**Sale Injunction**." The Sale Injunction shall be a permanent injunction against the Enjoined Actions and may not be modified, dissolved, or terminated.

24.     The Sale Injunction shall be effective upon Closing. The Sale Injunction bars pursuit of the above referenced Claims and/or Interests against the Insurer Released Parties, or the property or assets of each (including, without limitation, the Purchased Property), but against no other person or thing.

25.     In a successful action to enforce this Sale Injunction in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

26.     The Sale Injunction shall not enjoin (a) the right of any Person or Entity against the Settlement Trust or a Non-Settling Insurer, or (b) the Settlement Trustee from enforcing the Settlement Trust Documents.

**Preserved Coverage**

27.     Nothing in this Order, the Settlement Agreement or the Sale Transaction affects Insurer's Preserved Coverage or the Archdiocese Bound Parties' rights or continuing obligations in connection with the Preserved Coverage under the Archdiocese Policies issued by Insurer, all of which shall survive the Settlement Agreement Effective Date, Bankruptcy Plan Effective Date and the closing of the Sale Transaction.

**Additional Provisions**

28.     From and after the date hereof, no Person or Entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreements and this Order.

29.     This Bankruptcy Court hereby retains jurisdiction, regardless of whether a chapter 11 plan has been confirmed in the Bankruptcy Case and consummated and irrespective of the provisions of any such plan or order confirming such plan, to enforce and implement the terms and provisions of the Settlement Agreement, all amendments thereto, any waivers and consents thereunder, and of any agreement(s) executed in connection therewith in all respects, including but not limited to retaining jurisdiction to: (a) compel delivery of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreement; (b) resolve any dispute, controversy, or claim arising under or related to the Settlement Agreement, or the breach thereof; and (c) interpret, implement, and enforce the provisions of this Order and resolve any disputes related thereto.

30.     Nothing contained in any plan confirmed in the Bankruptcy Case or any order of this Bankruptcy Court confirming such plan shall conflict with or derogate from the provisions of the Settlement Agreement or the terms of this Order.

31.     This Order shall not limit or preclude the entry or effectiveness of any additional releases or injunctions that may be granted protecting the Insurer Released Parties and/or the assets or property of any Insurer Released Parties in connection with, or as part of, any order confirming a chapter 11 plan.

32.     The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being

23

688

the intent of the Bankruptcy Court that the Settlement Agreement be authorized and approved in its entirety.

33.     The transactions contemplated by the Settlement Agreement are undertaken by Insurer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code. Insurer is a good faith purchaser of the Purchased Property and is entitled to all the protections afforded by Section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction to Insurer.

34.     Insurer has given substantial consideration under the Settlement Agreement for the benefit of the Debtor Parties, their Estates, and creditors, along with the other Archdiocese Bound Parties. Such consideration given by Insurer constitutes valid and valuable consideration for the Purchased Property and the releases set forth in the Settlement Agreement, including, without limitation, the extinguishment and release of all Interests pursuant to this Order. The consideration provided by Insurer for the Purchased Property under the Settlement Agreement is fair and reasonable; accordingly, the purchase may not be avoided under Section 363(n) of the Bankruptcy Code.

35.     The terms and provisions of the Settlement Agreement and this Order shall be binding notwithstanding any subsequent appointment of any trustee(s) examiner(s) or receiver(s) under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtor Parties, their Estates, their creditors, or any examiner(s) or receiver(s).

24

689

36.     The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Bankruptcy Court that the Settlement Agreement and the Parties' performance thereof be authorized and approved in its entirety.

37.     Pursuant to the provisions of the Settlement Agreement, each of the Archdiocese Bound Parties and Insurer shall be authorized to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper, or advisable under applicable law or otherwise to consummate and make effective the transactions contemplated by the Settlement Agreement.

38.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39.     All obligations of the Debtor Parties under the Settlement Agreement shall be deemed administrative expenses of their Estates under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

40.     Each and every federal, state, and local governmental agency or department is hereby directed to accept this Order in lieu of any document necessary to consummate the transactions contemplated by the Settlement Agreement and this Order.

41.     The Settlement Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the Parties, in a writing signed by the Parties, and in accordance with the terms thereof, without further order of this Bankruptcy Court; *provided* that such modification, amendment, or supplement does not constitute a material change to the relief sought in the Approval Motion and approved by this Order.

**IT IS SO ORDERED.**

New Orleans, Louisiana, _____, 2025

_____
          MEREDITH S. GRABILL
      UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

## BILL OF SALE AND ASSIGNMENT

**THIS BILL OF SALE AND ASSIGNMENT** is made and entered into as of _____, 2025, by and between The Roman Catholic Archdiocese of New Orleans and its Bankruptcy Estate (the "**Archdiocese**" or "**Debtor**"), the Additional Debtors and their respective Bankruptcy Estates, the Non-Debtor Catholic Entities (collectively, the "**Archdiocese Signatory Parties**"), and The Catholic Mutual Relief Society of America ("**Insurer**"). All capitalized terms used herein without definition have the meanings set forth in the Settlement Agreement, Release, and Policy Buyback by, between, and among the Archdiocese, the other Archdiocese Signatory Parties, and Insurer, as amended or modified (the "**Settlement Agreement**").

## W I T N E S S E T H:

WHEREAS, pursuant to the Settlement Agreement, the Archdiocese Signatory Parties have, on behalf of themselves and all other Archdiocese Bound Parties, agreed to sell and/or convey any and all right, title, and interest (including all Subject Interests) in and to the Purchased Property (as defined in the Approval Order), and Insurer has agreed to purchase and buy-back the Purchased Property, in consideration of the payment of a purchase price of $2,000,000.00 (the "Purchase Price") and other good and valuable consideration as provided in and under the Settlement Agreement and Plan;

WHEREAS, the Approval Order, as filed at Docket No. [*], has approved the Sale Transaction (as defined in the Approval Order) and found that the Purchase Price is a fair and reasonable price for the Purchased Property;

NOW, THEREFORE, in consideration of the payment of the Purchase Price by Insurer as set forth in the Settlement Agreement, and in accordance therewith and with Approval Order, the Debtor Parties do hereby sell, transfer, and assign to Insurer, and Insurer does hereby accept, all of the Archdiocese Bound Parties' right, title, and interest in and to the Purchased Property, and all Subject Interests therein.

[signatures appear on following pages]

IN WITNESS WHEREOF, the parties have executed this Bill of Sale and Assignment as of the date first above written.


**The Catholic Mutual Relief Society of America**


By: _____
          Rodney Oligmueller
          Assistant Vice President, Specialty Claims


Date: _____


[Signatures continue on adjacent pages]

**The Roman Catholic Archdiocese of New Orleans of Louisiana**

By: _____

     [●]

Date: _____

[Signatures continue on adjacent pages]

**All Archdiocese Signatory Parties**
**Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title:     **Their Authorized Signer Pursuant to Resolutions**
_____

Date: _____

[Signatures continue on adjacent pages]

## SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK

This Settlement Agreement, Release, and Policy Buyback ("**Settlement Agreement**") is hereby made by, and between, and among The Roman Catholic Archdiocese of New Orleans (the "**Archdiocese**" or "**Debtor**" as further defined in Section ~~1.1.28~~1.1.31 below), the other Archdiocese Signatory Parties (as defined in Section ~~1.1.13~~1.1.15 below), and ~~[___]~~The Catholic Mutual Relief Society of America ("**Insurer**" as further defined in Section ~~1.1.45~~1.1.49 below). Insurer, the Archdiocese, the other Archdiocese Signatory Parties, and the Creditors' Committee (as defined below), collectively are the "**Parties**" and each a "**Party**" to this Settlement Agreement.

## RECITALS:

WHEREAS, on May 1, 2020 (the "**Petition Date**" as further defined in Section ~~1.1.62~~1.1.67 below), the Archdiocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**" as further defined in Section ~~1.1.15~~1.1.17) pending under Case No. 20-10846 (the "**Bankruptcy Case**" as further defined in Section ~~1.1.14~~1.1.16 below);

WHEREAS, each of the Additional Debtors (as defined in Section ~~1.1.9~~1.1.11 below) intends to file in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;

WHEREAS, certain Entities have asserted or may hold Claims, including Abuse Claims, against the Archdiocese Bound Parties (each as defined below);

WHEREAS, Insurer issued, allegedly issued, may have issued, assumed by novation or otherwise, or may be administering the Archdiocese Policies (as defined in Section ~~1.1.7~~1.1.9 below) providing certain coverage to the Archdiocese Bound Parties;

WHEREAS, asserted disputes between the Debtor Parties (as defined below) and Insurer have arisen, and assertable disputes between the Archdiocese Bound Parties and Insurer may arise in the future, concerning the scope and nature of Insurer's responsibilities, if any, to provide insurance coverage to the Archdiocese Bound Parties under the Archdiocese Policies (as further defined in Section ~~1.1.25~~1.1.28 below, the "**Coverage Claims**");

WHEREAS, claimants may contend, as a matter of Louisiana law, particularly La. Rev. Stat § 22:1269 *et~~.~~ seq*., that certain Entities may have Claims arising under or related to the Archdiocese Policies that could entitle them to bring a Direct Action Claim (as defined in Section ~~1.1.32~~1.1.35 below) against Insurer;

WHEREAS, claimants may contend that as a matter of Louisiana law, the time within which Claims relating to Abuse may be asserted against certain of the Archdiocese Bound Parties and/or the Insurer may not have expired with respect to certain Claims;

WHEREAS, the Archdiocese Signatory Parties and Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Claims and all other

disputes between and among them and to release Insurer from any further obligations under the Archdiocese Policies except with respect to Preserved Coverage (as defined in Section 1.1.67 below);

WHEREAS, Insurer would not pay the full amount of the Settlement Amount (as defined in Section 1.1.75 1.1.81 below) without the buy-back of the Subject Interests (as defined below) in the Archdiocese Policies, including without limitation, the interests of the Archdiocese, Additional Debtors, other Archdiocese Bound Parties and holders of Direct Action Claims, pursuant to section 363 of the Bankruptcy Code, and without the Sale Injunction, the Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeping Injunction (each as defined below), additionally providing protection to the Insurer Released Parties (as defined below) from Claims against the Insurer Released Parties and their property;

WHEREAS, through this Settlement Agreement and the Plan (as defined in Section 1.1.63 1.1.68 below) the Archdiocese Signatory Parties intend to provide Insurer Released Parties with the broadest possible release of all Claims and Subject Interests with respect to the Archdiocese Policies, except with respect to Preserved Coverage; and

WHEREAS, through this Settlement Agreement and the Plan, as part of the compromise and resolution of the Coverage Claims, the Debtor Parties and Insurer also wish to effect a sale, pursuant to § 363(b), (f), and (m) of the Bankruptcy Code of the Archdiocese Policies, along with the Coverage Claims and Related Insurance Claims (the "**Purchased Property**" as further defined in Section 1.1.66 1.1.71 below), to provide the Insurer Released Parties with the broadest possible release and buyback with respect to the Archdiocese Policies, resulting in the Insurer Released Parties having no obligations now or in the future with respect to the Archdiocese Policies, including without limitation to any Direct Action Claim, except with respect to Preserved Coverage.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Settlement Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound subject to the approval of the Bankruptcy Court pursuant to Section 2 below, the Parties hereby agree as follows:

## 1. DEFINITIONS

1.1    As used in this Settlement Agreement (as defined above), the following terms shall have the meanings set forth below.

1.1.1    "**Abuse**" means  any of the following actual or alleged acts: (a) touching by the Perpetrator of the person's intimate body parts (genitals, breasts, or buttocks), the touching by the person of the Perpetrator's intimate body parts, showing pictures of the person's body or other persons' bodies, taking pictures of the person's body, showing pornography, or making images of the person while naked or engaged in any sexual activity, or any sexualized interaction including observing the person in bathing, toileting, or undressing that was made possible by the Perpetrator's position of authority, or by the inducement of the Perpetrator; or (b) sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to

the genital or anal openings: (i) of the person's body by any part of the Perpetrator's body or any object used by the Perpetrator for this purpose; or (ii) of the person's body by any part of the body of the Perpetrator or by any part of the body of another person, or by any object used by the Perpetrator or another person for this purpose; (c) inappropriate physical contact and/or contact that infringes upon another's personal, physical boundaries including but not limited to groping, kissing, extended hugging, and/or any unwelcomed touching; (d) grooming or trying to create a special relationship, including but not limited to: talk of a sexual nature, talk of a romantic nature, communications expressing individual love to the person, as opposed to a salutation, providing material resources or experiences which induce the person into a relationship where trust is then violated; or (e) any actual or alleged acts of the kind described in subsections (a)-(c) above that occur between or among minors and that the Perpetrator orchestrates or encourages. For the avoidance of doubt, "Abuse" also includes: any actual or alleged conduct which (a) is described in the Louisiana Child Victims Act or (b) would constitute (i) a sexual offense as defined in article 603(2) of the Louisiana Children's Code; (ii) sexual battery as defined in La. Rev. Stat. §§ 14:43.1; 14:43.1.1; 14:43.2; 14: or 43.3, (iii) a crime against nature as defined in La. Rev. Stat. § 14:89, or (i) pornography involving juveniles as defined in La. Rev. Stat. § 14:81.1, or with respect to the foregoing subsection (i)-(iv), any predecessor statute that prohibited such conduct at the time of the act.

1.1.2 "**Abuse Action**" means an Action asserting an Abuse Claim against any of the Covered Parties.

1.1.3 "**Abuse Claim**" means any Claim that has been asserted, or could be asserted, against any Settling Party or Non-Settling Insurer, that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively alleged Abuse that occurred, in whole or in part, before the applicable Debtor's Petition Date or Additional Debtors' Petition Date, including any such Claim that seeks monetary damages or any other relief, under any legal or equitable theory of liability, including, but not limited to, the following: vicarious liability; *respondeat superior*; any conspiracy, fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, negligent, insufficient, or inadequate supervision, retention or misrepresentation; any theory based on misrepresentation, concealment, or unfair practice; public or private nuisance; or any theory, including, without limitation, any theory based on public policy or any acts or failures to act by any Settling Party, or any other Entity for whom any Settling Party is allegedly responsible, including, but not limited to, any such Abuse Claim against any Settling Party, Non-Settling Insurer, or any other Entity for whom any Settling Party or Non-Settling Insurer is alleged to be responsible. Abuse Claims are: (a) the Known Abuse Claims, which are treated in Class 3; and (b) the Unknown Abuse Claims, which are treated in Class 4. For the avoidance of doubt, "Abuse Claim" includes (a) all Unknown Abuse Claims, (b) Claims or causes of action defined or described in the Revival Window Laws against the Archdiocese or any other Archdiocese Bound Party, (c) Direct Action Claims, and (d) any Claim against the Archdiocese or any other Archdiocese Bound Party that is attributable to, arises from, is based upon, relates to, or results from Abuse that, as of the Petition Date is barred by any applicable statute of

limitations, and in each case, irrespective of whether (x) such Claims also involve the conduct of joint tortfeasors (or similar concepts under applicable law), (y) such Claims arise under, or were revived pursuant to, the Revival Window Laws, or any future reviver law, statute, or binding precedential decision passed or issued on or after the Bankruptcy Plan Effective Date, or (z) a proof of claim has been filed, before or after the Claims Bar Date, or not at all, or an Abuse Action has been commenced with respect to such Claim. "Abuse Claim" does not include: (a) Related Insurance Claims or Coverage Claims against Settling Insurers or Non-Settling Insurers; (b) Non-Insurer Contribution Claims with respect to any Abuse Claim; (c) Insurer Contribution Claims with respect to any Abuse Claim; or (d) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to a Claim against these dioceses only. For the avoidance of doubt, a Claim based on Abuse solely occurring following the applicable Petition Date is not an Abuse Claim. Nothing in this definition shall constitute a waiver of any defense that would otherwise be available under applicable law to any Settling Party, the Settlement Trust, or any other Entity.

1.1.4 "**Abuse Claim Release and Certification**" means a written release in favor of the Insurer Released Parties, in the form of Exhibit C to the Acceptable Plan, or otherwise in form and substance acceptable to the Parties, which an Abuse Claimant must deliver before he or she is entitled to Settlement Trust Distributions, which shall provide that the Claimant releases the Insurer Released Parties from any and all Claims related to his/her Abuse Claim or any of the Archdiocese Policies, subject to Section 12.14 and related provisions of the Plan.

1.1.5 "**Abuse Claimant**" means the holder of an Abuse Claim, including, but not limited to, any Known Abuse Claim, Unknown Abuse Claim, or Direct Action Claim. For the avoidance of doubt, Abuse Claimants are Creditors. The definition of an Abuse Claimant includes the legal representative of the holder of an Abuse Claim, such as a bankruptcy trustee, the estate of a deceased individual who held an Abuse Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Abuse Claim, as the case may be. An Entity holding the following Claim is not an Abuse Claimant: (i) a Non-Insurer Contribution Claim with respect to such Abuse Claim; (ii) an Insurer Contribution Claim with respect to such Abuse Claim; (iii) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to such Entity's claim against such dioceses only.

1.1.6 "**Acceptable Plan**" means the *Fourth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and The Official Committee of Unsecured Creditors* filed at Docket No. [—4419], and its exhibits and schedules, which as may be modified solely in accordance herewith (i.e., with the consent of the Insurer), and such modified plan constituting the "Acceptable Plan" for the purposes hereof.

1.1.7 "**Archdiocesan Parishes**" means all currently Catholic Church parishes and missions, as identified on Exhibit B-1, Part I, of the Acceptable Plan. Each of the Archdiocesan Parishes is organized as a non-profit corporation. For the avoidance of

doubt, the definition of Archdiocesan Parishes does not include St. Louis Cathedral, Our Lady of Guadalupe Church & Shrine of St. Jude, or any Suppressed Archdiocesan Parish identified on Exhibit B-1, Part II, of the Acceptable Plan.

1.1.8   "**Archdiocesan Schools**" means the means the following schools that are owned and operated by the Archdiocese: (a) the Academy of Our Lady High School; (b) Archbishop Chapelle High School; (c)Archbishop Hannan High School; (d) Archbishop Rummel High School; (e) Archbishop Shaw High School; (f) Pope John Paul II High School; (g) St. Charles Catholic High School; (h) St. Scholastica Academy; and (i) St. Michael Special School.

1.1.71.1.9   "**Archdiocese Policies**" means (a) the contracts, binders, certificates, and policies of insurance that are listed on Schedule 1 hereto, and (b) all other known and unknown contracts, binders, certificates, or policies of general liability insurance, in effect on or before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date that were issued to, or for the benefit of, or subscribed on behalf or that otherwise actually insure, (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) policies issued to the Archdiocese that name as an insured or additional insured (or related concept under applicable law or document) the Diocese of Houma-Thibodaux or Diocese of Baton Rouge, but not policies issued to either of these dioceses that were not also issued to the Archdiocese or name it as insured, (iv) any Entity owned, created, operated, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, or (v) any institution, religious organization or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control or active management; in each case of (a) and (b), that were issued, subscribed to, or underwritten in whole or in part or allegedly issued, subscribed to, or underwritten in whole or in part by Insurer or any of its predecessors.[†]

1.1.81.1.10   "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

1.1.91.1.11   "**Additional Debtors**" means the Entities listed on Acceptable Plan Exhibit B-1 and on Schedule 2 hereto.  As used herein, references to the "Additional Debtors" includes the Additional Debtor's Estates.

1.1.101.1.12   "**Approval Motion**" means the motion filed in the Archdiocese Bankruptcy ~~Court~~Case at Docket No. 4181 seeking approval of this Settlement Agreement as described in Section 22.1 of this Settlement Agreement.

---

[†] SPARTA Settlement Agreement to provide:

For the avoidance of doubt, the "Archdiocese Policies" include any and all known and unknown contracts, binders, certificates, or policies of general liability insurance that were issued, allegedly issued, or may have been issued by or in the name of American Employers Insurance Company."

1.1.11 1.1.13   "**Approval Order**" means the order granting the Approval Motion described in Section 2.1 of this Settlement Agreement and providing the relief described in Section 2.1 of this Settlement Agreement and in substantially form attached **Exhibit A,** with only such changes as are satisfactory to Insurer.

1.1.12 1.1.14   "**Archbishop**" has the meaning given to it in Section 3.7.

1.1.13 1.1.15   "**Archdiocese Signatory Parties**" means, collectively, (a) the Debtor Parties and (b) the Non-Debtor Catholic Entities.

1.1.14 1.1.16   "**Bankruptcy Case**" means all of the following: (a) with respect to the Archdiocese, "Bankruptcy Case" has the meaning set forth in the Recitals; and (b) with respect to any given Additional Debtor, "Bankruptcy Case" means the case initiated when such Additional Debtor filed in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.15 1.1.17   "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Louisiana, having subject matter jurisdiction over the Bankruptcy Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

1.1.16 1.1.18   "**Bankruptcy Plan Effective Date**" means the date upon which a Plan approved by the Bankruptcy Court that contains terms and conditions consistent with those required by this Settlement Agreement becomes effective.

1.1.17 1.1.19   "**Barred Claim**"  means any Claim against a Settling Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with an Abuse Claim or any of the Archdiocese Policies, including, but not limited to, any:  (a) Abuse Claim; (b) Direct Action Claim; (c) Coverage Claim; (d) Related Insurance Claim;  (e) Non-Insurer  Contribution  Claim;  (f)  Insurer  Contribution  Claim; (g) Medicare Claim; (h) Penalty Claim; and (i) any other Claim that is otherwise released herein.  A Barred Claim further includes any Claim against a Settling Party based on allegations that it is an alter ego or liable as a successor of an Entity that is not a Settling Party or that the Settling Party's corporate veil should be pierced on account of Claims against an Entity that is not a Settling Party or based on any other theory under which the legal separateness of any Person and any other Entity may be disregarded to impose liability for a claim on either such Entity.  Notwithstanding the foregoing, Barred Claims do not include any Claims to the extent they are asserted against (x) Non-Settling Insurers or (y) Excluded Parties, notwithstanding that such Entity may also have asserted or be able to assert a Claim for contribution, indemnity, reimbursement, or subrogation against any Settling Party relating to or arising from a such Claim; *provided, however*, that, for the avoidance of doubt, (i) any Claims that assert liability against such Entity in conjunction with a Settling Party will in all events be Barred Claims as to the Settling Party, (ii) any such Claim for contribution, indemnity, reimbursement, or subrogation against a Settling Party is a Barred Claim; and (iii) any Entity who has actually or

allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party for the purposes of this definition.

1.1.20 "**Catholic Charities**" has the meaning set forth in Section 6.3.15.

1.1.18 1.1.21 "**Channeling Injunction**" has the meaning set forth in Section 2.2.2.

1.1.19 1.1.22 "**Claim**" means any past, present or future claim, demand, Action, request, right, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether sounding in law, equity, tort, warranty, contract, or under any other theory, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been or may be asserted by or on behalf of any Entity, whether seeking damages (including compensatory, exemplary, punitive, or Penalty claims) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, or orders, including without limitation whether by way of direct action, subrogation, contribution, indemnity, alter ego, veil piercing, or regulatory action, or otherwise, regardless of whether such Claims arise under law, in equity, or under statute, before or after the Petition Date(s), or *in rem* or *in personam*, and include all Claims for damages to the environment or based on any theory of *respondeat superior,* vicarious, successor or transferee liability, or change in control, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

1.1.20 1.1.23 "**Claims Bar Date**" means the date(s) and time(s) indicated in the Final Order(s) (which may be the Plan Confirmation Order) setting the deadline(s) for filing proofs of Abuse Claim against the Debtor or Additional Debtor(s), as applicable.

1.1.21 1.1.24 "**CMS**" has the meaning set forth in Section 2.4.1.

1.1.22 1.1.25 "**Co-Insured Party**" means any other Entity that is a "Named Assured" or "named insured" or "protected person" under the Archdiocese Policies, and all other Entities that are determined by agreement or a court of competent jurisdiction to be an "Assured," an "Additional Assured," an "insured," or "protected person" or otherwise entitled to insurance coverage under any Archdiocese Policies.

1.1.23 1.1.26 "**Conditional Payment**" means any payment made to an Abuse Claimant under the MMSEA, including any payment by a Medicare Advantage Organization (as defined in the MSPA).

1.1.24 1.1.27 "**Controlling Document Provision**" has the meaning given to it in Section 2.2.9.

1.1.25 1.1.28 "**Covered Parties**" or "**Archdiocese Bound Parties**" means, collectively, the following Entities: (a) the Debtor Parties; (b) the Reorganized Debtor; (c) the Reorganized Additional Debtors; (d) the Non-Debtor Catholic Entities; (e) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP; (f) the applicable

Parish Schools and Archdiocesan Schools (each as defined in the Acceptable Plan); (g) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans; (h) any Co-Insured Party; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entities' predecessors, successors, assigns, subsidiaries, direct and indirect past, present, and future affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, and estates. For the avoidance of doubt, the Entities in clauses (g), (h), and (i) are only Archdiocese Bound Parties in connection with the Archdiocese Policies.

1.1.261.1.29 "**Coverage Claims**" has the meaning set forth in the Recitals and further includes any Claim under relating to or arising out of the Archdiocese Policies or the rights and obligations thereunder, or the breach thereof, including any Claim seeking insurance coverage.

1.1.271.1.30 "**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed in the Archdiocese's Chapter 11 Case on May 20, 2020, [Docket Nos. 94 & 114], as such committee may be reconstituted from time to time.

1.1.281.1.31 "**Debtor**" or "**Archdiocese**" means, before the Bankruptcy Plan Effective Date, The Roman Catholic Church of the Archdiocese of New Orleans of Louisiana. As used herein, references to the "Debtor" or "Archdiocese" includes the Debtor's Estate.

1.1.291.1.32 "**Debtor Parties**" means (i) the Archdiocese and (ii) all of the Additional Debtors.

1.1.301.1.33 "**Diocese of Baton Rouge**" means the Diocese of Baton Rouge. References to the "Diocese of Baton Rouge CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) July 22, 1961 whichever occurred last; references to the "Diocese of Baton Rouge SD" refer to the period after such date.

1.1.311.1.34 "**Diocese of Houma-Thibodaux**" means the Diocese of Houma-Thibodaux. References to the "Diocese of Houma-Thibodaux CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) June 5, 1977, whichever occurred last; references to the "Diocese of Houma-Thibodaux SD" refer to the period after such date.

1.1.321.1.35 "**Direct Action Claim**" means any Claim by any Entity that is a "direct action" as that term is used in La. Rev. Stat § 22:1269 *et. seq* (or similar law in other jurisdictions), against any Insurer Released Party or related to any Archdiocese Policy, including, without limitation, (a) any claim that is similar or related to any Claim that could also be asserted by the Archdiocese or any Archdiocese Bound Party, (b) any Claim that directly or indirectly arises out of, relates to, or is connected with any Abuse Claim, (c) any Claim that directly or indirectly arises out of, relates to, or is in connection

with any Insurer Released Party's handling of any Abuse Claim under the laws of any applicable jurisdiction, or (d) any Claim arising under any law of any jurisdiction that may give a third party a direct Cause of Action against an Insurer Released Party for monetary or other relief.²

~~1.1.33~~1.1.36 "**Entity**" means any individual, corporation, corporation sole, partnership, association, limited liability company, joint stock company, proprietorship, unincorporated organization, joint venture, trust, estate, executor, legal representative, or any other entity or organization, as well as any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency, department, board or instrumentality thereof, any other "Person" within the definition of section 101(41) of the Bankruptcy Code, and any successor in interest, heir executor, administrator, trustee, trustee in bankruptcy, or receiver of any Entity and also has the meaning set forth in section 101(15) of the Bankruptcy Code.

~~1.1.34~~1.1.37 "**Escrow Agent**" means the agent appointed in accordance with the Escrow Agreement.

~~1.1.35~~1.1.38 "**Escrow Agreement**" means the agreement governing the escrow which shall hold the Settlement Amount in escrow and in trust for the benefit of Insurer, and which shall provide for the: (i) transfer of the Settlement Amount, with any accrued interest, to the Settlement Trust following the Settlement Agreement Effective Date, or (ii) return of the Settlement Amount to Insurer, with any accrued interest, upon receipt of notice that the Settlement Agreement has been terminated.

~~1.1.36~~1.1.39 "**Estate**" means the (a) the Debtor's estate, and (b) Additional Debtors' estates, each created pursuant to section 541 of the Bankruptcy Code.

~~1.1.37~~1.1.40 "**Excluded Party**" means the following Entities: (a) the Holy See (State of Vatican City); (b) any Perpetrator; and (c) any ~~religious order (i.e., institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy),~~<u>archdiocese or diocese (other than the Archdiocese itself), any Religious Order</u> or other Entity that is an affiliate or associated with the Roman Catholic Church (in its capacity as such, and other than (i) the Non-Debtor Catholic Entities; (ii) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP, (iii) the ~~applicable~~ Parish Schools and Archdiocesan Schools ~~(each as defined in the Acceptable Plan)~~; and (iv)~~,~~ any Co-Insured Party); *provided, however,* that any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party.²²

---

² ~~SPARTA Settlement Agreement will provide:~~

~~For the avoidance of doubt, Direct Action Claim does not include the following action: SPARTA Insurance Company v. Pennsylvania General Insurance Company, No. 21-11205 (D. Mass.).~~

1.1.38 1.1.41 "**Extra-Contractual Claim**" means any Claim against any Insurer Released Party seeking any type of relief, other than coverage or benefits, under or with respect to the Archdiocese Policies. Extra-Contractual Claims include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs, or any other type of relief, alleging any of the following with respect to (a) any Archdiocese Policy; (b) any Claim allegedly or actually covered under a Archdiocese Policy; or (c) the conduct of any Insurer Released Party with respect to (a) or (b): (i) bad faith; (ii) failure to provide insurance coverage under any Archdiocese Policy, including any failure to investigate or to provide a defense or adequate defense; (iii) failure or refusal to compromise and settle any Claim insured under any Archdiocese Policy; (iv) failure to act in good faith; (v) violation or breach of any covenant or duty of good faith and fair dealing, whether express, implied, or otherwise; (vi) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (vii) violation of any unfair claims practices act or similar statute, regulation or code, including any statute, regulation, or code relating to unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising; (viii) any type of misconduct; or (ix) any other act or omission of any type by any Insurer Released Party for which the claimant seeks relief other than coverage or benefits under a Archdiocese Policy. "Extra-Contractual Claims" further include all Claims relating to any Insurer Released Party's (x) handling of any Claims under the Archdiocese Policies, (y) conduct in negotiating this Settlement Agreement and/or the Plan, and (z) conduct in the settlement of any Claims. For the avoidance of doubt, Extra-Contractual Claims of the Archdiocese Bound Parties are included within the property Insurer is purchasing hereunder.

1.1.39 1.1.42 "**Final Order**" means an order as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending and in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order will have been affirmed by the highest court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari,* petition for review, or move for reargument or rehearing will have expired; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order will not cause such order not to be a Final Order.

1.1.40 1.1.43 "**Gatekeeper Injunction**" has the meaning set forth in Section 2.2.2.

1.1.44 "**HH**" has the meaning set forth in Section 6.3.15.

1.1.41 1.1.45 "**Indemnified Claims**" shall have has the meaning set forth in Section 7.2 of this Settlement Agreement.

~~1.1.42~~1.1.46    **"Indemnity Cost Reserve"** ~~shall have~~has the meaning set forth in Section 7.2.

~~1.1.43~~1.1.47    **"Injunctions"** means the Sale Injunction, Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeper Injunction.

~~1.1.44~~1.1.48    **"Insurance Settlement Agreement"** ~~shall have~~has the meaning set forth in the Acceptable Plan.

~~1.1.45~~1.1.49    **"Insurer"** means ~~[___].³~~The Catholic Mutual Relief Society of America.

~~1.1.46~~1.1.50    **"Insurer Contribution Claim"** means any (a) Non-Settling Insurer Contribution Claim or (b) Settling Insurer Contribution Claim.

~~1.1.47~~1.1.51    **"Insurer Released Party"** means Insurer and its Related Parties, each in their capacities solely as such with respect to the Archdiocese Policies and all Subject Interests therein.

~~1.1.48~~1.1.52    **"Known Abuse Claims"** means any Abuse Claim, other than an Unknown Abuse Claim, against any Settling Party, Settling Insurer, and/or Non-Settling Insurer.

~~1.1.49~~1.1.53    **"Medicare Claims"** means any Claim by CMS, and/or any agent or successor of CMS, charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA or pursuing a Claim under MSP Provisions, relating to any payments in respect of any Abuse Claim, including any Claim for reimbursement of conditional payments, and any Claim relating to reporting obligations.

---

³ ~~US Fire/International Settlement Agreement to include the following definition for "Insurer": "United States Fire Insurance Company ("U.S. Fire"), International Insurance Company ("International"), and Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company individually and, to the extent that policies issued by U.S. Fire and/or International were novated to or assumed by either or both of them ("U.S. Fire/International"). Any Entity that meets the definition set forth above shall be individually referred to as an 'Insurer.'"~~

~~SPARTA Settlement Agreement to include the following definition for "Insurer":~~

~~"SPARTA Insurance Company and American Employers' Insurance Company ("SPARTA")."~~

~~Catholic Mutual Settlement Agreement to include the following definition for "Insurer":~~

~~"Catholic Mutual Relief Society of America."~~

~~National Union Settlement Agreement to include the following definition for "Insurer":~~

~~"National Union Fire Insurance Company of Pittsburgh, Pa., or its successors and assigns."~~

~~Puritan Insurance Company to include the following definition for "Insurer":~~

~~"Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation."~~

~~Twin City Settlement Agreement to include the following definition for "Insurer":~~

~~"Twin City Fire Insurance Company and First State Insurance Company."~~

1.1.50 1.1.54 "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which imposes reporting obligations on those Entities with payment obligations under the MSPA.

1.1.51 1.1.55 "**MSPA**" means 42 U.S.C. §1395y et seq., or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto, including the regulations promulgated thereunder, found at 42 C.F.R. §411.1 et seq.

1.1.52 1.1.56 "**Non-Debtor Catholic Entity Policy Sale**" has the meaning set forth in Section 4.6.

1.1.53 1.1.57 "**Non-Debtor Catholic Entities**" collectively means those entities listed on the Acceptable Plan Exhibit B-2 and Schedule 2 hereto who are not Additional Debtors, but which are (a) insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies and/or (b) have actually or allegedly acquired or been assigned the right to make a claim for coverage under any of the Archdiocese Policies (excluding, however, for the avoidance of doubt, the Debtor Parties, the Settlement Trust, and any Abuse Claimant).

1.1.54 1.1.58 "**Non-Insurer Contribution Claim**" means any Claim for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law that is attributable to, arises from, is based upon, relates to, or results from, an Abuse Claim or payment of an Abuse Claim, and any other derivative or indirect Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, other than a Non-Settling Insurer Contribution Claim or a Settling Insurer Contribution Claim.

1.1.55 1.1.59 "**Non-Settling Insurer**" means any insurer (together with its Related Parties) that is not a Settling Insurer.

1.1.56 1.1.60 "**Non-Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Non-Settling Insurer against any Settling Insurer for the payment of money where such Non-Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.61 "**Parish Schools**" means the elementary Catholic schools that are owned and operated by the Archdiocesan Parishes. For the avoidance of doubt, the definition of Parish Schools expressly excludes Catholic schools that are owned and operated by Religious Orders and the Archdiocesan Schools. For the further avoidance of doubt, the Parish Schools are not separately incorporated.

1.1.57 1.1.62   "**Parties**" has the meaning set forth in the first paragraph of this Settlement Agreement.

1.1.58   "**Payment Security**]" means 1.1.63   [**Intentionally Omitted**.]4

1.1.59 1.1.64   "**Penalty Claims**" means a Claim against any Settling Party or Settling Insurer for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Creditor holding such Claim.

1.1.60 1.1.65   "**Perpetrator**" means an individual who personally committed or is alleged to have personally committed an act of Abuse. For the avoidance of doubt, the definition of Perpetrator does not include any individual who did not personally commit an act of Abuse or is not alleged to have personally committed an act of Abuse, but against whom an Abuse Claim or Non-Insurer Contribution Claim is asserted nonetheless, or may be asserted, by virtue of such individual's position or service as a member, representative, contractor, consultant, professional, or volunteer of the Archdiocese or any Non-Debtor Catholic Entity or any council or representative body associated with such Entities.

1.1.61 1.1.66   "**Person**" has the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

1.1.62 1.1.67   "**Petition Date**" means (a) with respect to the Archdiocese, May 1, 2020; and (b) with respect to each Additional Debtor, the date(s) on which such Additional Debtor files in the Bankruptcy Court its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.63 1.1.68   "**Plan**" refers to the Chapter 11 Plan of Reorganization for the Archdiocese and all Additional Debtors (and all exhibits annexed thereto) which shall, among other things, provide for the resolution of Abuse Claims and Subject Interests in the Archdiocese Policies as set forth herein, and which shall be in form and substance acceptable to Insurer in its sole discretion.

1.1.64 1.1.69   "**Plan Confirmation Order**" has the meaning set forth in Section 2.3.

---

4 Intentionally omitted, except the SPARTA Settlement Agreement, in which this section will provide:
   has the meaning given to it in Section 3.1.1 hereof.

~~1.1.65~~1.1.70 **"Preserved Coverage"** means ~~[Intentionally Omitted.]~~[5]Insurer's obligations under Certificate No. 8554 issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the bodily injury or personal injury claims listed in the attached Schedule 4, in each case, subject to the limits, declarations, terms and conditions of such certificate; *provided, however,* that Preserved Coverage shall not include coverage for any and all Abuse Claims or any and all other Barred Claims.

~~1.1.66~~1.1.71 **"Purchased Property"** means any and all right, title, and interest (including all Subject Interests) in and to the Archdiocese Policies and the Related Insurance Claims and Coverage Claims.

~~1.1.67~~1.1.72 **"Related Insurance Claim"** means (a) any Extra-Contractual Claim and (b) any other Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies, including, without limitation, bad faith Claims.

~~1.1.68~~1.1.73 **"Related Party"** means, with respect to any Entity, such Entity's (a) predecessors, successors, assigns, and any Entity that assumed the obligation of the forgoing for the Archdiocese Policies by novation or otherwise (b) direct and indirect past, present, and future Affiliates (as defined in section 101(2) of the Bankruptcy Code), holding companies, merged companies, related companies, subsidiaries, divisions, acquired companies, joint ventures, joint venturers, (c) current and former employees, officers, directors, principals, partners, managing agents, trustees, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, brokers, adjusters, reinsurers, retrocessionaires, subrogees, agents, claims handling administrators, and other professionals, and (d) respective heirs, executors, estates, and nominees; and all Entities acting on behalf of, by, through or in concert with them, each solely in their capacities as such with respect to such Entity (and with respect to such Entity (including Insurer) that is an insurer of any Archdiocese Bound Party or has assumed the obligations of such by novation or otherwise, such insurer's applicable insurance policy(ies) (including the Archdiocese Policies)).[6]

1.1.74 **"Religious Order"** means, collectively, an institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred

---

[5] Intentionally omitted, except the Catholic Mutual Settlement Agreement, in which this section will provide:

"Preserved Coverage" means Insurer's obligations under Certificate No. [∗] issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the personal injury claims listed in the attached Schedule [X], in each case, subject to the limits, declarations, terms and conditions of such certificate; provided, however, that Preserved Coverage shall not include coverage for any and all Abuse Claims or other Barred Claims.

[6] The SPARTA Settlement Agreement will additionally provide:

For the purposes of this definition and this Settlement Agreement, Pennsylvania General Insurance Corporation shall not be a considered a Related Party of SPARTA Insurance Company.

bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy.

~~1.1.69~~1.1.75    "**Reorganized Additional Debtors**" means the Additional Debtors, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

~~1.1.70~~1.1.76    "**Reorganized Debtor**" means the Debtor, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

~~1.1.71~~1.1.77    "**Revival Window**" means Section 2 of La. Acts 2021, No. 322, as amended by La. Acts 2022, No. 386, and La. Acts 2024, No. 481.

~~1.1.72~~1.1.78    "**Revival Window Laws**" means the Revival Window, together with any other law that extends the prescriptive period or statute of limitations for asserting Abuse Claims under Louisiana or other applicable state law.

~~1.1.73~~1.1.79    "**Sale Injunction**" has the meaning set forth in Section 2.1.

~~1.1.74~~1.1.80    "**Settlement Agreement Effective Date**" means the first day on which: (a) the Archdiocese Signatory Parties and Insurer have executed this Settlement Agreement; (b) the Unknown Abuse Claims Representative shall have supported the releases provided for herein and the protections granted hereby and in the Plan in favor of the Insurer Released Parties, in a manner acceptable to Insurer in its sole discretion; (c) the Approval Order shall have become a Final Order; (d) the Plan Confirmation Order shall have become a Final Order; and (e) the Settlement Trust shall have been created pursuant to the Plan[; *provided, however,* ~~that in Insurer's sole discretion~~with the prior written consent of the Trustee, not to be unreasonably withheld, Insurer may elect to waive the conditions set forth in clauses (b) through (e) and pay or direct the payment of the Settlement Amount to the escrow or Settlement Trust prior to the occurrence of the events set forth in (b) through (e) hereof, in which case, the date of such payment shall be the Settlement Agreement Effective Date for all purposes hereunder including the date of the closing of the purchase and sale of the Archdiocese Policies.]7

~~1.1.75~~1.1.81    "**Settlement Amount**" means the sum of Two Million and 00/100 Dollars ($~~____~~2,000,000.00) to be paid (in accordance with Section 3.1) by Insurer after satisfaction of all conditions precedent herein in accordance herewith.

~~1.1.76~~1.1.82    "**Settlement Trust**" means the settlement trust established under the Plan for the purposes set forth therein, including assuming liability for all Channeled Claims (as defined in the Acceptable Plan) and Indemnified Claims (as defined herein),

---

7 *Note: Subject to further discussion.*

subject to the limitations on indemnification and liability contained in Section 7.2 of this Settlement Agreement.

1.1.77 1.1.83 "**Settlement Trust Agreement**" means the agreement between the Debtor and the Settlement Trustee governing the Settlement Trust, ~~to be filed with the Plan Supplement (as defined in the~~ in the form of Exhibit D-1 to the Acceptable Plan~~)~~.

1.1.78 1.1.84 "**Settlement Trust Allocation Protocol**" means the Settlement Trust Allocation Protocol (as defined and used in the Settlement Trust Agreement), ~~to be filed with the~~ in the form of Exhibit D-2 to the Acceptable Plan ~~Supplement~~.

1.1.79 1.1.85 "**Settlement Trust Documents**" means, collectively, (a) the Settlement Trust Agreement, (b) the Settlement Trust Allocation Protocol, and (c) any other agreements, instruments and documents governing the establishment and administration of the Settlement Trust, which shall be consistent with the terms of the Plan, as the same may be amended or modified from time to time in accordance with the terms thereof.

1.1.80 1.1.86 "**Settlement Trustee**" means the Entity appointed to act as the initial trustee of the Settlement Trust pursuant to the terms of the Settlement Trust Documents, along with any successor trustee appointed in accordance with the Settlement Trust Documents.

1.1.81 1.1.87 "**Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Settling Insurer against any Settling Insurer or Non-Settling Insurer for the payment of money where such Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.82 1.1.88 "**Settling Insurers**" shall have the meaning set forth in the Acceptable Plan.

1.1.83 1.1.89 "**Settling Insurers' Policies**" shall have the meaning set forth in the Acceptable Plan.

1.1.84 1.1.90 "**Settling Parties**" means, collectively, the following Entities: (a) Archdiocese Bound Parties; and (b) the Settling Insurers.

1.1.85 1.1.91 "**Subject Interests**" means all Claims, liens (as defined by Section 101(37) of the Bankruptcy Code), encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief, including: (a) all interests of the Archdiocese in, to and under the Archdiocese Policies; (b) all interests in, to, and under the Archdiocese Policies of any Entity other than the Archdiocese (including all Abuse Claimants and the Archdiocese Bound Parties); and (c) all interests in, to and under the Archdiocese Policies of any other Entity claiming coverage by, through, or on behalf of any Archdiocese Bound Party, including, without limitation, rights and interests as an

insured, co-insured or additional insured, insurer or creditors of the Archdiocese Bound Parties; in each case within the meaning of "interest" as used in sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code. For the avoidance of doubt, a Direct Action Claim constitutes a Subject Interest. The meaning of Subject Interests also includes: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property.

1.1.861.1.92 **"Supplemental Settling Insurers' Injunction"** has the meaning set forth in Section 2.2.2.

1.1.871.1.93 **"Unknown Abuse Claim"** means an Abuse Claim that occurred before the Petition Date and the Abuse Claimant did not file a proof of claim by the

applicable Abuse Claims Bar Date, for which there exists a valid legal excuse for not filing, as further defined in the in the Acceptable Plan.

1.1.88 1.1.94 "**Unknown Abuse Claims Representative**" means Michael R. Hogan, the legal representative appointed by the Bankruptcy Court pursuant to the *Order (I) Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, and (II) Approving the Retention of Michael R. Hogan as the Unknown Tort Claims Representative, Nunc Pro Tunc To July 26, 2021* (Docket No. 1012 ), any successor legal representative appointed by the Bankruptcy Court, or, on and after the Bankruptcy Plan Effective Date, any successor legal representative appointed in accordance with the applicable Settlement Trust Document.

1.2 Capitalized terms not defined in this Section 1 or elsewhere in this Settlement Agreement shall have the meanings given to them in the Bankruptcy Code.

## 2. THE BANKRUPTCY CASE AND PLAN OF REORGANIZATION

2.1 On or before July 29, 2025, the Archdiocese shall file a motion in the Bankruptcy Court (the "**Approval Motion**"), in form and substance acceptable to Insurer in its sole discretion, that seeks the entry of an order in substantially the form attached as **Exhibit A** to this Settlement Agreement, or otherwise in form and substance acceptable to Insurer in its sole discretion (the "**Approval Order**"), that:

(a) approves this Settlement Agreement, including Insurer's buyback of the Archdiocese Policies and the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests except Preserved Coverage, and otherwise authorizes the Parties to undertake the settlement and the transactions contemplated by this Settlement Agreement, in each case pursuant to sections 363(b), (f),and (m) of the Bankruptcy Code and any other applicable provisions of the Bankruptcy Code;

(b) contains an injunction (the "**Sale Injunction**") that, subject to and conditioned upon the Settlement Agreement Effective Date and the Insurer's payment of the Settlement Amount, bars all Claims except Claims for Preserved Coverage against the Insurer Released Parties and their property and assets of each based on or arising out of any Subject Interests in the Archdiocese Policies including without limitation all Coverage Claims, Related Insurance Claims, and Barred Claims, leaving the Settling Insurers free and clear of all Subject Interests of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); any Abuse Claimant; or any holder of a Barred Claim pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code;

(c) provides that this Settlement Agreement is binding on the Archdiocese Signatory Parties, all other Settling Parties, any trust created in the Bankruptcy Case(s), and any successors of the foregoing; and

(d) provides, subject to and conditioned upon the Settlement Agreement Effective Date, that the Approval Order is binding on all Persons (including, for the avoidance of doubt, all Persons set forth in the foregoing (c)).

2.1.1    The Archdiocese shall provide written notice of the Approval Motion, which notice shall be in form and substance acceptable to Insurer, to, at a minimum, any known Archdiocese Bound Party, holder of an Abuse Claim, or party whose rights or interests may reasonably be considered to be impacted by the relief requested in the Approval Motion, and any party identified on Schedule 3 hereto.  In addition, the Archdiocese shall include notice of the Approval Motion together with notice provided with respect to confirmation of the Joint Plan, including publication notice of the hearing on the Approval Motion. The Archdiocese will provide a draft service list of the foregoing for Insurer's review and comment.

2.1.2    If any Entity files an objection to the Approval Motion, the Archdiocese and Creditors' Committee shall consult with Insurer in connection with filing any written response thereto.  The Archdiocese Signatory Parties, as applicable, and Creditors' Committee shall take commercially reasonable steps to defend against any objection, appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order.  Insurer will cooperate with the Archdiocese Signatory Parties and Creditors' Committee in this regard, including making commercially reasonable submissions.

2.2    The Archdiocese shall file and prosecute a joint Plan with the Creditors Committee, which shall be in form and substance satisfactory to the Insurer in its sole discretion, substantially in the form as the Acceptable Plan, which the Parties acknowledge and agree satisfies the terms of this Settlement Agreement.  Any modifications to the Plan, the Settlement Trust Documents, the Plan Confirmation Order, or the Approval Order, including those relating to the Channeling Injunction,  Supplemental Settling Insurers' Injunction, Gatekeeper Injunction, releases by holders of Abuse Claims, Insurers, Insurance Settlement Agreements, and related definitional terms, including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Abuse Related Insurance Claims," "Channeled Claim," "Covered Parties," "Direct Action Claim," "Enjoined Party," "Insurer Contribution Claim," "Non-Insurer Contribution Claim," "Penalty Claims," "Protected Parties," "Settling Insurers," "Settling Insurer's Policies," "Subject Insurance Policies," "Subject Interests," or any exhibits, schedules, and documents related thereto, must be in all respects consistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties without Insurer's written consent in its sole discretion.

2.2.1    The Plan shall create the Settlement Trust, which shall be responsible for making any and all payments to the Abuse Claimants entitled to receive payment under the Plan and which shall assume all liability for Channeled Claims.

2.2.2    The Plan shall include: (a) an injunction in substantially the form included in Article [12.4] of the Acceptable Plan (the "**Channeling Injunction**"); and (b) an injunction in substantially the form included in Article [12.5] of the Acceptable Plan (the "**Supplemental Settling Insurers' Injunction**"); and (c) an injunction in substantially

715

the form included in Article [12.6]12.8 of the Acceptable Plan (the "**Gatekeeper Injunction**").

2.2.3   The Plan shall incorporate by reference the releases and indemnities set forth in this Settlement Agreement, including that the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to all Indemnified Claims as forth in Section 7.2 of this Settlement Agreement.

2.2.4   The Settlement Trust Documents shall provide that as a condition to receiving payment from the Settlement Trust, all Abuse Claimants shall provide an Abuse Claim Release and Certification.

2.2.5   The Plan shall provide for the commencement, prior to the Court's consideration of the Approval Motion, by the Additional Debtors of Chapter 11 cases to be jointly administered with the Bankruptcy Case.

2.2.6   The Plan shall provide a supplemental bar date for the Additional Debtors in a form and substance satisfactory to the Insurer with respect to Abuse Claims against the Additional Debtors and the form, manner, and deadline for filing proofs of claim and the treatment of confidential information contained therein.

2.2.7   The Plan shall provide that confirmation of the Plan will not occur unless all of the following conditions precedent have been satisfied: (a) the Plan Confirmation Order approves and implements the Injunctions and (b) the Bankruptcy Court shall have granted the Approval Motion in form and substance acceptable to Insurer in its sole discretion.

2.2.8   The Plan shall provide that the Bankruptcy Plan Effective Date will not occur unless all of the following conditions precedent have been satisfied or waived (as applicable with consent of Insurer): (a) the Plan Confirmation Order will have been entered by the Bankruptcy Court and become a Final Order, and (b) the Bankruptcy Court shall have entered the Approval Order (with both such Approval Order and this Settlement Agreement in form and substance acceptable to the Insurer) and such Approval Order shall have become a Final Order.

2.2.9   The Plan shall provide that (collectively, as follows, the "**Controlling Document Provision**") in the event of a conflict between (a) the Settlement Agreement, on the one hand, and (b) the Plan, on the other, the terms of the Settlement Agreement shall control and govern; and in the event of a conflict between the (x) Approval Order, on the one hand, and (y) Plan Confirmation Order, on the other, the terms of the Approval Order shall control and govern.

2.2.10  The Plan shall provide that the execution and delivery of this Settlement Agreement is a condition to entry of the Plan Confirmation Order and the occurrence of the Bankruptcy Plan Effective Date. The inclusion of this Settlement Agreement in the Plan shall not be waivable as a condition to entry of the Plan Confirmation Order or the

occurrence of the Bankruptcy Plan Effective Date absent the prior written consent of the Settling Insurers.

2.3     The Debtor Parties shall seek and obtain entry of an order from the Bankruptcy Court, which order shall be in form and substance acceptable to the Parties, that: (i) approves the Plan pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code; (ii) contains the Channeling Injunction; (iii) ratifies the Sale Injunction as independent of the Channeling Injunction and Supplemental Settling Insurers' Injunction; (iv) contains the Gatekeeper Injunction; (v) provides that this Settlement Agreement is binding on any Settlement Trust created in the Bankruptcy Case, the Reorganized Debtor, the Reorganized Additional Debtors, and any successors of the Settlement Trust, Reorganized Debtor, or Reorganized Additional Debtors, and all of the Archdiocese Bound Parties; and (vi) contains the Controlling Document Provision (the "**Plan Confirmation Order**").

2.3.1    The Plan and Plan Confirmation Order must not be inconsistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties.

2.3.2    In seeking to obtain the Plan Confirmation Order, the Debtor and Additional Debtors will: (i) seek a confirmation hearing on an appropriately timely basis; (ii) urge the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) take all reasonable steps to defend against any objection, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order.

2.3.3    Prior to entry of the Plan Confirmation Order, the Archdiocese and/or any applicable Additional Debtor shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Abuse Claim that (i) is asserted against any Debtor Party and (ii) implicates, or is reasonably likely to implicate, any Archdiocese Insurance Policies (including by alleging Abuse that took place during any policy period of any Archdiocese Policy). If, prior to the Plan Confirmation Order becoming a Final Order, the Bankruptcy Court allows any Entity to prosecute any such Abuse Claim, the Debtor Parties shall defend themselves against such Abuse Claims and comply with the terms of any order of the Bankruptcy Court, and Insurer's rights and obligations relating to such litigation shall be determined by, and subject to, the terms and conditions of the Archdiocese Policies, this Settlement Agreement, and any applicable orders of the Bankruptcy Court.

2.3.4    The Plan and Plan Confirmation Order shall provide that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any Covered Party with respect to any Archdiocese Policy, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court, except with respect to Preserved Coverage.

2.3.5    Nothing in this Section or elsewhere in this Settlement Agreement shall bar any party from arguing that any appeal from the Plan Confirmation Order should be dismissed on grounds of statutory or equitable mootness or otherwise.

2.3.6    None of the releases, Injunctions, or other provisions of the Plan with apply to, or have any effect, on the rights of the Settling Insurers to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with any Settling Insurer's Policy.

2.4    The Settlement Trust Documents shall require the Settlement Trust to register as a Responsible Reporting Entity under the reporting provisions of MMSEA.

2.4.1    The Settlement Trust Documents shall require the Settlement Trust, at its sole expense, to timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated and to follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

2.4.2    The Settlement Trust Documents shall require the Settlement Trust to obtain, prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Abuse Claim, a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. §1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim.

2.5    The Debtor Parties and Reorganized Debtor and Reorganized Additional Debtors will undertake commercially reasonable actions to cooperate with Insurer in connection with responding to any inquiry from Insurer's regulators, auditors, reinsurers, or retrocessionaires.

2.6    From and after the execution date of this Settlement Agreement and until the earlier of: (A) occurrence of (i) the Settlement Agreement Effective Date and (ii) Insurer's remittance of the Settlement Amount (at which time this covenant is superseded by the releases provided in Section 4); and (B) the date on which this Settlement Agreement is terminated, (i) none of the Insurer Released Parties, the Debtor, the Additional Debtors or Creditors' Committee will initiate any litigation activity against the other in any Bankruptcy Case and (ii) the Archdiocese and the Insurer Released Parties shall cease all litigation activities against each other in the Bankruptcy Case, including that the Insurer Released Parties will neither object to any proposed Plan consistent with this Settlement Agreement, nor serve or compel any discovery in connection with the Bankruptcy Case; *provided that*: (y) neither the Archdiocese nor any Additional Debtor shall include any provision in any Plan that adversely affects the rights or benefits of the Insurer Released Parties under this Settlement Agreement, or that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement; and (z) neither the Archdiocese nor any Additional Debtor shall act, or fail to act, in such a way that otherwise violates, or is contrary to, the agreements and covenants contained in this

Settlement Agreement. Notwithstanding the foregoing, the Insurer Released Parties may participate in the Bankruptcy Case for the purpose of supporting or enforcing any of the terms of this Settlement Agreement and protecting their rights.

2.7 ~~The Parties shall each bear, as to each other only, their own costs, expenses, and counsel and professional fees in the Bankruptcy Case.~~

~~2.8~~2.7 From and after the execution date of this Settlement Agreement and until the date on which this Settlement Agreement is terminated, the obligations of the ~~Debtors~~ Parties set forth in this Section 2 shall be binding on the Debtor Parties.

## 3. PAYMENT OF THE SETTLEMENT AMOUNTS

3.1 By no later than thirty (30) days after (a) the Settlement Agreement Effective Date, and (b) Insurer receiving appropriate instructions for the transmission of the payment to the Escrow Agent or Settlement Trust, Insurer shall pay (or cause to be paid) the Settlement Amount to the Settlement Trust or Escrow Agent pursuant to the Escrow Agreement. Payment of the Settlement Amount may be by check, ACH transfer, wire transfer, or other method.

3.1.1 [Intentionally Omitted.][8]

3.2 The delivery of the Settlement Amount to the Escrow Agent or Settlement Trust shall be in full and final settlement of all responsibilities under and arising out of the Archdiocese Policies, the sale of the ~~Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties back~~Purchased Property to Insurer free and clear of all Subject Interests of any Entity, and the other releases provided.

3.3 Subject to the occurrence of the Settlement Agreement Effective Date, the Parties agree: (i) the Settlement Amount is the total amount that Insurer is obligated to pay on account of any and all Claims under, arising out of, relating to, or in connection with the Archdiocese Policies (including Barred Claims, and any reimbursement obligations for Conditional Payments under the MSPA); (ii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of anyone in connection with the Archdiocese Policies, including any payments in connection with amounts allegedly owed under the MSPA or in connection with any Claims, including any Barred Claim; (iii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of the Archdiocese Bound Parties or any Abuse Claimants in connection with the Archdiocese Policies; and (iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted[9], *except that* this Section 3.3 shall not apply to Preserved Coverage.

---

[8] ~~Intentionally omitted, except the SPARTA Settlement Agreement, in which this section will provide:~~

~~[SPARTA shall provide a standby letter of credit, in a manner acceptable to the Debtor, to secure payment of the Settlement Amount. References herein or in the Plan to "payment" of the Settlement Amount shall be deemed to include the draw down of the letter of credit, as applicable.]~~

[9] ~~The Catholic Mutual Settlement Agreement will include the following~~

~~["(iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits,~~

The Parties further agree that the Settlement Amount includes the full purchase price of the Archdiocese Policies and Related Insurance Claims <u>and Coverage Claims</u> of the Archdiocese Bound Parties and consideration for the releases and other protections afforded by this Settlement Agreement.

3.4     The Parties represent and agree that (i) the consideration to be provided by Insurer pursuant to this Settlement Agreement constitutes a fair and reasonable compromise and exchange for the consideration granted to the Insurer Released Parties in this Settlement Agreement (including the releases set forth below), and (ii) the consideration to be provided by the Archdiocese Bound Parties to the Insurer Released Parties pursuant to this Settlement Agreement (including the releases set forth below) constitutes a fair and reasonable compromise and exchange for the consideration granted to the Archdiocese Bound Parties in this Settlement Agreement. The Insurer Released Parties are not acting as volunteers, and the Settlement Amount reflects potential liabilities and obligations to the Archdiocese Bound Parties of the amount Insurer allegedly is obligated to pay.

3.5     Each of the Archdiocese Signatory Parties: (i) consents to the sale of the Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests and Claims of all Persons, including, without limitation, the Archdiocese Bound Parties in accordance with the terms of this Settlement Agreement, and (ii) agrees and acknowledges that the contribution of the proceeds from such sale and settlement to the Settlement Trust, as provided in the Plan and this Settlement Agreement, is a fair and reasonable compromise and exchange for value and constitutes reasonable and adequate consideration for any Subject Interest or Claim the Archdiocese Bound Parties may have in the Archdiocese Policies.

3.6     The Parties further agree that they have attempted to resolve the matters set forth herein in compliance with both state and federal law and believe that the settlement terms adequately consider CMS's interest and do not reflect any attempt to shift responsibility for payment of medical expenses to CMS pursuant to 42 U.S.C. § 1395y(b).  The Parties acknowledge, understand, and agree that any present or future action or decision by CMS, including actions regarding an Abuse Claimant's eligibility or entitlement to receive Medicare or Medicare payments, will not render this Settlement Agreement (including the releases set forth in it) void or ineffective, or in any way affect the finality of this Settlement Agreement.  The Settlement Trust is responsible for all future medical payments, including any and all claims by CMS and/or CMS contractors that have been or may be in the future arising out of, relating (directly or indirectly) in any way to, or in connection with this Settlement Agreement.

3.7     To facilitate the purchase of the ~~Archdiocese Policies~~<u>Purchased Property</u> as set forth herein, ~~the Archdiocese and~~ each ~~of the other~~ Archdiocese Bound ~~Parties authorizes the Archbishop[10]or any other person employed by the Archdiocese that he designates, as its~~<u>Party is</u>

---

<sub>["(iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted *except for the Preserved Coverage*."]</sub>

[10] ~~As used herein, "Archbishop" refers to: (a) the office of the ordinary of the Archdiocese under Canon Law; (b) the Most Reverend Gregory Michael Aymond, the Archbishop on the Effective Date; and (c) any duly appointed or elected administrator of the Archdiocese pending the appointment of a new individual to serve as the Archbishop, and his duly appointed or elected successor.~~

authorized to designate a lawful attorney in fact, with full powers of substitution, to execute any bill of sale or other document reasonably requested by the Archdiocese or Insurer to accomplish the sale and purchase contemplated herein. A form of Bill of Sale is attached hereto as **Exhibit B**.

## 4. RELEASES AND SALE FREE AND CLEAR

4.1     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, with no further action being required, the Archdiocese Signatory Parties fully, finally, and completely remise, release, acquit, and forever discharge the Insurer Released Parties (including, for the avoidance of doubt, any of their reinsurers or retrocessionaires, solely in their capacity as such), from any and all past, present, and future: (a) Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies or Claims that are covered or are determined to be covered by agreement or a court of competent jurisdiction under the Archdiocese Policies, including, without limitation, any Barred Claims, Direct Action Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims, the handling of the Abuse Claims or the Bankruptcy Case *provided that*, the Insurer is not released from its obligations under the Archdiocese Policies with respect to the Preserved Coverage.   The Archdiocese Signatory Parties further acknowledge, stipulate, and agree that (x) the releases in this Section 4.1 specifically include all Unknown Abuse Claims, and demands that are based in whole or in part on Unknown Abuse Claims and (y) **with respect to all Claims released under this Section 4.1, the Archdiocese Signatory Parties waive any and all provisions, rights, and benefits conferred by Cal. Civ. Code 1542 or any law of any state of the United States, or any principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code 1542, which provides: "a general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, that, if known by him or her, would have materially affected his or her settlement with the debtor or released party"** and (z) the releases in this Section 4.1 shall be equal in breadth to the broadest releases and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

4.2     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, and with no further action being required, Insurer shall fully, finally, and completely remise, release, acquit, and forever discharge the Archdiocese Signatory Parties from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies, including any Barred Claims, and reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case subject to the protections in favor of the Insurer Released Parties set forth herein[11]. *, provided that*, the

[11] Catholic Mutual Settlement Agreement will include the following addition:

"all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case *provided that, the obligations of the applicable Archdiocese Bound Parties are not released from their obligations under the Archdiocese Policies with respect to the Preserved Coverage."*

obligations of the applicable Archdiocese Bound Parties are not released from their obligations under the Archdiocese Policies with respect to the Preserved Coverage.

4.3    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, none of the Archdiocese Signatory Parties or other Archdiocese Bound Parties shall assert against the Insurer Released Parties any Claim with respect to any matter, conduct, transaction, occurrence, fact, or other circumstance that, directly or indirectly, arises out of, relates to, or is in connection with any of the Archdiocese Policies, any Barred Claim, or any other matter released pursuant to Sections 4.1 and 4.2 above.

4.4    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer hereby buys back the Archdiocese Policies free and clear of all Subject Interests, including without limitation all Coverage Claims and Related Insurance Claims, of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); and any Abuse Claimant, or any other holder of a Barred Claim.  This sale is pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code.  The Parties acknowledge and agree, and the Approval Order shall find and conclude, that upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount:

4.4.1    Insurer is a good faith purchaser of the Archdiocese Policies and any Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), within the meaning of section 363(m) of the Bankruptcy Code, with all the protections afforded such a purchaser under 363(m) of the Bankruptcy Code;

4.4.2     the consideration exchanged constitutes a fair and reasonable settlement and compromise of the Parties' disputes and of their respective rights and obligations relating to the foregoing Archdiocese Policies and Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), and constitutes reasonably equivalent value;

4.4.3     the releases in this Settlement Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy law;

4.4.4     the Archdiocese Policies and all Subject Interests therein (including, without limitation, to the extent applicable, any Direct Action Claim) shall be terminated and of no further force and effect;

4.4.5    Insurer's payment of the Settlement Amount constitutes Insurer's full and complete performance of any and all obligations under the Archdiocese Policies, including any performance owed to the Archdiocese Bound Parties or any holder or purported holder of any Claim against (including any Abuse Claim or Direct Action Claim) or Subject Interest in, the Archdiocese Policies, and exhausts all limits of liability of the Archdiocese Policies;

4.4.6   All Subject Interests the Archdiocese Bound Parties and any other Entity may have had, may presently have, or in the future may have in the Archdiocese Policies are released pursuant to the terms of this Settlement Agreement and policy buyback;

4.4.7    all per occurrence and/or aggregate limits of coverage under the Archdiocese Policies are fully eroded, exhausted and settled upon the Settlement Agreement Effective Date;

4.4.8   the Insurer would not pay the Settlement Amount without buyback of the Archdiocese Policies upon all of the terms and conditions set forth herein; ~~and~~

4.4.9    the Archdiocese Signatory Parties accept the Settlement Amount in full and complete compromise and satisfaction of all Insurer Released Parties' past, present, and future obligations, including any obligations to any of the Archdiocese Bound Parties under such Archdiocese Policies or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever that are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies (including without limitation Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether or not such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, the Bankruptcy Case, or otherwise; and.

4.4.10   notwithstanding any of the foregoing, nothing in the Sale Approval Order, the Settlement Agreement or the Sale Transaction affects the Preserved Coverage or the Archdiocese Bound Parties' rights or continuing obligations in connection with the Preserved Coverage under the Archdiocese Policies issued by Insurer, all of which shall survive the Settlement Agreement Effective Date, Bankruptcy Plan Effective Date and the closing of the Sale Transaction.

4.5    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer shall have no obligation to pay, handle, object, or otherwise respond to any Claim against the Archdiocese Bound Parties; and the Archdiocese Bound Parties will: (i) will withdraw, and are deemed to have withdrawn, all outstanding tenders of Claims to the Insurer Released Parties for defense and indemnity; (ii) will not tender any Claims to the Insurer Released Parties; and (iii) will not request that the Insurer Released Parties fund any judgments, settlements, or defense costs that, in each case, are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies issued by a Settling Insurer.

4.6    To the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer consent to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date,

and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under this Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Subject Interests of any Entity in such Archdiocese Policies (the "**Non-Debtor Catholic Entity Policy Sale**"). The Plan Confirmation Order and Approval Order shall so provide and Insurer shall be designated in the Plan Confirmation Order as a good-faith purchaser of the Archdiocese Policies with all the protections afforded such a purchaser under section 363(m) of the Bankruptcy Code.

4.7    [Intentionally Omitted.]¹² Notwithstanding anything in this Settlement Agreement to the contrary, nothing in the Settlement Agreement shall assign, sell or purchase the Preserved Coverage; withdraw or deem withdrawn the tender of the claims listed in attached Schedule 4; erode, exhaust the limits of, or terminate the Preserved Coverage; release the Insurer from providing the Preserved Coverage to the applicable Archdiocese Bound Parties; or release the rights or obligations of the applicable Archdiocese Bound Parties under the Archdiocese Policies with respect to such Preserved Coverage.

4.8    The Archdiocese Signatory Parties further covenant, stipulate and agree that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Abuse Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any insured or additional insured covered by any insurance policy issued by any Insurer Released Party, and to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in any Archdiocese Policy to the Debtor's Estate and sale thereof to Insurer, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court. Without limiting the foregoing, the Insurer Released Parties shall receive protections against Claims by Non-Debtor Catholic Entities and any other Entity equal in breadth to the broadest protections received by any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, or any Insurance Settlement Agreement approved by the Bankruptcy Court.

4.9    If the Archdiocese Signatory Parties, or anyone of them, enter into any agreement (that is embodied in such agreement as approved by the Bankruptcy Court, the Plan, and/or the Plan Confirmation Order) with any other one of the Settling Insurers (including any Non-Settling Insurer who becomes a Settling Insurer) in the Bankruptcy Case, that provides that insurer with releases, injunctions or other protections that are more favorable than those contained in this Settlement Agreement, then this Settlement Agreement shall be deemed to be modified to

---

¹² Intentionally omitted, except the Catholic Mutual Settlement Agreement, in which this section will provide:

4.15  Notwithstanding anything in this Settlement Agreement to the contrary, nothing in the Settlement Agreement shall sell or purchase the Preserved Coverage; erode, exhaust the limits of, or terminate the Preserved Coverage; release the Insurer from providing the Preserved Coverage to the applicable Archdiocese Bound Parties; or release the obligations of the applicable Archdiocese Bound Parties under the Archdiocese Policies with respect to such Preserved Coverage.

provide Insurer with those more favorable injunctions, releases or other protections, except with respect to Preserved Coverage.

    4.10    Notwithstanding anything in this Settlement Agreement, nothing in this Settlement Agreement is intended to or shall be construed to:

        4.10.1    apply to or have any effect on the Insurer Released Parties' rights to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer;[13]

        4.10.2    release any Claims that any Insurer Released Party has or might have against any Non-Settling Insurer, except that, to the extent such other insurers have agreed or in the future agree to release any Claims against the Insurer Released Parties arising out of or related in any way to the Abuse Claims, then the Insurer Released Parties also release such Claims against such other insurers to the same extent; or

        4.10.3    release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Settlement Agreement or the Plan (to the extent not inconsistent with this Settlement Agreement).

## 5.    TERMINATION OF AGREEMENT

    5.1    The Parties may terminate this Settlement Agreement by mutual agreement in writing.

    5.2    Insurer may terminate this Settlement Agreement upon fifteen (15) days written notice to the other Parties in the event of any of the following occurs prior to the Settlement Agreement Effective Date: (i) any of the Debtor Parties or the Creditors' Committee files a plan inconsistent with this Settlement Agreement; (ii) the Approval Order and the Plan Confirmation Order are not entered by February 15, 2026; (iii) the Bankruptcy Court enters an order that becomes a Final Order that (a) denies the Approval Motion or (b) is inconsistent with the Approval Order or the Plan Confirmation Order; (iv) a plan that is inconsistent with the terms of this Settlement Agreement is confirmed; or (v) any Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

---

[13] SPARTA Settlement Agreement will provide:

    For the avoidance of doubt, any release provided pursuant to this Settlement Agreement does not include any release by Insurer of any Claims against Pennsylvania General Insurance Corporation. Nothing in the Settlement Agreement shall impair any right of Insurer to pursue any direct claim or claim based on theories of contribution, indemnity, reimbursement, or subrogation against Pennsylvania General Insurance Corporation.

    The Plan shall provide the same.

5.3     In the event of termination pursuant to this Section 5, unless the Parties agree otherwise in writing, the Parties' interests, rights, and obligations under the Archdiocese Policies shall not be impacted by such termination.

## 6.     REPRESENTATIONS AND WARRANTIES OF THE PARTIES

6.1     The Parties separately represent and warrant as follows:

6.1.1   To the extent it is a corporation, including a non-profit, religious, or charitable corporation, or other legal entity, each such Party has the requisite power and authority to enter into this Settlement Agreement and to perform the obligations contemplated by this Settlement Agreement[1], subject only to approval of the Bankruptcy Court; and

6.1.2   This Settlement Agreement has been analyzed by counsel to the Parties and executed and delivered in good faith pursuant to arm's length negotiations and for value and valuable consideration.

6.2     The Archdiocese Signatory Parties represent and warrant that they have not assigned, and will not assign, any Subject Interests in the Archdiocese Policies to any Entity, except for the avoidance of doubt, the assignment of the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate.

6.3     The Archdiocese Signatory Parties represent and warrant that (i) all Archdiocese Bound Parties have either signed this agreement, are represented herein by the Archdiocese or the Archdiocese Signatory Parties, or are juridical entities whose existence has been terminated as a matter of applicable non-bankruptcy law and (ii) the Archdiocese Signatory Parties are duly authorized to bind the Archdiocese Bound Parties who are not Archdiocese Signatory Parties. Without limiting the foregoing, the Archdiocese Signatory Parties represent and warrant that:

6.3.1   all entities known to them that are Co-Insured Parties (~~or~~under the Archdiocese Policies (by express reference, assignment, judicial determination or any related concept under applicable law or other document) ~~under the Archdiocese Policies~~ other than the Debtor, the Additional Debtors, the Parish Schools and Archdiocesan Schools, the Non-Debtor Catholic Entities, and the cemeteries identified in Section 6.3.3, are identified in Schedule 2 hereto, if any;[14]

6.3.2   the Archdiocesan Schools are not separately incorporated and are merely unincorporated operations of the Debtor and the Parish Schools are not separately

---

[1] Specifically, each Archdiocese Signatory Party is duly authorized to execute this Settlement Agreement and any related document and the signatory hereto on behalf of such Archdiocese Signatory Party has full power and authority to bind such Archdiocese Signatory Party. Forms of the related corporate resolutions and incumbency certificate are attached in Schedule 5 and Schedule 6 respectively.

[14] ~~SPARTA Settlement Agreement to include:~~

~~The Archdiocese Signatory Parties represent and warrant that they are not aware of being an "additional assured" (or related concept under applicable law or document) under any American Employers Insurance Company ("AEIC") policy.~~

~~Note: SPARTA Settlement Agreement Schedule 2, will be listed as "None."~~

incorporated and are merely unincorporated operations of the Archdiocesan Parishes that are Additional Debtors;

6.3.3    the Debtor, through the Office of Catholic Cemeteries, operates certain cemeteries including, without limitation: All God's Babies Tomb & Holy Innocents Prayer Garden, St. Charles Cemetery, St. Joseph Cemetery #1, St. Joseph Cemetery #2, St. Louis Cemetery #1, St. Louis Cemetery #2, St. Louis Cemetery #3, St. Patrick Cemetery #1, St. Patrick Cemetery #2, St. Patrick Cemetery #3, St. Roch Cemetery #1, St. Roch Cemetery #2, St. Vincent De Paul Cemetery #1, St. Vincent DePaul Cemetery #2, which  cemeteries are either: (a) Non-Debtor Catholic Entities or (b) not separately incorporated and are merely unincorporated operations of the Debtor;

6.3.4    Holy Redeemer School, Redeemer-Seton High School, and St. Joseph ~~Benedictine~~Benedictine High School were formerly owned and operated by the Archdiocese, but ceased operations and were closed by the Debtor at some point prior to the Petition Date, and were not separately incorporated and were merely unincorporated operations of the Debtor;

6.3.5    St. Robert Bellarmine School was formerly owned and operated by one or more of the Archdiocese Signatory Parties, but ceased operations and was closed by one or more of the Archdiocese Signatory Parties at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of one of the Additional Debtors;

6.3.6    Notre Dame Seminary and the Society of the Propagation of the Faith of the Archdiocese of New Orleans are owned and operated by the Archdiocese and are not separately incorporated, but are merely unincorporated operations of the Debtor;

6.3.7    San Pedro Pescador Church was owned and operated by the Archdiocese, but was closed by the Archdiocese prior to the Petition Date and was not separately incorporated, but was merely an unincorporated operation of the Archdiocese;

6.3.8    the following Roman Catholic Schools: the Academy of the Sacred Heart, Holy Cross, Jesuit, St. Mary's Academy, St. Mary's Dominican, Brother Martin, Mount Carmel Academy, Ursuline Academy, Cabrini, De La Salle, and St. Paul's School, are not Co-Insured Parties, named insured's or additional insureds (or related concept under applicable law or document) under the Archdiocese Policies, or institutions, religious organizations or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control and active management, and were themselves not under the control or active management of the Archdiocese.

6.3.9    St. John Vianney Preparatory School was formerly owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

   6.3.10 the Louise Home a/k/a as the Louise Headstart Center was an unincorporated ministry of the Debtor;

   6.3.11 Holy Guardian Angel was owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

   6.3.12 the Social Apostolate Housing Program was an unincorporated ministry of the Debtor;

   6.3.13 at all times Tulane Catholic and the Newman Center were and are unincorporated activities of the Debtor, with no existence separate and apart from the Debtor;

   6.3.14 Crescent City Convent Corporation, Lyric Realty and Parking Company, Inc., The Chinchuba Deaf-Mute Institute, People for Teens of St. Anthony of Padua Corporation, Kiwanis Foundation of New Orleans, Kiwanis Club of New Orleans, and Seminarians Parents Association, Inc. were never owned, operated, or controlled by the Debtor or the Additional Debtors and were neither insured nor additional insureds under the Archdiocese Policies; and

   6.3.15 (a) Catholic Charities Archdiocese of New Orleans ("**Catholic Charities**") owned and operated Hope Haven – Madonna Manor ("**HH**"), which was organized under Louisiana law; (b) HH was dissolved and its status as a juridical person was, thus, terminated as a matter of Louisiana law; (c) at all times, Catholic Charities was the sole member and/ or shareholder of HH; and (d) it is the intention of Catholic Charities that HH be bound by this Agreement as if it remained in existence and had signed the Agreement as a party.

   6.4 The Archdiocese Signatory Parties represent and warrant that they are not aware of any Abuse Claim asserted against any entity associated with the Archdiocese (including any parishes, institutions or religious organizations or any subsidiary of the person or organization listed in the declarations of the Archdiocese Policies, or any other organization coming under the Archdiocese's control and active management), that is not listed on Exhibit B-1 to the Acceptable Plan.

   6.5 The Debtor represents and warrants that it will undertake good faith efforts to cause actual notice of the Approval Motion to be sent in accordance with Section 2.1.1 hereof. Without limitation, the Debtor has sent or will send notice to the entities on Schedule 3.

   6.6 The Archdiocese Signatory Parties and Insurer (limited to such Insurer person that worked on and were familiar with this Settlement Agreement and matters referenced therein), respectively, represent and warrant that they have completed a reasonable search for evidence of any policy of insurance issued by Insurer to the Archdiocese Signatory Parties that would afford coverage with respect to any Abuse Claim, Coverage Claim, or Related Insurance Claim and other than the policies identified in Schedule 1, no such policies have been identified. The Archdiocese Signatory Parties further represent and warrant that, to the best of their knowledge after reasonably diligent investigation: there are no contracts, binders, certificates, and policies of

insurance that insure or purport to insure (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) (x) the Diocese of Houma-Thibodaux or (y) the Diocese of Baton Rouge (excluding, for the avoidance of doubt, policies issued to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD, but including any such policies issued to the Archdiocese that provide or may provide insurance coverage to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD), or (iv) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, other than the policies identified in Schedule 1. Notwithstanding the foregoing, nothing in this Settlement Agreement, including the Schedules or Exhibits hereto, shall be construed as or deemed to be an admission or evidence that any binder, certificate, or policy of insurance was in fact issued or affords coverage in connection with any Abuse Claims.

6.7    The Debtor Parties represent and warrant that they have not in any way assisted, and covenant that they shall not in any way assist, any Entity in the establishment or pursuit of any Claim, including any Barred Claim, against the Insurer Released Parties.

## 7.    ACTIONS INVOLVING THIRD PARTIES

7.1    For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Archdiocese Policies resulting from the purchase and sale thereof contemplated by this Settlement Agreement, the Parties hereby agree as follows:

7.1.1    From and after (i) the occurrence of the Settlement Agreement Effective Date, and (ii) Insurer's payment of the Settlement Amount, if any other insurer of the Archdiocese Bound Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from Insurer as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for any of Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense or indemnity obligation of Insurer for any Claims or reimbursement obligations for Conditional Payments released or resolved pursuant to this Settlement Agreement, the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and the Settlement Trust shall voluntarily reduce any judgment or Claim against, or settlement with, such other insurers to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against Insurer. To ensure that such a reduction is accomplished, Insurer shall be entitled to assert this Section 7 as a defense to any action against it brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Insurer from any liability for the judgment or Claim. Moreover, if a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against Insurer, such Claim may be asserted as a defense against a Claim by the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust in any coverage litigation (and the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and/or the Settlement Trust may assert the legal and equitable rights of Insurer in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Archdiocese Signatory Parties, other Archdiocese Bound

Parties, or the Settlement Trust shall be reduced dollar for dollar by the amount so determined.

7.1.2    Unless this Settlement Agreement is terminated, Insurer shall not seek reimbursement for any payments it makes under this Settlement Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other Settling Insurer unless that other insurer first seeks contribution, subrogation, indemnification, or similar relief from Insurer.  Notwithstanding the foregoing, nothing in this Settlement Agreement, the Approval Order or the Plan Confirmation Order shall be construed as prohibiting Insurer from seeking recovery (including with respect to the Settlement Amount or otherwise) from its reinsurers or retrocessionaires in their capacity as such.

7.2    Subject to the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, and subject to the limitations set forth below, the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein, including any Claims made by (i) any Entity who is an insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies; (ii) any Entity who ~~has made, will make, or can make~~makes (a) an Abuse Claim or (b) a Related Insurance Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a Claim under any of the Archdiocese Policies (collectively, the "**Indemnified Claims**"), as set forth below: ~~15~~

7.2.1    The Insurer Released Parties shall have the right (but not the obligation) to (a) seek to enforce the Injunctions against any Entity seeking to assert an Indemnified Claim, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions) identified in this Section 7.2.  With the Insurer Released Parties' consent, such consent not to be unreasonably withheld, the Settlement Trustee can satisfy the obligations contained in (a) and (b) above.  An amount equal to ~~[    ]16~~Twenty Thousand and 00/00 Dollars ($20,000.00) (the "**Indemnity Cost Reserve**") shall be reserved from the Settlement Amount for payment of reasonable attorneys' fees, expenses, costs, and other amounts incurred by the Insurer Released Parties in defending against such Indemnified Claims, which amount shall be released from reserve if no Indemnified Claims are asserted within 30 days after the Revival Window has closed under every applicable Revival Window Law.

7.2.2    ~~The~~Neither any Archdiocese Bound Party, nor the Settlement Trust shall ~~not~~ in any way assist, any Entity in the establishment or pursuit of any Claim against any

---

~~15~~ ~~Note: Certain limitations on scope of indemnity subject to further discussion.~~

~~16~~ ~~Amount to be equal to $250,000 for SPARTA, and an equivalent percentage of Settlement Amount for other Settling Insurers.  The Indemnity Cost Reserve is a reserve amount provided for each individual Settling Insurer and cannot be aggregated.~~

Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein.

7.2.3   The Settlement Trust and Archdiocese shall support and join in the enforcement of the Injunctions against any Entity seeking to assert an Indemnified Claim; *provided that* if the Insurer Released Party(ies) elect(s) not to enforce the Injunctions in accordance with Section 7.2.1, the Settlement Trust shall (a) seek to enforce the Injunctions against such Entity, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions).

7.2.4   To the extent that a Final Order is entered against any Insurer Released Party with respect to any Indemnified Claim, the Settlement Trust shall indemnify and hold harmless such Insurer Released Party with respect thereto up to the Settlement Amount; *provided that* to the extent the Insurer Released Party(ies) elect not to enforce the Injunctions or defend against the Indemnified Claims, the Settlement Trust's indemnity obligation shall be limited to the amount of the Indemnity Cost Reserve; *provided further* that if the Settlement Trust breaches its obligation set forth in Section 7.2.2 hereof, the Settlement Trust's indemnity obligation shall not be so limited and shall instead be up to the Settlement Amount.  In no event shall the Settlement Trust's indemnity obligation exceed each individual Settling Insurer's Settlement Amount.  To the extent the Settlement Amount has been distributed in accordance with the Plan, the Settlement Trust's indemnification obligation shall be so reduced.

7.2.5   The indemnification provided for herein shall not impose liability on the Settlement Trustee or Settlement Trust professionals for their own acts or omissions; *further*, funds provided for the administration of the Settlement Trust or payment of the Settlement Trustee or Settlement Trust professionals shall not be subject to indemnification claims as provided for herein.

7.3     If any Entity attempts to prosecute a Claim other than any of the claims listed in attached Schedule 4 that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies against the Insurer Released Parties before the Approval Order and Plan Confirmation Order become Final Orders, then promptly following notice to do so from Insurer, the Archdiocese and/or the Additional Debtor(s), as applicable, will file a motion and supporting papers to obtain an order from the Bankruptcy Court pursuant to sections 362 and 105(a) of the Bankruptcy Code protecting the Insurer Released Parties from any such Claims until the Plan Confirmation Order has become a Final Order, the Bankruptcy Case is dismissed, or this Settlement Agreement is terminated under Section 5 hereof.

## 8.     MISCELLANEOUS

8.1     If any action or proceeding of any type whatsoever is commenced or prosecuted by any Entity not a Party to this Settlement Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Settlement Agreement, the Parties mutually agree to cooperate fully in opposing such action or proceeding.

8.2    The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Settlement Agreement and to preserve its validity and enforceability.

8.3    The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Plan Confirmation Order, and the Bankruptcy Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof.

8.4    Notwithstanding any language to the contrary in this Settlement Agreement, under no circumstance will any Archdiocese Signatory Party be obligated to take any action that violates any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, and if a court of competent jurisdiction determines that a term or condition in this Settlement Agreement does violate any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, the applicable Archdiocese Signatory Party shall be relieved of such term or condition, but the scope and finality of the releases, injunctions, and buybacks set forth in this Settlement Agreement shall not be affected or modified.

8.5    This Settlement Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.6    This Settlement Agreement may be modified only by a written amendment signed by all of the Parties, and no waiver of any provision of this Settlement Agreement or of a breach thereof shall be effective unless expressed in a writing signed by the waiving Party.  The waiver by any Party of any of the provisions of this Settlement Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach. Any change or modification of this Agreement that would result in a material adverse change to the rights of the Abuse Claimants or Trust shall require the consent of the Creditors' Committee (if at the time of the proposed change or modification a Trustee has not been appointed) or Settlement Trustee (if at the time of the proposed change or modification a Trustee has been appointed and approved), as applicable, which consent shall not be unreasonably withheld.

8.7    By entering into this Settlement Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Settlement Agreement. No part of this Settlement Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Settlement Agreement.  All actions taken and statements made by the Parties or by their representatives relating to this Settlement Agreement or participation in this Settlement Agreement, including its development and implementation, shall be without prejudice or value as precedent.

8.8    This Settlement Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession regarding liability, culpability, wrongdoing, or insurance coverage.  All related discussions, negotiations, and all prior drafts of this Settlement

Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. Any evidence of the negotiations or discussions associated with this Settlement Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.8, in (i) an action or proceeding to enforce the terms of this Settlement Agreement, including any use as set forth in Section 7.1.1, or (ii) any possible action or proceeding between the Insurer Released Parties and any reinsurers. This Settlement Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Insurer Released Parties' obligations under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer.

8.9     None of the Parties shall make any public statements or disclosures (i) regarding another Party's rationale or motivation for negotiating or entering into this Settlement Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued or determined by agreement or a court of competent jurisdiction to have been issued by the Insurer Released Parties, including handling of or involvement in connection with any claims asserted thereunder.

8.10     Neither this Settlement Agreement nor the rights and obligations set forth in this Settlement Agreement shall be assigned without the prior written consent of the other Parties.

8.11     This Settlement Agreement was jointly drafted by the Parties, and the wording of this Settlement Agreement was reviewed by legal counsel for each of the Parties, and each of them had sufficient opportunity to propose and negotiate changes prior to its execution. The language of all parts of this Settlement Agreement shall in all cases be construed as a whole according to its meaning and not strictly for or against any Party.

8.12     Section titles and headings contained in this Settlement Agreement are included only for ease of reference and shall have no substantive effect.

8.13     All notices, demands, or other communication to be provided pursuant to this Settlement Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other Entity or address as any of them may designate in writing from time to time:

If to the Debtor or Reorganized Debtor:

Mark A. Mintz
Samantha A. Oppenheim
Jones Walker LLP
Telephone: 504-582-8368
Telephone: 504-582-8641
Email: mmintz@joneswalker.com

733

Email: soppenheim@joneswalker.com

        with copies to:

[∗]

~~-and-~~

If to an Archdiocese Signatory Party other than a Debtor Party:

        As set forth on Plan Exhibit B-2.

If to Insurer or the Insurer Released Parties:

Michael Lee
Catholic Mutual Group
Director of Specialty Claims
10843 Old Mill Road
Omaha, NE 68164
mlee@catholicmutual.org

        with copies to:

Everett J. Cygal, Esq.
ArentFox Schiff LLP
~~-and-~~

233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
everett.cygal@afslaw.com

~~-and-~~

If to the Settlement Trust:

Donald C. Massey
Couhig Partners, LLC
1100 Poydras Street, Suite 3250
New Orleans, Louisiana 70163
Telephone: (504) 599-5777
Email: dmassey@couhigpartners.com

with copies to:

Andrew W. Caine
Pachulski, Stang, Ziehl & Jones LLP
10100 Santa Monica Blvd, Suite 1300
Los Angeles, CA 90067
Telephone: 310-277-6910
Email: acaine@pszjlaw.com


-and-


-and-


8.14    This Settlement Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument.  This Settlement Agreement may be executed and delivered by facsimile, e-mail, or other electronic image, which facsimile, e-mail, or other electronic image counterparts shall be deemed to be originals.

8.148.15    Nothing contained in this Settlement Agreement shall be deemed or construed to constitute (i) an admission by the Insurer Released Parties that the Archdiocese Bound Parties, or any other Entity, was or is entitled to any insurance coverage under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by the Insurer Released Parties or as to the validity of any of the positions that have been or could have been asserted by the any of the Archdiocese Bound Parties, (ii) an admission by any of the Archdiocese Bound Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by the Insurer Released Parties or any Claims that have been or could have been asserted by the Archdiocese Bound Parties against the Insurer Released Parties, or (iii) an admission by the Archdiocese Bound Parties or the Insurer Released Parties of any liability whatsoever with respect to any of the Abuse Claims.

8.158.16    The Parties to this Settlement Agreement, all of the Entities included in the definition of "Insurer Released Parties," and the Settlement Trust are intended beneficiaries of this Settlement Agreement.  Except as set forth in the preceding sentence or otherwise set forth in this Settlement Agreement, there are no third-party beneficiaries of this Settlement Agreement.

8.168.17    The Archdiocese Signatory Parties and the Insurer Released Parties shall each be responsible for their own fees and costs incurred in connection with the Bankruptcy Case, this Settlement Agreement, and the implementation of this Settlement Agreement, except as specifically set forth herein (including in Section 7).

8.178.18    The following rules of construction shall apply to this Settlement Agreement:

8.17.18.18.1   Unless the context of this Settlement Agreement otherwise requires:  (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Settlement Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.17.28.18.2   References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Settlement Agreement.

8.17.38.18.3   The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Settlement Agreement when the stated intent is not achieved.

8.188.19   The Bankruptcy Court in the Bankruptcy Case shall retain jurisdiction to interpret and enforce the provisions of this Settlement Agreement, which shall be construed in accordance with Louisiana law without regard to conflicts of law principles thereof.  The Insurer Released Parties do not, by virtue of this Section 8.188.19 or any other provision in this Settlement Agreement, consent to the Bankruptcy Court's jurisdiction as to any other matter.

8.198.20   This Settlement Agreement and each Debtor Party's obligations under this Settlement Agreement shall be binding on each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) and shall survive the entry of the Plan Confirmation Order; *provided, however*, after the occurrence of the Bankruptcy Plan Effective Date, recourse for all obligations, other than those set forth in Sections 6.5, 6.7, and 7 hereof or a remedy of specific performance, shall be to the Settlement Trust; *provided further, however*, if specific performance is not available, each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) may be held liable for an intentional breach of a representation in this Agreement or their bad faith material breach of this Agreement, and if liability on any such ground is established, then recourse may be had directly against the Debtor Party, Reorganized Debtor, and/or Reorganized Additional Debtor(s) responsible.

8.208.21   The obligations of the Parties herein, other than those conditioned upon the Settlement Agreement Effective Date, shall be binding upon execution hereof by the Parties.

8.218.22   Nothing in this Settlement Agreement will prevent Insurer from allocating the Settlement Amount among the Archdiocese Policies at Insurer's discretion.

8.228.23   If any provision of this Settlement Agreement, or the application thereof, shall for any reason or to any extent, be construed to be invalid or unenforceable, the remainder of this Settlement Agreement, and the application of such provision to other circumstances, shall be interpreted so as to best effect the intent of the Parties, unless such determination of invalidity or unenforceability deprives any Party of the substantial benefit of its bargain.

8.238.24    The Parties agree that all matters relating to the negotiation and terms of this Settlement Agreement (including by way of example and not limitation, all prior drafts, exchanges of terms, and related discussions or correspondence) shall be confidential and are not to be disclosed except by order of court or consent of the Parties in writing.  This Section 8.238.24 does not prevent or prohibit the Parties from publicly filing on the docket in the Bankruptcy Case the final, executed copy of this Settlement Agreement.

[*Remainder of Page Intentionally Left Blank*]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed:    _____

_____

Date:    _____

41

737

*[Signatures Continue on Adjacent Pages]*

[Insurer]

**The Catholic Mutual Relief Society of America**

Signed:

_____

Name
 Printed:   _____

Title:   _____

Date:   _____

*[Signatures Continue on Adjacent Pages]*

**All Archdiocese Signatory Parties
Other than the Archdiocese**

Signed:  _____

Name
Printed:  _____

Title:  **Their Authorized Signer Pursuant to
Resolutions** _____

Date:  _____

*[Signatures Continue on Adjacent Pages]*

## SCHEDULE 1 – Catholic Mutual Certificates that are "Archdiocese Policies"

- Certificate Number 8139 (for the term 7/1/89-7/1/90)

- Certificate Number 8554 (initially issued for the 7/1/90-7/1/91 term and annually renewed until the Archdiocese non-renewed effective 7/1/21)

Case 20-10846 Doc 4345-2 Filed 10/27/25 Entered 10/27/25 16:27:53 Plan Suppl Plan
7.1(a) Pt. 6 Schedule 2 Part 2 of 2 Page 46 of 101

## SCHEDULE 2 – Co-Insured Parties[1]

### Other Co-Insureds Known to Diocesan Signatory Parties

NONE

For the avoidance of doubt, the following Entities are bound by the terms of the

Settlement Agreement in addition to the Archdiocese:

### Additional Debtors

**I.**   **Archdiocesan Parishes**

1.   All Saints Roman Catholic Church, New Orleans, Louisiana

2.   Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana

3.   Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana

4.   Assumption of Mary Roman Catholic Church, Avondale, Louisiana

5.   Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana[2]

6.   Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana

7.   Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana

8.   Blessed Trinity Roman Catholic Church, New Orleans, Louisiana

9.   Christ the King Roman Catholic Church, Gretna, Louisiana

10.   Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana

11.   Divine Mercy Roman Catholic Church, Kenner, Louisiana

12.   Good Shepherd Roman Catholic Church, New Orleans, Louisiana

13.   Holy Family Roman Catholic Church, Franklinton, Louisiana

14.   Holy Family Roman Catholic Church, Luling, Louisiana

15.   Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana

16.   Holy Spirit Roman Catholic Church, New Orleans, Louisiana

17.   Immaculate Conception Roman Catholic Church, Marrero, Louisiana

18.   Immaculate Conception Roman Catholic Church, New Orleans, Louisiana

---

[1]   Without limiting Section 6.4 of the Settlement Agreement, Insurer does not concede that any of the Entities listed on this schedule are "insureds," "additional insureds," or "protected persons" under its Archdiocese Policies.

[2]   Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

| 19. | Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana |
| 20. | Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana |
| 21. | Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana, for itself and as successor to St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc. |
| 22. | Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana |
| 23. | Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana |
| 24. | Most Holy Trinity Roman Catholic Church, Covington, Louisiana |
| 25. | Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana |
| 26. | Our Lady of Grace Roman Catholic Church, Reserve, Louisiana |
| 27. | Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana |
| 28. | Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana |
| 29. | Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana |
| 30. | Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana |
| 31. | Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana |
| 32. | Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana |
| 33. | Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana |
| 34. | Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana |
| 35. | Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana |
| 36. | Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana |
| 37. | Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana |
| 38. | Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana |
| 39. | Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana |
| 40. | St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana |
| 41. | St. Agnes Roman Catholic Church, Jefferson, Louisiana |
| 42. | St. Alphonsus Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc. |
| 43. | St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana |
| 44. | St. Angela Merici Roman Catholic Church, Metairie, Louisiana |
| 45. | St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana |
| 46. | St. Anselm Roman Catholic Church, Madisonville, Louisiana |
| 47. | St. Anthony of Bataria Roman Catholic Church, Lafitte, Louisiana |

| | |
|---|---|
| 48. | St. Anthony of Padua Roman Catholic Church, Luling, Louisiana |
| 49. | St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana |
| 50. | St. Anthony Roman Catholic Church, Gretna, Louisiana |
| 51. | St. Augustine Roman Catholic Church, New Orleans, Louisiana |
| 52. | St. Benedict Roman Catholic Church, Covington, Louisiana |
| 53. | St. Benilde Roman Catholic Church, Metairie, Louisiana |
| 54. | St. Bernard Roman Catholic Church, St. Bernard, Louisiana |
| 55. | St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana |
| 56. | St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana |
| 57. | St. Christopher Roman Catholic Church, Metairie, Louisiana |
| 58. | St. Clement of Rome Roman Catholic Church, Metairie, Louisiana |
| 59. | St. Cletus Roman Catholic Church, Gretna, Louisiana |
| 60. | St. David Roman Catholic Church, New Orleans, Louisiana |
| 61. | St. Dominic's Roman Catholic Church, New Orleans, Louisiana |
| 62. | St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana |
| 63. | St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana |
| 64. | St. Francis Xavier Roman Catholic Church, Metairie, Louisiana |
| 65. | St. Genevieve Roman Catholic Church, Slidell, Louisiana |
| 66. | St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana |
| 67. | St. Jerome Roman Catholic Church, Kenner, Louisiana |
| 68. | St. Joachim Roman Catholic Church, Marrero, Louisiana |
| 69. | St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana |
| 70. | St. John of the Cross Roman Catholic Church, Lacombe, Louisiana |
| 71. | St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, for itself and as successor to St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc. |
| 72. | St. John the Baptist Roman Catholic Church, Edgard, Louisiana |
| 73. | St. John the Baptist Roman Catholic Church, Folsom, Louisiana |
| 74. | St. Joseph Roman Catholic Church, Algiers, Louisiana |
| 75. | St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana |
| 76. | St. Joseph's Roman Catholic Church, Gretna, Louisiana |
| 77. | St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, for itself and |

as successor to Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc.

78.     St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana

79.     St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana

80.     St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana

81.     St. Margaret Mary Roman Catholic Church, Slidell, Louisiana

82.     St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana

83.     St. Mark Roman Catholic Church, Ama, Louisiana

84.     St. Martha Roman Catholic Church, Harvey, Louisiana

85.     St. Martin de Porres Roman Catholic Church, New Orleans, formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc.

86.     St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana

87.     St. Mary's Roman Catholic Church, New Orleans, Louisiana

88.     St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana

89.     St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St. John the Baptist Roman Catholic Church, Paradis, Louisiana, for itself and as successor to St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc.

90.     St. Patrick's Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

91.     St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana

92.     St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana

93.     St. Peter Claver Roman Catholic Church, New Orleans, Louisiana

94.     St. Peter Roman Catholic Church, Reserve, Louisiana, for itself and as successor to St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc.

95.     St. Peter's Roman Catholic Church, Covington, Louisiana

96.     St. Philip Neri Roman Catholic Church, Metairie, Louisiana

97.     St. Pius X Roman Catholic Church, New Orleans, Louisiana

98.     St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana

99.     St. Rita Roman Catholic Church, Harahan, Louisiana

100.    St. Rita Roman Catholic Church, New Orleans, Louisiana

101.   St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana[3]

102.   Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana

103.   The Congregation of St. Rita Roman Catholic Church of Harahan

104.   The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana


**II.    Suppressed Archdiocesan Parishes[4]**

1.   Blessed Sacrament, Inc.

2.   Epiphany, Inc.

3.   Immaculate Heart of Mary, Inc.

4.   Incarnate Word, Inc.

5.   Our Lady of Good Counsel, Inc.

6.   Our Lady of Good Harbor, Inc.

7.   Our Lady of Lourdes, New Orleans, Louisiana, Inc.

8.   Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.

9.   Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana

10.   St. Ann, New Orleans, Louisiana, Inc.

11.   St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana

---

[3] As stated in footnote 2, Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

[4] The Suppressed Archdiocesan Parishes no longer operate as separate church parishes. The Suppressed Archdiocesan Parishes were not dissolved, and may own property.

Following Hurricane Katrina, the operations of certain of the Suppressed Archdiocesan Parishes were combined with Archdiocesan Parishes. In 2024, in the ongoing aftermath of Hurricane Ida and a result of storm damage, the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental statistics, and financial difficulties encountered, the following additional Suppressed Archdiocesan Parishes were canonically merged with neighboring Archdiocesan Parishes: (a) St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc., was canonically merged into St. Peter Roman Catholic Church, Reserve, Louisiana; (b) (i) St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and (ii) St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc., were both canonically merged into Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, now known as St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana; (c) St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc., was canonically merged into St. Rosalie Roman Catholic Church, Harvey, Louisiana, now known as Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana; (d) St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc., was canonically merged into Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, now known as St. John Paul II Roman Catholic Church, Waggaman, Louisiana; (e) St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc., was canonically merged into St. John the Baptist Roman Catholic Church, Paradis, Louisiana, now known as St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana; (f) Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc., was canonically merged into St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, now known as St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana; and (g) St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc., had its canonical territory divided so that (i) the area north of the Pontchartrain Expressway was canonically merged into St. Patrick's Roman Catholic Church, New Orleans, Louisiana, and (ii) the area south of the Pontchartrain Expressway was canonically merged into St. Alphonsus Roman Catholic Church, New Orleans, Louisiana.

12.   St. Frances Xavier Cabrini, Inc.

13.   St. Francis de Salles, Inc.

14.   St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana

15.   St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana

16.   St. Henry's, Inc.

17.   St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana

18.   St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana

19.   St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana

20.   St. John the Baptist, New Orleans, Louisiana, Inc.

21.   St. Julian Eymard, Inc.

22.   St. Lawrence the Martyr, Inc.

23.   St. Louise de Marillac, Inc.

24.   St. Maurice, Inc.

25.   St. Monica, Inc.

26.   St. Philip the Apostle, Inc.

27.   St. Raymond's, Inc.

28.   St. Rose of Lima, Inc.

29.   St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana

30.   St. Theresa of the Child Jesus, Inc.

31.   The Congregation of Saints Peter and Paul Roman Catholic Church

32.   The Congregation of St. Cecelia Roman Catholic Church

33.   The Congregation of the Annunciation Roman Catholic Church

34.   The Congregation of the Holy Trinity Roman Catholic Church


III.   **Archdiocesan Agencies**

1.   Archdiocesan Spirituality Center

2.   Catholic Charities Archdiocese of New Orleans

3.   Catholic Charities Children's Day Care Centers

747

4.      Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)

5.      Clarion Herald Publishing Company

6.      Korean Catholic Community of New Orleans, Inc.

7.      Notre Dame Seminary

8.      Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana

9.      Pace Greater New Orleans

10.     Padua House (merged into Catholic Charities Archdiocese of New Orleans)

11.     Philmat, Inc.

12.     Project Lazarus

13.     Roman Catholic Center of Jesus the Lord

14.     School Food and Nutrition Services of New Orleans, Inc.

15.     Second Harvest Food Bank of Greater New Orleans and Acadiana

16.     St. Jude Community Center, Inc.

17.     St. Michael Special School

18.     St. Thérèse Catholic Academy

19.     The Society for the Propagation of the Faith, Archdiocese of New Orleans


**IV.      Non-Debtor Catholic Entities**


**Archdiocesan Agencies**


1.      7887 Walmsley, Inc.

2.      Annunciation Inn, Inc.

3.      Archdiocese of New Orleans Indemnity, Inc.

4.      Aspiring Scholars

5.      Catholic Community Foundation Archdiocese of New Orleans

6.      Christopher Homes, Inc.

7.      Christopher Inn

8.      Dubourg Home

9.      Holy Redeemer Catholic Virtual Academy

10.     Holy Trinity Drive Land Corporation

11.     Iberia Investment Fund II, LLC

| 12. | Metairie III |
| 13. | Metairie Manor |
| 14. | Monsignor Wynhoven Apartments, Inc. |
| 15. | Nazareth II |
| 16. | Nazareth Manor |
| 17. | New Orleans Archdiocesan Cemeteries |
| 18. | Notre Dame Health System (f/k/a Chateau de Notre Dame) |
| 19. | Rouquette III |
| 20. | St. Anthony's Gardens |
| 21. | St. Bernard II |
| 22. | St. Bernard III |
| 23. | St. Bernard Manor |
| 24. | St. Martin's Manor, Inc. |
| 25. | St. Tammany Catholic Cemetery |
| 26. | St. Tammany Manor |
| 27. | The Apartments at Mater Dolorosa |
| 28. | The Mental Health Association Development Corporation |
| 29. | Villa Additions, doing business as St. Teresa's Villa |
| 30. | Villa St. Maurice, Inc. |

749

## SCHEDULE 3 – Additional Notice Parties

**The Redemptorists/Denver Province**
1633 North Cleveland Avenue
Chicago, IL 60614

**Dominican Province of St. Albert the Great**
1910 S. Ashland Avenue
Chicago, Illinois, 60608-2905

**Congregation of Holy Cross**
P.O. Box 1064
Notre Dame, IN 46556-0541

**St. Elio Roman Catholic Church**
1335 Bayou Dularge Road
Theriot, LA 70397

**Central Catholic High School**
2100 Cedar Street, Unit 1
Morgan City, LA 70380

**Edward Douglas White Catholic High School**
555 Cardinal Drive
Thibodaux, LA 70301

**Chinchuba Institute for the Deaf**
2929 Carrollton
New Orleans, LA 70118

and

1231 Prytania St.
New Orleans, LA 70130

**St. Scholastica Academy**
122 South Massachusetts St.
Covington, Louisiana 70433

**Hope Haven – Madonna Manor**
1231 Prytania
New Orleans LA  70130

7887 Walmsley Ave.
New Orleans, LA 70125

2929 Carrollton
New Orleans, LA  70118

**Holy Cross College, Inc.**
Attn Remy Donnelly
5500 Paris Ave.
New Orleans, LA  70122

**Tulane Catholic**
1037 Audubon St
New Orleans, LA 70118

**University of New Orleans**
2000 Lakeshore Drive
New Orleans, LA 70148

**Our Lady of Peace Catholic Church**
13281 LA-644
South Vacherie, LA 70090

**St. Lucy Child Development Center**
1220 Aycock St
Houma, LA 70360

**St. Augustine High School, Inc.**
c/o Alfred Harrell, III
2600 A.P. Tureaud Ave
New Orleans LA 70119

**St. Joseph's Society of the Sacred Heart**
P.O. Box 65010
Baltimore, MD 21209

**The Community of the Sisters of the Immaculate Conception**
c/o Melanie Baglow
6208 Ithaca Street
Metairie, LA  70003

**Sisters of Mount Carmel**
**Generalate Office**
21388 Smith Road
Covington, LA 70435-6349

**Daughters of St. Paul**
50 St. Paul's Ave.
Jamaica Plain, MA  02130

and

c/o Mary Martha Moss
4403 Veterans Blvd.
Metairie, LA  70006

Crescent City Convent Corporation
210 Baronne St.
New Orleans, LA  70112

**Holy Rosary Academy High School**
2437 Jena St
New Orleans, LA 70115

**St. Brigid Parish**
7887 Walmsey Avenue
New Orleans, LA 70125

**Prince of Peace Parish**
7887 Walmsey Avenue
New Orleans, LA 70125

**St. Nicholas of Myra Mission**
9701 Hammond St
New Orleans, LA 70127

**Infant Jesus of Prague Mission**
c/o St. Martha Parish
2555 Apollo Drive
Harvey, LA 70058

**Catholic Youth Ministry**
1007 Airline Park Blvd
Metaire, LA 70003

**Family Life Apostolate**
7887 Walmsey Avenue
New Orleans, LA 70125

**Ozanam Inn Inc**
P.O. Box 30565
New Orleans, LA 70190

**Gayle & Tom Benson House of Priestly Formation**
2925 South Carrolton
New Orleans, LA 70118

**Stella Maris Maritime Center**
7887 Walmsey Avenue
New Orleans, LA 70125

**Camp Abbey**
CYO Youth Office
1007 Airline Park Blvd
Metaire, LA 70003

**St. Therese Academy**
917 N. Atlanta St
Metaire, LA 70003

**Our Lady of Guadalupe Parish**
411 North Rampart Street
New Orleans, LA 70112

**Lyric Realty and Parking Company, Inc.**
c/o Kenneth D. Boudreaux
1115 Tallowtree Dr.
Mandeville, LA  70448

**Sacred Heart of Jesus Catholic Church**
1111 Highway 55
PO Box 2
Montegut, LA 70377

**Diocese of Houma Thibodaux**
P.O. Box 505
Schriever, LA

**Diocese of Baton Rouge**
Post Office Box 2028
Baton Rouge, Louisiana 70821-2028

**Vandebilt Catholic High School**
209 South Hollywood Road
Houma, LA 70360

**General Services Administration**
1800 F St., NW
Washington, DC 20405

4

**People For Teens of St. Anthony of Padua Corporation**
4700 Cleveland
New Orleans, LA  70119

**Society of the Sacred Heart**
4120 Forest Park Avenue
St. Louis, MO 63108

**Seminarians Parents Association, Inc.**
718 Wood St
Houma, La 70360

**Society of the Divine Word**
PO Box 6038
Techny, IL 60082

**Ursuline Sisters of the Roman Union, Central Province,**
353 South Sappington
St. Louis, MO 63122

**Salesians of Don Bosco, Eastern Province**
in the USA d/b/a Salesian Society, Inc.
Through its agent for service of process:
Rev. Louis Molinelli, SDB
1000 Barataria Boulevard
Marrero, LA 70072

And

Rev. Louis Molinelli, S.D.B.
1000 Salesian Lane
Marrero, LA 70072

## SCHEDULE 4
### Bodily Injury or Personal Injury Claimants Within Catholic Mutual Preserved Coverage

| |
|---|
| MIKKAL PETERSON |
| JO ANN REDMOND WADE |
| GINO CAMINITA |
| LAUREN THEOBOLD |
| BEOLIA MARTIN |
| WARREN DEEMER |
| MELISSA BLUNT |
| TINA GUIDRY JOHNSON |
| MERLE NOULLET |
| KENDRA LAFRANCE |
| TONY MIGLIORE |
| PAMELA MIGLIORE |
| MICAYLA BROWN |
| FATHER KENNETH HAMILTON |
| PATSY PERKINS |
| ANGEL CARDONA |
| LA Fair Housing Action Center, Inc. |
| CARRIE KINARD |
| CCANO-PACE GREATER NEW ORLEANS |

**Schedule 5**

**[Form of Corporate Resolutions]**

## CORPORATE RESOLUTION

## RESOLUTION OF THE MEMBERSHIP AND BOARD OF DIRECTORS OF [NAME], [ADDRESS], A LOUISIANA NON-PROFIT [CORPORATION][LIMITED LIABILITY COMPANY (hereinafter this "Corporation").

BE IT RESOLVED, that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation, are hereby authorized to transact on behalf of this Corporation any and all business related to the following:

1. Engaging 1793 Group, a Louisiana non-profit corporation, on terms and conditions deemed appropriate in their sole discretion, to assist with and administer on this Corporation's behalf, any and all matters in which this Corporation may have an interest in relation to a Plan of Reorganization filed or anticipated to be filed by The Roman Catholic Church of the Archdiocese of New Orleans in proceedings commenced under Chapter 11 of the Bankruptcy Code, captioned *In re The Roman Catholic Church of the Archdiocese of New Orleans*, Case No. 20-10846 (Bankr. E.D. La.) (the "Chapter 11 Case"), including, but not limited to, preparing and filing a petition in the Chapter 11 Case seeking relief under Chapter 11 of the United States Bankruptcy Code as an additional debtor, executing any and all documents necessary for this Corporation to file for relief in the Chapter 11 Case, executing on behalf of this Corporation all documents required to comply with the requirements imposed upon parties filing for relief under Chapter 11of the Bankruptcy Code, Bankruptcy Rules, Local Rules for the Eastern District of Louisiana and/or the requirement imposed by the United States Trustee.

2. Engaging the firm of Heller Draper and/or any other attorneys to represent this Corporation in actions or proceedings related to the Chapter 11 Case.

3. Engaging accountants, financial advisors, and any other professionals necessary to administer the Chapter 11 Case on behalf of this Corporation.

4. Making decisions with regard to the payment of fees and costs for which this Corporation may become responsible to pay in the Chapter 11 Case.

5. Making decisions with regard to the filing of any plan within the Chapter 11 case, provided that such shall contain terms and provisions consistent with those set forth in Appendix "A" attached hereto and incorporated herein by this reference.
FURTHER RESOLVED that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation with the power of substitution, is authorized to execute and deliver on behalf of this Corporation each and every Insurance Settlement Agreement with the Settling Insurers, as those terms are defined in the Fourth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of September 23, 2025 (the "Plan"), and any amendment or modification to the Plan, including, without limitation, the documents attached or referred to in Plan Supplement 7.1(a), any Bill of Sale required under such Insurance Settlement Agreements,

and any other documents reasonably requested by any such Settling Insurer to effectuate the transactions provided for in its Insurance Settlement Agreement or the Plan.

FURTHER GIVING AND GRANTING unto either Very Rev. Patrick Carr or Rev. Leon Poche, full power and authority to sign any and all documents and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER GIVING AND GRANTING unto Very Rev. Peter Akpoghiran or any other officer of the Corporation, full power and authority to certify the passage and effectiveness of this Resolution to the Settling Insurers and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER RATIFYING AND CONFIRMING all that either Very Rev. Patrick Carr or Rev. Leon Poche, in his said capacity may do or cause to be done in the premises.

I, the undersigned President of this Corporation do hereby certify that the above and foregoing is a true and correct copy of a resolution adopted by the Membership and Board of Directors of said corporation in conformity with the Articles of Incorporation and Louisiana law, and that said resolution remains in full force and effect and has not been amended or rescinded.

WITNESS MY HAND AND SEAL, effective this _____ day of _____, 2025

_____
Very Reverend Patrick J. Williams, V.G.

ATTEST

_____
Dirk Wild, Director

**Schedule 6**

**[Form of Incumbency Certificates]**

*Filing Version 7/29/2025*

## INCUMBENCY CERTIFICATE

 I, **Very Rev. Peter Akpoghiran, J.C.D**., the duly elected, qualified, and acting **Vice President of each of the Louisiana nonprofit corporations or limited liability companies listed on Exhibit A** attached hereto (each, a "Corporation," and collectively, the "Corporations"), do hereby certify as follows:

1.  That the person named below has been duly elected or appointed and is the qualified and acting officer of each of the Corporations holding the office set forth opposite his/her name.

    **NAME**                                    **TITLE**

    **Very Rev. Patrick J. Williams, V.G.**      **President and Director**

2.  That the foregoing person is duly authorized to act on behalf of each Corporation in such capacity and to exercise the powers and perform the duties incident to said office under the respective Articles of Incorporation and Bylaws of each Corporation.

3.  That attached hereto as **Exhibit B** is a true and correct copy of a resolution adopted at a duly noticed special meeting by the sole member of each of the Corporations and all of the Board of Directors of each said Corporation in attendance at such meeting in conformity with such Articles of Incorporation and Louisiana law and that said resolution remains in full force and effect and has not been amended or rescinded.

    IN WITNESS WHEREOF, I have hereunto set my hand as Vice President of each of the

Corporations as of this _____ day of October, 2025.

_____
Very Rev. Peter Akpoghiran, J.C.D
Vice President of Each Corporation
(See Attached Exhibit A)

State of Louisiana
Parish of Orleans

On this _____ day of October, 2025, before me, the undersigned Notary Public, personally appeared **Very Rev. Peter Akpoghiran, J.C.D.,** who acknowledged that he/she executed the foregoing instrument for the purposes therein contained and in the capacity therein stated.

Notary Public
Printed Name: _____
Notary ID or Bar Roll No.: _____
My Commission Expires: _____

AFSDOCS:303317248.5

2

| Summary report: Litera Compare for Word 11.7.0.54 Document comparison done on 10/24/2025 8:59:26 AM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** C:\Users\mfisher\OneDrive - ArentFox Schiff LLP\Desktop\ANOLA\25 10 23 - Template ADNO Documents (10.23)\ADNO Documents (10.23)\Filing Versions\ADNO - Insurer Model Settlement Agreement FINAL 4922-4535-1762 65.docx | |
| **Modified filename:** C:\Users\mfisher\OneDrive - ArentFox Schiff LLP\Desktop\ANOLA\25 10 23 - Template ADNO Documents (10.23)\ADNO Documents (10.23)\Filing Versions\25 10 24 - As Filed - CM Insurance Settlement Agreement & Schedules.docx | |
| **Changes:** | |
| Add | 680 |
| Delete | 241 |
| Move From | 7 |
| Move To | 7 |
| Table Insert | 1 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 936 |

~~Exhibit~~

~~Form of Proposed Order~~

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-10846 (MSG) |
| | § | |
| | § | |
| THE ROMAN CATHOLIC CHURCH | § | CHAPTER 11 |
| OF THE ARCHDIOCESE OF NEW | § | |
| ORLEANS, *et al.*,[1] | § | SECTION A |
| | § | |
| DEBTORS. | § | COMPLEX CASE |
| | § | |
| | § | |

**ORDER (I) APPROVING [●]'S THE CATHOLIC MUTUAL RELIEF SOCIETY OF AMERICA'S SETTLEMENT AGREEMENT, RELEASE AND BUYBACK, (II) APPROVING THE SALE OF THE ARCHDIOCESE POLICIES FREE AND CLEAR, (III) ENJOINING CLAIMS, AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated July 29, 2025 [D.E. 4181] and supplemented by the filing of the Settlement Agreement (as defined below) on October 27, 2025 [D.E.[∗]] ("Approval Motion") of The Roman Catholic Church of the Archdiocese of New Orleans, the lead debtor and debtor-in-possession (the "Debtor" or "Archdiocese") and the other debtors and debtors-in-possession[2] (the "Additional Debtors" and, together with the Archdiocese, the "Debtor Parties") in the above-captioned chapter 11 cases, by and through their respective counsel, for entry of an order (this "Order") approving the settlement agreement, releases, insurance policy buyback, and related injunction-in-aid ("Settlement") by and among the Archdiocese, the Additional Debtors, the other Archdiocese Signatory Parties, the Creditors' Committee, and [●][3] The Catholic Mutual Relief Society of America ("Insurer" and, collectively

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtors' the Debtor's federal tax identification number, are: [●] 8966.

[2] In connection with the Plan, the Catholic Entities listed on Plan Exhibit B-1 (the **"Additional Debtors"**) filed individual chapter 11 cases. The Plan is a combined joint Plan for the Archdiocese and the Additional Debtors, and the Approval Motion is deemed to have been filed (and this Order is entered) in each Additional Debtor's bankruptcy case for purposes of the relief requested herein.

[3] [This Order is the proposed form of order for the Settling Insurers. The Debtor Parties will file proposed orders for each Settling Insurer prior to the Sale Hearing.]

with the foregoing, the "<u>Parties</u>"), pursuant to Sections 105(a) and 363 of Title 11 of the United States Code ("<u>Bankruptcy Code</u>") and Rules 2002(a)(2), 6004, and 9019 of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>"), in each case as described in the Approval Motion and the *Settlement Agreement, Release, and Policy Buyback* attached to this Order as **<u>Exhibit 1</u>**[4] (the "<u>Settlement Agreement</u>");[~~5~~3] and the Bankruptcy Court having reviewed the Approval Motion and the Settlement Agreement; and it appearing that due and adequate notice of the Approval Motion and Settlement Agreement having been given to all Entities entitled thereto, and that no other or further notice need be given; and the Bankruptcy Court on <u>November 17</u>, 2025 at ~~[[ ] AM/PM]~~<u>9:00 AM</u> having held a hearing (the "<u>Sale Hearing</u>") to consider the relief requested in the Approval Motion; and upon the record of the Sale Hearing; and, after due deliberation, including, without limitation, for the reasons stated by the Bankruptcy Court on the record of the Sale Hearing, it appearing that the relief requested in the Approval Motion and granted herein is in the best interests of the Debtor Parties' estates (the "<u>Estates</u>"), their creditors, and other parties in interest; and good sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

    A.    This Bankruptcy Court has jurisdiction over the Approval Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of this case and the Approval Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

[4] ~~[The form of Settlement Agreement is attached as~~ **~~Exhibit 1~~** ~~to this Order. Prior to the hearing on the Approval Motion, the Debtor Parties will file the proposed Settlement Agreement for each Settling Insurer.]~~

[~~5~~3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

B.    The statutory predicates for the relief sought in the Approval Motion are Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007. 9008 and 9019, and Rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Louisiana.

C.    It is necessary and appropriate for the Bankruptcy Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Settlement Agreement, and to adjudicate, if necessary, to the extent provided under 28 U.S.C. § 1334(b), any and all disputes arising from or relating to the Settlement Agreement or this Order.

D.    Proper, timely, adequate and sufficient notice of the Sale Hearing and Approval Motion and the relief requested therein, including, without limitation, the Settlement and the transactions described in the Settlement Agreement, including, without limitation, issuance of the injunction-in-aid referenced in the Settlement Agreement and the Approval Motion (all such transactions being collectively referred to, for convenience, as the "Sale Transaction") has been provided by the Debtor Parties in accordance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules to all interested Entities, including, without limitation the parties listed on **Schedule 3** of the Settlement Agreement, through service of the Confirmation Hearing Notice (as defined in the Plan) in accordance with the Disclosure Statement Order (also as defined in the Plan).

E.    Notice of the Approval Motion was ~~duly published as follows: [     ]~~provided through publication of the Additional Debtors' Abuse Claims Bar Date Publication Notice (**Plan Exhibit G**) in daily and community newspapers throughout Louisiana.

F.    The notices described above were good, sufficient, and appropriate under the circumstances, and no other notice of the Approval Motion or Sale Hearing is required.

3

G.     The disclosures made by the Debtor Parties concerning the Settlement Agreement, the Sale Transaction, and the Sale Hearing were good, complete, and adequate.

H.     [The Unknown Abuse Claims Representative has consented to, and approved of the Settlement Agreement and Sale Transaction on behalf of Unknown Abuse Claims in connection with the treatment of such Claims under the Plan.][6]

I.     A reasonable opportunity to object or be heard with respect to the Approval Motion and the relief requested therein has been afforded to all interested Entities.

J.     The Archdiocese Signatory Parties, on their own behalf and on behalf of the Archdiocese Bound Parties, as applicable, have duly executed the Insurance Settlement Agreement by their duly authorized representative, agent and/or attorney in fact, and have full corporate power and authority to consummate the Sale Transaction pursuant to the Settlement Agreement and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Settlement Agreement, are required for the Archdiocese Bound Parties to consummate the Sale Transaction.

K.     The Debtor Parties have demonstrated (i) good, sufficient, and sound business purpose and justification and compelling circumstances for the Sale Transaction pursuant to Section 363(b) of the Bankruptcy Code and (ii) that the Sale Transaction is fair, reasonable, and in the best interests of their Estates and creditors pursuant to Bankruptcy Rule 9019. Among other things, the Debtor Parties have demonstrated that: the Settlement Agreement, and closing thereon, is necessary and appropriate to realize the value of the Purchased Property (as defined below) and maximize the value of their Estates; the probability of success for their Estates in

---

[6]     [To confirm consent and approval by the Unknown Abuse Claims Representative.]

litigation over the matters resolved by the Settlement Agreement is uncertain; litigation of the matters resolved by the Settlement Agreement would be complex and costly to their Estates; and the Settlement Amount is within the reasonable range of potential litigation outcomes. As used herein, "Purchased Property" means, collectively, all right, title and interest (including "Interests" as defined below) in and to the Archdiocese Policies issued by Insurer and the Related Insurance Claims and Coverage Claims of the Archdiocese Bound Parties; [Intentionally Omitted.][7]; *provided that* the Purchased Property does not include Insurer's obligations under Certificate No. 8554 issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the bodily injury or personal injury claims listed in Schedule 4 attached to the Settlement Agreement, in each case, subject to the limits, declarations, terms and conditions of such certificate (the "Preserved Coverage"), and *provided further that* the Preserved Coverage does not include coverage for any and all Abuse Claims or for any and all other Barred Claims. The Sale Transaction constitutes a reasonable and sound exercise of the Debtor Parties' business judgment and their powers and duties under applicable law and should be approved. Approval of the Settlement Agreement and consummation of the Sale Transaction are in the best interests of the Debtor Parties' Estates, their creditors (specifically including the Abuse Claimants of the Debtor Parties), and other

---

[7] Intentionally omitted, except the Order approving the Catholic Mutual Settlement Agreement, in which this section will provide:

". . . *provided that* the Purchased Property does not include Insurer's obligations under the Certificate No. [•] issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the personal injury claims listed in Schedule [X] attached to the Settlement Agreement, in each case, subject to the limits, declarations, terms and conditions of such certificate (the "Preserved Coverage"), and *provided further that* the Preserved Coverage does not include coverage for any and all Abuse Claims or other Barred Claims."

5

parties-in-interest, including because the proceeds of and from the Sale Transaction will benefit Abuse Claimants.

  L.  The Settlement Agreement was negotiated, proposed, and entered into without collusion, in good faith, and from arm's length bargaining positions. Without limiting the foregoing, the Settlement Agreement resulted from a lengthy mediation that proceeded pursuant to a prior order of the Bankruptcy Court. Insurer is not an "insider" or "affiliate" (as those terms are defined in the Bankruptcy Code) of any of the Debtor Parties. None of the Archdiocese Bound Parties or Insurer have engaged in any conduct that would: (i) cause or permit the avoidance of the Settlement Agreement or the consummation of the Sale Transaction under Section 363(n) of the Bankruptcy Code; (ii) cause or permit the imposition of any costs or damages (including without limitation attorneys' fees or punitive damages) under Section 363(n) of the Bankruptcy Code; or (iii) prevent the application of Section 363(m) of the Bankruptcy Code. The releases, injunctions, policy buyback, and all other components of the Sale Transaction comply with the Bankruptcy Code and all applicable non-bankruptcy law.

  M.  Pursuant to the Settlement Agreement and to the maximum extent permitted by applicable law, and except with respect to Preserved Coverage, the Non-Debtor Catholic Entities and Insurer have consented to the assignment of the Non-Debtor Catholic Entities' Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under the Settlement Agreement, pursuant to sections 363,

6

769

1123, and/or 1141 of the Bankruptcy Code, free and clear of all Interests of any Entity in such Archdiocese Policies (the "Non-Debtor Catholic Entity Policy Sale").

N.      Insurer is a good faith purchaser of the Purchased Property under Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, in that, among other things: (i) all payments to be made by or to Insurer, and other agreements or arrangements entered into by Insurer, including without limitation any escrow agreement pertaining to the payment of the Settlement Amount, in connection with the Sale Transaction have been disclosed; (ii) Insurer neither induced nor caused the Debtor Parties' chapter 11 filings; (iii) the negotiation and execution of the Settlement Agreement and any other agreements or instruments related thereto was in good faith, the arm's length transaction between Insurer and the other Parties was the product of mediation, and all Parties to the Settlement Agreement were, or had the opportunity to be, represented by counsel; and (iv) Insurer has not violated Section 363(n) of the Bankruptcy Code by any action or inaction. Insurer has at all times acted in good faith with respect to the Settlement Agreement and will continue to be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale Transaction.

O.      The terms and conditions of the Settlement Agreement are fair and reasonable. The Settlement Amount provided by Insurer pursuant to the Settlement Agreement (i) is fair and reasonable; (ii) monetizes the Purchased Property at the highest and best amount; (iii) will provide a higher and more certain recovery for the Debtor Parties' creditors than would be provided by any other practical available alternative given the complexity, cost, and uncertainty of such alternatives; (iv) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (v) constitutes reasonably equivalent value (as defined in Section 548 of the Bankruptcy Code) and

fair consideration under the Bankruptcy Code and applicable non-bankruptcy law. The Settlement Amount is within the reasonable range of potential litigation outcomes, and the Debtor Parties' determination to accept the Settlement Amount and otherwise enter into the Settlement Agreement is a valid and sound exercise of their business judgment and consistent with the Debtor Parties' fiduciary duties.  The releases to be made pursuant to the Settlement Agreement, including without limitation the releases of the Archdiocese Bound Parties and the Insurer Released Parties, are appropriate and should be approved.

P.      Insurer: (i) is not a mere continuation of any of the Archdiocese Bound Parties or the Estate of any of the Debtor Parties, nor is there any continuity of enterprise between Insurer and the Debtor Parties or Insurer and any of the other Archdiocese Bound Parties; (ii) is not holding itself out to the public as a continuation of any of the Archdiocese Bound Parties; and (iii) is not a successor to the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties for any purpose, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of Insurer and any of the Archdiocese Bound Parties.

Q.      The Settlement Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither Insurer nor any of the Archdiocese Bound Parties are fraudulently entering into the Sale Transaction.

R.      The transfer of the Purchased Property to Insurer (i) does not constitute an avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law and (ii) does not and will not subject Insurer to any liability whatsoever with respect to the Debtor Parties' operation prior to the closing of the Sale Transaction (i.e., the occurrence of both the Settlement Agreement Effective Date and payment[84] of the Settlement

—————————————
[84]  For the avoidance of doubt, all references to payment ~~or delivery~~ of the Settlement Amount by Insurer herein shall encompass all transfers of the Settlement Amount contemplated by the Settlement Agreement,

8

Amount by Insurer to the Settlement Trust or Escrow Agent pursuant to the terms of Insurer's Settlement Agreement) (the "Closing").

S.      Insurer has agreed to purchase the Purchased Property pursuant to its Settlement Agreement and this Order; Insurer has not agreed to purchase, and is not purchasing, any other assets of the Estate of any of the Debtor Parties. Insurer has not agreed to assume, and after Closing shall have no obligations with respect to, any liabilities of the Archdiocese Bound Parties. Without limiting the generality of the foregoing, Insurer: (i) is not assuming and shall have no liability for any Claims arising from or relating to Abuse, the Purchased Property, or the Bankruptcy Case; and (ii) is not assuming and shall have no liability with respect to the Archdiocese's or any other Archdiocese Bound Party's obligations to Abuse Claimants, any other creditors, future claimants (including without limitation Unknown Abuse Claimants), or the Archdiocese's or any Archdiocese Bound Party's employees, in each case, by reason of the purchase of the Purchased Property under the Settlement Agreement.

T.      The Purchased Property constitutes property of the Debtor Parties' Estates, and the Archdiocese Bound Parties are the lawful owner of the Purchased Property and hold good title thereto. The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement will be a legal, valid, binding, and effective transfer of the Purchased Property, and will vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property, in each case free and clear of all Interests (as defined below, including, without limitation, any Interests of the Archdiocese Bound Parties, Abuse Claimants, and holders of Direct Action Claims). Upon Closing, Insurer shall have no liability

---

herein shall encompass all transfers of the Settlement Amount contemplated by the Settlement Agreement, including without limitation funding and transfer of funds to the Settlement Trust via letters of credit or escrow accounts.

for any Claims against or liabilities of the Debtor Parties, their Estates, or the other Archdiocese Bound Parties. Without limiting any of the foregoing, the Archdiocese, the Archdiocese Signatory Parties, and Insurer have agreed that, upon Closing: (i) the Purchased Property shall be deemed void *ab initio*, terminated, extinguished, and of no further force and effect; and (ii) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

U.      Pursuant to §§ 363(f) and 105(a) of the Bankruptcy Code, and subject to the terms and conditions set forth in the Settlement Agreement, and upon Closing, without the need for further action, the Debtor Parties shall be deemed to have sold, transferred and conveyed the Purchased Property to the Insurer, and the Insurer shall be deemed to have purchased from the Debtor Parties, all right title and interest in and under the Purchased Property, free and clear of all "Interests" of any Entity of any kind or nature whatsoever, to the fullest extent permitted under §§ 363(b) and (f) of the Bankruptcy Code, with such "Interests" including: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese

10

773

Bound Parties and any and all Claims, Subject Interests, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by

11

whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property. Without limiting the generality of the foregoing and without finding that any Entity has any Interest in the Archdiocese Policies: (i) any Entity with Interests (if any) in or with respect to the Purchased Property who did not object, or who withdrew their objections to the Sale Transaction or the Approval Motion have waived their right to object to the sale of the Purchased Property free and clear of such Entity's Interests in the Purchased Property pursuant to Section 363(f)(2) of the Bankruptcy Code; and (ii) any such Entity with Interests in or with respect to the Purchased Property who objected to the Approval Motion and did not withdraw any such objection (a) are the holders of Interests subject to *bona fide* dispute under Bankruptcy Code Section 363(f)(4) and/or (b) can be compelled to accept a monetary satisfaction of their Interests within the meaning of Section 363(f)(5) of the Bankruptcy Code.

V.     If the sale of the Purchased Property were not free and clear of all Interests, including without limitation all Abuse Claims, Direct Action Claims, and Coverage Claims, or if the Insurer Released Parties would, or in the future could, be liable for any of the Interests, Insurer would not have entered into the Settlement Agreement and would not consummate the Sale Transaction or pay the Settlement Amount, thus adversely affecting the Debtor Parties, their Estates, and their creditors (including, without limitation, the Abuse Claimants), as well as the other Archdiocese Bound Parties.

W.     Issuing a supplemental injunction under Section 105(a) of the Bankruptcy Code as provided herein is essential to give effect to the sale of the Purchased Property to Insurer and this Order's approval of such sale free and clear of Interests pursuant to Section 363(f) of the Bankruptcy Code. The Sale Injunction set forth in Paragraph 23 below not only is a necessary

prerequisite for Insurer's assent to the terms and conditions of its Settlement Agreement, such that Insurer will not consummate the Sale Transaction or pay its Settlement Amount in the absence of such an injunction from this Bankruptcy Court, but also is warranted to ensure compliance with this Order. Likewise, Insurer will not consummate the Sale Transaction or pay its Settlement Amount without the benefit of the releases contained in the Settlement Agreement and approval thereof by the Bankruptcy Court.

X.      Neither the Settlement Agreement nor the Sale Transaction constitute a *sub rosa* chapter 11 plan. The Settlement Agreement does not impermissibly restructure the rights of the Debtor Parties' creditors nor impermissibly dictate a chapter 11 plan for the Debtor Parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

### General Provisions

1.      The Approval Motion, and the relief sought therein (including without limitation the approval of the Settlement Agreements and the Sale Transaction) is GRANTED and APPROVED, in all respects as set forth herein.

2.      The findings of fact set forth above and conclusions of law stated herein, in addition to any findings of fact and conclusions of law stated by the Bankruptcy Court at the Sale Hearing, shall constitute this Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the Approval Motion pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.      Any and all objections, if any, to the Approval Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case the Entity asserting the objection or reservation of rights is enjoined from taking any action against the Insurer Released Parties or the assets or property of any Insurer Released Parties to recover any Claim or Interest held by such objecting Entity. Those parties who did not object or who withdrew their objections to the Approval Motion are deemed to have consented to the relief granted herein, pursuant to Section 363(f)(2) of the Bankruptcy Code.

### Approval of the Settlement Agreement

4.      The Settlement Agreement is approved in its entirety, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Without limiting the generality of the foregoing, the settlement and releases of Claims as set forth in the Settlement Agreement is hereby approved pursuant to Bankruptcy Rule 9019. All factors set forth in *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey* (*In re Cajun Elec. Power Coop.*), 119 F. 3d 349, 356 (5th Cir. 1997), either weigh in favor of the Settlement Agreement or do not apply.

5.      Pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, the Non-Debtor Catholic Entity Policy Sale, free and clear of all Interests of any Entity in the Archdiocese Policies, is hereby approved.

6.      Pursuant to Section 363(b) of the Bankruptcy Code, each of the Parties is authorized to consummate the Sale Transaction under and in accordance with the terms and

conditions of the Settlement Agreement, and the Archdiocese Bound Parties shall at all times act in accordance with the terms thereof.

7. ~~The Parties and their attorneys in fact under the Settlement Agreement or otherwise are~~<u>Any representative, agent or attorney in fact of the Archdiocese Signatory Parties is</u> authorized to execute any other documentation and perform such other ministerial tasks as may be reasonably necessary to effectuate the Settlement Agreement and the Sale Transaction <u>on behalf of the Archdiocese Bound Parties</u>, including without limitation, any bill of sale substantially in the form attached to the Settlement Agreement as **Exhibit B**.

8. Subject to all of the terms and conditions of the Settlement Agreement, upon Closing, the Archdiocese Bound Parties and Insurer shall be deemed to have granted the releases as set forth in the Settlement Agreement.

9. The Parties are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Settlement Agreement, together with all additional instruments and documents that may be reasonably necessary, convenient, or desirable to implement the Settlement Agreement and consummate the Sale Transaction pursuant thereto and effectuate the provisions of this Order and the transactions approved hereby, and to take all further actions as may be requested by Insurer for the purpose of assigning, transferring, granting, conveying, and conferring to Insurer or reducing to Insurer's possession, the Purchased Property, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Settlement Agreement.

10. Insurer is authorized and directed to pay the Settlement Amount under and subject to the satisfaction of all terms and conditions of the Settlement Agreement.

11.     The Settlement Amount provided by Insurer for the Purchased Property (i) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

12.     None of the Insurer Released Parties shall be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its or their rights or remedies under the Settlement Agreement or any other document related to the Settlement Agreement or the Sale Transaction. The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order; *provided*, *however*, that this Bankruptcy Court shall retain jurisdiction over any and all disputes with respect thereto.

13.     This Order shall be binding in all respects upon: (a) the Debtor Parties and their Related Parties; (b) the Debtor Parties' Estates; (c) the other Archdiocese Bound Parties; (d) all creditors of the Debtor Parties; (e) all Abuse Claimants and holders of Direct Action Claims; (f) all holders of Interests whether known or unknown against or on all or any portion of the Purchased Property; (g) any Non-Settling Insurer; (h) the Insurer Released Parties; (i) the Purchased Property; (j) the Unknown Claims Representative; (k) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code; and (l) all Entities receiving notice (or deemed to have received notice pursuant to this Order) of the Approval Motion or the Sale

Hearing, including without limitation all Entities listed on **Schedule 3** to the Settlement Agreement. The Settlement Agreement shall be binding in all respects upon: (x) the Debtor Parties, their Estates, and their Related Parties; (y) the Archdiocese Bound Parties; and (z) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code.

<div align="center">

**Transfer of Assets**

</div>

14.     The conditions of Section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Archdiocese may sell the Purchased Property free and clear of any Interests therein.

15.     Pursuant to Sections 105 and 363(b) and (f) of the Bankruptcy Code, Bankruptcy Rule 9019, applicable Louisiana State law, the testimonial and other documentary evidence filed in support of the Approval Motion, and the record of the Sale Hearing, the Archdiocese has set forth the legal authority necessary to support this Bankruptcy Court's findings herein.

16.     Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Property and the Archdiocese Bound Parties' rights, title, and interest therein shall upon Closing be transferred to Insurer, free and clear of all Interests (including without limitation the Interests of any of the Archdiocese Bound Parties), and all such Interests are unconditionally and forever released and extinguished as against the Purchased Property. Without limiting the generality of the foregoing, the sale of the Purchased Property under the Settlement Agreement shall be free and clear of all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution

<div align="center">17</div>

Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property.

17.     Upon the Closing, (a) all of the Archdiocese Bound Parties', the Debtor Parties' Estates', and the Settlement Trustee's rights under and with respect to the Purchased Property, if any, shall be permanently and irrevocably extinguished as if the Archdiocese Policies had never been issued and (b) the Insurer Released Parties shall be entitled to all of the protections afforded by §363(m) of the Bankruptcy Code.

18.     Upon Closing, all Entities (and their respective successors and assigns), including but not limited to all governmental, tax, and regulatory authorities, Archdiocese Bound Parties, Non-Settling Insurers, Abuse Claimants, Direct Action Claimants, trade and other creditors, and any Entities holding Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) against, in, or with respect to the Purchased Property, including, without limitation, such Interests arising or accruing under or out of, in connection with, or in any way relating to the transfer of the Purchased Property to Insurer, hereby are forever barred, estopped, and permanently enjoined from asserting such Person's or Entity's Interests against the Purchased Property, the Insurer Released Parties, or the assets or property of any Insurer Released Parties. Effective upon Closing, none of the Insurer Released Parties shall have any liability for any Claims (a) against the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties or (b) that arise under or related in any way or in respect of the Purchased Property.

19.     The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement constitutes a legal, valid, and effective transfer of the Purchased Property, and shall

vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property. Upon Closing, the Archdiocese Policies shall be terminated and no longer in force or effect, exhausted in retrospect as to all coverages, and all Interests that the Archdiocese or any other Person or Entity (including without limitation any of the other Archdiocese Bound Parties) may have had, may presently have, or may in the future have, in such Purchased Property are released and extinguished, and all such Entities (including without limitation the Archdiocese Bound Parties) hereby are forever barred, estopped, and permanently enjoined from asserting any such Interest against the Purchased Property and/or any of the Insurer Released Parties. Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent constitutes full and complete performance of any and all obligations under the Purchased Property, including without limitation any performance owed to the Archdiocese Bound Parties, and all limits of coverage under the Archdiocese Policies, including per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

20.     Upon occurrence of the Closing:

(a)     all Interests the Archdiocese Bound Parties may have had, may presently have, or in the future may have in the Purchased Property, as applicable, are released pursuant to the terms of the Settlement Agreement; and

(b)     the Archdiocese Bound Parties accept Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent in full and complete satisfaction of Insurer's past, present, and future obligations, including, without limitation, any obligations to any of the Archdiocese Bound Parties under such Purchased Property or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of

19

any nature whatsoever arising out of or related in any way to such Purchased Property (including Coverage Claims), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, direct or indirect, and regardless of whether such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, or otherwise.

## No Successor Liability

21.     The transfer of the Purchased Property to Insurer shall not result in any Insurer Released Parties or the Purchased Property having any of the following: (a) any liability or responsibility for Interests in or Claims against the Archdiocese Bound Parties or any of their Related Parties; (b) liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any Claims or Interests; or (c) any liability or responsibility to the Archdiocese Bound Parties except as is expressly set forth in the Settlement Agreement.

22.     Without limiting the generality of the foregoing, none of the Insurer Released Parties shall have any successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability, *de facto* merger or joint venture, mere continuation or substantial continuity, whether known or unknown as of Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between the Archdiocese Bound Parties and any non-debtor subsidiary or affiliate (including, without limitation, any other Archdiocese

20

Bound Party), liabilities relating to or arising from any environmental laws, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Purchased Property prior to Closing.

<h3 align="center">Sale Injunction</h3>

23.     Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, and in consideration of the undertakings of Insurer pursuant to the Settlement Agreement, including Insurer's purchase of the Purchased Property free and clear of all Claims and Interests pursuant to Section 363(f) of the Bankruptcy Code as provided herein, any and all Entities that have held, now hold, or who may in the future hold any Claims or Interests (including without limitation all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Abuse Claimants, holders of Direct Action Claims, Perpetrators, Non-Settling Insurers, the Archdiocese Bound Parties, and all others holding Claims or Interests of any kind or nature whatsoever, including, without limitation, those Claims released or to be released pursuant to the Settlement Agreement), which Claims or Interests are under, arise out of, relate to, or connect in any way with an Abuse Claim or any of the Purchased Property, including, without limitation, (a) all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property, (b) the payment of any of the Claims identified previously, including, without limitation, Abuse Claims, Direct Action Claims, and Coverage Claims and (c) all other Interests, are hereby permanently stayed, enjoined, barred,

<div align="center">21</div>

<div align="right">784</div>

and restrained from taking any Action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or Interest against any of (x) the Insurer Released Parties, (y) the assets or property of any Insurer Released Parties, or (z) the Purchased Property, including by:

(a)     commencing, conducting, or continuing in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind, in any forum, with respect to any such Claim or Interest, against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(b)     enforcing, levying, attaching, collecting, or otherwise recovering, or seeking to accomplish any of the preceding, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(c)     creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, or seeking to accomplish any of the preceding, any lien of any kind against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(d)     asserting, implementing, or effectuating any such Claim or Interest of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any of the Insurer Released Parties, (B) any of the Insurer Released Parties, or (C) any property or interest in property of any Insurer Released Party; and

(e)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Order.

The actions described in this Paragraph 23 are "**Enjoined Actions**," and the injunction set forth herein is the "**Sale Injunction**." The Sale Injunction shall be a permanent injunction against the Enjoined Actions and may not be modified, dissolved, or terminated.

24.      The Sale Injunction shall be effective upon Closing. The Sale Injunction bars pursuit of the above referenced Claims and/or Interests against the Insurer Released Parties, or the property or assets of each (including, without limitation, the Purchased Property), but against no other person or thing.

25.      In a successful action to enforce this Sale Injunction in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

26.      The Sale Injunction shall not enjoin (a) the right of any Person or Entity against the Settlement Trust or a Non-Settling Insurer, or (b) the Settlement Trustee from enforcing the Settlement Trust Documents.

**Preserved Coverage**

27.      [**Intentionally Omitted.**][9]Nothing in this Order, the Settlement Agreement or the Sale Transaction affects Insurer's Preserved Coverage or the Archdiocese Bound Parties' rights or continuing obligations in connection with the Preserved Coverage under the Archdiocese

---

[9]   Intentionally omitted, except the Order approving the Catholic Mutual Settlement Agreement, in which this section will provide:

"Nothing in this Order, the Settlement Agreement or the Sale Transaction affects Insurer's Preserved Coverage or the Archdiocese Bound Parties' continuing obligations in connection with the Preserved Coverage under the Archdiocese Policies issued by Insurer, all of which shall survive the Settlement Agreement Effective Date, Bankruptcy Plan Effective Date and the closing of the Sale Transaction."

Policies issued by Insurer, all of which shall survive the Settlement Agreement Effective Date, Bankruptcy Plan Effective Date and the closing of the Sale Transaction.

**Additional Provisions**

28.     From and after the date hereof, no Person or Entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreements and this Order.

29.     This Bankruptcy Court hereby retains jurisdiction, regardless of whether a chapter 11 plan has been confirmed in the Bankruptcy Case and consummated and irrespective of the provisions of any such plan or order confirming such plan, to enforce and implement the terms and provisions of the Settlement Agreement, all amendments thereto, any waivers and consents thereunder, and of any agreement(s) executed in connection therewith in all respects, including but not limited to retaining jurisdiction to: (a) compel delivery of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreement; (b) resolve any dispute, controversy, or claim arising under or related to the Settlement Agreement, or the breach thereof; and (c) interpret, implement, and enforce the provisions of this Order and resolve any disputes related thereto.

30.     Nothing contained in any plan confirmed in the Bankruptcy Case or any order of this Bankruptcy Court confirming such plan shall conflict with or derogate from the provisions of the Settlement Agreement or the terms of this Order.

31.     This Order shall not limit or preclude the entry or effectiveness of any additional releases or injunctions that may be granted protecting the Insurer Released Parties and/or the

assets or property of any Insurer Released Parties in connection with, or as part of, any order confirming a chapter 11 plan.

32.     The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Settlement Agreement be authorized and approved in its entirety.

33.     The transactions contemplated by the Settlement Agreement are undertaken by Insurer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code. Insurer is a good faith purchaser of the Purchased Property and is entitled to all the protections afforded by Section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction to Insurer.

34.     Insurer has given substantial consideration under the Settlement Agreement for the benefit of the Debtor Parties, their Estates, and creditors, along with the other Archdiocese Bound Parties. Such consideration given by Insurer constitutes valid and valuable consideration for the Purchased Property and the releases set forth in the Settlement Agreement, including, without limitation, the extinguishment and release of all Interests pursuant to this Order. The consideration provided by Insurer for the Purchased Property under the Settlement Agreement is fair and reasonable; accordingly, the purchase may not be avoided under Section 363(n) of the Bankruptcy Code.

35.     The terms and provisions of the Settlement Agreement and this Order shall be binding notwithstanding any subsequent appointment of any trustee(s) examiner(s) or receiver(s) under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms

shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtor Parties, their Estates, their creditors, or any examiner(s) or receiver(s).

36.     The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Bankruptcy Court that the Settlement Agreement and the Parties' performance thereof be authorized and approved in its entirety.

37.     Pursuant to the provisions of the Settlement Agreement, each of the Archdiocese Bound Parties and Insurer shall be authorized to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper, or advisable under applicable law or otherwise to consummate and make effective the transactions contemplated by the Settlement Agreement.

38.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39.     All obligations of the Debtor Parties under the Settlement Agreement shall be deemed administrative expenses of their Estates under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

40.     Each and every federal, state, and local governmental agency or department is hereby directed to accept this Order in lieu of any document necessary to consummate the transactions contemplated by the Settlement Agreement and this Order.

41.     The Settlement Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the Parties, in a writing signed by the Parties, and in accordance with the terms thereof, without further order of this Bankruptcy

Court; *provided* that such modification, amendment, or supplement does not constitute a material change to the relief sought in the Approval Motion and approved by this Order.

**IT IS SO ORDERED.**

New Orleans, Louisiana, _____, 2025

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

| Summary report:<br>**Litera Compare for Word 11.7.0.54 Document comparison done on 10/24/2025 8:55:43 AM** | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** C:\Users\mfisher\OneDrive - ArentFox Schiff LLP\Desktop\ANOLA\25 10 23 - Template ADNO Documents (10.23)\ADNO Documents (10.23)\Filing Versions\Exhibit A - Form of Proposed Sale Order - FINAL.docx | |
| **Modified filename:** C:\Users\mfisher\OneDrive - ArentFox Schiff LLP\Desktop\ANOLA\25 10 23 - Template ADNO Documents (10.23)\ADNO Documents (10.23)\Filing Versions\25 10 24 - As Filed - CM Settlement Ex A - Approval Order.docx | |
| **Changes:** | |
| Add | 27 |
| Delete | 40 |
| Move From | 5 |
| Move To | 5 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 77 |

**EXHIBIT B**

Insurer Draft 7/29/25

### BILL OF SALE AND ASSIGNMENT

THIS BILL OF SALE AND ASSIGNMENT is made and entered into as of _____, 2025, by and between The Roman Catholic Archdiocese of New Orleans ~~of Louisiana~~ and its Bankruptcy Estate (the "**Archdiocese**" or "**Debtor**"), the Additional Debtors, and their respective Bankruptcy Estates, the Non-Debtor Catholic Entities (collectively, the "**Archdiocese Signatory Parties**"), and [—]The Catholic Mutual Relief Society of America (~~the~~ "**Insurer**"). All capitalized terms used herein without definition have the meanings set forth in the Settlement Agreement, Release, and Policy Buyback by, between, and among ~~The~~the Archdiocese, the other Archdiocese Signatory Parties, and Insurer, as amended or modified (the "**Settlement Agreement**").

### W I T N E S S E T H :

WHEREAS, pursuant to the Settlement Agreement, the Archdiocese Signatory Parties have, on behalf of themselves and all other Archdiocese Bound Parties, agreed to sell and/or convey any and all right, title, and interest (including all Subject Interests) in and to the Purchased Property[1] (as defined in the Approval Order), and Insurer has agreed to purchase and buy-back the Purchased Property, in consideration of the payment of a purchase price of $[—]2,000,000.00 (the "Purchase Price") and other good and valuable consideration as provided in and under the Settlement Agreement and Plan;

WHEREAS, the Approval Order, as filed at Docket No. [—*], has approved the Sale Transaction (as defined in the Approval Order) and found that the Purchase Price is a fair and reasonable price for the Purchased Property;

NOW, THEREFORE, in consideration of the payment of the Purchase Price by Insurer as set forth in the Settlement Agreement, and in accordance therewith and with Approval Order, the Debtor Parties do hereby sell, transfer, and assign to Insurer, and Insurer does hereby accept, all of the Archdiocese Bound Parties' right, title, and interest in and to the Purchased Property, and all Subject Interests therein.

[signatures appear on following pages]

---

[1] Note: The Bill of Sale and Assignment to Catholic Mutual to include:

"(other than the Preserved Coverage)"

4935-6760-8664v.6

Insurer Draft 7/29/25

IN WITNESS WHEREOF, the parties have executed this Bill of Sale and Assignment as of the date first above written.


**The Catholic Mutual Relief Society of America**

By: _____
        Rodney Oligmueller
        Assistant Vice President, Specialty Claims


Date: _____

[——————————————Signatures continue on adjacent pages]

4935-6760-8664v.6

Insurer Draft 7/29/25

**The Roman Catholic Archdiocese of New Orleans of Louisiana**

By: _____

[●]

[●]

Date: _____

[Signatures continue on adjacent pages]

Insurer Draft 7/29/25

**All Archdiocese Signatory Parties Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title: **Their Authorized Signer Pursuant to Resolutions** _____

Date: _____

[Signatures continue on adjacent pages]

4935-6760-8664v.6

| Summary report: |  |
| **Litera Compare for Word 11.7.0.54 Document comparison done on 10/24/2025 7:57:50 AM** | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** C:\Users\mfisher\OneDrive - ArentFox Schiff LLP\Desktop\ANOLA\25 10 23 - Template ADNO Documents (10.23)\ADNO Documents (10.23)\Filing Versions\ADNO-  Form of Bill of Sale 4935-6760-8664 7.docx | |
| **Modified filename:** C:\Users\mfisher\OneDrive - ArentFox Schiff LLP\Desktop\ANOLA\25 10 23 - Template ADNO Documents (10.23)\ADNO Documents (10.23)\Filing Versions\25 10 24 - As Filed - CM Settlement Ex B - Bill of Sale(303318572.3).docx | |
| **Changes:** | |
| Add | 27 |
| Delete | 17 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 1 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 45 |

## SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK

This Settlement Agreement, Release, and Policy Buyback ("**Settlement Agreement**") is hereby made by, and between, and among The Roman Catholic Archdiocese of New Orleans (the "**Archdiocese**" or "**Debtor**" as further defined in Section 1.1.31 below), the other Archdiocese Signatory Parties (as defined in Section 1.1.15 below), and Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation ("**Insurer**" as further defined in Section 1.1.49 below). Insurer, the Archdiocese, the other Archdiocese Signatory Parties, and the Creditors' Committee (as defined below), collectively are the "**Parties**" and each a "**Party**" to this Settlement Agreement.

## RECITALS:

WHEREAS, on May 1, 2020 (the "**Petition Date**" as further defined in Section 1.1.66 below), the Archdiocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**" as further defined in Section 1.1.17) pending under Case No. 20-10846 (the "**Bankruptcy Case**" as further defined in Section 1.1.16 below);

WHEREAS, each of the Additional Debtors (as defined in Section 1.1.11 below) intends to file in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;

WHEREAS, certain Entities have asserted or may hold Claims, including Abuse Claims, against the Archdiocese Bound Parties (each as defined below);

WHEREAS, Insurer issued, allegedly issued, may have issued, assumed by novation or otherwise, or may be administering the Archdiocese Policies (as defined in Section 1.1.9 below) providing certain coverage to the Archdiocese Bound Parties;

WHEREAS, asserted disputes between the Debtor Parties (as defined below) and Insurer have arisen, and assertable disputes between the Archdiocese Bound Parties and Insurer may arise in the future, concerning the scope and nature of Insurer's responsibilities, if any, to provide insurance coverage to the Archdiocese Bound Parties under the Archdiocese Policies (as further defined in Section 1.1.29 below, the "**Coverage Claims**");

WHEREAS, claimants may contend, as a matter of Louisiana law, particularly La. Rev. Stat § 22:1269 *et. seq.*, that certain Entities may have Claims arising under or related to the Archdiocese Policies that could entitle them to bring a Direct Action Claim (as defined in Section 1.1.35 below) against Insurer;

WHEREAS, claimants may contend that as a matter of Louisiana law, the time within which Claims relating to Abuse may be asserted against certain of the Archdiocese Bound Parties and/or the Insurer may not have expired with respect to certain Claims;

WHEREAS, the Archdiocese Signatory Parties and Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Claims and all other

disputes between and among them and to release Insurer from any further obligations under the Archdiocese Policies;

WHEREAS, Insurer would not pay the full amount of the Settlement Amount (as defined in Section 1.1.79 below) without the buy-back of the Subject Interests (as defined below) in the Archdiocese Policies, including without limitation, the interests of the Archdiocese, Additional Debtors, other Archdiocese Bound Parties and holders of Direct Action Claims, pursuant to section 363 of the Bankruptcy Code, and without the Sale Injunction, the Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeping Injunction (each as defined below), additionally providing protection to the Insurer Released Parties (as defined below) from Claims against the Insurer Released Parties and their property;

WHEREAS, through this Settlement Agreement and the Plan (as defined in Section 1.1.67 below) the Archdiocese Signatory Parties intend to provide Insurer Released Parties with the broadest possible release of all Claims and Subject Interests with respect to the Archdiocese Policies; and

WHEREAS, through this Settlement Agreement and the Plan, as part of the compromise and resolution of the Coverage Claims, the Debtor Parties and Insurer also wish to effect a sale, pursuant to § 363(b), (f), and (m) of the Bankruptcy Code of the Archdiocese Policies, along with the Coverage Claims and Related Insurance Claims (the "**Purchased Property**" as further defined in Section 1.1.69 below), to provide the Insurer Released Parties with the broadest possible release and buyback with respect to the Archdiocese Policies, resulting in the Insurer Released Parties having no obligations now or in the future with respect to the Archdiocese Policies, including without limitation to any Direct Action Claim.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Settlement Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound subject to the approval of the Bankruptcy Court pursuant to Section 2 below, the Parties hereby agree as follows:

## 1. DEFINITIONS

1.1    As used in this Settlement Agreement (as defined above), the following terms shall have the meanings set forth below.

1.1.1    "**Abuse**" means any of the following actual or alleged acts: (a) touching by the Perpetrator of the person's intimate body parts (genitals, breasts, or buttocks), the touching by the person of the Perpetrator's intimate body parts, showing pictures of the person's body or other persons' bodies, taking pictures of the person's body, showing pornography, or making images of the person while naked or engaged in any sexual activity, or any sexualized interaction including observing the person in bathing, toileting, or undressing that was made possible by the Perpetrator's position of authority, or by the inducement of the Perpetrator; or (b) sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to the genital or anal openings:  (i) of the person's body by any part of the Perpetrator's body or any object used by the Perpetrator for this purpose; or (ii) of the person's body by any

2

part of the body of the Perpetrator or by any part of the body of another person, or by any object used by the Perpetrator or another person for this purpose; (c) inappropriate physical contact and/or contact that infringes upon another's personal, physical boundaries including but not limited to groping, kissing, extended hugging, and/or any unwelcomed touching; (d) grooming or trying to create a special relationship, including but not limited to: talk of a sexual nature, talk of a romantic nature, communications expressing individual love to the person, as opposed to a salutation, providing material resources or experiences which induce the person into a relationship where trust is then violated; or (e) any actual or alleged acts of the kind described in subsections (a)-(c) above that occur between or among minors and that the Perpetrator orchestrates or encourages. For the avoidance of doubt, "Abuse" also includes: any actual or alleged conduct which (a) is described in the Louisiana Child Victims Act or (b) would constitute (i) a sexual offense as defined in article 603(2) of the Louisiana Children's Code; (ii) sexual battery as defined in LA. REV. STAT. §§ 14:43.1; 14:43.1.1; 14:43.2; 14: or 43.3, (iii) a crime against nature as defined in LA. REV. STAT. § 14:89, or (i) pornography involving juveniles as defined in LA. REV. STAT. § 14:81.1, or with respect to the foregoing subsection (i)-(iv), any predecessor statute that prohibited such conduct at the time of the act.

1.1.2   "**Abuse Action**" means an Action asserting an Abuse Claim against any of the Covered Parties.

1.1.3   "**Abuse Claim**" means any Claim that has been asserted, or could be asserted, against any Settling Party or Non-Settling Insurer, that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively alleged Abuse that occurred, in whole or in part, before the applicable Debtor's Petition Date or Additional Debtors' Petition Date, including any such Claim that seeks monetary damages or any other relief, under any legal or equitable theory of liability, including, but not limited to, the following:  vicarious liability; *respondeat superior*; any conspiracy, fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, negligent, insufficient, or inadequate supervision, retention or misrepresentation; any theory based on misrepresentation, concealment, or unfair practice; public or private nuisance; or any theory, including, without limitation, any theory based on public policy or any acts or failures to act by any Settling Party, or any other Entity for whom any Settling Party is allegedly responsible, including, but not limited to, any such Abuse Claim against any Settling Party, Non-Settling Insurer, or any other Entity for whom any Settling Party or Non-Settling Insurer is alleged to be responsible. Abuse Claims are:  (a) the Known Abuse Claims, which are treated in Class 3; and (b) the Unknown Abuse Claims, which are treated in Class 4.  For the avoidance of doubt, "Abuse Claim" includes (a) all Unknown Abuse Claims, (b) Claims or causes of action defined or described in the Revival Window Laws against the Archdiocese or any other Archdiocese Bound Party, (c) Direct Action Claims, and (d) any Claim against the Archdiocese or any other Archdiocese Bound Party that is attributable to, arises from, is based upon, relates to, or results from Abuse that, as of the Petition Date is barred by any applicable statute of limitations, and in each case, irrespective of whether (x) such Claims also involve the conduct of joint tortfeasors (or similar concepts under applicable law), (y) such Claims arise under, or were revived pursuant to, the Revival Window Laws, or any future reviver law, statute, or binding

3

precedential decision passed or issued on or after the Bankruptcy Plan Effective Date, or (z) a proof of claim has been filed, before or after the Claims Bar Date, or not at all, or an Abuse Action has been commenced with respect to such Claim. "Abuse Claim" does not include: (a) Related Insurance Claims or Coverage Claims against Settling Insurers or Non-Settling Insurers; (b) Non-Insurer Contribution Claims with respect to any Abuse Claim; (c) Insurer Contribution Claims with respect to any Abuse Claim; or (d) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to a Claim against these dioceses only. For the avoidance of doubt, a Claim based on Abuse solely occurring following the applicable Petition Date is not an Abuse Claim. Nothing in this definition shall constitute a waiver of any defense that would otherwise be available under applicable law to any Settling Party, the Settlement Trust, or any other Entity.

1.1.4 "**Abuse Claim Release and Certification**" means a written release in favor of the Insurer Released Parties, in the form of Exhibit C to the Acceptable Plan, or otherwise in form and substance acceptable to the Parties, which an Abuse Claimant must deliver before he or she is entitled to Settlement Trust Distributions, which shall provide that the Claimant releases the Insurer Released Parties from any and all Claims related to his/her Abuse Claim or any of the Archdiocese Policies, subject to Section 12.14 and related provisions of the Plan.

1.1.5 "**Abuse Claimant**" means the holder of an Abuse Claim, including, but not limited to, any Known Abuse Claim, Unknown Abuse Claim, or Direct Action Claim. For the avoidance of doubt, Abuse Claimants are Creditors. The definition of an Abuse Claimant includes the legal representative of the holder of an Abuse Claim, such as a bankruptcy trustee, the estate of a deceased individual who held an Abuse Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Abuse Claim, as the case may be. An Entity holding the following Claim is not an Abuse Claimant: (i) a Non-Insurer Contribution Claim with respect to such Abuse Claim; (ii) an Insurer Contribution Claim with respect to such Abuse Claim; (iii) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to such Entity's claim against such dioceses only.

1.1.6 "**Acceptable Plan**" means the *Fourth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and The Official Committee of Unsecured Creditors* filed at Docket No. [4419], and its exhibits and schedules, which as may be modified solely in accordance herewith (i.e., with the consent of the Insurer), and such modified plan constituting the "Acceptable Plan" for the purposes hereof.

1.1.7 "**Archdiocesan Parishes**" means all currently Catholic Church parishes and missions, as identified on Exhibit B-1, Part I, of the Acceptable Plan. Each of the Archdiocesan Parishes is organized as a non-profit corporation. For the avoidance of doubt, the definition of Archdiocesan Parishes does not include St. Louis Cathedral, Our Lady of Guadalupe Church & Shrine of St. Jude, or any Suppressed Archdiocesan Parish identified on Exhibit B-1, Part II, of the Acceptable Plan.

1.1.8 "**Archdiocesan Schools**" means the means the following schools that are owned and operated by the Archdiocese: (a) the Academy of Our Lady High School; (b) Archbishop Chapelle High School; (c)Archbishop Hannan High School; (d) Archbishop Rummel High School; (e) Archbishop Shaw High School; (f) Pope John Paul II High School; (g) St. Charles Catholic High School; (h) St. Scholastica Academy; and (i) St. Michael Special School.

1.1.9 "**Archdiocese Policies**" means (a) the contracts, binders, certificates, and policies of insurance that are listed on Schedule 1 hereto, and (b) all other known and unknown contracts, binders, certificates, or policies of general liability insurance, in effect on or before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date that were issued to, or for the benefit of, or subscribed on behalf or that otherwise actually insure, (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) policies issued to the Archdiocese that name as an insured or additional insured (or related concept under applicable law or document) the Diocese of Houma-Thibodaux or Diocese of Baton Rouge, but not policies issued to either of these dioceses that were not also issued to the Archdiocese or name it as insured, (iv) any Entity owned, created, operated, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, or (v) any institution, religious organization or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control or active management; in each case of (a) and (b), that were issued, subscribed to, or underwritten in whole or in part or allegedly issued, subscribed to, or underwritten in whole or in part by Insurer or any of its predecessors.

1.1.10 "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

1.1.11 "**Additional Debtors**" means the Entities listed on Acceptable Plan Exhibit B-1. As used herein, references to the "Additional Debtors" includes the Additional Debtor's Estates.

1.1.12 "**Approval Motion**" means the motion filed in the Archdiocese Bankruptcy Case at Docket No. 4181 seeking approval of this Settlement Agreement as described in Section 2.1 of this Settlement Agreement.

1.1.13 "**Approval Order**" means the order granting the Approval Motion described in Section 2.1 of this Settlement Agreement and providing the relief described in Section 2.1 of this Settlement Agreement and in substantially form attached **Exhibit A,** with only such changes as are satisfactory to Insurer.

1.1.14 "**Archbishop**" has the meaning given to it in Section 3.7.

1.1.15 "**Archdiocese Signatory Parties**" means, collectively, (a) the Debtor Parties and (b) the Non-Debtor Catholic Entities.

1.1.16 "**Bankruptcy Case**" means all of the following: (a) with respect to the Archdiocese, "Bankruptcy Case" has the meaning set forth in the Recitals; and (b) with respect to any given Additional Debtor, "Bankruptcy Case" means the case initiated when such Additional Debtor filed in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.17 "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Louisiana, having subject matter jurisdiction over the Bankruptcy Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

1.1.18 "**Bankruptcy Plan Effective Date**" means the date upon which a Plan approved by the Bankruptcy Court that contains terms and conditions consistent with those required by this Settlement Agreement becomes effective.

1.1.19 "**Barred Claim**" means any Claim against a Settling Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with an Abuse Claim or any of the Archdiocese Policies, including, but not limited to, any: (a) Abuse Claim; (b) Direct Action Claim; (c) Coverage Claim; (d) Related Insurance Claim; (e) Non-Insurer Contribution Claim; (f) Insurer Contribution Claim; (g) Medicare Claim; (h) Penalty Claim; and (i) any other Claim that is otherwise released herein. A Barred Claim further includes any Claim against a Settling Party based on allegations that it is an alter ego or liable as a successor of an Entity that is not a Settling Party or that the Settling Party's corporate veil should be pierced on account of Claims against an Entity that is not a Settling Party or based on any other theory under which the legal separateness of any Person and any other Entity may be disregarded to impose liability for a claim on either such Entity. Notwithstanding the foregoing, Barred Claims do not include any Claims to the extent they are asserted against (x) Non-Settling Insurers or (y) Excluded Parties, notwithstanding that such Entity may also have asserted or be able to assert a Claim for contribution, indemnity, reimbursement, or subrogation against any Settling Party relating to or arising from a such Claim; provided, however, that, for the avoidance of doubt, (i) any Claims that assert liability against such Entity in conjunction with a Settling Party will in all events be Barred Claims as to the Settling Party, (ii) any such Claim for contribution, indemnity, reimbursement, or subrogation against a Settling Party is a Barred Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party for the purposes of this definition.

1.1.20 "**Catholic Charities**" has the meaning set forth in Section 6.3.15.

1.1.21 "**Channeling Injunction**" has the meaning set forth in Section 2.2.2.

1.1.22 "**Claim**" means any past, present or future claim, demand, Action, request, right, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether sounding in law, equity, tort, warranty, contract, or under any other theory, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been

6

or may be asserted by or on behalf of any Entity, whether seeking damages (including compensatory, exemplary, punitive, or Penalty claims) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, or orders, including without limitation whether by way of direct action, subrogation, contribution, indemnity, alter ego, veil piercing, or regulatory action, or otherwise, regardless of whether such Claims arise under law, in equity, or under statute, before or after the Petition Date(s), or *in rem* or *in personam*, and include all Claims for damages to the environment or based on any theory of *respondeat superior,* vicarious, successor or transferee liability, or change in control, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

1.1.23 "**Claims Bar Date**" means the date(s) and time(s) indicated in the Final Order(s) (which may be the Plan Confirmation Order) setting the deadline(s) for filing proofs of Abuse Claim against the Debtor or Additional Debtor(s), as applicable.

1.1.24 "**CMS**" has the meaning set forth in Section 2.4.1.

1.1.25 "**Co-Insured Party**" means any other Entity that is a "Named Assured" or "named insured" or "protected person" under the Archdiocese Policies, and all other Entities that are determined by agreement or a court of competent jurisdiction to be an "Assured," an "Additional Assured," an "insured," or "protected person" or otherwise entitled to insurance coverage under any Archdiocese Policies.

1.1.26 "**Conditional Payment**" means any payment made to an Abuse Claimant under the MMSEA, including any payment by a Medicare Advantage Organization (as defined in the MSPA).

1.1.27 "**Controlling Document Provision**" has the meaning given to it in Section 2.2.9.

1.1.28 "**Covered Parties**" or "**Archdiocese Bound Parties**" means, collectively, the following Entities: (a) the Debtor Parties; (b) the Reorganized Debtor; (c) the Reorganized Additional Debtors; (d) the Non-Debtor Catholic Entities; (e) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP; (f) the Parish Schools and Archdiocesan Schools; (g) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans; (h) any Co-Insured Party; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entities' predecessors, successors, assigns, subsidiaries, direct and indirect past, present, and future affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, and estates. For the avoidance of doubt, the Entities in clauses (g), (h), and (i) are only Archdiocese Bound Parties in connection with the Archdiocese Policies.

1.1.29 "**Coverage Claims**" has the meaning set forth in the Recitals and further includes any Claim under relating to or arising out of the Archdiocese Policies or the rights and obligations thereunder, or the breach thereof, including any Claim seeking insurance coverage.

1.1.30 "**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed in the Archdiocese's Chapter 11 Case on May 20, 2020, [Docket Nos. 94 & 114], as such committee may be reconstituted from time to time.

1.1.31 "**Debtor**" or "**Archdiocese**" means, before the Bankruptcy Plan Effective Date, The Roman Catholic Church of the Archdiocese of New Orleans of Louisiana. As used herein, references to the "Debtor" or "Archdiocese" includes the Debtor's Estate.

1.1.32 "**Debtor Parties**" means (i) the Archdiocese and (ii) all of the Additional Debtors.

1.1.33 "**Diocese of Baton Rouge**" means the Diocese of Baton Rouge. References to the "Diocese of Baton Rouge CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) July 22, 1961 whichever occurred last; references to the "Diocese of Baton Rouge SD" refer to the period after such date.

1.1.34 "**Diocese of Houma-Thibodaux**" means the Diocese of Houma-Thibodaux. References to the "Diocese of Houma-Thibodaux CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) June 5, 1977, whichever occurred last; references to the "Diocese of Houma-Thibodaux SD" refer to the period after such date.

1.1.35 "**Direct Action Claim**" means any Claim by any Entity that is a "direct action" as that term is used in La. Rev. Stat § 22:1269 *et. seq* (or similar law in other jurisdictions) against any Insurer Released Party or related to any Archdiocese Policy, including, without limitation, (a) any claim that is similar or related to any Claim that could also be asserted by the Archdiocese or any Archdiocese Bound Party, (b) any Claim that directly or indirectly arises out of, relates to, or is connected with any Abuse Claim, (c) any Claim that directly or indirectly arises out of, relates to, or is in connection with any Insurer Released Party's handling of any Abuse Claim under the laws of any applicable jurisdiction, or (d) any Claim arising under any law of any jurisdiction that may give a third party a direct Cause of Action against an Insurer Released Party for monetary or other relief.

1.1.36 "**Entity**" means any individual, corporation, corporation sole, partnership, association, limited liability company, joint stock company, proprietorship, unincorporated organization, joint venture, trust, estate, executor, legal representative, or any other entity or organization, as well as any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency, department, board or instrumentality thereof, any other "Person" within the definition of section 101(41) of the Bankruptcy Code, and any successor in interest, heir executor, administrator, trustee, trustee in bankruptcy, or receiver of any Entity and also has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.1.37  "**Escrow Agent**" means the agent appointed in accordance with the Escrow Agreement.

1.1.38  "**Escrow Agreement**" means the agreement governing the escrow which shall hold the Settlement Amount in escrow and in trust for the benefit of Insurer, and which shall provide for the: (i) transfer of the Settlement Amount, with any accrued interest, to the Settlement Trust following the Settlement Agreement Effective Date, or (ii) return of the Settlement Amount to Insurer, with any accrued interest, upon receipt of notice that the Settlement Agreement has been terminated.

1.1.39  "**Estate**" means the (a) the Debtor's estate, and (b) Additional Debtors' estates, each created pursuant to section 541 of the Bankruptcy Code.

1.1.40  "**Excluded Party**" means the following Entities: (a) the Holy See (State of Vatican City); (b) any Perpetrator; and (c) any archdiocese or diocese (other than the Archdiocese itself), any Religious Order, or other Entity that is an affiliate or associated with the Roman Catholic Church (in its capacity as such, and other than (i) the Non-Debtor Catholic Entities; (ii) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP, (iii) the Parish Schools and Archdiocesan Schools; and (iv) any Co-Insured Party); provided, however, that any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party.

1.1.41  "**Extra-Contractual Claim**" means any Claim against any Insurer Released Party seeking any type of relief, other than coverage or benefits, under or with respect to the Archdiocese Policies.  Extra-Contractual Claims include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs, or any other type of relief, alleging any of the following with respect to (a) any Archdiocese Policy; (b) any Claim allegedly or actually covered under a Archdiocese Policy; or (c) the conduct of any Insurer Released Party with respect to (a) or (b): (i) bad faith; (ii) failure to provide insurance coverage under any Archdiocese Policy, including any failure to investigate or to provide a defense or adequate defense; (iii) failure or refusal to compromise and settle any Claim insured under any Archdiocese Policy; (iv) failure to act in good faith; (v) violation or breach of any covenant or duty of good faith and fair dealing, whether express, implied,  or otherwise; (vi) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (vii) violation of any unfair claims practices act or similar statute, regulation or code, including any statute, regulation, or code relating to  unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising; (viii) any type of misconduct; or (ix) any other act or omission of any type by any Insurer Released Party for which the claimant seeks relief other than coverage or benefits under a Archdiocese Policy.  "Extra-Contractual Claims" further include all Claims relating to any Insurer Released Party's (x) handling of any Claims under the Archdiocese Policies, (y) conduct in negotiating this Settlement Agreement and/or the Plan, and (z) conduct in the settlement of any Claims.  For the avoidance of doubt, Extra-Contractual Claims of the Archdiocese Bound Parties are included within the property Insurer is purchasing hereunder.

1.1.42 "**Final Order**" means an order as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending and in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order will have been affirmed by the highest court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari,* petition for review, or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order will not cause such order not to be a Final Order.

1.1.43 "**Gatekeeper Injunction**" has the meaning set forth in Section 2.2.2.

1.1.44 "**HH**" has the meaning set forth in Section 6.3.15.

1.1.45 "**Indemnified Claims**" has the meaning set forth in Section 7.2 of this Settlement Agreement.

1.1.46 "**Indemnity Cost Reserve**" has the meaning set forth in Section 7.2.1.

1.1.47 "**Injunctions**" means the Sale Injunction, Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeper Injunction.

1.1.48 "**Insurance Settlement Agreement"** has the meaning set forth in the Acceptable Plan.

1.1.49 "**Insurer**" means Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation.

1.1.50 "**Insurer Contribution Claim**" means any (a) Non-Settling Insurer Contribution Claim or (b) Settling Insurer Contribution Claim.

1.1.51 "**Insurer Released Party**" means Insurer and its Related Parties, each in their capacities solely as such with respect to the Archdiocese Policies and all Subject Interests therein.

1.1.52 "**Known Abuse Claims**" means any Abuse Claim, other than an Unknown Abuse Claim, against any Settling Party, Settling Insurer, and/or Non-Settling Insurer.

1.1.53 "**Medicare Claims**" means any Claim by CMS, and/or any agent or successor of CMS, charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA or pursuing a Claim under MSP Provisions, relating to any payments in respect of any Abuse Claim, including any Claim for reimbursement of conditional payments, and any Claim relating to reporting obligations.

1.1.54 "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which imposes reporting obligations on those Entities with payment obligations under the MSPA.

1.1.55 "**MSPA**" means 42 U.S.C. §1395y et seq., or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto, including the regulations promulgated thereunder, found at 42 C.F.R. §411.1 et seq.

1.1.56 "**Non-Debtor Catholic Entity Policy Sale**" has the meaning set forth in Section 4.6.

1.1.57 "**Non-Debtor Catholic Entities**" collectively means those entities listed on the Acceptable Plan Exhibit B-2 who are not Additional Debtors, but which are (a) insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies and/or (b) have actually or allegedly acquired or been assigned the right to make a claim for coverage under any of the Archdiocese Policies (excluding, however, for the avoidance of doubt, the Debtor Parties, the Settlement Trust, and any Abuse Claimant).

1.1.58 "**Non-Insurer Contribution Claim**" means any Claim for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law that is attributable to, arises from, is based upon, relates to, or results from, an Abuse Claim or payment of an Abuse Claim, and any other derivative or indirect Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, other than a Non-Settling Insurer Contribution Claim or a Settling Insurer Contribution Claim.

1.1.59 "**Non-Settling Insurer**" means any insurer (together with its Related Parties) that is not a Settling Insurer.

1.1.60 "**Non-Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Non-Settling Insurer against any Settling Insurer for the payment of money where such Non-Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.61 "**Parish Schools**" means the elementary Catholic schools that are owned and operated by the Archdiocesan Parishes. For the avoidance of doubt, the definition of Parish Schools expressly excludes Catholic schools that are owned and operated by Religious Orders and the Archdiocesan Schools. For the further avoidance of doubt, the Parish Schools are not separately incorporated.

1.1.62 "**Parties**" has the meaning set forth in the first paragraph of this Settlement Agreement.

11

1.1.63 "**Penalty Claims**" means a Claim against any Settling Party or Settling Insurer for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Creditor holding such Claim.

1.1.64 "**Perpetrator**" means an individual who personally committed or is alleged to have personally committed an act of Abuse. For the avoidance of doubt, the definition of Perpetrator does not include any individual who did not personally commit an act of Abuse or is not alleged to have personally committed an act of Abuse, but against whom an Abuse Claim or Non-Insurer Contribution Claim is asserted nonetheless, or may be asserted, by virtue of such individual's position or service as a member, representative, contractor, consultant, professional, or volunteer of the Archdiocese or any Non-Debtor Catholic Entity or any council or representative body associated with such Entities.

1.1.65 "**Person**" has the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

1.1.66 "**Petition Date**" means (a) with respect to the Archdiocese, May 1, 2020; and (b) with respect to each Additional Debtor, the date(s) on which such Additional Debtor files in the Bankruptcy Court its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.67 "**Plan**" refers to the Chapter 11 Plan of Reorganization for the Archdiocese and all Additional Debtors (and all exhibits annexed thereto) which shall, among other things, provide for the resolution of Abuse Claims and Subject Interests in the Archdiocese Policies as set forth herein, and which shall be in form and substance acceptable to Insurer in its sole discretion.

1.1.68 "**Plan Confirmation Order**" has the meaning set forth in Section 2.3.

1.1.69 "**Purchased Property**" means any and all right, title, and interest (including all Subject Interests) in and to the Archdiocese Policies and the Related Insurance Claims and Coverage Claims.

1.1.70 "**Related Insurance Claim**" means (a) any Extra-Contractual Claim and (b) any other Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies, including, without limitation, bad faith Claims.

1.1.71 "**Related Party**" means, with respect to any Entity, such Entity's (a) predecessors, successors, assigns, and any Entity that assumed the obligation of the forgoing for the Archdiocese Policies by novation or otherwise (b) direct and indirect past, present, and future Affiliates (as defined in section 101(2) of the Bankruptcy Code), holding companies, merged companies, related companies, subsidiaries, divisions, acquired companies, joint ventures, joint venturers, (c) current and former employees, officers, directors, principals, partners, managing agents, trustees, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, brokers, adjusters, reinsurers, retrocessionaires, subrogees, agents, claims handling administrators,

12

809

and other professionals, and (d) respective heirs, executors, estates, and nominees; and all Entities acting on behalf of, by, through or in concert with them, each solely in their capacities as such with respect to such Entity (and with respect to such Entity (including Insurer) that is an insurer of any Archdiocese Bound Party or has assumed the obligations of such by novation or otherwise, such insurer's applicable insurance policy(ies) (including the Archdiocese Policies)).

1.1.72 "**Religious Order**" means, collectively, an institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy.

1.1.73 "**Reorganized Additional Debtors**" means the Additional Debtors, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.74 "**Reorganized Debtor**" means the Debtor, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.75 "**Revival Window**" means Section 2 of La. Acts 2021, No. 322, as amended by La. Acts 2022, No. 386, and La. Acts 2024, No. 481.

1.1.76 "**Revival Window Laws**" means the Revival Window, together with any other law that extends the prescriptive period or statute of limitations for asserting Abuse Claims under Louisiana or other applicable state law.

1.1.77 "**Sale Injunction**" has the meaning set forth in Section 2.1.

1.1.78 "**Settlement Agreement Effective Date**" means the first day on which: (a) the Archdiocese Signatory Parties and Insurer have executed this Settlement Agreement; (b) the Unknown Abuse Claims Representative shall have supported the releases provided for herein and the protections granted hereby and in the Plan in favor of the Insurer Released Parties, in a manner acceptable to Insurer in its sole discretion; (c) the Approval Order shall have become a Final Order; (d) the Plan Confirmation Order shall have become a Final Order; and (e) the Settlement Trust shall have been created pursuant to the Plan; provided, however, with the prior written consent of the Trustee, not to be unreasonably withheld, Insurer may elect to waive the conditions set forth in clauses (b) through (e) and pay or direct the payment of the Settlement Amount to the escrow or Settlement Trust prior to the occurrence of the events set forth in (b) through (e) hereof, in which case, the date of such payment shall be the Settlement Agreement Effective Date for all purposes hereunder including the date of the closing of the purchase and sale of the Archdiocese Policies.

13

1.1.79  "**Settlement Amount**" means the sum of Eighty-Five Thousand and 00/100 Dollars ($85,000) to be paid (in accordance with Section 3.1) by Insurer after satisfaction of all conditions precedent herein in accordance herewith.

1.1.80  "**Settlement Trust**" means the settlement trust established under the Plan for the purposes set forth therein, including assuming liability for all Channeled Claims (as defined in the Acceptable Plan) and Indemnified Claims (as defined herein), subject to the limitations on indemnification and liability contained in Section 7.2 of this Settlement Agreement.

1.1.81  "**Settlement Trust Agreement**" means the agreement between the Debtor and the Settlement Trustee governing the Settlement Trust, in the form of Exhibit D-1 to the Acceptable Plan.

1.1.82  "**Settlement Trust Allocation Protocol**" means the Settlement Trust Allocation Protocol (as defined and used in the Settlement Trust Agreement), in the form of Exhibit D-2 to the Acceptable Plan.

1.1.83  "**Settlement Trust Documents**" means, collectively, (a) the Settlement Trust Agreement, (b) the Settlement Trust Allocation Protocol, and (c) any other agreements, instruments and documents governing the establishment and administration of the Settlement Trust, which shall be consistent with the terms of the Plan, as the same may be amended or modified from time to time in accordance with the terms thereof.

1.1.84  "**Settlement Trustee**" means the Entity appointed to act as the initial trustee of the Settlement Trust pursuant to the terms of the Settlement Trust Documents, along with any successor trustee appointed in accordance with the Settlement Trust Documents.

1.1.85  "**Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Settling Insurer against any Settling Insurer or Non-Settling Insurer for the payment of money where such Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.86  "**Settling Insurers**" shall have the meaning set forth in the Acceptable Plan.

1.1.87  "**Settling Insurers' Policies**" shall have the meaning set forth in the Acceptable Plan.

1.1.88  "**Settling Parties**" means, collectively, the following Entities: (a) Archdiocese Bound Parties; and (b) the Settling Insurers.

1.1.89  "**Subject Interests**" means all Claims, liens (as defined by Section 101(37) of the Bankruptcy Code), encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief, including: (a) all interests of the Archdiocese in, to and under the Archdiocese Policies; (b) all interests in, to, and under the Archdiocese Policies of any

Entity other than the Archdiocese (including all Abuse Claimants and the Archdiocese Bound Parties); and (c) all interests in, to and under the Archdiocese Policies of any other Entity claiming coverage by, through, or on behalf of any Archdiocese Bound Party, including, without limitation, rights and interests as an insured, co-insured or additional insured, insurer or creditors of the Archdiocese Bound Parties; in each case within the meaning of "interest" as used in sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code. For the avoidance of doubt, a Direct Action Claim constitutes a Subject Interest. The meaning of Subject Interests also includes: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property.

1.1.90 "**Supplemental Settling Insurers' Injunction**" has the meaning set forth in Section 2.2.2.

1.1.91  "**Unknown Abuse Claim**" means an Abuse Claim that occurred before the Petition Date and the Abuse Claimant did not file a proof of claim by the applicable Abuse Claims Bar Date, for which there exists a valid legal excuse for not filing, as further defined in the in the Acceptable Plan.

1.1.92  "**Unknown Abuse Claims Representative**" means Michael R. Hogan, the legal representative appointed by the Bankruptcy Court pursuant to the *Order (I) Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, and  (II) Approving the Retention of Michael R. Hogan as the Unknown Tort Claims Representative,  Nunc Pro Tunc To July 26, 2021* (Docket No. 1012 ), any successor legal representative appointed by the Bankruptcy Court, or, on and after the Bankruptcy Plan Effective Date, any successor legal representative appointed in accordance with the applicable Settlement Trust Document.

1.2     Capitalized terms not defined in this Section 1 or elsewhere in this Settlement Agreement shall have the meanings given to them in the Bankruptcy Code.

## 2.     THE BANKRUPTCY CASE AND PLAN OF REORGANIZATION

2.1     On or before July 29, 2025, the Archdiocese shall file a motion in the Bankruptcy Court (the "**Approval Motion**"), in form and substance acceptable to Insurer in its sole discretion, that seeks the entry of an order in substantially the form attached as **Exhibit A** to this Settlement Agreement, or otherwise in form and substance acceptable to Insurer in its sole discretion (the "**Approval Order**"), that:

(a) approves this Settlement Agreement, including Insurer's buyback of the Archdiocese Policies and the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests, and otherwise authorizes the Parties to undertake the settlement and the transactions contemplated by this Settlement Agreement, in each case pursuant to sections 363(b), (f),and (m) of the Bankruptcy Code and any other applicable provisions of the Bankruptcy Code;

(b) contains an injunction (the "**Sale Injunction**") that, subject to and conditioned upon the Settlement Agreement Effective Date and the Insurer's payment of the Settlement Amount, bars all Claims against the Insurer Released Parties and their property and assets of each based on or arising out of any Subject Interests in the Archdiocese Policies including without limitation all Coverage Claims, Related Insurance Claims, and Barred Claims, leaving the Settling Insurers free and clear of all Subject Interests of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); any Abuse Claimant; or any holder of a Barred Claim pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code;

16

(c) provides that this Settlement Agreement is binding on the Archdiocese Signatory Parties, all other Settling Parties, any trust created in the Bankruptcy Case(s), and any successors of the foregoing; and

(d) provides, subject to and conditioned upon the Settlement Agreement Effective Date, that the Approval Order is binding on all Persons (including, for the avoidance of doubt, all Persons set forth in the foregoing (c)).

2.1.1    The Archdiocese shall provide written notice of the Approval Motion, which notice shall be in form and substance acceptable to Insurer, to, at a minimum, any known Archdiocese Bound Party, holder of an Abuse Claim, or party whose rights or interests may reasonably be considered to be impacted by the relief requested in the Approval Motion, and any party identified on Schedule 3 hereto.  In addition, the Archdiocese shall include notice of the Approval Motion together with notice provided with respect to confirmation of the Joint Plan, including publication notice of the hearing on the Approval Motion. The Archdiocese will provide a draft service list of the foregoing for Insurer's review and comment.

2.1.2    If any Entity files an objection to the Approval Motion, the Archdiocese and Creditors' Committee shall consult with Insurer in connection with filing any written response thereto.  The Archdiocese Signatory Parties, as applicable, and Creditors' Committee shall take commercially reasonable steps to defend against any objection, appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order.  Insurer will cooperate with the Archdiocese Signatory Parties and Creditors' Committee in this regard, including making commercially reasonable submissions.

2.2    The Archdiocese shall file and prosecute a joint Plan with the Creditors Committee, which shall be in form and substance satisfactory to the Insurer in its sole discretion, substantially in the form as the Acceptable Plan, which the Parties acknowledge and agree satisfies the terms of this Settlement Agreement.  Any modifications to the Plan, the Settlement Trust Documents, the Plan Confirmation Order, or the Approval Order, including those relating to the Channeling Injunction, Supplemental Settling Insurers' Injunction, Gatekeeper Injunction, releases by holders of Abuse Claims, Insurers, Insurance Settlement Agreements, and related definitional terms, including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Abuse Related Insurance Claims," "Channeled Claim," "Covered Parties," "Direct Action Claim," "Enjoined Party," "Insurer Contribution Claim," "Non-Insurer Contribution Claim," "Penalty Claims," "Protected Parties," "Settling Insurers," "Settling Insurer's Policies," "Subject Insurance Policies," "Subject Interests," or any exhibits, schedules, and documents related thereto, must be in all respects consistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties without Insurer's written consent in its sole discretion.

2.2.1    The Plan shall create the Settlement Trust, which shall be responsible for making any and all payments to the Abuse Claimants entitled to receive payment under the Plan and which shall assume all liability for Channeled Claims.

2.2.2    The Plan shall include: (a) an injunction in substantially the form included in Article 12.4 of the Acceptable Plan (the "**Channeling Injunction**"); and (b) an injunction in substantially the form included in Article 12.5 of the Acceptable Plan (the "**Supplemental Settling Insurers' Injunction**"); and (c) an injunction in substantially the form included in Article 12.8 of the Acceptable Plan (the "**Gatekeeper Injunction**").

2.2.3    The Plan shall incorporate by reference the releases and indemnities set forth in this Settlement Agreement, including that the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to all Indemnified Claims as forth in Section 7.2 of this Settlement Agreement.

2.2.4    The Settlement Trust Documents shall provide that as a condition to receiving payment from the Settlement Trust, all Abuse Claimants shall provide an Abuse Claim Release and Certification.

2.2.5    The Plan shall provide for the commencement, prior to the Court's consideration of the Approval Motion, by the Additional Debtors of Chapter 11 cases to be jointly administered with the Bankruptcy Case.

2.2.6    The Plan shall provide a supplemental bar date for the Additional Debtors in a form and substance satisfactory to the Insurer with respect to Abuse Claims against the Additional Debtors and the form, manner, and deadline for filing proofs of claim and the treatment of confidential information contained therein.

2.2.7    The Plan shall provide that confirmation of the Plan will not occur unless all of the following conditions precedent have been satisfied: (a) the Plan Confirmation Order approves and implements the Injunctions and (b) the Bankruptcy Court shall have granted the Approval Motion in form and substance acceptable to Insurer in its sole discretion.

2.2.8    The Plan shall provide that the Bankruptcy Plan Effective Date will not occur unless all of the following conditions precedent have been satisfied or waived (as applicable with consent of Insurer): (a) the Plan Confirmation Order will have been entered by the Bankruptcy Court and become a Final Order, and (b) the Bankruptcy Court shall have entered the Approval Order (with both such Approval Order and this Settlement Agreement in form and substance acceptable to the Insurer) and such Approval Order shall have become a Final Order.

2.2.9    The Plan shall provide that (collectively, as follows, the "**Controlling Document Provision**") in the event of a conflict between (a) the Settlement Agreement, on the one hand, and (b) the Plan, on the other, the terms of the Settlement Agreement shall control and govern; and in the event of a conflict between the (x) Approval Order, on the one hand, and (y) Plan Confirmation Order, on the other, the terms of the Approval Order shall control and govern.

2.2.10    The Plan shall provide that the execution and delivery of this Settlement Agreement is a condition to entry of the Plan Confirmation Order and the occurrence of the Bankruptcy Plan Effective Date. The inclusion of this Settlement Agreement in the Plan

shall not be waivable as a condition to entry of the Plan Confirmation Order or the occurrence of the Bankruptcy Plan Effective Date absent the prior written consent of the Settling Insurers.

2.3     The Debtor Parties shall seek and obtain entry of an order from the Bankruptcy Court, which order shall be in form and substance acceptable to the Parties, that: (i) approves the Plan pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code; (ii) contains the Channeling Injunction; (iii) ratifies the Sale Injunction as independent of the Channeling Injunction and Supplemental Settling Insurers' Injunction; (iv) contains the Gatekeeper Injunction; (v) provides that this Settlement Agreement is binding on any Settlement Trust created in the Bankruptcy Case, the Reorganized Debtor, the Reorganized Additional Debtors, and any successors of the Settlement Trust, Reorganized Debtor, or Reorganized Additional Debtors, and all of the Archdiocese Bound Parties; and (vi) contains the Controlling Document Provision (the "**Plan Confirmation Order**").

2.3.1   The Plan and Plan Confirmation Order must not be inconsistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties.

2.3.2   In seeking to obtain the Plan Confirmation Order, the Debtor and Additional Debtors will: (i) seek a confirmation hearing on an appropriately timely basis; (ii) urge the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) take all reasonable steps to defend against any objection, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order.

2.3.3   Prior to entry of the Plan Confirmation Order, the Archdiocese and/or any applicable Additional Debtor shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Abuse Claim that (i) is asserted against any Debtor Party and (ii) implicates, or is reasonably likely to implicate, any Archdiocese Insurance Policies (including by alleging Abuse that took place during any policy period of any Archdiocese Policy). If, prior to the Plan Confirmation Order becoming a Final Order, the Bankruptcy Court allows any Entity to prosecute any such Abuse Claim, the Debtor Parties shall defend themselves against such Abuse Claims and comply with the terms of any order of the Bankruptcy Court, and Insurer's rights and obligations relating to such litigation shall be determined by, and subject to, the terms and conditions of the Archdiocese Policies, this Settlement Agreement, and any applicable orders of the Bankruptcy Court.

2.3.4   The Plan and Plan Confirmation Order shall provide that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any Covered Party with respect to any Archdiocese Policy, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

2.3.5    Nothing in this Section or elsewhere in this Settlement Agreement shall bar any party from arguing that any appeal from the Plan Confirmation Order should be dismissed on grounds of statutory or equitable mootness or otherwise.

2.3.6    None of the releases, Injunctions, or other provisions of the Plan with apply to, or have any effect, on the rights of the Settling Insurers to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with any Settling Insurer's Policy.

2.4    The Settlement Trust Documents shall require the Settlement Trust to register as a Responsible Reporting Entity under the reporting provisions of MMSEA.

2.4.1    The Settlement Trust Documents shall require the Settlement Trust, at its sole expense, to timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated and to follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

2.4.2    The Settlement Trust Documents shall require the Settlement Trust to obtain, prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Abuse Claim, a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. §1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim.

2.5    The Debtor Parties and Reorganized Debtor and Reorganized Additional Debtors will undertake commercially reasonable actions to cooperate with Insurer in connection with responding to any inquiry from Insurer's regulators, auditors, reinsurers, or retrocessionaires.

2.6    From and after the execution date of this Settlement Agreement and until the earlier of: (A) occurrence of (i) the Settlement Agreement Effective Date and (ii) Insurer's remittance of the Settlement Amount (at which time this covenant is superseded by the releases provided in Section 4); and (B) the date on which this Settlement Agreement is terminated, (i) none of the Insurer Released Parties, the Debtor, the Additional Debtors or Creditors' Committee will initiate any litigation activity against the other in any Bankruptcy Case and (ii) the Archdiocese and the Insurer Released Parties shall cease all litigation activities against each other in the Bankruptcy Case, including that the Insurer Released Parties will neither object to any proposed Plan consistent with this Settlement Agreement, nor serve or compel any discovery in connection with the Bankruptcy Case; *provided that*: (y) neither the Archdiocese nor any Additional Debtor shall include any provision in any Plan that adversely affects the rights or benefits of the Insurer Released Parties under this Settlement Agreement, or that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement; and (z) neither the Archdiocese nor any Additional Debtor shall act, or fail to act, in such a way that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement.

20

Notwithstanding the foregoing, the Insurer Released Parties may participate in the Bankruptcy Case for the purpose of supporting or enforcing any of the terms of this Settlement Agreement and protecting their rights.

2.7 From and after the execution date of this Settlement Agreement and until the date on which this Settlement Agreement is terminated, the obligations of the Debtors Parties set forth in this Section 2 shall be binding on the Debtor Parties.

## 3. PAYMENT OF THE SETTLEMENT AMOUNTS

3.1 By no later than thirty (30) days after (a) the Settlement Agreement Effective Date, and (b) Insurer receiving appropriate instructions for the transmission of the payment to the Escrow Agent or Settlement Trust, Insurer shall pay (or cause to be paid) the Settlement Amount to the Settlement Trust or Escrow Agent pursuant to the Escrow Agreement. Payment of the Settlement Amount may be by check, ACH transfer, wire transfer, or other method.

3.2 The delivery of the Settlement Amount to the Escrow Agent or Settlement Trust shall be in full and final settlement of all responsibilities under and arising out of the Archdiocese Policies, the sale of the Purchased Property to Insurer free and clear of all Subject Interests of any Entity, and the other releases provided.

3.3 Subject to the occurrence of the Settlement Agreement Effective Date, the Parties agree: (i) the Settlement Amount is the total amount that Insurer is obligated to pay on account of any and all Claims under, arising out of, relating to, or in connection with the Archdiocese Policies (including Barred Claims, and any reimbursement obligations for Conditional Payments under the MSPA); (ii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of anyone in connection with the Archdiocese Policies, including any payments in connection with amounts allegedly owed under the MSPA or in connection with any Claims, including any Barred Claim; (iii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of the Archdiocese Bound Parties or any Abuse Claimants in connection with the Archdiocese Policies; and (iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted. The Parties further agree that the Settlement Amount includes the full purchase price of the Archdiocese Policies and Related Insurance Claims and Coverage Claims of the Archdiocese Bound Parties and consideration for the releases and other protections afforded by this Settlement Agreement.

3.4 The Parties represent and agree that (i) the consideration to be provided by Insurer pursuant to this Settlement Agreement constitutes a fair and reasonable compromise and exchange for the consideration granted to the Insurer Released Parties in this Settlement Agreement (including the releases set forth below), and (ii) the consideration to be provided by the Archdiocese Bound Parties to the Insurer Released Parties pursuant to this Settlement Agreement (including the releases set forth below) constitutes a fair and reasonable compromise and exchange for the consideration granted to the Archdiocese Bound Parties in this Settlement Agreement. The Insurer Released Parties are not acting as volunteers, and the Settlement Amount reflects potential

818

liabilities and obligations to the Archdiocese Bound Parties of the amount Insurer allegedly is obligated to pay.

3.5    Each of the Archdiocese Signatory Parties: (i) consents to the sale of the Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests and Claims of all Persons, including, without limitation, the Archdiocese Bound Parties in accordance with the terms of this Settlement Agreement, and (ii) agrees and acknowledges that the contribution of the proceeds from such sale and settlement to the Settlement Trust, as provided in the Plan and this Settlement Agreement, is a fair and reasonable compromise and exchange for value and constitutes reasonable and adequate consideration for any Subject Interest or Claim the Archdiocese Bound Parties may have in the Archdiocese Policies.

3.6    The Parties further agree that they have attempted to resolve the matters set forth herein in compliance with both state and federal law and believe that the settlement terms adequately consider CMS's interest and do not reflect any attempt to shift responsibility for payment of medical expenses to CMS pursuant to 42 U.S.C. § 1395y(b).  The Parties acknowledge, understand, and agree that any present or future action or decision by CMS, including actions regarding an Abuse Claimant's eligibility or entitlement to receive Medicare or Medicare payments, will not render this Settlement Agreement (including the releases set forth in it) void or ineffective, or in any way affect the finality of this Settlement Agreement.  The Settlement Trust is responsible for all future medical payments, including any and all claims by CMS and/or CMS contractors that have been or may be in the future arising out of, relating (directly or indirectly) in any way to, or in connection with this Settlement Agreement.

3.7    To facilitate the purchase of the Purchased Property as set forth herein, each Archdiocese Bound Party is authorized to designate a lawful attorney in fact, with full powers of substitution, to execute any bill of sale or other document reasonably requested by the Archdiocese or Insurer to accomplish the sale and purchase contemplated herein. A form of Bill of Sale is attached hereto as **Exhibit B**.

## 4.    RELEASES AND SALE FREE AND CLEAR

4.1    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, with no further action being required, the Archdiocese Signatory Parties fully, finally, and completely remise, release, acquit, and forever discharge the Insurer Released Parties (including, for the avoidance of doubt, any of their reinsurers or retrocessionaires, solely in their capacity as such), from any and all past, present, and future: (a) Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies or Claims that are covered or are determined to be covered by agreement or a court of competent jurisdiction under the Archdiocese Policies, including, without limitation, any Barred Claims, Direct Action Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims, the handling of the Abuse Claims or the Bankruptcy Case. The Archdiocese Signatory Parties further acknowledge, stipulate, and agree that (x) the releases in this Section 4.1 specifically include all Unknown Abuse Claims, and demands that are based in whole or in part on Unknown Abuse Claims and (y) **with respect to all Claims released under**

22

819

this Section 4.1, the Archdiocese Signatory Parties waive any and all provisions, rights, and benefits conferred by Cal. Civ. Code 1542 or any law of any state of the United States, or any principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code 1542, which provides: "a general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, that, if known by him or her, would have materially affected his or her settlement with the debtor or released party" and (z) the releases in this Section 4.1 shall be equal in breadth to the broadest releases and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

4.2    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, and with no further action being required, Insurer shall fully, finally, and completely remise, release, acquit, and forever discharge the Archdiocese Signatory Parties from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies, including any Barred Claims, and reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case subject to the protections in favor of the Insurer Released Parties set forth herein.

4.3    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, none of the Archdiocese Signatory Parties or other Archdiocese Bound Parties shall assert against the Insurer Released Parties any Claim with respect to any matter, conduct, transaction, occurrence, fact, or other circumstance that, directly or indirectly, arises out of, relates to, or is in connection with any of the Archdiocese Policies, any Barred Claim, or any other matter released pursuant to Sections 4.1 and 4.2 above.

4.4    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer hereby buys back the Archdiocese Policies free and clear of all Subject Interests, including without limitation all Coverage Claims and Related Insurance Claims, of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); and any Abuse Claimant, or any other holder of a Barred Claim. This sale is pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code. The Parties acknowledge and agree, and the Approval Order shall find and conclude, that upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount:

    4.4.1    Insurer is a good faith purchaser of the Archdiocese Policies and any Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), within the meaning of section 363(m) of the Bankruptcy Code, with all the protections afforded such a purchaser under 363(m) of the Bankruptcy Code;

    4.4.2    The consideration exchanged constitutes a fair and reasonable settlement and compromise of the Parties' disputes and of their respective rights and obligations

23

relating to the foregoing Archdiocese Policies and Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), and constitutes reasonably equivalent value;

4.4.3    The releases in this Settlement Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy law;

4.4.4    The Archdiocese Policies and all Subject Interests therein (including, without limitation, to the extent applicable, any Direct Action Claim) shall be terminated and of no further force and effect;

4.4.5    Insurer's payment of the Settlement Amount constitutes Insurer's full and complete performance of any and all obligations under the Archdiocese Policies, including any performance owed to the Archdiocese Bound Parties or any holder or purported holder of any Claim against (including any Abuse Claim or Direct Action Claim) or Subject Interest in, the Archdiocese Policies, and exhausts all limits of liability of the Archdiocese Policies;

4.4.6    All Subject Interests the Archdiocese Bound Parties and any other Entity may have had, may presently have, or in the future may have in the Archdiocese Policies are released pursuant to the terms of this Settlement Agreement and policy buyback;

4.4.7    All per occurrence and/or aggregate limits of coverage under the Archdiocese Policies are fully eroded, exhausted and settled upon the Settlement Agreement Effective Date;

4.4.8    The Insurer would not pay the Settlement Amount without buyback of the Archdiocese Policies upon all of the terms and conditions set forth herein; and

4.4.9    The Archdiocese Signatory Parties accept the Settlement Amount in full and complete compromise and satisfaction of all Insurer Released Parties' past, present, and future obligations, including any obligations to any of the Archdiocese Bound Parties under such Archdiocese Policies or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever that are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies (including without limitation Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether or not such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, the Bankruptcy Case, or otherwise.

4.5    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer shall have no obligation to pay, handle, object, or otherwise respond to any Claim against the Archdiocese Bound Parties; and the Archdiocese Bound Parties will: (i) will withdraw, and are deemed to have withdrawn, all outstanding tenders of Claims to the Insurer Released Parties for defense and indemnity; (ii) will not tender any Claims to the Insurer Released Parties; and (iii) will not request that the Insurer Released Parties fund any

judgments, settlements, or defense costs that, in each case, are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies issued by a Settling Insurer.

4.6     To the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer consent to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under this Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Subject Interests of any Entity in such Archdiocese Policies (the "**Non-Debtor Catholic Entity Policy Sale**"). The Plan Confirmation Order and Approval Order shall so provide and Insurer shall be designated in the Plan Confirmation Order as a good-faith purchaser of the Archdiocese Policies with all the protections afforded such a purchaser under section 363(m) of the Bankruptcy Code.

4.7     The Archdiocese Signatory Parties further covenant, stipulate and agree that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Abuse Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any insured or additional insured covered by any insurance policy issued by any Insurer Released Party, and to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in any Archdiocese Policy to the Debtor's Estate and sale thereof to Insurer, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court. Without limiting the foregoing, the Insurer Released Parties shall receive protections against Claims by Non-Debtor Catholic Entities and any other Entity equal in breadth to the broadest protections received by any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, or any Insurance Settlement Agreement approved by the Bankruptcy Court.

4.8     If the Archdiocese Signatory Parties, or anyone of them, enter into any agreement (that is embodied in such agreement as approved by the Bankruptcy Court, the Plan, and/or the Plan Confirmation Order) with any other one of the Settling Insurers (including any Non-Settling Insurer who becomes a Settling Insurer) in the Bankruptcy Case, that provides that insurer with releases, injunctions or other protections that are more favorable than those contained in this Settlement Agreement, then this Settlement Agreement shall be deemed to be modified to provide Insurer with those more favorable injunctions, releases or other protections.

4.9     Notwithstanding anything in this Settlement Agreement, nothing in this Settlement Agreement is intended to or shall be construed to:

    4.9.1     apply to or have any effect on the Insurer Released Parties' rights to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer;

    4.9.2   release any Claims that any Insurer Released Party has or might have against any Non-Settling Insurer, except that, to the extent such other insurers have agreed or in the future agree to release any Claims against the Insurer Released Parties arising out of or related in any way to the Abuse Claims, then the Insurer Released Parties also release such Claims against such other insurers to the same extent; or

    4.9.3   release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Settlement Agreement or the Plan (to the extent not inconsistent with this Settlement Agreement).

## 5.    TERMINATION OF AGREEMENT

    5.1    The Parties may terminate this Settlement Agreement by mutual agreement in writing.

    5.2    Insurer may terminate this Settlement Agreement upon fifteen (15) days written notice to the other Parties in the event of any of the following occurs prior to the Settlement Agreement Effective Date: (i) any of the Debtor Parties or the Creditors' Committee files a plan inconsistent with this Settlement Agreement; (ii) the Approval Order and the Plan Confirmation Order are not entered by February 15, 2026; (iii) the Bankruptcy Court enters an order that becomes a Final Order that (a) denies the Approval Motion or (b) is inconsistent with the Approval Order or the Plan Confirmation Order; (iv) a plan that is inconsistent with the terms of this Settlement Agreement is confirmed; or (v) any Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

    5.3    In the event of termination pursuant to this Section 5, unless the Parties agree otherwise in writing, the Parties' interests, rights, and obligations under the Archdiocese Policies shall not be impacted by such termination.

## 6.    REPRESENTATIONS AND WARRANTIES OF THE PARTIES

    6.1    The Parties separately represent and warrant as follows:

    6.1.1   To the extent it is a corporation, including a non-profit, religious, or charitable corporation, or other legal entity, each such Party has the requisite power and authority to enter into this Settlement Agreement and to perform the obligations contemplated by this Settlement Agreement[1], subject only to approval of the Bankruptcy Court; and

    6.1.2   This Settlement Agreement has been analyzed by counsel to the Parties and executed and delivered in good faith pursuant to arm's length negotiations and for value and valuable consideration.

---

[1]   Specifically, each Archdiocese Signatory Party is duly authorized to execute this Settlement Agreement and any related document and the signatory hereto on behalf of such Archdiocese Signatory Party has full power and authority to bind such Archdiocese Signatory Party. The related corporate resolutions and incumbency certificates are identified in Schedule 4 and Schedule 5 respectively.

6.2    The Archdiocese Signatory Parties represent and warrant that they have not assigned, and will not assign, any Subject Interests in the Archdiocese Policies to any Entity, except for the avoidance of doubt, the assignment of the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate.

6.3    The Archdiocese Signatory Parties represent and warrant that (i) all Archdiocese Bound Parties have either signed this agreement, are represented herein by the Archdiocese or the Archdiocese Signatory Parties, or are juridical entities whose existence has been terminated as a matter of applicable non-bankruptcy law and (ii) the Archdiocese Signatory Parties are duly authorized to bind the Archdiocese Bound Parties who are not Archdiocese Signatory Parties. Without limiting the foregoing, the Archdiocese Signatory Parties represent and warrant that:

6.3.1    all entities known to them that are Co-Insured Parties under the Archdiocese Policies (by express reference, assignment, judicial determination or any related concept under applicable law or other document) other than the Debtor, the Additional Debtors, the Parish Schools and Archdiocesan Schools, the Non-Debtor Catholic Entities, and the cemeteries identified in Section 6.3.3, are identified in Schedule 2 hereto, if any;

6.3.2    the Archdiocesan Schools are not separately incorporated and are merely unincorporated operations of the Debtor and the Parish Schools are not separately incorporated and are merely unincorporated operations of the Archdiocesan Parishes that are Additional Debtors;

6.3.3    the Debtor, through the Office of Catholic Cemeteries, operates certain cemeteries including, without limitation: All God's Babies Tomb & Holy Innocents Prayer Garden, St. Charles Cemetery, St. Joseph Cemetery #1, St. Joseph Cemetery #2, St. Louis Cemetery #1, St. Louis Cemetery #2, St. Louis Cemetery #3, St. Patrick Cemetery #1, St. Patrick Cemetery #2, St. Patrick Cemetery #3, St. Roch Cemetery #1, St. Roch Cemetery #2, St. Vincent De Paul Cemetery #1, St. Vincent DePaul Cemetery #2, which cemeteries are either: (a) Non-Debtor Catholic Entities or (b) not separately incorporated and are merely unincorporated operations of the Debtor;

6.3.4    Holy Redeemer School, Redeemer-Seton High School, and St. Joseph Benedectine High School were formerly owned and operated by the Archdiocese, but ceased operations and were closed by the Debtor at some point prior to the Petition Date, and were not separately incorporated and were merely unincorporated operations of the Debtor;

6.3.5    St. Robert Bellarmine School was formerly owned and operated by one or more of the Archdiocese Signatory Parties, but ceased operations and was closed by one or more of the Archdiocese Signatory Parties at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of one of the Additional Debtors;

6.3.6    Notre Dame Seminary and the Society of the Propagation of the Faith of the Archdiocese of New Orleans are owned and operated by the Archdiocese and are not separately incorporated, but are merely unincorporated operations of the Debtor;

6.3.7   San Pedro Pescador Church was owned and operated by the Archdiocese, but was closed by the Archdiocese prior to the Petition Date and was not separately incorporated, but was merely an unincorporated operation of the Archdiocese;

6.3.8   the following Roman Catholic Schools: the Academy of the Sacred Heart, Holy Cross, Jesuit, St. Mary's Academy, St. Mary's Dominican, Brother Martin, Mount Carmel Academy, Ursuline Academy, Cabrini, De La Salle, and St. Paul's School, are not Co-Insured Parties, named insured's or additional insureds (or related concept under applicable law or document) under the Archdiocese Policies, or institutions, religious organizations or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control and active management, and were themselves not under the control or active management of the Archdiocese;

6.3.9   St. John Vianney Preparatory School was formerly owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.10  the Louise Home a/k/a as the Louise Headstart Center was an unincorporated ministry of the Debtor;

6.3.11  Holy Guardian Angel was owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.12  the Social Apostolate Housing Program was an unincorporated ministry of the Debtor;

6.3.13  at all times Tulane Catholic and the Newman Center were and are unincorporated activities of the Debtor, with no existence separate and apart from the Debtor;

6.3.14  Crescent City Convent Corporation, Lyric Realty and Parking Company, Inc., The Chinchuba Deaf-Mute Institute, People for Teens of St. Anthony of Padua Corporation, Kiwanis Foundation of New Orleans, Kiwanis Club of New Orleans, and Seminarians Parents Association, Inc. were never owned, operated, or controlled by the Debtor or the Additional Debtors and were neither insureds nor additional insureds under the Archdiocese Policies; and

6.3.15   (a) Catholic Charities Archdiocese of New Orleans ("**Catholic Charities**") owned and operated Hope Haven – Madonna Manor ("**HH**"), which was organized under Louisiana law; (b) HH was dissolved and its status as a juridical person was, thus, terminated as a matter of Louisiana law; (c) at all times, Catholic Charities was the sole member and/ or shareholder of HH; and (d) it is the intention of Catholic Charities that HH be bound by this Agreement as if it remained in existence and had signed the Agreement as a Party.

6.4     The Archdiocese Signatory Parties represent and warrant that they are not aware of any Abuse Claim asserted against any entity associated with the Archdiocese (including any parishes, institutions or religious organizations or any subsidiary of the person or organization listed in the declarations of the Archdiocese Policies, or any other organization coming under the Archdiocese's control and active management), that is not listed on Exhibit B-1 to the Acceptable Plan.

6.5     The Debtor represents and warrants that it will undertake good faith efforts to cause actual notice of the Approval Motion to be sent in accordance with Section 2.1.1 hereof.  Without limitation, the Debtor has sent or will send notice to the entities on Schedule 3.

6.6     The Archdiocese Signatory Parties and Insurer (limited to such Insurer person that worked on and were familiar with this Settlement Agreement and matters referenced therein), respectively, represent and warrant that they have completed a reasonable search for evidence of any policy of insurance issued by Insurer to the Archdiocese Signatory Parties that would afford coverage with respect to any Abuse Claim, Coverage Claim, or Related Insurance Claim and other than the policies identified in Schedule 1, no such policies have been identified.  The Archdiocese Signatory Parties further represent and warrant that, to the best of their knowledge after reasonably diligent investigation: there are no contracts, binders, certificates, and policies of insurance that insure or purport to insure (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) (x) the Diocese of Houma-Thibodaux or (y) the Diocese of Baton Rouge (excluding, for the avoidance of doubt, policies issued to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD, but including any such policies issued to the Archdiocese that provide or may provide insurance coverage to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD), or (iv) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, other than the policies identified in Schedule 1. Notwithstanding the foregoing, nothing in this Settlement Agreement, including the Schedules or Exhibits hereto, shall be construed as or deemed to be an admission or evidence that any binder, certificate, or policy of insurance was in fact issued or affords coverage in connection with any Abuse Claims.

6.7     The Debtor Parties represent and warrant that they have not in any way assisted, and covenant that they shall not in any way assist, any Entity in the establishment or pursuit of any Claim, including any Barred Claim, against the Insurer Released Parties.

## 7.     ACTIONS INVOLVING THIRD PARTIES

7.1     For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Archdiocese Policies resulting from the purchase and sale thereof contemplated by this Settlement Agreement, the Parties hereby agree as follows:

7.1.1     From and after (i) the occurrence of the Settlement Agreement Effective Date, and (ii) Insurer's payment of the Settlement Amount, if any other insurer of the Archdiocese Bound Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from Insurer as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for any of Insurer's alleged share or

equitable share, or to enforce subrogation rights, if any, with respect to the defense or indemnity obligation of Insurer for any Claims or reimbursement obligations for Conditional Payments released or resolved pursuant to this Settlement Agreement, the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and the Settlement Trust shall voluntarily reduce any judgment or Claim against, or settlement with, such other insurers to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against Insurer. To ensure that such a reduction is accomplished, Insurer shall be entitled to assert this Section 7 as a defense to any action against it brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Insurer from any liability for the judgment or Claim. Moreover, if a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against Insurer, such Claim may be asserted as a defense against a Claim by the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust in any coverage litigation (and the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and/or the Settlement Trust may assert the legal and equitable rights of Insurer in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust shall be reduced dollar for dollar by the amount so determined.

7.1.2   Unless this Settlement Agreement is terminated, Insurer shall not seek reimbursement for any payments it makes under this Settlement Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other Settling Insurer unless that other insurer first seeks contribution, subrogation, indemnification, or similar relief from Insurer. Notwithstanding the foregoing, nothing in this Settlement Agreement, the Approval Order or the Plan Confirmation Order shall be construed as prohibiting Insurer from seeking recovery (including with respect to the Settlement Amount or otherwise) from its reinsurers or retrocessionaires in their capacity as such.

7.2     Subject to the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, and subject to the limitations set forth below, the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein, including any Claims made by (i) any Entity who is an insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies; (ii) any Entity who makes (a) an Abuse Claim or (b) a Related Insurance Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a Claim under any of the Archdiocese Policies (collectively, the "**Indemnified Claims**"), as set forth below:

7.2.1   The Insurer Released Parties shall have the right (but not the obligation) to (a) seek to enforce the Injunctions against any Entity seeking to assert an Indemnified Claim, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions) identified in this Section 7.2. With the Insurer Released Parties' consent, such consent not to be unreasonably withheld, the Settlement Trustee can satisfy the obligations contained in (a) and (b) above. An amount

equal to One Thousand Eleven and 90/100 Dollars ($1,011.90) (the "**Indemnity Cost Reserve**") shall be reserved from the Settlement Amount for payment of reasonable attorneys' fees, expenses, costs, and other amounts incurred by the Insurer Released Parties in defending against such Indemnified Claims, which amount shall be released from reserve if no Indemnified Claims are asserted within 30 days after the Revival Window has closed under every applicable Revival Window Law.

7.2.2    Neither any Archdiocese Bound Party, nor the Settlement Trust shall in any way assist, any Entity in the establishment or pursuit of any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein.

7.2.3    The Settlement Trust and Archdiocese shall support and join in the enforcement of the Injunctions against any Entity seeking to assert an Indemnified Claim; *provided that* if the Insurer Released Party(ies) elect(s) not to enforce the Injunctions in accordance with Section 7.2.1, the Settlement Trust shall (a) seek to enforce the Injunctions against such Entity, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions).

7.2.4    To the extent that a Final Order is entered against any Insurer Released Party with respect to any Indemnified Claim, the Settlement Trust shall indemnify and hold harmless such Insurer Released Party with respect thereto up to the Settlement Amount; *provided that* to the extent the Insurer Released Party(ies) elect not to enforce the Injunctions or defend against the Indemnified Claims, the Settlement Trust's indemnity obligation shall be limited to the amount of the Indemnity Cost Reserve; *provided further* that if the Settlement Trust breaches its obligation set forth in Section 7.2.2 hereof, the Settlement Trust's indemnity obligation shall not be so limited and shall instead be up to the Settlement Amount.  In no event shall the Settlement Trust's indemnity obligation exceed each individual Settling Insurer's Settlement Amount.  To the extent the Settlement Amount has been distributed in accordance with the Plan, the Settlement Trust's indemnification obligation shall be so reduced.

7.2.5    The indemnification provided for herein shall not impose liability on the Settlement Trustee or Settlement Trust professionals for their own acts or omissions; *further*, funds provided for the administration of the Settlement Trust or payment of the Settlement Trustee or Settlement Trust professionals shall not be subject to indemnification claims as provided for herein.

7.3    If any Entity attempts to prosecute a Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies against the Insurer Released Parties before the Approval Order and Plan Confirmation Order become Final Orders, then promptly following notice to do so from Insurer, the Archdiocese and/or the Additional Debtor(s), as applicable, will file a motion and supporting papers to obtain an order from the Bankruptcy Court pursuant to sections 362 and 105(a) of the Bankruptcy Code protecting the Insurer Released Parties from any such Claims until the Plan Confirmation Order has become a Final Order, the Bankruptcy Case is dismissed, or this Settlement Agreement is terminated under Section 5 hereof.

## 8.    MISCELLANEOUS

8.1    If any action or proceeding of any type whatsoever is commenced or prosecuted by any Entity not a Party to this Settlement Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Settlement Agreement, the Parties mutually agree to cooperate fully in opposing such action or proceeding.

8.2    The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Settlement Agreement and to preserve its validity and enforceability.

8.3    The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Plan Confirmation Order, and the Bankruptcy Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof.

8.4    Notwithstanding any language to the contrary in this Settlement Agreement, under no circumstance will any Archdiocese Signatory Party be obligated to take any action that violates any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, and if a court of competent jurisdiction determines that a term or condition in this Settlement Agreement does violate any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, the applicable Archdiocese Signatory Party shall be relieved of such term or condition, but the scope and finality of the releases, injunctions, and buybacks set forth in this Settlement Agreement shall not be affected or modified.

8.5    This Settlement Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.6    This Settlement Agreement may be modified only by a written amendment signed by all of the Parties, and no waiver of any provision of this Settlement Agreement or of a breach thereof shall be effective unless expressed in a writing signed by the waiving Party.  The waiver by any Party of any of the provisions of this Settlement Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach. Any change or modification of this Agreement that would result in a material adverse change to the rights of the Abuse Claimants or Trust shall require the consent of the Creditors' Committee (if at the time of the proposed change or modification a Trustee has not been appointed) or Settlement Trustee (if at the time of the proposed change or modification a Trustee has been appointed and approved), as applicable, which consent shall not be unreasonably withheld.

8.7    By entering into this Settlement Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Settlement Agreement.  No part of this Settlement Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Settlement Agreement.  All actions taken and statements

made by the Parties or by their representatives relating to this Settlement Agreement or participation in this Settlement Agreement, including its development and implementation, shall be without prejudice or value as precedent.

8.8     This Settlement Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession regarding liability, culpability, wrongdoing, or insurance coverage.  All related discussions, negotiations, and all prior drafts of this Settlement Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. Any evidence of the negotiations or discussions associated with this Settlement Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.8, in (i) an action or proceeding to enforce the terms of this Settlement Agreement, including any use as set forth in Section 7.1.1, or (ii) any possible action or proceeding between the Insurer Released Parties and any reinsurers.  This Settlement Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Insurer Released Parties' obligations under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer.

8.9     None of the Parties shall make any public statements or disclosures (i) regarding another Party's rationale or motivation for negotiating or entering into this Settlement Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued or determined by agreement or a court of competent jurisdiction to have been issued by the Insurer Released Parties, including handling of or involvement in connection with any claims asserted thereunder.

8.10    Neither this Settlement Agreement nor the rights and obligations set forth in this Settlement Agreement shall be assigned without the prior written consent of the other Parties.

8.11    This Settlement Agreement was jointly drafted by the Parties, and the wording of this Settlement Agreement was reviewed by legal counsel for each of the Parties, and each of them had sufficient opportunity to propose and negotiate changes prior to its execution.  The language of all parts of this Settlement Agreement shall in all cases be construed as a whole according to its meaning and not strictly for or against any Party.

8.12    Section titles and headings contained in this Settlement Agreement are included only for ease of reference and shall have no substantive effect.

8.13    All notices, demands, or other communication to be provided pursuant to this Settlement Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other Entity or address as any of them may designate in writing from time to time:

If to the Debtor or Reorganized Debtor:

Mark A. Mintz

Samantha A. Oppenheim
Jones Walker LLP
Telephone: 504-582-8368
Telephone: 504-582-8641
Email: mmintz@joneswalker.com
Email: soppenheim@joneswalker.com

with copies to:

-and-

If to an Archdiocese Signatory Party other than a Debtor Party:

As set forth on Plan Exhibit B-2.

If to Insurer or the Insurer Released Parties:

with copies to:

-and-

-and-

If to the Settlement Trust:

Donald C. Massey
Couhig Partners, LLC
1100 Poydras Street, Suite 3250
New Orleans, Louisiana 70163
Telephone: (504) 599-5777
Email: dmassey@couhigpartners.com

with copies to:

Andrew W. Caine

> Pachulski, Stang, Ziehl & Jones LLP
> 10100 Santa Monica Blvd, Suite 1300
> Los Angeles, CA 90067
> Telephone: 310-277-6910
> Email: acaine@pszjlaw.com

8.14    This Settlement Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument. This Settlement Agreement may be executed and delivered by facsimile, e-mail, or other electronic image, which facsimile, e-mail, or other electronic image counterparts shall be deemed to be originals.

8.15    Nothing contained in this Settlement Agreement shall be deemed or construed to constitute (i) an admission by the Insurer Released Parties that the Archdiocese Bound Parties, or any other Entity, was or is entitled to any insurance coverage under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by the Insurer Released Parties or as to the validity of any of the positions that have been or could have been asserted by the any of the Archdiocese Bound Parties, (ii) an admission by any of the Archdiocese Bound Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by the Insurer Released Parties or any Claims that have been or could have been asserted by the Archdiocese Bound Parties against the Insurer Released Parties, or (iii) an admission by the Archdiocese Bound Parties or the Insurer Released Parties of any liability whatsoever with respect to any of the Abuse Claims.

8.16    The Parties to this Settlement Agreement, all of the Entities included in the definition of "Insurer Released Parties," and the Settlement Trust are intended beneficiaries of this Settlement Agreement. Except as set forth in the preceding sentence or otherwise set forth in this Settlement Agreement, there are no third-party beneficiaries of this Settlement Agreement.

8.17    The Archdiocese Signatory Parties and the Insurer Released Parties shall each be responsible for their own fees and costs incurred in connection with the Bankruptcy Case, this Settlement Agreement, and the implementation of this Settlement Agreement, except as specifically set forth herein (including in Section 7).

8.18    The following rules of construction shall apply to this Settlement Agreement:

8.18.1 Unless the context of this Settlement Agreement otherwise requires: (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Settlement Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.18.2 References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Settlement Agreement.

8.18.3  The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Settlement Agreement when the stated intent is not achieved.

8.19   The Bankruptcy Court in the Bankruptcy Case shall retain jurisdiction to interpret and enforce the provisions of this Settlement Agreement, which shall be construed in accordance with Louisiana law without regard to conflicts of law principles thereof.  The Insurer Released Parties do not, by virtue of this Section 8.19 or any other provision in this Settlement Agreement, consent to the Bankruptcy Court's jurisdiction as to any other matter.

8.20   This Settlement Agreement and each Debtor Party's obligations under this Settlement Agreement shall be binding on each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) and shall survive the entry of the Plan Confirmation Order; provided, however, after the occurrence of the Bankruptcy Plan Effective Date, recourse for all obligations, other than those set forth in Sections 6.5, 6.7, and 7 hereof or a remedy of specific performance, shall be to the Settlement Trust; provided further, however, if specific performance is not available, each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) may be held liable for an intentional breach of a representation in this Agreement or their bad faith material breach of this Agreement, and if liability on any such ground is established, then recourse may be had directly against the Debtor Party, Reorganized Debtor, and/or Reorganized Additional Debtor(s) responsible.

8.21   The obligations of the Parties herein, other than those conditioned upon the Settlement Agreement Effective Date, shall be binding upon execution hereof by the Parties.

8.22   Nothing in this Settlement Agreement will prevent Insurer from allocating the Settlement Amount among the Archdiocese Policies at Insurer's discretion.

8.23   If any provision of this Settlement Agreement, or the application thereof, shall for any reason or to any extent, be construed to be invalid or unenforceable, the remainder of this Settlement Agreement, and the application of such provision to other circumstances, shall be interpreted so as to best effect the intent of the Parties, unless such determination of invalidity or unenforceability deprives any Party of the substantial benefit of its bargain.

8.24   The Parties agree that all matters relating to the negotiation and terms of this Settlement Agreement (including by way of example and not limitation, all prior drafts, exchanges of terms, and related discussions or correspondence) shall be confidential and are not to be disclosed except by order of court or consent of the Parties in writing.  This Section 8.24 does not prevent or prohibit the Parties from publicly filing on the docket in the Bankruptcy Case the final, executed copy of this Settlement Agreement.

[*Remainder of Page Intentionally Left Blank*]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed: _____

_____

Date: _____

*[Signatures Continue on Adjacent Pages]*

834

**Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation**

Signed: _____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

38

**All Archdiocese Signatory Parties**
**Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title:          **Their Authorized Signer**

Date:          _____

*[Signatures Continue on Adjacent Pages]*

Case 20-10846 Doc 4334-2 Filed 10/27/25 Entered 10/27/25 16:24:54 Ex Supplement Settlement Page 837 of 1339 Page 40 of 88

**<u>Exhibit A</u>**

**Sale Order**

1

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| IN RE: | § |
|  | § |
| THE ROMAN CATHOLIC CHURCH | § |
| OF THE ARCHDIOCESE OF NEW | § |
| ORLEANS, *et al.*,[1] | § |
|  | § |
| DEBTORS. | § |
|  | § |

CASE NO. 20-10846 (MSG)

CHAPTER 11

SECTION A

COMPLEX CASE

**ORDER (I) APPROVING PURITAN INSURANCE COMPANY, THE MANHATTAN
FIRE AND MARINE INSURANCE COMPANY, AND WESTPORT INSURANCE
CORPORATION'S SETTLEMENT AGREEMENT, RELEASE AND BUYBACK, (II)
APPROVING THE SALE OF THE ARCHDIOCESE POLICIES FREE AND CLEAR,
(III) ENJOINING CLAIMS, AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated July 29, 2025 [D.E. 4181] and supplemented by the filing of the revised Settlement Agreement (as defined below) on October 27, 2025 [D.E.[∗]] ("Approval Motion") of The Roman Catholic Church of the Archdiocese of New Orleans, the lead debtor and debtor-in-possession (the "Debtor" or "Archdiocese") and the other debtors and debtors-in-possession[2] (the "Additional Debtors" and, together with the Archdiocese, the "Debtor Parties") in the above-captioned chapter 11 cases, by and through their respective counsel, for entry of an order (this "Order") approving the settlement agreement, releases, insurance policy buyback, and related injunction-in-aid ("Settlement") by and among the Archdiocese, the Additional Debtors, the other Archdiocese Signatory Parties, the Creditors' Committee, and Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation ("Insurer" and, collectively with the foregoing, the "Parties"), pursuant to Sections

---

[1]   The last four digits of the Debtor's federal tax identification number is 8966.

[2]   In connection with the Plan, the Catholic Entities listed on Plan **Exhibit B-1** (the "**Additional Debtors**") filed individual chapter 11 cases. The Plan is a combined joint Plan for the Archdiocese and the Additional Debtors, and the Approval Motion is deemed to have been filed (and this Order is entered) in each Additional Debtor's bankruptcy case for purposes of the relief requested herein.

2

838

105(a) and 363 of Title 11 of the United States Code ("<u>Bankruptcy Code</u>") and Rules 2002(a)(2), 6004, and 9019 of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>"), in each case as described in the Approval Motion and the *Settlement Agreement, Release, and Policy Buyback* attached to this Order as **Exhibit 1** (the "<u>Settlement Agreement</u>");[3] and the Bankruptcy Court having reviewed the Approval Motion and the Settlement Agreement; and it appearing that due and adequate notice of the Approval Motion and Settlement Agreement having been given to all Entities entitled thereto, and that no other or further notice need be given; and the Bankruptcy Court on November 17, 2025 at 9:00 AM having held a hearing (the "<u>Sale Hearing</u>") to consider the relief requested in the Approval Motion; and upon the record of the Sale Hearing; and, after due deliberation, including, without limitation, for the reasons stated by the Bankruptcy Court on the record of the Sale Hearing, it appearing that the relief requested in the Approval Motion and granted herein is in the best interests of the Debtor Parties' estates (the "<u>Estates</u>"), their creditors, and other parties in interest; and good sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.    This Bankruptcy Court has jurisdiction over the Approval Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of this case and the Approval Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief sought in the Approval Motion are Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007, 9008 and 9019,

---

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

and Rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Louisiana.

C.     It is necessary and appropriate for the Bankruptcy Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Settlement Agreement, and to adjudicate, if necessary, to the extent provided under 28 U.S.C. § 1334(b), any and all disputes arising from or relating to the Settlement Agreement or this Order.

D.     Proper, timely, adequate and sufficient notice of the Sale Hearing and Approval Motion and the relief requested therein, including, without limitation, the Settlement and the transactions described in the Settlement Agreement, including, without limitation, issuance of the injunction-in-aid referenced in the Settlement Agreement and the Approval Motion (all such transactions being collectively referred to, for convenience, as the "Sale Transaction") has been provided by the Debtor Parties in accordance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules to all interested Entities, including, without limitation the parties listed on **Schedule 3** of the Settlement Agreement, through service of the Confirmation Hearing Notice (as defined in the Plan) in accordance with the Disclosure Statement Order (also as defined in the Plan).

E.     Notice of the Approval Motion was provided through publication of the Additional Debtors' Abuse Claims Bar Date Publication Notice (**Plan Exhibit G**) in daily and community newspapers throughout Louisiana.

F.     The notices described above were good, sufficient, and appropriate under the circumstances, and no other notice of the Approval Motion or Sale Hearing is required.

G.     The disclosures made by the Debtor Parties concerning the Settlement Agreement, the Sale Transaction, and the Sale Hearing were good, complete, and adequate.

4

H.    The Unknown Abuse Claims Representative has consented to, and approved of the Settlement Agreement and Sale Transaction on behalf of Unknown Abuse Claims in connection with the treatment of such Claims under the Plan.

I.    A reasonable opportunity to object or be heard with respect to the Approval Motion and the relief requested therein has been afforded to all interested Entities.

J.    The Archdiocese Signatory Parties, on their own behalf and on behalf of the Archdiocese Bound Parties, as applicable, have duly executed the Insurance Settlement Agreement by their duly authorized representative, agent and/or attorney in fact, and have full corporate power and authority to consummate the Sale Transaction pursuant to the Settlement Agreement and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Settlement Agreement, are required for the Archdiocese Bound Parties to consummate the Sale Transaction.

K.    The Debtor Parties have demonstrated (i) good, sufficient, and sound business purpose and justification and compelling circumstances for the Sale Transaction pursuant to Section 363(b) of the Bankruptcy Code and (ii) that the Sale Transaction is fair, reasonable, and in the best interests of their Estates and creditors pursuant to Bankruptcy Rule 9019. Among other things, the Debtor Parties have demonstrated that: the Settlement Agreement, and closing thereon, is necessary and appropriate to realize the value of the Purchased Property (as defined below) and maximize the value of their Estates; the probability of success for their Estates in litigation over the matters resolved by the Settlement Agreement is uncertain; litigation of the matters resolved by the Settlement Agreement would be complex and costly to their Estates; and the Settlement Amount is within the reasonable range of potential litigation outcomes. As used herein, "Purchased Property" means, collectively, all right, title and interest (including "Interests" as defined below)

5

841

in and to the Archdiocese Policies issued by Insurer and the Related Insurance Claims and Coverage Claims. The Sale Transaction constitutes a reasonable and sound exercise of the Debtor Parties' business judgment and their powers and duties under applicable law and should be approved. Approval of the Settlement Agreement and consummation of the Sale Transaction are in the best interests of the Debtor Parties' Estates, their creditors (specifically including the Abuse Claimants of the Debtor Parties), and other parties-in-interest, including because the proceeds of and from the Sale Transaction will benefit Abuse Claimants.

L.     The Settlement Agreement was negotiated, proposed, and entered into without collusion, in good faith, and from arm's length bargaining positions. Without limiting the foregoing, the Settlement Agreement resulted from a lengthy mediation that proceeded pursuant to a prior order of the Bankruptcy Court. Insurer is not an "insider" or "affiliate" (as those terms are defined in the Bankruptcy Code) of any of the Debtor Parties. None of the Archdiocese Bound Parties or Insurer have engaged in any conduct that would: (i) cause or permit the avoidance of the Settlement Agreement or the consummation of the Sale Transaction under Section 363(n) of the Bankruptcy Code; (ii) cause or permit the imposition of any costs or damages (including without limitation attorneys' fees or punitive damages) under Section 363(n) of the Bankruptcy Code; or (iii) prevent the application of Section 363(m) of the Bankruptcy Code. The releases, injunctions, policy buyback, and all other components of the Sale Transaction comply with the Bankruptcy Code and all applicable non-bankruptcy law.

M.     Pursuant to the Settlement Agreement and to the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer have consented to the assignment of the Non-Debtor Catholic Entities' Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities'

6

Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under the Settlement Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Interests of any Entity in such Archdiocese Policies (the "Non-Debtor Catholic Entity Policy Sale").

N.    Insurer is a good faith purchaser of the Purchased Property under Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, in that, among other things: (i) all payments to be made by or to Insurer, and other agreements or arrangements entered into by Insurer, including without limitation any escrow agreement pertaining to the payment of the Settlement Amount, in connection with the Sale Transaction have been disclosed; (ii) Insurer neither induced nor caused the Debtor Parties' chapter 11 filings; (iii) the negotiation and execution of the Settlement Agreement and any other agreements or instruments related thereto was in good faith, the arm's length transaction between Insurer and the other Parties was the product of mediation, and all Parties to the Settlement Agreement were, or had the opportunity to be, represented by counsel; and (iv) Insurer has not violated Section 363(n) of the Bankruptcy Code by any action or inaction. Insurer has at all times acted in good faith with respect to the Settlement Agreement and will continue to be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale Transaction.

O.    The terms and conditions of the Settlement Agreement are fair and reasonable. The Settlement Amount provided by Insurer pursuant to the Settlement Agreement (i) is fair and reasonable; (ii) monetizes the Purchased Property at the highest and best amount; (iii) will provide a higher and more certain recovery for the Debtor Parties' creditors than would be provided by

7

843

any other practical available alternative given the complexity, cost, and uncertainty of such alternatives; (iv) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (v) constitutes reasonably equivalent value (as defined in Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law. The Settlement Amount is within the reasonable range of potential litigation outcomes, and the Debtor Parties' determination to accept the Settlement Amount and otherwise enter into the Settlement Agreement is a valid and sound exercise of their business judgment and consistent with the Debtor Parties' fiduciary duties. The releases to be made pursuant to the Settlement Agreement, including without limitation the releases of the Archdiocese Bound Parties and the Insurer Released Parties, are appropriate and should be approved.

P.      Insurer: (i) is not a mere continuation of any of the Archdiocese Bound Parties or the Estate of any of the Debtor Parties, nor is there any continuity of enterprise between Insurer and the Debtor Parties or Insurer and any of the other Archdiocese Bound Parties; (ii) is not holding itself out to the public as a continuation of any of the Archdiocese Bound Parties; and (iii) is not a successor to the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties for any purpose, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of Insurer and any of the Archdiocese Bound Parties.

Q.      The Settlement Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither Insurer nor any of the Archdiocese Bound Parties are fraudulently entering into the Sale Transaction.

8

844

R.     The transfer of the Purchased Property to Insurer (i) does not constitute an avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law and (ii) does not and will not subject Insurer to any liability whatsoever with respect to the Debtor Parties' operation prior to the closing of the Sale Transaction (i.e., the occurrence of both the Settlement Agreement Effective Date and payment[4] of the Settlement Amount by Insurer to the Settlement Trust or Escrow Agent pursuant to the terms of Insurer's Settlement Agreement) (the "Closing").

S.     Insurer has agreed to purchase the Purchased Property pursuant to its Settlement Agreement and this Order; Insurer has not agreed to purchase, and is not purchasing, any other assets of the Estate of any of the Debtor Parties. Insurer has not agreed to assume, and after Closing shall have no obligations with respect to, any liabilities of the Archdiocese Bound Parties. Without limiting the generality of the foregoing, Insurer: (i) is not assuming and shall have no liability for any Claims arising from or relating to Abuse, the Purchased Property, or the Bankruptcy Case; and (ii) is not assuming and shall have no liability with respect to the Archdiocese's or any other Archdiocese Bound Party's obligations to Abuse Claimants, any other creditors, future claimants (including without limitation Unknown Abuse Claimants), or the Archdiocese's or any Archdiocese Bound Party's employees, in each case, by reason of the purchase of the Purchased Property under the Settlement Agreement.

T.     The Purchased Property constitutes property of the Debtor Parties' Estates, and the Archdiocese Bound Parties are the lawful owner of the Purchased Property and hold good title thereto. The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement

---

[4]     For the avoidance of doubt, all references to "payment" or "delivery" of the Settlement Amount by Insurer herein shall encompass all transfers of the Settlement Amount contemplated by the Settlement Agreement, including without limitation funding and transfer of funds to the Settlement Trust via letters of credit or escrow accounts.

9

will be a legal, valid, binding, and effective transfer of the Purchased Property, and will vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property, in each case free and clear of all Interests (as defined below, including, without limitation, any Interests of the Archdiocese Bound Parties, Abuse Claimants, and holders of Direct Action Claims). Upon Closing, Insurer shall have no liability for any Claims against or liabilities of the Debtor Parties, their Estates, or the other Archdiocese Bound Parties. Without limiting any of the foregoing, the Archdiocese, the Archdiocese Signatory Parties, and Insurer have agreed that, upon Closing: (i) the Purchased Property shall be deemed void *ab initio*, terminated, extinguished, and of no further force and effect; and (ii) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

U.        Pursuant to §§ 363(f) and 105(a) of the Bankruptcy Code, and subject to the terms and conditions set forth in the Settlement Agreement, and upon Closing, without the need for further action, the Debtor Parties shall be deemed to have sold, transferred and conveyed the Purchased Property to the Insurer, and the Insurer shall be deemed to have purchased from the Debtor Parties, all right title and interest in and under the Purchased Property, free and clear of all "Interests" of any Entity of any kind or nature whatsoever, to the fullest extent permitted under §§ 363(b) and (f) of the Bankruptcy Code, with such "Interests" including: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands,

10

846

encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, Subject Interests, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand

11

847

is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property. Without limiting the generality of the foregoing and without finding that any Entity has any Interest in the Archdiocese Policies: (i) any Entity with Interests (if any) in or with respect to the Purchased Property who did not object, or who withdrew their objections to the Sale Transaction or the Approval Motion have waived their right to object to the sale of the Purchased Property free and clear of such Entity's Interests in the Purchased Property pursuant to Section 363(f)(2) of the Bankruptcy Code; and (ii) any such Entity with Interests in or with respect to the Purchased Property who objected to the Approval Motion and did not withdraw any such objection (a) are the holders of Interests subject to *bona fide* dispute under Bankruptcy Code Section 363(f)(4) and/or (b) can be compelled to accept a monetary satisfaction of their Interests within the meaning of Section 363(f)(5) of the Bankruptcy Code.

V.      If the sale of the Purchased Property were not free and clear of all Interests, including without limitation all Abuse Claims, Direct Action Claims, and Coverage Claims, or if the Insurer Released Parties would, or in the future could, be liable for any of the Interests, Insurer would not have entered into the Settlement Agreement and would not consummate the Sale Transaction or pay the Settlement Amount, thus adversely affecting the Debtor Parties, their Estates, and their creditors (including, without limitation, the Abuse Claimants), as well as the other Archdiocese Bound Parties.

12

848

W.      Issuing a supplemental injunction under Section 105(a) of the Bankruptcy Code as provided herein is essential to give effect to the sale of the Purchased Property to Insurer and this Order's approval of such sale free and clear of Interests pursuant to Section 363(f) of the Bankruptcy Code. The Sale Injunction set forth in Paragraph 23 below not only is a necessary prerequisite for Insurer's assent to the terms and conditions of its Settlement Agreement, such that Insurer will not consummate the Sale Transaction or pay its Settlement Amount in the absence of such an injunction from this Bankruptcy Court, but also is warranted to ensure compliance with this Order. Likewise, Insurer will not consummate the Sale Transaction or pay its Settlement Amount without the benefit of the releases contained in the Settlement Agreement and approval thereof by the Bankruptcy Court.

X.      Neither the Settlement Agreement nor the Sale Transaction constitute a *sub rosa* chapter 11 plan. The Settlement Agreement does not impermissibly restructure the rights of the Debtor Parties' creditors nor impermissibly dictate a chapter 11 plan for the Debtor Parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.      The Approval Motion, and the relief sought therein (including without limitation the approval of the Settlement Agreements and the Sale Transaction) is GRANTED and APPROVED, in all respects as set forth herein.

2.      The findings of fact set forth above and conclusions of law stated herein, in addition to any findings of fact and conclusions of law stated by the Bankruptcy Court at the Sale Hearing, shall constitute this Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the Approval Motion pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall

13

be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.     Any and all objections, if any, to the Approval Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case the Entity asserting the objection or reservation of rights is enjoined from taking any action against the Insurer Released Parties or the assets or property of any Insurer Released Parties to recover any Claim or Interest held by such objecting Entity. Those parties who did not object or who withdrew their objections to the Approval Motion are deemed to have consented to the relief granted herein, pursuant to Section 363(f)(2) of the Bankruptcy Code.

### Approval of the Settlement Agreement

4.     The Settlement Agreement is approved in its entirety, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Without limiting the generality of the foregoing, the settlement and releases of Claims as set forth in the Settlement Agreement is hereby approved pursuant to Bankruptcy Rule 9019. All factors set forth in *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey* (*In re Cajun Elec. Power Coop.*), 119 F. 3d 349, 356 (5th Cir. 1997), either weigh in favor of the Settlement Agreement or do not apply.

5.     Pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, the Non-Debtor Catholic Entity Policy Sale, free and clear of all Interests of any Entity in the Archdiocese Policies, is hereby approved.

6.     Pursuant to Section 363(b) of the Bankruptcy Code, each of the Parties is authorized to consummate the Sale Transaction under and in accordance with the terms and conditions of the

14

Settlement Agreement, and the Archdiocese Bound Parties shall at all times act in accordance with the terms thereof.

7.      Any representative, agent or attorney in fact of the Archdiocese Signatory Parties is authorized to execute any other documentation and perform such other ministerial tasks as may be reasonably necessary to effectuate the Settlement Agreement and the Sale Transaction on behalf of the Archdiocese Bound Parties, including without limitation, any bill of sale substantially in the form attached to the Settlement Agreement as **Exhibit B**.

8.      Subject to all of the terms and conditions of the Settlement Agreement, upon Closing, the Archdiocese Bound Parties and Insurer shall be deemed to have granted the releases as set forth in the Settlement Agreement.

9.      The Parties are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Settlement Agreement, together with all additional instruments and documents that may be reasonably necessary, convenient, or desirable to implement the Settlement Agreement and consummate the Sale Transaction pursuant thereto and effectuate the provisions of this Order and the transactions approved hereby, and to take all further actions as may be requested by Insurer for the purpose of assigning, transferring, granting, conveying, and conferring to Insurer or reducing to Insurer's possession, the Purchased Property, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Settlement Agreement.

10.      Insurer is authorized and directed to pay the Settlement Amount under and subject to the satisfaction of all terms and conditions of the Settlement Agreement.

11.      The Settlement Amount provided by Insurer for the Purchased Property (i) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title

IV, Chapter 12 of the Louisiana Civil Code; and (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

12. None of the Insurer Released Parties shall be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its or their rights or remedies under the Settlement Agreement or any other document related to the Settlement Agreement or the Sale Transaction. The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order; *provided*, *however*, that this Bankruptcy Court shall retain jurisdiction over any and all disputes with respect thereto.

13. This Order shall be binding in all respects upon: (a) the Debtor Parties and their Related Parties; (b) the Debtor Parties' Estates; (c) the other Archdiocese Bound Parties; (d) all creditors of the Debtor Parties; (e) all Abuse Claimants and holders of Direct Action Claims; (f) all holders of Interests whether known or unknown against or on all or any portion of the Purchased Property; (g) any Non-Settling Insurer; (h) the Insurer Released Parties; (i) the Purchased Property; (j) the Unknown Claims Representative; (k) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code; and (l) all Entities receiving notice (or deemed to have received notice pursuant to this Order) of the Approval Motion or the Sale Hearing, including without limitation all Entities listed on **Schedule 3** to the Settlement Agreement. The Settlement Agreement shall be binding in all respects upon: (x) the Debtor Parties, their Estates, and their Related Parties; (y) the

16

Archdiocese Bound Parties; and (z) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code.

### Transfer of Assets

14.     The conditions of Section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Archdiocese may sell the Purchased Property free and clear of any Interests therein.

15.     Pursuant to Sections 105 and 363(b) and (f) of the Bankruptcy Code, Bankruptcy Rule 9019, applicable Louisiana State law, the testimonial and other documentary evidence filed in support of the Approval Motion, and the record of the Sale Hearing, the Archdiocese has set forth the legal authority necessary to support this Bankruptcy Court's findings herein.

16.     Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Property and the Archdiocese Bound Parties' rights, title, and interest therein shall upon Closing be transferred to Insurer, free and clear of all Interests (including without limitation the Interests of any of the Archdiocese Bound Parties), and all such Interests are unconditionally and forever released and extinguished as against the Purchased Property. Without limiting the generality of the foregoing, the sale of the Purchased Property under the Settlement Agreement shall be free and clear of all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any

17

other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property.

17.     Upon the Closing, (a) all of the Archdiocese Bound Parties', the Debtor Parties' Estates', and the Settlement Trustee's rights under and with respect to the Purchased Property, if any, shall be permanently and irrevocably extinguished as if the Archdiocese Policies had never been issued and (b) the Insurer Released Parties shall be entitled to all of the protections afforded by §363(m) of the Bankruptcy Code.

18.     Upon Closing, all Entities (and their respective successors and assigns), including but not limited to all governmental, tax, and regulatory authorities, Archdiocese Bound Parties, Non-Settling Insurers, Abuse Claimants, Direct Action Claimants, trade and other creditors, and any Entities holding Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) against, in, or with respect to the Purchased Property, including, without limitation, such Interests arising or accruing under or out of, in connection with, or in any way relating to the transfer of the Purchased Property to Insurer, hereby are forever barred, estopped, and permanently enjoined from asserting such Person's or Entity's Interests against the Purchased Property, the Insurer Released Parties, or the assets or property of any Insurer Released Parties. Effective upon Closing, none of the Insurer Released Parties shall have any liability for any Claims (a) against the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties or (b) that arise under or related in any way or in respect of the Purchased Property.

19.     The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement constitutes a legal, valid, and effective transfer of the Purchased Property, and shall vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties

18

854

in and to the Purchased Property. Upon Closing, the Archdiocese Policies shall be terminated and no longer in force or effect, exhausted in retrospect as to all coverages, and all Interests that the Archdiocese or any other Person or Entity (including without limitation any of the other Archdiocese Bound Parties) may have had, may presently have, or may in the future have, in such Purchased Property are released and extinguished, and all such Entities (including without limitation the Archdiocese Bound Parties) hereby are forever barred, estopped, and permanently enjoined from asserting any such Interest against the Purchased Property and/or any of the Insurer Released Parties. Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent constitutes full and complete performance of any and all obligations under the Purchased Property, including without limitation any performance owed to the Archdiocese Bound Parties, and all limits of coverage under the Archdiocese Policies, including per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

20. Upon occurrence of the Closing:

(a) all Interests the Archdiocese Bound Parties may have had, may presently have, or in the future may have in the Purchased Property, as applicable, are released pursuant to the terms of the Settlement Agreement; and

(b) the Archdiocese Bound Parties accept Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent in full and complete satisfaction of Insurer's past, present, and future obligations, including, without limitation, any obligations to any of the Archdiocese Bound Parties under such Purchased Property or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever arising out of or related in any way to such Purchased Property

(including Coverage Claims), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, direct or indirect, and regardless of whether such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, or otherwise.

### No Successor Liability

21.     The transfer of the Purchased Property to Insurer shall not result in any Insurer Released Parties or the Purchased Property having any of the following: (a) any liability or responsibility for Interests in or Claims against the Archdiocese Bound Parties or any of their Related Parties; (b) liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any Claims or Interests; or (c) any liability or responsibility to the Archdiocese Bound Parties except as is expressly set forth in the Settlement Agreement.

22.     Without limiting the generality of the foregoing, none of the Insurer Released Parties shall have any successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability, *de facto* merger or joint venture, mere continuation or substantial continuity, whether known or unknown as of Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between the Archdiocese Bound Parties and any non-debtor subsidiary or affiliate (including, without limitation, any other Archdiocese Bound Party), liabilities relating to or arising from any environmental laws, and any taxes arising, accruing, or

20

856

payable under, out of, in connection with, or in any way relating to the Purchased Property prior to Closing.

## Sale Injunction

23.      Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, and in consideration of the undertakings of Insurer pursuant to the Settlement Agreement, including Insurer's purchase of the Purchased Property free and clear of all Claims and Interests pursuant to Section 363(f) of the Bankruptcy Code as provided herein, any and all Entities that have held, now hold, or who may in the future hold any Claims or Interests (including without limitation all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Abuse Claimants, holders of Direct Action Claims, Perpetrators, Non-Settling Insurers, the Archdiocese Bound Parties, and all others holding Claims or Interests of any kind or nature whatsoever, including, without limitation, those Claims released or to be released pursuant to the Settlement Agreement), which Claims or Interests are under, arise out of, relate to, or connect in any way with an Abuse Claim or any of the Purchased Property, including, without limitation, (a) all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property, (b) the payment of any of the Claims identified previously, including, without limitation, Abuse Claims, Direct Action Claims, and Coverage Claims and (c) all other Interests, are hereby permanently stayed, enjoined, barred, and restrained from taking any Action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or

21

Interest against any of (x) the Insurer Released Parties, (y) the assets or property of any Insurer Released Parties, or (z) the Purchased Property, including by:

(a)     commencing, conducting, or continuing in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind, in any forum, with respect to any such Claim or Interest, against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(b)     enforcing, levying, attaching, collecting, or otherwise recovering, or seeking to accomplish any of the preceding, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(c)     creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, or seeking to accomplish any of the preceding, any lien of any kind against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(d)     asserting, implementing, or effectuating any such Claim or Interest of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any of the Insurer Released Parties, (B) any of the Insurer Released Parties, or (C) any property or interest in property of any Insurer Released Party; and

(e)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Order.

The actions described in this Paragraph 23 are "**Enjoined Actions**," and the injunction set forth herein is the "**Sale Injunction**." The Sale Injunction shall be a permanent injunction against the Enjoined Actions and may not be modified, dissolved, or terminated.

24.     The Sale Injunction shall be effective upon Closing. The Sale Injunction bars pursuit of the above referenced Claims and/or Interests against the Insurer Released Parties, or the property or assets of each (including, without limitation, the Purchased Property), but against no other person or thing.

25.     In a successful action to enforce this Sale Injunction in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

26.     The Sale Injunction shall not enjoin (a) the right of any Person or Entity against the Settlement Trust or a Non-Settling Insurer, or (b) the Settlement Trustee from enforcing the Settlement Trust Documents.

### Additional Provisions

27.     From and after the date hereof, no Person or Entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreements and this Order.

28.     This Bankruptcy Court hereby retains jurisdiction, regardless of whether a chapter 11 plan has been confirmed in the Bankruptcy Case and consummated and irrespective of the provisions of any such plan or order confirming such plan, to enforce and implement the terms and provisions of the Settlement Agreement, all amendments thereto, any waivers and consents thereunder, and of any agreement(s) executed in connection therewith in all respects, including but

23

not limited to retaining jurisdiction to: (a) compel delivery of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreement; (b) resolve any dispute, controversy, or claim arising under or related to the Settlement Agreement, or the breach thereof; and (c) interpret, implement, and enforce the provisions of this Order and resolve any disputes related thereto.

29.     Nothing contained in any plan confirmed in the Bankruptcy Case or any order of this Bankruptcy Court confirming such plan shall conflict with or derogate from the provisions of the Settlement Agreement or the terms of this Order.

30.     This Order shall not limit or preclude the entry or effectiveness of any additional releases or injunctions that may be granted protecting the Insurer Released Parties and/or the assets or property of any Insurer Released Parties in connection with, or as part of, any order confirming a chapter 11 plan.

31.     The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Settlement Agreement be authorized and approved in its entirety.

32.     The transactions contemplated by the Settlement Agreement are undertaken by Insurer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code. Insurer is a good faith purchaser of the Purchased Property and is entitled to all the protections afforded by Section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction to Insurer.

33.     Insurer has given substantial consideration under the Settlement Agreement for the benefit of the Debtor Parties, their Estates, and creditors, along with the other Archdiocese Bound

Parties. Such consideration given by Insurer constitutes valid and valuable consideration for the Purchased Property and the releases set forth in the Settlement Agreement, including, without limitation, the extinguishment and release of all Interests pursuant to this Order. The consideration provided by Insurer for the Purchased Property under the Settlement Agreement is fair and reasonable; accordingly, the purchase may not be avoided under Section 363(n) of the Bankruptcy Code.

34.      The terms and provisions of the Settlement Agreement and this Order shall be binding notwithstanding any subsequent appointment of any trustee(s) examiner(s) or receiver(s) under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtor Parties, their Estates, their creditors, or any examiner(s) or receiver(s).

35.      The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Bankruptcy Court that the Settlement Agreement and the Parties' performance thereof be authorized and approved in its entirety.

36.      Pursuant to the provisions of the Settlement Agreement, each of the Archdiocese Bound Parties and Insurer shall be authorized to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper, or advisable under applicable law or otherwise to consummate and make effective the transactions contemplated by the Settlement Agreement.

37.      All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

38.     All obligations of the Debtor Parties under the Settlement Agreement shall be deemed administrative expenses of their Estates under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

39.     Each and every federal, state, and local governmental agency or department is hereby directed to accept this Order in lieu of any document necessary to consummate the transactions contemplated by the Settlement Agreement and this Order.

40.     The Settlement Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the Parties, in a writing signed by the Parties, and in accordance with the terms thereof, without further order of this Bankruptcy Court; *provided* that such modification, amendment, or supplement does not constitute a material change to the relief sought in the Approval Motion and approved by this Order.

**IT IS SO ORDERED.**

New Orleans, Louisiana, _____, 2025

_____

MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**Bill of Sale**

## BILL OF SALE AND ASSIGNMENT

**THIS BILL OF SALE AND ASSIGNMENT** is made and entered into as of
_____, 2025, by and between The Roman Catholic Archdiocese of New
Orleans and its Bankruptcy Estate (the "**Archdiocese**" or "**Debtor**"), the Additional Debtors and
their respective Bankruptcy Estates, Non-Debtor Catholic Entities (collectively, "**Archdiocese
Signatory Parties**"), and Puritan Insurance Company, The Manhattan Fire and Marine Insurance
Company, and Westport Insurance Corporation (the "**Insurer**"). All capitalized terms used
herein without definition have the meanings set forth in the Settlement Agreement, Release, and
Policy Buyback by, between, and among The Archdiocese, the other Archdiocese Signatory
Parties, and Insurer, as amended or modified (the "**Settlement Agreement**").

## W I T N E S S E T H:

WHEREAS, pursuant to the Settlement Agreement, the Archdiocese Signatory Parties
have, on behalf of themselves and all other Archdiocese Bound Parties, agreed to sell and/or
convey any and all right, title, and interest (including all Subject Interests) in and to the
Purchased Property (as defined in the Approval Order), and Insurer has agreed to purchase and
buy-back the Purchased Property, in consideration of the payment of a purchase price of $85,000
(the "**Purchase Price**") and other good and valuable consideration as provided in and under the
Settlement Agreement and Plan;

WHEREAS, the Approval Order, as filed at Docket No. [_], has approved the Sale
Transaction (as defined in the Approval Order) and found that the Purchase Price is a fair and
reasonable price for the Purchased Property;

NOW, THEREFORE, in consideration of the payment of the Purchase Price by Insurer as
set forth in the Settlement Agreement, and in accordance therewith and with Approval Order, the
Debtor Parties do hereby sell, transfer, and assign to Insurer, and Insurer does hereby accept, all
of the Archdiocese Bound Parties' right, title, and interest in and to the Purchased Property, and
all Subject Interests therein.

[signatures appear on following pages]

2

**IN WITNESS WHEREOF**, the parties have executed this Bill of Sale and Assignment by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed:  _____

               _____

Date:  _____

*[Signatures Continue on Adjacent Pages]*

**Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation**

Signed: _____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

4

**All Archdiocese Signatory Parties
Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title: **Their Authorized Signer** _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

5

## Schedule 1

**Archdiocese Policies**

The following policies shall be included in the definition of Archdiocese Policies:

| Policy Number | Policy Period |
|---|---|
| ML651464 | 2/1/1979-3/1/1980 |
| ML652658 | 3/1/1980-3/1/1981 |

**Schedule 2**

**Other Co-Insureds Known to the Archdiocese Signatory Parties**

1

Case 20-10846 Doc 4234-2 Filed 10/27/25 Entered 10/27/25 16:27:53 Plan Supplement 7.1(a) Pt. 7 - Buppler Settle Page 872 of 1339 Page 74 of 88

**1.     None**

For the avoidance of doubt, the following entities are bound by the terms of the Settlement Agreement:[1]

### I.     Archdiocesan Parishes

1.     All Saints Roman Catholic Church, New Orleans, Louisiana

2.     Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana

3.     Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana

4.     Assumption of Mary Roman Catholic Church, Avondale, Louisiana

5.     Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana[2]

6.     Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana

7.     Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana

8.     Blessed Trinity Roman Catholic Church, New Orleans, Louisiana

9.     Christ the King Roman Catholic Church, Gretna, Louisiana

10.     Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana

11.     Divine Mercy Roman Catholic Church, Kenner, Louisiana

12.     Good Shepherd Roman Catholic Church, New Orleans, Louisiana

13.     Holy Family Roman Catholic Church, Franklinton, Louisiana

14.     Holy Family Roman Catholic Church, Luling, Louisiana

15.     Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana

16.     Holy Spirit Roman Catholic Church, New Orleans, Louisiana

17.     Immaculate Conception Roman Catholic Church, Marrero, Louisiana

18.     Immaculate Conception Roman Catholic Church, New Orleans, Louisiana

19.     Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana

20.     Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana

21.     Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana, for itself and as successor to St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc.

22.     Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana

---

[1]     Without limiting Section 6.4 of the Settlement Agreement, Insurer does not concede that any of the Entities listed on this schedule are "insureds," "additional insureds," or "protected persons" under its Archdiocese Policies.

[2]     Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

23.    Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana

24.    Most Holy Trinity Roman Catholic Church, Covington, Louisiana

25.    Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana

26.    Our Lady of Grace Roman Catholic Church, Reserve, Louisiana

27.    Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana

28.    Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana

29.    Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana

30.    Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana

31.    Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana

32.    Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana

33.    Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana

34.    Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana

35.    Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana

36.    Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana

37.    Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana

38.    Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana

39.    Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana

40.    St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana

41.    St. Agnes Roman Catholic Church, Jefferson, Louisiana

42.    St. Alphonsus Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

43.    St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana

44.    St. Angela Merici Roman Catholic Church, Metairie, Louisiana

45.    St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana

46.    St. Anselm Roman Catholic Church, Madisonville, Louisiana

47.    St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana

48.    St. Anthony of Padua Roman Catholic Church, Luling, Louisiana

49.    St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana

50.    St. Anthony Roman Catholic Church, Gretna, Louisiana

51.    St. Augustine Roman Catholic Church, New Orleans, Louisiana

52.    St. Benedict Roman Catholic Church, Covington, Louisiana

53.    St. Benilde Roman Catholic Church, Metairie, Louisiana

54. St. Bernard Roman Catholic Church, St. Bernard, Louisiana

55. St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana

56. St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana

57. St. Christopher Roman Catholic Church, Metairie, Louisiana

58. St. Clement of Rome Roman Catholic Church, Metairie, Louisiana

59. St. Cletus Roman Catholic Church, Gretna, Louisiana

60. St. David Roman Catholic Church, New Orleans, Louisiana

61. St. Dominic's Roman Catholic Church, New Orleans, Louisiana

62. St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana

63. St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana

64. St. Francis Xavier Roman Catholic Church, Metairie, Louisiana

65. St. Genevieve Roman Catholic Church, Slidell, Louisiana

66. St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana

67. St. Jerome Roman Catholic Church, Kenner, Louisiana

68. St. Joachim Roman Catholic Church, Marrero, Louisiana

69. St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana

70. St. John of the Cross Roman Catholic Church, Lacombe, Louisiana

71. St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, for itself and as successor to St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc.

72. St. John the Baptist Roman Catholic Church, Edgard, Louisiana

73. St. John the Baptist Roman Catholic Church, Folsom, Louisiana

74. St. Joseph Roman Catholic Church, Algiers, Louisiana

75. St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana

76. St. Joseph's Roman Catholic Church, Gretna, Louisiana

77. St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc.

78. St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana

79. St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana

80. St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana

81. St. Margaret Mary Roman Catholic Church, Slidell, Louisiana

4

873

82.  St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana

83.  St. Mark Roman Catholic Church, Ama, Louisiana

84.  St. Martha Roman Catholic Church, Harvey, Louisiana

85.  St. Martin de Porres Roman Catholic Church, New Orleans, formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc.

86.  St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana

87.  St. Mary's Roman Catholic Church, New Orleans, Louisiana

88.  St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana

89.  St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St. John the Baptist Roman Catholic Church, Paradis, Louisiana, for itself and as successor to St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc.

90.  St. Patrick's Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

91.  St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana

92.  St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana

93.  St. Peter Claver Roman Catholic Church, New Orleans, Louisiana

94.  St. Peter Roman Catholic Church, Reserve, Louisiana, for itself and as successor to St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc.

95.  St. Peter's Roman Catholic Church, Covington, Louisiana

96.  St. Philip Neri Roman Catholic Church, Metairie, Louisiana

97.  St. Pius X Roman Catholic Church, New Orleans, Louisiana

98.  St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana

99.  St. Rita Roman Catholic Church, Harahan, Louisiana

100.  St. Rita Roman Catholic Church, New Orleans, Louisiana

101.  St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana[3]

102.  Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana

103.  The Congregation of St. Rita Roman Catholic Church of Harahan

104.  The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana

---

[3] As stated in footnote 2, Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

## II. Suppressed Archdiocesan Parishes[4]

1. Blessed Sacrament, Inc.

2. Epiphany, Inc.

3. Immaculate Heart of Mary, Inc.

4. Incarnate Word, Inc.

5. Our Lady of Good Counsel, Inc.

6. Our Lady of Good Harbor, Inc.

7. Our Lady of Lourdes, New Orleans, Louisiana, Inc.

8. Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.

9. Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana

10. St. Ann, New Orleans, Louisiana, Inc.

11. St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana

12. St. Frances Xavier Cabrini, Inc.

13. St. Francis de Salles, Inc.

14. St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana

15. St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana

---

[4] The Suppressed Archdiocesan Parishes no longer operate as separate church parishes. The Suppressed Archdiocesan Parishes were not dissolved, and may own property.

Following Hurricane Katrina, the operations of certain of the Suppressed Archdiocesan Parishes were combined with Archdiocesan Parishes. In 2024, in the ongoing aftermath of Hurricane Ida and a result of storm damage, the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental statistics, and financial difficulties encountered, the following additional Suppressed Archdiocesan Parishes were canonically merged with neighboring Archdiocesan Parishes: (a) St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc., was canonically merged into St. Peter Roman Catholic Church, Reserve, Louisiana; (b) (i) St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and (ii) St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc., were both canonically merged into Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, now known as St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana; (c) St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc., was canonically merged into St. Rosalie Roman Catholic Church, Harvey, Louisiana, now known as Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana; (d) St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc., was canonically merged into Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, now known as St. John Paul II Roman Catholic Church, Waggaman, Louisiana; (e) St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc., was canonically merged into St. John the Baptist Roman Catholic Church, Paradis, Louisiana, now known as St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana; (f) Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc., was canonically merged into St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, now known as St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana; and (g) St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc., had its canonical territory divided so that (i) the area north of the Pontchartrain Expressway was canonically merged into St. Patrick's Roman Catholic Church, New Orleans, Louisiana, and (ii) the area south of the Pontchartrain Expressway was canonically merged into St. Alphonsus Roman Catholic Church, New Orleans, Louisiana.

16.     St. Henry's, Inc.

17.     St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana

18.     St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana

19.     St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana

20.     St. John the Baptist, New Orleans, Louisiana, Inc.

21.     St. Julian Eymard, Inc.

22.     St. Lawrence the Martyr, Inc.

23.     St. Louise de Marillac, Inc.

24.     St. Maurice, Inc.

25.     St. Monica, Inc.

26.     St. Philip the Apostle, Inc.

27.     St. Raymond's, Inc.

28.     St. Rose of Lima, Inc.

29.     St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana

30.     St. Theresa of the Child Jesus, Inc.

31.     The Congregation of Saints Peter and Paul Roman Catholic Church

32.     The Congregation of St. Cecelia Roman Catholic Church

33.     The Congregation of the Annunciation Roman Catholic Church

34.     The Congregation of the Holy Trinity Roman Catholic Church


**III.     Archdiocesan Agencies**

1.     Archdiocesan Spirituality Center

2.     Catholic Charities Archdiocese of New Orleans

3.     Catholic Charities Children's Day Care Centers

4.     Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)

5.     Clarion Herald Publishing Company

6.     Korean Catholic Community of New Orleans, Inc.

7.     Notre Dame Seminary

8.     Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana

9.     Pace Greater New Orleans

10.    Padua House (merged into Catholic Charities Archdiocese of New Orleans)

11.    Philmat, Inc.

12.    Project Lazarus

13.    Roman Catholic Center of Jesus the Lord

14.    School Food and Nutrition Services of New Orleans, Inc.

15.    Second Harvest Food Bank of Greater New Orleans and Acadiana

16.    St. Jude Community Center, Inc.

17.    St. Michael Special School

18.    St. Thérèse Catholic Academy

19.    The Society for the Propagation of the Faith, Archdiocese of New Orleans


## IV.     Non-Debtor Catholic Entities

**Archdiocesan Agencies**

1.     7887 Walmsley, Inc.

2.     Annunciation Inn, Inc.

3.     Archdiocese of New Orleans Indemnity, Inc.

4.     Aspiring Scholars

5.     Catholic Community Foundation Archdiocese of New Orleans

6.     Christopher Homes, Inc.

7.     Christopher Inn

8.     Dubourg Home

9.     Holy Redeemer Catholic Virtual Academy

10.    Holy Trinity Drive Land Corporation

11.    Iberia Investment Fund II, LLC

12.    Metairie III

13.    Metairie Manor

14.    Monsignor Wynhoven Apartments, Inc.

15.    Nazareth II

16.    Nazareth Manor

17.    New Orleans Archdiocesan Cemeteries

18.    Notre Dame Health System (f/k/a Chateau de Notre Dame)

19.    Rouquette III

20.    St. Anthony's Gardens

21.    St. Bernard II

22.    St. Bernard III

23.    St. Bernard Manor

24.    St. Martin's Manor, Inc.

25.    St. Tammany Catholic Cemetery

26.    St. Tammany Manor

27.    The Apartments at Mater Dolorosa

28.    The Mental Health Association Development Corporation

29.    Villa Additions, doing business as St. Teresa's Villa

30.    Villa St. Maurice, Inc.

**Schedule 3**

**Additional Notice Parties**

**<u>Schedule 4</u>**

**Form of Corporate Resolutions**

## CORPORATE RESOLUTION

RESOLUTION OF THE MEMBERSHIP AND BOARD OF DIRECTORS OF [NAME], [ADDRESS], A LOUISIANA NON-PROFIT [CORPORATION][LIMITED LIABILITY COMPANY (hereinafter this "Corporation").

BE IT RESOLVED, that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation, are hereby authorized to transact on behalf of this Corporation any and all business related to the following:

1. Engaging 1793 Group, a Louisiana non-profit corporation, on terms and conditions deemed appropriate in their sole discretion, to assist with and administer on this Corporation's behalf, any and all matters in which this Corporation may have an interest in relation to a Plan of Reorganization filed or anticipated to be filed by The Roman Catholic Church of the Archdiocese of New Orleans in proceedings commenced under Chapter 11 of the Bankruptcy Code, captioned *In re The Roman Catholic Church of the Archdiocese of New Orleans*, Case No. 20-10846 (Bankr. E.D. La.) (the "Chapter 11 Case"), including, but not limited to, preparing and filing a petition in the Chapter 11 Case seeking relief under Chapter 11 of the United States Bankruptcy Code as an additional debtor, executing any and all documents necessary for this Corporation to file for relief in the Chapter 11 Case, executing on behalf of this Corporation all documents required to comply with the requirements imposed upon parties filing for relief under Chapter 11 of the Bankruptcy Code, Bankruptcy Rules, Local Rules for the Eastern District of Louisiana and/or the requirement imposed by the United States Trustee.

2. Engaging the firm of Heller Draper and/or any other attorneys to represent this Corporation in actions or proceedings related to the Chapter 11 Case.

3. Engaging accountants, financial advisors, and any other professionals necessary to administer the Chapter 11 Case on behalf of this Corporation.

4. Making decisions with regard to the payment of fees and costs for which this Corporation may become responsible to pay in the Chapter 11 Case.

5. Making decisions with regard to the filing of any plan within the Chapter 11 case, provided that such shall contain terms and provisions consistent with those set forth in Appendix "A" attached hereto and incorporated herein by this reference.

FURTHER RESOLVED that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation with the power of substitution, is authorized to execute and deliver on behalf of this Corporation each and every Insurance Settlement Agreement with the Settling Insurers, as those terms are defined in the Fourth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of September 23, 2025 (the "Plan"), and any amendment or modification to the Plan, including, without limitation, the documents attached or referred to in

2

Plan Supplement 7.1(a), any Bill of Sale required under such Insurance Settlement Agreements, and any other documents reasonably requested by any such Settling Insurer to effectuate the transactions provided for in its Insurance Settlement Agreement or the Plan.

FURTHER GIVING AND GRANTING unto either Very Rev. Patrick Carr or Rev. Leon Poche, full power and authority to sign any and all documents and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER GIVING AND GRANTING unto Very Rev. Peter Akpoghiran or any other officer of the Corporation, full power and authority to certify the passage and effectiveness of this Resolution to the Settling Insurers and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER RATIFYING AND CONFIRMING all that either Very Rev. Patrick Carr or Rev. Leon Poche, in his said capacity may do or cause to be done in the premises.

I, the undersigned President of this Corporation do hereby certify that the above and foregoing is a true and correct copy of a resolution adopted by the Membership and Board of Directors of said corporation in conformity with the Articles of Incorporation and Louisiana law, and that said resolution remains in full force and effect and has not been amended or rescinded.

WITNESS MY HAND AND SEAL, effective this ____day of _____, 2025

_____
Very Reverend Patrick J. Williams, V.G.

ATTEST

_____
Dirk Wild, Director

3

882

**Schedule 5**

**Form of Incumbency Certificates**

## INCUMBENCY CERTIFICATE

I, **Very Rev. Peter Akpoghiran, J.C.D**., the duly elected, qualified, and acting **Vice President** of each of the Louisiana nonprofit corporations or limited liability companies listed on **Exhibit A** attached hereto (each, a "Corporation," and collectively, the "Corporations"), do hereby certify as follows:

1. That the person named below has been duly elected or appointed and is the qualified and acting officer of each of the Corporations holding the office set forth opposite his/her name.

| NAME | TITLE |
|---|---|
| **Very Rev. Patrick J. Williams, V.G.** | **President and Director** |

2. That the foregoing person is duly authorized to act on behalf of each Corporation in such capacity and to exercise the powers and perform the duties incident to said office under the respective Articles of Incorporation and Bylaws of each Corporation.

3. That attached hereto as **Exhibit B** is a true and correct copy of a resolution adopted at a duly noticed special meeting by the sole member of each of the Corporations and all of the Board of Directors of each said Corporation in attendance at such meeting in conformity with such Articles of Incorporation and Louisiana law and that said resolution remains in full force and effect and has not been amended or rescinded.

IN WITNESS WHEREOF, I have hereunto set my hand as Vice President of each of the

Corporations as of this ___ day of October, 2025.

_____
Very Rev. Peter Akpoghiran, J.C.D
Vice President of Each Corporation
(See Attached Exhibit A)

2

State of Louisiana
Parish of Orleans

On this _____ day of October, 2025, before me, the undersigned Notary Public, personally appeared **Very Rev. Peter Akpoghiran, J.C.D.,** who acknowledged that he/she executed the foregoing instrument for the purposes therein contained and in the capacity therein stated.

Notary Public
Printed Name: _____
Notary ID or Bar Roll No.: _____
My Commission Expires: _____

**EXHIBIT A**
**List of Corporations**

3

## SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK

This Settlement Agreement, Release, and Policy Buyback ("**Settlement Agreement**") is hereby made by, and between, and among The Roman Catholic Archdiocese of New Orleans (the "**Archdiocese**" or "**Debtor**" as further defined in Section 1.1.~~28~~31 below), the other Archdiocese Signatory Parties (as defined in Section 1.1.~~13~~15 below), and ~~[___]~~Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation ("**Insurer**" as further defined in Section 1.1.~~45~~49 below). Insurer, the Archdiocese, the other Archdiocese Signatory Parties, and the Creditors' Committee (as defined below), collectively are the "**Parties**" and each a "**Party**" to this Settlement Agreement.

## RECITALS:

WHEREAS, on May 1, 2020 (the "**Petition Date**" as further defined in Section 1.1.~~62~~66 below), the Archdiocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**" as further defined in Section 1.1.~~15~~17) pending under Case No. 20-10846 (the "**Bankruptcy Case**" as further defined in Section 1.1.~~14~~16 below);

WHEREAS, each of the Additional Debtors (as defined in Section 1.1.~~9~~11 below) intends to file in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;

WHEREAS, certain Entities have asserted or may hold Claims, including Abuse Claims, against the Archdiocese Bound Parties (each as defined below);

WHEREAS, Insurer issued, allegedly issued, may have issued, assumed by novation or otherwise, or may be administering the Archdiocese Policies (as defined in Section 1.1.~~7~~9 below) providing certain coverage to the Archdiocese Bound Parties;

WHEREAS, asserted disputes between the Debtor Parties (as defined below) and Insurer have arisen, and assertable disputes between the Archdiocese Bound Parties and Insurer may arise in the future, concerning the scope and nature of Insurer's responsibilities, if any, to provide insurance coverage to the Archdiocese Bound Parties under the Archdiocese Policies (as further defined in Section ~~1.1.25~~1.1.29 below, the "**Coverage Claims**");

WHEREAS, claimants may contend, as a matter of Louisiana law, particularly La. Rev. Stat § 22:1269 *et. seq*., that certain Entities may have Claims arising under or related to the Archdiocese Policies that could entitle them to bring a Direct Action Claim (as defined in Section 1.1.~~32~~35 below) against Insurer;

WHEREAS, claimants may contend that as a matter of Louisiana law, the time within which Claims relating to Abuse may be asserted against certain of the Archdiocese Bound Parties and/or the Insurer may not have expired with respect to certain Claims;

WHEREAS, the Archdiocese Signatory Parties and Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Claims and all other

886

disputes between and among them and to release Insurer from any further obligations under the Archdiocese Policies;

WHEREAS, Insurer would not pay the full amount of the Settlement Amount (as defined in Section 1.1.~~75~~79 below) without the buy-back of the Subject Interests (as defined below) in the Archdiocese Policies, including without limitation, the interests of the Archdiocese, Additional Debtors, other Archdiocese Bound Parties and holders of Direct Action Claims, pursuant to section 363 of the Bankruptcy Code, and without the Sale Injunction, the Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeping Injunction~~,~~ (each as defined below), additionally providing protection to the Insurer Released Parties (as defined below) from Claims against the Insurer Released Parties and their property;

WHEREAS, through this Settlement Agreement and the Plan (as defined in Section 1.1.~~63~~67 below) the Archdiocese Signatory Parties intend to provide Insurer Released Parties with the broadest possible release of all Claims and Subject Interests with respect to the Archdiocese Policies; and

WHEREAS, through this Settlement Agreement and the Plan, as part of the compromise and resolution of the Coverage Claims, the Debtor Parties and Insurer also wish to effect a sale, pursuant to § 363(b), (f), and (m) of the Bankruptcy Code of the Archdiocese Policies, along with the Coverage Claims and Related Insurance Claims (the "**Purchased Property**" as further defined in Section 1.1.~~66~~69 below), to provide the Insurer Released Parties with the broadest possible release and buyback with respect to the Archdiocese Policies, resulting in the Insurer Released Parties having no obligations now or in the future with respect to the Archdiocese Policies, including without limitation to any Direct Action Claim.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Settlement Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound subject to the approval of the Bankruptcy Court pursuant to Section 2 below, the Parties hereby agree as follows:

1. **DEFINITIONS**

1.1    As used in this Settlement Agreement (as defined above), the following terms shall have the meanings set forth below.

1.1.1    "**Abuse**" means any of the following actual or alleged acts: (a) touching by the Perpetrator of the person's intimate body parts (genitals, breasts, or buttocks), the touching by the person of the Perpetrator's intimate body parts, showing pictures of the person's body or other persons' bodies, taking pictures of the person's body, showing pornography, or making images of the person while naked or engaged in any sexual activity, or any sexualized interaction including observing the person in bathing, toileting, or undressing that was made possible by the Perpetrator's position of authority, or by the inducement of the Perpetrator; or (b) sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to the genital or anal openings: (i) of the person's body by any part of the Perpetrator's body or any object used by the Perpetrator for this purpose; or (ii) of the person's body by any

part of the body of the Perpetrator or by any part of the body of another person, or by any object used by the Perpetrator or another person for this purpose; (c) inappropriate physical contact and/or contact that infringes upon another's personal, physical boundaries including but not limited to groping, kissing, extended hugging, and/or any unwelcomed touching; (d) grooming or trying to create a special relationship, including but not limited to: talk of a sexual nature, talk of a romantic nature, communications expressing individual love to the person, as opposed to a salutation, providing material resources or experiences which induce the person into a relationship where trust is then violated; or (e) any actual or alleged acts of the kind described in subsections (a)-(c) above that occur between or among minors and that the Perpetrator orchestrates or encourages. For the avoidance of doubt, "Abuse" also includes: any actual or alleged conduct which (a) is described in the Louisiana Child Victims Act or (b) would constitute (i) a sexual offense as defined in article 603(2) of the Louisiana Children's Code; (ii) sexual battery as defined in LA. REV. STAT. §§ 14:43.1; 14:43.1.1; 14:43.2; 14: or 43.3, (iii) a crime against nature as defined in LA. REV. STAT. § 14:89, or (i) pornography involving juveniles as defined in LA. REV. STAT. § 14:81.1, or with respect to the foregoing subsection (i)-(iv), any predecessor statute that prohibited such conduct at the time of the act.

1.1.2 "**Abuse Action**" means an Action asserting an Abuse Claim against any of the Covered Parties.

1.1.3 "**Abuse Claim**" means any Claim that has been asserted, or could be asserted, against any Settling Party or Non-Settling Insurer, that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively alleged Abuse that occurred, in whole or in part, before the applicable Debtor's Petition Date or Additional Debtors' Petition Date, including any such Claim that seeks monetary damages or any other relief, under any legal or equitable theory of liability, including, but not limited to, the following: vicarious liability; *respondeat superior*; any conspiracy, fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, negligent, insufficient, or inadequate supervision, retention or misrepresentation; any theory based on misrepresentation, concealment, or unfair practice; public or private nuisance; or any theory, including, without limitation, any theory based on public policy or any acts or failures to act by any Settling Party, or any other Entity for whom any Settling Party is allegedly responsible, including, but not limited to, any such Abuse Claim against any Settling Party, Non-Settling Insurer, or any other Entity for whom any Settling Party or Non-Settling Insurer is alleged to be responsible. Abuse Claims are: (a) the Known Abuse Claims, which are treated in Class 3; and (b) the Unknown Abuse Claims, which are treated in Class 4. For the avoidance of doubt, "Abuse Claim" includes (a) all Unknown Abuse Claims, (b) Claims or causes of action defined or described in the Revival Window Laws against the Archdiocese or any other Archdiocese Bound Party, (c) Direct Action Claims, and (d) any Claim against the Archdiocese or any other Archdiocese Bound Party that is attributable to, arises from, is based upon, relates to, or results from Abuse that, as of the Petition Date is barred by any applicable statute of limitations, and in each case, irrespective of whether (x) such Claims also involve the conduct of joint tortfeasors (or similar concepts under applicable law), (y) such Claims arise under, or were revived pursuant to, the Revival Window Laws, or any future reviver law, statute, or binding

precedential decision passed or issued on or after the Bankruptcy Plan Effective Date, or (z) a proof of claim has been filed, before or after the Claims Bar Date, or not at all, or an Abuse Action has been commenced with respect to such Claim. "Abuse Claim" does not include: (a) Related Insurance Claims or Coverage Claims against Settling Insurers or Non-Settling Insurers; (b) Non-Insurer Contribution Claims with respect to any Abuse Claim; (c) Insurer Contribution Claims with respect to any Abuse Claim; or (d) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to a Claim against these dioceses only. For the avoidance of doubt, a Claim based on Abuse solely occurring following the applicable Petition Date is not an Abuse Claim. Nothing in this definition shall constitute a waiver of any defense that would otherwise be available under applicable law to any Settling Party, the Settlement Trust, or any other Entity.

1.1.4 "**Abuse Claim Release and Certification**" means a written release in favor of the Insurer Released Parties, in the form of Exhibit C to the Acceptable Plan, or otherwise in form and substance acceptable to the Parties, which an Abuse Claimant must deliver before he or she is entitled to Settlement Trust Distributions, which shall provide that the Claimant releases the Insurer Released Parties from any and all Claims related to his/her Abuse Claim or any of the Archdiocese Policies, subject to Section 12.14 and related provisions of the Plan.

1.1.5 "**Abuse Claimant**" means the holder of an Abuse Claim, including, but not limited to, any Known Abuse Claim, Unknown Abuse Claim, or Direct Action Claim. For the avoidance of doubt, Abuse Claimants are Creditors. The definition of an Abuse Claimant includes the legal representative of the holder of an Abuse Claim, such as a bankruptcy trustee, the estate of a deceased individual who held an Abuse Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Abuse Claim, as the case may be. An Entity holding the following Claim is not an Abuse Claimant: (i) a Non-Insurer Contribution Claim with respect to such Abuse Claim; (ii) an Insurer Contribution Claim with respect to such Abuse Claim; (iii) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to such Entity's claim against such dioceses only.

1.1.6 "**Acceptable Plan**" means the *Fourth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and The Official Committee of Unsecured Creditors* filed at Docket No. [——],[4419], and its exhibits and schedules, which as may be modified solely in accordance herewith (i.e., with the consent of the Insurer), and such modified plan constituting the "Acceptable Plan" for the purposes hereof.

1.1.7 "**Archdiocesan Parishes**" means all currently Catholic Church parishes and missions, as identified on Exhibit B-1, Part I, of the Acceptable Plan. Each of the Archdiocesan Parishes is organized as a non-profit corporation. For the avoidance of doubt, the definition of Archdiocesan Parishes does not include St. Louis Cathedral, Our Lady of Guadalupe Church & Shrine of St. Jude, or any Suppressed Archdiocesan Parish identified on Exhibit B-1, Part II, of the Acceptable Plan.

1.1.8   "**Archdiocesan Schools**" means the means the following schools that are owned and operated by the Archdiocese: (a) the Academy of Our Lady High School; (b) Archbishop Chapelle High School; (c)Archbishop Hannan High School; (d) Archbishop Rummel High School; (e) Archbishop Shaw High School; (f) Pope John Paul II High School; (g) St. Charles Catholic High School; (h) St. Scholastica Academy; and (i) St. Michael Special School.

1.1.71.1.9   "**Archdiocese Policies**" means (a) the contracts, binders, certificates, and policies of insurance that are listed on Schedule 1 hereto, and (b) all other known and unknown contracts, binders, certificates, or policies of general liability insurance, in effect on or before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date that were issued to, or for the benefit of, or subscribed on behalf or that otherwise actually insure, (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) policies issued to the Archdiocese that name as an insured or additional insured (or related concept under applicable law or document) the Diocese of Houma-Thibodaux or Diocese of Baton Rouge, but not policies issued to either of these dioceses that were not also issued to the Archdiocese or name it as insured, (iv) any Entity owned, created, operated, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, or (v) any institution, religious organization or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control or active management; in each case of (a) and (b), that were issued, subscribed to, or underwritten in whole or in part or allegedly issued, subscribed to, or underwritten in whole or in part by Insurer or any of its predecessors.[1]

1.1.81.1.10   "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

1.1.91.1.11   "**Additional Debtors**" means the Entities listed on Acceptable Plan Exhibit B-1.  As used herein, references to the "Additional Debtors" includes the Additional Debtor's Estates.

1.1.101.1.12   "**Approval Motion**" means the motion filed in the Archdiocese Bankruptcy CourtCase at Docket No. 4181 seeking approval of this Settlement Agreement as described in Section 22.1 of this Settlement Agreement.

1.1.111.1.13   "**Approval Order**" means the order granting the Approval Motion described in Section 22.1 of this Settlement Agreement and providing the relief described

---

[1] SPARTA Settlement Agreement to provide:

For the avoidance of doubt, the "Archdiocese Policies" include any and all known and unknown contracts, binders, certificates, or policies of general liability insurance that were issued, allegedly issued, or may have been issued by or in the name of American Employers Insurance Company."

in Section ~~22~~.1 of this Settlement Agreement and in substantially form attached **Exhibit A,** with only such changes as are satisfactory to Insurer.

~~1.1.12~~1.1.14   "**Archbishop**" has the meaning given to it in Section 3.7.

~~1.1.13~~1.1.15   "**Archdiocese Signatory Parties**" means, collectively, (a) the Debtor Parties and (b) the Non-Debtor Catholic Entities.

~~1.1.14~~1.1.16   "**Bankruptcy Case**" means all of the following: (a) with respect to the Archdiocese, "Bankruptcy Case" has the meaning set forth in the Recitals; and (b) with respect to any given Additional Debtor, "Bankruptcy Case" means the case initiated when such Additional Debtor filed in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

~~1.1.15~~1.1.17   "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Louisiana, having subject matter jurisdiction over the Bankruptcy Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

~~1.1.16~~1.1.18   "**Bankruptcy Plan Effective Date**" means the date upon which a Plan approved by the Bankruptcy Court that contains terms and conditions consistent with those required by this Settlement Agreement becomes effective.

~~1.1.17~~1.1.19   "**Barred Claim**"  means any Claim against a Settling Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with an Abuse Claim or any of the Archdiocese Policies, including, but not limited to, any:  (a) Abuse Claim; (b) Direct Action Claim; (c) Coverage Claim; (d) Related Insurance Claim; (e) Non-Insurer Contribution Claim; (f) Insurer Contribution Claim; (g) Medicare Claim; (h) Penalty Claim; and (i) any other Claim that is otherwise released herein.  A Barred Claim further includes any Claim against a Settling Party based on allegations that it is an alter ego or liable as a successor of an Entity that is not a Settling Party or that the Settling Party's corporate veil should be pierced on account of Claims against an Entity that is not a Settling Party or based on any other theory under which the legal separateness of any Person and any other Entity may be disregarded to impose liability for a claim on either such Entity.  Notwithstanding the foregoing, Barred Claims do not include any Claims to the extent they are asserted against (x) Non-Settling Insurers or (y) Excluded Parties, notwithstanding that such Entity may also have asserted or be able to assert a Claim for contribution, indemnity, reimbursement, or subrogation against any Settling Party relating to or arising from a such Claim; provided, however, that, for the avoidance of doubt, (i) any Claims that assert liability against such Entity in conjunction with a Settling Party will in all events be Barred Claims as to the Settling Party, (ii) any such Claim for contribution, indemnity, reimbursement, or subrogation against a Settling Party is a Barred Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party for the purposes of this definition.

1.1.20  "**Catholic Charities**" has the meaning set forth in Section 6.3.15.

1.1.18<u>1.1.21</u>   "**Channeling Injunction**" has the meaning set forth in Section 2.2.2.

1.1.19<u>1.1.22</u>   "**Claim**" means any past, present or future claim, demand, Action, request, right, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether sounding in law, equity, tort, warranty, contract, or under any other theory, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been or may be asserted by or on behalf of any Entity, whether seeking damages (including compensatory, exemplary, punitive, or Penalty claims) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, or orders, including without limitation whether by way of direct action, subrogation, contribution, indemnity, alter ego, veil piercing, or regulatory action, or otherwise, regardless of whether such Claims arise under law, in equity, or under statute, before or after the Petition Date(s), or *in rem* or *in personam*, and include all Claims for damages to the environment or based on any theory of *respondeat superior,* vicarious, successor or transferee liability, or change in control, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

1.1.20<u>1.1.23</u>   "**Claims Bar Date**" means the date(s) and time(s) indicated in the Final Order(s) (which may be the Plan Confirmation Order) setting the deadline(s) for filing proofs of Abuse Claim against the Debtor or Additional Debtor(s), as applicable.

1.1.21<u>1.1.24</u>   "**CMS**" has the meaning set forth in Section 2.4.1.

1.1.22<u>1.1.25</u>   "**Co-Insured Party**" means  any other Entity that is a "Named Assured" or "named insured" or "protected person" under the Archdiocese Policies, and all other Entities that are determined by agreement or a court of competent jurisdiction to be an "Assured," an "Additional Assured," an "insured," or "protected person" or otherwise entitled to insurance coverage under any Archdiocese Policies.

1.1.23<u>1.1.26</u>   "**Conditional Payment**" means any payment made to an Abuse Claimant under the MMSEA, including any payment by a Medicare Advantage Organization (as defined in the MSPA).

1.1.24<u>1.1.27</u>   "**Controlling Document Provision**" has the meaning given to it in Section 2.2.9.

1.1.25<u>1.1.28</u>   "**Covered Parties**" or "**Archdiocese Bound Parties**" means, collectively, the following Entities: (a) the Debtor Parties; (b) the Reorganized Debtor; (c) the Reorganized Additional Debtors; (d) the Non-Debtor Catholic Entities; (e) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP; (f the applicable Parish Schools and Archdiocesan Schools (each as defined in the Acceptable Plan);; (g) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans; (h) any Co-Insured Party; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entities'

predecessors, successors, assigns, subsidiaries, direct and indirect past, present, and future affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, and estates.  For the avoidance of doubt, the Entities in clauses (g), (h), and (i) are only Archdiocese Bound Parties in connection with the Archdiocese Policies.

1.1.26~~1.1.29~~   "**Coverage Claims**" has the meaning set forth in the Recitals and further includes any Claim under relating to or arising out of the Archdiocese Policies or the rights and obligations thereunder, or the breach thereof, including any Claim seeking insurance coverage.

1.1.27~~1.1.30~~   "**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed in the Archdiocese's Chapter 11 Case on May 20, 2020, [Docket Nos. 94 & 114], as such committee may be reconstituted from time to time.

1.1.28~~1.1.31~~   "**Debtor**" or "**Archdiocese**" means, before the Bankruptcy Plan Effective Date, The Roman Catholic Church of the Archdiocese of New Orleans of Louisiana.  As used herein, references to the "Debtor" or "Archdiocese" includes the Debtor's Estate.

1.1.29~~1.1.32~~   "**Debtor Parties**" means (i) the Archdiocese and (ii) all of the Additional Debtors.

1.1.30~~1.1.33~~   "**Diocese of Baton Rouge**" means the Diocese of Baton Rouge. References to the "Diocese of Baton Rouge CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) July 22, 1961 whichever occurred last; references to the "Diocese of Baton Rouge SD" refer to the period after such date.

1.1.31~~1.1.34~~   "**Diocese of Houma-Thibodaux**" means the Diocese of Houma-Thibodaux.  References to the "Diocese of Houma-Thibodaux CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) June 5, 1977, whichever occurred last; references to the "Diocese of Houma-Thibodaux SD" refer to the period after such date.

1.1.32~~1.1.35~~   "**Direct Action Claim**" means any Claim by any Entity that is a "direct action" as that term is used in La. Rev. Stat § 22:1269 *et. ~~seq.~~seq (or similar law in other jurisdictions)* against any Insurer Released Party or related to any Archdiocese Policy, including, without limitation, (a) any claim that is similar or related to any Claim that could also be asserted by the Archdiocese or any Archdiocese Bound Party, (b) any Claim that directly or indirectly arises out of, relates to, or is connected with any Abuse Claim, (c) any Claim that directly or indirectly arises out of, relates to, or is in connection with any Insurer Released Party's  handling of any Abuse Claim under the laws of any applicable jurisdiction, or (d) any Claim arising under any law of any jurisdiction that may give a third

party a direct Cause of Action against an Insurer Released Party for monetary or other relief.[2]

~~1.1.33~~1.1.36   "**Entity**" means any individual, corporation, corporation sole, partnership, association, limited liability company, joint stock company, proprietorship, unincorporated organization, joint venture, trust, estate, executor, legal representative, or any other entity or organization, as well as any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency, department, board or instrumentality thereof, any other "Person" within the definition of section 101(41) of the Bankruptcy Code, and any successor in interest, heir executor, administrator, trustee, trustee in bankruptcy, or receiver of any Entity and also has the meaning set forth in section 101(15) of the Bankruptcy Code.

~~1.1.34~~1.1.37   "**Escrow Agent**" means the agent appointed in accordance with the Escrow Agreement.

~~1.1.35~~1.1.38   "**Escrow Agreement**" means the agreement governing the escrow which shall hold the Settlement Amount in escrow and in trust for the benefit of Insurer, and which shall provide for the: (i) transfer of the Settlement Amount, with any accrued interest, to the Settlement Trust following the Settlement Agreement Effective Date, or (ii) return of the Settlement Amount to Insurer, with any accrued interest, upon receipt of notice that the Settlement Agreement has been terminated.

~~1.1.36~~1.1.39   "**Estate**" means the (a) the Debtor's estate, and (b) Additional Debtors' estates, each created pursuant to section 541 of the Bankruptcy Code.

~~1.1.37~~1.1.40   "**Excluded Party**" means the ~~following~~following Entities: (a) the Holy See (State of Vatican City); (b) any Perpetrator; and (c) any ~~religious order (i.e., institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (~~archdiocese  or ~~perfect charity), and obedience by religious vows or~~ diocese (other ~~sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy);~~than the Archdiocese itself), any Religious Order, or other Entity that is an affiliate or associated with the Roman Catholic Church (in its capacity as such, and other than (i) the Non-Debtor Catholic Entities; (ii) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP, (iii) the ~~applicable~~ Parish Schools and Archdiocesan Schools ~~(each as defined in the Acceptable Plan);;~~ and (iv~~),)~~ any Co-Insured Party); provided, however, that any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party.~~"~~.

~~1.1.38~~1.1.41   "**Extra-Contractual Claim**" means any Claim against any Insurer Released Party seeking any type of relief, other than coverage or benefits, under or with respect to the Archdiocese Policies.   Extra-Contractual Claims include Claims for

---

[2] ~~SPARTA Settlement Agreement will provide:~~

~~For the avoidance of doubt, Direct Action Claim does not include the following action:   SPARTA Insurance Company v. Pennsylvania General Insurance Company, No. 21-11205 (D. Mass.).~~

compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs, or any other type of relief, alleging any of the following with respect to (a) any Archdiocese Policy; (b) any Claim allegedly or actually covered under a Archdiocese Policy; or (c) the conduct of any Insurer Released Party with respect to (a) or (b): (i) bad faith; (ii) failure to provide insurance coverage under any Archdiocese Policy, including any failure to investigate or to provide a defense or adequate defense; (iii) failure or refusal to compromise and settle any Claim insured under any Archdiocese Policy; (iv) failure to act in good faith; (v) violation or breach of any covenant or duty of good faith and fair dealing, whether express, implied, or otherwise; (vi) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (vii) violation of any unfair claims practices act or similar statute, regulation or code, including any statute, regulation, or code relating to unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising; (viii) any type of misconduct; or (ix) any other act or omission of any type by any Insurer Released Party for which the claimant seeks relief other than coverage or benefits under a Archdiocese Policy. "Extra-Contractual Claims" further include all Claims relating to any Insurer Released Party's (x) handling of any Claims under the Archdiocese Policies, (y) conduct in negotiating this Settlement Agreement and/or the Plan, and (z) conduct in the settlement of any Claims. For the avoidance of doubt, Extra-Contractual Claims of the Archdiocese Bound Parties are included within the property Insurer is purchasing hereunder.

~~1.1.39~~1.1.42 "**Final Order**" means an order as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending and in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order will have been affirmed by the highest court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari,* petition for review, or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order will not cause such order not to be a Final Order.

~~1.1.40~~1.1.43 "**Gatekeeper Injunction**" has the meaning set forth in Section 2.2.2.

1.1.44 "**HH**" has the meaning set forth in Section 6.3.15.

~~1.1.41~~1.1.45 "**Indemnified Claims**" ~~shall have~~has the meaning set forth in Section 7.2 of this Settlement Agreement.

~~1.1.42~~1.1.46 "**Indemnity Cost Reserve**" ~~shall have~~has the meaning set forth in Section ~~7.2~~7.2.1.

~~1.1.43~~1.1.47 "**Injunctions**" means the Sale Injunction, Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeper Injunction.

1.1.441.1.48 "**Insurance Settlement Agreement**" shall havehas the meaning set forth in the Acceptable Plan.

1.1.451.1.49 "**Insurer**" means [___].[3]"**Insurer**" means Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation.

1.1.461.1.50 "**Insurer Contribution Claim**" means any (a) Non-Settling Insurer Contribution Claim or (b) Settling Insurer Contribution Claim.

1.1.471.1.51 "**Insurer Released Party**" means Insurer and its Related Parties, each in their capacities solely as such with respect to the Archdiocese Policies and all Subject Interests therein.

1.1.481.1.52 "**Known Abuse Claims**" means any Abuse Claim, other than an Unknown Abuse Claim, against any Settling Party, Settling Insurer, and/or Non-Settling Insurer.

1.1.491.1.53 "**Medicare Claims**" means any Claim by CMS, and/or any agent or successor of CMS, charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA or pursuing a Claim under MSP Provisions, relating to any payments in respect of any Abuse Claim, including any Claim for reimbursement of conditional payments, and any Claim relating to reporting obligations.

1.1.501.1.54 "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which imposes reporting obligations on those Entities with payment obligations under the MSPA.

1.1.511.1.55 "**MSPA**" means 42 U.S.C. §1395y et seq., or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection

---

[3] US Fire/International Settlement Agreement to include the following definition for "Insurer": "United States Fire Insurance Company ("U.S. Fire"), International Insurance Company ("International"), and Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company individually and, to the extent that policies issued by U.S. Fire and/or International were novated to or assumed by either or both of them ("U.S. Fire/International"). Any Entity that meets the definition set forth above shall be individually referred to as an "Insurer.""

SPARTA Settlement Agreement to include the following definition for "Insurer":

"SPARTA Insurance Company and American Employers' Insurance Company ("SPARTA")."

Catholic Mutual Settlement Agreement to include the following definition for "Insurer":

"Catholic Mutual Relief Society of America."

National Union Settlement Agreement to include the following definition for "Insurer":

"National Union Fire Insurance Company of Pittsburgh, Pa., or its successors and assigns."

Puritan Insurance Company to include the following definition for "Insurer":

"Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation."

Twin City Settlement Agreement to include the following definition for "Insurer":

"Twin City Fire Insurance Company and First State Insurance Company."

therewith or amendments thereto, including the regulations promulgated thereunder, found at 42 C.F.R. §411.1 et seq.

~~1.1.52~~1.1.56  "**Non-Debtor Catholic Entity Policy Sale**" has the meaning set forth in Section 4.6.

~~1.1.53~~1.1.57  "**Non-Debtor Catholic Entities**" collectively means those entities listed on the Acceptable Plan Exhibit B-2 who are not Additional Debtors, but which are (a) insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies and/or (b) have actually or allegedly acquired or been assigned the right to make a claim for coverage under any of the Archdiocese Policies (excluding, however, for the avoidance of doubt, the Debtor Parties, the Settlement Trust, and any Abuse Claimant).

~~1.1.54~~1.1.58  "**Non-Insurer Contribution Claim**" means any Claim for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law that is attributable to, arises from, is based upon, relates to, or results from, an Abuse Claim or payment of an Abuse Claim, and any other derivative or indirect Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, other than a Non-Settling Insurer Contribution Claim or a Settling Insurer Contribution Claim.

~~1.1.55~~1.1.59  "**Non-Settling Insurer**" means any insurer (together with its Related Parties) that is not a Settling Insurer.

~~1.1.56~~1.1.60  "**Non-Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Non-Settling Insurer against any Settling Insurer for the payment of money  where such Non-Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.61  "**Parish Schools**" means the elementary Catholic schools that are owned and operated by the Archdiocesan Parishes. For the avoidance of doubt, the definition of Parish Schools expressly excludes Catholic schools that are owned and operated by Religious Orders and the Archdiocesan Schools. For the further avoidance of doubt, the Parish Schools are not separately incorporated.

~~1.1.57~~1.1.62  "**Parties**" has the meaning set forth in the first paragraph of this Settlement Agreement.

1.1.58  "**Payment Security**]" means [**Intentionally Omitted**]⁴

1.1.59~~1.1.63~~  "**Penalty Claims**" means a Claim against any Settling Party or Settling Insurer for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Creditor holding such Claim.

1.1.60~~1.1.64~~  "**Perpetrator**" means an individual who personally committed or is alleged to have personally committed an act of Abuse. For the avoidance of doubt, the definition of Perpetrator does not include any individual who did not personally commit an act of Abuse or is not alleged to have personally committed an act of Abuse, but against whom an Abuse Claim or Non-Insurer Contribution Claim is asserted nonetheless, or may be asserted, by virtue of such individual's position or service as a member, representative, contractor, consultant, professional, or volunteer of the Archdiocese or any Non-Debtor Catholic Entity or any council or representative body associated with such Entities.

1.1.61~~1.1.65~~  "**Person**" has the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

1.1.62~~1.1.66~~  "**Petition Date**" means (a) with respect to the Archdiocese, May 1, 2020; and (b) with respect to each Additional Debtor, the date(s) on which such Additional Debtor files in the Bankruptcy Court its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.63~~1.1.67~~  "**Plan**" refers to the Chapter 11 Plan of Reorganization for the Archdiocese and all Additional Debtors (and all exhibits annexed thereto) which shall, among other things, provide for the resolution of Abuse Claims and Subject Interests in the Archdiocese Policies as set forth herein, and which shall be in form and substance acceptable to Insurer in its sole discretion.

1.1.64~~1.1.68~~  "**Plan Confirmation Order**" has the meaning set forth in Section 2.3.

1.1.65  "**Preserved Coverage**" means [**Intentionally Omitted.**]⁵

1.1.66~~1.1.69~~  "**Purchased Property**" means any and all right, title, and interest (including all Subject Interests) in and to the Archdiocese Policies and the Related Insurance Claims and Coverage Claims.

---

⁴  Intentionally omitted, except the SPARTA Settlement Agreement, in which this section will provide:

has the meaning given to it in Section 3.1.1 hereof.

⁵  Intentionally omitted, except the Catholic Mutual Settlement Agreement, in which this section will provide:

"Preserved Coverage" means Insurer's obligations under Certificate No. [●] issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the personal injury claims listed in the attached Schedule [X], in each case, subject to the limits, declarations, terms and conditions of such certificate; provided, however,  that Preserved Coverage shall not include coverage for any and all Abuse Claims or other Barred Claims.

1.1.671.1.70   "**Related Insurance Claim**" means (a) any Extra-Contractual Claim and (b) any other Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies, including, without limitation, bad faith Claims.

1.1.681.1.71   "**Related Party**" means, with respect to any Entity, such Entity's (a) predecessors, successors, assigns, and any Entity that assumed the obligation of the forgoing for the Archdiocese Policies by novation or otherwise (b) direct and indirect past, present, and future Affiliates (as defined in section 101(2) of the Bankruptcy Code), holding companies, merged companies, related companies, subsidiaries, divisions, acquired companies, joint ventures, joint venturers, (c) current and former employees, officers, directors, principals, partners, managing agents, trustees, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, brokers, adjusters, reinsurers, retrocessionaires, subrogees, agents, claims handling administrators, and other professionals, and (d) respective heirs, executors, estates, and nominees; and all Entities acting on behalf of, by, through or in concert with them, each solely in their capacities as such with respect to such Entity (and with respect to such Entity (including Insurer) that is an insurer of any Archdiocese Bound Party or has assumed the obligations of such by novation or otherwise, such insurer's applicable insurance policy(ies) (including the Archdiocese Policies)).[6]

1.1.72  "**Religious Order**" means, collectively, an institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy.

1.1.691.1.73   "**Reorganized Additional Debtors**" means the Additional Debtors, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.701.1.74   "**Reorganized Debtor**" means the Debtor, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.711.1.75   "**Revival Window**" means Section 2 of La. Acts 2021, No. 322, as amended by La. Acts 2022, No. 386, and La. Acts 2024, No. 481.

---

[6] The SPARTA Settlement Agreement will additionally provide:

For the purposes of this definition and this Settlement Agreement, Pennsylvania General Insurance Corporation shall not be a considered a Related Party of SPARTA Insurance Company.

~~1.1.72~~1.1.76   "**Revival Window Laws**" means the Revival Window, together with any other law that extends the prescriptive period or statute of limitations for asserting Abuse Claims under Louisiana or other applicable state law.

~~1.1.73~~1.1.77   "**Sale Injunction**" has the meaning set forth in Section 2.1.

~~1.1.74~~1.1.78   "**Settlement Agreement Effective Date**" means the first day on which: (a) the Archdiocese Signatory Parties and Insurer have executed this Settlement Agreement; (b) the Unknown Abuse Claims Representative shall have supported the releases provided for herein and the protections granted hereby and in the Plan in favor of the Insurer Released Parties, in a manner acceptable to Insurer in its sole discretion; (c) the Approval Order shall have become a Final Order; (d) the Plan Confirmation Order shall have become a Final Order; and (e) the Settlement Trust shall have been created pursuant to the Plan~~[.;~~ provided, however, ~~that in Insurer's sole discretion~~with the prior written consent of the Trustee, not to be unreasonably withheld, Insurer may elect to waive the conditions set forth in clauses (b) through (e) and pay or direct the payment of the Settlement Amount to the escrow or Settlement Trust prior to the occurrence of the events set forth in (b) through (e) hereof, in which case, the date of such payment shall be the Settlement Agreement Effective Date for all purposes hereunder including the date of the closing of the purchase and sale of the Archdiocese Policies.~~]7~~.

~~1.1.75~~1.1.79   "**Settlement Amount**" means the sum of $~~[____]~~Eight Five Thousand and 00/100 Dollars ($85,000) to be paid (in accordance with Section 3.1) by Insurer after satisfaction of all conditions precedent herein in accordance herewith.

~~1.1.76~~1.1.80   "**Settlement Trust**" means the settlement trust established under the Plan for the purposes set forth therein, including assuming liability for all Channeled Claims (as defined in the Acceptable Plan) and Indemnified Claims (as defined herein), subject to the limitations on indemnification and liability contained in Section 7.2 of this Settlement Agreement.

~~1.1.77~~1.1.81   "**Settlement Trust Agreement**" means the agreement between the Debtor and the Settlement Trustee governing the Settlement Trust, ~~to be filed with the Plan Supplement (as defined~~ in the form of Exhibit D-1 to the Acceptable Plan~~)~~.

~~1.1.78~~1.1.82   "**Settlement Trust Allocation Protocol**" means the Settlement Trust Allocation Protocol (as defined and used in the Settlement Trust Agreement), ~~to be filed within~~ the form of Exhibit D-2 to the Acceptable Plan~~Supplement~~.

~~1.1.79~~1.1.83   "**Settlement Trust Documents**" means, collectively, (a) the Settlement Trust Agreement, (b) the Settlement Trust Allocation Protocol, and (c) any other agreements, instruments and documents governing the establishment and administration of the Settlement Trust, which shall be consistent with the terms of the Plan,

---

7 ~~Note: Subject to further discussion.~~

as the same may be amended or modified from time to time in accordance with the terms thereof.

1.1.801.1.84   "**Settlement Trustee**" means the Entity appointed to act as the initial trustee of the Settlement Trust pursuant to the terms of the Settlement Trust Documents, along with any successor trustee appointed in accordance with the Settlement Trust Documents.

1.1.811.1.85   "**Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Settling Insurer against any Settling Insurer or Non-Settling Insurer for the payment of money where such Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.821.1.86   "**Settling Insurers**" shall have the meaning set forth in the Acceptable Plan.

1.1.831.1.87   "**Settling Insurers' Policies**" shall have the meaning set forth in the Acceptable Plan.

1.1.841.1.88   "**Settling Parties**" means, collectively, the following Entities: (a) Archdiocese Bound Parties; and (b) the Settling Insurers.

1.1.851.1.89   "**Subject Interests**" means all Claims, liens (as defined by Section 101(37) of the Bankruptcy Code), encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief, including: (a) all interests of the Archdiocese in, to and under the Archdiocese Policies; (b) all interests in, to, and under the Archdiocese Policies of any Entity other than the Archdiocese (including all Abuse Claimants and the Archdiocese Bound Parties); and (c) all interests in, to, and under the Archdiocese Policies of any other Entity claiming coverage by, through, or on behalf of any Archdiocese Bound Party, including, without limitation, rights and interests as an insured, co-insured or additional insured, insurer or creditors of the Archdiocese Bound Parties; in each case within the meaning of "interest" as used in sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code. For the avoidance of doubt, a Direct Action Claim constitutes a Subject Interest. The meaning of Subject Interests also includes: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or  other title retention agreements, pledges, liens (including without limitation any statutory lien  on real and personal property and any and all "liens" as that term is defined and used in the  Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent  rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature,  if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of  income or other exercise of any attributes of ownership (the foregoing collectively referred to in  this order as "liens"), and (b) all debts arising in any way in connection with any acts of the  Archdiocese Bound Parties and any and all Claims, obligations, demands, guaranties, options,   rights, contractual commitments, executory contracts, unexpired leases,

employment agreements, any  other employee, workers' compensation, occupational diseases or unemployment or temporary  disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims,  interests and matters of any kind and nature, whether arising prior to or subsequent to the  commencement  of  the  Bankruptcy  Case, and  whether  imposed  by  agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged  or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit,  expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether  in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or  extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any  Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for  "bad faith," unfair  claims  practices,  breach  of  any  implied  duty  of  good  faith  and  fair  dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under  the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all  "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code;  and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor  Parties' Estates, including without  limitation any asserted by any third party or any other person   or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or  demand is reduced  to  judgment,  liquidated,  unliquidated,  fixed,  contingent,  matured,  unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal  bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by   whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property.

1.1.861.1.90   "**Supplemental Settling Insurers' Injunction**" has the meaning set forth in Section 2.2.2.

1.1.871.1.91   "**Unknown Abuse Claim**" means an Abuse Claim that occurred before the Petition Date and the Abuse Claimant did not file a proof of claim by the applicable Abuse Claims Bar Date, for which there exists a valid legal excuse for not filing, as further defined in the in the Acceptable Plan.

1.1.881.1.92   "**Unknown Abuse Claims Representative**" means Michael R. Hogan, the legal representative appointed by the Bankruptcy Court pursuant to the *Order (I) Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, and  (II) Approving the Retention of Michael R. Hogan as the Unknown Tort Claims Representative,  Nunc Pro Tunc To July 26, 2021* (Docket No. 1012 ), any successor legal representative appointed by the Bankruptcy Court, or, on and after the Bankruptcy Plan Effective Date, any successor legal representative appointed in accordance with the applicable Settlement Trust Document.

1.2    Capitalized terms not defined in this Section 1 or elsewhere in this Settlement Agreement shall have the meanings given to them in the Bankruptcy Code.

## 2.    THE BANKRUPTCY CASE AND PLAN OF REORGANIZATION

2.1     On or before July 29, 2025, the Archdiocese shall file a motion in the Bankruptcy Court (the "**Approval Motion**"), in form and substance acceptable to Insurer in its sole discretion, that seeks the entry of an order in substantially the form attached as **Exhibit A** to this Settlement Agreement, or otherwise in form and substance acceptable to Insurer in its sole discretion (the "**Approval Order**"), that:

(a) approves this Settlement Agreement, including Insurer's buyback of the Archdiocese Policies and the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests, and otherwise authorizes the Parties to undertake the settlement and the transactions contemplated by this Settlement Agreement, in each case pursuant to sections 363(b), (f),and (m) of the Bankruptcy Code and any other applicable provisions of the Bankruptcy Code;

(b) contains an injunction (the "**Sale Injunction**") that, subject to and conditioned upon the Settlement Agreement Effective Date and the Insurer's payment of the Settlement Amount, bars all Claims against the Insurer Released Parties and their property and assets of each based on or arising out of any Subject Interests in the Archdiocese Policies including without limitation all Coverage Claims, Related Insurance Claims, and Barred Claims, leaving the Settling Insurers free and clear of all Subject Interests of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); any Abuse Claimant; or any holder of a Barred Claim pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code;

(c) provides that this Settlement Agreement is binding on the Archdiocese Signatory Parties, all other Settling Parties, any trust created in the Bankruptcy Case(s), and any successors of the foregoing; and

(d) provides, subject to and conditioned upon the Settlement Agreement Effective Date, that the Approval Order is binding on all Persons (including, for the avoidance of doubt, all Persons set forth in the foregoing (c)).

2.1.1     The Archdiocese shall provide written notice of the Approval Motion, which notice shall be in form and substance acceptable to Insurer, to, at a minimum, any known Archdiocese Bound Party, holder of an Abuse Claim, or party whose rights or interests may reasonably be considered to be impacted by the relief requested in the Approval Motion, and any party identified on Schedule 3 hereto.  In addition, the Archdiocese shall include notice of the Approval Motion together with notice provided with respect to confirmation of the Joint Plan, including publication notice of the hearing on the Approval Motion. The Archdiocese will provide a draft service list of the foregoing for Insurer's review and comment.

2.1.2     If any Entity files an objection to the Approval Motion, the Archdiocese and Creditors' Committee shall consult with Insurer in connection with filing any written response thereto.   The Archdiocese Signatory Parties, as applicable, and Creditors'

Committee shall take commercially reasonable steps to defend against any objection, appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order. Insurer will cooperate with the Archdiocese Signatory Parties and Creditors' Committee in this regard, including making commercially reasonable submissions.

2.2    The Archdiocese shall file and prosecute a joint Plan with the Creditors Committee, which shall be in form and substance satisfactory to the Insurer in its sole discretion, substantially in the form as the Acceptable Plan, which the Parties acknowledge and agree satisfies the terms of this Settlement Agreement. Any modifications to the Plan, the Settlement Trust Documents, the Plan Confirmation Order, or the Approval Order, including those relating to the Channeling Injunction, Supplemental Settling Insurers' Injunction, Gatekeeper Injunction, releases by holders of Abuse Claims, Insurers, Insurance Settlement Agreements, and related definitional terms, including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Abuse Related Insurance Claims," "Channeled Claim," "Covered Parties," "Direct Action Claim," "Enjoined Party," "Insurer Contribution Claim," "Non-Insurer Contribution Claim," "Penalty Claims," "Protected Parties," "Settling Insurers," "Settling Insurer's Policies," "Subject Insurance Policies," "Subject Interests," or any exhibits, schedules, and documents related thereto, must be in all respects consistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties without Insurer's written consent in its sole discretion.

2.2.1    The Plan shall create the Settlement Trust, which shall be responsible for making any and all payments to the Abuse Claimants entitled to receive payment under the Plan and which shall assume all liability for Channeled Claims.

2.2.2    The Plan shall include: (a) an injunction in substantially the form included in Article [12.4] of the Acceptable Plan (the "**Channeling Injunction**"); and (b) an injunction in substantially the form included in Article [12.5] of the Acceptable Plan (the "**Supplemental Settling Insurers' Injunction**"); and (c) an injunction in substantially the form included in Article [12.6]8 of the Acceptable Plan (the "**Gatekeeper Injunction**").

2.2.3    The Plan shall incorporate by reference the releases and indemnities set forth in this Settlement Agreement, including that the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to all Indemnified Claims as forth in Section 7.2 of this Settlement Agreement.

2.2.4    The Settlement Trust Documents shall provide that as a condition to receiving payment from the Settlement Trust, all Abuse Claimants shall provide an Abuse Claim Release and Certification.

2.2.5    The Plan shall provide for the commencement, prior to the Court's consideration of the Approval Motion, by the Additional Debtors of Chapter 11 cases to be jointly administered with the Bankruptcy Case.

2.2.6    The Plan shall provide a supplemental bar date for the Additional Debtors in a form and substance satisfactory to the Insurer with respect to Abuse Claims against

904

the Additional Debtors and the form, manner, and deadline for filing proofs of claim and the treatment of confidential information contained therein.

2.2.7    The Plan shall provide that confirmation of the Plan will not occur unless all of the following conditions precedent have been satisfied: (a) the Plan Confirmation Order approves and implements the Injunctions and (b) the Bankruptcy Court shall have granted the Approval Motion in form and substance acceptable to Insurer in its sole discretion.

2.2.8    The Plan shall provide that the Bankruptcy Plan Effective Date will not occur unless all of the following conditions precedent have been satisfied: or waived (as applicable with consent of Insurer): (a) the Plan Confirmation Order will have been entered by the Bankruptcy Court and become a Final Order, and (b) the Bankruptcy Court shall have entered the Approval Order (with both such Approval Order and this Settlement Agreement in form and substance acceptable to the Insurer) and such Approval Order shall have become a Final Order.

2.2.9    The Plan shall provide that (collectively, as follows, the "**Controlling Document Provision**") in the event of a conflict between (a) the Settlement Agreement, on the one hand, and (b) the Plan, on the other, the terms of the Settlement Agreement shall control and govern; and in the event of a conflict between the (x) Approval Order, on the one hand, and (y) Plan Confirmation Order, on the other, the terms of the Approval Order shall control and govern.

2.2.10    The Plan shall provide that the execution and delivery of this Settlement Agreement is a condition to entry of the Plan Confirmation Order and the occurrence of the Bankruptcy Plan Effective Date. The inclusion of this Settlement Agreement in the Plan shall not be waivable as a condition to entry of the Plan Confirmation Order or the occurrence of the Bankruptcy Plan Effective Date absent the prior written consent of the Settling Insurers.

2.3    The Debtor Parties shall seek and obtain entry of an order from the Bankruptcy Court, which order shall be in form and substance acceptable to the Parties, that: (i) approves the Plan pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code; (ii) contains the Channeling Injunction; (iii) ratifies the Sale Injunction as independent of the Channeling Injunction and Supplemental Settling Insurers' Injunction; (iv) contains the Gatekeeper Injunction; (v) provides that this Settlement Agreement is binding on any Settlement Trust created in the Bankruptcy Case, the Reorganized Debtor, the Reorganized Additional Debtors, and any successors of the Settlement Trust, Reorganized Debtor, or Reorganized Additional Debtors, and all of the Archdiocese Bound Parties; and (vi) contains the Controlling Document Provision (the "**Plan Confirmation Order**").

2.3.1    The Plan and Plan Confirmation Order must not be inconsistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties.

2.3.2    In seeking to obtain the Plan Confirmation Order, the Debtor and Additional Debtors will: (i) seek a confirmation hearing on an appropriately timely basis; (ii) urge the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) take all reasonable steps to defend against any objection, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order.

2.3.3    Prior to entry of the Plan Confirmation Order, the Archdiocese and/or any applicable Additional Debtor shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Abuse Claim that (i) is asserted against any Debtor Party and (ii) implicates, or is reasonably likely to implicate, any Archdiocese Insurance Policies (including by alleging Abuse that took place during any policy period of any Archdiocese Policy).  If, prior to the Plan Confirmation Order becoming a Final Order, the Bankruptcy Court allows any Entity to prosecute any such Abuse Claim, the Debtor Parties shall defend themselves against such Abuse Claims and comply with the terms of any order of the Bankruptcy Court, and Insurer's rights and obligations relating to such litigation shall be determined by, and subject to, the terms and conditions of the Archdiocese Policies, this Settlement Agreement, and any applicable orders of the Bankruptcy Court.

2.3.4    The Plan and Plan Confirmation Order shall provide that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any Covered Party with respect to any Archdiocese Policy, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

2.3.5    Nothing in this Section or elsewhere in this Settlement Agreement shall bar any party from arguing that any appeal from the Plan Confirmation Order should be dismissed on grounds of statutory or equitable mootness or otherwise.

2.3.6    None of the releases, Injunctions, or other provisions of the Plan with apply to, or have any effect, on the rights of the Settling Insurers to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with any Settling Insurer's Policy.

2.4    The Settlement Trust Documents shall require the Settlement Trust to register as a Responsible Reporting Entity under the reporting provisions of MMSEA.

2.4.1    The Settlement Trust Documents shall require the Settlement Trust, at its sole expense, to timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated and to follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

906

2.4.2 The Settlement Trust Documents shall require the Settlement Trust to obtain, prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Abuse Claim, a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. §1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim.

2.5 The Debtor Parties and Reorganized Debtor and Reorganized Additional Debtors will undertake commercially reasonable actions to cooperate with Insurer in connection with responding to any inquiry from Insurer's regulators, auditors, reinsurers, or retrocessionaires.

2.6 From and after the execution date of this Settlement Agreement and until the earlier of: (A) occurrence of (i) the Settlement Agreement Effective Date and (ii) Insurer's remittance of the Settlement Amount (at which time this covenant is superseded by the releases provided in Section 4); and (B) the date on which this Settlement Agreement is terminated, (i) none of the Insurer Released Parties, the Debtor, the Additional Debtors or Creditors' Committee will initiate any litigation activity against the other in any Bankruptcy Case and (ii) the Archdiocese and the Insurer Released Parties shall cease all litigation activities against each other in the Bankruptcy Case, including that the Insurer Released Parties will neither object to any proposed Plan consistent with this Settlement Agreement, nor serve or compel any discovery in connection with the Bankruptcy Case; *provided that*: (y) neither the Archdiocese nor any Additional Debtor shall include any provision in any Plan that adversely affects the rights or benefits of the Insurer Released Parties under this Settlement Agreement, or that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement; and (z) neither the Archdiocese nor any Additional Debtor shall act, or fail to act, in such a way that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement. Notwithstanding the foregoing, the Insurer Released Parties may participate in the Bankruptcy Case for the purpose of supporting or enforcing any of the terms of this Settlement Agreement and protecting their rights.

~~2.7   The Parties shall each bear, as to each other only, their own costs, expenses, and counsel and professional fees in the Bankruptcy Case.~~

~~2.8~~2.7  From and after the execution date of this Settlement Agreement and until the date on which this Settlement Agreement is terminated, the obligations of the Debtors Parties set forth in this Section 2 shall be binding on the Debtor Parties.

## 3. PAYMENT OF THE SETTLEMENT AMOUNTS

3.1 By no later than thirty (30) days after (a) the Settlement Agreement Effective Date, and (b) Insurer receiving appropriate instructions for the transmission of the payment to the Escrow Agent or Settlement Trust, Insurer shall pay (or cause to be paid) the Settlement Amount to the Settlement Trust or Escrow Agent pursuant to the Escrow Agreement.  Payment of the Settlement Amount may be by check, ACH transfer, wire transfer, or other method.

3.1.1 ~~[Intentionally Omitted.]~~[8]

3.2    The delivery of the Settlement Amount to the Escrow Agent or Settlement Trust shall be in full and final settlement of all responsibilities under and arising out of the Archdiocese Policies, the sale of the ~~Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties back~~Purchased Property to Insurer free and clear of all Subject Interests of any Entity, and the other releases provided.

3.3    Subject to the occurrence of the Settlement Agreement Effective Date, the Parties agree:  (i) the Settlement Amount is the total amount that Insurer is obligated to pay on account of any and all Claims under, arising out of, relating to, or in connection with the Archdiocese Policies (including Barred Claims, and any reimbursement obligations for Conditional Payments under the MSPA); (ii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of anyone in connection with the Archdiocese Policies, including any payments in connection with amounts allegedly owed under the MSPA or in connection with any Claims, including any Barred Claim; (iii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of the Archdiocese Bound Parties or any Abuse Claimants in connection with the Archdiocese Policies; and (iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted[9]. The Parties further agree that the Settlement Amount includes the full purchase price of the Archdiocese Policies and Related Insurance Claims and Coverage Claims of the Archdiocese Bound Parties and consideration for the releases and other protections afforded by this Settlement Agreement.

3.4    The Parties represent and agree that (i) the consideration to be provided by Insurer pursuant to this Settlement Agreement constitutes a fair and reasonable compromise and exchange for the consideration granted to the Insurer Released Parties in this Settlement Agreement (including the releases set forth below), and (ii) the consideration to be provided by the Archdiocese Bound Parties to the Insurer Released Parties pursuant to this Settlement Agreement (including the releases set forth below) constitutes a fair and reasonable compromise and exchange for the consideration granted to the Archdiocese Bound Parties in this Settlement Agreement. The Insurer Released Parties are not acting as volunteers, and the Settlement Amount reflects potential liabilities and obligations to the Archdiocese Bound Parties of the amount Insurer allegedly is obligated to pay.

---

[8] ~~Intentionally omitted, except the SPARTA Settlement Agreement, in which this section will provide:~~

~~[SPARTA shall provide a standby letter of credit, in a manner acceptable to the Debtor, to secure payment of the Settlement Amount. References herein or in the Plan to "payment" of the Settlement Amount shall be deemed to include the draw down of the letter of credit, as applicable.]~~

[9] ~~The Catholic Mutual Settlement Agreement will include the following~~

~~["(iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted *except for the Preserved Coverage.*"]~~

3.5     Each of the Archdiocese Signatory Parties: (i) consents to the sale of the Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests and Claims of all Persons, including, without limitation, the Archdiocese Bound Parties in accordance with the terms of this Settlement Agreement, and (ii) agrees and acknowledges that the contribution of the proceeds from such sale and settlement to the Settlement Trust, as provided in the Plan and this Settlement Agreement, is a fair and reasonable compromise and exchange for value and constitutes reasonable and adequate consideration for any Subject Interest or Claim the Archdiocese Bound Parties may have in the Archdiocese Policies.

3.6     The Parties further agree that they have attempted to resolve the matters set forth herein in compliance with both state and federal law and believe that the settlement terms adequately consider CMS's interest and do not reflect any attempt to shift responsibility for payment of medical expenses to CMS pursuant to 42 U.S.C. § 1395y(b).  The Parties acknowledge, understand, and agree that any present or future action or decision by CMS, including actions regarding an Abuse Claimant's eligibility or entitlement to receive Medicare or Medicare payments, will not render this Settlement Agreement (including the releases set forth in it) void or ineffective, or in any way affect the finality of this Settlement Agreement.  The Settlement Trust is responsible for all future medical payments, including any and all claims by CMS and/or CMS contractors that have been or may be in the future arising out of, relating (directly or indirectly) in any way to, or in connection with this Settlement Agreement.

3.7     To facilitate the purchase of the ~~Archdiocese Policies~~Purchased Property as set forth herein, ~~the Archdiocese and~~ each ~~of the other~~ Archdiocese Bound ~~Parties authorizes the Archbishop¹⁰ or any other person employed by the Archdiocese that he designates, as its~~Party is authorized to designate a lawful attorney in fact, with full powers of substitution, to execute any bill of sale or other document reasonably requested by the Archdiocese or Insurer to accomplish the sale and purchase contemplated herein. A form of Bill of Sale is attached hereto as **Exhibit B**.

## 4.     RELEASES AND SALE FREE AND CLEAR

4.1     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, with no further action being required, the Archdiocese Signatory Parties fully, finally, and completely remise, release, acquit, and forever discharge the Insurer Released Parties (including, for the avoidance of doubt, any of their reinsurers or retrocessionaires, solely in their capacity as such), from any and all past, present, and future: (a) Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies or Claims that are covered or are determined to be covered by agreement or a court of competent jurisdiction under the Archdiocese Policies, including, without limitation, any Barred Claims, Direct Action Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims, the handling of the Abuse Claims or the Bankruptcy Case. The Archdiocese Signatory Parties further acknowledge, stipulate, and agree that (x) the releases

---

¹⁰ ~~As used herein, "Archbishop" refers to: (a) the office of the ordinary of the Archdiocese under Canon Law; (b) the Most Reverend Gregory Michael Aymond, the Archbishop on the Effective Date; and (c) any duly appointed or elected administrator of the Archdiocese pending the appointment of a new individual to serve as the Archbishop, and his duly appointed or elected successor.~~

in this Section 4.1 specifically include all Unknown Abuse Claims, and demands that are based in whole or in part on Unknown Abuse Claims and (y) **with respect to all Claims released under this Section 4.1, the Archdiocese Signatory Parties waive any and all provisions, rights, and benefits conferred by Cal. Civ. Code 1542 or any law of any state of the United States, or any principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code 1542, which provides: "a general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, that, if known by him or her, would have materially affected his or her settlement with the debtor or released party"** and (z) the releases in this Section 4.1 shall be equal in breadth to the broadest releases and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

4.2     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, and with no further action being required, Insurer shall fully, finally, and completely remise, release, acquit, and forever discharge the Archdiocese Signatory Parties from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies, including any Barred Claims, and reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case subject to the protections in favor of the Insurer Released Parties set forth herein[11].

4.3     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, none of the Archdiocese Signatory Parties or other Archdiocese Bound Parties shall assert against the Insurer Released Parties any Claim with respect to any matter, conduct, transaction, occurrence, fact, or other circumstance that, directly or indirectly, arises out of, relates to, or is in connection with any of the Archdiocese Policies, any Barred Claim, or any other matter released pursuant to Sections 4.1 and 4.2 above.

4.4     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer hereby buys back the Archdiocese Policies free and clear of all Subject Interests, including without limitation all Coverage Claims and Related Insurance Claims, of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); and any Abuse Claimant, or any other holder of a Barred Claim.  This sale is pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code.  The Parties acknowledge and agree, and the Approval Order shall find and conclude, that upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount:

---

[11] Catholic Mutual Settlement Agreement will include the following addition:

"all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case *provided that, the obligations of the applicable Archdiocese Bound Parties are not released from their obligations under the Archdiocese Policies with respect to the Preserved Coverage.*"

4.4.1   Insurer is a good faith purchaser of the Archdiocese Policies and any Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), within the meaning of section 363(m) of the Bankruptcy Code, with all the protections afforded such a purchaser under 363(m) of the Bankruptcy Code;

4.4.2   ~~the~~The consideration exchanged constitutes a fair and reasonable settlement and compromise of the Parties' disputes and of their respective rights and obligations relating to the foregoing Archdiocese Policies and Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), and constitutes reasonably equivalent value;

4.4.3   ~~the~~The releases in this Settlement Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy law;

4.4.4   ~~the~~The Archdiocese Policies and all Subject Interests therein (including, without limitation, to the extent applicable, any Direct Action Claim) shall be terminated and of no further force and effect;

4.4.5   Insurer's payment of the Settlement Amount constitutes Insurer's full and complete performance of any and all obligations under the Archdiocese Policies, including any performance owed to the Archdiocese Bound Parties or any holder or purported holder of any Claim against (including any Abuse Claim or Direct Action Claim) or Subject Interest in, the Archdiocese Policies, and exhausts all limits of liability of the Archdiocese Policies;

4.4.6   All Subject Interests the Archdiocese Bound Parties and any other Entity may have had, may presently have, or in the future may have in the Archdiocese Policies are released pursuant to the terms of this Settlement Agreement and policy buyback;

4.4.7   ~~all~~All per occurrence and/or aggregate limits of coverage under the Archdiocese Policies are fully eroded, exhausted and settled upon the Settlement Agreement Effective Date;

4.4.8   ~~the~~The Insurer would not pay the Settlement Amount without buyback of the Archdiocese Policies upon all of the terms and conditions set forth herein; and

4.4.9   ~~the~~The Archdiocese Signatory Parties accept the Settlement Amount in full and complete compromise and satisfaction of all Insurer Released Parties' past, present, and future obligations, including any obligations to any of the Archdiocese Bound Parties under such Archdiocese Policies or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever that are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies (including without limitation Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether or not such Claims arise from, relate to, or

are in connection with the Abuse Claims, Barred Claims, the Bankruptcy Case, or otherwise.

4.5     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer shall have no obligation to pay, handle, object, or otherwise respond to any Claim against the Archdiocese Bound Parties; and the Archdiocese Bound Parties will: (i) will withdraw, and are deemed to have withdrawn, all outstanding tenders of Claims to the Insurer Released Parties for defense and indemnity; (ii) will not tender any Claims to the Insurer Released Parties; and (iii) will not request that the Insurer Released Parties fund any judgments, settlements, or defense costs that, in each case, are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies issued by a Settling Insurer.

4.6     To the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer consent to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under this Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Subject Interests of any Entity in such Archdiocese Policies (the "**Non-Debtor Catholic Entity Policy Sale**"). The Plan Confirmation Order and Approval Order shall so provide and Insurer shall be designated in the Plan Confirmation Order as a good-faith purchaser of the Archdiocese Policies with all the protections afforded such a purchaser under section 363(m) of the Bankruptcy Code.

4.7     [Intentionally Omitted.][12]

4.84.7   The Archdiocese Signatory Parties further covenant, stipulate and agree that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Abuse Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any insured or additional insured covered by any insurance policy issued by any Insurer Released Party, and to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in any Archdiocese Policy to the Debtor's Estate and sale thereof to Insurer, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court. Without limiting the foregoing, the Insurer Released Parties shall receive protections against Claims by Non-Debtor Catholic Entities and any other Entity equal in breadth to the broadest protections received by any other Settling

---

[12] Intentionally omitted, except the Catholic Mutual Settlement Agreement, in which this section will provide:

4.15  Notwithstanding anything in this Settlement Agreement to the contrary, nothing in the Settlement Agreement shall sell or purchase the Preserved Coverage; erode, exhaust the limits of, or terminate the Preserved Coverage; release the Insurer from providing the Preserved Coverage to the applicable Archdiocese Bound Parties; or release the obligations of the applicable Archdiocese Bound Parties under the Archdiocese Policies with respect to such Preserved Coverage.

Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, or any Insurance Settlement Agreement approved by the Bankruptcy Court.

4.9~~4.8~~ If the Archdiocese Signatory Parties, or anyone of them, enter into any agreement (that is embodied in such agreement as approved by the Bankruptcy Court, the Plan, and/or the Plan Confirmation Order) with any other one of the Settling Insurers (including any Non-Settling Insurer who becomes a Settling Insurer) in the Bankruptcy Case, that provides that insurer with releases, injunctions or other protections that are more favorable than those contained in this Settlement Agreement, then this Settlement Agreement shall be deemed to be modified to provide Insurer with those more favorable injunctions, releases or other protections.

4.9~~4.10~~         Notwithstanding anything in this Settlement Agreement, nothing in this Settlement Agreement is intended to or shall be construed to:

4.9.1~~4.10.1~~   apply to or have any effect on the Insurer Released Parties' rights to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer;[13]

4.9.2~~4.10.2~~   release any Claims that any Insurer Released Party has or might have against any Non-Settling Insurer, except that, to the extent such other insurers have agreed or in the future agree to release any Claims against the Insurer Released Parties arising out of or related in any way to the Abuse Claims, then the Insurer Released Parties also release such Claims against such other insurers to the same extent; or

4.9.3~~4.10.3~~   release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Settlement Agreement or the Plan (to the extent not inconsistent with this Settlement Agreement).

## 5.    TERMINATION OF AGREEMENT

5.1    The Parties may terminate this Settlement Agreement by mutual agreement in writing.

5.2    Insurer may terminate this Settlement Agreement upon fifteen (15) days written notice to the other Parties in the event of any of the following occurs prior to the Settlement Agreement Effective Date: (i) any of the Debtor Parties or the Creditors' Committee files a plan inconsistent with this Settlement Agreement; (ii) the Approval Order and the Plan Confirmation Order are not entered by February 15, 2026; (iii) the Bankruptcy Court enters an order that becomes a Final Order that (a) denies the Approval Motion or (b) is inconsistent with the Approval

---

[13] ~~SPARTA Settlement Agreement will provide:~~

~~For the avoidance of doubt, any release provided pursuant to this Settlement Agreement does not include any release by Insurer of any Claims against Pennsylvania General Insurance Corporation. Nothing in the Settlement Agreement shall impair any right of Insurer to pursue any direct claim or claim based on theories of contribution, indemnity, reimbursement, or subrogation against Pennsylvania General Insurance Corporation.~~

~~The Plan shall provide the same.~~

Order or the Plan Confirmation Order; (iv) a plan that is inconsistent with the terms of this Settlement Agreement is confirmed; or (v) any Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

5.3    In the event of termination pursuant to this Section 5, unless the Parties agree otherwise in writing, the ~~Parties'~~Parties' interests, rights, and obligations under the Archdiocese Policies shall not be impacted by such termination.

## 6.    REPRESENTATIONS AND WARRANTIES OF THE PARTIES

6.1    The Parties separately represent and warrant as follows:

6.1.1    To the extent it is a corporation, including a non-profit, religious, or charitable corporation, or other legal entity, each such Party has the requisite power and authority to enter into this Settlement Agreement and to perform the obligations contemplated by this Settlement Agreement[14], subject only to approval of the Bankruptcy Court; and

6.1.2    This Settlement Agreement has been analyzed by counsel to the Parties and executed and delivered in good faith pursuant to arm's length negotiations and for value and valuable consideration.

6.2    The Archdiocese Signatory Parties represent and warrant that they have not assigned, and will not assign, any Subject Interests in the Archdiocese Policies to any Entity, except for the avoidance of doubt, the assignment of the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate.

6.3    The Archdiocese Signatory Parties represent and warrant that (i) all Archdiocese Bound Parties have either signed this agreement, are represented herein by the Archdiocese or the Archdiocese Signatory Parties, or are juridical entities whose existence has been terminated as a matter of applicable non-bankruptcy law and (ii) the Archdiocese Signatory Parties are duly authorized to bind the Archdiocese Bound Parties who are not Archdiocese Signatory Parties. Without limiting the foregoing, the Archdiocese Signatory Parties represent and warrant that:

6.3.1    all entities known to them that are Co-Insured Parties ~~(or~~under the Archdiocese Policies (by express reference, assignment, judicial determination or any related concept under applicable law or other document) ~~under the Archdiocese Policies~~ other than the Debtor, the Additional Debtors, the Parish Schools and Archdiocesan Schools, the Non-Debtor Catholic Entities, and the cemeteries identified in Section 6.3.3, are identified in Schedule 2 hereto, if any;~~15~~

---

[14]    Specifically, each Archdiocese Signatory Party is duly authorized to execute this Settlement Agreement and any related document and the signatory hereto on behalf of such Archdiocese Signatory Party has full power and authority to bind such Archdiocese Signatory Party. The related corporate resolutions and incumbency certificates are identified in Schedule 4 and Schedule 5 respectively.

~~15    SPARTA Settlement Agreement to include:~~

~~The Archdiocese Signatory Parties represent and warrant that they are not aware of being an "additional assured" (or related concept under applicable law or document) under any American Employers Insurance Company ("AEIC") policy.~~

6.3.2    the Archdiocesan Schools are not separately incorporated and are merely unincorporated operations of the Debtor, and the Parish Schools are not separately incorporated and are merely unincorporated operations of the Archdiocesan Parishes that are Additional Debtors;

6.3.3    the Debtor, through the Office of Catholic Cemeteries, operates certain cemeteries including, without limitation: All God's Babies Tomb & Holy Innocents Prayer Garden, St. Charles Cemetery, St. Joseph Cemetery #1, St. Joseph Cemetery #2, St. Louis Cemetery #1, St. Louis Cemetery #2, St. Louis Cemetery #3, St. Patrick Cemetery #1, St. Patrick Cemetery #2, St. Patrick Cemetery #3, St. Roch Cemetery #1, St. Roch Cemetery #2, St. Vincent De Paul Cemetery #1, St. Vincent DePaul Cemetery #2, which cemeteries are either: (a) Non-Debtor Catholic Entities or (b) not separately incorporated and are merely unincorporated operations of the Debtor;

6.3.4    Holy Redeemer School, Redeemer-Seton High School, and St. Joseph Benedectine High School were formerly owned and operated by the Archdiocese, but ceased operations and were closed by the Debtor at some point prior to the Petition Date, and were not separately incorporated and were merely unincorporated operations of the Debtor;

6.3.5    St. Robert Bellarmine School was formerly owned and operated by one or more of the Archdiocese Signatory Parties, but ceased operations and was closed by one or more of the Archdiocese Signatory Parties at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of one of the Additional Debtors;

6.3.6    Notre Dame Seminary and the Society of the Propagation of the Faith of the Archdiocese of New Orleans are owned and operated by the Archdiocese and are not separately incorporated, but are merely unincorporated operations of the Debtor;

6.3.7    San Pedro Pescador Church was owned and operated by the Archdiocese, but was closed by the Archdiocese prior to the Petition Date and was not separately incorporated, but was merely an unincorporated operation of the Archdiocese;

6.3.8    the following Roman Catholic Schools: the Academy of the Sacred Heart, Holy Cross, Jesuit, St. Mary's Academy, St. Mary's Dominican, Brother Martin, Mount Carmel Academy, Ursuline Academy, Cabrini, De La Salle, and St. Paul's School, are not Co-Insured Parties, named insured's or additional insureds (or related concept under applicable law or document) under the Archdiocese Policies, or institutions, religious organizations or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control and active management, and were themselves not under the control or active management of the Archdiocese.;

---

Note: SPARTA Settlement Agreement Schedule 2, will be listed as "None."

915

6.3.9   St. John Vianney Preparatory School was formerly owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.10  the Louise Home a/k/a as the Louise Headstart Center was an unincorporated ministry of the Debtor;

6.3.11  Holy Guardian Angel was owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.12  the Social Apostolate Housing Program was an unincorporated ministry of the Debtor;

6.3.13  at all times Tulane Catholic and the Newman Center were and are unincorporated activities of the Debtor, with no existence separate and apart from the Debtor;

6.3.14  Crescent City Convent Corporation, Lyric Realty and Parking Company, Inc., The Chinchuba Deaf-Mute Institute, People for Teens of St. Anthony of Padua Corporation, Kiwanis Foundation of New Orleans, Kiwanis Club of New Orleans, and Seminarians Parents Association, Inc. were never owned, operated, or controlled by the Debtor or the Additional Debtors and were neither insureds nor additional insureds under the Archdiocese Policies; and

6.3.15   (a) Catholic Charities Archdiocese of New Orleans ("**Catholic Charities**") owned and operated Hope Haven – Madonna Manor ("**HH**"), which was organized under Louisiana law; (b) HH was dissolved and its status as a juridical person was, thus, terminated as a matter of Louisiana law; (c) at all times, Catholic Charities was the sole member and/ or shareholder of HH; and (d) it is the intention of Catholic Charities that HH be bound by this Agreement as if it remained in existence and had signed the Agreement as a Party.

6.4     The Archdiocese Signatory Parties represent and warrant that they are not aware of any Abuse Claim asserted against any entity associated with the Archdiocese (including any parishes, institutions or religious organizations or any subsidiary of the person or organization listed in the declarations of the Archdiocese Policies, or any other organization coming under the Archdiocese's control and active management), that is not listed on Exhibit B-1 to the Acceptable Plan.

6.5     The Debtor represents and warrants that it will undertake good faith efforts to cause actual notice of the Approval Motion to be sent in accordance with Section 2.1.1 hereof.  Without limitation, the Debtor has sent or will send notice to the entities on Schedule 3.

6.6     The Archdiocese Signatory Parties and Insurer (limited to such Insurer person that worked on and were familiar with this Settlement Agreement and matters referenced therein), respectively, represent and warrant that they have completed a reasonable search for evidence of

any policy of insurance issued by Insurer to the Archdiocese Signatory Parties that would afford coverage with respect to any Abuse Claim, Coverage Claim, or Related Insurance Claim and other than the policies identified in Schedule 1, no such policies have been identified. The Archdiocese Signatory Parties further represent and warrant that, to the best of their knowledge after reasonably diligent investigation: there are no contracts, binders, certificates, and policies of insurance that insure or purport to insure (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) (x) the Diocese of Houma-Thibodaux or (y) the Diocese of Baton Rouge (excluding, for the avoidance of doubt, policies issued to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD, but including any such policies issued to the Archdiocese that provide or may provide insurance coverage to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD), or (iv) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, other than the policies identified in Schedule 1. Notwithstanding the foregoing, nothing in this Settlement Agreement, including the Schedules or Exhibits hereto, shall be construed as or deemed to be an admission or evidence that any binder, certificate, or policy of insurance was in fact issued or affords coverage in connection with any Abuse Claims.

6.7 The Debtor Parties represent and warrant that they have not in any way assisted, and covenant that they shall not in any way assist, any Entity in the establishment or pursuit of any Claim, including any Barred Claim, against the Insurer Released Parties.

## 7. ACTIONS INVOLVING THIRD PARTIES

7.1 For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Archdiocese Policies resulting from the purchase and sale thereof contemplated by this Settlement Agreement, the Parties hereby agree as follows:

7.1.1 From and after (i) the occurrence of the Settlement Agreement Effective Date, and (ii) Insurer's payment of the Settlement Amount, if any other insurer of the Archdiocese Bound Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from Insurer as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for any of Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense or indemnity obligation of Insurer for any Claims or reimbursement obligations for Conditional Payments released or resolved pursuant to this Settlement Agreement, the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and the Settlement Trust shall voluntarily reduce any judgment or Claim against, or settlement with, such other insurers to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against Insurer. To ensure that such a reduction is accomplished, Insurer shall be entitled to assert this Section 7 as a defense to any action against it brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Insurer from any liability for the judgment or Claim. Moreover, if a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against Insurer, such Claim may be asserted as a defense against a Claim by the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement

Trust in any coverage litigation (and the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and/or the Settlement Trust may assert the legal and equitable rights of Insurer in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust shall be reduced dollar for dollar by the amount so determined.

7.1.2    Unless this Settlement Agreement is terminated, Insurer shall not seek reimbursement for any payments it makes under this Settlement Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other Settling Insurer unless that other insurer first seeks contribution, subrogation, indemnification, or similar relief from Insurer.  Notwithstanding the foregoing, nothing in this Settlement Agreement, the Approval Order or the Plan Confirmation Order shall be construed as prohibiting Insurer from seeking recovery (including with respect to the Settlement Amount or otherwise) from its reinsurers or retrocessionaires in their capacity as such.

7.2     Subject to the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, and subject to the limitations set forth below, the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein, including any Claims made by (i) any Entity who is an insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies; (ii) any Entity who ~~has made, will make, or can make~~makes (a) an Abuse Claim or (b) a Related Insurance Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a Claim under any of the Archdiocese Policies (collectively, the "**Indemnified Claims**"), as set forth below: ~~16~~

7.2.1    The Insurer Released Parties shall have the right (but not the obligation) to (a) seek to enforce the Injunctions against any Entity seeking to assert an Indemnified Claim, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions) identified in this Section 7.2.  With the Insurer Released Parties' consent, such consent not to be unreasonably withheld, the Settlement Trustee can satisfy the obligations contained in (a) and (b) above.  An amount equal to ~~[    ]17~~One Thousand Eleven and 90/100 Dollars ($1,011.90) (the "**Indemnity Cost Reserve**") shall be reserved from the Settlement Amount for payment of reasonable attorneys' fees, expenses, costs, and other amounts incurred by the Insurer Released Parties in defending against such Indemnified Claims, which amount shall be released from reserve if no Indemnified Claims are asserted within 30 days after the Revival Window has closed under every applicable Revival Window Law.

7.2.2    ~~The~~Neither any Archdiocese Bound Party, nor the Settlement Trust shall ~~not~~ in any way assist, any Entity in the establishment or pursuit of any Claim against any

---

~~16~~ *Note: Certain limitations on scope of indemnity subject to further discussion.*

~~17~~ Amount to be equal to $250,000 for SPARTA, and an equivalent percentage of Settlement Amount for other Settling Insurers.  The Indemnity Cost Reserve is a reserve amount provided for each individual Settling Insurer and cannot be aggregated.

Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein.

7.2.3    The Settlement Trust and Archdiocese shall support and join in the enforcement of the Injunctions against any Entity seeking to assert an Indemnified Claim; *provided that* if the Insurer Released Party(ies) elect(s) not to enforce the Injunctions in accordance with Section 7.2.1, the Settlement Trust shall (a) seek to enforce the Injunctions against such Entity, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions).

7.2.4    To the extent that a Final Order is entered against any Insurer Released Party with respect to any Indemnified Claim, the Settlement Trust shall indemnify and hold harmless such Insurer Released Party with respect thereto up to the Settlement Amount; *provided that* to the extent the Insurer Released Party(ies) elect not to enforce the Injunctions or defend against the Indemnified Claims, the Settlement Trust's indemnity obligation shall be limited to the amount of the Indemnity Cost Reserve; *provided further* that if the Settlement Trust breaches its obligation set forth in Section 7.2.2 hereof, the Settlement Trust's indemnity obligation shall not be so limited and shall instead be up to the Settlement Amount.  In no event shall the Settlement Trust's indemnity obligation exceed each individual Settling Insurer's Settlement Amount.  To the extent the Settlement Amount has been distributed in accordance with the Plan, the Settlement Trust's indemnification obligation shall be so reduced.

7.2.5    The indemnification provided for herein shall not impose liability on the Settlement Trustee or Settlement Trust professionals for their own acts or omissions; *further*, funds provided for the administration of the Settlement Trust or payment of the Settlement Trustee or Settlement Trust professionals shall not be subject to indemnification claims as provided for herein.

7.3    If any Entity attempts to prosecute a Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies against the Insurer Released Parties before the Approval Order and Plan Confirmation Order become Final Orders, then promptly following notice to do so from Insurer, the Archdiocese and/or the Additional Debtor(s), as applicable, will file a motion and supporting papers to obtain an order from the Bankruptcy Court pursuant to sections 362 and 105(a) of the Bankruptcy Code protecting the Insurer Released Parties from any such Claims until the Plan Confirmation Order has become a Final Order, the Bankruptcy Case is dismissed, or this Settlement Agreement is terminated under Section 5 hereof.

## 8.    MISCELLANEOUS

8.1    If any action or proceeding of any type whatsoever is commenced or prosecuted by any Entity not a Party to this Settlement Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Settlement Agreement, the Parties mutually agree to cooperate fully in opposing such action or proceeding.

8.2　　The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Settlement Agreement and to preserve its validity and enforceability.

8.3　　The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Plan Confirmation Order, and the Bankruptcy Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof.

8.4　　Notwithstanding any language to the contrary in this Settlement Agreement, under no circumstance will any Archdiocese Signatory Party be obligated to take any action that violates any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, and if a court of competent jurisdiction determines that a term or condition in this Settlement Agreement does violate any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, the applicable Archdiocese Signatory Party shall be relieved of such term or condition, but the scope and finality of the releases, injunctions, and buybacks set forth in this Settlement Agreement shall not be affected or modified.

8.5　　This Settlement Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.6　　This Settlement Agreement may be modified only by a written amendment signed by all of the Parties, and no waiver of any provision of this Settlement Agreement or of a breach thereof shall be effective unless expressed in a writing signed by the waiving Party. The waiver by any Party of any of the provisions of this Settlement Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach. Any change or modification of this Agreement that would result in a material adverse change to the rights of the Abuse Claimants or Trust shall require the consent of the Creditors' Committee (if at the time of the proposed change or modification a Trustee has not been appointed) or Settlement Trustee (if at the time of the proposed change or modification a Trustee has been appointed and approved), as applicable, which consent shall not be unreasonably withheld.

8.7　　By entering into this Settlement Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Settlement Agreement. No part of this Settlement Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Settlement Agreement. All actions taken and statements made by the Parties or by their representatives relating to this Settlement Agreement or participation in this Settlement Agreement, including its development and implementation, shall be without prejudice or value as precedent.

8.8　　This Settlement Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession regarding liability, culpability, wrongdoing, or insurance coverage. All related discussions, negotiations, and all prior drafts of this Settlement

Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. Any evidence of the negotiations or discussions associated with this Settlement Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.8, in (i) an action or proceeding to enforce the terms of this Settlement Agreement, including any use as set forth in Section 7.1.1, or (ii) any possible action or proceeding between the Insurer Released Parties and any reinsurers. This Settlement Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Insurer Released Parties' obligations under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer.

8.9    None of the Parties shall make any public statements or disclosures (i) regarding another Party's rationale or motivation for negotiating or entering into this Settlement Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued or determined by agreement or a court of competent jurisdiction to have been issued by the Insurer Released Parties, including handling of or involvement in connection with any claims asserted thereunder.

8.10    Neither this Settlement Agreement nor the rights and obligations set forth in this Settlement Agreement shall be assigned without the prior written consent of the other Parties.

8.11    This Settlement Agreement was jointly drafted by the Parties, and the wording of this Settlement Agreement was reviewed by legal counsel for each of the Parties, and each of them had sufficient opportunity to propose and negotiate changes prior to its execution. The language of all parts of this Settlement Agreement shall in all cases be construed as a whole according to its meaning and not strictly for or against any Party.

8.12    Section titles and headings contained in this Settlement Agreement are included only for ease of reference and shall have no substantive effect.

8.13    All notices, demands, or other communication to be provided pursuant to this Settlement Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other Entity or address as any of them may designate in writing from time to time:

If to the Debtor or Reorganized Debtor:

Mark A. Mintz
Samantha A. Oppenheim
Jones Walker LLP
Telephone: 504-582-8368
Telephone: 504-582-8641
Email: mmintz@joneswalker.com
Email: soppenheim@joneswalker.com

with copies to:

-and-

If to an Archdiocese Signatory Party other than a Debtor Party:

As set forth on Plan Exhibit B-2.

If to Insurer or the Insurer Released Parties:

with copies to:

-and-

-and-

If to the Settlement Trust:

~~——————————~~ Donald C. Massey
Couhig Partners, LLC
1100 Poydras Street, Suite 3250
New Orleans, Louisiana 70163
Telephone: (504) 599-5777
Email: dmassey@couhigpartners.com

with copies to:

~~——————————~~ Andrew W. Caine
~~————————————— and—~~

~~——————————————~~

~~——————————————— and—~~

~~—————————————~~ Pachulski, Stang, Ziehl & Jones LLP

10100 Santa Monica Blvd, Suite 1300
Los Angeles, CA 90067
Telephone: 310-277-6910
Email: acaine@pszjlaw.com

8.14    This Settlement Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument.  This Settlement Agreement may be executed and delivered by facsimile, e-mail, or other electronic image, which facsimile, e-mail, or other electronic image counterparts shall be deemed to be originals.

8.148.15    Nothing contained in this Settlement Agreement shall be deemed or construed to constitute (i) an admission by the Insurer Released Parties that the Archdiocese Bound Parties, or any other Entity, was or is entitled to any insurance coverage under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by the Insurer Released Parties or as to the validity of any of the positions that have been or could have been asserted by the any of the Archdiocese Bound Parties, (ii) an admission by any of the Archdiocese Bound Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by the Insurer Released Parties or any Claims that have been or could have been asserted by the Archdiocese Bound Parties against the Insurer Released Parties, or (iii) an admission by the Archdiocese Bound Parties or the Insurer Released Parties of any liability whatsoever with respect to any of the Abuse Claims.

8.158.16    The Parties to this Settlement Agreement, all of the Entities included in the definition of "Insurer Released Parties," and the Settlement Trust are intended beneficiaries of this Settlement Agreement.  Except as set forth in the preceding sentence or otherwise set forth in this Settlement Agreement, there are no third-party beneficiaries of this Settlement Agreement.

8.168.17    The Archdiocese Signatory Parties and the Insurer Released Parties shall each be responsible for their own fees and costs incurred in connection with the Bankruptcy Case, this Settlement Agreement, and the implementation of this Settlement Agreement, except as specifically set forth herein (including in Section 7).

8.178.18    The following rules of construction shall apply to this Settlement Agreement:

8.17.18.18.1    Unless the context of this Settlement Agreement otherwise requires: (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Settlement Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.17.28.18.2    References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Settlement Agreement.

8.17.38.18.3   The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Settlement Agreement when the stated intent is not achieved.

8.188.19      The Bankruptcy Court in the Bankruptcy Case shall retain jurisdiction to interpret and enforce the provisions of this Settlement Agreement, which shall be construed in accordance with Louisiana law without regard to conflicts of law principles thereof.  The Insurer Released Parties do not, by virtue of this Section 8.1819 or any other provision in this Settlement Agreement, consent to the Bankruptcy Court's jurisdiction as to any other matter.

8.198.20      This Settlement Agreement and each Debtor Party's obligations under this Settlement Agreement shall be binding on each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) and shall survive the entry of the Plan Confirmation Order; provided, however, after the occurrence of the Bankruptcy Plan Effective Date, recourse for all obligations, other than those set forth in Sections 6.5, 6.7, and 7 hereof or a remedy of specific performance, shall be to the Settlement Trust; provided further, however, if specific performance is not available, each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) may be held liable for an intentional breach of a representation in this Agreement or their bad faith material breach of this Agreement, and if liability on any such ground is established, then recourse may be had directly against the Debtor Party, Reorganized Debtor, and/or Reorganized Additional Debtor(s) responsible.

8.208.21      The obligations of the Parties herein, other than those conditioned upon the Settlement Agreement Effective Date, shall be binding upon execution hereof by the Parties.

8.218.22      Nothing in this Settlement Agreement will prevent Insurer from allocating the Settlement Amount among the Archdiocese Policies at Insurer's discretion.

8.228.23      If any provision of this Settlement Agreement, or the application thereof, shall for any reason or to any extent, be construed to be invalid or unenforceable, the remainder of this Settlement Agreement, and the application of such provision to other circumstances, shall be interpreted so as to best effect the intent of the Parties, unless such determination of invalidity or unenforceability deprives any Party of the substantial benefit of its bargain.

8.238.24      The Parties agree that all matters relating to the negotiation and terms of this Settlement Agreement (including by way of example and not limitation, all prior drafts, exchanges of terms, and related discussions or correspondence) shall be confidential and are not to be disclosed except by order of court or consent of the Parties in writing.  This Section 8.2324 does not prevent or prohibit the Parties from publicly filing on the docket in the Bankruptcy Case the final, executed copy of this Settlement Agreement.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed: _____

Date: _____

_____

*[Signatures Continue on Adjacent Pages]*

**Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation**

~~[Insurer]~~

Signed: _____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**All Archdiocese Signatory Parties**
**Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title:     **Their Authorized Signer** _____

Date:     _____

*[Signatures Continue on Adjacent Pages]*

**Exhibit A**

**Sale Order**

**Exhibit B**

**Bill of Sale**

**Schedule 1**

**Archdiocese Policies**

The following policies shall be included in the definition of Archdiocese Policies:

| Policy Number | Policy Period |
|---|---|
| ML651464 | 2/1/1979-3/1/1980 |
| ML652658 | 3/1/1980-3/1/1981 |

**Schedule 2**

**Other Co-Insureds Known to the Archdiocese Signatory Parties**

**1.     None**

For the avoidance of doubt, the following entities are bound by the terms of the Settlement Agreement: [1]

### I.     Archdiocesan Parishes

1.     All Saints Roman Catholic Church, New Orleans, Louisiana

2.     Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana

3.     Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana

4.     Assumption of Mary Roman Catholic Church, Avondale, Louisiana

5.     Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana[2]

6.     Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana

7.     Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana

8.     Blessed Trinity Roman Catholic Church, New Orleans, Louisiana

9.     Christ the King Roman Catholic Church, Gretna, Louisiana

10.     Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana

11.     Divine Mercy Roman Catholic Church, Kenner, Louisiana

12.     Good Shepherd Roman Catholic Church, New Orleans, Louisiana

13.     Holy Family Roman Catholic Church, Franklinton, Louisiana

14.     Holy Family Roman Catholic Church, Luling, Louisiana

15.     Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana

16.     Holy Spirit Roman Catholic Church, New Orleans, Louisiana

17.     Immaculate Conception Roman Catholic Church, Marrero, Louisiana

18.     Immaculate Conception Roman Catholic Church, New Orleans, Louisiana

19.     Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana

20.     Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana

21.     Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana, for itself and as successor to St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc.

22.     Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana

---

[1]     Without limiting Section 6.4 of the Settlement Agreement, Insurer does not concede that any of the Entities listed on this schedule are "insureds," "additional insureds," or "protected persons" under its Archdiocese Policies.

[2]     Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

23.     Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana

24.     Most Holy Trinity Roman Catholic Church, Covington, Louisiana

25.     Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana

26.     Our Lady of Grace Roman Catholic Church, Reserve, Louisiana

27.     Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana

28.     Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana

29.     Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana

30.     Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana

31.     Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana

32.     Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana

33.     Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana

34.     Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana

35.     Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana

36.     Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana

37.     Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana

38.     Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana

39.     Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana

40.     St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana

41.     St. Agnes Roman Catholic Church, Jefferson, Louisiana

42.     St. Alphonsus Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

43.     St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana

44.     St. Angela Merici Roman Catholic Church, Metairie, Louisiana

45.     St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana

46.     St. Anselm Roman Catholic Church, Madisonville, Louisiana

47.     St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana

48.     St. Anthony of Padua Roman Catholic Church, Luling, Louisiana

49.     St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana

50.     St. Anthony Roman Catholic Church, Gretna, Louisiana

51.     St. Augustine Roman Catholic Church, New Orleans, Louisiana

52.     St. Benedict Roman Catholic Church, Covington, Louisiana

53.     St. Benilde Roman Catholic Church, Metairie, Louisiana

54. St. Bernard Roman Catholic Church, St. Bernard, Louisiana

55. St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana

56. St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana

57. St. Christopher Roman Catholic Church, Metairie, Louisiana

58. St. Clement of Rome Roman Catholic Church, Metairie, Louisiana

59. St. Cletus Roman Catholic Church, Gretna, Louisiana

60. St. David Roman Catholic Church, New Orleans, Louisiana

61. St. Dominic's Roman Catholic Church, New Orleans, Louisiana

62. St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana

63. St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana

64. St. Francis Xavier Roman Catholic Church, Metairie, Louisiana

65. St. Genevieve Roman Catholic Church, Slidell, Louisiana

66. St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana

67. St. Jerome Roman Catholic Church, Kenner, Louisiana

68. St. Joachim Roman Catholic Church, Marrero, Louisiana

69. St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana

70. St. John of the Cross Roman Catholic Church, Lacombe, Louisiana

71. St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, for itself and as successor to St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc.

72. St. John the Baptist Roman Catholic Church, Edgard, Louisiana

73. St. John the Baptist Roman Catholic Church, Folsom, Louisiana

74. St. Joseph Roman Catholic Church, Algiers, Louisiana

75. St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana

76. St. Joseph's Roman Catholic Church, Gretna, Louisiana

77. St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc.

78. St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana

79. St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana

80. St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana

81. St. Margaret Mary Roman Catholic Church, Slidell, Louisiana

936

82.     St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana

83.     St. Mark Roman Catholic Church, Ama, Louisiana

84.     St. Martha Roman Catholic Church, Harvey, Louisiana

85.     St. Martin de Porres Roman Catholic Church, New Orleans, formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc.

86.     St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana

87.     St. Mary's Roman Catholic Church, New Orleans, Louisiana

88.     St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana

89.     St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St. John the Baptist Roman Catholic Church, Paradis, Louisiana, for itself and as successor to St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc.

90.     St. Patrick's Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

91.     St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana

92.     St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana

93.     St. Peter Claver Roman Catholic Church, New Orleans, Louisiana

94.     St. Peter Roman Catholic Church, Reserve, Louisiana, for itself and as successor to St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc.

95.     St. Peter's Roman Catholic Church, Covington, Louisiana

96.     St. Philip Neri Roman Catholic Church, Metairie, Louisiana

97.     St. Pius X Roman Catholic Church, New Orleans, Louisiana

98.     St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana

99.     St. Rita Roman Catholic Church, Harahan, Louisiana

100.    St. Rita Roman Catholic Church, New Orleans, Louisiana

101.    St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana[3]

102.    Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana

103.    The Congregation of St. Rita Roman Catholic Church of Harahan

104.    The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana

---

[3]     As stated in footnote 2, Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

## II.  **Suppressed Archdiocesan Parishes**[4]

1.  Blessed Sacrament, Inc.

2.  Epiphany, Inc.

3.  Immaculate Heart of Mary, Inc.

4.  Incarnate Word, Inc.

5.  Our Lady of Good Counsel, Inc.

6.  Our Lady of Good Harbor, Inc.

7.  Our Lady of Lourdes, New Orleans, Louisiana, Inc.

8.  Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.

9.  Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana

10.  St. Ann, New Orleans, Louisiana, Inc.

11.  St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana

12.  St. Frances Xavier Cabrini, Inc.

13.  St. Francis de Salles, Inc.

14.  St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana

15.  St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana

---

[4] The Suppressed Archdiocesan Parishes no longer operate as separate church parishes.  The Suppressed Archdiocesan Parishes were not dissolved, and may own property.

Following Hurricane Katrina, the operations of certain of the Suppressed Archdiocesan Parishes were combined with Archdiocesan Parishes.  In 2024, in the ongoing aftermath of Hurricane Ida and a result of storm damage, the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental statistics, and financial difficulties encountered, the following additional Suppressed Archdiocesan Parishes were canonically merged with neighboring Archdiocesan Parishes: (a) St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc., was canonically merged into St. Peter Roman Catholic Church, Reserve, Louisiana; (b) (i) St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and (ii) St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc., were both canonically merged into Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, now known as St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana; (c) St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc., was canonically merged into St. Rosalie Roman Catholic Church, Harvey, Louisiana, now known as Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana; (d) St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc., was canonically merged into Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, now known as St. John Paul II Roman Catholic Church, Waggaman, Louisiana; (e) St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc., was canonically merged into St. John the Baptist Roman Catholic Church, Paradis, Louisiana, now known as St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana; (f) Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc., was canonically merged into St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, now known as St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana; and (g) St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc., had its canonical territory divided so that (i) the area north of the Pontchartrain Expressway was canonically merged into St. Patrick's Roman Catholic Church, New Orleans, Louisiana, and (ii) the area south of the Pontchartrain Expressway was canonically merged into St. Alphonsus Roman Catholic Church, New Orleans, Louisiana.

16.     St. Henry's, Inc.

17.     St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana

18.     St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana

19.     St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana

20.     St. John the Baptist, New Orleans, Louisiana, Inc.

21.     St. Julian Eymard, Inc.

22.     St. Lawrence the Martyr, Inc.

23.     St. Louise de Marillac, Inc.

24.     St. Maurice, Inc.

25.     St. Monica, Inc.

26.     St. Philip the Apostle, Inc.

27.     St. Raymond's, Inc.

28.     St. Rose of Lima, Inc.

29.     St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana

30.     St. Theresa of the Child Jesus, Inc.

31.     The Congregation of Saints Peter and Paul Roman Catholic Church

32.     The Congregation of St. Cecelia Roman Catholic Church

33.     The Congregation of the Annunciation Roman Catholic Church

34.     The Congregation of the Holy Trinity Roman Catholic Church


**III.     Archdiocesan Agencies**

1.     Archdiocesan Spirituality Center

2.     Catholic Charities Archdiocese of New Orleans

3.     Catholic Charities Children's Day Care Centers

4.     Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)

5.     Clarion Herald Publishing Company

6.     Korean Catholic Community of New Orleans, Inc.

7.     Notre Dame Seminary

8.     Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana

9.      Pace Greater New Orleans

10.     Padua House (merged into Catholic Charities Archdiocese of New Orleans)

11.     Philmat, Inc.

12.     Project Lazarus

13.     Roman Catholic Center of Jesus the Lord

14.     School Food and Nutrition Services of New Orleans, Inc.

15.     Second Harvest Food Bank of Greater New Orleans and Acadiana

16.     St. Jude Community Center, Inc.

17.     St. Michael Special School

18.     St. Thérèse Catholic Academy

19.     The Society for the Propagation of the Faith, Archdiocese of New Orleans


**IV.      Non-Debtor Catholic Entities**


**Archdiocesan Agencies**

1.      7887 Walmsley, Inc.

2.      Annunciation Inn, Inc.

3.      Archdiocese of New Orleans Indemnity, Inc.

4.      Aspiring Scholars

5.      Catholic Community Foundation Archdiocese of New Orleans

6.      Christopher Homes, Inc.

7.      Christopher Inn

8.      Dubourg Home

9.      Holy Redeemer Catholic Virtual Academy

10.     Holy Trinity Drive Land Corporation

11.     Iberia Investment Fund II, LLC

12.     Metairie III

13.     Metairie Manor

14.     Monsignor Wynhoven Apartments, Inc.

15.     Nazareth II

16.     Nazareth Manor

17.     New Orleans Archdiocesan Cemeteries

18.     Notre Dame Health System (f/k/a Chateau de Notre Dame)

19.     Rouquette III

20.     St. Anthony's Gardens

21.     St. Bernard II

22.     St. Bernard III

23.     St. Bernard Manor

24.     St. Martin's Manor, Inc.

25.     St. Tammany Catholic Cemetery

26.     St. Tammany Manor

27.     The Apartments at Mater Dolorosa

28.     The Mental Health Association Development Corporation

29.     Villa Additions, doing business as St. Teresa's Villa

30.     Villa St. Maurice, Inc.

**Schedule 3**

**Additional Notice Parties**

*Filing Version 7/29/2025*

**Schedule 4**

**Form of Corporate Resolutions**

*Filing Version 7/29/2025*

**Schedule 5**

**Form of Incumbency Certificates**

**Exhibit A**
**Form of Proposed Order**

Case 20-10846 Doc 4345-2 Filed 10/27/25 Entered 10/27/25 16:24:54 Plan Supplement 7.1(a) Supplemental Redline Page 1 of 86

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-10846 (MSG) |
| | § | |
| | § | |
| THE ROMAN CATHOLIC CHURCH | § | CHAPTER 11 |
| OF THE ARCHDIOCESE OF NEW | § | |
| ORLEANS, *et al.*,[1] | § | SECTION A |
| | § | |
| DEBTORS. | § | COMPLEX CASE |
| | § | |
| | § | |

**ORDER (I) APPROVING [●]'SPURITAN INSURANCE COMPANY, THE MANHATTAN FIRE AND MARINE INSURANCE COMPANY, AND WESTPORT INSURANCE CORPORATION'S SETTLEMENT AGREEMENT, RELEASE AND BUYBACK, (II) APPROVING THE SALE OF THE ARCHDIOCESE POLICIES FREE AND CLEAR, (III) ENJOINING CLAIMS, AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated _____, 2025July 29, 2025 [D.E. 4181] and supplemented by the filing of the revised Settlement Agreement (as defined below) on October 27, 2025 [D.E.[●]] ("Approval Motion") of The Roman Catholic Church of the Archdiocese of New Orleans, the lead debtor and debtor-in-possession (the "Debtor" or "Archdiocese") and the other debtors and debtors-in-possession[2] (the "Additional Debtors" and, together with the Archdiocese and their respective Bankruptcy Estates, the "Debtor Parties") in the above-captioned chapter 11 cases, by and through their respective counsel, for entry of an order (this "Order") approving the settlement agreement, releases, insurance policy buyback, and related injunction-in-aid ("Settlement") by and among the Archdiocese, the Additional Debtors, the other Archdiocese Signatory Parties, the

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtors'the Debtor's federal tax identification number, are: [●]. is 8966.

[2]    In connection with the Plan, the Catholic Entities listed on Plan **Exhibit B-1** (the "**Additional Debtors**") filed individual chapter 11 cases. The Plan is a combined joint Plan for the Archdiocese and the Additional Debtors, and the Approval Motion is deemed to have been filed (and this Order is entered) in each Additional Debtor's bankruptcy case for purposes of the relief requested herein.

Creditors' Committee, and [●][3] Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation ("Insurer" and, collectively with the foregoing, the "Parties"), pursuant to Sections 105(a) and 363 of Title 11 of the United States Code ("Bankruptcy Code") and Rules 2002(a)(2), 6004, and 9019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), in each case as described in the Approval Motion and the *Settlement Agreement, Release, and Policy Buyback* attached to this Order as **Exhibit 1**[4] (the "Settlement Agreement");[5] and the Bankruptcy Court having reviewed the Approval Motion and the Settlement Agreement; and it appearing that due and adequate notice of the Approval Motion and Settlement Agreement having been given to all Entities entitled thereto, and that no other or further notice need be given; and the Bankruptcy Court on November 17, 2025 at [[ ]]9:00 AM/[PM] having held a hearing (the "Sale Hearing") to consider the relief requested in the Approval Motion; and upon the record of the Sale Hearing; and, after due deliberation, including, without limitation, for the reasons stated by the Bankruptcy Court on the record of the Sale Hearing, it appearing that the relief requested in the Approval Motion and granted herein is in the best interests of the Debtor Parties' estates (the "Estates"), their creditors, and other parties in interest; and good sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.    This Bankruptcy Court has jurisdiction over the Approval Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b). This matter is a core proceeding

---

[3]    [This Order is the proposed form of order for the Settling Insurers. The Debtor Parties will file proposed orders for each Settling Insurer prior to the Sale Hearing.]

[4]    [The form of Settlement Agreement is attached as **Exhibit 1** to this Order. Prior to the hearing on the Approval Motion, the Debtor Parties will file the proposed Settlement Agreement for each Settling Insurer.]

[5]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

2

pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of this case and the Approval Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief sought in the Approval Motion are Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007, 9008 and 9019, and Rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Louisiana.

C.    It is necessary and appropriate for the Bankruptcy Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Settlement Agreement, and to adjudicate, if necessary, to the extent provided under 28 U.S.C. § 1334(b), any and all disputes arising from or relating to the Settlement Agreement or this Order.

D.    Proper, timely, adequate and sufficient notice of the Sale Hearing and Approval Motion and the relief requested therein, including, without limitation, the Settlement and the transactions described in the Settlement Agreement, including, without limitation, issuance of the injunction-in-aid referenced in the Settlement Agreement and the Approval Motion (all such transactions being collectively referred to, for convenience, as the "Sale Transaction") has been provided by the Debtor Parties in accordance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules to all interested Entities, including, without limitation the parties listed on **Schedule 3** of the Settlement Agreement, through service of the Confirmation Hearing Notice (as defined in the Plan) in accordance with the Disclosure Statement Order (also as defined in the Plan).

E.    Notice of the Approval Motion was duly published as follows: [___]. provided through publication of the Additional Debtors' Abuse Claims Bar Date Publication Notice (**Plan Exhibit G**) in daily and community newspapers throughout Louisiana.

3

F.      The notices described above were good, sufficient, and appropriate under the circumstances, and no other notice of the Approval Motion or Sale Hearing is required.

G.      The disclosures made by the Debtor Parties concerning the Settlement Agreement, the Sale Transaction, and the Sale Hearing were good, complete, and adequate.

H.      [The Unknown Abuse Claims Representative has consented to, and approved of the Settlement Agreement and Sale Transaction on behalf of Unknown Abuse Claims in connection with the treatment of such Claims under the Plan.][6].

I.      A reasonable opportunity to object or be heard with respect to the Approval Motion and the relief requested therein has been afforded to all interested Entities.

J.      The Archdiocese Signatory Parties, on their own behalf and on behalf of the Archdiocese Bound Parties, as applicable, have duly executed the Insurance Settlement Agreement by their duly authorized representative, agent and/or attorney in fact, and have full corporate power and authority to consummate the Sale Transaction pursuant to the Settlement Agreement and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Settlement Agreement, are required for the Archdiocese Bound Parties to consummate the Sale Transaction.

K.      The Debtor Parties have demonstrated (i) good, sufficient, and sound business purpose and justification and compelling circumstances for the Sale Transaction pursuant to Section 363(b) of the Bankruptcy Code and (ii) that the Sale Transaction is fair, reasonable, and in the best interests of their Estates and creditors pursuant to Bankruptcy Rule 9019. Among other things, the Debtor Parties have demonstrated that: the Settlement Agreement, and closing thereon, is necessary and appropriate to realize the value of the Purchased Property (as defined below) and

---

[6]      [To confirm consent and approval by the Unknown Abuse Claims Representative.]

maximize the value of their Estates; the probability of success for their Estates in litigation over the matters resolved by the Settlement Agreement is uncertain; litigation of the matters resolved by the Settlement Agreement would be complex and costly to their Estates; and the Settlement Amount is within the reasonable range of potential litigation outcomes. As used herein, "Purchased Property" means, collectively, all right, title and interest (including "Interests" as defined below) in and to the Archdiocese Policies issued by Insurer and the Related Insurance Claims and Coverage Claims ~~of the Archdiocese Bound Parties;~~ **[Intentionally Omitted.]**[7]. The Sale Transaction constitutes a reasonable and sound exercise of the Debtor Parties' business judgment and their powers and duties under applicable law and should be approved. Approval of the Settlement Agreement and consummation of the Sale Transaction are in the best interests of the Debtor Parties' Estates, their creditors (specifically including the Abuse Claimants of the Debtor Parties), and other parties-in-interest, including because the proceeds of and from the Sale Transaction will benefit Abuse Claimants.

L.      The Settlement Agreement was negotiated, proposed, and entered into without collusion, in good faith, and from arm's length bargaining positions. Without limiting the foregoing, the Settlement Agreement resulted from a lengthy mediation that proceeded pursuant to a prior order of the Bankruptcy Court. Insurer is not an "insider" or "affiliate" (as those terms are defined in the Bankruptcy Code) of any of the Debtor Parties. None of the Archdiocese Bound Parties or Insurer have engaged in any conduct that would: (i) cause or permit the avoidance of the

---

[7] ~~Intentionally omitted, except the Order approving the Catholic Mutual Settlement Agreement, in which this section will provide:~~

~~". . . *provided that* the Purchased Property does not include Insurer's obligations under the Certificate No. [•] issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the personal injury claims listed in Schedule [X] attached to the Settlement Agreement, in each case, subject to the limits, declarations, terms and conditions of such certificate (the "Preserved Coverage"), and *provided further that* the Preserved Coverage does not include coverage for any and all Abuse Claims or other Barred Claims."~~

Settlement Agreement or the consummation of the Sale Transaction under Section 363(n) of the Bankruptcy Code; (ii) cause or permit the imposition of any costs or damages (including without limitation attorneys' fees or punitive damages) under Section 363(n) of the Bankruptcy Code; or (iii) prevent the application of Section 363(m) of the Bankruptcy Code. The releases, injunctions, policy buyback, and all other components of the Sale Transaction comply with the Bankruptcy Code and all applicable non-bankruptcy law.

      M.    Pursuant to the Settlement Agreement and to the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer have consented to the assignment of the Non-Debtor Catholic Entities' Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under the Settlement Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Interests of any Entity in such Archdiocese Policies (the "Non-Debtor Catholic Entity Policy Sale").

      N.    Insurer is a good faith purchaser of the Purchased Property under Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, in that, among other things: (i) all payments to be made by or to Insurer, and other agreements or arrangements entered into by Insurer, including without limitation any escrow agreement pertaining to the payment of the Settlement Amount, in connection with the Sale Transaction have been disclosed; (ii) Insurer neither induced nor caused the Debtor Parties' chapter 11 filings; (iii) the negotiation and execution of the Settlement Agreement and any other agreements or

6

instruments related thereto was in good faith, the arm's length transaction between Insurer and the other Parties was the product of mediation, and all Parties to the Settlement Agreement were, or had the opportunity to be, represented by counsel; and (iv) Insurer has not violated Section 363(n) of the Bankruptcy Code by any action or inaction. Insurer has at all times acted in good faith with respect to the Settlement Agreement and will continue to be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale Transaction.

O.      The terms and conditions of the Settlement Agreement are fair and reasonable. The Settlement Amount provided by Insurer pursuant to the Settlement Agreement (i) is fair and reasonable; (ii) monetizes the Purchased Property at the highest and best amount; (iii) will provide a higher and more certain recovery for the Debtor Parties' creditors than would be provided by any other practical available alternative given the complexity, cost, and uncertainty of such alternatives; (iv) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (v) constitutes reasonably equivalent value (as defined in Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law. The Settlement Amount is within the reasonable range of potential litigation outcomes, and the Debtor Parties' determination to accept the Settlement Amount and otherwise enter into the Settlement Agreement is a valid and sound exercise of their business judgment and consistent with the Debtor Parties' fiduciary duties. The releases to be made pursuant to the Settlement Agreement, including without limitation the releases of the Archdiocese Bound Parties and the Insurer Released Parties, are appropriate and should be approved.

P.      Insurer: (i) is not a mere continuation of any of the Archdiocese Bound Parties or the Estate of any of the Debtor Parties, nor is there any continuity of enterprise between Insurer

<div align="center">7</div>

and the Debtor Parties or Insurer and any of the other Archdiocese Bound Parties; (ii) is not holding itself out to the public as a continuation of any of the Archdiocese Bound Parties; and (iii) is not a successor to the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties for any purpose, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of Insurer and any of the Archdiocese Bound Parties.

Q.     The Settlement Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither Insurer nor any of the Archdiocese Bound Parties are fraudulently entering into the Sale Transaction.

R.     The transfer of the Purchased Property to Insurer (i) does not constitute an avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law and (ii) does not and will not subject Insurer to any liability whatsoever with respect to the Debtor Parties' operation prior to the closing of the Sale Transaction (i.e., the occurrence of both the Settlement Agreement Effective Date and payment[8] of the Settlement Amount by Insurer to the Settlement Trust or Escrow Agent pursuant to the terms of Insurer's Settlement Agreement) (the "Closing").

S.     Insurer has agreed to purchase the Purchased Property pursuant to its Settlement Agreement and this Order; Insurer has not agreed to purchase, and is not purchasing, any other assets of the Estate of any of the Debtor Parties. Insurer has not agreed to assume, and after Closing shall have no obligations with respect to, any liabilities of the Archdiocese Bound Parties. Without limiting the generality of the foregoing, Insurer: (i) is not assuming and shall have no liability for

---

[8]     For the avoidance of doubt, all references to "payment" or "delivery" of the Settlement Amount by Insurer herein shall encompass all transfers of the Settlement Amount contemplated by the Settlement Agreement, including without limitation funding and transfer of funds to the Settlement Trust via letters of credit or escrow accounts.

any Claims arising from or relating to Abuse, the Purchased Property, or the Bankruptcy Case; and (ii) is not assuming and shall have no liability with respect to the Archdiocese's or any other Archdiocese Bound Party's obligations to Abuse Claimants, any other creditors, future claimants (including without limitation Unknown Abuse Claimants), or the Archdiocese's or any Archdiocese Bound Party's employees, in each case, by reason of the purchase of the Purchased Property under the Settlement Agreement.

T.      The Purchased Property constitutes property of the Debtor Parties' Estates, and the Archdiocese Bound Parties are the lawful owner of the Purchased Property and hold good title thereto. The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement will be a legal, valid, binding, and effective transfer of the Purchased Property, and will vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property, in each case free and clear of all Interests (as defined below, including, without limitation, any Interests of the Archdiocese Bound Parties, Abuse Claimants, and holders of Direct Action Claims). Upon Closing, Insurer shall have no liability for any Claims against or liabilities of the Debtor Parties, their Estates, or the other Archdiocese Bound Parties. Without limiting any of the foregoing, the Archdiocese, the Archdiocese Signatory Parties, and Insurer have agreed that, upon Closing: (i) the Purchased Property shall be deemed void *ab initio*, terminated, extinguished, and of no further force and effect; and (ii) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

U.      Pursuant to §§ 363(f) and 105(a) of the Bankruptcy Code, and subject to the terms and conditions set forth in the Settlement Agreement, and upon Closing, without the need for

9

further action, the Debtor Parties shall be deemed to have sold, transferred and conveyed the Purchased Property to the Insurer, and the Insurer shall be deemed to have purchased from the Debtor Parties, all right title and interest in and under the Purchased Property, free and clear of all "Interests" of any Entity of any kind or nature whatsoever, to the fullest extent permitted under §§ 363(b) and (f) of the Bankruptcy Code, with such "Interests" including: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, Subject Interests, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual,

10

direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims,
any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims
practices, breach of any implied duty of good faith and fair dealing, including, but not limited to,
La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action
Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5)
of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and
(d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor
Parties' Estates, including without limitation any asserted by any third party or any other person
or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand
is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,
undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases
therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by
whomever and by whatever procedure asserted, seeking damages or any other kind of relief
whatsoever, including without limitation, those in any way relating to, arising out of, connected
with, and/or involving the Purchased Property. Without limiting the generality of the foregoing
and without finding that any Entity has any Interest in the Archdiocese Policies: (i) any Entity with
Interests (if any) in or with respect to the Purchased Property who did not object, or who withdrew
their objections to the Sale Transaction or the Approval Motion have waived their right to object
to the sale of the Purchased Property free and clear of such Entity's Interests in the Purchased
Property pursuant to Section 363(f)(2) of the Bankruptcy Code; and (ii) any such Entity with
Interests in or with respect to the Purchased Property who objected to the Approval Motion and
did not withdraw any such objection (a) are the holders of Interests subject to *bona fide* dispute

11

under Bankruptcy Code Section 363(f)(4) and/or (b) can be compelled to accept a monetary satisfaction of their Interests within the meaning of Section 363(f)(5) of the Bankruptcy Code.

V.      If the sale of the Purchased Property were not free and clear of all Interests, including without limitation all Abuse Claims, Direct Action Claims, and Coverage Claims, or if the Insurer Released Parties would, or in the future could, be liable for any of the Interests, Insurer would not have entered into the Settlement Agreement and would not consummate the Sale Transaction or pay the Settlement Amount, thus adversely affecting the Debtor Parties, their Estates, and their creditors (including, without limitation, the Abuse Claimants), as well as the other Archdiocese Bound Parties.

W.      Issuing a supplemental injunction under Section 105(a) of the Bankruptcy Code as provided herein is essential to give effect to the sale of the Purchased Property to Insurer and this Order's approval of such sale free and clear of Interests pursuant to Section 363(f) of the Bankruptcy Code. The Sale Injunction set forth in Paragraph 23 below not only is a necessary prerequisite for Insurer's assent to the terms and conditions of its Settlement Agreement, such that Insurer will not consummate the Sale Transaction or pay its Settlement Amount in the absence of such an injunction from this Bankruptcy Court, but also is warranted to ensure compliance with this Order. Likewise, Insurer will not consummate the Sale Transaction or pay its Settlement Amount without the benefit of the releases contained in the Settlement Agreement and approval thereof by the Bankruptcy Court.

X.      Neither the Settlement Agreement nor the Sale Transaction constitute a *sub rosa* chapter 11 plan. The Settlement Agreement does not impermissibly restructure the rights of the Debtor Parties' creditors nor impermissibly dictate a chapter 11 plan for the Debtor Parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.      The Approval Motion, and the relief sought therein (including without limitation the approval of the Settlement Agreements and the Sale Transaction) is GRANTED and APPROVED, in all respects as set forth herein.

2.      The findings of fact set forth above and conclusions of law stated herein, in addition to any findings of fact and conclusions of law stated by the Bankruptcy Court at the Sale Hearing, shall constitute this Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the Approval Motion pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.      Any and all objections, if any, to the Approval Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case the Entity asserting the objection or reservation of rights is enjoined from taking any action against the Insurer Released Parties or the assets or property of any Insurer Released Parties to recover any Claim or Interest held by such objecting Entity. Those parties who did not object or who withdrew their objections to the Approval Motion are deemed to have consented to the relief granted herein, pursuant to Section 363(f)(2) of the Bankruptcy Code.

**Approval of the Settlement Agreement**

4.      The Settlement Agreement is approved in its entirety, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Without limiting the generality of the foregoing, the settlement and releases of Claims as set forth in the Settlement Agreement is

13

hereby approved pursuant to Bankruptcy Rule 9019. All factors set forth in *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey* (*In re Cajun Elec. Power Coop.*), 119 F. 3d 349, 356 (5th Cir. 1997), either weigh in favor of the Settlement Agreement or do not apply.

5.        Pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, the Non-Debtor Catholic Entity Policy Sale, free and clear of all Interests of any Entity in the Archdiocese Policies, is hereby approved.

6.        Pursuant to Section 363(b) of the Bankruptcy Code, each of the Parties is authorized to consummate the Sale Transaction under and in accordance with the terms and conditions of the Settlement Agreement, and the Archdiocese Bound Parties shall at all times act in accordance with the terms thereof.

7.        ~~The Parties and their attorneys~~Any representative, agent or attorney in fact ~~under~~of the ~~Settlement Agreement or otherwise are~~Archdiocese Signatory Parties is authorized to execute any other documentation and perform such other ministerial tasks as may be reasonably necessary to effectuate the Settlement Agreement and the Sale Transaction on behalf of the Archdiocese Bound Parties, including without limitation, any bill of sale substantially in the form attached to the Settlement Agreement as **Exhibit B**.

8.        Subject to all of the terms and conditions of the Settlement Agreement, upon Closing, the Archdiocese Bound Parties and Insurer shall be deemed to have granted the releases as set forth in the Settlement Agreement.

9.        The Parties are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Settlement Agreement, together with all additional instruments and documents that may be reasonably necessary, convenient, or desirable to implement the

14

Settlement Agreement and consummate the Sale Transaction pursuant thereto and effectuate the provisions of this Order and the transactions approved hereby, and to take all further actions as may be requested by Insurer for the purpose of assigning, transferring, granting, conveying, and conferring to Insurer or reducing to Insurer's possession, the Purchased Property, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Settlement Agreement.

10.     Insurer is authorized and directed to pay the Settlement Amount under and subject to the satisfaction of all terms and conditions of the Settlement Agreement.

11.     The Settlement Amount provided by Insurer for the Purchased Property (i) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

12.     None of the Insurer Released Parties shall be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its or their rights or remedies under the Settlement Agreement or any other document related to the Settlement Agreement or the Sale Transaction. The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order; *provided*, *however*, that this Bankruptcy Court shall retain jurisdiction over any and all disputes with respect thereto.

13.     This Order shall be binding in all respects upon: (a) the Debtor Parties and their Related Parties; (b) the Debtor Parties' Estates; (c) the other Archdiocese Bound Parties; (d) all creditors of the Debtor Parties; (e) all Abuse Claimants and holders of Direct Action Claims; (f)

all holders of Interests whether known or unknown against or on all or any portion of the Purchased Property; (g) any Non-Settling Insurer; (h) the Insurer Released Parties; (i) the Purchased Property; (j) the Unknown Claims Representative; (k) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code; and (l) all Entities receiving notice (or deemed to have received notice pursuant to this Order) of the Approval Motion or the Sale Hearing, including without limitation all Entities listed on **Schedule 3** to the Settlement Agreement. The Settlement Agreement shall be binding in all respects upon: (x) the Debtor Parties, their Estates, and their Related Parties; (y) the Archdiocese Bound Parties; and (z) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code.

### Transfer of Assets

14.     The conditions of Section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Archdiocese may sell the Purchased Property free and clear of any Interests therein.

15.     Pursuant to Sections 105 and 363(b) and (f) of the Bankruptcy Code, Bankruptcy Rule 9019, applicable Louisiana State law, the testimonial and other documentary evidence filed in support of the Approval Motion, and the record of the Sale Hearing, the Archdiocese has set forth the legal authority necessary to support this Bankruptcy Court's findings herein.

16

16.     Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Property and the Archdiocese Bound Parties' rights, title, and interest therein shall upon Closing be transferred to Insurer, free and clear of all Interests (including without limitation the Interests of any of the Archdiocese Bound Parties), and all such Interests are unconditionally and forever released and extinguished as against the Purchased Property. Without limiting the generality of the foregoing, the sale of the Purchased Property under the Settlement Agreement shall be free and clear of all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property.

17.     Upon the Closing, (a) all of the Archdiocese Bound Parties', the Debtor Parties' Estates', and the Settlement Trustee's rights under and with respect to the Purchased Property, if any, shall be permanently and irrevocably extinguished as if the Archdiocese Policies had never been issued and (b) the Insurer Released Parties shall be entitled to all of the protections afforded by §363(m) of the Bankruptcy Code.

18.     Upon Closing, all Entities (and their respective successors and assigns), including but not limited to all governmental, tax, and regulatory authorities, Archdiocese Bound Parties, Non-Settling Insurers, Abuse Claimants, Direct Action Claimants, trade and other creditors, and any Entities holding Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) against, in, or with respect to the Purchased Property, including, without limitation, such Interests arising or accruing under or out of, in connection with, or in any way relating to the transfer of the Purchased Property to Insurer,

17

hereby are forever barred, estopped, and permanently enjoined from asserting such Person's or Entity's Interests against the Purchased Property, the Insurer Released Parties, or the assets or property of any Insurer Released Parties. Effective upon Closing, none of the Insurer Released Parties shall have any liability for any Claims (a) against the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties or (b) that arise under or related in any way or in respect of the Purchased Property.

19.     The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement constitutes a legal, valid, and effective transfer of the Purchased Property, and shall vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property. Upon Closing, the Archdiocese Policies shall be terminated and no longer in force or effect, exhausted in retrospect as to all coverages, and all Interests that the Archdiocese or any other Person or Entity (including without limitation any of the other Archdiocese Bound Parties) may have had, may presently have, or may in the future have, in such Purchased Property are released and extinguished, and all such Entities (including without limitation the Archdiocese Bound Parties) hereby are forever barred, estopped, and permanently enjoined from asserting any such Interest against the Purchased Property and/or any of the Insurer Released Parties. Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent constitutes full and complete performance of any and all obligations under the Purchased Property, including without limitation any performance owed to the Archdiocese Bound Parties, and all limits of coverage under the Archdiocese Policies, including per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

20.     Upon occurrence of the Closing:

<center>18</center>

(a)    all Interests the Archdiocese Bound Parties may have had, may presently have, or in the future may have in the Purchased Property, as applicable, are released pursuant to the terms of the Settlement Agreement; and

(b)    the Archdiocese Bound Parties accept Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent in full and complete satisfaction of Insurer's past, present, and future obligations, including, without limitation, any obligations to any of the Archdiocese Bound Parties under such Purchased Property or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever arising out of or related in any way to such Purchased Property (including Coverage Claims), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, direct or indirect, and regardless of whether such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, or otherwise.

### No Successor Liability

21.    The transfer of the Purchased Property to Insurer shall not result in any Insurer Released Parties or the Purchased Property having any of the following: (a) any liability or responsibility for Interests in or Claims against the Archdiocese Bound Parties or any of their Related Parties; (b) liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any Claims or Interests; or (c) any liability or responsibility to the Archdiocese Bound Parties except as is expressly set forth in the Settlement Agreement.

22.    Without limiting the generality of the foregoing, none of the Insurer Released Parties shall have any successor or vicarious liabilities of any kind or character, including, but not

19

limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability, *de facto* merger or joint venture, mere continuation or substantial continuity, whether known or unknown as of Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between the Archdiocese Bound Parties and any non-debtor subsidiary or affiliate (including, without limitation, any other Archdiocese Bound Party), liabilities relating to or arising from any environmental laws, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Purchased Property prior to Closing.

## Sale Injunction

23.     Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, and in consideration of the undertakings of Insurer pursuant to the Settlement Agreement, including Insurer's purchase of the Purchased Property free and clear of all Claims and Interests pursuant to Section 363(f) of the Bankruptcy Code as provided herein, any and all Entities that have held, now hold, or who may in the future hold any Claims or Interests (including without limitation all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Abuse Claimants, holders of Direct Action Claims, Perpetrators, Non-Settling Insurers, the Archdiocese Bound Parties, and all others holding Claims or Interests of any kind or nature whatsoever, including, without limitation, those Claims released or to be released pursuant to the Settlement Agreement), which Claims or Interests are under, arise out of, relate to, or connect in any way with an Abuse Claim or any of the Purchased Property, including, without limitation, (a) all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action

20

Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer

Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other

Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any

portion of the Purchased Property, (b) the payment of any of the Claims identified previously,

including, without limitation, Abuse Claims, Direct Action Claims, and Coverage Claims and (c)

all other Interests, are hereby permanently stayed, enjoined, barred, and restrained from taking any

Action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or

Interest against any of (x) the Insurer Released Parties, (y) the assets or property of any Insurer

Released Parties, or (z) the Purchased Property, including by:

(a)     commencing, conducting, or continuing in any manner, whether directly or

indirectly, any suit, action, or other proceeding of any kind, in any forum, with respect to

any such Claim or Interest, against any Insurer Released Party, or any property or interest

in property of any Insurer Released Party;

(b)     enforcing, levying, attaching, collecting, or otherwise recovering, or

seeking to accomplish any of the preceding, by any manner or means, either directly or

indirectly, any judgment, award, decree, or order against any Insurer Released Party, or

any property or interest in property of any Insurer Released Party;

(c)     creating, perfecting, or enforcing, by any manner or means, whether directly

or indirectly, or seeking to accomplish any of the preceding, any lien of any kind against

any Insurer Released Party, or any property or interest in property of any Insurer Released

Party;

(d)     asserting, implementing, or effectuating any such Claim or Interest of any

kind or accomplishing any setoff, right of subrogation, indemnity, contribution or

21

recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any of the Insurer Released Parties, (B) any of the Insurer Released Parties, or (C) any property or interest in property of any Insurer Released Party; and

      (e)    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Order.

The actions described in this Paragraph 23 are "**Enjoined Actions**," and the injunction set forth herein is the "**Sale Injunction**." The Sale Injunction shall be a permanent injunction against the Enjoined Actions and may not be modified, dissolved, or terminated.

24.    The Sale Injunction shall be effective upon Closing. The Sale Injunction bars pursuit of the above referenced Claims and/or Interests against the Insurer Released Parties, or the property or assets of each (including, without limitation, the Purchased Property), but against no other person or thing.

25.    In a successful action to enforce this Sale Injunction in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

26.    The Sale Injunction shall not enjoin (a) the right of any Person or Entity against the Settlement Trust or a Non-Settling Insurer, or (b) the Settlement Trustee from enforcing the Settlement Trust Documents.

<p style="text-align:center; color:red;"><del>Preserved Coverage</del></p>

<p style="color:red;"><del>27.    [Intentionally Omitted.]⁹</del></p>

<h3 style="text-align:center;">Additional Provisions</h3>

<del>28.</del>27.  From and after the date hereof, no Person or Entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreements and this Order.

<del>29.</del>28.  This Bankruptcy Court hereby retains jurisdiction, regardless of whether a chapter 11 plan has been confirmed in the Bankruptcy Case and consummated and irrespective of the provisions of any such plan or order confirming such plan, to enforce and implement the terms and provisions of the Settlement Agreement, all amendments thereto, any waivers and consents thereunder, and of any agreement(s) executed in connection therewith in all respects, including but not limited to retaining jurisdiction to: (a) compel delivery of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreement; (b) resolve any dispute, controversy, or claim arising under or related to the Settlement Agreement, or the breach thereof; and (c) interpret, implement, and enforce the provisions of this Order and resolve any disputes related thereto.

<del>30.</del>29.  Nothing contained in any plan confirmed in the Bankruptcy Case or any order of this Bankruptcy Court confirming such plan shall conflict with or derogate from the provisions of the Settlement Agreement or the terms of this Order.

<del>31.</del>30.  This Order shall not limit or preclude the entry or effectiveness of any additional releases or injunctions that may be granted protecting the Insurer Released Parties and/or the assets

<hr>

<p style="color:red;"><del>⁹  Intentionally omitted, except the Order approving the Catholic Mutual Settlement Agreement, in which this section will provide:</del></p>

<p style="color:red;"><del>"Nothing in this Order, the Settlement Agreement or the Sale Transaction affects Insurer's Preserved Coverage or the Archdiocese Bound Parties' continuing obligations in connection with the Preserved Coverage under the Archdiocese Policies issued by Insurer, all of which shall survive the Settlement Agreement Effective Date, Bankruptcy Plan Effective Date and the closing of the Sale Transaction."</del></p>

<p style="text-align:center;">23</p>

or property of any Insurer Released Parties in connection with, or as part of, any order confirming a chapter 11 plan.

32.31.  The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Settlement Agreement be authorized and approved in its entirety.

33.32.  The transactions contemplated by the Settlement Agreement are undertaken by Insurer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code. Insurer is a good faith purchaser of the Purchased Property and is entitled to all the protections afforded by Section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction to Insurer.

34.33.  Insurer has given substantial consideration under the Settlement Agreement for the benefit of the Debtor Parties, their Estates, and creditors, along with the other Archdiocese Bound Parties. Such consideration given by Insurer constitutes valid and valuable consideration for the Purchased Property and the releases set forth in the Settlement Agreement, including, without limitation, the extinguishment and release of all Interests pursuant to this Order. The consideration provided by Insurer for the Purchased Property under the Settlement Agreement is fair and reasonable; accordingly, the purchase may not be avoided under Section 363(n) of the Bankruptcy Code.

35.34.  The terms and provisions of the Settlement Agreement and this Order shall be binding notwithstanding any subsequent appointment of any trustee(s) examiner(s) or receiver(s) under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms

24

shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtor Parties, their Estates, their creditors, or any examiner(s) or receiver(s).

36.35. The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Bankruptcy Court that the Settlement Agreement and the Parties' performance thereof be authorized and approved in its entirety.

37.36. Pursuant to the provisions of the Settlement Agreement, each of the Archdiocese Bound Parties and Insurer shall be authorized to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper, or advisable under applicable law or otherwise to consummate and make effective the transactions contemplated by the Settlement Agreement.

38.37. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39.38. All obligations of the Debtor Parties under the Settlement Agreement shall be deemed administrative expenses of their Estates under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

40.39. Each and every federal, state, and local governmental agency or department is hereby directed to accept this Order in lieu of any document necessary to consummate the transactions contemplated by the Settlement Agreement and this Order.

41.40. The Settlement Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the Parties, in a writing signed by the Parties, and in accordance with the terms thereof, without further order of this Bankruptcy Court;

*provided* that such modification, amendment, or supplement does not constitute a material change to the relief sought in the Approval Motion and approved by this Order.

**IT IS SO ORDERED.**

New Orleans, Louisiana, _____, 2025

_____

MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

## SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK

This Settlement Agreement, Release, and Policy Buyback ("**Settlement Agreement**") is hereby made by, and between, and among The Roman Catholic Archdiocese of New Orleans (the "**Archdiocese**" or "**Debtor**" as further defined in Section 1.1.31 below), the other Archdiocese Signatory Parties (as defined in Section 1.1.15 below), and National Union Fire Insurance Company of Pittsburgh, Pa. ("**Insurer**" as further defined in Section 1.1.49 below). Insurer, the Archdiocese, the other Archdiocese Signatory Parties, and the Creditors' Committee (as defined below), collectively are the "**Parties**" and each a "**Party**" to this Settlement Agreement.

### RECITALS:

WHEREAS, on May 1, 2020 (the "**Petition Date**" as further defined in Section 1.1.67 below), the Archdiocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**" as further defined in Section 1.1.17) pending under Case No. 20-10846 (the "**Bankruptcy Case**" as further defined in Section 1.1.16 below);

WHEREAS, each of the Additional Debtors (as defined in Section 1.1.11 below) intends to file in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;

WHEREAS, certain Entities have asserted or may hold Claims, including Abuse Claims, against the Archdiocese Bound Parties (each as defined below);

WHEREAS, Insurer issued, allegedly issued, may have issued, assumed by novation or otherwise, or may be administering the Archdiocese Policies (as defined in Section 1.1.9 below) providing certain coverage to the Archdiocese Bound Parties;

WHEREAS, asserted disputes between the Debtor Parties (as defined below) and Insurer have arisen, and assertable disputes between the Archdiocese Bound Parties and Insurer may arise in the future, concerning the scope and nature of Insurer's responsibilities, if any, to provide insurance coverage to the Archdiocese Bound Parties under the Archdiocese Policies (as further defined in Section 1.1.29 below, the "**Coverage Claims**");

WHEREAS, claimants may contend, as a matter of Louisiana law, particularly La. Rev. Stat § 22:1269 *et. seq*., that certain Entities may have Claims arising under or related to the Archdiocese Policies that could entitle them to bring a Direct Action Claim (as defined in Section 1.1.35 below) against Insurer;

WHEREAS, claimants may contend that as a matter of Louisiana law, the time within which Claims relating to Abuse may be asserted against certain of the Archdiocese Bound Parties and/or the Insurer may not have expired with respect to certain Claims;

WHEREAS, the Archdiocese Signatory Parties and Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Claims and all other

disputes between and among them and to release Insurer from any further obligations under the Archdiocese Policies;

WHEREAS, Insurer would not pay the full amount of the Settlement Amount (as defined in Section 1.1.81 below) without the buy-back of the Subject Interests (as defined below) in the Archdiocese Policies, including without limitation, the interests of the Archdiocese, Additional Debtors, other Archdiocese Bound Parties and holders of Direct Action Claims, pursuant to section 363 of the Bankruptcy Code, and without the Sale Injunction, the Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeping Injunction (each as defined below), additionally providing protection to the Insurer Released Parties (as defined below) from Claims against the Insurer Released Parties and their property;

WHEREAS, through this Settlement Agreement and the Plan (as defined in Section 1.1.68 below) the Archdiocese Signatory Parties intend to provide Insurer Released Parties with the broadest possible release of all Claims and Subject Interests with respect to the Archdiocese Policies; and

WHEREAS, through this Settlement Agreement and the Plan, as part of the compromise and resolution of the Coverage Claims, the Debtor Parties and Insurer also wish to effect a sale, pursuant to § 363(b), (f), and (m) of the Bankruptcy Code of the Archdiocese Policies, along with the Coverage Claims and Related Insurance Claims (the "**Purchased Property**" as further defined in Section 1.1.71 below), to provide the Insurer Released Parties with the broadest possible release and buyback with respect to the Archdiocese Policies, resulting in the Insurer Released Parties having no obligations now or in the future with respect to the Archdiocese Policies, including without limitation to any Direct Action Claim.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Settlement Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound subject to the approval of the Bankruptcy Court pursuant to Section 2 below, the Parties hereby agree as follows:

## 1. DEFINITIONS

1.1 As used in this Settlement Agreement (as defined above), the following terms shall have the meanings set forth below.

1.1.1 "**Abuse**" means any of the following actual or alleged acts: (a) touching by the Perpetrator of the person's intimate body parts (genitals, breasts, or buttocks), the touching by the person of the Perpetrator's intimate body parts, showing pictures of the person's body or other persons' bodies, taking pictures of the person's body, showing pornography, or making images of the person while naked or engaged in any sexual activity, or any sexualized interaction including observing the person in bathing, toileting, or undressing that was made possible by the Perpetrator's position of authority, or by the inducement of the Perpetrator; or (b) sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to the genital or anal openings: (i) of the person's body by any part of the Perpetrator's body or any object used by the Perpetrator for this purpose; or (ii) of the person's body by any

973

part of the body of the Perpetrator or by any part of the body of another person, or by any object used by the Perpetrator or another person for this purpose; (c) inappropriate physical contact and/or contact that infringes upon another's personal, physical boundaries including but not limited to groping, kissing, extended hugging, and/or any unwelcomed touching; (d) grooming or trying to create a special relationship, including but not limited to: talk of a sexual nature, talk of a romantic nature, communications expressing individual love to the person, as opposed to a salutation, providing material resources or experiences which induce the person into a relationship where trust is then violated; or (e) any actual or alleged acts of the kind described in subsections (a)-(c) above that occur between or among minors and that the Perpetrator orchestrates or encourages. For the avoidance of doubt, "Abuse" also includes: any actual or alleged conduct which (a) is described in the Louisiana Child Victims Act or (b) would constitute (i) a sexual offense as defined in article 603(2) of the Louisiana Children's Code; (ii) sexual battery as defined in LA. REV. STAT. §§ 14:43.1; 14:43.1.1; 14:43.2; 14: or 43.3, (iii) a crime against nature as defined in LA. REV. STAT. § 14:89, or (i) pornography involving juveniles as defined in LA. REV. STAT. § 14:81.1, or with respect to the foregoing subsection (i)-(iv), any predecessor statute that prohibited such conduct at the time of the act.

1.1.2   "**Abuse Action**" means an Action asserting an Abuse Claim against any of the Covered Parties.

1.1.3   "**Abuse Claim**" means any Claim that has been asserted, or could be asserted, against any Settling Party or Non-Settling Insurer, that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively alleged Abuse that occurred, in whole or in part, before the applicable Debtor's Petition Date or Additional Debtors' Petition Date, including any such Claim that seeks monetary damages or any other relief, under any legal or equitable theory of liability, including, but not limited to, the following:  vicarious liability; *respondeat superior*; any conspiracy, fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, negligent, insufficient, or inadequate supervision, retention or misrepresentation; any theory based on misrepresentation, concealment, or unfair practice; public or private nuisance; or any theory, including, without limitation, any theory based on public policy or any acts or failures to act by any Settling Party, or any other Entity for whom any Settling Party is allegedly responsible, including, but not limited to, any such Abuse Claim against any Settling Party, Non-Settling Insurer, or any other Entity for whom any Settling Party or Non-Settling Insurer is alleged to be responsible.  Abuse Claims are:  (a) the Known Abuse Claims, which are treated in Class 3; and (b) the Unknown Abuse Claims, which are treated in Class 4.  For the avoidance of doubt, "Abuse Claim" includes (a) all Unknown Abuse Claims, (b) Claims or causes of action defined or described in the Revival Window Laws against the Archdiocese or any other Archdiocese Bound Party, (c) Direct Action Claims, and (d) any Claim against the Archdiocese or any other Archdiocese Bound Party that is attributable to, arises from, is based upon, relates to, or results from Abuse that, as of the Petition Date is barred by any applicable statute of limitations, and in each case, irrespective of whether (x) such Claims also involve the conduct of joint tortfeasors (or similar concepts under applicable law), (y) such Claims arise under, or were revived pursuant to, the Revival Window Laws, or any future reviver law, statute, or binding

precedential decision passed or issued on or after the Bankruptcy Plan Effective Date, or (z) a proof of claim has been filed, before or after the Claims Bar Date, or not at all, or an Abuse Action has been commenced with respect to such Claim. "Abuse Claim" does not include: (a) Related Insurance Claims or Coverage Claims against Settling Insurers or Non-Settling Insurers; (b) Non-Insurer Contribution Claims with respect to any Abuse Claim; (c) Insurer Contribution Claims with respect to any Abuse Claim; or (d) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to a Claim against these dioceses only. For the avoidance of doubt, a Claim based on Abuse solely occurring following the applicable Petition Date is not an Abuse Claim. Nothing in this definition shall constitute a waiver of any defense that would otherwise be available under applicable law to any Settling Party, the Settlement Trust, or any other Entity.

1.1.4 "**Abuse Claim Release and Certification**" means a written release in favor of the Insurer Released Parties, in the form of Exhibit C to the Acceptable Plan, or otherwise in form and substance acceptable to the Parties, which an Abuse Claimant must deliver before he or she is entitled to Settlement Trust Distributions, which shall provide that the Claimant releases the Insurer Released Parties from any and all Claims related to his/her Abuse Claim or any of the Archdiocese Policies, subject to Section 12.14 and related provisions of the Plan.

1.1.5 "**Abuse Claimant**" means the holder of an Abuse Claim, including, but not limited to, any Known Abuse Claim, Unknown Abuse Claim, or Direct Action Claim. For the avoidance of doubt, Abuse Claimants are Creditors. The definition of an Abuse Claimant includes the legal representative of the holder of an Abuse Claim, such as a bankruptcy trustee, the estate of a deceased individual who held an Abuse Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Abuse Claim, as the case may be. An Entity holding the following Claim is not an Abuse Claimant: (i) a Non-Insurer Contribution Claim with respect to such Abuse Claim; (ii) an Insurer Contribution Claim with respect to such Abuse Claim; (iii) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to such Entity's claim against such dioceses only.

1.1.6 "**Acceptable Plan**" means the *Fourth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and The Official Committee of Unsecured Creditors* filed at Docket No. [4419], and its exhibits and schedules, which as may be modified solely in accordance herewith (i.e., with the consent of the Insurer), and such modified plan constituting the "Acceptable Plan" for the purposes hereof.

1.1.7 "**Archdiocesan Parishes**" means all currently Catholic Church parishes and missions, as identified on Exhibit B-1, Part I, of the Acceptable Plan. Each of the Archdiocesan Parishes is organized as a non-profit corporation. For the avoidance of doubt, the definition of Archdiocesan Parishes does not include St. Louis Cathedral, Our Lady of Guadalupe Church & Shrine of St. Jude, or any Suppressed Archdiocesan Parish identified on Exhibit B-1, Part II, of the Acceptable Plan.

1.1.8    "**Archdiocesan Schools**" means the means the following schools that are owned and operated by the Archdiocese: (a) the Academy of Our Lady High School; (b) Archbishop Chapelle High School; (c)Archbishop Hannan High School; (d) Archbishop Rummel High School; (e) Archbishop Shaw High School; (f) Pope John Paul II High School; (g) St. Charles Catholic High School; (h) St. Scholastica Academy; and (i) St. Michael Special School.

1.1.9    "**Archdiocese Policies**" means (a) the contracts, binders, certificates, and policies of insurance that are listed on Schedule 1 hereto, and (b) all other known and unknown contracts, binders, certificates, or policies of general liability insurance, in effect on or before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date that were issued to, or for the benefit of, or subscribed on behalf or that otherwise actually insure, (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) policies issued to the Archdiocese that name as an insured or additional insured (or related concept under applicable law or document) the Diocese of Houma-Thibodaux or Diocese of Baton Rouge, but not policies issued to either of these dioceses that were not also issued to the Archdiocese or name it as insured, (iv) any Entity owned, created, operated, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, or (v) any institution, religious organization or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control or active management; in each case of (a) and (b), that were issued, subscribed to, or underwritten in whole or in part or allegedly issued, subscribed to, or underwritten in whole or in part by Insurer or any of its predecessors.

1.1.10   "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

1.1.11   "**Additional Debtors**" means the Entities listed on Acceptable Plan Exhibit B-1.  As used herein, references to the "Additional Debtors" includes the Additional Debtor's Estates.

1.1.12   "**Approval Motion**" means the motion filed in the Archdiocese Bankruptcy Case at Docket No. 4181 seeking approval of this Settlement Agreement as described in Section 2.1 of this Settlement Agreement.

1.1.13   "**Approval Order**" means the order granting the Approval Motion described in Section 2.1 of this Settlement Agreement and providing the relief described in Section 2.1 of this Settlement Agreement and in substantially form attached **Exhibit A,** with only such changes as are satisfactory to Insurer.

1.1.14   "**Archbishop**" has the meaning given to it in Section 3.7.

1.1.15   "**Archdiocese Signatory Parties**" means, collectively, (a) the Debtor Parties and (b) the Non-Debtor Catholic Entities.

1.1.16 "**Bankruptcy Case**" means all of the following: (a) with respect to the Archdiocese, "Bankruptcy Case" has the meaning set forth in the Recitals; and (b) with respect to any given Additional Debtor, "Bankruptcy Case" means the case initiated when such Additional Debtor filed in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.17 "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Louisiana, having subject matter jurisdiction over the Bankruptcy Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

1.1.18 "**Bankruptcy Plan Effective Date**" means the date upon which a Plan approved by the Bankruptcy Court that contains terms and conditions consistent with those required by this Settlement Agreement becomes effective.

1.1.19 "**Barred Claim**" means any Claim against a Settling Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with an Abuse Claim or any of the Archdiocese Policies, including, but not limited to, any: (a) Abuse Claim; (b) Direct Action Claim; (c) Coverage Claim; (d) Related Insurance Claim; (e) Non-Insurer Contribution Claim; (f) Insurer Contribution Claim; (g) Medicare Claim; (h) Penalty Claim; and (i) any other Claim that is otherwise released herein. A Barred Claim further includes any Claim against a Settling Party based on allegations that it is an alter ego or liable as a successor of an Entity that is not a Settling Party or that the Settling Party's corporate veil should be pierced on account of Claims against an Entity that is not a Settling Party or based on any other theory under which the legal separateness of any Person and any other Entity may be disregarded to impose liability for a claim on either such Entity. Notwithstanding the foregoing, Barred Claims do not include any Claims to the extent they are asserted against (x) Non-Settling Insurers or (y) Excluded Parties, notwithstanding that such Entity may also have asserted or be able to assert a Claim for contribution, indemnity, reimbursement, or subrogation against any Settling Party relating to or arising from a such Claim; provided, however, that, for the avoidance of doubt, (i) any Claims that assert liability against such Entity in conjunction with a Settling Party will in all events be Barred Claims as to the Settling Party, (ii) any such Claim for contribution, indemnity, reimbursement, or subrogation against a Settling Party is a Barred Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party for the purposes of this definition.

1.1.20 "**Catholic Charities**" has the meaning set forth in Section 6.3.15.

1.1.21 "**Channeling Injunction**" has the meaning set forth in Section 2.2.2.

1.1.22 "**Claim**" means any past, present or future claim, demand, Action, request, right, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether sounding in law, equity, tort, warranty, contract, or under any other theory, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been

or may be asserted by or on behalf of any Entity, whether seeking damages (including compensatory, exemplary, punitive, or Penalty claims) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, or orders, including without limitation whether by way of direct action, subrogation, contribution, indemnity, alter ego, veil piercing, or regulatory action, or otherwise, regardless of whether such Claims arise under law, in equity, or under statute, before or after the Petition Date(s), or *in rem* or *in personam*, and include all Claims for damages to the environment or based on any theory of *respondeat superior,* vicarious, successor or transferee liability, or change in control, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

1.1.23 **"Claims Bar Date"** means the date(s) and time(s) indicated in the Final Order(s) (which may be the Plan Confirmation Order) setting the deadline(s) for filing proofs of Abuse Claim against the Debtor or Additional Debtor(s), as applicable.

1.1.24 **"CMS"** has the meaning set forth in Section 2.4.1.

1.1.25 **"Co-Insured Party"** means any other Entity that is a "Named Assured" or "named insured" or "protected person" under the Archdiocese Policies, and all other Entities that are determined by agreement or a court of competent jurisdiction to be an "Assured," an "Additional Assured," an "insured," or "protected person" or otherwise entitled to insurance coverage under any Archdiocese Policies.

1.1.26 **"Conditional Payment"** means any payment made to an Abuse Claimant under the MMSEA, including any payment by a Medicare Advantage Organization (as defined in the MSPA).

1.1.27 **"Controlling Document Provision"** has the meaning given to it in Section 2.2.9.

1.1.28 **"Covered Parties"** or **"Archdiocese Bound Parties"** means, collectively, the following Entities: (a) the Debtor Parties; (b) the Reorganized Debtor; (c) the Reorganized Additional Debtors; (d) the Non-Debtor Catholic Entities; (e) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP; (f) the Parish Schools and Archdiocesan Schools; (g) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans; (h) any Co-Insured Party; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entities' predecessors, successors, assigns, subsidiaries, direct and indirect past, present, and future affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, and estates. For the avoidance of doubt, the Entities in clauses (g), (h), and (i) are only Archdiocese Bound Parties in connection with the Archdiocese Policies.

1.1.29 "**Coverage Claims**" has the meaning set forth in the Recitals and further includes any Claim under relating to or arising out of the Archdiocese Policies or the rights and obligations thereunder, or the breach thereof, including any Claim seeking insurance coverage.

1.1.30 "**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed in the Archdiocese's Chapter 11 Case on May 20, 2020, [Docket Nos. 94 & 114], as such committee may be reconstituted from time to time.

1.1.31 "**Debtor**" or "**Archdiocese**" means, before the Bankruptcy Plan Effective Date, The Roman Catholic Church of the Archdiocese of New Orleans of Louisiana. As used herein, references to the "Debtor" or "Archdiocese" includes the Debtor's Estate.

1.1.32 "**Debtor Parties**" means (i) the Archdiocese and (ii) all of the Additional Debtors.

1.1.33 "**Diocese of Baton Rouge**" means the Diocese of Baton Rouge. References to the "Diocese of Baton Rouge CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) July 22, 1961 whichever occurred last; references to the "Diocese of Baton Rouge SD" refer to the period after such date.

1.1.34 "**Diocese of Houma-Thibodaux**" means the Diocese of Houma-Thibodaux. References to the "Diocese of Houma-Thibodaux CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) June 5, 1977, whichever occurred last; references to the "Diocese of Houma-Thibodaux SD" refer to the period after such date.

1.1.35 "**Direct Action Claim**" means any Claim by any Entity that is a "direct action" as that term is used in La. Rev. Stat § 22:1269 *et. seq* (or similar law in other jurisdictions) against any Insurer Released Party or related to any Archdiocese Policy, including, without limitation, (a) any claim that is similar or related to any Claim that could also be asserted by the Archdiocese or any Archdiocese Bound Party, (b) any Claim that directly or indirectly arises out of, relates to, or is connected with any Abuse Claim, (c) any Claim that directly or indirectly arises out of, relates to, or is in connection with any Insurer Released Party's handling of any Abuse Claim under the laws of any applicable jurisdiction, or (d) any Claim arising under any law of any jurisdiction that may give a third party a direct Cause of Action against an Insurer Released Party for monetary or other relief.

1.1.36 "**Entity**" means any individual, corporation, corporation sole, partnership, association, limited liability company, joint stock company, proprietorship, unincorporated organization, joint venture, trust, estate, executor, legal representative, or any other entity or organization, as well as any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency, department, board or instrumentality thereof, any other "Person" within the definition of section 101(41) of the Bankruptcy Code, and any successor in interest, heir executor, administrator, trustee, trustee in bankruptcy, or receiver of any Entity and also has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.1.37 "**Escrow Agent**" means the agent appointed in accordance with the Escrow Agreement.

1.1.38 "**Escrow Agreement**" means the agreement governing the escrow which shall hold the Settlement Amount in escrow and in trust for the benefit of Insurer, and which shall provide for the: (i) transfer of the Settlement Amount, with any accrued interest, to the Settlement Trust following the Settlement Agreement Effective Date, or (ii) return of the Settlement Amount to Insurer, with any accrued interest, upon receipt of notice that the Settlement Agreement has been terminated.

1.1.39 "**Estate**" means the (a) the Debtor's estate, and (b) Additional Debtors' estates, each created pursuant to section 541 of the Bankruptcy Code.

1.1.40 "**Excluded Party**" means the following Entities: (a) the Holy See (State of Vatican City); (b) any Perpetrator; and (c) any archdiocese or diocese (other than the Archdiocese itself), any Religious Order, or other Entity that is an affiliate or associated with the Roman Catholic Church (in its capacity as such, and other than (i) the Non-Debtor Catholic Entities; (ii) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP, (iii) the Parish Schools and Archdiocesan Schools; and (iv) any Co-Insured Party); provided, however, that any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party.

1.1.41 "**Extra-Contractual Claim**" means any Claim against any Insurer Released Party seeking any type of relief, other than coverage or benefits, under or with respect to the Archdiocese Policies. Extra-Contractual Claims include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs, or any other type of relief, alleging any of the following with respect to (a) any Archdiocese Policy; (b) any Claim allegedly or actually covered under a Archdiocese Policy; or (c) the conduct of any Insurer Released Party with respect to (a) or (b): (i) bad faith; (ii) failure to provide insurance coverage under any Archdiocese Policy, including any failure to investigate or to provide a defense or adequate defense; (iii) failure or refusal to compromise and settle any Claim insured under any Archdiocese Policy; (iv) failure to act in good faith; (v) violation or breach of any covenant or duty of good faith and fair dealing, whether express, implied, or otherwise; (vi) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (vii) violation of any unfair claims practices act or similar statute, regulation or code, including any statute, regulation, or code relating to unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising; (viii) any type of misconduct; or (ix) any other act or omission of any type by any Insurer Released Party for which the claimant seeks relief other than coverage or benefits under a Archdiocese Policy. "Extra-Contractual Claims" further include all Claims relating to any Insurer Released Party's (x) handling of any Claims under the Archdiocese Policies, (y) conduct in negotiating this Settlement Agreement and/or the Plan, and (z) conduct in the settlement of any Claims. For the avoidance of doubt, Extra-Contractual Claims of the Archdiocese Bound Parties are included within the property Insurer is purchasing hereunder.

1.1.42  "**Final Order**" means an order as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending and in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order will have been affirmed by the highest court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order will not cause such order not to be a Final Order.

1.1.43  "**Gatekeeper Injunction**" has the meaning set forth in Section 2.2.2.

1.1.44  "**HH**" has the meaning set forth in Section 6.3.15.

1.1.45  "**Indemnified Claims**" has the meaning set forth in Section 7.2 of this Settlement Agreement.

1.1.46  "**Indemnity Cost Reserve**" has the meaning set forth in Section 7.2.1.

1.1.47  "**Injunctions**" means the Sale Injunction, Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeper Injunction.

1.1.48  "**Insurance Settlement Agreement**" has the meaning set forth in the Acceptable Plan.

1.1.49  "**Insurer**" means National Union Fire Insurance Company of Pittsburgh, Pa., or its successors and assigns..

1.1.50  "**Insurer Contribution Claim**" means any (a) Non-Settling Insurer Contribution Claim or (b) Settling Insurer Contribution Claim.

1.1.51  "**Insurer Released Party**" means Insurer and its Related Parties, each in their capacities solely as such with respect to the Archdiocese Policies and all Subject Interests therein.

1.1.52  "**Known Abuse Claims**" means any Abuse Claim, other than an Unknown Abuse Claim, against any Settling Party, Settling Insurer, and/or Non-Settling Insurer.

1.1.53  "**Medicare Claims**" means any Claim by CMS, and/or any agent or successor of CMS, charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA or pursuing a Claim under MSP Provisions, relating to any payments in respect of any Abuse Claim, including any Claim for reimbursement of conditional payments, and any Claim relating to reporting obligations.

1.1.54 "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which imposes reporting obligations on those Entities with payment obligations under the MSPA.

1.1.55 "**MSPA**" means 42 U.S.C. §1395y et seq., or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto, including the regulations promulgated thereunder, found at 42 C.F.R. §411.1 et seq.

1.1.56 "**Non-Debtor Catholic Entity Policy Sale**" has the meaning set forth in Section 4.6.

1.1.57 "**Non-Debtor Catholic Entities**" collectively means those entities listed on the Acceptable Plan Exhibit B-2 who are not Additional Debtors, but which are (a) insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies and/or (b) have actually or allegedly acquired or been assigned the right to make a claim for coverage under any of the Archdiocese Policies (excluding, however, for the avoidance of doubt, the Debtor Parties, the Settlement Trust, and any Abuse Claimant).

1.1.58 "**Non-Insurer Contribution Claim**" means any Claim for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law that is attributable to, arises from, is based upon, relates to, or results from, an Abuse Claim or payment of an Abuse Claim, and any other derivative or indirect Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, other than a Non-Settling Insurer Contribution Claim or a Settling Insurer Contribution Claim.

1.1.59 "**Non-Settling Insurer**" means any insurer (together with its Related Parties) that is not a Settling Insurer.

1.1.60 "**Non-Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Non-Settling Insurer against any Settling Insurer for the payment of money where such Non-Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.61 "**Parish Schools**" means the elementary Catholic schools that are owned and operated by the Archdiocesan Parishes. For the avoidance of doubt, the definition of Parish Schools expressly excludes Catholic schools that are owned and operated by Religious Orders and the Archdiocesan Schools. For the further avoidance of doubt, the Parish Schools are not separately incorporated.

1.1.62 "**Parties**" has the meaning set forth in the first paragraph of this Settlement Agreement.

1.1.63  "**Payment Security**" means [**Intentionally Omitted**]

1.1.64  "**Penalty Claims**" means a Claim against any Settling Party or Settling Insurer for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Creditor holding such Claim.

1.1.65  "**Perpetrator**" means an individual who personally committed or is alleged to have personally committed an act of Abuse. For the avoidance of doubt, the definition of Perpetrator does not include any individual who did not personally commit an act of Abuse or is not alleged to have personally committed an act of Abuse, but against whom an Abuse Claim or Non-Insurer Contribution Claim is asserted nonetheless, or may be asserted, by virtue of such individual's position or service as a member, representative, contractor, consultant, professional, or volunteer of the Archdiocese or any Non-Debtor Catholic Entity or any council or representative body associated with such Entities.

1.1.66  "**Person**" has the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

1.1.67  "**Petition Date**" means (a) with respect to the Archdiocese, May 1, 2020; and (b) with respect to each Additional Debtor, the date(s) on which such Additional Debtor files in the Bankruptcy Court its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.68  "**Plan**" refers to the Chapter 11 Plan of Reorganization for the Archdiocese and all Additional Debtors (and all exhibits annexed thereto) which shall, among other things, provide for the resolution of Abuse Claims and Subject Interests in the Archdiocese Policies as set forth herein, and which shall be in form and substance acceptable to Insurer in its sole discretion.

1.1.69  "**Plan Confirmation Order**" has the meaning set forth in Section 2.3.

1.1.70  "**Preserved Coverage**" means [**Intentionally Omitted**.]

1.1.71  "**Purchased Property**" means any and all right, title, and interest (including all Subject Interests) in and to the Archdiocese Policies and the Related Insurance Claims and Coverage Claims.

1.1.72  "**Related Insurance Claim**" means (a) any Extra-Contractual Claim and (b) any other Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies, including, without limitation, bad faith Claims.

1.1.73  "**Related Party**" means, with respect to any Entity, such Entity's (a) predecessors, successors, assigns, and any Entity that assumed the obligation of the forgoing for the Archdiocese Policies by novation or otherwise (b) direct and indirect past, present, and future Affiliates (as defined in section 101(2) of the Bankruptcy Code), holding companies, merged companies, related companies, subsidiaries, divisions,

acquired companies, joint ventures, joint venturers, (c) current and former employees, officers, directors, principals, partners, managing agents, trustees, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, brokers, adjusters, reinsurers, retrocessionaires, subrogees, agents, claims handling administrators, and other professionals, and (d) respective heirs, executors, estates, and nominees; and all Entities acting on behalf of, by, through or in concert with them, each solely in their capacities as such with respect to such Entity (and with respect to such Entity (including Insurer) that is an insurer of any Archdiocese Bound Party or has assumed the obligations of such by novation or otherwise, such insurer's applicable insurance policy(ies) (including the Archdiocese Policies)).

1.1.74 "**Religious Order**" means, collectively, an institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy.

1.1.75 "**Reorganized Additional Debtors**" means the Additional Debtors, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.76 "**Reorganized Debtor**" means the Debtor, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.77 "**Revival Window**" means Section 2 of La. Acts 2021, No. 322, as amended by La. Acts 2022, No. 386, and La. Acts 2024, No. 481.

1.1.78 "**Revival Window Laws**" means the Revival Window, together with any other law that extends the prescriptive period or statute of limitations for asserting Abuse Claims under Louisiana or other applicable state law.

1.1.79 "**Sale Injunction**" has the meaning set forth in Section 2.1.

1.1.80 "**Settlement Agreement Effective Date**" means the first day on which: (a) the Archdiocese Signatory Parties and Insurer have executed this Settlement Agreement; (b) the Unknown Abuse Claims Representative shall have supported the releases provided for herein and the protections granted hereby and in the Plan in favor of the Insurer Released Parties, in a manner acceptable to Insurer in its sole discretion; (c) the Approval Order shall have become a Final Order; (d) the Plan Confirmation Order shall have become a Final Order; and (e) the Settlement Trust shall have been created pursuant to the Plan; provided, however, with the prior written consent of the Trustee, not to be unreasonably withheld, Insurer may elect to waive the conditions set forth in clauses (b) through (e) and pay or direct the payment of the Settlement Amount to the escrow or Settlement Trust prior to the occurrence of the events set forth in (b) through (e) hereof, in

which case, the date of such payment shall be the Settlement Agreement Effective Date for all purposes hereunder including the date of the closing of the purchase and sale of the Archdiocese Policies.

1.1.81 "**Settlement Amount**" means the sum of $290,000 to be paid (in accordance with Section 3.1) by Insurer after satisfaction of all conditions precedent herein in accordance herewith.

1.1.82 "**Settlement Trust**" means the settlement trust established under the Plan for the purposes set forth therein, including assuming liability for all Channeled Claims (as defined in the Acceptable Plan) and Indemnified Claims (as defined herein), subject to the limitations on indemnification and liability contained in Section 7.2 of this Settlement Agreement.

1.1.83 "**Settlement Trust Agreement**" means the agreement between the Debtor and the Settlement Trustee governing the Settlement Trust, in the form of Exhibit D-1 to the Acceptable Plan.

1.1.84 "**Settlement Trust Allocation Protocol**" means the Settlement Trust Allocation Protocol (as defined and used in the Settlement Trust Agreement), in the form of Exhibit D-2 to the Acceptable Plan.

1.1.85 "**Settlement Trust Documents**" means, collectively, (a) the Settlement Trust Agreement, (b) the Settlement Trust Allocation Protocol, and (c) any other agreements, instruments and documents governing the establishment and administration of the Settlement Trust, which shall be consistent with the terms of the Plan, as the same may be amended or modified from time to time in accordance with the terms thereof.

1.1.86 "**Settlement Trustee**" means the Entity appointed to act as the initial trustee of the Settlement Trust pursuant to the terms of the Settlement Trust Documents, along with any successor trustee appointed in accordance with the Settlement Trust Documents.

1.1.87 "**Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Settling Insurer against any Settling Insurer or Non-Settling Insurer for the payment of money where such Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.88 "**Settling Insurers**" shall have the meaning set forth in the Acceptable Plan.

1.1.89 "**Settling Insurers' Policies**" shall have the meaning set forth in the Acceptable Plan.

1.1.90 "**Settling Parties**" means, collectively, the following Entities: (a) Archdiocese Bound Parties; and (b) the Settling Insurers.

1.1.91 "**Subject Interests**" means all Claims, liens (as defined by Section 101(37) of the Bankruptcy Code), encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief, including: (a) all interests of the Archdiocese in, to and under the Archdiocese Policies; (b) all interests in, to, and under the Archdiocese Policies of any Entity other than the Archdiocese (including all Abuse Claimants and the Archdiocese Bound Parties); and (c) all interests in, to and under the Archdiocese Policies of any other Entity claiming coverage by, through, or on behalf of any Archdiocese Bound Party, including, without limitation, rights and interests as an insured, co-insured or additional insured, insurer or creditors of the Archdiocese Bound Parties; in each case within the meaning of "interest" as used in sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code. For the avoidance of doubt, a Direct Action Claim constitutes a Subject Interest. The meaning of Subject Interests also includes: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief

whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property.

1.1.92 "**Supplemental Settling Insurers' Injunction**" has the meaning set forth in Section 2.2.2.

1.1.93 "**Unknown Abuse Claim**" means an Abuse Claim that occurred before the Petition Date and the Abuse Claimant did not file a proof of claim by the applicable Abuse Claims Bar Date, for which there exists a valid legal excuse for not filing, as further defined in the in the Acceptable Plan.

1.1.94 "**Unknown Abuse Claims Representative**" means Michael R. Hogan, the legal representative appointed by the Bankruptcy Court pursuant to the *Order (I) Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, and (II) Approving the Retention of Michael R. Hogan as the Unknown Tort Claims Representative, Nunc Pro Tunc To July 26, 2021* (Docket No. 1012 ), any successor legal representative appointed by the Bankruptcy Court, or, on and after the Bankruptcy Plan Effective Date, any successor legal representative appointed in accordance with the applicable Settlement Trust Document.

1.2    Capitalized terms not defined in this Section 1 or elsewhere in this Settlement Agreement shall have the meanings given to them in the Bankruptcy Code.

## 2.    THE BANKRUPTCY CASE AND PLAN OF REORGANIZATION

2.1    On or before July 29, 2025, the Archdiocese shall file a motion in the Bankruptcy Court (the "**Approval Motion**"), in form and substance acceptable to Insurer in its sole discretion, that seeks the entry of an order in substantially the form attached as **Exhibit A** to this Settlement Agreement, or otherwise in form and substance acceptable to Insurer in its sole discretion (the "**Approval Order**"), that:

(a) approves this Settlement Agreement, including Insurer's buyback of the Archdiocese Policies and the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests, and otherwise authorizes the Parties to undertake the settlement and the transactions contemplated by this Settlement Agreement, in each case pursuant to sections 363(b), (f),and (m) of the Bankruptcy Code and any other applicable provisions of the Bankruptcy Code;

(b) contains an injunction (the "**Sale Injunction**") that, subject to and conditioned upon the Settlement Agreement Effective Date and the Insurer's payment of the Settlement Amount, bars all Claims against the Insurer Released Parties and their property and assets of each based on or arising out of any Subject Interests in the Archdiocese Policies including without limitation all Coverage Claims, Related Insurance Claims, and Barred Claims, leaving the Settling Insurers free and clear of all Subject Interests of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer

(including Non-Settling Insurers); any Abuse Claimant; or any holder of a Barred Claim pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code;

(c) provides that this Settlement Agreement is binding on the Archdiocese Signatory Parties, all other Settling Parties, any trust created in the Bankruptcy Case(s), and any successors of the foregoing; and

(d) provides, subject to and conditioned upon the Settlement Agreement Effective Date, that the Approval Order is binding on all Persons (including, for the avoidance of doubt, all Persons set forth in the foregoing (c)).

2.1.1    The Archdiocese shall provide written notice of the Approval Motion, which notice shall be in form and substance acceptable to Insurer, to, at a minimum, any known Archdiocese Bound Party, holder of an Abuse Claim, or party whose rights or interests may reasonably be considered to be impacted by the relief requested in the Approval Motion, and any party identified on Schedule 3 hereto.  In addition, the Archdiocese shall include notice of the Approval Motion together with notice provided with respect to confirmation of the Joint Plan, including publication notice of the hearing on the Approval Motion. The Archdiocese will provide a draft service list of the foregoing for Insurer's review and comment.

2.1.2    If any Entity files an objection to the Approval Motion, the Archdiocese and Creditors' Committee shall consult with Insurer in connection with filing any written response thereto.  The Archdiocese Signatory Parties, as applicable, and Creditors' Committee shall take commercially reasonable steps to defend against any objection, appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order.  Insurer will cooperate with the Archdiocese Signatory Parties and Creditors' Committee in this regard, including making commercially reasonable submissions.

2.2    The Archdiocese shall file and prosecute a joint Plan with the Creditors Committee, which shall be in form and substance satisfactory to the Insurer in its sole discretion, substantially in the form as the Acceptable Plan, which the Parties acknowledge and agree satisfies the terms of this Settlement Agreement.  Any modifications to the Plan, the Settlement Trust Documents, the Plan Confirmation Order, or the Approval Order, including those relating to the Channeling Injunction, Supplemental Settling Insurers' Injunction, Gatekeeper Injunction, releases by holders of Abuse Claims, Insurers, Insurance Settlement Agreements, and related definitional terms, including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Abuse Related Insurance Claims," "Channeled Claim," "Covered Parties," "Direct Action Claim," "Enjoined Party," "Insurer Contribution Claim," "Non-Insurer Contribution Claim," "Penalty Claims," "Protected Parties," "Settling Insurers," "Settling Insurer's Policies," "Subject Insurance Policies," "Subject Interests," or any exhibits, schedules, and documents related thereto, must be in all respects consistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties without Insurer's written consent in its sole discretion.

2.2.1   The Plan shall create the Settlement Trust, which shall be responsible for making any and all payments to the Abuse Claimants entitled to receive payment under the Plan and which shall assume all liability for Channeled Claims.

2.2.2   The Plan shall include: (a) an injunction in substantially the form included in Article 12.4 of the Acceptable Plan (the "**Channeling Injunction**"); and (b) an injunction in substantially the form included in Article 12.5 of the Acceptable Plan (the "**Supplemental Settling Insurers' Injunction**"); and (c) an injunction in substantially the form included in Article 12.8 of the Acceptable Plan (the "**Gatekeeper Injunction**").

2.2.3   The Plan shall incorporate by reference the releases and indemnities set forth in this Settlement Agreement, including that the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to all Indemnified Claims as forth in Section 7.2 of this Settlement Agreement.

2.2.4   The Settlement Trust Documents shall provide that as a condition to receiving payment from the Settlement Trust, all Abuse Claimants shall provide an Abuse Claim Release and Certification.

2.2.5   The Plan shall provide for the commencement, prior to the Court's consideration of the Approval Motion, by the Additional Debtors of Chapter 11 cases to be jointly administered with the Bankruptcy Case.

2.2.6   The Plan shall provide a supplemental bar date for the Additional Debtors in a form and substance satisfactory to the Insurer with respect to Abuse Claims against the Additional Debtors and the form, manner, and deadline for filing proofs of claim and the treatment of confidential information contained therein.

2.2.7   The Plan shall provide that confirmation of the Plan will not occur unless all of the following conditions precedent have been satisfied: (a) the Plan Confirmation Order approves and implements the Injunctions and (b) the Bankruptcy Court shall have granted the Approval Motion in form and substance acceptable to Insurer in its sole discretion.

2.2.8   The Plan shall provide that the Bankruptcy Plan Effective Date will not occur unless all of the following conditions precedent have been satisfied or waived (as applicable with consent of Insurer): (a) the Plan Confirmation Order will have been entered by the Bankruptcy Court and become a Final Order, and (b) the Bankruptcy Court shall have entered the Approval Order (with both such Approval Order and this Settlement Agreement in form and substance acceptable to the Insurer) and such Approval Order shall have become a Final Order.

2.2.9   The Plan shall provide that (collectively, as follows, the "**Controlling Document Provision**") in the event of a conflict between (a) the Settlement Agreement, on the one hand, and (b) the Plan, on the other, the terms of the Settlement Agreement shall control and govern; and in the event of a conflict between the (x) Approval Order, on the one hand, and (y) Plan Confirmation Order, on the other, the terms of the Approval Order shall control and govern.

2.2.10  The Plan shall provide that the execution and delivery of this Settlement Agreement is a condition to entry of the Plan Confirmation Order and the occurrence of the Bankruptcy Plan Effective Date. The inclusion of this Settlement Agreement in the Plan shall not be waivable as a condition to entry of the Plan Confirmation Order or the occurrence of the Bankruptcy Plan Effective Date absent the prior written consent of the Settling Insurers.

2.3     The Debtor Parties shall seek and obtain entry of an order from the Bankruptcy Court, which order shall be in form and substance acceptable to the Parties, that: (i) approves the Plan pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code; (ii) contains the Channeling Injunction; (iii) ratifies the Sale Injunction as independent of the Channeling Injunction and Supplemental Settling Insurers' Injunction; (iv) contains the Gatekeeper Injunction; (v) provides that this Settlement Agreement is binding on any Settlement Trust created in the Bankruptcy Case, the Reorganized Debtor, the Reorganized Additional Debtors, and any successors of the Settlement Trust, Reorganized Debtor, or Reorganized Additional Debtors, and all of the Archdiocese Bound Parties; and (vi) contains the Controlling Document Provision (the "**Plan Confirmation Order**").

2.3.1   The Plan and Plan Confirmation Order must not be inconsistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties.

2.3.2   In seeking to obtain the Plan Confirmation Order, the Debtor and Additional Debtors will: (i) seek a confirmation hearing on an appropriately timely basis; (ii) urge the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) take all reasonable steps to defend against any objection, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order.

2.3.3   Prior to entry of the Plan Confirmation Order, the Archdiocese and/or any applicable Additional Debtor shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Abuse Claim that (i) is asserted against any Debtor Party and (ii) implicates, or is reasonably likely to implicate, any Archdiocese Insurance Policies (including by alleging Abuse that took place during any policy period of any Archdiocese Policy).  If, prior to the Plan Confirmation Order becoming a Final Order, the Bankruptcy Court allows any Entity to prosecute any such Abuse Claim, the Debtor Parties shall defend themselves against such Abuse Claims and comply with the terms of any order of the Bankruptcy Court, and Insurer's rights and obligations relating to such litigation shall be determined by, and subject to, the terms and conditions of the Archdiocese Policies, this Settlement Agreement, and any applicable orders of the Bankruptcy Court.

2.3.4   The Plan and Plan Confirmation Order shall provide that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any Covered Party with respect to any Archdiocese Policy, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as

confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

2.3.5    Nothing in this Section or elsewhere in this Settlement Agreement shall bar any party from arguing that any appeal from the Plan Confirmation Order should be dismissed on grounds of statutory or equitable mootness or otherwise.

2.3.6    None of the releases, Injunctions, or other provisions of the Plan with apply to, or have any effect, on the rights of the Settling Insurers to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with any Settling Insurer's Policy.

2.4    The Settlement Trust Documents shall require the Settlement Trust to register as a Responsible Reporting Entity under the reporting provisions of MMSEA.

2.4.1    The Settlement Trust Documents shall require the Settlement Trust, at its sole expense, to timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated and to follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

2.4.2    The Settlement Trust Documents shall require the Settlement Trust to obtain, prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Abuse Claim, a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. §1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim.

2.5    The Debtor Parties and Reorganized Debtor and Reorganized Additional Debtors will undertake commercially reasonable actions to cooperate with Insurer in connection with responding to any inquiry from Insurer's regulators, auditors, reinsurers, or retrocessionaires.

2.6    From and after the execution date of this Settlement Agreement and until the earlier of: (A) occurrence of (i) the Settlement Agreement Effective Date and (ii) Insurer's remittance of the Settlement Amount (at which time this covenant is superseded by the releases provided in Section 4); and (B) the date on which this Settlement Agreement is terminated, (i) none of the Insurer Released Parties, the Debtor, the Additional Debtors or Creditors' Committee will initiate any litigation activity against the other in any Bankruptcy Case and (ii) the Archdiocese and the Insurer Released Parties shall cease all litigation activities against each other in the Bankruptcy Case, including that the Insurer Released Parties will neither object to any proposed Plan consistent with this Settlement Agreement, nor serve or compel any discovery in connection with the Bankruptcy Case; *provided that*: (y) neither the Archdiocese nor any Additional Debtor shall include any provision in any Plan that adversely affects the rights or benefits of the Insurer Released Parties under this Settlement Agreement, or that otherwise violates, or is contrary to, the

agreements and covenants contained in this Settlement Agreement; and (z) neither the Archdiocese nor any Additional Debtor shall act, or fail to act, in such a way that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement. Notwithstanding the foregoing, the Insurer Released Parties may participate in the Bankruptcy Case for the purpose of supporting or enforcing any of the terms of this Settlement Agreement and protecting their rights.

2.7    From and after the execution date of this Settlement Agreement and until the date on which this Settlement Agreement is terminated, the obligations of the Debtors Parties set forth in this Section 2 shall be binding on the Debtor Parties.

## 3.    PAYMENT OF THE SETTLEMENT AMOUNTS

3.1    By no later than thirty (30) days after (a) the Settlement Agreement Effective Date, and (b) Insurer receiving appropriate instructions for the transmission of the payment to the Escrow Agent or Settlement Trust, Insurer shall pay (or cause to be paid) the Settlement Amount to the Settlement Trust or Escrow Agent pursuant to the Escrow Agreement.   Payment of the Settlement Amount may be by check, ACH transfer, wire transfer, or other method.

3.1.1    [Intentionally Omitted.]

3.2    The delivery of the Settlement Amount to the Escrow Agent or Settlement Trust shall be in full and final settlement of all responsibilities under and arising out of the Archdiocese Policies, the sale of the Purchased Property to Insurer free and clear of all Subject Interests of any Entity, and the other releases provided.

3.3    Subject to the occurrence of the Settlement Agreement Effective Date, the Parties agree:  (i) the Settlement Amount is the total amount that Insurer is obligated to pay on account of any and all Claims under, arising out of, relating to, or in connection with the Archdiocese Policies (including Barred Claims, and any reimbursement obligations for Conditional Payments under the MSPA); (ii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of anyone in connection with the Archdiocese Policies, including any payments in connection with amounts allegedly owed under the MSPA or in connection with any Claims, including any Barred Claim; (iii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of the Archdiocese Bound Parties or any Abuse Claimants in connection with the Archdiocese Policies; and (iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted. The Parties further agree that the Settlement Amount includes the full purchase price of the Archdiocese Policies and Related Insurance Claims and Coverage Claims of the Archdiocese Bound Parties and consideration for the releases and other protections afforded by this Settlement Agreement.

3.4    The Parties represent and agree that (i) the consideration to be provided by Insurer pursuant to this Settlement Agreement constitutes a fair and reasonable compromise and exchange for the consideration granted to the Insurer Released Parties in this Settlement Agreement

(including the releases set forth below), and (ii) the consideration to be provided by the Archdiocese Bound Parties to the Insurer Released Parties pursuant to this Settlement Agreement (including the releases set forth below) constitutes a fair and reasonable compromise and exchange for the consideration granted to the Archdiocese Bound Parties in this Settlement Agreement. The Insurer Released Parties are not acting as volunteers, and the Settlement Amount reflects potential liabilities and obligations to the Archdiocese Bound Parties of the amount Insurer allegedly is obligated to pay.

3.5    Each of the Archdiocese Signatory Parties: (i) consents to the sale of the Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests and Claims of all Persons, including, without limitation, the Archdiocese Bound Parties in accordance with the terms of this Settlement Agreement, and (ii) agrees and acknowledges that the contribution of the proceeds from such sale and settlement to the Settlement Trust, as provided in the Plan and this Settlement Agreement, is a fair and reasonable compromise and exchange for value and constitutes reasonable and adequate consideration for any Subject Interest or Claim the Archdiocese Bound Parties may have in the Archdiocese Policies.

3.6    The Parties further agree that they have attempted to resolve the matters set forth herein in compliance with both state and federal law and believe that the settlement terms adequately consider CMS's interest and do not reflect any attempt to shift responsibility for payment of medical expenses to CMS pursuant to 42 U.S.C. § 1395y(b). The Parties acknowledge, understand, and agree that any present or future action or decision by CMS, including actions regarding an Abuse Claimant's eligibility or entitlement to receive Medicare or Medicare payments, will not render this Settlement Agreement (including the releases set forth in it) void or ineffective, or in any way affect the finality of this Settlement Agreement. The Settlement Trust is responsible for all future medical payments, including any and all claims by CMS and/or CMS contractors that have been or may be in the future arising out of, relating (directly or indirectly) in any way to, or in connection with this Settlement Agreement.

3.7    To facilitate the purchase of the Purchased Property as set forth herein, each Archdiocese Bound Party is authorized to designate a lawful attorney in fact, with full powers of substitution, to execute any bill of sale or other document reasonably requested by the Archdiocese or Insurer to accomplish the sale and purchase contemplated herein. A form of Bill of Sale is attached hereto as **Exhibit B**.

## 4.    RELEASES AND SALE FREE AND CLEAR

4.1    Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, with no further action being required, the Archdiocese Signatory Parties fully, finally, and completely remise, release, acquit, and forever discharge the Insurer Released Parties (including, for the avoidance of doubt, any of their reinsurers or retrocessionaires, solely in their capacity as such), from any and all past, present, and future: (a) Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies or Claims that are covered or are determined to be covered by agreement or a court of competent jurisdiction under the Archdiocese Policies, including, without limitation, any Barred Claims, Direct Action Claims, reimbursement obligations for Conditional

Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims, the handling of the Abuse Claims or the Bankruptcy Case. The Archdiocese Signatory Parties further acknowledge, stipulate, and agree that (x) the releases in this Section 4.1 specifically include all Unknown Abuse Claims, and demands that are based in whole or in part on Unknown Abuse Claims and (y) **with respect to all Claims released under this Section 4.1, the Archdiocese Signatory Parties waive any and all provisions, rights, and benefits conferred by Cal. Civ. Code 1542 or any law of any state of the United States, or any principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code 1542, which provides: "a general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, that, if known by him or her, would have materially affected his or her settlement with the debtor or released party"** and (z) the releases in this Section 4.1 shall be equal in breadth to the broadest releases and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

4.2     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, and with no further action being required, Insurer shall fully, finally, and completely remise, release, acquit, and forever discharge the Archdiocese Signatory Parties from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies, including any Barred Claims, and reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case subject to the protections in favor of the Insurer Released Parties set forth herein.

4.3     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, none of the Archdiocese Signatory Parties or other Archdiocese Bound Parties shall assert against the Insurer Released Parties any Claim with respect to any matter, conduct, transaction, occurrence, fact, or other circumstance that, directly or indirectly, arises out of, relates to, or is in connection with any of the Archdiocese Policies, any Barred Claim, or any other matter released pursuant to Sections 4.1 and 4.2 above.

4.4     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer hereby buys back the Archdiocese Policies free and clear of all Subject Interests, including without limitation all Coverage Claims and Related Insurance Claims, of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); and any Abuse Claimant, or any other holder of a Barred Claim.  This sale is pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code.  The Parties acknowledge and agree, and the Approval Order shall find and conclude, that upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount:

4.4.1     Insurer is a good faith purchaser of the Archdiocese Policies and any Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), within the meaning of section 363(m) of the

Bankruptcy Code, with all the protections afforded such a purchaser under 363(m) of the Bankruptcy Code;

4.4.2   the consideration exchanged constitutes a fair and reasonable settlement and compromise of the Parties' disputes and of their respective rights and obligations relating to the foregoing Archdiocese Policies and Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), and constitutes reasonably equivalent value;

4.4.3   the releases in this Settlement Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy law;

4.4.4   the Archdiocese Policies and all Subject Interests therein (including, without limitation, to the extent applicable, any Direct Action Claim) shall be terminated and of no further force and effect;

4.4.5   Insurer's payment of the Settlement Amount constitutes Insurer's full and complete performance of any and all obligations under the Archdiocese Policies, including any performance owed to the Archdiocese Bound Parties or any holder or purported holder of any Claim against (including any Abuse Claim or Direct Action Claim) or Subject Interest in, the Archdiocese Policies, and exhausts all limits of liability of the Archdiocese Policies;

4.4.6   All Subject Interests the Archdiocese Bound Parties and any other Entity may have had, may presently have, or in the future may have in the Archdiocese Policies are released pursuant to the terms of this Settlement Agreement and policy buyback;

4.4.7   all per occurrence and/or aggregate limits of coverage under the Archdiocese Policies are fully eroded, exhausted and settled upon the Settlement Agreement Effective Date;

4.4.8   the Insurer would not pay the Settlement Amount without buyback of the Archdiocese Policies upon all of the terms and conditions set forth herein; and

4.4.9   the Archdiocese Signatory Parties accept the Settlement Amount in full and complete compromise and satisfaction of all Insurer Released Parties' past, present, and future obligations, including any obligations to any of the Archdiocese Bound Parties under such Archdiocese Policies or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever that are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies (including without limitation Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether or not such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, the Bankruptcy Case, or otherwise.

4.5     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer shall have no obligation to pay, handle, object, or otherwise respond to any Claim against the Archdiocese Bound Parties; and the Archdiocese Bound Parties will: (i) will withdraw, and are deemed to have withdrawn, all outstanding tenders of Claims to the Insurer Released Parties for defense and indemnity; (ii) will not tender any Claims to the Insurer Released Parties; and (iii) will not request that the Insurer Released Parties fund any judgments, settlements, or defense costs that, in each case, are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies issued by a Settling Insurer.

4.6     To the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer consent to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under this Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Subject Interests of any Entity in such Archdiocese Policies (the "**Non-Debtor Catholic Entity Policy Sale**"). The Plan Confirmation Order and Approval Order shall so provide and Insurer shall be designated in the Plan Confirmation Order as a good-faith purchaser of the Archdiocese Policies with all the protections afforded such a purchaser under section 363(m) of the Bankruptcy Code.

4.7     [Intentionally Omitted.]

4.8     The Archdiocese Signatory Parties further covenant, stipulate and agree that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Abuse Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any insured or additional insured covered by any insurance policy issued by any Insurer Released Party, and to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in any Archdiocese Policy to the Debtor's Estate and sale thereof to Insurer, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court. Without limiting the foregoing, the Insurer Released Parties shall receive protections against Claims by Non-Debtor Catholic Entities and any other Entity equal in breadth to the broadest protections received by any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, or any Insurance Settlement Agreement approved by the Bankruptcy Court.

4.9     If the Archdiocese Signatory Parties, or anyone of them, enter into any agreement (that is embodied in such agreement as approved by the Bankruptcy Court, the Plan, and/or the Plan Confirmation Order) with any other one of the Settling Insurers (including any Non-Settling Insurer who becomes a Settling Insurer) in the Bankruptcy Case, that provides that insurer with releases, injunctions or other protections that are more favorable than those contained in this Settlement Agreement, then this Settlement Agreement shall be deemed to be modified to provide Insurer with those more favorable injunctions, releases or other protections.

996

4.10    Notwithstanding anything in this Settlement Agreement, nothing in this Settlement Agreement is intended to or shall be construed to:

    4.10.1    apply to or have any effect on the Insurer Released Parties' rights to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer;

    4.10.2    release any Claims that any Insurer Released Party has or might have against any Non-Settling Insurer, except that, to the extent such other insurers have agreed or in the future agree to release any Claims against the Insurer Released Parties arising out of or related in any way to the Abuse Claims, then the Insurer Released Parties also release such Claims against such other insurers to the same extent; or

    4.10.3    release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Settlement Agreement or the Plan (to the extent not inconsistent with this Settlement Agreement).

## 5.    TERMINATION OF AGREEMENT

5.1    The Parties may terminate this Settlement Agreement by mutual agreement in writing.

5.2    Insurer may terminate this Settlement Agreement upon fifteen (15) days written notice to the other Parties in the event of any of the following occurs prior to the Settlement Agreement Effective Date: (i) any of the Debtor Parties or the Creditors' Committee files a plan inconsistent with this Settlement Agreement; (ii) the Approval Order and the Plan Confirmation Order are not entered by February 15, 2026; (iii) the Bankruptcy Court enters an order that becomes a Final Order that (a) denies the Approval Motion or (b) is inconsistent with the Approval Order or the Plan Confirmation Order; (iv) a plan that is inconsistent with the terms of this Settlement Agreement is confirmed; or (v) any Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

5.3    In the event of termination pursuant to this Section 5, unless the Parties agree otherwise in writing, the Parties' interests, rights, and obligations under the Archdiocese Policies shall not be impacted by such termination.

## 6.    REPRESENTATIONS AND WARRANTIES OF THE PARTIES

6.1    The Parties separately represent and warrant as follows:

    6.1.1    To the extent it is a corporation, including a non-profit, religious, or charitable corporation, or other legal entity, each such Party has the requisite power and authority to enter into this Settlement Agreement and to perform the obligations

contemplated by this Settlement Agreement[1], subject only to approval of the Bankruptcy Court; and

6.1.2   This Settlement Agreement has been analyzed by counsel to the Parties and executed and delivered in good faith pursuant to arm's length negotiations and for value and valuable consideration.

6.2   The Archdiocese Signatory Parties represent and warrant that they have not assigned, and will not assign, any Subject Interests in the Archdiocese Policies to any Entity, except for the avoidance of doubt, the assignment of the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate.

6.3   The Archdiocese Signatory Parties represent and warrant that (i) all Archdiocese Bound Parties have either signed this agreement, are represented herein by the Archdiocese or the Archdiocese Signatory Parties, or are juridical entities whose existence has been terminated as a matter of applicable non-bankruptcy law and (ii) the Archdiocese Signatory Parties are duly authorized to bind the Archdiocese Bound Parties who are not Archdiocese Signatory Parties. Without limiting the foregoing, the Archdiocese Signatory Parties represent and warrant that:

6.3.1   all entities known to them that are Co-Insured Parties under the Archdiocese Policies (by express reference, assignment, judicial determination or any related concept under applicable law or other document) other than the Debtor, the Additional Debtors, the Parish Schools and Archdiocesan Schools, the Non-Debtor Catholic Entities, and the cemeteries identified in Section 6.3.3, are identified in Schedule 2 hereto, if any;

6.3.2   the Archdiocesan Schools are not separately incorporated and are merely unincorporated operations of the Debtor and the Parish Schools are not separately incorporated and are merely unincorporated operations of the Archdiocesan Parishes that are Additional Debtors;

6.3.3   the Debtor, through the Office of Catholic Cemeteries, operates certain cemeteries including, without limitation: All God's Babies Tomb & Holy Innocents Prayer Garden, St. Charles Cemetery, St. Joseph Cemetery #1, St. Joseph Cemetery #2, St. Louis Cemetery #1, St. Louis Cemetery #2, St. Louis Cemetery #3, St. Patrick Cemetery #1, St. Patrick Cemetery #2, St. Patrick Cemetery #3, St. Roch Cemetery #1, St. Roch Cemetery #2, St. Vincent De Paul Cemetery #1, St. Vincent DePaul Cemetery #2, which cemeteries are either: (a) Non-Debtor Catholic Entities or (b) not separately incorporated and are merely unincorporated operations of the Debtor;

6.3.4   Holy Redeemer School, Redeemer-Seton High School, and St. Joseph Benedictine High School were formerly owned and operated by the Archdiocese, but ceased operations and were closed by the Debtor at some point prior to the Petition Date,

---

[1] Specifically, each Archdiocese Signatory Party is duly authorized to execute this Settlement Agreement and any related document and the signatory hereto on behalf of such Archdiocese Signatory Party has full power and authority to bind such Archdiocese Signatory Party. The related corporate resolutions and incumbency certificates are identified in Schedule 4 and Schedule 5 respectively.

998

and were not separately incorporated and were merely unincorporated operations of the Debtor;

6.3.5    St. Robert Bellarmine School was formerly owned and operated by one or more of the Archdiocese Signatory Parties, but ceased operations and was closed by one or more of the Archdiocese Signatory Parties at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of one of the Additional Debtors;

6.3.6    Notre Dame Seminary and the Society of the Propagation of the Faith of the Archdiocese of New Orleans are owned and operated by the Archdiocese and are not separately incorporated, but are merely unincorporated operations of the Debtor;

6.3.7    San Pedro Pescador Church was owned and operated by the Archdiocese, but was closed by the Archdiocese prior to the Petition Date and was not separately incorporated, but was merely an unincorporated operation of the Archdiocese;

6.3.8    the following Roman Catholic Schools: the Academy of the Sacred Heart, Holy Cross, Jesuit, St. Mary's Academy, St. Mary's Dominican, Brother Martin, Mount Carmel Academy, Ursuline Academy, Cabrini, De La Salle, and St. Paul's School, are not Co-Insured Parties, named insured's or additional insureds (or related concept under applicable law or document) under the Archdiocese Policies, or institutions, religious organizations or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control and active management, and were themselves not under the control or active management of the Archdiocese;

6.3.9    St. John Vianney Preparatory School was formerly owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.10  the Louise Home a/k/a as the Louise Headstart Center was an unincorporated ministry of the Debtor;

6.3.11  Holy Guardian Angel was owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.12  the Social Apostolate Housing Program was an unincorporated ministry of the Debtor;

6.3.13  at all times Tulane Catholic and the Newman Center were and are unincorporated activities of the Debtor, with no existence separate and apart from the Debtor;

6.3.14  Crescent City Convent Corporation, Lyric Realty and Parking Company, Inc., The Chinchuba Deaf-Mute Institute, People for Teens of St. Anthony of Padua

Corporation, Kiwanis Foundation of New Orleans, Kiwanis Club of New Orleans, and Seminarians Parents Association, Inc. were never owned, operated, or controlled by the Debtor or the Additional Debtors and were neither insureds nor additional insureds under the Archdiocese Policies; and

6.3.15   (a) Catholic Charities Archdiocese of New Orleans ("**Catholic Charities**") owned and operated Hope Haven – Madonna Manor ("**HH**"), which was organized under Louisiana law; (b) HH was dissolved and its status as a juridical person was, thus, terminated as a matter of Louisiana law; (c) at all times, Catholic Charities was the sole member and/ or shareholder of HH; and (d) it is the intention of Catholic Charities that HH be bound by this Agreement as if it remained in existence and had signed the Agreement as a Party.

6.4     The Archdiocese Signatory Parties represent and warrant that they are not aware of any Abuse Claim asserted against any entity associated with the Archdiocese (including any parishes, institutions or religious organizations or any subsidiary of the person or organization listed in the declarations of the Archdiocese Policies, or any other organization coming under the Archdiocese's control and active management), that is not listed on Exhibit B-1 to the Acceptable Plan.

6.5     The Debtor represents and warrants that it will undertake good faith efforts to cause actual notice of the Approval Motion to be sent in accordance with Section 2.1.1 hereof.  Without limitation, the Debtor has sent or will send notice to the entities on Schedule 3.

6.6     The Archdiocese Signatory Parties and Insurer (limited to such Insurer person that worked on and were familiar with this Settlement Agreement and matters referenced therein), respectively, represent and warrant that they have completed a reasonable search for evidence of any policy of insurance issued by Insurer to the Archdiocese Signatory Parties that would afford coverage with respect to any Abuse Claim, Coverage Claim, or Related Insurance Claim and other than the policies identified in Schedule 1, no such policies have been identified.  The Archdiocese Signatory Parties further represent and warrant that, to the best of their knowledge after reasonably diligent investigation: there are no contracts, binders, certificates, and policies of insurance that insure or purport to insure (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) (x) the Diocese of Houma-Thibodaux or (y) the Diocese of Baton Rouge (excluding, for the avoidance of doubt, policies issued to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD, but including any such policies issued to the Archdiocese that provide or may provide insurance coverage to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD), or (iv) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, other than the policies identified in Schedule 1. Notwithstanding the foregoing, nothing in this Settlement Agreement, including the Schedules or Exhibits hereto, shall be construed as or deemed to be an admission or evidence that any binder, certificate, or policy of insurance was in fact issued or affords coverage in connection with any Abuse Claims.

6.7    The Debtor Parties represent and warrant that they have not in any way assisted, and covenant that they shall not in any way assist, any Entity in the establishment or pursuit of any Claim, including any Barred Claim, against the Insurer Released Parties.

## 7.    ACTIONS INVOLVING THIRD PARTIES

7.1    For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Archdiocese Policies resulting from the purchase and sale thereof contemplated by this Settlement Agreement, the Parties hereby agree as follows:

7.1.1    From and after (i) the occurrence of the Settlement Agreement Effective Date, and (ii) Insurer's payment of the Settlement Amount, if any other insurer of the Archdiocese Bound Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from Insurer as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for any of Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense or indemnity obligation of Insurer for any Claims or reimbursement obligations for Conditional Payments released or resolved pursuant to this Settlement Agreement, the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and the Settlement Trust shall voluntarily reduce any judgment or Claim against, or settlement with, such other insurers to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against Insurer. To ensure that such a reduction is accomplished, Insurer shall be entitled to assert this Section 7 as a defense to any action against it brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Insurer from any liability for the judgment or Claim. Moreover, if a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against Insurer, such Claim may be asserted as a defense against a Claim by the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust in any coverage litigation (and the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and/or the Settlement Trust may assert the legal and equitable rights of Insurer in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust shall be reduced dollar for dollar by the amount so determined.

7.1.2    Unless this Settlement Agreement is terminated, Insurer shall not seek reimbursement for any payments it makes under this Settlement Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other Settling Insurer unless that other insurer first seeks contribution, subrogation, indemnification, or similar relief from Insurer. Notwithstanding the foregoing, nothing in this Settlement Agreement, the Approval Order or the Plan Confirmation Order shall be construed as prohibiting Insurer from seeking recovery (including with respect to the Settlement Amount or otherwise) from its reinsurers or retrocessionaires in their capacity as such.

7.2    Subject to the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, and subject to the limitations set forth below, the Settlement

Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein, including any Claims made by (i) any Entity who is an insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies; (ii) any Entity who makes (a) an Abuse Claim or (b) a Related Insurance Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a Claim under any of the Archdiocese Policies (collectively, the "**Indemnified Claims**"), as set forth below:

7.2.1    The Insurer Released Parties shall have the right (but not the obligation) to (a) seek to enforce the Injunctions against any Entity seeking to assert an Indemnified Claim, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions) identified in this Section 7.2.  With the Insurer Released Parties' consent, such consent not to be unreasonably withheld, the Settlement Trustee can satisfy the obligations contained in (a) and (b) above.  An amount equal to $3,451(the "**Indemnity Cost Reserve**") shall be reserved from the Settlement Amount for payment of reasonable attorneys' fees, expenses, costs, and other amounts incurred by the Insurer Released Parties in defending against such Indemnified Claims, which amount shall be released from reserve if no Indemnified Claims are asserted within 30 days after the Revival Window has closed under every applicable Revival Window Law.

7.2.2    Neither any Archdiocese Bound Party, nor the Settlement Trust shall in any way assist, any Entity in the establishment or pursuit of any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein.

7.2.3    The Settlement Trust and Archdiocese shall support and join in the enforcement of the Injunctions against any Entity seeking to assert an Indemnified Claim; *provided that* if the Insurer Released Party(ies) elect(s) not to enforce the Injunctions in accordance with Section 7.2.1, the Settlement Trust shall (a) seek to enforce the Injunctions against such Entity, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions).

7.2.4    To the extent that a Final Order is entered against any Insurer Released Party with respect to any Indemnified Claim, the Settlement Trust shall indemnify and hold harmless such Insurer Released Party with respect thereto up to the Settlement Amount; *provided that* to the extent the Insurer Released Party(ies) elect not to enforce the Injunctions or defend against the Indemnified Claims, the Settlement Trust's indemnity obligation shall be limited to the amount of the Indemnity Cost Reserve; *provided further* that if the Settlement Trust breaches its obligation set forth in Section 7.2.2 hereof, the Settlement Trust's indemnity obligation shall not be so limited and shall instead be up to the Settlement Amount.  In no event shall the Settlement Trust's indemnity obligation exceed each individual Settling Insurer's Settlement Amount.  To the extent the Settlement Amount has been distributed in accordance with the Plan, the Settlement Trust's indemnification obligation shall be so reduced.

7.2.5   The indemnification provided for herein shall not impose liability on the Settlement Trustee or Settlement Trust professionals for their own acts or omissions; *further*, funds provided for the administration of the Settlement Trust or payment of the Settlement Trustee or Settlement Trust professionals shall not be subject to indemnification claims as provided for herein.

7.3     If any Entity attempts to prosecute a Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies against the Insurer Released Parties before the Approval Order and Plan Confirmation Order become Final Orders, then promptly following notice to do so from Insurer, the Archdiocese and/or the Additional Debtor(s), as applicable, will file a motion and supporting papers to obtain an order from the Bankruptcy Court pursuant to sections 362 and 105(a) of the Bankruptcy Code protecting the Insurer Released Parties from any such Claims until the Plan Confirmation Order has become a Final Order, the Bankruptcy Case is dismissed, or this Settlement Agreement is terminated under Section 5 hereof.

## 8.   MISCELLANEOUS

8.1     If any action or proceeding of any type whatsoever is commenced or prosecuted by any Entity not a Party to this Settlement Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Settlement Agreement, the Parties mutually agree to cooperate fully in opposing such action or proceeding.

8.2     The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Settlement Agreement and to preserve its validity and enforceability.

8.3     The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Plan Confirmation Order, and the Bankruptcy Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof.

8.4     Notwithstanding any language to the contrary in this Settlement Agreement, under no circumstance will any Archdiocese Signatory Party be obligated to take any action that violates any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, and if a court of competent jurisdiction determines that a term or condition in this Settlement Agreement does violate any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, the applicable Archdiocese Signatory Party shall be relieved of such term or condition, but the scope and finality of the releases, injunctions, and buybacks set forth in this Settlement Agreement shall not be affected or modified.

8.5     This Settlement Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.6     This Settlement Agreement may be modified only by a written amendment signed by all of the Parties, and no waiver of any provision of this Settlement Agreement or of a breach

1003

thereof shall be effective unless expressed in a writing signed by the waiving Party. The waiver by any Party of any of the provisions of this Settlement Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach. Any change or modification of this Agreement that would result in a material adverse change to the rights of the Abuse Claimants or Trust shall require the consent of the Creditors' Committee (if at the time of the proposed change or modification a Trustee has not been appointed) or Settlement Trustee (if at the time of the proposed change or modification a Trustee has been appointed and approved), as applicable, which consent shall not be unreasonably withheld.

8.7 By entering into this Settlement Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Settlement Agreement. No part of this Settlement Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Settlement Agreement. All actions taken and statements made by the Parties or by their representatives relating to this Settlement Agreement or participation in this Settlement Agreement, including its development and implementation, shall be without prejudice or value as precedent.

8.8 This Settlement Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession regarding liability, culpability, wrongdoing, or insurance coverage. All related discussions, negotiations, and all prior drafts of this Settlement Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. Any evidence of the negotiations or discussions associated with this Settlement Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.8, in (i) an action or proceeding to enforce the terms of this Settlement Agreement, including any use as set forth in Section 7.1.1, or (ii) any possible action or proceeding between the Insurer Released Parties and any reinsurers. This Settlement Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Insurer Released Parties' obligations under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer.

8.9 None of the Parties shall make any public statements or disclosures (i) regarding another Party's rationale or motivation for negotiating or entering into this Settlement Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued or determined by agreement or a court of competent jurisdiction to have been issued by the Insurer Released Parties, including handling of or involvement in connection with any claims asserted thereunder.

8.10 Neither this Settlement Agreement nor the rights and obligations set forth in this Settlement Agreement shall be assigned without the prior written consent of the other Parties.

8.11    This Settlement Agreement was jointly drafted by the Parties, and the wording of this Settlement Agreement was reviewed by legal counsel for each of the Parties, and each of them had sufficient opportunity to propose and negotiate changes prior to its execution.  The language of all parts of this Settlement Agreement shall in all cases be construed as a whole according to its meaning and not strictly for or against any Party.

8.12    Section titles and headings contained in this Settlement Agreement are included only for ease of reference and shall have no substantive effect.

8.13    All notices, demands, or other communication to be provided pursuant to this Settlement Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other Entity or address as any of them may designate in writing from time to time:

If to the Debtor or Reorganized Debtor:

Mark A. Mintz
Samantha A. Oppenheim
Jones Walker LLP
Telephone: 504-582-8368
Telephone: 504-582-8641
Email: mmintz@joneswalker.com
Email: soppenheim@joneswalker.com

with copies to:


-and-

If to an Archdiocese Signatory Party other than a Debtor Party:

As set forth on Plan Exhibit B-2.

If to Insurer or the Insurer Released Parties:

Kevin J. Larner
Associate General Counsel
Corporate Litigation
American International Group, Inc. (AIG)
300 Kimball Drive, Suite 500, Parsippany, NJ 07054
Telephone: 212-458-7101
Telephone: 917-574-4482
Email: kevin.larner@aig.com

with copies to:

Robert W. DiUbaldo
Alex B. Silverman
Nora A. Valenza-Frost
Carlton Fields, P.A.
405 Lexington Avenue, 36th Floor
New York, New York 10174-0002
Telephone: 212-785-2577
Email: rdiubaldo@carltonfields.com
Email: asilverman@carltonfields.com
Email: nvalenza-frost@carltonfields.com

If to the Settlement Trust:

Donald C. Massey
Couhig Partners, LLC
1100 Poydras Street, Suite 3250
New Orleans, Louisiana 70163
Telephone: (504) 599-5777
Email: dmassey@couhigpartners.com

        with copies to:

Andrew W. Caine
Pachulski, Stang, Ziehl & Jones LLP
10100 Santa Monica Blvd, Suite 1300
Los Angeles, CA 90067
Telephone: 310-277-6910
Email: acaine@pszjlaw.com

8.14    This Settlement Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument.  This Settlement Agreement may be executed and delivered by facsimile, e-mail, or other electronic image, which facsimile, e-mail, or other electronic image counterparts shall be deemed to be originals.

8.15    Nothing contained in this Settlement Agreement shall be deemed or construed to constitute (i) an admission by the Insurer Released Parties that the Archdiocese Bound Parties, or any other Entity, was or is entitled to any insurance coverage under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by the Insurer Released Parties or as to the validity of any of the positions that have been or could have been asserted by the any of the Archdiocese Bound Parties, (ii) an admission by any of the Archdiocese Bound Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by the Insurer Released Parties or any Claims that have been or could have been asserted by the Archdiocese Bound Parties against the Insurer Released Parties, or (iii) an admission by the Archdiocese Bound Parties or the Insurer Released Parties of any liability whatsoever with respect to any of the Abuse Claims.

8.16    The Parties to this Settlement Agreement, all of the Entities included in the definition of "Insurer Released Parties," and the Settlement Trust are intended beneficiaries of this Settlement Agreement.  Except as set forth in the preceding sentence or otherwise set forth in this Settlement Agreement, there are no third-party beneficiaries of this Settlement Agreement.

8.17    The Archdiocese Signatory Parties and the Insurer Released Parties shall each be responsible for their own fees and costs incurred in connection with the Bankruptcy Case, this Settlement Agreement, and the implementation of this Settlement Agreement, except as specifically set forth herein (including in Section 7).

8.18    The following rules of construction shall apply to this Settlement Agreement:

8.18.1 Unless the context of this Settlement Agreement otherwise requires: (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Settlement Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.18.2 References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Settlement Agreement.

8.18.3 The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Settlement Agreement when the stated intent is not achieved.

8.19    The Bankruptcy Court in the Bankruptcy Case shall retain jurisdiction to interpret and enforce the provisions of this Settlement Agreement, which shall be construed in accordance with Louisiana law without regard to conflicts of law principles thereof.  The Insurer Released Parties do not, by virtue of this Section 8.19 or any other provision in this Settlement Agreement, consent to the Bankruptcy Court's jurisdiction as to any other matter.

8.20    This Settlement Agreement and each Debtor Party's obligations under this Settlement Agreement shall be binding on each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) and shall survive the entry of the Plan Confirmation Order; provided, however, after the occurrence of the Bankruptcy Plan Effective Date, recourse for all obligations, other than those set forth in Sections 6.5, 6.7, and 7 hereof or a remedy of specific performance, shall be to the Settlement Trust; provided further, however, if specific performance is not available, each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) may be held liable for an intentional breach of a representation in this Agreement or their bad faith material breach of this Agreement, and if liability on any such ground is established, then recourse may be had directly against the Debtor Party, Reorganized Debtor, and/or Reorganized Additional Debtor(s) responsible.

8.21    The obligations of the Parties herein, other than those conditioned upon the Settlement Agreement Effective Date, shall be binding upon execution hereof by the Parties.

8.22     Nothing in this Settlement Agreement will prevent Insurer from allocating the Settlement Amount among the Archdiocese Policies at Insurer's discretion.

8.23     If any provision of this Settlement Agreement, or the application thereof, shall for any reason or to any extent, be construed to be invalid or unenforceable, the remainder of this Settlement Agreement, and the application of such provision to other circumstances, shall be interpreted so as to best effect the intent of the Parties, unless such determination of invalidity or unenforceability deprives any Party of the substantial benefit of its bargain.

8.24     The Parties agree that all matters relating to the negotiation and terms of this Settlement Agreement (including by way of example and not limitation, all prior drafts, exchanges of terms, and related discussions or correspondence) shall be confidential and are not to be disclosed except by order of court or consent of the Parties in writing.  This Section 8.24 does not prevent or prohibit the Parties from publicly filing on the docket in the Bankruptcy Case the final, executed copy of this Settlement Agreement.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

### The Roman Catholic Archdiocese of New Orleans

Signed: _____

_____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**National Union Fire Insurance Company
of Pittsburgh, Pa.**

Signed:

_____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**All Archdiocese Signatory Parties**
**Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title: **Their Authorized Signer** _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**Exhibit A**

**Sale Order**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-10846 (MSG) |
| | § | |
| THE ROMAN CATHOLIC CHURCH | § | CHAPTER 11 |
| OF THE ARCHDIOCESE OF NEW | § | |
| ORLEANS, *et al.*,[1] | § | SECTION A |
| | § | |
| DEBTORS. | § | COMPLEX CASE |
| | § | |

### ORDER (I) APPROVING NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.'S SETTLEMENT AGREEMENT, RELEASE AND BUYBACK, (II) APPROVING THE SALE OF THE ARCHDIOCESE POLICIES FREE AND CLEAR, (III) ENJOINING CLAIMS, AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated July 29, 2025 [D.E. 4181] and supplemented by the filing of the revised Settlement Agreement (as defined below) on October 27, 2025 [D.E.[*]] ("Approval Motion") of The Roman Catholic Church of the Archdiocese of New Orleans, the lead debtor and debtor-in-possession (the "Debtor" or "Archdiocese") and the other debtors and debtors-in-possession[2] (the "Additional Debtors" and, together with the Archdiocese, the "Debtor Parties") in the above-captioned chapter 11 cases, by and through their respective counsel, for entry of an order (this "Order") approving the settlement agreement, releases, insurance policy buyback, and related injunction-in-aid ("Settlement") by and among the Archdiocese, the Additional Debtors, the other Archdiocese Signatory Parties, the Creditors' Committee, and National Union Fire Insurance Company of Pittsburgh, Pa. ("Insurer" and, collectively with the foregoing, the "Parties"), pursuant to Sections 105(a) and 363 of Title 11 of the United States Code ("Bankruptcy

---

[1]    The last four digits of the Debtor's federal tax identification number is 8966.

[2]    In connection with the Plan, the Catholic Entities listed on Plan **Exhibit B-1** (the "**Additional Debtors**") filed individual chapter 11 cases. The Plan is a combined joint Plan for the Archdiocese and the Additional Debtors, and the Approval Motion is deemed to have been filed (and this Order is entered) in each Additional Debtor's bankruptcy case for purposes of the relief requested herein.

Code") and Rules 2002(a)(2), 6004, and 9019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), in each case as described in the Approval Motion and the *Settlement Agreement, Release, and Policy Buyback* attached to this Order as **Exhibit 1** (the "Settlement Agreement");[3] and the Bankruptcy Court having reviewed the Approval Motion and the Settlement Agreement; and it appearing that due and adequate notice of the Approval Motion and Settlement Agreement having been given to all Entities entitled thereto, and that no other or further notice need be given; and the Bankruptcy Court on November 17, 2025 at 9:00 AM having held a hearing (the "Sale Hearing") to consider the relief requested in the Approval Motion; and upon the record of the Sale Hearing; and, after due deliberation, including, without limitation, for the reasons stated by the Bankruptcy Court on the record of the Sale Hearing, it appearing that the relief requested in the Approval Motion and granted herein is in the best interests of the Debtor Parties' estates (the "Estates"), their creditors, and other parties in interest; and good sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.  This Bankruptcy Court has jurisdiction over the Approval Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of this case and the Approval Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.  The statutory predicates for the relief sought in the Approval Motion are Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007. 9008 and 9019,

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

and Rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Louisiana.

C.      It is necessary and appropriate for the Bankruptcy Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Settlement Agreement, and to adjudicate, if necessary, to the extent provided under 28 U.S.C. § 1334(b), any and all disputes arising from or relating to the Settlement Agreement or this Order.

D.      Proper, timely, adequate and sufficient notice of the Sale Hearing and Approval Motion and the relief requested therein, including, without limitation, the Settlement and the transactions described in the Settlement Agreement, including, without limitation, issuance of the injunction-in-aid referenced in the Settlement Agreement and the Approval Motion (all such transactions being collectively referred to, for convenience, as the "Sale Transaction") has been provided by the Debtor Parties in accordance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules to all interested Entities, including, without limitation the parties listed on **Schedule 3** of the Settlement Agreement, through service of the Confirmation Hearing Notice (as defined in the Plan) in accordance with the Disclosure Statement Order (also as defined in the Plan).

E.      Notice of the Approval Motion was provided through publication of the Additional Debtors' Abuse Claims Bar Date Publication Notice (**Plan Exhibit G**) in daily and community newspapers throughout Louisiana.

F.      The notices described above were good, sufficient, and appropriate under the circumstances, and no other notice of the Approval Motion or Sale Hearing is required.

G.      The disclosures made by the Debtor Parties concerning the Settlement Agreement, the Sale Transaction, and the Sale Hearing were good, complete, and adequate.

3

H.    The Unknown Abuse Claims Representative has consented to, and approved of the Settlement Agreement and Sale Transaction on behalf of Unknown Abuse Claims in connection with the treatment of such Claims under the Plan.

I.    A reasonable opportunity to object or be heard with respect to the Approval Motion and the relief requested therein has been afforded to all interested Entities.

J.    The Archdiocese Signatory Parties, on their own behalf and on behalf of the Archdiocese Bound Parties, as applicable, have duly executed the Insurance Settlement Agreement by their duly authorized representative, agent and/or attorney in fact, and have full corporate power and authority to consummate the Sale Transaction pursuant to the Settlement Agreement and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Settlement Agreement, are required for the Archdiocese Bound Parties to consummate the Sale Transaction.

K.    The Debtor Parties have demonstrated (i) good, sufficient, and sound business purpose and justification and compelling circumstances for the Sale Transaction pursuant to Section 363(b) of the Bankruptcy Code and (ii) that the Sale Transaction is fair, reasonable, and in the best interests of their Estates and creditors pursuant to Bankruptcy Rule 9019. Among other things, the Debtor Parties have demonstrated that: the Settlement Agreement, and closing thereon, is necessary and appropriate to realize the value of the Purchased Property (as defined below) and maximize the value of their Estates; the probability of success for their Estates in litigation over the matters resolved by the Settlement Agreement is uncertain; litigation of the matters resolved by the Settlement Agreement would be complex and costly to their Estates; and the Settlement Amount is within the reasonable range of potential litigation outcomes. As used herein, "Purchased Property" means, collectively, all right, title and interest (including "Interests" as defined below)

4

in and to the Archdiocese Policies issued by Insurer and the Related Insurance Claims and Coverage Claims; [**Intentionally Omitted.**] The Sale Transaction constitutes a reasonable and sound exercise of the Debtor Parties' business judgment and their powers and duties under applicable law and should be approved. Approval of the Settlement Agreement and consummation of the Sale Transaction are in the best interests of the Debtor Parties' Estates, their creditors (specifically including the Abuse Claimants of the Debtor Parties), and other parties-in-interest, including because the proceeds of and from the Sale Transaction will benefit Abuse Claimants.

L.    The Settlement Agreement was negotiated, proposed, and entered into without collusion, in good faith, and from arm's length bargaining positions. Without limiting the foregoing, the Settlement Agreement resulted from a lengthy mediation that proceeded pursuant to a prior order of the Bankruptcy Court. Insurer is not an "insider" or "affiliate" (as those terms are defined in the Bankruptcy Code) of any of the Debtor Parties. None of the Archdiocese Bound Parties or Insurer have engaged in any conduct that would: (i) cause or permit the avoidance of the Settlement Agreement or the consummation of the Sale Transaction under Section 363(n) of the Bankruptcy Code; (ii) cause or permit the imposition of any costs or damages (including without limitation attorneys' fees or punitive damages) under Section 363(n) of the Bankruptcy Code; or (iii) prevent the application of Section 363(m) of the Bankruptcy Code. The releases, injunctions, policy buyback, and all other components of the Sale Transaction comply with the Bankruptcy Code and all applicable non-bankruptcy law.

M.    Pursuant to the Settlement Agreement and to the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer have consented to the assignment of the Non-Debtor Catholic Entities' Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities'

5

Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under the Settlement Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Interests of any Entity in such Archdiocese Policies (the "Non-Debtor Catholic Entity Policy Sale").

N.      Insurer is a good faith purchaser of the Purchased Property under Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, in that, among other things: (i) all payments to be made by or to Insurer, and other agreements or arrangements entered into by Insurer, including without limitation any escrow agreement pertaining to the payment of the Settlement Amount, in connection with the Sale Transaction have been disclosed; (ii) Insurer neither induced nor caused the Debtor Parties' chapter 11 filings; (iii) the negotiation and execution of the Settlement Agreement and any other agreements or instruments related thereto was in good faith, the arm's length transaction between Insurer and the other Parties was the product of mediation, and all Parties to the Settlement Agreement were, or had the opportunity to be, represented by counsel; and (iv) Insurer has not violated Section 363(n) of the Bankruptcy Code by any action or inaction. Insurer has at all times acted in good faith with respect to the Settlement Agreement and will continue to be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale Transaction.

O.      The terms and conditions of the Settlement Agreement are fair and reasonable. The Settlement Amount provided by Insurer pursuant to the Settlement Agreement (i) is fair and reasonable; (ii) monetizes the Purchased Property at the highest and best amount; (iii) will provide a higher and more certain recovery for the Debtor Parties' creditors than would be provided by

6

1018

any other practical available alternative given the complexity, cost, and uncertainty of such alternatives; (iv) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (v) constitutes reasonably equivalent value (as defined in Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law. The Settlement Amount is within the reasonable range of potential litigation outcomes, and the Debtor Parties' determination to accept the Settlement Amount and otherwise enter into the Settlement Agreement is a valid and sound exercise of their business judgment and consistent with the Debtor Parties' fiduciary duties. The releases to be made pursuant to the Settlement Agreement, including without limitation the releases of the Archdiocese Bound Parties and the Insurer Released Parties, are appropriate and should be approved.

P.      Insurer: (i) is not a mere continuation of any of the Archdiocese Bound Parties or the Estate of any of the Debtor Parties, nor is there any continuity of enterprise between Insurer and the Debtor Parties or Insurer and any of the other Archdiocese Bound Parties; (ii) is not holding itself out to the public as a continuation of any of the Archdiocese Bound Parties; and (iii) is not a successor to the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties for any purpose, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of Insurer and any of the Archdiocese Bound Parties.

Q.      The Settlement Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither Insurer nor any of the Archdiocese Bound Parties are fraudulently entering into the Sale Transaction.

7

R.     The transfer of the Purchased Property to Insurer (i) does not constitute an avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law and (ii) does not and will not subject Insurer to any liability whatsoever with respect to the Debtor Parties' operation prior to the closing of the Sale Transaction (i.e., the occurrence of both the Settlement Agreement Effective Date and payment[4] of the Settlement Amount by Insurer to the Settlement Trust or Escrow Agent pursuant to the terms of Insurer's Settlement Agreement) (the "Closing").

S.     Insurer has agreed to purchase the Purchased Property pursuant to its Settlement Agreement and this Order; Insurer has not agreed to purchase, and is not purchasing, any other assets of the Estate of any of the Debtor Parties. Insurer has not agreed to assume, and after Closing shall have no obligations with respect to, any liabilities of the Archdiocese Bound Parties. Without limiting the generality of the foregoing, Insurer: (i) is not assuming and shall have no liability for any Claims arising from or relating to Abuse, the Purchased Property, or the Bankruptcy Case; and (ii) is not assuming and shall have no liability with respect to the Archdiocese's or any other Archdiocese Bound Party's obligations to Abuse Claimants, any other creditors, future claimants (including without limitation Unknown Abuse Claimants), or the Archdiocese's or any Archdiocese Bound Party's employees, in each case, by reason of the purchase of the Purchased Property under the Settlement Agreement.

T.     The Purchased Property constitutes property of the Debtor Parties' Estates, and the Archdiocese Bound Parties are the lawful owner of the Purchased Property and hold good title thereto. The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement

---

[4]     For the avoidance of doubt, all references to "payment" or "delivery" of the Settlement Amount by Insurer herein shall encompass all transfers of the Settlement Amount contemplated by the Settlement Agreement, including without limitation funding and transfer of funds to the Settlement Trust via letters of credit or escrow accounts.

8

will be a legal, valid, binding, and effective transfer of the Purchased Property, and will vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property, in each case free and clear of all Interests (as defined below, including, without limitation, any Interests of the Archdiocese Bound Parties, Abuse Claimants, and holders of Direct Action Claims). Upon Closing, Insurer shall have no liability for any Claims against or liabilities of the Debtor Parties, their Estates, or the other Archdiocese Bound Parties. Without limiting any of the foregoing, the Archdiocese, the Archdiocese Signatory Parties, and Insurer have agreed that, upon Closing: (i) the Purchased Property shall be deemed void *ab initio*, terminated, extinguished, and of no further force and effect; and (ii) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

U.     Pursuant to §§ 363(f) and 105(a) of the Bankruptcy Code, and subject to the terms and conditions set forth in the Settlement Agreement, and upon Closing, without the need for further action, the Debtor Parties shall be deemed to have sold, transferred and conveyed the Purchased Property to the Insurer, and the Insurer shall be deemed to have purchased from the Debtor Parties, all right title and interest in and under the Purchased Property, free and clear of all "Interests" of any Entity of any kind or nature whatsoever, to the fullest extent permitted under §§ 363(b) and (f) of the Bankruptcy Code, with such "Interests" including: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands,

9

encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, Subject Interests, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand

10

is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property. Without limiting the generality of the foregoing and without finding that any Entity has any Interest in the Archdiocese Policies: (i) any Entity with Interests (if any) in or with respect to the Purchased Property who did not object, or who withdrew their objections to the Sale Transaction or the Approval Motion have waived their right to object to the sale of the Purchased Property free and clear of such Entity's Interests in the Purchased Property pursuant to Section 363(f)(2) of the Bankruptcy Code; and (ii) any such Entity with Interests in or with respect to the Purchased Property who objected to the Approval Motion and did not withdraw any such objection (a) are the holders of Interests subject to *bona fide* dispute under Bankruptcy Code Section 363(f)(4) and/or (b) can be compelled to accept a monetary satisfaction of their Interests within the meaning of Section 363(f)(5) of the Bankruptcy Code.

V.     If the sale of the Purchased Property were not free and clear of all Interests, including without limitation all Abuse Claims, Direct Action Claims, and Coverage Claims, or if the Insurer Released Parties would, or in the future could, be liable for any of the Interests, Insurer would not have entered into the Settlement Agreement and would not consummate the Sale Transaction or pay the Settlement Amount, thus adversely affecting the Debtor Parties, their Estates, and their creditors (including, without limitation, the Abuse Claimants), as well as the other Archdiocese Bound Parties.

W.      Issuing a supplemental injunction under Section 105(a) of the Bankruptcy Code as provided herein is essential to give effect to the sale of the Purchased Property to Insurer and this Order's approval of such sale free and clear of Interests pursuant to Section 363(f) of the Bankruptcy Code. The Sale Injunction set forth in Paragraph 23 below not only is a necessary prerequisite for Insurer's assent to the terms and conditions of its Settlement Agreement, such that Insurer will not consummate the Sale Transaction or pay its Settlement Amount in the absence of such an injunction from this Bankruptcy Court, but also is warranted to ensure compliance with this Order. Likewise, Insurer will not consummate the Sale Transaction or pay its Settlement Amount without the benefit of the releases contained in the Settlement Agreement and approval thereof by the Bankruptcy Court.

X.      Neither the Settlement Agreement nor the Sale Transaction constitute a *sub rosa* chapter 11 plan. The Settlement Agreement does not impermissibly restructure the rights of the Debtor Parties' creditors nor impermissibly dictate a chapter 11 plan for the Debtor Parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.      The Approval Motion, and the relief sought therein (including without limitation the approval of the Settlement Agreement and the Sale Transaction) is GRANTED and APPROVED, in all respects as set forth herein.

2.      The findings of fact set forth above and conclusions of law stated herein, in addition to any findings of fact and conclusions of law stated by the Bankruptcy Court at the Sale Hearing, shall constitute this Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the Approval Motion pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall

12

be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.        Any and all objections, if any, to the Approval Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case the Entity asserting the objection or reservation of rights is enjoined from taking any action against the Insurer Released Parties or the assets or property of any Insurer Released Parties to recover any Claim or Interest held by such objecting Entity. Those parties who did not object or who withdrew their objections to the Approval Motion are deemed to have consented to the relief granted herein, pursuant to Section 363(f)(2) of the Bankruptcy Code.

### Approval of the Settlement Agreement

4.        The Settlement Agreement is approved in its entirety, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Without limiting the generality of the foregoing, the settlement and releases of Claims as set forth in the Settlement Agreement is hereby approved pursuant to Bankruptcy Rule 9019. All factors set forth in *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey* (*In re Cajun Elec. Power Coop.*), 119 F. 3d 349, 356 (5th Cir. 1997), either weigh in favor of the Settlement Agreement or do not apply.

5.        Pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, the Non-Debtor Catholic Entity Policy Sale, free and clear of all Interests of any Entity in the Archdiocese Policies, is hereby approved.

6.        Pursuant to Section 363(b) of the Bankruptcy Code, each of the Parties is authorized to consummate the Sale Transaction under and in accordance with the terms and conditions of the

13

Settlement Agreement, and the Archdiocese Bound Parties shall at all times act in accordance with the terms thereof.

7.      Any representative, agent or attorney in fact of the Archdiocese Signatory Parties is authorized to execute any other documentation and perform such other ministerial tasks as may be reasonably necessary to effectuate the Settlement Agreement and the Sale Transaction on behalf of the Archdiocese Bound Parties, including without limitation, any bill of sale substantially in the form attached to the Settlement Agreement as **Exhibit B**.

8.      Subject to all of the terms and conditions of the Settlement Agreement, upon Closing, the Archdiocese Bound Parties and Insurer shall be deemed to have granted the releases as set forth in the Settlement Agreement.

9.      The Parties are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Settlement Agreement, together with all additional instruments and documents that may be reasonably necessary, convenient, or desirable to implement the Settlement Agreement and consummate the Sale Transaction pursuant thereto and effectuate the provisions of this Order and the transactions approved hereby, and to take all further actions as may be requested by Insurer for the purpose of assigning, transferring, granting, conveying, and conferring to Insurer or reducing to Insurer's possession, the Purchased Property, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Settlement Agreement.

10.     Insurer is authorized and directed to pay the Settlement Amount under and subject to the satisfaction of all terms and conditions of the Settlement Agreement.

11.     The Settlement Amount provided by Insurer for the Purchased Property (i) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title

14

1026

IV, Chapter 12 of the Louisiana Civil Code; and (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

12.     None of the Insurer Released Parties shall be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its or their rights or remedies under the Settlement Agreement or any other document related to the Settlement Agreement or the Sale Transaction. The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order; *provided*, *however*, that this Bankruptcy Court shall retain jurisdiction over any and all disputes with respect thereto.

13.     This Order shall be binding in all respects upon: (a) the Debtor Parties and their Related Parties; (b) the Debtor Parties' Estates; (c) the other Archdiocese Bound Parties; (d) all creditors of the Debtor Parties; (e) all Abuse Claimants and holders of Direct Action Claims; (f) all holders of Interests whether known or unknown against or on all or any portion of the Purchased Property; (g) any Non-Settling Insurer; (h) the Insurer Released Parties; (i) the Purchased Property; (j) the Unknown Claims Representative; (k) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code; and (l) all Entities receiving notice (or deemed to have received notice pursuant to this Order) of the Approval Motion or the Sale Hearing, including without limitation all Entities listed on **Schedule 3** to the Settlement Agreement.  The Settlement Agreement shall be binding in all respects upon: (x) the Debtor Parties, their Estates, and their Related Parties; (y) the

Archdiocese Bound Parties; and (z) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code.

### Transfer of Assets

14.     The conditions of Section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Archdiocese may sell the Purchased Property free and clear of any Interests therein.

15.     Pursuant to Sections 105 and 363(b) and (f) of the Bankruptcy Code, Bankruptcy Rule 9019, applicable Louisiana State law, the testimonial and other documentary evidence filed in support of the Approval Motion, and the record of the Sale Hearing, the Archdiocese has set forth the legal authority necessary to support this Bankruptcy Court's findings herein.

16.     Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Property and the Archdiocese Bound Parties' rights, title, and interest therein shall upon Closing be transferred to Insurer, free and clear of all Interests (including without limitation the Interests of any of the Archdiocese Bound Parties), and all such Interests are unconditionally and forever released and extinguished as against the Purchased Property. Without limiting the generality of the foregoing, the sale of the Purchased Property under the Settlement Agreement shall be free and clear of all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any

16

1028

other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property.

17.      Upon the Closing, (a) all of the Archdiocese Bound Parties', the Debtor Parties' Estates', and the Settlement Trustee's rights under and with respect to the Purchased Property, if any, shall be permanently and irrevocably extinguished as if the Archdiocese Policies had never been issued and (b) the Insurer Released Parties shall be entitled to all of the protections afforded by §363(m) of the Bankruptcy Code.

18.      Upon Closing, all Entities (and their respective successors and assigns), including but not limited to all governmental, tax, and regulatory authorities, Archdiocese Bound Parties, Non-Settling Insurers, Abuse Claimants, Direct Action Claimants, trade and other creditors, and any Entities holding Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) against, in, or with respect to the Purchased Property, including, without limitation, such Interests arising or accruing under or out of, in connection with, or in any way relating to the transfer of the Purchased Property to Insurer, hereby are forever barred, estopped, and permanently enjoined from asserting such Person's or Entity's Interests against the Purchased Property, the Insurer Released Parties, or the assets or property of any Insurer Released Parties. Effective upon Closing, none of the Insurer Released Parties shall have any liability for any Claims (a) against the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties or (b) that arise under or related in any way or in respect of the Purchased Property.

19.      The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement constitutes a legal, valid, and effective transfer of the Purchased Property, and shall vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties

17

in and to the Purchased Property. Upon Closing, the Archdiocese Policies shall be terminated and no longer in force or effect, exhausted in retrospect as to all coverages, and all Interests that the Archdiocese or any other Person or Entity (including without limitation any of the other Archdiocese Bound Parties) may have had, may presently have, or may in the future have, in such Purchased Property are released and extinguished, and all such Entities (including without limitation the Archdiocese Bound Parties) hereby are forever barred, estopped, and permanently enjoined from asserting any such Interest against the Purchased Property and/or any of the Insurer Released Parties. Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent constitutes full and complete performance of any and all obligations under the Purchased Property, including without limitation any performance owed to the Archdiocese Bound Parties, and all limits of coverage under the Archdiocese Policies, including per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

20.     Upon occurrence of the Closing:

(a)     all Interests the Archdiocese Bound Parties may have had, may presently have, or in the future may have in the Purchased Property, as applicable, are released pursuant to the terms of the Settlement Agreement; and

(b)     the Archdiocese Bound Parties accept Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent in full and complete satisfaction of Insurer's past, present, and future obligations, including, without limitation, any obligations to any of the Archdiocese Bound Parties under such Purchased Property or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever arising out of or related in any way to such Purchased Property

18

(including Coverage Claims), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, direct or indirect, and regardless of whether such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, or otherwise.

### No Successor Liability

21.     The transfer of the Purchased Property to Insurer shall not result in any Insurer Released Parties or the Purchased Property having any of the following: (a) any liability or responsibility for Interests in or Claims against the Archdiocese Bound Parties or any of their Related Parties; (b) liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any Claims or Interests; or (c) any liability or responsibility to the Archdiocese Bound Parties except as is expressly set forth in the Settlement Agreement.

22.     Without limiting the generality of the foregoing, none of the Insurer Released Parties shall have any successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability, *de facto* merger or joint venture, mere continuation or substantial continuity, whether known or unknown as of Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between the Archdiocese Bound Parties and any non-debtor subsidiary or affiliate (including, without limitation, any other Archdiocese Bound Party), liabilities relating to or arising from any environmental laws, and any taxes arising, accruing, or

19

payable under, out of, in connection with, or in any way relating to the Purchased Property prior to Closing.

<div align="center">

**Sale Injunction**

</div>

23.     Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, and in consideration of the undertakings of Insurer pursuant to the Settlement Agreement, including Insurer's purchase of the Purchased Property free and clear of all Claims and Interests pursuant to Section 363(f) of the Bankruptcy Code as provided herein, any and all Entities that have held, now hold, or who may in the future hold any Claims or Interests (including without limitation all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Abuse Claimants, holders of Direct Action Claims, Perpetrators, Non-Settling Insurers, the Archdiocese Bound Parties, and all others holding Claims or Interests of any kind or nature whatsoever, including, without limitation, those Claims released or to be released pursuant to the Settlement Agreement), which Claims or Interests are under, arise out of, relate to, or connect in any way with an Abuse Claim or any of the Purchased Property, including, without limitation, (a) all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property, (b) the payment of any of the Claims identified previously, including, without limitation, Abuse Claims, Direct Action Claims, and Coverage Claims and (c) all other Interests, are hereby permanently stayed, enjoined, barred, and restrained from taking any Action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or

<div align="center">

20

</div>

Interest against any of (x) the Insurer Released Parties, (y) the assets or property of any Insurer Released Parties, or (z) the Purchased Property, including by:

      (a)     commencing, conducting, or continuing in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind, in any forum, with respect to any such Claim or Interest, against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

      (b)     enforcing, levying, attaching, collecting, or otherwise recovering, or seeking to accomplish any of the preceding, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

      (c)     creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, or seeking to accomplish any of the preceding, any lien of any kind against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

      (d)     asserting, implementing, or effectuating any such Claim or Interest of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any of the Insurer Released Parties, (B) any of the Insurer Released Parties, or (C) any property or interest in property of any Insurer Released Party; and

      (e)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Order.

The actions described in this Paragraph 23 are "**Enjoined Actions**," and the injunction set forth herein is the "**Sale Injunction**." The Sale Injunction shall be a permanent injunction against the Enjoined Actions and may not be modified, dissolved, or terminated.

24.    The Sale Injunction shall be effective upon Closing. The Sale Injunction bars pursuit of the above referenced Claims and/or Interests against the Insurer Released Parties, or the property or assets of each (including, without limitation, the Purchased Property), but against no other person or thing.

25.    In a successful action to enforce this Sale Injunction in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

26.    The Sale Injunction shall not enjoin (a) the right of any Person or Entity against the Settlement Trust or a Non-Settling Insurer, or (b) the Settlement Trustee from enforcing the Settlement Trust Documents.

<div align="center">

**Preserved Coverage**

</div>

27.    [**Intentionally Omitted.**]

<div align="center">

**Additional Provisions**

</div>

28.    From and after the date hereof, no Person or Entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreements and this Order.

29.    This Bankruptcy Court hereby retains jurisdiction, regardless of whether a chapter 11 plan has been confirmed in the Bankruptcy Case and consummated and irrespective of the provisions of any such plan or order confirming such plan, to enforce and implement the terms and

<div align="center">22</div>

provisions of the Settlement Agreement, all amendments thereto, any waivers and consents thereunder, and of any agreement(s) executed in connection therewith in all respects, including but not limited to retaining jurisdiction to: (a) compel delivery of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreement; (b) resolve any dispute, controversy, or claim arising under or related to the Settlement Agreement, or the breach thereof; and (c) interpret, implement, and enforce the provisions of this Order and resolve any disputes related thereto.

30.     Nothing contained in any plan confirmed in the Bankruptcy Case or any order of this Bankruptcy Court confirming such plan shall conflict with or derogate from the provisions of the Settlement Agreement or the terms of this Order.

31.     This Order shall not limit or preclude the entry or effectiveness of any additional releases or injunctions that may be granted protecting the Insurer Released Parties and/or the assets or property of any Insurer Released Parties in connection with, or as part of, any order confirming a chapter 11 plan.

32.     The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Settlement Agreement be authorized and approved in its entirety.

33.     The transactions contemplated by the Settlement Agreement are undertaken by Insurer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code. Insurer is a good faith purchaser of the Purchased Property and is entitled to all the protections afforded by Section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction to Insurer.

34.     Insurer has given substantial consideration under the Settlement Agreement for the benefit of the Debtor Parties, their Estates, and creditors, along with the other Archdiocese Bound Parties. Such consideration given by Insurer constitutes valid and valuable consideration for the Purchased Property and the releases set forth in the Settlement Agreement, including, without limitation, the extinguishment and release of all Interests pursuant to this Order. The consideration provided by Insurer for the Purchased Property under the Settlement Agreement is fair and reasonable; accordingly, the purchase may not be avoided under Section 363(n) of the Bankruptcy Code.

35.     The terms and provisions of the Settlement Agreement and this Order shall be binding notwithstanding any subsequent appointment of any trustee(s) examiner(s) or receiver(s) under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtor Parties, their Estates, their creditors, or any examiner(s) or receiver(s).

36.     The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Bankruptcy Court that the Settlement Agreement and the Parties' performance thereof be authorized and approved in its entirety.

37.     Pursuant to the provisions of the Settlement Agreement, each of the Archdiocese Bound Parties and Insurer shall be authorized to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper, or advisable under applicable law or otherwise to consummate and make effective the transactions contemplated by the Settlement Agreement.

38.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39.     All obligations of the Debtor Parties under the Settlement Agreement shall be deemed administrative expenses of their Estates under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

40.     Each and every federal, state, and local governmental agency or department is hereby directed to accept this Order in lieu of any document necessary to consummate the transactions contemplated by the Settlement Agreement and this Order.

41.     The Settlement Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the Parties, in a writing signed by the Parties, and in accordance with the terms thereof, without further order of this Bankruptcy Court; *provided* that such modification, amendment, or supplement does not constitute a material change to the relief sought in the Approval Motion and approved by this Order.

**IT IS SO ORDERED.**

New Orleans, Louisiana, _____, 2025

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

25

## Exhibit B

## Bill of Sale

Case 20-10846 Doc 4345-2 Filed 10/27/25 Entered 10/27/25 16:27:54 Plan Supplement Documents Page 1039 of 1339

## BILL OF SALE AND ASSIGNMENT

**THIS BILL OF SALE AND ASSIGNMENT** is made and entered into as of _____, 2025, by and between The Roman Catholic Archdiocese of New Orleans and its Bankruptcy Estate (the "**Archdiocese**" or "**Debtor**"), the Additional Debtors and their respective Bankruptcy Estates, Non-Debtor Catholic Entities (collectively, "**Archdiocese Signatory Parties**"), and National Union Fire Insurance Company of Pittsburgh, Pa. (the "**Insurer**"). All capitalized terms used herein without definition have the meanings set forth in the Settlement Agreement, Release, and Policy Buyback by, between, and among The Archdiocese, the other Archdiocese Signatory Parties, and Insurer, as amended or modified (the "**Settlement Agreement**").

## W I T N E S S E T H:

WHEREAS, pursuant to the Settlement Agreement, the Archdiocese Signatory Parties have, on behalf of themselves and all other Archdiocese Bound Parties, agreed to sell and/or convey any and all right, title, and interest (including all Subject Interests) in and to the Purchased Property (as defined in the Approval Order), and Insurer has agreed to purchase and buy-back the Purchased Property, in consideration of the payment of a purchase price of $290,000 (the "**Purchase Price**") and other good and valuable consideration as provided in and under the Settlement Agreement and Plan;

WHEREAS, the Approval Order, as filed at Docket No. [_], has approved the Sale Transaction (as defined in the Approval Order) and found that the Purchase Price is a fair and reasonable price for the Purchased Property;

NOW, THEREFORE, in consideration of the payment of the Purchase Price by Insurer as set forth in the Settlement Agreement, and in accordance therewith and with Approval Order, the Debtor Parties do hereby sell, transfer, and assign to Insurer, and Insurer does hereby accept, all of the Archdiocese Bound Parties' right, title, and interest in and to the Purchased Property, and all Subject Interests therein.

[signatures appear on following pages]

**IN WITNESS WHEREOF**, the parties have executed this Bill of Sale and Assignment by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed: _____

Date: _____

_____

*[Signatures Continue on Adjacent Pages]*

**National Union Fire Insurance Company
of Pittsburgh, Pa.**

Signed:

_____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**All Archdiocese Signatory Parties**
**Other than the Archdiocese**


Signed: _____


Name Printed: _____

Title:        **Their Authorized Signer**_____

Date:        _____


*[Signatures Continue on Adjacent Pages]*

## Schedule 1

### Archdiocese Policies

The following policies shall be included in the definition of Archdiocese Policies:

1.   **Insurer**: National Union Fire Insurance Company of Pittsburgh, Pa.

   **Policy Number**: 1168737

   **Policy Period**: April 1, 1977 to March 1, 1978

## Schedule 2

### Other Co-Insureds Known to the Archdiocese Signatory Parties

**1.     NONE**

For the avoidance of the doubt, the following entities are bound by the terms of the Settlement Agreement:[1]

### I.     Archdiocesan Parishes

1.     All Saints Roman Catholic Church, New Orleans, Louisiana

2.     Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana

3.     Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana

4.     Assumption of Mary Roman Catholic Church, Avondale, Louisiana

5.     Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana[2]

6.     Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana

7.     Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana

8.     Blessed Trinity Roman Catholic Church, New Orleans, Louisiana

9.     Christ the King Roman Catholic Church, Gretna, Louisiana

10.     Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana

11.     Divine Mercy Roman Catholic Church, Kenner, Louisiana

12.     Good Shepherd Roman Catholic Church, New Orleans, Louisiana

13.     Holy Family Roman Catholic Church, Franklinton, Louisiana

14.     Holy Family Roman Catholic Church, Luling, Louisiana

15.     Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana

16.     Holy Spirit Roman Catholic Church, New Orleans, Louisiana

17.     Immaculate Conception Roman Catholic Church, Marrero, Louisiana

18.     Immaculate Conception Roman Catholic Church, New Orleans, Louisiana

19.     Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana

20.     Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana

21.     Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana, for itself and as successor to St.

---

[1] Without limiting Section 6.4 of the Settlement Agreement, Insurer does not concede that any of the Entities listed on this schedule are "insureds," "additional insureds," or "protected persons" under its Archdiocese Policies.

[2] Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc.

22.  Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana

23.  Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana

24.  Most Holy Trinity Roman Catholic Church, Covington, Louisiana

25.  Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana

26.  Our Lady of Grace Roman Catholic Church, Reserve, Louisiana

27.  Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana

28.  Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana

29.  Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana

30.  Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana

31.  Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana

32.  Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana

33.  Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana

34.  Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana

35.  Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana

36.  Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana

37.  Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana

38.  Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana

39.  Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana

40.  St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana

41.  St. Agnes Roman Catholic Church, Jefferson, Louisiana

42.  St. Alphonsus Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

43.  St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana

44.  St. Angela Merici Roman Catholic Church, Metairie, Louisiana

45.  St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana

46.  St. Anselm Roman Catholic Church, Madisonville, Louisiana

47.  St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana

48.  St. Anthony of Padua Roman Catholic Church, Luling, Louisiana

49.  St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana

50.  St. Anthony Roman Catholic Church, Gretna, Louisiana

51.   St. Augustine Roman Catholic Church, New Orleans, Louisiana

52.   St. Benedict Roman Catholic Church, Covington, Louisiana

53.   St. Benilde Roman Catholic Church, Metairie, Louisiana

54.   St. Bernard Roman Catholic Church, St. Bernard, Louisiana

55.   St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana

56.   St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana

57.   St. Christopher Roman Catholic Church, Metairie, Louisiana

58.   St. Clement of Rome Roman Catholic Church, Metairie, Louisiana

59.   St. Cletus Roman Catholic Church, Gretna, Louisiana

60.   St. David Roman Catholic Church, New Orleans, Louisiana

61.   St. Dominic's Roman Catholic Church, New Orleans, Louisiana

62.   St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana

63.   St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana

64.   St. Francis Xavier Roman Catholic Church, Metairie, Louisiana

65.   St. Genevieve Roman Catholic Church, Slidell, Louisiana

66.   St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana

67.   St. Jerome Roman Catholic Church, Kenner, Louisiana

68.   St. Joachim Roman Catholic Church, Marrero, Louisiana

69.   St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana

70.   St. John of the Cross Roman Catholic Church, Lacombe, Louisiana

71.   St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, for itself and as successor to St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc.

72.   St. John the Baptist Roman Catholic Church, Edgard, Louisiana

73.   St. John the Baptist Roman Catholic Church, Folsom, Louisiana

74.   St. Joseph Roman Catholic Church, Algiers, Louisiana

75.   St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana

76.   St. Joseph's Roman Catholic Church, Gretna, Louisiana

77.   St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc.

78.   St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana

79.  St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana

80.  St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana

81.  St. Margaret Mary Roman Catholic Church, Slidell, Louisiana

82.  St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana

83.  St. Mark Roman Catholic Church, Ama, Louisiana

84.  St. Martha Roman Catholic Church, Harvey, Louisiana

85.  St. Martin de Porres Roman Catholic Church, New Orleans, formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc.

86.  St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana

87.  St. Mary's Roman Catholic Church, New Orleans, Louisiana

88.  St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana

89.  St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St. John the Baptist Roman Catholic Church, Paradis, Louisiana, for itself and as successor to St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc.

90.  St. Patrick's Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

91.  St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana

92.  St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana

93.  St. Peter Claver Roman Catholic Church, New Orleans, Louisiana

94.  St. Peter Roman Catholic Church, Reserve, Louisiana, for itself and as successor to St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc.

95.  St. Peter's Roman Catholic Church, Covington, Louisiana

96.  St. Philip Neri Roman Catholic Church, Metairie, Louisiana

97.  St. Pius X Roman Catholic Church, New Orleans, Louisiana

98.  St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana

99.  St. Rita Roman Catholic Church, Harahan, Louisiana

100.  St. Rita Roman Catholic Church, New Orleans, Louisiana

101.  St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana[3]

---

[3]  As stated in footnote 2, Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

102.  Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana

103.  The Congregation of St. Rita Roman Catholic Church of Harahan

104.  The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana

**II.    Suppressed Archdiocesan Parishes[4]**

1.   Blessed Sacrament, Inc.

2.   Epiphany, Inc.

3.   Immaculate Heart of Mary, Inc.

4.   Incarnate Word, Inc.

5.   Our Lady of Good Counsel, Inc.

6.   Our Lady of Good Harbor, Inc.

7.   Our Lady of Lourdes, New Orleans, Louisiana, Inc.

8.   Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.

9.   Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana

10.  St. Ann, New Orleans, Louisiana, Inc.

11.  St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana

12.  St. Frances Xavier Cabrini, Inc.

13.  St. Francis de Salles, Inc.

14.  St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana

---

[4] The Suppressed Archdiocesan Parishes no longer operate as separate church parishes. The Suppressed Archdiocesan Parishes were not dissolved, and may own property.

Following Hurricane Katrina, the operations of certain of the Suppressed Archdiocesan Parishes were combined with Archdiocesan Parishes. In 2024, in the ongoing aftermath of Hurricane Ida and a result of storm damage, the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental statistics, and financial difficulties encountered, the following additional Suppressed Archdiocesan Parishes were canonically merged with neighboring Archdiocesan Parishes: (a) St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc., was canonically merged into St. Peter Roman Catholic Church, Reserve, Louisiana; (b) (i) St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and (ii) St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc., were both canonically merged into Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, now known as St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana; (c) St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana; (d) St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc., was canonically merged into Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, now known as St. John Paul II Roman Catholic Church, Waggaman, Louisiana; (e) St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc., was canonically merged into St. John the Baptist Roman Catholic Church, Paradis, Louisiana, now known as St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana; (f) Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc., was canonically merged into St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, now known as St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana; and (g) St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc., had its canonical territory divided so that (i) the area north of the Pontchartrain Expressway was canonically merged into St. Patrick's Roman Catholic Church, New Orleans, Louisiana, and (ii) the area south of the Pontchartrain Expressway was canonically merged into St. Alphonsus Roman Catholic Church, New Orleans, Louisiana.

15. St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana

16. St. Henry's, Inc.

17. St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana

18. St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana

19. St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana

20. St. John the Baptist, New Orleans, Louisiana, Inc.

21. St. Julian Eymard, Inc.

22. St. Lawrence the Martyr, Inc.

23. St. Louise de Marillac, Inc.

24. St. Maurice, Inc.

25. St. Monica, Inc.

26. St. Philip the Apostle, Inc.

27. St. Raymond's, Inc.

28. St. Rose of Lima, Inc.

29. St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana

30. St. Theresa of the Child Jesus, Inc.

31. The Congregation of Saints Peter and Paul Roman Catholic Church

32. The Congregation of St. Cecelia Roman Catholic Church

33. The Congregation of the Annunciation Roman Catholic Church

34. The Congregation of the Holy Trinity Roman Catholic Church

## III. Archdiocesan Agencies

1. Archdiocesan Spirituality Center

2. Catholic Charities Archdiocese of New Orleans

3. Catholic Charities Children's Day Care Centers

4. Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)

5. Clarion Herald Publishing Company

6. Korean Catholic Community of New Orleans, Inc.

7. Notre Dame Seminary

8. Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana

9. Pace Greater New Orleans

10. Padua House (merged into Catholic Charities Archdiocese of New Orleans)

11. Philmat, Inc.

12. Project Lazarus

13. Roman Catholic Center of Jesus the Lord

14. School Food and Nutrition Services of New Orleans, Inc.

15. Second Harvest Food Bank of Greater New Orleans and Acadiana

16. St. Jude Community Center, Inc.

17. St. Michael Special School

18. St. Thérèse Catholic Academy

19. The Society for the Propagation of the Faith, Archdiocese of New Orleans

## IV.  Non-Debtor Catholic Entities

### Archdiocesan Agencies

1. 7887 Walmsley, Inc.

2. Annunciation Inn, Inc.

3. Archdiocese of New Orleans Indemnity, Inc.

4. Aspiring Scholars

5. Catholic Community Foundation Archdiocese of New Orleans

6. Christopher Homes, Inc.

7. Christopher Inn

8. Dubourg Home

9. Holy Redeemer Catholic Virtual Academy

10. Holy Trinity Drive Land Corporation

11. Iberia Investment Fund II, LLC

12. Metairie III

13. Metairie Manor

14. Monsignor Wynhoven Apartments, Inc.

15. Nazareth II

16.  Nazareth Manor

17.  New Orleans Archdiocesan Cemeteries

18.  Notre Dame Health System (f/k/a Chateau de Notre Dame)

19.  Rouquette III

20.  St. Anthony's Gardens

21.  St. Bernard II

22.  St. Bernard III

23.  St. Bernard Manor

24.  St. Martin's Manor, Inc.

25.  St. Tammany Catholic Cemetery

26.  St. Tammany Manor

27.  The Apartments at Mater Dolorosa

28.  The Mental Health Association Development Corporation

29.  Villa Additions, doing business as St. Teresa's Villa

30.  Villa St. Maurice, Inc.

## Schedule 3

### Additional Notice Parties

**The Redemptorists/Denver Province**
1633 North Cleveland Avenue
Chicago, IL 60614

**Dominican Province of St. Albert the Great**
1910 S. Ashland Avenue
Chicago, Illinois, 60608-2905

**Congregation of Holy Cross**
P.O. Box 1064
Notre Dame, IN 46556-0541

**St. Elio Roman Catholic Church**
1335 Bayou Dularge Road
Theriot, LA 70397

**Central Catholic High School**
2100 Cedar Street, Unit 1
Morgan City, LA 70380

**Edward Douglas White Catholic High School**
555 Cardinal Drive
Thibodaux, LA 70301

**Chinchuba Institute for the Deaf**
2929 Carrollton
New Orleans, LA 70118

and

1231 Prytania St.
New Orleans, LA 70130

**St. Scholastica Academy**
122 South Massachusetts St.
Covington, Louisiana 70433

**Hope Haven – Madonna Manor**
1231 Prytania
New Orleans LA  70130

7887 Walmsley Ave.
New Orleans, LA 70125

2929 Carrollton
New Orleans, LA  70118

**Holy Cross College, Inc.**
Attn Remy Donnelly
5500 Paris Ave.
New Orleans, LA  70122

**Tulane Catholic**
1037 Audubon St
New Orleans, LA 70118

**University of New Orleans**
2000 Lakeshore Drive
New Orleans, LA 70148

**Our Lady of Peace Catholic Church**
13281 LA-644
South Vacherie, LA 70090

**St. Lucy Child Development Center**
1220 Aycock St
Houma, LA 70360

**St. Augustine High School, Inc.**
c/o Alfred Harrell, III
2600 A.P. Tureaud Ave
New Orleans LA 70119

**St. Joseph's Society of the Sacred Heart**
P.O. Box 65010
Baltimore, MD 21209

**The Community of the Sisters of the Immaculate Conception**
c/o Melanie Baglow
6208 Ithaca Street
Metairie, LA 70003

**Sisters of Mount Carmel**
**Generalate Office**
21388 Smith Road
Covington, LA 70435-6349

**Daughters of St. Paul**
50 St. Paul's Ave.
Jamaica Plain, MA 02130

and

c/o Mary Martha Moss
4403 Veterans Blvd.
Metairie, LA 70006

Crescent City Convent Corporation
210 Baronne St.
New Orleans, LA 70112

**Lyric Realty and Parking Company, Inc.**
c/o Kenneth D. Boudreaux
1115 Tallowtree Dr.
Mandeville, LA 70448

**Sacred Heart of Jesus Catholic Church**
1111 Highway 55
PO Box 2
Montegut, LA 70377

**Diocese of Houma Thibodaux**
P.O. Box 505
Schriever, LA

**Diocese of Baton Rouge**
Post Office Box 2028
Baton Rouge, Louisiana 70821-2028

**Vandebilt Catholic High School**
209 South Hollywood Road
Houma, LA 70360

**General Services Administration**
1800 F St., NW
Washington, DC 20405

**People For Teens of St. Anthony of Padua Corporation**
4700 Cleveland
New Orleans, LA 70119

**Society of the Sacred Heart**
4120 Forest Park Avenue
St. Louis, MO 63108

**Seminarians Parents Association, Inc.**
718 Wood St
Houma, La 70360

**Society of the Divine Word**
PO Box 6038
Techny, IL 60082

**Ursuline Sisters of the Roman Union, Central Province,**
353 South Sappington
St. Louis, MO 63122

**Salesians of Don Bosco, Eastern Province**
in the USA d/b/a Salesian Society, Inc.
Through its agent for service of process:
Rev. Louis Molinelli, SDB
1000 Barataria Boulevard
Marrero, LA 70072

And

Rev. Louis Molinelli, S.D.B.
1000 Salesian Lane
Marrero, LA 70072

## Schedule 4

**Form of Corporate Resolutions**

<u>CORPORATE RESOLUTION</u>

RESOLUTION OF THE MEMBERSHIP AND BOARD OF DIRECTORS OF [NAME], [ADDRESS], A LOUISIANA NON-PROFIT [CORPORATION][LIMITED LIABILITY COMPANY (hereinafter this "Corporation").

BE IT RESOLVED, that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation, are hereby authorized to transact on behalf of this Corporation any and all business related to the following:

1. Engaging 1793 Group, a Louisiana non-profit corporation, on terms and conditions deemed appropriate in their sole discretion, to assist with and administer on this Corporation's behalf, any and all matters in which this Corporation may have an interest in relation to a Plan of Reorganization filed or anticipated to be filed by The Roman Catholic Church of the Archdiocese of New Orleans in proceedings commenced under Chapter 11 of the Bankruptcy Code, captioned *In re The Roman Catholic Church of the Archdiocese of New Orleans*, Case No. 20-10846 (Bankr. E.D. La.) (the "Chapter 11 Case"), including, but not limited to, preparing and filing a petition in the Chapter 11 Case seeking relief under Chapter 11 of the United States Bankruptcy Code as an additional debtor, executing any and all documents necessary for this Corporation to file for relief in the Chapter 11 Case, executing on behalf of this Corporation all documents required to comply with the requirements imposed upon parties filing for relief under Chapter 11of the Bankruptcy Code, Bankruptcy Rules, Local Rules for the Eastern District of Louisiana and/or the requirement imposed by the United States Trustee.

2. Engaging the firm of Heller Draper and/or any other attorneys to represent this Corporation in actions or proceedings related to the Chapter 11 Case.

3. Engaging accountants, financial advisors, and any other professionals necessary to administer the Chapter 11 Case on behalf of this Corporation.

4. Making decisions with regard to the payment of fees and costs for which this Corporation may become responsible to pay in the Chapter 11 Case.

5. Making decisions with regard to the filing of any plan within the Chapter 11 case, provided that such shall contain terms and provisions consistent with those set forth in Appendix "A" attached hereto and incorporated herein by this reference.

FURTHER RESOLVED that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation with the power of substitution, is authorized to execute and deliver on behalf of this Corporation each and every Insurance Settlement Agreement with the Settling Insurers, as those terms are defined in the Fourth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of September 23, 2025 (the "Plan"), and any amendment or modification to the Plan, including, without limitation, the documents attached or referred to in Plan Supplement 7.1(a), any Bill of Sale required under such Insurance Settlement Agreements,

and any other documents reasonably requested by any such Settling Insurer to effectuate the transactions provided for in its Insurance Settlement Agreement or the Plan.

FURTHER GIVING AND GRANTING unto either Very Rev. Patrick Carr or Rev. Leon Poche, full power and authority to sign any and all documents and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER GIVING AND GRANTING unto Very Rev. Peter Akpoghiran or any other officer of the Corporation, full power and authority to certify the passage and effectiveness of this Resolution to the Settling Insurers and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER RATIFYING AND CONFIRMING all that either Very Rev. Patrick Carr or Rev. Leon Poche, in his said capacity may do or cause to be done in the premises.

I, the undersigned President of this Corporation do hereby certify that the above and foregoing is a true and correct copy of a resolution adopted by the Membership and Board of Directors of said corporation in conformity with the Articles of Incorporation and Louisiana law, and that said resolution remains in full force and effect and has not been amended or rescinded.

WITNESS MY HAND AND SEAL, effective this _____ day of _____, 2025

_____
Very Reverend Patrick J. Williams, V.G.

ATTEST

_____
Dirk Wild, Director

AFSDOCS:304059010.4

4922-4535-1762v.80

1059

**Schedule 5**

**Form of Incumbency Certificates**

## INCUMBENCY CERTIFICATE

I, **Very Rev. Peter Akpoghiran, J.C.D**., the duly elected, qualified, and acting **Vice President** of each of the Louisiana nonprofit corporations or limited liability companies listed on **Exhibit A** attached hereto (each, a "Corporation," and collectively, the "Corporations"), do hereby certify as follows:

1. That the person named below has been duly elected or appointed and is the qualified and acting officer of each of the Corporations holding the office set forth opposite his/her name.

   **NAME**                                    **TITLE**

   **Very Rev. Patrick J. Williams, V.G.**     **President and Director**

2. That the foregoing person is duly authorized to act on behalf of each Corporation in such capacity and to exercise the powers and perform the duties incident to said office under the respective Articles of Incorporation and Bylaws of each Corporation.

3. That attached hereto as **Exhibit B** is a true and correct copy of a resolution adopted at a duly noticed special meeting by the sole member of each of the Corporations and all of the Board of Directors of each said Corporation in attendance at such meeting in conformity with such Articles of Incorporation and Louisiana law and that said resolution remains in full force and effect and has not been amended or rescinded.

   IN WITNESS WHEREOF, I have hereunto set my hand as Vice President of each of the

Corporations as of this ___ day of October, 2025.

_____
Very Rev. Peter Akpoghiran, J.C.D
Vice President of Each Corporation
(See Attached Exhibit A)

4922-4535-1762v.80

State of Louisiana
Parish of Orleans

On this _____ day of October, 2025, before me, the undersigned Notary Public, personally appeared **Very Rev. Peter Akpoghiran, J.C.D.,** who acknowledged that he/she executed the foregoing instrument for the purposes therein contained and in the capacity therein stated.

Notary Public
Printed Name: _____
Notary ID or Bar Roll No.: _____
My Commission Expires: _____

**EXHIBIT A**
**List of Corporations**

## SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK

This Settlement Agreement, Release, and Policy Buyback ("**Settlement Agreement**") is hereby made by, and between, and among The Roman Catholic Archdiocese of New Orleans (the "**Archdiocese**" or "**Debtor**" as further defined in Section ~~1.1.28~~1.1.31 below), the other Archdiocese Signatory Parties (as defined in Section ~~1.1.13~~1.1.15 below), and [ ]National Union Fire Insurance Company of Pittsburgh, Pa. ("**Insurer**" as further defined in Section ~~1.1.45~~1.1.49 below). Insurer, the Archdiocese, the other Archdiocese Signatory Parties, and the Creditors' Committee (as defined below), collectively are the "**Parties**" and each a "**Party**" to this Settlement Agreement.

## RECITALS:

WHEREAS, on May 1, 2020 (the "**Petition Date**" as further defined in Section ~~1.1.62~~1.1.67 below), the Archdiocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**" as further defined in Section ~~1.1.15~~1.1.17) pending under Case No. 20-10846 (the "**Bankruptcy Case**" as further defined in Section ~~1.1.14~~1.1.16 below);

WHEREAS, each of the Additional Debtors (as defined in Section ~~1.1.9~~1.1.11 below) intends to file in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;

WHEREAS, certain Entities have asserted or may hold Claims, including Abuse Claims, against the Archdiocese Bound Parties (each as defined below);

WHEREAS, Insurer issued, allegedly issued, may have issued, assumed by novation or otherwise, or may be administering the Archdiocese Policies (as defined in Section ~~1.1.7~~1.1.9 below) providing certain coverage to the Archdiocese Bound Parties;

WHEREAS, asserted disputes between the Debtor Parties (as defined below) and Insurer have arisen, and assertable disputes between the Archdiocese Bound Parties and Insurer may arise in the future, concerning the scope and nature of Insurer's responsibilities, if any, to provide insurance coverage to the Archdiocese Bound Parties under the Archdiocese Policies (as further defined in Section ~~1.1.25~~1.1.29 below, the "**Coverage Claims**");

WHEREAS, claimants may contend, as a matter of Louisiana law, particularly La. Rev. Stat § 22:1269 *et. seq*., that certain Entities may have Claims arising under or related to the Archdiocese Policies that could entitle them to bring a Direct Action Claim (as defined in Section ~~1.1.32~~1.1.35 below) against Insurer;

WHEREAS, claimants may contend that as a matter of Louisiana law, the time within which Claims relating to Abuse may be asserted against certain of the Archdiocese Bound Parties and/or the Insurer may not have expired with respect to certain Claims;

WHEREAS, the Archdiocese Signatory Parties and Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Claims and all other

disputes between and among them and to release Insurer from any further obligations under the Archdiocese Policies;

WHEREAS, Insurer would not pay the full amount of the Settlement Amount (as defined in Section 1.1.75 1.1.81 below) without the buy-back of the Subject Interests (as defined below) in the Archdiocese Policies, including without limitation, the interests of the Archdiocese, Additional Debtors, other Archdiocese Bound Parties and holders of Direct Action Claims, pursuant to section 363 of the Bankruptcy Code, and without the Sale Injunction, the Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeping Injunction (each as defined below), additionally providing protection to the Insurer Released Parties (as defined below) from Claims against the Insurer Released Parties and their property;

WHEREAS, through this Settlement Agreement and the Plan (as defined in Section 1.1.63 1.1.68 below) the Archdiocese Signatory Parties intend to provide Insurer Released Parties with the broadest possible release of all Claims and Subject Interests with respect to the Archdiocese Policies; and

WHEREAS, through this Settlement Agreement and the Plan, as part of the compromise and resolution of the Coverage Claims, the Debtor Parties and Insurer also wish to effect a sale, pursuant to § 363(b), (f), and (m) of the Bankruptcy Code of the Archdiocese Policies, along with the Coverage Claims and Related Insurance Claims (the "**Purchased Property**" as further defined in Section 1.1.66 1.1.71 below), to provide the Insurer Released Parties with the broadest possible release and buyback with respect to the Archdiocese Policies, resulting in the Insurer Released Parties having no obligations now or in the future with respect to the Archdiocese Policies, including without limitation to any Direct Action Claim.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Settlement Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound subject to the approval of the Bankruptcy Court pursuant to Section 2 below, the Parties hereby agree as follows:

1. **DEFINITIONS**

1.1    As used in this Settlement Agreement (as defined above), the following terms shall have the meanings set forth below.

1.1.1    "**Abuse**" means any of the following actual or alleged acts: (a) touching by the Perpetrator of the person's intimate body parts (genitals, breasts, or buttocks), the touching by the person of the Perpetrator's intimate body parts, showing pictures of the person's body or other persons' bodies, taking pictures of the person's body, showing pornography, or making images of the person while naked or engaged in any sexual activity, or any sexualized interaction including observing the person in bathing, toileting, or undressing that was made possible by the Perpetrator's position of authority, or by the inducement of the Perpetrator; or (b) sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to

the genital or anal openings: (i) of the person's body by any part of the Perpetrator's body or any object used by the Perpetrator for this purpose; or (ii) of the person's body by any part of the body of the Perpetrator or by any part of the body of another person, or by any object used by the Perpetrator or another person for this purpose; (c) inappropriate physical contact and/or contact that infringes upon another's personal, physical boundaries including but not limited to groping, kissing, extended hugging, and/or any unwelcomed touching; (d) grooming or trying to create a special relationship, including but not limited to: talk of a sexual nature, talk of a romantic nature, communications expressing individual love to the person, as opposed to a salutation, providing material resources or experiences which induce the person into a relationship where trust is then violated; or (e) any actual or alleged acts of the kind described in subsections (a)-(c) above that occur between or among minors and that the Perpetrator orchestrates or encourages. For the avoidance of doubt, "Abuse" also includes: any actual or alleged conduct which (a) is described in the Louisiana Child Victims Act or (b) would constitute (i) a sexual offense as defined in article 603(2) of the Louisiana Children's Code; (ii) sexual battery as defined in LA. REV. STAT. §§ 14:43.1; 14:43.1.1; 14:43.2; 14: or 43.3, (iii) a crime against nature as defined in LA. REV. STAT. § 14:89, or (i) pornography involving juveniles as defined in LA. REV. STAT. § 14:81.1, or with respect to the foregoing subsection (i)-(iv), any predecessor statute that prohibited such conduct at the time of the act.

1.1.2 "**Abuse Action**" means an Action asserting an Abuse Claim against any of the Covered Parties.

1.1.3 "**Abuse Claim**" means any Claim that has been asserted, or could be asserted, against any Settling Party or Non-Settling Insurer, that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively alleged Abuse that occurred, in whole or in part, before the applicable Debtor's Petition Date or Additional Debtors' Petition Date, including any such Claim that seeks monetary damages or any other relief, under any legal or equitable theory of liability, including, but not limited to, the following: vicarious liability; *respondeat superior*; any conspiracy, fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, negligent, insufficient, or inadequate supervision, retention or misrepresentation; any theory based on misrepresentation, concealment, or unfair practice; public or private nuisance; or any theory, including, without limitation, any theory based on public policy or any acts or failures to act by any Settling Party, or any other Entity for whom any Settling Party is allegedly responsible, including, but not limited to, any such Abuse Claim against any Settling Party, Non-Settling Insurer, or any other Entity for whom any Settling Party or Non-Settling Insurer is alleged to be responsible. Abuse Claims are: (a) the Known Abuse Claims, which are treated in Class 3; and (b) the Unknown Abuse Claims, which are treated in Class 4. For the avoidance of doubt, "Abuse Claim" includes (a) all Unknown Abuse Claims, (b) Claims or causes of action defined or described in the

Revival Window Laws against the Archdiocese or any other Archdiocese Bound Party, (c) Direct Action Claims, and (d) any Claim against the Archdiocese or any other Archdiocese Bound Party that is attributable to, arises from, is based upon, relates to, or results from Abuse that, as of the Petition Date is barred by any applicable statute of limitations, and in each case, irrespective of whether (x) such Claims also involve the conduct of joint tortfeasors (or similar concepts under applicable law), (y) such Claims arise under, or were revived pursuant to, the Revival Window Laws, or any future reviver law, statute, or binding precedential decision passed or issued on or after the Bankruptcy Plan Effective Date, or (z) a proof of claim has been filed, before or after the Claims Bar Date, or not at all, or an Abuse Action has been commenced with respect to such Claim. "Abuse Claim" does not include: (a) Related Insurance Claims or Coverage Claims against Settling Insurers or Non-Settling Insurers; (b) Non-Insurer Contribution Claims with respect to any Abuse Claim; (c) Insurer Contribution Claims with respect to any Abuse Claim; or (d) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to a Claim against these dioceses only.   For the avoidance of doubt, a Claim based on Abuse solely occurring following the applicable Petition Date is not an Abuse Claim. Nothing in this definition shall constitute a waiver of any defense that would otherwise be available under applicable law to any Settling Party, the Settlement Trust, or any other Entity.

1.1.4   "**Abuse Claim Release and Certification**" means a written release in favor of the Insurer Released Parties, in the form of Exhibit C to the Acceptable Plan, or otherwise in form and substance acceptable to the Parties, which an Abuse Claimant must deliver before he or she is entitled to Settlement Trust Distributions, which shall provide that the Claimant releases the Insurer Released Parties from any and all Claims related to his/her Abuse Claim or any of the Archdiocese Policies, subject to Section 12.14 and related provisions of the Plan.

1.1.5   "**Abuse Claimant**" means the holder of an Abuse Claim, including, but not limited to, any Known Abuse Claim, Unknown Abuse Claim, or Direct Action Claim. For the avoidance of doubt, Abuse Claimants are Creditors.  The definition of an Abuse Claimant includes the legal representative of the holder of an Abuse Claim, such as a bankruptcy trustee, the estate of a deceased individual who held an Abuse Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Abuse Claim, as the case may be.  An Entity holding the following Claim is not an Abuse Claimant: (i) a Non-Insurer Contribution Claim with respect to such Abuse Claim; (ii) an Insurer Contribution Claim with respect to such Abuse Claim; (iii) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to such Entity's claim against such dioceses only.

1.1.6   "**Acceptable Plan**" means the *Fourth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and The Official Committee of Unsecured Creditors* filed at Docket No. [—4419], and its exhibits and schedules, which as may be modified solely in accordance herewith (i.e., with the consent

of the Insurer), and such modified plan constituting the "Acceptable Plan" for the purposes hereof.

1.1.7 "**Archdiocesan Parishes**" means all currently Catholic Church parishes and missions, as identified on Exhibit B-1, Part I, of the Acceptable Plan. Each of the Archdiocesan Parishes is organized as a non-profit corporation. For the avoidance of doubt, the definition of Archdiocesan Parishes does not include St. Louis Cathedral, Our Lady of Guadalupe Church & Shrine of St. Jude, or any Suppressed Archdiocesan Parish identified on Exhibit B-1, Part II, of the Acceptable Plan.

1.1.8 "**Archdiocesan Schools**" means the means the following schools that are owned and operated by the Archdiocese: (a) the Academy of Our Lady High School; (b) Archbishop Chapelle High School; (c)Archbishop Hannan High School; (d) Archbishop Rummel High School; (e) Archbishop Shaw High School; (f) Pope John Paul II High School; (g) St. Charles Catholic High School; (h) St. Scholastica Academy; and (i) St. Michael Special School.

1.1.9 ~~1.1.7~~ "**Archdiocese Policies**" means (a) the contracts, binders, certificates, and policies of insurance that are listed on Schedule 1 hereto, and (b) all other known and unknown contracts, binders, certificates, or policies of general liability insurance, in effect on or before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date that were issued to, or for the benefit of, or subscribed on behalf or that otherwise actually insure, (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) policies issued to the Archdiocese that name as an insured or additional insured (or related concept under applicable law or document) the Diocese of Houma-Thibodaux or Diocese of Baton Rouge, but not policies issued to either of these dioceses that were not also issued to the Archdiocese or name it as insured, (iv) any Entity owned, created, operated, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, or (v) any institution, religious organization or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control or active management; in each case of (a) and (b), that were issued, subscribed to, or underwritten in whole or in part or allegedly issued, subscribed to, or underwritten in whole or in part by Insurer or any of its predecessors.~~1~~

1.1.10 ~~1.1.8~~ "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

---

~~1 SPARTA Settlement Agreement to provide:~~

~~For the avoidance of doubt, the "Archdiocese Policies" include any and all known and unknown contracts, binders, certificates, or policies of general liability insurance that were issued, allegedly issued, or may have been issued by or in the name of American Employers Insurance Company."~~

1.1.11    ~~1.1.9~~ "**Additional Debtors**" means the Entities listed on Acceptable Plan Exhibit B-1.  As used herein, references to the "Additional Debtors" includes the Additional Debtor's Estates.

1.1.12   ~~1.1.10~~ "**Approval Motion**" means the motion filed in the Archdiocese Bankruptcy ~~Court~~Case at Docket No. 4181 seeking approval of this Settlement Agreement as described in Section ~~2~~2.1 of this Settlement Agreement.

1.1.13   ~~1.1.11~~ "**Approval Order**" means the order granting the Approval Motion described in Section ~~2~~2.1 of this Settlement Agreement and providing the relief described in Section ~~2~~2.1 of this Settlement Agreement and in substantially form attached **Exhibit A,** with only such changes as are satisfactory to Insurer.

1.1.14   ~~1.1.12~~ "**Archbishop**" has the meaning given to it in Section 3.7.

1.1.15   ~~1.1.13~~ "**Archdiocese Signatory Parties**" means, collectively, (a) the Debtor Parties and (b) the Non-Debtor Catholic Entities.

1.1.16   ~~1.1.14~~ "**Bankruptcy Case**" means all of the following: (a) with respect to the Archdiocese, "Bankruptcy Case" has the meaning set forth in the Recitals; and (b) with respect to any given Additional Debtor, "Bankruptcy Case" means the case initiated when such Additional Debtor filed in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.17   ~~1.1.15~~ "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Louisiana, having subject matter jurisdiction over the Bankruptcy Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

1.1.18   ~~1.1.16~~ "**Bankruptcy Plan Effective Date**" means the date upon which a Plan approved by the Bankruptcy Court that contains terms and conditions consistent with those required by this Settlement Agreement becomes effective.

1.1.19   ~~1.1.17~~ "**Barred Claim**"  means any Claim against a Settling Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with an Abuse Claim or any of the Archdiocese Policies, including, but not limited to, any:  (a) Abuse Claim; (b) Direct Action Claim; (c) Coverage Claim; (d) Related Insurance Claim;  (e) Non-Insurer  Contribution  Claim;  (f)  Insurer  Contribution  Claim; (g) Medicare Claim; (h) Penalty Claim; and (i) any other Claim that is otherwise released herein.  A Barred Claim further includes any Claim against a Settling Party based on allegations that it is an alter ego or liable as a successor of an Entity that is not a Settling Party or that the Settling Party's corporate veil should be pierced on account of Claims against an Entity that is not a Settling Party or based on any other theory under which the legal separateness of any Person and any other Entity may be disregarded to impose liability for a claim on either such Entity.  Notwithstanding the foregoing, Barred Claims do not include any Claims to the extent they are asserted against (x) Non-Settling Insurers or (y) Excluded Parties, notwithstanding that such Entity may also have asserted or be able to assert a Claim for contribution, indemnity, reimbursement, or subrogation

against any Settling Party relating to or arising from a such Claim; provided, however, that, for the avoidance of doubt, (i) any Claims that assert liability against such Entity in conjunction with a Settling Party will in all events be Barred Claims as to the Settling Party, (ii) any such Claim for contribution, indemnity, reimbursement, or subrogation against a Settling Party is a Barred Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party for the purposes of this definition.

1.1.20 "**Catholic Charities**" has the meaning set forth in Section 6.3.15.

1.1.21 1.1.18 "**Channeling Injunction**" has the meaning set forth in Section 2.2.2.

1.1.22 1.1.19 "**Claim**" means any past, present or future claim, demand, Action, request, right, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether sounding in law, equity, tort, warranty, contract, or under any other theory, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been or may be asserted by or on behalf of any Entity, whether seeking damages (including compensatory, exemplary, punitive, or Penalty claims) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, or orders, including without limitation whether by way of direct action, subrogation, contribution, indemnity, alter ego, veil piercing, or regulatory action, or otherwise, regardless of whether such Claims arise under law, in equity, or under statute, before or after the Petition Date(s), or *in rem* or *in personam*, and include all Claims for damages to the environment or based on any theory of *respondeat superior*, vicarious, successor or transferee liability, or change in control, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

1.1.23 1.1.20 "**Claims Bar Date**" means the date(s) and time(s) indicated in the Final Order(s) (which may be the Plan Confirmation Order) setting the deadline(s) for filing proofs of Abuse Claim against the Debtor or Additional Debtor(s), as applicable.

1.1.24 1.1.21 "**CMS**" has the meaning set forth in Section 2.4.1.

1.1.25 1.1.22 "**Co-Insured Party**" means any other Entity that is a "Named Assured" or "named insured" or "protected person" under the Archdiocese Policies, and all other Entities that are determined by agreement or a court of competent jurisdiction to be an "Assured," an "Additional Assured," an "insured," or "protected person" or otherwise entitled to insurance coverage under any Archdiocese Policies.

1.1.26 1.1.23 "**Conditional Payment**" means any payment made to an Abuse Claimant under the MMSEA, including any payment by a Medicare Advantage Organization (as defined in the MSPA).

1.1.27 ~~1.1.24~~ "**Controlling Document Provision**" has the meaning given to it in Section 2.2.9.

1.1.28 ~~1.1.25~~ "**Covered Parties**" or "**Archdiocese Bound Parties**" means, collectively, the following Entities: (a) the Debtor Parties; (b) the Reorganized Debtor; (c) the Reorganized Additional Debtors; (d) the Non-Debtor Catholic Entities; (e) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP; (f) the ~~applicable~~ Parish Schools and Archdiocesan Schools ~~(each as defined in the Acceptable Plan)~~; (g) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans; (h) any Co-Insured Party; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entities' predecessors, successors, assigns, subsidiaries, direct and indirect past, present, and future affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, and estates. For the avoidance of doubt, the Entities in clauses (g), (h), and (i) are only Archdiocese Bound Parties in connection with the Archdiocese Policies.

1.1.29 ~~1.1.26~~ "**Coverage Claims**" has the meaning set forth in the Recitals and further includes any Claim under relating to or arising out of the Archdiocese Policies or the rights and obligations thereunder, or the breach thereof, including any Claim seeking insurance coverage.

1.1.30 ~~1.1.27~~ "**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed in the Archdiocese's Chapter 11 Case on May 20, 2020, [Docket Nos. 94 & 114], as such committee may be reconstituted from time to time.

1.1.31 ~~1.1.28~~ "**Debtor**" or "**Archdiocese**" means, before the Bankruptcy Plan Effective Date, The Roman Catholic Church of the Archdiocese of New Orleans of Louisiana. As used herein, references to the "Debtor" or "Archdiocese" includes the Debtor's Estate.

1.1.32 ~~1.1.29~~ "**Debtor Parties**" means (i) the Archdiocese and (ii) all of the Additional Debtors.

1.1.33 ~~1.1.30~~ "**Diocese of Baton Rouge**" means the Diocese of Baton Rouge. References to the "Diocese of Baton Rouge CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) July 22, 1961 whichever occurred last; references to the "Diocese of Baton Rouge SD" refer to the period after such date.

1.1.34 ~~1.1.31~~ "**Diocese of Houma-Thibodaux**" means the Diocese of Houma-Thibodaux. References to the "Diocese of Houma-Thibodaux CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) June 5, 1977, whichever occurred last; references to the "Diocese of Houma-Thibodaux SD" refer to the period after such date.

1.1.35 ~~1.1.32~~ "**Direct Action Claim**" means any Claim by any Entity that is a "direct action" as that term is used in La. Rev. Stat § 22:1269 *et. seq*, (or similar law in other jurisdictions) against any Insurer Released Party or related to any Archdiocese Policy, including, without limitation, (a) any claim that is similar or related to any Claim that could also be asserted by the Archdiocese or any Archdiocese Bound Party, (b) any Claim that directly or indirectly arises out of, relates to, or is connected with any Abuse Claim, (c) any Claim that directly or indirectly arises out of, relates to, or is in connection with any Insurer Released Party's  handling of any Abuse Claim under the laws of any applicable jurisdiction, or (d) any Claim arising under any law of any jurisdiction that may give a third party a direct Cause of Action against an Insurer Released Party for monetary or other relief.[2]

1.1.36 ~~1.1.33~~ "**Entity**" means any individual, corporation, corporation sole, partnership, association, limited liability company, joint stock company, proprietorship, unincorporated organization, joint venture, trust, estate, executor, legal representative, or any other entity or organization, as well as any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency, department, board or instrumentality thereof, any other "Person" within the definition of section 101(41) of the Bankruptcy Code, and any successor in interest, heir executor, administrator, trustee, trustee in bankruptcy, or receiver of any Entity and also has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.1.37 ~~1.1.34~~ "**Escrow Agent**" means the agent appointed in accordance with the Escrow Agreement.

1.1.38 ~~1.1.35~~ "**Escrow Agreement**" means the agreement governing the escrow which shall hold the Settlement Amount in escrow and in trust for the benefit of Insurer, and which shall provide for the: (i) transfer of the Settlement Amount, with any accrued interest, to the Settlement Trust following the Settlement Agreement Effective Date, or (ii) return of the Settlement Amount to Insurer, with any accrued interest, upon receipt of notice that the Settlement Agreement has been terminated.

1.1.39 ~~1.1.36~~ "**Estate**" means the (a) the Debtor's estate, and (b) Additional Debtors' estates, each created pursuant to section 541 of the Bankruptcy Code.

1.1.40 ~~1.1.37~~ "**Excluded Party**" means the following Entities: (a) the Holy See (State of Vatican City); (b) any Perpetrator; and (c) any ~~religious order (i.e., institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy)~~archdiocese or diocese (other than the Archdiocese itself), any Religious Order, or other Entity that is an affiliate or associated with the Roman Catholic Church (in its capacity as such, and other than (i)

---

[2] ~~SPARTA Settlement Agreement will provide:~~

~~For the avoidance of doubt, Direct Action Claim does not include the following action:  SPARTA Insurance Company v. Pennsylvania General Insurance Company, No. 21-11205 (D. Mass.).~~

1071

the Non-Debtor Catholic Entities; (ii) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP, (iii) the ~~applicable~~ Parish Schools and Archdiocesan Schools ~~(each as defined in the Acceptable Plan)~~; and (iv)~~,~~ any Co-Insured Party); provided, however, that any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party.~~"~~

1.1.41 ~~1.1.38~~ "**Extra-Contractual Claim**" means any Claim against any Insurer Released Party seeking any type of relief, other than coverage or benefits, under or with respect to the Archdiocese Policies. Extra-Contractual Claims include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs, or any other type of relief, alleging any of the following with respect to (a) any Archdiocese Policy; (b) any Claim allegedly or actually covered under a Archdiocese Policy; or (c) the conduct of any Insurer Released Party with respect to (a) or (b): (i) bad faith; (ii) failure to provide insurance coverage under any Archdiocese Policy, including any failure to investigate or to provide a defense or adequate defense; (iii) failure or refusal to compromise and settle any Claim insured under any Archdiocese Policy; (iv) failure to act in good faith; (v) violation or breach of any covenant or duty of good faith and fair dealing, whether express, implied,  or otherwise; (vi) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (vii) violation of any unfair claims practices act or similar statute, regulation or code, including any statute, regulation, or code relating to  unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising; (viii) any type of misconduct; or (ix) any other act or omission of any type by any Insurer Released Party for which the claimant seeks relief other than coverage or benefits under a Archdiocese Policy. "Extra-Contractual Claims" further include all Claims relating to any Insurer Released Party's (x) handling of any Claims under the Archdiocese Policies, (y) conduct in negotiating this Settlement Agreement and/or the Plan, and (z) conduct in the settlement of any Claims. For the avoidance of doubt, Extra-Contractual Claims of the Archdiocese Bound Parties are included within the property Insurer is purchasing hereunder.

1.1.42 ~~1.1.39~~ "**Final Order**" means an order as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending and in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order will have been affirmed by the highest court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari,* petition for review, or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order will not cause such order not to be a Final Order.

1.1.43 ~~1.1.40~~ "**Gatekeeper Injunction**" has the meaning set forth in Section 2.2.2.

1.1.44 "**HH**" has the meaning set forth in Section 6.3.15.

1.1.45 1.1.41 "**Indemnified Claims**" shall havehas the meaning set forth in Section 7.2 of this Settlement Agreement.

1.1.46 1.1.42 "**Indemnity Cost Reserve**" shall havehas the meaning set forth in Section 7.27.2.1.

1.1.47 1.1.43 "**Injunctions**" means the Sale Injunction, Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeper Injunction.

1.1.48 1.1.44 "**Insurance Settlement Agreement"** shall havehas the meaning set forth in the Acceptable Plan.

1.1.49 1.1.45 "**Insurer**" means [___].³National Union Fire Insurance Company of Pittsburgh, Pa., or its successors and assigns..

1.1.50 1.1.46 "**Insurer Contribution Claim**" means any (a) Non-Settling Insurer Contribution Claim or (b) Settling Insurer Contribution Claim.

1.1.51 1.1.47 "**Insurer Released Party**" means Insurer and its Related Parties, each in their capacities solely as such with respect to the Archdiocese Policies and all Subject Interests therein.

1.1.52 1.1.48 "**Known Abuse Claims**" means any Abuse Claim, other than an Unknown Abuse Claim, against any Settling Party, Settling Insurer, and/or Non-Settling Insurer.

1.1.53 1.1.49 "**Medicare Claims**" means any Claim by CMS, and/or any agent or successor of CMS, charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA or pursuing a Claim under MSP Provisions, relating to any

---

³ US Fire/International Settlement Agreement to include the following definition for "Insurer": "United States Fire Insurance Company ("U.S. Fire"), International Insurance Company ("International"), and Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company individually and, to the extent that policies issued by U.S. Fire and/or International were novated to or assumed by either or both of them ("U.S. Fire/International"). Any Entity that meets the definition set forth above shall be individually referred to as an 'Insurer.'"

SPARTA Settlement Agreement to include the following definition for "Insurer":

"SPARTA Insurance Company and American Employers' Insurance Company ("SPARTA")."

Catholic Mutual Settlement Agreement to include the following definition for "Insurer":

"Catholic Mutual Relief Society of America."

National Union Settlement Agreement to include the following definition for "Insurer":

"National Union Fire Insurance Company of Pittsburgh, Pa., or its successors and assigns."

Puritan Insurance Company to include the following definition for "Insurer":

"Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation."

Twin City Settlement Agreement to include the following definition for "Insurer":

"Twin City Fire Insurance Company and First State Insurance Company."

payments in respect of any Abuse Claim, including any Claim for reimbursement of
conditional payments, and any Claim relating to reporting obligations.

1.1.54 ~~1.1.50~~ "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP
Extension Act of 2007 (P.L. 110-173), which imposes reporting obligations on those
Entities with payment obligations under the MSPA.

1.1.55 ~~1.1.51~~ "**MSPA**" means 42 U.S.C. §1395y et seq., or any other similar
statute or regulation, and any related rules, regulations, or guidance issued in connection
therewith or amendments thereto, including the regulations promulgated thereunder,
found at 42 C.F.R. §411.1 et seq.

1.1.56 ~~1.1.52~~ "**Non-Debtor Catholic Entity Policy Sale**" has the meaning set
forth in Section 4.6.

1.1.57 ~~1.1.53~~ "**Non-Debtor Catholic Entities**" collectively means those entities
listed on the Acceptable Plan Exhibit B-2 who are not Additional Debtors, but which are
(a) insured (as a named insured, additional insured, or otherwise) under any of the
Archdiocese Policies and/or (b) have actually or allegedly acquired or been assigned the
right to make a claim for coverage under any of the Archdiocese Policies (excluding,
however, for the avoidance of doubt, the Debtor Parties, the Settlement Trust, and any
Abuse Claimant).

1.1.58 ~~1.1.54~~ "**Non-Insurer Contribution Claim**" means any Claim for
contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation,
allocation or reallocation, or reimbursement, or any other indirect or derivative recovery
(as those terms are defined by the applicable non-bankruptcy law of the relevant
jurisdiction), whether contractual or implied by law that is attributable to, arises from, is
based upon, relates to, or results from, an Abuse Claim or payment of an Abuse Claim,
and any other derivative or indirect Abuse Claim of any kind whatsoever, whether in the
nature of or sounding in contract, tort, warranty or any other theory of law or equity
whatsoever, other than a Non-Settling Insurer Contribution Claim or a Settling Insurer
Contribution Claim.

1.1.59 ~~1.1.55~~ "**Non-Settling Insurer**" means any insurer (together with its
Related Parties) that is not a Settling Insurer.

1.1.60 ~~1.1.56~~ "**Non-Settling Insurer Contribution Claim**" means all Claims,
most commonly expressed in terms of contribution, indemnity, equitable indemnity,
subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or
any other indirect or derivative recovery, by a Non-Settling Insurer against any Settling
Insurer for the payment of money where such Non-Settling Insurer contends that it has
paid more than its equitable or proportionate share of a Claim.

1.1.61 "**Parish Schools**" means the elementary Catholic schools that are owned
and operated by the Archdiocesan Parishes. For the avoidance of doubt, the definition of
Parish Schools expressly excludes Catholic schools that are owned and operated by

Religious Orders and the Archdiocesan Schools. For the further avoidance of doubt, the Parish Schools are not separately incorporated.

1.1.62 ~~1.1.57~~ "**Parties**" has the meaning set forth in the first paragraph of this Settlement Agreement.

1.1.63 ~~1.1.58~~ "**Payment Security**]" means [**Intentionally Omitted**][4]

1.1.64 ~~1.1.59~~ "**Penalty Claims**" means a Claim against any Settling Party or Settling Insurer for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Creditor holding such Claim.

1.1.65 ~~1.1.60~~ "**Perpetrator**" means an individual who personally committed or is alleged to have personally committed an act of Abuse. For the avoidance of doubt, the definition of Perpetrator does not include any individual who did not personally commit an act of Abuse or is not alleged to have personally committed an act of Abuse, but against whom an Abuse Claim or Non-Insurer Contribution Claim is asserted nonetheless, or may be asserted, by virtue of such individual's position or service as a member, representative, contractor, consultant, professional, or volunteer of the Archdiocese or any Non-Debtor Catholic Entity or any council or representative body associated with such Entities.

1.1.66 ~~1.1.61~~ "**Person**" has the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

1.1.67 ~~1.1.62~~ "**Petition Date**" means (a) with respect to the Archdiocese, May 1, 2020; ~~and~~ (b) with respect to each Additional Debtor, the date(s) on which such Additional Debtor files in the Bankruptcy Court its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.68 ~~1.1.63~~ "**Plan**" refers to the Chapter 11 Plan of Reorganization for the Archdiocese and all Additional Debtors (and all exhibits annexed thereto) which shall, among other things, provide for the resolution of Abuse Claims and Subject Interests in the Archdiocese Policies as set forth herein, and which shall be in form and substance acceptable to Insurer in its sole discretion.

1.1.69 ~~1.1.64~~ "**Plan Confirmation Order**" has the meaning set forth in Section 2.3.

1.1.70 ~~1.1.65~~ "**Preserved Coverage**" means [**Intentionally Omitted**.][5]

---

[4] ~~Intentionally omitted, except the SPARTA Settlement Agreement, in which this section will provide:~~

~~has the meaning given to it in Section 3.1.1 hereof.~~

[5] ~~Intentionally omitted, except the Catholic Mutual Settlement Agreement, in which this section will provide:~~

~~"Preserved Coverage" means Insurer's obligations under Certificate No. [•] issued by Insurer to the Archdiocese to defend and~~

1.1.71 ~~1.1.66~~ "**Purchased Property**" means any and all right, title, and interest (including all Subject Interests) in and to the Archdiocese Policies and the Related Insurance Claims and Coverage Claims.

1.1.72 ~~1.1.67~~ "**Related Insurance Claim**" means (a) any Extra-Contractual Claim and (b) any other Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies, including, without limitation, bad faith Claims.

1.1.73 ~~1.1.68~~ "**Related Party**" means, with respect to any Entity, such Entity's (a) predecessors, successors, assigns, and any Entity that assumed the obligation of the forgoing for the Archdiocese Policies by novation or otherwise (b) direct and indirect past, present, and future Affiliates (as defined in section 101(2) of the Bankruptcy Code), holding companies, merged companies, related companies, subsidiaries, divisions, acquired companies, joint ventures, joint venturers, (c) current and former employees, officers, directors, principals, partners, managing agents, trustees, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, brokers, adjusters, reinsurers, retrocessionaires, subrogees, agents, claims handling administrators, and other professionals, and (d) respective heirs, executors, estates, and nominees; and all Entities acting on behalf of, by, through or in concert with them, each solely in their capacities as such with respect to such Entity (and with respect to such Entity (including Insurer) that is an insurer of any Archdiocese Bound Party or has assumed the obligations of such by novation or otherwise, such insurer's applicable insurance policy(ies) (including the Archdiocese Policies)).[6]

1.1.74 "**Religious Order**" means, collectively, an institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy.

1.1.75 ~~1.1.69~~ "**Reorganized Additional Debtors**" means the Additional Debtors, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.76 ~~1.1.70~~ "**Reorganized Debtor**" means the Debtor, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or

---

~~"Preserved Coverage" means Insurer's obligations under Certificate No. [•] issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the personal injury claims listed in the attached Schedule [X], in each case, subject to the limits, declarations, terms and conditions of such certificate; provided, however, that Preserved Coverage shall not include coverage for any and all Abuse Claims or other Barred Claims.~~

~~[6] The SPARTA Settlement Agreement will additionally provide:~~

~~For the purposes of this definition and this Settlement Agreement, Pennsylvania General Insurance Corporation shall not be a considered a Related Party of SPARTA Insurance Company.~~

otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.77 ~~1.1.71~~ "**Revival Window**" means Section 2 of La. Acts 2021, No. 322, as amended by La. Acts 2022, No. 386, and La. Acts 2024, No. 481.

1.1.78 ~~1.1.72~~ "**Revival Window Laws**" means the Revival Window, together with any other law that extends the prescriptive period or statute of limitations for asserting Abuse Claims under Louisiana or other applicable state law.

1.1.79 ~~1.1.73~~ "**Sale Injunction**" has the meaning set forth in Section 2.1.

1.1.80 ~~1.1.74~~ "**Settlement Agreement Effective Date**" means the first day on which: (a) the Archdiocese Signatory Parties and Insurer have executed this Settlement Agreement; (b) the Unknown Abuse Claims Representative shall have supported the releases provided for herein and the protections granted hereby and in the Plan in favor of the Insurer Released Parties, in a manner acceptable to Insurer in its sole discretion; (c) the Approval Order shall have become a Final Order; (d) the Plan Confirmation Order shall have become a Final Order; and (e) the Settlement Trust shall have been created pursuant to the Plan~~[; provided, however, that in Insurer's sole discretion~~ with the prior written consent of the Trustee, not to be unreasonably withheld, Insurer may elect to waive the conditions set forth in clauses (b) through (e) and pay or direct the payment of the Settlement Amount to the escrow or Settlement Trust prior to the occurrence of the events set forth in (b) through (e) hereof, in which case, the date of such payment shall be the Settlement Agreement Effective Date for all purposes hereunder including the date of the closing of the purchase and sale of the Archdiocese Policies.~~]~~[7]

1.1.81 ~~1.1.75~~ "**Settlement Amount**" means the sum of $~~[___]~~290,000 to be paid (in accordance with Section 3.1) by Insurer after satisfaction of all conditions precedent herein in accordance herewith.

1.1.82 ~~1.1.76~~ "**Settlement Trust**" means the settlement trust established under the Plan for the purposes set forth therein, including assuming liability for all Channeled Claims (as defined in the Acceptable Plan) and Indemnified Claims (as defined herein), subject to the limitations on indemnification and liability contained in Section 7.2 of this Settlement Agreement.

1.1.83 ~~1.1.77~~ "**Settlement Trust Agreement**" means the agreement between the Debtor and the Settlement Trustee governing the Settlement Trust, ~~to be filed with the Plan Supplement (as defined in the~~ in the form of Exhibit D-1 to the Acceptable Plan~~)~~.

1.1.84 ~~1.1.78~~ "**Settlement Trust Allocation Protocol**" means the Settlement Trust Allocation Protocol (as defined and used in the Settlement Trust Agreement), ~~to be filed with the~~ in the form of Exhibit D-2 to the Acceptable Plan ~~Supplement~~.

---

[7] ~~Note: Subject to further discussion.~~

1.1.85 ~~1.1.79~~ "**Settlement Trust Documents**" means, collectively, (a) the Settlement Trust Agreement, (b) the Settlement Trust Allocation Protocol, and (c) any other agreements, instruments and documents governing the establishment and administration of the Settlement Trust, which shall be consistent with the terms of the Plan, as the same may be amended or modified from time to time in accordance with the terms thereof.

1.1.86 ~~1.1.80~~ "**Settlement Trustee**" means the Entity appointed to act as the initial trustee of the Settlement Trust pursuant to the terms of the Settlement Trust Documents, along with any successor trustee appointed in accordance with the Settlement Trust Documents.

1.1.87 ~~1.1.81~~ "**Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Settling Insurer against any Settling Insurer or Non-Settling Insurer for the payment of money where such Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.88 ~~1.1.82~~ "**Settling Insurers**" shall have the meaning set forth in the Acceptable Plan.

1.1.89 ~~1.1.83~~ "**Settling Insurers' Policies**" shall have the meaning set forth in the Acceptable Plan.

1.1.90 ~~1.1.84~~ "**Settling Parties**" means, collectively, the following Entities: (a) Archdiocese Bound Parties; and (b) the Settling Insurers.

1.1.91 ~~1.1.85~~ "**Subject Interests**" means all Claims, liens (as defined by Section 101(37) of the Bankruptcy Code), encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief, including: (a) all interests of the Archdiocese in, to and under the Archdiocese Policies; (b) all interests in, to, and under the Archdiocese Policies of any Entity other than the Archdiocese (including all Abuse Claimants and the Archdiocese Bound Parties); and (c) all interests in, to and under the Archdiocese Policies of any other Entity claiming coverage by, through, or on behalf of any Archdiocese Bound Party, including, without limitation, rights and interests as an insured, co-insured or additional insured, insurer or creditors of the Archdiocese Bound Parties; in each case within the meaning of "interest" as used in sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code. For the avoidance of doubt, a Direct Action Claim constitutes a Subject Interest. The meaning of Subject Interests also includes: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the

use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property.

    1.1.92 ~~1.1.86~~ "**Supplemental Settling Insurers' Injunction**" has the meaning set forth in Section 2.2.2.

    1.1.93 ~~1.1.87~~ "**Unknown Abuse Claim**" means an Abuse Claim that occurred before the Petition Date and the Abuse Claimant did not file a proof of claim by the applicable Abuse Claims Bar Date, for which there exists a valid legal excuse for not filing, as further defined in the in the Acceptable Plan.

    1.1.94 ~~1.1.88~~ "**Unknown Abuse Claims Representative**" means Michael R. Hogan, the legal representative appointed by the Bankruptcy Court pursuant to the *Order (I) Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, and (II) Approving the Retention of Michael R. Hogan as the Unknown Tort Claims Representative, Nunc Pro Tunc To July 26, 2021* (Docket No. 1012 ), any successor legal representative appointed by the Bankruptcy Court, or, on and after the

Bankruptcy Plan Effective Date, any successor legal representative appointed in accordance with the applicable Settlement Trust Document.

1.2    Capitalized terms not defined in this Section 1 or elsewhere in this Settlement Agreement shall have the meanings given to them in the Bankruptcy Code.

## 2.  THE BANKRUPTCY CASE AND PLAN OF REORGANIZATION

2.1    On or before July 29, 2025, the Archdiocese shall file a motion in the Bankruptcy Court (the "**Approval Motion**"), in form and substance acceptable to Insurer in its sole discretion, that seeks the entry of an order in substantially the form attached as **Exhibit A** to this Settlement Agreement, or otherwise in form and substance acceptable to Insurer in its sole discretion (the "**Approval Order**"), that:

(a) approves this Settlement Agreement, including Insurer's buyback of the Archdiocese Policies and the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests, and otherwise authorizes the Parties to undertake the settlement and the transactions contemplated by this Settlement Agreement, in each case pursuant to sections 363(b), (f),and (m) of the Bankruptcy Code and any other applicable provisions of the Bankruptcy Code;

(b) contains an injunction (the "**Sale Injunction**") that, subject to and conditioned upon the Settlement Agreement Effective Date and the Insurer's payment of the Settlement Amount, bars all Claims against the Insurer Released Parties and their property and assets of each based on or arising out of any Subject Interests in the Archdiocese Policies including without limitation all Coverage Claims, Related Insurance Claims, and Barred Claims, leaving the Settling Insurers free and clear of all Subject Interests of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); any Abuse Claimant; or any holder of a Barred Claim pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code;

(c) provides that this Settlement Agreement is binding on the Archdiocese Signatory Parties, all other Settling Parties, any trust created in the Bankruptcy Case(s), and any successors of the foregoing; and

(d) provides, subject to and conditioned upon the Settlement Agreement Effective Date, that the Approval Order is binding on all Persons (including, for the avoidance of doubt, all Persons set forth in the foregoing (c)).

2.1.1    The Archdiocese shall provide written notice of the Approval Motion, which notice shall be in form and substance acceptable to Insurer, to, at a minimum, any known Archdiocese Bound Party, holder of an Abuse Claim, or party whose rights or interests may reasonably be considered to be impacted by the relief requested in the Approval Motion, and any party identified on Schedule 3 hereto. In addition, the

Archdiocese shall include notice of the Approval Motion together with notice provided with respect to confirmation of the Joint Plan, including publication notice of the hearing on the Approval Motion. The Archdiocese will provide a draft service list of the foregoing for Insurer's review and comment.

2.1.2   If any Entity files an objection to the Approval Motion, the Archdiocese and Creditors' Committee shall consult with Insurer in connection with filing any written response thereto.  The Archdiocese Signatory Parties, as applicable, and Creditors' Committee shall take commercially reasonable steps to defend against any objection, appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order.  Insurer will cooperate with the Archdiocese Signatory Parties and Creditors' Committee in this regard, including making commercially reasonable submissions.

2.2     The Archdiocese shall file and prosecute a joint Plan with the Creditors' Committee, which shall be in form and substance satisfactory to the Insurer in its sole discretion, substantially in the form as the Acceptable Plan, which the Parties acknowledge and agree satisfies the terms of this Settlement Agreement.  Any modifications to the Plan, the Settlement Trust Documents, the Plan Confirmation Order, or the Approval Order, including those relating to the Channeling Injunction,  Supplemental Settling Insurers' Injunction, Gatekeeper Injunction, releases by holders of Abuse Claims, Insurers, Insurance Settlement Agreements, and related definitional terms, including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Abuse Related Insurance Claims," "Channeled Claim," "Covered Parties," "Direct Action Claim," "Enjoined Party," "Insurer Contribution Claim," "Non-Insurer Contribution Claim," "Penalty Claims," "Protected Parties," "Settling Insurers," "Settling Insurer's Policies," "Subject Insurance Policies," "Subject Interests," or any exhibits, schedules, and documents related thereto, must be in all respects consistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties without Insurer's written consent in its sole discretion.

2.2.1   The Plan shall create the Settlement Trust, which shall be responsible for making any and all payments to the Abuse Claimants entitled to receive payment under the Plan and which shall assume all liability for Channeled Claims.

2.2.2   The Plan shall include: (a) an injunction in substantially the form included in Article [12.4] of the Acceptable Plan (the "**Channeling Injunction**"); and (b) an injunction in substantially the form included in Article [12.5] of the Acceptable Plan (the "**Supplemental Settling Insurers' Injunction**"); and (c) an injunction in substantially the form included in Article [12.6]12.8 of the Acceptable Plan (the "**Gatekeeper Injunction**").

2.2.3   The Plan shall incorporate by reference the releases and indemnities set forth in this Settlement Agreement, including that the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to all Indemnified Claims as forth in Section 7.2 of this Settlement Agreement.

2.2.4    The Settlement Trust Documents shall provide that as a condition to receiving payment from the Settlement Trust, all Abuse Claimants shall provide an Abuse Claim Release and Certification.

2.2.5    The Plan shall provide for the commencement, prior to the Court's consideration of the Approval Motion, by the Additional Debtors of Chapter 11 cases to be jointly administered with the Bankruptcy Case.

2.2.6    The Plan shall provide a supplemental bar date for the Additional Debtors in a form and substance satisfactory to the Insurer with respect to Abuse Claims against the Additional Debtors and the form, manner, and deadline for filing proofs of claim and the treatment of confidential information contained therein.

2.2.7    The Plan shall provide that confirmation of the Plan will not occur unless all of the following conditions precedent have been satisfied: (a) the Plan Confirmation Order approves and implements the Injunctions and (b) the Bankruptcy Court shall have granted the Approval Motion in form and substance acceptable to Insurer in its sole discretion.

2.2.8    The Plan shall provide that the Bankruptcy Plan Effective Date will not occur unless all of the following conditions precedent have been satisfied or waived (as applicable with consent of Insurer): (a) the Plan Confirmation Order will have been entered by the Bankruptcy Court and become a Final Order, and (b) the Bankruptcy Court shall have entered the Approval Order (with both such Approval Order and this Settlement Agreement in form and substance acceptable to the Insurer) and such Approval Order shall have become a Final Order.

2.2.9    The Plan shall provide that (collectively, as follows, the "**Controlling Document Provision**") in the event of a conflict between (a) the Settlement Agreement, on the one hand, and (b) the Plan, on the other, the terms of the Settlement Agreement shall control and govern; and in the event of a conflict between the (x) Approval Order, on the one hand, and (y) Plan Confirmation Order, on the other, the terms of the Approval Order shall control and govern.

2.2.10   The Plan shall provide that the execution and delivery of this Settlement Agreement is a condition to entry of the Plan Confirmation Order and the occurrence of the Bankruptcy Plan Effective Date. The inclusion of this Settlement Agreement in the Plan shall not be waivable as a condition to entry of the Plan Confirmation Order or the occurrence of the Bankruptcy Plan Effective Date absent the prior written consent of the Settling Insurers.

2.3      The Debtor Parties shall seek and obtain entry of an order from the Bankruptcy Court, which order shall be in form and substance acceptable to the Parties, that: (i) approves the Plan pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code; (ii) contains the Channeling Injunction; (iii) ratifies the Sale Injunction as independent of the Channeling Injunction and Supplemental Settling Insurers' Injunction; (iv)

contains the Gatekeeper Injunction; (v) provides that this Settlement Agreement is binding on any Settlement Trust created in the Bankruptcy Case, the Reorganized Debtor, the Reorganized Additional Debtors, and any successors of the Settlement Trust, Reorganized Debtor, or Reorganized Additional Debtors, and all of the Archdiocese Bound Parties; and (vi) contains the Controlling Document Provision (the "**Plan Confirmation Order**").

2.3.1    The Plan and Plan Confirmation Order must not be inconsistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties.

2.3.2    In seeking to obtain the Plan Confirmation Order, the Debtor and Additional Debtors will: (i) seek a confirmation hearing on an appropriately timely basis; (ii) urge the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) take all reasonable steps to defend against any objection, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order.

2.3.3    Prior to entry of the Plan Confirmation Order, the Archdiocese and/or any applicable Additional Debtor shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Abuse Claim that (i) is asserted against any Debtor Party and (ii) implicates, or is reasonably likely to implicate, any Archdiocese Insurance Policies (including by alleging Abuse that took place during any policy period of any Archdiocese Policy).  If, prior to the Plan Confirmation Order becoming a Final Order, the Bankruptcy Court allows any Entity to prosecute any such Abuse Claim, the Debtor Parties shall defend themselves against such Abuse Claims and comply with the terms of any order of the Bankruptcy Court, and Insurer's rights and obligations relating to such litigation shall be determined by, and subject to, the terms and conditions of the Archdiocese Policies, this Settlement Agreement, and any applicable orders of the Bankruptcy Court.

2.3.4    The Plan and Plan Confirmation Order shall provide that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any Covered Party with respect to any Archdiocese Policy, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

2.3.5    Nothing in this Section or elsewhere in this Settlement Agreement shall bar any party from arguing that any appeal from the Plan Confirmation Order should be dismissed on grounds of statutory or equitable mootness or otherwise.

2.3.6    None of the releases, Injunctions, or other provisions of the Plan with apply to, or have any effect, on the rights of the Settling Insurers to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with any Settling Insurer's Policy.

2.4    The Settlement Trust Documents shall require the Settlement Trust to register as a Responsible Reporting Entity under the reporting provisions of MMSEA.

2.4.1    The Settlement Trust Documents shall require the Settlement Trust, at its sole expense, to timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated and to follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

2.4.2    The Settlement Trust Documents shall require the Settlement Trust to obtain, prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Abuse Claim, a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. §1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim.

2.5    The Debtor Parties and Reorganized Debtor and Reorganized Additional Debtors will undertake commercially reasonable actions to cooperate with Insurer in connection with responding to any inquiry from Insurer's regulators, auditors, reinsurers, or retrocessionaires.

2.6    From and after the execution date of this Settlement Agreement and until the earlier of: (A) occurrence of (i) the Settlement Agreement Effective Date and (ii) Insurer's remittance of the Settlement Amount (at which time this covenant is superseded by the releases provided in Section 4); and (B) the date on which this Settlement Agreement is terminated, (i) none of the Insurer Released Parties, the Debtor, the Additional Debtors or Creditors' Committee will initiate any litigation activity against the other in any Bankruptcy Case and (ii) the Archdiocese and the Insurer Released Parties shall cease all litigation activities against each other in the Bankruptcy Case, including that the Insurer Released Parties will neither object to any proposed Plan consistent with this Settlement Agreement, nor serve or compel any discovery in connection with the Bankruptcy Case; *provided that*: (y) neither the Archdiocese nor any Additional Debtor shall include any provision in any Plan that adversely affects the rights or benefits of the Insurer Released Parties under this Settlement Agreement, or that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement; and (z) neither the Archdiocese nor any Additional Debtor shall act, or fail to act, in such a way that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement. Notwithstanding the foregoing, the Insurer Released Parties may participate in the Bankruptcy Case for the purpose of supporting or enforcing any of the terms of this Settlement Agreement and protecting their rights.

~~2.7    The Parties shall each bear, as to each other only, their own costs, expenses, and counsel and professional fees in the Bankruptcy Case.~~

2.7    ~~2.8~~ From and after the execution date of this Settlement Agreement and until the date on which this Settlement Agreement is terminated, the obligations of the Debtors Parties set forth in this Section 2 shall be binding on the Debtor Parties.

## 3. PAYMENT OF THE SETTLEMENT AMOUNTS

3.1    By no later than thirty (30) days after (a) the Settlement Agreement Effective Date, and (b) Insurer receiving appropriate instructions for the transmission of the payment to the Escrow Agent or Settlement Trust, Insurer shall pay (or cause to be paid) the Settlement Amount to the Settlement Trust or Escrow Agent pursuant to the Escrow Agreement.   Payment of the Settlement Amount may be by check, ACH transfer, wire transfer, or other method.

3.1.1    [Intentionally Omitted.][8]

3.2    The delivery of the Settlement Amount to the Escrow Agent or Settlement Trust shall be in full and final settlement of all responsibilities under and arising out of the Archdiocese Policies, the sale of the ~~Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties back~~ Purchased Property to Insurer free and clear of all Subject Interests of any Entity, and the other releases provided.

3.3    Subject to the occurrence of the Settlement Agreement Effective Date, the Parties agree:  (i) the Settlement Amount is the total amount that Insurer is obligated to pay on account of any and all Claims under, arising out of, relating to, or in connection with the Archdiocese Policies (including Barred Claims, and any reimbursement obligations for Conditional Payments under the MSPA); (ii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of anyone in connection with the Archdiocese Policies, including any payments in connection with amounts allegedly owed under the MSPA or in connection with any Claims, including any Barred Claim; (iii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of the Archdiocese Bound Parties or any Abuse Claimants in connection with the Archdiocese Policies; and (iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted[9]. The Parties further agree that the Settlement Amount includes the full purchase price of the Archdiocese Policies and Related Insurance Claims and Coverage Claims of the Archdiocese Bound Parties and consideration for the releases and other protections afforded by this Settlement Agreement.

---

[8] ~~Intentionally omitted, except the SPARTA Settlement Agreement, in which this section will provide:~~

~~[SPARTA shall provide a standby letter of credit, in a manner acceptable to the Debtor, to secure payment of the Settlement Amount. References herein or in the Plan to "payment" of the Settlement Amount shall be deemed to include the draw down of the letter of credit, as applicable.]~~

[9] ~~The Catholic Mutual Settlement Agreement will include the following~~

~~["(iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted *except for the Preserved Coverage*."]~~

3.4     The Parties represent and agree that (i) the consideration to be provided by Insurer pursuant to this Settlement Agreement constitutes a fair and reasonable compromise and exchange for the consideration granted to the Insurer Released Parties in this Settlement Agreement (including the releases set forth below), and (ii) the consideration to be provided by the Archdiocese Bound Parties to the Insurer Released Parties pursuant to this Settlement Agreement (including the releases set forth below) constitutes a fair and reasonable compromise and exchange for the consideration granted to the Archdiocese Bound Parties in this Settlement Agreement. The Insurer Released Parties are not acting as volunteers, and the Settlement Amount reflects potential liabilities and obligations to the Archdiocese Bound Parties of the amount Insurer allegedly is obligated to pay.

3.5     Each of the Archdiocese Signatory Parties: (i) consents to the sale of the Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests and Claims of all Persons, including, without limitation, the Archdiocese Bound Parties in accordance with the terms of this Settlement Agreement, and (ii) agrees and acknowledges that the contribution of the proceeds from such sale and settlement to the Settlement Trust, as provided in the Plan and this Settlement Agreement, is a fair and reasonable compromise and exchange for value and constitutes reasonable and adequate consideration for any Subject Interest or Claim the Archdiocese Bound Parties may have in the Archdiocese Policies.

3.6     The Parties further agree that they have attempted to resolve the matters set forth herein in compliance with both state and federal law and believe that the settlement terms adequately consider CMS's interest and do not reflect any attempt to shift responsibility for payment of medical expenses to CMS pursuant to 42 U.S.C. § 1395y(b).  The Parties acknowledge, understand, and agree that any present or future action or decision by CMS, including actions regarding an Abuse Claimant's eligibility or entitlement to receive Medicare or Medicare payments, will not render this Settlement Agreement (including the releases set forth in it) void or ineffective, or in any way affect the finality of this Settlement Agreement.  The Settlement Trust is responsible for all future medical payments, including any and all claims by CMS and/or CMS contractors that have been or may be in the future arising out of, relating (directly or indirectly) in any way to, or in connection with this Settlement Agreement.

3.7     To facilitate the purchase of the ~~Archdiocese Policies~~Purchased Property as set forth herein, ~~the Archdiocese and~~ each ~~of the other~~ Archdiocese Bound ~~Parties authorizes the Archbishop[10]or any other person employed by the Archdiocese that he designates, as its~~Party is authorized to designate a lawful attorney in fact, with full powers of substitution, to execute any bill of sale or other document reasonably requested by the Archdiocese or Insurer to accomplish the sale and purchase contemplated herein. A form of Bill of Sale is attached hereto as **Exhibit B**.

## 4.  RELEASES AND SALE FREE AND CLEAR

---

[10] ~~As used herein, "Archbishop" refers to: (a) the office of the ordinary of the Archdiocese under Canon Law; (b) the Most Reverend Gregory Michael Aymond, the Archbishop on the Effective Date; and (c) any duly appointed or elected administrator of the Archdiocese pending the appointment of a new individual to serve as the Archbishop, and his duly appointed or elected successor.~~

4.1     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, with no further action being required, the Archdiocese Signatory Parties fully, finally, and completely remise, release, acquit, and forever discharge the Insurer Released Parties (including, for the avoidance of doubt, any of their reinsurers or retrocessionaires, solely in their capacity as such), from any and all past, present, and future: (a) Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies or Claims that are covered or are determined to be covered by agreement or a court of competent jurisdiction under the Archdiocese Policies, including, without limitation, any Barred Claims, Direct Action Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims, the handling of the Abuse Claims or the Bankruptcy Case.  The Archdiocese Signatory Parties further acknowledge, stipulate, and agree that (x) the releases in this Section 4.1 specifically include all Unknown Abuse Claims, and demands that are based in whole or in part on Unknown Abuse Claims and (y) **with respect to all Claims released under this Section 4.1, the Archdiocese Signatory Parties waive any and all provisions, rights, and benefits conferred by Cal. Civ. Code 1542 or any law of any state of the United States, or any principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code 1542, which provides: "a general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, that, if known by him or her, would have materially affected his or her settlement with the debtor or released party"** and (z) the releases in this Section 4.1 shall be equal in breadth to the broadest releases and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

4.2     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, and with no further action being required, Insurer shall fully, finally, and completely remise, release, acquit, and forever discharge the Archdiocese Signatory Parties from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies, including any Barred Claims, and reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case subject to the protections in favor of the Insurer Released Parties set forth herein[11].

4.3     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, none of the Archdiocese Signatory Parties or other Archdiocese Bound Parties shall assert against the Insurer Released Parties any Claim with respect to any matter, conduct, transaction, occurrence, fact, or other circumstance that, directly

---

[11] Catholic Mutual Settlement Agreement will include the following addition:

"all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case *provided that, the obligations of the applicable Archdiocese Bound Parties are not released from their obligations under the Archdiocese Policies with respect to the Preserved Coverage."*

or indirectly, arises out of, relates to, or is in connection with any of the Archdiocese Policies, any Barred Claim, or any other matter released pursuant to Sections 4.1 and 4.2 above.

4.4     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer hereby buys back the Archdiocese Policies free and clear of all Subject Interests, including without limitation all Coverage Claims and Related Insurance Claims, of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); and any Abuse Claimant, or any other holder of a Barred Claim.  This sale is pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code.  The Parties acknowledge and agree, and the Approval Order shall find and conclude, that upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount:

4.4.1     Insurer is a good faith purchaser of the Archdiocese Policies and any Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), within the meaning of section 363(m) of the Bankruptcy Code, with all the protections afforded such a purchaser under 363(m) of the Bankruptcy Code;

4.4.2     the consideration exchanged constitutes a fair and reasonable settlement and compromise of the Parties' disputes and of their respective rights and obligations relating to the foregoing Archdiocese Policies and Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), and constitutes reasonably equivalent value;

4.4.3     the releases in this Settlement Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy law;

4.4.4     the Archdiocese Policies and all Subject Interests therein (including, without limitation, to the extent applicable, any Direct Action Claim) shall be terminated and of no further force and effect;

4.4.5     Insurer's payment of the Settlement Amount constitutes Insurer's full and complete performance of any and all obligations under the Archdiocese Policies, including any performance owed to the Archdiocese Bound Parties or any holder or purported holder of any Claim against (including any Abuse Claim or Direct Action Claim) or Subject Interest in, the Archdiocese Policies, and exhausts all limits of liability of the Archdiocese Policies;

4.4.6     All Subject Interests the Archdiocese Bound Parties and any other Entity may have had, may presently have, or in the future may have in the Archdiocese Policies are released pursuant to the terms of this Settlement Agreement and policy buyback;

1088

4.4.7  all per occurrence and/or aggregate limits of coverage under the Archdiocese Policies are fully eroded, exhausted and settled upon the Settlement Agreement Effective Date;

4.4.8  the Insurer would not pay the Settlement Amount without buyback of the Archdiocese Policies upon all of the terms and conditions set forth herein; and

4.4.9  the Archdiocese Signatory Parties accept the Settlement Amount in full and complete compromise and satisfaction of all Insurer Released Parties' past, present, and future obligations, including any obligations to any of the Archdiocese Bound Parties under such Archdiocese Policies or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever that are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies (including without limitation Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether or not such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, the Bankruptcy Case, or otherwise.

4.5  Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer shall have no obligation to pay, handle, object, or otherwise respond to any Claim against the Archdiocese Bound Parties; and the Archdiocese Bound Parties will: (i) will withdraw, and are deemed to have withdrawn, all outstanding tenders of Claims to the Insurer Released Parties for defense and indemnity; (ii) will not tender any Claims to the Insurer Released Parties; and (iii) will not request that the Insurer Released Parties fund any judgments, settlements, or defense costs that, in each case, are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies issued by a Settling Insurer.

4.6  To the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer consent to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under this Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Subject Interests of any Entity in such Archdiocese Policies (the "**Non-Debtor Catholic Entity Policy Sale**"). The Plan Confirmation Order and Approval Order shall so provide and Insurer shall be designated in the Plan Confirmation Order as a good-faith purchaser of the Archdiocese Policies with all the protections afforded such a purchaser under section 363(m) of the Bankruptcy Code.

4.7  [Intentionally Omitted.]¹²

---

¹² Intentionally omitted, except the Catholic Mutual Settlement Agreement, in which this section will provide:

4.15  Notwithstanding anything in this Settlement Agreement to the contrary, nothing in the Settlement Agreement shall sell or purchase

4.8    The Archdiocese Signatory Parties further covenant, stipulate and agree that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Abuse Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any insured or additional insured covered by any insurance policy issued by any Insurer Released Party, and to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in any Archdiocese Policy to the Debtor's Estate and sale thereof to Insurer, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court. Without limiting the foregoing, the Insurer Released Parties shall receive protections against Claims by Non-Debtor Catholic Entities and any other Entity equal in breadth to the broadest protections received by any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, or any Insurance Settlement Agreement approved by the Bankruptcy Court.

4.9    If the Archdiocese Signatory Parties, or anyone of them, enter into any agreement (that is embodied in such agreement as approved by the Bankruptcy Court, the Plan, and/or the Plan Confirmation Order) with any other one of the Settling Insurers (including any Non-Settling Insurer who becomes a Settling Insurer) in the Bankruptcy Case, that provides that insurer with releases, injunctions or other protections that are more favorable than those contained in this Settlement Agreement, then this Settlement Agreement shall be deemed to be modified to provide Insurer with those more favorable injunctions, releases or other protections.

4.10    Notwithstanding anything in this Settlement Agreement, nothing in this Settlement Agreement is intended to or shall be construed to:

4.10.1    apply to or have any effect on the Insurer Released Parties' rights to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer;[13]

4.10.2    release any Claims that any Insurer Released Party has or might have against any Non-Settling Insurer, except that, to the extent such other insurers have agreed or in the future agree to release any Claims against the Insurer Released Parties arising out of or related in any way to the Abuse Claims, then the Insurer

---

4.15  Notwithstanding anything in this Settlement Agreement to the contrary, nothing in the Settlement Agreement shall sell or purchase the Preserved Coverage; erode, exhaust the limits of, or terminate the Preserved Coverage; release the Insurer from providing the Preserved Coverage to the applicable Archdiocese Bound Parties; or release the obligations of the applicable Archdiocese Bound Parties under the Archdiocese Policies with respect to such Preserved Coverage.

[13] SPARTA Settlement Agreement will provide:

For the avoidance of doubt, any release provided pursuant to this Settlement Agreement does not include any release by Insurer of any Claims against Pennsylvania General Insurance Corporation. Nothing in the Settlement Agreement shall impair any right of Insurer to pursue any direct claim or claim based on theories of contribution, indemnity, reimbursement, or subrogation against Pennsylvania General Insurance Corporation.

The Plan shall provide the same.

Released Parties also release such Claims against such other insurers to the same extent; or

    4.10.3  release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Settlement Agreement or the Plan (to the extent not inconsistent with this Settlement Agreement).

## 5. TERMINATION OF AGREEMENT

5.1    The Parties may terminate this Settlement Agreement by mutual agreement in writing.

5.2    Insurer may terminate this Settlement Agreement upon fifteen (15) days written notice to the other Parties in the event of any of the following occurs prior to the Settlement Agreement Effective Date: (i) any of the Debtor Parties or the Creditors' Committee files a plan inconsistent with this Settlement Agreement; (ii) the Approval Order and the Plan Confirmation Order are not entered by February 15, 2026; (iii) the Bankruptcy Court enters an order that becomes a Final Order that (a) denies the Approval Motion or (b) is inconsistent with the Approval Order or the Plan Confirmation Order; (iv) a plan that is inconsistent with the terms of this Settlement Agreement is confirmed; or (v) any Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

5.3    In the event of termination pursuant to this Section 5, unless the Parties agree otherwise in writing, the Parties' interests, rights, and obligations under the Archdiocese Policies shall not be impacted by such termination.

## 6. REPRESENTATIONS AND WARRANTIES OF THE PARTIES

6.1    The Parties separately represent and warrant as follows:

6.1.1    To the extent it is a corporation, including a non-profit, religious, or charitable corporation, or other legal entity, each such Party has the requisite power and authority to enter into this Settlement Agreement and to perform the obligations contemplated by this Settlement Agreement[1], subject only to approval of the Bankruptcy Court; and

6.1.2    This Settlement Agreement has been analyzed by counsel to the Parties and executed and delivered in good faith pursuant to arm's length negotiations and for value and valuable consideration.

6.2    The Archdiocese Signatory Parties represent and warrant that they have not assigned, and will not assign, any Subject Interests in the Archdiocese Policies to any Entity,

---

[1] Specifically, each Archdiocese Signatory Party is duly authorized to execute this Settlement Agreement and any related document and the signatory hereto on behalf of such Archdiocese Signatory Party has full power and authority to bind such Archdiocese Signatory Party. The related corporate resolutions and incumbency certificates are identified in Schedule 4 and Schedule 5 respectively.

except for the avoidance of doubt, the assignment of the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate.

6.3      The Archdiocese Signatory Parties represent and warrant that (i) all Archdiocese Bound Parties have either signed this agreement, are represented herein by the Archdiocese or the Archdiocese Signatory Parties, or are juridical entities whose existence has been terminated as a matter of applicable non-bankruptcy law and (ii) the Archdiocese Signatory Parties are duly authorized to bind the Archdiocese Bound Parties who are not Archdiocese Signatory Parties. Without limiting the foregoing, the Archdiocese Signatory Parties represent and warrant that:

6.3.1   all entities known to them that are Co-Insured Parties (or under the Archdiocese Policies (by express reference, assignment, judicial determination or any related concept under applicable law or other document) under the Archdiocese Policies other than the Debtor, the Additional Debtors, the Parish Schools and Archdiocesan Schools, the Non-Debtor Catholic Entities, and the cemeteries identified in Section 6.3.3, are identified in Schedule 2 hereto, if any;[14]

6.3.2   the Archdiocesan Schools are not separately incorporated and are merely unincorporated operations of the Debtor and the Parish Schools are not separately incorporated and are merely unincorporated operations of the Archdiocesan Parishes that are Additional Debtors;

6.3.3   the Debtor, through the Office of Catholic Cemeteries, operates certain cemeteries including, without limitation: All God's Babies Tomb & Holy Innocents Prayer Garden, St. Charles Cemetery, St. Joseph Cemetery #1, St. Joseph Cemetery #2, St. Louis Cemetery #1, St. Louis Cemetery #2, St. Louis Cemetery #3, St. Patrick Cemetery #1, St. Patrick Cemetery #2, St. Patrick Cemetery #3, St. Roch Cemetery #1, St. Roch Cemetery #2, St. Vincent De Paul Cemetery #1, St. Vincent DePaul Cemetery #2, which  cemeteries are either: (a) Non-Debtor Catholic Entities or (b) not separately incorporated and are merely unincorporated operations of the Debtor;

6.3.4   Holy Redeemer School, Redeemer-Seton High School, and St. Joseph Benedictine High School were formerly owned and operated by the Archdiocese, but ceased operations and were closed by the Debtor at some point prior to the Petition Date, and were not separately incorporated and were merely unincorporated operations of the Debtor;

6.3.5   St. Robert Bellarmine School was formerly owned and operated by one or more of the Archdiocese Signatory Parties, but ceased operations and was closed by one or more of the Archdiocese Signatory Parties at some point prior to the Petition Date, and

---

[14] SPARTA Settlement Agreement to include:

The Archdiocese Signatory Parties represent and warrant that they are not aware of being an "additional assured" (or related concept under applicable law or document) under any American Employers Insurance Company ("AEIC") policy.

Note: SPARTA Settlement Agreement Schedule 2, will be listed as "None."

it was not separately incorporated and was merely an unincorporated operation of one of the Additional Debtors;

6.3.6    Notre Dame Seminary and the Society of the Propagation of the Faith of the Archdiocese of New Orleans are owned and operated by the Archdiocese and are not separately incorporated, but are merely unincorporated operations of the Debtor;

6.3.7    San Pedro Pescador Church was owned and operated by the Archdiocese, but was closed by the Archdiocese prior to the Petition Date and was not separately incorporated, but was merely an unincorporated operation of the Archdiocese;

6.3.8    the following Roman Catholic Schools: the Academy of the Sacred Heart, Holy Cross, Jesuit, St. Mary's Academy, St. Mary's Dominican, Brother Martin, Mount Carmel Academy, Ursuline Academy, Cabrini, De La Salle, and St. Paul's School, are not Co-Insured Parties, named insured's or additional insureds (or related concept under applicable law or document) under the Archdiocese Policies, or institutions, religious organizations or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control and active management, and were themselves not under the control or active management of the Archdiocese—;

6.3.9    St. John Vianney Preparatory School was formerly owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.10    the Louise Home a/k/a as the Louise Headstart Center was an unincorporated ministry of the Debtor;

6.3.11    Holy Guardian Angel was owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.12    the Social Apostolate Housing Program was an unincorporated ministry of the Debtor;

6.3.13    at all times Tulane Catholic and the Newman Center were and are unincorporated activities of the Debtor, with no existence separate and apart from the Debtor;

6.3.14    Crescent City Convent Corporation, Lyric Realty and Parking Company, Inc., The Chinchuba Deaf-Mute Institute, People for Teens of St. Anthony of Padua Corporation, Kiwanis Foundation of New Orleans, Kiwanis Club of New Orleans, and Seminarians Parents Association, Inc. were never owned, operated, or controlled by the Debtor or the Additional Debtors and were neither insureds nor additional insureds under the Archdiocese Policies; and

6.3.15   (a) Catholic Charities Archdiocese of New Orleans ("**Catholic Charities**") owned and operated Hope Haven – Madonna Manor ("**HH**"), which was organized under Louisiana law; (b) HH was dissolved and its status as a juridical person was, thus, terminated as a matter of Louisiana law; (c) at all times, Catholic Charities was the sole member and/ or shareholder of HH; and (d) it is the intention of Catholic Charities that HH be bound by this Agreement as if it remained in existence and had signed the Agreement as a Party.

6.4      The Archdiocese Signatory Parties represent and warrant that they are not aware of any Abuse Claim asserted against any entity associated with the Archdiocese (including any parishes, institutions or religious organizations or any subsidiary of the person or organization listed in the declarations of the Archdiocese Policies, or any other organization coming under the Archdiocese's control and active management), that is not listed on Exhibit B-1 to the Acceptable Plan.

6.5      The Debtor represents and warrants that it will undertake good faith efforts to cause actual notice of the Approval Motion to be sent in accordance with Section 2.1.1 hereof. Without limitation, the Debtor has sent or will send notice to the entities on Schedule 3.

6.6      The Archdiocese Signatory Parties and Insurer (limited to such Insurer person that worked on and were familiar with this Settlement Agreement and matters referenced therein), respectively, represent and warrant that they have completed a reasonable search for evidence of any policy of insurance issued by Insurer to the Archdiocese Signatory Parties that would afford coverage with respect to any Abuse Claim, Coverage Claim, or Related Insurance Claim and other than the policies identified in Schedule 1, no such policies have been identified.  The Archdiocese Signatory Parties further represent and warrant that, to the best of their knowledge after reasonably diligent investigation: there are no contracts, binders, certificates, and policies of insurance that insure or purport to insure (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) (x) the Diocese of Houma-Thibodaux or (y) the Diocese of Baton Rouge (excluding, for the avoidance of doubt, policies issued to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD, but including any such policies issued to the Archdiocese that provide or may provide insurance coverage to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD), or (iv) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, other than the policies identified in Schedule 1.   Notwithstanding the foregoing, nothing in this Settlement Agreement, including the Schedules or Exhibits hereto, shall be construed as or deemed to be an admission or evidence that any binder, certificate, or policy of insurance was in fact issued or affords coverage in connection with any Abuse Claims.

6.7      The Debtor Parties represent and warrant that they have not in any way assisted, and covenant that they shall not in any way assist, any Entity in the establishment or pursuit of any Claim, including any Barred Claim, against the Insurer Released Parties.

## 7.  ACTIONS INVOLVING THIRD PARTIES

7.1     For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Archdiocese Policies resulting from the purchase and sale thereof contemplated by this Settlement Agreement, the Parties hereby agree as follows:

7.1.1    From and after (i) the occurrence of the Settlement Agreement Effective Date, and (ii) Insurer's payment of the Settlement Amount, if any other insurer of the Archdiocese Bound Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from Insurer as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for any of Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense or indemnity obligation of Insurer for any Claims or reimbursement obligations for Conditional Payments released or resolved pursuant to this Settlement Agreement, the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and the Settlement Trust shall voluntarily reduce any judgment or Claim against, or settlement with, such other insurers to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against Insurer.  To ensure that such a reduction is accomplished, Insurer shall be entitled to assert this Section 7 as a defense to any action against it brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Insurer from any liability for the judgment or Claim.  Moreover, if a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against Insurer, such Claim may be asserted as a defense against a Claim by the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust in any coverage litigation (and the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and/or the Settlement Trust may assert the legal and equitable rights of Insurer in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust shall be reduced dollar for dollar by the amount so determined.

7.1.2    Unless this Settlement Agreement is terminated, Insurer shall not seek reimbursement for any payments it makes under this Settlement Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other Settling Insurer unless that other insurer first seeks contribution, subrogation, indemnification, or similar relief from Insurer.  Notwithstanding the foregoing, nothing in this Settlement Agreement, the Approval Order or the Plan Confirmation Order shall be construed as prohibiting Insurer from seeking recovery (including with respect to the Settlement Amount or otherwise) from its reinsurers or retrocessionaires in their capacity as such.

7.2     Subject to the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, and subject to the limitations set forth below, the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein, including any Claims made by (i) any Entity who is an insured (as a

named insured, additional insured, or otherwise) under any of the Archdiocese Policies; (ii) any Entity who ~~has made, will make, or can make~~makes (a) an Abuse Claim or (b) a Related Insurance Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a Claim under any of the Archdiocese Policies (collectively, the "**Indemnified Claims**"), as set forth below: ~~15~~

     7.2.1   The Insurer Released Parties shall have the right (but not the obligation) to (a) seek to enforce the Injunctions against any Entity seeking to assert an Indemnified Claim, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions) identified in this Section 7.2. With the Insurer Released Parties' consent, such consent not to be unreasonably withheld, the Settlement Trustee can satisfy the obligations contained in (a) and (b) above. An amount equal to ~~[    ]~~16$3,451(the "**Indemnity Cost Reserve**") shall be reserved from the Settlement Amount for payment of reasonable attorneys' fees, expenses, costs, and other amounts incurred by the Insurer Released Parties in defending against such Indemnified Claims, which amount shall be released from reserve if no Indemnified Claims are asserted within 30 days after the Revival Window has closed under every applicable Revival Window Law.

     7.2.2   ~~The~~Neither any Archdiocese Bound Party, nor the Settlement Trust shall ~~not~~ in any way assist, any Entity in the establishment or pursuit of any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein.

     7.2.3   The Settlement Trust and Archdiocese shall support and join in the enforcement of the Injunctions against any Entity seeking to assert an Indemnified Claim; *provided that* if the Insurer Released Party(ies) elect(s) not to enforce the Injunctions in accordance with Section 7.2.1, the Settlement Trust shall (a) seek to enforce the Injunctions against such Entity, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions).

     7.2.4   To the extent that a Final Order is entered against any Insurer Released Party with respect to any Indemnified Claim, the Settlement Trust shall indemnify and hold harmless such Insurer Released Party with respect thereto up to the Settlement Amount; *provided that* to the extent the Insurer Released Party(ies) elect not to enforce the Injunctions or defend against the Indemnified Claims, the Settlement Trust's indemnity obligation shall be limited to the amount of the Indemnity Cost Reserve; *provided further* that if the Settlement Trust breaches its obligation set forth in Section 7.2.2 hereof, the Settlement Trust's indemnity obligation shall not be so limited and shall instead be up to the Settlement Amount. In no event shall the Settlement Trust's indemnity obligation exceed each individual Settling Insurer's Settlement Amount. To

---

~~15 *Note: Certain limitations on scope of indemnity subject to further discussion.*~~

~~16 Amount to be equal to $250,000 for SPARTA, and an equivalent percentage of Settlement Amount for other Settling Insurers. The Indemnity Cost Reserve is a reserve amount provided for each individual Settling Insurer and cannot be aggregated.~~

the extent the Settlement Amount has been distributed in accordance with the Plan, the Settlement Trust's indemnification obligation shall be so reduced.

7.2.5    The indemnification provided for herein shall not impose liability on the Settlement Trustee or Settlement Trust professionals for their own acts or omissions; *further*, funds provided for the administration of the Settlement Trust or payment of the Settlement Trustee or Settlement Trust professionals shall not be subject to indemnification claims as provided for herein.

7.3    If any Entity attempts to prosecute a Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies against the Insurer Released Parties before the Approval Order and Plan Confirmation Order become Final Orders, then promptly following notice to do so from Insurer, the Archdiocese and/or the Additional Debtor(s), as applicable, will file a motion and supporting papers to obtain an order from the Bankruptcy Court pursuant to sections 362 and 105(a) of the Bankruptcy Code protecting the Insurer Released Parties from any such Claims until the Plan Confirmation Order has become a Final Order, the Bankruptcy Case is dismissed, or this Settlement Agreement is terminated under Section 5 hereof.

## 8.  MISCELLANEOUS

8.1    If any action or proceeding of any type whatsoever is commenced or prosecuted by any Entity not a Party to this Settlement Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Settlement Agreement, the Parties mutually agree to cooperate fully in opposing such action or proceeding.

8.2    The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Settlement Agreement and to preserve its validity and enforceability.

8.3    The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Plan Confirmation Order, and the Bankruptcy Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof.

8.4    Notwithstanding any language to the contrary in this Settlement Agreement, under no circumstance will any Archdiocese Signatory Party be obligated to take any action that violates any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, and if a court of competent jurisdiction determines that a term or condition in this Settlement Agreement does violate any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, the applicable Archdiocese Signatory Party shall be relieved of such term or condition, but the scope and finality of the releases, injunctions, and buybacks set forth in this Settlement Agreement shall not be affected or modified.

8.5     This Settlement Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.6     This Settlement Agreement may be modified only by a written amendment signed by all of the Parties, and no waiver of any provision of this Settlement Agreement or of a breach thereof shall be effective unless expressed in a writing signed by the waiving Party. The waiver by any Party of any of the provisions of this Settlement Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach. Any change or modification of this Agreement that would result in a material adverse change to the rights of the Abuse Claimants or Trust shall require the consent of the Creditors' Committee (if at the time of the proposed change or modification a Trustee has not been appointed) or Settlement Trustee (if at the time of the proposed change or modification a Trustee has been appointed and approved), as applicable, which consent shall not be unreasonably withheld.

8.7     By entering into this Settlement Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Settlement Agreement. No part of this Settlement Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Settlement Agreement. All actions taken and statements made by the Parties or by their representatives relating to this Settlement Agreement or participation in this Settlement Agreement, including its development and implementation, shall be without prejudice or value as precedent.

8.8     This Settlement Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession regarding liability, culpability, wrongdoing, or insurance coverage. All related discussions, negotiations, and all prior drafts of this Settlement Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. Any evidence of the negotiations or discussions associated with this Settlement Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.8, in (i) an action or proceeding to enforce the terms of this Settlement Agreement, including any use as set forth in Section 7.1.1, or (ii) any possible action or proceeding between the Insurer Released Parties and any reinsurers. This Settlement Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Insurer Released Parties' obligations under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer.

8.9     None of the Parties shall make any public statements or disclosures (i) regarding another Party's rationale or motivation for negotiating or entering into this Settlement Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued or determined by agreement or a court of competent jurisdiction to

have been issued by the Insurer Released Parties, including handling of or involvement in connection with any claims asserted thereunder.

8.10     Neither this Settlement Agreement nor the rights and obligations set forth in this Settlement Agreement shall be assigned without the prior written consent of the other Parties.

8.11     This Settlement Agreement was jointly drafted by the Parties, and the wording of this Settlement Agreement was reviewed by legal counsel for each of the Parties, and each of them had sufficient opportunity to propose and negotiate changes prior to its execution. The language of all parts of this Settlement Agreement shall in all cases be construed as a whole according to its meaning and not strictly for or against any Party.

8.12     Section titles and headings contained in this Settlement Agreement are included only for ease of reference and shall have no substantive effect.

8.13     All notices, demands, or other communication to be provided pursuant to this Settlement Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other Entity or address as any of them may designate in writing from time to time:

       If to the Debtor or Reorganized Debtor:

       Mark A. Mintz
       Samantha A. Oppenheim
       Jones Walker LLP
       Telephone: 504-582-8368
       Telephone: 504-582-8641
       Email: mmintz@joneswalker.com
       Email: soppenheim@joneswalker.com

       with copies to:

       -and-

       If to an Archdiocese Signatory Party other than a Debtor Party:

       As set forth on Plan Exhibit B-2.

       If to Insurer or the Insurer Released Parties:

       Kevin J. Larner
       Associate General Counsel
       Corporate Litigation
       American International Group, Inc. (AIG)

300 Kimball Drive, Suite 500, Parsippany, NJ 07054
Telephone: 212-458-7101
Telephone: 917-574-4482
Email: kevin.larner@aig.com

with copies to:

~~and~~

Robert W. DiUbaldo
Alex B. Silverman
Nora A. Valenza-Frost
Carlton Fields, P.A.
405 Lexington Avenue, 36th Floor
New York, New York 10174-0002
Telephone: 212-785-2577
Email: rdiubaldo@carltonfields.com
Email: asilverman@carltonfields.com
Email: nvalenza-frost@carltonfields.com

~~and~~

If to the Settlement Trust:

Donald C. Massey
Couhig Partners, LLC
1100 Poydras Street, Suite 3250
New Orleans, Louisiana 70163
Telephone: (504) 599-5777
Email: dmassey@couhigpartners.com

with copies to:

Andrew W. Caine
~~and~~

Pachulski, Stang, Ziehl & Jones LLP
10100 Santa Monica Blvd, Suite 1300
Los Angeles, CA 90067
Telephone: 310-277-6910
Email: acaine@pszjlaw.com

~~and~~

8.14    This Settlement Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument.  This Settlement Agreement may be executed and delivered by facsimile, e-mail, or other electronic image, which facsimile, e-mail, or other electronic image counterparts shall be deemed to be originals.

8.15    8.14  Nothing contained in this Settlement Agreement shall be deemed or construed to constitute (i) an admission by the Insurer Released Parties that the Archdiocese Bound Parties, or any other Entity, was or is entitled to any insurance coverage under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by the Insurer Released Parties or as to the validity of any of the positions that have been or could have been asserted by the any of the Archdiocese Bound Parties, (ii) an admission by any of the Archdiocese Bound Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by the Insurer Released Parties or any Claims that have been or could have been asserted by the Archdiocese Bound Parties against the Insurer Released Parties, or (iii) an admission by the Archdiocese Bound Parties or the Insurer Released Parties of any liability whatsoever with respect to any of the Abuse Claims.

8.16    8.15  The Parties to this Settlement Agreement, all of the Entities included in the definition of "Insurer Released Parties," and the Settlement Trust are intended beneficiaries of this Settlement Agreement.  Except as set forth in the preceding sentence or otherwise set forth in this Settlement Agreement, there are no third-party beneficiaries of this Settlement Agreement.

8.17    8.16  The Archdiocese Signatory Parties and the Insurer Released Parties shall each be responsible for their own fees and costs incurred in connection with the Bankruptcy Case, this Settlement Agreement, and the implementation of this Settlement Agreement, except as specifically set forth herein (including in Section 7).

8.18    8.17  The following rules of construction shall apply to this Settlement Agreement:

8.18.1    8.17.1  Unless the context of this Settlement Agreement otherwise requires:  (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Settlement Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.18.2    8.17.2  References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Settlement Agreement.

8.18.3    8.17.3  The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Settlement Agreement when the stated intent is not achieved.

8.19    8.18  The Bankruptcy Court in the Bankruptcy Case shall retain jurisdiction to interpret and enforce the provisions of this Settlement Agreement, which shall be construed in

accordance with Louisiana law without regard to conflicts of law principles thereof. The Insurer Released Parties do not, by virtue of this Section ~~8.18~~8.19 or any other provision in this Settlement Agreement, consent to the Bankruptcy Court's jurisdiction as to any other matter.

8.20 ~~8.19~~ This Settlement Agreement and each Debtor Party's obligations under this Settlement Agreement shall be binding on each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) and shall survive the entry of the Plan Confirmation Order; provided, however, after the occurrence of the Bankruptcy Plan Effective Date, recourse for all obligations, other than those set forth in Sections 6.5, 6.7, and 7 hereof or a remedy of specific performance, shall be to the Settlement Trust; provided further, however, if specific performance is not available, each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) may be held liable for an intentional breach of a representation in this Agreement or their bad faith material breach of this Agreement, and if liability on any such ground is established, then recourse may be had directly against the Debtor Party, Reorganized Debtor, and/or Reorganized Additional Debtor(s) responsible.

8.21 ~~8.20~~ The obligations of the Parties herein, other than those conditioned upon the Settlement Agreement Effective Date, shall be binding upon execution hereof by the Parties.

8.22 ~~8.21~~ Nothing in this Settlement Agreement will prevent Insurer from allocating the Settlement Amount among the Archdiocese Policies at Insurer's discretion.

8.23 ~~8.22~~ If any provision of this Settlement Agreement, or the application thereof, shall for any reason or to any extent, be construed to be invalid or unenforceable, the remainder of this Settlement Agreement, and the application of such provision to other circumstances, shall be interpreted so as to best effect the intent of the Parties, unless such determination of invalidity or unenforceability deprives any Party of the substantial benefit of its bargain.

8.24 ~~8.23~~ The Parties agree that all matters relating to the negotiation and terms of this Settlement Agreement (including by way of example and not limitation, all prior drafts, exchanges of terms, and related discussions or correspondence) shall be confidential and are not to be disclosed except by order of court or consent of the Parties in writing. This Section ~~8.23~~8.24 does not prevent or prohibit the Parties from publicly filing on the docket in the Bankruptcy Case the final, executed copy of this Settlement Agreement.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed: _____

_____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**National Union Fire Insurance Company of Pittsburgh, Pa.**

Signed: _____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**All Archdiocese Signatory Parties**
**Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title: **Their Authorized Signer** _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**Exhibit A**

**Sale Order**

**Exhibit B**

**Bill of Sale**

### BILL OF SALE AND ASSIGNMENT

**THIS BILL OF SALE AND ASSIGNMENT** is made and entered into as of _____, 2025, by and between The Roman Catholic Archdiocese of New Orleans and its Bankruptcy Estate (the "**Archdiocese**" or "**Debtor**"), the Additional Debtors and their respective Bankruptcy Estates, Non-Debtor Catholic Entities (collectively, "**Archdiocese Signatory Parties**"), and National Union Fire Insurance Company of Pittsburgh, Pa. (the "**Insurer**"). All capitalized terms used herein without definition have the meanings set forth in the Settlement Agreement, Release, and Policy Buyback by, between, and among The Archdiocese, the other Archdiocese Signatory Parties, and Insurer, as amended or modified (the "**Settlement Agreement**").

### W I T N E S S E T H:

WHEREAS, pursuant to the Settlement Agreement, the Archdiocese Signatory Parties have, on behalf of themselves and all other Archdiocese Bound Parties, agreed to sell and/or convey any and all right, title, and interest (including all Subject Interests) in and to the Purchased Property (as defined in the Approval Order), and Insurer has agreed to purchase and buy-back the Purchased Property, in consideration of the payment of a purchase price of $290,000 (the "**Purchase Price**") and other good and valuable consideration as provided in and under the Settlement Agreement and Plan;

WHEREAS, the Approval Order, as filed at Docket No. [ ], has approved the Sale Transaction (as defined in the Approval Order) and found that the Purchase Price is a fair and reasonable price for the Purchased Property;

NOW, THEREFORE, in consideration of the payment of the Purchase Price by Insurer as set forth in the Settlement Agreement, and in accordance therewith and with Approval Order, the Debtor Parties do hereby sell, transfer, and assign to Insurer, and Insurer does hereby accept, all of the Archdiocese Bound Parties' right, title, and interest in and to the Purchased Property, and all Subject Interests therein.

[signatures appear on following pages]

**IN WITNESS WHEREOF**, the ~~Parties~~ parties have executed this ~~Agreement~~ Bill of Sale and Assignment by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed: _____

Date: _____

_____

*[Signatures Continue on Adjacent Pages]*

~~[Insurer]~~

**National Union Fire Insurance Company of Pittsburgh, Pa.**

Signed:

_____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**All Archdiocese Signatory Parties
Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title:   **Their Authorized Signer** _____

Date:   _____

*[Signatures Continue on Adjacent Pages]*

**Schedule 1**

**Archdiocese Policies**

The following policies shall be included in the definition of Archdiocese Policies:

1.  **Insurer**: National Union Fire Insurance Company of Pittsburgh, Pa.

    **Policy Number**: 1168737

    **Policy Period**: April 1, 1977 to March 1, 1978

**Schedule 2**

**Other Co-Insureds Known to the Archdiocese Signatory Parties**

1.    **NONE**

For the avoidance of the doubt, the following entities are bound by the terms of the Settlement Agreement:[1]

I.    **Archdiocesan Parishes**

1.    All Saints Roman Catholic Church, New Orleans, Louisiana

2.    Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana

3.    Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana

4.    Assumption of Mary Roman Catholic Church, Avondale, Louisiana

5.    Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana[2]

6.    Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana

7.    Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana

8.    Blessed Trinity Roman Catholic Church, New Orleans, Louisiana

9.    Christ the King Roman Catholic Church, Gretna, Louisiana

10.    Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana

11.    Divine Mercy Roman Catholic Church, Kenner, Louisiana

12.    Good Shepherd Roman Catholic Church, New Orleans, Louisiana

13.    Holy Family Roman Catholic Church, Franklinton, Louisiana

14.    Holy Family Roman Catholic Church, Luling, Louisiana

15.    Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana

16.    Holy Spirit Roman Catholic Church, New Orleans, Louisiana

17.    Immaculate Conception Roman Catholic Church, Marrero, Louisiana

18.    Immaculate Conception Roman Catholic Church, New Orleans, Louisiana

19.    Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana

20.    Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana

21.    Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana, for itself and as successor to St.

---

[1] Without limiting Section 6.4 of the Settlement Agreement, Insurer does not concede that any of the Entities listed on this schedule are "insureds," "additional insureds," or "protected persons" under its Archdiocese Policies.

[2] Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

|     | John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc. |
| 22. | Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana |
| 23. | Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana |
| 24. | Most Holy Trinity Roman Catholic Church, Covington, Louisiana |
| 25. | Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana |
| 26. | Our Lady of Grace Roman Catholic Church, Reserve, Louisiana |
| 27. | Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana |
| 28. | Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana |
| 29. | Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana |
| 30. | Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana |
| 31. | Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana |
| 32. | Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana |
| 33. | Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana |
| 34. | Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana |
| 35. | Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana |
| 36. | Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana |
| 37. | Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana |
| 38. | Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana |
| 39. | Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana |
| 40. | St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana |
| 41. | St. Agnes Roman Catholic Church, Jefferson, Louisiana |
| 42. | St. Alphonsus Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc. |
| 43. | St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana |
| 44. | St. Angela Merici Roman Catholic Church, Metairie, Louisiana |
| 45. | St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana |
| 46. | St. Anselm Roman Catholic Church, Madisonville, Louisiana |
| 47. | St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana |
| 48. | St. Anthony of Padua Roman Catholic Church, Luling, Louisiana |
| 49. | St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana |
| 50. | St. Anthony Roman Catholic Church, Gretna, Louisiana |

51. St. Augustine Roman Catholic Church, New Orleans, Louisiana

52. St. Benedict Roman Catholic Church, Covington, Louisiana

53. St. Benilde Roman Catholic Church, Metairie, Louisiana

54. St. Bernard Roman Catholic Church, St. Bernard, Louisiana

55. St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana

56. St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana

57. St. Christopher Roman Catholic Church, Metairie, Louisiana

58. St. Clement of Rome Roman Catholic Church, Metairie, Louisiana

59. St. Cletus Roman Catholic Church, Gretna, Louisiana

60. St. David Roman Catholic Church, New Orleans, Louisiana

61. St. Dominic's Roman Catholic Church, New Orleans, Louisiana

62. St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana

63. St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana

64. St. Francis Xavier Roman Catholic Church, Metairie, Louisiana

65. St. Genevieve Roman Catholic Church, Slidell, Louisiana

66. St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana

67. St. Jerome Roman Catholic Church, Kenner, Louisiana

68. St. Joachim Roman Catholic Church, Marrero, Louisiana

69. St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana

70. St. John of the Cross Roman Catholic Church, Lacombe, Louisiana

71. St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, for itself and as successor to St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc.

72. St. John the Baptist Roman Catholic Church, Edgard, Louisiana

73. St. John the Baptist Roman Catholic Church, Folsom, Louisiana

74. St. Joseph Roman Catholic Church, Algiers, Louisiana

75. St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana

76. St. Joseph's Roman Catholic Church, Gretna, Louisiana

77. St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc.

78. St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana

79. St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana

80. St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana

81. St. Margaret Mary Roman Catholic Church, Slidell, Louisiana

82. St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana

83. St. Mark Roman Catholic Church, Ama, Louisiana

84. St. Martha Roman Catholic Church, Harvey, Louisiana

85. St. Martin de Porres Roman Catholic Church, New Orleans, formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc.

86. St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana

87. St. Mary's Roman Catholic Church, New Orleans, Louisiana

88. St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana

89. St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St. John the Baptist Roman Catholic Church, Paradis, Louisiana, for itself and as successor to St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc.

90. St. Patrick's Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

91. St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana

92. St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana

93. St. Peter Claver Roman Catholic Church, New Orleans, Louisiana

94. St. Peter Roman Catholic Church, Reserve, Louisiana, for itself and as successor to St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc.

95. St. Peter's Roman Catholic Church, Covington, Louisiana

96. St. Philip Neri Roman Catholic Church, Metairie, Louisiana

97. St. Pius X Roman Catholic Church, New Orleans, Louisiana

98. St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana

99. St. Rita Roman Catholic Church, Harahan, Louisiana

100. St. Rita Roman Catholic Church, New Orleans, Louisiana

101. St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana[3]

---

[3] As stated in footnote 2, Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

102.  Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana

103.  The Congregation of St. Rita Roman Catholic Church of Harahan

104.  The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana

**II.    Suppressed Archdiocesan Parishes**[4]

1.    Blessed Sacrament, Inc.

2.    Epiphany, Inc.

3.    Immaculate Heart of Mary, Inc.

4.    Incarnate Word, Inc.

5.    Our Lady of Good Counsel, Inc.

6.    Our Lady of Good Harbor, Inc.

7.    Our Lady of Lourdes, New Orleans, Louisiana, Inc.

8.    Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.

9.    Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana

10.   St. Ann, New Orleans, Louisiana, Inc.

11.   St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana

12.   St. Frances Xavier Cabrini, Inc.

13.   St. Francis de Salles, Inc.

14.   St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana

---

[4]  The Suppressed Archdiocesan Parishes no longer operate as separate church parishes.  The Suppressed Archdiocesan Parishes were not dissolved, and may own property.

Following Hurricane Katrina, the operations of certain of the Suppressed Archdiocesan Parishes were combined with Archdiocesan Parishes.  In 2024, in the ongoing aftermath of Hurricane Ida and a result of storm damage, the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental statistics, and financial difficulties encountered, the following additional Suppressed Archdiocesan Parishes were canonically merged with neighboring Archdiocesan Parishes: (a) St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc., was canonically merged into St. Peter Roman Catholic Church, Reserve, Louisiana; (b) (i) St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and (ii) St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc., were both canonically merged into Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, now known as St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana; (c) St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc., was canonically merged into St. Rosalie Roman Catholic Church, Harvey, Louisiana, now known as Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana; (d) St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc., was canonically merged into Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, now known as St. John Paul II Roman Catholic Church, Waggaman, Louisiana; (e) St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc., was canonically merged into St. John the Baptist Roman Catholic Church, Paradis, Louisiana, now known as St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana; (f) Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc., was canonically merged into St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, now known as St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana; and (g) St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc., had its canonical territory divided so that (i) the area north of the Pontchartrain Expressway was canonically merged into St. Patrick's Roman Catholic Church, New Orleans, Louisiana, and (ii) the area south of the Pontchartrain Expressway was canonically merged into St. Alphonsus Roman Catholic Church, New Orleans, Louisiana.

15.  St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana

16.  St. Henry's, Inc.

17.  St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana

18.  St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana

19.  St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana

20.  St. John the Baptist, New Orleans, Louisiana, Inc.

21.  St. Julian Eymard, Inc.

22.  St. Lawrence the Martyr, Inc.

23.  St. Louise de Marillac, Inc.

24.  St. Maurice, Inc.

25.  St. Monica, Inc.

26.  St. Philip the Apostle, Inc.

27.  St. Raymond's, Inc.

28.  St. Rose of Lima, Inc.

29.  St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana

30.  St. Theresa of the Child Jesus, Inc.

31.  The Congregation of Saints Peter and Paul Roman Catholic Church

32.  The Congregation of St. Cecelia Roman Catholic Church

33.  The Congregation of the Annunciation Roman Catholic Church

34.  The Congregation of the Holy Trinity Roman Catholic Church


III.  **Archdiocesan Agencies**

1.  Archdiocesan Spirituality Center

2.  Catholic Charities Archdiocese of New Orleans

3.  Catholic Charities Children's Day Care Centers

4.  Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)

5.  Clarion Herald Publishing Company

6.  Korean Catholic Community of New Orleans, Inc.

7.     Notre Dame Seminary

8.     Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana

9.     Pace Greater New Orleans

10.    Padua House (merged into Catholic Charities Archdiocese of New Orleans)

11.    Philmat, Inc.

12.    Project Lazarus

13.    Roman Catholic Center of Jesus the Lord

14.    School Food and Nutrition Services of New Orleans, Inc.

15.    Second Harvest Food Bank of Greater New Orleans and Acadiana

16.    St. Jude Community Center, Inc.

17.    St. Michael Special School

18.    St. Thérèse Catholic Academy

19.    The Society for the Propagation of the Faith, Archdiocese of New Orleans


**IV.     Non-Debtor Catholic Entities**


**Archdiocesan Agencies**

1.     7887 Walmsley, Inc.

2.     Annunciation Inn, Inc.

3.     Archdiocese of New Orleans Indemnity, Inc.

4.     Aspiring Scholars

5.     Catholic Community Foundation Archdiocese of New Orleans

6.     Christopher Homes, Inc.

7.     Christopher Inn

8.     Dubourg Home

9.     Holy Redeemer Catholic Virtual Academy

10.    Holy Trinity Drive Land Corporation

11.    Iberia Investment Fund II, LLC

12.    Metairie III

13.    Metairie Manor

14.    Monsignor Wynhoven Apartments, Inc.

15.    Nazareth II

16.  Nazareth Manor

17.  New Orleans Archdiocesan Cemeteries

18.  Notre Dame Health System (f/k/a Chateau de Notre Dame)

19.  Rouquette III

20.  St. Anthony's Gardens

21.  St. Bernard II

22.  St. Bernard III

23.  St. Bernard Manor

24.  St. Martin's Manor, Inc.

25.  St. Tammany Catholic Cemetery

26.  St. Tammany Manor

27.  The Apartments at Mater Dolorosa

28.  The Mental Health Association Development Corporation

29.  Villa Additions, doing business as St. Teresa's Villa

30.  Villa St. Maurice, Inc.

**Schedule 3**

**Additional Notice Parties**

**The Redemptorists/Denver Province**
1633 North Cleveland Avenue
Chicago, IL 60614

**Dominican Province of St. Albert the Great**
1910 S. Ashland Avenue
Chicago, Illinois, 60608-2905

**Congregation of Holy Cross**
P.O. Box 1064
Notre Dame, IN 46556-0541

**St. Elio Roman Catholic Church**
1335 Bayou Dularge Road
Theriot, LA 70397

**Central Catholic High School**
2100 Cedar Street, Unit 1
Morgan City, LA 70380

**Edward Douglas White Catholic High School**
555 Cardinal Drive
Thibodaux, LA 70301

**Chinchuba Institute for the Deaf**
2929 Carrollton
New Orleans, LA 70118

and

1231 Prytania St.
New Orleans, LA 70130

**St. Scholastica Academy**
122 South Massachusetts St.
Covington, Louisiana 70433

**Hope Haven – Madonna Manor**
1231 Prytania
New Orleans LA  70130

7887 Walmsley Ave.
New Orleans, LA 70125

2929 Carrollton
New Orleans, LA  70118

**Holy Cross College, Inc.**
Attn Remy Donnelly
5500 Paris Ave.
New Orleans, LA  70122

**Tulane Catholic**
1037 Audubon St
New Orleans, LA 70118

**University of New Orleans**
2000 Lakeshore Drive
New Orleans, LA 70148

**Our Lady of Peace Catholic Church**
13281 LA-644
South Vacherie, LA 70090

**St. Lucy Child Development Center**
1220 Aycock St
Houma, LA 70360

**St. Augustine High School, Inc.**
c/o Alfred Harrell, III
2600 A.P. Tureaud Ave
New Orleans LA 70119

**St. Joseph's Society of the Sacred Heart**
P.O. Box 65010
Baltimore, MD 21209

**The Community of the Sisters of the Immaculate Conception**
c/o Melanie Baglow
6208 Ithaca Street
Metairie, LA  70003

**Sisters of Mount Carmel**
**Generalate Office**
21388 Smith Road
Covington, LA 70435-6349

**Daughters of St. Paul**
50 St. Paul's Ave.
Jamaica Plain, MA  02130

and

c/o Mary Martha Moss
4403 Veterans Blvd.
Metairie, LA  70006

**Crescent City Convent Corporation**

210 Baronne St.
New Orleans, LA  70112

**Lyric Realty and Parking Company, Inc.**
c/o Kenneth D. Boudreaux
1115 Tallowtree Dr.
Mandeville, LA  70448

**Sacred Heart of Jesus Catholic Church**
1111 Highway 55
PO Box 2
Montegut, LA 70377

**Diocese of Houma Thibodaux**
P.O. Box 505
Schriever, LA

**Diocese of Baton Rouge**
Post Office Box 2028
Baton Rouge, Louisiana 70821-2028

**Vandebilt Catholic High School**
209 South Hollywood Road
Houma, LA 70360

**General Services Administration**
1800 F St., NW
Washington, DC 20405

**People For Teens of St. Anthony of Padua Corporation**
4700 Cleveland
New Orleans, LA  70119

**Society of the Sacred Heart**
4120 Forest Park Avenue
St. Louis, MO 63108

**Seminarians Parents Association, Inc.**
718 Wood St
Houma, La 70360

**Society of the Divine Word**
PO Box 6038
Techny, IL 60082

**Ursuline Sisters of the Roman Union, Central Province,**
353 South Sappington
St. Louis, MO 63122

**Salesians of Don Bosco, Eastern Province**
in the USA d/b/a Salesian Society, Inc.
Through its agent for service of process:
Rev. Louis Molinelli, SDB
1000 Barataria Boulevard
Marrero, LA 70072

And

Rev. Louis Molinelli, S.D.B.
1000 Salesian Lane
Marrero, LA 70072

## Schedule 4

## Form of Corporate Resolutions

## CORPORATE RESOLUTION

RESOLUTION OF THE MEMBERSHIP AND BOARD OF DIRECTORS OF [NAME], [ADDRESS], A LOUISIANA NON-PROFIT [CORPORATION][LIMITED LIABILITY COMPANY (hereinafter this "Corporation").

BE IT RESOLVED, that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation, are hereby authorized to transact on behalf of this Corporation any and all business related to the following:

1. Engaging 1793 Group, a Louisiana non-profit corporation, on terms and conditions deemed appropriate in their sole discretion, to assist with and administer on this Corporation's behalf, any and all matters in which this Corporation may have an interest in relation to a Plan of Reorganization filed or anticipated to be filed by The Roman Catholic Church of the Archdiocese of New Orleans in proceedings commenced under Chapter 11 of the Bankruptcy Code, captioned *In re The Roman Catholic Church of the Archdiocese of New Orleans*, Case No. 20-10846 (Bankr. E.D. La.) (the "Chapter 11 Case"), including, but not limited to, preparing and filing a petition in the Chapter 11 Case seeking relief under Chapter 11 of the United States Bankruptcy Code as an additional debtor, executing any and all documents necessary for this Corporation to file for relief in the Chapter 11 Case, executing on behalf of this Corporation all documents required to comply with the requirements imposed upon parties filing for relief under Chapter 11of the Bankruptcy Code, Bankruptcy Rules, Local Rules for the Eastern District of Louisiana and/or the requirement imposed by the United States Trustee.

2. Engaging the firm of Heller Draper and/or any other attorneys to represent this Corporation in actions or proceedings related to the Chapter 11 Case.

3. Engaging accountants, financial advisors, and any other professionals necessary to administer the Chapter 11 Case on behalf of this Corporation.

4. Making decisions with regard to the payment of fees and costs for which this Corporation may become responsible to pay in the Chapter 11 Case.

5. Making decisions with regard to the filing of any plan within the Chapter 11 case, provided that such shall contain terms and provisions consistent with those set forth in Appendix "A" attached hereto and incorporated herein by this reference.

FURTHER RESOLVED that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation with the power of substitution, is authorized to execute and deliver on behalf of this Corporation each and every Insurance Settlement Agreement with the Settling Insurers, as those terms are defined in the Fourth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of September 23, 2025 (the "Plan"), and any amendment or modification to the Plan, including, without limitation, the documents attached or referred to in Plan Supplement 7.1(a), any Bill of Sale required under such Insurance Settlement Agreements,

and any other documents reasonably requested by any such Settling Insurer to effectuate the transactions provided for in its Insurance Settlement Agreement or the Plan.

FURTHER GIVING AND GRANTING unto either Very Rev. Patrick Carr or Rev. Leon Poche, full power and authority to sign any and all documents and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER GIVING AND GRANTING unto Very Rev. Peter Akpoghiran or any other officer of the Corporation, full power and authority to certify the passage and effectiveness of this Resolution to the Settling Insurers and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER RATIFYING AND CONFIRMING all that either Very Rev. Patrick Carr or Rev. Leon Poche, in his said capacity may do or cause to be done in the premises.

I, the undersigned President of this Corporation do hereby certify that the above and foregoing is a true and correct copy of a resolution adopted by the Membership and Board of Directors of said corporation in conformity with the Articles of Incorporation and Louisiana law, and that said resolution remains in full force and effect and has not been amended or rescinded.

WITNESS MY HAND AND SEAL, effective this _____ day of _____, 2025

_____
Very Reverend Patrick J. Williams, V.G.

ATTEST

_____
Dirk Wild, Director

AFSDOCS:304059010.4

*Filing Version 7/29/2025*

**Schedule 5**

**Form of Incumbency Certificates**

## INCUMBENCY CERTIFICATE

 I, **Very Rev. Peter Akpoghiran, J.C.D**., the duly elected, qualified, and acting **Vice President** of each of the Louisiana nonprofit corporations or limited liability companies listed on **Exhibit A** attached hereto (each, a "Corporation," and collectively, the "Corporations"), do hereby certify as follows:

1. That the person named below has been duly elected or appointed and is the qualified and acting officer of each of the Corporations holding the office set forth opposite his/her name.

   **NAME**                                    **TITLE**

   **Very Rev. Patrick J. Williams, V.G.**       **President and Director**

2. That the foregoing person is duly authorized to act on behalf of each Corporation in such capacity and to exercise the powers and perform the duties incident to said office under the respective Articles of Incorporation and Bylaws of each Corporation.

3. That attached hereto as **Exhibit B** is a true and correct copy of a resolution adopted at a duly noticed special meeting by the sole member of each of the Corporations and all of the Board of Directors of each said Corporation in attendance at such meeting in conformity with such Articles of Incorporation and Louisiana law and that said resolution remains in full force and effect and has not been amended or rescinded.

   IN WITNESS WHEREOF, I have hereunto set my hand as Vice President of each of the Corporations as of this ____ day of October, 2025.

   _____
   Very Rev. Peter Akpoghiran, J.C.D
   Vice President of Each Corporation
   (See Attached Exhibit A)

2

State of Louisiana
Parish of Orleans

On this _____ day of October, 2025, before me, the undersigned Notary Public, personally appeared **Very Rev. Peter Akpoghiran, J.C.D.,** who acknowledged that he/she executed the foregoing instrument for the purposes therein contained and in the capacity therein stated.

Notary Public
Printed Name: _____
Notary ID or Bar Roll No.: _____
My Commission Expires: _____

**EXHIBIT A**
**List of Corporations**

4922-4535-1762v.80

| Summary report: |||
|---|---|---|
| **Litera Compare for Word 11.7.0.54 Document comparison done on 10/24/2025 4:18:13 PM** |||
| **Style name:** CF_Word_new |||
| **Intelligent Table Comparison:** Active |||
| **Original filename:** ADNO - Insurer Model Settlement Agreement FINAL 4922-4535-1762 65.docx |||
| **Modified filename:** ADNO - National Union Settlement Agreement [FINAL] - Clean.docx |||
| **Changes:** |||
| Add | 670 | |
| Delete | 242 | |
| Move From | 2 | |
| Move To | 2 | |
| Table Insert | 3 | |
| Table Delete | 0 | |
| Table moves to | 0 | |
| Table moves from | 0 | |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 | |
| Embedded Excel | 0 | |
| Format changes | 0 | |
| **Total Changes:** | 919 | |

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-10846 (MSG) |
| | § | |
| | § | |
| THE ROMAN CATHOLIC CHURCH | § | CHAPTER 11 |
| OF THE ARCHDIOCESE OF NEW | § | |
| ORLEANS, *et al.*,[1] | § | SECTION A |
| | § | |
| DEBTORS. | § | COMPLEX CASE |
| | § | |
| | § | |

**ORDER (I) APPROVING [●]NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.'S SETTLEMENT AGREEMENT, RELEASE AND BUYBACK, (II) APPROVING THE SALE OF THE ARCHDIOCESE POLICIES FREE AND CLEAR, (III) ENJOINING CLAIMS, AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated July 29, 2025 [D.E. 4181] and supplemented by the filing of the revised Settlement Agreement (as defined below) on October 27, 2025 [D.E.[*]] ("Approval Motion") of The Roman Catholic Church of the Archdiocese of New Orleans, the lead debtor and debtor-in-possession (the "Debtor" or "Archdiocese") and the other debtors and debtors-in-possession[2] (the "Additional Debtors" and, together with the Archdiocese, the "Debtor Parties") in the above-captioned chapter 11 cases, by and through their respective counsel, for entry of an order (this "Order") approving the settlement agreement, releases, insurance policy buyback, and related injunction-in-aid ("Settlement") by and among the Archdiocese, the Additional Debtors, the other Archdiocese Signatory Parties, the Creditors' Committee, and [●][3]National Union Fire Insurance Company of Pittsburgh, Pa. ("Insurer" and,

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtors'the Debtor's federal tax identification number, are: [●] is 8966.

[2] In connection with the Plan, the Catholic Entities listed on Plan **Exhibit B-1** (the **"Additional Debtors"**) filed individual chapter 11 cases. The Plan is a combined joint Plan for the Archdiocese and the Additional Debtors, and the Approval Motion is deemed to have been filed (and this Order is entered) in each Additional Debtor's bankruptcy case for purposes of the relief requested herein.

[3] [This Order is the proposed form of order for the Settling Insurers. The Debtor Parties will file proposed orders for each Settling Insurer prior to the Sale Hearing.]

collectively with the foregoing, the "Parties"), pursuant to Sections 105(a) and 363 of Title 11 of the United States Code ("Bankruptcy Code") and Rules 2002(a)(2), 6004, and 9019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), in each case as described in the Approval Motion and the *Settlement Agreement, Release, and Policy Buyback* attached to this Order as **Exhibit 1**[4] (the "Settlement Agreement");[53] and the Bankruptcy Court having reviewed the Approval Motion and the Settlement Agreement; and it appearing that due and adequate notice of the Approval Motion and Settlement Agreement having been given to all Entities entitled thereto, and that no other or further notice need be given; and the Bankruptcy Court on November 17, 2025 at ~~[[ ] AM/PM]~~9:00 AM having held a hearing (the "Sale Hearing") to consider the relief requested in the Approval Motion; and upon the record of the Sale Hearing; and, after due deliberation, including, without limitation, for the reasons stated by the Bankruptcy Court on the record of the Sale Hearing, it appearing that the relief requested in the Approval Motion and granted herein is in the best interests of the Debtor Parties' estates (the "Estates"), their creditors, and other parties in interest; and good sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.     This Bankruptcy Court has jurisdiction over the Approval Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of this case and the Approval Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

[4]   ~~[The form of Settlement Agreement is attached as **Exhibit 1** to this Order. Prior to the hearing on the Approval Motion, the Debtor Parties will file the proposed Settlement Agreement for each Settling Insurer.]~~

[53]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

B.       The statutory predicates for the relief sought in the Approval Motion are Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007. 9008 and 9019, and Rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Louisiana.

C.       It is necessary and appropriate for the Bankruptcy Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Settlement Agreement, and to adjudicate, if necessary, to the extent provided under 28 U.S.C. § 1334(b), any and all disputes arising from or relating to the Settlement Agreement or this Order.

D.       Proper, timely, adequate and sufficient notice of the Sale Hearing and Approval Motion and the relief requested therein, including, without limitation, the Settlement and the transactions described in the Settlement Agreement, including, without limitation, issuance of the injunction-in-aid referenced in the Settlement Agreement and the Approval Motion (all such transactions being collectively referred to, for convenience, as the "Sale Transaction") has been provided by the Debtor Parties in accordance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules to all interested Entities, including, without limitation the parties listed on **Schedule 3** of the Settlement Agreement, through service of the Confirmation Hearing Notice (as defined in the Plan) in accordance with the Disclosure Statement Order (also as defined in the Plan).

E.       Notice of the Approval Motion was ~~duly published as follows: [   ]~~provided through publication of the Additional Debtors' Abuse Claims Bar Date Publication Notice (**Plan Exhibit G**) in daily and community newspapers throughout Louisiana.

F.       The notices described above were good, sufficient, and appropriate under the circumstances, and no other notice of the Approval Motion or Sale Hearing is required.

3

G.     The disclosures made by the Debtor Parties concerning the Settlement Agreement, the Sale Transaction, and the Sale Hearing were good, complete, and adequate.

H.     [The Unknown Abuse Claims Representative has consented to, and approved of the Settlement Agreement and Sale Transaction on behalf of Unknown Abuse Claims in connection with the treatment of such Claims under the Plan.][6]

I.     A reasonable opportunity to object or be heard with respect to the Approval Motion and the relief requested therein has been afforded to all interested Entities.

J.     The Archdiocese Signatory Parties, on their own behalf and on behalf of the Archdiocese Bound Parties, as applicable, have duly executed the Insurance Settlement Agreement by their duly authorized representative, agent and/or attorney in fact, and have full corporate power and authority to consummate the Sale Transaction pursuant to the Settlement Agreement and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Settlement Agreement, are required for the Archdiocese Bound Parties to consummate the Sale Transaction.

K.     The Debtor Parties have demonstrated (i) good, sufficient, and sound business purpose and justification and compelling circumstances for the Sale Transaction pursuant to Section 363(b) of the Bankruptcy Code and (ii) that the Sale Transaction is fair, reasonable, and in the best interests of their Estates and creditors pursuant to Bankruptcy Rule 9019. Among other things, the Debtor Parties have demonstrated that: the Settlement Agreement, and closing thereon, is necessary and appropriate to realize the value of the Purchased Property (as defined below) and maximize the value of their Estates; the probability of success for their Estates in

---

[6]     [To confirm consent and approval by the Unknown Abuse Claims Representative.]

4

1136

litigation over the matters resolved by the Settlement Agreement is uncertain; litigation of the matters resolved by the Settlement Agreement would be complex and costly to their Estates; and the Settlement Amount is within the reasonable range of potential litigation outcomes. As used herein, "Purchased Property" means, collectively, all right, title and interest (including "Interests" as defined below) in and to the Archdiocese Policies issued by Insurer and the Related Insurance Claims and Coverage Claims ~~of the Archdiocese Bound Parties~~; [**Intentionally Omitted.**][7] The Sale Transaction constitutes a reasonable and sound exercise of the Debtor Parties' business judgment and their powers and duties under applicable law and should be approved. Approval of the Settlement Agreement and consummation of the Sale Transaction are in the best interests of the Debtor Parties' Estates, their creditors (specifically including the Abuse Claimants of the Debtor Parties), and other parties-in-interest, including because the proceeds of and from the Sale Transaction will benefit Abuse Claimants.

L. The Settlement Agreement was negotiated, proposed, and entered into without collusion, in good faith, and from arm's length bargaining positions. Without limiting the foregoing, the Settlement Agreement resulted from a lengthy mediation that proceeded pursuant to a prior order of the Bankruptcy Court. Insurer is not an "insider" or "affiliate" (as those terms are defined in the Bankruptcy Code) of any of the Debtor Parties. None of the Archdiocese Bound Parties or Insurer have engaged in any conduct that would: (i) cause or permit the

---

[7] ~~Intentionally omitted, except the Order approving the Catholic Mutual Settlement Agreement, in which this section will provide:~~

~~". . . *provided that* the Purchased Property does not include Insurer's obligations under the Certificate No. [\*] issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the personal injury claims listed in Schedule [X] attached to the Settlement Agreement, in each case, subject to the limits, declarations, terms and conditions of such certificate (the "Preserved Coverage"), and *provided further that* the Preserved Coverage does not include coverage for any and all Abuse Claims or other Barred Claims."~~

5

avoidance of the Settlement Agreement or the consummation of the Sale Transaction under Section 363(n) of the Bankruptcy Code; (ii) cause or permit the imposition of any costs or damages (including without limitation attorneys' fees or punitive damages) under Section 363(n) of the Bankruptcy Code; or (iii) prevent the application of Section 363(m) of the Bankruptcy Code. The releases, injunctions, policy buyback, and all other components of the Sale Transaction comply with the Bankruptcy Code and all applicable non-bankruptcy law.

M. Pursuant to the Settlement Agreement and to the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer have consented to the assignment of the Non-Debtor Catholic Entities' Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under the Settlement Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Interests of any Entity in such Archdiocese Policies (the "Non-Debtor Catholic Entity Policy Sale").

N. Insurer is a good faith purchaser of the Purchased Property under Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, in that, among other things: (i) all payments to be made by or to Insurer, and other agreements or arrangements entered into by Insurer, including without limitation any escrow agreement pertaining to the payment of the Settlement Amount, in connection with the Sale Transaction have been disclosed; (ii) Insurer neither induced nor caused the Debtor Parties' chapter 11

6

filings; (iii) the negotiation and execution of the Settlement Agreement and any other agreements or instruments related thereto was in good faith, the arm's length transaction between Insurer and the other Parties was the product of mediation, and all Parties to the Settlement Agreement were, or had the opportunity to be, represented by counsel; and (iv) Insurer has not violated Section 363(n) of the Bankruptcy Code by any action or inaction. Insurer has at all times acted in good faith with respect to the Settlement Agreement and will continue to be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale Transaction.

O.    The terms and conditions of the Settlement Agreement are fair and reasonable. The Settlement Amount provided by Insurer pursuant to the Settlement Agreement (i) is fair and reasonable; (ii) monetizes the Purchased Property at the highest and best amount; (iii) will provide a higher and more certain recovery for the Debtor Parties' creditors than would be provided by any other practical available alternative given the complexity, cost, and uncertainty of such alternatives; (iv) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (v) constitutes reasonably equivalent value (as defined in Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law. The Settlement Amount is within the reasonable range of potential litigation outcomes, and the Debtor Parties' determination to accept the Settlement Amount and otherwise enter into the Settlement Agreement is a valid and sound exercise of their business judgment and consistent with the Debtor Parties' fiduciary duties. The releases to be made pursuant to the Settlement Agreement, including without limitation the releases of the Archdiocese Bound Parties and the Insurer Released Parties, are appropriate and should be approved.

P.      Insurer: (i) is not a mere continuation of any of the Archdiocese Bound Parties or the Estate of any of the Debtor Parties, nor is there any continuity of enterprise between Insurer and the Debtor Parties or Insurer and any of the other Archdiocese Bound Parties; (ii) is not holding itself out to the public as a continuation of any of the Archdiocese Bound Parties; and (iii) is not a successor to the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties for any purpose, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of Insurer and any of the Archdiocese Bound Parties.

Q.      The Settlement Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither Insurer nor any of the Archdiocese Bound Parties are fraudulently entering into the Sale Transaction.

R.      The transfer of the Purchased Property to Insurer (i) does not constitute an avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law and (ii) does not and will not subject Insurer to any liability whatsoever with respect to the Debtor Parties' operation prior to the closing of the Sale Transaction (i.e., the occurrence of both the Settlement Agreement Effective Date and payment[84] of the Settlement Amount by Insurer to the Settlement Trust or Escrow Agent pursuant to the terms of Insurer's Settlement Agreement) (the "Closing").

S.      Insurer has agreed to purchase the Purchased Property pursuant to its Settlement Agreement and this Order; Insurer has not agreed to purchase, and is not purchasing, any other

---

[84] For the avoidance of doubt, all references to "payment" or "delivery" of the Settlement Amount by Insurer herein shall encompass all transfers of the Settlement Amount contemplated by the Settlement Agreement, including without limitation funding and transfer of funds to the Settlement Trust via letters of credit or escrow accounts.

assets of the Estate of any of the Debtor Parties. Insurer has not agreed to assume, and after Closing shall have no obligations with respect to, any liabilities of the Archdiocese Bound Parties. Without limiting the generality of the foregoing, Insurer: (i) is not assuming and shall have no liability for any Claims arising from or relating to Abuse, the Purchased Property, or the Bankruptcy Case; and (ii) is not assuming and shall have no liability with respect to the Archdiocese's or any other Archdiocese Bound Party's obligations to Abuse Claimants, any other creditors, future claimants (including without limitation Unknown Abuse Claimants), or the Archdiocese's or any Archdiocese Bound Party's employees, in each case, by reason of the purchase of the Purchased Property under the Settlement Agreement.

T.     The Purchased Property constitutes property of the Debtor Parties' Estates, and the Archdiocese Bound Parties are the lawful owner of the Purchased Property and hold good title thereto. The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement will be a legal, valid, binding, and effective transfer of the Purchased Property, and will vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property, in each case free and clear of all Interests (as defined below, including, without limitation, any Interests of the Archdiocese Bound Parties, Abuse Claimants, and holders of Direct Action Claims). Upon Closing, Insurer shall have no liability for any Claims against or liabilities of the Debtor Parties, their Estates, or the other Archdiocese Bound Parties. Without limiting any of the foregoing, the Archdiocese, the Archdiocese Signatory Parties, and Insurer have agreed that, upon Closing: (i) the Purchased Property shall be deemed void *ab initio*, terminated, extinguished, and of no further force and effect; and (ii) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each

9

1141

professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

U.      Pursuant to §§ 363(f) and 105(a) of the Bankruptcy Code, and subject to the terms and conditions set forth in the Settlement Agreement, and upon Closing, without the need for further action, the Debtor Parties shall be deemed to have sold, transferred and conveyed the Purchased Property to the Insurer, and the Insurer shall be deemed to have purchased from the Debtor Parties, all right title and interest in and under the Purchased Property, free and clear of all "Interests" of any Entity of any kind or nature whatsoever, to the fullest extent permitted under §§ 363(b) and (f) of the Bankruptcy Code, with such "Interests" including: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, Subject Interests, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by

10

agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property. Without limiting the generality of the foregoing and without finding that any Entity has any Interest in the Archdiocese Policies: (i) any Entity with Interests (if any) in or with respect to the Purchased Property who did not object, or who withdrew their objections to the Sale Transaction or the Approval Motion have waived their right to object to the sale of the

11

1143

Purchased Property free and clear of such Entity's Interests in the Purchased Property pursuant to Section 363(f)(2) of the Bankruptcy Code; and (ii) any such Entity with Interests in or with respect to the Purchased Property who objected to the Approval Motion and did not withdraw any such objection (a) are the holders of Interests subject to *bona fide* dispute under Bankruptcy Code Section 363(f)(4) and/or (b) can be compelled to accept a monetary satisfaction of their Interests within the meaning of Section 363(f)(5) of the Bankruptcy Code.

V.     If the sale of the Purchased Property were not free and clear of all Interests, including without limitation all Abuse Claims, Direct Action Claims, and Coverage Claims, or if the Insurer Released Parties would, or in the future could, be liable for any of the Interests, Insurer would not have entered into the Settlement Agreement and would not consummate the Sale Transaction or pay the Settlement Amount, thus adversely affecting the Debtor Parties, their Estates, and their creditors (including, without limitation, the Abuse Claimants), as well as the other Archdiocese Bound Parties.

W.     Issuing a supplemental injunction under Section 105(a) of the Bankruptcy Code as provided herein is essential to give effect to the sale of the Purchased Property to Insurer and this Order's approval of such sale free and clear of Interests pursuant to Section 363(f) of the Bankruptcy Code. The Sale Injunction set forth in Paragraph 23 below not only is a necessary prerequisite for Insurer's assent to the terms and conditions of its Settlement Agreement, such that Insurer will not consummate the Sale Transaction or pay its Settlement Amount in the absence of such an injunction from this Bankruptcy Court, but also is warranted to ensure compliance with this Order. Likewise, Insurer will not consummate the Sale Transaction or pay its Settlement Amount without the benefit of the releases contained in the Settlement Agreement and approval thereof by the Bankruptcy Court.

12

1144

X.    Neither the Settlement Agreement nor the Sale Transaction constitute a *sub rosa* chapter 11 plan. The Settlement Agreement does not impermissibly restructure the rights of the Debtor Parties' creditors nor impermissibly dictate a chapter 11 plan for the Debtor Parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

### General Provisions

1.    The Approval Motion, and the relief sought therein (including without limitation the approval of the Settlement ~~Agreements~~Agreement and the Sale Transaction) is GRANTED and APPROVED, in all respects as set forth herein.

2.    The findings of fact set forth above and conclusions of law stated herein, in addition to any findings of fact and conclusions of law stated by the Bankruptcy Court at the Sale Hearing, shall constitute this Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the Approval Motion pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.    Any and all objections, if any, to the Approval Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case the Entity asserting the objection or reservation of rights is enjoined from taking any action against the Insurer Released Parties or the assets or property of any Insurer Released Parties to recover any Claim or Interest held by such objecting Entity. Those parties who did not object or who withdrew their objections to the Approval Motion are deemed to have consented to the relief granted herein, pursuant to Section 363(f)(2) of the Bankruptcy Code.

13

1145

**Approval of the Settlement Agreement**

4.      The Settlement Agreement is approved in its entirety, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Without limiting the generality of the foregoing, the settlement and releases of Claims as set forth in the Settlement Agreement is hereby approved pursuant to Bankruptcy Rule 9019. All factors set forth in *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey* (*In re Cajun Elec. Power Coop.*), 119 F. 3d 349, 356 (5th Cir. 1997), either weigh in favor of the Settlement Agreement or do not apply.

5.      Pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, the Non-Debtor Catholic Entity Policy Sale, free and clear of all Interests of any Entity in the Archdiocese Policies, is hereby approved.

6.      Pursuant to Section 363(b) of the Bankruptcy Code, each of the Parties is authorized to consummate the Sale Transaction under and in accordance with the terms and conditions of the Settlement Agreement, and the Archdiocese Bound Parties shall at all times act in accordance with the terms thereof.

7.      ~~The Parties and their attorneys in fact under the Settlement Agreement or otherwise are~~Any representative, agent or attorney in fact of the Archdiocese Signatory Parties is authorized to execute any other documentation and perform such other ministerial tasks as may be reasonably necessary to effectuate the Settlement Agreement and the Sale Transaction on behalf of the Archdiocese Bound Parties, including without limitation, any bill of sale substantially in the form attached to the Settlement Agreement as **Exhibit B**.

14

8.      Subject to all of the terms and conditions of the Settlement Agreement, upon Closing, the Archdiocese Bound Parties and Insurer shall be deemed to have granted the releases as set forth in the Settlement Agreement.

9.      The Parties are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Settlement Agreement, together with all additional instruments and documents that may be reasonably necessary, convenient, or desirable to implement the Settlement Agreement and consummate the Sale Transaction pursuant thereto and effectuate the provisions of this Order and the transactions approved hereby, and to take all further actions as may be requested by Insurer for the purpose of assigning, transferring, granting, conveying, and conferring to Insurer or reducing to Insurer's possession, the Purchased Property, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Settlement Agreement.

10.     Insurer is authorized and directed to pay the Settlement Amount under and subject to the satisfaction of all terms and conditions of the Settlement Agreement.

11.     The Settlement Amount provided by Insurer for the Purchased Property (i) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

12.     None of the Insurer Released Parties shall be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its or their rights or remedies under the Settlement Agreement or any other document related to the Settlement Agreement or the Sale Transaction. The automatic stay imposed by Section 362 of the

Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order; *provided*, *however*, that this Bankruptcy Court shall retain jurisdiction over any and all disputes with respect thereto.

13.    This Order shall be binding in all respects upon: (a) the Debtor Parties and their Related Parties; (b) the Debtor Parties' Estates; (c) the other Archdiocese Bound Parties; (d) all creditors of the Debtor Parties; (e) all Abuse Claimants and holders of Direct Action Claims; (f) all holders of Interests whether known or unknown against or on all or any portion of the Purchased Property; (g) any Non-Settling Insurer; (h) the Insurer Released Parties; (i) the Purchased Property; (j) the Unknown Claims Representative; (k) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code; and (l) all Entities receiving notice (or deemed to have received notice pursuant to this Order) of the Approval Motion or the Sale Hearing, including without limitation all Entities listed on **Schedule 3** to the Settlement Agreement. The Settlement Agreement shall be binding in all respects upon: (x) the Debtor Parties, their Estates, and their Related Parties; (y) the Archdiocese Bound Parties; and (z) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code.

1148

**Transfer of Assets**

14.    The conditions of Section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Archdiocese may sell the Purchased Property free and clear of any Interests therein.

15.    Pursuant to Sections 105 and 363(b) and (f) of the Bankruptcy Code, Bankruptcy Rule 9019, applicable Louisiana State law, the testimonial and other documentary evidence filed in support of the Approval Motion, and the record of the Sale Hearing, the Archdiocese has set forth the legal authority necessary to support this Bankruptcy Court's findings herein.

16.    Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Property and the Archdiocese Bound Parties' rights, title, and interest therein shall upon Closing be transferred to Insurer, free and clear of all Interests (including without limitation the Interests of any of the Archdiocese Bound Parties), and all such Interests are unconditionally and forever released and extinguished as against the Purchased Property. Without limiting the generality of the foregoing, the sale of the Purchased Property under the Settlement Agreement shall be free and clear of all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property.

17.    Upon the Closing, (a) all of the Archdiocese Bound Parties', the Debtor Parties' Estates', and the Settlement Trustee's rights under and with respect to the Purchased Property, if any, shall be permanently and irrevocably extinguished as if the Archdiocese Policies had never

17

1149

been issued and (b) the Insurer Released Parties shall be entitled to all of the protections afforded by §363(m) of the Bankruptcy Code.

18.     Upon Closing, all Entities (and their respective successors and assigns), including but not limited to all governmental, tax, and regulatory authorities, Archdiocese Bound Parties, Non-Settling Insurers, Abuse Claimants, Direct Action Claimants, trade and other creditors, and any Entities holding Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) against, in, or with respect to the Purchased Property, including, without limitation, such Interests arising or accruing under or out of, in connection with, or in any way relating to the transfer of the Purchased Property to Insurer, hereby are forever barred, estopped, and permanently enjoined from asserting such Person's or Entity's Interests against the Purchased Property, the Insurer Released Parties, or the assets or property of any Insurer Released Parties. Effective upon Closing, none of the Insurer Released Parties shall have any liability for any Claims (a) against the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties or (b) that arise under or related in any way or in respect of the Purchased Property.

19.     The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement constitutes a legal, valid, and effective transfer of the Purchased Property, and shall vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property. Upon Closing, the Archdiocese Policies shall be terminated and no longer in force or effect, exhausted in retrospect as to all coverages, and all Interests that the Archdiocese or any other Person or Entity (including without limitation any of the other Archdiocese Bound Parties) may have had, may presently have, or may in the future have, in such Purchased Property are released and extinguished, and all such Entities (including

without limitation the Archdiocese Bound Parties) hereby are forever barred, estopped, and permanently enjoined from asserting any such Interest against the Purchased Property and/or any of the Insurer Released Parties. Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent constitutes full and complete performance of any and all obligations under the Purchased Property, including without limitation any performance owed to the Archdiocese Bound Parties, and all limits of coverage under the Archdiocese Policies, including per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

20. Upon occurrence of the Closing:

(a) all Interests the Archdiocese Bound Parties may have had, may presently have, or in the future may have in the Purchased Property, as applicable, are released pursuant to the terms of the Settlement Agreement; and

(b) the Archdiocese Bound Parties accept Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent in full and complete satisfaction of Insurer's past, present, and future obligations, including, without limitation, any obligations to any of the Archdiocese Bound Parties under such Purchased Property or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever arising out of or related in any way to such Purchased Property (including Coverage Claims), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, direct or indirect, and regardless of whether such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, or otherwise.

19

1151

**No Successor Liability**

21.     The transfer of the Purchased Property to Insurer shall not result in any Insurer Released Parties or the Purchased Property having any of the following: (a) any liability or responsibility for Interests in or Claims against the Archdiocese Bound Parties or any of their Related Parties; (b) liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any Claims or Interests; or (c) any liability or responsibility to the Archdiocese Bound Parties except as is expressly set forth in the Settlement Agreement.

22.     Without limiting the generality of the foregoing, none of the Insurer Released Parties shall have any successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability, *de facto* merger or joint venture, mere continuation or substantial continuity, whether known or unknown as of Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between the Archdiocese Bound Parties and any non-debtor subsidiary or affiliate (including, without limitation, any other Archdiocese Bound Party), liabilities relating to or arising from any environmental laws, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Purchased Property prior to Closing.

**Sale Injunction**

23.     Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, and in consideration of the undertakings of Insurer pursuant to the Settlement Agreement, including

20

Insurer's purchase of the Purchased Property free and clear of all Claims and Interests pursuant to Section 363(f) of the Bankruptcy Code as provided herein, any and all Entities that have held, now hold, or who may in the future hold any Claims or Interests (including without limitation all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Abuse Claimants, holders of Direct Action Claims, Perpetrators, Non-Settling Insurers, the Archdiocese Bound Parties, and all others holding Claims or Interests of any kind or nature whatsoever, including, without limitation, those Claims released or to be released pursuant to the Settlement Agreement), which Claims or Interests are under, arise out of, relate to, or connect in any way with an Abuse Claim or any of the Purchased Property, including, without limitation, (a) all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property, (b) the payment of any of the Claims identified previously, including, without limitation, Abuse Claims, Direct Action Claims, and Coverage Claims and (c) all other Interests, are hereby permanently stayed, enjoined, barred, and restrained from taking any Action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or Interest against any of (x) the Insurer Released Parties, (y) the assets or property of any Insurer Released Parties, or (z) the Purchased Property, including by:

      (a)      commencing, conducting, or continuing in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind, in any forum, with respect to

any such Claim or Interest, against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(b)     enforcing, levying, attaching, collecting, or otherwise recovering, or seeking to accomplish any of the preceding, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(c)     creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, or seeking to accomplish any of the preceding, any lien of any kind against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(d)     asserting, implementing, or effectuating any such Claim or Interest of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any of the Insurer Released Parties, (B) any of the Insurer Released Parties, or (C) any property or interest in property of any Insurer Released Party; and

(e)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Order.

The actions described in this Paragraph 23 are "**Enjoined Actions**," and the injunction set forth herein is the "**Sale Injunction**." The Sale Injunction shall be a permanent injunction against the Enjoined Actions and may not be modified, dissolved, or terminated.

24.     The Sale Injunction shall be effective upon Closing. The Sale Injunction bars pursuit of the above referenced Claims and/or Interests against the Insurer Released Parties, or

the property or assets of each (including, without limitation, the Purchased Property), but against no other person or thing.

25.     In a successful action to enforce this Sale Injunction in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

26.     The Sale Injunction shall not enjoin (a) the right of any Person or Entity against the Settlement Trust or a Non-Settling Insurer, or (b) the Settlement Trustee from enforcing the Settlement Trust Documents.

## Preserved Coverage

27.     [**Intentionally Omitted.**][9]

## Additional Provisions

28.     From and after the date hereof, no Person or Entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreements and this Order.

29.     This Bankruptcy Court hereby retains jurisdiction, regardless of whether a chapter 11 plan has been confirmed in the Bankruptcy Case and consummated and irrespective of the provisions of any such plan or order confirming such plan, to enforce and implement the terms and provisions of the Settlement Agreement, all amendments thereto, any waivers and consents

---

[9] Intentionally omitted, except the Order approving the Catholic Mutual Settlement Agreement, in which this section will provide:

"Nothing in this Order, the Settlement Agreement or the Sale Transaction affects Insurer's Preserved Coverage or the Archdiocese Bound Parties' continuing obligations in connection with the Preserved Coverage under the Archdiocese Policies issued by Insurer, all of which shall survive the Settlement Agreement Effective Date, Bankruptcy Plan Effective Date and the closing of the Sale Transaction."

thereunder, and of any agreement(s) executed in connection therewith in all respects, including but not limited to retaining jurisdiction to: (a) compel delivery of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreement; (b) resolve any dispute, controversy, or claim arising under or related to the Settlement Agreement, or the breach thereof; and (c) interpret, implement, and enforce the provisions of this Order and resolve any disputes related thereto.

30.    Nothing contained in any plan confirmed in the Bankruptcy Case or any order of this Bankruptcy Court confirming such plan shall conflict with or derogate from the provisions of the Settlement Agreement or the terms of this Order.

31.    This Order shall not limit or preclude the entry or effectiveness of any additional releases or injunctions that may be granted protecting the Insurer Released Parties and/or the assets or property of any Insurer Released Parties in connection with, or as part of, any order confirming a chapter 11 plan.

32.    The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Settlement Agreement be authorized and approved in its entirety.

33.    The transactions contemplated by the Settlement Agreement are undertaken by Insurer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code. Insurer is a good faith purchaser of the Purchased Property and is entitled to all the protections afforded by Section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction to Insurer.

<div align="center">24</div>

34.     Insurer has given substantial consideration under the Settlement Agreement for the benefit of the Debtor Parties, their Estates, and creditors, along with the other Archdiocese Bound Parties. Such consideration given by Insurer constitutes valid and valuable consideration for the Purchased Property and the releases set forth in the Settlement Agreement, including, without limitation, the extinguishment and release of all Interests pursuant to this Order. The consideration provided by Insurer for the Purchased Property under the Settlement Agreement is fair and reasonable; accordingly, the purchase may not be avoided under Section 363(n) of the Bankruptcy Code.

35.     The terms and provisions of the Settlement Agreement and this Order shall be binding notwithstanding any subsequent appointment of any trustee(s) examiner(s) or receiver(s) under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtor Parties, their Estates, their creditors, or any examiner(s) or receiver(s).

36.     The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Bankruptcy Court that the Settlement Agreement and the Parties' performance thereof be authorized and approved in its entirety.

37.     Pursuant to the provisions of the Settlement Agreement, each of the Archdiocese Bound Parties and Insurer shall be authorized to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper, or advisable under applicable law or otherwise to consummate and make effective the transactions contemplated by the Settlement Agreement.

38.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39.     All obligations of the Debtor Parties under the Settlement Agreement shall be deemed administrative expenses of their Estates under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

40.     Each and every federal, state, and local governmental agency or department is hereby directed to accept this Order in lieu of any document necessary to consummate the transactions contemplated by the Settlement Agreement and this Order.

41.     The Settlement Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the Parties, in a writing signed by the Parties, and in accordance with the terms thereof, without further order of this Bankruptcy Court; *provided* that such modification, amendment, or supplement does not constitute a material change to the relief sought in the Approval Motion and approved by this Order.

**IT IS SO ORDERED.**

New Orleans, Louisiana, _____, 2025

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

| Summary report: Litera Compare for Word 11.7.0.54 Document comparison done on 10/24/2025 5:03:58 PM | |
|---|---|
| **Style name:** CF_Word_new | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Exhibit A - Form of Proposed Sale Order - FINAL.docx | |
| **Modified filename:** ADNO - National Union Proposed Sale Order (For Filing).docx | |
| **Changes:** | |
| Add | 19 |
| Delete | 37 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 56 |

## SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK

This Settlement Agreement, Release, and Policy Buyback ("**Settlement Agreement**") is hereby made by, and between, and among The Roman Catholic Archdiocese of New Orleans (the "**Archdiocese**" or "**Debtor**" as further defined in Section 1.1.31 below), the other Archdiocese Signatory Parties (as defined in Section 1.1.15 below), and Twin City Fire Insurance Company and First State Insurance Company ("**Insurer**" as further defined in Section 1.1.49 below). Insurer, the Archdiocese, the other Archdiocese Signatory Parties, and the Creditors' Committee (as defined below), collectively are the "**Parties**" and each a "**Party**" to this Settlement Agreement.

### RECITALS:

WHEREAS, on May 1, 2020 (the "**Petition Date**" as further defined in Section 1.1.67 below), the Archdiocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**" as further defined in Section 1.1.17) pending under Case No. 20-10846 (the "**Bankruptcy Case**" as further defined in Section 1.1.16 below);

WHEREAS, each of the Additional Debtors (as defined in Section 1.1.11 below) intends to file in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;

WHEREAS, certain Entities have asserted or may hold Claims, including Abuse Claims, against the Archdiocese Bound Parties (each as defined below);

WHEREAS, Insurer issued, allegedly issued, may have issued, assumed by novation or otherwise, or may be administering the Archdiocese Policies (as defined in Section 1.1.9 below) providing certain coverage to the Archdiocese Bound Parties;

WHEREAS, asserted disputes between the Debtor Parties (as defined below) and Insurer have arisen, and assertable disputes between the Archdiocese Bound Parties and Insurer may arise in the future, concerning the scope and nature of Insurer's responsibilities, if any, to provide insurance coverage to the Archdiocese Bound Parties under the Archdiocese Policies (as further defined in Section 1.1.29 below, the "**Coverage Claims**");

WHEREAS, claimants may contend, as a matter of Louisiana law, particularly La. Rev. Stat § 22:1269 *et. seq.*, that certain Entities may have Claims arising under or related to the Archdiocese Policies that could entitle them to bring a Direct Action Claim (as defined in Section 1.1.35 below) against Insurer;

WHEREAS, claimants may contend that as a matter of Louisiana law, the time within which Claims relating to Abuse may be asserted against certain of the Archdiocese Bound Parties and/or the Insurer may not have expired with respect to certain Claims;

WHEREAS, the Archdiocese Signatory Parties and Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Claims and all other

1160

disputes between and among them and to release Insurer from any further obligations under the Archdiocese Policies;

WHEREAS, Insurer would not pay the full amount of the Settlement Amount (as defined in Section 1.1.81 below) without the buy-back of the Subject Interests (as defined below) in the Archdiocese Policies, including without limitation, the interests of the Archdiocese, Additional Debtors, other Archdiocese Bound Parties and holders of Direct Action Claims, pursuant to section 363 of the Bankruptcy Code, and without the Sale Injunction, the Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeping Injunction (each as defined below), additionally providing protection to the Insurer Released Parties (as defined below) from Claims against the Insurer Released Parties and their property;

WHEREAS, through this Settlement Agreement and the Plan (as defined in Section 1.1.68 below) the Archdiocese Signatory Parties intend to provide Insurer Released Parties with the broadest possible release of all Claims and Subject Interests with respect to the Archdiocese Policies; and

WHEREAS, through this Settlement Agreement and the Plan, as part of the compromise and resolution of the Coverage Claims, the Debtor Parties and Insurer also wish to effect a sale, pursuant to § 363(b), (f), and (m) of the Bankruptcy Code of the Archdiocese Policies, along with the Coverage Claims and Related Insurance Claims (the "**Purchased Property**" as further defined in Section 1.1.71 below), to provide the Insurer Released Parties with the broadest possible release and buyback with respect to the Archdiocese Policies, resulting in the Insurer Released Parties having no obligations now or in the future with respect to the Archdiocese Policies, including without limitation to any Direct Action Claim.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Settlement Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound subject to the approval of the Bankruptcy Court pursuant to Section 2 below, the Parties hereby agree as follows:

1. **DEFINITIONS**

1.1    As used in this Settlement Agreement (as defined above), the following terms shall have the meanings set forth below.

1.1.1    "**Abuse**" means any of the following actual or alleged acts: (a) touching by the Perpetrator of the person's intimate body parts (genitals, breasts, or buttocks), the touching by the person of the Perpetrator's intimate body parts, showing pictures of the person's body or other persons' bodies, taking pictures of the person's body, showing pornography, or making images of the person while naked or engaged in any sexual activity, or any sexualized interaction including observing the person in bathing, toileting, or undressing that was made possible by the Perpetrator's position of authority, or by the inducement of the Perpetrator; or (b) sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to the genital or anal openings: (i) of the person's body by any part of the Perpetrator's body or any object used by the Perpetrator for this purpose; or (ii) of the person's body by any

part of the body of the Perpetrator or by any part of the body of another person, or by any object used by the Perpetrator or another person for this purpose; (c) inappropriate physical contact and/or contact that infringes upon another's personal, physical boundaries including but not limited to groping, kissing, extended hugging, and/or any unwelcomed touching; (d) grooming or trying to create a special relationship, including but not limited to: talk of a sexual nature, talk of a romantic nature, communications expressing individual love to the person, as opposed to a salutation, providing material resources or experiences which induce the person into a relationship where trust is then violated; or (e) any actual or alleged acts of the kind described in subsections (a)-(c) above that occur between or among minors and that the Perpetrator orchestrates or encourages.  For the avoidance of doubt, "Abuse" also includes: any actual or alleged conduct which (a) is described in the Louisiana Child Victims Act or (b) would constitute (i) a sexual offense as defined in article 603(2) of the Louisiana Children's Code; (ii) sexual battery as defined in LA. REV. STAT. §§ 14:43.1; 14:43.1.1; 14:43.2; 14: or 43.3, (iii) a crime against nature as defined in LA. REV. STAT. § 14:89, or (i) pornography involving juveniles as defined in LA. REV. STAT. § 14:81.1, or with respect to the foregoing subsection (i)-(iv), any predecessor statute that prohibited such conduct at the time of the act.

1.1.2   "**Abuse Action**" means an Action asserting an Abuse Claim against any of the Covered Parties.

1.1.3   "**Abuse Claim**" means any Claim that has been asserted, or could be asserted, against any Settling Party or Non-Settling Insurer, that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively alleged Abuse that occurred, in whole or in part, before the applicable Debtor's Petition Date or Additional Debtors' Petition Date, including any such Claim that seeks monetary damages or any other relief, under any legal or equitable theory of liability, including, but not limited to, the following:  vicarious liability; *respondeat superior*; any conspiracy, fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, negligent, insufficient, or inadequate supervision, retention or misrepresentation; any theory based on misrepresentation, concealment, or unfair practice; public or private nuisance; or any theory, including, without limitation, any theory based on public policy or any acts or failures to act by any Settling Party, or any other Entity for whom any Settling Party is allegedly responsible, including, but not limited to, any such Abuse Claim against any Settling Party, Non-Settling Insurer, or any other Entity for whom any Settling Party or Non-Settling Insurer is alleged to be responsible.  Abuse Claims are:  (a) the Known Abuse Claims, which are treated in Class 3; and (b) the Unknown Abuse Claims, which are treated in Class 4.  For the avoidance of doubt, "Abuse Claim" includes (a) all Unknown Abuse Claims, (b) Claims or causes of action defined or described in the Revival Window Laws against the Archdiocese or any other Archdiocese Bound Party, (c) Direct Action Claims, and (d) any Claim against the Archdiocese or any other Archdiocese Bound Party that is attributable to, arises from, is based upon, relates to, or results from Abuse that, as of the Petition Date is barred by any applicable statute of limitations, and in each case, irrespective of whether (x) such Claims also involve the conduct of joint tortfeasors (or similar concepts under applicable law), (y) such Claims arise under, or were revived pursuant to, the Revival Window Laws, or any future reviver law, statute, or binding

precedential decision passed or issued on or after the Bankruptcy Plan Effective Date, or (z) a proof of claim has been filed, before or after the Claims Bar Date, or not at all, or an Abuse Action has been commenced with respect to such Claim. "Abuse Claim" does not include: (a) Related Insurance Claims or Coverage Claims against Settling Insurers or Non-Settling Insurers; (b) Non-Insurer Contribution Claims with respect to any Abuse Claim; (c) Insurer Contribution Claims with respect to any Abuse Claim; or (d) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to a Claim against these dioceses only. For the avoidance of doubt, a Claim based on Abuse solely occurring following the applicable Petition Date is not an Abuse Claim. Nothing in this definition shall constitute a waiver of any defense that would otherwise be available under applicable law to any Settling Party, the Settlement Trust, or any other Entity.

1.1.4 "**Abuse Claim Release and Certification**" means a written release in favor of the Insurer Released Parties, in the form of Exhibit C to the Acceptable Plan, or otherwise in form and substance acceptable to the Parties, which an Abuse Claimant must deliver before he or she is entitled to Settlement Trust Distributions, which shall provide that the Claimant releases the Insurer Released Parties from any and all Claims related to his/her Abuse Claim or any of the Archdiocese Policies, subject to Section 12.14 and related provisions of the Plan.

1.1.5 "**Abuse Claimant**" means the holder of an Abuse Claim, including, but not limited to, any Known Abuse Claim, Unknown Abuse Claim, or Direct Action Claim. For the avoidance of doubt, Abuse Claimants are Creditors. The definition of an Abuse Claimant includes the legal representative of the holder of an Abuse Claim, such as a bankruptcy trustee, the estate of a deceased individual who held an Abuse Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Abuse Claim, as the case may be. An Entity holding the following Claim is not an Abuse Claimant: (i) a Non-Insurer Contribution Claim with respect to such Abuse Claim; (ii) an Insurer Contribution Claim with respect to such Abuse Claim; (iii) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to such Entity's claim against such dioceses only.

1.1.6 "**Acceptable Plan**" means the *Fourth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and The Official Committee of Unsecured Creditors* filed at Docket No. [4419], and its exhibits and schedules, which as may be modified solely in accordance herewith (i.e., with the consent of the Insurer), and such modified plan constituting the "Acceptable Plan" for the purposes hereof.

1.1.7 "**Archdiocesan Parishes**" means all currently Catholic Church parishes and missions, as identified on Exhibit B-1, Part I, of the Acceptable Plan. Each of the Archdiocesan Parishes is organized as a non-profit corporation. For the avoidance of doubt, the definition of Archdiocesan Parishes does not include St. Louis Cathedral, Our Lady of Guadalupe Church & Shrine of St. Jude, or any Suppressed Archdiocesan Parish identified on Exhibit B-1, Part II, of the Acceptable Plan.

1.1.8 "**Archdiocesan Schools**" means the means the following schools that are owned and operated by the Archdiocese: (a) the Academy of Our Lady High School; (b) Archbishop Chapelle High School; (c)Archbishop Hannan High School; (d) Archbishop Rummel High School; (e) Archbishop Shaw High School; (f) Pope John Paul II High School; (g) St. Charles Catholic High School; (h) St. Scholastica Academy; and (i) St. Michael Special School.

1.1.9 "**Archdiocese Policies**" means (a) the contracts, binders, certificates, and policies of insurance that are listed on Schedule 1 hereto, and (b) all other known and unknown contracts, binders, certificates, or policies of general liability insurance, in effect on or before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date that were issued to, or for the benefit of, or subscribed on behalf or that otherwise actually insure, (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) policies issued to the Archdiocese that name as an insured or additional insured (or related concept under applicable law or document) the Diocese of Houma-Thibodaux or Diocese of Baton Rouge, but not policies issued to either of these dioceses that were not also issued to the Archdiocese or name it as insured, (iv) any Entity owned, created, operated, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, or (v) any institution, religious organization or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control or active management; in each case of (a) and (b), that were issued, subscribed to, or underwritten in whole or in part or allegedly issued, subscribed to, or underwritten in whole or in part by Insurer or any of its predecessors.

1.1.10 "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

1.1.11 "**Additional Debtors**" means the Entities listed on Acceptable Plan Exhibit B-1. As used herein, references to the "Additional Debtors" includes the Additional Debtor's Estates.

1.1.12 "**Approval Motion**" means the motion filed in the Archdiocese Bankruptcy Case at Docket No. 4181 seeking approval of this Settlement Agreement as described in Section 2.1 of this Settlement Agreement.

1.1.13 "**Approval Order**" means the order granting the Approval Motion described in Section 2.1 of this Settlement Agreement and providing the relief described in Section 2.1 of this Settlement Agreement and in substantially form attached **Exhibit A,** with only such changes as are satisfactory to Insurer.

1.1.14 "**Archbishop**" has the meaning given to it in Section 3.7.

1.1.15 "**Archdiocese Signatory Parties**" means, collectively, (a) the Debtor Parties and (b) the Non-Debtor Catholic Entities.

1.1.16 "**Bankruptcy Case**" means all of the following: (a) with respect to the Archdiocese, "Bankruptcy Case" has the meaning set forth in the Recitals; and (b) with respect to any given Additional Debtor, "Bankruptcy Case" means the case initiated when such Additional Debtor filed in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.17 "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Louisiana, having subject matter jurisdiction over the Bankruptcy Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

1.1.18 "**Bankruptcy Plan Effective Date**" means the date upon which a Plan approved by the Bankruptcy Court that contains terms and conditions consistent with those required by this Settlement Agreement becomes effective.

1.1.19 "**Barred Claim**" means any Claim against a Settling Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with an Abuse Claim or any of the Archdiocese Policies, including, but not limited to, any: (a) Abuse Claim; (b) Direct Action Claim; (c) Coverage Claim; (d) Related Insurance Claim; (e) Non-Insurer Contribution Claim; (f) Insurer Contribution Claim; (g) Medicare Claim; (h) Penalty Claim; and (i) any other Claim that is otherwise released herein. A Barred Claim further includes any Claim against a Settling Party based on allegations that it is an alter ego or liable as a successor of an Entity that is not a Settling Party or that the Settling Party's corporate veil should be pierced on account of Claims against an Entity that is not a Settling Party or based on any other theory under which the legal separateness of any Person and any other Entity may be disregarded to impose liability for a claim on either such Entity. Notwithstanding the foregoing, Barred Claims do not include any Claims to the extent they are asserted against (x) Non-Settling Insurers or (y) Excluded Parties, notwithstanding that such Entity may also have asserted or be able to assert a Claim for contribution, indemnity, reimbursement, or subrogation against any Settling Party relating to or arising from a such Claim; provided, however, that, for the avoidance of doubt, (i) any Claims that assert liability against such Entity in conjunction with a Settling Party will in all events be Barred Claims as to the Settling Party, (ii) any such Claim for contribution, indemnity, reimbursement, or subrogation against a Settling Party is a Barred Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party for the purposes of this definition.

1.1.20 "**Catholic Charities**" has the meaning set forth in Section 6.3.15.

1.1.21 "**Channeling Injunction**" has the meaning set forth in Section 2.2.2.

1.1.22 "**Claim**" means any past, present or future claim, demand, Action, request, right, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether sounding in law, equity, tort, warranty, contract, or under any other theory, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been

or may be asserted by or on behalf of any Entity, whether seeking damages (including compensatory, exemplary, punitive, or Penalty claims) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, or orders, including without limitation whether by way of direct action, subrogation, contribution, indemnity, alter ego, veil piercing, or regulatory action, or otherwise, regardless of whether such Claims arise under law, in equity, or under statute, before or after the Petition Date(s), or *in rem* or *in personam*, and include all Claims for damages to the environment or based on any theory of *respondeat superior,* vicarious, successor or transferee liability, or change in control, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

1.1.23 "**Claims Bar Date**" means the date(s) and time(s) indicated in the Final Order(s) (which may be the Plan Confirmation Order) setting the deadline(s) for filing proofs of Abuse Claim against the Debtor or Additional Debtor(s), as applicable.

1.1.24 "**CMS**" has the meaning set forth in Section 2.4.1.

1.1.25 "**Co-Insured Party**" means any other Entity that is a "Named Assured" or "named insured" or "protected person" under the Archdiocese Policies, and all other Entities that are determined by agreement or a court of competent jurisdiction to be an "Assured," an "Additional Assured," an "insured," or "protected person" or otherwise entitled to insurance coverage under any Archdiocese Policies.

1.1.26 "**Conditional Payment**" means any payment made to an Abuse Claimant under the MMSEA, including any payment by a Medicare Advantage Organization (as defined in the MSPA).

1.1.27 "**Controlling Document Provision**" has the meaning given to it in Section 2.2.9.

1.1.28 "**Covered Parties**" or "**Archdiocese Bound Parties**" means, collectively, the following Entities: (a) the Debtor Parties; (b) the Reorganized Debtor; (c) the Reorganized Additional Debtors; (d) the Non-Debtor Catholic Entities; (e) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP; (f) the Parish Schools and Archdiocesan Schools; (g) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans; (h) any Co-Insured Party; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entities' predecessors, successors, assigns, subsidiaries, direct and indirect past, present, and future affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, and estates. For the avoidance of doubt, the Entities in clauses (g), (h), and (i) are only Archdiocese Bound Parties in connection with the Archdiocese Policies.

1.1.29 "**Coverage Claims**" has the meaning set forth in the Recitals and further includes any Claim under relating to or arising out of the Archdiocese Policies or the rights and obligations thereunder, or the breach thereof, including any Claim seeking insurance coverage.

1.1.30 "**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed in the Archdiocese's Chapter 11 Case on May 20, 2020, [Docket Nos. 94 & 114], as such committee may be reconstituted from time to time.

1.1.31 "**Debtor**" or "**Archdiocese**" means, before the Bankruptcy Plan Effective Date, The Roman Catholic Church of the Archdiocese of New Orleans of Louisiana. As used herein, references to the "Debtor" or "Archdiocese" includes the Debtor's Estate.

1.1.32 "**Debtor Parties**" means (i) the Archdiocese and (ii) all of the Additional Debtors.

1.1.33 "**Diocese of Baton Rouge**" means the Diocese of Baton Rouge. References to the "Diocese of Baton Rouge CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) July 22, 1961 whichever occurred last; references to the "Diocese of Baton Rouge SD" refer to the period after such date.

1.1.34 "**Diocese of Houma-Thibodaux**" means the Diocese of Houma-Thibodaux. References to the "Diocese of Houma-Thibodaux CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) June 5, 1977, whichever occurred last; references to the "Diocese of Houma-Thibodaux SD" refer to the period after such date.

1.1.35 "**Direct Action Claim**" means any Claim by any Entity that is a "direct action" as that term is used in La. Rev. Stat § 22:1269 *et. seq* (or similar law in other jurisdictions) against any Insurer Released Party or related to any Archdiocese Policy, including, without limitation, (a) any claim that is similar or related to any Claim that could also be asserted by the Archdiocese or any Archdiocese Bound Party, (b) any Claim that directly or indirectly arises out of, relates to, or is connected with any Abuse Claim, (c) any Claim that directly or indirectly arises out of, relates to, or is in connection with any Insurer Released Party's handling of any Abuse Claim under the laws of any applicable jurisdiction, or (d) any Claim arising under any law of any jurisdiction that may give a third party a direct Cause of Action against an Insurer Released Party for monetary or other relief.

1.1.36 "**Entity**" means any individual, corporation, corporation sole, partnership, association, limited liability company, joint stock company, proprietorship, unincorporated organization, joint venture, trust, estate, executor, legal representative, or any other entity or organization, as well as any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency, department, board or instrumentality thereof, any other "Person" within the definition of section 101(41) of the Bankruptcy Code, and any successor in interest, heir executor, administrator, trustee, trustee in bankruptcy, or receiver of any Entity and also has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.1.37 "**Escrow Agent**" means the agent appointed in accordance with the Escrow Agreement.

1.1.38 "**Escrow Agreement**" means the agreement governing the escrow which shall hold the Settlement Amount in escrow and in trust for the benefit of Insurer, and which shall provide for the: (i) transfer of the Settlement Amount, with any accrued interest, to the Settlement Trust following the Settlement Agreement Effective Date, or (ii) return of the Settlement Amount to Insurer, with any accrued interest, upon receipt of notice that the Settlement Agreement has been terminated.

1.1.39 "**Estate**" means the (a) the Debtor's estate, and (b) Additional Debtors' estates, each created pursuant to section 541 of the Bankruptcy Code.

1.1.40 "**Excluded Party**" means the following Entities: (a) the Holy See (State of Vatican City); (b) any Perpetrator; and (c) any archdiocese or diocese (other than the Archdiocese itself), any Religious Order, or other Entity that is an affiliate or associated with the Roman Catholic Church (in its capacity as such, and other than (i) the Non-Debtor Catholic Entities; (ii) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP, (iii) the Parish Schools and Archdiocesan Schools; and (iv) any Co-Insured Party); provided, however, that any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party.

1.1.41 "**Extra-Contractual Claim**" means any Claim against any Insurer Released Party seeking any type of relief, other than coverage or benefits, under or with respect to the Archdiocese Policies. Extra-Contractual Claims include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs, or any other type of relief, alleging any of the following with respect to (a) any Archdiocese Policy; (b) any Claim allegedly or actually covered under a Archdiocese Policy; or (c) the conduct of any Insurer Released Party with respect to (a) or (b): (i) bad faith; (ii) failure to provide insurance coverage under any Archdiocese Policy, including any failure to investigate or to provide a defense or adequate defense; (iii) failure or refusal to compromise and settle any Claim insured under any Archdiocese Policy; (iv) failure to act in good faith; (v) violation or breach of any covenant or duty of good faith and fair dealing, whether express, implied, or otherwise; (vi) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (vii) violation of any unfair claims practices act or similar statute, regulation or code, including any statute, regulation, or code relating to unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising; (viii) any type of misconduct; or (ix) any other act or omission of any type by any Insurer Released Party for which the claimant seeks relief other than coverage or benefits under a Archdiocese Policy. "Extra-Contractual Claims" further include all Claims relating to any Insurer Released Party's (x) handling of any Claims under the Archdiocese Policies, (y) conduct in negotiating this Settlement Agreement and/or the Plan, and (z) conduct in the settlement of any Claims. For the avoidance of doubt, Extra-Contractual Claims of the Archdiocese Bound Parties are included within the property Insurer is purchasing hereunder.

1.1.42  "**Final Order**" means an order as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending and in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order will have been affirmed by the highest court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order will not cause such order not to be a Final Order.

1.1.43  "**Gatekeeper Injunction**" has the meaning set forth in Section 2.2.2.

1.1.44  "**HH**" has the meaning set forth in Section 6.3.15.

1.1.45  "**Indemnified Claims**" has the meaning set forth in Section 7.2 of this Settlement Agreement.

1.1.46  "**Indemnity Cost Reserve**" has the meaning set forth in Section 7.2.1.

1.1.47  "**Injunctions**" means the Sale Injunction, Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeper Injunction.

1.1.48  "**Insurance Settlement Agreement**" has the meaning set forth in the Acceptable Plan.

1.1.49  "**Insurer**" means Twin City Fire Insurance Company and First State Insurance Company.

1.1.50  "**Insurer Contribution Claim**" means any (a) Non-Settling Insurer Contribution Claim or (b) Settling Insurer Contribution Claim.

1.1.51  "**Insurer Released Party**" means Insurer and its Related Parties, each in their capacities solely as such with respect to the Archdiocese Policies and all Subject Interests therein.

1.1.52  "**Known Abuse Claims**" means any Abuse Claim, other than an Unknown Abuse Claim, against any Settling Party, Settling Insurer, and/or Non-Settling Insurer.

1.1.53  "**Medicare Claims**" means any Claim by CMS, and/or any agent or successor of CMS, charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA or pursuing a Claim under MSP Provisions, relating to any payments in respect of any Abuse Claim, including any Claim for reimbursement of conditional payments, and any Claim relating to reporting obligations.

1.1.54 "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which imposes reporting obligations on those Entities with payment obligations under the MSPA.

1.1.55 "**MSPA**" means 42 U.S.C. §1395y et seq., or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto, including the regulations promulgated thereunder, found at 42 C.F.R. §411.1 et seq.

1.1.56 "**Non-Debtor Catholic Entity Policy Sale**" has the meaning set forth in Section 4.6.

1.1.57 "**Non-Debtor Catholic Entities**" collectively means those entities listed on the Acceptable Plan Exhibit B-2 who are not Additional Debtors, but which are (a) insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies and/or (b) have actually or allegedly acquired or been assigned the right to make a claim for coverage under any of the Archdiocese Policies (excluding, however, for the avoidance of doubt, the Debtor Parties, the Settlement Trust, and any Abuse Claimant).

1.1.58 "**Non-Insurer Contribution Claim**" means any Claim for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law that is attributable to, arises from, is based upon, relates to, or results from, an Abuse Claim or payment of an Abuse Claim, and any other derivative or indirect Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, other than a Non-Settling Insurer Contribution Claim or a Settling Insurer Contribution Claim.

1.1.59 "**Non-Settling Insurer**" means any insurer (together with its Related Parties) that is not a Settling Insurer.

1.1.60 "**Non-Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Non-Settling Insurer against any Settling Insurer for the payment of money where such Non-Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.61 "**Parish Schools**" means the elementary Catholic schools that are owned and operated by the Archdiocesan Parishes. For the avoidance of doubt, the definition of Parish Schools expressly excludes Catholic schools that are owned and operated by Religious Orders and the Archdiocesan Schools. For the further avoidance of doubt, the Parish Schools are not separately incorporated.

1.1.62 "**Parties**" has the meaning set forth in the first paragraph of this Settlement Agreement.

1.1.63  **[Reserved.]**

1.1.64  "**Penalty Claims**" means a Claim against any Settling Party or Settling Insurer for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Creditor holding such Claim.

1.1.65  "**Perpetrator**" means an individual who personally committed or is alleged to have personally committed an act of Abuse. For the avoidance of doubt, the definition of Perpetrator does not include any individual who did not personally commit an act of Abuse or is not alleged to have personally committed an act of Abuse, but against whom an Abuse Claim or Non-Insurer Contribution Claim is asserted nonetheless, or may be asserted, by virtue of such individual's position or service as a member, representative, contractor, consultant, professional, or volunteer of the Archdiocese or any Non-Debtor Catholic Entity or any council or representative body associated with such Entities.

1.1.66  "**Person**" has the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

1.1.67  "**Petition Date**" means (a) with respect to the Archdiocese, May 1, 2020; and (b) with respect to each Additional Debtor, the date(s) on which such Additional Debtor files in the Bankruptcy Court its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.68  "**Plan**" refers to the Chapter 11 Plan of Reorganization for the Archdiocese and all Additional Debtors (and all exhibits annexed thereto) which shall, among other things, provide for the resolution of Abuse Claims and Subject Interests in the Archdiocese Policies as set forth herein, and which shall be in form and substance acceptable to Insurer in its sole discretion.

1.1.69  "**Plan Confirmation Order**" has the meaning set forth in Section 2.3.

1.1.70  **[Reserved.]**

1.1.71  "**Purchased Property**" means any and all right, title, and interest (including all Subject Interests) in and to the Archdiocese Policies and the Related Insurance Claims and Coverage Claims.

1.1.72  "**Related Insurance Claim**" means (a) any Extra-Contractual Claim and (b) any other Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies, including, without limitation, bad faith Claims.

1.1.73  "**Related Party**" means, with respect to any Entity, such Entity's (a) predecessors, successors, assigns, and any Entity that assumed the obligation of the forgoing for the Archdiocese Policies by novation or otherwise (b) direct and indirect past, present, and future Affiliates (as defined in section 101(2) of the Bankruptcy Code), holding companies, merged companies, related companies, subsidiaries, divisions,

acquired companies, joint ventures, joint venturers, (c) current and former employees, officers, directors, principals, partners, managing agents, trustees, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, brokers, adjusters, reinsurers, retrocessionaires, subrogees, agents, claims handling administrators, and other professionals, and (d) respective heirs, executors, estates, and nominees; and all Entities acting on behalf of, by, through or in concert with them, each solely in their capacities as such with respect to such Entity (and with respect to such Entity (including Insurer) that is an insurer of any Archdiocese Bound Party or has assumed the obligations of such by novation or otherwise, such insurer's applicable insurance policy(ies) (including the Archdiocese Policies)).

1.1.74  "**Religious Order**" means, collectively, an institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy.

1.1.75 "**Reorganized Additional Debtors**" means the Additional Debtors, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.76 "**Reorganized Debtor**" means the Debtor, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.77  "**Revival Window**" means Section 2 of La. Acts 2021, No. 322, as amended by La. Acts 2022, No. 386, and La. Acts 2024, No. 481.

1.1.78 "**Revival Window Laws**" means the Revival Window, together with any other law that extends the prescriptive period or statute of limitations for asserting Abuse Claims under Louisiana or other applicable state law.

1.1.79  "**Sale Injunction**" has the meaning set forth in Section 2.1.

1.1.80 "**Settlement Agreement Effective Date**" means the first day on which: (a) the Archdiocese Signatory Parties and Insurer have executed this Settlement Agreement; (b) the Unknown Abuse Claims Representative shall have supported the releases provided for herein and the protections granted hereby and in the Plan in favor of the Insurer Released Parties, in a manner acceptable to Insurer in its sole discretion; (c) the Approval Order shall have become a Final Order; (d) the Plan Confirmation Order shall have become a Final Order; and (e) the Settlement Trust shall have been created pursuant to the Plan; provided, however, with the prior written consent of the Trustee, not to be unreasonably withheld, Insurer may elect to waive the conditions set forth in clauses (b) through (e) and pay or direct the payment of the Settlement Amount to the escrow or Settlement Trust prior to the occurrence of the events set forth in (b) through (e) hereof, in

which case, the date of such payment shall be the Settlement Agreement Effective Date for all purposes hereunder including the date of the closing of the purchase and sale of the Archdiocese Policies.

1.1.81 "**Settlement Amount**" means the sum of nine hundred thousand dollars ($900,000.00) to be paid (in accordance with Section 3.1) by Insurer after satisfaction of all conditions precedent herein in accordance herewith.

1.1.82 "**Settlement Trust**" means the settlement trust established under the Plan for the purposes set forth therein, including assuming liability for all Channeled Claims (as defined in the Acceptable Plan) and Indemnified Claims (as defined herein), subject to the limitations on indemnification and liability contained in Section 7.2 of this Settlement Agreement.

1.1.83 "**Settlement Trust Agreement**" means the agreement between the Debtor and the Settlement Trustee governing the Settlement Trust, in the form of Exhibit D-1 to the Acceptable Plan.

1.1.84 "**Settlement Trust Allocation Protocol**" means the Settlement Trust Allocation Protocol (as defined and used in the Settlement Trust Agreement), in the form of Exhibit D-2 to the Acceptable Plan.

1.1.85 "**Settlement Trust Documents**" means, collectively, (a) the Settlement Trust Agreement, (b) the Settlement Trust Allocation Protocol, and (c) any other agreements, instruments and documents governing the establishment and administration of the Settlement Trust, which shall be consistent with the terms of the Plan, as the same may be amended or modified from time to time in accordance with the terms thereof.

1.1.86 "**Settlement Trustee**" means the Entity appointed to act as the initial trustee of the Settlement Trust pursuant to the terms of the Settlement Trust Documents, along with any successor trustee appointed in accordance with the Settlement Trust Documents.

1.1.87 "**Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Settling Insurer against any Settling Insurer or Non-Settling Insurer for the payment of money where such Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.88 "**Settling Insurers**" shall have the meaning set forth in the Acceptable Plan.

1.1.89 "**Settling Insurers' Policies**" shall have the meaning set forth in the Acceptable Plan.

1.1.90 "**Settling Parties**" means, collectively, the following Entities: (a) Archdiocese Bound Parties; and (b) the Settling Insurers.

1.1.91 "**Subject Interests**" means all Claims, liens (as defined by Section 101(37) of the Bankruptcy Code), encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief, including: (a) all interests of the Archdiocese in, to and under the Archdiocese Policies; (b) all interests in, to, and under the Archdiocese Policies of any Entity other than the Archdiocese (including all Abuse Claimants and the Archdiocese Bound Parties); and (c) all interests in, to and under the Archdiocese Policies of any other Entity claiming coverage by, through, or on behalf of any Archdiocese Bound Party, including, without limitation, rights and interests as an insured, co-insured or additional insured, insurer or creditors of the Archdiocese Bound Parties; in each case within the meaning of "interest" as used in sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code. For the avoidance of doubt, a Direct Action Claim constitutes a Subject Interest. The meaning of Subject Interests also includes: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any

other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property.

1.1.92 "**Supplemental Settling Insurers' Injunction**" has the meaning set forth in Section 2.2.2.

1.1.93 "**Unknown Abuse Claim**" means an Abuse Claim that occurred before the Petition Date and the Abuse Claimant did not file a proof of claim by the applicable Abuse Claims Bar Date, for which there exists a valid legal excuse for not filing, as further defined in the in the Acceptable Plan.

1.1.94 "**Unknown Abuse Claims Representative**" means Michael R. Hogan, the legal representative appointed by the Bankruptcy Court pursuant to the *Order (I) Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, and (II) Approving the Retention of Michael R. Hogan as the Unknown Tort Claims Representative, Nunc Pro Tunc To July 26, 2021* (Docket No. 1012 ), any successor legal representative appointed by the Bankruptcy Court, or, on and after the Bankruptcy Plan Effective Date, any successor legal representative appointed in accordance with the applicable Settlement Trust Document.

1.2 Capitalized terms not defined in this Section 1 or elsewhere in this Settlement Agreement shall have the meanings given to them in the Bankruptcy Code.

## 2. THE BANKRUPTCY CASE AND PLAN OF REORGANIZATION

2.1 On or before July 29, 2025, the Archdiocese shall file a motion in the Bankruptcy Court (the "**Approval Motion**"), in form and substance acceptable to Insurer in its sole discretion, that seeks the entry of an order in substantially the form attached as **Exhibit A** to this Settlement Agreement, or otherwise in form and substance acceptable to Insurer in its sole discretion (the "**Approval Order**"), that:

(a) approves this Settlement Agreement, including Insurer's buyback of the Archdiocese Policies and the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests, and otherwise authorizes the Parties to undertake the settlement and the transactions contemplated by this Settlement Agreement, in each case pursuant to sections 363(b), (f),and (m) of the Bankruptcy Code and any other applicable provisions of the Bankruptcy Code;

(b) contains an injunction (the "**Sale Injunction**") that, subject to and conditioned upon the Settlement Agreement Effective Date and the Insurer's payment of the Settlement Amount, bars all Claims against the Insurer Released Parties and their property and assets of each based on or arising out of any Subject Interests in the Archdiocese Policies including without limitation all Coverage Claims, Related Insurance Claims, and Barred Claims, leaving the Settling Insurers free and clear of all Subject Interests of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer

(including Non-Settling Insurers); any Abuse Claimant; or any holder of a Barred Claim pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code;

(c) provides that this Settlement Agreement is binding on the Archdiocese Signatory Parties, all other Settling Parties, any trust created in the Bankruptcy Case(s), and any successors of the foregoing; and

(d) provides, subject to and conditioned upon the Settlement Agreement Effective Date, that the Approval Order is binding on all Persons (including, for the avoidance of doubt, all Persons set forth in the foregoing (c)).

2.1.1    The Archdiocese shall provide written notice of the Approval Motion, which notice shall be in form and substance acceptable to Insurer, to, at a minimum, any known Archdiocese Bound Party, holder of an Abuse Claim, or party whose rights or interests may reasonably be considered to be impacted by the relief requested in the Approval Motion, and any party identified on Schedule 3 hereto.  In addition, the Archdiocese shall include notice of the Approval Motion together with notice provided with respect to confirmation of the Joint Plan, including publication notice of the hearing on the Approval Motion. The Archdiocese will provide a draft service list of the foregoing for Insurer's review and comment.

2.1.2    If any Entity files an objection to the Approval Motion, the Archdiocese and Creditors' Committee shall consult with Insurer in connection with filing any written response thereto.  The Archdiocese Signatory Parties, as applicable, and Creditors' Committee shall take commercially reasonable steps to defend against any objection, appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order.  Insurer will cooperate with the Archdiocese Signatory Parties and Creditors' Committee in this regard, including making commercially reasonable submissions.

2.2    The Archdiocese shall file and prosecute a joint Plan with the Creditors Committee, which shall be in form and substance satisfactory to the Insurer in its sole discretion, substantially in the form as the Acceptable Plan, which the Parties acknowledge and agree satisfies the terms of this Settlement Agreement.  Any modifications to the Plan, the Settlement Trust Documents, the Plan Confirmation Order, or the Approval Order, including those relating to the Channeling Injunction, Supplemental Settling Insurers' Injunction, Gatekeeper Injunction, releases by holders of Abuse Claims, Insurers, Insurance Settlement Agreements, and related definitional terms, including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Abuse Related Insurance Claims," "Channeled Claim," "Covered Parties," "Direct Action Claim," "Enjoined Party," "Insurer Contribution Claim," "Non-Insurer Contribution Claim," "Penalty Claims," "Protected Parties," "Settling Insurers," "Settling Insurer's Policies," "Subject Insurance Policies," "Subject Interests," or any exhibits, schedules, and documents related thereto, must be in all respects consistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties without Insurer's written consent in its sole discretion.

2.2.1    The Plan shall create the Settlement Trust, which shall be responsible for making any and all payments to the Abuse Claimants entitled to receive payment under the Plan and which shall assume all liability for Channeled Claims.

2.2.2    The Plan shall include: (a) an injunction in substantially the form included in Article 12.4 of the Acceptable Plan (the "**Channeling Injunction**"); and (b) an injunction in substantially the form included in Article 12.5 of the Acceptable Plan (the "**Supplemental Settling Insurers' Injunction**"); and (c) an injunction in substantially the form included in Article 12.8 of the Acceptable Plan (the "**Gatekeeper Injunction**").

2.2.3    The Plan shall incorporate by reference the releases and indemnities set forth in this Settlement Agreement, including that the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to all Indemnified Claims as forth in Section 7.2 of this Settlement Agreement.

2.2.4    The Settlement Trust Documents shall provide that as a condition to receiving payment from the Settlement Trust, all Abuse Claimants shall provide an Abuse Claim Release and Certification.

2.2.5    The Plan shall provide for the commencement, prior to the Court's consideration of the Approval Motion, by the Additional Debtors of Chapter 11 cases to be jointly administered with the Bankruptcy Case.

2.2.6    The Plan shall provide a supplemental bar date for the Additional Debtors in a form and substance satisfactory to the Insurer with respect to Abuse Claims against the Additional Debtors and the form, manner, and deadline for filing proofs of claim and the treatment of confidential information contained therein.

2.2.7    The Plan shall provide that confirmation of the Plan will not occur unless all of the following conditions precedent have been satisfied: (a) the Plan Confirmation Order approves and implements the Injunctions and (b) the Bankruptcy Court shall have granted the Approval Motion in form and substance acceptable to Insurer in its sole discretion.

2.2.8    The Plan shall provide that the Bankruptcy Plan Effective Date will not occur unless all of the following conditions precedent have been satisfied or waived (as applicable with consent of Insurer): (a) the Plan Confirmation Order will have been entered by the Bankruptcy Court and become a Final Order, and (b) the Bankruptcy Court shall have entered the Approval Order (with both such Approval Order and this Settlement Agreement in form and substance acceptable to the Insurer) and such Approval Order shall have become a Final Order.

2.2.9    The Plan shall provide that (collectively, as follows, the "**Controlling Document Provision**") in the event of a conflict between (a) the Settlement Agreement, on the one hand, and (b) the Plan, on the other, the terms of the Settlement Agreement shall control and govern; and in the event of a conflict between the (x) Approval Order, on the one hand, and (y) Plan Confirmation Order, on the other, the terms of the Approval Order shall control and govern.

2.2.10  The Plan shall provide that the execution and delivery of this Settlement Agreement is a condition to entry of the Plan Confirmation Order and the occurrence of the Bankruptcy Plan Effective Date. The inclusion of this Settlement Agreement in the Plan shall not be waivable as a condition to entry of the Plan Confirmation Order or the occurrence of the Bankruptcy Plan Effective Date absent the prior written consent of the Settling Insurers.

2.3     The Debtor Parties shall seek and obtain entry of an order from the Bankruptcy Court, which order shall be in form and substance acceptable to the Parties, that: (i) approves the Plan pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code; (ii) contains the Channeling Injunction; (iii) ratifies the Sale Injunction as independent of the Channeling Injunction and Supplemental Settling Insurers' Injunction; (iv) contains the Gatekeeper Injunction; (v) provides that this Settlement Agreement is binding on any Settlement Trust created in the Bankruptcy Case, the Reorganized Debtor, the Reorganized Additional Debtors, and any successors of the Settlement Trust, Reorganized Debtor, or Reorganized Additional Debtors, and all of the Archdiocese Bound Parties; and (vi) contains the Controlling Document Provision (the "**Plan Confirmation Order**").

2.3.1   The Plan and Plan Confirmation Order must not be inconsistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties.

2.3.2   In seeking to obtain the Plan Confirmation Order, the Debtor and Additional Debtors will: (i) seek a confirmation hearing on an appropriately timely basis; (ii) urge the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) take all reasonable steps to defend against any objection, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order.

2.3.3   Prior to entry of the Plan Confirmation Order, the Archdiocese and/or any applicable Additional Debtor shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Abuse Claim that (i) is asserted against any Debtor Party and (ii) implicates, or is reasonably likely to implicate, any Archdiocese Insurance Policies (including by alleging Abuse that took place during any policy period of any Archdiocese Policy).  If, prior to the Plan Confirmation Order becoming a Final Order, the Bankruptcy Court allows any Entity to prosecute any such Abuse Claim, the Debtor Parties shall defend themselves against such Abuse Claims and comply with the terms of any order of the Bankruptcy Court, and Insurer's rights and obligations relating to such litigation shall be determined by, and subject to, the terms and conditions of the Archdiocese Policies, this Settlement Agreement, and any applicable orders of the Bankruptcy Court.

2.3.4   The Plan and Plan Confirmation Order shall provide that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any Covered Party with respect to any Archdiocese Policy, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as

confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

2.3.5    Nothing in this Section or elsewhere in this Settlement Agreement shall bar any party from arguing that any appeal from the Plan Confirmation Order should be dismissed on grounds of statutory or equitable mootness or otherwise.

2.3.6    None of the releases, Injunctions, or other provisions of the Plan with apply to, or have any effect, on the rights of the Settling Insurers to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with any Settling Insurer's Policy.

2.4    The Settlement Trust Documents shall require the Settlement Trust to register as a Responsible Reporting Entity under the reporting provisions of MMSEA.

2.4.1    The Settlement Trust Documents shall require the Settlement Trust, at its sole expense, to timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated and to follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

2.4.2    The Settlement Trust Documents shall require the Settlement Trust to obtain, prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Abuse Claim, a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. §1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim.

2.5    The Debtor Parties and Reorganized Debtor and Reorganized Additional Debtors will undertake commercially reasonable actions to cooperate with Insurer in connection with responding to any inquiry from Insurer's regulators, auditors, reinsurers, or retrocessionaires.

2.6    From and after the execution date of this Settlement Agreement and until the earlier of: (A) occurrence of (i) the Settlement Agreement Effective Date and (ii) Insurer's remittance of the Settlement Amount (at which time this covenant is superseded by the releases provided in Section 4); and (B) the date on which this Settlement Agreement is terminated, (i) none of the Insurer Released Parties, the Debtor, the Additional Debtors or Creditors' Committee will initiate any litigation activity against the other in any Bankruptcy Case and (ii) the Archdiocese and the Insurer Released Parties shall cease all litigation activities against each other in the Bankruptcy Case, including that the Insurer Released Parties will neither object to any proposed Plan consistent with this Settlement Agreement, nor serve or compel any discovery in connection with the Bankruptcy Case; *provided that*: (y) neither the Archdiocese nor any Additional Debtor shall include any provision in any Plan that adversely affects the rights or benefits of the Insurer Released Parties under this Settlement Agreement, or that otherwise violates, or is contrary to, the

agreements and covenants contained in this Settlement Agreement; and (z) neither the Archdiocese nor any Additional Debtor shall act, or fail to act, in such a way that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement. Notwithstanding the foregoing, the Insurer Released Parties may participate in the Bankruptcy Case for the purpose of supporting or enforcing any of the terms of this Settlement Agreement and protecting their rights.

2.7     From and after the execution date of this Settlement Agreement and until the date on which this Settlement Agreement is terminated, the obligations of the Debtors Parties set forth in this Section 2 shall be binding on the Debtor Parties.

## 3.     PAYMENT OF THE SETTLEMENT AMOUNTS

3.1     By no later than thirty (30) days after (a) the Settlement Agreement Effective Date, and (b) Insurer receiving appropriate instructions for the transmission of the payment to the Escrow Agent or Settlement Trust, Insurer shall pay (or cause to be paid) the Settlement Amount to the Settlement Trust or Escrow Agent pursuant to the Escrow Agreement.   Payment of the Settlement Amount may be by check, ACH transfer, wire transfer, or other method.

3.1.1    [Reserved.]

3.2     The delivery of the Settlement Amount to the Escrow Agent or Settlement Trust shall be in full and final settlement of all responsibilities under and arising out of the Archdiocese Policies, the sale of the Purchased Property to Insurer free and clear of all Subject Interests of any Entity, and the other releases provided.

3.3     Subject to the occurrence of the Settlement Agreement Effective Date, the Parties agree:  (i) the Settlement Amount is the total amount that Insurer is obligated to pay on account of any and all Claims under, arising out of, relating to, or in connection with the Archdiocese Policies (including Barred Claims, and any reimbursement obligations for Conditional Payments under the MSPA); (ii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of anyone in connection with the Archdiocese Policies, including any payments in connection with amounts allegedly owed under the MSPA or in connection with any Claims, including any Barred Claim; (iii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of the Archdiocese Bound Parties or any Abuse Claimants in connection with the Archdiocese Policies; and (iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted. The Parties further agree that the Settlement Amount includes the full purchase price of the Archdiocese Policies and Related Insurance Claims and Coverage Claims of the Archdiocese Bound Parties and consideration for the releases and other protections afforded by this Settlement Agreement.

3.4     The Parties represent and agree that (i) the consideration to be provided by Insurer pursuant to this Settlement Agreement constitutes a fair and reasonable compromise and exchange for the consideration granted to the Insurer Released Parties in this Settlement Agreement

(including the releases set forth below), and (ii) the consideration to be provided by the Archdiocese Bound Parties to the Insurer Released Parties pursuant to this Settlement Agreement (including the releases set forth below) constitutes a fair and reasonable compromise and exchange for the consideration granted to the Archdiocese Bound Parties in this Settlement Agreement. The Insurer Released Parties are not acting as volunteers, and the Settlement Amount reflects potential liabilities and obligations to the Archdiocese Bound Parties of the amount Insurer allegedly is obligated to pay.

3.5     Each of the Archdiocese Signatory Parties: (i) consents to the sale of the Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests and Claims of all Persons, including, without limitation, the Archdiocese Bound Parties in accordance with the terms of this Settlement Agreement, and (ii) agrees and acknowledges that the contribution of the proceeds from such sale and settlement to the Settlement Trust, as provided in the Plan and this Settlement Agreement, is a fair and reasonable compromise and exchange for value and constitutes reasonable and adequate consideration for any Subject Interest or Claim the Archdiocese Bound Parties may have in the Archdiocese Policies.

3.6     The Parties further agree that they have attempted to resolve the matters set forth herein in compliance with both state and federal law and believe that the settlement terms adequately consider CMS's interest and do not reflect any attempt to shift responsibility for payment of medical expenses to CMS pursuant to 42 U.S.C. § 1395y(b). The Parties acknowledge, understand, and agree that any present or future action or decision by CMS, including actions regarding an Abuse Claimant's eligibility or entitlement to receive Medicare or Medicare payments, will not render this Settlement Agreement (including the releases set forth in it) void or ineffective, or in any way affect the finality of this Settlement Agreement. The Settlement Trust is responsible for all future medical payments, including any and all claims by CMS and/or CMS contractors that have been or may be in the future arising out of, relating (directly or indirectly) in any way to, or in connection with this Settlement Agreement.

3.7     To facilitate the purchase of the Purchased Property as set forth herein, each Archdiocese Bound Party is authorized to designate a lawful attorney in fact, with full powers of substitution, to execute any bill of sale or other document reasonably requested by the Archdiocese or Insurer to accomplish the sale and purchase contemplated herein. A form of Bill of Sale is attached hereto as **Exhibit B**.

## 4.     RELEASES AND SALE FREE AND CLEAR

4.1     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, with no further action being required, the Archdiocese Signatory Parties fully, finally, and completely remise, release, acquit, and forever discharge the Insurer Released Parties (including, for the avoidance of doubt, any of their reinsurers or retrocessionaires, solely in their capacity as such), from any and all past, present, and future: (a) Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies or Claims that are covered or are determined to be covered by agreement or a court of competent jurisdiction under the Archdiocese Policies, including, without limitation, any Barred Claims, Direct Action Claims, reimbursement obligations for Conditional

Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims, the handling of the Abuse Claims or the Bankruptcy Case. The Archdiocese Signatory Parties further acknowledge, stipulate, and agree that (x) the releases in this Section 4.1 specifically include all Unknown Abuse Claims, and demands that are based in whole or in part on Unknown Abuse Claims and (y) **with respect to all Claims released under this Section 4.1, the Archdiocese Signatory Parties waive any and all provisions, rights, and benefits conferred by Cal. Civ. Code 1542 or any law of any state of the United States, or any principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code 1542, which provides: "a general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, that, if known by him or her, would have materially affected his or her settlement with the debtor or released party"** and (z) the releases in this Section 4.1 shall be equal in breadth to the broadest releases and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

4.2     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, and with no further action being required, Insurer shall fully, finally, and completely remise, release, acquit, and forever discharge the Archdiocese Signatory Parties from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies, including any Barred Claims, and reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case subject to the protections in favor of the Insurer Released Parties set forth herein.

4.3     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, none of the Archdiocese Signatory Parties or other Archdiocese Bound Parties shall assert against the Insurer Released Parties any Claim with respect to any matter, conduct, transaction, occurrence, fact, or other circumstance that, directly or indirectly, arises out of, relates to, or is in connection with any of the Archdiocese Policies, any Barred Claim, or any other matter released pursuant to Sections 4.1 and 4.2 above.

4.4     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer hereby buys back the Archdiocese Policies free and clear of all Subject Interests, including without limitation all Coverage Claims and Related Insurance Claims, of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); and any Abuse Claimant, or any other holder of a Barred Claim.  This sale is pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code.  The Parties acknowledge and agree, and the Approval Order shall find and conclude, that upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount:

4.4.1     Insurer is a good faith purchaser of the Archdiocese Policies and any Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), within the meaning of section 363(m) of the

Bankruptcy Code, with all the protections afforded such a purchaser under 363(m) of the Bankruptcy Code;

4.4.2   the consideration exchanged constitutes a fair and reasonable settlement and compromise of the Parties' disputes and of their respective rights and obligations relating to the foregoing Archdiocese Policies and Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), and constitutes reasonably equivalent value;

4.4.3   the releases in this Settlement Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy law;

4.4.4   the Archdiocese Policies and all Subject Interests therein (including, without limitation, to the extent applicable, any Direct Action Claim) shall be terminated and of no further force and effect;

4.4.5   Insurer's payment of the Settlement Amount constitutes Insurer's full and complete performance of any and all obligations under the Archdiocese Policies, including any performance owed to the Archdiocese Bound Parties or any holder or purported holder of any Claim against (including any Abuse Claim or Direct Action Claim) or Subject Interest in, the Archdiocese Policies, and exhausts all limits of liability of the Archdiocese Policies;

4.4.6   All Subject Interests the Archdiocese Bound Parties and any other Entity may have had, may presently have, or in the future may have in the Archdiocese Policies are released pursuant to the terms of this Settlement Agreement and policy buyback;

4.4.7   all per occurrence and/or aggregate limits of coverage under the Archdiocese Policies are fully eroded, exhausted and settled upon the Settlement Agreement Effective Date;

4.4.8   the Insurer would not pay the Settlement Amount without buyback of the Archdiocese Policies upon all of the terms and conditions set forth herein; and

4.4.9   the Archdiocese Signatory Parties accept the Settlement Amount in full and complete compromise and satisfaction of all Insurer Released Parties' past, present, and future obligations, including any obligations to any of the Archdiocese Bound Parties under such Archdiocese Policies or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever that are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies (including without limitation Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether or not such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, the Bankruptcy Case, or otherwise.

4.5     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer shall have no obligation to pay, handle, object, or otherwise respond to any Claim against the Archdiocese Bound Parties; and the Archdiocese Bound Parties will: (i) will withdraw, and are deemed to have withdrawn, all outstanding tenders of Claims to the Insurer Released Parties for defense and indemnity; (ii) will not tender any Claims to the Insurer Released Parties; and (iii) will not request that the Insurer Released Parties fund any judgments, settlements, or defense costs that, in each case, are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies issued by a Settling Insurer.

4.6     To the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer consent to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under this Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Subject Interests of any Entity in such Archdiocese Policies (the "**Non-Debtor Catholic Entity Policy Sale**"). The Plan Confirmation Order and Approval Order shall so provide and Insurer shall be designated in the Plan Confirmation Order as a good-faith purchaser of the Archdiocese Policies with all the protections afforded such a purchaser under section 363(m) of the Bankruptcy Code.

4.7     [Reserved.]

4.8     The Archdiocese Signatory Parties further covenant, stipulate and agree that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Abuse Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any insured or additional insured covered by any insurance policy issued by any Insurer Released Party, and to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in any Archdiocese Policy to the Debtor's Estate and sale thereof to Insurer, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court. Without limiting the foregoing, the Insurer Released Parties shall receive protections against Claims by Non-Debtor Catholic Entities and any other Entity equal in breadth to the broadest protections received by any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, or any Insurance Settlement Agreement approved by the Bankruptcy Court.

4.9     If the Archdiocese Signatory Parties, or anyone of them, enter into any agreement (that is embodied in such agreement as approved by the Bankruptcy Court, the Plan, and/or the Plan Confirmation Order) with any other one of the Settling Insurers (including any Non-Settling Insurer who becomes a Settling Insurer) in the Bankruptcy Case, that provides that insurer with releases, injunctions or other protections that are more favorable than those contained in this Settlement Agreement, then this Settlement Agreement shall be deemed to be modified to provide Insurer with those more favorable injunctions, releases or other protections.

4.10     Notwithstanding anything in this Settlement Agreement, nothing in this Settlement Agreement is intended to or shall be construed to:

    4.10.1   apply to or have any effect on the Insurer Released Parties' rights to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer;

    4.10.2   release any Claims that any Insurer Released Party has or might have against any Non-Settling Insurer, except that, to the extent such other insurers have agreed or in the future agree to release any Claims against the Insurer Released Parties arising out of or related in any way to the Abuse Claims, then the Insurer Released Parties also release such Claims against such other insurers to the same extent; or

    4.10.3   release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Settlement Agreement or the Plan (to the extent not inconsistent with this Settlement Agreement).

## 5.     TERMINATION OF AGREEMENT

5.1     The Parties may terminate this Settlement Agreement by mutual agreement in writing.

5.2     Insurer may terminate this Settlement Agreement upon fifteen (15) days written notice to the other Parties in the event of any of the following occurs prior to the Settlement Agreement Effective Date: (i) any of the Debtor Parties or the Creditors' Committee files a plan inconsistent with this Settlement Agreement; (ii) the Approval Order and the Plan Confirmation Order are not entered by February 15, 2026; (iii) the Bankruptcy Court enters an order that becomes a Final Order that (a) denies the Approval Motion or (b) is inconsistent with the Approval Order or the Plan Confirmation Order; (iv) a plan that is inconsistent with the terms of this Settlement Agreement is confirmed; or (v) any Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

5.3     In the event of termination pursuant to this Section 5, unless the Parties agree otherwise in writing, the Parties' interests, rights, and obligations under the Archdiocese Policies shall not be impacted by such termination.

## 6.     REPRESENTATIONS AND WARRANTIES OF THE PARTIES

6.1     The Parties separately represent and warrant as follows:

    6.1.1   To the extent it is a corporation, including a non-profit, religious, or charitable corporation, or other legal entity, each such Party has the requisite power and authority to enter into this Settlement Agreement and to perform the obligations

contemplated by this Settlement Agreement[1], subject only to approval of the Bankruptcy Court; and

  6.1.2 This Settlement Agreement has been analyzed by counsel to the Parties and executed and delivered in good faith pursuant to arm's length negotiations and for value and valuable consideration.

  6.2 The Archdiocese Signatory Parties represent and warrant that they have not assigned, and will not assign, any Subject Interests in the Archdiocese Policies to any Entity, except for the avoidance of doubt, the assignment of the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate.

  6.3 The Archdiocese Signatory Parties represent and warrant that (i) all Archdiocese Bound Parties have either signed this agreement, are represented herein by the Archdiocese or the Archdiocese Signatory Parties, or are juridical entities whose existence has been terminated as a matter of applicable non-bankruptcy law and (ii) the Archdiocese Signatory Parties are duly authorized to bind the Archdiocese Bound Parties who are not Archdiocese Signatory Parties. Without limiting the foregoing, the Archdiocese Signatory Parties represent and warrant that:

  6.3.1 all entities known to them that are Co-Insured Parties under the Archdiocese Policies (by express reference, assignment, judicial determination or any related concept under applicable law or other document) other than the Debtor, the Additional Debtors, the Parish Schools and Archdiocesan Schools, the Non-Debtor Catholic Entities, and the cemeteries identified in Section 6.3.3, are identified in Schedule 2 hereto, if any;

  6.3.2 the Archdiocesan Schools are not separately incorporated and are merely unincorporated operations of the Debtor and the Parish Schools are not separately incorporated and are merely unincorporated operations of the Archdiocesan Parishes that are Additional Debtors;

  6.3.3 the Debtor, through the Office of Catholic Cemeteries, operates certain cemeteries including, without limitation: All God's Babies Tomb & Holy Innocents Prayer Garden, St. Charles Cemetery, St. Joseph Cemetery #1, St. Joseph Cemetery #2, St. Louis Cemetery #1, St. Louis Cemetery #2, St. Louis Cemetery #3, St. Patrick Cemetery #1, St. Patrick Cemetery #2, St. Patrick Cemetery #3, St. Roch Cemetery #1, St. Roch Cemetery #2, St. Vincent De Paul Cemetery #1, St. Vincent DePaul Cemetery #2, which cemeteries are either: (a) Non-Debtor Catholic Entities or (b) not separately incorporated and are merely unincorporated operations of the Debtor;

  6.3.4 Holy Redeemer School, Redeemer-Seton High School, and St. Joseph Benedictine High School were formerly owned and operated by the Archdiocese, but ceased operations and were closed by the Debtor at some point prior to the Petition Date,

---

[1] Specifically, each Archdiocese Signatory Party is duly authorized to execute this Settlement Agreement and any related document and the signatory hereto on behalf of such Archdiocese Signatory Party has full power and authority to bind such Archdiocese Signatory Party. The related corporate resolutions and incumbency certificates are identified in Schedule 4 and Schedule 5 respectively.

and were not separately incorporated and were merely unincorporated operations of the Debtor;

6.3.5    St. Robert Bellarmine School was formerly owned and operated by one or more of the Archdiocese Signatory Parties, but ceased operations and was closed by one or more of the Archdiocese Signatory Parties at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of one of the Additional Debtors;

6.3.6    Notre Dame Seminary and the Society of the Propagation of the Faith of the Archdiocese of New Orleans are owned and operated by the Archdiocese and are not separately incorporated, but are merely unincorporated operations of the Debtor;

6.3.7    San Pedro Pescador Church was owned and operated by the Archdiocese, but was closed by the Archdiocese prior to the Petition Date and was not separately incorporated, but was merely an unincorporated operation of the Archdiocese;

6.3.8    the following Roman Catholic Schools: the Academy of the Sacred Heart, Holy Cross, Jesuit, St. Mary's Academy, St. Mary's Dominican, Brother Martin, Mount Carmel Academy, Ursuline Academy, Cabrini, De La Salle, and St. Paul's School, are not Co-Insured Parties, named insured's or additional insureds (or related concept under applicable law or document) under the Archdiocese Policies, or institutions, religious organizations or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control and active management, and were themselves not under the control or active management of the Archdiocese;

6.3.9    St. John Vianney Preparatory School was formerly owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.10  the Louise Home a/k/a as the Louise Headstart Center was an unincorporated ministry of the Debtor;

6.3.11  Holy Guardian Angel was owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.12  the Social Apostolate Housing Program was an unincorporated ministry of the Debtor;

6.3.13  at all times Tulane Catholic and the Newman Center were and are unincorporated activities of the Debtor, with no existence separate and apart from the Debtor;

6.3.14  Crescent City Convent Corporation, Lyric Realty and Parking Company, Inc., The Chinchuba Deaf-Mute Institute, People for Teens of St. Anthony of Padua

Corporation, Kiwanis Foundation of New Orleans, Kiwanis Club of New Orleans, and Seminarians Parents Association, Inc. were never owned, operated, or controlled by the Debtor or the Additional Debtors and were neither insureds nor additional insureds under the Archdiocese Policies; and

  6.3.15 (a) Catholic Charities Archdiocese of New Orleans ("**Catholic Charities**") owned and operated Hope Haven – Madonna Manor ("**HH**"), which was organized under Louisiana law; (b) HH was dissolved and its status as a juridical person was, thus, terminated as a matter of Louisiana law; (c) at all times, Catholic Charities was the sole member and/ or shareholder of HH; and (d) it is the intention of Catholic Charities that HH be bound by this Agreement as if it remained in existence and had signed the Agreement as a Party.

  6.4 The Archdiocese Signatory Parties represent and warrant that they are not aware of any Abuse Claim asserted against any entity associated with the Archdiocese (including any parishes, institutions or religious organizations or any subsidiary of the person or organization listed in the declarations of the Archdiocese Policies, or any other organization coming under the Archdiocese's control and active management), that is not listed on Exhibit B-1 to the Acceptable Plan.

  6.5 The Debtor represents and warrants that it will undertake good faith efforts to cause actual notice of the Approval Motion to be sent in accordance with Section 2.1.1 hereof. Without limitation, the Debtor has sent or will send notice to the entities on Schedule 3.

  6.6 The Archdiocese Signatory Parties and Insurer (limited to such Insurer person that worked on and were familiar with this Settlement Agreement and matters referenced therein), respectively, represent and warrant that they have completed a reasonable search for evidence of any policy of insurance issued by Insurer to the Archdiocese Signatory Parties that would afford coverage with respect to any Abuse Claim, Coverage Claim, or Related Insurance Claim and other than the policies identified in Schedule 1, no such policies have been identified. The Archdiocese Signatory Parties further represent and warrant that, to the best of their knowledge after reasonably diligent investigation: there are no contracts, binders, certificates, and policies of insurance that insure or purport to insure (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) (x) the Diocese of Houma-Thibodaux or (y) the Diocese of Baton Rouge (excluding, for the avoidance of doubt, policies issued to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD, but including any such policies issued to the Archdiocese that provide or may provide insurance coverage to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD), or (iv) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, other than the policies identified in Schedule 1. Notwithstanding the foregoing, nothing in this Settlement Agreement, including the Schedules or Exhibits hereto, shall be construed as or deemed to be an admission or evidence that any binder, certificate, or policy of insurance was in fact issued or affords coverage in connection with any Abuse Claims.

6.7    The Debtor Parties represent and warrant that they have not in any way assisted, and covenant that they shall not in any way assist, any Entity in the establishment or pursuit of any Claim, including any Barred Claim, against the Insurer Released Parties.

## 7.    ACTIONS INVOLVING THIRD PARTIES

7.1    For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Archdiocese Policies resulting from the purchase and sale thereof contemplated by this Settlement Agreement, the Parties hereby agree as follows:

7.1.1    From and after (i) the occurrence of the Settlement Agreement Effective Date, and (ii) Insurer's payment of the Settlement Amount, if any other insurer of the Archdiocese Bound Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from Insurer as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for any of Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense or indemnity obligation of Insurer for any Claims or reimbursement obligations for Conditional Payments released or resolved pursuant to this Settlement Agreement, the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and the Settlement Trust shall voluntarily reduce any judgment or Claim against, or settlement with, such other insurers to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against Insurer. To ensure that such a reduction is accomplished, Insurer shall be entitled to assert this Section 7 as a defense to any action against it brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Insurer from any liability for the judgment or Claim. Moreover, if a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against Insurer, such Claim may be asserted as a defense against a Claim by the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust in any coverage litigation (and the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and/or the Settlement Trust may assert the legal and equitable rights of Insurer in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust shall be reduced dollar for dollar by the amount so determined.

7.1.2    Unless this Settlement Agreement is terminated, Insurer shall not seek reimbursement for any payments it makes under this Settlement Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other Settling Insurer unless that other insurer first seeks contribution, subrogation, indemnification, or similar relief from Insurer. Notwithstanding the foregoing, nothing in this Settlement Agreement, the Approval Order or the Plan Confirmation Order shall be construed as prohibiting Insurer from seeking recovery (including with respect to the Settlement Amount or otherwise) from its reinsurers or retrocessionaires in their capacity as such.

7.2    Subject to the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, and subject to the limitations set forth below, the Settlement

Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein, including any Claims made by (i) any Entity who is an insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies; (ii) any Entity who makes (a) an Abuse Claim or (b) a Related Insurance Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a Claim under any of the Archdiocese Policies (collectively, the "**Indemnified Claims**"), as set forth below:

7.2.1   The Insurer Released Parties shall have the right (but not the obligation) to (a) seek to enforce the Injunctions against any Entity seeking to assert an Indemnified Claim, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions) identified in this Section 7.2.  With the Insurer Released Parties' consent, such consent not to be unreasonably withheld, the Settlement Trustee can satisfy the obligations contained in (a) and (b) above.  An amount equal to $10,715.00 (the "**Indemnity Cost Reserve**") shall be reserved from the Settlement Amount for payment of reasonable attorneys' fees, expenses, costs, and other amounts incurred by the Insurer Released Parties in defending against such Indemnified Claims, which amount shall be released from reserve if no Indemnified Claims are asserted within 30 days after the Revival Window has closed under every applicable Revival Window Law.

7.2.2   Neither any Archdiocese Bound Party, nor the Settlement Trust shall in any way assist, any Entity in the establishment or pursuit of any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein.

7.2.3   The Settlement Trust and Archdiocese shall support and join in the enforcement of the Injunctions against any Entity seeking to assert an Indemnified Claim; *provided that* if the Insurer Released Party(ies) elect(s) not to enforce the Injunctions in accordance with Section 7.2.1, the Settlement Trust shall (a) seek to enforce the Injunctions against such Entity, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions).

7.2.4   To the extent that a Final Order is entered against any Insurer Released Party with respect to any Indemnified Claim, the Settlement Trust shall indemnify and hold harmless such Insurer Released Party with respect thereto up to the Settlement Amount; *provided that* to the extent the Insurer Released Party(ies) elect not to enforce the Injunctions or defend against the Indemnified Claims, the Settlement Trust's indemnity obligation shall be limited to the amount of the Indemnity Cost Reserve; *provided further* that if the Settlement Trust breaches its obligation set forth in Section 7.2.2 hereof, the Settlement Trust's indemnity obligation shall not be so limited and shall instead be up to the Settlement Amount.  In no event shall the Settlement Trust's indemnity obligation exceed each individual Settling Insurer's Settlement Amount.  To the extent the Settlement Amount has been distributed in accordance with the Plan, the Settlement Trust's indemnification obligation shall be so reduced.

7.2.5   The indemnification provided for herein shall not impose liability on the Settlement Trustee or Settlement Trust professionals for their own acts or omissions; *further*, funds provided for the administration of the Settlement Trust or payment of the Settlement Trustee or Settlement Trust professionals shall not be subject to indemnification claims as provided for herein.

7.3     If any Entity attempts to prosecute a Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies against the Insurer Released Parties before the Approval Order and Plan Confirmation Order become Final Orders, then promptly following notice to do so from Insurer, the Archdiocese and/or the Additional Debtor(s), as applicable, will file a motion and supporting papers to obtain an order from the Bankruptcy Court pursuant to sections 362 and 105(a) of the Bankruptcy Code protecting the Insurer Released Parties from any such Claims until the Plan Confirmation Order has become a Final Order, the Bankruptcy Case is dismissed, or this Settlement Agreement is terminated under Section 5 hereof.

## 8.    MISCELLANEOUS

8.1     If any action or proceeding of any type whatsoever is commenced or prosecuted by any Entity not a Party to this Settlement Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Settlement Agreement, the Parties mutually agree to cooperate fully in opposing such action or proceeding.

8.2     The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Settlement Agreement and to preserve its validity and enforceability.

8.3     The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Plan Confirmation Order, and the Bankruptcy Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof.

8.4     Notwithstanding any language to the contrary in this Settlement Agreement, under no circumstance will any Archdiocese Signatory Party be obligated to take any action that violates any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, and if a court of competent jurisdiction determines that a term or condition in this Settlement Agreement does violate any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, the applicable Archdiocese Signatory Party shall be relieved of such term or condition, but the scope and finality of the releases, injunctions, and buybacks set forth in this Settlement Agreement shall not be affected or modified.

8.5     This Settlement Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.6     This Settlement Agreement may be modified only by a written amendment signed by all of the Parties, and no waiver of any provision of this Settlement Agreement or of a breach

thereof shall be effective unless expressed in a writing signed by the waiving Party. The waiver by any Party of any of the provisions of this Settlement Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach. Any change or modification of this Agreement that would result in a material adverse change to the rights of the Abuse Claimants or Trust shall require the consent of the Creditors' Committee (if at the time of the proposed change or modification a Trustee has not been appointed) or Settlement Trustee (if at the time of the proposed change or modification a Trustee has been appointed and approved), as applicable, which consent shall not be unreasonably withheld.

8.7    By entering into this Settlement Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Settlement Agreement. No part of this Settlement Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Settlement Agreement. All actions taken and statements made by the Parties or by their representatives relating to this Settlement Agreement or participation in this Settlement Agreement, including its development and implementation, shall be without prejudice or value as precedent.

8.8    This Settlement Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession regarding liability, culpability, wrongdoing, or insurance coverage. All related discussions, negotiations, and all prior drafts of this Settlement Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. Any evidence of the negotiations or discussions associated with this Settlement Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.8, in (i) an action or proceeding to enforce the terms of this Settlement Agreement, including any use as set forth in Section 7.1.1, or (ii) any possible action or proceeding between the Insurer Released Parties and any reinsurers. This Settlement Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Insurer Released Parties' obligations under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer.

8.9    None of the Parties shall make any public statements or disclosures (i) regarding another Party's rationale or motivation for negotiating or entering into this Settlement Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued or determined by agreement or a court of competent jurisdiction to have been issued by the Insurer Released Parties, including handling of or involvement in connection with any claims asserted thereunder.

8.10    Neither this Settlement Agreement nor the rights and obligations set forth in this Settlement Agreement shall be assigned without the prior written consent of the other Parties.

8.11    This Settlement Agreement was jointly drafted by the Parties, and the wording of this Settlement Agreement was reviewed by legal counsel for each of the Parties, and each of them had sufficient opportunity to propose and negotiate changes prior to its execution.  The language of all parts of this Settlement Agreement shall in all cases be construed as a whole according to its meaning and not strictly for or against any Party.

8.12    Section titles and headings contained in this Settlement Agreement are included only for ease of reference and shall have no substantive effect.

8.13    All notices, demands, or other communication to be provided pursuant to this Settlement Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other Entity or address as any of them may designate in writing from time to time:

If to the Debtor or Reorganized Debtor:

Mark A. Mintz
Samantha A. Oppenheim
Jones Walker LLP
Telephone: 504-582-8368
Telephone: 504-582-8641
Email: mmintz@joneswalker.com
Email: soppenheim@joneswalker.com

with copies to:

-and-

If to an Archdiocese Signatory Party other than a Debtor Party:

As set forth on Plan Exhibit B-2.

If to Insurer or the Insurer Released Parties:

Christine Zdrojeski
Vice President
The Hartford
690 Asylum Avenue
Hartford, CT 06155

with copies to:

Joshua D. Weinberg
Ruggeri Parks Weinberg LLP

1875 K Street, NW 8th Floor
Washington, D.C. 20006
(202) 469-7750
jweinberg@ruggerilaw.com

-and-

If to the Settlement Trust:

Donald C. Massey
Couhig Partners, LLC
1100 Poydras Street, Suite 3250
New Orleans, Louisiana 70163
Telephone: (504) 599-5777
Email: dmassey@couhigpartners.com

with copies to:

Andrew W. Caine
Pachulski, Stang, Ziehl & Jones LLP
10100 Santa Monica Blvd, Suite 1300
Los Angeles, CA 90067
Telephone: 310-277-6910
Email: acaine@pszjlaw.com

8.14    This Settlement Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument. This Settlement Agreement may be executed and delivered by facsimile, e-mail, or other electronic image, which facsimile, e-mail, or other electronic image counterparts shall be deemed to be originals.

8.15    Nothing contained in this Settlement Agreement shall be deemed or construed to constitute (i) an admission by the Insurer Released Parties that the Archdiocese Bound Parties, or any other Entity, was or is entitled to any insurance coverage under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by the Insurer Released Parties or as to the validity of any of the positions that have been or could have been asserted by the any of the Archdiocese Bound Parties, (ii) an admission by any of the Archdiocese Bound Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by the Insurer Released Parties or any Claims that have been or could have been asserted by the Archdiocese Bound Parties against the Insurer Released Parties, or (iii) an admission by the Archdiocese Bound Parties or the Insurer Released Parties of any liability whatsoever with respect to any of the Abuse Claims.

8.16    The Parties to this Settlement Agreement, all of the Entities included in the definition of "Insurer Released Parties," and the Settlement Trust are intended beneficiaries of this

Settlement Agreement. Except as set forth in the preceding sentence or otherwise set forth in this Settlement Agreement, there are no third-party beneficiaries of this Settlement Agreement.

8.17 The Archdiocese Signatory Parties and the Insurer Released Parties shall each be responsible for their own fees and costs incurred in connection with the Bankruptcy Case, this Settlement Agreement, and the implementation of this Settlement Agreement, except as specifically set forth herein (including in Section 7).

8.18 The following rules of construction shall apply to this Settlement Agreement:

8.18.1 Unless the context of this Settlement Agreement otherwise requires: (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Settlement Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.18.2 References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Settlement Agreement.

8.18.3 The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Settlement Agreement when the stated intent is not achieved.

8.19 The Bankruptcy Court in the Bankruptcy Case shall retain jurisdiction to interpret and enforce the provisions of this Settlement Agreement, which shall be construed in accordance with Louisiana law without regard to conflicts of law principles thereof. The Insurer Released Parties do not, by virtue of this Section 8.19 or any other provision in this Settlement Agreement, consent to the Bankruptcy Court's jurisdiction as to any other matter.

8.20 This Settlement Agreement and each Debtor Party's obligations under this Settlement Agreement shall be binding on each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) and shall survive the entry of the Plan Confirmation Order; provided, however, after the occurrence of the Bankruptcy Plan Effective Date, recourse for all obligations, other than those set forth in Sections 6.5, 6.7, and 7 hereof or a remedy of specific performance, shall be to the Settlement Trust; provided further, however, if specific performance is not available, each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) may be held liable for an intentional breach of a representation in this Agreement or their bad faith material breach of this Agreement, and if liability on any such ground is established, then recourse may be had directly against the Debtor Party, Reorganized Debtor, and/or Reorganized Additional Debtor(s) responsible.

8.21 The obligations of the Parties herein, other than those conditioned upon the Settlement Agreement Effective Date, shall be binding upon execution hereof by the Parties.

8.22    Nothing in this Settlement Agreement will prevent Insurer from allocating the Settlement Amount among the Archdiocese Policies at Insurer's discretion.

8.23    If any provision of this Settlement Agreement, or the application thereof, shall for any reason or to any extent, be construed to be invalid or unenforceable, the remainder of this Settlement Agreement, and the application of such provision to other circumstances, shall interpreted so as to best effect the intent of the Parties, unless such determination of invalidity or unenforceability deprives any Party of the substantial benefit of its bargain.

8.24    The Parties agree that all matters relating to the negotiation and terms of this Settlement Agreement (including by way of example and not limitation, all prior drafts, exchanges of terms, and related discussions or correspondence) shall be confidential and are not to be disclosed except by order of court or consent of the Parties in writing.  This Section 8.24 does not prevent or prohibit the Parties from publicly filing on the docket in the Bankruptcy Case the final, executed copy of this Settlement Agreement.

[*Remainder of Page Intentionally Left Blank*]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed: _____

_____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**Twin City Fire Insurance Company and
First State Insurance Company**

Signed:

_____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**All Archdiocese Signatory Parties
Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title: **Their Authorized Signer** _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**Exhibit A**

**Sale Order**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: | § | CASE NO. 20-10846 (MSG) |
|  | § |  |
| THE ROMAN CATHOLIC CHURCH | § | CHAPTER 11 |
| OF THE ARCHDIOCESE OF NEW | § |  |
| ORLEANS, *et al.,*[1] | § | SECTION A |
|  | § |  |
| DEBTORS. | § | COMPLEX CASE |
|  | § |  |

## ORDER (I) APPROVING TWIN CITY FIRE INSURANCE COMPANY AND FIRST STATE INSURANCE COMPANY'S SETTLEMENT AGREEMENT, RELEASE AND BUYBACK, (II) APPROVING THE SALE OF THE ARCHDIOCESE POLICIES FREE AND CLEAR, (III) ENJOINING CLAIMS, AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated July 29, 2025 [D.E. 4181] and supplemented by the filing of the revised Settlement Agreement (as defined below) on October 27, 2025 [D.E.[∗]] ("Approval Motion") of The Roman Catholic Church of the Archdiocese of New Orleans, the lead debtor and debtor-in-possession (the "Debtor" or "Archdiocese") and the other debtors and debtors-in-possession[2] (the "Additional Debtors" and, together with the Archdiocese, the "Debtor Parties") in the above-captioned chapter 11 cases, by and through their respective counsel, for entry of an order (this "Order") approving the settlement agreement, releases, insurance policy buyback, and related injunction-in-aid ("Settlement") by and among the Archdiocese, the Additional Debtors, the other Archdiocese Signatory Parties, the Creditors' Committee, and Twin City Fire Insurance Company and First State Insurance Company ("Insurer" and, collectively with the foregoing, the "Parties"), pursuant to Sections 105(a) and 363 of Title 11 of the United States Code ("Bankruptcy

---

[1]    The last four digits of the Debtor's federal tax identification number is 8966.

[2]    In connection with the Plan, the Catholic Entities listed on Plan **Exhibit B-1** (the "**Additional Debtors**") filed individual chapter 11 cases. The Plan is a combined joint Plan for the Archdiocese and the Additional Debtors, and the Approval Motion is deemed to have been filed (and this Order is entered) in each Additional Debtor's bankruptcy case for purposes of the relief requested herein.

Code") and Rules 2002(a)(2), 6004, and 9019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), in each case as described in the Approval Motion and the *Settlement Agreement, Release, and Policy Buyback* attached to this Order as **Exhibit 1** (the "Settlement Agreement");[3] and the Bankruptcy Court having reviewed the Approval Motion and the Settlement Agreement; and it appearing that due and adequate notice of the Approval Motion and Settlement Agreement having been given to all Entities entitled thereto, and that no other or further notice need be given; and the Bankruptcy Court on November 17, 2025 at 9:00 AM having held a hearing (the "Sale Hearing") to consider the relief requested in the Approval Motion; and upon the record of the Sale Hearing; and, after due deliberation, including, without limitation, for the reasons stated by the Bankruptcy Court on the record of the Sale Hearing, it appearing that the relief requested in the Approval Motion and granted herein is in the best interests of the Debtor Parties' estates (the "Estates"), their creditors, and other parties in interest; and good sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.     This Bankruptcy Court has jurisdiction over the Approval Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of this case and the Approval Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.     The statutory predicates for the relief sought in the Approval Motion are Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007. 9008 and 9019,

---

[3]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

2

and Rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Louisiana.

        C.      It is necessary and appropriate for the Bankruptcy Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Settlement Agreement, and to adjudicate, if necessary, to the extent provided under 28 U.S.C. § 1334(b), any and all disputes arising from or relating to the Settlement Agreement or this Order.

        D.      Proper, timely, adequate and sufficient notice of the Sale Hearing and Approval Motion and the relief requested therein, including, without limitation, the Settlement and the transactions described in the Settlement Agreement, including, without limitation, issuance of the injunction-in-aid referenced in the Settlement Agreement and the Approval Motion (all such transactions being collectively referred to, for convenience, as the "Sale Transaction") has been provided by the Debtor Parties in accordance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules to all interested Entities, including, without limitation the parties listed on **Schedule 3** of the Settlement Agreement, through service of the Confirmation Hearing Notice (as defined in the Plan) in accordance with the Disclosure Statement Order (also as defined in the Plan).

        E.      Notice of the Approval Motion was provided through publication of the Additional Debtors' Abuse Claims Bar Date Publication Notice (**Plan Exhibit G**) in daily and community newspapers throughout Louisiana.

        F.      The notices described above were good, sufficient, and appropriate under the circumstances, and no other notice of the Approval Motion or Sale Hearing is required.

        G.      The disclosures made by the Debtor Parties concerning the Settlement Agreement, the Sale Transaction, and the Sale Hearing were good, complete, and adequate.

H.     The Unknown Abuse Claims Representative has consented to, and approved of the Settlement Agreement and Sale Transaction on behalf of Unknown Abuse Claims in connection with the treatment of such Claims under the Plan.

I.     A reasonable opportunity to object or be heard with respect to the Approval Motion and the relief requested therein has been afforded to all interested Entities.

J.     The Archdiocese Signatory Parties, on their own behalf and on behalf of the Archdiocese Bound Parties, as applicable, have duly executed the Insurance Settlement Agreement by their duly authorized representative, agent and/or attorney in fact, and have full corporate power and authority to consummate the Sale Transaction pursuant to the Settlement Agreement and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Settlement Agreement, are required for the Archdiocese Bound Parties to consummate the Sale Transaction.

K.     The Debtor Parties have demonstrated (i) good, sufficient, and sound business purpose and justification and compelling circumstances for the Sale Transaction pursuant to Section 363(b) of the Bankruptcy Code and (ii) that the Sale Transaction is fair, reasonable, and in the best interests of their Estates and creditors pursuant to Bankruptcy Rule 9019. Among other things, the Debtor Parties have demonstrated that: the Settlement Agreement, and closing thereon, is necessary and appropriate to realize the value of the Purchased Property (as defined below) and maximize the value of their Estates; the probability of success for their Estates in litigation over the matters resolved by the Settlement Agreement is uncertain; litigation of the matters resolved by the Settlement Agreement would be complex and costly to their Estates; and the Settlement Amount is within the reasonable range of potential litigation outcomes. As used herein, "Purchased Property" means, collectively, all right, title and interest (including "Interests" as defined below)

4

in and to the Archdiocese Policies issued by Insurer and the Related Insurance Claims and Coverage Claims. The Sale Transaction constitutes a reasonable and sound exercise of the Debtor Parties' business judgment and their powers and duties under applicable law and should be approved. Approval of the Settlement Agreement and consummation of the Sale Transaction are in the best interests of the Debtor Parties' Estates, their creditors (specifically including the Abuse Claimants of the Debtor Parties), and other parties-in-interest, including because the proceeds of and from the Sale Transaction will benefit Abuse Claimants.

L.      The Settlement Agreement was negotiated, proposed, and entered into without collusion, in good faith, and from arm's length bargaining positions. Without limiting the foregoing, the Settlement Agreement resulted from a lengthy mediation that proceeded pursuant to a prior order of the Bankruptcy Court. Insurer is not an "insider" or "affiliate" (as those terms are defined in the Bankruptcy Code) of any of the Debtor Parties. None of the Archdiocese Bound Parties or Insurer have engaged in any conduct that would: (i) cause or permit the avoidance of the Settlement Agreement or the consummation of the Sale Transaction under Section 363(n) of the Bankruptcy Code; (ii) cause or permit the imposition of any costs or damages (including without limitation attorneys' fees or punitive damages) under Section 363(n) of the Bankruptcy Code; or (iii) prevent the application of Section 363(m) of the Bankruptcy Code. The releases, injunctions, policy buyback, and all other components of the Sale Transaction comply with the Bankruptcy Code and all applicable non-bankruptcy law.

M.      Pursuant to the Settlement Agreement and to the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer have consented to the assignment of the Non-Debtor Catholic Entities' Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities'

Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under the Settlement Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Interests of any Entity in such Archdiocese Policies (the "Non-Debtor Catholic Entity Policy Sale").

N.      Insurer is a good faith purchaser of the Purchased Property under Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, in that, among other things: (i) all payments to be made by or to Insurer, and other agreements or arrangements entered into by Insurer, including without limitation any escrow agreement pertaining to the payment of the Settlement Amount, in connection with the Sale Transaction have been disclosed; (ii) Insurer neither induced nor caused the Debtor Parties' chapter 11 filings; (iii) the negotiation and execution of the Settlement Agreement and any other agreements or instruments related thereto was in good faith, the arm's length transaction between Insurer and the other Parties was the product of mediation, and all Parties to the Settlement Agreement were, or had the opportunity to be, represented by counsel; and (iv) Insurer has not violated Section 363(n) of the Bankruptcy Code by any action or inaction. Insurer has at all times acted in good faith with respect to the Settlement Agreement and will continue to be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale Transaction.

O.      The terms and conditions of the Settlement Agreement are fair and reasonable. The Settlement Amount provided by Insurer pursuant to the Settlement Agreement (i) is fair and reasonable; (ii) monetizes the Purchased Property at the highest and best amount; (iii) will provide a higher and more certain recovery for the Debtor Parties' creditors than would be provided by

6

any other practical available alternative given the complexity, cost, and uncertainty of such alternatives; (iv) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (v) constitutes reasonably equivalent value (as defined in Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law. The Settlement Amount is within the reasonable range of potential litigation outcomes, and the Debtor Parties' determination to accept the Settlement Amount and otherwise enter into the Settlement Agreement is a valid and sound exercise of their business judgment and consistent with the Debtor Parties' fiduciary duties. The releases to be made pursuant to the Settlement Agreement, including without limitation the releases of the Archdiocese Bound Parties and the Insurer Released Parties, are appropriate and should be approved.

P.     Insurer: (i) is not a mere continuation of any of the Archdiocese Bound Parties or the Estate of any of the Debtor Parties, nor is there any continuity of enterprise between Insurer and the Debtor Parties or Insurer and any of the other Archdiocese Bound Parties; (ii) is not holding itself out to the public as a continuation of any of the Archdiocese Bound Parties; and (iii) is not a successor to the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties for any purpose, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of Insurer and any of the Archdiocese Bound Parties.

Q.     The Settlement Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither Insurer nor any of the Archdiocese Bound Parties are fraudulently entering into the Sale Transaction.

R.     The transfer of the Purchased Property to Insurer (i) does not constitute an avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law and (ii) does not and will not subject Insurer to any liability whatsoever with respect to the Debtor Parties' operation prior to the closing of the Sale Transaction (i.e., the occurrence of both the Settlement Agreement Effective Date and payment[4] of the Settlement Amount by Insurer to the Settlement Trust or Escrow Agent pursuant to the terms of Insurer's Settlement Agreement) (the "Closing").

S.     Insurer has agreed to purchase the Purchased Property pursuant to its Settlement Agreement and this Order; Insurer has not agreed to purchase, and is not purchasing, any other assets of the Estate of any of the Debtor Parties. Insurer has not agreed to assume, and after Closing shall have no obligations with respect to, any liabilities of the Archdiocese Bound Parties. Without limiting the generality of the foregoing, Insurer: (i) is not assuming and shall have no liability for any Claims arising from or relating to Abuse, the Purchased Property, or the Bankruptcy Case; and (ii) is not assuming and shall have no liability with respect to the Archdiocese's or any other Archdiocese Bound Party's obligations to Abuse Claimants, any other creditors, future claimants (including without limitation Unknown Abuse Claimants), or the Archdiocese's or any Archdiocese Bound Party's employees, in each case, by reason of the purchase of the Purchased Property under the Settlement Agreement.

T.     The Purchased Property constitutes property of the Debtor Parties' Estates, and the Archdiocese Bound Parties are the lawful owner of the Purchased Property and hold good title thereto. The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement

---

[4]     For the avoidance of doubt, all references to "payment" or "delivery" of the Settlement Amount by Insurer herein shall encompass all transfers of the Settlement Amount contemplated by the Settlement Agreement, including without limitation funding and transfer of funds to the Settlement Trust via letters of credit or escrow accounts.

8

will be a legal, valid, binding, and effective transfer of the Purchased Property, and will vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property, in each case free and clear of all Interests (as defined below, including, without limitation, any Interests of the Archdiocese Bound Parties, Abuse Claimants, and holders of Direct Action Claims). Upon Closing, Insurer shall have no liability for any Claims against or liabilities of the Debtor Parties, their Estates, or the other Archdiocese Bound Parties. Without limiting any of the foregoing, the Archdiocese, the Archdiocese Signatory Parties, and Insurer have agreed that, upon Closing: (i) the Purchased Property shall be deemed void *ab initio*, terminated, extinguished, and of no further force and effect; and (ii) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

U.     Pursuant to §§ 363(f) and 105(a) of the Bankruptcy Code, and subject to the terms and conditions set forth in the Settlement Agreement, and upon Closing, without the need for further action, the Debtor Parties shall be deemed to have sold, transferred and conveyed the Purchased Property to the Insurer, and the Insurer shall be deemed to have purchased from the Debtor Parties, all right title and interest in and under the Purchased Property, free and clear of all "Interests" of any Entity of any kind or nature whatsoever, to the fullest extent permitted under §§ 363(b) and (f) of the Bankruptcy Code, with such "Interests" including: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands,

9

encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, Subject Interests, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand

10

is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property. Without limiting the generality of the foregoing and without finding that any Entity has any Interest in the Archdiocese Policies: (i) any Entity with Interests (if any) in or with respect to the Purchased Property who did not object, or who withdrew their objections to the Sale Transaction or the Approval Motion have waived their right to object to the sale of the Purchased Property free and clear of such Entity's Interests in the Purchased Property pursuant to Section 363(f)(2) of the Bankruptcy Code; and (ii) any such Entity with Interests in or with respect to the Purchased Property who objected to the Approval Motion and did not withdraw any such objection (a) are the holders of Interests subject to *bona fide* dispute under Bankruptcy Code Section 363(f)(4) and/or (b) can be compelled to accept a monetary satisfaction of their Interests within the meaning of Section 363(f)(5) of the Bankruptcy Code.

V.      If the sale of the Purchased Property were not free and clear of all Interests, including without limitation all Abuse Claims, Direct Action Claims, and Coverage Claims, or if the Insurer Released Parties would, or in the future could, be liable for any of the Interests, Insurer would not have entered into the Settlement Agreement and would not consummate the Sale Transaction or pay the Settlement Amount, thus adversely affecting the Debtor Parties, their Estates, and their creditors (including, without limitation, the Abuse Claimants), as well as the other Archdiocese Bound Parties.

11

W.      Issuing a supplemental injunction under Section 105(a) of the Bankruptcy Code as provided herein is essential to give effect to the sale of the Purchased Property to Insurer and this Order's approval of such sale free and clear of Interests pursuant to Section 363(f) of the Bankruptcy Code. The Sale Injunction set forth in Paragraph 23 below not only is a necessary prerequisite for Insurer's assent to the terms and conditions of its Settlement Agreement, such that Insurer will not consummate the Sale Transaction or pay its Settlement Amount in the absence of such an injunction from this Bankruptcy Court, but also is warranted to ensure compliance with this Order. Likewise, Insurer will not consummate the Sale Transaction or pay its Settlement Amount without the benefit of the releases contained in the Settlement Agreement and approval thereof by the Bankruptcy Court.

X.      Neither the Settlement Agreement nor the Sale Transaction constitute a *sub rosa* chapter 11 plan. The Settlement Agreement does not impermissibly restructure the rights of the Debtor Parties' creditors nor impermissibly dictate a chapter 11 plan for the Debtor Parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.      The Approval Motion, and the relief sought therein (including without limitation the approval of the Settlement Agreements and the Sale Transaction) is GRANTED and APPROVED, in all respects as set forth herein.

2.      The findings of fact set forth above and conclusions of law stated herein, in addition to any findings of fact and conclusions of law stated by the Bankruptcy Court at the Sale Hearing, shall constitute this Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the Approval Motion pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall

12

be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.　　Any and all objections, if any, to the Approval Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case the Entity asserting the objection or reservation of rights is enjoined from taking any action against the Insurer Released Parties or the assets or property of any Insurer Released Parties to recover any Claim or Interest held by such objecting Entity. Those parties who did not object or who withdrew their objections to the Approval Motion are deemed to have consented to the relief granted herein, pursuant to Section 363(f)(2) of the Bankruptcy Code.

### Approval of the Settlement Agreement

4.　　The Settlement Agreement is approved in its entirety, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Without limiting the generality of the foregoing, the settlement and releases of Claims as set forth in the Settlement Agreement is hereby approved pursuant to Bankruptcy Rule 9019. All factors set forth in *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey* (*In re Cajun Elec. Power Coop.*), 119 F. 3d 349, 356 (5th Cir. 1997), either weigh in favor of the Settlement Agreement or do not apply.

5.　　Pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, the Non-Debtor Catholic Entity Policy Sale, free and clear of all Interests of any Entity in the Archdiocese Policies, is hereby approved.

6.　　Pursuant to Section 363(b) of the Bankruptcy Code, each of the Parties is authorized to consummate the Sale Transaction under and in accordance with the terms and conditions of the

Settlement Agreement, and the Archdiocese Bound Parties shall at all times act in accordance with the terms thereof.

7.      Any representative, agent or attorney in fact of the Archdiocese Signatory Parties is authorized to execute any other documentation and perform such other ministerial tasks as may be reasonably necessary to effectuate the Settlement Agreement and the Sale Transaction on behalf of the Archdiocese Bound Parties, including without limitation, any bill of sale substantially in the form attached to the Settlement Agreement as **Exhibit B**.

8.      Subject to all of the terms and conditions of the Settlement Agreement, upon Closing, the Archdiocese Bound Parties and Insurer shall be deemed to have granted the releases as set forth in the Settlement Agreement.

9.      The Parties are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Settlement Agreement, together with all additional instruments and documents that may be reasonably necessary, convenient, or desirable to implement the Settlement Agreement and consummate the Sale Transaction pursuant thereto and effectuate the provisions of this Order and the transactions approved hereby, and to take all further actions as may be requested by Insurer for the purpose of assigning, transferring, granting, conveying, and conferring to Insurer or reducing to Insurer's possession, the Purchased Property, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Settlement Agreement.

10.     Insurer is authorized and directed to pay the Settlement Amount under and subject to the satisfaction of all terms and conditions of the Settlement Agreement.

11.     The Settlement Amount provided by Insurer for the Purchased Property (i) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title

IV, Chapter 12 of the Louisiana Civil Code; and (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

12. None of the Insurer Released Parties shall be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its or their rights or remedies under the Settlement Agreement or any other document related to the Settlement Agreement or the Sale Transaction. The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order; *provided*, *however*, that this Bankruptcy Court shall retain jurisdiction over any and all disputes with respect thereto.

13. This Order shall be binding in all respects upon: (a) the Debtor Parties and their Related Parties; (b) the Debtor Parties' Estates; (c) the other Archdiocese Bound Parties; (d) all creditors of the Debtor Parties; (e) all Abuse Claimants and holders of Direct Action Claims; (f) all holders of Interests whether known or unknown against or on all or any portion of the Purchased Property; (g) any Non-Settling Insurer; (h) the Insurer Released Parties; (i) the Purchased Property; (j) the Unknown Claims Representative; (k) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code; and (l) all Entities receiving notice (or deemed to have received notice pursuant to this Order) of the Approval Motion or the Sale Hearing, including without limitation all Entities listed on **Schedule 3** to the Settlement Agreement. The Settlement Agreement shall be binding in all respects upon: (x) the Debtor Parties, their Estates, and their Related Parties; (y) the

15

Archdiocese Bound Parties; and (z) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code.

### Transfer of Assets

14.     The conditions of Section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Archdiocese may sell the Purchased Property free and clear of any Interests therein.

15.     Pursuant to Sections 105 and 363(b) and (f) of the Bankruptcy Code, Bankruptcy Rule 9019, applicable Louisiana State law, the testimonial and other documentary evidence filed in support of the Approval Motion, and the record of the Sale Hearing, the Archdiocese has set forth the legal authority necessary to support this Bankruptcy Court's findings herein.

16.     Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Property and the Archdiocese Bound Parties' rights, title, and interest therein shall upon Closing be transferred to Insurer, free and clear of all Interests (including without limitation the Interests of any of the Archdiocese Bound Parties), and all such Interests are unconditionally and forever released and extinguished as against the Purchased Property. Without limiting the generality of the foregoing, the sale of the Purchased Property under the Settlement Agreement shall be free and clear of all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any

16

other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property.

17.    Upon the Closing, (a) all of the Archdiocese Bound Parties', the Debtor Parties' Estates', and the Settlement Trustee's rights under and with respect to the Purchased Property, if any, shall be permanently and irrevocably extinguished as if the Archdiocese Policies had never been issued and (b) the Insurer Released Parties shall be entitled to all of the protections afforded by §363(m) of the Bankruptcy Code.

18.    Upon Closing, all Entities (and their respective successors and assigns), including but not limited to all governmental, tax, and regulatory authorities, Archdiocese Bound Parties, Non-Settling Insurers, Abuse Claimants, Direct Action Claimants, trade and other creditors, and any Entities holding Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) against, in, or with respect to the Purchased Property, including, without limitation, such Interests arising or accruing under or out of, in connection with, or in any way relating to the transfer of the Purchased Property to Insurer, hereby are forever barred, estopped, and permanently enjoined from asserting such Person's or Entity's Interests against the Purchased Property, the Insurer Released Parties, or the assets or property of any Insurer Released Parties. Effective upon Closing, none of the Insurer Released Parties shall have any liability for any Claims (a) against the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties or (b) that arise under or related in any way or in respect of the Purchased Property.

19.    The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement constitutes a legal, valid, and effective transfer of the Purchased Property, and shall vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties

17

in and to the Purchased Property. Upon Closing, the Archdiocese Policies shall be terminated and no longer in force or effect, exhausted in retrospect as to all coverages, and all Interests that the Archdiocese or any other Person or Entity (including without limitation any of the other Archdiocese Bound Parties) may have had, may presently have, or may in the future have, in such Purchased Property are released and extinguished, and all such Entities (including without limitation the Archdiocese Bound Parties) hereby are forever barred, estopped, and permanently enjoined from asserting any such Interest against the Purchased Property and/or any of the Insurer Released Parties. Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent constitutes full and complete performance of any and all obligations under the Purchased Property, including without limitation any performance owed to the Archdiocese Bound Parties, and all limits of coverage under the Archdiocese Policies, including per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

20.     Upon occurrence of the Closing:

(a)     all Interests the Archdiocese Bound Parties may have had, may presently have, or in the future may have in the Purchased Property, as applicable, are released pursuant to the terms of the Settlement Agreement; and

(b)     the Archdiocese Bound Parties accept Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent in full and complete satisfaction of Insurer's past, present, and future obligations, including, without limitation, any obligations to any of the Archdiocese Bound Parties under such Purchased Property or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever arising out of or related in any way to such Purchased Property

18

(including Coverage Claims), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, direct or indirect, and regardless of whether such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, or otherwise.

### No Successor Liability

21.     The transfer of the Purchased Property to Insurer shall not result in any Insurer Released Parties or the Purchased Property having any of the following: (a) any liability or responsibility for Interests in or Claims against the Archdiocese Bound Parties or any of their Related Parties; (b) liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any Claims or Interests; or (c) any liability or responsibility to the Archdiocese Bound Parties except as is expressly set forth in the Settlement Agreement.

22.     Without limiting the generality of the foregoing, none of the Insurer Released Parties shall have any successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability, *de facto* merger or joint venture, mere continuation or substantial continuity, whether known or unknown as of Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between the Archdiocese Bound Parties and any non-debtor subsidiary or affiliate (including, without limitation, any other Archdiocese Bound Party), liabilities relating to or arising from any environmental laws, and any taxes arising, accruing, or

payable under, out of, in connection with, or in any way relating to the Purchased Property prior to Closing.

<div align="center">

**Sale Injunction**

</div>

23.    Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, and in consideration of the undertakings of Insurer pursuant to the Settlement Agreement, including Insurer's purchase of the Purchased Property free and clear of all Claims and Interests pursuant to Section 363(f) of the Bankruptcy Code as provided herein, any and all Entities that have held, now hold, or who may in the future hold any Claims or Interests (including without limitation all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Abuse Claimants, holders of Direct Action Claims, Perpetrators, Non-Settling Insurers, the Archdiocese Bound Parties, and all others holding Claims or Interests of any kind or nature whatsoever, including, without limitation, those Claims released or to be released pursuant to the Settlement Agreement), which Claims or Interests are under, arise out of, relate to, or connect in any way with an Abuse Claim or any of the Purchased Property, including, without limitation, (a) all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property, (b) the payment of any of the Claims identified previously, including, without limitation, Abuse Claims, Direct Action Claims, and Coverage Claims and (c) all other Interests, are hereby permanently stayed, enjoined, barred, and restrained from taking any Action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or

<div align="center">

20

</div>

Interest against any of (x) the Insurer Released Parties, (y) the assets or property of any Insurer Released Parties, or (z) the Purchased Property, including by:

(a)     commencing, conducting, or continuing in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind, in any forum, with respect to any such Claim or Interest, against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(b)     enforcing, levying, attaching, collecting, or otherwise recovering, or seeking to accomplish any of the preceding, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(c)     creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, or seeking to accomplish any of the preceding, any lien of any kind against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(d)     asserting, implementing, or effectuating any such Claim or Interest of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any of the Insurer Released Parties, (B) any of the Insurer Released Parties, or (C) any property or interest in property of any Insurer Released Party; and

(e)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Order.

21

1221

The actions described in this Paragraph 23 are "**Enjoined Actions**," and the injunction set forth herein is the "**Sale Injunction**." The Sale Injunction shall be a permanent injunction against the Enjoined Actions and may not be modified, dissolved, or terminated.

24.    The Sale Injunction shall be effective upon Closing. The Sale Injunction bars pursuit of the above referenced Claims and/or Interests against the Insurer Released Parties, or the property or assets of each (including, without limitation, the Purchased Property), but against no other person or thing.

25.    In a successful action to enforce this Sale Injunction in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

26.    The Sale Injunction shall not enjoin (a) the right of any Person or Entity against the Settlement Trust or a Non-Settling Insurer, or (b) the Settlement Trustee from enforcing the Settlement Trust Documents.

### Additional Provisions

27.    From and after the date hereof, no Person or Entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreements and this Order.

28.    This Bankruptcy Court hereby retains jurisdiction, regardless of whether a chapter 11 plan has been confirmed in the Bankruptcy Case and consummated and irrespective of the provisions of any such plan or order confirming such plan, to enforce and implement the terms and provisions of the Settlement Agreement, all amendments thereto, any waivers and consents thereunder, and of any agreement(s) executed in connection therewith in all respects, including but

22

1222

not limited to retaining jurisdiction to: (a) compel delivery of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreement; (b) resolve any dispute, controversy, or claim arising under or related to the Settlement Agreement, or the breach thereof; and (c) interpret, implement, and enforce the provisions of this Order and resolve any disputes related thereto.

29.     Nothing contained in any plan confirmed in the Bankruptcy Case or any order of this Bankruptcy Court confirming such plan shall conflict with or derogate from the provisions of the Settlement Agreement or the terms of this Order.

30.     This Order shall not limit or preclude the entry or effectiveness of any additional releases or injunctions that may be granted protecting the Insurer Released Parties and/or the assets or property of any Insurer Released Parties in connection with, or as part of, any order confirming a chapter 11 plan.

31.     The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Settlement Agreement be authorized and approved in its entirety.

32.     The transactions contemplated by the Settlement Agreement are undertaken by Insurer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code. Insurer is a good faith purchaser of the Purchased Property and is entitled to all the protections afforded by Section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction to Insurer.

33.     Insurer has given substantial consideration under the Settlement Agreement for the benefit of the Debtor Parties, their Estates, and creditors, along with the other Archdiocese Bound

Parties. Such consideration given by Insurer constitutes valid and valuable consideration for the Purchased Property and the releases set forth in the Settlement Agreement, including, without limitation, the extinguishment and release of all Interests pursuant to this Order. The consideration provided by Insurer for the Purchased Property under the Settlement Agreement is fair and reasonable; accordingly, the purchase may not be avoided under Section 363(n) of the Bankruptcy Code.

34.     The terms and provisions of the Settlement Agreement and this Order shall be binding notwithstanding any subsequent appointment of any trustee(s) examiner(s) or receiver(s) under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtor Parties, their Estates, their creditors, or any examiner(s) or receiver(s).

35.     The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Bankruptcy Court that the Settlement Agreement and the Parties' performance thereof be authorized and approved in its entirety.

36.     Pursuant to the provisions of the Settlement Agreement, each of the Archdiocese Bound Parties and Insurer shall be authorized to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper, or advisable under applicable law or otherwise to consummate and make effective the transactions contemplated by the Settlement Agreement.

37.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

24

38.     All obligations of the Debtor Parties under the Settlement Agreement shall be deemed administrative expenses of their Estates under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

39.     Each and every federal, state, and local governmental agency or department is hereby directed to accept this Order in lieu of any document necessary to consummate the transactions contemplated by the Settlement Agreement and this Order.

40.     The Settlement Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the Parties, in a writing signed by the Parties, and in accordance with the terms thereof, without further order of this Bankruptcy Court; *provided* that such modification, amendment, or supplement does not constitute a material change to the relief sought in the Approval Motion and approved by this Order.

**IT IS SO ORDERED.**

New Orleans, Louisiana, _____, 2025

_____
            MEREDITH S. GRABILL
            UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**Bill of Sale**

## BILL OF SALE AND ASSIGNMENT

**THIS BILL OF SALE AND ASSIGNMENT** is made and entered into as of _____, 2025, by and between The Roman Catholic Archdiocese of New Orleans and its Bankruptcy Estate (the "**Archdiocese**" or "**Debtor**"), the Additional Debtors and their respective Bankruptcy Estates, Non-Debtor Catholic Entities (collectively, "**Archdiocese Signatory Parties**"), and Twin City Fire Insurance Company and First State Insurance Company (the "**Insurer**"). All capitalized terms used herein without definition have the meanings set forth in the Settlement Agreement, Release, and Policy Buyback by, between, and among The Archdiocese, the other Archdiocese Signatory Parties, and Insurer, as amended or modified (the "**Settlement Agreement**").

### W I T N E S S E T H:

WHEREAS, pursuant to the Settlement Agreement, the Archdiocese Signatory Parties have, on behalf of themselves and all other Archdiocese Bound Parties, agreed to sell and/or convey any and all right, title, and interest (including all Subject Interests) in and to the Purchased Property (as defined in the Approval Order), and Insurer has agreed to purchase and buy-back the Purchased Property, in consideration of the payment of a purchase price of $900,000.00 (the "**Purchase Price**") and other good and valuable consideration as provided in and under the Settlement Agreement and Plan;

WHEREAS, the Approval Order, as filed at Docket No. [_], has approved the Sale Transaction (as defined in the Approval Order) and found that the Purchase Price is a fair and reasonable price for the Purchased Property;

NOW, THEREFORE, in consideration of the payment of the Purchase Price by Insurer as set forth in the Settlement Agreement, and in accordance therewith and with Approval Order, the Debtor Parties do hereby sell, transfer, and assign to Insurer, and Insurer does hereby accept, all of the Archdiocese Bound Parties' right, title, and interest in and to the Purchased Property, and all Subject Interests therein.

[signatures appear on following pages]

**IN WITNESS WHEREOF**, the parties have executed this Bill of Sale and Assignment by their duly authorized representatives.

**The Roman Catholic Archdiocese of New Orleans**

Signed: _____

_____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**Twin City Fire Insurance Company and
First State Insurance Company**

Signed: _____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

**All Archdiocese Signatory Parties
Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title: **Their Authorized Signer** _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

## Schedule 1

### Archdiocese Policies

The following policies shall be included in the definition of Archdiocese Policies:

| Writing Company | Policy Number | Policy Period |
|---|---|---|
| First State Ins. Co. | 932030 | 3/1/1981-2/1/1982 |
| Twin City Fire Ins. Co. | TXS 100558 | 2/1/1982-2/1/1983 |
| Twin City Fire Ins. Co. | TXS 100641 | 2/1/1983-6/30/1983 |

## Schedule 2

### Other Co-Insureds Known to the Archdiocese Signatory Parties

For the avoidance of the doubt, the following entities are bound by the terms of the Settlement Agreement:[1]

### I.    Archdiocesan Parishes

1.    All Saints Roman Catholic Church, New Orleans, Louisiana

2.    Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana

3.    Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana

4.    Assumption of Mary Roman Catholic Church, Avondale, Louisiana

5.    Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana[2]

6.    Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana

7.    Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana

8.    Blessed Trinity Roman Catholic Church, New Orleans, Louisiana

9.    Christ the King Roman Catholic Church, Gretna, Louisiana

10.    Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana

11.    Divine Mercy Roman Catholic Church, Kenner, Louisiana

12.    Good Shepherd Roman Catholic Church, New Orleans, Louisiana

13.    Holy Family Roman Catholic Church, Franklinton, Louisiana

14.    Holy Family Roman Catholic Church, Luling, Louisiana

15.    Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana

16.    Holy Spirit Roman Catholic Church, New Orleans, Louisiana

17.    Immaculate Conception Roman Catholic Church, Marrero, Louisiana

18.    Immaculate Conception Roman Catholic Church, New Orleans, Louisiana

19.    Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana

20.    Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana

21.    Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana, for itself and as successor to St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc.

---

[1] Without limiting Section 6.4 of the Settlement Agreement, Insurer does not concede that any of the Entities listed on this schedule are "insureds," "additional insureds," or "protected persons" under its Archdiocese Policies.

[2] Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

22.  Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana

23.  Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana

24.  Most Holy Trinity Roman Catholic Church, Covington, Louisiana

25.  Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana

26.  Our Lady of Grace Roman Catholic Church, Reserve, Louisiana

27.  Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana

28.  Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana

29.  Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana

30.  Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana

31.  Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana

32.  Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana

33.  Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana

34.  Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana

35.  Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana

36.  Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana

37.  Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana

38.  Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana

39.  Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana

40.  St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana

41.  St. Agnes Roman Catholic Church, Jefferson, Louisiana

42.  St. Alphonsus Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

43.  St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana

44.  St. Angela Merici Roman Catholic Church, Metairie, Louisiana

45.  St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana

46.  St. Anselm Roman Catholic Church, Madisonville, Louisiana

47.  St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana

48.  St. Anthony of Padua Roman Catholic Church, Luling, Louisiana

49.  St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana

50.  St. Anthony Roman Catholic Church, Gretna, Louisiana

51.  St. Augustine Roman Catholic Church, New Orleans, Louisiana

52.  St. Benedict Roman Catholic Church, Covington, Louisiana

| 53. | St. Benilde Roman Catholic Church, Metairie, Louisiana |
|---|---|

53.   St. Benilde Roman Catholic Church, Metairie, Louisiana

54.   St. Bernard Roman Catholic Church, St. Bernard, Louisiana

55.   St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana

56.   St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana

57.   St. Christopher Roman Catholic Church, Metairie, Louisiana

58.   St. Clement of Rome Roman Catholic Church, Metairie, Louisiana

59.   St. Cletus Roman Catholic Church, Gretna, Louisiana

60.   St. David Roman Catholic Church, New Orleans, Louisiana

61.   St. Dominic's Roman Catholic Church, New Orleans, Louisiana

62.   St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana

63.   St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana

64.   St. Francis Xavier Roman Catholic Church, Metairie, Louisiana

65.   St. Genevieve Roman Catholic Church, Slidell, Louisiana

66.   St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana

67.   St. Jerome Roman Catholic Church, Kenner, Louisiana

68.   St. Joachim Roman Catholic Church, Marrero, Louisiana

69.   St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana

70.   St. John of the Cross Roman Catholic Church, Lacombe, Louisiana

71.   St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, for itself and as successor to St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc.

72.   St. John the Baptist Roman Catholic Church, Edgard, Louisiana

73.   St. John the Baptist Roman Catholic Church, Folsom, Louisiana

74.   St. Joseph Roman Catholic Church, Algiers, Louisiana

75.   St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana

76.   St. Joseph's Roman Catholic Church, Gretna, Louisiana

77.   St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc.

78.   St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana

79.   St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana

80.   St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana

81.  St. Margaret Mary Roman Catholic Church, Slidell, Louisiana

82.  St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana

83.  St. Mark Roman Catholic Church, Ama, Louisiana

84.  St. Martha Roman Catholic Church, Harvey, Louisiana

85.  St. Martin de Porres Roman Catholic Church, New Orleans, formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc.

86.  St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana

87.  St. Mary's Roman Catholic Church, New Orleans, Louisiana

88.  St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana

89.  St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St. John the Baptist Roman Catholic Church, Paradis, Louisiana, for itself and as successor to St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc.

90.  St. Patrick's Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

91.  St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana

92.  St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana

93.  St. Peter Claver Roman Catholic Church, New Orleans, Louisiana

94.  St. Peter Roman Catholic Church, Reserve, Louisiana, for itself and as successor to St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc.

95.  St. Peter's Roman Catholic Church, Covington, Louisiana

96.  St. Philip Neri Roman Catholic Church, Metairie, Louisiana

97.  St. Pius X Roman Catholic Church, New Orleans, Louisiana

98.  St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana

99.  St. Rita Roman Catholic Church, Harahan, Louisiana

100. St. Rita Roman Catholic Church, New Orleans, Louisiana

101. St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana[3]

102. Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana

103. The Congregation of St. Rita Roman Catholic Church of Harahan

---

[3] As stated in footnote 2, Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

104.    The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana


**II.    Suppressed Archdiocesan Parishes**[4]

1.    Blessed Sacrament, Inc.

2.    Epiphany, Inc.

3.    Immaculate Heart of Mary, Inc.

4.    Incarnate Word, Inc.

5.    Our Lady of Good Counsel, Inc.

6.    Our Lady of Good Harbor, Inc.

7.    Our Lady of Lourdes, New Orleans, Louisiana, Inc.

8.    Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.

9.    Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana

10.    St. Ann, New Orleans, Louisiana, Inc.

11.    St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana

12.    St. Frances Xavier Cabrini, Inc.

13.    St. Francis de Salles, Inc.

14.    St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana

---

[4]    The Suppressed Archdiocesan Parishes no longer operate as separate church parishes.  The Suppressed Archdiocesan Parishes were not dissolved, and may own property.

Following Hurricane Katrina, the operations of certain of the Suppressed Archdiocesan Parishes were combined with Archdiocesan Parishes.  In 2024, in the ongoing aftermath of Hurricane Ida and a result of storm damage, the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental statistics, and financial difficulties encountered, the following additional Suppressed Archdiocesan Parishes were canonically merged with neighboring Archdiocesan Parishes: (a) St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc., was canonically merged into St. Peter Roman Catholic Church, Reserve, Louisiana; (b) (i) St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and (ii) St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc., were both canonically merged into Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, now known as St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana; (c) St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc., was canonically merged into St. Rosalie Roman Catholic Church, Harvey, Louisiana, now known as Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana; (d) St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc., was canonically merged into Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, now known as St. John Paul II Roman Catholic Church, Waggaman, Louisiana; (e) St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc., was canonically merged into St. John the Baptist Roman Catholic Church, Paradis, Louisiana, now known as St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana; (f) Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc., was canonically merged into St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, now known as St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana; and (g) St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc., had its canonical territory divided so that (i) the area north of the Pontchartrain Expressway was canonically merged into St. Patrick's Roman Catholic Church, New Orleans, Louisiana, and (ii) the area south of the Pontchartrain Expressway was canonically merged into St. Alphonsus Roman Catholic Church, New Orleans, Louisiana.

15. St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana

16. St. Henry's, Inc.

17. St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana

18. St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana

19. St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana

20. St. John the Baptist, New Orleans, Louisiana, Inc.

21. St. Julian Eymard, Inc.

22. St. Lawrence the Martyr, Inc.

23. St. Louise de Marillac, Inc.

24. St. Maurice, Inc.

25. St. Monica, Inc.

26. St. Philip the Apostle, Inc.

27. St. Raymond's, Inc.

28. St. Rose of Lima, Inc.

29. St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana

30. St. Theresa of the Child Jesus, Inc.

31. The Congregation of Saints Peter and Paul Roman Catholic Church

32. The Congregation of St. Cecelia Roman Catholic Church

33. The Congregation of the Annunciation Roman Catholic Church

34. The Congregation of the Holy Trinity Roman Catholic Church


**III.     Archdiocesan Agencies**

1. Archdiocesan Spirituality Center

2. Catholic Charities Archdiocese of New Orleans

3. Catholic Charities Children's Day Care Centers

4. Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)

5. Clarion Herald Publishing Company

6. Korean Catholic Community of New Orleans, Inc.

7.   Notre Dame Seminary

8.   Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana

9.   Pace Greater New Orleans

10.  Padua House (merged into Catholic Charities Archdiocese of New Orleans)

11.  Philmat, Inc.

12.  Project Lazarus

13.  Roman Catholic Center of Jesus the Lord

14.  School Food and Nutrition Services of New Orleans, Inc.

15.  Second Harvest Food Bank of Greater New Orleans and Acadiana

16.  St. Jude Community Center, Inc.

17.  St. Michael Special School

18.  St. Thérèse Catholic Academy

19.  The Society for the Propagation of the Faith, Archdiocese of New Orleans


**IV.    Non-Debtor Catholic Entities**

**Archdiocesan Agencies**

1.   7887 Walmsley, Inc.

2.   Annunciation Inn, Inc.

3.   Archdiocese of New Orleans Indemnity, Inc.

4.   Aspiring Scholars

5.   Catholic Community Foundation Archdiocese of New Orleans

6.   Christopher Homes, Inc.

7.   Christopher Inn

8.   Dubourg Home

9.   Holy Redeemer Catholic Virtual Academy

10.  Holy Trinity Drive Land Corporation

11.  Iberia Investment Fund II, LLC

12.  Metairie III

13.  Metairie Manor

14.  Monsignor Wynhoven Apartments, Inc.

15.  Nazareth II

16.  Nazareth Manor

17.  New Orleans Archdiocesan Cemeteries

18.       Notre Dame Health System (f/k/a Chateau de Notre Dame)

19.       Rouquette III

20.       St. Anthony's Gardens

21.       St. Bernard II

22.       St. Bernard III

23.       St. Bernard Manor

24.       St. Martin's Manor, Inc.

25.       St. Tammany Catholic Cemetery

26.       St. Tammany Manor

27.       The Apartments at Mater Dolorosa

28.       The Mental Health Association Development Corporation

29.       Villa Additions, doing business as St. Teresa's Villa

30.       Villa St. Maurice, Inc.

**Schedule 3**

**Additional Notice Parties**

## Schedule 4

**Form of Corporate Resolutions**

<u>CORPORATE RESOLUTION</u>

RESOLUTION OF THE MEMBERSHIP AND BOARD OF DIRECTORS OF [NAME], [ADDRESS], A LOUISIANA NON-PROFIT [CORPORATION][LIMITED LIABILITY COMPANY (hereinafter this "Corporation").

      BE IT RESOLVED, that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation, are hereby authorized to transact on behalf of this Corporation any and all business related to the following:

1. Engaging 1793 Group, a Louisiana non-profit corporation, on terms and conditions deemed appropriate in their sole discretion, to assist with and administer on this Corporation's behalf, any and all matters in which this Corporation may have an interest in relation to a Plan of Reorganization filed or anticipated to be filed by The Roman Catholic Church of the Archdiocese of New Orleans in proceedings commenced under Chapter 11 of the Bankruptcy Code, captioned *In re The Roman Catholic Church of the Archdiocese of New Orleans*, Case No. 20-10846 (Bankr. E.D. La.) (the "Chapter 11 Case"), including, but not limited to, preparing and filing a petition in the Chapter 11 Case seeking relief under Chapter 11 of the United States Bankruptcy Code as an additional debtor, executing any and all documents necessary for this Corporation to file for relief in the Chapter 11 Case, executing on behalf of this Corporation all documents required to comply with the requirements imposed upon parties filing for relief under Chapter 11 of the Bankruptcy Code, Bankruptcy Rules, Local Rules for the Eastern District of Louisiana and/or the requirement imposed by the United States Trustee.

2. Engaging the firm of Heller Draper and/or any other attorneys to represent this Corporation in actions or proceedings related to the Chapter 11 Case.

3. Engaging accountants, financial advisors, and any other professionals necessary to administer the Chapter 11 Case on behalf of this Corporation.

4. Making decisions with regard to the payment of fees and costs for which this Corporation may become responsible to pay in the Chapter 11 Case.

5. Making decisions with regard to the filing of any plan within the Chapter 11 case, provided that such shall contain terms and provisions consistent with those set forth in Appendix "A" attached hereto and incorporated herein by this reference.

      FURTHER RESOLVED that either Very Rev. Patrick Carr or Rev. Leon Poche, as authorized agents of this Corporation with the power of substitution, is authorized to execute and deliver on behalf of this Corporation each and every Insurance Settlement Agreement with the Settling Insurers, as those terms are defined in the Fourth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of September 23, 2025 (the "Plan"), and any amendment or modification to the Plan, including, without limitation, the documents attached or referred to in Plan Supplement 7.1(a), any Bill of Sale required under such Insurance Settlement Agreements,

and any other documents reasonably requested by any such Settling Insurer to effectuate the transactions provided for in its Insurance Settlement Agreement or the Plan.

FURTHER GIVING AND GRANTING unto either Very Rev. Patrick Carr or Rev. Leon Poche, full power and authority to sign any and all documents and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER GIVING AND GRANTING unto Very Rev. Peter Akpoghiran or any other officer of the Corporation, full power and authority to certify the passage and effectiveness of this Resolution to the Settling Insurers and to take any and all actions necessary and proper in furtherance of the foregoing premises by on and on behalf of this Corporation.

FURTHER RATIFYING AND CONFIRMING all that either Very Rev. Patrick Carr or Rev. Leon Poche, in his said capacity may do or cause to be done in the premises.

I, the undersigned President of this Corporation do hereby certify that the above and foregoing is a true and correct copy of a resolution adopted by the Membership and Board of Directors of said corporation in conformity with the Articles of Incorporation and Louisiana law, and that said resolution remains in full force and effect and has not been amended or rescinded.

WITNESS MY HAND AND SEAL, effective this _____ day of _____, 2025

_____
Very Reverend Patrick J. Williams, V.G.

ATTEST

_____
Dirk Wild, Director

**Schedule 5**

**Form of Incumbency Certificates**

# INCUMBENCY CERTIFICATE

 I, **Very Rev. Peter Akpoghiran, J.C.D**., the duly elected, qualified, and acting **Vice President** of each of the Louisiana nonprofit corporations or limited liability companies listed on **Exhibit A** attached hereto (each, a "Corporation," and collectively, the "Corporations"), do hereby certify as follows:

1. That the person named below has been duly elected or appointed and is the qualified and acting officer of each of the Corporations holding the office set forth opposite his/her name.

   **NAME**                                    **TITLE**

   **Very Rev. Patrick J. Williams, V.G.**     **President and Director**

2. That the foregoing person is duly authorized to act on behalf of each Corporation in such capacity and to exercise the powers and perform the duties incident to said office under the respective Articles of Incorporation and Bylaws of each Corporation.

3. That attached hereto as **Exhibit B** is a true and correct copy of a resolution adopted at a duly noticed special meeting by the sole member of each of the Corporations and all of the Board of Directors of each said Corporation in attendance at such meeting in conformity with such Articles of Incorporation and Louisiana law and that said resolution remains in full force and effect and has not been amended or rescinded.

   IN WITNESS WHEREOF, I have hereunto set my hand as Vice President of each of the

Corporations as of this ___ day of October, 2025.

_____
Very Rev. Peter Akpoghiran, J.C.D
Vice President of Each Corporation
(See Attached Exhibit A)

State of Louisiana
Parish of Orleans

On this _____ day of October, 2025, before me, the undersigned Notary Public, personally appeared **Very Rev. Peter Akpoghiran, J.C.D.,** who acknowledged that he/she executed the foregoing instrument for the purposes therein contained and in the capacity therein stated.

Notary Public
Printed Name: _____
Notary ID or Bar Roll No.: _____
My Commission Expires: _____

## EXHIBIT A
### List of Corporations

1246

*Filing Version 7/29/2025*

## SETTLEMENT AGREEMENT, RELEASE, AND POLICY BUYBACK

This Settlement Agreement, Release, and Policy Buyback ("**Settlement Agreement**") is hereby made by, and between, and among The Roman Catholic Archdiocese of New Orleans (the "**Archdiocese**" or "**Debtor**" as further defined in Section 1.1.~~28~~31 below), the other Archdiocese Signatory Parties (as defined in Section 1.1.1~~3~~5 below), and ~~[ ]~~Twin City Fire Insurance Company and First State Insurance Company ("**Insurer**" as further defined in Section 1.1.4~~5~~9 below). Insurer, the Archdiocese, the other Archdiocese Signatory Parties, and the Creditors' Committee (as defined below), collectively are the "**Parties**" and each a "**Party**" to this Settlement Agreement.

### RECITALS:

WHEREAS, on May 1, 2020 (the "**Petition Date**" as further defined in Section 1.1.6~~2~~7 below), the Archdiocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**" as further defined in Section 1.1.1~~5~~7) pending under Case No. 20-10846 (the "**Bankruptcy Case**" as further defined in Section 1.1.1~~4~~6 below);

WHEREAS, each of the Additional Debtors (as defined in Section 1.1.~~9~~11 below) intends to file in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;

WHEREAS, certain Entities have asserted or may hold Claims, including Abuse Claims, against the Archdiocese Bound Parties (each as defined below);

WHEREAS, Insurer issued, allegedly issued, may have issued, assumed by novation or otherwise, or may be administering the Archdiocese Policies (as defined in Section 1.1.~~7~~9 below) providing certain coverage to the Archdiocese Bound Parties;

WHEREAS, asserted disputes between the Debtor Parties (as defined below) and Insurer have arisen, and assertable disputes between the Archdiocese Bound Parties and Insurer may arise in the future, concerning the scope and nature of Insurer's responsibilities, if any, to provide insurance coverage to the Archdiocese Bound Parties under the Archdiocese Policies (as further defined in Section 1.1.2~~5~~9 below, the "**Coverage Claims**");

WHEREAS, claimants may contend, as a matter of Louisiana law, particularly La. Rev. Stat § 22:1269 *et. seq*., that certain Entities may have Claims arising under or related to the Archdiocese Policies that could entitle them to bring a Direct Action Claim (as defined in Section 1.1.3~~2~~5 below) against Insurer;

WHEREAS, claimants may contend that as a matter of Louisiana law, the time within which Claims relating to Abuse may be asserted against certain of the Archdiocese Bound Parties and/or the Insurer may not have expired with respect to certain Claims;

WHEREAS, the Archdiocese Signatory Parties and Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Claims and all other

disputes between and among them and to release Insurer from any further obligations under the Archdiocese Policies;

WHEREAS, Insurer would not pay the full amount of the Settlement Amount (as defined in Section 1.1.~~75~~81 below) without the buy-back of the Subject Interests (as defined below) in the Archdiocese Policies, including without limitation, the interests of the Archdiocese, Additional Debtors, other Archdiocese Bound Parties and holders of Direct Action Claims, pursuant to section 363 of the Bankruptcy Code, and without the Sale Injunction, the Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeping Injunction (each as defined below), additionally providing protection to the Insurer Released Parties (as defined below) from Claims against the Insurer Released Parties and their property;

WHEREAS, through this Settlement Agreement and the Plan (as defined in Section 1.1.~~63~~38 below) the Archdiocese Signatory Parties intend to provide Insurer Released Parties with the broadest possible release of all Claims and Subject Interests with respect to the Archdiocese Policies; and

WHEREAS, through this Settlement Agreement and the Plan, as part of the compromise and resolution of the Coverage Claims, the Debtor Parties and Insurer also wish to effect a sale, pursuant to § 363(b), (f), and (m) of the Bankruptcy Code of the Archdiocese Policies, along with the Coverage Claims and Related Insurance Claims (the "**Purchased Property**" as further defined in Section 1.1.~~66~~71 below), to provide the Insurer Released Parties with the broadest possible release and buyback with respect to the Archdiocese Policies, resulting in the Insurer Released Parties having no obligations now or in the future with respect to the Archdiocese Policies, including without limitation to any Direct Action Claim.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Settlement Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound subject to the approval of the Bankruptcy Court pursuant to Section 2 below, the Parties hereby agree as follows:

# 1. DEFINITIONS

1.1    As used in this Settlement Agreement (as defined above), the following terms shall have the meanings set forth below.

1.1.1    "**Abuse**" means any of the following actual or alleged acts: (a) touching by the Perpetrator of the person's intimate body parts (genitals, breasts, or buttocks), the touching by the person of the Perpetrator's intimate body parts, showing pictures of the person's body or other persons' bodies, taking pictures of the person's body, showing pornography, or making images of the person while naked or engaged in any sexual activity, or any sexualized interaction including observing the person in bathing, toileting, or undressing that was made possible by the Perpetrator's position of authority, or by the inducement of the Perpetrator; or (b) sexual intercourse, simulated intercourse, masturbation, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, to the genital or anal openings: (i) of the person's body by any part of the Perpetrator's body or any object used by the Perpetrator for this purpose; or (ii) of the person's body by any

part of the body of the Perpetrator or by any part of the body of another person, or by any object used by the Perpetrator or another person for this purpose; (c) inappropriate physical contact and/or contact that infringes upon another's personal, physical boundaries including but not limited to groping, kissing, extended hugging, and/or any unwelcomed touching; (d) grooming or trying to create a special relationship, including but not limited to: talk of a sexual nature, talk of a romantic nature, communications expressing individual love to the person, as opposed to a salutation, providing material resources or experiences which induce the person into a relationship where trust is then violated; or (e) any actual or alleged acts of the kind described in subsections (a)-(c) above that occur between or among minors and that the Perpetrator orchestrates or encourages.  For the avoidance of doubt, "Abuse" also includes: any actual or alleged conduct which (a) is described in the Louisiana Child Victims Act or (b) would constitute (i) a sexual offense as defined in article 603(2) of the Louisiana Children's Code; (ii) sexual battery as defined in LA. REV. STAT. §§ 14:43.1; 14:43.1.1; 14:43.2; 14: or 43.3, (iii) a crime against nature as defined in LA. REV. STAT. § 14:89, or (i) pornography involving juveniles as defined in LA. REV. STAT. § 14:81.1, or with respect to the foregoing subsection (i)-(iv), any predecessor statute that prohibited such conduct at the time of the act.

1.1.2 "**Abuse Action**" means an Action asserting an Abuse Claim against any of the Covered Parties.

1.1.3 "**Abuse Claim**" means any Claim that has been asserted, or could be asserted, against any Settling Party or Non-Settling Insurer, that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively alleged Abuse that occurred, in whole or in part, before the applicable Debtor's Petition Date or Additional Debtors' Petition Date, including any such Claim that seeks monetary damages or any other relief, under any legal or equitable theory of liability, including, but not limited to, the following:  vicarious liability; *respondeat superior*; any conspiracy, fraud-based theory, including fraud in the inducement; any negligence-based or employment-based theory, including negligent hiring, negligent, insufficient, or inadequate supervision, retention or misrepresentation; any theory based on misrepresentation, concealment, or unfair practice; public or private nuisance; or any theory, including, without limitation, any theory based on public policy or any acts or failures to act by any Settling Party, or any other Entity for whom any Settling Party is allegedly responsible, including, but not limited to, any such Abuse Claim against any Settling Party, Non-Settling Insurer, or any other Entity for whom any Settling Party or Non-Settling Insurer is alleged to be responsible.  Abuse Claims are:  (a) the Known Abuse Claims, which are treated in Class 3; and (b) the Unknown Abuse Claims, which are treated in Class 4.  For the avoidance of doubt, "Abuse Claim" includes (a) all Unknown Abuse Claims, (b) Claims or causes of action defined or described in the Revival Window Laws against the Archdiocese or any other Archdiocese Bound Party, (c) Direct Action Claims, and (d) any Claim against the Archdiocese or any other Archdiocese Bound Party that is attributable to, arises from, is based upon, relates to, or results from Abuse that, as of the Petition Date is barred by any applicable statute of limitations, and in each case, irrespective of whether (x) such Claims also involve the conduct of joint tortfeasors (or similar concepts under applicable law), (y) such Claims arise under, or were revived pursuant to, the Revival Window Laws, or any future reviver law, statute, or binding

precedential decision passed or issued on or after the Bankruptcy Plan Effective Date, or (z) a proof of claim has been filed, before or after the Claims Bar Date, or not at all, or an Abuse Action has been commenced with respect to such Claim. "Abuse Claim" does not include: (a) Related Insurance Claims or Coverage Claims against Settling Insurers or Non-Settling Insurers; (b) Non-Insurer Contribution Claims with respect to any Abuse Claim; (c) Insurer Contribution Claims with respect to any Abuse Claim; or (d) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to a Claim against these dioceses only.   For the avoidance of doubt, a Claim based on Abuse solely occurring following the applicable Petition Date is not an Abuse Claim. Nothing in this definition shall constitute a waiver of any defense that would otherwise be available under applicable law to any Settling Party, the Settlement Trust, or any other Entity.

1.1.4   "**Abuse Claim Release and Certification**" means a written release in favor of the Insurer Released Parties, in the form of Exhibit C to the Acceptable Plan, or otherwise in form and substance acceptable to the Parties, which an Abuse Claimant must deliver before he or she is entitled to Settlement Trust Distributions, which shall provide that the Claimant releases the Insurer Released Parties from any and all Claims related to his/her Abuse Claim or any of the Archdiocese Policies, subject to Section 12.14 and related provisions of the Plan.

1.1.5   "**Abuse Claimant**" means the holder of an Abuse Claim, including, but not limited to, any Known Abuse Claim, Unknown Abuse Claim, or Direct Action Claim.  For the avoidance of doubt, Abuse Claimants are Creditors.  The definition of an Abuse Claimant includes the legal representative of the holder of an Abuse Claim, such as a bankruptcy trustee, the estate of a deceased individual who held an Abuse Claim, or the personal executor or personal representative of the estate of a deceased individual who held an Abuse Claim, as the case may be.  An Entity holding the following Claim is not an Abuse Claimant: (i) a Non-Insurer Contribution Claim with respect to such Abuse Claim; (ii) an Insurer Contribution Claim with respect to such Abuse Claim; (iii) a Claim against the Diocese of Houma-Thibodaux SD, or the Diocese of Baton Rouge SD, with respect to such Entity's claim against such dioceses only.

1.1.6   "**Acceptable Plan**" means the *Fourth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and The Official Committee of Unsecured Creditors* filed at Docket No. [—4419], and its exhibits and schedules, which as may be modified solely in accordance herewith (i.e., with the consent of the Insurer), and such modified plan constituting the "Acceptable Plan" for the purposes hereof.

1.1.7   "**Archdiocesan Parishes**" means all currently Catholic Church parishes and missions, as identified on Exhibit B-1, Part I, of the Acceptable Plan. Each of the Archdiocesan Parishes is organized as a non-profit corporation. For the avoidance of doubt, the definition of Archdiocesan Parishes does not include St. Louis Cathedral, Our Lady of Guadalupe Church & Shrine of St. Jude, or any Suppressed Archdiocesan Parish identified on Exhibit B-1, Part II, of the Acceptable Plan.

1.1.8   "**Archdiocesan Schools**" means the means the following schools that are owned and operated by the Archdiocese: (a) the Academy of Our Lady High School; (b) Archbishop Chapelle High School; (c)Archbishop Hannan High School; (d) Archbishop Rummel High School; (e) Archbishop Shaw High School; (f) Pope John Paul II High School; (g) St. Charles Catholic High School; (h) St. Scholastica Academy; and (i) St. Michael Special School.

1.1.9   "**Archdiocese Policies**" means (a) the contracts, binders, certificates, and policies of insurance that are listed on Schedule 1 hereto, and (b) all other known and unknown contracts, binders, certificates, or policies of general liability insurance, in effect on or before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date that were issued to, or for the benefit of, or subscribed on behalf or that otherwise actually insure, (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) policies issued to the Archdiocese that name as an insured or additional insured (or related concept under applicable law or document) the Diocese of Houma-Thibodaux or Diocese of Baton Rouge, but not policies issued to either of these dioceses that were not also issued to the Archdiocese or name it as insured, (iv) any Entity owned, created, operated, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, or (v) any institution, religious organization or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control or active management; in each case of (a) and (b), that were issued, subscribed to, or underwritten in whole or in part or allegedly issued, subscribed to, or underwritten in whole or in part by Insurer or any of its predecessors. 1

1.1.10 1.1.8"**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

1.1.11   1.1.9"**Additional Debtors**" means the Entities listed on Acceptable Plan Exhibit B-1.   As used herein, references to the "Additional Debtors" includes the Additional Debtor's Estates.

1.1.12 1.1.10"**Approval Motion**" means the motion filed in the Archdiocese Bankruptcy Court Case at Docket No. 4181 seeking approval of this Settlement Agreement as described in Section 22.1 of this Settlement Agreement.

1.1.13 1.1.11"**Approval Order**" means the order granting the Approval Motion described in Section 22.1 of this Settlement Agreement and providing the relief described

---

1 SPARTA Settlement Agreement to provide:

   For the avoidance of doubt, the "Archdiocese Policies" include any and all known and unknown contracts, binders, certificates, or policies of general liability insurance that were issued, allegedly issued, or may have been issued by or in the name of American Employers Insurance Company."

in Section ~~2~~2.1 of this Settlement Agreement and in substantially form attached **Exhibit A,** with only such changes as are satisfactory to Insurer.

1.1.14 ~~1.1.12~~"**Archbishop**" has the meaning given to it in Section 3.7.

1.1.15 ~~1.1.13~~"**Archdiocese Signatory Parties**" means, collectively, (a) the Debtor Parties and (b) the Non-Debtor Catholic Entities.

1.1.16 ~~1.1.14~~"**Bankruptcy Case**" means all of the following: (a) with respect to the Archdiocese, "Bankruptcy Case" has the meaning set forth in the Recitals; and (b) with respect to any given Additional Debtor, "Bankruptcy Case" means the case initiated when such Additional Debtor filed in the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.17 ~~1.1.15~~"**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Louisiana, having subject matter jurisdiction over the Bankruptcy Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

1.1.18 ~~1.1.16~~"**Bankruptcy Plan Effective Date**" means the date upon which a Plan approved by the Bankruptcy Court that contains terms and conditions consistent with those required by this Settlement Agreement becomes effective.

1.1.19 ~~1.1.17~~ "**Barred Claim**" means any Claim against a Settling Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with an Abuse Claim or any of the Archdiocese Policies, including, but not limited to, any: (a) Abuse Claim; (b) Direct Action Claim; (c) Coverage Claim; (d) Related Insurance Claim; (e) Non-Insurer Contribution Claim; (f) Insurer Contribution Claim; (g) Medicare Claim; (h) Penalty Claim; and (i) any other Claim that is otherwise released herein. A Barred Claim further includes any Claim against a Settling Party based on allegations that it is an alter ego or liable as a successor of an Entity that is not a Settling Party or that the Settling Party's corporate veil should be pierced on account of Claims against an Entity that is not a Settling Party or based on any other theory under which the legal separateness of any Person and any other Entity may be disregarded to impose liability for a claim on either such Entity. Notwithstanding the foregoing, Barred Claims do not include any Claims to the extent they are asserted against (x) Non-Settling Insurers or (y) Excluded Parties, notwithstanding that such Entity may also have asserted or be able to assert a Claim for contribution, indemnity, reimbursement, or subrogation against any Settling Party relating to or arising from a such Claim; provided, however, that, for the avoidance of doubt, (i) any Claims that assert liability against such Entity in conjunction with a Settling Party will in all events be Barred Claims as to the Settling Party, (ii) any such Claim for contribution, indemnity, reimbursement, or subrogation against a Settling Party is a Barred Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party for the purposes of this definition.

1.1.20 "**Catholic Charities**" has the meaning set forth in Section 6.3.15.

1.1.21 ~~1.1.18~~"**Channeling Injunction**" has the meaning set forth in Section 2.2.2.

1.1.22 ~~1.1.19~~"**Claim**" means any past, present or future claim, demand, Action, request, right, cause of action, suit, proceeding or liability of any kind or nature whatsoever, whether sounding in law, equity, tort, warranty, contract, or under any other theory, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been or may be asserted by or on behalf of any Entity, whether seeking damages (including compensatory, exemplary, punitive, or Penalty claims) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, or orders, including without limitation whether by way of direct action, subrogation, contribution, indemnity, alter ego, veil piercing, or regulatory action, or otherwise, regardless of whether such Claims arise under law, in equity, or under statute, before or after the Petition Date(s), or *in rem* or *in personam*, and include all Claims for damages to the environment or based on any theory of *respondeat superior,* vicarious, successor or transferee liability, or change in control, and any other claim within the definition of "claim" in section 101(5) of the Bankruptcy Code.

1.1.23 ~~1.1.20~~"**Claims Bar Date**" means the date(s) and time(s) indicated in the Final Order(s) (which may be the Plan Confirmation Order) setting the deadline(s) for filing proofs of Abuse Claim against the Debtor or Additional Debtor(s), as applicable.

1.1.24 ~~1.1.21~~"**CMS**" has the meaning set forth in Section 2.4.1.

1.1.25 ~~1.1.22~~"**Co-Insured Party**" means  any other Entity that is a "Named Assured" or "named insured" or "protected person" under the Archdiocese Policies, and all other Entities that are determined by agreement or a court of competent jurisdiction to be an "Assured," an "Additional Assured," an "insured," or "protected person" or otherwise entitled to insurance coverage under any Archdiocese Policies.

1.1.26 ~~1.1.23~~"**Conditional Payment**" means any payment made to an Abuse Claimant under the MMSEA, including any payment by a Medicare Advantage Organization (as defined in the MSPA).

1.1.27 ~~1.1.24~~"**Controlling Document Provision**" has the meaning given to it in Section 2.2.9.

1.1.28 ~~1.1.25~~"**Covered Parties**" or "**Archdiocese Bound Parties**" means, collectively, the following Entities: (a) the Debtor Parties; (b) the Reorganized Debtor; (c) the Reorganized Additional Debtors; (d) the Non-Debtor Catholic Entities; (e) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP; (f) the ~~applicable~~ Parish Schools and Archdiocesan Schools ~~(each as defined in the Acceptable Plan)~~; (g) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans; (h) any Co-Insured Party; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entities' predecessors, successors, assigns, subsidiaries, direct and indirect past, present, and future

affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, and estates. For the avoidance of doubt, the Entities in clauses (g), (h), and (i) are only Archdiocese Bound Parties in connection with the Archdiocese Policies.

1.1.29 ~~1.1.26~~"**Coverage Claims**" has the meaning set forth in the Recitals and further includes any Claim under relating to or arising out of the Archdiocese Policies or the rights and obligations thereunder, or the breach thereof, including any Claim seeking insurance coverage.

1.1.30 ~~1.1.27~~"**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed in the Archdiocese's Chapter 11 Case on May 20, 2020, [Docket Nos. 94 & 114], as such committee may be reconstituted from time to time.

1.1.31 ~~1.1.28~~"**Debtor**" or "**Archdiocese**" means, before the Bankruptcy Plan Effective Date, The Roman Catholic Church of the Archdiocese of New Orleans of Louisiana. As used herein, references to the "Debtor" or "Archdiocese" includes the Debtor's Estate.

1.1.32 ~~1.1.29~~"**Debtor Parties**" means (i) the Archdiocese and (ii) all of the Additional Debtors.

1.1.33 ~~1.1.30~~"**Diocese of Baton Rouge**" means the Diocese of Baton Rouge. References to the "Diocese of Baton Rouge CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) July 22, 1961 whichever occurred last; references to the "Diocese of Baton Rouge SD" refer to the period after such date.

1.1.34 ~~1.1.31~~"**Diocese of Houma-Thibodaux**" means the Diocese of Houma-Thibodaux. References to the "Diocese of Houma-Thibodaux CP" refer to the period prior to (i) its founding, (ii) erection, or (iii) June 5, 1977, whichever occurred last; references to the "Diocese of Houma-Thibodaux SD" refer to the period after such date.

1.1.35 ~~1.1.32~~"**Direct Action Claim**" means any Claim by any Entity that is a "direct action" as that term is used in La. Rev. Stat § 22:1269 *et. seq*, (or similar law in other jurisdictions) against any Insurer Released Party or related to any Archdiocese Policy, including, without limitation, (a) any claim that is similar or related to any Claim that could also be asserted by the Archdiocese or any Archdiocese Bound Party, (b) any Claim that directly or indirectly arises out of, relates to, or is connected with any Abuse Claim, (c) any Claim that directly or indirectly arises out of, relates to, or is in connection with any Insurer Released Party's  handling of any Abuse Claim under the laws of any applicable jurisdiction, or (d) any Claim arising under any law of any jurisdiction that may give a third

party a direct Cause of Action against an Insurer Released Party for monetary or other relief.[2]

1.1.36 ~~1.1.33~~"**Entity**" means any individual, corporation, corporation sole, partnership, association, limited liability company, joint stock company, proprietorship, unincorporated organization, joint venture, trust, estate, executor, legal representative, or any other entity or organization, as well as any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency, department, board or instrumentality thereof, any other "Person" within the definition of section 101(41) of the Bankruptcy Code, and any successor in interest, heir executor, administrator, trustee, trustee in bankruptcy, or receiver of any Entity and also has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.1.37 ~~1.1.34~~"**Escrow Agent**" means the agent appointed in accordance with the Escrow Agreement.

1.1.38 ~~1.1.35~~"**Escrow Agreement**" means the agreement governing the escrow which shall hold the Settlement Amount in escrow and in trust for the benefit of Insurer, and which shall provide for the: (i) transfer of the Settlement Amount, with any accrued interest, to the Settlement Trust following the Settlement Agreement Effective Date, or (ii) return of the Settlement Amount to Insurer, with any accrued interest, upon receipt of notice that the Settlement Agreement has been terminated.

1.1.39 ~~1.1.36~~"**Estate**" means the (a) the Debtor's estate, and (b) Additional Debtors' estates, each created pursuant to section 541 of the Bankruptcy Code.

1.1.40 ~~1.1.37~~ "**Excluded Party**" means the following Entities: (a) the Holy See (State of Vatican City); (b) any Perpetrator; and (c) any ~~religious order (i.e., institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy)~~ archdiocese or diocese (other than the Archdiocese itself), any Religious Order, or other Entity that is an affiliate or associated with the Roman Catholic Church (in its capacity as such, and other than (i) the Non-Debtor Catholic Entities; (ii) the Diocese of Houma-Thibodaux CP and Diocese of Baton Rouge CP, (iii) the ~~applicable~~ Parish Schools and Archdiocesan Schools ~~(each as defined in the Acceptable Plan)~~; and (iv)~~,~~ any Co-Insured Party); provided, however, that any Entity who has actually or allegedly acquired or been assigned the right to make a claim for coverage under any Archdiocese Policy is not an Excluded Party.[22]

1.1.41 ~~1.1.38~~"**Extra-Contractual Claim**" means any Claim against any Insurer Released Party seeking any type of relief, other than coverage or benefits, under or with respect to the Archdiocese Policies. Extra-Contractual Claims include Claims for

---

[2] ~~SPARTA Settlement Agreement will provide:~~

~~For the avoidance of doubt, Direct Action Claim does not include the following action: SPARTA Insurance Company v. Pennsylvania General Insurance Company, No. 21-11205 (D. Mass.).~~

compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs, or any other type of relief, alleging any of the following with respect to (a) any Archdiocese Policy; (b) any Claim allegedly or actually covered under a Archdiocese Policy; or (c) the conduct of any Insurer Released Party with respect to (a) or (b): (i) bad faith; (ii) failure to provide insurance coverage under any Archdiocese Policy, including any failure to investigate or to provide a defense or adequate defense; (iii) failure or refusal to compromise and settle any Claim insured under any Archdiocese Policy; (iv) failure to act in good faith; (v) violation or breach of any covenant or duty of good faith and fair dealing, whether express, implied, or otherwise; (vi) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (vii) violation of any unfair claims practices act or similar statute, regulation or code, including any statute, regulation, or code relating to unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising; (viii) any type of misconduct; or (ix) any other act or omission of any type by any Insurer Released Party for which the claimant seeks relief other than coverage or benefits under a Archdiocese Policy. "Extra-Contractual Claims" further include all Claims relating to any Insurer Released Party's (x) handling of any Claims under the Archdiocese Policies, (y) conduct in negotiating this Settlement Agreement and/or the Plan, and (z) conduct in the settlement of any Claims. For the avoidance of doubt, Extra-Contractual Claims of the Archdiocese Bound Parties are included within the property Insurer is purchasing hereunder.

1.1.42  1.1.39"**Final Order**" means an order as to which the time to appeal, petition for *certiorari*, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing will then be pending and in the event that an appeal, *writ of certiorari*, petition for review, or reargument or rehearing thereof has been sought, such order will have been affirmed by the highest court to which such order was appealed, or *certiorari* or review has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari,* petition for review, or move for reargument or rehearing will have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order will not cause such order not to be a Final Order.

1.1.43  1.1.40"**Gatekeeper Injunction**" has the meaning set forth in Section 2.2.2.

1.1.44  "**HH**" has the meaning set forth in Section 6.3.15.

1.1.45  1.1.41"**Indemnified Claims**" shall havehas the meaning set forth in Section 7.2 of this Settlement Agreement.

1.1.46  1.1.42"**Indemnity Cost Reserve**" shall havehas the meaning set forth in Section 7.2.1.

1.1.47  1.1.43"**Injunctions**" means the Sale Injunction, Channeling Injunction, Supplemental Settling Insurers' Injunction, and Gatekeeper Injunction.

1.1.48  ~~1.1.44~~ "**Insurance Settlement Agreement**" ~~shall have~~has the meaning set forth in the Acceptable Plan.

1.1.49  ~~1.1.45~~ "**Insurer**" means ~~[___].³~~ Twin City Fire Insurance Company and First State Insurance Company.

1.1.50  ~~1.1.46~~ "**Insurer Contribution Claim**" means any (a) Non-Settling Insurer Contribution Claim or (b) Settling Insurer Contribution Claim.

1.1.51  ~~1.1.47~~ "**Insurer Released Party**" means Insurer and its Related Parties, each in their capacities solely as such with respect to the Archdiocese Policies and all Subject Interests therein.

1.1.52  ~~1.1.48~~ "**Known Abuse Claims**" means any Abuse Claim, other than an Unknown Abuse Claim, against any Settling Party, Settling Insurer, and/or Non-Settling Insurer.

1.1.53  ~~1.1.49~~ "**Medicare Claims**" means any Claim by CMS, and/or any agent or successor of CMS, charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA or pursuing a Claim under MSP Provisions, relating to any payments in respect of any Abuse Claim, including any Claim for reimbursement of conditional payments, and any Claim relating to reporting obligations.

1.1.54  ~~1.1.50~~ "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which imposes reporting obligations on those Entities with payment obligations under the MSPA.

1.1.55  ~~1.1.51~~ "**MSPA**" means 42 U.S.C. §1395y et seq., or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith

---

³ ~~US Fire/International Settlement Agreement to include the following definition for "Insurer": "United States Fire Insurance Company ("U.S. Fire"), International Insurance Company ("International"), and Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company individually and, to the extent that policies issued by U.S. Fire and/or International were novated to or assumed by either or both of them ("U.S. Fire/International"). Any Entity that meets the definition set forth above shall be individually referred to as an "Insurer.'"~~

~~SPARTA Settlement Agreement to include the following definition for "Insurer":~~

~~"SPARTA Insurance Company and American Employers' Insurance Company ("SPARTA").~~"

~~Catholic Mutual Settlement Agreement to include the following definition for "Insurer":~~

~~"Catholic Mutual Relief Society of America."~~

~~National Union Settlement Agreement to include the following definition for "Insurer":~~

~~"National Union Fire Insurance Company of Pittsburgh, Pa., or its successors and assigns."~~

~~Puritan Insurance Company to include the following definition for "Insurer":~~

~~"Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation."~~

~~Twin City Settlement Agreement to include the following definition for "Insurer":~~

~~"Twin City Fire Insurance Company and First State Insurance Company."~~

or amendments thereto, including the regulations promulgated thereunder, found at 42 C.F.R. §411.1 et seq.

1.1.56 ~~1.1.52~~"**Non-Debtor Catholic Entity Policy Sale**" has the meaning set forth in Section 4.6.

1.1.57 ~~1.1.53~~"**Non-Debtor Catholic Entities**" collectively means those entities listed on the Acceptable Plan Exhibit B-2 who are not Additional Debtors, but which are (a) insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies and/or (b) have actually or allegedly acquired or been assigned the right to make a claim for coverage under any of the Archdiocese Policies (excluding, however, for the avoidance of doubt, the Debtor Parties, the Settlement Trust, and any Abuse Claimant).

1.1.58 ~~1.1.54~~"**Non-Insurer Contribution Claim**" means any Claim for contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law that is attributable to, arises from, is based upon, relates to, or results from, an Abuse Claim or payment of an Abuse Claim, and any other derivative or indirect Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, other than a Non-Settling Insurer Contribution Claim or a Settling Insurer Contribution Claim.

1.1.59 ~~1.1.55~~"**Non-Settling Insurer**" means any insurer (together with its Related Parties) that is not a Settling Insurer.

1.1.60 ~~1.1.56~~"**Non-Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Non-Settling Insurer against any Settling Insurer for the payment of money where such Non-Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.61 "**Parish Schools**" means the elementary Catholic schools that are owned and operated by the Archdiocesan Parishes. For the avoidance of doubt, the definition of Parish Schools expressly excludes Catholic schools that are owned and operated by Religious Orders and the Archdiocesan Schools. For the further avoidance of doubt, the Parish Schools are not separately incorporated.

1.1.62 ~~1.1.57~~"**Parties**" has the meaning set forth in the first paragraph of this Settlement Agreement.

1.1.63 ~~1.1.58~~"**Payment Security**]" ~~means~~ [**Intentionally Omitted** [**Reserved.**]⁴

1.1.64 ~~1.1.59~~"**Penalty Claims**" means a Claim against any Settling Party or Settling Insurer for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the applicable Archdiocese's Petition Date or Additional Debtors' Petition Date, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Creditor holding such Claim.

1.1.65 ~~1.1.60~~"**Perpetrator**" means an individual who personally committed or is alleged to have personally committed an act of Abuse. For the avoidance of doubt, the definition of Perpetrator does not include any individual who did not personally commit an act of Abuse or is not alleged to have personally committed an act of Abuse, but against whom an Abuse Claim or Non-Insurer Contribution Claim is asserted nonetheless, or may be asserted, by virtue of such individual's position or service as a member, representative, contractor, consultant, professional, or volunteer of the Archdiocese or any Non-Debtor Catholic Entity or any council or representative body associated with such Entities.

1.1.66 ~~1.1.61~~"**Person**" has the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

1.1.67 ~~1.1.62~~"**Petition Date**" means (a) with respect to the Archdiocese, May 1, 2020; and (b) with respect to each Additional Debtor, the date(s) on which such Additional Debtor files in the Bankruptcy Court its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.1.68 ~~1.1.63~~"**Plan**" refers to the Chapter 11 Plan of Reorganization for the Archdiocese and all Additional Debtors (and all exhibits annexed thereto) which shall, among other things, provide for the resolution of Abuse Claims and Subject Interests in the Archdiocese Policies as set forth herein, and which shall be in form and substance acceptable to Insurer in its sole discretion.

1.1.69 ~~1.1.64~~"**Plan Confirmation Order**" has the meaning set forth in Section 2.3.

1.1.70 ~~1.1.65~~"~~Pr~~[R]eserved ~~Coverage~~" ~~means~~ [**Intentionally Omitted.**]⁵

1.1.71 ~~1.1.66~~"**Purchased Property**" means any and all right, title, and interest (including all Subject Interests) in and to the Archdiocese Policies and the Related Insurance Claims and Coverage Claims.

---

⁴ ~~Intentionally omitted, except the SPARTA Settlement Agreement, in which this section will provide:~~

~~has the meaning given to it in Section 3.1.1 hereof.~~

⁵ ~~Intentionally omitted, except the Catholic Mutual Settlement Agreement, in which this section will provide:~~

~~"Preserved Coverage" means Insurer's obligations under Certificate No. [•] issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the personal injury claims listed in the attached Schedule [X], in each case, subject to the limits, declarations, terms and conditions of such certificate; provided, however, that Preserved Coverage shall not include coverage for any and all Abuse Claims or other Barred Claims.~~

1.1.72 ~~1.1.67~~"**Related Insurance Claim**" means (a) any Extra-Contractual Claim and (b) any other Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies, including, without limitation, bad faith Claims.

1.1.73 ~~1.1.68~~"**Related Party**" means, with respect to any Entity, such Entity's (a) predecessors, successors, assigns, and any Entity that assumed the obligation of the forgoing for the Archdiocese Policies by novation or otherwise (b) direct and indirect past, present, and future Affiliates (as defined in section 101(2) of the Bankruptcy Code), holding companies, merged companies, related companies, subsidiaries, divisions, acquired companies, joint ventures, joint venturers, (c) current and former employees, officers, directors, principals, partners, managing agents, trustees, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, brokers, adjusters, reinsurers, retrocessionaires, subrogees, agents, claims handling administrators, and other professionals, and (d) respective heirs, executors, estates, and nominees; and all Entities acting on behalf of, by, through or in concert with them, each solely in their capacities as such with respect to such Entity (and with respect to such Entity (including Insurer) that is an insurer of any Archdiocese Bound Party or has assumed the obligations of such by novation or otherwise, such insurer's applicable insurance policy(ies) (including the Archdiocese Policies)).[6]

1.1.74 "**Religious Order**" means, collectively, an institute of consecrated life and societies of apostolic life which enable people who profess the evangelical counsels of chastity, poverty (or perfect charity), and obedience by religious vows or other sacred bonds, to be joined to the Roman Catholic Church without becoming members of the Roman Catholic Church hierarchy.

1.1.75 ~~1.1.69~~"**Reorganized Additional Debtors**" means the Additional Debtors, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.76 ~~1.1.70~~"**Reorganized Debtor**" means the Debtor, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Bankruptcy Plan Effective Date, after giving effect to the transactions implementing the Plan.

1.1.77 ~~1.1.71~~"**Revival Window**" means Section 2 of La. Acts 2021, No. 322, as amended by La. Acts 2022, No. 386, and La. Acts 2024, No. 481.

---

[6] ~~The SPARTA Settlement Agreement will additionally provide:~~

~~For the purposes of this definition and this Settlement Agreement, Pennsylvania General Insurance Corporation shall not be considered a Related Party of SPARTA Insurance Company.~~

1.1.78 ~~1.1.72~~"**Revival Window Laws**" means the Revival Window, together with any other law that extends the prescriptive period or statute of limitations for asserting Abuse Claims under Louisiana or other applicable state law.

1.1.79 ~~1.1.73~~"**Sale Injunction**" has the meaning set forth in Section 2.1.

1.1.80 ~~1.1.74~~"**Settlement Agreement Effective Date**" means the first day on which: (a) the Archdiocese Signatory Parties and Insurer have executed this Settlement Agreement; (b) the Unknown Abuse Claims Representative shall have supported the releases provided for herein and the protections granted hereby and in the Plan in favor of the Insurer Released Parties, in a manner acceptable to Insurer in its sole discretion; (c) the Approval Order shall have become a Final Order; (d) the Plan Confirmation Order shall have become a Final Order; and (e) the Settlement Trust shall have been created pursuant to the Plan~~[~~; provided, however, ~~that in Insurer's sole discretion~~with the prior written consent of the Trustee, not to be unreasonably withheld, Insurer may elect to waive the conditions set forth in clauses (b) through (e) and pay or direct the payment of the Settlement Amount to the escrow or Settlement Trust prior to the occurrence of the events set forth in (b) through (e) hereof, in which case, the date of such payment shall be the Settlement Agreement Effective Date for all purposes hereunder including the date of the closing of the purchase and sale of the Archdiocese Policies.~~]~~[7]

1.1.81 ~~1.1.75~~"**Settlement Amount**" means the sum of ~~$[___] to be paid~~ nine hundred thousand dollars ($900,000.00) to be paid (in accordance with Section 3.1) by Insurer after satisfaction of all conditions precedent herein in accordance herewith.

1.1.82 ~~1.1.76~~"**Settlement Trust**" means the settlement trust established under the Plan for the purposes set forth therein, including assuming liability for all Channeled Claims (as defined in the Acceptable Plan) and Indemnified Claims (as defined herein), subject to the limitations on indemnification and liability contained in Section 7.2 of this Settlement Agreement.

1.1.83 ~~1.1.77~~"**Settlement Trust Agreement**" means the agreement between the Debtor and the Settlement Trustee governing the Settlement Trust, ~~to be filed with the Plan Supplement (as defined in~~in the form of Exhibit D-1 to the Acceptable Plan~~)~~.

1.1.84 ~~1.1.78~~"**Settlement Trust Allocation Protocol**" means the Settlement Trust Allocation Protocol (as defined and used in the Settlement Trust Agreement), ~~to be filed with the Plan Supplement.~~in the form of Exhibit D-2 to the Acceptable Plan.

1.1.85 ~~1.1.79~~"**Settlement Trust Documents**" means, collectively, (a) the Settlement Trust Agreement, (b) the Settlement Trust Allocation Protocol, and (c) any other agreements, instruments and documents governing the establishment and administration of the Settlement Trust, which shall be consistent with the terms of the Plan,

---

[7] ~~Note: Subject to further discussion.~~

as the same may be amended or modified from time to time in accordance with the terms thereof.

1.1.86 ~~1.1.80~~"**Settlement Trustee**" means the Entity appointed to act as the initial trustee of the Settlement Trust pursuant to the terms of the Settlement Trust Documents, along with any successor trustee appointed in accordance with the Settlement Trust Documents.

1.1.87 ~~1.1.81~~"**Settling Insurer Contribution Claim**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, allocation or reallocation, or reimbursement, or any other indirect or derivative recovery, by a Settling Insurer against any Settling Insurer or Non-Settling Insurer for the payment of money where such Settling Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

1.1.88 ~~1.1.82~~"**Settling Insurers**" shall have the meaning set forth in the Acceptable Plan.

1.1.89 ~~1.1.83~~"**Settling Insurers' Policies**" shall have the meaning set forth in the Acceptable Plan.

1.1.90 ~~1.1.84~~"**Settling Parties**" means, collectively, the following Entities: (a) Archdiocese Bound Parties; and (b) the Settling Insurers.

1.1.91 ~~1.1.85~~"**Subject Interests**" means all Claims, liens (as defined by Section 101(37) of the Bankruptcy Code), encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief, including: (a) all interests of the Archdiocese in, to and under the Archdiocese Policies; (b) all interests in, to, and under the Archdiocese Policies of any Entity other than the Archdiocese (including all Abuse Claimants and the Archdiocese Bound Parties); and (c) all interests in, to and under the Archdiocese Policies of any other Entity claiming coverage by, through, or on behalf of any Archdiocese Bound Party, including, without limitation, rights and interests as an insured, co-insured or additional insured, insurer or creditors of the Archdiocese Bound Parties; in each case within the meaning of "interest" as used in sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code. For the avoidance of doubt, a Direct Action Claim constitutes a Subject Interest. The meaning of Subject Interests also includes: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or  other title retention agreements, pledges, liens (including without limitation any statutory lien  on real and personal property and any and all "liens" as that term is defined and used in the  Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent  rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature,  if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of  income or other exercise of any attributes of ownership (the foregoing collectively referred to in  this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, obligations, demands, guaranties, options,  rights, contractual commitments, executory contracts, unexpired leases,

employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property.

1.1.92 1.1.86"**Supplemental Settling Insurers' Injunction**" has the meaning set forth in Section 2.2.2.

1.1.93 1.1.87"**Unknown Abuse Claim**" means an Abuse Claim that occurred before the Petition Date and the Abuse Claimant did not file a proof of claim by the applicable Abuse Claims Bar Date, for which there exists a valid legal excuse for not filing, as further defined in the in the Acceptable Plan.

1.1.94 1.1.88"**Unknown Abuse Claims Representative**" means Michael R. Hogan, the legal representative appointed by the Bankruptcy Court pursuant to the *Order (I) Appointing a Legal Representative to Represent the Interests of Unknown Tort Claimants, and (II) Approving the Retention of Michael R. Hogan as the Unknown Tort Claims Representative, Nunc Pro Tunc To July 26, 2021* (Docket No. 1012 ), any successor legal representative appointed by the Bankruptcy Court, or, on and after the Bankruptcy Plan Effective Date, any successor legal representative appointed in accordance with the applicable Settlement Trust Document.

1.2     Capitalized terms not defined in this Section 1 or elsewhere in this Settlement Agreement shall have the meanings given to them in the Bankruptcy Code.

## 2.     THE BANKRUPTCY CASE AND PLAN OF REORGANIZATION

17

2.1    On or before July 29, 2025, the Archdiocese shall file a motion in the Bankruptcy Court (the "**Approval Motion**"), in form and substance acceptable to Insurer in its sole discretion, that seeks the entry of an order in substantially the form attached as **Exhibit A** to this Settlement Agreement, or otherwise in form and substance acceptable to Insurer in its sole discretion (the "**Approval Order**"), that:

(a) approves this Settlement Agreement, including Insurer's buyback of the Archdiocese Policies and the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests, and otherwise authorizes the Parties to undertake the settlement and the transactions contemplated by this Settlement Agreement, in each case pursuant to sections 363(b), (f),and (m) of the Bankruptcy Code and any other applicable provisions of the Bankruptcy Code;

(b) contains an injunction (the "**Sale Injunction**") that, subject to and conditioned upon the Settlement Agreement Effective Date and the Insurer's payment of the Settlement Amount, bars all Claims against the Insurer Released Parties and their property and assets of each based on or arising out of any Subject Interests in the Archdiocese Policies including without limitation all Coverage Claims, Related Insurance Claims, and Barred Claims, leaving the Settling Insurers free and clear of all Subject Interests of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); any Abuse Claimant; or any holder of a Barred Claim pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code;

(c) provides that this Settlement Agreement is binding on the Archdiocese Signatory Parties, all other Settling Parties, any trust created in the Bankruptcy Case(s), and any successors of the foregoing; and

(d) provides, subject to and conditioned upon the Settlement Agreement Effective Date, that the Approval Order is binding on all Persons (including, for the avoidance of doubt, all Persons set forth in the foregoing (c)).

2.1.1    The Archdiocese shall provide written notice of the Approval Motion, which notice shall be in form and substance acceptable to Insurer, to, at a minimum, any known Archdiocese Bound Party, holder of an Abuse Claim, or party whose rights or interests may reasonably be considered to be impacted by the relief requested in the Approval Motion, and any party identified on Schedule 3 hereto.  In addition, the Archdiocese shall include notice of the Approval Motion together with notice provided with respect to confirmation of the Joint Plan, including publication notice of the hearing on the Approval Motion. The Archdiocese will provide a draft service list of the foregoing for Insurer's review and comment.

2.1.2    If any Entity files an objection to the Approval Motion, the Archdiocese and Creditors' Committee shall consult with Insurer in connection with filing any written response thereto.   The Archdiocese Signatory Parties, as applicable, and Creditors'

Committee shall take commercially reasonable steps to defend against any objection, appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order. Insurer will cooperate with the Archdiocese Signatory Parties and Creditors' Committee in this regard, including making commercially reasonable submissions.

2.2    The Archdiocese shall file and prosecute a joint Plan with the Creditors Committee, which shall be in form and substance satisfactory to the Insurer in its sole discretion, substantially in the form as the Acceptable Plan, which the Parties acknowledge and agree satisfies the terms of this Settlement Agreement. Any modifications to the Plan, the Settlement Trust Documents, the Plan Confirmation Order, or the Approval Order, including those relating to the Channeling Injunction, Supplemental Settling Insurers' Injunction, Gatekeeper Injunction, releases by holders of Abuse Claims, Insurers, Insurance Settlement Agreements, and related definitional terms, including, for the avoidance of doubt, "Abuse," "Abuse Claim," "Abuse Related Insurance Claims," "Channeled Claim," "Covered Parties," "Direct Action Claim," "Enjoined Party," "Insurer Contribution Claim," "Non-Insurer Contribution Claim," "Penalty Claims," "Protected Parties," "Settling Insurers," "Settling Insurer's Policies," "Subject Insurance Policies," "Subject Interests," or any exhibits, schedules, and documents related thereto, must be in all respects consistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties without Insurer's written consent in its sole discretion.

2.2.1    The Plan shall create the Settlement Trust, which shall be responsible for making any and all payments to the Abuse Claimants entitled to receive payment under the Plan and which shall assume all liability for Channeled Claims.

2.2.2    The Plan shall include: (a) an injunction in substantially the form included in Article [12.4] of the Acceptable Plan (the "**Channeling Injunction**"); and (b) an injunction in substantially the form included in Article [12.5] of the Acceptable Plan (the "**Supplemental Settling Insurers' Injunction**"); and (c) an injunction in substantially the form included in Article [12.6]8 of the Acceptable Plan (the "**Gatekeeper Injunction**").

2.2.3    The Plan shall incorporate by reference the releases and indemnities set forth in this Settlement Agreement, including that the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to all Indemnified Claims as forth in Section 7.2 of this Settlement Agreement.

2.2.4    The Settlement Trust Documents shall provide that as a condition to receiving payment from the Settlement Trust, all Abuse Claimants shall provide an Abuse Claim Release and Certification.

2.2.5    The Plan shall provide for the commencement, prior to the Court's consideration of the Approval Motion, by the Additional Debtors of Chapter 11 cases to be jointly administered with the Bankruptcy Case.

2.2.6    The Plan shall provide a supplemental bar date for the Additional Debtors in a form and substance satisfactory to the Insurer with respect to Abuse Claims against

the Additional Debtors and the form, manner, and deadline for filing proofs of claim and the treatment of confidential information contained therein.

2.2.7    The Plan shall provide that confirmation of the Plan will not occur unless all of the following conditions precedent have been satisfied: (a) the Plan Confirmation Order approves and implements the Injunctions and (b) the Bankruptcy Court shall have granted the Approval Motion in form and substance acceptable to Insurer in its sole discretion.

2.2.8    The Plan shall provide that the Bankruptcy Plan Effective Date will not occur unless all of the following conditions precedent have been satisfied or waived (as applicable with consent of Insurer): (a) the Plan Confirmation Order will have been entered by the Bankruptcy Court and become a Final Order, and (b) the Bankruptcy Court shall have entered the Approval Order (with both such Approval Order and this Settlement Agreement in form and substance acceptable to the Insurer) and such Approval Order shall have become a Final Order.

2.2.9    The Plan shall provide that (collectively, as follows, the "**Controlling Document Provision**") in the event of a conflict between (a) the Settlement Agreement, on the one hand, and (b) the Plan, on the other, the terms of the Settlement Agreement shall control and govern; and in the event of a conflict between the (x) Approval Order, on the one hand, and (y) Plan Confirmation Order, on the other, the terms of the Approval Order shall control and govern.

2.2.10    The Plan shall provide that the execution and delivery of this Settlement Agreement is a condition to entry of the Plan Confirmation Order and the occurrence of the Bankruptcy Plan Effective Date. The inclusion of this Settlement Agreement in the Plan shall not be waivable as a condition to entry of the Plan Confirmation Order or the occurrence of the Bankruptcy Plan Effective Date absent the prior written consent of the Settling Insurers.

2.3    The Debtor Parties shall seek and obtain entry of an order from the Bankruptcy Court, which order shall be in form and substance acceptable to the Parties, that: (i) approves the Plan pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code; (ii) contains the Channeling Injunction; (iii) ratifies the Sale Injunction as independent of the Channeling Injunction and Supplemental Settling Insurers' Injunction; (iv) contains the Gatekeeper Injunction; (v) provides that this Settlement Agreement is binding on any Settlement Trust created in the Bankruptcy Case, the Reorganized Debtor, the Reorganized Additional Debtors, and any successors of the Settlement Trust, Reorganized Debtor, or Reorganized Additional Debtors, and all of the Archdiocese Bound Parties; and (vi) contains the Controlling Document Provision (the "**Plan Confirmation Order**").

2.3.1    The Plan and Plan Confirmation Order must not be inconsistent with this Settlement Agreement and must not contain any provisions that diminish or impair the benefit of this Settlement Agreement to the Insurer Released Parties.

2.3.2    In seeking to obtain the Plan Confirmation Order, the Debtor and Additional Debtors will: (i) seek a confirmation hearing on an appropriately timely basis; (ii) urge the Bankruptcy Court to overrule any objections and confirm the Plan; and (iii) take all reasonable steps to defend against any objection, petition, motion, or other challenge to the Bankruptcy Court's entry of the Plan Confirmation Order.

2.3.3    Prior to entry of the Plan Confirmation Order, the Archdiocese and/or any applicable Additional Debtor shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Abuse Claim that (i) is asserted against any Debtor Party and (ii) implicates, or is reasonably likely to implicate, any Archdiocese Insurance Policies (including by alleging Abuse that took place during any policy period of any Archdiocese Policy).  If, prior to the Plan Confirmation Order becoming a Final Order, the Bankruptcy Court allows any Entity to prosecute any such Abuse Claim, the Debtor Parties shall defend themselves against such Abuse Claims and comply with the terms of any order of the Bankruptcy Court, and Insurer's rights and obligations relating to such litigation shall be determined by, and subject to, the terms and conditions of the Archdiocese Policies, this Settlement Agreement, and any applicable orders of the Bankruptcy Court.

2.3.4    The Plan and Plan Confirmation Order shall provide that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any Covered Party with respect to any Archdiocese Policy, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

2.3.5    Nothing in this Section or elsewhere in this Settlement Agreement shall bar any party from arguing that any appeal from the Plan Confirmation Order should be dismissed on grounds of statutory or equitable mootness or otherwise.

2.3.6    None of the releases, Injunctions, or other provisions of the Plan with apply to, or have any effect, on the rights of the Settling Insurers to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with any Settling Insurer's Policy.

2.4    The Settlement Trust Documents shall require the Settlement Trust to register as a Responsible Reporting Entity under the reporting provisions of MMSEA.

2.4.1    The Settlement Trust Documents shall require the Settlement Trust, at its sole expense, to timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated and to follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

2.4.2    The Settlement Trust Documents shall require the Settlement Trust to obtain, prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Abuse Claim, a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. §1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim.

2.5    The Debtor Parties and Reorganized Debtor and Reorganized Additional Debtors will undertake commercially reasonable actions to cooperate with Insurer in connection with responding to any inquiry from Insurer's regulators, auditors, reinsurers, or retrocessionaires.

2.6    From and after the execution date of this Settlement Agreement and until the earlier of: (A) occurrence of (i) the Settlement Agreement Effective Date and (ii) Insurer's remittance of the Settlement Amount (at which time this covenant is superseded by the releases provided in Section 4); and (B) the date on which this Settlement Agreement is terminated, (i) none of the Insurer Released Parties, the Debtor, the Additional Debtors or Creditors' Committee will initiate any litigation activity against the other in any Bankruptcy Case and (ii) the Archdiocese and the Insurer Released Parties shall cease all litigation activities against each other in the Bankruptcy Case, including that the Insurer Released Parties will neither object to any proposed Plan consistent with this Settlement Agreement, nor serve or compel any discovery in connection with the Bankruptcy Case; *provided that*: (y) neither the Archdiocese nor any Additional Debtor shall include any provision in any Plan that adversely affects the rights or benefits of the Insurer Released Parties under this Settlement Agreement, or that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement; and (z) neither the Archdiocese nor any Additional Debtor shall act, or fail to act, in such a way that otherwise violates, or is contrary to, the agreements and covenants contained in this Settlement Agreement. Notwithstanding the foregoing, the Insurer Released Parties may participate in the Bankruptcy Case for the purpose of supporting or enforcing any of the terms of this Settlement Agreement and protecting their rights.

2.7    The Parties shall each bear, as to each other only, their own costs, expenses, and counsel and professional fees in the Bankruptcy Case.

2.7    2.8From and after the execution date of this Settlement Agreement and until the date on which this Settlement Agreement is terminated, the obligations of the Debtors Parties set forth in this Section 2 shall be binding on the Debtor Parties.

## 3.    PAYMENT OF THE SETTLEMENT AMOUNTS

3.1    By no later than thirty (30) days after (a) the Settlement Agreement Effective Date, and (b) Insurer receiving appropriate instructions for the transmission of the payment to the Escrow Agent or Settlement Trust, Insurer shall pay (or cause to be paid) the Settlement Amount to the Settlement Trust or Escrow Agent pursuant to the Escrow Agreement.   Payment of the Settlement Amount may be by check, ACH transfer, wire transfer, or other method.

3.1.1    -[~~Intentionally Omitted~~Reserved.][8]

3.2      The delivery of the Settlement Amount to the Escrow Agent or Settlement Trust shall be in full and final settlement of all responsibilities under and arising out of the Archdiocese Policies, the sale of the ~~Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties back~~Purchased Property to Insurer free and clear of all Subject Interests of any Entity, and the other releases provided.

3.3      Subject to the occurrence of the Settlement Agreement Effective Date, the Parties agree:  (i) the Settlement Amount is the total amount that Insurer is obligated to pay on account of any and all Claims under, arising out of, relating to, or in connection with the Archdiocese Policies (including Barred Claims, and any reimbursement obligations for Conditional Payments under the MSPA); (ii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of anyone in connection with the Archdiocese Policies, including any payments in connection with amounts allegedly owed under the MSPA or in connection with any Claims, including any Barred Claim; (iii) under no circumstance will the Insurer Released Parties ever be obligated to make any additional payments to or on behalf of the Archdiocese Bound Parties or any Abuse Claimants in connection with the Archdiocese Policies; and (iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted[9]. The Parties further agree that the Settlement Amount includes the full purchase price of the Archdiocese Policies and Related Insurance Claims and Coverage Claims of the Archdiocese Bound Parties and consideration for the releases and other protections afforded by this Settlement Agreement.

3.4      The Parties represent and agree that (i) the consideration to be provided by Insurer pursuant to this Settlement Agreement constitutes a fair and reasonable compromise and exchange for the consideration granted to the Insurer Released Parties in this Settlement Agreement (including the releases set forth below), and (ii) the consideration to be provided by the Archdiocese Bound Parties to the Insurer Released Parties pursuant to this Settlement Agreement (including the releases set forth below) constitutes a fair and reasonable compromise and exchange for the consideration granted to the Archdiocese Bound Parties in this Settlement Agreement. The Insurer Released Parties are not acting as volunteers, and the Settlement Amount reflects potential liabilities and obligations to the Archdiocese Bound Parties of the amount Insurer allegedly is obligated to pay.

---

[8] ~~Intentionally omitted, except the SPARTA Settlement Agreement, in which this section will provide:~~

~~[SPARTA shall provide a standby letter of credit, in a manner acceptable to the Debtor, to secure payment of the Settlement Amount. References herein or in the Plan to "payment" of the Settlement Amount shall be deemed to include the draw down of the letter of credit, as applicable.]~~

[9]  ~~The Catholic Mutual Settlement Agreement will include the following~~

~~["(iv) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted *except for the Preserved Coverage*."]~~

3.5     Each of the Archdiocese Signatory Parties: (i) consents to the sale of the Archdiocese Policies and the Related Insurance Claims of the Archdiocese Bound Parties free and clear of all Subject Interests and Claims of all Persons, including, without limitation, the Archdiocese Bound Parties in accordance with the terms of this Settlement Agreement, and (ii) agrees and acknowledges that the contribution of the proceeds from such sale and settlement to the Settlement Trust, as provided in the Plan and this Settlement Agreement, is a fair and reasonable compromise and exchange for value and constitutes reasonable and adequate consideration for any Subject Interest or Claim the Archdiocese Bound Parties may have in the Archdiocese Policies.

3.6     The Parties further agree that they have attempted to resolve the matters set forth herein in compliance with both state and federal law and believe that the settlement terms adequately consider CMS's interest and do not reflect any attempt to shift responsibility for payment of medical expenses to CMS pursuant to 42 U.S.C. § 1395y(b).  The Parties acknowledge, understand, and agree that any present or future action or decision by CMS, including actions regarding an Abuse Claimant's eligibility or entitlement to receive Medicare or Medicare payments, will not render this Settlement Agreement (including the releases set forth in it) void or ineffective, or in any way affect the finality of this Settlement Agreement.  The Settlement Trust is responsible for all future medical payments, including any and all claims by CMS and/or CMS contractors that have been or may be in the future arising out of, relating (directly or indirectly) in any way to, or in connection with this Settlement Agreement.

3.7     To facilitate the purchase of the ~~Archdiocese Policies~~Purchased Property as set forth herein, ~~the Archdiocese and each of the other~~ each Archdiocese Bound Part~~y i~~es authorize~~d the Archbishop[10] or any other person employed by the Archdiocese that he~~to designate~~s, as its~~a lawful attorney in fact, with full powers of substitution, to execute any bill of sale or other document reasonably requested by the Archdiocese or Insurer to accomplish the sale and purchase contemplated herein. A form of Bill of Sale is attached hereto as **Exhibit B**.

## 4.     RELEASES AND SALE FREE AND CLEAR

4.1     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, with no further action being required, the Archdiocese Signatory Parties fully, finally, and completely remise, release, acquit, and forever discharge the Insurer Released Parties (including, for the avoidance of doubt, any of their reinsurers or retrocessionaires, solely in their capacity as such), from any and all past, present, and future: (a) Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies or Claims that are covered or are determined to be covered by agreement or a court of competent jurisdiction under the Archdiocese Policies, including, without limitation, any Barred Claims, Direct Action Claims, reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims, the handling of the Abuse Claims or the Bankruptcy Case. The Archdiocese Signatory Parties further acknowledge, stipulate, and agree that (x) the releases

---

[10] ~~As used herein, "Archbishop" refers to: (a) the office of the ordinary of the Archdiocese under Canon Law; (b) the Most Reverend Gregory Michael Aymond, the Archbishop on the Effective Date; and (c) any duly appointed or elected administrator of the Archdiocese pending the appointment of a new individual to serve as the Archbishop, and his duly appointed or elected successor.~~

in this Section 4.1 specifically include all Unknown Abuse Claims, and demands that are based in whole or in part on Unknown Abuse Claims and (y) **with respect to all Claims released under this Section 4.1, the Archdiocese Signatory Parties waive any and all provisions, rights, and benefits conferred by Cal. Civ. Code 1542 or any law of any state of the United States, or any principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code 1542, which provides: "a general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, that, if known by him or her, would have materially affected his or her settlement with the debtor or released party"** and (z) the releases in this Section 4.1 shall be equal in breadth to the broadest releases and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court.

4.2     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent, and with no further action being required, Insurer shall fully, finally, and completely remise, release, acquit, and forever discharge the Archdiocese Signatory Parties from any and all past, present, and future Claims that, directly or indirectly, arise out of, relate to, or are in connection with the Archdiocese Policies, including any Barred Claims, and reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case subject to the protections in favor of the Insurer Released Parties set forth herein[11].

4.3     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, none of the Archdiocese Signatory Parties or other Archdiocese Bound Parties shall assert against the Insurer Released Parties any Claim with respect to any matter, conduct, transaction, occurrence, fact, or other circumstance that, directly or indirectly, arises out of, relates to, or is in connection with any of the Archdiocese Policies, any Barred Claim, or any other matter released pursuant to Sections 4.1 and 4.2 above.

4.4     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer hereby buys back the Archdiocese Policies free and clear of all Subject Interests, including without limitation all Coverage Claims and Related Insurance Claims, of all Entities, including all Subject Interests of: the Archdiocese Bound Parties and any other Entity covered by, through, or on behalf of any of the Archdiocese Bound Parties; any Settling Party; any other insurer (including Non-Settling Insurers); and any Abuse Claimant, or any other holder of a Barred Claim.  This sale is pursuant to sections 363(b), (f), and (m) and 1141 of the Bankruptcy Code.  The Parties acknowledge and agree, and the Approval Order shall find and conclude, that upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount:

---

[11] ~~Catholic Mutual Settlement Agreement will include the following addition:~~

*~~"all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims or the Bankruptcy Case~~ provided that, the obligations of the applicable Archdiocese Bound Parties are not released from their obligations under the Archdiocese Policies with respect to the Preserved Coverage."*

4.4.1 Insurer is a good faith purchaser of the Archdiocese Policies and any Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), within the meaning of section 363(m) of the Bankruptcy Code, with all the protections afforded such a purchaser under 363(m) of the Bankruptcy Code;

4.4.2 the consideration exchanged constitutes a fair and reasonable settlement and compromise of the Parties' disputes and of their respective rights and obligations relating to the foregoing Archdiocese Policies and Subject Interests therein (including the Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), and constitutes reasonably equivalent value;

4.4.3 the releases in this Settlement Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy law;

4.4.4 the Archdiocese Policies and all Subject Interests therein (including, without limitation, to the extent applicable, any Direct Action Claim) shall be terminated and of no further force and effect;

4.4.5 Insurer's payment of the Settlement Amount constitutes Insurer's full and complete performance of any and all obligations under the Archdiocese Policies, including any performance owed to the Archdiocese Bound Parties or any holder or purported holder of any Claim against (including any Abuse Claim or Direct Action Claim) or Subject Interest in, the Archdiocese Policies, and exhausts all limits of liability of the Archdiocese Policies;

4.4.6 All Subject Interests the Archdiocese Bound Parties and any other Entity may have had, may presently have, or in the future may have in the Archdiocese Policies are released pursuant to the terms of this Settlement Agreement and policy buyback;

4.4.7 all per occurrence and/or aggregate limits of coverage under the Archdiocese Policies are fully eroded, exhausted and settled upon the Settlement Agreement Effective Date;

4.4.8 the Insurer would not pay the Settlement Amount without buyback of the Archdiocese Policies upon all of the terms and conditions set forth herein; and

4.4.9 the Archdiocese Signatory Parties accept the Settlement Amount in full and complete compromise and satisfaction of all Insurer Released Parties' past, present, and future obligations, including any obligations to any of the Archdiocese Bound Parties under such Archdiocese Policies or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever that are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies (including without limitation Coverage Claims and Related Insurance Claims of the Archdiocese Bound Parties), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether or not such Claims arise from, relate to, or

26

are in connection with the Abuse Claims, Barred Claims, the Bankruptcy Case, or otherwise.

4.5     Upon the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, Insurer shall have no obligation to pay, handle, object, or otherwise respond to any Claim against the Archdiocese Bound Parties; and the Archdiocese Bound Parties will: (i) will withdraw, and are deemed to have withdrawn, all outstanding tenders of Claims to the Insurer Released Parties for defense and indemnity; (ii) will not tender any Claims to the Insurer Released Parties; and (iii) will not request that the Insurer Released Parties fund any judgments, settlements, or defense costs that, in each case, are under, arise out of, relate (directly or indirectly) to, or connect in any way with the Archdiocese Policies issued by a Settling Insurer.

4.6     To the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer consent to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under this Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Subject Interests of any Entity in such Archdiocese Policies (the "**Non-Debtor Catholic Entity Policy Sale**"). The Plan Confirmation Order and Approval Order shall so provide and Insurer shall be designated in the Plan Confirmation Order as a good-faith purchaser of the Archdiocese Policies with all the protections afforded such a purchaser under section 363(m) of the Bankruptcy Code.

4.7     [~~Intentionally Omitted~~Reserved.]¹²

4.8     The Archdiocese Signatory Parties further covenant, stipulate and agree that the Insurer Released Parties are Settling Insurers entitled to the protection of the Injunctions for all Abuse Claims against any Insurer Released Party and to releases, injunctions, and other protections, including injunctions and releases of Abuse Claims against any insured or additional insured covered by any insurance policy issued by any Insurer Released Party, and to the assignment of the Non-Debtor Catholic Entities' Subject Interests, if any, in any Archdiocese Policy to the Debtor's Estate and sale thereof to Insurer, that are equal in breadth to the broadest releases, injunctions, and other protections afforded to any other Settling Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, and/or any applicable Insurance Settlement Agreement approved by the Bankruptcy Court. Without limiting the foregoing, the Insurer Released Parties shall receive protections against Claims by Non-Debtor Catholic Entities and any other Entity equal in breadth to the broadest protections received by any other Settling

---

¹² Intentionally omitted, except the Catholic Mutual Settlement Agreement, in which this section will provide:

4.15  Notwithstanding anything in this Settlement Agreement to the contrary, nothing in the Settlement Agreement shall sell or purchase the Preserved Coverage; erode, exhaust the limits of, or terminate the Preserved Coverage; release the Insurer from providing the Preserved Coverage to the applicable Archdiocese Bound Parties; or release the obligations of the applicable Archdiocese Bound Parties under the Archdiocese Policies with respect to such Preserved Coverage.

Insurer under the Plan as confirmed by the Bankruptcy Court, the Plan Confirmation Order, or any Insurance Settlement Agreement approved by the Bankruptcy Court.

4.9    If the Archdiocese Signatory Parties, or anyone of them, enter into any agreement (that is embodied in such agreement as approved by the Bankruptcy Court, the Plan, and/or the Plan Confirmation Order) with any other one of the Settling Insurers (including any Non-Settling Insurer who becomes a Settling Insurer) in the Bankruptcy Case, that provides that insurer with releases, injunctions or other protections that are more favorable than those contained in this Settlement Agreement, then this Settlement Agreement shall be deemed to be modified to provide Insurer with those more favorable injunctions, releases or other protections.

4.10    Notwithstanding anything in this Settlement Agreement, nothing in this Settlement Agreement is intended to or shall be construed to:

4.10.1    apply to or have any effect on the Insurer Released Parties' rights to reinsurance recoveries under any applicable reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer;[13]

4.10.2    release any Claims that any Insurer Released Party has or might have against any Non-Settling Insurer, except that, to the extent such other insurers have agreed or in the future agree to release any Claims against the Insurer Released Parties arising out of or related in any way to the Abuse Claims, then the Insurer Released Parties also release such Claims against such other insurers to the same extent; or

4.10.3    release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Settlement Agreement or the Plan (to the extent not inconsistent with this Settlement Agreement).

## 5.    TERMINATION OF AGREEMENT

5.1    The Parties may terminate this Settlement Agreement by mutual agreement in writing.

5.2    Insurer may terminate this Settlement Agreement upon fifteen (15) days written notice to the other Parties in the event of any of the following occurs prior to the Settlement Agreement Effective Date: (i) any of the Debtor Parties or the Creditors' Committee files a plan inconsistent with this Settlement Agreement; (ii) the Approval Order and the Plan Confirmation Order are not entered by February 15, 2026; (iii) the Bankruptcy Court enters an order that becomes a Final Order that (a) denies the Approval Motion or (b) is inconsistent with the Approval Order or the Plan Confirmation Order; (iv) a plan that is inconsistent with the terms of this

---

[13] SPARTA Settlement Agreement will provide:

For the avoidance of doubt, any release provided pursuant to this Settlement Agreement does not include any release by Insurer of any Claims against Pennsylvania General Insurance Corporation. Nothing in the Settlement Agreement shall impair any right of Insurer to pursue any direct claim or claim based on theories of contribution, indemnity, reimbursement, or subrogation against Pennsylvania General Insurance Corporation.

The Plan shall provide the same.

Settlement Agreement is confirmed; or (v) any Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

5.3     In the event of termination pursuant to this Section 5, unless the Parties agree otherwise in writing, the Parties' interests, rights, and obligations under the Archdiocese Policies shall not be impacted by such termination.

## 6.    REPRESENTATIONS AND WARRANTIES OF THE PARTIES

6.1     The Parties separately represent and warrant as follows:

6.1.1    To the extent it is a corporation, including a non-profit, religious, or charitable corporation, or other legal entity, each such Party has the requisite power and authority to enter into this Settlement Agreement and to perform the obligations contemplated by this Settlement Agreement[14], subject only to approval of the Bankruptcy Court; and

6.1.2    This Settlement Agreement has been analyzed by counsel to the Parties and executed and delivered in good faith pursuant to arm's length negotiations and for value and valuable consideration.

6.2     The Archdiocese Signatory Parties represent and warrant that they have not assigned, and will not assign, any Subject Interests in the Archdiocese Policies to any Entity, except for the avoidance of doubt, the assignment of the Non-Debtor Catholic Entities' Subject Interests in the Archdiocese Policies to the Debtor's Estate.

6.3     The Archdiocese Signatory Parties represent and warrant that (i) all Archdiocese Bound Parties have either signed this agreement, are represented herein by the Archdiocese or the Archdiocese Signatory Parties, or are juridical entities whose existence has been terminated as a matter of applicable non-bankruptcy law and (ii) the Archdiocese Signatory Parties are duly authorized to bind the Archdiocese Bound Parties who are not Archdiocese Signatory Parties. Without limiting the foregoing, the Archdiocese Signatory Parties represent and warrant that:

6.3.1    all entities known to them that are Co-Insured Parties (or under the Archdiocese Policies (by express reference, assignment, judicial determination or any related concept under applicable law or other document) under the Archdiocese Policies other than the Debtor, the Additional Debtors, the Parish Schools and Archdiocesan Schools, the Non-Debtor Catholic Entities, and the cemeteries identified in Section 6.3.3, are identified in Schedule 2 hereto, if any;[15]

---

[14] Specifically, each Archdiocese Signatory Party is duly authorized to execute this Settlement Agreement and any related document and the signatory hereto on behalf of such Archdiocese Signatory Party has full power and authority to bind such Archdiocese Signatory Party. The related corporate resolutions and incumbency certificates are identified in Schedule 4 and Schedule 5 respectively.

[15] SPARTA Settlement Agreement to include:

The Archdiocese Signatory Parties represent and warrant that they are not aware of being an "additional assured" (or related concept under applicable law or document) under any American Employers Insurance Company ("AEIC") policy.

Note: SPARTA Settlement Agreement Schedule 2, will be listed as "None."

6.3.2    the Archdiocesan Schools are not separately incorporated and are merely unincorporated operations of the Debtor; and the Parish Schools are not separately incorporated and are merely unincorporated operations of the Archdiocesan Parishes that are Additional Debtors;

6.3.3    the Debtor, through the Office of Catholic Cemeteries, operates certain cemeteries including, without limitation: All God's Babies Tomb & Holy Innocents Prayer Garden, St. Charles Cemetery, St. Joseph Cemetery #1, St. Joseph Cemetery #2, St. Louis Cemetery #1, St. Louis Cemetery #2, St. Louis Cemetery #3, St. Patrick Cemetery #1, St. Patrick Cemetery #2, St. Patrick Cemetery #3, St. Roch Cemetery #1, St. Roch Cemetery #2, St. Vincent De Paul Cemetery #1, St. Vincent DePaul Cemetery #2, which cemeteries are either: (a) Non-Debtor Catholic Entities or (b) not separately incorporated and are merely unincorporated operations of the Debtor;

6.3.4    Holy Redeemer School, Redeemer-Seton High School, and St. Joseph Benedictine High School were formerly owned and operated by the Archdiocese, but ceased operations and were closed by the Debtor at some point prior to the Petition Date, and were not separately incorporated and were merely unincorporated operations of the Debtor;

6.3.5    St. Robert Bellarmine School was formerly owned and operated by one or more of the Archdiocese Signatory Parties, but ceased operations and was closed by one or more of the Archdiocese Signatory Parties at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of one of the Additional Debtors;

6.3.6    Notre Dame Seminary and the Society of the Propagation of the Faith of the Archdiocese of New Orleans are owned and operated by the Archdiocese and are not separately incorporated, but are merely unincorporated operations of the Debtor;

6.3.7    San Pedro Pescador Church was owned and operated by the Archdiocese, but was closed by the Archdiocese prior to the Petition Date and was not separately incorporated, but was merely an unincorporated operation of the Archdiocese;

6.3.8    the following Roman Catholic Schools: the Academy of the Sacred Heart, Holy Cross, Jesuit, St. Mary's Academy, St. Mary's Dominican, Brother Martin, Mount Carmel Academy, Ursuline Academy, Cabrini, De La Salle, and St. Paul's School, are not Co-Insured Parties, named insured's or additional insureds (or related concept under applicable law or document) under the Archdiocese Policies, or institutions, religious organizations or subsidiaries of any organization listed in the declarations of the Archdiocese Policies, or any other organization coming under any named insured's control and active management, and were themselves not under the control or active management of the Archdiocese.;

6.3.9    St. John Vianney Preparatory School was formerly owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition

Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.10   the Louise Home a/k/a as the Louise Headstart Center was an unincorporated ministry of the Debtor;

6.3.11   Holy Guardian Angel was owned and operated by the Debtor, but ceased operations and was closed by at some point prior to the Petition Date, and it was not separately incorporated and was merely an unincorporated operation of the Debtor;

6.3.12   the Social Apostolate Housing Program was an unincorporated ministry of the Debtor;

6.3.13   at all times Tulane Catholic and the Newman Center were and are unincorporated activities of the Debtor, with no existence separate and apart from the Debtor;

6.3.14   Crescent City Convent Corporation, Lyric Realty and Parking Company, Inc., The Chinchuba Deaf-Mute Institute, People for Teens of St. Anthony of Padua Corporation, Kiwanis Foundation of New Orleans, Kiwanis Club of New Orleans, and Seminarians Parents Association, Inc. were never owned, operated, or controlled by the Debtor or the Additional Debtors and were neither insureds nor additional insureds under the Archdiocese Policies; and

6.3.15   (a) Catholic Charities Archdiocese of New Orleans ("**Catholic Charities**") owned and operated Hope Haven – Madonna Manor ("**HH**"), which was organized under Louisiana law; (b) HH was dissolved and its status as a juridical person was, thus, terminated as a matter of Louisiana law; (c) at all times, Catholic Charities was the sole member and/ or shareholder of HH; and (d) it is the intention of Catholic Charities that HH be bound by this Agreement as if it remained in existence and had signed the Agreement as a Party.

6.4   The Archdiocese Signatory Parties represent and warrant that they are not aware of any Abuse Claim asserted against any entity associated with the Archdiocese (including any parishes, institutions or religious organizations or any subsidiary of the person or organization listed in the declarations of the Archdiocese Policies, or any other organization coming under the Archdiocese's control and active management), that is not listed on Exhibit B-1 to the Acceptable Plan.

6.5   The Debtor represents and warrants that it will undertake good faith efforts to cause actual notice of the Approval Motion to be sent in accordance with Section 2.1.1 hereof.  Without limitation, the Debtor has sent or will send notice to the entities on Schedule 3.

6.6   The Archdiocese Signatory Parties and Insurer (limited to such Insurer person that worked on and were familiar with this Settlement Agreement and matters referenced therein), respectively, represent and warrant that they have completed a reasonable search for evidence of any policy of insurance issued by Insurer to the Archdiocese Signatory Parties that would afford coverage with respect to any Abuse Claim, Coverage Claim, or Related Insurance Claim and other

31

than the policies identified in Schedule 1, no such policies have been identified. The Archdiocese Signatory Parties further represent and warrant that, to the best of their knowledge after reasonably diligent investigation: there are no contracts, binders, certificates, and policies of insurance that insure or purport to insure (i) the Archdiocese or any of its predecessors in interest, successors, or assigns, (ii) any of the Additional Debtors or Non-Debtor Catholic Entities, (iii) (x) the Diocese of Houma-Thibodaux or (y) the Diocese of Baton Rouge (excluding, for the avoidance of doubt, policies issued to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD, but including any such policies issued to the Archdiocese that provide or may provide insurance coverage to the Diocese of Houma-Thibodaux SD or Diocese of Baton Rouge SD), or (iv) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Office of the archbishop for the Archdiocese of New Orleans, other than the policies identified in Schedule 1. Notwithstanding the foregoing, nothing in this Settlement Agreement, including the Schedules or Exhibits hereto, shall be construed as or deemed to be an admission or evidence that any binder, certificate, or policy of insurance was in fact issued or affords coverage in connection with any Abuse Claims.

6.7     The Debtor Parties represent and warrant that they have not in any way assisted, and covenant that they shall not in any way assist, any Entity in the establishment or pursuit of any Claim, including any Barred Claim, against the Insurer Released Parties.

## 7.     ACTIONS INVOLVING THIRD PARTIES

7.1     For purposes of supporting the releases granted in Section 4 and the extinguishment of any and all rights under the Archdiocese Policies resulting from the purchase and sale thereof contemplated by this Settlement Agreement, the Parties hereby agree as follows:

7.1.1     From and after (i) the occurrence of the Settlement Agreement Effective Date, and (ii) Insurer's payment of the Settlement Amount, if any other insurer of the Archdiocese Bound Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from Insurer as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for any of Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense or indemnity obligation of Insurer for any Claims or reimbursement obligations for Conditional Payments released or resolved pursuant to this Settlement Agreement, the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and the Settlement Trust shall voluntarily reduce any judgment or Claim against, or settlement with, such other insurers to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against Insurer. To ensure that such a reduction is accomplished, Insurer shall be entitled to assert this Section 7 as a defense to any action against it brought by any other insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Insurer from any liability for the judgment or Claim. Moreover, if a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against Insurer, such Claim may be asserted as a defense against a Claim by the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust in any coverage litigation (and the Archdiocese Signatory Parties, other Archdiocese Bound Parties, and/or the Settlement Trust may assert the legal and equitable rights of

32

Insurer in response thereto); and to the extent such a Claim is determined to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Archdiocese Signatory Parties, other Archdiocese Bound Parties, or the Settlement Trust shall be reduced dollar for dollar by the amount so determined.

7.1.2    Unless this Settlement Agreement is terminated, Insurer shall not seek reimbursement for any payments it makes under this Settlement Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other Settling Insurer unless that other insurer first seeks contribution, subrogation, indemnification, or similar relief from Insurer.   Notwithstanding the foregoing, nothing in this Settlement Agreement, the Approval Order or the Plan Confirmation Order shall be construed as prohibiting Insurer from seeking recovery (including with respect to the Settlement Amount or otherwise) from its reinsurers or retrocessionaires in their capacity as such.

7.2    Subject to the occurrence of the Settlement Agreement Effective Date and Insurer's payment of the Settlement Amount, and subject to the limitations set forth below, the Settlement Trust shall defend, indemnify, and hold harmless the Insurer Released Parties with respect to any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein, including any Claims made by (i) any Entity who is an insured (as a named insured, additional insured, or otherwise) under any of the Archdiocese Policies; (ii) any Entity who ~~has made, will make, or can make~~makes (a) an Abuse Claim or (b) a Related Insurance Claim; and (iii) any Entity who has actually or allegedly acquired or been assigned the right to make a Claim under any of the Archdiocese Policies (collectively, the "**Indemnified Claims**"), as set forth below: ~~16~~

7.2.1    The Insurer Released Parties shall have the right (but not the obligation) to (a) seek to enforce the Injunctions against any Entity seeking to assert an Indemnified Claim, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions) identified in this Section 7.2.  With the Insurer Released Parties' consent, such consent not to be unreasonably withheld, the Settlement Trustee can satisfy the obligations contained in (a) and (b) above.  An amount equal to [    ]~~17~~$10,715.00 (the "**Indemnity Cost Reserve**") shall be reserved from the Settlement Amount for payment of reasonable attorneys' fees, expenses, costs, and other amounts incurred by the Insurer Released Parties in defending against such Indemnified Claims, which amount shall be released from reserve if no Indemnified Claims are asserted within 30 days after the Revival Window has closed under every applicable Revival Window Law.

7.2.2    Neither any Archdiocese Bound Party, nor ~~T~~the Settlement Trust shall ~~not~~ in any way assist, any Entity in the establishment or pursuit of any Claim against any Insurer Released Party that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies or that was otherwise released herein.

---

~~16~~ *~~Note: Certain limitations on scope of indemnity subject to further discussion.~~*

~~17~~ ~~Amount to be equal to $250,000 for SPARTA, and an equivalent percentage of Settlement Amount for other Settling Insurers.  The Indemnity Cost Reserve is a reserve amount provided for each individual Settling Insurer and cannot be aggregated.~~

7.2.3    The Settlement Trust and Archdiocese shall support and join in the enforcement of the Injunctions against any Entity seeking to assert an Indemnified Claim; *provided that* if the Insurer Released Party(ies) elect(s) not to enforce the Injunctions in accordance with Section 7.2.1, the Settlement Trust shall (a) seek to enforce the Injunctions against such Entity, and (b) defend against any Indemnified Claims (to the extent such Claim is determined to not be barred by the Injunctions).

7.2.4    To the extent that a Final Order is entered against any Insurer Released Party with respect to any Indemnified Claim, the Settlement Trust shall indemnify and hold harmless such Insurer Released Party with respect thereto up to the Settlement Amount; *provided that* to the extent the Insurer Released Party(ies) elect not to enforce the Injunctions or defend against the Indemnified Claims, the Settlement Trust's indemnity obligation shall be limited to the amount of the Indemnity Cost Reserve; *provided further* that if the Settlement Trust breaches its obligation set forth in Section 7.2.2 hereof, the Settlement Trust's indemnity obligation shall not be so limited and shall instead be up to the Settlement Amount.  In no event shall the Settlement Trust's indemnity obligation exceed each individual Settling Insurer's Settlement Amount.  To the extent the Settlement Amount has been distributed in accordance with the Plan, the Settlement Trust's indemnification obligation shall be so reduced.

7.2.5    The indemnification provided for herein shall not impose liability on the Settlement Trustee or Settlement Trust professionals for their own acts or omissions; *further*, funds provided for the administration of the Settlement Trust or payment of the Settlement Trustee or Settlement Trust professionals shall not be subject to indemnification claims as provided for herein.

7.3    If any Entity attempts to prosecute a Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Archdiocese Policies against the Insurer Released Parties before the Approval Order and Plan Confirmation Order become Final Orders, then promptly following notice to do so from Insurer, the Archdiocese and/or the Additional Debtor(s), as applicable, will file a motion and supporting papers to obtain an order from the Bankruptcy Court pursuant to sections 362 and 105(a) of the Bankruptcy Code protecting the Insurer Released Parties from any such Claims until the Plan Confirmation Order has become a Final Order, the Bankruptcy Case is dismissed, or this Settlement Agreement is terminated under Section 5 hereof.

## 8.    MISCELLANEOUS

8.1    If any action or proceeding of any type whatsoever is commenced or prosecuted by any Entity not a Party to this Settlement Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Settlement Agreement, the Parties mutually agree to cooperate fully in opposing such action or proceeding.

8.2    The Parties will take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Settlement Agreement and to preserve its validity and enforceability.

34

8.3     The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Plan Confirmation Order, and the Bankruptcy Case. Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof.

8.4     Notwithstanding any language to the contrary in this Settlement Agreement, under no circumstance will any Archdiocese Signatory Party be obligated to take any action that violates any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, and if a court of competent jurisdiction determines that a term or condition in this Settlement Agreement does violate any obligation or duty owed by such Archdiocese Signatory Party to any other insurer, the applicable Archdiocese Signatory Party shall be relieved of such term or condition, but the scope and finality of the releases, injunctions, and buybacks set forth in this Settlement Agreement shall not be affected or modified.

8.5     This Settlement Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.6     This Settlement Agreement may be modified only by a written amendment signed by all of the Parties, and no waiver of any provision of this Settlement Agreement or of a breach thereof shall be effective unless expressed in a writing signed by the waiving Party.  The waiver by any Party of any of the provisions of this Settlement Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach. Any change or modification of this Agreement that would result in a material adverse change to the rights of the Abuse Claimants or Trust shall require the consent of the Creditors' Committee (if at the time of the proposed change or modification a Trustee has not been appointed) or Settlement Trustee (if at the time of the proposed change or modification a Trustee has been appointed and approved), as applicable, which consent shall not be unreasonably withheld.

8.7     By entering into this Settlement Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Settlement Agreement.  No part of this Settlement Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Settlement Agreement.  All actions taken and statements made by the Parties or by their representatives relating to this Settlement Agreement or participation in this Settlement Agreement, including its development and implementation, shall be without prejudice or value as precedent.

8.8     This Settlement Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession regarding liability, culpability, wrongdoing, or insurance coverage.  All related discussions, negotiations, and all prior drafts of this Settlement Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. Any evidence of the negotiations or discussions associated with this Settlement Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or

obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.8, in (i) an action or proceeding to enforce the terms of this Settlement Agreement, including any use as set forth in Section 7.1.1, or (ii) any possible action or proceeding between the Insurer Released Parties and any reinsurers. This Settlement Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Insurer Released Parties' obligations under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by Insurer.

8.9     None of the Parties shall make any public statements or disclosures (i) regarding another Party's rationale or motivation for negotiating or entering into this Settlement Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Archdiocese Policies or any other binder, certificate, or policy of insurance issued or determined by agreement or a court of competent jurisdiction to have been issued by the Insurer Released Parties, including handling of or involvement in connection with any claims asserted thereunder.

8.10     Neither this Settlement Agreement nor the rights and obligations set forth in this Settlement Agreement shall be assigned without the prior written consent of the other Parties.

8.11     This Settlement Agreement was jointly drafted by the Parties, and the wording of this Settlement Agreement was reviewed by legal counsel for each of the Parties, and each of them had sufficient opportunity to propose and negotiate changes prior to its execution. The language of all parts of this Settlement Agreement shall in all cases be construed as a whole according to its meaning and not strictly for or against any Party.

8.12     Section titles and headings contained in this Settlement Agreement are included only for ease of reference and shall have no substantive effect.

8.13     All notices, demands, or other communication to be provided pursuant to this Settlement Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other Entity or address as any of them may designate in writing from time to time:

If to the Debtor or Reorganized Debtor:

Mark A. Mintz
Samantha A. Oppenheim
Jones Walker LLP
Telephone: 504-582-8368
Telephone: 504-582-8641
Email: mmintz@joneswalker.com
Email: soppenheim@joneswalker.com

with copies to:

36

-and-

If to an Archdiocese Signatory Party other than a Debtor Party:

      As set forth on Plan Exhibit B-2.

If to Insurer or the Insurer Released Parties:

      Christine Zdrojeski
      Vice President
      The Hartford
      690 Asylum Avenue
      Hartford, CT 06155

         with copies to:

      Joshua D. Weinberg
-and-      Ruggeri Parks Weinberg LLP
      1875 K Street, NW 8th Floor
      Washington, D.C. 20006
      (202) 469-7750
      jweinberg@ruggerilaw.com

-and-

If to the Settlement Trust:

      Donald C. Massey
      Couhig Partners, LLC
      1100 Poydras Street, Suite 3250
      New Orleans, Louisiana 70163
      Telephone: (504) 599-5777
      Email: dmassey@couhigpartners.com

         with copies to:

_____-and-

37

1283

~~and~~

Andrew W. Caine
Pachulski, Stang, Ziehl & Jones LLP
10100 Santa Monica Blvd, Suite 1300
Los Angeles, CA 90067
Telephone: 310-277-6910
Email: acaine@pszjlaw.com

8.14     This Settlement Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument.  This Settlement Agreement may be executed and delivered by facsimile, e-mail, or other electronic image, which facsimile, e-mail, or other electronic image counterparts shall be deemed to be originals.

8.15     ~~8.14~~Nothing contained in this Settlement Agreement shall be deemed or construed to constitute (i) an admission by the Insurer Released Parties that the Archdiocese Bound Parties, or any other Entity, was or is entitled to any insurance coverage under the Archdiocese Policies or any other binder, certificate, or policy of insurance issued by the Insurer Released Parties or as to the validity of any of the positions that have been or could have been asserted by the any of the Archdiocese Bound Parties, (ii) an admission by any of the Archdiocese Bound Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by the Insurer Released Parties or any Claims that have been or could have been asserted by the Archdiocese Bound Parties against the Insurer Released Parties, or (iii) an admission by the Archdiocese Bound Parties or the Insurer Released Parties of any liability whatsoever with respect to any of the Abuse Claims.

8.16     ~~8.15~~The Parties to this Settlement Agreement, all of the Entities included in the definition of "Insurer Released Parties," and the Settlement Trust are intended beneficiaries of this Settlement Agreement.  Except as set forth in the preceding sentence or otherwise set forth in this Settlement Agreement, there are no third-party beneficiaries of this Settlement Agreement.

8.17     ~~8.16~~The Archdiocese Signatory Parties and the Insurer Released Parties shall each be responsible for their own fees and costs incurred in connection with the Bankruptcy Case, this Settlement Agreement, and the implementation of this Settlement Agreement, except as specifically set forth herein (including in Section 7).

8.18     ~~8.17~~The following rules of construction shall apply to this Settlement Agreement:

8.18.1   ~~8.17.1~~Unless the context of this Settlement Agreement otherwise requires: (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Settlement Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.18.2 ~~8.17.2~~References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Settlement Agreement.

8.18.3 ~~8.17.3~~The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Settlement Agreement when the stated intent is not achieved.

8.19 ~~8.18~~The Bankruptcy Court in the Bankruptcy Case shall retain jurisdiction to interpret and enforce the provisions of this Settlement Agreement, which shall be construed in accordance with Louisiana law without regard to conflicts of law principles thereof. The Insurer Released Parties do not, by virtue of this Section 8.1~~8~~9 or any other provision in this Settlement Agreement, consent to the Bankruptcy Court's jurisdiction as to any other matter.

8.20 ~~8.19~~This Settlement Agreement and each Debtor Party's obligations under this Settlement Agreement shall be binding on each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) and shall survive the entry of the Plan Confirmation Order; provided, however, after the occurrence of the Bankruptcy Plan Effective Date, recourse for all obligations, other than those set forth in Sections 6.5, 6.7, and 7 hereof or a remedy of specific performance, shall be to the Settlement Trust; provided further, however, if specific performance is not available, each Debtor Party, the Reorganized Debtor, and the Reorganized Additional Debtors (as applicable) may be held liable for an intentional breach of a representation in this Agreement or their bad faith material breach of this Agreement, and if liability on any such ground is established, then recourse may be had directly against the Debtor Party, Reorganized Debtor, and/or Reorganized Additional Debtor(s) responsible.

8.21 ~~8.20~~The obligations of the Parties herein, other than those conditioned upon the Settlement Agreement Effective Date, shall be binding upon execution hereof by the Parties.

8.22 ~~8.21~~Nothing in this Settlement Agreement will prevent Insurer from allocating the Settlement Amount among the Archdiocese Policies at Insurer's discretion.

8.23 ~~8.22~~If any provision of this Settlement Agreement, or the application thereof, shall for any reason or to any extent, be construed to be invalid or unenforceable, the remainder of this Settlement Agreement, and the application of such provision to other circumstances, shall be interpreted so as to best effect the intent of the Parties, unless such determination of invalidity or unenforceability deprives any Party of the substantial benefit of its bargain.

8.24 ~~8.23~~The Parties agree that all matters relating to the negotiation and terms of this Settlement Agreement (including by way of example and not limitation, all prior drafts, exchanges of terms, and related discussions or correspondence) shall be confidential and are not to be disclosed except by order of court or consent of the Parties in writing. This Section 8.2~~3~~4 does not prevent or prohibit the Parties from publicly filing on the docket in the Bankruptcy Case the final, executed copy of this Settlement Agreement.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

                     **The Roman Catholic Archdiocese of New Orleans**

Signed:        _____

                  _____

Date:          _____

*[Signatures Continue on Adjacent Pages]*

41

[Insurer]Twin City Fire Insurance Company and First State Insurance Company

Signed:

_____

Name Printed: _____

Title: _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

42

**All Archdiocese Signatory Parties**
**Other than the Archdiocese**

Signed: _____

Name Printed: _____

Title:  **Their Authorized Signer** _____

Date: _____

*[Signatures Continue on Adjacent Pages]*

43

**Exhibit A**

**Sale Order**

**Exhibit B**

**Bill of Sale**

## Schedule 1

### Archdiocese Policies

The following policies shall be included in the definition of Archdiocese Policies:

| Writing Company | Policy Number | Policy Period |
|---|---|---|
| First State Ins. Co. | 932030 | 3/1/1981-2/1/1982 |
| Twin City Fire Ins. Co. | TXS 100558 | 2/1/1982-2/1/1983 |
| Twin City Fire Ins. Co. | TXS 100641 | 2/1/1983-6/30/1983 |

## Schedule 2

## Other Co-Insureds Known to the Archdiocese Signatory Parties

For the avoidance of the doubt, the following entities are bound by the terms of the Settlement Agreement:[1]

### I.  Archdiocesan Parishes

1.  All Saints Roman Catholic Church, New Orleans, Louisiana

2.  Annunciation of the Blessed Virgin Mary Roman Catholic Church, Bogalusa, Louisiana

3.  Ascension of Our Lord Roman Catholic Church, LaPlace, Louisiana

4.  Assumption of Mary Roman Catholic Church, Avondale, Louisiana

5.  Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana[2]

6.  Blessed Francis Xavier Seelos Roman Catholic Church, New Orleans, Louisiana

7.  Blessed Sacrament-St. Joan of Arc Roman Catholic Church, New Orleans, Louisiana

8.  Blessed Trinity Roman Catholic Church, New Orleans, Louisiana

9.  Christ the King Roman Catholic Church, Gretna, Louisiana

10.  Corpus Christi-Epiphany Roman Catholic Church, New Orleans, Louisiana

11.  Divine Mercy Roman Catholic Church, Kenner, Louisiana

12.  Good Shepherd Roman Catholic Church, New Orleans, Louisiana

13.  Holy Family Roman Catholic Church, Franklinton, Louisiana

14.  Holy Family Roman Catholic Church, Luling, Louisiana

15.  Holy Name of Mary Roman Catholic Church, New Orleans, Louisiana

16.  Holy Spirit Roman Catholic Church, New Orleans, Louisiana

17.  Immaculate Conception Roman Catholic Church, Marrero, Louisiana

18.  Immaculate Conception Roman Catholic Church, New Orleans, Louisiana

19.  Mary Queen of Peace Roman Catholic Church, Mandeville, Louisiana

20.  Mary Queen of Vietnam Roman Catholic Church, New Orleans, Louisiana

21.  Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana, formerly known as St. Rosalie Roman Catholic Church, Harvey, Louisiana, for itself and as successor to St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc.

---

[1] Without limiting Section 6.4 of the Settlement Agreement, Insurer does not concede that any of the Entities listed on this schedule are "insureds," "additional insureds," or "protected persons" under its Archdiocese Policies.

[2] Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

22.     Mater Dolorosa Roman Catholic Church, New Orleans, Louisiana

23.     Most Holy Name of Jesus Roman Catholic Church, New Orleans, Louisiana

24.     Most Holy Trinity Roman Catholic Church, Covington, Louisiana

25.     Our Lady of Divine Providence Roman Catholic Church, Metairie, Louisiana

26.     Our Lady of Grace Roman Catholic Church, Reserve, Louisiana

27.     Our Lady of Lavang Roman Catholic Church, New Orleans, Louisiana

28.     Our Lady of Lourdes Roman Catholic Church, Slidell, Louisiana

29.     Our Lady of Lourdes Roman Catholic Church, Violet, Louisiana

30.     Our Lady of Perpetual Help Roman Catholic Church, Belle Chasse, Louisiana

31.     Our Lady of Perpetual Help Roman Catholic Church, Kenner, Louisiana

32.     Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana

33.     Our Lady of Prompt Succor Roman Catholic Church, Westwego, Louisiana

34.     Our Lady of the Holy Rosary Roman Catholic Church, Hahnville, Louisiana

35.     Our Lady of the Lake Roman Catholic Church, Mandeville, Louisiana

36.     Our Lady of the Rosary Roman Catholic Church, New Orleans, Louisiana

37.     Resurrection of Our Lord Roman Catholic Church, New Orleans, Louisiana

38.     Sacred Heart of Jesus Roman Catholic Church, Lacombe, Louisiana

39.     Sacred Heart of Jesus Roman Catholic Church, Norco, Louisiana

40.     St. Agnes Le Thi Thanh Roman Catholic Church, Marrero, Louisiana

41.     St. Agnes Roman Catholic Church, Jefferson, Louisiana

42.     St. Alphonsus Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

43.     St. Andrew the Apostle Roman Catholic Church, New Orleans, Louisiana

44.     St. Angela Merici Roman Catholic Church, Metairie, Louisiana

45.     St. Ann Roman Catholic Church and Shrine, Metairie, Louisiana

46.     St. Anselm Roman Catholic Church, Madisonville, Louisiana

47.     St. Anthony of Barataria Roman Catholic Church, Lafitte, Louisiana

48.     St. Anthony of Padua Roman Catholic Church, Luling, Louisiana

49.     St. Anthony of Padua Roman Catholic Church, New Orleans, Louisiana

50.     St. Anthony Roman Catholic Church, Gretna, Louisiana

51.     St. Augustine Roman Catholic Church, New Orleans, Louisiana

52.     St. Benedict Roman Catholic Church, Covington, Louisiana

2

53.     St. Benilde Roman Catholic Church, Metairie, Louisiana

54.     St. Bernard Roman Catholic Church, St. Bernard, Louisiana

55.     St. Catherine of Siena Roman Catholic Church, Metairie, Louisiana

56.     St. Charles Borromeo Roman Catholic Church, Destrehan, Louisiana

57.     St. Christopher Roman Catholic Church, Metairie, Louisiana

58.     St. Clement of Rome Roman Catholic Church, Metairie, Louisiana

59.     St. Cletus Roman Catholic Church, Gretna, Louisiana

60.     St. David Roman Catholic Church, New Orleans, Louisiana

61.     St. Dominic's Roman Catholic Church, New Orleans, Louisiana

62.     St. Edward the Confessor Roman Catholic Church, Metairie, Louisiana

63.     St. Francis of Assisi Roman Catholic Church, New Orleans, Louisiana

64.     St. Francis Xavier Roman Catholic Church, Metairie, Louisiana

65.     St. Genevieve Roman Catholic Church, Slidell, Louisiana

66.     St. Jane de Chantal Roman Catholic Church, Abita Springs, Louisiana

67.     St. Jerome Roman Catholic Church, Kenner, Louisiana

68.     St. Joachim Roman Catholic Church, Marrero, Louisiana

69.     St. Joan of Arc Roman Catholic Church, LaPlace, Louisiana

70.     St. John of the Cross Roman Catholic Church, Lacombe, Louisiana

71.     St. John Paul II Roman Catholic Church, Waggaman, Louisiana, formerly known as Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, for itself and as successor to St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc.

72.     St. John the Baptist Roman Catholic Church, Edgard, Louisiana

73.     St. John the Baptist Roman Catholic Church, Folsom, Louisiana

74.     St. Joseph Roman Catholic Church, Algiers, Louisiana

75.     St. Joseph the Worker Roman Catholic Church, Marrero, Louisiana

76.     St. Joseph's Roman Catholic Church, Gretna, Louisiana

77.     St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana, formerly known as St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc.

78.     St. Katharine Drexel Roman Catholic Church, New Orleans, Louisiana

79.     St. Louis, King of France, Roman Catholic Church, Metairie, Louisiana

80.     St. Luke the Evangelist Roman Catholic Church, Slidell, Louisiana

81.      St. Margaret Mary Roman Catholic Church, Slidell, Louisiana

82.      St. Maria Goretti Roman Catholic Church, New Orleans, Louisiana

83.      St. Mark Roman Catholic Church, Ama, Louisiana

84.      St. Martha Roman Catholic Church, Harvey, Louisiana

85.      St. Martin de Porres Roman Catholic Church, New Orleans, formerly known as Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc.

86.      St. Mary Magdalen Roman Catholic Church, Metairie, Louisiana

87.      St. Mary's Roman Catholic Church, New Orleans, Louisiana

88.      St. Matthew the Apostle Roman Catholic Church, River Ridge, Louisiana

89.      St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana, formerly known as St. John the Baptist Roman Catholic Church, Paradis, Louisiana, for itself and as successor to St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc.

90.      St. Patrick's Roman Catholic Church, New Orleans, Louisiana, for itself and as successor to St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc.

91.      St. Patrick's Roman Catholic Church, Port Sulphur, Louisiana

92.      St. Paul the Apostle Roman Catholic Church, New Orleans, Louisiana

93.      St. Peter Claver Roman Catholic Church, New Orleans, Louisiana

94.      St. Peter Roman Catholic Church, Reserve, Louisiana, for itself and as successor to St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc.

95.      St. Peter's Roman Catholic Church, Covington, Louisiana

96.      St. Philip Neri Roman Catholic Church, Metairie, Louisiana

97.      St. Pius X Roman Catholic Church, New Orleans, Louisiana

98.      St. Raymond and St. Leo the Great Roman Catholic Church, New Orleans, Louisiana

99.      St. Rita Roman Catholic Church, Harahan, Louisiana

100.      St. Rita Roman Catholic Church, New Orleans, Louisiana

101.      St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana[3]

102.      Sts. Peter and Paul Roman Catholic Church, Pearl River, Louisiana

103.      The Congregation of St. Rita Roman Catholic Church of Harahan

---

[3]      As stated in footnote 2, Assumption of the Blessed Virgin Mary Roman Catholic Church, Braithwaite, Louisiana, and St. Thomas Roman Catholic Church, Pointe a La Hache, Louisiana operate jointly as one Archdiocesan Parish.

4

104.    The Visitation of Our Lady Roman Catholic Church, Marrero, Louisiana

## II.    Suppressed Archdiocesan Parishes[4]

1.    Blessed Sacrament, Inc.

2.    Epiphany, Inc.

3.    Immaculate Heart of Mary, Inc.

4.    Incarnate Word, Inc.

5.    Our Lady of Good Counsel, Inc.

6.    Our Lady of Good Harbor, Inc.

7.    Our Lady of Lourdes, New Orleans, Louisiana, Inc.

8.    Our Lady of the Sacred Heart, New Orleans, Louisiana, Inc.

9.    Our Lady Star of the Sea, Inc., formerly known as Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana

10.    St. Ann, New Orleans, Louisiana, Inc.

11.    St. Bonaventure, Inc., formerly known as St. Bonaventure Roman Catholic Church, Avondale, Louisiana

12.    St. Frances Xavier Cabrini, Inc.

13.    St. Francis de Salles, Inc.

14.    St. Gabriel, Inc., formerly known as St. Gabriel Roman Catholic Church, New Orleans, Louisiana

---

[4]    The Suppressed Archdiocesan Parishes no longer operate as separate church parishes.  The Suppressed Archdiocesan Parishes were not dissolved, and may own property.

Following Hurricane Katrina, the operations of certain of the Suppressed Archdiocesan Parishes were combined with Archdiocesan Parishes.  In 2024, in the ongoing aftermath of Hurricane Ida and a result of storm damage, the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental statistics, and financial difficulties encountered, the following additional Suppressed Archdiocesan Parishes were canonically merged with neighboring Archdiocesan Parishes: (a) St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert, Inc., was canonically merged into St. Peter Roman Catholic Church, Reserve, Louisiana; (b) (i) St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and (ii) St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc., were both canonically merged into Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, now known as St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana; (c) St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc., was canonically merged into St. Rosalie Roman Catholic Church, Harvey, Louisiana, now known as Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana; (d) St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc., was canonically merged into Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, now known as St. John Paul II Roman Catholic Church, Waggaman, Louisiana; (e) St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc., was canonically merged into St. John the Baptist Roman Catholic Church, Paradis, Louisiana, now known as St. Michael the Archangel Roman Catholic Church, Paradis, Louisiana; (f) Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc., was canonically merged into St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, now known as St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana; and (g) St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc., had its canonical territory divided so that (i) the area north of the Pontchartrain Expressway was canonically merged into St. Patrick's Roman Catholic Church, New Orleans, Louisiana, and (ii) the area south of the Pontchartrain Expressway was canonically merged into St. Alphonsus Roman Catholic Church, New Orleans, Louisiana.

15.    St. Gertrude, Inc., formerly known as St. Gertrude Roman Catholic Church, Des Allemands, Louisiana

16.    St. Henry's, Inc.

17.    St. Hubert, Inc., formerly known as St. Hubert Roman Catholic Church, Garyville, Louisiana

18.    St. James Major, Inc., formerly known as St. James Major Roman Catholic Church, New Orleans, Louisiana

19.    St. John Bosco, Inc., formerly known as St. John Bosco Roman Catholic Church, Harvey, Louisiana

20.    St. John the Baptist, New Orleans, Louisiana, Inc.

21.    St. Julian Eymard, Inc.

22.    St. Lawrence the Martyr, Inc.

23.    St. Louise de Marillac, Inc.

24.    St. Maurice, Inc.

25.    St. Monica, Inc.

26.    St. Philip the Apostle, Inc.

27.    St. Raymond's, Inc.

28.    St. Rose of Lima, Inc.

29.    St. Theresa of Avila, Inc., formerly known as St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana

30.    St. Theresa of the Child Jesus, Inc.

31.    The Congregation of Saints Peter and Paul Roman Catholic Church

32.    The Congregation of St. Cecelia Roman Catholic Church

33.    The Congregation of the Annunciation Roman Catholic Church

34.    The Congregation of the Holy Trinity Roman Catholic Church


**III.    Archdiocesan Agencies**

1.    Archdiocesan Spirituality Center

2.    Catholic Charities Archdiocese of New Orleans

3.    Catholic Charities Children's Day Care Centers

4.    Catholic Charities Group Homes (merged into Catholic Charities Archdiocese of New Orleans)

5.    Clarion Herald Publishing Company

6.    Korean Catholic Community of New Orleans, Inc.

7.      Notre Dame Seminary

8.      Our Lady of Mount Carmel Latin Mass Community, Covington, Louisiana

9.      Pace Greater New Orleans

10.     Padua House (merged into Catholic Charities Archdiocese of New Orleans)

11.     Philmat, Inc.

12.     Project Lazarus

13.     Roman Catholic Center of Jesus the Lord

14.     School Food and Nutrition Services of New Orleans, Inc.

15.     Second Harvest Food Bank of Greater New Orleans and Acadiana

16.     St. Jude Community Center, Inc.

17.     St. Michael Special School

18.     St. Thérèse Catholic Academy

19.     The Society for the Propagation of the Faith, Archdiocese of New Orleans


**IV.     Non-Debtor Catholic Entities**

**Archdiocesan Agencies**

1.      7887 Walmsley, Inc.

2.      Annunciation Inn, Inc.

3.      Archdiocese of New Orleans Indemnity, Inc.

4.      Aspiring Scholars

5.      Catholic Community Foundation Archdiocese of New Orleans

6.      Christopher Homes, Inc.

7.      Christopher Inn

8.      Dubourg Home

9.      Holy Redeemer Catholic Virtual Academy

10.     Holy Trinity Drive Land Corporation

11.     Iberia Investment Fund II, LLC

12.     Metairie III

13.     Metairie Manor

14.     Monsignor Wynhoven Apartments, Inc.

15.     Nazareth II

16.     Nazareth Manor

17.     New Orleans Archdiocesan Cemeteries

7

18.      Notre Dame Health System (f/k/a Chateau de Notre Dame)

19.      Rouquette III

20.      St. Anthony's Gardens

21.      St. Bernard II

22.      St. Bernard III

23.      St. Bernard Manor

24.      St. Martin's Manor, Inc.

25.      St. Tammany Catholic Cemetery

26.      St. Tammany Manor

27.      The Apartments at Mater Dolorosa

28.      The Mental Health Association Development Corporation

29.      Villa Additions, doing business as St. Teresa's Villa

30.      Villa St. Maurice, Inc.

8

**Schedule 3**

**Additional Notice Parties**

**Schedule 4**

**Form of Corporate Resolutions**

## **Schedule 5**

## **Form of Incumbency Certificates**

**Exhibit A**
**Form of Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-10846 (MSG) |
| | § | |
| THE ROMAN CATHOLIC CHURCH | § | CHAPTER 11 |
| OF THE ARCHDIOCESE OF NEW | § | |
| ORLEANS, *et al.*,[1] | § | SECTION A |
| | § | |
| DEBTORS. | § | COMPLEX CASE |
| | § | |

**ORDER (I) APPROVING [•]TWIN CITY FIRE INSURANCE COMPANY AND FIRST STATE INSURANCE COMPANY'S SETTLEMENT AGREEMENT, RELEASE AND BUYBACK, (II) APPROVING THE SALE OF THE ARCHDIOCESE POLICIES FREE AND CLEAR, (III) ENJOINING CLAIMS, AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated July 29, 2025 [D.E. 4181] and supplemented by the filing of the revised Settlement Agreement (as defined below) on October 27, 2025 [D.E.[*]] ("Approval Motion") of The Roman Catholic Church of the Archdiocese of New Orleans, the lead debtor and debtor-in-possession (the "Debtor" or "Archdiocese") and the other debtors and debtors-in-possession[2] (the "Additional Debtors" and, together with the Archdiocese, the "Debtor Parties") in the above-captioned chapter 11 cases, by and through their respective counsel, for entry of an order (this "Order") approving the settlement agreement, releases, insurance policy buyback, and related injunction-in-aid ("Settlement") by and among the Archdiocese, the Additional Debtors, the other Archdiocese Signatory Parties, the Creditors' Committee, and [•][3]Twin City Fire Insurance Company and First State Insurance Company ("Insurer" and, collectively with the

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtorsthe Debtor's federal tax identification number, are: [•]is 8966.

[2] In connection with the Plan, the Catholic Entities listed on Plan **Exhibit B-1** (the "**Additional Debtors**") filed individual chapter 11 cases. The Plan is a combined joint Plan for the Archdiocese and the Additional Debtors, and the Approval Motion is deemed to have been filed (and this Order is entered) in each Additional Debtor's bankruptcy case for purposes of the relief requested herein.

[3] [This Order is the proposed form of order for the Settling Insurers. The Debtor Parties will file proposed orders for each Settling Insurer prior to the Sale Hearing.]

foregoing, the "Parties"), pursuant to Sections 105(a) and 363 of Title 11 of the United States Code ("Bankruptcy Code") and Rules 2002(a)(2), 6004, and 9019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), in each case as described in the Approval Motion and the *Settlement Agreement, Release, and Policy Buyback* attached to this Order as **Exhibit 1**[4] (the "Settlement Agreement");[5] and the Bankruptcy Court having reviewed the Approval Motion and the Settlement Agreement; and it appearing that due and adequate notice of the Approval Motion and Settlement Agreement having been given to all Entities entitled thereto, and that no other or further notice need be given; and the Bankruptcy Court on November 17, 2025 at [[ ] AM/PM]9:00 AM having held a hearing (the "Sale Hearing") to consider the relief requested in the Approval Motion; and upon the record of the Sale Hearing; and, after due deliberation, including, without limitation, for the reasons stated by the Bankruptcy Court on the record of the Sale Hearing, it appearing that the relief requested in the Approval Motion and granted herein is in the best interests of the Debtor Parties' estates (the "Estates"), their creditors, and other parties in interest; and good sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.     This Bankruptcy Court has jurisdiction over the Approval Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of this case and the Approval Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

[4]     [The form of Settlement Agreement is attached as **Exhibit 1** to this Order. Prior to the hearing on the Approval Motion, the Debtor Parties will file the proposed Settlement Agreement for each Settling Insurer.]

[5]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

B.      The statutory predicates for the relief sought in the Approval Motion are Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007. 9008 and 9019, and Rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Louisiana.

C.      It is necessary and appropriate for the Bankruptcy Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Settlement Agreement, and to adjudicate, if necessary, to the extent provided under 28 U.S.C. § 1334(b), any and all disputes arising from or relating to the Settlement Agreement or this Order.

D.      Proper, timely, adequate and sufficient notice of the Sale Hearing and Approval Motion and the relief requested therein, including, without limitation, the Settlement and the transactions described in the Settlement Agreement, including, without limitation, issuance of the injunction-in-aid referenced in the Settlement Agreement and the Approval Motion (all such transactions being collectively referred to, for convenience, as the "Sale Transaction") has been provided by the Debtor Parties in accordance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules to all interested Entities, including, without limitation the parties listed on **Schedule 3** of the Settlement Agreement, through service of the Confirmation Hearing Notice (as defined in the Plan) in accordance with the Disclosure Statement Order (also as defined in the Plan).

E.      Notice of the Approval Motion was ~~duly published as follows: [   ]~~ provided through publication of the Additional Debtors' Abuse Claims Bar Date Publication Notice (**Plan Exhibit G**) in daily and community newspapers throughout Louisiana.

F.      The notices described above were good, sufficient, and appropriate under the circumstances, and no other notice of the Approval Motion or Sale Hearing is required.

3

G.     The disclosures made by the Debtor Parties concerning the Settlement Agreement, the Sale Transaction, and the Sale Hearing were good, complete, and adequate.

H.     [The Unknown Abuse Claims Representative has consented to, and approved of the Settlement Agreement and Sale Transaction on behalf of Unknown Abuse Claims in connection with the treatment of such Claims under the Plan.][6]

I.     A reasonable opportunity to object or be heard with respect to the Approval Motion and the relief requested therein has been afforded to all interested Entities.

J.     The Archdiocese Signatory Parties, on their own behalf and on behalf of the Archdiocese Bound Parties, as applicable, have duly executed the Insurance Settlement Agreement by their duly authorized representative, agent and/or attorney in fact, and have full corporate power and authority to consummate the Sale Transaction pursuant to the Settlement Agreement and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Settlement Agreement, are required for the Archdiocese Bound Parties to consummate the Sale Transaction.

K.     The Debtor Parties have demonstrated (i) good, sufficient, and sound business purpose and justification and compelling circumstances for the Sale Transaction pursuant to Section 363(b) of the Bankruptcy Code and (ii) that the Sale Transaction is fair, reasonable, and in the best interests of their Estates and creditors pursuant to Bankruptcy Rule 9019. Among other things, the Debtor Parties have demonstrated that: the Settlement Agreement, and closing thereon, is necessary and appropriate to realize the value of the Purchased Property (as defined below) and maximize the value of their Estates; the probability of success for their Estates in litigation over the matters resolved by the Settlement Agreement is uncertain; litigation of the matters resolved

---

[6]     [To confirm consent and approval by the Unknown Abuse Claims Representative.]

4

by the Settlement Agreement would be complex and costly to their Estates; and the Settlement Amount is within the reasonable range of potential litigation outcomes. As used herein, "Purchased Property" means, collectively, all right, title and interest (including "Interests" as defined below) in and to the Archdiocese Policies issued by Insurer and the Related Insurance Claims and Coverage Claims of the Archdiocese Bound Parties; [**Intentionally Omitted.**][7]. The Sale Transaction constitutes a reasonable and sound exercise of the Debtor Parties' business judgment and their powers and duties under applicable law and should be approved. Approval of the Settlement Agreement and consummation of the Sale Transaction are in the best interests of the Debtor Parties' Estates, their creditors (specifically including the Abuse Claimants of the Debtor Parties), and other parties-in-interest, including because the proceeds of and from the Sale Transaction will benefit Abuse Claimants.

L.    The Settlement Agreement was negotiated, proposed, and entered into without collusion, in good faith, and from arm's length bargaining positions. Without limiting the foregoing, the Settlement Agreement resulted from a lengthy mediation that proceeded pursuant to a prior order of the Bankruptcy Court. Insurer is not an "insider" or "affiliate" (as those terms are defined in the Bankruptcy Code) of any of the Debtor Parties. None of the Archdiocese Bound Parties or Insurer have engaged in any conduct that would: (i) cause or permit the avoidance of the Settlement Agreement or the consummation of the Sale Transaction under Section 363(n) of the Bankruptcy Code; (ii) cause or permit the imposition of any costs or damages (including without

---

[7]    Intentionally omitted, except the Order approving the Catholic Mutual Settlement Agreement, in which this section will provide:

"*. . . provided that* the Purchased Property does not include Insurer's obligations under the Certificate No. [•] issued by Insurer to the Archdiocese to defend and indemnify the protected persons under such certificate with respect to the personal injury claims listed in Schedule [X] attached to the Settlement Agreement, in each case, subject to the limits, declarations, terms and conditions of such certificate (the "Preserved Coverage"), and *provided further that* the Preserved Coverage does not include coverage for any and all Abuse Claims or other Barred Claims."

5

limitation attorneys' fees or punitive damages) under Section 363(n) of the Bankruptcy Code; or (iii) prevent the application of Section 363(m) of the Bankruptcy Code. The releases, injunctions, policy buyback, and all other components of the Sale Transaction comply with the Bankruptcy Code and all applicable non-bankruptcy law.

M.      Pursuant to the Settlement Agreement and to the maximum extent permitted by applicable law, the Non-Debtor Catholic Entities and Insurer have consented to the assignment of the Non-Debtor Catholic Entities' Interests, if any, in the Archdiocese Policies to the Debtor's Estate, and each Non-Debtor Catholic Entity shall assign the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to the Debtor's Estate prior to the Settlement Agreement Effective Date, and the Debtor's Estate shall sell the Non-Debtor Catholic Entities' Interests in the Archdiocese Policies to Insurer on the Settlement Agreement Effective Date, in exchange for the Settlement Amount and other consideration provided by Insurer under the Settlement Agreement, pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, free and clear of all Interests of any Entity in such Archdiocese Policies (the "Non-Debtor Catholic Entity Policy Sale").

N.      Insurer is a good faith purchaser of the Purchased Property under Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, in that, among other things: (i) all payments to be made by or to Insurer, and other agreements or arrangements entered into by Insurer, including without limitation any escrow agreement pertaining to the payment of the Settlement Amount, in connection with the Sale Transaction have been disclosed; (ii) Insurer neither induced nor caused the Debtor Parties' chapter 11 filings; (iii) the negotiation and execution of the Settlement Agreement and any other agreements or instruments related thereto was in good faith, the arm's length transaction between Insurer and the other Parties was the product of mediation, and all Parties to the Settlement Agreement were, or

6

1310

had the opportunity to be, represented by counsel; and (iv) Insurer has not violated Section 363(n) of the Bankruptcy Code by any action or inaction. Insurer has at all times acted in good faith with respect to the Settlement Agreement and will continue to be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale Transaction.

O.     The terms and conditions of the Settlement Agreement are fair and reasonable. The Settlement Amount provided by Insurer pursuant to the Settlement Agreement (i) is fair and reasonable; (ii) monetizes the Purchased Property at the highest and best amount; (iii) will provide a higher and more certain recovery for the Debtor Parties' creditors than would be provided by any other practical available alternative given the complexity, cost, and uncertainty of such alternatives; (iv) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (v) constitutes reasonably equivalent value (as defined in Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law. The Settlement Amount is within the reasonable range of potential litigation outcomes, and the Debtor Parties' determination to accept the Settlement Amount and otherwise enter into the Settlement Agreement is a valid and sound exercise of their business judgment and consistent with the Debtor Parties' fiduciary duties. The releases to be made pursuant to the Settlement Agreement, including without limitation the releases of the Archdiocese Bound Parties and the Insurer Released Parties, are appropriate and should be approved.

P.     Insurer: (i) is not a mere continuation of any of the Archdiocese Bound Parties or the Estate of any of the Debtor Parties, nor is there any continuity of enterprise between Insurer and the Debtor Parties or Insurer and any of the other Archdiocese Bound Parties; (ii) is not holding itself out to the public as a continuation of any of the Archdiocese Bound Parties; and (iii) is not a

7

1311

successor to the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties for any purpose, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of Insurer and any of the Archdiocese Bound Parties.

Q.    The Settlement Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither Insurer nor any of the Archdiocese Bound Parties are fraudulently entering into the Sale Transaction.

R.    The transfer of the Purchased Property to Insurer (i) does not constitute an avoidable transfer under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law and (ii) does not and will not subject Insurer to any liability whatsoever with respect to the Debtor Parties' operation prior to the closing of the Sale Transaction (i.e., the occurrence of both the Settlement Agreement Effective Date and payment[8] of the Settlement Amount by Insurer to the Settlement Trust or Escrow Agent pursuant to the terms of Insurer's Settlement Agreement) (the "Closing").

S.    Insurer has agreed to purchase the Purchased Property pursuant to its Settlement Agreement and this Order; Insurer has not agreed to purchase, and is not purchasing, any other assets of the Estate of any of the Debtor Parties. Insurer has not agreed to assume, and after Closing shall have no obligations with respect to, any liabilities of the Archdiocese Bound Parties. Without limiting the generality of the foregoing, Insurer: (i) is not assuming and shall have no liability for any Claims arising from or relating to Abuse, the Purchased Property, or the Bankruptcy Case; and (ii) is not assuming and shall have no liability with respect to the Archdiocese's or any other

---

[8]    For the avoidance of doubt, all references to "payment" or "delivery" of the Settlement Amount by Insurer herein shall encompass all transfers of the Settlement Amount contemplated by the Settlement Agreement, including without limitation funding and transfer of funds to the Settlement Trust via letters of credit or escrow accounts.

Archdiocese Bound Party's obligations to Abuse Claimants, any other creditors, future claimants (including without limitation Unknown Abuse Claimants), or the Archdiocese's or any Archdiocese Bound Party's employees, in each case, by reason of the purchase of the Purchased Property under the Settlement Agreement.

T.    The Purchased Property constitutes property of the Debtor Parties' Estates, and the Archdiocese Bound Parties are the lawful owner of the Purchased Property and hold good title thereto. The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement will be a legal, valid, binding, and effective transfer of the Purchased Property, and will vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property, in each case free and clear of all Interests (as defined below, including, without limitation, any Interests of the Archdiocese Bound Parties, Abuse Claimants, and holders of Direct Action Claims). Upon Closing, Insurer shall have no liability for any Claims against or liabilities of the Debtor Parties, their Estates, or the other Archdiocese Bound Parties. Without limiting any of the foregoing, the Archdiocese, the Archdiocese Signatory Parties, and Insurer have agreed that, upon Closing: (i) the Purchased Property shall be deemed void *ab initio*, terminated, extinguished, and of no further force and effect; and (ii) all limits of liability of the Archdiocese Policies, regardless of how the Archdiocese Policies identify or describe those limits, including all per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

U.    Pursuant to §§ 363(f) and 105(a) of the Bankruptcy Code, and subject to the terms and conditions set forth in the Settlement Agreement, and upon Closing, without the need for further action, the Debtor Parties shall be deemed to have sold, transferred and conveyed the Purchased Property to the Insurer, and the Insurer shall be deemed to have purchased from the

Debtor Parties, all right title and interest in and under the Purchased Property, free and clear of all "Interests" of any Entity of any kind or nature whatsoever, to the fullest extent permitted under §§ 363(b) and (f) of the Bankruptcy Code, with such "Interests" including: (a) all mortgages, security interests, notes, security agreements, privileges, conditional sale or other title retention agreements, pledges, liens (including without limitation any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code), licenses, deeds of trust, equity interests, rights of first refusal, consent rights, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to in this order as "liens"), and (b) all debts arising in any way in connection with any acts of the Archdiocese Bound Parties and any and all Claims, Subject Interests, obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, any other employee, workers' compensation, occupational diseases or unemployment or temporary disability related claims, restrictions, rights of lesion beyond moiety, tort claims, and claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise; (c) any and all past, present, or future, actual, alleged or potential demand, liability, duty, obligation, claim, debt, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extra-contractual, direct or indirect (including without limitation, (i) any Abuse Claims, any Direct Action Claims, any Coverage Claims, and all other Barred Claims, and (ii) any claims for "bad faith," unfair claims

10

practices, breach of any implied duty of good faith and fair dealing, including, but not limited to, La. Rev. Stat. §§ 22:1892 and 22:1973, or any claim arising under the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269) and including all Claims and all "claims" as defined in § 101(5) of the Bankruptcy Code and all "demands" as defined in § 524(g)(5) of the Bankruptcy Code; and (d) any claim, remedy, liability, or demand against the Archdiocese Bound Parties or the Debtor Parties' Estates, including without limitation any asserted by any third party or any other person or entity, now existing or hereafter arising, whether or not such Claim, remedy, liability, or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, by whomever and by whatever procedure asserted, seeking damages or any other kind of relief whatsoever, including without limitation, those in any way relating to, arising out of, connected with, and/or involving the Purchased Property. Without limiting the generality of the foregoing and without finding that any Entity has any Interest in the Archdiocese Policies: (i) any Entity with Interests (if any) in or with respect to the Purchased Property who did not object, or who withdrew their objections to the Sale Transaction or the Approval Motion have waived their right to object to the sale of the Purchased Property free and clear of such Entity's Interests in the Purchased Property pursuant to Section 363(f)(2) of the Bankruptcy Code; and (ii) any such Entity with Interests in or with respect to the Purchased Property who objected to the Approval Motion and did not withdraw any such objection (a) are the holders of Interests subject to *bona fide* dispute under Bankruptcy Code Section 363(f)(4) and/or (b) can be compelled to accept a monetary satisfaction of their Interests within the meaning of Section 363(f)(5) of the Bankruptcy Code.

11

V.   If the sale of the Purchased Property were not free and clear of all Interests, including without limitation all Abuse Claims, Direct Action Claims, and Coverage Claims, or if the Insurer Released Parties would, or in the future could, be liable for any of the Interests, Insurer would not have entered into the Settlement Agreement and would not consummate the Sale Transaction or pay the Settlement Amount, thus adversely affecting the Debtor Parties, their Estates, and their creditors (including, without limitation, the Abuse Claimants), as well as the other Archdiocese Bound Parties.

W.   Issuing a supplemental injunction under Section 105(a) of the Bankruptcy Code as provided herein is essential to give effect to the sale of the Purchased Property to Insurer and this Order's approval of such sale free and clear of Interests pursuant to Section 363(f) of the Bankruptcy Code. The Sale Injunction set forth in Paragraph 23 below not only is a necessary prerequisite for Insurer's assent to the terms and conditions of its Settlement Agreement, such that Insurer will not consummate the Sale Transaction or pay its Settlement Amount in the absence of such an injunction from this Bankruptcy Court, but also is warranted to ensure compliance with this Order. Likewise, Insurer will not consummate the Sale Transaction or pay its Settlement Amount without the benefit of the releases contained in the Settlement Agreement and approval thereof by the Bankruptcy Court.

X.   Neither the Settlement Agreement nor the Sale Transaction constitute a *sub rosa* chapter 11 plan. The Settlement Agreement does not impermissibly restructure the rights of the Debtor Parties' creditors nor impermissibly dictate a chapter 11 plan for the Debtor Parties.

12

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.      The Approval Motion, and the relief sought therein (including without limitation the approval of the Settlement Agreements and the Sale Transaction) is GRANTED and APPROVED, in all respects as set forth herein.

2.      The findings of fact set forth above and conclusions of law stated herein, in addition to any findings of fact and conclusions of law stated by the Bankruptcy Court at the Sale Hearing, shall constitute this Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the Approval Motion pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.      Any and all objections, if any, to the Approval Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case the Entity asserting the objection or reservation of rights is enjoined from taking any action against the Insurer Released Parties or the assets or property of any Insurer Released Parties to recover any Claim or Interest held by such objecting Entity. Those parties who did not object or who withdrew their objections to the Approval Motion are deemed to have consented to the relief granted herein, pursuant to Section 363(f)(2) of the Bankruptcy Code.

**Approval of the Settlement Agreement**

4.      The Settlement Agreement is approved in its entirety, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Without limiting the generality of the foregoing, the settlement and releases of Claims as set forth in the Settlement Agreement is

hereby approved pursuant to Bankruptcy Rule 9019. All factors set forth in *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey* (*In re Cajun Elec. Power Coop.*), 119 F. 3d 349, 356 (5th Cir. 1997), either weigh in favor of the Settlement Agreement or do not apply.

5. Pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code, the Non-Debtor Catholic Entity Policy Sale, free and clear of all Interests of any Entity in the Archdiocese Policies, is hereby approved.

6. Pursuant to Section 363(b) of the Bankruptcy Code, each of the Parties is authorized to consummate the Sale Transaction under and in accordance with the terms and conditions of the Settlement Agreement, and the Archdiocese Bound Parties shall at all times act in accordance with the terms thereof.

7. ~~The Parties and their~~Any representative, agent or attorney~~s~~ in fact ~~under~~of the ~~Settlement Agreement or otherwise are~~Archdiocese Signatory Parties is authorized to execute any other documentation and perform such other ministerial tasks as may be reasonably necessary to effectuate the Settlement Agreement and the Sale Transaction on behalf of the Archdiocese Bound Parties, including without limitation, any bill of sale substantially in the form attached to the Settlement Agreement as **Exhibit B**.

8. Subject to all of the terms and conditions of the Settlement Agreement, upon Closing, the Archdiocese Bound Parties and Insurer shall be deemed to have granted the releases as set forth in the Settlement Agreement.

9. The Parties are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Settlement Agreement, together with all additional instruments and documents that may be reasonably necessary, convenient, or desirable to implement the

14

Settlement Agreement and consummate the Sale Transaction pursuant thereto and effectuate the provisions of this Order and the transactions approved hereby, and to take all further actions as may be requested by Insurer for the purpose of assigning, transferring, granting, conveying, and conferring to Insurer or reducing to Insurer's possession, the Purchased Property, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Settlement Agreement.

10.      Insurer is authorized and directed to pay the Settlement Amount under and subject to the satisfaction of all terms and conditions of the Settlement Agreement.

11.      The Settlement Amount provided by Insurer for the Purchased Property (i) does not increase the insolvency of the Debtor or any of the Additional Debtors, within the meaning of Title IV, Chapter 12 of the Louisiana Civil Code; and (ii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

12.      None of the Insurer Released Parties shall be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its or their rights or remedies under the Settlement Agreement or any other document related to the Settlement Agreement or the Sale Transaction. The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order; *provided*, *however*, that this Bankruptcy Court shall retain jurisdiction over any and all disputes with respect thereto.

13.      This Order shall be binding in all respects upon: (a) the Debtor Parties and their Related Parties; (b) the Debtor Parties' Estates; (c) the other Archdiocese Bound Parties; (d) all creditors of the Debtor Parties; (e) all Abuse Claimants and holders of Direct Action Claims; (f)

15

all holders of Interests whether known or unknown against or on all or any portion of the Purchased Property; (g) any Non-Settling Insurer; (h) the Insurer Released Parties; (i) the Purchased Property; (j) the Unknown Claims Representative; (k) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code; and (l) all Entities receiving notice (or deemed to have received notice pursuant to this Order) of the Approval Motion or the Sale Hearing, including without limitation all Entities listed on **Schedule 3** to the Settlement Agreement. The Settlement Agreement shall be binding in all respects upon: (x) the Debtor Parties, their Estates, and their Related Parties; (y) the Archdiocese Bound Parties; and (z) any trustee that may be subsequently appointed in the Bankruptcy Case, whether pursuant to any plan of reorganization or liquidation (including without limitation the Settlement Trustee appointed under the Plan), under Section 1104 of the Bankruptcy Code, or upon a dismissal or conversion of this Bankruptcy Case under Chapter 7 of the Bankruptcy Code.

### Transfer of Assets

14.     The conditions of Section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Archdiocese may sell the Purchased Property free and clear of any Interests therein.

15.     Pursuant to Sections 105 and 363(b) and (f) of the Bankruptcy Code, Bankruptcy Rule 9019, applicable Louisiana State law, the testimonial and other documentary evidence filed in support of the Approval Motion, and the record of the Sale Hearing, the Archdiocese has set forth the legal authority necessary to support this Bankruptcy Court's findings herein.

16

16.     Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Property and the Archdiocese Bound Parties' rights, title, and interest therein shall upon Closing be transferred to Insurer, free and clear of all Interests (including without limitation the Interests of any of the Archdiocese Bound Parties), and all such Interests are unconditionally and forever released and extinguished as against the Purchased Property. Without limiting the generality of the foregoing, the sale of the Purchased Property under the Settlement Agreement shall be free and clear of all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property.

17.     Upon the Closing, (a) all of the Archdiocese Bound Parties', the Debtor Parties' Estates', and the Settlement Trustee's rights under and with respect to the Purchased Property, if any, shall be permanently and irrevocably extinguished as if the Archdiocese Policies had never been issued and (b) the Insurer Released Parties shall be entitled to all of the protections afforded by §363(m) of the Bankruptcy Code.

18.     Upon Closing, all Entities (and their respective successors and assigns), including but not limited to all governmental, tax, and regulatory authorities, Archdiocese Bound Parties, Non-Settling Insurers, Abuse Claimants, Direct Action Claimants, trade and other creditors, and any Entities holding Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) against, in, or with respect to the Purchased Property, including, without limitation, such Interests arising or accruing under or out of, in connection with, or in any way relating to the transfer of the Purchased Property to Insurer,

17

hereby are forever barred, estopped, and permanently enjoined from asserting such Person's or Entity's Interests against the Purchased Property, the Insurer Released Parties, or the assets or property of any Insurer Released Parties. Effective upon Closing, none of the Insurer Released Parties shall have any liability for any Claims (a) against the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties or (b) that arise under or related in any way or in respect of the Purchased Property.

19.     The transfer of the Purchased Property to Insurer pursuant to the Settlement Agreement constitutes a legal, valid, and effective transfer of the Purchased Property, and shall vest Insurer with all right, title, and interest of the Archdiocese and the Archdiocese Bound Parties in and to the Purchased Property. Upon Closing, the Archdiocese Policies shall be terminated and no longer in force or effect, exhausted in retrospect as to all coverages, and all Interests that the Archdiocese or any other Person or Entity (including without limitation any of the other Archdiocese Bound Parties) may have had, may presently have, or may in the future have, in such Purchased Property are released and extinguished, and all such Entities (including without limitation the Archdiocese Bound Parties) hereby are forever barred, estopped, and permanently enjoined from asserting any such Interest against the Purchased Property and/or any of the Insurer Released Parties. Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent constitutes full and complete performance of any and all obligations under the Purchased Property, including without limitation any performance owed to the Archdiocese Bound Parties, and all limits of coverage under the Archdiocese Policies, including per person, per occurrence, per claim, "each professional incident," per event, per accident, total, and aggregate limits, shall be deemed fully and properly exhausted.

20.     Upon occurrence of the Closing:

18

(a)     all Interests the Archdiocese Bound Parties may have had, may presently have, or in the future may have in the Purchased Property, as applicable, are released pursuant to the terms of the Settlement Agreement; and

(b)     the Archdiocese Bound Parties accept Insurer's payment of the Settlement Amount to the Settlement Trust or Escrow Agent in full and complete satisfaction of Insurer's past, present, and future obligations, including, without limitation, any obligations to any of the Archdiocese Bound Parties under such Purchased Property or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever arising out of or related in any way to such Purchased Property (including Coverage Claims), whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, direct or indirect, and regardless of whether such Claims arise from, relate to, or are in connection with the Abuse Claims, Barred Claims, or otherwise.

### No Successor Liability

21.     The transfer of the Purchased Property to Insurer shall not result in any Insurer Released Parties or the Purchased Property having any of the following: (a) any liability or responsibility for Interests in or Claims against the Archdiocese Bound Parties or any of their Related Parties; (b) liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any Claims or Interests; or (c) any liability or responsibility to the Archdiocese Bound Parties except as is expressly set forth in the Settlement Agreement.

22.     Without limiting the generality of the foregoing, none of the Insurer Released Parties shall have any successor or vicarious liabilities of any kind or character, including, but not

19

limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability, *de facto* merger or joint venture, mere continuation or substantial continuity, whether known or unknown as of Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between the Archdiocese Bound Parties and any non-debtor subsidiary or affiliate (including, without limitation, any other Archdiocese Bound Party), liabilities relating to or arising from any environmental laws, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Purchased Property prior to Closing.

### Sale Injunction

23.    Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, and in consideration of the undertakings of Insurer pursuant to the Settlement Agreement, including Insurer's purchase of the Purchased Property free and clear of all Claims and Interests pursuant to Section 363(f) of the Bankruptcy Code as provided herein, any and all Entities that have held, now hold, or who may in the future hold any Claims or Interests (including without limitation all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Abuse Claimants, holders of Direct Action Claims, Perpetrators, Non-Settling Insurers, the Archdiocese Bound Parties, and all others holding Claims or Interests of any kind or nature whatsoever, including, without limitation, those Claims released or to be released pursuant to the Settlement Agreement), which Claims or Interests are under, arise out of, relate to, or connect in any way with an Abuse Claim or any of the Purchased Property, including, without limitation, (a) all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action

20

Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer

Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other

Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any

portion of the Purchased Property, (b) the payment of any of the Claims identified previously,

including, without limitation, Abuse Claims, Direct Action Claims, and Coverage Claims and (c)

all other Interests, are hereby permanently stayed, enjoined, barred, and restrained from taking any

Action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or

Interest against any of (x) the Insurer Released Parties, (y) the assets or property of any Insurer

Released Parties, or (z) the Purchased Property, including by:

(a)     commencing, conducting, or continuing in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind, in any forum, with respect to any such Claim or Interest, against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(b)     enforcing, levying, attaching, collecting, or otherwise recovering, or seeking to accomplish any of the preceding, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(c)     creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, or seeking to accomplish any of the preceding, any lien of any kind against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(d)     asserting, implementing, or effectuating any such Claim or Interest of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution or

recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any of the Insurer Released Parties, (B) any of the Insurer Released Parties, or (C) any property or interest in property of any Insurer Released Party; and

(e)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Order.

The actions described in this Paragraph 23 are "**Enjoined Actions**," and the injunction set forth herein is the "**Sale Injunction**." The Sale Injunction shall be a permanent injunction against the Enjoined Actions and may not be modified, dissolved, or terminated.

24.     The Sale Injunction shall be effective upon Closing. The Sale Injunction bars pursuit of the above referenced Claims and/or Interests against the Insurer Released Parties, or the property or assets of each (including, without limitation, the Purchased Property), but against no other person or thing.

25.     In a successful action to enforce this Sale Injunction in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

26.     The Sale Injunction shall not enjoin (a) the right of any Person or Entity against the Settlement Trust or a Non-Settling Insurer, or (b) the Settlement Trustee from enforcing the Settlement Trust Documents.

<p style="text-align:center"><strong>Preserved Coverage</strong></p>

27.     [**Intentionally Omitted.**]⁹

---

9   Intentionally omitted, except the Order approving the Catholic Mutual Settlement Agreement, in which this section will provide:

<div style="text-align:center">22</div>

## Additional Provisions

27. ~~28.~~From and after the date hereof, no Person or Entity shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreements and this Order.

28. ~~29.~~This Bankruptcy Court hereby retains jurisdiction, regardless of whether a chapter 11 plan has been confirmed in the Bankruptcy Case and consummated and irrespective of the provisions of any such plan or order confirming such plan, to enforce and implement the terms and provisions of the Settlement Agreement, all amendments thereto, any waivers and consents thereunder, and of any agreement(s) executed in connection therewith in all respects, including but not limited to retaining jurisdiction to: (a) compel delivery of the Purchased Property to Insurer in accordance with the terms of the Settlement Agreement; (b) resolve any dispute, controversy, or claim arising under or related to the Settlement Agreement, or the breach thereof; and (c) interpret, implement, and enforce the provisions of this Order and resolve any disputes related thereto.

29. ~~30.~~Nothing contained in any plan confirmed in the Bankruptcy Case or any order of this Bankruptcy Court confirming such plan shall conflict with or derogate from the provisions of the Settlement Agreement or the terms of this Order.

30. ~~31.~~This Order shall not limit or preclude the entry or effectiveness of any additional releases or injunctions that may be granted protecting the Insurer Released Parties and/or the assets or property of any Insurer Released Parties in connection with, or as part of, any order confirming a chapter 11 plan.

---

~~"Nothing in this Order, the Settlement Agreement or the Sale Transaction affects Insurer's Preserved Coverage or the Archdiocese Bound Parties' continuing obligations in connection with the Preserved Coverage under the Archdiocese Policies issued by Insurer, all of which shall survive the Settlement Agreement Effective Date, Bankruptcy Plan Effective Date and the closing of the Sale Transaction."~~

23

31.   32. The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Settlement Agreement be authorized and approved in its entirety.

32.   33. The transactions contemplated by the Settlement Agreement are undertaken by Insurer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code. Insurer is a good faith purchaser of the Purchased Property and is entitled to all the protections afforded by Section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction to Insurer.

33.   34. Insurer has given substantial consideration under the Settlement Agreement for the benefit of the Debtor Parties, their Estates, and creditors, along with the other Archdiocese Bound Parties. Such consideration given by Insurer constitutes valid and valuable consideration for the Purchased Property and the releases set forth in the Settlement Agreement, including, without limitation, the extinguishment and release of all Interests pursuant to this Order. The consideration provided by Insurer for the Purchased Property under the Settlement Agreement is fair and reasonable; accordingly, the purchase may not be avoided under Section 363(n) of the Bankruptcy Code.

34.   35. The terms and provisions of the Settlement Agreement and this Order shall be binding notwithstanding any subsequent appointment of any trustee(s) examiner(s) or receiver(s) under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to

24

rejection or avoidance by the Debtor Parties, their Estates, their creditors, or any examiner(s) or receiver(s).

35. ~~36.~~The failure specifically to include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Bankruptcy Court that the Settlement Agreement and the Parties' performance thereof be authorized and approved in its entirety.

36. ~~37.~~Pursuant to the provisions of the Settlement Agreement, each of the Archdiocese Bound Parties and Insurer shall be authorized to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper, or advisable under applicable law or otherwise to consummate and make effective the transactions contemplated by the Settlement Agreement.

37. ~~38.~~All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

38. ~~39.~~All obligations of the Debtor Parties under the Settlement Agreement shall be deemed administrative expenses of their Estates under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

39. ~~40.~~Each and every federal, state, and local governmental agency or department is hereby directed to accept this Order in lieu of any document necessary to consummate the transactions contemplated by the Settlement Agreement and this Order.

40. ~~41.~~The Settlement Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the Parties, in a writing signed by the Parties, and in accordance with the terms thereof, without further order of this Bankruptcy Court;

*provided* that such modification, amendment, or supplement does not constitute a material change

to the relief sought in the Approval Motion and approved by this Order.

**IT IS SO ORDERED.**

New Orleans, Louisiana, _____, 2025

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

## PLAN SUPPLEMENT 7.1(f)

### List of the Settling Insurers' Policies

| INSURER | POLICY NUMBER | POLICY PERIOD |
|---|---|---|
| American Employers Insurance Co. (SPARTA Insurance Co.) | A11-9154-150 | 2/1/64-2/1/66 |
| American Employers Insurance Co. (SPARTA Insurance Co.) | A11-9154-151 | 2/1/64-2/1/67 |
| American Employers Insurance Co. (SPARTA Insurance Co.) | A11-9154-175 | 2/1/66-2/1/67 |
| American Employers Insurance Co. (SPARTA Insurance Co.) | A11-9154-229 | 2/1/67-2/1/68 |
| American Employers Insurance Co. (SPARTA Insurance Co.) | A11-9154-231 | 2/1/67-2/1/70 |
| American Employers Insurance Co. (SPARTA Insurance Co.) | A11-9154-270 | 2/1/68-2/1/69 |
| American Employers Insurance Co. (SPARTA Insurance Co.) | AG9154-296 | 2/1/69-2/1/70 |
| American Employers Insurance Co. (SPARTA Insurance Co.) | AG9154-324 | 2/1/70-2/1/71 |
| American Employers Insurance Co. (SPARTA Insurance Co.) | AG9154-327 | 2/1/70-2/1/73 |
| American Employers Insurance Co. (SPARTA Insurance Co.) | AG9154-342 | 2/1/71-2/1/72 |
| American Employers Insurance Co. (SPARTA Insurance Co.) | AB9154-350 | 2/1/72-2/1/73 |
| United States Fire Insurance Co. | 520 02210 9 | 4/1/77-3/1/78 |
| National Union Fire Insurance Co. of Pittsburgh, Pa. | 1168737 | 4/1/77-3/1/78 |
| United States Fire Insurance Co. | 522 000084 6 | 3/1/78-2/1/79 |
| United States Fire Insurance Co. | 522 007224 3 | 2/1/79-3/1/80 |
| Puritan Insurance Co. | ML651464 | 2/1/79-3/1/80 |

1331

| INSURER | POLICY NUMBER | POLICY PERIOD |
|---|---|---|
| United States Fire Insurance Co. | 522 010391 4 | 3/1/80-3/1/81 |
| Puritan Insurance Co. | ML652658 | 3/1/80-3/1/81 |
| International Insurance Co. | 522 010882 8 | 3/1/81-2/1/82 |
| International Insurance Co. | 522 010833 7 | 3/1/81-2/1/82 |
| First State Insurance Co. | 932030 | 3/1/81-2/1/82 |
| International Insurance Co. | 522 0291231 1 | 2/1/82-2/1/83 |
| Twin City Fire Insurance Co. | TXS 100558 | 2/1/82-2/1/83 |
| International Insurance Co. | 522 029140 2 | 2/1/83-6/30/83 |
| Twin City Fire Insurance Co. | TXS100641 | 2/1/83-6/30/83 |
| Catholic Mutual Relief Society of America | 8139 | 7/1/89-7/1/90 |
| Catholic Mutual Relief Society of America | 8554 | Initially issued for the 7/1/90-7/1/91 term and annually renewed until 7/1/21 |

## PLAN SUPPLEMENT 7.2

### List of the Non-Settling Insurers' Policies

| INSURER | POLICY NUMBER | POLICY PERIOD |
|---|---|---|
| Employers Liability Assurance Co. | E11-8154-139 | 11/1/63-2/1/64 |
| United States Fidelity & Guaranty Co. | R1CC-620804 | 2/1/73-2/1/74 |
| United States Fidelity & Guaranty Co. | CEP 27522 | 2/1/73-2/1/74 |
| United States Fidelity & Guaranty Co. | R1CC-720422 | 2/1/74-2/1/75 |
| United States Fidelity & Guaranty Co. | CEP 39041 | 2/1/74-2/1/75 |
| United States Fidelity & Guaranty Co. | R1CC-828620 | 2/1/75-2/1/76 |
| United States Fidelity & Guaranty Co. | CEP 58078 | 2/1/75-2/1/76 |
| United States Fidelity & Guaranty Co. | R1CC 863042 | 2/1/76-2/1/77 |
| United States Fidelity & Guaranty Co. | CEP 57377 | 2/1/76-2/1/77 |
| United States Fidelity & Guaranty Co. | R1CC-A04686 | 2/1/77-2/1/78 |
| United States Fidelity & Guaranty Co. | CEP 57461 | 2/1/77-2/1/78 |
| United States Fidelity & Guaranty Co. | R1CC-B17772 | 2/1/78-2/1/79 |
| United States Fidelity & Guaranty Co. | CEP-94078 | 2/1/78-2/1/79 |
| United States Fidelity & Guaranty Co. | 01C 12720 | 2/1/79-2/1/80 |
| United States Fidelity & Guaranty Co. | CEP 107579 | 2/1/79-2/1/80 |
| United States Fidelity & Guaranty Co. | 01C 12818 | 2/1/80-2/1/81 |
| Mission Insurance Co. | M856642 | 3/1/80-3/1/81 |
| United States Fidelity & Guaranty Co. | 01C 12972 | 2/1/81-2/1/82 |
| Mission Insurance Co. | M876430 | 3/1/81-2/1/82 |
| United States Fidelity & Guaranty Co. | 01C 15789 | 2/1/82-2/1/83 |
| Mission Insurance Co. | MN007032 | 2/1/82-2/1/83 |

| INSURER | POLICY NUMBER | POLICY PERIOD |
|---------|---------------|---------------|
| United States Fidelity & Guaranty Co. | 01C 17559 | 2/1/83-7/1/83 |
| Mission Insurance Co. | MN020845 | 2/1/83-6/30/83 |
| United States Fidelity & Guaranty Co. | ANO 025198129 | 7/1/83-7/1/84 |
| United States Fidelity & Guaranty Co. | ANO 022753324 | 7/1/84-7/1/85 |
| United States Fidelity & Guaranty Co. | ANO 022755293 | 7/1/85-7/1/86 |
| United States Fidelity & Guaranty Co. | ANO 046492897 | 7/1/86-7/1/87 |
| United States Fidelity & Guaranty Co. | ANO 091686760 | 7/1/87-7/1/88 |
| United States Fidelity & Guaranty Co. | ANO 07851234601 | 7/1/88-7/1/89 |

## PLAN SUPPLEMENT 12.12(a)
### Debtor's Preserved Estate Causes of Action

Section 12.12 of the Joint Plan addresses causes of action and defenses that are retained for the benefit of the Settlement Trust and for the benefit of the Debtor and the Additional Debtors. On the Effective Date, the Preserved Estate Causes of Action and defenses of the Debtor will re-vest in the Reorganized Archdiocese, and the Preserved Estate Causes of Action and defenses of the Additional Debtors will re-vest in the Reorganized Additional Debtors.

Except as otherwise specifically provided in the Joint Plan or any Final Order, the Preserved Estate Causes of Action of the Debtor include, without limitation, the following:

- Any and all Claims and Estate Causes of Action against Richard C. Trahant related to the Memorandum Opinion and Order, [ECF 1844], assessing monetary sanctions against Mr. Trahant;

- Any and all Claims and Estate Causes of Action related to the lawsuit filed by Mr. Trahant and his wife originally filed in the Civil District Court for the Parish of Orleans, removed to the District Court, and then referred to the Bankruptcy Court in Adversary Proceeding No. 23-1018, against (a) the law firm that represents the Debtor in the Archdiocese's Chapter 11 Case, Jones Walker, (b) Jones Walker's partner, Mark A. Mintz, and (c) the Claims and Voting Agent, Donlin Recano & Company, LLC;

- Any and all Claims and Estate Causes of Action against Greenberg Traurig, Colleen A. Murphy, Chris Marks, and Argent Institutional Trust Company related to the defamatory statements made on or about June 13, 2025;

- *The Roman Catholic Church of the Archdiocese of New Orleans and Point Aufer, LLC versus Caruthers Producing Co., Inc., Anadarko OGC Company, LLOG Exploration Company LLC, Roger L. Hebert, SWEPI LP, Chevron USA, Inc., BASF Corporation, Eni Oil & Gas Inc., Cabot Oil & Gas Corporation, Helis Oil & Gas, LLC, Legacy Energy Corporation, Cody Energy LLC, Sunoco Inc., Kerr-McGee Oil & Gas Onshore LP*, pending in the 32nd Judicial District Court for Terrebonne Parish, case no. 169160;

- *The Archdiocese of New Orleans, as subrogee of Cynthia Johnson versus Steve Marino, Geico Casualty Company*, Civil District Court Parish of Orleans, case no. 2020-2329;

- *The Roman Catholic Church of the Archdiocese of New Orleans versus Societe Catholique Pour L'instrucion Des Orphelenis Dans L'indigence A/K/A The Catholic Society For The Instruction of Indigent Orphans, Constantine Maehnaut; Succession of Marie Justine Cirnair Couvent; and Henry Fletcher*, Civil District Court Of Parish of Orleans, case no. 2019-0106;

- Any and all Estate Causes of Action arising out of a payroll check-kiting scheme against Interlogic Outsourcing, Inc., N.A. Khan, and numerous affiliates or related parties, each of whom filed a chapter 11 case in the United States Bankruptcy Court for the Western District of Michigan;

- Any and all Estate Causes of Action against vendors or suppliers for warranty, indemnity, back charge, set-off issues, overpayments, duplicate payments, or issues related to accounts receivables;

- Any and all Estate Causes of Action for any breaches or defaults arising from the failure of any Entity to fully perform under contracts with the Debtor before the assumption or rejection of the subject contracts;

- Any and all Estate Causes of Action for deposits or any other amounts owed by any Non-Debtor Catholic Entity, Creditor, lessee, utility, supplier, vendor, or other Entity;

- Any and all Estate Causes of Action for damages or other relief against any Entity arising out of environmental, asbestos, or product liability matters;

- Any and all Estate Causes of Action arising under section 362 of the Bankruptcy Code;

- Any and all Estate Causes of Action for equitable subordination under section 510 of the Bankruptcy Code, or other applicable law;

- Any and all Estate Causes of Action for damages caused by Hurricane Ida and its aftermath;

- Any and all Estate Causes of Action for damages and other relief against Jansen Adjusters International for breach of contract and failure to perform services as a third-party administrator related to Hurricane Ida and its aftermath;

- Any and all Estate Causes of Action for indemnity or contribution related to any Abuse Claim against any Perpetrator, any Religious Order, any archdiocese or diocese other than the Archdiocese itself, or against any of the foregoing Entities' insurers;

- Any and all Estate Causes of Action to collect loans made from the Deposit and Loan Program, and any related promissory note;

- Any and all Estate Causes of Action to collect from the Archdiocesan Parishes for any outstanding Archdiocesan Parish Assessment;

- Any and all Estate Causes of Action to collect from the Archdiocesan Agencies for any outstanding Archdiocesan Agency Assessment;

- Any and all Estate Causes of Action to collect against any Additional Debtor or Non-Debtor Catholic Entity any charges for services subcontracted by the Archdiocese or owed to other Entities, including, but not limited to, legal fees, bank investment charges and services, employee benefits charges and services, insurance premiums and self-insured retentions and deductibles, the Priest Pension Plan, and the Priest Retiree Medical Benefits; and

- Any and all Estate Causes of Action under or arising out of the following agreements, each of which are Preserved Estate Causes of Action:

  o Any of the Parish Service Agreements;

  o The Temporalities Manual; and

  o Any promissory note executed by, or money lent to, any Additional Debtor or Non-Debtor Catholic Entity that is payable to the Archdiocese.

2

THE FAILURE TO LIST, DISCLOSE, DESCRIBE, IDENTIFY, OR REFER TO A RIGHT, CLAIM, ESTATE CAUSE OF ACTION, DEFENSE, OR COUNTERCLAIM, OR POTENTIAL RIGHT, CLAIM, ESTATE CAUSE OF ACTION, DEFENSE, OR COUNTERCLAIM, IN THIS PLAN SUPPLEMENT, THE JOINT PLAN, THE DISCLOSURE STATEMENT, THE SCHEDULES, OR ANY OTHER DOCUMENT FILED WITH THE BANKRUPTCY COURT, WILL IN NO MANNER WAIVE, ELIMINATE, MODIFY, RELEASE, OR ALTER ANY RIGHT OF THE APPLICABLE DEBTOR, REORGANIZED ARCHDIOCESE, ADDITIONAL DEBTORS, OR REORGANIZED ADDITIONAL DEBTORS TO COMMENCE, PROSECUTE, DEFEND AGAINST, SETTLE, AND REALIZE UPON ANY RIGHTS, CLAIMS, ESTATE CAUSES OF ACTION, DEFENSES, OR COUNTERCLAIMS THAT THE ARCHDIOCESE, THE ADDITIONAL DEBTORS, OR THEIR ESTATES HAVE, OR MAY HAVE, AS OF THE EFFECTIVE DATE.

## PLAN SUPPLEMENT 12.12(b)
### Additional Debtors' Preserved Estate Causes of Action

Section 12.12 of the Joint Plan addresses causes of action and defenses that are retained for the benefit of the Settlement Trust and for the benefit of the Debtor and the Additional Debtors. On the Effective Date, the Preserved Estate Causes of Action and defenses of the Debtor will re-vest in the Reorganized Archdiocese, and the Preserved Estate Causes of Action and defenses of the Additional Debtors will re-vest in the Reorganized Additional Debtors.

Except as otherwise specifically provided in the Joint Plan or any Final Order, the Preserved Estate Causes of Action of the Additional Debtors include, without limitation, the following:

- Any and all Estate Causes of Action against vendors or suppliers for warranty, indemnity, back charge, set-off issues, overpayments, duplicate payments, or issues related to accounts receivables;

- Any and all Estate Causes of Action for any breaches or defaults arising from the failure of any Entity to fully perform under contracts with any Additional Debtor before the assumption or rejection of the subject contracts;

- Any and all Estate Causes of Action for damages or other relief against any Entity arising out of environmental, asbestos, or product liability matters;

- Any and all Estate Causes of Action arising under section 362 of the Bankruptcy Code;

- Any and all Estate Causes of Action for equitable subordination under section 510 of the Bankruptcy Code, or other applicable law;

- Any and all Estate Causes of Action for damages caused by Hurricane Ida and its aftermath;

- Any and all Estate Causes of Action for damages and other relief against Jansen Adjusters International for breach of contract and failure to perform services as a third-party administrator related to Hurricane Ida and its aftermath;

- Any and all Estate Causes of Action for indemnity or contribution related to any Abuse Claim against any Perpetrator, any Religious Order, any archdiocese or diocese other than the Archdiocese itself, or against any of the foregoing Entities' insurers;

- Any and all Estate Causes of Action under or arising out of any of the Parish Service Agreements or the Temporalities Manual;

- Any and all Estate Causes of Action possessed by the Additional Debtors against the Debtor for funds deposited in the Deposit and Loan Program; and

- Any and all Estate Causes of Action of Catholic Charities Archdiocese of New Orleans and School Food and Nutrition Services of New Orleans, Inc. against Notre Dame Health for funds advanced.

**THE FAILURE TO LIST, DISCLOSE, DESCRIBE, IDENTIFY, OR REFER TO A RIGHT, CLAIM, ESTATE CAUSE OF ACTION, DEFENSE, OR COUNTERCLAIM, OR POTENTIAL RIGHT, CLAIM, ESTATE CAUSE OF ACTION, DEFENSE, OR COUNTERCLAIM, IN THIS PLAN SUPPLEMENT, THE JOINT PLAN, THE DISCLOSURE STATEMENT, THE**

SCHEDULES, OR ANY OTHER DOCUMENT FILED WITH THE BANKRUPTCY COURT, WILL IN NO MANNER WAIVE, ELIMINATE, MODIFY, RELEASE, OR ALTER ANY RIGHT OF THE APPLICABLE DEBTOR, REORGANIZED ARCHDIOCESE, ADDITIONAL DEBTORS, OR REORGANIZED ADDITIONAL DEBTORS TO COMMENCE, PROSECUTE, DEFEND AGAINST, SETTLE, AND REALIZE UPON ANY RIGHTS, CLAIMS, ESTATE CAUSES OF ACTION, DEFENSES, OR COUNTERCLAIMS THAT THE ARCHDIOCESE, THE ADDITIONAL DEBTORS, OR THEIR ESTATES HAVE, OR MAY HAVE, AS OF THE EFFECTIVE DATE.