*8-8-25 Solicitation Version*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 20-10846** |
| THE ROMAN CATHOLIC CHURCH OF | § | |
| THE ARCHDIOCESE OF NEW ORLEANS, | § | **Section "A"** |
| | § | |
| Debtor.[1] | § | **Chapter 11** |
| | § | |

**SECOND AMENDED MODIFIED DISCLOSURE STATEMENT FOR THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS AND ADDITIONAL DEBTORS, PROPOSED BY THE DEBTOR, THE ADDITIONAL DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, DATED AS OF AUGUST 6, 2025**

JONES WALKER LLP
R. Patrick Vance (#13008)
Elizabeth J. Futrell (#05863)
Mark A. Mintz (#31878)
Samantha A. Oppenheim (#38364)
201 St. Charles Avenue, 51st Floor
New Orleans, LA 70170
Telephone: (504) 582-8000
Facsimile: (504) 589-8260
Email: pvance@joneswalker.com
efutrell@joneswalker.com
mmintz@joneswalker.com
soppenheim@joneswalker.com

**ATTORNEYS FOR**
**THE ROMAN CATHOLIC CHURCH OF THE**
**ARCHDIOCESE OF NEW ORLEANS**

HELLER, DRAPER, & HORN, L.L.C.
Douglas S. Draper
Greta S. Brouphy
Michael E. Landis
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130
Telephone: 504-299-3300
Facsimile: 504-299-3399
E-mail: ddraper@hellerdraper.com
gbrouphy@hellerdraper.com
mlandis@hellerdraper.com

**ATTORNEYS FOR**
**THE ADDITIONAL DEBTORS**

PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang (CA Bar 94435) (pro hac vice)
Iain A.W. Nasatir (CA Bar 148977) (pro hac vice)
Andrew W. Caine (CA Bar 110345) (pro hac vice)
Karen B. Dine (NY Bar 2625366) (pro hac vice)
10100 Santa Monica Blvd., Ste. 1300
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jstang@pszjlaw.com
inasatir@pszjlaw.com
acaine@pszjlaw.com
kdine@pszjlaw.com

TROUTMAN PEPPER LOCKE LLP
Omer F. Kuebel, III (La #21682)
Bradley C. Knapp (La #35867)
601 Poydras Street, Suite 2660
New Orleans, Louisiana 70130-6036
Telephone: (504) 558-5210
Facsimile: (504) 910-6847
Email: rkuebel@lockelord.com
bknapp@lockelord.com

TROUTMAN PEPPER LOCKE LLP
W. Steven Bryant (TX Bar No. 2427413)
300 Colorado Street, Ste. 2100
Austin, Texas 78701
Telephone: (512) 305-4726
Facsimile: (512) 305-4800
Email: steven.bryant@troutman.com

**ATTORNEYS FOR THE OFFICIAL COMMITTEE**
**OF UNSECURED CREDITORS**

---

[1] The last four digits of the Debtor's federal tax identification number are 8966. The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

**PP Ex.**

**3**

1

## IMPORTANT INFORMATION ABOUT THE DISCLOSURE STATEMENT

**THE DISCLOSURE STATEMENT AND THE JOINT PLAN ARE AN INTEGRAL PACKAGE, AND THEY MUST BE CONSIDERED TOGETHER FOR YOU TO BE ADEQUATELY INFORMED. THE DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE JOINT PLAN. EACH CREDITOR IS URGED TO REVIEW THE JOINT PLAN BEFORE VOTING ON IT. A COPY OF THE JOINT PLAN IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1. CERTAIN ATTORNEYS ARE ADVOCATING FOR REJECTION OF THE JOINT PLAN, WHICH COULD RESULT IN DISMISSAL OF THIS BANKRUPTCY CASE.**

## EXECUTIVE SUMMARY OF PLAN TERMS

This Executive Summary is a Chart comparing the benefits to Abuse Claimants under the Joint Plan compared to what Abuse Claimants could expect if the bankruptcy case is dismissed.

## SUMMARY OF JOINT PLAN VERSUS CASE DISMISSAL OPTIONS

| Joint Plan | Bankruptcy Case Dismissal |
|---|---|
| **Guaranteed Recovery:**<br><br>On the Effective Date of the Joint Plan, a settlement fund of $159,275,000 in cash and a 4-year $20 million promissory note will be placed into the Settlement Trust solely for the benefit of Abuse Claimants to pay Abuse Claims and the costs of the Settlement Trust. All allowed Abuse Claims will share in this recovery. | **No Guaranteed Recovery:**<br>A claimant will only recover for certain if they file a lawsuit and settle the case. Litigating the case may result in a judgment that may or may not be collectible depending on the assets of the Entity against which the judgment is obtained. Collection is uncertain and may take time even if the judgment is against a solvent Entity, as other creditors may also lay claim to the Entity's assets or the Entity could file bankruptcy. |
| **Additional Recoveries:**<br><br>1) Payment from the net proceeds of the Christopher Homes affordable housing properties (estimate in excess of $44 million based on non-binding letters of intent). Proceeds anticipated to be received 3rd quarter of 2026.<br><br>2) Potential recovery against the Non-Settling Insurers (amount unknown, but which recovery the Plan Proponents estimate as much as $150 million to $300 million). | **No Additional Recoveries:**<br><br>You will only receive a settlement from or a judgment against a specific Entity. You will only be able to collect against that Entity to the extent that Entity has assets. You will not be able to collect against the Christopher Homes affordable housing sales proceeds.<br><br>You may be able to collect against an insurance company you have a claim against if the Court does not uphold policy defenses to insurance coverage. |
| **Insurance Settlements:**<br><br>The Joint Plan provides for more than $29 million from the Settling Insurers, including $21 million from SPARTA Insurance Company and American Employers' Insurance Company ("**SPARTA**") contingent on SPARTA providing financial assurance acceptable to the Survivors' Committee in its sole discretion. If United States Fidelity & Guaranty Company, affiliate of | **No Insurance Settlements:**<br><br>No dedicated funds from insurance companies. You may receive insurance funds through a settlement or judgment if coverage exists and the insurer is solvent. |

| | |
|---|---|
| Travelers Indemnity Company ("**Travelers**") settles for all of its policies, this insurance settlement amount will increase. | |
| **Guaranteed Timing of Payment**<br><br>First payments to the Settlement Trust will be made by the Effective Date, currently scheduled for December 31, 2025, with payments to Abuse Claimants in early 2026. | **Unknown Timing of Payment**<br><br>Payment pursuant to a settlement will occur based on when the claim is asserted and settled. Absent a settlement, in federal court in New Orleans, the average time from filing a lawsuit to trial is 2 years. Even if you get a judgment, it will likely be appealed, adding as long as 2 years before you get a final judgment. Additional time and effort will be required to enforce and collect on any final judgment. You also run the risk that a bankruptcy will be filed before you can collect on your judgment. |
| **Equal Timing of Payment:**<br><br>Subject to the Allocation Protocol, all Abuse Claimants will be paid at the same time. | **Unequal Timing of Payment:**<br><br>Each claimant will need to file lawsuit and either negotiate their own settlement or litigate to try to obtain their own judgment. Some claimants may recover quickly. Others may litigate for many years. Creditors, including bondholders, who obtain judgments first will be paid first and may exhaust the assets of the Entities you ultimately obtain a final judgment against. |
| **No New Proof Is Needed:**<br><br>Your existing Abuse Claim documentation is sufficient to evaluate your claim. You have the option to supplement your Claim with additional information. While testimony to the Claims Reviewer is permitted, it is not required. Under the Joint Plan you may remain anonymous, and will not have to appear or testify in Court or be involved in any depositions, document production, or incur any additional expert costs. | **More Proof Is Needed:**<br><br>Abuse Claimants will have to obtain Certificates of Merit, file a lawsuit, participate in document production, participate in depositions (possibly including family members, employers, and friends), attend independent medical exams, publicly identify themselves, testify at trial, and potentially defend appeals, all without a guarantee of any payment. Some of this process can be shortened by entering into a settlement before trial. Even if the case settles, much more documentation will be required compared to the bankruptcy process. |
| **Travelers Insurance**<br><br>Abuse Claimants with Claims covered by Travelers (February 1, 1973, to July 1, 1989) have the option to receive their distribution from the Settlement Trust and can bring litigation against Travelers in the Court system. | **Travelers Insurance**<br><br>Abuse Claimants will receive no money until they either reach a settlement or get a judgment against the defendants they sue. As noted above, obtaining a final judgment could take up to four more years. |

| Child Protection Procedures and Survivor Bill of Rights | Child Protection Procedures and Survivor Bill of Rights |
|---|---|
| The Joint Plan has the most detailed and comprehensive Non-Monetary Plan Provisions ever agreed to by any Catholic Diocese. | The Non-Monetary Plan Provisions are only enforceable if the Joint Plan is confirmed. If the Bankruptcy Case is dismissed, the Provisions will have no effect and cannot be enforced, and no public archive of abuse records will be created. |
| **Claim Evaluation:** | **Claim Evaluation:** |
| Abuse Claims will be evaluated by an experienced Abuse Claims Reviewer chosen by the Survivors' Committee and approved by the Court. Your recovery will be consistent with the Allocation Protocol proposed by the Survivors' Committee. This process provides consistent, predictable outcomes for Abuse Claimants as a whole and provides that your recovery will, in most respects, be equal to all other Abuse Survivors who possess similar claims. | Unless you reach a settlement, your claim will be decided by either a judge or a jury after a trial. During the trial process, you and possibly family members, friends, co-workers will be subject to formal discovery and cross-examination by the defense lawyers. Your claims also will be scrutinized and evaluated by other experts selected by the defendants. |
| **Settlement Trust Protected From Other Creditors:** | **No Protection From Other Creditors:** |
| Confirmation of the Joint Plan ensures a dedicated fund—the Settlement Trust. Other creditors, including Bondholders, will be paid out of separate funds. | All creditors will be competing for the same assets. For example, Bondholders will likely sue the Archdiocese, and, due to the nature of the claim, would likely obtain a judgment before any Abuse Claimant, potentially allowing them to seize Archdiocesan assets that could have been used to pay Abuse Claims. Bondholders seek $40 million plus past-due interest and unpaid attorneys' fees. |

## ARTICLE I – PRELIMINARY STATEMENT

You are receiving this Disclosure Statement to assist you in making a decision regarding whether to accept the *Second Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, dated as of August 6, 2025* (as amended, modified, or supplemented from time to time, the "**Joint Plan**"). This Disclosure Statement will refer to the Debtor, the Additional Debtors, and the Survivors' Committee as the "**Plan Proponents.**" No one is authorized by the Plan Proponents to give any information, or to make any representation regarding this Disclosure Statement or Joint Plan, other than as contained in this Disclosure Statement. Capitalized terms not defined in this Disclosure Statement have the meanings assigned to them in the Joint Plan.

The primary purpose of the Joint Plan is to create a Settlement Trust for the payment of Abuse Claims. Non-Abuse Claims are NOT paid by the Settlement Trust. The Settlement Trust will be overseen by the Settlement Trustee, an independent third party. The Joint Plan also provides for the appointment of an Abuse Claims Reviewer, another independent third party, who evaluates Abuse Claims for the purpose of allocating payments from the Settlement Trust. The Settlement Trust will be funded with cash contributions from the Archdiocese, the Additional Debtors, the Non-Debtor Catholic Entities, and the Settling Insurers; proceeds from the sale of the Affordable

Housing Facilities; and future contributions from the Archdiocese and Additional Debtors through payment of a promissory note. Under the Joint Plan, the Settlement Trust will be funded with a <u>minimum</u> of $179,275,000 with funding likely to exceed $223,000,000 <u>excluding</u> any settlement with the Non-Settling Insurer. To assist Abuse Claimants in understanding the Joint Plan, the Survivors' Committee has prepared a letter to Abuse Claimants (the "**Survivors' Committee Letter**"), which is provided to Abuse Claimants along with this Disclosure Statement.

The contributions to the Joint Plan come from the Archdiocese, the Additional Debtors, the Non-Debtor Catholic Entities, and the Settling Insurers. Each is discussed below:

- **The Joint Plan Contributions**. The contributions to the Settlement Trust are set forth in Sections 5.2 – 5.3 of the Joint Plan. The Archdiocese, the Additional Debtors, the Non-Debtor Catholic Entities, and the Settling Insurers have agreed to the following contributions:

  (a) On the Effective Date, the Archdiocese, the Additional Debtors, and the Non-Debtor Catholic Entities[2] will deposit Cash in the amount of $130,000,000 to the Settlement Trust. Specifically, the Debtor will transfer $65,000,000 in Cash directly to the Settlement Trust, while the Additional Debtors and the Non-Debtor Catholic Entities will contribute Cash in the respective amounts of $60,000,000 and $5,000,000 to 1793 Group, which will transfer such consideration to the Settlement Trust.

  (b) On or near the Effective Date, the Settling Insurers will transfer $29,275,000[3] into the Settlement Trust, which will be allocated to Abuse Claimants who sign an Abuse Claim Release and Certification. The exact amount of each Settling Insurer's contribution is set forth in Section 5.3(b) of the Joint Plan.

  (c) On the Effective Date, the Archdiocese and the Additional Debtors will enter into a four-year Settlement Trust Promissory Note in the amount of $20,000,000 with the Settlement Trust as payee. The first payment under the Settlement Trust Promissory Note will be due on July 1, 2026. The Settlement Trust Promissory Note may be paid more quickly through sale proceeds as discussed below.

  (d) The Affordable Housing Entities will sell the Affordable Housing Facilities identified on Schedule A-2 to Plan Exhibit A and commonly known as the Christopher Homes. The sale of the Affordable Housing Facilities is being conducted by Newmark Affordable Housing Advisors as broker ("**Newmark**") and an Independent Financial Advisor, who will be selected in the near future. Newmark prepared marketing materials, worked with 20 potential buyers, and received eight non-binding letters of intent or offers to purchase the Affordable Housing Facilities. Newmark has recommended inviting the top five potential buyers to participate in a "best and final" bid process to conclude on or before September 15, 2025. Each of the five potential buyers is viewed by Newmark as a national firm capable of closing the transaction. Any sale of Christopher Homes will likely close and

---

[2] The Settlement Trust contribution from the Non-Debtor Catholic Entities is in exchange for a release of potential claims and causes of action held by the Debtor and discussed in more detail in Section 4.07 of this Disclosure Statement. Claims related to contracts between the Debtor and Non-Debtor Catholic Entities pass through unaffected by the Joint Plan pursuant to Section 10.7 of the Joint Plan.

[3] Of this amount, $21,000,000 is related to a settlement with SPARTA, which is contingent on SPARTA providing financial assurance acceptable to the Survivors' Committee in the Survivors' Committee's discretion by the commencement of the Confirmation Hearing. If SPARTA fails to provide such financial assurance, SPARTA will become a Non-Settling Insurer, and litigation rights will be preserved against SPARTA and any insurance guarantee fund, should SPARTA trigger guarantee fund coverage.

fund in 2026. Net proceeds[4] from the sale of the Affordable Housing Facilities will be distributed as follows: (i) first $23 million in net proceeds from the sale will be paid to the applicable Debtor, Reorganized Archdiocese, Additional Debtors, and Reorganized Additional Debtors; and (ii) the next $33 million in net proceeds will be paid to the Settlement Trust. From the first $23 million in net proceeds, $20 million will be used to repay the Settlement Trust Promissory Note. Net proceeds exceeding $56 million will be divided between the Settlement Trust, the applicable Debtor, Reorganized Archdiocese, Additional Debtors, and Reorganized Additional Debtors, as follows:

| Division of Net Proceeds from Christopher Homes Sale Exceeding $56 Million | | |
| --- | --- | --- |
| Net Sale Proceeds | Percentage of Net Proceeds Paid to Debtor and Additional Debtors | Percentage of Net Proceeds Paid to Settlement Trust |
| $56–$66 million | 25% | 75% |
| $66–$76 million | 35% | 65% |
| + $76 million | 50% | 50% |

The Parties estimate, based on preliminary broker value analysis which is further supported by non-binding letters of intent or offers received by Newmark, that net sale proceeds will be available to fund the Settlement Trust in a range of approximately $30,904,000 to $55,924,000. The lowest of the top five offers received by Newmark is in the mid-range of values estimated by Newmark, and the price guidance suggested by the letters of intent or offers suggests the ultimate contribution to the Settlement Trust could be at the mid to upper range of these estimates. A lower or higher recovery is possible depending on sale outcomes.

(e)    On the Effective Date, the transfer and vesting of rights related to the Non-Settling Insurers' Policies will be transferred to the Settlement Trust, as set forth in Section 7.2 of the Joint Plan.

(f)    The Archdiocese and Additional Debtors have agreed to certain additional consideration including the Non-Monetary Plan Provisions, payment of Abuse Claims Reviewer Fees, and other consideration set forth in Sections 5.3 and 6.5 of the Joint Plan.

(g)    The transfer of rights of the Archdiocese and the Additional Debtors to the Settlement Trust constitutes significant additional consideration that will be received by the Abuse Claimants, particularly the value of assigned rights against Non-Settling Insurers.

---

[4] "Net proceeds" refers to proceeds available after payment of existing debt on the Christopher Homes (approximately $68 million) and payment of commissions and customary closing costs.

As a result of these contributions, total estimated Settlement Trust funding based on low, middle, and high value estimates for the Affordable Housing Facilities prepared by Newmark appears as follows:

| Settlement Trust Funding Source | Low Value | Middle Value | High Value |
|---|---|---|---|
| Debtor and Additional Debtor Effective Date Payment | $130,000,000 | $130,000,000 | $130,000,000 |
| Promissory Note | $20,000,000 | $20,000,000 | $20,000,000 |
| Settling Insurance Contribution[5] | $29,275,000 | $29,275,000 | $29,275,000 |
| Affordable Housing Funding to Settlement Trust (estimated) | $30,904,859 | $44,787,438 | $55,924,680 |
| **Total:** | **$210,179,859** | **$224,062,438** | **$235,199,680** |

The Archdiocese is not selling personal property, such as art and collectibles, to fund the Settlement Trust. The Archdiocese has appraised certain art and collectibles at approximately $2.4 million. The Plan Proponents note that any sale of art and collectibles would incur significant market fees and sales commissions that would reduce any value that could be recovered. The Archdiocese has sold approximately $20 million worth of real estate during the course of this bankruptcy case to help fund the Settlement Trust. Values for the Archdiocese and Additional Debtors' real estate are set forth on Exhibits 6 and 7 to this Disclosure Statement, although some parties assert that the real estate is worth more than set forth on Exhibits 6 and 7.

The Survivors' Committee, the Archdiocese, and the Additional Debtors have agreed to *Non-Monetary Plan Provisions to Foster Child Safety and Prevent Child Sexual Abuse* attached to the Joint Plan as Exhibit E. Performance of the Non-Monetary Plan Provisions will provide improvements to the Archdiocese's child protection policies and transparency regarding past abuse by creating a public archive of abuse-related documents. The Non-Monetary Plan Provisions also include a Survivor Bill of Rights to provide a clear, predictable process for the handling of future abuse claims.

After the Joint Plan is confirmed, Abuse Claimants will be eligible to pursue litigation against the Non-Settling Insurers in accordance with the Settlement Trust Documents by submitting a litigation election to the Settlement Trustee. Abuse Claimants will have their Settlement Trust Distribution held while they pursue litigation claims against Non-Settling Insurers unless they specifically request to receive their Settlement Trust Distribution while litigation against Non-Settling Insurers is on-going. If an Abuse Claimant elects not to pursue litigation against the Non-Settling Insurers, their litigation rights will transfer to the Settlement Trust. The Settlement Trust Documents provide for certain enhancements if litigation claims result in settlements involving all claimants and also provides for certain recovery sharing for individual settlements and judgments. The Settlement Trustee will determine the timing in which litigation claims may be asserted, but absent a global settlement with the Non-Settling Insurers, all Abuse Claimants with claims during a Non-Settling Insurer's coverage period will be allowed to assert litigation claims before the closing of the Revival Window. Non-Settling Insurers preserve all defenses they have to the asserted claims and insurance coverage.

Settlement Trust Distributions to Abuse Claimants will be paid from the Settlement Trust, according to the Abuse Claims Reviewer's application of the Allocation Protocol to such Abuse Claims. If Abuse Claimants choose to litigate against Non-Settling Insurers, Abuse Claimants pursuing litigation will have their Settlement Trust

---

[5] Abuse Claimants reserve litigation rights against Non-Settling Insurers, including Travelers. Further, as discussed in Note 3 above, SPARTA could become a Non-Settling Insurer if the financial assurance contingency is not fulfilled, which would result in the Settling Insurer Contribution being reduced by $21,000,000.

Distribution withheld while they litigate and can later elect to either receive their Settlement Trust Distribution or the proceeds of their authorized litigation claims, if any.[6] **THE SURVIVORS' COMMITTEE ANTICIPATES THE SETTLEMENT TRUSTEE WILL BE ABLE TO MAKE INITIAL DISTRIBUTIONS TO CLAIMANTS WHO DO NOT ELECT TO PURSUE LITIGATION AGAINST NON-SETTLING INSURERS WITHIN MONTHS OF THE EFFECTIVE DATE.** The Settlement Trustee may make supplemental distributions in the future when the Affordable Housing Facilities are sold and as the Settlement Trust Promissory Note is paid.

Distributions to Creditors holding Claims that are *not* Abuse Claims (the "**Non-Abuse Claims**") will be paid under the Joint Plan by the Reorganized Debtor and Reorganized Additional Debtors from their remaining assets after funding the Settlement Trust. Creditors holding Non-Abuse Claims will not be entitled to any recovery from the Settlement Trust. The Reorganized Debtor and Reorganized Additional Debtors reserve the right to object to any Non-Abuse Claim.

The following Exhibits are attached to this Disclosure Statement and provide additional information regarding the Joint Plan and assets of the Debtor and Additional Debtors:

| | |
|---|---|
| Exhibit 1 | The Joint Plan |
| Exhibit 2 | Feasibility Projections of the Joint Plan |
| Exhibit 3 | Liquidation Analysis of the Debtor |
| Exhibit 4 | Financial Information of the Additional Debtors |
| Exhibit 5 | Liquidation Analysis of the Additional Debtors |
| Exhibit 6 | Immovable Property of the Debtor |
| Exhibit 7 | Immovable Property of the Additional Debtors |
| Exhibit 8 | Post-Petition Operations Summary of the Debtor |

### <u>ARTICLE II – OVERVIEW OF THE VOTING AND CONFIRMATION PROCESS</u>

**Section 2.01    Obtaining Answers to Your Procedural Questions about the Disclosure Statement, Joint Plan, or Ballots, and Obtaining Copies of Pleadings or Other Documents.**

If you need a Ballot, you should contact Donlin, Recano & Company, LLC (the "**Claims and Voting Agent**"), by: (a) telephoning the Claims and Voting Agent at 1-877-476-4389 (toll free); (b) visiting the restructuring website, maintained by the Claims and Voting Agent, at https://www.donlinrecano.com/Clients/rcano/Index; (c) writing the Claims and Voting Agent, (i) via First Class Mail, to Donlin, Recano & Company, LLC, re: The Roman Catholic Church of the Archdiocese of New Orleans, Attn: Voting Department, P.O. Box 2053, New York, NY 10272- 2042, or (ii) via Overnight/hand delivery, Donlin, Recano & Company, LLC, c/o Angeion Group, re: The Roman Catholic Church of the Archdiocese of New Orleans, Attn: Voting Department, 200 Vesey Street, 24th Floor, New York, NY 10281, or (d) emailing the Claims and Voting Agent at DRCVote@angeiongroup.com.

All pleadings and other documents filed in the Archdiocese's Chapter 11 Case are available for inspection and copying (a) by visiting the restructuring website, maintained by the Claims and Voting Agent, at https://www.donlinrecano.com/Clients/rcano/Dockets (without charge), or (b) on the Bankruptcy Court's electronic case management system website at http://www.laeb.uscourts.gov (fee charged). To access documents on the Bankruptcy Court's electronic case management system, you will need a PACER password and login, which can be obtained at pacer.psc.uscourts.gov.  If you have procedural questions regarding the Joint Plan, you may contact counsel for the Survivors' Committee. Committee counsel's contact information is on the first page of this Disclosure Statement.

---

[6] However, if an Abuse Claimant asserts litigation and loses in that litigation, the Joint Plan provides that the Abuse Claimant will receive no recovery under the Joint Plan.

Only individuals who have filed a proof of claim or have deemed to file a proof of claim by the Voting Record Date will be entitled to vote.

### Section 2.02     Voting Record Date.

The record date for purposes of determining which Creditors holding Claims in the Voting Classes are entitled to vote to accept or reject the Joint Plan (the "**Voting Record Date**") shall be **August 14, 2025, at 11:59 p.m. (Central Time)**; provided, however, that if a Known Abuse Claimant files an Abuse Proof of Claim against an Additional Debtor, then the Voting Record Date for such Known Abuse Claim shall be **October 15, 2025, at 11:59 p.m. (Central Time)**.

### Section 2.03     Voting on the Joint Plan and the Voting Deadline.

The Bankruptcy Court has established **October 29, 2025, at 11:59 p.m. (Central Time)**, as the voting deadline (the "**Voting Deadline**") for the Joint Plan.  The Plan Proponents may extend the Voting Deadline, in their discretion, without further Order of the Bankruptcy Court.  To be counted as votes to accept or reject the Joint Plan, all Ballots must be properly executed, completed, and delivered to the Claims and Voting Agent so that such Ballots are actually received on or before the Voting Deadline by one of the following methods: (i) first class mail (using the reply envelope provided in the Solicitation Package or otherwise); (ii) overnight courier; (iii) hand delivery; or (iv) the E-Balloting Portal (for Claims in Classes 3, 4, 7, and 8) or email (for Claims in Class 6).  The proper return address for the Claims and Voting Agent is shown on each Ballot.

### Section 2.04     Confirmation Hearing.

The Bankruptcy Court will hold a hearing to consider Confirmation of the Joint Plan (the "**Confirmation Hearing**") commencing **on November 12, 2025, at 9 a.m. (Central Time)**, before the Honorable Meredith S. Grabill, in the Bankruptcy Court located at 500 Poydras Street, Suite B-709, New Orleans, LA  70130.  You may participate in the Confirmation Hearing (a) in person, (b) by telephone through the Bankruptcy Court's Teleconference Line, 504-517-1385, Conference Code 129611, or (c) by video at https://gotomeet.me/JudgeGrabill (audio will still be through the dial in Conference Code above).  Parties in interest are directed to the Bankruptcy Court's General Order 2021-2 for information on hearings, available at https://www.laeb.uscourts.gov/.  The Confirmation Hearing will continue, if needed, at 9 AM Central Time on November 13, November 17, November 18, November 20, November 21, November 24, November 25, December 1, and December 2, 2025. The Confirmation Hearing may be adjourned from time to time without further notice other than by such adjournment being announced during the Confirmation Hearing, or by a notice of adjournment filed with the Bankruptcy Court.

### Section 2.05     Objections to Confirmation of the Joint Plan.

Objections, if any, to the Confirmation of the Joint Plan (other than objections that arise based on the balloting and tabulation results on the Joint Plan), any of the other relief sought in connection with the Confirmation of the Joint Plan must (a) be in writing and state with particularity the basis and nature of any such objection, (b) state the name and address of the objecting party, and the nature of the Claim of such party, and (c) be filed with the Bankruptcy Court **on or before October 30, 2025** (the "**Confirmation Objection Deadline**").

## ARTICLE III – QUESTIONS AND ANSWERS ABOUT THE DISCLOSURE STATEMENT AND JOINT PLAN

**Section 3.01    What is Chapter 11?**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  The commencement of a Chapter 11 case creates an estate comprised of any and all the legal and equitable interests of the debtor as of the date of filing of its bankruptcy petition.  The Bankruptcy Code provides that the Chapter 11 debtor may continue to operate and remain in possession of its property as a "debtor-in-possession."  Under Chapter 11, a debtor is authorized to reorganize for the benefit of itself and its creditors.

The objective of a Chapter 11 case is the confirmation and consummation of a Chapter 11 plan.  A plan sets forth the means for satisfying claims against a debtor.  The confirmation of a Chapter 11 plan by a bankruptcy court binds the debtor, any creditor of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the Bankruptcy Code.

**Section 3.02    Why have I received this Disclosure Statement?**

You were sent this Disclosure Statement so that you can make an informed voting decision about the Joint Plan.  On [•], 2025, the Bankruptcy Court entered an Order (the "**Disclosure Statement Order**"), [ECF •], approving the Disclosure Statement as containing adequate information so that you can make that judgment and establishing certain dates, deadlines, and procedures in connection with the proposed confirmation of the Joint Plan.

**Section 3.03    How much will I receive on my Abuse Claim?**

Your Abuse Claim will be paid from a Settlement Trust that will be funded as set forth on the table below on or after the Effective Date. The value ranges tie to different estimated values of the Affordable Housing Facilities, which are being sold under the Joint Plan.

| Settlement Trust Funding Source | Low Value | Middle Value | High Value |
|---|---|---|---|
| Debtor and Additional Debtor Effective Date Payment | $130,000,000 | $130,000,000 | $130,000,000 |
| Promissory Note | $20,000,000 | $20,000,000 | $20,000,000 |
| Settling Insurance Contribution[7] | $29,275,000 | $29,275,000 | $29,275,000 |
| Affordable Housing Funding to Settlement Trust (estimated) | $30,904,859 | $44,787,438 | $55,924,680 |
| **Total:** | **$210,179,859** | **$224,062,438** | **$235,199,680** |

---

[7] Abuse Claimants reserve litigation rights against Non-Settling Insurers, including Travelers. Further, as discussed in Note 3 above, SPARTA could become a Non-Settling Insurer if the financial assurance contingency is not fulfilled, which would reduce the Settling Insurer contribution by $21 million.

As of July 1, 2025, approximately 660 non-duplicative Abuse Claims had been filed, not all of which are valid. Your share of the Settlement Trust will be determined by the Allocation Protocol which awards you a share of the money in the Settlement Trust. While you may see estimates regarding an average recovery, no Abuse Claimant knows, at this point in time, the actual amount that he or she will receive from the Settlement Trust. You will be advised of your share through the Allocation Protocol after you vote on the Joint Plan.

### Section 3.04    Am I entitled to vote on the Joint Plan?

Your ability to vote on the Joint Plan depends on whether you filed a claim before the Voting Record Date and what type of Claim that you hold. As set forth in Sections 3.5 and Article 4 of the Joint Plan and pursuant to section 1122(a) of the Bankruptcy Code, each category of Claims is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class No. | Class Description | Impaired or Unimpaired | Voting Rights |
|-----------|-------------------|------------------------|---------------|
| 1 | **Other Priority Claims** (Against the Debtor and the Additional Debtors) | Unimpaired | No, deemed to accept |
| 2 | **Secured Claims** (Against the Debtor and the Additional Debtors) | Unimpaired | No, deemed to accept |
| 3 | **Known Abuse Claims** (Against the Debtor and the Additional Debtors) | Impaired | Yes |
| 4 | **Unknown Abuse Claims** (Against the Debtor and the Additional Debtors) | Impaired | Yes |
| 5 | **Non-Insurer Contribution Claims** (Against the Debtor and the Additional Debtors) | Impaired | No, deemed to reject |
| 6 | **Bond Claims** (Against the Debtor) | Impaired | Yes |
| 7 | **General Unsecured Claims and Unsecured Trade Claims—Debtor** (Against the Debtor) | Impaired | Yes |
| 8 | **Non-Abuse Personal Injury Claims--Debtor** (Against the Debtor) | Impaired | Yes |
| 9 | **Unsecured Trade Claims—Additional Debtors** (Against the Additional Debtors) | Unimpaired | No, deemed to accept |
| 10 | **Additional Debtors' Non-Trade Unsecured Claims—Additional Debtors** (Against the Additional Debtors) | Unimpaired | No, deemed to accept |

### Section 3.05    Does the Joint Plan contain Provisions Designed to Foster the Protection of Children from Sexual Abuse?

Yes. Subject to the occurrence of the Effective Date, the Debtor and Additional Debtors have agreed upon The Roman Catholic Church of the Archdiocese of New Orleans Non-Monetary Plan Provisions to Foster Child Safety and Prevent Child Sexual Abuse, which are listed at Plan Exhibit E (the "**Non-Monetary Plan Provisions**"). The Non-Monetary Plan Provisions are extensive and include detailed provisions regarding child protection and prevention of child sexual abuse, recognition, transparency, reconciliation, and much more. For the avoidance of doubt, the Non-Monetary Plan Provisions are binding on the Archbishop.

### Section 3.06    What is meant by "Confirmation" and "Effective Date"?

"Confirmation" or "Confirmation of the Plan" refers to the Bankruptcy Court's approval of the Joint Plan. Subject to certain limited exceptions, the Confirmation Order discharges a debtor from any debt that arose before

the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization. Confirmation of the Joint Plan does not guarantee that you will receive the distribution indicated under the Joint Plan or Settlement Trust Documents. After Confirmation of the Joint Plan, there are conditions that need to be satisfied or waived so that the Joint Plan can become effective. Distributions to Creditors holding Allowed Claims will only be made on or after the date the Plan becomes effective—the "Effective Date." More information is contained in Section 11.2 of the Joint Plan.

**Section 3.07     Does the Joint Plan contain releases and permanent injunctions in favor of the Debtor and Additional Debtors?**

YES. THE JOINT PLAN CONTAINS RELEASES AND PERMANENT INJUNCTIONS THAT RELATE TO AND AFFECT THE RIGHTS, CLAIMS, AND/OR CAUSES OF ACTION THAT CREDITORS, INCLUDING ABUSE CLAIMANTS, MAY HAVE AGAINST THE DEBTOR, THE REORGANIZED DEBTOR, THE ADDITIONAL DEBTORS, THE REORGANIZED ADDITIONAL DEBTORS, AND THE SETTLING INSURERS AS PROVIDED IN ARTICLE 12 OF THE JOINT PLAN. BEFORE YOU VOTE, YOU SHOULD REVIEW THE ENTIRE DISCLOSURE STATEMENT AND JOINT PLAN, INCLUDING, BUT NOT LIMITED TO, THE RELEASES AND INJUNCTIONS.

**Section 3.08     Does the Joint Plan contain non-consensual releases and permanent injunctions in favor of third parties?**

No. The Joint Plan does not include non-consensual third-party releases or injunctions. Conversely, the U.S. Trustee asserts that there are non-consensual third-party releases, and directs the reader to Joint Plan Sections 3.2, 4.3(c), 4.4(c), 12.4, 12.5, 12.8, and 12.15.

**Section 3.09     Are there any Exculpation Provisions contained in the Joint Plan?**

Yes. The Joint Plan also contains certain exculpatory and limitation of liability provisions that relate to and affect the rights, Claims, and/or Causes of Actions of Creditors, including the Abuse Claimants, may have against the Debtor, the Additional Debtors, the Survivors' Committees, and the members of the Survivors' Committees (defined more specifically in the Joint Plan as "**Exculpated Parties**"), as provided in Section 12.3 of the Joint Plan (the "**Exculpations**").

**Section 3.10     What is the Effect of the Joint Plan on the Debtor's and Additional Debtors' Ongoing Operations?**

On and after the Effective Date, the Reorganized Debtor and the Reorganized Additional Debtors will continue their charitable, non-profit operations and, except as otherwise provided by the Joint Plan, may use, acquire, or dispose of property, and compromise or settle any Non-Abuse Claims without supervision or approval by the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the occurrence of the Effective Date, all actions contemplated by the Joint Plan will be deemed authorized and approved.

**Section 3.11     What is a pre-packaged bankruptcy case?**

The Additional Debtors have not yet filed bankruptcy cases as of the date of this Disclosure Statement. Instead, the Joint Plan contemplates that the Additional Debtors will file bankruptcy cases shortly before Plan Confirmation and will emerge from bankruptcy shortly after Plan confirmation. This process is designed to provide notice to creditors through the Joint Plan and Disclosure Statement while conserving resources of the Additional Debtors for their Joint Plan contributions. The Additional Debtors are identified on Exhibit B-1 to the Joint Plan.

**Section 3.12    What happens if the Joint Plan is not confirmed?**

If the Joint Plan is not confirmed, the Bankruptcy Court has announced its intention to dismiss the bankruptcy case.  The Executive Summary at the beginning of this Disclosure Statement sets forth the risks associated with dismissal of the bankruptcy case.

Please note that the Joint Plan is a settlement resulting from extensive negotiations and mediations. If the Joint Plan is not confirmed the Survivors' Committee reserves all rights against the Debtor and Additional Debtors including seeking standing to assert the claims set forth in the Porfolios Adversary Proceeding and claims subject to the Tolling Agreements. Additionally, the Survivors' Committee reserves the right to challenge representations made in and exhibits attached to this Disclosure Statement, which are the work product of the Debtor and Additional Debtors.

## ARTICLE IV – DESCRIPTION OF THE DEBTOR AND ADDITIONAL DEBTORS

**Section 4.01    History and Structure of the Archdiocese.**

Erected in 1793, and originally known as the Diocese of Louisiana and the Floridas, the Archdiocese of New Orleans was a joint creation of the king of Spain and the Pope. In 1941, the Archdiocese was incorporated as a nonprofit corporation under the laws of the State of Louisiana.  The Archdiocese is an organization classified under IRC Section 501(c)(3).  On July 22, 1961, Pope John XXIII erected the Diocese of Baton Rouge, taking its territory from the Archdiocese.  On March 2, 1977, Pope Paul VI erected the Diocese of Houma-Thibodaux, also taking its territory from the Archdiocese.  Since 1977, the Archdiocese operates in the following eight civil parishes in the metropolitan New Orleans area, covering 4,208 square miles (the "**Region**"): Jefferson; Orleans; Plaquemines; St. Bernard; St. Charles; St. John the Baptist; St. Tammany; and Washington.

**Section 4.02    The Mission and Ministries.**

The Archdiocese's stated mission is to administer religious, charitable, educational, health, and life service programs of the Catholic Church.

The Archdiocesan Parishes (which, in turn, own the Parish Schools), the Suppressed Archdiocesan Parishes, and the Archdiocesan Agencies are all affiliated with the Archdiocese. Most of these entities will be filing bankruptcy as the Additional Debtors identified on Exhibit B-1 to the Joint Plan. In addition to the Additional Debtors there are certain Non-Debtor Catholic Entities that will not file bankruptcy, which are identified on Exhibit B-2 to the Joint Plan.

Set forth below is certain statistical information pertaining to the Archdiocese, the Additional Debtors, and the Non-Debtor Catholic Entities for the Fiscal Years 2021, 2022, 2023, 2024, and 2025:

| Archdiocese | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| Parishioners | 518,251 | 514,847 | 508,711 | 505,369 | 505,675 |
| Employees (Administrative Offices Only) | 155 | 161 | 158 | 131 | 157 |
| Parishes[8] | 112 | 112 | 112 | 105 | 104 |
| Nursing Homes | 3 | 3 | 0 | 0 | 0 |

---

[8] This includes both the Archdiocesan Parishes and the two church parishes that are not separately incorporated. It does not include the Archdiocesan Suppressed Parishes.

| | | | | | |
|---|---|---|---|---|---|
| Affordable Housing Facilities[9] | 21 | 21 | 20 | 20 | 20 |

The number of nursing homes and Affordable Housing Facilities at the end of Fiscal Year 2023 reflects the transactions described later in this Disclosure Statement.

Section 4.03    The Archdiocesan Schools.

The Debtor directly owns and operates the following schools (collectively, the "**Archdiocesan Schools**"): (a) the Academy of Our Lady High School (located in Marrero); (b) Archbishop Chapelle High School (located in Metairie); (c) Archbishop Hannan High School (located in Covington); (d) Archbishop Rummel High School (located in Metairie); (e) Archbishop Shaw High School (located in Marrero); (f) Pope John Paul II High School (located in Slidell); (g) St. Charles Catholic High School (located in LaPlace); (h) St. Scholastica Academy (located in Covington); and (i) St. Michael Special School for Exceptional Children (located in New Orleans).[10] Each Archdiocesan School is expected to comply with the Archdiocese's existing child protection policies, procedures, and programs, and each will be expected to comply any applicable provision of the Non-Monetary Plan Provisions after the Effective Date. In August 2024, the Archdiocesan Schools employed an aggregate number of 774 people. The Archdiocesan Schools do not include the Parish Schools discussed below.

Section 4.04    **Additional Information about the Additional Debtors and Non-Debtor Catholic Entities.**

The Additional Debtors generally fit within the following categories: (1) the Archdiocesan Parishes, (2) the Suppressed Archdiocesan Parishes and (3) the Archdiocesan Agencies. The Archdiocese (the corporation) is not a member or shareholder of any Additional Debtor, but the Archbishop (the individual) is the sole member of all of the Archdiocesan Parishes and most of the Archdiocesan Agencies. The Archdiocese's administrative office (the "**Administrative Offices**") provides administrative services to the Additional Debtors, such as securing insurance coverage and managing deductibles, self-insured retentions and premiums for health, general liability, property, and auto insurance.

The Additional Debtors and the Non-Debtor Catholic Entities are represented by Heller Draper & Horn, L.L.C:

(a)    *The Archdiocesan Parishes, the Mission, and the Parish Schools*. On the Petition Date, one hundred and twelve separate church parishes or missions operated within in the Region (collectively, the "**Archdiocesan Parishes**"). The Archdiocesan Parishes are listed on Joint Plan Exhibit B-1, at Part I. Each Archdiocesan Parish is separately incorporated.[11] For the Archdiocesan Parishes, the administrative services performed by the Archdiocese are detailed in both (a) a Parish Service Agreement, executed by most of the Archdiocesan Parishes, and (b) a Temporalities Manual. Under the Parish Service Agreements, the Archdiocese "[p]rovide[s] for the investment and management of Parish funds," at section 1.2(d), as an agent for the Archdiocesan Parishes. The vast majority of the Archdiocesan Parishes have executed Parish Service

---

[9] As discussed at Section 4.10 of this Disclosure Statement, the Affordable Housing Facilities are owned by the Affordable Housing Entities and managed by CHI Management.

[10] A nonprofit corporation is registered in Louisiana that bears the name "St. Michael Special School." That entity, however, does not operate St. Michael Special School for Exceptional Children.

[11] As noted in Joint Plan Exhibit A, two church parishes are not separately incorporated: (i) St. Louis Cathedral, and (ii) Our Lady of Guadalupe Church & Shrine of St. Jude.

Agreements.  Although there are no similar written undertakings for non-Parishes, all Additional Debtors and Non-Debtor Catholic Entities operate in the same manner as the Parishes.

The Archdiocese provides administrative services to the Archdiocesan Parishes, including Catholic elementary schools, each of which is owned and operated by an Archdiocesan Parish (collectively, "**Parish Schools**").  The Parish Schools do not include schools that are owned and operated by Religious Orders.  Each Parish School is expected to comply with the existing Archdiocese's child protection policies, procedures, and programs, and each will be expected to comply with any applicable provision of the Non-Monetary Plan Provisions after the Effective Date.

The Archbishop is the sole member of each separately incorporated Archdiocesan Parish.  The members of the Board of Directors of each Archdiocesan Parish consist of the Archbishop, Vicar General, the Chancellor, the Archdiocese's Chief Financial Officer, and the Pastor of the particular Archdiocesan Parish.  Pastors are responsible for religious, financial, and other matters.  The Board of Directors of each Archdiocesan Parish elects the officers.  Currently, the Board of Directors of each Archdiocesan Parish has elected the Vicar General as President, the Chancellor as Vice-President, and the Pastor of the Archdiocesan Parish as Secretary-Treasurer.  In 2023, Father Williams was appointed as President of each Archdiocesan Parish.

(b)    *The Suppressed Archdiocesan Parishes*.  Following Hurricanes Katrina and Ida, the operations of the Suppressed Archdiocesan Parishes (each listed in Part II of Joint Plan Exhibit B-1) were combined with one or more of the other Archdiocesan Parishes, such that the Suppressed Archdiocesan Parishes no longer operate as a separate Archdiocesan Parish. The Suppressed Parishes are all legal corporations in good standing with the Louisiana Secretary of State, and the Suppressed Parishes may own property. The Archbishop is the sole member of each Suppressed Archdiocesan Parish. The Board of Directors of each Suppressed Parish includes the Archbishop, the Vicar General, and the Archdiocese's Chief Financial Officer, while the officers of the Suppressed Archdiocesan Parishes are the Archbishop, as President, the Vicar General as Vice-President, and the Chief Financial Officer as Secretary-Treasurer.  Although the assets of a Suppressed Archdiocesan Parish may have allegedly been transferred under Canon Law to another Archdiocesan Parish, the real property records do not always reflect the transfer of any such real property.

(c)    *The Archdiocesan Agencies*.  The Archdiocese also provides administrative services to separately incorporated Entities, such as the Catholic Community Foundation Archdiocese of New Orleans ("**Catholic Foundation**"), Catholic Charities Archdiocese of New Orleans ("**Catholic Charities**"), Second Harvest Food Bank ("**Second Harvest**"), and Christopher Homes Management, Inc. ("**CHI Management**") (each as discussed below), St. Thérèse Catholic Academy (a separate Louisiana non-profit corporation that serves elementary and high school students with mild to moderate exceptionalities), and several other community service facilities and agencies (collectively, the "**Archdiocesan Agencies**"). The Archdiocesan Agencies are either Additional Debtors (listed in Part III of Joint Plan Exhibit B-1) or Non-Debtor Catholic Entities (listed on Joint Plan Exhibit B-2).  Each Archdiocesan Agency is expected to comply with the Archdiocese's existing child protection policies, procedures, and programs, and will be expected to comply with any applicable provision of the Non-Monetary Plan Provisions after the Effective Date.  The Affordable Housing Facilities, which are managed by CHI Management through a subcontractor, Providence Community Housing, will be sold under the Joint Plan with a substantial portion of the proceeds being using to fund the Settlement Trust.

Each Archdiocesan Agency is a non-profit corporation, created as a nonprofit Entity under IRC Section 501(c)(3), and, except for ANOI and 7887 Walmsley, Inc., each is organized under the laws of the State of Louisiana. ANOI and 7887 Walmsley, Inc. are each organized under the laws of the State of Vermont. The Archbishop is the sole member of most, but not all, of the Archdiocesan Agencies.  The Archdiocesan Agencies are responsible for paying the applicable Archdiocesan Agency Assessments to the Archdiocese for administrative services. Since COVID and Hurricane Ida, the collectability of the Archdiocesan Agency Assessments has declined.

In 2025, 1793 Group was formed for the purpose of facilitating payments required by the Joint Plan. The sole member of 1793 Group is the Archbishop. The officers of 1793 Group are Father Patrick Carr, Father Patrick Williams, and Father Leon Poche.

Balance sheets for the Additional Debtors are attached to this Disclosure Statement as Exhibit 4.

**Section 4.05      The Charter for the Protection of Children and Young People.**

In 2002, the United States Conference of Catholic Bishops (the "**USCCB**") adopted the Charter for the Protection of Children and Young People (as revised in 2005, 2001, and 2008, the "**Charter**"), which can be found at www.usccb.org/issues-and-action/child-and-youth-protection/charter.cfm. The Archdiocese is required to implement the Charter. Among other things, the Charter directs action in the following areas:

- Creating a safe environment for children and young people
- Healing and reconciliation of victims and survivors
- Ensuring prompt and effective response to allegations
- Cooperating with civil authorities
- Holding offenders accountable
- Instituting a process of accountability for the future to ensure instances of allegations are dealt with swiftly and effectively, assisted by the Secretariat of Child and Youth Protection and the National Review Board

**Section 4.06      The Archdiocese's Response before and after the Charter.**

In 1993, the Archdiocese adopted and implemented a Policy Concerning Abuse or Neglect of Minors (as amended, from time to time, including the current version that was adopted in 2021, the "**Policy**"). In 2011, the Archdiocese adopted the Principles of Ethics and Integrity in Ministry: Code of Ethics (as amended from time to time, including revisions adopted in 2021, the "**Code of Ethics**"). Both the Policy and the Code of Ethics are posted on the Archdiocese's website at https://nolacatholic.org/policies-and-procedures-of-the-archdiocese-of-new-orleans. In November 2018, the Archdiocese first publicly posted online a report regarding clergy abuse, which it has amended from time-to-time (as updated, the "**Report Regarding Clergy Abuse**"). The Report Regarding Clergy Abuse and is posted on the Archdiocese's website at https://nolacatholic.org/2018-report.

The Non-Monetary Plan Provisions will improve the Archdiocese's, the Additional Debtors, and Non-Debtor Catholic Entities' child protection policies to prevent future abuse. After the Effective Date, the Archdiocese will continue to publish information on its website, will investigate additional clergy based on claims filed in the Bankruptcy Case, and will make supplemental disclosures in accordance with the Non-Monetary Plan Provisions.

**Section 4.07      The Non-Debtor Catholic Entities.**

The Non-Debtor Catholic Entities are listed on Plan Exhibit B-2. The Joint Plan releases claims possessed by the Debtor against the Non-Debtor Catholic Entities in exchange for payments by the Non-Debtor Catholic Entities to 1793 Group for transfer to the Settlement Trust. Additionally, the Affordable Housing Entities, which are Non-Debtor Catholic Entities, are ultimately transferring sale proceeds as additional consideration as discussed in Section 4.09 of this Disclosure Statement.

In exchange for the release, the Non-Debtor Catholic Entities are contributing $5,000,000 in cash and the proceeds from the sale of the Affordable Housing Facilities as set forth in Section 4.08 of this Disclosure Statement.

The Debtor is releasing claims against the Non-Debtor Catholic Entities including, but not limited to claims asserting that: (a) property of the Non-Debtor Catholic Entities are property of the estate, (b) potential claims that the Archdiocese, the Additional Debtors, and the Non-Debtor Catholic Entities are a single business enterprise / alter ego and should all be treated as if they were in the same bankruptcy case, and (c) claims for avoidance actions under Chapter 5 of the Bankruptcy Code and under State Law.

The Non-Debtor Catholic Entities are separately incorporated entities, in good standing with the State of Louisiana, and have separate bank accounts. The Non-Debtor Catholic Entities assert that they have separate books and records and have their own separate creditor body with little or no debt guaranteed by the Debtor.

The Non-Debtor Catholic Entities assert that they have had minimal dealing with the public and have not had contact with minors that would have given rise to Abuse Claims.

The settlement of potential claims between the Debtor and Non-Debtor Catholic Entities is reasonable given the amount of funding coming from the Non-Debtor Catholic Entities and the extraordinary cost, time, and uncertainty of any litigation outcome if the claims were pursued.

### Section 4.08    The Affordable Housing Facilities.

Known as the Christopher Homes properties, fifteen housing complexes (the "**Affordable Housing Facilities**") are owned by certain Non-Debtor Catholic Entities (collectively, the "**Affordable Housing Entities**"), as follows: (a) Christopher Inn, owned by the Non-Debtor Catholic Entity of the same name; (b) The Apartments at Mater Dolorosa, owned by the Non-Debtor Catholic Entity of the same name; (c) Metairie Manor, owned by the Non-Debtor Catholic Entity of the same name; (d) Metairie Manor III, owned by the Non-Debtor Catholic Entity of the same name; (e) Metairie Manor IV, owned by St. Bernard II, one of the Non-Debtor Catholic Entities; (f) Place DuBourg, owned by Dubourg Home, one of the Non-Debtor Catholic Entities; (g) Rouquette Lodge, owned by St. Tammany Manor, Inc., one of the Non-Debtor Catholic Entities; (h) Rouquette Lodge III, owned by the Non-Debtor Catholic Entity of the same name; (i) Rouquette Lodge, IV, owned by St. Bernard III, one of the Non-Debtor Catholic Entities; (j) Wynhoven, owned by Monsignor Wynhoven Apartments, Inc., one of the Non-Debtor Catholic Entities; (k) St. Martin House, owned by Mental Health Association Development Corporation, one of the Non-Debtor Catholic Entities; (l) St. Bernard Manor, owned by the Non-Debtor Catholic Entity of the same name; (m) St. Martin's Manor, owned by the Non-Debtor Catholic Entity of the same name; (n) Villa St. Maurice, owned by Villa St. Maurice, Inc., one of the Non-Debtor Catholic Entities; and (o) St. Teresa's Villa, owned Villa Additions, one of the Non-Debtor Catholic Entities. Each of the Affordable Housing Entities is a separate entity, formed under the laws of the State of Louisiana. Providence Community Housing manages all of these properties.

With the exception of St. Martin's House,[12] each of the Affordable Housing Facilities was originally financed through HUD 202 Supportive Housing for the Elderly, and is now refinanced through HUD's 223(f) Housing Program (https://www.hud.gov/program_offices/housing/mfh/progdesc/purchrefi223f).

Under the Joint Plan, the Affordable Housing Facilities will be sold, and the net proceeds of the sale, if a sale is achieved, will fund the Settlement Trust. The sale of the Affordable Housing Facilities is being conducted by Newmark Affordable Housing Advisors ("**Newmark**") as broker, and an Independent Financial Advisor also will be selected. Newmark prepared marketing materials, worked with 20 potential buyers, and received eight non-binding letters of intent or offers to purchase the Affordable Housing Facilities. Newmark has recommended inviting the top five potential buyers to participate in a "best and final" bid process to conclude on or before September 15, 2025. Each of the five potential buyers is viewed by Newmark as a national firm capable of closing the transaction. Any sale of Christopher Homes will likely close in 2026. Proceeds from the sale of the Affordable

---

[12] St. Martin's House is encumbered by a mortgage in favor of the Louisiana Public Facilities Association.

Housing Facilities will be distributed as follows: (i) first $23 million in proceeds from the sale will be paid to the applicable Debtor, Reorganized Archdiocese, Additional Debtors, and Reorganized Additional Debtors; and (ii) the next $33 million in proceeds will be paid to the Settlement Trust. From the first $23 million in proceeds, $20 million will be used to repay the Settlement Trust Promissory Note. Proceeds exceeding $56 million will be divided between the Settlement Trust, the applicable Debtor, Reorganized Archdiocese, Additional Debtors, and Reorganized Additional Debtors, as follows:

| Division of Net Proceeds from Christopher Homes Sale Exceeding $56 Million | | |
|---|---|---|
| Sale Proceeds | Percentage of Proceeds Paid to Debtor and Additional Debtors | Percentage of Proceeds Paid to Settlement Trust |
| $56–$66 million | 25% | 75% |
| $66–$76 million | 35% | 65% |
| + $76 million | 50% | 50% |

Newmark has provided the Debtor, the Additional Debtors, and the Survivors' Committee with preliminary estimates of market value. The lowest of the top five offers received by Newmark is in the mid-range of values estimated by Newmark, and the price guidance suggested by the letters of intent suggests the ultimate contribution to the Settlement Trust could be at the mid to upper range of these estimates. Any sale outcome could be higher or lower than the Newmark estimates, but the lowest of the top five bids suggests the contribution to the Settlement Trust, if a sale is completed, will exceed $40,000,000. While no sale or sale price can be certain and closing costs may require additional adjustments, the chart below shows the anticipated, estimated net sale proceeds based on these preliminary market values, including Settling Insurer contributions.[13] The Additional Debtors' share of the Affordable Housing Facilities' sale proceeds pursuant to the sharing agreement must be paid to a not-for-profit entity.

---

[13] The chart includes the SPARTA settlement, which is subject to the financial assurance contingency discussed in Note 3 above.

| Settlement Trust Funding - Christopher Homes Sale Scenarios | | | |
|---|---|---|---|
| | Low | Medium | High |
| **Sales Price - Properties of Christopher Homes Communities** | $ 123,290,000 | $ 142,170,000 | $ 163,840,000 |
| Sales Commission | (1,232,900) | (1,421,700) | (1,838,400) |
| Estimated Closing Costs | n/a | n/a | n/a |
| Total Debt | (68,152,241) | (68,152,241) | (68,152,241) |
| **Net Proceeds - Properties of Christopher Homes Communities** | $ 53,904,859 | $ 72,596,059 | $ 93,849,359 |
| **Debtor, Additional Debtor, and Non-Debtor Catholic Entity Contributions** | | | |
| Promissory Note To Settlement Trust | $ 20,000,000 | $ 20,000,000 | $ 20,000,000 |
| Christopher Homes Base Proceeds to Settlement Trust | 30,904,859 | 33,000,000 | 33,000,000 |
| Christopher Homes Additional Proceeds to Settlement Trust | - | 11,787,438 | 22,924,680 |
| Effective Date Contribution to Settlement Trust | 130,000,000 | 130,000,000 | 130,000,000 |
| **Total Debtor, Additional Debtor, and Non-Debtor Catholic Entity Contributions** | $ 180,904,859 | $ 194,787,438 | $ 205,924,680 |
| **Settling Insurer Contributions** | | | |
| Sparta | $ 21,000,000 | $ 21,000,000 | $ 21,000,000 |
| Puritan | 85,000 | 85,000 | 85,000 |
| Chubb | 5,000,000 | 5,000,000 | 5,000,000 |
| Catholic Mutual | 2,000,000 | 2,000,000 | 2,000,000 |
| National Union (AIG) | 290,000 | 290,000 | 290,000 |
| Hartford | 900,000 | 900,000 | 900,000 |
| **Total Settling Insurer Contributions** | $ 29,275,000 | $ 29,275,000 | $ 29,275,000 |
| **Total Estimated Funding to Settlement Trust** | $ 210,179,859 | $ 224,062,438 | $ 235,199,680 |

Again, these estimates are subject to change based on whether a sale is concluded, the actual ultimate sale price, and adjustments in closing costs. If the Joint Plan is not confirmed, the Affordable Housing Facilities sale funds will not be available to Abuse Claimants.

**Section 4.09    The Archdiocese's Sources of Revenue.**

Revenue for the Archdiocese comes from a variety of sources, including the previously discussed Assessments, certain fee-based services, and the net interest margin received for administering the Deposit and Loan Fund Program, as well as donations, bequests, and charitable grants, portions of which are allegedly subject to donor restrictions. The Assessments, including the Archdiocesan Parish Assessments and Archdiocesan Agency Assessments, are the Archdiocese's major sources of income.

The Archdiocese bases the Assessments as a percentage of net income. Some Archdiocesan Parishes are delinquent in payment on the Assessments and the Archdiocese believes that Archdiocesan Parishes may remain delinquent in paying Assessments in the future. The Debtor's Accounts Receivable are discussed at Section 6.06 of this Disclosure Statement.

**Section 4.10    The Debtor's Governance and Administration.**

The Archbishop and the current President of the Archdiocese is the Most Reverend Gregory Michael Aymond. The Archbishop directly supervises the following officers of the Archdiocese and delegates to them full responsibility within their respective functions. The Archbishop is the only individual who may serve as President of the Archdiocese.   The following are brief biographic sketches derived from representations made by the Archdiocese regarding its senior administrative officers and financial officers:

***Most Reverend Gregory Michael Aymond, Archbishop, President, and Board Member***.   The Most Reverend Gregory Michael Aymond became the fourteenth Archbishop of New Orleans on August 20, 2009, succeeding Archbishop Alfred Clifton Hughes.   Archbishop Aymond was ordained an Auxiliary Bishop of New

Orleans on January 10, 1997, became Coadjutor Bishop of Austin in 2000, and was installed as Bishop of Austin on August 3, 2000. After graduating from St. Joseph Seminary College, St. Benedict, Louisiana, in 1971, he earned a master's degree in Divinity from Notre Dame Seminary in New Orleans in 1975. He was ordained a priest in New Orleans on May 10, 1975. From 1973 to 1981, he was a Professor, Business Administrator, and then Rector of St. John Vianney Preparatory Seminary in New Orleans. From 1981 to 1986, he was Professor of Pastoral Theology and Homiletics and Director of Education at Notre Dame Seminary. Archbishop Aymond served as President-Rector of Notre Dame Seminary from 1986 until the end of the 1999-2000 academic year. On November 12, 2024, having reached the mandatory retirement age under Canon law, Archbishop Aymond tendered a resignation letter to Pope Francis. Pope Leo XIV will make any decision to accept Archbishop Aymond's resignation.

*Dirk J. Wild, Chief Financial Officer.* Dirk J. Wild was appointed to the position of Chief Financial Officer in October 2022. Mr. Wild holds a Bachelor of Science degree in Accounting from Louisiana Tech University and a master's degree in Professional Accounting from the University of Texas. Mr. Wild worked from 1990 to 2001 at Arthur Andersen in New Orleans, where he served as a Senior Manager in Assurance and Business Advisory Services. From 2001 to 2010, he was on the Strategic Executive Team for The Shaw Group Inc. Thereafter, he served as the Chief Financial Officer of Globalstar, Inc., a public company that provides satellite communications services, and two private equity-owned companies in South Louisiana. Mr. Wild is an adjunct lecturer at the Tulane University A.B. Freeman School of Business.

*Very Reverend Patrick R. Carr, Vicar of Finance.* Father Carr earned a Master of Divinity Degree from Notre Dame Seminary. He was ordained to the priesthood in June 2016. He graduated from Louisiana State University in accounting and is a Certified Public Accountant. He worked in public accounting for eleven years. Father Carr is currently the Pastor at St. Rita Catholic Church in New Orleans. He is a member of the Finance Council and was appointed the Vicar of Finance for the Archdiocese in August 2019. From July 2022 to October 2022, Father Carr formerly served as the Archdiocese's interim Chief Financial Officer until Mr. Wild was appointed.

*Very Reverend Patrick J. Williams, First-Vice President, Vicar General, and Board Member*. Father Williams, a native of New Orleans and graduate of Holy Cross High School, attended Notre Dame Seminary and was ordained in May 1993. On January 1, 2014, he was appointed Vicar General for the Archdiocese. Father Williams earned a Master of Divinity Degree from Notre Dame Seminary and a Master's of Science in Education from Loyola University, both in 1993. After a Parochial Vicar Position and Vice Rector of Notre Dame Seminary, Father Williams was named Rector of Notre Dame Seminary in 2000. He remained in that position until 2007, when he was assigned to St. Pius X until he was appointed Rector of Cathedral-Basilica of Saint Louis King of France in July 2023. Father Williams is currently the Executive Director for Clergy, appointed in February 2009, and Assistant Secretary for the Archdiocese, and he serves as the President of each separately incorporated Archdiocesan Parish and the Vice-President of each Suppressed Parish, as discussed at Section 4.05 of this Disclosure Statement.

*Very Reverend Peter O. Akpoghiran, J.C.D., Second Vice President, Judicial Vicar, Chancellor, and Board Member*. Father Akpoghiran was ordained to the priesthood on December 12, 1992. He completed his Masters of Theology Degree from St. John's University, Queens, New York, in 2002. He served as the Associate Pastor of St. Francis of Paola, Brooklyn, New York, from 2001-2003. He obtained a Licentiate in Canon Law in 2005 and a Doctor of Canon Law Degree in 2007, from The Catholic University of America, Washington, D.C. He served as Judge in the Diocese of Richmond, Virginia, from 2007-2011. In September of 2011, the Archbishop appoint Father Akpoghiran as the Judicial Vicar of the Archdiocese. In 2013, Father Akpoghiran was also appointed as the Archdiocese's Chancellor.

### Section 4.11   Archdiocesan Councils and the Committee.

The Archbishop receives advice from a number of councils including the Priests' Council, the Administrative Council, the College of Consultors, the Finance Council, and a sustainability committee.

**Section 4.12    The Subcommittees.**

The Finance Council's work is supported by three sub-committees: the Audit Subcommittee, the Investment Subcommittee, and the Real Estate Subcommittee. In addition, in conjunction with the Archdiocese's Chapter 11 Case, a subcommittee of the Finance Council was formed, for the purpose of reviewing the internal budget and revenues of the Archdiocese and provide on-going recommendations to reduce any Archdiocese operating deficit.

Additionally, a subcommittee of the Finance Council provides recommendations designed to reduce any operating deficits, and a special subcommittee reviews the bills of Professionals that are paid by the Estate, which subcommittee is composed of Mr. Lloyd E. Eagan Jr., chair, Raechelle M. Munna, Esq., and E. Howell Crosby, Esq.

Mr. Eagan ran a New Orleans-based regional industrial supply and machine tool distributor, Oliver H. Van Horn Co., LLC, for many years before retiring from the business. After retirement, Mr. Eagan has volunteered at the Archdiocese, serving various roles on the Finance Council and its various subcommittees described above. Mr. Eagan is currently a member of the Finance Council. Mr. Eagan, working with the Estate's Financial Advisors, has provided advice to the Archbishop and the Finance Council throughout the Archdiocese's Chapter 11 Case.

**Section 4.13    The Deaneries.**

The Archdiocesan Parishes are organized into ten deaneries. Deaneries are regional clusters of Archdiocesan Parishes. A dean supervises the parochial records, implements the policies of the Archdiocese and the policies of the Archdiocesan Parishes, and coordinates the apostolic efforts of clergy, religious, and the faithful within the deanery.

**Section 4.14    Religious and Religious Orders.**

There are individuals who are laypersons or clerics that contribute to the mission of the Catholic Church (a "**Religious**"). If a Religious is not a cleric, that person is referred to as a sister or brother. Although there are a variety of forms by which Religious are organized in institutes of consecrated life, they are most often referred to as religious orders ("**Religious Orders**").

Religious Orders are Entities that are separate from the Archdiocese, the Additional Debtors, and the Non-Debtor Catholic Entities and are not insureds under the Subject Insurance Policies. Religious Orders often operate, or have operated, schools and other facilities within the Archdiocesan Region. The Archdiocese contends that members of a Religious Order are not subject to the supervision or discipline of the Archdiocese, or the diocese wherein they are located, unless they are employed in an Archdiocesan Parish, Archdiocesan School, or other institution that is subject to the Archbishop's oversight. Members of Religious Orders must obtain faculties from the Archbishop to operate in a facility operated by the Archdiocese, and these faculties may be withdrawn by the Archbishop following a Canon law process. Members of Religious Orders appear on the Credibly Accused List. Today, within the Region, there are about 102 Religious Order priests, with 20 communities of Religious men, and 32 communities of Religious women. As discussed below, many Abuse Claims that were filed in the Archdiocese's Chapter 11 Case involve Religious Order men or women. As of the date of this Disclosure Statement, no Religious Order is participating in the Joint Plan.

**Section 4.15 Results from Operations after the Petition Date.**

During the Bankruptcy Case, the Archdiocesan Schools have operated on a self-sustaining basis, so that income generated from tuition and fees by each Archdiocesan School has been sufficient to cover the costs of operations of that Archdiocesan School. During this same time period, the Debtor-Owned Parishes have essentially operated at break even. Attached as Exhibit 8 is a public filing setting forth the operations of the Archdiocese, excluding the high schools, for the past five years. As reflected in the June 2025 Monthly Operating Report [ECF 4167], as of June 30, 2025, total receipts over the course of the case were $1,973,787,554, and total disbursements were $1,923,454,753.

**Section 4.16 Impact of Hurricane Ida.**

On August 29, 2021, Hurricane Ida made landfall as a category 4 hurricane at Port Fourchon, Louisiana. The Archdiocesan Schools and certain of the Non-Debtor Catholic Entities suffered significant wide-ranging damage due to Hurricane Ida. For the most part, the damage caused by Hurricane Ida to the Archdiocese and Non-Debtor Catholic Entities is covered, with policy limits and self-insured retentions, by insurance policies that are administered in the Insurance Program, along with anticipated grants from FEMA. According to the Archdiocese, the Archdiocese, the Additional Debtors, and Non-Debtor Catholic Entities will have responsibility for uninsured losses that FEMA and the insurance proceeds do not cover. That amount is still being determined. The FEMA process is currently being impacted by changes in the current administration.

The evaluation of the damage to the properties of the Debtor and Non-Debtor Catholic Entities is still in process. As of June 30, 2025, 660 of the 1,455 buildings that sustained damage in the Region had been assessed by the insurance adjuster. A combination of FEMA reimbursements, insurance proceeds, and available cash are expected to be applied to the renovation and reconstruction costs for the Archdiocese, the Additional Debtors, and Non-Debtor Catholic Entities, which costs are currently expected by the Archdiocese to exceed $130 million. The applicable insurance policies have a named-storm deductible which is $35 million on $70 million of named-storm policy limits. The Debtor estimates its uninsured losses to exceed $60 million. Although the Archdiocese has sought assistance from FEMA for losses for itself, the Additional Debtors, and the Non-Debtor Catholic Entities, the amount and timing of any such assistance remains uncertain. As of June 30, 2025, the only FEMA reimbursements received is $12 million for Category A/B, or debris removal and mitigation. This amount, along with the $70 million received from insurance, makes up the only reimbursement received. FEMA is still in the process of working with the Archdiocese on "Permanent Repair" grants.

In addition to the damages noted above, Archdiocese property insurance costs have increased substantially in the years following Hurricane Ida.

## ARTICLE V – THE DEBTOR'S AND ADDITIONAL DEBTORS' LIABILITIES

**Section 5.01 The Abuse Proofs of Claim.**

As of the Petition Date, the Archdiocese asserts that it knew of roughly 80 unresolved claims for Abuse, including 34 lawsuits against the Archdiocese that alleged liability for Abuse (the "**Abuse Lawsuits**"), 33 of which were pending in a Louisiana state court, and one of which was pending in the District Court. As of July 1, 2025, approximately 660 non-duplicative Abuse Proofs of Claim were filed, including 250 claims filed after the Archdiocese's Abuse Claims Bar Date.

While the Archdiocese historically defended abuse claims based on the applicable prescriptive (statute of limitations) period, the Louisiana Legislature created the Revival Window eliminating prescription until June 14, 2024, for certain actions involving the sexual abuse of a minor. The Revival Window was subsequently extended

by the Louisiana Legislature until June 14, 2027. In June 2024, the Louisiana Supreme Court, on rehearing, ruled that the Revival Window does not violate the Due Process Clause of the Louisiana Constitution. *Bienvenu v. Defendant 1*, 2023-01194 (La. 06/12/24); 386 So. 3d 280. Defendants in child sex abuse litigation continue to raise constitutional concerns regarding the Revival Window, which have not yet been resolved. In addition, the Debtor continues to dispute liability with respect to the Abuse Claims.

### Section 5.02     The Known Abuse Claims Subject to the BSA Channeling Injunction.

On February 15, 2022, the Boy Scouts of America and Delaware BSA, LLC (collectively, "**BSA**") filed their Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (as amended, modified, or supplemented, and together with any exhibits and schedules thereto, the "**BSA Plan**"), [ECF 8813, In re Boy Scouts of America, No. 20-10343-LSS (Bankr. D. Del.) (filed Feb. 15, 2022)]. The BSA Plan was modified in part by United States Court of Appeals for the Third Circuit following the United States Supreme Court's decision in Harrington v. Purdue Pharma, L.P., 603 U.S. -- (June 27, 2024), but the Third Circuit left the channeling injunction intact. *In re Boy Scouts of America, et al.*, -- F.4th --, Case Nos. 23-1664, et seq. (3d Cir. May 13, 2025).

In accordance with the BSA Plan, in this Bankruptcy Case, the Archdiocese became a "Participating Chartered Organization". This, in turn, also makes the Archdiocese a "Limited Protected Party" under the BSA Plan which affords the Archdiocese certain protections. The Debtor believes that the following 11 Abuse Proofs of Claim have been released and channeled to the settlement trust that was created pursuant to the BSA Plan: 20015, 20070, 20086, 20128, 20214, 20282, 20284, 20327, 20351, 20364, and 30046. Under the Joint Plan, the Settlement Trustee will evaluate these claims to determine whether they are channeled under the BSA Plan.

### Section 5.03     The Bonds.

The Louisiana Public Facilities Authority, a public trust and public corporation of the State of Louisiana (the "**LPFA**"), issued the Louisiana Public Facilities Authority Refunding Bonds in the aggregate principal amount of $41,895,000 (the "**Bonds**"), pursuant to (among other things) (a) that certain Trust Indenture, dated as of April 1, 2017 (the "**Bond Indenture**"), by and between the LPFA and the Bond Trustee, and (b) that certain Loan Agreement, also dated as of April 1, 2017 (the "**Bond Documents**"). The Bonds are tax-exempt, limited and special obligations of the LPFA and do not constitute or create an obligation, general or special, or liability of the State of Louisiana. With certain limited exception, the LPFA assigned all its right, title, and interest in, to and under the Bond Indenture and Bond Documents to the Bond Trustee. (Bond Indenture, §§ 7.01 and 7.03.) As of the Petition Date, the Debtor was indebted on the Bonds in the principal amount of $37,970,000. The Archdiocese's obligations under the Bond Documents constitute general, unsecured obligations of the Archdiocese, payable from its gross revenues, its general fund, or any other moneys legally available to the Archdiocese. (Loan Agreement, at Section 6.07).

The Bond Documents requires, among other things, that the Archdiocese make payments to the Bond Trustee in aggregate amounts sufficient to pay, when due, the principal of and interest on the Bonds, including (a) payments made semiannually, on the third business day before each January 1 and July 1, in an amount equal to the interest due and payable on the Bonds on such January 1 or July 1, as the case may be, and (b) annually on the third business day before each July 1, in an amount equal to the principal amount of the Bonds that are maturing or scheduled for optional redemption on such July 1. (Bond Loan Agreement, § 4.01.) The Bond Loan Agreement also contains certain financial covenants.

As of the Petition Date, the following amounts were due and payable on the Bonds: (a) a semi-annual interest payment, in the amount of $930,207.25; and (b) an annual principal payment for 2020 in the amount of $1,385,000. In the Loan Agreement, the Archdiocese also agreed that, on demand, it would pay the Bond Trustee

its expenses and the reasonable fees of its attorneys for the collection of amounts payable under the Bond Documents, or the enforcement of the performance or observance of any covenants or agreements contained in the Bond Loan Agreement. (Bond Loan Agreement, § 9.04.) Following entry of an Order approving the Bond Settlement Agreement, as discussed at Section 7.05 of this Disclosure Statement, the Debtor paid the semi-annual interest payments that became due after the Petition Date, on July 1 and January 1. The Debtor's last semi-annual interest payment was paid for the January 1, 2025 interest payment. The Debtor did not pay the July 1, 2025 interest payment.

The Bond Claims are treated in Class 6 at Section 4.6 of the Plan.

**Section 5.04     The Priest Pension Plan.**

Incardinated priests of the Archdiocese and Archdiocesan Parishes, whose retirement from active service is duly accepted by the Archbishop, are eligible for retirement benefits under the Priest Pension Plan that is sponsored by the Archdiocese. The Priest Pension Plan is a non-contributory defined benefit plan and qualifies as a church institution under the IRC. As such, the Priest Pension Plan is not subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), nor are benefits under the Priest Pension Plan guaranteed by the Pension Benefit Guarantee Corporation. The Priest Pension Plan is exempt from federal income tax under provisions of IRC Section 501(c)(3). The Priest Pension Plan is covered under IRC Section 414(e) - Church Plans.

In addition to the Priest Pension Plan, Priest Retiree Medical Benefits are offered to priests who retire at age 65 due to permanent mental or physical disability, or with the approval of the Archbishop. For these retired priests, the Archdiocese purchases a Medicare Supplement plan, and pays the entire premium for such plan. Since 2020, the Medicare Advantage plan has been insured through Retiree First. The Archdiocese also reimburses each retired priest (a) 100% of the retired priest's medical expenses that not covered by the Medicare Advantage plan, and (b) 100% of the retired priest's dental and vision medical expenses. Finally, the nursing or assisted living costs for retired priests are also covered 100% net of (a) offsets against any hospital chaplain fees to which the retired priest would otherwise be entitled, and (b) offsets against payments otherwise payable under the Priest Pension Plan as follows: (i) if the retired priest is a resident of a skilled nursing, 97% of payments from the Priest Pension Plan; (ii) if the retired priest is a resident of an assisted living facility, 80% of the payments otherwise payable to the retired priest under the Priest Pension Plan, and (iii) 60% of the costs of independent living.

**Section 5.05     Priority Tax Claims and Other Priority Claims.**

The Louisiana Department of Revenue has filed a Proof of Claim for Priority Taxes that were allegedly assessed in December 2019, in the amount of $6,534.50. No other Priority Tax Claims have been filed or were listed on the Debtor's Schedules. Priority Tax Claims are unclassified under the Joint Plan and are treated at Section 4.1 of the Joint Plan.

As of the Petition Date, there were roughly $628,000 in alleged Other Priority Claims for refunds of deposits for events that were cancelled due to COVID (collectively, the "**Refund Claims**"), including $626,458.55 that were listed in the Debtor's Schedules. Because most of the Refund Claims were less than $3,025 per individual, the Refund Claims are Priority Claims under section 504(a)(7) of the Bankruptcy Code. As previously mentioned, the Debtor obtained an Order that authorized, but did not require, the Debtor to pay Refund Claims that were less than $3,025 per individual. [ECF 162]. The Debtor estimates that it has paid all or substantially all of the Refund Claims.

Besides the Refund Claims, certain Creditors filed Priority Claims, including Claims related to employee medical expenses and pension payments to certain retired priests, for a total of about $729,000. Since the Petition Date, many of the employee medical Claims have been paid pursuant to the Final Order granting the Insurance

Motion. [ECF 176]. Further, the Debtor disputes the Priority Claim status of many of the remaining Claims that assert Priority Claim status. Other Priority Claims are treated in Class 1 at Section 4.1 of the Joint Plan. None of the foregoing claims are paid by the Settlement Trust.

### Section 5.06    Leases of Miscellaneous Computers and Office Equipment.

The Archdiocese leases certain computers and other office equipment (the "**Office Equipment Leases**"), primarily for use in the following Archdiocesan Schools in the Region: Academy of Our Lady High School; Archbishop Hannan High School; Archbishop Rummel High School; Pope John Paul II High School; and St. Charles Catholic High School. The Joint Plan provides that executory contracts, such as the Office Equipment Leases, will be assumed as of the Effective Date unless specifically rejected. As of the Petition Date, the Debtor estimates that aggregate balance due on the Office Equipment Leases was approximately $995,706. These Claims are not paid by the Settlement Trust.

### Section 5.07    Non-Insurer Contribution Claims.

The Debtor estimates that two hundred and five (205) Proofs of Claim were filed that assert Non-Insurer Contribution Claims. The vast majority of such Non-Insurer Contribution Claims were filed by the Non-Debtor Catholic Entities, although several were filed by other Creditors, including an insurer, one university, several Religious Orders, and an alleged Perpetrator for legal fees and expenses. Non-Insurer Contribution Claims are treated in Class 5, at Section 4.5 of the Joint Plan. These Claims are extinguished under the Joint Plan, and to the extent the Claims are between the Debtor, the Additional Debtors, and the Non-Debtor Catholic Entities, they are released. These Claims are not paid by the Settlement Trust.

### Section 5.08    General Unsecured Claims and Unsecured Trade Claims in Class 7.

Based on the Debtor's Schedules and the Proofs of Claim, the Debtor estimates that the General Unsecured Claims and Unsecured Trade Claims total approximately $1.4 million, excluding unliquidated Non-Abuse Personal Injury Claims treated in Class 8 at section 4.8 of the Joint Plan. The General Unsecured Claims and Unsecured Trade Claims are treated in Class 7 at Section 4.7 of the Joint Plan. This section provides that holders of General Unsecured Claims and Unsecured Trade Claims will be paid 1% of the value of their Claim unless their Claim is treated as a Convenience Claim, which will be paid in full up to a cap of $50,000. These Claims are not paid by the Settlement Trust.

### Section 5.09    Certain FEMA Projects and the Disputed FEMA Claim.

For itself and as agent for certain of the Additional Debtors and Non-Debtor Catholic Entities, the Archdiocese asserts it has received approximately $298 million of federal grant monies related to Hurricane Katrina. Depending on the result of ongoing review of certain FEMA "Project Worksheets" for projects that have not yet been closed, the Debtor and certain of the Additional Debtors and Non-Debtor Catholic Entities may owe money to FEMA. It is important to note that when a FEMA grant is received there is an ongoing requirement that the entity that received the grant obtain and maintain appropriate insurance up to the amount of the grant. Failure to meet these requirements could result in an inability to secure future FEMA funding.

By letter dated February 23, 2023, from the Governor's Office of Homeland Security and Preparedness, the Archdiocese was notified that a determination had been made that the Archdiocese received payments in excess of the grant funding provided by FEMA in the aggregate amount of approximately $5.7 million. The Archdiocese is in the process of reviewing the alleged overpayments, and has not yet determined if it agrees with the letter. Further, no Proof of Claim was filed for any such overpayment, which would have been a Contingent Claim as of the applicable Claims Bar Date. If Allowed, the FEMA Claim, currently in the amount of $5.7 million, would be

treated as a General Unsecured Claim in Class 7. The foregoing does not include the settled Qui Tam Claim discussed at Section 7.15 of this Disclosure Statement. These Claims are not paid by the Settlement Trust.

### Section 5.10   The SAG Senior Bonds, the Subordinated SAG HWB Debt, and the Terminated SAG Guaranty.

Pursuant to that certain Guaranty by the Archdiocese, dated September 4, 2014, and the Guarantor Acknowledgement, dated April 25, 2017 (collectively, the "**SAG Guaranty**"), the Archdiocese guaranteed certain indebtedness of St. Anthony's Gardens ("**SAG**"), a Louisiana non-profit corporation formed in 2012 for the sole purpose of developing a rental fee-for-service senior living retirement community known as St. Anthony's Gardens, located in St. Tammany Parish, Louisiana (the "**SAG Project**"). The SAG Project was initially funded by the Archdiocese's contribution of 23.8 acres of land, together with up to roughly $40.5 million of senior bonds (the "**SAG Senior Bonds**"), and (c) $12.6 million of subordinate debt, issued through the LPFA for SAG's benefit, as borrower. The SAG Senior Bonds are secured by a mortgage granted by SAG on the SAG Project and other SAG assets. As of the Petition Date, the principal outstanding balance of the SAG Senior Bonds was about $37.1, together with interest until paid in full, attorneys' fees, and costs and other amounts. As discussed in Section 7.11 of this Disclosure Statement, SAG sold the SAG Project to CommCare in a transaction that occurred on June 13, 2023. Following the closing of that transaction, HWB cancelled and terminated the SAG Guaranty, and amended its Proof of Claim accordingly. (Amended Proof of Claim 51.) Following these transactions, no Claim remains related to the SAG Senior Bonds or SAG Guaranty. Any Claim that does exist would be a General Unsecured Claim under Section 4.7 of the Joint Plan.

### Section 5.11   The Forgiven Paycheck Protection Program Loans.

Before the Petition Date, the Debtor received the following loans under the Paycheck Protection Program, sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act, and the Small Business Administration's "7(a) loan program": (a) HWB, as lender, for use by St. Michael's Special School; (b) Home Bank, as lender, for use by St. Scholastica Academy; (c) Gulf Coast Bank & Trust Company, as lender, for use by Academy of Our Lady; and (d) First Bank & Trust, as lender, for use by one or more of Archbishop Chappelle High School, Archbishop Hannan High School, St. Charles Catholic School, Archbishop Shaw High School, and/or Archbishop Rummel High School. Each of the foregoing loans has been fully forgiven, although the corresponding Proofs of Claim have not been withdrawn yet.

### Section 5.12   The Non-Abuse Personal Injury Claims.

Certain Claims have been asserted against the Debtor related to non-abuse personal injuries that occurred prior to the Petition Date. Non-Abuse Personal Injury Claims are classified as Class 8 of the Joint Plan at Section 4.8, which generally provides that Non-Abuse Personal Injury Claims may litigate such Non-Abuse Personal Injury Claims against the Reorganized Archdiocese and recover (i) first, from any available insurance proceeds to the extent insurance coverage exists, until occurrence limits applicable to the Non-Abuse Personal Injury Claim under such insurance policy are fully exhausted and (ii) second, from the Reorganized Archdiocese in an amount equal to the balance of such Allowed Non-Abuse Personal Injury Claim still remaining (if any) after such Creditor recovers any available insurance proceeds from such applicable insurance policy. These Claims are not paid by the Settlement Trust.

### Section 5.13   Non-Abuse Claims Against the Additional Debtors

The Additional Debtors are filing pre-packaged bankruptcies. To facilitate this process, the Joint Plan provides that the Additional Debtors will pay all Non-Abuse Claims in the ordinary course of business as they come due.

This treatment is set out in Classes 9 and 10 of Sections 4.9 and 4.10 of the Joint Plan. These Claims are not paid by the Settlement Trust.

## ARTICLE VI – PROPERTY OF THE DEBTOR AND THE ADDITIONAL DEBTORS

### Section 6.01    Overview of Debtor's and Additional Debtors' Property.

The Debtor and Additional Debtor's property is generally comprised of the following: (a) immovable (real) property; (b) tangible movable (personal) property (including insurance policies); (c) incorporable movable property, including cash, investments, and receivables; and (d) Avoidance Actions. Except for the Avoidance Actions, the Archdiocese and Additional Debtors have valued assets based on public records, independent appraisals, and assumptions and analysis provided by its financial advisor.

### Section 6.02    The Immovable (Real) Property.

The Debtor and the Additional Debtors have significant real estate assets comprising of approximately 1,500 properties and/or structures including church buildings, rectories, residential homes, apartments, schools, and vacant land. While certain assets have been appraised at various times by the Debtor or the Survivors' Committee, the Debtor does not have comprehensive appraisals of all of its assets. A summary of the Debtor's immovable property is attached to this Disclosure Statement as Exhibit 6. Information regarding the immovable property of the Additional Debtors is set forth in Exhibit 7 to this Disclosure Statement.

### Section 6.03    The Debtor's Tangible Movable (Personal) Property.

In 2022 and 2023, the Debtor obtained appraisals of its art and other collectables, including, but not limited to, antique furniture, paintings, ecclesiastical statues, and other objects of religious or historical significance. The appraisals include artwork and collectables located at St. Louis Cathedral and its rectory, Ursuline Convent, the Catholic Cultural Heritage Ctr. & St. Mary Church, Our Lady of Guadalupe & Shrine of St. Jude, 7997 Walmsley Ave., and other property stored at a New Orleans storage facility. The appraisals were prepared by Winston & Associates, L.L.C., appraisers and consultants of fine arts and antiques. According to those appraisals, the Debtor's art and collectables have a collective appraised value of $2,463,240. The appraisals are based on fair market value, with the exception of one item that was appraised at a replacement value of $12,000.

The Archdiocese also owns furniture, fixtures, and equipment ("**FF&E**"), the vast majority of which is used in the operation of the Archdiocesan Schools. The Debtor estimates that the liquidation value of its FF&E is approximately $675,000, which is also 15% of the net book value of such FF&E. Finally, the Archdiocese owns a number of vehicles, including cars, school buses, and vans, which vehicles are mostly used by one of the Archdiocesan Schools. The Debtor estimates that the collective fair market value of those vehicles is approximately $500,000, based on Kelley Blue Book and used sale cites. The Debtor anticipates having approximately $48,000,000 in Cash after making its payments on the Effective Date.

### Section 6.04    Portfolio A.

Portfolio A refers to funds under a custodial agreement with Hancock Whitney Bank. Portfolio A contains investments owned by the Archdiocese, the Additional Debtors, and third parties. The funds that were invested in Portfolio A are from donations, some of which are restricted donations and others which are unrestricted. Portfolio A is comprised of the following investments as of May 31, 2025:

**Debtor/ Additional Debtor Investments:**

| | |
|---|---|
| Debtor Investments | $ 113,652,954 |
| Additional Debtor Investments | 149,122,249 |
| | $ 262,775,203 |

**Debtor investments (Donor restricted vs Unrestricted):**

| | |
|---|---|
| Donor Restricted Funds | $ 35,041,712 |
| Unrestricted Investments | 78,611,242 |
| Total | $ 113,652,954 |

**Section 6.05    The Deposit and Loan Program, the Deposit and Loan Fund Notes Receivables, and Portfolio B.**

The Archdiocese maintains funds deposited by the Archdiocese, the Additional Debtors, and the Non-Debtor Catholic Entities in the "Deposit and Loan Fund Program."  The Deposit and Loan Fund Program essentially functions as a savings bank for the Non-Debtor Catholic Entities and Archdiocese, (a) providing a source of funds for loans for, among other things, construction, renovations, and expansions, and (b) serving as a vehicle to invest working capital, donor restricted funds, endowments, and quasi-endowments ("**Deposit and Loan Deposits**"). The receivables generated from the Deposit and Loan Fund are referred to as the "Deposit and Loan Notes Receivables." Deposit and Loan Deposits are invested in Portfolio B, an investment management account maintained at Hancock Whitney Bank. The Additional Debtors and the Non-Debtor Catholic Entities assert that they can trace the funds they deposited into the Deposit and Loan Fund and that, under applicable law, the money in the fund is not property of the Estate.  This position has been disputed by the Survivors' Committee. The ownership of the money in the Deposit and Loan Fund would be subject to litigation if the Joint Plan is not confirmed.  In addition, to the extent that the fund could be deemed to be property of the Estate claims would exist in favor of the Additional Debtors and the Non-Debtor Catholic Entities against the Debtor.

As of May 31, 2025, the Deposit and Loan Fund Program held a total of $23,221,806 in cash or cash equivalents and fixed income securities. However, like any loan program, the Deposit and Loan Program has liabilities for deposits and uncollectible loans. Additionally, funds from the Deposit and Loan Fund Program have been segregated for funding the Joint Plan as well as funding operational losses during the bankruptcy. This has resulted in a Deposit and Loan Program deficit of $72,483,921 as of May 31, 2025.  In addition to these liabilities, deferred tuition payments for the upcoming school year create a liability of $20,820,614 as of May 31, 2025, resulting in a total deficit of $93,304,535.  The Deposit and Loan Program will pass through the bankruptcy case pursuant to section 10.7 of the Joint Plan.

**Section 6.06    The Debtor's Accounts Receivable.**

Below is a summary provided by the Debtor of its accounts receivable (excluding the Deposit and Loan Fund Program) as of May 31, 2025:

|  |  |  |
|---|---|---|
| 0-30 days | $ | 51,600,975 |
| 31-60 days | | 346,594 |
| 61-90 days | | 422,355 |
| 90+ days | | 17,809,166 |
| **Total Receivables** | | 70,179,090 |
| Allowance for Bad Debts | | (7,925,841) |
| Net | $ | 62,253,249 |

The following is the Debtor's breakdown of the accounts receivable owed to the Archdiocese by the Additional Debtors and Non-Debtor Catholic Entities excluding the Deposit and Loan Fund:

| Category | 0-30 | 31-60 | 61-90 | 90+ | Total |
|---|---|---|---|---|---|
| Allowance (reserves) | $ (195,115) $ | (194,878) $ | (194,767) $ | (7,341,081) $ | (7,925,842) |
| Assessments | 153,083 | 37,053 | - | 1,626,459 | 1,816,595 |
| Health Insurance | 1,917,601 | - | - | - | 1,917,601 |
| Insurance | 666,637 | 154,011 | 42,952 | 1,802,479 | 2,666,079 |
| Miscellaneous/Departmental | 1,345,394 | 75,015 | 315,654 | 1,617,628 | 3,353,692 |
| Priest Benefits | 33,410 | 12,158 | 2,877 | 332,029 | 380,474 |
| Storm Related | 23,967,644 | 5,440 | 60,872 | 5,991,142 | 30,025,097 |
| Pledges Receivable | 150,000 | 62,917 | - | 2,342,432 | 2,555,349 |
| Tuition and Fees | 23,367,206 | - | - | 4,096,999 | 27,464,205 |
| | $ 51,405,860 $ | 151,716 $ | 227,588 $ | 10,468,085 $ | 62,253,249 |

**Section 6.07      The Insurance Program, the Subject Insurance Policies, and ANOI.**

A.      Current Insurance Program

The Archdiocese administers an insurance program for itself, the Additional Debtors, and the Non-Debtor Catholic Entities (the "**Insurance Program**").  The Insurance Program includes various types of insurance coverages, including, but not limited to, insurance for building and contents including named storm, business interruption, commercial general liability, excess liability, personal misconduct, directors' and officers' liability, healthcare liability, professional liability, flood, and cyber security.  As the Archdiocese administered the Insurance Program before the Petition Date, a portion of the costs of these coverages has been allocated, as appropriate, to various Additional Debtors and Non-Debtor Catholic Entities.  Effective July 1, 2021, the Debtor changed its insurance broker of record to A.J. Gallagher.  A.J. Gallagher assisted the Debtor in placing its insurance program in the commercial insurance market.  The Insurance Program includes commercial liability insurance, including primary, umbrella, and excess liability policies that protect the Archdiocese, the Additional Debtors, and Non-Debtor Catholic Entities as Covered Entities for Claims arising out of alleged Abuse (collectively, the "**Subject Insurance Policies**").



B.     Historical Insurance Coverage.

Additionally, the Debtor asserts that certain Subject Insurance Policies may provide coverage to (a) Diocese of Houma-Thibodaux, as a Covered Entity, (i) at any time before March 2, 1977, when the Diocese of Houma-Thibodaux was erected separately from the Archdiocese, and (ii) thereafter from March 2, 1977 through February 2, 1982, when the Diocese of Houma-Thibodaux was named as a Covered Entity on certain Subject Insurance Policies; and (b) the Diocese of Baton Rouge, at any time before July 22, 1961, when the Diocese of Baton Rouge was erected separately from the Archdiocese.

Subject to coverage defenses that may exist, the Subject Insurance Policies covering the time period from February 1, 1964, to February 1, 1973, were issued by American Employers' Insurance Company. American Employers' Insurance Company was acquired by another entity prior to American Employers' Insurance Company being placed into liquidation. There is pending litigation between SPARTA Insurance Company and American Employers' Insurance Company ("**SPARTA**") and Pennsylvania General Insurance Co. over which insurer is responsible for American Employers' Insurance Company policies. *See Sparta Insurance Co. v. Pennsylvania General Ins. Co.*, 1:21-cv-112-5-FDS (D. Mass). For a complete understanding of the issues and status of that litigation, please refer to the pleadings filed in that litigation.

Subject to coverage defenses that may exist, the Subject Insurance Policies covering the time period from February 1, 1973, to July 1, 1989, are largely insured by United States Fidelity & Guaranty Company, affiliate of Travelers Indemnity Company ("**Travelers**"). During some of those years, high excess insurance was provided by entities now known as Chub Insurance Group and Hartford Insurance Group. Lastly, subject to coverage defenses that may exist, the Subject Insurance Policies or similar certificates covering the time periods after July 1, 1989, to the extent such coverage exists, are issued by Catholic Mutual Relief Society of America.

C.     Archdiocese of New Orleans Indemnity, Inc.

In May 2011, Archdiocese of New Orleans Indemnity, Inc. ("**ANOI**") was incorporated as a non-profit captive insurance company in the State of Vermont, and was started with $2.0 million from the Archdiocese.

According to the Debtor, to reduce the long-term cost of the Insurance Program, ANOI provides a self-insurance program as follows: for workers' compensation $800,000 self-insured retention, with no annual aggregate; for property liability, $500,000 per occurrence, no annual aggregate; for auto liability, $300,000 per occurrence, with no annual aggregate; for auto physical damage for $500,000 per occurrence, with no annual aggregate; for general liability, $300,000 per occurrence, no annual aggregate; and for misconduct, $500,000 per occurrence, with no annual aggregate. ANOI is a Non-Settling Insurer under the Joint Plan.

For the Fiscal Years 2025, 2024, 2023, 2022, and 2021 total net premium payments made by the Debtor to ANOI were approximately $5,072,000, $5,550,000, $5,929,000, $5,825,000 and $5,821,000 respectively, which payments were recorded as premium earned by ANOI. ANOI declared a dividend of $875,000 in Fiscal Year 2018 and $2,500,000 in Fiscal Year 2019.

The Debtor changed Insurance Program for employee health insurance during Fiscal Year 2019. The Non-Debtor Catholic Entities participate in the employee health insurance program, which includes enrollment of approximately 2,921. The Archdiocese funds claims up to $10,000 under the employee health insurance program. ANOI provides medical stop-loss coverage for claims between $10,000 and $300,000 and aggregate stop-loss coverage for total claims in excess of 110% of expected claims. Additionally, employee health insurance program has an excess medical/pharmacy stop-loss coverage for claims over $300,000.

The Archdiocese of New Orleans Indemnity, Inc is a "reimbursement captive" following the coverages of its insurance carriers.

### Section 6.08    Avoidance Rights.

The deadline to file actions related to Avoidance Rights expired on May 2, 2022, pursuant to section 546(a) of the Bankruptcy Code. Before the expiration of the deadline, the Debtor and Committees entered into certain Tolling Agreements with the Tolling Parties, including, but not limited to the Non-Debtor Catholic Entities. The Tolling Agreements currently extend the tolling through May 1, 2026. [ECF 3774]. The avoidance rights of the Debtor and the Additional Debtors against the Non-Debtor Catholic Entities will be released under the Joint Plan in exchange for settlement consideration as discussed in Section 4.07 of this Disclosure Statement.

### Section 6.09    Assets and Liabilities of the Additional Debtors.

The Additional Debtors are comprised of the parishes (including 103 parishes following the canonical mergers discussed at Section 6.11 below), suppressed parishes, and Archdiocesan agencies, as described in Section 4.05 of this Disclosure Statement and are listed on Joint Plan Exhibit B-1. The property owned by the Additional Debtors consists of immovable (real) property, tangible movable (personal) property, investments, and Cash. The Additional Debtors are funded with a combination of donations, interest or investment income, and, in the case of certain Additional Debtors, grants. A disclosure of the assets and liabilities of the Additional Debtors is set forth in Exhibits 4 and 7 to this Disclosure Statement.

### Section 6.10    Post-Petition Changes to Archdiocesan Parishes.

In 2024, in the ongoing aftermath of Hurricane Ida and a result of storm damage, the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental statistics, and financial difficulties encountered by different Archdiocesan Parishes, the following Archdiocesan Parishes were canonically merged with neighboring Archdiocesan Parishes:[14]

---

[14] Canonical mergers are not legal mergers of corporate entities within the meaning of or under Louisiana civil law. Instead, a canonical merger of the territory is covered by a particular Archdiocesan Parish.

(a) St. Hubert Roman Catholic Church, Garyville, Louisiana, now known as St. Hubert's Inc., was canonically merged into St. Peter Roman Catholic Church, Reserve, Louisiana;

(b) (i) St. James Major Roman Catholic Church, New Orleans, Louisiana, now known as St. James Major, Inc., and (ii) St. Gabriel Roman Catholic Church, New Orleans, Louisiana, now known as St. Gabriel, Inc., were both canonically merged into Transfiguration of the Lord Roman Catholic Church, New Orleans, Louisiana, now known as St. Martin de Porres Roman Catholic Church, New Orleans, Louisiana;

(c) St. John Bosco Roman Catholic Church, Harvey, Louisiana, now known as St. John Bosco, Inc., was canonically merged into St. Rosalie Catholic Church, Harvey, Louisiana, now known as Mary, Help of Christians Roman Catholic Church, Harvey, Louisiana;

(d) St. Bonaventure Roman Catholic Church, Avondale, Louisiana, now known as St. Bonaventure, Inc., was canonically merged into Our Lady of the Angels Roman Catholic Church, Waggaman, Louisiana, now known as St. John Paul I Roman Catholic Church;

(e) St. Gertrude Roman Catholic Church, Des Allemands, Louisiana, now known as St. Gertrude, Inc., was canonically merged into St. John the Baptist Roman Catholic Church, Paradis, Louisiana, now known as St. Michael the Archangel Parish, Paradis, Louisiana;

(f) Our Lady Star of the Sea Roman Catholic Church, New Orleans, Louisiana, now known as Our Lady Star of the Sea, Inc., was canonically merged into St. Mary of the Angels Roman Catholic Church, New Orleans, Louisiana, now known as St. Josephine Bakhita Roman Catholic Church, New Orleans, Louisiana; and

(g) St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, now known as St. Theresa of Avila, Inc., had its canonical territory divided so that (i) the area north of the Pontchartrain Expressway was canonically merged St. Patrick Roman Catholic Church, New Orleans, Louisiana, and (ii) the area south of the Pontchartrain Expressway was canonically merged into St. Alphonsus Roman Catholic Church, New Orleans, Louisiana.

Under Canon Law, the assets and liabilities of these canonically merged Archdiocesan Parishes became the property of the Archdiocesan Parish that accepts the parishioners of the other Archdiocesan Parish, except that assets of St. Theresa of Avila Roman Catholic Church, New Orleans, Louisiana, were proportionately divided under Canon Law between the two receiving Archdiocesan Parishes, St. Patrick Roman Catholic Church, New Orleans, Louisiana, and St. Alphonsus Roman Catholic Church, New Orleans, Louisiana. Even if the assets of the canonically merged Archdiocesan Parishes were liquidated, under Canon Law, the funds generated by the liquidation can only be used for mission purposes of the receiving Archdiocesan Parish. Although the assets of the foregoing canonically merged Archdiocesan Parishes may have been transferred under Canon Law to an Archdiocesan Parish, the real property records do not always reflect the recorded transfer of any such real property.

In the future, certain Archdiocesan Parishes may be canonically merged into neighboring Archdiocesan Parishes, or canonically merged into a newly erected different Archdiocesan Parish, depending upon the shift of demographics and Catholic population, decreased or low Mass attendance, sacramental statistics, financial difficulties, and other canonical-defined purposes. Canon Law does not allow for the merging of an Archdiocesan Parish on the purpose of finances alone.

The Survivors' Committee has no opinion regarding the representations above concerning Canon Law. Representations in this Disclosure Statement regarding Canon Law are asserted by the Archdiocese.

## ARTICLE VII – EVENTS LEADING TO AND SIGNIFICANT LEGAL MATTERS DURING THE ARCHDIOCESE'S CHAPTER 11 CASE

**Section 7.01    Events Leading to Filing the Archdiocese's Chapter 11 Case.**

On May 1, 2020, the Debtor filed its voluntary bankruptcy petition seeking relief under Chapter 11 of the Bankruptcy Code.  The Debtor continues to operate as a debtor-in-possession.  As of the Petition Date, the Archdiocese was defending the 34 Abuse lawsuits and was aware of additional Abuse Claims. At the same time, the Archdiocese asserts it was experiencing a decline in its working capital in the years leading up to its Chapter 11 Case—and further asserts that decline was exacerbated by the effects of the COVID-19 public health emergency in March and April 2020.

**Section 7.02    Motions Filed On or Near the First Day, and Modifications Thereafter.**

On the Petition Date or shortly thereafter, the Debtor filed motions to minimize any disruptions of its operations.  In support of the foregoing motions, the Debtor filed the Declaration of Fr. Patrick R. Carr in Support of First Day Motions.  [ECF 14].  The most significant Motions filed on the Petition Date or shortly thereafter are discussed below:

**Cash Management Motion.**  On the Petition Date, the Debtor filed an Expedited Motion for Entry of (A) Interim and Final Orders (i) Authorizing the Maintenance of Existing Accounts, Continued Use of Existing Cash Management System, and Continued Use of Existing Business Forms, (ii) Waiving the Requirements of Section 345(b) of the Bankruptcy Code, and (iii) Granting Related Relief, and (B) an Order Scheduling a Final Hearing (the "**Cash Management Motion**").  [ECF 9].  The Cash Management Motion was granted pursuant to (a) an Interim Order, [ECF 52], and (b) a Final Order, [ECF 174].

**Wage and Benefit Motion.**  On the Petition Date, the Debtor filed an Emergency Motion for Entry of an Order to (A) Pay All Outstanding Pre-Petition Wages, Salaries, Other Accrued Compensation, Expense Reimbursements, Benefits, and Related Amounts; and (B) Continue Specified Benefit Programs in the Ordinary Course of Business (the "**Wage and Benefit Motion**").  [ECF 7].  The Bankruptcy Court granted the Wage and Benefit Motion, as provided in an Order entered on May 5, 2020 (the "**Original Wage and Benefit Order**").  [ECF 47].  Following briefing and a hearing, the Bankruptcy Court further amended the Amended Wage and Benefit Order to provide that the Debtor was no longer authorized to pay retirement benefits to the five identified additional living, retired priests, although the Debtor was instructed to continue provision of "retiree benefits" as that term is defined in 11 U.S.C. § 1114(a)," [ECF 1759, at page 14].

**Insurance Motion.** On the Petition Date, the Debtor filed an Expedited Motion for Interim and Final Orders (a) Authorizing the Debtor to Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (b) Authorizing the Debtor to Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (c) Scheduling a Final Hearing (the "**Insurance Motion**"). [ECF 6].  In the Insurance Motion, the Archdiocese sought (a) authority to maintain the Insurance Program (as defined therein) that existed before the Petition Date, and to satisfy prepetition obligations related thereto, including paying any applicable premiums, fees, deductibles, and self-insured retentions, and (b) authority to renew, amend, supplement, extend, or purchase additional insurance policies, as needed, to maintain the Insurance Program. The Insurance Motion was granted as provided in (a) an Interim Order, [ECF 54], and (b) a Final Order, [ECF 176].

**Motion to File Under Seal.** On the Petition Date, the Debtor filed a Motion for Order Authorizing the Roman Catholic Church for the Archdiocese of New Orleans to File Portions of the Schedules and State

4938-3511-8681.4 05067.002

of Financial Affairs the Master Creditor Mailing Matrix, and Other Pleadings and Documents Under Seal (the "**Motion to File Under Seal**"), [ECF 4], seeking authority to file, under seal, any documents that may contain the names of individuals whose Claims against the Debtor are premised on allegations of Abuse, as well as any other identifying information such as social security numbers, addresses, telephone numbers, names of close relatives, e-mail addresses, or other similar information. The Motion to File Under Seal was granted as provided in (a) an Interim Order, [ECF 53], and (b) a Final Order, [ECF 177].

**Debtor's Professionals.** The Debtor has retained the following professionals: Donlin Recano & Company, LLC as claims, noticing, and solicitation agent [ECF 10, 51, 188]; Jones Walker LLP as counsel [ECF 75, 138, 170]; Carr Riggs & Ingram LLC as financial advisor [ECF 77, 143, 171]; Blank Rome LLP as special insurance counsel [ECF 123, 172]; Keegan Linscott & Associates, PC as financial advisor [ECF 1272, 1304]; and certain professionals who are retained as ordinary course professionals [ECF 191, 269].

**Refund Motion.** The Debtor filed a Motion for Entry of an Order, Pursuant to Sections 105, 504(a)(7), 363(b), and 549(a)(2)(B) of the Bankruptcy Code, Authorizing the Debtor to Return Certain Pre-Petition Deposits, Including Deposits for Events that are Canceled, Rescheduled, or Otherwise Altered Due to the COVID-19 Pandemic (the "**Refund Motion**"). [ECF 116]. In the Refund Motion, the Archdiocese sought authority to refund certain payments that constituted deposits, up to the aggregate amount of $3,025 per individual, as described in the Refund Motion. The Refund Motion was granted. [ECF 162].

### Section 7.03    The Claims Bar Dates.

The Court established the following Claims Bar Dates: (a) November 30, 2020, at 5:00 p.m. (Central Time) as a Bar Date for General Claims, which applies to all persons and entities excluding Governmental Units and Abuse Claimants; (b) November 30, 2020, at 5:00 p.m. (prevailing Central Time) as a Bar Date for Governmental Unit Claims; and (c) March 1, 2021, at 5:00 p.m. (Central Time) as the Abuse Claims Bar Date. The Claims Bar Date Order, [ECF 461], was subsequently supplemented to identify, among other things, additional "Permitted Parties" who could have access to the Abuse Proofs of Claim upon execution of a specific Confidentiality Agreement. [ECF 844 and 1168].

### Section 7.04    The Creditors' Committees.

(a)    The Survivors' Committee, its Members, and Professionals. The U.S. Trustee's Office appointed the Official Committee of Unsecured Creditors (the "**Survivors' Committee**") [ECF 94 and 151]. Since June 2020, the Survivors' Committee has been reconstituted several times.

First, on October 8, 2020, without receiving direction from the Bankruptcy Court, the U.S. Trustee's Office reconstituted the Survivors' Committee to relieve the Bond Trustee, [ECF 478], from service on the Survivors' Committee, based on the allegation that the Bond Trustee had a conflict of interest that precluded it from serving on the Survivors' Committee, and that the conflict arose out of the Bond Trustee Settlement Motion. Before removal, the Bond Trustee was the only Survivors' Committee member who did not hold an Abuse Claim. Since removal, each member of the Survivors' Committee has been an Abuse Claimant.

Second, on June 7, 2022, [ECF 1575], four of the six members were relieved from service on the Survivors' Committee based on alleged breaches of a confidentiality order by one of their counsel. The Bankruptcy Court later sanctioned that counsel in the amount of $400,000. [ECF 1844]. The sanctions opinion remains on appeal.[15]

---

[15] The sanctioned counsel also filed a lawsuit against Jones Walker, Jones Walker partner Mark Mintz, and Donlin Recano & Company related to the service of process for the Bankruptcy Court's sanctions opinion. That lawsuit has been dismissed at summary judgment and is also on appeal. Donlin Recano & Company is indemnified by the Archdiocese for its costs related to the lawsuit.

As of June 7, 2022, the remaining two Survivors' Committee members were George Coulon and Patricia Moody. From June 2022 through February 2023, following the addition of new members, five members served on the Survivors' Committee, which was reduced to four members following the death of one of the members. [ECF 2081]. The members currently serving on the Survivors' Committee and their counsel of record are as follows:

| Member | Counsel to Member |
|--------|-------------------|
| Patricia Moody, Chair | Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC |
| George Coulon | Damon J. Baldone & Associates; Andrews & Thornton |
| Michael Robinson | Lamothe Law Firm |
| John Aleman | AVA Law Group, Inc. |

The Survivors' Committee has retained the following Professionals: (a) as legal counsel, (i) Pachulski Stang Ziehl & Jones LLP, [ECF 181, 183, and 267], and (ii) Troutman Pepper Locke LLP (formerly Locke Lord LLP), [ECF 179 and 256]; and (b) the following experts and/or consultants: (i) Berkeley Research Group, LLC, as financial advisors, [ECF 205 and 362]; (ii) Zobrio, Inc., as a "computer consultant," [ECF 859 and 853]; (iii) Stegall, Benton, Melancon & Associates, LLC, as a "real estate appraiser/valuation expert," [ECF 907 and 973]; (iv) Rock Creek Advisors, LLC, as a "Pension Financial Advisor," [ECF 1221 and 1249]; (v) Actuarial Value, LLC, as an "Actuarial Advisor," [ECF 2351 and 2430], (vi) Stout Risius Ross, LLC (fka The Claro Group, LLC), as an "expert consultant on Sexual Abuse," [ECF 1481 and 1555]; and (vii) Kinsella Media, LLC, as an "expert consultant to provide advice regarding the Debtor's bar date noticing program," [ECF 383 and 410].

(b) The Commercial Creditors' Committee, its Members, and Professionals. Shortly after being relieved from service on the Survivors' Committee in October 2020, the Bond Trustee filed a motion for entry of Order requiring the U.S. Trustee to appoint a separate creditors' committee and/or reinstate the Bond Trustee as a member of and reconstituting the Survivors' Committee (the "**Committee Motion**"). The Bankruptcy Court later entered the Order Directing United States Trustee to Appoint Additional Committee of Commercial Unsecured Creditors, [ECF 746].

The U.S. Trustee thereafter appointed the following members to a new Official Committee of Unsecured Commercial Creditors (the "**Commercial Creditors' Committee**"), [ECF 772 and 792], each of whom continues to serve:

| Member | Counsel to Member if any |
|--------|--------------------------|
| Jeff Ehlinger, BankPlus, f/k/a First Bank & Trust, Chair | Mark C. Landry, Esq.<br>Newman, Mathis, Brady & Spedale, PLC |
| Crescent Door & Hardware, Inc.<br>c/o Neuville C. Hotstream, Sr. | Wayne Jablonowski, APLC |
| Brown Rice Marketing, LLC<br>c/o Mark W. Brown | Not applicable |
| MetroStudio, LLC<br>c/o Heather Gorman | Not applicable |

Although the Bond Trustee was not appointed to the Commercial Creditors' Committee, it served as an ex officio, non-voting member [ECF Doc. 854, n.2], although later it was removed from ex officio status. The Commercial Creditors' Committee has retained the following Professionals: (a) as legal counsel, Stewart Robbins Brown & Altazan, LLC, [ECF 817, 833, and 874]; (b) as financial advisors, Dundon Advisors, LLC, [ECF 854 and 881]; (c) as pension analyst, Kroll, LLC, [ECF 2687 and 2772]; and (d) as conflicts counsel for limited purposes, H. Kent Aguillard, [ECF 2946 and 2981].

35

**Section 7.05    Bond Settlement Agreement.**

On November 2, 2020, the Court approved an agreement between the Debtor and the Bond Trustee pursuant to which the Archdiocese is authorized to pay semi-annual interest payments on the Bonds (the "**Settlement Payments**"), although all parties reserve their rights to argue that the Settlement Payments should be recharacterized as payments of principal due under the Bond Documents.  The agreement states that consideration for the Settlement Payments includes, but is not limited to, the following:

(a)    "During the pendency of the Chapter 11 Case and through the greater of (A) nine (9) months from the effective date of a plan of reorganization that is confirmed pursuant to an order of the Bankruptcy Court . . .), or (B) the end of the Fiscal Year of the Debtor in which the Plan Effective Date occurs, the [Bond] Trustee . . . waives any default by the Debtor under the Bond Documents associated with . . . any failure to meet any of the financial covenants set forth in Sections 6.12, 6.14, and 6.15 of the Loan Agreement" (Section 2.2.2 of the Amended Settlement Agreement);

(b)    "During the pendency of the Chapter 11 Case and through the greater of (A) nine (9) months from the effective date of a plan of reorganization that is confirmed pursuant to an order of the Bankruptcy Court . . ., or (B) the end of the Fiscal Year of the Debtor in which the Plan Effective Date occurs, the [Bond] Trustee . . . waives any default by the Debtor under the Bond Documents associated with (A) failure to deliver any annual audited financial statement required in the Bond Documents, provided that the Archdiocese will deliver semi-annual unaudited financial statements within sixty days of each June 30 and December 31, unless extended by the Bond Trustee in writing, and all other information required pursuant to that certain Continuing Disclosure Agreement, by the Archdiocese, dated as of April 1, 2017. . ." (Section 2.2.2 of the Amended Settlement Agreement); and

(c)    The Loan Agreement contains certain restrictions that allegedly prohibit the Archdiocese from selling, transferring, or alienating most of its revenues and properties (the "**Transfer Restrictions**").  (Loan Agreement, § 6.03(a)(ii).)  The Bond Settlement Agreement provides that, because "the Archdiocese contemplated the [sales or transfers] to fund the Settlement Trust, the Bond Settlement Agreement waives the Transfer Restrictions to permit sales or transfers of Archdiocesan property up to the net sale proceeds of $20.0 million."  The Transfer Restrictions do not apply to "assets which, prior to the sale, lease or other disposition, have, or within the next succeeding two years are reasonably expect to, become inadequate, obsolete, worn out, unsuitable, unprofitable, undesirable or unnecessary and the sale, lease, removal or other disposition thereof will not impair the structural soundness, efficiency or economic value of the remaining operating assets" (the "**Transfer Restrictions Exception**"). (Id.)

The treatment of the Bonds under the Joint Plan is different than set forth in the Bond Trustee Settlement Agreement due to the fact that the incorporation of the Bond Settlement into a Joint Plan would have made it impossible for the Debtor to confirm a plan absent all Abuse Claimants accepting the plan. The Bond Claims will be paid in a reduced amount to comply with the requirements of the Bankruptcy Code that a plan cannot unfairly discriminate between classes and that each creditor receive under the plan an amount that such creditor would receive if the Debtor were liquidated.  The treatment of Bond Claims as set forth in section 4.6 of the Joint Plan meets these requirements.

**Section 7.06    Denial of the Motion to Dismiss.**

On July 3, 2020, the Survivors' Committee filed the Motion of the Official Committee of Unsecured Creditors to Dismiss Chapter 11 Case (the "**Motion to Dismiss**").  [ECF 203].  Following discovery and a hearing, the Bankruptcy Court denied the Motion to Dismiss.

Section 7.07    Expiration of the Exclusive Periods.

The Debtor's exclusive period to propose a Chapter 11 plan expired on November 1, 2021, and the Debtor's exclusive period to solicit acceptances of a Chapter 11 plan expired on January 3, 2022. [ECF 949].

Section 7.08    The Unknown Tort Claims Representative.

The Debtor obtained an Order (the "**Unknown Tort Claims Order**"), [ECF 1012], authorizing the appointment, Nunc Pro Tunc to July 26, 2021, of Michael R. Hogan as the Unknown Tort Claims Representative, to act on behalf of and to represent the Unknown Tort Claimants. Under the Joint Plan, a Unknown Tort Claim is an Abuse Claim that arose before the Petition Date for which the Abuse Claimant has not filed a proof of claim before the Effective Date and the Claimant (i) had not attained eighteen (18) years of age as of the Petition Date and / or (ii) was not aware of such Abuse Claim as a result of insanity, mental disability, dissociative amnesia, or other similar cause, as contemplated under, and within the meaning of, applicable law. In accordance with the Order authorizing his appointment, on August 26, 2021, the Unknown Tort Claims Representative filed a Proof of Claim for the Unknown Tort Claimants, asserting an Unsecured Claim in an amount that is not liquidated (Claims and Voting Agent Claim No. 30050).

Section 7.09    Immovable (Real) Property Sales and Leases after the Petition Date.

(a)    *Debtor's Sales of Immovable (Real Property)*.  To date, the Debtor has sold property for the total aggregate net sale proceeds of $19,188,585, each sale having been approved by the Bankruptcy Court, as follows: (a) the sale of commercial property at 1000 Howard Avenue and Oretha Castle Haley Boulevard, with the net sale proceeds of $7,967,675; (b) the sale of certain unused real property commonly known as 4119 St. Elizabeth Drive, located in Kenner, Louisiana, with the net sale proceeds of $1,810,000; (c) the sale of a parcel of real property located in New Orleans East, with the net sale proceeds of $63,450; (d) a dedication of a sewer servitude located on Westbank Expressway, Marrero, Louisiana, in exchange for $20,475; (e) the sale of property known as St. Jude Community Center, with net sale proceeds of $2,089,390; (f) the sale of municipal numbers 3017-3019 S. Carrollton Ave., New Orleans, with the net sale proceeds of $366,600; (g) the sale of municipal numbers 3003-3009 S. Carrollton Ave., New Orleans, with the net sale proceeds of $807,485; (h) the sale of property known as the  Bishop Perry Center located at 1941 Dauphine St., New Orleans, LA 70116, with the net sale proceeds of $1,043,560; (i) the sale of municipal number 2908 S. Carrollton Ave., New Orleans, LA 70118 (vacant lots adjacent to Archbishop's residence), with the net sale proceeds of $711,350; (j) the sale of municipal number 69033 Riverbend Dr., Covington, LA 70433, with the net sale proceeds of $458,600; and (k) the sale of the Hope Haven property, consisting of a portion of Lot 6A1, Fazande Tract, Marrero, Jefferson Parish, with net sale proceeds of $3,850,000. The foregoing net sale proceeds are held in segregated accounts consistent with the Bankruptcy Court Orders approving the sales and will be used as part of the $130 million funding for the Joint Plan as of the Effective Date.[16]

Additional properties of the Debtor are listed for sale by TMC Realty, LLC d/b/a The McEnery Company ("**TMC**") as its real estate broker, [ECF 2496 & 3374], including: (a) 3200 Canal St., New Orleans, LA 70119 (known as Sacred Heart of Jesus Church); and (b) a surface parking lot located at 1032 and 1042 S. Rampart St., New Orleans, LA 70113 (also known as 1032 and 1042 Loyola Ave., New Orleans, LA 70113).

The Bankruptcy Court granted [ECF 1119] the Debtor's Motion for Authority to Lease Property Pursuant to §§ 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004, pursuant to which the Archdiocese entered into an oil, gas and mineral lease regarding its undivided 40% interest in Point Au Fer.  Pursuant to the

---

[16] In accordance with the Order approving the Hope Haven sale [ECF 4043], the Debtor is authorized to pay up to $55,000 out of the net sale proceeds in the segregated account to construct and complete a monument for abuse survivors.

4938-3511-8681.4 05067.002

lease, Castex E&P, LLC agreed to lease a certain portion of Point Au Fer for the purpose of exploring, drilling for, and producing oil, gas, and other hydrocarbons.

The net proceeds of the foregoing sales are being used to fund the Settlement Trust.

(b) *Sales of Immovable (Real) by Additional Debtors.* During the Archdiocese's Chapter 11 Case, the Additional Debtors sold certain immovable (real) property including Our Lady of Lourdes at Freret and Napoleon in New Orleans.

### Section 7.10 CommCare's Transactions regarding NDHS.

As of the Petition Date, certain of the Non-Debtor Catholic Entities owned and operated residential skilled nursing, assisted living and independent living facilities, and home health and hospice businesses. As of the Petition Date, Notre Dame Health System, ("**NDHS**") owned Chateau de Notre Dame Facilities Corporation ("**Chateau de Notre Dame**") and Our Lady of Wisdom Facility Corporation ("**Our Lady of Wisdom**"), each a Louisiana non-profit corporation.

These assets were sold pursuant to a transaction with CommCare Louisiana, which closed on June 13, 2023 (the "**NDHS/CommCare Closing**"). To enable NDHS to pay certain of its outstanding obligations in connection with the NDHS/CommCare Closing, Catholic Charities loaned $6,000,000 to NDHS on May 26, 2023 (the "**CCANO Note**"), and School Food and Nutrition Services of New Orleans, Inc. loaned $2,600,000 to NDHS on June 7, 2023. Both loans were evidenced by promissory notes issued by NDHS payable within one year. The CCANO Note is secured by NDHS/FEMA Claim, as discussed below. At the NDHS/CommCare Closing, $7,703,413 was transferred to the Archdiocese for the repayment of loans made by the Archdiocese to NDHS, which funds are held in a segregated bank account pursuant to an Order of the Bankruptcy Court. [ECF 2312]. This amount is being used to fund the Settlement Trust.

After the NDHS/CommCare Closing, NDHS continues to own a FEMA claim for reimbursement that NDHS made, in the approximate amount of $26 million, for damages incurred during Hurricane Ida and its aftermath ("**NDHS FEMA Claim**"). Neither the Debtor nor NDHS can predict when the NDHS/FEMA Claim will be processed for payment, or the amount that FEMA will pay. Any amount received on the NDHS FEMA Claim will first be used to first pay NDHS's unpaid trade debt and other obligations.

Under the NDHS/CommCare Purchase Agreement, NDHS may be required to reimburse CommCare in the future. For example, if CommCare receives notice of any chargebacks from a third-party payor in connection with NDHS's services rendered pre-closing, NDHS must reimburse CommCare to the extent of the chargeback. Also, if CommCare has a right to be indemnified by NDHS under the NDHS/CommCare Purchase Agreement, and if the $1 million indemnity escrow fund has been depleted, then CommCare has a right to reduce the NDHS/CommCare Note by the amount of any deficiency. CommCare, SAG and NDHS agreed in an Omnibus Indemnity Agreement that the $1 million indemnity escrow fund would be the primary source of recovery for any indemnification claims against NDHS, and to the extent the indemnity fund is insufficient, the NDHS/CommCare Note would be reduced by the amount of the deficiency.

### Section 7.11 CommCare Transaction regarding SAG.

On January 5, 2023, an Agreement to Sell and Purchase Assets and Real Estate (the "**SAG/CommCare Agreement**") was entered into between CommCare, as purchaser, and SAG, as seller, which closed on June 13, 2023. Pursuant to the SAG/CommCare Agreement, CommCare (a) acquired substantially all of the operating assets of SAG, including the SAG Project, and (b) assumed certain liabilities, including the following obligations that the Archdiocese guaranteed under the SAG Guaranty: (i) approximately $34 million of indebtedness that SAG

owes in connection with SAG Senior Bonds; and (ii) $7 million of indebtedness that SAG owed HWB. Following the closing of the SAG/CommCare Agreement (the "**SAG/CommCare Closing**"), (a) HWB cancelled and terminated the SAG Guaranty, and (b) $16,854,674 was transferred to the Archdiocese at closing for the repayment of loans to SAG, which funds are held in a segregated account pursuant to an Order of the Bankruptcy Court. [ECF 2312 and 2327].

After the SAG/CommCare Closing, SAG may owe funds to CommCare under the SAG/CommCare Purchase Agreement. For example, if CommCare receives notice of any chargebacks from a third-party payor in connection with SAG's services rendered pre-closing, SAG is responsible for reimbursement of CommCare. Also, if CommCare makes a claim for indemnification by SAG under the SAG/CommCare Purchase Agreement, and the $1 million indemnity escrow fund is insufficient to cover such indemnification claim, then CommCare has a right to reduce the NDHS/CommCare Note by the amount of the deficiency. SAG agreed in the Omnibus Indemnity Agreement that the NDHS/CommCare Note would be a source of recovery to satisfy obligations of SAG under the SAG/CommCare Purchase Agreement.

### Section 7.12    Settlement Regarding the Legacy Litigation.

The Archdiocese was a plaintiff in two lawsuits as of the Petition Date styled, The Roman Catholic Church of the Archdiocese of New Orleans and Point Au Fer, LLC vs. Caruthers Producing Co., Inc., Anadarko OGC Company, LLOG Exploration Company LLC, Roger L. Hebert, SWEPI LP, Chevron USA, Inc., BASF Corporation, Eni Oil & Gas Corporation, Helis Oil & Gas, LLC, Legacy Energy Corporation, Cody Energy LLC, Sunoco Inc., Kerr-McGee Oil & Gas Onshore LP, pending in the in the 32nd Judicial District Court for the Parish of Terrebonne, State of Louisiana (the "**Legacy Litigation**"). [ECF 198, at 72]. The Debtor obtained Orders that approve the settlement of the Legacy Litigation for a Cash payment to the Archdiocese from Shell Oil Company in the amount of $104,000, [ECF 986], from Chevron USA, Inc. in a confidential amount [ECF 3039], and from Coterra Energy Inc. f/k/a Cabot Oil and Gas Corporation and Cody Energy, LLC in the amount of $1,026,999.62, [ECF 3038]. The settlements also included certain indemnity obligations by the settling defendants. Each Order requires the Debtor to hold the Cash settlements pending further Order of the Bankruptcy Court. The Settlement Trust funding under the Joint Plan comes, in part, with the use of these funds.

### Section 7.13    Claims Caused by Payroll Processing Check-Kiting Scheme.

The Debtor obtained an Order, [ECF 812], that authorized it to vote to accept, as a consenting creditor, a joint Chapter 11 plan of liquidation (the "**Liquidation Plan**") with respect to certain claims that arose from a check-kiting scheme perpetrated by payroll processing business, Interlogic Outsourcing, Inc. (the "**Payroll Processor**"), and its principle (N.A. Khan). After the check-kiting scheme was discovered, the Archdiocese was forced to pay certain taxing authorities approximately $632,331 to satisfy certain outstanding payroll tax obligations of the Archdiocese and certain of the Additional Debtors and Non-Debtor Catholic Entities, even though that money had earlier been paid to Payroll Processor for the benefit of the taxing authorities. Although the Archdiocese is named as the creditor in the proofs of claim, the Debtor takes the position that the majority of any recovery for such proofs of claim ultimately belongs to certain of the Additional Debtors and Non-Debtor Catholic Entities. The Debtor has received the aggregate amount of $667,687.78 in distributions on account of the Liquidation Plan. As required by the applicable Bankruptcy Court Order, none of these distributions have been distributed to any Additional Debtor or Non-Debtor Catholic Entity but form part of the funds that will be used to fund the Settlement Trust under the Joint Plan.

### Section 7.14    Termination of Certain Testamentary Trusts.

The Debtor was one of five principal beneficiaries of several trusts (the "**Testamentary Trusts**") that were created under a Louisiana Last Will and Testament for the purpose of making yearly annuity payments to two

income beneficiaries. The Debtor obtained an Order, [ECF 1013], that authorizes it to execute a letter addressed to the trustee of the Testamentary Trusts that confirms both that the Archdiocese (a) has no objection to the estimated lump-sum payouts to the income beneficiaries of the Testamentary Trusts, and (b) consents to the termination of the Testamentary Trusts. After termination of the Testamentary Trusts, the Debtor received an interim payment of $715,000 in May 2022, and anticipates an additional payment of $40,000. Under the terms of that Order, the lump-sum payment to the Archdiocese will be held in a segregated account pending further Order of the Bankruptcy Court. These funds will be used to fund the Settlement Trust under the Joint Plan.

### Section 7.15    Settlement of the Qui Tam Claim.

On the Petition Date, the Debtor was defending a lawsuit brought under the False Claims Act, 31 U.S.C. §§ 3729-3733, in that certain civil action pending before the District Court, bearing civil action no. 16-15092 (the "**Qui Tam Claim**"). The civil action alleged approximately $46 million in overpayments by FEMA to the Archdiocese as a result of the allegedly improper submission of certain FEMA "Project Worksheets" from August 29, 2005 through May 29, 2020 for specific facilities damaged by Hurricane Katrina, and sought treble damages in addition to civil penalties. As such, the total potential exposure to the Archdiocese from the Qui Tam Claim asserted in the civil action was more than $138 million, which, if Allowed, would have been non-dischargeable pursuant to section 1141(d)(6) of the Bankruptcy Code. In 2021, the Debtor obtained authority to enter into a settlement agreement, pursuant to which the Archdiocese has paid a total of $1,050,000. [ECF 1139].

### Section 7.16    Mediation.

(a)    The Bankruptcy Court entered an Order, [ECF 1058], appointing U.S. Bankruptcy Judge Gregg W. Zive as mediator in the Archdiocese's Chapter 11 Case (the "**Mediator Zive**"). Mediator Zive's original term has been extended from time to time [ECF 1322, 1747, 2443, 2817, 3413, 3758], and currently expires on September 30, 2025, subject to extensions.

(b)    The Bankruptcy Court entered an Order, [ECF 2892], appointing John W. Perry, Jr. as an additional mediator in the Archdiocese's Chapter 11 Case (the "**Mediator Perry**") to assist Mediator Zive. Mediator Perry's term original term has been extended from time to time [ECF 3036, 3430, 3843, 4029], and currently expires on July 31, 2025, subject to extensions.

(c)    The Bankruptcy Court entered an Order [ECF 3694], appointing U.S. Bankruptcy Judge Christopher Sontchi (Ret.) as an additional mediator in the Archdiocese's Chapter 11 Case (the "**Mediator Sontchi**") to assist Mediator Zive and Mediator Perry. Mediator Sontchi's term commenced on January 24, 2025, has been extended once [ECF 4029], and currently expires on July 31, 2025.

### Section 7.17    The Tolling Agreements.

The Archdiocese and the Committees entered into tolling agreements with the Additional Debtors and Non-Debtor Catholic Entities, which were approved by the Bankruptcy Court. [ECF 1406, ECF 2154, ECF 3774]. Additionally, the Archdiocese and the Committees entered into various Tolling Agreements with additional parties who are not Additional Debtors or Non-Debtor Catholic Entities. The current Tolling Period expires on May 1, 2026, as to those parties who have executed tolling agreement extensions. The causes of action preserved under the Tolling Agreements will be released under the Joint Plan.

### Section 7.18    The Portfolios Adversary Proceeding.

In April 2022, the Survivors' Committee filed an adversary proceeding against the Debtor and certain of the Additional Debtors and Non-Debtor Catholic Entities regarding Portfolio A and Portfolio B. The Debtor filed a Motion to Dismiss the adversary proceeding, arguing that (a) the claims that the Survivors' Committee asserted were property of the bankruptcy estate and, as such, the Survivors' Committee does not have independent standing,

and had not sought derivative standing to do so, and (b) the adversary proceeding violated the tolling agreement. The Bankruptcy Court granted the Debtor's Motion to Dismiss, without prejudice. [Portfolios Adversary Proceeding ECF 96]. The claims asserted in the Portfolio Adversary Proceeding will be Released under the Joint Plan.

### Section 7.19    Removed Lawsuits and Other Adversary Proceedings.

Following the Petition Date, all but one of the Abuse Lawsuits was removed from state court to District Court, and six were referred to the Bankruptcy Court where they are pending as adversary proceedings. Lawsuits commenced in state court after the Petition Date against the Archdiocese were also removed to District Court. After removal, a motion to remand was filed in one of the removed cases. Judge Barry Ashe denied the motion to remand on the basis that the proceeds of the Debtors' insurance policies were property of the Estate. No additional motions to remand have been filed.

### Section 7.20    The Class Action Lawsuit Filed after the Petition Date.

In 2022, a Class Action Petition for Injunction (the "**Class Action Lawsuit**") was commenced against the Archdiocese in state court, seeking injunctive relief related to the alleged unlawful discrimination against prospective students with disabilities. The Class Action Lawsuit has now been settled.

### Section 7.21    Partial Lift-Stay Motions Related to Filing, but not Prosecuting, Lawsuits.

With the consent of the Debtor, the Additional Debtors, the Non-Debtor Catholic Entities, and the Survivors' Committee, the Bankruptcy Court entered an amended Scheduling Order (the "**Scheduling Order**"), [ECF 2478], for the purpose of streamlining the process for filing and consideration of motions for partial relief from the automatic stay by Abuse Claimants to file, but not thereafter prosecute, lawsuits against the Debtor, the Additional Debtors, and the Non-Debtor Catholic Entities (the "**Partial Lift-Stay Motions**"). The Partial Lift-Stay Motion process was also an effort to prompt parties who had not yet filed a Claim to assert their Claim. Under the Scheduling Order, any Partial Lift-Stay Motions were to (a) be filed no later than October 17, 2023, (b) noticed for a hearing on November 14, 2023, and (c) identify each proposed defendant. Thereafter, 27 Partial Lift-Stay Motions were filed [ECF 2512, 2538, 2542, 2544, 2545, 2547, 2550, 2552, 2554, 2556, 2558, 2560, 2562, 2564, 2566, 2568, 2570, 2571, 2573, 2574, 2575, 2578, 2579, 2580, 2581, 2582, and 2583], each of which was filed by Abuse Claimants who asserts that they have already filed an Abuse Proof of Claim. The Debtor, the Non-Debtor Catholic Entities, the Commercial Committee, and various Insurers filed objections to the Partial Lift-Stay Motion. [ECF 2611, 2612, 2613, 2614, and 2615]. After several hearings, including an evidentiary hearing, the Bankruptcy Court denied the Partial Lift-Stay Motions, without prejudice [ECF 2847]. In so ruling, the Bankruptcy Court also found that "the filing of a claim interrupts prescription under Louisiana Civil Code Article 3462 that has not already accrued until the date that is thirty (30) days after notice of the termination or expiration of the stay with respect to any such claim. For the avoidance of doubt, the Court finds that the provisions of 11 U.S.C. § 108(c) apply to the claims filed in this Bankruptcy Case." [ECF 2847, at ¶ 3].

### Section 7.22    Motion to Appoint a Chapter 11 Trustee Filed by Certain Abuse Claimants.

Certain Abuse Claimants filed a Motion to Appoint a Chapter 11 Trustee and Fee Examiner (the "**Motion to Appoint**") [ECF 3246] pursuant to section 1104 of the Bankruptcy Code. The Motion to Appoint was stayed pursuant to the Expert Witness Order discussed below. The Debtor has stated it opposes the Motion to Appoint. The Motion to Appoint remains pending at the time of this Disclosure Statement.

### Section 7.23    Order Appointing Expert Witness.

On August 21, 2024, the Bankruptcy Court entered the Order Appointing an Expert Witness Under Federal Rule of Evidence (the "**Expert Witness Order**"). [ECF 3303]. The Expert Witness Order appoints Mr. Mohsin Meghji of M3 Partners (the "**Expert Witness**"), and Latham & Watson as the Expert Witness's legal counsel, to assist him in fulling his duties in the Archdiocese's Chapter 11 Case. The Expert Witness "will assess where this case stands and provide a public report," to be filed on or before October 23, 2024, regarding the following: (a) the existence and status of a plan structure(s) and available alternatives; (b) the structure, functioning, and capabilities of Debtor's management; (c) a review of administrative costs incurred in the context of the record in this case and an assessment of ongoing resources required to bring this case to conclusion; and (d) considering the Debtor's current tort liability, the financial wherewithal of the Debtor to reorganize and proceed as a going concern, including the availability of insurance proceeds and contributions from non-debtor affiliates, as well as implementation of non-monetary remedies to attempt to prevent and/or respond to any future tort liability." *Id.* at pages 1 and 2. The Expert Witness filed his report on October 23, 2024. [ECF 3436].

### Section 7.24    Order to Show Cause and Motion to Dismiss.

On April 28, 2025, the Court entered an Order to Show Cause requiring the Debtor to appear and show cause as to why the Bankruptcy Case should not be dismissed. [ECF 3949]. Shortly thereafter, certain abuse survivors filed a Motion to Dismiss [ECF 3965], Motion for Evidentiary Hearing [ECF 3969], and Motion for Leave to Conduct Rule 2004 Examination of Archbishop Gregory Aymond [ECF 3970] (collectively the "**Certain Survivor Motions**"). As of the filing of the Disclosure Statement, the Order to Show Cause and the Certain Survivor Motions remain pending and will be considered at the Confirmation Hearing.

### Section 7.25    Memorandum of Understanding.

Following a mediation held on May 16, 2025, the Debtor, Non-Debtor Catholic Entities, and Committee entered into a Memorandum of Understanding, which outlined the broad terms of the settlement that forms the basis of the Joint Plan. A redacted copy of the Memorandum of Understanding was filed with the Bankruptcy Court on May 21, 2025. [ECF 4020].

### Section 7.26    The Insurance Settlements.

After years of mediation, and after the Louisiana Supreme Court finally resolved the constitutionality of the Revival Window, the Debtor, Additional Debtors, Non-Debtor Catholic Entities, and the other Co-Insured Parties reached a settlement with all but one of their insurers. As fully set forth in section 6.07, commencing in approximately 1964 with SPARTA, followed by United States Fidelity & Guaranty Company, and then by Catholic Mutual, the Co-Insured Parties were issued insurance policies or certificates providing primary insurance coverage up until the date of the bankruptcy filing (gaps in coverage due to insolvency or other factors are not pertinent to this discussion).

On July 29, 2025, the Debtors and Additional Debtors filed a motion with the Bankruptcy Court seeking approval of separate settlement agreements (the "**Insurance Settlement Agreements**") with the Settling Insurers [ECF 4181] (the "**Insurance Settlement Motion**"). A form of the Insurance Settlement Agreement as well as a proposed order approving the Insurance Settlement Agreements are attached to the Insurance Settlement Motion. Prior to the Confirmation Hearing, the Debtors and Additional Debtors will file the specific Insurance Settlement Agreement with each Settling Insurer as well as the proposed form of order with respect to the Insurance Settlement Agreement with each Settling Insurer.

The proposed Insurance Settlement Agreements provide for a total settlement consideration of $29,275,000 to be paid by the Settling Insurers to buy back the Settling Insurers' policies along with related claims and interests. As noted in the Insurance Settlement Motion, the Settling Insurers agreed to buy back their policies in exchange

for differing amounts, under certain conditions. Pursuant to the Insurance Settlement Agreements, each of the Settling Insurers will pay settlement funds as follows: (i) SPARTA, in the amount of $21,000,000; (ii) United States Fire Insurance Company ("**U.S. Fire**"), International Insurance Company ("**International**"), Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company individually and, to the extent that policies issued by U.S. Fire and/or International were novated to or assumed by either or both of them ("**U.S. Fire/International**"), in the amount of $5,000,000; (iii) Catholic Mutual Relief Society of America ("**Catholic Mutual**"), in the amount of $2,000,000; (iv) Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and Westport Insurance Corporation ("**Puritan**"), in the amount of $85,000; (v) National Union Fire Insurance Company of Pittsburgh, Pa. ("**National Union**"), in the amount of $290,000; and (vi) Twin City Fire Insurance Company and First State Insurance Company ("**Twin City**"), in the amount of $900,000. Because of the Survivors' Committee's concerns over SPARTA's financial stability, SPARTA must provide, by the commencement of the Confirmation Hearing, financial assurance of the payment of its settlement amount, which assurance must be acceptable to the Survivors' Committee in its own discretion.

The sale and buy-back of the insurance policies and related claims and interests (the "**Purchased Property**" as defined in the Insurance Settlement Agreements), and payment of the settlement consideration, is contingent upon confirmation of the Joint Plan and the issuance of certain injunctions channeling claims to the Settlement Trust and barring the assertion of Claims against the Settling Insurers to ensure finality for both the Settling Insurers and the Debtors, Additional Debtors and additional parties bound by the Insurance Settlement Agreements as set forth in the Insurance Settlement Agreements (the "**Archdiocese Bound Parties**") with respect to any potential liability for Abuse Claims and any claims against the Settling Insurers with respect to the relevant insurance policies, including the Sale Injunction. Ultimately, each Insurance Settlement Agreement requires two separate court orders: (1) an individualized Insurance Settlement Order that approves the Insurance Settlement Agreement for each Settling Insurer and buy-back of their respective policies pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019, which will make a legal determination that the buy back of the insurance policies is free and clear of all interests, that the settlement is reasonable and an exercise of sound business judgment, and that the Settling Insurers are good faith purchasers of all interests in their policies; and (2) a universal Confirmation Order that confirms the Joint Plan and approves the injunctions outlined therein. Payment by each Settling Insurer is subject to the successful entry of these two orders. Additionally, any Abuse Claimant receiving a distribution from the funds paid out by the Settling Insurers will sign a separate release for the benefit of the Settling Insurers.

Upon the closing of the transactions described in the Insurance Settlement Agreements (the "**Insurance Settlement Closing**"), the Debtor and other relevant Archdiocese Bound Parties fully, finally, and completely remise, release, acquit, and forever discharge the Insurer Released Parties (as defined in the Insurance Settlement Agreements), from any and all past, present, and future: (a) Claims (including Unknown Abuse Claims) that, directly or indirectly, arise out of, relate to, or are in connection with the Settling Insurers' Policies or Claims that are covered or are determined to be covered by agreement or a court of competent jurisdiction under the Settling Insurers' Policies, including, without limitation, any Coverage Claims, Insurance Related Claims, Barred Claims, and Direct Action Claims, as well as any reimbursement obligations for Conditional Payments under the MSPA, and all Claims that, directly or indirectly, arise from, relate to, or are in connection with the Abuse Claims, the handling of the Abuse Claims or the Bankruptcy Case.

Additionally, upon Insurance Settlement Closing, (a) all of the Archdiocese Bound Parties', the Estates', and the Settlement Trustee's rights under and with respect to the Purchased Property, if any, shall be permanently and irrevocably extinguished as if the Settling Insurers' Policies had never been issued, (b) the Settling Insurers' Policies will be bought back free and clear of all Interests and (c) the Insurer Released Parties shall be entitled to all of the protections afforded by § 363(m) of the Bankruptcy Code. All Entities (and their respective successors and assigns), including but not limited to all governmental, tax, and regulatory authorities, Archdiocese Bound Parties, Non-Settling Insurers, Abuse Claimants, Direct Action Claimants, trade and other creditors, and any Entities holding "**Interests**" (as defined in the Insurance Settlement Order) (whether legal or equitable, secured or

unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated) against, in, or with respect to the Purchased Property, including, without limitation, such Interests arising or accruing under or out of, in connection with, or in any way relating to the transfer of the Purchased Property to Insurer, hereby are forever barred, estopped, and permanently enjoined from asserting such Person's or Entity's Interests against the Purchased Property, the Insurer Released Parties, or the assets or property of any Insurer Released Parties. Effective upon Closing, none of the Insurer Released Parties shall have any liability for any Claims (a) against the Debtor Parties, their Estates, or any of the Archdiocese Bound Parties or (b) that arise under or related in any way or in respect of the Purchased Property.

The proposed order approving the Insurance Settlement Agreements also provides for an injunction (the "**Sale Injunction**") to effectuate the terms of the Insurance Settlement Agreements. Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including each Settling Insurer's purchase of the Purchased Property free and clear of all Claims and Interests pursuant to section 363(f) of the Bankruptcy Code, any and all Entities that have held, now hold, or who may in the future hold any Claims or Interests (including without limitation all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Abuse Claimants, holders of Direct Action Claims, Perpetrators, Non-Settling Insurers, the Archdiocese Bound Parties, and all others holding Claims or Interests of any kind and nature whatsoever, including, without limitation, those Claims released or to be released pursuant to the Settlement Agreement), which Claims or Interests are under, arise out of, relate to, or connect in any way with an Abuse Claim or any of the Purchased Property; including, without limitation, (a) all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Barred Claims, any other Channeled Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property; (b) the payment of any of the Claims identified previously, including, without limitation, Abuse Claims, Direct Action Claims, and Coverage Claims; and (c) all other Interests, are hereby permanently stayed, enjoined, barred, and restrained from taking any Action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or Interest against any of (x) the Insurer Released Parties, (y) the assets or property of any Insurer Released Parties, or (z) the Purchased Property. However, the Sale Injunction shall not enjoin (a) the right of any Person or Entity against the Settlement Trust or a Non-Settling Insurer, or (b) the Settlement Trustee from enforcing the Settlement Trust Documents.

For the reasons more fully set forth in the Insurance Settlement Motion, the Plan Proponents believe that the approval of the Insurance Settlement Agreements and entry of the proposed order approving the Insurance Settlement Agreements, is in the best interests of the Debtor, the Additional Debtors and their Estates and Creditors.

Travelers is a Non-Settling Insurer and remains subject to continued litigation by Abuse Claimants regarding the liability of the Co-Insured Parties for Abuse occurring during the Travelers affiliate's coverage period (approximately 1973-1989). ANOI is also a Non-Settling Insurer. If SPARTA fails to provide financial assurance in a form acceptable to the Survivors' Committee in its sole discretion, then SPARTA will also be a Non-Settling Insurer. In addition, if any Insurer has not executed its respective Insurance Settlement Agreement prior to the Confirmation Hearing, such Insurer shall not be deemed a Settling Insurer.

The deadlines with respect to discovery and any objections relating to the Insurance Settlement Motion are set forth in the *Order Scheduling Trial and Pretrial Deadlines in Connection with (I) Confirmation of Plan Proponents' Joint Amended Plan Of Reorganization, (II) Motions To Approve Settlements With Insurers, (III) Certain Abuse Survivors' Motion To Dismiss Bankruptcy Pursuant to 11 U.S.C. § 1112(B), and (IV) The Court's Order to Show Cause Issued Against the Debtor, Dated April 28, 2025* [ECF 4105].

**Section 7.27      Bond Trustee's Securities Fraud Allegations.**

Counsel for the Bond Trustee (purportedly on behalf of the holders of Bond Claims ("**Bondholders**")) has asserted in open court that the Archdiocese has committed securities fraud in connection with alleged statements that the Bondholders would be paid in full pursuant to any plan ultimately filed in the Archdiocese's Chapter 11 Case. This contention is contained in *Argent Institutional Trust Company, as Indenture Trustee's, Request for a Determination that the Automatic Stay is Not Applicable to Potential Post-Petition Causes of Action for Securities Fraud* [ECF 4135] wherein the Bond Trustee seeks Bankruptcy Court authority to file a post-petition securities fraud claim against the Archdiocese, asserting that the treatment of the Bondholders in the Joint Plan is not payment in full and, thus, the alleged assurances to the contrary give rise to securities fraud claims.

The Debtor believes that the assertion that the Bondholders relied on any alleged statements by the Archdiocese is contradicted by the Bond Trustee's own prior pleading, which states:

> The Settlement Agreement was negotiated based, in part, on the Bond Trustee's understanding that the Debtor intends to pay all allowed unsecured claims in full. Indeed, the Settlement Agreement [which provided for the reinstatement of the Bonds] only works if all allowed unsecured claims are paid in full; otherwise, as the Bond Trustee fully acknowledges, that it would not be entitled to the payment of post-petition interest and fees.[17]

The Bond Trustee disagrees that the above statement contradicts its position that the Bondholders have relied on the Debtor's promises of full payment in this case and believes that Bondholders have good claims for securities fraud and other torts, stemming from pre-petition and post-petition statements made by the Debtor.

Moreover, the Debtor believes the *Barton* Doctrine and other laws protecting debtors make the Bond Trustee's claims suspect.

For the avoidance of doubt, the Bondholders' tort claims against the Debtor under the securities laws and common law are classified in Class 8 of the Joint Plan, and the Debtor reserves all of its rights and defenses with respect to those claims.

### Section 7.28    Bond Trustee's Motion to Estimate Claims.

The Bond Trustee filed a *Motion Pursuant to 11 U.S.C. §§ 105(a) and 502(c) for the Estimation of Tort Claims* [ECF 4136] ("**Motion to Estimate**"). The Motion to Estimate requests that the Bankruptcy Court estimate the aggregate amount of the Abuse Claims. Objections to the Motion to Estimate are due seven days prior to the scheduled hearing date. The Motion to Estimate is set for hearing on August 21, 2025.

Section 502(c) of the Bankruptcy Code authorizes the Bankruptcy Court to estimate, for purposes of allowance, any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case. The Motion to Estimate seeks estimation of the Abuse Claims. The Plan Proponents believe that the Motion to Estimate will be denied because the Abuse Claims will be estimated as part of the Confirmation Hearing and will not delay the administration of the case. The granting of the Motion to Estimate is not necessary for the prompt administration of the case.

### Section 7.29    Bond Trustee's Motion to Dismiss.

---

[17] *Reply Memorandum of TMI Trust Company in Support of Motion for Entry of an Order (I) Approving Settlement Agreement with TMI Trust Company, as Indenture Trustee, Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [ECF 481, at ¶ 17].

The Bond Trustee filed *Argent Institutional Trust Company, as Indenture Trustee's, Motion to Dismiss Bankruptcy Case* [ECF 4158] (the "**Argent Motion to Dismiss**"), which the Bankruptcy Court converted to an objection to the Joint Plan, to be heard at the Confirmation Hearing [ECF 4162]. The Argent Motion to Dismiss asserts that the Archdiocese's Chapter 11 Case should be dismissed because the Joint Plan violates the fair and equitable requirement embodied in 11 U.S.C. § 1129(b) and improperly classifies the Bondholders separately from other unsecured creditors in violation of 11 U.S.C. § 1122.

The Plan Proponents question the timing of the filing of the Argent Motion to Dismiss. More importantly, the financial assertions in the Argent Motion to Dismiss are not accurate. For example, the Bond Trustee overstates the Archdiocese's property valuation by $20 million and forgets that money alleged to be retained by the Archdiocese includes proceeds from the sale of Affordable Housing Facilities that are not property of the Archdiocese.

### Section 7.30     *Lousteau* **Decision.**

On July 25, 2025, a federal jury returned a verdict in favor of John Lousteau in the amount of $2,375,000.00 in connection with his abuse claim against the Congregation of Holy Cross Southern Providence, Inc. *Lousteau* filed suit on August 1, 2021; thus, four years passed from filing to entry of judgment. The defendants have advised that they will appeal the decision to the United States Court of Appeals for the Fifth Circuit; if so, the time from filing suit to possible collection on the judgment will exceed five years.

Further, the *Lousteau* case has no precedential value to the Abuse Claims. The *Lousteau* verdict was a determination of Mr. Lousteau's claim before a particular jury. There are more than 600 Abuse Claims in this case, each of which is unique. Every claim is different, every jury is different, and every fact pattern is different.

## <u>ARTICLE VIII – SUMMARY OF THE CHAPTER 11 JOINT PLAN</u>

### Section 8.01     **Administrative Claims.**

Section 2.1 of the Joint Plan provides for payment of Administrative Claims, either (a) on or as soon as possible following the Effective Date or, if later, the Allowance Date; or (b) upon such terms as are agreed to in writing by the Administrative Claimant.

*Professional Fee Claims.* Section 2.2 of the Joint Plan provides a bar date and objection deadline for filing Fee Applications seeking final Allowance of Professional Fee Claims. As reported in the June 2025 Monthly Operating Report [ECF 4167], as of June 30, 2025, a total of $47,199,383.12 in fees and expenses had been paid. The estimated fees and expenses that will be incurred by the Effective Date are approximately $8,000,000.

*Administrative Trade Claims.* Section 2.3 of the Joint Plan provides for payment of Administrative Trade Claims against the Debtor and/or any Additional Debtors.

*The DIP Credit Card Claim and Letters of Credit Claims*. As provided in Section 2.4 of the Joint Plan, the Reorganized Debtor will pay the DIP Credit Card Claim and the Letters of Credit Claims in accordance with the terms and conditions of the documents governing such Claims and any Final Orders of the Bankruptcy Court concerning such Claims.

*Priority Tax Claims.* Section 2.5 of the Joint Plan provides for payment of Priority Tax Claims.

*United States Trustee Fees.* Section 2.7 of the Joint Plan provides for payment of United States Trustee fees as required by the Bankruptcy Code.

### Section 8.02    Treatment of Classified Claims.

The following is a summary of the treatment of classified Claims under the Joint Plan:

#### Class 1 – Other Priority Claims.

Class 1 includes Other Priority Claims against the Debtor and/or the Additional Debtors. Section 4.1 of the Joint Plan provides for the treatment of Other Priority Claims. Class 1 is Unimpaired under the Joint Plan and is not entitled to vote.

#### Class 2 – Secured Claims.

Class 2 consists of any Secured Claims against the Debtor and/or Additional Debtors. Section 4.2 of the Joint Plan provides for surrender of security property, payment of any secured Claims, or abandonment of secured property, or such other treatment as will render the secured Claims unimpaired. Class 2 is Unimpaired under the Joint Plan and is not entitled to vote.

#### Class 3 – Known Abuse Claims.

Class 3 consists of the Known Abuse Claims against the Debtor and/or any Additional Debtors. Section 4.3 of the Joint Plan provides for the treatment of Known Abuse Claims. The treatment of Known Abuse Claims is also described in the Survivors' Committee Letter provided to Abuse Claimants along with this Disclosure Statement. The Survivors' Committee recommends that Abuse Claimants review the Survivors' Committee Letter for a more discussion of the treatment of Class 3 Claims as well as information about the Settlement Trust and Allocation Protocol. Class 3 Claims are Impaired under the Joint Plan, and Class 3 Claimants are allowed to vote on the Joint Plan. For purposes of voting, as set forth on the Ballots for Class 3 Claimants, each Abuse Claim will have an equal vote in the amount of $1.

### Allocation Protocol Summary[18]

Process for Review, Determination and Distributions to Abuse Claimants

The Allocation Protocol is the document that states the process for the evaluation and determination of Abuse Claims in Class 4. The Abuse Claims Reviewer will consider all of the facts and evidence presented in the Abuse Claimant's filed proof of claim. Abuse Claimants may also submit a supplement to the Abuse Claims Reviewer. The process for making supplemental submissions will be included in a separate notice.

The Abuse Claims Reviewer will first conduct an initial evaluation of each Abuse Claim. In such initial evaluation, he will determine (a) whether the Abuse Claimant has proven by credible evidence that the Abuse was perpetrated by a Perpetrator of the Debtor and (b) for claims filed for claims filed after certain deadlines, whether a valid legal excuse exists for not filing prior to applicable deadlines.

For claims that meet both of those initial burdens, the Abuse Claims Reviewer will then allocate to the Abuse Claimant a number of points between 0 (which would mean no recovery) and 100. Factors for the review include, but are not limited to:

---

[18] The purpose of this summary is to provide a general description for the process of the review and determination of Abuse Claims. Abuse Claimants should review the Allocation Protocol in its entirety for a complete description of the treatment of Abuse Claims.

- Nature of Abuse

- Impact of Abuse

- Additional Factors (participation in litigation against the Diocese, leadership role in helping sexual abuse survivors, participation in criminal proceedings against perpetrator, testimony at Grand Jury, filing lawsuit against Additional Debtor in state court).

The Abuse Claims Reviewer's determination shall be final unless the Abuse Claimant makes a timely request (along with a payment of $1,000) for the point award to be reconsidered by the Abuse Claims Reviewer. The Abuse Claimant shall not have a right to any other appeal of the Abuse Claims Reviewer's point award.

The Settlement Trustee will calculate the value of an individual "point" after all Abuse Claims, except Future Abuse Claims, have been reviewed.  The point value will be determined by dividing (a) the total dollars determined by the Settlement Trustee to be available for distribution to the Abuse Claimants by (b) the total of points among the individual Abuse Claims.  For example, if there are 50 claimants and a total of 10,000 awarded points within the Claimant Pool, and a total settlement fund of $2 million, then each point would be valued at $200.

The Settlement Trustee shall notify each Abuse Claimant in writing of the Claimant's projected initial monetary distribution (referred to as the "**Allocated Payment**").  The Settlement Trustee shall mail this preliminary determination to the Abuse Claimant's counsel of record or, in the case of unrepresented parties, to the last address based on the Abuse Claimant's filed proof of claim.  Following the Abuse Claims Reviewer's determination of any Abuse Claims that requested for reconsideration, the Settlement Trustee will finally determine the value of the point for the first distribution.  The Settlement Trustee will then inform Abuse Claimants of the final amount of their Allocated Payment for the first distribution which amount may be greater or smaller than the initial projected Allocated Payment based on reserves established by the Settlement Trustee and the outcome of any reconsideration.

The Abuse Claimant's point award will apply to any subsequent distributions being made from Settlement Trust.  The Settlement Trustee will determine the value of the point when making any additional distributions from the Settlement Trust.

*Hypothetical Abuse Claimant A*:

Abuse Claimant A was not abused during the time period covered by insurance policies of a Non-Settling Insurer, and timely filed a proof of claim in the Bankruptcy Case.  The Abuse Claims Reviewer will be supplied with Abuse Claimant A's proof of claim.  The Abuse Claimant may also choose to submit supplemental information regarding the claim to the Abuse Claims Reviewer.

The Abuse Claims Reviewer then conducts an initial evaluation of the claim and any supplemental information provided by Abuse Claimant A and determines that Abuse Claimant A has established that he/she has credible claim against the Diocese that was timely filed. The Abuse Claims Reviewer then reviews the claim, considers the factors, and allocates 50 points to Abuse Claimant A.

Abuse Claimant A will be notified of the Abuse Claims Reviewer's determination.  If Abuse Claimant A believes there is a basis for reconsideration of the Abuse Claims Reviewer's determination, Abuse Claimant A must make a request for reconsideration, accompanied by a payment of $1,000 will have 30 days to request reconsideration of the point award from the Abuse Claims Reviewer.  If reconsideration is requested and the Abuse Claims Reviewer's further review determines that 50 points is the appropriate point award, then Abuse Claimant A has no further ability to request any change to the award.

After the Abuse Claims Reviewer has completed his review of the Abuse Claims (other than Unknown Abuse Claims), then the Settlement Trustee will calculate the value of an individual "point" after all Abuse Claims. For example, if the Settlement Trustee determines that the amount of funds available for distribution is $200,000,000 and the Abuse Claims Reviewer awards 100,0000 points, then each point will be worth $20,000. Abuse Claimant A would then be entitled to receive a distribution of $1,000,000 (50 pts multiplied by $20,0000). To receive the distribution, Abuse Claimant A will need to execute an Acknowledgment and Release. The Acknowledgment and Release will acknowledge the release by Abuse Claimant A of the Debtor and the Additional Debtors through the Plan.

In order for Abuse Claimant A to receive his/her allocated share of the amounts contributed by the Settling Insurers, Abuse Claimant A will also need to sign a release of the Settling Insurers releasing the Settling Insurers from the independent claims, if any, against the Settling Insurers relating to the Archdiocese's Insurance Policies. .

*Hypothetical Abuse Claimant B*:

Abuse Claimant B was abused in during the time period covered by insurance policies of a Non-Settling Insurer, and timely filed a proof of claim in the Bankruptcy Case. The process for determining the points to be awarded to Abuse Claimant B are the same as those as for Abuse Claimant A above.

Because Abuse Claimant B was abused during the insurance coverage period of the Non-Settling Insurer, however, Abuse Claimant B may elect to become a Litigation Claimant and pursue the Abuse Claim in any court of competent jurisdiction, subject to and in accordance with the Plan, only to determine any liability that the Debtor and/or any Additional Debtor may have regarding an Abuse Claim and the amount of that liability. Abuse Claimant B will be responsible for the fees and expenses relating to the pursuit of such a claim.

To the extent there is a settlement agreement whereby a Non-Settling Insurer becomes a Settling Insurer (such settlement, a "**Insurance Settlement**") that covers Abuse Claimant B's Abuse Claim, Abuse Claimant B shall receive an enhancement (the "**Claim Enhancement**") to his/her point allocation. The Claim Enhancement shall be payable only from the proceeds of the applicable Insurance Settlement. The Claim Enhancements are independent of one another and are not intended to be cumulative. The Settlement Trustee shall reserve sufficient amounts to fund such enhanced payments before distribution of Insurance Settlement proceeds to Abuse Claimants who are not Litigation Claimants.

Claim Enhancements shall be applied as follows:

    i.    Abuse Claimant B shall receive an enhancement of 1.1 times his/her Allocated Payment if the Insurance Settlement is entered into before the Litigation Claimant files a substantive pleading (not merely a notice, certificate or other procedural document) or propounds discovery after the Settlement Trustee has issued the Notice of Litigation Schedule.

    ii.    Abuse Claimant B shall receive an enhancement of 1.5 times his/her Allocated Payment if the Insurance Settlement is entered into after a Litigation Claimant files a substantive pleading (not merely a notice, certificate or other procedural document) or propounds discovery after the Settlement Trustee has issued the Notice of Litigation Schedule, but before a deposition of the Litigation Claimant by opposing counsel.

    iii.    Abuse Claimant B shall receive an enhancement of 2 times his/her Allocated Payment if the Insurance Settlement is entered into after a post-Notice of Litigation Schedule deposition of the Litigation Claimant by opposing counsel but before commencement of a trial in Abuse Claimant B's case.

4938-3511-8681.4 05067.002

    iv.        Abuse Claimant B shall receive an enhancement of 3 times his/her Allocated Payment if the Insurance Settlement is entered into on or after the first day of a trial in Abuse Claimant B's case.

    v.        Abuse Claimant B shall receive an enhancement of 4 times his/her Allocated Payment if the Insurance Settlement is entered into after a Litigation Award is entered in favor of Abuse Claimant B in such litigation.

Abuse Claimant B may withdraw his/her election to be a Litigation Claimant at any time.

Unless Abuse Claimant B makes a Distribution Election, Abuse Claimant B's Allocated Payment shall be held in reserve by the Settlement Trustee (and Abuse Claimant B will not receive any distribution from the Settlement Trust) until one of the below occur ("**Release Events**"). Following a Release Event, Abuse Claimant B shall receive his/her Allocated Payment (including any Claim Enhancement described above).

    (a)      The Settlement Trust enters into an Insurance Settlement regarding the applicable Insurance Policy, in which case the Abuse Claimant B shall be treated as a Channeled Claim under the Joint Plan subject to the Claim Enhancements provided for in the Allocation Protocol;

    (b)      A court enters a Litigation Award to Abuse Claimant B, in which case, Abuse Claimant B may elect to:

        (i) retain the entirety of his/her Litigation Award and the Settlement Trustee shall release Abuse Claimant B's Allocated Payment reserve for distribution to other Abuse Claimants and Abuse Claimant B shall not be entitled to any Claim Enhancement of his/her award or any Insurance Settlement proceeds; or

        (ii) assign his/her Litigation Award to the Settlement Trust and participate in all distributions from the Settlement Trust with any Claim Enhancement.

        If Abuse Claimant B does not assign his/her Litigation Award to the Settlement Trust, then 10% of any Litigation Award, net of attorneys' fees and costs, if collected from any Non-Settling Insurer and not assigned to the Settlement Trust **shall be paid by Abuse Claimant B to the Settlement Trust** on account of costs and expenses incurred by the Settlement Trust. For example, if Abuse Claimant B receives a $50,000 award with $15,000 in attorneys' fees and costs, the Settlement Trust will receive $3,500 and the Abuse Claimant B will receive $31,500.

        If the election is not made within 30 days of the Litigation Award, Abuse Claimant B shall be deemed to have elected not to assign his/her Litigation Award to the Settlement Trust.

    (c)      Abuse Claimant B enters into a settlement regarding his/her Abuse Claim (other than an Insurance Settlement) (a "**Litigation Claimant Settlement**"), Abuse Claimant B may elect to:

        (i) retain the entirety of his/her Litigation Claim Settlement and the Settlement Trustee shall release Abuse Claimant B's Allocated Payment reserve for distribution to other Abuse Claimants and Abuse Claimant B shall not be entitled to any enhancement of his/her award or any Insurance Settlement proceeds; or

(ii) assign his/her Litigation Claim Settlement to the Settlement Trust and participate in all distributions from the Settlement Trust including any Claim Enhancement.

If Abuse Claimant B does not assign his/her Litigation Claim Settlement to the Settlement Trust, then a portion of any such Litigation Claim Settlement, net of attorneys' fees and costs, if collected from any Non-Settling Insurer by a Litigation Claimant and not assigned to the Settlement Trust, shall be paid by the Litigation Claimant to the Settlement Trust on account of costs and expenses incurred by the Settlement Trust in connection with the Abuse Claimant B's Abuse Claim. The portion payable to the Settlement Trust is based on the following litigation case milestones: (a) 50% to the Settlement Trust and 50% to Abuse Claimant B if the Abuse Claim is settled after litigation is commenced but prior to discovery; (b) 25% to the Settlement Trust and 75% to Abuse Claimant B if the Abuse Claim is settled after at least one party has produced documents or at least one deposition has occurred; and (c) 100% to Abuse Claimant B if the Abuse Claim is settled after a trial commences. For example, if Abuse Claimant B reaches a settlement of $50,000 under the scenario of foregoing subparagraph (b) and incurs $15,000 in attorneys' fees and costs after a deposition is taken, the Settlement Trust will receive $8,750, and Abuse Claimant B will receive the remaining $26,250.

If the election is not made within 30 days of the settlement, Abuse Claimant B shall be deemed to have elected not to assign his/her Litigation Claimant Settlement to the Settlement Trust.

(d) If a Final Order is entered against Abuse Claimant B finding that a Covered Party or Non-Settling Insurer does not have any liability to such Claimant on account of an Abuse Claim, then the Allocated Payment reserve shall revert to the non-reserved assets of the Settlement Trust and Abuse Claimant B shall have no recourse against the Settlement Trustee, the Settlement Trust or the Settlement Trust Assets.

### Class 4 – Unknown Abuse Claims.

Class 4 consists of the Unknown Abuse Claims against the Debtor and/or any Additional Debtors. Section 4.4 of the Joint Plan provides for the treatments of Unknown Abuse Claims. Because Unknown Abuse Claims are asserted by Claimants who are not yet identified, the Joint Plan provides that the Unknown Claims Representative may vote on the Joint Plan on account of the Unknown Abuse Claims against the Debtor or any Additional Debtors.

### Class 5 – Non-Insurer Contribution Claims.

Class 5 consists of the Non-Insurer Contribution Claims against the Debtor and/or any Additional Debtors. Section 4.5 of the Joint Plan provides for the treatments of Non-Insurer Contribution Claims. Because no Distribution will be made to Class 5 Claimants, Class 5 is not entitled to vote and is deemed to have rejected the Joint Plan.

### Class 6 – Bond Claims.

Class 6 consists of the Bond Claims against the Debtor. Section 4.6 of the Joint Plan provides for the treatment of Bond Claims. Class 6 is Impaired under the Joint Plan and is entitled to vote. Beginning on the Effective Date, and except to the extent that a Creditor holding an Allowed Bond Claim agrees to less favorable treatment, each Creditor holding an Allowed Bond Claim shall receive, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Allowed Bond Claim, its pro rata share of ten (10) annual Cash payments based on the following formula: The product of (i) a fraction with a numerator equal to the Allowed

Bond Claims and a denominator equal to all Unsecured Claims against the Debtor that would be paid in the hypothetical chapter 7 case described in the Liquidation Analysis and (ii) the amount available to be distributed to all Unsecured Claims against the Debtor in the hypothetical chapter 7 case described in the Liquidation Analysis (as such analysis may be amended or otherwise determined as appropriate by the Bankruptcy Court at the Confirmation Hearing or otherwise). For example, if (i) the Allowed Bond Claims were $29 million, (ii) the total Unsecured Claims (including the Bond Claims) in the Liquidation Analysis were $1,429,299,271, and (iii) the total assets available for distribution to Creditors holding Unsecured Claims in the Liquidation Analysis were $209,230,813, then the Allowed Bond Claims would receive the present value of 2.02% of the $209,230,813 (i.e., a present value of $4,245,222.61). The present value amount determined by the preceding formula shall be amortized over ten (10) years and paying an 8.5% interest rate. Additionally, such Creditor's pro rata share of the Cash payments set forth above may be reduced by the application of amounts payable to the Bond Trustee in accordance with the Amended Bond Documents. The treatment of the Bond Claims outlined in this Section 4.6 will be memorialized in the Amended Bond Documents, which Amended Bond Documents shall (i) substantially conform to the Joint Plan as set forth in Plan Supplement 4.6 and (ii) be executed and delivered to the Bond Trustee by the Archdiocese or the Reorganized Archdiocese on or before the Effective Date.

Applying these assumptions, an 8.5% interest rate, and a 10-year amortization results in an annual payment to the Bondholders of $647,004.61, amortized on the schedule below:

| Year | Payment | Principal Paid | Interest Paid | Remaining Balance |
|---|---|---|---|---|
| June 1, 2026 | $ 647,004.61 | $ 286,160.72 | $ 360,843.92 | $ 3,959,061.89 |
| June 1, 2027 | $ 647,004.61 | $ 310,484.38 | $ 336,520.26 | $ 3,648,577.51 |
| June 1, 2028 | $ 647,004.61 | $ 336,875.55 | $ 310,129.09 | $ 3,311,701.96 |
| June 1, 2029 | $ 647,004.61 | $ 365,509.97 | $ 281,494.67 | $ 2,946,191.99 |
| June 1, 2030 | $ 647,004.61 | $ 396,578.32 | $ 250,426.32 | $ 2,549,613.67 |
| June 1, 2031 | $ 647,004.61 | $ 430,287.48 | $ 216,717.16 | $ 2,119,326.19 |
| June 1, 2032 | $ 647,004.61 | $ 466,861.91 | $ 180,142.73 | $ 1,652,464.28 |
| June 1, 2033 | $ 647,004.61 | $ 506,545.18 | $ 140,459.46 | $ 1,145,919.10 |
| June 1, 2034 | $ 647,004.61 | $ 549,601.52 | $ 97,403.12 | $ 596,317.58 |
| June 1, 2035 | $ 647,004.61 | $ 596,317.58 | $ 50,686.99 | $0 |
| Totals | $ 6,470,046.33 | $ 4,245,222.61 | $ 2,224,823.72 | |

After the entry of the Confirmation Order, the Archdiocese will request that the LPFA adopt a resolution authorizing the amendment to the Bond Documents reflecting the terms of the approved bankruptcy plan regarding the Bonds. Such amendments will reflect the approved amortization schedule for principal and interest on the Bonds. On or before the Effective Date of the Joint Plan, Foley & Judell, L.L.P. ("**Bond Counsel**") is expected to render its opinion that under existing law, interest on the Bonds is excludable from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code of 1986, as amended, and is not a specific item of tax preference for purposes of the federal alternative minimum tax imposed on individuals; however, such interest may be taken into account for the purpose of computing the alternative minimum tax imposed on certain corporations. The opinion of Bond Counsel is also expected to state that pursuant to the provisions of chapter 14-A of title 39 of the Louisiana Revised Statutes of 1950, as amended and supplemented, the Bonds and the income derived therefrom are exempt from all taxation by the State of Louisiana.

Drafts of the Amended Bond Documents will be provided to the Bond Trustee prior to the Solicitation Deadline of August 28, 2025. The Debtor anticipates that the amendments will change only the payment terms of the Bonds.

*Class 7 – General Unsecured Claims and Unsecured Trade Claims—Debtor.*

Class 7 consists of General Unsecured Claims and Unsecured Trade Claims against the Debtor. Section 4.7 of the Joint Plan provides for the treatment of Claimants holding General Unsecured Claims or Unsecured Trade Claims against the Debtor. Class 7 is Impaired under the Joint Plan and is entitled to vote. Any Class 7 Claimant holding a Convenience Claim that properly makes a Convenience Class Election with respect to its General Unsecured Claim or Unsecured Trade Claim is deemed to vote to accept the Joint Plan. Based on the claims register as of the date of this Disclosure Statement, there are two claims above the Convenience Class amount. All parties continue to investigate the claims.

### Class 8 – Non-Abuse Personal Injury Claims—Debtor.

Class 8 consists of the Non-Abuse Personal Injury Claims against the Debtor. Section 4.8 of the Joint Plan provides for the treatment of Claimants holding Non-Abuse Personal Injury Claims against the Debtor. Class 8 Claimants are Impaired under the Joint Plan and are entitled to vote.

### Class 9 – Unsecured Trade Claims—Additional Debtors.

Class 9 consists of Unsecured Trade Claims against the Additional Debtors. Section 4.9 of the Joint Plan provides for the treatment of Claimants holding Unsecured Trade Claims against the Additional Debtors. Class 9 is Unimpaired under the Joint Plan and is not entitled to vote.

### Class 10 – Additional Debtors' Non-Trade Unsecured Claims—Additional Debtors.

Class 10 consists of all Additional Debtors' Non-Trade Unsecured Claims against any Additional Debtors. Section 4.10 of the Joint Plan provides for the treatment of Claimants holding Non-Trade Unsecured Claims the Additional Debtors. Class 10 is Unimpaired under the Joint Plan and is not entitled to vote.

**Section 8.03    Discharge and Discharge Injunctions in Favor of the Debtor and Reorganized Debtor.**

**Section 12.2(a) and (c) of the Joint Plan provide the following discharge and discharge injunction provisions in favor of the Debtor:**

*Discharge of the Debtor*.  **Except as expressly provided in the Insurance Settlement Agreements, the Joint Plan (including but not limited to section 12.14 below), or Confirmation Order, all consideration distributed under the Joint Plan, as well as the Debtor and Additional Debtor Settlement Consideration, will be in exchange for, and in complete satisfaction, settlement, discharge, and termination of, all Claims of any nature whatsoever against or in the Debtor or any of its assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date, and, as of the Effective Date, the Debtor will be deemed discharged, and each Creditor and any successor, assign, and affiliate of such Creditor will be deemed to have forever waived and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, liabilities, and debts of the kind specified in section 502 of the Bankruptcy Code, based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date, in each case whether or not (a) a Proof of Claim based upon such debt is Filed or deemed Filed under section 501 of the Bankruptcy Code, (b) a Claim (including an Abuse Claim) based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has become an Expunged Claim, or (d) an Abuse Claimant holding an Abuse Claim based upon such debt is deemed to have accepted the Joint Plan.**

Without limiting the foregoing, the Archdiocesan Schools are not separate Entities from the Debtor, and all Abuse Claims asserted against the Archdiocesan Schools are discharged and released in accordance with the preceding paragraph.

In the event any Entity takes any action that is prohibited by, or is otherwise inconsistent with, the injunction provisions in the Joint Plan or the Confirmation Order, then, upon notice to the Bankruptcy Court by an affected party, the action or proceeding in which the Claim of such Entity is asserted will automatically be transferred to the Bankruptcy Court or District Court for enforcement of the Joint Plan. In a successful action to enforce the injunctive provisions of this Section 12.2(a) of the Joint Plan in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

Notwithstanding any other provision of the Joint Plan, if any court of competent jurisdiction enters a Final Order releasing a Non-Settling Insurer of its duty to defend and/or indemnify the Debtor, the Reorganized Archdiocese, or any other Covered Party or Settling Insurer due, in whole or in part, to the Debtor's or the Reorganized Archdiocese's breach of its Post-Effective Date Insurance Obligations, the Debtor and/or the Reorganized Archdiocese shall be liable for any such breach causing a loss of insurance coverage under any Non-Settling Insurers' Policies, and the Debtor and the Reorganized Archdiocese shall not have a discharge of any Claim that becomes uninsured as a result, and any release or discharge of such Claim under section 1141 of the Bankruptcy Code and the Joint Plan shall be null and void. The Settlement Trustee and the Reorganized Archdiocese shall have the right at their respective discretion to intervene and be heard as parties-in-interest in any Action related to an Abuse Claim in which (i) the Debtor's or the Reorganized Archdiocese's Post-Effective Date Insurance Obligations or (ii) the duty of a Non-Settling Insurer to defend and/or indemnify the Debtor, the Reorganized Archdiocese, or any other Covered Party, are implicated, disputed, or otherwise raised.

*Discharge Injunction – Debtor.* As of the Effective Date, except as expressly provided in the Insurance Settlement Agreements, the Joint Plan, or the Confirmation Order, all Creditors holding Claims of any nature whatsoever against or in the Debtor or any of its assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date will be precluded and permanently enjoined from prosecuting or asserting any such discharged Claim against the Debtor, the Reorganized Archdiocese, or the property of the Debtor or the Reorganized Archdiocese. In accordance with the foregoing, except as expressly provided in the Joint Plan, the Insurance Settlement Agreements, the Confirmation Order, or the Insurance Settlement Orders, the Confirmation Order will be a judicial determination of discharge or termination of all Claims, and other debts and liabilities against or in the Debtor pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtor or the Reorganized Archdiocese at any time to the extent such judgment relates to a discharged Claim.

Without limiting the foregoing, the Archdiocesan Schools are not separate Entities from the Debtor, and the discharge injunction set forth in the preceding paragraph will include the Archdiocesan Schools and will apply to all discharged Claims against the Archdiocesan Schools.

**Section 8.04    Discharge and Discharge Injunctions in Favor of the Additional Debtors and Reorganized Additional Debtors.**

Section 12.2(b) and (d) of the Joint Plan provide discharge and discharge injunction provisions in favor of the Additional Debtors as follows:

*Discharge of the Additional Debtors*. Except as expressly provided in the Insurance Settlement Agreements, Joint Plan (including but not limited to section 12.14 below), or Confirmation Order, all

consideration distributed under the Joint Plan, as well as the Debtor and Additional Debtor Settlement Consideration, will be in exchange for, and in complete satisfaction, settlement, discharge, and termination of all Claims of any nature whatsoever against or in the Additional Debtors or any of their assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date, and, as of the Effective Date, the Additional Debtors will be deemed discharged, and each Creditor and any successor, assign, and affiliate of such Creditor will be deemed to have forever waived and discharged the Additional Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, liabilities, and debts of the kind specified in section 502 of the Bankruptcy Code, based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date, in each case whether or not (a) a Proof of Claim based upon such debt is Filed or deemed Filed under section 501 of the Bankruptcy Code, (b) a Claim (including an Abuse Claim) based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has become an Expunged Claim, or (d) an Abuse Claimant holding an Abuse Claim based upon such debt is deemed to have accepted the Joint Plan.

Without limiting the foregoing, the Parish Schools are not separate Entities from the Additional Debtors, and all Abuse Claims asserted against the Parish Schools are discharged and released in accordance with the preceding paragraph.

If any Entity takes any action that is prohibited by, or is otherwise inconsistent with, the injunction provisions in the Joint Plan or the Confirmation Order, then, upon notice to the Bankruptcy Court by an affected party, the action or proceeding in which the Claim of such Entity is asserted will automatically be transferred to the Bankruptcy Court or District Court for enforcement of the Joint Plan. In a successful action to enforce the injunctive provisions of this Section 12.2(b) of the Joint Plan in response to a willful violation thereof, the moving party may seek an award of costs (including reasonable attorneys' fees) against the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

Notwithstanding any other provision of the Joint Plan, if any court of competent jurisdiction enters a Final Order releasing any Non-Settling Insurer of its duty to defend and/or indemnify an Additional Debtor (or Additional Debtors), a Reorganized Additional Debtor (or Reorganized Additional Debtors), or any other Covered Party or Settling Insurer due, in whole or in part, to such Additional Debtor's(s') or such Reorganized Additional Debtor's(s') breach of its (or their) Post-Effective Date Insurance Obligations, then such Additional Debtor(s) and/or Reorganized Additional Debtor(s) shall be liable for any breach causing a loss of insurance coverage under any Non-Settling Insurers' Policies, and such Additional Debtor(s) and/or Reorganized Additional Debtor(s) shall not have a discharge of any Claim that becomes uninsured as a result, and any release or discharge of such Claim under section 1141 of the Bankruptcy Code and the Joint Plan shall be null and void. The Settlement Trustee and such Reorganized Additional Debtor (or Reorganized Additional Debtors) shall have the right at their respective discretion to intervene and be heard at any time as parties-in-interest in any Action related to an Abuse Claim in which (i) the Additional Debtor's (or Additional Debtors') or the Reorganized Additional Debtor's(s') Post-Effective Date Insurance Obligations or (ii) the duty of a Non-Setting Insurer to defend and/or indemnify the Additional Debtors, the Reorganized Additional Debtors, or any other Covered Party, are implicated, disputed, or otherwise raised.

*Discharge Injunction – Additional Debtors.* As of the Effective Date, except as expressly provided in the Insurance Settlement Agreements, the Joint Plan, or the Confirmation Order, all Creditors holding Claims of any nature whatsoever against or in any Additional Debtors or any of the assets or properties of any Additional Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Confirmation Date will be precluded and permanently enjoined from prosecuting or asserting any such discharged Claim against the Additional Debtors, the Reorganized Additional Debtors, or the property of the Additional Debtors or Reorganized Additional Debtors. In accordance with the foregoing, except as expressly provided in the Joint Plan, the Insurance Settlement

Agreements, the Confirmation Order, or the Insurance Settlement Orders, the Confirmation Order will be a judicial determination of discharge or termination of all Claims, and other debts and liabilities against or in the Additional Debtors pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Additional Debtors or the Reorganized Additional Debtors at any time to the extent such judgment relates to a discharged Claim.

Without limiting the foregoing, the Parish Schools are not separate Entities from the applicable Additional Debtors, and the discharge injunction set forth in the preceding paragraph will include the Parish Schools and will apply to all discharged Claims against the Parish Schools.

Section 8.05    Exculpation and Limitation of Liability.

As set forth in section 12.3 of the Joint Plan, from and after the Effective Date, to the maximum extent permitted by law, no Exculpated Party will have or incur any liability for, and each Exculpated Party will be released from, any Claims, Causes of Action, or liability, and each Exculpated Party is hereby exculpated from any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, Estate Cause of Action, remedy, loss, and liability for conduct occurring on or after the applicable Archdiocese's Petition Date or the Additional Debtors' Petition Date in connection with or arising out of: (a) the Filing and administration of any Chapter 11 Cases; (b) the negotiation and pursuit of the Disclosure Statement, the Joint Plan, or the Plan Documents, as well as the solicitation of votes for, or Confirmation of, the Joint Plan; (c) the funding or consummation of the Joint Plan, the Settlement Trust, the Plan Documents, or any related agreements, instruments, or other documents, as well as any offer, issuance, and/or Distribution under the Joint Plan or any Settlement Trust Distributions or other disbursements made by the Settlement Trust, whether or not such Distributions, Settlement Trust Distributions, or other disbursements occur following the Effective Date; (d) the implementation of the Joint Plan; and (e) any negotiations, transactions, and documentation in connection with the foregoing clauses (a)-(d), provided, however, the foregoing will not apply to any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct. The Exculpations will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Joint Plan, which protect such Exculpated Parties from liability.

The Exculpated Parties have participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and any distribution of consideration made pursuant to the Joint Plan or Settlement Trust and, therefore, are not, and on account of such distributions, will not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Joint Plan, any Distributions made pursuant to the Joint Plan, or any Settlement Trust Distributions or other disbursements made by the Settlement Trust.

As of the Effective Date, all Creditors are, and will be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Exculpated Party and, solely to the extent provided by section 1125(e) of the Bankruptcy Code, any Entity described in section 1125(e) or its or their property or successors or assigns on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise with respect to any liability or obligation for which an Exculpated Party is discharged, exculpated, or released under the Joint Plan (which, as set forth in Section 12.3(a) does not include any liability or obligation arising out of or related to acts or omissions of such Exculpated Party that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct): (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, Action, or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other Order; (iii) creating, perfecting, or in any way enforcing in any matter, directly or

indirectly, any Lien or encumbrance; and/or (v) setting off, seeking reimbursement, contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged or released under the Joint Plan.

Section 8.06    Channeling Injunction Regarding Abuse Claims against Protected Parties and Settling Insurers.

Section 12.4 of the Joint Plan provides for a Channeling Injunction Regarding Abuse Claims against the Protected Parties and Settling Insurers. In consideration of the undertakings of the Protected Parties and Settling Insurers, their respective contributions to the Settlement Trust, and other consideration, and, where applicable, pursuant to their respective settlements with the Debtor and/or any Additional Debtors and to further preserve and promote the agreements between and among the Protected Parties and Settling Insurers, and to supplement where necessary the injunctive effect of the discharge as provided in section 1141 and 524 of the Bankruptcy Code, and pursuant to sections 105 and 363 of the Bankruptcy Code:

(a)    Any and all Channeled Claims against the Protected Parties and Settling Insurers are channeled into the Settlement Trust and will be treated, administered, determined, and resolved under the procedures and protocols and in the amounts established under the Joint Plan and the Settlement Trust Documents as the sole and exclusive remedy for all Entities holding Channeled Claims;

(b)    all Entities that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Channeled Claims against the Protected Parties and Settling Insurers will be permanently and forever stayed, restrained, enjoined, and barred from taking any action, directly or indirectly, for the purpose of asserting, enforcing, collecting, recovering, or receiving payments, satisfaction, or recovery from any Protected Party or any of the Settling Insurers, including:

(i)    commencing, conducting, or continuing, in any manner, whether directly or indirectly, any suit, Action, or other proceeding of any kind in any forum with respect to any such Channeled Claim against any Protected Party, Settling Insurer, or any property or interest in property of any Protected Party or Settling Insurer;

(ii)    enforcing, levying, attaching, collecting, or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or other Order against any Protected Party, Settling Insurer, or any property or interest in property of any Protected Party or Settling Insurer with respect to any such Channeled Claim;

(iii)    creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, any Lien or encumbrance of any kind against any Protected Party, Settling Insurer, or any property or interest in property of any Protected Party or Settling Insurer with respect to any such Channeled Claim;

(iv)    asserting, implementing, or effectuating any Channeled Claim of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any Protected Party or Settling Insurer, (B) any Protected Party or Settling Insurer, or (C) any property or interest in property of any Protected Party or Settling Insurer; and

(v)    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Joint Plan and the Plan Documents.

Notwithstanding anything to the contrary in Section 12.4 of the Joint Plan, the Channeling Injunction will not enjoin the following:

        (i)      the right of any Entity to the treatment afforded to such Entity under the Joint Plan;

        (ii)      the right of any Entity to assert any Claim for payment of Settlement Trust expenses solely against the Settlement Trust;

        (iii)      the Settlement Trustee's enforcing rights under the Settlement Trust Documents;

        (iv)      the Settling Insurers' enforcing rights under the Insurance Settlement Agreements;

        (v)      the rights of the Settlement Trust, the Settlement Trustee, Abuse Claimants, Covered Parties, the Reorganized Archdiocese, and the Reorganized Additional Debtors (in each case, to the extent permitted or required under the Joint Plan) to prosecute any Claims against the Non-Settling Insurers based on or arising from the Non-Settling Insurance Rights Transfer or otherwise; or

        (vi)      the rights of the Covered Parties with respect to Non-Insurer Contribution Claims against, or with respect to, the Settlement Trust.

**Section 8.07**    **Supplemental Settling Insurers' Injunction.**

Section 12.5 of the Joint Plan provides for a Supplemental Settling Insurers' Injunction. Pursuant to sections 105(a) and 363 of the Bankruptcy Code, and in consideration of the undertakings of the Settling Insurers pursuant to any Insurance Settlement Agreement and the Joint Plan, including the Settling Insurers' purchases of the Settling Insurers' Policies pursuant to section 363(f) of the Bankruptcy Code and the Insurance Settlement Orders, any and all Entities who have held, now hold, or who may in the future hold any Claims against any Protected Party, any Covered Party, or any Settling Insurer, which, directly or indirectly, relate to, any of the Settling Insurers' Policies, are hereby permanently and forever stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce, collect, or recover, or attempt to assert, enforce, collect, or recover, any such Claim against any Settling Insurer, and/or any Settling Insurers' Policies, including:

    (a)  commencing, conducting, or continuing, in any manner, whether directly or indirectly, any suit, Action, or other proceeding of any kind in any forum with respect to any such Claim against any Settling Insurer, or any property or interest in property of any Settling Insurer;

    (b)  enforcing, levying, attaching, collecting, or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or other Order against any Settling Insurer, or any property or interest in property of any Settling Insurer with respect to any such Claim;

    (c)  creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, any Lien or encumbrance of any kind against any Settling Insurer, or any property or interest in property of any Settling Insurer with respect to such Claim;

    (d)  asserting, implementing, or effectuating any Claim of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any Settling Insurer, (B) any Settling Insurer, or (C) any property or interest in property of any Settling Insurers; and

(e) taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Joint Plan and the Plan Documents.

The Supplemental Settling Insurers' Injunction will not apply to the rights of any Settling Insurer to any reinsurance recoveries, as provided in Section 7.1(f) of the Joint Plan.

**Section 8.08    Injunction against Interference with the Joint Plan.**

Under Section 12.6 of the Joint Plan, upon entry of the Confirmation Order, all Creditors holding Claims will be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Joint Plan.

**Section 8.09    Gatekeeper Injunction.**

The Joint Plan contains a gatekeeper injunction at Section 12.8 requiring Enjoined Parties to demonstrate they have a colorable claim that is not released, enjoined, or otherwise barred by the Joint Plan and Confirmation Order before bringing any such claim in court. Violation of Section 12.8 can result in an award of attorneys' fees. The specific provision is set forth as follows:

Subject in all respects to Article 12 of the Joint Plan, no Enjoined Party may assert a Claim or cause of action of any kind or institute any proceeding of any kind against any of the Covered Parties, Settling Insurers, or Settlement Trust that arises from or is in any manner related to the Chapter 11 Cases, the negotiation of the Joint Plan, the negotiation of the Insurance Settlement Agreements, the administration of the Joint Plan by the Settlement Trust and the Debtor, or the property to be distributed under the Joint Plan, or transactions in furtherance of the foregoing without the Bankruptcy Court 1) determining, after Notice and Hearing, that such claim or cause of action (a) is a colorable claim of any kind against the Debtor, the Additional Debtors, the Settlement Trust, or the Settling Insurers; (b) did not arise prior to the Effective Date of the Joint Plan; and (c) is not a Claim owned by the Debtor or Settling Insurers against such Protected Party, Settling Insurer, or the Settlement Trust and 2) subject in all respects to the Injunctions, specifically authorizing such Enjoined Party to initiate a proceeding to assert such Claim or cause of action against such Protected Party, Settling Insurer, or the Settlement Trust.

To the extent that a Claim or cause of action is filed against a Covered Party, Settling Insurer, or the Settlement Trust, without the Bankruptcy Court authorizing such Claim or cause of action in accordance with the preceding paragraph, the Claim or cause of action shall be deemed a willful violation of the Injunctions contained in the Joint Plan if the Claim or cause of action is not dismissed within 10 days of the lawyer filing such Claim or cause of action being provided notice that the Claim or cause of action is in violation of the Injunctions contained in the Joint Plan and this provision. The Bankruptcy Court, for any willful violation of the Injunctions contained in the Joint Plan and this provision, shall assess the attorney filing such Claim or cause of action and the named plaintiff in the Claim or cause of action reasonable legal fees incurred by the party enforcing the respective Injunction and this provision.

**Section 8.10    Term of Pre-Confirmation Injunctions or Stays.**

All injunctions and/or stays provided for in the Joint Plan, the injunctive provisions of sections 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting Participating Parties and any Settling Insurer are permanent, will remain in full force and effect following the Effective Date, and are not subject to being vacated or modified. Debtor's settlement agreements, if any, with the Settling Insurers and the Protected Parties previously authorized by the Bankruptcy Court are affirmed, and any obligations of the Debtor with respect to such settlement agreements are excepted from the Debtor's Discharge and shall be assumed by the Reorganized Debtor and Trustee, as applicable, on the Effective Date.

### Section 8.11    Existing Benefits and Pension Programs.

Pursuant to Sections 10.4 and 10.7 of the Joint Plan, as of the Effective Date, all Existing Benefits Programs will be assumed by the Reorganized Debtor. The Reorganized Debtor maintains the right to object to any claims related to the Priest Pension Plan or its employee and retiree benefit plans.

Pursuant to Sections 10.7 of the Joint Plan, the Parish Service Agreements, the Temporalities Manual, and all oral agreements between the Archdiocesan Parishes and the Archdiocese will be neither assumed nor rejected and will instead pass through and be treated on and after the Effective Date for all purposes as if the Archdiocese Chapter 11 Case and the Additional Debtors' Chapter 11 Cases had never been filed.

The Joint Plan provides for the "ride through" of the contractual relationships between the archdiocese on one hand and the Additional Debtors on the other.  The contractual relationship between the Archdiocese and the Additional Debtors accounts for over 90 % of the archdiocese operating revenue and the archdiocese provides support and other benefits (such as group property coverage) to the Additional Debtors. The archdiocese could not function without the Additional Debtors and the Additional Debtors could not continue in existence without the archdiocese.

The choice was either to assume the contracts or have them ride through the Chapter 11.   The assumption choice would have required a prompt cure of the defaults under the various agreements and adequate assurance of future performance which would have adversely affected the ability of the Archdiocese and the Additional Debtor to pay creditors.  Rejection was not an option since the archdiocese divorced from the Additional Debtors and the Additional Debtors divorced from the archdiocese would mean the dissolution of each entity and the inability to carry out the mission for each

### Section 8.12    Assumption and Rejection of Executory Contracts.

Pursuant to Section 10.1 of the Joint Plan, all executory contracts and unexpired leases of the Debtor not specifically rejected will be deemed assumed by the Reorganized Debtor as of the Effective Date; provided, however, that, in accordance with Section 10.7 of the Joint Plan, the Parish Service Agreements, the Temporalities Manual, and all oral agreements between the Archdiocesan Parishes and the Archdiocese will be neither assumed nor rejected under Bankruptcy Code § 365 and will instead pass through, and each party shall have the same rights and liabilities they possessed under such contracts as if the Chapter 11 Cases had not been filed.

If any party to an executory contract or unexpired lease that is being assumed objects to such assumption, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court.  All payments to cure defaults that may be required under section 365(b)(1) of the Bankruptcy Code will be made by the applicable Debtor, Reorganized Archdiocese, Additional Debtor, or Reorganized Additional Debtor. In the event of a dispute regarding the amount of any such payments, or the ability of the Debtor to provide adequate assurance of future performance, applicable Reorganized Archdiocese or Reorganized Additional Debtor will make any payments required by section 365(b)(1) of the Bankruptcy Code after the entry of the Final Order resolving such dispute.

### Section 8.13    Claims for Contract Rejection.

In the event any contract is rejected, all proofs of claim regarding Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court by no later than thirty (30) calendar days after the Effective Date or such Claims will be forever barred. If any order providing for the rejection of an executory contract or unexpired lease did not provide a deadline for filing Claims arising from such rejection,

proofs of claim with respect thereto must be filed by no later than thirty (30) calendar days after the later to occur of (a) the Effective Date or, (b) if the order is entered after the Effective Date, the date such order becomes a Final Order, or such Claims will be forever barred.

**Section 8.14     Conditions to the Effective Date.**

Pursuant to Section 11.1 of the Joint Plan, the Joint Plan will not be consummated, and the Effective Date will not occur, until each of the following conditions has been satisfied:

(a)     the Confirmation Order, in form and substance acceptable to the Debtor, the Additional Debtors, and the Survivors' Committee, will have been entered by the Bankruptcy Court and will have become a Final Order; provided that if any appeal of the Confirmation Order is determined by a court of competent jurisdiction to be equitably moot due to substantial consummation as provided in the Joint Plan, the Confirmation Order will be considered a Final Order as of the date that the order determining such appeal to be moot has become a Final Order;

(b)     the Settlement Trust Documents will have become effective in accordance with the terms of the Joint Plan;

(c)     the Settlement Trust will have been established and funded with the Settlement Trust Consideration on the Effective Date in accordance with the Joint Plan;

(d)     the Additional Debtors' Petition Date will have occurred;

(e)     the Debtor and the Additional Debtors will have obtained all authorizations, consents, certifications, approvals, rulings, opinions or other documents that are necessary to implement and effectuate the Joint Plan, including any and all canonical approvals;

(f)     all actions, documents, and agreements necessary to implement and effectuate the Joint Plan will have been effected or executed;

(g)     the Debtor will have executed and delivered the Amended Bond Documents to the Bond Trustee; and

(h)     the Bankruptcy Court shall have entered Insurance Settlement Orders approving all the Insurance Settlement Agreements (with both such Insurance Settlement Orders and Insurance Settlement Agreements in a form and substance acceptable to the Debtor, the Additional Debtors, the Survivors' Committee, and applicable Settling Insurer), and such Insurance Settlement Orders shall have become Final Orders.

**Section 8.15     Waiver of Conditions.**

The conditions set forth in Section 11.2 of the Joint Plan may be waived by the written consent of the Debtor, the Additional Debtors, the Survivors' Committee, and applicable Settling Insurer.

**Section 8.16     Non-Occurrence of Effective Date.**

Subject to consent of the Plan Proponents or further Order of the Bankruptcy Court, if the Effective Date does not occur within ninety (90) days after entry of a Final Order confirming the Joint Plan, the Joint Plan shall become null and void. The Reorganized Archdiocese will File a notice of occurrence of the Effective Date by no

4938-3511-8681.4 05067.002                                          61

later than three (3) days after the Effective Date. Such Notice must state (a) that all conditions to the Joint Plan's becoming effective have been satisfied and (b) the date of the Effective Date.

**Section 8.17    Ratification of Sale Injunction.**

Under Section 12.15 of the Joint Plan, pursuant to sections 105(a), 363, and 1123 of the Bankruptcy Code, and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including the Settling Insurers' purchase of the Settling Insurers' Policies free and clear of all Liens, Claims and Subject Interests pursuant to section 363(f) of the Bankruptcy Code, the Joint Plan incorporates by reference, adopts, and ratifies (and the Confirmation Order shall adopt and ratify) the injunction of Claims against a Settling Insurer with respect to any Subject Insurance Policy set forth in the Insurance Settlement Order(s) (each, a "Sale Injunction") in all respects. The Sale Injunction(s) are in addition to and independent of the injunctions in Sections 12.4 and 12.5 of the Joint Plan.

## ARTICLE IX – SUMMARY OF OTHER PROVISIONS OF THE JOINT PLAN

**Section 9.01    Appointment of the Settlement Trustee and Review and Payment of Abuse Claims.**

The Joint Plan provides for formation of the Settlement Trust, which is administered pursuant to the Settlement Trust Documents, and the Allocation Protocol. The Settlement Trustee will be [●], and the Abuse Claims Reviewer will be Richard Arsenault. The Abuse Claims Reviewer's compensation will be $1,500 per Abuse Claim, which compensation shall be paid by the applicable Debtor, Reorganized Archdiocese, Additional Debtors, and/or Reorganized Additional Debtors. If an Abuse Claimant makes a timely request for reconsideration, the Abuse Claims Reviewer shall receive an additional $1,000, to be paid by the Abuse Claimant as set forth in the Allocation Protocol. The Survivors' Committee recommends Abuse Claimants review the Survivors' Committee Letter for a discussion regarding how claims will be reviewed and paid by the Settlement Trustee as well as a discussion regarding litigation options and claim enhancements based on litigation.

**Section 9.02    The Settlement Trust Oversight Committee.**

The Joint Plan also creates a Settlement Trust Oversight Committee to handle certain duties under the Trust Documents. The Survivor Trust Oversight Committee Members will be identified in a plan supplement.

**Section 9.03    Non-Monetary Plan Provisions.**

As set forth in Section 5.3 of the Joint Plan, to promote healing, reconciliation, transparency, and improvement to child protection policies, as of the Effective Date, the Debtor, Reorganized Debtor, the Additional Debtors, the Reorganized Additional Debtors, and the Non-Debtor Catholic Entities agree to undertake the commitments attached to the Joint Plan as Exhibit E.

**Section 9.04    Treatment of Late-Filed Non-Abuse Claims.**

Section 9.4 of the Joint Plan provides that no Distribution will be made on account of a Late-Filed Non-Abuse Claim unless it is Allowed either (a) by the Bankruptcy Court, after notice and hearing, or (b) a written agreement between the Creditor holding such Late-Filed Non-Abuse Claim and the applicable Debtor, Reorganized Archdiocese, Additional Debtor, or Reorganized Additional Debtor. Late-Filed Abuse Claims are addressed in the Allocation Protocol.

**Section 9.05    Medicare Reimbursement and Reporting Obligations.**

As set forth in Section 6.6 of the Joint Plan, the Settlement Trust shall qualify as an RRE under the MMSEA. The Settlement Trust shall timely submit all reports required under MMSEA because of any Abuse Claims settled, resolved, paid, or otherwise liquidated by the Settlement Trust. The Settlement Trust, as an RRE, shall follow all applicable guidance published by CMS to determine whether, and, if so, how, to report to CMS under the MMSEA. For Abuse Claims that occurred after December 5, 1980, before remitting funds to Claimant or Claimants' counsel (in accordance with Section 6.6(b)), regarding any Abuse Claim, the Settlement Trustee shall obtain (i) a certification that said Claimant (or such Claimant's authorized representative) has provided or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim and (ii) that the Claimant and/or Claimant's counsel indemnifies the Settlement Trust for any such obligations.

### Section 9.06    Insurance Neutrality and Related Matters.

No provision of the Joint Plan shall diminish or impair the right of any Non-Settling Insurer to assert any defense to any Insurance Claim. The duties and obligations, if any, of the Non-Settling Insurers under each Non-Settling Insurance Policy shall not be impaired, altered, reduced or diminished by: (a) the discharge granted to the Debtor or Additional Debtors under the Joint Plan under section 1141(d) of the Bankruptcy Code or Section 12.2 of the Joint Plan, (b) the exonerations, exculpations and releases in the Joint Plan, or (c) the Channeling Injunctions. Furthermore, that the Settlement Trust is liquidating and paying/reserving monies because of the Abuse Claims shall not be construed to diminish any duty of any Insurer under any Insurance Policy to provide Insurance Coverage to the Archdiocese for Abuse Claims.

### Section 9.07    Withdrawal or Revocation of the Joint Plan.

The Debtor, Additional Debtors, and Survivors' Committee each reserve the right to revoke or withdraw their respective status as plan proponents to the Joint Plan at any time before the Confirmation Date by Filing a notice of withdrawal or revocation.

### Section 9.08    Bankruptcy Court Approval of Settlements.

In consideration for the classification, Distributions, and other benefits provided under the Joint Plan, the Joint Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved under the Joint Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each compromise and settlement provided for in the Joint Plan, and the Bankruptcy Court's findings shall constitute its determination under the standards of Bankruptcy Rule 9019 that such compromises and settlements are in the best interests of the Debtor and the Estates.

### Section 9.09    Provisions Governing Distributions to Creditors Holding Non-Abuse Claims.

The provisions governing the Reorganized Archdiocese or Reorganized Additional Debtor's Distributions to a Creditor holding a Non-Abuse Claim under the Joint Plan, including, but not limited to, Setoff, objections to Penalty Claims, Post-Petition Interest, and Late-Filed Non-Abuse Claims, and De Minimis Distributions, are set forth in Article 9 of the Joint Plan.

### Section 9.10    Reservation and Retention of Preserved Estate Causes of Action.

Section 12.12 of the Joint Plan addresses causes of action and defenses that are retained for the benefit of the Settlement Trust and for the benefit of the Debtor and the Additional Debtors. On the Effective Date, the Preserved Estate Causes of Action and defenses of the Debtor, listed on Plan Supplement 12.11(a), will re-vest in the Reorganized Archdiocese and the Preserved Estate Causes of Action of the Additional Debtors and Reorganized Additional Debtors, listed on Plan Supplement 12.11(b), will re-vest in the Reorganized Additional Debtors.

The Preserved Estate Causes of Action of the Debtor include, without limitation, the following:

- Any and all Claims and Estate Causes of Action against Richard C. Trahant related to the Memorandum Opinion and Order, [ECF 1844], assessing monetary sanctions against Mr. Trahant;

- Any and all Claims and Estate Causes of Action related to the lawsuit filed by Mr. Trahant and his wife originally filed in the Civil District Court for the Parish of Orleans, removed to the District Court, and then referred to the Bankruptcy Court in Adversary Proceeding No. 23-1018, against (a) the law firm that represents the Debtor in the Archdiocese's Chapter 11 Case, Jones Walker, (b) Jones Walker's partner, Mark A. Mintz, and (c) the Claims and Voting Agent, Donlin Recano & Company, LLC;

- Any and all Claims and Estate Causes of Action against Greenberg Traurig, Colleen A. Murphy, Chris Marks, and Argent Institutional Trust Company related to the Defamatory Statements made on or about June 13, 2025;

- *The Roman Catholic Church of the Archdiocese of New Orleans and Point Aufer, LLC versus Caruthers Producing Co., Inc., Anadarko OGC Company, LLOG Exploration Company LLC, Roger L. Hebert, SWEPI LP, Chevron USA, Inc., BASF Corporation, Eni Oil & Gas Inc., Cabot Oil & Gas Corporation, Helis Oil & Gas, LLC, Legacy Energy Corporation, Cody Energy LLC, Sunoco Inc., Kerr-McGee Oil & Gas Onshore LP*, pending in the 32nd Judicial District Court for Terrebonne Parish, case no. 169160;

- *The Archdiocese of New Orleans, as subrogee of Cynthia Johnson versus Steve Marino, Geico Casualty Company*, Civil District Court Parish of Orleans, case no. 2020-2329;

- *The Roman Catholic Church of the Archdiocese of New Orleans versus Societe Catholique Pour L'instrucion Des Orphelenis Dans L'indigence A/K/A The Catholic Society For The Instruction of Indigent Orphans, Constantine Maehnaut; Succession of Marie Justine Cirnair Couvent; and Henry Fletcher*, Civil District Court Of Parish of Orleans, case no. 2019-0106;

- Any and all Estate Causes of Action arising out of a payroll check-kiting scheme against Interlogic Outsourcing, Inc., N.A. Kahn, and numerous affiliates or related parties, each of whom filed a chapter 11 case in the United States Bankruptcy Court for the Western District of Michigan;

- Any and all Estate Causes of Action against vendors or suppliers for warranty, indemnity, back charge, set-off issues, overpayments, duplicate payments, or issues related to accounts receivables;

- Any and all Estate Causes of Action for any breaches or defaults arising from the failure of any Entity to fully perform under contracts with the Debtor before the assumption or rejection of the subject contracts;

- Any and all Estate Causes of Action for deposits or any other amounts owed by any Non-Debtor Catholic Entity, Creditor, lessee, utility, supplier, vendor, or other Entity;

- Any and all Estate Causes of Action for damages or other relief against any Entity arising out of environmental, asbestos, or product liability matters;

- Any and all Estate Causes of Action arising under section 362 of the Bankruptcy Code;

- Any and all Estate Causes of Action for equitable subordination under section 510 of the Bankruptcy Code, or other applicable law;

- Any and all Estate Causes of Action for damages caused by Hurricane Ida and its aftermath; and

- Any and all Estate Causes of Action for damages and other relief against Jansen Adjusters International for breach of contract and failure to perform services a as third-party administrator related to Hurricane Ida and its aftermath.

Except as otherwise specifically provided in the Joint Plan or any Final Order, for the avoidance of doubt, the following Estate Causes of Action are retained by the Debtor and vested in the Reorganized Archdiocese pursuant to the Joint Plan:

- Any and all Estate Causes of Action for indemnity or contribution related to any Abuse Claim against any Perpetrator, any Religious Order, any archdiocese or diocese other than the Archdiocese itself, or against any of the foregoing Entities' insurers;

- Any and all Estate Causes of Action to collect loans made from the Deposit and Loan Program, and any related promissory note;

- Any and all Estate Causes of Action to collect from the Archdiocesan Parishes for any outstanding Archdiocesan Parish Assessment;

- Any and all Estate Causes of Action to collect from the Archdiocesan Agencies for any outstanding Archdiocesan Agency Assessment;

- Any and all Estate Causes of Action to collect against any Non-Debtor Catholic Entity any charges for services subcontracted by the Archdiocese or owed to other Entities, including, but not limited to, legal fees, bank investment charges and services, employee benefits charges and services, insurance premiums and self-insured retentions and deductibles, the Priest Pension Plan, and the Priest Retiree Medical Benefits; and

- Any and all Estate Causes of Action under the following agreements, each of which are Preserved Estate Causes of Action:

  - Any of the Parish Service Agreements; and

  - Any promissory note executed by, or money lent to, a Non-Debtor Catholic Entity that is payable to the Archdiocese.

The Preserved Estate Causes of Action of the Additional Debtors include, without limitation, the following:

- Any and all Estate Causes of Action possessed by the Additional Debtors against the Debtor for funds deposited in the Deposit and Loan Program;

- Any and all Estate Causes of Action of Catholic Charities Archdiocese of New Orleans and School Food and Nutrition Services of New Orleans, Inc. against Notre Dame Health for funds advanced; and

- Other Estate Causes of Action to be identified in Plan Supplement 12.11(b).

**Section 9.11     The Debtor's Post-Effective Date Management.**

Pursuant to Section 5.8 of the Joint Plan and in accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the persons proposed to serve as directors and officers of the Reorganized Debtor and Reorganized Additional Debtors on and after the Effective Date are set forth on Joint Plan Supplement 5.7.

**Section 9.12     Governing Law**.

Pursuant to Section 14.22 of the Joint Plan, except when federal law (including the Bankruptcy Code or Bankruptcy Rules) is applicable, the rights and obligations arising under the Joint Plan or under the Joint Plan Documents shall be governed by and construed and enforced under the laws of the State of Louisiana without giving effect to the principles of conflicts of laws.

**Section 9.13     Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court will retain jurisdiction as set forth in Section 13.1 of the Joint Plan.

**Section 9.14     Closing of the Case.**

Pursuant to Section 14.29 of the Joint Plan, as soon as practicable after the Effective Date, when the Reorganized Debtor and the Reorganized Additional Debtors deem appropriate, the Reorganized Debtor and the Reorganized Additional Debtors will seek authority from the Bankruptcy Court to close the Cases under the Bankruptcy Code and the Bankruptcy Rules; provided, however, that entry of a final decree closing the Cases shall, whether or not specified therein, be without prejudice to the right of the Archdiocese, the Reorganized Debtor, the Additional Debtors, the Reorganized Additional Debtors, the Settlement Trustee or any other party in interest to reopen the Cases for any matter over which the Bankruptcy Court or the U.S. District Court for the Eastern District of Louisiana has retained jurisdiction under the Joint Plan.  Any order closing this Case will provide that the Bankruptcy Court or the U.S. District Court for the Eastern District of Louisiana, as appropriate, will retain (a) jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation Order, any other orders entered in this Case, and the obligations created by the Joint Plan and the Joint Plan Documents; and (b) all other jurisdiction and authority granted to it under the Joint Plan and the Joint Plan Documents.

## ARTICLE X – PLAN CONFIRMATION STANDARDS

**Section 10.01     Confirmation Standards Generally.**

Among the requirements for Confirmation pursuant to section 1129 of the Bankruptcy Code are: (a) the Joint Plan is accepted by all Impaired Classes, or if rejected by an Impaired Class, the Joint Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (b) the Joint Plan is feasible; and (c) the Joint Plan is in the "best interests" of Creditors.  At the Confirmation Hearing, the Bankruptcy Court will determine whether the Joint Plan satisfies all the requirements of section 1129 of the Bankruptcy Code.  The Plan Proponents believe that: (a) the Joint Plan satisfies, or will satisfy, all the necessary statutory requirements of Chapter 11 for plan Confirmation; (b) the Debtor has complied, or will have complied, with all the necessary requirements of Chapter 11 for Confirmation of the Joint Plan; and (3) the Joint Plan has been proposed in good faith.  The rights of all parties to timely object to the Joint Plan, including based on the feasibility of the Joint Plan, valuation, Liquidation Analysis, and whether the Joint Plan satisfies the best interest of creditors test under section 1129(a)(7), are expressly preserved, and reserved.

**Section 10.02     Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that Confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization). To determine whether the Joint Plan meets this feasibility requirement, the Debtor and the Additional Debtors, with the assistance of their advisors, have analyzed the Debtor's and Additional Debtors' ability to meet their obligations under the Plan. As part of this analysis, the Plan Proponents have provided Feasibility Projections of the Joint Plan as Disclosure Statement Exhibit 2. In addition, Disclosure Statement Exhibit 4 reflects that the Additional Debtors possess sufficient cash, investments, and other property to fund their $60,000,000 contribution that is due on the Effective Date. The Plan Proponents believe that these demonstrate that the Archdiocese and Additional Debtors will be able to fund the Joint Plan on the Effective Date and that the Reorganized Debtor and Reorganized Additional Debtors will be able to make all payments required pursuant to the Joint Plan without the need for further financial reorganization. Based upon foregoing, the Plan Proponents believes the Joint Plan satisfies the feasibility requirements of the Bankruptcy Code.

### Section 10.03    Best Interests of Creditors Test.

With respect to each Impaired Class, Confirmation requires that each Creditor either (a) accept the Joint Plan, or (b) receive or retain under the Joint Plan property of a value, as of the Effective Date, which is not less than the value such Creditor would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. This is generally referred to as the "best interests of creditors" test. To determine what Creditors holding Claims in an Impaired Class would receive if the Debtor were liquidated under Chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a Chapter 7 liquidation case. The Cash amount that would be available for satisfaction of Claims would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtor, augmented by the unencumbered Cash held by the Debtor at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional Administrative and Priority Claims that may result from the termination of the Debtor's operations and the use of Chapter 7 for the purposes of liquidation. A Liquidation Analysis of the Debtor is attached as Disclosure Statement Exhibit 3, and a Liquidation Analysis of the Additional Debtors is attached as Exhibit 5. The Liquidation Analysis was prepared by Keegan Linscott, a financial advisory and consulting services firm retained by the Debtor with Bankruptcy Court authority.

To determine if the Joint Plan satisfies the best interests of creditors test, the present value of the Settlement Trust Distributions from the proceeds of the liquidation of the Debtor's unencumbered assets and properties (after subtracting the amounts attributable to the Chapter 7 and Chapter 11 Administrative Claims described in the preceding paragraph), are then compared with the value of the property offered to such Classes under the Joint Plan. The Plan Proponents believe that the Joint Plan as proposed is in the best interest of all Creditors. Although the Archdiocese may not be forced to convert to a Chapter 7 case, the Plan Proponents believe that Abuse Claimants holding Abuse Claims and holders of General Unsecured Claims will receive either Settlement Trust Distributions under the Settlement Trust, or Distribution under the Joint Plan (including recoveries from the Non-Settling Insurers due to the assignment of those policies by the Archdiocese and the Additional Debtors to the Settlement Trust), greater than a distribution they would receive in a hypothetical Chapter 7 liquidation.

The Chapter 7 trustee would be entitled to compensation of a percentage of all funds distributed to parties in interest pursuant to 11 U.S.C. § 326, with the compensation necessarily diluting the amount of funds available to pay Creditors.

Although the Liquidation Analysis includes the liquidation of the Archdiocese's and Additional Debtors' property, the value of any property that would be capable of liquidation under Chapter 7 is difficult to assess due to various historical restrictions, First Amendment considerations, and market conditions. In addition, significant

assets owned by certain Additional Debtors (those with no Abuse Claims against them) and Non-Debtor Catholic Entities (such as the Affordable Housing Facilities) would not be available to Abuse Claimants.

The Debtor and the Additional Debtors believe that the Joint Plan satisfies the "best interests of creditors" test because assets are being monetized and paid, or otherwise contributed, to the Settlement Trust that are not assets of the Debtor or the Additional Debtors or that cannot be monetized by the Debtor or the Additional Debtors. These contributions include but are not limited to: (a) net proceeds from the sale of the Affordable Housing Facilities, which are estimated to exceed $44,000,000; (b) the assignment of the Non-Settling Insurers' Policies, having an estimated value of approximately $150,000,000 to $300,000,000; and (c) the Settling Insurers' settlement contribution of $29,275,000.

### Section 10.04    Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to Confirmation, except as described in the in the Joint Plan and below, that each Class Impaired under a plan, accept the plan. A Class that is not Impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a Class is not required. A Class is "impaired" within the meaning of section 1124 of the Bankruptcy Code, and the Joint Plan, unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the Claim or equity interest entitles the holder of such Claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such Claim or equity interest entitles the holder of such Claim or equity interest. References to "equity interests" are from applicable provisions in the Bankruptcy Code but have no relevance in the Archdiocese's Chapter 11 Case.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a Class of Impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half (1/2) in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a Class will have voted to accept the Joint Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such Class that vote on the Joint Plan actually cast their ballots in favor of acceptance.

### Section 10.05    Confirmation without the Acceptance by Each Impaired Class.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to Confirm a plan even if all Impaired Classes have not accepted it, provided the plan has been accepted by at least one Impaired Class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an Impaired Class's rejection or deemed rejection of the plan, the plan will be Confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class that is Impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Joint Plan, the Plan Proponents reserve the right to seek to Confirm the Joint Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Joint Plan or is deemed to have rejected the Joint Plan, the Plan Proponents may request Confirmation under section 1129(b) of the Bankruptcy Code.

In a "cram-down," a bankruptcy court may confirm a plan at the request of the plan proponent if the plan "does not discriminate unfairly" and "is fair and equitable" as to each impaired class that has not accepted the plan, each as described below.

(a)      *No Unfair Discrimination.* The "unfair discrimination" test applies to classes of claims that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the

same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will consider several factors in determining whether a plan discriminates unfairly. The Plan "does not discriminate unfairly" within the meaning of section 1129(b)(1) of the Bankruptcy Code if (a) the legal rights of any dissenting Class are treated in a manner that is consistent with the treatment of other Classes whose legal rights are like those of the dissenting Class, and (b) no Class receives payments in excess of those which it is legally entitled to receive for its Claims. The Plan does not discriminate unfairly as to any Impaired Class.

(b)     *Fair and Equitable.*  Section 1129(b)(2) of the Bankruptcy Code contains different "fair and equitable" tests for Unsecured Claims and Secured Claims. As to Unsecured Claims, the determination of what is fair and equitable is different in the Archdiocese's Chapter 11 Case than in most reorganization cases because the Debtor is a nonprofit corporation. The sole member of the Archdiocese, the Archbishop, has no personal interest in the Archdiocese's earnings or assets. See La. R.S. 12:210(F) and Art. IV of the Archdiocese's Articles of Incorporation ("[n]o part of the net earnings or other assets of this Corporation will inure to the benefit of any private shareholder, Member or individual."). Accordingly, the Debtor believes there is effectively no equity interest in the Archdiocese, thereby rendering the fair and equitable determination inapplicable to the Joint Plan.

The Bond Trustee disagrees that the "fair and equitable" requirement of section 1129(b)(2) of the Bankruptcy Code is "inapplicable to the Joint Plan" and notes that the Bankruptcy Court has not decided this issue in this case. It is the Bond Trustee's position that the "fair and equitable" requirement of section 1129(b)(2) of the Bankruptcy Code is applicable to the Debtor and that the Joint Plan must be "fair and equitable" to all classes of creditors who do not vote to accept the Joint Plan.

## ARTICLE XI – CERTAIN RISKS AND BENEFITS TO BE CONSIDERED

**BEFORE DETERMINING WHETHER AND HOW TO VOTE ON THE JOINT PLAN, YOU SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND, IN PARTICULAR, THE BENEFITS AND RISKS DESCRIBED BELOW. IF ANY OF THE FOLLOWING RISKS ACTUALLY OCCURS, CREDITOR RECOVERIES COULD BE LOWER THAN OTHERWISE DESCRIBED HEREIN.   THE RISKS AND UNCERTAINTIES BELOW ARE NOT EXHAUSTIVE, BUT REPRESENT THE RISKS THAT THE PLAN PROPONENTS BELIEVE ARE MATERIAL.**

### Section 11.01    Benefits of the Joint Plan.

The Joint Plan offers a number of benefits to Abuse Claimants not available should the Bankruptcy Case be dismissed. These benefits include the following:

(a)  The Joint Plan provides a dedicated fund to pay Abuse Claims. If the case is dismissed, there will be no dedicated fund, and Abuse Claimants will have to pursue collection efforts if they obtain judgments and prevail on appeals. Additionally, Abuse Claimants will be competing against other creditors, such as the Bond Trustee, to collect.

(b)  The Joint Plan provides for additional funds through sale of the Affordable Housing Facilities and Non-Debtor Catholic Entity funds that will not be available following case dismissal. Abuse Claimants will only be able to obtain judgments against specific entities, which may or may not have available assets to pay judgments.

(c)  The Joint Plan is structured to allow initial payments to Abuse Claimants in early 2026. If the case is dismissed, parties will have to pursue lengthy litigation followed by appeals, which could take many years. Moreover, instead of Abuse Claimants receiving similar distributions at the same time, case dismissal would result in a race to the courthouse with Abuse Claimants competing against each other to obtain judgments with likely unequal collection outcomes.

4938-3511-8681.4 05067.002

(d) The Joint Plan allows Abuse Claimants to receive a distribution based on their currently filed Abuse Claim (with an option to submit additional information). Abuse Claimants will have an opportunity to testify but do not have to testify. If the bankruptcy case is dismissed, Abuse Claimants will have to obtain Certificates of Merit, file a lawsuit, participate in document production, participate in depositions (possibly including family members, employers, and friends), attend independent medical exams, publicly identify themselves, testify at trial, and potentially defend appeals, all without a guaranteed payment.

(e) The Joint Plan provides Non-Monetary Plan Provisions that provide for outside child safety experts to advise the Debtor, provide for a public archive of abuse-related documentation for added transparency, and provides for new processes upon receipt of an Abuse Claim report. If the case is dismissed, the Non-Monetary Plan Provisions are not enforceable and no archive will be created.

**Section 11.02   Risks Related to the Debtor's and Additional Debtors' Operations and Financial Condition.**

(a)   *Impact of Adverse Weather Events*.  Louisiana has experienced a significant number of damaging weather events. These weather events have included hurricanes, such as the massive devastation done by Hurricane Katrina in 2005 and Hurricane Ida in 2021.  Properties and operations of the Archdiocese and the Additional Debtors have been affected by adverse weather-related events in the past and will likely be affected by such events in the future.

(b)   *Insurance Costs and Flood Insurance Premiums.*  In recent years, like other Gulf South states, Louisiana has experienced increasing insurance costs.  After Hurricane Ida, property insurance premiums to residential and commercial facilities in the southern part of Louisiana have experienced substantial increases.  There are no assurances that the premiums will not continue to rise, or that insurance carriers will continue to insure property.

Further, the aggregate amount of the named-storm deductible for the Debtor is high.  While the Debtor has previously been able to meet its deductible, there is no assurance that the named-storm deductible will not increase, or that sufficient funds will exist to pre-fund the named-storm deductible.

The Archdiocese obtains flood insurance on all eligible properties under the National Flood Insurance Program, which is administered by FEMA. The insurance premiums for such flood insurance have risen substantially over the last two years.  Furthermore, not all properties are eligible for flood insurance.

Finally, wind and flood insurance coverage are necessary to both obtain and maintain eligibility for FEMA assistance in the event of future hurricanes and other natural disasters. The Robert T. Stafford Disaster Relief and Emergency Assistance Act (the "**Stafford Act**"), 42 U.S.C. 5121 et seq., requires that any organization that has received assistance funding from FEMA must obtain and maintain insurance coverage equal to or greater than the amount of eligible damage to the facility that receives assistance and that the insurance coverage must be for the peril that caused the damage in order to protect against future loss. This is known as the Stafford Act "Obtain and Maintain Requirement."

(c)   *Dependence upon Contributions and Other Income Sources*.  The Archdiocese is dependent upon various income sources, including Assessment and fee income, donations and grants, investment returns, rent and royalties, and other sources. While the Archdiocese has never failed to meet its financial commitments, its income sources are variable.

(d)   *Population Decline.* Data released by the U.S. Census Bureau shows that Louisiana ranked fifth among states for decline in the population between July 1, 2021, and July 1, 2022.  Moreover, four civil parishes

in Louisiana were among the top 10 counties in the U.S. with the largest percentage of population loss in 2022, according to the U.S. Census Bureau. Three of the four civil parishes are in the Archdiocesan Region--St. John the Baptist, Plaquemines, and St. Charles. See https://www.census.gov/newsroom/press-releases/2023/population-estimates-counties.html.

In 2022, the Archdiocese engaged Villavaso & Associates, LLC (the "**Demographer**") to prepare demographic and geographic profiles with population estimates and projections for the Archdiocesan Parishes. Looking at a geographic area around each Archdiocesan Parish, for the period between 2022 and 2027, the Demographer predicted whether the population in the area would be stable, stagnant, decrease, or increase. According to the Demographer, only a dozen or so Archdiocesan Parishes are predicted to experience even a slight population growth. The remainder are projected to have population growth that is stagnant, declining, or, at best, stable. Population stagnation or decline could negatively impact Archdiocese income and could also reduce its expenses. Likewise, such stagnation or decline could negatively impact the operations of the Archdiocesan Schools and the two Archdiocesan-owned church parishes but could also eliminate operating expenses. The Archdiocese and the Additional Debtors, to an extent, have addressed demographic challenges by closing and merging parishes.

### Section 11.03    Risks Related to Bankruptcy Law.

(a)        *Risk of Non-Confirmation of the Joint Plan.*  Although the Plan Proponents believe that the Joint Plan satisfies all requirements necessary for Confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Joint Plan will not be required for Confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Plan Proponents can make no assurances that they will receive the requisite acceptances to Confirm the Joint Plan. Additionally, even if all Voting Classes vote in favor of the Joint Plan, or the requirements for "cramdown" are met with respect to any Class that rejects or is deemed to reject the Joint Plan, the Bankruptcy Court may exercise discretion and choose not to Confirm the Plan.  If not Confirmed, it is unclear what distributions Creditors would ultimately receive with respect to their Claims in a subsequent plan of reorganization or other proceeding.

Even if all Impaired Classes accept or could be deemed to have accepted the Plan, the Plan might not be Confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code lists requirements for Confirmation, including: (a) that the Confirmation not be followed by the need for a further liquidation or financial reorganization; (b) that the value of Distributions or Settlement Trust Distributions to dissenting holders not be less than the value of Distributions or Settlement Trust Distributions to such holders if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code; and (c) that the Joint Plan and the Debtor otherwise comply with applicable provisions of the Bankruptcy Code.  The Plan Proponents believe the Joint Plan will meet all applicable tests, but there is no assurance that the Bankruptcy Court will reach the same conclusion.

(b)        *Dismissal of the Archdiocese's Chapter 11 Case.*  If the Joint Plan is not Confirmed, the Survivors' Committee, the Debtor, or other parties in interest may seek dismissal of the Archdiocese's Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code. Certain parties in interest have a pending motion to dismiss, and the Bankruptcy Court has issued its own Order to Show Cause why the case should not be dismissed.  Without limitation, dismissal of the Archdiocese's Chapter 11 Case would terminate the automatic stay and would allow Creditors to file lawsuits against the Archdiocese and others affected by the automatic stay. The Plan Proponents strongly believe that dismissal of the Archdiocese's Chapter 11 Case is not in the best interest of creditors. Specifically, the Survivors' Committee notes that litigation recoveries will be uncertain, take significant time and effort to achieve, and could be followed by subsequent bankruptcy filings by the Debtor and Additional Debtors. A full discussion of the implications of dismissal of this bankruptcy case is set forth in the chart set forth in the Executive Summary above.

(c)        *Post-Confirmation Litigation May Not Result in Additional Recovery.*  The Joint Plan provides for litigation by Claimants against the Non-Settling Insurers. The Non-Settling Insurers are likely to assert factual and

legal defenses to both their coverage obligations and to the underlying liability of the Archdiocese, the Additional Debtors, Non-Debtor Catholic Entities, and other parties related to Abuse Claims. Litigation against Non-Settling Insurers could be protracted and expensive. There is no guarantee that the Litigation Claimants will prevail in their prosecution of Claims against Non-Settling Insurers. Moreover, it is unclear whether the Non-Settling Insurers will be able to prevail on coverage defenses related to the Insurance Policies.

(d)    *Risks related to the Releases and Injunctions.* In *Harrington v. Purdue Pharma L.P.*, 144 S.Ct. 2071, 219 L.Ed.2d 721 (2024), U.S. Supreme Court ruled that the Bankruptcy Code does not permit non-consensual releases in favor of non-debtors in reorganization plans. The Joint Plan addresses this risk by drastically limiting the scope of releases and injunctions facilitated, in part, by the bankruptcy filings by the Additional Debtors.

(e)    *Non-Consensual Confirmation of the Joint Plan.* If any Impaired Classes do not accept or is deemed not to accept the Joint Plan, the Bankruptcy Court may nevertheless Confirm the Joint Plan if at least one Impaired Class has accepted the Joint Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and as to each Impaired Class that has not accepted the Joint Plan, the Bankruptcy Court determines that the Joint Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Classes. If any Class votes to reject or is deemed to reject the Joint Plan, these requirements must be satisfied with respect to such rejecting Class. The Plan Proponents believe that the Joint Plan satisfies these requirements.

(f)    *Non-Settling Insurers May Raise Objections to Confirmation.* Certain Non-Settling Insurers may object to Confirmation of the Joint Plan by asserting that the Joint Plan impermissibly alters their contractual rights, duties and obligations under their Insurance Policies. For example, certain insurers may raise concerns regarding, among other things, the Joint Plan's treatment of applicable self-insured retentions required under any Non-Settling Insurer's Policy. Although the Plan Proponents do not believe there is any merit to such objections or assertions, if the Non-Settling Insurers were to prevail on such contentions, the Bankruptcy Court might find that the Plan is not feasible or otherwise not confirmable.

United States Fidelity & Guaranty Company, an affiliate of Travelers Indemnity Company ("**Travelers**"), is a Non-Settling Insurer under the Joint Plan. The Joint Plan proposes to grant the Settlement Trustee and, under conditions set forth in the Joint Plan, certain Abuse Claimants the right to pursue litigation against Travelers for insurance coverage and other claims related to insurance policies alleged to have been issued by Travelers. Notwithstanding that the Joint Plan states that, as a Non-Settling Insurer, Travelers retains all of its defenses to coverage under the alleged policies, Travelers asserts that the Joint Plan impermissibly impairs or alters the rights, duties and obligations under the Travelers' policies in a number of ways. Although Travelers has not objected to the Plan Proponent's solicitation of votes to accept the Joint Plan, Travelers has retained all rights to object to confirmation of the Joint Plan and intends to pursue such objections. If Travelers' objections are sustained, the Joint Plan cannot be confirmed in its current form as it pertains to Non-Settling Insurers. Accordingly, parties voting to accept or reject the Joint Plan should consider that the Joint Plan's provisions regarding Non-Settling Insurers, including the ability of an Abuse Claimant to pursue a Litigation Claim against a Non-Settling Insurer, may not be approved by the Bankruptcy Court.

(g)    *Classification and Treatment of Claims.* Section 1122 of the Bankruptcy Code requires that the Joint Plan classify Claims against the Archdiocese. The Bankruptcy Code also provides that the Joint Plan may place a Claim in a particular Class or Subclass only if the Claim is substantially like the other Claims in the Class or Subclass. The Plan Proponents believe all Claims have been appropriately classified in the Joint Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be Confirmed, and the reclassification adversely affects the treatment of Claims, the Plan Proponents may be required to re-solicit votes on the Joint Plan.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim of a particular Class or Subclass unless the holder of a particular Claim agrees to a less favorable treatment of its Claim. The Plan Proponents believe that they have complied with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Joint Plan does not satisfy the equal treatment requirement, the Bankruptcy Court could deny Confirmation. Issues or disputes relating to Claim classification or treatment could delay Confirmation and could increase the risk that the Joint Plan will not be consummated.

(h)     *Risk the Effective Date Will Not Occur.*  Although the Plan Proponents believe that the Effective Date will occur reasonably soon after the Confirmation Date, there is no assurance as to the timing or as to whether the Effective Date will in fact occur.

(i)     *Appeal Risk.*  If the Joint Plan is Confirmed, it is possible that one or more parties may appeal the Confirmation Order and object to all or a part of the Plan.

(j)     *The Plan Proponents May Modify the Plan to Address Certain Objections*.  The Plan Proponents reserve the right to modify the Joint Plan to the extent, if any, that Confirmation (including Confirmation pursuant to section 1129(b) of the Bankruptcy Code) requires modification of any provision of the Joint Plan, including, without limitation, by (a) modifying the treatment applicable to a Class to the extent the Bankruptcy Court indicates it will not Confirm the Joint Plan on account of such treatment, (b) reclassifying any Claim in one particular Class together with any substantially similar Claim in a different Class, as applicable, to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules, and/or (c) withdrawing the Joint Plan at any time before the Confirmation Date.

### Section 11.04   Additional Risk Factors.

(a)     *The Plan Proponents Could Withdraw the Joint Plan.*  Pursuant to Section 14.14 of the Joint Plan, the Debtor, Additional Debtors, and Survivors' Committee each reserve the right to revoke or withdraw their respective status as plan proponents to the Joint Plan at any time before the Confirmation Date.

(b)     *The Plan Proponents Have No Duty to Update.* The statements contained in this Disclosure Statement are made by the Plan Proponents as of the date hereof unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. Additionally, the Plan Proponents have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

(c)     *No Representations Outside the Disclosure Statement Are Authorized.*  Other than as set forth in this Disclosure Statement, no representations concerning or related to the Debtor, the Additional Debtors, the Archdiocese's Chapter 11 Case, or the Joint Plan are authorized by the Bankruptcy Court or the Bankruptcy Code. In deciding to vote to accept or reject the Joint Plan, you should not rely on any representations or inducements made to you that are not contained in, or included with, this Disclosure Statement.

(d)     *No Legal or Tax Advice is Provided by the Disclosure Statement*. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Creditor should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim. This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Joint Plan or whether to object to Confirmation.

(e)     *The Disclosure Statement May Contain Forward Looking Statements.*  This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified using forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative

thereof or other variations thereon or comparable terminology. You are cautioned that any and all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis, Distribution and Settlement Trust Distribution projections, or other information contained in this Disclosure Statement and its attachments are estimates only. The timing and amount of any Settlement Trust Distribution to Abuse Claimants must be in accordance with the Joint Plan, the Settlement Trust Documents, and the Allocation Protocol, and may be affected by factors that cannot be predicted.

(f)     *U.S. Federal Income Tax Risks.*  For a discussion of certain U.S. federal income tax consequences of the implementation of the Joint Plan, see Article XIV of this Disclosure Statement.

## ARTICLE XII – ALTERNATIVES TO THE PLAN

The Plan Proponents believe the Joint Plan is in the best interests of its Creditors and, accordingly, should be accepted and Confirmed.  If, however, the Joint Plan is not Confirmed, the following two alternatives may be available: (a) an alternative plan of reorganization may be proposed and Confirmed, or (b) the Archdiocese's Chapter 11 Case may be dismissed.  A third option, liquidation under Chapter 7 of the Bankruptcy Code, is not likely an available alternative in the Archdiocese's Chapter 11 Case for the reasons discussed below. In addition to the discussion below, the Preliminary Statement and Survivors' Committee Letter set forth the reasons why the Joint Plan is superior to dismissal of this case.

### Section 12.01    Alternative Plan Pursuant to Chapter 11.

If the Joint Plan is not Confirmed, the Debtor, the Survivors' Committees, or a Creditor, either jointly or separately, may propose a different Chapter 11 plan, which might involve an alternative means for the Archdiocese's and Additional Debtors' reorganization. The Plan Proponents believe that the terms of the Joint Plan provide for the best result for Creditors and satisfies feasibility requirements.  For these reasons, the Plan Proponents do not believe that alternative plans of reorganization are preferable alternatives to the Joint Plan.

### Section 12.02    Dismissal of the Archdiocese's Chapter 11 Case.

If the Plan is not Confirmed, the Survivors' Committee, the Archdiocese, or another party in interest may seek to dismiss the Archdiocese's Chapter 11 Case. The Bankruptcy Court may also choose to dismiss the case under its own Order to Show Cause or under the existing Motion to Dismiss filed by certain survivors. Dismissal of the Archdiocese's Chapter 11 Case would have the effect of restoring, or attempting to restore, any and all parties to the position they were in immediately before the Petition Date. The Plan Proponents believe the Joint Plan is a better alternative to dismissal because the Joint Plan will allow all claimants to receive equitable recoveries within months of the Effective Date. Litigation recoveries are uncertain, require significant litigation effort and expense, and will result in uneven outcomes among similar Abuse Claimants. Abuse Claimants also face the risk of the Archdiocese re-filing a bankruptcy case, and the Additional Debtors could also file bankruptcy cases. A full discussion of the implications of dismissal of this bankruptcy case is set forth in the chart set forth in the Executive Summary above.

### Section 12.03    Chapter 7 Liquidation is Not an Alternative.

Pursuant to section 1112(c) of the Bankruptcy Code, if a debtor is "not a moneyed corporation," the debtor's Chapter 11 case cannot be converted to a Chapter 7 case without the debtor's consent.  As a non-profit entity, the Archdiocese may not be forced to convert its Chapter 11 Case to a liquidation under Chapter 7 of the Bankruptcy Code.  Because the Archdiocese would likely never grant such consent, conversion to a Chapter 7 case is not an available alternative to the Joint Plan.

## ARTICLE XIII – SOLICITATION AND VOTING PROCEDURES

**Section 13.01    Solicitation Packages.**

Pursuant to the Disclosure Statement Order, the following materials will be distributed:

a.      The approved Disclosure Statement, together with the Joint Plan and other exhibits;

b.      The Solicitation and Voting Procedures;

c.      The applicable form of ballot;

d.      A letter from the Debtor, which urges the Creditors holding Claims in each of the Voting Classes to vote to accept the Joint Plan, and for Class 3 Claims, a letter from the Survivors' Committee, recommending that Known Abuse Claimants vote to accept the Joint Plan;

e.      The Notice of the Confirmation Hearing;

f.      The Disclosure Statement Order (without exhibits); and

g.      A pre-addressed, postage pre-paid reply envelope.

**Section 13.02    Distribution of the Solicitation Materials.**

The Solicitation Deadline shall be **August 28, 2025 at 11:59 PM**; provided, however, following the Solicitation Deadline, the Claims and Voting Agent shall distribute a Class 3 Solicitation Package to a Known Abuse Claimant (or counsel, if applicable) no later than two (2) Business Days (or as soon as reasonably possible) after the Known Abuse Claimant files an Abuse Proof of Claim against an Additional Debtor.

**Section 13.03    Distributions of Notices to Creditors in Non-Voting Classes.**

Certain Creditors are not entitled to vote on the Joint Plan because their Claims are Unimpaired, or they will receive no Distributions on account of their Claim. Such Creditors will receive (a) the applicable Notice of Non-Voting Status substantially in the form of Schedule 6 to the Disclosure Statement Order, and (b) the Confirmation Hearing Notice substantially in the form of Schedule 5 to the Disclosure Statement Order.

## ARTICLE XIV – CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE JOINT PLAN

The following summary is a general discussion of certain of the potential Federal income tax consequences of the Joint Plan.  The summary is based upon relevant provisions of the IRC, the applicable Treasury Regulations promulgated thereunder, judicial authority, published rulings, and such other authorities considered relevant now in effect, all of which are subject to change.

The Federal income tax consequences to any particular Creditor may be affected by matters not discussed below.  Furthermore, the summary does not address all categories of Creditors, some of which may be subject to special rules not addressed herein.  There also may be state, local, or foreign tax considerations applicable to each Creditor, the Debtor, or the Additional Debtors

**THE SUMMARY SET FORTH BELOW IS INCLUDED FOR GENERAL INFORMATION ONLY. EACH CREDITOR IS URGED TO CONSULT YOUR OWN TAX ADVISOR AS TO THE**

**CONSEQUENCES OF THE JOINT PLAN UNDER FEDERAL AND APPLICABLE STATE, LOCAL, AND FOREIGN TAX LAWS.**

**Section 14.01    Federal Income Tax Consequences to Creditors Holding Unsecured Claims.**

In accordance with the Joint Plan, certain Classes of Unsecured Claims, including, but not limited to, Abuse Claimants will receive Distributions on account if such Claims from the Reorganized Debtor, the Reorganized Additional Debtors, or Settlement Trust, as applicable.  Any holder of an Unsecured Claim will realize a loss in an amount equal to the Claim, minus any recovery, on an adjusted tax basis.

The tax consequences to Creditors holding Unsecured Claims will differ and will depend on factors specific to the holder, including but not limited to:  (a) whether the Claim, or a portion of the Claim, constitutes a claim for interest or principal; (b) the origin of the Claim; (c) the type of consideration received in exchange for the Claim; (d) whether the holder is a United States person or a foreign person for tax purposes; (e) whether the holder reports income on the accrual or cash basis method; and (f) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

A Creditor that receives Cash in satisfaction of its Claim will generally recognize gain or loss in an amount that is equal to the difference between (a) the amount of cash received by such Creditor in respect of its Claim (excluding any Cash received in respect of a Claim for accrued interest), and (b) the Creditor's tax basis in its Claim.

The character of any gain or loss recognized as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among other things, the tax status of the Creditor, whether the Claim constitutes a capital asset in the hands of the Creditor, whether the Claim has been held for more than one year, and whether and to what extent the Creditor has previously claimed a bad debt deduction (or charged a reserve for bad debts) with respect to the Claim.

In the case of a cash basis Creditor, any amounts received that are allocable to a Claim for accrued interest (unless previously reported as taxable income by the Creditor) will be includable as interest income.  In the case of an accrual basis creditor, any amounts received that are allocable to a claim for accrued interest will, to the extent not previously included in gross income, be includable as interest income.  The extent to which consideration distributable under the Joint Plan is allocable to such interest is not clear.  Creditors are advised to consult their own tax advisors to determine the amount, if any, of consideration received under the Joint Plan that is allocable to interest.

The Plan Proponents anticipate that Settlement Trust Distributions to Abuse Claimants will constitute damages, other than punitive damages, on account of personal physical injuries and physical sickness, within the meaning of IRC Section 104(a)(2).  The Plan Proponents have not fully analyzed such tax issues, however, and cannot (and do not hereby) make any assurances or representations regarding the anticipated tax treatment of Abuse Claims.

**THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF AN UNSECURED CLAIM.  FURTHERMORE, THE TAX CONSEQUENCES OF THE JOINT PLAN ARE COMPLEX, AND IN SOME SITUATIONS, UNCERTAIN.  THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF AN UNSECURED CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO THE HOLDER OF AN UNSECURED CLAIM AS A RESULT OF THE JOINT PLAN.**

**Section 14.02   Federal Tax Consequences to the Debtor and Additional Debtors.**

The Debtor and the Additional Debtors are not-for-profit, non-stock member corporations, with tax-exempt status under 26 U.S.C. § 501(c)(3).  Therefore, the Debtor and Additional Debtors do not expect that the Joint Plan will result in any significant federal income tax consequences to the Debtor and Additional Debtors.

**Section 14.03   Tax Consequences to the Settlement Trust.**

The Settlement Trust may satisfy the requirements of a Designated Settlement Fund under § 468B of the Tax Code or a Qualified Settlement Fund under Regulation 1.468B-1 of the Treasury Regulations.  There are certain tax consequences associated with the characterization of the Settlement Trust as a Designated Settlement Fund or a Qualified Settlement Fund.  The primary tax consequences of the Settlement Trust being characterized as a Qualified Settlement Fund are the following:

(a)      The Settlement Trust must use a calendar taxable year and the accrual method of accounting.

(b)      If the Debtor funds the Settlement Trust with appreciated property, the Debtor is deemed to sell the property to the Settlement Trust.  Accordingly, any gain or loss from the deemed sale must be reported by the Debtor.

(c)      The Settlement Trust takes a fair market value basis in property contributed to it by the Debtor, Additional Debtors, or Non-Debtor Catholic Entities, as applicable.

(d)      The Settlement Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and estates (currently 35%).

(e)      The funding of the Settlement Trust with Cash and other property is not reported by the Settlement Trust as taxable income. Earnings recognized from, for example, the short-term investment of the Settlement Trust's funds will be subject to tax.

(f)      The Settlement Trust may deduct from its gross income a limited number of administrative expenses; the Settlement Trust in not entitled to deduct Settlement Trust Distributions paid to the Abuse Claimants who are Settlement Trust Beneficiaries.

(g)      The Settlement Trust will have a separate taxpayer identification number and will be required to file annual tax returns (which are due on March 15).  The Settlement Trust will also be required to comply with several other administrative tax rules including filing information returns (generally IRS Form 1099) when approved payments are made to the Abuse Claimants who are Settlement Trust Beneficiaries.

**THE PLAN PROPONENTS EXPRESS NO OPINION REGARDING WHETHER THE SETTLEMENT TRUST IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT FUND.  THE JOINT PLAN PROPONENTS HAVE NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE, OR AN OPINION OF COUNSEL, ON WHETHER THE SETTLEMENT TRUST IS A DESIGNATED SETTLEMENT OR A QUALIFIED SETTLEMENT FUND.  ACCORDINGLY, EACH ABUSE CLAIMANT IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE CHARACTERIZATION OF THE SETTLEMENT TRUST OR THE SETTLEMENT TRUST DISTRIBUTIONS, AND THE TAX CONSEQUENCES OF SUCH CHARACTERIZATION.**

## ARTICLE XV – VOTING BY CREDITORS ENTITLED TO VOTE AND ESTABLISHING CLAIM AMOUNTS FOR VOTING PURPOSES ONLY

### Section 15.01    Creditors Entitled to Vote.

Only the following Creditors holding Claims in the Voting Classes will be entitled to vote regarding such Claims:

(a)    Creditors who, on or before the Voting Record Date, have Filed a Proof of Claim that (i) has not been expunged, Disallowed, disqualified, withdrawn, or superseded before the Voting Record Date, and (ii) is not the subject of a pending objection, other than a "reduce and allow" objection, Filed with the Bankruptcy Court at least seven days before the Voting Deadline, pending a Resolution Event as provided herein; provided, however, that a Creditor holding a Claim that is the subject of a pending objection on a "reduce and allow" basis will receive a Solicitation Package and be entitled to vote such Claim in the reduced amount contained in such objection absent further Order of the Bankruptcy Court;

(b)    Creditors whose Claims arise (i) pursuant to an agreement or settlement with the Debtor, as reflected in a document Filed with the Bankruptcy Court, (ii) in an Order entered by the Bankruptcy Court, or (iii) in a document executed by the Debtor pursuant to authority granted by the Bankruptcy Court, in each case regardless of whether a Proof of Claim has been Filed;

(c)    Creditors who hold any Disputed Claim that has been temporarily Allowed for voting purposes only pursuant to Bankruptcy Rule 3018;

(d)    The assignee of any Claim that was transferred on or before the Voting Record Date by any Entity described in subparagraphs (a) through (c) above; provided, however, that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date; and

(e)    Creditors who have Filed or purchased duplicate Claims within the same Voting Class will be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Debtor has objected to such duplicate Claims.

### Section 15.02    Voting Classes.

The following Classes are Impaired under the Joint Plan, and are entitled to vote on the Joint Plan as Voting Classes: Class 3 (Known Abuse Claims), Class 4 (Unknown Abuse Claims, acting by and through the Unknown Abuse Claims Representative), Class 6 (Bond Claims), Class 7 (General Unsecured Claims and Unsecured Trade Claims - Debtor), and Class 8 (Non-Abuse Personal Injury Claims – Debtor).

### Section 15.03    Establishing Claim Amounts for Voting Purposes Only.

Any amount filled in on Ballots by the Claims and Voting Agent are not binding for purposes of Allowance, Distribution, or Settlement Trust Distribution.  As provided in the Disclosure Statement Order, in tabulating votes, for voting purposes only, the following claims-estimation procedure (the "**Claims Estimation Procedure**") will be used to determine the amount of the Claim associated with each Creditor's vote:

Each Known Abuse Claims in Class 3, Unknown Abuse Claims in Class 4, and Non-Abuse Personal Injury Claims in Class 8 shall be temporarily allowed in the amount of **$1.00** per Claim **for the purpose of voting to accept or reject the Joint Plan only, and not for the purposes of allowing such Claim on a final basis and/or for distributing any property on account of such Claim**. The temporary allowance of the Class 3 Known Abuse Claims, Class 4 Unknown Abuse Claims and the Class 8 Non-Abuse Personal Injury Claims in the amount of $1.00 shall be without prejudice to the rights, if any, that the Survivors' Committee, the Settlement Trustee, or any other Entity may have with respect to such Claims under, among other things, the Joint Plan, and the Allocation Protocol.

As indicated above in Section 7.28, the Bond Trustee filed a Motion to Estimate, seeking to estimate the Abuse Claims. The Bond Trustee disagrees with the Liquidation Analysis as set forth in Disclosure Statement Exhibit 3 and believes that if the assets of the Debtor were liquidated by a Chapter 7 trustee that all creditors of the Debtor would be paid in full. As part of this analysis, the Bond Trustee believes that the Bankruptcy Court should estimate the claims of the Abuse Claimants to determine the appropriate measure of such liability for purposes of the "best interest of creditors" test. The Bond Trustee further believes that the estimate of the Abuse Claims for such purposes could differ from the valuation or estimate of such claims for other purposes under the Joint Plan and reserves all rights with respect to same. Moreover, estimation of the claims of the Abuse Claimants is required because the Debtor proposes to size the distribution to Bondholders based on what they would receive in a Chapter 7 liquidation, so the Court will be required to estimate the claims of the Abuse Claimants for that purpose as well. The Debtor and Additional Debtors believe any further estimation (other than the Claims Estimation Procedure as discussed above in this Section 15.03) is unnecessary for the prompt administration of the case.

### Section 15.04    Disputed Claims.

The following procedures address voting for Disputed Claims:

(a)      Absent a further Order of the Bankruptcy Court, if any Plan Proponent Files, on or before fifteen (15) days before the Voting Deadline, an objection to a Claim in a Voting Class on a "reduce and allow" basis, the Creditor holding such a Claim will be entitled to vote such Claim in the reduced amount contained in such objection.

(b)      Absent a further Order of the Bankruptcy Court, if any Plan Proponent Files, on or before  fifteen (15) days before the Voting Deadline, an objection to a Claim in a Voting Class *other than* on a "reduce and allow" basis: (i) the filing Plan Proponent will cause the applicable Creditor to be served with both (A) a Non-Voting Status Notice and (B) a Confirmation Hearing Notice; and (ii) the applicable Creditor will not be entitled to vote to accept or reject the Joint Plan on account of such Claim unless a Resolution Event (as defined below) occurs.

(c)      A "**Resolution Event**" means the occurrence of one or more of the following events no later than two (2) Business Days before the Voting Deadline:

      i.      An Order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

      ii.      An Order of the Bankruptcy Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

      iii.      A stipulation or other agreement is executed between the Creditor holding such Claim and the applicable Plan Proponent resolving the objection and allowing such Claim in an agreed upon amount; or

      iv.      The pending objection is voluntarily withdrawn by the objecting party.

(d)      No later than one (1) Business Day (or as soon as reasonably possible) following the occurrence of a Resolution Event, the Debtor will cause the Claims and Voting Agent to distribute, via email, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant Creditor to the extent such Creditor has not already received a Solicitation Package containing a Ballot

If you are a Creditor that is entitled to vote to accept or reject the Joint Plan, a Ballot is enclosed for the purpose of voting on the Joint Plan.  If you are a Creditor that is entitled to vote and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the procedures for voting on the Joint Plan, please contact the Claims and Voting Agent at the address located below.

Creditors holding Claims in the Voting Classes will receive a Ballot and a return envelope addressed to the Balloting Agent. Ballots must be received by the Claims and Voting Agent on or before the **Voting Deadline of October 29, 2025.** Any Ballot received by the Claims and Voting Agent after the Voting Deadline will not be counted. Complete the Ballot by providing all the information requested, and sign, date and return the Ballot by mail, overnight courier, or personal delivery to the Claims and Voting Agent at one of the following addresses:

| **By U.S. Mail** |
| --- |
| Donlin, Recano & Company, LLC<br>Re: The Roman Catholic Church of the Archdiocese of New Orleans,<br>Attn: Voting Department<br>P.O. Box 2053<br>New York, NY 10272- 2042 |
| **By Overnight or Personal Delivery** |
| Donlin, Recano & Company, LLC, c/o Angeion Group<br>Re: The Roman Catholic Church of the Archdiocese of New Orleans<br>Attn: Voting Department<br>200 Vesey Street, 24th Floor<br>New York, NY 10281 |

ANY EXECUTED BALLOT THAT FAILS TO INDICATE AN ACCEPTANCE OR REJECTION OF THE JOINT PLAN WILL NOT BE COUNTED. **BALLOTS RECEIVED BY FACSIMILE TRANSMISSION, EMAIL, OR ANY OTHER ELECTRONIC MEANS, WILL NOT BE ACCEPTED UNLESS SUCH ELECTRONIC SUBMISSION IS MADE PURSUANT TO INSTRUCTIONS SET FORTH ON THE BALLOT.**

**Section 15.05    Non-Voting Classes.**

The following Classes are Unimpaired under the Joint Plan: Class 1 (Other Priority Claims); Class 2 (Secured Claims); Class 9 (Unsecured Trade Claims—Additional Debtors); and Class 10 (Additional Debtors' Non-Trade Unsecured Claims—Additional Debtors). Because the Claims in the foregoing Non-Voting Classes are Unimpaired under the Joint Plan, Creditors holding Claims in such Classes are deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, the Debtor also will not solicit acceptances of the Plan from Creditors holding Claims in Class 1, Class 2, Class 9, and Class 10 on account of such Claims.

Because they will receive no Distribution under the Joint Plan or Settlement Distribution under the Settlement Trust Documents, Creditors in Class 5 – Non-Insurer Contribution Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, the Debtor also will not solicit acceptances of the Plan from Creditors holding Claims in Class 5 on account of such Claims.

## ARTICLE XVI – CONCLUSION AND RECOMMENDATION

This Disclosure Statement is intended to assist Creditors to make an informed decision regarding the acceptance of the Joint Plan. If the Joint Plan is Confirmed, all Creditors will be bound by its terms.

**THE PLAN PROPONENTS STRONGLY BELIEVE THAT THE CONFIRMATION OF THE JOINT PLAN PROVIDES AN OPPORTUNITY FOR GREATER RECOVERY FOR CREDITORS. ACCORDINGLY, THE PLAN PROPONENTS BELIEVE THAT THE JOINT PLAN IS IN THE BEST INTERESTS OF ITS CREDITORS AND OTHER INTERESTED PARTIES. THE PLAN PROPONENTS**

ENCOURAGE CREDITORS TO VOTE TO ACCEPT THE JOINT PLAN AND TO EVIDENCE THEIR ACCEPTANCE BY PROPERLY VOTING AND TIMELY RETURNING THEIR BALLOTS.

Dated: August 8, 2025

*/s/ Mark A. Mintz*
JONES WALKER LLP
R. Patrick Vance (#13008)
Elizabeth J. Futrell (#05863)
Mark A. Mintz (#31878)
Samantha A. Oppenheim (#38364)
201 St. Charles Avenue, 51st Floor
New Orleans, LA  70170
Telephone: (504) 582-8000
Facsimile:  (504) 589-8260
Email:  pvance@joneswalker.com
            efutrell@joneswalker.com
            mmintz@joneswalker.com
            soppenheim@joneswalker.com

**ATTORNEYS FOR**
**THE ROMAN CATHOLIC CHURCH OF**
**THE ARCHDIOCESE OF NEW ORLEANS**

*/s/ Douglas S. Draper*
HELLER, DRAPER, & HORN, L.L.C.
Douglas S. Draper
Greta S. Brouphy
Michael E. Landis
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130
Telephone: 504-299-3300
Facsimile: 504-299-3399
E-mail: ddraper@hellerdraper.com
            gbrouphy@hellerdraper.com
            mlandis@hellerdraper.com

**ATTORNEYS FOR**
**THE ADDITIONAL DEBTORS**

*/s/ James S. Stang*
PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang (CA Bar 94435) (pro hac vice)
Iain A.W. Nasatir (CA Bar 148977) (pro hac vice)
Andrew W. Caine (CA Bar 110345) (pro hac vice)
Karen B. Dine (NY Bar 2625366) (pro hac vice)
10100 Santa Monica Blvd., Ste. 1300
Los Angeles, CA  90067
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760
Email:  jstang@pszjlaw.com
            inasatir@pszjlaw.com
            acaine@pszjlaw.com
            kdine@pszjlaw.com

*/s/ Bradley C. Knapp*
TROUTMAN PEPPER LOCKE LLP
Omer F. Kuebel, III (La #21682)
Bradley C. Knapp (La #35867)
601 Poydras Street, Suite 2660
New Orleans, Louisiana 70130-6036
Telephone: (504) 558-5210
Facsimile: (504) 910-6847
Email:  rkuebel@lockelord.com
            bknapp@lockelord.com

TROUTMAN PEPPER LOCKE LLP
W. Steven Bryant (TX Bar No. 2427413)
300 Colorado Street, Ste. 2100
Austin, Texas 78701
Telephone: (512) 305-4726
Facsimile: (512) 305-4800
Email: steven.bryant@troutman.com

**ATTORNEYS FOR THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS**

# EXHIBIT 1

# Joint Plan

# Filed at ECF No. 4235

# EXHIBIT 2

# Feasibility Projections of the Joint Plan

## FEASIBILITY NOTES

1) The Joint Plan requires that on December 31, 2025, the Debtor and the Additional Debtors contribute $130,000,000 to the Settlement Trust. The $130,000,000 payment comes from the following sources: $5,000,000 from the Non-Debtor Catholic Entities; a cash amount from the Additional Debtors equal to $60,000,000; and a cash amount from the Debtor equal to $65,000,000.

2) The Joint Plan also requires the Debtor and Additional Debtors to issue a $20,000,000 note payable to the Settlement Trust. The note calls for four annual payments of $5,000,000 each. This analysis assumes that the note will be paid by the seller of the Affordable Housing Facilities in 2026 from proceeds from the sale of the Affordable Housing Facilities.

3) This analysis assumes that the Debtor will owe $6,500,000 in administrative expenses on the Effective Date. This figure is comprised of US Trustee fees under 28 U.S.C. § 1930 for the third and fourth quarters of 2025, the payment of fees that were previously allowed but not paid through December 31, 2025, and estimated professional fees for the Debtor and the Creditors' Committees. The various professionals for this case have provided fee estimates for the period through December 31, 2025.

4) The proforma attached to this analysis is provided solely to reflect that payments due to the Bondholders can be funded from the operations of the Archdiocese from the Effective Date through the ten-year payment period to the Bondholders.

5) The analysis does not assign a specific value to the policies of the Non-Settling Insurers, which will be assigned to the Settlement Trust.

{00383894-1}

6) The analysis also excludes proceeds from the sale of the Affordable Housing Facilities that ultimately will be paid to the Settlement Trust.

7) The analysis includes the Debtor's operations for its administrative offices, schools, and its two parishes (Our Lady of Guadalupe and the St. Louis Cathedral). The feasibility analysis reflects the Debtor's cash flows which include operational and non-operational items, including capital expenditures.

8) As of June 30, 2026, the Debtor will have approximately $48.5 million in unrestricted cash and investments. This amount includes cash of $20.8 million which represents ninety days of working capital for the Debtor's administrative offices. The additional funds are necessary to protect against non-operational contingencies such as: (a) non-payment by FEMA on capital expenditures; (b) any adverse weather event (which is not contemplated in these projections); (c) unknown repairs of a capital nature; (d) availability of funds to make Note payments to the Settlement Trust in the event a sale of the Affordable Housing Facilities is less than expected or delayed; or (e) a general downturn in donations or collections due to economic reasons or political reasons.

9) The accompanying spreadsheet depicting the feasibility analysis references certain explanatory footnotes as follows:

   a. Note 1: The beginning cash balance is per the May 31, 2025 Monthly Operating Report. Cash includes funds in segregated accounts totaling $45,070,571 and excludes tuition loan receivables classified as cash in the MOR.

   b. Note 2: Assumes an Effective Date of December 31, 2025.

   c. Note 3: Assumes a medium gross sale price of Christopher Homes of approximately $142 million.

   d. Note 4: Based on current settlements with Settling Insurers. Not all Insurers are Settling Insurers.

e.  Note 5: Comprised of $76,170,740 of Portfolio A unrestricted, plus $23,221,806 of Portfolio B unrestricted, less high school deferred revenue of $20,820,614 as of May 31, 2025.

f.  Note 6: Includes $60 million from Additional Debtors, $5 million from Non-Debtor Catholic Entities, $29.75 million from Settling Insurers, and $44.71 million from Christopher Homes sale which flows directly to the Settlement Trust.

g.  Note 7: Includes $60 million from Additional Debtors, $5 million from Non-Debtor Catholic Entities, $29.75 million from Settling Insurers, $44.71 million from Christopher Homes sale which flows directly to the Settlement Trust, $20 million accelerated paydown on the Notes to the Settlement Trust from the Debtor and Additional Debtors' portion of the Christopher Homes sales proceeds, and $65 million from the Debtor.

10) A separate exhibit reflecting the feasibility of the Additional Debtors' $60,000,000 payment due on the Effective Date has not been prepared. A review of Disclosure Statement Exhibit 4 (consisting of the balance sheets of the Additional Debtors, including cash, investments, and real estate) shows sufficient assets to make the Effective Date payment.

**The Archdiocese of New Orleans**
**Case No.: 20-10846**

| Plan of Reorganization Cash Flow Projections | Budget Fiscal 2025-26 | Effective Date and Six Months Ended June 30, 2026 | Plan Fiscal Year June 30, 2027 | Plan Fiscal Year June 30, 2028 | Plan Fiscal Year June 30, 2029 | Notes |
|---|---|---|---|---|---|---|
| **Administrative Offices** | | | | | | |
| Archdiocesan Support - Assessments | $ 11,027,450 | $ 5,513,725 | $ 11,027,450 | $ 11,027,450 | $ 11,027,450 | Flat revenue stream |
| Priest Health Insurance and Retirement - Assessments | 3,398,198 | 1,699,099 | 3,500,144 | 3,605,148 | 3,713,303 | 3% CPI |
| Insurance Income - Assessments | 46,087,487 | 23,043,744 | 48,391,861 | 50,811,454 | 53,352,027 | 5% estimated increase per annum |
| Fee Revenue | 5,393,152 | 2,696,576 | 5,554,947 | 5,721,595 | 5,893,243 | 3% CPI |
| Contributions and Grants | 2,008,009 | 1,004,005 | 2,068,249 | 2,130,297 | 2,194,206 | 3% CPI |
| Rents and Royalties | 380,396 | 190,198 | 391,808 | 403,562 | 415,669 | 3% CPI |
| Interest Income - DLS Loans | 2,840,200 | 1,420,100 | 1,700,000 | 1,900,000 | 2,100,000 | Loans receivable and insurance financing for 2027 FY forward |
| Miscellaneous Income | 515,414 | 257,707 | 530,876 | 546,803 | 563,207 | 3% CPI |
| Investment Income | 2,885,600 | 1,442,800 | 900,000 | 900,000 | 900,000 | 4.5% on $20 million Portfolio A and B for 2027 FY forward |
| **Operating Cash Inflows** | **$ 74,535,906** | **$ 37,267,953** | **$ 74,065,335** | **$ 77,046,309** | **$ 80,159,104** | |
| | | | | | | |
| Advertising & Promotion | $ 132,150 | $ 66,075 | $ 136,115 | $ 140,198 | $ 144,404 | 3% CPI |
| Contractual Services | 2,649,590 | 1,324,795 | 2,729,078 | 2,810,950 | 2,895,279 | 3% CPI |
| Grants & Contributions | 1,623,589 | 811,795 | 1,672,297 | 1,722,466 | 1,774,140 | 3% CPI |
| Insurance | 44,792,037 | 22,396,019 | 47,031,639 | 49,383,221 | 51,852,382 | 5% gross increase per annum |
| Interest | 5,210,000 | 2,605,000 | 4,807,000 | 4,783,000 | 4,757,000 | 3% on $150 million Portfolio B custodial funds plus bond interest |
| Ministry Services | 1,255,850 | 627,925 | 1,293,526 | 1,332,331 | 1,372,301 | 3% CPI |
| Miscellaneous | 148,917 | 74,459 | 153,385 | 157,986 | 162,726 | 3% CPI |
| Occupancy | 916,474 | 458,237 | 943,968 | 972,287 | 1,001,456 | 3% CPI |
| Office Expenses | 1,203,284 | 601,642 | 1,239,383 | 1,276,564 | 1,314,861 | 3% CPI |
| Payroll Tax & Employee Benefits | 2,235,932 | 1,117,966 | 2,303,010 | 2,372,100 | 2,443,263 | 3% CPI |
| Priest Housing & Living | 144,426 | 72,213 | 148,759 | 153,222 | 157,818 | 3% CPI |
| Priest Medical | 2,930,935 | 1,465,468 | 3,018,863 | 3,109,429 | 3,202,712 | 3% CPI |
| Priest Retirement | 1,630,000 | 815,000 | 1,678,900 | 1,729,267 | 1,781,145 | 3% CPI |
| Repairs & Maintenance | 800,589 | 400,295 | 824,607 | 849,345 | 874,825 | 3% CPI |
| Salaries & Wages | 8,204,365 | 4,102,183 | 8,450,496 | 8,704,011 | 8,965,131 | 3% CPI |
| Seminarian Assistance & Education | 1,120,000 | 560,000 | 1,153,600 | 1,188,208 | 1,223,854 | 3% CPI |
| Special Events | 353,575 | 176,788 | 364,182 | 375,108 | 386,361 | 3% CPI |
| Staff Development | 362,456 | 181,228 | 373,330 | 384,530 | 396,065 | 3% CPI |
| Subscriptions & Dues | 526,965 | 263,483 | 542,774 | 559,057 | 575,829 | 3% CPI |
| Travel, Meals, & Entertainment | 135,074 | 67,537 | 139,126 | 143,300 | 147,599 | 3% CPI |
| **Operating Cash Outflows** | **$ 76,376,208** | **$ 38,188,104** | **$ 79,004,035** | **$ 82,146,579** | **$ 85,429,151** | |
| | | | | | | |
| **Net Operating Cash Flow - Administrative** | **$ (1,840,302)** | **$ (920,151)** | **$ (4,938,700)** | **$ (5,100,270)** | **$ (5,270,047)** | |
| | | | | | | |
| Net Operating Cash Flow - High Schools | $ (800,000) | $ (400,000) | $ (900,000) | $ (900,000) | $ (900,000) | |
| Net Operating Cash Flow - Parishes | $ (200,000) | $ (100,000) | $ (400,000) | $ (400,000) | $ (200,000) | |
| **Total Net Operating Cash Flow** | **$ (2,840,302)** | **$ (1,420,151)** | **$ (6,238,700)** | **$ (6,400,270)** | **$ (6,370,047)** | |
| | | | | | | |
| **Non-Operating Cash Inflow / (Outflow)** | | | | | | |
| Sale of Assets | $ 5,100,000 | $ 1,500,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | |
| A/R Collections | - | - | - | - | - | Assumes static balance |
| Notes Receivable Principal Collections | $ 500,000 | $ 250,000 | $ 500,000 | $ 500,000 | $ 500,000 | |
| Reorganization Expenses | $ (8,000,000) | $ (2,000,000) | - | - | - | |
| Cap-Ex/Deferred Maintenance | $ (500,000) | $ (250,000) | $ (500,000) | $ (500,000) | $ (500,000) | |
| Portfolio B Deficit Funding | $ (2,400,000) | $ (2,400,000) | $ (4,800,000) | $ (4,800,000) | $ (4,800,000) | |
| (Hurricane Repairs) FEMA Grant, net | $ (12,000,000) | $ (6,000,000) | $ 3,000,000 | $ 10,000,000 | $ 10,000,000 | FEMA forecast on additional costs and reimbursement |
| **Net Non-Operating Cash Inflow / (Outflow)** | **$ (17,300,000)** | **$ (8,900,000)** | **$ 200,000** | **$ 7,200,000** | **$ 7,200,000** | |
| | | | | | | |
| **Net Cash Flow** | **$ (20,140,302)** | **$ (10,320,151)** | **$ (6,038,700)** | **$ 799,730** | **$ 829,953** | |
| | | | | | | |
| [1] Beginning Cash | $ 64,558,770 | $ 54,738,619 | $ 27,771,716 | $ 19,573,046 | $ 18,188,752 | |
| | | | | | | |
| **Ending Cash** | **$ 44,418,468** | **$ 44,418,468** | **$ 21,733,017** | **$ 20,372,776** | **$ 19,018,706** | |
| Restricted Cash | $ 1,876,996 | $ 1,876,996 | $ 1,876,996 | $ 1,876,996 | $ 1,876,996 | Assumes constant restricted cash, including grant money |
| Unrestricted Cash | $ 42,541,472 | $ 42,541,472 | $ 19,856,021 | $ 18,495,780 | $ 17,141,710 | |
| [5] Unrestricted Investments | $ 78,570,932 | $ 78,570,932 | $ - | $ - | $ - | |
| | | | | | | |
| **3rd Party Sources of Payments Under the Joint Plan** | | | | | | |
| [4] Insurance Contributions | $ - | $ 29,275,000 | $ - | $ - | $ - | |
| [6] Other Catholic Organizations' Contributions | $ - | $ 85,000,000 | $ - | $ - | $ - | |
| [3] Proceeds from Sale of Christopher Homes to Settlement Trust | | 44,710,000 | | | | |
| **Total 3rd Party Payments Under the Joint Plan** | **$ -** | **$ 158,985,000** | **$ -** | **$ -** | **$ -** | |
| | | | | | | |
| Less : 90 Days Working Capital for Debtor | | $ (20,751,009) | | | | |
| | | | | | | |
| **Unrestricted Cash Available for Plan Payments** | **$ 121,112,404** | **$ 259,346,395** | **$ 19,856,021** | **$ 18,495,780** | **$ 17,141,710** | |

**The Archdiocese of New Orleans**
**Case No.: 20-10846**

| Plan of Reorganization Cash Flow Projections | Budget Fiscal 2025-26 | Effective Date and Six Months Ended June 30, 2026 | Plan Fiscal Year June 30, 2027 | Plan Fiscal Year June 30, 2028 | Plan Fiscal Year June 30, 2029 | Notes |
|---|---|---|---|---|---|---|
| **Administrative Offices** | | | | | | |
| **Plan Payments** | | | | | | |
| | | | | | | |
| **Administrative Claims** | | | | | | |
| Legal Fees | $ - | $ 5,000,000 | $ - | $ - | $ - | |
| Other Professional Fees | $ - | $ 1,000,000 | $ - | $ - | $ - | Includes claim reviewer |
| UST Fees | $ - | $ 500,000 | $ - | $ - | $ - | |
| **Administrative Claims** | $ - | $ 6,500,000 | $ - | $ - | $ - | |
| | | | | | | |
| **Claims** | | | | | | |
| Class 1 - Other Priority | $ - | $ - | $ - | $ - | $ - | |
| Class 2 - Secured | $ - | $ - | $ - | $ - | $ - | |
| Class 3 - Known Abuse Claims | $ - | $ 223,985,000 | $ - | $ - | $ - | |
| Class 4 - Unknown Abuse Claims | $ - | $ - | $ - | $ - | $ - | |
| Class 5 - Non-Insurer Contribution Claims | $ - | $ - | $ - | $ - | $ - | |
| Class 6 - Bond Claims Principal | $ - | $ 589,679 | $ 282,975 | $ 307,028 | $ 333,125 | |
| Class 7 - General Unsecured Claims and Unsecured Trade | $ - | $ 500,000 | $ - | $ - | $ - | |
| Class 8 - Non-Abuse Personal Injury Claims - Debtor | $ - | $ - | $ - | $ - | $ - | |
| Class 9 - Unsecured Trade Claims - Additional Debtors | $ - | $ - | $ - | $ - | $ - | |
| Class 10 - Additional Debtors' Non-Trade Unsecured Claims | $ - | $ - | $ - | $ - | $ - | |
| **Total Claims** | $ - | $ 225,074,679 | $ 282,975 | $ 307,028 | $ 333,125 | |
| | | | | | | |
| **Total Plan Payments** | $ - | $ 231,574,679 | $ 282,975 | $ 307,028 | $ 333,125 | |
| | | | | | | |
| **Ending Unrestricted Cash After Plan Payments** | $ 121,112,404 | $ 27,771,716 | $ 19,573,046 | $ 18,188,752 | $ 16,808,585 | |

[7]

88

# EXHIBIT 3

# Liquidation Analysis of the Debtor

## LIQUIDATION ANALYSIS EXECUTIVE SUMMARY

As referenced in section 10.03 of the Disclosure Statement, the Debtor and Additional Debtors must meet the requirements of the "Best Interest of Creditors Test," which requires a comparison of distributions under the Joint Plan to a hypothetical liquidation under chapter 7 of the Bankruptcy Code. The Debtor and Additional Debtors must obtain the consent of all creditors in all impaired classes *or* must show that all impaired creditors are receiving at least as much as such creditors would receive in a hypothetical liquidation under chapter 7. In order to show this comparison, the Debtor and Additional Debtors have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**"), based on certain estimates and assumptions and prepared by Keegan Linscott & Associates, PC. While the Debtor and Additional Debtors consider these estimates and assumptions to be reasonable under the circumstances, all estimates and assumptions are inherently subject to significant uncertainties (economic, operations, legal, natural disasters, etc.), and the Debtor and Additional Debtors cannot guarantee that these values would come to fruition in an actual chapter 7 liquidation.

The following numbers are based on the latest numbers available for the Debtor and Additional Debtors as of June 30, 2025 (the "**Liquidation Date**"). It is assumed for all purposes below that on the Liquidation Date, the Bankruptcy Court would appoint chapter 7 trustees for both the Debtor and the Additional Debtors to begin the process of liquidating the Debtor's and Additional Debtors' assets in order to distribute the proceeds from the liquidation to the various creditors of the Debtor and Additional Debtors in accordance with the priority scheme contained in the Bankruptcy Code.

The Liquidation Analysis assumes that the chapter 7 trustees will retain certain professionals to assist them with the liquidation process, including legal counsel (for bankruptcy purposes and litigation of Abuse Claims), accounting professionals, brokers, and real estate agents. Further, it is assumed that the liquidation process would take five years to complete, taking into account the loss of key personnel, the nature of a forced and rushed sale process, the restrictive use/nature of some of the Debtor's and Additional Debtors' assets that would limit the pool of potential buyers, and the protracted litigation of Abuse Claims and potential contribution and indemnity claims. The immediate closing of the Debtor's and Additional Debtors' operations and the forced layoffs of all personnel would also likely trigger potential employee claims (severance and WARN Act claims). These fees and expenses would be entitled to administrative and priority status, which would be paid prior to any payout to general unsecured creditors. Also included in these costs and fees are fees owed to the U.S. Trustee and Clerk of the Bankruptcy Court. In addition, the chapter 7 trustees will be entitled to a percentage of funds that are distributed to creditors, estimated at 3%.

Many of the available assets of the Debtor and Additional Debtors come from donors and are subject to donor restrictions, thereby preventing those assets from being used to pay any Abuse Claims or any Claims other than those for which they were designated. This is true in both a chapter 11 and a chapter 7 liquidation. However, there has been dispute in this case over which funds are truly restricted and which are not. A GAAP analysis has been used to value restricted funds. The Joint Plan avoids that issue through an agreed-upon payment amount into the Settlement Trust

{00383827-9}

while a chapter 7 liquidation would likely restart that dispute, resulting in further litigation fees and costs.

Although both the Debtor and the Additional Debtors have insurance policies that may cover many of the claims against the Debtor and Additional Debtors (both Abuse Claims and Non-Abuse Claims), neither the Debtor Liquidation Analysis nor the Additional Debtors Liquidation Analysis includes recovery from insurance proceeds or the sale of the Debtor's or Additional Debtors' interest in certain insurance policies. Any potential sale of the policies or ability of a chapter 7 trustee to monetize a claim against an insurance carrier is entirely speculative. As such, no value has been ascribed to the so-called "insurance assets" in the hypothetical chapter 7 liquidation. The Joint Plan, on the other hand, monetizes some of these assets through settlements with the Settling Insurers using a policy buyback. The Debtor and Additional Debtors also have assigned their respective interests in the policies with the Non-Settling Insurers to the Settlement Trust for the benefit of the Abuse Claimants.

The liquidation analysis assumes no contributions from insurance or third-party payments for the Abuse Claims because such payments are speculative and would be considered "collateral sources of recovery." The insurance policies are deemed to have no value for purposes of this liquidation analysis because:

a)  outside of a chapter 11 case, the Abuse Claimants will have a direct right of action against the insurers under Louisiana law;
b)  there are over 150 insureds (including the Debtor and Additional Debtors), and outside of the Joint Plan, there is no ability to allocate insurance payouts among the insured entities;
c)  SPARTA is in a precarious financial condition and may not repurchase its policies at all;
d)  noticing and providing due process to claimants who have claims against the insurance policies would be cost prohibitive in a chapter 7 liquidation;
e)  coverage issues that may exist; and
f)  the estate cannot sue the insurers and obtain the proceeds of the policies because the policies are indemnity policies.

The liquidation analysis also assumes no contributions from third parties to offset liability for the Abuse Claims. The reasons are the following:

a)  There are potential coverage issues and solvency issues of insurers;
b)  The Non-Debtor Catholic Entities have no exposure for Abuse Claims; and
c)  No information is available concerning religious orders' ability to pay or applicable insurance coverage. Prior to the bankruptcy filing, the orders provided minimal funds to pay claims.

The liquidation analysis of the Additional Debtors excludes the assets of any Additional Debtors who have not had claims filed against them by any of the applicable bar dates. In a hypothetical chapter 7 liquidation, the assets of those entities would not be available to Abuse

{00383827-9}

Claimants in the other cases. In the Joint Plan, the Additional Debtors all contribute to the Settlement Trust regardless of whether an Additional Debtor has claims against it or not.

There is no value attributed to a potential single business enterprise claim being asserted by or against the Debtor, the Additional Debtors, and the Non-Debtor Catholic Entities. Each of the Additional Debtors and the Non-Debtor Catholic Entities does not comingle money against between entities, and has separate bank accounts, separate EIN numbers, separate employees, and separate boards of directors. Some of the Additional Debtors and Non-Debtor Catholic Entities have audited financial statements and other indicia of separateness, making the success of a single business enterprise claim highly speculative at best.

Both the Debtor and Additional Debtors have "executory contracts" with certain counterparties that will either be assumed during the bankruptcy (meaning the Debtor/Additional Debtors will continue to perform under the contracts) or will "ride through" the bankruptcy unaffected with the same outcome. In a chapter 7 liquidation, however, those executory contracts would all be rejected by the chapter 7 trustee, and the counterparties would have claims for rejection damages, to be paid *pari pasu* with the other general unsecured creditors, further diminishing the payout under a liquidation analysis.

The value of the Abuse Claims in the liquidation analysis represents the midpoint of a report by Stout Risius Ross, LLC, the Committee's expert consultant on sexual abuse. I have not seen the report, and the number I have used was provided to me orally based on a range of $752 million to $1.69 billion. I understand that the report will be updated, and I will adjust my liquidation analysis based upon my review of the final report.

### Debtor (Archdiocese) Liquidation Analysis

In a hypothetical liquidation, the Debtor estimates that the total value that would be available to unsecured creditors (including Abuse Claimants) is **$209,230,813**. The total unsecured claims amount is projected to be **$1,429,299,271**, resulting in a *pro rata* recovery of **14.6%**. As stated above, this Liquidation Analysis excludes contributions to be made by the Settling Insurers, whereas under the Joint Plan, the Setting Insurers are contributing $29,275,000 to the Settlement Trust.

The Archdiocese hypothetical liquidation also excludes approximately $60,000,000 in contributions from the Additional Debtors, $5,000,000.00 from the Non-Debtor Catholic Entities, and the proceeds from the sale of the Affordable Housing Facilities estimated to be between $65,000,000 and $80,000,000.

The sale of non-church real estate owned by the Archdiocese assumes a bulk sale discount of 15% and accounts for the fact that the chapter 7 trustee would incur costs to hold the property until sale and address deferred maintenance for the properties. The assumed purchase price also accounts for an internal rate of return for a buyer on its investment.

Churches have been valued for liquidation at $100,000 per church. The sale of churches presents challenges and costs that do not exist with other properties. For example, any potential buyer would have to account for: a) the historic designation of some of the churches; b) the costs

{00383827-9}

of repurposing the properties; c) litigation over repurposing; d) re-zoning issues; e) IRS issues related to the sale of property of a 501(c)(3) to a for-profit entity; f) state law limitations; and g) First Amendment and other religious freedom issues that may impair the sale of the church. Indeed, a recent article in THE ADVOCATE indicates that a large number of churches and schools on the market have not been sold due to difficulties in the market and with these particular properties. The article is available at https://www.nola.com/news/business/la-agencies-struggle-to-sell-real-estate-in-slow-market/article_d6da3501-f71c-4a63-a979-1c8de98e4bfa.html.

The below estimates are based upon numbers available to the Debtor as of June 30, 2025.

**Available Assets.**   The additional assets included in the liquidation scenario include the following: unrestricted cash and cash equivalents on hand; accounts receivable; accounts receivable from tuition and fees; loans receivable; unrestricted investments; inventory; real property; vehicles; furniture and fixtures; and art and collectibles.  Grants are excluded from the liquidation value, as are certain prepaid expenses of the Debtor and pledges receivable because they would not be available to a chapter 7 trustee.

Unrestricted Cash and Cash Equivalents: The Debtor expects a 100% recovery on unrestricted cash and cash equivalents in a chapter 7 liquidation.  As of the Liquidation Date, the Debtor holds approximately $68,622,085 in unrestricted cash and cash equivalents.

Accounts and Loans Receivable: The accounts receivable are comprised of third-party receivables as well as Archdiocesan Agency and Archdiocesan Parish assessments. The delinquency of the assessments has increased in recent years. In addition, under the hypothetical liquidation for the Additional Debtors, there is only expected to be a payout approximating 12.6%, which would include payments to the Debtor for their accounts receivable. The Debtor does not anticipate a full recovery in a chapter 7 liquidation, and accounts receivable have been discounted to 50% of their book value.  Loans receivable from certain affiliates are discounted to 25% of the book value. If the Additional Debtors filed for relief, the notes and assessments due from the Additional Debtors would be unsecured claims against the Additional Debtors' estates, and the recovery would approximate 12.6% due to the size of the Abuse Claims.

Accounts Receivable – Tuition and Fees: These receivables are related to pre-billed tuition for the Debtor's schools for the 2025-2026 school year. In effect, the Debtor grosses up its balance sheet by booking accounts receivable and deferred revenue. Because these amounts are offset by deferred revenue in the liquidation analysis, they are included in their entirety.

Inventory and Other Assets: Inventory and certain other assets are discounted to 50% of the book value.  Inventory consists of food and other supply-type items at the Debtor's high schools which would yield very little in a liquidation.

Real Property: Real property values are discounted to $100,000,000 in a liquidation scenario.  This liquidation value was estimated based on an approximate 40% reduction to the Fair Market Value (FMV) of the Debtor's property. The FMV of the properties was determined based on independent third-party appraisals. The 40% reduction to arrive at liquidation value considers the approximate 1200 properties from the Debtor and Additional Debtors in a hypothetical

liquidation that would flood the market and depress sales value. The reduction also recognizes the need for a potential bulk sale of certain properties and a five-year term over which the properties would be sold. The reduction further considers the commission and closing costs for the properties. Church real property has been discounted to $100,000 per church to account for the issues related to the sale of a church and costs attributable to readying the property for sale.

Other Fixed Assets, Artwork and Religious Items: Vehicles values are based on the Kelly Blue Book value. Furniture and fixtures values are based on 15% of net book value. Art and collectibles values are based on appraised values from third-party appraisers.

Investments: The Debtor records investments in its books for investments held in Portfolio A and Portfolio B. Portfolio A investments are held by the Catholic Community Foundation, and the Debtor records a contra-account in its books for investments of third parties. The Debtor's total investments in Portfolio A as of the Liquidation Date are $113,652,955. The value of the Debtor's investments in Portfolio A is based upon the most recent unitization report that is a mark-to-market value for the Investments of the Debtor. It is largely prepared by the Catholic Community Foundation based upon information provided by its investment advisors at the end of each month. The Debtor's investments are segregated between restricted and unrestricted funds. All restricted fund investments are excluded entirely from the liquidation value. The Debtor expects a 100% recovery on unrestricted investments in Portfolio A under a chapter 7 liquidation.

Portfolio B investments relate to the funds invested under the Debtor's Deposit and Loan Program. The Debtor has $23,221,806 in investments as of the Liquidation Date, which is expected to be fully realized in a liquidation. The Debtor has an obligation to the depositors under this program, and there is a deficiency to the depositors in the amount of $111,924,355, which is reflected in the liquidation analysis.

Prepaid Expenses: The Debtor's administrative offices and high schools have certain prepaid expenses related to insurance, professional fees, and tuition-related matters. In a liquidation scenario, the Debtor does not expect to realize any refund of these amounts because the expense amounts will generally continue during the Chapter 11 and be worked off over time, and the tuition amounts will be offset against deferred revenue.

Pledges Receivable: The Debtor has certain pledges from donors that have not been collected as of the Liquidation Date. Because the Debtor will cease operations in a liquidation, it is not expected that donors will fulfill and pay their pledges, as the activities the donor is supporting will no longer exist.

Beneficial Interest in Charitable Remainder Trust: The Debtor is a named beneficiary in a Trust administered by a third party. If the Debtor liquidates, it is assumed the Debtor will be removed as a beneficiary of that Trust, which will result in no value for the Debtor.

Excluded Assets: The Debtor does not expect any recovery from grants receivable because the nature of the grant can no longer be fulfilled when the Debtor stops operations. The Debtor also does not expect to recover any funds from its equity investment in the CUP (Catholic Umbrella Pool).

{00383827-9}

**Additional Administrative Costs.**  Administrative costs in a chapter 7 liquidation include chapter 7 trustee fees, professional fees, shut-down costs, and residual costs and fees from the chapter 11.

Chapter 7 trustee fees are estimated at 3% of the available assets for distribution, excluding any recovery from insurance proceeds, or $7,646,314.  Further, chapter 7 professional fees are estimated at $12,000,000, which assumes a five-year liquidation process and fees related to: pursuing and litigating claims against other Catholic organizations for contributions or indemnification; litigating Abuse Claims; and legal fees associated with asset liquidation.

The liquidation costs also include what are termed "shut-down costs." These costs primarily include the personnel and property-related costs needed to close and fully liquidate the Debtor's operations and assets over the five-year anticipated shut-down period. From a personnel perspective, it is anticipated that the Debtor will be subject to the WARN Act and will incur significant costs for these claims. It is also anticipated that the Debtor will need to retain existing personnel for varying periods of time to assist the chapter 7 trustee in the areas of accounting and finance, IT, legal, property, repair and maintenance, insurance and risk management, and archives. From a property perspective, costs will include property, casualty, and liability insurance for the properties based on the properties being empty and shuttering the properties, ensuring security at the properties to protect them from vandalism and vagrancy, utility costs, and some repair and maintenance costs. It is expected that the properties will be subject to property taxes because they will no longer be exempt. The shut-down costs are estimated at $19,500,000. These estimated shut-down costs do not have any provision for a weather event of any significance, which could greatly increase these costs.

Lastly, also included in the administrative costs are residual chapter 11 costs, calculated as two quarters of the average U.S. Trustee fees throughout the case ($500,000), and four months of residual chapter 11 professional fees at $1,500,000 a month ($6,000,000).

The number and dollar amount of the unsecured claims is greater in a chapter 7 than under the Joint Plan.  The increase in unsecured claimants is a function of the rejection damages that would result from the inability of a chapter 7 trustee to assume the executory contract giving rise to rejection damages.

**Distributions to Unsecured Creditors.**  The unsecured creditor pool includes Abuse Claims, Non-Abuse Claims, prepetition accounts payable, prepetition capital lease obligations, prepetition bonds payable, and prepetition employment benefits and pensions. The Debtor estimates the total amount of unsecured claims to be **$1,429,299,271**.  With **$209,230,813** projected to be available to general unsecured creditors, after payment in full of all senior classes (Administrative and Priority Claims), general unsecured creditors would receive a **14.6%** payment on their claims.

**Footnotes to Exhibit 3 (Debtor's Liquidation Analysis).** The spreadsheet depicting the Debtor's Liquidation Analysis on Exhibit 3 references certain explanatory footnotes as follows:

Note 1: Financial information presented is as of May 31, 2025, which is the most recent data available. Losses are expected to continue after May 31, 2025, which may reduce the liquidation value.

Note 2: Liquidation value is assumed to be 50% of book value.

Note 3: Prepaid expenses include approximately $2,296,000 for the Debtor's high schools.

Note 4: Portfolio A funds are shown net of third-party funds.

Note 5: Includes accounts payable and unpaid reorganization expenses as of May 31, 2025.

Note 6: Estimated at 3% of available assets, excluding any insurance proceeds.

Note 7: Including pursuit of and potential litigation with other Catholic organizations for contribution or indemnification claims.

Note 8: Amount represents midpoint of Abuse Claims per Stout, the Committee's expert (range of claims is $752 million to $1.69 billion).

Note 9: Does not include any recoveries related to insurance coverage for tort claims.

Note 10: Assumes four months of unpaid legal and professional costs at Effective Date.

Note 11: Estimated at two quarters of average U.S. Trustee fees.

Note 12: Excludes accrued liabilities for survivor claims.

Note 13: Based on average Kelly Blue Book value.

Note 14: Estimated at 15% of book value.

Note 15: Includes bond principal.

Note 16: Assumes five-year wind down with half of the properties remaining being sold each year.

Note 17: Liquidation value is assumed to be 25% of book value.

Note 18: Value is based on third-party appraisals obtained by the Debtor.

### Additional Debtors' Liquidation Analysis

The Additional Debtors were examined on a legal entity basis for each Additional Debtor but have been consolidated for this Liquidation Analysis into one comprehensive report.

In a hypothetical liquidation, the Additional Debtors estimate that the total value that would be available to unsecured creditors (including Abuse Claimants) is **$167,409,245**. The total

unsecured claims amount is projected to be **$1,326,564,719**, resulting in a pro rata recovery of **12.6%.** As is the case with the Debtor's Liquidation Analysis, the Additional Debtors' Liquidation Analysis excludes contributions to be made by the Settling Insurers, whereas under the Joint Plan, the Setting Insurers are contributing $29,275,000 to the Settlement Trust. The hypothetical liquidation also excludes a $5,000,000 contribution from the Non-Debtor Catholic Entities, a $65,000,000 contribution from the Debtor, and the value of the assigned insurance policies with the Non-Settling Insurers that are available under the Joint Plan. The hypothetical liquidation includes additional administrative fees that would be associated with a chapter 7 liquidation, such as chapter 7 trustee and professional fees; costs associated with shutting down operations, laying off employees, and securing and insuring real property owned by the Additional Debtors; and various residual costs and professional fees from the chapter 11 bankruptcy. As stated in the Disclosure Statement, 1793 Group was formed in 2025 for the express purpose of facilitating payments from the Additional Debtors into the Joint Plan. The hypothetical liquidation also excludes funds from the sale of the Affordable Housing Facilities that would be due directly to the Settlement Trust. In a chapter 7 liquidation, 1793 Group would not be able to serve this purpose, and each Additional Debtor would have to be liquidated with funds segregated by entity and distributed on an entity-by-entity basis, further adding to the administrative costs associated with chapter 7 liquidations.

**Available Assets.** The Additional Debtors' available assets in a hypothetical liquidation include cash and cash equivalents, accounts receivable, notes receivable, unrestricted investment funds, real property, plant and equipment, and other miscellaneous assets for entities that have Abuse Claims asserted against them. Certain Additional Debtors are not implicated in the Abuse Proofs of Claim filed in the Debtor's Chapter 11 Case. As such, the liquidation value of the assets and liabilities related to these Additional Debtors has been excluded from the liquidation value in Exhibit 5. It is assumed that the Additional Debtors that have no Abuse Claims against them have sufficient funds to pay their debts and that no funds would be available to the survivors or other creditors. Exhibit 4 to the Disclosure Statement identifies the Additional Debtors that are implicated in the Abuse Proofs of Claim filed in the Debtor's Chapter 11 Case.

Cash and Cash Equivalents: Based on the Additional Debtors' most recent financial assessment, as of June 30, 2025, the Additional Debtors' combined cash on hand is $98,977,624. The Additional Debtors anticipate a recovery of $73,789,693, after removing the entities who do not have any Abuse Claims asserted against them and who would not otherwise become Additional Debtors.

Accounts and Notes Receivable: The Additional Debtors' accounts receivable primarily consist of amounts due from Portfolio B and tuition for the Parish Schools that are run by the corresponding parish. Note that these schools are separate from the Archdiocesan Schools that are directly operated by the Archdiocese. In a hypothetical liquidation for the Debtor, the Additional Debtors would only receive 14.6% of their Portfolio B funds. Because the Additional Debtors do not expect a significant recovery from the accounts receivable, receivables have been discounted to 25%, or $17,069,423 after removing the entities who do not have an Abuse Claim asserted against them and who would not otherwise become Additional Debtors.

{00383827-9}

The Additional Debtors have $9,500,000 in outstanding notes receivable and expect a recovery of $6,000,000, again discounting the notes that are payable to entities who do not have an Abuse Claim asserted against them and who would not otherwise become an Additional Debtor.

<u>Investment Funds</u>: Just as with the Debtor, the Additional Debtors have investments that are divided between restricted and unrestricted funds. The Additional Debtors expect a 100% recovery on investments under a chapter 7 liquidation, subject to a reduction of the restricted investments, addressed below. The Additional Debtors have $89,205,761 available investments (both restricted and unrestricted) based on a mark-to-market value. This value is largely prepared by the Catholic Community Foundation based upon information provided by its investment advisors at the end of each month. Removing the entities who do not have Abuse Claims asserted against them, the Additional Debtors anticipate a recovery of $46,944,068 for distribution to creditors.

<u>Real Property, Plant, and Equipment</u>: Real property of the Additional Debtors falls into two categories: church property (property used as a church) and non-church property (property not used as a church). Church property is valued for liquidation purposes at $100,000 per property due to its limited use and the process of repurposing it after the sale to a non-church property. See discussion above in Debtor (Archdiocese) Liquidation Analysis for the rationale behind the church valuations.

Non-church property liquidation values are discounted from the replacement cost of the property by two factors. After removing properties for the entities who do not have an Abuse Claim asserted against them, a reduction of 65% is applied to replacement cost value to arrive at fair market value. This 65% factor was determined using a sample of approximately 40 third-party fair market appraisals as compared to replacement cost value. Second, the liquidation value was estimated based on an approximate 40% reduction to the Fair Market Value (FMV) of the Additional Debtor's property. The 40% reduction to arrive at liquidation value considers the approximate 1200 properties from the Debtor and Additional Debtors in a hypothetical liquidation that would flood the market and depress sales value. The reduction also recognizes the need for a potential bulk sale of certain properties and a five-year term over which the properties would be sold. The reduction further considers the commission and closing costs for the properties. The liquidation value is estimated at $135,170,401 for the Additional Debtors' real property, plant and equipment. The Additional Debtors have not obtained a fair-market-value appraisal of all their real estate.

<u>Other Assets</u>: The Additional Debtors estimate that their other assets have a book value of $12,324,843 based on their latest inventory and financial information. Over 80% of the Other Assets is food and related inventory held by two of the Additional Debtors. After removing the entities who do not have Abuse Claims asserted against them, the Additional Debtors apply a discount of 50% of the book value given the forced sale. The estimated liquidation value of the other assets is $538,722.

<u>Excluded Assets</u>: The Additional Debtors have excluded all restricted investment funds from available assets in a chapter 7 liquidation as well as all assets owned by other entities who

are listed as Additional Debtors but who have no Abuse Claims asserted against them. The Additional Debtors calculate that they hold $6,231,394 in custodial funds for the benefit of non-debtor entities and $10,121,668 in restricted cash and investments. The Additional Debtors have also excluded all prepaid expenses of the Additional Debtors and do not expect to recover any of those payments. However, the chapter 7 trustee fees and costs for litigating against Additional Debtors without Abuse Claims asserted against them are included because the Bankruptcy Code requires a hypothetical liquidation of the entities who are included in the Joint Plan regardless of whether there are Abuse Claims asserted against them.

**Additional Administrative Costs**. Once in bankruptcy, the Additional Debtors will begin to incur post-petition administrative costs such as post-petition payables for employees and other operating expenses until the Additional Debtors are officially closed. The Additional Debtors estimate these costs (to be paid prior to any distributions in the ordinary course of business) to be $500,000, based on the assumption of $5,000 per Additional Debtor (with 100 Additional Debtors filing).

Other administrative costs include chapter 7 trustee fees, professional fees, shut-down costs, and residual costs and fees from the chapter 11.

Chapter 7 trustee fees are estimated at $10,000,000, excluding any recovery from insurance proceeds. These fees are based on an estimate of 3% of the funds distributed to creditors for all of the Additional Debtors. Further, chapter 7 professional fees are estimated at $25,000,000, which assumes a five-year liquidation process and fees related to: pursuing and litigating claims against other organizations for contributions or indemnification; litigating Abuse Claims; and legal fees associated with asset liquidation. The total is based on an assumption of $250,000 in professional fees per Additional Debtor (with 100 Additional Debtors filing).

The liquidation costs also include what are termed "shut-down costs." These costs primarily include the personnel and property-related costs need to close and fully liquidate the debtor's operations and assets over the five-year anticipated shut-down period. From a personnel perspective, it is anticipated that some of the Additional Debtors will be subject to the WARN Act and will incur significant costs for these claims. It is also anticipated that the Additional Debtors will need to retain existing personnel for varying periods of time to assist the chapter 7 trustee in the areas of accounting and finance, IT, legal, property, repair and maintenance, insurance and risk management, and archives. From a property perspective, costs will include property, casualty, and liability insurance for the properties based on the properties being empty and shuttering the properties, ensuring security at the properties to protect them from vandalism and vagrancy, utility costs, and some repair and maintenance costs. It also is expected the properties will be subject to property taxes because they will no longer be exempt. The shut-down costs are estimated at $59,500,000. These estimated shut-down costs do not have any provision for a weather event of any significance, which could greatly increase these costs.

**Distributions to Unsecured Creditors.** The unsecured creditor pool includes Abuse Claims, Non-Abuse Claims, prepetition accounts payable, prepetition capital lease obligations, prepetition bonds payable, and prepetition employment benefits and pensions. The Additional

Debtors estimate the total amount of unsecured claims to be **$1,326,564,719**. With **$167,409,245** projected to be available to general unsecured creditors, after payment in full of all senior classes (Administrative and Priority Claims), general unsecured creditors would receive a **12.6%** payment on their claims.

   **Footnotes to Exhibit 5 (Additional Debtors' Liquidation Analysis).** The spreadsheet depicting the Additional Debtors' Liquidation Analysis on Exhibit 5 references certain explanatory footnotes as follows:

   Note 1: Financial information presented is as of December 31, 2024, which is the most recent data available. Losses are expected to continue after December 31, 2024, which may reduce the liquidation value.

   Note 2: Liquidation value is assumed to be 25% of book value for Additional Debtors with Abuse Claims against them.

   Note 3: Liquidation value is assumed to be 50% of book value for Additional Debtors with Abuse Claims against them.

   Note 4: Includes accounts payable and accrued expenses estimated at $5,000 per Additional Debtor with Abuse Claims against them.

   Note 5: Estimated at 3% of available assets, excluding any insurance proceeds for all Additional Debtors.

   Note 6: Including pursuit of and potential litigation with other Catholic organizations for contribution or indemnification claims. Estimated at $250,000 per Additional Debtor for 100 Additional Debtors.

   Note 7: Assumes five-year wind down with half of the properties remaining being sold each year for 100 Additional Debtors.

   Note 8: Amount represents midpoint of Abuse Claims per Stout, the Committee's expert (range of claims is $752 million to $1.69 billion).

   Note 9: Does not include any recoveries related to insurance coverage for tort claims.

   Note 10: Estimated at $2,500 per Additional Debtor for 100 Additional Debtors.

   Note 11: Estimated at $5,000 per Additional Debtor for 100 Additional Debtors.

   Note 12: Accounts payable, accrued expenses, and FEMA-related payables.

   Note 13: Represents estimated liquidation value for Additional Debtors' property for Additional Debtors with Abuse Claims against them.

Archdiocese of New Orleans
Case No.: 20-10846

**Liquidation Analysis**
As of May 31, 2025

| Account Description | | 5/31/2025 Balance Sheet Amount | | 5/31/2025 Liquidation Value | Global FN Reference |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ | 68,622,085 | $ | 68,622,085 | |
| Petty cash | | 17,851 | | 17,851 | |
| Grants receivable | | 184,345 | | | |
| Accounts receivable | | 32,788,070 | | 16,394,035 | 2 |
| Accounts receivable- tuition and fees, net | | 29,948,814 | | 29,948,814 | |
| Prepaid expenses | | 5,791,646 | | - | 3 |
| Pledges receivable, net | | 2,202,781 | | - | |
| Loans receivable from Affiliates, net | | 15,381,959 | | 4,212,579 | 17 |
| Investments - Portfolio A | | 262,775,204 | | 113,652,955 | 2 |
| Investments - Portfolio B | | 23,221,806 | | 23,221,806 | |
| Investments - unrestricted - CUIP | | 357,199 | | - | |
| Investments - unrestricted - Other | | 833 | | - | |
| Inventory | | 283,253 | | 141,627 | 2 |
| Other current assets | | 63,053 | | 31,527 | 2 |
| Real Property, net | | 114,342,699 | | 100,000,000 | |
| Vehicles, net | | 400,000 | | 500,000 | 13 |
| Furniture and Fixtures, net | | 4,500,000 | | 675,000 | 14 |
| Art and collectibles | | - | | 2,463,240 | 18 |
| Beneficial interest in charitable remainder trust | | 800,164 | | | |
| Other assets | | 122,000 | | 61,000 | 2 |
| **Total Assets** | $ | 561,803,762 | $ | 359,942,518 | |
| LESS: | | | | | |
| Post-petition payables - unrestricted | | | $ | (2,588,616) | 5 |
| Accrued expenses | | | | (9,001,572) | |
| Custodial funds (agency payables) | | | | (1,464,593) | |
| Accrued liability for self-insured claims | | | | (1,528,505) | 12 |
| Deferred Revenue | | | | (47,058,580) | |
| Restricted Custodial Cash | | | | (4,063,315) | |
| Donor Restricted Assets: | | | | | |
| Restricted cash - by donor | | | | (1,876,996) | |
| Investments - Portfolio A – Restricted by Donor | | | | (35,041,712) | |
| Investments - Portfolio B – Restricted by Donor | | | | (2,441,502) | |
| Total Donor Restricted Assets | | | $ | (39,360,210) | |
| Total: Post-petition payables - unrestricted | | | $ | (105,065,391) | |
| **Total Assets Available Prior to Chapter 7** | | | $ | 254,877,127 | |
| Less: | | | | | |
| Chapter 7 Trustee Fees | | | $ | (7,646,314) | 6,9 |
| Chapter 7 Attorney and Financial Professional Fees | | | | (12,000,000) | 7 |
| Shut-down costs | | | | (19,500,000) | 16 |
| Residual Costs of Chapter 11 Administration | | | | (500,000) | 11 |
| Residual Legal and Professional Costs of Chapter 11 | | | | (6,000,000) | 10 |
| Subtotal | | | $ | (45,646,314) | |
| **Amount available to unsecured creditors** | | | $ | 209,230,813 | 9 |
| **Unsecured Debts:** | | | | | |
| Tort Claimant Payables | | | $ | (1,221,000,000) | 8 |
| Accounts payable - Prepetition | | | | (1,332,883) | |
| Capital lease obligations - Prepetition | | | | (790,590) | |
| Bonds payable - Prepetition | | | | (37,970,000) | 15 |
| Portfolio B deficiency | | | | (111,924,355) | |
| Accrued other post employment benefits - Prepetition | | | | (25,435,054) | |
| Accrued pension liability - Prepetition | | | | (30,846,389) | |
| Total | | | $ | (1,429,299,271) | |

101

# EXHIBIT 4

# Financial Information of the Additional Debtors

Additional Debtors, Balance Sheets
December 31, 2024

| | 1 | 2 | 3 | 5 | 8 | 10 | 11 | 13 | 14 | 15 | 16 | 102 | 103 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Archdiocesan Spirituality Center | Aspiring Scholars | Catholic Charities Archdiocese of New Orleans (PACE and Philmat roll up)* | Notre Dame Seminary* | Project Lazarus | School Food and Nutrition Services of New Orleans, Inc. | Second Harvest of Greater New Orleans and Acadiana | St. Tammany Catholic Cemetery | St. Thérèse Catholic Academy | The Society for the Propagation of the Faith, Archdiocese of New Orleans | Holy Redeemer Catholic Virtual Academy | All Saints* | St. Alphonsus* |
| Operating Account | 120,844 | 1,087,638 | 4,575,420 | 1,647,346 | 197,615 | 4,630,599 | 2,223,877 | 443,623 | 125,143 | 155,693 | 9,352 | 26,642 | 182,074 |
| Fair Account | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll Account | - | - | 740,460 | - | 1,007 | - | - | - | - | - | - | - | 182,624 |
| Charitable Gaming Account | - | - | - | - | - | - | - | - | 3,328 | 6,707 | - | - | - |
| Ministry/Organization Accounts (Total) | - | - | 53,368 | - | - | - | - | - | - | - | - | 17,571 | - |
| Petty Cash | - | - | 6,654 | - | 1,699 | - | - | - | - | 100 | - | - | 500 |
| PayPal Account | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Archdiocesan Savings Account (Total) | - | 3,645,355 | - | - | - | - | - | - | - | - | - | - | - |
| Other Accounts (Total) | 57,908 | - | 5,421,110 | - | 316,491 | 2,000,000 | - | - | 4,572 | - | - | 2,870 | 50 |
| Total Cash | 178,752 | 4,732,993 | 10,797,013 | 1,647,346 | 516,813 | 6,630,599 | 2,223,877 | 443,623 | 133,044 | 162,500 | 9,352 | 47,083 | 182,624 |
| Archdiocesan Accounts Receivable | - | - | - | - | 1,129,592 | - | 2,979,434 | - | 246,424 | - | - | 328,116 | 267,261 |
| Other Receivable | - | 5,818 | 5,298,025 | 419,301 | 154,570 | 576,238 | 615,675 | 7,292 | 287,909 | - | - | - | (12,307) |
| Due from/Due to School | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Due from/to others | - | - | 54,477 | - | - | - | - | - | - | - | - | - | - |
| Prepaid expenses | - | - | 299,926 | 263,942 | 3,795 | - | 218,185 | - | 6,499 | 984 | - | 20,163 | 715 |
| Hurricane Ida Insurance Receivable | - | - | - | - | - | - | - | - | 32,897 | - | - | - | - |
| Other current assets | - | - | 966,513 | - | - | 2,258,140 | 8,973,839 | - | 205 | 9,829 | - | - | 15,478 |
| Total Other Current Assets | - | 5,818 | 6,618,941 | 683,243 | 1,287,956 | 2,834,378 | 12,787,133 | 7,292 | 573,933 | 10,813 | - | 348,279 | 271,147 |
| Catholic Foundation Funds | 95,848 | - | 10,907,090 | 21,286,797 | 513,128 | 99,000 | 36,540,043 | - | - | 2,059,969 | - | - | 73,895 |
| Other investments | - | - | - | 42,195 | - | - | - | - | - | - | - | - | - |
| Total Designated Fund Accounts | 95,848 | - | 10,907,090 | 21,328,993 | 513,128 | 99,000 | 36,540,043 | - | - | 2,059,969 | - | - | 73,895 |
| Property, plant & equipment, net | - | - | 9,072,736 | 17,284,966 | 649,614 | - | 35,518,557 | 5,157,430 | 11,737 | 77 | - | 60,000 | 18,012 |
| Notes Receivable | - | - | 6,000,000 | - | - | 3,500,000 | - | - | - | - | - | - | - |
| Total Notes Receivable | - | - | 6,000,000 | - | - | 3,500,000 | - | - | - | - | - | - | - |
| Total Assets | 274,600 | 4,738,811 | 43,395,780 | 40,944,548 | 2,967,511 | 13,063,977 | 87,069,609 | 5,608,345 | 718,713 | 2,233,359 | 9,352 | 455,363 | 545,678 |
| LIABILITIES | | | | | | | | | | | | | |
| Accounts Payable | - | 200 | 84,759 | 126,693 | 17,729 | 18,025 | 1,900,510 | 254 | 15,269 | - | 4,930 | - | - |
| Accrued Expenses/Deferred Revenue | - | 2,264 | 3,382,721 | - | 9,706 | 653,246 | 2,242,724 | - | 1,000,954 | 1,554 | - | - | 2,118 |
| Total AP, Accruals, Deferred Revenue | - | 2,464 | 3,467,480 | 126,693 | 27,435 | 671,272 | 4,143,235 | 254 | 1,016,222 | 1,554 | 4,930 | - | 2,118 |
| Organization Accounts | - | - | 109,019 | - | - | - | - | - | 6,872 | 42,167 | - | 17,571 | 50,010 |
| Total Funds Held for Others | - | - | 109,019 | - | - | - | - | - | 6,872 | 42,167 | - | 17,571 | 50,010 |
| Extra-Diocesan Collections | - | - | - | - | - | - | - | - | - | - | - | 595 | - |
| Total Extra-Diocesan Collections | - | - | - | - | - | - | - | - | - | - | - | 595 | - |
| ANO Balance Due per Customer Statement | - | - | - | - | - | - | - | - | - | - | - | 22,222 | 2,845 |
| Adjustment Added | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parish Share Assessment Future Expense | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Flood Assessment Future Expense | - | - | - | - | - | - | - | - | - | - | - | (13,810) | - |
| Total Assessment Liabilities | - | - | - | - | - | - | - | - | - | - | - | 8,412 | 2,845 |
| Payroll taxes payable | - | - | 1,586,067 | - | 13,767 | 37,881 | 384,783 | - | 110,566 | 5,677 | - | - | 2,206 |
| Total Payroll Liabilities | - | - | 1,586,067 | - | 13,767 | 37,881 | 384,783 | - | 110,566 | 5,677 | - | - | 2,206 |
| Loans - Archdiocesan | - | - | - | - | - | - | - | 1,504,330 | 312,530 | - | - | - | - |
| Total Long-Term Liabilities | - | - | - | - | - | - | - | 1,504,330 | 312,530 | - | - | - | - |
| Total Liabilities | - | 2,464 | 5,162,565 | 126,693 | 41,202 | 709,153 | 4,528,018 | 1,504,584 | 1,446,190 | 49,398 | 4,930 | 26,578 | 57,179 |
| NET ASSETS | | | | | | | | | | | | | |
| Net Assets (Retained Earnings) | 274,600 | 4,736,347 | 33,409,259 | 37,261,440 | 2,920,174 | 12,354,824 | 56,904,699 | 4,103,762 | (727,477) | 1,834,112 | 4,422 | 428,785 | 350,960 |
| Net Assets (Retained Earnings) - Restricted | - | - | 4,823,956 | 3,556,415 | 6,134 | - | 25,636,893 | - | - | 349,849 | - | - | 137,540 |
| Total Net Assets | 274,600 | 4,736,347 | 38,233,215 | 40,817,855 | 2,926,309 | 12,354,824 | 82,541,592 | 4,103,762 | (727,477) | 2,183,961 | 4,422 | 428,785 | 488,499 |
| Total Liabilities and Net Assets | 274,600 | 4,738,811 | 43,395,780 | 40,944,548 | 2,967,511 | 13,063,977 | 87,069,609 | 5,608,346 | 718,713 | 2,233,359 | 9,352 | 455,363 | 545,678 |

| | 104 | 105 | 107 | 108 | 113 | 114 | 117 | 119 | 122 | 123 | 124 | 126 | 129 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | St Andrew the Apostle church* | Blessed Francis Seelos* | St Anthony of Padua* | St Augustine Church* | St David* | St Dominic* | St Francis of Assisi Church | St Gabriel the Archangel* | Holy Name of Jesus* | Holy Name of Mary* | Holy Spirit Catholic Church | Jesuit Church, Immaculate Conception* | St James Major* |
| **Additional Debtors, Balance Sheets December 31, 2024** | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Operating Account | 197,261 | 25,251 | 109,300 | (83) | 2,142 | 88,562 | 267,706 | | 124,986 | 188,411 | 6,423 | 155,006 | |
| Fair Account | - | - | - | - | 576 | - | - | | 106,214 | - | - | - | |
| Payroll Account | - | - | - | - | - | - | - | | 60 | - | - | - | |
| Charitable Gaming Account | - | - | - | - | - | 202,106 | - | | 9,299 | - | - | - | |
| Ministry/Organization Accounts (Total) | 25,221 | - | - | - | 1,136 | 680,114 | 5,881 | | 73,517 | 50,608 | 23,380 | 15,136 | |
| Petty Cash | - | - | 535 | - | - | 500 | - | | 38 | - | - | 100 | |
| PayPal Account | - | - | - | - | - | - | - | | - | - | - | - | |
| Archdiocesan Savings Account (Total) | - | - | - | - | - | - | - | | - | - | - | - | |
| Other Accounts (Total) | 1,133,812 | - | 31,596 | 8,537 | - | 1,990,251 | - | | 1,242,432 | 42,777 | 1,646 | 378,099 | |
| **Total Cash** | 1,356,294 | 25,251 | 141,431 | 8,455 | 3,854 | 2,961,533 | 273,586 | | 1,556,546 | 281,796 | 31,449 | 548,341 | |
| | | | | | | | | | | | | | |
| Archdiocesan Accounts Receivable | 171 | 8 | 109,721 | 3,786 | 331,594 | 320,358 | 651,408 | | 3,679,750 | 19,744 | 30,749 | 594,707 | |
| Other Receivable | 417,596 | - | - | - | - | 1,132,110 | - | | 1,389,836 | - | - | 180 | |
| Due from/Due to School | - | - | - | - | - | - | - | | - | - | - | - | |
| Due from/to others | (113,116) | - | - | - | - | - | 66,379 | | 22,413 | - | - | - | |
| Prepaid expenses | - | - | 236 | - | - | - | - | | - | - | - | - | |
| Hurricane Ida Insurance Receivable | - | - | - | - | - | 271,386 | - | | - | - | - | - | |
| Other current assets | - | - | - | - | - | - | - | | 108,960 | - | - | - | |
| **Total Other Current Assets** | 304,651 | 8 | 109,956 | 3,786 | 331,594 | 1,723,854 | 717,787 | | 5,200,958 | 19,744 | 30,749 | 594,887 | |
| | | | | | | | | | | | | | |
| Catholic Foundation Funds | - | - | 12,513 | 555,839 | - | - | 1,026,032 | | 82,327 | 392,089 | - | 1,908,426 | |
| Other investments | - | - | - | - | - | - | - | | - | - | - | - | |
| **Total Designated Fund Accounts** | - | - | 12,513 | 555,839 | - | - | 1,026,032 | | 82,327 | 392,089 | - | 1,908,426 | |
| | | | | | | | | | | | | | |
| Property, plant & equipment, net | 500,000 | 60,000 | 60,000 | 60,000 | - | 500,000 | 60,000 | - | 560,000 | 60,000 | 60,000 | 60,000 | - |
| | | | | | | | | | | | | | |
| Notes Receivable | - | - | - | - | - | - | - | | - | - | - | - | |
| **Total Notes Receivable** | - | - | - | - | - | - | - | | - | - | - | - | |
| | | | | | | | | | | | | | |
| **Total Assets** | 2,160,944 | 85,259 | 323,900 | 628,080 | 335,449 | 5,185,387 | 2,077,405 | - | 7,399,831 | 753,630 | 122,198 | 3,111,655 | - |
| | | | | | | | | | | | | | |
| **LIABILITIES** | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Accounts Payable | - | - | - | 87 | - | - | 4,736 | | - | - | 4,397 | - | |
| Accrued Expenses/Deferred Revenue | 1,212,685 | - | - | - | - | 4,189 | - | | 5,700 | - | - | 4,058 | |
| **Total AP, Accruals, Deferred Revenue** | 1,212,685 | - | - | 87 | - | 4,189 | 4,736 | | 5,700 | - | 4,397 | 4,058 | |
| | | | | | | | | | | | | | |
| Organization Accounts | 25,394 | - | 2,325 | - | - | 328,543 | 2,221 | | 70,667 | 75,836 | - | - | |
| **Total Funds Held for Others** | 25,394 | - | 2,325 | - | - | 328,543 | 2,221 | | 70,667 | 75,836 | - | - | |
| | | | | | | | | | | | | | |
| Extra-Diocesan Collections | - | (218) | 1,929 | - | 1,641 | - | 22,906 | | - | 1,599 | - | - | |
| **Total Extra-Diocesan Collections** | - | (218) | 1,929 | - | 1,641 | - | 22,906 | | - | 1,599 | - | - | |
| | | | | | | | | | | | | | |
| ANO Balance Due per Customer Statement | 1,535 | 594,075 | - | 76,174 | - | - | - | | 2,633 | - | 95,531 | 28 | |
| Adjustment Added | - | - | - | - | 104,801 | - | - | | - | - | - | - | |
| Parish Share Assessment Future Expense | - | - | 60 | - | - | - | 8,277 | | - | 18,726 | - | - | |
| Flood Assessment Future Expense | - | - | - | - | - | - | - | | - | (17,490) | - | - | |
| **Total Assessment Liabilities** | 1,535 | 594,075 | 60 | 76,174 | 104,801 | - | 8,277 | | 2,633 | 1,236 | 95,531 | 28 | |
| | | | | | | | | | | | | | |
| Payroll taxes payable | - | 593 | 283,206 | - | - | 341 | - | | - | - | - | - | |
| **Total Payroll Liabilities** | - | 593 | 283,206 | - | - | 341 | - | | - | - | - | - | |
| | | | | | | | | | | | | | |
| Loans - Archdiocesan | - | - | - | 877,088 | - | - | - | | - | - | - | - | |
| **Total Long-Term Liabilities** | - | - | - | 877,088 | - | - | - | | - | - | - | - | |
| | | | | | | | | | | | | | |
| **Total Liabilities** | 1,239,613 | 594,449 | 287,520 | 953,349 | 106,442 | 333,072 | 38,141 | | 78,999 | 78,672 | 99,928 | 4,086 | |
| | | | | | | | | | | | | | |
| **NET ASSETS** | | | | | | | | | | | | | |
| Net Assets (Retained Earnings) | 921,331 | (509,190) | 36,380 | (325,270) | 229,006 | 4,852,314 | 2,039,265 | | 7,144,774 | 674,958 | 22,270 | 3,107,569 | |
| Net Assets (Retained Earnings) - Restricted | - | - | - | - | - | - | - | | 176,057 | - | - | - | |
| **Total Net Assets** | 921,331 | (509,190) | 36,380 | (325,270) | 229,006 | 4,852,314 | 2,039,265 | - | 7,320,832 | 674,958 | 22,270 | 3,107,569 | - |
| | | | | | | | | | | | | | |
| **Total Liabilities and Net Assets** | 2,160,944 | 85,259 | 323,900 | 628,080 | 335,449 | 5,185,387 | 2,077,405 | - | 7,399,831 | 753,630 | 122,198 | 3,111,655 | - |

**Additional Debtors, Balance Sheets**
**December 31, 2024**

| | 131 | 135 | 136 | Merged w/171 | 138 | 145 | Merged w/171 | 148 | 149 | 150 | 154 | 156 | 157 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | St John the Baptist | St Maria Goretti* | Blessed Trinity* | St Mary of the Angels* | Mater Dolorosa Church* | Our Lady of the Rosary* | Our Lady Star of the Sea* | St Patrick, New Orleans | St Paul the Apostle | St Peter Claver Church* | St Puis X Church* | Resurrection of Our Lord* | St Rita, New Orleans* |
| Operating Account | 33,355 | 73,825 | 22,535 | | 202,023 | 445,272 | | 232,731 | 52,462 | 101,003 | 147,357 | 534,300 | 617,952 |
| Fair Account | - | - | - | | - | - | | - | - | - | - | - | - |
| Payroll Account | - | - | - | | - | - | | - | - | - | - | - | - |
| Charitable Gaming Account | - | 11,300 | - | | - | - | | - | - | - | - | - | - |
| Ministry/Organization Accounts (Total) | - | 78,228 | 1,249 | | 71,901 | - | | - | - | 115,013 | 119,190 | - | - |
| Petty Cash | - | - | - | | - | - | | - | - | - | - | - | - |
| PayPal Account | - | - | - | | - | - | | - | - | - | - | - | - |
| Archdiocesan Savings Account (Total) | - | - | - | | - | - | | - | - | - | - | - | - |
| Other Accounts (Total) | 66,098 | - | - | | - | - | | 1,075,111 | 4,609 | 8,500 | 2,042,373 | 119,478 | 105,225 |
| Total Cash | 99,453 | 163,353 | 23,785 | - | 273,925 | 445,272 | - | 1,307,842 | 57,071 | 224,516 | 2,308,920 | 653,778 | 723,177 |
| Archdiocesan Accounts Receivable | 26,100 | 1,095,387 | 975,062 | | 699,828 | - | | 92,203 | 1,439,534 | 124,830 | 57,122 | 305,502 | 505,657 |
| Other Receivable | - | 600 | - | | - | - | | - | - | 73,274 | 895,433 | 79,514 | - |
| Due from/Due to School | - | - | - | | - | - | | - | - | - | - | - | - |
| Due from/to others | 19,818 | - | - | | - | - | | - | - | - | - | - | - |
| Prepaid expenses | - | 35,138 | - | | - | - | | - | - | 47,568 | 30,590 | - | 35,453 |
| Hurricane Ida Insurance Receivable | - | - | - | | - | - | | - | - | - | - | - | - |
| Other current assets | - | 3,000 | - | | - | - | | (54) | - | - | - | - | - |
| Total Other Current Assets | 45,917 | 1,134,125 | 975,062 | - | 699,828 | - | - | 92,149 | 1,439,534 | 245,671 | 983,145 | 385,015 | 541,109 |
| Catholic Foundation Funds | - | - | - | | - | 2,257,306 | | 118,973 | - | - | - | 1,847,743 | - |
| Other investments | - | - | - | | - | - | | - | - | - | - | - | - |
| Total Designated Fund Accounts | - | - | - | - | - | 2,257,306 | - | 118,973 | - | - | - | 1,847,743 | - |
| Property, plant & equipment, net | 39,179 | 60,000 | 60,000 | - | 60,000 | 60,000 | - | 1,247,450 | 60,000 | 60,000 | 500,000 | 310,000 | 168,534 |
| Notes Receivable | - | - | - | | - | - | | - | - | - | - | - | - |
| Total Notes Receivable | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Assets | 184,550 | 1,357,478 | 1,058,847 | - | 1,033,753 | 2,762,578 | - | 2,766,414 | 1,556,605 | 530,187 | 3,792,065 | 3,196,537 | 1,432,820 |

LIABILITIES

| | 131 | 135 | 136 | Merged w/171 | 138 | 145 | Merged w/171 | 148 | 149 | 150 | 154 | 156 | 157 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Accounts Payable | - | - | - | | - | - | | - | - | 1,525 | 48,498 | 3,547 | 6,406 |
| Accrued Expenses/Deferred Revenue | - | - | - | | - | - | | - | - | - | - | 4,656 | - |
| Total AP, Accruals, Deferred Revenue | - | - | - | - | - | - | - | - | - | 1,525 | 48,498 | 8,203 | 6,406 |
| Organization Accounts | 801 | 78,228 | 1,249 | | 575 | 29,013 | | 37,501 | 11,579 | - | 119,190 | 11,760 | - |
| Total Funds Held for Others | 801 | 78,228 | 1,249 | - | 575 | 29,013 | - | 37,501 | 11,579 | - | 119,190 | 11,760 | - |
| Extra-Diocesan Collections | - | 743 | 10,563 | | 106 | 2,160 | | 3,263 | 4,291 | 1,067 | - | 511 | 3,674 |
| Total Extra-Diocesan Collections | - | 743 | 10,563 | - | 106 | 2,160 | - | 3,263 | 4,291 | 1,067 | - | 511 | 3,674 |
| ANO Balance Due per Customer Statement | - | 15,433 | 768,548 | | 250 | 11,158 | | 167 | 6,042 | - | - | 60,861 | 2,808 |
| Adjustment Added | - | - | - | | - | - | | - | - | - | - | - | - |
| Parish Share Assessment Future Expense | - | - | - | | - | - | | - | - | 252,529 | - | - | - |
| Flood Assessment Future Expense | - | (4,825) | (7,470) | | (4,691) | (8,341) | | - | - | (14,819) | - | (2,316) | - |
| Total Assessment Liabilities | - | 10,608 | 761,078 | - | (4,441) | 2,817 | - | 167 | 6,042 | 237,710 | - | 58,545 | 2,808 |
| Payroll taxes payable | - | - | - | | - | - | | (12) | 4,751 | - | - | - | - |
| Total Payroll Liabilities | - | - | - | - | - | - | - | (12) | 4,751 | - | - | - | - |
| Loans - Archdiocesan | 96,725 | - | - | | - | - | | - | - | 2,673,784 | - | 209,000 | - |
| Total Long-Term Liabilities | 96,725 | - | - | - | - | - | - | - | - | 2,673,784 | - | 209,000 | - |
| Total Liabilities | 97,526 | 89,580 | 772,890 | - | (3,760) | 33,990 | - | 40,920 | 26,663 | 2,914,086 | 167,688 | 288,019 | 12,888 |

NET ASSETS

| | 131 | 135 | 136 | Merged w/171 | 138 | 145 | Merged w/171 | 148 | 149 | 150 | 154 | 156 | 157 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Assets (Retained Earnings) | 87,024 | 1,267,898 | 285,957 | | 1,037,513 | 2,728,589 | | 2,725,494 | 1,529,941 | (2,383,899) | 3,624,377 | 2,908,517 | 1,008,926 |
| Net Assets (Retained Earnings) - Restricted | - | - | - | | - | - | | - | - | - | - | - | 411,007 |
| Total Net Assets | 87,024 | 1,267,898 | 285,957 | - | 1,037,513 | 2,728,589 | - | 2,725,494 | 1,529,941 | (2,383,899) | 3,624,377 | 2,908,517 | 1,419,932 |
| Total Liabilities and Net Assets | 184,550 | 1,357,478 | 1,058,847 | - | 1,033,753 | 2,762,578 | - | 2,766,414 | 1,556,605 | 530,187 | 3,792,065 | 3,196,537 | 1,432,820 |

| | 161 | 164 | Merged w/172 | 167 | 168 | 169 | 170 | 171 | 172 | 173 | 174 | 175 | 201 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | St. Theresa Of Avila Church | St Raymond / St Leo the Great* | Transfiguration of the Lord* | Blessed Sacrament - St Joan of Arc* | St Katharine Drexel* | Corpus Christi-epiphany* | Good Shepherd* | St Josephine Bakhita | St Martin de Porres | Mary, Help of Christians | St Michael The Archangel | St John Paul II | St Jane de Chantal |
| **Additional Debtors, Balance Sheets December 31, 2024** | | | | | | | | | | | | | |
| Operating Account | 41,948 | 9,001 | | (4,800) | 5,725 | 26,823 | 203,614 | 6,407 | 46,300 | 134,319 | 156,597 | 125,187 | 206,439 |
| Fair Account | - | - | | | - | - | - | - | - | - | 27,555 | - | - |
| Payroll Account | - | - | | | | | | | | | - | - | - |
| Charitable Gaming Account | - | - | | - | | | - | - | | - | - | - | - |
| Ministry/Organization Accounts (Total) | - | 76,447 | | 3,933 | | | 94,774 | 1,393 | 68,146 | 14,691 | 193,643 | 1,055 | 19,298 |
| Petty Cash | - | - | | - | | | 50 | | | - | - | | |
| PayPal Account | - | - | | - | | | - | - | | - | - | | |
| Archdiocesan Savings Account (Total) | - | - | | - | | | - | - | | 567,448 | - | | |
| Other Accounts (Total) | 54 | 790,634 | | 80,554 | - | | 21,297 | 28,225 | | 30,612 | - | | - |
| Total Cash | 42,002 | 876,082 | | 79,688 | 5,725 | 26,823 | 319,736 | 36,025 | 114,446 | 774,625 | 350,240 | 126,241 | 225,737 |
| Archdiocesan Accounts Receivable | 464,753 | 1,877,000 | | 63,678 | 358,125 | 658,718 | 591,593 | 638,280 | 89,192 | | 1,803 | 45,897 | 70,147 |
| Other Receivable | - | - | | - | - | - | 193 | 28,920 | - | | - | - | - |
| Due from/Due to School | | | | (2,233) | | | 25,893 | | - | | | | |
| Due from/to others | | | | - | | | - | - | - | | | | |
| Prepaid expenses | | | | - | | | - | - | 56,714 | | | | |
| Hurricane Ida Insurance Receivable | | | | - | | | - | - | - | | | | |
| Other current assets | | | | - | - | - | - | 1,478 | - | | - | - | - |
| Total Other Current Assets | 464,753 | 1,877,000 | - | 61,445 | 358,125 | 658,718 | 617,679 | 668,678 | 145,906 | - | 1,803 | 45,897 | 70,147 |
| Catholic Foundation Funds | - | | | - | - | - | 1,068,681 | - | - | 385,971 | 45,666 | - | - |
| Other investments | - | 831 | | - | - | - | 1,585,000 | - | - | - | - | - | - |
| Total Designated Fund Accounts | - | 831 | - | - | - | - | 2,653,681 | - | - | 385,971 | 45,666 | - | - |
| Property, plant & equipment, net | 60,000 | 60,000 | - | 60,000 | 60,000 | 60,000 | 560,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 |
| Notes Receivable | - | - | | - | - | - | - | - | - | - | - | - | - |
| Total Notes Receivable | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Assets | 566,755 | 2,813,913 | - | 201,133 | 423,850 | 745,541 | 4,151,096 | 764,703 | 320,352 | 1,220,596 | 457,710 | 232,138 | 355,884 |
| **LIABILITIES** | | | | | | | | | | | | | |
| Accounts Payable | - | - | | - | - | - | 57,697 | - | - | - | - | - | - |
| Accrued Expenses/Deferred Revenue | - | - | | - | - | - | 10,431 | - | - | 531 | - | - | - |
| Total AP, Accruals, Deferred Revenue | - | - | - | - | - | - | 68,128 | - | - | 531 | - | - | - |
| Organization Accounts | - | - | | 3,933 | 5,688 | - | 37,304 | - | - | 72,987 | 193,643 | 1,055 | 19,298 |
| Total Funds Held for Others | - | - | - | 3,933 | 5,688 | - | 37,304 | - | - | 72,987 | 193,643 | 1,055 | 19,298 |
| Extra-Diocesan Collections | - | - | | 8,187 | (965) | 2,453 | 40,471 | 4,832 | 6,005 | (807) | 2,145 | 2,766 | - |
| Total Extra-Diocesan Collections | - | - | - | 8,187 | (965) | 2,453 | 40,471 | 4,832 | 6,005 | (807) | 2,145 | 2,766 | - |
| ANO Balance Due per Customer Statement | 199 | 3,149 | | 151,765 | - | 7,333 | 129,975 | 127,128 | 49,178 | 103,796 | 2,476 | 380 | 23,308 |
| Adjustment Added | - | - | | - | - | - | - | - | - | - | - | - | - |
| Parish Share Assessment Future Expense | - | - | | - | 13,952 | - | - | - | - | - | - | - | - |
| Flood Assessment Future Expense | - | - | | (8,457) | (10,987) | - | - | (16,673) | (27,269) | - | (6,100) | - | - |
| Total Assessment Liabilities | 199 | 3,149 | - | 143,308 | 2,965 | 7,333 | 129,975 | 110,455 | 21,908 | 103,796 | (3,624) | 380 | 23,308 |
| Payroll taxes payable | - | - | | - | - | - | - | - | - | - | - | - | - |
| Total Payroll Liabilities | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Loans - Archdiocesan | - | - | | 186,330 | 93,011 | - | 29,899 | 129,859 | 1,286,323 | 444,590 | 315,672 | 3,063 | 473,624 |
| Total Long-Term Liabilities | - | - | - | 186,330 | 93,011 | - | 29,899 | 129,859 | 1,286,323 | 444,590 | 315,672 | 3,063 | 473,624 |
| Total Liabilities | 199 | 3,149 | - | 341,758 | 100,698 | 9,785 | 305,777 | 245,146 | 1,314,236 | 621,098 | 507,836 | 7,263 | 516,230 |
| **NET ASSETS** | | | | | | | | | | | | | |
| Net Assets (Retained Earnings) | 566,556 | 2,810,764 | | (140,625) | 323,151 | 735,755 | 3,845,319 | 519,557 | (993,883) | 599,498 | (50,126) | 224,875 | (162,219) |
| Net Assets (Retained Earnings) - Restricted | - | - | | - | - | - | - | - | - | - | - | - | 1,872 |
| Total Net Assets | 566,556 | 2,810,764 | - | (140,625) | 323,151 | 735,755 | 3,845,319 | 519,557 | (993,883) | 599,498 | (50,126) | 224,875 | (160,347) |
| Total Liabilities and Net Assets | 566,755 | 2,813,913 | - | 201,133 | 423,850 | 745,541 | 4,151,096 | 764,703 | 320,352 | 1,220,596 | 457,710 | 232,138 | 355,884 |

| | 202 | Merged w/175 | 206 | 207 | 208 | 210 | 214 | 216 | 219 | 220 | 221 | 222 | 224 | 225 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | St Mark, Ama | St Bonaventure* | St Anthony Lafitte | St Genevieve | Our Lady of Perpetual Help Belle Chasse* | Annunciation Catholic Church* | OLPS Chalmette* | St Peter Church, Covington* | St Gertrude Church, Des Allemands* | St Charles Borromeo* | St John the Baptist, Edgard* | Visitation of Our Lady* | St John the Baptist, Folsom | Holy Family, Franklinton |
| **Additional Debtors, Balance Sheets** | | | | | | | | | | | | | | |
| **December 31, 2024** | | | | | | | | | | | | | | |
| Operating Account | 30,733 | - | 19,568 | 29,815 | 581,322 | 195,930 | 10,256 | 887,207 | | 1,065,710 | 33,392 | 249,285 | 167,911 | 114,448 |
| Fair Account | - | | 32,403 | - | 21,190 | - | 23,154 | - | | - | - | 4,866 | - | - |
| Payroll Account | - | | - | - | - | - | - | 6,859 | | - | - | - | - | - |
| Charitable Gaming Account | - | | - | - | 8,721 | - | - | - | | - | - | 2,866 | - | - |
| Ministry/Organization Accounts (Total) | - | | 27,592 | 58,180 | 53,376 | - | - | 295,398 | | 410,332 | 73,595 | 102,755 | 21,422 | 16,380 |
| Petty Cash | - | | - | - | - | 200 | - | 200 | | - | - | 900 | - | - |
| PayPal Account | - | | - | - | - | - | - | - | | - | - | - | - | - |
| Archdiocesan Savings Account (Total) | - | | - | - | - | - | - | - | | - | - | - | - | - |
| Other Accounts (Total) | - | | 12,574 | 1,210 | 1,077,225 | 168,541 | 1,340,384 | 942,613 | | 9,129 | 164,213 | 1,308,412 | 179,894 | 5,351 |
| Total Cash | 30,733 | - | 92,137 | 89,205 | 1,741,833 | 364,671 | 1,373,795 | 2,132,278 | | 1,485,171 | 271,200 | 1,669,084 | 369,227 | 136,179 |
| Archdiocesan Accounts Receivable | 41,873 | | 21,266 | 264,190 | 769,912 | 111,878 | 244,769 | 3,104,549 | | 1,067,994 | 78,687 | 600,126 | 2,483 | 4,251 |
| Other Receivable | - | | - | - | - | - | 271,767 | 894,509 | | 3,774 | - | 409,896 | - | - |
| Due from/Due to School | | | | | | | | 55 | | | | | | |
| Due from/to others | - | | - | - | - | - | - | - | | - | - | - | - | - |
| Prepaid expenses | - | | - | - | 5,195 | - | - | 227,737 | | - | - | - | - | - |
| Hurricane Ida Insurance Receivable | - | | - | - | - | - | - | - | | - | - | - | - | - |
| Other current assets | - | | - | - | - | - | - | - | | - | - | (5,995) | - | - |
| Total Other Current Assets | 41,873 | - | 21,266 | 264,190 | 775,107 | 111,878 | 516,536 | 4,226,851 | - | 1,071,769 | 78,687 | 1,004,026 | 2,483 | 4,251 |
| Catholic Foundation Funds | - | | - | - | - | - | 77,138 | 103,920 | | 63,580 | - | - | - | 446,063 |
| Other investments | - | | - | - | 168,225 | - | - | - | | - | - | - | - | - |
| Total Designated Fund Accounts | - | - | - | - | 168,225 | - | 77,138 | 103,920 | - | 63,580 | - | - | - | 446,063 |
| Property, plant & equipment, net | 60,000 | | 60,000 | 60,000 | 310,000 | 310,000 | 560,000 | 7,178,763 | | 560,000 | 60,000 | 560,000 | 60,000 | 60,000 |
| Notes Receivable | - | | - | - | - | - | - | - | | - | - | - | - | - |
| Total Notes Receivable | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Assets | 132,606 | - | 173,404 | 413,395 | 2,995,164 | 786,549 | 2,527,469 | 13,641,812 | - | 3,180,520 | 409,887 | 3,233,109 | 431,709 | 646,493 |
| **LIABILITIES** | | | | | | | | | | | | | | |
| Accounts Payable | - | | - | (1,284) | 104,278 | 5,146 | - | - | | - | - | 176,260 | - | 3,220 |
| Accrued Expenses/Deferred Revenue | - | | - | - | - | - | 165 | 2,739,759 | | 1,450 | - | 1,118,069 | - | - |
| Total AP, Accruals, Deferred Revenue | - | - | - | (1,284) | 104,278 | 5,146 | 165 | 2,739,759 | - | 1,450 | - | 1,294,329 | - | 3,220 |
| Organization Accounts | - | | 26,212 | - | 59,159 | 9,001 | - | 348,541 | | 416,653 | 70,441 | 103,730 | - | 21,731 |
| Total Funds Held for Others | - | - | 26,212 | - | 59,159 | 9,001 | - | 348,541 | - | 416,653 | 70,441 | 103,730 | - | 21,731 |
| Extra-Diocesan Collections | - | | (137) | - | 23,842 | - | - | (225) | | 14,774 | 335 | 44,592 | - | 50 |
| Total Extra-Diocesan Collections | - | - | (137) | - | 23,842 | - | - | (225) | - | 14,774 | 335 | 44,592 | - | 50 |
| ANO Balance Due per Customer Statement | 6,956 | | 195,456 | 1,182 | - | 46,202 | 131,877 | 31,880 | | 4,674 | 15,647 | 28,911 | 8,125 | - |
| Adjustment Added | - | | - | - | - | - | - | - | | - | - | - | - | - |
| Parish Share Assessment Future Expense | - | | - | - | - | - | - | - | | - | - | - | - | - |
| Flood Assessment Future Expense | - | | - | - | - | - | - | - | | - | (4,194) | (24,376) | - | - |
| Total Assessment Liabilities | 6,956 | - | 195,456 | 1,182 | - | 46,202 | 131,877 | 31,880 | - | 4,674 | 11,453 | 4,535 | 8,125 | - |
| Payroll taxes payable | - | | - | - | (0) | 24,666 | (364) | 224,184 | | - | - | - | - | - |
| Total Payroll Liabilities | - | - | - | - | (0) | 24,666 | (364) | 224,184 | - | - | - | - | - | - |
| Loans - Archdiocesan | - | | 111,445 | - | - | - | - | 3,136,676 | | - | - | 2,459,406 | - | - |
| Total Long-Term Liabilities | - | - | 111,445 | - | - | - | - | 3,136,676 | - | - | - | 2,459,406 | - | - |
| Total Liabilities | 6,956 | - | 332,977 | (102) | 187,280 | 85,015 | 131,678 | 6,480,816 | - | 437,551 | 82,229 | 3,906,592 | 8,125 | 25,001 |
| **NET ASSETS** | | | | | | | | | | | | | | |
| Net Assets (Retained Earnings) | 125,650 | | (159,573) | 413,498 | 2,807,885 | 606,888 | 2,395,791 | 6,399,027 | | 2,742,969 | 327,658 | (673,482) | 423,584 | 621,492 |
| Net Assets (Retained Earnings) - Restricted | - | | - | - | - | 94,646 | - | 761,969 | | - | - | - | - | - |
| Total Net Assets | 125,650 | - | (159,573) | 413,498 | 2,807,885 | 701,534 | 2,395,791 | 7,160,996 | - | 2,742,969 | 327,658 | (673,482) | 423,584 | 621,492 |
| Total Liabilities and Net Assets | 132,606 | - | 173,404 | 413,395 | 2,995,164 | 786,549 | 2,527,469 | 13,641,812 | - | 3,180,520 | 409,887 | 3,233,109 | 431,709 | 646,493 |

**Additional Debtors, Balance Sheets**
December 31, 2024

| | Merged w/267 St Hubert Church | 227 St Anthony Parish, Gretna* | 228 St Cletus Church* | 229 St Joseph Church, Gretna* | 230 Saint Rita, Harahan | 232 St. Martha | Merged w/173 St. Rosalie | 235 OLPH Kenner* | 236 St. Jerome | 237 Sacred Heart* | 238 Ascension of Our Lord | 239 St. Joan of Arc* | 240 St. Matthew the Apostle* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating Account | | 591,509 | 215,668 | 49,181 | 473,205 | 95,724 | | 791,837 | 66,694 | 43,964 | 381,279 | 289,444 | 157,341 |
| Fair Account | | - | 3,611 | - | - | - | | - | - | - | - | - | 53,898 |
| Payroll Account | | - | - | - | - | - | | - | - | - | - | - | - |
| Charitable Gaming Account | | - | 421 | 59,632 | (3,272) | 12,013 | | 94 | - | - | - | 16,270 | 59,576 |
| Ministry/Organization Accounts (Total) | | 9,040 | 70,035 | 50,941 | - | 2,802 | | 16,794 | 5,378 | - | 50,192 | 78,516 | 49,683 |
| Petty Cash | | - | 340 | - | 250 | 84 | | - | - | - | - | 250 | 400 |
| PayPal Account | | - | - | - | - | - | | - | - | - | - | - | - |
| Archdiocesan Savings Account (Total) | | - | - | - | - | - | | 18,786 | - | - | - | - | - |
| Other Accounts (Total) | | 55,648 | 784,415 | - | 547,807 | - | | 112,408 | - | 21,496 | 2,596 | 7,355 | 824,036 |
| **Total Cash** | - | 656,197 | 1,074,489 | 159,755 | 1,017,989 | 110,623 | - | 939,919 | 72,072 | 65,460 | 434,068 | 391,836 | 1,144,935 |
| Archdiocesan Accounts Receivable | | 229,004 | 1,336,801 | 397,306 | 576,543 | 570,749 | | 547,079 | 234,841 | - | 476,593 | 1,317,081 | 2,503,075 |
| Other Receivable | | 6,064 | 379,018 | - | 263,101 | - | | 46,361 | - | - | 140,189 | 262,725 | 1,447 |
| Due from/Due to School | | - | - | 6,037 | - | - | | - | - | - | - | (3,547) | 6,325 |
| Due from/to others | | - | 2,561 | - | 16,643 | - | | - | - | - | - | (14,161) | - |
| Prepaid expenses | | - | 40,447 | - | - | - | | - | 22,834 | - | - | 86,191 | 0 |
| Hurricane Ida Insurance Receivable | | - | - | - | - | - | | - | - | - | - | - | - |
| Other current assets | | - | - | 5,257 | 4,091 | (95) | | - | - | - | - | - | - |
| **Total Other Current Assets** | - | 235,068 | 1,758,827 | 408,600 | 860,378 | 570,654 | - | 593,440 | 257,675 | - | 616,782 | 1,648,288 | 2,510,847 |
| Catholic Foundation Funds | | 149,227 | - | 636,419 | 316,037 | - | | - | - | - | - | - | 35,304 |
| Other investments | | - | - | - | - | - | | - | - | - | 1,565 | 348,948 | - |
| **Total Designated Fund Accounts** | - | 149,227 | - | 636,419 | 316,037 | - | - | - | - | - | 1,565 | 348,948 | 35,304 |
| Property, plant & equipment, net | - | 310,000 | 560,000 | 60,000 | 560,000 | 60,000 | | 310,000 | 60,000 | 60,000 | 310,000 | 560,000 | 560,000 |
| Notes Receivable | | - | - | - | - | - | | - | - | - | - | - | - |
| **Total Notes Receivable** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Assets** | - | 1,350,491 | 3,393,316 | 1,264,774 | 2,754,404 | 741,277 | - | 1,843,359 | 389,747 | 125,460 | 1,362,415 | 2,949,072 | 4,251,086 |
| **LIABILITIES** | | | | | | | | | | | | | |
| Accounts Payable | | 55 | 13,545 | - | 23,789 | 2,796 | | 10 | - | - | 6,187 | - | 28,840 |
| Accrued Expenses/Deferred Revenue | | 2,240 | 1,015,753 | - | 500 | - | | - | - | 21,496 | - | - | 1,847,045 |
| **Total AP, Accruals, Deferred Revenue** | - | 2,295 | 1,029,298 | - | 24,289 | 2,796 | - | 10 | - | 21,496 | 6,187 | - | 1,875,884 |
| Organization Accounts | | 15,810 | 95,408 | 56,633 | 8,270 | 2,802 | | 7,504 | 9,497 | - | 122,388 | 219,320 | 175,745 |
| **Total Funds Held for Others** | - | 15,810 | 95,408 | 56,633 | 8,270 | 2,802 | - | 7,504 | 9,497 | - | 122,388 | 219,320 | 175,745 |
| Extra-Diocesan Collections | | 551 | 10 | 6,683 | - | 5,169 | | 10,760 | 193 | 522 | 35 | 994 | - |
| **Total Extra-Diocesan Collections** | - | 551 | 10 | 6,683 | - | 5,169 | - | 10,760 | 193 | 522 | 35 | 994 | - |
| ANO Balance Due per Customer Statement | | 4,167 | 10,947 | 52 | 25,872 | - | | 20,669 | - | 86,209 | 4,187 | 9,513 | 16,140 |
| Adjustment Added | | - | - | - | - | - | | - | - | - | - | - | - |
| Parish Share Assessment Future Expense | | - | - | - | - | 74 | | - | 16,028 | - | - | - | - |
| Flood Assessment Future Expense | | - | - | - | - | - | | (5,032) | (7,895) | - | - | - | - |
| **Total Assessment Liabilities** | - | 4,167 | 10,947 | 52 | 25,872 | 74 | - | 15,637 | 8,133 | 86,209 | 4,187 | 9,513 | 16,140 |
| Payroll taxes payable | | (128) | - | (1,094) | 957 | - | | (536) | - | - | - | (856) | - |
| **Total Payroll Liabilities** | - | (128) | - | (1,094) | 957 | - | - | (536) | - | - | - | (856) | - |
| Loans - Archdiocesan | | - | - | - | - | - | | - | - | - | - | - | - |
| **Total Long-Term Liabilities** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Liabilities** | - | 22,695 | 1,135,663 | 62,274 | 59,387 | 10,841 | - | 33,377 | 17,823 | 108,227 | 132,796 | 228,971 | 2,067,770 |
| **NET ASSETS** | | | | | | | | | | | | | |
| Net Assets (Retained Earnings) | | 1,327,796 | 2,257,653 | 1,202,500 | 2,477,486 | 730,436 | | 1,669,382 | 371,924 | 17,233 | 1,229,619 | 2,720,101 | 2,183,316 |
| Net Assets (Retained Earnings) - Restricted | | - | - | - | 217,531 | - | | 140,601 | - | - | - | - | - |
| **Total Net Assets** | - | 1,327,796 | 2,257,653 | 1,202,500 | 2,695,017 | 730,436 | - | 1,809,983 | 371,924 | 17,233 | 1,229,619 | 2,720,101 | 2,183,316 |
| **Total Liabilities and Net Assets** | - | 1,350,491 | 3,393,316 | 1,264,774 | 2,754,404 | 741,277 | - | 1,843,359 | 389,747 | 125,460 | 1,362,415 | 2,949,072 | 4,251,086 |

| | 241 | 242 | 243 | 244 | 245 | 246 | 247 | 248 | 249 | 250 | 251 | 252 | 253 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | St. Anthony of Padua, Luling* | Holy Family, Luling* | St. Anselm, Madisonville* | Our Lady of the Lake* | Immaculate Conception, Marrero* | Church of St. Joseph the Worker* | Our Lady of Divine Providence* | Saint Agnes Church* | St Ann Roman Catholic Church* | St Benilde Church* | Sr Catherine of Siena Church* | St Christopher Parish* | St Clement of Rome* |
| **Additional Debtors, Balance Sheets December 31, 2024** | | | | | | | | | | | | | |
| Operating Account | 22,058 | 51,743 | 167,209 | 362,878 | 208,232 | 120,536 | 15,925 | 53,027 | 335,972 | 311,513 | 392,565 | 844,611 | 384,076 |
| Fair Account | - | - | - | - | - | - | 1,068 | - | - | - | 4,498 | 83,902 | - |
| Payroll Account | - | - | - | 10,317 | - | - | - | - | - | - | - | - | - |
| Charitable Gaming Account | 20,545 | 48,127 | 108,545 | - | 550,725 | - | 85 | 19 | - | - | - | 199 | - |
| Ministry/Organization Accounts (Total) | - | 129,353 | 62,078 | 300,038 | 11,473 | 34,557 | 14,769 | 17,433 | 30,762 | 2,393 | 257,444 | 228,119 | 17,742 |
| Petty Cash | - | - | 100 | - | - | 1,655 | 362 | - | 200 | 635 | 600 | - | - |
| PayPal Account | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Archdiocesan Savings Account (Total) | - | - | - | - | - | - | - | - | - | - | 408,171 | 138,124 | - |
| Other Accounts (Total) | 4,125 | 359,883 | - | - | 2,095,410 | - | - | - | 129,146 | 323,883 | 7,020,336 | 681,257 | 1,113,600 |
| Total Cash | 46,729 | 589,106 | 337,932 | 673,233 | 2,865,841 | 156,748 | 32,209 | 70,479 | 496,081 | 638,424 | 8,083,614 | 1,976,211 | 1,515,419 |
| Archdiocesan Accounts Receivable | - | - | 152,812 | 3,921,029 | 2,366,105 | - | 306 | 6,174 | 5,438,357 | - | 698,449 | 58,001 | 1,057,356 |
| Other Receivable | - | - | - | 436,062 | 1,031,759 | 207,772 | 52,731 | - | 555,472 | 955,593 | 1,397,176 | 365,546 | 546,280 |
| Due from/Due to School | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Due from/to others | - | - | - | - | - | - | 1,800 | - | - | - | 1,190,154 | 2,500 | - |
| Prepaid expenses | - | - | - | - | - | - | - | - | - | 1,589 | - | - | - |
| Hurricane Ida Insurance Receivable | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other current assets | - | (11,418) | - | - | - | - | - | - | - | - | - | - | - |
| Total Other Current Assets | - | (11,418) | 152,812 | 4,357,091 | 3,397,864 | 207,772 | 54,836 | 6,174 | 5,993,829 | 957,182 | 3,285,779 | 426,047 | 1,603,636 |
| Catholic Foundation Funds | - | 58,919 | 22,787 | - | 474,334 | - | 29,185 | 359,104 | 154,737 | - | 190,422 | 74,174 | 54,962 |
| Other investments | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Designated Fund Accounts | - | 58,919 | 22,787 | - | 474,334 | - | 29,185 | 359,104 | 154,737 | - | 190,422 | 74,174 | 54,962 |
| Property, plant & equipment, net | 60,000 | 60,000 | 60,000 | 500,000 | 560,000 | 60,000 | 60,000 | 60,000 | 500,000 | 250,000 | 560,000 | 560,000 | 500,000 |
| Notes Receivable | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Notes Receivable | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Assets | 106,729 | 696,607 | 573,531 | 5,530,324 | 7,298,038 | 424,520 | 176,230 | 495,757 | 7,144,647 | 1,845,606 | 12,119,814 | 3,036,432 | 3,674,016 |
| **LIABILITIES** | | | | | | | | | | | | | |
| Accounts Payable | - | - | - | - | (225) | - | - | 3,606 | 45,776 | 18,321 | - | - | - |
| Accrued Expenses/Deferred Revenue | - | - | - | 2,432,642 | - | - | - | - | 7,068 | 6,365 | 60,346 | 1,663 | 6,038 |
| Total AP, Accruals, Deferred Revenue | - | - | - | 2,432,642 | (225) | - | - | 3,606 | 52,844 | 24,687 | 60,346 | 1,663 | 6,038 |
| Organization Accounts | - | 22,546 | (18,071) | - | 297,285 | 35,567 | 4,509 | 21,074 | 30,762 | - | 1,498,944 | 102,973 | 17,742 |
| Total Funds Held for Others | - | 22,546 | (18,071) | - | 297,285 | 35,567 | 4,509 | 21,074 | 30,762 | - | 1,498,944 | 102,973 | 17,742 |
| Extra-Diocesan Collections | 1,328 | 6,027 | 37,523 | - | - | 772 | 5,188 | 175 | - | - | 10,394 | 9,561 | - |
| Total Extra-Diocesan Collections | 1,328 | 6,027 | 37,523 | - | - | 772 | 5,188 | 175 | - | - | 10,394 | 9,561 | - |
| ANO Balance Due per Customer Statement | 16,262 | 16,400 | 11,794 | 3,207 | 90,728 | 34,891 | 64,154 | 218 | - | - | 103,231 | 403 | - |
| Adjustment Added | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Parish Share Assessment Future Expense | - | - | - | - | - | - | - | (5,763) | - | - | - | - | - |
| Flood Assessment Future Expense | (7,934) | - | - | - | - | - | (9,097) | (5,763) | - | - | - | (9,445) | - |
| Total Assessment Liabilities | 8,328 | 16,400 | 11,794 | 3,207 | 90,728 | 34,891 | 55,057 | (5,545) | - | - | 103,231 | (9,042) | - |
| Payroll taxes payable | - | - | 9,760 | 209,605 | 130,119 | - | - | - | - | - | - | (895) | - |
| Total Payroll Liabilities | - | - | 9,760 | 209,605 | 130,119 | - | - | - | - | - | - | (895) | - |
| Loans - Archdiocesan | - | - | - | - | - | - | 254,641 | - | - | - | - | - | - |
| Total Long-Term Liabilities | - | - | - | - | - | - | 254,641 | - | - | - | - | - | - |
| Total Liabilities | 9,656 | 44,972 | 41,006 | 2,645,454 | 517,907 | 71,230 | 319,395 | 19,310 | 83,606 | 24,687 | 1,672,915 | 104,259 | 23,780 |
| **NET ASSETS** | | | | | | | | | | | | | |
| Net Assets (Retained Earnings) | 97,072 | 651,635 | 532,525 | 2,884,871 | 6,780,131 | 353,290 | (143,165) | 476,447 | 7,061,041 | 1,820,920 | 10,446,899 | 2,932,173 | 3,650,236 |
| Net Assets (Retained Earnings) - Restricted | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Net Assets | 97,072 | 651,635 | 532,525 | 2,884,871 | 6,780,131 | 353,290 | (143,165) | 476,447 | 7,061,041 | 1,820,920 | 10,446,899 | 2,932,173 | 3,650,236 |
| Total Liabilities and Net Assets | 106,729 | 696,607 | 573,531 | 5,530,324 | 7,298,038 | 424,520 | 176,230 | 495,757 | 7,144,647 | 1,845,606 | 12,119,814 | 3,036,432 | 3,674,016 |

**Additional Debtors, Balance Sheets**
**December 31, 2024**

| | 254 | 255 | 257 | 258 | 259 | 260 | 261 | Merged w/174 | 263 | 264 | 266 | 267 | 268 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | St. Edward the Confessor* | St. Francis Xavier Catholic Church* | St. Louis King of France Catholic Church* | St. Mary Magdalen Church* | St. Angela Merici Church | Saint Philip Neri Church* | Sacred Heart of Jesus Church, Norco* | St. John the Baptist Church, Paradis | St. Thomas, Braithwaite | St Patrick, Port Sulphur* | Our Lady of Grace* | St Peter Church, Reserve* | St Benedict Roman Catholic Church |
| Operating Account | 635,949 | 507,390 | 915,458 | 43,696 | 180,022 | 5,057,353 | 17,234 | | 21,837 | 89,918 | 156,164 | 182,564 | 164,919 |
| Fair Account | - | - | 24,820 | - | - | - | - | | - | - | - | 21,165 | - |
| Payroll Account | - | - | - | 819 | - | - | 79 | | - | - | - | - | 3,394 |
| Charitable Gaming Account | - | - | 37,333 | - | - | - | - | | - | 54,729 | - | 36,244 | - |
| Ministry/Organization Accounts (Total) | 14,246 | 5,965 | 7,671 | 50,370 | 12,059 | - | 10,993 | | 27,408 | 9,192 | 36,272 | 32,013 | 13,175 |
| Petty Cash | 170 | - | - | - | 400 | - | 150 | | - | - | - | - | - |
| PayPal Account | - | - | - | - | - | - | - | | - | - | - | - | 1,371 |
| Archdiocesan Savings Account (Total) | - | - | - | - | - | - | - | | - | - | - | - | - |
| Other Accounts (Total) | - | 560,710 | 1,477,412 | 842,324 | - | - | 69,341 | | 52,937 | 48,867 | 116,249 | 150,976 | - |
| Total Cash | 650,365 | 1,074,064 | 2,462,693 | 937,210 | 192,481 | 5,057,353 | 97,797 | - | 102,182 | 202,706 | 308,685 | 422,962 | 182,859 |
| Archdiocesan Accounts Receivable | 580,423 | 745,330 | - | 11,162 | 1,515,256 | 131,350 | 6,198 | | - | 645,877 | 255,302 | 26,561 | 651,979 |
| Other Receivable | 283,705 | - | 1,482,765 | 15,092 | 418,054 | 2,410 | - | | - | - | - | 11,599 | - |
| Due from/Due to School | - | - | - | - | - | - | - | | - | - | - | - | - |
| Due from/to others | - | - | - | - | - | - | - | | - | - | - | - | - |
| Prepaid expenses | - | - | - | 6,695 | - | - | - | | - | - | - | - | - |
| Hurricane Ida Insurance Receivable | - | - | - | - | - | - | - | | - | - | - | - | - |
| Other current assets | - | - | - | - | - | - | - | | - | - | - | - | - |
| Total Other Current Assets | 864,128 | 745,330 | 1,482,765 | 32,950 | 1,933,311 | 133,761 | 6,198 | - | - | 645,877 | 255,302 | 38,160 | 651,979 |
| Catholic Foundation Funds | 395,646 | 71,485 | - | - | - | - | - | | - | - | 23,983 | 10,062 | 198,249 |
| Other investments | - | - | - | - | - | - | - | | - | - | - | - | - |
| Total Designated Fund Accounts | 395,646 | 71,485 | - | - | - | - | - | - | - | - | 23,983 | 10,062 | 198,249 |
| Property, plant & equipment, net | 500,000 | 500,000 | 500,000 | 60,000 | 500,000 | 500,000 | 60,000 | - | 60,000 | 60,000 | 60,000 | 310,000 | 60,000 |
| Notes Receivable | - | - | - | - | - | - | - | | - | - | - | - | - |
| Total Notes Receivable | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Assets | 2,410,139 | 2,390,878 | 4,445,459 | 1,030,160 | 2,625,792 | 5,691,114 | 163,995 | - | 162,182 | 908,582 | 647,970 | 781,184 | 1,093,087 |
| LIABILITIES | | | | | | | | | | | | | |
| Accounts Payable | 24,689 | - | (3,290) | 2,134 | 8,116 | - | - | | 19,254 | - | - | - | - |
| Accrued Expenses/Deferred Revenue | 7,832 | (11,145) | - | - | 19,191 | 41,089 | - | | - | 2,561 | - | - | 416 |
| Total AP, Accruals, Deferred Revenue | 32,520 | (11,145) | (3,290) | 2,134 | 27,306 | 41,089 | - | - | 19,254 | 2,561 | - | - | 416 |
| Organization Accounts | 8,892 | 44,702 | - | 36,867 | - | - | 10,993 | | 47,520 | 9,192 | 36,272 | 89,422 | 13,175 |
| Total Funds Held for Others | 8,892 | 44,702 | - | 36,867 | - | - | 10,993 | - | 47,520 | 9,192 | 36,272 | 89,422 | 13,175 |
| Extra-Diocesan Collections | - | - | - | - | - | - | - | | 3 | 885 | 1,006 | 3,350 | - |
| Total Extra-Diocesan Collections | - | - | - | - | - | - | - | - | 3 | 885 | 1,006 | 3,350 | - |
| ANO Balance Due per Customer Statement | - | 1,544 | 1,177 | 325 | - | - | 7,501 | | - | 40,549 | - | 77,115 | - |
| Adjustment Added | - | - | - | - | - | - | - | | - | - | - | - | - |
| Parish Share Assessment Future Expense | - | - | - | - | - | - | - | | 72,652 | - | 35,208 | - | - |
| Flood Assessment Future Expense | - | - | - | - | - | - | - | | (13,554) | (10,960) | (2,818) | - | - |
| Total Assessment Liabilities | - | 1,544 | 1,177 | 325 | - | - | 7,501 | - | 59,098 | 29,589 | 32,390 | 77,115 | - |
| Payroll taxes payable | - | 778 | - | - | (253) | - | - | | - | - | - | - | 156 |
| Total Payroll Liabilities | - | 778 | - | - | (253) | - | - | - | - | - | - | - | 156 |
| Loans - Archdiocesan | - | - | - | - | - | - | - | | 260,849 | - | - | 397,160 | - |
| Total Long-Term Liabilities | - | - | - | - | - | - | - | - | 260,849 | - | - | 397,160 | - |
| Total Liabilities | 41,412 | 35,878 | (2,113) | 39,326 | 27,054 | 41,089 | 18,494 | - | 386,723 | 42,228 | 69,668 | 567,203 | 13,590 |
| NET ASSETS | | | | | | | | | | | | | |
| Net Assets (Retained Earnings) | 2,368,727 | 2,354,999 | 4,447,572 | 990,834 | 2,598,738 | 5,650,025 | 145,501 | | (224,541) | 866,355 | 578,302 | 213,982 | 1,079,497 |
| Net Assets (Retained Earnings) - Restricted | - | - | - | - | - | - | - | | - | - | - | - | - |
| Total Net Assets | 2,368,727 | 2,354,999 | 4,447,572 | 990,834 | 2,598,738 | 5,650,025 | 145,501 | - | (224,541) | 866,355 | 578,302 | 213,982 | 1,079,497 |
| Total Liabilities and Net Assets | 2,410,139 | 2,390,878 | 4,445,459 | 1,030,160 | 2,625,792 | 5,691,114 | 163,995 | - | 162,182 | 908,582 | 647,970 | 781,184 | 1,093,087 |

| | 269 | 270 | 271 | 272 | 273 | 274 | 275 | Merged w/175 | 277 | Merged w/173 | 280 | 286 | 287 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Additional Debtors, Balance Sheets December 31, 2024** | St Bernard Catholic Church* | St. Margaret Mary Slidell* | Our Lady of Lourdes, Slidell* | St Peter and Paul* | Our Lady of the Holy Rosary Hahnville* | Christ the King Church* | Our Lady of Lourdes Violet* | Our Lady of the Angels | Our Lady of Prompt Succor Roman Catholic Church. Westwego* | St John Bosco | Divine Mercy Parish* | St Luke the Evangelist Church* | Center of Jesus the Lord |
| Operating Account | 6,120 | 99,558 | 213,848 | 52,916 | 120,534 | 115,620 | 2,909 | | 319,856 | | 797,623 | 370,563 | 31,253 |
| Fair Account | 37,066 | - | - | - | - | 122,373 | - | | 81,950 | | 57,579 | - | - |
| Payroll Account | - | - | - | - | - | - | - | | - | | - | - | - |
| Charitable Gaming Account | - | - | - | - | - | 51,632 | - | | 100 | | 10,950 | - | - |
| Ministry/Organization Accounts (Total) | 72,546 | 62,934 | 12,257 | 41,664 | 41,299 | 12,998 | - | | 49,820 | | 189,351 | 101,727 | - |
| Petty Cash | - | 100 | - | - | - | - | 100 | | 338 | | - | - | - |
| PayPal Account | - | - | - | - | - | - | - | | - | | - | - | - |
| Archdiocesan Savings Account (Total) | - | - | - | - | - | - | - | | - | | - | - | - |
| Other Assets (Total) | 3,206 | 114,010 | 814,199 | 51,817 | 49,436 | - | 6,498 | | 1,179 | | 1,384,366 | 25,148 | - |
| **Total Cash** | **118,938** | **276,601** | **1,040,305** | **146,397** | **211,269** | **302,625** | **9,507** | | **453,244** | | **2,439,869** | **497,439** | **31,253** |
| Archdiocesan Accounts Receivable | 126,970 | - | 279,385 | 56,793 | 630,073 | 19,123 | 1,383 | | 101,259 | | 1,370,072 | 93,330 | 130,131 |
| Other Receivable | - | 852,695 | 679,482 | - | - | - | - | | 255,874 | | 779,655 | - | - |
| Due from/Due to School | - | - | - | - | - | 30 | - | | - | | - | - | - |
| Due from/to others | - | - | - | - | 9,691 | - | - | | 48,604 | | - | - | - |
| Prepaid expenses | - | - | - | - | - | - | - | | - | | 13,492 | 40,894 | - |
| Hurricane Ida Insurance Receivable | - | - | - | - | - | - | - | | - | | - | - | - |
| Other current assets | - | - | 0 | - | - | - | - | | (4,350) | | - | - | - |
| **Total Other Current Assets** | **126,970** | **852,695** | **958,866** | **56,793** | **639,763** | **19,153** | **1,383** | | **401,387** | | **2,163,219** | **134,224** | **130,131** |
| Catholic Foundation Funds | 9,899 | - | - | - | - | 22,961 | - | | - | | 146,654 | 595,524 | - |
| Other investments | - | 645,736 | - | - | - | - | - | | - | | - | - | - |
| **Total Designated Fund Accounts** | **9,899** | **645,736** | **-** | **-** | **-** | **22,961** | **-** | | **-** | | **146,654** | **595,524** | **-** |
| Property, plant & equipment, net | 60,000 | 500,000 | 500,000 | 60,000 | 60,000 | 60,000 | 60,000 | - | 310,000 | - | 560,000 | 60,000 | 60,000 |
| Notes Receivable | - | - | - | - | - | - | - | | - | | - | - | - |
| **Total Notes Receivable** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | | **-** | | **-** | **-** | **-** |
| **Total Assets** | **315,807** | **2,275,033** | **2,499,171** | **263,190** | **911,032** | **404,739** | **70,890** | **-** | **1,164,631** | **-** | **5,309,742** | **1,287,187** | **221,384** |
| **LIABILITIES** | | | | | | | | | | | | | |
| Accounts Payable | - | - | - | - | 75 | 1,093 | - | | 265,600 | | 11,771 | - | - |
| Accrued Expenses/Deferred Revenue | - | (9,975) | 32,105 | - | - | - | - | | 87,428 | | 4,950 | - | - |
| **Total AP, Accruals, Deferred Revenue** | **-** | **(9,975)** | **32,105** | **-** | **75** | **1,093** | **-** | | **353,028** | | **16,721** | **-** | **-** |
| Organization Accounts | 64,674 | 81,711 | - | - | 41,350 | 12,998 | - | | 61,554 | | 193,021 | 661,711 | - |
| **Total Funds Held for Others** | **64,674** | **81,711** | **-** | **-** | **41,350** | **12,998** | **-** | | **61,554** | | **193,021** | **661,711** | **-** |
| Extra-Diocesan Collections | - | - | - | 5,266 | 19,615 | 1,365 | 502 | | 1,081 | | 38,457 | 1,800 | 2,367 |
| **Total Extra-Diocesan Collections** | **-** | **-** | **-** | **5,266** | **19,615** | **1,365** | **502** | | **1,081** | | **38,457** | **1,800** | **2,367** |
| ANO Balance Due per Customer Statement | 764 | 1,436 | - | 49,736 | 302 | 358,368 | 4,092 | | - | | 160,244 | - | 5,267 |
| Adjustment Added | - | - | - | - | - | - | - | | - | | - | - | - |
| Parish Share Assessment Future Expense | - | - | - | - | - | - | - | | - | | - | 88,379 | - |
| Flood Assessment Future Expense | (2,186) | - | - | - | (6,359) | - | - | | (12,940) | | - | (15,462) | - |
| **Total Assessment Liabilities** | **(1,423)** | **1,436** | **-** | **49,736** | **(6,057)** | **358,368** | **4,092** | | **(12,940)** | | **160,244** | **72,917** | **5,267** |
| Payroll taxes payable | - | (113) | - | (46,289) | - | - | - | | - | | 1,213 | - | - |
| **Total Payroll Liabilities** | **-** | **(113)** | **-** | **(46,289)** | **-** | **-** | **-** | | **-** | | **1,213** | **-** | **-** |
| Loans - Archdiocesan | - | - | 35,137 | - | - | 338,544 | 856,045 | | 2,024,829 | | 14,608,497 | - | 406,243 |
| **Total Long-Term Liabilities** | **-** | **-** | **35,137** | **-** | **-** | **338,544** | **856,045** | | **2,024,829** | | **14,608,497** | **-** | **406,243** |
| **Total Liabilities** | **63,251** | **73,059** | **67,242** | **8,713** | **54,983** | **712,368** | **860,639** | | **2,427,552** | | **15,018,153** | **736,428** | **413,877** |
| **NET ASSETS** | | | | | | | | | | | | | |
| Net Assets (Retained Earnings) | 252,556 | 2,201,973 | 2,431,929 | 254,478 | 856,049 | (307,629) | (789,749) | | (1,262,922) | | (9,708,411) | 531,280 | (192,493) |
| Net Assets (Retained Earnings) - Restricted | - | - | - | - | - | - | - | | - | | - | 19,478 | - |
| **Total Net Assets** | **252,556** | **2,201,973** | **2,431,929** | **254,478** | **856,049** | **(307,629)** | **(789,749)** | **-** | **(1,262,922)** | **-** | **(9,708,411)** | **550,759** | **(192,493)** |
| **Total Liabilities and Net Assets** | **315,807** | **2,275,033** | **2,499,171** | **263,190** | **911,032** | **404,739** | **70,890** | | **1,164,631** | | **5,309,742** | **1,287,187** | **221,384** |

111

Additional Debtors, Balance Sheets
December 31, 2024

| | 288 | 290 | 291 | 292 | 293 | 294 | 297 | 298 | 299 | 361 | 511 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Most Holy Trinity | Mary Queen of Vietnam Parish | St Joachim* | Assumption of Mary | St John of the Cross | St Agnes Le Thi Thanh | St Joseph Church Algiers* | Mary Queen od Peace Church | Our Lady of La Vang | Hanmaum | Our Lady of Mount Carmel |
| Operating Account | 47,975 | 63,539 | 19,596 | 152,119 | 74,160 | 39,348 | 52,786 | 1,475,028 | 66,152 | 58,126 | 180,209 |
| Fair Account | - | 40,987 | - | - | - | - | 236,265 | - | - | - | - |
| Payroll Account | - | - | - | - | - | - | - | - | - | - | - |
| Charitable Gaming Account | - | 2,130 | - | - | - | - | - | 351 | - | - | 100 |
| Ministry/Organization Accounts (Total) | 61,598 | 75,405 | 19,470 | - | 70,063 | - | - | 67,441 | - | - | - |
| Petty Cash | - | - | 300 | - | 200 | - | - | 35 | - | - | - |
| PayPal Account | - | - | - | - | - | - | - | - | - | - | - |
| Archdiocesan Savings Account (Total) | - | - | - | - | - | - | - | - | - | 152,508 | - |
| Other Accounts (Total) | 437,900 | 418,270 | 116,257 | - | - | 52,976 | - | 30,650 | 289,383 | - | - |
| Total Cash | 547,472 | 600,330 | 155,623 | 152,119 | 144,423 | 92,324 | 289,051 | 1,573,505 | 355,535 | 210,633 | 180,309 |
| | | | | | | | | | | | |
| Archdiocesan Accounts Receivable | 159,441 | 5,863,566 | 148 | 536,389 | 4,576 | 1,729,822 | 832,537 | 2,244,671 | 1,175,088 | | |
| Other Receivable | - | - | - | 450 | - | - | - | 517,789 | - | - | - |
| Due from/Due to School | - | - | - | - | - | - | - | (5,006) | - | - | - |
| Due from/to others | - | - | - | - | - | - | - | 20,400 | - | - | - |
| Prepaid expenses | - | 47,180 | - | - | - | - | - | - | - | - | - |
| Hurricane Ida Insurance Receivable | - | - | - | - | - | - | - | - | - | - | - |
| Other current assets | - | - | - | - | - | - | - | (35) | - | - | - |
| Total Other Current Assets | 159,441 | 5,910,746 | 148 | 536,839 | 4,576 | 1,729,822 | 832,537 | 2,777,819 | 1,175,088 | - | - |
| | | | | | | | | | | | |
| Catholic Foundation Funds | 409,299 | - | - | - | - | - | - | 5,851 | - | - | - |
| Other investments | - | - | - | - | - | - | - | - | - | - | - |
| Total Designated Fund Accounts | 409,299 | - | - | - | - | - | - | 5,851 | - | - | - |
| | | | | | | | | | | | |
| Property, plant & equipment, net | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 560,000 | 60,000 | - | 60,000 |
| | | | | | | | | | | | |
| Notes Receivable | - | - | - | - | - | - | - | - | - | - | - |
| Total Notes Receivable | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| Total Assets | 1,176,213 | 6,571,076 | 215,771 | 748,957 | 208,999 | 1,882,146 | 1,181,588 | 4,917,175 | 1,590,623 | 210,633 | 240,309 |
| | | | | | | | | | | | |
| LIABILITIES | | | | | | | | | | | |
| | | | | | | | | | | | |
| Accounts Payable | - | 3,050 | 2,485 | - | - | - | - | - | - | - | - |
| Accrued Expenses/Deferred Revenue | - | - | - | - | - | - | - | 1,414,926 | 10,154 | - | 2,462 |
| Total AP, Accruals, Deferred Revenue | - | 3,050 | 2,485 | - | - | - | - | 1,414,926 | 10,154 | - | 2,462 |
| | | | | | | | | | | | |
| Organization Accounts | 61,598 | 73,565 | 10,446 | - | - | - | - | - | - | - | - |
| Total Funds Held for Others | 61,598 | 73,565 | 10,446 | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| Extra-Diocesan Collections | (4,586) | 6,970 | - | - | - | 9,333 | (11,641) | 16,169 | 809 | - | 122 |
| Total Extra-Diocesan Collections | (4,586) | 6,970 | - | - | - | 9,333 | (11,641) | 16,169 | 809 | - | 122 |
| | | | | | | | | | | | |
| ANO Balance Due per Customer Statement | 673 | 1,263 | - | 14 | - | (244) | 50 | 1,739 | - | 9,410 | 69 |
| Adjustment Added | - | - | - | - | - | - | - | - | - | - | - |
| Parish Share Assessment Future Expense | - | - | 3,680 | - | - | - | - | - | - | - | - |
| Flood Assessment Future Expense | - | (8,649) | - | - | - | - | - | - | - | - | - |
| Total Assessment Liabilities | 673 | (7,386) | 3,680 | 14 | - | (244) | 50 | 1,739 | - | 9,410 | 69 |
| | | | | | | | | | | | |
| Payroll taxes payable | 10,049 | - | - | - | - | - | - | - | - | - | (885) |
| Total Payroll Liabilities | 10,049 | - | - | - | - | - | - | - | - | - | (885) |
| | | | | | | | | | | | |
| Loans - Archdiocesan | 13,174,851 | - | - | - | 451,763 | - | - | - | - | 389,000 | - |
| Total Long-Term Liabilities | 13,174,851 | - | - | - | 451,763 | - | - | - | - | 389,000 | - |
| | | | | | | | | | | | |
| Total Liabilities | 13,242,585 | 76,198 | 16,611 | 14 | 451,763 | 9,089 | (11,592) | 1,432,833 | 10,963 | 398,410 | 1,768 |
| | | | | | | | | | | | |
| NET ASSETS | | | | | | | | | | | |
| Net Assets (Retained Earnings) | (12,072,804) | 6,494,878 | 199,160 | 748,943 | (242,763) | 1,873,058 | 1,193,180 | 3,484,341 | 1,579,660 | (187,777) | 238,541 |
| Net Assets (Retained Earnings) - Restricted | 6,432 | - | - | - | - | - | - | - | - | - | - |
| Total Net Assets | (12,066,372) | 6,494,878 | 199,160 | 748,943 | (242,763) | 1,873,058 | 1,193,180 | 3,484,341 | 1,579,660 | (187,777) | 238,541 |
| | | | | | | | | | | | |
| Total Liabilities and Net Assets | 1,176,213 | 6,571,076 | 215,771 | 748,957 | 208,999 | 1,882,146 | 1,181,588 | 4,917,175 | 1,590,623 | 210,633 | 240,309 |

| Additional Debtors, Balance Sheets<br>December 31, 2024 | | Total |
|---|---|---|
| Operating Account | $ | 42,155,317.07 |
| Fair Account | $ | 985,139.42 |
| Payroll Account | $ | 759,722.80 |
| Charitable Gaming Account | $ | 1,314,146.26 |
| Ministry/Organization Accounts (Total) | $ | 5,401,406.15 |
| Petty Cash | $ | 18,145.49 |
| PayPal Account | $ | 1,370.89 |
| Archdiocesan Savings Account (Total) | $ | 4,930,392.62 |
| Other Accounts (Total) | $ | 43,411,983.59 |
| Total Cash | $ | 98,977,624.29 |
| | | |
| Archdiocesan Accounts Receivable | $ | 68,997,064.12 |
| Other Receivable | $ | 24,896,987.92 |
| Due from/Due to School | $ | 27,553.34 |
| Due from/to others | $ | 1,261,783.88 |
| Prepaid expenses | $ | 1,578,541.16 |
| Hurricane Ida Insurance Receivable | $ | 304,282.69 |
| Other current assets | $ | 12,324,843.08 |
| Total Other Current Assets | $ | 109,391,056.19 |
| | | |
| Catholic Foundation Funds | $ | 86,413,260.41 |
| Other investments | $ | 2,792,500.81 |
| Total Designated Fund Accounts | $ | 89,205,761.22 |
| | | |
| Property, plant & equipment, net | $ | 97,197,055.00 |
| | | |
| Notes Receivable | $ | 9,500,000.00 |
| Total Notes Receivable | $ | 9,500,000.00 |
| | | |
| Total Assets | $ | 404,271,496.70 |
| | | |
| LIABILITIES | | |
| | | |
| Accounts Payable | $ | 3,060,557.64 |
| Accrued Expenses/Deferred Revenue | $ | 19,400,129.97 |
| Total AP, Accruals, Deferred Revenue | $ | 22,460,687.61 |
| | | |
| Organization Accounts | $ | 6,696,269.06 |
| Total Funds Held for Others | $ | 6,696,269.06 |
| | | |
| Extra-Diocesan Collections | $ | 391,901.32 |
| Total Extra-Diocesan Collections | $ | 391,901.32 |
| | | |
| ANO Balance Due per Customer Statement | $ | 3,970,339.93 |
| Adjustment Added | $ | 104,801.27 |
| Parish Share Assessment Future Expense | $ | 509,564.39 |
| Flood Assessment Future Expense | $ | (289,911.21) |
| Total Assessment Liabilities | $ | 4,294,794.38 |
| | | |
| Payroll taxes payable | $ | 2,989,900.27 |
| Total Payroll Liabilities | $ | 2,989,900.27 |
| | | |
| Loans - Archdiocesan | $ | 47,540,913.55 |
| Total Long-Term Liabilities | $ | 47,540,913.55 |
| | | |
| Total Liabilities | $ | 84,374,466.19 |
| | | |
| NET ASSETS | | |
| Net Assets (Retained Earnings) | $ | 283,556,651.30 |
| Net Assets (Retained Earnings) - Restricted | $ | 36,340,379.84 |
| Total Net Assets | $ | 319,897,031.14 |
| | | |
| Total Liabilities and Net Assets | $ | 404,271,497.33 |

113

# EXHIBIT 5

# Liquidation Analysis of the Additional Debtors

### LIQUIDATION ANALYSIS EXECUTIVE SUMMARY

As referenced in section 10.03 of the Disclosure Statement, the Debtor and Additional Debtors must meet the requirements of the "Best Interest of Creditors Test," which requires a comparison of distributions under the Joint Plan to a hypothetical liquidation under chapter 7 of the Bankruptcy Code. The Debtor and Additional Debtors must obtain the consent of all creditors in all impaired classes *or* must show that all impaired creditors are receiving at least as much as such creditors would receive in a hypothetical liquidation under chapter 7. In order to show this comparison, the Debtor and Additional Debtors have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**"), based on certain estimates and assumptions and prepared by Keegan Linscott & Associates, PC. While the Debtor and Additional Debtors consider these estimates and assumptions to be reasonable under the circumstances, all estimates and assumptions are inherently subject to significant uncertainties (economic, operations, legal, natural disasters, etc.), and the Debtor and Additional Debtors cannot guarantee that these values would come to fruition in an actual chapter 7 liquidation.

The following numbers are based on the latest numbers available for the Debtor and Additional Debtors as of June 30, 2025 (the "**Liquidation Date**"). It is assumed for all purposes below that on the Liquidation Date, the Bankruptcy Court would appoint chapter 7 trustees for both the Debtor and the Additional Debtors to begin the process of liquidating the Debtor's and Additional Debtors' assets in order to distribute the proceeds from the liquidation to the various creditors of the Debtor and Additional Debtors in accordance with the priority scheme contained in the Bankruptcy Code.

The Liquidation Analysis assumes that the chapter 7 trustees will retain certain professionals to assist them with the liquidation process, including legal counsel (for bankruptcy purposes and litigation of Abuse Claims), accounting professionals, brokers, and real estate agents. Further, it is assumed that the liquidation process would take five years to complete, taking into account the loss of key personnel, the nature of a forced and rushed sale process, the restrictive use/nature of some of the Debtor's and Additional Debtors' assets that would limit the pool of potential buyers, and the protracted litigation of Abuse Claims and potential contribution and indemnity claims. The immediate closing of the Debtor's and Additional Debtors' operations and the forced layoffs of all personnel would also likely trigger potential employee claims (severance and WARN Act claims). These fees and expenses would be entitled to administrative and priority status, which would be paid prior to any payout to general unsecured creditors. Also included in these costs and fees are fees owed to the U.S. Trustee and Clerk of the Bankruptcy Court. In addition, the chapter 7 trustees will be entitled to a percentage of funds that are distributed to creditors, estimated at 3%.

Many of the available assets of the Debtor and Additional Debtors come from donors and are subject to donor restrictions, thereby preventing those assets from being used to pay any Abuse Claims or any Claims other than those for which they were designated. This is true in both a chapter 11 and a chapter 7 liquidation. However, there has been dispute in this case over which funds are truly restricted and which are not. A GAAP analysis has been used to value restricted funds. The Joint Plan avoids that issue through an agreed-upon payment amount into the Settlement Trust

{00383827-9}

115

while a chapter 7 liquidation would likely restart that dispute, resulting in further litigation fees and costs.

Although both the Debtor and the Additional Debtors have insurance policies that may cover many of the claims against the Debtor and Additional Debtors (both Abuse Claims and Non-Abuse Claims), neither the Debtor Liquidation Analysis nor the Additional Debtors Liquidation Analysis includes recovery from insurance proceeds or the sale of the Debtor's or Additional Debtors' interest in certain insurance policies. Any potential sale of the policies or ability of a chapter 7 trustee to monetize a claim against an insurance carrier is entirely speculative. As such, no value has been ascribed to the so-called "insurance assets" in the hypothetical chapter 7 liquidation. The Joint Plan, on the other hand, monetizes some of these assets through settlements with the Settling Insurers using a policy buyback. The Debtor and Additional Debtors also have assigned their respective interests in the policies with the Non-Settling Insurers to the Settlement Trust for the benefit of the Abuse Claimants.

The liquidation analysis assumes no contributions from insurance or third-party payments for the Abuse Claims because such payments are speculative and would be considered "collateral sources of recovery." The insurance policies are deemed to have no value for purposes of this liquidation analysis because:

a)  outside of a chapter 11 case, the Abuse Claimants will have a direct right of action against the insurers under Louisiana law;
b)  there are over 150 insureds (including the Debtor and Additional Debtors), and outside of the Joint Plan, there is no ability to allocate insurance payouts among the insured entities;
c)  SPARTA is in a precarious financial condition and may not repurchase its policies at all;
d)  noticing and providing due process to claimants who have claims against the insurance policies would be cost prohibitive in a chapter 7 liquidation;
e)  coverage issues that may exist; and
f)  the estate cannot sue the insurers and obtain the proceeds of the policies because the policies are indemnity policies.

The liquidation analysis also assumes no contributions from third parties to offset liability for the Abuse Claims. The reasons are the following:

a)  There are potential coverage issues and solvency issues of insurers;
b)  The Non-Debtor Catholic Entities have no exposure for Abuse Claims; and
c)  No information is available concerning religious orders' ability to pay or applicable insurance coverage. Prior to the bankruptcy filing, the orders provided minimal funds to pay claims.

The liquidation analysis of the Additional Debtors excludes the assets of any Additional Debtors who have not had claims filed against them by any of the applicable bar dates. In a hypothetical chapter 7 liquidation, the assets of those entities would not be available to Abuse

Claimants in the other cases. In the Joint Plan, the Additional Debtors all contribute to the Settlement Trust regardless of whether an Additional Debtor has claims against it or not.

There is no value attributed to a potential single business enterprise claim being asserted by or against the Debtor, the Additional Debtors, and the Non-Debtor Catholic Entities. Each of the Additional Debtors and the Non-Debtor Catholic Entities does not comingle money against between entities, and has separate bank accounts, separate EIN numbers, separate employees, and separate boards of directors. Some of the Additional Debtors and Non-Debtor Catholic Entities have audited financial statements and other indicia of separateness, making the success of a single business enterprise claim highly speculative at best.

Both the Debtor and Additional Debtors have "executory contracts" with certain counterparties that will either be assumed during the bankruptcy (meaning the Debtor/Additional Debtors will continue to perform under the contracts) or will "ride through" the bankruptcy unaffected with the same outcome. In a chapter 7 liquidation, however, those executory contracts would all be rejected by the chapter 7 trustee, and the counterparties would have claims for rejection damages, to be paid *pari pasu* with the other general unsecured creditors, further diminishing the payout under a liquidation analysis.

The value of the Abuse Claims in the liquidation analysis represents the midpoint of a report by Stout Risius Ross, LLC, the Committee's expert consultant on sexual abuse. I have not seen the report, and the number I have used was provided to me orally based on a range of $752 million to $1.69 billion. I understand that the report will be updated, and I will adjust my liquidation analysis based upon my review of the final report.

### Debtor (Archdiocese) Liquidation Analysis

In a hypothetical liquidation, the Debtor estimates that the total value that would be available to unsecured creditors (including Abuse Claimants) is **$209,230,813**. The total unsecured claims amount is projected to be **$1,429,299,271**, resulting in a *pro rata* recovery of **14.6%**. As stated above, this Liquidation Analysis excludes contributions to be made by the Settling Insurers, whereas under the Joint Plan, the Setting Insurers are contributing $29,275,000 to the Settlement Trust.

The Archdiocese hypothetical liquidation also excludes approximately $60,000,000 in contributions from the Additional Debtors, $5,000,000.00 from the Non-Debtor Catholic Entities, and the proceeds from the sale of the Affordable Housing Facilities estimated to be between $65,000,000 and $80,000,000.

The sale of non-church real estate owned by the Archdiocese assumes a bulk sale discount of 15% and accounts for the fact that the chapter 7 trustee would incur costs to hold the property until sale and address deferred maintenance for the properties. The assumed purchase price also accounts for an internal rate of return for a buyer on its investment.

Churches have been valued for liquidation at $100,000 per church. The sale of churches presents challenges and costs that do not exist with other properties. For example, any potential buyer would have to account for: a) the historic designation of some of the churches; b) the costs

{00383827-9}

117

of repurposing the properties; c) litigation over repurposing; d) re-zoning issues; e) IRS issues related to the sale of property of a 501(c)(3) to a for-profit entity; f) state law limitations; and g) First Amendment and other religious freedom issues that may impair the sale of the church. Indeed, a recent article in THE ADVOCATE indicates that a large number of churches and schools on the market have not been sold due to difficulties in the market and with these particular properties. The article is available at https://www.nola.com/news/business/la-agencies-struggle-to-sell-real-estate-in-slow-market/article_d6da3501-f71c-4a63-a979-1c8de98e4bfa.html.

The below estimates are based upon numbers available to the Debtor as of June 30, 2025.

**Available Assets.** The additional assets included in the liquidation scenario include the following: unrestricted cash and cash equivalents on hand; accounts receivable; accounts receivable from tuition and fees; loans receivable; unrestricted investments; inventory; real property; vehicles; furniture and fixtures; and art and collectibles. Grants are excluded from the liquidation value, as are certain prepaid expenses of the Debtor and pledges receivable because they would not be available to a chapter 7 trustee.

Unrestricted Cash and Cash Equivalents: The Debtor expects a 100% recovery on unrestricted cash and cash equivalents in a chapter 7 liquidation. As of the Liquidation Date, the Debtor holds approximately $68,622,085 in unrestricted cash and cash equivalents.

Accounts and Loans Receivable: The accounts receivable are comprised of third-party receivables as well as Archdiocesan Agency and Archdiocesan Parish assessments. The delinquency of the assessments has increased in recent years. In addition, under the hypothetical liquidation for the Additional Debtors, there is only expected to be a payout approximating 12.6%, which would include payments to the Debtor for their accounts receivable. The Debtor does not anticipate a full recovery in a chapter 7 liquidation, and accounts receivable have been discounted to 50% of their book value. Loans receivable from certain affiliates are discounted to 25% of the book value. If the Additional Debtors filed for relief, the notes and assessments due from the Additional Debtors would be unsecured claims against the Additional Debtors' estates, and the recovery would approximate 12.6% due to the size of the Abuse Claims.

Accounts Receivable – Tuition and Fees: These receivables are related to pre-billed tuition for the Debtor's schools for the 2025-2026 school year. In effect, the Debtor grosses up its balance sheet by booking accounts receivable and deferred revenue. Because these amounts are offset by deferred revenue in the liquidation analysis, they are included in their entirety.

Inventory and Other Assets: Inventory and certain other assets are discounted to 50% of the book value. Inventory consists of food and other supply-type items at the Debtor's high schools which would yield very little in a liquidation.

Real Property: Real property values are discounted to $100,000,000 in a liquidation scenario. This liquidation value was estimated based on an approximate 40% reduction to the Fair Market Value (FMV) of the Debtor's property. The FMV of the properties was determined based on independent third-party appraisals. The 40% reduction to arrive at liquidation value considers the approximate 1200 properties from the Debtor and Additional Debtors in a hypothetical

liquidation that would flood the market and depress sales value. The reduction also recognizes the need for a potential bulk sale of certain properties and a five-year term over which the properties would be sold. The reduction further considers the commission and closing costs for the properties. Church real property has been discounted to $100,000 per church to account for the issues related to the sale of a church and costs attributable to readying the property for sale.

Other Fixed Assets, Artwork and Religious Items:  Vehicles values are based on the Kelly Blue Book value. Furniture and fixtures values are based on 15% of net book value.  Art and collectibles values are based on appraised values from third-party appraisers.

Investments: The Debtor records investments in its books for investments held in Portfolio A and Portfolio B. Portfolio A investments are held by the Catholic Community Foundation, and the Debtor records a contra-account in its books for investments of third parties. The Debtor's total investments in Portfolio A as of the Liquidation Date are $113,652,955. The value of the Debtor's investments in Portfolio A is based upon the most recent unitization report that is a mark-to-market value for the Investments of the Debtor.  It is largely prepared by the Catholic Community Foundation based upon information provided by its investment advisors at the end of each month. The Debtor's investments are segregated between restricted and unrestricted funds.  All restricted fund investments are excluded entirely from the liquidation value. The Debtor expects a 100% recovery on unrestricted investments in Portfolio A under a chapter 7 liquidation.

Portfolio B investments relate to the funds invested under the Debtor's Deposit and Loan Program. The Debtor has $23,221,806 in investments as of the Liquidation Date, which is expected to be fully realized in a liquidation. The Debtor has an obligation to the depositors under this program, and there is a deficiency to the depositors in the amount of $111,924,355, which is reflected in the liquidation analysis.

Prepaid Expenses: The Debtor's administrative offices and high schools have certain prepaid expenses related to insurance, professional fees, and tuition-related matters. In a liquidation scenario, the Debtor does not expect to realize any refund of these amounts because the expense amounts will generally continue during the Chapter 11 and be worked off over time, and the tuition amounts will be offset against deferred revenue.

Pledges Receivable: The Debtor has certain pledges from donors that have not been collected as of the Liquidation Date. Because the Debtor will cease operations in a liquidation, it is not expected that donors will fulfill and pay their pledges, as the activities the donor is supporting will no longer exist.

Beneficial Interest in Charitable Remainder Trust: The Debtor is a named beneficiary in a Trust administered by a third party. If the Debtor liquidates, it is assumed the Debtor will be removed as a beneficiary of that Trust, which will result in no value for the Debtor.

Excluded Assets: The Debtor does not expect any recovery from grants receivable because the nature of the grant can no longer be fulfilled when the Debtor stops operations. The Debtor also does not expect to recover any funds from its equity investment in the CUP (Catholic Umbrella Pool).

{00383827-9}

119

**Additional Administrative Costs.** Administrative costs in a chapter 7 liquidation include chapter 7 trustee fees, professional fees, shut-down costs, and residual costs and fees from the chapter 11.

Chapter 7 trustee fees are estimated at 3% of the available assets for distribution, excluding any recovery from insurance proceeds, or $7,646,314. Further, chapter 7 professional fees are estimated at $12,000,000, which assumes a five-year liquidation process and fees related to: pursuing and litigating claims against other Catholic organizations for contributions or indemnification; litigating Abuse Claims; and legal fees associated with asset liquidation.

The liquidation costs also include what are termed "shut-down costs." These costs primarily include the personnel and property-related costs needed to close and fully liquidate the Debtor's operations and assets over the five-year anticipated shut-down period. From a personnel perspective, it is anticipated that the Debtor will be subject to the WARN Act and will incur significant costs for these claims. It is also anticipated that the Debtor will need to retain existing personnel for varying periods of time to assist the chapter 7 trustee in the areas of accounting and finance, IT, legal, property, repair and maintenance, insurance and risk management, and archives. From a property perspective, costs will include property, casualty, and liability insurance for the properties based on the properties being empty and shuttering the properties, ensuring security at the properties to protect them from vandalism and vagrancy, utility costs, and some repair and maintenance costs. It is expected that the properties will be subject to property taxes because they will no longer be exempt. The shut-down costs are estimated at $19,500,000. These estimated shut-down costs do not have any provision for a weather event of any significance, which could greatly increase these costs.

Lastly, also included in the administrative costs are residual chapter 11 costs, calculated as two quarters of the average U.S. Trustee fees throughout the case ($500,000), and four months of residual chapter 11 professional fees at $1,500,000 a month ($6,000,000).

The number and dollar amount of the unsecured claims is greater in a chapter 7 than under the Joint Plan. The increase in unsecured claimants is a function of the rejection damages that would result from the inability of a chapter 7 trustee to assume the executory contract giving rise to rejection damages.

**Distributions to Unsecured Creditors.** The unsecured creditor pool includes Abuse Claims, Non-Abuse Claims, prepetition accounts payable, prepetition capital lease obligations, prepetition bonds payable, and prepetition employment benefits and pensions. The Debtor estimates the total amount of unsecured claims to be **$1,429,299,271**. With **$209,230,813** projected to be available to general unsecured creditors, after payment in full of all senior classes (Administrative and Priority Claims), general unsecured creditors would receive a **14.6%** payment on their claims.

**Footnotes to Exhibit 3 (Debtor's Liquidation Analysis).** The spreadsheet depicting the Debtor's Liquidation Analysis on Exhibit 3 references certain explanatory footnotes as follows:

Note 1: Financial information presented is as of May 31, 2025, which is the most recent data available. Losses are expected to continue after May 31, 2025, which may reduce the liquidation value.

Note 2: Liquidation value is assumed to be 50% of book value.

Note 3: Prepaid expenses include approximately $2,296,000 for the Debtor's high schools.

Note 4: Portfolio A funds are shown net of third-party funds.

Note 5: Includes accounts payable and unpaid reorganization expenses as of May 31, 2025.

Note 6: Estimated at 3% of available assets, excluding any insurance proceeds.

Note 7: Including pursuit of and potential litigation with other Catholic organizations for contribution or indemnification claims.

Note 8: Amount represents midpoint of Abuse Claims per Stout, the Committee's expert (range of claims is $752 million to $1.69 billion).

Note 9: Does not include any recoveries related to insurance coverage for tort claims.

Note 10: Assumes four months of unpaid legal and professional costs at Effective Date.

Note 11: Estimated at two quarters of average U.S. Trustee fees.

Note 12: Excludes accrued liabilities for survivor claims.

Note 13: Based on average Kelly Blue Book value.

Note 14: Estimated at 15% of book value.

Note 15: Includes bond principal.

Note 16: Assumes five-year wind down with half of the properties remaining being sold each year.

Note 17: Liquidation value is assumed to be 25% of book value.

Note 18: Value is based on third-party appraisals obtained by the Debtor.

### Additional Debtors' Liquidation Analysis

The Additional Debtors were examined on a legal entity basis for each Additional Debtor but have been consolidated for this Liquidation Analysis into one comprehensive report.

In a hypothetical liquidation, the Additional Debtors estimate that the total value that would be available to unsecured creditors (including Abuse Claimants) is **$167,409,245**. The total

unsecured claims amount is projected to be **$1,326,564,719**, resulting in a pro rata recovery of **12.6%.** As is the case with the Debtor's Liquidation Analysis, the Additional Debtors' Liquidation Analysis excludes contributions to be made by the Settling Insurers, whereas under the Joint Plan, the Setting Insurers are contributing $29,275,000 to the Settlement Trust. The hypothetical liquidation also excludes a $5,000,000 contribution from the Non-Debtor Catholic Entities, a $65,000,000 contribution from the Debtor, and the value of the assigned insurance policies with the Non-Settling Insurers that are available under the Joint Plan. The hypothetical liquidation includes additional administrative fees that would be associated with a chapter 7 liquidation, such as chapter 7 trustee and professional fees; costs associated with shutting down operations, laying off employees, and securing and insuring real property owned by the Additional Debtors; and various residual costs and professional fees from the chapter 11 bankruptcy. As stated in the Disclosure Statement, 1793 Group was formed in 2025 for the express purpose of facilitating payments from the Additional Debtors into the Joint Plan. The hypothetical liquidation also excludes funds from the sale of the Affordable Housing Facilities that would be due directly to the Settlement Trust. In a chapter 7 liquidation, 1793 Group would not be able to serve this purpose, and each Additional Debtor would have to be liquidated with funds segregated by entity and distributed on an entity-by-entity basis, further adding to the administrative costs associated with chapter 7 liquidations.

**Available Assets.** The Additional Debtors' available assets in a hypothetical liquidation include cash and cash equivalents, accounts receivable, notes receivable, unrestricted investment funds, real property, plant and equipment, and other miscellaneous assets for entities that have Abuse Claims asserted against them. Certain Additional Debtors are not implicated in the Abuse Proofs of Claim filed in the Debtor's Chapter 11 Case. As such, the liquidation value of the assets and liabilities related to these Additional Debtors has been excluded from the liquidation value in Exhibit 5. It is assumed that the Additional Debtors that have no Abuse Claims against them have sufficient funds to pay their debts and that no funds would be available to the survivors or other creditors. Exhibit 4 to the Disclosure Statement identifies the Additional Debtors that are implicated in the Abuse Proofs of Claim filed in the Debtor's Chapter 11 Case.

Cash and Cash Equivalents: Based on the Additional Debtors' most recent financial assessment, as of June 30, 2025, the Additional Debtors' combined cash on hand is $98,977,624. The Additional Debtors anticipate a recovery of $73,789,693, after removing the entities who do not have any Abuse Claims asserted against them and who would not otherwise become Additional Debtors.

Accounts and Notes Receivable: The Additional Debtors' accounts receivable primarily consist of amounts due from Portfolio B and tuition for the Parish Schools that are run by the corresponding parish. Note that these schools are separate from the Archdiocesan Schools that are directly operated by the Archdiocese. In a hypothetical liquidation for the Debtor, the Additional Debtors would only receive 14.6% of their Portfolio B funds. Because the Additional Debtors do not expect a significant recovery from the accounts receivable, receivables have been discounted to 25%, or $17,069,423 after removing the entities who do not have an Abuse Claim asserted against them and who would not otherwise become Additional Debtors.

{00383827-9}

The Additional Debtors have $9,500,000 in outstanding notes receivable and expect a recovery of $6,000,000, again discounting the notes that are payable to entities who do not have an Abuse Claim asserted against them and who would not otherwise become an Additional Debtor.

Investment Funds: Just as with the Debtor, the Additional Debtors have investments that are divided between restricted and unrestricted funds. The Additional Debtors expect a 100% recovery on investments under a chapter 7 liquidation, subject to a reduction of the restricted investments, addressed below. The Additional Debtors have $89,205,761 available investments (both restricted and unrestricted) based on a mark-to-market value. This value is largely prepared by the Catholic Community Foundation based upon information provided by its investment advisors at the end of each month. Removing the entities who do not have Abuse Claims asserted against them, the Additional Debtors anticipate a recovery of $46,944,068 for distribution to creditors.

Real Property, Plant, and Equipment: Real property of the Additional Debtors falls into two categories: church property (property used as a church) and non-church property (property not used as a church). Church property is valued for liquidation purposes at $100,000 per property due to its limited use and the process of repurposing it after the sale to a non-church property. See discussion above in Debtor (Archdiocese) Liquidation Analysis for the rationale behind the church valuations.

Non-church property liquidation values are discounted from the replacement cost of the property by two factors. After removing properties for the entities who do not have an Abuse Claim asserted against them, a reduction of 65% is applied to replacement cost value to arrive at fair market value. This 65% factor was determined using a sample of approximately 40 third-party fair market appraisals as compared to replacement cost value. Second, the liquidation value was estimated based on an approximate 40% reduction to the Fair Market Value (FMV) of the Additional Debtor's property. The 40% reduction to arrive at liquidation value considers the approximate 1200 properties from the Debtor and Additional Debtors in a hypothetical liquidation that would flood the market and depress sales value. The reduction also recognizes the need for a potential bulk sale of certain properties and a five-year term over which the properties would be sold. The reduction further considers the commission and closing costs for the properties. The liquidation value is estimated at $135,170,401 for the Additional Debtors' real property, plant and equipment. The Additional Debtors have not obtained a fair-market-value appraisal of all their real estate.

Other Assets: The Additional Debtors estimate that their other assets have a book value of $12,324,843 based on their latest inventory and financial information. Over 80% of the Other Assets is food and related inventory held by two of the Additional Debtors. After removing the entities who do not have Abuse Claims asserted against them, the Additional Debtors apply a discount of 50% of the book value given the forced sale. The estimated liquidation value of the other assets is $538,722.

Excluded Assets: The Additional Debtors have excluded all restricted investment funds from available assets in a chapter 7 liquidation as well as all assets owned by other entities who

{00383827-9}

are listed as Additional Debtors but who have no Abuse Claims asserted against them. The Additional Debtors calculate that they hold $6,231,394 in custodial funds for the benefit of non-debtor entities and $10,121,668 in restricted cash and investments. The Additional Debtors have also excluded all prepaid expenses of the Additional Debtors and do not expect to recover any of those payments. However, the chapter 7 trustee fees and costs for litigating against Additional Debtors without Abuse Claims asserted against them are included because the Bankruptcy Code requires a hypothetical liquidation of the entities who are included in the Joint Plan regardless of whether there are Abuse Claims asserted against them.

**Additional Administrative Costs**. Once in bankruptcy, the Additional Debtors will begin to incur post-petition administrative costs such as post-petition payables for employees and other operating expenses until the Additional Debtors are officially closed. The Additional Debtors estimate these costs (to be paid prior to any distributions in the ordinary course of business) to be $500,000, based on the assumption of $5,000 per Additional Debtor (with 100 Additional Debtors filing).

Other administrative costs include chapter 7 trustee fees, professional fees, shut-down costs, and residual costs and fees from the chapter 11.

Chapter 7 trustee fees are estimated at $10,000,000, excluding any recovery from insurance proceeds. These fees are based on an estimate of 3% of the funds distributed to creditors for all of the Additional Debtors. Further, chapter 7 professional fees are estimated at $25,000,000, which assumes a five-year liquidation process and fees related to: pursuing and litigating claims against other organizations for contributions or indemnification; litigating Abuse Claims; and legal fees associated with asset liquidation. The total is based on an assumption of $250,000 in professional fees per Additional Debtor (with 100 Additional Debtors filing).

The liquidation costs also include what are termed "shut-down costs." These costs primarily include the personnel and property-related costs need to close and fully liquidate the debtor's operations and assets over the five-year anticipated shut-down period. From a personnel perspective, it is anticipated that some of the Additional Debtors will be subject to the WARN Act and will incur significant costs for these claims. It is also anticipated that the Additional Debtors will need to retain existing personnel for varying periods of time to assist the chapter 7 trustee in the areas of accounting and finance, IT, legal, property, repair and maintenance, insurance and risk management, and archives. From a property perspective, costs will include property, casualty, and liability insurance for the properties based on the properties being empty and shuttering the properties, ensuring security at the properties to protect them from vandalism and vagrancy, utility costs, and some repair and maintenance costs. It also is expected the properties will be subject to property taxes because they will no longer be exempt. The shut-down costs are estimated at $59,500,000. These estimated shut-down costs do not have any provision for a weather event of any significance, which could greatly increase these costs.

**Distributions to Unsecured Creditors.** The unsecured creditor pool includes Abuse Claims, Non-Abuse Claims, prepetition accounts payable, prepetition capital lease obligations, prepetition bonds payable, and prepetition employment benefits and pensions. The Additional

Debtors estimate the total amount of unsecured claims to be **$1,326,564,719**. With **$167,409,245** projected to be available to general unsecured creditors, after payment in full of all senior classes (Administrative and Priority Claims), general unsecured creditors would receive a **12.6%** payment on their claims.

    **Footnotes to Exhibit 5 (Additional Debtors' Liquidation Analysis).** The spreadsheet depicting the Additional Debtors' Liquidation Analysis on Exhibit 5 references certain explanatory footnotes as follows:

    Note 1: Financial information presented is as of December 31, 2024, which is the most recent data available. Losses are expected to continue after December 31, 2024, which may reduce the liquidation value.

    Note 2: Liquidation value is assumed to be 25% of book value for Additional Debtors with Abuse Claims against them.

    Note 3: Liquidation value is assumed to be 50% of book value for Additional Debtors with Abuse Claims against them.

    Note 4: Includes accounts payable and accrued expenses estimated at $5,000 per Additional Debtor with Abuse Claims against them.

    Note 5: Estimated at 3% of available assets, excluding any insurance proceeds for all Additional Debtors.

    Note 6: Including pursuit of and potential litigation with other Catholic organizations for contribution or indemnification claims. Estimated at $250,000 per Additional Debtor for 100 Additional Debtors.

    Note 7: Assumes five-year wind down with half of the properties remaining being sold each year for 100 Additional Debtors.

    Note 8: Amount represents midpoint of Abuse Claims per Stout, the Committee's expert (range of claims is $752 million to $1.69 billion).

    Note 9: Does not include any recoveries related to insurance coverage for tort claims.

    Note 10: Estimated at $2,500 per Additional Debtor for 100 Additional Debtors.

    Note 11: Estimated at $5,000 per Additional Debtor for 100 Additional Debtors.

    Note 12: Accounts payable, accrued expenses, and FEMA-related payables.

    Note 13: Represents estimated liquidation value for Additional Debtors' property for Additional Debtors with Abuse Claims against them.

**Archdiocese of New Orleans**
Case No.: 20-10846

**Additional Debtors Liquidation Analysis**
**As of December 31, 2024**

| Account Description | 12/31/2024 Balance Sheet Amount | 12/31/2024 Liquidation Value | Global FN Reference |
|---|---|---|---|
| **ASSETS** | | | |
| Cash and cash equivalents | $ 98,977,624 | $ 73,789,693 | |
| Accounts receivable | 95,487,672 | 17,069,423 | 2 |
| Notes receivable | 9,500,000 | 6,000,000 | |
| Prepaid expenses | 1,578,541 | - | |
| Investments | 89,205,761 | 46,944,068 | |
| Other current assets | 12,324,843 | 538,722 | 3 |
| Property, plant and equipment | 97,197,055 | 135,170,401 | 13 |
| **Total Assets** | $ 404,271,496 | $ 279,512,307 | |
| LESS: | | | |
| Post-petition payables - unrestricted | | $ (500,000) | 4 |
| Custodial funds | | (6,231,394) | |
| Restricted cash and investments - by donor | | (10,121,668) | |
| **Total Assets Available Prior to Chapter 7** | | $ 262,659,245 | |
| Less: | | | |
| Chapter 7 Trustee Fees | | $ (10,000,000) | 5 |
| Chapter 7 Attorney and Financial Professional Fees | | (25,000,000) | 6 |
| Shut-down costs | | (59,500,000) | 7 |
| Residual Costs of Chapter 11 Administration | | (500,000) | 11 |
| Residual Legal and Professional Costs of Chapter 11 | | (250,000) | 10 |
| Subtotal | | $ (95,250,000) | |
| **Amount available to unsecured creditors** | | $ 167,409,245 | 9 |
| **Unsecured Debts:** | | | |
| Tort Claimant Payables | | $ (1,221,000,000) | 8 |
| Accounts payable - Prepetition | | (21,103,229) | 12 |
| Notes payable - Prepetition | | (28,180,047) | |
| Accrued other post employment benefits - Prepetition | | (25,435,054) | |
| Accrued pension liability - Prepetition | | (30,846,389) | |
| Total | | $ (1,326,564,719) | |

# EXHIBIT 6

# Immovable Property of the Debtor

| Civil Parish | ADDRESS | OCCUPANT | Market Value | Liquidation Value | Entity / Notes | Notes | Notes 2 |
|---|---|---|---|---|---|---|---|
| Orleans / Jefferson | NOT VERIFIED *SEE NOTE IN TAX PARCEL ID | (Now Orleans Parish) | | $100.0 | Unknown Value | | Unknown Value |
| Lafourche | n/a | (Unknown) | | $100.0 | Unknown Value | | Unknown Value |
| St. Bernard | N/A | (Unknown) | | $100.0 | Unknown Value | | Unknown Value |
| Lafourche | Brule Guillot Road | (Vacant Land) | | $100.0 | Unknown Value | | Unknown Value |
| Jefferson | 1000 Salesian Lane (a/k/a 5501 Westbank Expy, 1000 Barataria Blvd.) Marrero, LA 70072 | Academy of Our Lady | $ 12,145,000.00 | $8,501,500.0 | | | Activee School |
| Jefferson | 8800 Veterans Memorial Blvd. Metairie, LA 70003 | Archbishop Chapelle High School | $ 5,910,000.00 | $4,137,000.0 | Archbishop Chapelle High School | This was a campus valuation | Active School |
| Jefferson | Fulton St. / Montana Ave. | Archbishop Chapelle High School | -- | $0.0 | Archbishop Chapelle High School | This was a campus valuation | Active School |
| Jefferson | Veterans Memorial Blvd. Metairie, LA 70003 | Archbishop Chapelle High School | | $0.0 | Archbishop Chapelle High School | This was a campus valuation | Active School |
| Jefferson | Veterans Memorial Blvd. Metairie, LA 70003 | Archbishop Chapelle High School | -- | $0.0 | Archbishop Chapelle High School | This was a campus valuation | Active School |
| St. Tammany | 71324 Hwy 1077 Covington, LA 70433 | Archbishop Hannan High School | $ 8,515,000.00 | $5,960,500.0 | | | Active School |
| Jefferson | 1901 Severn Ave. Metairie, LA 70001 | Archbishop Rummel High School | -- | $0.0 | Archbishop Rummel High School | This was a campus valuation | Active School |
| Jefferson | 2113 N. Hullen St. Metairie, LA 70001 | Archbishop Rummel High School | $ 5,575,000.00 | $3,902,500.0 | Archbishop Rummel High School | This was a campus valuation | Active School |
| Jefferson | Field at W. Napoleon and Severn Avenue Metairie, LA 70001 | Archbishop Rummel High School | | $0.0 | Archbishop Rummel High School | This was a campus valuation | Active School |
| Jefferson | 1000 Salesian Lane (a/k/a 5501 Westbank Expy, 1000 Barataria Blvd.) Marrero, LA 70072 | Archbishop Shaw High School only | $ 6,405,000.00 | $4,483,500.0 | | | Active School |
| Jefferson | 5500 St. Mary St. Metairie, LA 70006 | Archdiocese of New Orleans Retreat Center | $ 3,810,000.00 | $2,667,000.0 | Archdiocese of New Orleans Retreat Center | This was a campus valuation | Active retreat House |

| Civil Parish | ADDRESS | OCCUPANT | Market Value | Liquidation Value | Entity / Notes | Notes | Notes 2 |
|---|---|---|---|---|---|---|---|
| Jefferson | Metairie, LA 70006 | Archdiocese of New Orleans Retreat Center | | $0.0 | Archdiocese of New Orleans Retreat Center | This was a campus valuation | Active retreat House |
| St. John the Baptist | 1809 Greenwood Dr. LaPlace, LA 70068 | Ascension of Our Lord Catholic Church | $ 2,085,000.00 | $1,459,500.0 | Ascension of Our Lord Catholic Church | This was a campus valuation | Active Parish and/or community |
| St. John the Baptist | 2004 East Frisco Dr. LaPlace, LA 70068 | Ascension of Our Lord Catholic Church | $ 100,000.00 | $70,000.0 | Ascension of Our Lord Catholic Church | This was a campus valuation | Active Parish and/or community |
| St. John the Baptist | 1900 Greenwood Dr LaPlace, LA 70068 | Ascension of Our Lord Catholic Church | | $0.0 | Ascension of Our Lord Catholic Church | This was a campus valuation | Active Parish and/or community |
| St. John the Baptist | 799 Fairway Dr. (Corner Of Greenwood Dr. & Fairway) LaPlace, LA 70068 | Ascension of Our Lord Catholic Church | | $0.0 | Ascension of Our Lord Catholic Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 172 Andre Dung Lac Dr. Avondale, LA 70094 | Assumption of Mary Church | $ 635,000.00 | $444,500.0 | Assumption of Mary Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | Avondale, LA 70094 | Assumption of Mary Church | | $0.0 | Assumption of Mary Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | Avondale, LA 70094 | Assumption of Mary Church | | $0.0 | Assumption of Mary Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | Avondale, LA 70094 | Assumption of Mary Church | | $0.0 | Assumption of Mary Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | Avondale, LA 70094 | Assumption of Mary Church | | $0.0 | Assumption of Mary Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | Avondale, LA 70094 | Assumption of Mary Church | | $0.0 | Assumption of Mary Church | This was a campus valuation | Active Parish and/or community |
| Orleans | | Blessed Francis Xavier Seelos RCC, New Orleans LA | $ 750,000.00 | $525,000.0 | Partial ownership | | Active Parish and/or community |
| Orleans | 14400 Peltier Dr. New Orleans, LA 70129 | CAC Thanh Tu Dao | $ 175,000.00 | $122,500.0 | CAC Thanh Tu Dao | This was a campus valuation | Active Parish and/or community |
| Orleans | 14408 Peltier Dr. New Orleans, LA 70129 | CAC Thanh Tu Dao | -- | $0.0 | CAC Thanh Tu Dao | This was a campus valuation | Active Parish and/or community |
| Orleans | 14418 Peltier Dr. New Orleans, LA 70129 | CAC Thanh Tu Dao | -- | $0.0 | CAC Thanh Tu Dao | This was a campus valuation | Active Parish and/or community |
| Orleans | 14424 Peltier Dr. New Orleans, LA 70129 | CAC Thanh Tu Dao | -- | $0.0 | CAC Thanh Tu Dao | This was a campus valuation | Active Parish and/or community |

2

| Civil Parish | ADDRESS | OCCUPANT | Market Value | Liquidation Value | Entity / Notes | Notes | Notes 2 |
|---|---|---|---|---|---|---|---|
| Orleans | 1037 Audubon St. New Orleans, LA 70118 | Catholic Center at Tulane University | $ 1,645,000.00 | $1,151,500.0 | | | Active Parish and/or community |
| Orleans | 2814 S Carrollton Ave New Orleans, LA 70125 | Catholic Counseling Services | $ 825,000.00 | $577,500.0 | | | Active Organization |
| Orleans | 1100-1116 Chartres St. New Orleans, LA 70116 | Catholic Cultural Heritage Center / Old Ursuline Covenant / St. Mary Church | $ 6,725,000.00 | $4,707,500.0 | Convent | | Active Organization |
| Jefferson | 4337 Sal Lentini Pkwy Kenner, LA 70065 | Divine Mercy Church | $ 9,790,000.00 | $6,853,000.0 | | | Active Parish and/or community |
| Jefferson | Metairie, LA 70003 | Elmwood Canal Property | | $1,000.0 | Unknown Value | | Unknown Value |
| Plaquemines | n/a | Fronts on Mississippi River (1 Arpent x 40 arpents) | | $1,000.0 | Value not knowmn | | Active Parish and/or community |
| Jefferson | 4812 W Napoleon Ave. Metairie, LA 70001 | Hanmaum Korean Catholic Chapel | $ 600,000.00 | $420,000.0 | | | Active Parish and/or community |
| St. Charles | 155 Holy Family Ave. Luling, LA 70070 | Holy Family Church | $ 1,535,000.00 | $1,074,500.0 | | | Active Parish and/or community |
| Jefferson | 1701 Bridge City Ave. Bridge City, LA, 70096 | Holy Guardian Angels Mission Church | $ 1,150,000.00 | $805,000.0 | Holy Guardian Angels Mission Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 425 10Th St. Bridge City, LA, 70096 | Holy Guardian Angels Mission Church | -- | $0.0 | Holy Guardian Angels Mission Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | Bridge City, LA, 70096 | Holy Guardian Angels Mission Church | -- | $0.0 | Holy Guardian Angels Mission Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | Bridge City, LA, 70096 | Holy Guardian Angels Mission Church | -- | $0.0 | Holy Guardian Angels Mission Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | Bridge City, LA, 70096 | Holy Guardian Angels Mission Church | -- | $0.0 | Holy Guardian Angels Mission Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | Bridge City, LA, 70096 | Holy Guardian Angels Mission Church | -- | $0.0 | Holy Guardian Angels Mission Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | Bridge City, LA, 70096 | Holy Guardian Angels Mission Church | -- | $0.0 | Holy Guardian Angels Mission Church | This was a campus valuation | Active Parish and/or community |

3

| Civil Parish | ADDRESS | OCCUPANT | Market Value | Liquidation Value | Entity / Notes | Notes | Notes 2 |
|---|---|---|---|---|---|---|---|
| Jefferson | Bridge City, LA, 70096 | Holy Guardian Angels Mission Church | -- | $0.0 | Holy Guardian Angels Mission Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | Bridge City, LA, 70096 | Holy Guardian Angels Mission Church | -- | $0.0 | Holy Guardian Angels Mission Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | Bridge City, LA, 70096 | Holy Guardian Angels Mission Church | -- | $0.0 | Holy Guardian Angels Mission Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | Bridge City, LA, 70096 | Holy Guardian Angels Mission Church | -- | $0.0 | Holy Guardian Angels Mission Church | This was a campus valuation | Active Parish and/or community |
| St. Charles | 16883 River Road Hahnville, LA 70057 | Holy Rosary Cemetery | | $0.0 | Cemetery | | Active Parish and/or community |
| Orleans | 6201 Stratford Pl New Orleans, LA 70131 | Holy Spirit Catholic Church | $ 760,000.00 | $532,000.0 | | | Active Parish and/or community |
| Orleans | 1201 Oretha Castle Haley Blvd., New | John the Baptist Head Start | $ 250,000.00 | $175,000.0 | estimate only | | Active Organization |
| St. Tammany | Rue De La Paix or Port Louis Access Road Madisonville, LA 70447 | Land/Swamp | | $1,000.0 | Unknown Value | | Unknown Value |
| Terrebonne | 209 South Hollywood Rd. | Maria Immaculate Catholic Church | | $0.0 | Houma | | Houma |
| St. Tammany | 1501 W. Causeway Approach Mandeville, LA 70471 | Mary Queen of Peace | $ 4,865,000.00 | $3,405,500.0 | | | Active Parish and/or community |
| Orleans | | Mary Queen of Vietnam | | $0.0 | Mary Queen of Vietnam | This was a campus valuation | Active Parish and/or community |
| Orleans | | Mary Queen of Vietnam | | $0.0 | Mary Queen of Vietnam | This was a campus valuation | Active Parish and/or community |
| Orleans | 13900 Dwyer Blvd. (A/K/A 5069 Willowbrook Dr.) | Mary Queen of Vietnam | $ 915,000.00 | $640,500.0 | Mary Queen of Vietnam | This was a campus valuation | Active Parish and/or community |
| Orleans | 14001 Dwyer Blvd. New Orleans, LA 70129 | Mary Queen of Vietnam | | $0.0 | Mary Queen of Vietnam | This was a campus valuation | Active Parish and/or community |
| Orleans | | Mary Queen of Vietnam | | $0.0 | Mary Queen of Vietnam | This was a campus valuation | Active Parish and/or community |

4

| Civil Parish | ADDRESS | OCCUPANT | Market Value | Liquidation Value | Entity / Notes | Notes | Notes 2 |
|---|---|---|---|---|---|---|---|
| St. Tammany | 4465 Hwy. 190 West Covington, LA 70433 | Most Holy Trinity Church / Archdiocese of New Orleans' Northshore Pastoral Center | $ 1,075,000.00 | $752,500.0 | | | Active Parish and/or community |
| Orleans | 4901 Alsace St. New Orleans, LA 70129 | Multifamily Residential Structure | $ 190,000.00 | $133,000.0 | | | Active Housing Entity |
| Terrebonne | (Marshland) | n/a | | $ 1,000.00 | Unknown Value | | Unknown Value |
| Terrebonne | (Misc. Land) | n/a | | $ 1,000.00 | Unknown Value | | Unknown Value |
| Terrebonne | (Misc. Land) | n/a | | $ 1,000.00 | Unknown Value | | Unknown Value |
| Terrebonne | (Woodland) | n/a | | $ 1,000.00 | Unknown Value | | Unknown Value |
| Orleans | 2901 S Carrollton Ave (2925 S. Carrollton Ave.) New Orleans, LA 70125 | Notre Dame Seminary, Archbishop Residence, Walmsley Ave. | | $0.0 | Notre Dame Seminary, Archbishop Residence, Walmsley Ave. | This was a campus valuation | Active Ministry |
| Orleans | 7887 Walmsley Ave. New Orleans, LA 70125 | Notre Dame Seminary, Archbishop Residence, Walmsley Ave. | $ 4,820,000.00 | $3,374,000.0 | Notre Dame Seminary, Archbishop Residence, Walmsley Ave. | This was a campus valuation | Active Ministry |
| Jefferson | 1000 Starrett Rd., 8600 W. Metairie Ave., and 925 Atlanta St. Metairie, LA 70003 | Our Lady of Divine Providence Catholic Church | -- | $0.0 | Our Lady of Divine Providence Catholic Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 8600 W. Metairie Ave. Metairie, LA 70003 | Our Lady of Divine Providence Catholic Church | $ 2,485,000.00 | $1,739,500.0 | Our Lady of Divine Providence Catholic | This was a campus valuation | Active Parish and/or community |
| Jefferson | 908 N Starrett Rd Metairie, LA 70003 | Our Lady of Divine Providence Catholic Church | -- | $0.0 | Our Lady of Divine Providence Catholic | This was a campus valuation | Active Parish and/or community |
| Jefferson | 908 N Starrett Rd Metairie, LA 70003 | Our Lady of Divine Providence Catholic Church | -- | $0.0 | Our Lady of Divine Providence Catholic | This was a campus valuation | Active Parish and/or community |
| Jefferson | Cumberland St. Metairie, LA 70003 | Our Lady of Divine Providence Catholic Church | -- | $0.0 | Our Lady of Divine Providence Catholic | This was a campus valuation | Active Parish and/or community |
| Jefferson | Cumberland St. Metairie, LA 70003 | Our Lady of Divine Providence Catholic Church | -- | $0.0 | Our Lady of Divine Providence Catholic | This was a campus valuation | Active Parish and/or community |
| Jefferson | Former Cumberland St. Metairie, LA 70003 | Our Lady of Divine Providence Catholic Church | -- | $0.0 | Our Lady of Divine Providence Catholic | This was a campus valuation | Active Parish and/or community |
| Jefferson | Portion Of Former Cumberland St. Metairie, LA 70003 | Our Lady of Divine Providence Catholic Church | -- | $0.0 | Our Lady of Divine Providence Catholic Church | This was a campus valuation | Active Parish and/or community |

5

| Civil Parish | ADDRESS | OCCUPANT | Market Value | Liquidation Value | Entity / Notes | Notes | Notes 2 |
|---|---|---|---|---|---|---|---|
| Orleans | 401 (411) Rampart New Orleans, LA 70112 | Our Lady of Guadalupe New Orleans, LA | $ 2,860,000.00 | $2,002,000.0 | | | Active Parish and/or community |
| Orleans | 6054 Vermillion Blvd. New Orleans, LA 70122 | Our Lady of Lavang Mission | $ 1,010,000.00 | $707,000.0 | | | Active Parish and/or community |
| St. Bernard | 2621 Colonial Blvd. Violet, LA 70092 | Our Lady of Lourdes | $ 805,000.00 | $563,500.0 | | | Active Parish and/or community |
| Plaquemines | 8968 LA-23 Belle Chasse, LA 70037 | Our Lady of Perpetual Help Roman Catholic Church | $ 1,480,000.00 | $1,036,000.0 | | | Active Parish and/or community |
| St. Tammany | 285 Ponchitolawa Dr. | Pastor Residence | $ 295,000.00 | $206,500.0 | | | Active Parish and/or community |
| St. Tammany | 1901 Jaguar Dr. Slidell, LA 70461 | Pope John Paul II Catholic High School (To be Confirmed) | $ 2,115,000.00 | $1,480,500.0 | | | Active School |
| St. Bernard | 3700 Jean Lafitte Pkwy. Chalmette, LA 70043 | Prince of Peace Church Rectory and Parish Center | $ 625,000.00 | $437,500.0 | | | Active Parish and/or community |
| Orleans | 2824 Dauphine St., New Orleans | Project Lazarus | $ 2,875,000.00 | $2,012,500.0 | | Broker Opinion | Active Organization |
| Orleans | 1025 Oretha C. Haley Blvd. | RCCANO Offices / Catholic Charities Office (Parking) | | $0.0 | Sold | | Sold |
| Orleans | 1032 S Rampart St. New Orleans, LA 70113 | RCCANO Offices / Catholic Charities Office (Parking) | $ 1,000,000.00 | $700,000.0 | Listed no offers | This was a campus valuation | Active Organization |
| Orleans | 1042 S Rampart St. New Orleans, LA 70113 | RCCANO Offices / Catholic Charities Office (Parking) | | $0.0 | Listed no offers | This was a campus valuation | Active Organization |
| Jefferson | 6105 Bridget St. Metairie, LA 70003 | Residence - Bridget Street | $ 215,000.00 | $150,500.0 | | | Active Housing Entity |
| Jefferson | 1916 N Arnoult Rd. Metairie, LA 70001 | Residence - N. Arnoult Drive | | $0.0 | | | Active Parish and/or community |
| Jefferson | 1000 Westwood Dr. Marrero, LA 70072 | Residence - Westwood Drive St Agnes Le Thi | $ 375,000.00 | $262,500.0 | | | Active Parish and/or community |
| Orleans | 2801 Pine St. New Orleans, LA 70125 | Residence / St. Rita Rectory | $ 190,000.00 | $133,000.0 | | | Active Parish and/or community |

| Civil Parish | ADDRESS | OCCUPANT | Market Value | Liquidation Value | Entity / Notes | Notes | Notes 2 |
|---|---|---|---|---|---|---|---|
| Orleans | 3200 Canal St. New Orleans, LA 70119 | Sacred Heart of Jesus Catholic Church - Partially Leased and certain buildings sold as separate improvements | $ 2,250,000.00 | $1,575,000.0 | PA for $1,500,000 w/o Church | | Current Offer in place |
| Orleans | 7919 Fig St. New Orleans, LA 70125 | Single family house across from Notre Dame Seminary | $ 165,000.00 | $115,500.0 | | | Active Housing Entity |
| Jefferson | 835 Melody Dr. Metairie, LA 70002 | St. Angela Merici Catholic Church | $ 5,640,000.00 | $3,948,000.0 | St. Angela Merici Catholic Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 901 Beverly Garden Dr. Metairie, LA 70002 | St. Angela Merici Catholic Church | -- | $0.0 | St. Angela Merici Catholic Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 901 Beverly Garden Dr. Metairie, LA 70002 | St. Angela Merici Catholic Church | -- | $0.0 | St. Angela Merici Catholic Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 3601 Transcontinental Dr. 4920 Loveland St. 4921 Meadowdale St. | St. Ann Church and National Shrine (St. Ann Church Parish School) | $ 4,535,000.00 | $3,174,500.0 | St. Ann Church and National Shrine (St. Ann Church Parish School) | This was a campus valuation | Active Parish and/or community |
| Jefferson | 4841 Meadowdale St. Metairie, LA 70006 | St. Ann Church and National Shrine (St. Ann Church Parish School) | -- | $0.0 | St. Ann Church and National Shrine (St. Ann Church Parish School) | This was a campus valuation | Active Parish and/or community |
| Jefferson | 4844 Loveland St. Metairie, LA 70006 | St. Ann Church and National Shrine (St. Ann Church Parish School) | -- | $0.0 | St. Ann Church and National Shrine (St. Ann Church Parish School) | This was a campus valuation | Active Parish and/or community |
| Jefferson | 4845 Meadowdale St. Metairie, LA 70006 | St. Ann Church and National Shrine (St. Ann Church Parish School) | -- | $0.0 | St. Ann Church and National Shrine (St. Ann Church Parish School) | This was a campus valuation | Active Parish and/or community |
| Jefferson | 4848 Loveland St. Metairie, LA 70006 | St. Ann Church and National Shrine (St. Ann Church Parish School) | -- | $0.0 | St. Ann Church and National Shrine (St. Ann Church Parish School) | This was a campus valuation | Active Parish and/or community |
| Jefferson | 4849 Meadowdale St. Metairie, LA 70006 | St. Ann Church and National Shrine (St. Ann Church Parish School) | -- | $0.0 | St. Ann Church and National Shrine (St. Ann Church Parish School) | This was a campus valuation | Active Parish and/or community |

7

| Civil Parish | ADDRESS | OCCUPANT | Market Value | Liquidation Value | Entity / Notes | Notes | Notes 2 |
|---|---|---|---|---|---|---|---|
| Jefferson | 4909 Loveland St. Metairie, LA 70006 | St. Ann Church and National Shrine (St. Ann Church Parish School) | -- | $0.0 | St. Ann Church and National Shrine (St. Ann Church Parish School) | This was a campus valuation | Active Parish and/or community |
| Jefferson | 4940 Meadowdale St. Metairie, LA 70006 | St. Ann Church and National Shrine (St. Ann Church Parish School) | -- | $0.0 | St. Ann Church and National Shrine (St. Ann Church Parish School) | This was a campus valuation | Active Parish and/or community |
| St. Tammany | | St. Anne Drive | | $ 1,000.00 | Value not knowmn | | Active Parish and/or community |
| St. Charles | 208 Angus Dr. Luling, LA 70070 | St. Anthony of Padua Church | $ 100,000.00 | $70,000.0 | St. Anthony of Padua Church | This was a campus valuation | Active Parish and/or community |
| St. Charles | 234 Angus Dr. Luling, LA 70070 | St. Anthony of Padua Church | | $0.0 | St. Anthony of Padua Church | This was a campus valuation | Active Parish and/or community |
| St. Charles | 234 Angus Dr. Luling, LA 70070 | St. Anthony of Padua Church | | $0.0 | St. Anthony of Padua Church | This was a campus valuation | Active Parish and/or community |
| St. Tammany | 20370 Smith Road Covington, LA 70435 | St. Benedict | $ 960,000.00 | $672,000.0 | St. Benedict | This was a campus valuation | Active Parish and/or community |
| St. Tammany | 20370 Smith Road Covington, LA 70435 | St. Benedict (Adjacent Property) | | $0.0 | St. Benedict | This was a campus valuation | Active Parish and/or community |
| St. Tammany | 20370 Smith Road Covington, LA 70435 | St. Benedict (Adjacent Property) | | $0.0 | St. Benedict | This was a campus valuation | Active Parish and/or community |
| Jefferson | 329 S Jamie Blvd. Avondale, LA 70094 | St. Bonaventure Church | $ 675,000.00 | $472,500.0 | St. Bonaventure Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 333 S Jamie Blvd. Avondale, LA 70094 | St. Bonaventure Church | -- | $0.0 | St. Bonaventure Church | This was a campus valuation | Active Parish and/or community |
| Orleans | 13435 Granville St. New Orleans, LA 70129 | St. Brigid | $ 235,000.00 | $164,500.0 | | | Active Housing Entity |
| St. Charles | 14538 River Road Destrehan, LA 70047 | St. Charles Borromeo Catholic Church | $ 100,000.00 | $70,000.0 | added | | Active Parish and/or community |
| St. John the Baptist | 100 Dominican Dr. Laplace, LA 70068 | St. Charles Catholic School | $ 3,640,000.00 | $2,548,000.0 | added | | Active School |

8

135

Case 20-10846 Doc 4242-8 Filed 08/08/25 Entered 08/08/25 16:00:55 Exhibit 6 - Discoverable Property Statement Page 19 Page 80 of 15

7/15/25

| Civil Parish | ADDRESS | OCCUPANT | Market Value | Liquidation Value | Entity / Notes | Notes | Notes 2 |
|---|---|---|---|---|---|---|---|
| Jefferson | 4410 Cleary Ave., 4317 Richland Ave., and 3928 Esplanade Ave. Metairie, LA 70002 | St. Clement of Rome Church | $ 4,630,000.00 | $3,241,000.0 | St. Clement of Rome Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 4313 Richland Ave. Metairie, LA 70002 | St. Clement of Rome Church (Residence) | | $0.0 | St. Clement of Rome Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 4408 Cleary Ave. Metairie, LA 70002 | St. Clement of Rome Church (Residence) | | $0.0 | St. Clement of Rome Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 4412 Era St. Metairie, LA 70002 | St. Clement of Rome Church (Residence) | | $0.0 | St. Clement of Rome Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 4413 Art St. Metairie, LA 70002 | St. Clement of Rome Church (Residence) | | $0.0 | St. Clement of Rome Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 3600 Claire Ave. (3610 Claire Ave.) Gretna, LA 70053 | St. Cletus Church and School | $ 2,290,000.00 | $1,603,000.0 | | | Active Parish and/or community |
| Orleans | 45586 Lamanche St. New Orleans, LA 70117 | St. David Church | $ 410,000.00 | $287,000.0 | | | Active Parish and/or community |
| St. Tammany | 58203 Hwy. 433 (at St. Genevieve Lane) Slidell, LA 70460 | St. Genevieve Church (Adjacent Property/Land) | $ 325,000.00 | $227,500.0 | St. Genevieve Church (Adjacent Property/Land) | | Active Parish and/or community |
| St. Tammany | 687 St. Genevieve Lane Slidell, LA 70460 | St. Genevieve Church (Adjacent Property/Land) | | $0.0 | St. Genevieve Church (Adjacent Property/Land) | | Active Parish and/or community |
| St. John the Baptist | Garyville, Louisiana | St. Hubert Parish | | $1,000.00 | | This is only a piece of the campus | Churcch Open for Sunday Mass |
| Jefferson | 2400 33rd St. (2402 33rd St.) Kenner, LA 70065 | St. Jerome Church | $ 655,000.00 | $458,500.0 | St. Jerome Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 5505 Barataria Blvd. Marrero, LA 70072 | St. Joachim Church | $ 595,000.00 | $416,500.0 | St. Jerome Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | Barataria Blvd. Marrero, LA 70072 | St. Joachim Church | | $0.0 | St. Jerome Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 2108 Magnolia Ridge St. Harvey, LA 70058 | St. John Bosco (Residence) | | $0.0 | St. John Bosco (Residence) | This was a campus valuation | Listed for Sale |

Case 20-10846 Doc 4242-8 Filed 08/08/25 Entered 08/08/25 16:00:55 Exhibit 8 - Immovable Property Renderings - Part 2 Page 137 of 161

7/15/25

| Civil Parish | ADDRESS | OCCUPANT | Market Value | Liquidation Value | Entity / Notes | Notes | Notes 2 |
|---|---|---|---|---|---|---|---|
| Jefferson | 2114 Oakmere Dr. Harvey, LA 70058 | St. John Bosco Church and Laureate Academy | $ 2,225,000.00 | $1,557,500.0 | St. John Bosco (Residence) | This was a campus valuation | Listed for Sale |
| Jefferson | 2115 Oakmere Dr. Harvey, LA 70058 | St. John Bosco Church and Laureate Academy | | $0.0 | St. John Bosco (Residence) | This was a campus valuation | Listed for Sale |
| St. Tammany | 61051 Brier Lake Dr. and 61030 Brier Lake Dr. Lacombe, LA | St. John of the Cross | $ 1,190,000.00 | $833,000.0 | St. John of the Cross | This was a campus valuation | Active Parish and/or community |
| St. Tammany | | St. John of the Cross | | $0.0 | St. John of the Cross | This was a campus valuation | Active Parish and/or community |
| St. Tammany | | St. John of the Cross | | $0.0 | St. John of the Cross | This was a campus valuation | Active Parish and/or community |
| Orleans | 6410 (6412) Medlock St. New Orleans, LA 70131 | St. Joseph Algiers on Westbank | $ 800,000.00 | $560,000.0 | St. Joseph Algiers | This was a campus valuation | Active Parish and/or community |
| Orleans | 4420 Fields St. New Orleans, LA 70131 | Near St. Joseph Algiers on Westbank | | $0.0 | St. Joseph Algiers | This was a campus valuation | Active Parish and/or community |
| Orleans | 6420 Kathy Ct New Orleans, LA 70131 | Near St. Joseph Algiers on Westbank | | $0.0 | St. Joseph Algiers | This was a campus valuation | Active Parish and/or community |
| Orleans | 6430 Kathy Ct New Orleans, LA 70131 | Near St. Joseph Algiers on Westbank | | $0.0 | St. Joseph Algiers | This was a campus valuation | Active Parish and/or community |
| Orleans | 6440 Kathy Ct New Orleans, LA 70131 | Near St. Joseph Algiers on Westbank | | $0.0 | St. Joseph Algiers | This was a campus valuation | Active Parish and/or community |
| Orleans | 4415 Joycelyn Dr. New Orleans, LA 70131 | Near St. Joseph Algiers on Westbank | | $0.0 | St. Joseph Algiers | This was a campus valuation | Active Parish and/or community |
| Orleans | 6450 Kathy Ct New Orleans, LA 70131 | Near St. Joseph Algiers on Westbank | | $0.0 | St. Joseph Algiers | This was a campus valuation | Active Parish and/or community |
| Orleans | 721 Chartres St. New Orleans, LA 70130 | St. Louis Cathedral | - | $100,000.0 | St. Louis Cathedral | This was a campus valuation | Active Parish and/or community |
| Orleans | 3748 Pere Antoine Alley (615 Pere Antoine Alley) New Orleans, LA 70116 | Included in St. St. Cathedral | | $0.0 | St. Louis Cathedral | This was a campus valuation | Part of SLC |
| Orleans | Dauphine St. New Orleans, LA 70116 | St. Louis Cathedral Academy | | $0.0 | St. Louis Cathedral Academy | This was a campus valuation | Partial Lease |

10

137

Case 20-10846 Doc 4342-8 Filed 08/08/25 Entered 08/08/25 16:00:55 Exhibit 8 - Immovable Property Settlement Dato 1980s page 121 of 15

7/15/25

| Civil Parish | ADDRESS | OCCUPANT | Market Value | Liquidation Value | Entity / Notes | Notes | Notes 2 |
|---|---|---|---|---|---|---|---|
| Orleans | 823 St. Ann St. New Orleans, LA 70119 | St. Louis Cathedral School | | $0.0 | St. Louis Cathedral Academy | This was a campus valuation | Partial Lease |
| Orleans | 820 Dauphine St. New Orleans, LA 70116 | St. Louis Cathedral Academy (Partially leased to third party for residential apartments) | $ 4,275,000.00 | $2,992,500.0 | St. Louis Cathedral Academy | This was a campus valuation | Partial Lease |
| St. Tammany | 910 Cross Gates Blvd Slidell, LA 70461 | St. Luke the Evangelist Catholic Church | $ 2,525,000.00 | $1,767,500.0 | St. Luke the Evangelist Catholic Church | This was a campus valuation | Active Parish and/or community |
| St. Tammany | Cross Gates Blvd. | St. Luke the Evangelist Catholic Church | | $0.0 | St. Luke the Evangelist Catholic Church | This was a campus valuation | Active Parish and/or community |
| Orleans | 7300 Crowder Rd New Orleans, LA 70127 | St. Maria Goretti Church | $ 1,550,000.00 | $1,085,000.0 | | | Active Parish and/or community |
| St. Charles | 10771 River Road Ama, LA 70031 | St. Mark Catholic Church | | $0.0 | St. Marks Catholic Church | This was a campus valuation | Active Parish and/or community |
| St. Charles | 10773 River Road Ama, LA 70031 | St. Mark Catholic Church | $ 360,000.00 | $252,000.0 | St. Marks Catholic Church | This was a campus valuation | Active Parish and/or community |
| St. Charles | 10774 River Road Ama, LA 70031 | St. Mark Catholic Church | | $0.0 | St. Marks Catholic Church | This was a campus valuation | Active Parish and/or community |
| St. Charles | 10779 River Road Ama, LA 70031 | St. Mark Catholic Church | | $0.0 | St. Marks Catholic Church | This was a campus valuation | Active Parish and/or community |
| St. Charles | 178 St. Mark Ave. Ama, LA 70031 | St. Mark Catholic Church (Community Center) | | $0.0 | St. Marks Catholic Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 2555 Apollo Ave. Harvey, LA 70058 | St. Martha Church | $ 770,000.00 | $539,000.0 | St. Martha Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 2136 Matador St. Harvey, LA 70058 | St. Martha Church (residence) | | $0.0 | St. Martha Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 2548 Apollo Ave. Harvey, LA 70058 | St. Martha Church (residence) | | $0.0 | St. Martha Church | This was a campus valuation | Active Parish and/or community |
| Orleans | 1522 Chippewa St. New Orleans, LA 70130 | St. Michael Special School | $ 6,815,000.00 | $4,770,500.0 | | | Active School |
| Orleans | 6828 Chef Menteur Hwy New Orleans, LA 70126 | St. Paul the Apostle RCC, New Orleans, LA | $ 575,000.00 | $402,500.0 | Added from Broker value | | Active Parish and/or community |
| Jefferson | 8151 Barataria Blvd. Crown Point, LA 70072 | St. Pius X Church | | $25,000.0 | Fire | The Church was destroyed by fire | Fire |

11

| Civil Parish | ADDRESS | OCCUPANT | Market Value | Liquidation Value | Entity / Notes | Notes | Notes 2 |
|---|---|---|---|---|---|---|---|
| Jefferson | Barataria Blvd. Crown Point, LA 70072 | St. Pius X Church | | $0.0 | Fire | | Fire |
| Jefferson | | St. Pius X Church | | $0.0 | Fire | | Fire |
| Jefferson | | St. Pius X Church (Unknown Location) | | $0.0 | Fire | | Fire |
| Jefferson | 604 1St Ave. Harvey, LA 70058 | St. Rosalie Church | $ 3,260,000.00 | $2,282,000.0 | St. Rosalie Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 617 2nd Ave. Harvey, LA 70058 | St. Rosalie Church | -- | $0.0 | St. Rosalie Church | This was a campus valuation | Active Parish and/or community |
| Jefferson | 620 1St Ave. Harvey, LA 70058 | St. Rosalie Church | -- | $0.0 | St. Rosalie Church | This was a campus valuation | Active Parish and/or community |
| St. Tammany | 122 S. Massachusetts St. Covington, LA 70433 | St. Scholastica Academy | $ 7,085,000.00 | $4,959,500.0 | St. Scholastica Academy | This was a campus valuation | Active Parish and/or community |
| St. Tammany | 416 E Rutland St. Covington, LA 70433 | St. Scholastica Academy | | $0.0 | St. Scholastica Academy | This was a campus valuation | Active Parish and/or community |
| St. Tammany | 424 E 21St / 111-113 S. Jahncke St. Covington, LA 70433 | St. Scholastica Academy | | $0.0 | St. Scholastica Academy | This was a campus valuation | Active Parish and/or community |
| St. Tammany | East 20th Ave. Covington, LA 70433 | St. Scholastica Academy | | $0.0 | St. Scholastica Academy | This was a campus valuation | Active Parish and/or community |
| St. Tammany | East Boston St. Covington, LA 70433 | St. Scholastica Academy | | $0.0 | St. Scholastica Academy | This was a campus valuation | Active Parish and/or community |
| St. Tammany | 122 S. Massachusetts St. Covington, LA 70433 | St. Scholastica Academy | | $0.0 | St. Scholastica Academy | This was a campus valuation | Active Parish and/or community |
| St. Tammany | 16118 Hwy. 190 (4354-4530 Ronald Reagan Hwy) Covington, LA 70433 | St. Scholastica Academy Athletic Complex | | $0.0 | St. Scholastica Academy | This was a campus valuation | Active Parish and/or community |
| Orleans | 1401 Erato St. New Orleans, LA | St. Teresa of Avila | $ 500,000.00 | $350,000.0 | Disputed Ownership | Has been on the market for over 6 | Active Parish and/or community |
| Orleans | 54423 Middle Rd New Orleans, LA 70435 | Storage Area (Old Gentilly Road) | | $1,000.0 | Unknown Value | | Unknown Value |
| Orleans | 54427 Middle Rd New Orleans, LA 70435 | Storage Area (Old Gentilly Road) | | $1,000.0 | Unknown Value | | Unknown Value |

Case 20-10846 Doc 4242-8 Filed 08/08/25 Entered 08/08/25 16:00:35 Exhibit G - Immovable Property Statement Page 140 of 161

Case 20-10846 Doc 1434-24 Filed 07/15/21 Page 13 of 15
7/15/25

| Civil Parish | ADDRESS | OCCUPANT | Market Value | Liquidation Value | Entity / Notes | Notes | Notes 2 |
|---|---|---|---|---|---|---|---|
| Orleans | 54436 Middle Rd New Orleans, LA 70435 | Storage Area (Old Gentilly Road) | | $1,000.0 | Unknown Value | | Unknown Value |
| Orleans | 54445 Middle Rd New Orleans, LA 70435 | Storage Area (Old Gentilly Road) | | $1,000.0 | Unknown Value | | Unknown Value |
| St. Tammany | Howze Beach Road | unknown | | $1,000.0 | Unknown Value | | Unknown Value |
| St. Tammany | Unknown | Unknown | | $1,000.0 | Unknown Value | | Unknown Value |
| St. Tammany | Unknown | Unknown | | $1,000.0 | Unknown Value | | Unknown Value |
| Orleans | 15049 Veronica St. New Orleans, LA | Vacant Land | | $1,000.0 | Unknown Value | | Unknown Value |
| St. Tammany | Gus Baldwin Road Pearl River, LA 70452 | Vacant Land | | $1,000.0 | Unknown Value | | Unknown Value |
| St. Tammany | Holy Trinity Drive Mandeville, LA 70471 | Vacant Land | $ 1,500,000.00 | $1,050,000.0 | Estimate | Depends on zoning | Depends on Zoning with St. Tammany |
| St. Tammany | Oak Harbor Blvd. | Vacant Land | | $1,000.0 | Unknown Value | | Unknown Value |
| Jefferson | 3500 Ames Blvd. Marrero, LA 70072 | Visitation of Our Lady Catholic Church | $ 2,250,000.00 | $1,575,000.0 | | | Active Parish and/or community |
| St. Bernard | 2501 Archbishop Hannan Meraux, LA 70075 | Old Hannan High | | $1,500,000.0 | Will be listing | | Listed for Sale |
| Plaquemines | n/a | | | $1,000.0 | Unknown Value | | Active Parish and/or community |
| Plaquemines | n/a | | | $1,000.0 | Unknown Value | | Active Parish and/or community |
| Plaquemines | n/a | | | $1,000.0 | Unknown Value | | Active Parish and/or community |
| St. Tammany | 306 St. Mary St., Madisonville, LA 70447 | St. Anselm | $ 1,875,000.00 | $1,312,500.0 | | | Active Parish and/or community |
| St. Tammany | 72040 Maple St., Abita Springs, LA 70420 | St. Jane de Chantal | $ 1,975,000.00 | $1,382,500.0 | | | Active Parish and/or community |

13

Case 20-10846 Doc 4242-8 Filed 08/08/25 Entered 08/08/25 16:00:55 Exhibit 6 - Immovable Property Statement Page 141 of 15

7/15/25

| Civil Parish | ADDRESS | OCCUPANT | Market Value | Liquidation Value | Entity / Notes | Notes | Notes 2 |
|---|---|---|---|---|---|---|---|
| St. Tammany | Prats Dairy Road | | $ 100,000.00 | $70,000.0 | | | Unknown Value |
| St. Tammany | N/A | | $1,000.0 | $1,000.0 | | Unknown Value | Unknown Value |
| St. Tammany | N/A | | $1,000.0 | $1,000.0 | | Unknown Value | Unknown Value |
| Lafourche | n/a - along Bayou Lafourche | | $1,000.0 | $1,000.0 | | Unknown Value | Unknown Value |
| Jefferson | approximately 200' fronting A.J. Ting St. Lafitte, Louisiana, by 40' depth adjacent to | | $1,000.0 | $1,000.0 | | Unknown Value | Unknown Value |
| Jefferson | 1101 Barataria Blvd | Madonna Manor (Former Site) | $ 1,250,000.00 | $875,000.0 | Fire on Property | Estimate | To be subdivided and listed for sale |
| | | | | $117,616,900.0 | | | |
| | | | Bulk Sale @-15% | $99,974,365.0 | | | |

14

141

# EXHIBIT 7

# Immovable Property of the Additional Debtors

| Entity | Description | Address | City | Zip | State | FMV | FMV Add'l Debtors W/Claims | Liquidation Value Add'l Debtors w/Claims |
|---|---|---|---|---|---|---|---|---|
| All Saints Church | 001 Church | 1437 Teche St. | New Orleans | 70114 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| All Saints Church | 002 Rectory | 1441 Teche St. | New Orleans | 70114 | LA | $ 76,650 | $ 76,650 | $ 45,990 |
| All Saints Church | 003 Parish Office | 1343 Teche St. | New Orleans | 70114 | LA | $ 93,450 | $ 93,450 | $ 56,070 |
| All Saints Church | 005 Althea W. Holmes Center | 300 Ptolemy Street | New Orleans | 70114 | LA | $ 81,900 | $ 81,900 | $ 49,140 |
| All Saints Church | 010 Garage | 1441 Teche St. | New Orleans | 70114 | LA | $ 5,600 | $ 5,600 | $ 3,360 |
| All Saints School | 004 School & Fountain Shed | 1441 Teche St. | New Orleans | 70114 | LA | $ 940,450 | $ 940,450 | $ 564,270 |
| All Saints | Land Behind School Bldg. Used for Playground | 323 Socrates | New Orleans | | LA | $ - | $ - | $ - |
| All Saints | Land Behind Rectory | 322 Ptolemy St | New Orleans | | LA | $ - | $ - | $ - |
| St. Alphonsus - St. Mary's Assumption Church | 013 Convent | 1017 St. Andrew St. | New Orleans | 70130 | LA | $ 438,200 | $ 438,200 | $ 262,920 |
| St. Alphonsus - St. Mary's Assumption Church | 016 St. Mary's Chapel | 1516 Jackson Ave. | New Orleans | 70130 | LA | $ 221,900 | $ 221,900 | $ 133,140 |
| St. Alphonsus - St. Mary's Assumption Church | 019 Storage Shed | 1017 St. Andrew St. | New Orleans | 70130 | LA | $ 680 | $ 680 | $ 408 |
| St. Andrew the Apostle Church | 001 Church & Classrooms | 3101 Eton St. | New Orleans | 70131 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Andrew the Apostle Church | 002 Rectory | 3101 Eton St. | New Orleans | 70131 | LA | $ 324,100 | $ 324,100 | $ 194,460 |
| St. Andrew the Apostle Church | 003 Sanyo Building (Youth Building 12/31/82) | 3129 Eton St. | New Orleans | 70131 | LA | $ 120,750 | $ 120,750 | $ 72,450 |
| St. Andrew the Apostle Church | 031 Gazebo (2020) | 3131 Eton St | New Orleans | 70131 | LA | $ 19,278 | $ 19,278 | $ 11,567 |
| St. Andrew the Apostle School | 004 Administration Building | 3131 Eton St. | New Orleans | 70131 | LA | $ 764,050 | $ 764,050 | $ 458,430 |
| St. Andrew the Apostle School | 005 Cafeteria/Religious Ed | 3103 Eton St. | New Orleans | 70131 | LA | $ 697,550 | $ 697,550 | $ 418,530 |
| St. Andrew the Apostle School | 006 Classroom Building A | 3131 Eton St. | New Orleans | 70131 | LA | $ 393,750 | $ 393,750 | $ 236,250 |
| St. Andrew the Apostle School | 007 Classroom Building B | 3131 Eton St. | New Orleans | 70131 | LA | $ 393,750 | $ 393,750 | $ 236,250 |
| St. Andrew the Apostle School | 008 Classroom Building C | 3131 Eton St. | New Orleans | 70131 | LA | $ 409,500 | $ 409,500 | $ 245,700 |
| St. Andrew the Apostle School | 009 Classroom Building D | 3131 Eton St. | New Orleans | 70131 | LA | $ 391,650 | $ 391,650 | $ 234,990 |
| St. Andrew the Apostle School | 010 Boiler/Storage | 3131 Eton St. | New Orleans | 70131 | LA | $ 14,288 | $ 14,288 | $ 8,573 |
| St. Andrew the Apostle School | 019 TLC Educational Building | 3131 Eton St. | New Orleans | 70131 | LA | $ 1,295,000 | $ 1,295,000 | $ 777,000 |
| St. Andrew the Apostle School | 020 Maintenance Building | 3131 Eton St. | New Orleans | 70131 | LA | $ 15,649 | $ 15,649 | $ 9,390 |
| St. Andrew the Apostle School | 025 Outside Walk-In Cooler/Freezer | 3131 Eton St. | New Orleans | 70131 | LA | $ 5,250 | $ 5,250 | $ 3,150 |
| St. Andrew the Apostle School | 027 Multi-Purpose/Gym Bldg. | 3131 Eton St. | New Orleans | 70131 | LA | $ 1,505,350 | $ 1,505,350 | $ 903,210 |
| St. Andrew the Apostle School | 028 Pre-K 3 Classrooms & Maintenance Shop | 3131 Eton St. | New Orleans | 70131 | LA | $ 81,550 | $ 81,550 | $ 48,930 |
| St. Andrew the Apostle School | 029 Storage Container 1 | 3101 Eton St. | New Orleans | 70131 | LA | $ 3,402 | $ 3,402 | $ 2,041 |
| St. Andrew the Apostle School | 030 Storage Container 2 | 3101 Eton St. | New Orleans | 70131 | LA | $ 3,402 | $ 3,402 | $ 2,041 |
| Blessed Francis Xavier Seelos Parish | 001 Church | 3053 Dauphine St. | New Orleans | 70117 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| Blessed Francis Xavier Seelos Parish | 002 Rectory | 3053 Dauphine St. | New Orleans | 70117 | LA | $ 215,600 | $ 215,600 | $ 129,360 |
| Blessed Seelos | Vacant Land Adjacent to Rectory off Dauphine -- Listing w 812-814 Clouet /44488 Clouet | | New Orleans | | LA | $ - | $ - | $ - |
| St. Anthony of Padua Church | 001 Church | 4640 Canal St. | New Orleans | 70119 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Anthony of Padua Church | 002 Priory (New & Old - 1 Building) | 4640 Canal St. | New Orleans | 70119 | LA | $ 1,147,300 | $ 1,147,300 | $ 688,380 |
| St. Anthony of Padua Church | 005 Carport | 4640 Canal St. | New Orleans | 70119 | LA | $ 2,381 | $ 2,381 | $ 1,429 |
| St. Anthony of Padua School | 003 Convent | 4601 Cleveland Ave | New Orleans | 70119 | LA | $ 684,250 | $ 684,250 | $ 410,550 |
| St. Anthony of Padua School | 004 Leased School | 4601 Cleveland Ave | New Orleans | 70119 | LA | $ - | $ - | $ - |
| St. Augustine Church | 001 Church/Rectory/Hall | 1210 Governor Nicholls St. | New Orleans | 70119 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. David School | 004 CCD Building | 5617 Marais St. | New Orleans | 70117 | LA | $ 63,700 | $ 63,700 | $ 38,220 |
| St. David School | 012 School/Gym | 1230 Lamanche St. | New Orleans | 70117 | LA | $ 1,235,850 | $ 1,235,850 | $ 741,510 |
| St. David | Vacant Parcel next to 5617 Marais (CCD Bldg.) | 687/5609 Marais St | | | LA | $ - | $ - | $ - |
| St. David | Vacant Parcel behind School ( School Leased to TCA) | 1208 Lamanche | | | LA | $ - | $ - | $ - |
| St. Dominic Church | 001 Church | 775 Harrison Ave. | New Orleans | 70124 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Dominic Church | 002 Bell Tower | 775 Harrison Ave. | New Orleans | 70124 | LA | $ 262,500 | $ 262,500 | $ 157,500 |
| St. Dominic Church | 003 Rectory | 775 Harrison Ave. | New Orleans | 70124 | LA | $ 1,477,700 | $ 1,477,700 | $ 886,620 |
| St. Dominic Church | 004 Dwelling (Sacristan) | 6330 Vicksburg St. | New Orleans | 70124 | LA | $ 52,850 | $ 52,850 | $ 31,710 |
| St. Dominic Church | 005 Aquinas Hall-Old Convent | 6361 Memphis St. | New Orleans | 70124 | LA | $ 1,528,800 | $ 1,528,800 | $ 917,280 |
| St. Dominic Church | 020 Rectory (Leased) | 5910 Milne Blvd | New Orleans | 70124 | LA | $- | $ - | $ - |
| St. Dominic School | 006 School & Cafeteria | 6326 Memphis St. | New Orleans | 70124 | LA | $ 2,902,200 | $ 2,902,200 | $ 1,741,320 |
| St. Dominic School | 007 Gym & Hall | 6326 Memphis St. | New Orleans | 70124 | LA | $ 1,009,750 | $ 1,009,750 | $ 605,850 |

| Entity | Building | Address | City | Zip | State | | | | |
|--------|----------|---------|------|-----|-------|---|---|---|---|
| St. Dominic School | 008 School | 6326 Memphis St. | New Orleans | 70124 | LA | $ | 1,453,900 | $ 1,453,900 | $ 872,340 |
| St. Dominic School | 011 Garage | 6330 Vicksburg St. | New Orleans | 70124 | LA | $ | 6,048 | $ 6,048 | $ 3,629 |
| St. Dominic School | 013 Storage Shed 1 | 6326 Memphis St. | New Orleans | 70124 | LA | $ | 680 | $ 680 | $ 408 |
| St. Dominic School | 014 Storage Shed 2 | 6330 Vicksburg St. | New Orleans | 70124 | LA | $ | 1,361 | $ 1,361 | $ 816 |
| St. Dominic School | 015 Concession | 775 Harrison Ave. | New Orleans | 70124 | LA | $ | 18,371 | $ 18,371 | $ 11,022 |
| St. Dominic School | 016 Shade Shelter 1 | 6326 Memphis St. | New Orleans | 70124 | LA | $ | 1,361 | $ 1,361 | $ 816 |
| St. Dominic School | 017 Shade Shelter 2 | 6326 Memphis St. | New Orleans | 70124 | LA | $ | 680 | $ 680 | $ 408 |
| St. Dominic School | 018 Shade Shelter 3 | 6326 Memphis St. | New Orleans | 70124 | LA | $ | 680 | $ 680 | $ 408 |
| St. Dominic School | 019 Shade Shelter 4 | 6326 Memphis St. | New Orleans | 70124 | LA | $ | 680 | $ 680 | $ 408 |
| St. Francis of Assisi Church | 001 Church | 619 State St. | New Orleans | 70118 | LA | $ | 100,000 | | |
| St. Francis of Assisi Church | 002 Rectory | 631 State St. | New Orleans | 70118 | LA | $ | 278,600 | | |
| St. Francis of Assisi Church | 003 Parish Center/Office | 611 State St. | New Orleans | 70118 | LA | $ | 722,400 | | |
| St. Francis of Assisi Church | 004 School - Lycee Francais | 5951 Patton St. | New Orleans | 70118 | LA | $ | 2,159,500 | | |
| St. Francis of Assisi Church | 006 Garage | 631 State St. | New Orleans | 70118 | LA | $ | 12,587 | | |
| Holy Name of Jesus Church | 001 Rectory & Parish Activity Center (Old Convent) | 3220 LaSalle St. | New Orleans | 70115 | LA | $ | 1,061,900 | $ 1,061,900 | $ 637,140 |
| Holy Name of Jesus Church | 003 Church | 6367 St Charles Ave, | New Orleans | 70115 | LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| Holy Name of Jesus School | 002 Elementary School | 6325 Cromwell Pl. | New Orleans | 70118 | LA | $ | 3,297,700 | $ 3,297,700 | $ 1,978,620 |
| Holy Name of Jesus School | 004 Storage Building | 6325 Cromwell Pl. | New Orleans | 70118 | LA | $ | 4,082 | $ 4,082 | $ 2,449 |
| Holy Name of Mary Church | 001 Church | 400 Verret St. | New Orleans | 70114 | LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| Holy Name of Mary Church | 002 Rectory | 500 Eliza St. | New Orleans | 70114 | LA | $ | 518,700 | $ 518,700 | $ 311,220 |
| Holy Name of Mary Church | 005 Garage | 500 Eliza St. | New Orleans | 70114 | LA | $ | 14,288 | $ 14,288 | $ 8,573 |
| Holy Name of Mary School | 004 School | 502 Olivier St. | New Orleans | 70114 | LA | $ | 1,217,650 | $ 1,217,650 | $ 730,590 |
| Immaculate Conception Church | 001 Church | 130 Baronne St. | New Orleans | 70112 | LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| | | 6300 Pines Blvd. Vacant Land Approx. | | | | | | | |
| Immaculate Heart of Mary , Inc. | Closed Parish -Former Immaculate Heart of Mary - Vacant | 5.8 Acres Pines Blvd | New Orleans | | LA | $ | - | | |
| St. Joseph Church | 001 Church | 1802 Tulane Ave. | New Orleans | 70112 | LA | $ | 100,000 | | |
| Blessed Trinity Church | 001 Church | 4230 S. Broad St. | New Orleans | 70125 | LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| Blessed Trinity Church | 002 Rectory | 4201 S Dorgenois St. | New Orleans | 70125 | LA | $ | 235,550 | $ 235,550 | $ 141,330 |
| Blessed Trinity Church | 003 Convent | 4222 South Broad St. | New Orleans | 70125 | LA | $ | 223,825 | $ 223,825 | $ 134,295 |
| Blessed Trinity Church | 004 Trinity Hall | 3900 General Taylor St. | New Orleans | 70125 | LA | $ | 1,539,475 | $ 1,539,475 | $ 923,685 |
| Blessed Trinity Church | 005 Rectory Garage | 4230 S. Broad St. | New Orleans | 70125 | LA | $ | 5,954 | $ 5,954 | $ 3,572 |
| Mater Dolorosa Church | 001 Church | 1230 S. Carrollton Ave. | New Orleans | 70118 | LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| Mater Dolorosa Church | 002 Rectory/Garage | 8128 Plum St. | New Orleans | 70118 | LA | $ | 698,250 | $ 698,250 | $ 418,950 |
| Mater Dolorosa Church | 003 Parish House | 1225 Dublin St. | New Orleans | 70118 | LA | $ | 192,150 | $ 192,150 | $ 115,290 |
| Mater Dolorosa Church | 004 Garage / Carport | 8128 Plum St. | New Orleans | 70118 | LA | $ | 24,494 | $ 24,494 | $ 14,697 |
| Mater Dolorosa Church | 005 Boiler House | 8128 Plum St. | New Orleans | 70118 | LA | $ | 5,783 | $ 5,783 | $ 3,470 |
| Our Lady of the Rosary Church | 001 Church | 3368 Esplanade Ave. | New Orleans | 70119 | LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| Our Lady of the Rosary Church | 002 Rectory | 1342 Moss St. | New Orleans | 70119 | LA | $ | 520,800 | $ 520,800 | $ 312,480 |
| Our Lady of the Rosary Church | 003 Church Office | 1322 Moss St. | New Orleans | 70119 | LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| Our Lady of the Rosary Church | 004 Vincent Hall | 1324 Moss St. | New Orleans | 70119 | LA | $ | 117,250 | $ 117,250 | $ 70,350 |
| Our Lady of the Rosary Church | 005 School/Gym | 1342 Moss St. | New Orleans | 70119 | LA | $ | 2,600,150 | $ 2,600,150 | $ 1,560,090 |
| Our Lady of the Rosary Church | 008 Carport 1 | 1342 Moss St. | New Orleans | 70119 | LA | $ | 2,268 | $ 2,268 | $ 1,361 |
| Our Lady of the Rosary Church | 013 Storage/Electrical | 3368 Esplanade Ave. | New Orleans | 70119 | LA | $ | 4,763 | $ 4,763 | $ 2,858 |
| Our Lady of the Rosary Church | 014 Storage/Irrigation Control | 3368 Esplanade Ave. | New Orleans | 70119 | LA | $ | 4,423 | $ 4,423 | $ 2,654 |
| Our Lady of the Rosary Church | 015 Storage Shed | 3368 Esplanade Ave. | New Orleans | 70119 | LA | $ | 350 | $ 350 | $ 210 |
| St. John the Baptist (New Orleans) | 002 Rectory | 1139 Oretha Castle Haley Blvd. | New Orleans | 70113 | LA | $ | 208,543 | | |
| St. John the Baptist (New Orleans) | 005 St. John the Baptist Church | 1139 Oretha Castle Haley Blvd. | New Orleans | 70113 | LA | $ | 100,000 | | |
| St. Patrick Church | 001 Church | 724 Camp St. | New Orleans | 70130 | LA | $ | 100,000 | | |
| St. Patrick Church | 002 Rectory | 724 Camp St. | New Orleans | 70130 | LA | $ | 811,650 | | |
| St. Patrick Church | 004 Msgr. John P. Reynolds Hall (Old School) | 724 Camp St. | New Orleans | 70130 | LA | $ | 140,700 | | |
| St. Paul the Apostle Church | 008 Building B | 6820 Chef Menteur Hwy. | New Orleans | 70126 | LA | $ | 83,300 | | |
| St. Paul the Apostle | Lot 7 & 8 Sq C purchase for resub ( new office bldg ) | 54688 America St. | New Orleans | | LA | $ | - | | |
| St. Peter Claver Church | 001 Church | 1923 St. Philip Street | New Orleans | 70116 | LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| St. Peter Claver Church | 002 Rectory | 1923 St. Philip Street | New Orleans | 70116 | LA | $ | 276,150 | $ 276,150 | $ 165,690 |

144

| Parish | Building | Address | City | ZIP | State | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| St. Peter Claver Church | 004 Church Office | 1910 Ursuline Ave. | New Orleans | 70116 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| St. Peter Claver Church | 011 Shed | 1020 N. Prieur St. | New Orleans | 70116 | LA | $ | 1,814 | $ | 1,814 | $ | 1,089 |
| St. Peter Claver Church | 012 Sankofa Building | 1007 N. Prieur St. | New Orleans | 70116 | LA | $ | 114,100 | $ | 114,100 | $ | 68,460 |
| St. Peter Claver Church | 014 Ujima Building | 1019 N. Prieur St. | New Orleans | 70116 | LA | $ | 105,350 | $ | 105,350 | $ | 63,210 |
| St. Peter Claver Church | 020 Edmundite Mission ( Food Pantry) | 1923 St. Phillip St. | New Orleans | 70116 | LA | $ | 120,050 | $ | 120,050 | $ | 72,030 |
| St. Peter Claver Church | 021 Ujima Shed | 1020 N. Prieur St. | New Orleans | 70116 | LA | $ | 7,144 | $ | 7,144 | $ | 4,287 |
| St. Ann Shrine, New Orleans | 008 Shrine | 2101 Ursuline Ave. | New Orleans | 70116 | LA | $ | 227,500 | $ | 227,500 | $ | 136,500 |
| St. Peter Claver School | 005 Enrichment Building | 1020 N. Prieur St. | New Orleans | 70116 | LA | $ | 123,550 | $ | 123,550 | $ | 74,130 |
| St. Peter Claver School | 006 School | 1020 N. Prieur St. | New Orleans | 70116 | LA | $ | 2,186,450 | $ | 2,186,450 | $ | 1,311,870 |
| St. Peter Claver School | 007 Outside Restrooms/Maintenance shop | 1020 N. Prieur St. | New Orleans | 70116 | LA | $ | 61,250 | $ | 61,250 | $ | 36,750 |
| St. Peter Claver | Green Space and Play area behind school | 1027-29 N. Roman St. | New Orleans | | LA | $ | - | $ | - | $ | - |
| St. Peter Claver | Parking Lot for parish | 2000-02 1/2 Ursuline Ave | New Orleans | | LA | $ | - | $ | - | $ | - |
| St. Pius X Church | 001 Church | 6670 Spanish Fort Blvd. | New Orleans | 70124 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| St. Pius X Church | 002 Mechanical Equipment Bldg. | 6670 Spanish Fort Blvd. | New Orleans | 70124 | LA | $ | 49,000 | $ | 49,000 | $ | 29,400 |
| St. Pius X Church | 003 School/Mechanical Bldg. | 6670 Spanish Fort Blvd. | New Orleans | 70124 | LA | $ | 17,350 | $ | 17,350 | $ | 10,410 |
| St. Pius X Church | 004 Church/Equipment Bldg. | 6666 Spanish Fort Blvd. | New Orleans | 70124 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| St. Pius X Church | 005 Church Offices (1983) | 6666 Spanish Fort Blvd. | New Orleans | 70124 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| St. Pius X Church | 006 Nursery | 49 Warbler St. | New Orleans | 70124 | LA | $ | 88,301 | $ | 88,301 | $ | 52,980 |
| St. Pius X Church | 011 St. Pius New Orleans Rectory (2012) | 57 Warbler St. | New Orleans | 70124 | LA | $ | 190,400 | $ | 190,400 | $ | 114,240 |
| St. Pius X Church | 012 Adoration Chapel (2013) | 6666 Spanish Fort Blvd. | New Orleans | 70124 | LA | $ | 108,850 | $ | 108,850 | $ | 65,310 |
| St. Pius X School | 007 Cafeteria/Admin Building | 6600 Spanish Fort Blvd. | New Orleans | 70124 | LA | $ | 1,245,650 | $ | 1,245,650 | $ | 747,390 |
| St. Pius X School | 008 Lower School | 6600 Spanish Fort Blvd. | New Orleans | 70124 | LA | $ | 1,858,850 | $ | 1,858,850 | $ | 1,115,310 |
| St. Pius X School | 009 Multipurpose Building (1983) | 6600 Spanish Fort Blvd. | New Orleans | 70124 | LA | $ | 999,950 | $ | 999,950 | $ | 599,970 |
| St. Pius X School | 010 Gymnasium | 6600 Spanish Fort Blvd. | New Orleans | 70124 | LA | $ | 1,254,400 | $ | 1,254,400 | $ | 752,640 |
| Resurrection of Our Lord Church | 001 Church/School Administration Building | 9701 Hammond St. | New Orleans | 70127 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Resurrection of Our Lord Church | 002 Rectory/ Garage (1988) | 9701 Hammond St. | New Orleans | 70127 | LA | $ | 219,800 | $ | 219,800 | $ | 131,880 |
| Resurrection of Our Lord Church | 003 Pastoral Center/ Offices/ Hall | 9701 Hammond St. | New Orleans | 70127 | LA | $ | 266,000 | $ | 266,000 | $ | 159,600 |
| St. Nicholas of Myra Mission | 001 Church | 21420 Chef Menteur Hwy. | New Orleans | 70129 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Resurrection Of Our Lord School | 005 Pre-K Classrooms | 4861 Rosalia Dr. | New Orleans | 70127 | LA | $ | 373,100 | $ | 373,100 | $ | 223,860 |
| Resurrection Of Our Lord School | 006 School #1/School #2/Restrooms | 4861 Rosalia Dr. | New Orleans | 70127 | LA | $ | 929,250 | $ | 929,250 | $ | 557,550 |
| Resurrection Of Our Lord School | 007 Cafeteria | 4861 Rosalia Dr. | New Orleans | 70127 | LA | $ | 545,650 | $ | 545,650 | $ | 327,390 |
| Resurrection Of Our Lord School | 009 Storage Building | 4861 Rosalia Dr. | New Orleans | 70127 | LA | $ | 43,050 | $ | 43,050 | $ | 25,830 |
| Resurrection Of Our Lord School | 011 Multipurpose Building | 4861 Rosalia St. | New Orleans | 70127 | LA | $ | 2,230,550 | $ | 2,230,550 | $ | 1,338,330 |
| Resurrection Of Our Lord School | 012 Garage | 9701 Hammond St. | New Orleans | 70127 | LA | $ | 16,670 | $ | 16,670 | $ | 10,002 |
| Resurrection Of Our Lord School | 013 School Building B | 4861 Rosalia Dr. | New Orleans | 70127 | LA | $ | 625,450 | $ | 625,450 | $ | 375,270 |
| Resurrection Of Our Lord School | 014 Restrooms | 4861 Rosalia Dr. | New Orleans | 70127 | LA | $ | 27,896 | $ | 27,896 | $ | 16,738 |
| Resurrection Of Our Lord School | 015 Storage Shed | 4861 Rosalia Dr. | New Orleans | 70127 | LA | $ | 2,041 | $ | 2,041 | $ | 1,225 |
| Resurrection of Our Lord | Nicholas of Myra Church parking lots on each side of church | 21400 & 21426 (Lots 7 & 8 Sq 8) Chef Menteur | New Orleans | | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| St. Rita Catholic Church | 001 Church/Rectory | 2729 Lowerline St. | New Orleans | 70125 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| St. Theresa of Avila Church | 001 Church | 1401 Erato Street | New Orleans | 70130 | LA | $ | 100,000 | | | | | |
| St. Raymond Church | 005 Convent | 3704 Paris Ave. | New Orleans | 70122 | LA | $ | 188,300 | | | | | |
| St. Raymond/St. Leo | 001 St. Leo the Great Church | 2916 Paris Ave. | New Orleans | 70119 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| St. Raymond/St. Leo | 002 Rectory | 2916 Paris Ave. | New Orleans | 70119 | LA | $ | 539,000 | $ | 539,000 | $ | 323,400 |
| St. Raymond/St. Leo | 009 Storage Shed (8' X 8") (5/94) | 1502 Abundance St. | New Orleans | 70119 | LA | $ | 1,701 | $ | 1,701 | $ | 1,021 |
| St. Raymond/St. Leo | 011 Ginyard Hall | 2910 Paris Ave. | New Orleans | 70119 | LA | $ | 64,750 | $ | 64,750 | $ | 38,850 |
| St. Leo the Great School | 005 School Annex | 2943 St. Bernard Ave. | New Orleans | 70119 | LA | $ | 572,600 | $ | 572,600 | $ | 343,560 |
| St. Leo the Great School | 006 Main School | 1501 Abundance St. | New Orleans | 70119 | LA | $ | 1,821,050 | $ | 1,821,050 | $ | 1,092,630 |
| St. Leo the Great School | 007 Storage (25'X25' Special Ed.) | 1501 Abundance St. | New Orleans | 70119 | LA | $ | 13,608 | $ | 13,608 | $ | 8,165 |
| Blessed Sacrament/ St. Joan of Arc Parish | 001 St. Joan of Arc Church | 8321 Burthe St. | New Orleans | 70118 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Blessed Sacrament/ St. Joan of Arc Parish | 002 Rectory | 8321 Burthe St. | New Orleans | 70118 | LA | $ | 244,650 | $ | 244,650 | $ | 146,790 |
| Blessed Sacrament/ St. Joan of Arc Parish | 003 Convent | 900 Cambronne St. | New Orleans | 70118 | LA | $ | 163,800 | $ | 163,800 | $ | 98,280 |
| Blessed Sacrament/ St. Joan of Arc Parish | 006 Parish Center - (916 Sq. Ft.) | 8321 Burthe St. | New Orleans | 70118 | LA | $ | 52,500 | $ | 52,500 | $ | 31,500 |
| Blessed Sacrament/ St. Joan of Arc Parish | 007 School Annex | 8316 Freret St. | New Orleans | 70118 | LA | $ | 52,850 | $ | 52,850 | $ | 31,710 |
| Blessed Sacrament/ St. Joan of Arc Parish | 009 Rectory Annex | 900 Dante St. | New Orleans | 70118 | LA | $ | 36,401 | $ | 36,401 | $ | 21,841 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Blessed Sacrament/ St. Joan of Arc Parish | 010 Rental/Storage | 904 Dante St. | New Orleans | 70118 | LA | $ | 102,900 | $ | 102,900 | $ | 61,740 |
| Blessed Sacrament/ St. Joan of Arc Parish | 011 Rectory Garage / Shed | 8321 Burthe St. | New Orleans | 70118 | LA | $ | 13,608 | $ | 13,608 | $ | 8,165 |
| Blessed Sacrament/ St. Joan of Arc Parish | 012 Carport | 8321 Burthe St. | New Orleans | 70118 | LA | $ | 1,361 | $ | 1,361 | $ | 816 |
| Blessed Sacrament/ St. Joan of Arc Parish | 013 Storage/Pavilion | 8321 Burthe St. | New Orleans | 70118 | LA | $ | 14,969 | $ | 14,969 | $ | 8,981 |
| Blessed Sacrament/ St. Joan of Arc Parish | 014 Gazebo | 8321 Burthe St. | New Orleans | 70118 | LA | $ | 1,021 | $ | 1,021 | $ | 612 |
| St. Joan of Arc School | 004 School | 919 Cambronne St. | New Orleans | 70118 | LA | $ | 1,368,500 | $ | 1,368,500 | $ | 821,100 |
| St. Katherine Drexel Parish | 001 Holy Ghost Church | 2001 Louisiana Ave. | New Orleans | 70115 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| St. Katherine Drexel Parish | 002 Rectory | 2015 Louisiana Ave. | New Orleans | 70115 | LA | $ | 376,950 | $ | 376,950 | $ | 226,170 |
| St. Katherine Drexel Parish | 003 Convent/ Church Office | 3325 Danneel St. | New Orleans | 70115 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| St. Katherine Drexel Parish | 007 Drexel Center | 3319 Danneel St. | New Orleans | 70115 | LA | $ | 91,350 | $ | 91,350 | $ | 54,810 |
| Holy Ghost School | 005 New School | 2039 Toledano St. | New Orleans | 70115 | LA | $ | 859,950 | $ | 859,950 | $ | 515,970 |
| Holy Ghost School | 006 Old School | 2029-35 Toledano St. | New Orleans | 70115 | LA | $ | 509,950 | $ | 509,950 | $ | 305,970 |
| Corpus Christi/Epiphany Church-2022 St. Bernard Ave 001 Corpus Christi Church | | 2014 St. Bernard Ave. | New Orleans | 70116 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Corpus Christi/Epiphany Church-2022 St. Bernard Ave 002 Rectory | | 2022 St. Bernard Ave. | New Orleans | 70116 | LA | $ | 309,750 | $ | 309,750 | $ | 185,850 |
| Corpus Christi/Epiphany Church-2022 St. Bernard Ave 003 St. Katherine Drexel Center | | 2000 St. Bernard Avenue | New Orleans | 70116 | LA | $ | 477,400 | $ | 477,400 | $ | 286,440 |
| Corpus Christi/Epiphany Church-2022 St. Bernard Ave 010 (2) Vehicle Carport behind Rectory | | 2022 St. Bernard Ave. | New Orleans | 70116 | LA | $ | 1,701 | $ | 1,701 | $ | 1,021 |
| Corpus Christi-Epiphany School | 005 Community Resource Center | 2022 St. Bernard Ave. Building C | New Orleans | 70116 | LA | $ | 3,391,500 | $ | 3,391,500 | $ | 2,034,900 |
| St. Henry Church | 001 Church 803 General Pershing | 803 General Pershing St. | New Orleans | 70115 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| St. Henry Church | 002 Rectory & Garage | 812 General Pershing St. | New Orleans | 70115 | LA | $ | 327,600 | $ | 327,600 | $ | 196,560 |
| St. Henry Church | 003 School | 811 General Pershing St. | New Orleans | 70115 | LA | $ | 806,050 | $ | 806,050 | $ | 483,630 |
| St. Henry Church | 005 Shed | 811 General Pershing St. | New Orleans | 70115 | LA | $ | 1,890 | $ | 1,890 | $ | 1,134 |
| St. Henry Church | 006 Restrooms | 811 General Pershing St. | New Orleans | 70115 | LA | $ | 23,474 | $ | 23,474 | $ | 14,084 |
| St. Henry Church | 007 Shed | 811 General Pershing St. | New Orleans | 70115 | LA | $ | 2,041 | $ | 2,041 | $ | 1,225 |
| St. Henry Church | 008 Blessed Pauline Center | 4219 Constance St. | New Orleans | 70115 | LA | $ | 407,050 | $ | 407,050 | $ | 244,230 |
| St. Henry Church | 009 El Yo Yo | 735 Gen. Pershing St. | New Orleans | 70115 | LA | $ | 376,250 | $ | 376,250 | $ | 225,750 |
| St. Henry Church | 010 Shade Shelter | 811 General Pershing St. | New Orleans | 70115 | LA | $ | 2,268 | $ | 2,268 | $ | 1,361 |
| Good Shepherd Parish | 001 St. Stephen Church | 1025 Napoleon Ave. | New Orleans | 70115 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Good Shepherd Parish | 002 Rectory | 1025 Napoleon Ave. | New Orleans | 70115 | LA | $ | 848,050 | $ | 848,050 | $ | 508,830 |
| St. Stephen School | 004 School/Gym/Cafeteria | 1027 Napoleon Ave. | New Orleans | 70115 | LA | $ | 4,016,950 | $ | 4,016,950 | $ | 2,410,170 |
| St. Stephen School | 007 Shade Shelter 1 | 1027 Napoleon Ave. | New Orleans | 70115 | LA | $ | 2,041 | $ | 2,041 | $ | 1,225 |
| St. Stephen School | 008 Shade Shelter 2 | 1027 Napoleon Ave. | New Orleans | 70115 | LA | $ | 680 | $ | 680 | $ | 408 |
| St. Josephine Bakhita Church | 001 Church | 3501 N. Miro St. | New Orleans | 70117 | LA | $ | 100,000 | | | | |
| St. Josephine Bakhita Church | 002 Friary | 3501 N. Miro St. | New Orleans | 70117 | LA | $ | 448,350 | | | | |
| St. Josephine Bakhita Church | 004 Head Start-St. Mary of the Angels (35%) | 2225 Congress St. | New Orleans | 70117 | LA | $ | 1,083,513 | | | | |
| Our Lady Star of the Sea | 001 Church | 1901 St. Roch Ave. | New Orleans | 70117 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Our Lady Star of the Sea | 002 Rectory | 1835 St. Roch Ave. | New Orleans | 70117 | LA | $ | 145,250 | $ | 145,250 | $ | 87,150 |
| Our Lady Star of the Sea | 008 Storage Shed (2008) | 1835 St. Roch Ave. | New Orleans | 70117 | LA | $ | 340 | $ | 340 | $ | 204 |
| Our Lady Star of the Sea | 031 Our Lady Star of the Sea School | 1927 St. Roch Ave. | New Orleans | 70117 | LA | $ | 533,750 | $ | 533,750 | $ | 320,250 |
| St. Martin de Porres Church | 002 Rectory | 4729 Pineda St. | New Orleans | 70126 | LA | $ | 50,750 | $ | 50,750 | $ | 30,450 |
| St. James Major | 001 Church | 3770 Gentilly Blvd. | New Orleans | 70122 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| St. James Major | 002 -Rectory | 3736 Gentilly Blvd. | New Orleans | 70122 | LA | $ | 171,850 | $ | 171,850 | $ | 103,110 |
| St. James Major | 003 -Convent | 3800 Gentilly Blvd. | New Orleans | 70122 | LA | $ | 445,200 | $ | 445,200 | $ | 267,120 |
| St. James Major | 004 -School Boiler House | 3774 Gentilly Blvd | New Orleans | 70122 | LA | $ | 23,275 | $ | 23,275 | $ | 13,965 |
| St. James Major | 006 -Elementary School | 3778 Gentilly Blvd. | New Orleans | 70122 | LA | $ | 1,252,650 | $ | 1,252,650 | $ | 751,590 |
| St. James Major | 007 -Middle School/Gym | 3774 Gentilly Blvd. | New Orleans | 70122 | LA | $ | 744,975 | $ | 744,975 | $ | 446,985 |
| St. James Major | 008 - Storage and Garage | 3736 Gentilly Blvd. | New Orleans | 70122 | LA | $ | 15,989 | $ | 15,989 | $ | 9,594 |
| St. James Major | 009 - Cottage | 3770 Gentilly Blvd. | New Orleans | 70122 | LA | $ | 23,275 | $ | 23,275 | $ | 13,965 |
| St. Martin de Porres Church | 001 Church/Rectory | 5621 Elysian Fields Ave. | New Orleans | 70122 | LA | $ | 100,000 | | | | |
| Mary, Help of Christians Church | 001 Church | 601 Second Ave. | Harvey | 70058 | LA | $ | 100,000 | | | | |
| Mary, Help of Christians Church | 002 Rectory | 608 First Ave. | Harvey | 70058 | LA | $ | 85,400 | | | | |
| Mary, Help of Christians Church | 005 Kindergarten Building | 607 First Ave. | Harvey | 70058 | LA | $ | 193,550 | | | | |
| Mary, Help of Christians Church | 016 Youth Center | 600 Second Ave. | Harvey | 70058 | LA | $ | 78,400 | | | | |
| Mary, Help of Christians Church | 017 Parish Center | 600 Second Ave. | Harvey | 70058 | LA | $ | 253,750 | | | | |
| Mary, Help of Christians Church | 018 Storage Building (Ruekest) | 600 Second Ave. | Harvey | 70058 | LA | $ | 19,051 | | | | |

146

| Entity | Building | Address | City | Zip | State | Value |
|---|---|---|---|---|---|---|
| Mary, Help of Christians Church | 021 Home School/ PTA House | 612 First Ave. | Harvey | 70058 | LA | $ 142,100 |
| Mary, Help of Christians Church | 022 Maintenance Shop | 621 First Ave. | Harvey | 70058 | LA | $ 32,319 |
| Mary, Help of Christians Church | 023 Storage Shed #1 (10 X 20) | 617 Second Ave | Harvey | 70058 | LA | $ 3,742 |
| Mary, Help of Christians Church | 024 Storage Shed #2 (8 X 8) | 617 Second Ave | Harvey | 70058 | LA | $ 680 |
| Mary, Help of Christians Church | 006 Main School Bldg. ( Connected by Overhead Bridge to | 617 Second Ave. | Harvey | 70058 | LA | $ 999,950 |
| Mary, Help of Christians Church | 007 1st Grade Building | 617 Second Ave. | Harvey | 70058 | LA | $ 178,500 |
| Mary, Help of Christians Church | 008 5th Grade Building- (7/88) | 617 Second Ave. | Harvey | 70058 | LA | $ 246,400 |
| Mary, Help of Christians Church | 009 Cafeteria | 617 Second Ave. | Harvey | 70058 | LA | $ 1,050,000 |
| Mary, Help of Christians Church | 010 Pre-K 4 Building (Yellow House) | 601 First Ave. | Harvey | 70058 | LA | $ 153,300 |
| Mary, Help of Christians Church | 011 Speech / Title One | 620 Second AVe. | Harvey | 70058 | LA | $ 149,100 |
| Mary, Help of Christians Church | 014 Hawk's Haven Building | 616 Second Ave. | Harvey | 70058 | LA | $ 120,400 |
| Mary, Help of Christians Church | 028 Middle School (2009) | 617 Second Ave. | Harvey | 70058 | LA | $ 1,807,750 |
| St. John Bosco | 001 Church | 2114 Oakmere Dr. | Harvey | 70058 | LA | $ 100,000 |
| St. John Bosco | 002 Parish Office | 2114 Oakmere Dr. | Harvey | 70058 | LA | $ 118,650 |
| St. John Bosco | 004 Pavilion | 2114 Oakmere Dr. | Harvey | 70058 | LA | $ 124,250 |
| St. John Bosco | 005 Family Life Center | 2114 Oakmere Dr. | Harvey | 70058 | LA | $ 966,700 |
| St. John Bosco | 006 Storage Shed | 2115 Oakmere Dr. | Harvey | 70058 | LA | $ 63,000 |
| St. John Bosco | 009 St. John Bosco Education Center | 2115 Oakmere Dr. | Harvey | 70058 | LA | $ 2,451,050 |
| St. Gertrude | 001 Church | 17302 LA Highway 631 | Des Allemands | 70030 | LA | $ 100,000 |
| St. Gertrude | 002 Rectory | 17292 LA Highway 631 | Des Allemands | 70030 | LA | $ 80,500 |
| St. Gertrude | 003 Community Center | 17324 LA Highway 631 | Des Allemands | 70030 | LA | $ 211,575 |
| St. Gertrude | 004 Religious Ed. Bldg. | 17336 LA Highway 631 | Des Allemands | 70030 | LA | $ 112,000 |
| St. Michael the Archangel Church | 005 Mausoleum Enclosed (80 Crypts) | 339 Down The Bayou Rd. | Des Allemands | 70030 | LA | $- |
| St. Michael the Archangel Church | 006 Mausoleum Phase 2 (108 Crypts) | 339 Down The Bayou Rd. | Des Allemands | 70030 | LA | $- |
| St. Gertrude | 008 Fair Booths | 17324 LA Highway 631 | Des Allemands | 70030 | LA | $ 23,814 |
| St. Michael the Archangel Church | 013 Mausoleum Phase 3 (220 Crypts) | 339 Down The Bayou Rd. | Des Allemands | 70030 | LA | $- |
| St. Gertrude | 014 Storage Shed (60'X40') | 17324 LA Highway 631 | Des Allemands | 70030 | LA | $ 24,675 |
| St. Michael the Archangel Church | 015 Mausoleum Phase 4 faces Bayou (128 Crypts) | | | | LA | $- |
| St. Gertrude | 016 Father Benedict Quang Pavilion | 17302 LA Highway 631 | Des Allemands | 70030 | LA | $ 67,025 |
| St. Gertrude | 017 Pavilion #1 | 17302 LA Highway 631 | Des Allemands | 70030 | LA | $ 2,722 |
| St. Gertrude | 018 Pavilion #2 | 17302 LA Highway 631 | Des Allemands | 70030 | LA | $ 2,722 |
| St. Gertrude | 019 Fair Booth #2 | 17302 LA Highway 631 | Des Allemands | 70030 | LA | $ 23,814 |
| St. Gertrude | 020 Ticket Booth | 17302 LA Highway 631 | Des Allemands | 70030 | LA | $ 2,041 |
| St. Gertrude | 021 Concession | 17302 LA Highway 631 | Des Allemands | 70030 | LA | $ 12,247 |
| St. Michael the Archangel Church | 001 Church/Community Center | 15405 Hwy. 90 | Paradis | 70080 | LA | $ 100,000 |
| St. Michael the Archangel Church | 002 Rectory/ Office | 15405 Hwy. 90 | Paradis | 70080 | LA | $ 139,300 |
| St. Michael the Archangel Church | 003 Education Building | 15405 Hwy. 90 | Paradis | 70080 | LA | $ 334,950 |
| St. Michael the Archangel Church | 004 Tractor Building | 15405 Hwy. 90 | Paradis | 70080 | LA | $ 32,999 |
| St. Bonaventure | 001 Church | 329 South Jamie Blvd. | Avondale | 70094 | LA | $ 100,000 |
| St. Bonaventure | 002 Rectory | 329 South Jamie Blvd. | Avondale | 70094 | LA | $ 52,500 |
| St. Bonaventure | 003 Assembly Building | 329 South Jamie Blvd. | Avondale | 70094 | LA | $ 207,725 |
| St. Bonaventure | 005 CCD Classroom | 330 South Jamie Blvd. | Avondale | 70094 | LA | $ 133,700 |
| St. Bonaventure | 002 Rectory - 139 Herman | 139 Herman St. | Westwego | 70094 | LA | $ 67,200 |
| St. John Paul II Church | 003 Mausoleum Phase I (96 Crypts) | 6121 River Rd. | Waggaman | 70094 | LA | $- |
| St. John Paul II Church | 004 Mausoleum Phase II (84 Crypts) | 6121 River Rd. | Waggaman | 70094 | LA | $- |
| St. Bonaventure | 005 Church | 6851 River Rd. | New Orleans | 70121 | LA | $ 100,000 |
| St. Bonaventure | 007 Hall (1996) | 6851 River Rd. | New Orleans | 70121 | LA | $ 296,800 |
| St. Jane de Chantal Church, Abita Springs | 007 St. Joseph Hall | 72054 Maple St. | Abita Springs | 70420 | LA | $ 117,950 |
| St. Jane de Chantal Church, Abita Springs | 010 Storage-Kitchen Equipment | 72040 Maple St | Abita Springs | 70420 | LA | $ 5,103 |
| St. Jane de Chantal Church, Abita Springs | 011 Hickory House (2014) | 72052 Hickory St. | Abita Springs | 70420 | LA | $ 61,600 |
| St. Jane de Chantal Church, Abita Springs | 012 Hickory House Garage (2014) | 72052 Hickory St. | Abita Springs | 70420 | LA | $ 13,948 |
| St. Michael the Archangel Mission, Bush | 003 St. Michael Church | 81340 Hwy. 41 | Bush | 70431 | LA | $ 100,000 |
| St. Michael the Archangel Mission, Bush | 004 Storage Building & Office | 81340 Hwy. 41 | Bush | 70431 | LA | $ 36,288 |
| St. Anthony Church, Lafitte | 001 Church/Bell Tower/Sign | 2653 Jean Lafitte Blvd. | Lafitte | 70067 | LA | $ 100,000 |
| St. Anthony Church, Lafitte | 002 Rectory | 2663 Jean Lafitte Blvd. | Lafitte | 70067 | LA | $ 110,950 |

| Entity | Description | Address | City | Zip | State | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|---|---|---|---|
| St. Anthony Church, Lafitte | 004 Parish Hall (Old Church) | 2685 Privateer Blvd. | Lafitte | 70067 | LA | $ 100,000 | | |
| St. Anthony Church, Lafitte | 005 Parish Hall (Old Rectory)-vacant | 2693 Jean Lafitte Blvd. | Lafitte | 70067 | LA | $- | | |
| St. Anthony Church, Lafitte | 007 Hall | 2685 Jean Lafitte Blvd. | Lafitte | 70067 | LA | $ 781,550 | | |
| St. Anthony Church, Lafitte | 011 Gymnasium/Tool Shed/ Quonset Hut | 2693 Jean Lafitte Blvd. | Lafitte | 70068 | LA | $- | | |
| St. Anthony Church, Lafitte | 012 Bell Tower | 2653 Jean Lafitte Blvd. | Lafitte | 70067 | LA | $ 2,381 | | |
| St. Anthony Church, Lafitte | 013 Storage Shed | 2653 Jean Lafitte Blvd. | Lafitte | 70067 | LA | $ 1,021 | | |
| St. Anthony, Lafitte | Land ( Former Old Church) | | Lafitte | | LA | $ 100,000 | | |
| St. Anthony, Lafitte | Land ( Former old rectory) - Need Survey re property adc | 2693 ? Privateer | Lafitte | | LA | $ - | | |
| St. Genevieve Church, Slidell | 006 CCD Building 1,2&3 | 35382 Highway 433 | Slidell | 70460 | LA | $ 179,550 | | |
| St. Genevieve Church, Slidell | 007 School Building # 2 | 35382 Highway 433 | Slidell | 70460 | LA | $ 241,500 | | |
| St. Genevieve Church, Slidell | 008 School Building # 3 | 35382 Highway 433 | Slidell | 70460 | LA | $ 235,900 | | |
| St. Genevieve Church, Slidell | 014 Rectory | 58031 St. Genevieve Ln. | Slidell | 70460 | LA | $ 175,000 | | |
| St. Genevieve Church, Slidell | 017 Parish Office (2015) | 58025 St. Genevieve Ln. | Slidell | 70460 | LA | $ 94,500 | | |
| St. Genevieve Church, Slidell | 020 Storage Shed | 58203 Highway 433 | Slidell | 70460 | LA | $- | | |
| St. Genevieve Church, Slidell | 021 Concession Stand | 35382 Highway 433 | Slidell | 70460 | LA | $- | | |
| St. Genevieve Church, Slidell | 022 Restroom | 58031 St. Genevieve Ln. | Slidell | 70460 | LA | $- | | |
| St. Genevieve Church | Approx. 1.67 Acres   Sec. 42. T9S-R13E | 58022 St. Genevieve Lane | Slidell | | LA | $- | | |
| Our Lady of Perpetual Help Church, Belle Chasse | 005 Mausoleum 1984 Building II (94 Crypts) | 8969 Hwy. 23 | Belle Chasse | 70037 | LA | $- | $- | $ - |
| Our Lady of Perpetual Help Church, Belle Chasse | 006 Mausoleum 1995 Building III (94 Crypts) | 8970 Hwy. 23 | Belle Chasse | 70037 | LA | $- | $- | $ - |
| Our Lady of Perpetual Help Church, Belle Chasse | 013 Church/Hall/ Kitchen (1992) | 8968 Hwy. 23 | Belle Chasse | 70037 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| Our Lady of Perpetual Help Church, Belle Chasse | 019 Mausoleum 2004 Building A (160 Crypts) | 8971 Hwy. 23 | Belle Chasse | 70037 | LA | $- | $- | $ - |
| Our Lady of Perpetual Help Church, Belle Chasse | 021 Mausoleum 2009 Building B (144 Crypts) | 8972 Hwy. 23 | Belle Chasse | 70037 | LA | $- | $- | $ - |
| Annunciation Church, Bogalusa | 001 Church | 509 Ave B | Bogalusa | 70427 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| Annunciation Church, Bogalusa | 002 Rectory | 517 Ave. B | Bogalusa | 70427 | LA | $ 282,800 | $ 282,800 | $ 169,680 |
| Annunciation Church, Bogalusa | 003 Dobyns Center | 517 Ave. B | Bogalusa | 70427 | LA | $ 583,800 | $ 583,800 | $ 350,280 |
| Annunciation School, Bogalusa | 004 School | 511 Ave B | Bogalusa | 70427 | LA | $ 659,400 | $ 659,400 | $ 395,640 |
| Annunciation School, Bogalusa | 005 School & Auditorium | 511 Ave B | Bogalusa | 70427 | LA | $ 505,050 | $ 505,050 | $ 303,030 |
| Annunciation School, Bogalusa | 006 After School Care Bldg. | 511 Ave B | Bogalusa | 70427 | LA | $ 39,550 | $ 39,550 | $ 23,730 |
| Annunciation School, Bogalusa | 007 Bookroom Modular Building Leased from State of LA. | 511 Ave B | Bogalusa | 70427 | LA | $ - | $ - | $ - |
| Annunciation School, Bogalusa | 011 Speech Classroom | 511 Ave B | Bogalusa | 70427 | LA | $ 6,048 | $ 6,048 | $ 3,629 |
| Annunciation School, Bogalusa | 012 Early Childhood Center | 511 Ave B | Bogalusa | 70427 | LA | $ 243,600 | $ 243,600 | $ 146,160 |
| Annunciation School, Bogalusa | 013 Metal Storage Building (20'X40') | 511 Ave B | Bogalusa | 70427 | LA | $ 8,165 | $ 8,165 | $ 4,899 |
| Annunciation School, Bogalusa | 016 Storage Shed | 549 Ave. B | Bogalusa | 70427 | LA | $ 14,629 | $ 14,629 | $ 8,777 |
| Annunciation Church, Bogalusa | Parish Parking and other use | 527 & 531 Avenue B | Bogalusa | | LA | $- | $- | $ - |
| Annunciation Church, Bogalusa | Land Behind School | 523 Avenue C | Bogalusa | | LA | $- | | $ - |
| Annunciation Church, Bogalusa | Block 55 Land Behind Parking and Parish Church | 526 Avenue C | Bogalusa | | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| Our Lady of Good Harbor, Inc. | Patrick's Port Sulphur Property consists of vacant land former church parish buildings demolished w open operating cemetery and batture | 240 Buras River Rd,, Buras Approx. 15 Acres Part Vacant/ Part Cemetery | | | | $ 100,000 | | |
| St. Louise de Marillac Church, Arabi | 001 Rectory | 6800 Patricia St. | Arabi | 70032 | LA | $ 300,300 | | |
| St. Louise de Marillac Church, Arabi | 007 Pavilion | 6800 Patricia St. | Arabi | 70032 | LA | $ 1,701 | | |
| St. Louise de Marillac School, Arabi | 006 School | 1914 Aycock St. | Arabi | 70032 | LA | $ 1,670,900 | | |
| Our Lady of Prompt Succor Church, Chalmette | 001 Church | 2320 Paris Rd. | Chalmette | 70043 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| Our Lady of Prompt Succor Church, Chalmette | 002 Rectory | 2320 Paris Rd. | Chalmette | 70043 | LA | $ 395,150 | $ 395,150 | $ 237,090 |
| Our Lady of Prompt Succor Church, Chalmette | 004 Fair Warehouse & Kitchen, Parish Center | 2305 Montesquieu St. | Chalmette | 70043 | LA | $ 113,750 | $ 113,750 | $ 68,250 |
| Our Lady of Prompt Succor Church, Chalmette | 019 Rectory Garage | 2320 Paris Rd. | Chalmette | 70043 | LA | $ 13,268 | $ 13,268 | $ 7,961 |
| Our Lady of Prompt Succor Church, Chalmette | 026 Chapel | 2305 Fenelon St. | Chalmette | 70043 | LA | $ 69,300 | $ 69,300 | $ 41,580 |
| Our Lady of Prompt Succor School, Chalmette | 005 Adminstration/Library/Cafeterial | 2305 Fenelon St. | Chalmette | 70043 | LA | $ 789,600 | $ 789,600 | $ 473,760 |
| Our Lady of Prompt Succor School, Chalmette | 006 School-Building # 1 | 2305 Fenelon St. | Chalmette | 70043 | LA | $ 319,200 | $ 319,200 | $ 191,520 |
| Our Lady of Prompt Succor School, Chalmette | 007 School-Building #2 | 2305 Fenelon St. | Chalmette | 70043 | LA | $ 311,850 | $ 311,850 | $ 187,110 |
| Our Lady of Prompt Succor School, Chalmette | 008 School-Building # 3 | 2305 Fenelon St. | Chalmette | 70043 | LA | $ 320,600 | $ 320,600 | $ 192,360 |
| Our Lady of Prompt Succor School, Chalmette | 009 Gym/Library | 2305 Fenelon St. | Chalmette | 70043 | LA | $ 757,050 | $ 757,050 | $ 454,230 |
| Our Lady of Prompt Succor School, Chalmette | 023 Early Learning Center | 2305 Fenelon St. | Chalmette | 70043 | LA | $ 930,300 | $ 930,300 | $ 558,180 |
| Our Lady of Prompt Succor School, Chalmette | 024 Middle School (2011) | 2305 Fenelon St. | Chalmette | 70043 | LA | $ 974,400 | $ 974,400 | $ 584,640 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| St. Peter Church, Covington | 001 Church | 125 E 19th Ave. | Covington | 70044 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Peter Church, Covington | 002 Ministry Center | 128 E. 19th Ave. | Covington | 70433 | LA | $ 283,850 | $ 283,850 | $ 170,310 |
| St. Peter Church, Covington | 013 Rectory | 125 E 19th Ave. | Covington | 70433 | LA | $ 340,550 | $ 340,550 | $ 204,330 |
| St. Peter Church, Covington | 015 Adoration Chapel | 126 E 19th Ave. | Covington | 70433 | LA | $ 70,700 | $ 70,700 | $ 42,420 |
| St. Peter Church, Covington | 016 Youth Center | 402 S. Jefferson St. | Covington | 70433 | LA | $ 104,650 | $ 104,650 | $ 62,790 |
| St. Peter Church, Covington | 017 St. Mary's Hall | 125 E 19th Ave. | Covington | 70433 | LA | $ 853,650 | $ 853,650 | $ 512,190 |
| St. Peter Church, Covington | 020 Dwelling-Upper Room | 318 S. Jefferson St. | Covington | 70433 | LA | $ 46,550 | $ 46,550 | $ 27,930 |
| St. Peter Church, Covington | 021 Storage Building-Upper Room (8 X 12) | 318 S. Jefferson St. | Covington | 70433 | LA | $ 1,701 | $ 1,701 | $ 1,021 |
| St. Peter Church, Covington | 022 Playground Pavilion (2009) | 129 E. 19th Ave. | Covington | 70433 | LA | $ 78,400 | $ 78,400 | $ 47,040 |
| St. Peter Church, Covington | 026 Storage Shed (Playground) | 129 E. 19th Ave. | Covington | 70433 | LA | $ 4,200 | $ 4,200 | $ 2,520 |
| St. Peter Church, Covington | 027 Storage Shed (Upper Room) | 318 S. Jefferson St. | Covington | 70433 | LA | $ 1,701 | $ 1,701 | $ 1,021 |
| St. Peter Church, Covington | 030 2024 House to be Demolished | 521 S. Jefferson Parkway | Covington | | LA | $- | $ - | $ - |
| St. Peter School, Covington | 005 Elementary School | 130 E. Temperance St. | Covington | 70433 | LA | $ 944,650 | $ 944,650 | $ 566,790 |
| St. Peter School, Covington | 007 Intermediate Classrooms | 130 E. Temperance St. | Covington | 70433 | LA | $ 436,800 | $ 436,800 | $ 262,080 |
| St. Peter School, Covington | 009 School Pavilion | 130 E. Temperance St. | Covington | 70433 | LA | $ 525,000 | $ 525,000 | $ 315,000 |
| St. Peter School, Covington | 010 Fair Shed | 130 E. Temperance St. | Covington | 70433 | LA | $ 8,505 | $ 8,505 | $ 5,103 |
| St. Peter School, Covington | 011 Early Childhood Center | 130 E. Temperance St. | Covington | 70433 | LA | $ 427,700 | $ 427,700 | $ 256,620 |
| St. Peter School, Covington | 014 Cafeteria | 130 E. Temperance St. | Covington | 70433 | LA | $ 424,550 | $ 424,550 | $ 254,730 |
| St. Peter School, Covington | 019 Middle School | 130 E. Temperance St. | Covington | 70433 | LA | $ 641,550 | $ 641,550 | $ 384,930 |
| St. Peter School, Covington | 024 Housekeeping Shed 10x20 (2014) | 130 E. Temperance St. | Covington | 70433 | LA | $ 2,722 | $ 2,722 | $ 1,633 |
| St. Peter School, Covington | 029 Holy Family Center | 130 E. Temperance St. | Covington | 70433 | LA | $ 2,177,000 | $ 2,177,000 | $ 1,306,200 |
| St. Pius X , New Orleans | Donation to St. Pius -- Tax # 66213 | Lot 146, Sq 1, Hillcrest Sub, St. Tammany | | | | $ - | | |
| St. Charles Borromeo Church, Destrehan | 001 Church | 13396 River Rd. | Destrehan | 70047 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Charles Borromeo Church, Destrehan | 002 Rectory & Garage | 13396 River Rd. | Destrehan | 70047 | LA | $ 362,250 | $ 362,250 | $ 217,350 |
| St. Charles Borromeo Church, Destrehan | 013 Maintenance Garage / Restrooms | 13396 River Rd. | Destrehan | 70047 | LA | $ 66,850 | $ 66,850 | $ 40,110 |
| St. Charles Borromeo Church, Destrehan | 014 Early Learning Childhood Center | 13396 River Rd. | Destrehan | 70047 | LA | $ 422,800 | $ 422,800 | $ 253,680 |
| St. Charles Borromeo Church, Destrehan | 015 Carport (North of Immaculate Conception Bldg.) | 13396 River Rd. | Destrehan | 70047 | LA | $ 1,701 | $ 1,701 | $ 1,021 |
| St. Charles Borromeo Church, Destrehan | 021 Mausoleum St. Charles Borromeo Phase I 1967 (714 | 13396 River Rd. | Destrehan | 70047 | LA | $- | $ - | $ - |
| St. Charles Borromeo Church, Destrehan | 022 Resurrection Mausoleum Phase I 1977 (532 Crypts) | 13396 River Rd. | Destrehan | 70047 | LA | $- | $ - | $ - |
| St. Charles Borromeo Church, Destrehan | 023 St. Charles Borromeo Mausoleum Phase II 1977 (480 | 13396 River Rd. | Destrehan | 70047 | LA | $- | $ - | $ - |
| St. Charles Borromeo Church, Destrehan | 024 Gethsemane Mausoleum Phase I 1982 (420 Crypts) | 13396 River Rd. | Destrehan | 70047 | LA | $- | $ - | $ - |
| St. Charles Borromeo Church, Destrehan | 025 Cemetery Statues-Lawn Mower & Lift Machine | 13396 River Rd. | Destrehan | 70047 | LA | $ 75,250 | $ 75,250 | $ 45,150 |
| St. Charles Borromeo Church, Destrehan | 026 Gethsemane Mausoleum Phase III 1994 (377 Crypts) | 13396 River Rd. | Destrehan | 70047 | LA | $- | $ - | $ - |
| St. Charles Borromeo Church, Destrehan | 027 Fred J. Roth Memorial Center (Multi-Purpose Bldg./O | 13396 River Rd. | Destrehan | 70047 | LA | $ 1,348,550 | $ 1,348,550 | $ 809,130 |
| St. Charles Borromeo Church, Destrehan | 030 Gethsemane Mausoleum Phase II 1991 (350 Crypts) | 13396 River Rd. | Destrehan | 70047 | LA | $- | $ - | $ - |
| St. Charles Borromeo Church, Destrehan | 031 Mausoleum Gethsemane Phase IV 2000 (408 Crypts) | | | | LA | $- | $ - | $ - |
| St. Charles Borromeo Church, Destrehan | 032 Mysteries Mausoleum | | | | LA | $- | $ - | $ - |
| St. Charles Borromeo Church, Destrehan | 033 Pavilion | 13396 River Rd. | Destrehan | 70047 | LA | $ 8,845 | $ 8,845 | $ 5,307 |
| St. Charles Borromeo Church, Destrehan | 034 Shrine | 13396 River Rd. | Destrehan | 70047 | LA | $ 1,701 | $ 1,701 | $ 1,021 |
| St. Charles Borromeo Church, Destrehan | 035 Perpetual Adoration Chapel | 13396 River Rd. | Destrehan | 70047 | LA | $ 68,250 | $ 68,250 | $ 40,950 |
| St. Charles Borromeo School, Destrehan | 003 Auditorium & Classrooms | 13396 River Rd. | Destrehan | 70047 | LA | $ 305,121 | $ 305,121 | $ 183,073 |
| St. Charles Borromeo School, Destrehan | 005 Classroom & Teachers Lounge & Library | 13396 River Rd. | Destrehan | 70047 | LA | $ 217,350 | $ 217,350 | $ 130,410 |
| St. Charles Borromeo School, Destrehan | 006 Cafeteria | 13396 River Rd. | Destrehan | 70047 | LA | $ 336,700 | $ 336,700 | $ 202,020 |
| St. Charles Borromeo School, Destrehan | 007 Fatima Hall & Office (Old High School) | 13396 River Rd. | Destrehan | 70047 | LA | $ 353,850 | $ 353,850 | $ 212,310 |
| St. Charles Borromeo School, Destrehan | 008 Old Convent (Old High School) Storage | 13396 River Rd. | Destrehan | 70047 | LA | $ 360,500 | $ 360,500 | $ 216,300 |
| St. Charles Borromeo School, Destrehan | 020 Implement Shed | 13396 River Rd. | Destrehan | 70047 | LA | $ 38,850 | $ 38,850 | $ 23,310 |
| St. Charles Borromeo School, Destrehan | 028 Msgr. John N. Phuc Education Center | 13396 River Rd. | Destrehan | 70047 | LA | $ 1,664,250 | $ 1,664,250 | $ 998,550 |
| St. John the Baptist Church, Edgard | 001 Church & Bell Tower | 2361 Hwy. 18 | Edgard | 70049 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. John the Baptist Church, Edgard | 002 Rectory | 2361 Hwy. 18 | Edgard | 70049 | LA | $ 144,550 | $ 144,550 | $ 86,730 |
| St. John the Baptist Church, Edgard | 003 Community Center | 2361 Hwy. 18 | Edgard | 70049 | LA | $ 131,600 | $ 131,600 | $ 78,960 |
| St. John the Baptist Church, Edgard | 004 St. Peter Claver Hall VACANT | 2361 Hwy. 18 | Edgard | 70049 | LA | $- | $ - | $ - |
| St. John the Baptist Church, Edgard | 005 Mausoleum Garden 1967 (30 Crypts) | 2361 Hwy. 18 | Edgard | 70049 | LA | $- | $ - | $ - |
| St. John the Baptist Church, Edgard | 007 Mausoleum Phase I 1971 (60 Crypts) | 2361 Hwy. 18 | Edgard | 70049 | LA | $- | $ - | $ - |
| St. John the Baptist Church, Edgard | 008 Boiler House | 2361 Hwy. 18 | Edgard | 70049 | LA | $ 3,402 | $ 3,402 | $ 2,041 |
| St. John the Baptist Church, Edgard | 009 Garage | 2361 Hwy. 18 | Edgard | 70049 | LA | $ 17,010 | $ 17,010 | $ 10,206 |

149

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| St. John the Baptist Church, Edgard | 010 Mausoleum Phase 2 1988 (138 Crypts) | 2361 Hwy. 18 | Edgard | 70049 LA | $- | | $ - | $ - |
| St. John the Baptist Church, Edgard | 012 Mausoleum Phase 3 2001 (123 Crypts) | 2361 Hwy. 18 | Edgard | 70049 LA | $- | | $ - | $ - |
| St. John the Baptist Church, Edgard | 013 Mausoleum Phase 4 2006 (108 Crypts) | | | LA | $- | | $ - | $ - |
| St. John the Baptist Church, Folsom | 001 Church | 11345 St. John Church Rd. | Folsom | 70437 LA | $ | 100,000 | | |
| St. John the Baptist Church, Folsom | 002 Rectory | 11345 St. John Church Rd. | Folsom | 70437 LA | $ | 74,200 | | |
| St. John the Baptist Church, Folsom | 003 Hall | 11345 St. John Church Rd. | Folsom | 70437 LA | $ | 80,850 | | |
| St. John the Baptist Church, Folsom | 004 Office | 11345 St. John Church Rd. | Folsom | 70437 LA | $ | 93,800 | | |
| St. John the Baptist Church, Folsom | 005 Bus Garage | 11345 St. John Church Rd. | Folsom | 70437 LA | $ | 5,103 | | |
| St. John the Baptist Church, Folsom | 007 Garage/Utility Room (30 X 30) | 11345 St. John Church Rd. | Folsom | 70437 LA | $ | 19,391 | | |
| St. John the Baptist Church, Folsom | 012 Family Life Center | 11345 St. John Church Rd. | Folsom | 70437 LA | $ | 509,600 | | |
| St. John the Baptist Church, Folsom | 014 Storage Building | 11345 St. John Church Rd. | Folsom | 70437 LA | $ | 42,350 | | |
| St. John the Baptist Church, Folsom | 015 Red Barn | 11345 St. John Church Rd. | Folsom | 70437 LA | $ | 4,423 | | |
| St. John the Baptist Church, Folsom | 016 Greenhouse | 11345 St. John Church Rd. | Folsom | 70437 LA | $ | 1,361 | | |
| St. John the Baptist Church, Folsom | 017 FLC-Storage | 11345 St. John Church Rd. | Folsom | 70437 LA | $ | 5,783 | | |
| St. John the Baptist Church, Folsom | 018 Bell Tower | 11345 St. John Church Rd. | Folsom | 70437 LA | $ | 1,021 | | |
| St. John the Baptist Church, Folsom | 019 Prayer Shelter | 11345 St. John Church Rd. | Folsom | 70437 LA | $ | 1,021 | | |
| Holy Family Church, Franklinton | 001 Church | 1220 Fourteenth Ave. | Folsom | 70438 LA | $ | 100,000 | | |
| Holy Family Church, Franklinton | 002 Rectory | 1213 Fourteenth Ave. | Franklinton | 70438 LA | $ | 76,300 | | |
| Holy Family Church, Franklinton | 003 Parish Hall/ Offices/ School Building | 1220 Fourteenth Ave. | New Orleans | 70438 LA | $ | 397,950 | | |
| Holy Family Church, Franklinton | 011 Rectory Shed | 1213 Fourteenth Ave. | New Orleans | 70438 LA | $ | 7,484 | | |
| Holy Family Church, Franklinton | 012 Storage Building 2 | 1220 Fourteenth Ave. | Franklinton | 70438 LA | $ | 4,082 | | |
| Holy Family Church, Franklinton | 013 Storage Building 1 | 1220 Fourteenth Ave. | New Orleans | 70438 LA | $ | 4,423 | | |
| Holy Family Church, Franklinton | 014 Friends of St. Francis Storage Bldg. | 1220 Fourteenth Ave. | New Orleans | 70438 LA | $ | 4,423 | | |
| St. Hubert Church, Garyville | Gazebo Rosary Walk  Area | 718 Church St, Garyville Part of D1399 | | | $- | | | |
| St. Anthony Church, Gretna | 001 Church | 924 Monroe St. | Gretna | 70053 LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| St. Anthony Church, Gretna | 002 Rectory | 924 Monroe St. | Gretna | 70053 LA | $ | 151,900 | $ 151,900 | $ 91,140 |
| St. Anthony Church, Gretna | 008 Storage Building | 625 Burmaster St. | Gretna | 70053 LA | $ | 55,300 | $ 55,300 | $ 33,180 |
| St. Anthony School, Gretna | 003 Convent | 901 Hancock St. | Gretna | 70053 LA | $ | 134,750 | $ 134,750 | $ 80,850 |
| St. Anthony School, Gretna | 004 School & Walkways | 900 Franklin St. | Gretna | 70053 LA | $ | 1,071,000 | $ 1,071,000 | $ 642,600 |
| St. Anthony School, Gretna | 006 Restrooms | 921 Franklin St. | Gretna | 70053 LA | $ | 35,000 | $ 35,000 | $ 21,000 |
| St. Anthony School, Gretna | 012 School Annex | 907 Hancock St. | Gretna | 70053 LA | $ | 105,000 | $ 105,000 | $ 63,000 |
| St. Anthony School, Gretna | 013 Portable Classroom #2 | 921 Hancock St. | Gretna | 70053 LA | $ | 24,494 | $ 24,494 | $ 14,697 |
| St. Anthony School, Gretna | 015 Portable Classroom #3 | 921 Hancock St. | Gretna | 70053 LA | $ | 24,494 | $ 24,494 | $ 14,697 |
| St. Joseph Church, Gretna | 001 Church & Schulmerick Bells | 610 Sixth Street | Gretna | 70053 LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| St. Joseph Church, Gretna | 002 Rectory | 610 Sixth Street | Gretna | 70053 LA | $ | 211,400 | $ 211,400 | $ 126,840 |
| St. Joseph Church, Gretna | 003 Parish Center | 609 Sixth Street | Gretna | 70053 LA | $ | 93,450 | $ 93,450 | $ 56,070 |
| St. Joseph Church, Gretna | 006 Classroom & Gym Building | 610 Sixth Street | Gretna | 70053 LA | $ | 1,096,900 | $ 1,096,900 | $ 658,140 |
| St. Joseph Church, Gretna | 007 Cafeteria & Auditorium | 610 Sixth Street | Gretna | 70053 LA | $ | 454,300 | $ 454,300 | $ 272,580 |
| St. Joseph Church, Gretna | 009 Garage adjacent to Rectory | 610 Sixth Street | Gretna | 70053 LA | $ | 10,206 | $ 10,206 | $ 6,124 |
| St. Joseph Church, Gretna | 010 Morgan Storage Bldg and Carport | 610 Sixth Street | Gretna | 70053 LA | $ | 9,866 | $ 9,866 | $ 5,919 |
| St. Joseph Church, Gretna | 011 Memorial Garden House | 610 Sixth Street | Gretna | 70053 LA | $ | 7,144 | $ 7,144 | $ 4,287 |
| St. Joseph Church, Gretna | 013 Cloister & Garden | 610 Sixth Street | Gretna | 70053 LA | $ | 34,700 | $ 34,700 | $ 20,820 |
| St. Joseph Church, Gretna | Lots 16, 17, 18 Sq 74  Parcel  9300000456 Donation to Fr. Francis Carabello 11/17/99 | Lots 16, 17 18 Sq 74 | Gretna | LA | $- | | $ - | |
| St. Rita Church, Harahan | 001 Church | 7100 Jefferson Hwy. | Harahan | 70123 LA | $ | 100,000 | | |
| St. Rita Church, Harahan | 002 Rectory | 160 Imperial Woods Dr. | River Ridge | 70123 LA | $ | 292,950 | | |
| St. Rita School, Harahan | 003 School/Cafeteria/Parish Complex | 194 Ravan Ave. | Harahan | 70123 LA | $ | 3,330,250 | | |
| St. Rita School, Harahan | 005 School/Auditorium | 194 Ravan Ave. | Harahan | 70123 LA | $ | 1,318,450 | | |
| St. Rita School, Harahan | 007 Boiler House/Concession Stand | 194 Ravan Ave. | Harahan | 70123 LA | $ | 72,100 | | |
| St. Rita School, Harahan | 009 Pavilion | 194 Ravan Ave. | Harahan | 70123 LA | $ | 7,825 | | |
| St. Rita School, Harahan | 010 Carpool Pavilion | 194 Ravan Ave. | Harahan | 70123 LA | $ | 19,051 | | |
| Infant Jesus of Prague Mission, Harvey | 001 Church | 700 Maple Ave. | Harvey | 70058 LA | $ | 100,000 | | |
| Infant Jesus of Prague Mission, Harvey | 002 Rectory | 700 Maple Ave. | Harvey | 70058 LA | $ | 121,100 | | |
| Infant Jesus of Prague Mission, Harvey | 003 Parish Hall | 700 Maple Ave. | Harvey | 70058 LA | $ | 548,100 | | |
| Our Lady of Perpetual Help Church, Kenner | 001 Church (1983) | 2008 Short St. | Kenner | 70062 LA | $ | 100,000 | $ 100,000 | $ 100,000 |

| Name | Building | Address | City | Zip | State | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|---|---|---|---|
| Sacred Heart Church, Lacombe | 002 O'Brian Hall (old rectory) | 28088 Main St. | Lacombe | 70445 | LA | $ 136,500 | $ 136,500 | $ 81,900 |
| Sacred Heart Church, Lacombe | 003 Rouquette Hall | 28088 Main St. | Lacombe | 70445 | LA | $ 206,150 | $ 206,150 | $ 123,690 |
| Sacred Heart Church, Lacombe | 004 Metal storage building | 62137 Fish Hatchery Rd. | Lacombe | 70445 | LA | $ 1,021 | $ 1,021 | $ 612 |
| Sacred Heart Church, Lacombe | 005 Chapel | 62137 Fish Hatchery Rd. | Lacombe | 70445 | LA | $ 164,150 | $ 164,150 | $ 98,490 |
| Sacred Heart Church, Lacombe | 006 Church (1980) | 28088 Main St. | Lacombe | 70445 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| Sacred Heart Church, Lacombe | 007 Rectory (2000) | 28029 Main St. | Lacombe | 70445 | LA | $ 131,950 | $ 131,950 | $ 79,170 |
| Sacred Heart Church, Lacombe | 010 Rental Dwelling | 28028 Main St. | Lacombe | 70445 | LA | $- | $ - | $ - |
| Sacred Heart | but Judgement of Possession is to Sacred Heart , Lacombe | 28028 Main St  Lots, 1, 2, 3 Sq 89 | Lacombe | | LA | $ - | $ - | $ - |
| Sacred Heart | Subdivision of Oaklawn Lacombe LA   Assessment # 74353 | Lots 5 & 6 Sq 5/Thompson St | Lacombe | | LA | $ - | $ - | $ - |
| Ascension of Our Lord Church, LaPlace | 015 Priest Residence (1980) | 809 Fairway Dr. | LaPlace | 70068 | LA | $ 59,500 | | |
| Ascension of Our Lord Church, LaPlace | 016 Piovan Parish Hall (1980) | 805 Fairway Dr. | LaPlace | 70068 | LA | $ 88,200 | | |
| Ascension of Our Lord | Ascension of Our Lord- Parking Lot/ Land   128.28 X 160 | Newport Drive | LaPlace | | LA | $ - | | |
| St. Joan of Arc Church, LaPlace | 001 Church (1981) | 511 W. 5th St. | LaPlace | 70068 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Joan of Arc Church, LaPlace | 002 Rectory / Parish Office | 529 W. 5th St. | LaPlace | 70068 | LA | $ 302,400 | $ 302,400 | $ 181,440 |
| St. Joan of Arc Church, LaPlace | 004 Convent | 386 Fir St. | LaPlace | 70068 | LA | $ 117,600 | $ 117,600 | $ 70,560 |
| St. Joan of Arc Church, LaPlace | 013 Thrift Store (20' x 60') | 370 Fir St. | LaPlace | 70068 | LA | $ 116,900 | $ 116,900 | $ 70,140 |
| St. Joan of Arc Church, LaPlace | 025 Metal Storage Bldg 40' X 80' | 370 Fir St. | LaPlace | 70068 | LA | $ 57,750 | $ 57,750 | $ 34,650 |
| St. Joan of Arc School, LaPlace | 005 Main School (North Bldg.) | 412 Fir St. | LaPlace | 70068 | LA | $ 805,000 | $ 805,000 | $ 483,000 |
| St. Joan of Arc School, LaPlace | 006 Cafeteria | 412 Fir St. | LaPlace | 70068 | LA | $ 370,650 | $ 370,650 | $ 222,390 |
| St. Joan of Arc School, LaPlace | 007 Classroom Building-(South Bldg.) | 412 Fir St. | LaPlace | 70068 | LA | $ 798,000 | $ 798,000 | $ 478,800 |
| St. Joan of Arc School, LaPlace | 008 Classroom (East Bldg.) (7/85) | 412 Fir St. | LaPlace | 70068 | LA | $ 672,350 | $ 672,350 | $ 403,410 |
| St. Joan of Arc School, LaPlace | 021 Parish Life Center/Gym | 412 Fir St. | LaPlace | 70068 | LA | $ 1,577,100 | $ 1,577,100 | $ 946,260 |
| St. Joan of Arc School, LaPlace | 022 Playground (Liability Only) | 412 Fir St. | LaPlace | 70068 | LA | $ - | $ - | $ - |
| St. Matthew the Apostle Church, River Ridge | 001 Church/Convent/Meeting Room | 10021 Jefferson Hwy. | River Ridge | 70123 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Matthew the Apostle Church, River Ridge | 002 Rectory/Parish Office | 10021 Jefferson Hwy. | River Ridge | 70123 | LA | $ 249,900 | $ 249,900 | $ 149,940 |
| St. Matthew the Apostle Church, River Ridge | 003 Old Rectory | 10021 Jefferson Hwy. | River Ridge | 70123 | LA | $ 171,850 | $ 171,850 | $ 103,110 |
| St. Matthew the Apostle Church, River Ridge | 004 Community Life Center/ Monsignor Bendix Center | 10021 Jefferson Hwy. | River Ridge | 70123 | LA | $ 687,050 | $ 687,050 | $ 412,230 |
| St. Matthew the Apostle Church, River Ridge | 011 Storage Building #2 | 10021 Jefferson Hwy. | River Ridge | 70123 | LA | $ 25,099 | $ 25,099 | $ 15,060 |
| St. Matthew the Apostle Church, River Ridge | 012 Parish Center  (Building Only Covg - Bldg Leased) | 10017 Jefferson Hwy. | River Ridge | 70123 | LA | $ 377,650 | $ 377,650 | $ 226,590 |
| St. Matthew the Apostle Church, River Ridge | 014 Office Building | 10019 Jefferson Hwy. | River Ridge | 70123 | LA | $ 86,450 | $ 86,450 | $ 51,870 |
| St. Matthew the Apostle Church, River Ridge | 016 Parish House | 10101 Jane Ct | River Ridge | 70123 | LA | $ 105,000 | $ 105,000 | $ 63,000 |
| St. Matthew the Apostle School, River Ridge | 006 School -Front Building | 10021 Jefferson Hwy. | River Ridge | 70123 | LA | $ 1,524,250 | $ 1,524,250 | $ 914,550 |
| St. Matthew the Apostle School, River Ridge | 007 School Annex-Rear Bldg. | 10021 Jefferson Hwy. | River Ridge | 70123 | LA | $ 1,497,300 | $ 1,497,300 | $ 898,380 |
| St. Matthew the Apostle School, River Ridge | 008 Cafeteria | 10021 Jefferson Hwy. | River Ridge | 70123 | LA | $ 523,600 | $ 523,600 | $ 314,160 |
| St. Matthew the Apostle School, River Ridge | 009 Storage Bldgs. | 10021 Jefferson Hwy. | River Ridge | 70123 | LA | $ 23,323 | $ 23,323 | $ 13,994 |
| St. Matthew the Apostle School, River Ridge | 010 Pre-K Building | 10021 Jefferson Hwy. | River Ridge | 70123 | LA | $ 124,600 | $ 124,600 | $ 74,760 |
| St. Matthew the Apostle School, River Ridge | 015 PK Trailer - Daycare | 10021 Jefferson Hwy. | River Ridge | 70123 | LA | $ 46,570 | $ 46,570 | $ 27,942 |
| St. Anthony of Padua Church, Luling | 001 Church/Storage Building | 234 Angus Dr. | Luling | 70070 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Anthony of Padua Church, Luling | 002 Rectory/ Library/ Garage | 234 Angus Dr. | Luling | 70070 | LA | $ 166,600 | $ 166,600 | $ 99,960 |
| St. Anthony of Padua Church, Luling | 003 Activities Building | 234 Angus Dr. | Luling | 70070 | LA | $ 513,450 | $ 513,450 | $ 308,070 |
| St. Anthony of Padua Church, Luling | 004 Annex Bldg. | 234 Angus Dr. | Luling | 70070 | LA | $ 56,350 | $ 56,350 | $ 33,810 |
| St. Anthony of Padua Church, Luling | 007 Electrical Bldg./Storage | 234 Angus Dr. | Luling | 70070 | LA | $ 14,969 | $ 14,969 | $ 8,981 |
| St. Anthony of Padua Church, Luling | 009 Garage | 234 Angus Dr. | Luling | 70070 | LA | $ 18,371 | $ 18,371 | $ 11,022 |
| St. Anthony of Padua Church, Luling | 010 Our Lady of Guadalupe Healing Chapel | 234 Angus Dr. | Luling | 70070 | LA | $ 245,700 | $ 245,700 | $ 147,420 |
| Our Lady of the Lake Church, Mandeville | 001 Church & Bell Tower | 312 Lafitte St. | Mandeville | 70448 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| Our Lady of the Lake Church, Mandeville | 003 Preschool #2 | 2114 Jefferson St. | Mandeville | 70448 | LA | $ 90,650 | $ 90,650 | $ 54,390 |
| Our Lady of the Lake Church, Mandeville | 008 Holy Family Hall | 395 Lafitte St. | Mandeville | 70448 | LA | $ 216,650 | $ 216,650 | $ 129,990 |
| Our Lady of the Lake Church, Mandeville | 011 Canisius Hall | 2120 Jefferson St. | Mandeville | 70448 | LA | $ 71,050 | $ 71,050 | $ 42,630 |
| Our Lady of the Lake Church, Mandeville | 014 Adoration Chapel | 312 Lafitte St. | Mandeville | 70448 | LA | $ 40,600 | $ 40,600 | $ 24,360 |
| Our Lady of the Lake Church, Mandeville | 016 Storage Bldg. Rear cafeteria | 316 Lafitte St. | Mandeville | 70448 | LA | $ 1,361 | $ 1,361 | $ 816 |
| Our Lady of the Lake Church, Mandeville | 027 Parish Life Center (312 Lafitte St.) | 312 Lafitte St. | Mandeville | 70448 | LA | $ 626,150 | $ 626,150 | $ 375,690 |
| Our Lady of the Lake Church, Mandeville | 028 Activity Center | 316 Lafitte St. | Mandeville | 70448 | LA | $ 1,948,800 | $ 1,948,800 | $ 1,169,280 |

| Entity | Building | Address | City | Zip | State | | | |
|--------|----------|---------|------|-----|-------|---|---|---|
| Our Lady of the Lake Church, Mandeville | 035 Rectory | 340 Girod St. | Mandeville | 70448 | LA | $ 220,150 | $ 220,150 | $ 132,090 |
| Our Lady of the Lake Church, Mandeville | 037 Rectory/Storage Building | 340 Girod St. | Mandeville | 70448 | LA | $ 11,227 | $ 11,227 | $ 6,736 |
| Our Lady of the Lake Church, Mandeville | 039 Pavillion (2010) | 312 Lafitte St. | Mandeville | 70448 | LA | $ 23,474 | $ 23,474 | $ 14,084 |
| Our Lady of the Lake Church, Mandeville | 043 Storage Shed | 316 Lafitte St. | Mandeville | 70448 | LA | $ 1,361 | $ 1,361 | $ 816 |
| Our Lady of the Lake Church, Mandeville | 044 Marion Grotto | 316 Lafitte St. | Mandeville | 70448 | LA | $ 2,381 | $ 2,381 | $ 1,429 |
| Our Lady of the Lake | 045 Parish Life Center | 402 Lafitte St. | Mandeville | 70448 | LA | $ 497,000 | $ 497,000 | $ 298,200 |
| Our Lady of the Lake School, Mandeville | 002 Pre-School 1 | 2115 Jefferson St. | Mandeville | 70448 | LA | $ 241,150 | $ 241,150 | $ 144,690 |
| Our Lady of the Lake School, Mandeville | 004 Cafeteria | 316 Lafitte St. | Mandeville | 70448 | LA | $ 850,150 | $ 850,150 | $ 510,090 |
| Our Lady of the Lake School, Mandeville | 007 Jan Strader Multi-Purpose Building | 316 Lafitte St. | Mandeville | 70448 | LA | $ 990,150 | $ 990,150 | $ 594,090 |
| Our Lady of the Lake School, Mandeville | 020 Junior High Bldg. # 2 | 316 Lafitte St. | Mandeville | 70448 | LA | $ 164,150 | $ 164,150 | $ 98,490 |
| Our Lady of the Lake School, Mandeville | 021 Junior High Bldg. # 3 | 316 Lafitte St. | Mandeville | 70448 | LA | $ 124,950 | $ 124,950 | $ 74,970 |
| Our Lady of the Lake School, Mandeville | 022 Junior High Bldg. # 4 | 316 Lafitte St. | Mandeville | 70448 | LA | $ 110,250 | $ 110,250 | $ 66,150 |
| Our Lady of the Lake School, Mandeville | 023 Junior High Bldg. # 5 | 316 Lafitte St. | Mandeville | 70448 | LA | $ 113,050 | $ 113,050 | $ 67,830 |
| Our Lady of the Lake School, Mandeville | 024 4th Grade 101/102 Classrooms | 316 Lafitte St. | Mandeville | 70448 | LA | $ 114,450 | $ 114,450 | $ 68,670 |
| Our Lady of the Lake School, Mandeville | 025 4th/5th Grade 103/104 Classrooms | 316 Lafitte St. | Mandeville | 70448 | LA | $ 114,800 | $ 114,800 | $ 68,880 |
| Our Lady of the Lake School, Mandeville | 026 Storage Containers (4) | 316 Lafitte St. | Mandeville | 70448 | LA | $ 13,608 | $ 13,608 | $ 8,165 |
| Our Lady of the Lake School, Mandeville | 042 Field House | 316 Lafitte St. | Mandeville | 70448 | LA | $ 25,175 | $ 25,175 | $ 15,105 |
| Our Lady of the Lake, Mandeville | Vacant Lot Instr. # 1771995 | Lot 13 -A Sq. 10 | Mandeville | | LA | $ - | $ - | $ - |
| Our Lady of the Lake, Mandeville | Vacant Lot Inst # 1771190 | Lot 14-A, Sq 10 | Mandeville | | LA | $ - | $ - | $ - |
| Immaculate Conception Church, Marrero | 001 Church | 4401 Seventh St. | Marrero | 70072 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| Immaculate Conception Church, Marrero | 002 Rectory/Parish Office & Carport | 4401 Seventh St. | Marrero | 70072 | LA | $ 452,900 | $ 452,900 | $ 271,740 |
| Immaculate Conception Church, Marrero | 008 Parish Hall | 500 Avenue A | Marrero | 70072 | LA | $ 481,950 | $ 481,950 | $ 289,170 |
| Immaculate Conception Church, Marrero | 022 Carmelite and St. Vincent de Paul Center | 601 Avenue C | Marrero | 70072 | LA | $ 96,600 | $ 96,600 | $ 57,960 |
| Immaculate Conception School, Marrero | 004 Elementary Classroom # 1, Rooms 17-23 | 601 Avenue C | Marrero | 70072 | LA | $ 525,700 | $ 525,700 | $ 315,420 |
| Immaculate Conception School, Marrero | 005 Elementary Gym/Cafeteria/Early Childhood Center/K | 601 Avenue C | Marrero | 70072 | LA | $ 1,932,350 | $ 1,932,350 | $ 1,159,410 |
| Immaculate Conception School, Marrero | 006 Elementary Classroom # 2, Rooms 9-12 | 601 Avenue C | Marrero | 70072 | LA | $ 280,000 | $ 280,000 | $ 168,000 |
| Immaculate Conception School, Marrero | 007 Elementary Classroom #3 Rooms, 13-16 | 601 Avenue C | Marrero | 70072 | LA | $ 279,650 | $ 279,650 | $ 167,790 |
| Immaculate Conception School, Marrero | 023 Priest Workshop | 601 Avenue C | Marrero | 70072 | LA | $ 38,850 | $ 38,850 | $ 23,310 |
| Immaculate Conception School, Marrero | 026 Restrooms | 601 Avenue C | Marrero | 70072 | LA | $ 40,250 | $ 40,250 | $ 24,150 |
| Immaculate Conception School, Marrero | 027 Restrooms | 601 Avenue C | Marrero | 70072 | LA | $ 37,100 | $ 37,100 | $ 22,260 |
| Immaculate Conception School, Marrero | 036 School/Classrooms | 537 Ave. D | Marrero | 70072 | LA | $ 940,450 | $ 940,450 | $ 564,270 |
| Immaculate Conception School, Marrero | 037 Library/Notre Dame Hall | 4520 6th St. | Marrero | 70072 | LA | $ 714,350 | $ 714,350 | $ 428,610 |
| Immaculate Conception School, Marrero | 038 Pagliughi Hall | 537 Ave. D | Marrero | 70072 | LA | $ 2,229,150 | $ 2,229,150 | $ 1,337,490 |
| Immaculate Conception School, Marrero | 039 Hebert Hall/Maintenance | 4512 6th St. | Marrero | 70072 | LA | $ 373,100 | $ 373,100 | $ 223,860 |
| St. Joseph the Worker Church, Marrero | 001 Church (1979) | 455 Ames Blvd. | Marrero | 70072 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Joseph the Worker Church, Marrero | 002 Parish Office | 455 Ames Blvd. | Marrero | 70072 | LA | $ 153,300 | $ 153,300 | $ 91,980 |
| St. Joseph the Worker Church, Marrero | 004 Priest Residence | 436 Pine St. | Marrero | 70072 | LA | $ 53,900 | $ 53,900 | $ 32,340 |
| St. Joseph the Worker Church, Marrero | 009 Ropollo Justice Center | 440 Pine St. | Marrero | 70072 | LA | $ 60,200 | $ 60,200 | $ 36,120 |
| St. Joseph the Worker Church, Marrero | 013 Tuff House | 455 Ames Blvd. | Marrero | 70072 | LA | $ 36,050 | $ 36,050 | $ 21,630 |
| St. Joseph the Worker School, Marrero | 005 Religious Education Building | 440 Pine St. | Marrero | 70072 | LA | $ 59,500 | $ 59,500 | $ 35,700 |
| St. Joseph the Worker School, Marrero | 006 School (2 story) | 440 Pine St. | Marrero | 70072 | LA | $ 214,200 | $ 214,200 | $ 128,520 |
| St. Joseph the Worker School, Marrero | 007 SJW Hall | 440 Pine Street | Marrero | 70072 | LA | $ 392,700 | $ 392,700 | $ 235,620 |
| St. Joseph the Worker School, Marrero | 008 Classrooms & Walkway Building | 440 Pine St. | Marrero | 70072 | LA | $ 258,300 | $ 258,300 | $ 154,980 |
| St. Agnes Church, Jefferson | 001 Church | 3310 Jefferson Hwy. | Jefferson | 70121 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Agnes Church, Jefferson | 002 Rectory & Garage | 3310 Jefferson Hwy. | Jefferson | 70121 | LA | $ 477,400 | $ 477,400 | $ 286,440 |
| St. Agnes Church, Jefferson | 004 Parish Life Center | 508 Shrewsbury Ct. | Jefferson | 70121 | LA | $ 329,700 | $ 329,700 | $ 197,820 |
| St. Agnes Church, Jefferson | 014 Garage (Rear of Rectory) | 3310 Jefferson Hwy. | Jefferson | 70121 | LA | $ 13,608 | $ 13,608 | $ 8,165 |
| St. Agnes School, Jefferson | 005 Main School Bldg. | 3410 Jefferson Hwy. | Jefferson | 70121 | LA | $ 1,844,850 | $ 1,844,850 | $ 1,106,910 |
| St. Agnes School, Jefferson | 006 Multi-Purpose /Marquette Activity Center (1983) | 3410 Jefferson Hwy. | Jefferson | 70121 | LA | $ 783,300 | $ 783,300 | $ 469,980 |
| St. Agnes School, Jefferson | 009 Janitorial Shed (Portable Bldg.) | 3410 Jefferson Hwy. | Jefferson | 70121 | LA | $ 34,020 | $ 34,020 | $ 20,412 |
| St. Agnes School, Jefferson | 010 Building A (Portable Bldg.) | 3410 Jefferson Hwy. | Jefferson | 70121 | LA | $ 92,050 | $ 92,050 | $ 55,230 |
| St. Agnes School, Jefferson | 011 Pre-School (Portable Bldg.) | 3410 Jefferson Hwy. | Jefferson | 70121 | LA | $ 92,050 | $ 92,050 | $ 55,230 |
| St. Agnes School, Jefferson | 012 Building B (Portable Bldg.) | 3410 Jefferson Hwy. | Jefferson | 70121 | LA | $ 92,050 | $ 92,050 | $ 55,230 |
| St. Agnes School, Jefferson | 013 Fair Storage | 3410 Jefferson Hwy. | Jefferson | 70121 | LA | $ 6,124 | $ 6,124 | $ 3,674 |
| St. Benilde Church, Metairie | 001 Church | 1901 Division St. | Metairie | 70001 | LA | $ 100,000 | $ 100,000 | $ 100,000 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| St. Benilde Church, Metairie | 002 Rectory | 1901 Division St. | Metairie | 70001 | LA | $ 199,150 | $ 199,150 | $ 119,490 |
| St. Benilde Church, Metairie | 003 Office Building/Parish Offices | 1901 Division St. | Metairie | 70001 | LA | $ 152,600 | $ 152,600 | $ 91,560 |
| St. Benilde Church, Metairie | 004 Early Learning Center | 1701 Division St. | Metairie | 70001 | LA | $ 183,400 | $ 183,400 | $ 110,040 |
| St. Benilde Church, Metairie | 005 45' Fair Storage Container (1979) | 1701 Division St. | Metairie | 70001 | LA | $ 3,402 | $ 3,402 | $ 2,041 |
| St. Benilde Church, Metairie | 008 Msgr. J. Carter Richaud Center | 1801 Division St. | Metairie | 70001 | LA | $ 620,900 | $ 620,900 | $ 372,540 |
| St. Benilde Church, Metairie | 009 Mens Club | 1801 Division St. | Metairie | 70001 | LA | $ 9,866 | $ 9,866 | $ 5,919 |
| St. Benilde Church, Metairie | 012 Fair Shed (1980) | 1901 Division St. | Metairie | 70001 | LA | $ 17,690 | $ 17,690 | $ 10,614 |
| St. Benilde Church, Metairie | 013 Gazebo | 1901 Division St. | Metairie | 70001 | LA | $ 8,845 | $ 8,845 | $ 5,307 |
| St. Benilde School, Metairie | 006 Main School | 1801 Division St. | Metairie | 70001 | LA | $ 1,337,000 | $ 1,337,000 | $ 802,200 |
| St. Benilde School, Metairie | 007 School (Rainbow Building) | 1801 Division St. | Metairie | 70001 | LA | $ 397,950 | $ 397,950 | $ 238,770 |
| St. Benilde School, Metairie | 011 Maintenance Shed | 1901 Division St. | Metairie | 70001 | LA | $ 7,144 | $ 7,144 | $ 4,287 |
| St. Benilde School, Metairie | 014 Pavilion | 1801 Division St. | Metairie | 70001 | LA | $ 79,531 | $ 79,531 | $ 47,719 |
| St. Catherine of Siena Church, Metairie | 001 Church & Bell Tower | 105 Bonnabel Blvd. | Metairie | 70005 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Catherine of Siena Church, Metairie | 002 Rectory/Garage/Parish Offices | 105 Bonnabel Blvd. | Metairie | 70005 | LA | $ 506,100 | $ 506,100 | $ 303,660 |
| St. Catherine of Siena Church, Metairie | Former Melancon Center | 1643 Metairie Rd. | Metairie | 70005 | LA | $- | $ - | $ - |
| St. Catherine of Siena Church, Metairie | 004 Incarnate Word Building | 400 Codifer Blvd. | Metairie | 70005 | LA | $ 726,250 | $ 726,250 | $ 435,750 |
| St. Catherine of Siena Church, Metairie | 010 Msgr. Barret Complex | 400 Codifer Blvd. | Metairie | 70005 | LA | $ 1,433,950 | $ 1,433,950 | $ 860,370 |
| St. Catherine of Siena Church, Metairie | 012 Storage | 400 Codifer Blvd. | Metairie | 70005 | LA | $ 17,350 | $ 17,350 | $ 10,410 |
| St. Catherine of Siena Church, Metairie | 013 Field of Dreams Playground | 324 Codifer St. | Metairie | 70005 | LA | $ 147,000 | $ 147,000 | $ 88,200 |
| St. Catherine of Siena Church, Metairie | 014 Convent | 315 Codifer St. | Metairie | 70005 | LA | $ 420,000 | $ 420,000 | $ 252,000 |
| St. Catherine of Siena Church, Metairie | 015 Rectory | 124-126 Bonnabel Blvd. | Metairie | 70005 | LA | $ 210,000 | $ 210,000 | $ 126,000 |
| St. Catherine of Siena School, Metairie | 005 School (Junior) | 400 Codifer Blvd. | Metairie | 70005 | LA | $ 2,810,500 | $ 2,810,500 | $ 1,686,300 |
| St. Catherine of Siena School, Metairie | 006 Judy Schambach McNitt Gym, Cafeteria & Classrooms | 105 Bonnabel Blvd. | Metairie | 70005 | LA | $ 2,323,650 | $ 2,323,650 | $ 1,394,190 |
| St. Catherine of Siena School, Metairie | 007 Sr. Imelda Moriarty Building | 400 Codifer Blvd. | Metairie | 70005 | LA | $ 1,339,450 | $ 1,339,450 | $ 803,670 |
| St. Christopher the Martyr Church, Metairie | 001 Church | 3924 Derbigny St. | Metairie | 70001 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Christopher the Martyr Church, Metairie | 002 Rectory (Including Statue & Sheds) | 309 Manson Ave. | Metairie | 70001 | LA | $ 297,850 | $ 297,850 | $ 178,710 |
| St. Christopher the Martyr Church, Metairie | 004 Early Education Center Annex | 3911 Derbigny St. | Metairie | 70001 | LA | $ 461,300 | $ 461,300 | $ 276,780 |
| St. Christopher the Martyr Church, Metairie | 007 Early Education Center | 3900 Derbigny St. | Metairie | 70001 | LA | $ 1,103,550 | $ 1,103,550 | $ 662,130 |
| St. Christopher the Martyr School, Metairie | 005 School (Including small metal classroom) | 3900 Derbigny St. | Metairie | 70001 | LA | $ 3,336,550 | $ 3,336,550 | $ 2,001,930 |
| St. Christopher the Martyr School, Metairie | 006 Gym | 3900 Derbigny St. | Metairie | 70001 | LA | $ 1,115,100 | $ 1,115,100 | $ 669,060 |
| St. Christopher the Martyr School, Metairie | 008 Storage Shed #1 | 3900 Derbigny St. | Metairie | 70001 | LA | $ 6,124 | $ 6,124 | $ 3,674 |
| St. Christopher the Martyr School, Metairie | 009 Storage Shed #2 | 3900 Derbigny St. | Metairie | 70001 | LA | $ 3,742 | $ 3,742 | $ 2,245 |
| St. Christopher the Martyr School, Metairie | 012 ECC Shed | 3924 Derbigny St. | Metairie | 70001 | LA | $ 3,402 | $ 3,402 | $ 2,041 |
| St. Christopher the Martyr School, Metairie | 013 Pavilion #1 | 3924 Derbigny St. | Metairie | 70001 | LA | $ 4,158 | $ 4,158 | $ 2,495 |
| St. Christopher the Martyr School, Metairie | 014 Pavilion # 2 | 3924 Derbigny St. | Metairie | 70001 | LA | $ 1,021 | $ 1,021 | $ 612 |
| St. Edward the Confessor Church, Metairie | 001 Church | 4921 W. Metairie Ave. | Metairie | 70001 | LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Edward the Confessor Church, Metairie | 002 Rectory | 1000 High Avenue | Metairie | 70001 | LA | $ 122,850 | $ 122,850 | $ 73,710 |
| St. Edward the Confessor Church, Metairie | 003 Parish Office & Walkways | 4921 W. Metairie Ave. | Metairie | 70001 | LA | $ 321,650 | $ 321,650 | $ 192,990 |
| St. Edward the Confessor Church, Metairie | 007 Storage building 24' x 73' | 4921 W. Metairie Ave. | Metairie | 70001 | LA | $ 75,250 | $ 75,250 | $ 45,150 |
| St. Edward the Confessor Church, Metairie | 008 Maintenance Building 15 X 30 | 4921 W. Metairie Ave. | Metairie | 70001 | LA | $ 10,886 | $ 10,886 | $ 6,532 |
| St. Edward the Confessor Church, Metairie | 012 Rectory Utility Room | 1000 High Avenue | Metairie | 70001 | LA | $ 4,763 | $ 4,763 | $ 2,858 |
| St. Edward the Confessor School, Metairie | 004 Convent & Rm 115 | 4900 Park Dr. | Metairie | 70001 | LA | $ 210,350 | $ 210,350 | $ 126,210 |
| St. Edward the Confessor School, Metairie | 005 Main School Classrooms 101-110 &201-210 | 4901 W. Metairie Ave. | Metairie | 70001 | LA | $ 1,446,900 | $ 1,446,900 | $ 868,140 |
| St. Edward the Confessor School, Metairie | 006 Pavilion | 4921 W. Metairie Ave. | Metairie | 70001 | LA | $ 135,800 | $ 135,800 | $ 81,480 |
| St. Edward the Confessor School, Metairie | 009 Administration/Cafeteria/Library/Walkways | 4901 W. Metairie Ave. | Metairie | 70001 | LA | $ 823,200 | $ 823,200 | $ 493,920 |
| St. Edward the Confessor School, Metairie | 010 Outside Classroom Bldg. Rooms 111-114 & Walkways | 4901 W. Metairie Ave. | Metairie | 70001 | LA | $ 161,350 | $ 161,350 | $ 96,810 |
| St. Edward the Confessor School, Metairie | 011 Pre-K Bldg. Room 100 & Walkways | 4901 W. Metairie Ave. | Metairie | 70001 | LA | $ 205,100 | $ 205,100 | $ 123,060 |
| St. Edward the Confessor School, Metairie | 013 Shed - Park Drive | 4901 W. Metairie Ave. | Metairie | 70001 | LA | $ 1,361 | $ 1,361 | $ 816 |
| St. Edward the Confessor School, Metairie | 014 Festival Pavillion #1 | 4901 W. Metairie Ave. | Metairie | 70001 | LA | $ 3,062 | $ 3,062 | $ 1,837 |
| St. Edward the Confessor School, Metairie | 015 Festival Pavillion #2 | 4901 W. Metairie Ave. | Metairie | 70001 | LA | $ 1,361 | $ 1,361 | $ 816 |
| St. Edward the Confessor School, Metairie | 016 Shed-Grammar Street | 4901 W. Metairie Ave. | Metairie | 70001 | LA | $ 680 | $ 680 | $ 408 |
| St. Francis Xavier Church, Metairie | 001 St. Joseph Hall | 446 Metairie Rd. | Metairie | 70005 | LA | $ 443,100 | $ 443,100 | $ 265,860 |
| St. Francis Xavier Church, Metairie | 002 Old Rectory | 448 Metairie Rd. | Metairie | 70005 | LA | $ 294,350 | $ 294,350 | $ 176,610 |
| St. Francis Xavier Church, Metairie | 008 Parish Center/ Office | 444 Metairie Rd | Metairie | 70005 | LA | $ 534,100 | $ 534,100 | $ 320,460 |
| St. Francis Xavier Church, Metairie | 020 Rectory | 105 Vincent Avenue | Metairie | 70005 | LA | $ 554,400 | $ 554,400 | $ 332,640 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| St. Francis Xavier Church, Metairie | 023 New Church | 400 Metairie Rd. | Metairie | 70005 LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Francis Xavier School, Metairie | 009 School (Including Library) | 215 Betz Place | Metairie | 70005 LA | $ 3,628,800 | $ 3,628,800 | $ 2,177,280 |
| | Continuing Donation to St. Francis Xavier - Sale Pending $350,000 Extension 3/31/2025 - Not Listed Parish Rcd/ | 12 Acre Parcel Tract 2 Lot 13-B4-C | | | | | |
| St. Francis Xavier | Offer Signed | Michoud | | | $ - | $ - | $ - |
| St. Lawrence the Martyr | Property Used for Hispanic Center - Excess Land next to re Soccer Field | | | | $ - | | |
| St. Louis King of France Church, Metairie | 001 Church | 1609 Carrollton Ave. | Metairie | 70005 LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Louis King of France Church, Metairie | 002 Rectory | 1609 Carrollton Ave. | Metairie | 70005 LA | $ 298,200 | $ 298,200 | $ 178,920 |
| St. Louis King of France Church, Metairie | 008 Multi-purpose Building - Lorio Center | 1600 Lake Ave. | Metairie | 70005 LA | $ 814,100 | $ 814,100 | $ 488,460 |
| St. Louis King of France Church, Metairie | 011 Rectory Shed | 1609 Carrollton Ave. | Metairie | 70005 LA | $ 2,381 | $ 2,381 | $ 1,429 |
| St. Louis King of France School, Metairie | 005 School - Administration Building/Cafeteria | 1600 Lake Ave. | Metairie | 70005 LA | $ 770,350 | $ 770,350 | $ 462,210 |
| St. Louis King of France School, Metairie | 006 School - Blanche Hall | 1600 Lake Ave. | Metairie | 70005 LA | $ 568,750 | $ 568,750 | $ 341,250 |
| St. Louis King of France School, Metairie | 007 School & Cafeteria - Marion Hall | 1600 Lake Ave. | Metairie | 70005 LA | $ 1,489,950 | $ 1,489,950 | $ 893,970 |
| St. Louis King of France School, Metairie | 015 Large Playground and Surface (2014) | 1600 Lake Ave. | Metairie | 70005 LA | $ 34,700 | $ 34,700 | $ 20,820 |
| St. Louis King of France School, Metairie | 016 Play Yard Surface | 1600 Lake Ave. | Metairie | 70005 LA | $ 11,200 | $ 11,200 | $ 6,720 |
| St. Mary Magdalen Church, Metairie | 001 Church/Classroom C | 6425 W. Metairie Ave. | Metairie | 70003 LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Mary Magdalen Church, Metairie | 002 Rectory | 6425 W. Metairie Ave. | Metairie | 70003 LA | $ 439,600 | $ 439,600 | $ 263,760 |
| St. Mary Magdalen Church, Metairie | 003 Convent | 1005 Airline Pk. Blvd. | Metairie | 70003 LA | $ 655,550 | $ 655,550 | $ 393,330 |
| St. Mary Magdalen Church, Metairie | 012 Storage building | 6425 W. Metairie Ave. | Metairie | 70003 LA | $ 22,793 | $ 22,793 | $ 13,676 |
| St. Mary Magdalen Church, Metairie | 016 Rectory Pavilion | 6425 W. Metairie Ave. | Metairie | 70003 LA | $ 3,742 | $ 3,742 | $ 2,245 |
| St. Mary Magdalen Church, Metairie | 017 Candle Room | 6425 W. Metairie Ave. | Metairie | 70003 LA | $ 13,268 | $ 13,268 | $ 7,961 |
| St. Mary Magdalen School, Metairie | 004 School A | 6421 W. Metairie Ave. | Metairie | 70003 LA | $ 1,115,100 | $ 1,115,100 | $ 669,060 |
| St. Mary Magdalen School, Metairie | 005 School Building B | 6421 W. Metairie Ave. | Metarie | 70003 LA | $ 1,038,800 | $ 1,038,800 | $ 623,280 |
| St. Mary Magdalen School, Metairie | 006 Cafeteria | 6421 W. Metairie Ave. | Metairie | 70003 LA | $ 550,200 | $ 550,200 | $ 330,120 |
| St. Mary Magdalen School, Metairie | 007 Lodge | 6421 W. Metairie Ave. | Metairie | 70003 LA | $ 92,400 | $ 92,400 | $ 55,440 |
| St. Mary Magdalen School, Metairie | 008 St. Jude Gift Shop | 6421 W. Metairie Ave. | Metairie | 70003 LA | $ 158,550 | $ 158,550 | $ 95,130 |
| St. Mary Magdalen School, Metairie | 010 Storage Container # 1-(8'X24') | 6421 W. Metairie Ave. | Metairie | 70003 LA | $ 3,402 | $ 3,402 | $ 2,041 |
| St. Mary Magdalen | Adjacent Lot - Parish Uses for Parking Sq 100 Lot 1 adjoi W. Met/Airline Park/Merle St | | Metairie | LA | $ - | $ - | $ - |
| St. Angela Merici Church, Metairie | 007 Priest Residence | 828 Melody Dr. | Metairie | 70002 LA | $ 191,377 | | |
| St. Angela Merici Church | Holy Family Hall | 824 Melody Drive | Metairie | 70002 LA | $ 306,250 | | |
| St. Philip Neri Church, Metairie | 001 Church (1979) | 6500 Kawanee Ave. | Metairie | 70003 LA | $ 100,000 | $ 100,000 | $ 100,000 |
| St. Philip Neri Church, Metairie | 002 Rectory | 6500 Kawanee Ave. | Metairie | 70003 LA | $ 381,850 | $ 381,850 | $ 229,110 |
| St. Philip Neri Church, Metairie | 015 Parishioners' Center (Gym, Hall, CCD, Ofcs) | 6600 Kawanee Ave. | Metairie | 70003 LA | $ 1,640,100 | $ 1,640,100 | $ 984,060 |
| St. Philip Neri School, Metairie | 004 Assembly Hall (1972) | 6600 Kawanee Ave. | Metairie | 70003 LA | $ 346,150 | $ 346,150 | $ 207,690 |
| St. Philip Neri School, Metairie | 005 School-Main Building | 6600 Kawanee Ave. | Metairie | 70003 LA | $ 1,052,100 | $ 1,052,100 | $ 631,260 |
| St. Philip Neri School, Metairie | 006 School Building # 2 | 6600 Kawanee Ave. | Metairie | 70003 LA | $ 907,200 | $ 907,200 | $ 544,320 |
| St. Philip Neri School, Metairie | 007 School Building #3 | 6600 Kawanee Ave. | Metairie | 70003 LA | $ 868,700 | $ 868,700 | $ 521,220 |
| St. Philip Neri School, Metairie | 009 Covered Walkways | 6600 Kawanee Ave. | Metairie | 70003 LA | $ 135,800 | $ 135,800 | $ 81,480 |
| St. Philip Neri School, Metairie | 013 Storage Container # 1 | 6600 Kawanee Ave. | Metairie | 70003 LA | $ 2,041 | $ 2,041 | $ 1,225 |
| St. Philip Neri School, Metairie | 014 Storage Container # 2 | 6600 Kawanee Ave. | Metairie | 70003 LA | $ 2,041 | $ 2,041 | $ 1,225 |
| St. Philip Neri School, Metairie | 016 Early Learning Center (2015)10 | 6500 Kawanee Ave. | Metairie | 70003 LA | $ 749,350 | $ 749,350 | $ 449,610 |
| Sacred Heart of Jesus Church, Norco | 001 Church | 401 Spruce St. | Norco | 70079 LA | $ 100,000 | $ 100,000 | $ 100,000 |
| Sacred Heart of Jesus Church, Norco | 002 Rectory/3 car garage | 401 Spruce St. | Norco | 70079 LA | $ 402,850 | $ 402,850 | $ 241,710 |
| Sacred Heart of Jesus Church, Norco | 004 Youth Center (1984) | 425 Spruce St. | Norco | 70079 LA | $ 463,750 | $ 463,750 | $ 278,250 |
| Sacred Heart of Jesus Church, Norco | 012 Fair Storage (16 x 30) | 401 Spruce St. | Norco | 70079 LA | $ 9,526 | $ 9,526 | $ 5,715 |
| Sacred Heart of Jesus Church, Norco | 013 Tractor Shed (20 x 30) | 401 Spruce St. | Norco | 70079 LA | $ 11,567 | $ 11,567 | $ 6,940 |
| Sacred Heart of Jesus Church, Norco | 015 Fair ticket booth (8'X10') | 401 Spruce St. | Norco | 70079 LA | $ 1,021 | $ 1,021 | $ 612 |
| Sacred Heart of Jesus School, Norco | 005 Cafeteria & Auditorium | 453 Spruce St. | Norco | 70079 LA | $ 507,850 | $ 507,850 | $ 304,710 |
| Sacred Heart of Jesus School, Norco | 006 Classroom # 1 | 453 Spruce St. | Norco | 70079 LA | $ 399,000 | $ 399,000 | $ 239,400 |
| Sacred Heart of Jesus School, Norco | 007 Classroom # 2 | 453 Spruce St. | Norco | 70079 LA | $ 386,050 | $ 386,050 | $ 231,630 |
| Sacred Heart of Jesus School, Norco | 008 Classroom # 3 | 453 Spruce St. | Norco | 70079 LA | $ 668,500 | $ 668,500 | $ 401,100 |
| Sacred Heart of Jesus School, Norco | 009 Administration /Classrooms | 453 Spruce St. | Norco | 70079 LA | $ 446,250 | $ 446,250 | $ 267,750 |
| Sacred Heart of Jesus School, Norco | 010 Restroom | 453 Spruce St. | Norco | 70079 LA | $ 62,650 | $ 62,650 | $ 37,590 |
| Sacred Heart of Jesus School, Norco | 016 Gymnasium | 453 Spruce St. | Norco | 70079 LA | $ 579,600 | $ 579,600 | $ 347,760 |
| St. Thomas Church, Pointe a la Hache | 001 Church | 17593 Hwy. 15 | Pointe a la Hach | 70082 LA | $ 100,000 | | |

154

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| St. Thomas Church, Pointe a la Hache | 007 Parish Hall (Modular Bldg.) | 17605 Hwy. 15 | Pointe a la Hache | 70082 | LA | $ | 66,150 | | |
| St. Thomas Church, Pointe a la Hache | 008 Storage Building | 17605 Hwy. 15 | Pointe a la Hache | 70082 | LA | $ | 6,804 | | |
| St. Thomas Church, Pointe a la Hache | 009 Rectory | 17605 Hwy. 15 | Pointe a la Hache | 70082 | LA | $ | 79,100 | | |
| Our Lady of Good Harbor Church, Buras | 007 St. Ann Mission | 32949 Hwy. 11 | Empire | 70050 | LA | $ | 141,750 | | |
| St. Patrick Church, Port Sulphur | 001 Church & Fatima Shrine | 28698 Hwy. 23 | Port Sulphur | 70083 | LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| St. Patrick Church, Port Sulphur | 002 Rectory | 28698 Hwy. 23 | Port Sulphur | 70083 | LA | $ | 209,300 | $ 209,300 | $ 125,580 |
| St. Patrick Church, Port Sulphur | 003 Parish Life Center | 28698 Hwy. 23 | Port Sulphur | 70083 | LA | $ | 605,500 | $ 605,500 | $ 363,300 |
| St. Patrick Church, Port Sulphur | 005 Mausoleum Phase I 1967 (90 Cryptst) | 28698 Hwy. 23 | Port Sulphur | 70083 | LA | $- | | $ - | $ - |
| St. Patrick Church, Port Sulphur | 010 Mausoleum Phase II (150 Crypts) | 28698 Hwy. 23 | Port Sulphur | 70083 | LA | $- | | $ - | $ - |
| St. Patrick Church, Port Sulphur | 011 Ludwig Storage Bldg. (25'X30'X14') | 28698 Hwy. 23 | Port Sulphur | 70083 | LA | $ | 15,309 | $ 15,309 | $ 9,185 |
| St. Patrick Church, Port Sulphur | 012 Mausoleum Phase III (160 Crypts) | | | | LA | $- | | $ - | $ - |
| St. Patrick Church, Port Sulphur | 013 Mausoleum Phase IV (80 Crypts) | | | | LA | $- | | $ - | $ - |
| Our Lady of Grace Church, Reserve | 002 Rectory | 772 Hwy. 44 | Reserve | 70084 | LA | $ | 273,700 | $ 273,700 | $ 164,220 |
| Our Lady of Grace Church, Reserve | 003 Parish Office | 772 Hwy. 44 | Reserve | 70084 | LA | $ | 73,150 | $ 73,150 | $ 43,890 |
| Our Lady of Grace Church, Reserve | 006 Church | 772 Hwy. 44 | Reserve | 70084 | LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| Our Lady of Grace Church, Reserve | 007 Storage Building (30' X 32') Behind Rectory | 772 Hwy. 44 | Reserve | 70084 | LA | $ | 19,391 | $ 19,391 | $ 11,635 |
| Our Lady of Grace Church, Reserve | 011 Bell Tower (2012) | 772 Hwy. 44 | Reserve | 70084 | LA | $ | 4,082 | $ 4,082 | $ 2,449 |
| Our Lady of Grace School, Reserve | 004 School & Cafeteria | 780 Hwy. 44 | Reserve | 70084 | LA | $ | 658,350 | $ 658,350 | $ 395,010 |
| Our Lady of Grace School, Reserve | 005 School & Gym | 780 Hwy. 44 | Reserve | 70084 | LA | $ | 853,650 | $ 853,650 | $ 512,190 |
| St. Hubert | 001 Church | 176 Anthony Monica St. | Garyville | 70051 | LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| St. Hubert | 002 Rectory/ Priest Office | 176 Anthony Monica St. | Garyville | 70051 | LA | $ | 127,750 | $ 127,750 | $ 76,650 |
| St. Hubert | 003 Parish Hall | 176 Anthony Monica St. | Garyville | 70051 | LA | $ | 311,150 | $ 311,150 | $ 186,690 |
| St. Hubert | 004 Shed-behind rectory | 713 Church St. | Garyville | 70051 | LA | $ | 18,711 | $ 18,711 | $ 11,227 |
| St. Peter Church, Reserve | 007 Gazebo-Rosary Walk | 718 Church St. | Garyville | 70051 | LA | $ | 6,464 | $ 6,464 | $ 3,878 |
| St. Peter Church, Reserve | 001 Church & Bell Tower | 1550 Hwy. 44 | Reserve | 70084 | LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| St. Peter Church, Reserve | 002 Rectory | 1550 Hwy. 44 | Reserve | 70084 | LA | $ | 230,300 | $ 230,300 | $ 138,180 |
| St. Peter Church, Reserve | 003 Lacour Center | 170 West 17th St. | Reserve | 70084 | LA | $ | 238,350 | $ 238,350 | $ 143,010 |
| St. Peter Church, Reserve | 006 Thrift Shop | 188 West 7th St. | Reserve | 70084 | LA | $ | 16,065 | $ 16,065 | $ 9,639 |
| St. Peter Church, Reserve | 012 St. Peter Mausoleum (236 Crypts) | | | | LA | $- | | $ - | $ - |
| St. Peter Church, Reserve | 013 1979 Resurrection Mausoleum (280 Crypts) | | | | LA | $- | | $ - | $ - |
| St. Peter Church, Reserve | 014 1981 Resurrection Mausoleum (312 Crypts) | | | | LA | $- | | $ - | $ - |
| St. Peter Church, Reserve | 015 1986 Resurrection Mausoleum (430 Crypts) | | | | LA | $- | | $ - | $ - |
| St. Peter Church, Reserve | 016 Cemetery Statue & Cross | 188 West 7th St. | Reserve | 70084 | LA | $ | 24,154 | $ 24,154 | $ 14,493 |
| St. Peter Church, Reserve | 018 1990 Resurrection Mausoleum (330 Crypts) | | | | LA | $- | | $ - | $ - |
| St. Peter Church, Reserve | 019 2000 Resurrection Mausoleum (306 Crypts) | | | | LA | $- | | $ - | $ - |
| St. Peter Church, Reserve | 020 Storage Shed | 188 West 7th St. | Reserve | 70084 | LA | $ | 5,292 | $ 5,292 | $ 3,175 |
| St. Peter Church, Reserve | 022 2008 Resurrection Mausoleum (282 Crypts) | | | | LA | $- | | $ - | $ - |
| St. Peter Church, Reserve | 023 2003 Resurrection Mausoleum (348 Crypts) | | | | LA | $- | | $ - | $ - |
| St. Peter School, Reserve | 007 Main School Bldg. | 188 West 7th St. | Reserve | 70084 | LA | $ | 1,387,400 | $ 1,387,400 | $ 832,440 |
| St. Peter School, Reserve | 008 Classrooms | 188 West 7th St. | Reserve | 70084 | LA | $ | 376,950 | $ 376,950 | $ 226,170 |
| St. Peter School, Reserve | 009 Pre-School | 188 West 7th St. | Reserve | 70084 | LA | $ | 50,400 | $ 50,400 | $ 30,240 |
| St. Peter School, Reserve | 011 Storage Shed | 188 West 7th St. | Reserve | 70084 | LA | $ | 5,292 | $ 5,292 | $ 3,175 |
| St. Bernard Church, St. Bernard | 001 Church | 2805 Bayou Rd. | St. Bernard | 70085 | LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| St. Bernard Church, St. Bernard | 003 Activities Building | 2805 Bayou Rd. | St. Bernard | 70085 | LA | $ | 297,150 | $ 297,150 | $ 178,290 |
| St. Bernard Catholic Church | Church, Rectory and Office Bldg. on large tract of land ap | 2809 Bayou Road | St. Bernard | | LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| St. Margaret Mary Church, Slidell | 001 Church/Youth Room | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 100,000 | $ 100,000 | $ 100,000 |
| St. Margaret Mary Church, Slidell | 002 Rectory-(1982) | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 220,500 | $ 220,500 | $ 132,300 |
| St. Margaret Mary Church, Slidell | 016 Evangelization Bldg. | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 814,450 | $ 814,450 | $ 488,670 |
| St. Margaret Mary School, Slidell | 003 Gym/Lab 7 | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 1,268,400 | $ 1,268,400 | $ 761,040 |
| St. Margaret Mary School, Slidell | 004 Cafeteria | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 442,400 | $ 442,400 | $ 265,440 |
| St. Margaret Mary School, Slidell | 005 Administration Building | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 367,500 | $ 367,500 | $ 220,500 |
| St. Margaret Mary School, Slidell | 006 Classrooms/LABS 1-3 | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 901,600 | $ 901,600 | $ 540,960 |
| St. Margaret Mary School, Slidell | 009 Classroom16-17-18/Lab 5 | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 227,150 | $ 227,150 | $ 136,290 |
| St. Margaret Mary School, Slidell | 010 Lab 6-Classromms 19-20-21 | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 201,250 | $ 201,250 | $ 120,750 |
| St. Margaret Mary School, Slidell | 011 Kindergarten Building, Lab 4, Rooms 13-14-15 | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 233,100 | $ 233,100 | $ 139,860 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| St. Margaret Mary School, Slidell | 015 Computer Lab & Room 22 | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 200,550 | $ | 200,550 | $ | 120,330 |
| St. Margaret Mary School, Slidell | 017 Religion, Music, Art Complex | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 394,450 | $ | 394,450 | $ | 236,670 |
| St. Margaret Mary School, Slidell | 021 Storage Building | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 66,850 | $ | 66,850 | $ | 40,110 |
| St. Margaret Mary School, Slidell | 022 Early Childhood Education Center | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 375,550 | $ | 375,550 | $ | 225,330 |
| St. Margaret Mary School, Slidell | 023 Child Care Center | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 249,200 | $ | 249,200 | $ | 149,520 |
| St. Margaret Mary School, Slidell | 024 Gazebo | 1050 Robert Blvd. | Slidell | 70458 | LA | $ | 3,062 | $ | 3,062 | $ | 1,837 |
| Our Lady of Lourdes Church, Slidell | 002 Church | 3924 Berkley St. | Slidell | 70458 | LA | $ | 343,700 | $ | 343,700 | $ | 206,220 |
| Our Lady of Lourdes Church, Slidell | 003 Parish Life Center | 3924 Berkley St. | Slidell | 70458 | LA | $ | 533,400 | $ | 533,400 | $ | 320,040 |
| Our Lady of Lourdes Church, Slidell | 012 Cemetery | 3924 Berkley St. | Slidell | 70458 | LA | $- | | $ | - | $ | - |
| Our Lady of Lourdes Church, Slidell | 026 Rectory Garage | 3924 Berkley St. | Slidell | 70458 | LA | $ | 63,700 | $ | 63,700 | $ | 38,220 |
| Our Lady of Lourdes Church, Slidell | 034 Church (2010) | 400 Westchester Pl | Slidell | 70458 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Our Lady of Lourdes Church, Slidell | 039 Bell Tower | 400 Westchester Pl | Slidell | 70458 | LA | $ | 17,350 | $ | 17,350 | $ | 10,410 |
| Our Lady of Lourdes School, Slidell | 011 Middle School | 345 Westchester Pl | Slidell | 70458 | LA | $ | 602,350 | $ | 602,350 | $ | 361,410 |
| Our Lady of Lourdes School, Slidell | 025 Clasroom Trailer "E" | 345 Westchester Pl | Slidell | 70458 | LA | $ | 59,500 | $ | 59,500 | $ | 35,700 |
| Our Lady of Lourdes School, Slidell | 033 Elementary School (North & South) (2012) | 345 Westchester Pl | Slidell | 70458 | LA | $ | 3,695,300 | $ | 3,695,300 | $ | 2,217,180 |
| Our Lady of Lourdes School, Slidell | 035 Gymnasium | 245 Westchester Pl | Slidell | 70458 | LA | $ | 1,404,200 | $ | 1,404,200 | $ | 842,520 |
| Our Lady of Lourdes School, Slidell | 037 Cafeteria | 345 Westchester Pl | Slidell | 70458 | LA | $ | 1,034,950 | $ | 1,034,950 | $ | 620,970 |
| Our Lady of Lourdes School, Slidell | 038 Chiller Plant | 345 Westchester Pl | Slidell | 70458 | LA | $ | 194,950 | $ | 194,950 | $ | 116,970 |
| Our Lady of Lourdes School, Slidell | 040 BBQ Shelter | 400 Westchester Pl | Slidell | 70458 | LA | $ | 7,825 | $ | 7,825 | $ | 4,695 |
| Our Lady of Lourdes School, Slidell | 041 Park Shelter | 400 Westchester Pl | Slidell | 70458 | LA | $ | 8,694 | $ | 8,694 | $ | 5,216 |
| Our Lady of Lourdes School, Slidell | 042 Gazebo | 400 Westchester Pl | Slidell | 70458 | LA | $ | 6,048 | $ | 6,048 | $ | 3,629 |
| Our Lady of Lourdes School, Slidell | 046 Early Childcare Center | 120 Westchester Pl. | Slidell | 70458 | LA | $ | 333,550 | $ | 333,550 | $ | 200,130 |
| Sts. Peter & Paul Church, Pearl River | 001 Church | 66209 St. Mary Dr. | Pearl River | 70452 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Sts. Peter & Paul Church, Pearl River | 003 Parish Hall | 66181 St. Mary Dr | Pearl River | 70452 | LA | $ | 729,050 | $ | 729,050 | $ | 437,430 |
| Sts. Peter & Paul Church, Pearl River | 007 Library/Annex Building & Storage Container | 66209 St. Mary Dr. | Pearl River | 70452 | LA | $ | 34,650 | $ | 34,650 | $ | 20,790 |
| Sts. Peter & Paul Church, Pearl River | 009 Rectory | 66192 St. Mary Dr. | Pearl River | 70452 | LA | $ | 151,200 | $ | 151,200 | $ | 90,720 |
| Sts. Peter & Paul Church, Pearl River | 010 Greenhouse | 66192 St. Mary Dr. | Pearl River | 70452 | LA | $ | 1,050 | $ | 1,050 | $ | 630 |
| Sts. Peter & Paul Church, Pearl River | 011 St. Joseph Workshop | 66209 St. Mary Dr. | Pearl River | 70452 | LA | $ | 22,453 | $ | 22,453 | $ | 13,472 |
| Sts. Peter & Paul Church, Pearl River | 014 St. Anthony Hall | 66202 St. Mary Dr. | Pearl River | 70452 | LA | $ | 140,000 | $ | 140,000 | $ | 84,000 |
| Sts. Peter & Paul Church, Pearl River | 015 Pump House | 66209 St. Mary Dr. | Pearl River | 70452 | LA | $ | 1,750 | $ | 1,750 | $ | 1,050 |
| Sts. Peter & Paul, Pearl River | Property located behind Rectory 66192 St. Mary Drive  Ac Lots 7, 8, 20, 21 22 Sq C Sec 37 | | Pearl River | | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Our Lady of the Holy Rosary Church, Hahnville | 001 Church & Bell Tower | 1 Rectory Lane | Hahnville | 70057 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Our Lady of the Holy Rosary Church, Hahnville | 002 Rectory | 1 Rectory Lane | Hahnville | 70057 | LA | $ | 141,750 | $ | 141,750 | $ | 85,050 |
| Our Lady of the Holy Rosary Church, Hahnville | 003 Food Pantry/ Garage | 1 Rectory Lane | Hahnville | 70057 | LA | $ | 111,300 | $ | 111,300 | $ | 66,780 |
| Our Lady of the Holy Rosary Church, Hahnville | 004 Church Community Center | 1 Rectory Lane | Hahnville | 70057 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Our Lady of the Holy Rosary Church, Hahnville | 005 Parish School of Religion Building | 1 Rectory Lane | Hahnville | 70057 | LA | $ | 189,350 | $ | 189,350 | $ | 113,610 |
| Our Lady of the Holy Rosary Church, Hahnville | 010 Mausoleum-Phase III 1998 (90 Crypts) | 1 Rectory Lane | Hahnville | 70057 | LA | $ | - | $ | - | $ | - |
| Our Lady of the Holy Rosary Church, Hahnville | 011 Rectory Shed | 1 Rectory Lane | Hahnville | 70057 | LA | $ | 1,021 | $ | 1,021 | $ | 612 |
| Our Lady of the Holy Rosary Church, Hahnville | 012 Pavilion | 1 Rectory Lane | Hahnville | 70057 | LA | $ | 340 | $ | 340 | $ | 204 |
| Christ the King Church, Terrytown | 001 Church (1982) & Bell Tower | 535 Deerfield Rd. | Terrytown | 70056 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Christ the King Church, Terrytown | 002 Rectory (10/85) - Including Black Wrought Iron Fence | 535 Deerfield Rd. | Terrytown | 70056 | LA | $ | 164,500 | $ | 164,500 | $ | 98,700 |
| Christ the King Church, Terrytown | 004 Parish Center | 535 Deerfield Rd. | Terrytown | 70056 | LA | $ | 220,500 | $ | 220,500 | $ | 132,300 |
| Christ the King School, Terrytown | 005 Administration & Classrooms | 2106 Deerfield Rd. | Terrytown | 70056 | LA | $ | 610,400 | $ | 610,400 | $ | 366,240 |
| Christ the King School, Terrytown | 006 Cafeteria & Parish Hall | 2106 Deerfield Rd. | Terrytown | 70056 | LA | $ | 815,500 | $ | 815,500 | $ | 489,300 |
| Christ the King School, Terrytown | 007 Elementary Classrooms | 2106 Deerfield Rd. | Terrytown | 70056 | LA | $ | 1,233,050 | $ | 1,233,050 | $ | 739,830 |
| Christ the King School, Terrytown | 010 305 Classroom Trailer (24x32) | 2106 Deerfield Rd. | Terrytown | 70056 | LA | $ | 24,797 | $ | 24,797 | $ | 14,878 |
| Christ the King School, Terrytown | 015 KC/Band Building | 535 Deerfield Rd. | Terrytown | 70056 | LA | $ | 46,550 | $ | 46,550 | $ | 27,930 |
| Christ the King School, Terrytown | 016 Restroom Building | 2106 Deerfield Rd. | Terrytown | 70056 | LA | $ | 32,200 | $ | 32,200 | $ | 19,320 |
| Christ the King School, Terrytown | 017 Storage Shed #1 (10x20) | 2106 Deerfield Rd. | Terrytown | 70056 | LA | $ | 4,082 | $ | 4,082 | $ | 2,449 |
| Christ the King School, Terrytown | 020 306-307 Modular Classroom #1 | 535 Deerfield Rd. | Terrytown | 70056 | LA | $ | 63,350 | $ | 63,350 | $ | 38,010 |
| Christ the King School, Terrytown | 021 308-309 Modular Classroom #2 | 535 Deerfield Rd. | Terrytown | 70056 | LA | $ | 63,350 | $ | 63,350 | $ | 38,010 |
| Christ the King School, Terrytown | 022 310-311 Modular Classroom #3 | 535 Deerfield Rd. | Terrytown | 70056 | LA | $ | 63,350 | $ | 63,350 | $ | 38,010 |
| Christ the King School, Terrytown | 023 Storage Shed #3 | 2106 Deerfield Rd. | Terrytown | 70056 | LA | $ | 5,103 | $ | 5,103 | $ | 3,062 |
| Our Lady of Prompt Succor Church, Westwego | 001 Church | 500 Avenue A | Westwego | 70094 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Our Lady of Prompt Succor Church, Westwego | 002 Rectory | 146 Fourth St. | Westwego | 70094 | LA | $ | 328,300 | $ | 328,300 | $ | 196,980 |

156

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Our Lady of Prompt Succor Church, Westwego | 003 Badeaux Hall | 500 Avenue A | Westwego | 70094 | LA | $ | 396,900 | $ | 396,900 | $ | 238,140 |
| Our Lady of Prompt Succor Church, Westwego | 004 Convent | 134 Avenue A | Westwego | 70094 | LA | $ | 92,750 | $ | 92,750 | $ | 55,650 |
| Our Lady of Prompt Succor Church, Westwego | 007 Mausoleum GOH Phase I 1986 & II 1993 (392 Crypts) | 624 Avenue A | Westwego | 70094 | LA | $- | | $ | - | $ | - |
| Our Lady of Prompt Succor Church, Westwego | 009 Lift Machine | 500 Avenue A | Westwego | 70094 | LA | $ | 9,800 | $ | 9,800 | $ | 5,880 |
| Our Lady of Prompt Succor Church, Westwego | 010 Garage/Storage | 146 Fourth St. | Westwego | 70094 | LA | $ | 19,950 | $ | 19,950 | $ | 11,970 |
| Our Lady of Prompt Succor Church, Westwego | 011 Convent Garage 24x27 | 134 Avenue A | Westwego | 70094 | LA | $ | 12,950 | $ | 12,950 | $ | 7,770 |
| Our Lady of Prompt Succor Church, Westwego | 012 Mausoleum 2002 GOH Phase III (196 Crypts) | | | | | $- | | $ | - | $ | - |
| Our Lady of Prompt Succor Church, Westwego | 013 Fair Storage | 146 Fourth St. | Westwego | 70094 | LA | $ | 25,200 | $ | 25,200 | $ | 15,120 |
| Our Lady of Prompt Succor Church, Westwego | 014 Mausoleum GOH Phase IV (196 Crypts) | | | | LA | $- | | $ | - | $ | - |
| Our Lady of Prompt Succor Church, Westwego | 015 Mausoleum GOH Phase V (2014) | 624 Avenue A | Westwego | 70094 | LA | $- | | $ | - | $ | - |
| Holy Guardian Angels Church, Bridge City | 001 Church | 1701 Bridge City Avenue | Westwego | 70094 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Holy Guardian Angels Church, Bridge City | 004 Msgr. Luminais Ed. Center | 1701 Bridge City Avenue | Westwego | 70094 | LA | $ | 466,200 | $ | 466,200 | $ | 279,720 |
| Holy Guardian Angels Church, Bridge City | 008 Youth Center | 425 10th St. | Westwego | 70094 | LA | $ | 168,700 | $ | 168,700 | $ | 101,220 |
| Holy Guardian Angels Church, Bridge City | 009 Storage Building | 1701 Bridge City Avenue | Westwego | 70094 | LA | $ | 2,722 | $ | 2,722 | $ | 1,633 |
| Holy Guardian Angels Church, Bridge City | 013 Stage | 1701 Bridge City Avenue | Westwego | 70094 | LA | $ | 5,950 | $ | 5,950 | $ | 3,570 |
| Our Lady of Prompt Succor School, Westwego | 005 School | 531 Ave. A | Westwego | 70094 | LA | $ | 1,972,950 | $ | 1,972,950 | $ | 1,183,770 |
| Our Lady of Prompt Succor School, Westwego | 006 Auditorium & Gym | 531 Ave. A | Westwego | 70094 | LA | $ | 508,550 | $ | 508,550 | $ | 305,130 |
| Our Lady of Property Succor, Westwego | Lots off 4th Street Resub in Process Lot 6A  - Listed w/ Badeaux Hall Listing Paul Richard | | Westwego | | LA | $ | - | $ | - | $ | - |
| St. Luke Church, Slidell | Property Adjacent to St. Luke Church 910 Cross Gates, pr | Lot 6 Coral St, Sq. 16 | Slidell | | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Our Lady of Good Counsel | 016 Church | 1235 Louisiana Ave. | New Orleans | 70115 | LA | $ | 100,000 | $ | 100,000 | $ | 100,000 |
| Our Lady of Good Counsel | 017 Rectory | 1307 Louisiana Ave. | New Orleans | 70115 | LA | $ | 491,400 | $ | 491,400 | $ | 294,840 |
| Most Holy Trinity | 007 Family Life Center (2016) | 509 Holy Trinity Dr. | Covington | 70433 | LA | $ | 792,750 | | | | |
| Most Holy Trinity | 008 Church (2016) | 501 Holy Trinity Dr. | Covington | 70433 | LA | $ | 100,000 | | | | |
| Most Holy Trinity | 009 Pastoral Center | 505 Most Holy Trinity Dr. | Covington | 70433 | LA | $ | 392,700 | | | | |
| St. Brigid Church | 001 Church/Aftercare | 13435 Granville St. | New Orleans | 70129 | LA | $ | 100,000 | | | | |
| St. Brigid Church | 002 Rectory | 13435 Granville St. | New Orleans | 70129 | LA | $ | 80,150 | | | | |
| St. Brigid Church | 009 Rectory Garage | 13435 Granville St. | New Orleans | 70129 | LA | $ | 18,031 | | | | |
| Assumption of Mary Church, Avondale | 009 Rectory Garage | 533 S. Jamie Blvd. | Avondale | 70094 | LA | $ | 1,701 | | | | |
| Assumption of Mary Church, Avondale | 010 Rectory | 533 S. Jamie Blvd. | Avondale | 70094 | LA | $ | 70,000 | | | | |
| St. Agnes Le Thi Thanh Church, Marrero | 001 Church | 6851 Le Thi Thanh St. | Marrero | 70072 | LA | $ | 100,000 | | | | |
| St. Agnes Le Thi Thanh Church, Marrero | 009 Multi-Purpose | 6851 Le Thi Thanh St. | Marrero | 70072 | LA | $ | 1,876,700 | | | | |
| St. Agnes Le Thi Thanh Church, Marrero | 017 Pavilion/Stage | 6851 Le Thi Thanh St. | Marrero | 70072 | LA | $ | 24,494 | | | | |
| St. Agnes Le Thi Thanh Church, Marrero | 018 Carport | 6851 Le Thi Thanh St. | Marrero | 70072 | LA | $ | 18,371 | | | | |
| St. Agnes Le Thi Thanh Church, Marrero | 019 Storage | 6851 Le Thi Thanh St. | Marrero | 70072 | LA | $ | 8,165 | | | | |
| St. Agnes Le Thi Thanh, Marrero | Leased to BT Towing) Parcel # 9420009197  adjacent to St. Agens Le Thi Thanh Church | Sq A-4  Behind 6801 Westbank Expressway | Marrero | | LA | $ | 100,000 | | | | |
| St. Joseph Church (Algiers) | 002 Dwelling/Rectory/ Office | 4410 Fields St. | New Orleans | 70131 | LA | $ | 147,000 | | | | |
| St. Martin de Porres Church | 012 Primary School | 5601 Elysian Fields Ave. | New Orleans | 70122 | LA | $ | 2,464,700 | | | | |
| Pontifical Mission Societies | 003 Society of Propagation of Faith Contents UNO Newm: | 2000 Lakeshore Dr. 2nd Floor | New Orleans | 70122 | LA | $ | - | | | | |
| Project Lazarus | 001 Houses 3&4 | 721 St. Ferdinand St. | New Orleans | 70117 | LA | $ | 252,350 | | | | |
| Project Lazarus | 009 Cottage & Maintenance Garage | 709 St. Ferdinand St. | New Orleans | 70117 | LA | $ | 116,550 | | | | |
| Project Lazarus | 012 Maintenance | 709 St. Ferdinand St. | New Orleans | 70117 | LA | $ | 7,825 | | | | |
| Christopher Homes - St. Bernard II dba Metairie IV | 001 Metairie Manor IV | 4937 York St. | Metairie | 70001 | LA | $ | 5,265,400 | | | | |
| St. Cecilia | 001 PACE Greater New Orleans (St. Cecilia) | 4201 N. Rampart | New Orleans | 70117 | LA | $ | 2,575,650 | $ | 2,575,650 | $ | 1,545,390 |
| St. Cecilia | 002 PACE Greater New Orleans (St. Cecilia) - Boiler House | 4201 N. Rampart | New Orleans | 70117 | LA | $ | 18,957 | $ | 18,957 | $ | 11,374 |
| St. Mary of the Angels School | 004 Head Start-St. Mary of the Angels (65%) | 2225 Congress St. | New Orleans | 70117 | LA | $ | 2,012,238 | | | | |
| Notre Dame Health System-Chateau de Notre Dame L | Bunkie Evacuation Site | 805 Shirley Road | Bunkie | 70132 | LA | $ | 2,897,300 | | | | |
| Catholic Charities | 002 Therapeutic Family Services | 405 Gretna Blvd. | Gretna | 70053 | LA | $ | | | | | |
| CCANO - Food For Seniors | 011 Warehouse | 5600 Hayne Blvd. | New Orleans | 70126 | LA | $ | 1,410,500 | $ | 1,410,500 | $ | 846,300 |
| CCANO - Food For Seniors | 013 Warehouse | 7649 Townsend Pl. | New Orleans | 70126 | LA | $ | 1,322,650 | $ | 1,322,650 | $ | 793,590 |
| CCANO - Immigration & Refugee Services | 001 Immigration & Refugee Services | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ | - | $ | - | $ | - |
| CCANO - Immigration & Refugee Services | 005 Refugee Services and Anti Trafficking | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ | - | $ | - | $ | - |
| CCANO - Immigration & Refugee Services | 006 Immigration & Refugee Services | 4200 I-10 Service Rd. W | Metairie | 70001 | LA | $ | - | $ | - | $ | - |

157

| Entity | Location | Address | City | Zip | State | | | |
|---|---|---|---|---|---|---|---|---|
| CCANO - Office of Peace & Justice | 003 Office of Peace & Justice | 2022 St. Bernard Ave. | New Orleans | 70116 | LA | $ - | $ - | $ - |
| CCANO - School Counseling Program | 002 School Counseling Program | 1 Rectory Lane | Hahnville | 70057 | LA | $ - | $ - | $ - |
| CCANO - ESL (English as a Second Language) | 015 ESL - Tulane University Newcomb Hall | 1229 Broadway St. | New Orleans | 70118 | LA | $ - | $ - | $ - |
| CCANO - ESL (English as a Second Language) | 021 ESL - St. Lawrence Hispanic Center | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ - | $ - | $ - |
| CCANO - Cornerstone Builders | 001 Cornerstone Builders | 2022 St. Bernard Ave. | New Orleans | 70116 | LA | $ - | $ - | $ - |
| CCANO - Cornerstone Builders | 002 Cornerstone Builders | 405 Gretna Blvd. | Gretna | 70053 | LA | $ - | $ - | $ - |
| CCANO - Cornerstone Builders | 003 Cornerstone Builders | 4465 Highway 190E Service Road | Covington | 70433 | LA | $ - | $ - | $ - |
| CCANO - North Shore Branch Office | 001 North Shore Branch Office | 4465 Highway 190E Service Road | Covington | 70433 | LA | $ - | $ - | $ - |
| CCANO - Parish and Community Ministry | 021 PCM-St. Charles Office | 100 Melonie Dr., Ste. F. | Boutte | 70039 | LA | $ - | $ - | $ - |
| CCANO - Parish and Community Ministry | 023 PCM Offices-Incarnate Word | 8326 Apricot St. | New Orleans | 70118 | LA | $ - | $ - | $ - |
| CCANO - Parish and Community Ministry | 024 PCM-North Shore Branch Offic | 4465 Highway 190E Service Road | Covington | 70433 | LA | $ - | $ - | $ - |
| CCANO - Parish and Community Ministry | 025 PCM-Samitan Food Bank | 402 Girod St. | Mandeville | 70448 | LA | $ - | $ - | $ - |
| CCANO - Parish and Community Ministry | 026 PCM | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ - | $ - | $ - |
| CCANO - Ciara Independent Living | 001 Ciara Independent Living | 1424 Dante St. | New Orleans | 70118 | LA | $ 34,300 | $ 34,300 | $ 20,580 |
| CCANO - Bethlehem Housing | 001 Community Based Supervised Apts. | 3021 Sienna Dr. | Harvey | 70058 | LA | $ 60,550 | $ 60,550 | $ 36,330 |
| CCANO - Bethlehem Housing | 002 Community Based Supervised Apts | 3023 Sienna Dr. | Harvey | 70058 | LA | $ 44,450 | $ 44,450 | $ 26,670 |
| CCANO - Bethlehem Housing | 003 Northshore | 4465 Highway 190E Service Road | Covington | 70433 | LA | $ - | $ - | $ - |
| CCANO - Bethlehem Housing | 004 Incarnate Word | 8326 Apricot St. | New Orleans | 70118 | LA | $ - | $ - | $ - |
| CCANO - Spirit of Hope | 001 SOH | 4465 Highway 190E Service Road | Covington | 70433 | LA | $ - | $ - | $ - |
| CCANO - Spirit of Hope | 002 SOH | 8326 Apricot St. | New Orleans | 70118 | LA | $ - | $ - | $ - |
| CCANO - Spirit of Hope | 003 SOH | 917 N. Atlanta St. | Metairie | 70003 | LA | $ - | $ - | $ - |
| CCANO - Spirit of Hope | 004 SOH | 100 Melonie Dr., Ste. F. | Boutte | 70039 | LA | $ - | $ - | $ - |
| CCANO - Food Pantry | 001 Food Pantry | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ - | $ - | $ - |
| CCANO - Sacred Heart Apartments | 001 Sacred Heart Apartments | 3222 Canal St. | New Orleans | 70119 | LA | $ - | $ - | $ - |
| CCANO - ADMIN. CORPORATE OFFICES | 045 CEO Office | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ - | $ - | $ - |
| CCANO - ADMIN. CORPORATE OFFICES | 047 CFO Office | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ - | $ - | $ - |
| CCANO - ADMIN. CORPORATE OFFICES | 065 TRAINING | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ - | $ - | $ - |
| CCANO - ADMIN. CORPORATE OFFICES | 088 Fund Development Ofs. | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ - | $ - | $ - |
| CCANO - ADMIN. CORPORATE OFFICES | 112 Human Resources | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ - | $ - | $ - |
| CCANO - ADMIN. CORPORATE OFFICES | 113 Volunteers | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ - | $ - | $ - |
| CCANO - ADMIN. CORPORATE OFFICES | 114 Communications Ofs | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ - | $ - | $ - |
| CCANO - ADMIN. CORPORATE OFFICES | 116 Information & Technology | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ - | $ - | $ - |
| CCANO - ADMIN. CORPORATE OFFICES | 117 Client Tracking, Planning & Evaluation | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ - | $ - | $ - |
| CCANO - ADMIN. CORPORATE OFFICES | 118 New COO Office | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ - | $ - | $ - |
| CCANO - Dwelling | 001 Dwelling A | 1430A Claire Ave. | Gretna | 70053 | LA | $ 71,050 | $ 71,050 | $ 42,630 |
| CCANO - Dwelling | 002 Dwelling B | 1430B Claire Ave. | Gretna | 70053 | LA | $ 71,050 | $ 71,050 | $ 42,630 |
| CCANO - Foster Grandparents | 001 Foster Grandparents | 8326 Apricot St. | New Orleans | 70118 | LA | $ - | $ - | $ - |
| CCANO - Padua House Residential Program | 001 Padua House | 200 Beta St. | Belle Chase | 70037 | LA | $ 1,667,400 | $ 1,667,400 | $ 1,000,440 |
| CCANO - Padua House Residential Program | 002 Maintenance Building | 200 Beta St. | Belle Chase | 70037 | LA | $ 19,732 | $ 19,732 | $ 11,839 |
| CCANO - Padua House Residential Program | 003 Storage Shed | 200 Beta St. | Belle Chase | 70037 | LA | $ 6,464 | $ 6,464 | $ 3,878 |
| CCANO - Padua Adult Residential Program | 003 St. Rosalie | 119 Kass St. | Terrytown | 70056 | LA | $ 114,450 | $ 114,450 | $ 68,670 |
| CCANO - Domestic Violence Services | 007 Project S.A.V.E. | 639 Loyola Ave., Ste. 1810 | New Orleans | 70113 | LA | $ - | $ - | $ - |
| CCANO - Counseling Solutions | 010 St. Tammany-Northshore Branch Office | 4465 Highway 190E Service Road | Covington | 70433 | LA | $ - | $ - | $ - |
| CCANO - Counseling Solutions | 013 Orleans | 1424 Dante St. | New Orleans | 70118 | LA | $ 34,300 | $ 34,300 | $ 20,580 |
| CCANO - Head Start Administration | 003 Head Start-Incarnate Word | 8326 Apricot St. | New Orleans | 70118 | LA | $ - | $ - | $ - |
| CCANO - Head Start Administration | 004 Head Start Admin. Office | 8326 Apricot St. | New Orleans | 70118 | LA | $ - | $ - | $ - |
| CCANO - Head Start Administration | 007 Head Start-St. John the Baptist | 1920 Clio St. | New Orleans | 70113 | LA | $ 771,750 | $ 771,750 | $ 463,050 |
| CCANO - Head Start Administration | 012 Head Start-St. Mary of the Angels | 2225 Congress St. | New Orleans | 70117 | LA | $ - | $ - | $ - |
| CCANO - Head Start Administration | 020 Tan Shed | 1920 Clio St. | New Orleans | 70113 | LA | $ 1,361 | $ 1,361 | $ 816 |
| CCANO - Head Start Administration | 021 Blue Shed | 1920 Clio St. | New Orleans | 70113 | LA | $ 1,701 | $ 1,701 | $ 1,021 |
| CCANO - Head Start Administration | 022 Storage Shed | 6828 Chef Hwy. | New Orleans | 70126 | LA | $ 12,096 | $ 12,096 | $ 7,258 |
| CCANO - Pregnancy & Adoption Services | 002 Access to Life-Adoptions Office | 4200 S. I-10 Service Rd. W., Ste. 124 | Metairie | 70001 | LA | $ - | $ - | $ - |
| CCANO - Pregnancy & Adoption Services | 003 Access Pregnancy Metairie | 921 Aris Ave., Ste. A | Metairie | 70005 | LA | $ - | $ - | $ - |
| CCANO - Mental Health Services | 001 Ciara Apartments | 3020 Independence St. | Metairie | 70006 | LA | $ 253,400 | $ 253,400 | $ 152,040 |
| CCANO - Mental Health Services | 003 Ciara Apts | 3021 Houma Blvd. | Metairie | 70006 | LA | $ 139,766 | $ 139,766 | $ 83,859 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| CCANO - Mental Health Services | 010 Ciara Independent Living | 1416 Dante St. | New Orleans | 70118 | LA | $ | 273,000 | $ | 273,000 | $ | 163,800 |
| CCANO - Mental Health Services | 015 Marque Medical Emergency Grant | 8326 Apricot St. | New Orleans | 70118 | LA | $ | - | $ | - | $ | - |
| CCANO - Mental Health Services | 022 Pavilion | 1416 Dante St. | New Orleans | 70118 | LA | $ | 700 | $ | 700 | $ | 420 |
| Second Harvest of GNO & Acadiana | 004 Second Harvest Warehouse | 700 Edwards Ave. | Elmwood | 70123 | LA | $ | 8,555,050 | | | |
| Second Harvest of GNO & Acadiana | 006 Lafayette Warehouse | 215 E. Pinhook Rd. | Lafayette | 70501 | LA | $ | - | | | |
| Second Harvest of GNO & Acadiana | 009 Lake Charles Warehouse | 2309 Highway 397 | Lake Charles | 70615 | LA | $ | 672,350 | | | |
| Second Harvest of GNO & Acadiana | 010 Deere Park Rd Warehouse | 8910 Deere Park Rd | Abbeville | 70510 | LA | $ | 136,150 | | | |
| Second Harvest of GNO & Acadiana | 011 Houma Warehouse (221 South Hollywood) | 221 South Hollywood Rd | Houma | 70360 | LA | $ | 1,221,081 | | | |
| Second Harvest of GNO & Acadiana | 012 Houma Warehouse (223 South Hollywood) | 223 South Hollywood Rd | Houma | 70360 | LA | $ | 929,669 | | | |
| Incarnate Word Church | 001 Incarnate Word Church | 8326 Apricot St. | New Orleans | 70118 | LA | $ | 100,000 | | | |
| Incarnate Word Church | 002 Rectory & Garage | 8326 Apricot St. | New Orleans | 70118 | LA | $ | 285,250 | | | |
| St. Lawrence the Martyr Church, Metairie | 001 Church | 2501 Maine Ave. | Metairie | 70003 | LA | $ | 100,000 | | | |
| St. Lawrence the Martyr Church, Metairie | 002 Rectory/ Hispanic Apostolate Office | 2525 Maine Ave. | Metairie | 70003 | LA | $ | 277,550 | | | |
| St. Lawrence the Martyr School, Metairie | 004 School #1/ CCANO Immigration & Refugee | 2505 Maine Ave. | Metairie | 70003 | LA | $ | 493,500 | | | |
| St. Lawrence the Martyr School, Metairie | 005 School #2 | 2505 Maine Ave. | Metairie | 70003 | LA | $ | 245,350 | | | |
| St. Lawrence the Martyr School, Metairie | 006 School #3/ CCANO Offices | 2505 Maine Ave. | Metairie | 70003 | LA | $ | 1,816,850 | | | |
| St. Lawrence the Martyr School, Metairie | 007 Cafeteria/Parish Hall | 2505 Maine Ave. | Metairie | 70003 | LA | $ | 357,350 | | | |
| St. Lawrence the Martyr School, Metairie | 008 Tractor Shed 16 x 20 | 2505 Maine Ave. | Metairie | 70003 | LA | $ | 7,144 | | | |
| St. Martin de Porres Church | 013 ANO CYO Gymnasium | 2241 Mendez St. | New Orleans | 70122 | LA | $ | 2,159,150 | | | |
| ADM - Fountainbleau Avenue | 003 Pastoral Center at St. Rita | 65 Fontainebleau Dr. | New Orleans | 70125 | LA | $ | 3,675,700 | $ | 3,675,700 | $ | 2,205,420 |
| Catholic Community Foundation | 011 Catholic Foundation | 3330 N. Causeway Blvd. Suite 361 | Metairie | 70002 | LA | $ | - | | | |
| Catholic Community Foundation | 012 Donated Uptown House | 1319 Valence St. | New Orleans | 70115 | LA | $ | 210,000 | | | |
| | | | | | | $ | 286,214,026 | $ | 220,284,001 | $ | 135,170,401 |

# EXHIBIT 8

# Post-Petition Operations Summary of the Debtor

## STATEMENTS OF ACTIVITIES

**Roman Catholic Church of the Archdiocese of New Orleans**
**Administrative Offices**

**For the Years Ended June 30, 2021, 2022, 2023, 2024 and the 6 Months Ended December 31, 2023 and 2024**

| | 2021 [1,2,3,4] | 2022 [1,3,4] | 2023 [1,3] | 2024 [1,3] | 6 Months Ended December 31, 2023 [1,3] | 6 Months Ended December 31, 2024 [1,3] |
|---|---|---|---|---|---|---|
| | (Unaudited) | (Unaudited) | (Unaudited) | (Unaudited) | (Unaudited) | (Unaudited) |
| **Revenue, Gains, and Other Support** | | | | | | |
| Assessments to affiliated entities for: | | | | | | |
| Archdiocesan support | $ 10,955,758 | $ 11,305,077 | $ 10,927,753 | $ 11,125,210 | $ 5,744,381 | $ 5,742,681 |
| Priest health insurance and retirement | 2,737,644 | 2,842,608 | 2,950,833 | 3,005,943 | 1,395,917 | 1,538,059 |
| Insurance | 39,359,477 | 40,418,700 | 40,503,453 | 43,726,458 | 23,045,626 | 22,936,340 |
| Total assessments | 53,052,879 | 54,566,385 | 54,382,039 | 57,857,611 | 30,185,924 | 30,217,080 |
| Fee revenue | 4,104,592 | 4,288,343 | 4,719,968 | 5,274,334 | 2,823,221 | 2,876,755 |
| Contributions and grants | 2,784,654 | 3,344,537 | 3,186,739 | 2,596,622 | 1,189,674 | 1,074,657 |
| Rents and royalties | 753,987 | 436,096 | 899,357 | 680,101 | 353,174 | 268,656 |
| Spending distribution - investment income | 4,493,428 | 4,392,201 | 4,421,120 | 3,676,189 | 1,838,095 | 1,419,025 |
| Interest income - Deposit and Loan Fund | 2,287,277 | 2,385,060 | 2,422,829 | 2,735,186 | 1,991,845 | 3,014,324 |
| Settlement income | 1,056,811 | 19,559 | 35,357 | 1,071,379 | 9,023 | 156,001 |
| Gain (loss) on sale of assets | (42,048) | 1,810,000 | 7,241,551 | 2,090,190 | 2,089,390 | 2,701,676 |
| Changes in value of charitable remainder trust | 117,327 | 197,204 | 4,921 | (2,909) | 598 | (3,425) |
| Miscellaneous | 455,427 | 417,611 | 465,895 | 566,762 | 231,754 | 239,880 |
| Total revenue, gains, and other support | 69,064,334 | 71,856,996 | 77,779,776 | 76,545,465 | 40,712,698 | 41,964,629 |
| **Expenses** | | | | | | |
| Program services: | | | | | | |
| Ministries | 18,107,558 | 18,842,723 | 19,961,181 | 17,793,111 | 8,714,462 | 8,739,511 |
| Supporting and services to various parishes and other related agencies | 36,088,255 | 35,817,307 | 42,191,089 | 46,051,863 | 23,814,874 | 24,096,509 |
| Management and general | 9,770,926 | 15,578,364 | 10,594,567 | 14,705,102 | 7,808,414 | 7,253,717 |
| Development and fundraising | 173,380 | 171,966 | 167,033 | 61,685 | 30,527 | 30,834 |
| Reorganization costs | 8,553,707 | 9,055,252 | 12,087,825 | 8,853,552 | 5,184,917 | 4,501,824 |
| Total expenses | 72,693,826 | 79,465,612 | 85,001,695 | 87,465,313 | 45,553,194 | 44,622,395 |
| **(Loss) Income From Operations** | (3,629,492) | (7,608,616) | (7,221,919) | (10,919,848) | (4,840,496) | (2,657,766) |
| **Non-Operating Revenues (Expenses)** | | | | | | |
| Investment income - net | 22,104,803 | (10,202,081) | 5,654,890 | 8,122,860 | 3,464,529 | 2,467,858 |
| Less - spending distribution | (4,493,428) | (4,392,201) | (4,421,120) | (3,676,189) | (1,838,095) | (1,419,025) |
| Investment income - net of spending distribution | 17,611,375 | (14,594,282) | 1,233,770 | 4,446,671 | 1,626,434 | 1,048,833 |
| Grants and donations related to hurricanes | 2,620,774 | 6,259 | 941,552 | 13,920,196 | 9,724,879 | - |
| Distributions of grants and donations to affiliates | (2,620,774) | (6,259) | (932,829) | (13,917,300) | (9,724,879) | - |
| Total non-operating revenues (expenses) - net | 17,611,375 | (14,594,282) | 1,242,493 | 4,449,567 | 1,626,434 | 1,048,833 |
| **Excess (Deficiency) of Revenue, Gains, and Other Support Over Expenses** | 13,981,883 | (22,202,898) | (5,979,426) | (6,470,281) | (3,214,062) | (1,608,933) |
| **Additional Minimum Other Post Employment Benefits Liability Adjustment** | (71,336) | 9,461,122 | 6,086,263 | (228,797) | - | - |
| **Additional Minimum Pension Liability Adjustment** | 2,504,436 | 11,639,142 | 4,872,482 | 3,253,770 | - | - |
| **Increase (Decrease) in Net Assets** | 16,414,983 | (1,102,634) | 4,979,319 | (3,445,308) | (3,214,062) | (1,608,933) |
| **Net Assets** | | | | | | |
| Beginning of year | 10,891,784 | 27,306,767 | 26,204,133 | 31,183,452 | 31,183,452 | 27,738,144 |
| End of year | $ 27,306,767 | $ 26,204,133 | $ 31,183,452 | $ 27,738,144 | $ 27,969,390 | $ 26,129,211 |

[1] Debtor-in-Possession

[2] Reported amounts have been restated to record the Corporation's OPEB Liability as discussed in the Other Post-Employment Benefits Section.

[3] Reported amounts do not reflect changes in estimates relating to certain reserves as discussed in the Financial Information Section.

[4] Reported amounts have been restated for correction of error to record prior period property dispositions as discussed in the Financial Information Section

Source: The Corporation

A-12