UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re:** | § § | **Case No. 20-10846** |
| **THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS,** | § § § § | **Section "A"** |
| | § | **Chapter 11** |
| **Debtor.**[1] | § § | |

### DECLARATION OF JAMES R. MURRAY IN SUPPORT OF MOTION FOR ENTRY OF ORDERS PURSUANT TO SECTIONS 363 AND 105(A) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 APPROVING SETTLEMENT AGREEMENTS AND POLICY BUY-BACKS WITH CERTAIN INSURERS AND GRANTING RELATED RELIEF

I, James R. Murray, declare as follows:

1. I am a partner at the law firm Blank Rome LLP, which is Special Insurance Counsel to the Roman Catholic Church of the Archdiocese of New Orleans ("**Archdiocese**" or "**Debtor**") in this case. This Declaration is filed in support of the Archdiocese's *Motion for Entry of Orders Pursuant to Sections 363 and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Settlement Agreements and Policy Buy-Backs with Certain Insurers and Granting Related Relief* [ECF No. 4181] (the "**Motion**").[2]

2. The United States Bankruptcy Court for the Eastern District of Louisiana (the "**Bankruptcy Court**" or "**Court**") appointed Blank Rome LLP as Special Insurance Counsel for

---

[1] The last four digits of the Debtor's federal tax identification number are 8966. The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion (as defined below) and/or the *Fifth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of October 27, 2025*, [ECF No. 4518], (as amended, modified, or supplemented from time to time, the "**Plan**"). On October 27, 2025, copies of the Insurance Settlement Agreements in substantially final form were filed along with redlines showing changes to the model Insurance Settlement attached to the Motion. *See* ECF Nos. 4520-10 through 4520-21.

#110113637v6

**PP Ex. 10**

the Archdiocese by Order dated June 19, 2020. *See* Order [ECF No. 172]. I have been personally and directly involved with the negotiations that led to the settlements that the Insurance Settlement Agreements memorialize.

## Summary of Insurance Settlement Agreements

3. As detailed in the Plan, the Settling Insurers will provide aggregate settlement consideration of $29,275,000 (the "**Settling Insurers' Settlement Consideration**"), to be combined with an additional $200,000,000 aggregate contribution from the Archdiocese, the Additional Debtors, and the Non-Debtor Catholic Entities, for a total of at least $230,000,000 in funding available for a trust to compensate survivors. The Settling Insurers' Settlement Consideration is broken down as follows:[3]

| Insurer | Settlement Amount |
|---|---|
| SPARTA | $21,000,000 |
| U.S. Fire/International | $5,000,000 |
| Catholic Mutual | $2,000,000 |
| Puritan | $85,000 |
| National Union | $290,000 |
| Twin City | $900,000 |
| **TOTAL** | **$29,275,000** |

4. As further detailed in the Motion, the Debtors and all other Covered Parties will sell back to the Settling Insurers all their respective claims and interests in the Archdiocese Policies (as defined in each respective Insurance Settlement Agreement, and collectively, the "**Subject Insurance Policies**") and "Related Insurance Claims" of the Archdiocese, the Additional Debtors and the Non-Debtor Catholic Entities (collectively, with the Subject Insurance Policies and Coverage Claims, the "**Purchased Property**") in exchange for each Settling Insurer's payment of its portion of the Settling Insurers' Settlement Consideration.

---

[3] United States Fidelity & Guaranty Company, affiliate of Travelers Indemnity Company, is the lone insurer to the Archdiocese with whom the Archdiocese and the Committee have not reached an agreement.

These "buy-backs" and the settlements, including the amount of payment, are contingent on, among other things, successful confirmation of a plan of reorganization satisfactory to the Settling Insurers, and will be free and clear of all claims and interests of all Entities in the Archdiocese Policies (other than, with respect to Catholic Mutual, the Preserved Coverage (as defined in the Catholic Mutual Settlement Agreement) in respect to certain non-Abuse personal injury or bodily injury claims and the Archdiocese Bound Parties' rights or continuing obligations in connection with such Preserved Coverage).

### Support for Approval of Insurance Settlement Agreements

5. On May 1, 2020, the Archdiocese filed for Chapter 11 bankruptcy. More than 650 individuals have filed proofs of claim in the bankruptcy, asserting that they were sexually abused by priests or other individuals and, among other claims, the Archdiocese was negligent in supervising these individuals. The Archdiocese tendered certain proofs of claims alleging sexual abuse to various of the Settling Insurers (the "**Claims**").

6. The Settling Insurers, for a variety of reasons, some of which are set forth below, disputed their coverage obligations in connection with the Claims. The Archdiocese disagrees with the Settling Insurers' positions, but given the time and financial resources it would take for the parties to litigate the insurance coverage issues to completion, the risks of litigation, and the potential for appeals to further delay insurance recoveries, it is in the Archdiocese's best interest to reach a consensual resolution of the disputes regarding the availability of insurance coverage for the Claims.

7. On September 15, 2021, the Bankruptcy Court appointed Judge Gregg W. Zive to serve as mediator. *See* Order Granting Joint Motion to Appoint Mediator [ECF No. 1058]. On March 11, 2024 and January 24, 2025, respectively, the Bankruptcy Court appointed John W.

3

Perry, Jr. and Hon. Christopher Sontchi (Ret.) to serve as additional mediators [ECF Nos. 2892, 3694]. Since then, the Archdiocese, the Committee, and the Settling Insurers have engaged in extensive mediation regarding, among other things, the insurance coverage available to compensate Abuse Claimants.

8. In particular, the Archdiocese contended that SPARTA is responsible for certain primary and excess general liability insurance policies with policy periods from February 1, 1964 to February 1, 1973. The Archdiocese further contended that U.S. Fire/International is responsible for certain excess policies with policy periods from April 1, 1977 to June 30, 1983; National Union is responsible for an excess policy with the policy period April 1, 1977 to March 1, 1978; Puritan is responsible for certain excess policies with policy periods from February 1, 1979 to March 1, 1981; and Twin City Fire is responsible for certain excess policies with policy periods from February 1, 1982 to June 30, 1983. The Archdiocese further contended that Catholic Mutual is responsible for certain insurance certificates providing sexual misconduct coverage with policy periods (as relevant here) from July 1, 1989 to July 1, 1990 and July 1, 2018 to July 1, 2021. Including late-filed proofs of claim, approximately 190 claimants allege abuse during SPARTA's policy periods, approximately 177 allege abuse during U.S. Fire/International's periods, approximately 85 allege abuse during National Union's periods, approximately 90 allege abuse during Puritan's periods, approximately 85 allege abuse during Twin City's periods, and approximately 65 allege abuse during Catholic Mutual's periods.

9. The Archdiocese contended that the foregoing policies provided substantial coverage for those Claims implicating the Settling Insurers' policy periods. For example, the Archdiocese contended that (1) there is a separate per occurrence limit of liability applicable per

4

#110113637v6

claimant, per perpetrator, per policy period (at least), and (2) the per occurrence limits of liability were annualized.

10. The Settling Insurers acknowledged the relevant policies under a reservation of rights, but nevertheless asserted numerous coverage defenses based on terms, conditions, limitations, and exclusions in their respective policies. If successful, these defenses would have substantially reduced or even eliminated coverage.

11. For instance, SPARTA asserted that the Archdiocese had the burden of proving, among other things, that the alleged abuse was caused by an "occurrence" under the policies. According to SPARTA, the Claims alleged injuries that were not caused by an "occurrence," but rather arose from the intentional conduct of the alleged abusers, because the Archdiocese allegedly had knowledge of historical sexual abuse such that the injuries were not unexpected. SPARTA further asserted that the Archdiocese may not be able to prove the terms of missing or incomplete policies or that it had satisfied the policies' notice provisions.

12. The Archdiocese and other insureds implicated by the Claims disputed the defenses to coverage raised by the Settling Insurers. For example, the Archdiocese contended that the alleged abuse constituted "occurrences" from its perspective and that the insurers would have had the burden to prove the Archdiocese actually expected or intended the injury on a claim by claim basis; the Archdiocese further disputed the allegations of prior notice.

13. Further, a material number of filed proofs of claim allege what the Settling Insurers are likely to assert would be, from either an insurance recovery and/or legal liability perspective, low- or no-value claims because, among other reasons, they (i) were not timely filed, (ii) allege abuse perpetrated by individuals over whom the Debtor / Additional Debtors do not exercise control, (iii) allege abuse at facilities over which the Debtor / Additional Debtors do

#110113637v6

not exercise control, (iv) allege abuse at churches that are not affiliated with the Archdiocese or the Catholic Church, (v) allege abuse by third parties associated with non-Covered Parties, (vi) allege claims where plaintiffs are unlikely to be able to satisfy the requisite burden of proof, (vii) allege abuse for which liability is questionable or for which potential damages are limited, or (viii) are otherwise susceptible to a speedy dismissal as a matter of law.

14. The Subject Insurance Policies also include certain excess policies issued by or novated to Twin City, National Union, Puritan, and U.S. Fire/International. In addition to the coverage defenses asserted by the other Settling Insurers, the settling excess insurers raised various allocation and coverage issues that challenged, among other things, whether the Claims would reach the excess policies and if they did, to what extent, if at all, there would be any coverage.

15. The Insurance Settlement Agreements between the Archdiocese, other Archdiocese Signatory Parties, and the Settling Insurers constitute reasonable compromises that benefit survivors. Had settlements not been reached with the Settling Insurers, the Archdiocese would have faced the prospect of prolonged litigation with multiple parties at great expense, and the risk of adverse rulings on one or more of the disputed issues, any one of which could limit or eliminate coverage, potentially for numerous Claims. The Archdiocese may have had to engage in significant discovery, motion practice, and trial to resolve disputed legal and factual issues, such as whether Claims alleged abuse that was sufficiently accidental from the perspective of the Archdiocese to constitute an "occurrence" covered by the policies, or whether the Archdiocese had prior knowledge of a given Claim or alleged perpetrator. At trial, any or all of the Settling Insurers may have taken the position that no "occurrence" existed or exclusions barred coverage and thus the Archdiocese was not entitled to any coverage, by contending that, among other

6

#110113637v6

things, the Archdiocese was allegedly aware that priests sexually abused minors, allowed abusers to return from treatment to their parishes without informing the parishioners, and did not supervise or have any policies or procedures regarding the supervision of priests.

16. Any trial or other determination at the trial court level likely would have been followed by post-trial motions and/or appeals, which would have added further delay and uncertainty to the resolution of the coverage issues. In addition to prolonging the final determination of the coverage issues possibly for years, with no certainty that the Archdiocese would prevail, the Archdiocese would continue to incur costs throughout the process, which would erode the value of the Archdiocese's estate and the resources available from the Archdiocese's estate to pay the Claims.

17. Additionally, absent settlement, collection on a successful judgment is far from guaranteed. For example, SPARTA, which is providing the largest contribution to the Settling Insurers' Settlement Consideration, is in runoff and faces future financial uncertainty. Therefore, even if a party were to have at a later date been successful at trial and on appeal, it may have been unable to collect payment.

18. In contrast, with the active assistance of the Court-appointed Mediators, the Settling Insurers, the Debtor, and the Committee engaged in lengthy, extensive, good faith and arm's length negotiations. These mediations were hard-fought, between sophisticated parties with opposing economic interests, but were much more efficient and cost effective than years of litigation would have been. And, the Insurance Settlement Agreements have resulted in a substantial benefit to the Archdiocese and Additional Debtors having secured funds that can be distributed to the Settlement Trust (and onwards to claimants) in the near term.

19. I participated in several meetings with the Archdiocese and Additional Debtors at which the respective Insurance Settlement Agreements were discussed. After evaluating the merits of the respective Insurance Settlement Agreements, I supported and recommended that the Archdiocese and Additional Debtors enter into the respective Insurance Settlement Agreements. At the time, the Committee also supported entry into the Insurance Settlement Agreements. In addition, the Unknown Claims Representative has since also supported the Insurance Settlements.

20. As set forth in the Declaration of Fr. Patrick R, Carr in support of the Motion, filed contemporaneously herewith, the Archdiocese and Additional Debtors did decide it was in the best interest of the Archdiocese and the Additional Debtors (and their respective estates and creditors) to reach a consensual resolution of the disputes with the Settling Insurers.

21. I still believe that the Insurance Settlement Agreements, both individually and collectively, constitute reasonable compromises that benefit survivors and are in the best interests of the Archdiocese, the Additional Debtors, and their respective estates, and their creditors, in light of, among other things: (1) the costs of litigating coverage claims with the Settling Insurers, (2) the time it would take to obtain a final determination of rights and claims under the Subject Insurance Policies, (3) the risk of failure to prevail in litigation of the issues, (4) the likelihood that the losing party would appeal any judgment, thus delaying ultimate resolution of the dispute potentially for years, (5) the difficulty of collecting on a successful judgment, and (6) the desire to obtain the maximum value as soon as possible from the Settling Insurers under the policies to use toward the resolution of Claims.

22. Given the above factors, including the risks of litigation and the interests of the creditors, I believe that the Insurance Settlement Agreements providing a total of $29,275,000 are within the range of reasonableness and should be approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: November 4, 2025
      Washington, D.C.

By: *James R. Murray*
    James R. Murray

#110113637v6