
Keegan
Linscott &
Associates, PC

September 4, 2025


Mr. Mark A. Mintz
Jones Walker LLP
201 St Charles Avenue
New Orleans, LA 70170-5100

Mr. Douglas S. Draper
Heller, Draper & Horn, LLC
650 Poydras St., STE 2500
New Orleans, LA 70130

Dear Messrs. Mintz and Draper:

You have requested that I prepare a report based on my role as financial advisor to The Roman Catholic Church of the Archdiocese of New Orleans ("Debtor"). This report will focus on my work preparing and opining on a Liquidation Analysis for the Debtor, a Liquidation Analysis for the Additional Debtors, and Feasibility Analysis for the Debtor and Additional Debtors. Since my appointment in February 2022, I have been involved in many aspects of the Debtor's and Additional Debtors' financial operations. This report encompasses not only their financial operations but also their historical and projected performance. In fulfilling my role as financial advisor, I have met and corresponded with other professionals and creditor constituencies on a frequent and constant basis. I have also worked extensively with the finance and accounting staff of the Debtor and its various outside professionals. My interaction with these third parties was done to share information about the Debtor and Additional Debtors' historical operations, ongoing performance, projected future performance and to address concerns expressed by the creditors and various professionals in the creation of a Plan of Reorganization. This work has resulted in the Joint Disclosure Statement and Joint Plan of Reorganization for the Debtor, Additional Debtors, and the Official Committee of Unsecured Creditors ("Committee").

## Executive Summary

In my opinion, the Debtor and the Additional Debtors' Second Amended Joint Plan satisfies the "best interests of creditors" test as each class of Creditors will receive or retain under the Second Amended Joint Plan property of a value, as of the Effective Date, which is not less than the value such Creditor would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

PP Ex.
14

1

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 2

For the Class 3 "Known Abuse Claims", this means that in addition to the cash and notes being paid by the Debtor, Additional Debtors, and Non-Debtor Catholic Entities, under the Second Amended Joint Plan of Reorganization, assets are being monetized and paid, or otherwise contributed, to the Settlement Trust that are not assets of the Debtor or the Additional Debtors or that cannot be monetized by the Debtor or the Additional Debtors. These contributions include but are not limited to: (a) net proceeds from the sale of the Affordable Housing Facilities, which are estimated to exceed $44,000,000; (b) the assignment of the Non-Settling Insurers' Policies, having an estimated value of approximately $150,000,000 to $300,000,000; and (c) the Settling Insurers' settlement contribution of $29,275,000. As such, the Known Abuse Claims are receiving value they would not otherwise receive in Chapter 7.

For the Class 6 "Bond Claims", these claims only reside with the Debtor. Under the Second Amended Joint Plan of Reorganization, the Bond Claims are based upon a formula that pays to the Bondholders the amount they would receive in a liquidation of the Debtor. Based upon my report I estimate an additional recovery to the Bondholders post confirmation to be $4,185,519. The reorganized bond principal amount will be amortized over ten (10) years at an 8.5% interest rate. There were additional payments of $9,302,063 made during Chapter 11 to the bondholders by the Debtor which makes the total recovery to the Bondholders on their claim to be $13,487,782 or 35.5%. The Bondholders are also benefiting, since the Plan does not call for a disgorgement of the $9,302,063. The treatment of the Bondholders under the Plan considering the formula approach to the post Effective Date payments and the prior payments received meets the "best interests test" as it relates to the treatment of Class 6

The Additional Debtors have sufficient funds in cash, investment accounts and property to fund the payment required by the Additional Debtors under the Plan.

It is my opinion that the Second Amended Joint Plan satisfies the feasibility requirements of the Bankruptcy Code, and the Second Amended Joint Plan of Reorganization is not likely to be followed by liquidation, or the need for further financial reorganization of the Debtor or Additional Debtors.

## Analysis

## Liquidation Analysis Overview

Under the "Best Interest of Creditors Test", Confirmation requires that each Impaired Class of Creditors either (a) accept the Joint Plan, or (b) receive or retain under the Joint Plan property of a value, as of the Effective Date, which is not less than the value such Creditor would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. To determine what Creditors holding Claims in an Impaired Class would receive if the Debtor were liquidated under Chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a Chapter 7 liquidation case. The Cash amount that would be available for satisfaction of Claims would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtor,

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 3

augmented by the unencumbered Cash held by the Debtor at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional Administrative and Priority Claims that may result from the termination of the Debtor's operations and the use of Chapter 7 for the purposes of liquidation. A Liquidation Analysis of the Debtor is attached as Exhibit 1, and a Liquidation Analysis of the Additional Debtors is attached as Exhibit 2.

To determine if the Joint Plan satisfies the best interests of creditors test, the present value of the Settlement Trust Distributions from the proceeds of the liquidation of the Debtor's unencumbered assets and properties (after subtracting the amounts attributable to the Chapter 7 and Chapter 11 Administrative Claims), are then compared with the value of the property offered to such Classes under the Joint Plan. The Plan Proponents believe that the Joint Plan as proposed is in the best interest of all Creditors. Although the Debtor may not be forced to convert to a Chapter 7 case, the Plan Proponents believe that Abuse Claimants holding Abuse Claims and holders of General Unsecured Claims will receive either Settlement Trust Distributions under the Settlement Trust, or Distribution under the Joint Plan (including recoveries from the Non-Settling Insurers due to the assignment of those policies by the Debtor and the Additional Debtors to the Settlement Trust), greater than a distribution they would receive in a hypothetical Chapter 7 liquidation.

The Liquidation Analysis assumes that the Chapter 7 trustee will retain certain professionals to assist them with the liquidation process, including legal counsel (for bankruptcy purposes and litigation of Abuse Claims), accounting professionals, brokers, and real estate agents. Further, it is assumed that the liquidation process would take five years to complete, taking into account the loss of key personnel, the nature of a forced and rushed sale process, the restrictive use/nature of some of the Debtor's and Additional Debtors' assets that would limit the pool of potential buyers, and the protracted litigation of Abuse Claims and potential contribution and indemnity claims. The immediate closing of the Debtor's and Additional Debtors' operations and the forced layoffs of all personnel would also likely trigger potential employee claims (severance and WARN Act claims). These fees and expenses would be entitled to administrative and priority status, which would be paid prior to any payout to general unsecured creditors. Also included in these costs and fees are fees owed to the U.S. Trustee and Clerk of the Bankruptcy Court. In addition, the Chapter 7 trustees will be entitled to a percentage of funds that are distributed to creditors, estimated at 3%.

Many of the available assets of the Debtor and Additional Debtors come from donors and are subject to donor restrictions, thereby preventing those assets from being used to pay any Abuse Claims or any Claims other than those for which they were designated. This is true in both Chapter 11 and Chapter 7. However, there has been dispute in this case over which funds are restricted.

Although both the Debtor and the Additional Debtors have insurance policies that may cover many of the claims against the Debtor and Additional Debtors (both Abuse Claims and

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 4

Non-Abuse Claims), neither the Debtor's Liquidation Analysis nor the Additional Debtors' Liquidation Analysis includes recovery from insurance proceeds or the sale of the Debtor's or Additional Debtors' interest in certain insurance policies. Any potential sale of the policies or ability of a chapter 7 trustee to monetize a claim against an insurance carrier is entirely speculative. There is also an argument that the Abuse Claimants have a vested right in the policy proceeds. As such, no value has been ascribed to the so-called "insurance assets" in the hypothetical chapter 7 liquidation. The Joint Plan, on the other hand, monetizes some of these assets through settlements with the Settling Insurers using a policy buyback. The Debtor and Additional Debtors also have assigned their respective interests in the policies with the Non-Settling Insurers to the Settlement Trust for the benefit of the Abuse Claimants.

The liquidation analysis assumes no contributions from insurance or third-party payments for the Abuse Claims because such payments are speculative and would be considered "collateral sources of recovery." The insurance policies are deemed to have no value for purposes of this liquidation analysis because:

a) outside of a Chapter 11 case, the Abuse Claimants will have a direct right of action against the insurers under Louisiana law;
b) there are over 150 insureds (including the Debtor and Additional Debtors), and outside of the Joint Plan, there is no ability to allocate insurance payouts among the insured entities;
c) SPARTA is in a precarious financial condition and may not repurchase its policies at all;
d) noticing and providing due process to claimants who have claims against the insurance policies would be cost prohibitive in a Chapter 7 liquidation;
e) coverage issues that may exist; and
f) the estate cannot sue the insurers and obtain the proceeds of the policies because the policies are indemnity policies.
g) the insurance policies covering Abuse Claims are indemnity policies and the Debtor and Additional Debtors cannot recover amounts under the policies greater than they would pay to the Abuse Claimants
h) To account for the payments received by the Abuse Claimants from a hypothetical liquidation of the Additional Debtors, I have reduced the claims amount for the Abuse Claimants in the Debtor case.

The liquidation analysis also assumes no contributions from third parties to offset liability for the Abuse Claims. The reasons are the following:

a) There are potential coverage issues and solvency issues of insurers;
b) The Non-Debtor Catholic Entities have no exposure for Abuse Claims; and
c) No information is available concerning religious Orders' ability to pay or applicable insurance coverage. Prior to the bankruptcy filing, the Orders provided minimal funds to pay claims.

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 5

The liquidation analysis of the Additional Debtors excludes the assets of any Additional Debtors who have not had claims filed against them by any of the applicable bar dates. In a hypothetical chapter 7 liquidation, the assets of those entities would not be available to Abuse Claimants in the other cases. In the Joint Plan, the Additional Debtors all contribute to the Settlement Trust regardless of whether an Additional Debtor has claims against it or not.

There is no value attributed to a potential single business enterprise claim being asserted by or against the Debtor, the Additional Debtors, and the Non-Debtor Catholic Entities. Each of the Additional Debtors and the Non-Debtor Catholic Entities does not comingle money against between entities, and has separate bank accounts, separate EIN numbers, separate employees, and separate boards of directors. Some of the Additional Debtors and Non-Debtor Catholic Entities have audited financial statements and other indicia of separateness, making the success of a single business enterprise claim highly speculative at best.

Both the Debtor and Additional Debtors have "executory contracts" with certain counterparties that will either be assumed during the bankruptcy (meaning the Debtor/Additional Debtors will continue to perform under the contracts) or will "ride through" the bankruptcy unaffected with the same outcome. These agreements include the Parish Services Agreements and the Temporalities Manual, and the normal course of business dealings between the Debtor and Additional Debtors. In Chapter 7 liquidation, however, those executory contracts would all be rejected by the chapter 7 trustee, and the counterparties would have claims for rejection damages, to be paid *pari pasu* with the other general unsecured creditors, further diminishing the payout under a liquidation analysis.

The value of the Abuse Claims in the liquidation analysis represents the midpoint of a report by Stout Risius Ross, LLC, the Committee's expert consultant on sexual abuse claim values. I have not seen the report, and the number I have used was provided to me orally based on a range of $752 million to $1.69 billion. This range is based on the Stout report that reduced the 828 filed proofs of claim to 626 claims (The Stout Report excluded duplicate claims, withdrawn claims, adult claims, minor abusers, and non-sexual abuse claims. I understand that the report will be updated, and I will adjust my liquidation analysis based upon my review of the final report.

**<u>Debtor's Liquidation Analysis</u>**

The Debtor's Liquidation Analysis is attached as Exhibit 1 to this report and has been prepared based on May 31, 2025, balance sheet amounts contained in the Debtor's May 2025 Monthly Operating Report. These balance sheet amounts are the combined amounts for the Debtor's administrative offices, high schools, and parishes. The specific analysis of the asset components in the Liquidation Analysis are as follows:

1. Cash and cash equivalents: The Debtor expects a 100% recovery on unrestricted cash and cash equivalents in a chapter 7 liquidation. As of May 31, 2025, the Debtor holds approximately $68,622,085 in cash and cash equivalents. Included in this amount is

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 6

custodial cash of $4,063,315 and restricted cash of $1,876,996, which would not be available to creditors.

2. Grants receivable: The Debtor does not expect any recovery from grants receivable because the purpose of the grant can no longer be fulfilled when the Debtor stops operations.

3. Accounts receivable: The accounts receivable are comprised of third-party storm-related receivables (FEMA) as well as Additional Debtors' Agency and Parish receivables. Under the hypothetical liquidation for the Additional Debtors, there is only expected to be a payout approximating 12.6%, which would include payments to the Debtor for their accounts receivable. The Debtor's storm-related receivables primarily relate to FEMA reimbursements for Hurricane Ida costs. The gross receivable from FEMA is approximately $30 million as of May 31, 2025, and there is a deductible offsetting this amount for $5,482,890 which is included in the allowance/reserve account. The Debtor estimates that 80% of the net storm-related receivables are collectible based on their prior experience with named-storm reimbursements. However, in my opinion the 80% collectability factor is aggressive since FEMA has claw backs in perpetuity for cost reimbursements, reimbursements under the current administration have been significantly delayed, the processes for obtaining reimbursements are in flux, and FEMA as an Agency is being restructured/reconsidered under the current political environment. Based on my analysis, the estimated collectability of the accounts receivable in Chapter 7 liquidation is $20,910,705 (See Exhibit 3 for a summary of the accounts receivable liquidation analysis).

4. Accounts receivable – tuition and fees, net: These receivables are related to pre-billed tuition for the Debtor's schools for the 2025-2026 school year. In effect, the Debtor increases its balance sheet by booking accounts receivable and deferred revenue. Because these amounts are offset by deferred revenue in the liquidation analysis, they are included in their entirety.

5. Prepaid expenses: The Debtor's administrative offices and high schools have certain prepaid expenses related to insurance, professional fees, and tuition-related matters. In a liquidation scenario, the Debtor does not expect to realize any refund of these amounts because the expense amounts will generally continue and be worked off over time, and the tuition amounts will be offset against deferred revenue. Prepaid expenses include approximately $2,296,000 for the Debtor's high schools.

6. Pledges receivable, net: The Debtor has certain pledges from donors that have not been collected as of the Liquidation Date. Since the Debtor will cease operations in a liquidation, it is not expected that donors will fulfill and pay their pledges, as the activities the donor is supporting will no longer exist.

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 7

7. Loans receivable from Affiliates, net: Loans receivable from certain affiliates are generally grouped into three types – Parish loans, Agency loans, and storm-related loans (see Exhibit 4). In Chapter 7 liquidation, the notes from the Parishes would pay approximately 12.6% of the corpus on average. This percentage may be a bit high due to the significant concentration of loans at two parishes (Divine Mercy and Most Holy Trinity). These two loans total $27,581,504 and represent two-thirds of the total parish loan portfolio. Neither loan is performing or paying principal, and the parish assets are not significant relative to the loan balances. The Agency loans are from Catholic entities that are not Additional Debtors, and their assets primarily consist of land, including cemetery land. These loans have been estimated at 50% collectible in Chapter 7 liquidation of the Debtor. The third group of loans consist of storm-related loans from Christopher Homes-related entities. These loans were booked when FEMA recently asserted an alleged overpayment related to Katrina from twenty years ago on these properties. The Debtor booked a corresponding receivable from these entities which is disputed. In my opinion, these loans have no liquidation value. Overall, the loans receivable has a liquidation value of $6,306,355.

8. Investments – Portfolio A: Portfolio A investments are divided between the funds that are owned or administered by the Catholic Foundation for others (including Additional Debtors and other third parties) and those funds administered through the Debtor. At May 31, 2025, the Debtor portion of these funds is $113,652,955, of which $35,041,712 is restricted. The Catholic Foundation portion of these funds is $149,122,249. The value of the Debtor's investments in Portfolio A is based upon May 31, 2025, unitization report that is a mark-to-market value for the Investments of the Debtor. The unitization report is prepared by the Catholic Community Foundation based upon information provided by its investment advisors at the end of each month. The Debtor expects a 100% recovery on unrestricted investments in Portfolio A under a chapter 7 liquidation. All restricted fund investments are excluded entirely from the liquidation value. Portfolio A refers to funds under a custodial agreement with Hancock Whitney Bank.

9. Investments Portfolio B: Portfolio B investments relate to funds invested under the Debtor's Deposit and Loan Program. The Debtor maintains funds deposited by the Debtor, the Additional Debtors, and the Non-Debtor Catholic Entities in the "Deposit and Loan Fund Program." The Deposit and Loan Fund Program essentially functions as a savings bank for the Non-Debtor Catholic Entities and the Debtor, (a) providing a source of funds for loans for, among other things, construction, renovations, and expansions, and (b) serving as a vehicle to invest working capital, donor restricted funds, endowments, and quasi-endowments ("**Deposit and Loan Deposits**"). The receivables generated from the Deposit and Loan Fund are referred to as the "Deposit and Loan Notes Receivables." Deposit and Loan Deposits are invested in Portfolio B, an investment management account maintained at Hancock Whitney Bank. The Additional Debtors and the Non-Debtor Catholic Entities assert that they can trace the

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 8

funds they deposited into the Deposit and Loan Fund and that, under applicable law, the money in the fund is not property of the Estate. This position has been disputed by the Survivors' Committee. The ownership of the money in the Deposit and Loan Fund would be subject to litigation if the Joint Plan is not confirmed. In addition, to the extent that the fund could be deemed to be property of the Estate claims would exist in favor of the Additional Debtors and the Non-Debtor Catholic Entities against the Debtor.

As of May 31, 2025, the Deposit and Loan Fund Program held a total of $23,221,806 in cash or cash equivalents and fixed income securities. Portfolio B also has certain loans receivable as noted above. Consistent with other deposit and loan programs, Portfolio B also has liabilities for deposits. At May 31, 2025, the Deposit and Loan Program has a deficit of $111,924,355 for deposit liabilities in excess of assets. The deficiency owed by the Debtor to the Additional Debtors is part of the executory contracts between the parties as evidenced by the Parish Services Agreements and Temporalities Manual and will pass through and be paid over time. For purposes of the Liquidation Analyses and the Feasibility Analysis, I have assumed that the assets and liabilities of Portfolio B are the property of the Debtor. I have also assumed that the ability of the Debtor to offset loans receivable against depositor liabilities is extremely limited. As noted on Exhibit 18, the Additional Debtors and third parties that have loans payable to the Debtor, have very limited funds on deposit in Portfolio B. In fact, the amount of deposits in Portfolio B for these borrowers is less than ten percent of the loan balance.

10. Investments CUP and Other: The Debtor does not expect to recover any funds from its equity investment in the CUP (Catholic Umbrella Pool).

11. Inventory, Other Current Assets, Other Assets: Inventory and certain other assets are discounted to 50% of the book value. Inventory consists of food and other supply-type items at the Debtor's high schools which would yield very little in a liquidation.

12. Real Property (Immovable Property[1]): The Debtor owns approximately 200 real property parcels that would need to be liquidated in Chapter 7. The Additional Debtors own approximately 900 parcels of real property. The 1100 parcels that will need to be sold are an extraordinary number and will flood the market with available properties. Based on my experience as a Trustee and as a CIRA working on numerous Chapter 7 and Chapter 11 cases, I have assumed that Chapter 7 cannot last more than five years. Based on that assumption, I requested that S. Parkerson McEnery of the McEnery Company perform an analysis of the proceeds that could be realized from the sale of the Debtor's property within a five-year period.

---

1 Includes the two parishes of the Debtor (Saint Louis Cathedral and our Lady of Guadalupe) and the Ursuline Convent

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 9

In his report dated August 29, 2025, McEnery opined that the Debtor could realize undiscounted net proceeds from the sale of the properties of $120,868,135. On a present value basis this equates to $107,835,603 in net sales proceeds using the 4.5% discount rate assumed by McEnery (see Exhibit 5). McEnery also notes that the sale of churches presents challenges and costs that do not exist with other properties. For example, any potential buyer would have to account for: a) the historic designation of some of the churches; b) the costs of repurposing the properties; c) litigation over repurposing; d) re-zoning issues; e) IRS issues related to the sale of property of a 501(c)(3) to a for-profit entity; f) state law limitations; and g) First Amendment and other religious freedom issues that may impair the sale of the church.

The McEnery report also addresses certain "holding costs" associated with the sale of the properties. We have addressed these holding costs in the Shut-down Costs section below.

13. Vehicles, net: The Debtor owns several vehicles, including cars, school buses, and vans, which are mainly used by one of the Debtor Schools. The Debtor estimates that the liquidation value of those vehicles is approximately $500,000, based on Kelley Blue Book and used sale cites.

14. Furniture & Fixtures, net: The Debtor also owns furniture, fixtures, and equipment ("FF&E"), the vast majority of which is used in the operation of the Debtor Schools. The Debtor estimates that the liquidation value of its FF&E is approximately $675,000, which is 15% of the net book value of FF&E.

15. Art and collectibles: In 2022 and 2023, the Debtor obtained appraisals of its art and other collectibles, including, but not limited to, antique furniture, paintings, ecclesiastical statues, and other objects of religious or historical significance. The appraisals include artwork and collectibles located at St. Louis Cathedral and its rectory, Ursuline Convent, the Catholic Cultural Heritage Ctr. & St. Mary Church, Our Lady of Guadalupe & Shrine of St. Jude, 7997 Walmsley Ave., and other property stored at a New Orleans storage facility. The appraisals were prepared by Winston & Associates, L.L.C., appraisers and consultants of fine arts and antiques. According to those appraisals, the Debtor's art and collectables have a collective appraised value of $2,463,240. The appraisals are based on fair market value, except for one item that was appraised at a replacement value of $12,000.

16. Beneficial Interest in Charitable Remainder Trust: The Debtor is a named beneficiary in a Trust administered by a third party. If the Debtor liquidates, it is assumed the Debtor will be replaced as a beneficiary of that Trust, which will result in no value for the Debtor.

In total, the Liquidation Value of the Debtor's assets is estimated at $359,942,518 as of May 31, 2025.

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 10

To determine the hypothetical amount of assets available for unsecured pre-petition creditors, certain deductions need to be made to the liquidation value of the assets for the following items:

1. Liabilities with a higher priority, which include post-petition liabilities for accounts payable, accrued expenses, deferred revenue, and liabilities for self-insured insurance claims totaling $60,177,273, as of May 31, 2025, per the MOR.

2. Assets that are unavailable to creditors, including restricted funds ($39,360,210) and custodial funds ($5,527,908), as of May 31, 2025, per the MOR.

3. The costs expected to be incurred during Chapter 7.

For the costs incurred during Chapter 7, there are various categories as follows:

1. Shut-down costs - The liquidation costs include what are termed "shut-down costs." These costs primarily include the personnel and property-related costs needed to close and fully liquidate the Debtor's operations and assets over the five-year anticipated shut-down period. The shut-down costs projected for the Debtor are $32,900,732 on an undiscounted basis and are shown on Exhibit 6. The net present value of the shut-down costs, using a 4.5% discount rate, are $30,515,467 (see Exhibit 7). As noted on Exhibit 6, shut-down costs are generally assumed to be half of the prior year costs, as the Debtor moves through the five-year shut-down period. There are different categories of shut-down expenses as follows:

   a. Insurance: Insurance is the most complicated of the shut-down cost categories. There are numerous types of insurance that the Debtor carries, and the Additional Debtors are co-insured under the policies, which saves costs versus each entity having its own policy. For purposes of the shut-down analysis, I have assumed the Debtor and Additional Debtors will remain under a combined policy.

   The Debtor and Additional Debtors currently utilize Archdiocese of New Orleans Indemnity, Inc. ("**ANOI**"), which was incorporated as a non-profit captive insurance company to reduce the long-term cost of the Debtor and Additional Debtors' joint Insurance Program. ANOI has provided a self-insurance program as follows: for workers' compensation $800,000 self-insured retention, with no annual aggregate; for property liability, $500,000 per occurrence, no annual aggregate; for auto liability, $300,000 per occurrence, with no annual aggregate; for auto physical damage for $500,000 per occurrence, with no annual aggregate; for general liability, $300,000 per occurrence, no annual aggregate; and for misconduct, $500,000 per occurrence, with no annual aggregate. ANOI is a Non-Settling Insurer under the Joint Plan. For purposes of the calculation of insurance shut-down costs, I have assumed that ANOI will cease to exist and that the Debtor and Additional Debtors will no longer fund the captive at the approximate rate of $6 million in premiums per year.

10

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 11

To determine an estimate of insurance costs in Chapter 7, I worked with the Debtor and Additional Debtors' insurance professionals at Gallagher to project insurance costs. There are issues of significance relative to coverage in Chapter 7. The first is that without the Captive, the premiums to the insurance companies will be higher. The second, and most important, is that it may not be possible to get insurance for unoccupied buildings. Insurance carriers will not be inclined to write policies for vacant properties. In instances where insurance carriers will not write policies, the Debtor and Additional Debtors would be forced to look at the carrier of last resort, which in Louisiana is Citizens. However, based on my conversation with Gallagher, the coverage Citizens could provide would be minimal and would not come close to covering the assets of the Debtor and Additional Debtors. Additionally, Citizens has recently struggled obtaining their own reinsurance cover and may not be an option as a carrier under any circumstances.

It is unclear whether the Debtor and Additional Debtors could obtain insurance in Chapter 7 and if they could not, the real property assets would be subject to abandonment or significant loss. As such, the values used in the liquidation analysis would be significantly overstated.

Assuming, the Debtor and Additional Debtors could obtain coverage, I requested that Gallagher put together the cost of coverage for insurance over the five-year Chapter 7 period with reduced property values and assuming a ratable sale of properties over the five-year period (see Exhibit 8).

In addition to the annual premium costs, the Debtor and Additional Debtors have deductibles due on open claims of $4,836,600 which will need to be paid. The Debtor and Additional Debtors will also be subject to deductibles on future claims during Chapter 7, which are estimated at $2,704,336 per annum.

Exhibit 8 breaks out the cost of insurance for the Debtor, the Additional Debtors, and the Additional Debtors with claims against them.

b.  Property Taxes: Currently the Debtor is not subject to property taxes as a religious non-profit organization. However, upon conversion to Chapter 7, the Chapter 7 Estate will lose the non-profit status and will be subject to property taxes. The property tax amount on Exhibit 6 comes from the August 29, 2025, McEnery report.

c.  Repairs/Maintenance/Security: During the period the properties are being held for sale, they will need to be maintained and protected from vandalism and unexpected weather events. The repair/maintenance/security shut-down expense on Exhibit 6 comes from the August 29, 2025, McEnery report. These costs are

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 12

assumed to be basic in nature and do not assume any significant repair or weather events.

d. Utilities: The average cost of utilities for the Debtor properties when they have been operational has been $2.5 million per annum. It is assumed that the administrative office building will continue to be occupied and that other properties will be vacant in relatively short order once archivists and property movers and IT providers can finish selected tasks. As such, utilities are estimated to be one-third of current costs for the first year of Chapter 7.

e. Personnel: As noted in Exhibit 6, from a personnel perspective, it is anticipated that the Debtor will be subject to the WARN Act and will incur significant costs for these claims. It is also anticipated that the Debtor will need to retain existing personnel for varying periods of time to assist the chapter 7 trustee in the areas of accounting and finance, IT, legal, property, repair and maintenance, insurance and risk management, and archives.

f. Other: As noted on Exhibit 6, the Debtor will have other costs to wind up benefit programs, costs related to the billing and collection of FEMA monies, moving costs and costs associated with the liquidation of personal property, and the costs associated with digitizing and storing more than 200 years of religious history at the Archdiocese.

These estimated shut-down costs do not have any provision for a weather event of any significance, which could greatly increase these costs.

2. Chapter 7 Attorney and Financial Professional Fees - Chapter 7 professional fees are estimated at $12,000,000, which assumes a five-year liquidation process and fees related to: pursuing and litigating claims against other Catholic organizations for potential comparative fault matters, contributions or indemnification; litigating Abuse Claims; and legal fees associated with asset liquidation. It is understood that if the insurers are providing a defense, a Chapter 7 attorney will not need to defend the claim by the Abuse Survivor since the insurer has a duty to defend. However, it is anticipated that there will be significant legal fees for coverage litigation items and for the approximately 200 alleged claims which implicate coverage through Sparta may not be covered due to Sparta's functional insolvency. The Chapter 7 Trustee will need to have their own counsel and staff to deal with the significant coverage litigation issues, for litigation in defense of claims related to the insolvent Sparta carrier, and for the significant discovery work related to over 600 claims. The Chapter 7 Trustee under the insurance policies owes a duty to cooperate with the insurers

3. Chapter 7 Trustee Fees - The Chapter 7 trustee would be entitled to compensation of a percentage of all funds distributed to parties in interest pursuant to 11 U.S.C. § 326,

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 13

    with the compensation necessarily diluting the amount of funds available to pay Creditors.

4. Residual Costs of Chapter 11 Administration - The administrative costs are residual chapter 11 costs, calculated as two quarters of the average U.S. Trustee fees throughout the case ($500,000), and

5. Residual Legal and Professional Costs of Chapter 11 four months of residual chapter 11 professional fees at $1,500,000 a month ($6,000,000).

The total unsecured claims amount is projected to be **$1,429,299,271**, resulting in a *pro rata* recovery of **14.6%**.

In my opinion, the Debtor and the Additional Debtors Joint Plan satisfies the "best interests of creditors" test because assets are being monetized and paid, or otherwise contributed, to the Settlement Trust that are not assets of the Debtor or the Additional Debtors or that cannot be monetized by the Debtor or the Additional Debtors. These contributions include but are not limited to: (a) net proceeds from the sale of the Affordable Housing Facilities, which are estimated to exceed $44,000,000; (b) the assignment of the Non-Settling Insurers' Policies, having an estimated value of approximately $150,000,000 to $300,000,000; and (c) the Settling Insurers' settlement contribution of $29,275,000

**<u>Additional Debtors' Liquidation Analysis</u>**

The Additional Debtors are comprised of the parishes (including 103 parishes following the canonical mergers noted in Section 6.11 of the Disclosure Statement), suppressed parishes, and Archdiocesan agencies (as described in Section 4.05 of the Disclosure Statement) and are listed on Joint Plan Exhibit B-1. Each Archdiocesan Parish is separately incorporated.[2] For the Archdiocesan Parishes, the administrative services performed by the Debtor are detailed in both (a) a Parish Service Agreement, executed by most of the Archdiocesan Parishes, and (b) a Temporalities Manual. Under the Parish Service Agreements, the Debtor "[p]rovide[s] for the investment and management of Parish funds," at section 1.2(d), as an agent for the Archdiocesan Parishes. The vast majority of the Archdiocesan Parishes have executed Parish Service Agreements. Although there are no similar written undertakings for non-Parishes, all Additional Debtors and Non-Debtor Catholic Entities operate in the same manner as the Parishes.

The Additional Debtors were examined on a legal entity basis for each Additional Debtor but have been consolidated for this Liquidation Analysis into one comprehensive report.

---

[2] As noted in Joint Plan Exhibit A, two church parishes are not separately incorporated: (i) St. Louis Cathedral, and (ii) Our Lady of Guadalupe Church & Shrine of St. Jude.

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 14

**Available Assets.** The Additional Debtors' available assets in a hypothetical liquidation include cash and cash equivalents, accounts receivable, notes receivable, prepaid expenses, unrestricted investment funds, real property, plant and equipment, and other miscellaneous assets for entities that have Abuse Claims asserted against them. Certain Additional Debtors are not implicated in the Abuse Proofs of Claim filed in the Debtor's Chapter 11 Case. As such, the liquidation value of the assets and liabilities related to these Additional Debtors has been excluded from the liquidation value in Exhibit 2. It is assumed that the Additional Debtors that have no Abuse Claims against them have sufficient funds to pay their debts and that no funds would be available to the survivors or other creditors. Exhibit 4 to the Disclosure Statement identifies the Additional Debtors that are implicated in the Abuse Proofs of Claim filed in the Debtor's Chapter 11 Case.

The Additional Debtors' Liquidation Analysis is attached as Exhibit 2 to this report and has been prepared based on December 31, 2024, balance sheet amounts contained in the Additional Debtors' financial records. The specific analysis of the asset components of the Liquidation Analysis are as follows:

1. Cash: Based on the Additional Debtors' most recent financial assessment, the Additional Debtors' combined cash on hand is $98,977,624. The Additional Debtors anticipate a recovery of $73,789,693, after removing the entities who do not have any Abuse Claims asserted against them and who would not otherwise become Additional Debtors.

2. Accounts receivable: The Additional Debtors' accounts receivable primarily consist of amounts due from Portfolio B and tuition for the Parish Schools that are run by the corresponding parish. It should be noted that the elementary schools are separate from the Debtor Schools that are directly operated by the Debtor. In a hypothetical liquidation for the Debtor, the Additional Debtors would only receive 14.6% of their Portfolio B funds from the Debtor. Because the Additional Debtors do not expect a significant recovery from the accounts receivable, receivables have been discounted to 25%, or $17,069,423 after removing the entities who do not have an Abuse Claim asserted against them and who would not otherwise become Additional Debtors.

3. Notes receivable: The Additional Debtors have $9,500,000 in outstanding notes receivable and expect a recovery of $6,000,000, after removing the notes that are payable to entities who do not have an Abuse Claim asserted against them and who would not otherwise become an Additional Debtor.

4. Prepaid expenses: Prepaid expenses primarily relate to insurance and professional fees. In a liquidation scenario, the Additional Debtors do not expect to realize any refund of these amounts because the expense amounts will generally be worked off over time.

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 15

5. Investments: Just as with the Debtor, the Additional Debtors have investments that are divided between restricted and unrestricted funds. The Additional Debtors expect a 100% recovery on investments in Chapter 7 liquidation, subject to a reduction of the restricted investments addressed below. The Additional Debtors have $89,205,761 available investments (both restricted and unrestricted) based on a mark-to-market value. This value is from the Catholic Community Foundation based upon information provided by its investment advisors at the end of each month. Removing the entities who do not have Abuse Claims asserted against them, the Additional Debtors will have $46,944,068 in total investments, of which $10,121,668 is restricted and unavailable to Creditors.

6. Other Current Assets: The Additional Debtors have other assets with a book value of $12,324,843 based on their latest inventory and financial information. Over 80% of the Other Assets are food and related inventory held by two of the Additional Debtors. After removing the entities who do not have Abuse Claims asserted against them, a discount of 50% of the book value has been applied in the liquidation. The estimated liquidation value of the other assets is $538,722.

7. Real Property (Immovable Property): The Additional Debtors own approximately 900 real property parcels that would need to be liquidated in Chapter 7. The Debtor owns approximately 200 parcels of real property. The 1100 parcels that will need to be sold are an extraordinary number and will flood the market with available properties. Based on my experience as a Trustee and as a CIRA working on numerous Chapter 7 and Chapter 11 cases, I have assumed that Chapter 7 cannot last more than five years. Based on that assumption, I requested that S. Parkerson McEnery of the McEnery Company perform an analysis of the proceeds that could be realized from the sale of the Additional Debtors' property within a five-year period.

In his report dated August 29, 2025, McEnery opined that the Additional Debtors could realize undiscounted net proceeds from the sale of the properties of $264,064,417. On a present value basis this equates to $236,860,292 in net sales proceeds using the 4.5% discount rate assumed by McEnery (see Exhibit 9). McEnery also notes that the sale of churches presents challenges and costs that do not exist with other properties. For example, any potential buyer would have to account for: a) the historic designation of some of the churches; b) the costs of repurposing the properties; c) litigation over repurposing; d) re-zoning issues; e) IRS issues related to the sale of property of a 501(c)(3) to a for-profit entity; f) state law limitations; and g) First Amendment and other religious freedom issues that may impair the sale of the church.

The McEnery report considers all real property of the Additional Debtors, not just for the Additional Debtors with claims against them. Exhibit 7 to the Disclosure Statement provides an approximation of the percentage of real property value for

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 16

entities with claims against them versus the total of all real property for the Additional Debtors. This percentage is 77%. Utilizing the McEnery values noted above, and applying a factor of 77% against that value, the net liquidation present value of the real property for Additional Debtors with claims against them would be $182,382,425.

The McEnery report also addresses certain "holding costs" associated with the sale of the properties. We have addressed these holding costs in the Shut-down Costs section below.

In total, the Liquidation Value of the Additional Debtors' assets is estimated at $262,659,245 as of December 31, 2024.

To determine the hypothetical amount of assets available for unsecured pre-petition creditors, certain deductions need to be made to the liquidation value of the assets for the following items:

1. Liabilities with a higher priority, which include post-petition liabilities for accounts payable and accrued expenses totaling $500,000.

2. Assets that are unavailable to creditors, including restricted funds ($10,121,668) and custodial funds ($6,231,394), as of December 31, 2024.

3. The costs expected to be incurred during Chapter 7.

For the costs incurred during a chapter 7, there are various categories as follows:

1. Shut-down costs – The shut-down costs for the Additional Debtors are significantly more voluminous and complex than those of the Debtor. The Additional Debtors comprise over 150 different entities with multiple locations and systems to liquidate over the five-year anticipated shut-down period. The shut-down costs projected for the Additional Debtors are $89,211,336 for all Additional Debtors and $68,692,729 for Additional Debtors with claims against them on an undiscounted basis (see Exhibit 10). The net present value of the shut-down costs, using a 4.5% discount rate for the Additional Debtors with claims against them are $63,578,045 (see Exhibit 11). As noted in Exhibit 10, shut-down costs are generally assumed to be half of the prior year's costs, as the Additional Debtors move through the five-year shut-down period. There are different categories of shut-down expenses as follows:

    a. Insurance: Insurance is the most complicated of the shut-down cost categories. There are numerous types of insurance that the Debtor carries, and the Additional Debtors are co-insured under the policies, which saves costs versus each entity having its own policy. For purposes of the shut-down analysis, I have assumed the Debtor and Additional Debtors will remain under a combined policy.

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 17

The Debtor and Additional Debtors currently utilize Archdiocese of New Orleans Indemnity, Inc. ("**ANOI**"), which was incorporated as a non-profit captive insurance company to reduce the long-term cost of the Debtor and Additional Debtors' joint Insurance Program. ANOI has provided a self-insurance program as follows: for workers' compensation $800,000 self-insured retention, with no annual aggregate; for property liability, $500,000 per occurrence, no annual aggregate; for auto liability, $300,000 per occurrence, with no annual aggregate; for auto physical damage for $500,000 per occurrence, with no annual aggregate; for general liability, $300,000 per occurrence, no annual aggregate; and for misconduct, $500,000 per occurrence, with no annual aggregate. ANOI is a Non-Settling Insurer under the Joint Plan. For purposes of the calculation of insurance shut-down costs, I have assumed that ANOI will cease to exist and that the Debtor and Additional Debtors will no longer fund the captive at the approximate rate of $6 million in premiums per year.

To determine an estimate of insurance costs in Chapter 7, I worked with the Debtor and Additional Debtors' insurance professionals at Gallagher to project insurance costs. There are issues of significance relative to coverage in Chapter 7. The first is that without the Captive, the premiums to the insurance companies will be higher. The second, and most important, is that it may not be possible to get insurance for unoccupied buildings. Insurance carriers will not be inclined to write policies for vacant properties. In instances where insurance carriers will not write policies, the Debtor and Additional Debtors would be forced to look at the carrier of last resort, which in Louisiana is Citizens. However, based on my conversation with Gallagher, the coverage Citizens could provide would be minimal and would not come close to covering the assets of the Debtor and Additional Debtors. Additionally, Citizens has recently struggled obtaining their own reinsurance cover and may not be an option as a carrier under any circumstances.

It is unclear whether the Debtor and Additional Debtors could obtain insurance in Chapter 7 and if they could not, the real property assets would be subject to abandonment or significant loss. As such, the values used in the liquidation analysis would be significantly overstated.

Assuming, the Debtor and Additional Debtors could obtain coverage, I requested that Gallagher put together the cost of coverage for insurance over the five-year Chapter 7 period with reduced property values and assuming a ratable sale of properties over the five-year period (see Exhibit 8).

In addition to the annual premium costs, the Debtor and Additional Debtors have deductibles due on open claims of $4,836,600 which will need to be paid. The

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 18

Debtor and Additional Debtors will also be subject to deductibles on future claims during Chapter 7, which are estimated at $2,704,336 per annum.

Exhibit 8 breaks out the cost of insurance for the Debtor, the Additional Debtors, and the Additional Debtors with claims against them.

b. Property Taxes: Currently the Additional Debtors are not subject to property taxes as religious non-profit organizations. However, upon conversion to Chapter 7, the Chapter 7 Estate will not have a non-profit status and will be subject to property taxes. The property tax amount on Exhibit 10 comes from the August 29, 2025, McEnery report.

c. Repairs/Maintenance/Security: During the period the properties are being held for sale, they will need to be maintained and protected from vandalism and unexpected weather events. The repair/maintenance/security shut-down expense on Exhibit 10 comes from the August 29, 2025, McEnery report. These costs are assumed to be basic in nature and do not assume any significant repair or weather events.

d. Utilities: The average cost of utilities for the Additional Debtors' properties when they have been operational has been approximately $12 million per annum. It is assumed that properties will be vacant in relatively short order once archivists and property movers and IT providers can finish selected tasks. As such, utilities are estimated to be one-third of current costs for the first year of the Chapter 7.

e. Personnel: As noted on Exhibit 10, it is anticipated that the Additional Debtors will need to retain existing personnel for varying periods of time to assist the Chapter 7 trustee in the areas of accounting and finance, IT, legal, property, repair and maintenance, insurance and risk management, and archives. It is unclear at this time whether any of the Additional Debtor agencies are subject to the WARN Act.

f. Other: As noted on Exhibit 10, the Additional Debtors will have other costs to wind up benefit programs, costs related to the billing and collection of FEMA monies, moving costs and costs associated with the liquidation of personal property, and the costs associated with digitizing and storing more than 200 years of religious history at the Archdiocese.

These estimated shut-down costs do not have any provision for a weather event of any significance, which could greatly increase these costs.

2. Chapter 7 Attorney and Financial Professional Fees - Chapter 7 professional fees are estimated at $25,000,000, which assumes a five-year liquidation process and fees related to: pursuing and litigating claims against other organizations for potential

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 19

comparative fault matters, contributions or indemnification; litigating Abuse Claims; and legal fees associated with asset liquidation. While it is understood that if the insurers are providing a defense, a Chapter 7 attorney will not need to defend the claim by the Abuse Survivor since the insurer has a duty to defend. However, it is anticipated that there will be significant legal fees for coverage litigation items and the approximately 200 alleged claims which implicate coverage through Sparta may not be covered due to Sparta's functional insolvency. The Chapter 7 Trustee will need to have their own counsel and staff to deal with the significant coverage litigation issues, for litigation in defense of claims related to the insolvent Sparta carrier, and for the significant discovery work related to over 600 claims. The total assumes $250,000 in professional fees per Additional Debtor (with 100 Additional Debtors filing).

3. Chapter 7 Trustee Fees - The Chapter 7 trustee would be entitled to compensation of a percentage of all funds distributed to parties in interest pursuant to 11 U.S.C. § 326, with the compensation necessarily diluting the amount of funds available to pay Creditors. Chapter 7 trustee fees are estimated at $10,000,000, excluding any recovery from insurance proceeds. These fees are based on an estimate of 3% of the funds distributed to creditors for all the Additional Debtors.

4. Residual Costs of Chapter 11 Administration - Estimated at $5,000 per Additional Debtor for 100 Additional Debtors.

5. Residual Legal and Professional Costs of Chapter 11 - Estimated at $2,500 per Additional Debtor for 100 Additional Debtors.

The unsecured creditor pool includes Abuse Claims, Non-Abuse Claims, prepetition accounts payable, prepetition notes payable, and prepetition employment benefits and pensions. The Additional Debtors estimate the total amount of unsecured claims to be **$1,326,564,719**. With **$167,409,245** projected to be available to general unsecured creditors, after payment in full of all senior classes (Administrative and Priority Claims), general unsecured creditors would receive a **12.6%** payment on their claims.

In my opinion, the Debtor and the Additional Debtors Joint Plan satisfies the "best interests of creditors" test because assets are being monetized and paid, or otherwise contributed, to the Settlement Trust that are not assets of the Debtor or the Additional Debtors or that cannot be monetized by the Debtor or the Additional Debtors. These contributions include but are not limited to: (a) net proceeds from the sale of the Affordable Housing Facilities, which are estimated to exceed $44,000,000; (b) the assignment of the Non-Settling Insurers' Policies, having an estimated value of approximately $150,000,000 to $300,000,000; and (c) the Settling Insurers' settlement contribution of $29,275,000.

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 20

### Debtor Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that Confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization). To determine whether the Joint Plan meets this feasibility requirement, I have prepared an analysis of the Debtor's ability to meet its obligations under the Plan. This analysis includes Feasibility Projections of the Joint Plan attached as Exhibit 12. In addition, Disclosure Statement Exhibit 4 reflects that the Additional Debtors possess sufficient cash, investments, and other property to fund their $60,000,000 contribution that is due on the Effective Date. The Plan Proponents believe that these demonstrate that the Debtor and Additional Debtors will be able to fund the Joint Plan on the Effective Date and that the Reorganized Debtor and Reorganized Additional Debtors will be able to make all payments required pursuant to the Joint Plan without the need for further financial reorganization. Based upon foregoing, it is my opinion that the Joint Plan satisfies the feasibility requirements of the Bankruptcy Code.

The Feasibility Projections of the Debtor are prepared on a cash basis and are broken into various parts. Part One includes the operations of the Debtor's administrative offices, the Debtor's high schools, and the Debtor's two parishes (St. Louis Cathedral, and (ii) Our Lady of Guadalupe Church & Shrine of St. Jude). Part Two includes the Debtor's non-operating cash flow activity and Part Three includes the funding for the Plan and payments to various classes of creditors under the Plan.

### Feasibility Projections – Part One- Operational Cash Flow

### Administrative Operations Cash Flow

To prepare the operational cash flow projections for the administrative offices of the Debtor, we obtained the fiscal 2025/2026 budget from the Debtor and evaluated it for reasonableness. This reasonableness analysis was based on a comparison of the budget with prior years' performance and on meetings and discussions with the CFO and finance staff of the Debtor. Certain adjustments were made to the budget based on an assumed Effective date of December 31, 2025, and to adjust for investment return due to reduced cash on hand from projected Plan payments.

Since the 2026 budget runs on a fiscal year from July 1, 2025, through June 30, 2026, we analyzed the budget to split it between the pre-confirmation and post-confirmation periods and reported the period from January 1, 2026 – June 30, 2026, as the initial period under the Plan. The three subsequent Plan periods were based on a complete fiscal year for the years ended June 30, 2027, 2028, and 2029.

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 21

Key assumptions in the feasibility projections are as follows:

1. Archdiocesan Support – Assessments will be flat going forward consistent with the flat to slightly declining parishioner population in the archdiocese.

2. Insurance expense, and the associated pass-through income from the co-insureds, will grow at 5% per annum. This represents a slowing of the expense increases experienced by the insureds of 10% over the past three years.

3. Investment returns will be approximately 4.5% on Portfolio A and B funds based on our research on projected returns for the equity and fixed income markets.

4. Recurring income and expense items will grow by 3% per annum, which represents the ten-year average CPI growth per the Bureau of Labor Statistics.

**High School Operations Cash Flow**

The Debtor directly owns and operates the following schools (collectively, the "**Archdiocesan Schools**"):  (a) the Academy of Our Lady High School (located in Marrero); (b) Archbishop Chapelle High School (located in Metairie); (c) Archbishop Hannan High School (located in Covington); (d) Archbishop Rummel High School (located in Metairie); (e) Archbishop Shaw High School (located in Marrero); (f) Pope John Paul II High School (located in Slidell); (g) St. Charles Catholic High School (located in LaPlace); (h) St. Scholastica Academy (located in Covington); and (i) St. Michael Special School for Exceptional Children (located in New Orleans).[3]

The process we used to prepare the feasibility projections for the operational cash flow of the high schools is the same process we used for the administrative offices. We analyzed the budgets for the various schools, analyzed the historical cash flow activity, and had discussions with school and Diocesan finance staff. When the cash flow of the high schools was originally prepared for the feasibility analysis, the 2026 budgets were not complete for the high schools and based on our analysis at that time, we projected negative cash flow for the high schools of $400,000 for the six months ended June 30, 2026, and $900,000 per year thereafter. We have now received the final budgets for the high schools for 2026 and have performed additional analyses on them. Based on our updated analysis, we are projecting a cash flow loss of approximately $162,000 for the six months ending June 30, 2026 (see Exhibit 13). We are not making any changes to the cash flow for the subsequent years.

---

[3] A nonprofit corporation is registered in Louisiana that bears the name "St. Michael Special School."  That entity, however, does not operate St. Michael Special School for Exceptional Children.

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 22

The high schools' annual cash flow is highly dependent on the amount of unrestricted donations, investment returns, restricted capital campaigns, and capital expenditure projects that are in-process. These amounts are variable from year-to-year.

## Parish Operations Cash Flow

The Debtor directly owns and operates the St. Louis Cathedral and Our Lady of Guadalupe Parish. The process we used to prepare the feasibility projections for the operational cash flow of the two parishes is the same process we used for the administrative offices. We analyzed the budgets for the two parishes, analyzed the historical cash flow activity, and had discussions with Diocesan finance staff.

When the cash flow of the two parishes was originally prepared for the feasibility analysis, the 2026 budgets were not complete and based on our analysis we projected negative cash flow of $100,000 for the six months ended June 30, 2026, and $400,000 per year thereafter. We have now received the final budgets for the two parishes for 2026 and have performed additional analyses on them. Based on our updated analysis, we are projecting a cash flow loss of approximately $200,000 for the six months ending June 30, 2026 (see Exhibit 14). We are not making any changes to the cash flow for the subsequent years.

The cash flow losses in fiscal years 2027-2029 are based on the St Louis Cathedral undergoing renovations and repairs that are expected to last two to three years. This will cause a reduction in income related to events that bring in income such as weddings, baptisms, and other events.

## Feasibility Projections – Part Two – Non-Operational Cash Flow

In addition to the operating cash flows of the Debtor, there are non-operating cash flows that affect the Debtor's financial position and have an impact on feasibility. These non-operating cash flow items are as follows:

1. Sale of Assets – During Chapter 11, the Debtor has sold excess real property to assist in the funding of the Settlement Trust. Post-confirmation, the Debtor expects to continue to sell excess property to fund operations and re-establish needed reserves. Attached as Exhibit 15 is a listing of the properties the Debtor anticipates selling during the Plan period.

2. Accounts and Note Receivable Collections – The billing and collections for accounts receivable are relative steady monthly. For purposes of the feasibility analysis, we have assumed that the levels of accounts receivable will remain constant throughout the Plan period and there will be no incremental increases or decreases in cash flow related to accounts receivable. For notes receivable, we assume there will be no new loans made due to the deterioration in cash available for loans in Portfolio B. In the feasibility projections, I assumed there would be $500,000 per annum in loan principal collections. This amount is low based on a subsequent analysis of the

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 23

categorization of interest and principal payments being made by non-performing borrowers. As such, loan principal payments should approximate $1.1 million per annum.

3. Reorganization Expenses – Reorganization expenses have been budgeted at $8 million for the fiscal year ending June 30, 2026. For budgeting purposes, this is consistent with the average annual expense during the five-year Chapter 11 period. For purposes of the feasibility projections, I have assumed that fees will be higher than budgeted due to the Plan and Disclosure Statement process, settlement work with various parties, certain contested matters and discovery matters, depositions, and the Plan confirmation process and associated expenses. In addition, there is approximately $1.3 million in unpaid professional fees as of May 31, 2025, which will need to be paid during the fiscal year ended June 30, 2026. Furthermore, there are one-time expenses above and beyond the recurring monthly expenses for noticing and mailing expenses (which may approximate $1 million) and expenses for the Settlement Trust claims reviewer, which could approximate $1 million. In total it is estimated that $8 million in professional fees will be paid during the initial six-month Plan period.

4. Capital Expenditures and Deferred Maintenance – It is estimated that the administrative offices of the Debtor will pay $500,00 per annum in capital expenditures each year of the Plan period. This amount is consistent with historical expenditures over the past three fiscal years.

5. Portfolio B Deficit Funding – The Debtor administers a savings and loan program for other Catholic entities including the Additional Debtors. Under this savings and loan program, the Debtor takes deposits from other Catholic entities and pays the depositors a fixed rate of return (currently 3%). The funds on deposit are pooled in investment accounts or loaned to Catholic entities for construction or other approved projects. The invested funds and loans are commonly referred to as Portfolio B. The relationship between the Debtor and depositors is governed by the Parish Services Agreement and/or Temporalities Manual. Due to the financial situation of the Debtor, there is a deficiency in Portfolio B as of May 31, 2025, of $111,924,355.

The feasibility projections assume the Debtor will commence curing the deficiencies in Portfolio B for the counterparties under the Parish Services Agreement and Temporalities Manual after the Effective Date at a rate of $400,000 per month.

6. Hurricane Repairs and FEMA Reimbursements – During the early stages of Chapter 11, Hurricane Ida struck New Orleans and caused significant damage to the property and operations of the Debtor and Additional Debtors. While the Debtor and Additional Debtors had significant insurance coverage ($70 million), it was not sufficient to cover all the devastation brought on by Ida. As of May 31, 2025, the entirety of the $70 million in insurance coverage has been billed and collected. In

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 24

addition, the Debtor has billed FEMA for approximately $30 million as of May 31, 2025, (see Accounts Receivable section above) and expects to bill an additional $19 million ($12 million during fiscal 2026, and $7 million in fiscal 2027). Under the current political administration, the reimbursements from FEMA have been slow to non-existent and there is significant turmoil at FEMA. For purposes of the feasibility projections, it is assumed that FEMA reimbursements will be approximately $10 million per year commencing in fiscal 2027.

## Cash and Unrestricted Investments Analysis and Working Capital

The cash balances for the Debtor (per the May MOR) were used as the initial starting point for the feasibility cash flow projections. The cash was split between the unrestricted and restricted portions to project forward. The restricted cash of $1,876,996 was segregated and was assumed to be consistent throughout the projection period. The restricted cash was segregated since it can only be used for the restricted purpose for which it is intended, and the Debtor has consistently maintained restricted cash. The Debtor also has unrestricted investments which were added to the feasibility projections since the unrestricted investments can be sold to create cash for general use during the projection period.

The feasibility projections also carve out 90 days of working capital ($20,751,009) for the administrative offices. This was done to recognize that these funds would not be available for Plan payments and, as in any organization, working capital is necessary to maintain feasibility. There was no specific set-aside for working capital for the Debtor's high school operations as the high schools typically fund their working capital through advance billings on tuition which provide consistent cash flow.

## Feasibility Projections – Part Three – Plan Funding and Payments to Settlement Trust

**Class 3 (Known Abuse Claims)** - Under the Joint Plan, the Settlement Trust will be funded with a minimum of $179,275,000 with funding likely to exceed $223,000,000 excluding any settlement with the Non-Settling Insurer. The contributions to the Joint Plan come from the Debtor, the Additional Debtors, the Non-Debtor Catholic Entities, and the Settling Insurers. Each is discussed below:

- **The Joint Plan Contributions**. The contributions to the Settlement Trust are set forth in Sections 5.2 – 5.3 of the Joint Plan. The Debtor, the Additional Debtors, the Non-Debtor Catholic Entities, and the Settling Insurers have agreed to the following contributions:

    (a) On the Effective Date, the Debtor, the Additional Debtors, and the Non-Debtor Catholic Entities[4] will deposit Cash in the amount of $130,000,000 to the

---

[4] The Settlement Trust contribution from the Non-Debtor Catholic Entities is in exchange for a release of potential claims and causes of action held by the Debtor and discussed in more detail in Section 4.07 of this Disclosure

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 25

Settlement Trust. Specifically, the Debtor will transfer $65,000,000 in Cash directly to the Settlement Trust, while the Additional Debtors and the Non-Debtor Catholic Entities will contribute Cash in the respective amounts of $60,000,000 and $5,000,000 to 1793 Group, which will transfer such consideration to the Settlement Trust.

(b) On or near the Effective Date, the Settling Insurers will transfer $29,275,0005 into the Settlement Trust, which will be allocated to Abuse Claimants who sign an Abuse Claim Release and Certification. The exact amount of each Settling Insurer's contribution is set forth in Section 5.3(b) of the Joint Plan.

(c) On the Effective Date, the Archdiocese and the Additional Debtors will enter a four-year Settlement Trust Promissory Note in the amount of $20,000,000 with the Settlement Trust as payee. The first payment under the Settlement Trust Promissory Note will be due on July 1, 2026. It is projected that the Settlement Trust Promissory Note will be paid more quickly through sale proceeds as discussed below.

(d) The Affordable Housing Entities will sell the Affordable Housing Facilities identified on Schedule A-2 to Plan Exhibit A and commonly known as Christopher Homes. The sale of the Affordable Housing Facilities is being conducted by Newmark Affordable Housing Advisors as broker ("**Newmark**") and an Independent Financial Advisor, who will be selected in the near future. Newmark prepared marketing materials, worked with 20 potential buyers, and received eight non-binding letters of intent or offers to purchase the Affordable Housing Facilities. The sale of Christopher Homes is projected to close and fund prior to June 30, 2026. Net proceeds[6] from the sale of the Affordable Housing Facilities will be distributed as follows: (i) first $23 million in net proceeds from the sale will be paid to the applicable Debtor, Reorganized Archdiocese, Additional Debtors, and Reorganized Additional Debtors; and (ii) the next $33 million in net proceeds will be paid to the Settlement Trust. From the first $23

Statement. Claims related to contracts between the Debtor and Non-Debtor Catholic Entities pass through unaffected by the Joint Plan pursuant to Section 10.7 of the Joint Plan. The Non-Debtor Catholic Entities are listed on Plan Exhibit B-2. Additionally, the Affordable Housing Entities, which are Non-Debtor Catholic Entities, are ultimately transferring sale proceeds as additional consideration as discussed in Section 4.09 of this Disclosure Statement.

[5] Of this amount, $21,000,000 is related to a settlement with SPARTA, which is contingent on SPARTA providing financial assurance acceptable to the Survivors' Committee in the Survivors' Committee's discretion by the commencement of the Confirmation Hearing. If SPARTA fails to provide such financial assurance, SPARTA will become a Non-Settling Insurer, and litigation rights will be preserved against SPARTA and any insurance guarantee fund, should SPARTA trigger guarantee fund coverage.

[6] "Net proceeds" refers to proceeds available after payment of existing debt on the Christopher Homes (approximately $68 million) and payment of commissions and customary closing costs.

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 26

million in net proceeds, $20 million will be used to repay the Settlement Trust Promissory Note. Net proceeds exceeding $56 million will be divided between the Settlement Trust, the applicable Debtor, Reorganized Archdiocese, Additional Debtors, and Reorganized Additional Debtors, as follows:

| Division of Net Proceeds from Christopher Homes' Sale Exceeding $56 Million | | |
|---|---|---|
| Net Sale Proceeds | Percentage of Net Proceeds Paid to Debtor and Additional Debtors | Percentage of Net Proceeds Paid to Settlement Trust |
| $56–$66 million | 25% | 75% |
| $66–$76 million | 35% | 65% |
| + $76 million | 50% | 50% |

The Parties estimate, based on preliminary broker value analysis which is further supported by non-binding letters of intent or offers received by Newmark, that net sale proceeds will be available to fund the Settlement Trust in a range of approximately $30,904,000 to $55,924,000. The lowest of the top five offers received by Newmark is in the mid-range of values estimated by Newmark, and the price guidance suggested by the letters of intent or offers suggests the ultimate contribution to the Settlement Trust could be at the mid to upper range of these estimates. A lower or higher recovery is possible depending on sale outcomes. For purposes of the Feasibility analysis, we have assumed the mid-range of value, which will yield $44,787,438 in proceeds to the Settlement Trust.

(e) On the Effective Date, the transfer and vesting of rights related to the Non-Settling Insurers' Policies will be transferred to the Settlement Trust, as set forth in Section 7.2 of the Joint Plan. Travelers is a Non-Settling Insurer and remains subject to continued litigation by Abuse Claimants regarding the liability of the Co-Insured Parties for Abuse occurring during the Travelers affiliate's coverage period (approximately 1973-1989). ANOI is also a Non-Settling Insurer. If SPARTA fails to provide financial assurance in a form acceptable to the Survivors' Committee in its sole discretion, then SPARTA will also be a Non-Settling Insurer. In addition, if any Insurer has not executed its respective Insurance Settlement Agreement prior to the Confirmation Hearing, such Insurer shall not be deemed a Settling Insurer.

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 27

(f) The Debtor and Additional Debtors have agreed to certain additional consideration including the Non-Monetary Plan Provisions, payment of Abuse Claims Reviewer Fees, and other consideration set forth in Sections 5.3 and 6.5 of the Joint Plan.

**<u>Risks Related to the Debtor's and Additional Debtors' Operations and Financial Condition.</u>**

The Debtor anticipates having approximately $48,500,000 in unrestricted cash and investments after making its payments on the Effective Date. This amount is comprised of the working capital reserve of $20.7 million and the June 30, 2026, ending balance per Exhibit 12). This amount of unrestricted cash and investments is deemed necessary to insure feasibility under the Plan. The Debtor needs approximately $10 million to cover operating losses as it restabilizes during the Plan period and it needs flexibility due to the unique environment in which it operates. Key considerations are as follows:

(a) *Impact of Adverse Weather Events.* Louisiana has experienced a significant number of damaging weather events. These weather events have included hurricanes, such as the massive devastation done by Hurricane Katrina in 2005 and Hurricane Ida in 2021. Properties and operations of the Debtor and the Additional Debtors have been affected by adverse weather-related events in the past and will likely be affected by such events in the future. The Debtor does not have any reserves for named-storm deductibles, or any insurance deductibles.

(b) *Insurance Costs and Flood Insurance Premiums.* In recent years, like other Gulf South states, Louisiana has experienced increasing insurance costs. After Hurricane Ida, property insurance premiums to residential and commercial facilities in the southern part of Louisiana have experienced substantial increases. There are no assurances that the premiums will not continue to rise, or that insurance carriers will continue to insure property.

The Debtor and Additional Debtors obtain flood insurance on all eligible properties under the National Flood Insurance Program, which is administered by FEMA. The insurance premiums for such flood insurance have risen substantially over the last five years. Furthermore, not all properties are eligible for flood insurance.

Finally, wind and flood insurance coverage are necessary to both obtain and maintain eligibility for FEMA assistance in the event of future hurricanes and other natural disasters. The Robert T. Stafford Disaster Relief and Emergency Assistance Act (the "**Stafford Act**"), 42 U.S.C. 5121 et seq., requires that any organization that has received assistance funding from FEMA must obtain and maintain insurance coverage equal to or greater than the amount of eligible damage to the facility that receives assistance and that the insurance coverage must be for the peril that caused the damage in order to protect against future loss. This is known as the Stafford Act "Obtain and Maintain Requirement."

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 28

(c)     *Dependence upon Contributions and Other Income Sources*.   The Debtor is dependent upon various income sources, including Assessment and fee income, donations and grants, investment returns, rent and royalties, and other sources. While the Debtor has never failed to meet its financial commitments, its income sources are variable. Events such as Covid and any adverse weather event can significantly impact the Debtor's income from these sources.

(d)     *Population Decline.* Data released by the U.S. Census Bureau shows that Louisiana ranked fifth among states for decline in the population between July 1, 2021, and July 1, 2022.  Moreover, four civil parishes in Louisiana were among the top 10 counties in the U.S. with the largest percentage of population loss in 2022, according to the U.S. Census Bureau. Three of the four civil parishes are in the Archdiocesan Region--St. John the Baptist, Plaquemines,     and     St.     Charles.     See     https://www.census.gov/newsroom/press-releases/2023/population-estimates-counties.html.

In 2022, the Debtor engaged Villavaso & Associates, LLC (the "**Demographe**r") to prepare demographic and geographic profiles with population estimates and projections for the Archdiocesan Parishes.  Looking at a geographic area around each Archdiocesan Parish, for the period between 2022 and 2027, the Demographer predicted whether the population in the area would be stable, stagnant, decrease, or increase. According to the Demographer, only a dozen or so Archdiocesan Parishes are predicted to experience even a slight population growth. The remainder are projected to have population growth that is stagnant, declining, or, at best, stable. Population stagnation or decline could negatively impact Debtor income and could also reduce its expenses.  Likewise, such stagnation or decline could negatively impact the operations of the Debtor Schools and the two Debtor-owned church parishes but could also eliminate operating expenses. The Debtor and the Additional Debtors, to an extent, have addressed demographic challenges by closing and merging parishes.

Set forth below is certain statistical information pertaining to the Archdiocese, the Additional Debtors, and the Non-Debtor Catholic Entities for the Fiscal Years 2021, 2022, 2023, 2024, and 2025:

| Archdiocese | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| Parishioners | 518,251 | 514,847 | 508,711 | 505,369 | 505,675 |

## Claims Analysis of Significant Unsecured Debts

### Abuse Claims

The value of the Abuse Claims in the liquidation analysis represents the midpoint of a report by Stout Risius Ross, LLC ("Stout"), the Committee's expert consultant on sexual abuse. I have not seen the report prepared by Stout, but it has been represented to me by counsel for the Committee that the range of value for the claims is $752 million to $1.69 billion. I have used a value of $1.221 billion for the unsecured claims of the abuse claimants. This range is based on

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 29

828 filed proofs of claim less 202 claims that have been excluded as duplicate claims, withdrawn claims, adult claims, minor abusers, and non-sexual abuse claims.

The unsecured claim amount has been used in both the Debtor's Liquidation Analysis and the Additional Debtors' Liquidation Analysis. It is my understanding that there are claims asserted against the Debtor only, both the Debtor and certain Additional Debtors, only against Additional Debtors. Assuming there is liability, it is currently impossible to determine which parties have liability and in what amounts. As such, the claim amount is shown in both Liquidation Analyses.

Assuming the Additional Debtors would be liable for the entirety of the abuse claim amount of $1.221 billion, in a liquidation the Additional Debtors would pay approximately 12.6% of their net liquidation proceeds ($154 million) to the abuse claimants. This would leave the Debtor with an unsecured obligation of approximately $1.067 billion to the abuse claimants.

### Other Debtor and Additional Debtor Pre-Petition Common Obligations

As the Administrative arm of the Catholic Church in the geographic area encompassing the Archdiocese, the Debtor sponsors and administers certain pension and post-retirement plans for active and retired priests of the Debtor and Additional Debtors. While these are Debtor Plans, the Addiitonal Debtors are obligated for their portions of the costs and liability under the Plans. The Debtor bills the Addiitonal Debtors for their portion of the costs in accordance with the Parish Services Agreement governing the relationship between the parties.

### The Priest Pension Plan and Priest Retiree Medical Benefits

Incardinated priests of the Archdiocese and Archdiocesan Parishes, whose retirement from active service is duly accepted by the Archbishop, are eligible for retirement benefits under the Priest Pension Plan that is sponsored by the Debtor. The Priest Pension Plan is a non-contributory defined benefit plan and qualifies as a church institution under the IRC. As such, the Priest Pension Plan is not subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), nor are benefits under the Priest Pension Plan guaranteed by the Pension Benefit Guarantee Corporation. The Priest Pension Plan is exempt from federal income tax under provisions of IRC Section 501(c)(3). The Priest Pension Plan is covered under IRC Section 414(e) - Church Plans. While the Debtor is the sponsor of the Plan, the Debtor is merely a conduit for administration of the group plan for all the entities who have priests and participate in the Plan. Each participant in the Plan, including the Debtor and Additional Debtors, pays their respective share of the costs and is obligated on their respective share of the liabilities under the Plan.

The liability under the Priest Pension Plan on May 31, 2025, is $30,846,389 (per the May 31, 2025, MOR based on the Willis Towers Watson report as of June 30, 2024. The updated Willis Towers Watson report for June 30, 2025, is also being provided which is not significantly different). Assuming the Additional Debtors would be liable for the entirety of the priest pension

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 30

liability amount, in a liquidation the Additional Debtors would pay approximately 12.6% of their net liquidation proceeds ($3,886,645) to the Debtor. This would leave the Debtor with an unsecured obligation of $26,959,744 for the Priest Pension Plan.

In accordance with the Parish Services Agreement, the liability for the Priest Pension Plan will "ride-through" under the Chapter 11 Plan. The Plan does not create a responsibility for either the Debtor or the Additional Debtors to make catch-up payments to fund the unsecured obligation. There are no catch-up payments made for the unfunded liability in the Plan. Annual expenses will be paid as they come due.

In addition to the Priest Pension Plan, Priest Retiree Medical Benefits are offered to priests who retire at age 65 due to permanent mental or physical disability, or with the approval of the Archbishop. For these retired priests, the Archdiocese purchases a Medicare Supplement plan and pays the entire premium for such plan. Since 2020, the Medicare Advantage plan has been insured through Retiree First. The Archdiocese also reimburses each retired priest (a) 100% of the retired priest's medical expenses that not covered by the Medicare Advantage plan, and (b) 100% of the retired priest's dental and vision medical expenses. Finally, the nursing or assisted living costs for retired priests are also covered 100% net of (a) offsets against any hospital chaplain fees to which the retired priest would otherwise be entitled, and (b) offsets against payments otherwise payable under the Priest Pension Plan as follows: (i) if the retired priest is a resident of a skilled nursing, 97% of payments from the Priest Pension Plan; (ii) if the retired priest is a resident of an assisted living facility, 80% of the payments otherwise payable to the retired priest under the Priest Pension Plan, and (iii) 60% of the costs of independent living. While the Debtor is the sponsor of the Plan, the Debtor is merely a conduit for administration of the group plan for all the entities who have priests and participate in the Plan. Each participant in the Plan, including the Debtor and Additional Debtors, pays their respective share of the costs and is obligated on their respective share of the liabilities under the Plan.

The unsecured liability for the Priest Retiree Medical Benefits is $25,435,054 (per the May 31, 2025, MOR based on the Willis Towers Watson report as of June 30, 2024. The updated Willis Towers Watson report for June 30, 2025, is also being provided which is not significantly different). Assuming the Additional Debtors would be liable for the entirety of the Priest Retiree Medical Benefits, in a liquidation the Additional Debtors would pay approximately 12.6% of their net liquidation proceeds ($3,204,817) to the Debtor. This would leave the Debtor with an unsecured obligation of $22,230,237 for the Priest Retiree Medical Benefits.

In accordance with the Parish Services Agreement, the liability for the Priest Retiree Medical Benefits will "ride-through" under the Chapter 11 Plan. The Plan does not create a responsibility for either the Debtor or the Additional Debtors to make catch-up payments to fund the unsecured obligation. There are no catchup payments made for the unfunded liability in the Plan. Annual expenses will be paid as they come due.

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 31

### Portfolio B Deficiency

In addition to the priest pension and postretirement plans, the Debtor administers a savings and loan program for other Catholic entities including the Additional Debtors. Under this savings and loan program, the Debtor takes deposits from other Catholic entities and pays the depositors a fixed rate of return (currently 3%). The funds on deposit are pooled in investment accounts or loaned to Catholic entities for construction or other approved projects. The invested funds and loans are commonly referred to as Portfolio B. The relationship between the Debtor and depositors is also governed by the Parish Services Agreement and/or Temporalities Manual.

Due to the financial situation of the Debtor, there is a deficiency in Portfolio B as of May 31, 2025, of $111,924,355.

In accordance with the Parish Services Agreement and Temporalities Manual, the liability for the Portfolio B Deficiency will "ride-through" under the Chapter 11 Plan. Under the Plan, the Debtor estimates paying $4,800,000 per year towards the deficiency.

### Unsecured Bond Debt

On the Petition Date, the unsecured bondholders were owed $37,970,000. On November 2, 2020, the Court approved an agreement between the Debtor and the Bond Trustee pursuant to which the Debtor was authorized to pay semi-annual interest payments on the Bonds (the "**Settlement Payments**"), although all parties reserved their rights to argue that the Settlement Payments should be recharacterized as payments of principal due under the Bond Documents.

The treatment of the Bonds under the Joint Plan is different than that set forth in the Bond Trustee Settlement Agreement because the incorporation of the Bond Settlement into a Joint Plan would have made it impossible for the Debtor to confirm a plan absent all Abuse Claimants accepting the plan. The Bond Claims will be paid in a reduced amount to comply with the requirements of the Bankruptcy Code that a plan cannot unfairly discriminate between classes and that each creditor receives under the plan an amount that such creditor would receive if the Debtor were liquidated.

The payments on the Bond claims during Chapter 11 are being treated as principal payments on the Bonds. The total payments of $9,302,063 during Chapter 11 reduce the Bond principal to $28,667,937 as of the Effective Date. This Bond principal amount will be paid 14.6%, consistent with the payment to unsecured creditors as computed in the Liquidation Analysis. This results in $4,185,519 to be paid to the Bondholders under the Plan. The Bond principal amount determined by the preceding formula shall be amortized over ten (10) years at an 8.5% interest rate. This results in an annual payment to the Bondholders of $588,068 (see Exhibit 16). Based upon my experience as a bankruptcy professional, I believe the interest rate proposed for the Bondholder debt reflects market rates. I believe the ten-year amortization period proposed for the Bondholders is fair and reasonable.

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 32

Even though the Bonds were already paid $9,302,063 million on their claim, which will allow them to realize a higher percentage than other unsecured claimants (35.5%), the Debtor is currently not anticipating disgorgement or other adjustments for payments made during Chapter 11.

### Class 7 (General Unsecured Claims and Unsecured Trade) –

Class 7 claims will be generally insignificant in nature (see Exhibit 17 for a list by Debtor location of the amounts due). Many of the Scheduled claims were allowed to be paid under the First Day Motions or were otherwise resolved by the court during Chapter 11. It is anticipated that Class 7 claims will only be approximately $500,000 and will be paid on the Effective Date.

### Other Considerations and Adjustments to Schedules filed with the Disclosure Statement

In the prior sections of this report, there are certain values in the liquidation analyses and the feasibility projections that are different than the amounts filed with the Court as follows:

Debtor's Liquidation Analysis: The accounts receivable, loans receivable, real property, and shut-down costs are all higher than they were represented in the Debtor Liquidation Analysis field with the Disclosure Statement. In total, these additions would add approximately $3 million to the amount available to unsecured creditors, which would raise the estimated payout from 14.6% to 14.8%.

Additional Debtors' Liquidation Analysis: The real property and shut-down costs are both higher than they were represented in the Additional Debtors' Liquidation Analysis filed with the Disclosure Statement. In total, these additions would add approximately $40 million to the amount available to unsecured creditors, which would raise the estimated payout from 12.6% to 15.6%.

Feasibility: The adjustments noted above to the Debtor's high school and parish operational cash flow, and the non-operational cash flow adjustment for loan principal collections, would result in an increase in cash flow of $438,000 in the first six-month plan period and an increase in $600,000 per annum for the three succeeding periods.

Debtor and Additional Debtors' Common Pre-Petition Obligations: As noted above, there are common pre-petition unsecured obligations of the Debtor and Additional Debtors that are difficult to ascribe a specific breakout between the parties. However, if the Additional Debtors were to liquidate, they would contribute funds towards the obligations of the Priest Pension Plan ($3,886,645), Priest Retiree Medical Plan ($3,204,817), and Abuse Claims ($154 million).

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 33

**<u>Conclusion</u>**

In my opinion, the Debtor and the Additional Debtors' Second Amended Joint Plan satisfies the "best interests of creditors" test as each class of Creditors will receive or retain under the Second Amended Joint Plan property of a value, as of the Effective Date, which is not less than the value such Creditor would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

For the Class 3 "Known Abuse Claims", this means that in addition to the cash and notes being paid by the Debtor, Additional Debtors, and Non-Debtor Catholic Entities, under the Second Amended Joint Plan of Reorganization, assets are being monetized and paid, or otherwise contributed, to the Settlement Trust that are not assets of the Debtor or the Additional Debtors or that cannot be monetized by the Debtor or the Additional Debtors.  These contributions include but are not limited to: (a) net proceeds from the sale of the Affordable Housing Facilities, which are estimated to exceed $44,000,000; (b) the assignment of the Non-Settling Insurers' Policies, having an estimated value of approximately $150,000,000 to $300,000,000; and (c) the Settling Insurers' settlement contribution of $29,275,000. As such, the Known Abuse Claims are receiving value they would not otherwise receive in Chapter 7.

For the Class 6 "Bond Claims", these claims only reside with the Debtor. Under the Second Amended Joint Plan of Reorganization, the Bond Claims are based upon a formula that pays the Bondholders the amount they would receive in a liquidation of the Debtor. Based upon my report I estimate an additional recovery to the Bondholders post confirmation to be $4,185,519. The reorganized bond principal amount will be amortized over ten (10) years at an 8.5% interest rate. There were additional payments of $9,302,063 made during Chapter 11 to the bondholders by the Debtor which makes the total recovery to the Bondholders on their claim to be $13,487,782 or 35.5%. The Bondholders are also benefiting, since the Plan does not call for a disgorgement of the $9,302,063. The treatment of the Bondholders under the Plan considering the formula approach to the post Effective Date payments and the prior payments received meets the "best interest test" as it relates to the treatment of Class 6.

The Additional Debtors have sufficient funds in investment accounts and property to fund the payment required by the Additional Debtors under the Plan.

It is my opinion that the Second Amended Joint Plan satisfies the feasibility requirements of the Bankruptcy Code, and the Second Amended Joint Plan of Reorganization is not likely to be followed by liquidation, or the need for further financial reorganization of the Debtor or Additional Debtors.

I appreciate being of service to the Debtor and Additional Debtors during the Chapter 11 process and would be pleased to answer any questions pertaining to this report.

A list of documents considered in this matter are summarized in Exhibit 19. We have enclosed Chris Linscott's curriculum vitae as Exhibit 20, his experience as a Chapter 7 and Liquidating

Mr. Mark A. Mintz
Mr. Douglas S. Draper
September 4, 2025
Page 34

Trustee as Exhibit 21, and his Summary of Expert Witness Testimony covering 2020 to 2025 as Exhibit 22. Fees charged by Keegan Linscott & Associates, PC for work performed on this engagement are based on hourly rates ranging from $125 to $350 per hour. Mr. Linscott has authored one publication in the past ten years ("The Small Business Reorganization Act, Arizona Attorney Magazine, September 2020").

I reserve the right to supplement my report should additional information be provided in this case.

Sincerely,

*Keegan Linscott & Associates, PC*

Christopher G. Linscott, CPA, CFE, CIRA
Director

Enclosures: Exhibits 1-22

# EXHIBIT 1

**Archdiocese of New Orleans**
**Case No.: 20-10846**

**Liquidation Analysis**
**As of May 31, 2025**

| Account Description | | 5/31/2025 Balance Sheet Amount | | 5/31/2025 Liquidation Value | Global FN Reference |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ | 68,622,085 | $ | 68,622,085 | |
| Petty cash | | 17,851 | | 17,851 | |
| Grants receivable | | 184,345 | | - | |
| Accounts receivable | | 32,788,070 | | 16,394,035 | 2 |
| Accounts receivable- tuition and fees, net | | 29,948,814 | | 29,948,814 | |
| Prepaid expenses | | 5,791,646 | | - | 3 |
| Pledges receivable, net | | 2,202,781 | | - | |
| Loans receivable from Affiliates, net | | 15,381,959 | | 4,212,579 | 17 |
| Investments - Portfolio A | | 262,775,204 | | 113,652,955 | 2 |
| Investments - Portfolio B | | 23,221,806 | | 23,221,806 | |
| Investments - unrestricted - CUP | | 357,199 | | - | |
| Investments - unrestricted - Other | | 833 | | - | |
| Inventory | | 283,253 | | 141,627 | 2 |
| Other current assets | | 63,053 | | 31,527 | 2 |
| Real Property, net | | 114,342,699 | | 100,000,000 | |
| Vehicles, net | | 400,000 | | 500,000 | 13 |
| Furniture and Fixtures, net | | 4,500,000 | | 675,000 | 14 |
| Art and collectibles | | - | | 2,463,240 | 18 |
| Beneficial interest in charitable remainder trust | | 800,164 | | - | |
| Other assets | | 122,000 | | 61,000 | 2 |
| **Total Assets** | $ | 561,803,762 | $ | 359,942,518 | |
| **LESS:** | | | | | |
| Post-petition payables - unrestricted | | | $ | (2,588,616) | 5 |
| Accrued expenses | | | | (9,001,572) | |
| Custodial funds (agency payables) | | | | (1,464,593) | |
| Accrued liability for self-insured claims | | | | (1,528,505) | 12 |
| Deferred Revenue | | | | (47,058,580) | |
| Restricted Custodial Cash | | | | (4,063,315) | |
| **Donor Restricted Assets:** | | | | | |
| Restricted cash - by donor | | | | (1,876,996) | |
| Investments - Portfolio A - Restricted by Donor | | | | (35,041,712) | |
| Investments - Portfolio B - Restricted by Donor | | | | (2,441,502) | |
| Total Donor Restricted Assets | | | $ | (39,360,210) | |
| Total: Post-petition payables - unrestricted | | | $ | (105,065,391) | |
| **Total Assets Available Prior to Chapter 7** | | | $ | 254,877,127 | |
| **Less:** | | | | | |
| Chapter 7 Trustee Fees | | | $ | (7,646,314) | 6,9 |
| Chapter 7 Attorney and Financial Professional Fees | | | | (12,000,000) | 7 |
| Shut-down costs | | | | (19,500,000) | 16 |
| Residual Costs of Chapter 11 Administration | | | | (500,000) | 11 |
| Residual Legal and Professional Costs of Chapter 11 | | | | (6,000,000) | 10 |
| Subtotal | | | $ | (45,646,314) | |
| **Amount available to unsecured creditors** | | | $ | 209,230,813 | 9 |
| **Unsecured Debts:** | | | | | |
| Tort Claimant Payables | | | $ | (1,221,000,000) | 8 |
| Accounts payable - Prepetition | | | | (1,332,883) | |
| Capital lease obligations - Prepetition | | | | (790,590) | |
| Bonds payable - Prepetition | | | | (37,970,000) | 15 |
| Portfolio B deficiency | | | | (111,924,355) | |
| Accrued other post employment benefits - Prepetition | | | | (25,435,054) | |
| Accrued pension liability - Prepetition | | | | (30,846,389) | |
| **Total** | | | $ | (1,429,299,271) | |

## LIQUIDATION ANALYSIS EXECUTIVE SUMMARY

As referenced in section 10.03 of the Disclosure Statement, the Debtor and Additional Debtors must meet the requirements of the "Best Interest of Creditors Test," which requires a comparison of distributions under the Joint Plan to a hypothetical liquidation under chapter 7 of the Bankruptcy Code. The Debtor and Additional Debtors must obtain the consent of all creditors in all impaired classes *or* must show that all impaired creditors are receiving at least as much as such creditors would receive in a hypothetical liquidation under chapter 7. In order to show this comparison, the Debtor and Additional Debtors have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**"), based on certain estimates and assumptions and prepared by Keegan Linscott & Associates, PC. While the Debtor and Additional Debtors consider these estimates and assumptions to be reasonable under the circumstances, all estimates and assumptions are inherently subject to significant uncertainties (economic, operations, legal, natural disasters, etc.), and the Debtor and Additional Debtors cannot guarantee that these values would come to fruition in an actual chapter 7 liquidation.

The following numbers are based on the latest numbers available for the Debtor and Additional Debtors as of June 30, 2025 (the "**Liquidation Date**"). It is assumed for all purposes below that on the Liquidation Date, the Bankruptcy Court would appoint chapter 7 trustees for both the Debtor and the Additional Debtors to begin the process of liquidating the Debtor's and Additional Debtors' assets in order to distribute the proceeds from the liquidation to the various creditors of the Debtor and Additional Debtors in accordance with the priority scheme contained in the Bankruptcy Code.

The Liquidation Analysis assumes that the chapter 7 trustees will retain certain professionals to assist them with the liquidation process, including legal counsel (for bankruptcy purposes and litigation of Abuse Claims), accounting professionals, brokers, and real estate agents. Further, it is assumed that the liquidation process would take five years to complete, taking into account the loss of key personnel, the nature of a forced and rushed sale process, the restrictive use/nature of some of the Debtor's and Additional Debtors' assets that would limit the pool of potential buyers, and the protracted litigation of Abuse Claims and potential contribution and indemnity claims. The immediate closing of the Debtor's and Additional Debtors' operations and the forced layoffs of all personnel would also likely trigger potential employee claims (severance and WARN Act claims). These fees and expenses would be entitled to administrative and priority status, which would be paid prior to any payout to general unsecured creditors. Also included in these costs and fees are fees owed to the U.S. Trustee and Clerk of the Bankruptcy Court. In addition, the chapter 7 trustees will be entitled to a percentage of funds that are distributed to creditors, estimated at 3%.

Many of the available assets of the Debtor and Additional Debtors come from donors and are subject to donor restrictions, thereby preventing those assets from being used to pay any Abuse Claims or any Claims other than those for which they were designated. This is true in both a chapter 11 and a chapter 7 liquidation. However, there has been dispute in this case over which funds are truly restricted and which are not. A GAAP analysis has been used to value restricted funds. The Joint Plan avoids that issue through an agreed-upon payment amount into the Settlement Trust

while a chapter 7 liquidation would likely restart that dispute, resulting in further litigation fees and costs.

Although both the Debtor and the Additional Debtors have insurance policies that may cover many of the claims against the Debtor and Additional Debtors (both Abuse Claims and Non-Abuse Claims), neither the Debtor Liquidation Analysis nor the Additional Debtors Liquidation Analysis includes recovery from insurance proceeds or the sale of the Debtor's or Additional Debtors' interest in certain insurance policies. Any potential sale of the policies or ability of a chapter 7 trustee to monetize a claim against an insurance carrier is entirely speculative. As such, no value has been ascribed to the so-called "insurance assets" in the hypothetical chapter 7 liquidation. The Joint Plan, on the other hand, monetizes some of these assets through settlements with the Settling Insurers using a policy buyback. The Debtor and Additional Debtors also have assigned their respective interests in the policies with the Non-Settling Insurers to the Settlement Trust for the benefit of the Abuse Claimants.

The liquidation analysis assumes no contributions from insurance or third-party payments for the Abuse Claims because such payments are speculative and would be considered "collateral sources of recovery." The insurance policies are deemed to have no value for purposes of this liquidation analysis because:

a) outside of a chapter 11 case, the Abuse Claimants will have a direct right of action against the insurers under Louisiana law;
b) there are over 150 insureds (including the Debtor and Additional Debtors), and outside of the Joint Plan, there is no ability to allocate insurance payouts among the insured entities;
c) SPARTA is in a precarious financial condition and may not repurchase its policies at all;
d) noticing and providing due process to claimants who have claims against the insurance policies would be cost prohibitive in a chapter 7 liquidation;
e) coverage issues that may exist; and
f) the estate cannot sue the insurers and obtain the proceeds of the policies because the policies are indemnity policies.

The liquidation analysis also assumes no contributions from third parties to offset liability for the Abuse Claims. The reasons are the following:

a) There are potential coverage issues and solvency issues of insurers;
b) The Non-Debtor Catholic Entities have no exposure for Abuse Claims; and
c) No information is available concerning religious orders' ability to pay or applicable insurance coverage. Prior to the bankruptcy filing, the orders provided minimal funds to pay claims.

The liquidation analysis of the Additional Debtors excludes the assets of any Additional Debtors who have not had claims filed against them by any of the applicable bar dates. In a hypothetical chapter 7 liquidation, the assets of those entities would not be available to Abuse

Claimants in the other cases. In the Joint Plan, the Additional Debtors all contribute to the Settlement Trust regardless of whether an Additional Debtor has claims against it or not.

There is no value attributed to a potential single business enterprise claim being asserted by or against the Debtor, the Additional Debtors, and the Non-Debtor Catholic Entities. Each of the Additional Debtors and the Non-Debtor Catholic Entities does not comingle money against between entities, and has separate bank accounts, separate EIN numbers, separate employees, and separate boards of directors. Some of the Additional Debtors and Non-Debtor Catholic Entities have audited financial statements and other indicia of separateness, making the success of a single business enterprise claim highly speculative at best.

Both the Debtor and Additional Debtors have "executory contracts" with certain counterparties that will either be assumed during the bankruptcy (meaning the Debtor/Additional Debtors will continue to perform under the contracts) or will "ride through" the bankruptcy unaffected with the same outcome. In a chapter 7 liquidation, however, those executory contracts would all be rejected by the chapter 7 trustee, and the counterparties would have claims for rejection damages, to be paid *pari pasu* with the other general unsecured creditors, further diminishing the payout under a liquidation analysis.

The value of the Abuse Claims in the liquidation analysis represents the midpoint of a report by Stout Risius Ross, LLC, the Committee's expert consultant on sexual abuse. I have not seen the report, and the number I have used was provided to me orally based on a range of $752 million to $1.69 billion. I understand that the report will be updated, and I will adjust my liquidation analysis based upon my review of the final report.

### Debtor (Archdiocese) Liquidation Analysis

In a hypothetical liquidation, the Debtor estimates that the total value that would be available to unsecured creditors (including Abuse Claimants) is **$209,230,813**. The total unsecured claims amount is projected to be **$1,429,299,271**, resulting in a *pro rata* recovery of **14.6%**. As stated above, this Liquidation Analysis excludes contributions to be made by the Settling Insurers, whereas under the Joint Plan, the Setting Insurers are contributing $29,275,000 to the Settlement Trust.

The Archdiocese hypothetical liquidation also excludes approximately $60,000,000 in contributions from the Additional Debtors, $5,000,000.00 from the Non-Debtor Catholic Entities, and the proceeds from the sale of the Affordable Housing Facilities estimated to be between $65,000,000 and $80,000,000.

The sale of non-church real estate owned by the Archdiocese assumes a bulk sale discount of 15% and accounts for the fact that the chapter 7 trustee would incur costs to hold the property until sale and address deferred maintenance for the properties. The assumed purchase price also accounts for an internal rate of return for a buyer on its investment.

Churches have been valued for liquidation at $100,000 per church. The sale of churches presents challenges and costs that do not exist with other properties. For example, any potential buyer would have to account for: a) the historic designation of some of the churches; b) the costs

of repurposing the properties; c) litigation over repurposing; d) re-zoning issues; e) IRS issues related to the sale of property of a 501(c)(3) to a for-profit entity; f) state law limitations; and g) First Amendment and other religious freedom issues that may impair the sale of the church. Indeed, a recent article in THE ADVOCATE indicates that a large number of churches and schools on the market have not been sold due to difficulties in the market and with these particular properties. The article is available at https://www.nola.com/news/business/la-agencies-struggle-to-sell-real-estate-in-slow-market/article_d6da3501-f71c-4a63-a979-1c8dc98e4bfa.html.

The below estimates are based upon numbers available to the Debtor as of June 30, 2025.

**Available Assets.**    The additional assets included in the liquidation scenario include the following: unrestricted cash and cash equivalents on hand; accounts receivable; accounts receivable from tuition and fees; loans receivable; unrestricted investments; inventory; real property; vehicles; furniture and fixtures; and art and collectibles. Grants are excluded from the liquidation scenario, as are certain prepaid expenses of the Debtor and pledges receivable because they would not be available to a chapter 7 trustee.

Unrestricted Cash and Cash Equivalents: The Debtor expects a 100% recovery on unrestricted cash and cash equivalents in a chapter 7 liquidation. As of the Liquidation Date, the Debtor holds approximately $68,622,085 in unrestricted cash and cash equivalents.

Accounts and Loans Receivable: The accounts receivable are comprised of third-party receivables as well as Archdiocesan Agency and Archdiocesan Parish assessments. The delinquency of the assessments has increased in recent years. In addition, under the hypothetical liquidation for the Additional Debtors, there is only expected to be a payout approximating 12.6%, which would include payments to the Debtor for their accounts receivable. The Debtor does not anticipate a full recovery in a chapter 7 liquidation, and accounts receivable have been discounted to 50% of their book value. Loans receivable from certain affiliates are discounted to 25% of the book value. If the Additional Debtors filed for relief, the notes and assessments due from the Additional Debtors would be unsecured claims against the Additional Debtors' estates, and the recovery would approximate 12.6% due to the size of the Abuse Claims.

Accounts Receivable – Tuition and Fees: These receivables are related to pre-billed tuition for the Debtor's schools for the 2025-2026 school year. In effect, the Debtor grosses up its balance sheet by booking accounts receivable and deferred revenue. Because these amounts are offset by deferred revenue in the liquidation analysis, they are included in their entirety.

Inventory and Other Assets: Inventory and certain other assets are discounted to 50% of the book value. Inventory consists of food and other supply-type items at the Debtor's high schools which would yield very little in a liquidation.

Real Property: Real property values are discounted to $100,000,000 in a liquidation scenario. This liquidation value was estimated based on an approximate 40% reduction to the Fair Market Value (FMV) of the Debtor's property. The FMV of the properties was determined based on independent third-party appraisals. The 40% reduction to arrive at liquidation value considers the approximate 1200 properties from the Debtor and Additional Debtors in a hypothetical

{00383827-9}

liquidation that would flood the market and depress sales value. The reduction also recognizes the need for a potential bulk sale of certain properties and a five-year term over which the properties would be sold. The reduction further considers the commission and closing costs for the properties. Church real property has been discounted to $100,000 per church to account for the issues related to the sale of a church and costs attributable to readying the property for sale.

Other Fixed Assets, Artwork and Religious Items: Vehicles values are based on the Kelly Blue Book value. Furniture and fixtures values are based on 15% of net book value. Art and collectibles values are based on appraised values from third-party appraisers.

Investments: The Debtor records investments in its books for investments held in Portfolio A and Portfolio B. Portfolio A investments are held by the Catholic Community Foundation, and the Debtor records a contra-account in its books for investments of third parties. The Debtor's total investments in Portfolio A as of the Liquidation Date are $113,652,955. The value of the Debtor's investments in Portfolio A is based upon the most recent unitization report that is a mark-to-market value for the Investments of the Debtor. It is largely prepared by the Catholic Community Foundation based upon information provided by its investment advisors at the end of each month. The Debtor's investments are segregated between restricted and unrestricted funds. All restricted fund investments are excluded entirely from the liquidation value. The Debtor expects a 100% recovery on unrestricted investments in Portfolio A under a chapter 7 liquidation.

Portfolio B investments relate to the funds invested under the Debtor's Deposit and Loan Program. The Debtor has $23,221,806 in investments as of the Liquidation Date, which is expected to be fully realized in a liquidation. The Debtor has an obligation to the depositors under this program, and there is a deficiency to the depositors in the amount of $111,924,355, which is reflected in the liquidation analysis.

Prepaid Expenses: The Debtor's administrative offices and high schools have certain prepaid expenses related to insurance, professional fees, and tuition-related matters. In a liquidation scenario, the Debtor does not expect to realize any refund of these amounts because the expense amounts will generally continue during the Chapter 11 and be worked off over time, and the tuition amounts will be offset against deferred revenue.

Pledges Receivable: The Debtor has certain pledges from donors that have not been collected as of the Liquidation Date. Because the Debtor will cease operations in a liquidation, it is not expected that donors will fulfill and pay their pledges, as the activities the donor is supporting will no longer exist.

Beneficial Interest in Charitable Remainder Trust: The Debtor is a named beneficiary in a Trust administered by a third party. If the Debtor liquidates, it is assumed the Debtor will be removed as a beneficiary of that Trust, which will result in no value for the Debtor.

Excluded Assets: The Debtor does not expect any recovery from grants receivable because the nature of the grant can no longer be fulfilled when the Debtor stops operations. The Debtor also does not expect to recover any funds from its equity investment in the CUP (Catholic Umbrella Pool).

**Additional Administrative Costs.** Administrative costs in a chapter 7 liquidation include chapter 7 trustee fees, professional fees, shut-down costs, and residual costs and fees from the chapter 11.

Chapter 7 trustee fees are estimated at 3% of the available assets for distribution, excluding any recovery from insurance proceeds, or $7,646,314. Further, chapter 7 professional fees are estimated at $12,000,000, which assumes a five-year liquidation process and fees related to: pursuing and litigating claims against other Catholic organizations for contributions or indemnification; litigating Abuse Claims; and legal fees associated with asset liquidation.

The liquidation costs also include what are termed "shut-down costs." These costs primarily include the personnel and property-related costs needed to close and fully liquidate the Debtor's operations and assets over the five-year anticipated shut-down period. From a personnel perspective, it is anticipated that the Debtor will be subject to the WARN Act and will incur significant costs for these claims. It is also anticipated that the Debtor will need to retain existing personnel for varying periods of time to assist the chapter 7 trustee in the areas of accounting and finance, IT, legal, property, repair and maintenance, insurance and risk management, and archives. From a property perspective, costs will include property, casualty, and liability insurance for the properties based on the properties being empty and shuttering the properties, ensuring security at the properties to protect them from vandalism and vagrancy, utility costs, and some repair and maintenance costs. It is expected that the properties will be subject to property taxes because they will no longer be exempt. The shut-down costs are estimated at $19,500,000. These estimated shut-down costs do not have any provision for a weather event of any significance, which could greatly increase these costs.

Lastly, also included in the administrative costs are residual chapter 11 costs, calculated as two quarters of the average U.S. Trustee fees throughout the case ($500,000), and four months of residual chapter 11 professional fees at $1,500,000 a month ($6,000,000).

The number and dollar amount of the unsecured claims is greater in a chapter 7 than under the Joint Plan. The increase in unsecured claimants is a function of the rejection damages that would result from the inability of a chapter 7 trustee to assume the executory contract giving rise to rejection damages.

**Distributions to Unsecured Creditors.** The unsecured creditor pool includes Abuse Claims, Non-Abuse Claims, prepetition accounts payable, prepetition capital lease obligations, prepetition bonds payable, and prepetition employment benefits and pensions. The Debtor estimates the total amount of unsecured claims to be **$1,429,299,271**. With **$209,230,813** projected to be available to general unsecured creditors, after payment in full of all senior classes (Administrative and Priority Claims), general unsecured creditors would receive a **14.6%** payment on their claims.

**Footnotes to Exhibit 3 (Debtor's Liquidation Analysis).** The spreadsheet depicting the Debtor's Liquidation Analysis on Exhibit 3 references certain explanatory footnotes as follows:

Note 1: Financial information presented is as of May 31, 2025, which is the most recent data available. Losses are expected to continue after May 31, 2025, which may reduce the liquidation value.

Note 2: Liquidation value is assumed to be 50% of book value.

Note 3: Prepaid expenses include approximately $2,296,000 for the Debtor's high schools.

Note 4: Portfolio A funds are shown net of third-party funds.

Note 5: Includes accounts payable and unpaid reorganization expenses as of May 31, 2025.

Note 6: Estimated at 3% of available assets, excluding any insurance proceeds.

Note 7: Including pursuit of and potential litigation with other Catholic organizations for contribution or indemnification claims.

Note 8: Amount represents midpoint of Abuse Claims per Stout, the Committee's expert (range of claims is $752 million to $1.69 billion).

Note 9: Does not include any recoveries related to insurance coverage for tort claims.

Note 10: Assumes four months of unpaid legal and professional costs at Effective Date.

Note 11: Estimated at two quarters of average U.S. Trustee fees.

Note 12: Excludes accrued liabilities for survivor claims.

Note 13: Based on average Kelly Blue Book value.

Note 14: Estimated at 15% of book value.

Note 15: Includes bond principal.

Note 16: Assumes five-year wind down with half of the properties remaining being sold each year.

Note 17: Liquidation value is assumed to be 25% of book value.

Note 18: Value is based on third-party appraisals obtained by the Debtor.

### Additional Debtors' Liquidation Analysis

The Additional Debtors were examined on a legal entity basis for each Additional Debtor but have been consolidated for this Liquidation Analysis into one comprehensive report.

In a hypothetical liquidation, the Additional Debtors estimate that the total value that would be available to unsecured creditors (including Abuse Claimants) is **$167,409,245**. The total

unsecured claims amount is projected to be **$1,326,564,719**, resulting in a pro rata recovery of **12.6%.** As is the case with the Debtor's Liquidation Analysis, the Additional Debtors' Liquidation Analysis excludes contributions to be made by the Settling Insurers, whereas under the Joint Plan, the Setting Insurers are contributing $29,275,000 to the Settlement Trust. The hypothetical liquidation also excludes a $5,000,000 contribution from the Non-Debtor Catholic Entities, a $65,000,000 contribution from the Debtor, and the value of the assigned insurance policies with the Non-Settling Insurers that are available under the Joint Plan. The hypothetical liquidation includes additional administrative fees that would be associated with a chapter 7 liquidation, such as chapter 7 trustee and professional fees; costs associated with shutting down operations, laying off employees, and securing and insuring real property owned by the Additional Debtors; and various residual costs and professional fees from the chapter 11 bankruptcy. As stated in the Disclosure Statement, 1793 Group was formed in 2025 for the express purpose of facilitating payments from the Additional Debtors into the Joint Plan. The hypothetical liquidation also excludes funds from the sale of the Affordable Housing Facilities that would be due directly to the Settlement Trust. In a chapter 7 liquidation, 1793 Group would not be able to serve this purpose, and each Additional Debtor would have to be liquidated with funds segregated by entity and distributed on an entity-by-entity basis, further adding to the administrative costs associated with chapter 7 liquidations.

**Available Assets.** The Additional Debtors' available assets in a hypothetical liquidation include cash and cash equivalents, accounts receivable, notes receivable, unrestricted investment funds, real property, plant and equipment, and other miscellaneous assets for entities that have Abuse Claims asserted against them. Certain Additional Debtors are not implicated in the Abuse Proofs of Claim filed in the Debtor's Chapter 11 Case. As such, the liquidation value of the assets and liabilities related to these Additional Debtors has been excluded from the liquidation value in Exhibit 5. It is assumed that the Additional Debtors that have no Abuse Claims against them have sufficient funds to pay their debts and that no funds would be available to the survivors or other creditors. Exhibit 4 to the Disclosure Statement identifies the Additional Debtors that are implicated in the Abuse Proofs of Claim filed in the Debtor's Chapter 11 Case.

Cash and Cash Equivalents: Based on the Additional Debtors' most recent financial assessment, as of June 30, 2025, the Additional Debtors' combined cash on hand is $98,977,624. The Additional Debtors anticipate a recovery of $73,789,693, after removing the entities who do not have any Abuse Claims asserted against them and who would not otherwise become Additional Debtors.

Accounts and Notes Receivable: The Additional Debtors' accounts receivable primarily consist of amounts due from Portfolio B and tuition for the Parish Schools that are run by the corresponding parish. Note that these schools are separate from the Archdiocesan Schools that are directly operated by the Archdiocese. In a hypothetical liquidation for the Debtor, the Additional Debtors would only receive 14.6% of their Portfolio B funds. Because the Additional Debtors do not expect a significant recovery from the accounts receivable, receivables have been discounted to 25%, or $17,069,423 after removing the entities who do not have an Abuse Claim asserted against them and who would not otherwise become Additional Debtors.

{00383827-9}

The Additional Debtors have $9,500,000 in outstanding notes receivable and expect a recovery of $6,000,000, again discounting the notes that are payable to entities who do not have an Abuse Claim asserted against them and who would not otherwise become an Additional Debtor.

Investment Funds: Just as with the Debtor, the Additional Debtors have investments that are divided between restricted and unrestricted funds. The Additional Debtors expect a 100% recovery on investments under a chapter 7 liquidation, subject to a reduction of the restricted investments, addressed below. The Additional Debtors have $89,205,761 available investments (both restricted and unrestricted) based on a mark-to-market value. This value is largely prepared by the Catholic Community Foundation based upon information provided by its investment advisors at the end of each month. Removing the entities who do not have Abuse Claims asserted against them, the Additional Debtors anticipate a recovery of $46,944,068 for distribution to creditors.

Real Property, Plant, and Equipment: Real property of the Additional Debtors falls into two categories: church property (property used as a church) and non-church property (property not used as a church). Church property is valued for liquidation purposes at $100,000 per property due to its limited use and the process of repurposing it after the sale to a non-church property. See discussion above in Debtor (Archdiocese) Liquidation Analysis for the rationale behind the church valuations.

Non-church property liquidation values are discounted from the replacement cost of the property by two factors. After removing properties for the entities who do not have an Abuse Claim asserted against them, a reduction of 65% is applied to replacement cost value to arrive at fair market value. This 65% factor was determined using a sample of approximately 40 third-party fair market appraisals as compared to replacement cost value. Second, the liquidation value was estimated based on an approximate 40% reduction to the Fair Market Value (FMV) of the Additional Debtor's property. The 40% reduction to arrive at liquidation value considers the approximate 1200 properties from the Debtor and Additional Debtors in a hypothetical liquidation that would flood the market and depress sales value. The reduction also recognizes the need for a potential bulk sale of certain properties and a five-year term over which the properties would be sold. The reduction further considers the commission and closing costs for the properties. The liquidation value is estimated at $135,170,401 for the Additional Debtors' real property, plant and equipment. The Additional Debtors have not obtained a fair-market-value appraisal of all their real estate.

Other Assets: The Additional Debtors estimate that their other assets have a book value of $12,324,843 based on their latest inventory and financial information. Over 80% of the Other Assets is food and related inventory held by two of the Additional Debtors. After removing the entities who do not have Abuse Claims asserted against them, the Additional Debtors apply a discount of 50% of the book value given the forced sale. The estimated liquidation value of the other assets is $538,722.

Excluded Assets: The Additional Debtors have excluded all restricted investment funds from available assets in a chapter 7 liquidation as well as all assets owned by other entities who

are listed as Additional Debtors but who have no Abuse Claims asserted against them. The Additional Debtors calculate that they hold $6,231,394 in custodial funds for the benefit of non-debtor entities and $10,121,668 in restricted cash and investments. The Additional Debtors have also excluded all prepaid expenses of the Additional Debtors and do not expect to recover any of those payments. However, the chapter 7 trustee fees and costs for litigating against Additional Debtors without Abuse Claims asserted against them are included because the Bankruptcy Code requires a hypothetical liquidation of the entities who are included in the Joint Plan regardless of whether there are Abuse Claims asserted against them.

**Additional Administrative Costs.** Once in bankruptcy, the Additional Debtors will begin to incur post-petition administrative costs such as post-petition payables for employees and other operating expenses until the Additional Debtors are officially closed. The Additional Debtors estimate these costs (to be paid prior to any distributions in the ordinary course of business) to be $500,000, based on the assumption of $5,000 per Additional Debtor (with 100 Additional Debtors filing).

Other administrative costs include chapter 7 trustee fees, professional fees, shut-down costs, and residual costs and fees from the chapter 11.

Chapter 7 trustee fees are estimated at $10,000,000, excluding any recovery from insurance proceeds. These fees are based on an estimate of 3% of the funds distributed to creditors for all of the Additional Debtors. Further, chapter 7 professional fees are estimated at $25,000,000, which assumes a five-year liquidation process and fees related to: pursuing and litigating claims against other organizations for contributions or indemnification; litigating Abuse Claims; and legal fees associated with asset liquidation. The total is based on an assumption of $250,000 in professional fees per Additional Debtor (with 100 Additional Debtors filing).

The liquidation costs also include what are termed "shut-down costs." These costs primarily include the personnel and property-related costs need to close and fully liquidate the debtor's operations and assets over the five-year anticipated shut-down period. From a personnel perspective, it is anticipated that some of the Additional Debtors will be subject to the WARN Act and will incur significant costs for these claims. It is also anticipated that the Additional Debtors will need to retain existing personnel for varying periods of time to assist the chapter 7 trustee in the areas of accounting and finance, IT, legal, property, repair and maintenance, insurance and risk management, and archives. From a property perspective, costs will include property, casualty, and liability insurance for the properties based on the properties being empty and shuttering the properties, ensuring security at the properties to protect them from vandalism and vagrancy, utility costs, and some repair and maintenance costs. It also is expected the properties will be subject to property taxes because they will no longer be exempt. The shut-down costs are estimated at $59,500,000. These estimated shut-down costs do not have any provision for a weather event of any significance, which could greatly increase these costs.

**Distributions to Unsecured Creditors.** The unsecured creditor pool includes Abuse Claims, Non-Abuse Claims, prepetition accounts payable, prepetition capital lease obligations, prepetition bonds payable, and prepetition employment benefits and pensions. The Additional

Debtors estimate the total amount of unsecured claims to be **$1,326,564,719**. With **$167,409,245** projected to be available to general unsecured creditors, after payment in full of all senior classes (Administrative and Priority Claims), general unsecured creditors would receive a **12.6%** payment on their claims.

**Footnotes to Exhibit 5 (Additional Debtors' Liquidation Analysis).** The spreadsheet depicting the Additional Debtors' Liquidation Analysis on Exhibit 5 references certain explanatory footnotes as follows:

Note 1: Financial information presented is as of December 31, 2024, which is the most recent data available. Losses are expected to continue after December 31, 2024, which may reduce the liquidation value.

Note 2: Liquidation value is assumed to be 25% of book value for Additional Debtors with Abuse Claims against them.

Note 3: Liquidation value is assumed to be 50% of book value for Additional Debtors with Abuse Claims against them.

Note 4: Includes accounts payable and accrued expenses estimated at $5,000 per Additional Debtor with Abuse Claims against them.

Note 5: Estimated at 3% of available assets, excluding any insurance proceeds for all Additional Debtors.

Note 6: Including pursuit of and potential litigation with other Catholic organizations for contribution or indemnification claims. Estimated at $250,000 per Additional Debtor for 100 Additional Debtors.

Note 7: Assumes five-year wind down with half of the properties remaining being sold each year for 100 Additional Debtors.

Note 8: Amount represents midpoint of Abuse Claims per Stout, the Committee's expert (range of claims is $752 million to $1.69 billion).

Note 9: Does not include any recoveries related to insurance coverage for tort claims.

Note 10: Estimated at $2,500 per Additional Debtor for 100 Additional Debtors.

Note 11: Estimated at $5,000 per Additional Debtor for 100 Additional Debtors.

Note 12: Accounts payable, accrued expenses, and FEMA-related payables.

Note 13: Represents estimated liquidation value for Additional Debtors' property for Additional Debtors with Abuse Claims against them.



# EXHIBIT 2

Archdiocese of New Orleans
Case No.: 20-10846

Additional Debtors Liquidation Analysis
As of December 31, 2024

| Account Description | | 12/31/2024 Balance Sheet Amount | | 12/31/2024 Liquidation Value | | Global FN Reference |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Cash and cash equivalents | $ | 98,977,624 | $ | 73,789,693 | | |
| Accounts receivable | | 95,487,672 | | 17,069,423 | | 2 |
| Notes receivable | | 9,500,000 | | 6,000,000 | | |
| Prepaid expenses | | 1,578,541 | | - | | |
| Investments | | 89,205,761 | | 46,944,068 | | |
| Other current assets | | 12,324,843 | | 538,722 | | 3 |
| Property, plant and equipment | | 97,197,055 | | 135,170,401 | | 11 |
| **Total Assets** | $ | 404,271,496 | $ | 279,512,307 | | |
| **LESS:** | | | | | | |
| Post-petition payables - unrestricted | | | $ | (500,000) | | 4 |
| Custodial funds | | | | (6,231,394) | | |
| Restricted cash and investments - by donor | | | | (10,121,668) | | |
| **Total Assets Available Prior to Chapter 7** | | | $ | 262,659,245 | | |
| **Less:** | | | | | | |
| Chapter 7 Trustee Fees | | | $ | (10,000,000) | | 5 |
| Chapter 7 Attorney and Financial Professional Fees | | | | (25,000,000) | | 6 |
| Shut-down costs | | | | (59,500,000) | | 7 |
| Residual Costs of Chapter 11 Administration | | | | (500,000) | | 13 |
| Residual Legal and Professional Costs of Chapter 11 | | | | (250,000) | | 10 |
| Subtotal | | | $ | (95,250,000) | | |
| **Amount available to unsecured creditors** | | | $ | 167,409,245 | | 9 |
| **Unsecured Debts:** | | | | | | |
| Tort Claimant Payables | | | $ | (1,221,000,000) | | 8 |
| Accounts payable - Prepetition | | | | (21,103,229) | | 12 |
| Notes payable - Prepetition | | | | (28,180,047) | | |
| Accrued other post employment benefits - Prepetition | | | | (25,435,054) | | |
| Accrued pension liability - Prepetition | | | | (30,846,389) | | |
| Total | | | $ | (1,326,564,719) | | |

## LIQUIDATION ANALYSIS EXECUTIVE SUMMARY

As referenced in section 10.03 of the Disclosure Statement, the Debtor and Additional Debtors must meet the requirements of the "Best Interest of Creditors Test," which requires a comparison of distributions under the Joint Plan to a hypothetical liquidation under chapter 7 of the Bankruptcy Code. The Debtor and Additional Debtors must obtain the consent of all creditors in all impaired classes *or* must show that all impaired creditors are receiving at least as much as such creditors would receive in a hypothetical liquidation under chapter 7. In order to show this comparison, the Debtor and Additional Debtors have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**"), based on certain estimates and assumptions and prepared by Keegan Linscott & Associates, PC. While the Debtor and Additional Debtors consider these estimates and assumptions to be reasonable under the circumstances, all estimates and assumptions are inherently subject to significant uncertainties (economic, operations, legal, natural disasters, etc.), and the Debtor and Additional Debtors cannot guarantee that these values would come to fruition in an actual chapter 7 liquidation.

The following numbers are based on the latest numbers available for the Debtor and Additional Debtors as of June 30, 2025 (the "**Liquidation Date**"). It is assumed for all purposes below that on the Liquidation Date, the Bankruptcy Court would appoint chapter 7 trustees for both the Debtor and the Additional Debtors to begin the process of liquidating the Debtor's and Additional Debtors' assets in order to distribute the proceeds from the liquidation to the various creditors of the Debtor and Additional Debtors in accordance with the priority scheme contained in the Bankruptcy Code.

The Liquidation Analysis assumes that the chapter 7 trustees will retain certain professionals to assist them with the liquidation process, including legal counsel (for bankruptcy purposes and litigation of Abuse Claims), accounting professionals, brokers, and real estate agents. Further, it is assumed that the liquidation process would take five years to complete, taking into account the loss of key personnel, the nature of a forced and rushed sale process, the restrictive use/nature of some of the Debtor's and Additional Debtors' assets that would limit the pool of potential buyers, and the protracted litigation of Abuse Claims and potential contribution and indemnity claims. The immediate closing of the Debtor's and Additional Debtors' operations and the forced layoffs of all personnel would also likely trigger potential employee claims (severance and WARN Act claims). These fees and expenses would be entitled to administrative and priority status, which would be paid prior to any payout to general unsecured creditors. Also included in these costs and fees are fees owed to the U.S. Trustee and Clerk of the Bankruptcy Court. In addition, the chapter 7 trustees will be entitled to a percentage of funds that are distributed to creditors, estimated at 3%.

Many of the available assets of the Debtor and Additional Debtors come from donors and are subject to donor restrictions, thereby preventing those assets from being used to pay any Abuse Claims or any Claims other than those for which they were designated. This is true in both a chapter 11 and a chapter 7 liquidation. However, there has been dispute in this case over which funds are truly restricted and which are not. A GAAP analysis has been used to value restricted funds. The Joint Plan avoids that issue through an agreed-upon payment amount into the Settlement Trust

while a chapter 7 liquidation would likely restart that dispute, resulting in further litigation fees and costs.

Although both the Debtor and the Additional Debtors have insurance policies that may cover many of the claims against the Debtor and Additional Debtors (both Abuse Claims and Non-Abuse Claims), neither the Debtor Liquidation Analysis nor the Additional Debtors Liquidation Analysis includes recovery from insurance proceeds or the sale of the Debtor's or Additional Debtors' interest in certain insurance policies. Any potential sale of the policies or ability of a chapter 7 trustee to monetize a claim against an insurance carrier is entirely speculative. As such, no value has been ascribed to the so-called "insurance assets" in the hypothetical chapter 7 liquidation. The Joint Plan, on the other hand, monetizes some of these assets through settlements with the Settling Insurers using a policy buyback. The Debtor and Additional Debtors also have assigned their respective interests in the policies with the Non-Settling Insurers to the Settlement Trust for the benefit of the Abuse Claimants.

The liquidation analysis assumes no contributions from insurance or third-party payments for the Abuse Claims because such payments are speculative and would be considered "collateral sources of recovery." The insurance policies are deemed to have no value for purposes of this liquidation analysis because:

a) outside of a chapter 11 case, the Abuse Claimants will have a direct right of action against the insurers under Louisiana law;
b) there are over 150 insureds (including the Debtor and Additional Debtors), and outside of the Joint Plan, there is no ability to allocate insurance payouts among the insured entities;
c) SPARTA is in a precarious financial condition and may not repurchase its policies at all;
d) noticing and providing due process to claimants who have claims against the insurance policies would be cost prohibitive in a chapter 7 liquidation;
e) coverage issues that may exist; and
f) the estate cannot sue the insurers and obtain the proceeds of the policies because the policies are indemnity policies.

The liquidation analysis also assumes no contributions from third parties to offset liability for the Abuse Claims. The reasons are the following:

a) There are potential coverage issues and solvency issues of insurers;
b) The Non-Debtor Catholic Entities have no exposure for Abuse Claims; and
c) No information is available concerning religious orders' ability to pay or applicable insurance coverage. Prior to the bankruptcy filing, the orders provided minimal funds to pay claims.

The liquidation analysis of the Additional Debtors excludes the assets of any Additional Debtors who have not had claims filed against them by any of the applicable bar dates. In a hypothetical chapter 7 liquidation, the assets of those entities would not be available to Abuse

Claimants in the other cases. In the Joint Plan, the Additional Debtors all contribute to the Settlement Trust regardless of whether an Additional Debtor has claims against it or not.

There is no value attributed to a potential single business enterprise claim being asserted by or against the Debtor, the Additional Debtors, and the Non-Debtor Catholic Entities. Each of the Additional Debtors and the Non-Debtor Catholic Entities does not comingle money against between entities, and has separate bank accounts, separate EIN numbers, separate employees, and separate boards of directors. Some of the Additional Debtors and Non-Debtor Catholic Entities have audited financial statements and other indicia of separateness, making the success of a single business enterprise claim highly speculative at best.

Both the Debtor and Additional Debtors have "executory contracts" with certain counterparties that will either be assumed during the bankruptcy (meaning the Debtor/Additional Debtors will continue to perform under the contracts) or will "ride through" the bankruptcy unaffected with the same outcome. In a chapter 7 liquidation, however, those executory contracts would all be rejected by the chapter 7 trustee, and the counterparties would have claims for rejection damages, to be paid *pari pasu* with the other general unsecured creditors, further diminishing the payout under a liquidation analysis.

The value of the Abuse Claims in the liquidation analysis represents the midpoint of a report by Stout Risius Ross, LLC, the Committee's expert consultant on sexual abuse. I have not seen the report, and the number I have used was provided to me orally based on a range of $752 million to $1.69 billion. I understand that the report will be updated, and I will adjust my liquidation analysis based upon my review of the final report.

### Debtor (Archdiocese) Liquidation Analysis

In a hypothetical liquidation, the Debtor estimates that the total value that would be available to unsecured creditors (including Abuse Claimants) is **$209,230,813**. The total unsecured claims amount is projected to be **$1,429,299,271**, resulting in a *pro rata* recovery of **14.6%**. As stated above, this Liquidation Analysis excludes contributions to be made by the Settling Insurers, whereas under the Joint Plan, the Setting Insurers are contributing $29,275,000 to the Settlement Trust.

The Archdiocese hypothetical liquidation also excludes approximately $60,000,000 in contributions from the Additional Debtors, $5,000,000.00 from the Non-Debtor Catholic Entities, and the proceeds from the sale of the Affordable Housing Facilities estimated to be between $65,000,000 and $80,000,000.

The sale of non-church real estate owned by the Archdiocese assumes a bulk sale discount of 15% and accounts for the fact that the chapter 7 trustee would incur costs to hold the property until sale and address deferred maintenance for the properties. The assumed purchase price also accounts for an internal rate of return for a buyer on its investment.

Churches have been valued for liquidation at $100,000 per church. The sale of churches presents challenges and costs that do not exist with other properties. For example, any potential buyer would have to account for: a) the historic designation of some of the churches; b) the costs

of repurposing the properties; c) litigation over repurposing; d) re-zoning issues; e) IRS issues related to the sale of property of a 501(c)(3) to a for-profit entity; f) state law limitations; and g) First Amendment and other religious freedom issues that may impair the sale of the church. Indeed, a recent article in THE ADVOCATE indicates that a large number of churches and schools on the market have not been sold due to difficulties in the market and with these particular properties. The article is available at https://www.nola.com/news/business/la-agencies-struggle-to-sell-real-estate-in-slow-market/article_d6da3501-f71c-4a63-a979-1c8de98e4bfa.html.

The below estimates are based upon numbers available to the Debtor as of June 30, 2025.

**Available Assets.** The additional assets included in the liquidation scenario include the following: unrestricted cash and cash equivalents on hand; accounts receivable; accounts receivable from tuition and fees; loans receivable; unrestricted investments; inventory; real property; vehicles; furniture and fixtures; and art and collectibles. Grants are excluded from the liquidation value, as are certain prepaid expenses of the Debtor and pledges receivable because they would not be available to a chapter 7 trustee.

Unrestricted Cash and Cash Equivalents: The Debtor expects a 100% recovery on unrestricted cash and cash equivalents in a chapter 7 liquidation. As of the Liquidation Date, the Debtor holds approximately $68,622,085 in unrestricted cash and cash equivalents.

Accounts and Loans Receivable: The accounts receivable are comprised of third-party receivables as well as Archdiocesan Agency and Archdiocesan Parish assessments. The delinquency of the assessments has increased in recent years. In addition, under the hypothetical liquidation for the Additional Debtors, there is only expected to be a payout approximating 12.6%, which would include payments to the Debtor for their accounts receivable. The Debtor does not anticipate a full recovery in a chapter 7 liquidation, and accounts receivable have been discounted to 50% of their book value. Loans receivable from certain affiliates are discounted to 25% of the book value. If the Additional Debtors filed for relief, the notes and assessments due from the Additional Debtors would be unsecured claims against the Additional Debtors' estates, and the recovery would approximate 12.6% due to the size of the Abuse Claims.

Accounts Receivable – Tuition and Fees: These receivables are related to pre-billed tuition for the Debtor's schools for the 2025-2026 school year. In effect, the Debtor grosses up its balance sheet by booking accounts receivable and deferred revenue. Because these amounts are offset by deferred revenue in the liquidation analysis, they are included in their entirety.

Inventory and Other Assets: Inventory and certain other assets are discounted to 50% of the book value. Inventory consists of food and other supply-type items at the Debtor's high schools which would yield very little in a liquidation.

Real Property: Real property values are discounted to $100,000,000 in a liquidation scenario. This liquidation value was estimated based on an approximate 40% reduction to the Fair Market Value (FMV) of the Debtor's property. The FMV of the properties was determined based on independent third-party appraisals. The 40% reduction to arrive at liquidation value considers the approximate 1200 properties from the Debtor and Additional Debtors in a hypothetical

{00383827-9}

liquidation that would flood the market and depress sales value. The reduction also recognizes the need for a potential bulk sale of certain properties and a five-year term over which the properties would be sold. The reduction further considers the commission and closing costs for the properties. Church real property has been discounted to $100,000 per church to account for the issues related to the sale of a church and costs attributable to readying the property for sale.

Other Fixed Assets, Artwork and Religious Items: Vehicles values are based on the Kelly Blue Book value. Furniture and fixtures values are based on 15% of net book value. Art and collectibles values are based on appraised values from third-party appraisers.

Investments: The Debtor records investments in its books for investments held in Portfolio A and Portfolio B. Portfolio A investments are held by the Catholic Community Foundation, and the Debtor records a contra-account in its books for investments of third parties. The Debtor's total investments in Portfolio A as of the Liquidation Date are $113,652,955. The value of the Debtor's investments in Portfolio A is based upon the most recent unitization report that is a mark-to-market value for the Investments of the Debtor. It is largely prepared by the Catholic Community Foundation based upon information provided by its investment advisors at the end of each month. The Debtor's investments are segregated between restricted and unrestricted funds. All restricted fund investments are excluded entirely from the liquidation value. The Debtor expects a 100% recovery on unrestricted investments in Portfolio A under a chapter 7 liquidation.

Portfolio B investments relate to the funds invested under the Debtor's Deposit and Loan Program. The Debtor has $23,221,806 in investments as of the Liquidation Date, which is expected to be fully realized in a liquidation. The Debtor has an obligation to the depositors under this program, and there is a deficiency to the depositors in the amount of $111,924,355, which is reflected in the liquidation analysis.

Prepaid Expenses: The Debtor's administrative offices and high schools have certain prepaid expenses related to insurance, professional fees, and tuition-related matters. In a liquidation scenario, the Debtor does not expect to realize any refund of these amounts because the expense amounts will generally continue during the Chapter 11 and be worked off over time, and the tuition amounts will be offset against deferred revenue.

Pledges Receivable: The Debtor has certain pledges from donors that have not been collected as of the Liquidation Date. Because the Debtor will cease operations in a liquidation, it is not expected that donors will fulfill and pay their pledges, as the activities the donor is supporting will no longer exist.

Beneficial Interest in Charitable Remainder Trust: The Debtor is a named beneficiary in a Trust administered by a third party. If the Debtor liquidates, it is assumed the Debtor will be removed as a beneficiary of that Trust, which will result in no value for the Debtor.

Excluded Assets: The Debtor does not expect any recovery from grants receivable because the nature of the grant can no longer be fulfilled when the Debtor stops operations. The Debtor also does not expect to recover any funds from its equity investment in the CUP (Catholic Umbrella Pool).

{00383827-9}

**Additional Administrative Costs.** Administrative costs in a chapter 7 liquidation include chapter 7 trustee fees, professional fees, shut-down costs, and residual costs and fees from the chapter 11.

Chapter 7 trustee fees are estimated at 3% of the available assets for distribution, excluding any recovery from insurance proceeds, or $7,646,314. Further, chapter 7 professional fees are estimated at $12,000,000, which assumes a five-year liquidation process and fees related to: pursuing and litigating claims against other Catholic organizations for contributions or indemnification; litigating Abuse Claims; and legal fees associated with asset liquidation.

The liquidation costs also include what are termed "shut-down costs." These costs primarily include the personnel and property-related costs needed to close and fully liquidate the Debtor's operations and assets over the five-year anticipated shut-down period. From a personnel perspective, it is anticipated that the Debtor will be subject to the WARN Act and will incur significant costs for these claims. It is also anticipated that the Debtor will need to retain existing personnel for varying periods of time to assist the chapter 7 trustee in the areas of accounting and finance, IT, legal, property, repair and maintenance, insurance and risk management, and archives. From a property perspective, costs will include property, casualty, and liability insurance for the properties based on the properties being empty and shuttering the properties, ensuring security at the properties to protect them from vandalism and vagrancy, utility costs, and some repair and maintenance costs. It is expected that the properties will be subject to property taxes because they will no longer be exempt. The shut-down costs are estimated at $19,500,000. These estimated shut-down costs do not have any provision for a weather event of any significance, which could greatly increase these costs.

Lastly, also included in the administrative costs are residual chapter 11 costs, calculated as two quarters of the average U.S. Trustee fees throughout the case ($500,000), and four months of residual chapter 11 professional fees at $1,500,000 a month ($6,000,000).

The number and dollar amount of the unsecured claims is greater in a chapter 7 than under the Joint Plan. The increase in unsecured claimants is a function of the rejection damages that would result from the inability of a chapter 7 trustee to assume the executory contract giving rise to rejection damages.

**Distributions to Unsecured Creditors.** The unsecured creditor pool includes Abuse Claims, Non-Abuse Claims, prepetition accounts payable, prepetition capital lease obligations, prepetition bonds payable, and prepetition employment benefits and pensions. The Debtor estimates the total amount of unsecured claims to be **$1,429,299,271**. With **$209,230,813** projected to be available to general unsecured creditors, after payment in full of all senior classes (Administrative and Priority Claims), general unsecured creditors would receive a **14.6%** payment on their claims.

**Footnotes to Exhibit 3 (Debtor's Liquidation Analysis).** The spreadsheet depicting the Debtor's Liquidation Analysis on Exhibit 3 references certain explanatory footnotes as follows:

{00383827-9}

Note 1: Financial information presented is as of May 31, 2025, which is the most recent data available. Losses are expected to continue after May 31, 2025, which may reduce the liquidation value.

Note 2: Liquidation value is assumed to be 50% of book value.

Note 3: Prepaid expenses include approximately $2,296,000 for the Debtor's high schools.

Note 4: Portfolio A funds are shown net of third-party funds.

Note 5: Includes accounts payable and unpaid reorganization expenses as of May 31, 2025.

Note 6: Estimated at 3% of available assets, excluding any insurance proceeds.

Note 7: Including pursuit of and potential litigation with other Catholic organizations for contribution or indemnification claims.

Note 8: Amount represents midpoint of Abuse Claims per Stout, the Committee's expert (range of claims is $752 million to $1.69 billion).

Note 9: Does not include any recoveries related to insurance coverage for tort claims.

Note 10: Assumes four months of unpaid legal and professional costs at Effective Date.

Note 11: Estimated at two quarters of average U.S. Trustee fees.

Note 12: Excludes accrued liabilities for survivor claims.

Note 13: Based on average Kelly Blue Book value.

Note 14: Estimated at 15% of book value.

Note 15: Includes bond principal.

Note 16: Assumes five-year wind down with half of the properties remaining being sold each year.

Note 17: Liquidation value is assumed to be 25% of book value.

Note 18: Value is based on third-party appraisals obtained by the Debtor.

**Additional Debtors' Liquidation Analysis**

The Additional Debtors were examined on a legal entity basis for each Additional Debtor but have been consolidated for this Liquidation Analysis into one comprehensive report.

In a hypothetical liquidation, the Additional Debtors estimate that the total value that would be available to unsecured creditors (including Abuse Claimants) is **$167,409,245**. The total

unsecured claims amount is projected to be **$1,326,564,719**, resulting in a pro rata recovery of **12.6%.** As is the case with the Debtor's Liquidation Analysis, the Additional Debtors' Liquidation Analysis excludes contributions to be made by the Settling Insurers, whereas under the Joint Plan, the Setting Insurers are contributing $29,275,000 to the Settlement Trust. The hypothetical liquidation also excludes a $5,000,000 contribution from the Non-Debtor Catholic Entities, a $65,000,000 contribution from the Debtor, and the value of the assigned insurance policies with the Non-Settling Insurers that are available under the Joint Plan. The hypothetical liquidation includes additional administrative fees that would be associated with a chapter 7 liquidation, such as chapter 7 trustee and professional fees; costs associated with shutting down operations, laying off employees, and securing and insuring real property owned by the Additional Debtors; and various residual costs and professional fees from the chapter 11 bankruptcy. As stated in the Disclosure Statement, 1793 Group was formed in 2025 for the express purpose of facilitating payments from the Additional Debtors into the Joint Plan. The hypothetical liquidation also excludes funds from the sale of the Affordable Housing Facilities that would be due directly to the Settlement Trust. In a chapter 7 liquidation, 1793 Group would not be able to serve this purpose, and each Additional Debtor would have to be liquidated with funds segregated by entity and distributed on an entity-by-entity basis, further adding to the administrative costs associated with chapter 7 liquidations.

**Available Assets.** The Additional Debtors' available assets in a hypothetical liquidation include cash and cash equivalents, accounts receivable, notes receivable, unrestricted investment funds, real property, plant and equipment, and other miscellaneous assets for entities that have Abuse Claims asserted against them. Certain Additional Debtors are not implicated in the Abuse Proofs of Claim filed in the Debtor's Chapter 11 Case. As such, the liquidation value of the assets and liabilities related to these Additional Debtors has been excluded from the liquidation value in Exhibit 5. It is assumed that the Additional Debtors that have no Abuse Claims against them have sufficient funds to pay their debts and that no funds would be available to the survivors or other creditors. Exhibit 4 to the Disclosure Statement identifies the Additional Debtors that are implicated in the Abuse Proofs of Claim filed in the Debtor's Chapter 11 Case.

Cash and Cash Equivalents: Based on the Additional Debtors' most recent financial assessment, as of June 30, 2025, the Additional Debtors' combined cash on hand is $98,977,624. The Additional Debtors anticipate a recovery of $73,789,693, after removing the entities who do not have any Abuse Claims asserted against them and who would not otherwise become Additional Debtors.

Accounts and Notes Receivable: The Additional Debtors' accounts receivable primarily consist of amounts due from Portfolio B and tuition for the Parish Schools that are run by the corresponding parish. Note that these schools are separate from the Archdiocesan Schools that are directly operated by the Archdiocese. In a hypothetical liquidation for the Debtor, the Additional Debtors would only receive 14.6% of their Portfolio B funds. Because the Additional Debtors do not expect a significant recovery from the accounts receivable, receivables have been discounted to 25%, or $17,069,423 after removing the entities who do not have an Abuse Claim asserted against them and who would not otherwise become Additional Debtors.

The Additional Debtors have $9,500,000 in outstanding notes receivable and expect a recovery of $6,000,000, again discounting the notes that are payable to entities who do not have an Abuse Claim asserted against them and who would not otherwise become an Additional Debtor.

Investment Funds: Just as with the Debtor, the Additional Debtors have investments that are divided between restricted and unrestricted funds. The Additional Debtors expect a 100% recovery on investments under a chapter 7 liquidation, subject to a reduction of the restricted investments, addressed below. The Additional Debtors have $89,205,761 available investments (both restricted and unrestricted) based on a mark-to-market value. This value is largely prepared by the Catholic Community Foundation based upon information provided by its investment advisors at the end of each month. Removing the entities who do not have Abuse Claims asserted against them, the Additional Debtors anticipate a recovery of $46,944,068 for distribution to creditors.

Real Property, Plant, and Equipment: Real property of the Additional Debtors falls into two categories: church property (property used as a church) and non-church property (property not used as a church). Church property is valued for liquidation purposes at $100,000 per property due to its limited use and the process of repurposing it after the sale to a non-church property. See discussion above in Debtor (Archdiocese) Liquidation Analysis for the rationale behind the church valuations.

Non-church property liquidation values are discounted from the replacement cost of the property by two factors. After removing properties for the entities who do not have an Abuse Claim asserted against them, a reduction of 65% is applied to replacement cost value to arrive at fair market value. This 65% factor was determined using a sample of approximately 40 third-party fair market appraisals as compared to replacement cost value. Second, the liquidation value was estimated based on an approximate 40% reduction to the Fair Market Value (FMV) of the Additional Debtor's property. The 40% reduction to arrive at liquidation value considers the approximate 1200 properties from the Debtor and Additional Debtors in a hypothetical liquidation that would flood the market and depress sales value. The reduction also recognizes the need for a potential bulk sale of certain properties and a five-year term over which the properties would be sold. The reduction further considers the commission and closing costs for the properties. The liquidation value is estimated at $135,170,401 for the Additional Debtors' real property, plant and equipment. The Additional Debtors have not obtained a fair-market-value appraisal of all their real estate.

Other Assets: The Additional Debtors estimate that their other assets have a book value of $12,324,843 based on their latest inventory and financial information. Over 80% of the Other Assets is food and related inventory held by two of the Additional Debtors. After removing the entities who do not have Abuse Claims asserted against them, the Additional Debtors apply a discount of 50% of the book value given the forced sale. The estimated liquidation value of the other assets is $538,722.

Excluded Assets: The Additional Debtors have excluded all restricted investment funds from available assets in a chapter 7 liquidation as well as all assets owned by other entities who

are listed as Additional Debtors but who have no Abuse Claims asserted against them. The Additional Debtors calculate that they hold $6,231,394 in custodial funds for the benefit of non-debtor entities and $10,121,668 in restricted cash and investments. The Additional Debtors have also excluded all prepaid expenses of the Additional Debtors and do not expect to recover any of those payments. However, the chapter 7 trustee fees and costs for litigating against Additional Debtors without Abuse Claims asserted against them are included because the Bankruptcy Code requires a hypothetical liquidation of the entities who are included in the Joint Plan regardless of whether there are Abuse Claims asserted against them.

**Additional Administrative Costs**. Once in bankruptcy, the Additional Debtors will begin to incur post-petition administrative costs such as post-petition payables for employees and other operating expenses until the Additional Debtors are officially closed. The Additional Debtors estimate these costs (to be paid prior to any distributions in the ordinary course of business) to be $500,000, based on the assumption of $5,000 per Additional Debtor (with 100 Additional Debtors filing).

Other administrative costs include chapter 7 trustee fees, professional fees, shut-down costs, and residual costs and fees from the chapter 11.

Chapter 7 trustee fees are estimated at $10,000,000, excluding any recovery from insurance proceeds. These fees are based on an estimate of 3% of the funds distributed to creditors for all of the Additional Debtors. Further, chapter 7 professional fees are estimated at $25,000,000, which assumes a five-year liquidation process and fees related to: pursuing and litigating claims against other organizations for contributions or indemnification; litigating Abuse Claims; and legal fees associated with asset liquidation. The total is based on an assumption of $250,000 in professional fees per Additional Debtor (with 100 Additional Debtors filing).

The liquidation costs also include what are termed "shut-down costs." These costs primarily include the personnel and property-related costs need to close and fully liquidate the debtor's operations and assets over the five-year anticipated shut-down period. From a personnel perspective, it is anticipated that some of the Additional Debtors will be subject to the WARN Act and will incur significant costs for these claims. It is also anticipated that the Additional Debtors will need to retain existing personnel for varying periods of time to assist the chapter 7 trustee in the areas of accounting and finance, IT, legal, property, repair and maintenance, insurance and risk management, and archives. From a property perspective, costs will include property, casualty, and liability insurance for the properties based on the properties being empty and shuttering the properties, ensuring security at the properties to protect them from vandalism and vagrancy, utility costs, and some repair and maintenance costs. It also is expected the properties will be subject to property taxes because they will no longer be exempt. The shut-down costs are estimated at $59,500,000. These estimated shut-down costs do not have any provision for a weather event of any significance, which could greatly increase these costs.

**Distributions to Unsecured Creditors.** The unsecured creditor pool includes Abuse Claims, Non-Abuse Claims, prepetition accounts payable, prepetition capital lease obligations, prepetition bonds payable, and prepetition employment benefits and pensions. The Additional

Debtors estimate the total amount of unsecured claims to be **$1,326,564,719**. With **$167,409,245** projected to be available to general unsecured creditors, after payment in full of all senior classes (Administrative and Priority Claims), general unsecured creditors would receive a **12.6%** payment on their claims.

**Footnotes to Exhibit 5 (Additional Debtors' Liquidation Analysis).** The spreadsheet depicting the Additional Debtors' Liquidation Analysis on Exhibit 5 references certain explanatory footnotes as follows:

Note 1: Financial information presented is as of December 31, 2024, which is the most recent data available. Losses are expected to continue after December 31, 2024, which may reduce the liquidation value.

Note 2: Liquidation value is assumed to be 25% of book value for Additional Debtors with Abuse Claims against them.

Note 3: Liquidation value is assumed to be 50% of book value for Additional Debtors with Abuse Claims against them.

Note 4: Includes accounts payable and accrued expenses estimated at $5,000 per Additional Debtor with Abuse Claims against them.

Note 5: Estimated at 3% of available assets, excluding any insurance proceeds for all Additional Debtors.

Note 6: Including pursuit of and potential litigation with other Catholic organizations for contribution or indemnification claims. Estimated at $250,000 per Additional Debtor for 100 Additional Debtors.

Note 7: Assumes five-year wind down with half of the properties remaining being sold each year for 100 Additional Debtors.

Note 8: Amount represents midpoint of Abuse Claims per Stout, the Committee's expert (range of claims is $752 million to $1.69 billion).

Note 9: Does not include any recoveries related to insurance coverage for tort claims.

Note 10: Estimated at $2,500 per Additional Debtor for 100 Additional Debtors.

Note 11: Estimated at $5,000 per Additional Debtor for 100 Additional Debtors.

Note 12: Accounts payable, accrued expenses, and FEMA-related payables.

Note 13: Represents estimated liquidation value for Additional Debtors' property for Additional Debtors with Abuse Claims against them.

# EXHIBIT 3

Debtor
Accounts Receivable
May 31, 2025

| Category | | Amount | Calculated % Collectible | | Total Liquidation Value |
|---|---|---|---|---|---|
| Assessments | $ | 1,816,595 | | | |
| Health Insurance | $ | 1,917,601 | | | |
| Insurance | $ | 2,666,079 | | | |
| Miscellaneous | $ | 3,353,692 | | | |
| Priest Benefits | $ | 380,474 | | | |
| Total Parish and Agency | $ | 10,134,441 | 12.6% | $ | 1,276,940 |
| Storm-related (1) | $ | 30,025,097 | | $ | 19,633,766 |
| Allowance (reserves) | $ | (7,925,842) | | | |
| Total | $ | 32,233,696 | | $ | 20,910,705 |

(1) The FMV of the Storm-related receivables is based on the gross receivable less the $5,482,890
deductible for Hurricane Ida (which is included in the reserves) multiplied by an 80%
collection factor



# EXHIBIT 4

Debtor
Loans Receivable

| Classification | DLS Location # | Int Rate | Borrower's Name | Loan Balance 05/31/2025 | Calculated % Collectible | Total Liquidation Value |
|---|---|---|---|---|---|---|
| Parish Loan | 131 | 0.00% | St. John the Baptist Parish - Loans to Parishes | 94,224.98 | | |
| Parish Loan | 216 | 4.60% | St. Peter Covington - School Construction LOC | 3,050,256.97 | | |
| Parish Loan | 267 | 4.60% | St. Peter Parish, Reserve Unpaid Assessment | 190,518.03 | | |
| Parish Loan | 247.5 | 0.00% | Our Lady of Divine Providence School - Bridge Loan | 239,527.01 | | |
| Parish Loan | 206 | 0.00% | St. Anthony Lafitte - Unpd Assessment Loan | 106,995.07 | | |
| Parish Loan | 150.5 | 0.00% | St. Peter Claver School - Bridge Loan | 106,684.56 | | |
| Parish Loan | 172 | 0.00% | St. James Major Closing AR | 2,060.88 | | |
| Parish Loan | 361 | 0.00% | Korean Catholic Community - Construction Loan | 389,000.00 | | |
| Parish Loan | 222 | 4.60% | Visitation of Our Lady - Multi Purpose Building Loan | 2,459,455.67 | | |
| Parish Loan | 154 | 4.60% | St. Piux X - School Expansion Loan | 2,007,235.48 | | |
| Parish Loan | 150 | 4.60% | St. Peter Claver Church Repair Loan | 171,669.10 | | |
| Parish Loan | 274 | 0.00% | Christ the King Unpd Assessment Loan | 260,129.33 | | |
| Parish Loan | 108 | 4.60% | St. Augustine Rectory Airconditioning | 168,326.41 | | |
| Parish Loan | 280 | 0.00% | Divine Mercy - Phase II St Elizabeth Ann Seton School | 14,528,155.89 | | |
| Parish Loan | 293 | 4.60% | St. John of the Cross - Construction Loan | 426,667.94 | | |
| Parish Loan | 171 | 0.00% | Our Lady Star of the Sea Closing AR | 104,102.35 | | |
| Parish Loan | 171 | 0.00% | St. Mary of the Angels Closing AR | 25,757.12 | | |
| Parish Loan | 172 | 0.00% | St. Gabriel Closing AR | 904,019.72 | | |
| Parish Loan | 172 | 0.00% | Tranfiguration of Our Lord Closing AR | 305,786.64 | | |
| Parish Loan | 172 | 0.00% | Transfiguration DLS Loan 166.1 | 74,173.42 | | |
| Parish Loan | 173 | 0.00% | St. Rosalie Closing AR | 86,470.43 | | |
| Parish Loan | 173 | 0.00% | St. Rosalie DLS Loan | 444,590.48 | | |
| Parish Loan | 174 | 0.00% | St. Gertrude Closing AR | 94,448.76 | | |
| Parish Loan | 174 | 0.00% | St. John the Baptist Closing AR | 221,222.97 | | |
| Parish Loan | 175 | 0.00% | St. Bonaventure Closing AR | 3,062.50 | | |
| Parish Loan | 263 | 0.00% | St. Thomas Braithwaite Unpd Assessment Loan | 260,849.22 | | |
| Parish Loan | 267 | 0.00% | St. Hubert Closing AR | 210,226.87 | | |
| Parish Loan | 277 | 0.00% | Our Lady of Prompt Succor Parish - Unpaid Assessment Loan | 577,348.21 | | |
| Parish Loan | 275 | 4.60% | Our Lady of Lourdes Violet - Community Center Loan | 449,686.89 | | |
| Parish Loan | 288 | 4.60% | Most Holy Trinity - Construction Loan | 13,053,347.82 | | |
| | | | | $ 41,016,000.72 | 12.6% | $    5,168,016 |
| | | | | | | |
| FEMA Receivable | 338 | 4.60% | Villa St. Maurice II | 1,656,693.64 | | |
| FEMA Receivable | 338 | 4.60% | St. Bernard Manor | 168,533.81 | | |
| FEMA Receivable | 338 | 4.60% | St. Bernard Manor II/Metairie Manor IV | 166,048.03 | | |
| FEMA Receivable | 338 | 4.60% | St. Bernard Manor III/Rouqette IV | 1,017,281.97 | | |
| | | | | 3,008,557.45 | 0.0% | $         - |
| | | | | | | |
| Agency Loan | 523 | 4.60% | St. Tammany Catholic Cemetery - Loan | 1,533,175.88 | | |
| Agency Loan | 524 | 4.60% | Holy Trinity Land Corp - Loan | 725,856.35 | | |
| | | | | 2,259,032.23 | 50% | $    1,129,516 |
| | | | | | | |
| Priest Loan | 016.6 | 4.60% | Rev. Emile George Noel III - Personal Loan | 56,893.52 | | |
| Priest Loan | 016.25 | 4.60% | William MacMaster - Loan | 2,133.26 | | |
| Priest Loan | 030 | 0.00% | Rev. Gerald Howell - Loan | 8,122.78 | | |
| Priest Loan | 098 | 4.60% | Rev. John Asare-Dankwah - Personal Loan | 2,876.42 | | |
| | | | | 70,025.98 | 12.6% | $       8,823 |
| | | | | | | |
| High School/Special School Loan | 324 | 4.60% | St. Charles Catholic - Construction Loan | 122,045.23 | | |
| High School/Special School Loan | 324 | 4.60% | St. Charles Catholic - Construction Loan 2 | 3,671,809.60 | | |
| High School/Special School Loan | 376 | 2.00% | Archbishop Hannan H.S. - Construction Loan | 2,921,844.59 | | |
| High School/Special School Loan | 305 | 0.00% | Rummel Renovations loan | 1,797,103.04 | | |
| High School/Special School Loan | 307 | 4.60% | St. Therese - Operating Loan | 284,995.91 | | |
| Parish Loan | 101 | 0.00% | St. Louis Cathedral - Parish Loan | 1,415,463.62 | | |
| | | | | 10,213,261.99 | 0.0% | $         - |
| | | | | | | |
| | | | *Grand Total - Loans Receivable - Per DLS* | 56,566,878.37 | | 6,306,355.48 |



# EXHIBIT 5

## Debtor Real Property Sales NPV

Compound Period ......... :  Annual

Nominal Annual Rate .... :  4.500 %

### CASH FLOW DATA

| | Event | Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|---|
| 1 | Loan | 12/31/2025 | 107,835,602.50 | 1 | | |
| 2 | Payment | 06/30/2026 | 22,077,790.00 | 1 | | |
| 3 | Payment | 06/30/2027 | 22,519,346.00 | 1 | | |
| 4 | Payment | 06/30/2028 | 22,969,733.00 | 1 | | |
| 5 | Payment | 06/30/2029 | 23,429,128.00 | 1 | | |
| 6 | Payment | 06/30/2030 | 29,872,138.00 | 1 | | |

### AMORTIZATION SCHEDULE - Normal Amortization

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| Loan   12/31/2025 | | | | 107,835,602.50 |
| 2025 Totals | 0.00 | 0.00 | 0.00 | |
| 1   06/30/2026 | 22,077,790.00 | 2,406,358.86 | 19,671,431.14 | 88,164,171.36 |
| 2026 Totals | 22,077,790.00 | 2,406,358.86 | 19,671,431.14 | |
| 2   06/30/2027 | 22,519,346.00 | 3,967,387.71 | 18,551,958.29 | 69,612,213.07 |
| 2027 Totals | 22,519,346.00 | 3,967,387.71 | 18,551,958.29 | |
| 3   06/30/2028 | 22,969,733.00 | 3,132,549.59 | 19,837,183.41 | 49,775,029.66 |
| 2028 Totals | 22,969,733.00 | 3,132,549.59 | 19,837,183.41 | |
| 4   06/30/2029 | 23,429,128.00 | 2,239,876.33 | 21,189,251.67 | 28,585,777.99 |
| 2029 Totals | 23,429,128.00 | 2,239,876.33 | 21,189,251.67 | |
| 5   06/30/2030 | 29,872,138.00 | 1,286,360.01 | 28,585,777.99 | 0.00 |
| 2030 Totals | 29,872,138.00 | 1,286,360.01 | 28,585,777.99 | |
| Grand Totals | 120,868,135.00 | 13,032,532.50 | 107,835,602.50 | |

# EXHIBIT 6

Debtor
Shut-down Costs

| Cost | Note | Year 1 Amount | Year 2 Amount | Year 3 Amount | Year 4 Amount | Year 5 Amount | Total |
|---|---|---|---|---|---|---|---|
| Insurance | (1) | $ 3,803,167 | $ 2,476,829 | $ 2,010,810 | $ 1,562,901 | $ 1,079,724 | |
| Property Taxes | (2) | $ 2,657,340 | $ 2,194,204 | $ 1,710,821 | $ 1,207,192 | $ 683,316 | |
| Repairs/Maintenance and Security | (2) | $ 1,575,000 | $ 1,300,500 | $ 1,014,000 | $ 715,500 | $ 405,000 | |
| Utilities | (3) | $ 800,000 | $ 400,000 | $ 200,000 | $ 100,000 | $ 50,000 | |
| Personnel: | | | | | | | |
| WARN Act | (4) | $ 1,400,000 | $ - | $ - | $ - | $ - | |
| Salaries: | | | | | | | |
| Legal | (5) | $ 400,000 | $ 200,000 | $ 100,000 | $ 50,000 | $ 25,000 | |
| Finance & Accounting | (5) | $ 685,000 | $ 342,500 | $ 171,250 | $ 85,625 | $ 42,813 | |
| IT | (6) | $ 290,000 | $ 145,000 | $ 72,500 | $ 36,250 | $ 18,125 | |
| Archives & Records Management | (6) | $ 175,000 | $ 87,500 | $ 43,750 | $ 21,875 | $ 10,938 | |
| Facilities Managers | (7) | $ 250,000 | $ 125,000 | $ 62,500 | $ 31,250 | $ 15,625 | |
| Maintenance | (7) | $ 125,000 | $ 62,500 | $ 31,250 | $ 15,625 | $ 7,813 | |
| Property Office personnel | (5) | $ 66,000 | $ 33,000 | $ 16,500 | $ 8,250 | $ 4,125 | |
| Risk Manager/claims | (9) | $ 22,000 | $ 11,000 | $ 5,500 | $ 2,750 | $ 1,375 | |
| | | $ 2,013,000 | $ 1,006,500 | $ 503,250 | $ 251,625 | $ 125,813 | |
| Payroll taxes and benefits @15% | | $ 301,950 | $ 150,975 | $ 75,488 | $ 37,744 | $ 18,872 | |
| Other: | | | | | | | |
| Health Insurance TPA | (8) | $ 80,300 | $ - | $ - | $ - | $ - | |
| P&C Insurance TPA | (9) | $ 39,600 | $ 19,800 | $ 9,900 | $ 4,950 | $ 2,475 | |
| Sulzer Group FEMA work | | $ 50,000 | $ 25,000 | $ 12,500 | $ 6,250 | $ 3,125 | |
| IT Equipment | | $ 20,000 | $ - | $ - | $ - | $ - | |
| Archive & Records Storage Space | | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | |
| Digitization Costs | | $ 100,000 | $ 50,000 | $ - | $ - | $ - | |
| Moving Costs | | $ 75,000 | $ 37,500 | $ 18,750 | $ 9,375 | $ 4,688 | |
| Total | | $ 13,015,357 | $ 7,761,308 | $ 5,655,519 | $ 3,995,537 | $ 2,473,012 | $ 32,900,732 |

Notes:
(1) Per Gallagher analysis, see Exhibit 8 supporting schedule
(2) Per McEnery Company Report dated August 29, 2025
(3) Total utilities in 2025 were $2.5 million. Estimate one-third for year one
(4) Two months at $700,000 per month
(5) Current staff at 22% for Debtor's share
(6) 50% of current staff
(7) Assumes starting the year with four and ending with one, 2.5 FTE average
(8) Five months @$73,000 per month times 22% for Debtor share
(9) Claims processing estimate at 22% for Debtor's share (but excludes FEMA work)



# EXHIBIT 7

---

Debtor Shut-down Costs NPV

---

Compound Period ......... :  Annual

Nominal Annual Rate .... :  4.500 %

CASH FLOW DATA

| | Event | Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|---|
| 1 | Loan | 12/31/2025 | 30,515,467.16 | 1 | | |
| 2 | Payment | 06/30/2026 | 13,015,357.00 | 1 | | |
| 3 | Payment | 06/30/2027 | 7,761,308.00 | 1 | | |
| 4 | Payment | 06/30/2028 | 5,655,519.00 | 1 | | |
| 5 | Payment | 06/30/2029 | 3,995,537.00 | 1 | | |
| 6 | Payment | 06/30/2030 | 2,473,012.00 | 1 | | |

AMORTIZATION SCHEDULE - Normal Amortization

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| Loan   12/31/2025 | | | | 30,515,467.16 |
| 2025 Totals | 0.00 | 0.00 | 0.00 | |
| 1   06/30/2026 | 13,015,357.00 | 680,954.74 | 12,334,402.26 | 18,181,064.90 |
| 2026 Totals | 13,015,357.00 | 680,954.74 | 12,334,402.26 | |
| 2   06/30/2027 | 7,761,308.00 | 818,147.92 | 6,943,160.08 | 11,237,904.82 |
| 2027 Totals | 7,761,308.00 | 818,147.92 | 6,943,160.08 | |
| 3   06/30/2028 | 5,655,519.00 | 505,705.72 | 5,149,813.28 | 6,088,091.54 |
| 2028 Totals | 5,655,519.00 | 505,705.72 | 5,149,813.28 | |
| 4   06/30/2029 | 3,995,537.00 | 273,964.12 | 3,721,572.88 | 2,366,518.66 |
| 2029 Totals | 3,995,537.00 | 273,964.12 | 3,721,572.88 | |
| 5   06/30/2030 | 2,473,012.00 | 106,493.34 | 2,366,518.66 | 0.00 |
| 2030 Totals | 2,473,012.00 | 106,493.34 | 2,366,518.66 | |
| Grand Totals | 32,900,733.00 | 2,385,265.84 | 30,515,467.16 | |



# EXHIBIT 8

Debtor and Additional Debtors
Insurance Shut-down Costs

| Cost | Note | Year 1 Amount | Year 2 Amount | Year 3 Amount | Year 4 Amount | Year 5 Amount |
|---|---|---|---|---|---|---|
| Insurance: | | | | | | |
| Property & Casualty | | $ 8,928,647 | $ 7,142,918 | $ 5,357,188 | $ 3,571,459 | $ 1,785,729 |
| Professional Liability | | $ 400,000 | $ 400,000 | $ 400,000 | $ 400,000 | $ 400,000 |
| Equipment | | $ 78,498 | $ 62,798 | $ 47,099 | $ 31,399 | $ 15,700 |
| Limited General Liability | | $ 600,000 | $ 600,000 | $ 500,000 | $ 500,000 | $ 300,000 |
| Terrorism | | $ 15,000 | $ 15,000 | $ 15,000 | $ 10,000 | $ 10,000 |
| Parametric Wind | | $ 200,000 | $ 160,000 | $ 120,000 | $ 80,000 | $ 40,000 |
| NFIP Flood | | $ 2,465,586 | $ 1,972,469 | $ 1,479,352 | $ 986,234 | $ 493,117 |
| W/C | | $ 70,000 | $ 60,000 | $ 50,000 | $ 40,000 | $ 40,000 |
| Subtotal | | $ 12,757,731 | $ 10,413,185 | $ 7,968,639 | $ 5,619,092 | $ 3,084,546 |
| Surplus Lines Tax @4.85% | | $ 618,750 | $ 505,039 | $ 386,479 | $ 272,526 | $ 149,600 |
| Subtotal | | $ 13,376,481 | $ 10,918,224 | $ 8,355,118 | $ 5,891,618 | $ 3,234,146 |
| Open Claim Deductibles | (1) | $ 4,836,600 | $ - | $ - | $ - | $ - |
| Future Claims Obligations | | $ 2,704,336 | $ 2,704,336 | $ 2,704,336 | $ 2,704,336 | $ 2,704,336 |
| Total | | $ 20,917,417 | $ 13,622,560 | $ 11,059,454 | $ 8,595,954 | $ 5,938,482 |
| Debtor Portion | (2) | $ 3,803,167 | $ 2,476,829 | $ 2,010,810 | $ 1,562,901 | $ 1,079,724 |
| Additional Debtors' Portion | | $ 17,114,250 | $ 11,145,731 | $ 9,048,644 | $ 7,033,053 | $ 4,858,758 |

Notes:
(1) Open Claim deductibles as of August 29, 2025. Assumes no Captive involvement.
(2) Based on 200 property parcels out of 1,100 total property parcels



# EXHIBIT 9

## Additional Debtors Real Property Sales NPV

Compound Period ......... :  Annual

Nominal Annual Rate .... :  4.500 %

### CASH FLOW DATA

| | Event | Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|---|
| 1 | Loan | 12/31/2025 | 236,860,292.30 | 1 | | |
| 2 | Payment | 06/30/2026 | 51,455,708.00 | 1 | | |
| 3 | Payment | 06/30/2027 | 52,484,822.00 | 1 | | |
| 4 | Payment | 06/30/2028 | 53,534,519.00 | 1 | | |
| 5 | Payment | 06/30/2029 | 54,605,209.00 | 1 | | |
| 6 | Payment | 06/30/2030 | 51,984,159.00 | 1 | | |

### AMORTIZATION SCHEDULE - Normal Amortization

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| Loan   12/31/2025 | | | | 236,860,292.30 |
| 2025 Totals | 0.00 | 0.00 | 0.00 | |
| 1   06/30/2026 | 51,455,708.00 | 5,285,553.65 | 46,170,154.35 | 190,690,137.95 |
| 2026 Totals | 51,455,708.00 | 5,285,553.65 | 46,170,154.35 | |
| 2   06/30/2027 | 52,484,822.00 | 8,581,056.21 | 43,903,765.79 | 146,786,372.16 |
| 2027 Totals | 52,484,822.00 | 8,581,056.21 | 43,903,765.79 | |
| 3   06/30/2028 | 53,534,519.00 | 6,605,386.75 | 46,929,132.25 | 99,857,239.91 |
| 2028 Totals | 53,534,519.00 | 6,605,386.75 | 46,929,132.25 | |
| 4   06/30/2029 | 54,605,209.00 | 4,493,575.80 | 50,111,633.20 | 49,745,606.71 |
| 2029 Totals | 54,605,209.00 | 4,493,575.80 | 50,111,633.20 | |
| 5   06/30/2030 | 51,984,159.00 | 2,238,552.29 | 49,745,606.71 | 0.00 |
| 2030 Totals | 51,984,159.00 | 2,238,552.29 | 49,745,606.71 | |
| Grand Totals | 264,064,417.00 | 27,204,124.70 | 236,860,292.30 | |



# EXHIBIT 10

Additional Debtors
Shut-down Costs

| Cost | Note | Year 1 Amount | Year 2 Amount | Year 3 Amount | Year 4 Amount | Year 5 Amount | Total |
|---|---|---|---|---|---|---|---|
| Insurance | (1) | $ 17,114,250 | $ 11,145,731 | $ 9,048,644 | $ 7,033,053 | $ 4,858,758 | |
| Property Taxes | (2) | $ 5,803,524 | $ 4,719,677 | $ 3,588,774 | $ 2,410,815 | $ 1,185,801 | |
| Repairs/Maintenance and Security | (2) | $ 1,924,000 | $ 1,564,680 | $ 1,189,760 | $ 799,240 | $ 393,120 | |
| Utilities | (3) | $ 4,000,000 | $ 2,000,000 | $ 1,000,000 | $ 500,000 | $ 250,000 | |
| **Salaries:** | | | | | | | |
| Legal | (4) | $ 400,000 | $ 200,000 | $ 100,000 | $ 50,000 | $ 25,000 | |
| Finance & Accounting | (4) | $ 685,000 | $ 342,500 | $ 171,250 | $ 85,625 | $ 42,813 | |
| IT | (4) | $ 290,000 | $ 145,000 | $ 72,500 | $ 36,250 | $ 18,125 | |
| Archives & Records Management | (5) | $ 350,000 | $ 175,000 | $ 87,500 | $ 43,750 | $ 21,875 | |
| Facilities Managers | (5) | $ 500,000 | $ 250,000 | $ 125,000 | $ 62,500 | $ 31,250 | |
| Maintenance | (5) | $ 250,000 | $ 125,000 | $ 62,500 | $ 31,250 | $ 15,625 | |
| Property Office personnel | (6) | $ 234,000 | $ 117,000 | $ 58,500 | $ 29,250 | $ 14,625 | |
| Risk Manager/claims | (8) | $ 78,000 | $ 39,000 | $ 19,500 | $ 9,750 | $ 4,875 | |
| | | $ 2,787,000 | $ 1,393,500 | $ 696,750 | $ 348,375 | $ 174,188 | |
| Payroll taxes and benefits @15% | | $ 418,050 | $ 208,025 | $ 104,513 | $ 52,256 | $ 26,128 | |
| **Other:** | | | | | | | |
| Health Insurance TPA | (7) | $ 284,700 | $ - | $ - | $ - | $ - | |
| P&C Insurance TPA | (8) | $ 140,440 | $ 70,200 | $ 35,100 | $ 17,550 | $ 8,775 | |
| Sulzer Group FEMA work | (5) | $ 100,000 | $ 50,000 | $ 25,000 | $ 12,500 | $ 6,250 | |
| IT Equipment | (5) | $ 40,000 | $ - | $ - | $ - | $ - | |
| Archive & Records Storage Space | (4) | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | |
| Digitization Costs | (9) | $ 400,000 | $ 200,000 | $ - | $ - | $ - | |
| Moving Costs | (9) | $ 300,000 | $ 150,000 | $ 75,000 | $ 37,500 | $ 18,750 | |
| **Total** | | $ 33,411,924 | $ 21,602,813 | $ 15,863,541 | $ 11,311,289 | $ 7,021,770 | $ 89,211,336 |
| Additional Debtors with claims | | $ 25,727,181 | $ 16,634,166 | $ 12,214,526 | $ 8,709,693 | $ 5,406,763 | $ 68,692,729 |

Notes:
(1) Per Gallagher analysis, see Exhibit 8 supporting schedule
(2) Per McEnery Company Report dated August 29, 2025
(3) Total utilities in 2025 were $9.2 million for parishes and elementary schools. Agencies are estimated at $2.8 million. Estimate one-third for year one
(4) Assumes the total cost for the Additional Debtors will be at least equivalent to Debtor costs
(5) Assumes the total cost for the Additional Debtors will be at least double the Debtor costs
(6) Assumes Additional Debtors' share of the current staff at 78%
(7) Five months @$73,000 per month times 78% for Additional Debtors' share
(8) Claims processing estimate at 78% for Additional Debtors' share (but excludes FEMA work)
(9) Assumes the total cost for the Additional Debtors will be at least four times the Debtor costs due to the number of Additional Debtors



# EXHIBIT 1 1

## Additional Debtors Shut-down Costs NPV

Compound Period ......... :  Annual

Nominal Annual Rate .... :  4.500 %

### CASH FLOW DATA

| | Event | Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|---|
| 1 | Loan | 12/31/2025 | 63,578,045.20 | 1 | | |
| 2 | Payment | 06/30/2026 | 25,727,181.00 | 1 | | |
| 3 | Payment | 06/30/2027 | 16,634,166.00 | 1 | | |
| 4 | Payment | 06/30/2028 | 12,214,926.00 | 1 | | |
| 5 | Payment | 06/30/2029 | 8,709,693.00 | 1 | | |
| 6 | Payment | 06/30/2030 | 5,406,763.00 | 1 | | |

### AMORTIZATION SCHEDULE - Normal Amortization

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| Loan   12/31/2025 | | | | 63,578,045.20 |
| 2025 Totals | 0.00 | 0.00 | 0.00 | |
| 1   06/30/2026 | 25,727,181.00 | 1,418,748.43 | 24,308,432.57 | 39,269,612.63 |
| 2026 Totals | 25,727,181.00 | 1,418,748.43 | 24,308,432.57 | |
| 2   06/30/2027 | 16,634,166.00 | 1,767,132.57 | 14,867,033.43 | 24,402,579.20 |
| 2027 Totals | 16,634,166.00 | 1,767,132.57 | 14,867,033.43 | |
| 3   06/30/2028 | 12,214,926.00 | 1,098,116.06 | 11,116,809.94 | 13,285,769.26 |
| 2028 Totals | 12,214,926.00 | 1,098,116.06 | 11,116,809.94 | |
| 4   06/30/2029 | 8,709,693.00 | 597,859.62 | 8,111,833.38 | 5,173,935.88 |
| 2029 Totals | 8,709,693.00 | 597,859.62 | 8,111,833.38 | |
| 5   06/30/2030 | 5,406,763.00 | 232,827.12 | 5,173,935.88 | 0.00 |
| 2030 Totals | 5,406,763.00 | 232,827.12 | 5,173,935.88 | |
| Grand Totals | 68,692,729.00 | 5,114,683.80 | 63,578,045.20 | |



# EXHIBIT 12

## The Archdiocese of New Orleans
### Case No. 20-10846

**Plan of Reorganization Cash Flow Projections**

| | Budget Fiscal 2025-26 | Effective Date and Six Months Ended June 30, 2026 | Plan Fiscal Year June 30, 2027 | Plan Fiscal Year June 30, 2028 | Plan Fiscal Year June 30, 2029 | Notes |
|---|---|---|---|---|---|---|
| **Administrative Offices** | | | | | | |
| Archdiocesan Support - Assessments | 11,027,450 | 5,513,726 | 11,027,450 | 11,027,450 | 11,027,450 | Flat revenue stream |
| Priest Health Insurance and Retirement - Assessments | 3,398,189 | 1,699,099 | 3,502,144 | 3,605,148 | 3,713,303 | 3% CPI |
| Insurance Income - Assessments | 46,087,487 | 23,043,744 | 48,381,861 | 50,811,454 | 53,352,027 | 5% estimated increase per annum |
| Fee Revenue | 5,393,152 | 2,696,576 | 5,554,947 | 5,721,595 | 5,893,243 | 3% CPI |
| Contributions and Grants | 2,008,009 | 1,004,005 | 2,068,249 | 2,130,297 | 2,194,206 | 3% CPI |
| Rents and Royalties | 380,386 | 190,198 | 391,808 | 403,562 | 415,669 | 3% CPI |
| Interest Income – DLS Loans | 2,840,200 | 1,420,100 | 1,700,000 | 1,900,000 | 2,100,000 | Loans receivable and insurance financing for 2027 FY forward |
| Miscellaneous Income | 515,414 | 257,707 | 530,876 | 546,803 | 563,207 | 3% CPI |
| Investment Income | 2,885,600 | 1,442,800 | 900,000 | 900,000 | 900,000 | 4.5% on $20 million Portfolio A and $ for 2027 FY forward |
| **Operating Cash Inflows** | 74,535,306 | 37,267,953 | 74,063,335 | 77,046,309 | 80,155,104 | |
| Advertising & Promotion | 132,150 | 66,075 | 136,115 | 140,198 | 144,404 | 3% CPI |
| Contractual Services | 2,649,590 | 1,324,796 | 2,729,078 | 2,810,950 | 2,895,279 | 3% CPI |
| Grants & Contributions | 1,623,589 | 811,795 | 1,672,297 | 1,722,466 | 1,774,140 | 3% CPI |
| Insurance | 44,792,037 | 22,396,019 | 47,031,638 | 49,383,221 | 51,852,382 | 5% gross increase per annum |
| Interest | 5,210,000 | 2,605,000 | 4,807,000 | 4,783,000 | 4,757,000 | 3% on $150 million Portfolio B custodial funds plus bond interest |
| Ministry Services | 1,255,850 | 627,925 | 1,293,526 | 1,332,331 | 1,372,301 | 3% CPI |
| Miscellaneous | 148,917 | 74,459 | 153,385 | 157,986 | 162,726 | 3% CPI |
| Occupancy | 916,474 | 458,237 | 943,968 | 972,287 | 1,001,456 | 3% CPI |
| Office Expenses | 1,203,284 | 601,642 | 1,239,383 | 1,276,564 | 1,314,861 | 3% CPI |
| Payroll Tax & Employee Benefits | 2,235,932 | 1,117,966 | 2,303,010 | 2,372,100 | 2,443,263 | 3% CPI |
| Priest Housing & Living | 144,425 | 72,213 | 148,758 | 153,222 | 157,818 | 3% CPI |
| Priest Medical | 2,930,935 | 1,465,468 | 3,018,863 | 3,109,429 | 3,202,712 | 3% CPI |
| Priest Retirement | 1,630,020 | 815,000 | 1,678,900 | 1,729,267 | 1,781,145 | 3% CPI |
| Repairs & Maintenance | 800,530 | 400,265 | 824,547 | 849,283 | 874,762 | 3% CPI |
| Salaries & Wages | 8,204,365 | 4,102,183 | 8,450,496 | 8,704,011 | 8,965,131 | 3% CPI |
| Seminarian Assistance & Education | 1,120,000 | 560,000 | 1,153,600 | 1,188,208 | 1,223,854 | 3% CPI |
| Special Events | 353,575 | 176,788 | 364,182 | 375,108 | 386,361 | 3% CPI |
| Staff Development | 362,456 | 181,228 | 373,330 | 384,530 | 396,065 | 3% CPI |
| Subscriptions & Dues | 526,965 | 263,483 | 542,774 | 559,057 | 575,829 | 3% CPI |
| Travel, Meals, & Entertainment | 135,074 | 67,537 | 139,126 | 143,300 | 147,599 | 3% CPI |
| **Operating Cash Outflows** | 76,376,208 | 38,188,104 | 79,004,095 | 82,346,579 | 85,429,151 | |
| **Net Operating Cash Flow - Administrative** | (1,840,902) | (920,151) | (4,938,700) | (5,100,270) | (5,270,047) | |
| Net Operating Cash Flow - High Schools | (800,000) | (400,000) | (900,000) | (900,000) | (900,000) | |
| Net Operating Cash Flow - Parishes | (100,000) | (100,000) | (400,000) | (600,000) | (200,000) | |
| **Total Net Operating Cash Flow** | (2,840,902) | (1,420,151) | (6,238,700) | (6,400,270) | (6,370,047) | |
| **Non-Operating Cash Inflow / (Outflow)** | | | | | | |
| Sale of Assets | 5,100,000 | 1,500,000 | 2,000,000 | 2,000,000 | 2,000,000 | Assumes static balance |
| A/R Collections | | | | | | |
| Notes Receivable Principal Collections | 900,000 | 250,000 | 500,000 | 500,000 | 500,000 | |
| Reorganization Expenses | (8,000,000) | (2,000,000) | | | | |
| Cap Ex/Deferred Maintenance | (250,000) | (250,000) | (500,000) | (500,000) | (500,000) | |
| Portfolio B Deficit Funding | (2,400,000) | (2,400,000) | (4,800,000) | (4,800,000) | (4,800,000) | |
| (Hurricane Repairs) FEMA Grant, net | (112,000,000) | (6,000,000) | 3,000,000 | 10,000,000 | 10,000,000 | FEMA forecast on additional costs and reimbursement |
| **Net Non-Operating Cash Inflow / (Outflow)** | (117,300,000) | (8,900,000) | 200,000 | 7,200,000 | 7,200,000 | |
| **Net Cash Flow** | (120,140,902) | (10,320,151) | (6,038,700) | 799,730 | 829,953 | |
| [1] Beginning Cash | 64,558,770 | 54,738,619 | 27,771,716 | 19,573,046 | 18,188,752 | |
| **Ending Cash** | 44,418,468 | 44,418,468 | 21,733,017 | 20,372,776 | 19,018,706 | |
| Restricted Cash | 1,876,996 | 1,876,996 | 1,876,996 | 1,876,996 | 1,876,996 | Assumes constant restricted cash, including grant money |
| Unrestricted Cash | 42,541,472 | 42,541,472 | 19,856,021 | 18,495,780 | 17,141,710 | |
| [5] Unrestricted Investments | 78,570,932 | 78,570,932 | | | | |
| **3rd Party Sources of Payments Under the Joint Plan** | | | | | | |
| [4] Insurance Contributions | | 29,375,000 | | | | |
| [6] Other Catholic Organizations' Contributions | | 85,000,000 | | | | |
| [6] Proceeds from Sale of Christopher Homes to Settlement Trust | | 44,710,000 | | | | |
| **Total 3rd Party Payments Under the Joint Plan** | | 158,585,000 | | | | |
| Less: 90 Days Working Capital for Debtor | | (20,751,009) | | | | |
| **Unrestricted Cash Available for Plan Payments** | 121,112,404 | 259,346,395 | 19,856,021 | 18,495,780 | 17,141,710 | |

**The Archdiocese of New Orleans**
Case No.: 20-10846
Plan of Reorganization Cash Flow Projections

| | Budget Fiscal 2025-26 | Effective Date and Six Months Ended June 30, 2026 | Plan Fiscal Year June 30, 2027 | Plan Fiscal Year June 30, 2028 | Plan Fiscal Year June 30, 2029 | Notes |
|---|---|---|---|---|---|---|
| **Administrative Offices** | | | | | | |
| **Plan Payments** | | | | | | |
| Administrative Claims | | | | | | |
| Legal Fees | $ - | $ 5,000,000 | $ - | $ - | $ - | |
| Other Professional Fees | $ - | $ 1,000,000 | $ - | $ - | $ - | includes claim reviewer |
| UST Fees | $ - | $ 500,000 | $ - | $ - | $ - | |
| Administrative Claims | $ - | $ 6,500,000 | $ - | $ - | $ - | |
| **Claims** | | | | | | |
| Class 1 - Other Priority | $ - | $ - | $ - | $ - | $ - | |
| Class 2 - Secured | $ - | $ - | $ - | $ - | $ - | |
| Class 3 - Known Abuse Claims | $ - | 123,985,000 | $ - | $ - | $ - | |
| Class 4 - Unknown Abuse Claims | $ - | $ - | $ - | $ - | $ - | |
| Class 5 - Non-Insurer Contribution Claims | $ - | $ - | $ - | $ - | $ - | |
| Class 6 - Bond Claims Principal | $ - | 589,679 | $ - | $ - | $ - | |
| Class 6 - Bond Claims Principal | $ - | 500,000 | $ - | $ - | $ - | |
| Class 7 - General Unsecured Claims and Unsecured Trade | $ - | $ - | 282,975 | 307,028 | 333,125 | |
| Class 8 - Non-Abuse Personal Injury Claims - Debtor | $ - | $ - | $ - | $ - | $ - | |
| Class 9 - Unsecured Trade Claims - Additional Debtors | $ - | $ - | $ - | $ - | $ - | |
| Class 10 - Additional Debtors' Non-Trade Unsecured Claims | $ - | $ - | $ - | $ - | $ - | |
| Total Claims | $ - | $ 225,074,679 | $ 282,975 | $ 307,028 | $ 333,125 | |
| Total Plan Payments | $ - | $ 231,574,679 | $ 282,975 | $ 307,028 | $ 333,125 | |
| Ending Unrestricted Cash After Plan Payments | $ 123,112,404 | $ 27,771,716 | $ 19,573,046 | $ 18,188,752 | $ 16,808,585 | |

## FEASIBILITY NOTES

1) The Joint Plan requires that on December 31, 2025, the Debtor and the Additional Debtors contribute $130,000,000 to the Settlement Trust. The $130,000,000 payment comes from the following sources: $5,000,000 from the Non-Debtor Catholic Entities; a cash amount from the Additional Debtors equal to $60,000,000; and a cash amount from the Debtor equal to $65,000,000.

2) The Joint Plan also requires the Debtor and Additional Debtors to issue a $20,000,000 note payable to the Settlement Trust. The note calls for four annual payments of $5,000,000 each. This analysis assumes that the note will be paid by the seller of the Affordable Housing Facilities in 2026 from proceeds from the sale of the Affordable Housing Facilities.

3) This analysis assumes that the Debtor will owe $6,500,000 in administrative expenses on the Effective Date. This figure is comprised of US Trustee fees under 28 U.S.C. § 1930 for the third and fourth quarters of 2025, the payment of fees that were previously allowed but not paid through December 31, 2025, and estimated professional fees for the Debtor and the Creditors' Committees. The various professionals for this case have provided fee estimates for the period through December 31, 2025.

4) The proforma attached to this analysis is provided solely to reflect that payments due to the Bondholders can be funded from the operations of the Archdiocese from the Effective Date through the ten-year payment period to the Bondholders.

5) The analysis does not assign a specific value to the policies of the Non-Settling Insurers, which will be assigned to the Settlement Trust.

{00383894-1}

6) The analysis also excludes proceeds from the sale of the Affordable Housing Facilities that ultimately will be paid to the Settlement Trust.

7) The analysis includes the Debtor's operations for its administrative offices, schools, and its two parishes (Our Lady of Guadalupe and the St. Louis Cathedral). The feasibility analysis reflects the Debtor's cash flows which include operational and non-operational items, including capital expenditures.

8) As of June 30, 2026, the Debtor will have approximately $48.5 million in unrestricted cash and investments. This amount includes cash of $20.8 million which represents ninety days of working capital for the Debtor's administrative offices. The additional funds are necessary to protect against non-operational contingencies such as: (a) non-payment by FEMA on capital expenditures; (b) any adverse weather event (which is not contemplated in these projections); (c) unknown repairs of a capital nature; (d) availability of funds to make Note payments to the Settlement Trust in the event a sale of the Affordable Housing Facilities is less than expected or delayed; or (e) a general downturn in donations or collections due to economic reasons or political reasons.

9) The accompanying spreadsheet depicting the feasibility analysis references certain explanatory footnotes as follows:

   a. Note 1: The beginning cash balance is per the May 31, 2025 Monthly Operating Report. Cash includes funds in segregated accounts totaling $45,070,571 and excludes tuition loan receivables classified as cash in the MOR.

   b. Note 2: Assumes an Effective Date of December 31, 2025.

   c. Note 3: Assumes a medium gross sale price of Christopher Homes of approximately $142 million.

   d. Note 4: Based on current settlements with Settling Insurers. Not all Insurers are Settling Insurers.

e. Note 5: Comprised of $76,170,740 of Portfolio A unrestricted, plus $23,221,806 of Portfolio B unrestricted, less high school deferred revenue of $20,820,614 as of May 31, 2025.

f. Note 6: Includes $60 million from Additional Debtors, $5 million from Non-Debtor Catholic Entities, $29.75 million from Settling Insurers, and $44.71 million from Christopher Homes sale which flows directly to the Settlement Trust.

g. Note 7: Includes $60 million from Additional Debtors, $5 million from Non-Debtor Catholic Entities, $29.75 million from Settling Insurers, $44.71 million from Christopher Homes sale which flows directly to the Settlement Trust, $20 million accelerated paydown on the Notes to the Settlement Trust from the Debtor and Additional Debtors' portion of the Christopher Homes sales proceeds, and $65 million from the Debtor.

10) A separate exhibit reflecting the feasibility of the Additional Debtors' $60,000,000 payment due on the Effective Date has not been prepared. A review of Disclosure Statement Exhibit 4 (consisting of the balance sheets of the Additional Debtors, including cash, investments, and real estate) shows sufficient assets to make the Effective Date payment.



# EXHIBIT 13

**The Roman Catholic Church of the Archdiocese of New Orleans**
**High Schools Cashflow Budget 2025-2026 School Year**

| | AOL | ACHS | AHHS | ARHS | ASHS | PJP | SCC | SSA | SMSS | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Inflow** | | | | | | | | | | |
| 4100 Tuition Income | 4,206,500 | 7,910,000 | 8,070,240 | 7,692,000 | 5,454,000 | 4,406,975 | 3,550,050 | 6,711,750 | 1,841,492 | 49,843,007 |
| 41xx Fee Income | 879,042 | 547,400 | 876,615 | 428,760 | 608,100 | 852,090 | 624,065 | 324,695 | 874,365 | 6,015,132 |
| 4190 Income Reductions | (360,000) | (482,000) | (749,368) | (1,077,385) | (845,025) | (556,775) | (213,988) | (265,500) | - | (4,550,041) |
| 4300 Student Activity Income | 81,200 | 78,650 | 262,000 | 376,100 | 30,100 | 100,210 | 177,000 | 60,958 | 38,040 | 1,204,258 |
| 4400 Student Services Income | 298,200 | 440,400 | 651,125 | 489,500 | 560,500 | 64,150 | 16,900 | 168,650 | 72,750 | 2,762,175 |
| 4500 Development Income | 166,500 | 356,700 | 606,500 | 505,500 | 386,500 | 78,000 | 34,500 | 350,300 | 519,998 | 3,004,498 |
| 4700 Fund Raising Income | 185,000 | 562,000 | 160,000 | 627,300 | 192,500 | 143,500 | 6,000 | 100,000 | 100,000 | 2,076,300 |
| [1] 4900 Other Income | 377,315 | 355,239 | 150,257 | 415,479 | 173,688 | 96,662 | 83,461 | 401,019 | 167,210 | 2,220,330 |
| **Total Cash Inflow** | 5,833,757 | 9,768,389 | 10,027,369 | 9,457,254 | 6,560,363 | 5,184,812 | 4,277,989 | 7,851,872 | 3,613,854 | 62,575,659 |
| **Cash Outflow** | | | | | | | | | | |
| 6100 Administration Expenses | 792,810 | 1,240,500 | 1,350,402 | 1,270,398 | 727,485 | 615,317 | 544,821 | 1,117,219 | 782,107 | 8,441,059 |
| 6200 Instructional Expenses | 2,665,631 | 4,251,800 | 4,860,643 | 3,852,235 | 2,793,950 | 2,520,910 | 1,996,610 | 3,895,075 | 2,012,239 | 28,849,092 |
| 6300 Operations & Maintenance of Plant | 985,733 | 2,240,000 | 1,613,170 | 1,775,184 | 1,201,200 | 673,098 | 1,016,539 | 1,296,926 | 424,818 | 11,226,668 |
| 6400 Other Costs | 424,450 | 490,600 | 468,526 | 529,918 | 506,600 | 215,872 | 286,118 | 359,588 | 561,199 | 3,842,871 |
| 6500 Student Activities Expenses | 432,562 | 718,400 | 859,594 | 718,721 | 637,700 | 579,696 | 471,162 | 483,968 | - | 4,901,803 |
| 6600 Student Services Expenses | 174,700 | 346,200 | 525,775 | 491,656 | 340,500 | 97,807 | 24,850 | 212,948 | 232,176 | 2,446,612 |
| 6700 Development & Marketing | 187,804 | 752,000 | 313,949 | 628,197 | 275,100 | 398,712 | 168,254 | 370,319 | 295,995 | 3,390,330 |
| **Total Cash Outflow** | 5,663,690 | 10,039,500 | 9,992,059 | 9,266,309 | 6,482,535 | 5,101,413 | 4,508,354 | 7,736,043 | 4,308,534 | 63,098,437 |
| **Net Cashflow** | 170,067 | (271,111) | 35,310 | 190,945 | 77,828 | 83,399 | (230,366) | 115,829 | (694,680) | (522,778) |
| ***Adjusting Items:*** | | | | | | | | | | |
| Add Back Depreciation | 196,000 | 1,200,000 | 485,000 | 696,000 | 470,000 | 140,000 | 420,294 | 576,000 | 359,785 | 4,543,079 |
| Capital Expenditures | (40,948) | (1,951,095) | (580,000) | (154,653) | | (196,622) | (182,413) | (100,000) | (360,000) | (3,565,731) |
| Debt Repayments (net of loan proceeds) | (5,796) | | (438,900) | (127,800) | | | (207,810) | | | (780,306) |
| **Total Net Cashflow** | 319,323 | (1,022,206) | (498,590) | 604,492 | 547,828 | 26,777 | (200,294) | 591,829 | (694,895) | (325,735) |

Notes

[1] Other Income budget is calculated as 4.5% of Portfolio A investments and 3% of Portfolio B balances at 5/31/25, plus other misc. income budgeted by the high schools



EXHIBIT 14

**The Roman Catholic Church of the Archdiocese of New Orleans**

ANO Parishes Cashflow Budget Fiscal Year June 30, 2026

|  | SLC | OLG | Total |
|---|---|---|---|
| **Cash Inflow** | | | |
| Weekly Envelopes | 210,000 | 480,000 | 690,000 |
| Loose Collection | 140,000 | 64,600 | 204,600 |
| Online Giving Collections | 40,000 | 192,800 | 232,800 |
| Votive Shrines, etc. | 645,000 | 186,600 | 831,600 |
| Rentals, Leases, Royalties | 268,000 | - | 268,000 |
| Interest Earned on Funds on Deposit | 55,000 | 10 | 55,010 |
| Donations, Legacies | 490,000 | 10,000 | 500,000 |
| Mass Stipends | 15,000 | 5,400 | 20,400 |
| Baptisms, Weddings, Funerals, etc. | 447,000 | 3,300 | 450,300 |
| Miscellaneous Income | 40,000 | 155,400 | 195,400 |
| Investment activity net of fees | 30,000 | 100,300 | 130,300 |
| **Total Cash Inflow** | **2,380,000** | **1,198,410** | **3,578,410** |
| | | | |
| **Cash Outflow** | | | |
| **Personal Costs** | | | |
| Salary - Pastor & Associates | 16,000 | 58,517 | 74,517 |
| Salary - Administrative | 85,000 | 82,900 | 167,900 |
| Salary - Housekeepers | 34,000 | 26,352 | 60,352 |
| Salary - Janitors | 112,000 | 90,340 | 202,340 |
| Salary - Music Staff | 144,000 | 800 | 144,800 |
| Salary - Others | 451,000 | | 451,000 |
| Contract Labor - Extra Priests | 9,000 | 7,600 | 16,600 |
| Contract Labor - Others | 121,000 | 83,270 | 204,270 |
| Payroll Taxes | 35,000 | 8,900 | 43,900 |
| Health Insurance Costs | 75,000 | 66,500 | 141,500 |
| Retirement Expense | 30,000 | 20,830 | 50,830 |
| **Total Personnal Costs** | **1,112,000** | **446,009** | **1,558,009** |
| **Other Operating Expenses** | | | |
| Sanctuary Expenses | 60,000 | 30,000 | 90,000 |
| Costs of Votives, Religious Goods, Etc. | 395,000 | 119,625 | 514,625 |
| Church Office Costs | 40,000 | 32,300 | 72,300 |
| Household Expenses | 15,000 | 16,700 | 31,700 |
| Professional Expense | | 800 | 800 |
| Utilities | 127,000 | 44,900 | 171,900 |
| Janitorial Supplies | 100,000 | 6,400 | 106,400 |
| Automobile and Business Expense | 9,000 | 8,280 | 17,280 |
| Conference and Travel Expense | - | 12,800 | 12,800 |
| Music Expense | 29,000 | - | 29,000 |
| Grounds Maintenance | 23,000 | | 23,000 |
| Ordinary Repairs | 105,000 | 8,000 | 113,000 |
| Social Welfare Ministry | 2,000 | 18,900 | 20,900 |
| Parish Socials and Community Events | 25,000 | | 25,000 |
| Religious Education Expense | - | 12,000 | 12,000 |
| Insurance Expense | 486,000 | 50,000 | 536,000 |

**The Roman Catholic Church of the Archdiocese of New Orleans**

ANO Parishes Cashflow Budget Fiscal Year June 30, 2026

|  | SLC | OLG | Total |
|---|---|---|---|
| Information Technology Expense | 15,000 |  | 15,000 |
| Replacement of Equipment | - | 2,000 | 2,000 |
| Bank Charges | 3,000 |  | 3,000 |
| Payroll Fees | 1,000 |  | 1,000 |
| Miscellaneous Expense | 7,000 | 46,500 | 53,500 |
| **Total Other Operating Expenses** | **1,442,000** | **409,205** | **1,851,205** |
| **Diocesan Assessements** |  |  |  |
| Parish Share | 378,000 | 188,660 | 566,660 |
| **Total Diocesan Assessments** | **378,000** | **188,660** | **566,660** |
| **Captial Expenditures** |  |  |  |
| Renovations and Repairs | - | 35,000 | 35,000 |
| Furniture, Fixtures & Equipment | 25,000 | 10,000 | 35,000 |
| **Total Capital Expenditures** | **25,000** | **45,000** | **70,000** |
| **Total Cash Outflow** | **2,957,000** | **1,088,874** | **4,045,874** |
| **Net Cashflow** | **(577,000)** | **109,536** | **(467,464)** |



# EXHIBIT 15

| Debtor Real Property | |
| --- | --- |
| **Anticipated Sales** | |
| | |
| **Property** | **Estimated FMV** |
| Holy Guardian Angels Mission Church | $ 950,000.00 |
| Residence - Bridget Street | $ 215,000.00 |
| Sacred Heart of Jesus Catholic Church - Partially Leased and certain buildings sold as separate improvements | $ 1,700,000.00 |
| Single family house across from Notre Dame Seminary (Fig St.) | $ 195,000.00 |
| St. Bonaventure Church | $ 560,000.00 |
| St. John Bosco Church and Laureate Academy, residence | $ 1,950,000.00 |
| St. Louis Cathedral Academy (Partially | $ 1,446,000.00 |
| St. Pius X Church | $ 25,000.00 |
| St. Teresa of Avila | $ 1,450,000.00 |
| Vacant Land - Holy Trinity Drive | $ 1,205,000.00 |
| Old Hannan High | $ 1,500,000.00 |
| Madonna Manor | $ 2,000,000.00 |
| | |
| Subtotal | $ 13,196,000.00 |
| Less; Commissions and closing costs @ 6% | $ (791,760.00) |
| | |
| Net Estimated Sales Proceeds | $ 12,404,240.00 |

1



# EXHIBIT 16

## Archdiocese of New Orleans - Bondholder Debt

Compound Period ......... :  Annual

Nominal Annual Rate .... :  8.500 %

### CASH FLOW DATA

| | Event | Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|---|
| 1 | Loan | 12/31/2025 | 4,185,519.00 | 1 | | |
| 2 | Payment | 01/01/2026 | 588,068.11 | 10 | Annual | 01/01/2035 |

### AMORTIZATION SCHEDULE - Normal Amortization

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| Loan   12/31/2025 | | | | 4,185,519.00 |
| 2025 Totals | 0.00 | 0.00 | 0.00 | |
| 1   01/01/2026 | 588,068.11 | 974.71 | 587,093.40 | 3,598,425.60 |
| 2026 Totals | 588,068.11 | 974.71 | 587,093.40 | |
| 2   01/01/2027 | 588,068.11 | 305,866.18 | 282,201.93 | 3,316,223.67 |
| 2027 Totals | 588,068.11 | 305,866.18 | 282,201.93 | |
| 3   01/01/2028 | 588,068.11 | 281,879.01 | 306,189.10 | 3,010,034.57 |
| 2028 Totals | 588,068.11 | 281,879.01 | 306,189.10 | |
| 4   01/01/2029 | 588,068.11 | 255,852.94 | 332,215.17 | 2,677,819.40 |
| 2029 Totals | 588,068.11 | 255,852.94 | 332,215.17 | |
| 5   01/01/2030 | 588,068.11 | 227,614.65 | 360,453.46 | 2,317,365.94 |
| 2030 Totals | 588,068.11 | 227,614.65 | 360,453.46 | |
| 6   01/01/2031 | 588,068.11 | 196,976.10 | 391,092.01 | 1,926,273.93 |
| 2031 Totals | 588,068.11 | 196,976.10 | 391,092.01 | |
| 7   01/01/2032 | 588,068.11 | 163,733.28 | 424,334.83 | 1,501,939.10 |
| 2032 Totals | 588,068.11 | 163,733.28 | 424,334.83 | |
| 8   01/01/2033 | 588,068.11 | 127,664.82 | 460,403.29 | 1,041,535.81 |
| 2033 Totals | 588,068.11 | 127,664.82 | 460,403.29 | |
| 9   01/01/2034 | 588,068.11 | 88,530.54 | 499,537.57 | 541,998.24 |
| 2034 Totals | 588,068.11 | 88,530.54 | 499,537.57 | |
| 10   01/01/2035 | 588,068.11 | 46,069.87 | 541,998.24 | 0.00 |
| 2035 Totals | 588,068.11 | 46,069.87 | 541,998.24 | |
| Grand Totals | 5,880,681.10 | 1,695,162.10 | 4,185,519.00 | |



# EXHIBIT 17

**Consolidated Summary - Pre-Petition Accounts Payable**

| Debtor Location | Amount |
|---|---|
| Archdiocese Administrative Offices | $ 182,739.45 |
| Academy of Our Lady | 4,632.58 |
| Archbishop Chapelle High School | 32,316.78 |
| Archbishop Rummel High School | 67,333.70 |
| Archbishop Hannah High School | 35,151.14 |
| Archbishop Shaw High School | 39,293.28 |
| St. Charles Catholic High School | 9,161.21 |
| Pope John Paul II High School | 27,906.88 |
| St. Scholastica Academy | 92,370.00 |
| St. Michael Special School | 1,782.76 |
| St. Louis Cathedral | 1,860.01 |
| Our Lady of Guadalupe | 3,594.26 |
| | $ 498,142.05 |



# EXHIBIT 18

Debtor Loans versus Funds in Portfolio B
June 30, 2025

| LOC # | LOCATION | Loans | Deposits |
|---|---|---|---|
| 16.25 | Willam MacMaster | $ 1,883.26 | $ - |
| 16.6 | Rev. Emile George Noel III | $ 56,458.62 | $ - |
| 30 | Rev. Gerard Howell | $ 8,122.78 | $ - |
| 98 | Rev. John Asare-Dankwah | $ 2,887.30 | $ - |
| 108 | St. Augustine Parish | $ 168,311.23 | $ 3,842.49 |
| 150 | St. Peter Claver Parish | $ 167,309.33 | $ 179,410.68 |
| 150.5 | St. Peter Claver School | $ 107,087.92 | $ - |
| 154 | St. Pius X Parish | $ 2,014,824.48 | $ 10,520.04 |
| 171 | St. Josephine Bakhita Church | $ 129,859.47 | $ - |
| 173 | Mary, Help of Christians | $ 531,060.91 | $ - |
| 174 | St. Michael the Archangel Church | $ 315,671.73 | $ 143,044.31 |
| 175 | St. John Paul II Church | $ 3,062.50 | $ - |
| 206 | St. Anthony Parish | $ 106,995.07 | $ 21,584.70 |
| 216 | St. Peter Parish | $ 3,032,702.02 | $ 345,915.41 |
| 222 | The Visitation of Our Lady Parish | $ 2,459,141.52 | $ 70,903.97 |
| 247.5 | Our Lady of Divine Providence Schoo | $ 233,248.30 | $ 310.33 |
| 263 | St. Thomas Parish | $ 260,849.22 | $ - |
| 267 | St. Peter Parish | $ 401,465.21 | $ 26,958.71 |
| 274 | Christ the King Parish | $ 248,653.48 | $ 19,408.92 |
| 275 | Our Lady of Lourdes Parish | $ 448,491.32 | $ 1,403.31 |
| 277 | Our Lady of Prompt Succor Parish | $ 577,348.21 | $ 11,166.26 |
| 280 | Divine Mercy Parish | $ 14,248,879.89 | $ 53,180.08 |
| 288 | Most Holy Trinity Parish | $ 13,053,347.82 | $ 139,793.92 |
| 293 | St. John of the Cross Parish | $ 421,598.03 | $ 4,644.72 |
| 307 | St. Therese Academy for Exceptional | $ 286,073.43 | $ 4,640.93 |
| 338 | Christopher Homes, Inc.* | $ 3,019,932.27 | $ 3,019,932.27 |
| 361 | Hanmaum Korean Catholic Church | $ 387,500.00 | $ 153,991.98 |
| 523 | St. Tammany Catholic Cemetery | $ 1,538,972.55 | $ - |
| 524 | Holy Trinity Land Corp. | $ 728,600.68 | $ - |
| | | $ 44,960,338.55 | $ 4,210,653.03 |

* Actual cash balance is $6,555,951.40 but shown here as limited to amount of loan



EXHIBIT 19

Documents Considered

1. Semi Annual Financial Information as of December 31, 2024
2. Professional Fees Breakdown as of July 31, 2025
3. Transcript of Bankruptcy Proceedings July 31, 2025
4. Disclosure Statement for the Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors and Exhibits [ECF 4151]
5. First Amended Disclosure Statement for the First Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors and Exhibits [ECF 4193]
6. Joint Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors and Exhibits [ECF 4150]
7. First Amended Joint Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors and Exhibits [ECF 4192]
8. Second Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of August 6, 2025 [ECF No. 4235]
9. Second Amended Modified Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of August 6, 2025 [ECF No. 4242]
10. The McEnery Company Real Property Expert Report dated August 29, 2025
11. Our City Our Cathedral Overview
12. Louisiana WARN Act Overview
13. Holy Trinity Drive Land Corporation Financials for the 12 months ended June 30, 2024
14. Estimated and Historical Maintenance and Utility Cost Summary
15. Wind-down cost estimate and payroll and expense detail
16. Debtor Administrative Offices 2025/2026 Preliminary Budget File
17. Debtor – Our Lady of Guadalupe Parish 2025/2026 Budget
18. Debtor – St Louis Cathedral Budget 2025/2026
19. Archdiocese of New Orleans Priest Pension Plan Actuarial Valuation Report Disclosure for Fiscal Year Ending June 30, 2025, and 2026 Benefit Cost Under US GAAP, prepared by Willis Towers Watson US LLC
20. Archdiocese of New Orleans Priest Retiree Medical Plan Actuarial Valuation Report Disclosure for Fiscal Year Ending June 30, 2025, and 2026 Benefit Cost Under US GAAP, prepared by Willis Towers Watson US LLC
21. Archdiocese of New Orleans Loan Activity Detail 2024 -2025
22. Consumer Price Index for All Urban Consumers (CPI-U) for 2005- 2025
23. Fed Funds Rate and Prime Rate support
24. Detail of Ida deductible as of August 25, 2025
25. Pre-petition AP detail by Debtor location
26. Debtor Vehicle list
27. Debtor Vehicle Kelly Blue Book Value Support

28. May 2025 Monthly Operating Report and related support
29. Schedule of Assets Sold During Chapter 11
30. Confidential Memorandum of Understanding (Settlement Agreement) between the Debtor, the Apostolates, and the Official Committee of Unsecured Creditors as Redacted [ECF 4020-1]
31. 2025/2026 Insurance Summary and Allocation prepared by Debtor
32. Schedule of Flood Insurance Policies prepared by the Debtor
33. Claim Count by DLS#
34. Various email correspondence with Gallagher on Chapter 7 insurance costs
35. Email correspondence re: Stout survivor claim values
36. Email correspondence with Debtor on FEMA
37. Email correspondence with Debtor on shut-down expenses
38. Excel summary of estimated insurance costs for Chapter 7 prepared by Gallagher
39. Additional Debtors' Financial Statements as of December 31, 2024
40. CHI Newmark Analysis for Sale Scenarios
41. Invesco Solutions, *2025 Capital Market Assumptions: Q1 Update (USD)*, Invesco, 2025.
42. William Edwards, "Stocks vs. Bonds: Vanguard Says 70% Allocation to Fixed Income Is Smart," *Business Insider*, August 6, 2025.
43. TD Asset Management Inc., *Long-Term Asset Class Assumptions*, September 30, 2024.
44. Art & Collectibles Summary and related appraisals
45. Federal News Network FEMA article dated September 2, 2025
46. June 2021 Budget Financials Workbook – V2 (Administrative Office)
47. June 2023 Financials and 2024 Budget Working (Administrative Office)
48. June 2025- Financials Workbook (Administrative Office)
49. June 2026 Prelim Budget File Financials (Administrative Office)
50. Fixed Asset Detail & Reconciliation for FYE June 2021 to June 2025 (Administrative Office)
51. 23.24 High School Cash Forecast (includes 21.22 and 22.23 Financials)
52. 23.24 High School Financial Report
53. 24.25 High School Financial Report
54. 25.26 High School Preliminary Budgets v2
55. 25.26 High School Budget Interest Income
56. High School Capital Projects Budget 25.26
57. Archbishop Hannan High School Cash Reserves and Planned Capital Expenditures FY 2026
58. Email regarding Archbishop Chapelle High School Capital Projects
59. Email regarding Pope John Paul High School Capital Projects
60. Detailed Profit & Loss Statement for all ANO High Schools for FY 2025
61. Analysis – Cash and Investments 5-2025
62. 2023 – ANO Parish Finance Reports
63. 2024 – ANO Parish Finance Reports
64. Our Lady of Guadalupe Balance Sheet and Profit and Loss as of 6/30/25
65. St Louis Cathedral Balance Sheet and Profit and Loss as of 6/30/25
66. Email regarding the St Louis Cathedral 2025-26 Budget
67. Parish Temporalities Manual
68. Parish Services Agreement All Saints Parish New Orleans

69. List of Parish Services Agreements by Parish
70. Miscellaneous Notes
71. DLS Deposit Summary June 30, 2025
72. DLS Loan Summary June 30, 2025
73. St Tammany Catholic Cemetery Financials for June 30, 2024



# EXHIBIT 20

**CHRISTOPHER G. LINSCOTT**
**3443 N. CAMPBELL AVENUE, SUITE 115**
**TUCSON, ARIZONA 85719**
**(520) 884-0176**

| | |
|---|---|
| **EDUCATION:** | B.A. Psychology, Amherst College, 1980<br>M.S. Accounting, New York University GBA, 1982<br>Certified Public Accountant (CPA) 1984<br>Certified Fraud Examiner (CFE) 1992<br>Certified Insolvency and Restructuring Advisor (CIRA) 1997 |

**BACKGROUND:**

1994 - Present
**DIRECTOR**
**Keegan Linscott & Associates, PC**

Owner of CPA firm. Head of bankruptcy and reorganization, litigation support, and forensic accounting practice for the firm.

1990-1993
**DIRECTOR, LITIGATION SUPPORT SERVICES**
**Coopers & Lybrand – Tucson, AZ**

Responsible for work associated with financial aspects of clients and support for attorneys involved in litigation, fraud, receivership cases and bankruptcy work primarily in Arizona. Duties included damage calculation review and preparation, forensic accounting and financial analysis. Other duties included manager responsibilities for financial audits.

1989-1990
**CHIEF FINANCIAL OFFICER**
**Tombstone & Southern Railroad, Inc.**

Served for two years as CFO of start-up real estate and entertainment project in Cochise County. As one of three principals in this project, duties encompassed finance; budgeting, taxes, financial reporting, prospective reporting, capital solicitation, cash management and development of a business plan. Non-financial responsibilities included marketing, public speaking and recruitment of personnel.

1981-1989
**SENIOR AUDIT MANAGER**
**Peat Marwick Main & Co. – New York, NY**
**Peat Marwick Main & Co. – Boston, MA**

Responsibilities included the supervision of fifty staff people on sixty audits for twelve clients. Duties included public and private reporting to the SEC and other third parties, day-to-day management of field work, oral and written presentations to top client management and Board of Directors, technical problem-solving and profit maximization. Areas of industry expertise include real estate, financial institutions, higher education, and manufacturing.

**RANGE OF EXPERIENCE:**

Served as Trustee for various Chapter 11 and Chapter 7 entities primarily in the real estate, hospitality and health care sectors.

Served as Chief Restructuring Officer for corporate commercial entity in Chapter 11.

Served as Examiner in Chapter 11 proceedings focusing on real estate entities and alleged fraud.

Served as "Responsible Party" (Trustee) for Chapter 11 debtor in successful corporate reorganization.

Served as Receiver for corporate commercial entities and financial institutions in Arizona and California.

Served as Liquidating Trustee for corporate commercial entities.

Served as Plan Agent in Chapter 11 proceeding.

Served as Court appointed Special Master in commercial litigation case.

Prepared operating cash forecasts for real estate projects, commercial entities, municipal and non-profit businesses.

Developed financial packages used to obtain project financing for real estate projects and commercial entities.

Assisted in due diligence reviews of corporate commercial acquisitions and joint ventures.

Assisted in the preparation of SEC filings for bankrupt real estate entities.

Served as accountant for various creditor committees in Chapter 11 proceedings to analyze fraudulent conveyance and preference issues and financial viability of ongoing entities.

Reviewed bankruptcy documents of various commercial entities to determine asset liquidation preference and financial viability of ongoing entity.

Served as financial advisor for various Chapter 11 entities, assisting with various aspects of corporate reorganization.

Provided expert witness testimony, including damage analysis and accounting-related issues in commercial litigation cases dealing with lost profits, owner disputes, securities fraud, employee/employer disputes, personal injury, business interruption claims and various other matters.

Performed various fraud analyses and forensic procedures related to litigation in Ponzi schemes and employee embezzlement schemes.

Constructed damage theories including computer-generated models for commercial businesses involved in litigation.

Analysis of sole and separate property issues, hidden assets and closely held corporations in divorce settlement litigation.

**PROFESSIONAL
ORGANIZATIONS:**    Member of the Arizona Society of CPA's, American Institute of Certified Public Accountants, National Association of Certified Fraud Examiners, Association of Insolvency and Restructuring Advisors.


**PUBLICATIONS:**    Arizona Attorney Magazine, September 2020, "Bankruptcy and the Small Business Reorganization Act".



# EXHIBIT 21

Christopher G. Linscott
Trustee Experience

## Chapter 7 Trustee and Liquidating Trustee Work

| | |
|---|---|
| Tucson Clinical Care, LLC | Stand Alone Hospital in Tucson, Arizona |
| Farwest Pump Company | Well and Pump Company |
| Murphy R. Kittrell, Jr. and Barbara C. Kittrell | Individual Bankruptcy inclduing numerous businesses |
| Claims AF Irrevocable Trust | Insurance-related Liquidating Trust |
| Suncor Liquidating Trust | Residential Real Estate in AZ, UT, NM |
| Green Fields School Liquidating Trust | Secondary School and Real Estate |
| Pasadera Behavioral Health Network Liquidating Trust | Behavioral Health Provider and Real Estate |

## Chapter 11 and Liquidating Chapter 11 Trustee Work

| | |
|---|---|
| McMahon Properties, LLC | Real Estate |
| Saunders of Yuma, LLC | Hotel |
| Rudolpho Valenzuela | Individual Bankruptcy including Law Practice |
| HTG Molecular Diagnostics, Inc. | Biomed Company |



# EXHIBIT 22

CHRISTOPHER G. LINSCOTT, CPA, CFE, CIRA
SUMMARY OF EXPERT WITNESS TESTIMONY
2020 - 2025

| YEAR | PLAINTIFF/PETITIONER | DEFENDANT/RESPONDENT | ISSUE | TESTIMONY RENDERED | TRIER OF FACT | CLIENT ATTORNEY / CLIENT ATTORNEY FIRM | OPPOSING COUNSEL / OPPOSING FIRM |
|---|---|---|---|---|---|---|---|
| 2025 | PRESCOTT BREWING COMPANY, INC. ET AL.* | HANNAY REALTY ADVISORS ET AL. | BREACH OF CONTRACT ET AL. | DEPOSITION | N/A | DALE SCHIAN GALLAGHER & KENNEDY, P.A. | GERALD SHELLEY FENNEMORE CRAIG, P.C. |
| 2025 | 20th STREET OSBORN, LLC | STEVEN MARSHALL ET AL.* | BREACH OF CONTRACT ET AL. | DEPOSITION | N/A | JUSTIN FOUTS DEGNAN LAW GROUP | JENNIFER AXEL ET AL. MURPHY CORDIER CASALE AXEL, PLC |
| 2024 | NBD ENTERPRISES, LLC* | ACP INVESTMENTS, LLC ET AL. | FRAUD, APPOINTMENT OF RECEIVER ET AL. | TRIAL | JUDGE | JESSE CALLAHAN MAY, POTENZA ET AL. | WARREN STAPLETON OSBORN MALEDON |
| 2024 | NT PROPERTIES, LLC* | KENNETH M. SILVERMAN ET AL. | BREACH OF CONTRACT ET AL. | DEPOSITION | N/A | EVAN THOMPSON THOMPSON KRONE PLC | WILLIAM WALKER WILLIAM WALKER PC |
| 2022 | MORGAN CORBELL FOR RYLEE RIVERS* | ENERPAC TOOL GROUP CORP ET AL. | WRONGFUL DEATH | DEPOSITION | N/A | NATHAN WEBB MILLER PITT ET AL. | GABRIEL OQUIN SLATTERY & PETERSEN |
| 2022 | STATE OF ARIZONA | JERONE DAVIS* | FRAUD | INTERVIEW | N/A | JUSTIN CLUCK PIMA COUNTY PUBLIC DEFENDER | STERLING STRUCKMEYER ASSISTANT ATTORNEY GENERAL |
| 2022 | MOSES GOMEZ | O'REILLY CHEVROLET, INC.* | WRONGFUL TERMINATION | DEPOSITION | N/A | ROBERT GARCIA FARHANG & MEDCOFF | GENE GOLDSMITH GOLDSMITH & MENDOZA PLLC |
| 2022 | STAR MOUNTAIN PLAN TRUST* | TITAN MINING CORPORATION ET AL. | FRAUDULENT TRANSFER, ETC... | DEPOSITION | N/A | ANTHONY CALI STINSON, LLP | BOB HARRIS QUARLES & BRADY, LLP |
| 2022 | OFFICIAL COMMITTEE OF TORT CREDITORS | DIOCESE OF HARRIBURG* | MOTION FOR DERIVATIVE STANDING | TRIAL | JUDGE | BLAKE ROTH WALLER LANSDEN ET AL. | ROB KUGLER STINSON, LLP |
| 2021 | NOVA FINANCIAL INVESTMENT CORP* | GERI FARR ET AL. | BREACH OF CONTRACT ETC... | DEPOSITION | N/A | ROBERT GARCIA FARHANG & MEDCOFF | JOHN KERKORIAN BALLARD SPAHR |
| 2021 | ANDES INDUSTRIES, INC., PCT INTERNATIONAL, INC. * | ROBINS KAPLAN | CHAPTER 11 FEASIBILITY | TRIAL | JUDGE | TOM SALERNO & ANTHONY CALI STINSON LLP | BOB HARRIS, ED SALANGA, QUARLES & BRADY, LLP |
| 2021 | ANDES INDUSTRIES, INC., PCT INTERNATIONAL, INC. * | ROBINS KAPLAN | CHAPTER 11 FEASIBILITY | DEPOSITION | N/A | TOM SALERNO & ANTHONY CALI, STINSON, LLP | BOB HARRIS, ED SALANGA, QUARLES & BRADY, LLP |
| 2020 | CLICKAWAY CORPORATION | VERIZON* | FRAUDULENT TRANSFER, ETC... | TRIAL | JUDGE | MARK CARDER STINSON, LLP | WENDY SMITH BINDER & MALTER, LLP |
| 2020 | KALIL BOTTLING CO.* | FIJI WATER COMPANY, LLC | BREACH OF CONTRACT | ARBITRATION | ARBITRATOR | JAMES M. SAKRISON SLUTES, SAKRISON & ROGERS, P.C. | JOHNNY TRABOULSI ROLL LAW GROUP PC |
| 2020 | PRESTON CONTRACTORS, INC. | REPUBLIC SERVICES PROCUREMENT, INC.* | BREACH OF CONTRACT | DEPOSITION | N/A | EMILY WARD FENNEMORE CRAIG, PC | SAM HRKO BAILEY & GLASSER LLP |
| 2020 | CLICKAWAY CORPORATION | VERIZON* | FRAUDULENT TRANSFER, ETC... | DEPOSITION | N/A | MARK CARDER STINSON, LLP | WENDY SMITH BINDER & MALTER, LLP |
| 2020 | AMANDA PENALVER ET AL. | HORTICULTURE UNLIMITED, INC. ET AL.* | WRONGFUL DEATH | DEPOSITION | N/A | PETER COLLINS GUST ROSENFELD | BERNARDO GONZALEZ LAW OFFICE OF THOMAS J. HENRY |
| 2020 | KALIL BOTTLING CO.* | FIJI WATER COMPANY, LLC | BREACH OF CONTRACT | DEPOSITION | N/A | JAMES M. SAKRISON SLUTES, SAKRISON & ROGERS, P.C. | JOHNNY TRABOULSI ROLL LAW GROUP PC |
| 2020 | BENJAMIN & ANGELA MORGAN* | JOHN & THERESA SCHRECK | TRESPASS, CONVERSION ETC... | DEPOSITION | N/A | RYAN O'NEAL DECONCINI MCDONALD | ROSCOE MUTZ FARHANG & MEDCOFF |
| 2020 | FEDERAL TRADE COMMISSION | TATE'S AUTO CENTER OF WINSLOW ET AL.* | FRAUD, VIOLATION OF FTC ACT | DEPOSITION | N/A | CRAIG MCCARTHY GUST ROSENFELD | NAOMI TAKAGI FEDERAL TRADE COMMISSION |

* Denotes client

109