PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "Agreement") is hereby entered into effective as of the 3rd day of September 2025 (the "Effective Date") is entered into as of the Effective Date, by and among the parties named in **Exhibit P** attached hereto (herein, collectively, "Selling Parties" and each individually "Seller") and Tredway Acquisitions LLC, a Delaware limited liability company ("Purchaser").

WITNESSETH:

WHEREAS, Purchaser desires to purchase from Selling Parties those multifamily projects (each individually, a "Project", and collectively, the "Projects") described in **Exhibit R** hereto (the "Recital Exhibits"), the legal description for each Project will be added to **Exhibit R** within three (3) Business Days of the Effective Date using the applicable Seller's existing title policy; and

WHEREAS, Selling Parties each desire to sell to Purchaser their respective Project which is located on the land described in each of the Recital Exhibits

WHEREAS, each of the Selling Parties agrees to sell to Purchaser and Purchaser agrees to purchase from each of the Selling Parties, upon and subject to the terms and conditions set forth in this Agreement, the Property (as defined in Section 1.1 hereof).

## **DEFINITIONS**

Unless otherwise defined herein, any term with its initial letter capitalized in this Agreement shall have the meaning set forth in forth in the Recital Exhibits, as applicable to the respective Project.

NOW, THEREFORE, in consideration of the premises and other mutual covenants and agreements hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions of the Agreement, Seller and Purchaser hereby covenant and agree as follows:

## I. INCLUSIONS IN SALE

1.1     With respect to each of the Projects, there shall be included in the sale all of the following (collectively, the "Property"):

1.1.1    The Land (as defined with respect to each Project in the Recital Exhibits), together with all rights and appurtenances pertaining thereto, including, without limitation, any and all rights of Seller in and to all: oil, gas and other minerals, air and development rights, roads, alleys, easements, streets and ways adjacent to the Land, rights of ingress and egress thereto, any strips and gores within or bounding the Land, profits or rights or appurtenances pertaining to the Land, and all goodwill, intellectual property, licenses, and permits owned and assignable by Seller and used in connection with the Project.

1.1.2   All buildings, and all other improvements, structures and fixtures placed, constructed or installed on the Land (collectively, the "Improvements").

1.1.3   All right, title and interest of Seller, as the landlord, in and to all residential and commercial leases (individually, a "Lease", collectively, the "Leases") covering space situated at or within the Land or Improvements and any claim or right to claim against a residential or commercial tenant or occupant (individually, a "Tenant", collectively, the "Tenants") under any Lease and all security deposits relating to the Leases.

1.1.4   To the extent assignable, all of Seller's rights in and to all contractual rights and intangibles with respect to the ownership, operation, maintenance, repair and improvement of the Land and Improvements, including service and maintenance agreements, construction, material and labor contracts, utility agreements and other contractual arrangements, to the extent assignable by Seller (collectively, the "Contracts") and warranties of any contractor, manufacturer or materialman with respect to the Project. No later than forty five (45) days prior to the Closing Date, Purchaser shall provide to Selling Parties a list of Contracts that it intends to assume (the "Assumed Contracts"). All Contracts which do not constitute Assumed Contracts shall be terminated by Selling Parties, at Selling Parties' sole cost and expense, on or prior to the Closing Date.

1.1.5   All equipment, furnishings, fixtures, supplies, and other tangible personal property owned by Seller placed or installed on or about the Land or Improvements now or prior to "Closing" (as such term is defined below in this Agreement) and used as part of or in connection with the Land or Improvements (collectively, the "Personal Property").

1.1.6   All of Seller's interest in the right to the use of the Project name and all logos, if any, associated therewith (collectively, the "Trade Name").

1.1.7   All of Seller's rights in and to any website, domain names, URL, Facebook pages, Twitter accounts or other social media or internet presence related to the Project or used by Seller in connection with the leasing and/or operation of the Project (the "Domains").

1.1.8   In the event any Agency Approvals require that any accounts, escrows, or reserves be delivered to Purchaser at Closing (or otherwise remain with the Projects) (the "Transferring Accounts"), all of Seller's interest and rights to the Transferring Accounts. Selling Parties shall not receive a credit to the Purchase Price for such Transferring Accounts. Should the Department of Housing and Urban Development ("HUD") agree to permanently release any existing HUD-required reserves, such reserves shall be released to Seller and the Purchase Price shall be reduced on a dollar-for-dollar basis.

## II.  PURCHASE PRICE

2.1     The purchase price (the "Purchase Price") for the Projects shall be the sum of One Hundred Fifty Two Million and no/100 Dollars ($152,000,000.00), subject to adjustments as provided for herein.  Within two (2) business days after the Effective Date, Purchaser shall deposit into escrow with the Escrow Agent (as hereinafter defined) the amount of One Million Five Hundred Thousand and no/100 Dollars ($1,500,000.00)

2

as an earnest deposit ("Earnest Deposit"), and within one (1) Business Day following the Due Diligence Expiration Date (as hereinafter defined), unless this Agreement shall have been terminated in accordance with its terms, Purchaser shall deposit into escrow with Escrow Agent the amount of One Million Five Hundred Thousand and no/100 Dollars ($1,500,000.00) as an additional earnest deposit (which said additional earnest deposit shall be an addition to the Earnest Deposit, and the Earnest Deposit shall thereafter be defined herein as the $3,000,000.00 aggregate sum held by Escrow Agent). The Escrow Agent shall deposit the Earnest Deposit in a federally insured, interest bearing account in the name of Purchaser with interest thereon accruing for the benefit of Purchaser. The Earnest Deposit shall be held and disbursed in accordance with the terms and conditions of this Agreement and applied against the Purchase Price, as directed by Selling Parties, at Closing. The Purchase Price shall be allocated among the various Projects at the reasonable discretion of the Purchaser. Should HUD, or any other lender to the Projects, agree to the assumption of existing debt (including without limitation any Capital Advance Loan) by Purchaser, the Purchase Price shall be reduced on a dollar-for-dollar basis by such assumed debt.

2.2     The Earnest Deposit shall be refundable to Purchaser only as stated in Section 3.1, Section 3.2, Section 3.4, Section 5.1.12, Article XI or Section 12.1 of this Agreement; and shall otherwise be immediately delivered, subject to Section 12.2, to the Selling Parties as directed by Selling Parties, upon termination of this Agreement and/or default by Purchaser.

2.3     The Earnest Deposit shall be delivered to Seller at Closing, as directed by Selling Parties, and the balance of the Purchase Price, subject to adjustment and proration as provided herein, shall be paid by wire transfer, bank, official or certified check, or any combination thereof, to the Escrow Agent no later than 5:00 p.m. eastern time, on the Closing Date.

2.4     As used herein, the term "Escrow Agent" or "Title Company" shall mean and refer to Chicago Title Insurance Company, or such other national title insurance company at the sole discretion of the Purchaser.

## III.  DUE DILIGENCE, APPROVAL PERIODS AND CONTINGENCIES

3.1     Within seven (7) days of the Effective Date, to the extent in Selling Parties' possession or control, each Seller shall deliver to Purchaser those documents and materials, with respect to Seller's respective Project, listed on **Exhibit A**, along with such updates as the parties may mutually agree within three (3) business days of the Effective Date (the "Due Diligence Records"). Commencing on the Effective Date and terminating on the date which is sixty (60) days thereafter (herein, said 60-day period is the "Due Diligence Period", and the date on which said period ends is the "Due Diligence Period Expiration Date"), Purchaser shall have the right, during normal business hours, to conduct an inspection of the Improvements, Personal Property and Land, all books and records and financial information concerning the Property to the extent located in the Improvements, and to obtain, perform and/or review a survey and title commitment and reports with respect to the Property (as more specifically described

in <u>Section 3.2</u>), and otherwise do that which, in Purchaser's sole opinion, is necessary or desirable to determine the suitability of the Property for Purchaser's intended use and operation. During the Due Diligence Period, each Seller shall cooperate with Purchaser to facilitate access to the Property during normal business hours and the inspection of the books and records pertaining to the Property, including but not limited to, furnishing to Purchaser, to the extent in Seller's possession or control, such information, materials and documents as Purchaser may reasonably request (with such items constituting "Due Diligence Records"). If Purchaser shall find such inspections to be unsatisfactory, as determined by Purchaser in its sole and absolute discretion, for no reason or any reason, Purchaser shall have the right, at its option, to be exercised not later than the Due Diligence Period Expiration Date, to terminate this Agreement (in its entirety and not with respect to any individual Project subject to the provisions of Article 11 hereof) by delivering written notice of termination to Selling Parties and Escrow Agent prior to the Due Diligence Period Expiration Date ("<u>Purchaser Termination Notice</u>"), upon which delivery of Purchaser Termination Notice the Earnest Deposit shall be delivered by Escrow Agent to Purchaser.

3.1.1    If Purchaser does not exercise its termination right under this Section 3.1, Purchaser shall have the right until Closing to continue to conduct, during normal business hours, examinations and inspections of the Property deemed reasonably necessary or desirable in Purchaser's discretion. Each Seller shall cooperate with Purchaser to facilitate reasonable access to the Property and the inspection of the books and records during normal business hours, including but not limited to, furnishing to Purchaser, to the extent such information is in Selling Parties' possession or control, such information, materials and documents as Purchaser may reasonably request.

3.1.2    Notwithstanding anything in this Agreement to the contrary, Purchaser shall not permit any mechanic's or materialmen's liens or any other liens to attach to any of the Property by reason of the performance of any work or the purchase of any materials by Purchaser or any other party in connection with any inspections or activities conducted by or for Purchaser. Purchaser shall give forty eight (48) hours' notice to Selling Parties prior to entry onto any Land and shall permit Seller to have a representative present during all inspections or activities conducted at the Property. Purchaser shall take all reasonable actions and implement all protections necessary to ensure that all actions taken in connection with the investigations and inspections of any Property, and all equipment, materials and substances generated, used or brought onto any Property pose no threat to the safety of persons or the environment and cause no damage to the Property or other property of Seller or other persons. All information made available by any Selling Parties to Purchaser in accordance with this Agreement or obtained by Purchaser in the course of its inspections shall be treated as confidential information by Purchaser, and, prior to the purchase of the Projects by Purchaser, Purchaser shall prevent its agents from divulging such information to any unrelated third parties except as reasonably necessary to third parties engaged by Purchaser for the limited purpose of analyzing and investigating such information for the purpose of consummating the transaction contemplated by this Agreement. Each Seller acknowledges and agrees that Purchaser will have to make direct contact with lending institutions and various governmental, regulatory and housing agencies and authorities having jurisdiction over the Property or any part thereof in order to effectuate this

4

4

transaction and such contact shall not constitute a breach of this provision. The provisions of this Section 3.1.2 shall survive the termination of this Agreement for a period of twelve (12) months, and if not so terminated shall survive (except for the confidentiality provisions of this Section 3.1.2) the Closing (as hereinafter defined).

3.1.3    Purchaser shall indemnify, hold harmless and, if requested by any Seller (in said Seller's sole discretion), defend (with counsel approved by Seller) Seller, together with Seller's affiliates, parent and subsidiary entities, successors, assigns, partners, managers, members, employees, officers, directors, trustees, shareholders, counsel, representatives, agents, from and against any and all damages, mechanics' liens, liabilities, losses, demands, actions, causes of action, claims, costs and expenses (including reasonable attorneys' fees, including the cost of in-house counsel and appeals) (collectively, "Losses") arising from or related to activities of Purchaser, its employees, agents or contractors pursuant to the inspection rights granted herein; however, the Purchaser's indemnity hereunder shall not include any Losses resulting from (x) the acts of Seller, its agents or representatives, or (y) the discovery of any pre-existing conditions on the Property. The provisions of this Section 3.1.3 shall survive the termination of this Agreement for a period of twelve (12) months, and if not so terminated shall survive the Closing (as hereinafter defined).

3.1.4    Notwithstanding anything in this Agreement to the contrary, each Seller shall have the right, without limitation, to disapprove any and all entries, surveys, tests, investigations requested by Purchaser to be performed following end of the Due Diligence Period that, in such Seller's reasonable judgment, could result in any injury to the Property or breach of any contract, or expose Seller to any losses or violation of applicable law. No consent by Seller to any such activity shall be deemed to constitute a waiver by any Seller or assumption of liability or risk by any Seller. Purchaser agrees to restore, at Purchaser's sole cost and expense, all Property to the same condition existing immediately prior to Purchaser's exercise of its rights pursuant to this Article 3. The provisions of this Section 3.1.4 shall survive the termination of this Agreement, and if not so terminated, the Closing.

3.2    Purchaser shall order title insurance commitments from the Title Company for each Project (the "Title Commitments"), at Purchaser's cost and deliver copies of said Title Commitments to Selling Parties. On or before the date that is not later than forty five (45) days following the Effective Date, Purchaser shall forward to Selling Parties any written objections ("Title Objections") that Purchaser has to the Title Commitments and any applicable survey, which written objections shall be indicated by individual Project (with respect to each Project, a "Title Disapproval Notice", and collectively, "Title Disapproval Notices"). Each Seller shall have until the date which is twelve (12) days after the date of receipt by Selling Parties of the last Title Disapproval Notice (the "Title Cure Expiration Date")(it being possible that Title Disapproval Notices for different Projects might not delivered to Selling Parties on the same date), in Seller's sole discretion, to give Purchaser notice (each a "Title Response") of those Title Objections that Seller is willing to cure, if any. With the prior written consent of Purchaser, Selling Parties shall be entitled to reasonable adjournments of the Closing Date to cure the Title Objections if determined necessary by any Seller. Any Seller's failure to deliver a Title Response by the Title Cure Expiration Date shall be

5

deemed a Title Response, with respect to such Seller's Project, in which Seller shall have elected not to cure or otherwise resolve any matter set forth in the Title Disapproval Notice. If Purchaser is dissatisfied with any Title Response, Purchaser may, as its exclusive remedy, either (a) accept the Title Objections with resolution, if any, of the Title Objections as set forth in the Title Response and without any reduction or abatement of the Purchase Price, or (b) to terminate this Agreement (in its entirety and not with respect to any individual Project), by delivering timely Purchaser Termination Notice to Selling Parties, in which event the Earnest Deposit shall be delivered by Escrow Agent to Purchaser. If Purchaser fails to give timely Purchaser Termination Notice on or before the Due Diligence Expiration Date, Purchaser shall be deemed to have elected to approve and to have irrevocably waived any objections to any matters covered by the Title Commitments or contained in any Title Disapproval Notice, subject only to resolution, if any, of the Title Objections as set forth in any Title Response. If Purchaser fails to give timely Title Disapproval Notice, Purchaser shall be deemed to have elected to approve and irrevocably waive any objections to any matters covered by the Title Commitments.

3.3     Notwithstanding anything in this Agreement to the contrary, each Seller covenants and agrees that all mortgages (not assumed by Purchaser), judgment liens, mechanics' liens and delinquent taxes or taxes which are otherwise due and payable on or before Closing (the "Monetary Liens"), shall be removed by Seller at or before Closing, whether or not Purchaser has designated or objected to such Monetary Liens in the Title Disapproval Notice. All matters, excluding Monetary Liens, shown on the Title Commitment to which Purchaser has not objected as provided herein (or if objected to, as to which Purchaser has waived or been deemed, in accordance with Section 3.2, to have waived its objection), shall be referred to collectively herein as the "Permitted Exceptions." Notwithstanding the foregoing, Permitted Exceptions shall include any HUD Use Agreement, rights of tenants under unrecorded Leases with no options to purchase, and taxes not yet due and payable.

3.4     Within forty five (45) days following the Due Diligence Period Expiration Date, Purchaser shall do the following:

3.4.1     Apply for approval by HUD, with respect to each Project (collectively "HUD Approval"), as follows:

3.4.1.1     for Purchaser to assume any HAP Contract, any Use Agreement between Seller and HUD (each a "HUD Use Agreement"), and any FHA Loan that Purchaser intends to assume and for each Capital Advance Loan, which application may include as necessary, but not be limited to, (i) a draft assignment, assumption and amendment agreement for Purchaser to assume, and Seller to assign, the HAP Contract, substantially in the form to be attached hereto within three (3) business days of the Effective Date, as **Exhibit H,** as same may be modified by HUD ("HAP Assignment Agreement") and, if applicable to a Project, a draft assumption of HUD Use Agreement ("HUD Use Agreement Assumption"); (ii) submission of Previous Participation Certification, form HUD-2530 for Purchaser and such other proposed Project participants as may be required to be disclosed to HUD by applicable

6

federal regulations ("2530 Certification"); and (iii) submission of application for full Transfer of Physical Asset ("Transfer of Physical Assets") and assumption of existing debt, for each FHA Loan that Purchaser intends to assume and for each Capital Advance Loan.

3.4.1.2    In the event, as a result of Seller default under the HAP Contract resulting in termination of the HAP Contract subsidy payments, Purchaser is unable to obtain HUD Approval, Purchaser shall have the right, at its option, to terminate this Agreement (in its entirety and not with respect to any individual Project) by delivering written notice of termination to Selling Parties and Escrow Agent within five (5) days of learning of such inability. Upon delivery of said written notice of termination pursuant to the foregoing sentence, the Earnest Deposit shall be delivered by Escrow Agent to Purchaser.

3.4.1.3    In the event Agency Approvals are not obtained by Purchaser by the Closing Date, the Earnest Deposit shall be immediately delivered to Purchaser; provided, however, that if Agency Approvals are not secured by the Closing Date directly due to the fault of the Purchaser, the Earnest Deposit shall be delivered to Selling Parties.

3.4.2    If necessary pursuant to the terms of any use agreement, apply for approval by the applicable Agency for Purchaser to assume the use agreement (each an "Authority Approval", and collectively "Authority Approvals"), which applications shall include, but not be limited to, a draft assignment and assumption of the applicable use agreement, as same may be modified by respective Agency (the "LURA Assumption Agreement")

3.4.3    Apply to such other federal, state, county and local authorities as may be necessary for Purchaser to obtain approval therefrom for its acquisition of the Projects and for the Projects to continue to be exempt from real property taxes ("Regulatory Approvals").

3.4.4    Reserved.

3.4.5    Purchaser agrees to diligently pursue satisfaction of the HUD Approval, the Authority Approvals, and Regulatory Approvals (collectively, "Agency Approvals"). Each Seller agrees to cooperate with Purchaser in the preparation and submission, of such materials, documentation, and information as is required in order to obtain Agency Approvals and any other necessary approvals needed to consummate the transactions contemplated herein.  Selling Parties shall have the right to request copies of Purchaser's applications for Agency Approvals.

3.5    Agency Approvals that are conditioned with unreasonable limitations or requirements (for example and not by way of limitation, extended compliance periods or establishment of additional guaranties), imposed by the applicable Agency shall not be considered to be an affirmative Agency Approval; provided, however, that Purchaser shall agree to reasonable affordability restrictions on a certain Project as a condition to receiving continued exemption from real property taxes for that certain Project. All reserve accounts associated with the Property, excepting any Transferring Accounts,

including without limitation, tax and insurance escrows and replacement reserves, residual receipts and operating accounts, shall be the property of Selling Parties following Closing and shall not transfer with the Property ("Non-Transferring Accounts").

## IV. REPRESENTATIONS. WARRANTIES AND COVENANTS

4.1 Each Seller hereby represents, warrants and covenants to Purchaser, which Seller represents as true and correct in all material respects as of the date hereof, and which shall be true in all material respects as of the Closing Date, subject to Section 4.2 and Section 4.5, and shall survive the Closing for a period of twelve (12) months, unless otherwise stated:

4.1.1 The rent roll, to be attached hereto within three (3) business days of the Effective Date, and made a part hereof as **Exhibit B** (the "Rent Roll") is, upon attachment, true and accurate as of its date, and there are no Tenants at the Property except as set forth on such Rent Roll. Seller has not received a notice of default from any tenant at the property alleging a Seller default. Seller has not provided any concessions, rebates, refunds or discounts to Tenants except as otherwise disclosed in writing.

4.1.2 There is no litigation, administrative proceeding, condemnation proceeding, or bankruptcy proceeding (collectively "Litigation") pending or, to Seller's actual knowledge, threatened against Seller or any portion of its Project, except as described in **Exhibit K** attached hereto and made a part hereof. There is no litigation, administration proceeding, condemnation proceeding or bankruptcy proceeding that would delay or prevent the effectuation of the transactions contemplated herein. There are no pending or threatened: special assessments, cancellation of licenses, cancellation of utilities or cancellation of certificates of occupancy, or other governmental action that would prevent the transactions contemplated herein or that would prevent or hinder the ongoing operation of the Projects.

4.1.3 All Contracts are described on **Exhibit C**, to be attached hereto within three (3) business days of the Effective Date, attached hereto and made a part hereof upon such attachment (each individually, a "Contract"). Seller has made available, or will make available in accordance with the terms of this Agreement, (a) all Due Diligence Records, and (b) all Ongoing Reporting Requirements, and such documents were true, accurate, and complete in all material respects at the time of delivery and remain true, accurate and complete as of the Closing Date.

4.1.4 Seller is an entity duly formed in Louisiana. Seller and each person executing and delivering this Agreement and all documents to be executed and delivered by Seller at the Closing represents and warrants to Purchaser that he or she has due and proper authority to execute and deliver the same. Provided Agency Approvals have been obtained, the consummation by Seller of the transaction that is the subject of this Agreement will not conflict with or result in a breach of any of the terms of any agreement or instrument to which Seller is a party or by which Seller is bound or constitute a default thereunder. This

8

Agreement constitutes the valid and legally binding obligation of Seller and is enforceable against Seller in accordance with its terms.

4.1.5 Other than this Agreement, no other party has any right to purchase the Property, or any part thereof, and other than the Leases, commercial leases delivered with Due Diligence Records or referenced in recorded documents and this Agreement, there are no leases, options to purchase, purchase agreements, unrecorded easements, rights of first offer, rights of first refusal or similar agreements in effect with respect to the Property or any portion thereof that will survive Closing.

4.1.6 [Reserved].

4.1.7 The Land for each Project is located within the zoning districts set forth in the Recital Exhibits, under which the each of the present uses of the Land is in compliance with the applicable zoning laws and ordinances, and Seller has received no notice from any governmental agency of any violation of any zoning, building, safety, health, environmental, subdivision or other statute, ordinance, regulation, rule, covenant, condition or restriction affecting the Property or the use thereof.

4.1.8 Except as disclosed to Purchaser on **Exhibit E** ("Environmental Disclosure Schedule") attached hereto, Seller has received no notice from any governmental agency of any violation of federal, state and/or local environmental laws and regulations.

4.1.9 Seller will not enter into any tenant lease upon terms which differ materially from the terms of existing Leases, without the written consent of Purchaser, which shall not be unreasonably withheld.

4.1.10 The property management agreement between Seller and Seller's management company, if any, may be and will be terminated by Seller effective no later than the Closing Date.

4.1.11 Seller has received no written notice from HUD of default under the HAP Contract and to the best of Seller's knowledge, Seller is not in default of the HAP Contract.

4.1.12 Seller has received no written notice of default under any contracts to which it is a party.

4.1.13 Seller is not a foreign person within the meaning of Sections 1445 and 7701 of the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

4.2 As a condition precedent to Purchaser's obligations at Closing, those representations and warranties provided in Section 4.1 of this Agreement shall be true, accurate and complete in all material respects as of the Closing Date, or a Seller shall have given Purchaser written notice of any event, action, fact or circumstances, of which such Seller obtains actual knowledge following the Effective Date, that would have constituted a breach of any said representations and warranties if Seller had had such awareness when it made the same; provided, however, that such notice shall not constitute a cure to such default. Selling Parties, will jointly and severally indemnify

Purchaser and its successors and assigns, against, and will hold Purchaser and its successors and assigns harmless from, any expenses or damages, including reasonable attorneys' fees, that Purchaser incurs, but not in excess of the Damages Cap because of the breach of any of the above representations and warranties, whether such breach is discovered before or after the Closing Date. Consummation of this Agreement by Purchaser with actual knowledge of any such breach by Seller will not constitute a waiver or release by Purchaser of any claims due to such breach. Each of the foregoing representations and warranties shall be deemed remade as of the Closing Date with respect to the Property and, as so remade, shall survive the Closing Date for a period of twelve (12) months, and any claim arising out of a breach of any representation or warranty in this Agreement or any document referenced in this Agreement not asserted in an action filed and served on or before the first anniversary date of Closing Date shall be barred and deemed waived. Following the Closing Date and for twelve (12) months thereafter, Seller Parties will maintain a combined liquidity of at least the amount of the Damages Cap, and such requirement expressly survives Closing.

4.3     Purchaser hereby represents, warrants and covenants to Selling Parties, which Purchaser represents as true and correct in all material respects as of the date hereof, and which shall be true in all material respects as of the Closing Date, subject to Section 4.4, and shall survive the Closing for a period of twelve (12) months, unless otherwise stated:

4.3.1   Purchaser is duly organized, validly existing and in good standing under the laws of the state, county or municipality in which it was organized and is or will be qualified to do business in the jurisdiction in which the Project is located on or before the Closing Date.

4.3.2   Each of the persons executing this Agreement on behalf of Purchaser is duly authorized to do so. Purchaser has full right and authority to enter into this Agreement and to consummate the transaction described in this Agreement. This Agreement constitutes the valid and legally binding obligation of Purchaser and is enforceable against Purchaser in accordance with its terms. Neither the execution or delivery of this Agreement nor the performance of Purchaser's obligations under this Agreement violates, or will violate, any contract or agreement to which Purchaser is a party or by which Purchaser is otherwise bound.

4.3.3   There is no Litigation pending or, to the best of Purchaser's knowledge, contemplated or threatened against Purchaser that could affect Purchaser's ability to perform its obligations when and as required under the terms of this Agreement.

4.3.4   Purchaser has experience owning and operating projects such as the Projects and complying with restrictions such as the HUD Use Agreement. To Purchaser's knowledge, Purchaser and its affiliates, officers and directors are in good standing with HUD and each Agency, and Purchaser is not aware of any fact or occurrence that would

limit or prevent Purchaser from participating in any affordable or low-income housing project, or from obtaining Agency Approvals.

4.4    As a condition precedent to Selling Parties' obligations at Closing, all of Purchaser's representations and warranties provided in this Agreement shall be true, accurate and complete in all material respects as of the Closing Date, or Purchaser shall have given Selling Parties written notice of any event, action, fact or circumstances, of which Purchaser obtains actual knowledge following the Effective Date, that would have constituted a breach of any of Purchaser's representations and warranties under this Agreement if Purchaser had had such awareness when it made the same.

4.5    [Reserved].

4.6    **AS-IS.**  Except for representations expressly set forth in Section 4.1 and 4.6 hereof, this Agreement and in any documents delivered by Seller at Closing, each Property is expressly purchased and sold "AS IS," "WHERE IS," and "WITH ALL FAULTS."  The Purchase Price and the terms and conditions set forth herein are the result of arm's-length bargaining between entities familiar with transactions of this kind, and said price, terms and conditions reflect the fact that Purchaser shall have the benefit of, and is not relying upon, any information provided by any Seller or any broker or statements, representations or warranties, express or implied, made by or enforceable directly against any Seller or any broker, including, without limitation, any relating to the value of the Property, the physical or environmental condition of the Property, any state, federal, county or local law, ordinance, order or permit; or the suitability, compliance or lack of compliance of the Property with any regulation, or any other attribute or matter of or relating to the Property (other than any covenants of title contained in any deed conveying the Property and Seller's express representations contained in Section 4.1 of this Agreement).  Purchaser agrees that no Seller shall be responsible or liable to Purchaser for any defects, errors or omissions, or on account of any conditions affecting the Property except as expressly provided herein.  Purchaser, its successors and assigns, and anyone claiming by, through or under Purchaser, hereby fully releases Selling Parties and their respective members, owners, agents, employees and officers from, and irrevocably waives its right to maintain, any and all claims and causes of action that it or they may now have or hereafter acquire against any of them with respect to any and all Losses arising from or related to any defects, errors, omissions or other conditions affecting the Property except as expressly provided herein.  Purchaser represents and warrants that, prior to the Closing Date, it shall have reviewed and conducted such independent analyses, studies (including, without limitation, environmental studies and analyses concerning the presence of lead, asbestos, PCBs and radon in and about any Project), reports, investigations and inspections as it deems appropriate in connection with the Property.  If any Seller provides or has provided any documents, summaries, opinions or work product of consultants, surveyors, architects, engineers, title companies, governmental authorities or any other person or entity with respect to any Property, including, without limitation, the offering prepared by any broker, Purchaser and Selling Parties agree that such Seller has done so or shall do so only for the convenience of both parties, and Purchaser shall not rely thereon and the reliance by Purchaser upon any such documents, summaries, opinions or work product shall not create or give rise to any liability of or against Seller, its owners, employees, agents or officers.  Purchaser shall rely only upon any title insurance obtained by Purchaser with respect to title to the Property.  Purchaser acknowledges and agrees that except as expressly

11

provided herein, no representation has been made and no responsibility is assumed by any Seller with respect to current and future applicable zoning or building code requirements or the compliance of any Property with any other laws, rules, ordinances or regulations, the financial earning capacity or expense history of such Property, the continuation of contracts, continued occupancy levels of any Project, or any part thereof, or the continued occupancy by tenants of any Leases or, without limiting any of the foregoing, occupancy at Closing.  The provisions of this <u>Section 4.6</u> shall survive the Closing and delivery of the Deed (as defined below) to Purchaser.

## V.  OPERATIONS PRIOR TO CLOSING AND AGENCY SUBMISSIONS

5.1     Between the Effective Date and the Closing Date, each Seller shall:

5.1.1    Continue to operate and maintain its respective Property consistent with Seller's historical operations.

5.1.2    Maintain, at its expense, through the Closing, all insurance on its respective Property in place on the Effective Date.

5.1.3    Pay or cause to be paid, in the normal course of business and, in any event, prior to Closing, payments on the any mortgage loan(s) that are due and payable, real estate taxes and assessments, utilities, property insurance payments and sums due for work, materials or services furnished or otherwise incurred in the ownership and operation of its respective Property up to the Closing Date.

5.1.4    Neither sell, grant or transfer, nor permit the sale, grant or transfer of, any interest in its respective Property other than to Purchaser in accordance with this Agreement.

5.1.5    Comply in all material respects with the HAP Contract and any HUD Use Agreement.

5.1.6    Promptly advise Purchaser of any litigation or governmental proceeding to which Seller becomes a party affecting its respective Property.

5.1.7    Not permit any alteration, structural modification or additions to its Project, except in the nature of ordinary maintenance, repair, or replacement without Purchaser's consent, which consent shall not be unreasonably withheld.

5.1.8    Not create (or agree to create) any exception to or covenant, restriction, easement or other lien on or affecting its respective Property without Purchaser's consent, which consent shall not be unreasonably withheld. Seller shall not enter into any contract that will survive Closing in excess of $5,000.

5.1.9    Not remove from the Improvements any of the Personal Property listed on **<u>Exhibit D</u>** attached hereto unless the same is replaced by Personal Property of a like kind and of equal or higher value.

5.1.10  Pay or cause to be paid on or prior to Closing all pre-Closing trade payables and other pre-Closing obligations related to its respective Property or disclose to Purchaser for appropriate proration at Closing.

5.1.11  Promptly provide copies of all correspondence received from HUD, an Agency, or any other governmental entity to Seller, as well as all written correspondence from Seller to HUD, an Agency, or any other governmental entity.

5.1.12  Seller shall not execute a renewal, modification or extension of any HAP Contract without Purchaser's prior written consent. A copy of any HUD issued document that grants an Operating Cost Adjustment Factor ("OCAF") for the HAP Contract shall be provided within 48 hours after Seller's receipt and prior to Seller's execution. Seller shall promptly provide to Purchaser copies of all material written correspondence received from HUD by Seller, its agents, or its counsel, as well as all material written correspondence from Seller, its agents, or its counsel, to HUD relating to (i) any notice of default under the HAP Contract; (ii) any HUD Approval; (iii) any REAC Score updates or notices regarding Property-specific violations; (iv) OCAF documents, and/or (v) reserve accounts. If, prior to the Closing Date, HUD requires either a full inspection of all residential units at the Property in order to determine that they meet Uniform Physical Condition Standards and Housing Quality Standards (as determined by HUD) ("UPCS/HQS") or a Real Estate Assessment Center ("REAC") physical inspection of the Property, prior to the Closing Date, Seller will provide prior written notice to Purchaser before any such inspection is performed, as well as a copy of the results of such inspection. In the event a REAC physical inspection is performed prior to the Closing Date and the Property receives a score less than 60, the Seller will provide written notice to Purchaser of same within three (3) business days of receipt of such score. If the REAC score issued is less than 60, then Purchaser may elect to either (x) proceed with the Closing, or (y) terminate this Agreement and receive the Earnest Deposit, and any interest accrued thereon, and neither party will have any further rights or obligations regarding this Agreement or the Property.

5.1.13  In addition to providing the Due Diligence Records, and any updates thereto, Seller shall provide to Purchaser on a monthly basis the following items (the "Ongoing Reporting Requirements"):

    5.1.13.1   Monthly financials

    5.1.13.2   A trailing twelve month report

    5.1.13.3   Monthly general ledger

    5.1.13.4   Monthly rent roll

    5.1.13.5   Monthly accounts receivable report

    5.1.13.6   Tenant waitlist

    5.1.13.7   List of 2025 and 2026 capital improvements completed, if any

5.1.14 Provide Purchaser with any and all reasonable documentation requested from any governmental agency in connection with its applications hereunder.

5.2 Between the Effective Date and the Closing Date, Purchaser shall:

5.2.1 Pursue Agency Approvals diligently, and deliver copies of all material correspondence from and to HUD and/or other applicable governmental authorities involved in Agency Approvals to Seller.

5.2.2 [Reserved.]

## VI. CLOSING ADJUSTMENTS

6.1 For each Project, the following are to be prorated or adjusted (as appropriate), if feasible, at the Closing, as of 11:59 P.M. on the day immediately preceding the Closing (the "Adjustment Date"):

6.1.1 Rents for the month in which the Closing Date occurs that have been received by Seller in good funds on or before the Adjustment Date. Rents received by Purchaser from such Tenant after the Closing Date shall be applied, after deduction of any costs of collection, including, without limitation, attorneys' fees, (i) first in payment of any rents for the then current month, (ii) then to any rents due and payable for the month in which the Closing Date occurs and Seller's aforesaid share thereof shall be promptly remitted by Purchaser to Seller, (iii) then to any rent due and payable for periods subsequent to the Closing Date other than the then current month, and (iv) then to any rent due and payable for periods prior to the Closing Date. Purchaser shall be under no obligation to take any action to collect any rents due to Seller for any period prior to the Closing Date. Seller shall promptly remit to Purchaser any rents received by Seller for any period after the Closing Date, which funds shall be applied in accordance with the preceding sentence. For purposes of this Section 6.1.1, the term "rents" shall include any sums paid or payable to Seller pursuant to either a Lease or Contracts, or the HAP Contract, and the term "tenant" shall include the Tenant as well as the service provider pursuant to such Lease or Contracts.

6.1.2 Real estate taxes and assessments and personal property taxes (if applicable). All prorations shall be based upon the most recent available tax rates, assessments and valuations but shall be subject to adjustment post-Closing in accordance with Section 6.5. Seller and Purchaser agree that (i) Seller shall be responsible for any real estate taxes and assessments applicable to the period of ownership prior to and including the Adjustment Date, regardless of when such real estate taxes and assessments and personal property taxes may be due and payable, and (ii) Purchaser shall be responsible for any real estate taxes and assessments applicable to the period of ownership after the Adjustment Date, regardless of when such real estate taxes and assessments and personal property taxes may be due and payable.

6.1.3    Electric, gas, water, sewer, municipal, garbage and rubbish removal charges on the basis of a reading effective as of the Adjustment Date.

6.1.4    Amounts paid on behalf of Seller or Seller's Property with respect to any Contracts, service arrangements or vendors for the period post-closing.

6.1.5    All Tenant security deposits and accrued interest to which Tenants are entitled pursuant to the Leases or law shall be transferred or credited to Purchaser at the Closing.

6.1.6    Reserved.

6.2      Except as set forth in this Agreement, the customs of the county in which the Property is located shall govern prorations. The provisions of this Article VI shall survive the Closing.

6.3      Each Seller shall cause all pre-Closing obligations of its Property such as trade payables to be brought current as of Closing, or if they are not current, Purchaser shall receive a credit at Closing to pay such costs.

6.4      If such prorations result in a payment due to Purchaser, then the Purchase Price shall be reduced by such sum. If such prorations result in a payment due to any Seller, then the same shall be paid to Seller in addition to the Purchase Price payable at Closing. The parties hereto shall endeavor to prepare a schedule of prorations no less than two (2) days prior to Closing. The parties hereto shall correct any errors in prorations as soon after the Closing as amounts are finally determined.

6.5      To the extent that any proration set forth herein is based upon estimated bills, or with respect to taxes, based on the most recent available tax rates, assessments and valuations, such amounts will be readjusted upon final determination of the amounts in question.  Any such readjustment shall be completed by the date which is ninety (90) days after the Closing Date, except with respect to the real estate taxes, which shall be readjusted by Purchaser and appropriate Seller after the Closing Date within thirty (30) days after the Purchaser's receipt of the final real estate and personal property tax bill for the tax year in which the Closing Date occurs.

## VII. CLOSING

7.1      Except as provided in Article 11 and this Section 7.1 the closing of the transaction for all Projects that are the subject of this Agreement (the "Closing") shall occur on a date specified by Purchaser and reasonably acceptable to Selling Parties, not earlier than the later of (i) Sixty (60) days after the Due Diligence Expiration Date and (ii) Thirty (30) days following receipt by Purchaser of all Agency Approvals, but in no event later than March 31, 2026 (the "Closing Deadline"), or such other earlier date mutually agreed upon in writing between Purchaser and Seller; provided, however, that Seller agrees to three (3) 45-day extensions of the Closing Deadline if so requested by Purchaser due to delay in receipt of Agency Approvals, upon delivery by Purchaser, with respect to each such extension, of notice to Seller of extension prior to the then

15

scheduled day of Closing (not later that the Closing Deadline as it may have been last extended pursuant to the foregoing) together with an extension fee of $150,000.00 which extension fee(s) shall be immediately released to Selling Parties, as directed by Selling Parties, but otherwise treated in the same manner as the Earnest Deposit and applied to the Purchase Price. Notwithstanding the foregoing or anything to the contrary contained herein, at Purchaser's election, Purchaser may close on the acquisition of one or more of the Projects in lieu of closing on the acquisition of all Projects concurrently (the "Staged Closing"). If Purchaser makes such election, Purchaser may close on one or more Projects within thirty (30) days of receipt of Agency Approvals for such Project or Projects. Should Purchaser elect a Staged Closing, with the closing of each Project, Purchaser shall pay the allocable portion of the Purchase Price to the applicable Seller, credited with the allocable portion of the Deposit, and the Deposit shall be reduced by such allocable portion. A Staged Closing does not alter any obligation Sellers or Purchaser may have hereunder with respect to any Projects which have not been acquired by Purchaser. The date on which Closing actually occurs shall herein be the "Closing Date", and, if Buyer elects a Staged Closing, the "Closing Date" applicable to that specific Project shall be the date on which Closing for that specific Project occurs. The Closing shall be held at the offices of the Title Company or an authorized agent thereof, at such other location as may be mutually agreed upon between the parties, or remotely.

7.2    If Closing does not occur by the Closing Deadline (as it may have been extended pursuant to the foregoing Sectio 7.1, Selling Parties may terminate this Agreement by delivering notice to Purchaser, and the Earnest Deposit shall be immediately delivered to Seller; and thereafter this Agreement shall terminate except with respect to those provisions that expressly survive termination.

## VIII.  CLOSING DOCUMENTS

8.1    To the extent applicable to the Closing, each Seller shall cause to be delivered to Purchaser at the Closing (or on the date otherwise indicated below), the following documents and instruments, duly executed by Seller and dated as of the Closing Date:

8.1.1    A special warranty deed (the "Deed") in the form to be attached hereto within three (3) business days of the Effective Date as **Exhibit F**, subject only to Permitted Encumbrances, attached hereto and made a part hereof.

8.1.2    A bill of sale and assignment (the "Bill of Sale and Assignment") in the form of **Exhibit G** attached hereto and made a part hereof and which shall also convey and assign all the Personal Property, Trade Name, and Contracts.

8.1.3    No less than ten (10) days prior to the Closing Date, a counterpart HAP Assignment Agreement.

8.1.4    A certificate in the form of **Exhibit I** attached hereto and made a part hereof (the "FIRPTA Certificate").

16

8.1.5    A letter in the form of **Exhibit J** attached hereto and made a part hereof, which letter shall be delivered to the Tenants by Purchaser (the "<u>Tenant Notice Letter</u>").

8.1.6    A rent roll for the Property certified by Seller to be true and correct as of the Closing Date and certifying that there are no Tenants at the Property except as set forth thereon.

8.1.7    All keys and combinations to all locks on the Improvements and all security system passwords and related documentation, which are in Seller's possession, which may be delivered outside of escrow on the Closing Date.

8.1.8    To the extent in Seller's possession, all plans, specifications, mechanical, electrical and plumbing layouts, operating manuals, purchase orders, brochures, marketing materials, advertisements, Tenant lease files, Tenant ledgers, data in the property management database, and other files and records, electronic or hardcopy, in the possession of Seller and its managing agent and utilized in connection with the operation and maintenance of the Land and Improvements, all of which may be delivered outside of escrow on the Closing Date.

8.1.9    Affidavits and certificates, in forms reasonably acceptable to the parties or as required by the Title Company, as to facts within the knowledge of Seller relevant to the determination by the Title Company as to the condition of title or the due performance by Seller of its obligations under this Agreement, and in all events to the extent required by the Title Company for it to issue the title policy without taking exception to the so-called "<u>gap</u>" or "<u>standard</u>" exclusions.

8.1.10  A Closing Statement to be prepared by Escrow Agent and agreed upon by Seller and Purchaser.

8.1.11  No less than twenty (20) days prior to the Closing Date, a counterpart of the HUD Use Agreement Assumption, if applicable.

8.1.12  No less than twenty (20) days prior to the Closing Date, a counterpart LURA Assignment Agreement(s), if applicable.

8.1.13  No less than twenty (20) days prior to the Closing Date, a counterpart Release and Assumption Agreement (or similar HUD-required document) meeting requirements of HUD Approval for each applicable Transfer of Physical Assets.

8.1.14  On the Closing Date, Seller shall transfer to Purchaser the accounting software (Real Page or other software utilized at the Project) currently utilized by Seller or Seller's property management company in connection with the Project, which shall include, without limitation, tenant payment history.

8.1.15  A certificate stating all representations and warranties of Seller in this Agreement were true and accurate as of the Effective Date and remain true and accurate as of the Closing Date.

17

8.1.16  Any other instruments specifically referred to in this Agreement or necessary to carry out Seller's obligations under its provisions

8.2  At the Closing, Purchaser or its assignee shall cause to be delivered to Escrow Agent the following documents and instruments:

8.2.1  Any funds, in addition to the Earnest Deposit, needed to pay the balance of the Purchase Price and any of Purchaser's closing costs under this Agreement.

8.2.2  Evidence reasonably acceptable to the Title Company authorizing the consummation by Purchaser of the transaction which is the subject of this Agreement and the execution and delivery of documents on behalf of Purchaser.

8.2.3  Any other instruments specifically referred to in this Agreement or necessary to carry out Purchaser's obligations under its provisions.

8.2.4  A counterpart of the Bill of Sale and Assignment.

8.2.5  No less than five (5) days prior to the Closing Date, a HAP Assignment Agreement for each Project fully executed by Purchaser and HUD.

8.2.6  No less than five (5) days prior to the Closing Date, a HUD Use Agreement Assumption for each Project to which it is applicable fully executed by HUD and Purchaser

8.2.7  No less than five (5) days prior to the Closing Date, each LURA Assumption Agreement fully executed by Purchaser and the applicable Agency.

8.2.8  No less than five (5) days prior to the Closing Date, a fully executed Release and Assumption Agreement (or similar HUD-required document) for each Project that for which a Transfer of Physical Assets is applicable.

8.3  At the Closing, each Seller and Purchaser shall cause to be delivered such other instruments and documents as may be required by law in order to complete the Closing of the transaction for each Project which is the subject of this Agreement.

8.4  As a simultaneous condition to Purchaser's obligations at the Closing, possession of the Property, in accordance with this Agreement, shall be delivered to Purchaser.

## IX.  COSTS

At or prior to the Closing, each Seller shall pay (i) all fees for obtaining and recording releases of liens and encumbrances which are not Permitted Exceptions with respect to its Project; (ii) one half (1/2) of all transfer taxes, recording costs and conveyance fees required for delivery and recordation of its Deed; (iii) Sellers' attorney fees; and (iv) one half of the escrow fee applicable to its Project.  With respect to (ii), above, Seller shall not pay nor be liable for any transfer tax liability resulting from Purchaser's assignment or novation of this Agreement in whole or in part, and Purchaser shall indemnify and defend Seller from and against any Losses suffered

by Seller resulting from such transfer tax liability. Purchaser shall pay: (i) the cost of the Title Commitments; (ii) the premium of any title policy obtained by Pbsurchaser; (iii) cost of any survey obtained by Purchaser; (iv) one half of the escrow fee; (v) one half (1/2) of all transfer taxes, recording costs and conveyance fees required for delivery and recordation of each Deed; (vi) recording fees for any financing obtained by Purchaser; and (vii) Purchaser's attorney fees. All other costs, charges, and expenses shall be paid as provided in this Agreement or, in the absence of such provision, in accordance with applicable laws or local customary practice, as the case may be.

## X. COMMISSIONS

10.1    Each Seller shall indemnify and hold Purchaser harmless from any and all real estate commissions, claims for such commissions or similar fees, including attorneys' fees incurred in any lawsuit regarding such commissions or fees arising out of contracts executed by or activities engaged in by Seller. The provisions of this paragraph shall survive the Closing or the earlier termination of this Agreement. AHA has been secured as a broker by Seller and Seller shall be solely responsible for any compensation or commission owed to AHA.

10.2    Purchaser shall indemnify and hold each Seller harmless from any and all real estate commissions, claims for such commissions or similar fees, including attorneys' fees incurred in any lawsuit regarding such commissions or fees arising out of contracts executed by or activities engaged in by Purchaser. The provisions of this paragraph shall survive the Closing or the earlier termination of this Agreement.

## XI. RISK OF LOSS

11.1    The risk of loss or damage to any Project by fire, earthquake, or other casualty shall be borne by Seller that is owner of that Project, until the Closing Date. If damage, loss or destruction of the Project or any part thereof, by flood, fire, earthquake, or other casualty, occurs prior to the Closing, the applicable Seller shall promptly notify Purchaser of such damage, loss or destruction.

11.2    If a Project is damaged by flood, fire, earthquake, wind-driven storm damage, or other casualty, and the damage, loss or destruction shall cost less than five percent (5%) of the assessed value of the Project to repair, or if the Projects in the aggregate are damaged by flood, fire, earthquake, wind-driven storm damage, or other casualty, and the damage, loss or destruction shall cost less than five percent (5%) of the aggregate assessed value of the Projects, based upon the determination of a contractor selected by Seller and reasonably acceptable to Purchaser, then Purchaser shall close the entire transaction which is the subject of this Agreement with the applicable Seller paying to Purchaser an amount equal to the amount of the applicable insurance deductibles together with all insurance proceeds attributable to such damage or destruction received by said Seller prior to the Closing Date, and said Seller shall assign to Purchaser: (a) Seller's rights to any payments which may be payable under any applicable insurance policy or policies in effect with respect to the Project and to all of Seller's rights and interests in and to the corresponding claims, and (b) Seller's rights to

19

payments with respect to rents due subsequent to the Closing Date under any rental insurance policy or policies with respect to the Project.

11.3     If a Project is damaged by fire, earthquake, wind-driven storm damage or other casualty and the damage, loss or destruction shall cost in excess of five percent (5%) of the assessed value of such Project, or if the Projects in the aggregate are damaged by flood, fire, earthquake, wind-driven storm damage, or other casualty, and the damage, loss or destruction shall cost in excess of five percent (5%) of the aggregate assessed value of the Projects, or more to repair, based upon the determination of a contractor selected by Seller and reasonably acceptable to Purchaser, then said Seller shall, promptly after Purchaser's request therefor, deliver to Purchaser a copy of each of the applicable insurance policies covering such fire, earthquake, or other casualty, and Purchaser shall, in its sole discretion, elect one of the following options:

11.3.1 To terminate this Agreement (in its entirety and not with respect to any individual Project), in which event, the entire Earnest Deposit shall be immediately refunded to Purchaser, and thereupon, this Agreement shall be terminated, and the parties hereto shall be relieved of all further obligations and liability under this Agreement (other than those that are expressly stated to survive the termination of this Agreement); or

11.3.2 To proceed with the Closing and receive (i) an assignment of Seller's rights to any payments which may be payable subsequent to the Closing Date under any applicable insurance policy or policies in effect with respect to the Project and to all of said Seller's rights and interests in and to the corresponding claims, (ii) an assignment of Seller's rights to payments with respect to rents due subsequent to the Closing Date under any rental insurance policy or policies with respect to the Project, and (iii) payment by said Seller to Purchaser of an amount equal to the aggregate amount of the deductibles with respect to all such insurance policies together with all insurance proceeds attributable to such damage or destruction received by Seller prior to the Closing Date. If Purchaser elects to exercise the option set forth in this Section 11.3.2 hereof, then prior to the Closing, Purchaser and said Seller shall cooperate to adjust, compromise and settle with the insurance company(s) with respect to the insurance policies; or

11.3.3 Remove such damaged Project or Projects and proceed with Closing on the remaining Projects. In such an event, the Purchase Price will be reduced by the value of the damaged Project immediately preceding the casualty event (as reasonably agreed between the Seller and Buyer) and the portion of the Deposit allocable to such Project shall be returned to Buyer.

11.3.4 Purchaser shall make its determination whether to terminate this Agreement as permitted under this Section 11.3 on or before the date that is the later of:  (x) thirty (30) days after the fire, earthquake, wind-driven storm, or other casualty; or (y) twenty (20) business days after the parties receive the contractor's determination of the cost to repair the damage and the insurer's proposed amount of insurance proceeds to be made available therefore.

11.4    If, prior to Closing, any governmental authority or other entity having condemnation authority shall institute an eminent domain proceeding or take any steps preliminary thereto (including the giving of any direct or indirect notice of intent to institute such proceedings) with regard to the Land or Improvements (a "Condemnation"), and the same is not dismissed in a final determination for which all appeal periods have passed on or before ten (10) days prior to the Closing Date set forth in this Agreement, then the applicable Seller shall promptly notify Purchaser thereof and Purchaser shall, in its sole discretion, elect one of the following options:

11.4.1 To terminate this Agreement (in its entirety and not with respect to any individual Project) in which event, the provisions of Section 11.3.1 hereof shall be applicable.

11.4.2 Continue with this Agreement, in which case Purchaser shall be entitled to participate with the applicable Seller in all aspects of the Condemnation proceedings, and upon Closing said  Seller shall credit to Purchaser any Condemnation award paid to Seller in connection with such Condemnation, and/or assign to Purchaser all of Seller's right, title, and interest in, to, and under any Condemnation award to be paid to Seller in connection with such Condemnation.

11.5    If Purchaser does not make an election to terminate within thirty (30) days of receipt of notice from Seller, or to not terminate and proceed to Closing, in accordance with this Article XI, Purchaser shall be deemed to have elected to waive its rights to terminate thereunder and to proceed to Closing.

## XII. TERMINATION AND REMEDIES

12.1    In the event any Seller fails to perform any of its obligations hereunder or if any of the representations and warranties made herein by such Seller are untrue, in any material respects, and such default is not cured within fifteen (15) days (provided that no cure period shall be allowed for a breach of Seller's representations and warranties) after notice of default given by Purchaser to Selling Parties (a "Seller Default"), Purchaser shall have the right: (i) enforce this agreement and the conveyance of the Property by specific performance, in which case Selling Parties shall be obligated to indemnify Purchaser for costs incurred by Purchaser in enforcing specific performance, (ii) to terminate this Agreement (in its entirety and not with respect to any individual Project) by giving notice thereof to Selling Parties and the Escrow Agent in which event the entire Earnest Deposit shall be returned to Purchaser and Seller shall pay to Purchaser an amount equal to its third party out-of-pocket costs and expenses incurred in connection with this transaction, but not exceeding Seven Hundred Fifty Thousand and No/100s Dollars ($750,000.00) (such amount being the "Damages Cap"), and after such disbursements are made, no parties will have any further rights, obligations or liabilities hereunder; or (iii) waive and proceed to Closing.

12.2    In the event of Purchaser's failure to perform any of its obligations hereunder or any of its representations or warranties made herein by Purchaser are untrue in any material respects and are not cured within fifteen (15) days after notice of

default by Seller is delivered to Purchaser (a "Purchaser Default"), Selling Parties, as their remedy, shall have the right to terminate this Agreement and, retain the Earnest Deposit as liquidated damages; thereafter, no parties shall have any further rights, obligations, or liabilities hereunder. The parties acknowledge and agree that the actual damages in such event are uncertain in amount and difficult to ascertain, and that said amount of liquidated damages was reasonably determined.

## XIII. ESCROW

The parties hereto have mutually requested that the Escrow Agent act as escrow agent for the purpose of holding the Earnest Deposit in accordance with the terms of this Agreement.

## XIV. NOTICES, CONSENTS, DIRECTIONS, APPROVALS

14.1    Except as otherwise provided in this Agreement, any and all notices, elections, demands, requests and responses thereto permitted or required to be given under this Agreement shall be in writing, signed by the party giving the same or by its attorneys, and shall be deemed to have been properly given and shall be deemed effective upon being (i) personally delivered, or (ii) delivered to an overnight delivery service with receipt for delivery, or (iii) deposited in the United States mail, postage prepaid, certified with return receipt requested, or (iv) sent via electronic mail. The time period in which a response to any such notice, election, demand or request must be given shall commence on the date of receipt thereof (except in the case of notices provided via electronic mail). Personal delivery to a party or to any officer, partner, member, agent or employee of such party, at said address shall constitute receipt. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Any such notice, election, demand, request or response shall be addressed as follows:

IF TO PURCHASER:

> Tredway Acquisitions LLC
> c/o Tredway
> 650 Fifth Avenue, 20th Floor
> New York, NY 10019
> Attn: William Kreinik
> Email: notices@tredway.com

With a copy to be given simultaneously to:

> Winthrop & Weinstine, P.A.
> 225 South Sixth Street, Suite 3500
> Minneapolis, Minnesota 55402
> Attention: Scott Jahnke
> Telephone: (612) 604-6400
> E-mail: sjahnke@winthrop.com

IF TO SELLING PARTIES OR AN SELLER:

With a copy to be given simultaneously to:

> Todd R. Gennardo, Esq.
> Denechaud and Denechaud, LLC
> 201 St. Charles Ave.
> Suite 3920
> New Orleans, LA 70170
> Telephone: (504)552-4756
> E-mail: tgennardo@denechaudlaw.com

IF TO THE ESCROW AGENT OR THE TITLE COMPANY:

> Chicago Title Insurance Company
> 711 Third Avenue, 8th Floor
> New York, NY 10017
> Attn: Neil Falcone
> Email: neil.falcone@ctt.com

14.2     With respect to all individual Sellers and Selling Parties, any notice from, consent by, direction given by, or approval of Todd Gennardo by email at tgennardo@denechaudlaw.com, shall be consent, notice, direction or approval of the applicable Seller or all Selling Parties, and may be relied upon by Purchaser as such.

## XV.  BROKERS

15.1     The sole cooperating broker in this transaction is Newmark (the "Broker"). The fees stemming from the Broker's services shall be paid by Seller pursuant to a separate agreement by and between Seller and Broker.

## XVI.  MISCELLANEOUS

16.1     This Agreement and the Exhibits attached hereto contain the entire agreement between the parties with respect to the subject matter hereof, and no promise, representation, warranty or covenant not included in this Agreement or such Exhibits has been or is relied upon by either party. This Agreement shall supersede all other agreements, written or oral, pertaining to the matters described herein.

16.2    The Article and Exhibit headings herein are for convenience only, and are not to be used in determining the meaning of this Agreement or any part hereof.

16.3    This Agreement and its interpretation and enforcement shall be governed by the laws of the State of Louisiana.

16.4    This Agreement shall be binding on, and the benefits hereof shall inure to, the successors and assigns of the parties hereto.

16.5    If any term or provision of this Agreement, or any part of such term or provision, or the application thereof to any person or circumstance shall to any extent be held invalid or unenforceable, the remainder of this Agreement or the application of such term or provision or remainder thereof to persons or circumstances other than those as to which it is held invalid and unenforceable shall not be affected thereby and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

16.6    All Exhibits which are attached to this Agreement are part of this Agreement and are incorporated herein by reference.

16.7    The provisions of this Agreement are for the sole benefit of the parties to this Agreement and their successors and assigns and shall not give rise to any rights by or on behalf of anyone other than such parties.

16.8    This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

16.9    This Agreement may be executed in any number of counterparts, each of which shall, when executed, be deemed to be an original and all of which shall be deemed to be one and the same instrument.

16.10    If any litigation arises under this Agreement, the prevailing party (which term shall mean the party which obtains substantially all of the relief sought by such party) shall be entitled to recover, as a part of its judgment, reasonable attorneys' and paralegals' fees, court costs and expert witness fees. The provisions of this Section 16.10 shall survive the Closing or earlier termination of this Agreement.

16.11    Assignments.    Neither party shall assign this Agreement without the other party's consent.  Notwithstanding the foregoing, Selling Parties acknowledge and agree that Purchaser, in Purchaser's sole discretion, shall be permitted to assign this Agreement with respect to any individual Project to an entity controlled by or under common control with Purchaser (or with respect to any Project subject to a Capital Advance Loan, a nonprofit or nonprofit affiliate satisfactory to HUD), upon written notice to Selling Parties, provided that in no case or such assignment, and notwithstanding the terms of any assignment document evidencing same, is Purchaser released nor shall it be released from its obligations, duties or liability hereunder.  The provisions of this Section 16.11 shall survive the Closing.

16.12   All reference to "days" in this agreement shall mean calendar days.   If the date for performance of any act pursuant to this Agreement is specified in terms of "business day" is not a business day (as defined below), then such act shall be performed on the next succeeding business day.   In the computation of any period provided for in this Agreement or by law, the day of the act or event from which such period runs shall be excluded, and the last day of such period shall be included, unless it is not a business day, in which case the period shall be deemed to run until the end of the next business day.   The term "business day" shall mean all days, except Saturdays, Sundays and all days observed by the Federal Government as legal holidays.   Time is of the essence in this Agreement.

16.13   [Reserved].

16.14   From the Effective Date until the earlier of (i) Purchaser's election to terminate this Agreement pursuant to one of its rights under this Agreement and (ii) Closing, each Seller agrees to remove its Project from the market and shall not enter into any negotiations or agreements with third parties regarding sale of the Project. In the event of any breach of this Section 16.14 by a Seller, Purchaser shall have all rights and remedies available at law or in equity, including without limitation specific performance by injunction.

[signature page follows]

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date set forth above.

**SELLER:**

By: _Fr. Patrick Carr_

Name: Very Rev. Patrick Carr

Title: Secretary of each Selling Party

**PURCHASER:**

Tredway Acquisitions LLC,
a Delaware limited liability company

By: _____

Name: William Kreinik

Title: Authorized Signatory

26

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date set forth above.

**SELLER:**

By: _____
Name: Very Rev. Patrick Carr
Title: Secretary of each Selling Party

**PURCHASER:**

Tredway Acquisitions LLC,
a Delaware limited liability company

By: _____
Name: William Kreinik
Title: Authorized Signatory

LIST OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| **Exhibit A** | Due Diligence Records |
| **Exhibit B** | Rent Rolls |
| **Exhibit C** | Contracts |
| **Exhibit D** | Personal Property |
| **Exhibit E** | Environmental Disclosure |
| **Exhibit F** | Deed |
| **Exhibit G** | Bill of Sale and Assignment |
| **Exhibit H** | HAP Assignment Agreement |
| **Exhibit I** | FIRPTA Certificate |
| **Exhibit J** | Notice to Tenants |
| **Exhibit K** | Litigation |
| **Exhibit L** | [Reserved] |
| **EXHIBIT P** | Selling Parties |
| **EXHIBIT R-1 THROUGH R-15** | Recital Exhibits |

## Exhibit A

### Due Diligence Records

1. Audited financial statements for the last 4 years

2. Operating statements for calendar years 2020, 2021, 2022, 2023, 2024 and Year-To-Date operating statement for 2025

3. 12 consecutive months of rent rolls dating to current month including names of residents, tenant portion of rent, subsidy portion of rent, and security deposit amounts

4. Tenant aged receivable reports broken out by 0-30, 30-60, 60-90, 90+ day periods

5. Household Income Report

6. Resident Demographic Report (including age)

7. Staff and employee salary and benefit schedule; Union Agreements (if applicable)

8. The trailing 24 months of all utility bills including natural gas bills, electric bills, water bills, sewer bills, and trash collection bills

9. Service contracts and other contracts affecting the Property, including supply, maintenance, service, property management or contracts for repairs or capital improvements, including correspondence related thereto

10. All reports from licensed pest control operators reporting on the status of the Property

11. Elevator Certificate(s) (if applicable)

12. Tax exemption/abatement detail, copies of all real estate tax bills and any petitions for reassessments for 2020, 2021, 2022, 2023, and 2024

13. Capital expenditure report for capital expenditures made since 2020

14. Any documents regarding any social service coordinator grants; detailed list of social services, if any, offered at the property and associated documentation

15. All documents relating to any loans which are secured by or for the benefit of the Property (unless the property is to be delivered free and clear)

16. List of all personal property used in the operation of the property and such personal property list to be included in the sale

17. Copies of all construction plans, site plans, and land surveys, if any, in the possession of the Seller; also any architectural, engineering, geological, soil and/or physical condition reports related to the Property

18. Most recent Phase I or Phase II environmental report for the Property in the possession of the Seller, if any; and any other reports, permits, studies, analyses, documents and materials related to Lead Based Paint, Asbestos, Soils or Sewer Inspections, or any environmental condition of the Property and the removal or remediation of any hazardous or toxic substances

19. Any incident reports for events that have occurred within last 12 months

20. Warranties: e.g., roof, HVAC, plumbing, etc.

21. Copy of Seller's existing Owner's title policy

22. Copies of all Property and Liability Insurance policies with copies of any claims (loss runs) for the Seller's period of ownership

23. Reports of any inspections performed on all or any portion of the Property within the last 36 months, including Property Condition Reports, whether by Seller, its managing agent, state or local agencies, insurance companies, or any other party

24. All certificates of occupancy, licenses, permits, governmental approvals and notices relating to the Property

25. Any ground lease, air space lease, license for use or occupancy of property, easement, or other permission relating to the Real Property between Seller and any other party

26. A list of all pending or threatened lawsuits, administrative proceedings, violation notices, enforcement actions, governmental inquiries and tax appeals affecting the Property and/or Seller with respect to the Property that currently exist or have been addressed at any time during the last three years

27. Current organizational chart for the Seller, including all constituent entities with respective parent organizations

28. Tenant Selection Plan

29. All unit leases and addendums

30. A copy of the standard Tenant Lease Agreement

31. Affirmative Fair Housing Marketing Plan

32. A Current Asset Management Plan and/or Management Plan for the Property

33. Copies of rent surveys and market studies over the last 24 months

34. BBRI requests for past 4 years (if applicable)

**HAP Supplement**

35. Original HAP Contract and all amendments thereto and any correspondence or notices given or received relating to the HAP Contract

36. Any and all REAC inspection reports, inspection notices, REAC Scores, and related appeals, correspondence and documents related to the Property during Seller's period of ownership

37. Any and all MOR inspection reports

38. Use Agreement(s)

39. Regulatory Agreement(s)

40. Current Rent Schedule

41. Previous year Rent Schedule

42. Most recent utility allowance analysis

43. Latest Rent Comparable Study / Rent Grids

**Exhibit B**

**Rent Roll**

**ATTACHED**

**Exhibit C**

**Contracts**

| Contracts | | | |
|---|---|---|---|
| **Company** | **Property** | **Service** | **Expiration Date** |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## **Exhibit D**

## **Personal Property**

All personal property, furniture, appliances and fixtures owned by Seller and located on and used in connection with the operation of the Project.

## Exhibit E

## Environmental Disclosure

None.

## **Exhibit F**

## **Form of Deed**

EXHIBIT A to deed
LEGAL DESCRIPTION

EXHIBIT B to deed
PERMITTED EXCEPTIONS

## Exhibit G

## Form of Bill of Sale and Assignment

### BILL OF SALE AND ASSIGNMENT AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AGREEMENT, dated as of the ____ day of _____, 2018, between _____, a _____ ("Seller"), and _____, a limited liability company created and existing under and by virtue of the laws of the State of _____, having an address of _____ ("Purchaser"), provides:

### RECITALS

Seller and Purchaser have entered into a Property Purchase and Sale Agreement, dated as of _____ (the "Agreement"), whereby Seller has agreed to sell to Purchaser, and Purchaser has agreed to purchase from Seller, certain real property with improvements commonly known as _____ located in _____, and more fully described in Exhibit A attached hereto (the "Property").

### AGREEMENT:

NOW, THEREFORE, in consideration of the Agreement and other good and valuable consideration, the receipt and sufficiency or which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

**1. Assignment of Leases.** Seller hereby sells, assigns, transfers and conveys unto Purchaser, and its successors and assigns, all of Seller's right, title and interest in and to the tenant leases (the "Leases"), and the rights and obligations of Seller thereunder, described on the schedule attached hereto as Exhibit B. By execution hereof, Purchaser agrees to assume and be bound by Seller's obligations accruing on or after the date hereof under the Leases.

**2. Transfer and Assignment of Other Property.** Seller hereby sells, assigns, transfers and conveys unto Purchaser, and its successors and assigns, those items listed on Exhibit C attached hereto, together with all of Seller's right title and interest, if any, in and to all other personal property and fixtures located on and used in connection with the operation of the Property (collectively, the "Personal Property").

**3. Transfer and Assignment of Intangibles and Licenses.** Seller hereby sells, assigns, transfers and conveys unto Purchaser, and its successors and assigns, all of Seller's right title and interest, if any, in and to, assignable licenses, occupancy agreements, or assignable permits with respect to the Property, all trade names and trademarks owned or used by Seller in connection with the operation of the Property, together with all appurtenances and rights related to such trade name or trademark, including, but not limited to, the goodwill associated therewith, telephone listings and telephone advertising used or owned by Seller and affecting the Property.

**4. Transfer of Contracts.** Seller hereby sells, assigns, transfers and conveys unto Purchaser, and its successors and assigns, all contracts or agreements listed in the attached Exhibit

D (the "Assigned Contracts"), pertaining, or applicable to, or in any way connected with, the rental, maintenance and operation of the Property.

**5.** **Indemnification.** Purchaser covenants to hold Seller harmless from and indemnify Seller for any claim, loss, damage, cost or expense (including reasonable attorneys' fees) that Seller may incur from and after the date hereof as a result of the failure of Purchaser to perform any of its obligations under the Leases or the Assigned Contracts accruing from and after the date hereof. Seller covenants to hold Purchaser harmless from and indemnify Purchaser for any claim, loss, damage, cost or expense (including reasonable attorneys' fees) that Purchaser may incur from and after the date hereof as a result of the failure of Seller to perform any of its obligations under the Leases or the Assigned Contracts accruing prior to the date hereof.

**6.** **Governing Law.** This Bill of Sale and Assignment Agreement and all other instruments referred to herein shall be governed by, and shall be construed in accordance with, the laws of the State of _____.

**7.** **Successors and Assigns.** This Bill of Sale and Assignment Agreement and the terms and provisions hereof shall inure to the benefit of, and shall be binding upon, the respective successors and assigns of Seller and Purchaser.

**8.** **Incorporation by Reference.** All of the Exhibits attached hereto or referred to herein and all documents in the nature of such Exhibits are by reference incorporated herein and made a part of this Bill of Sale and Assignment Agreement.

**9.** **Counterparts.** To facilitate execution, this Agreement may be executed in as many counterparts as may be required. It shall not be necessary that the signatures on behalf of all parties appear on each counterpart hereof. All counterparts hereof shall collectively constitute a single agreement.

[Signatures appear on next page]

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Bill of Sale and Assignment Agreement to be executed on its behalf by its duly authorized representative as of the date first above written.

**Seller**:


**Purchaser**:

**Exhibit H**

**Form of HAP Assignment Agreement**

**Exhibit I**

**Form of FIRPTA**

CERTIFICATE OF NON-FOREIGN STATUS OF THE SELLER PURSUANT TO SECTION
1445 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED

Section 1445 of the Internal Revenue Code of 1986, as amended, provides that a transferee (buyer) of a U.S. real property interest must withhold tax if the transferor (seller) is a foreign person. For U.S. tax purposes (including section 1445 of the Code), the owner of a disregarded entity (which has legal to title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform [NAME OF BUYER ENTITY] ("Buyer") that withholding of tax is not required upon the disposition of a U.S. real property interest by [_____, a(n) _____] ("Seller"), the undersigned hereby certifies the following on behalf of the Seller:

1. Seller is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and Treasury regulations);

2. Seller is not a disregarded entity as defined in Treasury Regulation §1.1445-2(b)(2)(iii);

3. Seller's U.S. employer identification number is _____; and

4. Seller's office address is _____.

I understand that this certification may be disclosed to the Internal Revenue Service by Buyer and that any false statement contained herein could be punished by fine, imprisonment, or both.

SELLER:
[_____,]
[a(n) _____]


By: _____
Name: _____
Its: _____

## Exhibit J

## Form of Notice to Tenants

[Seller's Address]

BY HAND

[Date]

To: All Tenants at [_____] Apartments

Re: Acquisition of [_____] Apartments

Dear Tenants:

We are pleased to announce that [BUYER ENTITY NAME] ("_____") has today acquired the [_____] Apartments (the "Property") from [_____]. [BUYER ENTITY]'s address is _____. Your security deposit (including any pet deposit) paid in accordance with your lease at the Property ("Lease") has been transferred to [BUYER ENTITY]. From this day forward, all checks payable to the landlord under your Lease should be made payable to [BUYER ENTITY] at the on-site manager's office.

Very truly yours,

[_____,]

[a(n) _____]

By: _____

Name: _____

Its: _____

**Exhibit K**

**Litigation**

None.

**Exhibit L**

**[Reserved]**

## **EXHIBIT P**

Selling Parties

1. Christopher Inn
   o Owner of Christopher Inn Apartments at 2110 Royal Street, New Orleans, LA 70116
2. The Apartments at Mater Dolorosa
   o Owner of Mater Dolorosa Apartments at 1226 S. Carrollton Ave., New Orleans, LA 70118
3. Metairie Manor
   o Owner of Metairie Manor I and II at 4929 York St., Metairie, LA 70001
4. Metairie III
   o Owner of Metairie Manor III at 4929 York St., Metairie, LA 70001
5. Dubourg Home
   o Owner of Place Dubourg Apartmentsat 201 Rue Dubourg, LaPlace, LA 70068
6. St. Tammany Manor, Inc.
   o Owner of Rouquette Lodge at 4300 Highway 22 OFC, Mandeville, LA 70471
7. Rouquette III
   o Owner of Roquette Lodge III Apartments at 4300 Highway 22 OFC, Mandeville, LA 70471
8. Monsignor Wynhoven Apartments, Inc.
   o Owner of Monsignor Wynhoven I at 4600 Tenth Street, Marrero, LA 70072
9. Mental Health Association Development Corp.
   o Owner of St. Martin House at 1540 N. Johnson St., New Orleans, LA 70116
10. St. Bernard Manor
    o Owner of St. Bernard Manor Apartments at 2400 Archbishop Hannan Blvd., Meraux, LA 70075
11. St. Martin's Manor, Inc.
    o Owner of St. Martin's Manor at 1501 N. Johnson St. New Orleans, LA 70116
12. St. Bernard II
    o Owner of SBM II (AKA Mataire IV) at 4937 York Street, Metairie, LA 70001
13. St. Bernard III
    o Owner of SBM III (AKA Roquette IV) at 4310 Highway 22 OFC, Mandeville, LA 70471
14. Villa St. Maurice, Inc.
    o Owner of Villa St. Maurice at 500 St. Maurice Ave., New Orleans, LA 70117
15. Villa Additions
    o Owner of St. Teresa's Villa at 1938 Gause Blvd W, Slidell, LA 70460

## EXHIBIT R

1. Christopher Inn Apartments at 2110 Royal Street, New Orleans, LA 70116
   o Owned by Christopher Inn
2. Mater Dolorosa Apartments at 1226 S. Carrollton Ave., New Orleans, LA 70118
   o Owned by The Apartments at Mater Dolorosa
3. Metairie Manor at 4929 York St., Metairie, LA 70001
   o Owned by Metairie Manor
4. Metairie Manor III at 4929 York St., Metairie, LA 70001
   o Owned by Metairie III
5. Place Dubourg at 201 Rue Dubourg, LaPlace, LA 70068
   o Owned by Dubourg Home
6. Rouquette Lodge at 4300 Highway 22 OFC, Mandeville, LA 70471
   o Owned by St. Tammany Manor, Inc.
7. Roquette Lodge III at 4300 Highway 22 OFC, Mandeville, LA 70471
   o Owned by Rouquette III
8. Monsignor Wynhoven I at 4600 Tenth Street, Marrero, LA 70072
   o Owned by Monsignor Wynhoven Apartments, Inc.
9. St. Martin House at 1540 N. Johnson St., New Orleans, LA 70116
   o Owned by Mental Health Association Development Corp.
10. St. Bernard Manor at 2400 Archbishop Hannan Blvd., Meraux, LA 70075
    o Owned by St. Bernard Manor
11. St. Martin's Manor at 1501 N. Johnson St.  New Orleans, LA 70116
    o Owned by St. Martin's Manor, Inc.
12. SBM II (AKA Mataire IV) at 4937 York Street, Metairie, LA 70001
    o Owned by St. Bernard II
13. SBM III (AKA Roquette IV) at 4310 Highway 22 OFC, Mandeville, LA 70471
    o Owned by St. Bernard III
14. Villa St. Maurice at 500 St. Maurice Ave., New Orleans, LA 70117
    o Owned by Villa St. Maurice, Inc.
15. St. Teresa's Villa at 1938 Gause Blvd W, Slidell, LA 70460
    o Owned by Villa Additions

## AMENDMENT TO
## PURCHASE AGREEMENT

This AMENDMENT TO PURCHASE AGREEMENT (the "**Amendment**") is made and entered into to be effective as of October 31, 2025, by and between the parties named in Exhibit P attached hereto (herein, collectively, the "Selling Parties"), and Tredway Acquisitions LLC, a Delaware limited liability company, its successors and assigns ("Purchaser")

## RECITALS

A.      Selling Parties and Purchaser entered into that certain Purchase Agreement dated effective as of September 3, 2025 ("the "**Agreement**") (all capitalized terms used but not otherwise defined herein shall have the meanings respectively ascribed to such terms in the Agreement).

B.      Selling Parties and Purchaser now desire to amend the Agreement in order to address certain matters as more particularly set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of these premises, and the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      **Recitals**.  The recitals set forth above, including each and every recital contained therein, are incorporated into and made a part of this Amendment as though fully set forth herein.

2.      **Due Diligence Period & Due Diligence Expiration Date**.  Section 3.1 of the Agreement is hereby amended so as to provide that the Due Diligence Period expires at 11:59 pm EST, November 10, 2025. References to the "Due Diligence Period", "Due Diligence Expiration Date", and the "Due Diligence Period Expiration Date" throughout the Agreement are correspondingly revised to reflect the foregoing.

3.      **Deed Restrictions.** The following is hereby incorporated into the Agreement as new Section 16.5:

DEED RESTRICTION.  Purchaser acknowledges the following restrictions on the Property which restrictions shall, be incorporated into each Deed and shall to the fullest extent allowed by law, run with the land and be binding on Purchaser and any future owners (the following restrictions are collectively referred to as the "Use Restrictions"):

The Property shall not be used for the following uses or purposes:

An abortion clinic or medical-service-type facility that includes the provision of abortion services or counseling that promotes and/or encourages individuals to obtain abortions; or

A counseling service that includes as part of its options and/or recommendation to clients the consideration of abortion as an alternative to carrying a pregnancy through birth; or

47

An organization that advocates, in any manner, abortion or right of free choice of an individual to elect abortion.

4. **Entire Agreement; Conflict**. Except as otherwise stated herein, all other terms, conditions and agreements contained in the Agreement remain unmodified and in full force and effect. To the extent a conflict exists between the terms of this Amendment and the Agreement, the terms of this Amendment shall control.

5. **Counterparts; Electronic or Facsimile Transmission**. This Amendment may be executed in counterparts which, when combined, shall constitute one instrument. The electronic or facsimile transmission of a signed counterpart of this Amendment shall be binding upon the party whose signature is contained on the transmitted copy.

**{Signature Pages to Follow}**

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the date listed above.

**SELLER:**

By: _____

Name: Very Rev. Patrick Carr

Title: Secretary of each Selling Party

**PURCHASER:**

**TREDWAY ACQUISITIONS LLC**

By: _____

Name: William Kreinik

Title: Authorized Signatory

41013950v2