I.2

LOAN AGREEMENT

BETWEEN

LOUISIANA PUBLIC FACILITIES AUTHORITY

AND

THE ROMAN CATHOLIC CHURCH OF THE
ARCHDIOCESE OF NEW ORLEANS

DATED AS OF APRIL 1, 2017

$41,895,000
LOUISIANA PUBLIC FACILITIES AUTHORITY
REFUNDING REVENUE BONDS
(ARCHDIOCESE OF NEW ORLEANS PROJECT)
SERIES 2017

PP Ex.
20

1

# TABLE OF CONTENTS

\*     \*     \*     \*     \*     \*

## ARTICLE I

### DEFINITIONS AND RULES OF CONSTRUCTION

**SECTION 1.01.**  Definitions.............................................................................................3
**SECTION 1.02.**  Rules of Construction. ..................................................................10

## ARTICLE II

### REPRESENTATIONS

**SECTION 2.01.**  Representations by the Authority.................................................10
**SECTION 2.02.**  Representations of the Corporation. ............................................10

## ARTICLE III

### TERM, NATURE AND BENEFITS OF AGREEMENT; ACQUISITION OF PROJECT

**SECTION 3.01.**  Term.....................................................................................................11
**SECTION 3.02.**  Nature and Benefits..........................................................................11

## ARTICLE IV

### PAYMENTS; DEBT SERVICE RESERVE FUND PAYMENTS; CREDITS; OBLIGATIONS UNCONDITIONAL; PREPAYMENT

**SECTION 4.01.**  Amounts Payable. ..............................................................................12
**SECTION 4.02.**  Credits Against Payments...............................................................14
**SECTION 4.03.**  Obligation to Make Payments Unconditional.................................14
**SECTION 4.04.**  Payments into Debt Service Reserve Fund.....................................15
**SECTION 4.05.**  Prepayment of Payments...................................................................15

## ARTICLE V

### NON-ARBITRAGE

**SECTION 5.01.**  Covenants as to Arbitrage................................................................16

## ARTICLE VI

### CERTAIN COVENANTS OF THE CORPORATION

**SECTION 6.01.**  General Covenants of Corporation. ...............................................16
**SECTION 6.02.**  Covenants Regarding Operation and Maintenance by the Corporation of its Properties. ......................................................................................18

i

2

**SECTION 6.03.** Covenants Against Pledge of Revenues or Properties and Disposition of Assets. ...................................................................................................19
**SECTION 6.04.** Covenant as to Redemption of Prior Bonds. ...............................................20
**SECTION 6.05.** Covenants, Representations and Warranties Relating to Federal Income Taxation. ................................................................................................20
**SECTION 6.06.** Information and Continuing Disclosure Agreement. .....................................21
**SECTION 6.07.** Source of Payments. ...............................................................................22
**SECTION 6.08.** Insurance. ..............................................................................................22
**SECTION 6.09.** Limitation on the Incurrence of Additional Debt by the Corporation. ..........22
**SECTION 6.10.** Use Covenants. ......................................................................................23
**SECTION 6.11.** Environmental Covenants. .......................................................................23
**SECTION 6.12.** Debt Service Coverage Covenant. ...........................................................25
**SECTION 6.13.** Management Consultant. .........................................................................25
**SECTION 6.14.** Liquidity Covenant. .................................................................................26
**SECTION 6.15.** Net Worth Covenant. ..............................................................................26
**SECTION 6.16.** Amendments. .........................................................................................26
**SECTION 6.17.** State Bond Commission Reporting Requirements. ......................................26
**SECTION 6.18.** Spending Policy. .....................................................................................27
**SECTION 6.19.** Rating Agency Covenant. ........................................................................27

# ARTICLE VII

## ASSIGNMENT

**SECTION 7.01.** Assignment of this Agreement. ................................................................27
**SECTION 7.02.** Restrictions on Transfer of Authority's Rights. ..........................................27
**SECTION 7.03.** Assignment by the Authority. ..................................................................27

# ARTICLE VIII

## SUPPLEMENTS AND AMENDMENTS

**SECTION 8.01.** Amendment Without Consent. ..................................................................27
**SECTION 8.02.** Amendment Upon Approval of a Majority of Bondholders. ...........................28
**SECTION 8.03.** Filing. ...................................................................................................28
**SECTION 8.04.** Reliance on Counsel. ..............................................................................28
**SECTION 8.05.** Notice to Rating Agencies. .......................................................................29

# ARTICLE IX

## EVENTS OF DEFAULT AND REMEDIES

**SECTION 9.01.** Events of Default Defined. .......................................................................29
**SECTION 9.02.** Remedies. ..............................................................................................30
**SECTION 9.03.** No Remedy Exclusive; Selective Enforcement. ...........................................30
**SECTION 9.04.** Indenture Overriding. ..............................................................................30
**SECTION 9.05.** Agreement to Pay Attorneys' Fees and Expenses. ......................................30
**SECTION 9.06.** Authority and Corporation to Give Notice of Default. ..................................31

**SECTION 9.07.** Correlative Waivers. .................................................................................31

## ARTICLE X

## MISCELLANEOUS

**SECTION 10.01.** References to the Bonds Ineffective After Bonds Paid. ...................................31
**SECTION 10.02.** Amounts Remaining in Funds. ...................................................................31
**SECTION 10.03.** Notices. .................................................................................................31
**SECTION 10.04.** Binding Effect. ........................................................................................32
**SECTION 10.05.** Performance on Legal Holidays...................................................................32
**SECTION 10.06.** Execution in Counterparts..........................................................................32
**SECTION 10.07.** Applicable Law. .......................................................................................32
**SECTION 10.08.** Severability. ...........................................................................................32
**SECTION 10.09.** Captions. ...............................................................................................32
**SECTION 10.10.** Consents and Approvals. ...........................................................................32
**SECTION 10.11.** Third Party Beneficiaries. ..........................................................................32
**SECTION 10.12.** Exculpatory Provision................................................................................33
**SECTION 10.13.** Accounts and Audits. ...............................................................................33
**SECTION 10.14.** Date of Agreement....................................................................................33

**EXHIBIT A**     **PROJECTS**
**EXHIBIT B**     **METHOD OF CALCULATING DEBT SERVICE COVERAGE COVENANT,
LIQUIDITY COVENANT AND NET WORTH COVENANT**

\*   \*   \*   \*   \*   \*

# LOAN AGREEMENT

This **LOAN AGREEMENT** dated as of April 1, 2017 (together with any amendments hereto, the "Agreement"), is between the **LOUISIANA PUBLIC FACILITIES AUTHORITY**, a public trust and public corporation of the State of Louisiana (the "Authority"), and **THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS** (the "Corporation"), a nonprofit corporation duly organized and validly existing under the laws of the State.

## WITNESSETH:

WHEREAS, the Authority is a public trust and public corporation of the State of Louisiana (the "State") created by a certain Indenture of Trust dated August 21, 1974 pursuant to the provisions of Chapter 2-A of Title 9 of the Louisiana Revised Statutes of 1950, as amended, to promote, encourage and further the accomplishment of all activities which are or may become of benefit to the State and its inhabitants and which have a public purpose, and to procure any funds necessary therefor by mortgage, pledge or other encumbrance of the trust estate dedicated by it therefor and is authorized pursuant to Chapter 14-A of Title 39 of the Louisiana Revised Statutes of 1950, as amended (the "Refunding Act") to refund bonded indebtedness incurred for said facilities; and

WHEREAS, for the benefit of The Roman Catholic Church of the Archdiocese of New Orleans (the "Corporation"), a Louisiana nonprofit corporation and 501(c)(3) corporation, the Authority previously issued its Revenue and Revenue Refunding Bonds (Archdiocese of New Orleans Project) Series 2007 (the "Prior Bonds") for the purpose of providing funds to (i) current refund the Authority's (a) outstanding Equipment and Capital Facilities Pool Loan Program Revenue Bonds, Series 2001A issued in the total aggregate principal amount of $9,000,000 and (b) outstanding Equipment and Capital Facilities Pooled Loan Program Revenue Bonds, Series 2002C issued in the aggregate principal amount of $8,500,000 on behalf of Chateau De Notre Dame and $3,500,000 on behalf of Wynhoven Health Care Center, (ii) finance or refinance the reconstruction, rehabilitation, restoration, construction, furnishing, improving and equipping of school buildings, office buildings, nursing homes and other facilities owned and operated by the Corporation and/or Archdiocesan related, Louisiana nonprofit corporations, (iii) fund a deposit to the debt service reserve fund, (iv) fund capitalized interest, and (iv) pay costs of issuance of the Prior Bonds; and

WHEREAS, the Corporation has requested that the Authority issue $41,895,000 aggregate principal amount of Louisiana Public Facilities Authority Refunding Revenue Bonds (Archdiocese of New Orleans Project) Series 2017 (the "Bonds"), the proceeds of the sale of such Bonds to be loaned to the Corporation pursuant to the terms of this Agreement, for the purpose of providing funds to, together with other available moneys of the Corporation, (i) refund all of the Prior Bonds and (ii) pay the costs of issuance of the Bonds; and

WHEREAS, in consideration of the issuance of the Bonds by the Authority, the Corporation will agree to make payments pursuant to this Agreement at such times and in an amount sufficient to make timely payments of principal of, premium, if any, and interest on the Bonds and to pay such other amounts as may be required by this Agreement; and

WHEREAS, the Authority has adopted a resolution authorizing the sale and the issuance of the Bonds, the execution and delivery of instruments pertaining to the issuance thereof and other actions to be taken by the Board of Trustees of the Authority in connection with the authorization, issuance, sale and delivery of the Bonds and the application of the proceeds thereof; and

WHEREAS, all acts, conditions and things required by the laws of the State to happen, exist and be performed precedent to and in the execution and delivery of this Agreement have happened, exist and have been performed as so required in order to make this Agreement a valid and binding agreement in accordance with its terms; and

WHEREAS, each of the parties hereto represents that it is fully authorized to enter into and perform and fulfill the obligations imposed upon it under this Agreement and the parties are now prepared to execute and deliver this Agreement; and

WHEREAS, in consideration of the respective representations and agreements contained herein, the parties hereto, recognizing that under the Refunding Act this Agreement shall not in any way obligate the State or any public corporation thereof, including, without limitation, the Authority, to raise any money by taxation or use other public moneys for any purpose in relation to the Bonds and that neither the State nor the Authority, shall pay or promise to pay any debt or meet any financial obligation to any person at any time in relation to the Bonds except from moneys received or to be received under the provisions of this Agreement and the Indenture or derived from the exercise of the rights of the Authority thereunder, agree as follows:

NOW, THEREFORE, THIS AGREEMENT WITNESSETH:

## ARTICLE I

### DEFINITIONS AND RULES OF CONSTRUCTION

**SECTION 1.01.** <u>Definitions.</u> All capitalized terms not otherwise defined herein shall have the meanings assigned thereto in the preamble hereto or in the Trust Indenture dated as of April 1, 2017 (the "Indenture") between the Authority and Whitney Bank, as Trustee (the "Trustee"). In addition to words and terms elsewhere defined in this Agreement, the following words and terms as used in this Agreement shall have the following meanings, unless some other meaning is plainly intended:

**"Agreement"** means this Loan Agreement dated as of April 1, 2017 between the Corporation and the Authority, including any amendments and supplements hereof and hereto as permitted hereunder.

**"Annual Debt Service Requirements"** means, when used with respect to any Long-Term Indebtedness for any Fiscal Year, as of any particular date of calculation the amount required to pay the sum of (a) the interest on such Long-Term Indebtedness payable during such Fiscal Year, and (b) the principal of and any amount required to effect any mandatory redemption of such Long-Term Indebtedness, if any, during such Fiscal Year, less any amount of such interest or principal for the payment of which moneys or investment obligations the principal of and interest on which when due will provide for such payment, are held in trust (including defeased obligations, capitalized interest and debt service reserve funds) and including all amounts due under any capitalized leases and any guarantees of at least one year in duration.

For the purpose of calculating the Annual Debt Service Requirements:

(i) with respect to any Variable Rate Indebtedness, for the purpose of calculating interest on any such Indebtedness for any period after the date of calculation, such Indebtedness shall be deemed to bear interest at The Bond Buyer Revenue Bond Index for a term equal to the remaining term of the Bonds;

(ii) with respect to any Balloon Long-Term Indebtedness, debt service shall be calculated at the option of the Corporation as follows: (A) if an irrevocable commitment for a credit facility the provider of which is rated at least "P-1" by Moody's or "A-1" by S&P or "F-1" by Fitch is in effect to pay the balloon debt when it comes due, then the terms of the contractual obligation to repay the credit facility provider may be used, (B) if balloon debt is contractually required to be amortized, then such amortization payments may be used, or (C) amortization may be assumed on a level-debt service basis over a 20-year period at an interest rate based on the Revenue Bond Index last published by *The Bond Buyer*. Notwithstanding the foregoing, the full amount of balloon debt shall be included in the calculation if the calculation is made within 12 months of the actual maturity of such balloon debt and no credit facility exists;

(iii) with respect to any Guaranty of any Indebtedness that would constitute Long-Term Indebtedness if incurred directly by the Corporation:

(A) for the purposes of determining debt service requirements,

(1) so long as no payment default shall have occurred with respect to such Indebtedness and no demand for payment shall have been made under such Guaranty as described in (2) below, only 20% of the debt service requirements of such guaranteed Indebtedness shall be included; and

3

(2)     if during the immediately preceding one-year period a payment default shall have occurred with respect to such Indebtedness and a demand for payment shall have been made under such Guaranty, 100% of the debt service requirements of such Indebtedness shall be taken into account for the two Fiscal Years following such period; and

(B)     such Indebtedness shall be taken into account only once in calculating the Debt Service Requirements of all Long-Term Indebtedness.

Notwithstanding anything to the contrary, with respect to the Louisiana Public Facilities Authority Revenue Bonds (St. Anthony's Gardens Project) Series 2014, amortization shall correspond to the amortization schedule through August 1, 2026 and shall thereafter be assumed to amortize on a level debt service basis over a twenty year period from a balloon payment thereon at an interest rate based on the "Revenue Bond Index" last published by *The Bond Buyer* on or prior to the date of calculation.

**"Authorized Corporation Representative"** means the Secretary, Chief Financial Officer or any other officer of the Corporation designated in writing to act hereunder and under the Indenture.

**"Balloon Long-Term Indebtedness"** means Long-Term Indebtedness, 25% or more of the principal amount of which matures in the same 12-month period, which portion of such principal amount is not required by the documents governing such Long-Term Indebtedness to be amortized by redemption prior to such period.

**"Bond Counsel"** means a firm of attorneys of nationally recognized standing in the field of law relating to municipal bond law and the excludability of interest on state or local bonds from gross income of the owners of the Bonds for purposes of federal income taxation, selected by the Authority and acceptable to the Corporation.

**"Bondholder," "Owners"** or **"owner",** when used with reference to a Bond or Bonds, means the registered owner of any outstanding Bond or Bonds.

**"Debt Service Coverage Ratio"** means, for any Fiscal Year, the ratio for such Fiscal Year of (x) Net Income Available for Debt Service to (y) Annual Debt Service Requirements due in such Fiscal Year.

**"Environmental Regulations"** means all Laws and Regulations, now or hereafter in effect, with respect to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act, as amended (42 U.S.C. Section 9601, et seq.) (together with the regulations promulgated thereunder, "CERCLA"), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Section 6901, et seq.) (together with the regulations promulgated thereunder, "RCRA"), the Emergency Planning and Community Right-to-Know Act, as amended (42 U.S.C. Section 11001, et seq.) (together with the regulations promulgated thereunder, "Title III"), the Clean Water Act, as amended (33 U.S.C. Section 1321, et seq.) (together with the regulations promulgated thereunder "CWA"), the Clean Air Act, as amended (42 U.S.C. Section 7401, et seq.) (together with the regulations promulgated thereunder, "CAA") and the Toxic Substance Control Act, as amended (151 U.S.C. Section 2601, et seq.) (together with the regulations promulgated thereunder, "TSCA"), and any state or local similar laws and regulations and any so-called local, state or federal "superfund" or "superlien" law.

**"Fair Market Value"** of any stock, bond, debenture or other obligation or equity instrument which is regularly traded on a nationally recognized exchange means, at any date, the closing sale price of such security on the business day (on which any national securities exchange is open for the normal transaction of business) next preceding such date, as appearing in any published list of any national

securities exchange or the National Market List of the National Association of Securities Dealers, Inc. or, if there is not such a closing sale price of such security, the average of the asked and bid prices for the purchase of such security at face value quoted on such business day by a financial institution of recognized standing which regularly deals in securities of such type.

**"Fiscal Year"** means any period of twelve consecutive months adopted by the Corporation as its fiscal year for financial reporting purposes, presently the period beginning on July 1 and ending on June 30 of each year.

**"Generally Accepted Accounting Principles"** means generally accepted accounting principles as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board, which are applicable to the circumstances as of the date of determination.

**"Guaranty"** means any guaranty, loan commitment or other obligation of the Corporation guaranteeing in any manner, whether directly or indirectly, any Indebtedness of any other person.

**"Hazardous Materials"** shall have the meanings set forth in Section 6.11 hereof.

**"Indebtedness"** means:

(a)     all indebtedness and other obligations of the Corporation for borrowed money or for the deferred purchase price of property or services (including, without limitation, the obligations of the Corporation under this Agreement);

(b)     the capitalized amount, as determined in accordance with Generally Accepted Accounting Principles, of all obligations of the Corporation under any lease of property by the Corporation as lessee which would be capitalized on a balance sheet of the Corporation prepared in accordance with Generally Accepted Accounting Principles;

(c)     all obligations of the Corporation evidenced by notes, bonds, debentures, or similar instruments;

(d)     all indebtedness of the Corporation created or arising under a conditional sale or other title retention agreement with respect to property acquired by the Corporation (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property);

(e)     any obligation of another person of the type described in (a), (b), (c) or (d) above, the payment or collection of which the Corporation has guaranteed (except by reason of endorsement for collection in the ordinary course of business) or in respect of which the Corporation is liable contingently or otherwise, including, without limitation, liable by way of agreement to purchase, to provide funds for payment, to supply funds to or otherwise invest in such other person, or otherwise to assure a creditor against loss; and

(f)     any obligation of another person of the type described in (a), (b), (c) or (d) above, secured by (or for which the holder of such indebtedness has a then existing right, contingent or otherwise, to be secured by) any mortgage, deed of trust, pledge, lien, security interest or other charge or encumbrance upon or in property owned by the Corporation, whether or not the Corporation has assumed or become liable for the payment of such indebtedness or obligation;

provided, however, that "Indebtedness" shall not include any indebtedness described above to the extent that the payment of principal and interest on which is to be made from cash, direct United States government obligations or obligations the principal of and interest on which is guaranteed by the United States, including earnings thereon, deposited with a trustee or escrow agent for such purpose. The amount of any Indebtedness referred to in clauses (e) or (f) shall be equal to 20 percent of the amount of the obligation so guaranteed or otherwise supported so long as such obligation is not in default. Should any such obligation be in default, the amount thereof shall be equal to the full amount of the obligation.

**"Independent Public Accountant"** means a firm of independent certified public accountants selected by the Corporation.

**"Investment Policy"** means the Corporation's Statement of Investment Policy, reviewed and revised as of September 27, 2016, and as the same may be amended and supplemented from time to time.

**"Land"** means the real Properties on which the primary operations of the Corporation are located and conducted, together with all buildings, improvements and fixtures located thereon and all additions, enlargements and extensions made thereto.

**"Laws and Regulations"** shall have the meanings given in Section 6.11 hereof.

**"Liquidity Covenant"** means Unrestricted Cash and Investments equal at least 1.10 times the principal amount of Total Debt.

**"Loan"** means the aggregate amount of the moneys loaned to the Corporation pursuant to this Agreement.

**"Long-Term Indebtedness"** means any Indebtedness which has an original stated maturity in excess of one year beyond the date of original issuance or incurrence, and any Indebtedness which has an original stated maturity of less than or equal to one year which is renewable or extendable at the option of the Corporation for a term greater than one year beyond the date of original issuance of incurrence; provided, however, that should any such Indebtedness be extendable or renewable at the option of the Corporation, it shall not be "Long-Term Indebtedness" if the applicable governing documents require that such Indebtedness not be outstanding for a period of at least 30 consecutive calendar days in each calendar or Fiscal Year.

**"Management Consultant"** means an independent professional management consultant having a favorable national reputation for skill and experience in charitable and educational consulting work similar to that carried on by the Corporation, selected by the Corporation and acceptable to the Trustee and the Authority, who may be (without limitation) the Independent Public Accountant if the Independent Public Accountant otherwise meets the criteria set forth in this definition.

**"Moody's"** means Moody's Investors Service, a Delaware corporation.

**"Net Extraordinary Expense"** means a gift or grant, outside of the Corporation's Fiscal Year budget less Revenues that are reallocated to or raised specific for such gift or grant.

**"Net Income Available for Debt Service"** means, for each Fiscal Year, "Increase (Decrease) in Net Assets" plus "Interest Expense" and "Interest expense – Deposit and Loan Fund", each as shown on the Corporation's Statement of Activities, plus "Depreciation and amortization" as shown on the Corporation's Statement of Cash Flows, less "Total non-operating revenues (expenses) – net" as shown

on the Corporation's Statement of Activities, as collectively calculated in the manner shown in **Exhibit B** to this Loan Agreement, and incorporating FASB ASC 715 pension expense in accordance with Generally Accepted Accounting Principles during such Fiscal Year then ended. Solely for the purposes of calculating Net Income Available for Debt Service, it shall be assumed that the Corporation's spending policy limits will be applied to the Corporation's available cash and investments, subject to the restrictions set forth in Section 6.18 hereof, and will be added to the Increase (Decrease) in Net Assets to compute Net Income Available for Debt Service. All capitalized terms used in this definition and not defined elsewhere in this Loan Agreement shall have the meaning given by Generally Accepted Accounting Principles.

**"Net Investment in Plant"** means "Land, buildings and equipment less accumulated depreciation" as set forth in the Corporation's financial statements minus Long-Term Debt.

**"Net Worth Covenant"** means the covenants set forth in Section 6.15 hereof.

**"Non-Recourse Indebtedness"** means Long-Term Indebtedness that does not constitute a general obligation of the Corporation and that is payable solely from Properties of the Corporation, or the revenues of Properties the purchase or improvement of which was financed by such Indebtedness.

**"Notes Payable"** means any indebtedness of the Corporation which has a maturity of one year or less and which is shown in the Corporation's Statement of Financial Position.

**"Officer's Certificate"** means a certificate signed by an Authorized Corporation Representative.

**"Opinion of Counsel"** means a written legal opinion from a firm of attorneys experienced in the matters to be covered in the opinion.

**"Permitted Liens"** means

(a)      Liens created by the terms of (i) this Agreement and (ii) the Indenture;

(b)      Liens arising by reason of good faith deposits by the Corporation in the ordinary course of business (for other than borrowed money);

(c)      Any lien arising, by reason of deposits with, or the giving of any form of security to, any governmental agency or any body created or approved by law or governmental regulation for any purpose at any time as required by law or governmental regulation as a condition to the transaction of any business or the exercise of any privilege or license, or to enable the Corporation to maintain self-insurance or to participate in any funds established to cover any insurance risks or in connection with worker's compensation, unemployment insurance, pension or profit-sharing plans or other social security, or to share in the privileges or benefits required for entities such as the Corporation participating in such arrangements;

(d)      (i) Rights reserved to or vested in any municipality or public authority by the terms of any right, power, franchise, grant, license, permit or provision of law, affecting any property; (ii) any liens on any property for taxes, assessments, levies, fees, water and sewer rents, and other governmental and similar charges and any liens of mechanics, materialmen, laborers, suppliers or vendors for work or services performed or materials furnished in connection with such property, which in each such case are not due and payable or are not delinquent, or the amount or validity of which in each such case is being contested and execution thereon is stayed or, with respect to liens of materialmen, laborers, suppliers or vendors have been due less than 90 days or the payment of which has been provided for by the posting of

a bond; (iii) easements, rights-of-way, servitudes, restrictions, oil, gas or other mineral reservations and other minor defects, encumbrances, and irregularities in the title to any property which do not impair the use of such property or materially and adversely affect the value thereof; and (iv) rights reserved to or vested in any municipality or public authority to control or regulate any property or to use such property in any manner;

(e)     Any lien on property acquired after the delivery date of the Bonds by the Corporation if a certificate of an Authorized Corporation Representative is delivered to the Trustee at or prior to the time of acquisition of such property certifying that (i) the lien and the indebtedness secured thereby were created and incurred by a person other than the Corporation before acquisition of such property by the Corporation, and (ii) the lien was created before the decision of the Corporation to acquire the property and was not created for the purpose of enabling the Corporation to avoid the limitations hereof on creation of liens, except that no such certificate shall be required if such lien secures indebtedness in an aggregate principal amount not exceeding $1,000,000 and such lien otherwise satisfies the conditions set forth in clauses (i) and (ii) of this subsection (e);

(f)     Liens on property received by the Corporation through gifts, grants or bequests such liens being due to restrictions on such gifts, grants or bequests of property or the income thereon; and

(g)     Purchase money security interests and security interests existing on any real estate, equipment or goods prior to the time of its acquisition through purchase or otherwise, or placed upon such property to secure a portion of the purchase price thereof, or lessee's interests in leases of equipment or goods required to be capitalized under Generally Accepted Accounting Principles, provided that (i) the aggregate principal amount of the indebtedness secured thereby shall not at the time of incurrence or assumption exceed the lesser of the cost or the fair market value of such property and (ii) in the case of real estate, such real estate is not to be used by the Corporation to a significant degree in connection with the operations of the Corporation; and

**"Prior Projects"** means the facilities financed or refinanced with the proceeds of the Prior Bonds as described in **Exhibit A** attached hereto.

**"Properties"** means, collectively, all of the Corporation's assets, including real and personal property, defined in the Corporation's Statements of Financial Position under the heading "Total Assets" excluding custodial accounts.  The term **"Properties"**, without intending, to limit the foregoing, as of any particular time, shall also include all Land and all furnishings, equipment and other property, movable and immovable, and all franchises, rights-of-way, privileges, servitudes, easements, licenses, rights and any other interests in Land and in other property owned, leased, subleased or otherwise held or occupied by the Corporation and used or useful by the Corporation in connection with or incident to its providing its charitable mission.

**"Readily Marketable Securities"** means investments of the Corporation held in portfolios A, B, and C that are not classified as illiquid.

**"Revenues"** means all receipts, revenues, income and other money received by the Corporation from any source and all rights to receive the same, whether in the form of accounts, accounts receivable, contract rights, chattel paper, instruments or other rights, and the proceeds thereof, whether cash or non-cash, and any insurance thereon, whether now existing or hereafter coming into existence and whether now owned or held or hereafter acquired by the Corporation; provided, however, that gifts, grants, bequests, donations and contributions heretofore or hereafter made, designated at the time of making thereof by the donor or maker as being for certain specific purposes, and the income derived therefrom, to the extent required by such designation, shall be excluded from Revenues.

8

**"S&P"** means S&P Global Ratings, a division of S&P Global, Inc., or any successor thereto.

**"Short-Term Indebtedness,"** when used in connection with indebtedness, means indebtedness having an original maturity less than or equal to one year and not renewable at the option of the debtor for a term greater than one year beyond the date of original issuance; provided that Short-Term Indebtedness shall not be deemed to include the current portion of Long-Term Indebtedness even if so classified under Generally Accepted Accounting Principles.

**"Subordinated Indebtedness"** means unsecured Indebtedness the principal of and interest on which are subordinated in payment and priority and may not be paid at any time when any Event of Default has occurred and is continuing under this Agreement and the Indenture and which are specifically designated as such by the Corporation.

**"Total Debt"** means all Indebtedness of the Corporation, whether fixed rate or variable rate, long-term and short-term, senior, parity or subordinate, and shall include Guaranties (provided that the amount of the Guaranty shall be calculated as provided in the definition of Annual Debt Service Requirements).

**"Total Annual Operating Costs"** means "Total Expenses" as set forth in the Corporation's audited financial statements.

**"Total Financial Resources"** means (a) the sum of Total Net Assets, Bonds Payable, Deposits Payable, and Accrued Pension Liability, less the sum of (b) Land, Buildings And Equipment, less accumulated depreciation, and Loans Receivable, less allowance for doubtful receivables, all as reflected on the Corporation's Statements of Financial Position.

**"Total Liabilities"** means the Corporation's total liabilities (including, without limitation, accounts payable and accrued liabilities, bonds, government loan programs, pension benefits and other liabilities), all in accordance with Generally Accepted Accounting Principles applied on a consistent basis.

**"Unrestricted Cash and Investments"** means (a) the sum of cash and cash equivalents and Readily Marketable Securities, less (b) the sum of Notes Payable, Temporarily Restricted Net Assets and Permanently Restricted Net Assets, as reflected on the Corporation's Statements of Financial Position (but for purposes of clarification, only to the extent that such Temporarily or Permanently Restricted Net Assets were already included in either Cash or Investments on the Corporation's Statement of Financial Position). Unrestricted and unencumbered cash, cash equivalents, long term marketable securities and liquid investments shall exclude any funds or amounts specifically dedicated to a particular purpose and constituting, part of the Corporation's Assets as recognized on the Corporation's Statement of Financial Position, whether now or hereafter created, such as: trustee-held funds (except the Debt Service Reserve Fund for the Bonds), reserves, set-asides, debt service funds, construction funds, reserve funds, malpractice funds, litigation reserves, self-insurance and captive insurer funds, pension and retirement funds, and the amount realized from the sale or factoring of accounts receivable.

**"Underwriters"** means Raymond James & Associates, Inc., BB&T Capital Markets, and Stifel, Nicolaus & Company Incorporated.

**"Variable Rate Indebtedness"** means, as of any particular date, Long-Term Indebtedness the interest rate on which is not established at a fixed rate or rates for the remaining term thereof.

9

**SECTION 1.02.**     Rules of Construction.   (a) Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.

(b)     Unless the context shall otherwise indicate, the word "person" shall include the plural as well as the singular number, and "person" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

(c)     Provisions calling for the redemption of Bonds or the calling of Bonds for redemption do not mean or include the payment of Bonds at their stated maturity or maturities.

(d)     All references in this Agreement to designated "Articles", "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of this Agreement. The words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision.

## ARTICLE II

### REPRESENTATIONS

**SECTION 2.01.**     Representations by the Authority.   The Authority represents and warrants as follows:

(a)     The Authority is a public trust and a public corporation of the State.

(b)     Under the provisions of the Refunding Act, the Authority is duly authorized to enter into, execute and deliver this Agreement, to undertake the transactions contemplated by this Agreement and to carry out its obligations hereunder.

(c)     The Authority has duly authorized the execution and delivery of this Agreement, the Indenture and the Bonds.

(d)     The Authority agrees that it will do or cause to be done all things necessary to preserve and keep in full force and affect its existence.

**SECTION 2.02.**     Representations of the Corporation.   The Corporation makes the following representations and warranties:

(a)     The Corporation is a nonprofit corporation duly organized and existing in good standing under the laws of the State, is duly qualified to do business and is duly authorized and licensed to operate all of the Properties as presently operated, has power to execute and deliver this Agreement, the Continuing Disclosure Agreement, the Escrow Agreement, and the Tax Regulatory Agreement and by proper action has been duly authorized to execute and deliver this Agreement, the Continuing Disclosure Agreement, the Escrow Agreement, and the Tax Regulatory Agreement.

(b)     Each of the statements made with respect to the Corporation in the recitals of this Agreement is true, correct and complete.

(c)     The Corporation is not in breach of or in default under any of the provisions of (i) the Charter of the Corporation, as amended, or By-laws, as amended, (ii) any judgment, decree, order, statute, rule or regulation applicable to it or to its Properties, or (iii) any material provision of any material

indenture, mortgage, loan agreement, financing agreement or other contract or instrument to which it is a party or by which it or any of its Properties is bound.

(d)     The Corporation is not required in connection with the transactions contemplated by this Agreement to obtain any consent not already obtained.

(e)     The Corporation has or timely will obtain as required all authority, permits, licenses, consents and authorizations as are necessary to own, lease and operate its Properties and to carry on its business and to carry out and consummate all the transactions contemplated by this Agreement, the Escrow Agreement, and the Tax Regulatory Agreement.

(f)     This Agreement, the Escrow Agreement, and the Tax Regulatory Agreement in accordance with their terms, are legal, valid and binding obligations of the Corporation, and the authorization, execution and delivery, hereof and thereof and compliance with the provisions hereof do not conflict with or constitute on the part of the Corporation a violation of, breach of, or default under (i) any provision of any indenture, mortgage, deed of trust, loan agreement or other contract or instrument to which the Corporation is a party or by which it or any of its Properties is bound, (ii) any order, injunction or decree of any court or governmental authority, or (iii) the provisions of its charter, as amended, or by-laws, as amended.

(g)     There is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, public board or body, pending or, to the knowledge of the Corporation, threatened against the Corporation, wherein an unfavorable decision, ruling or finding would materially and adversely affect the Properties, business, prospects, profits or condition of the Corporation, or which would adversely affect the validity or enforceability of this Agreement, the Escrow Agreement, or the Tax Regulatory Agreement or any other agreement or instrument to which the Corporation is a party used in consummation of the transactions contemplated hereunder.

## ARTICLE III

### TERM, NATURE AND BENEFITS OF
### AGREEMENT; ACQUISITION OF PROJECT

**SECTION 3.01.**     Term.  The term of this Agreement shall commence on the Closing Date for the Bonds, and shall terminate (unless discharged upon prepayment of all sums due hereunder by the Corporation prior thereto as hereinafter provided) on the date on which the Bonds and all other sums secured hereunder shall have been paid or provision for their payment shall have been made in accordance herewith. Notwithstanding the foregoing, the indemnification provisions of this Agreement shall survive the termination thereof and the defeasance of the Bonds under the Indenture.

**SECTION 3.02.**     Nature and Benefits.  This Agreement has been executed and delivered in part to induce concurrently herewith the purchase by others of the Bonds, and, accordingly, all covenants and agreements on the part of the Corporation and the Authority, as set forth therein and herein, are hereby declared to be for the benefit of the Trustee for the owners from time to time of the Bonds. The Corporation consents and agrees to the assignment by the Authority to the Trustee under the Indenture of all of the Authority's right, title and interest (except for certain rights relating to exculpation, indemnification and payment of expenses) in, to and under this Agreement and agrees that the provisions hereof may be enforced by the Trustee under the provisions of the Indenture. The Corporation agrees to do all things within its power in order to comply with, and to enable the Authority to comply with, all requirements and to fulfill, and to enable the Authority to fulfill, all covenants of the Indenture and the Bonds.

This Agreement is a general obligation of the Corporation, the full faith and credit of the Corporation are pledged to the payment of the Corporation's obligations hereunder, and this Agreement shall remain in full force and effect until the Bonds and the interest therein have been fully paid or otherwise provided for or discharged.

## ARTICLE IV

## PAYMENTS; DEBT SERVICE RESERVE FUND PAYMENTS; CREDITS; OBLIGATIONS UNCONDITIONAL; PREPAYMENT

**SECTION 4.01.** <u>Amounts Payable.</u> Upon the terms and conditions of this Agreement, the Authority shall lend to the Corporation the proceeds of the sale of the Bonds. The proceeds of the Loan shall be deposited with the Trustee and applied in accordance with Section 4.01 of the Indenture.

The Corporation, for and in consideration of the issuance of the Bonds under the Indenture by the Authority and the application of the proceeds thereof by the Authority as provided in the Indenture for the benefit of the Corporation, hereby unconditionally promises to repay the Loan by making the following payments (collectively called the "Payments") to or for the account of the Authority:

(a) *Payments.* Payments being, in the aggregate, an amount sufficient for the payment in full of all Bonds from time to time issued under the Indenture and then outstanding, including (i) the total interest becoming due and payable on the Bonds to the date of payment thereof, and (ii) the total principal amount of and premium, if any, on the Bonds. The Payments with respect to the Bonds shall be payable directly to the Trustee for the account of the Authority in installments as follows:

(i) Semiannually on the third Business Day before each January 1 and July 1, commencing July 1, 2017, an amount equal to the interest due and payable on the Bonds on such January 1 or July 1, as the case may be;

(ii) Annually on the third Business Day before each July 1, commencing July 1, 2017, an amount equal to the principal amount of the Bonds maturing or scheduled for optional redemption on such July 1; and

(iii) On the dates required in the Indenture, into any of the funds established in the Indenture, including, without limitation, the Debt Service Reserve Fund as provided in the Indenture and in Section 4.04 hereof an amount sufficient to make up any deficiency in any prior payment required to be made into such fund and to restore any loss resulting from investment or other causes from such fund and any other payment required to be made to such fund by the Indenture.

Each installment of the Payments payable by the Corporation hereunder shall be in an amount which, without regard to the payments required under Section 4.01(a)(iii) above, but including moneys in the Debt Service Fund then available, shall be designed to provide for the timely payment in full of the principal of, premium, if any, and interest on the Bonds. The Corporation shall receive a credit for any amounts transferred from the Debt Service Reserve Fund to the Debt Service Fund representing earnings thereon.

Notwithstanding anything to the contrary contained herein, the Corporation unconditionally promises that it will pay the Payments at such times and in such amounts as to assure that no default in the payment of the principal of, premium, if any, or interest on the Bonds shall at any time occur.

Whenever the Corporation shall fail to pay the full amount of any installment of Payments payable under Sections 4.01(a)(i) or 4.01(a)(ii) above by the day of the month in which such installment is due, the Trustee shall give immediate notice thereof, promptly confirmed in writing, to an Authorized Corporation Representative.

(b) *Default or Delay Payments.* Default or Delay Payments consisting of the amounts, fees and expenses which the Authority may incur or be or become legally obligated to pay under the terms of the Bonds or the Indenture by reason of any default hereunder or thereunder or any default or delay in payment of the sums due hereunder or thereunder, provided that such default or delay shall have resulted from the Corporation's default or breach of covenant under this Agreement; the amount expended by the Authority or the Trustee or indebtedness incurred by the Authority or the Trustee for the purpose of curing the Corporation's defaults hereunder or in connection with any defaults under the Bonds or the Indenture and all costs, expenses and charges, including reasonable attorneys' fees, incurred by the Authority or the Trustee in collecting the Payments or in enforcing any covenant or agreement of the Corporation contained in this Agreement or incurred in pursuing any remedy hereunder or under the Indenture.

(c) *Trustee Expense Payments.* Trustee Expense Payments consisting of costs of issuance of the Bonds and the Trustee's fees and expenses, including the Trustee's initial acceptance fee and the fees and expenses of counsel to the Trustee in connection with the issuance of the Bonds, to be paid directly to the Trustee or counsel to the Trustee upon demand, commencing on Closing Date and continuing until the principal of and interest on all Bonds outstanding under the Indenture shall have been fully paid, including (i) the annual fee, if any, of the Trustee for the ordinary services of the Trustee rendered and ordinary expenses incurred under the Indenture during the twelve month period preceding that date, (ii) the reasonable fees and charges of the Trustee, and all costs relating to the exchanging of Bonds as provided in the Indenture, as and when the same become due, and (iii) the reasonable fees and charges of the Trustee for necessary extraordinary services rendered by it and extraordinary expenses incurred by it under the Indenture, including attorneys' fees, as and when the same become due, provided that the Corporation may, without creating a default hereunder, contest in good faith the necessity for any such extraordinary services and extraordinary expenses and the reasonableness of any such fees, charges or expenses, and in the event of such contest may only withhold payment of the contested fees, charges or expenses.

(d) *Administrative Payments to be paid directly to the Authority.* The Corporation agrees there shall be paid (i) all of the Authority's reasonable actual out-of-pocket expenses and costs of issuance in connection with the Bonds and (ii) on the date of delivery of the Bonds, a financing acceptance fee in the amount of 1/20th of 1% of the principal amount of the Bonds. The Corporation further agrees to make annual administrative payments directly to the Authority on June 1 of each year in an amount equal to 1/10th of 1% of the aggregate principal amount of the outstanding Bonds on January 1 of each year, unless waived by the Authority. The administrative payments shall be used for the purpose of paying administrative and related costs of the Authority, but shall not include Trustee fees incurred by the Authority in enforcing the provisions of this Agreement. The Authority agrees that it will notify the Corporation in writing prior to March 15 of each year whether it shall waive such administrative payments for such year. If these fees are not waived, such written notice shall advise the Corporation of the amount that is to be paid (not to exceed 1/10th of 1% per annum), the date on which payment is due, and where such payment is to be remitted. The Corporation further agrees to pay the Administrative Expenses of the Trustee under the Indenture directly to the Trustee, and the Trustee shall receive and disburse such payments as provided in Section 9.04 of the Indenture. In the event the Corporation should fail to pay such administrative expenses then due, the payment shall continue as an obligation of the Corporation until the amount shall have been fully paid, and the Corporation agrees to pay the same with

13

interest thereon (to the extent legally enforceable) at a rate per annum equal to the interest rate in effect from time to time on the Bonds, until paid.

(e) *Priority of Payments*.  The Payments paid by the Corporation shall be applied in the following order of priority:

(i)  Default or Delay Payments, described in Subsection (b) above;

(ii)  Payments, described in Subsection (a), above;

(iii)  Trustee Expense Payments, described in Subsection (c) above; and

(iv)  Administrative Payments, described in Subsection (d) above.

**SECTION 4.02.**  Credits Against Payments.  A credit against and reduction of the Payments shall be derived only from the following sources:

(a)  Surplus moneys (including investment earnings) contained in the Funds and Accounts held by the Trustee under the Indenture;

(b)  Advance payments or prepayments of Payments; and

(c)  Reductions in principal and interest requirements of Bonds due to the purchase or redemption of Bonds as provided in the Indenture.

**SECTION 4.03.**  Obligation to Make Payments Unconditional.  The obligation of the Corporation to repay the Loan by making the Payments shall be absolute and unconditional and shall not be subject to, nor shall the Corporation be entitled to assert, any rights of abatement, deduction, reduction, deferment, recoupment, setoff, offset or counterclaim by the Corporation or any other person, nor shall the same be abated, abrogated, waived, diminished, postponed, delayed or otherwise modified under or by reason of any circumstance or occurrence that may arise or take place, irrespective of what statutory rights the Corporation may have to the contrary, including but without limiting the generality of the foregoing:

(a)  Any damage to or destruction of part or all of the Properties;

(b)  The taking or damaging of part or all of the Properties or any temporary or partial use thereof by any public authority or agency in the exercise of the power of eminent domain, sequestration or otherwise;

(c)  Any assignment, novation, merger, consolidation, transfer of assets, leasing or other similar transaction of, by or affecting the Corporation, except as otherwise provided in this Agreement;

(d)  Any change in the tax or other laws of the United States, the State or any governmental authority;

(e)  Any failure of title or any lawful or unlawful prohibition of the Corporation's use of the Properties or any portion thereof or the interference with such use by any person or any commercial frustration of purpose or loss or revocation of any permits, licenses or other authorizations required for the operation of the Properties; and

14

(f)     Any failure of the Authority or the Trustee to perform and observe any agreement or covenant, expressed or implied, or any duty, liability or obligation arising out of or in connection with this Agreement, the invalidity, unenforceability or disaffirmance of any of this Agreement, the Indenture or the Bonds or for any other cause similar or dissimilar to the foregoing.

Furthermore, the Corporation covenants and agrees that it will remain obligated under this Agreement in accordance with its terms, and that it will not take or participate or acquiesce in any action to terminate, rescind or avoid this Agreement.

SECTION 4.04.     Payments into Debt Service Reserve Fund.  On the date of delivery of the Bonds, no moneys or Permitted Investments are required to be deposited into the Debt Service Reserve Fund.  The Corporation shall be required to deposit into the Debt Service Reserve Fund within 30 days after such calculations are certified by the auditors, the Debt Service Reserve Requirement upon a showing that the Liquidity Covenant as calculated in accordance with Section 6.13 hereof, with respect to senior debt of the Corporation is less than 1.00.  The funding of the Debt Service Reserve Fund shall not be satisfied from the proceeds of any borrowing (not including indebtedness incurred pursuant to obtaining a letter of credit or insurance policy for the Debt Service Reserve Fund).  The Corporation agrees to make all such deposits in the Debt Service Reserve Fund when required under Section 4.02 of the Indenture, (including making any payments to cure any deficiencies in the Debt Service Reserve Fund due to a valuation of the investments on deposit therein);

Upon final payment of all Bonds outstanding, the balance of amounts remaining in the Debt Service Reserve Fund shall be paid to the Corporation.

If the Debt Service Reserve Fund has been funded as set forth above, and the Liquidity Covenant is continuously met for any two consecutive Fiscal Years thereafter (computed, at the time and in the manner set forth in the Indenture), the Corporation may withdraw the investments, letter of credit or insurance policy on deposit in the Debt Service Reserve Fund, subject to funding the Debt Service Reserve Fund again in the manner stated in this Section 4.04 if the Liquidity Covenant is not met in the future.

SECTION 4.05.     Prepayment of Payments.  The Corporation shall have the option to prepay the Payments, in whole on any date on which the Bonds are subject to redemption pursuant to the Indenture.

To exercise such option, the Corporation shall give written notice to the Authority and the Trustee and shall specify therein the date of such prepayment, which prepayment date shall be not less than 15 days from the date such notice is received by the Trustee. The Authority and the Trustee shall make all necessary arrangements satisfactory to the Trustee for the redemption of Bonds to be redeemed under the Indenture in accordance with the provisions thereof.

The prepayment price payable by the Corporation, in the event of its exercise of the option granted in this Section, or in the case of its obligation to prepay the Payments shall be the sum of the following:

(a)     An amount of money which, when added to the moneys and investments held by the Trustee pursuant to the provisions of the Indenture and available for such redemption, is sufficient to pay and discharge the Bonds to be redeemed (including the total principal amount of such Bonds and interest to accrue thereon to the date fixed for redemption of such Bonds to be redeemed, plus a premium equal to the amount of premium, if any, required to be paid in connection with the redemption of such Bonds) on the date fixed for redemption; plus

(b)     An amount of money equal to the fees and expenses of the Trustee and the Authority accrued and to accrue through such redemption.

## ARTICLE V

## NON-ARBITRAGE

SECTION 5.01.     <u>Covenants as to Arbitrage.</u>  The Corporation hereby agrees to prepare and provide instructions to the Trustee as to the investment and reinvestment of moneys held as part of any fund or account relating to the Bonds. Any such moneys so held as part of any fund or account shall be invested or reinvested by the Trustee in Permitted Investments as specified in Section 4.11 of the Indenture. The Corporation hereby covenants that it will comply with the terms of the Tax Regulatory Agreement and that it will make such use of the proceeds of the Bonds and all other funds held by the Trustee under the Indenture, regulate the investment of such proceeds and other funds and take such other and further action as may be required so that the Bonds will not constitute arbitrage bonds under Section 148 of the Code and the regulations promulgated thereunder. The Corporation agrees that it will comply with the terms of any letter of instructions provided to it by nationally recognized bond counsel relating to compliance with the provisions of Section 148 of the Code.

If the Corporation determines that it is necessary to restrict or limit the yield on the investment of any money paid to or held by the Trustee hereunder or under the Indenture in order to avoid classification of the Bonds as arbitrage bonds within the meaning of the Code, the Corporation may issue to the Trustee an instrument to such effect (along with appropriate written instructions), in which event the Trustee will take such action as is necessary to restrict or limit the yield on such moneys in accordance with such instrument and instructions.

## ARTICLE VI

## CERTAIN COVENANTS OF THE CORPORATION

SECTION 6.01.     <u>General Covenants of Corporation.</u>  The Corporation further expressly represents, covenants and agrees:

(a)     To comply with the terms, covenants and provisions expressed or implied, of all contracts pertaining to, affecting or involving the Properties or the business of the Corporation, the violation or breach of which would materially and adversely affect the ability of the Corporation to fulfill its obligations hereunder;

(b)     Whenever and so often as requested so to do by the Trustee or the Authority, promptly to execute and deliver or cause to be executed and delivered all such other and further instruments and documents, and to promptly do or cause to be done all such other and further things, as may be necessary or reasonably required in order to further and more fully vest in the Authority, the Trustee and the owners of the Bonds all rights, interests, powers, benefits, privileges and advantages conferred upon them under this Agreement and the Indenture;

(c)     Promptly, upon the request of the Authority or the Trustee from time to time, to take such action as may be necessary or proper to remedy or cure any material defect in or cloud upon the title to any of the Properties or any part thereof that are material to the operations of the Corporation, where the failure to so remedy or cure could be expected to have a material adverse impact on the ability of the Corporation to make the Payments, whether now existing or hereafter developing, to prosecute all such suits, actions and other proceedings as may be appropriate for such purpose and to indemnify and save the Authority and the Trustee harmless from all loss, cost, damage and expense, including reasonable

16

attorney's fees, which they or either of them may ever incur by reason of any such defect, cloud, suit, action or proceeding;

(d)     To defend against every suit, action or proceeding at any time brought against the Authority or the Trustee based on any claim arising out of the receipt, application or disbursement of any of the Trust Estate or involving the Authority's or the Trustee's rights or obligations under this Agreement or under the Indenture (except in the case of the Trustee's negligence or willful misconduct), to indemnify and hold harmless the Trustee and each officer, employee, agent, or other representative of the Trustee against claims arising out of the Trustee's responsibilities under this Agreement, the Indenture or any other document entered into by the Trustee in connection with the Bonds (except in the case of the Trustee's negligence or willful misconduct), to indemnify and hold harmless the Authority and any officer, employee, agent, servant or trustee of the Authority against claims during the term of this Agreement that may be occasioned by any cause pertaining to the construction, use, possession, operation, service, design or management or leasing or subleasing of the Prior Projects or the Properties and any liabilities or losses resulting from violations by the Corporation of conditions, agreements and requirements of law affecting the Prior Projects or the Properties or the ownership, occupancy or use thereof or arising from any defect in or from the operation of the Prior Projects or the Properties, and to protect and insulate the Authority and the members of its Board of, Trustees individually from any and all financial responsibility or liability whatsoever with respect to the Prior Projects or the Properties;

(e)     At all times to maintain the Corporation's rights to carry on the business of the Corporation and to duly procure all licenses and other authorizations required for the carrying on of its business and to diligently maintain, preserve and renew all the rights, powers, privileges, approvals, licenses and franchises required for the carrying on of its business;

(f)     To fulfill its obligations and to perform punctually its duties and obligations under this Agreement and to otherwise carry on its business in accordance with the terms hereof to assure its continued ability to make the Payments of the Corporation hereunder;

(g)     To cause compliance with all material provisions of applicable Federal, State and local laws where non-compliance could reasonably be expected to have a material adverse impact on the ability of the Corporation to make the Payments;

(h)     To pay, discharge, indemnify and save the Authority and the Trustee and their respective officers, agents, employees, servants and trustees, except with respect to the Trustee, the negligence or willful misconduct of the Trustee, harmless of, from and against any and all costs, claims, damages, expenses, liabilities, liens, obligations, penalties and taxes of every character and nature, by or on behalf of any person, firm, corporation, entity or governmental authority regardless of by whom advanced, asserted, held, imposed or made, which may be imposed upon, incurred by or asserted against the Authority and the Trustee and their respective officers, agents, employees, servants and trustees arising out of, resulting from or in any way connected with this Agreement, the Bonds or the Indenture excepting willful misconduct and negligence on the part of the Trustee or their respective officers, agents, employees, servants and trustees. The Corporation also covenants and agrees, at its expense, to pay and to indemnify and to save the foregoing harmless of, from and against, all costs, reasonable counsel fees, expenses and liabilities incurred in any action or proceeding brought by reason of any such claim or demand; and

(i)     That (i) as of the date of this Agreement, it is an organization organized and operated (A) exclusively for charitable, scientific or literary purposes, (B) not for pecuniary profit and (C) no part of the net earnings of which inures to the benefit of any person, private stockholder or individual, all within the meaning, respectively, of 15 USC Section 77c(a)(4), Section 3(a)(4) of the Securities Act of 1933, as

17

amended, and of 15 USC Section 78 1(g)(2)(D), Section 12(g)(2)(D) of the Securities Exchange Act of 1934, as amended, (ii) it shall not perform any act or enter into any agreement which shall adversely affect such status as set forth in this Section, and (iii) it will maintain its existence as a corporation under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

**SECTION 6.02.** Covenants Regarding Operation and Maintenance by the Corporation of its Properties. The Corporation acknowledges and agrees that it shall pay during the term hereof all Payments and other sums required hereunder. The Corporation also expressly covenants and agrees:

(a)     At all times to cause its business to be carried on and conducted and to cause its Properties which are material to the operations of the Corporation to be maintained, preserved and kept in reasonably good repair, working order and condition and to make needed and proper repairs, renewals and replacements thereof; provided, however, that nothing herein shall (1) prevent it from ceasing to operate any portion of its Properties if, in its judgment (evidenced, in the case of such a cessation other than in the ordinary course of business, by an authorizing resolution of its governing body), it is advisable not to operate the same or if it intends to sell or otherwise dispose of the same and within a reasonable time endeavors to effect such sale or other disposition, or (2) obligate it to operate, retain, preserve, repair, renew or replace any Properties, leases, rights, privileges or licenses no longer used or, in the judgement of the Corporation, useful in the conduct of its business;

(b)     That the Corporation (and not the Authority or the Trustee) shall have full and sole responsibility for the condition, repair, replacement, maintenance and management of the Properties; provided, however, the Authority, the Trustee and their agents shall have the right to inspect the Properties at any reasonable time in a manner which will not interfere unreasonably with the Corporation's use thereof;

(c)     That it shall pay, as the same respectively become due, all taxes and assessments, whether general or special, and governmental charges of any kind whatsoever that may at any time be lawfully assessed or levied against or with respect to the Properties. The Corporation shall not allow any part of the Properties to become and remain subjected to any mechanics', laborer's or materialmen's liens of record, other than Permitted Liens. Notwithstanding the foregoing-, the Corporation may, at its own expense and in its own name, contest any such item of tax, assessment, liens or other governmental charge and, in the event of such contest, may permit the item so contested to remain unpaid during the period of such contest and any appeal therefrom unless the Authority or the Trustee shall notify the Corporation that, in the opinion of nationally recognized bond counsel, by nonpayment of any such items the security afforded the Bonds pursuant to the terms of the Indenture or this Agreement will be materially endangered, in which event such taxes, assessments or charges shall be paid forthwith. The Authority will cooperate to the extent reasonably necessary with the Corporation in any such claim, defense or contest. In the event the Corporation fails to do so, the Authority or the Trustee may, but shall be under no obligation to, pay any such item and any amounts so advanced therefor by the Authority or the Trustee shall become an additional obligation of the Corporation to the one making the advancement, which amount the Corporation agrees to pay together with interest thereon at the rate of the Trustee's prime lending rate;

(d)     That it shall comply promptly with all material provisions of present and future laws, ordinances, orders, rules, regulations and requirements of every duly constituted governmental authority or agency and all material orders, rules and regulations of any regulatory, licensing, insurance underwriting or rating organization or other body exercising similar functions. The Corporation shall likewise perform and comply with all duties and obligations of any kind imposed by law, covenant, condition, agreement or easement and the requirements of all policies of insurance at any time in force with respect to the Properties;

18

(e)     That it shall not use or allow the Properties to be used or occupied for any unlawful purpose or in violation of any private covenant, restriction, condition, easement or agreement covering or affecting the use of the Properties where such use or occupation could reasonably be expected to have a material adverse impact on the ability of the Corporation to make the Payments;

(f)     That the Properties which are material to the operations of the Corporation shall be properly operated, managed and maintained in an economical and efficient manner, consistent with standards of operation and administration generally acceptable for facilities of comparable size and scope of operations; and

(g)     That it shall take all action, if any, that may be required to obtain such consents, exceptions, exemptions or approvals of governmental authorities as may be necessary to permit it to comply fully with all covenants, stipulations, obligations and agreements of the Corporation contained in this Agreement.

**SECTION 6.03.**     Covenants Against Pledge of Revenues or Properties and Disposition of Assets. (a) The Corporation covenants that, so long as any of the Bonds remain outstanding,

(i)     it shall not hereafter create or suffer to be created, except for Permitted Liens or as otherwise permitted in this Section 6.03(i), any encumbrance, assignment, pledge, hypothecation or lien on any Revenues or Properties (but only as to the Corporation's assets, including real and personal property, included in the Corporation's Statements of Financial Position under the heading "Total Assets" excluding custodial accounts).

Notwithstanding the provisions of the preceding paragraph of this Section 6.03(a), the Corporation may create or suffer to be created an assignment, pledge, hypothecation or lien on any such Revenues or Properties, whether now owned or hereafter acquired, only if and so long as effective provision is made, in each instance and by the instrument creating such assignment, pledge, hypothecation or lien, whereby all Bonds issued and outstanding under the Indenture are directly secured thereby equally and ratably with the indebtedness to be issued or incurred under and secured by such assignment, pledge, hypothecation or lien.

(ii)     it shall not sell, transfer or otherwise alienate its Revenues and Properties (but only as to the Corporation's assets, including real and personal property, included in the Corporation's Statements of Financial Position under the heading "Total Assets" excluding custodial accounts) to any other person or entity, but such restriction shall not extend to:

(A)     transfers of assets which, prior to the sale, lease or other disposition, have, or within the next succeeding two years are reasonably expected to, become inadequate, obsolete, worn out, unsuitable, unprofitable, undesirable or unnecessary and the sale, lease, removal or other disposition thereof will not impair the structural soundness, efficiency or economic value of the remaining operating assets of the Corporation, and the Trustee has received a certificate of the chief financial officer of the Corporation stating an opinion to such effect and stating that there has not been an Event of Default under this Agreement, provided that no such certificate shall be required in the case of any such disposition of any assets not used to a significant degree in connection with the Corporation's operations;

(B)     sales or exchanges of assets held by the Corporation primarily for investment and not in connection with its mission and purpose activities (including

19

property currently owned by the Corporation), provided that such sale or exchange is for the Fair Market Value of such assets and any cash proceeds of such sale are promptly reinvested by the Corporation or applied to the Corporation's activities;

        (C)    budgeted expenditures of Revenues by the Corporation in connection with its mission and activities and otherwise in the ordinary course of business so long as the Corporation has determined that such expenditure will not adversely affect the ability of the Corporation to make its required loan repayments under this Agreement and to make any payments on any other of its indebtedness when due; or

        (D)    annual Net Extraordinary Expense expenditures made by the Corporation so long as such expenditure of Revenues shall not exceed 10% of the "Total Revenues, Gains, and Other Support" as shown on the Corporation's most recently audited financial statement and the Corporation has determined that such expenditures will not cause the Liquidity Covenant to fall below 1.25x.

      **SECTION 6.04.**    <u>Covenant as to Redemption of Prior Bonds.</u>  The Corporation covenants that it will cause the Prior Bonds to be paid and redeemed as provided in the Escrow Agreement.

      **SECTION 6.05.**    <u>Covenants, Representations and Warranties Relating to Federal Income Taxation.</u>  The Corporation covenants that it shall make such use of the proceeds of the Bonds, regulate investment of proceeds thereof and take such other and further actions as may be required by the Code and applicable temporary, proposed and final Regulations and procedures, necessary to assure that interest on the Bonds is excludable from gross income for Federal income tax purposes. Without limiting the generality of the foregoing covenant, the Corporation hereby covenants, represents and warrants, as follows:

      (a)    The Corporation will take, will not fail to take or permit the commission of, any action within its control necessary to be taken in order that interest on the Bonds will continue to be excludable from gross income for Federal income tax purposes;

      (b)    The Corporation is and will be an organization described in Section 501(c)(3) of the Code or corresponding provisions of prior law and is not a private foundation as defined in Section 509 of said Code; the Corporation is and shall continue to be exempt from federal income taxes under Section 501(a) of the Code; the Corporation shall not perform any act or enter into any agreement which shall adversely affect such federal income tax status; the Corporation shall not perform any act, enter into any agreement or use or permit any property of the Corporation to be used in any manner (including any unrelated trade or business) which could adversely affect the exclusion from gross income of interest on the Bonds for Federal income tax purposes pursuant to Section 103 of the Code; the Corporation shall not carry on or permit to be carried on in any property of the Corporation or permit any property of the Corporation to be used in or for any trade or business the conduct of which is not substantially related to the exercise or performance by such institution of the purposes or functions constituting the basis for its exemption under Section 501 of such Code to the extent that such use of such property would adversely affect the exclusion from gross income of interest on the Bonds for Federal income tax purposes; and the Corporation is duly organized and existing as a nonprofit corporation under the laws of the State and it will maintain, extend and renew its corporate existence under the laws of the State and will not do, suffer or permit any act or thing to be done whereby its right to transact its functions might or could be terminated or its activities restricted;

      (c)    The Corporation will timely file a statement with the United States of America setting forth the information required pursuant to Section 149(e) of the Code;

(d)     The average term of the Bonds, calculated in proportion to the "issue price" (as defined in Section 1273 of the Code) of the bonds of each stated maturity of such Bonds, will not exceed 120% of the average reasonably expected economic life of the Prior Projects refinanced with the proceeds of the Bonds or the investment earnings thereon, weighted in proportion to the respective cost of each item comprising the Prior Projects refinanced with the proceeds of such Bonds. For purposes of the preceding sentence, the reasonably expected economic life of property shall be determined as of the later of (i) the date on which the Bonds are issued or (ii) the date on which such property is placed in service (or expected to be placed in service);

(e)     The Corporation will not cause the Bonds to be treated as "federally guaranteed" obligations within the meaning of Section 149(b) of the Code (as may be modified in any applicable rules, rulings, policies, procedures, regulations or other official statements promulgated or proposed by the Department of the Treasury or the Internal Revenue Service with respect to "federally guaranteed" obligations described in Section 149(b) of the Code);

(f)     Based upon all facts and estimates now known or reasonably expected to be in existence on the date the Bonds are delivered, the Corporation reasonably expects that the proceeds of the Bonds will not be used in a manner that would cause the Bonds or any portion thereof to be an "arbitrage bond" within the meaning of Section 148 of the Code;

(g)     As provided in Article V hereof, the Corporation will monitor the yield on the investment of the proceeds of the Bonds and moneys pledged to the repayment of the Bonds, other than amounts not subject to yield restriction and will restrict the yield on such investments to the extent required by the Code or the Regulations;

(h)     The Corporation will expend the proceeds of the Bonds in such a manner as to cause the Bonds to be "Qualified 501(c)(3) Bonds" within the meaning of Section 145 of the Code;

(i)     The Corporation (or any "related person", within the meaning of the Code) shall not, pursuant to an arrangement, formal or informal, purchase the Bonds in an amount related to the principal amounts advanced to the Corporation pursuant to this Agreement; and

(j)     The Corporation agrees to comply with all the terms and provisions of the Tax Regulatory Agreement executed in connection with the issuance and sale of the Bonds, and to perform the covenants and duties imposed on it contained therein.

All officers, employees and agents of the Corporation are authorized and directed to provide certifications of facts and estimates that are material to the reasonable expectations of the Corporation as of the date the Bonds are delivered. In complying with the foregoing covenants, the Corporation may rely from time to time upon an opinion issued by nationally-recognized bond counsel to the effect that any action by the Corporation or reliance upon any interpretation of the Code or Regulations contained in such opinion will not cause interest on the Bonds to be includable in gross income for Federal income tax purposes under existing law.

**SECTION 6.06.**     Information and Continuing Disclosure Agreement.  Unless and to the extent prohibited by court order or required to be kept confidential by the Corporation in accordance with the terms of any compromise or settlement (but only to the extent requested by the applicable plaintiff), the Corporation agrees, whenever reasonably requested by the Authority or the Trustee, to provide and certify or cause to be provided and certified such information concerning the Properties, the Corporation, its finances, and other topics as the Authority or Trustee, as the case may be, considers necessary to

21

enable counsel to the Authority or the Trustee, as the case may be, to issue its opinions and otherwise advise the Authority or the Trustee, as the case may be, as to the transaction or the legal capacity of the parties to enter into the same, or to enable it to make any reports required by law, governmental regulation or the Indenture. When any such information is provided by the Corporation pursuant to this Section 6.06 the Corporation shall provide such information to both the Authority and the Trustee.

The Corporation hereby covenants and agrees that it will comply with and carry out all of the provisions of the Continuing Disclosure Agreement. Notwithstanding any other provision of the Agreement, failure of the Corporation to comply with the Continuing Disclosure Agreement shall not be considered an Event of Default hereunder; however, the Underwriter (as defined in the Continuing Disclosure Agreement) or the holders of at least a majority in aggregate principal amount of Outstanding Bonds, may take such actions as may be necessary and appropriate, including seeking specific performance by court order, to cause the Corporation to comply with its obligations under this Section.

**SECTION 6.07.** <u>Source of Payments.</u> The Corporation agrees to pay or cause to be paid the payments required by this Agreement from its gross revenues, its general fund or any other moneys legally available to it in the manner and at the times provided by this Agreement. The Corporation has the legal ability to use amounts shown on its audited financial statements under "Deposits Payable" to make the payments required by this Agreement, and the Corporation covenants to use such amounts to make any payments required hereunder to the extent necessary and to the extent such amounts are available.)

**SECTION 6.08.** <u>Insurance.</u> (a) The Corporation's utilization of the existing Catholic Mutual Group is permissible insurance in all respects. The following provisions shall apply if the Corporation changes its insurance coverage or provider. Insurance shall be provided by carriers rated "A" or better by A.M. Best. Insurance shall be subject to review every three years by an insurance consultant, satisfactory to the Corporation, qualified to survey risks and to recommend insurance coverage for the type or types of activities conducted and facilities operated by the Corporation and who may be a broker or agent who has been regularly retained by the Corporation.

(b) Except as provided in the first sentence of Section 6.08(a) above, the Corporation may not self-insure against casualty losses (excluding flood) to any real or personal property owned, leased or used by it, including Plant, Property and Equipment; provided, however, reasonable deductibles approved by an insurance consultant shall be permitted and provided the Corporation may self-insure against flood losses.

(c) Condemnation and casualty proceeds may be used for legally permitted purposes of the Corporation, including but not limited to either repair of the damaged or taken property or to redeem the Bonds.

**SECTION 6.09.** <u>Limitation on the Incurrence of Additional Debt by the Corporation.</u> (a) No Long-Term Indebtedness shall be incurred by the Corporation, including, but not limited to Non-Recourse Indebtedness and Subordinated Indebtedness, unless the Debt Service Coverage Ratio, for the two most recent complete Fiscal Years immediately preceding the date of the proposed issuance of such Long-Term Indebtedness, after giving effect to the issuance of the proposed Long-Term Indebtedness, and the two Fiscal Years after the issuance of such debt after giving effect to the issuance of such proposed Long-Term Indebtedness is at least 1.25 times the maximum Annual Debt Service Requirements on all senior debt of the Corporation and 1.10 times maximum Annual Debt Service Requirements on all senior and Subordinated Indebtedness of the Corporation.

(b)     Notwithstanding subsection (a), refunding debt may be incurred so long, as (i) debt service on the refunding, debt is, in each year, no greater than the debt service on the refunded debt, (ii) the principal amount of the refunding debt does not exceed the principal amount of the refunded debt by 10%, and (iii) the final maturity of the refunding debt is no later than the final maturity of the refunded debt.

(c)     Short-Term Indebtedness may not be incurred if the principal amount of such Indebtedness would exceed 10% of unrestricted revenues of the Corporation, excluding any non-operating extraordinary gain or loss or any non-operating assets released from restrictions for the immediately preceding Fiscal Year.

(d)     The Corporation covenants that it shall not engage in speculative derivative transactions.

Any Additional Bonds which are incurred pursuant to the provisions hereof and Article VI of the Indenture and which are on a parity with the obligations of the Corporation under this Agreement shall be secured by a Debt Service Reserve Fund, if so required to be funded, in an amount equal to that set forth in a supplemental indenture.

**SECTION 6.10.**     Use Covenants.     (a) The Corporation has, after due inquiry, no knowledge and has not given or received any written notice from any governmental agency having jurisdiction with respect to the subject matter of such notice stating that the Land or the past or present use thereof or any practice, procedure or policy employed by the Corporation in the conduct of its business materially violates any applicable law, regulation, code, order, rule, judgment or consent agreement, relating to zoning, building, use and occupancy, fire safety, health, sanitation, conservation, parking, architectural barriers to the handicapped, or restrictive covenants or other agreements affecting title to the Land.

(b)     The Corporation has not received any notice from any insurance company which has issued a policy with respect to the Land or from the applicable state or local government agency responsible for insurance standards (or, any other body exercising similar functions) requiring the performance of any repairs, alterations or other work, which repairs, alterations or other work have not been completed at the Land. The Corporation has not received any notice of default or breach which has not been cured under any covenant, condition, restriction, right-of-way, reciprocal easement agreement or other easement affecting its Land which is to be performed or complied with by it.

**SECTION 6.11.**     Environmental Covenants. (a) The Corporation has, after due inquiry, no knowledge and has not given or received any written notice from any governmental agency having jurisdiction with respect to the subject matter of such notice stating that the Land or the past or present use thereof or any practice, procedure or policy employed by the Corporation in the conduct of its business materially violates any applicable law, regulation, code, order, rule, judgment or consent agreement, relating to air pollution, environmental protection, hazardous or toxic materials, substances or wastes (collectively, "Laws and Regulations"). Without limiting the generality of the foregoing, neither the Corporation nor to the best of its knowledge, after due inquiry, any prior or present owner, tenant or subtenant of any of the Land has, other than as set forth in subsections (a) and (b) of this Section or as may have been remediated in accordance with Laws and Regulations, (i) used, treated, stored, transported or disposed of any material amount of flammable explosives, polychlorinated biphenyl compounds, heavy metals, chlorinated solvents, cyanide, radon, petroleum products, asbestos or any Asbestos Containing Materials, methane, radioactive materials, pollutants, hazardous materials, hazardous wastes, hazardous, toxic, or regulated substances or related materials, as defined in CERCLA, RCRA, CWA, CAA, TSCA and Title III (all as defined in the definition of Environmental Regulations in Article I hereof), and the regulations promulgated pursuant thereto, and in all other Environmental Regulations applicable to the

23

Corporation (collectively, "Hazardous Materials") on from or beneath the Land, (ii) pumped, spilled, leaked, disposed of, emptied, discharged or released (hereinafter collectively referred to as "Release") any material amount of Hazardous Materials on, from or beneath the Land, or (iii) stored any material amount of petroleum products at the Land in underground storage tanks.

(b)     Excluded from the representations and warranties in subsection (a) hereof with respect to Hazardous Materials are those Hazardous Materials in those amounts ordinarily found in the inventory of or used in the maintenance of a Corporation, the use, treatment, storage, transportation and disposal of which has been and shall be in compliance with all Laws and Regulations.

(c)     No portion of the Land located in an area of high potential incidence of radon has an unventilated basement or subsurface portion which is occupied or used for any purpose other than the foundation or support of the improvements to such Land.

(d)     The Corporation shall not use or permit the Land or any part thereof to be used to generate, manufacture, refine, treat, store, handle, transport or dispose of, transfer, produce or process Hazardous Materials, except, and only to the extent if necessary to maintain the improvements on the Land and then, only in compliance with all Environmental Regulations, and any state equivalent laws and regulations, nor shall it permit, as a result of any intentional or unintentional act or omission on its part or by any tenant, subtenant, licensee, guest, invitee, contractor, employee and agent, the storage, transportation, disposal or use of Hazardous Materials or the Release or threat of Release of Hazardous Materials on, from or beneath the Land or onto any other property excluding, however, those Hazardous Materials in those amounts ordinarily found in the inventory of or used in the maintenance of a corporation, the use, storage, treatment, transportation and disposal of which shall be in compliance with all Environmental Regulations. Upon the occurrence of any Release or threat of Release of Hazardous Materials, the Corporation shall promptly commence and perform, or cause to be commenced and performed promptly, without cost to the Authority, all investigations, studies, sampling and testing, and all remedial, removal and other actions necessary to clean up and remove all Hazardous Materials so released, on, from or beneath the Land or other property, in compliance with all Environmental Regulations. Notwithstanding anything to the contrary contained herein, underground storage tanks shall only be permitted subject to compliance with subsections (g) and only to the extent necessary to maintain the improvements on the Land.

(e)     The Corporation shall comply with, and shall cause its tenants, subtenants, licensees, guests, invitees, contractors, employees and agents to comply with, all Environmental Regulations, and shall keep the Land free and clear of any Liens imposed pursuant thereto (provided, however, that any such Liens, if not discharged, may be bonded). The Corporation shall cause each tenant under any lease, and use its best efforts to cause all of such tenant's subtenants, agents, licensees, employees, contractors, guests and invitees and the guests and invitees of all of the foregoing to comply with all Environmental Regulations with respect to the Land; provided, however, that notwithstanding that a portion of this covenant is limited to the Corporation use of its best efforts, the Corporation shall remain solely responsible for ensuring such compliance and such limitation shall not diminish or affect in any way the Corporation's obligations contained in subsection (f) hereof as provided in such subsection (f) hereof. Upon receipt of any notice from any person with regard to the Release of Hazardous Materials on, from or beneath the Land, the Corporation shall give prompt written notice thereof to the Authority (and, in any event, prior to the expiration of any period in which to respond to such notice under any Environmental Regulation).

(f)     Irrespective of whether any representation or warranty contained in subsections 6.11(a), (b) and (c) is not true or correct, the Corporation shall defend, indemnify and hold harmless the Authority, the Trustee and the Underwriter, its partners, depositors and each of its and their employees, agents,

24

officers, directors, trustees, successors and assigns, from and against any claims, demands, penalties, fines, attorneys' fees (including, without limitation, reasonable attorneys' fees incurred to enforce the indemnification contained in this Section 6.11(f), reasonable consultants' fees, investigations and laboratory fees, liabilities, settlements (five (5) Business Days' prior notice of which the Authority or the Trustee, as appropriate, shall have delivered to the Corporation), court costs, damages, losses, costs or expenses of whatever kind or nature, known or unknown, contingent or otherwise, occurring in whole or in part, arising out of, or in any way related to (i) the presence, disposal, Release, threat of Release, removal, discharge, storage or transportation of any Hazardous Materials on, from or beneath the Land, (ii) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Materials, (iii) any lawsuit brought or threatened, settlement reached (five (5) Business Days' prior notice of which the Authority or the Trustee, as appropriate, shall have delivered to the Corporation), or governmental order relating to Hazardous Materials on, from or beneath any of the Land, (iv) any violation of Environmental Regulations of subsection (v) or (vi) hereof by its or any of its agents, tenants, employees, contractors, licensees, guests, subtenants or invitees, and (e) the imposition of any governmental Lien for the recovery of environmental cleanup or removal costs. To the extent that the Corporation is strictly liable under any Environmental Regulation, its obligation to the Authority, the Trustee and the Underwriter and the other indemnitees under the foregoing indemnification shall likewise be without regard to fault on its part with respect to the violation of any Environmental Regulation which results in liability to any indemnitee. Its obligations and liabilities under this Section 6.11(vi) shall survive the satisfaction of all Bonds.

(g)     The Corporation shall conform to and carry out a reasonable program of maintenance and inspection of all underground storage tanks, and shall maintain, repair, and replace such tanks only in accordance with Laws and Regulations, including but not limited to Environmental Regulations. All such tanks are in good condition and repair and comply with all Laws and Regulations, including Environmental Regulations.

**SECTION 6.12.**     <u>Debt Service Coverage Covenant.</u>  Annually, within 150 days after the end of the Fiscal Year, the Corporation shall, concurrently with the delivery of its annual audited financial statements, calculate the Debt Service Coverage Ratio for such Fiscal Year and shall provide the same to the Trustee.  The Debt Service Coverage Ratio for any Fiscal Year is the ratio of Net Income Available for Debt Service to Annual Debt Service Requirements.  It shall constitute an Event of Default hereunder if the Debt Service Coverage Ratio is less than 1.00 for two consecutive Fiscal Years.

For illustration purposes, compliance with the covenant contained herein was calculated based on the Corporation's audited financial statements for Fiscal Years 2015 and 2016 as demonstrated in **<u>Exhibit B</u>**, and for all future Fiscal Years, compliance with the covenant contained herein shall be calculated in the same manner.

**SECTION 6.13.**     <u>Management Consultant.</u>  At any point during the period when the Corporation conducts the review of the Debt Service Coverage Ratio or the Liquidity Covenant as provided in Section 6.14, if the Corporation determines that it does not meet the requirements of Section 6.12 or 6.14 (for two successive semiannual periods in the case of Section 6.14), the Corporation shall immediately request a Management Consultant to make a report and recommendation with respect to the Corporation's Net Income Available for Debt Service and Liquidity Covenant, as the case may be, at the sole expense of the Corporation. The Corporation further covenants that upon receipt of such report and recommendation from the Consultant, the Corporation shall cause copies thereof to be filed with the Authority and the Trustee (who shall have no responsibility except to hold such reports and make them available to Owners requesting to review the same during regular business hours); and the Corporation shall follow the recommendations of the Consultant to cure such default to the extent such recommendation would not cause the Corporation to be in violation of any law, rules or regulations to

which the Corporation is bound (including Canon Law); provided, however, that the Corporation shall follow such recommendations until the Debt Service Coverage Ratio is at least equal to 1.00x and/ or the Liquidity Covenant is met.

The report of the Management Consultant shall be delivered to the Trustee and the Authority within 30 days after its completion. The Trustee and the Authority shall be entitled to consult with the Management Consultant, attend the Management Consultant's briefings with management of the Corporation and receive all interim reports of the Management Consultant. Management Consultant's reports shall be addressed to the Corporation, the Trustee and the Authority and delivered simultaneously to management of the Corporation, the Trustee and the Authority. If the Corporation fails to retain a Management Consultant within 30 days after the occurrence of an event which gives rise to an obligation to retain such Management Consultant, the Trustee may retain a Management Consultant at the sole expense of the Corporation.

There shall not be any Event of Default pursuant to this provision so long as (a) the Corporation follows the recommendations of the Management Consultant and (b) the Debt Service Coverage Ratio in each Fiscal Year is at least 1.00x and/or the Liquidity Covenant is at least 1.10x as the case may be.

**SECTION 6.14.** <u>Liquidity Covenant.</u> The Corporation shall maintain the Liquidity Covenant equal to at least 1.10. The Corporation shall calculate the Liquidity Covenant on a semiannual basis for each semiannual period ending June 30 and December 31 within 45 days after the end of each such period. For illustration purposes, compliance with the covenant contained herein was calculated based on the Corporation's audited financial statements for Fiscal Year 2016 as demonstrated in **Exhibit B**, and for all future Fiscal Years, compliance with the covenant contained herein shall be calculated in the same manner. If the Liquidity Covenant is not met for two successive semiannual periods, the Corporation is required to retain a Management Consultant as provided in Section 6.13.

It shall constitute an Event of Default hereunder if this Liquidity Covenant is not met for two consecutive Fiscal Years.

**SECTION 6.15.** <u>Net Worth Covenant.</u> The Corporation shall at all times maintain Total Financial Resources to Total Debt of at least 1:1. The Corporation shall calculate compliance with this covenant on a semiannual basis for each semiannual period ending June 30 and December 31 within 45 days after the end of such period. For illustration purposes, compliance with the covenant contained herein was calculated based on the Corporation's audited financial statements for Fiscal Year 2016, as demonstrated in **Exhibit B**, and for all future Fiscal Years, compliance with the covenant contained herein shall be calculated in the same manner.

It shall constitute an Event of Default hereunder if this Net Worth Covenant is not met for two consecutive Fiscal Years.

**SECTION 6.16.** <u>Amendments.</u> Notwithstanding anything to the contrary contained herein or in the Indenture, the covenants contained herein shall be amended to conform the covenants and provisions of the Corporation contained herein to any different financial statement presentation required by the Financial Accounting Standard Board which is different than the presentation required as of the date of issuance of the Bonds, so long, as the effect of such conformed covenants and provisions is substantially identical to the effect of the covenants and provisions as in effect on the date of issuance of the Bonds.

**SECTION 6.17.** <u>State Bond Commission Reporting Requirements.</u> The Corporation covenants that it shall furnish to the Authority and Bond Counsel such information necessary to satisfy

the reporting requirements of La. R.S. 39:1405.4 as it may be amended from time to time. This information shall be delivered to the Authority and Bond Counsel not less than five Business Days prior to the date such information is to be reported to the State Bond Commission.

      **SECTION 6.18.** <u>Spending Policy.</u> The Corporation covenants that it will maintain an Investment Policy which shall provide for a spending policy related to the Corporation's portfolio for the purpose of calculating the amount assumed to be added to the value "Increase (Decrease) in Net Assets" as shown in the Corporation's Statement of Activities, in order to compute the Net Income Available for Debt Service. Such amount shall equal 5% of said portfolio or such other amount provided for in said Investment Policy, but in no event more than 7% of such portfolio.

      **SECTION 6.19.** <u>Rating Agency Covenant.</u> The Corporation covenants that it shall use its best efforts to maintain ratings from at least two nationally recognized rating agencies.

**ARTICLE VII**

**ASSIGNMENT**

      **SECTION 7.01.** <u>Assignment of this Agreement.</u> The rights of the Corporation under this Agreement may be assigned as a whole or in part but no such assignment shall constitute a release of the Corporation from its obligations hereunder.

      Each transferee of the Corporation's interest in this Agreement shall assume the obligations of the Corporation hereunder to the extent of the interest assigned, sold or leased, and the Corporation shall, not more than 60 nor less than 30 days prior to the effective date of any such assignment or lease, furnish or cause to be furnished to the Authority and the Trustee a true and complete copy of each such assignment or lease.

      **SECTION 7.02.** <u>Restrictions on Transfer of Authority's Rights.</u> The Authority agrees that, except for the assignment of certain of its rights, title and interest under this Agreement (including its rights to receive payments to be made hereunder) to the Trustee pursuant to the Indenture, it will not during the term of this Agreement sell, assign, transfer or convey its interests in this Agreement except pursuant to the Indenture and as provided hereinafter in Section 7.03.

      **SECTION 7.03.** <u>Assignment by the Authority.</u> It is understood, agreed and acknowledged that the Authority will assign to the Trustee pursuant to the Indenture certain of its rights, title and interests in and to this Agreement (reserving its rights, however, pursuant to sections of this Agreement providing that notices, reports and other statements be given to the Authority and also reserving its rights to reimbursement and payment of costs and expenses under Sections 4.01(d) and 9.05 hereof; its rights to indemnification under Section 6.01(d) hereof and its individual and corporate rights to exemption from liability Under Section 10.12 hereof) and the Corporation hereby assents to such assignment and pledge.

**ARTICLE VIII**

**SUPPLEMENTS AND AMENDMENTS**

      **SECTION 8.01.** <u>Amendment Without Consent.</u> The Authority and the Corporation with the consent of the Trustee with respect to Sections 8.01(c), 8.01(e) and 8.01(f) hereof, but without the consent of the owners of any of the Bonds outstanding under the Indenture, may enter into supplements to this Agreement which shall not be inconsistent with the terms and provisions hereof for any of the purposes heretofore specifically authorized in this Agreement or the Indenture, and in addition thereto for the following purposes:

27

(a)     To cure any ambiguity or formal defect, inconsistency or omission in this Agreement or to clarify matters or questions arising hereunder;

(b)     To add covenants and agreements for the purpose of further securing the obligations of the Corporation hereunder;

(c)     To prescribe further limitations and restrictions upon the incurring of indebtedness by the Corporation which are not contrary to or inconsistent with the limitations and restrictions theretofore in effect;

(d)     To confirm as further assurance any mortgage or pledge of additional property, revenues, securities or funds;

(e)     To conform the provisions of this Agreement in connection with the provisions of any supplements or amendments to the Indenture entered into pursuant to the provisions of Section 10.01 thereof; or

(f)     To provide any other modifications which, in the sole judgment of the Trustee, are not prejudicial to the interests of the Bondholders.

**SECTION 8.02.**     <u>Amendment Upon Approval of a Majority of Bondholders.</u>     The provisions of this Agreement may be amended in any particular way with the written consent of the owners of not less than a majority of the aggregate principal amount of Bonds then outstanding; provided, however, that no such amendment may be adopted (i) which decreases the percentage of owners of Bonds required to approve an amendment, or (ii) which permits a change in the date of payment of the principal of or interest on any Bonds or of any redemption price thereof or the rate of interest thereon without the approvals of the Bondholders so affected by the amendment.

If at any time the Authority and the Corporation shall request the Trustee to consent to a proposed amendment for any of the purposes of this Section 8.02, the Trustee shall, upon being satisfactorily indemnified with respect to expenses, cause notice of the proposed execution of such proposed amendment to be given in the manner required by the Indenture to redeem Bonds. Such notice shall briefly set forth the nature of the proposed amendment and shall state that copies thereof are on file at the principal corporate trust office of the Trustee for inspection by all Bondholders. If, within 90 days or such longer period as shall be prescribed by the Authority following such notice, the owners of not less than a majority in aggregate principal amount of the Bonds outstanding at the time of the execution of any such proposed amendment shall have consented to and approved the execution thereof as herein provided, no owner of any Bond shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Trustee, the Corporation or the Authority from executing or approving the same or from taking any action pursuant to the provisions thereof. Upon the execution of any such proposed amendment as in this Section permitted and provided, this Agreement shall be and be deemed to be modified and amended in accordance therewith.

**SECTION 8.03.**     <u>Filing.</u>  Copies of any such supplement or amendment shall be filed with the Trustee and delivered to the Authority and the Corporation before such supplement or amendment may become effective.

**SECTION 8.04.**     <u>Reliance on Counsel.</u>  The Authority and the Trustee shall be entitled to receive, shall be provided with and shall be fully protected in relying upon an Opinion of Counsel

satisfactory to the Trustee, who may be counsel for the Authority, as conclusive evidence that any such proposed supplement or amendment complies with the provisions of this Agreement and the Indenture and that it is proper for the Authority and the Trustee under the provisions of this Article to execute or approve such supplement or amendment.

**SECTION 8.05.** Notice to Rating Agencies. No supplemental agreement or amendment shall be executed and delivered pursuant to Sections 8.01 or 8.02 hereof without prior written notice having been given by the Corporation to any national rating agency by which any of the Bonds are then rated of the Corporation's intention to execute such supplemental agreement or amendment not less than 15 days in advance of the execution of said supplemental agreement or amendment.

## ARTICLE IX

## EVENTS OF DEFAULT AND REMEDIES

**SECTION 9.01.** Events of Default Defined. The terms "Event of Default" and "Default" shall mean any one or more of the following events:

(a) The Corporation shall default in the timely payment of any Payment pursuant to Article IV of this Agreement.

(b) An Event of Default shall exist under the Indenture or the Tax Regulatory Agreement.

(c) The Corporation shall fail to meet any of the covenants contained in Sections 6.12, 6.14 or 6.15 for two consecutive years.

(d) The Corporation shall fail duly to perform, observe or comply with any other covenant, condition or agreement on its part under this Agreement (other than a failure to make any payment required under this Agreement), and such failure continues for a period of 30 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Corporation by the Trustee; provided, however, that if such performance, observation or compliance requires work to be done, action to be taken, or conditions to be remedied, which by their nature cannot reasonably be done, taken or remedied, as the case may be, within such 30 day period, no Event of Default shall be deemed to have occurred or to exist if, and so long as the Corporation shall commence such performance, observation or compliance within such period and shall diligently and continuously prosecute the same to completion.

(e) The entry of a decree or order by a court having jurisdiction in the premises adjudicating the Corporation as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Corporation under the United States Bankruptcy Code or any other applicable federal or state law, or appointing a receiver, liquidator, custodian, assignee, or sequestrator (or other similar official) of the Corporation or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 90 consecutive days.

(f) The institution by the Corporation of proceedings to be adjudicated as bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under the United States Bankruptcy Code or any other similar applicable federal or state law, or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, custodian, assignee, trustee or sequestrator (or other similar official) of the Corporation or of any substantial part of its property, or the making by it of an assignment

29

for the benefit of creditors, or the admission by it in writing its inability to pay its debts generally as they become due.

**SECTION 9.02.** <u>Remedies.</u> Whenever any Event of Default under Section 9.01 hereof shall have happened and be continuing, any one or more of the following remedial steps may be taken:

(a) The Authority or the Trustee may declare all installments of Payments under Section 4.02 hereof to be immediately due and payable, whereupon the same shall become immediately due and payable;

(b) The Authority or the Trustee may take whatever action at law or in equity may appear necessary or desirable to collect the Payments then due and thereafter to become due, or to enforce performance and observance of any obligation, agreement or covenant of the Corporation under this Agreement;

(c) The Authority or the Trustee may have access to and inspect, examine and make copies of any and all books, accounts and records of the Corporation; and/or

(d) The Authority or the Trustee (or the owners of the Bonds in the circumstances permitted by the Indenture) may exercise any option and pursue any remedy provided by the Indenture.

**SECTION 9.03.** <u>No Remedy Exclusive; Selective Enforcement.</u> No remedy conferred upon or reserved to the Authority or the Trustee by this Agreement is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement and as now or hereafter existing at law or in equity. No delay or omission to exercise any right or power accruing upon any event of nonperformance shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. In order to entitle the Authority or the Trustee to exercise any remedy reserved to it in this Article, it shall not be necessary to give any notice, other than such notice as may be herein expressly required. In the event the Authority or the Trustee shall elect to selectively and successively enforce its rights under this Agreement, such action shall not be deemed a waiver or discharge of any other lien, encumbrance or security interest securing payment of the indebtedness secured hereby or thereby until such time that it shall have been paid in full all sums secured hereunder and thereunder. The foreclosure of any lien provided pursuant to this Agreement without the simultaneous foreclosure of all such liens shall not merge the liens granted which are not foreclosed with any interest which the Authority or the Trustee might obtain as a result of such selective and successive foreclosure.

**SECTION 9.04.** <u>Indenture Overriding.</u> All of the provisions of this Article are subject to and subordinate to the rights and remedies of the Bondholders and the Trustee pursuant to the Indenture. The Authority shall have no power to waive any event of default hereunder, except with respect to indemnification and its administrative payments, without the consent of the Trustee to such waiver.

**SECTION 9.05.** <u>Agreement to Pay Attorneys' Fees and Expenses.</u> In any Event of Default, if the Authority or the Trustee employs attorneys or incurs other expenses for the collection of amounts payable hereunder or the enforcement of the performance or observance of any covenants or agreements on the part of the Corporation herein contained, whether or not such suit is commenced, the Corporation agrees that it will on demand therefor pay to the Authority or the Trustee the reasonable fees of such attorneys and such other reasonable expenses so incurred by the Authority or the Trustee.

**SECTION 9.06.** <u>Authority and Corporation to Give Notice of Default.</u> The Authority and the Corporation severally covenant that they will, at the expense of the Corporation, promptly give to the Trustee written notice of any Event of Default under this Agreement of which they shall have actual knowledge or written notice, but the Authority shall not be liable (except as provided in Section 6.01(d) hereof for failing to give such notice.

**SECTION 9.07.** <u>Correlative Waivers.</u> If an Event of Default under Section 8.02 of the Indenture shall be cured or waived and any remedial action by the Trustee rescinded, any correlative Default under this Agreement shall be deemed to have been cured or waived.

## ARTICLE X

### MISCELLANEOUS

**SECTION 10.01.** <u>References to the Bonds Ineffective After Bonds Paid.</u> Upon payment of the Bonds, all references in this Agreement to the Bondholders shall be ineffective and the Authority and any holder of the Bonds shall not thereafter have any rights hereunder, excepting those that shall have theretofore vested.

**SECTION 10.02.** <u>Amounts Remaining in Funds.</u> It is agreed by the parties hereto that any amounts remaining in the Funds and Accounts existing pursuant to the Indenture upon the expiration or sooner cancellation or termination of this Agreement, as provided herein, after payment in full of all Bonds then outstanding under the Indenture (or provisions for payment thereof having been made in accordance with the provisions of the Indenture), and the fees, charges and expenses of the Authority and the Trustee and all other amounts required to be paid hereunder and under the Indenture (other than amounts payable as arbitrage rebate pursuant to the Code), shall belong to and be paid to the Corporation.

**SECTION 10.03.** <u>Notices.</u> All notices, demands and requests to be given or made hereunder to or by the Authority, the Trustee, the Corporation, or their designated successors, shall be in writing and shall be properly made if hand delivered or sent by United States mail, postage prepaid, and addressed as follows:

If to the Authority:  Louisiana Public Facilities Authority
2237 South Acadian Thruway, Suite 650
Baton Rouge, LA 70808

Attention: President and Chief Executive Officer

If to the Corporation:  The Roman Catholic Church of the Archdiocese of New Orleans
7887 Walmsley Avenue
New Orleans, LA 70125

Attention: Chief Financial Officer

If to the Trustee:  Whitney Bank
445 North Blvd., Suite 201
Baton Rouge, LA 70802

Attention: Senior Vice President and Trust Officer

Notice hereunder shall be deemed effective on the date of its receipt by the addressee. The Corporation, the Authority and the Trustee may, by notice given hereunder, designate any further or different

addresses, counsel or counsel addresses to which subsequent notices, certificates, requests or other communications shall be sent.

**SECTION 10.04.** Binding Effect. This Agreement shall inure to the benefit and shall be binding upon the Authority, the Corporation and their respective successors and assigns, subject to the limitation that any obligation of the Authority created by or arising out of this Agreement shall not be a general debt of the Authority, but shall be payable solely out of the proceeds derived from this Agreement and the sale of the Bonds under the Indenture.

**SECTION 10.05.** Performance on Legal Holidays. In any case where the date of maturity of interest on or principal of the Bonds or the date fixed for redemption or purchase of any Bonds or the date fixed for the giving, of notice or the taking, of any action under this Agreement shall not be a Business Day, then payment of such interest, principal, purchase price and redemption premium, if any, the giving of such notice or the taking of such action need not be made on such date but may be made on the next succeeding Business Day with the same force and effect as if made on the date of maturity or the date fixed for redemption or purchase, and no interest on such payment shall accrue for the period after such date.

**SECTION 10.06.** Execution in Counterparts. This Agreement may be executed in several counterparts, each of which shall be regarded as an original and all of which shall constitute but one and the same instrument; provided, however, that upon the assignment and pledge to the Trustee provided for in Section 3.02 hereof, the Authority shall deliver to the Trustee an executed counterpart of this Agreement which executed counterpart shall be deemed to be collateral of which the Trustee has taken possession and no other counterpart shall be deemed to be collateral for any other purpose.

**SECTION 10.07.** Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the State.

**SECTION 10.08.** Severability. If any clause, provision or Section of this Agreement be held illegal or invalid by any court, the invalidity of such clause, provision or Section shall not affect any of the remaining clauses, provisions or Sections hereof and this Agreement shall be construed and enforced as if such illegal or invalid clause, provision or Section had not been contained herein. In case any agreement or obligation contained in this Agreement be held to be in violation of law, then such agreement or obligation shall be deemed to be the agreement or obligation of the Authority or the Corporation, as the case may be, only to the extent permitted by law.

**SECTION 10.09.** Captions. The table of contents, captions or headings of the several articles and sections of this Agreement are for convenience only and shall not control, affect the meaning of or be taken as an interpretation of any provisions of this Agreement.

**SECTION 10.10.** Consents and Approvals. Whenever the consent or approval of the Authority, the Corporation or the Trustee shall be required under the provisions of this Agreement, such consent or approval shall not be unreasonably withheld or delayed.

**SECTION 10.11.** Third Party Beneficiaries. It is specifically agreed between the parties executing this Agreement that it is not intended by any of the provisions of any part of this Agreement to make the public or any member thereof, other than the Trustee and except as expressly provided herein or as contemplated in the Indenture, a third party beneficiary hereunder, or to authorize anyone not a party to this Agreement to maintain a suit for personal injuries or property damage pursuant to the terms or provisions of this Agreement. The duties, obligations and responsibilities, if any, of the parties to this Agreement with respect to third parties shall remain as imposed by law.

SECTION 10.12. Exculpatory Provision. In the exercise of the powers of the Authority and the Trustee and their respective trustees, directors, officers, employees and agents under this Agreement, the Authority and the Trustee shall not be accountable or liable to the Corporation (i) for any actions taken or omitted by it or its trustees, directors, officers, employees or agents in good faith and believed by it or them to be authorized or within their discretion or rights or powers conferred upon them (other than the negligence or willful misconduct of the Trustee and its respective trustees, directors, officers, employees or agents), or (ii) for any claims based on this Agreement against any trustee, director, officer, employee or agent of the Authority or the Trustee, all such liability, if any, being expressly waived by the Corporation by the execution of this Agreement. The Corporation shall indemnify and hold harmless the Authority, the Trustee and their respective trustees, directors, officers, employees and agents against any claim or liability based on the foregoing asserted by any other person.

In case any action shall be brought against the Authority or the Trustee, as the case may be, in respect of which indemnity may be sought against the Corporation, the Authority or the Trustee, as the case may be, shall promptly notify the Corporation in writing and the Corporation shall assume the defense thereof, including the employment of counsel of the Corporation's choice and the payment of all expenses. The Authority and the Trustee shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be paid by the Authority or the Trustee, as the case may be, unless the employment of such counsel has been authorized by the Corporation. The Corporation shall not be liable for any settlement of any such action without its consent but if any such action is settled with the consent of the Corporation or if there be final judgement for the plaintiff of any such action, the Corporation agrees to indemnify and hold harmless the Authority and the Trustee from and against any loss or liability by reason of such settlement or judgment.

SECTION 10.13. Accounts and Audits. The Authority shall cause the Trustee to keep proper books of records and accounts (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Bonds.

SECTION 10.14. Date of Agreement. The dating of this Agreement as of April 1, 2017 is intended as and for the convenient identification of this Agreement and is not intended to indicate that this Agreement was executed and delivered on said date, this Agreement being executed on the dates of the respective acknowledgments hereto attached.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

33

[SIGNATURE PAGE TO THE AGREEMENT]

IN WITNESS WHEREOF, the Authority has caused this Agreement to be executed by its Chairman or Vice Chairman and has caused the seal of the Authority to be affixed hereto and attested by its Secretary-Treasurer or an Assistant Secretary and the Corporation has caused this Agreement to be executed in its behalf by its Secretary and its seal to be affixed hereto, all as of the day and year above written.

LOUISIANA PUBLIC FACILITIES AUTHORITY

By: _____
            Chairman

ATTEST:

By: _____
       Assistant Secretary

[SEAL]

THE ROMAN CATHOLIC CHURCH OF THE
ARCHDIOCESE OF NEW ORLEANS

By: _____
            Secretary

[SEAL]

38

EXHIBIT A

## PRIOR PROJECTS DESCRIPTION

The specific project and the costs are as follows:

Set forth below is a description of the elements that comprise the Project and the approximate amount of Bond proceeds for each project.

Hannan High School (St. Tammany Parish) New Construction of a new approximately 62,000 square foot two-story high school multi-building complex to service 500 students including classrooms, administrative offices, a gymnasium, cafeteria and library. The initial owner is the Corporation. ($20,000,000)

Administrative Offices for Schools and Departments (Walmsley) (Orleans Parish)—Replacement and relocation of Flood-damaged electrical and HVAC equipment. ($1,650,000)

Central Office for Community Services (Howard) (Orleans Parish)—Replacement of flood-damaged electrical and HVAC equipment. ($1,250,000)

Mater Dolorosa (Orleans Parish)—Substantial rehabilitation including major HVAC repairs, room replacement and waterproofing. Owned and operated by The Apartments at Mater Dolorosa. ($2,350,000)

Chateau de Notre Dame Apartments and Nursing Home (Orleans Parish)—Repairs to flood-damaged walls, floors and electrical equipment. Owned and operated by Chateau de Notre Dame. ($9,500,000 for repairs)

St. Peter Claver School (Orleans Parish)—Replacement of flood damaged walls, floors, electrical and HVAC equipment. Owned and operated by Congregation of St. Peter Claver Roman Catholic Church. ($500,000)

Information technology (Ouachita Parish)—Purchase of back-up site equipment and related costs for disaster planning and preparation. ($425,000)

Information technology infrastructure at schools—Upgrade core technology including network cabling, Gigabit managed network switches, PBX and digital telephone systems, services, rack enclosures, uninterruptible power supplies for components, and distance learning (video streaming) components. ($750,000)

Mary Queen of Peace School (St. Tammany Parish)—Infrastructure improvements and purchase of temporary buildings to accommodate additional students. ($400,000)

Resurrection of Our Lord School (Orleans Parish)—Replacement of flood damaged walls, floors, electrical and HVAC equipment. ($1,100,000)
St. Dominic School (Orleans Parish)—Replacement of flood damaged walls, floors, electrical and HVAC equipment. Owned and operated by Congregation of St. Dominic's Roman Catholic Church. ($1,550,000)

St. Ann School (Jefferson Parish)—Replacement of flood damaged walls, floors, electrical and HVAC equipment. ($400,000)

A-1

St. Clement of Rome School (Jefferson Parish)—Replacement of flood damaged walls, floors, electrical and HVAC equipment. ($l,300,000)

Congregation of Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana (St. Bernard Parish)—Replacement of flood damaged walls, floors, electrical and HVAC equipment. Owned and operated by Congregation of Our Lady of Prompt Succor Roman Catholic Church, Chalmette, Louisiana. ($1,000,000)

Congregation of Our Lady of Lourdes Roman Catholic Church, St. Tammany Parish (St. Tammany Parish)—Construction of a new elementary school including classrooms and administrative offices to service 600 students. Owned and operated by Congregation of Our Lady of Lourdes Roman Catholic Church, St. Tammany Parish. ($5,125,000)

EXHIBIT B

## METHOD OF CALCULATING DEBT SERVICE COVERAGE COVENANT, LIQUIDITY COVENANT AND NET WORTH COVENANT

| DEBT SERVICE COVERAGE COVENANT | 2016 |
|---|---|
| Increase(Decrease) in Net Assets | ($19,046,626) |
| Less: Non-Operating Revenue / (Expense) [1] | 9,114,880 |
| Plus: Depreciation/Amortization | 2,163,638 |
| Plus: Interest Expense & Deposit & Loan Fund Int. Expense | 3,983,772 |
| Pension Expense Actuarial Adjustment [2] | 1,324,742 |
| Plus: Annual Available Distribution of Cash & Investments (at 5%) [3] | 8,207,327 |
| Net Income Available for Debt Service | $5,747,733 |
| | |
| **Debt Service Coverage Ratio** | |
| **Coverage Ratio: Actual Debt Service Requirements** | |
| | |
| Net Income Available for Debt Service | $5,747,733 |
| Actual Debt Service | 4,309,025 |
| Debt Service Coverage | 1.33 |
| | |
| [1] **Non-Operating Revenues (Expenses)** | |
| Investment Return [4] | ($1,919,548) |
| Donations related to Hurricane Katrina | 28,089,184 |
| Net Assets released from restriction- Katrina | 0 |
| Distributions of donations to affiliates | (27,349,715) |
| Additional minimum pension liability adjustment | (7,934,801) |
| Cumulative effect of change in accounting principle | 0 |
| Hurricane Katrina related expenses (net of insurance proceeds) | 0 |
| Non-Operating Revenue (Expense) *Includes Investment Classified as Current Revenues- "Spending Distribution" | ($9,114,880) |
| [2] **Pension Expense Actuarial Adjustment** | **2016** |
| Current Year Accrued pension liability | $46,105,433 |
| Less: Prior Year Accrued pension liability | (36,845,890) |
| Current Year Increase (Decrease) Accrued Pension Liability | 9,259,543 |
| Current Year Intangible Pension (Expense) Income | 0 |
| Less: Current Year Increase (Decrease) Accrued Pension Liability | 9,259,543 |
| Current Year Total Net Pension Revenue & Expense Effect | (9,259,543) |
| Less: Current Year Addtl minimum pension liability adjustment | 7,934,801 |
| Current Year Pension Expense Adjustment included in net assets | ($1,324,742) |
| | |
| [3] **Annual Distribution of Cash & Investments** | **2016** |
| Available Cash & Investments (see calculation on Liquid Cash & Inv. Tab) | $164,146,530 |
| 5.00% | 8,207,327 |

B-1

| LIQUIDITY COVENANT | |
|---|---|
| **FYE 6/30** | **2016** |
| Cash & Cash Equivalents | 5,248,515 |
| Readily Marketable Securities [1] | 143,865,653 |
| Less Notes Payable and Restricted Assets [2] | (26,641,286) |
| Total Unrestricted Cash and Investments | 122,472,882 |
| Total Debt **(Corporation Only)** | 57,630,000 |
| Liquidity Ratio | 2.125 |
| Total Debt **(ANO 2017/20% SAG)** [4] | 65,734,372 |
| Liquidity Ratio [1,2] | 1.863 |
| Total Debt **(ANO 2017/100% SAG)** [4] | 98,151,861 |
| Net Worth [1,2] | 1.248 |
| **Readily Marketable Securities** [1] | |
| Corporation Identified Investments | 143,214,967 |
| Less Illiquid Investments [3] | (5,384,677) |
| Debt Service Fund | 6,035,363 |
| Total Readily Marketable Securities | 143,865,653 |
| **Less Portion of Restricted Assets in Investments** [2] | |
| Temporarily Restricted Net Assets in Investments | 12,498,923 |
| Permanently Restricted Net Assets in Investments | 14,142,363 |
| Total Readily Marketable Securities | 26,641,286 |
| **Illiquid Investments** [3] | |
| Illiquid Investments from Portfolio A | |
| Siguler Guff DOF III | 2,538,205 |
| Siguler Guff DOF IV | 2,721,974 |
| Siguler Guff Distressed REOF II | 3,327,591 |
| MDFLTD Cerberus | 94,319 |
| MDFLTD HF | 119,679 |
| VIA Energy III | 2,021,306 |
| Illiquid Investments | 10,823,074 |
| Corporation Portion | 49.752% |
| Corporation Portion of Illiquid Invest [3] | 5,384,677 |

B-2

| NET WORTH COVENANT | 2016 |
|---|---|
| Total Net Assets | 82,040,174 |
| + Bonds Payable (excl premium amort) | 57,630,000 |
| + Deposits Payable | 115,749,156 |
| + Accrued Pension Liability | 46,105,433 |
| - Net Land, Bldg, & Equip | 77,212,519 |
| - Loans Receivable (net of doubtful) | 71,946,780 |
| Total Financial Resources | 152,365,464 |
| Total Debt **(Corporation)** | 57,630,000 |
| Net Worth | 2.644 |
| | |
| Total Debt **(Corporation / 20% SAG)** [1] | 65,734,372 |
| Net Worth | 2.318 |
| | |
| Total Debt **(Corporation /100% SAG)** [1] | 98,151,861 |
| Net Worth [1,2] | 1.552 |

B-3