NEW ISSUE
BOOK-ENTRY ONLY

RATINGS: Fitch: "A-"
Moody's: "Baa1"
See "RATINGS" herein.

*In the opinion of Foley & Judell, L.L.P., Bond Counsel, under existing law, interest on the Bonds is excluded from gross income for federal income tax purposes and is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. However, interest on the Bonds is to be taken into account in the computation of certain taxes that may be imposed with respect to corporations, including, without limitation, the federal alternative minimum tax. Bond Counsel is further of the opinion that, pursuant to the Refunding Act (herein defined), the Bonds and the income therefrom are exempt from all taxation by the State of Louisiana (the "State") or any political subdivision thereof. See "TAX EXEMPTION" herein and the proposed form of opinion of Bond Counsel attached hereto as Appendix D.*



**$41,895,000**
## LOUISIANA PUBLIC FACILITIES AUTHORITY
### REFUNDING REVENUE BONDS
### (ARCHDIOCESE OF NEW ORLEANS PROJECT)
### SERIES 2017



**Dated: Date of Issuance**

**Due: July 1, as shown on inside front cover**

The Bonds are issuable in fully registered form without coupons in denominations of $5,000 or any integral multiple thereof ("Authorized Denominations") as described herein and when issued will be initially registered in the name of Cede & Co., as nominee for The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Bonds (the "Securities Depository"). Purchasers will not receive certificates representing their interest in the Bonds purchased. Purchases of the Bonds may be made only in book-entry form in Authorized Denominations by credit to participating broker-dealers and other institutions on the books of DTC as described herein. The principal of, premium, if any, and interest on the Bonds will be payable by Whitney Bank, as trustee (the "Trustee") to the Securities Depository, which will remit such payments in accordance with its normal procedures, as described herein. Interest on the Bonds will be payable beginning on July 1, 2017 and semiannually thereafter, on each January 1 and July 1. See "THE BONDS" herein.

The proceeds of the Bonds will be loaned by the Louisiana Public Facilities Authority (the "Authority") to The Roman Catholic Church of the Archdiocese of New Orleans, a Louisiana nonprofit corporation (the "Corporation"), pursuant to the Loan Agreement, dated as of April 1, 2017 (the "Loan Agreement"), by and between the Authority and the Corporation for the purpose of providing funds, together with other available moneys, to: (a) refund all of the Authority's outstanding Revenue and Revenue Refunding Bonds, Series 2007 currently outstanding in the total aggregate principal amount of $57,630,000 and (b) pay costs of issuance of the Bonds (the "Refunding Project"). See "PLAN OF FINANCE" and "ESTIMATED SOURCES AND USES OF FUNDS" herein.

**MATURITIES, PRINCIPAL AMOUNTS, INTEREST RATES, YIELDS, PRICES AND CUSIPS SHOWN ON INSIDE COVER**

*The Bonds are subject to optional redemption, mandatory redemption and extraordinary redemption prior to maturity, as more particularly described herein. See "THE BONDS—Redemption" herein.*

The obligation of the Corporation to make payments under the Loan Agreement constitutes a general, unsecured obligation, payable from its gross revenues, its general fund or any other moneys legally available to the Corporation. See "SECURITY FOR THE BONDS" herein.

**THE BONDS ARE LIMITED AND SPECIAL OBLIGATIONS OF THE AUTHORITY AND DO NOT CONSTITUTE OR CREATE AN OBLIGATION, GENERAL OR SPECIAL, DEBT, LIABILITY OR MORAL OBLIGATION OF THE STATE OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY PROVISIONS WHATSOEVER AND NEITHER THE FAITH OR CREDIT NOR THE TAXING POWER OF THE STATE OR OF ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR THE INTEREST ON THE BONDS. THE BONDS ARE NOT A GENERAL OBLIGATION OF THE AUTHORITY (WHICH HAS NO TAXING POWER AND RECEIVES NO FUNDS FROM ANY GOVERNMENTAL BODY) BUT ARE A LIMITED AND SPECIAL REVENUE OBLIGATION OF THE AUTHORITY PAYABLE SOLELY FROM THE INCOME, REVENUES AND RECEIPTS DERIVED OR TO BE DERIVED FROM PAYMENTS MADE PURSUANT TO THE LOAN AGREEMENT.**

**THIS COVER PAGE CONTAINS CERTAIN INFORMATION FOR QUICK REFERENCE ONLY. THIS COVER PAGE IS NOT INTENDED TO BE A SUMMARY OF THIS ISSUE. INVESTORS MUST READ THE ENTIRE OFFICIAL STATEMENT TO OBTAIN INFORMATION ESSENTIAL TO THE MAKING OF AN INFORMED INVESTMENT DECISION. AN INVESTMENT IN THE BONDS INVOLVES CERTAIN RISKS. SEE "INVESTMENT CONSIDERATIONS" HEREIN.**

Subject to applicable securities laws and prevailing market conditions, the Underwriters intend, but are not obligated, to effect secondary market trading in the Bonds. The Underwriters are not obligated to repurchase any Bonds at the request of the registered owners thereof. There can be no assurance that a secondary market for the Bonds will develop or be maintained.

*The Bonds are offered when, as and if issued by the Authority and received by the Underwriters, subject to the approving opinion of Foley & Judell, L.L.P., New Orleans, Louisiana, Bond Counsel, and certain other conditions. Certain legal matters will be passed upon for the Underwriters by their counsel, Kutak Rock LLP, for the Authority by Jacob S. Capraro, Esq., New Orleans, Louisiana, Special Counsel to the Authority, for the Corporation by Chaffe McCall, L.L.P., New Orleans, Louisiana, Counsel to the Corporation, and for the Trustee by Gregory A. Pletsch & Associates, Counsel to the Trustee. It is expected that the Bonds in definitive form will be available for delivery through the facilities of DTC in New York, New York, on or about April 4, 2017, against payment therefor.*

## RAYMOND JAMES®


Capital Markets

STIFEL

This Official Statement is dated March 8, 2017

**PRINCIPAL AMOUNTS, MATURITIES, INTEREST RATES, YIELDS, PRICES AND CUSIPS**

**$41,895,000**
**LOUISIANA PUBLIC FACILITIES AUTHORITY**
**REFUNDING REVENUE BONDS**
**(ARCHDIOCESE OF NEW ORLEANS PROJECT)**
**SERIES 2017**

**MATURITY SCHEDULE**

| Date (July 1) | Principal Amount | Interest Rate | Yield | Price | CUSIP[1] |
|---|---|---|---|---|---|
| 2017 | $1,350,000 | 2.00% | 0.970% | 100.247% | 5463986R4 |
| 2018 | 1,255,000 | 5.00 | 1.520 | 104.262 | 5463986S2 |
| 2019 | 1,320,000 | 5.00 | 1.840 | 106.905 | 5463986T0 |
| 2020 | 1,385,000 | 2.25 | 2.140 | 100.341 | 5463986U7 |
| 2021 | 1,415,000 | 5.00 | 2.420 | 110.337 | 5463986V5 |
| 2022 | 1,485,000 | 5.00 | 2.690 | 111.219 | 5463986Y9 |
| 2023 | 1,560,000 | 5.00 | 2.990 | 111.362 | 5463986Z6 |
| 2024 | 1,640,000 | 5.00 | 3.240 | 111.274 | 5463987A0 |
| 2025 | 1,720,000 | 5.00 | 3.450 | 111.031 | 5463987B8 |
| 2026 | 1,805,000 | 5.00 | 3.620 | 110.752 | 5463986W3 |
| 2027 | 1,900,000 | 5.00 | 3.710 | 110.902 | 5463987C6 |
| 2028 | 1,995,000 | 5.00 | 3.820 | 109.918[c] | 5463987D4 |
| 2029 | 2,090,000 | 5.00 | 3.900 | 109.208[c] | 5463987E2 |
| 2030 | 2,195,000 | 5.00 | 3.960 | 108.680[c] | 5463987F9 |
| 2031 | 2,305,000 | 5.00 | 4.010 | 108.242[c] | 5463987G7 |
| 2032 | 2,420,000 | 5.00 | 4.120 | 107.286[c] | 5463987H5 |
| 2033 | 2,545,000 | 5.00 | 4.190 | 106.682[c] | 5463987J1 |

$11,510,000 5.00% Term Bonds due July 1, 2037 Yield 4.340% Price 105.403%[c] CUSIP[1] 5463986X1

---

[c] Priced to first optional call date of July 1, 2027.
[1] Copyright 2017, CUSIP Global Services. CUSIP® is a registered trademark of the American Bankers Association. CUSIP data herein is provided by CUSIP Global Services which is managed on behalf of the American Bankers Association by S&P Capital IQ. The Authority takes no responsibility for the accuracy of the CUSIP numbers, which are included solely for the convenience of the owners of the Bonds.

NO DEALER, BROKER, SALESMAN OR OTHER PERSON HAS BEEN AUTHORIZED BY THE AUTHORITY, THE CORPORATION, OR THE UNDERWRITERS TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS, OTHER THAN THOSE CONTAINED IN THIS OFFICIAL STATEMENT, AND IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY ANY OF THE FOREGOING. THIS OFFICIAL STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY, NOR SHALL THERE BE ANY SALE OF, THE BONDS BY ANY PERSON IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL FOR SUCH PERSON TO MAKE SUCH OFFER, SOLICITATION OR SALE. THE UNDERWRITERS HAVE PROVIDED THE FOLLOWING SENTENCE FOR INCLUSION IN THIS OFFICIAL STATEMENT. THE UNDERWRITERS HAVE REVIEWED THE INFORMATION IN THIS OFFICIAL STATEMENT IN ACCORDANCE WITH, AND AS PART OF, THEIR RESPONSIBILITIES TO INVESTORS UNDER THE FEDERAL SECURITIES LAWS AS APPLIED TO THE FACTS AND CIRCUMSTANCES OF THIS TRANSACTION, BUT THE UNDERWRITERS DO NOT GUARANTEE THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. THE INFORMATION ON THE CORPORATION IS NOT GUARANTEED AS TO ACCURACY OR COMPLETENESS BY, AND IS NOT TO BE CONSTRUED AS A REPRESENTATION OF, THE AUTHORITY. THE INFORMATION REGARDING DTC HAS BEEN OBTAINED FROM DTC, BUT IS NOT GUARANTEED AS TO ACCURACY OR COMPLETENESS BY THE AUTHORITY OR THE CORPORATION. THE AUTHORITY NEITHER HAS NOR WILL ASSUME ANY RESPONSIBILITY AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION IN THIS OFFICIAL STATEMENT OTHER THAN THAT INFORMATION RELATING TO THE AUTHORITY UNDER THE HEADINGS "THE AUTHORITY" AND "ABSENCE OF LITIGATION AFFECTING THE BONDS—THE AUTHORITY." THE INFORMATION AND EXPRESSIONS OF OPINION HEREIN ARE SUBJECT TO CHANGE WITHOUT NOTICE, AND NEITHER THE DELIVERY OF THIS OFFICIAL STATEMENT NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE AUTHORITY, THE CORPORATION OR ANY OTHER ENTITY DESCRIBED HEREIN. THIS OFFICIAL STATEMENT DOES NOT CONSTITUTE A CONTRACT BETWEEN THE AUTHORITY OR THE UNDERWRITERS AND ANY ONE OR MORE OF THE PURCHASERS OR REGISTERED OWNERS OF THE BONDS.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVER ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE BONDS AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

THE BONDS HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION. THE REGISTRATION, QUALIFICATION OR EXEMPTION OF THE BONDS IN ACCORDANCE WITH THE APPLICABLE SECURITIES LAW PROVISIONS OF THE JURISDICTIONS IN WHICH THESE SECURITIES HAVE BEEN REGISTERED, QUALIFIED OR EXEMPTED SHOULD NOT BE REGARDED AS A RECOMMENDATION THEREOF. NEITHER THESE JURISDICTIONS NOR ANY OF THEIR AGENCIES HAVE GUARANTEED OR PASSED UPON THE SAFETY OF THE BONDS AS AN INVESTMENT, UPON THE PROBABILITY OF ANY EARNINGS THEREON OR UPON THE ACCURACY OR ADEQUACY OF THIS OFFICIAL STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE PRICES AT WHICH THE BONDS ARE OFFERED TO THE PUBLIC (AND THE YIELDS RESULTING THEREFROM) MAY VARY FROM THE INITIAL PUBLIC OFFERING PRICES APPEARING ON THE INSIDE COVER PAGE OF THIS OFFICIAL STATEMENT. IN

ADDITION, THE UNDERWRITERS MAY ALLOW COMMISSIONS OR DISCOUNTS FROM SUCH INITIAL OFFERING PRICES TO DEALERS AND OTHERS.

## FORWARD-LOOKING STATEMENTS

THIS OFFICIAL STATEMENT CONTAINS CERTAIN FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS ARE STATEMENTS OTHER THAN HISTORICAL INFORMATION OR STATEMENTS OF CURRENT CONDITION. SOME FORWARD-LOOKING STATEMENTS MAY BE IDENTIFIED BY USE OF TERMS SUCH AS "BELIEVES," "ESTIMATES," "ANTICIPATES," "INTENDS" OR "EXPECTS." THE FORWARD-LOOKING STATEMENTS CONTAINED AND INCORPORATED BY REFERENCE IN THIS OFFICIAL STATEMENT ARE GENERALLY LOCATED IN THE MATERIAL SET FORTH IN APPENDIX A BUT MAY BE FOUND IN OTHER LOCATIONS AS WELL. THESE FORWARD-LOOKING STATEMENTS RELATE TO THE PLANS AND OBJECTIVES OF THE CORPORATION FOR FUTURE OPERATIONS. IN LIGHT OF THE RISKS AND UNCERTAINTIES INHERENT IN ALL FUTURE PROJECTIONS, INCLUDING BUT NOT LIMITED TO THOSE SET FORTH UNDER THE HEADING "INVESTMENT CONSIDERATIONS," THE INCLUSION OF THE FORWARD-LOOKING STATEMENTS IN THIS OFFICIAL STATEMENT SHOULD NOT BE REGARDED AS A REPRESENTATION BY THE CORPORATION OR ANY OTHER PERSON THAT THE OBJECTIVES OR PLANS OF THE CORPORATION WILL BE ACHIEVED. MANY FACTORS COULD CAUSE THE CORPORATION'S ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE IN THE FORWARD-LOOKING STATEMENTS, INCLUDING AN UNANTICIPATED FLUCTUATION IN DEMAND FOR THE CORPORATION'S SERVICES OR ITS INABILITY TO ATTRACT A SUFFICIENT NUMBER OF DONORS. THE FOREGOING REVIEW OF IMPORTANT FACTORS SHOULD NOT BE CONSTRUED AS EXHAUSTIVE AND SHOULD BE READ IN CONJUNCTION WITH OTHER CAUTIONARY STATEMENTS THAT ARE INCLUDED IN THIS OFFICIAL STATEMENT. THE CORPORATION UNDERTAKES NO OBLIGATION TO RELEASE PUBLICLY THE RESULTS OF ANY FUTURE REVISIONS IT MAY MAKE TO FORWARD-LOOKING STATEMENTS TO REFLECT EVENTS OR CIRCUMSTANCES AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

THE CORPORATION HAS COVENANTED TO BONDHOLDERS TO PROVIDE FINANCIAL STATEMENTS, FINANCIAL INFORMATION AND OPERATING DATA, AND TO PROVIDE NOTICE OF CERTAIN EVENTS, PURSUANT TO THE REQUIREMENTS OF SECTION (B)(5)(1) OF THE SECURITIES AND EXCHANGE COMMISSION RULE 15C2-12 (17 CFR PART 240, § 240.15C2-12) (THE "RULE").

THE ORDER AND PLACEMENT OF MATERIALS IN THE OFFICIAL STATEMENT, INCLUDING THE APPENDICES, ARE NOT TO BE DEEMED A DETERMINATION OF RELEVANCE, MATERIALITY OR IMPORTANCE, AND THIS OFFICIAL STATEMENT, INCLUDING THE APPENDICES, MUST BE CONSIDERED IN ITS ENTIRETY. THE CAPTIONS AND HEADINGS IN THIS OFFICIAL STATEMENT ARE FOR CONVENIENCE ONLY AND IN NO WAY DEFINE, LIMIT OR DESCRIBE THE SCOPE OR INTENT, OR AFFECT THE MEANING OR CONSTRUCTION, OF ANY PROVISION OR SECTIONS OF THIS OFFICIAL STATEMENT. THE OFFERING OF THE BONDS IS MADE ONLY BY MEANS OF THIS ENTIRE OFFICIAL STATEMENT.

THIS OFFICIAL STATEMENT IS BEING PROVIDED TO PROSPECTIVE PURCHASERS EITHER IN BOUND PRINTED FORM ("ORIGINAL BOUND FORMAT") OR IN ELECTRONIC FORMAT ON THE FOLLOWING WEBSITE: http://www.MuniOS.com. THIS OFFICIAL

STATEMENT MAY BE RELIED UPON ONLY IF IT IS IN ITS ORIGINAL BOUND FORMAT OR AS PRINTED IN ITS ENTIRETY DIRECTLY FROM SUCH WEBSITE.

THIS PRELIMINARY OFFICIAL STATEMENT IS DEEMED "FINAL" BY THE AUTHORITY AND THE CORPORATION FOR PURPOSES OF RULE 15c2-12 OF THE REGULATIONS UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, EXCEPT FOR ANY INFORMATION PERMITTED BY SUCH RULE TO BE OMITTED.

[THIS PAGE INTENTIONALLY LEFT BLANK]

# TABLE OF CONTENTS

Page

INTRODUCTORY STATEMENT .................................................................................................1
THE AUTHORITY .......................................................................................................................2
    General ...................................................................................................................................2
    Membership of the Authority................................................................................................3
    Legality for Investment.........................................................................................................3
    Other Financings...................................................................................................................4
    Limitation of Liability...........................................................................................................4
THE CORPORATION ...................................................................................................................4
PLAN OF FINANCE......................................................................................................................6
    General ...................................................................................................................................6
    The Refunding .......................................................................................................................6
ESTIMATED SOURCES AND USES OF FUNDS .....................................................................7
THE BONDS ..................................................................................................................................8
    General ...................................................................................................................................8
    Book-Entry Only System ......................................................................................................8
    Provisions Applicable if Book-Entry Only System Is Terminated .....................................11
    Redemption ..........................................................................................................................12
SECURITY FOR THE BONDS .................................................................................................14
    General .................................................................................................................................14
    Limited Obligation of the Authority ...................................................................................15
    General Unsecured Obligation of the Corporation .............................................................15
    Negative Pledge and Restrictions on Transfer of Revenues and Properties ......................15
    Debt Service Coverage Ratio...............................................................................................16
    Liquidity Covenant ..............................................................................................................17
    Net Worth Covenant ............................................................................................................17
    Limitation on the Incurrence of Additional Debt by the Corporation .................................17
    Additional Bonds .................................................................................................................18
    Debt Service Reserve Fund..................................................................................................18
    Provision for Payment..........................................................................................................19
ANNUAL DEBT SERVICE REQUIREMENTS .......................................................................20
    Historical Net Income Available for Debt Service and Pro-Forma Debt Service Coverage
        Ratio...............................................................................................................................20
INVESTMENT CONSIDERATIONS .........................................................................................22
    General .................................................................................................................................22
    Limited Obligations of the Authority; General Obligations of the Corporation..................23
    Impact of Adverse Climate and Weather Events on the Corporation ..................................23
    Dependence Upon Contributions and Other Income Sources.............................................23
    Tax Exemption for Nonprofit Organizations ......................................................................24
    Consequences of Changes in Tax-Exempt Status of the Corporation .................................24
    Intermediate Sanctions........................................................................................................25
    Covenant to Maintain Tax-Exempt Status of the Bonds.....................................................25
    Risk of Possible Adverse Ruling Under the First Amendment to the United States
        Constitution and the Louisiana Constitution ................................................................26
    Implications of the Code of Canon Law ..............................................................................26
    Personal Misconduct Litigation ..........................................................................................26
    Future Capital Expenditures ................................................................................................27
    Difficulties in Enforcing Remedies .....................................................................................27
    Potential Effects of Bankruptcy ..........................................................................................27

i

Financial Information.................................................................................................................28
Environmental Regulation .........................................................................................................28
Other Factors..............................................................................................................................28
Secondary Market ......................................................................................................................28
Failure To Provide Ongoing Disclosure ....................................................................................28
Book-Entry.................................................................................................................................28
Risk of Loss From Nonpresentment Upon Redemption .............................................................29
TAX EXEMPTION ...........................................................................................................................29
Federal and State Tax Exemption ...............................................................................................29
Alternative Minimum Tax Considerations ..................................................................................29
Tax Compliance .........................................................................................................................29
Tax Treatment of Original Issue Premium ..................................................................................30
Potential Tax Law Changes ........................................................................................................30
LEGAL MATTERS............................................................................................................................31
RATINGS ..........................................................................................................................................31
UNDERWRITING .............................................................................................................................31
FINANCIAL ADVISOR TO THE CORPORATION.........................................................................31
FINANCIAL STATEMENTS ............................................................................................................31
CONTINUING DISCLOSURE..........................................................................................................31
ABSENCE OF LITIGATION AFFECTING THE BONDS ...............................................................32
The Authority.............................................................................................................................32
The Corporation .........................................................................................................................32
MISCELLANEOUS ...........................................................................................................................33

APPENDIX A   THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS
APPENDIX B   AUDITED FINANCIAL STATEMENTS OF THE CORPORATION'S
              ADMINISTRATIVE OFFICES FOR FISCAL YEARS ENDED JUNE 30, 2016 AND
              2015
APPENDIX C   CERTAIN DEFINITIONS AND SUMMARY OF PRINCIPAL DOCUMENTS
APPENDIX D   PROPOSED FORM OF OPINION OF BOND COUNSEL
APPENDIX E   FORM OF CONTINUING DISCLOSURE AGREEMENT

**OFFICIAL STATEMENT**

**$41,895,000**
**LOUISIANA PUBLIC FACILITIES AUTHORITY**
**REFUNDING REVENUE BONDS**
**(ARCHDIOCESE OF NEW ORLEANS PROJECT)**
**SERIES 2017**

**INTRODUCTORY STATEMENT**

The purpose of this Official Statement (including the cover page and all appendices) is to furnish information pertaining to the sale of $41,895,000 aggregate principal amount of Refunding Revenue Bonds (Archdiocese of New Orleans Project) Series 2017 (the "Bonds") of the Louisiana Public Facilities Authority (the "Authority"). The Authority is a duly constituted public trust and public corporation of the State of Louisiana (the "State"), created in 1974 for the benefit of the State. The Authority was organized under an Indenture of Trust, dated August 21, 1974 (the "Authority's Indenture of Trust") and pursuant to the provisions of the Louisiana Public Trust Act, Sections 2341 through 2347, inclusive, of Chapter 2-A of Title 9 of the Louisiana Revised Statutes of 1950, as amended (the "Public Trust Act"), to engage in a variety of activities including serving as the conduit issuer of obligations such as the Bonds. See "THE AUTHORITY" herein.

The Roman Catholic Church of the Archdiocese of New Orleans (the "Corporation") is a Louisiana nonprofit corporation, founded in 1941. The Corporation, together with a significant number of archdiocesan churches, parishes, schools, nursing homes and other community service facilities and agencies, make up the Archdiocese of New Orleans, which is engaged primarily as a Roman Catholic Church. See "THE CORPORATION" herein and "THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS" in Appendix A hereto.

The Bonds are being issued by the Authority pursuant to the provisions of Chapter 14-A of Title 39 of the Louisiana Revised Statutes of 1950, as amended (the "Refunding Act") and a Trust Indenture, dated as of April 1, 2017 (the "Indenture"), by and between the Authority and Whitney Bank, as trustee (the "Trustee"), and the proceeds of the Bonds are being loaned to the Corporation pursuant to a Loan Agreement, dated as of April 1, 2017 (the "Loan Agreement"), by and between the Authority and the Corporation, for the purpose of providing funds, together with other available moneys, to: (a) current refund all of the Authority's outstanding Revenue and Revenue Refunding Bonds, Series 2007 currently outstanding in the aggregate principal amount of $57,630,000 (the "Refunded Bonds") and (b) pay costs of issuance of the Bonds (the "Refunding Project"). See "PLAN OF FINANCE" and "ESTIMATED SOURCES AND USES OF FUNDS" herein.

The obligation of the Corporation under the Loan Agreement to make payments under the Loan Agreement constitutes a general, unsecured obligation, payable from all legally available revenues and funds of the Corporation. The Corporation has other outstanding indebtedness in the form of a guarantee, and may incur additional indebtedness as permitted by the Loan Agreement. See "Outstanding Indebtedness" in Appendix A hereto, "SECURITY FOR THE BONDS—Additional Bonds" and "—Limitation on the Incurrence of Additional Debt by the Corporation" herein.

The Bonds are being issued pursuant to (a) the Refunding Act; (b) the Authority's Indenture of Trust; (c) the Indenture; (d) a resolution of the Authority adopted on June 7, 2016, authorizing the issuance of the Bonds; and (e) a resolution of the Louisiana State Bond Commission adopted on June 21, 2016.

THE BONDS ARE LIMITED AND SPECIAL OBLIGATIONS OF THE AUTHORITY AND DO NOT CONSTITUTE OR CREATE AN OBLIGATION, GENERAL OR SPECIAL, DEBT, LIABILITY OR MORAL OBLIGATION OF THE STATE OF LOUISIANA (THE "STATE") OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY PROVISIONS WHATSOEVER AND NEITHER THE FAITH OR CREDIT NOR THE TAXING POWER OF THE STATE OR OF ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR THE INTEREST ON THE BONDS. THE BONDS ARE NOT A GENERAL OBLIGATION OF THE AUTHORITY (WHICH HAS NO TAXING POWER AND RECEIVES NO FUNDS FROM ANY GOVERNMENTAL BODY) BUT ARE A LIMITED AND SPECIAL REVENUE OBLIGATION OF THE AUTHORITY PAYABLE SOLELY FROM THE INCOME, REVENUES AND RECEIPTS DERIVED OR TO BE DERIVED FROM PAYMENTS MADE PURSUANT TO THE LOAN AGREEMENT.

Certain risks are involved in the purchase of the Bonds. See "INVESTMENT CONSIDERATIONS" herein.

Definitions of certain terms used in this Official Statement and summaries of certain provisions of the Indenture and the Loan Agreement are set forth in Appendix C hereto. This Official Statement contains brief descriptions of, among other things, the Bonds, the Loan Agreement and the Indenture. Such descriptions do not purport to be comprehensive or definitive, and references in this Official Statement to documents are qualified in their entirety by references to each such document, and references in this Official Statement to the Bonds are qualified in their entirety by reference to the form of the Bond included in the Indenture. Until the issuance and delivery of the Bonds, draft copies of such documents may be obtained from the Underwriters. After the issuance and delivery of the Bonds, copies of such documents will be available for inspection at the corporate trust office of the Trustee in New Orleans, Louisiana. The audited financial statements of the Corporation's Administrative Offices as of and for the Fiscal Years Ended June 30, 2016 and June 30, 2015 are included herein as Appendix B. The proposed form of opinion of Bond Counsel is included herein as Appendix D. The form of Continuing Disclosure Agreement is included herein as Appendix E.

## THE AUTHORITY

**General**

The Authority was created pursuant to the Authority's Indenture of Trust for the benefit of the State. The Governor, on behalf of the State, accepted the beneficial interest in the Authority by Executive Order Number 71 on August 27, 1974. The Authority is a public trust and public corporation organized pursuant to the laws of the State, including the Public Trust Act, and is governed by seven trustees who are appointed for staggered terms by the Governor. The Authority has no taxing power and receives no appropriations from the State or any governmental body. The Authority is not organized for profit, and no part of its net earnings may inure to the benefit of any private person. The Public Trust Act provides that no trustee of the Authority may be charged personally with any liability whatsoever by reason of any act or omission committed or suffered in the performance of the functions of the Authority or in the operation of the Authority's property. The Public Trust Act requires that any amendments to the Authority's Indenture of Trust must be approved by a two-thirds (2/3) vote of both Houses of the Legislature and by the Governor of the State.

The purposes of the Authority are to promote and encourage a wide range of public and industrial activities within the State, and to provide funds in furtherance thereof. Pursuant to and in accordance with the provisions of the Public Trust Act and the Refunding Act, the Authority is authorized to issue revenue bonds and use the funds derived from the sale thereof for the purpose of providing, among other

2

things, (i) hospital, medical, health, nursery care, nursing care, clinical, ambulance, laboratory, and related services and facilities; (ii) educational services and facilities and related housing and dormitory services and facilities; (iii) cultural and civic facilities, services and activities; and (iv) community development and redevelopment facilities and activities, and to issue its refunding bonds to refinance its revenue bonds. The Authority also has general powers which include the powers to enter into, make and perform contracts of every lawful kind to accomplish its purposes.

## Membership of the Authority

The present trustees of the Authority, and their terms of office and occupations or affiliations, are as follows:

| Name | Term Expires [*] | Principal Occupation/Affiliation |
| --- | --- | --- |
| Guy Campbell, III, *Chairman* | October 15, 2017 | Attorney, Snellings, Breard, Sartor, Inabnett & Trascher, L.L.P. Monroe, Louisiana |
| Camille A. Cutrone, *Vice Chairman* | January 31, 2016* | Attorney, Cutrone, Verlander & Meyer New Orleans, Louisiana |
| Craig Cheramie, *Secretary-Treasurer* | August 25, 2020 | CPA, PFS, H.D. Vest Financial Services Harahan, Louisiana |
| Dale Benoit | December 20, 2013* | Print All, Inc. Belle Chasse, Louisiana |
| Ronald H. Bordelon | January 31, 2022 | Chief Facilities Officer, Recovery School District New Orleans, Louisiana |
| Michael C. Darnell | March 2, 2022 | Attorney, Murray, Darnell & Assoc., L.L.C. New Orleans, Louisiana |
| Eric Liew | August 2, 2017 | CEO, AOSS Medical Supply, Inc. Monroe, Louisiana |

---

[*] Board members shall continue in office until reappointed or a successor has been duly appointed and qualified. Board members are eligible for reappointment.

Mr. James W. Parks, II serves as President and Chief Executive Officer and as Assistant Secretary for the Authority. The address of the Authority is 2237 South Acadian Thruway, Baton Rouge, Louisiana 70808. The Authority's telephone number is (225) 923-0020 and the Authority's facsimile number is (225) 923-0021.

## Legality for Investment

With respect to bonds and notes issued by the Authority, including the Bonds, the Public Trust Act provides in La. R.S. 9:2347(A)(3) as follows:

3

Bonds and notes issued hereunder are hereby declared legal investments and are hereby made securities in which all insurance companies and associations and other persons carrying on an insurance business, trust companies, banks, bankers, banking associations, savings banks and savings associations, including savings and loan associations, credit unions, building and loan associations, investment companies, executors, administrators, trustees and other fiduciaries, pension, profit-sharing, retirement funds and other persons carrying on a banking business, and all other persons who are authorized to invest in revenue bonds may properly and legally invest funds, including capital in their control or belonging to them.  Such bonds and notes are hereby made securities which may properly and legally be deposited with and received by any state or municipal or public officer or any agency or political subdivision of the state for any purpose for which the deposit of revenue bonds is authorized by law.  Nothing contained herein shall authorize the investment of public pension or retirement funds in public trust bonds or other obligations.

**Other Financings**

The Authority has issued, and may continue to issue, other series of bonds or notes for the purpose of financing other projects and programs.  Each such series of bonds or notes is or will be secured by instruments separate and apart from the Indenture securing the Bonds and is payable from different sources of revenue.

**Limitation of Liability**

THE BONDS ARE LIMITED AND SPECIAL OBLIGATIONS OF THE AUTHORITY AND DO NOT CONSTITUTE OR CREATE AN OBLIGATION, GENERAL OR SPECIAL, DEBT, LIABILITY OR MORAL OBLIGATION OF THE STATE OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY PROVISIONS WHATSOEVER AND NEITHER THE FAITH OR CREDIT NOR THE TAXING POWER OF THE STATE OR OF ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR THE INTEREST ON THE BONDS.  THE BONDS ARE NOT A GENERAL OBLIGATION OF THE AUTHORITY (WHICH HAS NO TAXING POWER AND RECEIVES NO FUNDS FROM ANY GOVERNMENTAL BODY) BUT ARE A LIMITED AND SPECIAL REVENUE OBLIGATION OF THE AUTHORITY PAYABLE SOLELY FROM THE INCOME, REVENUES AND RECEIPTS DERIVED OR TO BE DERIVED FROM PAYMENTS MADE PURSUANT TO THE LOAN AGREEMENT.

## THE CORPORATION

The Archdiocese of New Orleans is the second oldest archdiocese in the United States and covers 4,208 square miles in the State of Louisiana.  The Archdiocese was established as a diocese in 1793 and became an archdiocese in 1850.  In 1941, the Roman Catholic Church of the Archdiocese of New Orleans (the "Corporation") was incorporated as a nonprofit corporation under the laws of the State, and the Corporation is an organization classified under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.  The Corporation, together with other separately incorporated entities, make up the Archdiocese of New Orleans (the "Archdiocese").

The Archdiocese currently operates in the eight civil parishes in the metropolitan New Orleans area and consists of 111 church parishes in the State.  As used in this Official Statement and except as otherwise indicated, the term "parish" refers to the church parishes and not to the civil parishes of the State.  The Corporation provides administrative support to the church parishes and to 84 schools with an

4

estimated fall enrollment for the 2016-17 school year of 37,050 students.  These schools include parish owned elementary schools, religious order schools and eight high schools and two special needs schools owned by the Corporation.  The schools owned by the Corporation have separate audited financial statements and their operations are not consolidated with the financial statements of the Corporation.  All 84 schools within the Archdiocese are generally self-sufficient.  The Corporation also provides administrative support for separately incorporated nursing homes, affordable senior living facilities and other community service facilities consistent with the mission of the Archdiocese.  With the exception of St. Anthony's Garden which has just been completed and for which the Corporation has provided a guarantee with respect to certain indebtedness, each of the nursing homes and affordable senior living facilities and other community services facilities are largely self-sufficient.  See "Description of Indebtedness" in Appendix A for more information regarding such guarantee.

The Corporation's obligation to make payments under the Loan Agreement, which supports the payment of the Bonds, is a general unsecured obligation of the Corporation.  The primary source of repayment under the Loan Agreement is expected to be from funds accounted for under the Corporation's administrative offices (the "Administrative Offices").  The Corporation is required to use all of its available resources to make loan repayments under the Loan Agreement, and the Corporation can access funds other than those represented by the Administrative Offices.  In addition, it could, subject to certain approvals, sell assets not on the financial statements of the Administrative Offices or assets which are reflected thereon but which are not shown at fair market value, the proceeds from which would go to the Administrative Offices.  The Administrative Offices do not include the financial operations or assets of the individual church parishes, or parish elementary schools or other church-related agencies and institutions within the Corporation's geographical boundaries, nor do they include the operations of the eight high schools and two special needs schools within its geographical boundaries which are owned and operated by the Corporation (although portions of such Corporation owned high schools and special needs schools are reflected on the balance sheet of the Corporation's Administrative Offices).  Parishes are separate legal entities which own the elementary schools and churches within their jurisdictions which are supported and administered by the Corporation as described herein, while the high schools and two special needs schools within the geographic boundaries of the Corporation referred to above are owned by the Corporation.

While the Administrative Offices do not include the financial operations of such parish schools and churches, a substantial portion of the revenues of the Administrative Offices come from assessments levied by the Corporation on the parishes.  See "THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS—Assessment Revenue" in Appendix A hereto.  The parishes and their schools and churches are responsible for their own budgets and are responsible for the operation of those institutions.  They are expected to manage the affairs of the parishes such that they are largely self-supporting.  See also "Annual Budget Process—*Parish and School Budgets*" in Appendix A hereto.

The high schools and two special needs schools owned and operated by the Corporation are also expected to be funded on a largely self-sufficient basis from year to year.  Most of the revenues necessary to operate those schools are derived from tuition and fees, and not from contributions of the Corporation from assets or revenues accounted for in the Administrative Offices.  However, there is no restriction in using such revenues in connection with the operation of such Corporation owned schools.

The Corporation maintains a Deposit and Loan Fund which is accounted for within the Administrative Offices' financial statements.  Parishes, schools and agencies within the boundaries of the operations of the Corporation are required to deposit certain excess funds with the Corporation, which amounts constitute deposits of those entities with the Corporation and on which the Corporation pays interest.  The Corporation has traditionally met requests from these depositors for funding of certain projects and operations by making moneys available through loans from the Deposit and Loan Fund.

Occasionally, based on particular facts and circumstances, the Corporation has used Administrative Office funds without making a loan to meet urgent situations presented by a parish or school, but this has only been done on a case by case basis.  Amounts in the Deposit and Loan Fund representing the difference between the deposits and the loans are available to the Corporation on the books of the Administrative Offices to make required repayments under the Loan Agreement to pay debt service on the Bonds.  See "THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS—Deposit and Loan Fund" in Appendix A hereto.

The Corporation also owns certain undeveloped land within the geographical boundaries of the Corporation.  While much of such land is included in the financial statements of the Administrative Offices, generally there are no recent appraisals of such property and therefore it is not reflected at its fair market value.  While there is no mortgage on any of these properties or other land not currently accounted for in the financial statements of the Corporation's Administrative Offices as security for the Corporation's loan repayments under the Loan Agreement, the proceeds of the Corporation's sale of any such properties would be accounted for in the financial statements of the Administrative Offices.

For additional information regarding the Corporation and its operations and finances, see "THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS" in Appendix A hereto.

The audited financial statements of the Corporation with respect to its Administrative Offices for the Fiscal Years Ended June 30, 2016 and 2015 are included in Appendix B hereto.  These financial statements include the assets, liabilities, net assets, and other financial activities of all administrative and program offices and departments maintained and directed by the Administrative Offices of the Corporation.  Certain other activities referred to above are not included and the audited financial statements do not include the fair market values of the churches, properties in the parishes, rectories, or schools nor the Corporation's captive non-profit insurance company.  See "SECURITY FOR THE BONDS" herein and "Information about Financial Statements" contained in Appendix A hereto.

## PLAN OF FINANCE

**General**

The proceeds of the Bonds will be used, together with other available moneys, to (a) current refund all of the Authority's outstanding Revenue and Revenue Refunding Bonds, Series 2007 issued in the total aggregate principal amount of $69,150,000 and currently outstanding in the aggregate principal amount of $57,630,000 (the "Refunded Bonds") and (b) pay costs of issuance of the Bonds (the "Refunding Project").

**The Refunding**

*General*.  Proceeds of the Bonds, together with other available moneys, will be used, along with investment earnings thereon, to current refund the Refunded Bonds issued in the total aggregate principal amount of $69,150,000 and currently outstanding in the aggregate principal amount of $57,630,000.  See "ESTIMATED SOURCES AND USES OF FUNDS").

*The Refunded Bonds*.  The Refunded Bonds were issued to provide funds to (a) current refund all or a portion of the Authority's (i) outstanding Equipment and Capital Facilities Pool Loan Program Revenue Bonds, Series 2001A and (ii) outstanding Equipment and Capital Facilities Pool Loan Program Revenue Bonds, Series 2002C issued on behalf of Chateau de Notre Dame and Wynhoven Health Care Center, (b) finance or refinance the reconstruction, rehabilitation, restoration, construction, furnishing,

improving, and equipping of school buildings, office buildings, nursing homes and other facilities owned and operated by the Corporation and/or Archdiocesan related Louisiana nonprofit corporations, (c) fund capitalized interest, (d) fund a debt service reserve fund and (e) pay costs of issuance of the Refunded Bonds.

*The Escrow Fund.*  $58,879,483 will be deposited in the Escrow Fund (the "Escrow Fund") established pursuant to the terms and provisions of the Escrow Agreement, dated as of April 1, 2017 (the "Escrow Agreement"), by and between the Corporation, the Authority and Whitney Bank, as escrow trustee thereunder (the "Escrow Trustee").  Moneys deposited in the Escrow Fund will be invested in non-callable direct general obligations of, or obligations the payment of the principal or and interest on which is unconditionally guaranteed by, the United States of America ("Governmental Obligations").  Principal of and interest on the Governmental Obligations will be used, together with any cash balance in the Escrow Fund, to pay the regularly scheduled principal of and interest on the Refunded Bonds through July 1, 2017 (the first optional redemption date), and to redeem on such date the Refunded Bonds maturing on and after July 1, 2018 at a redemption price equal to the par amount thereof plus accrued interest to the redemption date.

*Verification Report.*  The accuracy of the mathematical computations of the adequacy of cash and securities to be held in the Escrow Fund, together with the interest to be earned thereon, to pay the principal of and interest on the Refunded Bonds according to the schedule established in the Escrow Agreement, and the computations supporting the conclusion of Bond Counsel that the Series 2017 Bonds are not "arbitrage bonds" within the meaning of Section 148 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder (the "Tax Code"), will be verified by Robert Thomas, CPA, LLC, certified public accountants.

## ESTIMATED SOURCES AND USES OF FUNDS

Set forth in the following table is a summary of the estimated sources and uses of Bond proceeds and other available moneys.

| SOURCES OF FUNDS | |
|---|---|
| Par Amount of the Bonds | $41,895,000 |
| Net Original Issue Premium | 3,157,727 |
| Transfer from Refunded Bonds Reserve Fund | 4,552,076 |
| Corporation Equity Contribution | 10,000,000 |
| Total | $59,604,803 |
| | |
| USES OF FUNDS | |
| Deposit to Escrow Fund | $58,879,483 |
| Deposit to Costs of Issuance Account of Bond Proceeds Fund [1] | 725,320 |
| Total | $59,604,803 |

_____
[1] Includes, without limitation, Underwriters' discount and all legal and other fees.  Payment of such costs are contingent upon the issuance and delivery of the Bonds on the Closing Date.
Source: The Underwriters

# THE BONDS

**General**

The Bonds will be issued pursuant to the Indenture and the Constitution and laws of the State, including the Refunding Act, subject to the conditions provided in the Indenture.  The principal of, premium, if any, and interest on all Bonds issued under the provisions of the Indenture shall be payable solely from the Trust Estate, including the moneys provided in the Indenture, and shall be entitled to the security and benefit of the Indenture.

The Bonds will be issued as fully registered bonds, without coupons, in denominations of $5,000 or any integral multiple thereof ("Authorized Denominations") initially in book-entry form, registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC").  Purchasers of Bonds (the "Beneficial Owners") will not receive physical delivery of bond certificates.  Ownership interests may be acquired in book-entry form only.  See "—Book-Entry Only System."  The Bonds will be dated as of the date of issuance, will mature (subject to prior redemption) on July 1 in the years and in the principal amounts and will bear interest at the rates per annum (using a year of 360 days comprised of twelve 30 day months) indicated on the inside front cover of this Official Statement payable on January 1 and July 1 of each year, commencing July 1, 2017 (each an "Interest Payment Date").  Principal of, premium, if any, and interest on the Bonds will be payable in the manner described below under "—Book-Entry Only System."  Payment of the Bonds will be made in such coin or currency of the United States of America as, at the respective times of payment, is legal tender for the payment of public and private debts.

**Book-Entry Only System**

The Bonds initially will be issued solely in book-entry form to be held in the book-entry only system maintained by The Depository Trust Company ("DTC"), New York, New York.  So long as such book-entry system is used, only DTC will receive or have the right to receive physical delivery of Bonds and, except as otherwise provided herein with respect to Beneficial Owners of Beneficial Ownership Interests, Beneficial Owners will not be or be considered to be, and will not have any rights as owners or holders of the Bonds under the Indenture.

*The following information about the book-entry only system applicable to the Bonds has been supplied by DTC.  None of the Authority, the Corporation, the Trustee or the Underwriters makes any representations, warranties or guarantees with respect to its accuracy or completeness.*

DTC will initially act as securities depository for the Bonds.  The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC.  One fully registered Bond certificate will be issued for each maturity of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934.  DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC.  DTC also facilitates the post-trade settlement among Direct Participants of sales and other

securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has an S&P rating of "AA+." The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

Purchases of Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of each Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transactions, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC will be registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of securities may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bond documents. For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record

9

date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority or the Trustee, on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Authority or the Trustee. Under such circumstances, in the event that a successor securities depository is not obtained, Bond certificates are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Authority believes to be reliable, but the Authority, the Corporation and the Underwriters take no responsibility for the accuracy thereof.

THE AUTHORITY, THE CORPORATION, THE TRUSTEE OR THE UNDERWRITERS CANNOT AND DO NOT GIVE ANY ASSURANCES THAT THE DTC PARTICIPANTS OR THE INDIRECT PARTICIPANTS WILL DISTRIBUTE TO THE BENEFICIAL OWNERS OF THE BONDS (I) PAYMENTS OF PRINCIPAL OF OR INTEREST AND PREMIUM, IF ANY, ON THE BONDS, (II) CONFIRMATION OF BENEFICIAL OWNERSHIP INTERESTS IN BONDS, OR (III) REDEMPTION OR OTHER NOTICES SENT TO DTC OR CEDE & CO., ITS NOMINEE, AS THE REGISTERED OWNERS OF THE BONDS, OR THAT THEY WILL DO SO ON A TIMELY BASIS OR THAT DTC, DTC PARTICIPANTS OR INDIRECT PARTICIPANTS WILL SERVE AND ACT IN THE MANNER DESCRIBED IN THIS OFFICIAL STATEMENT. THE CURRENT "RULES" APPLICABLE TO DTC ARE ON FILE WITH THE SECURITIES AND EXCHANGE COMMISSION AND THE CURRENT "PROCEDURES" OF DTC TO BE FOLLOWED IN DEALING WITH DTC PARTICIPANTS ARE ON FILE WITH DTC.

NEITHER THE AUTHORITY, THE CORPORATION, THE TRUSTEE NOR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATIONS TO SUCH DTC PARTICIPANTS OR THE BENEFICIAL OWNERS WITH RESPECT TO (1) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC OR ANY DTC PARTICIPANT; (2) THE PAYMENT BY ANY DTC PARTICIPANT OF ANY AMOUNT DUE TO ANY BENEFICIAL OWNER IN RESPECT OF THE PRINCIPAL AMOUNT OR INTEREST OR PREMIUM, IF ANY, ON THE BONDS; (3) THE DELIVERY BY ANY DTC PARTICIPANT OF ANY NOTICE TO ANY BENEFICIAL OWNER WHICH IS REQUIRED OR PERMITTED UNDER THE TERMS OF THE BONDS TO BE GIVEN TO BONDHOLDERS; (4) THE SELECTION OF THE BENEFICIAL OWNERS TO RECEIVE PAYMENT

IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS; OR (5) ANY CONSENT GIVEN OR OTHER ACTION TAKEN BY DTC AS BONDHOLDER.

**Provisions Applicable if Book-Entry
Only System Is Terminated**

*General*.  Purchasers of Bonds will receive principal and interest payments, and may transfer and exchange Bonds, pursuant to the following provisions only if the book-entry only system is terminated. Otherwise, payments and transfers will be made only as described above under "—Book-Entry Only System."

*Payment of Principal and Interest*.  The principal of, and premium, if any, of the Bonds will be payable to the registered owners thereof upon surrender of the Bonds at the principal corporate trust office of the Trustee.  The interest on the Bonds, when due and payable, will be paid by check or draft mailed by the Trustee on such due date to the persons in whose names the Bonds are registered, at the addresses as they appear on the Bond Register maintained by the Trustee at the close of business on the applicable Record Date (the December 15th or June 15th, as the case may be, next preceding an Interest Payment Date or, if such day shall not be a Business Day, the next preceding Business Day) irrespective of any transfer or exchange of the Bonds subsequent to such Record Date and prior to such Interest Payment Date, unless the Authority shall default in payment of interest due on such Interest Payment Date.  In the event of any such default, such defaulted interest shall be payable on a payment date established by the Trustee to the persons in whose names the Bonds are registered at the close of business on a special record date for the payment of such defaulted interest as set forth in the Indenture.

*Registration, Exchange and Transfer*.  Each Bond shall be transferable only upon the Bond Register at the principal corporate trust office of the Trustee at the written request of the registered owner thereof or his legal representative duly authorized in writing upon surrender thereof, together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his legal representative duly authorized in writing.  Upon the transfer of any such bond, the Trustee shall issue in the name of the transferee, in authorized denominations, one or more Bonds of the same aggregate principal amount as the surrendered Bonds.

As long as any of the Bonds remain outstanding, there shall be permitted the exchange of Bonds at the principal corporate trust office of the Trustee.  Any Bond or Bonds upon surrender thereof at the principal corporate trust office of the Trustee with a written instrument of transfer satisfactory to the Trustee, duly executed by the registered owner or his legal representative duly authorized in writing, may, at the option of the registered owner thereof, be exchanged for an equal aggregate principal amount of other Bonds in Authorized Denominations.

For every such exchange or transfer of Bonds, the Authority or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.

The Trustee shall not be required to register the transfer or exchange of (a) any Bonds during the 15-day period next preceding the selection of Bonds to be redeemed and thereafter until the date of the mailing of a notice of redemption of Bonds selected for redemption, or (b) any Bonds selected, called or being called for redemption in whole or in part, except in the case of any Bond to be redeemed in part, the portion thereof not so to be redeemed.

## Redemption

*Optional Redemption of Bonds*.  The Bonds maturing on or after July 1, 2028 are subject to redemption by the Authority upon the direction of the Corporation on July 1, 2027 and on any date thereafter, as a whole or in part at any time at a redemption price equal to the principal amount of such Bonds being redeemed plus accrued interest to the redemption date.

*Mandatory Sinking Fund Redemption*.  The Bonds maturing on July 1, 2037 are subject to mandatory sinking fund redemption at a redemption price equal to 100% of the principal amount thereof plus accrued interest to the redemption date on the dates and in the principal amounts shown in the table below:

### Bonds Maturing on July 1, 2037

| Year (July 1) | Principal Amount To Be Redeemed |
|---|---|
| 2034 | $2,670,000 |
| 2035 | 2,805,000 |
| 2036 | 2,945,000 |
| 2037 [1] | 3,090,000 |

_____
[1] Final Maturity.

Not more than 45 days nor less than 30 days prior to a sinking fund payment date for the Bonds, the Trustee shall proceed to select for redemption (by lot in such manner as the Trustee may determine) from all Bonds Outstanding which mature on July 1, 2037 a principal amount of such Bonds equal to the aggregate principal amount of Bonds redeemable with the required sinking fund payment, and shall call such Bonds for redemption from the sinking fund on the next July 1, and give notice of such call.

At the option of the Corporation to be exercised by delivery of a written certificate to the Trustee and the Authority not less than 45 days next preceding any sinking fund redemption date, it may (a) deliver to the Trustee for cancellation such Bonds maturing on July 1, 2037 which are subject to sinking fund redemption on such date in an aggregate principal amount designated by the Corporation; or (b) specify a principal amount of such Bonds maturing on July 1, 2037 which prior to said date have been redeemed (otherwise than through the operation of such sinking fund) and canceled by the Trustee and not theretofore applied as a credit against any sinking fund redemption obligation for such Bonds.  Each Bond so delivered or previously redeemed shall be credited by the Trustee at 100% of the principal amount thereof against the obligation of the Corporation on such sinking fund redemption date, and any excess shall be so credited against future sinking fund redemption obligations for Bonds as directed by the Corporation.  In the event the Corporation shall avail itself of the provisions of clause (a) of the first sentence of this paragraph the certificate required by the first sentence of this paragraph shall be accompanied by the Bonds to be canceled.

*Extraordinary Redemption*.  The Bonds are subject to extraordinary redemption in whole or in part on any date at the principal amount thereof plus accrued interest to the redemption date and without premium, if the Corporation shall have elected to make prepayment of all Payments payable under the Loan Agreement as provided therein (and the Corporation shall have delivered to the Trustee a copy, duly certified by an Authorized Corporation Representative, of a resolution of the Corporation making such determination and requesting such redemption) because the Corporation is required or ordered by

12

legislative, judicial or administrative action of the United States of America or the State or any agency, department or subdivision thereof to operate the facilities financed or refinanced by the Refunded Bonds in a manner inconsistent with the stated goals, purposes and policies of the Corporation, and such action is applicable to the Corporation because the Corporation is a party to the Loan Agreement.

The Bonds are also subject to extraordinary redemption in whole or in part on any date at the principal amount thereof plus accrued interest to the redemption date and without premium, if as a result of any changes in the State Constitution or the Constitution of the United States of America or legislative, judicial or administrative action of the United States of America or the State or any agency, department or subdivision thereof, (i) the Indenture or the Loan Agreement shall have become void or unenforceable or impossible of performance in accordance with the intention of the parties as expressed therein, or (ii) the interest on the Bonds shall no longer be excluded from the gross income of the owners thereof for federal income tax purposes.

The Bonds are also subject to extraordinary redemption in whole or in part on any date at the principal amount thereof plus accrued interest to the redemption date and without premium, in the event of damage, destruction, or condemnation of all or a portion of the projects financed or refinanced by the Refunded Bonds (the "Refunded Projects") after a determination by the Corporation (i) finding that the reasonable fair market value of the Refunded Projects damaged, destroyed or condemned is equal to or greater than 5% of the fair market value of all of the Properties of the Corporation and (ii) determining to apply all or a portion of any casualty loss or condemnation awards relating to such Refunded Projects to the redemption of the Bonds.

***Notice and Method of Redemption***.  At least 30 days before the redemption date of any Bonds, the Trustee shall cause a notice of any such redemption, signed by an authorized officer of the Trustee to be mailed, postage prepaid, to all Bondholders of record owning Bonds to be redeemed in whole or in part, at their addresses as they appear on the registration books of the Trustee, but any defect in such mailing of any such notice shall not affect the validity of the proceedings for such redemption.  Each such notice shall set forth the date fixed for redemption and the redemption price to be paid and, if less than all of the Bonds then outstanding shall be called for redemption, the numbers of such Bonds to be redeemed and, in the case of Bonds to be redeemed in part only, the portion of the principal amount thereof to be redeemed.  In case any Bond is to be redeemed in part only, the notice of redemption shall state also that on or after the redemption date, upon surrender of such Bond, a new Bond in principal amount equal to the unredeemed portion of such Bond will be issued.

On the date so designated for redemption, notice having been given in the manner and under the conditions provided in the Indenture and money for payment of the redemption price being held in the Debt Service Fund in trust for the owners of the Bonds or portions thereof to be redeemed, the Bonds so called for redemption shall become and be due and payable at the redemption price provided for redemption of such Bonds on such date, interest on the Bonds so called for redemption shall cease to accrue, such Bonds shall cease to be entitled to any benefit or security under the Indenture, and the owners of such Bonds shall not have rights in respect thereof except to receive payment of the redemption price thereof.

Bonds which have been duly called for redemption as described above, or with respect to which irrevocable instructions to call for redemption have been given to the Trustee in form satisfactory to it, and for the payment of the redemption price for which moneys, or Defeasance Obligations, shall be held by the Trustee in a segregated account in trust for the owners of the Bonds to be redeemed, shall not thereafter be deemed to be outstanding under the provisions of the Indenture and shall cease to be entitled to any security or benefit under the Indenture other than the right to receive payment from such moneys.

With respect to any notice of optional redemption of Bonds, unless upon the giving of such notice such Bonds or portions thereof shall be deemed to have been paid within the meaning hereof, such notice shall state that such redemption shall be conditioned upon the receipt by the Trustee on or prior to the date fixed for such redemption of moneys sufficient to pay the principal of, premium, if any, and interest on such Bonds or portions thereof to be redeemed, and that if such moneys shall not have been so received said notice shall be of no force and effect and the Authority shall not be required to redeem such Bonds or portions thereof. In the event that such notice of redemption contains such a condition and such moneys are not so received, the redemption shall not be made and the Trustee shall within five (5) days thereafter give notice, in the manner in which the notice of redemption was given, that such moneys were not so received.

## SECURITY FOR THE BONDS

### General

Under the Loan Agreement, the Corporation (a) unconditionally promises to make the required payments pursuant to the Loan Agreement and (b) covenants that the Loan Agreement shall remain in full force and effect until the Bonds and the interest thereon have been fully paid or otherwise provided for or discharged. The obligation of the Corporation to make payments under the Loan Agreement constitutes a general, unsecured obligation of the Corporation, payable from its gross revenues, its general fund or any other moneys legally available to the Corporation. There will not be a mortgage on or a security interest in any of the property of the Corporation or its revenues or other funds or assets.

The audited financial statements of the Corporation attached hereto as Appendix B are solely the audited financial statements of the Corporation's Administrative Offices and include the assets, liabilities, net assets, and financial activities of the Administrative Offices, but do not include the financial operations or assets of the individual parishes and their elementary schools or other church-related agencies and institutions within the Corporation's geographical boundaries, or the operations of the Corporation owned high schools or special needs schools. The audited financial statements also do not include the assets of the Corporation owned schools (except for certain limited amounts with respect thereto), and they do not include the fair market values of the churches, properties in the parishes, rectories, schools belonging to the Corporation, undeveloped land owned by the Corporation, or the Corporation's captive non-profit insurance company.

With respect to repayment of the Bonds, the Corporation alone (and not the separately incorporated individual parishes, schools or other church related agencies) will be liable to the Authority for payments due under the Loan Agreement, which are the source of payment of the principal, interest and premium, if any, of the Bonds. In addition, as noted herein, certain of the covenants which are based on the financial statements or include terms defined as being from the financial statements of the Corporation pertain only to the assets, liabilities, revenues and expenses of the Administrative Offices, and not to the assets, liabilities, revenues and expenses of the Corporation which are not included within the Administrative Offices. At the time of any payment of debt service on the Bonds, any and all revenues available to the Corporation would be required to be used to pay debt service on the Bonds. See "Information about Financial Statements" in Appendix A hereto and other information in Appendix A hereto with respect to the source and availability of Corporation revenues.

The Loan Agreement provides, among other things, that payments are to be made by the Corporation to the Trustee, for the account of the Authority, in aggregate amounts sufficient to pay when due the principal of, premium, if any, and interest on the Bonds, as well as certain other payments to the Authority and the Trustee required by the Loan Agreement and the Indenture. Such payments under the Loan Agreement, except for payments of the Authority's fees, costs, expenses and judgments and its

rights to indemnification and exculpation, will be assigned by the Authority to the Trustee pursuant to the Indenture. The Loan Agreement also provides that all covenants and agreements on the part of the Corporation and the Authority are to be for the benefit of the owners of the Bonds and that all rights of the Authority to receive payments from the Corporation under the Loan Agreement are to be assigned and pledged to the Trustee. For a more complete description of the security provisions contained in the Loan Agreement and in the Indenture, see "CERTAIN DEFINITIONS AND SUMMARY OF PRINCIPAL DOCUMENTS—SUMMARY OF CERTAIN PROVISIONS OF THE LOAN AGREEMENT" and "—SUMMARY OF CERTAIN PROVISIONS OF THE INDENTURE" in Appendix C hereto.

**Limited Obligation of the Authority**

**THE BONDS ARE LIMITED AND SPECIAL OBLIGATIONS OF THE AUTHORITY AND DO NOT CONSTITUTE OR CREATE AN OBLIGATION, GENERAL OR SPECIAL, DEBT, LIABILITY OR MORAL OBLIGATION OF THE STATE OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL OR STATUTORY PROVISIONS WHATSOEVER AND NEITHER THE FAITH OR CREDIT NOR THE TAXING POWER OF THE STATE OR OF ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR THE INTEREST ON THE BONDS. THE BONDS ARE NOT A GENERAL OBLIGATION OF THE AUTHORITY (WHICH HAS NO TAXING POWER AND RECEIVES NO FUNDS FROM ANY GOVERNMENTAL BODY) BUT ARE A LIMITED AND SPECIAL REVENUE OBLIGATION OF THE AUTHORITY PAYABLE SOLELY FROM THE INCOME, REVENUES AND RECEIPTS DERIVED OR TO BE DERIVED FROM PAYMENTS MADE PURSUANT TO THE LOAN AGREEMENT.**

**General Unsecured Obligation of the Corporation**

As described above, the obligation of the Corporation to make payments under the Loan Agreement constitutes a general, unsecured obligation of the Corporation, payable from its gross revenues, its general fund or any other moneys legally available to the Corporation. There will not be a mortgage on or a security interest in any of the property of the Corporation or its revenues or other funds or assets. There are not restrictions on the Corporation with respect to the use of its revenues, other than complying with the financial covenants described below relating to the assets, liabilities, revenues and expenses of the Administrative Offices.

**Negative Pledge and Restrictions on Transfer of Revenues and Properties**

In the Loan Agreement, the Corporation has covenanted that, so long as any of the Bonds remain outstanding, it shall not create or suffer to be created, except for Permitted Liens as defined in Appendix C hereto, and as otherwise described in this paragraph, any encumbrance, assignment, pledge, hypothecation or lien, on any Revenues or Properties (but only as to the Corporation's assets, including real and personal property, included in the Corporation's Statements of Financial Position under the heading "Total Assets" excluding custodial accounts (see Note 2(m) in the Corporation's audited financial statements in Appendix B hereto)). Notwithstanding the foregoing, the Corporation may create or suffer to be created an assignment, pledge, hypothecation or lien on any such Revenues or Properties, whether now owned or hereafter acquired, only if and so long as effective provision is made, in each instance and by the instrument creating such assignment, pledge, hypothecation or lien, whereby all Bonds issued and outstanding under the Indenture are directly secured thereby equally and ratably with the indebtedness to be issued or incurred under and secured by such assignment, pledge, hypothecation or lien. See also "CERTAIN DEFINITIONS AND SUMMARY OF PRINCIPAL DOCUMENTS" in Appendix C hereto.

The Corporation has also covenanted in the Loan Agreement not to sell, transfer or otherwise alienate its Revenues and Properties (but only as to the Corporation's assets, including real and personal property, included in the Corporation's Statements of Financial Position under the heading "Total Assets" excluding custodial accounts) to any other person or entity, but such restriction and the restrictions described in the prior paragraph do not extend to: (a) transfers of assets which, prior to the sale, lease or other disposition, have, or within the next succeeding two years are reasonably expected to, become inadequate, obsolete, worn out, unsuitable, unprofitable, undesirable or unnecessary and the sale, lease, removal or other disposition thereof will not impair the structural soundness, efficiency or economic value of the remaining operating assets of the Corporation, and the Trustee has received a certificate of the chief financial officer of the Corporation stating an opinion to such effect and stating that there has not been an Event of Default under the Loan Agreement (provided that no such certificate shall be required in the case of any such disposition of any assets not used to a significant degree in connection with the Corporation's operations); (b) sales or exchanges of assets held by the Corporation primarily for investment and not in connection with its mission and purpose activities (including property currently owned by the Corporation), provided that such sale or exchange is for the Fair Market Value of such assets and any cash proceeds of such sale are promptly reinvested by the Corporation or applied to the Corporation's activities; (c) budgeted expenditures of Revenues by the Corporation in connection with its mission and activities and otherwise in the ordinary course of business so long as the Corporation has determined that such expenditure will not adversely affect the ability of the Corporation to make its required loan repayments under the Loan Agreement and to make any payments on any other of its indebtedness when due; or (d) annual Net Extraordinary Expense expenditures made by the Corporation so long as such expenditure of Revenues shall not exceed 10% of the "Total Revenues, Gains, and Other Support" as shown on the Corporation's most recently audited financial statements and the Corporation has determined that such expenditures will not cause the Liquidity Covenant to fall below 1.25. See "Liquidity Covenant" below. The term "Net Extraordinary Expense" means a gift or grant, outside of the Corporation's Fiscal Year budget less Revenues that are reallocated to or raised specific for such gift or grant.

The Corporation is also subject to other on-going financial covenants under the Loan Agreement. See "Debt Service Coverage Ratio," "Liquidity Covenant" and "Net Worth Requirement" below.

The covenants summarized above do not apply to assets of the Corporation not constituting a part of the Administrative Offices and also would not prohibit the use of its revenues, including the revenues of the Administrative Offices, for operation of the high schools and special needs schools and other properties owned by the Corporation.

Most parishes and schools overseen by the Corporation are separate corporate entities, and as such, the provisions described in the prior paragraph would be applicable to sales, transfers or alienation of the Corporation's Revenues and Properties to such separate entities. Typically, the Corporation provides support for such separate entities through loans from its Deposit and Loan Fund. The Corporation takes deposits to its Deposit and Loan Fund from such entities, and pays interest on deposits made by such parishes, schools and other Archdiocesan institutions and makes loans to such entities at what the Corporation deems to be at fair market value terms. Deposits on which the Corporation is paying interest to the depositor are treated effectively as temporarily designated assets that the Corporation believes could (net of loans made with such funds in the Deposit and Loan Fund) be used to pay debt service on the Bonds. See "Deposit and Loan Fund" in Appendix A hereto.

**Debt Service Coverage Ratio**

Within 150 days after the end of the Fiscal Year, the Corporation will, concurrently with the delivery of its annual audited financial statements, calculate the Debt Service Coverage Ratio for such

Fiscal Year with respect to the Administrative Offices and shall provide the same to the Trustee. It shall constitute an Event of Default under the Loan Agreement if the Debt Service Coverage Ratio is less than 1.00 for two consecutive Fiscal Years. See "CERTAIN DEFINITIONS AND SUMMARY OF PRINCIPAL DOCUMENTS" in Appendix C hereto.

**Liquidity Covenant**

Under the Loan Agreement, the Corporation is required to maintain Unrestricted Cash and Investments (as accounted for in the financial statements for only the Administrative Offices) equal to at least the amount of the Liquidity Covenant. The Corporation shall calculate the Liquidity Covenant on a semiannual basis for each semiannual period ending June 30 and December 31 within 45 days after the end of each such period. The "Liquidity Covenant" is defined in the Loan Agreement as 1.10 times the amount of Total Debt. Total Debt includes all Indebtedness of the Corporation, whether fixed rate or variable rate, long-term and short-term, senior, parity or subordinate, and shall include all Guaranties; provided, however, that with respect to Guaranties, for purposes of the Liquidity Covenant so long as in the preceding one-year period from the date of calculation, no default shall have occurred and be continuing with respect to the indebtedness guaranteed and no demand for payment shall have been made under the Guaranty with respect to such indebtedness, then only 20% the principal amount of the debt guaranteed shall be included. It shall constitute an Event of Default under the Loan Agreement if this covenant is not met for two consecutive Fiscal Years. See "CERTAIN DEFINITIONS AND SUMMARY OF PRINCIPAL DOCUMENTS" in Appendix C hereto.

**Net Worth Covenant**

The Corporation will at all times maintain Total Financial Resources to Total Debt of at least 1:1. The Corporation will calculate compliance with this covenant on a semiannual basis for each semiannual period ending June 30 and December 31 within 45 days after the end of such period. It shall constitute an Event of Default under the Loan Agreement if this covenant is not met for two consecutive Fiscal Years. This covenant is based upon the assets and liabilities of the Administrative Offices. See "CERTAIN DEFINITIONS AND SUMMARY OF PRINCIPAL DOCUMENTS" in Appendix C hereto.

**Limitation on the Incurrence of**
**Additional Debt by the Corporation**

(i) No Long-Term Indebtedness may be incurred by the Corporation, including but not limited to Non-Recourse Indebtedness and Subordinated Indebtedness, unless the Debt Service Coverage Ratio, for the two most recent complete Fiscal Years immediately preceding the date of the proposed issuance of such Long-Term Indebtedness, after giving effect to the issuance of the proposed Long-Term Indebtedness, and the two Fiscal Years after the issuance of such debt after giving effect to the issuance of such proposed Long Term Indebtedness is at least 1.25 times the maximum Annual Debt Service Requirements on all senior debt of the Corporation and 1.10 times maximum Annual Debt Service Requirements on all senior and subordinate debt of the Corporation (see "CERTAIN DEFINITIONS AND SUMMARY OF PRINCIPAL DOCUMENTS" in Appendix C hereto for the definition of Annual Debt Service Requirements).

(ii) Notwithstanding (i) above, refunding debt may be incurred so long as (a) debt service on the refunding debt is, in each year, no greater than the debt service on the refunded debt, (b) the principal amount of the refunding debt does not exceed the principal amount of the refunded debt by 10% and (c) the final maturity of the refunding debt is no later than the final maturity of the refunded debt.

(iii)    Short-Term Indebtedness may not be incurred if the principal amount of such Indebtedness would exceed 10% of unrestricted revenues of the Corporation, excluding any non-operating extraordinary gain or loss of any non-operating assets released from restrictions for the immediately preceding Fiscal Year.

(iv)    The Corporation covenants that it shall not engage in speculative derivative transactions.

Upon the issuance of the Bonds and the concurrent defeasance of the Refunded Bonds, the Corporation will have no other material long-term indebtedness outstanding other than its obligations under the Loan Agreement and a Guaranty with respect to the Existing Senior SAG Debt as described below under "ANNUAL DEBT SERVICE REQUIREMENTS—Historical Net Income Available for Debt Service and Pro-Forma Debt Service Coverage Ratio" below and "Description of Indebtedness" in Appendix A hereto.

**Additional Bonds**

Upon compliance by the Corporation with respect to incurrence of any debt or obligation as provided and in compliance with the provisions of the Loan Agreement described above under "Limitation on the Incurrence of Additional Debt by the Corporation," Additional Bonds may be issued in one or more series by the Authority at the request of the Corporation under a supplement to the Indenture to pay or finance costs of projects authorized to be financed by the Authority so long as (a) no Event of Default under the Indenture has occurred and is then continuing, and the Authority shall have approved the issuance of such additional bonds; (b) there shall have been filed with the Trustee an opinion of an attorney or firm of attorneys generally recognized as having expertise in matters relating to municipal bonds to the effect that the exclusion from "gross income" for Federal income tax purposes of interest on the Bonds then outstanding under the Indenture shall not be adversely affected; and (c) the requirements of the Loan Agreement with regard to the issuance of additional debt shall have been satisfied.

Such series of Additional Bonds shall be appropriately designated, shall be dated, shall bear interest at a rate or rates not exceeding the maximum rate then permitted by law, shall be numbered, shall have the same requirement with respect to the Debt Service Reserve Fund as is the case for the Bonds, shall have such paying agents and shall have such maturities and redemption provisions, all as may be provided in the supplement to the Indenture or the separate indenture authorizing the issuance of such series of Additional Bonds.

Refunding Bonds may also be issued and secured by a supplement to the Indenture for the purpose of providing funds for the refunding of the Bonds and Additional Bonds upon compliance with the provisions of the Indenture described above.

Any supplemental Indenture providing for the issuance of Additional Bonds shall provide that the Debt Service Reserve Fund shall be required to be funded only to the extent required and on the same basis as described below for the Bonds under the caption "Debt Service Reserve Fund."

**Debt Service Reserve Fund**

While the Indenture establishes a Debt Service Reserve Fund, there will be no funding of or deposit to the Debt Service Reserve Fund when the Bonds are issued, and the Indenture requires funding in the future in an amount equal to the Debt Service Reserve Requirement only under the circumstances described below.  In addition, to the extent a deposit to the Debt Service Reserve Fund is subsequently

required and made, the Indenture and the Loan Agreement also permit the withdrawal of any deposited amount as described below.

If the amount calculated in connection with the Liquidity Covenant but solely with respect to senior debt of the Corporation is less than 1.00, then within 30 days after such calculations are certified by its auditors, the Corporation is required to deposit an amount equal to the Debt Service Reserve Requirement into the Debt Service Reserve Fund. Such deposit may not be satisfied by using the proceeds of any borrowing. The Debt Service Reserve Requirement means an amount equal to the lesser of (i) 10% of the original principal amount of the Bonds, (ii) 100% of the maximum Annual Debt Service Requirements or (iii) 125% of the average annual debt service on the Bonds and any Additional Bonds.

If the Debt Service Reserve Fund is funded as described above, and the Liquidity Covenant with respect to senior debt is continuously met (on a semiannual calculation basis on each June 30 and December 31) for any two consecutive Fiscal Years thereafter, the Corporation may withdraw the amount on deposit therein, subject to subsequent required deposits and withdrawals based upon the Liquidity Covenant requirements described above.

The Corporation may deliver to the Trustee an irrevocable letter of credit, surety bond, guarantee or policy of insurance which is equal to, or together with moneys on deposit therein, is equal to the Debt Service Reserve Fund Requirement, if such letter of credit, policy of insurance, surety bond or guarantee meets the requirements set forth in the Indenture.

The Debt Service Reserve Fund will be (i) used for the transfer to the Debt Service Fund for payment of interest on or principal of the Bonds (and any Additional Bonds), when due, at any time when there is not sufficient money in the Debt Service Fund for such purpose from any other source, (ii) transferred to the Debt Service Fund upon an acceleration of the maturity of the Bonds and any Additional Bonds, and (iii) transferred to the Debt Service Fund for payment of the last maturing payments of interest on or principal of the Bonds or Additional Bonds as the same become due and payable (or upon redemption of the Bonds and Additional Bonds in full).

Any amounts drawn from the Debt Service Reserve Fund until final payment or defeasance of the Bonds must be replenished within 12 months pursuant to the Loan Agreement.

**Provision for Payment**

Any Bonds shall be deemed to have been paid and discharged within the meaning of the Indenture if the Trustee, or an escrow agent, shall hold, in trust for and irrevocably committed thereto, cash or Defeasance Obligations (for a description of the obligations which constitute Defeasance Obligations, see the definition of Defeasance Obligations contained in Appendix C hereto), which are not subject to redemption at the option of the obligor prior to their maturity, of such maturities and interest payment dates and bearing such interest as will, without further investment or reinvestment of either the principal amount thereof or the interest earnings therefrom (likewise to be held in trust and committed, except as hereinafter provided), be sufficient for the payment of such Bonds, at their maturity or redemption date, of the principal thereof, together with the redemption premium, if any, and interest accrued to the date of maturity or redemption, as the case may be, or if default in such payment shall have occurred on such date then to the date of the tender of such payment; provided, that if any Bonds are to be redeemed prior to the maturity thereof, notice of such redemption shall have been duly given or provisions satisfactory to the Trustee shall have been duly made for the giving of such notice. Any moneys held in accordance with the provisions regarding the release of the Indenture shall be invested only in Defeasance Obligations the maturities or redemption dates and interest payment dates of which, at the option of the owner, shall coincide as nearly as practicable with, but not later than, the time or times at

19

which said moneys will be required for the aforesaid purposes. Any income or interest earned by the Defeasance Obligations held under this paragraph shall, as determined by the Escrow Trustee, to the extent not required for the purposes of this paragraph, be paid to the Corporation as overpayment of Payments.

## ANNUAL DEBT SERVICE REQUIREMENTS

The following table sets forth, for each bond year ending July 1, the amount required for the payment of principal, at stated maturity or by mandatory sinking fund redemption, and interest on the Bonds.

| Bond Year Ended July 1 | Principal | Interest | Total Debt Service Requirements |
|---|---|---|---|
| 2017 | $ 1,350,000.00 | $ 487,239.27 | $ 1,837,239.27 |
| 2018 | 1,255,000.00 | 1,989,162.50 | 3,244,162.50 |
| 2019 | 1,320,000.00 | 1,926,412.50 | 3,246,412.50 |
| 2020 | 1,385,000.00 | 1,860,412.50 | 3,245,412.50 |
| 2021 | 1,415,000.00 | 1,829,250.00 | 3,244,250.00 |
| 2022 | 1,485,000.00 | 1,758,500.00 | 3,243,500.00 |
| 2023 | 1,560,000.00 | 1,684,250.00 | 3,244,250.00 |
| 2024 | 1,640,000.00 | 1,606,250.00 | 3,246,250.00 |
| 2025 | 1,720,000.00 | 1,524,250.00 | 3,244,250.00 |
| 2026 | 1,805,000.00 | 1,438,250.00 | 3,243,250.00 |
| 2027 | 1,900,000.00 | 1,348,000.00 | 3,248,000.00 |
| 2028 | 1,995,000.00 | 1,253,000.00 | 3,248,000.00 |
| 2029 | 2,090,000.00 | 1,153,250.00 | 3,243,250.00 |
| 2030 | 2,195,000.00 | 1,048,750.00 | 3,243,750.00 |
| 2031 | 2,305,000.00 | 939,000.00 | 3,244,000.00 |
| 2032 | 2,420,000.00 | 823,750.00 | 3,243,750.00 |
| 2033 | 2,545,000.00 | 702,750.00 | 3,247,750.00 |
| 2034 | 2,670,000.00 | 575,500.00 | 3,245,500.00 |
| 2035 | 2,805,000.00 | 442,000.00 | 3,247,000.00 |
| 2036 | 2,945,000.00 | 301,750.00 | 3,246,750.00 |
| 2037 | 3,090,000.00 | 154,500.00 | 3,244,500.00 |
| Total | $41,895,000.00 | $24,846,226.77 | $66,741,226.77 |

_____
Source: The Underwriters

**Historical Net Income Available for Debt Service
and Pro-Forma Debt Service Coverage Ratio**

The table below shows the Net Income Available for Debt Service for the Corporation for each of the four fiscal years ended June 30, 2013 through June 30, 2016 and the pro-forma Debt Service Coverage Ratio on the Bonds for those periods based on the maximum Annual Debt Service Requirements on the Bonds. It also shows the actual Debt Service Coverage Ratio on the Refunded Bonds for those four fiscal years.

20

The table also shows such pro-forma coverage taking into account a guarantee by the Corporation (the "SAG Guaranty") of certain indebtedness of St. Anthony's Garden ("SAG"), a non-profit affiliate of the Corporation, with respect to certain of its indebtedness incurred for its St. Anthony's Garden project (the "SAG Debt"). The SAG Debt was incurred by SAG for the purpose of developing a rental fee-for-service senior living retirement community (the "SAG Project") located in St. Tammany Parish, Louisiana near New Orleans. The SAG Project is complete and consists of 213 units, including 120 independent living units, 57 assisted living units and 36 memory care units. Occupancy commenced in late November of 2016, and stabilization is expected by the end of 2018. As of February 9, 2017, SAG had 36 units under lease, of which 18 were for independent living, 16 were for assisted living and two were for memory care. In addition, SAG had deposits for an additional 31 units as of February 9, 2017, of which 19 were for independent living, 11 were for assisted living and one was for memory care. Currently, the Corporation has guaranteed 100% of the senior SAG Debt (referred to herein as the "Existing Senior SAG Debt") ($40,521,000), which guarantee is subject to certain reductions. So long as no default has occurred and is continuing on the Existing Senior SAG Debt, only 20% of the Existing Senior SAG Debt will be computed as "Indebtedness" for purposes of the Corporation's financial covenants contained in the Loan Agreement. SAG is exploring a refinancing of the Existing Senior SAG Debt, but there can be no assurance that such refinancing will be accomplished and the Corporation may guarantee any such refinancing debt. If the Corporation's guarantee with respect to the Existing SAG Guaranteed Debt is called upon, the obligation of the Corporation thereunder is a general unsecured obligation, and, like payments required of the Corporation under the Loan Agreement, the Corporation would have available to it use of any and all unencumbered revenues and assets of the Corporation. See "Description of Indebtedness" in Appendix A for further information with respect to the SAG Guaranty.

The pro-forma coverage table is based on certain assumptions set forth in the footnotes below. **However, past operating history is not necessarily indicative of future results.**

Pursuant to the Loan Agreement, "Debt Service Coverage Ratio" means, for any Fiscal Year, the ratio for such Fiscal Year of (x) Net Income Available for Debt Service to (y) Annual Debt Service Requirements due in such Fiscal Year.

Pursuant to the Loan Agreement, "Net Income Available for Debt Service" means, for each Fiscal Year, "Increase (Decrease) in Net Assets" plus "Interest Expense" and "Interest expense – Deposit and Loan Fund", each as shown on the Corporation's Statement of Activities, plus "Depreciation and amortization" as shown on the Corporation's Statement of Cash Flows, less "Total non-operating revenues (expenses) – net" as shown on the Corporation's Statement of Activities, as collectively calculated in the manner set forth in the Loan Agreement, and incorporating FASB ASC 715 pension expense in accordance with Generally Accepted Accounting Principles during such Fiscal Year then ended (all based upon the financial statements of the Corporation's Administrative Offices). Solely for the purposes of calculating Net Income Available for Debt Service, it shall be assumed that the Corporation's spending policy limits will be applied to the Corporation's available cash and investments, subject to the restrictions set forth in the Loan Agreement (see "SUMMARY OF CERTAIN PROVISIONS OF THE LOAN AGREEMENT-Spending Policy" in Appendix C to this Official Statement), and will be added to the Increase (Decrease) in Net Assets to compute Net Income Available for Debt Service. All such capitalized terms used in this definition and not defined elsewhere in the Loan Agreement shall have the meaning given by Generally Accepted Accounting Principles.

Pursuant to the Loan Agreement, "Annual Debt Service Requirements" means, for each Fiscal Year, as of any particular date of calculation the amount required to pay the sum of (a) the interest on such Long-Term Indebtedness payable during such Fiscal Year, and (b) the principal of and any amount required to effect any mandatory redemption of such Long Term Indebtedness, if any, during such Fiscal Year, less any amount of such interest or principal for the payment of which moneys or investment

obligations the principal of and interest on which when due will provide for such payment, are held in trust (including defeased obligations, capitalized interest and debt service reserve funds) and including all amounts due under any capitalized leases and any guarantees of at least one year in duration.   The definition allows for certain assumptions and adjustments with respect to variable rate indebtedness, guaranties and balloon indebtedness.

## Net Income Available for Debt Service and Pro-Forma Debt Service Coverage

| | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Increase(Decrease) in Net Assets | $ 9,301,795 | $20,504,094 | $ 4,490,417 | $(19,046,626) |
| Subtract Non-Operating Revenues[1] | (18,847,271) | (28,722,201) | (14,239,850) | -- |
| Add Non-Operating Expense[1] | -- | -- | -- | 9,114,880 |
| Plus: Depreciation/Amortization | 1,309,087 | 1,396,546 | 1,631,599 | 2,163,638 |
| Plus: Interest Expense & interest expense - Deposit & Loan Fund | 4,030,534 | 4,160,562 | 4,054,683 | 3,983,772 |
| Plus: Pension Expense Actuarial Adjustment [2] | 2,235,337 | 2,131,444 | 2,027,609 | 1,324,742 |
| Plus: Annual Available Distribution at 5% [3] | 7,883,622 | 8,001,831 | 8,341,194 | 8,207,327 |
| Net Income Available for Debt Service | $ 5,913,098 | $ 7,472,276 | $ 6,305,652 | $ 5,747,733 |
| | | | | |
| Actual Debt Service on Refunded Bonds | $4,303,275 | $4,307,025 | $4,307,275 | $4,309,025 |
| Actual Debt Service Coverage on Refunded Bonds | 1.37x | 1.74x | 1.46x | 1.33x |
| | | | | |
| Maximum Annual Debt Service on Bonds[4] | $3,248,000 | $3,248,000 | $3,248,000 | $3,248,000 |
| Pro Forma Debt Service Coverage on Bonds | 1.82x | 2.30x | 1.94x | 1.77x |
| | | | | |
| Maximum Annual Debt Service on Bonds plus only 20% of that portion of Existing Senior SAG Debt assuming fully performing[4,5] | $3,747,358 | $3,747,358 | $3,747,358 | $3,747,358 |
| | | | | |
| Pro Forma Debt Service Coverage on Bonds plus 20% of that portion of Existing Senior SAG Debt assuming fully performing | 1.59x | 1.99x | 1.68x | 1.53x |
| | | | | |
| Maximum Annual Debt Service on Bonds plus 100% of Existing Senior SAG Debt assuming non-performing[4,5] | $5,751,140 | $5,751,140 | $5,751,140 | $5,751,140 |
| | | | | |
| Pro Forma Debt Service Coverage on Bonds plus 100% of Existing Senior SAG Debt assuming non-performing | 1.03x | 1.30x | 1.11x | 1.00x |

---

[1, 2, 3] The calculation of each of these components of "Net Income Available for Debt Service" is shown with the corresponding number in the table entitled Component Calculations of Certain Items Included in "Net Income Available For Debt Service" For Pro-Forma Debt Service Coverage set forth in Appendix A hereto.

[4] Maximum Annual Debt Service is calculated as provided in the Loan Agreement, including without limitation adjustments for treatment of balloon payments and guarantee indebtedness.

[5] See above and "Description of Indebtedness" in Appendix A for a description of Existing Senior SAG Debt; and, based on the definition of Annual Debt Service Requirements in the Loan Agreement, assumes that only 20% of that will be included in the calculation so long as that debt is performing on its own or if that is not the case 100% of the Existing Senior SAG Debt must be included.

Source:  The Corporation

# INVESTMENT CONSIDERATIONS

## General

The Bonds are payable from payments to be made by the Corporation under the Loan Agreement. The ability of the Corporation to comply with its obligations under the Loan Agreement depends primarily upon the ability of the Corporation to obtain sufficient revenues from the operation of the Corporation and related activities and to maintain sufficient creditworthiness.   There are a number of factors affecting institutions in general, including the Corporation, that could have an adverse effect on the Corporation's financial position and its ability to make the payments required under the Loan

22

Agreement. These factors include, but are not limited to, the continuing rising costs of providing services; any decline in the number of persons in the region; the level of confidence in and support of the Corporation; economic developments in the area and competition from other institutions in the area; the failure to maintain or increase in the future the funds obtained by the Corporation from other sources, including gifts and contributions from donors, grants or appropriations from governmental bodies and income from investment of endowment funds; adverse results from the investment of endowment funds; imposition of federal or State unrelated business income or local property taxes; increasing costs of compliance with federal or State regulatory laws or regulations, including, without limitation, laws or regulations concerning environmental quality, work safety and accommodating the handicapped; changes in federal governmental policy relating to the reimbursement of overhead costs of government contracts; any unionization of the Corporation's work force with consequent impact on wage scales and operating costs of the Corporation; and legislation or regulations which may affect other program funding. The Corporation cannot assess or predict the ultimate effect of these factors on its operations or financial results of operations. Some of the possible changes in future conditions and other risks are discussed below, but this discussion of risk factors is not, and is not intended to be, exhaustive and should be read in conjunction with Appendix A hereto.

**Limited Obligations of the Authority;
General Obligations of the Corporation**

The Bonds are special and limited obligations of the Authority. They are secured by and payable solely from funds payable by the Corporation under the terms and conditions of the Loan Agreement and as otherwise described herein. The obligations of the Corporation under the Loan Agreement are the general obligations of the Corporation and the full faith and credit of the Corporation are pledged to the payment of the Corporation's obligations under the Loan Agreement. While the Corporation believes, based on present circumstances, that it will generate sufficient revenues and will be able to manage its expenses in a manner that will allow it to meet its obligations under the Loan Agreement, the basis of the assumptions utilized by the Corporation to formulate this belief may change. There will not be a mortgage on or a security interest in any of the movable or immovable property of the Corporation with respect to the Bonds.

**Impact of Adverse Climate and Weather Events on the Corporation**

The State of Louisiana has experienced a significant number of extremely catastrophic and damaging weather events as a function of its location and generally low-elevation terrain. These have included over the years, hurricanes, such as the massive devastation done by Hurricane Katrina in 2005, flooding (such as the significant and damaging flooding recently occurring in the Baton Rouge area), tornadoes and the consequences related to or which can result from such events. Properties and operations of the Corporation, including schools and churches, have been affected by these events in the past, and will likely be significantly affected by these events from time to time in the future.

**Dependence Upon Contributions
and Other Income Sources**

The Corporation is dependent upon income sources including assessment and fee income, donations and grants, investment returns, rent and royalties, Archdiocesan support and other sources. There can be no assurance that contributions or revenues will continue at levels sufficient to meet the financial requirements of the Corporation.

Various factors could affect individuals' continued contributions. For example, a change in marginal income tax rates or conversion to a flat tax could reduce or eliminate the tax advantages of

charitable contributions for many taxpayers. Donations of stock and other appreciated property may result in tax liability under the Code's alternative minimum tax provisions, thereby discouraging contributions of such property. Such factors may adversely affect contributions to organizations such as the Corporation.

**Tax Exemption for Nonprofit Organizations**

The tax-exempt status of nonprofit corporations, and the exclusion of income earned by them from taxation, has been the subject of review by various federal, state and local legislative, regulatory and judicial bodies. This review has included proposals to broaden and strengthen existing federal tax law with respect to unrelated business income of nonprofit corporations.

In addition to the foregoing proposals with respect to income by nonprofit corporations, various state and local governmental bodies in certain parts of the country have challenged the tax-exempt status of such institutions and have sought to remove the exemption of property from real estate taxes of part or all of the property of various nonprofit institutions. Several of these disputes have been determined in favor of the taxing authorities or have resulted in settlements. See "Dependence Upon Tax-Exempt Status" below.

**Consequences of Changes in Tax-Exempt Status of the Corporation**

By virtue of letters from the Internal Revenue Service, the Corporation has been determined to be an exempt organization as described in Section 501(c)(3) of the Code and is not classified as a "private foundation." To maintain its tax-exempt status and to avoid treatment as a private foundation, the Corporation is subject to a number of requirements affecting its operations. In a series of recent actions, the Internal Revenue Service has stepped up its audit and scrutiny of 501(c)(3) organizations in general and their use of tax-exempt financing in particular. The possible modification or repeal of certain existing federal income tax laws, the change of Internal Revenue Service policies, the change of the method of operations, purposes or character of the Corporation, or other factors could result in the loss by the Corporation of its status as an exempt organization under Section 501(c)(3) of the Code.

The Internal Revenue Service recently announced an enhanced audit program for tax-exempt organizations. Although the Corporation employs reasonable efforts to operate its programs consistently within its interpretation of tax requirements, a future audit could discover areas in which the Internal Revenue Service may impose unrelated business income taxes or require changes in the Corporation's operations, perhaps combined with payments as a condition to any closing agreement which might be proposed by the Internal Revenue Service as a consequence of an audit. In the case of a serious departure from the Corporation's nonprofit mission, the Internal Revenue Service has the right to remove the Corporation's status as an exempt organization under Section 501(c)(3) of the Code.

The Corporation is generally not subject to income and property tax. This treatment affects the revenues available to the Corporation to meet financial obligations, including the payment of principal of and interest on the Bonds. While the Corporation has covenanted in the Loan Agreement to maintain its tax-exempt status with respect to the Bonds, there can be no assurance that this tax-exempt status will continue.

In past legislative sessions, the State Legislature has presented bills for consideration which would have removed State tax exemptions for certain nonprofit corporations, including, without limitation, their present exemption from payment of State income taxes and local property taxes. Removal of such tax exemptions would have required an amendment to the Constitution of the State,

which amendment would require a two thirds vote of the Legislature and a majority vote of the voters of the State. Loss of the Corporation's tax exemptions in the State would have an adverse effect upon the financial condition of the Corporation. To date, such bills have not been enacted into law. However, no assurances can be given that similar legislation will not be introduced and enacted in the future and there can be no assurance that future changes in the laws and regulations of the federal, State or local governments will not materially and adversely affect the operations and revenues of the Corporation.

**Intermediate Sanctions**

Revocation of tax-exempt status is rarely imposed on tax-exempt organizations, but is an available sanction for conduct inconsistent with exempt status. In addition, the Internal Revenue Service can use the threat of revocation of tax-exempt status to impose closing agreements on tax-exempt entities that require substantial payments by those entities to the Internal Revenue Service, and such a closing agreement could have a material effect on such an entity's ability to meet its financial obligations.

The Taxpayer Bill of Rights 2 (H.R. 2337) was signed into law on July 30, 1996. This legislation provides for intermediate sanctions on "disqualified persons" who participate in "excess benefit transactions" with organizations that are tax-exempt under Section 501(c)(3) or Section 501(c)(4) of the Code, and on organization managers who participate in the transactions. "Disqualified persons" are those "in a position to exercise substantial influence over the affairs of the organization."

The legislation provides for first tier penalty excise taxes of 25% of the excess benefit (i.e., the amount of inurement) on disqualified persons and of 10% (subject to a $10,000 per transaction limit) on organization managers. If the excess benefit transaction is not corrected within a specified period, the legislation provides for a second tier tax on the disqualified person of 200% of the excess benefit.

The Committee Report for H.R. 2337 states that, while the intermediate sanctions may be imposed in lieu of or in addition to revocation of the organization's exempt status, they are generally the sole sanction imposed in cases in which the excess benefit does not rise to a level calling into question whether the organization functions as a charitable or other tax-exempt organization. It is unclear whether this language will cause the Internal Revenue Service to be less willing to pursue revocation of exempt status or will result in a reduction in the use of closing agreements in cases involving private inurement. The Internal Revenue Service may view the existence of intermediate sanctions as having no relevance to the appropriateness of revocation or closing agreements in lieu of revocation in cases involving conduct that is not subject to those sanctions, such as more than insubstantial private benefit or illegal activity. Further, because intermediate sanctions provide the Internal Revenue Service with a penalty for private inurement that is less severe than revocation of exempt status, the new legislation is likely to result in an increase in Internal Revenue Service activity to combat perceived private inurement.

**Covenant to Maintain Tax-Exempt Status of the Bonds**

The excludability from gross income for federal income taxation purposes of the interest on the Bonds is based on the continuing compliance by the Corporation and the Authority with certain covenants contained in the Indenture, the Loan Agreement and the Tax Regulatory Agreement. These covenants relate generally to restrictions on the use of the facilities financed or refinanced with proceeds of the Bonds, arbitrage limitations, continuation of the Corporation's 501(c)(3) status and rebate of certain excess investment earnings, if any, to the federal government. Failure to comply with such covenants could cause interest on the Bonds to become subject to federal income taxation retroactive to the date of issuance of the Bonds. See "TAX EXEMPTION" herein.

**Risk of Possible Adverse Ruling Under the First Amendment
to the United States Constitution and the Louisiana Constitution**

The "Establishment Clause" of the First Amendment to the United States Constitution has been interpreted to restrict public financial assistance to certain sectarian institutions generally referred to as pervasively sectarian institutions.  The Louisiana Constitution also contains similar provisions.  The United States Supreme Court has not directly addressed the question or whether the Establishment Clause restricts the lending to pervasively sectarian institutions of the proceeds of a tax-exempt or taxable bond issue involving no expenditure of public funds.  Also, the Louisiana Supreme Court has not addressed the question of whether the Louisiana Constitution prohibits the financing by a state political subdivision on behalf of a sectarian institution or the financing of a project involving a sectarian facility if such financing is accomplished with the proceeds of a tax-exempt or taxable bond issue involving no expenditure of public funds.  However, Bond Counsel is of the opinion that the Bonds are valid, based upon the analysis of existing United States Supreme Court and lower court precedent in cases involving the Establishment Clause in various other contexts and upon the analysis of existing Louisiana and lower court precedent in cases involving the Louisiana Constitution in various other contexts.

If a court were to find the issuance of the bonds and the use of the proceeds to finance the Refunding Project described in this Official Statement unconstitutional under the federal or Louisiana Constitution, and if such an adverse decision were to become final, the Bonds could be declared unenforceable or void.  Such an adverse decision could become final if the Corporation does not appeal the adverse decision or if the Corporation were unsuccessful upon appeal because the adverse decision is upheld by the United States or Louisiana Supreme Court or because the United States or Louisiana Supreme Court declined to review the adverse ruling or such review is not sought.  In the event of a final adverse decision, any interest paid on the Bonds could become includable in gross income for federal and state income tax purposes.

The Authority is not obligated to appeal an adverse ruling with respect to the Bonds or any determination that the interest paid on the Bonds is includable in gross income for federal or state tax purposes.

**Implications of the Code of Canon Law**

The Corporation was formed under Louisiana applicable laws and generally operates and is bound by such laws.  The Corporation is also required to comply with the provisions of the Code of Canon Law for the Church in carrying out its mission and in conducting its business affairs.  See "Canon Law" in Appendix A hereto.  Remedies under the Loan Agreement may be limited by Canon Law.  No assurances can be given that Canon Law will not be changed in the future by the Holy See in a manner that may affect or delay the enforcement of remedies under the Loan Agreement.  For further information on the entities that advise the Corporation on certain policies and procedures, see "THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS—Archdiocesan Councils" in Appendix A hereto.

**Personal Misconduct Litigation**

An adverse outcome of personal misconduct litigation could materially impact the financial condition of the Corporation.  The Corporation is currently reserving funds with respect to these cases.  No assurance can be given that such reserves will be adequate.  See "Litigation and Contingencies" in Appendix A.

**Future Capital Expenditures**

The Corporation does not presently have any plans for making material capital expenditures.  In the future, to the extent a borrowing would be required for any such capital improvements, the Loan Agreement contains financial covenants that would have to be met in order to incur additional debt.  See "SECURITY FOR THE BONDS—Additional Bonds" and "—Limitation on the Incurrence of Additional Debt by the Corporation" herein.

**Difficulties in Enforcing Remedies**

The remedies available to the Trustee or the owners of the Bonds upon an event of default under the Indenture or the Loan Agreement are in many respects dependent upon judicial actions which are often subject to discretion and delay.   Under existing constitutional and statutory law and judicial decisions, including specifically the United States Bankruptcy Code, 11 U.S.C. §10 et seq. (the "Bankruptcy Code"), the remedies provided in the Indenture and the Loan Agreement may not be readily available or may be limited.  The various legal opinions delivered concurrently with the delivery of the Bonds will be qualified as to the enforceability of the various legal instruments by limitations imposed by general principles of equity and by bankruptcy, reorganization, insolvency or other similar laws affecting the rights of creditors generally.

The churches, schools and facilities of the Corporation have limited utility for purposes other than the operation of the Corporation.  As a result, in the event of a default and any resulting judgment and sale of any of said facilities, the Trustee's remedies and the number of entities which could purchase or lease the same would be limited, and the sales price or rentals generated thereby might thus be affected.  The obligations of the Corporation under the Loan Agreement are not secured by a mortgage or any other interest in the Corporation's property and are on a parity with other existing obligations of the Corporation and may be secured on a parity with future obligations of the Corporation so that any proceeds that might be derived from the exercise of remedies would be required to be shared among the owners of the Bonds and the holders of any parity indebtedness.

**Potential Effects of Bankruptcy**

If the Corporation were to file a petition for relief (or if a petition were filed against the Corporation) under the Bankruptcy Code, the filing would operate as an automatic stay of the commencement or continuation of any judicial or other proceeding against the Corporation and its property.  If the bankruptcy court so ordered, the Corporation's property, including its revenues, could be used for the benefit of the Corporation despite the claims of its creditors, including the Trustee and the Assignee.

In a bankruptcy proceeding, the Corporation could file a plan for the adjustment of its debts which modifies the rights of creditors generally or the rights of any class of creditors, secured or unsecured (including registered owners of the Bonds).  The plan, when confirmed by the court, binds all creditors who had notice or knowledge of the plan and discharges all claims against the debtor provided for in the plan.  No plan may be confirmed unless, among other conditions, the plan is in the best interest of creditors, is feasible and has been accepted by each class of creditors impaired thereunder.  Each class of creditors has accepted the plan if at least two thirds in dollar amount and more than one half in number of the allowed claims of the class that are voted with respect to the plan are cast in its favor.  Even if the plan is not so accepted, it may be confirmed if the court finds that the plan is fair and equitable with respect to each class of non accepting creditors impaired thereunder and does not discriminate unfairly.

The assets of the Corporation's parishes and the schools are not available to the Corporation or its creditors if the Corporation were to file a petition for relief (or if a petition were filed against the Corporation) under the Bankruptcy Code.

**Financial Information**

Certain financial information of the Corporation is set forth in Appendices A and B hereto. There can be no assurance that the financial results achieved by the Corporation in the future will be similar to historical results. Such future results will vary from historical results and actual variations may be material. Therefore, the historical operating results of the Corporation cannot be taken as a representation that the Corporation will be able to generate sufficient revenues in the future to make payments under the Loan Agreement sufficient for the full and timely payment of the principal of, premium, if any, and interest on the Bonds.

**Environmental Regulation**

The Corporation is subject to various federal, State and local laws and regulations governing health and the environment. In general, these laws and regulations could result in liability to the Corporation for remediating adverse environmental conditions on or relating to the Corporation's churches, schools and facilities, whether arising from preexisting conditions or conditions arising as a result of the activities conducted in connection with the ownership and operation of the Corporation's churches, schools and facilities. Costs incurred by the Corporation with respect to environmental remediation or liability could adversely impact its financial condition and its ability to own and operate its facility and its ability to produce revenues.

**Other Factors**

Other factors may also affect the operation of the Corporation and affect its ability to maintain sufficient operating margins. These factors include: (a) changes in the cost and availability of energy; (b) changes in the cost and availability of insurance, such as fire and general comprehensive liability, that institutions of a similar size and type generally carry; (c) occurrence of uninsured acts of God; and (d) an increase in the rate of inflation, combined with difficulties in increasing tuition, fees and charges while maintaining the quantity and quality of churches, schools, facilities and services.

**Secondary Market**

There is no guarantee that a secondary trading market will develop for the Bonds. Consequently, prospective Bond purchasers should be prepared to hold their Bonds to maturity or prior redemption. Subject to applicable securities laws and prevailing market conditions, the Underwriters intend, but are not obligated, to make a market in the Bonds.

**Failure To Provide Ongoing Disclosure**

The Corporation has entered into the Undertaking pursuant to the Rule (as such terms are defined herein). Failure to comply with the Undertaking and the Rule may adversely affect the transferability and liquidity of the Bonds and their market price. See "CONTINUING DISCLOSURE" herein.

**Book-Entry**

Persons who purchase Bonds through DTC Participants become creditors of the DTC Participant with respect to the Bonds. Records of the investors' holdings are maintained only by the DTC Participant

and the investor.  In the event of the insolvency of the DTC Participant, the investor would be required to look to the DTC Participant's estate and to any insurance maintained by the DTC Participant, to make good the investor's loss.  Neither the Authority, the Corporation, the Trustee nor the Underwriters are responsible for failures to act by, or insolvencies of, the Securities Depository or any DTC Participant. See "THE BONDS—Book-Entry Only System" herein.

### Risk of Loss From Nonpresentment Upon Redemption

The rights of the registered owners of the Bonds to receive interest will terminate on the date, if any, on which the Bonds are to be redeemed pursuant to a call for redemption, notice of which has been given under the terms of the Indenture.

## TAX EXEMPTION

### Federal and State Tax Exemption

In the opinion of Bond Counsel, interest on the Bonds (including any original issue discount) is excluded from the gross income of the owners thereof for federal income tax purposes under existing law.

Bond Counsel is further of the opinion that, pursuant to the Refunding Act, the Bonds and the income thereof are exempt from all taxation by the State or any political subdivision thereof.

### Alternative Minimum Tax Considerations

Except as described in this paragraph, interest on the Bonds will not be an item of tax preference for purposes of the alternative minimum tax on individuals and corporations.  The Code, however, imposes a 20% alternative minimum tax on the "alternative minimum taxable income" of a corporation, if the amount of such alternative minimum tax is greater than the amount of the corporation's regular income tax.  Generally, a corporation's alternative minimum taxable income will include 75% of the amount by which a corporation's "adjusted current earnings" exceed a corporation's alternative minimum taxable income.  Because interest on tax-exempt obligations is included in a corporation's "adjusted current earnings," ownership of the Bonds could subject a corporation to alternative minimum tax consequences.

### Tax Compliance

The Code imposes a number of requirements that must be satisfied for interest on state and local obligations to be excludable from gross income for federal income tax purposes.  These requirements include limitations on the use of bond proceeds and the source of repayment of bonds, limitations on the investment of bond proceeds prior to expenditure, a requirement that excess arbitrage earned on the investment of certain bond proceeds be paid periodically to the United States of America, except under certain circumstances, and a requirement that information reports be filed with the Internal Revenue Service.  The Authority and the Corporation have covenanted that they will, to the extent permitted by the laws of the State, comply with the requirements of the Code in order to maintain the exclusion from gross income of interest on the Bonds for federal income tax purposes.

The opinion of Bond Counsel will assume continuing compliance with the covenants of the Authority and the Corporation pertaining to those sections of the Code which affect the exclusion from gross income of interest on the Bonds for federal income tax purposes and, in addition, will rely on representations by the Corporation with respect to matters solely within the knowledge of the Corporation which Bond Counsel has not independently verified.  If the Corporation or the Authority should fail to

comply with their covenants or if the foregoing representations should be determined to be inaccurate or incomplete, interest on the Bonds could become taxable from the date of issuance of the Bonds, regardless of the date on which the event causing such taxation occurs. Bond Counsel has not undertaken to determine (or to inform any person) whether any action taken (or not taken) or events occurring (or not occurring) after the date of issuance of the Bonds may affect the tax status of interest on the Bonds.

Except as stated above, Bond Counsel will express no opinion as to any federal, state or local tax consequences resulting from the ownership of, receipt of interest on or disposition of the Bonds. However, owners of the Bonds should be aware that the ownership of tax-exempt obligations may result in collateral federal income tax consequences to financial institutions, property and casualty insurance companies, individual recipients of Social Security or Railroad Retirement benefits, corporations with Subchapter S earnings and profits and passive investment income that exceed 25% of their gross receipts and taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations. In addition, certain foreign corporations doing business in the United States may be subject to a "branch profits tax" on their effectively connected earnings and profits. These categories of owners should consult their own tax advisors as to the applicability of these consequences.

**Tax Treatment of Original Issue Premium**

All of the Bonds (referred to in this paragraph as "Premium Bonds") are offered and sold to the public at a premium. The premium is the excess of the issue price over the stated redemption price at maturity and must be amortized on an actuarial basis by the owner of the Premium Bonds from the date of acquisition of the Premium Bonds through the maturity date thereof. The premium is not deductible for federal income tax purposes, and owners of the Premium Bonds are required to reduce their basis in the Premium Bonds by the amount of premium that accrued while they owned such Premium Bonds. Owners of the Premium Bonds (including owners that purchase a Premium Bond other than pursuant to the initial public offering) should consult their own tax advisors as to the determination for federal income tax purposes of the amount of premium amortized each year with respect to the Premium Bonds, the adjusted basis of the Premium Bonds for purposes of determining the taxable gain or loss upon the sale or other disposition of the Premium Bonds (prior to maturity and at maturity) and all other federal tax consequences and any state and local tax aspects of owning the Premium Bonds.

**Potential Tax Law Changes**

During recent years, legislative proposals have been introduced in Congress, and in some cases enacted, that altered certain federal tax consequences resulting from the ownership of obligations that are similar to the Bonds. In some cases, these proposals have contained provisions that altered these consequences on a retroactive basis. Such alteration of federal tax consequences may have affected the market value of obligations similar to the Bonds. From time to time, legislative proposals are pending which could have an effect on both the federal tax consequences resulting from ownership of the Bonds and their market value. No assurance can be given that legislative proposals will not be enacted that would apply to, or have an adverse effect upon, the Bonds. For example, in connection with federal deficit reduction, job creation and tax law reform efforts, proposals have been and others are likely to be made that could significantly reduce the benefit of, or otherwise affect, the exclusion from gross income of interest on obligations like the Bonds. There can be no assurance that any such legislation or proposal will be enacted, and if enacted, what form it may take. The introduction or enactment of any such legislative proposals may affect, perhaps significantly, the market price for, or marketability of, the Bonds. Prospective purchasers of the Bonds should consult their own tax advisors as to the tax consequences of owning the Bonds in their particular state or local jurisdiction and regarding any pending or proposed federal or state tax legislation, regulations or litigation, as to which Bond Counsel expresses no opinion.

## LEGAL MATTERS

The issuance of the Bonds is subject to the approval of legality by Foley & Judell, L.L.P., New Orleans, Louisiana, Bond Counsel. The proposed form of such approving opinion is attached hereto as Appendix D. Certain legal matters will be passed upon for the Authority by Jacob S. Capraro, Esq., New Orleans, Louisiana, Special Counsel to the Authority, for the Trustee by Gregory A. Pletsch & Associates, Baton Rouge, Louisiana, for the Corporation by Chaffe McCall, L.L.P., New Orleans, Louisiana, and for the Underwriters by Kutak Rock LLP.

## RATINGS

Fitch, Inc. and Moody's Investors Service have assigned ratings of "A-" and "Baa1," respectively, to the Bonds. Such ratings reflect only the views of such organizations and any desired explanation of the significance should be obtained from the rating agency furnishing the same. Generally, a rating agency bases its rating on the information and materials furnished to it and on investigations, studies and assumptions of its own. There is no assurance such ratings will continue for any given period of time or that such ratings will not be revised downward or withdrawn entirely by the rating agencies, if in the sole judgment of such rating agencies, circumstances so warrant. Any such downward revision or withdrawal of such ratings may have an adverse effect on the market price of the Bonds.

## UNDERWRITING

The Bonds are being purchased by Raymond James & Associates, Inc., BB&T Capital Markets and Stifel, Nicolaus & Company, Incorporated (collectively, the "Underwriters") at a purchase price of $44,805,603 (representing the $41,895,000 principal amount of the Bonds, less Underwriters' discount of $247,124 plus original issue premium of $3,157,727). The Bond Purchase Agreement dated March 8, 2017 executed by the Underwriters provides that the Underwriters will purchase all of the Bonds if any are purchased. The Bonds may be offered and sold to certain dealers (including underwriters and other dealers depositing such Bonds into investment trusts) at prices lower than the public offering prices, and such public offering prices may be changed, from time to time, by the Underwriters.

## FINANCIAL ADVISOR TO THE CORPORATION

Public Financial Management, Inc. ("PFM") has served as Financial Advisor to the Corporation for the issuance of the Bonds. PFM is not obligated to undertake, and has not undertaken, either to make an independent verification of, or to assume responsibility for, the accuracy, completeness, or fairness of the information contained in this Official Statement. PFM is an independent financial advisory firm and is not engaged in the business of underwriting, trading, or distributing securities.

## FINANCIAL STATEMENTS

The financial statements of the Corporation (with respect to its Administrative Offices) as of and for the Fiscal Year ended June 30, 2016 included in Appendix B to this Official Statement have been audited by Bourgeois Bennett, L.L.C., Certified Public Accountants, as stated in their report appearing in Appendix B.

## CONTINUING DISCLOSURE

The Corporation will enter into an undertaking (the "Undertaking") for the benefit of the owners, including beneficial owners, of the Bonds to provide certain financial information and operating data to the Municipal Securities Rulemaking Board's (the "MSRB") Electronic Municipal Market Access

("EMMA") annually and to provide notice of certain events to the MSRB pursuant to the requirements of Section (b)(5)(i) of Securities and Exchange Commission Rule 15c2 12 (17 C.F.R. Part 240, et seq.; 240.15c2-12) (the "Rule").   See "FORM OF CONTINUING DISCLOSURE AGREEMENT" in Appendix E hereto.

A failure by the Corporation to comply with the Undertaking will not constitute an Event of Default under the Indenture (although Bondholders will have any available remedy at law or in equity). Nevertheless, such a failure must be reported in accordance with the Rule and must be considered by a broker dealer or municipal securities dealer before recommending the purchase or sale of the Bonds in the secondary market.   Consequently, such a failure may adversely affect the transferability and liquidity of the Bonds and their market price.

The Corporation entered into a similar undertaking in connection with the issuance of the Refunded Bonds.   For fiscal years ended June 30, 2012 through 2015, the Corporation failed to effectively file its annual financial information and operating data with EMMA for those years.   In addition, for fiscal years ended June 30, 2012 and 2015, the audited financial statements were filed significantly later than required but were filed on April 24, 2013 and January 12, 2016, respectively.   On November 10, 2016, the Corporation corrected the circumstances where it failed to file the required annual financial information and operating data and filed the required information for those years.   The Corporation also filed an event notice describing the failures under the Rule.   Annual financial information and audited financial statements for fiscal year 2016 were filed timely in November of 2016. The Corporation has now adopted a continuing disclosure policy to ensure its ability to maintain compliance with the Rule, including designation of a specific officer or officers to take responsibility for all future filings of financial statements, annual financial information and operating data and event notices.

## ABSENCE OF LITIGATION AFFECTING THE BONDS

### The Authority

There is not now pending or, to the knowledge of the Authority, threatened, any litigation restraining or enjoining the issuance or delivery of the Bonds or questioning or affecting the validity of the Bonds or the proceedings or authority under which they are to be issued.   Neither the creation, organization or existence, nor the title of the present members and officers of the Authority to their respective office, is, to the knowledge of the Authority, being challenged or questioned.   There is no litigation pending or, to its knowledge, threatened, which in any manner questions the right of the Authority to enter into the Loan Agreement with the Corporation or to secure the Bonds in the manner provided in the Indenture. There is no action, suit, proceeding or investigation, at law or in equity, before or by any court, public board or body pending or, to its knowledge, threatened, against or affecting the Authority, wherein an unfavorable decision, ruling or finding would materially and adversely affect the transactions contemplated hereunder or under the Indenture or the Loan Agreement or which in any way would adversely affect the validity or enforceability of the Bonds, the Indenture or the Loan Agreement or any agreement or instrument to which the Authority is a party, used or contemplated for use in the consummation of the transactions contemplated hereby.

### The Corporation

There is currently no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, public board or body pending or, to its knowledge, threatened against or affecting the Corporation, wherein an unfavorable decision, ruling or finding would materially and adversely affect the transactions contemplated herein or under the Loan Agreement or which in any way would adversely

affect the validity or enforceability of the Bonds or the Loan Agreement, or any agreement or instrument to which the Corporation is a party, used or contemplated for use in the consummation of the transactions contemplated hereby, or the Corporation's performance of its obligations under the Loan Agreement, or in which any liability of the Corporation is not adequately covered by insurance or for which adequate reserves are not provided or for which any judgment or order would have a material adverse effect upon the business, operations or assets of the Corporation or affect its existence or authority to do business. See "Litigation and Contingencies" in Appendix A to this Official Statement.

## MISCELLANEOUS

The covenants and agreements of the Authority and the Trustee with each other for the benefit of the Bondholders are fully set forth in the Indenture and the Loan Agreement and reference is made to such documents for a complete statement of the rights and obligations of the Authority, the Corporation, the Trustee and the Bondholders. Neither this Official Statement nor any statements which may have been made orally or in writing are to be construed as a contract with the Bondholders. All estimates, whether or not so stated, are not to be construed as representations that they will be realized.

The references herein to the Indenture, the Loan Agreement and other materials are brief outlines of certain provisions thereof. Such outlines do not purport to be complete, and for full and complete statements of such provisions reference is made to such instruments, documents and other materials, copies of which will be on file at the principal office of the Trustee.

The attached Appendices are integral parts of this Official Statement and must be read together with all of the foregoing statements.

The Corporation has reviewed the information contained herein which relates to it and has approved all such information for use within this Official Statement. The Bond Purchase Agreement for the Bonds requires the Corporation to deliver to the Underwriters and the Authority its Inducement Letter constituting the agreement of the Corporation to indemnify the Underwriters and the Authority against losses, claims, damages and liabilities arising out of any incorrect statements or information contained in or omitted from this Official Statement pertaining to the Corporation or supplied by the Corporation.

LOUISIANA PUBLIC FACILITIES AUTHORITY

By /s/ Guy Campbell
      Chairman

THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS

By /s/ Jeffrey J. Entwisle
      Secretary

[THIS PAGE INTENTIONALLY LEFT BLANK]

## APPENDIX A

## THE ROMAN CATHOLIC CHURCH OF
## THE ARCHDIOCESE OF NEW ORLEANS

**General Description and History**

The Archdiocese of New Orleans is the second oldest archdiocese in the United States and covers 4,208 square miles in the State of Louisiana (the "State").  The Archdiocese was established as a diocese in 1793 and became an archdiocese in 1850.  In 1941, the Roman Catholic Church of the Archdiocese of New Orleans (the "Corporation") was incorporated as a nonprofit corporation under the laws of the State, and the Corporation is an organization classified under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.  The Corporation, together with other separately incorporated entities, make up the Archdiocese of New Orleans (the "Archdiocese").

The Archdiocese currently operates in the eight civil parishes in the metropolitan New Orleans area and consists of 111 church parishes in the State.  As used in this Appendix A and except as otherwise indicated, the term "parish" refers to the church parishes and not to the civil parishes of the State.  The Corporation provides administrative support to the church parishes and to 84 schools with an estimated fall enrollment for the 2016-17 school year of 37,050 students.  These schools include parish owned elementary schools, religious order schools and eight high schools and two special needs schools owned by the Corporation.  The schools owned by the Corporation have separate audited financial statements and their operations are not consolidated with the financial statements of the Corporation.  All 84 schools within the Archdiocese are generally self-sufficient.  The Corporation also provides administrative support for separately incorporated nursing homes, affordable senior living facilities and other community service facilities consistent with the mission of the Archdiocese.  With the exception of St. Anthony's Garden which has just been completed and for which the Corporation has provided a guarantee with respect to certain indebtedness, each of the nursing homes and affordable senior living facilities and other community services facilities are largely self-sufficient.  See "Description of Indebtedness" in this Appendix A for more information regarding such guarantee.

**Mission Statement**

The Corporation administers religious, charitable, educational, health and life service programs of the Roman Catholic Church (the "Church") within its geographic territory.  The mission of the Corporation is stated as follows:

"Impelled by Christ's call and inspired by the Holy Spirit through the work of the Ninth General Synod, the ministries of the Archdiocese of New Orleans, in union with the Archbishop and with one another, serve the people of the parishes, schools, and organizations of the archdiocese in enabling them to encounter Jesus and to witness with joy."

**Service Area**

Set forth below is a map of the Archdiocese's service area.

The following Louisiana civil parishes comprise and are served by the Archdiocese: Jefferson, Orleans, Plaquemines, St. Bernard, St. Charles, St. John the Baptist, St. Tammany and Washington.



Set forth below is certain statistical information pertaining to the Archdiocese for the fiscal years ended June 30, 2014, 2015 and 2016.

| Archdiocese | 2014 | 2015 | 2016 |
|---|---|---|---|
| Parishioners | 500,800[1] | 506,300[1] | 510,600[1] |
| Employees | 166 | 200 | 202 |
| Schools | 85 | 83 | 84 |
| School Enrollment | 38,300 | 37,700 | 37,050 |
| Parishes | 108 | 111 | 111 |
| Nursing Homes | 2 | 2 | 2[2] |
| Affordable Senior Living Facilities | 16 | 18 | 18 |

_____
[1] Estimated population figures.
[2] In January of 2017 the Corporation acquired a third nursing home. See "Nursing Homes and Affordable Senior Living" herein.
Source: The Corporation

A-2

## Governance

The Corporation is organized exclusively for charitable, religious and educational purposes. The Archbishop of New Orleans (the "Archbishop") is the sole member and chief administrator of the Corporation, and his responsibilities include appointment and removal of priests and deans, review and approval of the Corporation's budget and expenses, and policy development regarding the Corporation. The Archbishop is aided and advised by the Board of Directors of the Corporation, the officers of the Corporation and the Archdiocesan Councils.

## Administration

The Archbishop and current President of the Corporation is Most Reverend Gregory Michael Aymond. The Archbishop directly supervises the following officers of the Corporation and delegates to them full responsibility within their respective functions. The following are brief biographic sketches of the senior administrative officers and financial officers of the Corporation:

***Most Reverend Gregory Michael Aymond, Archbishop, President and Board Member***. The Most Reverend Gregory Michael Aymond became the fourteenth Archbishop of New Orleans on August 20, 2009, succeeding Archbishop Alfred Clifton Hughes.

Archbishop Aymond was ordained an Auxiliary Bishop of New Orleans on January 10, 1997 and became Coadjutor Bishop of Austin in 2000 and was installed as Bishop there on August 3, 2000. Archbishop Aymond has served as Chairman of the United States Conference of Catholic Bishops Committee on the Protection of Children and Young People. He also was Chairman of the Board of Directors of the National Catholic Educational Association from 2000-04. He currently serves as a member of the U.S. Bishops Committee on Laity, Marriage, Family Life and Youth, the Committee on Clergy, Consecrated Life and Vocations, and is Secretary of the United States Conference of Catholic Bishops.

After graduating from St. Joseph Seminary College, St. Benedict, Louisiana, in 1971, he earned a Master's Degree in Divinity from Notre Dame Seminary in New Orleans in 1975. He was ordained a priest in New Orleans on May 10, 1975. From 1973 to 1981, he was a Professor, Business Administrator and then Rector of St. John Vianney Preparatory Seminary in New Orleans. From 1981 to 1986, he was Professor of Pastoral Theology and Homiletics and Director of Education at Notre Dame Seminary.

Archbishop Aymond served as President-Rector of Notre Dame Seminary from 1986 until the end of the 1999-2000 academic year. Archbishop Aymond also served as the Executive Director of the Archdiocesan Department of Christian Formation, and Director of the Society of the Propagation of the Faith.

***Jeffrey J. Entwisle, Chief Financial Officer, Secretary and Board Member***. Jeffrey J. Entwisle was appointed to the position of Chief Financial Officer and Secretary for the Archdiocese of New Orleans in July 2016. Prior to this, he was the Chief Operating Officer and Treasurer for the Archdiocese of New Orleans, and held those positions since February 2007, and held the position of Finance Review Officer since April 2002. Prior to joining the Archdiocese, he was the Accounting Manager at Reagan Equipment Company for two years. Mr. Entwisle has a B.S. in Accounting and Master of Business Administration from the University of New Orleans and maintains the certified internal auditor and certified fraud examiner designations, and a certification on risk management assurance.

***Kathleen R. Hebert, CPA, Chief Operating Officer***. Kathleen R. Hebert is Chief Operating Officer for the Archdiocese of New Orleans. She began her career as an audit professional at Ernst &

A-3

Young, LLP where she was an Audit Manager.  She served as the Vice President of Finance & Administration for The Greater New Orleans Foundation from 2002-2007.  She began her own accounting and consulting practice in 2008 in which she provided services to the Archdiocese of New Orleans.  Ms. Hebert has a B.S. in Accounting from Louisiana State University and is a licensed Certified Public Accountant in the State of Louisiana.

*John L. Eckholdt, Director of Special Projects*.  Until June 30, 2016, Mr. Eckholdt had served for 16 years as the Chief Financial Officer of the Archdiocese of New Orleans.  From July 1, 2016 to December 31, 2016, he was Chief Compliance Officer, and as of January 1, 2017 he was made Director of Special Projects.  His responsibilities in that position include property developments, project and property acquisitions, planning and implementing long term debt strategies, and supervision and monitoring of various investment portfolios.

*Most Reverend Fernand J. Cheri, III, O.F.M., First Vice-President, Vicar General and Board Member*.  The Most Reverend Fernand J. Cheri, III, a Franciscan Friar of the Sacred Heart Province, was ordained to the Episcopacy and appointed Vicar General on March 23, 2015.  He completed his Masters of Divinity degree at Notre Dame Seminary in New Orleans and his Masters of Theology from Xavier University in New Orleans.  He has served in parishes in the New Orleans area and in Nashville, Tennessee, and taught in high schools in New Orleans, Chicago, and Belleville, Illinois.  Bishop Cheri has been appointed to, and served on, a variety of national prestigious Black Catholic committees and conferences throughout the years.

*Very Reverend Patrick J. Williams, Vicar General*.  Father Williams, a native of New Orleans and graduate of Holy Cross High School, attended Notre Dame Seminary and was ordained in May 1993.  On January 1, 2014, he was appointed Vicar General for the Archdiocese of New Orleans.  Father Williams earned a Master's of Divinity Degree from Notre Dame Seminary and a Master's of Science in Education from Loyola University, both in 1993.  After a Parochial Vicar Position and Vice Rector of Notre Dame Seminary, Father Williams was named Rector of Notre Dame Seminary in 2000 and remained in that position until 2007, when he was assigned to St. Pius X as parochial vicar and then as pastor in 2009 where he is presently pastor.  Father Williams is currently the Executive Director for Clergy which he was appointed to in February 2009 and Assistant Secretary for the Archdiocese of New Orleans.

*Very Reverend Peter O. Akpoghiran, J.C.D., Second Vice President, Judicial Vicar, Chancellor and Board Member*.  Father Akpoghiran was ordained to the priesthood on December 12, 1992.  He completed his Masters of Theology Degree from St. John's University, Queens, New York, in 2002.  He served as the Associate Pastor of St. Francis of Paola, Brooklyn, New York, from 2001-2003.  He obtained a Licentiate in Canon Law in 2005 and a Doctor of Canon Law Degree in 2007, from The Catholic University of America, Washington, D.C.  He served as Judge in the Diocese of Richmond, Virginia, from 2007-2011.  In September of 2011, he was appointed by His Excellency, Archbishop of New Orleans, as the Judicial Vicar of the Archdiocese of New Orleans.  In 2013, Father Akpoghiran was also appointed as the Chancellor of the Archdiocese of New Orleans.

**Archdiocesan Councils**

The Archdiocesan Councils which advise the Archbishop on policies, procedures and practices include:

*The Priests' Council*.  The Priests' Council advises and assists the Archbishop in the governance of the Corporation in accordance with the norms of Canon Law for the Church.

**The Administrative Council**.  The Administrative Council consists of the Vicars Generals, the Chancellor, the Executive Director of Pastoral Planning and Ministries, the Chief Financial Officer, the General Counsel, and the Human Resource Director.  It advises the Archbishop on Corporation policies, procedures and practices.

**The College of Consultors**.  The College of Consultors is appointed by the Archbishop from the membership of the Priests' Council.  It elects a Corporation administrator when the seat becomes vacant, offers advice on extraordinary acts of administration and consent for the acquisition and alienation of certain ecclesiastical properties.

**The Finance Council**.  The Finance Council is established pursuant to the Code of Canon Law for the Church and consists of clergy and lay persons of the Church who are skilled in financial matters and familiar with elements of Canon and civil law.  The Finance Council is appointed by the Archbishop to provide advice on the temporal administration of the Corporation, to assist the Archbishop in the economic administration of the Corporation and to prepare and review annual budgets for the Corporation.  All Finance Council members serve five-year terms.  After serving two consecutive terms, an appointed member must relinquish membership status, but may be reappointed as long as two years have passed since his or her last appointment.  Finance Council members currently include the following individuals:

| Name | Affiliation | Appointed |
|------|-------------|-----------|
| Mr. Rodney J. Abele, Jr. | Partner, Orleans Capital Management | 9/2002 |
| Ms. Marguerite L. Adams, Esq. | Liskow & Lewis | 9/2009 |
| Rev. Patrick Carr | Parochial Vicar, St. Angela Merici Parish | 1/2017 |
| Mr. Lloyd E. Eagan, Jr. | Retired | 4/2013 |
| Mr. Paul L. Fine | President, Goldring Family Interests | 9/2009 |
| Mr. William F. Finegan | President, Eye Ear Nose Throat Foundation | 10/2010 |
| Mr. William A. Lazaro, Jr. | Base Logistics LLC | 12/2015 |
| Ms. Emily Marcotte | Entergy Services, Inc. | 4/2013 |
| Mr. Jerome J. Reso, Jr. | Baldwin & Haspel | 9/2002 |
| Mr. Stephen F. Stumpf | Durr Heavy Construction | 10/2010 |
| Mr. Calvin S. Tregre | Retired | 9/2009 |
| Rev. Otis W. Young, Jr. | Pastor, St. Peter Church | 8/2011 |

The Finance Council's work is supported by three sub-committees: the Audit Subcommittee, the Investment Subcommittee and the Real Estate Subcommittee.

**Subcommittees**.  The members of the Real Estate Subcommittee, the Audit Subcommittee and the Investment Subcommittee and their affiliations are as follows:

[Remainder of page intentionally left blank]

A-5

| | Name | Affiliation |
|---|---|---|
| Real Estate Subcommittee | Rodney J. Abele, Jr. | Orleans Capital Management |
| | Marguerite L. Adams | Liskow & Lewis |
| | Todd R. Gennardo | Denechaud and Denechaud |
| | Very Rev. Philip G. Landry | Rector, Cathedral of St. Louis |
| | Mark Rodi | Re/Max Affiliates |
| | | |
| Audit Subcommittee | William F. Finegan | Eye Ear Nose Throat Foundation |
| | Catherine B. Howard | Performance Architecture, LLC |
| | Claytus J. Plaisance III | Retired, Ernst & Young |
| | Lloyd A. Tate | Retired, Deloitte & Touche, LLP |
| | | |
| Investment Subcommittee | Joseph Carrere | Kennan Capital |
| | Mason G. Couvillon | Dardis Couvillon & Associates |
| | Terry A. DuFrene | JP Morgan Securities, LLC |
| | John L. Eckholdt | Director of Special Projects, Archdiocese of New Orleans |
| | Paul L. Fine | President, Goldring Family Investments |
| | Octave J. Francis, III | Francis Financial Consultants |
| | Alex Gershanik | Power Courses, LLC |
| | Cory Howat | Catholic Foundation, Archdiocese of New Orleans |
| | St. Denis J. Villere | St. Denis J. Villere & Company |

The members of the subcommittees referenced above are appointed and removed from the subcommittees by the Archbishop.

**Archdiocesan Departments**

The Archbishop oversees all Corporation and Archdiocese activities pursuant to the following chart:

[Remainder of page intentionally left blank]



# Archbishop

## Auxiliary Bishop and Vicars General

## Councils
### (Administrative, College of Consultors, Ministerial, Presbyteral, and Finance)

## Administrative Offices
### (Financial and Administrative Services)

**Archdiocesan Ministries**

- Catholic Charities
- Catholic Foundation
- Chateau de Notre Dame
- Christopher Homes, Inc.
- New Orleans Catholic Cemeteries

- Notre Dame Hospice
- Project Lazarus
- School Food Program
- Second Harvest Food Bank
- Propagation of the Faith
- St. Anthony's Garden

**Other Facilities:**
- 18 Independent Elderly Housing
- 3 Nursing Homes*

**Higher Learning:**
- Notre Dame Seminary
- St. Joseph Seminary College

**Catholic Elementary and High Schools**
- 61 Elementary Schools
- 21 High Schools
- 2 Special Needs Schools

**Deans (10 Deaneries)**
- 111 Parishes
- 8 Missions
- 2 Campus Ministry Centers

A-7

49

**Deaneries**

The Archdiocese is comprised of 111 parishes, organized into 10 deaneries. Deaneries are regional clusters of parishes. A Dean supervises the parochial records, implements church and Archdiocesan policies and coordinates the apostolic efforts of clergy, religious and the faithful within the deanery.

**Parishes**

Parishes are geographic entities that include churches and in some cases elementary schools, and are served by a pastor. Almost all of the 111 Parishes are separately incorporated under Louisiana law as legal entities separate and apart from the Corporation. The Archbishop is the sole member of each separately incorporated parish. Pastors are responsible for all religious, financial and other matters and are accountable to the Archbishop. The Parish Council is an advisory body that assists the Pastor with general parish matters. The Parish Finance Council is an advisory body that provides consultation on financial matters of the parish.

**Canon Law**

The Corporation was formed under Louisiana applicable laws and generally operates and is bound by such laws. The Corporation is also required to comply with the provisions of the Code of Canon Law for the Church in carrying out its mission and in conducting its business affairs. Canon Law includes policies, procedures, and practices that must be followed by the Corporation and the Archdiocesan Councils in conducting the business of the Corporation. These procedures include, but are not limited to, hearing from the Finance Council (which consists of clergy and lay persons of the Church who are skilled in financial matters and familiar with elements of Canon and civil law) on extraordinary assessments imposed on, among other entities, parishes of the Corporation and having the Finance Council review the annual budget. Additionally, the Corporation must also hear from the Presbyteral Council on taxes imposed on such parishes for the needs of the diocese. The College of Consultors approval is required for the alienation of certain ecclesiastical properties. In addition, Canon Law directs administrators serving the Church to fulfill their function with diligence, and consequently they must pay, at the stated time, the interest due on loans and take care that the debt itself is repaid in a timely manner. See also "INVESTMENT CONSIDERATIONS—Implications of the Code of Canon Law" in this Official Statement.

**Information about Financial Statements**

The audited financial statements attached hereto as Appendix B are solely the audited financial statements of the Corporation's Administrative Offices (the "Administrative Offices") and include the assets, liabilities, net assets, and financial activities of the Administrative Offices, but do not include the financial operations or assets of the individual parishes, the Corporation owned high schools or special needs schools (other than a portion of the value of such Corporation owned schools on the balance sheet of the Corporation's Administrative Offices), or other church-related agencies and institutions within the Corporation's geographical boundaries. The audited financial statements also do not include the fair market values of the churches, properties in the parishes, rectories, or schools belonging to the Corporation nor The Archdiocese of New Orleans Indemnity, Inc., a captive non-profit insurance company (see "Insurance Coverage" in this Appendix A). With respect to repayment of the Bonds, however, the Corporation alone (and not the individual parishes, schools or other church related agencies) will be liable to the Authority for payments due under the Loan Agreement, which are the source of payment of the principal, interest and premium, if any, of the Bonds.

As discussed above, the Administrative Offices is an administrative unit of the Corporation whose income is largely generated through the assessment of fees charged to parishes and schools to pay for administrative costs of organizing and administering Corporation-wide programs for insurance and other programs.  Fees for such services are set to cover these administrative costs and not to build cash reserves or endowments.  The Administrative Offices generally operates on a break-even basis. Therefore, the audited financial statements of the Administrative Offices do not generally reflect the overall financial wealth and trends in the Corporation.  Total revenues of the Administrative Offices increased from $41,549,304 in fiscal year 2015 to $43,857,150 in fiscal year 2016, or 5.5%, due primarily to bad debt recovery and insurance assessments.  Total revenues (unaudited) for the six-month period ended December 31, 2016 increased $604,004 or 3% from the six-month period ended December 31, 2015.  Net unrestricted assets of the Corporation were $71,756,782 and $54,563,320 at the end of the fiscal years ended June 30, 2015 and 2016, respectively, and (on an unaudited basis) were $65,219,925 and $50,545,008 at December 31, 2015 and 2016, respectively.

As also noted above, the financial statements of the parishes and schools of the Corporation are not independently audited.  The revenues and expenses of these entities are, however, reviewed by the Corporation's Finance Office, and annual financial statements are internally prepared, indicating total income, total expense, and net income (loss) for each parish and school within the Corporation. Additionally, each year approximately one-third of the schools and parishes undergo an on-site review of internal financial controls conducted by the internal audit function of the Corporation.  Each parish and school maintains operating accounts in its own name, with excess cash and investments held at the Corporation in the Deposit and Loan Fund.

**Financial Information**

Set forth below is the Corporation's statement of financial position and statement of activities for the fiscal years ended June 30, 2013 through 2016 with respect to its Administrative Offices.  This information was derived from the Corporation's financial statements with respect to its Administrative Offices and its financial records and only includes the assets, liabilities, revenues and financial activities of the Corporation's Administrative Offices.  Also included on an unaudited basis is certain information with respect to the Administrative Offices for the six months ended December 31, 2015 and 2016.

While the obligation of the Archdiocese to make payments under the Loan Agreement with respect to the Bonds is a general, unsecured obligation of the Archdiocese, payable from its gross revenues, its general fund or any other moneys legally available to the Archdiocese, there will not be a mortgage on or a security interest in any of the property of the Archdiocese or its revenues or other funds or assets.  See however "Undeveloped Land and Properties of the Corporation" in this Appendix A. Parish financial records are not audited and are generally maintained on a cash basis.

[Remainder of page intentionally left blank]

## STATEMENTS OF FINANCIAL POSITION

**Roman Catholic Church of the Archdiocese of New Orleans
Administrative Offices**

**As of June 30, 2013, 2014, 2015 and 2016
and (Unaudited) December 31, 2015 and 2016**

### ASSETS

| | 2013 | 2014 | 2015 | 2016 | (unaudited) 12-31-15 | (unaudited) 12-31-2016 |
|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 12,161,942 | $ 8,447,058 | $ 8,735,002 | $ 5,248,515 | $ 4,458,753 | $ 7,150,275 |
| Grants receivable - FEMA | 2,756,549 | 3,668,471 | 7,052,963 | 2,497,613 | -- | -- |
| Accounts receivable from affiliates and other | 3,748,962 | 3,668,218 | 3,477,767 | 3,645,493 | 16,042,111 | 17,205,418 |
| Prepaid expenses | 1,328,186 | 1,465,656 | 1,480,541 | 1,467,726 | 2,138,545 | 1,787,411 |
| Pledges receivable | 197,200 | -- | -- | -- | -- | -- |
| Loans receivable from affiliates – less allowance for doubtful receivables | 67,054,023 | 53,453,471 | 59,802,336 | 71,946,780 | 74,065,538 | 68,735,165 |
| Investments | 232,774,889 | 270,710,586 | 264,624,171 | 232,603,063 | 231,566,340 | 235,495,958 |
| Land, buildings and equipment – less accumulated depreciation | 51,151,887 | 67,002,472 | 76,247,124 | 77,212,519 | 75,504,832 | 76,191,017 |
| Other assets | 2,579,745 | 2,475,945 | 2,372,145 | 2,268,345 | 2,320,245 | 2,216,445 |
| Beneficial interest in charitable remainder trust | 582,012 | 628,245 | 403,430 | 429,556 | 403,430 | 429,556 |
| Total assets | $374,335,395 | $411,520,122 | $424,195,479 | $397,319,610 | $406,499,794 | $409,211,245 |

### LIABILITIES AND NET ASSETS

| | 2013 | 2014 | 2015 | 2016 | (unaudited) 12-31-15 | (unaudited) 12-31-2016 |
|---|---|---|---|---|---|---|
| **Liabilities** | | | | | | |
| Accounts payable | $ 6,446,940 | $ 4,411,055 | $ 7,315,255 | $ 2,858,843 | $ 6,252 | $ 111,864 |
| Undistributed flood insurance proceeds due to affiliates | 248,041 | -- | -- | -- | -- | -- |
| Accrued expenses and other | 3,804,436 | 3,863,024 | 3,933,472 | 4,066,673 | 2,782,025 | 2,785,176 |
| Deferred Revenue | -- | -- | -- | -- | 13,140,173 | 14,068,164 |
| Accrued liability for self-insured claims | 1,852,235 | 1,278,342 | 1,167,859 | 1,284,299 | 1,173,130 | 1,290,271 |
| Line of credit loan | 6,000,000 | -- | -- | -- | -- | -- |
| Deposits payable to affiliates | 106,910,344 | 116,386,408 | 123,978,928 | 115,749,156 | 120,660,730 | 119,182,507 |
| Funds held for affiliates | 76,258,710 | 88,970,075 | 89,906,975 | 86,854,026 | 79,013,455 | 88,232,482 |
| Bonds payable | 62,943,347 | 61,486,105 | 59,960,300 | 58,361,006 | 59,960,300 | 58,361,006 |
| Accrued pension liability | 33,779,053 | 38,528,730 | 36,845,890 | 46,105,433 | 36,845,890 | 46,105,433 |
| Total liabilities | 298,243,106 | 314,923,739 | 323,108,679 | 315,279,436 | 313,581,955 | 330,136,903 |
| **Net Assets** | | | | | | |
| Unrestricted | 48,285,328 | 66,486,811 | 71,756,782 | 54,563,320 | 65,219,925 | 50,545,008 |
| Temporarily restricted | 13,671,886 | 15,973,911 | 15,193,527 | 13,334,491 | 13,561,193 | 14,386,761 |
| Permanently restricted | 14,135,075 | 14,135,661 | 14,136,491 | 14,142,363 | 14,136,721 | 14,142,573 |
| Total net assets | 76,092,289 | 96,596,383 | 101,086,800 | 82,040,174 | 92,917,839 | 79,074,342 |
| Total liabilities and net assets | $374,335,395 | $411,520,122 | $424,195,479 | $397,319,610 | $406,499,794 | $409,211,245 |

Source: The Corporation

[Remainder of page intentionally left blank]

A-10

**STATEMENTS OF ACTIVITIES**

**Roman Catholic Church of the Archdiocese of New Orleans**
**Administrative Offices**

**For each of the Years Ended June 30, 2013, 2014, 2015 and 2016 and Six-Months(Unaudited) Ended December 31, 2015 and 2016**

| | 2013 | 2014 | 2015 | 2016 | (unaudited) 12-31-15 | (unaudited) 12-31-16 |
|---|---|---|---|---|---|---|
| **Revenue, Gains and Other Support** | | | | | | |
| Assessments to affiliated entities for: | | | | | | |
| Archdiocesan support | $ 8,972,465 | $ 8,983,853 | $ 9,268,868 | $ 9,317,871 | $ 4,317,841 | $ 5,214,944 |
| Priest health insurance and retirement | 2,030,468 | 2,279,177 | 2,400,503 | 2,487,790 | 1,152,113 | 1,237,100 |
| Insurance | 14,013,009 | 14,457,914 | 14,613,661 | 15,390,638 | 7,385,548 | 7,387,142 |
| Total assessments | $25,015,942 | $25,720,944 | $26,283,032 | $27,196,299 | $12,855,502 | $ 13,839,186 |
| Bad debt recovery | $ 1,260,165 | $    87,720 | $   155,103 | $   729,276 | | |
| Contributions and grants | 1,380,470 | 1,567,694 | 1,324,164 | 1,160,009 | 420,426 | 1,114,870 |
| Rent and royalties | 868,158 | 3,703,587 | 776,246 | 816,096 | 473,078 | 456,768 |
| Spending distribution – investment income | 3,737,844 | 3,844,902 | 3,783,770 | 3,722,000 | 1,861,000 | 1,861,000 |
| Interest income – Deposit and Loan Fund | 2,412,952 | 2,407,408 | 2,093,516 | 2,521,189 | 1,198,387 | 1,158,684 |
| Fees collected and other revenue | 3,672,492 | 4,456,253 | 4,622,350 | 4,993,688 | 2,434,266 | 2,436,329 |
| Gain (Loss) on sale of assets | (2,417,499) | 1,179,093 | 2,735,938 | 2,692,467 | 1,020,174 | 0 |
| Changes in value of split-interest agreement | 65,394 | 46,233 | (224,815) | 26,126 | -- | -- |
| Net assets released from restrictions – satisfaction of program restrictions | -- | -- | -- | -- | -- | -- |
| Total revenue, gains and other support | $35,995,918 | $43,013,834 | $41,549,304 | $ 43,857,150 | $ 20,262,833 | $ 20,866,837 |
| **Expenses** | | | | | | |
| Program services: | | | | | | |
| Christian Formation | $ 4,172,594 | $ 4,692,175 | $ 4,666,443 | $ 5,283,625 | $ 2,444,058 | $ 2,398,904 |
| Clergy | 8,759,833 | 8,317,440 | 8,636,334 | 8,296,390 | 3,349,185 | 3,680,635 |
| Community services | 162,041 | 141,362 | 95,566 | 95,864 | 48,535 | 48,538 |
| Gifts and grants | 232,591 | 255,307 | 353,348 | 280,163 | 96,808 | 713,526 |
| Insurance | 11,240,027 | 14,569,317 | 14,532,053 | 13,343,519 | 5,451,987 | 7,927,919 |
| Pastoral services | 1,463,682 | 2,333,349 | 2,909,161 | 3,017,186 | 1,510,083 | 1,591,554 |
| Religious | 236,978 | 204,697 | 210,206 | 219,454 | 107,581 | 95,454 |
| Total program services expenses | $ 26,267,746 | $ 30,513,647 | $ 31,403,111 | $30,536,201 | $ 13,008,237 | $ 16,456,530 |
| Supporting Services: | | | | | | |
| Administration | $ 2,956,404 | $ 2,979,073 | $ 3,174,746 | $ 3,492,961 | $ 1,874,620 | 1,581,837 |
| Financial services | 8,548,872 | 9,733,757 | 8,882,427 | 12,053,962 | 3,730,880 | 5,139,985 |
| Interest | 2,915,667 | 2,935,908 | 2,785,397 | 2,709,729 | 1,384,510 | 1,346,013 |
| Interest expense—Deposit and Loan Fund | 1,114,867 | 1,224,654 | 1,269,286 | 1,274,043 | 657,151 | 757,764 |
| Total supporting services expenses | 15,535,810 | 16,873,392 | 16,111,856 | 19,530,695 | 7,647,161 | 8,825,599 |
| Total Expenses | $ 41,803,556 | $ 47,387,039 | $ 47,514,967 | $ 50,066,896 | $ 20,655,398 | $ 25,282,129 |
| **Income (Loss) From Operations** | $ (5,807,638) | $ (4,373,205) | $ (5,965,663) | $ (6,209,746) | $   (392,565) | $ (4,415,292) |
| **Non-Operating Revenues (Expenses)** | | | | | | |
| Investment income | $ 12,232,266 | $ 14,030,108 | $ 1,869,082 | $ (1,919,548) | ($5,862,605) | $3,130,633 |
| Less – spending distribution | (3,737,844) | (3,844,902) | (3,783,770) | (3,722,000) | (1,861,000) | (1,861,000) |
| Investment income (loss) net of spending distribution | 8,494,422 | 10,185,206 | (1,914,688) | (5,641,548) | (7,723,605) | 1,269,633 |
| Grants and donations related to hurricanes | 31,683,831 | 43,280,553 | 43,594,834 | 28,089,184 | 12,843,685 | 9,258,446 |
| Distributions of grants and donations to affiliates | (29,421,302) | (25,970,227) | (34,934,515) | (27,349,715) | (12,896,476) | (9,078,619) |
| Total non-operating revenues (expenses) – net | $10,756,951 | $ 27,495,532 | $  6,745,631 | $ (4,902,079) | ($7,776,396) | $1,449,460 |
| **Excess (Deficiency) of Revenue, Gains and Other Support Over Expenses** | $ 4,949,313 | $23,122,327 | $     779,968 | $ (11,111,825) | ($8,168,961) | ($2,965,832) |
| **Additional Minimum Pension Liability Adjustment** | $  4,352,482 | $ (2,618,233) | $  3,710,449 | $  (7,934,801) | -- | -- |
| **Increase (Decrease) in Net Assets** | $  9,301,795 | $20,504,094 | $  4,490,417 | $ (19,046,626) | (8,168,961) | (2,965,832) |
| **Net Assets** | | | | | | |
| Beginning of year | $66,790,494 | $ 76,092,289 | $ 96,596,383 | $101,086,800 | $101,086,800 | $ 82,040,174 |
| End of year or period | $76,092,289 | $ 96,596,383 | $101,086,800 | $ 82,040,174 | $ 92,917,839 | $79,074,342 |

Source: The Corporation

A-11

**Underlying Calculations for Pro-Forma**
**Debt Service Coverage Ratio**

The following table sets forth the component calculations for certain items included in "Net Income Available for Debt Service," as defined in the Loan Agreement, used to calculate the pro-forma Debt Service Coverage Ratio on the Bonds as set forth in the "ANNUAL DEBT SERVICE REQUIREMENTS" section of this Official Statement.

**Component Calculations of Certain Items Included in**
**"Net Income Available for Debt Service"**
**For Pro-Forma Debt Service Coverage**

| | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| [1] **Non-Operating Revenue (Expense)** | | | | |
| Investment Return [4] | $12,232,266 | $14,030,108 | $1,869,082 | $(1,919,548) |
| Donations related to Hurricane Katrina | 31,683,831 | 43,280,553 | 43,594,834 | 28,089,184 |
| Net Assets released from restriction- Hurricane Katrina | | | | |
| Distributions of donations to affiliates | (29,421,302) | (25,970,227) | (34,934,515) | (27,349,715) |
| Additional minimum pension liability adjustment | 4,352,482 | (2,618,233) | 3,710,449 | (7,934,801) |
| Cumulative effect of change in accounting principle | | | | |
| Hurricane Katrina related expenses (net of insurance proceeds) | | | | |
| Non-Operating Gain (Loss) | $18,847,277 | $28,722,201 | $14,239,850 | $(9,114,880) |

| | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| [2] **Pension Expense Actuarial Adjustment** | | | | |
| Current Year Intangible pension asset | | | | |
| Less: Prior Year Intangible pension asset | | | | |
| Current Year Intangible Pension (Expense) Income | | | | |
| Current Year Accrued pension liability | $33,779,053 | $38,528,730 | $ 36,845,890 | $46,105,433 |
| Less: Prior Year Accrued pension liability | (35,896,198) | (33,779,053) | (38,528,730) | (36,845,890) |
| Current Year Increase (Decrease) Accrued Pension Liability | $ (2,117,145) | $ 4,749,677 | $ (1,682,840) | $ 9,259,543 |
| Current Year Intangible Pension (Expense) Income | 0 | 0 | 0 | 0 |
| Less: Current Year Increase (Decrease) Accrued Pension Liability | $(2,117,145) | $4,749,677 | $ (1,682,840) | $ 9,259,543 |
| Current Year Total Net Pension Revenue & Expense Effect | 2,117,145 | (4,749,677) | 1,682,840 | (9,259,543) |
| Less: Current Year Additional minimum pension liability adjustment | (4,352,482) | 2,618,233 | (3,710,449) | 7,934,801 |
| Current Year Pension Expense Adjustment included in net assets | $(2,235,337) | $(2,131,444) | $ (2,027,609) | $(1,324,742) |

| | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| [3] **Annual Distribution of Cash and Investments** | | | | |
| Available Cash & Investments | $172,224,510 | $174,588,705 | $181,375,958 | $178,698,606 |
| 5.00% | 8,611,225 | 8,729,435 | 9,068,798 | 8,934,930 |
| Available Cash & Investments – Adjusted by Refunding Contribution | 157,672,434 | 160,036,629 | 166,823,882 | 164,146,530 |
| Adjusted – 5% Contribution to DSCR | 7,883,622 | 8,001,831 | 8,341,194 | 8,207,327 |
| Adjusted – Rev's Available for D.S. | 5,913,098 | 7,472,276 | 6,305,652 | 5,747,733 |

[1, 2, 3] See the table set forth in "ANNUAL DEBT SERVICE REQUIREMENTS—Historical Net Income Available for Debt Service and Pro-Forma Debt Service Coverage Ratio" in this Official Statement.
[4] Investment return reduced by the portion of cumulative net appreciation designated for current operations (unrestricted).
Source: The Corporation

**Liquidity and Net Worth**

The Loan Agreement contains several financial covenants. Pro-forma debt service coverage is shown under the caption "ANNUAL DEBT SERVICE REQUIREMENTS—Historical Net Income Available for Debt Service and Pro-Forma Debt Service Coverage" in the front portion of this Official Statement.

The Loan Agreement also contains a Liquidity Covenant and a Net Worth Covenant. See the descriptions of both under the heading "SECURITY FOR THE BONDS" in the front portion of this Official Statement and under "SUMMARY OF CERTAIN PROVISIONS OF THE AGREEMENT—Liquidity Covenant" and "—Net Worth of the Corporation" in Appendix C hereto.

Set forth below are calculations of the Liquidity Covenant and Net Worth Covenant over the past four fiscal years of the Corporation based solely upon the direct debt of the Corporation outstanding. Also included for fiscal year 2016 and as of December 31, 2016 are calculations done on a pro-forma basis giving effect to the issuance of the Bonds, the refunding of the Refunded Bonds and the Corporation's contribution of moneys to be used for the refunding. The pro forma calculations also show the calculations of those covenant ratios giving effect to the Bonds plus 20% of the guaranteed Existing Senior SAG Debt (which is the percentage to be used as long as no default has occurred under the Existing Senior SAG Debt and the guarantee has not been drawn upon), and the Bonds plus 100% of the guaranteed Senior SAG Debt. **However, past operating history is not necessarily indicative of future results.**

### Liquidity Covenant

| | 2013 | 2014 | 2015 | 2016 | 2016 Pro-Forma | (Unaudited) 12-31-2016 Pro-Forma |
|---|---|---|---|---|---|---|
| Unrestricted Cash & Investments | $141,253,910 | $161,227,546 | $153,269,204 | $122,472,882 | $107,920,806 | $107,409,554 |
| Total Debt (Bonds) | $ 62,030,000 | $ 60,635,000 | $ 59,170,000 | $ 57,630,000 | $ 41,895,000 | $ 41,895,000 |
| Liquidity Ratio with respect to Bonds | 2.28 | 2.66 | 2.59 | 2.13 | 2.58 | 2.56 |
| Liquidity Ratio Adding 20% of Guaranteed Existing Senior SAG Debt | | | | | 2.16 | 2.15 |
| Liquidity Ratio Adding 100% of Guaranteed Existing Senior SAG Debt | | | | | 1.31 | 1.30 |

A-13

**Net Worth Test**

| | 2013 | 2014 | 2015 | 2016 | 2016 Pro-Forma | (Unaudited) 12-31-2016 Pro-Forma |
|---|---|---|---|---|---|---|
| Total Financial Resources | $160,605,776 | $191,690,578 | $185,032,158 | $152,365,464 | $137,813,388 | $142,514,024 |
| Total Debt (Bonds) | $ 62,030,000 | $ 60,635,000 | $ 59,170,000 | $ 57,630,000 | $ 41,895,000 | $ 41,895,000 |
| Net Worth with respect to Bonds | 2.59 | 3.16 | 3.13 | 2.64 | 3.29 | 3.40 |
| Net Worth Adding 20% of Guaranteed Existing Senior SAG Debt | | | | | 2.76 | 2.85 |
| Net Worth Adding 100% of Guaranteed Existing Senior SAG Debt | | | | | 1.67 | 1.73 |

[Remainder of page intentionally left blank]

A-14

**2017 Budget**

Set forth below is a comparison of the Corporation's June 30, 2016 and June 30, 2017 approved budget.

**Corporation's Budget**
**June 30, 2016 vs. June 30, 2017**
**Approved Budget**

| | June 30, 2016 Approved Budget | June 30, 2017 Approved Budget | Budget Increases (Reductions) |
|---|---|---|---|
| Revenue: | | | |
| Donations and Grants | $ 856,384 | $ 943,116 | $ 86,732 |
| Parish Assessment Income | 8,300,000 | 8,300,000 | -- |
| School Assessment Income | 982,000 | 930,150 | (51,850) |
| Priest Health Insurance and Retirement | 2,900,000 | 3,000,000 | 100,000 |
| Rent and Royalties | 1,846,019 | 835,900 | (1,010,119) |
| Insurance Income | 14,514,600 | 15,017,100 | 502,500 |
| Other Miscellaneous Income | 4,061,655 | 4,191,801 | 130,146 |
| Gains on Sale of Assets | 1,500,000 | 1,200,000 | (300,000) |
| Deposit and Loan Fund Income | 2,300,000 | 2,300,000 | -- |
| Total Revenue | $37,260,658 | $36,718,067 | $(542,591) |
| Expenses: | | | |
| Administration | $ 4,249,981 | $ 4,051,651 | $(198,330) |
| Christian Formation | 4,860,525 | 4,691,197 | (169,328) |
| Clergy Programs | 6,637,321 | 6,943,308 | 305,987 |
| Community Services | 147,269 | 120,784 | (26,485) |
| Pastoral Services | 3,426,173 | 3,444,784 | 18,611 |
| Religious | 211,818 | 202,471 | (9,347) |
| Financial and Administrative Services[1] | 10,804,623 | 10,995,874 | 191,251 |
| Insurance Expense | 14,725,470 | 14,752,650 | 27,180 |
| Deposit and Loan Fund Expense | 1,250,000 | 1,200,000 | (50,000) |
| Total Expenses | $46,313,180 | $46,402,719 | $ 89,539 |
| Excess (Shortage) of Revenues | (9,052,522) | (9,684,652) | (632,130) |
| Drawdown on Investments (5%—6%) | 4,512,000 | $4,417,000 | (95,000) |
| Excess drawdown of investment return | | | |
| Net Increase (Shortage) of Revenues | $(4,540,522) | $(5,267,652) | $(727,130) |

---

[1] Includes debt service.
Source: The Corporation

The audited financial statements of the Corporation's Administrative Offices for the fiscal year ended June 30, 2016 are included in Appendix B. The financial statements for the fiscal year ended June 30, 2016 were audited by Bourgeois Bennett, L.L.C., New Orleans, Louisiana, certified public accountants.

**Annual Budget Process**

*Corporation Budget*. The Corporation operates on a July 1 through June 30 fiscal year. Department heads within the Corporation submit budgets, which are then reviewed by the Finance Office and the Corporation's Administrative Council. The overall budget is reviewed by the Corporation's Finance Council, which makes recommendations to the Archbishop. The Archbishop has ultimate responsibility for the budget. The major revenue components for the budget are the insurance premiums

charged to parishes and schools for the Corporation health insurance, worker's compensation and property insurance programs, parish and school assessments and investment income. The Corporation expects that the high schools and special needs schools which are owned by the Corporation will budget on a self-sustaining basis with respect to tuition and fees budgeted to cover costs of operations. However, the Corporation is not restricted by its Administrative Offices budget or otherwise from providing additional support to these Corporation owned schools.

The major expense components of the budget in fiscal year 2016 were (in the following order of magnitude) costs incurred for Corporation administration, health and general liability and property insurance, worker's compensation insurance programs, clergy, Christian formation and pastoral services. In addition, the Corporation pays annual assessments to the Vatican, the United States Conference of Catholic Bishops, and the Louisiana Catholic Conference. The Corporation generally budgets and operates on a basis consistent with its mission.

*Parish and School Budgets*. Each parish of the Corporation prepares an individual budget for such parish, which is developed by the pastor of the parish and his staff under the guidelines provided by the Corporation, and is then reviewed by the parish Finance Council. A parish Finance Council generally includes at least three Catholic parishioners appointed by the pastor for three year terms, and meets at least quarterly to assist in the preparation of the annual budget and to prepare annual reports of actual financial results to parishioners. The parish Finance Councils serve an advisory role only, and have no independent authority.

Parish and school budgets are not centrally prepared. The Chief Financial Officer of the Corporation provides the parishes and schools with budget guidelines. The budgets are prepared by the pastor, parish council, finance council and school administration of each parish. Parishes report their financial position and results of operations to the Corporation on an annual basis. In addition, all capital expenditures requiring significant loans are reviewed by the Corporation's Finance Council with final approval by the Archbishop. To the extent parishes need additional funds to operate, they are generally eligible to borrow from the Corporation's Deposit and Loan Fund. On a case by case basis, the Corporation may provide additional financial support, but such instances have been rare and, under the Loan Agreement, can be done only if the Corporation determines that use of such revenues will not adversely affect the ability of the Corporation to make its required loan repayments under the Loan Agreement and to make any payments on any other of its indebtedness when due.

## Investments

The Corporation's investments are accounted for in pooled assets and separately invested portfolios. Pooled assets represent funds that are invested in a commingled portfolio of assets, as opposed to the separately invested assets which have segregated investments. Investments are recorded at fair value at June 30, 2013-2016 and consisted of the following:

| | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Pooled asset portfolio: | | | | |
| Cash and cash equivalents | $ 3,282,571 | $ 3,234,182 | $ 2,473,910 | $ 6,916,730 |
| U.S. government and agency obligations | 10,400,498 | 8,937,911 | 9,080,478 | 9,478,794 |
| Corporate and foreign obligations | 10,024,901 | 6,754,785 | 6,391,353 | 7,719,010 |
| Collateralized mortgage obligations | 2,911,133 | 2,321,532 | 2,396,960 | 1,194,605 |
| Asset-backed securities | 814,580 | 266,955 | 459,259 | 1,310,580 |
| Common stocks | 7,212,987 | 9,448,714 | 10,413,724 | 9,850,547 |
| Mutual funds | 65,995,864 | 78,671,140 | 79,241,876 | 76,483,833 |
| Exchange traded funds | 13,630,781 | 18,026,299 | 11,550,224 | 6,745,258 |
| Preferred stock | -- | -- | 102,531 | 94,275 |
| Common trust funds | 18,541,197 | 17,360,088 | 18,462,199 | 16,588,191 |
| Limited partnerships | 18,551,464 | 19,523,574 | 20,262,212 | 10,609,076 |
| Fund of Funds | -- | -- | -- | 4,915,753 |
| Hedge feeder fund | -- | 4,175,426 | 4,292,826 | 4,058,724 |
| Segregated portfolio companies | 7,430,064 | 10,361,012 | 10,968,860 | 9,916,940 |
| Total pooled asset portfolio | $158,796,040 | $179,081,618 | $176,096,358 | $165,882,116 |
| Separately Invested Portfolio: | | | | |
| Cash and cash equivalents | $ 9,362,364 | $ 17,018,513 | $ 8,284,526 | $ 2,990,203 |
| Brokered certificates of deposit | 3,903,761 | 3,338,817 | 3,343,474 | 2,357,892 |
| Commercial paper | -- | 599,638 | -- | -- |
| Government and agency obligations | 13,364,031 | 7,259,505 | 8,852,899 | 11,400,116 |
| Corporate obligations | 21,994,847 | 35,307,334 | 40,718,281 | 27,045,432 |
| Investment in Catholic Umbrella Pool | 930,482 | 928,143 | 727,995 | 697,224 |
| Municipal obligations | 17,040,681 | 22,104,185 | 24,943,466 | 21,081,117 |
| Collateralized mortgage obligations | 6,876,541 | 4,561,625 | 1,153,317 | 837,863 |
| Asset-backed securities | 506,142 | 511,208 | 503,855 | 311,100 |
| Total separately invested portfolio | $ 73,978,849 | $ 91,628,968 | $ 88,527,813 | $ 66,720,947 |
| Totals | $232,774,889 | $270,710,586 | $264,624,171 | $232,603,063 |

Included within the "Total pooled asset portfolio" and "Totals" above are investments made by the Corporation of custodial funds, which are not funds of the Corporation but are funds held and invested by the Corporation for others. The amounts of custodial funds accounted for within these investments for fiscal years ended June 30, 2013 through 2016 were approximately $71.4 million, $84.2 million, $86.0 million and $83.4 million, respectively, and accordingly, approximately $87.4 million, $94.8 million, $90.1 million and $82.5 million were investments owned by the Corporation. Such amounts also include the net amount of the Deposit and Loan Fund (described below) being the total amount of deposits to the Deposit and Loan Fund less amounts loaned to depositors.

**Deposit and Loan Fund**

The Deposit and Loan Fund has been the "internal bank" for the Corporation since the early 1960s. The Deposit and Loan Fund has aided parishes, schools and other Archdiocesan institutions with low-interest loans for construction, renovations, expansions and emergency needs and has been a facility in which to invest excess working capital. Archdiocesan institutions are required to deposit funds in excess of 90 days of operating cash with the Deposit and Loan Fund. Deposit rates are based on the 90-day U.S. Treasury Bill rate as of March 31 to be adjusted annually effective July 1. The deposit rate equals the 90-day Treasury Bill plus 100 basis points. The loan rate equals the 90-day Treasury Bill plus 400 basis points. The Archdiocesan Finance Council recommended, and Archbishop Aymond approved, the interest rates as follows: loans equaled 4.3% and deposits equaled 1.3% for fiscal year ending June 30, 2017. All borrowing at the individual parish level goes through the Deposit and Loan Fund. The criteria for granting the loan is need, ability to service debt and the financial condition of the Archdiocese. The standard requirement to qualify for a loan is 50% of estimated value of the project on deposit with the Archdiocese, 25% pledged and a plan to service the remaining 25%. Loans up to $100,000 require the approvals of the Chief Operating Officer or Chief Financial Officer; loans from $100,000 to $500,000

require the approval of the Vicar General; and loans over $500,000 require the recommendation of the Archdiocesan Finance Council, and the approval of the Archbishop.

Although deposits are technically reported as liabilities in the Corporation's financial statements, they represent obligations the Corporation owes to its own parishes and therefore function effectively as temporarily designated assets that could be used to pay debt service for capital projects. As of December 31, 2016, the amount of deposits in the Deposit and Loan Fund was approximately $119 million, the amount of loans was approximately $69 million and, accordingly, approximately $50 million was on deposit but not loaned out, constituting temporarily designated assets that would be repaid to depositors when due or requested by the depositors.

**Assessment Revenue**

The Corporation assesses its parishes, schools and affiliates. Assessment Revenue is comprised of three components: Archdiocesan Support, which includes parish share (or church tax) and student assessments, the Insurance Assessment; and the Priests' Benefits Assessment. The schools are assessed $26.50 per student. The parish share is based on a series of incremental (marginal) graduated rates based on a parish's income. Income subject to assessment by the Archdiocese equals the total income of the parish minus capital campaign revenue minus school support. Total income of a parish is comprised of ordinary income (weekly collections, etc.) and extraordinary income (fairs, fundraisers, etc.).

### Parish Tax Rates

| Income Subject to Assessment | Incremental Tax Rate | Applies to | Incremental Tax Rate | Applies To | Incremental Tax Rate | Applies To | Incremental Tax Rate | Applies To |
|---|---|---|---|---|---|---|---|---|
| $0–$100,000 | 5% | Entire Amount | | | | | | |
| $100,001–$200,000 | 8% | Entire Amount | | | | | | |
| $200,001–$400,000 | 10% | First $200,000 | 15% | Remainder | | | | |
| $400,001–$600,000 | 15% | First $400,000 | 18% | Remainder | | | | |
| $600,001–$800,000 | 15% | First $400,000 | 18% | $400,001–$600,000 | 19% | Remainder | | |
| Over $800,000 | 15% | First $400,000 | 18% | $400,001–$600,000 | 19% | $600,001–$800,000 | 20% | Remainder |

Source: The Corporation

### Distribution of Assessment Revenue
### Fiscal Year Ended June 30, 2016

| | School Share | Parish Share | Parish Insurance | Priests' Benefits | Total |
|---|---|---|---|---|---|
| Total | $950,602 | $8,367,269 | $15,390,638 | $2,487,790 | $27,196,299 |

Source: The Corporation

### Undeveloped Land of the Corporation

The Corporation owns approximately 400 acres of undeveloped land and properties which, in many instances, have been owned by the Corporation and its predecessors for many years. While accounted for on the financial statements of the Administrative Offices, in most cases there have been no recent appraisals, and therefore such land and properties are not recorded at fair market value but instead are carried at little or no value.

A-18

Approximately 365 of such acres were in close proximity to the hereinafter described SAG Project.  Of that 365 acres, the Corporation contributed 23.8 acres of land to the SAG Project and 11.5 acres for construction of a church, leaving approximately 330 acres of undeveloped land in that area.  The 330 acres is carried on the books of the Administrative Offices at $660,000.  The Corporation has a contract to sell 104 acres of such land to an unrelated third party for $1.6 million (subject to a variety of closing conditions).  However, this transaction is not necessarily indicative of the value of any other undeveloped property of the Corporation, and, in addition, not all of the land is developable, and any permitted development would require a variety of approvals, permits and potentially zoning changes.

None of these parcels of real estate is mortgaged in support of the Corporation's obligations under the Loan Agreement supporting the Bonds.  However, any proceeds from the sale of these parcels would constitute revenues of the Administrative Offices and as such, would be available to make loan repayments under the Loan Agreement and pay debt service on the Bonds.

**Description of Indebtedness**

Subsequent to the issuance of the Bonds, the Bonds will be the only direct long-term indebtedness of the Corporation.

The Corporation has also guaranteed certain indebtedness of an affiliate, St. Anthony's Garden ("SAG"), a state of Louisiana non-profit corporation formed in 2012 for the sole purpose of developing a rental fee-for-service senior living retirement community known as St. Anthony's Garden (the "SAG Project") and located in St. Tammany Parish, Louisiana near New Orleans.  The SAG Project was funded by a contribution of 23.8 acres of land by the Corporation, and $40,521,000 of senior (the "Existing Senior SAG Debt") and $11,782,013 of subordinate debt (as of January 31, 2017), issued through the Authority for the benefit of SAG, which was the borrower.  The Corporation is the holder of the subordinate debt.  The amount of subordinate debt is expected to continue to increase to be used to pay debt service on the Existing Senior SAG Debt and for working capital for the SAG Project until stabilization of the SAG Project (expected to occur by the end of 2018).  Such additional increase may bring the amount of such subordinate debt up to approximately $15 million.  The SAG Project is complete and consists of 213 units, including 120 independent living units, 57 assisted living units and 36 memory care units.  Occupancy commenced in late November of 2016, and stabilization is expected by the end of 2018.  As of February 9, 2017, SAG had 36 units under lease of which 18 were for independent living, 16 were for assisted living and two were for memory care.  In addition, SAG had deposits for an additional 31 units as of February 9, 2017, of which 19 were for independent living, 11 were for assisted living and one was for memory care.  However, there can be no assurance of any level or levels of occupancy.

Currently, the Corporation has guaranteed 100% of the Existing Senior SAG Debt pursuant to a Guaranty dated September 4, 2014 (the "SAG Guaranty").  The SAG Guaranty provides that the amount of the Senior SAG Debt guaranteed reduces from 100% to 35% when (a) completion of the SAG Project has occurred, (ii) the senior debt service ratio of SAG for the immediately preceding fiscal year exceeds 1:25 to 1, (c) no event of default or default has occurred and is continuing and (d) SAG's days cash on hand exceeds 120.  The SAG Guaranty will terminate in full when (i) completion of the SAG Project has occurred, (b) the senior debt service ratio of SAG for the immediately preceding fiscal year exceeds 1.4 to 1, (iii) no event of default or default has occurred and is continuing and (iv) SAG's days cash on hand exceeds 120.  Conditions (a), (b) and (d) and (i), (ii) and (iv) have yet to occur.

SAG is exploring a refinancing of the SAG Debt, including the Existing Senior SAG Debt guaranteed by the Corporation.  The Corporation expects, if the refinancing is accomplished, to be

A-19

responsible for guaranteeing all or a portion of any new SAG Debt. There can be no assurance that such refinancing will be accomplished.

Under the covenants contained in the Loan Agreement for the Bonds being offered by this Official Statement, guarantees (other than on non-performing debt) are generally included at a 20% level of the debt guaranteed or 100% of the level guaranteed on non-performing debt. See the definition of "Annual Debt Service Requirements" in Appendix C to this Official Statement. A pro-forma debt service coverage ratio for the Bonds plus the Existing Senior SAG Debt is contained under the caption "ANNUAL DEBT SERVICE REQUIREMENTS—Historical Net Income Available for Debt Service and Pro-Forma Debt Service Coverage Ratio" in this Official Statement.

**Hurricane Katrina and Recovery**

On August 29, 2005, Hurricane Katrina crossed the Louisiana coast causing catastrophic damage to many of the Archdiocese properties in the civil parishes of Orleans, Plaquemines, St. Bernard, Jefferson, and St. Tammany.

The June 30, 2016 and 2015 financial statements reflect certain unusual items resulting from the effects of Hurricane Katrina on the operations of the Administrative Offices and certain non-combined affiliated entities. The 2016 and 2015 statements of activities reflect approximately $27.6 million and $43.6 million, respectively, of federal grant monies received and approximately $27.3 million and $34.9 million, respectively, of recovery-related expenses. The federal grant monies received in excess of recovery-related expenses totaling approximately $250,000 and $8.8 million during the years ended June 30, 2016 and 2015, respectively, were spent on non-combined affiliated entity capital projects which were recorded as part of land, buildings, and equipment.

Cumulatively, through June 30, 2016, the Administrative Offices has received approximately $265 million of federal grant monies related to Hurricane Katrina. Of this total, approximately $48 million was spent on non-combined affiliated entity capital projects which were recorded as part of land, buildings, and equipment. As of June 30, 2016, unrestricted net assets includes expenditures of federal grant monies of approximately $44.5 million related to capital costs, net of accumulated depreciation. Remaining federal grant monies to be received as of June 30, 2016, total approximately $42 million.

Temporarily restricted net assets consisting of non-federal donations related to Hurricane Katrina Recovery totaled $1,997,245 as of June 30, 2016 and 2015.

**Nursing Homes and Affordable Senior Living**

The Corporation operates nursing homes and subsidized affordable senior living rental units through various affiliated entities:

*Chateau de Notre Dame* offers assisted living and skilled nursing care. There are 100 assisted living apartment units and 171 nursing beds.

*Wynhoven Health Care Center* offers skilled nursing care. Currently it has 188 nursing beds.

*Our Lady of Wisdom* was acquired at the beginning of 2017 and offers skilled nursing care with approximately 138 skilled nursing beds.

*Notre Dame Hospice* offers hospice services through three offices (New Orleans and Prairieville, Louisiana and Diamondhead, Mississippi) to qualifying individuals who reside within a 50 mile radius of one of those offices.  Those service areas cover much of southeastern Louisiana and the Mississippi gulf coast.

*Christopher Homes, Inc. ("CHI")* currently manages approximately 2,176 subsidized rental units in 18 separate facilities for the low income elderly.  It also will manage 152 units in two other separate facilities expected to open in fiscal year 2017.  CHI is the housing management agent for the Corporation.

Chateau de Notre Dame, Wynhoven Health Care Center, Our Lady of Wisdom and Notre Dame Hospice are licensed through the Louisiana Department of Health (and in the case of the Notre Dame Hospice, also by the appropriate agencies in Mississippi).  They are designated to receive Medicare reimbursements, Medicaid reimbursements, and private pay billings.

**Schools**

Approximately 37,050 students receive a quality and disciplined education in the schools administered by the Corporation.  Catholic education began in America in New Orleans in 1725.  The Corporation has consistently demonstrated the ability to meet the high demand for education and maintain the reputation of providing a quality product.

**Insurance Coverage**

In May 2011, the Corporation incorporated a non-profit captive insurance company in the State of Vermont and The Archdiocese of New Orleans Indemnity, Inc. was capitalized with a $2,000,000 investment from the Corporation.  The purpose of the captive is to reduce the Corporation's long term cost of insurance.

The captive provides a self-insurance program for general liability, property, auto liability, and personal misconduct.  The captive is self-insured for $300,000 per occurrence up to an annual aggregate limit of $3.5 million.  In addition, the captive provides coverage for workman's compensation with an $800,000 self-insured retention with no annual aggregate.

The Corporation incurs an annual insurance expense of approximately $5,350,000 related to the captive.  This $5,350,000 is premium earned for the captive.

In the fiscal year ended June 30, 2016, the captive declared a dividend of $2,000,000.  The Corporation received the dividend and has now recovered its initial investment.  The dividend is reflected in the net asset reduction from the fiscal year ended June 30, 2015 to the fiscal year ended June 30, 2016.

At June 30, 2015 and 2016, and at December 31, 2015 and 2016 (on an unaudited basis), the captive's balance sheet was as follows:

A-21

|  | Audited 6/30/2015 | Audited 6/30/2016 | (Unaudited) 12-31-2015 | (Unaudited) 12-31-2016 |
|---|---|---|---|---|
| ASSETS |  |  |  |  |
| Cash & Investments | $12,835,246 | $12,926,794 | $12,115,270 | $13,548,663 |
| Receivables | -- | -- | 2,675,072 | 2,702,180 |
| Other Assets | 69,076 | 70,632 | 72,166 | 84,357 |
| Total Assets | 12,904,322 | 12,997,426 | 14,862,508 | 16,335,200 |
| LIABILITIES |  |  |  |  |
| Case Base Reserves | 2,061,053 | 2,831,138 | 2,565,141 | 3,612,810 |
| IBNR Reserves | 4,227,484 | 4,576,374 | 5,088,630 | 4,826,458 |
| Losses Payable | 248,709 | 392,187 | 187,869 | 135,720 |
| Deferred Revenue | -- | -- | 2,675,072 | 2,702,180 |
| Accounts Payable | 54,000 | 55,500 | 47,956 | 48,287 |
| Total Liabilities | 6,591,246 | 7,855,199 | 10,564,668 | 11,325,455 |
| NET ASSETS | $6,313,076 | $5,142,227 | $4,297,840 | $5,009,745 |

The Corporation also insured through the Catholic Mutual Group (CMG). CMG provides various types of coverages. For example, building and contents, general liability, excess liability, personal misconduct, directors and officers liability, excess named storms, etc. These expenses are allocated to various entities throughout the Archdiocese. The revenues and expenses related to these items are reflected in the statement of Income and Expense of the Archdiocese. These various entities reimburse the Archdiocese for their share of these premiums.

The Archdiocese also obtains flood insurance on all eligible properties under the federal National Flood Program. However, not all properties of the Archdiocese are eligible for this type of insurance or insurance under the federal program.

Total annual insurance premium expenses for all purposes is approximately $14 million, including the insurance premium paid to the captive described above.

**Litigation and Contingencies**

The Corporation has certain pending and threatened litigation and claims; however, management believes the probable resolution of such contingencies will not exceed the established reserves or insurance coverage and will not materially affect its financial position.

The Corporation has resolved almost all of its known claims for personal misconduct. The Corporation annually funds a reserve for future personal misconduct claims, and its experience in recent years has had a minimal impact outside of its established reserves and net of insurance. The Corporation maintains an insurance policy for future potential personal misconduct claims in the amount of $2,000,000 (annual aggregate). See "Insurance Coverage" immediately above. The Archbishop and the Corporation continue to implement the Charter for the Protection of Children and Young People" adopted by the United States Conference of Catholic Bishops in 2002 and other proactive policies adopted by the Corporation in regard to the prevention and recognition of abusive situations.

**Limits on Capital Expenditures**

The Archdiocese controls all building renovation and repair projects through the Building Office. The Building Office employs three design professionals: two architects and a construction manager.

A-22

Initial requests for projects must include the following details: the pastoral or institutional need for the project; the nature of the project and a description of how it meets the pastoral or institutional need; approximate cost of the project; how the project will be financed (e.g., funds on deposit, building campaign, or Archdiocesan loan); and if the project involves a worship area, the pastor must meet with the office of worship.

Approvals are required as follows: on projects from $10,000 to $100,000, the approval of the Chief Financial Officer or the Chief Operating Officer is required; on projects from $100,000 to $500,000, the approval of the Vicar General is required, and on projects over $500,000, the approvals of the Archdiocesan Finance Council and the Archbishop are required.

**Defined Benefit Pension Plan**

Incardinated priests of the Archdiocese whose retirement from active service is duly accepted by the Archbishop are eligible for retirement benefits.  Benefit payments are based on years of service rather than compensation levels.  The retirement plan is not an ERISA plan.

As of June 30, 2016, the plan had an accrued pension liability of approximately $46.1 million. The actuarial present value of the projected benefit obligation was computed using a weighted average discount rate of 3.78%.  The Corporation expects to make benefit payments to the pension plan of $1.486 million in fiscal year 2017.

**Employee Relations**

The Corporation characterizes its employee relations to be good.  No portion of the Corporation's workforce is unionized or participates in collective bargaining.

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX B**

**AUDITED FINANCIAL STATEMENTS OF THE CORPORATION'S ADMINISTRATIVE OFFICES**
**FOR FISCAL YEARS ENDED JUNE 30, 2016 AND 2015**

[THIS PAGE INTENTIONALLY LEFT BLANK]

*Financial Report*

# *Roman Catholic Church of the Archdiocese of New Orleans Administrative Offices*

### *June 30, 2016*





*Financial Report*

# *Roman Catholic Church of the Archdiocese of New Orleans Administrative Offices*

*June 30, 2016*

# TABLE OF CONTENTS

**Roman Catholic Church of the Archdiocese of New Orleans
Administrative Offices**

June 30, 2016 and 2015

|  | Page Number |
|---|---|
| **Financial Section** | |
| Independent Auditor's Report | 1 - 2 |
| **Exhibits** | |
| A    - Statements of Financial Position | 3 |
| B-1 - Statement of Activities, June 30, 2016 | 4 - 5 |
| B-2 - Statement of Activities, June 30, 2015 | 6 - 7 |
| C    - Statements of Cash Flows | 8 - 9 |
| D    - Notes to Financial Statements | 10 - 50 |
| **Supplementary Information** | |
| **Schedules** | |
| 1 - Schedule of Changes in Net Assets - Temporarily Restricted | 51 |
| 2 - Schedule of Changes in Net Assets - Permanently Restricted | 52 |
| 3 - Schedule of Expenses - Program Services | 53 |
| 4 - Schedule of Expenses - Supporting Services | 54 |
| 5 - Schedule of Investment Balances by Classification | 55 - 60 |
| 6 - Schedule of Compensation, Benefits, and Other Payments to Agency Head or Chief Executive Officer | 61 |

## TABLE OF CONTENTS (Continued)

**Roman Catholic Church of the Archdiocese of New Orleans**
**Administrative Offices**

June 30, 2016 and 2015

|  | Page Number |
|---|---|
| **Special Reports of Certified Public Accountants** | |
| Independent Auditor's Report on Internal Control Over Financial Reporting and on Compliance and Other Matters Based on an Audit of Financial Statements Performed in Accordance with *Government Auditing Standards* | 62 - 63 |
| Independent Auditor's Report on Compliance for Each Major Program and on Internal Control Over Compliance Required by the Uniform Guidance | 64 - 66 |
| Schedule of Expenditures of Federal Award | 67 |
| Notes to Schedule of Expenditures of Federal Award | 68 |
| Schedule of Findings and Questioned Costs | 69 - 71 |
| **Reports by Management** | |
| Schedule of Prior Year Findings and Questioned Costs | 72 |
| Management's Corrective Action Plan on Current Year Findings | 73 - 74 |

**FINANCIAL SECTION**



# INDEPENDENT AUDITOR'S REPORT

To the Most Reverend Gregory M. Aymond,
      Archbishop of the Roman Catholic Church of
         The Archdiocese of New Orleans,
           New Orleans, Louisiana.

**Report on the Financial Statements**

We have audited the accompanying  financial statements of the Roman Catholic Church of the Archdiocese of New Orleans Administrative Offices (the "Administrative Offices"), which comprise the statements of financial position as of June 30, 2016 and 2015, and the related statements of activities and cash flows for the years then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal controls relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits.  We conducted our audits in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States.  Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements.  The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error.  In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control.  Accordingly, we express no such opinion.  An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

1

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Administrative Offices as of June 30, 2016 and 2015, and the changes in its net assets and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

**Other Matters**

*Other Information*

Our audits were conducted for the purpose of forming an opinion on the financial statements as a whole. The supplemental schedules (Schedules 1 through 5) are presented for purposes of additional analysis and are not a required part of the financial statements of the Administrative Offices. The accompanying schedule of expenditures of federal award, as required by Title 2 U.S. *Code of Federal Regulations* (CFR) Part 200, *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, is presented for purposes of additional analysis and is also not a required part of the financial statements. The Schedule of Compensation, Benefits, and Other Payments to Agency Head or Chief Executive Officer (Schedule 6) is presented for purposes of additional analysis and is required by Louisiana Revised Statute 24:513(A)(3) and is not a required part of the financial statements. Such information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole.

**Other Reporting Required by *Government Auditing Standards***

In accordance with *Government Auditing Standards*, we have also issued our report dated November 14, 2016, on our consideration of the Administrative Offices' internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts and grant agreements, and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the Administrative Offices' internal control over financial reporting and compliance.

*Bourgeois Bennett, L.L.C.*

Certified Public Accountants.

New Orleans, Louisiana,
November 14, 2016.

2

**Exhibit A**

## STATEMENTS OF FINANCIAL POSITION

**Roman Catholic Church of the Archdiocese of New Orleans
Administrative Offices**

June 30, 2016 and 2015

### ASSETS

|  | 2016 | 2015 |
|---|---|---|
| Cash and cash equivalents | $ 5,248,515 | $ 8,735,002 |
| Grants receivable - FEMA | 2,497,613 | 7,052,963 |
| Accounts receivable from affiliates and other | 3,645,493 | 3,477,767 |
| Prepaid expenses | 1,467,726 | 1,480,541 |
| Loans receivable from affiliates - less allowance for doubtful receivables of $11,097,625 and $11,212,902 for 2016 and 2015, respectively | 71,946,780 | 59,802,336 |
| Investments | 232,603,063 | 264,624,171 |
| Land, buildings, and equipment - less accumulated depreciation of $37,299,030 and $35,841,349 for 2016 and 2015, respectively | 77,212,519 | 76,247,124 |
| Other assets | 2,268,345 | 2,372,145 |
| Beneficial interest in charitable remainder trust | 429,556 | 403,430 |
| Total assets | $ 397,319,610 | $ 424,195,479 |

### LIABILITIES AND NET ASSETS

| **Liabilities** | 2016 | 2015 |
|---|---|---|
| Accounts payable | $ 2,858,843 | $ 7,315,255 |
| Accrued expenses and other | 4,066,673 | 3,933,472 |
| Accrued liability for self-insured claims | 1,284,299 | 1,167,859 |
| Deposits payable to affiliates | 115,749,156 | 123,978,928 |
| Funds held for affiliates | 86,854,026 | 89,906,975 |
| Bonds payable | 58,361,006 | 59,960,300 |
| Accrued pension liability | 46,105,433 | 36,845,890 |
| Total liabilities | 315,279,436 | 323,108,679 |
| **Commitments and Contingencies** (Note 15) | - | - |
| **Net Assets** |  |  |
| Unrestricted | 54,563,320 | 71,756,782 |
| Temporarily restricted | 13,334,491 | 15,193,527 |
| Permanently restricted | 14,142,363 | 14,136,491 |
| Total net assets | 82,040,174 | 101,086,800 |
| Total liabilities and net assets | $ 397,319,610 | $ 424,195,479 |

See notes to financial statements.

3

**Exhibit B-1**

## STATEMENT OF ACTIVITIES

**Roman Catholic Church of the Archdiocese of New Orleans Administrative Offices**

For the year ended June 30, 2016
(with comparative totals for 2015)

| | 2016 | | | | 2015 |
| --- | --- | --- | --- | --- | --- |
| | Unrestricted | Temporarily Restricted | Permanently Restricted | Totals | Comparative Totals |
| **Revenue, Gains, and Other Support** | | | | | |
| Assessments to affiliated entities for: | | | | | |
| Archdiocesan support | $ 9,317,871 | | | $ 9,317,871 | $ 9,268,868 |
| Priest health insurance and retirement | 2,487,790 | | | 2,487,790 | 2,400,503 |
| Insurance | 15,390,638 | | | 15,390,638 | 14,613,661 |
| Total assessments | 27,196,299 | | | 27,196,299 | 26,283,032 |
| Bad debt recovery | 729,276 | | | 729,276 | 155,103 |
| Contributions and grants | 698,976 | $ 455,161 | $ 5,872 | 1,160,009 | 1,324,164 |
| Rents and royalties | 816,096 | | | 816,096 | 776,246 |
| Spending distribution - investment income | 3,240,000 | 482,000 | | 3,722,000 | 3,783,770 |
| Interest income - Deposit and Loan Fund | 2,521,189 | | | 2,521,189 | 2,093,516 |
| Fees collected and other revenue | 4,993,688 | | | 4,993,688 | 4,622,350 |
| Gain on sale of assets | 2,692,467 | | | 2,692,467 | 2,735,938 |
| Changes in value of split-interest agreement | | 26,126 | | 26,126 | (224,815) |
| Net assets released from restrictions - satisfaction of program restrictions | 1,482,034 | (1,482,034) | | - | - |
| Total revenue, gains, and other support | 44,370,025 | (518,747) | 5,872 | 43,857,150 | 41,549,304 |
| **Expenses** | | | | | |
| Program services: | | | | | |
| Christian formation | 5,283,625 | | | 5,283,625 | 4,666,443 |
| Clergy | 8,296,390 | | | 8,296,390 | 8,636,334 |
| Community services | 95,864 | | | 95,864 | 95,566 |
| Gifts and grants | 280,163 | | | 280,163 | 353,348 |
| Insurance | 13,343,519 | | | 13,343,519 | 14,532,053 |
| Pastoral services | 3,017,186 | | | 3,017,186 | 2,909,161 |
| Religious | 219,454 | | | 219,454 | 210,206 |
| Total program services expenses | 30,536,201 | - | - | 30,536,201 | 31,403,111 |

4

**Exhibit B-1 (Continued)**

| | 2016 | | | | 2015 |
| | Unrestricted | Temporarily Restricted | Permanently Restricted | Totals | Comparative Totals |
|---|---|---|---|---|---|
| **Expenses (Continued)** | | | | | |
| Supporting services: | | | | | |
| Administration | 3,492,961 | | | 3,492,961 | 3,174,746 |
| Financial services | 12,053,962 | | | 12,053,962 | 8,882,427 |
| Interest | 2,709,729 | | | 2,709,729 | 2,785,397 |
| Interest expense - Deposit and Loan Fund | 1,274,043 | | | 1,274,043 | 1,269,286 |
| Total supporting services expenses | 19,530,695 | - | - | 19,530,695 | 16,111,856 |
| Total expenses | 50,066,896 | - | - | 50,066,896 | 47,514,967 |
| Income (Loss) From Operations | (5,696,871) | (518,747) | 5,872 | (6,209,746) | (5,965,663) |
| **Non-Operating Revenues (Expenses)** | | | | | |
| Investment income (loss) - net | (1,061,259) | (858,289) | | (1,919,548) | 1,869,082 |
| Less - spending distribution | (3,240,000) | (482,000) | | (3,722,000) | (3,783,770) |
| Investment income (loss) - net of spending distribution | (4,301,259) | (1,340,289) | - | (5,641,548) | (1,914,688) |
| Grants and donations related to hurricanes | 28,089,184 | | | 28,089,184 | 43,594,834 |
| Distributions of grants and donations to affiliates | (27,349,715) | | | (27,349,715) | (34,934,515) |
| Total non-operating revenues (expenses) - net | (3,561,790) | (1,340,289) | - | (4,902,079) | 6,745,631 |
| **Excess (Deficiency) of Revenue, Gains, and Other Support Over Expenses** | (9,258,661) | (1,859,036) | 5,872 | (11,111,825) | 779,968 |
| **Additional Minimum Pension Liability Adjustment** | (7,934,801) | | | (7,934,801) | 3,710,449 |
| **Increase (Decrease) in Net Assets** | (17,193,462) | (1,859,036) | 5,872 | (19,046,626) | 4,490,417 |
| **Net Assets** | | | | | |
| Beginning of year | 71,756,782 | 15,193,527 | 14,136,491 | 101,086,800 | 96,596,383 |
| End of year | $ 54,563,320 | $ 13,334,491 | $ 14,142,363 | $ 82,040,174 | $ 101,086,800 |

See notes to financial statements.

5

78

Exhibit B-2

## STATEMENT OF ACTIVITIES

**Roman Catholic Church of the Archdiocese of New Orleans**
**Administrative Offices**

For the year ended June 30, 2015

| | Unrestricted | Temporarily Restricted | Permanently Restricted | Totals |
|---|---|---|---|---|
| **Revenue, Gains, and Other Support** | | | | |
| Assessments to affiliated entities for: | | | | |
| Archdiocesan support | $ 9,268,868 | | | $ 9,268,868 |
| Priest health insurance and retirement | 2,400,503 | | | 2,400,503 |
| Insurance | 14,613,661 | | | 14,613,661 |
| Total assessments | 26,283,032 | | | 26,283,032 |
| Bad debt recovery | 155,103 | | | 155,103 |
| Contributions and grants | 733,463 | $ 589,871 | $ 830 | 1,324,164 |
| Rents and royalties | 776,246 | | | 776,246 |
| Spending distribution – investment income | 3,223,739 | 560,031 | | 3,783,770 |
| Interest income – Deposit and Loan Fund | 2,093,516 | | | 2,093,516 |
| Fees collected and other revenue | 4,622,350 | | | 4,622,350 |
| Gain on sale of assets | 2,735,938 | | | 2,735,938 |
| Changes in value of split-interest agreement | | (224,815) | | (224,815) |
| Net assets released from restrictions - satisfaction of program restrictions | 1,284,564 | (1,284,564) | | - |
| Total revenue, gains, and other support | 41,907,951 | (359,477) | 830 | 41,549,304 |
| **Expenses** | | | | |
| Program services: | | | | |
| Christian formation | 4,666,443 | | | 4,666,443 |
| Clergy | 8,636,334 | | | 8,636,334 |
| Community services | 95,566 | | | 95,566 |
| Gifts and grants | 353,348 | | | 353,348 |
| Insurance | 14,532,053 | | | 14,532,053 |
| Pastoral services | 2,909,161 | | | 2,909,161 |
| Religious | 210,206 | | | 210,206 |
| Total program services expenses | 31,403,111 | - | - | 31,403,111 |

6

79

**Exhibit B-2 (Continued)**

| | Unrestricted | Temporarily Restricted | Permanently Restricted | Totals |
|---|---|---|---|---|
| **Expenses (Continued)** | | | | |
| Supporting services: | | | | |
| Administration | 3,174,746 | | | 3,174,746 |
| Financial services | 8,882,427 | | | 8,882,427 |
| Interest | 2,785,397 | | | 2,785,397 |
| Interest expense – Deposit and Loan Fund | 1,269,286 | | | 1,269,286 |
| Total supporting services expenses | 16,111,856 | - | - | 16,111,856 |
| Total expenses | 47,514,967 | - | - | 47,514,967 |
| **Income (Loss) From Operations** | (5,607,016) | (359,477) | 830 | (5,965,663) |
| **Non-Operating Revenues (Expenses)** | | | | |
| Investment income (loss) - net | 1,729,958 | 139,124 | | 1,869,082 |
| Less - spending distribution | (3,223,739) | (560,031) | | (3,783,770) |
| Investment income (loss) - net of spending distribution | (1,493,781) | (420,907) | - | (1,914,688) |
| Grants and donations related to hurricanes | 43,594,834 | | | 43,594,834 |
| Distributions of grants and donations to affiliates | (34,934,515) | | | (34,934,515) |
| Total non-operating revenues (expenses) - net | 7,166,538 | (420,907) | - | 6,745,631 |
| **Excess (Deficiency) of Revenue, Gains, and Other Support Over Expenses** | 1,559,522 | (780,384) | 830 | 779,968 |
| **Additional Minimum Pension Liability Adjustment** | 3,710,449 | | | 3,710,449 |
| **Increase (Decrease) in Net Assets** | 5,269,971 | (780,384) | 830 | 4,490,417 |
| **Net Assets** | | | | |
| Beginning of year | 66,486,811 | 15,973,911 | 14,135,661 | 96,596,383 |
| End of year | $ 71,756,782 | $ 15,193,527 | $ 14,136,491 | $ 101,086,800 |

See notes to financial statements.

7

Exhibit C

# STATEMENTS OF CASH FLOWS

**Roman Catholic Church of the Archdiocese of New Orleans
Administrative Offices**

For the years ended June 30, 2016 and 2015

|  | 2016 | 2015 |
|---|---|---|
| **Cash Flows From Operating Activities** | | |
| Increase (decrease) in net assets | $ (19,046,626) | $ 4,490,417 |
| Adjustments to reconcile increase (decrease) in net assets to net cash used in operating activities: | | |
| Federal grants restricted for building construction | (242,699) | (8,755,862) |
| Depreciation and amortization | 2,163,638 | 1,631,599 |
| Bond premium amortization | (59,294) | (60,805) |
| Asset retirement obligation accretion | 45,286 | 43,130 |
| Provision for doubtful receivables - net | 3,579,908 | (1,416,992) |
| Net gain from sale of assets | (2,692,467) | (2,735,938) |
| Unrealized loss on investments | 2,312,002 | 1,878,230 |
| Increase (decrease) in accrued pension liability | 9,259,543 | (1,682,840) |
| Change in beneficial interest in charitable remainder trust | (26,126) | 224,815 |
| Contributions restricted for long-term investments | (5,872) | (830) |
| Changes in operating assets and liabilities: | | |
| Decrease (increase) in grants, accounts and other receivables | 4,213,089 | (4,630,015) |
| Decrease (increase) in prepaid expenses | 12,815 | (14,885) |
| Increase (decrease) in accounts payable, accrued expenses, and other | (4,252,057) | 2,821,035 |
| Net cash used in operating activities | (4,738,860) | (8,208,941) |

8

**Exhibit C
(Continued)**

| | 2016 | 2015 |
|---|---|---|
| **Cash Flows From Investing Activities** | | |
| Collection on loans to affiliates | 77,205,572 | 62,037,975 |
| Loans made to affiliates | (95,400,776) | (66,969,848) |
| Decrease in investments - net | 29,673,585 | 4,172,206 |
| Proceeds from sale of land, buildings, and equipment | 3,193,962 | 3,248,779 |
| Purchases of land, buildings, and equipment | (1,055,876) | (11,285,292) |
| Decrease in investments restricted for debt service | 35,521 | 35,979 |
| Net cash provided by (used in) investing activities | 13,651,988 | (8,760,201) |
| **Cash Flows From Financing Activities** | | |
| Collection of federal grant funds restricted for building construction | 417,234 | 10,191,836 |
| Increase (decrease) in deposits payable to affiliates - net | (8,229,772) | 7,592,520 |
| Bond principal payments | (1,540,000) | (1,465,000) |
| Increase (decrease) in funds held for affiliates | (3,052,949) | 936,900 |
| Proceeds from permanently restricted contributions | 5,872 | 830 |
| Net cash provided by (used in) financing activities | (12,399,615) | 17,257,086 |
| **Net Increase (Decrease) In Cash and Cash Equivalents** | (3,486,487) | 287,944 |
| **Cash and Cash Equivalents** | | |
| Beginning of year | 8,735,002 | 8,447,058 |
| End of year | $ 5,248,515 | $ 8,735,002 |
| **Supplemental Disclosure of Cash Flow Information** | | |
| Cash paid during the year for interest | $ 2,805,648 | $ 2,881,078 |
| Non-Cash Transaction | | |
| Property repossession in partial satisfaction of affiliate loan receivable | $ 2,470,852 | $ - |

See notes to financial statements.

9

Exhibit D

# NOTES TO FINANCIAL STATEMENTS

### Roman Catholic Church of the Archdiocese of New Orleans
### Administrative Offices

June 30, 2016 and 2015

**Note 1 -   ORGANIZATION**

The accompanying financial statements of the Roman Catholic Church of the Archdiocese of New Orleans Administrative Offices (the "Administrative Offices") include the assets, liabilities, net assets, and the financial activities of all administrative and program offices and departments maintained and directed by the administrative offices of the Roman Catholic Church of the Archdiocese of New Orleans, a Louisiana corporation (the "Archdiocese"), and also include certain assets which are owned by the Archdiocese and are used in the operations of certain non-combined affiliated entities. The purpose of the Administrative Offices is to provide support and services to the various church parishes and other related agencies within the Archdiocese.  Operating support is derived primarily from assessments received from affiliated entities, contributions and bequests, interest on loans to church parishes and other related organizations, and investment earnings.  The activities of the Administrative Offices also include:

- the operation of the Deposit and Loan Fund, which provides savings and loan services to the parishes and other related organizations;

- the administration of a centralized property and casualty insurance program;

- the investment of endowment funds; and

- the administration and funding of health care, auto insurance, and retirement costs for priests of the Archdiocese.

The activities of church parishes, schools, cemeteries, seminaries, nursing homes, charitable institutions, and other distinct operating entities, including a captive insurance company (see Note 15), which operate within the Archdiocese ("non-combined affiliated entities") have not been included in the accompanying financial statements.

**Note 2 -   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

### a. Basis of Accounting

The financial statements of the Administrative Offices have been prepared in accordance with accounting principles generally accepted in the United States of America.

10

**Exhibit D**
**(Continued)**

**Note 2 -  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

    **b.  Basis of Presentation**

The Administrative Offices reports information regarding its financial position and activities according to three classes of net assets:

**Unrestricted Net Assets** - Those net assets whose use is not restricted by donors.

**Temporarily Restricted Net Assets** - Those net assets whose use by the Administrative Offices has been limited by donors (a) to later periods of time or after specified dates or (b) to specific purposes.

**Permanently Restricted Net Assets -** Those net assets that must be maintained in perpetuity due to donor-imposed restrictions that will neither expire with the passage of time nor be removed by meeting certain requirements. Income earned on these investments may be restricted for specific purposes.

    **c.  Use of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect certain reported amounts of assets and liabilities, and disclosure of contingent assets and liabilities, as of the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Of particular significance to the Administrative Offices' financial statements are estimates related to pension assumptions, the allowance for doubtful loans receivable, and the accrued liability for self-insured claims. Actual results could differ from those estimates.

    **d.  Cash and Cash Equivalents**

For the purpose of the Statements of Cash Flows, cash equivalents is defined to include highly liquid short-term investments, including money market account deposits, commercial paper investments, and certificates of deposit purchased with an original maturity of 90 days or less, unless held in the investment portfolios.

11

<b>Exhibit D<br>(Continued)</b>

**Note 2 -   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

### e.  Accounts and Loans Receivable

The accounts and loans receivable include advances made to church parishes and diocesan-related organizations, as a result of a cooperative lending program established by the Administrative Offices for the mutual benefit of participants. The determination of the terms of repayment and interest charges is made by the Administrative Offices on an individual case basis. Since most of the accounts and loans receivable consist of large amounts due from a limited number of related organizations, the determination of the collectability of these receivables is also made by management on an individual case basis, using prior collection histories and current economic factors as judgment criteria.

### f.  Allowance for Doubtful Receivables

The Administrative Offices establishes an allowance for uncollectible loans receivable based on management's evaluation of the collectability of outstanding loans receivable.

### g.  Pledges Receivable

Unconditional promises to give are recognized as revenue or gains and as assets in the period in which the promise is made, and are recorded at the present value of their estimated future cash flows. The discounts on those amounts are computed using risk-free interest rates applicable to the years in which the promises are received. Amortization of the discounts is included in contribution revenue. Conditional promises to give are not included as support until the conditions are substantially met. Allowances for uncollectible promises to give, if any, are based on management's evaluation of the collectability of such amounts. As of June 30, 2016 and 2015, there were no pledges receivable.

### h.  Investments

Investments are valued at their fair values in the Statements of Financial Position. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. See Note 16 for a discussion of fair value measurements. Purchases and sales of securities are recorded on a trade-date basis. Unrealized gains and losses on investments recorded at fair value are included in the Statements of Activities as increases or decreases in unrestricted net assets, unless their use is temporarily or permanently restricted by explicit donor stipulations or by law.

12

**Note 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

### h. Investments (Continued)

Investments are managed to achieve the maximum long-term total return. A spending rate approach is used to allocate investment return for operating purposes each year, with the remainder of investment income reinvested and reported as non-operating income. A spending rate of approximately 5% of the market value of the Administrative Offices' pooled investments (excluding funds held for others) as of the beginning of each fiscal year was used during each of the fiscal years ended June 30, 2016 and 2015.

Investments consist of the following:

- Investments over which the Archdiocese retains control and may use at its own discretion subject to donor restrictions, if any;

- Investments restricted for debt service, which are those funds set aside to pay related debt service costs;

- Funds held for others, which funds are owned by affiliated entities that are held in a custodial capacity and invested in a centralized investment pool of assets.

### i. Land, Buildings, and Equipment

Land, buildings, and equipment are recorded at cost or, when donated, at fair value. Additions and major improvements are capitalized, while expenditures for maintenance and repairs are expensed as incurred.

Depreciation on buildings, improvements, and equipment is calculated using the straight-line method over the estimated useful lives, as follows:

| | |
|---|---|
| Furniture and fixtures | 5 years |
| Transportation equipment | 5 years |
| Buildings and improvements | 40 years |

13

**Exhibit D**
**(Continued)**

**Note 2 -   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

    **j.  Impairment of Long-Lived Assets**

The Administrative Offices reviews its long-lived assets, consisting of buildings and equipment, for impairment and determines whether an event or change in facts and circumstances indicates that their carrying amount may not be recoverable. The Administrative Offices determines recoverability of the assets by comparing the carrying value of the asset to the net future undiscounted cash flows that the asset is expected to generate or to fair value. The impairment recognized is the amount by which the carrying amount exceeds the fair value of the asset. During the years ended June 30, 2016 and 2015, no asset impairments were recorded.

    **k.  Historical Treasures**

Included in other assets is a donation of historical documents (Garrison St. Lazarus) that does not meet the definition of a collection. This asset was recorded at fair value at the time of donation.

    **l.  Deposits Payable to Affiliates**

Entities affiliated with the Archdiocese are encouraged to deposit funds not required for short-term operating needs with the Administrative Offices. Such deposits are used to fund loans and make other investments. Market rates of interest are paid on such deposits. Such interest rates are adjusted annually based on changes in the 90-day U.S. Treasury bill rate.

    **m.  Funds Held for Affiliates**

The Administrative Offices acts as a custodian for funds owned by affiliated entities to provide centralized investment of pooled assets. Earnings on these investments are allocated monthly.

    **n.  Amortization of Bond Issue Costs**

Included in other assets are bond issue costs of approximately $3,104,000 as of June 30, 2016 and 2015, which are being amortized over the term of the related bond issue using a method that approximates the interest method. Accumulated amortization was approximately $958,000 and $854,000 as of June 30, 2016 and 2015, respectively.

14

**Exhibit D**
**(Continued)**

## Note 2 -  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

    **o.  Statements of Activities**

Transactions deemed to be ongoing, major, or central to the operations of the Administrative Offices are reported as operating revenues and expenses. Peripheral or incidental transactions, when material, are reported as non-operating gains or losses, as are investment returns net of the predetermined spending rate.

Grants and donations received and distributed to affiliates and expenses incurred relating to Hurricane Katrina (see Note 3) are reported as non-operating activities.

Changes in unrestricted net assets that are excluded from excess of unrestricted revenues, gains, and other support over expenses include changes in the additional minimum pension liability. (See Note 9.)

    **p.  Contributed Support**

The Administrative Offices recognizes all contributed support received as income in the period received. Contributed support is reported as unrestricted or as restricted depending on the existence of donor stipulations that limit the use of the support.

When a donor restriction expires, that is, when a stipulated time restriction ends or purpose restriction is accomplished, temporarily restricted net assets are reclassified to unrestricted net assets and reported in the Statement of Activities as net assets released from restrictions. Federal grant income received and expended in the same year is recorded as unrestricted revenue.

Long-lived assets acquired with gifts of cash restricted for those acquisitions are reported as unrestricted or as temporarily restricted depending on whether there is an explicit, donor-imposed time requirement as to how long the assets must be maintained. Long-lived assets are reported as permanently restricted only if the Administrative Offices must maintain the assets in perpetuity or if the donor explicitly restricted the proceeds from any future disposition of the assets to reinvestment in long-lived assets.

**Note 2 -    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

    **q.  Functional Allocation of Expenses**

    The costs of providing various programs and other activities of the Administrative Offices have been summarized on a functional basis in the statement of activities. Accordingly, certain costs have been allocated among the programs and supporting services benefited.

    **r.  Income Taxes**

    The Archdiocese operates as a non-profit corporation pursuant to Section 501(c)(3) of the Internal Revenue Code.  As such, the Administrative Offices is subject to income tax only on unrelated business taxable income, resulting from certain investment holdings.

    Accounting standards provide detailed guidance for financial statement recognition, measurement, and disclosure of uncertain tax positions recognized in an entity's financial statements.  It requires an entity to recognize the financial statement impact of a tax position when it is more likely than not that the position will not be sustained on examination. As of June 30, 2016 and 2015, management of the Administrative Offices believes that it has no uncertain tax positions that qualify for either recognition or disclosure in the financial statements. Tax years ended June 30, 2013 and later remain subject to examination by the taxing authorities.

    **s.  Subsequent Events**

    Management evaluates events occurring subsequent to the date of the financial statements in determining the accounting for and disclosure of transactions and events that affect the financial statements.  Subsequent events have been evaluated through November 14, 2016, which is the date the financial statements were available to be issued.

**Exhibit D**
**(Continued)**

**Note 3 -** **HURRICANE KATRINA AND RECOVERY**

The June 30, 2016 and 2015 financial statements reflect certain unusual items resulting from the effects of Hurricane Katrina on the operations of the Administrative Offices and certain non-combined affiliated entities. The 2016 and 2015 statements of activities reflect approximately $27.6 million and $43.6 million, respectively, of federal grant monies received and approximately $27.3 million and $34.9 million, respectively, of recovery-related expenses. The federal grant monies received in excess of recovery-related expenses totaling approximately $250,000 and $8.8 million during the years ended June 30, 2016 and 2015, respectively, were spent on non-combined affiliated entity capital projects which were recorded as part of land, buildings, and equipment.

Cumulatively, through June 30, 2016, the Administrative Offices has received approximately $265 million of federal grant monies related to Hurricane Katrina. Of this total, approximately $48 million was spent on non-combined affiliated entity capital projects which were recorded as part of land, buildings, and equipment. The remaining $217 million was distributed to other non-combined affiliated entities and was recorded on the books of those entities. As of June 30, 2016, unrestricted net assets includes expenditures of federal grant monies of approximately $44.5 million related to capital costs, net of accumulated depreciation. Remaining federal grant monies to be received as of June 30, 2016, totals approximately $42 million.

Temporarily restricted net assets consisting of non-federal donations related to Hurricane Katrina Recovery totaled $1,997,245 as of June 30, 2016 and 2015.

**Exhibit D**<br>**(Continued)**

### Note 3 -  HURRICANE KATRINA AND RECOVERY (Continued)

The following table presents information related to Hurricane Katrina recovery for the years ended June 30, 2016 and 2015:

|  | 2016 | 2015 |
|---|---|---|
| Unrestricted revenues: | | |
| Unrestricted donations related to Hurricane Katrina | $ 496,770 | $ - |
| Federal grant monies received | 27,592,414 | 43,594,834 |
| Total unrestricted revenues related to Hurricane Katrina | 28,089,184 | 43,594,834 |
| Temporarily restricted revenues: | | |
| Restricted donations related to Hurricane Katrina | - | - |
| Total revenues related to Hurricane Katrina | $ 28,089,184 | $ 43,594,834 |
| Distributions - non-combined affiliated entities: | | |
| Restricted donations received and distributed to affiliates | $ - | $ - |
| Unrestricted donations received and distributed to affiliates | - | (95,543) |
| Federal grant monies distributed to affiliates | (27,349,715) | (34,838,972) |
| Total distributions to non-combined affiliated entities | (27,349,715) | (34,934,515) |
| Administrative offices: | | |
| Hurricane Katrina related expenses | - | - |
| Total expenses related to Hurricane Katrina | $ (27,349,715) | $ (34,934,515) |

18

**Exhibit D**
**(Continued)**

## Note 4 - LOANS RECEIVABLE FROM AFFILIATES

A summary of loans receivable from affiliates as of June 30, 2016 and 2015, is as follows:

|  | 2016 | 2015 |
|---|---|---|
| Parishes | $ 38,666,099 | $ 40,723,003 |
| Nursing homes | 646,772 | 341,135 |
| Archdiocesan-sponsored high schools | 10,018,812 | 10,253,572 |
| Real estate - affordable housing ministries | 13,256,291 | 10,021,828 |
| Real estate - housing ministry | 10,291,602 | 2,460,044 |
| Other school-related loans | 376,843 | 1,653,243 |
| Other | 9,787,986 | 5,562,413 |
| Total loans | 83,044,405 | 71,015,238 |
| Less allowance for doubtful receivables | (11,097,625) | (11,212,902) |
| Total loans - net | $ 71,946,780 | $ 59,802,336 |

As of June 30, 2016 and 2015, the allowance for doubtful receivables relates primarily to parish receivables.

A summary of loans receivable from affiliates based on interest-accrued status as of June 30, 2016 and 2015, is as follows:

|  | 2016 | 2015 |
|---|---|---|
| Balances on which interest is accrued | $ 64,945,599 | $ 55,287,963 |
| Balances on which interest is not accrued | 18,098,806 | 15,727,275 |
| Totals | $ 83,044,405 | $ 71,015,238 |

19

**Exhibit D**
**(Continued)**

Note 5 -   **INVESTMENTS**

The Administrative Offices' investments are held in pooled assets and separately invested portfolios.  Pooled assets represent funds that are invested in a commingled portfolio of investments, as opposed to the separately invested assets, which have segregated investments.  Investments are recorded at fair value as of June 30, 2016 and 2015, and consist of the following:

|  | 2016 | 2015 |
|---|---|---|
| **Pooled asset portfolio:** | | |
| Cash and cash equivalents | $ 6,916,730 | $ 2,473,910 |
| U.S. government and agency obligations | 9,478,794 | 9,080,478 |
| Corporate and foreign obligations | 7,719,010 | 6,391,353 |
| Collateralized mortgage obligations | 1,194,605 | 2,396,906 |
| Asset-backed securities | 1,310,580 | 459,259 |
| Common stocks | 9,850,547 | 10,413,724 |
| Mutual funds | 76,483,833 | 79,241,876 |
| Exchange traded funds | 6,745,258 | 11,550,224 |
| Preferred stock | 94,275 | 102,531 |
| Common trust funds | 16,588,191 | 18,462,199 |
| Limited partnerships | 10,609,076 | 20,262,212 |
| Fund of funds | 4,915,753 | - |
| Hedge feeder fund | 4,058,724 | 4,292,826 |
| Segregated portfolio companies | 9,916,740 | 10,968,860 |
| Total pooled asset portfolio | 165,882,116 | 176,096,358 |
| **Separately invested portfolio:** | | |
| Cash and cash equivalents | 2,990,203 | 8,284,526 |
| Brokered certificates of deposit | 2,357,892 | 3,343,474 |
| Government and agency obligations | 11,400,116 | 8,852,899 |
| Corporate obligations | 27,045,432 | 40,718,281 |
| Investment in Catholic Umbrella Pool | 697,224 | 727,995 |
| Municipal obligations | 21,081,117 | 24,943,466 |
| Collateralized mortgage obligations | 837,863 | 1,153,317 |
| Asset-backed securities | 311,100 | 503,855 |
| Total separately invested portfolio | 66,720,947 | 88,527,813 |
| Totals | $ 232,603,063 | $ 264,624,171 |

20

**Exhibit D**
**(Continued)**

**Note 5 - INVESTMENTS (Continued)**

As of June 30, 2016 and 2015, investments are comprised of amounts owned by the Administrative Offices and funds held for others, as follows:

|  | 2016 | 2015 |
|---|---|---|
| Administrative Offices: |  |  |
| Restricted for debt service | $ 6,035,363 | $ 6,070,883 |
| Other | 143,214,968 | 172,513,157 |
|  | 149,250,331 | 178,584,040 |
| Funds held for others | 83,352,732 | 86,040,131 |
| Totals | $ 232,603,063 | $ 264,624,171 |

Net investment income for the years ended June 30, 2016 and 2015, is comprised of the following:

|  | 2016 | 2015 |
|---|---|---|
| Interest, dividends, and realized gains (losses) - net | $ 392,454 | $ 3,747,312 |
| Unrealized gains (losses) - net | (2,312,002) | (1,878,230) |
| Total net investment income | $ (1,919,548) | $ 1,869,082 |

Investment income is reported net of investment fees. Investment fees were approximately $468,000 and $509,000 for the years ended June 30, 2016 and 2015, respectively.

21

**Exhibit D**
**(Continued)**

**Note 6 -  LAND, BUILDINGS, AND EQUIPMENT**

Land, buildings, and equipment include certain properties, which are owned by the Archdiocese, but are used in the operations of certain non-combined affiliated entities. Additionally, included in land, buildings, and equipment is land held for future development by the Archdiocese.

The composition of land, buildings, and equipment and accumulated depreciation as of June 30, 2016 and 2015, is summarized as follows:

|  | 2016 | 2015 |
|---|---|---|
| Administrative offices: | | |
| Land | $ 4,631,666 | $ 6,410,583 |
| Buildings and improvements | 34,081,131 | 29,642,637 |
| Furniture and fixtures | 1,324,783 | 1,324,783 |
| Transportation equipment | 137,046 | 58,120 |
|  | 40,174,626 | 37,436,123 |
| Less accumulated depreciation | (17,467,264) | (16,933,825) |
| Subtotals | 22,707,362 | 20,502,298 |
| Non-combined affiliated entities: | | |
| Land | 6,264,804 | 6,404,690 |
| Buildings and improvements | 64,444,650 | 64,620,191 |
|  | 70,709,454 | 71,024,881 |
| Less accumulated depreciation | (19,831,766) | (18,907,524) |
| Subtotals | 50,877,688 | 52,117,357 |
| Land held for future development (includes $190,625 of land, the use of which is restricted) | 3,627,469 | 3,627,469 |
| Totals | $ 77,212,519 | $ 76,247,124 |

22

**Exhibit D**
**(Continued)**

**Note 6 -   LAND, BUILDINGS, AND EQUIPMENT (Continued)**

Depreciation expense for the years ended June 30, 2016 and 2015 was $2,059,838 and $1,527,799 respectively, and is reported in the statements of activities by functional category as follows:

|  | 2016 | 2015 |
|---|---|---|
| Program services | $ 324,365 | $ 260,591 |
| Supporting services | 1,735,473 | 1,267,208 |
| Totals | $ 2,059,838 | $ 1,527,799 |

**Note 7 -   BENEFICIAL INTEREST IN CHARITABLE REMAINDER TRUST**

During the fiscal year ended June 30, 2001, the Administrative Offices received possession of a 20% interest in the assets of the Margaret Ellen Lauer Estate (the "Estate"). However, certain assets from the Estate were placed in a charitable remainder trust. The Administrative Offices' interest in this charitable remainder trust is, as follows:

|  | 2016 | 2015 |
|---|---|---|
| Contribution receivable | $ 984,549 | $ 973,075 |
| Less discount to net present value | (554,993) | (569,645) |
| Beneficial interest in charitable remainder trust | $ 429,556 | $ 403,430 |

Initially, present values were calculated using a discount rate of 5% and the applicable mortality tables pertinent to each trust beneficiary. During the year ended June 30, 2015, the Administrative Offices was informed that no distributions would be made until there are no trust beneficiaries remaining. Beginning in 2015, present value was calculated using a discount rate of 5% and the applicable mortality table pertinent to the youngest remaining trust beneficiary. The effect of this change in the present value calculation was recognized as part of changes in value of split-interest agreement on the accompanying statement of activities for the year ended June 30, 2015.

All amounts are considered to be long-term since the dates of the distribution of the trust are uncertain.

23

**Exhibit D**
**(Continued)**

Note 8 -    **BONDS PAYABLE**

In March 2007, the Archdiocese completed a refinancing for the purpose of advance refunding certain bonds, and providing for the financing of certain capital projects of the Archdiocese and non-combined affiliated entities.    The Louisiana Public Facilities Authority issued the $69.15 million par value 2007 Series Revenue and Revenue Refunding Bonds, at a premium of $1.3 million.    Approximately $14.8 million of the proceeds were designated for the refunding of all outstanding principal and accrued interest on the 2001A Series Bonds, which were previously outstanding as of June 30, 2006, and the 2002C Series Bonds, which were previously guaranteed by the Administrative Offices on behalf of certain non-combined affiliated entities.    Amounts under the 2002C Series, which were refunded by the 2007 Series, were converted to loans receivable from the original obligated parties.    Debt service on the bonds is provided, in part, by collections on these loans receivable.    The 2007 bonds were issued at fixed rates ranging from 4.5% to 5% and are secured by an assignment of all presently existing and future revenues of the Archdiocese as defined in the loan agreement.

The bonds require the Administrative Offices to maintain certain covenants under the terms of the bond agreement.    As of June 30, 2016, management of the Administrative Offices was not aware of any violation of the covenants.

The aggregate maturities of the bonds payable as of June 30, 2016, are as follows:

| Years Ending June 30, | |
|---|---|
| 2017 | $ - |
| 2018 | 1,620,000 |
| 2019 | 1,700,000 |
| 2020 | 1,790,000 |
| 2021 | 1,880,000 |
| 2022 - 2038 | 50,640,000 |
| Subtotal | 57,630,000 |
| Unamortized bond premium | 731,006 |
| | $ 58,361,006 |

24

**Exhibit D**
**(Continued)**

**Note 9 -  RETIREMENT PLANS**

The Administrative Offices offers a 401(k) defined contribution plan (the "401(k) Plan") to
its lay employees and employees of affiliates.  Employees electing to participate in the
401(k) Plan are required to contribute a minimum of 3% of their salaries, and may elect to
contribute up to a maximum of 16%.  The 401(k) Plan requires the Administrative Offices
to contribute 3.5% of the participants' salaries.  Retirement plan expenses also include an
additional 2% contribution by the Administrative Offices to cover costs for life insurance
and disability insurance for the employees.  Any remaining funds from the 2% contribution
may be used as a discretionary employer contribution to the 401(k) Plan.  The 401(k) Plan
administrator is the Archdiocese.  The Administrative Offices contributed approximately
$368,000 and $346,000 for the years ended June 30, 2016 and 2015, respectively.

Incardinated priests of the Archdiocese, whose retirement from active service is duly
accepted by the Archbishop, are eligible for retirement benefits under an unfunded
retirement plan (the "Plan").  The Administrative Offices has elected to account for these
retirement benefits under accounting principles generally accepted in the United States of
America, as a defined benefit pension plan.

FASB ASC 715-20 requires an employer to recognize the overfunded or underfunded status
of defined benefit pension, and postretirement plans, as an asset or liability in its statements
of financial position, and to recognize changes in that funded status in the year in which the
changes occur through net assets for not-for-profit entities.

25

**Exhibit D**
**(Continued)**

**Note 9 -    RETIREMENT PLANS (Continued)**

The following table as of June 30, 2016 and 2015 sets forth the Plan's change in benefit obligation, change in Plan assets, and the funded status of the Plan:

|  | 2016 | 2015 |
|---|---|---|
| Change in benefit obligation: |  |  |
| Projected benefit obligation - beginning of year | $ (36,845,890) | $ (38,528,730) |
| Service cost | (611,968) | (641,404) |
| Interest cost | (1,648,485) | (1,610,308) |
| Plan amendments | 1,220,126 | 523,808 |
| Actuarial gain (loss) | (9,560,490) | 2,162,641 |
| Benefits paid | 1,341,274 | 1,248,103 |
| Projected benefit obligation - end of year | (46,105,433) | (36,845,890) |
| Change in plan assets: |  |  |
| Fair value of plan assets - beginning of year | - | - |
| Employer contributions made | 1,341,274 | 1,248,103 |
| Benefits paid | (1,341,274) | (1,248,103) |
| Fair value of plan assets - end of year | - | - |
| Funded status - (deficit) | $ (46,105,433) | $ (36,845,890) |
| Amounts recognized in the statements of financial position consist of: |  |  |
| Accrued pension liability | $ (46,105,433) | $ (36,845,890) |
| Unrestricted net assets |  |  |
| Net loss - cumulative | $ 17,103,529 | $ 7,814,011 |
| Prior service cost (credit) | (171,043) | 1,183,674 |
| Totals | $ 16,932,486 | $ 8,997,685 |

26

**Exhibit D**
**(Continued)**

**Note 9 -    RETIREMENT PLANS (Continued)**

The actuarial present value of the projected benefit obligation was computed using a weighted-average discount rate of 3.780% and 4.570% as of June 30, 2016 and 2015, respectively.    Because benefit payments are based on years of service rather than compensation levels, there is no difference between the accumulated and projected benefit obligation.

For the years ended June 30, 2016 and 2015, net periodic pension cost, included in Clergy expense in the statement of activities, includes the following components:

|  | 2016 | 2015 |
|---|---|---|
| Service costs - benefits earned during the periods | $    611,968 | $    641,404 |
| Interest cost on projected benefit obligation | 1,648,485 | 1,610,308 |
| Amortization of transition obligation | - | 399,908 |
| Amortization of net loss | 270,972 | 414,735 |
| Amortization of prior service cost | 134,591 | 209,357 |
| Net periodic pension cost | $  2,666,016 | $  3,275,712 |

The net periodic pension cost was computed using a weighted-average discount rate of 4.570% and 4.270% for the years ended June 30, 2016 and 2015, respectively.

The additional minimum pension liability adjustment, presented in the statement of activities, resulted in a loss of $7,934,801 for the year ended June 30, 2016 and a gain of $3,710,449 for the year ended June 30, 2015.    The loss in 2016 was primarily due to actuarial losses attributable to a decrease in the discount rate, whereas the gain in 2015 was primarily due to actuarial gains attributable to an increase in the discount rate.

The Administrative Offices currently expects to make benefit payments and contributions to the Plan of approximately $1,486,000 in fiscal year 2016.

The estimated net loss and prior service credit for the Plan that will be amortized from accumulated unrestricted net assets into net periodic benefit cost over the next fiscal year are estimated to be $821,263 and $11,244, respectively.

27

**Exhibit D**
**(Continued)**

## Note 9 - RETIREMENT PLANS (Continued)

Future benefit payments expected to be paid in each of the next five fiscal years, and in the aggregate for the following five years as of June 30, 2016, are as follows:

| Years Ending June 30, | |
|---|---|
| 2017 | $ 1,485,960 |
| 2018 | 1,606,512 |
| 2019 | 1,728,314 |
| 2020 | 1,799,180 |
| 2021 | 1,876,743 |
| 2022 - 2026 | 10,904,256 |
| | $ 19,400,965 |

## Note 10 - NET ASSETS

Unrestricted net assets as of June 30, 2016 and 2015 were $54,563,320 and $71,756,782, respectively.

Temporarily restricted net assets as of June 30, 2016 and 2015 consist of the following:

| | 2016 | 2015 |
|---|---|---|
| School Endowment | $ 1,372,906 | $ 2,499,148 |
| Infirm priests | 6,622,393 | 6,708,950 |
| Hurricane Katrina Recovery | 1,997,245 | 1,997,245 |
| Cathedral Capital Campaign | 898,336 | 962,786 |
| Margaret Lauer | 708,443 | 682,317 |
| Burses | 352,678 | 580,594 |
| Hector Ragas | 334,314 | 343,069 |
| Disaster Fund | 322,295 | 303,790 |
| Cummings land donation | 127,125 | 127,125 |
| Other - miscellaneous | 598,756 | 988,503 |
| Totals | $ 13,334,491 | $ 15,193,527 |

28

**Exhibit D**
**(Continued)**

### Note 10 - NET ASSETS (Continued)

The following temporarily restricted net assets were released during the years ended June 30, 2016 and 2015, due to satisfaction of program restrictions:

|  | 2016 | 2015 |
|---|---|---|
| School Endowment | $ 600,000 | $ 698,000 |
| Infirm Priests | 190,919 | 203,271 |
| Hurricane Katrina Recovery | - | 2,932 |
| Cathedral Capital Campaign | - | 102,271 |
| Burses | 130,000 | 131,000 |
| Disaster Fund | - | 70,000 |
| Other - miscellaneous | 561,115 | 77,090 |
| Totals | $ 1,482,034 | $ 1,284,564 |

Permanently restricted net assets as of June 30, 2016 and 2015 consist of endowment funds and are held as follows:

|  | 2016 | 2015 |
|---|---|---|
| School Endowment | $ 11,152,537 | $ 11,152,537 |
| Burses | 1,989,826 | 1,983,954 |
| St. Louis Cathedral | 1,000,000 | 1,000,000 |
| Totals | $ 14,142,363 | $ 14,136,491 |

### Note 11 - CONCENTRATIONS OF CREDIT RISK

The Administrative Offices maintains a substantial amount of cash in certain banks, which at times may exceed federally insured deposit limits. The Administrative Offices has not experienced any loss in such accounts, and management believes that the Administrative Offices is not exposed to any significant credit risk related to the cash in banks. As of June 30, 2016, the Administrative Offices had $1,194,318 of uninsured bank deposits.

The Administrative Offices extends unsecured credit to non-combined affiliated entities, as further explained in Note 2e. Financial instruments that potentially subject the Administrative Offices to credit risk include these accounts, which are shown on the statements of financial position as accounts and loans receivable.

29

**Exhibit D**
**(Continued)**

## Note 12 - RELATED-PARTY TRANSACTIONS

The Archbishop of New Orleans serves as president of the Archdiocese. He also serves as the controlling member of all other corporations, boards of trustees, and separate activities sponsored by, or operated under, the auspices of the Archdiocese. In the normal course of operations, the Administrative Offices has made and will, when necessary, make available to these non-combined affiliated entities, specific assistance in the form of operating subsidies, loans, use of facilities, and/or administrative support. The Administrative Offices receives income from affiliates in the form of assessments to cover insurance and other administrative costs. In addition, the Administrative Offices pays interest on deposits payable to affiliates and collects interest on loans receivable from affiliates.

In lieu of rental payments for the use of facilities, non-combined affiliated entities pay insurance, repairs and maintenance for the facilities. The provision of the facilities is not recorded as an in-kind contribution and related rental income by the Administrative Offices. The values of the land and buildings are not readily determinable. These rental agreements are classified as exchange transactions because both parties receive significant value from these arrangements.

Other related party transactions include premium payments to a captive insurance company (Note 15).

## Note 13 - FAIR VALUE OF FINANCIAL INSTRUMENTS

**Cash and Cash Equivalents** - The carrying amount approximates fair value because of the short maturity of these instruments.

**Loans Receivable From Affiliates** - The carrying amount approximates fair value because amounts not reserved generally bear interest at market rates.

**Investments** - The carrying amounts of the marketable investment securities reported on the Statements of Financial Position are predominately based on quoted market prices and other observable inputs. See Note 16 for a discussion of fair value measurements.

**Bonds Payable** - The carrying value of long-term debt as of June 30, 2016 and 2015, is $58,361,006 and $59,960,300, respectively, which approximates fair value.

**Limitations** - Fair value estimates are made at a specific point in time, based on relevant market information and information about the financial instruments. These estimates are subjective in nature and involve uncertainties and matters of significant judgment and, therefore, cannot be determined with precision. Changes in assumptions could significantly affect the estimates.

30

**Exhibit D**
**(Continued)**

## Note 14 - ENDOWMENT

*The Endowments.* The Administrative Offices' endowment consists of three individual funds established for specific purposes. Endowment assets include those assets of donor-restricted funds that the Administrative Offices must hold in perpetuity or for a donor-specified period. As required by accounting principles generally accepted in the United States of America, net assets associated with endowment funds are classified and reported based on the existence or absence of donor-imposed restrictions.

*Interpretation of Relevant Law.* The Administrative Offices has interpreted the Uniform Prudent Management of Institutional Funds Act (UPMIFA) as requiring preservation of the purchasing power (real value) of the donor-restricted endowment funds, absent explicit donor stipulations to the contrary. As a result of this interpretation, the Administrative Offices classifies the following amounts as permanently restricted net assets in the accompanying financial statements: (a) the original value of gifts donated to the permanent endowment, (b) the original value of subsequent gifts to the permanent endowment, and (c) accumulations to the permanent endowment, made in accordance with the direction of the applicable donor gift instrument at the time the accumulation is added to the fund. The remaining portion of the donor-restricted endowment fund that is not classified as permanently restricted net assets is classified as temporarily restricted net assets until those amounts are appropriated for expenditure by the Administrative Offices in a manner consistent with the language of UPMIFA.

In accordance with UPMIFA, the Administrative Offices considers the following factors in making a determination to appropriate or accumulate donor-restricted endowment funds:

- The duration and preservation of the fund;
- The purposes of the Administrative Offices and the donor-restricted endowment fund;
- General economic conditions;
- The possible effect of inflation and deflation;
- The expected total return from income and the appreciation of investments;
- Other resources of the Administrative Offices; and
- The investment policies of the Administrative Offices.

31

**Exhibit D**
**(Continued)**

## Note 14 - ENDOWMENT (Continued)

Endowment fund net asset composition by type of fund as of June 30, 2016 and 2015, are as follows:

| | Unrestricted | Temporarily Restricted | Permanently Restricted | Total Endowment Fund Net Assets |
|---|---|---|---|---|
| **June 30, 2016** | | | | |
| Donor-restricted Endowments: | | | | |
| School Endowment Funds | $ - | $ 1,372,906 | $ 11,152,537 | $ 12,525,443 |
| Other | - | 1,251,014 | 2,989,826 | 4,240,840 |
| Totals | $ - | $ 2,623,920 | $ 14,142,363 | $ 16,766,283 |
| **June 30, 2015** | | | | |
| Donor-restricted Endowments: | | | | |
| School Endowment Funds | $ - | $ 2,499,148 | $ 11,152,537 | $ 13,651,685 |
| Other | - | 1,543,380 | 2,983,954 | 4,527,334 |
| Totals | $ - | $ 4,042,528 | $ 14,136,491 | $ 18,179,019 |

Changes in endowment fund net assets for the years ended June 30, 2016 and 2015 are as follows:

| | Unrestricted | Temporarily Restricted | Permanently Restricted | Total Endowment Fund Net Assets |
|---|---|---|---|---|
| Net assets, July 1, 2014 | $ - | $ 4,863,887 | $ 14,135,661 | $ 18,999,548 |
| Contributions | - | - | 830 | 830 |
| Investment earnings: | | | | |
| Realized gains | - | 446,859 | - | 446,859 |
| Unrealized losses | - | (336,947) | - | (336,947) |
| Net asset releases | - | (931,271) | - | (931,271) |
| Net assets, June 30, 2015 | - | 4,042,528 | 14,136,491 | 18,179,019 |
| Contributions | - | - | 5,872 | 5,872 |
| Investment earnings: | | | | |
| Realized losses | - | (105,831) | - | (105,831) |
| Unrealized losses | - | (582,777) | - | (582,777) |
| Net asset releases | - | (730,000) | - | (730,000) |
| Net assets, June 30, 2016 | $ - | $ 2,623,920 | $ 14,142,363 | $ 16,766,283 |

32

## Note 14 - ENDOWMENT (Continued)

*Funds with Deficiencies* - From time to time, the fair value of assets associated with individual donor-restricted endowment funds may fall below the level that the donor or UPMIFA requires the Administrative Offices to retain as a fund of perpetual duration. As of June 30, 2016 and 2015, no deficiencies existed.

*Return Objectives and Risk Parameters* - The Administrative Offices has adopted investment and spending policies for endowment assets that attempt to provide a predictable stream of funding to programs supported by its endowment, while seeking to maintain the purchasing power of the endowment assets. Under the investment policy, the performance objective is to exceed by 100 basis points a target annualized rate of return equal to the aggregate of inflation, spending rate and administrative costs, over a full market cycle (defined as market peak to market peak) without exceeding a standard deviation of 1.2 times a weighted benchmark index. The benchmark index will be comprised of each asset class index weighted by its target allocation. It is expected that the portfolio will outperform its weighted benchmark index by 50 basis points and rank in the top half of the appropriate balanced universe over a full market cycle. Actual returns in any given year may vary from this amount.

*Strategies Employed for Achieving Objectives* - Because the Archdiocese is expected to endure indefinitely, and because inflation is a key component in its performance objective, the long-term risk of not investing in equity securities outweighs the short-term volatility risk. As a result, the majority of assets will be invested in equity securities. Fixed income securities will be used to lower the short-term volatility of the portfolio and to provide income stability, especially during periods of weak or negative equity markets. Cash is not a strategic asset of the portfolio, but is a residual to the investment process and used to meet short-term liquidity needs. Other asset classes are included to provide diversification and incremental return (e.g. small cap equities, international equities, etc.). The Administrative Offices targets a diversified asset allocation that places a greater emphasis on equity-based investments to achieve its long-term return objectives within prudent constraints.

*Spending Policy and How the Investment Objectives Relate to Spending Policy* - The Administrative Offices authorized a policy of appropriating for distribution each year (spending rate) a maximum of 5% of the prior year market value of the endowment funds. This is consistent with its objective to maintain the purchasing power of donor-restricted funds.

33

## Note 15 - COMMITMENTS AND CONTINGENCIES

**Commitments** - The Administrative Offices has agreed to provide financing via the cooperative lending program (see Note 2e) to individual church parishes for capital expenditures.  As of June 30, 2016, such commitments totaled approximately $71,000,000.

In February 2009, the Administrative Offices subscribed to a $7,000,000 investment in Siguler Guff Distressed Opportunity Fund III, L.P.  As of June 30, 2016, $6,790,000 of this investment was funded.  In October 2010, the Administrative Offices subscribed to a $4,000,000 investment in Siguler Guff Distressed Opportunity Fund IV, L.P.  As of June 30, 2016, $3,520,000 of this investment was funded. In October 2014, the Administrative Offices subscribed to a $5,000,000 investment in Siguler Guff Distressed Real Estate Opportunity Fund II, L.P.  As of June 30, 2016, $3,242,500 of this investment was funded. In March 2015, the Administrative Offices subscribed to a $7,000,000 investment in Venture Investment Associates Energy III, L.P.  As of June 30, 2016, $2,240,000 of this investment was funded. In March 2016, the Administrative Offices subscribed to a $5,500,000 investment in Harvest MLP Income Fund.  As of June 30, 2016, $4,000,000 of this investment was funded.

**Guarantees** - As of June 30, 2016, the Administrative Offices has guaranteed $900,000 of indebtedness of a non-combined affiliate.

On September 4, 2014, the Administrative Offices agreed to provide up to $14,000,000 of subordinated debt and/or equity and guarantee the financing of a housing ministry project up to $43,000,000.  After completion of the project and achievement of certain financial ratios, the guarantee will be reduced to 35% of the guaranteed obligation and ultimately, the guarantee will terminate upon achievement of more stringent financial ratios.

**Self-Insurance Programs** - The Archdiocese, through the operations of the Administrative Offices, serves as a conduit in providing insurance coverage to its affiliates.  Prior to July 1, 2011, the Administrative Offices assessed premiums to the various entities based on relevant factors for each type of coverage and retained all of the related risk of self-insurance liability.  The accrued liability for self-insured claims on the accompanying statements of financial position represents the estimated reserves for all of the covered entities for claims occurring prior to July 1, 2011.

On June 28, 2011, Archdiocese of New Orleans Indemnity, Inc. (ANOI), a captive insurance company was created to help lower the insurance costs associated with managing the risks of the parishes and various non-combined affiliated entities.  ANOI is a wholly-owned subsidiary of 7887 Walmsley, Inc., which is a wholly-owned subsidiary of the Archdiocese.

34

**Exhibit D**
**(Continued)**

### Note 15 - COMMITMENTS AND CONTINGENCIES (Continued)

For claims occurring subsequent to June 30, 2011, ANOI provides deductible reimbursement property, automobile liability and physical damage, workers' compensation, breach of personal conduct, and general liability coverages to the Archdiocese. Property, automobile liability and physical damage, and general liability coverages are provided on an occurrence basis and breach of personal conduct on a claims-made basis with limits of $300,000 per occurrence and a combined $3,500,000 annual aggregate (limits of $250,000 per occurrence and a combined $3,000,000 annual aggregate prior to July 1, 2013). Workers' compensation coverage is provided on an occurrence basis with limits of $800,000 per accident and no annual aggregate.

The Archdiocese is a subscribing member in the Catholic Umbrella Pool (CUP). The CUP provides the Archdiocese with reinsurance for general property and auto liability claims in excess of its primary layer of insurance coverage of $3,000,000 through June 30, 2013, and $3,500,000 thereafter, with excess coverage limits of $25,000,000 in the aggregate. The Archdiocese has an equity investment in the CUP of approximately $697,000 and $728,000 as of June 30, 2016 and 2015, respectively.

For claims prior to July 1, 2011, the Archdiocese is self-insured, as follows:

*General, Property, and Auto Liability* - The Archdiocese is self-insured for $200,000 per occurrence up to an annual aggregate limit of $1,500,000 through June 30, 2003, and $1,750,000 thereafter.

*Workers' Compensation* - The Archdiocese is self-insured for workers' compensation claims for the first $225,000 per occurrence for claims occurring prior to July 1, 2002, for the first $750,000 per occurrence for claims occurring between July 1, 2002 and June 30, 2009, and for workers' compensation claims for the first $800,000 per occurrence for claims occurring subsequent to June 30, 2009.

The Archdiocese is also self-insured for claims relating to breaches of personal conduct. The self-insured portion applies to claims in excess of annual aggregate limits (which include reinsurance for amounts provided by the CUP) as follows: amounts in excess of $100,000 from July 1, 1990 to July 1, 1993; amounts in excess of $650,000 from July 1, 1993 to July 1, 1998; and amounts in excess of $1,000,000 for claims after July 1, 1998.

The Archdiocese has reflected its estimate of the ultimate liability for all known and incurred, but not reported claims in the accompanying financial statements. The estimated reserves for these claims are undiscounted and are approximately $1,284,000 and $1,168,000 as of June 30, 2016 and 2015, respectively.

35

**Exhibit D**
**(Continued)**

## Note 15 - COMMITMENTS AND CONTINGENCIES (Continued)

**Asset Retirement Obligations** - In accordance with FASB ASC 410-20, an entity is required to recognize a liability for the fair value of a conditional asset retirement obligation when incurred, if the liability's fair value can be reasonably estimated. The corresponding cost is capitalized as part of the carrying amount of the related long-lived asset as of the obligating event date. The liability is accreted to its present value each period and the capitalized cost is depreciated over the useful life of the related asset. If the liability is settled for an amount other than the recorded amount, a gain or loss is recognized.

As of June 30, 2006, the Administrative Offices recognized obligations associated with the future retirement of long-lived assets. Asbestos abatement costs were added to the carrying value of the Administrative Offices' building cost. The recorded net book value of the abatement costs totaled approximately $303,000 and $324,000 as of June 30, 2016 and 2015, respectively.

Estimated asset retirement obligations of approximately $951,000 and $906,000 as of June 30, 2016 and 2015, respectively, were recorded as part of accrued expenses and other liabilities.

**Contingencies -** The Archdiocese has certain pending and threatened litigation and claims; however, management believes the probable resolution of such contingencies will not exceed the established reserves or insurance coverage, and will not materially affect its financial position. It is reasonably possible that estimates included in the financial statements related to these contingencies may change in the near term.

## Note 16 - FAIR VALUE MEASUREMENTS

The framework for measuring fair value provides a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (level 1) and the lowest priority to unobservable inputs (level 3). The three levels of the fair value hierarchy under FASB ASC 820 are described below:

Level 1 - Inputs to the valuation methodology are unadjusted quoted prices for identical assets or liabilities in active markets that the Administrative Offices has the ability to access.

36

**Exhibit D**<br>**(Continued)**

## Note 16 - FAIR VALUE MEASUREMENTS (Continued)

Level 2 - Inputs to the valuation methodology include:

- quoted prices for similar assets or liabilities in active markets;
- quoted prices for identical or similar assets or liabilities in inactive markets;
- inputs other than quoted prices that are observable for the asset or liability;
- inputs that are derived principally from or corroborated by observable market data by correlation or other means.

If the asset or liability has a specified (contractual) term, the level 2 input must be observable for substantially the full term of the asset or liability.

Level 3 - Inputs to the valuation methodology are unobservable and significant to the fair value measurement.

The asset's or liability's fair value measurement level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement. Valuation techniques maximize the use of relevant observable inputs and minimize the use of unobservable inputs.

The following is a description of the valuation methodologies used for assets and liabilities measured at fair value. There have been no changes in the methodologies used as of June 30, 2016 and 2015.

*Government obligations and corporate stocks* - Valued at the closing price reported on the active market on which the individual securities are traded. These are included in level 1 of the fair value hierarchy.

*Money market funds, mutual funds, and exchange traded funds* - Valued at quoted market prices, which represent the net asset value per unit. These are included in level 1 of the fair value hierarchy.

37

**Exhibit D**
**(Continued)**

## Note 16 - FAIR VALUE MEASUREMENTS (Continued)

*Government agency mortgage obligations, municipal obligations, corporate and foreign obligations, collateralized mortgage obligations, asset-backed securities, and preferred stock* - Valued by independent pricing vendors used by the custodians of the investments. The pricing vendor uses various pricing models for each asset class that are consistent with what other market participants would use.  The inputs and assumptions to the models used by the pricing vendors are derived from market-observable sources, including benchmark yields, reported trades, broker/dealer quotes, and other market-related data.  Since many of these fixed income securities do not trade on a daily basis, the methodology of the pricing vendor uses available information, including benchmark curves, benchmarking of like securities, and matrix pricing.  These investments are included in level 2 of the fair value hierarchy.

*Common trust funds, segregated portfolio companies, hedge feeder funds, fund of funds, and limited partnerships* - Valued, as a practical expedient, using the net asset values reported by the investees.  The net asset values are determined based on the fair values of the underlying investments of the funds, companies, or partnerships.  Common trust funds are included in level 2 of the fair value hierarchy.  Due to restrictions on withdrawals from the investment, the Administrative Offices' investments in segregated portfolio companies, the hedge feeder fund, funds of funds, and limited partnerships are included in level 3 of the fair value hierarchy.

*Brokered certificates of deposit* - Valued based on amounts reported by Interactive Data Corporation which uses modeling techniques which integrate observed transactions data, credit quality, perceived market movements, and other relevant information and included in level 2 of the fair value hierarchy.

*Corporate obligation-bond-related portfolio* - Valued by the Administrative Offices at par and classified within level 2 of the fair value hierarchy.

*Investment in the Catholic Umbrella Pool* - The Administrative Offices values its investment in this pool based on information provided by the pool manager.  This investment is classified within level 2 of the fair value hierarchy.

*Beneficial Interest in Charitable Remainder Trust* - The Administrative Offices values its investment in this trust based on present value calculations (Note 7) applied to the fair value of trust assets.  This investment is classified within level 2 of the fair value hierarchy.

*Asset Retirement Obligation* - The Administrative Offices calculates this liability based on an original cost estimate of the obligation and accretes such amount to its present value each year.

**Exhibit D**
**(Continued)**

**Note 16 - FAIR VALUE MEASUREMENTS (Continued)**

*Accrued Pension Liability* - The Administrative Offices uses actuarial services to calculate the present value of the projected benefit obligation (Note 9).

The methods described above may produce fair value calculations that may not be indicative of net realizable value or reflective of future fair values.  Furthermore, while the Administrative Offices believes its valuation methods are appropriate and consistent with those of other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

The Statements of Financial Position as of June 30, 2016 and 2015, include the following assets which are measured at fair value on a non-recurring basis: donated historical treasures included in other assets totaling $122,000 (level 3) and donated land in an undetermined amount (level 3), which are valued at estimated or appraised fair value as of the time of the donations.

Assets and liabilities measured at fair value on a recurring basis as of June 30, 2016 and 2015 are comprised of and determined, as follows:

39

## Note 16-  FAIR VALUE MEASUREMENTS (Continued)

| June 30, 2016<br>Description | Total Assets and Liabilities Measured At Fair Value | Quoted Prices In Active Markets (Level 1) | Based on Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Portfolio A** | | | | |
| Cash and money market funds | $    6,916,730 | $    6,916,730 | | |
| Government obligations | 5,781,154 | 5,781,154 | | |
| Government agency mortgage obligations | 3,697,640 | | $    3,697,640 | |
| Corporate obligations (a) | | | | |
| Aa2 | 343,229 | | 343,229 | |
| Aa3 | 178,654 | | 178,654 | |
| A1 | 231,034 | | 231,034 | |
| A2 | 46,648 | | 46,648 | |
| A3 | 804,108 | | 804,108 | |
| Baa1 | 574,707 | | 574,707 | |
| Baa2 | 1,565,704 | | 1,565,704 | |
| Baa3 | 2,589,471 | | 2,589,471 | |
| Ba1 | 836,990 | | 836,990 | |
| Ba2 | 164,066 | | 164,066 | |
| Ba3 | 209,120 | | 209,120 | |
| B1 | 85,823 | | 85,823 | |
| B2 | 68,568 | | 68,568 | |
| Caa1 | 20,888 | | 20,888 | |
| Collateralized mortgage obligations (a) | | | | |
| Aaa | 401,137 | | 401,137 | |
| Aa2 | 260,089 | | 260,089 | |
| Aa3 | 96,502 | | 96,502 | |
| A2 | 215,485 | | 215,485 | |
| Baa1 | 49,138 | | 49,138 | |
| Baa2 | 121,540 | | 121,540 | |
| Baa3 | 50,714 | | 50,714 | |
| Asset-backed securities (a) | | | | |
| Aaa | 641,221 | | 641,221 | |
| Aa1 | 68,539 | | 68,539 | |
| Aa3 | 266,923 | | 266,923 | |
| A1 | 147,892 | | 147,892 | |
| A2 | 186,005 | | 186,005 | |
| Common stock | | | | |
| Basic materials | 477,203 | 477,203 | | |
| Consumer goods | 1,228,078 | 1,228,078 | | |
| Financial | 2,783,614 | 2,783,614 | | |
| Healthcare | 1,309,629 | 1,309,629 | | |
| Industrial goods | 889,153 | 889,153 | | |
| Services | 1,871,048 | 1,871,048 | | |
| Technology | 636,265 | 636,265 | | |
| Utilities | 655,557 | 655,557 | | |
| Preferred stock | 94,275 | | 94,275 | |
| Mutual funds | | | | |
| U.S. large blend | 20,705,037 | 20,705,037 | | |
| Foreign large blend | 24,302,995 | 24,302,995 | | |

40

**Exhibit D**
**(Continued)**

## Note 16 - FAIR VALUE MEASUREMENTS (Continued)

| June 30, 2016 Description | Total Assets and Liabilities Measured At Fair Value | Quoted Prices In Active Markets (Level 1) | Based on Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Portfolio A (Continued)** | | | | |
| Mutual funds (Continued) | | | | |
| Real estate | 16,096,805 | 16,096,805 | | |
| Diversified emerging markets | 15,378,996 | 15,378,996 | | |
| Exchange traded funds | | | | |
| World bond | 6,745,258 | 6,745,258 | | |
| Common trust fund | | | | |
| SSgA S&P MidCap 400 Index Securities Lending QP Common Trust Fund | 16,588,191 | | 16,588,191 | |
| Limited partnerships | | | | |
| Siguler Guff Distressed Opportunity Fund III, LP | 2,538,205 | | | $ 2,538,205 |
| Siguler Guff Distressed Opportunity Fund IV, LP | 2,721,974 | | | 2,721,974 |
| Siguler Guff Distressed Real Estate Opportunity Fund II, LP | 3,327,591 | | | 3,327,591 |
| Venture Investment Associates Energy III, L.P. | 2,021,306 | | | 2,021,306 |
| Harvest MLP Income Fund, L.L.C. | 4,915,753 | | | 4,915,753 |
| Hedge feeder fund | | | | |
| Rimrock High Income PLUS (Cayman) Fund, Ltd. | 4,058,724 | | | 4,058,724 |
| Segregated portfolio companies | | | | |
| ABS Offshore SPC Global Segregated Portfolio Class B | 9,702,742 | | 9,702,742 | |
| MDFLTD Cerberus March 2009 Segregated Portfolio | 94,319 | | | 94,319 |
| MDFLTD HF March 2009 Segregated Portfolio | 119,679 | | | 119,679 |
| Total Portfolio A | 165,882,116 | 105,777,522 | 40,307,043 | 19,797,551 |
| **Portfolio B** | | | | |
| Money market fund | 1,394,563 | 1,394,563 | | |
| Brokered certificates of deposit | 1,862,497 | | 1,862,497 | |
| Collateralized mortgage obligations (a) | | | | |
| Aaa | 252,944 | | 252,944 | |
| Aa1 | 57,254 | | 57,254 | |
| A1 | 502,610 | | 502,610 | |
| Baa3 | 25,055 | | 25,055 | |
| Government agency mortgage obligations | 3,498,017 | | 3,498,017 | |
| Corporate obligations (a) | | | | |
| Aaa | 60,174 | | 60,174 | |
| Aa1 | 1,056,150 | | 1,056,150 | |
| Aa2 | 113,731 | | 113,731 | |
| Aa3 | 2,029,469 | | 2,029,469 | |

41

**Exhibit D**
**(Continued)**

## Note 16 - FAIR VALUE MEASUREMENTS (Continued)

| June 30, 2016 Description | Total Assets and Liabilities Measured At Fair Value | Quoted Prices In Active Markets (Level 1) | Based on Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Portfolio B (Continued)** | | | | |
| Corporate obligations (a) (Continued) | | | | |
| A1 | 5,218,110 | | 5,218,110 | |
| A2 | 1,897,158 | | 1,897,158 | |
| A3 | 2,852,658 | | 2,852,658 | |
| Baa1 | 1,005,250 | | 1,005,250 | |
| Baa2 | 550,080 | | 550,080 | |
| Government agency obligations | 5,524,345 | | 5,524,345 | |
| Municipal obligations (a) | | | | |
| Aaa | 678,644 | | 678,644 | |
| Aa1 | 2,978,514 | | 2,978,514 | |
| Aa2 | 5,396,099 | | 5,396,099 | |
| Aa3 | 4,646,565 | | 4,646,565 | |
| A1 | 727,398 | | 727,398 | |
| A2 | 510,945 | | 510,945 | |
| A3 | 534,253 | | 534,253 | |
| Asset-backed securities (a) | | | | |
| Aaa | 110,286 | | 110,286 | |
| Total Portfolio B | 43,482,769 | 1,394,563 | 42,088,206 | - |
| **Portfolio C** | | | | |
| Money market fund | 112,352 | 112,352 | | |
| Brokered certificates of deposit | 495,395 | | 495,395 | |
| Corporate obligations (a) | | | | |
| Aa1 | 151,536 | | 151,536 | |
| Aa3 | 805,336 | | 805,336 | |
| A1 | 2,766,631 | | 2,766,631 | |
| A2 | 1,366,574 | | 1,366,574 | |
| A3 | 1,816,910 | | 1,816,910 | |
| Baa1 | 501,817 | | 501,817 | |
| Ba2 | 301,773 | | 301,773 | |
| Government agency obligations | 959,172 | | 959,172 | |
| Government agency mortgage obligations | 1,418,582 | | 1,418,582 | |
| Municipal obligations (a) | | | | |
| Aaa | 301,287 | | 301,287 | |
| Aa1 | 1,991,916 | | 1,991,916 | |
| Aa2 | 1,798,743 | | 1,798,743 | |
| Aa3 | 813,328 | | 813,328 | |
| A1 | 347,929 | | 347,929 | |
| A2 | 103,939 | | 103,939 | |
| A3 | 251,557 | | 251,557 | |
| Asset-backed securities (a) | | | | |
| Aa3 | 200,814 | | 200,814 | |
| Total Portfolio C | 16,505,591 | 112,352 | 16,393,239 | - |

42

**Exhibit D**
**(Continued)**

## Note 16 - FAIR VALUE MEASUREMENTS (Continued)

| June 30, 2016 Description | Total Assets and Liabilities Measured At Fair Value | Quoted Prices In Active Markets (Level 1) | Based on Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Bond-related portfolio | | | | |
| Money market fund | 1,483,288 | 1,483,288 | | |
| Corporate obligation (a) | | | | |
| Aa2 | 4,552,075 | | 4,552,075 | |
| Total bond-related portfolio | 6,035,363 | 1,483,288 | 4,552,075 | - |
| Investment in Catholic Umbrella Pool | 697,224 | | 697,224 | |
| Total investments | $ 232,603,063 | $ 108,767,725 | $ 104,037,787 | $ 19,797,551 |
| (a) Based on Moody's bond credit rating. | | | | |
| Beneficial Interest in Charitable Remainder Trust | $ 429,556 | $ - | $ 429,556 | $ - |
| Liabilities, at Fair Value | | | | |
| Asset Retirement Obligation - included in accrued expenses and other | $ 951,004 | | | $ 951,004 |
| Accrued Pension Liability | 46,105,433 | | $ 46,105,433 | |
| Total liabilities | $ 47,056,437 | $ - | $ 46,105,433 | $ 951,004 |

43

## Note 16 - FAIR VALUE MEASUREMENTS (Continued)

| June 30, 2015<br>Description | Total Assets<br>and Liabilities<br>Measured At<br>Fair Value | Quoted Prices<br>In Active<br>Markets<br>(Level 1) | Based on<br>Other<br>Observable<br>Inputs<br>(Level 2) | Unobservable<br>Inputs<br>(Level 3) |
|---|---|---|---|---|
| **Portfolio A** | | | | |
| Cash and money market funds | $ 2,473,910 | $ 2,473,910 | | |
| Government obligations | 4,209,460 | 4,209,460 | | |
| Government agency mortgage | | | | |
| obligations | 4,871,018 | | $ 4,871,018 | |
| Corporate obligations (a) | | | | |
| Aa1 | 76,262 | | 76,262 | |
| Aa3 | 101,976 | | 101,976 | |
| A2 | 413,213 | | 413,213 | |
| A3 | 848,867 | | 848,867 | |
| Baa1 | 655,857 | | 655,857 | |
| Baa2 | 1,428,109 | | 1,428,109 | |
| Baa3 | 1,923,390 | | 1,923,390 | |
| Ba1 | 406,740 | | 406,740 | |
| Ba2 | 226,740 | | 226,740 | |
| Ba3 | 49,093 | | 49,093 | |
| B1 | 213,131 | | 213,131 | |
| B2 | 47,975 | | 47,975 | |
| Collateralized mortgage obligations (a) | | | | |
| Aaa | 1,178,545 | | 1,178,545 | |
| Aa2 | 274,025 | | 274,025 | |
| Aa3 | 547,270 | | 547,270 | |
| A2 | 159,598 | | 159,598 | |
| A3 | 187,972 | | 187,972 | |
| Baa1 | 49,496 | | 49,496 | |
| Asset-backed securities (a) | | | | |
| Aaa | 86,080 | | 86,080 | |
| Aa1 | 99,370 | | 99,370 | |
| Aa3 | 213,512 | | 213,512 | |
| A2 | 60,297 | | 60,297 | |
| Common stock | | | | |
| Basic materials | 56,277 | 56,277 | | |
| Consumer goods | 1,176,860 | 1,176,860 | | |
| Financial | 2,611,041 | 2,611,041 | | |
| Healthcare | 2,066,154 | 2,066,154 | | |
| Industrial goods | 1,152,190 | 1,152,190 | | |
| Services | 1,850,682 | 1,850,682 | | |
| Technology | 1,500,520 | 1,500,520 | | |
| Preferred stock | 102,531 | | 102,531 | |
| Mutual funds | | | | |
| U.S. large blend | 19,840,080 | 19,840,080 | | |
| Foreign large blend | 27,247,341 | 27,247,341 | | |
| Real estate | 15,296,645 | 15,296,645 | | |
| Diversified emerging markets | 16,857,810 | 16,857,810 | | |
| Exchange traded funds | | | | |
| Commodity index | 4,505,040 | 4,505,040 | | |
| World bond | 7,045,184 | 7,045,184 | | |

44

## Note 16 - FAIR VALUE MEASUREMENTS (Continued)

| June 30, 2015<br>Description | Total Assets<br>and Liabilities<br>Measured At<br>Fair Value | Quoted Prices<br>In Active<br>Markets<br>(Level 1) | Based on<br>Other<br>Observable<br>Inputs<br>(Level 2) | Unobservable<br>Inputs<br>(Level 3) |
|---|---|---|---|---|
| **Portfolio A (Continued)** | | | | |
| Common trust fund | | | | |
| SSgA S&P MidCap 400 Index | | | | |
| Securities Lending QP Common | | | | |
| Trust Fund | 18,462,199 | | 18,462,199 | |
| Limited partnerships | | | | |
| Siguler Guff Distressed | | | | |
| Opportunity Fund III, LP | 3,490,714 | | | $ 3,490,714 |
| Siguler Guff Distressed | | | | |
| Opportunity Fund IV, LP | 3,819,213 | | | 3,819,213 |
| Siguler Guff Distressed Real | | | | |
| Estate Opportunity Fund II, LP | 1,784,746 | | | 1,784,746 |
| Venture Investment | | | | |
| Associates Energy III, L.P. | 1,332,543 | | | 1,332,543 |
| Kayne Anderson MLP Fund, L.P. | 9,834,996 | | | 9,834,996 |
| Hedge feeder fund | | | | |
| Rimrock High Income PLUS | | | | |
| (Cayman) Fund, Ltd. | 4,292,826 | | | 4,292,826 |
| Segregated portfolio companies | | | | |
| ABS Offshore SPC Global | | | | |
| Segregated Portfolio Class B | 10,584,132 | | 10,584,132 | |
| MDFLTD Cerberus March 2009 | | | | |
| Segregated Portfolio | 183,679 | | | 183,679 |
| MDFLTD HF March 2009 | | | | |
| Segregated Portfolio | 201,049 | | | 201,049 |
| Total Portfolio A | 176,096,358 | 107,889,194 | 43,267,398 | 24,939,766 |
| | | | | |
| **Portfolio B** | | | | |
| Money market fund | 6,702,671 | 6,702,671 | | |
| Brokered certificates of deposit | 2,851,100 | | 2,851,100 | |
| Collateralized mortgage obligations (a) | | | | |
| Aaa | 454,949 | | 454,949 | |
| Aa1 | 104,703 | | 104,703 | |
| A3 | 523,547 | | 523,547 | |
| Baa1 | 33,038 | | 33,038 | |
| B1 | 37,080 | | 37,080 | |
| Government agency mortgage | | | | |
| obligations | 6,460,007 | | 6,460,007 | |
| Corporate obligations (a) | | | | |
| Aaa | 1,780,160 | | 1,780,160 | |
| Aa1 | 3,519,335 | | 3,519,335 | |
| Aa2 | 611,034 | | 611,034 | |
| Aa3 | 1,514,697 | | 1,514,697 | |
| A1 | 6,603,584 | | 6,603,584 | |
| A2 | 5,150,036 | | 5,150,036 | |
| A3 | 5,335,490 | | 5,335,490 | |
| Baa1 | 2,776,112 | | 2,776,112 | |

45

**Exhibit D**
**(Continued)**

## Note 16 - FAIR VALUE MEASUREMENTS (Continued)

| June 30, 2015<br>Description | Total Assets and Liabilities Measured At Fair Value | Quoted Prices In Active Markets (Level 1) | Based on Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Portfolio B (Continued) | | | | |
| Government agency obligations | 990,020 | | 990,020 | |
| Municipal obligations (a) | | | | |
| Aaa | 1,203,500 | | 1,203,500 | |
| Aa1 | 4,056,042 | | 4,056,042 | |
| Aa2 | 5,389,940 | | 5,389,940 | |
| Aa3 | 5,158,456 | | 5,158,456 | |
| A1 | 872,547 | | 872,547 | |
| A2 | 961,159 | | 961,159 | |
| A3 | 782,606 | | 782,606 | |
| Asset-backed securities (a) | | | | |
| Aaa | 503,855 | | 503,855 | |
| Total Portfolio B | 64,375,668 | 6,702,671 | 57,672,997 | - |
| Portfolio C | | | | |
| Money market fund | 63,047 | 63,047 | | |
| Brokered certificates of deposit | 492,374 | | 492,374 | |
| Corporate obligations (a) | | | | |
| Aaa | 303,489 | | 303,489 | |
| Aa1 | 499,275 | | 499,275 | |
| Aa2 | 250,403 | | 250,403 | |
| Aa3 | 504,821 | | 504,821 | |
| A1 | 2,213,306 | | 2,213,306 | |
| A2 | 2,231,364 | | 2,231,364 | |
| A3 | 2,070,337 | | 2,070,337 | |
| Baa1 | 802,763 | | 802,763 | |
| Government agency obligations | 758,810 | | 758,810 | |
| Government agency mortgage obligations | 644,062 | | 644,062 | |
| Municipal obligations (a) | | | | |
| Aaa | 300,669 | | 300,669 | |
| Aa1 | 1,746,261 | | 1,746,261 | |
| Aa2 | 2,276,356 | | 2,276,356 | |
| Aa3 | 1,131,695 | | 1,131,695 | |
| A1 | 601,463 | | 601,463 | |
| A2 | 211,205 | | 211,205 | |
| A3 | 251,567 | | 251,567 | |
| Total Portfolio C | 17,353,267 | 63,047 | 17,290,220 | - |

46

**Exhibit D
(Continued)**

## Note 16 - FAIR VALUE MEASUREMENTS (Continued)

| June 30, 2015 Description | Total Assets and Liabilities Measured At Fair Value | Quoted Prices In Active Markets (Level 1) | Based on Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Bond-related portfolio | | | | |
| Money market fund | 1,518,808 | 1,518,808 | | |
| Corporate obligation (a) | | | | |
| Aa2 | 4,552,075 | | 4,552,075 | |
| Total bond-related portfolio | 6,070,883 | 1,518,808 | 4,552,075 | - |
| Investment in Catholic Umbrella Pool | 727,995 | | 727,995 | |
| Total investments | $ 264,624,171 | $ 116,173,720 | $ 123,510,685 | $ 24,939,766 |

(a) Based on Moody's bond credit rating.

| | | | | |
|---|---|---|---|---|
| Beneficial Interest in Charitable Remainder Trust | $ 403,430 | $ - | $ 403,430 | $ - |
| Liabilities, at Fair Value | | | | |
| Asset Retirement Obligation - included in accrued expenses and other | $ 905,718 | | | $ 905,718 |
| Accrued Pension Liability | 36,845,890 | | $ 36,845,890 | |
| Total liabilities | $ 37,751,608 | $ - | $ 36,845,890 | $ 905,718 |

47

**Exhibit D (Continued)**

## Note 16 – FAIR VALUE MEASUREMENTS (Continued)

The table below sets forth a summary of changes in the fair value of the Administrative Offices' Level 3 assets and liability for the years ended June 30, 2016 and 2015.

| | Limited Partnerships | | | | | Fund of Funds | Hedge Feeder Fund | Segregated Portfolio Companies | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Sigular Gulf Distressed Opportunity Fund III, L.P. | Sigular Gulf Distressed Opportunity Fund IV, L.P. | Sigular Gulf Distressed Real Estate Opportunity Fund II, L.P. | Venture Investment Associates Energy III, L.P. | Kayne Anderson MLP Fund, L.P. | Harvest MLP Income Fund, L.L.C. | Rimrock High Income Plus (Cayman) Fund, Ltd. | MDFLTD Cerberus March 2009 | MDFLTD HF March 2009 | Totals | Asset Retirement Obligation |
| **Balance July 1, 2014** | $ 4,932,978 | $ 3,368,450 | $ 1,825,000 | $ 1,400,000 | $ 11,222,146 | | $ 4,175,426 | $ 195,140 | $ 226,388 | $ 24,120,528 | $ 862,588 |
| Purchases and capital contributions | 280,000 | 540,000 | | | | | | 29,734 | 14,845 | 4,045,000 | |
| *Income, gains, and (losses) | 254,351 | 328,065 | (40,254) | (67,457) | (1,387,150) | | 117,400 | | | (750,466) | |
| Exchanges in and (out) | | | | | | | | | | - | |
| Sales and distributions | (1,976,615) | (417,302) | | | | | | (41,195) | (40,184) | (2,475,296) | |
| Accretion | | | | | | | | | | - | 43,130 |
| **Balance June 30, 2015** | 3,490,714 | 3,819,213 | 1,784,746 | 1,332,543 | 9,834,996 | | 4,292,826 | 183,679 | 201,049 | 24,939,766 | 905,718 |
| Purchases and capital contributions | | 140,000 | 1,417,500 | 840,000 | | $ 4,000,000 | | | | 6,397,500 | |
| *Income, gains, and (losses) | (20,551) | (147,525) | 125,345 | (151,237) | (3,569,036) | 915,753 | (234,102) | (19,395) | (14,125) | (3,114,873) | |
| Exchanges in and (out) | | | | | | | | | | - | |
| Sales and distributions | (931,958) | (1,089,714) | | | (6,265,960) | | | (69,965) | (67,245) | (8,424,842) | |
| Accretion | | | | | | | | | | - | 45,286 |
| **Balance June 30, 2016** | $ 2,538,205 | $ 2,721,974 | $ 3,327,591 | $ 2,021,306 | $ - | $ 4,915,753 | $ 4,058,724 | $ 94,319 | $ 119,679 | $ 19,797,551 | $ 951,004 |

* Total gains (losses). Amount attributable to unrealized gains (losses) is not available.

48

**Exhibit D (Continued)**

## Note 16 – FAIR VALUE MEASUREMENTS (Continued)

The following tables summarize investments measured at fair value based on net asset value (NAV) per share as of June 30, 2016 and 2015, respectively.

| Category of Investment | | Fair Value | | Investment Strategy | Unfunded Commitments | | Redemption Frequency (If Currently Eligible) | Redemption Restrictions and Terms | Redemption Notice Period |
|---|---|---|---|---|---|---|---|---|---|
| | | June 30, 2016 | June 30, 2015 | | June 30, 2016 | June 30, 2015 | | | |
| Common trust | SSgA S & P Mid Cap 400 Index Securities Lending QP Common Trust Fund | $16,588,191 | $18,462,199 | Approximates the performance of the S & P Mid Cap 400 Index over the long term | - | - | Daily | N/A | N/A |
| Hedge feeder fund | Rimrock High Income PLUS (Cayman) Fund, Ltd | $4,058,724 | $4,292,826 | Invests in Master Fund that seeks to exploit inefficiencies in the market through the use of hedging, modest leverage, and select longer-term total return investments | - | - | Annually | 2 year lockup, 10% holdback on redemption | 120 days prior to the last day of the 4th quarter |
| Limited partnership | Venture Investment Associates Energy III, L.P. | $2,021,306 | $1,332,543 | Energy-related private equity partnerships or similar entities | $4,760,000 | $5,600,000 | Not Redeemable | Not Redeemable | Not Redeemable |
| Limited partnership | Siguler Guff Distressed Opportunity Fund III, L.P. | $2,538,205 | $3,490,714 | Securities of companies undergoing financial distress, operating difficulties, or restructuring | $210,000 | $210,000 | Not Redeemable | Not Redeemable | Not Redeemable |
| Limited partnership | Siguler Guff Distressed Opportunity Fund IV, L.P. | $2,721,974 | $3,819,213 | Securities of companies undergoing financial distress, operating difficulties, or restructuring | $480,000 | $620,000 | Not Redeemable | Not Redeemable | Not Redeemable |

49

**Exhibit D (Continued)**

## Note 16 – FAIR VALUE MEASUREMENTS (Continued)

| Category of Investment | Fund | Fair Value June 30, 2016 | Fair Value June 30, 2015 | Investment Strategy | Unfunded Commitments June 30, 2016 | Unfunded Commitments June 30, 2015 | Redemption Frequency (If Currently Eligible) | Redemption Restrictions and Terms | Redemption Notice Period |
|---|---|---|---|---|---|---|---|---|---|
| Limited partnership | Siguler Guff Distressed Real Estate Opportunity Fund II, LP | $3,327,591 | $1,784,746 | Securities of real estate companies investing in high quality properties appraising below market value due to mismanagement or high vacancy | | | Not Redeemable | Not Redeemable | Not Redeemable |
| Fund of funds | Kayne Anderson MLP Fund, L. P. | - | $9,834,996 | Energy-related master limited partnerships | - | $3,175,000 | Monthly | N/A | 90 days |
| Fund of funds | Harvest MLP Income Fund, LLC | $4,915,753 | - | Energy-related and other C-Corporation energy infrastructure master limited partnerships | $1,757,500 | - | Monthly | Penalty of 1% if less than 12 months of initial investment | 30 Days |
| Segregated portfolio company | ABS Offshore SPC Global Segregated Portfolio Class B | $9,702,742 | $10,584,132 | Diversified investment strategies throughout the global financial markets aimed at generating absolute returns with moderate risk | $1,500,000 | - | Quarterly | N/A | 45 days prior to the last business day of each quarter |
| Segregated portfolio company | MDFLTD Cerberus Segregated Portfolio March 2009 | $94,319 | $183,679 | Acquire, hold, and distribute the proceeds of investments in Cerberus International, Ltd. | - | - | Not Redeemable | Not Redeemable | Not Redeemable |
| Segregated portfolio company | MDFLTD HF Segregated Portfolio March 2009 | $119,679 | $201,049 | Acquire, hold, and distribute the proceeds of investments in Highfields Capital, Ltd. | - | - | Not Redeemable | Not Redeemable | Not Redeemable |

50

**<u>SUPPLEMENTARY INFORMATION</u>**

Schedule 1

## SCHEDULE OF CHANGES IN NET ASSETS - TEMPORARILY RESTRICTED

### Roman Catholic Church of The Archdiocese of New Orleans
#### Administrative Offices

For the year ended June 30, 2016
(with comparative totals for 2015)

| | School Endowment | Infirm Priests | Burses | Disaster Fund | Cummings Land Donation | Cathedral Capital Campaign | Hector Ragas | Margaret Lauer | Hurricane Katrina Recovery | Others | 2016 Totals | 2015 Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balances, beginning of year | $ 2,499,148 | $ 6,708,950 | $ 580,594 | $ 303,790 | $ 127,125 | $ 962,786 | $ 343,069 | $ 682,317 | $ 1,997,245 | $ 988,503 | $ 15,193,527 | $ 15,973,911 |
| Additions: | | | | | | | | | | | | |
| Investment earnings: | | | | | | | | | | | | |
| Realized gains | (85,538) | (28,470) | (14,214) | | | (6,079) | (381) | | | (460) | (135,142) | 558,139 |
| Unrealized losses | (440,704) | (122,040) | (83,702) | | | (58,371) | (8,374) | | | (9,956) | (723,147) | (419,015) |
| Changes in value of split-interest agreements | | | | | | | | 26,126 | | | 26,126 | (224,815) |
| Contributions and grants | | 254,872 | | 18,505 | | | | | | 181,784 | 455,161 | 589,871 |
| Total additions | (526,242) | 104,362 | (97,916) | 18,505 | | (64,450) | (8,755) | 26,126 | | 171,368 | (377,002) | 504,180 |
| Deductions: | | | | | | | | | | | | |
| Net assets released from restrictions - satisfaction of program restrictions | 600,000 | 190,919 | 130,000 | | | | | | | 561,115 | 1,482,034 | 1,284,564 |
| Net change | (1,126,242) | (86,557) | (227,916) | 18,505 | | (64,450) | (8,755) | 26,126 | | (389,747) | (1,859,036) | (780,384) |
| Balances, end of year | $ 1,372,906 | $ 6,622,393 | $ 352,678 | $ 322,295 | $ 127,125 | $ 898,336 | $ 334,314 | $ 708,443 | $ 1,997,245 | $ 598,756 | $ 13,334,491 | $ 15,193,527 |

51

**Schedule 2**

## <u>SCHEDULE OF CHANGES IN NET ASSETS - PERMANENTLY RESTRICTED</u>

**Roman Catholic Church of the Archdiocese of New Orleans Administrative Offices**

For the year ended June 30, 2016
(with comparative totals for 2015)

| | School Endowment | Burses Fund | St. Louis Cathedral | 2016 Totals | 2015 Totals |
|---|---|---|---|---|---|
| Balances, beginning of year | $ 11,152,537 | $ 1,983,954 | $ 1,000,000 | $ 14,136,491 | $ 14,135,661 |
| Additions - contributions | - | 5,872 | - | 5,872 | 830 |
| Balances, end of year | $ 11,152,537 | $ 1,989,826 | $ 1,000,000 | $ 14,142,363 | $ 14,136,491 |

52

Schedule 3

### SCHEDULE OF EXPENSES - PROGRAM SERVICES

**Roman Catholic Church of the Archdiocese of New Orleans Administrative Offices**

For the years ended June 30, 2016 and 2015

|  | 2016 | 2015 |
|---|---|---|
| **Christian Formation:** | | |
| Campus ministry | $ 532,010 | $ 348,490 |
| Office of Catholic Schools | 2,268,609 | 2,090,215 |
| Catholic Youth Organization | 1,666,750 | 1,531,967 |
| Director's office | 16,389 | 15,757 |
| Religious education office | 570,867 | 609,806 |
| Respect life office | 71,017 | - |
| Eucharistic adoration office | 157,983 | 70,208 |
| Totals | $ 5,283,625 | $ 4,666,443 |
| **Clergy:** | | |
| Clergy programs | $ 5,789,964 | $ 6,534,955 |
| Permanent diaconate | 162,771 | 214,405 |
| Priest personnel office | 126,782 | 228,950 |
| Vocation office | 2,216,873 | 1,658,024 |
| Totals | $ 8,296,390 | $ 8,636,334 |
| **Community Services:** | | |
| Director's office | $ - | $ 193 |
| Seaman's Center | 95,864 | 95,373 |
| Totals | $ 95,864 | $ 95,566 |
| **Gifts and Grants:** | | |
| Donations | $ 280,163 | $ 353,348 |
| **Pastoral Services:** | | |
| Bishop Perry Center | $ 118,013 | $ 129,953 |
| Black Catholics office | 138,820 | 134,678 |
| Cenacle Retreat House | 1,012,086 | 1,050,107 |
| Chaplains | 470,863 | 431,397 |
| Director's office | 139,833 | 122,557 |
| Ecumenical office | 15,214 | 3,010 |
| Family Life Apostolate | 410,170 | 311,266 |
| Hispanic Apostolate | 481,354 | 504,503 |
| Office of Worship | 164,612 | 160,246 |
| Spirituality Center | 49,109 | 42,309 |
| Courage Ministry | 17,112 | 19,135 |
| Totals | $ 3,017,186 | $ 2,909,161 |
| **Religious:** | | |
| Director's office | $ 219,454 | $ 210,206 |

Schedule 4

## SCHEDULE OF EXPENSES - SUPPORTING SERVICES

### Roman Catholic Church of the Archdiocese of New Orleans Administrative Offices

For the years ended June 30, 2016 and 2015

|  | 2016 | 2015 |
|---|---|---|
| **Administration:** | | |
| Archbishop - household | $ 160,036 | $ 194,819 |
| Archbishop - office | 388,506 | 427,961 |
| Archives | 426,260 | 435,124 |
| Communications and public relations | 506,596 | 284,777 |
| Former archbishops | 121,742 | 136,563 |
| National and regional fees | 286,405 | 268,729 |
| Racial Harmony | 35,719 | 36,622 |
| Tribunal - first instance | 325,719 | 351,546 |
| Tribunal - second instance | 175,298 | 180,738 |
| Vicar General | 129,100 | 212,902 |
| Victims Assistance Office | 98,666 | 62,855 |
| Development activities | 838,914 | 582,110 |
| Totals | $ 3,492,961 | $ 3,174,746 |
| **Financial Services:** | | |
| Accounting office | $ 382,089 | $ 573,769 |
| Bad debt expense | 3,579,908 | 759,685 |
| Building office | 415,463 | 412,915 |
| Depreciation | 1,459,423 | 1,022,105 |
| Howard Avenue building services | 1,146,109 | 1,117,515 |
| Human resources and employee benefits | 262,700 | 228,594 |
| In-house legal department | 116,333 | 98,053 |
| Internal audit department | 322,147 | 235,512 |
| Internet services | 2,419,777 | 2,248,545 |
| Office of Chief Administrative Officer | 651,330 | 695,009 |
| Office of Chief Financial Officer | 467,667 | 430,446 |
| Property and general costs | 387,638 | 656,683 |
| Walmsley Avenue building services | 443,378 | 403,596 |
| Totals | $ 12,053,962 | $ 8,882,427 |

Schedule 5

**SCHEDULE OF INVESTMENT BALANCES BY CLASSIFICATION**

**Roman Catholic Church of the Archdiocese of New Orleans**
**Administrative Offices**

June 30, 2016

| | Investment Pool | Non-pooled Investments | Equity In CUP | Restricted For Debt Service | Totals |
|---|---|---|---|---|---|
| **Operating Fund:** | | | | | |
| Burse Fund | $ 2,363,352 | | | | $ 2,363,352 |
| General Account | 57,778,181 | $ 59,988,360 | $ 697,224 | $ 6,035,363 | 124,499,128 |
| Parish Development Fund | 2,479,916 | | | | 2,479,916 |
| School Endowment Fund | 12,781,666 | | | | 12,781,666 |
| Elmer G. Ponton Trust | 250,535 | | | | 250,535 |
| Priests' Pension Fund | 3,456,912 | | | | 3,456,912 |
| St. Louis King of France | | | | | |
| Cathedral Endowment | 1,676,570 | | | | 1,676,570 |
| Elizabeth G. Lockett Legacy | 1,342,825 | | | | 1,342,825 |
| Hector Ragas Fund | 210,269 | | | | 210,269 |
| Monsignor Reynolds Aged | | | | | |
| and Infirm Priests' Endowment | 189,158 | | | | 189,158 |
| Total operating fund | 82,529,384 | 59,988,360 | 697,224 | 6,035,363 | 149,250,331 |
| **Funds Held For Others:** | | | | | |
| Agnes Byrnes Roniger/St. Rita Church | | | | | |
| Capital Endowment | 83,120 | | | | 83,120 |
| Agnes Byrnes Roniger /St. Rita School | | | | | |
| Endowment Fund | 46,021 | | | | 46,021 |
| Archbishop Alfred C. Hughes Endowment Fund | 183,281 | | | | 183,281 |
| The Almar Foundation Endowment | 29,668 | | | | 29,668 |
| St. Andrew the Apostle School Endowment Fund | 1,472,760 | | | | 1,472,760 |
| Carmen Anguis Endowment Fund | 309,396 | | | | 309,396 |
| Helen M. Arlt Endowment Fund | 78,822 | | | | 78,822 |
| Msgr. Charles F. Aucoin - Gift Annuity | 54,574 | | | | 54,574 |
| Katherine Aycock - Gift Annuity | 1,774 | | | | 1,774 |
| Association Bendictina de Esquipulas Fund | 661,597 | | | | 661,597 |
| Champions of Catholic Education Endowment | 40,763 | | | | 40,763 |
| Champions of Catholic Education Custodial Fund | 12,076 | | | | 12,076 |
| Archbishop Chapelle High School | | | | | |
| Endowment Fund | 784,701 | | | | 784,701 |
| Catholic Charities Archdiocese of New Orleans | 1,423,575 | | | | 1,423,575 |
| B. Frank Eshleman Seminarian Fund | 157,867 | | | | 157,867 |
| Bahan Trust | 370,395 | | | | 370,395 |
| Barbara Lynn Riehl Endowment | 315,500 | | | | 315,500 |
| Gloria T. Becnel Gift Annuity | 178,894 | | | | 178,894 |
| St. Bernard Catholic Church Endowment | 62,188 | | | | 62,188 |
| Beverly B. Durand Memorial Endowment | 48,572 | | | | 48,572 |
| Blackie (Loyd) Barras/Our Lady of | | | | | |
| Perpetual Help School Endowment | 176,182 | | | | 176,182 |
| Boggs/Cathedral | 31,174 | | | | 31,174 |
| Rev. Rodney Bourg - Gift Annuity | 73,848 | | | | 73,848 |
| Boys Hope Girls Hope Endowment Fund | 929,982 | | | | 929,982 |
| Rev. Douglas Brougher - Gift Annuity | 17,929 | | | | 17,929 |
| Patrick and Joyce Bryer Endowment Fund | 466,308 | | | | 466,308 |
| C.J. & Jane Dunaway Endowment | 8,461 | | | | 8,461 |
| Carboni Family Fund | 333,116 | | | | 333,116 |
| Rev. Francis J. Carabello Charitable Gift Annuity | 9,569 | | | | 9,569 |
| Care Center Endowment | 92,441 | | | | 92,441 |
| Catholic Charities Endowment | 335,027 | | | | 335,027 |
| Catholic Community on Scouting | 34,571 | | | | 34,571 |

55

**Schedule 5
(Continued)**

| | Investment Pool | Non-pooled Investments | Equity In CUP | Restricted For Debt Service | Totals |
|---|---|---|---|---|---|
| **Funds Held For Others: (Continued)** | | | | | |
| Catholic Foundation Board of Directors Endowment Fund | 2,686,380 | | | | 2,686,380 |
| Catholic Foundation | 3,561,376 | | | | 3,561,376 |
| Catholic Foundation Right to Life Special Projects Fund | 1,290,125 | | | | 1,290,125 |
| Marguerite S. Celestin Endowment Scholarship Fund | 53,898 | | | | 53,898 |
| Elizabeth S. and Alan C. Arnold Fund | 18,869 | | | | 18,869 |
| Chateau De Notre Dame Development Fund | 438,545 | | | | 438,545 |
| Christ The King Church Endowment | 13,379 | | | | 13,379 |
| Christian Brothers School Endowment | 83,259 | | | | 83,259 |
| Christian Meibaum Endowment | 1,409,505 | | | | 1,409,505 |
| Christopher Homes | 88,740 | | | | 88,740 |
| Christopher Homes Endowment | 21,703 | | | | 21,703 |
| Ciara Endowment | 305,110 | | | | 305,110 |
| Class of '83 Thanksgiving Drive Inc,. Endowment | 75,326 | | | | 75,326 |
| Cheryl and Rick Collarini Donor Advised Fund | 94,725 | | | | 94,725 |
| Cole Michael Geigerman Special Needs Trust | 2,618 | | | | 2,618 |
| Community of Deacon's Endowment Fund | 34,469 | | | | 34,469 |
| Covenant House New Orleans Endowment Fund | 36,144 | | | | 36,144 |
| Ann and Price Crane Family Fund | 98,328 | | | | 98,328 |
| Anna Maria D'Antonio and Donald P. Mitchell Endowment | 10,580 | | | | 10,580 |
| Caruso and D'Antonio Endowment Fund | 10,580 | | | | 10,580 |
| Robert & Melanie D'Aquin Gift Annuity | 9,903 | | | | 9,903 |
| Robert & Melanie D'Aquin Gift Annuity #2 | 15,140 | | | | 15,140 |
| Charles J. Derbes, Jr. & Edmund R. Vales Memorial Endowment | 11,492 | | | | 11,492 |
| Robert E. Dionne "A" - Gift Annuity | 49,114 | | | | 49,114 |
| Robert E. Dionne "B" - Gift Annuity | 41,653 | | | | 41,653 |
| Robert E. Dionne #3 - Gift Annuity | 108,004 | | | | 108,004 |
| Robert E. Dionne #4 - Gift Annuity | 110,071 | | | | 110,071 |
| Robert E. Dionne #5 - Gift Annuity | 69,921 | | | | 69,921 |
| Robert E. Dionne #6 - Gift Annuity | 35,479 | | | | 35,479 |
| Robert E. Dionne #7 - Gift Annuity | 36,032 | | | | 36,032 |
| Robert E. Dionne #8 - Gift Annuity | 37,691 | | | | 37,691 |
| Robert E. Dionne #9 - Gift Annuity | 38,244 | | | | 38,244 |
| Robert E. Dionne #10 - Gift Annuity | 51,648 | | | | 51,648 |
| Robert E. Dionne #11 - Gift Annuity | 52,064 | | | | 52,064 |
| Robert E. Dionne #12 - Gift Annuity | 52,899 | | | | 52,899 |
| Robert E. Dionne #13 - Gift Annuity | 53,734 | | | | 53,734 |
| Robert E. Dionne #14 - Gift Annuity | 39,093 | | | | 39,093 |
| Robert E. Dionne #15 - Gift Annuity | 39,334 | | | | 39,334 |
| Robert E. Dionne #16 - Gift Annuity | 40,298 | | | | 40,298 |
| Robert E. Dionne #17 - Gift Annuity | 40,539 | | | | 40,539 |
| Robert E. Dionne #18 - Gift Annuity | 44,474 | | | | 44,474 |
| Robert E. Dionne #19 - Gift Annuity | 42,623 | | | | 42,623 |
| Robert E. Dionne #20 - Gift Annuity | 44,937 | | | | 44,937 |
| Robert E. Dionne #21 - Gift Annuity | 46,016 | | | | 46,016 |
| Robert E. Dionne #22 - Gift Annuity | 238,946 | | | | 238,946 |
| Domestic Violence Services Endowment | 92,441 | | | | 92,441 |
| Brandt J. Dufrene Family Fund Endowment Fund | 32,208 | | | | 32,208 |
| E.J. and Marjory B. Ourso Family Fund for Second Harvesters Food Bank | 1,329,890 | | | | 1,329,890 |
| Mr. & Mrs. Fred Fabacher - Gift Annuity | 51,755 | | | | 51,755 |
| Father Harold Cohen Memorial Endowment | 58,530 | | | | 58,530 |
| Sr. Juanita Federico Scholarship Fund | 11,909 | | | | 11,909 |
| Candy R. Fitch Charitable Gift Annuity | 60,492 | | | | 60,492 |
| Joseph T. Fitch Charitable Gift Annuity | 56,747 | | | | 56,747 |

56

| | Investment Pool | Non-pooled Investments | Equity In CUP | Restricted For Debt Service | Totals |
|---|---|---|---|---|---|
| **Funds Held For Others: (Continued)** | | | | | |
| Ms. Dagmar Foley - Gift Annuity | 52,125 | | | | 52,125 |
| Archbishop Francis B. Schulte | 141,759 | | | | 141,759 |
| Archbishop Francis B. Schulte of the Archdiocese | 716,813 | | | | 716,813 |
| Lee Gardemal Scholarship Fund | 12,606 | | | | 12,606 |
| Donald Garvey Donor Advised Fund - Pool | 31,241 | | | | 31,241 |
| Larry Garvey Family Fund | 13,746,632 | | | | 13,746,632 |
| Lawrence Garvey Presidential Scholarship | 733,065 | | | | 733,065 |
| Joan E. Gaulene - Gift Annuity | 6,509 | | | | 6,509 |
| John & Dathel Geores Endowment | 99,860 | | | | 99,860 |
| Clifford J. Giffin Jr. - Gift Annuity | 40,997 | | | | 40,997 |
| Good Shepherd Parish Endowment | 62,822 | | | | 62,822 |
| The Hillary Lanaux Greve Memorial Scholarship Fund | 45,774 | | | | 45,774 |
| Thomas Greve "A" - Gift Annuity | 975 | | | | 975 |
| Thomas Greve "B" - Gift Annuity | 18,841 | | | | 18,841 |
| Thomas Greve "C" - Gift Annuity | 46,479 | | | | 46,479 |
| Thomas Greve "D" - Gift Annuity | 70,900 | | | | 70,900 |
| Thomas Greve "E" - Gift Annuity | 89,712 | | | | 89,712 |
| Thomas Greve "F" - Gift Annuity | 101,131 | | | | 101,131 |
| Thomas & Marie Louise Lemarie Greve Memorial Fund | 89,667 | | | | 89,667 |
| Dolores F. Harris Endowment Fund | 355,930 | | | | 355,930 |
| Harry & Ruth Henderlite Fund | 555,654 | | | | 555,654 |
| William B. Herbert - Gift Annuity | 6,329 | | | | 6,329 |
| Helen Knesel Endowment/St. Catherine of Siena School | 21,031 | | | | 21,031 |
| Holmes Family Endowment | 193,896 | | | | 193,896 |
| Holy Family Endowment | 132,142 | | | | 132,142 |
| Holy Name of Mary Church Endowment Foundation | 83,469 | | | | 83,469 |
| Hooper Endowment | 983,400 | | | | 983,400 |
| Hope Haven Endowment | 18,844 | | | | 18,844 |
| Hotel Hope Custodial Fund | 195,813 | | | | 195,813 |
| Anna Hugel Endowment | 83,802 | | | | 83,802 |
| Immaculate Conception Church, New Orleans | 868,555 | | | | 868,555 |
| Immaculate Conception Scholarship | 99,569 | | | | 99,569 |
| Frank Incaprera Charitable Gift Annuity | 8,286 | | | | 8,286 |
| Father Michael Jacques Endowment | 3,700 | | | | 3,700 |
| Josephite Fathers Endowment Fund for Needy African American Mothers | 13,139 | | | | 13,139 |
| Saint Katharine Drexel Monument Endowment Fund | 40,379 | | | | 40,379 |
| Tom & Connie Kitchens Family Fund | 72,432 | | | | 72,432 |
| Bobbie & Ray Landry Fund | 10,912 | | | | 10,912 |
| Mark & Jane Landry - Gift Annuity | 67,124 | | | | 67,124 |
| Literacy Endowment | 42,695 | | | | 42,695 |
| T. Ben Lockett Lay Missionary Endowment | 333,785 | | | | 333,785 |
| Thomas B. Lockett Endowment | 1,085,633 | | | | 1,085,633 |
| Athalie Macgowan #3 - Gift Annuity | 22 | | | | 22 |
| Athalie Macgowan #4 - Gift Annuity | 2,816 | | | | 2,816 |
| Athalie Macgowan #5 - Gift Annuity | 5,767 | | | | 5,767 |
| McPeake/Madonna Manor/Hope Haven | 8,456 | | | | 8,456 |
| Magendie Scholarship Fund | 24,887 | | | | 24,887 |
| Mary June Ragas/St. Mary Magdalen School Endowment | 180,222 | | | | 180,222 |
| Mary Queen of Peace Endowment Fund | 1,439 | | | | 1,439 |
| Mary Queen of Peace School, Rev. Calkins Fund | 2,028 | | | | 2,028 |
| Metairie Manor Endowment Fund B | 185,394 | | | | 185,394 |

57

**Schedule 5**
**(Continued)**

| | Investment Pool | Non-pooled Investments | Equity In CUP | Restricted For Debt Service | Totals |
|---|---|---|---|---|---|
| **Funds Held For Others: (Continued)** | | | | | |
| Metairie Manor Endowment Fund | 274,766 | | | | 274,766 |
| T. Milton Hynes & Norma M. Hynes Endowment | 90,578 | | | | 90,578 |
| Monsignor Wynhoven Endowment Fund B | 226,702 | | | | 226,702 |
| Monsignor Wynhoven Apartments, Inc. | 12,127 | | | | 12,127 |
| Most Holy Trinity Church Endowment | 240,439 | | | | 240,439 |
| Myers Family Fund | 1,919 | | | | 1,919 |
| New Orleans Archdiocesan Cemeteries Fund | 16,206 | | | | 16,206 |
| Betty Jane Nolan Charitable Fund | 27,272 | | | | 27,272 |
| Notre Dame Hospice Development Fund | 63,363 | | | | 63,363 |
| Notre Dame Seminary | 4,825,027 | | | | 4,825,027 |
| Notre Dame Seminary Endowment | 181,556 | | | | 181,556 |
| Our Lady of Divine Providence Parish Endowment Fund | 92,246 | | | | 92,246 |
| Our Lady of Grace Church Endowment | 13,975 | | | | 13,975 |
| Our Lady of Guadalupe Church | 1,091,223 | | | | 1,091,223 |
| National Shrine of Our Lady of Prompt Succor | 231,908 | | | | 231,908 |
| Our Lady of Prompt Succor School, Chalmette | 32,112 | | | | 32,112 |
| Our Lady of Prompt Succor Church (Chalmette) Endowment | 12,835 | | | | 12,835 |
| Our Lady of The Rosary Church Endowment | 12,575 | | | | 12,575 |
| Our Lady of The Rosary Church #2 | 25,489 | | | | 25,489 |
| Our Lady of Wisdom Custodian Fund | 736,529 | | | | 736,529 |
| Ozanam Inn Endowment | 33,745 | | | | 33,745 |
| Jacqueline S. Palama - Gift Annuity | 176,723 | | | | 176,723 |
| The Pat and Bobby McIntyre Family Fund | 27,487 | | | | 27,487 |
| Paula Zabrecky Scholarship Endowment Fund / St. Edward The Confessor School | 37,490 | | | | 37,490 |
| Pennies for Bread Endowment Fund | 33,619 | | | | 33,619 |
| Archbishop Philip M. Hannan Educational Fund | 418,079 | | | | 418,079 |
| Archbishop Philip M. Hannan Memorial Fund | 197,877 | | | | 197,877 |
| Philmat Inc., Endowment Fund | 4,603,443 | | | | 4,603,443 |
| Philmat Operating Account | 786,412 | | | | 786,412 |
| Project Lazarus Custodial Fund | 50,158 | | | | 50,158 |
| Propagation of the Faith | 1,609,709 | | | | 1,609,709 |
| Quirk/Magnificat Ministry | 32,184 | | | | 32,184 |
| Ralph J. & Faye M. Alvarez Scholarship Endowment Fund - St. Benilde School | 29,515 | | | | 29,515 |
| Resurrection of Our Lord Church Endowment Fund | 1,039,227 | | | | 1,039,227 |
| Reverend Msgr. Andrew C. Taormina Endowment Account | 25,493 | | | | 25,493 |
| Reverend Piovan Endowment Account | 23,685 | | | | 23,685 |
| Rev. William J. McGough Endowment | 39,032 | | | | 39,032 |
| Rick and Maxine Resweber Family Fund | 17,414 | | | | 17,414 |
| Dr. Winston P. Riehl #1- Gift Annuity | 20,959 | | | | 20,959 |
| Dr. Winston P. Riehl #2 - Gift Annuity | 31,714 | | | | 31,714 |
| Dr. Winston P. Riehl #3 - Gift Annuity | 58,141 | | | | 58,141 |
| Robert E. Dionne Endowment Fund | 16,361 | | | | 16,361 |
| Robin R. & Pamela F. Mingo Family Fund | 995,982 | | | | 995,982 |
| Fr. Ignatius M Roppolo Memorial Fund | 91,401 | | | | 91,401 |
| Msgr. Allen J. Roy Endowment Fund | 17,277 | | | | 17,277 |
| Archbishop Rummel High School Alumni Association | 231,687 | | | | 231,687 |
| Archbishop Rummel High School Endowment Fund | 463,387 | | | | 463,387 |
| Scholastica Excellence Fund | 169,701 | | | | 169,701 |
| Msgr. Marion F. Schutten Endowment | 481,368 | | | | 481,368 |

58

**Schedule 5
(Continued)**

| | Investment Pool | Non-pooled Investments | Equity In CUP | Restricted For Debt Service | Totals |
|---|---|---|---|---|---|
| **Funds Held For Others: (Continued)** | | | | | |
| Peter & Joy Schwehm Scholarship Fund | 10,478 | | | | 10,478 |
| Inez P. Segreto Scholarship Fund | 300,889 | | | | 300,889 |
| Second Harvesters Food Bank | 2,476,025 | | | | 2,476,025 |
| Second Harvesters Food Bank, Food for Families, Food for Seniors | 204,990 | | | | 204,990 |
| Serra Club of New Orleans (Connie & Frank Walk Endowment) | 12,138 | | | | 12,138 |
| Archbishop Shaw High School, Msgr. Hebert Endowment | 74,658 | | | | 74,658 |
| Sister Anthony Barczykowski, D.C. Endowment Fund | 7,792 | | | | 7,792 |
| Sister Germaine O. P. Early Childhood Development Center Fund | 36,219 | | | | 36,219 |
| Sisters of the Spirit of Jesus | 261,781 | | | | 261,781 |
| St. Agnes Church Parish Endowment | 210,770 | | | | 210,770 |
| St. Ann School Endowment Fund | 61,699 | | | | 61,699 |
| St. Anthony Garden Endowment | 437,642 | | | | 437,642 |
| St. Francis Xavier Hickey | 57,171 | | | | 57,171 |
| St. John Bosco Parish Endowment Fund | 307,401 | | | | 307,401 |
| St. John The Baptist Church Endowment | 38,082 | | | | 38,082 |
| St. Mary's Dominican High School Endowment Fund | 2,346,232 | | | | 2,346,232 |
| St. Peter School - Reserve Endowment | 7,581 | | | | 7,581 |
| St. Alphonsus Fund | 34,553 | | | | 34,553 |
| St. Anthony School (Gretna) Endowment Fund | 112,459 | | | | 112,459 |
| St. Bernard Catholic Church Endowment | 5,768 | | | | 5,768 |
| Sr. Imelda Moriarity/St. Catherine of Siena School | 160,532 | | | | 160,532 |
| St. Christopher the Martyr Church | 43,220 | | | | 43,220 |
| St. Charles Borromeo School Endowment | 20,791 | | | | 20,791 |
| St. Clement of Rome Church Fund | 62,258 | | | | 62,258 |
| St. Clement of Rome School Fund | 31,601 | | | | 31,601 |
| St. Dominic Church Endowment | 579,936 | | | | 579,936 |
| St. Dominic School Endowment | 77,221 | | | | 77,221 |
| St. Francis of Assisi Church Endowment | 476,687 | | | | 476,687 |
| St. Francis Xavier School Endowment | 23,697 | | | | 23,697 |
| St. Joan of Arc Msgr. Robert Vincent Endowment | 211,440 | | | | 211,440 |
| St. Joseph Church Endowment | 474,019 | | | | 474,019 |
| St. Joseph Church Patrimony Endowment | 881,681 | | | | 881,681 |
| St. Joseph Church, Gretna - St. Vincent de Paul Society | 86,786 | | | | 86,786 |
| St. Joseph of Arimathea Priests Recovery Endowment | 55,001 | | | | 55,001 |
| St. Leo The Great Church Endowment | 25,713 | | | | 25,713 |
| St. Louis King of France Parish Endowment | 350,831 | | | | 350,831 |
| St. Luke The Evangelist Parish Endowment | 4,449 | | | | 4,449 |
| St. Margaret Mary Parish Endowment | 32,165 | | | | 32,165 |
| St. Margaret Mary School Scholarship Fund | 368,911 | | | | 368,911 |
| St. Margaret Mary School Endowment | 58,048 | | | | 58,048 |
| St. Mary Magdalen Church Endowment | 7,017 | | | | 7,017 |
| St. Michael Endowment | 1,243,723 | | | | 1,243,723 |
| St. Peter Church, Covington | 253,273 | | | | 253,273 |
| St. Peter (Covington) School Endowment Fund | 63,639 | | | | 63,639 |
| St. Pius X Church Endowment Fund | 6,876 | | | | 6,876 |
| St. Pius X Pillars of Pius Endowment Fund | 378,429 | | | | 378,429 |
| St. Pius X Tuition Assistance Fund | 43,054 | | | | 43,054 |
| St. Rita (Harahan) Parish School Endowment Fund | 260,975 | | | | 260,975 |
| St. Rita Church Parish Endowment Fund | 128,850 | | | | 128,850 |
| St. Robert Bellarmine Seminarial Support Fund | 428,787 | | | | 428,787 |
| St. Scholastica Academy Alumnae Scholarship Fund | 28,964 | | | | 28,964 |
| St. Scholastica Academy Endowment Fund | 1,366,649 | | | | 1,366,649 |

**Schedule 5**
**(Continued)**

| | Investment Pool | Non-pooled Investments | Equity In CUP | Restricted For Debt Service | Totals |
|---|---|---|---|---|---|
| **Funds Held For Others: (Continued)** | | | | | |
| St. Scholastica Academy Endowment Scholarship Fund | 17,278 | | | | 17,278 |
| Betty & James E. Smith Endowment | 16,585 | | | | 16,585 |
| St. Stephen School | 226,124 | | | | 226,124 |
| St. Theresa of the Child Jesus | 735,338 | | | | 735,338 |
| St. Anthony of Padua Church (New Orleans) | | | | | |
| Parish Endowment Fund | 12,985 | | | | 12,985 |
| Spirituality Center | 53,677 | | | | 53,677 |
| Bishop Stanley J. Ott Notre Dame Seminary | | | | | |
| Memorial Endowment | 176,316 | | | | 176,316 |
| Steiner Aged/Infirm | 200,603 | | | | 200,603 |
| S. Sternberg (deferred) - Gift Annuity | 21,559 | | | | 21,559 |
| S. Sternberg (deferred) - Gift Annuity #2 | 19,913 | | | | 19,913 |
| Stewart/Social Apostolate | 45,394 | | | | 45,394 |
| Stoulig Fund | 336,783 | | | | 336,783 |
| T. Hartley Kingsmill Family Endowment | 10,082 | | | | 10,082 |
| The Calamari Family Endowment Fund | 1,397 | | | | 1,397 |
| The Gift of Life Endowment | 1,273,104 | | | | 1,273,104 |
| George & Catherine Theobald Memorial Endowment | 78,127 | | | | 78,127 |
| Charlotte L. Todd #1 - Gift Annuity | 743 | | | | 743 |
| Charlotte L. Todd #2 - Gift Annuity | 7,256 | | | | 7,256 |
| Tujague/Social Apostolate | 124,928 | | | | 124,928 |
| Angelle Ulfers Memorial Scholarship | 18,101 | | | | 18,101 |
| Visitation of our Lord Endowment | 30,700 | | | | 30,700 |
| Rev. Jules A. Vitte | 161,468 | | | | 161,468 |
| Connie and Frank Walk Endowment Fund | 173,021 | | | | 173,021 |
| Loretta G. Whyte Donor Advised Fund | 2,965 | | | | 2,965 |
| William Richard & Helen Hock St. Joseph | | | | | |
| Parish Endowment | 169,407 | | | | 169,407 |
| Wiseman Endowment Fund | 38,746 | | | | 38,746 |
| Wynhoven Health Care Center Development Fund | 32,046 | | | | 32,046 |
| Peggy Yancey Endowment | 163,828 | | | | 163,828 |
| Total funds held for others | 83,352,732 | - | - | - | 83,352,732 |
| Total investments | $ 165,882,116 | $ 59,988,360 | $ 697,224 | $ 6,035,363 | $ 232,603,063 |

60

Schedule 6

# SCHEDULE OF COMPENSATION, BENEFITS, AND OTHER
# PAYMENTS TO AGENCY HEAD OR CHIEF EXECUTIVE OFFICER

### Roman Catholic Church of the Archdiocese of New Orleans
### Administrative Offices
New Orleans, Louisiana

For the year ended June 30, 2016

**Agency Head Name:**  Archbishop Gregory M. Aymond

**Purpose**

| | | |
|---|---|---:|
| Salary | $ | 0 |
| Benefits - insurance | | 0 |
| Benefits - retirement | | 0 |
| Benefits - other | | 0 |
| Car allowance | | 0 |
| Vehicle provided by government | | 0 |
| Per diem | | 0 |
| Reimbursements | | 0 |
| Travel | | 0 |
| Registration fees | | 0 |
| Conference travel | | 0 |
| Continuing professional education fees | | 0 |
| Housing | | 0 |
| Unvouchered expenses | | 0 |
| Special meals | | 0 |
| | $ | 0 |

Note: No public funds were used to pay the Archbishop's salary, benefits, or any
other compensation during the year ended June 30, 2016.

61

**SPECIAL REPORTS OF CERTIFIED PUBLIC ACCOUNTANTS**



## INDEReviewPENDENT AUDITOR'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING AND ON COMPLIANCE AND OTHER MATTERS BASED ON AN AUDIT OF FINANCIAL STATEMENTS PERFORMED IN ACCORDANCE WITH *GOVERNMENT AUDITING STANDARDS*

To the Most Reverend Gregory M. Aymond,
        Archbishop of the Roman Catholic Church of
            The Archdiocese of New Orleans,
                New Orleans, Louisiana.

We have audited, in accordance with the auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards* issued by the Comptroller General of the United States, the financial statements of the Roman Catholic Church of the Archdiocese of New Orleans Administrative Offices (the "Administrative Offices"),  which comprise the statement of financial position as of June 30, 2016, and the related statements of activities and cash flows for the year then ended, and the related notes to the financial statements, and have issued our report thereon dated November 14, 2016.

**Internal Control Over Financial Reporting**

In planning and performing our audit of the financial statements, we considered the Administrative Offices' internal control over financial reporting (internal control) to determine the audit procedures that are appropriate in the circumstances for the purpose of expressing our opinion on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of the Administrative Offices' internal control. Accordingly, we do not express an opinion on the effectiveness of the Administrative Offices' internal control.

A *deficiency in internal control* exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct, misstatements on a timely basis. A *material weakness* is a deficiency, or a combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the entity's financial statements will not be prevented, or detected and corrected on a timely basis. A *significant deficiency* is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance.

P.O. Box 60600  •  NEW ORLEANS, LA  70160-0600  504.831.4949  BOURGEOISBENNETT.COM

Our consideration of internal control was for the limited purpose described in the first paragraph of this section and was not designed to identify all deficiencies in internal control that might be material weaknesses or significant deficiencies  and therefore, material weaknesses or significant deficiencies may exist that were not identified.  We did identify a deficiency in internal control, described in the accompanying schedule of findings and questioned costs that we consider to be a material weakness.  (See Finding 16-01).

## Compliance and Other Matters

As part of obtaining reasonable assurance about whether the Administrative Offices' financial statements are free from material misstatement, we performed tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements, noncompliance with which could have a direct and material effect on the determination of financial statement amounts.  However, providing an opinion on compliance with those provisions was not an objective of our audit, and accordingly, we do not express such an opinion.  The results of our tests disclosed no instances of noncompliance or other matters that are required to be reported under *Government Auditing Standards*.

## The Administrative Offices' Response to Findings

The Administrative Offices' response to the findings identified in our audit is described in the accompanying schedule of findings and questioned costs. The Administrative Offices' response was not subjected to the auditing procedures applied in the audit of the financial statements and, accordingly, we express no opinion on it.

## Purpose of this Report

The purpose of this report is solely to describe the scope of our testing of internal control and compliance and the results of that testing, and not to provide an opinion on the effectiveness of the Administrative Offices' internal control or on compliance. This report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the Administrative Offices' internal control and compliance. Accordingly, this communication is not suitable for any other purpose.

*Bourgeois Bennett, L.L.C.*

Certified Public Accountants.

New Orleans, Louisiana,
November 14, 2016.



# INDEPENDENT AUDITOR'S REPORT ON COMPLIANCE FOR EACH MAJOR PROGRAM AND ON INTERNAL CONTROL OVER COMPLIANCE REQUIRED BY THE UNIFORM GUIDANCE

To the Most Reverend Gregory M. Aymond,
      Archbishop of the Roman Catholic Church of
        The Archdiocese of New Orleans,
          New Orleans, Louisiana.

**Report on Compliance for Major Federal Program**

We have audited the Roman Catholic Church of the Archdiocese of New Orleans Administrative Offices' (the "Administrative Offices") compliance with the types of compliance requirements described in the *OMB Compliance Supplement* that could have a direct and material effect on the Administrative Offices' major federal program for the year ended June 30, 2016. The Administrative Offices' major federal program is identified in the summary of auditor's results section of the accompanying schedule of findings and questioned costs.

**Management's Responsibility**

Management is responsible for compliance with federal statutes, regulations, and the terms and conditions of its federal award applicable to its federal program.

**Auditor's Responsibility**

Our responsibility is to express an opinion on compliance for the Administrative Offices' major federal program based on our audit of the types of compliance requirements referred to above. We conducted our audit of compliance in accordance with auditing standards generally accepted in the United States of America; the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States; and the audit requirements of Title 2 U.S. *Code of Federal Regulations* Part 200, *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance). Those standards and the Uniform Guidance require that we plan and perform the audit to obtain reasonable assurance about whether noncompliance with the types of compliance requirements referred to above that could have a direct and material effect on a major federal program occurred. An audit includes examining, on a test basis, evidence about the Administrative Offices' compliance with

64

those requirements and performing such other procedures as we considered necessary in the circumstances.

We believe that our audit provides a reasonable basis for our opinion on compliance for the Administrative Offices' major federal program. However, our audit does not provide a legal determination of the Administrative Offices' compliance.

**Opinion on Each Major Federal Program**

In our opinion, the Administrative Offices complied, in all material respects, with the types of compliance requirements referred to above that could have a direct and material effect on its major federal program for the year ended June 30, 2016.

**Report on Internal Control Over Compliance**

Management of the Administrative Offices is responsible for establishing and maintaining effective internal control over compliance with the types of compliance requirements referred to above. In planning and performing our audit of compliance, we considered the Administrative Offices' internal control over compliance with the types of requirements that could have a direct and material effect on its major federal program to determine the auditing procedures that are appropriate in the circumstances for the purpose of expressing an opinion on compliance for its major federal program and to test and report on internal control over compliance in accordance with the Uniform Guidance, but not for the purpose of expressing an opinion on the effectiveness of internal control over compliance. Accordingly, we do not express an opinion on the effectiveness of the Administrative Offices' internal control over compliance.

A *deficiency in internal control over compliance* exists when the design or operation of a control over compliance does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct, noncompliance with a type of compliance requirement of a federal program on a timely basis. A *material weakness in internal control over compliance* is a deficiency, or combination of deficiencies, in internal control over compliance, such that there is a reasonable possibility that material noncompliance with a type of compliance requirement of a federal program will not be prevented, or detected and corrected, on a timely basis. A *significant deficiency in internal control over compliance* is a deficiency, or a combination of deficiencies, in internal control over compliance with a type of compliance requirement of a federal program that is less severe than a material weakness in internal control over compliance, yet important enough to merit attention by those charged with governance.

Our consideration of internal control over compliance was for the limited purpose described in the first paragraph of this section and was not designed to identify all deficiencies in internal control over compliance that might be material weaknesses or significant deficiencies. We did not identify any deficiencies in internal control over compliance that we consider to be material weaknesses. However, material weaknesses may exist that have not been identified.

The purpose of this report on internal control over compliance is solely to describe the scope of our testing of internal control over compliance and the results of that testing based on the requirements of the Uniform Guidance. Accordingly, this report is not suitable for any other purpose.

*Bourgeois Bennett, L.L.C.*

Certified Public Accountants.

New Orleans, Louisiana,
November 14, 2016.

66

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARD

### Roman Catholic Church of the Archdiocese of New Orleans
### Administrative Offices

For the year ended June 30, 2016

| Federal Grantor / Program Title | Federal CFDA Number | Pass-Through Entity Identifying Number | Federal Expenditures |
|---|---|---|---|
| **U.S. Department of Homeland Security:** | | | |
| **Passed Through the Louisiana Governor's Office of Homeland Security and Emergency Preparedness** | | | |
| Disaster Grants - Public Assistance (Presidentially Declared Disasters) | 97.036 | 1603-DR-LA | $  27,592,414 |
| Total expenditures of federal award | | | $  27,592,414 |

See notes to schedule of expenditures of federal award.

67

## NOTES TO SCHEDULE OF EXPENDITURES
## OF FEDERAL AWARD

### Roman Catholic Church of the Archdiocese of New Orleans
### Administrative Offices

For the year ended June 30, 2016

**Note 1 -  BASIS OF PRESENTATION**

The accompanying Schedule of Expenditures of Federal Award includes the federal grant activity of Roman Catholic Church of the Archdiocese of New Orleans Administrative Offices (the "Administrative Offices") and is presented on the accrual basis of accounting. Grant revenues are recorded for financial reporting purposes when the Administrative Offices' has met the qualifications for the respective grants.  The information in this schedule is presented in accordance with the requirements of *Title 2 U.S. Code of Federal Regulations Part 200, Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (Uniform Guidance).*  Therefore, the amount presented in the schedule may differ from the amount presented in, or used in the preparation of, the financial statements.

Funds received from this grant by the Administrative Offices were distributed to various affiliated entities.  For financial reporting purposes, these entities are not consolidated with the Administrative Offices' financial statement.

**Note 2 -  FINDINGS OF NONCOMPLIANCE**

No federal award findings or questioned costs were reported during the audit of the financial statements for the year ended June 30, 2016.

## SCHEDULE OF FINDINGS AND QUESTIONED COSTS

### Roman Catholic Church of the Archdiocese of New Orleans Administrative Offices

For the year ended June 30, 2016

**Section I - Summary of Auditor's Results**

a)  Financial Statements

   Type of auditor's report issued: unqualified

   Internal control over financial reporting:

   - Material weakness(es) identified?                    X  Yes ____ No
   - Significant deficiency(ies) identified that are
     not considered to be a material weakness?    ____ Yes  X  None reported

   Noncompliance material to financial
   statements noted?                                          ____ Yes  X  No

b)  Federal Awards

   Internal control over major program:

   - Material weakness(es) identified?                    ____ Yes  X  No
   - Significant deficiency(ies) identified that are
     not considered to be a material weakness?    ____ Yes  X  None reported

   Type of auditor's report issued on compliance for major programs:  unqualified

   - Any audit findings disclosed that are required
     to be reported in accordance with section
     200.516 of the Uniform Guidance?                ____ Yes  X  No

69

(Continued)

## Section I - Summary of Auditor's Results (Continued)

c) Identification of Major Program:

| CFDA Number | Name of Federal Program |
|---|---|
| 97.036 | U.S. Department of Homeland Security: Disaster Grants - Public Assistance (Presidentially Declared Disasters) |

Dollar threshold used to distinguish between
Type A and Type B programs:        $827,772

Auditee qualified as a low-risk auditee?     _X_ Yes ____ No

## Section II - Internal Control Over Financial Reporting and Compliance and Other Matters Material to the Basic Financial Statements

### Internal Control Over Financial Reporting

#### 16-01  Adjustments Caused by Inadequate Interdepartmental Communication

**Criteria** - Complete and accurate accounting requires input from all departments within an organization.

**Condition** - An adjustment was required to correct the accounting for a duplicate payment of grant funds received by the Building Office.  While normal grant closing procedures would have identified and corrected this duplicate payment by the end of the grant period, the adjustment, although identified internally and communicated to GOHSEP, had not been made as of the reporting date.

**Context** - Isolated.

**Cause** - The accounting department was not advised by the Building Office of a duplicate receipt from the grantor agency; therefore, the grant revenue and related expenditure was duplicated in the accounting records.

**Effect** - Inadequate communication with the accounting department by other departments within the organization can result in material financial statement misstatements.

70

(Continued)

**Section II -  Internal Control Over Financial Reporting and Compliance and Other Matters Material to the Basic Financial Statements (Continued)**

**Internal Control Over Financial Reporting (Continued)**

**16-01  Adjustments Caused by Inadequate Interdepartmental Communication (Continued)**

**Recommendation** - Departments within the organization should be advised of the importance of communicating on a timely basis with the accounting department regarding events or occurrences which may have an effect on the accounting records. Specifically, communication by the Building Office with the accounting department regarding any unusual or duplicate payments received for project work order reimbursements should be documented.

**Views of responsible officials of the auditee when there is a disagreement with the findings, to the extent of practical** - None

**Compliance and Other Matters**

There were no findings noted during the audit for the year ended June 30, 2016, related to compliance and other matters.

**Section III - Internal Control and Compliance Material to Federal Awards**

**Internal Control / Compliance**

There were no findings noted during the audit for the year ended June 30, 2016, related to federal award compliance or federal award internal control over compliance.

71

## REPORTS BY MANAGEMENT

## SCHEDULE OF PRIOR YEAR FINDINGS
## AND QUESTIONED COSTS

**Roman Catholic Church of the Archdiocese of New Orleans
Administrative Offices**

For the year ended June 30, 2016

**Section I -  Internal Control Over Financial Reporting and Compliance and Other Matters
Material to the Basic Financial Statements**

**Internal Control Over Financial Reporting**

There were no findings noted during the audit for the year ended June 30, 2015, related to
internal control over financial reporting material to the basic financial statements.

**Compliance and Other Matters**

There were no findings noted during the audit for the year ended June 30, 2015, related to
compliance and other matters.

**Section II - Internal Control and Compliance Material to Federal Awards**

There were no findings noted during the audit for the year ended June 30, 2015, related to
federal award compliance or federal award internal control over compliance.

**Section III - Management Letter**

A management letter was not issued in connection with the audit for the year ended June 30,
2015.

72

## MANAGEMENT'S CORRECTIVE ACTION PLAN
## ON CURRENT YEAR FINDINGS

**Roman Catholic Church of the Archdiocese of New Orleans
Administrative Offices**

For the year ended June 30, 2016

**Section I -  Internal Control Over Financial Reporting and Compliance and Other Matters Material to the Basic Financial Statements**

**Internal Control Over Financial Reporting**

**16-01 Adjustments Caused by Inadequate Interdepartmental Communication**

**Recommendation** - Departments within the organization should be advised of the importance of communicating on a timely basis with the accounting department regarding events or occurrences which may have an effect on the accounting records. Specifically, communication by the Building Office with the accounting department regarding any unusual or duplicate payments received for project work order reimbursements should be documented.

**Management's Corrective Action -** Management has a year-end closing process that includes contacting departments within the organization to ensure that the Accounting Office is aware of events or occurrences that affect the accounting records. The Accounting Office will formalize and reinforce the year-end interview process with departments to identify unusual or extraordinary transactions to ensure that they are recorded in a timely manner.

**Compliance and Other Matters**

There were no findings noted during the audit for the year ended June 30, 2016, related to compliance and other matters.

**Section II - Internal Control and Compliance Material to Federal Awards**

There were no findings noted during the audit for the year ended June 30, 2016, related to federal award compliance or federal award internal control over compliance.

73

**(Continued)**

**Section III - Management Letter**

A management letter was not issued in connection with the audit for the year ended June 30, 2016.

## APPENDIX C

## CERTAIN DEFINITIONS AND SUMMARY OF PRINCIPAL DOCUMENTS

The following are definitions of certain words and terms used in this Official Statement. Words and terms used in this Official Statement which are not defined below or elsewhere in this Official Statement have the meanings set forth in the Indenture and the Agreement.

"*Additional Bonds*" means bonds, if any, issued in one or more series on a parity with the Bonds.

"*Administrative Expenses*" means the necessary, reasonable and direct out-of-pocket expenses incurred by the Authority or the Trustee pursuant to the Indenture and the Agreement, the compensation of the Trustee under the Indenture (including, but not limited to any annual administrative fee charged by the Trustee), and the necessary, reasonable and direct out-of-pocket expenses of the Trustee incurred by the Trustee in the performance of its duties under the Indenture.

"*Agreement*" or "*Loan Agreement*" means the Loan Agreement dated as of April 1, 2017 between the Corporation and the Authority, including any amendments and supplements thereof and thereto as permitted thereunder.

"*Annual Debt Service Requirements*" means, when used with respect to any Long-Term Indebtedness for any Fiscal Year, as of any particular date of calculation the amount required to pay the sum of (a) the interest on such Long-Term Indebtedness payable during such Fiscal Year, and (b) the principal of and any amount required to effect any mandatory redemption of such Long-Term Indebtedness, if any, during such Fiscal Year, less any amount of such interest or principal for the payment of which moneys or investment obligations the principal of and interest on which when due will provide for such payment, are held in trust (including defeased obligations, capitalized interest and debt service reserve funds) and including all amounts due under any capitalized leases and any guarantees of at least one year in duration.

For the purpose of calculating the Annual Debt Service Requirements: (i) with respect to any Variable Rate Indebtedness, for the purpose of calculating interest on any such Indebtedness for any period after the date of calculation, such Indebtedness shall be deemed to bear interest at The Bond Buyer Revenue Bond Index for a term equal to the remaining term of the Bonds; (ii) with respect to any Balloon Long-Term Indebtedness, debt service shall be calculated at the option of the Corporation as follows: (A) if an irrevocable commitment for a credit facility the provider of which is rated at least "P-1" by Moody's or "A-1" by S&P or "F-1" by Fitch is in effect to pay the balloon debt when it comes due, then the terms of the contractual obligation to repay the credit facility provider may be used, (B) if balloon debt is contractually required to be amortized, then such amortization payments may be used, or (C) amortization may be assumed on a level-debt service basis over a 20-year period at an interest rate based on the Revenue Bond Index last published by *The Bond Buyer*. Notwithstanding the foregoing, the full amount of balloon debt shall be included in the calculation if the calculation is made within 12 months of the actual maturity of such balloon debt and no credit facility exists; (iii) with respect to any Guaranty of any Indebtedness that would constitute Long-Term Indebtedness if incurred directly by the Corporation: (A) for the purposes of determining debt service requirements, (1) so long as no payment default shall have occurred with respect to such Indebtedness and no demand for payment shall have been made under such Guaranty as described in (2) below, only 20% of the debt service requirements of such guaranteed Indebtedness shall be included; and (2) if during the immediately preceding one-year period a payment default shall have occurred with respect to such Indebtedness and a demand for payment shall have been made under such Guaranty, 100% of the debt service requirements of such Indebtedness shall

be taken into account for the two Fiscal Years following such period; and (B) such Indebtedness shall be taken into account only once in calculating the Debt Service Requirements of all Long-Term Indebtedness. Notwithstanding anything to the contrary, with respect to the guarantee of the Existing Senior SAG Debt described in this Official Statement, the amortization schedule shall correspond to the amortization schedule through August 1, 2016 and shall thereafter be assumed to amortize on a level debt service basis over a twenty year period from a balloon payment thereon at an interest rate based on the "Revenue Bond Index" last published by *The Bond Buyer* on or prior to the date of calculation.

"*Authority*" means the Louisiana Public Facilities Authority, a public trust and public corporation of the State of Louisiana, created by the provisions of the Public Trust Act and its Indenture of Trust dated August 21, 1974, or any agency, board, body, commission, department of officer succeeding to the principal functions thereof or to whom the powers conferred upon the Authority by said provisions shall be given by law.

"*Authorized Corporation Representative*" means the Secretary, Chief Financial Officer or any other officer of the Corporation designated in writing to act under the Indenture and under the Agreement.

"*Balloon Long-Term Indebtedness*" means Long-Term Indebtedness, 25% or more of the principal amount of which matures in the same 12-month period, which portion of such principal amount is not required by the documents governing such Long-Term Indebtedness to be amortized by redemption prior to such period.

"*Bond Proceeds Fund*" means the fund of that name created under the Indenture.

"*Bondholder*" or "*Owners*" or "*owner*," when used with reference to a Bond or Bonds, means the registered owner of any outstanding Bond or Bonds.

"*Bonds*" or "*Series 2017 Bonds*" means the Louisiana Public Facilities Authority Refunding Revenue Bonds (Archdiocese of New Orleans Project) Series 2017, authorized to be issued by the Authority in the aggregate principal amount of $41,895,000 including such Bonds issued in exchange for other such Bonds pursuant to the Indenture, or in replacement for mutilated, destroyed, lost or stolen Bonds pursuant to the Indenture.

"*Business Day*" means any day other than (i) a Saturday, (ii) a Sunday or (iii) any other day on which banking institutions in New York, New York, or New Orleans or Baton Rouge, Louisiana, are authorized or required not to be open for the transaction of regular banking business.

"*Closing Date*" means the date on which the Bonds are delivered and payment therefor is received by the Authority.

"*Code*" means the Internal Revenue Code of 1986, as amended, and the regulations and rulings promulgated or proposed thereunder or (to the extent applicable) under prior law, including temporary regulations.

"*Collateral*" means all Revenues, whether now existing or arising hereafter and the Unrestricted Cash and Investments.

"*Corporation*" means The Roman Catholic Church of the Archdiocese of New Orleans, a non-profit corporation organized and existing under the laws of the State, and also includes every successor corporation and transferee of the corporation until payment or provision for the payment of all of the Bonds.

"*Costs of Issuance Account*" means the account so designated which is established pursuant to the Indenture.

"*Debt Service Coverage Ratio*" means, for any Fiscal Year, the ratio for such Fiscal Year of (x) Net Income Available for Debt Service to (y) Annual Debt Service Requirements due in such Fiscal Year.

"*Debt Service Fund*" means the fund of that name created under Article IV of the Indenture.

"*Debt Service Reserve Fund*" means the special fund of that name established with the Trustee pursuant to Article IV of the Indenture.

"*Debt Service Reserve Fund Requirement*" means, to the extent required and applicable as set forth in the Indenture, an amount equal to the lesser of (i) 10% of the original principal amount of the Bonds, (ii) 100% of the maximum Annual Debt Service Requirements, or (iii) 125% of the average annual debt service on the Bonds and, with respect to any Additional Bonds, the same amounts with respect to the Additional Bonds.

"*Defeasance Obligations*" means:

     (a)     Direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America;

     (b)     Cash;

     (c)     U. S. Treasury Certificates, Notes and Bonds (including State and Local Government Series – "SLGs");

     (d)     Direct obligations of the Treasury which have been stripped by the Treasury itself, CATS, TIGRS and similar securities;

     (e)     Obligations of the Resolution Funding Corp. (REFCORP). Only the interest component of REFCORP strips which have been stripped by request to the Federal Reserve Bank of New York in book entry form is acceptable.

     (f)     Pre-refunded municipal bonds rated "Aaa" by Moody's and "AAA" by Fitch or S&P. If, however, the issue is only rated by Fitch (i.e., there if no Moody's or S&P rating), then the pre-refunded bonds must have been pre-refunded with cash, direct U. S. or U. S. guaranteed obligations, or AAA rated pre-refunded municipals to satisfy this condition; and

     (g)     Obligations issued by the following agencies which are backed by the full faith and credit of the United States:

          (i)     Farmers Home Administration (FmHA)
                Certificates of beneficial ownership

          (ii)     Federal Financing Bank

          (iii)     General Services Administration
                Participation certificates

(iv)    U. S. Maritime Administration
Guaranteed Title XI financing

(v)    U. S. Department of Housing and Urban Development (HUD)
Project Notes
Local Authority Bonds
New Communities Debentures - U. S. government guaranteed debentures
U. S Public Housing Notes and Bonds - U. S. government guaranteed public housing notes and bonds

"*Environmental Regulations*" means all Laws and Regulations, now or hereafter in effect, with respect to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act, as amended (42 U.S.C. Section 9601, et seq.) (together with the regulations promulgated thereunder, "CERCLA"), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Section 6901, et seq.) (together with the regulations promulgated thereunder, "RCRA"), the Emergency Planning and Community Right-to-Know Act, as amended (42 U.S.C. Section 11001, et seq.) (together with the regulations promulgated thereunder, "Title III"), the Clean Water Act, as amended (33 U.S.C. Section 1321, et seq.) (together with the regulations promulgated thereunder "CWA"), the Clean Air Act, as amended (42 U.S.C. Section 7401, et seq.) (together with the regulations promulgated thereunder, "CAA") and the Toxic Substance Control Act, as amended (15 U.S.C. Section 2601, et seq.) (together with the regulations promulgated thereunder, "TSCA"), and any state or local similar laws and regulations and any so-called local, state or federal "superfund" or "superlien" law.

"*Fair Market Value*" of any stock, bond, debenture or other obligation or equity instrument which is regularly traded on a nationally recognized exchange means, at any date, the closing sale price of such security on the business day (on which any national securities exchange is open for the normal transaction of business) next preceding such date, as appearing in any published list of any national securities exchange or the National Market List of the National Association of Securities Dealers, Inc. or, if there is not such a closing sale price of such security, the average of the asked and bid prices for the purchase of such security at face value quoted on such business day by a financial institution of recognized standing which regularly deals in securities of such type.

"*Fiscal Year*" means any period of twelve consecutive months adopted by the Corporation as its fiscal year for financial reporting purposes, presently the period beginning on July 1 and ending on June 30 of each year.

"*Fitch*" means Fitch, Inc., and its successors and assigns.

"*Generally Accepted Accounting Principles*" means generally accepted accounting principles as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board, which are applicable to the circumstances as of the date of determination.

"*Government Obligations*" means:

(a)    direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America or any instrumentality or agency of the United States of America; and

(b)     evidences of a direct ownership interest in future interest or principal payments on obligations issued or guaranteed by the United States of America or any instrumentality or agency of the United States of America, which obligations are held in a custody account by a custodian satisfactory, in the case of the Bonds, to the Trustee (stripped securities are only permitted if they have been stripped by the agency itself) or, if such Government Obligations are deposited to effect the refunding of the Bonds or any portion thereof, any bond trustee, pursuant to the terms of a custody agreement; and

(c)     obligations issued by any state of the United States of America or any political subdivision, public instrumentality or public authority of any state of the United States of America, which obligations are fully secured by and payable solely from direct obligations of, or obligations the principal of and interest on which are fully guaranteed by, the United States of America or any agency or instrumentality of the United States of America, which security is held pursuant to an agreement in form and substance acceptable to the Trustee, and which obligations or agreement or an escrow comprised thereof are rated in the highest rating category by at least two of the following: Moody's, Fitch and S&P.

"*Guaranty*" means any guaranty, loan commitment or other obligation of the Corporation guaranteeing in any manner, whether directly or indirectly, any Indebtedness of any other person.

"*Indebtedness*" means:

(a)     all indebtedness and other obligations of the Corporation for borrowed money or for the deferred purchase price of property or services (including, without limitation, the obligations of the Corporation under the Agreement);

(b)     the capitalized amount, as determined in accordance with Generally Accepted Accounting Principles, of all obligations of the Corporation under any lease of property by the Corporation as lessee which would be capitalized on a balance sheet of the Corporation prepared in accordance with Generally Accepted Accounting Principles;

(c)     all obligations of the Corporation evidenced by notes, bonds, debentures, or similar instruments;

(d)     all indebtedness of the Corporation created or arising under a conditional sale or other title retention agreement with respect to property acquired by the Corporation (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property);

(e)     any obligation of another person of the type described in (a), (b), (c) or (d) above, the payment or collection of which the Corporation has guaranteed (except by reason of endorsement for collection in the ordinary course of business) or in respect of which the Corporation is liable contingently or otherwise, including, without limitation, liable by way of agreement to purchase, to provide funds for payment, to supply funds to or otherwise invest in such other person, or otherwise to assure a creditor against loss; and

(f)     any obligation of another person of the type described in (a), (b), (c) or (d) above, secured by (or for which the holder of such indebtedness has a then existing right, contingent or otherwise, to be secured by) any mortgage, deed of trust, pledge, lien, security interest or other charge or encumbrance upon or in property owned by the Corporation, whether or not the Corporation has assumed or become liable for the payment of such indebtedness or obligation;

C-5

provided, however, that "Indebtedness" will not include any indebtedness described above to the extent that the payment of principal and interest on which is to be made from cash, direct United States government obligations or obligations the principal of and interest on which is guaranteed by the United States, including earnings thereon, deposited with a trustee or escrow agent for such purpose.  The amount of any Indebtedness referred to in clauses (e) or (f) will be equal to 20% of the amount of the obligation so guaranteed or otherwise supported so long as such obligation is not in default.  Should any such obligation be in default, the amount thereof will be equal to the full amount of the obligation.

"*Indenture*" means the Trust Indenture dated as of April 1, 2017 between the Authority and the Trustee, as it may be amended or supplemented from time to time in accordance with the provisions of the Indenture.

"*Independent Public Accountant*" means a firm of independent certified public accountants selected by the Corporation.

"*Interest Account*" means the Interest Account within the Debt Service Fund created pursuant to the Indenture.

"*Interest Payment Date*" or "*interest payment date*," when used with respect to the Bonds, means each January 1 and July 1, commencing July 1, 2017.

"*Investment Policy*" means the Corporation's Statement of Investment Policy, reviewed and revised as of September 27, 2016, and as the same may be amended and supplemented from time to time.

"*Land*" means the real Properties on which the primary operations of the Corporation are located and conducted, together with all buildings, improvements and fixtures located thereon and all additions, enlargements and extensions made thereto.

"*Liquidity Covenant*" means Unrestricted Cash and Investments equal at least 1.10 times the principal amount of Total Debt.

"*Loan*" means the aggregate amount of the moneys loaned to the Corporation pursuant to the Agreement.

"*Long-Term Indebtedness*" means any Indebtedness which has an original stated maturity in excess of one year beyond the date of original issuance or incurrence, and any Indebtedness which has an original stated maturity of less than or equal to one year which is renewable or extendable at the option of the Corporation for a term greater than one year beyond the date of original issuance of incurrence; provided, however, that should any such Indebtedness be extendable or renewable at the option of the Corporation, it shall not be "Long-Term Indebtedness" if the applicable governing documents require that such Indebtedness not be outstanding for a period of at least 30 consecutive calendar days in each calendar or Fiscal Year.

"*Management Consultant*" means an independent professional management consultant having a favorable national reputation for skill and experience in charitable and educational consulting work similar to that carried on by the Corporation, selected by the Corporation and acceptable to the Trustee and the Authority, who may be (without limitation) the Independent Public Accountant if the Independent Public Accountant otherwise meets the criteria set forth in this definition.

"*Moody's*" means Moody's Investors Service, a Delaware corporation, and its successors and assigns.

"*Net Extraordinary Expense*" means a gift or grant, outside of the Corporation's Fiscal Year budget less Revenues that are reallocated to or raised specific for such gift or grant.

"*Net Income Available for Debt Service*" means, for each Fiscal Year, "Increase (Decrease) in Net Assets" plus "Interest Expense" and "Interest expense – Deposit and Loan Fund", each as shown on the Corporation's Statement of Activities, plus "Depreciation and amortization" as shown on the Corporation's Statement of Cash Flows, less "Total non-operating revenues (expenses) – net" as shown on the Corporation's Statement of Activities, as collectively calculated in the manner shown in Exhibit B to this Loan Agreement, and incorporating FASB ASC 715 pension expense in accordance with Generally Accepted Accounting Principles during such Fiscal Year then ended. Solely for the purposes of calculating Net Income Available for Debt Service, it shall be assumed that the Corporation's spending policy limits will be applied to the Corporation's available cash and investments, subject to the restrictions set forth in the Loan Agreement (see "SUMMARY OF CERTAIN PROVISIONS OF THE LOAN AGREEMENT-Spending Policy" in this Appendix C), and will be added to the Increase (Decrease) in Net Assets to compute Net Income Available for Debt Service. All capitalized terms used in this definition and not defined elsewhere in the Loan Agreement shall have the meaning given by Generally Accepted Accounting Principles.

"*Net Investment in Plant*" means "Land, buildings and equipment less accumulated depreciation" as set forth in the Corporation's financial statements minus Long-Term Debt.

"*Net Worth Covenant*" means the covenants set forth in Section 6.15 of the Agreement. See "SUMMARY OF CERTAIN PROVISIONS OF THE AGREEMENT—Net Worth of the Corporation" below.

"*Non-Recourse Indebtedness*" means Long-Term Indebtedness that does not constitute a general obligation of the Corporation and that is payable solely from Properties of the Corporation, or the revenues of Properties the purchase or improvement of which was financed by such Indebtedness.

"*Notes Payable*" means any indebtedness of the Corporation which has a maturity of one year or less and which is shown in the Corporation's Statement of Financial Position.

"*Opinion of Counsel*" means a written legal opinion from a firm of attorneys experienced in the matters to be covered in the opinion.

"*Outstanding*" or "*outstanding*," when used with reference to Bonds, means all Bonds which have been authenticated and issued under the Indenture except:

      (a)      Bonds canceled by the Trustee pursuant to the Indenture;

      (b)      Bonds for the payment of which moneys or Defeasance Obligations shall be held in trust for their payment by the Trustee as provided in the defeasance provisions of the Indenture;

      (c)      Bonds which have been duly called for redemption and for which the redemption price thereof is held in trust by the Trustee as provided in the Indenture;

      (d)      Bonds in exchange for which other Bonds shall have been authenticated and delivered by the Trustee as provided in the Indenture; and

(e)    for all purposes regarding consents and approvals or directions of Bondholders under the Agreement or the Indenture, Bonds held by or for the Authority, the Corporation or any person controlling, controlled by or under common control with either of them.

"*Payments*" means the amounts of repayments of the Loan with respect to the Bonds to be made by the Corporation as provided in the Agreement, together with other amounts due thereunder.

"*Permitted Investments*" means any of the following which at the time are legal investments under the laws of the State for moneys held under the Indenture and then proposed to be invested therein:

(a)    Government Obligations;

(b)    obligations issued by any state of the United States of America, or any political subdivision thereof, rated by at least two nationally recognized rating agencies in one of the three highest rating categories, and obligations fully secured by and payable solely from an escrow fund held by a trustee consisting of cash or (a) above;

(c)    (1) debt obligations of any United States corporation or trust, which obligations are rated by at least two nationally recognized rating agencies in one of the three highest rating categories, or (2) commercial paper of same rated by at least two nationally recognized rating agencies in the highest rating category (without incorporating refinements or gradation of rating category by numerical modifier or otherwise);

(d)    certificates of deposit or time deposits of any bank, trust company or savings and loan which deposits are fully insured by a federally sponsored deposit insurance program;

(e)    bankers acceptances of any bank which bank or its parent holding company's debt conforms to the rating requirements of (c) above;

(f)    repurchase agreements, entered in conformance with prevailing industry standard guidelines, of obligations listed in (a) above, delivered versus payment to the trustee and continuously collateralized at 102% or greater, with counterparties having debt rated in conformance with the rating requirements of (c) above;

(g)    investment agreements of any corporation which agreements or the corporation's long term debt is rated by at least two nationally recognized rating agencies in one of the three highest rating categories; and

(h)    shares of a money market fund or commingled trust which fund or trust's investments are restricted to the Permitted Investments, including, without limitation any money market mutual fund for which the Trustee or an affiliate of the Trustee serves as investment manager, administrator, shareholder servicing agent, and/or custodian or subcustodian, notwithstanding that (i) the Trustee or an affiliate of the Trustee receives fees from funds for services rendered, (ii) the Trustee collects fees for services rendered pursuant to this Indenture, which fees are separate from the fees received from such funds, and (iii) services performed for such funds and pursuant to this Indenture may at times duplicate those provided to such funds by the Trustee or an affiliate of the Trustee.

"*Permitted Liens*" means:

(a)    Liens created by the terms of (i) the Agreement and (ii) the Indenture;

C-8

(b)      Liens arising by reason of good faith deposits by the Corporation in the ordinary course of business (for other than borrowed money);

(c)      Any lien arising by reason of deposits with, or the giving of any form of security to, any governmental agency or any body created or approved by law or governmental regulation for any purpose at any time as required by law or governmental regulation as a condition to the transaction of any business or the exercise of any privilege or license, or to enable the Corporation to maintain self-insurance or to participate in any funds established to cover any insurance risks or in connection with worker's compensation, unemployment insurance, pension or profit-sharing plans or other social security, or to share in the privileges or benefits required for entities such as the Corporation participating in such arrangements;

(d)      (i) Rights reserved to or vested in any municipality or public authority by the terms of any right, power, franchise, grant, license, permit or provision of law, affecting any property; (ii) any liens on any property for taxes, assessments, levies, fees, water and sewer rents, and other governmental and similar charges and any liens of mechanics, materialmen, laborers, suppliers or vendors for work or services performed or materials furnished in connection with such property, which in each such case are not due and payable or are not delinquent, or the amount or validity of which in each such case is being contested and execution thereon is stayed or, with respect to liens of materialmen, laborers, suppliers or vendors have been due less than 90 days or the payment of which has been provided for by the posting of a bond; (iii) easements, rights-of-way, servitudes, restrictions, oil, gas or other mineral reservations and other minor defects, encumbrances, and irregularities in the title to any property which do not impair the use of such property or materially and adversely affect the value thereof; and (iv) rights reserved to or vested in any municipality or public authority to control or regulate any property or to use such property in any manner;

(e)      Any lien on property acquired after the delivery date of the Bonds by the Corporation if a certificate of an Authorized Corporation Representative is delivered to the Trustee at or prior to the time of acquisition of such property certifying that (i) the lien and the indebtedness secured thereby were created and incurred by a person other than the Corporation before acquisition of such property by the Corporation, and (ii) the lien was created before the decision of the Corporation to acquire the property and was not created for the purpose of enabling the Corporation to avoid the limitations of the Indenture on creation of liens, except that no such certificate will be required if such lien secures indebtedness in an aggregate principal amount not exceeding $1,000,000 and such lien otherwise satisfies the conditions set forth in clauses (i) and (ii) of this subsection (e);

(f)      Liens on property received by the Corporation through gifts, grants or bequests such liens being due to restrictions on such gifts, grants or bequests of property or the income thereon; and

(g)      Purchase money security interests and security interests existing on any real estate, equipment or goods prior to the time of its acquisition through purchase or otherwise, or placed upon such property to secure a portion of the purchase price thereof, or lessee's interests in leases of equipment or goods required to be capitalized under Generally Accepted Accounting Principles, provided that (i) the aggregate principal amount of the indebtedness secured thereby will not at the time of incurrence or assumption exceed the lesser of the cost or the Fair Market Value of such property and (ii) in the case of real estate, such real estate is not to be used by the Corporation to a significant degree in connection with the operations of the Corporation.

C-9

"*Principal Account*" means the Principal Account within the Debt Service Fund created pursuant to the Indenture.

"*Project*" or "*Prior Project*" means the facilities financed or refinanced with the proceeds of the Refunded Bonds.

"*Properties*" means, collectively, all of the Corporation's assets, including real and personal property, defined in the Corporation's Statements of Financial Position under the heading "Total Assets" excluding custodial accounts. The term "Properties," without intending to limit the foregoing, as of any particular time, will also include all Land and all furnishings, equipment and other property, movable and immovable, and all franchises, rights-of-way, privileges, servitudes, easements, licenses, rights and any other interests in Land and in other property owned, leased, subleased or otherwise held or occupied by the Corporation and used or useful by the Corporation in connection with or incident to its providing its charitable mission.

"*Public Trust Act*" means the Louisiana Public Trust Act, constituting Chapter 2-A of Title 9 being Louisiana Revised Statutes 9:2341-2347, inclusive of 1950, as amended and supplemented.

"*Readily Marketable Securities*" means investments of the Corporation held in portfolios A, B, and C that are not classified as illiquid.

"*Refunding Act*" means Chapter 14-A of Title 39 of the Louisiana Revised Statutes of 1950, as amended and supplemented.

"*Revenues*" means all receipts, revenues, income and other money received by the Corporation from any source and all rights to receive the same, whether in the form of accounts, accounts receivable, contract rights, chattel paper, instruments or other rights, and the proceeds thereof, whether cash or non-cash, and any insurance thereon, whether now existing or hereafter coming into existence and whether now owned or held or hereafter acquired by the Corporation; provided, however, that gifts, grants, bequests, donations and contributions heretofore or hereafter made, designated at the time of making thereof by the donor or maker as being for certain specific purposes, and the income derived therefrom, to the extent required by such designation, will be excluded from Revenues.

"*S&P*" means S&P Global Ratings, a division of S&P Global, Inc., or any successor thereto.

"*Short-Term Indebtedness*," when used in connection with indebtedness, means indebtedness having an original maturity less than or equal to one year and not renewable at the option of the debtor for a term greater than one year beyond the date of original issuance; provided that Short-Term Indebtedness will not be deemed to include the current portion of Long-Term Indebtedness even if so classified under Generally Accepted Accounting Principles.

"*State*" means the State of Louisiana.

"*Subordinated Indebtedness*" means unsecured Indebtedness the principal of and interest on which are subordinated in payment and priority and may not be paid at any time when any Event of Default has occurred and is continuing under the Agreement and the Indenture and which are specifically designated as such by the Corporation.

"*Tax Regulatory Agreement*" means the Tax Regulatory Agreement dated as of April 1, 2017 among the Authority, the Trustee and the Corporation.

"*Total Debt*" means all Indebtedness of the Corporation, whether fixed rate or variable rate, long-term and short-term, senior, parity or subordinate, and will include Guaranties (provided that the amount of the Guaranty will be calculated as provided in the definition of Annual Debt Service Requirements).

"*Total Financial Resources*" means (a) the sum of Total Net Assets, Bonds Payable, Deposits Payable, and Accrued Pension Liability, less the sum of (b) Land, Buildings And Equipment, less accumulated depreciation, and Loans Receivable, less allowance for doubtful receivables, all as reflected on the Corporation's Statements of Financial Position.

"*Total Liabilities*" means the Corporation's total liabilities (including, without limitation, accounts payable and accrued liabilities, bonds, government loan programs, pension benefits and other liabilities), all in accordance with Generally Accepted Accounting Principles applied on a consistent basis.

"*Trust Estate*" means all the property assigned by the Authority to the Trustee pursuant to the Indenture as security for the Bonds.

"*Trustee*" means the state banking corporation or association or the national banking corporation or association with corporate trust powers qualified to act as Trustee under the Indenture which may be designated (originally or as a successor) as Trustee for the owners of the Bonds issued and secured under the terms of the Indenture, initially Whitney Bank.

"*Underwriters*" means Raymond James & Associates, Inc., BB&T Capital Markets and Stifel, Nicolaus & Company, Incorporated.

"*Unrestricted Cash and Investments*" means (a) the sum of cash and cash equivalents and Readily Marketable Securities, less (b) the sum of Notes Payable, Temporarily Restricted Net Assets and Permanently Restricted Net Assets, as reflected on the Corporation's Statements of Financial Position. Unrestricted and unencumbered cash, cash equivalents, long term marketable securities and liquid investments will exclude any funds or amounts specifically dedicated to a particular purpose and constituting part of the Corporation's Assets as recognized on the Corporation's Statement of Financial Position, whether now or hereafter created, such as: trustee-held funds (except the Debt Service Reserve Fund for the Bonds), reserves, set-asides, debt service funds, construction funds, reserve funds, malpractice funds, litigation reserves, self-insurance and captive insurer funds, pension and retirement funds, and the amount realized from the sale or factoring of accounts receivable.

"*Variable Rate Indebtedness*" means, as of any particular date, Long-Term Indebtedness the interest rate on which is not established at a fixed rate or rates for the remaining term thereof.

## SUMMARY OF CERTAIN PROVISIONS OF THE INDENTURE

The following summarizes certain provisions of the Indenture made by and between the Authority and the Trustee.

## Pledge and Assignment

Under the Indenture, the Authority pledges and assigns to the Trustee all right, title and interest of the Authority in, to and under the Agreement, including the interest of the Authority in and to all payments, proceeds, revenues, income, receipts, issues, benefits and other moneys received or derived by the Authority under the Agreement including, without limitation, the Payments (except the administrative

payments) to be paid by the Corporation to the Trustee for the account of the Authority pursuant to the Agreement, saving and excepting, however, the Authority's rights to exculpation, indemnification and payment of expenses by the Corporation under the Agreement. The Authority further assigns and pledges to the Trustee all cash, moneys, securities and investments which may at any time and from time to time, pursuant to the provisions of the Indenture, be paid to the Trustee or be in the hands of the Trustee, except with respect to arbitrage rebate payments made to the Trustee under the terms of the Tax Regulatory Agreement by the Corporation, and except as the interest of the Trustee in such cash, moneys, securities and investments may otherwise appear in the Indenture, provided, however, that nothing in the Indenture shall be construed to affect any property held by the Trustee in any capacity other than as Trustee under the Indenture; and to the extent not covered in this paragraph, all proceeds of any and all of the foregoing.

**Establishment of Funds and Accounts**

The Bond Proceeds Fund, the Debt Service Fund and the Debt Service Reserve Fund shall be established, held and maintained by the Trustee in trust so long as any Bonds issued under the Indenture are outstanding.

The Bond Proceeds Fund shall be used to receive the proceeds of the Bonds; to transfer to the Escrow Trustee for deposit in the Escrow Fund for the Refunded Bonds the amounts set forth in the request and authorization delivered pursuant to the Indenture in order to cause the defeasance of the Refunded Bonds; and to transfer to the Costs of Issuance Account the balance of the proceeds of the Bonds.

The Debt Service Fund and its corresponding Accounts shall be used for the following purposes: (a) the Interest Account shall be used to receive the portions of the Payments applicable to interest on the Bonds; to receive the investment income therefrom and to utilize such investment income to reduce the next required interest installment of the Payments; and to pay the interest on the Bonds as it becomes due and payable; and (b) the Principal Account shall be used to receive the portion of the Payments applicable to the principal requirements of the Bonds; to receive the investment income therefrom and to utilize such investment income to reduce the next required principal installment of the Payments; to pay the principal of the Bonds as it becomes due and payable whether at maturity or upon scheduled sinking fund redemption; and, if funds are available for such purpose and at the written direction of the Authority, to effect the redemption of the Bonds prior to their maturity in accordance with the redemption provisions thereof or the purchase of Bonds prior to their maturity in the open market at a price not in excess of the principal amount thereof, premium, if any, plus accrued interest.

The Debt Service Reserve Fund shall be (i) used for the transfer to the Debt Service Fund for payment of interest on or principal of the Bonds, when due, at any time when there is not sufficient money in the Debt Service Fund for such purpose from any other source, (ii) transferred to the Debt Service Fund upon an acceleration of the maturity of the Bonds, and (iii) transferred to the Debt Service Fund for payment of the last maturing payments of interest on or principal of the Bonds as the same become due and payable.

**Debt Service Reserve Fund**

On the date of delivery of the Bonds, no moneys or Permitted Investments are required to be deposited into the Debt Service Reserve Fund. The Corporation shall be required to deposit the Debt Service Requirement into the Debt Service Reserve Fund under the circumstances described below.

If the amount calculated in connection with the Liquidity Covenant but solely with respect to senior debt of the Corporation is less than 1.00, then within 30 days after such calculations are certified by

its auditors, the Corporation is required to deposit an amount equal to the Debt Service Reserve Requirement into the Debt Service Reserve Fund. Such deposit may not be satisfied by using the proceeds of any borrowing. The Debt Service Reserve Requirement means an amount equal to the lesser of (i) 10% of the original principal amount of the Bonds, (ii) 100% of the maximum Annual Debt Service Requirements or (iii) 125% of the average annual debt service on the Bonds and any Additional Bonds.

If the Debt Service Reserve Fund is funded as described above, and the Liquidity Covenant with respect to senior debt is continuously met (on a semiannual calculation basis on each June 30 and December 31) for any two consecutive Fiscal Years thereafter, the Corporation may withdraw the amount on deposit therein, subject to subsequent required deposits and withdrawals based upon the Liquidity Covenant requirements described above.

At the time any Additional Bonds are issued, an amount equal to the Debt Service Reserve Fund Requirement for such Additional Bonds shall be deposited in the Debt Service Reserve Fund (after taking into account any amounts on deposit in the Debt Service Reserve Fund in excess of the then current Debt Service Reserve Fund Requirement as a result of any earnings on investments of amounts in the Debt Service Reserve Fund). In addition, there shall be deposited into the Debt Service Reserve Fund any other amount delivered to the Trustee specifically designated for deposit thereto. The Corporation may deliver to the Trustee an irrevocable letter of credit, surety bond, guarantee or policy of insurance which is equal to, or together with moneys on deposit therein, is equal to the Debt Service Reserve Fund Requirement, if such letter of credit, policy of insurance, surety bond or guarantee meets the requirements set forth below.

Any irrevocable letter of credit, surety bond, guarantee, policy of insurance, or other comparable obligation held by the Trustee shall meet the following requirements: the senior debt of the obligor shall be, at the time of issuance of such obligation, if the Bonds are then rated by Moody's, rated in a bond rating category by Moody's and, if the Bonds are then rated by Fitch, rated in a Bond rating category by Fitch, equal to or higher than the rating then assigned by the applicable rating agency or agencies to the Bonds, and there shall be delivered an Opinion of Counsel which states that such obligation constitutes a legal, valid and binding obligation of the obligor thereon and is enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by senior debt, bankruptcy, insolvency, reorganization, moratorium or other laws for the relief of debtors as applied to such obligor and by general principles of equity which permit the exercise of judicial discretion.

In determining the balance of such letter of credit, guarantee, surety bond or policy of insurance, if such obligor undertakes to pay, to the extent of its stated amount, on any date for payment of principal of and interest on the Bonds, the difference between the amount of principal and interest then coming due and the combined balance of the Debt Service Fund and the Debt Service Reserve Fund, and on its expiration date, unless replaced by a substitute obligation described in this sentence, an amount equal to the difference between the Debt Service Reserve Fund Requirement and the balance of the Debt Service Reserve Fund (without giving effect to this sentence), all upon demand or order by the Trustee (accompanied by such documents as may reasonably be required to evidence such difference), then the stated amount of such obligation shall be credited to the Debt Service Reserve Fund.

In the event that any such obligation shall not be renewed, extended or replaced, the Trustee shall draw on or make claim against such obligation prior to the expiration date thereof to the extent described above.

Any amounts drawn from the Debt Service Reserve Fund must be replenished within 12 months.

Upon final payment of all Bonds outstanding, the balance of amounts remaining in the Debt Service Reserve Fund shall be paid to the Corporation.

## Investments

Moneys contained in the funds and accounts held by the Trustee shall be continuously invested and reinvested by the Trustee at the direction of the Corporation in Permitted Investments, to the extent practicable, that shall mature not later than the respective dates, as estimated by the Trustee. Any income derived from and any profit or loss on any such investment of moneys on deposit in any such fund or account shall be credited or debited, as the case may be, to the respective fund or account in which earned; provided that if at any time amounts on deposit in the Debt Service Reserve Fund exceed the Debt Service Reserve Fund Requirement, all income and profits on investments in the Debt Service Reserve Fund shall be deposited in the Principal Account.

An Authorized Corporation Representative shall give to the Trustee directions respecting the investment of any money required to be invested under the Indenture, subject, however, to the provisions of the Indenture and the Agreement, and the Trustee shall then invest such money under this section as so directed. The Trustee shall in no event have any liability for any loss resulting from the investment of moneys in accordance with the directions of the Authorized Corporation Representative. The Trustee shall furnish the Authority annually with a written copy and the Corporation with a written copy, on at least a monthly basis, of the types, amounts, yield and maturities of all such investments.

## Arbitrage

Notwithstanding all the provisions of the Indenture, the Authority shall not direct the investment of moneys in the various funds and accounts created under the Indenture in a manner which would result in the loss of exclusion from gross income of interest on the Bonds for Federal income tax purposes or in such manner which would result in the Bonds becoming "arbitrage bonds" within the meaning of Section 148 of the Code.

## Additional Bonds

Additional Bonds may be issued in one or more series by the Authority at the request of the Corporation under a supplement to the Indenture to pay all or part of the additional cost of any new project so long as: (a) no Event of Default under the Indenture has occurred and is then continuing and the Authority shall have approved the issuance of such additional bonds; (b) there shall have been filed with the Trustee an opinion of an attorney or firm of attorneys generally recognized as having expertise in matters relating to municipal bonds to the effect that the exclusion from "gross income" for Federal income tax purposes of the interest on the Bonds then outstanding under the Indenture shall not be adversely affected; and (c) the Corporation satisfies the requirements of the Agreement (in satisfying the Agreement, the Corporation shall take into account all outstanding Bonds and Additional Bonds, if any, and any proposed Additional Bonds).

Such series of Additional Bonds shall be appropriately designated, shall be dated, shall bear interest at a rate or rates not exceeding the maximum rate then permitted by law, shall be numbered, shall have the same requirement with respect to the Debt Service Reserve Fund as is the case for the Bonds, shall have such paying agents and shall have such maturities and redemption provisions, all as may be provided in the supplement to the Indenture or the separate indenture authorizing the issuance of such series of Additional Bonds.

C-14

**Refunding**

Refunding Bonds may be issued under and secured by a supplement to the Indenture for the purpose of providing funds for the refunding of the Bonds and Additional Bonds, upon compliance with the Indenture and the Agreement.

**Events of Default**

Each of the following events constitutes an "Event of Default" under the Indenture:

(a) The payment of any installment of interest on any of the Bonds shall not be made when the same shall become due and payable;

(b) The payment of the principal of or premium, if any, on any of the Bonds shall not be made when the same shall become due and payable, whether at maturity or by proceedings for redemption or by acceleration or otherwise;

(c) An "Event of Default" under the Agreement shall have occurred and shall not have been cured within the applicable cure period; or

(d) Default by the Authority in the due and punctual performance of any other of the covenants, conditions, agreements and provisions contained in the Bonds or in the Indenture on the part of the Authority to be performed, if such default shall continue for 60 days after written notice specifying such default and requiring the same to be remedied shall have been given to the Authority and the Corporation by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of the owners of not less than a majority in principal amount of the Bonds then outstanding. Such default shall not become an Event of Default if said default be of the nature that (i) it cannot be corrected within the 60-day period after receipt of notice, but the Authority (or the Corporation pursuant to the provisions of the Indenture) promptly shall institute and diligently pursue corrective action until such default is cured, or (ii) the Trustee shall determine that such default is not curable but such default does not affect the validity or enforceability of the Bonds or the exclusion from gross income of interest on the Bonds for federal income tax purposes, the Indenture or the Agreement, an event of nonperformance shall not have occurred under the Agreement (other than as a result of the cross-default provisions), and such default does not impair the security or the obligations provided for or under the Bonds, the Indenture or the Agreement.

The word "default" as used in the Indenture means failure of performance when due, exclusive of any period of grace, if any, allowed to correct any such failure.

**Remedies on Default**

Upon the occurrence of an Event of Default, the Authority and the Trustee, and, subject to the Indenture, the Bondholders shall have all the rights and remedies as may be allowed by law, the Indenture or pursuant to the provisions of the Agreement by virtue of their assignment under the Indenture, including but not limited to, acceleration of the maturity of all Bonds, or suit at law or in equity to enforce or enjoin the action or inaction of parties under the provisions of the Indenture or the Agreement.

**Acceleration; Annulment of Acceleration**

Upon the occurrence of an Event of Default described in the Indenture, the Trustee may, and upon the written request of the owners of not less than a majority of the aggregate principal amounts of Bonds outstanding shall, by notice in writing to the Authority and the Corporation, declare the principal amount of all Bonds then Outstanding and the interest accrued thereon to be immediately due and payable and said principal and interest shall thereupon become immediately due and payable. Upon any declaration of acceleration under the Indenture, the Authority and the Trustee shall immediately declare all Loan Repayments under the Agreement to be immediately due and payable as provided in the Agreement. Subject to the Indenture, the Trustee may exercise any remedies granted to it in the Indenture. In such event, there shall be due and payable on the Bonds an amount equal to the principal amount of all the Bonds then outstanding plus all interest accrued thereon and which shall accrue thereon to the date of payment.

At any time after the principal of the Bonds shall have been so declared to be due and payable and before the entry of final judgment or decree in any suit, action or proceeding instituted on account of such default, or before the completion of the enforcement of any other remedy under the Indenture or the Agreement, the Trustee may annul such declaration and its consequences with respect to the Bonds if (i) moneys shall have been deposited in the Debt Service Fund sufficient to pay all matured installments of principal (other than principal due solely because of acceleration) and interest; (ii) moneys shall be available sufficient to pay the charges, compensation, expenses, disbursements, advances and liabilities of the Authority and the Trustee; (iii) all other amounts then payable by the Authority or the Corporation under the Indenture or the Agreement shall have been paid or a sum sufficient to pay the same shall have been deposited with the Trustee and (iv) every Event of Default known to the Authority or the Trustee (other than a default in the payment of the principal of the Bonds due only because of such declaration) shall have been remedied to the satisfaction of the Authority and the Trustee. No such annulment shall extend to or affect any subsequent Event of Default or impair any right consequent thereon.

**Bondholders to Control Proceedings**

Subject to the provisions of the Indenture, if an Event of Default shall have occurred and be continuing, the owners of at least 25% of the aggregate outstanding principal amount of Bonds then outstanding shall have the right, at any time by an instrument or instruments in writing executed and delivered to the Trustee, to direct the method and place of conducting any proceeding to be taken in connection with the enforcement of the terms and conditions of the Indenture, provided the direction is in accordance with law and the provisions of the Indenture and, in the sole judgment of the Trustee, is not unduly prejudicial to the interest of Bondholders not joining in such direction, and provided further, that nothing in this section shall impair the right of the Trustee in its discretion to take any other action under the Indenture which it may deem proper and which is not inconsistent with the direction by Bondholders; and provided further if the Trustee shall receive conflicting or inconsistent directions from two or more groups of Bondholders, the Trustee shall follow the directions of the group of Bondholders representing the largest percentage of outstanding Bonds (determined based on the principal amount thereof). Anything in the Indenture to the contrary notwithstanding the owners of a majority in aggregate principal amount of Bonds then outstanding shall have the right at any time to direct the Trustee with respect to remedies under the Indenture and under the Agreement subject to provisions of the Indenture pursuant to which the Trustee may be entitled to indemnity from the Bondholders.

C-16

**Individual Bondholder Action Restricted**

No owner of any Bond shall have any right to institute any suit, action or proceeding for the enforcement of the Indenture or for the execution of any trust thereunder or for any remedy under the Indenture, except as provided in the Indenture.

**Limitation on Trustee Responsibility**

The Trustee shall not be responsible for (a) the legality or enforceability of the Indenture (except with respect to performance of its obligations thereunder), the Agreement (except with respect to performance of its obligations thereunder), the Tax Regulatory Agreement (except with respect to performance of its obligations thereunder), the Bonds (except as to the authentication of the Bonds), or any instruments or documents related thereto or (b) the legality, perfection, sufficiency or priority of the Trust Estate or any lien purported to be granted thereon under any of the aforesaid documents or otherwise.

**Supplemental Indentures**

*Supplemental Indentures Not Requiring Consent of Bondholders*. The Authority and the Trustee may, without the consent of, or notice to, any of the Bondholders, enter into an indenture or indentures supplemental to the Indenture as shall be inconsistent with the terms and provisions of the Indenture for any one or more of the following purposes: (a) to cure any ambiguity or formal defect or omission in the Indenture; (b) to grant to or confer upon the Trustee for the benefit of the Bondholders any additional rights, remedies, powers or authority that may be lawfully granted to or conferred upon the Bondholders or the Trustee or either of them; (c) to subject to the lien and pledge of the Indenture additional revenues, Properties or collateral; (d) to provide for the issuance of Additional Bonds in conformity with the provisions of the Indenture and to fix all details with respect thereto or to provide further conditions, limitations or restrictions on the issuance of Additional Bonds; (e) to modify, amend or supplement the Indenture or any indenture supplemental thereto in such manner as to permit the qualification of the Indenture under any Federal statute hereafter in effect or under any state Blue Sky Law, and, in connection therewith, if they so determine, to add to the Indenture or any indenture supplemental thereto such other terms, conditions and provisions as may be permitted or required by any said Federal statute or Blue Sky Law; provided, that any such indenture supplemental thereto referred to in the Indenture shall not, in the judgment of the Trustee, which may rely on an Opinion of Counsel, be to the prejudice of the owners of the Bonds; or (f) to provide any other modifications which, in the sole judgment of the Trustee, are not prejudicial to the interests of the Bondholders.

*Supplemental Indentures Requiring Consent of Bondholders*. Anything contained in the Indenture to the contrary notwithstanding, except for supplemental indentures referred to in the preceding paragraph and subject to the terms and provisions described in this paragraph, and not otherwise, the owners of not less than a majority in aggregate principal amount of the Bonds then outstanding shall have the right from time to time to consent to and approve the execution by the Authority and the Trustee of such other indenture or indentures supplemental thereto as shall be deemed necessary and desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the Indenture or in any indenture supplemental thereto; provided, however, that nothing contained in this paragraph shall permit, or be construed as permitting, without the consent of the owners of all the Bonds then outstanding (a) an extension of the stated maturity or scheduled sinking fund redemption or reduction in the principal amount or premium of, or reduction in the rate or extension of the time of payment of interest on, any Bonds, or (b) the creation of any lien on the Trust Estate or any part thereof pledged under the Indenture prior to or on a parity with the lien of the Indenture, or (c) a reduction in the aforesaid aggregate outstanding principal amount of Bonds the owners

C-17

of which are required to consent to any such indenture supplemental thereto. No such amendment shall modify the rights, duties or immunities of the Trustee without the written consent of the Trustee.

If at any time the Authority shall request the Trustee to enter into any such supplemental indenture for any of the purposes of the Indenture, the Trustee shall, upon being satisfactorily indemnified with respect to expenses, cause notice of the proposed execution of such supplemental indenture to be given to the Bondholders in the manner provided in the Indenture. Such notice shall briefly set forth the nature of the proposed supplemental indenture and shall state that copies thereof are on file at the principal corporate trust office of the Trustee for inspection by all Bondholders. If, within 90 days or such longer period as shall be prescribed by the Authority following the giving of such notice, the owners of not less than a majority in aggregate principal amount of the Bonds outstanding at the time of the execution of any such supplemental indenture shall have consented to and approved the execution thereof as provided in the Indenture, no owner of any Bond shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Trustee or the Authority from executing the same or from taking any action pursuant to the provisions thereof. Upon the execution of any such supplemental indenture as in the Indenture permitted and provided, the Indenture shall be and be deemed to be modified and amended in accordance therewith.

So long as no Event of Default or other event of nonperformance under the Agreement has occurred and is continuing, no such supplement shall become effective unless the Corporation shall have given its prior written approval.

## Covenants by the Authority

*Payment of Principal, Premium and Interest*. The Authority covenants that it shall promptly pay, or cause to be paid, the principal of, premium, if any, and the interest on every Bond at the places, on the dates and in the manner provided in the Indenture and in said Bonds according to the true intent and meaning thereof but solely from the revenues of the Trust Estate and not from any other fund or source. The Authority further covenants that it shall faithfully perform at all times all of its covenants, undertakings and agreements contained in the Indenture, the Agreement or in any Bond executed, authenticated and delivered under the Indenture or in any proceedings of the Authority pertaining thereto.

*Additional Security*. The Authority covenants, whenever and so often as reasonably required to do so by the Trustee, promptly to execute and deliver or cause to be delivered all such other and further instruments, documents or assurances, and to promptly do or cause to be done all such other further things, as may be necessary or reasonably required in order to further and more fully vest in the Trustee and the owners of the Bonds all rights, interest, powers, benefits, privileges and advantages conferred or intended to be conferred upon them by the Indenture.

*Cure Title Defects*. The Authority covenants, whenever and so often as reasonably required to do so by the Trustee, promptly to execute and deliver or cause to be delivered all such other and further instruments, documents or assurances, and to promptly do or cause to be done all such other further things, as may be necessary or reasonably required in order to further and more fully vest in the Trustee and the owners of the Bonds all rights, interest, powers, benefits, privileges and advantages conferred or intended to be conferred upon them by the Indenture.

*Defend Against Actions*. The Authority has covenanted, after being indemnified to its satisfaction, to defend or cause to be defended every suit, action or proceeding at any time brought against the Trustee (other than for its negligence or willful misconduct) or any owner of Bonds upon any claim arising out of the receipt, application or disbursement of any of the revenues of the Trust Estate or

C-18

involving the Authority's, the Trustee's or such Bondholders' rights under the Indenture or the Agreement and to indemnify and save harmless, solely from the Trust Estate, the Trustee and Bondholders against any and all liability claimed or asserted by any person whomsoever, arising out of such receipt, application or disbursement of any such revenues; provided, however, that the Trustee or any owner of Bonds at its or his election may appear in and defend against any such suit, action or proceeding; and notwithstanding any contrary provision of the Indenture, this covenant shall continue and remain in full force and effect until all indebtedness, liabilities, obligations and other sums secured by the Indenture have been fully paid and satisfied, and the Indenture has been released of record and the lien thereof discharged.

*Non-Impairment of Security*.  The Authority has covenanted that so long as any of the Bonds issued pursuant to the Indenture are outstanding and unpaid, the Authority shall not voluntarily consent to any amendment to the Agreement or otherwise take any action which shall reduce the amount of moneys made available thereunder to the Trustee, or which shall in any manner impair or adversely affect the rights of the Authority or the Trustee or the security provided by the Indenture to the owners from time to time of the Bonds.

*Authority's Obligation Limited*.  Nothing in the Agreement or the Indenture is intended to require or obligate nor shall anything therein be interpreted to require or obligate the Authority for any purpose or at any time whatsoever, to provide, apply or expend any funds coming into the hands of the Authority other than from the Trust Estate.

**Defeasance**

*Payment*.  When all of the Bonds shall have been paid and discharged, and there shall have been paid all fees and charges of the Trustee due or to become due through the date on which the last of the Bonds is retired, then the Indenture shall cease, terminate and become null and void, and thereupon the Trustee shall release the Indenture including the cancellation and discharge of the lien of the Indenture, and execute and deliver to the Authority such instruments in writing as shall be requisite to satisfy the lien of the Indenture and, if necessary, to enter on the records such satisfaction and discharge and to re-convey to the Authority any property or interest therein or other rights thereby conveyed and such other instruments to evidence such release and discharge as may be reasonably required by the Authority, and the Trustee shall assign and deliver to the Authority any property at the time subject to the lien of the Indenture which may then be in its possession, except amounts in any Fund otherwise required to be paid by the Indenture and except such cash and investments as are held by the Trustee for the payment of interest and premium, if any, on and retirement of the Bonds.

*Provision for Payment*.  Any Bonds shall be deemed to have been paid and discharged within the meaning of the preceding paragraphs, if the Trustee, or an escrow trustee, shall hold, in trust for and irrevocably committed thereto, cash or Defeasance Obligations (which are not subject to redemption at the option of the obligor prior to their maturity) of such maturities and interest payment dates and bearing such interest as shall, without further investment or reinvestment of either the principal amount thereof or the interest earnings therefrom (likewise to be held in trust and committed, except as provided in the Indenture), be sufficient for the payment of such Bonds, at their maturity or redemption date, of the principal thereof, together with the redemption premium, if any, and interest accrued to the date of maturity or redemption, as the case may be, or if default in such payment shall have occurred on such date then to the date of the tender of such payment; provided, that if any Bonds are to be redeemed prior to the maturity thereof, notice of such redemption shall have been duly given or provisions satisfactory to the Trustee shall have been duly made for the giving of such notice.  Any moneys held in accordance with the provisions of the Indenture shall be invested only in Defeasance Obligations the maturities or redemption dates and interest payment dates of which, at the option of the owner, shall coincide as nearly as

practicable with, but not later than, the time or times at which said moneys shall be required for the aforesaid purposes. Any income or interest earned by the Defeasance Obligations held under the Indenture as summarized under this caption shall, as determined by the Trustee or the escrow trustee, to the extent not required for the purposes of the Indenture described in this paragraph, be paid to the Corporation as overpayment of Payments.

## SUMMARY OF CERTAIN PROVISIONS OF THE AGREEMENT

The following summarizes certain provisions of the Agreement made by the Authority and the Corporation.

### Representations of the Authority and the Corporation

The Authority represents and warrants that: (a) it is a public trust and a public corporation of the State; (b) under the provisions of the Refunding Act, the Authority is duly authorized to enter into, execute and deliver the Agreement, to undertake the transactions contemplated by the Agreement and to carry out its obligations thereunder; (c) it has duly authorized the execution and delivery of the Agreement, the Indenture and the Bonds; and (d) it shall do or cause to be done all things necessary to preserve and keep in full force and effect its existence.

The Corporation makes the following representations and warranties: (a) the Corporation is a nonprofit corporation duly organized and existing in good standing under the laws of the State, is duly qualified to do business and is duly authorized and licensed to operate all of the Properties as presently operated, has power to execute and deliver the Agreement, the Continuing Disclosure Agreement and the Tax Regulatory Agreement and by proper action has been duly authorized to execute and deliver the Agreement, the Tax Regulatory Agreement and the Continuing Disclosure Agreement; (b) each of the statements made with respect to the Corporation in the recitals of the Agreement is true, correct and complete; (c) the Corporation is not in breach of or in default under any of the provisions of (i) the Charter of the Corporation, as amended, or By-laws, as amended, (ii) any judgment, decree, order, statute, rule or regulation applicable to it or to its Properties, or (iii) any material provision of any material indenture, mortgage, loan agreement, financing agreement or other contract or instrument to which it is a party or by which it or any of its Properties is bound; (d) the Corporation is not required in connection with the transactions contemplated by the Agreement to obtain any consent not already obtained; (e) the Corporation has or timely shall obtain as required all authority, permits, licenses, consents and authorizations as are necessary to own, lease and operate its Properties and to carry on its business and to carry out and consummate all the transactions contemplated by the Agreement, the Escrow Agreement and the Tax Regulatory Agreement; (f) the Agreement and the Tax Regulatory Agreement, in accordance with their terms, are legal, valid and binding obligations of the Corporation, and the authorization, execution and delivery of the Agreement and compliance with the provisions thereof do not conflict with or constitute on the part of the Corporation a violation of, breach of, or default under (i) any provision of any indenture, mortgage, deed of trust, loan agreement or other contract or instrument to which the Corporation is a party or by which it or any of its Properties is bound, (ii) any order, injunction or decree of any court or governmental authority, or (iii) the provisions of its charter, as amended, or by-laws, as amended; and (g) there is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, public board or body, pending or, to the knowledge of the Corporation, threatened against the Corporation, wherein an unfavorable decision, ruling or finding would materially and adversely affect the Properties, business, prospects, profits or condition of the Corporation, or which would adversely affect the validity or enforceability of the Agreement or any other agreement or instrument to which the Corporation is a party used in consummation of the transactions contemplated under the Agreement.

C-20

**Payments by the Corporation to the Authority**

The Corporation, for and in consideration of the issuance of the Bonds under the Indenture by the Authority and the application of the proceeds thereof by the Authority as provided in the Indenture for the benefit of the Corporation, thereby unconditionally promises to repay the Loan by making the following payments to or for the account of the Authority:

*Payments* being, in the aggregate, an amount sufficient for the payment in full of all Bonds from time to time issued under the Indenture and then outstanding, including (a) the total interest becoming due and payable on the Bonds to the date of payment thereof, and (b) the total principal amount of and premium, if any, on the Bonds.

*Default or Delay Payments* consisting of the amounts, fees and expenses which the Authority may incur or be or become legally obligated to pay under the terms of the Bonds or the Indenture by reason of any default under the Indenture or Agreement or any default or delay in payment of the sums due under the Indenture or Agreement, provided that such default or delay shall have resulted from the Corporation's default or breach of covenant under the Agreement; the amount expended by the Authority or the Trustee or indebtedness incurred by the Authority or the Trustee for the purpose of curing the Corporation's defaults under the Agreement or in connection with any defaults under the Bonds or the Indenture and all costs, expenses and charges, including reasonable attorneys' fees, incurred by the Authority or the Trustee in collecting the Payments or in enforcing any covenant or agreement of the Corporation contained in the Agreement or incurred in pursuing any remedy under the Agreement or the Indenture.

*Costs of Issuance, Trustee Expense Payments* consisting of costs of issuance of the Bonds and the Trustee's fees and expenses, including the Trustee's initial acceptance fee and the fees and expenses of counsel to the Trustee in connection with the issuance of the Bonds, to be paid directly to the Trustee or counsel to the Trustee upon demand, commencing on Closing Date and continuing until the principal of and interest on all Bonds outstanding under the Indenture shall have been fully paid, including (a) the annual fee, if any, of the Trustee for the ordinary services of the Trustee rendered and ordinary expenses incurred under the Indenture during the twelve month period preceding that date, (b) the reasonable fees and charges of the Trustee, and all costs relating to the exchanging of Bonds as provided in the Indenture, as and when the same become due, and (c) the reasonable fees and charges of the Trustee for necessary extraordinary services rendered by it and extraordinary expenses incurred by it under the Indenture, including attorneys' fees, as and when the same become due, provided that the Corporation may, without creating a default under the Agreement, contest in good faith the necessity for any such extraordinary services and extraordinary expenses and the reasonableness of any such fees, charges or expenses, and in the event of such contest may only withhold payment of the contested fees, charges or expenses.

*Administrative Payments* to be paid directly to the Authority.  The Corporation agrees to pay the reasonable out-of-pocket expenses of the Authority in connection with the issuance of the Bonds, and on the date of issuance of the Bonds the Authority's financing fee.  The Corporation further agrees to make administrative payments directly to the Authority on June 1 of each year in an amount equal to 1/10th of 1% of the outstanding Bonds on January 1 of each year unless waived by the Authority.  The administrative payments shall be used for the purpose of paying administrative and related costs of the Authority, but shall not include Trustee fees or expenses incurred by the Authority in enforcing the provisions of the Agreement.  The Authority agrees that it will notify the Corporation in writing prior to March 15  of each year whether it will waive such administrative payments for such year.  The Corporation further agrees to pay the Administrative Expenses of the Trustee under the Indenture directly to the Trustee and the Trustee will receive and disburse such payments as provided in the Indenture.  In the event the Corporation should fail to pay any Administrative Expenses, the payment so in default will

continue as an obligation of the Corporation until the amount in default shall have been fully paid, and the Corporation agrees to pay the same with interest thereon (to the extent legally enforceable) at a rate per annum equal to the interest rate in effect from time to time on the Bonds, until paid.

**Credits Against Payments**

A credit against and reduction of the Payments shall be derived only from the following sources:

(a) Surplus moneys (including investment earnings) contained in the Funds and Accounts held by the Trustee under the Indenture;

(b) Advance payments or prepayments of Payments; and

(c) Reductions in principal and interest requirements of Bonds due to the purchase or redemption of Bonds as provided in the Indenture.

**Obligation to Make Payments Unconditional**

The obligation of the Corporation to repay the Loan by making the Payments shall be absolute and unconditional and shall not be subject to, nor shall the Corporation be entitled to assert, any rights of abatement, deduction, reduction, deferment, recoupment, setoff, offset or counterclaim by the Corporation or any other person, nor shall the same be abated, abrogated, waived, diminished, postponed, delayed or otherwise modified under or by reason of any circumstance or occurrence that may arise or take place, irrespective of what statutory rights the Corporation may have to the contrary, including but without limiting the generality of the foregoing:

(a) any damage to or destruction of part or all of the Properties;

(b) the taking or damaging of part or all of the Properties or any temporary or partial use thereof by any public authority or agency in the exercise of the power of eminent domain, sequestration or otherwise;

(c) any assignment, novation, merger, consolidation, transfer of assets, leasing or other similar transaction of, by or affecting the Corporation, except as otherwise provided in the Agreement;

(d) any change in the tax or other laws of the United States, the State or any governmental authority;

(e) any failure of title or any lawful or unlawful prohibition of the Corporation's use of the Properties or any portion thereof or the interference with such use by any person or any commercial frustration of purpose or loss or revocation of any permits, licenses or other authorizations required for the operation of the Properties; and

(f) any failure of the Authority or the Trustee to perform and observe any agreement or covenant, expressed or implied, or any duty, liability or obligation arising out of or in connection with the Agreement, the invalidity, unenforceability or disaffirmance of any of the Agreement, the Indenture or the Bonds or for any other cause similar or dissimilar to the foregoing.

C-22

Furthermore, the Corporation covenants and agrees that it shall remain obligated under the Agreement in accordance with its terms, and that it shall not take or participate or acquiesce in any action to terminate, rescind or avoid the Agreement.

**Prepayment of Payments**

The Corporation shall have the option to prepay the Payments, in whole, on any date on which the Bonds are subject to redemption pursuant to the Indenture.

To exercise such option, the Corporation shall give written notice to the Authority and the Trustee and shall specify therein the date of such prepayment, which prepayment date shall be not less than 15 days from the date such notice is received by the Trustee.  The Authority and the Trustee shall make all necessary arrangements satisfactory to the Trustee for the redemption of Bonds to be redeemed under the Indenture in accordance with the provisions thereof.

The prepayment price payable by the Corporation, in the event of its exercise of the option granted in the Agreement, or in the case of its obligation to prepay the Payments shall be the sum of the following:

(a)      an amount of money which, when added to the moneys and investments held by the Trustee pursuant to the provisions of the Indenture and available for such redemption, is sufficient to pay and discharge the Bonds to be redeemed (including the total principal amount of such Bonds and interest to accrue thereon to the date fixed for redemption of such Bonds to be redeemed, plus a premium equal to the amount of premium, if any, required to be paid in connection with the redemption of such Bonds) on the date fixed for redemption; plus

(b)      an amount of money equal to the fees and expenses of the Trustee and the Authority accrued and to accrue through such redemption.

**Payments Into Debt Service Reserve Fund**

Upon the issuance of the Bonds, no amounts will be required to be deposited into the Debt Service Reserve Fund.  Under certain circumstances, the Corporation is required to fund the Debt Service Reserve Fund to an amount equal to the Debt Service Reserve Fund Requirement.  See "Debt Service Reserve Fund" under "SUMMARY OF CERTAIN PROVISIONS OF THE INDENTURE" in this Appendix C.

If the Debt Service Reserve Fund is funded, then, in the event amounts are disbursed from the Debt Service Reserve Fund to pay debt service on the Bonds or in the event the amount on deposit in the Debt Service Reserve Fund is at anytime less than the amount required by the Indenture for any reason other than a valuation of the obligations in the Debt Service Reserve Fund required by the Indenture, the Corporation shall, subject to the limitations of the Agreement and the requirements of the Indenture, make payments into the Debt Service Reserve Fund in amounts sufficient to restore the amount on deposit in the Debt Service Reserve Fund to the Debt Service Reserve Fund Requirement within twelve months.

**Certain Covenants of the Corporation**

In the Agreement, the Corporation has expressly represented, covenanted and agreed:

(a)      to comply with the terms, covenants and provisions expressed or implied, of all contracts pertaining to, affecting or involving the Properties or the business of the Corporation,

the violation or breach of which would materially and adversely affect the ability of the Corporation to fulfill its obligations under the Agreement;

(b)      whenever and so often as requested so to do by the Trustee or the Authority, promptly to execute and deliver or cause to be executed and delivered all such other and further instruments and documents, and to promptly do or cause to be done all such other and further things, as may be necessary or reasonably required in order to further and more fully vest in the Authority, the Trustee and the owners of the Bonds all rights, interests, powers, benefits, privileges and advantages conferred upon them under and by the Agreement and the Indenture;

(c)      promptly, upon the request of the Authority or the Trustee from time to time, to take such action as may be necessary or proper to remedy or cure any material defect in or cloud upon the title to any of the Properties or any part thereof that are material to the operations of the Corporation, where the failure to so remedy or cure could be expected to have a material adverse impact on the ability of the Corporation to make the Payments, whether now existing or hereafter developing, to prosecute all such suits, actions and other proceedings as may be appropriate for such purpose and to indemnify and save the Authority and the Trustee harmless from all loss, cost, damage and expense, including reasonable attorney's fees, which they or either of them may ever incur by reason of any such defect, cloud, suit, action or proceeding;

(d)      to defend against every suit, action or proceeding at any time brought against the Authority or the Trustee based on any claim arising out of the receipt, application or disbursement of any of the Trust Estate or involving the Authority's or the Trustee's rights or obligations under the Agreement or under the Indenture (except in the case of the Trustee's negligence or willful misconduct), to indemnify and hold harmless the Trustee and each officer, employee, agent, or other representative of the Trustee against claims arising out of the Trustee's responsibilities under the Agreement, the Indenture or any other document entered into by the Trustee in connection with the Bonds (except in the case of the Trustee's negligence or willful misconduct), to indemnify and hold harmless the Authority and any officer, employee, agent, servant or trustee of the Authority against claims during the term of the Agreement that may be occasioned by any cause pertaining to the construction, use, possession, operation, service, design or management or leasing or subleasing of the Project or the Properties and any liabilities or losses resulting from violations by the Corporation of conditions, agreements and requirements of law affecting the Project or the Properties or the ownership, occupancy or use thereof or arising from any defect in or from the operation of the Project or the Properties, and to protect and insulate the Authority and the members of its Board of Trustees individually from any and all financial responsibility or liability whatsoever with respect to the Project or the Properties;

(e)      at all times to maintain the Corporation's rights to carry on the business of the Corporation and to duly procure all licenses and other authorizations required for the carrying on of its business and to diligently maintain, preserve and renew all the rights, powers, privileges, approvals, licenses and franchises required for the carrying on of its business;

(f)      to fulfill its obligations and to perform punctually its duties and obligations under the Agreement and to otherwise carry on its business in accordance with the terms thereof to assure its continued ability to make the Payments of the Corporation under the Agreement;

(g)      to cause compliance with all material provisions of applicable Federal, State and local laws where non-compliance could reasonably be expected to have a material adverse impact on the ability of the Corporation to make the Payments;

(h)    to pay, discharge, indemnify and save the Authority and the Trustee and their respective officers, agents, employees, servants and trustees, except with respect to the Trustee, the negligence or willful misconduct of the Trustee, harmless of, from and against any and all costs, claims, damages, expenses, liabilities, liens, obligations, penalties and taxes of every character and nature, by or on behalf of any person, firm, corporation, entity or governmental authority regardless of by whom advanced, asserted, held, imposed or made, which may be imposed upon, incurred by or asserted against the Authority and the Trustee and their respective officers, agents, employees, servants and trustees arising out of, resulting from or in any way connected with the Agreement, the Bonds or the Indenture excepting willful misconduct and negligence on the part of the Trustee or their respective officers, agents, employees, servants and trustees.  The Corporation also covenants and agrees, at its expense, to pay and to indemnify and to save the foregoing harmless of, from and against, all costs, reasonable counsel fees, expenses and liabilities incurred in any action or proceeding brought by reason of any such claim or demand; and

(i)    that (i) as of the date of the Agreement, it is an organization organized and operated (A) exclusively for charitable, scientific or literary purposes, (B) not for pecuniary profit, and (C) no part of the net earnings of which inures to the benefit of any person, private stockholder or individual, all within the meaning, respectively, of 15 USC Section 77c(a)(4), Section 3(a)(4) of the Securities Act of 1933, as amended, and of 15 USC Section 78 1(g)(2)(D), Section 12(g)(2)(D) of the Securities Exchange Act of 1934, as amended, (ii) it shall not perform any act or enter into any agreement which shall adversely affect such status as set forth in the Agreement, and (iii) it shall maintain its existence as a corporation under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

The Corporation acknowledges and agrees that it shall pay during the term of the Agreement all Payments and other sums required under the Agreement.  The Corporation also expressly covenants and agrees:

(a)    at all times to cause its business to be carried on and conducted and to cause its Properties which are material to the operations of the Corporation to be maintained, preserved and kept in reasonably good repair, working order and condition and to make needed and proper repairs, renewals and replacements thereof; provided, however, that nothing therein shall (i) prevent it from ceasing to operate any portion of its Properties if, in its judgment (evidenced, in the case of such a cessation other than in the ordinary course of business, by an authorizing resolution of its governing body), it is advisable not to operate the same or if it intends to sell or otherwise dispose of the same and within a reasonable time endeavors to effect such sale or other disposition, or (ii) obligate it to operate, retain, preserve, repair, renew or replace any Properties, leases, rights, privileges or licenses no longer used or, in the judgment of the Corporation, useful in the conduct of its business;

(b)    that the Corporation (and not the Authority or the Trustee) shall have full and sole responsibility for the condition, repair, replacement, maintenance and management of the Properties; provided, however, the Authority, the Trustee and their agents shall have the right to inspect the Properties at any reasonable time in a manner which shall not interfere unreasonably with the Corporation's use thereof;

(c)    that it shall pay, as the same respectively become due, all taxes and assessments, whether general or special, and governmental charges of any kind whatsoever that may at any time be lawfully assessed or levied against or with respect to the Properties.  The Corporation shall not allow any part of the Properties to become and remain subjected to any mechanics',

laborer's or materialmen's liens of record, other than Permitted Liens.  Notwithstanding the foregoing, the Corporation may, at its own expense and in its own name, contest any such item of tax, assessment, liens or other governmental charge and, in the event of such contest, may permit the item so contested to remain unpaid during the period of such contest and any appeal therefrom unless the Authority or the Trustee shall notify the Corporation that, in the opinion of nationally recognized bond counsel, by nonpayment of any such items the security afforded the Bonds pursuant to the terms of the Indenture or the Agreement shall be materially endangered, in which event such taxes, assessments or charges shall be paid forthwith.  The Authority shall cooperate to the extent reasonably necessary with the Corporation in any such claim, defense or contest.  In the event the Corporation fails to do so, the Authority or the Trustee may, but shall be under no obligation to, pay any such item and any amounts so advanced therefor by the Authority or the Trustee shall become an additional obligation of the Corporation to the one making the advancement, which amount the Corporation agrees to pay together with interest thereon at the rate of the Trustee's prime lending rate;

(d)     that it shall comply promptly with all material provisions of present and future laws, ordinances, orders, rules, regulations and requirements of every duly constituted governmental authority or agency and all material orders, rules and regulations of any regulatory, licensing, insurance underwriting or rating organization or other body exercising similar functions.  The Corporation shall likewise perform and comply with all duties and obligations of any kind imposed by law, covenant, condition, agreement or easement and the requirements of all policies of insurance at any time in force with respect to the Properties;

(e)     that it shall not use or allow the Properties to be used or occupied for any unlawful purpose or in violation of any private covenant, restriction, condition, easement or agreement covering or affecting the use of the Properties where such use or occupation could reasonably be expected to have a material adverse impact on the ability of the Corporation to make the Payments;

(f)     that the Properties which are material to the operations of the Corporation shall be properly operated, managed and maintained in an economical and efficient manner, consistent with standards of operation and administration generally acceptable for facilities of comparable size and scope of operations; and

(g)     that it shall take all action, if any, that may be required to obtain such consents, exceptions, exemptions or approvals of governmental authorities as may be necessary to permit it to comply fully with all covenants, stipulations, obligations and agreements of the Corporation contained in the Agreement.

In addition, the Corporation has agreed to comply with the terms of the Tax Regulatory Agreement and agreed to certain matters which shall preserve the exclusion from gross income of the interest on the Bonds.

## Covenant as to Ratings

The Corporation covenants that it shall use its best efforts to maintain ratings from at least two nationally recognized rating agencies.

**Covenants as to Alienation**

For a description of the Corporation's covenant not to alienate its Properties, see "SECURITY FOR THE BONDS—Negative Pledge and Restrictions on Transfer of Revenues and Properties" in the body of this Official Statement.

**Insurance**

(a)     The Corporation's utilization of the existing Catholic Mutual Group is permissible insurance in all respects.  The following provisions shall apply if the Corporation changes its insurance coverage or provider.  Insurance shall be provided by carriers rated "A" or better by A.M. Best.  Insurance shall be subject to review every three years by an insurance consultant, satisfactory to the Corporation, qualified to survey risks and to recommend insurance coverage for the type or types of activities conducted and facilities operated by the Corporation and who may be a broker or agent who has been regularly retained by the Corporation.

(b)     Except as provided in the first sentence of paragraph (a) above, the Corporation may not self-insure against casualty losses (excluding flood) to any real or personal property owned, leased or used by it, including Plant, Property and Equipment; provided, however, reasonable deductibles approved by an insurance consultant shall be permitted; and provided the Corporation may self-insure against flood losses.

(c)     Condemnation and casualty proceeds may be used for legally permitted purposes of the Corporation, including but not limited to either repair of the damaged or taken property or to redeem the Bonds.

**Limitation on the Incurrence of Additional Debt by the Corporation**

(a)     No Long-Term Indebtedness shall be incurred by the Corporation, including but not limited to Non-Recourse Indebtedness and Subordinated Indebtedness, unless the Debt Service Coverage Ratio, for the two most recent complete Fiscal Years immediately preceding the date of the proposed issuance of such Long-Term Indebtedness, after giving effect to the issuance of the proposed Long-Term Indebtedness, and the two Fiscal Years after the issuance of such debt after giving effect to the issuance of such proposed Long Term Indebtedness is at least 1.25 times the maximum Annual Debt Service Requirements on all senior debt of the Corporation and 1.10 times maximum Annual Debt Service Requirements on all senior and subordinate debt of the Corporation.

(b)     Notwithstanding the foregoing, refunding debt may be incurred so long as (i) debt service on the refunding debt is, in each year, no greater than the debt service on the refunded debt, (ii) the principal amount of the refunding debt does not exceed the principal amount of the refunded debt by 10%, and (iii) the final maturity of the refunding debt is no later than the final maturity of the refunded debt.

(c)     Short-Term Indebtedness may not be incurred if the principal amount of such Indebtedness would exceed 10% of unrestricted revenues of the Corporation, excluding any non-operating extraordinary gain or loss or any non-operating assets released from restrictions for the immediately preceding Fiscal Year.

(d)     The Corporation shall not engage in speculative derivative transactions.

Any Additional Bonds which are incurred pursuant to the provisions of the Agreement and the Indenture and which are on a parity with the obligations of the Corporation under the Agreement shall be secured by a Debt Service Reserve Fund in an amount described under the caption "Debt Service Reserve Fund" under "SUMMARY OF CERTAIN PROVISIONS OF THE INDENTURE" in this Appendix C.

**Environmental Covenants**

(a)     The Corporation has, after due inquiry, no knowledge and has not given or received any written notice from any governmental agency having jurisdiction with respect to the subject matter of such notice stating that the Land or the past or present use thereof or any practice, procedure or policy employed by the Corporation in the conduct of its business materially violates any applicable law, regulation, code, order, rule, judgment or consent agreement, relating to air pollution, environmental protection, hazardous or toxic materials, substances or wastes (collectively, "Laws and Regulations").  Without limiting the generality of the foregoing, neither the Corporation nor to the best of its knowledge, after due inquiry, any prior or present owner, tenant or subtenant of any of the Land has, other than as set forth in subsections (i) and (ii) of this paragraph or as may have been remediated in accordance with Laws and Regulations, (i) used, treated, stored, transported or disposed of any material amount of flammable explosives, polychlorinated biphenyl compounds, heavy metals, chlorinated solvents, cyanide, radon, petroleum products, asbestos or any Asbestos Containing Materials, methane, radioactive materials, pollutants, hazardous materials, hazardous wastes, hazardous, toxic, or regulated substances or related materials, as defined in CERCLA, RCRA, CWA, CAA, TSCA and Title III, and the regulations promulgated pursuant thereto, and in all other Environmental Regulations applicable to the Corporation (collectively, "Hazardous Materials") on, from or beneath the Land, (ii) pumped, spilled, leaked, disposed of, emptied, discharged or released (hereinafter collectively referred to as "Release") any material amount of Hazardous Materials on, from or beneath the Land, or (iii) stored any material amount of petroleum products at the Land in underground storage tanks.

(b)     Excluded from the representations and warranties in subsection (a) with respect to Hazardous Materials are those Hazardous Materials in those amounts ordinarily found in the inventory of or used in the maintenance of a Corporation, the use, treatment, storage, transportation and disposal of which has been and shall be in compliance with all Laws and Regulations.

(c)     No portion of the Land located in an area of high potential incidence of radon has an unventilated basement or subsurface portion which is occupied or used for any purpose other than the foundation or support of the improvements to such Land.

(d)     The Corporation shall not use or permit the Land or any part thereof to be used to generate, manufacture, refine, treat, store, handle, transport or dispose of, transfer, produce or process Hazardous Materials, except, and only to the extent if necessary to maintain the improvements on the Land and then, only in compliance with all Environmental Regulations, and any state equivalent laws and regulations, nor shall it permit, as a result of any intentional or unintentional act or omission on its part or by any tenant, subtenant, licensee, guest, invitee, contractor, employee and agent, the storage, transportation, disposal or use of Hazardous Materials or the Release or threat of Release of Hazardous Materials on, from or beneath the Land or onto any other property excluding, however, those Hazardous Materials in those amounts ordinarily found in the inventory of or used in the maintenance of a university, the use, storage, treatment, transportation and disposal of which shall be in compliance with all Environmental Regulations.  Upon the occurrence of any Release or threat of Release of Hazardous Materials,

the Corporation shall promptly commence and perform, or cause to be commenced and performed promptly, without cost to the Authority, all investigations, studies, sampling and testing, and all remedial, removal and other actions necessary to clean up and remove all Hazardous Materials so released, on, from or beneath the Land or other property, in compliance with all Environmental Regulations.  Notwithstanding anything to the contrary contained in the Agreement, underground storage tanks shall only be permitted subject to compliance with subsection (g) and only to the extent necessary to maintain the improvements on the Land.

(e)     The Corporation shall comply with, and shall cause its tenants, subtenants, licensees, guests, invitees, contractors, employees and agents to comply with, all Environmental Regulations, and shall keep the Land free and clear of any Liens imposed pursuant thereto (provided, however, that any such Liens, if not discharged, may be bonded).  The Corporation shall cause each tenant under any lease, and use its best efforts to cause all of such tenant's subtenants, agents, licensees, employees, contractors, guests and invitees and the guests and invitees of all of the foregoing to comply with all Environmental Regulations with respect to the Land; provided, however, that notwithstanding that a portion of this covenant is limited to the Corporation use of its best efforts, the Corporation shall remain solely responsible for ensuring such compliance and such limitation shall not diminish or affect in any way the Corporation's obligations contained in subsection (f) of this section.  Upon receipt of any notice from any person with regard to the Release of Hazardous Materials on, from or beneath the Land, the Corporation shall give prompt written notice thereof to the Authority (and, in any event, prior to the expiration of any period in which to respond to such notice under any Environmental Regulation).

(f)     Irrespective of whether any representation or warranty contained in the above paragraphs (a), (b) and (c) is not true or correct, the Corporation shall defend, indemnify and hold harmless the Authority, the Trustee and the Underwriter, its partners, depositors and each of its and their employees, agents, officers, directors, trustees, successors and assigns, from and against any claims, demands, penalties, fines, attorneys' fees (including, without limitation, reasonable attorneys' fees incurred to enforce the indemnification contained in this paragraph, consultants' fees, investigations and laboratory fees, liabilities, settlements (five Business Days' prior notice of which the Authority or the Trustee, as appropriate, shall have delivered to the Corporation), court costs, damages, losses, costs or expenses of whatever kind or nature, known or unknown, contingent or otherwise, occurring in whole or in part, arising out of, or in any way related to (i) the presence, disposal, Release, threat of Release, removal, discharge, storage or transportation of any Hazardous Materials on, from or beneath the Land, (ii) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Materials, (iii) any lawsuit brought or threatened, settlement reached (five Business Days' prior notice of which the Authority or the Trustee, as appropriate, shall have delivered to the Corporation), or governmental order relating to Hazardous Materials on, from or beneath any of the Land, (iv) any violation of Environmental Regulations of subsection (e) or (f) of this section by its or any of its agents, tenants, employees, contractors, licensees, guests, subtenants or invitees, and (v) the imposition of any governmental Lien for the recovery of environmental cleanup or removal costs.  To the extent that the Corporation is strictly liable under any Environmental Regulation, its obligation to the Authority, the Trustee and the Underwriter and the other indemnitees under the foregoing indemnification shall likewise be without regard to fault on its part with respect to the violation of any Environmental Regulation which results in liability to any indemnite.  Its obligations and liabilities under this section shall survive the satisfaction of all Bonds.

(g)    The Corporation shall conform to and carry out a reasonable program of maintenance and inspection of all underground storage tanks, and shall maintain, repair, and replace such tanks only in accordance with Laws and Regulations, including but not limited to Environmental Regulations. All such tanks are in good condition and repair and comply with all Laws and Regulations, including Environmental Regulations.

**Debt Service Coverage Ratio**

Annually, within 150 days after the end of the Fiscal Year, the Corporation shall, concurrently with the delivery of its annual audited financial statements, calculate the Debt Service Coverage Ratio for such Fiscal Year and shall provide the same to the Trustee. The Debt Service Coverage Ratio for any Fiscal Year is the ratio of Net Income Available for Debt Service to Annual Debt Service Requirements. It shall constitute an Event of Default under the Agreement if the Debt Service Coverage Ratio is less than 1.00 for two consecutive Fiscal Years.

See the definitions of "Debt Service Coverage Ratio," "Net Income Available for Debt Service" and "Annual Debt Service" contained in this Appendix C.

**Liquidity Covenant**

The Corporation shall maintain the Liquidity Covenant equal to at least 1.10, meaning the Corporation is required to maintain Unrestricted Cash and Investments equal to at least 1.10 times the amount of Total Debt. The Corporation shall calculate the Liquidity Covenant on a semiannual basis for each semiannual period ending June 30 and December 31 within 45 days after the end of each such period. See the definitions of "Unrestricted Cash and Investments," "Total Debt" and "Liquidity Covenant" in this Appendix C.

If the Liquidity Covenant is not met for two successive semiannual periods, the Corporation is required to retain a Management Consultant. See the requirements therefor described under the caption "Debt Service Coverage Ratio" above.

It shall constitute an Event of Default if the Liquidity Covenant is not met for two consecutive Fiscal Years.

**Management Consultant**

At any point during the period when the Corporation conducts the review of the Debt Service Coverage Ratio or the Liquidity Covenant, if the Corporation determines that it does not meet the requirements with respect to the annual Debt Service Coverage Ratio or the Liquidity Covenant (for two successive semiannual periods), the Corporation shall immediately request a Management Consultant to make a report and recommendation with respect to the Corporation's Net Income Available for Debt Service and Liquidity Covenant, as the case may be, at the sole expense of the Corporation. The Corporation further covenants that upon receipt of such report and recommendation from the Consultant, the Corporation shall cause copies thereof to be filed with the Authority and the Trustee (who shall have no responsibility except to hold such reports and make them available to Owners requesting to review the same during regular business hours); and the Corporation shall follow the recommendations of the Consultant to cure such default to the extent such recommendation would not cause the Corporation to be in violation of any law, rules or regulations to which the Corporation is bound (including Canon Law); provided, however, that the Corporation shall follow such recommendations until the Debt Service Coverage Ratio is at least equal to 1.00x and/or the Liquidity Covenant is met, as the case may be.

The report of the Management Consultant shall be delivered to the Trustee and the Authority within 30 days after its completion. The Trustee and the Authority shall be entitled to consult with the Management Consultant, attend the Management Consultant's briefings with management of the Corporation and receive all interim reports of the Management Consultant. Management Consultant's reports shall be addressed to the Corporation, the Trustee and the Authority and delivered simultaneously to management of the Corporation, the Trustee and the Authority. If the Corporation fails to retain a Management Consultant within 30 days after the occurrence of an event which gives rise to an obligation to retain such Management Consultant, the Trustee may retain a Management Consultant.

There shall not be any Event of Default pursuant to this provision so long as (i) the Corporation follows the recommendations of the Management Consultant, and (ii) the Debt Service Coverage Ratio in each Fiscal Year is at least 1.00x and/or the Liquidity Covenant is at least 1.10x, as the case may be.

**Net Worth of the Corporation**

The Corporation shall at all times maintain Total Financial Resources to Total Debt of at least 1:1. The Corporation shall calculate compliance with this covenant on a semiannual basis for each semiannual period ending June 30 and December 31 within 45 days after the end of such period calculated in the manner demonstrated in Exhibit B to the Agreement. See the definitions of "Total Financial Resources" and "Total Debt" in this Appendix C.

It shall constitute an Event of Default if this Net Worth Covenant is not met for two consecutive Fiscal Years.

**Spending Policy**

The Corporation covenants that it will maintain an Investment Policy which shall provide for a spending policy related to the Corporation's portfolio for the purpose of calculating the amount assumed to be added to the Increase in Net Assets in order to compute the Net Income Available for Debt Service. Such amount shall equal 5% of its investments and cash portfolio or such other amount provided for in said Investment Policy, but in no event more than 7% of such portfolio.

**Amendments**

Notwithstanding anything to the contrary contained in the Agreement or in the Indenture, the covenants contained in the Agreement shall be amended to conform the covenants and provisions of the Corporation contained in the Agreement to any different financial statement presentation required by the Financial Accounting Standard Board which is different than the presentation required as of the date of issuance of the Bonds, so long as the effect of such conformed covenants and provisions is substantially identical to the effect of the covenants and provisions as in effect on the date of issuance of the Bonds.

**Assignment of the Agreement**

The rights of the Corporation under the Agreement may be assigned as a whole or in part but no such assignment shall constitute a release of the Corporation from its obligations thereunder. Each transferee of the Corporation's interest in the Agreement shall assume the obligations of the Corporation under the Agreement to the extent of the interest assigned, sold or leased, and the Corporation shall, not more than 60 nor less than 30 days prior to the effective date of any such assignment or lease, furnish or cause to be furnished to the Authority and the Trustee a true and complete copy of each such assignment or lease.

## Amendments to the Agreement

*Amendments Not Requiring Bondholder Consent*.  The Authority and the Corporation with the consent of the Trustee with respect to clauses (c), (e) and (f) of this paragraph, but without the consent of the owners of any of the Bonds outstanding under the Indenture, may enter into supplements to the Agreement which shall not be inconsistent with the terms and provisions of the Agreement for any of the purposes heretofore specifically authorized in the Agreement or the Indenture, and in addition thereto for the following purposes: (a) to cure any ambiguity or formal defect, inconsistency or omission in the Agreement or to clarify matters or questions arising under the Agreement; (b) to add covenants and agreements for the purpose of further securing the obligations of the Corporation under the Agreement; (c) to prescribe further limitations and restrictions upon the incurring of indebtedness by the Corporation which are not contrary to or inconsistent with the limitations and restrictions theretofore in effect; (d) to confirm as further assurance any mortgage or pledge of additional property, revenues, securities or funds; (e) to conform the provisions of the Agreement in connection with the provisions of any supplements or amendments to the Indenture entered into pursuant to the provisions of the Indenture; or (f) to provide any other modifications which, in the sole judgment of the Trustee, are not prejudicial to the interests of the Bondholders.

*Amendments Requiring Bondholder Consent*.  The provisions of the Agreement may be amended in any particular way with the written consent of the owners of not less than a majority of the aggregate principal amount of Bonds then outstanding; provided, however, that no such amendment may be adopted (a) which decreases the percentage of owners of Bonds required to approve an amendment, or (b) which permits a change in the date of payment of the principal of or interest on any Bonds or of any redemption price thereof or the rate of interest thereon without the approvals of the Bondholders so affected by the amendment.

If at any time the Authority and the Corporation shall request the Trustee to consent to a proposed amendment for any of the purposes of this section, the Trustee shall, upon being satisfactorily indemnified with respect to expenses, cause notice of the proposed execution of such proposed amendment to be given in the manner required by the Indenture to redeem Bonds.  Such notice shall briefly set forth the nature of the proposed amendment and shall state that copies thereof are on file at the principal corporate trust office of the Trustee for inspection by all Bondholders.  If, within 90 days or such longer period as shall be prescribed by the Authority following such notice, the owners of not less than a majority in aggregate principal amount of the Bonds outstanding at the time of the execution of any such proposed amendment shall have consented to and approved the execution thereof as provided in the Agreement, no owner of any Bond shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Trustee, the Corporation or the Authority from executing or approving the same or from taking any action pursuant to the provisions thereof.  Upon the execution of any such proposed amendment as in this section permitted and provided, the Agreement shall be and be deemed to be modified and amended in accordance therewith.

## Events of Default

The following constitute Events of Default by the Corporation under the Agreement:

(a)    The Corporation shall default in the timely payment of any Payment pursuant to Article IV of the Agreement.

(b)    An Event of Default shall exist under the Indenture or the Tax Regulatory Agreement.

(c)     The Corporation shall fail to meet any of the covenants of Sections 6.12 (Debt Service Coverage Ratio), 6.14 (Liquidity Covenant) or 6.15 (Net Worth Covenant) of the Agreement.

(d)     The Corporation shall fail duly to perform, observe or comply with any other covenant, condition or agreement on its part under the Agreement (other than a failure to make any payment required under the Agreement), and such failure continues for a period of 30 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Corporation by the Trustee; provided, however, that if such performance, observation or compliance requires work to be done, action to be taken, or conditions to be remedied, which by their nature cannot reasonably be done, taken or remedied, as the case may be, within such 30-day period, no Event of Default shall be deemed to have occurred or to exist if, and so long as the Corporation shall commence such performance, observation or compliance within such period and shall diligently and continuously prosecute the same to completion.

(e)     The entry of a decree or order by a court having jurisdiction in the premises adjudicating the Corporation as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Corporation under the United States Bankruptcy Code or any other applicable federal or state law, or appointing a receiver, liquidator, custodian, assignee, or sequestrator (or other similar official) of the Corporation or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 90 consecutive days.

(f)     The institution by the Corporation of proceedings to be adjudicated as bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under the United States Bankruptcy Code or any other similar applicable federal or state law, or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, custodian, assignee, trustee or sequestrator (or other similar official) of the Corporation or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due.

## Remedies

Whenever any Event of Default described above shall have happened and be continuing, any one or more of the following remedial steps may be taken: (a) the Authority or the Trustee may declare all installments of Payments under the Agreement to be immediately due and payable, whereupon the same shall become immediately due and payable; (b) the Authority or the Trustee may take whatever action at law or in equity may appear necessary or desirable to collect the Payments then due and thereafter to become due, or to enforce performance and observance of any obligation, agreement or covenant of the Corporation under the Agreement; (c) the Authority or the Trustee may have access to and inspect, examine and make copies of any and all books, accounts and records of the Corporation; and/or (d) the Authority or the Trustee (or the owners of the Bonds in the circumstances permitted by the Indenture) may exercise any option and pursue any remedy provided by the Indenture.

## Indenture Overriding

All of the provisions of the Agreement are subject to and subordinate to the rights and remedies of the Bondholders and the Trustee pursuant to the Indenture. The Authority shall have no power to waive any event of default under the Agreement, except with respect to indemnification and its administrative payments, without the consent of the Trustee to such waiver.

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX D**

**PROPOSED FORM OF OPINION OF BOND COUNSEL**

[THIS PAGE INTENTIONALLY LEFT BLANK]

April 4, 2017

Louisiana Public Facilities Authority
Baton Rouge, Louisiana

**$41,895,000**
**LOUISIANA PUBLIC FACILITIES AUTHORITY**
**REFUNDING REVENUE BONDS**
**(ARCHDIOCESE OF NEW ORLEANS PROJECT)**
**SERIES 2017**

We have acted as bond counsel to the Louisiana Public Facilities Authority (the "Authority"), a public trust and public corporation of the State of Louisiana (the "State"), organized and existing under and pursuant to the Indenture of Trust executed August 21, 1974 creating the Authority and the provisions of the Louisiana Public Trust Act, being Chapter 2-A of Title 9 of the Louisiana Revised Statutes of 1950, as amended (the "Act"), and other applicable law, in connection with the authorization and issuance by the Authority of the captioned bonds (the "Bonds").

The Bonds have been issued by the Authority pursuant to the provisions of Chapter 14-A of Title 39 of the Louisiana Revised Statutes of 1950, as amended (the "Refunding Act"), and other constitutional and statutory authority, and a Trust Indenture dated as of April 1, 2017 (the "Indenture") between the Authority and Whitney Bank, as trustee (the "Trustee").  Capitalized terms used herein which are not otherwise defined have the meanings given them in the Indenture.

The Bonds are issuable as fully registered bonds, bear interest from the date thereof until paid at the rates per annum, mature in the principal amounts and on the dates, and are subject to redemption all as set forth in the Indenture and in the Bonds.

The Bonds are issued under and are secured as to principal, redemption premium, if any, and interest by the Indenture, which provides a description of the nature and extent of the security for the Bonds, a statement of the terms and conditions under which additional pari passu bonds may be issued and secured, the rights, duties and obligations of the Authority, the rights, duties and immunities of the Trustee and the rights of the owners of the Bonds.

The Bonds are issued for the purpose of providing funds to The Roman Catholic Church of the Archdiocese of New Orleans, a Louisiana nonprofit corporation (the "Archdiocese") to, together with other available monies of the Archdiocese, (i) refund all of the Authority's outstanding Revenue and Revenue Refunding Bonds (Archdiocese of New Orleans Project) Series 2007 and (ii) pay costs of issuance of the Bonds.

The Authority and the Archdiocese have entered into a Loan Agreement dated as of April 1, 2017 (the "Loan Agreement"), pursuant to which the Authority will loan the proceeds from the sale of the Bonds to the Archdiocese for the foregoing purposes.  Pursuant to the Loan Agreement, the Archdiocese has agreed to make loan repayments sufficient to pay the principal of, premium, if any, and interest on the Bonds.

The rights of the Authority under the Loan Agreement (except for the rights of the Authority relating to exculpation, indemnification and payment of expenses) have been pledged and assigned by the Authority to the Trustee as security for the Bonds.

We have examined (i) the Constitution and statutes of the State, including the Act and the Refunding Act; (ii) a certified transcript of the proceedings of the Authority authorizing the issuance of the Bonds; (iii) the Indenture, the Loan Agreement, and the Tax Regulatory Agreement dated as of April 1, 2017, among the Authority, the Archdiocese and the Trustee (the "Tax Regulatory Agreement"); and (iv) such other documents, instruments, proofs and matters of law as we have deemed relevant to the issuance of the Bonds and necessary for the purpose of this opinion.

As to questions of fact material to our opinion, we have relied upon the representations of the Authority and the Archdiocese contained in the Loan Agreement, the certified proceedings and other certifications of public officials and others furnished to us, including certifications furnished to us by or on behalf of the Archdiocese, without undertaking to verify the same by independent investigation.

On the basis of the foregoing examinations, we are of the opinion, as of the date hereof and under existing law, that:

1.      The Authority is a public trust and public corporation duly organized and existing under the Constitution and statutes of the State.

2.      The Bonds are valid and binding special and limited obligations of the Authority secured by and entitled to the benefits of the Indenture and are payable solely from the payments made by the Archdiocese pursuant to the Loan Agreement, and certain funds held by the Trustee under the Indenture.

3.      The Loan Agreement and the Indenture have been duly authorized, executed and delivered by the Authority and constitute valid and binding agreements of the Authority, and all interest of the Authority under the Loan Agreement has been validly assigned, except with respect to certain rights of the Authority relating to exculpation, indemnification and payment of expenses, to the Trustee under the Indenture.

4.      The Bonds do not constitute or create an obligation, general or special, debt, liability or moral obligation of the State, or any political subdivision thereof, and neither the faith and credit nor the taxing power of the State, or any political subdivision thereof, is pledged to the payment of the principal of, premium, if any, or interest on the Bonds.

5.      Interest on the Bonds is excluded from gross income for federal income tax purposes and is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, for the purpose of computing the federal alternative minimum tax imposed on certain corporations, such interest is taken into account in determining adjusted current earnings.

6.      Pursuant to the Act, the Bonds and the income therefrom are exempt from all taxation by the State or any political subdivision thereof.

In rendering the opinion expressed in paragraph 5 above, we have relied on representations of the Authority and the Archdiocese with respect to questions of fact material to our opinion without undertaking to verify the same by independent investigation, and have assumed continuing compliance with the covenants in the Indenture, the Loan Agreement and the Tax Regulatory Agreement pertaining to those sections of the Internal Revenue Code of 1986, as amended (the "Code"), which affect the exclusion from gross income of interest on the Bonds for federal income tax purposes. In the event that such

representations are determined to be inaccurate or incomplete or the Authority or the Archdiocese fails to comply with the foregoing covenants, interest on the Bonds could be includable in gross income for federal income tax purposes from the date of their original delivery, regardless of the date on which the event causing such inclusion occurs.

It is to be understood that the rights of the owners of the Bonds and the enforceability of the Bonds, the Indenture, the Loan Agreement and the other documents enumerated above may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable, and that their enforcement may also be subject to the exercise of the sovereign police powers of the State or its governmental bodies and the exercise of judicial discretion in appropriate cases.

In rendering this opinion, we have relied upon the opinion, of even date herewith, of Chaffe McCall, L.L.P., New Orleans, Louisiana, counsel to the Archdiocese, with respect to (i) the due organization and good standing status of the Archdiocese as a nonprofit corporation duly organized and existing under the laws of the State and the status of the Archdiocese as an organization described in Section 501(c)(3) of the Code, (ii) the corporate power of the Archdiocese to enter into and the due authorization, execution and delivery by the Archdiocese of the documents described above to which it is a party and that the same constitute legal, valid and binding obligations of the Archdiocese enforceable in accordance with their terms, and (iii) matters which might be disclosed as a result of an examination of the indentures, mortgages, deeds of trust and other agreements or instruments to which the Archdiocese is a party or by which it or its properties are bound.  We are not passing upon title to or the description of the Archdiocese's facilities or the nature or extent of any liens thereon.  We have also relied on the opinion of Gregory A. Pletsch & Associates, counsel to the Trustee, with respect to the corporate power of the Trustee to enter into and the due authorization, execution and delivery by the Trustee of the documents described above to which it is a party and the binding effect thereof on the Trustee.

For the purposes of this opinion, our services as bond counsel have not extended beyond the examinations and expressions of the conclusions referred to above.  Except as stated above, no opinion is expressed as to any federal, state or local tax consequences resulting from the purchase, ownership of, receipt of interest on, or disposition of the Bonds.

Respectfully submitted,

D-3

[THIS PAGE INTENTIONALLY LEFT BLANK]

## APPENDIX E

## FORM OF CONTINUING DISCLOSURE AGREEMENT

This Continuing Disclosure Agreement, dated as of April 1, 2017 (this "Agreement"), is executed and delivered by The Roman Catholic Church of the Archdiocese of New Orleans, a Louisiana nonprofit corporation (the "Corporation") in connection with the issuance by the Louisiana Public Facilities Authority (the "Issuer") of its Refunding Revenue Bonds (Archdiocese of New Orleans Project) Series 2017 (the "Bonds"). The Bonds are being issued pursuant to a Trust Indenture, dated as of April 1, 2017 (the "Indenture"), by and between the Issuer and Whitney Bank, as trustee. Capitalized terms used but not otherwise defined herein shall have the meanings assigned thereto in the Indenture.

**Section 1. Purpose of Agreement**. This Agreement is being executed and delivered by the Corporation for the benefit of holders of the Bonds and to assist each Participating Underwriter (as defined below) in complying with the requirements of the Rule (as defined below). The Corporation represents that it will be the only obligated person (as defined in the Rule) with respect to the Bonds at the time the Bonds are delivered to each Participating Underwriter and that no other person is expected to become an obligated person at any time after the issuance of the Bonds.

**Section 2. Definitions**. The terms set forth below shall have the following meanings in this Agreement, unless the context clearly otherwise requires.

"*Annual Financial Information*" means the financial information and operating data described in Appendix A to the Official Statement, and a chart or charts showing the calculation of the Liquidity Covenant and Net Worth Test.

"*Annual Financial Information Disclosure*" means the dissemination of disclosure concerning Annual Financial Information and the dissemination of the Audited Financial Statements as set forth in Section 4.

"*Audited Financial Statements*" means the Corporation's annual financial statements, prepared in accordance with accounting principles generally accepted in the United States of America, which financial statements shall have been audited by a firm of certified public accountants.

"*Commission*" means the Securities and Exchange Commission.

"*Dissemination Agent*" means the Corporation or any agent designated as such in writing by the Corporation and which has filed with the Corporation a written acceptance of such designation, and such agent's successors and assigns.

"*EMMA*" means the Electronic Municipal Market Access facility for municipal securities disclosure of the MSRB.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*MSRB*" means the Municipal Securities Rulemaking Board.

"*Notice Event*" means the occurrence of any of the events with respect to the Bonds set forth in Exhibit II.

"*Notice Events Disclosure*" means dissemination of a notice of a Material Event as set forth in Section 6.

"*Participating Underwriter*" means each broker, dealer or municipal securities dealer acting as an underwriter in any primary offering of the Bonds.

"*Prescribed Form*" means, with regard to the filing of Annual Financial Information, Audited Financial Statements and Notice Events with the MSRB at *www.emma.msrb.org* (or such other address or addresses as the MSRB may from time to time specify), such electronic format, accompanied by such identifying information, as shall have been prescribed by the MSRB and which shall be in effect on the date of filing of such information.

"*Rule*" means Rule 15c2-12 adopted by the Commission under the Exchange Act, as the same may be amended from time to time.

"*Semi-Annual Information*" means the December 31 unaudited financial statements of the Corporation.

"*State*" means the State of Louisiana

"*Undertaking*" means the obligations of the Corporation pursuant to Sections 4, 5 and 6.

**Section 3.  CUSIP Number/Final Official Statement**.  The base CUSIP Number of the Bonds is 546398.  The final Official Statement relating to the Bonds is dated March 8, 2017 (the "Final Official Statement").

**Section 4.  Annual Financial Information Disclosure**.  Subject to Section 10 of this Agreement, the Corporation hereby covenants that it will disseminate the Annual Financial Information and the Audited Financial Statements (in the form and by the dates set forth below and in Exhibit I) by delivering such Annual Financial Information and the Audited Financial Statements to the MSRB in Prescribed Form no later than 180 days after the end of the Corporation's fiscal year.

The Corporation is required to deliver such information in Prescribed Form and by such time so that such entities receive the information by the dates specified.

If any part of the Annual Financial Information can no longer be generated because the operations to which it is related have been materially changed or discontinued, the Corporation will disseminate a statement to such effect as part of its Annual Financial Information for the year in which such event first occurs.

If any amendment is made to this Agreement, the Annual Financial Information for the year in which such amendment is made (or in any notice or supplement provided to the MSRB) shall contain a narrative description of the reasons for such amendment and its impact on the type of information being provided.

In addition, the Corporation shall arrange and announce a call with investors within 15 days following the filing of such Annual Information with EMMA and shall hold such call within 30 days of such filing.

E-2

**Section 5**.  **Provision of Semi-Annual Information**.  The Corporation hereby agrees to provide or cause to be provided through EMMA the Semi-Annual Information within 60 days after each December 31, commencing December 31, 2017.

**Section 6.  Notice Events Disclosure**.  Subject to Section 10 of this Agreement, the Corporation hereby covenants that it will disseminate in a timely manner, not in excess of 10 business days after the occurrence of a Notice Event, a Notice Events Disclosure to the MSRB in Prescribed Form.  The Corporation is required to deliver such Notice Events Disclosure in the same manner as provided by Section 4 of this Agreement.

**Section 7.  Duty To Update EMMA/MSRB**.  The Corporation shall determine, in the manner it deems appropriate, whether there has occurred a change in the MSRB's e-mail address or filing procedures and requirements under EMMA each time it is required to file information with the MSRB.

**Section 8.  Consequences of Failure of the Corporation To Provide Information**.  The Corporation shall give notice in a timely manner, not in excess of 10 business days after the occurrence of the event, to the MSRB in Prescribed Form of any failure to provide Annual Financial Information Disclosure when the same is due hereunder.

In the event of a failure of the Corporation to comply with any provision of this Agreement, the Bondholder of any Bond may seek specific performance by court order to cause the Corporation to comply with its obligations under this Agreement.  A default under this Agreement shall not be deemed an Event of Default under the Indenture or the Agreement or any other agreement, and the sole remedy under this Agreement in the event of any failure of the Corporation to comply with this Agreement shall be an action to compel performance.

**Section 9.  Amendments; Waiver**.  Notwithstanding any other provision of this Agreement, the Corporation may amend this Agreement, and any provision of this Agreement may be waived, if:

(i)  The amendment or waiver is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature or status of the Corporation or type of business conducted;

(ii)  This Agreement, as amended, or the provision, as waived, would have complied with the requirements of the Rule at the time of the primary offering, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; and

(iii)  The amendment or waiver does not materially impair the interests of the Bondholders of the Bonds, as determined either by parties unaffiliated with the Corporation or by an approving vote of the Bondholders of the Bonds holding a majority of the aggregate principal amount of the Bonds (excluding Bonds held by or on behalf of the Corporation or its affiliates) pursuant to the terms of the Indenture at the time of the amendment; or

(iv)  The amendment or waiver is otherwise permitted by the Rule.

**Section 10.  Termination of Agreement**.  This Agreement shall be terminated hereunder when the Corporation shall no longer have any legal liability for any obligation on or relating to the repayment of the Bonds.  The Corporation shall give notice to the MSRB in a timely manner and in Prescribed Form if this Section is applicable.

**Section 11.  Dissemination Agent**.  The Corporation may appoint a Dissemination Agent to assist it in carrying out its obligations under this Agreement, and may discharge any such Dissemination Agent, with or without appointing a successor Dissemination Agent.

**Section 12.  Additional Information**.  Nothing in this Agreement shall be deemed to prevent the Corporation from disseminating any other information, using the means of dissemination set forth in this Agreement or any other means of communication, or including any other information in any Annual Financial Information Disclosure or notice of occurrence of a Notice Event, in addition to that which is required by this Agreement.  If the Corporation chooses to include any information from any document or notice of occurrence of a Notice Event in addition to that which is specifically required by this Agreement, the Corporation shall not have any obligation under this Agreement to update such information or include it in any future disclosure or notice of the occurrence of a Notice Event.

**Section 13.  Beneficiaries**.  This Agreement has been executed in order to assist the Participating Underwriter in complying with the Rule; however, this Agreement shall inure solely to the benefit of the Corporation, the Dissemination Agent, if any, and the Bondholders of the Bonds, and shall create no rights in any other person or entity.

**Section 14.  Recordkeeping**.  The Corporation shall maintain records of all Annual Financial Information Disclosure and Material Events Disclosure, including the content of such disclosure, the names of the entities with whom such disclosure was filed and the date of filing such disclosure.

**Section 15.  Past Compliance**.  For fiscal years ended June 30, 2012 through 2015, the Corporation failed to effectively file its annual financial information and operating data with EMMA for those years.  In addition, for fiscal years ended June 30, 2012 and 2015, the audited financial statements were filed significantly later than required but were filed on April 24, 2013 and January 12, 2016, respectively.  On November 10, 2016, the Corporation corrected the circumstances where it failed to file the required annual financial information and operating data and filed the required information for those years.  The Corporation also filed an event notice describing the failures under the Rule.  Annual financial information and audited financial statements for fiscal year 2016 were filed timely in November of 2016.  The Corporation has now adopted a continuing disclosure policy to ensure its ability to maintain compliance with the Rule, including designation of a specific officer or officers to take responsibility for all future filings of financial statements, annual financial information and operating data and event notices.  The Corporation represents that it is currently in compliance with its continuing disclosure requirements.

**Section 16.  Assignment**.  The Corporation shall not transfer its obligations under the Indenture unless the transferee agrees to assume all obligations of the Corporation under this Agreement or to execute a continuing disclosure undertaking under the Rule.

**Section 17.  Governing Law**.  This Agreement shall be governed by the laws of the State.

THE ROMAN CATHOLIC CHURCH OF THE
ARCHDIOCESE OF NEW ORLEANS

By: _____
Title: _____

E-4

## EXHIBIT I

### ANNUAL FINANCIAL INFORMATION AND TIMING AND AUDITED
### FINANCIAL STATEMENTS

"*Annual Financial Information*" means financial information and operating data exclusive of Audited Financial Statements as set forth below in Appendix A to the Final Official Statement.

All or a portion of the Annual Financial Information and the Audited Financial Statements as set forth below may be included by reference to other documents which have been submitted to the MSRB or filed with the Commission.  The Corporation shall clearly identify each such item of information included by reference.

Annual Financial Information will be provided to the MSRB no later than 180 days after the end of the Corporation's fiscal year.  Audited Financial Statements as described below should be filed at the same time as the Annual Financial Information.  If Audited Financial Statements are not available when the Annual Financial Information is filed, unaudited financial statements shall be included, and Audited Financial Statements will be provided to the MSRB within 10 business days after availability to the Corporation.

Audited Financial Statements will be prepared in accordance with generally accepted accounting principles in the United States as in effect from time to time.

If any change is made to the Annual Financial Information as permitted by Section 4 of the Disclosure Undertaking, including for this purpose a change made to the fiscal year end of the Corporation, the Corporation will disseminate a notice to the MSRB of such change in Prescribed Form as required by such Section 4.

## EXHIBIT II

### EVENTS WITH RESPECT TO THE BONDS FOR WHICH
### NOTICE EVENTS DISCLOSURE IS REQUIRED

1.      Principal and interest payment delinquencies

2.      Nonpayment related defaults, if material

3.      Unscheduled draws on debt service reserves reflecting financial difficulties

4.      Unscheduled draws on credit enhancements reflecting financial difficulties

5.      Substitution of credit or liquidity providers, or their failure to perform

6.      Adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701 TEB) or other material notices or determinations with respect to the tax status of the security, or other material events affecting the tax status of the Bonds

7.      Modifications to rights of security holders, if material

8.      Bond calls, if material, and tender offers

9.      Defeasances

10.     Release, substitution or sale of property securing repayment of the securities, if material

11.     Rating changes

12.     Bankruptcy, insolvency, receivership or similar event of the Corporation[*]

13.     The consummation of a merger, consolidation or acquisition involving the Corporation or the sale of all or substantially all of the assets of the Corporation other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material

14.     Appointment of a successor or additional trustee or the change of name of a trustee, if material

---

[*] This event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for the Corporation in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the Corporation, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the Corporation.

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]



LOUISIANA PUBLIC FACILITIES AUTHORITY • REFUNDING REVENUE BONDS (ARCHDIOCESE OF NEW ORLEANS PROJECT) SERIES 2017

