**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re:** | **CASE NO. 20-10846** |
| **THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS,** | **SECTION "A"** |
| | **CHAPTER 11** |
| **Debtor** | |

**UNITED STATES TRUSTEE'S OBJECTION**
**TO CONFIRMATION OF THE FIFTH AMENDED JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION FOR THE ROMAN CATHOLIC CHURCH OF THE**
**ARCHDIOCESE OF NEW ORLEANS AND ADDITIONAL DEBTORS**

NOW INTO COURT comes David W. Asbach, Acting United States Trustee for Region 5 (the "United States Trustee"), by and through undersigned counsel, and respectfully submits this objection (the "Objection") to the confirmation of the *Fifth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of October 27, 2025* [ECF Doc. No. 4518] (as amended, supplemented, or modified, the "Plan").[1]  In support of the Objection,[2] the United States Trustee respectfully states, as follows:

## PRELIMINARY STATEMENT

The United States Trustee objects to confirmation of the Plan on the grounds that it improperly seeks to impose expansive, overbroad, non-consensual third-party releases and injunctions.  The Debtor and Additional Debtors[3] bind creditors to such releases and injunctions

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

[2] The United States Trustee reserves the right to object to any supplemental filings, as well as the right to object to confirmation of the plan, including objecting to the plan as unconfirmable on arguments not discussed herein.

[3] The "Additional Debtors" are the 157 Archdiocesan Parishes, Suppressed Archdiocesan Parishes, and Archdiocesan Agencies listed on Plan Exhibit B-1 at ECF Doc. No. 4518-2.

1

without their consent, including non-voting creditors, in violation of *Harrington v. Purdue Pharma, L.P.*, 144 S. Ct. 2071 (2024) ("*Purdue*").

The Plan proposes to channel all abuse claims held by survivors and certain other stakeholders to a Settlement Trust, which will, among other things, make all distributions for such claims. The release and injunction provisions embedded throughout the Plan, including the channeling injunction, prevent survivors holding abuse claims and other stakeholders – without their consent – from pursuing certain claims against non-debtor third parties, including various insurance companies who have entered or will later enter into settlements with the Debtor, Additional Debtors, and Non-Debtor Catholic Entities.

The Plan contemplates that, in the future, claimants will be required to sign releases of claims against these non-debtors as a condition of receiving any distribution on their claims against the Debtor from the trust – but not until after this Court has already discharged the Debtor and enjoined claimants from bringing claims against the Debtor, Additional Debtors, and their estates. Thus, abuse claimants will only receive a distribution for their claims against the Debtor if they sign the release giving up direct claims against non-debtors, including against third-party insurance companies. However, they are being asked to do so at a time when they have no alternative, as this Court will have already confirmed the Plan and enjoined claimants from pursuing their estate claims. At that point, if they do not sign the non-debtor release, they receive no distribution for their claims against the Debtor. Requiring claimants to sign the release as a condition of receiving a distribution to which they are legally entitled under the Bankruptcy Code is coercive; it does not make the release "consensual" and does not take this Plan outside of the reach of *Purdue*.

The Plan also contains overbroad gatekeeper provisions. Non-debtors, who wish to pursue a claim or cause of action against another non-debtor, must come to this Court and only

this Court for a determination of whether such claim can proceed. The Plan's gatekeeping injunction is improper for the same reasons as its overbroad third-party releases; the bankruptcy court lacks both jurisdiction and statutory authority to enter such an injunction, and there has been no showing that injunctive relief is warranted.

Moreover, the Plan fails to satisfy section 1123(a)(4)'s requirement that similarly situated creditors receive similar treatment and section 1124(1)'s "best interest of creditors" test—all because of the non-consensual third-party release. Creditors signing the release will receive their pro rata distribution to which the Code entitles them, while those signing the release will not. Similarly, in a hypothetical chapter 7, dissenting creditors would receive better treatment by receiving the pro rata distribution to which they are entitled without having to sign the coercive release.

Lastly, the Plan reflects due process and noticing issues by setting claim filing and voting deadlines that bind the creditors of the Additional Debtors, despite the Additional Debtors not having bankruptcy cases pending before this Court. While the Plan references claim filing and noticing protocols, the specific protocols have not been disclosed. Thus, at this time, the parties and the Court cannot evaluate whether adequate notice was provided to the Additional Debtors abuse and non-abuse claimants.

## **BACKGROUND**

1.      On May 1, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code. [ECF Doc. No. 1].

2.      Debtor's Chapter 11 case was filed because of "financial and operational difficulties" ranging from "claims and lawsuits alleging sexual abuse by clergy" to "losses of revenue from offerings and collections at Masses which are no longer publicly celebrated due to

the COVID-19 pandemic."  [*Decl. of Fr. Carr*, ECF Doc. No. 14, ⁋ 9].

3.      On the Petition Date, the Debtor filed a *Notice of Designation of a Complex Case*. [ECF Doc. No. 2].  That same day, the Court entered an *Order Granting Complex Chapter 11 Bankruptcy Case Treatment*, thereby ordering that the Procedures for Complex Chapter 11 Cases in the Eastern District of Louisiana[4] (the "Complex Procedures") apply in the above-captioned case.  [ECF Doc. No. 18].

4.      On May 20, 2020, the U.S. Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to 11 U.S.C. § 1102(a).  [ECF Doc. No. 94].  The U.S. Trustee reconstituted the Committee on June 10, 2020 [ECF Doc. No. 151], October 8, 2020 [ECF Doc. No. 478], June 7, 2022 [ECF Doc. No. 1575], and June 21, 2022 [ECF Doc. No. 1618].  The Committee members consist of abuse survivors.

5.      On March 5, 2021, the United States Trustee appointed an Official Committee of Unsecured Commercial Creditors (the "Commercial Committee").  [ECF Doc. No. 772].

6.      No Chapter 11 trustee has been appointed in the bankruptcy case, and the Debtor remains in possession and control of its property as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

**The Disclosure Statement, Plan, and Sale Motion**

7.      On July 29, 2025, the Debtor filed a *Motion for Entry of Orders pursuant to Sections 363 and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Insurance Settlement Agreement and Policy Buybacks with Certain Insurers and Granting Related Relief* [ECF Doc. No. 4181] (the "Sale Motion").  Through the Sale Motion, the Debtor, Additional Debtors, and other Non-Debtor Catholic Entities seek to sell back to the Settling Insurers all right,

---

[4] The Complex Procedures are found in General Order 2019-4, posted on this Court's website at https://www.laeb.uscourts.gov.

title, and interest in the Settling Insurers' Policies, in exchange for payment to the Settlement Trust and broad injunctive relief.

8.     On August 8, 2025, the Debtor filed a Second Amended Modified Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of August 6, 2025 [ECF Doc. No. 4242] (the "Second Amended Disclosure Statement").

9.     The Court entered an Order approving the Second Amended Disclosure Statement on August 12, 2025.  [ECF Doc. No. 4253].

10.     On October 27, 2025, the Debtor filed the *Fifth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of October 27, 2025*.  [ECF Doc. No. 4518].

11.     Under the Plan, five classes of claims are impaired and allowed to vote:

    i.   Class 3 – Known Abuse Claims against the Debtor and Additional Debtors
    ii.  Class 4 – Unknown Abuse Claims against the Debtor and Additional Debtors
    iii. Class 6 – Bond Claims
    iv.  Class 7 – General Unsecured Claims and Unsecured Trade Claims against the Debtor
    v.   Class 8 – Non-Abuse Personal Injury Claims against the Debtor

*See* Plan, Section 3.5, p. 7.

12.     Under the Plan, Abuse Claims will be "channeled," and holders of Abuse Claims will only be able to look to the Settlement Trust for payment, without any right to pursue direct claims against third parties.  *See* Plan, Section 4.3-4.4, pp. 8-10.

13.     The Settlement Trust will eventually be funded with approximately $230 million over a period of less than one year.  *See* Plan, Article 5, p. 15.

**Key Definitions and Provisions of the Plan and Sale Motion**

i.  The Channeling Injunction

14.     The Plan's channeling injunction provides, in relevant part, that "[a]ny and all **Channeled Claims** against the **Protected Parties** and **Settling Insurers** are channeled into the Settlement Trust and will be treated, administered, determined, and resolved under the procedures and protocols and in the amounts established under the Joint Plan and the Settlement Trust Documents as the sole and exclusive remedy for all Entities holding Channeled Claims[.] […] [A]ll Entities that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Channeled Claims against the Protected Parties and Settling Case Insurers will be permanently and forever stayed, restrained, enjoined, and barred from taking any action, directly or indirectly, for the purpose of asserting, enforcing, collecting, recovering, or receiving payments, satisfaction, or recovery from any Protected Party or any of the Settling Insurers[.]"  Plan, Section 12.4, pp. 48-49 (emphasis added).

15.     The Plan defines "**Protected Parties**" as: "(a) the Archdiocese, (b) the Reorganized Archdiocese, (c) the Additional Debtors, and (d) the Reorganized Additional Debtors."  Plan, Exhibit A.

16.     A "**Settling Insurer**" is defined as (a) SPARTA Insurance Company and American Employers' Insurance Company ("SPARTA");2 (b) United States Fire Insurance Company ("U.S. Fire"), International Insurance Company ("International"), Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company individually and, to the extent that policies issued by U.S. Fire and/or International were novated to or assumed by either or both of them ("U.S. Fire/International"); (c) Catholic Mutual Relief Society of America ("Catholic Mutual"); (d) Puritan Insurance Company, The Manhattan Fire and Marine Insurance Company, and

Westport Insurance Corporation ("Puritan"); (e) National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"); and (f) Twin City Fire Insurance Company and First State Insurance Company ("Twin City"), together with the following: (i) each such Entity's past, present and future affiliates, divisions, reinsurers, and retrocessionaires, including Entities released pursuant to any Insurance Settlement Agreement; (ii) each such Entity's respective past, present and future affiliates, holding companies, merged companies, related companies, divisions and acquired companies, including the Entities released pursuant to any Insurance Settlement Agreement; and (iii) each such Entity's Related Persons." Plan, Exhibit A.

17. The Plan defines "**Covered Parties**" as: (a) the Debtor and Reorganized Archdiocese; (b) the Additional Debtors and Reorganized Additional Debtors; (c) the Non-Debtor Catholic Entities; (d) the Diocese of Houma-Thibodaux CP; (e) the Diocese of Baton Rouge CP; (f) any Entity owned, created, affiliated with, or controlled by the Archdiocese or the Archbishop; (g) any Co-Insured Party; and (h) with respect to each of the foregoing Entities in clauses (a) through (g), such Entities' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, estates, and nominees, including the applicable Parish Schools and Archdiocesan Schools. For the avoidance of doubt, the Entities or persons in clauses (f), (g), and (h) are only Covered Parties in connection with the Abuse Claims and the Setting Insurers' Policies. No Excluded Party shall constitute, or be deemed to be, a Covered Party under any circumstances, provided however, that any Entity who has actually or

allegedly acquired or been assigned the right to make a claim for coverage under any Subject Insurance Policy is a Covered Party."  Plan, Exhibit A.

18.     The Plan defines "**Channeled Claims**," in relevant part, as follows: "(a) any Abuse Claim against the Debtor, the Additional Debtors, or any Co-Insured Parties; (b) any Non-Settling Insurer Contribution Claims; (c) any Medicare Claim; (d) **any Related Insurance Claim**; or (e) any other Claim (including any Direct Action Claim) against (i) the Debtor and/or any Additional Debtors, (ii) any Non-Debtor Catholic Entity, (iii) the Diocese of Houma-Thibodaux CP, (iv) the Diocese of Baton Rouge CP, (v) any Co-Insured Parties or (vi) any Settling Insurer, to the extent that such Claim is under, arises out of, relates (directly or indirectly) to, or connects in any way with any Settling Insurers' Policies.  A Channeled Claim further includes any Claim against a Covered Party or Settling Insurer based on allegations that it is an alter ego or liable as a successor of an Entity that is not a Covered Party or Settling Insurer or that the Covered Party's or Settling Insurer's corporate veil should be pierced on account of Claims against an Entity that is not a Covered Party or based on any other theory under which the legal separateness of any Person and any other Entity may be disregarded to impose liability for a claim on either such Entity."  Plan, Exhibit A (emphasis added).

19.     "**Any Related Insurance Claim**" is a catch-all provision defined as "(a) any **Extra-Contractual Claim** and (b) any other Claim that is under, arises out of, relates (directly or indirectly) to, or connects in any way with the Subject Insurance Policies, including, without limitation, bad faith Claims."  Plan, Exhibit A (emphasis added).

20.     Channeled Claims thus include "**Extra-Contractual Claims**," which are defined as "with respect to any Insurer, any Claim against Insurer seeking any type of relief, other than coverage or benefits, under or with respect to any Subject Insurance Policies issued by such

Insurer.   Extra-Contractual Claims include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interests, costs, or any other type of relief, alleging any of the following with respect to (a) any Subject Insurance Policy, (b) any Claim allegedly or actually covered under a Subject Insurance Policy, or (c) the conduct of any Insurer with respect to (a) or (b): (i) bad faith; (ii) failure to provide insurance coverage under any Subject Insurance Policy, including any failure to investigate or to provide a defense or adequate defense; (iii) failure or refusal to compromise and settle any Claim insured under any Subject Insurance Policy; (iv) failure to act in good faith; (v) violation or breach of any covenant or duty of good faith and fair dealing, whether express, implied, or otherwise; (vi) violation of any state insurance codes, state surplus lines statutes, or similar codes or statutes; (vii) violation of any unfair claims practices act or similar statute, regulation, or code, including any statute, regulation, or code relating to unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising; (viii) any type of misconduct; or (ix) any other act or omission of any type by any Insurer for which the Creditor seeks relief other than coverage or benefits under a Subject Insurance Policy.   "Extra-Contractual Claims" further include all Claims relating to any Insurer's (x) handling of any Claims under Subject Insurance Policies, (y) conduct in negotiating any Insurance Settlement Agreement and/or the Joint Plan, and (z) conduct in the settlement of any Claims. For the avoidance of doubt, Extra-Contractual Claims are included within the property purchased by any Settling Insurer under any Insurance Settlement Agreement."  Plan, Exhibit A.

ii.  The Settling Insurer Supplemental Injunction

21.     The Plan sets forth a "Settling Insurer Supplemental Injunction," which provides, among other things, that pursuant to insurance settlement agreements, including certain settling insurers' purchase of applicable settling insurer policies pursuant to § 363(f) of the Bankruptcy

Code, "**any and all Entities** who have held, now hold, or who may in the future hold any Claims against any Protected Party, any Covered Party, or any Settling Insurer, which, directly or indirectly, relate to, any of the Settling Insurers' Policies, are hereby permanently and forever stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce, collect, or recover, or attempt to assert, enforce, collect, or recover, any such Claim against any Settling Insurer, and/or any Settling Insurers' Policies[.]" Plan, Section 12.5, p. 50 (emphasis added).

22.     The proposed Order attached to the Sale Motion provides: "Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, and in consideration of the undertakings of Insurer pursuant to the Settlement Agreement, including Insurer's purchase of the Purchased Property free and clear of all Claims and Interests pursuant to Section 363(f) of the Bankruptcy Code as provided herein, any and all Entities that have held, now hold, or who may in the future hold any Claims or Interests (including without limitation all debt holders, all equity holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, Abuse Claimants, holders of Direct Action Claims, Perpetrators, Non-Settling Insurers, the Archdiocese Bound Parties, and all others holding Claims or Interests of any kind or nature whatsoever, including, without limitation, those Claims released or to be released pursuant to the Settlement Agreement), which Claims or Interests are under, arise out of, relate to, or connect in any way with an Abuse Claim or any of the Purchased Property, including, without limitation, (a) all Abuse Claims (whether Known Abuse Claims or Unknown Abuse Claims), Direct Action Claims, Coverage Claims, Related Insurance Claims, Non-Insurer Contribution Claims, Insurer Contribution Claims, Medicare Claims, Penalty Claims, any other Channeled Claims, any other Barred Claims, and any other Claims arising from or related in any way to an Abuse Claim or any portion of the Purchased Property, (b) the payment of any of

the Claims identified previously, including, without limitation, Abuse Claims, Direct Action Claims, and Coverage Claims and (c) all other Interests, are hereby permanently stayed, enjoined, barred, and restrained from taking any Action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or Interest against any of (x) the Insurer Released Parties, (y) the assets or property of any Insurer Released Parties, or (z) the Purchased Property, including by:

(a) commencing, conducting, or continuing in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind, in any forum, with respect to any such Claim or Interest, against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(b) enforcing, levying, attaching, collecting, or otherwise recovering, or seeking to accomplish any of the preceding, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(c) creating, perfecting, or enforcing, by any manner or means, whether directly or indirectly, or seeking to accomplish any of the preceding, any lien of any kind against any Insurer Released Party, or any property or interest in property of any Insurer Released Party;

(d) asserting, implementing, or effectuating any such Claim or Interest of any kind or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against: (A) any obligation due to any of the Insurer Released Parties, (B) any of the Insurer Released Parties, or (C) any property or interest in property of any Insurer Released Party; and

(e) taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Order."

Sale Motion, Exhibit A, pp. 21-23.

    iii.  <u>The Gatekeeper Provision</u>

23.    The Plan's "Gatekeeper Injunction," which limits the ability of holders of Abuse Claims or other stakeholders from pursuing their legal rights in other forums without incurring the costs of first gaining permission from this Court, states, in relevant part, that "no Enjoined Party may assert a Claim or cause of action of any kind or institute any proceeding of any kind against any of the Covered Parties, Settling Insurers, or Settlement Trust that arises from or is in any manner related to the Chapter 11 Cases, the negotiation of the Joint Plan, the negotiation of the Insurance Settlement Agreements, the administration of the Joint Plan by the Settlement Trust and the Debtor, or the property to be distributed under the Joint Plan, or transactions in furtherance of the foregoing without the Bankruptcy Court 1) determining, after Notice and Hearing, that such claim or cause of action (a) is a colorable claim of any kind against the Debtor, the Additional Debtors, the Settlement Trust, or the Settling Insurers; (b) did not arise prior to the Effective Date of the Joint Plan; and (c) is not a Claim owned by the Debtor or Settling Insurers against such Protected Party, Settling Insurer, or the Settlement Trust and 2) subject in all respects to the Injunctions, specifically authorizing such Enjoined Party to initiate a proceeding to assert such Claim or cause of action against such Protected Party, Settling Insurer, or the Settlement Trust." Plan, Section 12.8, p. 51.

24.    The Plan defines "Enjoined Parties" broadly: "all Entities who have held, hold or may hold or who have held or hold Causes of Action that have been released or discharged or are

subject to exculpation, the Channeling Injunction, the Supplemental Settling Insurer Injunction, the Confirmation Order, or any Insurance Settlement Order." Plan, Exhibit A.

    iv.  <u>Claimant Release Requirement in Exchange for Distribution</u>

25.    The Plan specifically states that, "[f]or the avoidance of doubt, Abuse Claimants will not receive any portion of the Settling Insurers' Settlement Consideration without having signed an Abuse Claim Release and Certification that releases all Claims against the Settling Insurers." Plan, Section 5.5, p. 19. The Abuse Claim Release and Certification is attached to the Plan as Exhibit C; it does not state whether the claimant retains any rights if the claimant does not execute the release.

    v.  <u>Additional Debtors Provisions</u>

26.    The Plan provides for the establishment of Proof of Claim Bar Dates for the Additional Debtors, who have not yet filed bankruptcy petitions.

27.    For Abuse Claims, the Plan defines the "Additional Debtors' Abuse Claims Bar Date" as December 2, 2025. Plan, Exhibit A. The Plan does not specifically state that if these claimants wish to vote on the Plan, their proof of claim had to be filed by October 15, 2025, and they had to submit the ballot by October 29, 2025. Rather, this information is contained in the Additional Debtors' Abuse Claims Bar Date Notice, which is attached to the Plan as Exhibit F.

28.    For the Additional Debtors' Non-Trade Unsecured Claims, Class 10, the bar date is also set for December 2, 2025. Plan, Exhibit A. While the Plan classifies these creditors as unimpaired and deemed to accept the Plan, the Class 10 claimants must file a proof of claim in order to "ride through" with their rights unimpaired - unlike the Additional Debtors' other non-Abuse Claim class (i.e. Class 9 Unsecured Trade Claims), also classified as unimpaired and deemed to accept the Plan. Plan, Section 4.10, p. 14.

29.    The Additional Debtors' Trade Claimants (Class 9) are not required to file a proof of claim, as the Plan calls for their payment in accordance with the terms and conditions governing the claim.  Plan, Section 4.9, p. 14.

## ARGUMENT

30.    Section 1129(a) of the Bankruptcy Code provides that the Court shall confirm plan only if it complies with all of the requirements of section 1129(a).  Relevant to this Objection, a plan must comply with the applicable provisions of Title 11, a plan's proponents must comply with the applicable provisions of Title 11, and a plan must be proposed in good faith and not by any means forbidden by law.  11 U.S.C. § 1129(a)(1)-(3).  The plan proponents bear the burden of proof as to compliance with § 1129 by a preponderance of the evidence.  *In re Briscoe Enters., Ltd. II*, 994 F.2d 1160 (5th Cir. 1993), cert. den., 510 U.S. 992, 114 S. Ct. 550, 126 L. Ed. 2d 451 (1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.").

i.  Merely Voting for a Plan Does Not Provide the Required Affirmative Consent.

31.    Under the Plan, the non-debtor third party releases would bind all Abuse Claimants, whether they vote to accept the Plan or not.  Because the Plan would impose non-debtor third party releases on these Claimants based on their silence, the releases are not consensual and thus cannot be approved under *Purdue*.

32.    The Plan Proponents appear to equate a vote for the Plan, which is governed by the Bankruptcy Code's provisions for adjusting relations between a debtor and its creditors, with acceptance of proposed third-party releases, which are contracts governed by state law dealing with relations between non-debtor parties.  Those are distinct legal constructs involving distinct

14

parties: the Plan disposes of a creditor's claims against the debtor, while a third-party release disposes of a non-debtor's right to sue other non-debtors. There is nothing in the Code that authorizes treating a vote to accept a chapter 11 plan as consent to a third-party release. "[A] creditor should not expect that [its] rights [against non-debtors] are even subject to being given away through the debtor's bankruptcy." *In re Smallhold, Inc*., 665 B.R. 704, 721 (Bankr. D. Del. 2024).

33.     Conflating voting for the Plan with acceptance of the third-party release violates black-letter contract law, which requires a manifestation of intent to be bound by the third-party release. Voting to accept a plan does not manifest that intent. A Chapter 11 plan allocates how the bankruptcy estate will pay claims and interests against the debtor. *See* 11 U.S.C. § 1123. If the plan is confirmed, only claims and interests against the debtor are discharged. 11 U.S.C. § 524(e). And it is "[b]ecause discharge affects a creditor's rights, [that] the Code generally requires a debtor to vie for the creditor's vote first." *Keystone Gas Gathering, L.L.C. v. Ad Hoc Comm*. *(In re Ultra Petroleum Corp.)*, 943 F.3d 758, 763 (5th Cir. 2019). The right to vote on a plan depends solely on how the plan treats claims and interests against the debtor. *See* 11 U.S.C. §§ 1124, 1126, 502, 501, 101(10); *Ultra Petroleum Corp.*, 943 F.3d at 763; 7 Collier on Bankruptcy ¶ 1126.02 (16th 2025). Claims and interests that are not impaired by the plan are deemed accept it. *See* 11 U.S.C. §§ 1124, 1126; *Ultra Petroleum Corp*., 943 F.3d at 763. Because the purpose of a Chapter 11 plan is to determine how claims and interests against the debtor will be treated, voting to accept a Chapter 11 plan does not manifest an intent to be bound by the third-party release. *See In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997); *In re Digital Impact, Inc*., 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998).

34.     Because "a creditor's approval of the plan cannot be deemed an act of assent having

15

significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan." *Arrowmill*, 211 B.R. at 507 (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194 ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *Digital Impact, Inc.*, 223 B.R. at 14. Rather, a creditor must "unambiguously manifest[] assent to the release of the non-debtor from liability on its debt." *Arrowmill*, 211 B.R. at 507. The "validity of th[at] release" necessarily "hinges upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order." *Id.* (citation and alterations omitted).

35.    Additionally, imposing a third-party release on everyone who votes to accept the plan may discourage creditors from voting. This would distort the voting process, which is intended to provide a valuable signal about the extent of creditor support, within each voting class, for the plan's treatment of creditors' allowed claims against the debtor. *Smallhold*, 665 B.R. 716. Here, according to the *Declaration* regarding the solicitation and tabulation of votes filed on November 4, 2025, there were 489 Abuse Claimants voting in favor of the Plan. [ECF Doc. No. 4543]. However, two Abuse Claimants rejected the Plan, eight Abuse Claimants abstained from voting, and approximately 225 Abuse Claimants did not cast a vote. *Id.*, s*ee also Affidavits of Service*, ECF Doc. Nos. 4336 and 4538.

ii.    Mandating a "Contractual Release" of Non-Debtors as a Condition to Receiving a Distribution for Claims Does Not Solve the *Purdue* Non-Consent Issues

36.    The Plan states that "Abuse Claimants will not receive any portion of the Settling Insurers' Settlement Consideration without having signed an Abuse Claim Release and Certification that releases all Claims against the Settling Insurers." Plan, Section 5.5, p. 19. *See also* Sale Motion, Exhibit A, p. 45. The Plan Proponents appear to assert that Abuse Claimants who sign a written document releasing third party claims in exchange for receiving distributions

from the Settlement Trust are thereby consenting to non-debtor releases, and thus such releases do not run afoul of the Supreme Court's ruling in *Purdue*. The United States Trustee respectfully disagrees.

37.     Conditioning distributions on execution of a release by an abuse survivor after the Sale Motion has been approved and after the Plan has been confirmed presents the Abuse Claimant with a Hobson's choice. The Abuse Claimant can sign the contractual release that releases both estate and their direct claims, and, in exchange, receive a distribution under the Plan. Conversely, the Abuse Claimant can decline to sign the contractual release, and not only receive no distribution from the Settlement Trust but, due to the breadth of the channeling injunction and related provisions, be left with few, if any options to pursue, because all avenues of recovery have been enjoined. The Abuse Claimant will be denied any recovery for Abuse Claims against the Debtor and Additional Debtors; the claimant has no real choice but to execute the contractual release to receive the distribution to which the claimant is legally entitled under the Bankruptcy Code. Coercing a creditor to provide a third-party release as a condition of receiving plan distributions does not make the release consensual. *Reichart v. Rapid Invs., Inc.*, 56 F.4th 1220, 1230-31 (9th Cir. 2022) (If an offeree is penalized unless an offer is accepted, that "preclude[s] an inference of assent.").

38.     When there is no choice, there is no consent. The Court should not put form over substance. The Supreme Court has held that non-consensual non-debtor releases and injunctions are not authorized by the Bankruptcy Code. *Purdue*, 144 S. Ct. at 2084 ("And precisely nothing in § 1123(b) suggests those claims can be bargained away without the consent of those affected, as if the claims were somehow Purdue's own property."). The Fifth Circuit also concluded in *In re Pac. Lumber Co.*, 34 F.3d 229, 251 (5th Cir. 2009) that a bankruptcy court may not confirm a

plan that provides non-consensual, non-debtor releases. Here, while the mechanics are more complicated than a typical non-consensual release, the analysis remains the same.

    iii.  The "Contractual Release" Condition improperly provides for different treatment to similarly situated creditors.

39.    The Plan also purports to provide different treatment to similarly situated creditors within the same class. Section 1123(a)(4) provides that a plan shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment . . . ." Section 1123(a)(4) implements a fundamental bankruptcy policy of equality of distribution to similarly situated creditors. *Begier v. IRS*, 496 U.S. 53, 58(1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property"). As stated above, the Plan states that "Abuse Claimants will not receive any portion of the Settling Insurers' Settlement Consideration without having signed an Abuse Claim Release and Certification that releases all Claims against the Settling Insurers." Plan, Section 5.5, p. 19. *See also* Sale Motion, Exhibit A, p. 45. Thus, under this procedure, an Abuse Claimant in Class 3 that does not sign the Abuse Claim Release and Certification form would not receive any distribution from estate assets while creditors in the same class that did sign the form will receive a distribution. This proposed treatment violates Section 1123(a)(4) and cannot be approved.

    iv.  The Plan does not satisfy the "best interest of creditors'" test because of the required "Contractual Release" Condition that leaves dissenting creditors with less than they would receive in a hypothetical chapter 7.

40.    Debtors' proffer no legal justification for why the compromise of an estate's causes of action against third parties, such as the insurance companies, requires creditors to release any direct claims they may have against other non-debtors to receive a distribution of estate assets to which they are legally entitled. Moreover, this release requirement also means that the Plan does

not satisfy section 1129(a)(7)'s "best interests of creditors' test," "which requires that each dissenting creditor receive at least as much as they would in a hypothetical Chapter 7 liquidation of the Debtor." *In re LMR, LLC*, 496 B.R.410, 440 (Bankr. W.D. Tex. 2013). The Plan proponents bear the burden of proof on compliance with section 1129(a)(7) by a preponderance of the evidence. *In re Harborwalk, LP*, 2010 WL3619911, at *3 (Bankr. S.D. Tex. Sept. 10, 2010). Here, two creditors voted against the Plan, and eight abstained for unknown reasons.

41.     Under a hypothetical Chapter 7 liquidation of the Debtor, a trustee would be appointed to marshal assets and prosecute claims on behalf of the estate and creditors. In Chapter 7, creditors—precluded by this chapter 11 plan from receiving their pro rata share of the estate's assets absent signing a release of any direct claims against the insurers—would receive a pro rata share of the estate, including the insurance proceeds to be paid through the insurance buyback. Dissenting creditors in this chapter 7 scenario would not be compelled to "grant" a non-consensual third-party release to receive their statutorily required share of the estate's proceeds. Under these circumstances, the dissenting creditors would receive more in a hypothetical liquidation, and thus, section 1129(a)(7) is not satisfied, and the Plan cannot be confirmed.

v.   The Plan and Sale Motion Improperly Enjoin Claims Outside the Scope of 363(f)

42.     The United States Trustee objects to the Plan to the extent that it seems to enjoin claims outside of the scope of 11 U.S.C. § 363(f). The Plan includes six Settlement Agreements with the Settling Insurers, and the Plan, Settlement Agreements, and Sale Motion provide for third-party releases and injunctions to these Settlement Insurers under the pretense of § 363(f) protection.

43.     For example, the Settling Insurer injunctions enjoin **direct** claims by Abuse Claimants that are premised on independent legal duties owed by the Setting Insurers to the

claimants outside of the jurisdiction of the Bankruptcy Court.  These direct claims include "Extra-Contractual Claims," which includes almost every kind of claim that one could imagine holding against an insurance company or even any business.  Extra-Contractual Claims include any type of relief *other* than coverage or benefits, such as t (i) bad faith; (ii) violation of any state insurance codes, state surplus lines statutes, or similar codes or statutes; (iii) violation of any unfair claims practices act or similar statute, regulation, or code, including any statute, regulation, or code relating to unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising;  or (iv) any type of misconduct.  *See* Plan, Exhibit A.  Non-debtor third parties have not been asked to consent to these provisions and, hence, the Plan proposes to impose release and injunctions that would bar claims against non-debtors without the consent of affected claimants, in violation of Purdue.  *Purdue*, 144 S. Ct. at 2088.

44.     Even prior to *Purdue*, courts recognized the limits of § 363(f) and declined to interpret Section 363(f) to permit non-consensual non-debtor injunctions and releases under the guise of sales of insurance policies free and clear of non-debtors' "interests in" the policies.  *See In re Adelphia Communications Corp.*, 364 B.R. 518, 528 (Bankr. S.D.N.Y. 2007) (permitting the debtor to sell its rights under insurance policies to the insurers but refusing to "authorize invocation of section 363(f)" or limit the rights of certain objecting parties to bring claims against the purchasing insurers and refusing to issue the "channeling injunction" barring claims against the purchasing insurers); *In re Fraser's Boiler Service, Inc.*, 2019 WL 1099713 at *8 (W.D. Wash. March 8, 2019) (reversing decision that approved the sale of insurance policies free and clear of claims between insurance companies because claims by non-settling insurance companies against the settling insurance companies were not an "interest" in the debtor's property and the bankruptcy court had no authority to release those third-party claims); *Overton's, Inc. v. Interstate Fire & Cas.*

*Ins. Co. (In re Sportstuff, Inc.)*, 430 B.R. 170, 178 (B.A.P. 8th Cir. 2010) (overturning a bankruptcy court's approval of an insurance settlement because it did not have "jurisdiction or authority to impair or extinguish independent contractual rights" belonging to third parties, including the right to defense and reimbursement of defense costs); *In re SoyNut Butter Co.*, 2018 WL 3689549 at *4 (Bankr. N.D. Ill. August 1, 2018) (holding that a Section 363(f) sale of an insurance policy that released the claims of additional insureds against the issuing insurance company could not be approved because the debtor could not sell the additional insureds' rights in the policy or their legal claims since those rights and claims were not part of the estate); *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 980 (Bankr. N.D. Ill. 1991), *aff'd*, 149 B.R. 860 (N.D. Ill 1992) (holding that Section 363(f) sale of a debtor's rights in an insurance policy could not support a release and injunction against the debtor's parent corporation that was an additional insured and had its own rights under the policy).

45.     Thus, while § 363(f) offers limited protections for purchasers of a debtor's assets in bankruptcy, it does not permit sweeping non-debtor releases that shield a purchaser from all claims, including (i) direct claims against the purchaser or (ii) claims between third parties that are not property of the Debtor and Additional Debtors and not directed against the estate property being sold.  Neither § 105 nor Fed. R. Bankr. P. 9019 can extend the Court's limited authority under § 363(f), and § 363(f) cannot be used as an end run around *Purdue's* holding that non-consensual releases are not permitted by the Bankruptcy Code.  Here, the Plan and Sale Motion provide for relief beyond that authorized by § 363(f) by enjoining or releasing claims outside the bounds of that section.

     vi.  <u>The Gatekeeper Provisions are Overbroad.</u>

46.     The Plan also includes a gatekeeping injunction that forces non-debtors (i.e.

"Enjoined Parties") who wishes to pursue a claim or cause of action against another non-debtor (i.e. Covered Parties, Settling Insurers, and/or Settlement Trust) to come to this Court—and only this Court—for a determination of whether such claim or cause of action can proceed.  By specifying that this Court shall determine whether a claimant can proceed, the Plan's gatekeeping injunction effectively grants this Court exclusive jurisdiction to adjudicate the claim or cause of action between non-debtors.  The gatekeeping injunction appears to apply even after Debtors' bankruptcy cases have been closed, which would require a non-debtor seeking to pursue a claim against another non-debtor to first move to reopen the bankruptcy cases.

47.     The plan's gatekeeping injunction is improper for the same reasons as its injunction barring claims: the bankruptcy court lacks both jurisdiction and statutory authority to enter such an injunction.  In addition, because there is no "related to" jurisdiction over these non-debtor claims, not only does the bankruptcy court lack jurisdiction to enter the injunction, it also lacks jurisdiction to perform the gatekeeping function the plan would exclusively assign to it.

48.     Even if there were "related to" jurisdiction, reserving exclusive jurisdiction in the bankruptcy court to determine whether those non-debtor claims can proceed is contrary to Congress's grant of concurrent jurisdiction over such claims.  11 U.S.C. § 1334(b) (providing "original but no exclusive jurisdiction"); *In re Brady, Texas, Mun. Gas Corp.*, 936 F.2d 212, 218 (5th Cir. 1991).  The defense of "release" is an affirmative defense that cannot be adjudicated prior to the filing of the action to which it relates.  *See, e.g.*, Fed. R. Civ. P. 8(c)(1), incorporated in Fed. R. Bankr. P. 7008. There is no reason why the court in which the relevant action has been filed cannot determine whether the non-debtor claim was released under the Plan.

49.     Further, the gatekeeping injunction contravenes the basic premise that once a company confirms a reorganization plan it "is without the protection of the bankruptcy court.  It

may not come running to the bankruptcy judge every time something unpleasant happens." *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390 (5th Cir. 2001).  This is even more true for the non-debtors protected by the gatekeeping injunction.  Gatekeeping would create inefficient piecemeal litigation contrary to the purpose of "related to" jurisdiction.  *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 752 ("[W]hen we define 'related to' jurisdiction, we should avoid the inefficiencies of piecemeal adjudication and promote judicial economy by aiding in the efficient and expeditious resolution of all matters connected to the debtor's estate.").  Parties would have to go to the bankruptcy court for permission to sue, then to the court where they want to sue to file the complaint, and then back to the bankruptcy court again if they want to amend the complaint, then back to the court presiding over the suit if the bankruptcy court allows the amendment.  This method increases the burden on the courts, imposes unnecessary costs and delay on the parties, and unnecessarily interferes with other courts' jurisdiction and ability to manage the cases before them.  *See Zale*, 62 F.3d at 755 ("[C]ourts must be particularly careful in ascertaining the source of their power, lest bankruptcy courts displace state courts for large categories of disputes.").  There is no reason to deviate from the ordinary course in which the court presiding over a lawsuit determines whether the claims are "colorable," adjudicates any defenses, including the defense of release, and determines whether any amendments to the complaint should be permitted.

50.     In light of the foregoing, the gatekeeping injunction should be struck from the Plan.

viii.  Evidence is Needed to Show the Additional Debtors' Creditors Have Been Provided Sufficient Notice and Afforded Due Process

51.     Plan describes claim filing and voting deadlines that bind the creditors of the Additional Debtors, despite the Additional Debtors not having bankruptcy cases pending before this Court.

52.     The Additional Debtors' Abuse Claimants (Classes 3 and 4) had to file proofs of

claim by October 15, 2025 – approximately one month before the Additional Debtors will file their own bankruptcy petitions.

53.     The Additional Debtors' Non-Trade Unsecured Claimants (Class 10), who are non-voting and deemed to accept the Plan, must file proofs of claim by December 2, 2025, in order to retain all rights and "pass through" unimpaired.  However, if a Class 10 Claimant fails to file a proof of claim, the claim "will be automatically Disallowed, forever barred from assertion, and unenforceable against any Additional Debtors or any Reorganized Additional Debtors, their respective Estates, or their respective property, without the need for any objection by any Reorganized Additional Debtors or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Proof of Claim against any Additional Debtors will be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary." Plan, Section 6.12, p. 28.

54.     Section 1124(1) defines a creditor as unimpaired if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1).  But because the Plan requires Class 10 creditors to file a proof of claim to retain their legal, equitable, and contractual rights and "ride through" the case, they are impaired.  That is, unless Class 10 creditors take affirmative steps that they would not have to take outside of bankruptcy to preserve their rights, the Plan impairs their interests, and they were entitled to vote.  It would be relatively easy for a Class 10 creditor to miss this impediment to payment after being told they are unimpaired and will be paid.

55.     The United States Trustee avers that these creditors deserve adequate notice and due process to protect their claims.  To date, the noticing protocol has not been filed into the record, and the United States Trustee reserves all rights to challenge the protocol once disclosed.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, the United States Trustee respectfully requests

that the Court sustain this Objection and grant such other relief as it deems just and proper.

Dated: November 6, 2025                    Respectfully submitted,
DAVID W. ASBACH
Acting United States Trustee, Region 5

By:*/s/ Amanda B. George*
AMANDA BURNETTE GEORGE (31642)
Acting Assistant United States Trustee
600 S. Maestri St., Suite 840-T
New Orleans, LA 70130
Telephone: (504) 589-4018
Direct: (504) 589-4092
Amanda.B.George@usdoj.gov

### CERTIFICATE OF SERVICE

This is to certify that copies of the foregoing United States Trustee's Objection to the Fifth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of October 27, 2025 were served on November 6, 2025, upon all parties entitled to receive notice through the Court's electronic notification system.

By:*/s/ Amanda B. George*
AMANDA BURNETTE GEORGE (31642)
Acting Assistant United States Trustee
600 S. Maestri St., Suite 840-T
New Orleans, LA 70130
Telephone: (504) 589-4018
Direct: (504) 589-4092
Amanda.B.George@usdoj.gov

26