# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 20-10846** |
| **THE ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF NEW ORLEANS,** | § | |
| | § | **Section "A"** |
| | § | **COMPLEX CASE** |
| | § | |
| **Debtor.**[1] | § | **Chapter 11** |

## FEE APPLICATION COVER SHEET *SEVENTEENTH INTERIM AND FINAL* APPLICATION OF TROUTMAN PEPPER LOCKE LLP AS CO-COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD FROM MAY 22, 2020 THROUGH FEBRUARY 27, 2026

| | |
|---|---|
| Name of Applicant: | Troutman Pepper Locke LLP |
| Authorized to Provide Professional Services to: | The Official Committee of Unsecured Creditors |
| Petition Date: | May 1, 2020 |
| Date of Retention: | Effective *nunc pro tunc* to May 22, 2020 |
| Date Order Signed Authorizing Employment: | July 17, 2020 [Docket #256] |
| Dates and Amounts of Compensation Approved in Previous Interim Requests: | (i)   December 29, 2020—$616,628.22;<br>(ii)   May 20, 2021—$498,601.19;<br>(iii)   October 26, 2021—$322,428.45;<br>(iv)   December 14, 2021—$508,624.47;<br>(v)   May 19, 2022—$425,927.64;<br>(vi)   December 13, 2022—$386,463.91;<br>(vii)   December 27, 2022—$575,200.82;<br>(viii)   April 14, 2023—$557,412.72<br>(ix)   August 11, 2023—$516,069.46;<br>(x)   December 19, 2023—$432,223.35<br>(xi)   April 25, 2024 – $402,884.70;<br>(xii)   August 16, 2024 - $320,189.72;<br>(xiii)   April 21, 2025 - $563,326.33 & $474,630.67; and<br>(xiv)   December 17, 2025 - $1,022,893.84 |
| Period for which compensation and reimbursement is sought: | May 22, 2020 through February 27, 2026 (the "Application Period") |
| Total Amount of Compensation sought as actual, reasonable, and necessary: | $8,373,675.00 |
| Total Amount of Expense Reimbursement sought as actual, reasonable, and necessary: | $237,798.67 |
| Fee Application: | Seventeenth Interim and Final Fee Application |
| Total: | $8,611,473.67 |

---

[1] The last four digits of the Debtor's federal tax identification number are 8966. The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

## HOURS WORKED AND FEES INCURRED BY TIMEKEEPER

The professionals of Troutman Pepper Locke LLP ("Troutman" or the "Firm") listed on **Exhibit "1"** (the "Timekeeper Schedule") to this Application rendered services for The Official Committee of Unsecured Creditors (the "Committee") in the above-styled Chapter 11 case (the "Bankruptcy Case") of The Roman Catholic Church of the Archdiocese of New Orleans (the "Debtor") during the period from May 22, 2020, through February 27, 2026 (the "Application Period"). The Timekeeper Schedule presents the hours worked and the fees incurred by each professional during the entire Application Period as follows:

(I)      First, the Timekeeper Schedule identifies the hours and fees for those professionals who provided services during the fifteenth interim fee period from March 1, 2025, through June 30, 2025 ("Fifteenth Period"). During the Fifteenth Period, Troutman professionals worked **1,024.8** hours for a fee of **$588,970**.[2] As of today's date, this Court has not yet approved the fees incurred by Troutman professionals during the Fifteenth Period, and therefore the Firm is presenting these amounts separately in the Timekeeper Schedule.

(II)      Second, the Timekeeper Schedule lists the hours and fees for those professionals who provided services during the seventeenth interim fee period from November 1, 2025, through February 25, 2026 (the "Seventeenth Period"). (The Seventeenth Period is split into separate sets of columns for November 2025 and December 2025-February 2026—i.e., one set of columns for each Troutman invoice issued during this final period.) During the Seventeenth Period, Troutman professionals worked **610.3** hours for a fee of **$357,757.50**.[3] This Court has not yet approved any

---

[2] In addition to the professional hours listed, Troutman timekeepers also worked an additional 1.1 hours during the Fifteenth Period that were marked as "no charge". These represent voluntary reductions of $660 from the fees incurred during this period. The total worked hours were therefore 1,025.9 for a total fee of $589,630.

[3] In addition to the professional hours listed, Troutman timekeepers also worked an additional 49.4 hours during the Seventeenth Period that were marked as "no charge". These represent voluntary and mandatory reductions of $27,907.50 from the fees incurred during this period. The total worked hours were therefore 659.7 for a total fee of $385,665.00.

2

fees for the Seventeenth Period on either an interim or final basis.

(III)    Third, the Timekeeper Schedule provides an estimated total of **15.0** hours (equal to fees of **$9,000**) as a figure incurred by the professionals who finalized this Application and certain other fee applications after the Seventeenth Period concluded (the "Estimated Period"). The Firm does not intend to seek any fees for additional time incurred after this final Estimated Period.

(IV)    Fourth, the Timekeeper Schedule lists by professional the hours and fees that this Court has already approved under previous interim fee orders entered in this Bankruptcy Case ("Approved Period"). The Approved Period consists of the first fourteen (14) interim fee periods from May 22, 2020, through February 28, 2025, plus the sixteenth interim fee period from July 1, 2025, through October 31, 2025. Troutman professionals worked **14,974.2** approved hours during the Approved Period, for a total, approved fee of **$7,417,947.50**. Relatedly, this Court did not approve 85.6 hours (for a fee of $39,057.50) that the Firm had originally sought for time expended during the Approved Period. The Firm is not seeking approval of these previously denied amounts. In addition, during the Approved Period, Firm professionals worked another 1,088.0 hours that were marked as "no charge" in the Firm's invoices. This figure represents an additional voluntary reduction of $505,780.50 in fees incurred during the Approved Period and shown on the Firm's invoices. Lastly, the Firm also reduced its fees during the Approved Period by an additional $5,600. (This fee reduction does not appear on the Firm's invoices and is not accounted for by reduced professional hours.) After all these voluntary reductions are included, the total worked hours during the Approved Period were 16,062.2 for a total fee of $7,929,328.00.[4]

(V)    Fifth, and finally, the last column of the Timekeeper Schedule lists by professional the total hours expended and fees incurred for each Firm professional across the entire Application

---

[4] These figures do not include the 85.6 hours (for a total fee of $39,057.50) that this Court affirmatively denied during the Approval Period. The Firm is **not** seeking approval of any of these previously denied amounts.

Period—i.e., the Approved Periods, the Fifteenth Period, the Seventeenth Period, and the Estimated Period. Troutman professionals worked a total of **16,624.3** hours during the Application Period for a fee of **$8,373,675.00**. The Firm seeks approval of this entire amount in this Application on a final basis.[5]

---

[5] As noted above, this final figure does not include the voluntary reductions of 1,088.0 hours in the Approved Period (equal to $505,780.50 in fees), the unallocated $5,600 voluntary reduction (also in the Approved Period), the additional reduction of 1.1 hours (equal to $660 in fees) during the Fifteenth Period, or the reductions of 49.4 hours (for a fee of $27,907.50) in the Seventeenth Period. When these voluntary reductions are included, the total hours worked during the Application Period were **17,762.80** while the total fees incurred were **$8,913,623.00.**

## HOURS WORKED AND FEES INCURRED BY PROJECT CATEGORY

The Firm has attached as **Exhibit "2"** (the "Task Code Schedule") to this Application the total hours and fees incurred by the Firm's professionals on the Committee's behalf during the Application Period separated out by Project Category/Task Code. The Task Code Schedule presents the hours worked and the fees incurred during the Application Period as follows:

(I)     First, the Task Code Schedule lists by Project Category the total hours and fees incurred during the Approved Period that this Court has already approved under its fifteen (15) previous interim fee orders. The Approved Period consists of the first fourteen (14) interim fee periods from May 22, 2020, through February 28, 2025, plus the sixteenth interim fee period from July 1, 2025, through October 31, 2025. During the Approved Period, Troutman professionals worked **14,974.2** approved hours, for a total, approved fee of **$7,417,947.50**. As noted above, Troutman does not seek approval of the 85.6 hours (for a fee of $39,057.50) that this Court denied on an interim basis during the Approved Period. Firm professionals also worked another 1,088.0 hours during the Approved Period that were marked as "no charge" on the Firm's invoices and represent a voluntary reduction of $505,780.50 in fees incurred. Additionally, the Firm also reduced its fees during the Approved Period by an extra $5,600—a reduction not reflected on the Firm's invoices. After including these voluntary reductions in the hours and fee totals, Firm professionals worked 16,062.2 hours (for a total fee of $7,929,328) during the Approved Period.

(II)     Second, the Task Code Schedule also lists by Project Category the total hours and fees that this Court has not yet approved on an interim basis. These unapproved fees consist of the following: (i) the hours worked and fees incurred during the Fifteenth Period from March 1, 2025, through June 30, 2025 (which total 1,024.8 and a fee of $588,970),[6] (ii) a total of 610.3 hours

---

[6] In addition to the professional hours listed, Troutman personnel also worked an additional 1.1 hours during the Fifteenth Period that were marked as "no charge". These represent voluntary reductions of $660 from the fees incurred during this period. The total worked hours were therefore 1,025.9 for a total fee of $589,630.

worked for a fee of $357,757.50 during the Seventeenth Period from November 1, 2025, through February 25, 2026,[7] and (iii) an estimated total of 15.0 hours worked for a fee of $9,000 during the Estimated Period for the professional who finalized and filed this Application. The total hours worked is therefore 1,650.10 for a fee of $955,727.50.

(III)   Third, and finally, the Task Code Schedule lists the total hours worked and fees incurred by Project Category/Task Code for all Troutman professionals who worked on matters related to this Bankruptcy Case for the entire Application Period (which consists of the Approved Period, the Fifteenth Period, the Seventeenth Period, and the Estimated Period). As set forth in the Task Code Schedule, Troutman professionals worked **16,624.3** hours during the Application Period for a total, combined fee of **$8,373,675.00**. The Firm seeks approval of this entire amount in this Application on a final basis.[8]

---

[7] In addition to the professional hours listed, Troutman timekeepers also worked an additional 49.4 hours during the Seventeenth Period that were marked as "no charge". These represent voluntary and mandatory reductions of $27,907.50 from the fees incurred during this period. The total worked hours were therefore 659.7 for a total fee of $385,665.00.

[8] As noted above, this final figure does not include the voluntary reductions of 1,088.0 hours in the Approved Period (for a fee of $505,780.5), the unallocated $5,600 voluntary reduction (also in the Approved Period), the additional voluntary reduction of 1.1 hours (for a fee of $660) during the Fifteenth Period, or the reductions of 49.4 hours (for a fee of $27,907.50) in the Seventeenth Period. When these reductions are included, the total hours worked during the Application Period were **17,762.80** while the total fees incurred were **$8,913,623.00.**

250911217v2

## EXPENSES INCURRED DURING THE APPLICATION PERIOD

The Firm has attached as **Exhibit "3"** (the "Expense Schedule") to this Application the total expenses by expense type incurred by the Firm for the Committee during the entire Application Period. The Expense Schedule presents the expenses incurred during the Application Period as follows:

(I)      First, the Expense Schedule lists in its first column the total expenses incurred by the Firm and approved by the Court during the Approved Period on an interim basis. The total expenses incurred and approved during this Approved Period were **$205,557.99**.

(II)      Second, the Expense Schedule lists in its third column the total expenses incurred by the Firm that this Court has not yet approved. The expenses in this category total **$32,240.68**. This category of expenses includes those expenses incurred during the following periods: (i) the Fifteenth Period from March 1, 2025, through June 30, 20225 ($5,433.83), (ii) the Seventeenth Period from November 1, 2025, through February 25, 2026 (which total $25,306.85), and (ii) the estimated expenses of $1,500 for the costs of printing and mailing this Application during the Estimated Period.[9]

(III)      Third, and finally, the Expense Schedule lists all the expenses incurred by the Firm during the entire Application Period (which consists of the Approved Period, the Fifteenth Period, the Seventeenth Period, and the Estimated Period. The total expenses for the Application Period are **$237,798.67.** This Application seeks approval of all these expenses on a final basis.

---

[9] This Court separately denied a total of $1,482.17 in expenses during the Approval Period. The Firm is **not** seeking approval of these previously denied expenses. These denied expenses also appear in the second column in the Expense Schedule.

250911217v2

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: | § § | |
| | § | **Case No. 20-10846** |
| **THE ROMAN CATHOLIC CHURCH OF** | § | **JOINTLY ADMINISTERED** |
| **THE ARCHDIOCESE OF NEW** | § | |
| **ORLEANS,** | § | **Section "A"** |
| | § | **COMPLEX CASE** |
| **Debtor.**[1] | § | |
| | § | **Chapter 11** |

*SEVENTEENTH INTERIM AND FINAL APPLICATION* OF TROUTMAN PEPPER LOCKE LLP AS CO-COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD FROM MAY 22, 2020, THROUGH FEBRUARY 27, 2026

> **A HEARING WILL BE CONDUCTED ON THIS MATTER BEGINNING ON MAY 14, 2026 AT 9:30 A.M. (CDT) AT THE UNITED STATES BANKRUPTCY COURT, 500 POYDRAS STREET, COURTROOM B-709, NEW ORLEANS, LOUISIANA 70130. PARTIES IN INTEREST MAY PARTICIPATE IN THE HEARING (I) IN PERSON; (II) BY TELEPHONE ONLY (DIAL-IN: 504.517.1385, ACCESS CODE: 129611); OR (III) BY TELEPHONE USING THE DIAL-IN NUMBER AND VIDEO USING HTTPS://GOTOMEET.ME/JUDGEGRABILL, (MEETING CODE: "JUDGEGRABILL".[2] IF YOU OBJECT TO THE RELIEF REQUESTED IN THIS PLEADING, YOU MUST RESPOND IN WRITING. UNLESS DIRECTED OTHERWISE BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT NO LATER THAN MARCH 31, 2026. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

TROUTMAN PEPPER LOCKE LLP (the "Firm" or "Troutman") files its *Seventeenth Interim and Final Application of Troutman Pepper Locke LLP as Co-Counsel to the Official Committee of Unsecured Creditors for Allowance of Compensation and Reimbursement of Expenses for the Period from May 22, 2020, through February 27, 2026* (the "Application"). In

---

[1] The last four digits of the Debtor's federal tax identification number are 8966. The Debtor's principal place of business is located at 7887 Walmsley Ave., New Orleans, LA 70125.

[2] Parties in interest are directed to the Court's Amended General Order 2021-2 for information on conduct of hearings, available at https://www.laeb.uscourts.gov/.

support of this Application covering May 22, 2020, through February 27, 2026 (the "Application Period"), the Firm respectfully states as follows:

## I.      INTRODUCTION

1.      This Application seeks interim and final payment of **$8,611,473.67** for work that the Firm performed and for the expenses it incurred from May 22, 2020 (when the Firm was first retained) through February 27, 2026 (the date of this Application). As explained below, this Bankruptcy Case would not have concluded with a confirmed Chapter 11 plan without the tireless efforts of the Committee, the Committee's members, and the Committee's professionals (including the Firm). The following represent a few of the many accomplishments obtained in this case for the benefit of the Committee's constituency of sexual abuse survivors:

- Even though the Debtor had recorded a financial reserve of only $8.5 million for payment of sexual abuse claims in 2018 and Archbishop Gregory M. Aymond had suggested when this Bankruptcy Case was filed that all such claims could be settled for $7 million, the Debtors and the Additional Debtors eventually agreed to provide $200,000,000 to fund a Settlement Trust for the benefit of survivors (an amount that does not include the additional $30,000,000 in insurance settlements obtained so far or a potential $75,000,000 settlement with Travelers);

- The Debtor and the Additional Debtors sold millions of dollars in excess immovable property for the benefit of the survivors during the Bankruptcy Case—cash proceeds that enabled the funding of the Settlement Trust; and

- The Debtor and the Additional Debtors agreed as part of the Seventh Joint Plan to reforms of their internal processes for handling sexual abuse claims—reforms that set a new, exacting standard for such "non-monetary" provisions in diocesan reorganization cases nationwide.

2.      Having achieved these results for the Committee's constituency, the Firm now seeks compensation on a final basis for the work its professionals performed in reaching these goals and the long-awaited, successful conclusion of this Bankruptcy Case.

250911217v2

## II.     JURISDICTION AND VENUE

3.      The Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.     BACKGROUND FACTS

**A.     Introduction**

5.      On May 1, 2020 (the "Archdiocese Petition Date"), The Roman Catholic Church of the Archdiocese of New Orleans (the "Archdiocese" or the "Debtor") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Bankruptcy Rules of the Eastern District of Louisiana (the "Local Bankruptcy Rules"), thereby commencing the above-styled Chapter 11 case for the Archdiocese (the "Bankruptcy Case").

6.      On November 11, 2025 (the "Additional Debtors' Petition Date"), those entities identified as the Additional Debtors[3] filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court, thereby commencing the Chapter 11 cases for the Additional Debtors (the "Additional Debtors' Bankruptcy Cases"). On November 13, 2025, the Court entered its *Order* [ECF Doc. No. 4603] (the "Joint Administration Order") granting consolidation of the Bankruptcy Case and the Additional Debtors' Bankruptcy Cases (collectively, the "Bankruptcy Cases") for procedural purposes only and providing for the Bankruptcy Cases' joint administration. The Additional Debtors' Bankruptcy Cases were subsequently closed on December 22, 2025 [ECF Doc. No. 4808] after the Plan was confirmed.

---

[3] A list of the Additional Debtors is attached as **Exhibit "4"** to this Application.

B.    **The Appointment of the Committee and Employment of the Firm.**

7.      On May 20, 2020, the Office of the United States Trustee for Region 5 (the "U.S. Trustee") appointed the Committee in the Bankruptcy Case pursuant to section 1102(a)(1) of the Bankruptcy Code [ECF Doc. No. 94]. The Committee was re-constituted on June 10, 2020,[4] October 8, 2020,[5] June 7, 2022,[6] June 21, 2022,[7] and February 13, 2023.[8] Throughout its existence, the Committee typically consisted of four (4) to six (6) committee members.

8.      On May 22, 2020, the Committee conducted its first meeting and at that meeting unanimously selected Locke Lord LLP ("Locke Lord") and Pachulski Stang Ziehl & Jones ("PSZJ") to serve as co-counsel to the Committee. As co-counsel, Locke Lord and PSZJ agreed to divide responsibility for various tasks to avoid duplication of effort between the two firms. For example, Locke Lord addressed real estate matters and Debtor property sales while PSZJ handled insurance issues (including negotiations with insurers) and key discovery tasks.

9.      On June 22, 2020, the Committee filed an *Application to Employ Locke Lord LLP as Co-Counsel* [ECF Doc. No. 179] (the "Retention Application"). As more fully described in the Retention Application, the Committee retained Locke Lord to render legal services to the Committee in the Bankruptcy Case.

10.     On July 17, 2020, this Court entered the *Order Authorizing the Employment and Retention of Locke Lord LLP as Co-Counsel for the Official Committee of Unsecured Creditors* [ECF Doc. No. 256] (the "Retention Order"). The Retention Order approved Locke Lord's retention as the Committee's co-counsel in the Bankruptcy Case.

---

[4] ECF Doc. No. 151.
[5] ECF Doc. No. 478.
[6] ECF Doc. No. 1575
[7] ECF Doc. No. 1618
[8] ECF Doc. No. 2081.

11.     On March 23, 2023, the Court entered an *Order* [ECF Doc. No. 2178] ("Retention Modification Order") approving in part and denying in part the Committee's *Motion to Amend Retention Orders of Its Co-Counsel and Authorize Increased Hourly Rate Caps and Annual Rate-Increase Procedure* [ECF Doc. No. 2004] (the "Retention Modification Motion"). The Retention Modification Order amended the Retention Order to permit Locke Lord to increase the hourly rate-caps then-applicable to Locke Lord *nunc pro tunc* to January 1, 2023. The motion also permitted Locke Lord to request additional increases on an annual basis thereafter.[9] (Retention Mod. Order, ECF Doc. No. 2178, p. 2). All invoices issued after January 1, 2023, reflected the revised rates authorized by the Retention Modification Order.

12.     Effective January 1, 2025, Locke Lord combined with Troutman Pepper Hamilton Sanders LLP, thereby creating a new, combined firm with the name "Troutman Pepper Locke LLP." The new, combined firm is referred to throughout this Application as the "Firm" or "Troutman".

**C.     The Plan Confirmation Process and the Successful Conclusion to this Bankruptcy Case.**

13.     On July 15, 2025, the Debtor, the Additional Debtors, and the Committee (together, the "Plan Proponents") filed a *Joint Chapter 11 Plan* [ECF Doc. No. 4150] (the "Plan") and *Disclosure Statement* [ECF Doc. No. 4151] (the "Disclosure Statement"). This Plan and Disclosure Statement incorporated a *Memorandum of Understanding* (the "MOU") reached by these parties on May 16, 2025, after several years of mediation led by the three mediators appointed in this Bankruptcy Case: (i) the Hon. Gregg W. Zive ("Judge Zive"), (ii) John W. Perry, Jr. ("Mr. Perry"), and (iii) the Hon. Christopher Sontchi ("Judge Sontchi" and together with Judge Zive and Mr.

---

[9] Although the Firm was permitted to increase its rate caps in 2024 and 2025, the Firm chose not to request any further rate increases. The rates therefore remained capped at the 2023 levels for the remainder of the Bankruptcy Case.

Perry, the "Mediators")). This Plan contemplated, among other things, that the Debtor and the Additional Debtors would fund an approximately $200 million Settlement Trust for the benefit of the Abuse Claimants—the Committee's principal constituency—and that the Debtor and the Additional Debtors would adopt meaningful non-monetary reforms of their internal processes for handling sexual abuse claims. The Firm and PSZJ represented the Committee throughout the difficult negotiations that resulted in the MOU as well as the Plan and Disclosure Statement.

14.     On August 12, 2025, this Court entered its *Order (I) Approving the Adequacy of the Joint Disclosure Statement, (II) Approving the Solicitation and Voting Procedures With Respect to Confirmation of the Joint Proposed Chapter 11 Plan, (III) Approving Ballots and Notices, and (IV) Granting Related Relief* [ECF Doc. No. 4253] ("Disclosure Statement Order"). The Disclosure Statement Order approved, *inter alia*, the adequacy of the *Plan Proponents' Second Amended Modified Disclosure Statement* [ECF Doc. No. 4242] (the "Solicitation Disclosure Statement") under Bankruptcy Code § 1125 and permitted the Plan Proponents (i.e., the Debtor, the Additional Debtors, and the Committee) to solicit votes from Abuse Claimants and other creditors to accept or reject the *Second Amended Joint Chapter 11 Plan* [ECF Doc. 4235] (the "Solicitation Plan"). The Solicitation Plan amended the previous Plan in certain respects but continued to incorporate the MOU and the Plan Proponents' agreement.

15.     During the plan-confirmation process, the Plan Proponents successfully resolved multiple objections to the Solicitation Plan, including from certain abuse survivors ("Certain Survivors"), the Official Committee of Unsecured Commercial Creditors (the "Commercial Committee"), and Argent Institutional Trust Company f/k/a TMI Trust Company, Inc., the indenture trustee (the "Bond Trustee") for the Debtor's *Louisiana Public Facilities Authority Refunding Revenue Bonds (Archdiocese of New Orleans Project) Series 2017* (the "Bonds"). These

settlements were reached only after extensive plan-related discovery and litigation, detailed briefing on myriad, disputed issues, and a plan-confirmation hearing lasting several weeks. These settlements were incorporated into a *Seventh Amended Modified Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of December 8, 2025* [ECF Doc. No. 4762] (the "Seventh Joint Plan"). Eventually, all the original plan opponents withdrew their objections to the Seventh Joint Plan except for (i) the U.S. Trustee and (ii) United States Fidelity & Guaranty Company, an affiliate of Travelers Indemnity Company ("Travelers"). In short, by the end of the plan process, support for the Seventh Joint Plan was nearly universal, with the abuse-survivor constituency being especially enthusiastic and voting 99.5% in favor of the plan. (Ballot Tabulation, ECF Doc. No. 4543, p. 5).

16.     On December 8, 2025, this Court overruled the remaining objections raised by Travelers and the U.S. Trustee, and confirmed the Seventh Joint Plan as set forth in its Order *Confirming Seventh Amended Modified Joint Chapter 11 Plan of Reorganization for The Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of December 8, 2025* [ECF Doc. No. 4767] (the "Confirmation Order"). Like the Solicitation Plan, the Seventh Joint Plan provided for the transfer to a newly created *The Archdiocese of New Orleans Settlement Trust* (the "Settlement Trust") of, among other things, $130,000,000 in cash on the plan's Effective Date, certain promissory notes totaling $70 million secured by letters of credit, funds from settling insurers, and certain other rights of the Debtors and Additional Debtors— resulting in approximately $230,000,000 in total funding for the Settlement Trust.

7

17.     The Seventh Joint Plan went effective on December 26, 2025 (the "Effective Date"), as reflected in the Debtor's *Notice of Occurrence of Effective Date* [ECF Doc. No. 4817] ("Effective Date Notice"). Although the Committee ceased to exist on the Effective Date and the Committee's members have now been discharged from their duties, the Debtor, the Additional Debtors, and Donald J. Massey, as trustee of the Settlement Trust (the "Settlement Trustee"), are continuing to implement the Seventh Joint Plan for the benefit of the Debtor's and the Additional Debtors' creditors and other parties-in-interest.

### IV.     WORK PERFORMED AND RESULTS OBTAINED / EXTRAORDINARY CIRCUMSTANCES

18.     The Firm now seeks final approval of all the fees and expenses it incurred during this Bankruptcy Case. Considering how this case began and the many twists and turns it took over the last five-and-a-half years, the Committee obtained an outstanding result for its constituency of sexual abuse survivors. This outcome would not have occurred without the tireless efforts of the Committee and its professionals (including the Firm). In this section, the Firm will examine how it helped achieve this outcome and explain why this Court should approve the Firm's fees and expenses. For more detailed information about the Firm's accomplishments, the Firm has attached all sixteen (16) interim fee applications (together, the "Interim Applications") previously filed in this Bankruptcy Case as exhibits to this Application.[10] These Interim Applications cover the Approved Period, which consists of the first fourteen (14) interim fee periods from May 22, 2020

---

[10] The interim applications are attached to this Application as follows: (i) First Interim Application (**Exhibit "5"**), (ii) Second Interim Application (**Exhibit "6"**), (iii) Third Interim Application (**Exhibit "7"**), (iv) Fourth Interim Application (**Exhibit "8"**), (v) Fifth Interim Application (**Exhibit "9"**), (iv) Sixth Interim Application (**Exhibit "10"**), (vii) Seventh Interim Application (**Exhibit "11"**), (viii) Eighth Interim Application (**Exhibit "12"**), (ix) Ninth Interim Application (**Exhibit "13"**), (x) Tenth Interim Application (**Exhibit "14"**), (xi) Eleventh Interim Application (**Exhibit "15"**), (xii) Twelfth Interim Application (**Exhibit "16"**), (xiii) Thirteenth Interim Application (**Exhibit "17"**), (xiv) Fourteenth Interim Application (**Exhibit "18"**), (xv) Fifteenth Interim Application (**Exhibit "19"**), and (xvi) Sixteenth Interim Application (**Exhibit "20"**). Additionally, the Firm has also attached its invoices for the Seventeenth Period as **Exhibit "21"**. The invoices filed with the interim fee applications, as well as the invoices for the Seventeenth Period, are collectively referred to in this Application as the **"Invoices"**.

through February 28, 2025, plus the sixteenth interim fee period from July 1, 2025 through October 31, 2025. This Court has already approved these fees on an interim basis. Additionally, the Firm has also attached the fifteenth interim application (and all attendant invoices) covering the Fifteenth Period from March 1, 2025 through June 30, 2025 as well as the invoices for the Seventeenth Period from November 1, 2025 through February 25, 2026. The fees incurred during the Fifteenth and Seventeenth Periods have not yet been approved. Taken together, these applications and invoices (plus the additional $9,000 fee for finalizing this Application and certain other final fee applications) provide a complete picture of the Firm's fees and expenses in this Bankruptcy Case. The following narrative summarizes the Firm's efforts and highlights several of the Committee's (and the Firm's) achievements.

A.    **The Filing of the Bankruptcy Case.**

19.    The Debtor filed this Bankruptcy Case on May 1, 2020, during the middle of the social and economic upheaval caused by the COVID-19 pandemic and in the face of mounting litigation pressure from approximately thirty-four (34) cases brought against the Debtor in the Louisiana state court system by abuse survivors. At that time, though, the Debtor still held unrealistic expectations regarding the financial burden presented by the sexual abuse claims. As late as fiscal year 2018, the Debtor had recorded a financial reserve of only $8.5 million for personal misconduct claims. (Mem. Opinion, ECF Doc. No. 991, p. 17). This reserve reflected the Debtor's (and its affiliates') belief that they could, for only a few million dollars, rely on various legal defenses and arguments, such as prescription under Louisiana law, to either defeat or settle the thirty-four (34) cases they were then facing as well as any future cases that might be filed (of which the Debtor expected very few). (*See id.* p. 4) ("As of the Petition Date, the Archdiocese was defending 34 lawsuits filed between 2018 and 2022 in Louisiana state court by claimants alleging

sexual abuse by clergy (the "Abuse Cases") and had been working to resolve a similar number of claims for which lawsuits had yet to be filed."). The Debtor and its affiliates no doubt considered it unrealistic to think that they might one day pay $200 million dollars to fund a settlement trust for sexual-abuse claimants—especially considering that Archbishop Gregory M. Aymond had previously informed the Holy See that he believed the Debtor could settle or resolve its sexual abuse liabilities for approximately $7 million.

20.     Through the efforts of the Committee and its counsel, however, the Debtor's and its affiliates' initial estimates of what the sexual abuse claimants might recover in this Bankruptcy Case were revealed to be much too low. Several of the Committee's achievements contributed to this realization. For instance, the Committee, the Firm, and PSZJ fought early in this case to implement a claims-filing and bar-date process that protected the due process rights and confidentiality of sexual-abuse claimants while ensuring that they had sufficient time and information to file their claims. This Court's *Order Fixing Time for Filing Proofs of Claims; Approving Proof of Claim Forms; Providing for Confidentiality Protocols; and Approving form and Manner of Notice* [ECF Doc. No. 461] (the "Bar Date Order") represented the culmination of these efforts, as the Court fixed March 1, 2021 as the bar date for filing sexual abuse claims—a considerably longer deadline than the September 29, 2020 date that the Debtor had requested. (Bar Date Motion, ECF Doc. No. 200, ¶ 14, p. 5). The entry of the Bar Date Order led to the filing of over six hundred (600) sexual abuse claims against the Debtor, which was far more than the Debtor had anticipated.

21.     To protect the interests of the Committee's constituency, the Committee also sought document discovery from the Debtor and its affiliates so that the Committee could better understand the Debtor's and its affiliates' assets, the true value of their many properties, and the

circumstances surrounding the Debtor's and its affiliates' handling of sexual abuse claims. This discovery process took years to complete and required the Committee to bring a motion to compel that was carried several times during the Bankruptcy Case. Eventually, however, the Committee uncovered evidence and assets that helped convince the Debtor and its affiliates that they would have to revise their expectations regarding what they would need to pay to sexual abuse survivors in order to confirm a Chapter 11 plan and exit this Bankruptcy Case. This discovery—and the facts the Committee uncovered—also played a crucial role in the Committee's negotiations with the Debtor and the Debtor's affiliates over the non-monetary reforms of their internal procedures for responding to sexual abuse claims and for protecting children and vulnerable adults. The Firm's professionals participated at all levels in these Committee efforts.

**B.      The Successful Mediation**

22.      Even though it took years of difficult negotiations to reach a resolution, the Committee (and the Firm) did not waver in their desire to identify assets, to press the Debtor to monetize those assets, to protect the Committee's constituents, and to obtain monetary recompense for survivors that would adequately compensate them and ensure survivor support for a Chapter 11 plan. For example, the Firm's professionals were involved at every stage of the mediation process after Judge Zive was appointed as the first Mediator in this Bankruptcy Case in October 2021. (Order Appointing Mediator, ECF Doc. No. 1058). Firm professionals also pressed the Committee's case during multiple mediation sessions before not only Judge Zive, but also Mr. Perry and Judge Sontchi—mediators whose appointment (and reappointment) the Committee and the Firm had supported.

23.      Yet, even as the Committee and the Firm fought for sexual abuse survivors in both this mediation and in their continuing discovery litigation with the Debtor, Firm personnel also

250911217v2

strived to identify those areas where the Committee could work cooperatively with the Debtor and the Debtor's affiliates. One of these areas involved the identification, valuation, and sale of a significate portion of the Debtor's immovable property. Along with the Debtor and the Commercial Committee, the Committee (and the Firm's personnel) assisted the Debtor with the successful marketing and sale of multiple parcels of immovable property, such as the Howard Avenue Main Site (Order, ECF Doc. No. 1726), the property located at 1032 South Rampart Street and 1042 South Rampart Street (Order, ECF Doc. No. 1925), the former Hope Haven site on Barataria Boulevard in Marrero, Louisiana (Order, ECF Doc. No. 4043), and many others. The proceeds generated by these property sales (which were, at the Committee's insistence, placed in segregated bank accounts) helped fund the Settlement Trust and thereby implement the Seventh Joint Plan.

C.     **The Competing Plan Process**

24.     Eventually, after numerous unsuccessful mediation sessions, the Committee decided that, to move this Bankruptcy Case forward, the Committee would have to file its own Chapter 11 plan of reorganization. It did just that on September 13, 2024. The Committee's *Chapter 11 Plan of Reorganization* [ECF Doc. No. 3382] (the "Committee Plan") represented an inflection point in this long-running Bankruptcy Case, as did the filing of the Debtor's *Chapter 11 Plan of Reorganization* [ECF Doc. No. 3384] (the "Debtor Plan"). Counsel for the Firm and PSZJ drafted the Committee Plan, negotiated at length with the Debtor over the terms of both the Committee Plan and the Debtor Plan, and—with the Mediators' tireless efforts—harmonized those plans and their contents in the MOU, the Plan, and, eventually, the Seventh Joint Plan. The Committee (and the Firm) pressed hard for their constituents throughout these negotiations.

25.     By any measure, the Committee's and the Firm's plan negotiations succeeded. The

12

Debtor Plan had originally included a mere $50,000,000 funding amount for the settlement trust to pay sexual abuse claims. (Debtor Plan, ECF Doc. No. 3384, § 5.2(a), p. 12). By contrast, the Seventh Joint Plan required the Debtor and the Additional Debtors to fund $200,000,000 for the Settlement Trust—a figure that does not include the additional $30,000,000 in insurance settlements obtained so far or the $75,000,000 expected when a potential settlement with Travelers is finalized. (Seventh Joint Plan, ECF Doc. No. 4762, §§ 5.3, pp. 12-15). This final outcome (which is currently estimated to be $305 million) represents a substantial improvement from the Debtor's initial $50 million plan offer—and a far cry from either Archbishop Aymond's initial estimate of $7 million or the $8.5 million reserve amount the Debtor had scheduled in 2018.

**D.      Confirmation of the Seventh Joint Plan**

26.      Ultimately, the Committee and the Firm obtained an extraordinary result for the Committee's constituency of sexual abuse survivors. Although this Bankruptcy Case was difficult, contentious, and lengthy, it concluded with a confirmed plan that created a $230,000,000 Settlement Trust for the benefit of survivors. The Seventh Joint Plan also implemented meaningful reforms of the Debtor's and the Additional Debtors' processes for responding to sexual abuse claims, created oversight for addressing future abuse allegations, and provided transparency regarding past abuse by establishing a public archive. This Seventh Joint Plan, which had the support of the Debtor, the Additional Debtors, the Committee, and nearly all (99.5%) of the sexual abuse survivors who voted, represents the true measure of success in this Bankruptcy Case. This achievement would have been impossible without the contributions of the Committee, the Committee's members, and the Committee's professionals (including the Firm and PSZJ). For these reasons, the Firm submits that the fees and expenses its professionals incurred to reach this successful endpoint were reasonable, well-spent, and justified by the results obtained.

## V.    PROJECT CATEGORIES

27.    The Firm's Invoices break down the legal services rendered into project categories as required by the U.S. Trustee. The Firm rendered services to the Committee in nineteen (19) different project categories during the Application Period. The pertinent project categories are: (1) Case Administration (B110), (2) Asset Analysis and Recovery (B120), (3) Asset Disposition (B130), (4) Relief from Stay/Adequate Protection Proceedings (B140), (5) Meetings & Communications with Creditors (B150), (6) Fee/Employment Applications (B160), (7) Fee/Employment Objections (B170), (8) Avoidance Action Analysis (B180), (9) Assumption/Rejection of Leases & Executory Contracts (B185), (10) Other Contested Matters (B190), (11) Non-Working Travel (B195), (12) Business Operations (B210), (13) Tax Issues (B240), (14) Employee Benefits/Pensions (B220), (15) Financing/Cash Collateral (B230), (16) Real Estate (B250), (17) Claims Administration and Objections (B310), (18) Plan and Disclosure Statement (B320), and (19) General Bankruptcy (B410).

28.    The Invoices included with this Application identify each Firm attorney, paraprofessional, or staff person who provided services during the Application Period. The Invoices reflect the name of the person as well as the following, additional information: (1) his or her billing rate, (2) the total number of hours expended by that person, and (3) the total fees incurred. This information is also summarized in the Timekeeper Schedule.

29.    The Invoices also separate this same information by project category. In addition, the Task Code Schedule included with this Application totals the hours expended and fees incurred during the Application Period by project category. Finally, the narratives below summarize the services provided by the Firm's personnel by project category.

A.      **Case Administration (Category Code B110)**

30.     The category of **Case Administration** concerns activities arising out of coordination and compliance with Chapter 11 requirements. During the Application Period, this category covered time spent by Firm attorneys participating in the standing weekly conference calls among counsel for the Debtor, the Additional Debtors, and the Committee. It also covered communications between Firm personnel and the Court regarding hearings, transcripts, and related materials, as well as the process of obtaining transcripts, filing required certificates of service, and fulfilling various other administrative tasks not covered by any other project categories.

31.     The Firm expended <u>472.0</u> hours of professional time on services in this category. The Firm's professional fees in this category total <u>$183,202.50</u>. Therefore, the Firm's blended hourly rate is <u>$388.14/hour</u>.[11]

B.      **Asset Analysis and Recovery (Category Code B120)**

32.     The category of **Asset Analysis and Recovery** concerns the identification and review of potential assets of the Debtor's bankruptcy estate. For instance, this category includes all the time the Firm spent pursuing the lengthy asset-discovery and motion-to-compel process initiated by the Committee, which was directed at identifying assets of both the Debtor's bankruptcy estate and of the Apostolates and at uncovering key information about these entities' internal processes. Among other things, this discovery initiative required the Committee to file and prosecute the Committee's *Motion to Compel* [ECF Doc. No. 804]. The hearing on this motion to compel was continued multiple times throughout the Application Period and became a focal point of disputes between the Debtor and the Committee for some time during the Application Period. Additionally, this project category also encompasses time the Firm spent working with the

---

[11] The blended rates as broken out by project categories do not reflect the discounts and "no charge" entries on the Invoices. Therefore, the actual blended rates are lower.

15

Committee's financial advisor in conjunction with this asset-discovery process and assisting the financial advisor's personnel in modeling the Debtor's and the Apostolates' business processes in order to determine their capacity to fund the Settlement Trust.

33.     Besides covering this discovery process, the category of Asset Analysis and Recovery also encompasses time spent addressing the disposition of assets owned by non-debtor affiliates, such as the sale of the properties associated with various Catholic parishes, the Notre Dame Health System, St. Anthony's Gardens, and Christopher Homes. (For its part, the Christopher Homes sale should increase the Settlement Trust by $70,000,000 once that transaction closes.) Some of the time the Committee spent analyzing and evaluating the Debtor's extensive property lists—particularly the Debtor's personal (or movable) property—also falls within this project category. Developing a complete understanding of the Debtor and Apostolate assets was critical to formulating a plan that would adequately compensate survivors while also satisfying plan feasibility requirements.

34.     The Firm expended <u>1,128.8</u> hours of professional time on services in this category. The Firm's professional fees in this category total <u>$579,160.00</u>. Therefore, the Firm's blended hourly rate is <u>$513.08/hour</u>.

## C.     Asset Disposition (Category Code B130)

35.     The category of **Asset Disposition** concerns sales of estate assets of the Debtor (and the Additional Debtors after their cases were filed) under Bankruptcy Code § 363, the abandonment of estate assets, and other matters related to transactions involving Chapter 11 debtors and their estates. The Firm expended considerable time in this category. Among other things, this category covers nearly all the time the Firm spent evaluating, responding to, and otherwise addressing the many property sales that the Debtor asked this Court to approve during

16

the Application Period. These included the sales of the Howard Avenue Main Site, the Hope Haven property at 1130 Barataria Boulevard, the Bishop Perry Center at 1941 Dauphine Street, the property located at 1032 South Rampart Street and 1042 South Rampart Street, and the former Our Lady of Lourdes Site at 2400 Napolean Avenue—to name just a few. Additionally, this category included time spent by Firm personnel working with the Debtor, the Debtor's real-estate advisor, and the Commercial Committee on these specific sales before the Debtor filed motions to approve those sales in the Bankruptcy Case. Lastly, this category also encompassed the Committee's review and assessment of various post-petition leasing transactions that the Debtor entered into after the Petition Date, such as the Debtor's motion [ECF Doc. No. 1584] to lease the immovable property located at 1000 N. Starrett Road in Metairie, Louisiana to Jefferson Community Action Programs for use as a Head Start school.

36.     The Firm expended <u>778.1</u> hours of professional time on services in this category. The Firm's professional fees in this category total <u>$414,800.00</u>. Therefore, the Firm's blended hourly rate is <u>$533.09/hour</u>.

**D.     Relief from Stay/Adequate Protection Proceedings (Category Code B140)**

37.     The category of **Relief from Stay/Adequate Protection Proceedings** covers the termination or continuation of the automatic stay in the Bankruptcy Case under 11 U.S.C. § 362 as well as motions for adequate protection under 11 U.S.C. § 361. This category includes all the time the Committee spent responding to and otherwise addressing the many stay-relief motions filed during the Bankruptcy Case, such as the motion [ECF Doc. No. 1779] to permit certain post-petition class-action litigation to proceed against the Debtor. Additionally, this category included all the time spent in connection with a motion for relief from stay brought by Travelers [ECF Doc. No. 4404] as well as the Committee's efforts to obtain stay relief for sexual abuse survivors who

17

supported the Seventh Joint Plan so that they could proceed with litigation outside of this Court against any non-settling insurers.

38.     The Firm expended <u>273.3</u> hours of professional time on services in this category. The Firm's professional fees in this category total <u>$143,667.50</u>. Therefore, the Firm's blended hourly rate is <u>$525.68/hour</u>.

**E.      Meetings & Communications with Creditors (Category Code B150)**

39.     The category of **Meetings & Communications with Creditors** encompasses all services related to communicating with the Debtors' creditors and the Committee, such as consulting with Committee members and attending regular Committee meetings. During the Application Period, the Committee typically held meetings every other week and, during especially active periods, more often than that. At the same time, Firm personnel also met regularly with the Committee members' state-court counsel in separate meetings—time also applied to this project category. Besides these communications with Committee members, this project category included time that Firm personnel spent directly responding to inquiries from individual abuse survivors who were not themselves members of the Committee. The volume of these survivor inquiries varied during the Bankruptcy Case and spiked shortly before the deadline to vote for the Solicitation Plan on October 29, 2025. Finally, this category encompassed all time spent preparing for and hosting the many town-hall meetings organized by the Committee during the Application Period. By engaging in these communications, the Committee was able to provide support to *pro se* claimants attempting to navigate an extremely complicated bankruptcy and plan process.

40.     The Firm expended <u>1,570.3</u> hours of professional time on services in this category. The Firm's professional fees in this category total <u>$827,100.00</u>. Therefore, the Firm's blended hourly rate is <u>$526.71/hour.</u>

18

**F.**     **Fee/Employment Applications (Category Code B160)**

41.     The category of **Fee/Employment Applications** involves, *inter alia*, preparing and filing employment and fee applications as well as circulating monthly fee statements to the requisite notice parties. The Firm filed multiple employment applications for various professionals during the Bankruptcy Case (including for itself) and filed sixteen (16) separate interim fee applications in accordance with this Court's Complex Case Procedures. The Firm also submitted monthly fee statements to the required notice parties during the Application Period. Lastly, this project category includes all time the Firm expended preparing this Application and various other final fee applications for certain Committee professionals. The time the Firm spent preparing final fee applications includes an estimated total of 15.0 hours (for a fee of $9,000) not reflected on any Firm invoice. The Firm included this additional time estimate to cover the fees expended after the conclusion of the Seventeenth Period on February 25, 2026.

42.     The Firm expended 1,399.3 hours of professional time on services in this category (which includes the estimated 10.0 hours). The Firm's professional fees in this category total $657,972.50 (which includes the estimated $9,000 fee). Therefore, the Firm's blended hourly rate is $470.22/hour.

**G.**     **Fee/Employment Objections (Category Code B170)**

43.     The category of **Fee/Employment Objections** includes all time spent evaluating (and, where appropriate, objecting to) employment and fee applications filed by other estate professionals in the Bankruptcy Case. Among other things, the Committee routinely assessed the fees and expenses incurred by the Debtor's professionals and corresponded with them about these fees and expenses during the Application Period. When appropriate, the Committee requested that the Debtor's professionals explain or reduce their requested fees and expenses. Conducting oversight of the fees and expenses of the Debtor (and other estate professionals) represents one of

19

the principal responsibilities of the Committee. Additionally, the Committee also evaluated the terms under which the Debtor sought to retain various professionals and objected to terms that were unreasonable or outside of the market. Firm professionals played a leading role in these efforts, and all time incurred fulfilling such oversight functions falls within the project category of Fee/Employment Objections.

44. The Firm expended <u>216.3</u> hours of professional time on services in this category. The Firm's professional fees in this category total <u>$107,025.00</u> for a blended hourly rate of <u>$494.80/hour</u>.[12]

## H. Avoidance Action Analysis (Category Code B180)

45. The category of **Avoidance Action Analysis** consists principally of time spent by the Firm analyzing potentially fraudulent transfers, preferences, single-business enterprise claims, and other viable avoidance and insider actions under Bankruptcy Code §§ 544-549 that the Debtor's bankruptcy estate held against various prepetition transferees of Debtor property. Beginning in 2022, the Committee and the Commercial Committee together reviewed the Debtor's business records at length and evaluated potentially avoidable pre-petition transfers made by the Debtor to its affiliates and various third-parties. To preserve these claims, the Committee and Commercial Committee obtained tolling agreements with the transferees who received the largest of these transfers. The Debtor's affiliates known as the Apostolates (most of whom eventually became Additional Debtors) faced the largest potential liability. This Court approved the tolling agreement preserving the Debtor's claims against the Apostolates pursuant to its *Order Approving*

---

[12] Applicable precedent prohibits the Firm from receiving compensation for responding to objections to its own fee applications. The Firm therefore did not charge the Debtor's or Additional Debtors' bankruptcy estates for time spent on such matters, although the Invoices do reflect these entries and categorize them in the Fee/Employment Objections project category. The Firm's voluntary and mandatory reductions from its invoiced fees are described in more detail below.

*Tolling Agreement* [ECF Doc. No. 1406] entered on April 1, 2022. The Committee and Commercial Committee subsequently obtained extended tolling agreements with these tolling parties (including the Apostolates) in 2023, 2024, and 2025. Much of the time spent obtaining these agreements and evaluating these avoidance actions falls within the category of **Avoidance Action Analysis**

46.     The Firm expended <u>93.8</u> hours of professional time on services in this category. The Firm's professional fees in this category total <u>$44,442.50</u> for a blended hourly rate of <u>$473.80/hour</u>.

I.      **Assumption/Rejection of Leases & Executory Contracts (Category Code B185)**

47.     The category of **Assumption/Rejection of Leases & Executory Contracts** covers time spent analyzing prepetition unexpired leases and executory contracts in order to determine whether the Debtor's bankruptcy estate should assume or reject those arrangements. The Firm's professionals spent some limited time in August 2020 in this project category examining a handful of executory contracts to which the Debtor was a party to determine whether these contracts should be assumed or rejected.

48.     The Firm expended <u>0.2</u> hours of professional time on services in this category. The Firm's professional fees in this category total <u>$100.00</u> for a blended hourly rate of <u>$500.00/hour</u>.

J.      **Other Contested Matters (Category Code B190).**

49.     The category of **Other Contested Matters** covers litigation and contested matters that do not properly fall within any other project categories. The Firm expended considerable time in this project category during the Application Period. At the beginning of the Bankruptcy Case in 2020, the Committee litigated its *Motion to Dismiss Chapter 11 Case* [ECF Doc. No. 203] (the "<u>Committee Motion to Dismiss</u>") that sought to dismiss this Bankruptcy Case. This litigation

involved extensive discovery and documentary evidence that resulted in this Court's issuing a nearly thirty-page opinion on August 4, 2021 [ECF Doc. No. 991]. The Firm assigned all fees associated with the Committee Motion to Dismiss to this project category.

50.      Additionally, in 2022 the Committee and the Firm found themselves embroiled in extended, contentious proceedings resulting from the breach of the Court's protective order by an attorney for one of the Committee's former members. The U.S. Trustee's investigation of the breach consumed hundreds of hours of professional time and resulted in this Court's eventually issuing an *Order* [ECF Doc. No. 1574] on June 7, 2022 removing three (3) of the Committee's members and ordering the Committee's reconstitution. All fees associated with the litigation that resulted from the breach of the Court's protective orders fall within this Other Contested Matter project category. The fees associated with the protective-order breach represent the largest, single component of fees in this project category.

51.      This project category also covers several other, smaller matters. These include the time the Committee and the Firm spent responding to requests for information submitted by this Court's appointed Rule 706 expert witness, Mohsin Meghiji, as well as preparing and submitting a statement in response to that report. In addition, the Firm also included all the time it incurred responding to this Court's April 28, 2025 *Order to Show Cause* [ECF Doc. No. 3949] as to why this Court should not dismiss this Bankruptcy Case (which was mooted when the Seventh Joint Plan was confirmed) as well as the *Motion to Dismiss* [ECF Doc. No. 4158] filed by the Bond Trustee in July 2025 (which the Bond Trustee withdrew once it no longer opposed plan confirmation).

52.      The Firm incurred <u>2,366.4</u> hours of professional time on services in this category. The Firm's professional fees in this category total <u>$1,020,917.50</u>. Therefore, the Firm's blended

hourly rate is $431.42/hour.

**K.**     **Non-Working Travel (Category Code B195)**

53.     The category of **Non-Working Travel** covers time that Firm personnel incurred traveling for Committee-related matters. For the Firm, nearly all this time consists of one Firm attorney's traveling to and from New Orleans, Louisiana in order to attend a limited number of critical, in-person, mediation sessions and Court hearings. (In most circumstances, this attorney did not travel for these matters and instead participated by telephone or videoconference.)  In any case, the Firm either, for all time spent on this category, billed its time at half the normal rate (when the Firm's billing software permitted) or charged for only half of the time its attorney spent travelling (when the Firm's billing software did not permit a reduced rate for just one project category). The effect in either situation was to bill all non-working travel time at half the attorney's ordinary capped rate, as required by the U.S. Trustee guidelines.

54.     The Firm expended 16.9 hours of professional time on services in this category. The Firm's professional fees in this category total $6,960.00 for a blended hourly rate of $411.83/hour.

**L.**     **Business Operations (Category Code B210)**

55.     The category of **Business Operations** concerns time spent in connection with a debtor-in-possession's operating its business while in Chapter 11, including employment matters, vendor and tenant issues, and the resolution of "first-day" motions.

56.     Firm personnel incurred substantial time in this project category early in this Bankruptcy Case addressing a variety of different matters involving the Debtor's operations. This time included, among other things, the Committee's various responses to the Debtor's first-day motions and assessments of its daily operations. Additionally, Firm attorneys also spent time

23

evaluating the Debtor's internal procedures for responding to sexual abuse claims. This time was also assigned to this project category. Finally, this project category encompasses nearly all the time spent reviewing and analyzing the Debtor's monthly operating reports.

57.     The Firm expended <u>224.9</u> hours of professional time on services in this category. The Firm's professional fees in this category total <u>$110,270.00</u> for a blended hourly rate of <u>$490.31/hour</u>.

**M.     Tax Issues (Category Code B240)**

58.     The category of **Tax Issues** includes analysis of tax issues and the preparation of federal and state tax returns for the debtor-in-possession. The Firm expended only one tenth (0.1) of an hour in this category during the Application Period. Specifically, it examined a limited tax issue in October 2020. Other than this entry, the Firm incurred no time in this category.

59.     The Firm expended <u>0.1</u> hours of professional time on services in this category. The Firm's professional fees in this category total <u>$50.00</u> for a blended hourly rate of <u>$500.00/hour</u>.

**N.     Employee Benefits/Pensions (Category Code B220)**

60.     The category of **Employee Benefits/Pensions** encompasses time spent analyzing and addressing employee and retiree benefits issues, such as compensation, bonuses, severance, health benefits, and pensions and retirement plans. The Firm expended some time in this category during the Application Period—principally in connection with the Committee's motion [ECF Doc. No. 1389] to require the Debtor to terminate pension benefits to credibly accused priests and other persons. After the Court entered its *Memorandum Opinion and Order* [ECF Doc. No. 1759] granting this motion over the Debtor's opposition, Fr. William O'Donnell sought reconsideration of the Court's decision [ECF Doc. No. 1782], and the Committee objected to that request [ECF Doc. No. 1893]. The Court ultimately denied Father O'Donnell's request for reconsideration [ECF

Doc. No. 1996] after extensive briefing and a lengthy hearing in which Firm personnel played a key role opposing Fr. O'Donnel's request. In addition to this matter, Committee personnel also worked with other Committee professionals throughout the Application Period to evaluate the breadth and scope of the contingent liabilities associated with the Debtor's prepetition pension, health, and other benefit obligations.

61.     The Firm expended 51.7 hours of professional time on services in this category. The Firm's professional fees in this category total $21,840.00 for a blended hourly rate of $422.44/hour.

**O.     Financing/Cash Collateral (Category Code B230)**

62.     The category of **Financing/Cash Collateral** includes all time expended on matters arising under Bankruptcy Code § 361, 363, and 364, including motions by the debtor-in-possession to use cash collateral, to grant adequate protection to secured lenders, and to obtain post-petition credit. This category also covers time spent analyzing a Chapter 11 debtor's secured financing arrangements. The Firm expended some time in this category early in the Application Period. The Firm represented the Committee in its negotiations with the Debtor and Hancock Whitney Bank ("HWB") over the Debtor's use of HWB's cash collateral and the Debtor's post-petition right to use certain HWB-issued credit cards. This Court eventually approved these agreed-upon arrangements as reflected in both a *Final Order* [ECF Doc. No. 174] approving the Debtor's use of HWB's cash collateral and an Order [ECF Doc. No. 758] authorizing the Debtor to obtain post-petition credit from HWB.

63.     The Firm expended 18.5 hours of professional time on services in this category. The Firm's professional fees in this category total $7,975.00 for a blended hourly rate of $431.08/hour.

### P.  Real Estate (Category Code B250)

64.    The category of **Real Estate** covers general topics related to real estate other than time spent addressing specific property sales (which fall under the category of Asset Disposition (B130) instead of Real Estate). During the Application Period, the Committee evaluated the Debtor's real estate portfolio at length and prepared a comprehensive report regarding the Debtor's properties for the Committee to review and analyze so that the Committee could better understand the scope of the Debtor's considerable property holdings. The Firm continued updating this report and analyzing the Debtor's real estate holdings throughout the Application Period. This time was all assigned to the category of Real Estate. Additionally, beginning in 2023, the Debtor, the Debtor's real-estate advisor, the Committee, and the Commercial Committee met regularly to review the Debtor's real estate holdings, assess the Debtor's marketing process for particular properties, and otherwise coordinate their efforts in this area. Finally, the Committee also examined various Debtor attempts during the Application Period to enact a standing procedure for the sale of potentially surplus real estate by the Debtor. All this time falls under this project category.

65.    The Firm expended 263.1 hours of billable professional time on services in this category. The Firm's professional fees in this category total $142,210.00. Therefore, the Firm's blended hourly rate is $540.52/hour.

### Q.  Claims Administration & Objections (Category Code B310)

66.    The category of **Claims Administration and Objections** includes all legal services that relate to claims against the Debtor and Additional Debtors, including the analysis and examination of both abuse and non-abuse claims filed against them. The Firm expended substantial time in this category responding during the Application Period.

26

67.     This category covers time the Firm expended on the Committee's behalf early in this Application Period negotiating (and litigating) with the Debtor over the terms of the sexual-abuse proof-of-claim process. The extensive proceedings on this matter eventually culminated in this Court's entry of the Bar Date Order [ECF Doc. No. 461] on October 1, 2020. After the March 1, 2021 bar date for filing sexual abuse proofs of claim had passed, the Committee prepared a comprehensive analysis of these sexual-abuse proofs of claim. Creating and maintaining this analytical database required considerable time and analysis on the part of Firm personnel throughout the Application Period. All time spent preparing and updating this database falls under the category of Claims Administration and Objections. Additionally, this category also covers all time the Firm spent reviewing, analyzing, and/or responding to the large number of motions filed by sexual-abuse survivors that sought to permit the filing of sexual abuse claims after the bar date for such claims. These motions were filed throughout the Application Period and, once filed, required that the Committee's claims database be updated continually.

68.     Finally, toward the end of the Application Period on July 11, 2025, the Bond Trustee filed a motion to estimate the sexual abuse claims [ECF Doc. No. 4136] as part of its strategy for opposing plan confirmation. The Firm's attorneys helped prepare the Committee's objection [ECF Doc. No. 4267] to this motion and appeared at the hearing on the motion, in which the Court ultimately denied it [ECF Doc. No. 4299].

69.     The Firm expended 931.4 hours of professional time on services in this category. The Firm's professional fees in this category total $418,337.50. Therefore, the Firm's blended hourly rate is $449.15/hour.

**R.      Plan and Disclosure Statement (Category Code B320)**

70.     The category of **Plan and Disclosure Statement** concerns the formulation and

presentation of a Chapter 11 plan and disclosure statement and all activities related to the disclosure and plan-confirmation process. The Firm expended far more time during the Application Period on matters in this category than in any other.

71.     First, in the earliest stages of the Application Period, this category covers the Committee's initial negotiations with the Debtor and the Apostolates over the terms of a hypothetical Chapter 11 plan. Similarly, it also encompasses all Firm research on issues related to the Louisiana prescriptive period and its impact on the plan-confirmation process as well as various discovery efforts and related concerns.

72.     Second, this project category encompasses all time expended on the mediation process that occurred during this Bankruptcy Case. This includes early efforts to identify potential mediators and to request that this Court appoint (and reappoint) the specific Mediators that were eventually chosen. Furthermore, once the mediation process commenced, Firm personnel spent long hours drafting mediation statements on the Committee's behalf, preparing for mediation sessions, communicating with the Mediators and the other mediation parties, and participating in extended mediation sessions both in-person and remotely. This years-long mediation process bore fruit when the MOU was finalized, executed, and implemented.

73.     Third, the category of Plan and Disclosure Statement also covers the extensive negotiations, meetings, and related back-and-forth among the Committee, the Debtor, and the Apostolates (and, eventually, the Additional Debtors) over the non-monetary provisions that would be included in any confirmed Chapter 11 plan. As explained above, these non-monetary reforms were intended to improve the Debtor's and the Additional Debtors' internal processes for handling and responding to sexual abuse claims. These non-monetary negotiations were protracted and difficult, continuing for years right up to plan confirmation. Ultimately, the parties agreed on a

28

comprehensive suite of non-monetary reforms that were incorporated into the Seventh Joint Plan as the Non-Monetary Plan Provisions (which were attached as Exhibit E to that plan).

74.     Fourth, the category of Plan and Disclosure Statement includes all time expended by the Firm preparing and drafting the Committee Plan and negotiating with the Debtor over the terms of both the Committee Plan and the Debtor Plan. Although this Court did not confirm either the Committee Plan or the Debtor Plan, the Seventh Joint Plan (and all previous iterations of the joint plan advanced by the Debtor, the Additional Debtors, and the Committee) represented, among other things, a harmonization of the parties' original competing plans. These negotiations over the competitive plans thus laid the foundation for the successful confirmation of the Seventh Joint Plan.

75.     Fifth, all time the Firm spent obtaining confirmation of the MOU parties' joint plan after the MOU was executed in May 2025 also falls within the category of Plan and Disclosure Statement. Firm personnel helped draft every iteration of the joint plan and disclosure statement, communicated with all relevant parties-in-interest (both those who supported and those who opposed the joint plan), and labored to obtain creditor support for the Solicitation Plan after this Court approved the Solicitation Disclosure Statement on August 12, 2025. Additionally, the Firm played a leading role in the ensuing plan-related discovery and litigation. Among other things, the Firm produced thousands of documents on behalf of the Plan Proponents in a few short months, submitted briefs supporting the joint plan, sat for a deposition, and opposed the Plan Opponents' objections to the joint plan. Finally, Firm personnel participated in the plan-confirmation hearings in November and December 2025 and, together with the Debtor and the Additional Debtors, helped negotiate the agreed resolutions that were incorporated into the Seventh Joint Plan. These agreements resolved plan opposition by Certain Survivors and the Bond Trustee, paving the way

for a nearly fully consensual confirmation. The Firm's efforts on the Committee's behalf were rewarded with near universal support for the Seventh Joint Plan among sexual abuse survivors, (Ballot Tabulation, ECF Doc. No. 4543, p. 5). As noted above, this Court confirmed the Seventh Joint Plan on December 8, 2025, and it went effective on December 26, 2025.

76.     The Firm expended <u>6,802.7</u> hours of professional time on services in this category. The Firm's professional fees in this category total <u>$3,684,995.00</u>. Therefore, the Firm's blended hourly rate is <u>$541.70/hour</u>.

## S.     <u>General Bankruptcy (Category Code B410)</u>

77.     The category of **General Bankruptcy** includes time spent on all matters related to the Bankruptcy Case that do not readily fall under any of the other project categories. The Firm expended some limited time in this category at the beginning of the Bankruptcy Case. Among other things, Firm personnel drew up initial task lists for the Committee, reviewed various Debtor motions, and addressed the resignation of HWB as the first indenture trustee under the Bonds.

78.     The Firm expended <u>16.5</u> hours of professional time on services in this category. The Firm's professional fees in this category total <u>$8,250.00</u> for a blended hourly rate of <u>$500.00/hour</u>.

## VI.     <u>REQUEST FOR REIMBURSEMENT OF EXPENSES INCURRED</u>

79.     Besides providing legal services, the Firm also incurred out-of-pocket expenses of **<u>$237,798.67</u>** while representing the Committee in the Bankruptcy Case. The Firm has attached an Expense Schedule as **<u>Exhibit "3"</u>** to this Application.[13] This Expense Schedule lists the total expenses incurred during the Application Period by expense category. In addition, the Expense Schedule breaks out the expenses as follows: (i) <u>$205,557.99</u> in expenses approved by this Court

---

[13] A more detailed record of the expenses appears in the Firm's Invoices attached to this Application.

250911217v2

on an interim basis during the Approved Period, (ii) $30,740.68 in expenses incurred during the Fifteenth Period and Seventeenth Period, and (iii) $1,500.00 in expenses estimated for the costs of printing and mailing this Application during the Estimated Period.[14] This Court has not approved the latter two groups of expenses.

80.     The Firm's expenses in the Application Period were necessary and reasonable. Expenses for computerized research and miscellaneous business expenses were billed at actual cost. Outside copying, printing, and postage charges were incurred serving pleadings and other relevant documents on interested parties in the Bankruptcy Case. These charges were significant because of the large number of parties on the Debtor's service list and the substantial volume of filings the Committee served during the Application Period. Furthermore, Firm attorneys also conducted PACER, LEXIS, and Westlaw research when necessary to accomplish various tasks. Firm attorneys only used these resources when the benefits of computerized research outweighed the costs because any decision to use traditional research methods alone would have cost substantially more than the electronic resources would. At the end of the Application Period, the Firm also incurred significant expenses in connection with the plan-related discovery process. These included the data-input, storage, and retention costs associated with collecting, analyzing, and producing thousands of pages of electronic documents on very short notice in response to discovery requests served by parties opposing plan confirmation. These electronic discovery and technology expenses were charged by Troutman eMerge, the Firm's in-house litigation- and discovery-support provider. The Firm has not requested general overhead expenses.

81.     The Firm requests that the Court allow the Firm **$237,798.67** in reimbursable expenses the Firm incurred on the Committee's behalf during the Application Period.

---

[14] This Court separately denied $1,482.17 in expenses during the Approval Period. The Firm is not seeking approval of these previously denied expenses.

31

## VII.    VOLUNTARY AND MANDATORY REDUCTIONS

82.     For purposes of this Application, the Firm made certain reductions from the award sought. The Invoices reflect reductions of **$534,348.00 (1,138.5 billable hours)** for work performed but <u>not</u> charged during the Application Period. These reductions appear on the Invoices under entries marked as "No Charge" and show both the fees and the hours not charged.

83.     In addition, under the First Application, the Firm also reduced its fee sought under the First Application by a flat amount of <u>$5,600.00</u>. This reduction does not appear on any Invoices submitted with the First Application. It instead represents a flat reduction from the total amount sought. The Court approved this $5,600 reduction when it approved the First Application.

84.     Taken together, the total amount of all reductions from the amounts sought by the Firm for hours expended during the Application period is **$539,948.00** (**1,138.5** billable hours).

## VIII.    STATEMENT IN COMPLIANCE WITH RULE 2016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

85.     As more fully described in the Retention Application, the Committee agreed to retain the Firm as its co-counsel and to compensate the Firm on an hourly basis at its ordinary and customary rates (but subject to the rate caps applicable in the Bankruptcy Case), plus reimbursement of the actual and necessary expenses the Firm has incurred in the Bankruptcy Cases. All compensation for services rendered, and reimbursement for expenses incurred, are subject to this Court's approval in accordance with the Retention Order, Bankruptcy Code §§ 330 and 331, the Bankruptcy Rules, the Local Bankruptcy Rules, and other procedures that this Court may fix. No entity has promised to compensate the Firm for any services rendered, or reimburse it for expenses incurred, in the Bankruptcy Case except as this Court may approve.

86.     As of today's date, the Firm has received payments totaling <u>$7,623,505.49</u> in connection with fifteen (15) of the sixteen (16) previous interim fee applications approved by

the Court on, respectively, December 29, 2020, May 20, 2021, October 26, 2021, December 14, 2021, May 19, 2022, December 13, 2022, December 27, 2022, April 14, 2023, August 11, 2023, December 19, 2023, April 25, 2024, August 16, 2024, April 21, 2025, and December 17, 2025. Additionally, the Firm has also received a total of $502,795.83 in interim payments from the Debtor under Section XIII(B) of the Court's December 4, 2019 *General Order Regarding Procedures for Complex Chapter 11 Cases*, on account of the following outstanding Invoices in the Fifteenth Period and Seventeenth Period, which have not yet been approved by this Court:

| Invoice Number | Invoice Date | Invoice Amount | Payment Date | Payment Amount | Amount Still Owed |
|---|---|---|---|---|---|
| **Troutman Fifteenth Fee Application** | | | | | |
| 131957645 | April 24, 2025 | $131,615.59 | June 4, 2025 | $131,615.59 | $0.00 |
| 131981587 | May 29, 2025 | $137,986.52 | August 20, 2025 | $110,866.02 | $27,120.50 |
| 132003684 | June 30, 2025 | $143,136.02 | August 20, 2025 | $114,932.52 | $28,203.50 |
| 132025087 | July 29, 2025 | $181,665.70 | August 20, 2025 | $145,381.70 | $36,284.00 |
| **Troutman Seventeenth Fee Application and Estimated Fee** | | | | | |
| 132130965 | December 29, 2025 | $203,889.09 | -- | -- | $203,889.09 |
| 132186013 | February 26, 2026 | $179,175.26 | -- | -- | $179,175.26 |
| Estimated Fee | -- | $10,500 | -- | -- | $10,500 |
| | **GRAND TOTAL ≡** | **$987,968.18** | | **$502,795.83** | **$485,172.35** |

The Firm seeks approval and payment of the total amount of **$8,611,473.67** reflected on all the Invoices whose interim and final approval the Firm is seeking under this Application.

87.     No agreement or understanding exists between the Firm and any other entity for the sharing of any compensation or reimbursement (i) that the Firm may receive for services rendered in, or in connection with, this Bankruptcy Case or (ii) that such other entity has already received or may receive for services that entity rendered in, or in connection with this Bankruptcy Case, except that the Firm will share any compensation or reimbursement it receives in connection

33

with this Bankruptcy Case with its members, partners, associates, and other Firm employees (as originally disclosed in the Retention Application).

## IX.    STANDARDS RELEVANT TO AWARDING REASONABLE COMPENSATION AND REIMBURSEMENT OF EXPENSES

88.    Section 330 of the Bankruptcy Code authorizes the Court to award the Firm reasonable compensation for its actual and necessary legal services rendered and reimbursement of actual and necessary expenses incurred in the rendering of those legal services as counsel to the Committee in the Bankruptcy Case. Bankruptcy Code § 330(a)(1) provides as follows:

(a)(1)    After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or a professional person employed under section 327 or 1103—

(A)    reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and

(B)    reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

89.    This Application substantiates the total amount the Firm seeks for fees and expenses in accordance with the standards this Court applies to fee applications. The factors that courts in this jurisdiction consider when making a discretionary award of reasonable attorneys' fees and reimbursable expenses were originally described in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) (the "*Johnson* Factors"). The Fifth Circuit has applied the *Johnson* Factors to the determination of awards of attorneys' fees and expenses in bankruptcy cases. *In re First Colonial Corp. of Am.*, 544 F.2d 1291 (5th Cir. 1977), *cert. denied* 431 U.S. 904 (1977). Many of these *Johnson* Factors have now been codified at Bankruptcy Code § 330(a)(3). 11 U.S.C. § 330(a)(3).

90.    The *Johnson* Factors are summarized as follows: (1) the time and labor required;

34

(2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services; (4) the preclusion of other employment by the attorneys due to acceptance of the bankruptcy case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amounts involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[15] Based upon the services described in this Application, the Firm respectfully states that it has fully satisfied the standards prescribed by the *Johnson* Factors.

## **The Time and Labor Required**

91.     Firm attorneys and paraprofessionals, in the performance of legal services, expended **17,762.80**[16] hours during the (over five-year) Application Period for a total fee of **$8,373,675.00**. When one includes the 1,088.0 hours that was worked but not charged (for a total fee reduction of $505,780.50) and further reduces the total amount billed by the additional $5,600 deducted from the amount sought in the First Application, the Firm's blended hourly rate during the Application Period is **$471.42/hour**. This blended hourly rate represents a substantial reduction from the Firm's regular, published rate ranges, as noted below.

92.     The names of the professionals who worked on the Bankruptcy Case during the Application Period appear in the Timekeeper Schedule, which is attached as **Exhibit "1"** to this Application. This Timekeeper Schedule lists all Firm professionals, their respective positions, their then-prevailing rates, and the total hours they billed. This information also appears on the

---

[15] The factors enunciated in *Johnson* have been adopted by four other courts of appeals. *See Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green*, 778 F.2d 890, 896 (1st Cir. 1985); *Harman v. Levin*, 772 F.2d 1151, 1152-53 (4th Cir. 1985); *Mann v. McCombs*, 751 F.2d 286, 287-88 (8th Cir. 1984); *Yermakov v. Fitzsimmons*, 718 F.2d 1465, 1471 (9th Cir. 1983).

[16] This includes the additional 1,138.50 hours worked but not charged. Total billable hours charged were 16,624.3.

respective Invoices attached to this Application. As explained above, the Firm's hourly rates were capped at all times during the Application Period. Since 2023, those rate caps were as follows:

| Category of Professional | Capped Application Period Rates since 2023 |
|---|---|
| Partners | $600/hour |
| Counsel | $550/hour |
| Associates | $425/hour |
| Paralegals | $225/hour |
| Other Professionals & Support | $225/hour |
| Blended Hourly Rate Throughout Application Period | **$471.42/hr** |

93.     By comparison, the Firm's published rate ranges for all its attorneys and other professionals for the twelve-month period from January 1, 2025, through December 31, 2025, were as follows:

| Category of Professional | Firm Published Rate Ranges from 1/1/25-12/31/25 |
|---|---|
| Partners | $1,250/hour to $2,210/hour |
| Counsel | $810/hour to $1,770/hour |
| Associates | $750/hour to $1,120/hour |
| Paralegals, Other Professionals & Support | $160/hour to $690/hour |

94.     Thus, the blended hourly rate that the Firm charged during the Application Period represents a substantial reduction from the Firm's published rates for the period from January 1, 2025 to December 31, 2025. In light of these circumstances, the Firm submits that the time and labor these professionals expended in the Bankruptcy Case are appropriate and reasonable and that this *Johnson* Factor supports the Firm's requested award.

**The Novelty and Difficulty of the Questions Presented**

95.     The Bankruptcy Case presented many novel, difficult, and contentious questions during the five-and-a-half years between the Petition Date and the Effective Date of the Seventh

36

Joint Plan. The Firm need not list these matters again given how familiar this Court is with them. Addressing these complicated issues necessitated considerable legal expertise and a tremendous amount of work. The Firm and its professionals demonstrated that they had the requisite knowledge and skill to handle these questions during the Firm's representation of the Committee. This factor therefore favors granting the Firm its requested award.

### The Skill Required to Perform the Services

96.     Representing the Committee in the Bankruptcy Case required considerable skill and expertise in bankruptcy. The Firm employed attorneys and other professionals of varying levels of skill and expertise to efficiently resolve these issues. The Firm also strived to limit the number of attorneys who worked on this Bankruptcy Case and to use the most appropriate person for any given task. As explained above, the Firm's skilled representation of the Committee produced a confirmed Chapter 11 plan that ultimately enjoyed the support of 99.5% of all voting sexual abuse claims and established a Settlement Trust funded with $230,000,000 for the benefit of survivors.

97.     These results would not have occurred absent the skills and legal expertise of the Firm's professionals. While counsel for a number of abuse survivors worked hard alongside the Committee in negotiations throughout this Bankruptcy Case, only Committee counsel had the duty, mandate, skill, training, and expertise to finalize the complicated set of agreements, plan documents, disclosure statements, and other materials that allowed this case to reach its successful conclusion. Additionally, of the Committee's professionals, only the Firm had attorneys licensed to practice law in Louisiana—a critical asset given the complex issues of Louisiana law that arose during this Bankruptcy Case, such as, for example, the multiple extensions of the lookback window for filing sexual abuse claims that occurred while this case was pending.

98.     The compensation the Firm is requesting for the services rendered by its attorneys

and other professionals also compares favorably to the compensation awarded in other bankruptcy cases of a similar size and complexity. This factor supports the Firm's requested award.

**Preclusion of Other Employment Due to Acceptance of the Case**

99.     The Firm has not declined any representation solely because it served as counsel for the Committee in the Bankruptcy Case. However, the Firm did shift certain resources from matters involving other clients to address issues arising in the Bankruptcy Case. In many of these other cases, the Firm charges its regular hourly rates and is not subject to the rate caps applicable in the Bankruptcy Case. The Firm nevertheless staffed this matter appropriately notwithstanding the differential between its regular hourly rates and the capped rates applicable in this Bankruptcy Case. For these reasons, this factor favors granting the award the Firm has sought.

**The Customary Fee**

100.     The Firm computed the amount of compensation it seeks in this Application according to its customary rates and then applied the currently prevailing rate cap applicable to the Firm in the Bankruptcy Case. Typically, the monthly billing statements accompanying the Invoices disclosed the difference between the hourly compensation at the Firm's regular rates and the capped rates. The Firm also maintained detailed time and disbursement records for all legal services for which it seeks compensation. The rates charged for the Firm's legal services in the Bankruptcy Case are, as noted above, much lower than the Firm's published, hourly rates. Additionally, the Firm's capped rates in this Application are comparable to those of other similarly situated firms representing official creditor committees in other Chapter 11 cases of a similar size and complexity to this Bankruptcy Case. Lastly, the Firm's rates also reflect fee reductions totaling **$539,948.00** (**1,138.50** billable hours) during the Application Period.

101.     Considering all these circumstances, the Firm's blended hourly rate of

38

**$471.42/hour** is reasonable and reflects below-market rates for legal services in Chapter 11 bankruptcy cases of comparable size and complexity. Similarly, the amounts sought for the reimbursement of expenses reflect the prevailing rates for expense reimbursement by law firms similar in size and reputation to the Firm.

**Whether the Fee is Fixed or Contingent**

102.     The Firm's fees for services rendered in the Bankruptcy Case are based on its regular hourly rates and are subject to both the rate caps applicable to the Firm in this case and to this Court's approval in all respects. The Firm has not requested any contingent fee in the Bankruptcy Case.

**Time Limitations Imposed by the Client or Other Circumstances**

103.     Throughout the Application Period, the Firm had to respond to tight time-constraints and other circumstances that often arose at a moment's notice in the Bankruptcy Case. These matters typically required the Firm's immediate and exhaustive attention. The tightly compressed plan-discovery litigation during the last few months of the Application Period provides one example. As explained above, the Firm collected, analyzed, and produced thousands of documents to the Plan Opponents in approximately two (2) months. Producing these documents became critical to the ultimate success of the Plan Proponents' plan-confirmation process and helped ensure that the Seventh Joint Plan would be confirmed. The emergency nature of this and other matters demanded that the Firm's professionals respond on very short notice to complicated and developing events as they unfolded. This factor therefore supports the award sought.

**The Amount Involved and the Results Obtained**

104.     The Timekeeper Schedule and the Task Code Schedule summarize the individual tasks that Firm personnel performed during the Application Period (as well as the amounts charged

for those tasks). Detailed time records appear on the Invoices attached to this Application. These sources demonstrate that the total fees that the Firm seeks to approve in this Application are commensurate with the issues in this Bankruptcy Case and the successful result obtained for sexual abuse survivors. As explained above, the smashing success of this Bankruptcy Case strongly favors granting the Firm the fee award sought. These results—i.e., the funding of a $230 million Settlement Trust for sexual abuse survivors, plus the potential $75 million Travelers settlement— speak for themselves.

**The Experience, Reputation, and Ability of the Attorneys**

105.    The Firm's attorneys have considerable experience in bankruptcy and other areas of the law, possess a high level of expertise, and have excellent reputations in their communities. The Firm's bankruptcy attorneys have appeared in cases throughout the United States and have provided services to secured creditors, unsecured creditors, creditors' committees, and debtors-in-possession. In addition, the Firm's attorneys also speak and write on various legal topics in Texas, Louisiana, and elsewhere. This factor also favors granting the award sought.

**The "Undesirability" of the Bankruptcy Cases**

106.    Serving as co-counsel to the Committee posed challenges and difficulties for the Firm. The effective rates charged in the Bankruptcy Case were well below the Firm's standard hourly rates. As explained above, this Bankruptcy Case was complex, contentious, risky, and complicated throughout the five-and-a-half years when it remained pending. Under these circumstances, many firms comparable to the Firm might consider representing the Committee undesirable (although the Firm did not). Given these considerations, however, this factor weighs in favor of granting the Firm the fee award it seeks.

40

**The Nature and Length of the Professional Relationship with the Client**

107.    The Firm's engagement by the Committee commenced shortly after the Committee was formed. This factor is therefore neutral.

**Awards in Similar Cases**

108.    The fee award the Firm seeks compares favorably to awards granted in other bankruptcy cases with a size and complexity resembling this Bankruptcy Case. This Bankruptcy Case lasted far longer than many Chapter 11 cases of a similar size and complexity, including other diocesan bankruptcy cases. The Firm seeks an award that is reasonable given these circumstances, and therefore this *Johnson* factor also favors granting the Application.

109.    In conclusion, the *Johnson* Factors favor granting the Firm the fee and expense award it seeks.

## X.    CONCLUSION

110.    The fee and expense award the Firm seeks in this Application is justifiable and appropriate. This Application demonstrates that the Firm is entitled to this award. This Application and the Firm's request for payment meet all the criteria for granting a final award of fees and expenses to the Firm, as set forth in the Retention Order, Bankruptcy Code §§ 330 and 331, the Bankruptcy Rules, the Local Bankruptcy Rules, and this Court's Complex Case Procedures.

111.    The Firm requests that this Court allow the Firm, on a final basis, an award for fees and expenses incurred during the Application Period equal to **$8,611,473.67**. The requested award consists of **$8,373,675.00** in fees and **$237,798.67** in expenses for the Application Period.

250911217v2

**WHEREFORE** Troutman Pepper Locke LLP respectfully requests that the Court enter an order: (i) approving this Application; (ii) allowing, on a final basis, the reasonable and necessary attorneys' fees and expenses claimed herein as allowed administrative expenses of the Debtor's estate under Bankruptcy Code § 503; (iii) directing the Debtor to pay these amounts on a final basis; and (iv) granting the Firm such other and further relief to which it may be justly entitled.

Dated: February 27, 2026

Respectfully submitted,

*/s/ W. Steven Bryant*
W. Steven Bryant (*admitted pro hac vice*)
Texas Bar. No. 24027413
Federal I.D. No. 32913
Troutman Pepper Locke LLP
300 Colorado St., Suite 2100
Austin, Texas 78701
Telephone: (512) 305-4726
Facsimile: (512) 305-4800
Email: steven.bryant@troutman.com

-and-

Bradley C. Knapp (La #35867)
Omer F. Kuebel, III (La #21682)
Troutman Pepper Locke LLP
601 Poydras Street, Suite 2660
New Orleans, Louisiana 70130-6036
Telephone: (504) 558-5210
Facsimile: (504) 910-6847
Email: brad.knapp@troutman.com
         rick.kuebel@troutman.com

*Former Co-Counsel to the Official Committee of Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby caused a copy of the foregoing *Application* to be served on February 27, 2026 upon all parties by electronic case filing for those parties receiving notice via the Court's Electronic Case Filing system.

*/s/ W. Steven Bryant*
W. Steven Bryant

43