## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 20-10846** |
| | § | |
| **THE ROMAN CATHOLIC CHURCH OF** | § | **CHAPTER 11** |
| **THE ARCHDIOCESE OF NEW** | § | |
| **ORLEANS,** | § | **COMPLEX CASE** |
| | § | |
| **DEBTORS.[1]** | § | **SECTION A** |

## MEMORANDUM OPINION AND ORDER

Before the Court are objections filed by Certain Abuse Survivors[2] to interim fee applications filed by counsel to the now-Reorganized Debtor and counsel to the former Official Committee of Unsecured Creditors (the "Committee"). For the following reasons, the Court finds that, at this point, Certain Abuse Survivors do not have standing to object to the pending interim fee applications or to any final fee applications filed by former estate and Committee professionals.

## JURISDICTION

This Court has jurisdiction to hear and determine the contested matter before it pursuant to 28 U.S.C. § 1334(b) and the matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2). *See U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 303–06 (5th Cir. 2002). Further, the confirmed joint plan reserves the jurisdiction of this Court to "determine, adjudicate, or decide any other applications, adversary proceedings, contested matters, and any

---

[1]     On November 13, 2025, this Court entered an Order directing joint administration of the chapter 11 bankruptcy case of The Roman Catholic Church of the Archdiocese of New Orleans with 157 cases filed by certain Archdiocesan parishes, suppressed Archdiocesan parishes, and Archdiocesan agencies (collectively, the "Additional Debtors"). [ECF Doc. 4603]. On December 8, 2025, this Court entered an Order confirming a joint plan of reorganization, [ECF Doc. 4767], and, on December 29, 2025, the jointly administered debtors filed a *Notice of Occurrence of the Effective Date* of that plan, [ECF Doc. 4817]. The Court entered final decrees and closed the cases filed by the Additional Debtors in January 2026.

[2]     "Certain Abuse Survivors" are 81 individuals identified in counsel's *Statement Pursuant to Rule 2019 of the Federal Rules of Civil Procedure*, [ECF Doc. 2340], filed in this case on June 20, 2023.

other matters pending on the Effective Date" and "hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 330, 331, and 503(b) of the Bankruptcy Code." [ECF Doc. 4762, §§ 13.1(b) & (k)].[3]

## RELEVANT BACKGROUND

### A. The Retention and Compensation of Professionals, Emerging Fee Disputes, and the Road to Plan Confirmation

The Roman Catholic Church of the Archdiocese of New Orleans (referred to herein as the "Archdiocese" or "Debtor" or, post-confirmation, the "Reorganized Debtor") filed a voluntary petition on May 1, 2020, seeking bankruptcy relief under chapter 11 of the Bankruptcy Code. [ECF Doc. 1]. The Court designated the Archdiocese's bankruptcy case as "complex" under its *Procedures for Complex Chapter 11 Cases* ("Complex Case Procedures")[4] based on the amount of debt scheduled by the Archdiocese, the number of parties in interest, and the presence of publicly traded claims with those creditors being represented by an indenture trustee. [ECF Doc. 18]. At the time of the Archdiocese's bankruptcy filing, there were over thirty pending lawsuits filed in Louisiana state court between 2018 and 2020 by individuals alleging claims of past sexual abuse by priests employed or supervised by the Archdiocese and the complicity of the Archdiocese in that abuse. On May 20, 2020, the Office of the United States Trustee ("UST") constituted the Committee; ultimately, the membership of the Committee included only individuals whose claims against the Archdiocese were premised on allegations of sexual abuse.[5]

---

[3]    Capitalized terms not otherwise defined are given the meanings found in the *Seventh Amended Modified Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of December 8, 2025* (the "Confirmed Joint Plan"), [ECF Doc. 4762], confirmed by this Court on the same date, [ECF Doc. 4767].

[4]    This Court's Complex Case Procedures are available at https://www.laeb.uscourts.gov/.

[5]    Although the membership of the Committee was adjusted on occasion, the Committee represented the interests of all sexual abuse claimants in the Debtor's and the Additional Debtors' cases. *See, e.g.*,

On June 19, 2020, the Archdiocese obtained Court approval pursuant to §§ 327(a) and 328(a) of the Bankruptcy Code to retain the law firm of Jones Walker LLP as counsel.  [ECF Doc. 170].  Shortly after its constitution, the Committee obtained Court approval pursuant to §§ 327(a), 328(a), and 1103 of the Bankruptcy Code to retain the law firms of Troutman Pepper Locke LLP ("Troutman Pepper")[6] and Pachulski Stang Ziehl & Jones LLP ("Pachulski Stang") as counsel. [ECF Docs. 256 & 257].  In addition to retention, Court approval is also required to compensate those professionals.   *See* 11 U.S.C. § 330.  The Court's Complex Case Procedures dictate procedures for professional compensation to streamline the fee-application process and more effectively enable the Court and parties in interest to monitor professional fees as the case progresses.[7]   Essentially, this Court's Complex Case Procedures require that professionals

---

*Adams v. Roman Catholic Church of the Archdiocese of New Orleans (In re Roman Catholic Church for Archdiocese of New Orleans)*, 101 F. 4th 400, 409–10 (5th Cir. 2024); *In re Roman Catholic Church for Archdiocese of New Orleans*, No. 20-10846, 2022 WL 7204872, at *4 (Bankr. E.D. La. Oct. 11, 2022), *aff'd*, 2026 WL 18901 (5th Cir. Jan. 2, 2026); *see also* [ECF Doc. 4762, Ex. B].

[6]      Locke Lord merged with law firm Troutman Pepper LLP on January 1, 2025, to form Troutman Pepper Locke LLP.

[7]      The Court's Complex Case Procedures provide:

> (1)      After the end of a month for which compensation is sought, each professional seeking compensation may serve a monthly statement (the "Monthly Fee Statement") on or before the 20th day of the following month on (a) counsel for the debtor(s); (b) counsel for the prepetition secured lender(s); (c) counsel for any post-petition lender(s); (d) counsel to all official committees; (e) the Office of the United States Trustee; and (f) any other party the Court designates (collectively, the "Professional Fee Notice Parties").
>
> (2)      Each Monthly Statement shall contain a list of individuals and their respective titles who provided services during the statement period, their respective billing rates, the aggregate hours spent by each individual, contemporaneously maintained time entries for each individual in increments of tenth of an hour, and a reasonably detailed breakdown of disbursements incurred.
>
> (3)      Any objections to a particular Monthly Fee Statement must be in writing and set forth the nature of the objection with specificity and the amount of fees or expenses at issue, and must be served upon all Professional Fee Notice Parties within fourteen (14) days after service of the Monthly Fee Statement.
>
> (4)      After the expiration of the fourteen (14)-day period described above and subject to subpart (12) below, the debtor(s) shall be authorized to pay 80% of fees and 100%

3

of expenses identified in each Monthly Fee Statement to which no objection has been served.

(5)     If counsel for the debtor(s) receives an objection to a particular professional's Monthly Fee Statement, the debtor shall withhold payment of that portion of the Monthly Fee Statement to which an objection has been lodged, but shall pay after the expiration of the fourteen (14)-day period 80% of the remaining fees and 100% of the expenses to which no objection has been lodged (subject to subpart (12) below).

(6)     If any objecting party resolves a dispute with a professional, the objecting party (or the debtor(s) with the consent of the objecting party) shall serve written notice on the Professional Fee Notice Parties that the objection is withdrawn and shall describe the terms of the resolution. Subject to subpart (12) below, the debtor(s) is authorized to pay that portion of the Monthly Fee Statement at issue that is no longer subject to objection.

(7)     Any objection that is not resolved by the parties shall be preserved and presented to the Court at the next interim or final fee application hearing.

(8)     The service or lack of an objection pursuant to subpart (3) above shall not prejudice the objecting party's right to object to any fee application made to the Court on any ground, whether raised in the objection or not. Furthermore, the decision by any party not to object to a Monthly Fee Statement shall not be a waiver of any kind or prejudice that party's right to object to any fee application subsequently made to the Court.

(9)     Each professional shall serve and file with the Court every 120 days (unless the Court orders otherwise) an application for interim or final approval and allowance of compensation and reimbursement of expenses pursuant to 11 U.S.C. §§ 330 and 331 and Bankruptcy Rule 2016, including compensation previously paid by the debtor(s) on the basis of Monthly Fee Statements.

(10)     Neither the payment of, nor the failure to pay, in whole or in part, monthly compensation and reimbursement as provided herein shall have any effect on this Court's interim or final allowance of compensation or reimbursement of expenses of any professional. All fees and expenses of each professional, whether or not paid or objected to in connection with a Monthly Fee Statement, remain subject to review and approval by the Court in connection with interim and final fee applications.

(11)     Interim payments received in accordance with the procedures outlined above shall be applied to the fees and expenses itemized, subject to disgorgement or offset if such fees are not approved by the Court.

(12)     Notwithstanding the authorization to pay fees and expenses pursuant to these procedures, the payment of fees and expenses as set forth herein shall be paid only to the extent authorized pursuant to an Order granting debtor-in-possession financing and/or authority to use cash collateral, if applicable.

Complex Case Procedures, § XV(C) (footnote omitted).

employed to represent a debtor or a committee circulate monthly invoices to a limited number of parties in interest.  If no objections are raised, those professionals may receive payment from the debtor of 100% of expenses and 80% of fees incurred.  At four-month intervals, those professionals may file, but are not required to file, fee applications with the Court, seeking interim or final approval of all reasonable and necessary services incurred within that fee period (inclusive of 20% of fees that had been withheld plus the 80% of fees previously paid by the debtor pursuant to monthly invoices issued without objection).  An objection to a monthly invoice or fee application initiates a contested matter under Bankruptcy Rule 9014, which the Court resolves after notice and hearing.  But all professional fees must ultimately be approved by the Court.  Section 330 provides that the Court—*sua sponte* or upon objection—"may . . . award compensation that is less than the amount of compensation that is requested." 11 U.S.C. § 330(a)(2).  In line with § 330, the Complex Case Procedures provide that "[i]nterim payments received in accordance with the procedures outlined above shall be applied to the fees and expenses itemized, subject to disgorgement or offset if such fees are not approved by the Court."  Complex Case Procedures, § XV(C)(11).

On April 4, 2024, counsel for the Debtor filed an *Eleventh Interim Application of Jones Walker LLP for Allowance of Compensation and Reimbursement of Expenses, as Counsel to the Debtor and the Debtor In Possession, for the Period from November 1, 2023 Through February 29, 2024* (the "JW 11th Interim Fee App") and properly noticed it for hearing on April 25, 2024. [ECF Docs. 2927, 2928 & 2934].  Certain Abuse Survivors timely filed an objection to the JW 11th Interim Fee App.  [ECF Doc. 2943].[8]  Following the announcement by the parties in open court of their agreement to continue the hearing on the fee dispute, *see* Hr'g Rec'g 1:34–:37 (Apr. 25, 2024), [ECF Doc. 2992], the Court entered an Agreed Order on April 26, 2024, continuing the

---

[8]      Other abuse survivors represented by different counsel filed a late joinder to Certain Abuse Survivors' objection.  [ECF Doc. 2960].

hearing on the JW 11th Interim Fee App to July 18, 2024, a regularly scheduled omnibus hearing date in the case.  [ECF Doc. 2987].

At the request of the parties, the Court entered an Order on May 8, 2024, setting an evidentiary hearing date on July 22, 2024, to resolve the JW 11th Interim Fee App.  [ECF Doc. 3011].[9]  On July 12, 2024, the Court issued an Order granting the parties' joint motion to postpone the evidentiary hearing on the fee dispute and set a status conference to select new trial dates.  [ECF Docs. 3148 & 3149].  On July 18, 2024, the Court held a status conference on the fee dispute and issued an Order continuing the status conference to August 15, 2024.  [ECF Doc. 3178].[10]

On August 5, 2024, counsel for the Debtor filed a *Twelfth Interim Application of Jones Walker LLP for Allowance of Compensation and Reimbursement of Expenses, as Counsel to the Debtor and the Debtor in Possession, for the Period from March 1, 2024 Through June 30, 2024* (the "JW 12th Interim Fee App"), and properly noticed it for hearing on September 16, 2024.  [ECF Doc. 3240, 3241 & 3249].  Certain Abuse Survivors timely objected to that fee application.  [ECF Doc. 3363].  On September 11, 2024, the parties filed a joint motion to continue the hearing on the JW 12th Interim Fee App to the November 21, 2024, omnibus hearing, which this Court granted.  [ECF Docs. 3372 & 3373].

Meanwhile, at the August 15, 2024, omnibus hearing, the Court addressed a motion filed by two of the Archdiocese's insurers who, in reaction to the pending JW 11th Interim Fee App

---

[9]      On June 6, 2024, Jones Walker filed a motion for summary judgment to resolve the fee dispute, which this Court denied.  [ECF Docs. 3060 & 3080].

[10]     In March 2024, this Court granted the joint motion filed by the Debtor and the Committee requesting the appointment of John W. Perry, Jr. as an additional mediator in the case.  [ECF Doc. 2892].  The parties reported that they planned to meet with Mr. Perry in an effort to resolve the fee dispute.  *See* Hr'g Rec'g 1:32–35 (July 18, 2024), [ECF Doc. 3181].  The Court offered to assign a new trial date; counsel for Certain Abuse Survivors expressed a preference to continue the trial without date, while Debtor's counsel opted to talk about the need for a trial date at the next regularly scheduled omnibus hearing on August 15, 2024.  *See* Hr'g Rec'g. 1:35–36 (July 18, 2024), [ECF Doc. 3181].

dispute, requested that this Court adjust its Complex Case Procedures in this case and require that the 20% monthly holdback of fees be paid to professionals only upon a final fee award (the "Holdback Motion").  [ECF Doc. 3168].  The primary purpose behind the Holdback Motion was "to moderate potentially excessive interim allowances and to offer an incentive for timely resolution" of the case.  *Id.* ¶ 25.  Responses to the Holdback Motion were understandably divided among parties whose professional fees are paid by the estate and those whose fees are not:  The UST, the Bond Trustee, and Certain Abuse Survivors supported the Holdback Motion, [ECF Docs. 3234, 3236 & 3245], while the Debtor and the Committee did not, [ECF Docs. 3244 & 3253].

The Court questioned whether the proposed holdback or the appointment of a fee examiner[11] would be effective in reaching the desired result of a confirmed plan and final resolution of the case, but observed that the accrual of significant administrative costs without demonstrated, meaningful progress in the case reflected the Court's more immediate concern:  that this case was no longer capable of being resolved under bankruptcy law.  [ECF Doc. 3275].  To address that existential question, and after notice and hearing, [ECF Doc. 3266], the Court appointed an expert under Federal Rule of Evidence 706 to obtain an independent and unvarnished assessment of the status of the case and the Debtor's ability to move forward in chapter 11; areas of inquiry assigned to the expert included:

- The existence and status of a plan structure(s) and available alternatives;

- The structure, functioning, and capabilities of Debtor's management;

- A review of administrative costs incurred in the context of the record in this case and an assessment of ongoing resources required to bring this case to conclusion; and

---

[11]     On August 8, 2024, Certain Abuse Survivors filed a motion to appoint a chapter 11 trustee as well as a fee examiner in the case and noticed it for the omnibus hearing scheduled on September 16, 2024. [ECF Doc. 3246].

- Considering the Debtor's current tort liability, the financial wherewithal of the Debtor to reorganize and proceed as a going concern, including the availability of insurance proceeds and contributions from non-debtor affiliates, as well as implementation of non-monetary remedies to attempt to prevent and/or respond to any future tort liability.

[ECF Doc. 3308].[12] The Court-appointed expert published his report and recommendations on October 23, 2024. [ECF Doc. 3436]. The report was thorough, reflecting hundreds of hours of interviews with parties in interest and analysis of extensive information provided by those parties. The Court found the expert's independent assessment to be extremely helpful and enlightening. After two status conferences with parties in interest regarding the contents of the expert's report, [ECF Docs. 3439 & 3496], the Court entered an Order on December 3, 2024, setting an expedited discovery schedule, designed to prepare multiple parties in interest for participation in mediation focused on plan negotiation, [ECF Doc. 3554]. The Court entered a second Order that day, setting status conferences in late December and early January to discuss proposed non-monetary plan provisions and plan mechanics. [ECF Doc. 3555]. On January 24, 2025, the Court entered an Order appointing Judge Christopher Sontchi (Ret.) as an additional mediator to assist parties and non-debtor affiliates in negotiating plan terms. [ECF Doc. 3694]. The Court continued to host regular status conferences to address issues regarding plan negotiation. [ECF Doc. 3692].

The Court continued hearings and stayed discovery regarding the Jones Walker fee disputes, the Holdback Motion, and the motion to appoint a chapter 11 trustee, *see supra* note 11, and continued hearings on new interim fee applications for **all** estate and Committee professionals

---

[12] On September 13, 2024, the Debtor and the Committee each filed a proposed plan of reorganization. [ECF Docs. 3382 & 3384]. Without the other's support and with neither having the support of Certain Abuse Survivors and other stakeholders, both plans were unconfirmable. *See, e.g.*, *In re Babyoff*, 445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011) ("A debtor's ability to effectuate a plan may well turn on practical considerations, including whether confirmation can be achieved. A debtor is unable to effectuate a plan where it 'lacks the ability to formulate a plan or to carry one out.'" (quoting *Hall v. Vance*, 887 F.3d 1041, 1044 (10th Cir. 1989))).

through mid-April 2025 to allow the parties to focus their efforts on determining whether the terms of a confirmable plan could be negotiated in the near term.  [ECF Docs. 3497, 3749 & 3840].[13]

On April 28, 2025, this Court issued an *Order To Show Cause*, instructing the Debtor to appear on June 26, 2025, and show cause as to why the case should not be dismissed, stating:

> The Court has made clear on numerous occasions following the appointment of the expert and the issuance of his report, however, that *if* the parties here can move to resolution, then time is of the essence.  The Court remains steadfast in its belief that this process can supply the best outcomes for all parties in this case because it can exclusively provide (i) fair, equitable, and timely monetary recoveries to creditors; (ii) finality, certainty, and closure to all parties in interest; and (iii) for abuse claimants specifically, non-monetary remedies in the form of disclosure, transparency, and lasting institutional protocols designed to prevent abuse and provide accountability going forward.  But the record in this case as it stands today shows that, after five years and millions of dollars expended, no coalition of parties has proposed a confirmable plan.

[ECF Doc. 3949].  On April 30, 2025, Certain Abuse Claimants filed a motion to dismiss the Debtor's bankruptcy case under § 1112(b) of the Bankruptcy Code.  [ECF Doc. 3965].  On May 5, 2025, the Court issued an Order setting a preliminary hearing on that motion for May 29, 2025.  [ECF Doc. 3997].[14]  On May 21, 2025, the Debtor, Committee, and Additional Debtors (the "Plan Proponents") filed a *Memorandum of Understanding* identifying terms of a joint plan of reorganization.  [ECF Doc. 4020-1].[15]  After two status conferences with all parties in interest, [ECF Docs. 4045 & 4064], the Court issued a Scheduling Order (i) requiring the Plan Proponents

---

[13]      For the reasons stated in this Court's *Memorandum Opinion and Order* dated February 8, 2021, [ECF Doc. 745], the Court instructed the UST to appoint an additional committee to represent the interests of commercial creditors in this case, [ECF Doc. 746].  The UST constituted the Official Committee of Commercial Creditors on March 5, 2021.  [ECF Doc. 772].

[14]      The Court continued the preliminary hearing at the request of the Certain Abuse Claimants to coincide with the Court's show-cause hearing scheduled for June 26, 2025.  [ECF Docs. 4016 & 4019].

[15]      The joint plan of reorganization contemplated that the 157 Additional Debtors would each file pre-packaged chapter 11 bankruptcy cases in this district pursuant to the Complex Case Procedures and join the Archdiocese and the Committee as Plan Proponents.  The Additional Debtors filed cases on or about November 12, 2025, and are identified in Exhibit B-1 to the Confirmed Joint Plan.  [ECF Doc. 4762-2].

to file a joint plan of reorganization and disclosure statement on or before July 15, 2025, and (ii) setting pretrial deadlines and trial dates for plan confirmation, settlement motions with insurers, the Court's *Order To Show Cause*, and Certain Abuse Survivors' motion to dismiss. [ECF Doc. 4105]. Per that Order, as amended, the matters would be tried over nine days between November 17, 2025, and December 4, 2025. [ECF Docs. 4249, 4443 & 4506].

Meanwhile, in November 2024 and March 2025, Jones Walker filed its thirteenth and fourteenth interim fee applications (the "JW 13th & 14th Interim Fee Apps"), [ECF Docs. 3525 & 3864], to which Certain Abuse Survivors objected, [ECF Docs. 3648 & 3891]. Starting in April 2025, the Court continued the hearings on all pending Jones Walker fee disputes through December 18, 2025. [ECF Docs. 3903, 4004, 4087 & 4301]. In July 2025, counsel for the Committee filed fee applications for services rendered between March 1, 2025, and June 30, 2025. [ECF Doc. 4184 (the "Pachulski 15th Interim Fee App"); ECF Doc. 4205 (the "Troutman 15th Interim Fee App")] (collectively, with the JW 11th Interim Fee App, the JW 12th Interim Fee App, and the JW 13th & 14th Interim Fee Apps, the "Pending Interim Fee Apps"). Certain Abuse Survivors objected to the Pachulski 15th Interim Fee App and the Troutman 15th Interim Fee App. [ECF Docs. 4264]. Committee counsel filed a joint response to those objections. [ECF Doc. 4288].[16]

## B. The Mechanics and Effect of the Confirmed Joint Plan

At a status conference in late September 2025, the Debtor and Certain Abuse Survivors announced a settlement of the objections to the proposed joint plan of reorganization lodged by

---

[16] On November 25 and 26, 2025, Committee counsel each filed fee applications for services rendered between July 1, 2025, and October 31, 2025. [ECF Docs. 4709 & 4718]. No objections were filed to those fee applications, and after its own review, the Court entered Orders granting the requested fees on an interim basis. [ECF Docs. 4793 & 4796]. Jones Walker has not filed a fee application seeking interim approval of fees since March 2025.

10

Certain Abuse Survivors, who subsequently withdrew their motion to dismiss and stated on the record that they fully supported confirmation of the proposed plan.  [ECF Doc. 4358 & 4446]. Going into the confirmation hearing, that left the Plan Proponents with only one impaired, non-accepting class (Class 6 Bond Claims) and objections to the plan filed by the UST, a non-settling insurer, and the Bond Trustee.  [ECF Docs. 4559, 4563 & 4564].

Over the course of the nine-day confirmation hearing, the Plan Proponents continued to negotiate with the Bond Trustee and, before the close of evidence, the parties settled upon class treatment terms.  The Plan Proponents also resolved all objections to confirmation of the plan but two.  After overruling the non-settling insurer's remaining objections, the Court (i) found that the proposed plan of reorganization satisfied all of the requirements of §§ 1122, 1123, and 1129 of the Bankruptcy Code; (ii) issued an Order on December 8, 2025, confirming the plan (the "Confirmation Order"); and (iii) withdrew its *Order To Show Cause*.  [ECF Docs. 4767–4769]. In the end, all impaired, non-insider creditor classes voted in favor of the plan; indeed, 491 claimants holding "Known Abuse Claims"—including Certain Abuse Survivors—voted in Class 3, with 489 or 99.59% of voting survivors accepting the terms of the plan.  [ECF Doc. 4543].

The Confirmation Order is a final and unappealable Order.  "It is often stated that a chapter 11 plan is a new contract between the debtor and its creditors, albeit one signed only by the plan proponent . . . ."  *Lawski v. Frontier Ins. Grp., LLC (In re Frontier Ins. Grp., Inc.)*, 585 B.R. 685, 693 (Bankr. S.D.N.Y. 2018) (citing cases).  "References to chapter 11 plans as contracts or agreements—while useful for purposes of interpreting plans—are only by analogy, however."  *Id*. (citations omitted).  "The binding effect of a chapter 11 plan is in fact premised on statutory and common law claim preclusion."  *Id*.  Indeed,

> for the debtor, its creditors and holders of interests, the chapter 11 plan is the crucible by which the parties' claims and rights in property dealt with by the plan

are transformed and governed post-confirmation—a "super-contract"—not because it is signed by all of the parties with claims against the debtor and holders of interests affected by the plan who participate in the case, but because of the applicable provisions of the Bankruptcy Code and principles of <u>res judicata</u>.

*Id*.

Section 1141 of the Bankruptcy Code specifically prescribes the binding nature of a confirmed plan:

> (a)    . . . [T]he provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not he claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.
>
> (b)    Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.
>
> (c)    . . . [E]xcept as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

11 U.S.C. § 1141(a)–(c).  Moreover, the doctrine of *res judicata* applies to orders confirming plans of reorganization.  *See New Falls Corp. v. LaHaye (In re LaHaye)*, 17 F.4th 513, 518 (5th Cir. 2021) (citing *Eubanks v. FDIC*, 977 F.2d 166, 170 (5th Cir. 1992)); *United Ind. Sch. Dist. v. Vitro Asset Corp. (In re Vitro Asset Corp.)*, 656 Fed. App'x 717, 723 (5th Cir. 2016) (citing *Republic Supply Co. v. Shoaf,* 815 F.2d 1046, 1050 (5th Cir. 1987)).

### 1.    The Confirmed Joint Plan's treatment of Known and Unknown Abuse Claims

The Confirmed Joint Plan provides monetary compensation to holders of "Known Abuse Claims" and "Unknown Abuse Claims."  The Confirmed Joint Plan created a Settlement Trust for the sole benefit of abuse claimants and appointed a Settlement Trustee for the purposes of "(a) assuming responsibility for the liabilities of the Debtor and Additional Debtors for the Abuse Claims and (b) receiving, liquidating, and distributing Settlement Trust Assets in accordance with

the Joint Plan and Settlement Trust Documents."  [ECF Doc. 4762, § 5.1]; *see also* [ECF Doc. 4762, art. 6]; [ECF Doc. 4762-5, § 1.6].  The Confirmed Joint Plan provided for the transfer on the Effective Date of $230 million in cash and cash equivalents to the Settlement Trust free and clear of all encumbrances:[17]

- $130 million in cash from the Debtor and Additional Debtors,

- Two promissory notes guaranteed by the Debtor and Additional Debtors totaling $70 million (to be satisfied by proceeds from pending sale of affordable housing facilities), and

- Approximately $30 million in cash from settling insurers.

[ECF Doc. 4762, § 5.3]; [ECF Doc. 4762-5, § 1.3].  The Settlement Trust also received all rights held by the Debtor, any co-insured, and abuse claimants to insurance proceeds or causes of action against the remaining non-settling insurer.  [ECF Doc. 4762, §§ 5.3 & 7.2]; *see also* [ECF Doc. 4762-1, ¶¶ 172 & 206].[18]

---

[17]     The "Effective Date" of the Confirmed Joint Plan "means the Business Day on which the Joint Plan becomes effective pursuant to Article 11 of the Joint Plan," with caveats not applicable in this case.  [ECF Doc. 4762-1, ¶ 136].  Here, the Effective Date of the Confirmed Joint Plan was December 26, 2025.  [ECF Doc. 4817].  No notices of default under the Confirmed Joint Plan have been filed.

[18]     The Settlement Trust Agreement provides that the Settlement Trustee as a fiduciary has authority to, among other powers,

> (i) authorize the commencement or continuation of a lawsuit by an Abuse Claimant in accordance with the Allocation Protocol (a "**Litigation Claim**"), and (ii) enter into any settlement that causes an Insurer to become a Settling Insurer (an "**Insurance Settlement**"), provided however, the powers set forth in this Section 2.1(e) shall in each case be subject to the provisions of the Settlement Trust Documents and the Allocation Protocol.

[ECF Doc. 4762-5, § 2.1(e)]; *see also* [ECF Doc. 4762-6, § 10 (outlining "Procedure for Litigation")].  The Settlement Trust Agreement also created a Settlement Trust Advisory Committee comprised of five abuse survivors.  [ECF Doc. 4762-5, § 7.1].  As to Insurance Settlements specifically,

> [t]he Settlement Trustee shall consult with the Settlement Trust Advisory Committee and seek written approval from the Settlement Trust Advisory Committee before accepting any Insurance Settlement.  If one Settlement Trust Advisory Committee member dissents from the Settlement Trustee's recommendation to approve an Insurance Settlement, the Settlement Trustee may override the dissent by obtaining Bankruptcy Court approval of the proposed settlement.  If two or more Settlement Trust Advisory Committee members dissent from the Settlement Trustee's recommendation to approve an Insurance Settlement,

13

The Settlement Trust Agreement as well as an Allocation Protocol were attached as exhibits and incorporated into the terms of the Confirmed Joint Plan. [ECF Docs. 4762-5 & 4762-6]; *see also* [ECF Doc. 4762-5, § 1.11]. The Allocation Protocol's purpose "is to provide for the distribution of funds to Abuse Claimants." [ECF Doc. 4762-6, § 1]. The Allocation Protocol identified the Abuse Claims Reviewer and his duties:

> The Abuse Claims Review shall review each of the Abuse Claims (as and when such Abuse Claims may be filed or submitted) and, according to the guidelines in section 5 below, make determinations upon which individual monetary distributions will be made subject to the Joint Plan and the Settlement Trust Documents. The Abuse Claim Reviewer's review as to each Abuse Claim shall be the final review, such only to reconsideration as set forth in section [8] below.
>
> . . . .
>
> The Abuse Claims Reviewer will arrive at a point total for each Abuse Claimant in accordance with this Allocation Protocol.
>
> The Settlement Trustee shall calculate the value of an individual "point" after all Abuse Claims, except Unknown Abuse Claims, have been reviewed on a final basis. The point value will be determined by dividing (a) the total dollars in the amount funded to the Settlement Trust for the Abuse Claims by (b) the total of points allocated to the individual Abuse Claims. For example, if there are 650 abuse claimants awarded a total of 50,000 points, with total distributable Settlement Trust Assets of $180 million, each point would be valued at $3,600. An Abuse Claimant with a 70-point award would receive a distribution from the trust of $252,000, subject to any amounts due under the Abuse Claimant's retainer agreement with counsel.
>
> . . . .
>
> The Abuse Claims Reviewer's point award shall be final unless the Abuse Claimant makes a timely request for the point award to be reconsidered by the Abuse Claims Reviewer. The Abuse Claimant shall not have a right to any other appeal of the Abuse Claims Reviewer's point award. . . . The Abuse Claims Reviewer's determination of such request for reconsideration shall be final and not

---

the Settlement Trustee shall hold a meeting of the Settlement Trust Advisory Committee. If multiple Settlement Trust Advisory Committee member objections remain following such a meeting, the Settlement Trustee and/or any Settlement Trust Advisory Committee member may seek relief regarding such proposed Insurance Settlement from the Bankruptcy Court.

[ECF Doc. 4762-5, § 7.3].

subject to any further reconsideration, review or appeal by any party, including a court.

[ECF Doc. 4762-6, §§ 4 & 7–8].

The plain terms of the Confirmed Joint Plan provide that Known and Unknown Abuse

Claimants' monetary recovery is limited exclusively to the Settlement Trust:

- "Except to the extent that a Known Abuse Claimant against the Debtor and/or any Additional Debtors agrees to less favorable treatment of such Known Abuse Claim <u>and</u> except as otherwise provided in Section 12.14 of the Joint Plan regarding Non-Settling Insurers, **each Known Abuse Claimant will, in full and final satisfaction, settlement, release, and discharge of its Known Abuse Claim against the Debtor and/or any Additional Debtors, receive such Settlement Trust Distributions as and to the extent provided in the Settlement Trust Documents**." [ECF Doc. 4762, § 4.3(a) (emphasis added)]; *see also* [ECF Doc. 4762, § 4.4(a) (containing identical terms for Unknown Abuse Claims)].

- "**The Joint Plan and this Allocation Protocol shall together be the sole and exclusive method by which an Abuse Claimant may seek distribution on account of an Abuse Claim** against the Debtor, the Additional Debtors, the Non-Catholic Entities, and the Settling Insurers." [ECF Doc. 4762-6, § 3.1 (emphasis added)].

- "The purposes of the Settlement Trust are (i) to assume all liability for the Channeled Claims; (ii) to administer Abuse Claims; and (iii) to make distributions to holders of Abuse Claims, in accordance with the Allocation Protocol attached hereto as Exhibit 1 . . . . **All Abuse Claims shall be resolved exclusively in accordance with the Allocation Protocol**." [ECF Doc. 4762-5, § 1.2 (emphasis added)].

- "**On the Effective Date, the liability of the Debtor, Additional Debtors, and Settling Insurers for, and obligation to pay, Abuse Claims will become the responsibility of the Settlement Trust. Abuse Claims will be paid by the Settlement Trust from the Settlement Trust Assets in accordance with the Settlement Trust Documents.** Additionally, as of the Effective Date, the transfer to, vesting in, and assumption by the Settlement Trust of the Settlement Trust Assets as contemplated by the Joint Plan will discharge all obligation and liabilities of and bar any recovery or action against the Protected Parties and Settling Insurers for or in respect of all Channeled Claims. The Confirmation Order will provide for such discharge." [ECF Doc. 4762, § 6.1(b) (emphasis added)].

2.      *The Confirmed Joint Plan's treatment of unclassified and classified claims*

Generally, debtors must pay all claims in a higher priority class in full before they can pay any claims in a lower priority class. Default rules governing distribution of a debtor's assets to creditors through a confirmed plan of reorganization require that claims are paid in the following order: (i) "superpriority" claims (not present here);[19] (ii) secured claims, other superpriority claims (not present here);[20] (iii) priority unsecured claims; (iv) general unsecured claims; and, lastly, (iv) equity (not present here). Priority unsecured claims include administrative expense claims. *See* 11 U.S.C. § 507(a)(2) (citing 11 U.S.C. § 503(b)).

The Confirmed Joint Plan identifies and provides treatment for unclassified claims, such as administrative expense claims (including Professional Fee Claims) and priority tax claims. [ECF Doc. 4762, art. 2]. The Confirmed Joint Plan classifies other creditors into ten classes:

---

[19]     Examples of "superpriority" claims include claims for surcharge against collateral under § 506(c) of the Bankruptcy Code, as well as carve-outs for professional fees and/or priming liens granted in association with debtor-in-possession financing.

[20]     Examples of "other superpriority" claims include administrative expenses incurred after conversion from chapter 11 to chapter 7 or post-petition issuance of unsecured debt to the debtor under § 362(c)(1).

| Class No. | Class Description | Impaired or Unimpaired | Voting Rights |
|---|---|---|---|
| 1 | **Other Priority Claims** (Against the Debtor and Additional Debtors) | Unimpaired | No, deemed to accept |
| 2 | **Secured Claims** (Against the Debtor and Additional Debtors) | Unimpaired | No, deemed to accept |
| 3 | **Known Abuse Claims** (Against the Debtor and Additional Debtors) | Impaired | Yes |
| 4 | **Unknown Abuse Claims** (Against the Debtor and Additional Debtors) | Impaired | Yes |
| 5 | **Non-Insurer Contribution Claims** (Against the Debtor and Additional Debtors) | Impaired | No, deemed to reject |
| 6 | **Bond Claims** (Against the Debtor) | Impaired | Yes |
| 7 | **General Unsecured Claims and Unsecured Trade Claims** (Against the Debtor) | Impaired | Yes |
| 8 | **Non-Abuse Personal Injury Claims** (Against the Debtor) | Impaired | Yes |
| 9 | **Unsecured Trade Claims** (Against the Additional Debtors) | Unimpaired | No, deemed to accept |
| 10 | **Additional Debtors' Non-Trade Unsecured Claims** (Against the Additional Debtors) | Unimpaired | No, deemed to accept |

[ECF Doc. 4762, § 3.5].  In line with §§ 507(a)(2) and 1129(a)(9), the Confirmed Joint Plan provides that administrative expense claims for professional fees will be treated as follows:

> Except to the extent that the holder of an Allowed Professional Fee Claim against the Debtor and/or any Additional Debtors agrees to less favorable treatment of such Claim, the applicable **Reorganized Archdiocese or Reorganized Additional Debtor will pay the Allowed amount of each Professional Fee Claim, in full, in Cash, within fifteen (15) days from the date such Claim becomes an Allowed Professional Fee Claim**.

[ECF Doc. 4762, § 2.2(a) (emphasis added)].  Classes 3 and 4, holding Known and Unknown Abuse Claims respectively, are general unsecured claims.  As described above, *supra* Subpart B.1., the monetary recovery available to Classes 3 and 4 is limited solely to the $230 million "pot" transferred to the Settlement Trust.

C.   **Counsel for the Reorganized Debtor and Former Committee Challenge Certain Abuse Survivors' Standing To Maintain Their Objections to the Pending Interim Fee Apps and Any Final Fee Applications Post-Confirmation.**

On December 18, 2025, this Court held a hearing to consider the Pending Interim Fee Apps, among other matters.  At the hearing, citing the post-confirmation status of the case, Jones Walker, Troutman Pepper, and Pachulski Stang challenged Certain Abuse Survivors' standing to press their objections to the Pending Interim Fee Apps and to object to final fee applications submitted by those law firms.  [ECF Doc. 4823].  The Court ordered briefing on the issue of post-confirmation standing.  [ECF Doc. 4811].  Certain Abuse Survivors, the three law firms, and the UST submitted briefs.  [ECF Docs. 4824–4827, 4832–4833 & 4835].[21]  The Court heard oral argument from the parties on January 22, 2026, and took the matter under submission.

## DISCUSSION

Counsel for the Reorganized Debtor and the former Committee have invoked this Court's federal subject-matter jurisdiction to approve the Pending Interim Fee Apps and, therefore, bear the burden of establishing their own constitutional standing—that is, they must show that they have live grievances that can be redressed by a favorable ruling from this Court that would allow this Court to resolve those disputes and grant relief pursuant to the "Cases and Controversies" provision in Article III of the Constitution.  *See F.D.A. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 379 (2024).  And although those principles of constitutional standing "do not map perfectly to an *in rem* dispute like a bankruptcy case, where a court is charged with distributing a *res* among competing claimants," the constitutional standing requirement nevertheless applies to any party invoking this Court's federal subject-matter jurisdiction.  *In re AIO US, Inc*., 672 B.R.

---

[21]   Although the UST submitted a brief on its own standing to object to fee applications in this case, the Court finds the issue to be premature as the UST has no pending objections to fee applications filed by counsel for the Reorganized Debtor or former Committee.

261, 269 (Bankr. D. Del. 2025). No one here, including the Court, questions the firms' constitutional standing to seek approval of the Pending Interim Fee Apps.

But Certain Abuse Survivors do not invoke this Court's federal jurisdiction to seek relief from this Court. They merely object to this Court's approval of the Pending Interim Fee Apps. After examining recent Supreme Court jurisprudence, the *AIO US, Inc*. court correctly concluded: "[T]he [Supreme] Court's more recent cases make clear that only the party invoking the jurisdiction of a federal court—the one that is seeking relief—needs to have Article III standing. The question of who may be heard to oppose the relief sought poses no constitutional issue." *Id.* at 268–73 (referencing *Truck Ins. Exch. v. Kaiser Gypsum Co*., 602 U.S. 268 (2024); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020); *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658 (2019)). This Court adopts the analysis in *In re AIO US, Inc*. and finds it unnecessary to inquire into the constitutional standing of Certain Abuse Survivors to object to the approval of the Pending Interim Fee Apps.

But Certain Abuse Survivors nevertheless must qualify as "parties in interest" under § 1109(b) of the Bankruptcy Code to appear and be heard regarding the Pending Interim Fee Apps. Indeed, Congress has specified who may appear and be heard in a bankruptcy case, enacting § 1109(b) to provide a participatory right to any "party in interest" to "raise[,] appear and be heard on any issue in a case under [chapter 11]." "[T]he lesson of the Supreme Court cases [*Truck Insurance*, *Little Sisters*, and *Virginia House of Delegates*, among others] is that this statutory standard is the only one that separates those who may participate in a bankruptcy case (at least to raise an objection to the relief sought by another party) from those who may not." *In re AIO US, Inc*., 672 B.R. at 273.

"The general theory behind [§ 1109(b)] is that anyone holding a direct financial stake in the outcome of the case should have an opportunity (either directly or through an appropriate representative) to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest." *Truck Ins. Exch. v. Kaiser Gypsum Co*., 602 U.S. 268, 277–78 (2024) (quoting 7 COLLIER ON BANKRUPTCY ¶ 1109.01 (Richard Levin & Henry J. Sommer eds., 16th ed.)).  To that end, § 1109(b) defines "party in interest" to include "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, and equity security holder, or any indenture trustee."  As unsecured creditors of the Debtor during the case, no one could credibly challenge the status of Certain Abuse Survivors to appear and be heard under § 1109(b) pre-confirmation.

Although the definition of "party in interest" is broad, it is not limitless.  "[T]he case law on party-in-interest standing under § 1109(b) limits an objector to asserting its own rights—it may not assert the rights of others."  *In re AIO US, Inc*., 672 B.R. at 274.  And "an entity that does not hold a financial stake in the case is generally excluded from the definition of 'party in interest.'" *In re MF Global Holdings, Ltd*., 469 B.R. 177, 188 (Bankr. S.D.N.Y. 2012); *see also Truck Ins. Exch*., 602 U.S. at 285 (holding that "an insurer with financial responsibility for bankruptcy claims is a 'party in interest' that may object to a chapter 11 plan of reorganization").  The question before the Court here is whether the standing conferred by § 1109(b) to Certain Abuse Survivors during the pendency of the case extends post-confirmation or whether they forfeited their standing by entering into a settlement with the Archdiocese and the Additional Debtors, the terms of which are memorialized in the Confirmed Joint Plan.

Certain Abuse Survivors cite two cases for the proposition that § 1109(b) standing extends to creditors post-confirmation.[22]   [ECF Doc. 4827, at 6–7].  Both of those cases, however, feature materially different facts from those here that affect the outcome.  In *In re AVC Villa Del Lago at Ocotillo Devco, L.L.C.*, the court confirmed a creditor-sponsored plan of reorganization, not a debtor-sponsored plan.  *See* Nos. 08-06834, 08-06836 & 08-06837, 2010 WL 119830, at *1 (Bankr. D. Ariz. Jan. 6, 2010).  The creditor-sponsor of the plan waived its claim and injected cash of its own to fund payments to other creditors under the terms of its plan.  *See id.* at *2.  The court found that the creditor-sponsor had standing to object post-confirmation to the "defeated" debtor's attorneys' fees, which makes sense:  As the plan proponent with responsibility to fund the plan, that creditor had a pecuniary interest in saving the estate costs in the form of attorneys' fees.  *See id.*

The second case cited by Certain Abuse Survivors is *In re Ridgeway*, an individual's chapter 11 case filed in this district in 2016, after the debtor received an adverse jury verdict against him in the principal amount of $745,195 in a Michigan trial court.  *See* No. 16-10643, 2018 WL 1116531, at *1 (Bankr. E.D. La. Feb. 27, 2018).  The debtor continued his appeal of the adverse judgment while his bankruptcy case proceeded.  *See id.* at *1–2.  The debtor confirmed a plan of

---

[22]      Certain Abuse Survivors also directed the Court to two other cases purportedly for the proposition that "standing before a bankruptcy court is governed by the plain language of Section 330."  [ECF Doc. 4827, at 5].  That is not a correct statement of the law.  Although § 330 provides that "[t]he court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, **or any other party in interest**, award compensation that is less than the amount of compensation that is requested," 11 U.S.C. § 330(a)(2) (emphasis added), that Code section does not convey standing.  Standing for Certain Abuse Survivors in this contested matter is determined here by § 1109(b).  *See* discussion *supra*.  That aside, the court in each of the two cases cited by Certain Abuse Survivors dealt with the ability of a creditor with a pecuniary interest to object to settlements proposed by a chapter 7 trustee in an active, pending chapter 7 case—not post-confirmation in a chapter 11 case.  *See In re C.P. Hall Co.*, 513 B.R. 540 (Bankr. N.D. Ill. 2014); *In re Mushroom Transp. Co.*, 486 B.R. 148 (Bankr. E.D. Pa. 2013).  No one contested Certain Abuse Survivors' standing to be heard pursuant to § 1109(b) during the pendency of these chapter 11 proceedings.  Accordingly, the Court finds *C.P. Hall* and *Mushroom Transportation* to be unhelpful given the current posture of these proceedings.

reorganization before his appeal of the adverse judgment was exhausted. *See id*.; [No. 16-10643, ECF Docs. 325 & 351]. That plan proposed to pay creditors in full, but at the time of confirmation—and even later when the judgment creditor objected to the debtor's attorneys' fees— the judgment creditor's unsecured claim against the estate in the amount of over $3 million had yet to be allowed on a final basis and thus not paid in full. *See* 2018 WL 1116531, at *1.[23] Moreover, distributions to creditors under the confirmed plan—including repayment of $4.25 million in exit-financing loaned to the debtor by an investor—would be funded primarily by the reorganized debtor's future cash flows from ongoing operations. [No. 16-10643, ECF Doc. 325, art. VII]. For those reasons, the Court, concerned about the future viability of the debtor's plan given the judgment creditor's then-outstanding proof of claim, found that the judgment creditor had standing to object to the debtor's counsel's fees because, at that time, the judgment creditor "ha[d] a pecuniary interest in the payment of [debtor's counsel's fees]." 2018 WL 1116531, at *2.

Unlike the creditors in *In re AVC Villa Del Lago at Ocotillo Devco, L.L.C.* and *In re Ridgeway*, Certain Abuse Survivors here do not currently hold a pecuniary interest in the payment of attorneys' fees to counsel for the Reorganized Debtor and the former Committee. The Committee, representing the interests of all Known and Unknown Abuse Claimants, with counsel for Certain Abuse Survivors, negotiated plan treatment afforded to those claimants with the Debtor, Additional Debtors, and their insurers. Based on the amount of litigation among the parties

---

[23]   The Sixth Circuit affirmed the adverse judgment in 2017 and the United States Supreme Court denied certiorari in January 2018. *See* 2018 WL 1116531, at n.3. After the judgment creditor filed a proof of claim in the debtor's bankruptcy case asserting an unsecured claim in the amount over $3 million, representing the principal amount of the judgment plus attorneys' fees, costs, and interest, the debtor objected to the proof of claim. *See id*. at *1 & n.2. After an evidentiary hearing, the Court entered an Order allowing the judgment creditor's unsecured claim in the full amount of over $3 million. The debtor appealed that ruling, the district court affirmed the bankruptcy court's allowance of the judgment creditor's unsecured claim, and the debtor appealed; that appeal was finally exhausted on February 16, 2021, when the Fifth Circuit Court of Appeals' order affirming the district court became final. [No. 16-10643, ECF Doc. 758].

evidenced on the docket as well as the time spent in mediation, to say that the ultimate settlement they reached was hard-won would be an understatement. The parties negotiated "pot plan" treatment for abuse survivors; that is, the Confirmed Joint Plan provides that the Debtor and Additional Debtors would contribute a fixed, agreed-upon sum of money into the Settlement Trust to be shared *pro-rata* among unsecured abuse claimants in Classes 3 and 4, regardless of the total amount of claims filed and allowed.[24] Crucial to the determination that Certain Abuse Survivors now lack a pecuniary interest in the payment of attorneys' fees is the fact that Known and Unknown Abuse Claimants' recovery is absolutely limited to the Settlement Trust. *See supra* Subpart B.1. So even if this Court reduces the amounts requested in the Pending Interim Fee Apps and any final fee applications, that reduction would never inure to the benefit of abuse claimants. The plain terms of the confirmed plan negotiated by the parties make it so.[25]

---

[24]    If class treatment provided for guaranteed payment of a certain percentage of allowed claims, the now-Reorganized Debtor and now-Reorganized Additional Debtors would bear the risk of their total payment obligation increasing if unexpected claims are filed and allowed. As it is, however, the contribution to the Settlement Trust by the Debtor and Additional Debtors cannot increase per the mechanics of the Confirmed Joint Plan.

[25]    Certain Abuse Survivors objected to the JW 11th Interim Fee App in April 2024 and continued to object to subsequent fee applications. All parties to plan negotiations—including unsecured creditors in other classes like the bondholders—knew of the Pending Interim Fee Apps and the possibility of reductions in allowed administrative expenses. Yet no "waterfall" provision appears in any version of the proposed plan or the Confirmed Joint Plan that would shift any reduction in administrative fees to unsecured creditor classes. *Cf. In re Farley, Inc*., 156 B.R. 203, 207–08 (Bankr. N.D. Ill. 1993) (including in the confirmed plan a provision that expressly provides that confirmation of the plan does not affect the liability of the reorganized debtor to a contingent creditor, which preserved that contingent creditor's pecuniary interest in the payment of estate professional fees).

Moreover, the parties in this case demonstrated that they knew how to negotiate the issue of standing, as an example, to enforce plan terms. Section 5.4 of the Confirmed Joint Plan and Exhibit E attached to the plan identifies Non-Monetary Plan Provisions to be implemented by the Reorganized Debtor, Reorganized Additional Debtors, and Non-Debtor Catholic Entities. The inclusion of Non-Monetary Plan Provisions as a term of the Confirmed Joint Plan represents the commitment of those entities to carry out one of the most robust, comprehensive sets of child-protection and abuse-prevention strategies in the country. The Non-Monetary Plan Provisions represent efforts to partner with abuse survivors and maintain transparency regarding abuse prevention and handling of abuse claims going forward. To that end, abuse survivors will forever sit on the Archdiocese's Internal Review Board, the mandated advisory committee designed to assist the Archbishop in handling allegations of sexual abuse of children and

Certain Abuse Survivors lastly assert that the filing of a motion for allowance of administrative expense claims under §§ 503(b)(3)(D) and (4) of the Bankruptcy Code (the "Substantial Contribution Claim") confers a pecuniary interest in the payment of professional fees in this case. [ECF Doc. 4833, at 6–10].[26]  The Confirmed Joint Plan defines "Professional Fee Claims" to include "claims for services and/or reimbursement of expenses pursuant to sections 327, 328, 331 or 503(b) of the Bankruptcy Code," and thus includes the Substantial Contribution Claims filed by Certain Abuse Survivors. [ECF Doc. 4762-1, ¶ 242].  Again, the Confirmed Joint Plan provides for the payment of Professional Fee Claims:

> Except to the extent that the holder of an Allowed Professional Fee Claim against the Debtor and/or any Additional Debtors agrees to less favorable treatment of such Claim, the applicable Reorganized Archdiocese or Reorganized Additional Debtor **will pay the Allowed amount of each Professional Fee Claim, in full, in Cash, within fifteen (15) days from the date such Claim becomes an Allowed Professional Fee Claim**.

[ECF Doc. 4762, § 2.2(a) (emphasis added)].  In other words, the Reorganized Debtor and/or the Reorganized Additional Debtors are obligated to pay 100% of each Allowed Professional Fee Claim within fifteen days of allowance—independent of their obligation to pay other Allowed Professional Fee Claims.  *See supra* note 24.  Thus, a reduction of fees requested in the Pending

---

vulnerable adults by clergy and lay ministers.  Pertinent here, § G.4 of the Non-Monetary Plan Provisions specifically addresses who has standing to seek specific enforcement of the provisions:

> The sole parties who have authority and/or standing to seek the specific performance of these Provisions shall be (i) the Settlement Trustee, and (ii) **any Child Sexual Abuse Claimant**, the parent or legal guardian of a Child Sexual Abuse Claimant who has not attained 18 years of age, or if a Child Sexual Abuse Claimant is deceased, one surviving family member as identified in accordance with Section D.2.d above.

[ECF Doc. 4762-7, § G.4.b.].  But no provision in the Confirmed Joint Plan preserves § 1109(b) standing to any party to object to the Pending Interim Fee Apps or any final fee apps.

[26]      Pursuant to this Court's *Order* dated December 23, 2025, [ECF Doc. 4811], Certain Abuse Survivors and their counsel timely filed a Substantial Contribution Claim, [ECF Doc. 4912].  Nothing in this *Memorandum Opinion and Order* should be construed to rule in whole or in part on the merits of that Substantial Contribution Claim.

Interim Fee Apps or any final fee application does not bear upon the right to payment afforded under the Confirmed Joint Plan to Certain Abuse Survivors or their counsel if they are successful in obtaining a substantial-contribution award under §§ 503(b)(3)(D) and (4) of the Bankruptcy Code.   Nothing in the record indicates that the Reorganized Debtor or Reorganized Additional Debtor cannot or will not pay Allowed Professional Fee Claims pursuant to the terms of the Confirmed Joint Plan.   The Court therefore finds that the mere filing of the Substantial Contribution Claim does not bestow upon Certain Abuse Survivors a pecuniary interest in the payment of other attorneys' fees.

Certain Abuse Survivors correctly recognize, however, that this Court has an independent duty to review fee applications even in the absence of any objections.  [ECF Doc. 4827, at 11]; *see also In re 1002 Gemini Interests LLC*, No. 11-38815, 2015 WL 913542, at *3 (Bankr. S.D. Tex. Feb. 27, 2015) ("Although Gemini's objections are limited to only the interim fee application filed, the Court has an independent duty to review the entire $62,147.53 in fees sought for final approval (including fees previously approved in interim applications)."); *In re Delgado*, No. 06-0439, 2006 WL 3227331, at *3 (Bankr. S.D. Tex. Nov. 2, 2006) ("The bankruptcy court has an independent duty to review fee applications, notwithstanding the absence of objections by the United States trustee, creditors, or any other interested party.").   In addition to sustaining objections to interim fee awards over the course of this case, this Court has also reduced the amount of requested fees in this case *sua sponte*, [*e.g.*, ECF Docs. 690, 1743 & 1998], and has purposefully scheduled the evidentiary hearing on final fee applications in May 2026 to allow the Court time to review each final fee application that was timely filed on February 27, 2026, and evaluate the reasonableness of services rendered and expenses incurred under §§ 330 and 503(b) of the Bankruptcy Code, [ECF Doc. 4811].

25

For the reasons stated above, the Court finds that Certain Abuse Survivors lack standing under § 1109(b) to maintain their objections to the Pending Interim Fee Apps as well as to object to any final fee application filed in this case.  Accordingly,

**IT IS ORDERED** that the objections to Pending Interim Fee Apps, [ECF Docs. 2943, 2960, 3363, 3648, 3891 & 4264], are **OVERRULED FOR LACK OF STANDING.**

**IT IS FURTHER ORDERED** that counsel for the Reorganized Debtor serve this *Memorandum Opinion and Order* on all parties who will not receive electronic notice via this Court's CM/ECF system via first class U.S. Mail pursuant to applicable Bankruptcy Rules, this Court's Complex Case Procedures, and any Order limiting notice in this case and file a Certificate of Service to that effect within three days.

New Orleans, Louisiana, March 10, 2026.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE