**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| THE ROMAN CATHOLIC CHURCH OF | ) | CASE NO. 20-10846 |
| THE ARCHDIOCESE OF NEW | ) | (JOINTLY ADMINISTERED) |
| ORLEANS | ) | |
| | ) | |
| | ) | CHAPTER 11 |
| DEBTOR.[1] | ) | COMPLEX CASE |
| | ) | |
| | ) | SECTION A |

**RESPONSE TO DEBTOR'S OBJECTION TO THE FINAL FEE APPLICATIONS OF PACHULSKI STANG ZIEHL & JONES LLP AND TROUTMAN PEPPER LOCKE LLP AS CO-COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

Troutman Pepper Locke LLP ("Troutman") and Pachulski Stang Ziehl & Jones LLP ("PSZJ", and together with Troutman, the "Committee Professionals") submit this *Response* (the "Response") to the *Debtor's Objection to the Final Fee Applications of Pachulski Stang Ziehl & Jones LLP and Troutman Pepper Locke LLP as Co-Counsel for the Official Committee of Unsecured Creditors* [ECF Doc. No. 5052] (the "Fee Objection") filed by the Roman Catholic Church of the Archdiocese of New Orleans (the "Archdiocese") in the above-styled Chapter 11 case (the "Bankruptcy Case") and respectfully state as follows:

**INTRODUCTION**

1.      Coming as it does after the triumphant conclusion of one of the longest and most contentious diocesan bankruptcy cases ever filed in the United States, the Fee Objection strikes a strange pose. Anyone unfamiliar with this Bankruptcy Case might imagine, after reading the Fee

---

1 On November 13, 2025, the Court entered an Order directing joint administration of the Chapter 11 bankruptcy case of The Roman Catholic Church of The Archdiocese of New Orleans, with 157 cases filed by certain Archdiocesan parishes, suppressed Archdiocesan parishes, and Archdiocesan agencies (collectively, the "Additional Debtors"). [ECF No. 4603]. On December 8, 2025, the Court entered an Order confirming a joint plan of reorganization [ECF No. 4767], and on December 29, 2025, the jointly administered debtors filed a Notice of Occurrence of the Effective Date of that plan [ECF No. 4817]. The Court has entered final decrees and closed the cases filed by the Additional Debtors in January 2026. The Court entered an *Order of Final Decree* in the main case on May 22, 2026 [ECF No. 5119].

1

Objection's hundreds of pages of briefing and exhibits, that the Committee and the Committee Professionals complicated these proceedings for years even as an impartial Archdiocese grieved the case's considerable time and expense. That uninformed reader might also conclude that the Archdiocese's fee objections are well-taken and that its demand that the Committee Professionals disgorge millions in compensation is reasonable under the circumstances. Those having lived this Bankruptcy Case for more than six (6) years know better. The Fee Objection is an intentionally misleading hit piece—a parting shot at the (now-disbanded) Committee and its professionals to recover funds for the Archdiocese from the counsel that expertly guided the survivors whose lives are forever burdened by Archdiocese clergy abuse.

2.      The Fee Objection's errors and omissions are legion. For instance, ignoring several docketed documents, the Fee Objection falsely accuses "the Committee" of a protective order violation that this Court has ruled was the fault of just one man. In addition, the Fee Objection challenges the time incurred by the Committee Professionals when the Committee opposed the Commercial Committee's creation (because the Committee knew that this would lead to professional fees in excess of the commercial claims themselves), even though, in a separate objection, the Archdiocese also attacks the fees incurred by that very same Commercial Committee. The Fee Objection ignores the Committee Professionals' deep rate discounts. The Fee Objection complains about time spent preparing for and attending lengthy mediation sessions made necessary only by the Archdiocese's intransigence. The Fee Objection characterizes as "clerical and administrative overhead" sensitive legal work critical to confirming the Archdiocese's own plan of reorganization, including the court-ordered claims summary. And, the Fee Objection cherry picks time entries, intentionally omits facts, and reflects a lack of knowledge and understanding of the role of a Committee in challenging diocesan chapter 11 proceedings—all to paint a picture of a Bankruptcy

Case bearing no resemblance to reality. In short, the Fee Objection lacks any sound legal or factual basis and represents a litigious debtor's tendentious attempt to punish the very professionals who made its successful reorganization possible. This Court should overrule the Fee Objection in its entirety.

## PROCEDURAL BACKGROUND

3. On May 1, 2020 (the "Petition Date"), the Archdiocese filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") to commence the above-captioned bankruptcy case (the "Bankruptcy Case").

4. On May 20, 2020, the Office of the United States Trustee for Region 5 (the "U.S. Trustee") appointed the Committee in the Bankruptcy Case pursuant to section 1102(a)(1) of the Bankruptcy Code [ECF Doc. No. 94]. The Committee was re-constituted on June 10, 2020,[2] October 8, 2020,[3] June 7, 2022,[4] June 21, 2022,[5] and February 13, 2023.[6] On May 22, 2020, the Committee conducted its first meeting and at that meeting unanimously selected Locke Lord LLP ("Locke Lord") and PSZJ to serve as co-counsel to the Committee

5. On September 15, 2021, the Court entered the *Order Granting Joint Motion to Appoint Mediator* [ECF Doc. No. 1058] (the "Mediation Order"), in which United States Bankruptcy Judge Gregg W. Zive was appointed to mediate the Bankruptcy Case effective October 1, 2021. The Mediation Order provided that the mediation would be governed by Section XVI of the Procedures for Complex Chapter 11 Cases in the Eastern District of Louisiana (the "Complex Case Procedures").[7] This Court subsequently appointed John W. Perry, Jr. ("Mr. Perry") and the

---

2 ECF Doc. No. 151.
3 ECF Doc. No. 478.
4 ECF Doc. No. 1575.
5 ECF Doc. No. 1618.
6 ECF Doc. No. 2081.
7 Since the filing of the Mediation Order, the Complex Case Procedures have been amended. Section XVI has been renumbered as Section XVII.

Hon. Christopher Sontchi ("Judge Sontchi") as additional mediators in the case.

6.    Effective January 1, 2025, Locke Lord combined with Troutman Pepper Hamilton Sanders LLP, thereby creating a new, combined firm of Troutman (which has the full name "Troutman Pepper Locke LLP".)

7.    On February 27, 2026, PSZJ filed the *Seventeenth and Final Application for Allowance and Payment of Compensation and Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP as Co-Counsel for the Official Committee of Unsecured Creditors for the Period May 22, 2020 Through December 26, 2025* [ECF Doc. No. 4895] (the "PSZJ Fee Application").

8.    On February 27, 2026, Troutman filed the *Seventeenth and Final Application of Troutman Pepper Locke LLP as Co-Counsel to the Official Committee of Unsecured Creditors for Allowance of Compensation and Reimbursement of Expenses for the Period from May 22, 2020 Through February 27, 2026* [ECF Doc. No. 4902] (the "Troutman Fee Application", and together with the PSZJ Fee Application, the "Fee Applications").

9.    On April 22, 2026, the Archdiocese filed the Fee Objection. Thereafter, the Committee Professionals and the Archdiocese attempted to resolve the disputes raised by the Fee Objection and participated in a mediation conducted by Judge Sontchi. That mediation was held on June 4, 2026. That mediation did not succeed, and the dispute between the Committee Professionals and the Archdiocese over the Fee Applications and the Fee Objection was not resolved.

10.    After the Fee Applications were filed, the U.S. Trustee exercised its statutory duties under the Bankruptcy Code and raised various concerns about certain of the Committee Professionals' time entries in the Fee Applications. The U.S. Trustee and the Committee Professionals resolved these issues amicably, and the U.S. Trustee did not object to the Fee Applications. On June 29, 2026, the U.S. Trustee memorialized these resolutions in the following:

(i) a *Joint Stipulation* [ECF Doc. No. 5188] (the "PSZJ Stipulation") and (ii) a *Joint Stipulation* [ECF Doc. No. 5192] (the "Troutman Stipulation" and together with the PSZJ Stipulation, the "Stipulations"). The PSZJ Stipulation memorialized PSZJ's agreed reduction of the amount sought in its PSZJ Fee Application (as subsequently and amended) by $103,264.94.[8] The Troutman Stipulation memorialized Troutman's agreed reduction of $140,817.17.[9] These Stipulations modify the Fee Applications, and the Committee Professionals have therefore reduced the fees and expenses they seek to recover under the Fee Applications by the amounts set forth in the Stipulations.

11.     Although the Committee Professionals have now addressed the U.S. Trustee's concerns, their dispute with the Archdiocese over the Fee Applications and the Fee Objection remains unresolved.

## LEGAL STANDARD

12.     Section 330 of the Bankruptcy Code governs the compensation of professionals under Chapter 11.[10] Professionals may receive "reasonable compensation for actual, necessary services rendered" and "reimbursement for actual, necessary expenses."[11] In determining the amount of compensation awarded to such professionals, the court may consider several factors, including, among others, "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, [a chapter 11 case]; [and] whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed."[12]

---

8 PSZJ Stip., ECF Doc. No. 5188, ¶ 2. The PSZJ Fee Application was supplemented on March 6, 2026 [ECF Doc. No. 4922] and further amended on May 11, 2026 [ECF Doc. No. 5092].
9 Troutman Stip., ECF Doc. No. 5192, ¶ 2.
10 11 U.S.C. § 330 (2026).
11 *Id*. § 330(a)(1)(A)-(B).
12 *Id*. § 330(a)(3).

13.     The Fifth Circuit Court of Appeals has analyzed section 330 at length and found that it extends considerable discretion to bankruptcy courts when awarding compensation.[13] Furthermore, the court concluded that section 330 "explicitly contemplates compensation for attorneys whose services were reasonable when rendered but which ultimately may fail to produce an actual, material benefit."[14.] That is, attorneys may be compensated for "good gambles," or "services that were objectively reasonable at the time they were made—even when those gambles do not produce an 'identifiable, tangible, and material benefit.'" [15]

14.     Ultimately, the Fifth Circuit adopted the "reasonable at the time" standard for evaluating attorney compensation.[16] As the Fifth Circuit subsequently explained in a later case construing *Woerner*, "[i]n awarding fees, hindsight is irrelevant; retrospect is irrelevant; 'material benefit to the bankruptcy estate' is irrelevant. 'What matters is that, prospectively, the choice to pursue a course of action was reasonable.'"[17] How a bankruptcy court applies this legal standard under § 330 to a particular fee application will not be disturbed on appeal absent an abuse of discretion.[18]

## ARGUMENT

15.     The Archdiocese's Fee Objection reviews the Fee Application according to the following self-styled "three-step framework": (a) it removes over $1.4 million in fees for allegedly non-compensable "workstreams"; (b) it applies a twenty percent (20%) across-the-board reduction

---

13 *See Barron & Newburger, P.C. v. Tex. Skyline Ltd. (In re Woerner)*, 783 F.3d 266, 273 (5th Cir. 2015).
14 *Id.* at 274.
15 *Id.*
16 *Id.* at 276 ("Under this framework, if a fee applicant establishes that its services were 'necessary to the administration' of a bankruptcy case or 'reasonably likely to benefit' the bankruptcy estate 'at the time at which [they were] rendered', then the services are compensable.") (quotations omitted) (citing 11 U.S.C. § 330(a)(3)(C), (4)(A)).
17 *Edwards Family P'ship L.P. v. Johnson (In re Cmty. Home Fin. Servs., Inc.)*, 990 F.3d 422, 427 (5th Cir. 2021) (citations omitted); *see also In re Damon Cap., Ltd.*, 672 B.R. 887, 897-98 (Bankr. W.D. Tex. 2024) (awarding fees for motion to lift stay that was not ultimately filed because "[the motion] was a reasonable project to work on at the time the work was performed").
18 *In re Cahill*, 428 F.3d 536, 539 (5th Cir. 2005*); see also Cmty. Home Fin.*, 990 F.3d at 426.

6

to account for the Archdiocese's objections with respect to various billing entries, such as claimed "overstaffing" and "non-compensable administrative overhead"; and (c) it caps the fees assigned by the Committee Professionals to the Project Category of Fee/Employment Applications (B160) to four percent (4%) of all fees incurred by the Committee Professionals during the Bankruptcy Case.[19] At all three stages, the Archdiocese's complaints wilt once examined in light of the § 330 test that *Woerner* actually employs rather than the one that the Archdiocese wishes it did.[20]

### I. THE ALLEGEDLY NON-COMPENSABLE "WORKSTREAMS" WERE NECESSARY TO CASE ADMINISTRATION AND REASONABLY LIKELY TO BENEFIT THE ESTATE.

16. In the first step of its "framework," the Archdiocese identified four "workstreams" that it seeks to categorically disallow based largely on the type of *ex ante* analysis that *Woerner* rejects.[21] The Committee Professionals address each of the Archdiocese's arguments below.

### A. Time related to the motion to dismiss the Bankruptcy Case is compensable.

17. First, the motion to dismiss was reasonable. It was not "frivolous or a bad gamble".[22] The motion to dismiss represented a serious and good-faith response to the unprecedented circumstances that the Committee and the survivor community faced at the time. These circumstances include the following:

> a. At the time, the Archdiocese appeared to have filed for bankruptcy primarily to obtain tactical leverage over the limited number of sexual abuse survivors who had commenced pre-petition sexual abuse cases and to avoid its discovery obligations in those cases. Indeed, the filing seemed principally intended to avoid an upcoming deposition of Archbishop Gregory Aymond in one of those cases.

---

19 Fee Obj. at 1. As explained more fully below, the Fee Objection disingenuously implies that this third step in its "framework" only caps time spent by the Committee Professionals on their own fee applications. In fact, the Archdiocese wishes to impose a flat cap on **ALL** time incurred in Project Category B160, disingenuously conflating the time spent by the Committee Professionals on their own fee applications versus other tasks covered by this category, such as time spent by the Committee Professionals (i) assisting other Committee-retained professionals with their own fee applications, (ii) preparing applications to retain Committee professionals in the first instance, and (iii) complying with this Court's monthly interim fee procedures under the Complex Case Procedures.

20 *See Woerner*, 783 F.3d at 273-74.

21 Fee Obj. at 8.

22 *Id.* at 10.

b. The Archdiocese was not insolvent. It had significant liquid assets in the form of cash holdings and a sizeable real estate portfolio. At the § 341 meeting of creditors, the Archdiocese's representative, Father Patrick Carr, confirmed that the Archdiocese was solvent. And, years later, the *Seventh Amended Modified Joint Chapter 11 Plan of Reorganization for the Roman Catholic Church of the Archdiocese of New Orleans and Additional Debtors, Proposed by the Debtor, the Additional Debtors, and the Official Committee of Unsecured Creditors, Dated as of December 8, 2025* [ECF Doc. No. 4762] (the "Joint Plan") demonstrated how robust the Archdiocese's financial condition truly was, as the Archdiocese managed to provide $200 million in consideration through cash and limited property sales *without* obtaining exit financing.

c. The motion to dismiss was rooted in a body of bad-faith filing jurisprudence that recognizes dismissal as an appropriate remedy when Chapter 11 is used for improper litigation purposes—regardless of formal "insolvency."

18. Although the Court eventually concluded—in a detailed opinion issued many months after a lengthy trial—that Chapter 11 relief was not limited to insolvent debtors (a proposition the Committee never disputed), the motion to dismiss nevertheless raised the legitimate issue of whether this particular Bankruptcy Case, against this factual backdrop, was consistent with the purpose of Chapter 11. Given its fiduciary duty to abuse survivors seeking just compensation, the Committee's decision to test the good faith of the bankruptcy filing was reasonable.

19. Second, even when a motion is denied, case law recognizes that ligation can nonetheless benefit the estate. After all, the Fifth Circuit has noted that ultimate success is "not dispositive of" attorney compensation.[23] Here, the motion to dismiss accomplished several key Committee objectives: (a) it provided extensive discovery into the Archdiocese's financial conditions, assets, internal deliberations, and strategic use of Chapter 11; (b) it clarified the Court's view of the Archdiocese's financial distress and permissible objectives, which informed later plan negotiations and oversight efforts; and (c) it signaled to all parties in interest, including the Archdiocese and its insurers, that the Committee would vigorously assert the interests of the

---

[23] *Woerner*, 783 F.3d at 274 (noting compensation available for "good gambles" even where gambles do not produce identifiable benefits).

survivor creditor constituency, thereby improving the Committee's negotiating position on plan and insurance issues.

20.     Rather than evaluate the decision to file the motion to dismiss in this broader context, the Archdiocese instead seeks to isolate the result (denial) and ignore the substantial process- and information-based benefits of the contested motion. Moreover, the Archdiocese advocates an inappropriate standard of "value to the Debtor," rather than the appropriate standard of value to the ESTATE, which here includes the interests of the survivor creditors. The Fifth Circuit's *Woerner* standard rejects the Archdiocese's 20/20 hindsight approach as "irrelevant" to any proper § 330 analysis.[24] Accordingly, the Committee Professionals should be compensated for their time spent on the motion to dismiss.

**B.     Time related to opposing the Bond Trustee's § 1102 motion is compensable.**

21.     First, despite what the Archdiocese may claim, the Committee's efforts to oppose the motion brought by TMI Trust Company, Inc (which was subsequently replaced in its role by Argent Institutional Trust Company) (the "Bond Trustee") would have benefited the estate even more had the Committee prevailed. In that matter, the Bond Trustee had sought to return to the Committee after the U.S. Trustee had expelled it based on its secret negotiation of an independent restructuring support agreement with the Archdiocese. This agreement allegedly controlled the treatment of the Archdiocese's *Louisiana Public Facilities Authority Refunding Revenue Bonds (Archdiocese of New Orleans Project) Series 2017* (the "Bonds").[25]

22.     This negotiation and the Archdiocese's and Bond Trustee's eventual settlement (subsequently abrogated by the Archdiocese so that it could confirm a feasible plan) created a fundamental problem with the Committee's constitution since the proposed treatment for the claims

---

24 *See Cmty. Home Fin.*, 990 F.3d at 427.
25 *See* ECF Doc. No. 403.

of both the bondholders and the Bond Trustee was (at least temporarily) resolved. This proposed treatment, coupled with the likelihood that non-abuse commercial creditors would receive full (or nearly full payment ) under any plan, concerned the Committee enough that it sought the Bond Trustee's removal as a Committee member. The Bond Trustee had created a conflict of interest that prevented it from serving as a fiduciary for the broader creditor constituency as required by a Committee member. The U.S. Trustee agreed with the Committee's conclusion and subsequently removed the Bond Trustee from the Committee.[26]

23.     The Bond Trustee responded by seeking the creation of a commercial committee or, alternatively, an order placing it back on the Committee.[27] The Committee opposed this effort because an additional committee would create substantial costs for a group of creditors likely to receive full payment, and the Committee's existing members could, in the Committee's view, adequately represent both sexual abuse survivors and commercial creditors.[28] Subsequent events proved the Committee right: the Commercial Committee's professionals incurred millions in fees even as its general unsecured creditor constituency was left essentially unimpaired under the Joint Plan.[29] These fees dwarf the $401,194.50 in Committee "workstream" fees that the Archdiocese now challenges.[30] In any event, the Committee's failure to prevent the Commercial Committee's creation does not render non-compensable the fees the Committee Professionals incurred opposing

---

26 ECF Doc. No. 478

27 ECF Doc. No. 521.

28 ECF Doc. No. 626.

29 *See, e.g.,* the *Fourteenth and Final Fee Application of Stewart Robbins Brown & Altazan LLC for Allowance of Compensation for Services Rendered and Reimbursement of Expenses as Former Counsel to the Official Committee of Unsecured Commercial Creditors for the Period of November 1, 2025 through December 25, 2025* [ECF Doc. No. 4890] (the "SRBA Application") and the *Thirteenth and Final Fee Application of Dundon Advisers LLC for Allowance of Compensation for Services Rendered and Reimbursement of Expenses as Former Financial Advisor to the Official Committee of Unsecured Commercial Creditors* [ECF Doc. No. 4892] (the "Dundon Application"). Under these two applications, the Commercial Committee's counsel sought total fees and expenses of $4,227,168.77 while the Dundon Application sought $1,252,889.18.

30 Fee Obj. at 8.

both that effort and the Bond Trustee's self-serving attempt to insert itself back onto the Committee after the U.S. Trustee removed it.

24.     Second, the Committee Professionals used appropriate resources when litigating this dispute. The Fee Objection emphasizes the number of hours spent by the Committee Professionals litigating the Bond Trustee's role on the Committee and opposing the creation of the Commercial Committee, as well as the presence of multiple lawyers on this matter.[31] However, this allocation of time and personnel was appropriate and reasonable for, among other reasons, the following:

     a.     The § 1102 litigation evolved into a quasi-trial on adequate representation, privilege, and conflicts. The conduct of both the Committee and the Bond Trustee was under intense scrutiny. Among other things, the litigation involved extensive pre-trial discovery and depositions of individual Committee members.

     b.     The Committee Professionals had to manage privilege issues delicately, balancing transparency with the need to preserve confidential Committee deliberations.

     c.     The Committee Professionals structured the matter to have Troutman (then Locke Lord) take the laboring oar on trial preparation and depositions to avoid duplication effort with PSZJ.

25.     Third, the Archdiocese's suggestion that this work "foment[ed] further mistrust"[32] ignores that the Archdiocese—and not the Committee or the U.S. Trustee—initiated this entire dispute when it reached a separate restructuring support agreement with one of the Committee's members without the other members' knowledge and without any acknowledgment (at least at first) that this agreement would impair the Bond Trustee's ability to represent the Committee's constituency. Any "mistrust" that arose from this situation is squarely on the Archdiocese and the Bond Trustee; the Committee Professionals should not be held responsible.

26.     Fourth, and finally, the notion that the Committee's opposition to the Bond Trustee's

---

31 Fee Obj. at 12-13.
32 *Id.* at 13.

motion denied "the Bond Trustee a seat at the table" is ludicrous.[33] The active role that the Bond Trustee and its counsel played in the plan-confirmation process prior to the Joint Plan's confirmation alone exposes the fallacy of this complaint. Whatever else may be said of the Bond Trustee's strategy and involvement in this case, the Bond Trustee vigorously exploited every opportunity to pursue its and its bondholders' interests.

27.     For this reason, the Committee Professionals' work was appropriate and compensable and was a "good gamble" to save the estate substantial costs.

**C.     Time related to Richard Trahant's protective order violation is compensable.**

28.     The Archdiocese knows that its assertion that "the Committee" violated the protective order is false.[34] Neither the Committee nor the Committee Professionals violated the protective order. Richard Trahant did. A quick reconsideration of the facts underlying this dispute bears this out.

29.     As this Court well knows, the Archdiocese itself initially alerted the Committee and this Court to a potential protective order violation in early 2022 and asked the Court to involve the U.S. Trustee. That effort produced an order from this Court requiring the Committee Professionals to participate in a fast-paced discovery process that demanded massive document review and nineteen (19) depositions. At the conclusion of this investigation, the U.S. Trustee issued a detailed evidentiary report that resulted in a show cause order—and ultimately a sanctions award—against Richard Trahant, which included a portion of the fees incurred by the Committee Professionals during this process.[35]

30.     On this gossamer basis, the Archdiocese plainly and falsely asserts that this Court

---

33 *Id.*
34 *Id.* at 14.
35 ECF Doc. Nos. 1574, 1589, and 1844.

imputed Trahant's "willful violation of the protective order" to the Committee.[36]  The October 11, 2022 *Memorandum Opinion and Order* (the "Trahant Sanctions Order") does not support this conclusion—to say the least. Issued following an extensive evidentiary hearing on August 22, 2022, that Trahant Sanctions Order explains in detail why this Court sanctioned Richard Trahant—and no one else—for the protective order violation.[37]  As the Court explained, Richard Trahant testified at the August 22, 2022 hearing that he acted alone in violating the Court's protective orders.[38] Indeed, the Committee Professionals played a principal role in investigating the very breach that the Archdiocese imagines the Committee perpetrated.[39] The Archdiocese appears to have intentionally misconstrued this Court's June 7, 2022 *Order* (the "Reconstitution Order") in which the Court imputed Trahant's violation ***to his three (3) innocent clients*** who were then serving on the Committee and, for that reason, ordered that the U.S. Trustee remove them from the Committee.[40] Under no reasonable interpretation of that Reconstitution Order can anyone argue that the Court imputed Trahant's protective order violation to the Committee itself, to the Committee Professionals, or to anyone other than the three individuals who were then Trahant's clients. The Archdiocese's claims to the contrary are frivolous.

31.     Furthermore, besides the complete lack of any factual or legal basis for the Archdiocese's accusation, the Archdiocese's cavil presents another problem. If the Committee Professionals' fees are reduced, should Richard Trahant's sanction be reduced as well? The Fee Objection would seem to require that to avoid a double recovery by the Archdiocese. Such an

---

36 Fee Obj., at 14.
37 Trahant Sanctions Order, ECF Doc. No. 1844, pp. 29-30.
38 *Id*. pp. 19-22.
39 *Id*. pp. 21-22 ("The Court asked Trahant why—if he did not believe he had violated the Court's Protective Order or if he believed he had good cause that justified his violation of the Protective Order—*why he declined to tell counsel for the Committee that he had communicated confidential information with his cousin and with a reporter*.") (emphasis added).
40 Reconstitution Order, ECF Doc. No. 1574, pp. 4-5 ("[T]he Court is forced to impute Trahant's actions to those of his clients on the Committee and finds cause for their removal from the Committee.")

outcome would be both incongruous and inappropriate.

32.     Accordingly, the Court should reject the Archdiocese's baseless claim that the Committee and the Committee Professionals are responsible for Trahant's actions and award the Committee Professionals' compensation for the time spent in connection with Trahant's protective order violation.

**D.     Time related to the Portfolio A/B Proceeding is compensable.**

33.     The Archdiocese's arguments regarding the last of its four (4) "workstreams" are no more convincing than they are as to the other three. Despite what the Archdiocese may say, all time and expenses related to the adversary proceeding commenced by the Committee on April 14, 2022 [ECF Doc. No. 1448] (the "Portfolio A/B Proceeding") are compensable.

34.     First, the Portfolio A/B Proceeding was an appropriate exercise of the Committee's judgment in fulfilling its fiduciary duties on behalf of its creditor constituency. Early in this case, the Apostolates (as defined in the Joint Plan) had asserted that their assets and the Archdiocese accounts known as Portfolio A and Portfolio B did not constitute property of the Archdiocese's bankruptcy estate. This negotiating position sought to shield the Apostolates' assets from recovery from the Archdiocese's creditors. The Committee naturally contested the Apostolates' position given the tight, interrelated nature of the relationship they had with the Archdiocese and the prospect that the Apostolates could not trace their interest in the comingled funds. The Portfolio A/B Proceeding represented the culmination of the Committee's position on these issues. Filing a declaratory-judgment action to clarify these matters—as opposed to waiting around for the Archdiocese and the Apostolates to respond and surely resist the Committee's requests and arguments—represented a reasonable approach to protecting creditor rights and demonstrated that significant Apostolate assets should be made available for a plan of reorganization. The Court's

14

later dismissal of the Portfolio A/B Proceeding on procedural grounds does not make its filing objectively unreasonable or serve as a basis for denying compensation under *Woerner*.[41]

35.     Second, the Apostolates resisted providing any documents or information about their assets in response to the Committee's continued requests for such information. Although the Apostolates eventually began providing that information a few years after the mediation process began, the Portfolio A/B Proceeding offered a potential, formal basis for obtaining information and documents from the Apostolates superior to continued, informal requests.

36.     Third, bringing the Portfolio A/B Proceeding helped contribute to the ultimate resolution reached in this Bankruptcy Case under the Joint Plan. Although the Portfolio A/B Proceeding was dismissed on procedural grounds with no ruling on the merits, the litigation nevertheless produced several positive outcomes for the Committee's constituency. Among other things, the litigation required the Archdiocese and the Apostolates to address asset-ownership and control questions that later informed plan negotiations and exponentially increased survivor recovery from the Archdiocese prior offers. It demonstrated to the Archdiocese and the Apostolates the kind of litigation that would likely result if plan negotiations failed. And it provided the Committee with leverage that contributed to the eventual settlement of all these issues in the Joint Plan. These outcomes would not have been achieved if the Committee had not brought the Portfolio A/B Proceeding .

37.     In conclusion, applicable Fifth Circuit law does not require a merits judgment in favor of the Committee's position to justify compensating the Committee Professionals for the time they spent in connection with the Portfolio A/B Proceeding. The law only requires that the litigation

---

41 *See Cmty. Home Fin.*, 990 F.3d at 428 (awarding fees for adversary proceedings that later settled because "[v]iewed prospectively, pursuit of the adversary proceedings was 'necessary to the administration of the case' to resolve otherwise unsettled disputes about the priority of claims'").

be objectively reasonable when it was commenced.[42] Bringing the Portfolio A/B Proceeding was a reasonable decision in April 2022 since the action (i) brought clarity to the Bankruptcy Case as a whole, (ii) improved the Committee's negotiating leverage, and (iii) reduced the risk that the Bankruptcy Case would fail. This Court should therefore conclude that the Committee Professionals' time spent on the Portfolio A/B Proceeding is compensable.

**II.       THE PROPOSED TWENTY PERCENT (20%) ACROSS-THE-BOARD REDUCTION FAILS AS A MATTER OF FACT, LAW, AND COMMON SENSE.**

38.       In addition to attacking four (4) broad categories of work the Committee Professionals performed, the Archdiocese also proposes a twenty percent (20%) across-the-board reduction based on a sampling of time entries from the Fee Applications.[43] The Archdiocese's objection to these entries ignores the U.S. Trustee's objective, painstaking, and line-by-line review of every single time entry and expense item in the Fee Applications, and the resolution of the U.S. Trustee's concerns as to many of the same issues by the fee reductions outlined in the Stipulations. The notion that the Archdiocese might somehow identify billing issues that the U.S. Trustee missed is absurd. Indeed, as discussed below, the Archdiocese's arguments in support of its proposed, across-the-board reduction all fail as a matter of fact, law, and common sense.[44]

**A.       Allegations of "overstaffing" are unwarranted.**

39.       For its first complaint, the Fee Objection highlights events with five (5) or more attorneys present.[45] However, the Archdiocese ignores the distinct roles that PSZJ and Troutman and their individual attorneys played in the Bankruptcy Case. Each firm took the lead on different

---

42 *Woerner*, 783 F.3d at 274.

43 Fee Obj. at 17.

44 Additionally, the Committee Professionals note that nowhere in this section of the Fee Objection does the Archdiocese acknowledge the deep rate discounts that both firms applied to the work that all their professionals and paraprofessionals performed in the Bankruptcy Case. The Committee Professionals will provide further evidence of these discounts at the hearing on the Fee Applications and the Fee Objection

45 Fee Obj. at 17-18.

aspects of the case depending on its specific experience and, in some situations, because of potential conflict issues. For this reason, PSZJ principally handled (a) insurance issues, (b) the non-monetary plan provisions, (c) the Rule 2004 discovery process, (d) other discovery matters related to abuse documentation, (e) analysis of donations, (f) the Portfolio A/B Proceeding, and (g) various aspects of the Joint Plan negotiations and documentation needed for confirmation—especially negotiations with the Archdiocese's insurers. Troutman analyzed (a) local real property assets and related issues, (b) the scope of the Archdiocese's potential bankruptcy avoidance claims, (c) the various real-estate sale processes, (d) survivor counsel and pro se survivor communications, (e) other local asset sales and ability-to-pay issues, (g) document review, discovery, and production efforts associated with the Bond Trustee dispute and litigation, and (h) most of the discovery related to the dispute over the protective-order violation.

40.     Given the firms' different duties and scope of work, professionals from both firms were often present at certain critical junctures. Applying an artificial cutoff to the number of attorneys who could participate in conferences and meetings ignores such complexity and, if applied in this jurisdiction, might even encourage waste in future cases as firms staff each matter up to the four-professional minimum. For instance, the Archdiocese objects to multiple attorneys at mediation sessions, but those sessions covered many different topics. During mediations, PSZJ lawyers often caucused separately with insurance companies even as Troutman lawyers worked with survivor counsel or discussed property-sale issues.[46] By the same token, Committee meetings, calls with the Debtor, and omnibus hearings typically involved multiple issues that fell across the firms' different focus areas. Committee counsel often did not attend or else participated in these events only in part in order to avoid overstaffing. These intentional decisions do not necessarily

---

46 *Id.* at p. 18.

appear on the firms' invoices, but they were certainly apparent to anyone who participated in these matters. In any event, the Committee Professionals will demonstrate at the hearing on the Fee Applications that the supposed "overstaffing" cited by the Archdiocese was nothing of the sort, and the Committee Professionals exercised reasonable and appropriate billing judgment.

**B.      Committee calls are a core function of creditors' committees.**

41.      Second, the Archdiocese also objects to weekly or bi-weekly Committee calls attended by multiple lawyers from both firms.[47] However, maintaining communication among the Committee's members represents one of the few statutorily-mandated Committee functions.[48] Committee meetings spanned multiple issues and therefore required the involvement of attorneys from each firm to address the different areas of focus that arose during Committee meetings. In other words, the Archdiocese seems most agitated (perhaps unsurprisingly) about the Committee Professionals' doing their job. This is not a valid basis for a fee objection. Furthermore, the Committee also reduced the frequency of its meetings when activity was slow, and meetings occurred much less frequently after the settlement with the Archdiocese was reached. In truth, the Archdiocese's real complaint is that the Committee had to meet for so many years—an unfortunate necessity that resulted largely from the Archdiocese's litigiousness and negotiating intransigence.

**C.      Allegedly vague or "block-billed" entries do not warrant the inference of a global documentation defect.**

42.      Third, the Archdiocese also deemed 667 time entries to be "vague" and, based on that, extrapolates an argument that the Committee Professionals' fees should be reduced across the board as a result.[49] However, a closer look at these supposedly "vague" entries reveals several interesting facts that the Archdiocese's analysis overlooks and that were resolved with the U.S.

---

47 *Id.* at 26.
48 *See* 11 U.S.C. § 1103(c) (discussing duties of committee).
49 Fee Obj. at 19.

Trustee (who actively participated throughout the case) in response to its concern on this topic. For instance, many targeted time entries are short "review" entries (0.1-0.5 hours) tied to specific pleadings, motions, or plan drafts. When one understands the broader context behind these entries, including the docket, associated filings, and task codes, they do in fact enable the parties involved in the Bankruptcy Case to know what was accomplished. By the same token, when longer entries combine tasks (*e.g.*, "review objections and draft reply; prepare witness list; conference with co-counsel"), those tasks are closely related and part of a single litigation event. Courts typically do not penalize such "block billing" absent evidence of abuse.[50] Lastly, the Archdiocese also objected to substantial blocks of time spent on discovery related to plan confirmation.[51.] Coming from the Archdiocese, this objection is at best surprising. In a very short period of time, the Committee undertook an extensive review, collection, and document-production process prior to plan-confirmation. The Archdiocese was a principal beneficiary of the Committee's efforts because the Archdiocese's counsel relied on Committee counsel's efforts to satisfy the robust review and production that the Court required of the Joint Plan proponents.[52]

43.     In sum, the Archdiocese's sample of time entries is just that: a sample. It says nothing about the thousands of entries that are detailed and precise. To infer a global documentation defect from the Archdiocese's cherry-picked sample is unwarranted and improper.

---

50 *See Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, Case No. H-14-1368, 2020 WL 821879, at *11 (S.D. Tex. Feb. 19, 2020) ("Block-billed entries do not preclude a fee award, 'as long as the evidence produced is adequate to determine reasonable hours.'") (citing *DeLeon v. Abbot,* 687 F.App'x 340, 346 n.4 (5th Cir. 2017) (Elrod, J., concurring).

51 Fee Obj. at 21.

52 The Archdiocese should have recognized this context. They note in the Fee Objection that this review occurred in "September 2025." Fee Obj. at 21. Of course, that was the heart of litigating the Bond Trustee's confirmation objection and addressing extensive discovery, which required Troutman to prepare a production from an initial data set of approximately 1.5 million documents. The Archdiocese itself relief on a privilege log prepared by the herculean efforts of the Committee Professionals after the Archdiocese decided initially *not* to do an electronic document collection.

**D.      Research related to prescription and the window statute was central to the Bankruptcy Case.**

44.      Fourth, the Fee Objection emphasizes (often in sarcastic tones) that approximately 507 hours were spent on prescription-related research and analysis, across both firms and over several years.[53] The Archdiocese knows that assessing the strength of its prescription defenses was critical to valuing the survivor claims in the Bankruptcy Case. For years, it fought in various forums to have the window statute overturned, and it argued in this very Bankruptcy Case that the window statute did not apply to abuse claims filed against it.

45.      Given the Archdiocese's position on this issue, the Committee Professionals had to research the issue at length in order to fight for a reasonable settlement offer for the claims of its survivor creditor constituency. This research included an extensive analysis of waiver and the *contra non valentem* exception doctrine and how it applied in abuse cases—arguments that would potentially overcome the Archdiocese's prescription claims were the State of Louisiana's window statute overturned. Additionally, the Committee Professionals also had to brief this issue in the Bankruptcy Case in response to the Archdiocese's objection to the Committee's motion to re-open the bar date.[54] The prescription issue was so central to the Bankruptcy Case that both firms addressed it, but most of the work was performed, as one would expect, by Louisiana counsel. The work was entirely appropriate to save the value of survivor claims—claims whose value the Archdiocese continued to deny right up to the very end of the Bankruptcy Case.

**E.      The Archdiocese objects to critical Joint Plan confirmation tasks as "clerical."**

46.      Fifth, the Archdiocese attacks the lowest-rate work performed in the entire case:

---

53 Fee Obj. at. 24.

54 Notably, while the Committee's motion was denied, the Archdiocese effectively reopened the bar date as part of the Joint Plan process.

essential duties performed by paralegals.[55] For instance, it objects to the preparation of a claims summary spreadsheet that this Court ordered the Committee to prepare so that the Commercial Committee could receive this claims information (as it was prohibited by the protective order from seeing proofs of claim).[56] Later, at critical stages of the confirmation process, the Bond Trustee also demanded claims information so that it could evaluate the Archdiocese's and the Committee's claim valuations. To provide that information without requiring disclosure of abuse survivor names, the Court required the Committee to update the claims summary spreadsheet with hundreds of additional claims in a matter of weeks. This was no "clerical" task. Troutman assembled a team of approximately ten (10) paralegals—many working across a holiday weekend—to carefully pull key data fields from survivor claims while simultaneously redacting any personally identifiable information. They succeeded spectacularly at a task that was not only long and difficult, but, given the nature of the claims and data involved, often traumatic and emotionally draining. However one might characterize this difficult work, it was no "clerical" task. This Court should therefore compensate the work that paraprofessionals did on this matter.

III. **APPLYING A SWEEPING FOUR PERCENT (4%) REDUCTION TO WORK PERFORMED UNDER THE PROJECT CATEGORY OF FEE/EMPLOYMENT APPLICATIONS (B160) IS FACTUALLY MISLEADING AND LEGALLY UNSOUND.**

47. For its last major category of objections, the Archdiocese demands that this Court reduce the fees that the Committee Professionals incurred in the Project Category of Fee/Employment Applications (B160) to a flat four percent (4%) of all the fees sought by the Committee Professionals. This position is both factually misleading and legally unsound and should be rejected.

48. First, the Fee Objection misrepresents what the Archdiocese is requesting when it

---

55 Fee Obj. at 28-29.
56 *Id*.at 29.

21

demands that this Court reduce the fees the Committee Professionals incurred in the Project Category of Fee/Employment Applications (B160) to a flat four percent (4%) of all fees. The Archdiocese asserts that the Committee Professionals spent eight percent (8%) of their total fees on their own fee applications. They calculate this figure by dividing all the fees each firm assigns to the B160 Project Category by the total fees incurred by that firm.[57] According to this logic, Troutman, for instance, incurred $657,972.50 in fees in the Fee/Employment Application (B160) category even as its total fee sought was $8,373,675.00. Thus, Troutman spent over eight percent (8%) of its time preparing its fee application, Q.E.D.[58] But this calculation ignores the reality that the Project Category of Fee/Employment Applications (B160) encompasses many tasks besides the Committee Professionals' preparation of their own fee applications. For instance, the time spent in this Project Category also includes the following time expended by the Committee Professionals: (a) assisting other Committee-retained professionals with their own fee applications (such as, for Troutman, Zobrio, Inc. and Actuarial Value, LLC and, for PSZJ, Berkeley Research Group LLC and Stout Risius Ross, LLC), (b) preparing, drafting, and litigating the initial applications to *__retain__* the Committee professionals, and (c) complying with this Court's monthly interim fee procedures under the Complex Case Procedures. Additionally, the Committee Professionals also prepared sixteen (16) interim fee applications for themselves over a nearly six-year period, and nearly as many for these other professionals. To characterize all this time as "work performed on fee applications" by the Committee Professionals is misleading at best.[59] In truth, the fees incurred by the Committee Professionals preparing their own fee applications represent a mere fraction of all the time expended in the B160 Project Category. Even if the case law in the Fifth Circuit supported

---

57 Fee Obj. at 32-33.

58 Troutman Fee Application, ECF Doc. No. 4902-2 (Task Code Schedule). The Archdiocese's calculation looks like this: $675,972.50/$8,373,675.00 = 0.0807 or **8.07%**.

59 Fee Obj. at 32-33.

capping the fees spent on fee applications (which it does not), the Committee Professionals did not spend anything close to eight percent (8%) of their total fees preparing their own fee applications. The Archdiocese is simply wrong on this point.

49.     Second, the cases the Archdiocese cites to impose a flat four percent (4%) cap on fees incurred by professionals in preparing their own fee applications do not support the conclusion the Archdiocese wishes to draw. For instance, *Rose Pass Mines, Inc. v. Howard*—the only Fifth Circuit case cited by the Archdiocese—addressed the fees incurred in preparing just one final fee application.[60] In that case, the attorney for the trustee sought $3,850 in compensation for time spent preparing a single, final fee application as against a total fee of $59,000—meaning that this one application by itself represented approximately six-and-a-half percent (6.5%) of that attorney's entire fee for the whole case.[61] Applying the then-applicable "principle of economy" under the old Bankruptcy Act, the Fifth Circuit concluded that this fee was exorbitant.[62] Even if the principle of economy still applied to the analysis of fee applications (which, under the Bankruptcy Code, it does not), one can hardly compare the situation in *Ross Pass Mines*, in which an attorney spent more than six percent of his total fee preparing a single application, to the circumstances before this Court, where the Committee Professionals prepared multiple interim applications, monthly fee processes, and retention applications for several different professionals. In short, the facts in *Ross Pass Mines* bear no resemblance to those here, and that earlier case certainly does not support the Archdiocese's proposition that this Court should apply a flat four percent (4%) cap to all fees incurred by the Committee Professionals in the B160 Project Category.

50.     The Archdiocese's other cases are similarly unavailing. Two of them, *In re Earl*

---

60 615 F.2d 1088, 1092-93 (5th Cir. 1980).
61 *Id*.
62 *Id.* at 1093 & n.5 (noting that the Bankruptcy Code repealed the Bankruptcy Act's principle of economy).

*Gaudio & Son, Inc.*[63] and *In re Spanjer Brothers, Inc.*,[64] hail from Illinois, where the bankruptcy courts do apparently cap fees spent preparing fee applications to approximately three percent (3%) of all the fees an estate professional may seek for a case. No such informal cap appears to apply in the Fifth Circuit, however, and the Archdiocese provides no legal justification for this Court's deciding to import this requirement into this jurisdiction. Moreover, even in those two cases, this informal cap applies to the preparation of the professionals' fee applications only and not (apparently) to all the fees incurred in the entire Project Category of Fee/Employment Applications (B160).[65] For this reason,  the Archdiocese seeks an even more draconian fee cap than that applied in these two, out-of-jurisdiction cases. Finally, the last case the Archdiocese cites to support its requested cap, *In re Mesa Air Group, Inc.*, also involved the preparation of a single, final fee application.[66] Once again, the case the Archdiocese cites to support its proposed fee cap does not stand for the sweeping proposition the Archdiocese makes.

51.     Given the paucity of legal support for the Archdiocese's fee cap, this Court should instead exercise its discretion and consider **all** the time spent by the Committee Professionals in the Project Category of Fee/Employment Applications (B160) in the particular context of this Bankruptcy Case and with full knowledge of the fact that this category encompasses far more time than just the Committee Professionals' preparation of their own fee applications. When this Court examines the time sought by the Committee Professionals in this light, the Committee Professionals believe this Court will deny the Fee Objection and award full compensation for all the fees sought by the Committee Professionals under this Project Category.

---

63 Case No. 13-90942, 2018 WL 3388917, at *9 (Bankr. C.D. Ill. July 10, 2018).
64 191 B.R. 738, 749-50  (Bankr. N.D. Ill. 1996).
65 *Earl Gaudio*, 2018 WL 3388917, at *9; *Spanjer Bros.*, 191 B.R. at 750.
66 449 B.R. 441, 445-46 (Bankr. S.D.N.Y. 2011).

## CONCLUSION

52. In conclusion, this Court should award the Committee Professionals the entire fee and expense award sought in the Fee Applications (reduced by the agreed amounts outlined in the Stipulations) and deny the Fee Objection in its entirety.

Dated: July 1, 2026

Respectfully submitted,

By: */s/ Bradley C. Knapp*
Bradley C. Knapp (La #35867)
Omer F. Kuebel, III (La #21682)
**TROUTMAN PEPPER LOCKE LLP**
601 Poydras Street, Suite 2660
New Orleans, Louisiana 70130-6036
Telephone: (504) 558-5111
Facsimile: (504) 558-5200
Email: brad.knapp@troutman.com
rick.kuebel@troutman.com

W. Steven Bryant (*admitted pro hac vice*)
Texas Bar. No. 24027413
Federal I.D. No. 32913
Troutman Pepper Locke LLP
300 Colorado Street, Ste. 2100
Austin, Texas 78701
Telephone: (512) 305-4726
Facsimile: (512) 305-4800
Email: steve.bryant@troutman.com

-**and**-

*/s/ Andrew W. Caine*
**PACHULSKI STANG ZIEHL & JONES LLP**
James I. Stang (CA Bar No. 94435)
Andrew W. Caine (CA Bar No. 110345)
10100 Santa Monica Blvd., Suite 1300
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jstang@pszjlaw.com
acaine@pszjlaw.com

*Former Co-Counsel to the Official Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

I hereby caused a true and correct copy of the foregoing *Response* to be served on July 1, 2026, upon all parties by electronic case filing for those parties receiving notice via the Court's Electronic Case Filing system.

*/s/ W. Steven Bryant*

W. Steven Bryant